**RESPONSE DEADLINE: June 3, 2013**
**REPLY DEADLINE: June 17, 2013**

DICKSTEIN SHAPIRO LLP
Barry N. Seidel
Eric B. Fisher
Katie L. Weinstein
Mary Kim (admitted *pro hac vice*)
1633 Broadway
New York, New York 10019-6708
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Counsel for Motors Liquidation*
*Company GUC Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
                                                                       :
In re:                                                                 :    Chapter 11
                                                                       :
MOTORS LIQUIDATION COMPANY, *et al.,*                                  :    Case No.: 09-50026 (REG)
f/k/a General Motors Corporation, *et al.,*                            :
                                                                       :    (Jointly Administered)
                                              Debtors.                 :
                                                                       :
----------------------------------------------------------------------x
   MOTORS LIQUIDATION COMPANY GUC TRUST,                               :
                                                                       :
                                              Plaintiff,               :    Adversary Proceeding
                                                                       :    Case No.: 12-09802
                              v.                                       :
                                                                       :
APPALOOSA INVESTMENT LIMITED                                           :
PARTNERSHIP I; *et al.,*                                               :
                                                                       :
                                                                       :
                                              Defendants.              :
                                                                       :
----------------------------------------------------------------------x

**NOTICE OF MOTORS LIQUIDATION COMPANY**
**GUC TRUST'S MOTION FOR RELIEF UNDER RULE 60(b) OF**
**THE FEDERAL RULES OF CIVIL PROCEDURE MADE APPLICABLE**
**<u>BY RULE 9024 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE</u>**

**PLEASE TAKE NOTICE** that the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), formed by the above-captioned debtors (collectively, the "**Debtors**") in connection with the Debtors' Second Amended Joint Chapter 11 Plan, dated March 18, 2011, hereby files its Motion for Relief Under Rule 60(b) of the Federal Rules of Civil Procedure made applicable by Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "**Motion**") to set forth in greater detail the grounds for the Rule 60(b) relief requested in the July 2, 2010 *Official Committee of Unsecured Creditors' Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief*, (Bankr. Dkt. No. 6248), and November 19, 2010 *Official Committee of Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief*, (Bankr. Dkt. No. 7859), and that a hearing date will be fixed by an order of this Court to consider the Motion and will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Room 621 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance

with General Order M-399 and on (i) Dickstein Shapiro LLP, attorneys for the GUC Trust, 1633

Broadway, New York, New York, 10019-6708  (Attn: Barry N. Seidel, Esq., and Eric. B. Fisher,

Esq.); (ii) the Debtors, c/o Motors Liquidation Company, 401 South Old Woodward Avenue,

Suite 370, Birmingham, Michigan 48009; (iii) General Motors, LLC, 400 Renaissance Center,

Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (iv) Cadwalader, Wickersham &

Taft LLP, attorneys for the United States Department of the Treasury, One World Financial

Center, New York, New York 10281 (Attn: John J. Rapisardi, Esq.); (v) the United States

Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C.

20220 (Attn: Joseph Samarias, Esq.); (vi) Vedder Price, P.C., attorneys for Export Development

Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman,

Esq. and Michael L. Schein, Esq.); (vii) Kramer Levin Naftalis & Frankel LLP, attorneys for the

statutory committee of unsecured creditors, 1177 Avenue of the Americas, New York, New York

10036 (Attn:  Thomas Moers Mayer, Esq., Robert Schmidt, Esq., Lauren Macksoud, Esq., and

Jennifer Sharret, Esq.); (viii) the Office of the United States Trustee for the Southern District of

New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy Hope

Davis, Esq.); (ix) the U.S. Attorney's Office, S.D.N.Y., 86 Chambers Street, Third Floor, New

York, New York 10007 (Attn: David S. Jones, Esq. and Natalie Kuehler, Esq.); (x) Caplin &

Drysdale, Chartered, attorneys for the official committee of unsecured creditors holding

asbestos-related claims, 375 Park Avenue, 35th Floor, New York, New York 10152-3500 (Attn:

Elihu Inselbuch, Esq. and Rita C. Tobin, Esq.) and One Thomas Circle, N.W., Suite 1100,

Washington, DC 20005 (Attn: Trevor W. Swett III, Esq. and Kevin C. Maclay, Esq.); (xi)

Stutzman, Bromberg, Esserman & Plifka, A Professional Corporation, attorneys for Dean M.

Trafelet in his capacity as the legal representative for future asbestos personal injury claimants,

2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq. and Robert

T. Brousseau, Esq.); (xii) Gibson, Dunn & Crutcher LLP, attorneys for Wilmington Trust

Company as GUC Trust Administrator and for Wilmington Trust Company as Avoidance Action

Trust Administrator, 200 Park Avenue, 47th Floor, New York, New York 10166 (Attn: Keith

Martorana, Esq.); (xiii) FTI Consulting, as the GUC Trust Monitor and as the Avoidance Action

Trust Monitor, One Atlantic Center, 1201 West Peachtree Street, Suite 500, Atlanta, Georgia

30309 (Attn: Anna Phillips); (xiv) Crowell & Moring LLP, attorneys for the Revitalizing Auto

Communities Environmental Response Trust, 590 Madison Avenue, 19th Floor, New York,

New York 10022-2524 (Attn: Michael V. Blumenthal, Esq.); and (xv) Kirk P. Watson, Esq., as

the Asbestos Trust Administrator, 2301 Woodlawn Boulevard, Austin, Texas 78703, so as to be

received no later than **June 3, 2013** (the "**Response Deadline**").

        **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Motion, the GUC Trust may, on or after the Response Deadline,

submit to the Bankruptcy Court an order granting the relief requested in the Motion, which order

may be entered with no further notice or opportunity to be heard offered to any party.

| | | |
|---|---|---|
| Dated: | New York, New York<br>May 3, 2013 | Respectfully submitted, |

                                   By: /s/ Eric B. Fisher                     

                                      Barry N. Seidel

                                      Eric B. Fisher

                                      Katie L. Weinstein

                                      Mary Kim (admitted *pro hac vice*)

                                      DICKSTEIN SHAPIRO LLP

                      1633 Broadway

                      New York, New York 10019-6708

                      Telephone: (212) 277-6500

                      Facsimile: (212) 277-6501

                      *Counsel for the Motors Liquidation*
                      *Company GUC Trust*

4

**RESPONSE DEADLINE:  June 3, 2013**
**REPLY DEADLINE:  June 17, 2013**

DICKSTEIN SHAPIRO LLP
Barry N. Seidel
Eric B. Fisher
Katie L. Weinstein
Mary Kim (admitted *pro hac vice*)
1633 Broadway
New York, New York 10019-6708
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Counsel for Motors Liquidation*
*Company GUC Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                    :
In re:                                              :    Chapter 11
                                                    :
MOTORS LIQUIDATION COMPANY, *et al.,*               :    Case No.:  09-50026 (REG)
f/k/a General Motors Corporation, *et al.,*         :
                                                    :    (Jointly Administered)
                          Debtors.                  :
                                                    :
-------------------------------------------------------------------x
  MOTORS LIQUIDATION COMPANY GUC TRUST,             :
                                                    :
                          Plaintiff,                :    Adversary Proceeding
                                                    :    Case No.:  12-09802
              v.                                    :
                                                    :
APPALOOSA INVESTMENT LIMITED                        :
PARTNERSHIP I; *et al.,*                            :
                                                    :
                                                    :
                          Defendants.               :
                                                    :
-------------------------------------------------------------------x

**MOTORS LIQUIDATION COMPANY**
**GUC TRUST'S MOTION AND INCORPORATED**
**MEMORANDUM OF LAW FOR RELIEF UNDER RULE 60(b)**
**OF THE FEDERAL RULES OF CIVIL PROCEDURE MADE APPLICABLE**
**BY RULE 9024 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

RELIEF REQUESTED AND PRELIMINARY STATEMENT ...................................................1

JURISDICTION AND VENUE ................................................................................4

FACTUAL BACKGROUND ....................................................................................4

    I.      THE LOCK-UP AGREEMENT........................................................................4

    II.     THE SWAPS ..........................................................................................5

    III.    THE LOCK-UP AGREEMENT WAS NOT
           THE SUBJECT OF A MOTION OR ADEQUATELY DISCLOSED .................7

           A.      The $450 Million Loan and
                    Anticipated Settlement with the
                    Noteholders Were Not Disclosed in the
                    First Day Affidavit Pursuant to Local Bankruptcy Rule 1007-2 ................7

           B.      The Lock-Up Agreement and
                    Swaps Were Not Adequately Disclosed
                    in the Disclosure Schedules to the MSPA .....................................7

           C.      There Was No Notice
                    of the Purported Assumption
                    and Assignment of the Lock-Up Agreement and Swaps ............................8

           D.      The Lock-Up Agreement and Swaps Were
                    Not Disclosed During the Sale Approval Process .....................................10

           E.      Old GM's Funding of the Consent Fee Was Not Disclosed.....................11

           F.      The June 1, 2009 Form 8-K Disclosure Was Inadequate .........................13

           G.      The Parties to the Lock-Up Agreement
                    Attempted to Evade this Court's Review......................................15

    IV.    PROCEDURAL BACKGROUND......................................................................16

           A.      The Creditors' Committee Did Not Become
                    Aware of the Lock-Up Agreement Until October 2009 ............................16

B.      The GUC Trust's Request for Rule 60(b)
        Relief Has Been Limited, Alternative and Consistent ............................. 17

C.      Defendants, New GM and the Court Have Long Been
        Aware of the Nature of the GUC Trust's Limited Rule 60(b) Relief ........ 19

ARGUMENT ................................................................................................................. 20

I.      RULE 60(b) RELIEF IS WARRANTED ................................................... 20

        A.      The Standard for Relief Under Rule 60(b) ................................... 20

        B.      Relief Under Rule 60(b)(1) and (2)
                Is Appropriate Because of the Failure
                to Disclose the Lock-Up Agreement and Swaps ....................... 22

                1.      The Creditors' Committee
                        Should Be Excused Under
                        Rule 60(b)(1) for Not Challenging
                        the Lock-Up Agreement Prior to Entry of the Sale Order ............ 22

                2.      Failure to Disclose the Lock-Up Agreement
                        and Swaps Warrants Relief Under Rule 60(b)(2) ......................... 23

        C.      Failure to Disclose the
                Lock-Up Agreement and Swaps Constitutes
                Misconduct Which Warrants Relief Under Rule 60(b)(3) ........................ 24

        D.      The Extraordinary Circumstances
                of this Matter Justify Rule 60(b)(6) Relief ................................. 25

