# EXHIBIT A

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 09-50026(REG)

4    Adv. Case No. 12-09802(REG)

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    GENERAL MOTORS CORPORATION,

9

10             Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   MOTORS LIQUIDATION COMPANY GUC TRUST,

14                 Plaintiff,

15           v.

16   APPALOSSA INVESTMENT LIMITED,

17                 Defendant.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20                 U.S. Bankruptcy Court

21                 One Bowling Green

22                 New York, New York

23

24                 July 19, 2012

25                 10:52 AM

Page 2

1    B E F O R E :

2    HON ROBERT E. GERBER

3    U.S. BANKRUPTCY JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12-09302-reg   Doc 143   Filed 07/24/12   Entered 07/26/12 09:44:36   Main Document
Pg 4 of 109

Page 3

1    Hearing re:  Motion for Summary Judgement re: Nova Scotia

2

3    Hearing re:  On the Record Conference

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

```
 1   A P P E A R A N C E S :

 2   KING & SPALDING

 3        Attorneys for the Debtors

 4        1185 Avenue of the Americas

 5        New York, NY 10036-4003

 6

 7   BY:  ARTHUR J. STEINBERG, ESQ.

 8        SCOTT DAVIDSON, ESQ.

 9

10   DICKSTEIN SHAPIRO LLP

11        Attorneys for the GUC Trust

12        1633 Broadway

13        New York, NY 10019-6708

14

15   BY:  ERIC B. FISHER, ESQ.

16        KATIE L. COOPERMAN, ESQ.

17        BARRY N. SEIDEL, ESQ.

18        STEFANIE BIRBROWER GREER, ESQ.

19

20

21

22

23

24

25
```

```
 1   GREENBERG TRAURIG, LLP
 2        Attorneys for the Noteholders
 3        MetLife Building
 4        200 Park Avenue
 5        New York, NY 10166
 6
 7   BY:  BRUCE R. ZIRINSKY, ESQ.
 8        JOHN H. BAE, ESQ.
 9        GARY D. TICOLL, ESQ.
10
11   GREENBERG TRAURIG, LLP
12        Attorneys for the Noteholders
13        77 West Wacker Drive, Suite 2500
14        Chicago, IL 60601
15
16   BY:  BEVIN M. BRENNAN, ESQ.
17
18   AKIN GUMP STRAUSS HAUER & FELD LLP
19        Attorney for Nova Scotia Trustee
20        One Bryant Park
21        New York, NY 10036-6745
22
23   BY:  SEAN E. O'DONNELL, ESQ.
24
25
```

1    CURTIS, MALLETT-PREVOST, COLT & MOSLE LLP

2         Attorneys for the Paulson & Company Noteholders

3         101 Park Avenue

4         New York, NY 10178-0016

5

6    BY:  STEVEN REISMAN, ESQ.

7         THERESA A. FOUNDY, ESQ.

8

9    PAUL HATINGS

10        75 East 55th Street

11        New York, NY 10022

12

13   BY:  BARRY G. SHER, ESQ.

14

15   BROWN RUDNICK LLP

16        Seven Times Square

17        New York, NY 10036

18

19   BY:  DANIEL J. SAVAL, ESQ.

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2         THE COURT:  Have seats everybody.

 3         All right, we're here on the New GM summary

 4    judgment motion.  I will hear argument on 60(b) relief and

 5    on anything that is relevant to that aspect of the request.

 6    That was the one and only thing for which I authorized a

 7    summary judgment motion to be made.

 8         I want both sides to focus principally on ripeness

 9    issues and the extent to which I should be deciding this now

10    when I don't know whether the GUC Trust is actually going to

11    be asking me for 60(b) relief, and if so, exactly what it's

12    going ask me to do, and how and what it's going to want me

13    to do in the way of modifying the earlier 363 order or

14    anything else.

15         Mr. Steinberg, when it's your turn, I want you to

16    focus incident to the ripeness issue on whether you dispute

17    that the ripeness doctrine applies.  I take it that you

18    don't dispute that there is a ripeness doctrine, that it

19    applies not just in declaratory judgment actions, but in

20    general to any matter in the federal courts to which

21    Article 3 applies, and your real point is that although is

22    such a doctrine you think that your matter is ripe.  I'll

23    need you to flesh that out.

24         Mr. Fisher, when it's your turn I need you to

25    either confirm or explain otherwise that the matter of
```

```
 1   whether you need 60(b) relief is still entirely in the air

 2   or can or should I assume that in one way or another you're

 3   still going to be asking for it.

 4          I also need you to tell me the extent to which

 5   we're only talking about one kind of a 60(b) motion or

 6   whether the nature of any 60(b) relief your request may turn

 7   on further developments later in the case.

 8          Another question that occurred to me, Mr. Fisher,

 9   since it seems that you don't need 60(b) relief today or

10   next week or three weeks from now, is why you didn't simply

11   dismiss without prejudice the request for the 60(b) relief

12   to bring it on again?  Is that because of the one-year

13   deadline for bringing a 60(b) motion or is it for some

14   different reason?  I guess at this point I would need to

15   approve a voluntary dismissal, but I have a need for

16   clarification in that regard.

17          Also I need both sides to discuss the underlying

18   issues to the extent of getting my arms around how they

19   could or would moot the need for 60(b) relief, and how or

20   why it is that people believe there are no issues of fact on

21   that.

22          I'm also troubled by this void/avoidable

23   distinction which seems to have at least some conflict in

24   the cases if you compare the decisions by Fred Block in the

25   Eastern District, albeit in a very different factual
```

1   context, and by Jim Marlar in Phoenix.

2           I think it goes without saying that over the -- I

3   guess it's 42 years now that I've been out of school, I've

4   seen a zillion cases in which reorganized debtors decided

5   not to bring preference actions which are avoidable

6   transfers in their discretion because they don't want to

7   kill their vendor community, and those are plainly voidable

8   and not void, but I wonder if unauthorized post-petition

9   transactions should be in the same category or not, and

10  whether judges should be helpless to remedy unauthorized

11  post-petition transfers, assuming of course they're

12  established, and I very well understand that there's a

13  zillion issues of fact associated with that, when they see

14  them on their watch.

15          All right, I'll hear first from you,

16  Mr. Steinberg.  Main lectern, please.

17          MR. STEINBERG:  Good morning, Your Honor, Arthur

18  Steinberg from King & Spalding on behalf of the purchaser,

19  New General Motors.

20          I'm very cognizant of your questions.  The

21  admonition that you made at the prior pretrial conference as

22  to what you thought the -- you had approved for the filing

23  the summary judgment motion, and I'd like to very much stay

24  on point with regard to responding to each of your

25  questions; however, one of the arguments that we made and

09-50026-reg Doc 12419-1 Filed 07/24/12 Entered 07/24/12 16:48:06 Exhibit A
Pg 11 of 110

1    some of the questions that you've asked today relates to the

2    fact that I do believe that the Rule 60(b) relief is ripe,

3    and the reason is because I believe that the issues that

4    lead you to the 60(b) relief are issues where there are no

5    genuine issues of material fact in dispute, and therefore

6    you ultimately have to get to the Rule 60(b) relief.

7            I also believe that it's ripe because for all the

8    reasons why Judge Sweet, when he handled the appeal of the

9    sale order, talked about equitable mootness doctrine and the

10   need to address these types of issues, which could affect

11   the sale, and Judge Sweet in that appeal also dealt with the

12   issue, which is very ripe, in connection with this motion

13   about the inability to selectively strike provisions of a

14   sale order and try to keep the rest of the sale order in

15   tact.

16           Judge -- Judge Sweet said the opposite when was

17   urged by the bondholders, and cited Second Circuit

18   precedence, and you just could not do that.

19           And then he cited the equitable mootness doctrine

20   because New GM had, as Your Honor had found, a Section

21   363(m) filing that they were a good faith purchaser, and

22   therefore the rights that they acquired under the MSPA, the

23   master sale and purchase agreement, could not be avoided as

24   long as they contacted in good faith.

25           That was the law of -- that is the law of this

Page 11

1   case and that was established years ago already.

2         The further that you delay addressing the issue of

3   whether the sale order could be modified in any way is a

4   further prejudice to everybody who is --

5         THE COURT: Are you contending that Bob Sweet or I

6   for that matter focused on matters of which I was totally

7   ignorant at the time that I entered the sale order? Or are

8   you suggesting, contrary to my memory, that in those three

9   days of the trial on the 363 hearing or in the briefs that

10   accompanied it that I was told that Old GM had entered into

11   a lock-up agreement, that I was informed of its terms, that

12   I was told that the debtor had agreed to make a payment of

13   about 367 million bucks to a select number of creditors, or

14   that it agreed to the allowance of some $2 billion odd in

15   claims, albeit as I understand the lock-up agreement only to

16   the extent authorized by law?

17         MR. STEINBERG: Well, Your Honor, I want to be

18   very careful here, because I am New General Motor's counsel,

19   and I was not the person to try to push this through Your

20   Honor, and I was not the counsel of record handling this on

21   behalf of Old GM in June of 2009. So I am not privy to

22   whatever you may have been told, and I -- I've not carefully

23   studied transcripts or anything that was done in chambers,

24   conferences off the record. So I have -- I'm incapable of

25   answers that.

Page 12

1          I will say with regard to Judge Sweet that he set

2    forth a proposition that you cannot selectively strike the

3    sale order, you can strike selective provisions of the sale

4    order, that it's either an all or nothing type of

5    proposition, and he did refer to Second Circuit opinion on

6    that in the context of an appeal and not a 60(b) motion, but

7    it was in the context of an appeal.

8          As to what was in the public record whether people

9    had actually said to Your Honor anything about it, but what

10   was in the public record was the 8-K that was filed on

11   June 1, prepared by Old GM's counsel, a securities filing,

12   which described all of the material terms of the lock-up

13   agreement.  That was --

14          THE COURT:  Do you think that there's a duty on

15   the part of judges with 363 cases on their watch, or for

16   that matter Chapter 11 cases on their watch, to go foraging

17   outside the matters that lawyers put before them to put

18   themselves on notice of facts that they should think about

19   as to whether one bunch of creditors got an advantage over

20   the remainder of the creditor community?

21          MR. STEINBERG:  Your Honor, these are excellent

22   questions, and I hope I can give you some excellent answers

23   as well too.

24          There are many judges who feel that their jobs as

25   judges are to do balls and strikes, which is that issues are

12-09302-reg    Doc 143-1    Filed 07/05/13    Entered 07/05/13 14:36:46    Main Document
Pg 13 of 109

Page 13

1    presented and they're supposed to decide those issues.

2            The issues relating to the lock-up agreement were

3    in the public arena, they were made known to the people who

4    would otherwise bring it to your attention if they thought

5    there was a problem.  The debtor's counsel is probably the

6    most experienced debtor counsel in the nation having handled

7    a plethora of cases.  If they thought in the context of what

8    was going on in the Old GM bankruptcy case that this

9    particular issue had to be brought to your attention I'm

10   sure that they would have done it, and they certainly

11   operate all of their large cases with the play book of being

12   open and notorious of everything that was going on.

13           I mean to tell you, Your Honor, that there was no

14   attempt, and that's clear from the record, that there was no

15   attempt to hide anything from the public arena, whether or

16   not someone should have specifically referred it to Your

17   Honor, but there was no attempt to hide it in the public

18   arena, and I say that for five things that were done in the

19   public arena before the sale order was entered, some of

20   which was actually before Your Honor.  And I don't have a

21   record of the transcript to say whether anybody particularly

22   focused on it, but my guess is, is that no one focused on it

23   to be able to tell Your Honor.

24           But I actually don't think that that is not

25   surprising.  Because -- and I know I'm already off script,

Page 14

1    but I'm trying to be responsive to your questions.  When

2    asked at his deposition the committee counsel, when asked

3    the question about whether he, as the committee counsel,

4    focused on GM Canada situation, whether that was a focus for

5    him to be able to look at, and obviously if it was a focus

6    for him he would bring it to your attention if he thought

7    that there was something wrong.  He answered, and we did

8    cite his deposition answer in our reply, and that is a

9    statement of undisputed fact in connection with the summary

10   judgment motion.  He said:

11           "Because the basic deal was that we got equity

12   securities representing 20 percent of New GM and remanaged

13   to negotiate for an adversary proceeding against the term

14   lenders and enough cash to get us through the case and that

15   was it.  And everything else went to New GM or the DIP

16   lenders, and the unsecured creditors never saw any of it.

17           So whatever GM Canada had -- would not have come

18   to our -- would not have registered to our register or radar

19   screen.  It was so unimportant with everything else we had

20   to worry about."

21           So what normally happens in the case is that you

22   make sure that the parties who are evaluating the sale

23   transaction are given the information to be able to evaluate

24   it, and then if there are issues that are raised in

25   connection with that information it's incumbent on those

1    people to raise those issues to Your Honor so that Your

2    Honor could rule on it.  No one expects Your Honor to be in

3    the same position as the advocates, the professionals who

4    are working on a transaction.  Your Honor is really I think

5    supposed to decide issues that are raised where there are a

6    problem.

7            So when someone files an 8-K on the day of the

8    bankruptcy filing, calls it a material and definitive

9    agreement, and then discloses all of the terms of the lock-

10    up agreement in that securities filing, and that securities

11    filing is reviewed by the creditors' committee, and the

12    creditors' committee calls it a standard form of diligence

13    to look at that type of information, then the information is

14    in the arena.  No one is quarreling about that at all.  And

15    four days later the schedules to the asset purchase

16    agreement are delivered to the creditors' committee, and

17    those schedules themselves specifically describe issues

18    relating to the lock-up agreement.  It's there in front if

19    there's an issue that's involved.

20            I'll leave aside the fact that the issue about the

21    lock-up agreement was published in the Financial Times, you

22    know, whether -- whether people are -- can rely on

23    publication for purposes of due process notice is an issue

24    that comes up in bar date notices, I just point it out that

25    it was there.

12-09802-reg    Doc 143    Filed 07/24/12    Entered 07/28/12 18:36:48    Main Document
Pg 17 of 110

1          The lock-up agreement was also specifically

2     mentioned in file before Your Honor in connection with the

3     amendment to the debtor-in-possession agreement.  It

4     specifically refers to the lock-up agreement and says that

5     the DIP lenders, who are the governments here, are not going

6     to call a default if Nova Scotia Finance files a bankruptcy

7     proceeding.

8          The schedules that were delivered to the committee

9     specifically say that -- that as far as ordinary course

10    business transactions GM -- Old GM could do whatever it

11    wants.  With things that are not necessarily in the ordinary

12    course of business they can't do what they want without

13    notifying the purchaser or the governments, unless it's on a

14    schedule, Schedule 6.2.  Schedule 6.2, given to the

15    creditors' committee, specifically says do everything that

16    are otherwise required in Canada that relates to

17    consummating the lock-up agreement.

18          So -- and then the one thing that happened before

19    just to round out the five items, was that prior to the

20    bankruptcy filing you had an S-4, a bond exchange offer.

21    The bond exchange was not just for the U.S. bonds, it was a

22    bond exchange actually for GM Nova Scotia as well too.  It

23    was a joint bond exchange offer.  The bond exchange offer

24    has a description of the Nova Scotia bonds, and even has a

25    discussion about what happens if it fails and then you may

Page 17

```
 1   have a GM Nova Scotia bankruptcy proceeding and the prospect

 2   of in effect a deficiency claim as well as a guarantee claim

 3   being asserted against Old GM.

 4            That S-4, which was published, was given to the

 5   indenture trustees who are on the creditors' committee, was

 6   reviewed by committee counsel as well too.

