**CLOSING ARGUMENTS: TO BE DETERMINED**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg
Scott Davidson

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

------------------------------------------------------------ x

| | | |
|---|---|---|
| MOTORS LIQUIDATION COMPANY GUC TRUST, | : | |
| | : | |
| Plaintiff, | : | Adversary Proceeding |
| | : | Case No.: 12-09802 (REG) |
| v. | : | |
| | : | |
| APPALOOSA INVESTMENT LIMITED PARTNERSHIP, *et al.*, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------ x

# OPENING POST-TRIAL BRIEF
## BY GENERAL MOTORS LLC

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 9

POINT I:  THE LOCK-UP AGREEMENT SHOULD NOT BE VOIDED ................................. 9

    A.    The Lock-Up Agreement was a Valid Pre-Petition Agreement ........................ 10

    B.    There is No Benefit to the Bankruptcy Estate By Voiding the Lock-Up
        Agreement ................................................................................................ 15

    C.    The Court Lacks Jurisdiction to Void the Lock-Up Agreement With
        Respect to the Non-Debtor Parties ............................................................. 17

    D.    The Lock-Up Agreement Was Either Validly Assumed and Assigned, or a
        Purchased Contract ................................................................................... 17

    E.    The Lock-Up Agreement is Not Void Pursuant to Sections 549 or Section
        363 of the Bankruptcy Code ....................................................................... 19

        1.    Section 549 of the Bankruptcy Code ................................................ 20

        2.    Section 363 of the Bankruptcy Code ................................................ 21

POINT II:  THE GUC TRUST CANNOT AVOID THE  CONSENT FEE FOR
DEFENSIVE PURPOSES OR OTHERWISE ................................................................. 25

    A.    Intercompany Avoiding Power Claims Were Sold to New GM ........................ 26

    B.    As the $450 Million Loan was Repaid, There is No Transfer to Avoid ............. 28

    C.    Even if the Loan was not Repaid, the Consent Fee Is Not Avoidable .............. 30

    D.    The Cash Management Order and Final DIP Order Would Have
        Authorized the Transfer of the $450 Million Loan to GM Canada ................... 31

POINT III:  THE SWAP CLAIM WAS VALIDLY TRANSFERRED TO NEW GM ............... 33

    A.    The Swaps Were Executory Contracts Assigned to New GM .......................... 33

    B.    If the Swaps are Not Executory Contracts, They Still Were Purchased by
        New GM ................................................................................................... 34

POINT IV:  THERE WAS NO ATTEMPT OR INTENTION TO CONCEAL THE
LOCK-UP AGREEMENT ........................................................................................ 36

CONCLUSION ...................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adelphia Recovery Trust v. Bank of America, N.A.*,
    390 B.R. 80 (S.D.N.Y. 2008).................................................................................28

*Bank of Utah v. Hiawatha Coal Company, Inc. (In re C.W. Mining Company)*,
    477 B.R. 176 (10th Cir. B.A.P. 2012)..................................................................28

*Bean v. Agard (In re Bean)*,
    252 F.3d 113 (2d Cir. 2001)...........................................................................17, 25

*Beaver Emp't Agency, Inc. v. Neostring, Inc.*,
    609 N.Y.S.2d 509 (N.Y. Civ. Ct. 1993)..............................................................14

*Brown v. U.S. (In re Larry's Marineland of Richmond, Inc.)*,
    166 B.R. 871 (Bankr. E.D. Ky. 1993)..................................................................27

*Consol. Pet Foods, Inc. v. Millard Refrigerated Serv., Inc. (In re S&D Foods, Inc.)*,
    110 B.R. 34 (Bankr. D. Colo. 1990)....................................................................27

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
    379 B.R. 425 (S.D.N.Y. 2007), *motion to certify appeal denied*, 2007 WL 2780394
    (S.D.N.Y. Sept. 24, 2007)....................................................................................27

*Express Indus. & Terminal Corp. v. N.Y. State DOT*,
    93 N.Y.2d 584 (1999), *reargument denied*, 93 N.Y.2d 1042 (1999) .....................11

*Friedman v. Schwartz*,
    No. 08-CV-2801 (JS) (WDW), 2009 WL 701111 (E.D.N.Y. March 13, 2009) ....................12

*Gordon v. Shirley Duke Assoc., A.P.I. (In re Shirley Duke Assoc.)*,
    611 F.2d 15 (2d Cir. 1979)...................................................................................17

*Guandong Enter. (N.A.) Fur Holdings Ltd. v. Hennessy*,
    No. 01 Civ. 0620 (SAS), 2002 WL 1000953 (S.D.N.Y. May 15, 2002)................14

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995)...................................................................................29

*In re Bean*,
    251 B.R. 196 (E.D.N.Y. 2000), *aff'd*, 252 F.3d 113 (2d Cir. 2001)......................21

*In re Consolidated Auto Recyclers Inc.*,
    123 B.R. 130 (Bankr. D. Me 1991)......................................................................24

*In re Enron Corp.*,
 No. 01 B 16034(AJG), 2005 WL 3874285 (Bankr. S.D.N.Y. Oct. 5, 2005)..........................33

*In re EnvisioNet Computer Serv., Inc.*,
 275 B.R. 664 (D. Me. 2002) .........................................................................................18

*In re Finnie*,
 Adversary No. 05-3652 (AJG), 2007 WL 1574294, (Bankr. S.D.N.Y. May 29, 2007)..........17

*In re Greater Se. Cmty. Hosp. Corp. I*,
 No. 02-02250, 2006 WL 1701971 (Bankr. D.D.C. May 10, 2006)........................................14

*In re Hooker Inv., Inc.*,
 155 B.R. 332 (Bankr. S.D.N.Y. 1993) ...............................................................................22

*In re Koneta*,
 357 B.R. 540 (Bankr. D. Az. 2006) ...........................................................................15, 25

*In re Lehman Bros. Holdings Inc.*,
 422 B.R. 407 (Bankr. S.D.N.Y. 2010) ...............................................................................33

*In re Nextwave Pers. Commc'ns Inc.*,
 244 B.R. 253 (Bankr. S.D.N.Y. 2000) ...............................................................................21

*Musso v. N.Y. State Higher Educ. Serv. Corp. (In re Royal Bus. Sch., Inc.)*,
 157 B.R. 932 (Bankr. E.D.N.Y. 1993)................................................................................22

*Official Committee of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.,
Inc. (In re Sunbeam)*,
 284 B.R. 355 (Bankr. S.D.N.Y. 2002) ..........................................................................29, 30

*Rafoth v. Smith & Schmidt Assocs., Inc. (In re Swedenborg)*,
 55 B.R. 820 (Bankr. N.D. Ohio 1985) ...............................................................................14

*Strauss v. Credit Lyonnais, S.A.*,
 No. CV-06-0702 (CPS), 2007 WL 2296832 (E.D.N.Y. Aug. 6, 2007)..................................36

*U.S. v. Nordic Village, Inc.*,
 503 U.S. 30 (1992)......................................................................................................27

*Whiteford Plastics Co. v. Chase National Bank*,
 179 F.2d 582 (2d Cir. 1950)..........................................................................................28

## STATUTES AND RULES

11 U.S.C. § 363....................................................................10, 19, 20, 21, 22, 23, 24, 25

11 U.S.C. § 365.............................................................................................................19

11 U.S.C. § 502(d) ...................................................................................................3, 27, 28

11 U.S.C. ¶ 546(a) ...............................................................................................................27

Rule 9019 of the Federal Rules of Bankruptcy Procedure ...........................................25

## OTHER AUTHORITIES

3 L. DISTRESSED REAL EST. § 34:91 (June 2012) ........................................................21

3 N.Y. JUR. 2d *Alteration of Instruments* § 10 (May 2012) ........................................13

22A N.Y. JUR. 2d *Contracts* § 483 (2012) ...................................................................15

Section 135 of the *Companies Act* .................................................................................15

## PRELIMINARY STATEMENT

New GM[1] intervened in this proceeding for only one reason: to protect GM Canada, which it acquired pursuant to the 363 Sale, free and clear of the Intercompany Loans made by GM Nova Scotia.[2]  To be sure, by designating the Lock-Up Agreement for assignment, New GM assumed the obligation to support the Noteholders' claims, if asked.  But that did not obligate New GM to intervene.   The Noteholders are capable of protecting their own interests.   In particular, New GM has no unique perspective on the "two claims" issue arising from GM Nova Scotia being an unlimited liability company ("**ULC**"), which is, by far, the largest dollar dispute herein.  However, the GUC Trust improperly tried to expand this proceeding by seeking to void the Lock-Up Agreement in order to invalidate the release given to GM Canada with respect to the Intercompany Loans.  This unwarranted action compelled New GM to become a party, even though the proceeding is ostensibly an objection to the claims of other entities.

To the extent that New GM has been perceived as an "advocate" for the Noteholders, it is only because the GUC Trust has tried to distort the factual record herein.  Both New GM and the Noteholders have a common objective in seeing that the underlying facts are presented fairly and accurately to the Court.   The Noteholders also share New GM's objective in preserving the Lock-Up Agreement.  But, having objectives in common in no way makes New GM an advocate for anyone other than itself.

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Joint Statement of Facts of Certain Noteholders, the GM Nova Scotia Trustee and New GM* (cited herein as "JSF, ¶ __)", which is incorporated herein by reference.

[2]  New GM would not have intervened in this proceeding to protect its Swap claims.  Those claims were made by New GM in the GM Nova Scotia insolvency proceeding, and are included as part of the Statutory Claim.  The GM Nova Scotia Trustee is the proper party to assert that claim in this proceeding.

New GM has always been concerned by the GUC Trust's passing, imprecise, references to Rule 60(b) relief relating to the Sale Order.  However, even after the evidentiary hearing in this proceeding was completed, almost four years after the Sale Order, the GUC Trust still had not made a motion for such relief.  New GM will shortly file a response to the Rule 60(b) motion, made earlier this month, which will demonstrate that the relief requested is improper and untimely.

In a similar vein, the GUC Trust has accused Old GM, and its bankruptcy counsel, Weil Gotshal, of concealing the Lock-Up Agreement from the Court. Clearly, New GM is not Old GM, and issues relating to what should have been presented to the Court for approval were the responsibility of Old GM and Weil Gotshal -- not New GM. That New GM presented evidence to demonstrate (a) why Weil Gotshal acted appropriately, and (b) that the Committee and its professionals reviewed numerous documents before the Sale Order which described the Lock-Up Agreement and never raised an issue with the Court, does not shift the responsibility relating to "disclosure" to New GM. The Sale Order was explicit that New GM acquired the Purchased Assets free and clear of all claims, whether such claims arose postpetition, and whether the claims were based on Old GM's actions or inactions, known or unknown, at the time. *See* Sale Order, ¶¶ AA, 7, 9, 10.

The underlying premise of Old GM's bankruptcy was the sale of *all* assets (not expressly excluded), free and clear of liens and claims, to a government-funded New GM, with the bankruptcy estate being compensated with a minority equity interest in the acquirer. In particular, there was no need to specify in the MSPA which assets were being sold. New GM was buying everything (other than Excluded Assets) for a purchase price well in excess of what anyone else was prepared to pay. *See* Sale Approval Decision, pp. 14-15.

Of note, there was no unencumbered cash in the bankruptcy estate. Virtually all of the available Old GM cash constituted proceeds of pre and postpetition secured government loans. Under the MSPA, the only cash left behind for Old GM was a negotiated sum for the funding of the wind-down of the bankruptcy estate. This was the deal negotiated between the U.S. Treasury and the ad hoc bondholder group at the time of the bankruptcy, implemented through the MSPA,

and well understood by the Committee, which supported the 363 Sale. *See* Tr. 10/03/12 (Mayer) at 13:25-14:7.

