GREENBERG TRAURIG, LLP
Bruce R. Zirinsky, Esq.
John H. Bae, Esq.
Gary D. Ticoll, Esq.
Paul T. Martin, Esq.
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
E-mail: zirinskyb@gtlaw.com
        baej@gtlaw.com
        ticollg@gtlaw.com
        martinpt@gtlaw.com

GREENBERG TRAURIG, LLP
Kevin D. Finger, Esq.
Bevin M. Brennan, Esq.
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
E-mail: fingerk@gtlaw.com
        brennanb@gtlaw.com

GREENBERG TRAURIG, LLP
Joseph P. Davis III, Esq.
One International Place
Boston, MA 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001
E-mail: davisjo@gtlaw.com

*Attorneys for Elliott Management Corporation, Fortress
Investment Group LLC and Morgan Stanley & Co.
International plc, and/or entities managed by them,
including Drawbridge DSO Securities LLC, Drawbridge
OSO Securities LLC, FCOF UB Securities LLC, Elliott
International LP and The Liverpool Limited Partnership*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | : Case No. 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.,* | : |
| | : |
| Debtors. | : (Jointly Administered) |

------------------------------------------------------------------- x

| | |
|---|---|
| **MOTORS LIQUIDATION COMPANY GUC TRUST,** | : |
| | : |
| Plaintiff, | : Adversary Proceeding |
| v. | : |
| | : Case No.: 12-09802 |
| **APPALOOSA INVESTMENT LIMITED** | : |
| **PARTNERSHIP I** *et al.* | : |
| Defendants. | : |

------------------------------------------------------------------- x

**POST-TRIAL BRIEF OF ELLIOTT MANAGEMENT CORPORATION,
FORTRESS INVESTMENT GROUP LLC AND
MORGAN STANLEY & CO. INTERNATIONAL PLC, AND/OR ENTITIES
MANAGED BY THEM, INCLUDING DRAWBRIDGE DSO SECURITIES LLC,
DRAWBRIDGE OSO SECURITIES LLC, FCOF UB SECURITIES LLC,
ELLIOTT INTERNATIONAL LP AND THE LIVERPOOL LIMITED PARTNERSHIP**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ........................................................................................................................ 6

I.    The GUC Trust Has Failed to Provide a Legal or Factual Basis to Equitably
Subordinate or Disallow the Claims ................................................................................ 8

    A.    The GUC Trust Has Not Satisfied the Requirements of Section 510(c) ............... 8

        1     The GUC Trust has failed to prove inequitable conduct ............................ 9
        2.    The GUC Trust failed to establish injury or unfair advantage................... 15
        3.    The request for equitable subordination is inconsistent with
bankruptcy law........................................................................................... 17

    B.    There Is No Authority to "Equitably Disallow" Claims....................................... 18
    C.    The Doctrine of Unclean Hands Bars Equitable Subordination .......................... 19

II.   The GUC Trust Has Failed to Provide a Legal or Factual Basis to
"Recharacterize" the Consent Fee As a Principal Payment............................................. 20

    A.    Section 105(a) Does Not Give the Court Power to "Recharacterize" the
Consent Fee........................................................................................................ 20
    B.    The Court Lacks Subject Matter Jurisdiction ..................................................... 23
    C.    The Lock-Up Agreement is a Valid Prepetition Agreement ............................... 24

        1.    The testimony is uncontroverted that the Lock-Up Agreement was
executed and signatures were delivered prepetition ................................. 24
        2.    The Weil Gotshal documents confirm that the Lock-Up Agreement
is a valid, prepetition agreement ............................................................. 27

III.  The GUC Trust's 502(d) Objection Should Be Overruled ............................................. 32

    A.    There Was No Transfer of Estate Property......................................................... 33
    B.    The GUC Trust's 502(d) Objection Must Be Overruled Because GM
Canada Repaid the $450 Million Loan in Full to Old GM .................................. 34
    C.    The GUC Trust Lacks Standing to Assert its 502(d) Objection Because
Old GM Sold the Avoidance Actions to New GM .............................................. 34
    D.    Section 502(d) is Inapplicable Because the Alleged Avoidable Transfer
Has Not Been Adjudicated................................................................................. 35
    E.    The Payment of the Consent Fee is Not Avoidable Under Section 547.............. 36
    F.    The Payment of the Consent Fee Is Not Avoidable Under Section 548.............. 37
    G.    The Payment of the Consent Fee is Not Avoidable Under Section 549 .............. 38
    H.    Collapsing Doctrine Does Not Apply ................................................................. 38
    I.    The Payment of the Consent Fee Qualifies for Section 546(e) Safe Harbor ........ 42

IV.    The Assumption and Assignment of the Lock-Up Agreement Bars the Equitable
       Subordination Claims and Challenges to the Lock-Up Agreement and Consent
       Fee.................................................................................................................................. 43

V.     The GUC Trust Does Not Have Standing to Bring Claims For Equitable
       Subordination, Recharacterization, or Avoidance Because Those Claims Were
       Not Preserved By the Plan or Assigned to the GUC Trust ............................................... 45

VI.    Judicial Estoppel Bars the GUC Trust from Challenging the Sale Order, the Lock-
       Up Agreement and the Assumption and Assignment of the Lock-Up Agreement........... 48

VII.   The Guarantee Claims and the Statutory Claims Are Not Duplicative ........................... 50

CONCLUSION.................................................................................................................................. 50

# TABLE OF AUTHORITIES

## Federal Cases

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
  169 B.R. 832 (Bankr. S.D.N.Y. 1994).................................................................. 8, 9

*ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*,
  210 B.R. 508 (Bankr. S.D.N.Y. 1997)...................................................................... 9

*Acton v. Fullmer (In re Fullmer)*,
  323 B.R. 287 (Bankr. D. Nev. 2005) ...................................................................... 29

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
  365 B.R. 24 (Bankr. S.D.N.Y. 2007),
    *aff'd in part*, 390 B.R. 64 (S.D.N.Y. 2008) .................................... 8, 12, 15, 18, 20

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*,
  145 F.3d 543 (2d Cir. 1998)............................................................................. 27, 28

*Air Vectors Assocs. v. N.Y. State Dept. of Transportation*,
  53 B.R. 668 (Bankr. S.D.N.Y. 1985)...................................................................... 20

*Ames Merchandising Corp. v. Cellmark Paper Inc. (In re Ames Dept. Stores, Inc.)*,
  450 B.R. 24 (Bankr. S.D.N.Y. 2011), *aff'd*, No. 12-1269-bk, 2012 WL 6684567 (2d
  Cir. Dec. 26, 2012).................................................................................................. 7

*AppliedTheory Corp. v. Halifax Fund Ltd. (In re AppliedTheory Corp.)*, 493 F.3d 82 (2d
  Cir. 2007) (per curiam) ......................................................................................... 46

*Bankers Trust Co. v. Seidle (In re Airlift Int'l Inc.)*,
  70 B.R. 935 (Bankr. S.D. Fla. 1987)...................................................................... 29

*Bankers' Trust Co. v. Irving Trust Co. (In re United Cigar Stores Co. of Am.)*,
  73 F.2d 296 (2d Cir. 1934), *cert. denied*, 294 U.S. 708 (1935)............................ 23

*Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*,
  529 F.3d 432 (2d Cir. 2008)............................................................................. 34, 45

*Barnum v. Millbrook Care Ltd. Partnership*,
  850 F. Supp. 1227 (S.D.N.Y. 1994), *aff'd*, 43 F.3d 1458 (2d Cir. 1994) .............. 31

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985)............................................................................................... 19

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
  563 F.2d 692 (5th Cir. 1977) ................................................................... 8, 15, 18

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant &
  Sons, Inc.)*,
  447 B.R. 170 (Bankr. S.D.N.Y. 2011)................................................................ 39, 40

*Butner v. United States*,
  440 U.S. 48 (1979).................................................................................................. 21

*Callahan v. Credit Suisse (USA), Inc.*,
    No. 10 Cv. 4599(BSJ), 2011 WL 4001001 (S.D.N.Y. Aug. 18, 2011) ................................. 28

*Campbell v. U.S. (In re Davis)*,
    889 F.2d 658 (5th Cir. 1989), *cert. denied*, 495 U.S. 933 (1990) ........................................... 35

*Canizzo v. Farrell Lines, Inc.*,
    579 F.2d 682 (2d Cir. 1978)............................................................................................................ 26

*Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assocs.*,
    260 A.D.2d 159 (N.Y. App. Div. 1999) ................................................................................... 31

*Chem. Bank N.Y. Trust Co. v. Kheel (In re Seatrade Corp.)*,
    369 F.2d. 845 (2d Cir. 1966)........................................................................................................... 17

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou*
    *Grp., LLC)*,
    439 B.R. 284 (S.D.N.Y. 2010)........................................................................................................ 7

*Cobble Hill Nursing Home v. Henry & Warren Corp.*,
    74 N.Y.2d 475 (1989), *cert. denied*, 498 U.S. 816 (1990) .................................................... 27

*Concerto Software, Inc. v. Vitaquest Int'l, Inc.*,
    290 B.R. 448 (D. Me. 2003) ........................................................................................................... 44

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
    699 F.2d 599 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983)........................................... 40

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network,*
    *Inc.)*,
    416 F.3d 136 (2d Cir. 2005)........................................................................................................... 22

*Dev. Specialists, Inc.  v. 1114 6th Ave. Co. (In re Coudert Bros. LLP)*,
    No. 09 Civ 5047 (DLC), 2009 WL 2868722 (S.D.N.Y. Sept. 4, 2009) ................................. 44

*Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enters., Inc.)*,
    400 F.3d 219 (4th Cir. 2005) ......................................................................................................... 38

*Duke Energy Royal v. Pillowtex Corp. (In re Pillowtex, Inc.)*,
    349 F.3d 711 (3d Cir. 2003).......................................................................................................... 7

*DuVoisin v. Foster (In re S. Indus. Banking Corp.)*,
    809 F.2d 329 (6th Cir. 1987) ......................................................................................................... 37

*E. Air Lines, Inc. v. Ins. Co of Pa. (In re Ionosphere Clubs, Inc.)*,
    85 F.3d 992 (2d Cir. 1996)............................................................................................................. 44

*Enron Corp. v. Springfield Assoc., L.L.C. (In re Enron Corp.)*,
    379 B.R. 425 (S.D.N.Y. 2007)................................................................................................... 8, 42

*Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*,
    93 N.Y.2d 584 (1999), *reargument denied*, 93 N.Y.2d 1042 (1999) .............................. 25, 27

*Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Official*
    *Comm. of Unsecured Creditors for Dornier Aviation (North Am.), Inc.)*,
    453 F.3d 225 (4th Cir. 2006) ......................................................................................................... 22

*Geltzer v. Fur Warehouse, Ltd. (In re Furs by Albert & Mark Kaufman, Inc.)*,
   Adv. No. 05-1838, 2006 WL 37356218 (Bankr. S.D.N.Y. Dec. 14, 2006) ......................... 42

*Geron v. Schulman (In re Manshul Const. Corp.)*,
   225 B.R. 41 (Bankr. S.D.N.Y. 1998) ...................................................................................... 24

*Gordon v. Shirley Duke Assocs. (In re Shirley Duke Assocs.)*,
   611 F.2d 15 (2d Cir. 1979) ...................................................................................................... 24

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*,
   453 B.R. 499 (Bankr. S.D.N.Y. 2011) .................................................................................... 39

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998) ...................................................................................... 19

*Hackeling v. Rael Automatic Sprinkler Co. (In re Luis Elec. Contracting Corp.)*,
   165 B.R. 358 (Bankr. E.D.N.Y. 1992) .................................................................................... 38

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995) ...................................................................................................... 39

*Holland Indus., Inc. v. United States (In re Holland Indus., Inc.)*,
   103 B.R. 461 (Bankr. S.D.N.Y. 1989) .................................................................................... 24

*Holloway v. IRS (In re Odom Antennas, Inc.)*,
   340 F.3d 705 (8th Cir. 2003) ............................................................................................ 35, 36

*Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*,
   No. 04 Civ. 1621(KMW), 2005 WL 1377853 (S.D.N.Y. June 9, 2005) ................................ 31

*Hounddog Productions, L.L.C. v. Empire Film Grp., Inc.*,
   826 F. Supp. 2d 619 (S.D.N.Y. 2011) .................................................................................... 22

*In re Allegheny Int'l.*,
   954 F.2d 167 (3d Cir. 1992) ...................................................................................................... 7

*In re Cincinnati Microwave, Inc.*,
   210 B.R. 130 (Bankr. S.D. Ohio 1997) .................................................................................. 31

*In re Cnty. of Orange*,
   219 B.R. 543 (Bankr. C.D. Cal. 1997) .................................................................................... 18

*In re F.W.D.C. Inc.*,
   158 B.R. 523 (Bankr. S.D. Fla. 1993) .................................................................................... 23

*In re Gen. Motors Corp.*,
   407 B.R. 463 (Bankr. S.D.N.Y. 2009), *aff'd*, 430 B.R. 65 (S.D.N.Y. 2010) ....................... 21

*In re Ionosphere Clubs, Inc.*,
   100 B.R. 670 (Bankr. S.D.N.Y. 1989) .................................................................................... 29

*In re Marion Carefree Ltd. P'ship*,
   No. 93-33010, 1994 WL 115911 (Bankr. N.D. Ohio Mar. 17, 1994) .................................... 20

*In re Randall's Island Family Golf Ctrs., Inc.*,
   261 B.R. 96 (Bankr. S.D.N.Y. 2001), *aff'd*, 272 B.R. 521 (S.D.N.Y. 2002) ......................... 28

*In re School Specialty, Inc.*,
    Case No. 13-10125 (KJC), 2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013) .................. 21

*Independent Energy Corp. v. Trigen Energy Corp.*,
    944 F. Supp. 1184 (S.D.N.Y. 1996) ................................................................................. 31

*Ivanhoe Bldg. & Loan Ass'n v. Orr*,
    295 U.S. 243 (1935) ....................................................................................................... 23

*Johnson v. First Nat'l Bank*,
    81 B.R. 87 (Bankr. N.D. Fla. 1987) ................................................................................ 40

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*,
    413 B.R. 115 (Bankr. S.D.N.Y. 2008), *aff'd*, No. 09 Civ. 1636(PKC), 2009 WL
    2900247 (S.D.N.Y. Sept. 9, 2009) ................................................................................... 7

*Klos v. Polskie Linie Lotnicze*,
    133 F.3d 164 (2d Cir. 1997) ........................................................................................... 22

*Krikor Dulgarian Trust v. Unified Mgmt. Corp. of R.I., Inc. (In re Peaberry's Ltd.)*,
    205 B.R. 6 (B.A.P. 1st Cir. 1997) ................................................................................... 49

*Lame v. U.S Dep't of Justice*,
    767 F.2d 66 (3d Cir. 1985) .............................................................................................. 27

*Liberty Mut. Ins. Co. v. Leroy Holding Co. (In re Fort Ann Express. Inc.)*,
    226 B.R. 746 (N.D.N.Y. 1998) ....................................................................................... 15

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
    639 F.3d 63 (2d Cir. 2011) ............................................................................................. 22