II.     THE GUC TRUST'S REQUEST FOR RULE 60(b) RELIEF IS TIMELY ........ 27

III.    RULE 60(b) RELIEF WILL NOT
        IMPOSE UNDUE HARDSHIP ON THE PARTIES ........................................... 29

NOTICE ....................................................................................................................... 31

CONCLUSION ............................................................................................................. 32

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon
Corp.*, No. 09 Civ. 6273 (RMB) (AJP), 2010 WL 3958790 (S.D.N.Y. Sept. 7, 2010) ...........23

*Catskill Dev., LLC v. Park Place Entm't Corp.*,
286 F. Supp. 2d 309 (S.D.N.Y. 2003), *judgment reinstated*, 345 F. Supp. 2d 360
(S.D.N.Y. Nov. 15, 2004), *vacated and remanded*, *Catskill Litig. Trust v. Park Place
Entm't Corp.*, 169 Fed. App'x 658 (2d Cir. 2006), *on remand to Debary v. Harrah's
Operating Co., Inc.*, 465 F. Supp. 2d 250 (S.D.N.Y. 2006), *aff'd*, 547 F.3d 115 (2d
Cir. 2008), *cert. denied*, *Catskill Dev., LLC v. Harrah's Operating Co., Inc.*, 129 S.
Ct. 1908 (2009) ......................................................................................................................20, 25

*Commer v. Mcentee*,
No. 00 Civ. 7913 (RWS), 2005 WL 1250214 (S.D.N.Y. May 27, 2005) ..............................23

*Golden Oldies, Ltd. v. Scorpion Auction Grp., Inc.*,
199 F.R.D. 98 (E.D.N.Y. 2001) .............................................................................................28

*Green v. Advanced Cardiovascular Imaging*,
No. 07 Civ. 3141, 2009 WL 3154317 (S.D.N.Y. Sept. 30, 2009) ....................................21, 22

*Guishan, Inc. v. Arici*,
635 F. Supp. 2d 187 (E.D.N.Y. 2009) ...............................................................................22, 28

*In re Enron Creditors Recovery Corp.*,
No. 01-16034 (AJG), 2009 WL 3756951 (Bankr. S.D.N.Y. Nov. 6, 2009) ......................22, 26

*In re Jack Kline Co., Inc.*,
440 B.R. 712 (Bankr. S.D. Tex. 2010) ...................................................................................22

*In re Olejnik*,
No. 09-76714-AST, 2010 WL 4366183 (Bankr. E.D.N.Y. Oct. 28, 2010) ................25, 27, 29

*Judith Ripka Creations, Inc. v. Rubinoff Imps., Inc.*,
No. 03 Civ. 9377 (BJT), 2004 WL 1609338 (S.D.N.Y. July 16, 2004) ...........................21, 25

*Katz v. Mogus*,
No. 07 Civ. 8314, 2012 WL 263462 (S.D.N.Y. Jan. 25, 2012)........................................23, 29

*Kotlicky v. U.S. Fid. & Guar. Co.*,
817 F.2d 6 (2d Cir. 1987).................................................................................................20, 29

*Kurzweil v. Philip Morris Cos., Inc.*,
  Nos. 94 Civ. 2373, 94 Civ. 2546 (MBM) (MBM),
  1997 WL 167043 (S.D.N.Y. April 9, 1997) ..................................................23, 24

*Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*,
  666 F.2d 754 (2d Cir. 1981)...............................................................26-29

*P.T. Busana Idaman Nurani v. Marissa by GHR Indus. Trading*,
  151 F.R.D. 32 (S.D.N.Y. 1993) ..................................................................27

*Pasquino v. Lev Parkview Developers, LLC*,
  No. 09 Civ. 4255, 2011 WL 4502205 (S.D.N.Y. Sept. 29, 2011)...........................20

*Pioneer Inv. Servs. v. Brunswick Assocs., LP*,
  507 U.S. 380 (1993)..............................................................................22

*Sec. Pac. Mortg. & Real Estate Servs. v. Herald Ctr. Ltd.*,
  731 F. Supp. 605 (S.D.N.Y. 1990) .............................................................29

*SEC v. Wojeski*,
  752 F. Supp. 2d 220 (N.D.N.Y. 2010),
  *aff'd, Smith v. SEC*, 432 F. App'x 10 (2d Cir. 2011)...............................21, 24-25

*Vasquez v. Carey*,
  No. 03 Civ. 3905 (RJH), 2010 WL 1140850 (S.D.N.Y. Mar. 24, 2010)................21, 28

## **Federal Statutes**

11 U.S.C. § 105(a) .................................................................................31

11 U.S.C. § 502(d) ...................................................................................2

28 U.S.C. § 157 .......................................................................................4

28 U.S.C. § 1334 .....................................................................................4

28 U.S.C. § 1409 .....................................................................................4

## **Rules**

Fed. R. Civ. P. 60(b) ......................................................1,2, 4, 14, 17-23, 25, 27-32

Fed. R. Civ. P. 60(b)(1)....................................................3, 21-23, 26, 28, 29

Fed. R. Civ. P. 60(b)(2) ....................................................3, 21-24, 26, 28

Fed. R. Civ. P. 60(b)(3).....................................................3, 21, 22, 24-26, 28

Fed. R. Civ. P. 60(b)(4) .....................................................................26, 28

Fed. R. Civ. P. 60(b)(5) ........................................................................................26, 28

Fed. R. Civ. P. 60(b)(6) ..................................................................... 3, 21, 22, 25-28

Fed. R. Civ. P. 60(c)(1)...............................................................................................28

Fed. R. Bankr. P. 1015(c) ...........................................................................................31

Fed. R. Bankr. P. 9007.................................................................................................31

Fed. R. Bankr. P. 9024..............................................................................................1, 21

S.D.N.Y. LBR 1007-2....................................................................................................7

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

The Motors Liquidation Company GUC Trust (the "**GUC Trust**") respectfully submits

this motion and incorporated memorandum of law (the "**Motion**") for relief under Rule 60(b)

("**Rule 60(b)**") of the Federal Rules of Civil Procedure (the "**Federal Rules**") made applicable

by Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").[1]

## RELIEF REQUESTED AND PRELIMINARY STATEMENT

By this Motion, the GUC Trust seeks relief from the order approving the Amended and

Restated Master Sale and Purchase Agreement dated as of June 26, 2009 (as amended on June

30, 2009 and July 5, 2009) between General Motors Corporation ("**Old GM**") and General

Motors LLC ("**New GM**") (the "**MSPA**")[2] and the related orders of this Court (collectively, the

"**Sale Order**").[3]

The grounds for this motion could not be simpler: because the Lock-Up Agreement and

Swaps (defined below) were not adequately disclosed and were never the subject of a motion

before this Court, the Sale Order should not have any impact upon the GUC Trust's ability to

challenge the Lock-Up Agreement, Swaps and related claims.  This Motion is brought in the

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them
in the GUC Trust's June 11, 2012 Amended Complaint (the "**Amended Complaint**") (Adv. Pro. Dkt. 37)
filed in *Motors Liquidation Co. GUC Trust v. Appaloosa Investment Ltd. Partnership I, et al.*, Adv. Pro.
No. 12-09802 (the "**Adversary Proceeding**").  All references herein to "**Pl. Ex.**" and "**Def. Ex.**" refer to
the GUC Trust's and Defendants' exhibits admitted into evidence in connection with the trial in the
Adversary Proceeding and hearing on the November 19, 2010 Official Committee of Unsecured
Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of
General Motors Nova Scotia Finance Company and Motion for Other Relief (the "**First Amended
Objection**") (Bankr. Dkt. No. 7859).  All references herein to "**Decl.**" refer to the direct testimony
affidavits submitted in connection with the Adversary Proceeding.

[2]     Def. Ex. 226 (Sale Approval Order attaching MSPA and its amendments) (Bankr. Dkt. No. 2968).

[3]     The related orders include the June 2, 2009 order approving the June 1, 2009 master sale and
purchase agreement  (the "**Sale Procedures Order**") (Pl. Ex. 275) (Bankr. Dkt. No. 274), and the July 5,
2009 order approving the MSPA dated as of June 26, 2009 (the "**Sale Approval Order**") (Def. Ex. 226)
(Bankr. Dkt. No. 2968).

alternative.  For the reasons to be set forth in the GUC Trust's post-trial brief, this Court may

grant all of the relief sought in the GUC Trust's Amended Complaint and First Amended

Objection[4] without any need to modify the Sale Order.

In particular, the alternative relief sought by this Motion includes rulings that:

- the Lock-Up Agreement was not assumed by the Debtors and assigned to New GM;[5]

- the Swaps (defined below) were not assumed and assigned, or otherwise transferred, to New GM;[6] and

- avoidance actions related to payment of the Consent Fee (defined below) were not sold to New GM.[7]

If the Court reaches the GUC Trust's request for Rule 60(b) relief, the Motion should be granted

because the Lock-Up Agreement and Swaps were not properly disclosed to this Court or the

Creditors' Committee until well after the Court approved the Sale Order in July 2009.[8]

New GM admitted at trial that the Lock-Up Agreement and Swaps were not disclosed to

the Court prior to July 2009 and, indeed, that there were no efforts to disclose either the Lock-Up

---

[4]    First Am. Objection (Bankr. Dkt. No. 7859); Amended Compl. (Adv. Pro. Dkt. 37).

[5]    This relief will not be necessary if, for example, the Court decides that the Lock-Up Agreement is void or was not transferred to New GM for other reasons.

[6]    This relief will not be necessary if, for example, the Court decides that the Swaps were not assumed and assigned due to the failure to comply with the applicable procedures.

[7]    This relief will not be necessary if, for example, the Court decides that these particular avoidance actions were not sold to New GM because the transfers at issue were not transfers to or from a Purchased Subsidiary (as that term is defined in the MSPA); or if the Court decides that, even if the avoidance actions have been sold, the GUC Trust may nonetheless obtain relief defensively under 11 U.S.C. § 502(d).

[8]    Although this Motion precedes the GUC Trust's post-trial brief, which is due to be filed in two weeks, the Court has already ruled in its July 19, 2012 bench decision on New GM's Motion for Summary Judgment ("**New GM SJ Hr'g**," attached hereto as Exhibit A) that the GUC Trust's request for Rule 60(b) relief is not ripe for adjudication.  This Motion will only need to be decided if the Court construes the terms of the Sale Order to preclude any of the relief sought by the GUC Trust in its Amended Complaint and First Amended Objection. *See* New GM SJ Hr'g Tr. 90:15-16 ("Because I find that the issues aren't ripe I'm not deciding the 60(b) motion today …."). For reasons to be set forth in the GUC Trust's post-trial brief, the reading of the Sale Order advanced by the Noteholders is mistaken.