 7            So -- so to get back to Your Honor's question, if

 8   the S-4 describes the Nova Scotia bond situation and the day

 9   of the bankruptcy filing there's an 8-K that talks about the

10   definitive agreement, it describes all the terms of the

11   lock-up agreement, and four days later you're giving the

12   committee the disclosure schedules which describe the lock-

13   up agreement, and you're publishing in the Financial Times,

14   and you're also providing for amendments in a DIP agreement

15   which specifically refer to the words lock-up agreement,

16   then I think that that was -- that's not an issue of

17   connecting the dots, that's an issue of being right in front

18   of the committee, where a committee who has acknowledged

19   that they didn't care about the issue, that they weren't

20   looking at the issue.  And that certainly is relevant for a

21   Rule 60(b) motion.

22            Because if you -- if you were given the

23   information and your turned in effect a blind eye, you

24   didn't care about it then you don't have a basis to argue

25   about it later on.
```

12-09802-reg Doc 143-1 Filed 07/24/12 Entered 07/25/12 09:44:36 Main Document
Pg 19 of 109

```
 1              Now, we also cite to the fact that after the sale

 2     order in August of 2009 the New GM files an 8-K which

 3     actually attaches the lock-up agreement.  That was of

 4     record.  And we also say that the interim report was filed

 5     on August 7th, 2009 at the request of the U.S. Trustee to

 6     basically say what went on and what's left to be doing in

 7     the case.  That interim report also references a specific

 8     discussion about the lock-up agreement.

 9              Both of those things, the interim report and the

10     8-K filed by New GM were reviewed by committee counsel and

11     they were told they were important documents for them to

12     review.  If the committee counsel didn't raise those issues

13     with you when having been presented to it before the sale

14     order or even shortly after the sale order then the question

15     is, is -- should someone have --

16              THE COURT:  Well, the sale order was entered on or

17     about July 7, 2009; am I correct?

18              MR. STEINBERG:  That's correct, Your Honor.

19              THE COURT:  Now some of the events that you're

20     talking about took place before that time and several took

21     place after; am I correct?

22              MR. STEINBERG:  That's correct.  Five before, two

23     after, that's what I've described so far.

24              THE COURT:  Go on.

25              MR. STEINBERG:  The -- the other thing, just to
```

Page 19

1   put it on the table as it relates to the Rule 60B issue and

2   whether it -- whether there -- whether this was a timely

3   time issue, is that the -- Mr. Mayer was the (indiscernible

4   - 01:28:45), the committee counsel from Kramer Levin.  He

5   said, I didn't understand anything until October of 2009

6   until he was asked questions by myself and by the

7   noteholder's side.  And in those questionings he ended up

8   saying, yes, I understand -- I understand that there were

9   Nova Scotia notes.  I knew that before the sale order.  Yes,

10  I knew about the issue about two types of claims, the

11  guaranteed claim and the deficiency claim, because I

12  represent on the other side, I have a noteholder signing

13  Calpine (ph), and I actually understood the issue of

14  unlimited liability companies and I knew the prospect of it.

15  He didn't say whether he had reviewed the S-4, which also

16  talked about that as well.

17          And then he was asked this specific question, you

18  know, you represent Orelius (ph) in other matters, right?

19  So do you remember talking to Dan Gropper (ph) of Orelius

20  about the Nova Scotia bonds in July of 2009?  And he said,

21  you know what, I guess I do remember, I had a conversation

22  about it.  And he says you know what Mr. Gropper told me, he

23  told about the good deal that Orelius got on the Nova Scotia

24  bonds.

25          So that's just the facts.  October 2009 they could

 1    -- they can postulate that they didn't know the world until

 2    that point in time, but they knew about the world before

 3    then for sure.  Whether it happened before the sale or not

 4    they knew about it for sure before then, and they were given

 5    all the information before the sale and they purposely

 6    chose, they made the decision, they chose not to look at it.

 7              Now, Your Honor's question said, do you think I

 8    should know about whether the estate is funding money, large

 9    sums of monies to preferred bondholders?  And I think that

10    that's the consent fee type issue I and need to sort of

11    address that head on so Your Honor understands the

12    perspective of what happened in this case, and then Your

13    Honor could accept it or not.

14              The money that was paid for the consent fee was

15    the compromise of the intercompany loan that was between GM

16    Canada and GM Nova Scotia, both of them are non-debtors.

17    The money that was given to GM Canada to fund that

18    obligation was given on May 29th.  It was given purposely

19    before --

20              THE COURT:  The 450 million bucks?

21              MR. STEINBERG:  That's correct.  That $450 million

22    loan was made to GM Canada before the bankruptcy, it was

23    made with the consent of the governments and with the

24    knowledge of the governments, and it was made for the

25    possibility that if a deal was cut with the noteholders over

1    the weekend before June 1 that there would be money at GM

2    Canada to consummate that deal.  $450 million I guess was

3    the outside specter of what they were prepared to do.  If

4    not GM Canada was going to file a parallel proceeding as the

5    U.S. proceeding on June 1.

6           The governments have said that the world had to --

7    you had to have some solution by June 1.  And when the bond

8    exchange offer failed on May 26th then Old GM knew that the

9    only thing it could do is to do a 363 sale, that was the

10    only chance of survivability.

11           And the question was when that happened on

12    May 26th, would they have to file any other debtors at the

13    same time?

14           At that time GM Canada had one major issue that

15    had been left unresolved.  It had other issues in May that

16    it was trying to deal with, but the one major issue was the

17    intercompany loan from Nova Scotia Finance to GM Canada.  If

18    that couldn't be resolved then GM Canada was going to file

19    on June 1 at the same time and they would try to do parallel

20    363 sales of the GM Canada assets and the U.S. assets.

21           And remember, the DIP lenders are not just the

22    U.S. government, they are the Canadian government, and the

23    Canadian government, for lots of reasons, didn't want GM

24    Canada to file for bankruptcy if the price was right and

25    then they could afford not to do that.

```
 1          So the money for the payment of the consent fee

 2     was part and put as a loan, an interest bearing loan, to GM

 3     Canada on May 29th, before the bankruptcy.

 4          So as of the bankruptcy filing date that money was

 5     not property of the estate, that money was GM Canada's

 6     money, a non-debtor entity.

 7          And there is an issue which is not a genuine issue

 8     of material fact in dispute.  The reality is, is that loan,

 9     that $450 million loan was repaid by GM Canada, and was

10     repaid by GM Canada before the sale.  It was GM Canada, not

11     Old GM, who paid for the satisfaction of that intercompany

12     loan.  It came out of -- it's their coffers, not Old GM

13     coffers, didn't affect the GUC Trust constituency at all.

14          In the reply to the summary judgment motion the

15     GUC Trust tries to take issue with that.  We had produced

16     the receipts.  Right, I mean it should be obvious, either

17     you paid something or you didn't pay something.  We had

18     produced the receipts showing that it was repaid prior to

19     the bankruptcy filing.  They said, you know what, I draw an

20     issue about that, I dispute it because in that interim

21     report that I referred to in August there was a one-page

22     exhibit to the interim report which tracks something called

23     receipts, receipts obtained by Old GM for the period June 1

24     to June 10th.  But when you look at what was the definition

25     of receipts, what they were trying to capture by that sheet
```

1    it did not involve repayments on intercompany loans, it

2    essentially referred to payments made from outside sources.

3            So therefore there is nothing to dispute the fact

4    that the loan was repaid, and that was GM Canada satisfying

5    that obligation.

6            Now the -- you've raised the issue and you wanted

7    me to respond to the void/voidable issue, and I will agree

8    with you, I thought I knew the answer before, I actually

9    tried to read some more of the cases, and the cases are not

10   consistent.

11           549 cases I think are pretty consistent.  549

12   cases say it's voidable, not void.

13           363 cases raise the specter as to whether it is

14   void ab initio, and 362 cases talk about it being void ab

15   initio.

16           THE COURT:  549 offenses are a lot more series

17   than 547 preferences.

18           When I was a practicing lawyer, maybe I was an

19   irresponsible one, I used to counsel my clients that it was

20   okay to take a preference, but I would never in 1,000 years

21   have told a client that it was okay to take an unauthorized

22   post-petition transfer.

23           MR. STEINBERG:  Oh, I agree with that, Your Honor.

24   But there are -- there are I think three or four responses I

25   have to Your Honor to that particular point.

1          First, there was no 549 violation if you agree

2     with me that it was GM Canada who was paying the obligation.

3     The loan --

4          THE COURT:  Well, Mr. Fisher, if he's going to

5     tell me the same thing orally that he told me in his brief

6     is going to say that he has a couple of answers to that.

7     One, his contention, which I assume is hotly disputed, that

8     the lock-up agreement itself was a post-petition transfer,

9     but also that collapsing doctrine is respected in the Second

10    Circuit, and then he points out a number of things,

11    including the 450 million buck loan being conditioned on the

12    premise that funds be used solely to settle the Nova Scotia

13    obligation on the notes and the similarity between the 367

14    million going in and out of the escrow.

15          Those look like things that walk and talk and

16    quake his contentions of fact with which I assume you're

17    going to differ.

18          MR. STEINBERG:  Yeah, but I think there are issues

19    that make that actually ripe for Your Honor's determination

20    right now, and if I can I'd like to address each one of

21    those issues.

22          THE COURT:  Well, do you dispute that collapsing

23    doctrine under appropriate circumstances be you used in the

24    Second Circuit?

25          MR. STEINBERG:  Your Honor, I agree that the --

1    that there is such a thing as a collapsing doctrine and it

2    is relevant law in the Second Circuit, but I will add, Your

3    Honor, that the collapsing doctrine has zero application if

4    the actual transfer was repaid.  There's nothing to collapse

5    at that time and there's no damage at that point in time,

6    and that's why it's so central for Your Honor to make the

7    factual determination, which is not in dispute, that the

8    consent fee was paid -- that the now -- the $450 million

9    loan was repaid, and repaid before the bankruptcy -- before

10   the sale order.

11          If that happens what is the damage to Old GM?  It

12   made a loan and it got repaid.  What are you collapsing?

13   What's the avoidable transfer?  There is none.

14          So I can say to Your Honor that there is a concept

15   of collapsing, but if the facts don't match up it's an

16   irrelevancy, and that's what I'm saying to Your Honor today,

17   it is an irrelevancy for the one fact that makes it

18   difference in this case.

19          I will also say to Your Honor that -- that it's

20   not -- it's not unusual in the context of these cases when

21   you're faced with a 363 sale and you're trying to act very

22   quickly and it's a very, very important case of national

23   interest, that Your Honor signed a cash management order in

24   this case, and the cash management order essentially try to

25   keep business as usual between Old GM and New GM.

```
 1          You authorized Old GM, which was in some respects

 2    the central back of all its (indiscernible - 01:39:20) of

 3    all its subsidiaries and make transfers as appropriate to

 4    its non-debtor subsidiaries.

 5          If this was a post-petition transfer they could

 6    have paid the consent fee in order to keep GM Canada out of

 7    bankruptcy.  They could have funded all of their non-debtor

 8    entities for purposes of trying to keep those entities out

 9    of bankruptcy if it was in their business judgment.

10          Under the purchase order they were never going to

11    do that without the consent of the governments, because the

12    governments had covenant protections on that both in the

13    master MSPA and the DIP loan agreement.

14          So there was an automatic check on their ability

15    to do that, but the governments said yes.

16          And the reason why that's relevant is that the

17    governments, who became the owner of New GM -- the primary

18    owners of New GM -- all bought cash.

19          So that is another argument that we make in our

20    case, which is since New GM bought the cash this was their

21    decision about how to spend their money for purposes of

22    doing the acquisition.

23          If the $450 million loan would not have been made

24    that cash would have gone to New GM.  It could have then

25    done the same transaction a month later.  If the receivable
```

Page 27

1   had not been repaid, the $450 million loan was made but not

2   repaid, New GM would have bought that receivable and kept

3   that obligation.

4           And the issue about that there was strings

5   attached to the money.  It was clearly documented as a loan.

6   The people involved in this transaction, when you talk about

7   candor to Your Honor about whether you should take a post-

8   petition transfer or not, they documented this as a loan,

9   they believed that this was GM Canada's money.

10          There were some strings attached to that, but that

11  just meant that there were contractual rights that Old GM

12  could have exercised against it wholly-owned subsidiary if

13  it chose to in order to try to bring back the money earlier

14  rather than later.

15          It chose not to do that because it was

16  effectuating an agreement that had the approval of the

17  governments, that was included in the disclosure schedules

18  as to what they needed to do to keep old -- GM Canada out of

19  bankruptcy so they could accomplish their 363 sale without

20  the detriment of trying to run two paralegal proceedings at

21  the same time and trying to have coordinations between a

22  Canadian judge and Your Honor and how to effectuate that

23  within a very short period of time.

24          They had the ability under the cash management

25  order to make this post-petition if they had wanted to, but

1    it happened prepetition any way, and they had the ability

2    that it was end of the day New GM's money, not anybody

3    else's money that was making the decision.

4           And these -- these noteholders -- and I know Your

5    Honor has -- has recognized the fact that -- that sometimes

6    when I talk it sounds like I'm the noteholders talking as

7    well too, and I don't -- I don't hide from that fact for a

8    particular reason, and I'd like to be able to explain that.

9           The reason why this lock-up agreement -- the

10   reason why this lock-up agreement is so important to New GM

11   -- forget about the noteholders -- why it's important to New

12   GM is because there's a release of the intercompany loan to

13   GM Canada, which is their wholly-owned subsidiary.

14          The structure of their 363 acquisition, what they

15   were trying to do, was to see whether I could get Canada

16   without have been to file a Canadian insolvency proceeding.

17   They needed to get that release done in order not to have

18   the parallel proceeding.

19          The attack on the lock-up agreement, whether it's

20   prepetition or post-petition, has really very, very little

21   to do with a claims objection.  The reason why I say that is

22   that the lock-up agreement by its terms does not constitute

23   the allowance of the noteholder's claims or the deficiency

24   claim.  It says it's going to be allowed to the fullest

25   extent permitted by law.  It preserved objections by

Page 29

1    somebody to be able to go to Your Honor.  That was clear

2    from the -- from the discovery here, the request was made by

3    the noteholders to have it deemed allowance.  And Weil

4    Gotshal and Old GM people properly said, I can't do that, I

5    can't bind a circumstance like that.  We'll support you.

6    We'll support you.  We think you have good grounds for the

7    support, but we can't bind anybody, it wouldn't be binding

8    any way, so take it for what it is.

9              So the lock-up agreement itself does not

10   constitute the allowance of the claims.  The lock-up

11   agreement itself doesn't even create the claims.  The

12   guaranteed claim was created in 2003, pursuant to a

13   guarantee instrument that was signed, and the deficiency

14   claim was created by the fact that Nova Scotia is an

15   unlimited liability company, it's inherent with that claim,

16   and the swaps that were -- the swap issue came because New

17   GM bought the swaps as part of the MSPA, as part of the

18   asset purchase agreement.  It's not part of the lock-up

19   agreement.

20             So why do you -- why do you attack the lock-up

21   agreement in the context of a claims objection?  It's the

22   reason why Mr. Venaski (ph) testified at his definition,

23   Mr. Venaski being the GUC Trust administrator, the guy from

24   Wilmington Trust.  And this is -- this an undisputed fact as

25   well too as part of our summary judgment motion.  He says,

Page 30

 1    we're going after the release that GM Canada got.  We want

 2    these noteholders to go against GM Canada, we don't want

 3    them to go against the funds in the GUC Trust, that's why

 4    they're doing it.

 5            Now, the intercompany loan settlement is a

 6    bilateral settlement, right?  Because you have Nova Scotia

 7    Finance on one side, GM Canada is on the other side.  Both

 8    sides to that settlement want to see the settlement

 9    preserved.

10            The Nova Scotia Finance side is the Nova Scotia

11    trustee and indirectly the noteholders, they have that

12    aligned interest that New GM has.  New GM, as the purchaser

13    of GM Canada, wants to see that preserved.  Their structure

14    was three years ago to acquire GM Canada and not be saddled

15    by this intercompany loan of a billion three Canadian.

16            The reason why I've been such an active

17    participate in this case, why you've heard my voice

18    sometimes when you didn't want to hear my voice, was because

19    I'm trying to preserve for this purchaser, this good-faith

20    purchaser who structured a deal that they didn't have to

21    file a Canadian filing, that that intercompany release is --

22    that that intercompany loan release is preserved.  That's

23    the primary reason why the lock-up agreement is such a

24    central focus in the claims objection, and that's why the

25    primary focuses that it's New GM more than anybody else who

```
 1    wants to make sure that that doesn't happen.  And it's New

 2    GM who says that when you deal with Rule 60(b) relief when

 3    you'd want to sit there and say 2.7 years since the sale

 4    order and push it off even further to leave this issue

 5    outstanding, and New GM has been saying for two years the

 6    issue should not be left outstanding.