Also of significance is the fact that, except possibly for the Term Loan Avoidance Action, all avoiding power claims that were not sold to New GM under the MSPA (*i.e.*, transfers to or by Purchased Subsidiaries), were previously pledged as collateral for the DIP Loans. JSF, ¶ 80. In the context of this proceeding, that means whether the Consent Fee is deemed to have been (a) a transfer by Old GM to GM Canada to GM Nova Scotia and ultimately to the Noteholders, or (b) a transfer by Old GM directly to the Noteholders, makes no difference from the bankruptcy estate's perspective. In either situation, the avoiding power claims did not inure to the benefit of the unsecured creditors and therefore, the GUC Trust cannot use Section 502(d) to reduce the Guarantee Claims or the Statutory Claim by the Consent Fee.

One of the important assets acquired by New GM was GM Canada which, although insolvent at that time,[3] was an important contributor to the Canadian economy, and a significant component of Old GM's North American business. JSF, ¶ 21. Preserving GM Canada as a viable enterprise was an important priority of the Canadian Governments, and they contributed over $9 billion to Old GM's restructuring for that purpose. JSF, ¶ 79. The Canadian Governments' participation in the Old GM restructuring was well known, and the unsecured

---

[3]    In the GUC Trust's pre-trial brief, it asserts that, if the Intercompany Loans had not been released, GM Canada "would have satisfied the Notes in full . . . ." GUC Trust Pre-Trial Brief, at p. 3. This implies that GM Canada was solvent as of June 2009, had the ability to repay the Notes in full, and the Noteholders made a bad deal when they consented to a 65% discount on the Intercompany Loans. Moreover, from the bankruptcy estate's perspective, Old GM paying a debt of a solvent GM Canada would have had no impact on Old GM since its equity position in GM Canada would have increased by the amount that GM Canada's liability decreased from the paydown. Significantly, the GUC Trust presented no evidence to support its "solvency" theory.

The GUC Trust has also argued in this proceeding the opposite position: that GM Canada was insolvent in June, 2009, and therefore the Consent Fee was substantially more than what would have been paid in a GM Canada bankruptcy on account of the Intercompany Loans.

3

creditors greatly benefitted from the substantial additional monetary contributions made by the Canadian Governments to Old GM.[4]

The Governments decided that they preferred *not* to have GM Canada file for bankruptcy in Canada. They were particularly concerned about preserving their strict timing deadlines for the 363 Sale,[5] and the increased "execution risk" of trying to coordinate insolvency proceedings in multiple countries. JSF, ¶¶ 22, 26. The Governments were prepared to have their collateral fund the last remaining obstacle to avoiding a GM Canada bankruptcy -- the settlement of the Intercompany Loans. JSF, ¶ 27. The Lock-Up Agreement, which led to the Extraordinary Resolution, was the mechanism to settle the Intercompany Loans. The cash required for the settlement emanated from the proceeds of the prepetition secured U.S. Treasury loan.[6]

The expenditure of the Governments' loan proceeds to avoid a GM Canada bankruptcy had no adverse impact on Old GM or its creditors and, in fact, clearly benefitted Old GM's creditors. *First*, the expenditure had no impact on unsecured creditors. Under no circumstances would the funds have been available to unsecured creditors. The funds would either have reduced the Governments' $33 billion DIP Loan, or would have been turned over to the predominately Government-owned New GM. JSF, ¶ 80. *Second*, to the extent the expenditure facilitated the successful implementation of the 363 Sale, it eliminated the risk of an Old GM

---

[4]  At trial, Committee counsel testified that the Committee never asked any questions about GM Canada. Tr. 10/03/12 (Mayer) at 22:22-23:13. The inference to be drawn from this "lack of inquiry" is not necessarily an "asleep at the wheel" Committee. Rather, the Committee clearly understood at the time that (a) the Canadian Governments were going to contribute $9 billion to bolster GM Canada, (b) it had little influence to stop the "steamrolling" 363 Sale, and (c) it would reap the benefit of the $9 billion contributions as future stockholders of New GM.

[5]  The Governments deadline was July 10, 2009. Sale Approval Decision, at 36. As noted in the Sale Approval Decision, the Court agreed with the Committee's argument that it should not play "Russian Roulette" with the Governments deadlines and that they should be taken very seriously. Sale Approval Decision, at pp. 36-38.

[6]  On May 22, 2009, just nine days before the bankruptcy filing, to address Old GM's liquidity needs, U.S. Treasury made a $4 billion loan to Old GM, and on May 29, 2009, U.S. Treasury advanced another $360 million. JSF, ¶ 27. As of the Petition Date, Old GM had only $2 billion on hand. *Id.* Thus, in this short interval, Old GM used $2 billion of the U.S. Treasury Facility to make substantial disbursements to its non-Debtor subsidiaries and third parties. The $450 Million Loan was one such transfer made during this period.

liquidation, which would have yielded no distribution to the unsecured creditors. *See* Sale Approval Decision, p. 5. ***Third***, to the extent the expenditure discounted a large GM Canada debt, it strengthened New GM's equity position in GM Canada, and Old GM unsecured creditors thereby benefitted through their equity interest in New GM. ***Fourth***, while the expenditure did not reduce unsecured claims against Old GM, it likewise did not increase the amount of unsecured claims. And, the fact that unsecured claims were not reduced was a risk shared by New GM, which agreed under the MSPA to provide additional equity to the unsecured creditors if allowed claims exceeded $35 billion.[7] JSF, ¶ 74.

The reality faced by Old GM in 2009 is the same reality which the GUC Trust faces now. The Noteholders have structurally superior claims than the other Old GM bondholders. JSF, ¶ 17. They were creditors of both Old GM ***and*** GM Canada (through GM Nova Scotia) and, since they also had claims against GM Nova Scotia, a ULC, they were the indirect beneficiary of the Statutory Claim. The *bona fides* of the Statutory Claim is premised on a Nova Scotia statute, and, in 2009, there was no clear legal precedent interpreting the statute or its interplay with U.S. bankruptcy law in respect of the "two claims" issue. Faced with this unsettled legal issue, Old GM and the Governments struck a deal with the Noteholders which allowed GM Canada to avoid filing for bankruptcy, yet preserved the "two claims" issue for eventual resolution by the Court.

Originally, Old GM tried to settle with the Noteholders by offering a sum for a full release of the Notes and the Guarantee. JSF, ¶ 35. The parties could not reach a deal on that basis. Ultimately, the parties settled by paying the Noteholders a sum so they would consent to GM Nova Scotia settling the Intercompany Loans at a steep discount. JSF, ¶ 41. This resolution

---

[7]   Similarly, any burden caused by the sale of the Swaps to New GM which increased the Statutory Claim would have been shared by New GM to the extent that the aggregate allowed claims against Old GM exceeded $35 billion. JSF, ¶ 74.

5

disentangled GM Canada from the Noteholders, but left all of the Noteholders' other claims and sources of recovery in place. That simplified structure was the economic deal reached by the parties, and the only path to avoid a GM Canada bankruptcy. The Governments and Old GM pursued this arrangement as the best available option, and the Governments allowed their collateral to be used to fund the settlement. That other potential settlement structures existed (but were rejected by the parties) is not a basis to invalidate the Lock-Up Agreement.

In approving the 363 Sale, the Court ruled that the ad hoc group of holdout bondholders did not have standing to tell the purchaser which creditors of Old GM it could voluntarily pay.[8] Similarly, the GUC Trust[9] does not have standing to tell the Governments how much of their collateral proceeds should be used to pay creditors of GM Canada in order to solve an issue which was vitally important to the Canadian Governments' national interests.[10] The Court properly noted that bondholders trying to increase their incremental recoveries by objecting to the 363 Sale needed to be careful what they wished for. Sale Approval Decision, pp. 3, 28. If they were successful and the 363 Sale was not approved and Old GM liquidated, they would end up with nothing. *Id.*

Indeed, since GM Canada did not file for bankruptcy, it was not under any Bankruptcy Code restrictions as to how it could pay its creditors.[11] In fact, since there was no bankruptcy shield, there was significant pressure on GM Canada to pay its creditors in full. Shortly before

---

[8]  Sale Approval Decision, at pp. 44-45. This situation is even one step more removed than the argument made by the objecting bondholder group. There, the objectors were complaining about disparate treatment among Old GM creditors. Here, the GUC Trust is complaining about how a creditor of a non-Debtor subsidiary was paid.

[9]  The GUC Trust unit holders are predominantly former bondholders and are led by a representative of Wilmington Trust, the indenture trustee for most of the bonds. *See* Motors Liquidation Company GUC Trust Quarterly GUC Trust Reports as of December 31, 2012, dated February 14, 2013 [Dkt. No. 12328]. This proceeding has many of the features of an inter-creditor fight between two distinct bondholder groups.

[10]  The Canadian Governments were highly concerned about saving their domestic auto industry.

[11]  Similarly, many other non-Debtor Purchased Subsidiaries were never under Bankruptcy Code restrictions as to how they ultimately paid their creditors. Def. Tr. Ex. 226 (MSPA) and Def. Tr. Ex. 204, at Section 4.4.

Old GM's bankruptcy filing, the determination was made by Old GM and the Governments that

GM Canada discounting the Intercompany Loans by 65% was a prudent decision, especially if

the by-product of this settlement was to ensure that GM Canada need not file for bankruptcy.

Buonomo Direct Test., ¶¶ 7, 37-40.

Essentially, the amount of the Governments' expenditure to solve the GM Canada

problem was based on what New GM and GM Canada could achieve if GM Canada avoided

bankruptcy. The Noteholders were not paid based on what they would have received in a GM

Canada bankruptcy.[12] That concept was followed in the Old GM bankruptcy. The unsecured

creditors were compensated based on what New GM could achieve by a prompt 363 Sale. They

were not compensated based on what they would get in a liquidation of Old GM (*i.e.*, nothing).

The complexities presented in this proceeding were not created by the Lock-Up

Agreement or even by the Noteholders. The structurally superior position of the Noteholders

arose from (a) the 2003 issuance of the Notes by a Nova Scotia ULC, (b) the Guarantee issued in

connection therewith, and (c) the tax advantaged Intercompany Loans made to GM Canada in

2003. The transfer of the Swaps to New GM did not occur because of the Lock-Up Agreement.

They were 2003 transactions that were transferred under the MSPA, along with all other assets of

---

[12] If the Lock-Up Agreement had not been signed before Old GM filed for bankruptcy, GM Canada would have
filed for bankruptcy on the same day, and would have tried to mirror Old GM's bankruptcy process by selling
its assets to a government-sponsored new entity, on the same timeline (and with the same deadlines) as the 363
Sale. JSF, ¶ 26. The GM Canada asset sale contemplated paying nothing for the Intercompany Loans. *Id.* Old
GM and GM Canada expected that the Noteholders who brought the Nova Scotia Litigation would have
vigorously contested that result. *Id.* The answers to (a) when a final litigated result in Canada would have
occurred, and what that result would have been, (b) what would have been the impact on GM Canada's business
if there was a protracted Canadian bankruptcy proceeding, (c) whether GM Canada would have ever been paid
the CAD $1.6 billion tax refund, and (d) whether the timeline to consummate the sales in the U.S. and
Canadian bankruptcy proceedings would have been compromised and, if so, would that have jeopardized the
Governments' funding and the sales itself, is highly debatable. The certainty achieved by the firm deal obtained
in the Lock-Up Agreement mooted the legal debate and the factual conjecturing with respect to the answers to
these questions.

value to New GM.  In short, the GUC Trust's argument that the Lock-Up Agreement actually created $2.6 billion of claims against the bankruptcy estate is unsupportable.