*LTV Steel Co., Inc. v. Aetna Casualty & Surety Co. (In re Chateaugay Corp.)*,
    Adv. No. 93-8444A, 1993 WL 563068 (Bankr. S.D.N.Y. Dec. 27, 1993) ......................... 18

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002) ............................................................................. 18

*Morris Plan Indus. Bank v. Finn*,
    149 F.2d 591 (2d Cir. 1945) ........................................................................................... 26

*Musso v. Brooklyn Navy Yard Dev. Corp. (In re Westchester Tank Fabricators, Ltd.)*,
    207 B.R. 391 (Bankr. E.D.N.Y. 1997) ............................................................................... 7

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart
    Convenience Stores, Inc.)*,
    351 F.3d 86 (2d Cir. 2003) ........................................................................................ 20, 21

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ....................................................................................................... 48

*Nw. Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139,
    147 (2d Cir. 2010) .......................................................................................................... 50

*Official Comm. of Unsecured Creditors of Veristar, Inc. v. Am. Tower Corp. (In re
    Verestar, Inc.)*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ........................................................................ 19, 37

*Official Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor World (USA), Inc.)*,
   453 B.R. 201 (Bankr. S.D.N.Y. 2011), *aff'd*, 480 B.R. 468 (S.D.N.Y. 2012) ...................... 42

*Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions)*,
   330 B.R. 67 (Bankr. D. Del. 2005) ...................................................................................... 44

*Official Comm. of Unsecured Creditors v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*,
   264 B.R. 69 (Bankr. S.D.N.Y. 2001) ..................................................................................... 9

*Official Comm. of Unsecured Creditors v. Tower Auto., Inc. (In re Tower Auto. Inc.)*,
   241 F.R.D. 162 (S.D.N.Y. 2006) .......................................................................................... 31

*Picard v. Katz*,
   462 B.R. 447 (S.D.N.Y. 2011) ............................................................................................. 42

*Rahl v. Bande*,
   328 B.R. 387 (S.D.N.Y. 2005) ............................................................................................. 45

*Seta Corp. of Boca, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*,
   173 B.R. 858 (S.D.N.Y. 1994) ........................................................................................ 34, 36

*Shann v. Dunk*,
   84 F.3d 73 (2d Cir. 1996) .................................................................................................... 28

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
   403 F.3d 43 (2d Cir. 2005) ................................................................................................... 39

*Sherman v. Novak (In re Reilly)*,
   245 B.R. 768 (B.A.P. 2d Cir. 2000), *aff'd*, 242 F.3d 367 (2d Cir. 2000) ............................... 7

*Shure v. State St. Bank & Trust Co. (In re Sure-Snap Corp.)*,
   948 F.2d 869 (2d Cir. 1991) ................................................................................................... 8

*Silverman v. K.E.R.U. Realty Corp.
   (In re Allou Distributors, Inc.)*, 379 B.R. 5 (Bankr. E.D.N.Y. 2007) ................................... 40

*Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs. LLC)*,
   423 F.3d 166 (2d. Cir. 2005) ................................................................................................ 21

*Solow v. Kalikow (In re Kalikow)*,
   602 F.3d 82 (2d Cir. 2010) ................................................................................................... 21

*Springel v. Prosser (In re Prosser)*,
   Adv. No. 08-03002, 2009 WL 3270765 (Bankr. D.V.I. Oct. 9, 2009) .................................. 36

*Springfield Assocs.*,
   379 B.R. (S.D.N.Y. 2007) ............................................................................................... 34, 35

*Stanziale v. Finova Capital Corp. (In re Tower Air, Inc.)*,
   397 F.3d 191 (3d Cir. 2005) ................................................................................................. 23

*Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.*,
   670 F. Supp. 491 (S.D.N.Y. 1987) .................................................................................. 27, 28

*The Mediators, Inc. v. Manney (In re The Mediators, Inc.)*,
    190 B.R. 515 (S.D.N.Y. 1995), *aff'd*, 105 F.3d 822 (2d Cir. 1997) ...................................... 19

*TM Patents, L.P. v. Int'l Bus. Machines Corp.*,
    121 F. Supp. 2d 349 (S.D.N.Y. 2000) ...................................................................... 33

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007) .......................................................................... 25, 27

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
    925 F.2d 566 (2d Cir. 1991) ................................................................................ 26

*United States Lines (S.A.), Inc. v. U.S. (In re McLean Indus., Inc.)*,
    30 F.3d 385 (2d Cir. 1994), *cert. denied*, 513 U.S. 1126 (1995) .......................................... 35

*United States v. Sutton*,
    786 F.2d 1305 (1986) ......................................................................................... 21

*Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*,
    779 F.2d 901 (2d Cir. 1985) ........................................................................... 36, 46

*Vacold LLC v. Cerami*,
    545 F.3d 114 (2d Cir. 2008) ................................................................................ 28

*Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C. (In re Vargas Enters., Inc.)*,
    440 B.R. 224 (S.D.N.Y. 2010) ............................................................................... 9

## State Cases

*College Auxiliary Servs. of State Univ. College, Inc. v. Slater Corp.*, 90 A.D.2d 893 (N.Y.
    App. Div. 1982) ............................................................................................... 31

*F&K Supply, Inc. v. Willowbrook Dev. Co.*, 288 A.D.2d 713 (N.Y. Sup. Ct. App. Div.
    2001) ......................................................................................................... 27

*Schoenfeld v. Masucci*,
    205 A.D.2d 749 (N.Y. App. Div. 1994), *leave to appeal denied*, 84 N.Y.2d 807
    (1994) ........................................................................................................ 28

## Federal Statutes

11 U.S.C. § 105(a) ........................................................................... 20, 21, 22, 23

11 U.S.C. § 365 ...................................................................................... 44

11 U.S.C. § 502(a) ....................................................................................... 7

11 U.S.C. § 502(d) ............................................................... 5, 7, 32, 33, 34, 35, 36, 40

11 U.S.C. § 510(c) ..................................................................................... 18

11 U.S.C. § 541(a)(1) ................................................................................... 33

11 U.S.C. § 544 ............................................................................... 36, 42, 43

11 U.S.C. § 545 ...................................................................................... 36

11 U.S.C. § 546(a)(1)(A) ........................................................................................................ 36

11 U.S.C. § 546(e) ........................................................................................................ 33, 42, 43

11 U.S.C. § 547 ........................................................................... 32, 33, 34, 36, 37, 42, 43

11 U.S.C. § 547(b) ........................................................................................................ 7, 36, 37

11 U.S.C. § 548 ........................................................................... 32, 33, 34, 36, 38, 40

11 U.S.C. § 548(a)(1)(A) ........................................................................................ 37, 38, 42

11 U.S.C. § 548(a)(1)(B) ........................................................................................ 37, 43

11 U.S.C. § 549 ........................................................................... 32, 33, 34, 36, 38

11 U.S.C. § 549(a) ........................................................................................................ 38

11 U.S.C. § 549(d) ........................................................................................................ 36

11 U.S.C. § 550(b)(1) ........................................................................................................ 42

11 U.S.C. § 724(a) ........................................................................................................ 36

11 U.S.C. § 726 ........................................................................................................ 22

11 U.S.C. §1123(a)(4) ........................................................................................................ 17

## Federal Federal Rules

Fed. R. Bankr. P. 2019(a) ........................................................................................................ 14

Fed. R. Bankr. P. 3001(f) ........................................................................................................ 7

Fed. R. Bankr. P. 9019 ........................................................................................................ 31

## Foreign Statutes

Companies Act, R.S.N.S., 1989, c. 81, s. 135 (Can.) ........................................................ 3, 6, 10

Elliott Management Corporation, Fortress Investment Group LLC and Morgan Stanley & Co. International plc, and/or entities managed by them, including Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, FCOF UB Securities LLC, Elliott International LP and The Liverpool Limited Partnership,[1] as holders (collectively, the "**Noteholders**") of Notes issued by General Motors Nova Scotia Finance Company, respectfully submit this post-trial brief.

## PRELIMINARY STATEMENT[2]

After a trial lasting sixteen days during which the Court heard the testimony of sixteen witnesses and received over 1,200 exhibits in evidence, it should now be crystal clear that there are no facts to support the GUC Trust's objections to the claims of the Noteholders and the Nova Scotia Trustee or its complaint for equitable subordination and recharacterization. The Guarantee Claims of the Noteholders and the Statutory Claim of the Nova Scotia Trustee are valid, legal, binding and enforceable and should be allowed claims. The GUC Trust has never contested the validity of the Guarantee Claims or the Statutory Claim, only incorrectly asserting they are duplicative. Rather, its attack on the Noteholders, Old GM, the Nova Scotia Trustee and New GM has been a campaign of baseless factual allegations and specious legal arguments designed to portray them as villains. Almost four years have passed since the events complained of, almost three years since the commencement of this litigation and over two years since the Noteholders otherwise would have received their distributions. It is time for this Court to bring this litigation to an end and reject these unfounded attacks.

---

[1] The GUC Trust has named Morgan Stanley as a defendant only with respect to Count II of the Complaint for equitable recharacterization of the Consent Fee as a payment of principal. Morgan Stanley did not acquire Notes until after Old GM filed its chapter 11 petition.

[2] The Noteholders hereby incorporate the Joint Statement of Facts of Certain Noteholders, the GM Nova Scotia Trustee, and New GM ("**SOF**"). Capitalized terms used herein not otherwise defined shall have the meanings ascribed to them in the SOF.

1

At trial, the GUC Trust failed to prove any allegations of wrongful conduct by the Noteholders which would justify subordination or disallowance of their claims. The evidence is overwhelming that the Noteholders at all times acted properly, legally and in good faith. Contrary to the allegations of the GUC Trust, the Lock-Up Agreement was the product of arms' length negotiations initiated by Old GM after the failure of the Bond Exchange Offer, not coercion by any inequitable conduct of the Noteholders. The Lock-Up Agreement was negotiated by parties with sophisticated legal and financial advisors; was approved by the United States and Canadian Governments, the parties that bore the financial costs of the agreement; was commercially fair and reasonable; contained material concessions by the Noteholders; and conferred substantial benefits on Old GM.

The Noteholders' agreement to vote for the Extraordinary Resolution and thereby consent to the release by GM Nova Scotia of GM Canada's CAD$1.3 Billion Intercompany Loan obligations was the final element of GM Canada's successful out-of-court restructuring. A potential GM Canada bankruptcy posed substantial costs and risks to the entire Old GM restructuring effort. Old GM and the United States and Canadian Governments had a strong preference for an out-of-court, consensual restructuring of GM Canada. By late May, GM Canada had reached agreements with its other major constituencies; all that remained was an agreement with GM Nova Scotia and its creditors. The Lock-Up Agreement, reached early on the morning of June 1, 2009 after around-the-clock negotiations, provided certainty. In addition, it preserved substantial tax benefits (NOLs and tax refunds) for both GM Canada and Old GM, aggregating more than CAD$2.0 billion.

Contrary to the GUC Trust's allegations, the Lock-Up Agreement neither harmed other creditors of Old GM nor provided any unfair advantage to the Noteholders. The funds Old GM

lent to GM Canada before the chapter 11 case did not diminish Old GM's estate or the distributions to unsecured creditors. Under the terms of the 363 Sale sponsored and financed by the United States and Canadian Governments, creditors would receive a minority equity stake in New GM and any cash in excess of the Wind-Down Amount would be acquired by New GM or reduce the DIP Loans. Moreover, GM Canada repaid the $450 Million Loan in full, with interest, prior to the 363 Sale.

Nor did the Lock-Up Agreement increase the claims against Old GM (let alone by $2.6 billion, as the GUC Trust has alleged). The Guarantee Claims were created in 2003 when the Notes were issued by GM Nova Scotia and unconditionally guaranteed by Old GM. The Statutory Claim under Section 135 of the Companies Act of Nova Scotia exists by operation of law: Old GM formed GM Nova Scotia as an unlimited liability company in 2003 to issue the Notes in order to obtain substantial tax benefits. Old GM held the Swap Claims against GM Nova Scotia since 2003, when those two parties entered into the Swap Transactions. In any event, New GM purchased them under the MSPA, not the Lock-Up Agreement. All of these claims exist independently of the Lock-Up Agreement.

The evidence completely contravenes the GUC Trust's assertions that Old GM and the Noteholders wrongfully conspired to keep the Lock-Up Agreement secret and withheld it from the Committee and the Court. All of the material terms of the Lock-Up Agreement and the existence of the $450 Million Loan were disclosed on numerous occasions and in numerous ways, both publicly and directly, to the Committee, both before and after the MSPA hearing and its approval by this Court. Thomas Mayer, lead counsel for the Committee, and David Vanaskey of Wilmington Trust, chair of the Committee and now Administrator for the GUC Trust, both testified that they received and read public filings and documents provided to them by Old GM

3

in early June 2009 in connection with the chapter 11 case and the MSPA, that identified and described the Lock-Up Agreement and the $450 Million Loan.  They also both testified that they made no further inquiry of Old GM nor took any other action regarding the information.  Mr. Vanaskey offered no explanation for his inaction, saying only that he relied on his professionals.  Mr. Mayer, his lead professional, acknowledged that he was not concerned about events in Canada because they had no impact on unsecured creditors in the United States.  Mr. Mayer also acknowledged that Old GM's loan to GM Canada had no effect on what other creditors of Old GM received in the chapter 11 case because they would only receive a *pro rata* share in a fixed number of shares of stock and warrants of New GM and no cash.

Old GM and Weil Gotshal made the good faith legal decision that bankruptcy court approval of the Lock-Up Agreement was not required.  After discussions with Old GM and its counsel, the Noteholders agreed with that position.  That is hardly evidence to support the GUC Trust's allegations of a conspiracy to keep the agreement secret.  The Committee had all of the information concerning the Lock-Up Agreement.

Likewise, the GUC Trust offered no credible evidence to support its allegations that the parties did not agree to and execute the Lock-Up Agreement until after the commencement of the chapter 11 case.  All seven witnesses who actually participated in the negotiation and the execution of the Lock-Up Agreement testified that the parties agreed to definitive terms and released signature pages before the chapter 11 case.  The documentary evidence supports that testimony as do the actions of all of the parties who proceeded to perform their obligations under the Lock-Up Agreement.  The public statements and filings by Old GM with the SEC and with this Court confirm that the Lock-Up Agreement was a prepetition agreement.  An expert witness offered by the GUC Trust opined that minor edits may have been made to the document on Weil

4

Gotshal's centralized document management system after the Lock-Up Agreement had been executed by the parties. However, the expert admits that he has no knowledge of when the parties agreed to any terms or whether even the edits he claims occurred after Old GM's bankruptcy petition had earlier been agreed to or existed elsewhere on other documents.

The evidence also conclusively establishes that Old GM did not make a voidable transfer. Old GM made the $450 Million Loan to GM Canada on May 29, 2009, three days before the chapter 11 case, in exchange for a Promissory Note. The proceeds of the $450 Million Loan was deposited in a GM Canada bank account with TD Bank. Old GM had no lien, security interest or other interest in the account. On June 5, 2009, GM Canada transferred £223 million (equivalent to USD$367 million) into an escrow account with CIBC for the benefit of GM Canada, GM Nova Scotia, and the Noteholders, from which, upon the approval of the Extraordinary Resolution, a procedure was put in place to disburse the funds to the Noteholders. Old GM was not a party to the Escrow Agreement nor did it have any interest in the escrow account. Old GM did not pay the Consent Fee; GM Nova Scotia paid the Consent Fee to the Fiscal and Paying Agent.