Agreement or the Swaps to the Court.[9]   It is unsurprising then that the representatives of the

Creditors' Committee were unaware of the Lock-Up Agreement during the sale approval

process.[10]   Indeed, the Court observed that it was a "shock" to learn of the Lock-Up Agreement

after the sale,[11] and that had it been aware of the Lock-Up Agreement, it "might well have

refused to sign the order in its then existing form, and […] insisted the lock-up agreement not be

insulated from judicial scrutiny no matter what threats the Nova Scotia Noteholders had made at

the time."[12]

Because the Lock-Up Agreement was not properly disclosed, and has never been the

subject of an approval motion, the Creditors' Committee did not know to object to its terms

before the Sale Order was entered, and the Court was never asked to, and was never in a position

to, determine whether the Lock-Up Agreement was in the best interests of the Debtors' estates.

Accordingly, as explained in detail below, the record supports the GUC Trust's request for relief

under Rule 60(b)(1), (2), (3) and (6).

---

[9]     *See* Buonomo Tr. 132:12-15 (Aug. 10, 2012) (Lawrence Buonomo, Practice Area Manager and Global Process Leader of Litigation for New GM's Legal Staff, in response to the Court's question "[a]re you aware of any efforts on the part of GM or its counsel to disclose the lock-up to me before this controversy arose?" responded "To you specifically, no."); *id.* at 132:22-133:1 (Court: "Do you know of any efforts on the part of GM or its counsel to disclose the existence of those swap agreements to me at any time before this controversy arose?" Buonomo: "No, as to that, I'm quite certain there was never any specific effort[] to disclose.").

[10]    *See* Vanaskey Tr. 96:4-5 (Nov. 27, 2012); Mayer Tr. 171:16-19; 173:10-23 (Oct. 3, 2012).

[11]    New GM SJ Hr'g Tr. 94:10-14 (Court: "It never once occurred to me, and nobody bothered to disclose, that amongst all of the assigned contracts was this lock-up agreement, if indeed it was assigned at all.  When I heard about that it wasn't just a surprise, it was a shock."); *id.* at 92:18-23 (there was a "failure of anyone to say anything to me at the time of the 363 sale hearing about the lock-up agreement or at the prospect that the sale order I'd signed would have the purpose or effect of authorizing the transactions that are said to be protected under my order here").

[12]    *Id.* at 93:14-18.

3

## JURISDICTION AND VENUE

This Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334.

This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court

pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND[13]

## I.    THE LOCK-UP AGREEMENT

The terms of the Lock-Up Agreement at the heart of this matter, which involve the

postpetition payment of approximately $367 million dollars and purportedly give rise to claims

against the Old GM estate totaling approximately $2.7 billion dollars, were not properly

disclosed to this Court or the Creditors' Committee in advance of entry of the Sale Order.

Indeed, the Lock-Up Agreement has never been the subject of any motion seeking this Court's

approval.

When Old GM's bankruptcy petition (the "**Petition**")[14] was filed with this Court at 7:57

a.m. (EDT) on June 1, 2009, Old GM, certain holders of Notes issued by Nova Scotia Finance

(the "**Noteholders**") and their respective counsel had still not completed the Lock-Up

Agreement.[15]  The parties to the negotiations completed the Lock-Up Agreement after Old GM

filed its bankruptcy petition, setting in motion a series of postpetition actions designed to secure

---

[13]    The GUC Trust refers the Court to the GUC Trust's forthcoming post-trial brief for a complete summary of the facts of this case.  This Motion only addresses those facts pertinent to Rule 60(b) relief.

[14]    Bankr. Dkt. No. 1.

[15]    As the GUC Trust will explain in its forthcoming post-trial brief, the evidence at trial shows that the Lock-Up Agreement is a postpetition agreement.  *See, e.g.*, Jones Tr. 212:16-25; 213:1-6 (Sept. 4, 2012) (the metadata log and the internal metadata for the execution version of the Lock-Up Agreement show that the execution version was created postpetition).

advantages for the Noteholders not enjoyed by Old GM's other unsecured creditors.  These

actions include:[16]

> (i)     Payment of a $367 million "consent fee" (the "**Consent Fee**")
>         representing over 36% of the face amount of the Notes to the
>         Noteholders – funded by a $450 million transfer from Old GM to
>         GM Canada (the "**450 Million Loan**") that was earmarked for the
>         Noteholders;[17]
>
> (ii)    Execution and delivery of Old GM's consent to Nova Scotia
>         Finance filing for bankruptcy;
>
> (iii)   Old GM's consent to the allowance of claims against it for the full
>         amount of the Notes based on Old GM's guarantee of those Notes,
>         without any reduction of principal to account for payment of the
>         Consent Fee (the "**Guarantee Claims**"); and
>
> (iv)    Old GM's consent to the allowance of a duplicative claim against
>         it on account of Old GM's alleged liability, under Nova Scotia law,
>         for the balance due on the Notes at maturity and the Swap Liability
>         (the "**ULC Claim**") to be asserted against it by Nova Scotia
>         Finance's bankruptcy trustee, (the "**Nova Scotia Finance
>         Trustee**"), who was selected by the Noteholders to administer
>         Nova Scotia Finance's estate.

## II.    THE SWAPS

As an indirect consequence of the Lock-Up Agreement, the Swap Liability, which was an

asset of Old GM as of the Petition Date, became a purported liability against Old GM in excess

of half a billion dollars.[18]  The Swap Liability arose out of currency swap agreements entered

into by Old GM and Nova Scotia Finance in July 2003 (the "**Swaps**") in connection with the

issuance of the Notes.[19]  Notably, as of June 1, 2009, Old GM was "in the money" with respect

---

[16]    *See generally* Pl. Ex. 315 (Nova Scotia Finance Trustee Proof of Claim); Pl. Ex. 16 (executed
Lock-Up Agreement).

[17]    Ammann Tr. 85:18-25; 86:1-2 (Sept. 27, 2013); Buonomo Decl. ¶ 43.

[18]    *See* Pl. Ex. 315 (Green Hunt Wedlake Proof of Claim).

[19]    Buonomo Decl. ¶¶ 22, 23.

to the Swaps.[20]  However, under the Lock-Up Agreement, the amount of the Swap Liability was

to be included in the ULC Claim and any claim against Nova Scotia Finance based on the Swaps

would be subordinated to payment in full of the Notes should the ULC Claim be disallowed,

even in part.  The Swaps were then purportedly transferred to New GM in connection with Old

GM's 363 sale in the bankruptcy case (the "**363 Sale**").[21]  As the supposed claimant under the

Swaps, New GM asserted a $564 million claim against Nova Scotia Finance in its Canadian

bankruptcy proceeding (the "**New GM Swap Claim**") on November 9, 2009.[22]  The Nova Scotia

Finance Trustee, in turn and at the direction of the Noteholders, included the amount of the New

GM Swap Claim in his ULC Claim against Old GM.[23]  As a consequence of these behind-the-

scenes maneuvers, a claim that should have been for the benefit of Old GM became a purported

liability.[24]

---

[20]     *See* Pl. Ex. 16 (executed copy of the Lock-Up Agreement) ¶ 6(v) ("Guarantor confirms that its only claim against [Nova Scotia Finance] is the Swap Liability").

[21]     *See* Pl. Ex. 139 (New GM Swap Claim, filed in the bankruptcy case of Nova Scotia Finance) (Buonomo certifies that New GM "acquired rights in the account as of July 10, 2009 pursuant to its acquisition of substantially all of the assets of" Old GM).  Subsequently, New GM took the position that the Swaps were assumed and assigned.  Buonomo Tr. 106:5-7 (Aug. 9, 2012) ("[The Swaps] were designated for assumption according to the procedures in place ….").

[22]     *Id.*

[23]     *See* Pl. Ex. 315 (Green Hunt Wedlake Proof of Claim).

[24]     In fact, the key individuals at New GM did not always believe that the Swap Liability had been assumed and assigned to New GM, a fact known to at least Aurelius Investment, LLC ("**Aurelius**"), one of the Noteholders.  *See* Pl. Ex. 248 (July 27, 2009 email from Prieto to Gropper: "there is a view [at GM] that [the] swap claim is not included when calculating the wind-up claim"); Pl. Ex. 22 (July 30, 2009 email from Buonomo to Prieto stating: "I inquired with Weil Gotshal, which reminded me that inasmuch as the Swap was not assigned this decision rests with Motors Liquidation Company (Oldco), which apparently has it under review."); Gropper Tr. 33:23-34:3 (Sept. 28, 2012) (Gropper was aware of this view).  Nevertheless, as will be explained more fully in the GUC Trust's post-trial brief, the Noteholders encouraged New GM to assert the claim.  *See* Gropper Tr. 84:13-22 (Sept. 28, 2012) (Gropper recommended that the swap claim be included in the wind-up claim).

III.    **THE LOCK-UP AGREEMENT WAS NOT
        THE SUBJECT OF A MOTION OR ADEQUATELY DISCLOSED**

Even though the Lock-Up Agreement involved a $367 million payment to the

Noteholders from funds advanced by Old GM,[25] and ultimately gave rise to more than $2.67

billion in claims, there was never a motion before this Court concerning the Lock-Up

Agreement.  Nor was there otherwise any adequate disclosure of the Lock-Up Agreement's key

terms.  As a result, the terms of the Lock-Up Agreement, and its serious consequences for

creditors of Old GM, were unknown to the Debtors' creditors, other parties in interest and this

Court until months after the Sale Order was approved.

   A.    **The $450 Million Loan and Anticipated
          Settlement with the Noteholders Were Not Disclosed
          in the First Day Affidavit Pursuant to Local Bankruptcy Rule 1007-2**

The disclosure failures began on the first day of this bankruptcy proceeding, when the

First Day Affidavit filed by the Debtors under Local Bankruptcy Rule 1007-2[26] omitted any

mention of the $450 Million Loan or the anticipated settlement with the Noteholders.

   B.    **The Lock-Up Agreement and Swaps Were Not
          Adequately Disclosed in the Disclosure Schedules to the MSPA**

The failure to disclose the Lock-Up Agreement and Swaps continued into the month of

June.  In early June of 2009, confidential disclosure schedules to the MSPA (the "**Disclosure

Schedules**") that were not otherwise publicly available, were provided to Kramer Levin Naftalis

& Frankel LLP ("**Kramer Levin**"), counsel for the Creditors' Committee.[27]    Among the 145-

---

[25]     As will be shown in the post-trial brief, these funds constituted property of Old GM's estate and
were earmarked for payment to the Noteholders.  The advance of the funds was subject to an undisclosed
Trust Agreement, the conditions of which were not satisfied.  *See* Buonomo Tr. 80:13-25; 81:1-9 (August
9, 2012).

[26]     Bankr. Dkt. No. 21.