 7            Each day that you leave it outstanding you make it

 8    even more emphatic why the equitable mootness doctrine

 9    applies.

10            And it is kind of shocking that someone sits there

11    and wants to attach nefarious motives to Old GM -- not New

12    GM -- Old GM as to how they conducted this case when they

13    put the information all out in the public arena and put the

14    information to the creditors' committee, and the creditors'

15    committee chose at that time not to deal with it.  And even

16    if they tried to deal with it there was nothing to be dealt

17    with.

18            And Your Honor has raised the issues about the --

19    the loan that was made to sort of -- to summarize it, the

20    loan was made prebankruptcy, the loan proceeds were GM

21    Canada's proceeds, GM Canada took actions after the filing.

22    GM Canada wasn't in bankruptcy to effectuate an intercompany

23    settlement that involved its assets.  It ended up repaying

24    that loan to Old GM so Old GM was never hurt at all, and the

25    person who could have been hurt was not the unsecured
```

12-09802-reg Doc 143-4 Filed 07/24/12 Entered 07/26/12 09:44:36 Main Document
Pg 33 of 109

1    creditors in this case, it was New GM who could have been

2    potentially hurt, but it was never going to be hurt.

3           Because the issue of whether -- when you buy a

4    company and you have as part of a conglomerate change a

5    wholly-owned subsidiary, whether your cash is sitting in

6    your wholly-owned subsidiary or whether you're upstreaming

7    the cash to the parent company which you bought both, it

8    really doesn't change the consolidated value of the entity

9    that you bought.  You just decide to keep the cash there or

10    not cash there.  For whatever reasons GM Canada repaid the

11    loan before the sale.

12           I think the reason that was given to me, it's not

13    in the record, I'll just throw it out, it was an interest

14    bearing loan.  GM Canada didn't want to -- didn't want to

15    incur the interest if it ultimately had the cash to repay

16    the loan.

17           And why -- why didn't they just pay it off

18    original, why did they need the loan from Old GM?  Is that

19    because in the uncertain chartered waters that everybody was

20    facing on May 29th you didn't know what was going to happen

21    in the Old GM bankruptcy, you didn't know whether GM Canada

22    was going to end up having to file for bankruptcy, and you

23    needed to preserve some cash at the GM Canada side to be

24    able to deal with circumstances in running a business.

25           So -- and by the way, the notion that GM Canada's

12-09302-reg   Doc 143-1   Filed 07/24/12   Entered 07/28/12 09:44:36   Main Document
Pg 34 of 109

Page 33

 1    creditors were treated differently than Old GM's creditors

 2    is true.  You know, GM Canada wasn't in bankruptcy, GM

 3    Canada wasn't governed by the U.S. Bankruptcy Code, it

 4    wasn't governed by the plan.  By definition non-debtor

 5    foreign subsidiaries sometimes treat their creditors

 6    differently.  Why?  One that they're allowed to.  But the

 7    other why is because those parties have different

 8    contractual rights and different obligations than -- than

 9    the creditors on the U.S. side.  It's just -- it's just the

10    fundamental truth that's involved there.  And that's what

11    happened here.

12              The noteholders in this case, they had the benefit

13    of having a claim against GM Nova Scotia as well as a claim

14    against Old GM.

15              It is not much different than some -- you know,

16    when I -- and when I was involved in Enron I represented the

17    examiner and they were always dealing with the issue whether

18    the Enron North America creditor, who had a guarantee from

19    Enron Corp., should be entitled to get a greater

20    distribution than the -- than the direct creditors of Enron

21    Corp., whether substantive consolidation should apply or

22    not, they had claims against two borrowers, and they argued

23    that they should be able to -- be able to collect from both

24    borrowers, which would give them a greater recovery.

25              In this case they're not both governed by a U.S.

1  proceeding, but they both had different contractual rights.

2  The U.S. bondholders didn't have those rights, and that was

3  the fundamental issue that the governments and the New GM

4  had to face when doing the acquisition.  Do I want to

5  effectuate a repayment to the noteholders, which would free

6  up GM Canada from filing for bankruptcy and provide for a

7  more expedient and clearer path for Old GM to reorganize,

8  and is it worth it from New GM's perspective, from the

9  governments perspective to buy that kind of surety, to buy

10  that kind of certainty?  Was it worth it?

11         They made the business decision, and it wasn't a

12  decision made by Old GM or New GM, it was a decision made

13  primarily by the people who controlled the checkbook.  It

14  was ultimately approved by the governments.  Canadian and

15  U.S., both who was funding the loan and the sale.  They made

16  the decision this is the way we wanted to go.  This is the

17  structure that we wanted to go.

18         Now, I wish with the benefit of hindsight I was

19  their special counsel and on June 2 I could have said to you

20  this is what we're doing, and be able to tell Your Honor

21  that this is what we're doing so Your Honor would have been

22  able to see this and would have foreclosed every type of

23  opportunity.

24         No one raised the issue, no one thought that it

25  was -- it was an issue that needed to be presented because

1    they thought they had dealt with it in a certain way, a way

2    where GM Canada was dealing with its own fiscal

3    responsibilities and that GM Canada was facilitating.  But

4    there clearly -- there clearly was no attempt to hide it.

5           And even though I'm not the person who was the

6    orchestrator or the person who had the disclosures, I have

7    the utmost respect to Old GM's counsel, and they clearly

8    understood what they were doing.  They put it in a

9    securities filing.  The market reacted to what had happened

10   there, the price of the noteholder bonds went up

11   significantly because of this deal.  The market knew right

12   away what was going on.  The disclosures that happened in

13   this case knew what was going on.  Every opportunity that

14   there was a disclosure that was going on.

15          It's kind of funny when you look at the papers and

16   you see what was the -- what was the fallibility of the 8-K

17   on June 1?  What did the -- what did the GUC Trust say was

18   wrong?  What should have been the grade of disclosure?  What

19   was the underlying issue that leads to what they tried to

20   argue on Tuesday was the insider trading issue?  What was

21   the things that were omitted?  Two things, only two things

22   that they said.

23          One, that there was no disclosure that Old GM had

24   lent the money to GM Canada, it was a statement that GM

25   Canada was paying the consent fee.  There was clearly a

1    disclosure that the consent fee was paid.  There was clearly

2    a disclosure that the noteholders were going to get a

3    consent fee and it wasn't going to reduce the amount of the

4    debt.  That was in the 8-K.  That information was there, it

5    was out in the public arena, everybody understood that.  But

6    he said we should have disclosed that this emanated from an

7    original loan from Old GM as for purposes of the lack of

8    disclosure.

9             My simple answer to that was, I disagree with

10   that, I think he's wrong, but I don't even pretend to be a

11   securities lawyer, I'll just say it simply, four days later

12   in the disclosure --

13            THE COURT:  Well, I used to be a securities lawyer

14   and we had a doctrine then, unless they've done away with it

15   in the 25 years since I did so much of this, you call it

16   half truths, and you are not allowed, or at least you used

17   to not be allowed until 10(b)(5) to state facts without

18   additionally stating facts necessary to make those facts

19   that had been stated not misleading.  That may be a

20   paraphrase, it was a while ago, for the last 20, 25 years

21   I've been doing bankruptcy, but I remembered that principal.

22            And I'm not saying that Old GM violated the 34 Act

23   or made a false 8-K filing or a false filing of any sort,

24   but what I am saying is that half truths aren't whole

25   truths, and certain facts that Old GM gave out $450 million

1    for the purpose, as least one of the exhibits your opponent

2    puts forward, of funding the $367 million consent fee might

3    in the view of some be necessary to clarify a statement that

4    otherwise suggests that GM Canada was the source of that

5    money.

6            MR. STEINBERG:  Well, Your Honor, I think what you

7    said about the half truths sounds true.  So while not a

8    securities lawyer and only knowing a little to be dangerous

9    I'm not even going to try to quibble with what your memory

10    is.

11            The thing -- the point that I was going to try to

12    make was that four days later in the disclosure schedules

13    that were sent over in connection with the MSPA it was

14    disclosed in the disclosure schedules that Old GM had made

15    the $450 million loan to GM Canada.  So that information was

16    made known to the creditors' committee right away.

17            Well, we can leave it for somebody else, it's not

18    going to be part of this trial whether the fact that that

19    information wasn't in an 8-K was in any way relevant to a --

20    to the noteholders as to whether what this transaction was

21    about.  But the $450 million loan from Old GM to GM Canada

22    was disclosed in the disclosure schedules on June 5th.

23            So my simple answer to you on that first point

24    which they talked about the infirmity is it was there, they

25    knew about it.  Whether anybody thought that it was

Page 38

1    important or not, you've already heard from Mr. Mayer's

2    testimony he didn't think anything about GM Canada was

3    important.

4           The second thing that they said was the infirmity

5    in the 8-K, just to put it on the table, was that they

6    believed that Old GM was going to facilitate Nova Scotia

7    Finance's bankruptcy filing which would then make it easier

8    to assert a deficiency claim and that should have been

9    disclosed that Old GM was going to facilitate it, not oppose

10    it.

11           And my simple answer to that was the 8-K referred

12    to the deficiency claim.  The deficiency claim comes up in

13    the context of a Nova Scotia Finance bankruptcy filing.

14           The S-4 that was filed before and also in the

15    public arena talked about the unlimited liability company

16    nature of this and that it could be asserted in a deficiency

17    claim.

18           The notes themselves had a default if Old GM filed

19    for bankruptcy.  These notes then would automatically be in

20    default and the noteholders have the ability to put Nova

21    Scotia Finance into bankruptcy any way.

22           The -- those issues about whether an entity -- and

23    by the way it was GM Nova Scotia, not Old GM that consented

24    to the filing.

25           So those are the only two things of all the things

1    in the lock-up agreement that they've identified was

2    deficient in the 8-K.  Everything else was disclosed.

3    Everything else was open and notorious as the material

4    definitive agreement entered into on day one of the

5    bankruptcy petition.

6           Now they try to argue that, you know, all right,

7    you made all these disclosures, but ah ha, you didn't make

8    these disclosures in certain areas and therefore we gotcha.

9    And so they point to the schedules and said you didn't

10   describe the $450 million loan in your schedules.  And the

11   reason why is that the schedules say they're not tracking in

12   the schedules intercompany loans.  So whatever they thought

13   was the gotcha wasn't applicable.

14          They say that you didn't put in the fact that Nova

15   Scotia Finance should be one of the 50 largest unsecured

16   creditors in the case in the context of filing a petition.

17   Well, okay, but you're not supposed to list insiders and

18   affiliates, so you weren't going to list that any way.

19          The fact of the matter is they're grasping at

20   straws to try to -- to basically deflect the attention from

21   the fact that it was all there.  It was all there and they

22   knew about it.

23          And Your Honor, when you -- when you -- when you

24   said that -- in response to the half truth about is it

25   relevant that Old GM gave the money to GM Canada?  In the

1   public filings made to Your Honor where they explain the

2   cash management system they explain that Old GM was sort of

3   like the central bank and it gave out its monies to its

4   subsidiaries as needed and when needed for purposes of their

5   operations.  That -- that wasn't anything that was really

6   hidden.  And I'm assuming while not being there that the

7   motion papers probably explain that in a sufficient way, and

8   they got authorization to make transfers to their non-debtor

9   subsidiaries, including GM Canada.

10          So -- so I believe that -- that there was nothing

11  that was wrong.

12          I'd like to -- I appreciate very much, Your Honor,

13  the opportunity for you to let me talk.  I'd like to now

14  specifically go to the 60(b) issues and why I think they're

15  ripe and what's involved here, because I don't think I've

16  touched on all the issues.

17          The -- on the 60(b) issues.  First as a general

18  matter they don't say what ground under Rule 60 that they're

19  moving under.  Right?  They throw out it could be (1), (2),

20  (3), or (6), but they never try to say what it is about (1).

21  (2), (3), or (6) that are applicable.

22          If you move under (1), (2), or (3) you

23  automatically have taken yourself out and moving under

24  60(b)(6).  60(b)(6) is your catch-all, which you can't use

25  if you're moving under specific grounds.

1          The -- the only thing they really say after just

2     listing the sections that these are exceptional

3     circumstances.

4          It is a little like the 2008 election when

5     President Obama now, and Obama would say I'm for change, but

6     never answered what the change was that he was for.  He was

7     just for change.

8          In this particular case they're citing exceptional

9     circumstances, but they're not saying what the exceptional

10    circumstances are.

11         And I think I've cited to you about Judge Sweet's

12    decision about you can't selectively move to strike

13    provisions of a sale order, that it's -- that the -- in the

14    context of a sale it is all or nothing.

15         And I think it's important to look at what it is

16    specifically that they're trying to obviate under Rule 60.

17    There are two grounds.

18         One is assuming the lock-up agreement is

19    considered a purchase contract.  And I think our papers

20    clearly demonstrate why it's a purchase contract.  Well, it

21    was validly assigned to New GM.  And I think our papers

22    clearly show why it was validly assigned to New GM.  Should

23    the provisions of the sale order approving the MSPA be

24    stricken to the extent required to eliminate the provisions?

25         And without trying to repeat all the things in our

12-09802-reg   Doc 146   Filed 07/24/12   Entered 07/26/12 09:44:36   Main Document
Pg 42 of 109

Page 42

1   papers as to why we had established that it was a purchase

2   contract and why it was a valid assignment, on the executory

3   contract side the lock-up agreement is clearly put into the

4   database as being assigned.  It clearly says I'm assigning

5   it.

6           And while the notice didn't immediately go out to

7   the noteholders, we attached in our summary judgment papers

8   the letters that Mr. Benamo (ph) from New GM gave to

9   Mr. Zirinsky saying the lock-up agreement has been assigned

10  to you, and Mr. Zirinsky's continual representations

11  throughout this proceeding that he recognizes that the lock-

12  up agreement has been assigned to us -- assigned to the

13  noteholders.

14          So there is no doubt that the lock-up agreement

15  was designated as an executory contract, was assigned, and

16  no one has questioned it.

17          And by the way, the committee has no standing to

18  object to an executory contract issue.  The committee did

19  not have notice of what was an executory contract.  The

20  committee did not have access to the database.  And the

21  committee negotiated the terms upon which that was to

22  happen.  And the reason for that was a logical base.

23          New GM was taking every asset that it wanted to

24  take.  So they wanted to take an asset they were going to

25  take the asset.  The only person they had to deal with was

Page 43

1   the counterparty to the contract.  And if the counterparty

2   was going to oppose it then they would oppose it.  If not

3   they were going to take it.  If it wasn't even a good asset

4   but it was more of akin to a liability but New GM wanted to

5   take it any way, God bless from the estate's viewpoint, they

6   just relieved the estate of a liability.  That's why the

7   committee took themselves out of this -- this circumstance.

8          They don't have standing.  Not having access to

9   the database, not having access to notice, they don't have

10  standing to object to the assignment of the lock-up

11  agreement.  The only party who had standing to do that were

12  the noteholders, the parties of the lock-up agreement, they

13  chose not to.  They chose to accept it.

14          The other thing is that we say it's a purchase

15  contract because -- and as I've argued before, Your Honor,

16  on other issues relating to the MSPA -- it's a purchase

17  contract, because it's not an excluded contract.  It doesn't

18  meet the definitions of excluded contracts.  Purchase

19  contracts are a broader term than executory contracts.  The

20  people who drafted this MSPA did a belt and suspenders

21  approach.  I'll have something called purchase contract,

22  I'll have something called executory contracts.  Executory

23  contracts aren't even 365 definition executory contracts.

24  It's anything that we designate as potentially being

25  executory as a manifestation of our intent that we want to

1   have it assigned to us, and that's what happened here.  And

2   that process of designating contracts and assigning it to

3   New GM had no time limit.  It wasn't like I had to do it by

4   two months three months, four months from now, it had no

5   time limit to do that at all.

6           So on the first 60(b) issue is that we clearly

7   establish that under the MSPA the lock-up agreement was

8   assigned to us.  That's why they need to have the 60(b)

9   release, because they want to say forget what we agreed to

10  before, forget that we don't -- you know, forget that they

11  originally understood that we didn't have standing, we don't

12  like it.

13          And by the way, just so it's clear, what's the

14  significance -- what's the significance of the fact that

15  this is assigned to us as -- assigned purchase contract?  It

16  takes away the prepetition/post-petition issue clearly.

17  Because purchase contracts are prepetition and post-petition

18  agreements.  It doesn't matter.  When Old GM filled it was

19  an ongoing business, it was entering into contracts every

20  day.  So anything that was designated as something that they

21  wanted to take over they were going to take it.  It was

22  going to be -- it didn't matter whether it's preopposed.

23          So if the lock-up agreement is a purchase

24  contract, if the lock-up agreement is an assigned executory

25  contract it doesn't matter whether this was a prepetition or

Page 45

1    a post-petition agreement.  It was assigned to New GM.  New

2    GM took what the responsibles are, and what those

3    responsibilities are, as limited as they are on, an ongoing

4    basis it's the cooperation provision, the cooperation

5    provision, which would have kept me in the tenth row of this

6    argument letting someone else talk if not for the fact that

7    they're going after the release given on the intercompany

8    loan which affects GM Canada.

9              So the first issue that they talk about --

10             THE COURT:  Mr. Steinberg, you've been going on

11   for over an hour now.  Are you going to get to ripeness?

12             MR. STEINBERG:  Uh-huh.  Yeah.

13             THE COURT:  Please.

14             MR. STEINBERG:  Okay.  The ripeness issue is that

15   when you move for 60(b) relief there's not an issue as to

16   whether it's provisional or not.  You have to move.  You

17   found grounds for it, you have to move.  Otherwise you're

18   faced with what is here already, which is the equitable

19   doctrine.  If they felt there was a need to act because they

20   were facing a one-year statute of limitations because they

21   were moving under 60(b)(1), (2), or (3), they had to move

22   that and move that on the agenda immediately, not defer this

23   for two years and say to Your Honor take a wait and see

24   approach and defer it even further.

25             All the grounds and all the basis for why you have