The Lock-Up Agreement was a multi-party agreement and Old GM was only one of the parties; it had minimal obligations thereunder.  They were (a) to cooperate, if requested by the Noteholders, (b) to subordinate, under certain conditions, the Swap Claims, and (c) to not setoff the Swap Claims against the Statutory Claim.  JSF, ¶ 64.  Since the Swap Claims were sold to New GM under the MSPA, the subordination/no setoff provisions ultimately became New GM issues -- not Old GM concerns.  The cooperation obligation was also assumed by New GM.  Thus, it is abundantly clear that voiding the Lock-Up Agreement so that Old GM (which is dissolved) does not have to perform obligations that it otherwise did not have to perform, has no benefit to the unsecured creditors of Old GM.  What the GUC Trust is really seeking to do by voiding the Lock-Up Agreement at this point is to reverse the settlement of the Intercompany Loans.  As set forth herein, there are many important reasons why that relief cannot, and should not, be granted.

The vitality of the Lock-Up Agreement, especially the release therein of GM Canada, is critically important to New GM.  The elimination of the Intercompany Loans was consistent with the 363 Sale structure agreed to by the purchaser.  Initially, there were only four Debtors that filed for bankruptcy in the United States.  Many of the Purchased Subsidiaries acquired by New GM, such as GM Canada, had substantial assets and never filed for bankruptcy.  Def. Tr. Ex. 158, at Schedule 8.  In agreeing to acquire valuable non-filed Subsidiaries, via a transfer of the Subsidiaries' stock -- instead of the Subsidiaries' assets -- New GM and the Governments made the determination that the creditor issues in these non-filed Purchased Subsidiaries were properly quantified and contained.  With respect to GM Canada, that determination was predicated in

8

major part on the elimination of the Intercompany Loans, which, in accordance with the passage of the Extraordinary Resolution, already had occurred as of the time of the approval of the 363 Sale. The Canadian Governments contributed $9 billion to Old GM, predicated on there being a firm deal in place with respect to the satisfaction of the Intercompany Loans.[13]

Since the Intercompany Loans issue has been raised by the GUC Trust in this proceeding, it is important to New GM that, however the Court parses the claims issues, it confirms that New GM and its subsidiary, GM Canada, remain unburdened by the already settled Intercompany Loans and the Nova Scotia Litigation. That is the fresh start which the Governments and New GM (as good faith purchaser) bargained for as part of the 363 Sale.

## ARGUMENT

## POINT I

## THE LOCK-UP AGREEMENT SHOULD NOT BE VOIDED

Years after the 363 Sale, the GUC Trust, in violation of its foundational documents, seeks to "void" the Lock-Up Agreement so that a restructured GM Canada (with the benefit of over $9 billion contributed by the Canadian Governments (JSF, ¶ 79)) would be required to pay an even greater amount for the benefit of the Noteholders. To be sure, the GUC Trust's strategy is "scatter shot," and anything but consistent. After years of demonizing the Noteholders about the "special deal" they got, they now seek relief which would result in the Noteholders obtaining an even greater recovery on their claims, without any regard to the rights of the purchaser.[14] Essentially, the GUC Trust is trying to have New GM (through a restructured GM Canada) pay

---

[13]   The majority of the Canadian Governments' $9 billion contribution occurred after the Extraordinary Resolution was passed, and the 363 Sale Hearing had occurred. *See Sale Approval Decision*, p. 14 n. 10.

[14]   Remarkably, the GUC Trust does not seemed troubled by simultaneously moving to equitably subordinate the Noteholders' claims because of their alleged "special deal," and seeking to void the Lock-Up Agreement so the Noteholders can potentially receive an even better "special" deal from New GM.

for claims (held by the Noteholders) which, under the 363 Sale, remained behind with Old GM. This result is contrary to the very essence of the 363 Sale, and it is way too late for such relief.

All of the GUC Trust's theories as to why the Lock-Up Agreement should be voided are without merit. **First**, the Lock-Up Agreement is a prepetition transaction and thus not "void" as a post-petition transaction. **Second**, the Lock-Up Agreement had minimal obligations for Old GM and such obligations did not negatively affect Old GM[15] or its unsecured creditors. **Third**, the Court lacks jurisdiction to affect the settled relationship between two non-U.S. Debtors, one of whom (GM Nova Scotia) has become the subject of a foreign insolvency proceeding. **Fourth**, the Lock-Up Agreement was either an assigned executory contract or a Purchased Contract. In either circumstance, the pre/postpetition issue as to when the Lock-Up Agreement became a binding agreement is rendered moot. **Fifth**, the GUC Trust has no standing to challenge the Lock-Up Agreement based on avoiding power claims.[16] **Sixth**, since New GM bought, *inter alia*, Section 549 claims relating to transfers between Old GM and Purchased Subsidiaries, there is no benefit to the unsecured creditors in challenging the Lock-Up Agreement or the payments made thereunder. Also, since the Lock-Up Agreement was not a "use", "sale" or "lease" of bankruptcy estate property, Section 363 of the Bankruptcy Code is not implicated.

## A.      The Lock-Up Agreement was a Valid Pre-Petition Agreement[17]

There was a binding agreement with respect to the terms of the Lock-Up Agreement, and all of the parties thereto executed the Lock-Up Agreement and directed the release of their

---

[15]    No party to the Lock-Up Agreement, including Old GM, has ever asked to modify, let alone "void" the Lock-Up Agreement after Old GM's bankruptcy filing.

[16]    The Noteholders' post-trial brief contains a section regarding the GUC Trust's lack of standing for this and other issues; New GM incorporates those "standing" arguments as if set forth herein.

[17]    New GM has tried to not replicate herein the legal arguments made by the Noteholders or the GM Nova Scotia Trustee, and, where appropriate, it incorporated by reference arguments made in the other post-trial briefs. Notwithstanding, there were certain unavoidable instances where New GM believed it necessary to make, from its perspective, important legal arguments which the Noteholders also were making in their post-trial brief.

signature pages, prior to Old GM's bankruptcy filing. JSF, ¶ 49. This fact was confirmed by a representative of each of the four Noteholders who testified, the Noteholders' counsel, as well as by witnesses who worked for Old GM at the time (*id.*),[18] and Old GM's professionals.[19] Each of these individuals was present at the offices of Weil Gotshal during the early morning of June 1, 2009 and had first-hand knowledge of these events.

The GUC Trust presented no evidence from any witness with a different version of these events. The only thing the GUC Trust proffered was the testimony of their "expert," who attempted to show when the final version of the Lock-Up Agreement was saved on Weil Gotshal's computer.[20] Pl. Tr. Ex. 288. However, when a computer file was last saved (or even when previously agreed to edits were put on Weil Gotshal's document services system) does not establish when the parties agreed to be bound by an agreement. In New York, "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. N.Y. State DOT*, 93 N.Y.2d 584, 589 (1999), *reargument denied*, 93 N.Y.2d 1042 (1999). Significantly, however:

> [n]ot all terms of a contract must be fixed with absolute certainty for a binding contract to exist. [citation omitted] Although "there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be 'pedantic or meticulous' in interpreting contract expression.

---

[18]  One of the Old GM witnesses (Mr. Buonomo) anticipated that if the 363 Sale was approved, he would work for the purchaser. His primary motivation in dealing with Lock-Up Agreement issues was getting a deal done that would be acceptable to his senior management at Old GM, and the Governments, who, as secured lenders to Old GM and GM Canada, needed to consent to the deal. Ultimately, it was senior management and the Governments (not Mr. Buonomo) who made the economic decision whether to enter into the Lock-Up Agreement or not. Buonomo Direct Test., ¶ 15; Tr. 08/09/12 (Buonomo) at 30:23-31:6, 229:24-231:16; *see generally* Sale Approval Decision, pp. 16, 41.

[19]  Smolinsky Dep., 15:10-16:11. Old GM also confirmed in a securities filing after the 363 Sale that the Lock-Up Agreement was a pre-petition agreement. JSF, ¶ 114.

[20]  The Noteholders' post-trial brief and the Joint Statement of Facts (JSF, ¶¶ 55-58) highlights the limited scope of Mr. Jones' opinions and the lack of reliability of some of his conclusions. That section of the Noteholders' brief is also incorporated herein by reference.

*Friedman v. Schwartz*, No. 08-CV-2801 (JS) (WDW), 2009 WL 701111, *9 (E.D.N.Y. March

13, 2009) (quoting *Express Indus.*, 93 N.Y.2d at 590).

Here, the uncontradicted testimony and documentary evidence presented at trial

demonstrated that there was a mutual agreement by the parties to be bound to all material terms

prior to Old GM's bankruptcy filing. JSF, ¶ 49. The parties signed the Lock-Up Agreement and

authorized the release of their signature pages prior to Old GM's bankruptcy filing. *id.* Old

GM's negotiators reported the deal as complete to their superiors, prior to Old GM's bankruptcy

filing. JSF, ¶¶ 50-52. Those superiors reported the deal as complete to GM Canada, which

suspended preparation on a June 1 GM Canada bankruptcy filing, prior to Old GM's bankruptcy

filing. *Id.* Old GM also reported the deal as complete to representatives of the Canadian

Governments, who were physically present to confirm that outcome, all of which occurred prior

to Old GM's bankruptcy filing. *Id.* A key party left Weil Gotshal prior to the bankruptcy filing

because he believed that there was a binding agreement in place. JSF, ¶ 53. Mr. Buonomo

testified that he had no discussions about modifying the terms of the Lock-Up Agreement after

Old GM's bankruptcy filing, he did not authorize any further changes to the terms of the Lock-

Up Agreement after the bankruptcy filing, and he was never made aware of any changes to the

Lock-Up Agreement by Weil Gotshal after the bankruptcy filing. JSF, ¶ 53. All of these facts

establish the parties' intention to be bound by the Lock-Up Agreement prior to Old GM's

bankruptcy. JSF, ¶ 49.

Paragraph 10 of the Lock-Up Agreement provides that "this Agreement shall not become

effective and binding on a Party unless and until a counterpart signature page to this Agreement

has been executed and delivered by such Party." Def. Tr. Ex. 187, ¶ 10. The trial testimony is clear that this all occurred prior to the bankruptcy filing.[21]

It is a question of law whether any changes to the Lock-Up Agreement, after the release of signature pages, affects its validity. As explained in New York Jurisprudence:

> If a correction is innocently made to conform a contract to the actual agreement and understanding of the parties, such an alteration will not vitiate the instrument. In other words, a change in an instrument to express the real bargain of the parties is not a material change.

3 N.Y. JUR. 2d *Alteration of Instruments* § 10 (May 2012).

Even assuming that some minor scrivener's errors were corrected after signature pages were released, the fact remains that there was already a final, binding agreement between the parties to the Lock-Up Agreement independent of whether further changes were made. And, even if changes were made post-petition, they were not substantive, and they had no impact on Old GM or any issue in this proceeding. At most, they constituted a non-material amendment to an already binding agreement.

Revised Demonstrative No. 4 highlights all of the potential changes made to the Lock-Up Agreement after the bankruptcy filing. There were only three minor changes to the Lock-Up Agreement itself -- none of them affected Old GM. Specifically:

> 1.    There was a relocation of a phrase "other than by reason of a material breach by a Holder." Mr. Buonomo testified about a clause that was in the wrong place which needed to be moved. Tr. 08/09/12 (Buonomo) at 235:11-236:9. It appears this clause did move before Old GM's bankruptcy filing (at 7:34 a.m.) but was not immediately deleted from its original spot. This was a scrivener's error made by the Weil Gotshal associate, and did not change the terms of the Lock-Up Agreement already agreed to. The clause that was deleted dealt with an exception to the effect of a termination of the Lock-Up Agreement by the Noteholders. Since the Lock-Up Agreement was never terminated, the scrivener's error had no practical relevance.