Even if there had been a voidable transfer, GM Canada repaid the $450 Million Loan in full with interest. On June 12, 2009, GM Canada made a partial repayment of USD$78.5 million. GM Canada repaid the balance of the $450 Million Loan, USD$371.5 million, on July 7, 2009. Because GM Canada fully repaid the $450 Million Loan, section 550(d) bars any further recovery and section 502(d) cannot be invoked to disallow the Noteholders' claims.

The evidence also shows that the payment to the Noteholders was a fee in consideration for their consent to the release of the Intercompany Loans from GM Nova Scotia, and not a payment of principal on the Notes. The Lock-Up Agreement expressly provides "for greater

certainty, the Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee

Claim or the [Statutory] Claim." (SOF ¶ 63.) All of the testimony, documents and public filings

in evidence describe the payment as a consent fee and not a payment of principal. That was the

economic substance of the deal, as confirmed by all the parties to the agreement.

There is also no evidence to support the GUC Trust's allegations that the Noteholders,

Old GM and New GM conspired to insulate the Lock-Up Agreement under the MSPA or the

Sale Order. The Noteholders did not participate in the negotiation or drafting of the MSPA, had

no input into its terms, and did not even see the MSPA until it became public and filed with the

Court. Likewise, the Noteholders had no role in the Sale Order. New GM decided to assume

and assign the Lock-Up Agreement and the Swap Agreements from Old GM, without the

knowledge or participation of the Noteholders, who did not learn of their assumption and

assignment until much later. Similarly, the Noteholders had no role in the decision to transfer

avoidance claims to New GM in connection with the 363 Sale or otherwise.

When viewed in light of the evidence presented at trial, each and every one of the GUC

Trust's objections and claims must fail. In addition, the GUC Trust, a creature of Old GM's

chapter 11 Plan, has overreached its authority under the Plan, and is without standing, power, or

authority to assert any claim for avoidance (whether offensively or defensively), equitable

subordination, equitable disallowance, or recharacterization.`

## **ARGUMENT**

The Noteholders timely filed proofs of claim against the Old GM estate totaling

$1,072,557,531.72 based on Old GM's Guaranty of the Notes. The Nova Scotia Trustee timely

filed a proof of claim against Old GM in the amount of $1,607,647,592.49 based on Section 135

of the Nova Scotia Companies Act. The claims are *prima facie* valid and enforceable as a matter

of law, and the GUC Trust bears the burden of proof to establish that the claims should be disallowed or reduced. *See* 11 U.S.C. § 502(a); *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000), *aff'd*, 242 F.3d 367 (2d Cir. 2000) (citing FED. R. BANKR. P. 3001(f)).

Lacking any bona fide basis to contest the validity of the Guarantee Claims and the Statutory Claim (collectively, the "**Claims**"), the GUC Trust nevertheless seeks to equitably subordinate the Claims, "recharacterize" the Consent Fee as a payment of principal, and disallow the Claims under section 502(d). The GUC Trust bears the burden of proof on each of these claims and has failed to meet that burden. *See Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd*, No. 09 Civ. 1636(PKC), 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009) (holding that in case of equitable subordination, "the proponent of subordination has the burden of proving" the claim); *In re Allegheny Int'l.*, 954 F.2d 167, 173 (3d Cir. 1992); *Duke Energy Royal v. Pillowtex Corp. (In re Pillowtex, Inc.)*, 349 F.3d 711, 716 (3d Cir. 2003) (holding that the debtor "is seeking to recharacterize [the agreement] as something other than what it purports to be and, therefore, [the debtor] bears the burden of proof."); *Ames Merchandising Corp. v. Cellmark Paper Inc. (In re Ames Dept. Stores, Inc.)*, 450 B.R. 24, 31 (Bankr. S.D.N.Y. 2011), *aff'd*, 470 B.R. 280 (S.D.N.Y. 2012), *aff'd*, No. 12-1269-bk, 2012 WL 6684567 (2d Cir. Dec. 26, 2012) ("In a preference action, the Debtor seeking to recover the preferential transfer has the burden of proving the avoidability of the transfer under section 547(b) of the Code."); *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 300 (S.D.N.Y. 2010) (holding that party asserting section 548 action bears burden of proof); *Musso v. Brooklyn Navy Yard Dev. Corp. (In re Westchester Tank Fabricators, Ltd.)*, 207 B.R. 391, 396 (Bankr. E.D.N.Y. 1997) (holding that trustee bears burden of proof in section 549 action).

7

I.    **The GUC Trust Has Failed to Provide a Legal or Factual
Basis to Equitably Subordinate or Disallow the Claims**

As discussed in Section V below, the GUC Trust has no standing or authority to seek equitable subordination, disallowance under section 502(d), or recharacterization of the Claims. The Plan did not preserve those claims nor did it and confer standing on the GUC Trust to bring them. Even if these claims had been preserved, the GUC Trust has not presented any facts or legal authority to support them.

A.    The GUC Trust Has Not Satisfied the Requirements of Section 510(c)

Equitable subordination is a "drastic and unusual remedy" applied only in limited circumstances. *See Enron Corp. v. Springfield Assoc., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 434 (S.D.N.Y. 2007) (citation omitted). "Inequitable conduct is that conduct which may be lawful, yet shocks one's good conscience." *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 68 (Bankr. S.D.N.Y. 2007) (Gerber, J.), *aff'd in part*, 390 B.R. 64 (S.D.N.Y. 2008) (citation omitted). In considering a claim for equitable subordination, courts uniformly apply a three-part test: (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is consistent with bankruptcy law. *Shure v. State St. Bank & Trust Co. (In re Sure-Snap Corp.)*, 948 F.2d 869, 876 (2d Cir. 1991); *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994). The GUC Trust bears the burden of proof with respect to each of these elements. *See Mobile Steel*, 563 F.2d at 701; *Nassau Assocs.;* 169 B.R. at 840 n.5.

8

1.    *The GUC Trust has failed to prove inequitable conduct.*

A claim for equitable subordination is only available in circumstances where the conduct involves (1) fraud, illegality or breach of fiduciary duty; (2) undercapitalization; or (3) control or use of the debtor as an alter ego for the benefit of the claimant.  *See ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997) (Bernstein, J.); *Nassau Assocs.*, 169 B.R. at 838.  The Court should dismiss the GUC Trust's equitable subordination claim because the GUC Trust has failed to prove any conduct that fits within any of the three categories.  *See Granite Partners*, 210 B.R. at 515 ("[I]t is not enough to allege simply that the defendant engaged in 'inequitable conduct'; the party seeking equitable subordination must allege conduct that fits within one of these three paradigms.").

A claim for equitable subordination generally does not apply to non-insider creditors, and "cases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between."  *Official Comm. of Unsecured Creditors v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 134 (Bankr. S.D.N.Y. 2001) (Gerber, J.) (citation omitted).  Unless the claimant controls the debtor, "the proponent of equitable subordination must show wrongful conduct involving ***fraud, illegality, or some other breach of a legally recognized duty***."  *Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C. (In re Vargas Enters., Inc.)*, 440 B.R. 224, 241 (S.D.N.Y. 2010) (citation omitted) (emphasis added).  The Noteholders are not insiders of Old GM, nor did they control it.  To support its claim for equitable subordination, therefore, the GUC Trust must prove that the Noteholders' actions involved "fraud, illegality, or some other breach of a legally recognized duty."  Although the GUC Trust has made numerous inflammatory allegations of Noteholder wrongdoing, it failed to present *any* evidence of Noteholder misconduct, much less evidence of fraud, illegality, or breach of a legally recognized duty.  The GUC Trust has not even alleged that the Noteholders owed any duty to anyone.

9

In one of its more egregious mischaracterizations of the facts, the GUC Trust has asserted that a "band" of Noteholders threatened to force GM Canada into bankruptcy to extract an unreasonable Consent Fee and other unfair terms under the Lock-Up Agreement from Old GM on the eve of its bankruptcy. (GUC Trust Pre-Trial Brief at 1.) In fact, the *evidence* shows that the GM parties and the Governments dictated the timing of the negotiations and informed the Noteholders that GM Canada would file a voluntary bankruptcy proceeding if a satisfactory resolution of the GM Canada Intercompany Loans could not be achieved. (SOF ¶¶ 6, 11, 32-33, 35.) The evidence also established that the terms of the Lock-Up Agreement were fair and negotiated at arms' length among parties represented by experienced and sophisticated advisors. (*Id.* ¶¶ 41-54.) In consideration for the $367 million Consent Fee paid by GM Nova Scotia, the Noteholders relinquished a significant source of recovery on the Notes by consenting to the release by GM Nova Scotia of its CAD$1.3 billion intercompany claim against GM Canada at "what was effectively a 65 percent discount on the face amount." (SOF ¶ 63; Tr. 08/09/12 (Buonomo) 194:9-23.)

The GUC Trust also incorrectly alleges that the Lock-Up Agreement created over $2.6 billion in claims against Old GM. (Amended Complaint ¶ 2.) In fact, the *evidence* is uncontroverted that the Lock-Up Agreement did not create any new claims against Old GM. (SOF ¶ 65.) The Guarantee Claims were created under the Fiscal and Paying Agency Agreement upon issuance of the Notes in 2003. (*Id.* ¶ 4.) The Statutory Claim was created under Section 135 of the Companies Act of Nova Scotia when Old GM caused the formation of GM Nova Scotia as an unlimited liability company in 2003. (*Id.* ¶ 4.) New GM bought the Swap Claims in the 363 Sale; Old GM held those claims against GM Nova Scotia since 2003. (*Id.* ¶ 6.) All of

these claims existed years before the Lock-Up Agreement and continue to exist independently of it.

The GUC Trust also incorrectly alleges that the Nova Scotia Action filed by certain Noteholders lacked merit and was filed in bad faith. (GUC Trust Pre-Trial Brief at 22.) However, the *evidence* demonstrates that, with the advice of highly skilled Canadian counsel, certain Noteholders commenced the Nova Scotia Action in good faith to protect their interests when they learned of actions Old GM and its affiliates took that jeopardized the ability of GM Nova Scotia to repay the Notes.  (SOF ¶¶ 8-10.)  The Noteholders commenced litigation only after their efforts to initiate a dialogue with Old GM were rebuffed. (*Id.* ¶ 8.)  The GUC Trust failed to present any evidence relating to the merits of the Nova Scotia Action, and instead, relies only on the arguments made by the defendants in a motion they filed in the Nova Scotia Action. (Amended Claims Objection ¶ 31.)  Motion practice does not establish that a case was meritless, in particular where no judgment was rendered and the case was dismissed as part of a global resolution embodied in the Lock-Up Agreement.  Indeed, Mr. Buonomo testified that New GM recognized that the outcome of the Nova Scotia Action was uncertain. (SOF ¶ 13.)  Even if the case lacked merit, and it did not, its filing was not egregious conduct.

The GUC Trust also incorrectly alleges that the $450 Million Loan was part of a scheme to use property of Old GM's estate.  (Amended Complaint ¶ 8.)  The *evidence* shows that the $450 Million Loan to GM Canada was never property of the estate.  The purpose of the $450 Million Loan, made on May 29, 2009 (three days before Old GM's bankruptcy and before any agreement had been reached with the Noteholders), was to ensure that GM Canada had the funds to settle its Intercompany Loan obligations to GM Nova Scotia if a settlement with the Noteholders could be finalized before Old GM filed bankruptcy. (SOF ¶¶ 37-40; Ammann Direct

11

Test. ¶ 18; Tr. 08/10/12 (Buonomo) 13:4-8.)  The Governments approved the $450 Million Loan. (*Id.* ¶ 37.)  The Noteholders were first informed on May 31, 2009 that Old GM had made a loan to GM Canada two days earlier, were not parties to the $450 Million Loan, Promissory Note or the $450 Million Loan Agreement (or its amendments), and were not told the amount of the loan. (Gropper Direct Test. ¶¶  85-86; Truong Direct Test. ¶ 72; Cederholm Direct Test. ¶ 65; Bolin Direct Test. ¶ 56; Tr. 08/10/12 (Bolin) 136:22-137:1; Def. Tr. Ex. 121.)  Even if the making of the $450 Million Loan was improper, which it was not, it was conduct by Old GM and GM Canada – not the Noteholders – and cannot provide grounds to equitably subordinate the Noteholders' claims. *See Adelphia Commc'ns*, 365 B.R. at 74 ("equitable subordination analyses focus on the *creditors' behavior*.") (original emphasis).   It is absurd to contend that the Noteholders were part of a scheme they did not even know about.

The GUC Trust also incorrectly alleges that there was a scheme to immunize the Lock-Up Agreement from Court scrutiny.  (Amended Complaint ¶ 147.)  The evidence shows that it was Old GM – not the Noteholders – that made the decision not to seek Court approval of the Lock-Up Agreement.  (SOF ¶ 29.)  To avoid the filing of a GM Canada bankruptcy, Old GM required an agreement that was enforceable upon execution and not contingent on Court approval.  (*Id.* ¶ 45.)  Weil Gotshal believed "that bankruptcy court approval was not required, [and] they were not going to seek bankruptcy court approval."  (*Id.* ¶ 54; Tr. 08/08/12 (Zirinsky) 30:7-31:1.)  Even if Old GM's decision not to seek Court approval of the Lock-Up Agreement could be deemed misconduct, such misconduct cannot provide grounds to equitably subordinate the Noteholders' claims in any scenario, as it too is attributable to Old GM, not the Noteholders.  The irony in the GUC Trust's claims is that the Noteholders were insistent that the Lock-Up Agreement and its material terms should be disclosed promptly.  The evidence shows that: "The

noteholders were insistent that there be disclosure because they wanted to trade." (*Id.* ¶ 82.) Old GM disclosed the Lock-Up Agreement on June 1, 2009 in a Form 8-K, which prominently discussed its terms, including the extinguishment of the Intercompany Loans, the payment of the Consent Fee, the existence of the Old GM Guaranty, the Extraordinary Resolution, the Statutory Claim and the possible subordination of certain GM claims. (*Id.* ¶ 81.) The Lock-Up Agreement was further publicly disclosed on numerous subsequent occasions, including (i) the June 3, 2009 Notice of Meeting for the Extraordinary Resolution, published in the Financial Times on June 3, 2009 (*id.* ¶ 84) (ii) the June 5, 2009 Disclosure Schedules that were part of the 363 Sale documents (*id.* ¶ 88-91);[3] (iii) The First Amendment to DIP Credit Agreement, dated June 25, 2009, which, among other things, stated that the DIP Lenders consented to GM Nova Scotia's bankruptcy filing, as contemplated by the Lock-Up Agreement (*id.* ¶¶ 93-94); (iv) the Form 8-K filed by New GM on August 7, 2009 to which the Lock-Up Agreement is annexed as an exhibit in its entirety (*id.* ¶ 113); and (v) the August 11, 2009 Interim Report (*id.*). Except for the Notice of Meeting, Mr. Mayer and Mr. Vanaskey testified that they, other attorneys and/or financial advisors to the Committee timely reviewed all of the foregoing documents. (*Id.* ¶¶ 91, 94-95, 112, 121-122, 125.) In addition, on July 29, 2009, Mr. Gropper discussed the Lock-Up Agreement with Mr. Mayer, who admitted that Mr. Gropper told him what a "good deal" the Noteholders had negotiated. (*Id.* ¶ 112.) All of these disclosures show that there was no attempt by anyone (and certainly not the Noteholders) to conceal anything from the Committee or the Court.