[27]     *See* Pl. Ex. 265 at CC005517-5664 (June 5, 2009 email from Weil, Gotshal & Manges LLP
circulating schedules).

pages of disclosure schedules, the Lock-Up Agreement is mentioned in a single paragraph in

Schedule 6.2.[28]   However, this is only one schedule among many where the Creditors'

Committee would expect an agreement such as the Lock-Up Agreement to appear, and this

particular Schedule 6.2 was omitted from the publicly filed version of the Disclosure

Schedules.[29]   The Disclosure Schedules also fail to disclose the amount of the Swaps ($564

million), the amount of the Consent Fee ($367 million) or the amount of the $450 Million

Loan.[30]   In fact, the final version of the confidential schedule attached to the MSPA did not

contain any disclosure at all about the $450 million transfer.[31]

Likewise, there is no mention of the Swaps in the Disclosure Schedules.   At trial, in

response to the Court's questions, Lawrence Buonomo conceded that he does not "believe the

word swap was ever mentioned" in the schedules and that the Swaps were not adequately

disclosed to the Court in the MSPA.[32]

C.    **There Was No Notice of the Purported**
      **Assumption and Assignment of the Lock-Up Agreement and Swaps**

New GM and the Noteholders contend that the Lock-Up Agreement and Swaps were

assumed by Old GM and assigned to New GM in connection with the 363 Sale.   However, the

Creditors' Committee never received any notice concerning the supposed assumption and

---

[28]      *Id.* at CC005655-56 (Disclosure Schedule 6.2).   Schedule 4.6 of the MSPA also briefly mentions
a "Nova Scotia Settlement" without any further detail or background.  *See id.* at CC005566 (¶ 14).

[29]      *Compare* Pl. Ex. 265 *with* Bankr. Dkt. No. 2649.

[30]      *See generally* Pl. Ex. 265 CC005655-56.   Mr. Buonomo also conceded that disclosure schedules
make no disclosure of the amount of the $450 Million Loan.   *See* Buonomo Tr. 100:18-24 (Aug. 10,
2012).

[31]      *Compare* Pl. Ex. 265 (Disclosure Schedule 6.2, ¶ 3 at CC005655-656) *with* Bankr. Dkt. No. 8087
(Disclosure Schedule 6.2, ¶ 2 at 106-107).

[32]      Buonomo Tr. 129:2-18 (Aug. 10, 2012).

assignment of the Lock-Up Agreement and Swaps.[33]  While notice to the Creditors' Committee

was not strictly required under the Sale Procedures Order, [34] notice should have been provided,

given the enormous consequences of the Lock-Up Agreement upon unsecured creditors and the

lack of information about the Lock-Up Agreement.

Indeed, notice was not even provided to the Noteholders themselves, who were required

to receive notice as a prerequisite to assumption and assignment.[35]  Mr. Buonomo concedes that

no assumption notice was sent to the Noteholders prior to the 363 Sale.[36]  The first indication the

Noteholders received that the Lock-Up Agreement had purportedly been assumed and assigned

was in November 2009, several months after entry of the Sale Order, when Mr. Zirinsky received

an email from Mr. Buonomo purporting to "confirm" that the Lock-Up Agreement was

assumed.[37]

---

[33]     Buonomo Tr. 145:13-20 (Aug. 9, 2012) (Fisher: "For clarification, before we objected to – before
the creditors' committee objected to the claims that are at issue, are you aware of the creditors' committee
having received notice of the assumption of the lockup agreement? ... I'm just asking whether you're
aware." Answer: "I have no knowledge.  Not that I'm aware.").

[34]     *See* Pl. Ex. 275 (Sale Procedure Order) ¶ 10, p. 10 (requiring Old GM to provide an assumption
and assignment notice containing an objection deadline, in the form attached as Exhibit D to the Sale
Procedures Order).

[35]     *See id.*; Zirinsky Tr. 109:21-23. (Aug. 8, 2012) (neither he, as counsel for the Noteholders, nor
any of his clients received notice that the Lock-Up Agreement was assumed); *id*. at 112:12-10 (he does
not recall ever having seen Exhibit D in relation to the Lock-Up Agreement).

[36]     Buonomo Tr. 143:20-144:4 (Aug. 9, 2012).

[37]     *See* Pl. Ex. 153 (November 18, 2009 email from Buonomo to Zirinsky attaching letter that
purported to "confirm" that New GM assumed the rights and obligations of Old GM under the Lock-Up
Agreement); Pl. Ex. 43 at AUR_GM020970 (November 18, 2009 emails between Buonomo and Zirinsky
regarding database, "Each of the noteholder parties should have received a notice of assumption with a
login to view contract to which they are a party." ); Zirinsky Tr. 109:14-23 (Aug. 8, 2012) (Zirinsky was
unaware that the Lock-Up Agreement had been assumed until he spoke with Buonomo in November); *id.*
at 110:1-111:5 (same).

9

D.    **The Lock-Up Agreement and Swaps Were
Not Disclosed During the Sale Approval Process**

Finally, there was an overall failure to disclose the Lock-Up Agreement and Swaps to the

Court and the Creditors' Committee during the sale approval process. For example, the Sale

Motion itself does not mention the Lock-Up Agreement.[38] In fact, the trial testimony establishes

that the Lock-Up Agreement was never disclosed to the Court at any point in the sale process.[39]

Nor were the Swaps disclosed prior to approval of the sale.[40]

As the Court noted during the July 19, 2012 New GM summary judgment hearing, there

was a failure to disclose the Lock-Up Agreement prior to commencement of this claim objection

proceeding in July 2010, and the disclosures that were made were "scattered and incomplete."[41]

The Court went on to explain that it was not just a "surprise" to learn of the Lock-Up Agreement,

but a "shock."[42] The Court explained that there was a "failure of anyone to say anything to me at

the time of the 363 sale hearing about the [Lock-Up Agreement] or at the prospect that the sale

order I'd signed would have the purpose or effect of authorizing the transactions that are said to

be protected under my order here."[43] The Court noted it was unaware that when it approved the

sale agreement, "I was also authorizing a payment to a limited number of creditors of $367

---

[38]     *See* Pl. Ex. 274 (Bankr. Dkt. No. 92).

[39]     *See, e.g.,* Mayer Tr. 171:16-19 (Oct. 3, 2012) (Fisher: "Do you recall the lock-up agreement being the subject of discussion at the hearing with respect to approval of the sale in this case?" Answer: "No."); Buonomo Tr. 132:12-15 (Aug. 10, 2012) (Court: "Are you aware of any efforts on the part of GM or its counsel to disclose the lock-up to me before this controversy arose?" Answer: "To you specifically, no.").

[40]     *See* Buonomo Tr. 132:22-133:1 (Aug. 10, 2012) (Court: "Do you know of any efforts on the part of GM or its counsel to disclose the existence of those swap agreements to me at any time before this controversy arose?" Answer: "No, as to that, I'm quite certain there was never any specific efforts to disclose."); *id.* at 133:2-5 (Court: "And would I be correct in concluding from that that your answer would be the same with respect to any assignment of the swap agreements?" Answer: "Yes.").

[41]     New GM SJ Hr'g Tr. 92:23.

[42]     *Id.* at 94:13-14.

[43]     *Id.* at 92:18-23.

million, a commitment not to object to as much as $2.67 billion in claims, and an assignment out

of the estate of the right to bring important avoidance actions."[44] Had the Court been aware of

the Lock-Up Agreement, it "might well have refused to sign the order in its then existing form,

and I would have insisted that the [Lock-Up Agreement] not be insulated from judicial scrutiny

no matter what threats the Nova Scotia Noteholders had made at the time."[45]  As the Court

observed, the lack of disclosure had the "potential to injure Old GM creditors to the extent of

hundreds of millions, if not billions of dollars."[46]

### E.    Old GM's Funding of the Consent Fee Was Not Disclosed

While disclosure of the Lock-Up Agreement was paltry and insufficient to provide

adequate notice to any party-in-interest, disclosure of the nearly half a billion dollar Old GM

loan used to fund the Consent Fee was wholly absent.  Prior to approval of the Sale Order, there

was no disclosure that on May 29, 2009, Old GM transferred $450 million to GM Canada.  Nor

was there a disclosure to the Creditors' Committee that the $450 Million Loan, supposedly made

one business day before the Petition was filed, was earmarked to fund the $367 million Consent

Fee that eventually made its way to the Noteholders.[47]  In fact, Old GM attempted to transfer the

funds on May 29th, even though the parties had not yet agreed on the amount of the Consent Fee,

because the parties wanted the funds out of Old GM's accounts in a deliberate attempt to keep

---

[44]     *Id.* at 94:5-9.

[45]     *Id.* at 93:14-18.

[46]     *Id.* at 91:19-21.

[47]     *See* Pl. Ex. 263 (August 11, 2009 Interim Report ) (Bankr. Dkt. No. 3762) (fails to disclose the loan to GM Canada); September 15, 2009 Statement of Financial Affairs for Motors Liquidation Company (f/k/a General Motors Corporation) (Bankr. Dkt. No. 4060) (fails to disclose the loan made to GM Canada).

the funds from being "attackable."[48]  In short, the Creditors' Committee and the Court were left

completely in the dark as to the use of estate funds to pay the $367 million Consent Fee.

Nor was it disclosed that the $450 million transferred from Old GM to GM Canada was

subject to a Trust Agreement.[49]  The Trust Agreement governed the advance of the funds, and as

of June 1, 2009, its conditions had not been satisfied.  The conditions set forth in the Trust

Agreement were then amended postpetition without this Court's approval, but, even then

remained unsatisfied.[50]  Postpetition, the terms of the Trust Agreement were amended to

"conform to the deal that was reached"[51] without any disclosure and without this Court's

approval.

The failure to disclose the $450 million transfer, the associated Trust Agreement and the

Consent Fee disadvantaged the Creditors' Committee during the sale approval process.  Had

these transactions been made known to the Creditors' Committee, it could potentially have

understood the implications of the Lock-Up Agreement, including the purported transfer of the

avoidance actions to New GM under the Sale Order.  Without this knowledge, the Creditors'

Committee had no reason to object to the Sale Order.

---

[48]     *See* Pl. Ex. 3 (Prieto Notebook) at AUR_GM021457 ("[T]he money is in a trust account in
Canada where it is being held for the deal – does not think that money will be attackable where it is now
… the rights to this preference will be assumed by NewCo in the 363."); *see also* Zirinsky Tr. 38:15-18
(Aug. 8, 2012) ("[W]e wanted to be comfortable that the way this transaction was going to be structured
would do so, would do it in the right way so that there wouldn't be any potential attack."); *id.* at 41:7-13
(Fisher "And, Mr. Zirinsky, when you were participating in the [Lock-Up Agreement] negotiations, you
wanted to be sure that you didn't end up in a position where the money used to fund the settlement was
still in a GM U.S. account, right?" Answer: "Mr. Fisher, my concern was to make sure that if we went
ahead and did this agreement that the money would be there to pay the [Noteholders] consent fee.");
Gropper Tr. 66:9-12 (Sept. 28, 2012) (it was important that funds not be in a GM account at the time of
GM's bankruptcy petition).