```
 1    equitable mootness when you have a plan that's been

 2    substantially consummated and thousands of transactions that

 3    are predicated upon the 363 sale structure, you have to move

 4    to upset it if you want to upset it, and do it now, not

 5    before.

 6              The reality is they can't do what they're trying

 7    to do.  The reality is that they can't do that.

 8              And why it's appropriate for summary judgment is

 9    because if Your Honor agrees with the issues that I've

10    raised in the summary judgment you will have taken this

11    trial and you will have cut it by more than 50 percent and

12    you will have eliminated more than 50 percent of the

13    witnesses in this case.  And that's the reason why people

14    have moved for summary judgment.  That's the reason why it's

15    ripe to deal with that issue now.

16              And, you know, I know that what I've said today in

17    my -- in my more than an hour has touched on issues that are

18    part of the trial, and the reason why if I can remember the

19    childhood refrain, and my kids are old enough that my memory

20    is a little saggy on this, but you know, the knee bone is

21    attached to the ankle bone, the ankle bone is attached to

22    the foot bone.  You know, things are connected.  Issues in

23    cases are connected.  My job here is to try the make this to

24    cut out the knee and the ankle and to make this an issue

25    about the foot, because the knee and ankle pertain to me,
```

1   and there are no genuine issues of disputed material facts

2   that are involved here.  That's why it's ripe to be decided

3   now.

4          The notion that you could put off 60(b) relief

5   indefinitely on the grounds that maybe you don't need it.

6   You definitely need it.  I've established the grounds that

7   you need it.  And you can't get it.  And you might as well

8   get rid of it so you can have a streamline trial instead of

9   taking Your Honor's time for three weeks when this should be

10   a four-day trial.

11          Because if I'm right that a purchase contract and

12   assigned executory contract means that the prepetition/post-

13   petition distinction of when the lock-up agreement was

14   signed doesn't matter then you don't -- then you've

15   eliminated witnesses, you've eliminated half of the direct

16   testimony on everybody in this case.

17          So -- so that's the reason why it's ripe for Your

18   Honor to deal with it for purposes of economy, for purposes

19   of the judicial policy on summary judgment, and for purposes

20   that it's ripe right now.

21          The other grounds that they're moving for

22   eliminating the -- the 60(b) relief is that assuming the

23   swaps of purchased assets were validly assigned to New GM

24   should the provisions of the sale order approving the MSPA

25   be stricken to the extent required to eliminate those

12-09802-reg    Doc 143    Filed 07/24/12    Entered 07/26/12 09:44:36    Main Document
Pg 48 of 109

Page 48

1    provisions.  And in our papers we establish that we

2    designated the ISDA (ph), the October 15, 2001 ISDA for an

3    assignment to the executory contract, and we attached the

4    confirmations which say in 2003 that that confirmation is

5    being entered into pursuant to the 2001 ISDA, that this is

6    an integrated agreement and it'll constitute one

7    transaction.  This was assigned.  The only party who could

8    object to that is the Nova Scotia Finance trustee.  He's not

9    objected to it, he's accepted the fact that New GM owns the

10   swaps.

11           These issues are before Your Honor because there

12   are no genuine issues of material fact.  They're wrong, I'm

13   right, they haven't presented any reason to suggest that I'm

14   wrong.  Anything that's genuine, that is material, that's

15   disputed, and therefore the 60(b) issues are ripe before,

16   and I think it's appropriate to get rid of them so that this

17   case moves forward.

18           And I think it's incumbent when you have this type

19   of issue, this overlay that you need to get rid of it.

20           The -- Your Honor, I'm not sure -- Your Honor, I'm

21   not sure if I've answered all of your questions.  If I have

22   not answered your questions I -- if you could remind me then

23   I would like to do it now.  If I have done that and you've

24   heard enough of me for now then I'm proceeded to cede the

25   platform.

1          I probably had some other things to talk about,

2     but if I look at my script I probably could figure out

3     whether they were taken or not.

4          So if you don't have any other questions I'm

5     prepared to --

6          THE COURT:  I think it's time to hear from

7     Mr. Fisher.

8          MR. FISHER:  Your Honor, Eric Fisher from

9     Dickstein Shapiro for the GUC Trust.

10         There's a manner in which this motion has become a

11    motion about everything, and I'm sure that Mr. Steinberg and

12    I could go back and forth all day about all of the

13    underlying facts in the case, and I'm not going to spend my

14    argument time doing that, Your Honor.  I'd like to focus in

15    very quickly on the 60(b) relief issue and on the questions

16    that Your Honor asked at the outset.

17         In July 2010 as part of our initial objection in

18    this case we indicated that we were asserting and reserving

19    our rights to pursue 60(b) relief protectively.  That's the

20    word that we used.  And we also made clear in the objection

21    that in the event that we needed to pursue 60(b) relief that

22    relief -- retried to make that relief as limited as

23    possible.

24         What the Second Circuit has said about Rule 60(b),

25    "Is that it strikes a balance between serving the ends of

 1    justice and preserving the finality of judgments and should

 2    be broadly construed to do substantial justice."

 3              So what's at stake when Your Honor deals with

 4    60(b) issues are two competing policy concerns.  One, the

 5    finality of judgments, and the other doing substantial

 6    justice.

 7              We actually had tried to proceed in a way that

 8    respects both of those objectives and respects that balance.

 9              The reason that we asserted 60(b) protectively is

10    because what we were saying is if we do not need relief from

11    the sale order we won't pull the trigger on that.  We

12    respect that wherever possible judgments should be treated

13    as final.

14              The reason why we felt compelled nonetheless to

15    include a request like that for relief in our initial

16    objection back in July 2010 is because we were concerned

17    that the demands of justice may require that we pull the

18    trigger on that relief.  That's exactly why we're in the

19    situation that we're in right now.

20              Your Honor asked is the request for 60(b) relief

21    still quote "Up in the air"?  Yes, it is.  The reason that

22    it is, is because we're actually more confident now than we

23    were back in July 2010 that we likely won't need any relief

24    from the sale order because of what we've learned in

25    discovery.

1           Before you get to the question of whether it's

2     necessary to provide relief from the sale order you need to

3     construe the sale order.

4           So at the heart of this is the question of whether

5     the sale order constitutes this Court's approval of the

6     assumption and assignment of the lock-up agreement.

7           For example, that's one question at stake.  If the

8     sale order is not construed to mean that the lock-up

9     agreement was assumed and assigned to New GM then at least

10    with regard to that issue we don't need relief from the sale

11    order.

12          And so at trial we're going to set out to prove

13    that the lock-up agreement is void because it's a post-

14    petition agreement.  If it's a void then it wasn't assumed

15    or assigned and it's not otherwise a purchase contract.

16          We're also going to set out to show that even if

17    it were a prepetition agreement it wasn't validly assumed

18    and assigned because of non-compliance with the assumption

19    and assignment procedures order.

20          All of these facts are we're going to show at

21    trial.  And if we prevail that the lock-up agreement was not

22    properly assumed and assigned then we won't need relief from

23    the sale order with regard to that issue.

24          Similarly with regard to the swaps.  At trial

25    we're going to show that the swaps were not properly assumed

```
 1    and assumed to New GM.  If we can show that we won't need

 2    relief from the sale order with regard to any issue

 3    concerning the swaps.

 4           So it's only when Your Honor gets to the end of

 5    the trial that Your Honor will even need to consider whether

 6    relief from the sale order is necessary.  And that's why

 7    when we say that this issue is premature or this issue is

 8    not ripe I think there's two components to that.  There's a

 9    legal component.  We're saying legally this is something

10    we've asserted, but we're not now seeking that relief.  And

11    so at the moment as a legal matter the issue is not ripe.

12           But I think we're also saying that prudentially

13    and pragmatically that this is an issue that the Court may

14    never need to reach, and if the Court may never need to

15    reach it why reach it now, particularly since as is apparent

16    from Mr. Steinberg argument in order to reach it Your Honor

17    needs to wade your way through almost all of the facts in

18    the case.

19           Mr. Steinberg said that if Your Honor takes 60(b)

20    out of the case and rules now that this was a prepetition

21    agreement that was validly assumed and assigned then 50

22    percent of the witnesses go away.  Yes, 50 percent of the

23    witnesses go away because Mr. Steinberg has set up his

24    summary judgment motion, which was supposed to be about

25    limited issues, in a way that tries to cover everything and
```

1    tries to get this Court to decide now that this was a

2    prepetition agreement validly assumed and assigned in order

3    to force our hand on Rule 60(b).

4           If New GM wanted to be respectful about the

5    finality of that judgment it wouldn't try to force any hand

6    when we're here saying we may not need relief from the sale

7    order.  It just doesn't make any sense.

8           In terms of the relief that we're seeking under

9    Rule 60(b).  Well, 60(b) provides:

10          "On motion and just terms the Court may relieve a

11   party or its legal representative from a final judgment,

12   order, or proceeding for the following reasons."

13          And there are four different sub-provisions of

14   Rule 60(b) that we think would apply here.

15          The first is mistake.  Because, Your Honor, if the

16   lock-up agreement -- if the sale order is read to mean that

17   the lock-up agreement was validly assumed by Old GM and

18   assigned to New GM, then we respectfully submit that the

19   sale order is mistaken, and that Your Honor didn't have a

20   record on which to make any findings about the lock-up

21   agreement, whether it was prepetition or post-petition,

22   whether it was subject -- whether it was executory or non-

23   executory, whether the funds that were used were property of

24   Old GM or property of GM Canada, there simply was no record.

25          I don't think that there's any question that this

1   agreement is monumentally important to the unsecured

2   creditors of Old GM, and obviously monumentally to the

3   noteholders who stand to get a windfall if the lock-up

4   agreement is applied in accordance with its terms.

5           So if the order is read to mean that the lock-up

6   agreement was a valid prepetition agreement that was validly

7   assumed and assigned to New GM then we respectfully submit

8   that the sale order in that narrow regard is mistaken and

9   would seek relief from this portion of a sale order that

10  achieves that result.

11          But again, Your Honor, we don't think that's the

12  proper reading of the sale order.  We actually think the

13  evidence will show that it wasn't validly assumed and

14  assigned so therefore the sale order is no obstacle to the

15  relief that the GUC Trust is seeking.

16          So that's Why we've been careful to preserve our

17  rights under 60(b)(1), but also not to pull the trigger.

18          Another ground listed in 60(b)(1) is excusable

19  neglect.  Mr. Steinberg says there was disclosure out there,

20  the creditors' committee knew about the lock-up agreement,

21  if they wanted to litigate the lock-up agreement the time to

22  litigate the lock-up agreement was before the sale order was

23  approved.

24          Well, the reason why these disclosure issues take

25  us down this factual rabbit hole, is because in order for

1    Your Honor to decide whether the disclosure was fair and

2    appropriate and complete -- and by the way we're not talking

3    about the standards of the securities laws, we're talking

4    about was it complete enough to put the creditors' committee

5    on notice that there was a major transaction happening that

6    had a major impact on the unsecured creditors of Old GM?

7    That's the disclosure standard.  I'm not quibbling with

8    securities filings.  We're taking fundamental issue with the

9    question of whether the creditors' committee and also

10   whether this Court had fair notice of what this lock-up

11   agreement transaction was all about.

12            And no matter what -- certainly I could go in and

13   out of each of the disclosures that Mr. Steinberg mentioned,

14   but fundamentally what was not disclosed was that Old GM was

15   the source of funds for the payment of this $367 million

16   consent fee, that there was a $450 million wire transfer on

17   Friday, May 29th, and that that wire transfer to a GM Canada

18   account was pursuant to a trust agreement, and if the terms

19   of the trust agreement were not satisfied under the trust

20   agreement the money reverted to Old GM.  And the trust

21   agreement terms on June 1 were not satisfied.  And the trust

22   agreement was modified post-petition on two different

23   occasions because the condition was not satisfied.

24            Those facts were not disclosed.  And certainly

25   those facts wouldn't need to be disclosed in the securities

1    filing, but those facts would need to be disclosed to the

2    creditors' committee or certainly to this Court in

3    connection with -- if anyone thought that Your Honor's sale

4    order was approval of the lock-up agreement at a minimum the

5    fact that $450 million of Old GM's money was moving into an

6    account pursuant to a trust agreement, the conditions of

7    which were not satisfied as of GM's filing of its bankruptcy

8    petition, was certainly a fact that Your Honor should have

9    been apprised of, if Your Honor was being asked to approve

10   the lock-up agreement in connection with the sale order.

11            THE COURT:  Mr. Fisher, you haven't yet used the

12   word surprise, which also appears in 60(b)(1).

13            As my questions to Mr. Steinberg indicated, the

14   idea that my sale order was approving in all of this was a

15   surprise to me.  And he may not have been at the trial, but

16   I was.  Surprise is subject to double entendre.

17            But how in your view does the fact that I was

18   ignorant of all of this bear on 60(b) relief, if in fact I

19   get to the merits of 60(b) relief today?

20            MR. FISHER:  If Your Honor was not aware of the

21   critical facts concerning the lock-up agreement, and Your

22   Honor is now being told by New GM and the noteholder parties

23   that Your Honor's sale order in effect led to the assumption

24   and assignment of the lock-up agreement, then Your Honor, I

25   see it more under the mistake rubric than under the surprise

```
 1    rubric, because I don't know that surprise is directed at

 2    the Court so much as the parties, but mistake certainly is

 3    just directed at the judgment itself.