---

[21]    The GUC Trust's reference to a provision in a non-disclosure agreement signed when negotiations started is irrelevant. That document was superseded by an agreed upon, binding, Lock-Up Agreement.

2.    The second change reflected "wordsmithing" a provision relating to the survivability of individual releases upon termination. The change in language only pertained to individuals (not Old GM), the triggering event (termination) never occurred, and there was no practical difference between the language used in the before and after versions.

3.    The last change made no difference either. The word "the" was deleted in favor of the word "each."

JSF, ¶ 60.

Exhibit "A" to the Lock-Up Agreement was the Extraordinary Resolution to be approved by the Noteholders (not Old GM). Def. Tr. Ex. 187, Exh. "A." Before the bankruptcy filing, the parties to the Lock-Up Agreement agreed that the terms of the Extraordinary Resolution should conform to the Lock-Up Agreement. JSF, ¶¶ 48, 61. Revised Demonstrative No. 4 shows that the edits were simply the agreed-upon conforming changes. In short, any minor, conforming edits that may have been made to the Lock-Up Agreement postpetition did not render the Lock-Up Agreement a postpetition agreement that required court-approval. *See In re Greater Se. Cmty. Hosp. Corp. I*, No. 02-02250, 2006 WL 1701971, at *15 (Bankr. D.D.C. May 10, 2006) (post-petition correction in agreement "was merely the parties' memorialization of a pre-existing fact" that did not require court approval); *Rafoth v. Smith & Schmidt Assocs., Inc. (In re Swedenborg)*, 55 B.R. 820, 828 (Bankr. N.D. Ohio 1985).

Even if post-petition corrections were made to the Lock-Up Agreement *and* such corrections materially affected Old GM (which is not the case), the result would not be that the Lock-Up Agreement would be void; rather, the pre-petition version of the Lock-Up Agreement would be valid and enforceable. In New York, if mutual assent to a proposed modification is lacking, the "original terms of the contract remain in effect." *Beaver Emp't Agency, Inc. v. Neostring, Inc.*, 609 N.Y.S.2d 509, 510 (N.Y. Civ. Ct. 1993); *see also Guandong Enter. (N.A.) Fur Holdings Ltd. v. Hennessy*, No. 01 Civ. 0620 (SAS), 2002 WL 1000953, at *14 n. 27

14

(S.D.N.Y. May 15, 2002); 22A N.Y. Jur. 2d *Contracts* § 483 (2012). The application of

bankruptcy law does not change this principle. *See In re Koneta*, 357 B.R. 540, 542-44 (Bankr.

D. Az. 2006) (finding that, even though one out of two post-petition modifications was not in the

ordinary course (the other was) and required court approval, the entire agreement was not void;

the version of the earlier agreement remained valid and enforceable).

The Lock-Up Agreement contains a "Severability" clause, which provides:

> Any provision of this Agreement which is prohibited or unenforceable in any
> jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such
> prohibition or unenforceability without invalidating the remaining provisions
> hereof or affecting the validity or enforceability of such provisions in any other
> jurisdiction.

Def. Tr. Ex. 187, ¶ 23. Pursuant to this provision, if some postpetition change to the Lock-Up

Agreement impermissibly affected Old GM (there is none), only those Old GM provisions would

have been avoided, and the remainder of the agreement would remain in effect for the other

parties. Here, in particular, the release of the Intercompany Loans between non-Debtor entities

would have remained valid and enforceable.

**B.      There is No Benefit to the Bankruptcy
         Estate By Voiding the Lock-Up Agreement**

The $450 Million Loan was made prepetition on May 29, 2009 (JSF, ¶¶ 37-40), and there

was no prohibition against non-Debtor GM Canada using *its* funds to discharge *its* obligations

under the Intercompany Loans. Moreover, the loan proceeds never would have gone to the

Debtors' unsecured creditors; they would have either gone to New GM, as the purchaser of cash

under the MSPA, or the DIP Lenders (the Governments), as the Debtors' secured creditors. JSF,

¶ 70. Under the 363 Sale, the unsecured creditors obtained a fixed recovery (*i.e.*, stock and

warrants in New GM, wind-down cash, and the possibility of a recovery with respect to the Term

Loan Avoidance Action), nothing else. Tr. 10/03/12 (Mayer) at 16:21-17:10.

The GUC Trust is just wrong when it contends that (i) the Guarantee Claims and Statutory Claim are obligations that arise under the Lock-Up Agreement (Claims Objection, ¶ 6; Complaint, ¶¶ 3, 136); and (ii) the Lock-Up Agreement "created a massive and improper Swap Liability against Old GM." (Complaint, ¶ 137). The Statutory Claim arose pursuant to Section 135 of the *Companies Act* (Nova Scotia). The Guarantee Claims were in existence since 2003. The Swaps were assigned to New GM pursuant to the MSPA.

Old GM only had the following minimal obligations under the Lock-Up Agreement ("**Three Old GM Covenants**"):

i.   Old GM agreed that the Statutory Claim and the Guarantee Claims were enforceable against Old GM "to the fullest extent permitted under applicable laws . . . ." If called upon, Old GM agreed to confirm its understanding. Def. Tr. Exh. 187 (Lock-Up Agreement, at ¶ 6(a)) ("**Cooperation Provision**").[22]

ii.  Old GM agreed that if any portion of the Statutory Claim was disallowed, Old GM's claim on account of the Swaps would be subordinated to the prior, indefeasible payment in full of the Notes. *Id.*, at ¶ 6(b)(v).

iii. Old GM agreed that it would not assert any right of set off with respect to the Statutory Claim. *Id.*, at ¶ 6(b)(vi).

JSF, ¶ 64. These obligations are not property of the Debtors that would have been distributed to the unsecured creditors.[23] Accordingly, there is no benefit to the bankruptcy estate in voiding the Lock-Up Agreement. Moreover, based on the Severability clause in the Lock-Up Agreement, even if the Court were to void the Lock-Up Agreement, the remedy would be limited to the Three Old GM Covenants, and nothing more. In such circumstances, where the bankruptcy

---

[22]  As noted. the trial testimony was clear that all parties understood that a firm deal needed to be in place, otherwise GM Canada would have filed for bankruptcy on June 1, 2009. JSF, ¶¶ 20, 24, 26. Thus, Old GM made clear by the language "to the fullest extent permitted under applicable laws" that it would have a firm deal with the Noteholders even though it could not guarantee the ultimate outcome of the treatment of the Guarantee Claims or the Statutory Claim in Old GM's bankruptcy case. Tr. 08/10/12 (Buonomo) at 113:17-114:19.

[23]  Since the Swaps were assigned to New GM under the MSPA, any bankruptcy estate issues relating to the subordination of Swap claims distributions, or the requirement to not setoff the Swap claims, are moot.

estate was not impacted, a postpetition sale transaction under Section 363 is not even voidable, let alone void. *See Bean v. Agard (In re Bean)*, 252 F.3d 113 (2d Cir. 2001).

### C.    The Court Lacks Jurisdiction to Void the Lock-Up Agreement With Respect to the Non-Debtor Parties

As a general rule, a bankruptcy court lacks jurisdiction to decide controversies between third parties which do not involve the debtor or its property. *See Gordon v. Shirley Duke Assoc., A.P.I. (In re Shirley Duke Assoc.)*, 611 F.2d 15, 18 (2d Cir. 1979); *see also In re Finnie*, Adversary No. 05–3652 (AJG), 2007 WL 1574294, *12 (Bankr. S.D.N.Y. May 29, 2007) (quoting *Shirley Duke*). Here, the Intercompany Loans were between non-Debtors (JSF, ¶ 5), and settled pursuant to an agreement between GM Canada and GM Nova Scotia, as consented to by the Noteholders through the Extraordinary Resolution, none of which were Debtor parties. The settlement payment for the Intercompany Loans came from non-Debtor property. JSF, ¶¶ 63, 86, 87. Simply put, the Court does not have jurisdiction to void the Lock-Up Agreement as it pertains to non-Debtor parties merely because Old GM is also a party thereto with minimal obligations until the date of assignment of the Lock-Up Agreement to New GM, and ***no*** obligations at this point.

### D.    The Lock-Up Agreement Was Either Validly Assumed and Assigned, or a Purchased Contract

Since the Lock-Up Agreement was assumed and assigned to New GM (JSF, ¶¶ 108-110), the prepetition/postpetition distinction raised by the GUC Trust relating to when the Lock-Up Agreement became binding is rendered moot.[24] All transfers made pursuant to an assumed executory contract are not subject to avoidance since the obligation to "cure" validates all prior

---

[24] Since the Lock-Up Agreement was designated for assignment months before the Committee raised any issue relating to the Lock-Up Agreement, it is clear that the purpose of the assignment was not to moot the pre/postpetition issue, even though that is the consequence of the assignment.

transfers made thereunder.[25]   Here, that principle is especially applicable since "cure" amounts were paid by New GM (Def. Tr. Ex. 226 (Sale Order), ¶ 23) and, under the MSPA, all cash (above the Wind-Down Amount) went to New GM (JSF, ¶¶ 69, 70), and all avoiding power claims were sold to New GM or pledged to the Governments under the DIP Loan. JSF, ¶ 80.

New GM did not want the Noteholders to claim a breach of the Lock-Up Agreement, which contained the release of the Intercompany Loans, based on a breach of the Cooperation Provision.  It therefore designated the Lock-Up Agreement for assignment which was noted in the Contract Database on July 24, 2009.  JSF, at, ¶ 108; Def. Tr. Ex. 348.  The Noteholders were notified of the Lock-Up Agreement assignment and have never challenged that action.  JSF, ¶110.  Old GM acknowledged that the Lock-Up Agreement was assigned to New GM.  *Id.*

The Committee agreed that it would be carved out of the assumption/assignment process. It agreed that it would not be entitled to receive notice of the designation of an executory contract, and it agreed that it would have no access to the Contract Database of assigned agreements.  JSF, ¶ 109.  Committee counsel acknowledged that the Committee has no standing to challenge the assignment of an executory contract.  *Id.*  The truncated assignment procedure was approved by the Committee and authorized by the Court pursuant to the Sale Procedures Order and the Sale Order.[26]  It reflects the reality that (i) there were hundreds of thousands of contracts at issue (Sale Motion, p. 35 n. 4),  (ii) the purchaser (New GM) paid for the right to

---

[25]   While it was New GM's right to determine which contracts to assume, it was Old GM's obligation to follow the Assumption and Assignment Procedures. Tr. 08/09/12 (Buonomo) at 106:1-11; Sale Procedures Order, ¶ 10. If Old GM did not expressly follow the relevant procedures, that still did not alter the fact that the Lock-Up Agreement became a Purchased Asset when New GM designated the executory contract for assignment.

[26]   It is too late for the Committee to complain about its lack of involvement in the assignment of executory contract process.  *See In re EnvisioNet Computer Serv., Inc.*, 275 B.R. 664, 669 (D. Me. 2002) ("The parties participated in negotiations and hearings leading up to the issuance of the August 20th order, and they were fully aware of the terms of the bid and sale procedures approved by the bankruptcy court.  The Court construes their failure to object at that time as a waiver of their right to do so.").