---

[3] Section 6.2 of the Disclosure Schedules provides that (a) Sellers may do all things necessary and appropriate in furtherance of consummating the Nova Scotia settlement, (b) references "***the transfer of funds from [Old GM] to [GM Canada], which funds will be used by [GM Canada] to pay the [GM Canada] Settlement Amount to [GM Nova Scotia], which transfer of funds occurred before the date of this Agreement***" (emphasis added) and (c) references the subordination of the obligations of GM Nova Scotia to Old GM pursuant to the Swap Transactions. Although Section 6.2 of the Disclosure Schedules was not publicly filed, Old GM provided it directly to the Committee no later than June 5, 2009, and the Committee's professionals read it. (SOF ¶ 89.)

The GUC Trust also incorrectly alleges that the Noteholders misrepresented that the Lock-Up Agreement is a prepetition agreement.  (Amended Complaint ¶ 156.)  The evidence shows, as demonstrated in Section II.C below, that the Lock-Up Agreement *is* a prepetition agreement.  Moreover, it is uncontroverted that the Noteholders and all the other parties who negotiated and executed the Lock-Up Agreement believed (and believe) it is a prepetition agreement.  In fact, in its October 2009 8-K, Old GM stated that the Lock-Up Agreement was a prepetition agreement. (SOF ¶ 114.)  It is untenable for the GUC Trust to contend that the Noteholders' statements based on their well-founded belief that the Lock-Up Agreement is a prepetition agreement constituted inequitable conduct.

Finally, the GUC Trust incorrectly alleges that certain of the Noteholders acted wrongfully by failing to disclose their holdings of credit default swaps in their Rule 2019 statement.  (GUC Trust Pre-Trial Brief at 22.)  As the evidence established, no credit default swaps even existed at the time of the filing of the Rule 2019 statement, having been triggered when Old GM filed its chapter 11 petition on June 1, 2009.  (Tr. 09/06/12 (Cederholm) 107:10-16; 107:24-108:6; Tr. 09/20/12 (Truong) 98:7-12.)  Even had credit default swaps continued to exist at the time the Rule 2019 statement was filed, the GUC Trust knows full well that Bankruptcy Rule 2019 did not require at that time the disclosure of the holdings of derivatives, including credit default swaps.  *See* FED. R. BANKR. P. 2019(a), 2011 Amendment Advisory Committee Note.  Moreover, the settlement of the credit default swaps was among private parties and in no way had any effect on Old GM or its estate.  (Tr. 09/20/12 (Truong) 102:17-22.) Their exclusion from the Rule 2019 statements was proper.

The evidence presented at trial completely refutes all of the GUC Trust's allegations that the Noteholders engaged in *any* wrongful or inequitable conduct, let alone that could possibly

14

warrant equitable subordination (and also disallowance) of the Noteholders' claims.

    *2.  The GUC Trust failed to establish injury or unfair advantage.*

The second prong of the *Mobile Steel* test requires the proponent of equitable subordination to prove that the alleged misconduct caused injury to the debtor or its creditors, or resulted in an unfair advantage. *Mobile Steel*, 563 F.2d at 700-701. Courts analyze the second prong of the *Mobile Steel* test in light of whether the debtor suffered harm from the creditor's conduct regardless of whether the court applies the "injury to creditors" or "unfair advantage" test. *See, e.g.*, *Adelphia Commc'ns*, 365 B.R. at 69 (stating that the second *Mobile Steel* prong requires proof of "harm to unsecured creditors."); *Liberty Mut. Ins. Co. v. Leroy Holding Co. (In re Fort Ann Express. Inc.)*, 226 B.R. 746, 756 (N.D.N.Y. 1998) (holding that "[t]o warrant subordination, this unfair advantage must have harmed the debtor or other creditors.").

The GUC Trust has failed to provide any evidence that any of the Noteholders' alleged inequitable conduct harmed the creditors of Old GM. In its pre-trial brief, the GUC Trust makes the disingenuous argument that if GM Nova Scotia had not released GM Canada's Intercompany Loan obligations pursuant to the Lock-Up Agreement, the proceeds of the loans would have satisfied the Notes in full and there would be no claims against Old GM. (GUC Trust Pre-Trial Brief at 3.) The GUC Trust did not present any evidence at trial to support its contention that GM Canada could have paid the Intercompany Loans. However, assuming, *arguendo*, that it were true, it defies credulity to suggest that the Noteholders gave up a full recovery on their claims in exchange for unsecured claims of uncertain value against Old GM. Furthermore, it is bizarre to argue that it was inequitable conduct for the Noteholders to forego a full recovery on their claims.

In truth, the evidence shows that Old GM's estate and its creditors actually benefited from the Lock-Up Agreement and the payment of the Consent Fee because, among other things,

Old GM was able to sell its assets, including the stock of GM Canada, without the disruption, cost, risk, delay, and loss of value that would have resulted from a GM Canada bankruptcy filing. As the sole owner of GM Canada, Old GM garnered the benefit of the increased value of GM Canada from the elimination of its CAD$1.3 billion Intercompany Loan obligations and the preservation by GM Canada of CAD$600,000,000 of NOLs and US$1.6 billion tax refund, both of which could have been lost if GM Canada had filed a CCAA proceeding.  (SOF ¶ 22.)  Old GM received this benefit at no cost, as GM Canada repaid Old GM the $450 Million Loan in full with interest.  (*Id.* ¶¶ 37, 95-106.)

Even without these benefits, the Lock-Up Agreement was not detrimental to Old GM or its creditors.  First, the Guarantee Claims, the Statutory Claim, and the Swap Claims were not created by the Lock-Up Agreement as discussed previously.  (*See supra* at 10-11.)  In addition, the Lock-Up Agreement did not purport to allow the Guarantee Claims or the Statutory Claim. Old GM merely agreed to support the allowance of the Claims "to the fullest extent permitted under applicable laws."  (SOF ¶ 63.)  Third, the potential subordination of the Swap Claims had no effect on Old GM's estate or its creditors because Old GM transferred the Swap Claims to New GM as part of the 363 Sale.  (*Id.* ¶ 111.)

Finally, the Noteholders were not given an unfair advantage over other unsecured creditors of Old GM.  The Lock-Up Agreement was part of an out-of-court restructuring of GM Canada.  Unlike holders of Old GM bonds and other unsecured creditors of Old GM, the Noteholders were direct creditors of GM Nova Scotia and indirect creditors of GM Canada, and GM Canada recognized this fact.  (Tr. 03/06/13 (Lopez) 173:21-174:3.)  As Mr. Buonomo testified:

> GM Canada did not file for bankruptcy protection.  This situation necessarily meant that the creditors of GM Canada could be treated differently than Old GM creditors.

(Buonomo Direct Test. ¶ 56.)   Indeed, the Noteholders were treated less favorably than all of

GM Canada's other creditors, who were paid in full as obligations became due throughout 2009.

(Tr. 03/06/13 (Lopez) 173:21-174:3.)  As creditors of a Nova Scotia unlimited liability company

and as indirect creditors of GM Canada, the Noteholders have and had rights that creditors of

solely Old GM do not have.   Accordingly, the Noteholders are entitled to be treated differently

than other creditors of Old GM in accordance with all of their rights vis-à-vis Old GM, GM

Canada and GM Nova Scotia.  Different treatment is not unfair treatment.  *See Chem. Bank N.Y.*

*Trust Co. v. Kheel* (*In re Seatrade Corp.*), 369 F.2d. 845, 848 (2d Cir. 1966) ("Equality among

creditors who have lawfully bargained for different treatment is not equity but its opposite").

Tellingly, the Committee and the GUC Trust have not objected to – or complained of the

lack of Court supervision of – any other aspects of GM Canada's out-of-court restructuring,

including GM Canada's settlements with the Canadian Auto Workers and the members of its

dealer network.  (SOF ¶ 23.)   The trial evidence shows that, rather than harming Old GM's

estate, the Lock-Up Agreement enhanced and preserved the value of Old GM for the benefit of

its unsecured creditors.

> 3.    *The request for equitable subordination is inconsistent with bankruptcy law.*

Bankruptcy Code section 1123(a)(4) provides that a plan must "provide the same

treatment for each claim of interest of a particular class, unless the holder of a particular claim or

interest agrees to less favorable treatment of such particular claim or interest."  11 U.S.C. §

1123(a)(4).   The subordination of the Claims is impermissible as it would violate section

1123(a)(4) because the Plan would then include dissimilar claims in Class 3, those claims being

the subordinated Claims of the Noteholders and the Nova Scotia Trustee, and the claims of the

17

other unsecured creditors that are not subordinated.  *See LTV Steel Co., Inc. v. Aetna Casualty & Surety Co. (In re Chateaugay Corp.)*, Adv. No. 93-8444A, 1993 WL 563068, at *1 (Bankr. S.D.N.Y. Dec. 27, 1993) (holding that where confirmed plan did not provide for subordination of a creditor's claims, and where other members of the class to which that creditor belongs are not subject to subordination, "the [creditor's] claims may not be subordinated, but rather must be treated in the manner provided for in the plan."); *see also In re Cnty. of Orange*, 219 B.R. 543, 567 (Bankr. C.D. Cal. 1997) (holding that under third prong of *Mobile Steel* test, attempt to equitably subordinate only one member of general unsecured class is barred because it would conflict with Bankruptcy Code section 1123(a)(4)).[4]

### B.  There Is No Authority to "Equitably Disallow" Claims

As the court in *Mobile Steel* held, the bankruptcy court lacks authority to disallow claims on equitable grounds.  563 F.2d at 699.  Section 510(c) of the Bankruptcy Code codifies the doctrine of equitable subordination, limiting the doctrine to reordering priorities; it does not permit the disallowance of claims.  *See Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002).  In addition, even if the Court had the statutory authority to disallow the Claims on equitable grounds, as demonstrated herein, the GUC Trust has failed to carry its burden of establishing any inequitable conduct on the part of the Noteholders to warrant such extraordinary relief.[5]

---

[4] Moreover, the GUC Trust (as successor to the Committee) is precluded by *res judicata* from seeking to equitably subordinate the Claims because the Committee did not object to the Plan on the grounds that the Claims of the Noteholders and the Nova Scotia Trustee should be separately classified and subordinated on equitable grounds to the payment of other unsecured creditors in Class 3.  *Id.* at 562 (citations omitted).

[5] While this Court has stated in *dicta* that section 510(c) of the Bankruptcy Code permits a court to equitably disallow a claim, *see Adelphia Commc'ns*, 365 B.R. at 70-73 (Gerber, J.), it also recognized that equitable disallowance is a remedy that is "more draconian" than equitable subordination and is therefore reserved for "extreme instances" that are "perhaps very rare."  *Id.* at 73.  Thus, even if equitable disallowance were an available remedy, because there is no evidence sufficient to justify a claim of equitable subordination, there certainly is not enough to justify the "more draconian" remedy of equitable disallowance.

C.  The Doctrine of Unclean Hands Bars Equitable Subordination

The doctrine of unclean hands or *in pari delicto* is an "established and salutary tenet of equity practice" based on the principle that "[o]ne who seeks equity must do equity." *The Mediators, Inc. v. Manney (In re The Mediators, Inc.)*, 190 B.R. 515, 530 (S.D.N.Y. 1995), *aff'd*, 105 F.3d 822 (2d Cir. 1997).  The defense of unclean hands is available even where the defendant bears some fault if the plaintiff bears at least equal responsibility for the injury it is seeking to redress.  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306-07 (1985). The defense applies where, as here, a trust established under a bankruptcy plan brings an equitable subordination action based on conduct of the debtor.  *See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 310-11 (S.D.N.Y. 1998); *The Mediators, Inc. v. Manney (In re The Mediators, Inc.)*, 105 F.3d 822, 825 (2d Cir. 1997) (barring claims of the committee based on the imputed conduct of the debtor); *Official Comm. of Unsecured Creditors of Veristar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 479 (Bankr. S.D.N.Y. 2006) (barring claims by the Committee based on the *in pari delicto* defense).

The GUC Trust bases its equitable subordination claim on the alleged misconduct of Old GM, not the Noteholders: (i) Old GM dictated the timing and pace of the negotiations of the Lock-Up Agreement (SOF ¶¶ 32-33); (ii) Old GM voluntarily entered into the Lock-Up Agreement (*id.* ¶¶ 41-53); (iii) Old GM made the decision not to seek Court approval of the Lock-Up Agreement (*id.* ¶ 54); (iv) Old GM made the decision to sell the avoidance claims and the Swap Claims to New GM (*id.* ¶¶ 69, 72-73); and (v) Old GM made the decision to assume and assign the Lock-Up Agreement to New GM (*id.* ¶ 108).  As Old GM would be legally barred from asserting claims based on its own purported misconduct, the GUC Trust, standing in the shoes of Old GM, is similarly barred from asserting these claims.

19

## II.    The GUC Trust Has Failed to Provide a Legal or Factual Basis to "Recharacterize" the Consent Fee As a Principal Payment

Under the Lock-Up Agreement, the parties expressly agreed that "the Consent Fee payment does not reduce, limit or impair the Notes, the Guaranty Claim[s] or the [Statutory] Claim." (SOF ¶ 63.)    That was the intent of the parties and the economic substance of the settlement agreement.    The GUC Trust has failed to provide any legal basis or present any evidence to support its "recharacterization" claim to change the terms of the Lock-Up Agreement and reduce the principal on the Notes by the amount of the Consent Fee.

### A.    Section 105(a) Does Not Give the Court Power to "Recharacterize" the Consent Fee

Neither the Bankruptcy Code nor any other authority permits the Court to alter the terms of the Lock-Up Agreement and "recharacterize" the prepetition payment of the Consent Fee (or similar payment) as a repayment of the principal of the Notes.    The GUC Trust's "recharacterization" claim is not really a claim for recharacterization, which means recharacterizing an agreement to *reflect* its substance.    *See Adelphia Commc'ns*, 365 B.R. at 73-74.    Here, the GUC Trust is seeking to *change* the substantive terms of the Lock-Up Agreement. There is no legal basis for such relief.    *See Air Vectors Assocs. v. N.Y. State Dept. of Transportation*, 53 B.R. 668, 687 (Bankr. S.D.N.Y. 1985) ("Nor, can the bankruptcy court rewrite the terms of a lease."); *In re Marion Carefree Ltd. P'ship*, No. 93-33010, 1994 WL 115911, at *3 (Bankr. N.D. Ohio Mar. 17, 1994) ("however expansive the bankruptcy court's power may be to protect the property interests of debtors-in-possession, it does not extend to enlarging the rights of a debtor under a contract or rewriting its terms.") (citation omitted).    The equitable powers of bankruptcy courts are both created and limited by section 105(a) of the Bankruptcy Code.    *See New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003) (finding that section

20

105(a) actually "limits the bankruptcy court's equitable powers, which 'must and can only be exercised within the confines of the Bankruptcy Code.'") (emphasis added) (citation omitted). A bankruptcy court may not invoke equity to modify rights or interests created by state law, except to "the extent of actual conflict with the system provided by the Bankruptcy [Code]." *Butner v. United States*, 440 U.S. 48, 54 n.9 (1979); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 517 (Bankr. S.D.N.Y. 2009) (Gerber, J.), *aff'd*, 430 B.R. 65 (S.D.N.Y. 2010) ("Decisions of the Second Circuit make it clear that, even with the presence of section 105(a), bankruptcy judges are not free to do whatever feels right.").