[49]     *See* Pl. Ex. 134 (May 29, 2009 email from Joyce Zhou to Buonomo and others attaching $450
Million Loan Promissory Note, Trust Agreement and Approval Note).

[50]     Buonomo Tr. 80:13-81:9 (August 9, 2012).

[51]     *See* Buonomo Tr. 87:4-5 (Aug. 8, 2012); *see also* Pl. Ex. 136 (June 5, 2009 email forwarding
second amendment to Trust Agreement).

F.      **The June 1, 2009 Form 8-K Disclosure Was Inadequate**

Throughout the case, Defendants  and New GM have pointed to Old GM's June 1, 2009

Form 8-K (the "**Form 8-K**") [52] as evidence that the Creditors' Committee and the Court should

have been aware of the Lock-Up Agreement and its associated transactions.  Despite Defendants'

and New GM's repeated contentions, the disclosure in the Form 8-K is inadequate for two

reasons.

First, the Form 8-K is not a pleading in this bankruptcy proceeding.  Defendants and New

GM are essentially arguing that the Court and the Creditors' Committee were obligated to search

the public record for evidence of the Lock-Up Agreement, an agreement neither knew existed.

This contention is absurd.  It was perfectly reasonable for the Creditors' Committee and this

Court to expect that an agreement involving Old GM, and as monumental as the Lock-Up

Agreement, would be the subject of a transparent filing in this bankruptcy proceeding.  This is

particularly so in light of the numerous filings, described above, which should have disclosed the

substance of the Lock-Up Agreement, but failed to do so.  As Mr. Mayer of Kramer Levin

testified, the Lock-Up Agreement was not the type of transaction as to which an 8-K filing would

have been sufficient to put the Creditors' Committee on notice. [53]

Second, even if, *arguendo*, the Form 8-K had been brought to the attention of the Court

and Creditors' Committee prior to entry of the Sale Order, the import of the Lock-Up Agreement

would still be unknown to anyone other than the select few involved in negotiating its terms.

---

[52]        *See* Pl. Ex. 29 (Form 8-K).

[53]        *See* Mayer Tr. 173:10-23 (Oct. 3, 2012) (Fisher: "And in or about October 2009 did you have any
communications with Weil, Gotshal about the lock-up agreement?" Answer: "Yes, we did." Fisher: "And
what did you discuss with them?" Answer: "Well, my recollection is that we said – and at some point and
it may have been to Mr. Karotkin – I said what the heck is this, and my interlocutor said, well, there was
an 8-K filed that – on June 1 that showed we were doing this.  And I said to him, you're telling me you
expected a $2.6 billion claim settlement and a 350 million cash payment to be done with adequate notice
by 8-K without actually bringing it to court for approval on notice to parties? You got to be kidding.").

The Form 8-K downplays the Lock-Up Agreement, describing it merely as a settlement of the Nova Scotia Proceeding "for a release of all defendants to that proceeding."[54]  The Form 8-K also mentions a cash payment, funded by GM Canada, to be paid by GM Nova Scotia to the Noteholders in exchange for extinguishment of the Intercompany Loans.[55]  This limited description, however, omits critical aspects of the Lock-Up Agreement.  For example, the Form 8-K does not mention Nova Scotia Finance's consent to bankruptcy (and contemplated duplicative assertion of the Guarantee and ULC Claims).[56]  Nor does the Form 8-K disclose the Swaps in any way.[57]  At trial, witnesses conceded that the Form 8-K also does not mention Old GM's transfer of $450 million to pay the Consent Fee.[58]

Thus, even if the Court overlooks the failure to disclose the terms of the Lock-Up Agreement in this bankruptcy proceeding and considers the Form 8-K a proper vehicle for disclosure, the Form 8-K's omission of critical terms of the Lock-Up Agreement still warrants Rule 60(b) relief from the Sale Order.

---

[54]     *See* Pl. Ex. 29 (Form 8-K) at AUR_GM014280-81.

[55]     *Id*.

[56]     *See* Pl. Ex. 29 (Form 8-K); Zirinsky Tr. 84:18-20 (Aug. 8, 2012) (Fisher: "Does [the Form 8-K] say anything about the Nova Scotia – the contemplated Nova Scotia Finance Company bankruptcy filing?" Answer: "Not to the best of my recollection."); Buonomo Tr. 139:21-24 (Aug. 9, 2012) (Fisher: "[The Form 8-K] doesn't say anything about GM Nova Scotia Finance Company being authorized to consent to a bankruptcy, does it?" Answer: "Not to my recollection.").

[57]     *See* Buonomo Tr. 142:7-10 (Aug. 10, 2012) ("I know there was never an 8-K filed by either Old or New GM about the swaps.  I don't think – I'm not aware of any other public disclosure, but I know pretty close to the certainty that there was never an 8-K done.").

[58]     *See* Pl. Ex. 29 (Form 8-K); Ammann Tr. 87:6-8 (Sept. 27, 2012) (Fisher: "Now, the transfer of $450 million from Old GM to GM Canada is not disclosed in this 8-K, correct?" Answer: "It doesn't appear to be."); Zirinsky Aug. 8, 2012 Tr. 84:5-84:6 (Fisher: "[The Form 8-K] didn't say anything about the loan, right?" Answer: "I don't believe so."); *id.* at 83:22–25 (Fisher: "And did [the Form 8-K] make any reference to a loan that had been made by old GM to GM Canada?" Answer: "I don't think the 8-K specifically referred to a loan by GM U.S. to GM Canada I don't believe."); Buonomo Tr. 139:10-14 (Aug. 9, 2012) (Fisher: "And the [Form 8K] that ultimately was filed, does it say anything about the $450 million loan from Old GM to GM Canada?" Answer: "I don't think so, although I don't have it in front of me, but I don't believe so.").

G.    **The Parties to the Lock-Up
Agreement Attempted to Evade this Court's Review**

Rather than disclose the Lock-Up Agreement, the parties to the agreement sought to

evade this Court's review.  The parties repeatedly discussed whether court approval was

necessary,[59] and decided that it was not, with the Noteholders' counsel concluding that "perhaps

court approval isn't so important."[60]  The parties were fully aware that any post-petition

amendment of the Lock-Up Agreement would require Court approval,[61] but the parties chose not

to seek Court approval of the agreement even though the Lock-Up Agreement was completed

postpetition.[62]  Ultimately, the parties, knowing the inequities of the Lock-Up Agreement, kept

the substance of the agreement hidden because they were aware that creditors would object and

did not want this transaction to face the scrutiny of the Court or Old GM's creditors.[63]

---

[59]    *See* Zirinsky Tr. 22:13-21 (Aug. 8, 2012) (the issue of bankruptcy court approval was discussed at least one or two times); Pl. Ex. 3 (Prieto Notebook) at AUR_GM021454 ("GM is not a party to the agreement, do not envision this being approved by Bankruptcy Court.").

[60]    Pl. Ex. 148 (May 30, 2009 email from Zirinsky) at NGM000000636; Zirinsky Tr. 30:7-31:1(Aug. 8, 2012) (Zirinsky concedes his initial view was that bankruptcy court approval was not important).

[61]    *See* Pl. Ex. 527 (June 26, 2009 email from Buonomo to Gropper discussing possible postpetition amendment to the Lock-Up Agreement) at AUR_GM037331 ("I need to be certain we can do it without bankruptcy court approval …").

[62]    *See* Jones Tr. 212:16-25; 213:1-6 (Mar. 3, 2013) (the metadata log and the internal metadata for the execution version of the Lock-Up Agreement show that the execution version was created postpetition).

[63]    *See* Buonomo Tr. 113:6-12 (Aug. 10, 2012) (when Buonomo was negotiating the Lock-Up Agreement, he knew that there would be objections down the road from Old GM's creditors); Pl. Ex. 3 (Prieto Notebook) at AUR_GM021453 ("[D]o not want to give GM US creditors more reasons to object.").

## IV.    PROCEDURAL BACKGROUND

### A.    The Creditors' Committee Did Not
### Become Aware of the Lock-Up Agreement Until October 2009

It was not until October of 2009, well after entry of the Sale Order, that the Creditors'

Committee became aware of the significance of the Lock-Up Agreement.[64]  The Lock-Up

Agreement was not brought to the attention of counsel for the Creditors' Committee until the fall

of 2009 when Old GM's counsel called Mr. Mayer to alert him to the Lock-Up Agreement for

the first time.[65]  After Mr. Mayer was told about the Lock-Up Agreement by Old GM's counsel,

the Creditors' Committee's counsel began to investigate the matter.  However, New GM and the

Nova Scotia Finance Trustee did not cooperate with requests for information made by Kramer

Levin in December 2009 concerning the Nova Scotia Proceeding and the Lock-Up Agreement.[66]

As Canadian counsel for certain of the Noteholders commented to Mr. Zirinsky, "I do not think

that Wedlake will wish to spend much time or money providing such information to the

unsecured creditors committee…"[67]

After investigating the Lock-Up Agreement, its related transactions and the many related

complexities, the Creditors' Committee filed its Objection to Claims Filed by Green Hunt

Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion

---

[64]    *See* Vanaskey Tr. 96:4-5 (Nov. 27, 2012) ("I don't recall discussing the matters of the lockup agreement before October of – of 2009 with anybody."); *id.* at 96:13-15 ("[The Committee became aware of the Lock-Up Agreement] sometime [in] October or you know the fall of 2009 is the first time the committee actively discussed the lockup agreement and or the Nova Scotia bonds.").

[65]    *See* Mayer Tr. 173:10-23 (Oct. 3, 2012).

[66]    *See* Pl. Ex. 157 (December 8, 2009 email from Kramer Levin to Lawrence Buonomo attaching information request); Buonomo Tr. 103:20-22 (Aug. 10, 2012) (Fisher: "You never provided any information to Ms. Macksoud, did you?"  Answer: "Not directly, I don't believe so."); Wedlake Tr. 123:15-18 (Aug. 7, 2012) (Fisher: "And in fact, Mr. Wedlake, in response to this request from the creditors committee you did not provide any information right?"  Answer: "Not that I recall no.").

[67]    Pl. Ex. 273 (December 8, 2009 email from Robert MacKeigan of Cox & Palmer to Zirinsky) at GHW0004126.