 4              So Your Honor is saying that certainly by

 5    approving the sale it wasn't your intent to approve the

 6    lock-up agreement.  They're saying that while in effect the

 7    sale order does that.  Then I would say, Your Honor, that if

 8    they're right about their reading of Your Honor's order then

 9    the order is mistaken.  And that's why I think it fits more

10    comfortably under that -- under that rubric.

11              Surprise and excusable neglect I think applies to

12    the fact that the creditors' committee did not -- was not

13    aware of the significance of this transaction for Old GM's

14    creditors.

15              No matter -- no matter what the disclosure was the

16    significance of this transaction for Old GM's creditors was

17    not something that the creditors' committee was aware of.

18    And Mr. Mayer, creditors' committee's counsel, has been

19    referred to a number of times by Mr. Steinberg.  When

20    Mr. Mayer said that they weren't -- that the creditors'

21    committee wasn't focusing on Canada, when his deposition

22    transcript is seen in context, it's very clear that what

23    he's saying is we didn't know that there would be anything

24    going on over there that would have a very dramatic effect

25    on the constituency that we were looking to represent,
```

1    namely the unsecured creditors of Old GM.  That's all he

2    meant.  There was no intent to look the other way and let

3    this lock-up agreement get through and then come back a year

4    later and challenge the lock-up agreement.

5              The idea that the creditors' committee

6    deliberately looked the other way and now it should be

7    punished and not allowed to challenge the lock-up agreement,

8    that's absolutely false.

9              I thought that New GM was making a sort of knew or

10   should have known argument.  And there I say that even under

11   a should have known standard this disclosure does not

12   disclose the critical facts that a creditors' committee

13   would want to know, and those critical facts did not come to

14   light until there was sort of the full heat of adversarial

15   discovery directed at the circumstances of this transaction.

16             What -- one thing that Mr. Mayer did testify to in

17   his deposition was -- and this is about the 8-K -- he said

18   that the idea that the lock-up agreement quote "was the kind

19   of transaction that we would have expected to have received

20   formal notice and Court approval of and we didn't consider

21   the filing of an 8-K with a summary of the transaction

22   without a description of its entire nature to be sufficient

23   to in any way put us on notice of something we should have

24   known earlier.  It was in the nature of you have got to be

25   kidding.  You got a $2.8 billion claim allowed and the

1    blessing of a massive avoidance actions cash transfer days

2    before the case and we were supposed to divine that an act

3    on an -- divine that and act on an 8-K without you guys

4    going to court?"  Close quote.

5          Of all the disclosure that happened with regard to

6    the lock-up agreement -- all the disclosure that supposedly

7    happened, but really isn't very good disclosure at all --

8    the one place you really would have expected to find some

9    discussion of a lock-up agreement is in the motion to

10   approve the sale order.

11         In the proceedings before Your Honor to approve

12   the sale order this was a deal that involved the transfer of

13   $450 million from Old GM on the eve of bankruptcy that we

14   think we're going to be able to show at trial actually still

15   -- that money still belonged to Old GM as of the date of the

16   bankruptcy.

17         It involved an agreement that we think we're going

18   to be able to show at trial wasn't finalized until after the

19   GM bankruptcy petition.

20         You'd think at a minimum, even if it were just as

21   exercise of caution, there would have been some description

22   of this transaction to Your Honor.  Even if everyone really

23   believed that this was all done and tied up with a bow

24   prepetition you would have thought that Your Honor would

25   have been apprised of this -- of this -- of this agreement.

1      The creditors' committee wasn't apprised of it,

2   aside from what if perhaps should have been known.  And by

3   the way, there's no evidence that the creditors' committee

4   actually knew.  Mr. -- Mr. Steinberg assumes that the

5   creditors' committee read the June 1 8-K because there are

6   time records indicating that in June lawyers at Kramer Levin

7   reviewed public filings related to this matter, but there's

8   no specific evidence that that particular 8-K was reviewed.

9      So we really are talking about should have known,

10  and we're talking about an environment in which the most

11  important things about the lock-up agreement when it comes

12  to the question of whether or not it's a valid agreement.

13  Those are the things that were not disclosed.

14     The amount of the consent fee, that was disclosed.

15     The fact that the consent fee doesn't apply

16  against the principal amount of the notes according to the

17  lock-up agreement, that was disclosed.

18     What wasn't disclosed was this massive wire

19  transfer on the eve of bankruptcy subject to the trust

20  agreement.

21     What also wasn't disclosed was the fact that --

22  that the -- in the June -- in the June 1 8-K there's no

23  discussion about the fact that Old GM had given its consent

24  to the post-petition bankruptcy filing of GM Nova Scotia

25  Finance Company, and that's what gave rise to this massive

12-09302-reg    Doc 146-4    Filed 07/24/12    Entered 07/24/12 16:36    Main Document
Pg 62 of 109

1    deficiency claim.

2          And whatever was said about the swap agreement

3    there was no discussion about the fact that ultimately this

4    swap agreement, which they claim the worth $564 million

5    would become a claim against the Old GM estate.

6          Getting back to Rule 60(b), Your Honor.  Under

7    (b)(2), 60(b) relief is appropriate when there's newly

8    discovered evidence that with reasonable diligence could not

9    have been discovered in time to move for a new trial under

10   Rule 59(b).

11         Here all of the evidence about the facts and

12   circumstances that we submit will show that this was a post-

13   petition agreement and therefore void were not facts that

14   anyone on the outside of this transaction knew or should

15   have known or could have reasonably discovered.  It has

16   taken many, many months and much thorough discovery to get

17   to the bottom of those facts and circumstances.

18         Similarly the trust agreement that I mentioned to

19   Your Honor, and that's the agreement that governed the wire

20   of cash, the $450 million of wire of cash from Old GM to GM

21   Canada, that agreement was not discussed in any public

22   filing.

23         The fact that the conditions under that agreement

24   were not satisfied was not discussed in any public filing.

25         And again, it's taken the Federal Rules of Civil

1    procedure to get to the bottom of those facts.

2           Three, fraud.  60(b)(3) allows for relief in the

3    event of fraud.  The cases are very clear it doesn't require

4    even bad faith.  So fraud here is generally bad disclosure.

5    And I think it's somewhat -- it's somewhat redundant of the

6    issues I've already discussed, but we think that that

7    applies.

8           And finally, Your Honor, 60(b)(6), any other

9    reason that justifies relief.

10          Mr. Steinberg is half right in that if Your Honor

11   finds that 60(b)(1), (2), or (3) apply then we're not also

12   entitled to relief under 60(b)(6).  60(b)(6) is the catch-

13   all.  But it's not true that you can't argue that you'd be

14   entitled to relief under (1), (2), (3), or (6), and that's

15   all we're arguing.

16          But again, it's unfortunate that I'm even arguing

17   that today, because I don't know that I need to argue that.

18   I don't know that we'll ever get to a place where we'll need

19   relief under Rule 60(b) from the sale order.  That depends

20   on what happens at trial.

21          Your Honor asked whether we've considered

22   dismissing the request for Rule 60(b) relief without

23   prejudice to renewing the request at some later date.  And

24   the reason we haven't is because -- again, because it could

25   affect the finality of that judgment.  We thought it was

1   important to get that request on the record and let the

2   public know about that request and the possibility for that

3   request before the one-year period from the sale order

4   judgment expired, and we wouldn't want to do anything to

5   create any impression that that's completely off the table

6   and that 60(b) relief may not in the future be an issue.

7           And you've heard from Mr. Steinberg, you know, he

8   accuses us of not moving fast enough.  He says we should

9   have -- we should have, you know, jumped at the 60(b)

10  relief, we should have pressed it perhaps by TRO, and we

11  didn't do that again out of respect for the finality of

12  judgments and out of the incredible uncertainty about what

13  the real facts surrounding this lock-up agreement were.

14          And it's somewhat inconsistent for New GM to argue

15  on the one hand that getting 60(b) relief would upset the

16  plan structure and on the other hand to try to force our

17  hand and make us ask for that relief when it may not be

18  necessary.

19          The idea that if the lock-up agreement were voided

20  or if the -- or if there were relief from the sale order

21  granted to find at least that the lock-up agreement had not

22  been assumed or assigned to New GM, that would not knock the

23  props out from under the sale transaction, Your Honor.

24          I'm not here to write some counter-history, but

25  the other way that this could have happened is there could

```
 1    have been fair disclosure about the lock-up agreement before
 2    the sale order was entered, the creditors' committee could
 3    have started to investigate it.  In all likelihood there's
 4    no way that that investigation could have been completed
 5    before the sale order had to be approved given the
 6    exigencies of the circumstances.  And so certainly one could
 7    imagine a situation where the ability to continue to
 8    investigate the lock-up agreement and bring such claims as
 9    may be necessary to get relief from the lock-up agreement
10    would simply be carved out of the sale order.
11            And in that circumstance, again, it's --
12            THE COURT:  By that you mean a clause like we're
13    so often asked to do in limited objections that would say
14    something like but nothing in this order shall be deemed to
15    be a finding as to whether or not it was assumed or assigned
16    or something of that sort?
17            MR. FISHER:  Exactly, Your Honor.
18            And so really what the 60(b) relief is about now
19    is if that had happened then 60(b) relief certainly would
20    not be necessary because the sale order would have been
21    written in a way that made crystal clear that it didn't have
22    a bearing on the lock-up agreement.
23            Because the sale order was not written that way,
24    because the lock-up agreement was not properly brought to
25    our attention, it was not brought to this Court's attention,
```

1    we're simply preserving our right to effectively have that

2    carve out now if it turns out that we need it.

3              On the topic of void and voidable.  Although I

4    think that's something of a side issue, I agree with

5    Mr. Steinberg that the 363 cases seem to be inconsistent.

6    Sometimes describing an act that violates 363 as void and

7    sometimes describing it as voidable.

8              But I think what New GM did not address is Rule

9    9019, which also applies here.

10             What the lock-up agreement did, among many other

11   things, is it settled litigation that was pending against

12   Old GM in Nova Scotia.  Litigation that was brought by the

13   group of noteholders that ultimately became party to the

14   lock-up agreement.

15             And so it was a settlement that if it's a post-

16   petition settlement, which is something that needs to await

17   trial, but if it's a post-petition settlement it's one that

18   required this Court's approval under Rule 9019.  And under

19   Rule 9019 it's simply not an agreement if this Court's

20   approval was not secure and had was necessary.

21             And so under 9019 I think it's very clear, even if

22   there's -- there are inconsistent cases that would need to

23   be dealt with under 363, under Rule 9019 I think it's very

24   clear that if we can show that the agreement is post-

25   petition it's void.

1          (Pause)

2               MR. FISHER:  There are so many factual points,

3     Your Honor, that I could respond to, and I'm happy to

4     respond to any factual questions that Your Honor finds --

5               THE COURT:  If there's anything that Mr. Steinberg

6     said that you think you need to take issue with you can, but

7     as I tried to indicate in my opens remarks I see this all

8     about whether 60(b)(6) is ripe for a decision now, and if it

9     is ripe whether there are issues of fact that would prohibit

10    me from deciding the 60(b)(6) issue today.

11              I don't want a preview of stuff that I think is

12    going to go on for days on and after August 7th.

13              MR. FISHER:  So just to respond to a couple of

14    points.

15              Mr. Steinberg said, well, of course the GM Nova

16    Scotia Finance creditors were treated better because

17    creditors of GM Canada -- could be treated better because GM

18    Canada never filed for bankruptcy.

19              Well, the Nova Scotia Finance noteholders are not

20    creditors of GM Canada, certainly not in any direct sense.

21    They are creditors of GM Nova Scotia Finance, which is a

22    wholly-owned subsidiary of Old GM.  And the reason that they

23    were treated better had nothing to do with GM Canada, it has

24    everything to do with the lock-up agreement.

25              I don't think the fact -- on the swaps.  This is

 1    just by way of example, and then I think I'll stop this

 2    point and counter-point, but the fact that Mr. Wedlake (ph),

 3    the GM Nova Scotia Finance trustee agrees and does not

 4    dispute that the swap claim was properly transferred to New

 5    GM is something that we are going to take issue with at

 6    trial by showing that Mr. Wedlake acts completely at the

 7    behest of the noteholders and solely for their benefit.  And

 8    so I don't think that his view on that is entitled to very

 9    much weight at all.

10         But again, that's the kind of issue that really

11    needs to await the trial of this matter.

12         To return to the questions that Your Honor asked

13    at the outset, we think that deciding Rule 60(b) now is not

14    ripe both as a matter of law, because we haven't pulled the

15    trigger on the 60(b) relief and we're saying we may never,

16    and so there's not a case or controversy.  But also as a

17    matter of prudence and pragmatism we don't think that it

18    makes sense to wade into all of the facts of this case to

19    decide an issue that may not need to be decided.

20         In the event that Your Honor does reach Rule 60(b)

21    we think that at the heart of the matter are these

22    disclosure issues, and that we don't think that these

23    disclosure issues can be resolved on summary judgment.

24    Because before Your Honor can decide whether the information

25    that was out there in the public was enough to put the

```
 1    creditors' committee on notice that this lock-up agreement

 2    is something they better take a look at and possibly

 3    challenge, Your Honor can't make a determination like that

 4    without first hearing the evidence and determining the

 5    facts.  Because without knowing the facts it's not possible

 6    to evaluate whether the disclosure is appropriate or not.

 7            We think the facts at trial will show that the

 8    disclosure, at least with regard to the most important

 9    issues that go to the very legitimacy of the lock-up

10    agreement, were not fairly disclosed in any public filing

11    that was made available to anyone on the creditors'

12    committees Your Honor.

13            THE COURT:  All right, thank you.

14            Mr. Steinberg, I'll take reply from you.  Much,

15    much shorter than your opening remarks and limited to what

16    we heard from Mr. Fisher.