18

acquire any asset, including any executory contract[27] it chose to assume, and (iii) all payments made under an assumed executory contract would be validated for the reasons stated above.

Even if the Lock-Up Agreement was not an executory contract, it constituted a "Purchased Contract" that was transferred to New GM pursuant to the MSPA. Section 2.2(a)(x) of the MSPA provides "all Contracts, other than the Excluded Contracts (collectively, the 'Purchased Contracts')" are Purchased Assets. Def. Tr. Ex. 226 (MSPA). "Excluded Contracts" include five categories of contracts that were not sold to New GM, and the Lock-Up Agreement is not in any of the categories. The definition of "Contracts" in the MSPA includes all postpetition Contracts.[28] Def. Tr. Ex. 226 (MSPA), p. 5. Accordingly, the Lock-Up Agreement, whether it was a pre- or postpetition contract, was purchased by New GM pursuant to the MSPA.

**E.    The Lock-Up Agreement is Not Void Pursuant
to Sections 549 or Section 363 of the Bankruptcy Code**

Since the Lock-Up Agreement was a prepetition agreement, Sections 549 and 363 of the Bankruptcy Code are not applicable. Even if the Lock-Up Agreement was a postpetition agreement, Section 549 would not be applicable since (a) the monetary payment referenced in the Lock-Up Agreement was ultimately made from a non Debtor to a non Debtor; (b) New GM bought all Section 549 claims relating to payments from Old GM to and by its Purchased Subsidiaries (i.e., GM Canada) (JSF, ¶¶ 69, 72, 73); (c) the GUC Trust has no standing to bring Section 549 claims and the two year time period to bring such claims has expired; (d) the assumption and assignment and/or sale of the Lock-Up Agreement to New GM rendered the pre/postpetition distinction moot, and thus, insulated any Section 549 transfers made thereunder;

---

[27]    The term executory contract as used in the MSPA was not limited to the contracts covered by Section 365 of the Bankruptcy Code. It included any contracts designated by New GM. Sale Procedures Order, Exh. D (Form of Assumption and Assignment Notice), at ¶ 15.

[28]    Since Old GM was an operating business during the postpetition period prior to the 363 Sale closing, New GM needed to be able to buy both pre- and postpetition Contracts.

and (e) the Cash Management Order and the DIP Loan would have authorized Old GM to make postpetition intercompany transfers to GM Canada anyway.

Section 363 would similarly not be applicable for most of the above-stated reasons. In addition, Section 363 relates to the "use", "sale" or "lease" of bankruptcy estate property and the Lock-Up Agreement does not involve bankruptcy estate property nor does it fit in any of the Section 363 categories.

### 1.     Section 549 of the Bankruptcy Code

Section 549 of the Bankruptcy Code does not apply because there was no "transfer of property of the estate that occur[ed] after the commencement of the case[.]" While the implementation of the Lock-Up Agreement required that certain events occur postpetition, Old GM had no role in those matters and/or they did not affect the bankruptcy estate. Specifically, while the Escrow Agreement was to be executed after the Petition Date, Old GM was not a party thereto -- this agreement concerned monies from GM Canada and the beneficiaries of the escrow were GM Canada, GM Nova Scotia, and ultimately the Noteholders (all non-Debtors). JSF, ¶ 86. Moreover, although a meeting of holders of Notes was required to be held to pass the Extraordinary Resolution, this solely concerned the Noteholders and GM Nova Scotia. JSF, ¶ 87. Further, the Consent Fee was transferred post-petition by GM Nova Scotia to the Fiscal and Paying Agent, who then transferred it to the Noteholders (all non-Debtors). *Id.*

Old GM's only continuing obligation after the Petition Date with respect to the Lock-Up Agreement was the Cooperation Provision (JSF, ¶ 64), which did not affect Old GM's bankruptcy estate or the Committee's ability to contest the Guarantee Claims or the Statutory

20

Claim.[29]  Moreover, Old GM never performed the Cooperation Provision,[30] as New GM assumed

it when the Lock-Up Agreement was assigned to it.  JSF, ¶ 108.

Even if there was some type of "postpetition transfer" (which there was not), it would be

"voidable" -- not "void":

> A trustee is under no mandatory duty to pursue and recover every transfer that
> might be avoidable under [Section 549.  This section] give[s] the trustee
> discretion to utilize the remedies set forth but do not force him to do so.  [Section
> 549 says] that a trustee 'may' pursue the remedy, not that he must.

*In re Bean*, 251 B.R. 196, 204 (E.D.N.Y. 2000), *aff'd*, 252 F.3d 113 (2d Cir. 2001); *see also* 3 L.

DISTRESSED REAL EST. § 34:91 (June 2012); *In re Nextwave Pers. Commc'ns Inc.*, 244 B.R. 253,

275-76 (Bankr. S.D.N.Y. 2000) (same).  Here, no Section 549 action was ever brought, the two-

year period to bring such action has passed.  Also, Section 549 claims relating to intercompany

transfers were sold to New GM, and otherwise pledged as collateral for the DIP Loan, so they do

not belong to the bankruptcy estate.  JSF, ¶ 80.

### 2.    Section 363 of the Bankruptcy Code

While the GUC Trust has asserted that the Lock-Up Agreement is "void" because Court-

approval was not sought pursuant to Section 363(b) of the Bankruptcy Code, the GUC Trust has

proffered no evidence explaining how the Lock-Up Agreement constituted the "use, sale or

lease" of "property of the estate."

As of the Petition Date, GM Canada -- not Old GM -- owned the funds which were

eventually used to pay the Consent Fee.  JSF, ¶ 39.  Transfers made by GM Canada, a non-

Debtor, are not a "use" of "property of the estate."  The GM Canada account where the proceeds

---

[29]   The GUC Trust's takes Mr. Buonomo's testimony out of context when it claims that he thought there could be
litigation relating to the Lock-Up Agreement.  Mr. Buonomo was referring to litigation over the unsettled "two
claims" issue which was preserved by the Lock-Up Agreement.  He never testified that he anticipated litigation
to void the Lock-Up Agreement.

[30]   Old GM is now dissolved, so it cannot perform the Cooperation Provision, which, in any event, is a burden to
perform, not a benefit.

of the $450 Million Loan were transferred was not a trust or escrow account; it was a general account owned by GM Canada and Old GM had no interest therein.  JSF, ¶ 39.  While Old GM may have had a contractual right, if certain events occurred, and GM Canada failed to return the proceeds of the $450 Million Loan, this did not make the actual loan proceeds "property of the estate."[31]  Dominion and control over the loan proceeds as of the Old GM Petition Date had unquestionably been transferred to GM Canada.  Even if the loan proceeds were considered escrow funds (which they were not) the result would not change.[32]  Moreover, Old GM never sought to exercise any contractual remedies against its wholly-owned subsidiary, so the GUC Trust's argument is not only meritless, but also a theoretical concern which never occurred.

Assuming *arguendo* that the loan proceeds were trust funds, the Cash Management Order still would have specifically allowed Old GM to transfer, postpetition, such funds.

> the Debtors . . . are authorized to (A) continue to maintain, service, and administer all such Custodial Agreements[33] . . . (whether such accounts were created prior or subsequent to the Petition Date), (B) perform and honor their respective obligations in accordance with the terms of such Custodial Agreements, and (C) to execute all documents and take all such other actions as are necessary or appropriate in connection therewith, all without further order of the Bankruptcy Court;

JSF, ¶ 77; Cash Management Order, p. 7.

The GUC Trust has identified in its pre-trial brief only the following three actions under the Lock-Up Agreement it contends implicates Section 363, none of which concerns the $450

---

[31]  That contractual right was sold, in any event, to New GM under the MSPA.

[32]  *See Musso v. N.Y. State Higher Educ. Serv. Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R. 932, 941 (Bankr. E.D.N.Y. 1993) ("most courts considering the issue under New York law have held that escrow accounts are not property which would vest in the trustee in bankruptcy"); *In re Hooker Inv., Inc.*, 155 B.R. 332, 339-40 (Bankr. S.D.N.Y. 1993) ("upon deposit the debtor reserves only a contingent interest to those escrowed funds; a subsequent release of the monies does not deprive the estate of anything of value").

[33]  Custodial Agreements include trust and escrow accounts.

22

Million Loan or the payment of the Consent Fee. As shown below, the three identified actions do not implicate Section 363.

### a.    The Post-Petition Amendment to the $450 Million Loan Agreement

While the GUC Trust argues that there were two post-petition amendments to the $450 Million Loan Agreement, the evidence demonstrated that there was only one. JSF, ¶¶ 46, 85.[34] That amendment merely amended the $450 Million Loan Agreement by confirming the prepetition understanding, as set forth in the Lock-Up Agreement, that GM Canada could use loan proceeds to pay certain legal fees and other expenses. JSF, ¶ 85. This change did not constitute a "use" of bankruptcy estate property, nor did it have any effect on the Debtors' estate.

### b.    Old GM Did Not Have To Consent to the Nova Scotia Bankruptcy Proceeding

The GUC Trust also asserted that Old GM used "its corporate powers post-petition to cause GM Nova Scotia to deliver its consent to a GM Nova Scotia bankruptcy . . . ." GUC Trust Pre-Trial Brief, at p. 10. One of the terms of the Lock-Up Agreement was that *GM Nova Scotia (not Old GM)* would provide the Noteholders with a consent to a bankruptcy order. JSF, ¶ 63. Thus, Old GM did not have to consent to such action.[35] Even if Old GM's consent was required, such action does not rise to the level of an avoidable action. The Debtors involved in this case did not all file on the same date. At least two additional wholly-owned subsidiaries -- Remediation and Liability Management Company, Inc. (Case No. 09-50029) and Environmental Corporate Remediation Company, Inc. (Case No. 09-50030) -- commenced their bankruptcy

---

[34]    Mr. Buonomo testified, without contradiction, that the first amendment to the $450 Million Loan Agreement was signed prepetition. Tr. 08/09/12 (Buonomo) at 78:10-15; Pl. Tr. Ex. 144. Furthermore, his testimony is consistent with the amendment, that refers to a prepetition deadline (June 1 at 6:00 a.m.) for the signing of the Lock-Up Agreement, which was not met. If this amendment was signed postpetition, it is evident that a deadline would have been selected that had been complied with.

[35]    Even if such consent was required, it was given by Old GM when it signed the Lock-Up Agreement before the Old GM bankruptcy filing. Pl. Tr. Ex. 135, at NGM000012436.

cases on October 9, 2009 (the same day that GM Nova Scotia commenced its bankruptcy case).

Old GM did not file a motion seeking authority to commence bankruptcy cases for these two

subsidiaries. *See generally* Case No. 09-50026. There is no relevant difference between the GM

Nova Scotia bankruptcy filing and the filing of the other two Debtor subsidiaries.

In any event, neither Old GM's nor GM Nova Scotia's consent was needed to commence

a bankruptcy case in Nova Scotia. The Noteholders could have effectuated the same result

without consent since the bankruptcy of Old GM constituted an Event of Default under the Fiscal

and Paying Agency Agreement. Def. Tr. Ex. 21. Upon such an Event of Default -- which

occurred on June 1, 2009 -- the Noteholders could have declared the principal of the Notes

immediately due and payable, and forced GM Nova Scotia into a Canadian bankruptcy

proceeding on their own.[36]

Finally, if there was no Lock-Up Agreement, GM Canada would have filed for

bankruptcy, which would have caused a default under the Intercompany Loans, which would

have triggered a GM Nova Scotia bankruptcy, and the assertion of the Statutory Claim against

Old GM. Thus, the Lock-Up Agreement did not cause an event to occur which would have been

inevitable, if the Lock-Up Agreement had never been agreed to.