Section 105(a) "does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'" *Dairy Mart*, 351 F.3d at 92 (quoting *United States v. Sutton*, 786 F.2d 1305, 1308 (1986)). Accordingly, courts reject attempts to utilize section 105(a) as a means of creating powers not found in the Bankruptcy Code. *See, e.g.*, *Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs. LLC)*, 423 F.3d 166, 184 (2d. Cir. 2005) (holding that there "are statutory limitations that the bankruptcy court cannot overstep simply by invoking § 105(a)"); *In re School Specialty, Inc.*, Case No. 13-10125 (KJC), 2013 WL 1838513, at *3 (Bankr. D. Del. Apr. 22, 2013) ("Absent some element of fraud, exploitive over-reaching or unconscionable conduct […] there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties.") (quotations omitted).

The Second Circuit requires that "an exercise of section 105 power [must] be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." *Dairy Mart,* 351 F.3d at 92 (citation omitted); *see also Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 97 (2d Cir. 2010) (emphasizing that section 105(a) limits bankruptcy court's equitable

power to confines of Bankruptcy Code); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005) ("Any 'power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code.'") (citation omitted).

The Lock-Up Agreement is governed by the laws of the State of New York.  (Lock-Up Agreement at ¶ 13.)  "It is well-established under New York law that a contract should be interpreted 'to give effect to the expressed intentions of the parties.'"  *Hounddog Productions, L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 630 (S.D.N.Y. 2011) (quoting *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)); *see also Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (holding that an unambiguous agreement is "enforced according to the plain meaning of its terms.").

The Lock-Up Agreement is unambiguous, stating that "for greater certainty, the Consent Fee does not reduce, limit or impair the Notes, the Guaranty Claim[s] or the [Statutory] Claim."  (DX 179 ¶ 6(b)(iv).)  Under New York law, the plain terms of the Lock-Up Agreement must be enforced, and the payment of the Consent Fee does not reduce the principal of the Notes.  The GUC Trust has not cited any state law authority to the contrary.  No section of the Bankruptcy Code allows the Court to use its equitable powers to alter the unambiguous intentions of the parties to the Lock-Up Agreement and "recharacterize" the Consent Fee as a payment of principal[6] just because the GUC Trust alleges that they are unfair or inequitable.[7]  The GUC Trust's "recharacterization" claim must fail.[8]

---

[6]  Although bankruptcy courts have invoked section 105(a) to recharacterize alleged debt as equity, such recharacterization is firmly rooted in section 726 of the Bankruptcy Code and has no connection to the "recharacterization" the GUC Trust seeks here.  *See, e.g., Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Official Comm. of Unsecured Creditors for Dornier Aviation (North Am.), Inc.)*, 453 F.3d 225, 231 (4th Cir. 2006) (recharacterization of debt as equity "facilitates the application of the priority scheme laid out in § 726.").

22

B.  The Court Lacks Subject Matter Jurisdiction

This Court lacks subject matter jurisdiction to recharacterize the Consent Fee as a payment of principal under the Notes.  First, GM Nova Scotia currently is a debtor in a Nova Scotia bankruptcy proceeding.  The enforceability of the Noteholders' Notes against GM Nova Scotia is properly before the Nova Scotia court that is overseeing its proceeding.  Indeed, the Confirmation Order expressly provides that "General Motors Nova Scotia Finance Company shall be wound up or liquidated as determined by the Court having jurisdiction over the winding-up proceeding of General Motors Nova Scotia Finance Company and dissolved pursuant to applicable Nova Scotia law."  (Confirmation Order ¶ 56 [Docket No. 9941].)  There is no legal or factual basis for this Court to adjudicate the amount the Noteholders should be permitted to recover against GM Nova Scotia under the Notes.  That matter is subject to the exclusive jurisdiction of the Nova Scotia court.

Second, GM Nova Scotia paid the Consent Fee with the proceeds of the payment from GM Canada, in consideration for the satisfaction of the Intercompany Loans.  Old GM made the

---

[7] Moreover, as demonstrated in Section II.C, *infra,* the Lock-Up Agreement is a valid, pre-petition agreement. However, assuming, *arguendo,* that the Lock-Up Agreement did not exist, nonetheless, the Court would not have the power under section 105 to "recharacterize" the Consent Fee as a payment of principal because, independent of the Lock-Up Agreement, the Extraordinary Resolution, which has not been challenged and to which Old GM was not a party, provided unambiguously that "the Consent Fee does not reduce, limit or impair the Notes, the Guaranty Claims or the [Statutory] Claim."  (DX 215 at A-3.)  In addition, the uncontroverted testimony of all the parties is that the payment of the Consent Fee was not intended to reduce the principal balance of the Notes.  Finally, the Noteholders accepted the Consent Fee and conducted themselves in good faith, in accordance with, and in reliance on, the Extraordinary Resolution and the agreements of the other parties, in particular GM Nova Scotia and GM Canada.

[8] Assuming, *arguendo,* that the Consent Fee was a payment of principal (which it was not), the Guarantee Claims should still not be reduced.   The Consent Fee was paid to the Noteholders on June 26, 2009, after the filing of Old GM's chapter 11 petition on June 1, 2009.  (SOF ¶ 87.)  Such a post-petition recovery on account of the Notes would not reduce the amount of the Guarantee Claims (which are not disputed).  *See In re F.W.D.C. Inc.*, 158 B.R. 523, 527-28 (Bankr. S.D. Fla. 1993) (allowing a creditor, who postpetition had recovered a portion of its debt from the borrower after the guarantor's bankruptcy, to prove the total amount of the debt against the guarantor-debtor, noting that such creditor may not ultimately collect more than the total amount of the indebtedness) (citing *Ivanhoe Bldg. & Loan Ass'n v. Orr*, 295 U.S. 243, 245 (1935)); *see also, e.g., Bankers' Trust Co. v. Irving Trust Co. (In re United Cigar Stores Co. of Am.),* 73 F.2d 296, 298 (2d Cir. 1934), *cert. denied,* 294 U.S. 708 (1935); *Stanziale v. Finova Capital Corp. (In re Tower Air, Inc.),* 397 F.3d 191, 199-200 (3d Cir. 2005).

$450 Million Loan to GM Canada in exchange for the Promissory Note, and GM Canada paid

$367 million to GM Nova Scotia in satisfaction of the CAD$1.3 billion intercompany debt owed

to GM Nova Scotia.  (SOF ¶ 87.)  The Consent Fee, thus, was not paid with estate property and

the Court lacks jurisdiction to adjudicate any claim that seeks to alter a transaction among non-

debtors.  *See Gordon v. Shirley Duke Assocs. (In re Shirley Duke Assocs.)*, 611 F.2d 15, 18-19

(2d Cir. 1979) (holding that creditor is subject to bankruptcy court's jurisdiction in his dealings

with the debtor, but not in his dealings with third parties); *Geron v. Schulman (In re Manshul*

*Const. Corp.)*, 225 B.R. 41, 45 (Bankr. S.D.N.Y. 1998) ("a proceeding involving non-debtors

will not be found to be related solely on the ground that it will affect a distribution to creditors

unless the proceeding involves property in which the debtor has a legally cognizable interest.")

(quoting *Holland Indus., Inc. v. United States (In re Holland Indus., Inc.)*, 103 B.R. 461, 469

(Bankr. S.D.N.Y. 1989)).

C.  The Lock-Up Agreement is a Valid Prepetition Agreement[9]

The GUC Trust contends that the Lock-Up Agreement is void *ab initio* because allegedly

it was not completed until after Old GM filed for bankruptcy on June 1, 2009.  (GUC Trust Pre-

Trial Brief at 8.)   However, the evidence proves that the Lock-Up Agreement is a valid

agreement that was completed, fully executed, and binding prior to the filing of Old GM's

bankruptcy petition.

1. *The testimony is uncontroverted that the Lock-Up Agreement was executed and*
*signatures were delivered prepetition.*

Under New York law, a binding contract is formed upon "manifestation of mutual assent

sufficiently definite to assure that the parties are truly in agreement with respect to all material

---

[9] Consistent with the Court's direction in the Endorsed Order [Adv. Docket No. 209], the Noteholders have
endeavored to collaborate to avoid duplication; however, similar arguments are included in more than one brief
where the issue addressed is critical to each party and necessary for the completeness and integrity of each of their
briefs.

terms." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007)

(quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589

(1999), *reargument denied*, 93 N.Y.2d 1042 (1999)).   Here, prior to the filing of Old GM's

bankruptcy petition at 7:57 a.m. on June 1, 2009, each and every party to the Lock-Up

Agreement agreed to its terms, delivered its respective executed signature page, and considered

the Lock-Up Agreement to be binding.  (SOF ¶ 49.)

    After having agreed to the business terms of a settlement, the parties met at the offices of

Weil Gotshal on the afternoon of May 31, 2009, with a singular goal:  to memorialize, execute,

and deliver the Lock-Up Agreement prior to the filing of Old GM's bankruptcy case.  (*Id.* ¶ 45.)

All the parties understood that if that deadline were not met, GM Canada would file a Canadian

bankruptcy case concurrently with the filing of Old GM's chapter 11 case, eliminating any

possibility of an out-of-court consensual resolution of the Intercompany Loans.  (*Id.* ¶¶ 26, 45.)

Among the parties to the Lock-Up Agreement, there is no dispute that the parties succeeded in

meeting this deadline, avoiding a GM Canada bankruptcy.  (*Id.* ¶ 49.)

    At least seven individuals in varying roles testified that the terms of the Lock-Up

Agreement were finalized, all the signature pages executed and delivered, and the parties were

bound prior to the chapter 11 filing of Old GM.[10] (SOF ¶ 49; Tr. 08/08/12 (Zirinsky) 79:12-32;

136:22-137:23; 142:11-143:5.)  The only changes made to the Lock-Up Agreement after it was

executed and delivered were made prepetition and consisted of minor corrections that had

previously been agreed upon by the parties, but omitted inadvertently.  These changes were

inserted into the document by a Weil Gotshal associate by 7:35 a.m., no further changes to the

---

[10] The witnesses included including Dan Gropper of Aurelius, Jim Bolin of Appaloosa, Didric Cederholm of Elliott, Bao Truong of Fortress, Bruce Zirinsky as counsel to the Noteholders, Larry Buonomo (the in-house counsel to Old GM), and Dan Ammann of Morgan Stanley & Co. (the financial advisor to Old GM).

Lock-Up Agreement were authorized after that time, and no further negotiations took place.  (*Id.* ¶¶ 52-53.)

Faced with the uncontroverted testimony and documents demonstrating that the parties to the Lock-Up Agreement finalized and executed it prior to 7:57 a.m. on June 1, 2009, the GUC Trust contends that the Lock-Up Agreement was not finalized until later that morning based solely on a review by its expert, Keith Jones, of certain documents from Weil Gotshal's central document repository system, known as DocsOpen.  (GUC Trust Pre-Trial Brief at 2, 9.)  Mr. Jones opines that the executed Lock-Up Agreement circulated by Weil Gotshal at 10:37 a.m. on June 1, 2009 (the "**10:37 PDF**") was created on DocsOpen no earlier than 9:21 a.m. on June 1, 2009.  (SOF ¶ 55.)  As a matter of law, when a Weil Gotshal typist may have created a copy of an agreement on a computer system is not relevant under New York law.

Mr. Jones admitted that he was not offering an opinion on when any party agreed to any particular term.  (*Id.*)  His analysis was limited to certain drafts provided by Weil Gotshal, but did not consider any versions saved outside of DocsOpen, even though he admitted such versions must have existed.  (*Id.* ¶¶ 56-57.)  Mr. Jones did not seek basic information in his analysis, such as even speaking to anybody at Weil Gotshal.  (*Id.* ¶ 55.)  As J. Christopher Racich, the expert retained by the Noteholders, testified, saving a document on the central system does not in any way indicate whether that document existed somewhere else at an earlier time.  (*Id.* ¶ 58.)  Mr. Jones' testimony does not refute the testimony of any of the other witnesses and all of the testimony shows that the Lock-Up Agreement was agreed to and fully executed before the bankruptcy filing.  Any other finding would be contrary to all of the testimony.[11]

---

[11] *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 571 (2d Cir. 1991) ("If a finding is directly contrary to the only testimony presented, it is properly considered to be clearly erroneous.") (citing *Morris Plan Indus. Bank v. Finn*, 149 F.2d 591, 592 (2d Cir. 1945); *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682, 686 (2d Cir. 1978) ("Where no substantial evidence supports a factual determination, it is clearly erroneous, and properly set

*2. The Weil Gotshal documents confirm that the Lock-Up Agreement is a valid, prepetition agreement.*

Likewise, all of the documents provided by Weil Gotshal are consistent with the trial testimony and demonstrate that all of the material terms of the Lock-Up Agreement had been entered in Weil Gotshal's computer(s) before the filing of Old GM's chapter 11 case. There is no legitimate basis to argue that the parties had not reached a binding, enforceable agreement prior to the filing of Old GM's bankruptcy petition.

New York law, which governs the Lock-Up Agreement, does not require "all terms of a contract" to "be fixed with absolute certainty" in order to form a binding agreement. *Tractebel*, 487 F.3d at 94 (quoting *Express Indus.*, 93 N.Y.2d at 589); *see also F&K Supply, Inc. v. Willowbrook Dev. Co.*, 288 A.D.2d 713, 715 (N.Y. Sup. Ct. App. Div. 2001). "[W]hile there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be pedantic or meticulous in interpreting contract expressions." *Id.* (quotations omitted); *see also Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998) ("'courts must enforce and preserve agreements that were intended to be binding, despite a need for further documentation or further negotiation,' for it is 'the aim of contract law to gratify, not to defeat, expectations.'") (quoting *Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). "[A]t some point virtually every agreement can be said to have a degree of indefiniteness," but this fact should not be used to "defeat the reasonable expectations of the parties entering into the contract." *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989), *cert. denied*, 498 U.S. 816 (1990).

---

aside."); *Lame v. U.S Dep't of Justice,* 767 F.2d 66, 70 (3d Cir. 1985) (factual findings clearly erroneous if unsupported by substantial evidence, lack adequate evidentiary support, or against clear weight of evidence).