16

for Other Relief on July 2, 2010 (the "**Initial Objection**")[68] and the First Amended Objection on

November 19, 2010.[69]  Both pleadings seek narrow Rule 60(b) relief from the Sale Order in the

alternative, to the extent the Court rules that the Sale Order "authorized the Debtors to assume

and/or assign the Lock-Up Agreement and any other obligations incident thereto, including those

concerning the swap transactions."[70]  For the nearly three years following that initial filing in

July 2010, the Creditors' Committee and, later the GUC Trust, have never deviated from the

limited request for alternative relief.

      **B.**      **The GUC Trust's Request for Rule 60(b)**
              **Relief Has Been Limited, Alternative and Consistent**

Since filing its Initial Objection in July 2010, the GUC Trust has only sought Rule 60(b)

relief in the alternative, should the Court find the Lock-Up Agreement was assumed and

assigned to New GM, that the Swaps were assumed and assigned (or otherwise transferred) to

New GM, or that avoidance actions with respect to the Consent Fee were sold to New GM.  The

GUC Trust has consistently told Defendants, New GM and this Court that the need for Rule

60(b) relief, although justified, is highly unlikely and only raised protectively.

For example, at the December 15, 2010 Status Hearing before this Court, counsel for the

GUC Trust noted: "[Defendants are] trying to use the assumption [of the Lock-Up Agreement]

itself to bootstrap arguments on the merits and to argue that the lockup agreement in its entirety

is insulated from review.  And so to the extent that the sale order and assumption order can be

construed to be a judicial finding to that effect, we might need [Rule 60(b)] relief from such an

---

[68]     Bankr. Dkt. No. 6248.

[69]     Bankr. Dkt. No. 7859.

[70]     *See* Initial Obj. ¶ 70; *see also* First. Am. Obj. ¶ 73 ("This request for relief is asserted protectively").

order."[71]   Again in its pre-trial brief, the GUC Trust reserved its rights to limited Rule 60(b)

relief should it become necessary based on the outcome of the trial.[72]   Finally, upon conclusion

of the trial on March 19, 2013, the GUC Trust's counsel acknowledged that the Rule 60(b) claim

was an argument in the alternative and explained:[73]

> Your Honor, for more than two years now, [our petition] for 60(b)
> relief has been consistent and there is not any change in our
> position on Rule 60(b) relief.  To reiterate our position and to be
> clear, we do plan to brief the Rule 60(b) issue as an alternative
> argument in our post-trial briefs[.]  [S]pecifically, what the 60(b)
> relief goes to.  Again, it's been constant for a very long time[.]
> [B]ut it goes to the argument that New GM or the Noteholders may
> make that avoidance actions related to the consent fee have been
> sold to New GM and, therefore, we can't seek 502(d) relief on the
> basis of any avoidance theory.  We don't think the court will need
> to grant 60(b) relief to get us to the relief that we are looking for in
> this case[.]  [B]ut if the court finds that the avoidance action
> related to the consent fee was sold to [N]ew GM, we would ask the
> court to amend the sale order in that respect.  Again, I don't think it
> will come to that[.]  [I]t is in the nature of an alternative argument,
> as it always has been. With regard to the swap claim, … it's our
> position that those swaps were never validly terminated, don't give
> rise to a proper claim, were not assumed and assigned, were not
> sold to [N]ew GM, but, in the event that the Court finds that they
> were sold to [N]ew GM by virtue of the sale order, then we would
> seek relief from the sale order to get us the relief that we think
> we're entitled to with regard to the swap claim, and finally, with
> regard to the [Lock-Up Agreement] itself, it's our position and we
> think that the evidence shows, that the [Lock-Up Agreement] is a
> void, post-petition agreement, but, in the event that the Court finds
> that the [Lock-Up Agreement] was assumed by the Old GM estate
> and assigned to [N]ew GM, then we reserve all rights to seek relief
> from any provisions of the sale order that endorse that view, that
> the [Lock-Up Agreement] was assigned to [N]ew GM.  Those are
> the areas in which we seek 60(b) relief and only in the alternative.

---

[71]      Dec. 15, 2010 Status Hr'g Tr. 52:8-13 (Bankr. Dkt. No. 8626).

[72]      July 27, 2012 GUC Trust Pre-Trial Br. at 25 n.6 (Adv. Pr. Dkt. 148) ("The GUC Trust has not briefed, but reserves all of its rights in connection with, any future requests for relief from the Sale Order under Rule 60(b) of the Federal Rules of Civil Procedure.").

[73]      Lopez Tr. 68:3-69:16 (Mar. 19, 2013).

C.    **Defendants, New GM and the Court Have Long
Been Aware of the Nature of the GUC Trust's Limited Rule 60(b) Relief**

Defendants and New GM have been aware that the GUC Trust seeks Rule 60(b) relief as

alternative relief for almost three years.[74]  In fact, certain Defendants addressed the GUC Trust's

claim for Rule 60(b) relief in their initial response to the First Amended Objection, which they

filed on December 13, 2010.[75]  The Court has also been consistently apprised of the nature of the

GUC Trust's Rule 60(b) request.[76]

Similarly, before the trial of this matter, New GM sought and was granted permission to

move for summary judgment to dismiss the GUC Trust's Rule 60(b) claim.[77]  In the process,

New GM filed almost sixty pages of briefing on the issue of Rule 60(b).[78]  In its opposition brief

and during oral arguments on the motion, the GUC Trust argued that Rule 60(b) relief was

---

[74]    *See* Oct. 28, 2011 Status Hr'g Tr. 19:17-22 (Bankr. Dkt. No. 11105) (Steinberg concedes he was aware of the request for Rule 60(b) relief); December 15, 2010 Status Hr'g Tr. 42:12-43:2 (Bankr. Dkt. No. 8626) (Steinberg: "[T]here's a Rule 60(b) request to vacate the sale order," and the relief sought is "protective."); Lopez Tr. 66:14-17 (Mar. 19, 2013) (Steinberg: "When the claims objection was filed, there was one paragraph there.  It said that they were asserting it protectively in anticipation of a need to respond to the [N]oteholders' argument.").

[75]    *See* Response of Certain Noteholders to First Amended Objection at 59-67 (Bankr. Dkt. No. 8084) ("The Committee is asking the Court to modify the Sale Order and set aside MLC's assumption and assignment to New GM of the Lock-Up Agreement."); Nova Scotia Trustee Response to First Amended Objection at 18 (Bankr. Dkt. No. 8088) (the Nova Scotia Trustee joins in the Noteholders' arguments regarding Rule 60(b)).

[76]    Lopez Tr. 70:21-71:6 (Mar. 19, 2013) (Court:  "As you well know, [E. Fisher] has on many occasions, expressed his desire to ask for 60(b) relief in the alternative[.]  [T]he problem to which I was subjected and you were subjected was not him coming up with new contentions today, March 19th.  It was him holding out the wild card that you might have to deal with new or shifting contentions.  This is not materially different than anything he's said before.  What he has brought to the table today is he has said, honest injun, this is all of it.  So now you know what you need to deal with.").

[77]    *See* May 15, 2012 Status Conference (granting request to file motion for summary judgment); May 24, 2012 Scheduling Order Regarding New GM Motion for Summary Judgment (Adv. Pr. Dkt. 24).

[78]    *See* June 8, 2012 Memorandum of Law In Support of New GM's Motion for Summary Judgment (Adv. Pr. Dkt. 33); July 11, 2012 Reply Brief in Support of New GM's Motion for Summary Judgment (Adv. Pr. Dkt 95).

limited, sought alternatively, and was likely unnecessary.[79]  Ultimately, New GM's motion was

denied on the ground that the Rule 60(b) claim was not ripe for decision until the very issues the

GUC Trust identified were decided.[80]  In light of the over ninety pages of briefing filed on the

Rule 60(b) claim alone, it is not credible for New GM, or for any other party, to claim that they

are unaware of the basis for the GUC Trust's request for Rule 60(b) relief.

## ARGUMENT

### I.    RULE 60(b) RELIEF IS WARRANTED

#### A.    The Standard for Relief Under Rule 60(b)

This Court has discretion to rescind or amend a final judgment under Rule 60(b).

*Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F.2d 6, 8 (2d Cir. 1987).  In applying the rule, the Court

must "strike[] a balance between serving the ends of justice and preserving the finality of

judgments."  *Pasquino v. Lev Parkview Developers, LLC*, No. 09 Civ. 4255, 2011 WL 4502205,

at *3 (S.D.N.Y. Sept. 29, 2011) (quotation and citation omitted); *Catskill Dev., LLC v. Park

Place Entm't Corp.*, 286 F. Supp. 2d 309, 312 (S.D.N.Y. 2003).[81]  Because final judgments

should not be reopened lightly, "Rule 60(b) is 'invoked only upon a showing of exceptional

circumstances.'" *Pasquino*, 2011 WL 4502205, at *3 (citation omitted).

---

[79]       June 29, 2012 GUC Trust Opp. Br. at 6-16 (Bankr. Dkt. No. 11884; Adv. Pr. Dkt. 72); New GM
SJ Hr'g Tr. 49:17-19 ("In July 2010 as part of our initial objection in this case we indicated that we were
asserting and reserving our rights to pursue 60(b) relief protectively."); *id.* at 50:9-13 ("The reason that
we asserted 60(b) protectively is because what we were saying is if we do not need relief from the sale
order we won't pull the trigger on that.  We respect that wherever possible judgments should be treated as
final.").

[80]       New GM SJ Hr'g Tr. 90:15-16.

[81]       *Judgment reinstated*, 345 F. Supp. 2d 360 (S.D.N.Y. Nov. 15, 2004), *vacated and remanded*,
*Catskill Litig. Trust v. Park Place Entm't Corp.*, 169 Fed. App'x 658 (2d Cir. 2006), *on remand to
Debary v. Harrah's Operating Co., Inc.*, 465 F. Supp. 2d 250 (S.D.N.Y. 2006) *aff'd by* 547 F.3d 115 (2d
Cir. 2008), *cert. denied*, *Catskill Dev., LLC v. Harrah's Operating Co., Inc.*, 129 S. Ct. 1908 (2009).

Rule 60(b) provides in relevant part:  "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b); Fed. R. Bankr. P. 9024.  The burden of showing the judgment should be amended or vacated rests on the movant, who must "(1) support its motions with highly convincing evidence; (2) show good cause for its failure to act sooner; and (3) prove that granting the motion will not impose any undue hardship on the other parties."  *Green v. Advanced Cardiovascular Imaging*, No. 07 Civ. 3141, 2009 WL 3154317, at *2 (S.D.N.Y. Sept. 30, 2009).