17            MR. STEINBERG:  I appreciate that, Your Honor.

18            We cited in our papers In re: Teligent, 326 B.R.

19    219, a Judge Koeltl decision which raises issues as to

20    whether a GUC Trust who derives its power under a plan has

21    authority to vacate orders when the trust arrangement that's

22    set up -- that set up that trust didn't specifically provide

23    for that.  Their rights are derivative of what rights they

24    had under the plan.  They rights have challenged --

25            THE COURT:  Where did this contention come from
```

Page 69

1    either in your opening papers or anything we heard from

2    Mr. Fisher?  And this sounds new to me.

3              MR. STEINBERG:  We cited the Teligent case and

4    Judge Koeltl in our papers, and in preparing for this oral

5    argument I noticed that this argument existed.  I had it in

6    my original script to give it and it didn't (sic) able to

7    give it.  I thought it was important to give it to Your

8    Honor as to appropriate precedent.

9              THE COURT:  You're saying the GUC Trust doesn't

10   have standing to do what?

11             MR. STEINBERG:  To vacate orders.  In the Teligent

12   case it was a trust set up to assume voiding powers and they

13   were looking to vacate an assumption order, and Judge Koeltl

14   and Judge Bernstein both suggested that there was a strong

15   argument that they didn't have -- the estate representative

16   didn't have authority for that because their authority was

17   based on the documents that were derived through the plan

18   and the plan didn't give them that specific authority.

19             I give it to Your Honor for consideration for

20   whatever it's worth, but I wanted to be able to pass that to

21   Your Honor.

22             The -- Your Honor, just so it's clear, the

23   concepts of executory contracts and whether it's assumed or

24   assigned, that process took place after the sale order.

25   What was blessed by Your Honor as of the sale order was the

1   process upon which it was taking place.  No one was coming

2   to Your Honor for blessing any particular executory

3   contracts.  All they did was to bless the process, a process

4   which did not involve the creditors' committee, only

5   involved the Old GM, New GM, and the counterparty to the

6   executory contract.

7           Your Honor had raised the question about shouldn't

8   someone have said something to me about the $450 million

9   loan at the sale hearing?  Maybe or maybe not.  But the fact

10  remains is that that $450 million loan was repaid before the

11  sale hearing started.

12          So they could have been talking to you about a

13  historical fact, but the loan was actually repaid, and that

14  it was GM Canada who satisfied the obligation.

15          Mr. Fisher says that he was going to raise issues

16  at trial relating to whether the -- whether the lock-up

17  agreement was validly assigned because the notice was

18  deficient.  Well the fact of the matter is, is there's no

19  genuine issue of material fact about what happened here, and

20  the by-product of this being either a purchase contract or

21  an assignment of an executory contract is that the

22  prepetition/post-petition issue becomes irrelevant.  That's

23  the reason why it's being done.  A lock-up agreement itself

24  doesn't deal with claims.

25          Mr. Fisher raised Bankruptcy Rule 9019.  The fact

1    of the matter is there was a settlement that was made under

2    the lock-up agreement in favor of Old GM.  Old GM paid

3    nothing for that settlement.  So it got a gratuitous release

4    of a present action.  I don't think you need to bring a 9019

5    action for approval of a settlement where you're just the

6    beneficiary of a release but you're not actually paying

7    anything for the release.

8              The issue of 363 void/voidable, I think you just

9    really got to ask what is the use sale or lease of property

10   of the estate?  Nothing was leased, nothing was sold.

11   What's the use?  The use is the consent fee.  The consent

12   fee, we take the position, and the papers are in front of

13   Your Honor, that were a prepetition loan, the use was the --

14   of a non-debtor GM Canada to pay an amount to satisfy its

15   obligation and to -- and an obligation that it repaid.

16             So there is no -- I mean you can say there's an

17   issue between void/voidability on 363, but the reality is,

18   is that it doesn't apply, because there was no use of

19   property of the estate, it was GM Canada's property, and GM

20   Canada actually repaid their property, and if it was

21   anybody's money at the end of the day it was going to be New

22   GM's money, not anything that deals with the unsecured

23   creditors.

24             The -- Your Honor has all the information on the

25   trust agreement, there's not going to be a witness that's

09-50026-mg    Doc 12419-1    Filed 05/03/12    Entered 05/03/12 16:48:06    Exhibit A
Pg 73 of 109
12-09802-reg    Doc 146-19    Filed 07/24/12    Entered 07/24/12 14:36:49    Main Document
Pg 73 of 109

Page 72

1    going to say anything more than what the agreements actually

2    say, and there were contractual rights clearly, but that

3    didn't mean that the ownership of those loan proceeds didn't

4    -- weren't with GM Canada.

5             The issue about excusable neglect.  I think we put

6    before Your Honor all of the hard facts of what information

7    was given.

8             And specifically just so I'll say for the third

9    time that it's clear, the issue that Old GM paid -- made a

10    loan of $450 million to GM Canada was disclosed to the

11    creditors' committee on June 5th -- or June 4th in the

12    disclosure schedules.  So there was nothing hidden from

13    them, that information was there.

14             The idea that he wants to proffer that it's

15    excusable neglect, that an 8-K filed in the bankruptcy

16    filing which says material definitive agreement no one

17    looked at that 8-K, even though they may have looked at

18    older 8-Ks, I'm not going to quibble with that.  I mean if

19    that's what his position is I'm prepared to rest on those

20    facts and let Your Honor decide whether that's an excusable

21    neglect or not.

22             We've -- we described to you five circumstances of

23    what was publicly in the arena relating to the lock-up

24    agreement, including documents that were before Your Honor.

25             So with that having been said the conclusion I

1    have on the Rule 60(b) is that there are no genuine issues

2    of material fact that are in dispute.  He can claim that

3    there are, but the documents speak for themselves, and our

4    facts that we presented and what he's admitted speak for

5    themselves, and that's a basis for summary judgment on the

6    underlying issues, which are the predicate for the Rule

7    60(b) relief.

8           THE COURT:  All right.  Mr. Fisher, if you have

9    any surreply limited to the new stuff that we just heard

10   from Mr. Steinberg I'll give you that chance.

11          MR. FISHER:  Thank you, Your Honor.

12          Just responding to those points, and some of them

13   I'm not even sure why they're -- why they're relevant or

14   exactly what they have to do with this motion, but standing

15   certainly a relevant, and the GUC Trust inherited the

16   objection that had been filed by the creditors' committee.

17   There's no question that their rights are coterminous with

18   what the rights of the creditors' committee were with regard

19   to that objection, and that objection asserted and certainly

20   the creditors' committee had standing to seek 60(b) relief.

21         Under Rule 9019 Mr. Steinberg argues Rule 9019

22   doesn't apply because Old GM didn't pay anything in exchange

23   for the release that it got with respect to the litigation

24   that was pending in Nova Scotia.  I don't think that's true.

25         As I've argued, first of all we think that the

12-09802-reg   Doc 146-1   Filed 07/24/15   Entered 07/26/15 09:44:36   Main Document
Pg 75 of 109

Page 74

1    funds were funds that were -- that belonged to Old GM, those

2    were the funds that were transferred to pay the consent fee

3    to secure the release, but additionally, Old GM has paid an

4    awful lot in the terms -- in terms of a lock-up agreement

5    that requires cooperation with a scheme to get two times the

6    -- the face amount of the notes, but additional swap value

7    on top of that.

8            So we think ultimately what will happen here is

9    that Old GM used the currency of what Old GM's unsecured

10   creditors were entitled to in order to settle litigation

11   that was pending against it in -- in Nova Scotia, and

12   certainly that's something that should have been brought to

13   Your Honor's attention and required a motion under Rule

14   9019.

15           In terms of the use of estate property under 363.

16   As I've already argued it is the consent fee, but there are

17   other uses of estate property that are at issue here as

18   well.  For example, Old GM used its stock powers when it

19   consented to the bankruptcy filing of GM Nova Scotia Finance

20   post-petition.  The bankruptcy filing didn't happen until

21   October, the extraordinary resolutions didn't happen until

22   the end of June, and so that's additional post-petition

23   conduct that involved property of the estate in violation of

24   Section 363, Your Honor.

25           With regard to the MSPA schedules, the MSPA

1    schedules do not disclose the amount of any transfer from

2    Old GM to GM Canada.

3           So I simply disagree with the characterization of

4    that disclosure and rest on all of my earlier arguments

5    about their not being any disclosure that fairly could have

6    put the creditors' committee on notice of the full extent of

7    the implications of the lock-up agreement for unsecured

8    creditors of Old GM, Your Honor.

9           THE COURT:  All right.

10          MR. STEINBERG:  Your Honor, just two -- just two

11   points I wanted to say.  They're only two points.

12          THE COURT:  Go ahead.

13          MR. STEINBERG:  With regard to bankruptcy filing

14   of subsidiaries, it's an admitted fact in this case that

15   during the course of this case there were two other

16   subsidiaries at least that were filled in October of 2009

17   other than Nova Scotia Finance.  No Court order was

18   obtained.  And it's traditional that if you're putting other

19   entities into bankruptcy you don't necessarily need a court

20   order for that.

21          And I just will highlight that Mr. Fisher said we

22   took the currency that the unsecured creditors were entitled

23   to, and I challenge him to say what that currency was,

24   because the cash belonged to New GM.

25          MR. ZIRINSKY:  Your Honor, may I briefly restate?

1        THE COURT:  No.  This was -- this was New GM's

2    motion.  Sit down, please, Mr. Zirinsky.

3        MR. ZIRINSKY:  I would just like to make a

4    statement for the record.  I'm not going to argue the

5    motion.

6        THE COURT:  Make your statement.

7        MR. ZIRINSKY:  Your Honor, I just want the record

8    to -- Bruce Zirinsky on behalf of Morgan Stanley, Elliott,

9    and Fortress noteholders -- Nova Scotia noteholders and

10   holders of guarantee claims.

11       Your Honor, I just want the record to be clear

12   that as you just noted this is GM's motion, not a

13   noteholder's motion.  I want the record to be clear that the

14   noteholders had requested leave to file motions for summary

15   judgment on these as well as other issues, and the Court did

16   not permit such leave, and I just want the record to be

17   clear that the noteholders that I represent are preserving

18   all of their rights, claims, and objections to any 60(b)

19   motion relief or with regard the any of the other matters

20   that are before Your Honor today on the GM motion.

21       Thank you.

22       THE COURT:  Now, back to where we were.  We have a

23   trial beginning on August 7th.  I will give you a ruling on

24   this today.  I'm going to dictate it.  I want everybody back

25   here at 3 o'clock.  I can't guarantee you that I'll have a

08-50026-mg    Doc 12419    Filed 05/03/12    Entered 05/08/12 16:48:06    Main Document
Pg 78 of 109

Page 77

1   ruling by that time, but I want you back here in this

2   courtroom at that time.

3          We're in recess.

4          MR. STEINBERG.  Your Honor, there was a note that

5   your chambers had said about a pretrial conference.  Did you

6   want to do that after your ruling?  Was there any reason to

7   do it now before your ruling?  I just wanted to remind Your

8   Honor.

9          THE COURT:  How long will the conference take?

10         MR. FISHER:  Your Honor, I think we agree on most

11  of the pretrial logistics issues, if that's what Your Honor

12  has in mind for the conference.  So I think it could be done

13  fairly quickly.

14         THE COURT:  All right, then we'll do it right now.

15  It may mean that I can't see you at 3:00 and you're going to

16  have to wait longer, but let's go ahead, do it.

17         MR. STEINBERG:  Your Honor, I would say that I

18  think it will take shorter, and so -- and I know this has

19  gone a long time, we can do it after Your Honor rules as

20  well too, and that might make it more efficient.

21         THE COURT:  I don't care what -- do you care,

22  Mr. Fisher is?

23         UNIDENTIFIED SPEAKER:  I would prefer it after.

24         MR. FISHER:  It seems that some of the parties

25  prefer to do it after Your Honor rules, and that's fine with

 1   us, Your Honor.

 2            THE COURT:  Okay.

 3            UNIDENTIFIED SPEAKER:  We prefer afterwards.

 4            THE COURT:  We'll do it afterwards.

 5            MR. FISHER:  Thank you, Judge.

 6        (Recess at 12:36 p.m.)

 7            THE COURT:  Have seats, please.  Do we have

 8   Mr. Steinberg here?

 9            MR. DAVIDSON:  I believe he went to the bathroom,

10   I can go get him, Your Honor.

11            THE COURT:  I'll sit here.

12        (Pause)

13            THE COURT:  I apologize for keeping you all

14   waiting.

15            As we discussed in oral argument New GM's motion

16   for summary judgment goes way beyond the issue for which I

17   authorized New GM to file a motion for summary judgment,

18   with the only issue properly before me being the GUC Trust's

19   request for 60(b) relief.

20            To the extent the summary judgment motion goes

21   beyond that it must be denied as unauthorized.

22            Though I note that here, as in the case of the

23   summary judgment motions proposed by Nova Scotia

24   bondholders, it raises issues of fact that can be determined

25   only at the upcoming trial or thereafter in any event.

Page 79

1          With respect to the one issue as to which I

2     authorized a summary judgment motion to be made, 60(b)

3     relief, I'm convinced after review of the briefs and hearing

4     oral argument, that the issues raised in New GM's summary

5     judgment motion aren't ripe for decision yet and won't be

6     until and unless we know that the GUC Trust will be in fact

7     seeking 60(b) relief from the sale order, and we know the

8     nature of the relief the GUC Trust seeks.

9          Thus, I'm denying New GM's motion for summary

10    judgment without prejudice to renewal if and when it ever is

11    needed or would make a difference.

12          I also will say now however that if forced to

13    decide a motion for summary judgment on 60(b) relief now I'd

14    easily include that material issues of fact would preclude

15    any grant of summary judgment in New GM's favor.

16          Turning first to the important threshold issue of

17    ripeness.

18          The GUC Trust has raised a number of issues, all

19    involving disputed material issues of fact, which if decided

20    in the GUC favor would or at least could obviate the need

21    for the GUC Trust to ask me for 60(b) relief or that could

22    change the nature of the 60(b) relief the GUC would request.

23          Several involved the time at which the lock-up

24    agreement was finalized and as related to that the time at

25    which it was entered into.

1          I will hear expert testimony from each side I'm

2     told based on computer metadata as to when the final version

3     of the lock-up agreement came into being.

4          Other issues involve the extent to which there was

5     compliance with the executory contract assumption

6     procedures, and the GUC Trust contention that if there

7     wasn't the lock-up agreement wasn't assigned to New GM.

8          The latter issues go to both the lock-up agreement

9     and the swaps.

10          There's still another issue of fact as to whether

11     there was an obligation outstanding under the swaps as of

12     the time of the closing on July 7.

13          So these are all matters that if decided favorably

14     to the GUC Trust at the trial, beginning two weeks from now,

15     would or at least could make the 60(b) issues merely

16     hypothetical and unnecessary to decide.

17          The GUC Trust says that the need for 60(b) relief

18     is quote "unlikely," and though I don't think it's either

19     possible or appropriate for me to quantify that likelihood

20     in any way, I think that the need for it is at least highly

21     uncertain.

22          New GM's contentions as to facts as to which it

23     says it should prevail that would force the GUC Trust to

24     seek 60(b) relief are to me unpersuasive.

25          The confidentiality agreement entered into on

1     May 28, three days before Old GM's Chapter 11 filing

2     provided that quote:

3            "Unless and until the parties have entered into a

4     definitive agreement with respect to the transaction,

5     neither [Nova Scotia Finance] nor [Old GM] will be under any

6     legal obligation of any kind whatsoever with respect to such

7     a transaction by virtue of this or any written or oral

8     expression with respect to such a transaction."

9            Cooperman (ph) declaration Exhibit 12 at Section

10    11.

11           There's an issue of fact as to when the document

12    that would embody that definitive agreement, what we now

13    call the lock-up agreement, was finalized.

14           There is also an issue of fact as to whether the

15    parties intended to be bound before the final agreement was

16    prepared.

17           There's a fair degree of law on this subject, and

18    under that law the standards are fact intensive.  Parties

19    may, if they wish, agree to be bound to a future deal based

20    on an agreement only as to a deals key points, but they can

21    also reserve the right not to be bound until the definitive

22    documentation is prepared and executed, which at least

23    arguably is the case here.

24           Though I can't find that to be true before trial,

25    I can and must find that I can't decide that as a matter of

09-50026-mg   Doc 12419-1   Filed 07/24/12   Entered 07/24/12 16:48:06   Exhibit A
Pg 83 of 109
12-09802-reg   Doc 143-1   Filed 07/05/13   Entered 07/05/13 16:49:36   Main Document
Pg 82 of 109

Page 82

1    law on this motion.

2         Then the lock-up agreement, which among other

3    things called for a cash payment of $367 million, and

4    acquiescence to the allowance of more than $2 billion in

5    claims, cannot be regarded as having been entered into in

6    the ordinary course of business.  And if the lock-up

7    agreement wasn't entered into before Old GM's bankruptcy,

8    it's at least arguably, if not plainly, a post-petition

9    transaction that was not authorized by the Bankruptcy Court.

10        If the lock-up agreement was not lawfully entered

11   into its enforceability would be subject to question.

12        New GM's answer to that, as stated at page 8 of

13   its reply, is that even if a post-petition transfer

14   requiring Court approval is unauthorized by the Court, it is

15   merely voidable and not void.  And New GM then goes on to

16   contend that since New GM purchased all intercompany

17   avoiding power claims, and that these would include Section

18   548 claims, there would be nothing to quote "avoid," quote

19   from the debtors' perspective.

20        I cannot agree.  Though there is case law in a

21   very distinguishable situation tending to support New GM's

22   position and making distinctions between quote "void" and

23   quote "voidable" quote, unauthorized post-petition

24   transfers.  See In re: Bean, 251 B.R. 196, Eastern District

25   of New York, 2000.  There is also law to the contrary,

1    referring to unauthorized post-petition transfers as quote

2    "null and void."  End quote.  See In re: Koneta,

3    K-O-N-E-T-A, 357 B.R. 540, 543 to 544, Bankruptcy District

4    of Arizona, 2006.

5              Though Bean is more specific Koneta does a better

6    job in dealing with the real concern here.  The reason by

7    which Section 549 was enacted, which is to protect a

8    debtor's creditor community from unauthorized dispositions

9    of estate property that come at the creditors' expense.

10             As importantly or more so, New GM's position is in

11   substance that if the unauthorized post-petition disposition

12   is egregious enough being accompanied by a disposition of

13   the power to protect the estate from the very post-petition

14   transfer, i.e., by a transfer of the right to bring the

15   avoidance action, the transferee can thereby be immunized

16   from judicial action with the Bankruptcy Court powerless to

17   protect the estate from the resulting harm.

18             Section 363(b) and 549 would be renders nugatory

19   by the simple act of assigning the right to bring the 549

20   action outside of the estate.  That cannot be the law.

21             Neither I, nor I think any other judge, could

22   every subscribe to such a suggestion.

23             Likewise, there are issues of fact as to whether

24   or not the payment of the consent fee should be deemed to

25   have come from a quote "purchased subsidiary," quote, or by

09-50026-reg  Doc 12419-1  Filed 05/03/12  Entered 05/03/12 16:48:06  Exhibit A
Pg 85 of 109
12-09802-reg  Doc 146  Filed 07/24/12  Entered 07/26/12 08:44:36  Main Document
Pg 85 of 109

Page 84

1   contrast should be deemed to come from the entity that

2   funded it in reality, Old GM.

3           The Second Circuit, like others, respects

4   collapsing doctrine.  See, for example, HBE Leasing Corp. v.

5   Frank, 48 F.3d 623, 635, Second Circuit 1995.

6           As the Second Circuit there held, quote:

7           "It is well established that multilateral

8   transactions may under appropriate circumstances be

9   'collapsed' and treated as phases of a single transaction

10  for analysis under the UFCA," i.e., the Uniform Fraudulent

11  Conveyance Act.

12          There are at least issues of fact as to whether it

13  was Old GM and not GM Canada that made the payment to the

14  Nova Scotia noteholders as part of a single integrated

15  transaction.

16          The GUC Trust has put forward evidence sufficient

17  to invoke collapsing doctrine and to establish that GM

18  Canada was merely a conduit and not the quote "initial

19  transferee of such transfer or the entity for whose benefit

20  such transfer was made," quote, as that expression is used

21  in Section 550 of the Code.

22          That evidence includes evidence that on May 29,

23  2009 Old GM approved the $450 million loan to GM Canada,

24  quote "conditioned on [the] premise, that funds be used

25  solely to settle" end quote, Nova Scotia Finances'

 1   obligation on the notes.  See Cooperman declaration

 2   Exhibit 35.

 3            That the $450 million loan was listed as step one

 4   in the quote "Nova Scotia bondholder transaction-steps

 5   list":  That on June 4, 2009 under an escrows agreement

 6   entered into among Old GM, GM Canada, Nova Scotia Finance,

 7   and the Nova Scotia noteholders, $367 million in proceeds

 8   from that $450 million loan was paid into an escrow account,

 9   and that on June 25th, 2011, $367 million, that very same

10   number, was paid from the escrow account for the Nova Scotia

11   noteholders in satisfaction of the consent fee.

12            Those facts, if proven and not contradicted, might

13   establish that the payment by Old GM through GM Canada and

14   the escrow account and then to the Nova Scotia bondholders

15   was a single integrated transaction, (avoids the payment by

16   which Old GM to GM Canada was the first step, and the

17   payment to the noteholders was the last), or that GM Canada

18   and the escrow account were conduits for the transfer.

19            I don't know that for a fact at this point, that's

20   the kind of thing we'll look at at the trial, but I

21   certainly can't grant summary judgment premised on the

22   notion that the payment of the consent fee wasn't from Old

23   GM, and I remain surprised that New GM even suggests that I

24   should.

25            Likewise, I'm surprised that New GM would even

1    suggest, as it does on page 8 of its reply, that a

2    transaction of this character could have been authorized

3    under my first day cash management order when its effect, if

4    not also its purpose, was to use GM Canada as the conduit

5    for the $367 million in Old GM funds that found their way

6    into the hands of certain noteholders.

7            We have a trial starting in 18 days on August 7.

8    Issues determined at the trial have the potential, if not

9    the certainty, of determining whether 60(b) relief will be

10   requested, and if so, what the requested 60(b) relief will

11   be.  At this point we know neither.

12           Both general case or controversy principals and

13   declaratory jurisprudence underscore the importance, if not

14   also the absolute requirement, of deciding issues only when

15   they with ripe.

16           In Thomas versus Union Carbide Agricultural

17   Products Company, 473 U.S. 568, 1985, a non-declaratory

18   judgment case involving general Article 3 jurisprudence

19   principals, the Supreme Court observed that quote:

20           "Ripeness is peculiarly a question of timing.  Its

21   basic rationale is to prevent the courts through premature

22   adjudication from entangling themselves in abstract

23   disagreements."  Internal quotation marks deleted.

24           See also Volvo New York American Corp. versus

25   Men's International Professional Tennis Council, 857 F.2d

1    55, 63, Second Circuit 1988 quoting Thomas 419 U.S. at 580

2    to 581.

3              In Volvo the Second Circuit observed that ripeness

4    doctrine quote "cautions courts against adjudicating'

5    contingent future events that may not occur as anticipated,

6    or indeed may not occur at all."  End quote.

7              Accord Cacchillo C-A-C-C-H-I-L-L-O, versus Insmed,

8    I-N-S-M-E-D, Inc., 638 F.3d 401, 405 Second Circuit, 2011.

9              Let's remember what the Second Circuit twice then

10   told us.  Ripeness doctrine cautions courts against

11   adjudicating contingent future events that may not occur as

12   anticipated, or indeed may not occur at all.

13             Here we have exactly that as the GUC Trust may

14   prevail on other issues that may make its need for a 60(b)

15   relief academic or it may refine or amend the request for

16   the 60(b) relief that it ultimately decides that it wants.

17             Likewise, there is another applicable doctrine

18   that is distinct, but similar in purpose.  It is quote

19   "Prudential ripeness," end quote.

20             As explained by the Second Circuit in New York

21   Civil Liberties Union versus Grandeau, G-R-A-N-D-E-A-U, 528

22   F.3d 122, Second Circuit, 2008, Prudential ripeness is

23   distinct from constitutional ripeness, but likewise

24   addresses whether the case could be better decided later.

25   Id. at 131.  It is the tool that courts may use to enhance

12-09802-reg  Doc 143-1  Filed 07/24/12  Entered 07/26/12 09:44:36  Exhibit A Pg 89 of 110

 1    the accuracy of their decisions and to avoid becoming

 2    embroiled in adjudications that may later turn out to be

 3    unnecessary.

 4            It is often used in constitutional issue

 5    litigation, but there is no reason why it should be limited

 6    to that.  Considerations of that type are equally applicable

 7    here.

 8            About eight years ago based on similar

 9    considerations in Bank of New York versus Adelphia

10    Communications Corp. In re: Adelphia Communications Corp.,

11    307 B.R. 432 Bankruptcy Southern District of New York, 2004,

12    I ruled that a controversary over an X-clause, that's X-

13    clause, and a bond indenture wasn't ripe for adjudication

14    even though the interpretation issue was unsettled and

15    resolution would facilitate plan negotiations.  I found that

16    it wasn't ripe for declaratory judgment purposes, and also

17    meet Article 3 case or controversy requirements "given the

18    many uncertainties as to whether the adverse consequences

19    the subdebt fears may or may not occur as expected or may

20    not happen at all."

21            Eight years ago the same exact concerns that we

22    have here today.

23            Just two weeks about in an adversary proceeding

24    under the umbrella of this very Chapter 11 case, that of

25    Motors Liquidation Company, Judge McMahon of the District