**c.    Old GM was Not a Party to The June 25 Agreement**

The GUC Trust also asserted that Old GM used "its corporate powers to cause GM Nova

Scotia to enter into a settlement postpetition that released GM Canada from its obligations under

---

[36]    In its pre-trial brief, the GUC Trust cites *In re Consolidated Auto Recyclers Inc.*, 123 B.R. 130 (Bankr. D. Me 1991) to support its argument. *Consolidated Auto* concerned, among other things, a chapter 11 trustee's voting of a debtor's stock in order to institute a bankruptcy proceeding for another entity, with the court stating that such an act was a "use" of property within the meaning of Section 363 of the Bankruptcy Code. *Id.* at 140-41. Here Old GM did not vote any stock in order to cause GM Nova Scotia to commence a bankruptcy proceeding; the directors of GM Nova Scotia consented to the bankruptcy filing of GM Nova Scotia. JSF, ¶ 63. In any event, to the extent that *Consolidated Auto* can be read to support the GUC Trust's contention, the Court should decline to follow *Consolidated Auto* -- a non-precedential case from another Circuit -- as it is inconsistent with the unchallenged practices followed in his case, and in general, the Southern District of New York.

24

the Intercompany Loans." GUC Trust Pre-Trial Brief, at p. 10. However, the settlement the

GUC Trust references is in the June 25 Agreement, which was an agreement between GM

Canada and GM Nova Scotia; Old GM was not a party. JSF, ¶ 87.

Even if any of the three actions implicated Section 363 of the Bankruptcy Code, the

Second Circuit has noted that such actions would be voidable, not void. *See Bean*, 252 F.3d at

117 (although chapter 7 trustee asserted that a post-petition sale was an unauthorized transfer,

void *ab initio,* the Second Circuit upheld the district court's denial of the trustee's claim, ruling

that "the Trustee is entitled to recover only the equity [the debtor] held in the Property the day he

filed for bankruptcy;" inherent in the Second Circuit's decision was that the unauthorized post-

petition sale was voidable -- not void); *see also Koneta*, 357 B.R. at 544.[37]

## POINT II

### THE GUC TRUST CANNOT AVOID THE
### CONSENT FEE FOR DEFENSIVE PURPOSES OR OTHERWISE

The GUC Trust has not sought a disgorgement of the Consent Fee. It has sought to avoid

the payment of the Consent Fee solely for the purpose of reducing the Guarantee Claims and

Statutory Claim by the amount of the Consent Fee.[38] However, the only way to do this is to

improperly use assets that were sold to New GM as part of the 363 Sale. Specifically, pursuant

---

[37]  Old GM paid nothing to settle claims asserted against it in the Nova Scotia Litigation. Nor did Old GM give up
any claims against third parties. Substantively, the Lock-Up Agreement was not a settlement agreement as it
pertains to Old GM and Bankruptcy Rule 9019 is, thus, not implicated. Bankruptcy Rule 9019 also does not
apply to prepetition agreements like the Lock-Up Agreement. Further, since Old GM received a gratuitous
release of the Nova Scotia Litigation, voiding the Lock-Up Agreement as an unauthorized settlement of the
Nova Scotia Litigation would be detrimental to the estate. A resurrection of the Nova Scotia Litigation would
only lead to a potential additional claim against Old GM, with no money coming back to Old GM.

[38]  New GM has a direct interest in this issue, given the Noteholders' threats that a reduction of their claims by
reason of the Consent Fee would constitute a "successful challenge to payment" within the meaning of certain
sections of the Lock-Up Agreement. New GM disagrees with this assertion; the only triggering economic event
was a disgorgement of the Consent Fee. However, New GM believes the issue should prove moot because the
Noteholders are correct that there is no basis to change the economic deal made by the parties and apply the
Consent Fee against the principal amount of the Notes. New GM adopts the arguments made by the
Noteholders in their post-trial brief on this issue.

to the MSPA, Old GM sold to New GM: (i) Intercompany Avoiding Power Claims, (ii) cash; and (iii) Intercompany Obligations. The GUC Trust cannot use these assets for any purpose -- defensive or otherwise. JSF, ¶ 69. Moreover, the purported avoidable transfer was returned to the bankruptcy estate so there is no harm to the bankruptcy estate and nothing to be avoided. JSF, ¶¶ 95-105. Even if the GUC Trust could somehow get around these dispositive arguments, as more fully set forth in the Noteholders' post-trial brief, the GUC Trust lacks standing to obtain its objective.

**A.    Intercompany Avoiding Power Claims Were Sold to New GM**

Bankruptcy Avoidance Actions "relating to or in connection with, any payments by or to, or other transfers or assignments by or to, any Purchased Subsidiary" constitute Purchased Assets. JSF, ¶ 69. GM Canada was a Purchased Subsidiary. JSF, ¶ 72. Accordingly, any avoidance actions premised on intercompany transfers by or to GM Canada were sold to New GM. Once sold, they no longer are property of the bankruptcy estate.

This provision was highlighted in the Sale Motion. JSF, ¶ 72. Counsel for the Committee testified that he was aware of this provision in the MSPA. JSF, ¶¶ 71, 73. As Mr. Buonomo testified, the Intercompany Avoiding Power Claims were purchased for the same reason why Intercompany Obligations were purchased by New GM. JSF, ¶ 73. Both assets are premised on transfers made between and among the Debtor and Purchased Subsidiaries. Under the 363 Sale, New GM was buying the GM corporate structure, and Purchased Subsidiaries were being acquired by a stock transaction as contrasted to an asset transaction. JSF, ¶ 73. New GM wanted to preserve continuity; it did not want any action taken by the bankruptcy estate after the 363 Sale to disturb earlier transfers made among Old GM and non-Debtor Purchased Subsidiaries. *Id.*

While there is a split in the case law regarding whether a trustee can use avoiding power claims defensively through Section 502(d) of the Bankruptcy Code, the narrow holding in the cases that support the defensive use is not applicable herein. In virtually all of the cases that have discussed the use of avoiding power claims defensively,[39] an affirmative action was unavailable because the Section 546(a) statute of limitations had expired. Inherent in these rulings is that the claims objector had standing to bring the avoiding power claims in the first place. That is not the situation here because of the sale of avoiding power claims. No case cited by the GUC Trust holds that *sold* avoiding power claims could be used defensively.

Moreover, courts in the Second Circuit have held that Section 502(d) of the Bankruptcy Code is meant to apply to situations where the estate is entitled to recover property. *See, e.g., Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 435 (S.D.N.Y. 2007), *motion to certify appeal denied*, 2007 WL 2780394 (S.D.N.Y. Sept. 24, 2007). The language of Section 502(d) confirms this principle. It uses phrases such as "from which property is recoverable" and "unless the transferee has paid the amount." Here, the bankruptcy estate is not entitled to recover property from the Noteholders because the Intercompany Avoiding Power Claims have been sold to New GM.

As a corollary to these principles, where an avoidance claim would not benefit all unsecured creditors, the debtor may not bring that claim. *See Consol. Pet Foods, Inc. v. Millard Refrigerated Serv., Inc. (In re S&D Foods, Inc.)*, 110 B.R. 34, 36 (Bankr. D. Colo. 1990) (debtor

---

[39] The only case located that did not concern a statute of limitations issue was *Brown v. U.S. (In re Larry's Marineland of Richmond, Inc.)*, 166 B.R. 871, 874 (Bankr. E.D. Ky. 1993). In *Larry's Marineland*, the bankruptcy court found that an affirmative avoidance action could not be pursued by the chapter 7 trustee against the United States because, under the Supreme Court's decision in *U.S. v. Nordic Village, Inc.*, 503 U.S. 30 (1992), a debtor could not affirmatively recover money from the United States. Significantly, *Nordic Village* did not preclude a defensive use of such claim. It should also be noted that in *Larry's Marineland*, the party asserting the section 502(d) defense -- the chapter 7 trustee -- would have had standing to assert the underlying avoidance action on behalf of the estate absent the limited sovereign immunity holding in *Nordic Village*.

precluded from asserting avoidance actions which benefit only the party that bought the claims).

Courts in the Second Circuit have followed this reasoning. *See Whiteford Plastics Co. v. Chase
National Bank*, 179 F.2d 582, 584 (2d Cir. 1950) (the debtor could not avoid a defectively
recorded lien because such avoidance would not have benefitted the debtor's unsecured
creditors); *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80 (S.D.N.Y. 2008)
(transaction can only be avoided to the extent it benefits unsecured creditors); *cf. Bank of Utah v.
Hiawatha Coal Company, Inc. (In re C.W. Mining Company)*, 477 B.R. 176, 185-86 (10th Cir.
B.A.P. 2012). By definition, avoiding power claims, once sold, do not benefit the unsecured
creditors.

    As a further corollary to these principles, it is clear that Section 502(d) provides that a
creditor who satisfies an avoiding power claim has a claim against the bankruptcy estate for the
amount repaid. In a sold avoiding power claim context, that would mean when the claimant pays
a third party purchaser of avoiding power claims, it has a claim against the bankruptcy estate for
that amount. A result that provides no benefit to the bankruptcy estate demonstrates why Section
502(d) cannot be used defensively for sold avoiding power claims.

**B.    As the $450 Million Loan was Repaid, There is No Transfer to Avoid**

    Even if the Intercompany Avoiding Power Claims were not sold to New GM (they were),
there is no transfer outstanding that could be voided. The proceeds of the $450 Million Loan
were used by GM Canada to settle the Intercompany Loans, and the $450 Million Loan was
repaid in full prior to the closing of the 363 Sale. *See* JSF, ¶¶ 95 to 105. The D&A Memo lays
out the transaction utilized by Old GM and GM Canada that effectuated the repayment of the
$450 Million Loan. JSF, ¶ 98; *see generally* Lopez Direct Testimony Declaration. Section
502(d) of the Bankruptcy Code on its face provides that the claims of creditors may be
disallowed "unless such entity or transferee has paid the amount . . . ." Accordingly, even if

28

Intercompany Avoiding Power Claims were not sold to New GM (which they were), as the $450 Million Loan was repaid, there is no transfer of the Debtor's interest in property that can be avoided by the GUC Trust.

The GUC Trust has asserted that the "collapsing doctrine" could be used to argue that Old GM transferred the Consent Fee to the Noteholders, and, therefore, such payment is not an Intercompany Avoiding Power Claim. The collapsing doctrine is inapplicable for the same reason why avoiding power claims for intercompany obligations, once sold, are inapplicable. For even if Old GM is deemed to have transferred the Consent Fee directly to the Noteholders, the beneficiary of that type of avoiding power claim is the DIP Lenders, who were transferred such claims as collateral for the DIP Loans. JSF, ¶ 80. The beneficiary is not the unsecured creditors.

Moreover, the GUC Trust is also wrong because (a) the "collapsing doctrine" is not applicable when the transfer originally made by the debtor was repaid by the initial transferee to the debtor, and (b) GM Canada was not a conduit for Old GM, as GM Canada was the obligor on the Intercompany Loans, which were used to discharge obligations owed to GM Nova Scotia.

The "collapsing doctrine" was discussed in *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) and *Official Committee of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam)*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002). In *HBE Leasing,* the Second Circuit explained the limitations of the collapsing doctrine as follows:

> the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors. If, instead, the debtor retains the proceeds from the first exchange, reconveys them for fair consideration, or uses them for some other legitimate purpose, including the preferential repayment of pre-existing debt, and if the debtor does not make the subsequent transfer with actual fraudulent intent, then the entire transaction, even if "collapsed," cannot be a fraudulent conveyance, because it does not adversely affect the debtor's ability to meet its overall obligations.