A contract is binding where the parties agree on all significant terms "and all that remained was the need for lawyers' embellishment." *Shann v. Dunk*, 84 F.3d 73, 77-78 (2d Cir. 1996). That is, an agreement is binding on parties, where there is an agreement on all material terms and all that remains is documenting the non-controversial details. *See Vacold LLC v. Cerami*, 545 F.3d 114, 129 (2d Cir. 2008); *Adjustrite*, 145 F.3d at 549; *Dunk*, 84 F.3d at 77-78; *Tribune Co.*, 670 F. Supp. at 498. Once negotiations over the terms of an agreement have concluded, a binding agreement exists even where additional documentation is required. *See Vacold*, 545 F.3d at 129. The uncontradicted testimony and the documentary evidence conclusively establish that, prior to the Old GM bankruptcy filing, there was a mutual agreement by all the parties to be bound to all the material terms of the Lock-Up Agreement and all the parties executed and delivered their respective signature pages. (SOF ¶ 49.)

Formal acceptance of an agreement accompanied by non-substantive revisions to that agreement does not create a new proposed agreement. *See, e.g.*, *Schoenfeld v. Masucci*, 205 A.D.2d 749, 750 (N.Y. App. Div. 1994), *leave to appeal denied*, 84 N.Y.2d 807 (1994) (holding that after parties executed an agreement, "the immaterial modification of . . . [a] provision did not render the agreement ineffectual or make the acceptance a rejection and a counter-offer."). Instead, the original agreement is enforceable where the revisions are non-material and the parties had accepted all material terms of the original agreement. *See Callahan v. Credit Suisse (USA), Inc.*, No. 10 Cv. 4599(BSJ), 2011 WL 4001001, at *5 (S.D.N.Y. Aug. 18, 2011) (holding that post-execution revisions did not affect enforceability of an agreement where the plaintiff "fully agree[d] to Defendants' offer and sought only to clarify logistical matters regarding the agreement and correct a typographical error"); *In re Randall's Island Family Golf Ctrs., Inc.*, 261 B.R. 96, 100 (Bankr. S.D.N.Y. 2001) (Bernstein, J.), *aff'd*, 272 B.R. 521 (S.D.N.Y. 2002)

("expressions of assent by an offeree, which contain immaterial deviations from the original offer, do not constitute counter-offers but, rather, operate to bind the parties to an enforceable contract.") (citations omitted). This is consistent with bankruptcy court holdings that hold that only material postpetition modifications to an agreement require bankruptcy court approval when they alter the obligations of a debtor's estate. *See In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989); *Bankers Trust Co. v. Seidle (In re Airlift Int'l Inc.)*, 70 B.R. 935, 941 (Bankr. S.D. Fla. 1987). Minor postpetition modifications to an agreement do not require court approval where such modifications do not alter the obligations of the debtor's estate. *See Acton v. Fullmer (In re Fullmer)*, 323 B.R. 287, 297-99 (Bankr. D. Nev. 2005). Here, even if the Court considers changes to the Lock-Up Agreement that the GUC Trust alleges occurred post-petition, they are all non-material and none of them alters the obligations of Old GM's estate. The Weil Gotshal documents demonstrate that, at a bare minimum, all of the material terms of the Lock-Up Agreement were entered into Weil Gotshal's DocsOpen system prior to the filing of Old GM's chapter 11 petition.

One of the documents provided by Weil Gotshal is a version of the Lock-Up Agreement that was attached to an internal Weil Gotshal email at 8:43 a.m. on June 1, 2009 (the "**8:43 Document**"). (SOF ¶ 59.) The 8:43 Document includes a summary of tracked changes, purportedly made from prior to 7:34 a.m. when the first change is tracked until 8:11 a.m. when the last change is tracked. Revised Demonstrative Exhibit No. 4 compares the 8:43 Document as it existed at the time of filing (7:57 a.m.) with the 10:37 PDF. (SOF ¶ 60.) The differences consist of non-material wordsmithing to the body of the Lock-Up Agreement, which contains the material terms of the parties' agreement, and changes to Exhibit A, the form of Extraordinary Resolution, that conform the language of Exhibit A to the agreed-upon language of the Lock-Up

Agreement, a concept that the parties had agreed to by 6:30 a.m. on June 1, 2009.  (SOF ¶  48.)

The only differences between the body of the 10:37 PDF and the Lock-Up Agreement on Weil

Gotshal's system prior to 7:57 as reflected by the 8:43 Document are: (i) the relocation of phrase

"other than by reason of a material breach by a Holder"; (ii) wordsmithing the exception of

individual Nova Scotia Proceeding defendants from preservation of claims; and (iii) changing

"the" to "each."  With respect to Exhibit A, each of the changes merely conforms the language in

the exhibit to the language in the body of the Lock-Up Agreement, lifting that language verbatim

from the body of the agreement.   Under New York law, such immaterial, non-substantive edits

cannot alter the fact that the Lock-Up Agreement was binding on all parties prior to Old GM's

chapter 11 case.   Neither would such immaterial changes require bankruptcy court approval, as

they do not alter in any way the obligations of Old GM.

Perhaps realizing this, the GUC Trust tries to impose a requirement on the parties to

which they never agreed.   The GUC Trust improperly seeks refuge in Paragraph 11 of the NDA

executed by the negotiating parties, which provides that "unless and until the Parties have

entered into a *definitive agreement* with respect to the Transaction, neither [GM Nova Scotia]

nor [Old GM] will be under any legal obligation of any kind whatsoever with respect to such a

transaction . . . ." (emphasis added).  (SOF ¶ 34; PX 256.)  Although this is a standard provision

nerely confirming that Old GM and GM Nova Scotia were not bound to enter into an agreement

by operation of the NDA, the GUC Trust claims Paragraph 11 requires a "final, written"

agreement, without so much as one typographical error.  (GUC Trust Pre-Trial Brief at 2, 9.)

This is contrary to law and common sense.   In any event, as shown by the evidence, all of the

parties had signed off on the agreement, delivered signature pages and considered themselves

bound.  The NDA required no more.  *See Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assocs.*, 260 A.D.2d 159, 159 (N.Y. App. Div. 1999).

Furthermore, once signed, the Lock-Up Agreement superceded the NDA.  *See Independent Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1195-96 (S.D.N.Y. 1996) ("Under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract."); *see also  Barnum v. Millbrook Care Ltd. Partnership*, 850 F. Supp. 1227, 1236 (S.D.N.Y. 1994), *aff'd*, 43 F.3d 1458 (2d Cir. 1994) ("It is well established that a subsequent contract regarding the same matter will supersede the prior contract."); *College Auxiliary Servs. of State Univ. College, Inc. v. Slater Corp.*, 90 A.D.2d 893, 894 (N.Y. App. Div. 1982) (same). Paragraph 10 of the Lock-Up Agreement provides that it is effective and binding on a party upon execution and delivery of a counterpart signature page by such party.   This supersedes any provision of the NDA regarding this subject matter.   Under New York law, this is sufficient to satisfy the requirement for a binding agreement.  *See Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, No. 04 Civ. 1621(KMW), 2005 WL 1377853, at *10 (S.D.N.Y. June 9, 2005).   Once each of the parties executed and delivered its signature page prior to Old GM's bankruptcy filing, under New York law, the Lock-Up Agreement became a binding, valid and enforceable agreement.[12]

---

[12] The GUC Trust also contends that the Lock-Up Agreement required Court approval under Bankruptcy Rule 9019. (GUC Trust Pre-Trial Brief n.2.)  In fact, it is black letter law that Rule 9019 only applies to settlements made during bankruptcy.  *See Official Comm. of Unsecured Creditors v. Tower Auto., Inc. (In re Tower Auto. Inc.)*, 241 F.R.D. 162, 170 (S.D.N.Y. 2006) ("Bankruptcy Rule 9019 applies to bankruptcy settlements"); *see also In re Cincinnati Microwave, Inc.*, 210 B.R. 130, 133 (Bankr. S.D. Ohio 1997) (stating that Rule 9019 has no application to settlements reached prior to bankruptcy).  Because the Lock-Up Agreement was completed prior to Old GM's bankruptcy, it did not require approval under Bankruptcy Rule 9019.

### III.   The GUC Trust's 502(d) Objection Should Be Overruled

The GUC Trust also asks the Court to disallow the Guarantee Claims under section

502(d), asserting that the Noteholders received an avoidable transfer which has not been repaid.

Section 502(d) of the Bankruptcy Code provides:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow
> any claim of any entity from which property is recoverable under sections 542,
> 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under
> section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such
> entity or transferee has paid the amount, or turned over any such property, for
> which such entity or transferee is liable under section 522(i), 542, 543, 550, or
> 553 of this title.

11 U.S.C. § 502(d).

The GUC Trust contends that the payment of the Consent Fee is avoidable under

sections 547, 548, and 549 of the Bankruptcy Code.  (Amended Objection ¶¶ 55, 58 and 60.)

Notably, because it has no standing or legal basis to prosecute any avoidance actions, the GUC

Trust has never filed, nor sought to file, an adversary proceeding in connection with its

avoidance allegations and is not seeking an affirmative recovery.  Instead, the GUC Trust is

claiming the right to use section 502(d) "defensively" against the Guarantee Claims and the

Statutory Claim.  (GUC Trust Pre-Trial Brief at 25.)  The GUC Trust has no such right and

cannot do indirectly what it cannot do directly.

Its 502(d) objection must be overruled because: (i) the GUC Trust, a creature of the Plan,

has no power or authority to assert any avoidance claims; (ii) the avoidance claims alleged by the

GUC Trust were sold to New GM under the 363 Sale and all other avoidance claims (except the

Term Loan Avoidance Action, which was transferred under the Plan to another entity) are

collateral for the DIP Loan, and the GUC Trust has no interest in them; (iii) there was no transfer

of estate property; (iv) any alleged transfer from Old GM (the $450 Million Loan) was repaid in

full; and (v) section 502(d) cannot be invoked where there has never been any determination of liability for any of the alleged avoidance claims.  In addition, the GUC Trust is unable to satisfy the requirements for a recovery under any of sections 547, 548, or 549.  Finally, the payment of the Consent Fee cannot be avoided because it qualifies for safe harbor under section 546(e) of the Bankruptcy Code.

A.    There Was No Transfer of Estate Property

Section 502(d) permits the court, under certain circumstances, to disallow a claim of an entity that is a transferee of an avoidable transfer under, *inter alia*, section 547, 548, or 549. 11 U.S.C. § 502(d).  A transfer may be avoidable, however, only if it is a transfer of estate property.  *See* 11 U.S.C. §§ 547, 548, 549.  Here, Old GM did not transfer any property to the Noteholders.  On May 29, 2009, Old GM made the $450 Million Loan to GM Canada in exchange for a promissory note.  (SOF ¶¶ 37-40.)  The proceeds of the $450 Million Loan were deposited in a GM Canada bank account with TD Bank.  (*Id.* ¶ 39.)  Old GM did not have a lien or security interest in that account.  (*Id.*)  Accordingly, as of the Petition Date, Old GM did not have an interest in the proceeds of the loan and those funds did not constitute property of the estate.  *See* 11 U.S.C. § 541(a)(1); *see also TM Patents, L.P. v. Int'l Bus. Machines Corp.*, 121 F. Supp. 2d 349, 361 (S.D.N.Y. 2000).  GM Canada subsequently used a portion of the proceeds of the $450 Million Loan to settle the Intercompany Loans with GM Nova Scotia, which in turn utilized those funds to pay the Consent Fee to the Fiscal and Paying Agent for disbursement to the Noteholders.  (SOF ¶¶ 86-87.)  The record is clear, therefore, that Old GM did not pay the Consent Fee to the Noteholders and the payment of the Consent Fee was not a transfer of estate property.  Accordingly, the Court should overrule the GUC Trust's 502(d) objection.

B.  The GUC Trust's 502(d) Objection Must Be Overruled Because GM Canada Repaid
the $450 Million Loan in Full to Old GM

Section 502(d) permits the court to disallow a claim of an entity that is a transferee of an

avoidable transfer under, *inter alia*, section 547, 548 or 549, ***"unless such entity has paid the***

***amount"*** for which such entity is liable.  11 U.S.C. § 502(d) (emphasis added); *see also*

*Springfield Assocs.*, 379 B.R. at 435 (S.D.N.Y. 2007); *Seta Corp. of Boca, Inc. v. Atl. Computer*

*Sys. (In re Atl. Computer Sys.)*, 173 B.R. 858, 862 (S.D.N.Y. 1994).

Prior to the closing of the 363 Sale, GM Canada repaid the $450 Million Loan, in full

with interest, to Old GM.  (SOF ¶¶ 95-106.)  Because the full amount of the alleged avoidable

transfer was paid to Old GM, as a matter of law, the GUC Trust's section 502(d) objection fails

in its entirety.  Section 550(d) bars more than a single recovery of an avoidance claim and partial

or full disallowance of the Guarantee Claims would result in a double recovery in violation of

section 550(d) which provides that the trustee "is entitled to only a single satisfaction …"

C.  The GUC Trust Lacks Standing to Assert its 502(d) Objection Because Old GM Sold
the Avoidance Actions to New GM

The GUC Trust lacks standing to object under section 502(d) to the Statutory Claim or

the Guarantee Claims based on the payment of the Consent Fee because Old GM's estate does

not own any avoidance claims that relate to that payment.  *See Bankr. Servs., Inc. v. Ernst &*

*Young (In re CBI Holding Co.),* 529 F.3d 432, 459 (2d Cir. 2008) (noting that bankruptcy trustee

cannot assert claims not assigned to it because "such claims are not part of the bankrupt's

estate") (citations omitted).  Under the MSPA, Old GM sold to New GM the Purchased

Avoidance Claims, which included any and all avoidance actions that "arise from, relate to, or

are in connection with," any payments by or to, or other transfers or assignments by or to a

Purchased Subsidiary (as defined in the MSPA).  (SOF ¶¶ 72-73.)  GM Canada is a Purchased

Subsidiary under the MSPA.  (*Id.* ¶ 72.)  Thus, these avoidance claims were sold to New GM

and do not constitute property of the Old GM estate.  Even if the avoidance claims had not been

sold to New GM, the GUC Trust would not have standing to assert them because all avoiding

power claims (except possibly the Term Loan Avoidance Action) were pledged as collateral for

the DIP Loan.  (*Id.* ¶ 80.)

> D.  Section 502(d) is Inapplicable Because the Alleged Avoidable Transfer Has Not Been
> Adjudicated

The GUC Trust's 502(d) objection should be denied because section 502(d) is an

enforcement provision that is only triggered after a trustee or debtor in possession successfully

prosecutes an avoidance action and obtains a judgment requiring the turnover of property to the

estate, and the recipient of the avoidable transfer fails to return the avoidable transfer.  *See*

*United States Lines (S.A.), Inc. v. U.S. (In re McLean Indus., Inc.)*, 30 F.3d 385, 388 (2d Cir.

1994), *cert. denied*, 513 U.S. 1126 (1995).  As the court stated in *Springfield Assocs.*:

> First . . . court action is necessary in order to disallow a claim.
> Section 502(d) states that the court shall disallow a claim if it meets
> the requirements of the statute.  *Thus, it is the court that must
> determine whether the claim is of the type to which disallowance is
> properly applied.*  Second, *disallowance of a claim under the terms
> of section 502(d) is completely contingent on the refusal or failure
> to return the avoidable transfer by the recipient of that avoidable
> transfer.*

379 B.R. at 438 (emphasis added); *see also Holloway v. IRS (In re Odom Antennas, Inc.)*, 340

F.3d 705, 708 (8th Cir. 2003) (a claim can be disallowed under section 502(d) only after claimant

is first adjudged liable and fails to pay).