As demonstrated more fully below, courts consistently grant Rule 60(b) relief under subsections (1), (2), (3) and (6) because of failures to disclose information that, if known, would have altered the final judgment or order in question.  *See e.g., SEC v. Wojeski*, 752 F. Supp. 2d 220, 229-31 (N.D.N.Y. 2010) (allowing reconsideration of judgment where trust failed to disclose certain pertinent annuity agreements), *aff'd, Smith v. SEC*, 432 F. App'x 10 (2d Cir. 2011); *Vasquez v. Carey,* No. 03 Civ. 3905 (RJH), 2010 WL 1140850, at *8 (S.D.N.Y. Mar. 24, 2010) (granting Rule 60(b)(1) motion for relief because identity of proper defendant was not revealed to movant until after entry of the order); *Judith Ripka Creations, Inc. v. Rubinoff Imps., Inc.*, No. 03 Civ. 9377 (BSJ), 2004 WL 1609338, at *3-4 (S.D.N.Y. July 16, 2004) (vacating judgment where defendants failed to disclose facts pertinent to settlement negotiations); *In re*

21

*Jack Kline Co., Inc.*, 440 B.R. 712, 738-39 (Bankr. S.D. Tex. 2010) (granting relief from, and amending, a sale order pursuant to Rule 60(b)(3)); *In re Enron Creditors Recovery Corp.*, No. 01-16034 (AJG), 2009 WL 3756951, at *4 (Bankr. S.D.N.Y. Nov. 6, 2009) (granting Rule 60(b)(6) relief because movant did not receive adequate notice of hearing).  Rule 60(b) relief is appropriate here because of the failure to disclose the Lock-Up Agreement and the Swaps prior to entry of the Sale Order.

**B.    Relief Under Rule 60(b)(1) and (2) Is Appropriate
      Because of the Failure to Disclose the Lock-Up Agreement and Swaps**

**1.    The Creditors' Committee Should Be
      Excused Under Rule 60(b)(1) for Not Challenging
      the Lock-Up Agreement Prior to Entry of the Sale Order**

Subsection (1) of Rule 60(b) permits relief from an order or judgment in the case of mistake, inadvertence, surprise, or excusable neglect.  Rule 60(b)(1) is typically applied to vacate default judgments.  The subsection is not limited to that use, however, and permits the court to vacate an order or judgment based on mistakes or excusable neglect by a party or its counsel. Excusable neglect is evaluated under the factors set forth by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates, LP*, 507 U.S. 380, 395 (1993): (1) the danger of prejudice to the non-moving party; (2) the length of delay and its potential impact on the judicial proceedings; (3) the reason for delay; and (4) whether the movant acted in good faith. *Green*, 2009 WL 3154317, at *2; *Guishan, Inc. v. Arici*, 635 F. Supp. 2d 187, 192 (E.D.N.Y. 2009).  The analysis of these factors is subsumed by the general Rule 60(b) requirements that relief from the order not impose undue hardship, and that the motion be brought within a reasonable time.  As discussed below,  in Sections II and III, the GUC Trust has satisfied the *Pioneer* standard.

Here, relief under Rule 60(b)(1) is warranted because the Creditors' Committee's failure to challenge the Lock-Up Agreement and Swaps before entry of the Sale Order resulted from "excusable neglect."  The Creditors' Committee did not challenge the Lock-Up Agreement and Swaps before entry of the Sale Order only because it was unaware, through no fault of its own, of the Lock-Up Agreement or its potential effect on the unsecured creditors of Old GM.  Under Rule 60(b)(1), the Creditors' Committee should thus be excused from the consequences of not challenging the Lock-Up Agreement and its related transactions before entry of the Sale Order, because the Creditors' Committee's inaction was not a calculated or deliberate choice.  *Katz v. Mogus*, No. 07 Civ. 8314, 2012 WL 263462, at *3 (S.D.N.Y. Jan. 25, 2012).

### 2.   Failure to Disclose the Lock-Up Agreement and Swaps Warrants Relief Under Rule 60(b)(2)

Rule 60(b)(2) permits relief from a judgment or order if the moving party shows the existence of "newly discovered evidence that, with reasonable diligence, could not have been discovered" in advance of the order and the "evidence [is] of such importance that it probably would have changed the outcome of the previous decision."  *Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, No. 09 Civ. 6273 (RMB) (AJP), 2010 WL 3958790, at *3-4 (S.D.N.Y. Sept. 7, 2010) (granting Rule 60(b) motion and reopening case without "definitively deciding" whether evidence would have changed the outcome of the judgment) (citation and quotation omitted); *Commer v. McEntee*, No. 00 Civ. 7913 (RWS), 2005 WL 1250214, at *2 (S.D.N.Y. May 27, 2005); *Kurzweil v. Philip Morris Cos., Inc.*, Nos. 94 Civ. 2373, 94 Civ. 2546 (MBM) (MBM), 1997 WL 167043, at *6 (S.D.N.Y. April 9, 1997).

The GUC Trust has shown that no party brought the Lock-Up Agreement or related transactions to the attention of the Creditors' Committee until October 2009, well after the Sale Order was entered.  The Creditors' Committee acted diligently in investigating the terms of the

23

Sale Order.  However, because disclosure of the Lock-Up Agreement and Swaps was deficient,

they remained unknown to the Creditors' Committee and its counsel.  The Creditors' Committee

had no reason to investigate the substance of an agreement it did not know about prior to entry of

the Sale Order.  As this Court has noted, the substance of the Lock-Up Agreement came as a

"shock" to the Court when this current controversy arose upon the filing of the Creditors'

Committee's Initial Objection.

        The sale process and, ultimately, the Sale Order would have been different if the

Creditors' Committee and this Court had known about the Lock-Up Agreement.  Undoubtedly,

the Creditors' Committee would have challenged the Lock-Up Agreement and related Swaps had

it been aware of the relevant facts before entry of the Sale Order.  Further, the Court has stated

that, had it known about the Lock-Up Agreement, it "might well have refused to sign the order in

its then existing form, and I would have insisted the lock-up agreement not be insulated from

judicial scrutiny no matter what threats the Nova Scotia Noteholders had made at the time."[82] All

of the information about the Lock-Up Agreement that has come to light only after entry of the

Sale Order satisfies the "newly-discovered evidence" standard of Rule 60(b)(2) and constitutes

exceptional circumstances warranting modification of the Sale Order under Rule 60(b)(2).

*Kurzweil*, 1997 WL 167043, at *6 (granting Rule 60(b)(2) motion).

   **C.    Failure to Disclose the Lock-Up Agreement and
           <u>Swaps Constitutes Misconduct Which Warrants Relief Under Rule 60(b)(3)</u>**

        Rule 60(b)(3) permits relief from a judgment or order that was the subject of fraud,

misrepresentation, or misconduct.  Fed. R. Civ. P. 60(b)(3).  A failure to disclose relevant

information that influences the Court's judgment or order constitutes exceptional circumstances

that justify Rule 60(b)(3) relief.  *Wojeski*, 752 F. Supp. 2d at 229 n.17 (SEC was entitled to

---

[82]      New GM SJ Hr'g Tr. 93:14-18.

reconsideration of a judgment based on a newly discovered annuity contract that was previously

not disclosed).  The movant must come forward with clear and convincing evidence that the

fraud, misrepresentation or misconduct complained of prevented the moving party from "fully

and fairly presenting his case or defense." *In re Olejnik*, No. 09-76714-AST, 2010 WL 4366183,

at *4 (Bankr. E.D.N.Y. Oct. 28, 2010) (granting relief where debtor misrepresented his assets

and failed to file mandatory disclosure statements).

Even where there was no duty to disclose, courts can find that the omission of pertinent

information satisfies Rule 60(b)(3), if that information would have affected the judgment or

order. *Judith Ripka Creations, Inc.*, 2004 WL 1609338, at *3-4 (granting Rule 60(b)(3) motion

and noting that "even if I did not find that Defendants had a duty to disclose, I would nonetheless

vacate the judgment under Rule 60(b)(3) because [Defendants] made statements in the course of

settlement negotiations that affirmatively misrepresented the amount that defendants profited

…").  The Court need not find intentional bad faith in order to vacate a judgment under Rule

60(b)(3).  *Id*. at 4; *Catskill Dev., LLC*, 286 F. Supp. 2d at 314 ("even an accidental failure to

disclose … can constitute 'misconduct' within the purview of Rule 60(b)(3)").

As described above, the terms of the Lock Up Agreement were never adequately

disclosed to the Creditors' Committee or this Court.  The failure to adequately disclose the Lock-

Up Agreement prior to entry of the Sale Order is misconduct that justifies Rule 60(b)(3) relief

because the concealment of this information impeded the Creditors' Committee's ability to act in

the interest of unsecured creditors with respect to the Sale Order.  Thus, Rule 60(b)(3) relief is

appropriate.

     **D.**     **The Extraordinary Circumstances of this Matter Justify Rule 60(b)(6) Relief**

Rule 60(b)(6) can be invoked for "any other reason that justifies relief."  Fed. R. Civ. P.

60(b)(6).  Should the court find that the other subsections of Rule 60(b) are inapplicable, it can

use Rule 60(b)(6) to modify the Sale Order.[83]  Rule 60(b)(6) is described as a "grand reservoir of equitable power to do justice in a particular case." *In re Enron Creditors Recovery Corp.*, 2009 WL 3756951, at *3 (citation and quotation omitted).  The movant must show extraordinary circumstances or that the judgment results in an extreme or undue hardship to justify relief under Rule 60(b)(6).  *Montco*, 666 F.2d at 759 (citing *U.S. v. Karahalias,* 205 F.2d 331, 333 (2d Cir. 1953)).

The facts of this case are nothing short of extraordinary.  The parties to the Lock-Up Agreement sought to evade judicial review of an agreement that resulted in the assertion of almost $2.7 billion in claims and a $367 million cash transfer to the Noteholders from funds advanced by Old GM.  Facts far more ordinary than these have warranted Rule 60(b)(6) relief.

For example, in *Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*, 666 F.2d 754 (2d Cir. 1981), the Second Circuit affirmed a lower court's modification of an order under Rule 60(b)(6).  The underlying order permitted a debtor to issue a certification of indebtedness, giving the holder of the certificate priority over other general creditors of the debtor.  *Id*. at 761.  The bankruptcy court had declined to authorize the certification at a hearing held prior to entry of the order because it lacked sufficient information about the certification, and no subsequent application for permission was made to the court.  *Id*. at 756.  Despite this, authorization to issue the certificate was included in a proposed order.  Unaware that the provision was included, the Court, not intending to authorize the certificate, signed the order.  *Id*. at 759.  Because "the court simply did not intend to authorize such a certificate," the Second Circuit found extraordinary circumstances justifying Rule 60(b)(6) relief. *Id*.