```
 1    Court determined that a controversy wasn't ripe for decision
 2    in the face of a dispute that was far riper for decision
 3    than the one we have here.  See U.S. Department of the
 4    Treasury versus Official Committee of Unsecured Creditors of
 5    Motors Liquidation Company, 2012 Westlaw, 2822547, *1,
 6    Southern District of New York, July 3rd, 2012.
 7              While that decision is binding on me only with
 8    respect to the matter she there decided, and turned in
 9    material part on events that took place after I issued my
10    ruling, it still is deserving of consideration here like any
11    other non-binding precedent.
12              In that case the creditors' committee had shown
13    without dispute that it would be affirmatively
14    counterproductive for it to continue its action against JP
15    Morgan Chase if that adversary proceeding, if successful,
16    would dramatically increase unsecured claims, while at the
17    same time not give the Motors Liquidation estate the
18    avoidance action proceeds.
19              Judge McMahon found, effectively, that the
20    uncertainties as to whether there would be anything to fight
21    over trumped the creditors' committee's other needs and
22    concerns.
23              If that matter wasn't ripe, notwithstanding the
24    all of the very real needs and concerns for which the
25    creditors' committee then needed a decision, and despite
```

Page 90

1    uncertainties that would exist in any case, as I had

2    addressed in the opinion below, this far more hypothetical

3    controversy on a 60(b) request that may not ever be

4    necessary can't be regarded as ripe for decision now either.

5             Finally, I don't agree with New GM's position that

6    if it's position is sustained on any of the four principal

7    issues 60(b) relief is immediately implicated.

8             For instance, if it's found as a fact that the

9    lock-up agreement wasn't a quote "purchase contract," quote,

10   or was an executory contract that was assigned to New GM,

11   most, if not all, of New GM's arguments would then fall, and

12   in any event the terrain of any future 60(b) motion would be

13   materially different.

14       (Pause)

15            THE COURT:  Because I find that the issues aren't

16   ripe I'm not deciding the 60(b) motion today, but I must

17   say, that even if I knew with more clarity what I needed to

18   rule on and why, I would have to deny summary judgment on

19   the 60(b) issues.

20            Certain of the GUC Trust allegations, if proven,

21   could indeed cause me to grant 60(b) relief.

22            I'm most assuredly not going to be ruling today as

23   a matter of law that on this record the GUC Trust could

24   never secure 60(b) relief.

25            Though the evidence may well not show that

Page 91

1   disclosure of the lock-up agreement was intentionally

2   concealed from the Court, the evidence will almost certainly

3   show, unless I'm forgetting something that I can't believe

4   that I would ever forget, that at the time of the sale

5   hearing, at the end of June and beginning of July 2009, no

6   disclosure was made to me whatever of Old GM's intention by

7   that motion to include provisions under which it would

8   cooperate in efforts to put beyond judicial review a payment

9   of $376 million to certain selected creditors, and

10  acquiescence an additional $2.67 billion in claims and the

11  give up of the estate's rights as to important avoidance

12  actions.

13          It may be simply that Old GM's lawyers had more

14  important things on their mind than to mention these things

15  to me when I approved the armsp (ph) and entered the sale

16  order, but the bottom line is, is that this matter is huge,

17  and if these things had been disclosed to me then I would

18  have been as concerned about them then as I am now.

19          There was a lack of disclosure to the Court on the

20  matter with the potential to injure Old GM creditors to the

21  extent of hundreds of millions, if not billions of dollars.

22          Based on the record so far issues of fact would

23  exist with respect to whether the GUC Trust could establish

24  an entitlement to 60(b) relief on three of the four Rule

25  60(b) subsections upon which the GUC Trust relies.

1      I've seen no evidence to support the fourth.

2  Fraud in procuring the sale order, especially since I

3  consider fraud to require scienter as contrasted to mere

4  non-disclosure.

5      But facts known to date might support relief under

6  subsection (1), for quote, "Mistake, inadvertence, surprise,

7  or excusable neglect"; subsection (2), newly discovered

8  evidence that with reasonable diligence could not have been

9  discovered in time to move for a new trial," end quote, and

10  subsection (6), quote, "Any other reason that justifies

11  relief."  End quote.

12      It might be that given my total lack of any

13  understanding or intent when I entered the sale order that I

14  was authorizing or immunizing from judicial scrutiny the

15  matters in question here that Rule 60(b) relief might not

16  even be necessary.  Another reason of course for which New

17  GM's summary judgment motion isn't yet ripe.

18      But in addition, given the failure of anyone to

19  say anything to me at the time of the 363 sale hearing about

20  the lock-up agreement or at the prospect that the sale order

21  I'd signed would have the purpose or effect of authorizing

22  the transactions that are said to be protected under my

23  order here and the scattered and incomplete disclosures as

24  to this matter that were available to the creditors'

25  committee, I think there are at the very least issues of

12-09802-reg   Doc 143   Filed 07/24/12   Entered 07/24/12 14:36:48   Main Document
Pg 94 of 109

Page 93

1   fact as to whether a claimed lack of diligence by the

2   creditors' committee would bar relief under 60(b).

3            Given the importance of the sale, the underlying

4   transaction, the jobs on the line, and the importance of

5   GM's survival to the U.S. auto industry, I'm of course not

6   suggesting that I would have disapproved the sale as a

7   whole, but with appropriate disclosure of what people are

8   now telling me was the consequences of the sale order that I

9   signed, I very well might have done what we bankruptcy

10  judges do all the time on limited objections to sales.

11  Simply put in a provision in my approval order that nothing

12  in the order should be deemed to be an authorization or

13  approval of the things that went on here.

14           With appropriate disclosure I might well have

15  refused to sign the order in its then existing form, and I

16  would have insisted that the lock-up agreement not be

17  insulated from judicial scrutiny no matter what threats the

18  Nova Scotia noteholders had made at the time.

19           When I approved the sale agreement and entered the

20  sale approval order I mistakenly thought that I was merely

21  saving GM, the supply chain, and about a million jobs.

22           Likewise, I thought that as part of that I was

23  approving the assumption and assignment of contracts mainly

24  with the many vendors in the supply chain whose contracts

25  were essential to New GM's future and the health of the U.S.

09-50026-mg Doc 12419-1 Filed 05/03/13 Entered 05/03/13 16:48:06 Exhibit A
12-09802-reg Doc 143 Filed 07/24/15 Entered 07/28/15 08:44:36 Main Document
Pg 95 of 109

Page 94

1    auto industry.

2         I was unaware that by an agreement undisclosed to

3    me that would be said to be assumed and assigned incident to

4    the sale order or that might have been an unauthorized post-

5    petition transaction.  I was also authorizing a payment to a

6    limited number of creditors of $376 million, a commitment

7    not to object to as much as $2.76 billion in claims, and an

8    assignment out of the estate of the right to bring important

9    avoidance actions.

10        It never once occurred to me, and nobody bothered

11   to disclose, that amongst all of the assigned contracts was

12   this lock-up agreement, if indeed it was assigned at all.

13   When I heard about that it wasn't just a surprise, it was a

14   shock.

15        The GUC Trust may well be able to make a showing

16   of mistake or newly discovered evidence.  It likewise may

17   well be able to make a showing of quote "any other reason

18   that justifies relief."  End quote.

19        The motion for summary judgment is denied without

20   prejudice to reconsideration if the GUC Trust ultimately

21   decides to ask for 60(b) relief.

22        New GM has of course a full reservation of rights

23   at any such time.

24        The GUC Trust is to settle on what are consistent

25   with this ruling promptly so that New GM, if it is of a mind

1        to, can file a motion to leave to appeal.

2              We're going to trial on August 7, that's 18 days

3        from now.  If New GM wishes to continue to take sides in

4        this dispute it can and should participate in the trial

5        then.

6              Those who are here now for this decision are free

7        to go.  I will not be leaving the bench and will go into the

8        conference with respect to the mechanics of issues that you

9        wanted to raise concerning the upcoming trial.

10       (Pause)

11             MR. FISHER:  Your Honor, Eric Fisher for the GUC

12       Trust.

13             As we indicated earlier today, we think that

14       there's substantial agreement among the parties with regard

15       to the trial logistics, and I'm going to defer to

16       Mr. O'Donnell, from Akin Gump, who will summarize what it is

17       that we've agreed to and certain questions that we have for

18       the Court about the conduct of the trial.

19             THE COURT:  Okay.

20             MR. O'DONNELL:  Good afternoon, Your Honor, Sean

21       O'Donnell with Akin Gump on behalf of Nova Scotia trustee,

22       may it please the Court.

23             There was a lot going on as the Court's aware

24       today, and during that time the parties, in accordance with

25       the Court's instructions, have met and conferred and tried

1   to coordinate some of the trial logistics for the hearing

2   that begins on the 7th.  All of this of course is subject to

3   your approval, and the parties were going to endeavor put it

4   in writing, but we thought it might be helpful to discuss a

5   couple of the issues with you today.

6           THE COURT:  Mr. O'Donnell, pull that microphone

7   closer to you or speak a little louder.

8           MR. O'DONNELL:  It's my height.

9           THE COURT:  Yeah, you're pretty tall.  Maybe

10  you're pretty far away.

11          MR. O'DONNELL:  Is that better, Your Honor?

12          THE COURT:  Much.  Go ahead.

13          MR. O'DONNELL:  Okay.  So with respect to the

14  trial dates one of the questions that the party had to the

15  Court is whether or not August 10th is also a date that's a

16  possible trial date.  It's a Friday.

17      (Pause)

18          MR. O'DONNELL:  And I'll warn the Court we're

19  going to ask if there are other days that you might have in

20  mind as well should we continue beyond that week.

21          THE COURT:  I don't know yet, Mr. O'Donnell.  It's

22  my wife's birthday.  I have commitments outside of this

23  courthouse.  I'll have to let you know.

24          MR. O'DONNELL:  Thank you, Your Honor, that's

25  fine.

1    And beyond August 10th within that month or

2    shortly thereafter are there other dates that you might have

3    in mind as potential dates for continuation of the trial

4    should we not finish that week?  We're happy to take that

5    under advisement as well.

6        THE COURT:  I think I do.

7    (Court confer with clerk)

8        THE COURT:  What day is Labor Day, September 3rd?

9        MR. O'DONNELL:  The 3rd, yes, Your Honor.

10    (Court confers with clerk)

11        THE COURT:  Mr. O'Donnell, I'll try to move the

12    matters that I have during the days from August 20 to 23rd

13    to earlier in the morning, as early as 8 o'clock if I can

14    pull it off, in which case you can have the time after those

15    days, not past 2:30 on the 20th, but you can have the

16    afternoon of the 21st, 22nd, and 23rd.  I'll confirm that

17    with Ms. Blum, but I'll do my best.

18        MR. O'DONNELL:  We greatly appreciate that, Your

19    Honor.  Thank you.

20        With respect to opens statements, and of course

21    we'd defer to the Court, but in the interest of trying to

22    expedite the trial the parties would wish to dispose of

23    opening statements and proceed with the introduction of

24    evidence.

25        THE COURT:  You were reading my mind, especially

1    if you guys are giving me trial briefs.

2              MR. O'DONNELL:  Hopefully that won't be the last

3    time, Your Honor.

4              THE COURT:  I'm sorry?

5              MR. O'DONNELL:  Hopefully that won't be the last

6    time we've read your mind.

7              THE COURT:  All right.

8              MR. O'DONNELL:  With respect to the introduction

9    of evidence and the use of exhibits the parties envision

10   using technology monitors and scanning in the exhibits.  As

11   the Court may or may not know we have a lot of exhibits we

12   anticipate coming into trial.  Is there any preference that

13   the Court has in terms of monitors?  I think what we

14   envision of course is a monitor for Your Honor, for your

15   clerks, for the witness, for the party's tables, as well as

16   one for the courtroom, but if there are any particularities

17   that you have please let us know.

18              THE COURT:  At this time you didn't read my mind.

19   I learned a lot about the way you guys use visual aids in

20   the motion and aid in Adelphia.  I can't take notes, pay

21   attention to what witness's are telling me, and have my head

22   bouncing up and down to watch a TV screen.

23              I want exhibits on paper.  I also want exhibits

24   that you can hand up that I can mark and scribble on using

25   an old-fashion highlighter and pen.

1       If you want, for the benefit of the people who may

2   be monitoring the case or even trading on it, you can set up

3   whatever visual aids you wanted for the people sitting in

4   the courtroom, as long as you make the arrangements in

5   advance with the Court's information technology people.

6       MR. O'DONNELL:  Yes, Your Honor, I apologize it

7   wasn't clear.  We had anticipated hard copies for the Court

8   in addition to the monitor screens that would be in the

9   courtroom.

10       THE COURT:  Well, I'm not going look at the

11   monitor, if you want to give me one any way you can, I

12   mean --

13       MR. O'DONNELL:  Thank you, Your Honor.

14       THE COURT:  -- that's fine.

15       MR. O'DONNELL:  The parties have also agreed that

16   we will be exchanging the witness list, the anticipated

17   order of witnesses one week prior to any particular block of

18   trial that we have.

19       In addition the parties have agreed to exchange

20   depo designations on July 31st, counter designations on

21   August 3rd, demonstratives that will be used for the first

22   week of trial, August 7th will be exchanged by 3 p.m. the

23   day prior, and we'll do the same thing again for the

24   following block of trial.

25       And with the Court's permission the plaintiff's

1   requested a slight extension to submit the pretrial briefs

2   pushing that back to 7/27, which the defendants are in

3   agreement with.  And I believe it's by 10 a.m., is that

4   right, Eric?  Yeah, 10 a.m. on the 27th if that's okay with

5   the Court.

6            THE COURT:  So that would still give me about ten

7   days?

8            MR. O'DONNELL:  That's correct, Your Honor.

9            THE COURT:  Yeah, that's okay.

10           One thing you said a moment ago, Mr. O'Donnell,

11   that I was thinking more about, and I think I might have

12   been too cynical and hard on you guys.

13           In a recent trial, I had a valuation trial back in

14   March or April, I don't remember one, I discovered that you

15   guyed now have a technique where when you bring a document

16   up for me to see you actually like electronically highlight

17   it so it looks like it's yellow on the screen or the

18   portions you want me to pay attention to.

19           MR. O'DONNELL:  That's correct, Your Honor.

20           THE COURT:  I actually found that was useful.  And

21   even though I then had to highlight it on my own hard copy

22   it was helpful for me to see where you guys were referring

23   to.

24           So I will take that offer for you to give me the

25   screen if that's one of the things you might be using it

1    for.

2                MR. O'DONNELL:  It is, Your Honor, and we'll be

3    sure to do that.

4                THE COURT:  Okay.

5                MR. O'DONNELL:  I think that's it, unless -- and

6    again, Your Honor, we'll put something in writing and submit

7    it to the Court.

8                THE COURT:  Okay.

9                MR. O'DONNELL:  Thank you.

10               THE COURT:  Anything else, anybody?

11               Mr. Reisman, I didn't know you were in this case.

12               MR. REISMAN:  I am now, Your Honor.

13               THE COURT:  Who are you representing?

14               MR. REISMAN:  I am appearing for eight investment

15   funds or accounts that are managed by Paulson & Company,

16   Inc. and they are noteholders, I'll call them the Paulson

17   noteholders if I could, Your Honor.

18               For the record as well, Steven Reisman, Curtis

19   Mallet-Prevost, Colt & Mosle LLP on behalf of the Paulson

20   noteholders.

21               The Paulson noteholders hold approximately 170

22   million pound sterling of the notes that are at issue here.

23               THE COURT:  Do you have a 2019 on file yet,

24   Mr. Reisman?

25               MR. REISMAN:  We do not, Your Honor, and they're

         1   affiliated entities, so my understanding of the law -- we

         2   filed --

         3            THE COURT:  You're all a single family of --

         4            MR. REISMAN:  Yeah.  Yeah.

         5            THE COURT:  Okay.

         6            MR. REISMAN:  Yes.  And my understanding of the

         7   law is that it's not necessary to be -- to be done, but

         8   we've disclosed the interests that are owned by the -- each

         9   of the funds in a notice of appearance that we filed with

        10   the Court, and we've provided that as well to Mr. Fisher and

        11   his clients and the other parties in interest in this -- in

        12   this matter.

        13            Your Honor, I rise because I wanted to suggest,

        14   and I know, you know, I'm kind of late to the game, but

        15   better late than never, one suggestion that I have on behalf

        16   of my clients, and I've broached it with other parties, is

        17   to see if mediation might be helpful here between the

        18   parties.

        19            I am not in any way looking to postpone the

        20   August 7th trial date, I'm looking to see if it's possible

        21   that the parties can spend a day with a neutral third-party

        22   mediator to see if -- not a sitting bankrupt judge, but

        23   someone from the outside in a confidential mediation setting

        24   -- to see if the parties can gain closer ground in trying to

        25   resolve the issues that are here.

1        I would like to try and do that between now and

2    the trial date of August 7th.  If not there's also the --

3    the week following, which I understand Your Honor is going

4    to be out that week.  Many times matters are mediated in the

5    context of trial, Tronox Anadarko is a good example of that

6    that's in this court right now, which is -- they're going to

7    mediation from public records that I've -- that I've read.

8        So I'd like to suggest that, and I'd like to see

9    if there's interest in it from the parties.  It could be

10   helpful in narrowing some of the issues or bring the parties

11   closer together to see if a resolution can in fact be

12   reached.

13        THE COURT:  Well, I always welcome consensual

14   resolution.  I think I need to let other parties comment on

15   your proposal, Mr. Reisman.

16        MR. REISMAN:  Okay.  Thank you.

17        THE COURT:  Mr. Fisher, first you on the

18   plaintiff's side, then I'll hear from those on the

19   defendant's side.

20        MR. FISHER:  Your Honor, we've been speaking with

21   Mr. Reisman.  Mr. Reisman's proposal to have this matter

22   mediated between now and when the trial starts is something

23   that we first heard about today.  We will take it seriously,

24   we will confer with our client about it.

25        To provide just a preliminary reaction.  I'm

1   concerned that between now and August 7th is not the right

2   time to mediate, because I don't know that it's the time

3   most likely to have a constructive mediation, given my own

4   sense of the parties representative views.  It could be that

5   the suggestion to attempt a mediation following that

6   first --

7                   THE COURT:  In that gap week?

8                   MR. FISHER:  During that gap week.  It could be

9   that that's a more propitious time for a mediation.

10                  But again, we're take thing proposal seriously, we

11  learned of it for the first time today, we need to discuss

12  the idea thoroughly with our clients before we can really

13  provide a meaningful response, Your Honor.

14                  THE COURT:  Uh-huh.  All right.

15                  Defendant's side, Mr. Sher, Mr. Zirinsky?

16                  MR. SHER:  Your Honor, this is -- I literally

17  didn't hear about it till just now.  I didn't -- I wasn't

18  consulted about it, so I am going to have to think about it,

19  consult with my client, and -- and then if it's okay with

20  the Court give you a reaction at -- at that point, because I

21  literally heard it for the first time when Mr. Reisman just

22  said it.

23                  THE COURT:  Uh-huh.

24                  MR. SHER:  If that's okay with the Court.

25                  Thank you.