29

*Id.*; *see also Sunbeam*, 284 B.R. at 371 ("Where the funds are ultimately used for legitimate corporate purposes, then the transfer is not fraudulent even if the series of transactions are viewed as a single integrated transaction.").

The transaction in this proceeding does not fall within the "collapsing doctrine" paradigm. The debtor entity -- Old GM -- made a valid, documented loan to GM Canada which was supported by consideration, *i.e.*, a binding promissory note. JSF, ¶ 37. GM Canada thereafter repaid the $450 Million Loan. JSF, ¶¶ 95 to 105. Accordingly, Old GM received fair consideration for the $450 Million Loan such that Old GM's estate was not adversely affected or depleted. In addition, Old GM had a legitimate corporate purpose for making the $450 Million Loan. GM Canada was a vital part of the GM enterprise which Old GM was obligated to deliver to New GM pursuant to the 363 Sale. JSF, ¶ 21. By virtue of the $450 Million Loan, GM Canada was able to settle the Intercompany Loans at a steep discount, and the settlement saved GM Canada from having to file for bankruptcy. The payment also increased GM Canada's equity value and thus, the value of the assets acquired by New GM, which redounded to the benefit of Old GM creditors receiving New GM equity.

**C.    Even if the Loan was not Repaid, the Consent Fee Is Not Avoidable**

Assuming, *arguendo*, that Intercompany Avoiding Power Claims were not sold to New GM (they were) or that the $450 Million Loan was not repaid (it was), the GUC Trust still would not be able to recover the Consent Fee because any claim relating to the Consent Fee was sold to New GM pursuant to the MSPA. Aside from the Intercompany Avoiding Power Claims, other categories of assets purchased by New GM, include (i) cash; and (ii) intercompany obligations JSF, ¶ 69. With respect to cash, even if the $450 Million Loan was not repaid by GM Canada, it was an issue only for New GM (and not the GUC Trust). Counsel for the Committee confirmed at trial that the Committee understood that any cash above the Wind-Down Amount would go to

30

the U.S. Treasury or New GM, and not back to the bankruptcy estate. JSF, ¶ 70.[40]  With respect

to Intercompany Obligations, if the balance of the $450 Million Loan was owed to Old GM by

GM Canada at the time of the closing of the 363 Sale (which it was not, as it was repaid in full),

the $450 Million Loan would have constituted an Intercompany Obligation, which was also a

Purchased Asset sold to New GM. JSF, ¶ 69.

### D.    The Cash Management Order and Final DIP Order Would Have Authorized the Transfer of the $450 Million Loan to GM Canada

Even if the $450 Million Loan could somehow be viewed as a post-petition transaction, it

would have been authorized pursuant to Orders of the Court.  Specifically, pursuant to the Cash

Management Order, the Debtors were authorized for the postpetition period to continue to fund

non-Debtor affiliates as they did prior to the Petition Date. JSF, ¶¶ 75-77.  Thus, Old GM was

authorized to enter into postpetition transactions with GM Canada to fund its operations pending

the 363 Sale, and to facilitate the closing of the 363 Sale.  There was no "ordinary course"

limitation set forth in the applicable provision of the Cash Management Order.[41]  *See* Cash

Management Order, p. 8.  Of course, the intercompany funding needed to be consistent with the

covenants of the DIP Loan.  Cash Management Motion, ¶¶ 56, 90.  This made sense since the

DIP Lenders were also the purchaser under the 363 Sale, and intercompany funding to non-

Debtors was needed to maintain (through the closing of the 363 Sale) the valuable worldwide

GM enterprise which the purchaser was buying.

---

[40]    Even if GM Canada was "required" to return the proceeds of the $450 Million Loan to Old GM "immediately" on the Petition Date, the fact that GM Canada did not would have only created a claim for breach of contract in Old GM's favor (an Intercompany Obligation that would have been purchased by New GM). Such claim would have become moot when GM Canada paid off the $450 Million Loan.

[41]    Moreover, under the Disclosure Schedules to the MSPA, New GM, with the consent of the Governments (who were the DIP Lenders and majority shareholders of New GM) specifically authorized Old GM to take all required actions in connection with or as contemplated by the Lock-Up Agreement. JSF, ¶ 90. This necessarily would have included funding the Consent Fee.  The Disclosure Schedules were approved by the Sale Order as part of the MSPA. Def. Tr. Ex. 226 (Sale Order), pp. 1, 20.

The Cash Management Order did not require Committee approval in advance for transfers to non-filed Subsidiaries. *See generally* Cash Management Order. The "no consent" right for the Committee was consistent with the contemplated 363 Sale wherein unsecured creditors were not receiving cash (other than the Wind-Down Amount), the DIP Loans were being made to bridge to the sale,[42] and the unsecured creditor dividend was essentially limited to a minority equity interest in the purchaser. *See generally* Def. Tr. Ex. 226 (MSPA).

Moreover, the Final DIP Order authorized the Debtors to use the proceeds of the DIP Facility for the benefit and working capital needs of the "North American Group Members" -- GM Canada was a member of the North American Group. JSF, ¶ 79. Funding the repayment of the Intercompany Loans at a steep discount was consistent with the purpose of the DIP Facility, which was for the benefit of GM Canada and other members of the North American Group. JSF, ¶ 79. The authority granted by the Court for GM Canada to use the DIP Facility was intentional and reflective of the Canadian Government's transfer of over $9 billion to Old GM to save the auto industry in their country.[43]

Finally, Paragraph 58 of the Sale Order also authorized the Debtors to take all actions in furtherance of the MSPA including transferring assets between subsidiaries. Def. Tr. Ex. 226.

---

[42] If the 363 Sale did not go forward and Old GM liquidated, the likely recovery to the Governments would be only $6-$10 billion. Sale Approval Decision, p. 15. In contrast, the DIP lending by the Governments was much greater than this amount. Under such circumstance, deferring to the Governments' judgment as to Old GM's permitted use of loan proceeds for intercompany loans made perfect sense. The Governments would have incurred the loss of such use if the 363 Sale had not occurred.

[43] As the Court noted in the Sale Approval Decision, the Governments were prepared to invest in Old GM, not because of the economics of the transaction, "but rather to address the underlying societal interests in preserving jobs in the North American auto industry, the thousands of suppliers to that industry, and the health of the communities, in the U.S. and Canada, in which GM operates." Sale Approval Decision, at p. 15.

## POINT III

## THE SWAP CLAIM WAS VALIDLY TRANSFERRED TO NEW GM

The Swap Claim was an asset of New GM that it acquired in connection with the 363 Sale. Section 2.2(a) of the MSPA expressly states that New GM was purchasing *all* of the assets of Old GM, except for Excluded Assets. Def. Tr. Ex. 226 (MSPA). The Swaps do not fall within any category of Excluded Assets and are thus, "Purchased Assets." The GUC Trust misses the point when it argues that the MSPA did not mention the Swaps. The specificity required under the MSPA is in respect of Excluded Assets. *See id.*, § 2.2(b). Everything else, by definition, is a Purchased Asset. *See id.*, § 2.2(a). In addition, as discussed below, the Swaps fall within various categories of the non-exclusive designated list of "Purchased Assets."

### A.    The Swaps Were Executory Contracts Assigned to New GM

Swap contracts governed by ISDA master agreements are generally considered executory contracts. *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 422 B.R. 407, 416 (Bankr. S.D.N.Y. 2010); *In re Enron Corp.*, No. 01 B 16034(AJG), 2005 WL 3874285 (Bankr. S.D.N.Y. Oct. 5, 2005). New GM properly designated the Swaps as assumable executory contracts (and thus, a Purchased Asset) in the Contracts Database by designating the ISDA Master Agreement for assignment on August 3, 2009. JSF, ¶ 111. By their express terms, the ISDA Master Agreement, the Schedules and the Confirmations all constitute one integrated agreement. *Id.*

Even if the GUC Trust could somehow raise an ambiguity with respect to the assignment of the Swaps, the parol evidence demonstrates that the Swaps were transferred to New GM. The two Confirmations relating to the Swaps were the only transactions governed by the ISDA Master Agreement when it was assigned to New GM. Tr. 08/10/12 (Buonomo) at 61:21-62:8. Old GM recognized that the Swaps were assigned to New GM. JSF, ¶ 111. The counterparty to the Swaps (GM Nova Scotia, and its successor, the GM Nova Scotia Trustee) understood that the

33

Swaps had been assigned to New GM (*id.*), and they were the only party with standing to contest the assignment of the Swaps. No one has contested the assignment of the Swaps to New GM, other than the GUC Trust, which does not have standing to contest the assignment.

**B.    If the Swaps are Not Executory Contracts, They Still Were Purchased by New GM**

If the Swaps are not considered executory contracts, other provisions of the MSPA demonstrate that the Swaps fall within the definition of Purchased Assets. For example, the Swaps were "intercompany obligations . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller . . . ." Def. Tr. Ex. 226 (MSPA), § 2.2(a)(iv). As of the closing of the 363 Sale, based on the Swap Transactions entered into in 2003, there was an "intercompany obligation" owed to Old GM (*i.e.*, a Seller) from GM Nova Scotia (*i.e.*, a Subsidiary of a Seller). Whether that amount was fixed or due as of the closing is not outcome determinative; the disjunctive "or" in the MSPA did not require that intercompany obligations be due as of the 363 Sale closing. Once the Swap transactions were entered into, GM Nova Scotia "owed" Old GM its performance obligation thereunder.[44] The "owed" concept was confirmed in the Form S-4 which acknowledged the amount of the Swap liability that was owed. JSF, ¶ 18. It was also confirmed in an Old GM filing after the 363 Sale which acknowledged the debt "owed" under the Swaps. JSF, ¶ 131.

---

[44]    The MSPA expressly provided that intercompany obligations "due to" and "due from" Sellers were not reciprocal. JSF, ¶ 92. Section 2.2(a)(iv) of the MSPA provides that the following are "Purchased Assets:" "all intercompany obligations ('Intercompany Obligations') owed or due, directly or indirectly, to Sellers by any Subsidiary of a Seller . . . ." Conversely, Section 2.3(b)(ii) of the MSPA provides that the following are "Retained Liabilities" (i.e., liabilities staying with Old GM): "(ii) all Intercompany Obligations owed or due, directly or indirectly, by Sellers to . . . (B) any Excluded Subsidiary . . . ." There were only four Excluded Subsidiaries and one of them was GM Nova Scotia. Def. Tr. Ex. 204, Schedule 2.2(b)(iv). Old GM had a claim against GM Nova Scotia (the Swaps) which was purchased by New GM. Old GM had a liability owed to GM Nova Scotia (the Statutory Claim) which was retained by Old GM. The Committee was fully aware of these provisions in the MSPA prior to the closing of the 363 Sale. Specifically, the lack of reciprocity in the MSPA, GM Nova Scotia, the Swaps and the Statutory Claim. JSF, ¶ 92. The Committee, at an in person meeting on June 14 2009, asked the Governments to change the aforecited provisions so there would be reciprocity, and it was turned down. *Id.* The Committee accepted the Governments' position and supported the approval of the MSPA with the "no reciprocity" terms.

Even if the Swaps were not intercompany obligations, the amount owing under the Swaps constituted a "Claim" held by Old GM against GM Nova Scotia. Def. Tr. Ex. 226 (MSPA), § 2.2(a)(xiii). Claims, as defined in the MSPA, included contingent and unliquidated claims. *Id.*, p. 4. Based on this category of assets sold, the Claims under the Swaps were sold to New GM.