The purpose of section 502(d) is to ensure the compliance with judicial orders.  *See*

*Odom Antennas*, 340 F.3d at 708; *Campbell v. U.S. (In re Davis)*, 889 F.2d 658, 661 (5th Cir.

1989), *cert. denied*, 495 U.S. 933 (1990).  The plain language of section 502(d) provides that an

entity's claim can only be disallowed if the entity or transferee has not paid the amount "*for

which such entity or transferee is liable . . . .*"  11 U.S.C. § 502(d) (emphasis added).  As the

Eighth Circuit stated: "This language indicates that section 502(d) should be used to disallow a claim after the entity is first adjudged liable; otherwise the court could not determine if the exception applies." *Odom Antennas*, 340 F. 3d at 708.

Here, neither the Noteholders nor the Nova Scotia Trustee have been adjudged liable under sections 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code and accordingly, as a matter of law, the Claims cannot be disallowed under section 502(d). *See Springel v. Prosser (In re Prosser)*, Adv. No. 08-03002, 2009 WL 3270765, at *13 (Bankr. D.V.I. Oct. 9, 2009) (section 502(d) is not applicable until the trustee successfully prosecutes an avoidance action); *Atl. Computer*, 173 B.R. at 862 (section 502(d) "envisions some sort of determination of the claimant's liability before its claims are disallowed, and in the event of an adverse determination, the provision of some opportunity to turn over the property.").[13]  Because the Noteholders have not been adjudged to have received an avoidable transfer, the GUC Trust's 502(d) objection must be overruled.

E.   The Payment of the Consent Fee is Not Avoidable Under Section 547

Under section 547 of the Bankruptcy Code, the trustee may avoid a transfer of an interest in the debtor in property if, *inter alia*, the transfer was (i) to or for the benefit of a creditor; (ii) for or on account of an antecedent debt owed by the debtor before such transfer was made; and (iii) enabled the creditor to receive more than it would have received in a chapter 7 liquidation. 11 U.S.C. § 547(b).  The GUC Trust failed to present any evidence to establish any of the requirements of section 547.

---

[13] The GUC Trust is barred from commencing avoidance actions because it failed to challenge any alleged avoidable transfers within two years of the Petition Date. 11 U.S.C. §§ 546(a)(1)(A), 549(d).  The Committee's filing of its Objection to the Claims on July 2, 2010, which asserted avoidance claims, did not cure this fatal defect because the Committee lacked standing to assert any avoidance claims of the Old GM estate.  *See Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985) (creditors' committees have no independent standing under the Bankruptcy Code to avoid fraudulent transfers).

As shown above, there was no transfer of estate property, and thus there is no valid preference claim. In addition, the evidence shows that Old GM transferred $450 million to and for the benefit of GM Canada in exchange for the Promissory Note, so that GM Canada could settle its Intercompany Loan obligations to GM Nova Scotia. (SOF ¶ 37.) Because the $450 Million Loan was to GM Canada, not the Noteholders or the Nova Scotia Trustee, the GUC Trust cannot satisfy the first prong of section 547(b). Finally, because Old GM transferred the $450 million to GM Canada in exchange for the Promissory Note, the transfer of the $450 million was *not* a transfer on account of an antecedent debt – it was made in exchange for the Promissory Note. *See DuVoisin v. Foster (In re S. Indus. Banking Corp.)*, 809 F.2d 329, 330 (6th Cir. 1987) (prepetition loan to creditor in exchange for promissory note is not a transfer on account of antecedent debt). Furthermore, because the Consent Fee was paid by GM Nova Scotia, not by Old GM, and not on account of any claim against Old GM, the GUC Trust cannot satisfy the requirement that the payment enabled the Noteholders to receive more than they would have received in a chapter 7 liquidation. Accordingly, the GUC Trust cannot invoke section 547 to support its section 502(d) objection.

F.  The Payment of the Consent Fee Is Not Avoidable Under Section 548

Under applicable state law and section 548(a)(1)(B) of the Bankruptcy Code, the trustee may avoid a transfer of an interest in the debtor in property if, *inter alia*, the debtor received less than reasonably equivalent value in exchange for such transfer. *See* 11 U.S.C. § 548(a)(1)(A); *Verestar*, 343 B.R. at 468. Again, as shown above, there was no transfer of estate property, and there is no valid section 548 claim.

The GUC Trust has also failed to satisfy its burden to prove that Old GM received less than reasonably equivalent value. The evidence demonstrates that in consideration for the $450

Million Loan, Old GM received the Promissory Note of equal value.  (SOF ¶ 37.)  The GUC

Trust has failed to discharge its burden of proof and the GUC Trust cannot invoke section 548 to

support its section 502(d) objection.[14]

G.    The Payment of the Consent Fee is Not Avoidable Under Section 549

Section 549(a) of the Bankruptcy Code "allows [a] trustee/debtor to avoid postpetition

transfers of estate property if not authorized by the court or the Bankruptcy Code." *Hackeling v.*

*Rael Automatic Sprinkler Co. (In re Luis Elec. Contracting Corp.),* 165 B.R. 358, 363 (Bankr.

E.D.N.Y. 1992) (citing 11 U.S.C. § 549(a)).   Relief under this section is limited to transfers

"made after the commencement of the case . . . ."  *Devan v. Phoenix Am. Life Ins. Co. (In re*

*Merry-Go-Round Enters., Inc.),* 400 F.3d 219, 224 (4th Cir. 2005).   Old GM lent the $450

million to GM Canada prior to the bankruptcy in exchange for the Promissory Note.  (SOF ¶ 37.)

Upon the bankruptcy filing, the Promissory Note – not the funds from the $450 Million Loan –

became an asset of Old GM's estate.   The Promissory Note was never transferred (and was

repaid in full).  (*Id.* ¶¶ 95-106.)  Thus, there was no post-petition transfer of estate property and

the GUC Trust cannot invoke section 549 to support its section 502(d) objection.

H.  Collapsing Doctrine Does Not Apply

The GUC Trust contends that the Court should collapse the initial $450 Million Loan

from Old GM to GM Canada, the $367 million payment by GM Canada to GM Nova Scotia in

settlement of the Intercompany Loans, and the payment by GM Nova Scotia of the Consent Fee

into a single transaction.  (GUC Trust Pre-Trial Brief at 24.)  The collapsing doctrine does not

apply here.

---

[14] Although the Objection also asserted fraudulent conveyance claims under Bankruptcy Code section 548(a)(1)(A) and applicable state law, the GUC Trust's Pre-Trial Brief did not include such claims and the GUC Trust has not pled or presented any evidence to support actual intent to hinder, delay, or defraud creditors.  That claim must be dismissed.

The seminal decision on the collapsing doctrine in the Second Circuit is *HBE Leasing* in which the Second Circuit held that "multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the UFCA." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).[15]  Under *HBE Leasing*, a party seeking to collapse a series of transactions must satisfy a two-prong test:

> (1) consideration received in exchange for the initial transfer of the debtor's property is reconveyed by the debtor for less than fair consideration or with fraudulent intent, and (2) the transferee of the initial conveyance has actual or constructive knowledge of the scheme.

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 55 (2d Cir. 2005) (quoting *HBE Leasing*, 48 F.3d at 635)); *see also, e.g.*, *Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 508 (Bankr. S.D.N.Y. 2011) (Bernstein, J.) ("A party seeking to collapse a series of transactions must satisfy two elements, or prongs.") (citing *HBE Leasing*, 48 F.3d 635).

The GUC Trust cannot satisfy the two-prong test.  As consideration for the $450 Million Loan, Old GM received the Promissory Note from GM Canada and Old GM did ***not*** transfer the Promissory Note to a third party.  (SOF ¶ 37.)  To the contrary, Old GM retained the Promissory Note, which was subsequently repaid in full by GM Canada.  (*Id.* ¶¶ 95-106.)  Accordingly, there is no basis to invoke the collapsing doctrine.  *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 447 B.R. 170, 186 (Bankr. S.D.N.Y. 2011).

---

[15] The GUC Trust also contends that the collapsing doctrine can be applied to interpret the MSPA and disregard the transfer under the $450 Million Loan from Old GM to GM Canada, so that the payment of the Consent Fee would be deemed not to involve a "Purchased Subsidiary."  (GUC Trust Pre-Trial Brief at 24.)  The GUC Trust fails to cite any authority to support this extraordinary contention.   Under the law in the Second Circuit, even if a series of transactions are collapsed, the separate transactions are not deemed non-existent and they are only collapsed for purpose of fraudulent conveyance analysis.  *HBE Leasing*, 48 F.3d at 635.

"If the debtor retains the consideration . . . its estate is not unfairly diminished and the initial transfer is not fraudulent." *Id.* at 187.[16] Thus, the collapsing doctrine has no application here.

Moreover, even under the GUC Trust's mistaken collapsing theory, the GUC Trust's fraudulent transfer claims under sections 502(d) and 548 fail because the evidence demonstrates that Old GM received reasonably equivalent value. Old GM's obligations under the Lock-Up Agreement were minimal. (SOF ¶ 64.) The benefits of the Lock-Up Agreement to Old GM were substantial and far exceeded any value that Old GM provided under the Lock-Up Agreement: (i) Old GM was able to sell its assets including the stock of GM Canada without the disruption, cost, risk, delay, and loss of value that would have resulted from a GM Canada proceeding; and (ii) as the sole owner of GM Canada, Old GM realized the benefit of the increased value of GM Canada that resulted from the elimination of its CAD$1.3 billion Intercompany Loan obligations and the preservation by GM Canada of CAD$600,000,000 worth of NOLs and US$1.6 billion tax refund (of which Old GM received $1.2 billion), which could have been lost if GM Canada had filed a CCAA proceeding. (SOF ¶ 22.) *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 609 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983) (where subsidiary received benefits of loan proceeds, parent received fair consideration for its guaranty); *Johnson v. First Nat'l Bank*, 81 B.R. 87, 89 (Bankr. N.D. Fla. 1987) (holding that a benefit received by a wholly-owned subsidiary may constitute reasonably equivalent value for purposes of a fraudulent conveyance analysis as to the parent company since the parent is the "indirect beneficiary of anything of value coming to the corporation.").

---

[16] There is one reported case in the Second Circuit where a court collapsed transactions that did not fit the paradigm in *HBE Leasing*. *See Silverman v. K.E.R.U. Realty Corp. (In re Allou Distributors, Inc.)*, 379 B.R. 5, 21 (Bankr. E.D.N.Y. 2007). There, the court held that the first prong of the *HBE Leasing* test should be read to require "that the transactions, taken as a whole, diminish the value of the debtor's estate *and* are marked by either a transfer made by the debtor for less than fair consideration or a transfer made by the debtor with actual fraudulent intent." *Id.* at 21-22 (emphasis added). The GUC Trust has not, and cannot, satisfy the *Allou* test as the Promissory Note was fair consideration for the loan and there is no evidence of fraudulent intent by the Debtor (or any other party). And, as shown below, the transactions, taken as a whole, did not diminish the value of the Debtor's estate.

To support its contention that Old GM received less than reasonably equivalent value, the GUC Trust relies solely, and incorrectly, on the so-called "indifference point" analysis. (Amended Complaint ¶ 130.)  As Mr. Buonomo testified, the "indifference point" was just one piece of an ever-changing internal analysis of how much GM Canada should be prepared to pay the Noteholders for their consent to a release of the CAD$1.3 billion debt GM Canada owed GM Nova Scotia.  (SOF ¶¶ 29-30.)  The "indifference point" was merely an average range based solely on purely financial inputs that did not consider other factors, including the risk of delay and the effect on the Canadian supply chain if GM Canada were to file a CCAA proceeding. (*Id.*; Buonomo Direct Test. ¶¶ 35-36; Tr. 08/09/12 (Buonomo) 215:23-261:5.)  In addition, the "indifference point" did not include the $1.6 billion tax refund (of which $1.2 billion was paid to Old GM) that could have been lost if GM Canada filed a CCAA proceeding.  (SOF ¶ 30.)  Old GM's internal documents reveal that the GM parties were prepared to pay up to $500 million to obtain the release of GM Canada's intercompany debt.  (DX 117; DX 448.)  Indeed, GM Canada obtained a $450 million loan from Old GM to fund the settlement, which amount is significantly higher than the $367 million Consent Fee that was agreed to in the Lock-Up Agreement and that GM Nova Scotia ultimately paid the Noteholders.  (*Id.* ¶ 37.)  Therefore, even under the GUC Trust's flawed collapsing theory, the payment of the Consent Fee is not avoidable as a fraudulent transfer.

Further, even if the payment of the Consent Fee were an avoidable transfer, the GUC Trust would have no right to seek recovery from the Noteholders for at least three reasons.  First, under section 550(a) of the Bankruptcy Code, the debtor (or its successor) "cannot recover the value of the transfer from any of the transferees or beneficiaries unless he first avoids the underlying transfer." *Geltzer v. Fur Warehouse, Ltd. (In re Furs by Albert & Mark Kaufman,*

*Inc.)*, Adv. No. 05-1838, 2006 WL 3735621, at *8 (Bankr. S.D.N.Y. Dec. 14, 2006). Here, prior

to seeking recovery from the Noteholders (mediate transferees) under section 550(a), the GUC

Trust would have to first avoid the loan to GM Canada, the initial transferee, which it has not

done. GM Canada is not even a party to these proceedings, let alone any avoidance proceeding.

Second, the GUC Trust cannot recover from the Noteholders because section 550(d) bars more

than one recovery. The trustee "is entitled to only a single satisfaction…" Third, under section

550(b) the trustee may not recover from any mediate transferees because (i) they gave value in

exchange for the Consent Fee by releasing GM Canada from its Intercompany Loan obligations

and (ii) the evidence shows they acted in good faith. 11 U.S.C. § 550(b)(1), (2).

I.   The Payment of the Consent Fee Qualifies for Section 546(e) Safe Harbor

The Consent Fee qualifies for the safe harbor provision of section 546(e), which provides

in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the
> trustee may not avoid a transfer that is . . . a transfer made by or to (or for the
> benefit of) a . . . financial institution [or] financial participant . . . in connection
> with a securities contract, as defined in section 741(7) . . . that is made before the
> commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).[17]   In determining whether section 546(e) protects specific transfers from

avoidance, a court must focus "on applying the literal language of the statutory exemption to the

facts presented." *Official Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re*

*Quebecor World (USA), Inc.)*, 453 B.R. 201, 219 (Bankr. S.D.N.Y. 2011), *aff'd*, 480 B.R. 468

(S.D.N.Y. 2012); *see also Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329,

336-37 (2d Cir. 2011); *accord Picard v. Katz,* 462 B.R. 447, 452 (S.D.N.Y. 2011) (ruling that

---

[17] Section 546(e) protects the payment of the Consent Fee from avoidance under sections 544, 547 or 548(a)(1)(B). For the reasons explained above, the payment of the Consent Fee cannot be avoided pursuant to section 548(a)(1)(A).

consideration of section 546(e)'s legislative history is improper because "the statute is plain and controlling on its face").