---

[83]      If the relief sought falls within Rule 60(b)(1) through (5), Rule 60(b)(6) relief is not available. *Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*, 666 F.2d 754, 758 (2d Cir. 1981).

26

Here, like in the Second Circuit's *Montco* decision, the Court was not aware of the Lock-Up Agreement or Swaps prior to entering the Sale Order and no one sought the Court's approval of the Lock-Up Agreement.  Like *Montco*, this Court did not intend the unknown consequences of approving the Sale Order.  As this Court stated in denying New GM's motion for summary judgment:

> When I approved the sale agreement and entered the sale approval order I mistakenly thought that I was merely saving GM, the supply chain, and about a million jobs.  Likewise, I thought that as part of that I was approving the assumption and assignment of contracts mainly with the many vendors in the supply chain whose contracts were essential to New GM's future and the health of the U.S. auto industry.  I was unaware that by an agreement undisclosed to me that would be said to be assumed and assigned incident to the sale order or that might have been an unauthorized post-petition transaction, I was also authorizing a payment to a limited number of creditors of $376 million, a commitment not to object to as much as $2.76 billion in claims, and an assignment out of the estate of the right to bring important avoidance actions.  It never once occurred to me, and nobody bothered to disclose, that amongst all of the assigned contracts was this [Lock-Up Agreement], if indeed it was assigned at all.

New GM SJ Hr'g Tr. 93:19-94:12.  As the Second Circuit found in *Montco*, if indeed the Court inadvertently approved assignment and assumption of  the Lock-Up Agreement and the Swaps, then there are extraordinary circumstances warranting relief under Rule 60(b)(6).

## II.    THE GUC TRUST'S REQUEST FOR RULE 60(b) RELIEF IS TIMELY

Timeliness under Rule 60(b) is a fact-intensive inquiry that requires a court to "look at the particular circumstances of the case, and balance the interests in finality of a judgment with the reasons for any delay." *In re Olejnik*, 2010 WL 4366183, at *4 (finding moving party's lack of knowledge of particular sale which influenced the judgment, justified the seven month delay after the case was closed); *P.T. Busana Idaman Nurani v. Marissa by GHR Indus. Trading*, 151 F.R.D. 32, 35 (S.D.N.Y. 1993) ("What constitutes a reasonable time for purposes of Rule 60(b)(6) will necessarily vary with the particular circumstances of a case.").  To be timely, a

motion for relief under Rule 60(b)(1) through (5) must be brought within one year of entry of the

judgment or order that is the subject of the motion. Fed. R. Civ. P. 60(c)(1).  Any motion for

Rule 60(b) relief, even those brought within one year of entry of the judgment or order, must also

be made "within a reasonable time."  *Id*.  It is the movant's burden to show that it acted in a

reasonable time and that there was good cause for any delay.  *Guishan, Inc.*, 635 F. Supp. 2d at

192.

       The Sale Order in this case was entered on July 5, 2009.  Less than one year later, the

GUC Trust requested Rule 60(b) relief in its Initial Objection, satisfying the first prong of the

timeliness requirement of Rule 60(b).  Further, the gap between entry of the Sale Order and the

GUC Trust's Initial Objection was "reasonable" under Rule 60(b).  Because of the concealment

of the terms of the Lock-Up Agreement prior to entry of the Sale Order, the Creditors'

Committee, despite its due diligence during the sale process, did not become aware of the Lock-

Up Agreement until October 2009.  Upon being told about the Lock-Up Agreement, counsel for

the Creditors' Committee began an in-depth investigation of the Lock-Up Agreement and the

complex surrounding circumstances.  As soon as counsel for the Creditors' Committee had a

sufficient understanding of the Lock-Up Agreement, Rule 60(b) relief was sought.

       Numerous cases hold that delays longer than one year are reasonable under Rule 60(b).

*See, e.g., Montco*, 666 F.2d at 760 (affirming an order vacating order despite a 26 month period

between entry of the order and trustee's challenge to the order); *Golden Oldies, Ltd. v. Scorpion

Auction Grp., Inc.*, 199 F.R.D. 98, 100 (E.D.N.Y. 2001) (granting Rule 60(b) motion, finding

two-year gap between entry of the order and challenge reasonable).  This is particularly so when

the reason for the delay is lack of disclosure.  *Vasquez*, 2010 WL 1140850, at *8 (holding nearly

one year delay was justified because pertinent information was not known to the movant for

many months); *In re Olejnik*, 2010 WL 4366183, at *4 (finding moving party's lack of

knowledge of particular sale which influenced the judgment justified the seven month delay after

the case was closed).

For example, in *Montco,*, the Second Circuit held that a 26 month delay was reasonable

where neither the "chairman of the creditors' committee nor co-counsel for the committee had

been served" with a copy of the proposed order that was the subject of the Rule 60(b) motion.

*Montco*, 666 F.2d at 760.  Although notice of the proposed order was not strictly required by the

Bankruptcy Rules, the *Montco* court noted that "lack of notice is an appropriate consideration in

evaluating the reasonableness of the time at which the motion to vacate was made."  *Id.*  As in

*Montco*, the failure to disclose the Lock-Up Agreement and Swaps to the Creditors' Committee

demonstrates that any delay on the part of the Creditors' Committee was reasonable.

### III.    RULE 60(b) RELIEF WILL NOT IMPOSE UNDUE HARDSHIP ON THE PARTIES

Applying Rule 60(b)(1) and Rule 60(b), generally, many courts analyze whether vacating

the judgment in question will prejudice or impose undue hardship on the non-moving parties.

*Kotlicky*, 817 F.2d at 9; *Katz*, 2012 WL 263462, at *4; *Sec. Pac. Mortg. & Real Estate Servs.,

Inc. v. Herald Ctr. Ltd.*, 731 F. Supp. 605, 610 (S.D.N.Y. 1990).  This condition lends itself more

appropriately to evaluating default judgments, when the non-moving party, through no fault of

its own, loses the benefit of a favorable judgment.

In this case, it is the Creditors' Committee that lost the opportunity to challenge the Lock-

Up Agreement and the Swaps through no fault of its own.  Moreover, the Noteholders are – at

least in part and in collaboration with Old GM employees and advisors who now work for New

29

GM[84] – responsible for the failure to disclose the Lock-Up Agreement and Swaps.[85]  The

Noteholders supported limited disclosure of the Lock-Up Agreement and Consent Fee because

they did not want the agreement to be subject to genuine scrutiny.[86]  Thus, unlike review of a

default judgment where the nonmoving party innocently loses the benefit of a favorable

judgment, Defendants here supported the lack of disclosure which serves as the basis for the

Rule 60(b) relief.

Also, none of the parties will be prejudiced if the Court grants the Motion because the

GUC Trust is seeking a narrow modification of the Sale Order only as to the Lock-Up

Agreement and Swaps, and transfer of certain avoidance actions.  Defendants cannot argue they

will be prejudiced by these modifications because the evidence at trial shows that, months after

entry of the Sale Order, Defendants themselves were not aware that the Lock-Up Agreement had

been assumed and assigned.[87]  Similarly, the parties did not always think that the Swaps had

been assumed and assigned to New GM.[88]  Thus, Defendants cannot argue that they relied on the

---

[84]    Along with the Noteholders, current employees of New GM also had a hand in the failure to disclose, and New GM has benefitted from the Lock-Up Agreement.  Dan Ammann, the former outside financial advisor for Old GM and Lawrence Buonomo, a former Old GM employee, are both now employed by New GM and both knew of the inadequate disclosures made by Old GM in June 2009.  *See* Buonomo Tr. 132:12-15, 132:22-133:1 (Aug. 10, 2012); Ammann Tr. 87:6-8 (Sept. 27, 2012).

[85]    *See* Truong Tr. 36:20-24 (Sept. 20, 2012) (Truong of Fortress had an opportunity to, and did, comment on the June 1, 2009 8-K); Buonomo Tr. 138:25-139: 4 (Aug. 9, 2012) (Gropper of Aurelius reviewed the Form 8-K before it was filed).

[86]    *See* Pl. Ex. 3 (Prieto Notebook) at AUR_GM021457 ("[T]he money is in a trust account in Canada where it is being held for the deal – does not think that money will be attackable where it is now ….."); Zirinsky Tr. 38:15-18 (Aug. 8, 2012) ("[W]e wanted to be comfortable that the way this transaction was going to be structured would do so, would do it in the right way so that there wouldn't be any potential attack.").

[87]    *See* Pl. Ex. 153 (November 18, 2009 email from Buonomo to Zirinsky attaching letter that purported to "confirm" that New GM assumed the rights and obligations of Old GM under the Lock-Up Agreement).

[88]    *See* Pl. Ex. 248 (July 27, 2009 email from Prieto to Gropper, "there was an internal debate at GM at around the time of the settlement as to whether the swap claim would be included in the wind-up claim" and "apparently there is a view that [the] swap claim is not included when calculating the wind-up

30

assumption and assignment of the Lock-Up Agreement and Swaps if the evidence shows that, when the Sale Order was entered (and for months after), they did not believe that those acts had occurred.

Thus, New GM and the Noteholders will not suffer undue hardship if the limited Rule 60(b) relief is granted.

### NOTICE

Notice of this Motion has been provided to the parties in interest in accordance with the Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rules 1015(c) and 9007 establishing Notice and Case Management Procedures, dated May 5, 2011.[89]  The GUC Trust submits that such notice is sufficient and no other or further notice need be provided.

Although this relief was first requested on July 2, 2010, this matter has not previously been presented to this Court for adjudication.

---

claim") at AUR_GM039690-R (05-2012); Pl. Ex. 22 (July 30, 2009 email from Buonomo to Prieto stating: "I inquired with Weil Gotshal, which reminded me that inasmuch as the Swap was not assigned this decision rests with Motors Liquidation Company (Oldco), which apparently has it under review.") at AUR_GM021994.

[89]      Bankr. Dkt. No. 10183.

## CONCLUSION

WHEREFORE, the GUC Trust respectfully requests that the Court enter an order

granting the Motion for relief under Rule 60(b), and granting such other and further relief as this

Court deems just and proper

Dated:         New York, New York            Respectfully submitted,
               May 3, 2013

                                             By: /s/ Eric B. Fisher_____
                                                  Barry N. Seidel
                                                  Eric B. Fisher
                                                  Katie L. Weinstein
                                                  Mary Kim (admitted *pro hac vice*)
                                                  DICKSTEIN SHAPIRO LLP
                                             1633 Broadway
                                             New York, New York 10019-6708
                                             Telephone: (212) 277-6500
                                             Facsimile: (212) 277-6501

                                             *Counsel for the Motors Liquidation
                                             Company GUC Trust*