```
 1              THE COURT:  Mr. Zirinsky?
 2              MR. ZIRINSKY:  Your Honor, we heard about this I
 3    believe it was yesterday.
 4              I've had the ability to communicate with my
 5    clients on the matter, and I just want to say that we do not
 6    want a mediation effort to in any way impact on the timing
 7    of the -- not only the commencement of the trial, but the
 8    conduct of the trial.  But if the other parties feel it
 9    would be useful to have a mediation session with a third
10    party on a confidential basis that would be agreeable to the
11    parties we would certainly be happy to go along with that.
12              We do think however that there's an awful lot of
13    work that needs to get done to get ready for trial, and so
14    like Mr. Fisher I'm highly skeptical that we really have
15    time between now and the -- and the scheduled start date for
16    the trial to do that.
17              But also I would agree that, you know, during the
18    gap period if the parties are -- at that time believe it
19    would be useful and the Court would like the parties to make
20    the effort we'll certainly will happy to participate.
21              Thank you.
22              THE COURT:  Okay.  Anybody else?  Mr. O'Donnell?
23    You've got Green Hunt Wedlake if I recall?
24              MR. O'DONNELL:  Yes, Your Honor, counsel for the
25    trustee.
```

1          It's also the first we've heard of it just now.

2     I'm not automatically opposed to it, but something that

3     we'll need to discuss with the client and share the same

4     concerns in terms of timing.

5          THE COURT:  Okay.  Well, it seems to me folks,

6     that in this area, perhaps this very limited area, your

7     thinking is largely congruent, which is you need to talk to

8     your guys and you also need to be pretty comfortable that

9     you're not going to be using scarce trial prep time between

10    now and the first day of the trial.  And I was a practicing

11    lawyer for 30 years, a general purpose litigator as well as

12    a bankruptcy guy, and I know what it's like to be getting

13    ready for a trial.

14         So what I -- I'm not going to order you guys to do

15    much, but I am going to direct you to talk to your folks,

16    your constituencies, and then to talk to each other about

17    the second variant that Mr. Reisman had proposed, which is

18    using the gap period between the first week of the trial and

19    the second.

20         One way or another I think that this matter, as

21    much or more so than many, deserves to be settled if you can

22    do it, if you can do it responsibly.  I don't on matters of

23    this size get involved as a settlement judge myself, and I

24    heard very carefully that Mr. Reisman was talking about

25    somebody who would act in a totally confidential basis

Page 107

1    without me being involved in any way, shape, or form, which

2    is the right idea.

3            So why don't you talk to your guys and then

4    Mr. Reisman be the center hub of the wheel in terms of

5    knowing what people's thoughts are, and then somebody,

6    Mr. Reisman or somebody else, just let me know whether your

7    thinking is the same as Mr. Zirinsky's, or different.

8    Although Mr. Zirinsky thinking doesn't seem to be all that

9    different than Mr. Reisman's.

10            But in any event, I'm going to assume that other

11    than the relatively brief time to talk to your

12    constituencies and to communicate with each other on this

13    that you're simply going to be putting all our other effort

14    into getting ready for trial, or if you have any other cases

15    to work on, stuff of that nature as well.  All right?

16            Anything else?  Okay, folks thank you very much,

17    we're adjourned.

18        (Whereupon these proceedings were concluded at 5:33 PM)

19

20

21

22

23

24

25

Page 108

1                          **I N D E X**

2

3                             **RULINGS**

4                                              Page        Line

5    Motion for Summary Judgment                78           15

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 109

1      C E R T I F I C A T I O N

2

3      I, Dawn South, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5      Dawn
       South          Digitally signed by Dawn South
                       DN: cn=Dawn South, o, ou,
6                      email=digital1@veritext.com,
                       c=US
                       Date: 2012.07.24 12:10:50 -04'00'
7

8      AAERT Certified Electronic Transcriber CET**D-408

9

10     Veritext

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  July 21, 2012

16

17

18

19

20

21

22

23

24

25