For the reasons set forth in the GM Nova Scotia Trustee's post-trial brief (which are incorporated herein by reference), (i) the Swaps were validly disclaimed by the GM Nova Scotia Trustee, and (ii) the amount of the Swap Claims, as set forth in New GM's proof of claim filed in the Nova Scotia bankruptcy proceeding, is correct.

The GUC Trust's observation that the transfer of the Swaps converted a bankruptcy estate asset into a liability (by virtue of the Statutory Claim) is a red herring. First, the MSPA transferred all material assets to New GM. *See* MSPA, § 2.2(a). Thus, including the Swaps as part of the assets transferred was an intended consequence of the MSPA. Further, the fact that certain liabilities associated with an asset remained behind with Old GM is inherent to the 363 Sale wherein assets were sold free and clear of the liens and claims associated thereto. Moreover, the structure of the 363 Sale was for Old GM to receive a variable consideration depending on the amount of allowed claims against the bankruptcy Estate. JSF, ¶ 74. The fact that the Swaps liability, when added to the other allowed claims, has turned out to be less than the claims threshold which determined the variability of the consideration to be paid by New GM, is the deal that was made in 2009 and approved by the Committee. This situation is no different than a hypothetical section 363 sale wherein the purchaser acquires leases for a fixed consideration, and the seller is contractually required to pay the cure amount associated with the assignment of the leases. In both situations, the purchaser acquired an asset of value, and the costs associated with the acquisition was paid by the seller from the sale consideration.

35

## POINT IV

## THERE WAS NO ATTEMPT OR INTENTION
## TO CONCEAL THE LOCK-UP AGREEMENT

"Concealment is an affirmative act intended or known to be likely to keep another from learning of a fact of which he would otherwise have learned. *Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702 (CPS), 2007 WL 2296832 (E.D.N.Y. Aug. 6, 2007) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 160 cmt. a (1979)). For the GUC Trust to argue that Old GM, which was being advised by its experienced bankruptcy counsel (Weil Gotshal), concealed the Lock-Up Agreement from the Court or the Committee is specious. Concealment involves a *mens rea* element -- an intentional act to hide a material fact. The GUC Trust did not present any evidence to support this type of allegation. Indeed, the evidence clearly established the opposite. The Committee and its professionals were given plenty of timely information relating to the Lock-Up Agreement, and it should have known, and very likely knew, of the transaction described therein. The Committee never considered GM Canada or intercompany transfers as important, and therefore never raised such issues with Old GM or the Court. Tr. 10/03/12 (Mayer) at 22:19-23:10, 24:1-3. It is way too late to complain now about these events, especially after the Canadian Governments transferred an additional $9 billion for the benefit of GM Canada.

The Lock-Up Agreement and the claims addressed therein were specifically referenced in the following documents that were either publicly filed or given to the Committee, many of which pre-date the Sale Order, all of which pre-date by at least 50 days the first time the Committee raised an issue about the Lock-Up Agreement: (i) the Form S-4; (ii) the June 1, 2009 8-K; (iii) the Notice of Meeting Concerning the Extraordinary Resolution; (iv) the Disclosure Schedules; (v) the First Amendment to the DIP Loan; (vi) the August 7, 2009 8-K; and (vii) the Interim Report. JSF, ¶¶ 16, 18, 81-84, 88-91, 93-84, 113. Except for possibly the Notice of

36

Meeting, Mr. Mayer and Mr. Vanaskey[45] testified that these documents were timely reviewed.[46] JSF, ¶¶ 91, 94, 113. Public disclosures like these demonstrate there was no attempt to conceal the Lock-Up Agreement.

In particular, on the day of the Lock-Up Agreement, Old GM filed the June 1, 2009 8-K which described the Lock-Up Agreement as a *Material Definitive Agreement*. JSF, ¶ 81. This 8-K also described the Lock-Up Agreement in detail. *Id.* The media reported on the transaction described in the June 1, 2009 8-K. JSF, ¶ 83. This important public securities filing designed to provide material disclosures, clearly demonstrates that there was no attempt to conceal.

In addition, at the First Day Hearing held in this case on June 1, 2009, Harvey Miller from Weil Gotshal, in his opening presentation to the Court, stated, to an overflowing courtroom:

> And Canada, Your Honor, there has been substantial advances made in resolving all of the issues relating to Canada over the last ten days to the point, Your Honor, that it is not necessary to institute any proceedings involving GMCO, which is the Canadian subsidiary.

JSF, ¶ 67.[47] Counsel for the Committee testified that it would have been in "the ordinary course for" his Firm to review the transcript from the First Day Hearings. JSF, ¶ 67 n. 202. Settlements of liabilities which would otherwise precipitate a bankruptcy of an entity the size of GM Canada involve payments of significant money. It was evident that GM Canada had paid creditors to

---

[45]  Mr. Vanaskey testified that he reviewed the June 1, 2009 8-K in June, 2009. Tr. 11/27/10 (Vanaskey) at 53:25-54:3; 97:25-98:9. This is consistent with his testimony that he reviewed a June 3, 2009 Form 8-K -- a mere two days after the June 1, 2009 8-K -- and that he circulated a detailed notice describing it to Wilmington Trust's bondholder clients on June 8, 2009. Tr. 11/27/10 (Vanaskey) at 43:3-45:17; Def. Tr. Exh. 440.

[46]  In a pleading filed on November 17, 2009 [Dkt. No. 4452], the Committee stated that its "advisors first learned of the Lock-Up Agreement on October 7, 2009, the day before the pre-arranged bankruptcy of" GM Nova Scotia. The pleading also stated that the Committee did not see the June 1 2009 8-K until October 2009. The Committee witnesses were given every chance at trial to recant this unsupportable assertion. They nevertheless reaffirmed this assertion under oath (Tr. 10/3/12 (Mayer) at 128:25-129:5; Tr. 11/27/12 (Vanaskey) at 52:19-53:2), even *after* testifying that, well before October 2009, Committee professionals and members had looked at documents which referenced the Lock-Up Agreement and the June 1, 2009 8-K.

[47]  Wilmington Trust's counsel (Gibson Dunne), and certain attorneys that have been representing the GUC Trust throughout this proceeding (currently at Dickstein Shapiro), attended the First Day Hearings. *See* First Day Hearing Transcript.

37

avoid filing for bankruptcy. It was also clear that Mr. Miller was not trying to conceal the fact that there were such settlements -- he was volunteering the information.

Mr. Miller's statement is especially relevant when viewed against statements made in the widely circulated Form S-4, which provided that GM Canada would have to file for bankruptcy in order to impair the Intercompany Loans. JSF, ¶ 18. To the Committee and its members' counsel who had reviewed the Form S-4, as well as the bondholders who received the Form S-4, a statement by Mr. Miller that GM Canada was not filing for bankruptcy would have indicated to them that the Intercompany Loans had been resolved, and a Noteholders settlement had been reached.

Another example of "no-concealment" is the First Amendment to the DIP Facility. JSF, ¶¶ 93-94. Counsel for the Committee stated in Court that the DIP Facility needed to be amended to relax certain default provisions. JSF, ¶ 93. There were only a couple of default provisions that were changed by the DIP amendment, and one of them mentioned a specific clause in the Lock-Up Agreement. How the Committee could have understood the impact of this change without looking at the Lock-Up Agreement is beyond comprehension. Certainly, referencing the Lock-Up Agreement in a document which the Committee reviewed is antithetical to a "concealment" allegation.

Further, in two separate Disclosure Schedules to the MSPA, there are specific references to the settlement with the Noteholders. JSF, ¶¶ 88-90. These disclosures, made prominently in a document which the Committee admits to have carefully read (JSF, ¶ 91),[48] belie any notion that there was an attempt to conceal the Lock-Up Agreement.

_____

[48] Committee counsel did not testify that, after his careful reading, he could not comprehend the Disclosure Schedules because they were approximately 145 pages. By way of comparison, the Disclosure Statement in this case was over 1,000 pages.

Moreover, counsel for the Committee was aware based on disclosures made by Old GM that one of the Noteholders (Aurelius) was a "major litigation claimant."[49]   Committee counsel testified that he was aware of the pendency of the Nova Scotia Litigation in June, 2009, and that Aurelius was a plaintiff.  Tr. 10/03/12 (Mayer) at 53:2-5.  Thus, there was no attempt to hide the litigation, which was settled by the Noteholders pursuant to the Lock-Up Agreement.[50]

Counsel for the Committee also testified at trial that he had communications with Aurelius' principal in July, 2009 regarding GM Nova Scotia, the Notes, and the "good deal" that the Noteholders obtained from Old GM.  JSF, ¶ 112.  The Noteholders were clearly not trying to hide the Lock-Up Agreement either.  Indeed, Aurelius was arguing to Committee counsel that he wanted the same good deal in *Smurfit Stone* that he got in the *GM* case.  *Id.*[51]

In short, there was no concealment of the Lock-Up Agreement.  In fact, it appears that the Committee has attempted to "conceal" that it knew about the Lock-Up Agreement before the 363 Sale was consummated.  The Committee should not be permitted to now feign ignorance, so that years after the fact, when memories have faded, in the context of a claims objection proceeding, it can try and get a "second helping" of 363 Sale consideration from New GM.  The Committee supported the Sale Order, and accepted the benefits of the 363 Sale, and the billions of dollars contributed by the Governments.  Having done so, it is prohibited from circumventing the Sale Order.  New GM, as the good faith purchaser, is entitled to the protections it bargained for.

---

[49]    See *Application of the Official Committee of Unsecured Creditors of General Motors Corporation, et al., for an Order Authorizing and Approving the Employment and retention of Kramer Levin Naftalis & Frankel LLP as Counsel, Nunc Pro Tunc, to June 3, 2009*, dated June 17, 2009 [Dkt. No. 1744], at p. 2 of Schedule of Contact Parties.

[50]    It is unclear how the Committee and its counsel could have determined there was no disabling conflict without also making an inquiry as to the status of this litigation, which would have revealed that it was being settled through the Lock-Up Agreement.

[51]    It is a mystery how Committee counsel can admit he said the Noteholders deserved a better deal in GM than Smurfit Stone, while still contending that he did not know that there was a deal in GM.  The Aurelius witness testified at trial that it was clear from this conversation that Mr. Mayer knew the terms of the Lock-Up Agreement.  JSF, ¶ 112.

39

Finally, the GUC Trust cannot gloss over the fact that, in this proceeding, it claims to be the successor to rights held by Old GM. The concealment issue, as framed by the GUC Trust, is an attack on Old GM's conduct. As such, the GUC Trust cannot use its predecessor's alleged misconduct to seek relief against others.

## **CONCLUSION**

A major focus of the GUC Trust has been on a valid, prepetition, intercompany loan (*i.e.*, the $450 Million Loan) to GM Canada, that was made from the collateral proceeds of a consenting secured lender (U.S. Treasury), and was repaid in less than six weeks. The GUC Trust ignored the undisputed fact that the $450 Million Loan was made to settle a debt owed by GM Canada, at a 65% discount, that this settlement assured GM Canada that it would not have to file for bankruptcy, and that result removed a potential pitfall to the 363 Sale, which benefitted Old GM's creditors.

For all of the foregoing reasons, New GM respectfully requests that the Court enter judgment, denying the relief requested in the Adversary Proceeding and in the Amended Claims Objection that affects New GM, and for such other and further relief as may be just and proper, including, but not limited to, finding that the release given by GM Nova Scotia to GM Canada, and the dismissal of the Nova Scotia Litigation is valid, and remains enforceable in its entirety.

Dated: New York, New York
May 24, 2013

Respectfully submitted,

   /s/ Arthur Steinberg
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Attorneys for General Motors LLC*

40