The Consent Fee initially was transferred by GM Nova Scotia to the Paying Agent, Banque Générale du Luxembourg, and subsequently *pro rata* shares were paid by the Paying Agent to the Noteholders. (SOF ¶ 87.)  Thus, payment of the Consent Fee was made "to" a financial institution.  Accordingly, section 546(e) protects the Consent Fee from avoidance under sections 544, 547 and 548(a)(1)(B).

**IV.    The Assumption and Assignment of the Lock-Up Agreement Bars the Equitable Subordination Claims and Challenges to the Lock-Up Agreement and Consent Fee**

The Lock-Up Agreement is a Purchased Contract under the MSPA that was assumed and assigned to New GM in accordance with the Sale Order approving the MSPA and the Assumption and Assignment Procedures. (SOF ¶ 108.)  The Assumption and Assignment Procedures did not require notice of the assumption and assignment of the contract to any party other than the counterparty to the agreement. (*Id.* ¶ 109.)  This made perfect sense in the context of the case.  The cost of the "cure" was paid by the purchaser.  All avoiding power claims relating to payments made under an assumed and assigned executory contract belonged to the DIP lenders (who were also the purchasers under the MSPA) as collateral, or were sold to New GM under the MSPA.  New GM paid for the right to obtain any contract it chose as part of the MSPA.  On November 18, 2009, Old GM provided notice to the Noteholders of the assumption and assignment of the Lock-Up Agreement, and no Noteholder ever objected.  (DX 266; Tr. 08/08/12 (Zirinsky) 109:10-23; 143:22-25.)  Pursuant to the Court's Sale Order, the assumption

and assignment was final and binding absent any objections by a counterparty.   Not being a

counterparty, the GUC Trust has no standing to challenge this result.[18]

Courts have consistently held that once a contract is assumed under section 365 of the

Bankruptcy Code, the rights and obligations under that **contract may not be attacked on any**

**ground.**   *See E. Air Lines, Inc. v. Ins. Co of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999-

1000 (2d Cir. 1996); *Dev. Specialists, Inc.  v. 1114 6th Ave. Co. (In re Coudert Bros. LLP)*, No.

09 Civ 5047 (DLC), 2009 WL 2868722, at *5 (S.D.N.Y. Sept. 4, 2009) (where debtor tries to

avoid a contract it previously assumed as a fraudulent transfer, dismissal of the avoidance action

is appropriate); *Official Comm. of Unsecured Creditors v. Aust (In re Network Access Solutions)*,

330 B.R. 67, 76-77 (Bankr. D. Del. 2005) (same); *Concerto Software, Inc. v. Vitaquest Int'l, Inc.*,

290 B.R. 448, 453-54, 456 (D. Me. 2003) (holding that bankruptcy court could not exercise

"core" or "related to" jurisdiction over dispute that arose following the assumption and

assignment of debtor's contract as part of court-approved sale of its assets).   This rule ensures

that once a debtor assumes a contract, it is bound by its terms.   In this case, the rule clearly

applies since Old GM sold the right to the purchaser to select any contract for assignment.

Having done so, it has no right to challenge an agreement acquired by New GM.   Accordingly

the GUC Trust is precluded from challenging the Lock-Up Agreement and seeking to avoid

and/or "recharacterize" the Consent Fee.   Similarly, because the Court's findings in the Sale

Order regarding the assumed contracts are antithetical to the GUC Trust's allegations of

inequitable conduct (which are based on the terms of the Lock-Up Agreement and the events

---

[18] The Sale Order provides that the sale transaction and the assumption of Purchased Contracts was an exercise of the Debtors' "sound business judgment" and that the "Debtors are receiving fair value for the assets being sold." (DX 226, Sale Order ¶¶ EE, G [Docket No. 2968].)   The Sale Order further states that "[t]he Purchased Contracts being assigned to, and the liabilities being assumed by, the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and, accordingly, such assumption and assignment of the Purchased Contracts and liabilities are reasonable, enhance the value of the Debtors' estates, and do not constitute unfair discrimination." *Id*.   As provided in the Sale Order, all of the parties are bound to the Court's findings and conclusions. (*Id*. ¶ 6.)

surrounding its negotiation), the GUC Trust, as successor to the Committee, cannot seek to equitably subordinate or disallow the Claims.

V.    **The GUC Trust Does Not Have Standing to Bring Claims For Equitable Subordination, Recharacterization, or Avoidance Because Those Claims Were Not Preserved By the Plan or Assigned to the GUC Trust**

The GUC Trust lacks standing to assert claims for avoidance, equitable subordination or disallowance and "recharacterization" (the "**Unassigned Claims**") because the Plan does not preserve these claims or assign them to the GUC Trust. *See CBI Holding,* 529 F.3d at 459 (stating that trustee cannot assert claims not assigned to it because "such claims are not part of the bankrupt's estate") (citations omitted); *see also Rahl v. Bande*, 328 B.R. 387, 400 (S.D.N.Y. 2005) (holding that litigation trustee has no standing to assert claims not assigned to it under chapter 11 plan). Under the Plan, the only assets transferred to the GUC Trust were New GM Securities and Wind-Down Amount. (SOF 140; Plan §§ 1.85, 1.87, 1.118, 5.2(a), 6.10 [Docket No. 9941].) The Unassigned Claims were not transferred to the GUC Trust. Accordingly, the GUC Trust does not have standing to bring the Unassigned Claims.

The GUC Trust cannot rely on Section 6.2(f)(iv) of the Plan as the basis of its purported right to prosecute equitable subordination or recharacterization claims. Section 6.2(f), entitled "Role of the GUC Trust Administrator," provides that the GUC Trust Administrator shall "have the power and authority to prosecute and resolve . . . subject to obtaining any applicable consent from [Old GM] or Post-Effective Date [Old GM], as the case may be, and any necessary approval of the Bankruptcy Court, any claims for equitable subordination and recharacterization in connection with such objections [to general unsecured claims]." The GUC Trust Administrator only can prosecute claims that are owned by the GUC Trust. Here, none of the Unassigned Claims were transferred to the GUC Trust, so the GUC Trust lacks standing to prosecute them. Moreover, pursuant to Section 6.2(f)(iv) and the case law, any purported power

of the GUC Trust Administrator to prosecute equitable subordination and recharacterization claims is subject to the consent of Old GM and approval of the Court, neither of which the Committee or the GUC Trust obtained.  *See AppliedTheory Corp. v. Halifax Fund Ltd. (In re AppliedTheory Corp.)*, 493 F.3d 82, 86 (2d Cir. 2007) (per curiam) (applying *STN Enters.* and holding that creditors' committee is required to seek bankruptcy court approval before it could assert equitable subordination claim).[19]

There is no provision in the Plan, including Section 6.2(f)(iv), that purports to grant any power or authority to the GUC Trust to prosecute any avoidance claims.  In addition, section 6.2(f)(iv) cannot serve as a basis to preserve the GUC Trust's right to assert equitable subordination claims because it was added to the Plan by amendment filed on March 18, 2011, two weeks after the Confirmation Hearing.  Section Z of the Confirmation Order states that these modifications "constitute technical changes and do not materially adversely affect or change the treatment of any Claims or Equity Interests."  That is, the amendment did not expand or create any rights, and therefore, cannot provide an independent basis to provide a right not otherwise provided for in the Plan.  If section 6.2(f)(iv) of the Plan were interpreted to preserve equitable subordination claims against the Noteholders, it clearly would adversely affect the Noteholders and change the treatment of the Claims under the Plan.  Such an interpretation would violate the Confirmation Order and section 1123(a)(4) of the Bankruptcy Code.

Aware that the Plan did not transfer the Unassigned Claims to it, the GUC Trust attempted to circumvent the Plan by secretly entering into, with Old GM, an Assumption and Assignment Agreement, dated December 15, 2011 (the "**Undisclosed Agreement**").  (SOF ¶

---

[19] To support such a request, the Committee would have had to demonstrate that "the trustee or debtor in possession unjustifiably failed to bring suit or abused its discretion in not suing . . . ."  *STN Enters.*, 779 F.2d at 904.  There is no evidence of this.

144.)   Section 1.1(d) of the Undisclosed Agreement, which was not filed with the Court or served on the Noteholders, provides for the purported transfer from Old GM to the GUC Trust on December 15, 2011, the date of dissolution of Old GM, of, among other things, defenses and claims for avoidance, recharacterization, and subordination.  (*Id.*)  The Undisclosed Agreement further provides that to the extent Old GM is not permitted to transfer its interest in any of the foregoing claims, Old GM appoints the GUC Trust as its agent to administer the resolution of the claims. (PX 283.)

The Undisclosed Agreement violates the Plan and the Confirmation Order.  Plan section 6.10 provides that, upon the dissolution of Old GM, (i) Old GM shall transfer certain cash assets to the GUC Trust; (ii) other assets of Old GM shall be transferred to the Avoidance Action Trust at the sole discretion of the Avoidance Action Trust Administrator; and (iii) any remaining assets not transferred to the Avoidance Action Trust shall be deemed abandoned by Old GM and the other debtors for all purposes without the necessity for any other or further actions to be taken by or on behalf of Old GM and the other debtors.   There is no provision in the Plan, the Confirmation Order, or the GUC Trust Agreement that permits the transfer of any other residual assets (other than the specified cash) to the GUC Trust.   The purported transfer of the Unassigned Claims to the GUC Trust under the Undisclosed Agreement is therefore impermissible under the Plan.  The GUC Trust's alternative mechanism to circumvent the Plan by its purported appointment as an agent of the Debtor to administer the claims also violates the Plan because, *inter alia*, Old GM has abandoned the claims at issue and it no longer owns any claims that an agent can administer on its behalf.

The Undisclosed Agreement also violates the Sale Order and the DIP Order.  At the time of the purported transfer of claims to the GUC Trust on December 15, 2011, Old GM did not

47

own the avoidance claims that it purported to transfer.  Under the Sale Order, Old GM had sold

the avoidance claims to New GM.  (SOF ¶ 69.)  Even if the avoidance claims had not been sold

to New GM, they were previously pledged as collateral under the DIP Loan.  (*Id.* ¶ 80.)  Further,

upon dissolution, any avoidance claims (other than possibly the Term Loan Avoidance Action)

not sold to New GM were abandoned to the DIP Lenders.   (*Id.* ¶¶ 140, 142.)  In no event did

Old GM have the right to transfer the avoidance claims.

The Undisclosed Agreement is a flagrant violation of the Plan, the Confirmation Order,

the Sale Order and the DIP Order, and is void *ab initio*.  The Court should not condone the GUC

Trust's conduct of entering into the Undisclosed Agreement in an effort to circumvent provisions

of its binding orders and concealing the Undisclosed Agreement from the Court and the

Noteholders.

## VI.    Judicial Estoppel Bars the GUC Trust from Challenging the Sale Order, the Lock-Up Agreement and the Assumption and Assignment of the Lock-Up Agreement

The doctrine of judicial estoppel bars the GUC Trust from challenging the Sale Order, the

Lock-Up Agreement, and the assumption and assignment procedures, pursuant to which the

Lock-Up Agreement was assumed and assigned to New GM.  "Where a party assumes a certain

position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter,

simply because his interests have changed, assume a contrary position, especially if it be to the

prejudice of the party who has acquiesced in the position formerly taken by him."  *New

Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citations omitted).

The Committee affirmatively supported the MSPA and consented to the Sale Order

(including the Assumption and Assignment Procedures) because it provided the only possible

recovery for unsecured creditors.   (Tr. 10/03/12 (Mayer) 78:19-79:3.)   The alternative was

liquidation and no recovery for unsecured creditors.  (*See* Sale Approval Decision at 16, 36

[Docket 2967].)   The Committee also supported and took the benefits of Old GM's chapter 11 plan, which depended entirely on the validity of the MSPA and the Sale Order.    The Committee's (and the GUC Trust's) attacks on the terms of the MSPA, including the sale of the avoidance claims and the Swap Claims, and the Assumption and Assignment Procedures, constitute a disguised attack on the Plan.

In addition, although the Committee had knowledge of the Lock-Up Agreement and understood that payment of the Consent Fee could not and did not adversely affect unsecured creditors because under the terms of the 363 Sale, any cash used to pay the Noteholders belonged to New GM and not Old GM's estate, which was only entitled to the agreed amount of Wind-Down Amount, and no other cash.  (SOF ¶ 70.)  The Lock-Up Agreement was disclosed to the Committee on numerous occasions.  (*Id.* ¶¶ 88-91, 93-94.)  The belated attacks by the Committee and its successor trust on the Lock-Up Agreement constitute an attempt to re-write the sale transaction the Committee agreed to, supported, and benefited from, which it cannot do.   In essence, in seeking to avoid or "recharacterize" the Consent Fee and subordinate the Claims, the GUC Trust is seeking an interest in cash to which it is not entitled under the 363 Sale the Committee supported.

The GUC Trust, as successor to the Committee, is judicially estopped from asking the Court to rewrite the agreement to permit the GUC Trust to receive benefits that were not part of the negotiated deal approved by the Court, to the detriment of the Noteholders and New GM. *See Krikor Dulgarian Trust v. Unified Mgmt. Corp. of R.I., Inc. (In re Peaberry's Ltd.)*, 205 B.R. 6, 9 (B.A.P. 1st Cir. 1997) (holding that a challenge to the terms of a lease "well *after* it had been assigned as part of the asset sale, was lodged too late.") (original emphasis).

**VII.    The Guarantee Claims and the Statutory Claims Are Not Duplicative**

The GUC Trust misstates U.S. and Canadian law by contending that the Guarantee Claims and the Statutory Claims are duplicative.  The Second Circuit decision in *Nw. Mut. Life Ins. Co. v. Delta Air Lines, Inc.* (*In re Delta Air Lines, Inc.*), 608 F.3d 139, 147 (2d Cir. 2010) is dispositive on this issue and is controlling law in this Circuit.   The Noteholders hereby incorporate and join in the other arguments contained in the Nova Scotia Trustee's post-trial brief.

## CONCLUSION

For all the foregoing reasons, the Noteholders respectfully request the Court overrule the Objection, grant judgment in favor of the Noteholders on the Amended Complaint, dismiss the Amended Complaint with prejudice, allow the Guarantee Claims and the Statutory Claim in full, and grant such other and further relief as is just.

Dated: May 24, 2013

GREENBERG TRAURIG, LLP

By: */s/* Bruce R. Zirinsky

Bruce R. Zirinsky, Esq.
John H. Bae, Esq.
Gary D. Ticoll, Esq.
Paul T. Martin, Esq.
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: zirinskyb@gtlaw.com
       baej@gtlaw.com
       ticollg@gtlaw.com
       martinpt@gtlaw.com

Kevin D. Finger, Esq.
Bevin M. Brennan, Esq.
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
E-mail: fingerk@gtlaw.com
        brennanb@gtlaw.com

Joseph P. Davis III, Esq.
One International Place
Boston, MA 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001
E-mail: davisjo@gtlaw.com

*Attorneys for Elliott Management Corporation,
Fortress Investment Group LLC and Morgan
Stanley & Co. International plc, and/or entities
managed by them, including Drawbridge DSO
Securities LLC, Drawbridge OSO Securities
LLC, FCOF UB Securities LLC, Elliott
International LP and The Liverpool Limited
Partnership*