| AKIN GUMP STRAUSS HAUER & FELD LLP | CURTIS, MALLET-PREVOST, COLT & MOSLE LLP |
|---|---|
| One Bryant Park<br>New York, New York 10036<br>(212) 872-1000 (Telephone)<br>(212) 872-1002 (Facsimile)<br>Daniel H. Golden<br>Sean E. O'Donnell<br>Philip C. Dublin<br>Dean L. Chapman, Jr.<br>William F. Mongan<br><br>*Counsel for Green Hunt Wedlake Inc.,*<br>*Trustee of General Motors Nova Scotia Finance*<br>*Company* | 101 Park Avenue<br>New York, New York 10178<br>(212) 696-6000 (Telephone)<br>(212) 697-1559 (Facsimile)<br>Steven J. Reisman<br>Theresa A. Foudy<br>Ada V. Anon<br><br>*Counsel for dbX – Risk Arbitrage 1 Fund,*<br>*Lyxor/Paulson International Fund Limited, Paulson*<br>*Enhanced Ltd., Paulson International Ltd., Paulson*<br>*Partners Enhanced, L.P., and Paulson Partners L.P.* |
| GREENBERG TRAURIG, LLP | KING & SPALDING LLP |
| MetLife Building<br>200 Park Avenue<br>New York, New York 10166<br>(212) 801-9200 (Telephone)<br>(212) 801-6400 (Facsimile)<br>Bruce R. Zirinsky<br>Kevin D. Finger (Chicago)<br>Joseph P. Davis III (Boston)<br><br>*Counsel for Elliott Management Corporation, Fortress*<br>*Investment Group LLC and Morgan Stanley & Co.*<br>*International plc* | 1185 Avenue of the Americas<br>New York, New York 10036<br>(212) 556-2100 (Telephone)<br>(212) 556-2222 (Facsimile)<br>Arthur Steinberg<br>Scott Davidson<br><br>*Counsel for General Motors LLC* |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X

In re                                                                   :   Chapter 11
                                                                        :
MOTORS LIQUIDATION COMPANY., *et al.*,                                   :   Case No. 09-50026 (REG)
*f/k/a General Motors Corp., et al.*,                                    :
                                                                        :   (Jointly Administered)
                              Debtors.                                   :
                                                                        :
                                                                        :
------------------------------------------------------------------------------X
                                                                        :
MOTORS LIQUIDATION COMPANY GUC TRUST,                                    :
                                                                        :   Adv. Pro. No. 12-09802 (REG)
                              Plaintiff,                                 :
                                                                        :
                              v.                                        :
                                                                        :
APPALOOSA INVESTMENT LIMITED PARTNERSHIP I, et al.,                      :
                                                                        :
                              Defendants.                                :
                                                                        :
------------------------------------------------------------------------------X

## JOINT STATEMENT OF FACTS OF CERTAIN NOTEHOLDERS, THE GM NOVA SCOTIA TRUSTEE, AND NEW GM

1.      The matter before the Court has come to be known as the GM Nova Scotia litigation.  It involves certain **Notes** (defined *infra*) issued by General Motors Nova Scotia Finance Company ("**GM Nova Scotia**") and guaranteed by General Motors Corp., n/k/a Motors Liquidation Company ("**Old GM**"), the proceeds of which were lent to its wholly-owned subsidiary General Motors of Canada Limited ("**GM Canada**").  Holders of those GM Nova Scotia Notes (the "**Noteholders**") have asserted claims against Old GM in respect of Old GM's guarantee, and the trustee of GM Nova Scotia has asserted a statutory claim against Old GM under Section 135 of the Nova Scotia Companies Act for money owed under the Notes as well as certain **Swap Transactions** (defined *infra*).  Each of these claims arises independently of a third matter that has been put at issue in this case, a **Lock-Up Agreement** (defined *infra*) that was executed shortly before Old GM filed its bankruptcy petition.  The primary purpose of the Lock-Up Agreement was to induce the Noteholders (as the primary creditors of GM Nova Scotia) to consent to the settlement, at a steep discount, of CAD $1.334 billion Intercompany Loan (defined *infra*) from GM Nova Scotia to another Old GM subsidiary, GM Canada, thereby allowing GM Canada to avoid having to file for bankruptcy, in exchange for the payment of a consent fee.

**The Creation of GM Nova Scotia**

2.      In 2001, in order to raise capital, Old GM formed GM Nova Scotia as an unlimited liability company ("**ULC**") under the Nova Scotia Companies Act.[1]  Unlike the typical

---

[1] Def. Tr. Ex. 352 (Expert Report of Professor Benjamin R.D. Alarie ¶¶ 9, 20-21).

corporate structure, which is specifically designed to limit a shareholder's liability, under Section 135 of the Nova Scotia Companies Act ("**Section 135**"), in the event a ULC is wound up, the members (*i.e.*, shareholders) of the ULC are liable to the ULC for its outstanding debts, liabilities and costs of winding up.  It is undisputed that Old GM is GM Nova Scotia's sole 100% member.

3.    By using a Nova Scotia ULC, Old GM was able to achieve certain tax benefits. Professor Benjamin Alarie, an expert in U.S./Canadian cross-border tax planning, testified that at the time GM Nova Scotia was created, U.S. companies commonly used ULC structures to raise capital because the ULC structure allowed multi-national corporations like Old GM to realize significant tax savings that would otherwise be unavailable using a more typical corporate structure.[2]  As Professor Alarie explained, these tax savings opportunities included the ability to: (i) flow through any losses from the ULC in order to reduce the U.S. taxpayer's taxable income; (ii) obtain otherwise unavailable tax credits for Canadian corporate income tax paid by the ULC; and (iii) finance Canadian operations of non-residents without additional tax penalties.  The GUC Trust's expert, Associate Professor Mohammed Khimji, acknowledged that by electing to raise capital through the ULC structure, Old GM enjoyed certain tax benefits.[3]

**The Nova Scotia Notes, Old GM's Guarantee, and the Intercompany Loans**

4.    On July 10, 2003, GM Nova Scotia issued: (i) £350,000,000 principal amount of 8.375% Guaranteed Notes due December 7, 2015: and (ii) £250,000,000 principal amount of 8.875% Guaranteed Notes due July 10, 2023 (together, the "**Notes**"), pursuant to the terms and conditions of that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003,

---

[2] Alarie Direct Test. ¶¶ 9-10.
[3] Tr. 09/21/12 (Khimji) 127:9-17.

3

among GM Nova Scotia, Old GM, Deutsche Bank Luxembourg S.A., as fiscal agent, and Banque Général du Luxembourg S.A., as paying agent (the "**Fiscal and Paying Agency Agreement**").[4]  Old GM guaranteed the Notes (the "**Guarantee**") under the Fiscal and Paying Agency Agreement.[5]  None of the Notes, the Fiscal and Paying Agency Agreement, or the Guarantee contained any provision restricting the liability of Old GM under Section 135, although the contracting parties could have done so under sub-section (f) of Section 135.[6]

5.     GM Nova Scotia loaned the proceeds of the Notes to GM Canada pursuant to two loan agreements each dated July 10, 2003 (the "**Intercompany Loans**") aggregating CAD $1,334,064,000.[7]  Under one loan agreement, GM Nova Scotia lent to GM Canada CAD $778,204,000 with the principal amount being due and payable on December 7, 2015.[8] Under the second loan agreement, GM Nova Scotia lent to GM Canada CAD $555,860,000 with the principal amount being due and payable on July 10, 2023.[9]

**The Swap Agreements**

6.     On the same day that Old GM caused GM Nova Scotia to issue the Notes, GM Nova Scotia and Old GM entered into two currency swap transactions (the "**Swap Agreements**") in order to hedge against currency exchange risk arising from the Notes being denominated in pounds sterling and the Intercompany Loans being denominated in Canadian

---

[4] Joint Pretrial Submission ¶ 2; *see also* Def. Tr. Exs. 16, 15, 21.

[5] *See* Def. Tr. Exs. 21 Schedule 1 § 5; 15 (at AUR_GM021181); 16 (at AUR_GM021211); 18; 21.

[6] Def. Tr. Ex. 377 (§ 135(f) (Companies Act, R.S.N.S., 1989, c. 81, s. 135(f)); *see In re Smurfit-Stone Container Corp.*, 444 B.R. 111, 117 (Bankr. D. Del. 2011).

[7] Joint Pretrial Submission ¶¶ 4-5.

[8] *Id*.

[9] *Id*.

dollars.[10]   The International Swap Dealers Association Master Agreement and schedule thereto (the "**ISDA Master Agreement**")[11] and two Currency Swap Confirmations both dated July 10, 2003 (the "**Confirmations**") issued in connection with and expressly made part of the ISDA Master Agreement memorialized the Swap Agreements.[12]

**The Nova Scotia Litigation**

7.    By 2008, the financial conditions of Old GM and GM Canada were severely deteriorating.[13]   In May 2008, GM Nova Scotia and an affiliated entity, General Motors Nova Scotia Investments Ltd. ("**Nova Scotia Investments**"), transferred in the aggregate more than CAD $590 million to Old GM (the "**Nova Scotia Transfers**").[14]   And in December 2008, the U.S. Treasury provided financing to temporarily sustain Old GM's operations on the condition that Old GM develop a business plan to fundamentally transform Old GM into a viable and profitable company.[15]

8.    Around the same time as the December 2008 financing, certain Noteholders learned of the Nova Scotia Transfers and grew concerned about their investments in GM Nova Scotia.[16]   In response, these Noteholders contacted representatives of GM Canada and GM Nova Scotia to initiate a discussion about the Nova Scotia Transfers and a potential restructuring of the Notes.[17]   When those efforts proved unsuccessful, the Noteholders engaged counsel, who then

---

[10] *Id.* ¶ 3; Buonomo Direct Test. ¶ 23.

[11] Def. Tr. Ex. 22.

[12] *Id.*; Def. Tr. Ex. 11.

[13] Def. Tr. Ex. 528; Tr. 08/10/12 (Buonomo) 133:10-13.

[14] Def. Tr. Exs. 33, 35; Joint Pretrial Submission ¶ 7.

[15] Def. Tr. Ex. 158 ¶ 13 (Henderson Affidavit, dated June 1, 2009).

[16] *See, e.g.*, Gropper Direct Test. ¶ 19-22; Truong Direct Test. ¶ 28-29; Bolin Direct Test. ¶ 10.

[17] *See* Truong Direct Test. ¶ 26-27; Def. Tr. Exs. 40, 43, 47, 48.

initiated an exchange of letters with counsel for GM Nova Scotia.[18]  But counsel's efforts to start a dialogue with Old GM and its subsidiaries were also rebuffed.[19]

9.     In February 2009, under the terms of an Amended and Restated Credit Agreement among Old GM, GM Canada and the Saturn Corporation, GM Canada was permitted to guarantee the indebtedness of other Old GM entities and post its assets as collateral.[20]  The Noteholders were concerned that this potential new GM Canada guarantee hindered its ability to repay the Intercompany Loans owed to GM Nova Scotia, which the Noteholders viewed as an important source of recovery under the Notes.[21]

10.    On March 2, 2009, three Noteholders, Aurelius Capital Management ("**Aurelius**"), Fortress Investment Group, LLC ("**Fortress**") and Appaloosa Management, L.P. ("**Appaloosa**," together with Aurelius and Fortress, the "**Noteholder Plaintiffs**"), commenced an action in the Supreme Court of Nova Scotia against Old GM, GM Canada, GM Nova Scotia and several other defendants, entitled *Aurelius Capital Partners, LP, et al. v. General Motors Corporation, et al.* (the "**Nova Scotia Litigation**").  The Noteholder Plaintiffs alleged, among other things, that GM Nova Scotia had insufficient assets to satisfy its financial obligations under the Notes and that the entities indebted to GM Nova Scotia (including GM Canada) had taken actions (*inter alia,* the Nova Scotia Transfers) that impaired their ability to satisfy obligations owed to GM Nova Scotia.[22]

---

[18] *See* Def. Tr. Exs. 50, 51, 52, 53.

[19] Gropper Direct Test. ¶ 20.

[20] Def. Tr. Ex. 55 at NGM000007200; Bolin Direct Test. ¶¶ 16-17; Truong Direct Test. ¶ 31.

[21] Truong Direct Test. ¶ 31; Bolin Direct Test. ¶¶ 16-17.

[22] Def. Tr. Ex. 55, ¶¶ 27, 30.

11.     While the Nova Scotia Litigation was pending, the Noteholders continued to try to engage Old GM and GM Nova Scotia in a settlement dialogue, but Old GM continued to rebuff those efforts.[23]  For example, in a March 18, 2009 email to Old GM and certain others, Stephen Worth of Evercore Partners (Old GM's restructuring advisor) wrote:  "We got a call from Dan Gropper (Aurelius [sic] Capital) – Nova Scotia investor along with Fortress and Appaloosa – to let us know that they are out there ready to talk when we are.  I assured him we knew they were out there."[24]

12.     Ultimately, the Noteholder Plaintiffs decided to ask the Nova Scotia court to appoint an interim receiver over the assets of GM Nova Scotia.[25]  To this end, the Noteholder Plaintiffs interviewed several parties for the engagement,[26] including Peter Wedlake, the Senior Vice President of Green Hunt Wedlake, Inc., a company operating in Halifax, Nova Scotia that consults on insolvencies and serves as a trustee in insolvency matters (**"Green Hunt Wedlake"**).[27]  Prior to this time, Mr. Wedlake and his firm had no dealings or interaction with any of the Noteholder Plaintiffs.[28]  Ultimately, the Noteholder Plaintiffs selected Mr. Wedlake and his firm to serve as interim receiver and filed a motion seeking such an appointment,[29] but, as

---

[23] Gropper Direct Test. ¶ 24; Bolin Direct Test. ¶¶ 15, 20; Def. Tr. Ex. 57.

[24] Def. Tr. Ex. 57; *see also* Def. Tr. Ex. 63; Tr. 09/06/12 (Cederholm) 122:20-22 ("Elliott did not want to wait to begin negotiations because it would be "a Herculean task given the parameters of this restructuring to get anything realistic done in that time frame.")

[25] Bolin Direct Test. ¶ 21.

[26] Gropper Direct Test. ¶ 23.

[27] Wedlake Direct Test. ¶ 10-11; Tr. 08/07/12 (Wedlake) 59:11-60:15.

[28] *See, e.g.,* Wedlake Direct Test. ¶¶ 7, 12; Bolin Direct Test. ¶ 21; Gropper Direct Test. ¶ 23.

[29] Wedlake Direct Test. ¶ 11; Bolin Tr. 1917:17-1918:6; Tr. 09/20/12 (Truong) 56:12-15; Gropper Direct Test. ¶ 23.

detailed below, the case was subsequently settled before the court issued any substantive rulings.[30]

13.    Old GM recognized there was uncertainty about which side would prevail in the Nova Scotia Litigation.[31]  Old GM was also concerned that the allegations in the Nova Scotia Litigation could complicate a sale of the Canadian assets if GM Canada filed for bankruptcy and sought such relief.[32]  Similarly, Old GM understood that settling the Intercompany Loans was a prerequisite to avoiding a GM Canada filing, and to do that meant that Old GM had to settle with the Noteholder Plaintiffs.[33]

**Old GM's Bond Exchange Offer and Form S-4**

14.    During the first five months of 2009, Old GM and the United States and Canadian Governments (the "**Governments**") were attempting to accomplish a restructuring that would allow Old GM and GM Canada to restructure their debts without the need to file for bankruptcy.[34]  On March 30, 2009, the U.S. government rejected Old GM's initial restructuring plan and granted Old GM only 60 days to "address the tough issues to improve the long-term viability of the company, including the restructuring of the financial obligations to the bondholders, unions and other stakeholders."[35]

---

[30] *See, e.g.*, Wedlake Direct Test. ¶¶ 7, 12; Bolin Direct Test. ¶ 21; Gropper Direct Test. ¶ 23.

[31] Buonomo Direct Test. ¶ 30.

[32] *Id.*

[33] Buonomo Direct Test. ¶ 9.

[34] *See generally* Def. Tr. Ex. 158 ¶ 13.

[35] *See* Def. Tr. Ex. 62.

15.    In response, on April 27, 2009, Old GM and its subsidiary GM Nova Scotia, jointly solicited *all* holders of their respective notes, aggregating approximately USD $27.2 billion, to exchange their notes for common stock (the "**Bond Exchange Offer**").[36]

16.    The Bond Exchange Offer was detailed in Old GM's April 27, 2009 Form S-4 (the "**Form S-4**"), which disclosed the unique position of the GM Nova Scotia Notes in the capital structure of Old GM and its subsidiaries.[37]  In particular, Old GM explained in its Form S-4 that if it were to file for bankruptcy, with respect to the GM Nova Scotia Notes:  (i) only the Guarantee would potentially be discharged; (ii) the Notes would remain a liability of GM Nova Scotia; and (iii) GM Nova Scotia would still be able to assert a claim against Old GM for the full amount of the Notes under Section 135 of the Nova Scotia Companies Act.[38]  The Form S-4 stated:

> [O]nly the guarantee by GM of the old GM Nova Scotia notes would potentially be discharged in GM's reorganization case.  The old GM Nova Scotia notes would not be cancelled and the holders thereof would not be precluded by a GM reorganization case from seeking payment from GM Nova Scotia for the balance due under the old GM Nova Scotia notes.  In addition, because GM Nova Scotia is an "unlimited company," under Nova Scotia corporate law, if GM Nova Scotia is "wound up" (which includes liquidation and likely includes bankruptcy), the liquidator or trustee in bankruptcy may be able to assert a claim against GM, the shareholder of GM Nova Scotia, to contribute to GM Nova Scotia an amount sufficient for GM Nova Scotia to pay its debts and liabilities, including amounts equal to any amounts outstanding under the old GM Nova Scotia notes. It is possible that such claim for contribution may be impaired in the event GM seeks relief under the U.S. Bankruptcy Code.[39]

---

[36] Buonomo Direct Test. ¶ 32.

[37] *See* Def. Tr. Ex. 75.

[38] *Id*. at NGM000007377.

[39] *Id.*

17.    The Bond Exchange Offer, however, treated each bond indebtedness as *pari passu,* without regard to the types of claims or avenues of recovery a particular bondholder held under its debt instrument.  For example, the Bond Exchange Offer "ignored the fact that the [N]otes had greater sources of recovery [than other indebtedness], which included:  (i) GM Nova Scotia's claims against GM Canada under the Intercompany Loans; (ii) Old GM's unconditional guaranty of the Notes; and (iii) Old GM's obligation to satisfy the debts of GM Nova Scotia under Section 135 of the Companies Act."[40]

18.    The Form S-4 also addressed the potential bankruptcy filing of GM Canada and its impact on the Intercompany Loans and the value of the Swap Agreements.  With respect to GM Canada, the Form S-4 noted that the Intercompany Loans could be impaired if GM Canada were to seek relief under Canadian bankruptcy law.[41]  The Form S-4 also provided that as of March 31, 2009, GM Nova Scotia would owe a net liability of approximately CAD $632 million to Old GM under the Swaps, if the Swaps were "terminated as of such date."[42]

19.    David Vanaskey of Wilmington Trust Company ("**Wilmington Trust**"), which (i) served as an indenture trustee for most of the Old GM bonds, (ii) served as chair of the unsecured creditors committee, and (iii) currently acts as the GUC Trust Administrator,[43] testified that he personally reviewed the Form S-4 at the time that it was circulated,[44] and that before Old GM filed for bankruptcy, he was personally aware of the existence and relative size

---

[40] Truong Direct Test. ¶¶ 36, 37.
[41] Def. Tr. Ex. 75 at NGM000007377.
[42] *Id.*
[43] *See* Tr. 11/27/12 (Vanaskey) 5:17-19.
[44] *Id.* 22:20-22.

of the Notes, the Guarantee, the Intercompany Loans, the Swap Liability, and the potential that GM Nova Scotia would file a Statutory Claim against Old GM.[45]

**The Goal to Keep GM Canada out of Bankruptcy**

20.    Old GM, GM Canada, and the Governments understood that if the Bond Exchange Offer failed, Old GM would need to file for bankruptcy on June 1, 2009.[46]   In connection with the planning for an Old GM June 1 bankruptcy filing, Old GM, GM Canada and the Governments considered a parallel bankruptcy proceeding for GM Canada in Canada,[47] but they strongly preferred keeping GM Canada out of bankruptcy if this could be achieved at an acceptable cost.[48]  The Governments and Old GM were aware that when Chrysler restructured its affairs through a sale, its Canadian subsidiary did not file for bankruptcy, and they wanted the same result for GM Canada.[49]

21.    In May 2009, GM Canada was an integral part of Old GM's North American business and an important part of the overall Canadian economy.[50]  GM Canada was the largest producer of automobiles in Canada,[51] employed over 10,000 employees, provided approximately 40,000 people with benefits, and played a critical role in the Canadian supplier industry and the Canadian automobile dealer network.[52]

---

[45] *Id.* 24:16-26:4.

[46] Def. Tr. Ex. 158 ¶ 71.

[47] Buonomo Direct Test. ¶ 11, 29.

[48] *Id.* ¶¶ 5, 29; Ammann Direct Test. ¶ 9; Tr. 08/09/12 (Buonomo) 204:11-206:8; Tr. 09/27/12 (Ammann) 131:10-132:24.

[49] Tr. 08/09/12 (Buonomo) 202:17-203:7.

[50] *Id.* 204:13-205:2.

[51] *Id.* 204:19.

[52] *Id.* 201:21- 205:14.

22.    In particular, Old GM identified the following factors, which it discussed with both Governments, as reasons to avoid filing a Canadian bankruptcy for GM Canada:

- **NOLS**:    GM Canada could lose highly valuable NOLs (net operating losses), estimated to be worth over CAD $3 billion, if it filed for bankruptcy.  Those NOLs had a present value of approximately CAD $600 million in 2009.[53]

- **Tax Refund**:  GM Canada expected a tax refund from the Canadian Government (the "**Tax Refund**").  In early May 2009, the management of GM Canada estimated the amount of the Tax Refund to be approximately CAD $600 million,[54] which GM Canada's management believed the company would not receive in the event of  a Canadian bankruptcy proceeding.[55]

- **Business Demand Risk**:    Old GM and GM Canada had a serious concern of a potentially significant, negative, business impact on GM Canada if it filed for bankruptcy, which could spill over to other Canadian companies with which it did business.[56]  This "Business Demand Risk" was real as the Court found that Old GM did "worse than expected in fleet sales in June [2009], as fleet sales customers pulled back their orders because they didn't know their status in a bankruptcy."[57]

- **CAMI Financing Default**:  A GM Canada bankruptcy filing would constitute an event of default of a loan in the amount of CAD $500 million that had been made to CAMI, a joint venture between GM Canada and Suzuki.[58]

- **Execution Risk**:  Old GM and GM Canada were concerned that a GM Canada bankruptcy would make the 363 Sale (defined *infra*) more complex, and have a negative effect on the companies' ability to quickly consummate the Old GM

---

[53]  Def. Tr. Exs. 445, 107 at NGM000021234, 528 at NGM000038042; Buonomo Direct Test. ¶ 6; Tr. 08/09/12 (Buonomo) 23:25-24:9, 205:20-206:8; Tr. 09/27/12 (Ammann) 137:1-7, 132:24-133:13.

[54]  Def. Tr. Ex. 445.

[55]  Tr. 03/06/13 (Lopez) 122:12-17; Tr. 09/27/12 (Ammann) 136:10-25.

[56]  Buonomo Direct Test. ¶ 6.

[57]  Decision On Debtor's Motion For Approval Of (1) Sale Of Assets To Vehicle Acquisition Holdings LLC; (2) Assumption And Assignment Of Related Executory Contracts; And (3) Entry Into UAW Retiree Settlement Agreement, dated July 5, 2009 [Docket No. 2967] ("**Sale Approval Decision**") at 23.

[58]  Pl. Tr. Ex. 130; Tr. 08/10/12 (Buonomo)  13:9-14:7; Tr. 09/27/12 (Ammann) 135:19-136:9.

12

restructuring in the United States.[59]   Mr. Buonomo referred to this as "Execution Risk."[60]

- **Expenses**:   A Canadian bankruptcy would impose significant expenses (*e.g.*, professional fees).[61]

23.     But Old GM, GM Canada, and the Governments also had identified the following three primary obstacles to avoiding a GM Canada bankruptcy filing:   (i) reorganizing GM Canada's dealer network at an acceptable cost; (ii) resolving GM Canada's pension obligations to the Canadian Auto Workers and its members; and (iii) addressing the CAD $1.33 billion Intercompany Loans owed by GM Canada to GM Nova Scotia.[62]

24.     By late May, the first two obstacles had been resolved.[63]   So long as GM Canada remained obligated to GM Nova Scotia for the Intercompany Loans, however, there was no way for it to avoid a GM Canada bankruptcy.[64]   Accordingly, a settlement needed to be reached whereby GM Nova Scotia would settle that indebtedness.[65]   Further, in order to obtain the certainty required by the Governments that there be a firm deal in place as of the time Old GM filed for bankruptcy, Noteholders holding at least two thirds of each of the Notes needed to consent to the settlement before Old GM filed for chapter 11 relief.[66]

---

[59] *See* Buonomo Direct Test. ¶ 6.

[60] Tr. 08/09/12 (Buonomo) 202:12-203:13; Tr. 09/27/12 (Ammann) 131:24-133:6, 134:25-135:10.  This Execution Risk was especially troublesome, given the tight deadlines imposed by the Governments as DIP Lenders to consummate the 363 Sale, which the Court properly understood to be very real.  *See* Sale Approval Decision at 36-37.  Absent compliance with these deadlines, Old GM's only alternative would have been liquidation, in which event "unsecured creditors would recover nothing."  *Id.* at 16 and 38.

[61] Buonomo Direct Test., ¶ 6; Tr. 08/09/12 (Buonomo)  23:25-24:9; Tr. 08/10/12 (Buonomo) 205:20-206:8; Tr. 09/27/12 (Ammann)  132:24-133:12.

[62] *Id.; see also* Def. Tr. Ex. 445 ("May 4, 2009 Plan B Planning Presentation").

[63] Buonomo Direct Test. ¶ 11.

[64] *Id.*

[65] *Id.*

[66] Ammann Direct Test. ¶ 22.

13

25.    In mid-May 2009, representatives of Old GM, GM Canada, the Auto Task Force established by the U.S. government, and the Canadian Government, met at the United States Treasury in Washington, D.C to discuss the potential bankruptcy filing by Old GM.  If the Bond Exchange Offer failed, the plan was for Old GM to file for bankruptcy no later than June 1, 2009 and attempt a rapid restructuring by a sale under Section 363 of the Bankruptcy Code (the "**363 Sale**") pursuant to which the Governments would sponsor and own the majority of the shares of a new company, General Motors LLC ("**New GM**"), and substantially all of Old GM's assets would be transferred to New GM.[67]  The deadline was driven in part by the impending June 1, 2009 maturity date for Old GM's USD $1 billion Series D Convertible Senior Debentures.[68]

26.    GM Canada likewise had a June 1, 2009 deadline to file for insolvency proceedings in Canada if an agreement could not be reached with the Noteholders.[69]  In that event, GM Canada was prepared to and would have simultaneously commenced a bankruptcy proceeding during the morning of June 1, 2009.[70]  GM Canada's bankruptcy plan was similar to Old GM's strategy.   GM Canada would have attempted to sell its assets to a government sponsored entity on an expedited basis.[71]  But if such a sale were to take place, GM Canada did not intend to make any payments on the Intercompany Loans, a position which GM Canada

---

[67] Buonomo Direct Test. ¶ 3; Def. Tr. Ex. 158 ¶ 14 (Henderson Affidavit).

[68] Def. Tr. Ex. 75 at NGM000007430.

[69] Buonomo Direct Test. ¶ 29; Ammann Direct Test. ¶ 11.

[70] *See* Buonomo Direct Test. ¶ 29; Ammann Direct Test. ¶ 11.  As testified to by Tyrone Lopez, all GM Canada personnel (including Mr. Lopez) were working around the clock up until 6:00 a.m. on June 1, 2009 readying GM Canada for a bankruptcy filing.  Tr. 03/06/13 (Lopez) 18:10-19:3.

[71] Pl. Tr. Ex. 214.

14

expected to be vigorously contested by the Noteholders, thereby materially increasing the execution risk for a GM Canada and Old GM restructuring.[72]

27.    At the Washington, D.C. meeting, in order to avoid a GM Canada filing, the Governments communicated that as the purchaser of Old GM and as a major secured lender to Old GM, they were prepared to use assets (*i.e.*, cash) that otherwise would flow to them as either secured lender to Old GM or to New GM as the purchaser of "cash" under the 363 Sale, to fund a settlement with the Noteholders.[73]  On May 22, 2009, to address Old GM's deteriorating liquidity, U.S. Treasury made a $4 billion loan to Old GM, and on May 29, 2009, U.S. Treasury lent Old GM an additional USD $360 million.[74]  Yet by June 1, 2009, Old GM had only USD $2 billion of cash remaining.[75]

**The "Indifference Analysis"**

28.    Immediately after the meeting in Washington, D.C., even though Old GM and its subsidiaries still had not yet begun negotiations with the Noteholders, Weil Gotshal & Manges ("**Weil Gotshal**") began preparing settlement papers providing for the Noteholders' consent to settle the CAD $1.33 billion obligation of GM Canada to GM Nova Scotia.[76]  Old GM also prepared certain analyses in order to help determine potential settlement ranges with the Noteholders.[77]  One of these analyses was referred to internally at Old GM as an "Indifference

---

[72] Tr. 08/09/12 (Buonomo) 49:22-50:7.

[73] Buonomo Direct Test. ¶ 7.

[74] Def. Tr. Ex. 158 ¶ 69.

[75] Transcript of Hearing Held on June 1, 2009 ("**First Day Hearing Transcript**") at 39:20-21.

[76] Def. Tr. Ex. 94 (May 16, 2009 email from Daniel Ammann to Ray Young and Adil Mistry of Old GM, stating that "[w]e are working with weil [sic] on draft lock-up agreement").

[77] *See* Ammann Direct Test. ¶ 14.

Analysis."[78]    According to Daniel Ammann, who at the time of the analysis was a Managing Director at Morgan Stanley who served as a financial advisor to Old GM, the Indifference Analysis was "a loosely defined attempt to quantify some of the financial aspects of an in-court versus out-of-court restructuring for GM Canada and was but one data point in the overall business assessment of the pros and cons of a GM Canada restructuring."[79]

29.    As reflected in the Indifference Analysis, Old GM considered a wide range of values for its "indifference point" that changed over time.  Lawrence Buonomo, former counsel to Old GM and now counsel to New GM, explained that this was a "dimensioning exercise," carried out "along with all the other things we discussed," in order "to sort of come to a conclusion or a basis for discussion, if you will, about what the number ought to be."[80]    One version of the Indifference Analyses shared with the Auto Task Force had USD $441 million as the upper limit of the range.

30.    Old GM and the Governments understood that important data points were missing from the Indifference Analysis.[81]    For example, although the "indifference point" analysis acknowledged the possibility of the Tax Refund, it did not include any value for the Tax Refund in calculating the "indifference point."    Nor did the calculations of the "indifference point" account for the Execution Risk, the Business Demand Risk, or the CAMI Financing Default, all

---

[78] Def. Tr. Exs. 93, 94, 95, 103; Pl. Tr. Ex. 130.
[79] *See* Ammann Direct Test. ¶ 15.
[80] Tr. 08/10/12 (Buonomo) 215:23-216:5.
[81] Pl. Tr. Ex. 130.

of which Old GM believed were important factors to consider when determining the value of keeping GM Canada out of bankruptcy.[82]

**GM First Engaged Certain Noteholders on May 27, 2009**

31.     On May 26, 2009, the Bond Exchange Offer expired because a majority of all of the holders of GM indebtedness, not just the GM Nova Scotia Noteholders, rejected it.[83]  The next day, May 27, 2009, GM Canada received notification that the amount of the Tax Refund would be approximately CAD $1.6 billion.[84]   Pursuant to the terms of the Tax Refund, GM Canada was, among other things, required to transfer USD $1,174,487,000 to Old GM within 180 days of May 27, 2009.[85]

32.     That same day, six days before the June 1, 2009 deadline for Old GM to file for bankruptcy, Old GM finally contacted certain Noteholders to initiate a settlement dialogue regarding the Notes.[86]  Certain Noteholder representatives, namely Mr. Gropper of Aurelius, and Mr. Bolin of Appaloosa and their counsel Bruce Zirinsky of Greenberg Traurig, had traveled to London to attend a meeting scheduled in the event that the Bond Exchange Offer was successful at the offices of Old GM's counsel, Weil Gotshal.  Fifteen minutes before the meeting was scheduled to commence, Old GM cancelled it.[87]   Shortly thereafter, while the Noteholder representatives were still at the offices of Weil Gotshal, Todd Chandler of Weil Gotshal

---

[82] *Id.*

[83] *See* Buonomo Direct Test. ¶ 10.

[84] Def. Tr. Ex. 446.

[85] *Id.* ¶ 7.

[86] Gropper Direct Test. ¶ 34; Bolin Direct Test. ¶ 33; Tr. 08/10/12 (Buonomo) 212:15-213:1.

[87] Gropper Direct Test. ¶ 35; Bolin Direct Test. ¶ 34.

contacted Mr. Zirinsky by telephone, and the parties agreed to have a face-to-face meeting the

next day in New York on May 28, 2009.[88]

33.    Mr. Buonomo expressly rejected any contention that it was the Noteholders who

had dictated the last-minute timing of negotiations in an effort to obtain leverage over Old GM

and its subsidiaries:

> The objection to claims . . . and the original adversary proceeding complaint . . .
> filed by the . . . [GUC Trust] incorrectly state that it was the Noteholders who
> raised the issue regarding the restructuring of the Notes at the last minute. *That is
> not correct.*  In fact, the Noteholders had sought to engage Old GM and GM
> Canada for months; Old GM, instead, pursued a strategy of the bond exchange for
> all bonds, including the Notes . . . .[89]

Because GM Nova Scotia was a participant in the Bond Exchange Offer, Old GM refused to

have separate negotiations with the Noteholders until after the Bond Exchange Offer expired on

May 26, 2009.[90]

**The Negotiations Began at Weil Gotshal's New York Office on May 28, 2009**

34.    After executing a standard non-disclosure agreement (the "**NDA**") requested by

Old GM,[91] the parties met at Weil Gotshal's New York offices on May 28, 2009.[92]  Daniel

Ammann and Lawrence Buonomo led the negotiations on behalf of Old GM, along with Todd

Chandler of Weil Gotshal as Old GM's outside counsel.[93]  Throughout the negotiations, these

representatives were in frequent contact with and took direction from the Old GM and GM

---

[88] Buonomo Direct Test. ¶ 37; Gropper Direct Test. ¶ 35; Bolin Direct Test. ¶ 35.

[89] Buonomo Direct Test. ¶ 12 (emphasis added); *see* Tr. 08/09/12 (Buonomo) 9:23-11:3 ("Q: And these negotiations
began when General Motors reached out to counsel for the noteholders, right?  A: That's correct.").

[90] Tr. 08/09/12 (Buonomo) 9:23-10:25; Tr. 08/10/12 (Buonomo) 212:15-213:13; Buonomo Direct Test. ¶ 12-14, 33.

[91] Def. Tr. Ex. 111.

[92] Truong Direct Test. ¶ 42.

[93] Ammann Direct Test. ¶ 20.

Canada management teams, the Auto Task Force, and representatives of the Canadian Government.[94]   Mark Brodsky and Dan Gropper of Aurelius, Bao Truong of Fortress, James Bolin of Appaloosa, Bruce Zirinsky, and Brian Pfeiffer (additional outside counsel for Appaloosa) attended the meeting on the Noteholders' side.[95]   The Noteholders present at this meeting held approximately 64%-65% of the Notes.[96]

35.     Old GM opened the negotiations by proposing to the Noteholders a settlement payment of 28% of the face value of the Notes in cash in exchange for a waiver of the Intercompany Loans, the Notes, and the Guarantee.[97]   The Noteholders rejected Old GM's initial proposal.[98]   At this time, the Noteholders requested financial information on GM Canada because none was publicly available.[99]   But Old GM refused to provide financial information for GM Canada,[100] and Old GM representatives stated that GM Canada would file for bankruptcy in Canada unless the parties reached a resolution.[101]

36.     The next day, May 29, 2009, Mr. Zirinsky sent Mr. Chandler a letter encouraging further constructive dialogue and again requested financial information about GM Canada.[102]

---

[94] Buonomo Direct Test. ¶¶ 4-9, 14-15, 40; Ammann Direct Test. ¶ 23.

[95] Bolin Direct Test. ¶ 36.

[96] Ammann Direct Test. ¶ 19.

[97] *Id.* ¶ 20; Gropper Direct Test. ¶ 42.

[98] Gropper Direct Test. ¶ 44; Ammann Direct Test. ¶ 20.

[99] Gropper Direct Test. ¶ 43.

[100] Gropper Direct Test. ¶ 43.

[101] Gropper Direct Test. ¶ 41; Bolin Direct Test. ¶ 37; Truong Direct Test. ¶ 54; *see also* Tr. 08/10/12 (Buonomo) 194:9-195:5 ("[I]n the absence of this transaction, the lockup transaction, GM of Canada would have filed for bankruptcy on June 1, 2009.  The team in Canada was all ready to do that.").

[102] Def. Tr. Ex. 113.

That evening, Old GM provided a one-page summary that included very limited financial information about GM Canada and proposed a conference call at 9:00 p.m. among the parties.[103]

**Old GM Lent GM Canada $450 Million on May 29, 2009 to Settle with the Noteholders**

37.    While the negotiations with the Noteholders were underway, Old GM, with the knowledge and approval of the United States and Canadian Governments, lent USD $450 million to GM Canada (the **"$450 Million Loan"**), for the purposes of funding a potential settlement with the Noteholders.[104]   The loan was documented pursuant to:  (i) an Approval Note executed by Walter Borst, the Treasurer of Old GM, authorizing a loan of up to USD $490 million; (ii) a promissory note executed on May 29, 2009 (**"Promissory Note"**); and (iii) a loan agreement, also executed on May 29, 2009 (the "**$450 Million Loan Agreement**").[105]

38.    Contemporaneous records confirm that Old GM transferred the funds for the $450 Million Loan to GM Canada by a wire transfer that was initiated and completed on Friday, May 29, 2009, including:

- a wire transfer transaction approval slip, dated May 29, 2009, signed by Ines Craviotto of GM Canada, authorizing the $450 million wire;[106]

- a JPMorgan Chase "Funds Transfer Initiation-Transaction Detail Report" for May 29, 2009, stating that the funds for the $450 Million Loan were released from Old GM's bank account on that same day at 4:19 p.m.;[107]

---

[103] Def. Tr. Ex. 114.

[104] Joint Pretrial Statement ¶¶ 36-37; Def. Tr. Ex. 448 (the EDC needed to approve the loan from Old GM to GM Canada and did so on May 29, 2009).

[105] Def. Tr. Ex. 121 (May 29, 2009 Promissory Note between GM Canada and Old GM); Def. Tr. Ex. 116 (May 29, 2009 email of Joyce Zhou to Walter Borst, *et al.*, attaching Promissory Note, Final Loan Approval and Old GM/GM Canada Trust Letter).  Old GM and GM Canada amended the $450 Million Loan Agreement twice.  *See* ¶¶ 46, 85 *infra*.

[106] Def. Tr. Ex. 123.

[107] Def. Tr. Exs. 122, 447.

- the JPMC bank account statement for May, 2009, showing a debit of $450 million on May 29, 2009;[108]

- Toronto Dominion Bank ("**TD Bank**") wire transaction reports demonstrating that the $450 Million Loan was received in GM Canada's TD Bank account on May 29, 2009, including one report showing the "release time" as 5:15 p.m.;[109]

- the TD Bank Statement re: Incoming Wire Payment Details;[110]

- a letter, dated October 12, 2012, from TD Bank, setting forth the transaction history for the TD Bank account that received the $450 Million Loan, with a line item showing a credit of $449,999,990 on May 29, 2009;[111]

- an e-mail from Debbie McCaroll (from TD Bank) to Tyrone Lopez, dated June 1, 2009, containing a screen print itemizing a credit of $449,999,990.00 in GM Canada's TD Bank account on May 29, 2009;[112]

- a letter from TD Bank that includes a screen print of the incoming wire transfer of $449,999,990 being processed at 5:15 p.m. on May 29, 2009;[113]

- a letter from TD Bank (signed by a TD Bank vice president and director) demonstrating that GM Canada's TD Bank account received the $449,999,990.00 on May 29, 2009 at 5:15 p.m.;[114] and

- the "Nova Scotia Bondholder Transaction - Steps List," providing: "On May 29, 2009, [GM Canada] borrowed from [Old GM] USD $450,000,000, evidenced by a promissory note dated May 29, 2009."[115]

39.    Tyrone Lopez, then Supervisor of Treasury and Corporate Finance at GM Canada[116] confirmed that the proceeds of the $450 Million Loan were received by GM Canada

---

[108] Def. Tr. Ex. 449 at NGM000045707.

[109] Def. Tr. Exs. 496, 497.

[110] Def. Tr. Ex. 124.

[111] Def. Tr. Ex. 498.  A $10 fee is deducted by the bank.  Tr. 03/06/13 (Lopez)  115:12-15.

[112] Pl. Tr. Ex. 700.

[113] Pl. Tr. Ex. 701

[114] Pl. Tr. Ex. 374 at NGM000017462.

[115] Pl. Tr. Ex. 144

[116] Lopez Direct Test. ¶ 2.

on May 29, 2009, and were deposited into a GM Canada bank account at TD Bank that was "de-linked" from GM Canada's general bank account so that the funds would not automatically be deposited into GM Canada's general account.[117]  TD Bank did not place any restrictions on that account (*i.e.*, it was not designated as a trust or escrow account), and neither Old GM nor the Noteholders ever had any ownership interest or lien on that account.[118]

40.     Old GM's counsel, Stephen Karotkin of Weil Gotshal, later confirmed to this Court that the $450 Million Loan was made pre-petition stating at a November 20, 2009 hearing:

> There is a statement in the pleading filed by the creditors' committee that monies were transferred by General Motors, the debtors, post-petition, in connection with these Notes.  That is not the case.  Any monies that were transferred up to Canada in connection with these Notes were transferred prior to the filing date.[119]

**The Parties Reached Agreement on May 30, 2009**

41.     Following the 9:00 p.m. conference call on May 29, 2009 and throughout the following day, the representatives of the Noteholders and Old GM participated in a series of telephone calls.[120]  In an early evening telephone call on May 30, 2009, the parties reached accord on the principal business terms of a resolution for the GM Canada and GM Nova Scotia issues.[121]  The terms agreed to included the following:  (i) the Noteholders would consent to the settlement of the CAD $1.334 billion Intercompany Loans; (ii) the Nova Scotia Litigation would be dismissed; (iii) the Noteholders would be paid a consent fee equal to 35% of the amount owing on the Notes (the "**Consent Fee**"); (iv) a trustee for GM Nova Scotia would remain

---

[117] Tr. 03/06/13 (Lopez) 98:20-22, 187:25-188:23, 33:16-34:25.

[118] *Id.* 188:24-189:19.

[119] November 20, 2009 Hearing Tr. at 20:1-7.

[120] Gropper Direct Test. ¶ 49.

[121] *Id.* ¶¶ 50-52; Ammann Direct Test. ¶ 21; Def. Tr. Ex. 133.

22

entitled to file a statutory claim against Old GM pursuant to Section 135 of the Nova Scotia Companies Act; and (v) the Noteholders would retain their claims against Old GM under the Guarantee.[122]

42.    After reaching agreement on the material terms, Mr. Ammann asked Mr. Gropper to assist in getting additional Noteholder support so that the holders of at least 67% of the Notes supported the terms of the agreement.[123]    In order to bind 100% of the Noteholders to the terms of the settlement, the Fiscal and Paying Agency Agreement required that 67% of the Noteholders vote in favor of an "**Extraordinary Resolution**."[124]    Mr. Gropper then contacted Didric Cederholm of Elliott.[125]    On May 31, 2009, Elliott executed the NDA and subsequently agreed to the terms of the previously negotiated business deal, thereby satisfying the requested 67% threshold.[126]

**The Parties Finalized and Executed a Definitive Agreement Pre-Petition**

43.    With Elliot's inclusion, the parties turned their attention to memorializing their agreement in writing.    Initially, the parties envisioned having two separate documents:    a settlement agreement and a lock-up agreement—only one of which would include Old GM as a

---

[122] Def. Tr. Ex. 174 § 6(b)(ii); Def. Tr. Ex. 133; Buonomo Direct Test. ¶ 49.

[123] Gropper Direct Test. ¶ 56.

[124] *See* Ammann Direct Test. ¶ 22; Def. Tr. Ex. 21 (Fiscal and Paying Agency Agreement) § 12, Schedule 4 ¶ 5 (requiring 2/3 of holders of Notes cast votes in favor of any "Extraordinary Resolution . . . affecting the interests of the Noteholders").

[125] Gropper Direct Test. ¶ 57.

[126] *Id.* ¶ 59; Ammann Direct Test. ¶ 22.

party.[127]  But relatively quickly the parties agreed that their objectives could be memorialized in a single document—the "Lock-Up Agreement."[128]

44.    Early in the morning of May 31, 2009, Weil Gotshal provided the initial draft of the Lock-Up Agreement memorializing the terms of the parties' agreement.[129]  Greenberg Traurig later transmitted a markup of the draft agreement to Weil Gotshal.[130]  At Old GM's request, the Noteholders and their representatives arrived at Weil Gotshal's offices at approximately 3:00 p.m. on May 31, 2009 to complete the drafting of the Lock-Up Agreement.[131]  Dan Gropper of Aurelius, James Bolin of Appaloosa, Bao Truong of Fortress, Didric Cederholm of Elliott, Brian Pfeiffer of Fried Frank, and Bruce Zirinsky, Gary Ticoll, and Tony Marsico of Greenberg Traurig attended on behalf of the participating Noteholders.[132]  Todd Chandler of Weil Gotshal, Larry Buonomo, Maurita Sutedja, and Dan Ammann represented Old GM.[133]  Representatives of GM Canada and the Canadian government were also present in person and by phone.[134]

45.    In a conference room at Weil Gotshal's office, the parties worked intensively through the night of May 31, 2009, frequently updating the Governments.[135]  Everyone understood that the Lock-Up Agreement needed to be a pre-petition agreement in order to avoid

---

[127] Def. Tr. Ex. 148.
[128] Tr. 08/08/12 (Zirinsky) 132:14-23.
[129] Truong Direct Test. ¶ 50; Def. Tr. Ex. 148.
[130] Gropper Direct Test. ¶ 65.
[131] Truong Direct Test. ¶¶ 50, 51.
[132] *Id.* ¶¶ 52; Gropper Direct Test. ¶ 66.
[133] Truong Direct Test. ¶ 51; Gropper Direct Test. ¶ 66.
[134] Tr. 08/09/12 (Buonomo) 229:25-230:12.
[135] Buonomo Direct Test. ¶¶ 38, 40; Ammann Direct Test. ¶ 21.

a bankruptcy filing by GM Canada, which was the primary objective of the Lock-Up Agreement.[136]

46.    Over the course of May 31, 2009 and the early morning of June 1, 2009, the parties exchanged various drafts of the Lock-Up Agreement.[137]  While the parties were drafting the Lock-Up Agreement and before Old GM filed its bankruptcy petition, Old GM and GM Canada amended the $450 Million Loan Agreement to reflect changes in the Lock-Up Agreement that was being prepared.[138]  In particular, the parties amended:  (i) Recital C to provide for the mechanism of the Extraordinary Resolution; (ii) Section 2 to permit the funds to be placed into an Escrow Account; (iii) Section 3 to provide for the return of excess proceeds of the loan that exceeded the amount of the Consent Fee; and (iv) the date for entering into the Lock-Up Agreement by extending the date from 11:30 p.m. on May 31, 2009 to 6:00 a.m. on June 1, 2009.[139]

47.    Weil Gotshal generally had control over the draft Lock-Up Agreement.[140] Without a computer in the conference room where the parties were negotiating, Mr. Chandler took handwritten notes and then provided them to one of his associates for incorporation.[141]  Weil Gotshal did not always accurately enter the agreed-upon revisions and subsequent corrections had to be made to the drafts.[142]

---

[136]  Buonomo Direct Test. ¶ 16; Ammann Direct Test. ¶ 23; Truong Direct Test. ¶ 54; Bolin Direct Test. ¶ 46; Gropper Direct Test. ¶ 68; Cederholm Direct Test. ¶¶ 44, 46.
[137]  Gropper Direct Test. ¶ 69; Def. Tr. Exs. 140, 144, 148, 165, 166, 170, 180.
[138]  Def. Tr. Ex. 150 at NGM000004810-14.
[139]  Id.
[140]  Gropper Direct Test. ¶ 70.
[141]  Cederholm Direct Test. ¶ 43.
[142]  Id.

48.    Unlike Mr. Chandler, Mr. Gropper had his laptop computer with him in the conference room and, at one point during the early morning of June 1, 2009, Mr. Gropper downloaded a copy of the draft onto his laptop.[143]    He discussed various edits with Messrs. Buonomo and Ammann and made changes directly to the draft on his laptop in real time.[144]    Old GM and the other Noteholders agreed with Mr. Gropper's changes, which he circulated in a blacklined version at 5:57 a.m. and another version at 6:30 a.m. Eastern Daylight Time.[145]    The 6:30 a.m. draft circulated by Mr. Gropper set forth the parties' agreement that the language of the Extraordinary Resolution, Exhibit A to the Lock-Up Agreement, would "conform" to the language in the body of the Lock-Up Agreement.[146]

49.    All of the parties executed the Lock-Up Agreement and released their signature pages prior to 7:15 a.m. on June 1, 2009.[147]    All of the parties to the Lock-Up Agreement who testified at trial confirmed their understanding that the Lock-Up Agreement was final and binding upon the release of the signature pages.[148]    This testimony is consistent with an express provision of the Lock-Up Agreement which states that the "Agreement shall not become

---

[143] Gropper Direct Test. ¶ 71.

[144] *Id.*

[145] *Id.* ¶ 72; Def. Tr. Exs. 164, 165, 183.

[146] Def. Tr. Ex. 164; *see also* Tr. 09/28/12 (Gropper) 84:2-5 ("The extraordinary resolution was just supposed to track the text in the lockup agreement, and we had all agreed amongst the parties it was going to be so conformed.").

[147] Buonomo Direct Test. ¶ 39 (stating that all signature pages released between 6 a.m. and 7:15 a.m. on June 1, 2009); Ammann Direct Test. ¶¶ 24-25 (stating that process was complete at approximately 7 a.m.); Cederholm Direct Test. ¶ 52 ("Between 7:00 and 7:30 a.m., the Elliott signature page was released."); Truong Direct Test. ¶¶ 58-59 (released signature of C. Dakolias at approximately 7 a.m.); Gropper Direct Test. ¶ 76 (stating that Gropper released signature at approximately 7:15 a.m.); Bolin Direct Test. ¶¶ 47-50 (stating that Bolin released his signature between 6 a.m. and 7 a.m. and was present for final execution of the agreement).

[148] *See* Bolin Direct Test. ¶ 50; *see also* Buonomo Direct Test. ¶ 18(i); Ammann Direct Test. ¶ 25; Truong Direct Test. ¶¶ 59-60; Gropper Direct Test. ¶ 76; Cederholm Direct Test. ¶¶ 52-53, 55.

effective and binding on a Party unless and until a counterpart signature page to this Agreement is executed and delivered by such Party."[149]

50.     Once all of the signature pages were released, Messrs. Buonomo and Chandler each represented to the Canadian government that an agreement had been reached and that the Lock-Up Agreement had been fully executed.[150]  Canadian officials present at Weil Gotshal's offices then proceeded to a separate conference room to inspect the Lock-Up Agreement and verify that at least 67% of the Noteholders had released their signature pages.[151]  At trial, Messrs. Truong and Cederholm testified that between 7:00 and 7:30 a.m., on June 1, 2009, they witnessed individuals whom they understood to be Canadian officials entering the separate conference room to inspect the signature pages.[152]  And Mr. Buonomo testified that he looked "over their shoulder" as the Canadian representatives inspected the Lock-Up Agreement.[153]

51.     After verifying that Old GM had obtained the requisite number of Noteholder signature pages, the Canadian government officials approved cancellation of the contingency plan to file a bankruptcy proceeding for GM Canada.[154]  Also around this time, Messrs. Ammann and Buonomo notified a large contingent of people of the successful negotiations,[155] including

---

[149] Def. Tr. Ex. 174 ¶ 10.

[150] Tr. 08/09/12 (Buonomo) 232:24-233:7.

[151] *Id.* 232:24-233:15.

[152] Cederholm Direct Test. ¶ 53; Truong Direct Test ¶ 57.

[153] Tr. 08/09/12 (Buonomo) 232:1-232:16; Buonomo Direct Test. ¶ 15.

[154] Buonomo Direct Test. ¶¶ 15, 40.

[155] Tr. 08/09/12 (Buonomo) 229:12-230:12.

Mr. Young and the Canadian bankruptcy team in Oshawa, Ontario and Matthew Feldman (a representative of the Auto Task Force).[156]

52.     At approximately 7:25 a.m., shortly after the Canadian officials left Weil Gotshal's conference room where the signature pages were being kept, Mr. Gropper asked Mr. Buonomo to correct certain scrivener errors to the Lock-Up Agreement.[157]  For example, "some language that was supposed to go in one place actually was put some place else."[158]  Mr. Gropper's hand-marked corrections to the agreement were given to Andrew Woodworth, an associate at Weil Gotshal to be implemented.[159]  Mr. Woodworth took the mark-up to his office to input the changes and returned to the conference room at approximately 7:35 a.m. with a print out of the document.[160]

53.     No other subsequent changes to the Lock-Up Agreement were requested by any of the parties to the contract.[161]  Nor were there any negotiations concerning the Lock-Up Agreement after the Canadian officials inspected the signature pages.[162]  In fact, Mr. Bolin of Appaloosa, who participated in the negotiations, testified that he left Weil Gotshal's offices after releasing his signature page but before Old GM filed at approximately 7:57 a.m. and that he would not have left prior to understanding that a fully binding agreement was in place.[163]  The

---

[156] *Id.* 229:6-230:12.

[157] *Id.* 235:15-236:1.

[158] *Id.* 235:22-24.

[159] *Id.* 58:25-59:16.

[160] *Id.* 60:7-24; *see also id.* 236:2-237:9.

[161] *Id.* 237:2-237:12.

[162] *Id.*; *see also* Bolin Direct Test. ¶ 49 ("I am aware of no negotiations between the parties taking place after the Canadian government reviewed the signature pages of the Lock-Up Agreement.").

[163] Bolin Direct Test. ¶ 50.

trial record plainly shows that the extensive number of emails chronicling the back-and-forth negotiations came to a halt no later than 7:35 a.m.[164]

54.    Lastly, although an attorney at Weil Gotshal circulated to the parties and their counsel a copy of the Lock-Up Agreement complete with all of the signature pages attached at 10:37 a.m. on June 1, 2009 (the **"10:37 PDF"**), neither Weil Gotshal nor Old GM circulated a redline showing changes made after 7:35 a.m.  Moreover, neither Weil Gotshal nor Old GM ever sought this Court's approval of the Lock-Up Agreement as a post-petition agreement.  This was a topic of discussion during the parties' negotiation of the Lock-Up Agreement.[165]  Old GM and Weil Gotshal stated that court approval was unnecessary, because it was a pre-petition agreement.[166]  The Noteholders ultimately became comfortable with this concept.[167]  In a May 30, 2009 email, inadvertently shared with Old GM, Mr. Zirinsky of Greenberg Traurig told his clients: "If they're not reducing the notes, are agreeing to leave the notes and guaranty in place, perhaps court approval isn't so important.  We should discuss offline."[168]  Finally, all the witnesses with personal knowledge testified that the final executed Lock-Up Agreement that was circulated by Weil Gotshal by email at 10:37 a.m. was the same as the Lock-Up Agreement that they had agreed to and executed prior to the filing of Old GM's petition.[169]

---

[164] Def. Tr. Exs. 140-49, 151-52, 157, 162-67, 169-73, 180-85.

[165] Tr. 08/08/12 (Zirinsky) 22:13-18.

[166] *Id.* 23:8-13, 24:4-8.

[167] *Id.* 30:7-31:1.

[168] Pl. Tr. Ex. 4.

[169] Tr. 08/08/12 (Zirinsky) 52:14-18; Tr. 08/09/12 (Buonomo) 38:11-15; Tr. 09/06/12 (Cederholm) 82:5-83:3; Tr. 09/20/12 (Truong) 18:15-19:9; Tr. 09/27/12 (Bolin) 10:15-18; Tr. 09/27/12 (Ammann) 62:2-4, 63:5-64:25; Tr. 09/28/12 (Gropper) 8:25-9:3.

**The Metadata "Expert" Testimony**

55.　　At trial, the GUC Trust's expert Keith Jones opined that the Word version of the 10:37 PDF was saved to Weil Gotshal's firmwide document management system no earlier than 9:21 a.m. on June 1, 2009.[170]  Mr. Jones, however, conceded that he has no knowledge or opinion as to when the parties actually agreed to any of the terms of the Lock-Up Agreement.[171]

56.　　In forming his opinion, Mr. Jones: (i) did not communicate with any person at Weil Gotshal;[172] (ii) did not obtain any data or information directly from Weil Gotshal;[173] (iii) did not test Weil Gotshal's computer systems for any anomalies, such as differences in time settings;[174] (iv) determine which version of an operating system Weil Gotshal employs;[175] (v) know whether Weil Gotshal's search had revealed any deleted files;[176] (vi) confirm that the data provided to him via the GUC Trust's counsel was collected in a forensically sound manner;[177] (vii) have any input as to the scope of Weil Gotshal's search for responsive information;[178] (viii) provide any reason for discrepancies in times listed in the internal metadata for certain documents and the times listed for the same activity in the log provided by Weil Gotshal;[179] or

---

[170] Pl. Tr. Ex. 288 at 11.

[171] Tr. 09/04/12 (Jones) 44:10-15.

[172] *Id.* 46:3-5, 47:25-48:2.

[173] *Id.* 44:17-19.

[174] *Id.* 45:20-21; Pl. Tr. Ex. 288 at 14 (§ 5.2).

[175] Tr. 09/04/12 (Jones) 45:12-14.

[176] *Id.* 50:6-8.

[177] Pl. Tr. Ex. 288 at 22 (§ 7.2.1).

[178] Tr. 09/04/12 (Jones) 44:20-45:2.

[179] Pl. Tr. Ex. 288 at 18 (§ 6.3.2).

(ix) consider any versions of the Lock-Up Agreement outside of Weil Gotshal's document management system.[180]

57.    Mr. Jones agreed with the Noteholders' forensic expert, J. Christopher Racich, that there were likely multiple versions of the Lock-Up Agreement existing locally during the morning of June 1.[181]

58.    As Mr. Racich explained, a local version of the Lock-Up Agreement containing all of the final terms likely existed prior to 7:57 a.m. without having been saved on Weil Gotshal's document management system until a later point in time.[182]  Mr. Racich provides significant technical detail in his expert report, but a fair summary of that detail is that edits encompassing 1,092 characters in a matter of seconds is extremely unlikely unless the typist copied and pasted from another, already-existing document.

**The Parties' Revised Demonstrative Exhibit No. 4**

59.    On July 24, 2012, after the exchange of expert reports and expert depositions, Weil Gotshal produced another version of the Lock-Up Agreement.  The file, which had been attached to an email sent by Peter Godhard at 8:43 a.m. on June 1, 2009 (the "**8:43 Document**"), contains "track changes" and includes a summary of edits.  The evidentiary record is devoid of any testimony explaining exactly what the 8:43 Document is.  That is, there is no evidence that another, more current version of the Lock-Up Agreement did not exist elsewhere or that the times contained in it are accurate.  In fact, Mr. Jones testified that Mr. Godhard's computer had

---

[180] Tr. 09/04/12 (Jones) 27:8-21, 28:5-24, 30:6-10.
[181] *Id.* 167:2-18, 169:7-10.
[182] Racich Direct Test. ¶¶ 39-44.

certain irregularities.[183]    As directed by the Court, the Noteholders have modified what was presented at trial as Defendants' Demonstrative No. 4 (the "**Revised Demonstrative Exhibit No. 4**"), which endeavors to show every edit that, at most, could have occurred after 7:57 a.m on June 1,[184] to address comments from the GUC Trust.

60.    The Revised Demonstrative Exhibit No. 4, assuming that the times listed in the tracked changes are true and accurate, shows the differences between the body of the 8:43 Document as that particular document existed at the time of filing (7:57 a.m.) according to the tracked changes and the 10:37 PDF.    With these assumptions in place, the Revised Demonstrative No. 4 shows that only three changes (none of which were substantive) were made to the Lock-Up Agreement during this time period.    The three changes, none of which related to Old GM, were as follows:

- the phrase "other than by reason of a material breach by a Holder" was relocated to another place in the document at 7:34 am, but the deletion of the clause from its original spot did not occur until at a later time.[185] The clause itself related to the Noteholders' termination right, which never occurred.[186]

- wordsmithing changes to the release language pertaining to certain individuals if an event occurred (which never did). The language changed was as follows: "(i) Upon termination of this Agreement . . . or (ii) if after the date on which the Extraordinary Resolution is passed the Holders are required to turnover the Consent Fee . . . [the releases against] the Canadian Entities and the Guarantor ~~and any other defendants~~ except in the case of clause (ii) ~~the individuals~~ *of this*

---

[183] Tr. 09/04/12 (Jones) 163:1-166:12.

[184] Pl. Tr. Ex. 16 (10:37 PDF), 687 (8:43 Document); Def. Tr. Ex. 179 (10:37 PDF); Tr. 11/27/12 (Racich) 220:3-223:16.

[185] Revised Demonstrative Exhibit No. 4 at 2, 4.

[186] *See* 08/09/12 (Buonomo) 235:11-236:9.  Mr. Buonomo testified about a clause that needed to move and that he authorized this change at around 7:30 a.m.

32

*sentence the individual defendants* in the Nova Scotia Proceeding shall be fully preserved . . . ."[187]

- the word "the" was changed to "each" in one instance.[188]

61.     The demonstrative also shows that changes were made to the Extraordinary Resolution to make it conform to the Lock-Up Agreement,[189] as expressly agreed to by the parties no later than 6:30 a.m. on June 1, 2009.[190]

62.     There are no drafts in evidence that show any material changes or edits to the terms of the Lock-Up Agreement after 7:57 a.m.

**The Terms of the Lock-Up Agreement**

63.     The Lock-Up Agreement provided for the following:

- GM Canada would make a payment to GM Nova Scotia in the approximate amount of USD $367 million in full settlement and satisfaction of the Intercompany Loans.  This gave GM Canada an approximate 67% discount on the debt.  After the payment was made to GM Nova Scotia, the Consent Fee would be paid ratably by a fiscal and paying agent to all holders of the Notes;[191]

- The Noteholders would retain their claims ("**Guarantee Claims**") against Old GM based on the Guarantee provided by Old GM;[192]

- GM Nova Scotia (not Old GM) would provide the Noteholders with a consent to a bankruptcy order in Nova Scotia;[193]

- The trustee appointed in the GM Nova Scotia bankruptcy case could assert a claim ("**Statutory Claim**") against Old GM, as the sole shareholder of GM Nova

---

[187] Revised Demonstrative Exhibit No. 4 at 5.

[188] *Id.* at 7.

[189] *Id.* at 14-21.

[190] Def. Tr. Ex. 164; Tr. 09/28/12 (Gropper) 84:2-5.

[191] Def. Tr. Ex. 187 ¶ 5(b).

[192] *Id.* ¶ 6(b)(ii).

[193] *Id.* ¶ 6(b)(i).

Scotia, for contribution for any amounts unpaid to the creditors of GM Nova Scotia;[194]

- "[F]or greater certainty, the Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee Claim or the [Statutory] Claim;"[195] and

- The Nova Scotia Litigation would be dismissed at no expense to Old GM.[196]

64.    Old GM's obligations under the Lock-Up Agreement were limited to:

- An agreement that the Statutory Claim and the Guarantee Claims were enforceable against Old GM "to the fullest extent permitted under applicable laws";[197]

- An agreement that, if any portion of the Statutory Claim was disallowed, Old GM's claim on account of the Swap Transactions would be subordinated to the prior, indefeasible payment in full of the Notes;[198]

- An agreement not to assert any right of set off with respect to the Statutory Claim;[199] and

- An agreement "not to take any action or assert any position inconsistent with this Section 6 and, if called upon by the Holders, will confirm its agreement with the positions confirmed herein in writing or at a court hearing as reasonably requested by the Holders."[200]

65.    The Lock-Up Agreement did not create the Guarantee Claims or the Statutory Claim, nor did the Lock-Up Agreement create a liability under the Swap Transactions against Old GM.[201]

---

[194] *Id.* ¶ 6(b)(iii).
[195] *Id.* ¶ 6(b)(iv).
[196] *Id.* ¶ 5(a).
[197] *Id.* ¶ 6(a).
[198] *Id.* ¶ 6(b)(v).
[199] *Id.* ¶ 6(b)(vi).
[200] *Id.* ¶ 6(b)(vii).
[201] Def. Tr. Ex. 187.

**The First Day Hearing and Certain First-Day Filings**

66.       At 7:57 a.m. on June 1, 2009 (the "**Petition Date**"), following execution of the
Lock-Up Agreement, Old GM filed for bankruptcy, seeking to restructure under the Bankruptcy
Code.

67.       At the First Day Hearing that same day, Harvey Miller of Weil Gotshal told an
overflowing court room that there were material advances that had been made in the days prior to
Old GM's filing, including the successful efforts to prevent GM Canada from filing for
bankruptcy:  "And Canada, Your Honor, there has been substantial advances made in resolving
all of the issues relating to Canada over the last ten days to the point, Your Honor, that it is not
necessary to institute any proceedings involving GMCO [sic], which is the Canadian
subsidiary."[202]

68.       In addition, on the Petition Date, Old GM filed several motions relative to this
proceeding, including motions seeking: (i) approval of the Master Sale and Purchase Agreement
("**MSPA**"), pursuant to which substantially all of Old GM's assets were to be sold to New GM
[Docket No. 92] (the "**Sale Motion**"); (ii) authority to continue to use its cash management
procedures [Docket No. 30] (the "**Cash Management Motion**"); and (iii) authority to enter into
debtor-in-possession financing (the "**DIP Motion**").

**The MSPA**

69.       Although the original MSPA was subsequently amended and restated at various
times in June 2009, many of the basic provisions governing the 363 Sale were established on

---

[202] Transcript of Hearing held on June 1, 2009 [Docket No. 374] ("First Day Hearings Tr.") 36:8-12. Counsel for the
Creditor's Committee testified at trial that it would have been in "the ordinary course for" Committee counsel to
review the transcript from the First Day Hearings.  Tr. 10/03/12 (Mayer) 27:4-11.

June 1, 2009. First, Section 2.2(a) of the MSPA stated that New GM was purchasing **all** of the assets of Old GM. Unless an asset was expressly identified as an "Excluded Asset" as defined in the MSPA, it would be an asset purchased by New GM.[203] For avoidance of doubt, there was also a non-exhaustive list of assets to be purchased pursuant to the MSPA which included:

- "all cash and cash equivalents . . . other than the Excluded Cash and Restricted Cash";[204]

- "all intercompany obligations . . . owed or due, directly or indirectly, to Sellers by any Subsidiary of a seller . . . or other entity in which a Seller or a Subsidiary of a Seller has any Equity Interest;"[205]

- all Equity Interests in the Transferred Entities (GM Canada was a Transferred Entity);[206]

- all Contracts,[] other than the Excluded Contracts (collectively, the 'Purchased Contracts'), including, for the avoidance of doubt . . . . any Executory Contract designated as an Assumable Executory Contract as of the applicable Assumption Effective Date;"[207]

- "Any and all Claims arising from, relating to or in connection with, any payments by or to, or other transfers or assignments by or to, any Purchased Subsidiary" ("**Intercompany Avoiding Power Claims**");[208] and

- Claims (whether contingent or unliquidated) owed to Old GM.[209]

70.    The Purchased Assets that were being transferred to New GM included all cash except for a specified amount that was intended to remain in the Old GM estate to fund the wind-

---

[203] Def. Tr. Ex. 226 (§ 2.2(a)).

[204] *Id*. (§§ 2.2(a)(i), 2.2(a)(ii), 2.2(b)(ii)).

[205] *Id*. (§ 2.2(a)(iv)).

[206] *Id*. (§ 2.2(a)(v) (this included the Equity Interests in all "Purchased Subsidiaries," including GM Canada)).

[207] *Id*. (§ 2.2(a)(x)).

[208] *Id*. at (§ 2.2(b)(xi)); Def. Tr. Ex. 204 at CC005534.

[209] *Id*. (§ 2.2(a)(xiii)).

down and liquidation (the "**Wind-Down Amount**").[210]    The Committee's counsel, Thomas

Mayer of Kramer Levin, testified to his understanding that unsecured creditors would receive no

amount of cash above the Wind-Down Amount,[211] and that any funds used to pay the Consent

Fee would never have gone to unsecured creditors, but, instead, to New GM or the DIP

Lenders.[212]

71.    Mr. Mayer also understood that the Intercompany Avoiding Power Claims were

sold to New GM,[213] and that, other than the Term Loan Avoidance Action, all other avoidance

actions were either for the benefit of New GM or the U.S. Treasury under the DIP Loan.[214]  Old

GM's counsel also testified that he had a conversation with Mr. Mayer, reminding him that

Intercompany Avoiding Power Claims were sold to New GM.[215]

72.    One of the "Extraordinary Provisions" of the MSPA, as explicitly set forth in the

Sale Motion, was the following:

> Sale of Avoidance Actions. The MSPA contemplates the sale to the Purchaser of
> potential avoidance Claims relating to or in connection with any payments by or
> to, or other transfers or assignments by or to, any Purchased Subsidiary.[216]

GM Canada was a "Purchased Subsidiary."[217]

73.    Mr. Buonomo explained that, because the entire business was being sold, it was

specifically contemplated and intended that the various transfers back and forth between Old GM

---

[210] *Id.* (§§ 2.2(a)(i), 2.2(a)(ii), 2.2(b)(i), 2.2(b)(ii)); *see also* Buonomo Direct Test. ¶¶ 60, 62; Smolinsky Dep. 89:13-
90:13; Tr. 08/10/12 (Buonomo) 26:22-27:5, 29:24-30:17.

[211]  Tr. 10/03/12 (Mayer) 16:21-19:23.

[212]  *Id.* 21:2-22:11.

[213] Def. Tr. Ex. 226 (§ 2.2(b)(xi)); Def. Tr. Ex. 204 (§ 2.2(b)(xi)); Tr. 10/03/12 (Mayer) 17:23-18:4, 95:20-96:5.

[214] Tr. 10/03/12 (Mayer) 136:5-11; *see also* Def. Tr. Ex. 430 at CC003328, CC003333.

[215] Smolinsky Dep. at 184:12 - 23.

[216] Sale Mot. ¶ 46.

[217] Def. Tr. Ex. 204 at CC005548.

and its Purchased Subsidiaries (including GM Canada) had to be included in the sale.[218]  Mr. Mayer acknowledged in his testimony that he understood that the MSPA provided that any claims of Old GM against either GM Canada or GM Nova Scotia were being transferred to New GM.[219]

74.    The MSPA provided for a variable consideration to the bankruptcy estate in the event allowed claims against Old GM exceeded USD $35 billion.   In such event, New GM would provide up to an additional 2% of its equity to the bankruptcy estate.[220]

**The Cash Management Motion**

75.    On the Petition Date, Old GM filed the Cash Management Motion seeking authority to continue to use its cash management procedures to allow Old GM to continue operating its business effectively and responsibly while it was in bankruptcy.[221]   The Cash Management Motion explained that: "If the Debtors' subsidiaries are not funded and cannot meet their obligations and manage their cash as a result of these chapter 11 cases, there is a likelihood that they will decrease substantially in value, causing great harm to the Debtors, their estates and their creditors."[222]

76.    In the Cash Management Motion, Old GM highlighted the fact that, "in the ordinary course of business, GM enters into foreign exchange transactions," including transactions between Old GM and GM Canada "to exchange U.S. dollars and Canadian dollars at

---

[218] Tr. 08/10/12 (Buonomo) 76:4-22.
[219] Tr. 10/03/12 (Mayer) 82:23-84:15.
[220] Def. Tr. Ex. 226 (§ 3.2(c)).
[221] Cash Management Motion, 09-50026 (REG) [Docket No. 30].
[222] Cash Mgmt. Mot. ¶ 90.

arms' length foreign exchange rates."[223]   With respect to intercompany funding, the Cash Management Motion also states that, "GM and its subsidiaries have historically transferred cash to one another through one-off transactions as the need has arisen."[224]   And it explained, that "[t]hese necessary funding transactions are accomplished through intercompany loans . . . ."[225]

77.     By Order entered on June 25, 2009, the Court approved the Cash Management Motion on a final basis [Dkt. No. 2542] ("**Cash Management Order**"), authorizing the Debtors to continue: (i) to maintain, service, and administer, and perform and honor their agreements under Custodial Agreements (as defined in the Cash Management Order), whether such agreements or accounts related thereto were created prior or subsequent to the Petition Date;[226] (ii) "to fund Debtor and non-Debtor affiliates as they did prior to the Commencement Date;"[227] and (iii) "to honor and make payments in respect of prepetition and postpetition intercompany obligations to subsidiaries and affiliates (Debtor and non-Debtor) in accordance with their prepetition practices."[228]

78.     The Cash Management Order did not condition Old GM's ability to make intercompany loans prior to the closing of the 363 Sale upon advance notice to or consent from the Committee.

---

[223] Cash Mgmt. Mot. ¶ 50.  Tyrone Lopez confirmed at trial that the statements made in paragraph 50 of the Cash Management Motion were accurate.  Tr. 03/06/12 (Lopez) 182:16-183:8.
[224] Cash Mgmt. Mot. ¶ 56.
[225] *Id.*
[226] Cash Mgmt. Order at 7.
[227] *Id*. at 8.
[228] *Id.*

**The DIP Motion**

79.    As set forth in the DIP Motion, the Governments provided a USD $33 billion Debtor in Possession financing facility ("**DIP Facility**"), of which the Canadian Government contributed USD $9 billion.  The DIP Facility was expressly designed so that funding would go to Old GM and its subsidiaries in the North American Group, of which GM Canada was a member.[229] As the Court noted in the Sale Approval Decision, the Governments were prepared to invest in Old GM, not because of the economics of the transaction, "but rather to address the underlying societal interests in preserving jobs in the North American auto industry, the thousands of suppliers to that industry, and the health of the communities in the U.S. and Canada, in which GM operates."[230]

80.    The only avoiding power claim in which the unsecured creditors retained an interest was potentially the Term Loan Avoidance Action.  Under the DIP Facility, avoiding power claims that were not sold to New GM under the MSPA were collateral for the USD $33 billion DIP loan and belonged to the DIP Lenders.[231]

**The June 2009 Public Disclosures of the Lock-Up Agreement**

81.    Also on the Petition Date, the Debtors and Weil Gotshal filed an 8-K with the Securities and Exchange Commission (the "**June 1, 2009 8-K**") that identified the Lock-Up Agreement as a "*Material Definitive Agreement*," and specifically described the following:

- subject to the passage of the Extraordinary Resolution, the Lock-Up Agreement settled the Nova Scotia Litigation, and cancelled the CAD $1.33 Intercompany Loan obligation from GM Canada to GM Nova Scotia;

---

[229] Def. Tr. Ex. 213 at DEF0575, 577, 584.
[230] Sale Approval Decision at 15.
[231] Def. Tr. Ex. 213 at DEF0567-68.

- GM Canada was making a payment to GM Nova Scotia, which would then be used to pay the Consent Fee to the Noteholders;

- the principal amount owing on the Notes would not be reduced by the payment of the Consent Fee;

- the Noteholders would maintain their Guarantee Claims against Old GM;

- GM Nova Scotia would maintain its Statutory Claim against Old GM under Section 135 of the Nova Scotia Companies Act in an amount sufficient (if paid in full) for GM Nova Scotia to pay its debts and liabilities, including those with respect to the Nova Scotia Notes, running from GM Nova Scotia to GM, which would not be reduced by the payment of the Consent Fee; and

- that Old GM agreed to subordinate its claims against GM Nova Scotia in certain circumstances.[232]

82.    None of the parties attempted to conceal the Lock-Up Agreement from the creditors or the Court.[233]  Indeed, Mr. Buonomo testified that the "Noteholders were insistent that there be disclosure because they wanted to trade."[234]  The decision by Old GM not to seek Court approval of the Lock-Up Agreement was based on its good faith belief that the Lock-Up Agreement was a pre-petition transaction.[235]

83.    On June 2, 2009, Debtwire, a trade publication, reported that the Noteholders would receive a cash payment of 36% on the Notes and that this was in addition to their distribution based on the Notes.[236]  The article also identified the Nova Scotia Litigation,

---

[232] Def. Tr. Ex. 159.

[233] Tr. 08/10/12 (Buonomo) 87:2-11.

[234] Id. 87:12-16.

[235] Tr. 08/09/12 (Buonomo) 241:4-15.

[236] Pl. Tr. Exs. 615, 616.

identified the Noteholder Plaintiffs by name, and then reprinted the entirety of the June 1, 2009 8-K.

84.     The next day, in accordance with the Lock-Up Agreement, a Notice of Meetings with respect to the Extraordinary Resolution required by the Lock-Up Agreement was published in the Financial Times (the "**Extraordinary Resolution Meeting Notice**").[237]   Like Old GM's June 1, 2009 Form 8-K, the Extraordinary Resolution Meeting Notice disclosed the material terms of the Lock-Up Agreement, including:

- the settlement and dismissal of the Nova Scotia Litigation;

- the amount of the Consent Fee;

- the existence of the Guarantee Claim and the Statutory Claim;

- the existence of the Swap Liability and Old GM's agreement to subordinate its Swap Claim to the Statutory Claim; and

- that the payment of the Consent Fee would not reduce or impair the Notes.[238]

The Extraordinary Resolution Meeting Notice also listed the date and time of the Extraordinary Resolution Meeting.

**Second Amendment of the $450 Million Loan**

85.     Also on June 3, 2009, Old GM and GM Canada amended the $450 Million Loan Agreement for a second time confirming that GM Canada could use the proceeds of the $450 Million Loan to pay the Noteholders' attorneys' fees and "any fees incurred by a trustee in bankruptcy in the event that GM Nova Scotia is petitioned into bankruptcy."[239]

---

[237] Def. Tr. Ex. 193.
[238] *Id.* at WGM00016823-26.
[239] Pl. Tr. Ex. 135.

**GM Canada Paid GM Nova Scotia and the Consent Fee was Paid**

86.     GM Canada, GM Nova Scotia, and the Noteholders had agreed in the Lock-Up Agreement (the "**Escrow Parties**") to execute an Escrow Agreement to facilitate the payment from GM Canada to GM Nova Scotia and ultimately the payment of the Consent Fee to the Noteholders.[240]   Accordingly, on June 4, 2009, the Escrow Parties (which did not include Old GM) executed such an Escrow Agreement, and on June 5, 2009, GM Canada transferred £223 million (equal on June 1, 2009 to USD $367 million) to an escrow account held by CIBC Mellon in favor of the Escrow Parties.[241]

87.     On June 25, 2009, the Noteholders passed the Extraordinary Resolution at the Noticed Meeting.[242]   On that day, GM Canada and GM Nova Scotia Finance (but not Old GM) executed an agreement (the "**June 25 Agreement**") which provided that GM Nova Scotia agreed to accept the payment by GM Canada of £223 million in full settlement of the Intercompany Loans.[243]   The next day, CIBC Mellon transferred the escrowed funds to another escrow account held in favor of the Fiscal and Paying Agent, which then paid the Consent Fee to each Noteholder on a pro rata basis based its holdings of the Notes.[244]

**The Disclosure Schedules Disclosed the Lock-Up Agreement**

88.     On June 5, 2009 and at subsequent times thereafter, as part of the 363 Sale documents, the Committee, its counsel, and its financial advisor, FTI, received the *Sellers'*

---

[240] Def. Tr. Ex. 174 § 1(d) at NGM000006774.

[241] Def. Tr. Ex. 200.

[242] Def. Tr. Ex. 215.

[243] Def. Tr. Ex. 216.

[244] Pl. Tr. Ex. 708; 748; Gropper Direct Test. ¶¶ 82, 88.

*Disclosure Schedules* (the "**Disclosure Schedules**"), which similarly provided material

information about the Lock-Up Agreement."[245]

89.    Two separate Disclosure Schedules disclosed the Lock-Up Agreement.  Section

4.6 of the Disclosure Schedules stated, "Sellers have taken actions prior to the date hereof to

effectuate the Nova Scotia Settlement," as defined in Section 6.2.[246]    Section 6.2 of the

Disclosure Schedules reported the "complete satisfaction and discharge" of the Intercompany

Loans between GM Canada and GM Nova Scotia in exchange for a cash payment by GM

Canada.  As set forth in Section 6.2, pursuant to the Lock-Up Agreement:

- there had been a "transfer of funds from [Old GM] to [GM Canada], which funds will be used by [GM Canada] to pay the [GM Canada Settlement Amount] to [GM Nova Scotia], which transfer of funds occurred before the date of this Agreement . . . ;"

- there would be "subordination of the obligations of [GM Nova Scotia] to [Old GM], under currency swap arrangements between [Old GM], to the obligations of [GM Nova Scotia] to the [Noteholders] under the notes issued pursuant to the Paying Agent Agreement;" and

- "an agreement by [Old GM] not to set off its rights under any amounts owed to it under the above-referenced currency swap arrangements against any amounts [Old GM] may owe to [GM Nova Scotia]."[247]

90.    The Disclosure Schedules also gave notice that "Sellers may do all things

necessary and appropriate in furtherance of consummating the Nova Scotia settlement."[248]

91.    Mr. Mayer conceded that his firm reviewed the Disclosure Schedules in early

June of 2009.[249]  He testified as follows:

---

[245] *See* Def. Tr. Ex. 204.

[246] *Id.* § 4.6 (CC005566).

[247] *Id.* § 6.2 (CC005655).

[248] *Id.*

44

Q.      Now, the documents that we've gone through that the committee had available in June of 2009 disclosed the existence of the Lock Up Agreement, correct?

A.      Yes.

Q.      And they disclosed the payment of the consent fee, correct?

A.      Yes.

Q.      And they disclosed the guarantee of the Nova Scotia notes by Old GM, correct?

A.      Yes.

Q.      And they disclosed the existence of a potential liability to Old GM because Nova Scotia Finance is an unlimited liability company, correct?

A.      Yes.

Q.      And these documents further disclose that the payment of the consent fee would not reduce the outstanding principal of the notes or the guarantee. Is that correct?

A.      One of the documents does that, I believe, yes.

Q.      And these documents also disclose that Old GM had transferred money to GM Canada that would be used by GM Nova Scotia for the payment of the consent fee. Is that correct?

A.      I think there is a clause in the schedules that says the [funds] were transferred from Old GM to GM Nova Scotia.

Q.      And these documents also disclose the potential subordination of any claims GM may have against GM Nova Scotia in certain circumstances, correct?

A.      One or two of them do.

Q.      And these documents also disclose the currency swap obligations, didn't they?

A.      Some of them do, yes.[250]

---

[249] Tr. 10/03/12 (Mayer)  124:17-21; Def. Tr. Ex. 204.
[250] Tr. 10/03/12 (Mayer) 129:6-130:10.

45

**Committee Negotiations Regarding the MSPA**

92.      On June 14, 2009, the Committee met with Old GM and the Governments to discuss the MSPA and complained that there was not a reciprocal assumption by New GM of intercompany liabilities in respect of the intercompany assets acquired by New GM under the MSPA.[251]  In particular, the Committee referred to Section 2.2(a)(iv) of the MSPA under which New GM would acquire all intercompany obligations owed to Old GM by an Old GM subsidiary (such as the Swaps); whereas, in contrast, under Section 2.3(b)(ii) of the MSPA, New GM was not assuming any liabilities owed by Old GM to any of four Excluded Subsidiaries such as the Statutory Claim.   GM Nova Scotia was an Excluded Subsidiary.[252]   The United States government rejected the Committee's reciprocity request, and the Committee acquiesced.[253]

**The First Amendment to the DIP Facility Disclosed the Lock-Up Agreement**

93.      GM Nova Scotia's consent to the bankruptcy filing as required by the Lock-Up Agreement would have been an event of default under the DIP Facility.  As a result, the DIP Facility was amended to allow for GM Nova Scotia's consent to the bankruptcy filing.[254]  At the June 25 hearing, Amy Caton, counsel for the Committee, told the Court that the Committee would be actively engaged in the negotiations of this amendment:

> We need to negotiate an amendment to the DIP credit facility to make it appropriate for a wind down.  Right now, there are a number of covenants and events of default that are a little stricter than what we would like to see on a going forward basis.  And it's our understanding that the parties intend to do this prior to

---

[251] *Id*. 158:19-161:10; Def. Tr. Ex. 430.
[252] Def. Tr. Ex. 204 at CC005530.
[253] Def. Tr. Ex. 430 at CC003331.
[254] Def. Tr. Ex. 213 at DEF0663-668.

closing of the sale. And paragraph 21 sets out specifically that the committee is to be included in the negotiations in this process.[255]

94.     The amendment itself is only a three page document and makes explicit reference to the Lock-Up Agreement.  Mr. Mayer confirmed that Ms. Caton and other members of Kramer Levin's team actively reviewed and participated in the negotiations of the DIP Facility documents.[256]  Vanaskey testified that: (i) he expected his counsel and financial advisor to review papers regarding DIP finance; (ii) it was his "practice to read documents relating to DIP financing in bankruptcy;" and (iii) it was his "practice to review amendments to DIP Financing Agreements."[257]

**GM Canada Repaid the $450 Million Loan in Full**

95.     After the Petition Date but before the closing of the 363 Sale, GM Canada repaid the $450 Million Loan in full with interest.  The repayment was made in two installments.  The first installment took place on June 12, 2009, when GM Canada made a $78.5 million payment to Old GM.[258]  This is undisputed.[259]

96.     The payment of the second installment was made in connection with the payment of other obligations owed by GM Canada to Old GM.  As described above, GM Canada was to receive a substantial Tax Refund, and under an agreement between the Governments, was required to remit USD $1.174 billion of the Tax Refund to Old GM (the "**Tax Refund Notice**").

---

[255] Def. Tr. Ex. 219 (Transcript of Final DIP Hearing held on June 25, 2009 [Docket No. 2595]) at 25:14-25:22.

[256] Tr. 10/03/12 (Mayer) 89:16-90:19.

[257] Tr. 11/27/12 (Vanaskey) 57:23-58:23.

[258] Tr. 03/06/13 (Lopez)  7:18-23; *see also* Def. Tr. Ex. 206 (which contains an Acknowledgement, dated June 12, 2009, signed by Walter Borst, for Old GM, confirming receipt of the $78,500,000 and a fully executed amended Promissory Note, dated June 12, 2009, reflecting the reduced amount of the $450 Million Loan); 207 (the receipt for the USD 778.5 million payment).

[259] Joint Pretrial Submission ¶ 39.

On June 16, 2009, GM Canada received the first installment of the Tax Refund in the amount of CAD $932,038,371.91.[260]  Immediately upon receipt of these funds, GM Canada requested the EDC's consent to repay the balance of the $450 Million Loan, and on the following day, GM Canada requested the EDC's consent to pay to Old GM the USD $1.174 billion required by the Tax Refund Notice.[261]  Shortly thereafter, on June 29, 2009:  (i) GM Canada received a second installment of the Tax Refund in the amount of CAD $443,488,614.10;[262] and (ii) the EDC provided its consent to GM Canada's repayment of the balance of the $450 Million Loan and the USD $1.174 billion required by the Tax Refund Notice.[263]

97.    On June 30, 2009, GM Canada paid Old GM USD $800,000,000.00 of the USD $1,174,487,000 that it owed to Old GM as a result of the Tax Refund, leaving a balance of USD $374,487,000 owed by GM Canada to Old GM on account of the Tax Refund.[264]

98.    On July 7, 2009, GM Canada repaid to Old GM the remaining balance owed on the $450 Million Loan along with the balance owed from the Tax Refund.[265]  The details of these two payments are set forth in a Direction and Acknowledgement, dated July 7, 2009 (the "**D&A Memo**").[266]  Mr. Lopez drafted, reviewed and arranged for the execution of the D&A Memo, which was executed by two manager-level finance employees at GM Canada.[267]

---

[260] Def. Tr. Ex. 469 at NGM000033670.

[261] Def. Tr. Exs. 222, 459, 466, 513; Tr. 03/06/13 (Lopez) 138:25-139:17.

[262] Def. Tr. Ex. 469 at NGM000033675 (*i.e.*, the five credits described as "P.Ont.000041997 MSP").

[263] Def. Tr. Ex. 459.

[264] Tr. 03/06/13 (Lopez) 7:24-8:2; Def. Tr. Ex. 471 at NGM000045739; Def. Tr. Ex. 488 at NGM000039410.

[265] Def. Tr. Exs. 433, 435, 436, 437, 438, 484, 488, 490.

[266] *See* Def. Tr. Ex. 425.

[267] Lopez Direct Test. ¶¶ 4, 5.

99.     Under the D&A Memo, the second installment of the repayment of the $450 Million Loan and the balance owed from the Tax Refund were accomplished in connection with GM Canada's sale of CAD $1 billion to Old GM.   That sale was necessitated by a Pension Escrow Agreement among Old GM, the EDC, and CIBC (the bank which held the escrow account), dated July 6, 2009, under which Old GM had undertaken an obligation to fund a Pension Escrow Account for the benefit of GM Canada in the amount of CAD $1 billion.[268]

100.    Because GM Canada's payment obligations to Old GM were denominated in U.S. dollars, while Old GM's obligation to fund the pension escrow account was denominated in Canadian dollars, GM Canada and Old GM agreed that GM Canada would sell to Old GM CAD $1 billion and GM Canada would receive in return US $860,511,143.62 from Old GM.[269]

101.    This foreign exchange transaction was not unusual.   As explained by Mr. Lopez, due to the dual currency nature of GM Canada's operations, GM Canada traditionally had been long Canadian Dollars (CAD) and short US Dollars (USD) and regularly engaged in internal foreign exchange transactions with its parent company (Old GM or New GM depending on the time period) through which it sold its excess CAD in exchange for USD to meet its USD denominated obligations.[270]

102.    The foreign currency transaction was completed on July 7, 2009.   Rather than paying the full US $860,511,143.62, Old GM ultimately transferred to GM Canada's USD

---

[268] *See* Def. Tr. Ex. 474.  Old GM was aware before the Petition Date of the Canadian government's desire that Old GM fund this obligation.  Pl. Tr. Ex. 703.  The DIP Loan provided for a Tranche B loan in the amount of $1 billion to be funded in Canadian dollars for an escrow by the Canadian government.  Def. Tr. Ex. 213 at DEF0621.  Mr. Lopez testified that he was not aware of any $1 billion escrow obligation in Canadian dollars other than the aforesaid Pension Escrow Account.  Tr. 03/19/13 (Lopez) 14:1-5.

[269] Tr. 03/06/13 (Lopez) 136:17-138:19.

[270] Lopez Direct Test. ¶ 7, 7 n.5; Tr. 03/06/13 (Lopez) 134:21-138:19.

denominated account at TD Bank a total of USD $113,434,410.29 29 because GM Canada owed to Old GM a total of USD $747,076,733.33 for the balance of the Tax Refund and the repayment of the $450 Million Loan (*i.e.*, $860,511,143.62 minus $747,076,733.33).[271]  In exchange, GM Canada transferred CAD $1 billion to Old GM.

103.    GM Canada's transfer of CAD $1 billion to Old GM did not follow the usual protocol for internal foreign exchange transactions.  The usual procedure was to utilize an Old GM JP Morgan Chase Bank London account ("**JPMC Account**").[272]  However, in order to save time and avoid the extra step of having to transfer the funds from the JPMC Account to the CIBC account per the terms of the Pension Escrow Agreement, Old GM issued a Direction, dated July 6, 2009 ("**July 6 Direction**") and executed by Joe McCabe, Director of Treasury Operations for Old GM, directing that the funds be transferred straight to an Old GM CIBC Mellon Trust Account (Account No. MELNUS3PGSS) ("**CIBC Account**").[273]  Specifically, GM Canada directed TD Bank to process two wires of CAD $500 million each from its CAD denominated general account (Account No. 0300029) ("**TD Bank Account**") to the benefit of the CIBC Account,[274] and TD Bank honored that request.[275]

104.    Upon completion of this transaction, Old GM, through Walter Borst, Treasurer of Old GM, provided a receipt to GM Canada, wherein Old GM "acknowledge[d] receipt from [GM Canada] of the amount of US$372,589,733.33 as the full and final repayment of the

---

[271] *See* Def. Tr. Ex. 438, 484, 488 at NGM000039410,  490 at NGM000045790.

[272] *See* Tr. 03/06/13 (Lopez) 63:1-7.

[273] *See* Def. Tr. Ex. 433; Def. Tr. Ex. 434.

[274] *See* Def. Tr. Ex. 436.

[275] Tr. 03/06/13 (Lopez) 86:15 – 87:8 ("Q: And the purpose of breaking it into two was to speed along the transfer, right?  A: Yeah.  Well, you can't send more than 999,000,000, and typically if you break wires into smaller amounts they go easier through the – through the systems.")

principal amount and accrued interest outstanding pursuant to the" $450 Million Loan.[276]  This

was a typical form of documentation that would be part of Old GM's records to show repayment

of an intercompany loan.[277]

105.    In addition to this receipt and the D&A Memo, additional evidence confirms that

GM Canada repaid the $450 Million Loan in full.    Mr. Lopez testified that GM Canada repaid

Old GM for the funds used to pay the Consent Fee.[278]  A July 7, 2009 email from Deborah

Crawley, Manager of GM Canada Treasury and Corporate Finance Department, states: "FYI we

paid competent authority and promissory note to GMC today"[279] and a query of the ELedger

system confirming that repayment of the $450 Million Loan was reflected in GM Canada's

accounting books and records.[280]

106.    Lastly, the CAD $1 billion held in the pension escrow account was released to

New GM on September 2, 2009.[281]

**The Sale Order and Sale Approval Decision**

107.    On July 5, 2009, the Court entered:  (i) an Order approving the 363 Sale to New

GM ("**Sale Order**"); and (ii) the Sale Approval Decision, in which the Court approved the sale

to New GM, free and clear of all liens, claims or encumbrances (unless expressly assumed).

---

[276] Def. Tr. Ex. 227.

[277] Tr. 03/06/13 (Lopez) 149:1-22.

[278] *Id*. 53:22-25, 134:16-20, 161:10-11.

[279] Def. Tr. Ex. 483.

[280] Def. Tr. Ex. 499; Tr. (Lopez) 158:16-161:11.

[281] Tr. 03/06/13(Lopez)  197:10-198:8.

**The Assumption and Assignment Of the Lock-Up Agreement**

108.    On July 10, 2009, Old GM closed the sale of its assets to New GM pursuant to the 363 Sale, and under the terms of the MSPA.[282]  Because New GM purchased GM Canada, which was a party to the Lock-Up Agreement, New GM took steps to ensure compliance with the Lock-Up Agreement on a going-forward basis.[283]  At the time of the assignment of the Lock-Up Agreement, Old GM's sole remaining obligation under the Lock-Up Agreement was a duty to cooperate.    New GM assumed this obligation by designating the Lock-Up Agreement as an Assumable Executory Contract under the MSPA.[284]  This designation was noted in the contract database maintained by Old GM and its counsel for assumption and assignment purposes ("**Contract Database**").[285]  The Debtors' Disclosure Statement, dated December 8, 2010 [Dkt. No. 8023] similarly confirms assignment of the Lock-Up Agreement: "In connection with the 363 Transaction, the Lock-Up Agreement was assumed and assigned to New GM."[286]

109.    There was no requirement that the Committee be notified of the assumption and assignment of the Lock-Up Agreement.[287]  In fact, counsel for the Committee testified at trial that:  (i) the Committee did not have any interest in knowing which contracts were to be assumed and assigned;[288] (ii) the notice was for the benefit of the counterparty to the contract, not the Committee;[289] and (iii) the Committee did not have standing to contest any assumption or

---

[282]  Buonomo Direct Test. ¶ 59.

[283]  *Id.* ¶ 68.

[284]  Def. Tr. Ex. 226.

[285]  Def. Tr. Ex. 348.

[286]  Disclosure Statement at 42.

[287]  Def. Tr. Ex. 188 (Sale Procedures Order) ¶ 10.

[288]  Tr. 10/03/12 (Mayer)  106:17-107:8.

[289]  *Id.* at 108:5-7.

assignment of any contract.[290]    Counsel for Old GM further similarly confirmed that: (i) the Committee did not request that it be given notice of the assumption and assignment of contracts; (ii) the Committee did not have access to the Contract Database and never requested such access; and (iii) that New GM had the right to determine which executory contracts to take as part of the 363 Sale.[291]    The Court entered the Sale Procedures Order [Docket No. 274] on June 2, 2009. The procedures governing the assumption and assignment of executory contracts were modified by the Sale Order.

110.    Old GM acknowledged that the Lock-Up Agreement was assigned to New GM and the Noteholders never challenged the assignment of the Lock-Up Agreement to New GM.[292]

**The Assumption and Assignment of the Swap Transactions**

111.    The Swap Transactions were similarly assumed and assigned from Old GM to New GM. Weil Gotshal added the ISDA Master Agreement dated October 15, 2001 governing the Swaps to the Contract Database on August 3, 2009.[293]    Although the Confirmations themselves were not specifically included as well, the ISDA Master Agreement expressly provides that: (i) it "includes the schedule . . ., and the documents and other confirming evidence (each a 'Confirmation') exchanged between the parties confirming those Transactions;" and (ii) "[a]ll Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties."[294]    Similarly, each Confirmation

---

[290] *Id.* at 108:8-13.

[291] Smolinsky Dep. at 78:18-82:9; 82:20-83:12.

[292] *Id.* at 169:15-21, 209:9-15; Tr. 10/03/12 (Mayer) 165:18-166:25; Tr. 08/08/12 (Zirinsky) 441:8-12.

[293] *See* Smolinsky Dep. at 240:13-241:11; 243:11-23; Buonomo Direct Test. ¶ 76; Tr. 08/09/12 (Buonomo) 129:25-131:18; Def. Tr. Exs. 348, 350; Pl. Tr. Ex. 281.

[294] Def. Tr. Ex. 350 ¶ 1(c).

provided: "The parties agree that this transaction is a Transaction under the Master Agreement of the [ISDA Master Agreement] . . . .  This Confirmation . . . will supplement, form part of, and be subject to the [ISDA Master Agreement]."[295]  At the time of the assignment, both Old GM and New GM understood that the designation of the ISDA Master Agreement constituted a complete assignment of the Swap Agreements to New GM.[296]  The counterparty to the Swap Agreements (GM Nova Scotia or the GM Nova Scotia Trustee) recognized that the Swap Agreements were assigned to New GM.[297]

**Mr. Gropper Discussed the Transaction with Mr. Mayer in July 2009**

112.    On July 29, 2009, Mr. Gropper discussed the transaction documented in the Lock-Up Agreement in a telephone conversation with Committee Counsel Mr. Mayer.  Both witnesses testified to this conversation in which Mr. Mayer stated that Mr. Gropper told him that he had received a "good deal" in the GM Nova Scotia transaction.[298] Mr. Mayer told Mr. Gropper that he was not entitled to that same good deal in the Smurfit Stone case, in which they both were involved.[299]  Mr. Gropper testified that Mr. Mayer knew the terms of the Lock-Up Agreement during this conversation.[300]  There was no intervening disclosures of the Lock-Up Agreement made by Old GM during the 19 day interval between the closing of the sale on July 10 and the date of this phone conversation.

---

[295] Def. Tr. Ex. 422 at DEF8710, 8715.

[296] *See* Smolinsky Dep. at 240:13-241:11; 243:11-23; 246:3-10; Def. Tr. Exs. 256, 303; Buonomo Direct Test. ¶ 76; Tr. 08/09/12 (Buonomo) 129:25-131:18 (recognizing that "we don't designate confirms, we designate contracts").

[297] Def. Tr. Ex. 303.

[298] Tr. 09/28/12 (Gropper) 95:16-96:4; Tr. 10/03/12 (Mayer) 113:7-15.

[299] Tr. 10/03/12 (Mayer) 112:24-113:6.

[300] Tr. 09/28/12 (Gropper) 96:7-9.

**Three Additional Public Filings Disclosed the Lock-Up Agreement in August 2009**

113.    Two additional public filings in August 2009 disclosed the Lock-Up Agreement. First, on August 7, 2009, New GM filed with the SEC a Form 8-K (the **"August 7, 2009 8-K"**), disclosing the Lock-Up Agreement and annexing it to the filing as an exhibit.[301]  Mr. Mayer reviewed the August 7, 2009 8-K and testified that it was a "material document."[302]  Next, on August 11, 2009, Old GM filed the Notice of Interim Report (the **"Interim Report"**), which specifically references the Lock-Up Agreement and the amendment to the Fiscal and Paying Agency Agreement, wherein the Noteholders agreed to limit their claims against Old GM to a recovery on the Guarantee Claims and the Statutory Claim asserted by the Nova Scotia Finance Trustee.[303]  Mr. Mayer testified that he was "sure" he reviewed the Interim Report when it was filed, and recalled having conversations with Debtors' counsel about it because the Committee "had questions regarding its content . . . ."[304]  The Interim Report mistakenly stated that the Noteholders' claims were allowed by the Lock-Up Agreement. The Committee raised no issue with this portion of the Interim Report at that time.

114.    A third public filing also disclosed the Lock-Up Agreement when Old GM disclosed the Lock-Up Agreement in a Form 8-K which it filed on October 9, 2009 ("**October 9, 2009 8-K**").  In that document, Old GM stated that before it filed its bankruptcy petition, it entered into a lock-up agreement with GM Canada, GM Nova Scotia, Nova Scotia Investments, and the Noteholders regarding the Notes.  It further disclosed that GM Nova Scotia had provided

---

[301] Def. Tr. Ex. 234.
[302] Tr. 10/03/12 (Mayer) 117:2-6.
[303] *See* Def. Tr. Ex. 235, Exhibit "A," ¶ 10(a)(iii) and (iv).
[304] Tr. 10/03/12 (Mayer) 117:19-121:15.

a consent to the bankruptcy order as provided in the Lock-Up Agreement and that on October 9, the bankruptcy order was approved.

**The GM Nova Scotia Bankruptcy Proceeding**

115.    On October 8, 2009, certain Noteholders, as "Petitioning Creditors" of GM Nova Scotia (the "**Petitioning Creditors**"), petitioned the Supreme Court of Nova Scotia to declare GM Nova Scotia bankrupt.[305]   The application was filed along with the Consent to a Bankruptcy Order, dated June 4, 2009, which had been executed by the directors of GM Nova Scotia and previously delivered to the Petitioning Creditors in accordance with the Lock-Up Agreement.[306]

116.    The petition requested that a trustee be appointed to administer the GM Nova Scotia estate.[307]   In Canada, because no trustee can be compelled to accept an appointment as trustee, a creditor seeking a bankruptcy order is required to provide the court with the name of a licensed trustee who has consented to serve as trustee of the bankrupt estate.[308]   The Petitioning Creditors included Green Hunt Wedlake's Consent with the petition. [309]   Previously, on or about May 30, 2009, the Petitioning Creditors had:  (i) notified Mr. Wedlake that there would be a petition to place GM Nova Scotia into bankruptcy; and (ii) sought and obtained Green Hunt Wedlake's consent to be proposed as trustee of the GM Nova Scotia estate.[310]   Mr. Wedlake otherwise had no knowledge or involvement regarding when the petition would be made.[311]

---

[305] *See* Wedlake Direct Test. ¶ 19; Def. Tr. Ex. 237.
[306] Def. Tr. Ex. 174 (Lock-Up Agreement) § 6(b)(i); Def. Tr. Exs. 198, 238.
[307] Def. Tr. Ex. 237.
[308] Wedlake Direct Test. ¶ 15.
[309] Def. Tr. Ex. 237.
[310] Wedlake Direct Test. ¶ 13.
[311] *Id*. ¶ 18.

117.    On October 9, 2009, the Nova Scotia court issued a bankruptcy order adjudging GM Nova Scotia bankrupt and ordering that Green Hunt Wedlake be appointed as trustee of the GM Nova Scotia bankrupt estate (**"Nova Scotia Trustee"**) to oversee GM Nova Scotia's winding up and administer the estate.[312]  As trustee, Green Hunt Wedlake, through Mr. Wedlake himself, serves an officer of the Supreme Court of Nova Scotia and is the legal representative of GM Nova Scotia charged with realizing on the assets of GM Nova Scotia for the benefit of its creditors.[313]

**The Nova Scotia Trustee's Initial Letter to Creditors**

118.    On October 29, 2009, the Nova Scotia Trustee sent a letter to all known creditors of GM Nova Scotia, alerting them to the bankruptcy of GM Nova Scotia and informing them that a first meeting of creditors would be held on November 12, 2009 (the "**First Meeting of Creditors**").[314]  The letter, among other things, stated:

- GM Nova Scotia was incorporated under the laws of the Province of Nova Scotia as a ULC, and when a ULC is wound up, the shareholders of the ULC are liable for all of the debts of the corporation;

- Green Hunt Wedlake intended to pursue a claim against GM Nova Scotia's members (in this case, its sole shareholder, Old GM);

- The purpose of the First Meeting of Creditors was to, among other things, give Green Hunt Wedlake directions with respect to the administration of the estate and have the creditors decide whether to appoint representatives known as "Inspectors" to work with Green Hunt Wedlake in administering the estate;

---

[312] *See* Def. Tr. Ex. 241.
[313] *See* Wedlake Direct Test. ¶ 21; Tr. 08/07/12 (Wedlake) 159:18-160:1.
[314] *See* Wedlake Direct Test. ¶ 25; Def. Tr. Ex. 244; *see* Tr. 08/07/12 (Wedlake) 130:20-131:13.

- The creditors should complete a proof of claim, including the provision of a detailed statement of account, and return it to Green Hunt Wedlake prior to the First Meeting of Creditors; and

- In accordance with standard bankruptcy procedure, all damages described in the proof of claim should be calculated as of the date of bankruptcy, *i.e.,* October 9, 2009.

**The Nova Scotia Trustee's Review of the Proofs of Claim**

119.     Mr. Wedlake received a number of proofs of claim from various Noteholders for amounts owing in respect of the Notes.[315]   Generally, each proof of claim from a Noteholder certified the amount owing under the Notes as of the date of bankruptcy with supporting documentation.[316]

120.     On November 9, 2009, counsel to New GM submitted to the Nova Scotia Trustee a copy of New GM's proof of claim for amounts owing in respect of the Swap Agreements (the "**Swap Claim**").[317]   Mr. Wedlake reviewed the Swap Claim and confirmed that it would be allowable for voting purposes.[318]   The Swap Claim included a certified and witnessed declaration from Mr. Buonomo indicating that New GM had acquired all rights in the Swap Agreements pursuant to the Sale Order.[319]

121.     The Swap Claim attached a spreadsheet demonstrating how the swap damages, in the amount of $564,493,957, had been calculated and also attached copies of the Confirmations.[320]   The swap calculation was performed by New GM's treasury office, with the advice of Canadian counsel and at the direction of Mr. Buonomo, Maurita Sutedja (a former GM

---

[315]   *See, e.g.,* Def. Tr. Exs. 253, 254; Wedlake Direct Test. ¶ 28.

[316]   *See id.*

[317]   *See* Def. Tr. Ex. 248.

[318]   *See* Wedlake Direct Test. ¶ 29.

[319]   *See* Def. Tr. Ex. 248.

[320]   *See id.*

Nova Scotia director), and New GM's Director of Foreign Exchange.[321]  Mr. Wedlake reviewed

the Swap Claim with his counsel and its in-house expert, and all parties agreed that the

calculation contained therein appeared to be correct.[322]

**The First Meeting of Creditors, Chaired Under the Auspices of the
Canadian Office of the Superintendent of Bankruptcy**

122.    GM Nova Scotia's First Meeting of Creditors occurred on November 12, 2009.[323]

At Mr. Wedlake's request, the meeting was chaired and conducted under the auspices of Mr.

Stephen Dickey, an Official Receiver employed by the Canadian Office of the Superintendent of

Bankruptcy (the "**OSB**").[324]  As chairman of the meeting, Mr. Dickey also drafted the meeting

minutes.[325]

123.    Green Hunt Wedlake's Preliminary Report to Creditors (the "**Preliminary

Report**") was presented at the First Meeting of Creditors.[326]  The Preliminary Report detailed

Green Hunt Wedlake's efforts to obtain information from GM Nova Scotia.[327]  For instance, the

report indicated that Green Hunt Wedlake had made a demand on the officers and directors of

GM Nova Scotia for the corporate books and records, but had not received them as of the First

Meeting of Creditors.[328]  GM Nova Scotia's directors had not yet prepared a corporate Statement

of Affairs by the first meeting, but Mr. Wedlake indicated that he understood through

---

[321]  *See* Buonomo Direct Test. ¶ 82; Tr. 08/09/12 (Buonomo) 115:14-116:2.

[322]  *See* Tr. 08/07/12 (Wedlake) 41:7-24, 56:10-57:6.

[323]  *See* Wedlake Direct Test. ¶ 34.

[324]  *Id.*; *See* Tr. 08/07/12 (Wedlake) 132:4-22; Gropper Direct Test. ¶ 96.

[325]  *See* Def. Tr. Ex. 262.

[326]  *See* Def. Tr. Ex. 256; Tr. 08/0712 (Wedlake) 163:7-25.

[327]  *See* Def. Tr. Ex. 256 at 2-3.

[328]  *See id.* 256 at 3.

conversations with them that GM Nova Scotia had certain assets in addition to its Statutory

claim, including a receivable from Nova Scotia Investments Co. and certain tax refunds.[329]

124.    The Preliminary Report also contained a section entitled "Preference and

Transfers at Undervalue," which was based upon Mr. Wedlake's review of the Lock-Up

Agreement and the June 25 Agreement.[330]    In the report, Mr. Wedlake questioned whether the

Intercompany Loan Settlement could qualify as a preference or "transfer at undervalue," but after

careful consideration and consultation with counsel, Mr. Wedlake decided against expending

estate resources on further pursuing a claim for the following reasons:

- As stated in the Preliminary Report, "all of the known creditors of GM Nova Scotia were either a beneficiary of the [lock-up] transaction or consented to and/or participated in the transaction."[331]

- The debtor itself, GM Nova Scotia, had consented to the transaction both by executing the Lock-Up Agreement and the June 25 Agreement.[332]

- GM Nova Scotia's sole shareholder, Old GM, was a party to the Lock-Up Agreement.[333]

- Canadian bankruptcy trustees are not generally obligated to investigate potential preferences or transfers at undervalue in any greater depth beyond what Mr. Wedlake had already done—unless they are asked to do so by their creditors.  In this case, none of the creditors asked Green Hunt Wedlake to further investigate the transaction or otherwise pursue a claim thereto.[334]

---

[329] *See id.* at 2-3.  Ultimately, after many hours investigating the company's affairs and working with Canadian government official at the Canada Revenue Agency, the Nova Scotia Trustee was able to recover (i) CAD $5,000 on a note receivable from Nova Scotia Investments Co. and (ii) corporate tax refunds in the total amount of CAD $2,691,831.90 on account of certain loss carrybacks.  *See* Wedlake Direct Test. ¶¶ 50-52.

[330] *See* Def. Tr. Ex. 256 at 5; Wedlake Direct Test. ¶ 37.

[331] *See* Def. Tr. Ex. 256 at 6.

[332] *See* Wedlake Direct Test. ¶ 38.

[333] *See id.*

[334] *Id.*

- Had he pursued a claim, Mr. Wedlake understood that he would have likely been opposed by his entire creditor constituency, equity (Old GM), and possibly the United States and Canadian Governments.[335]

125.    Likewise, Mr. Dickey, who had received the Preliminary Report, declined to instruct Mr. Wedlake to investigate the matter further, even though the OSB had the power to do so and has done so historically if a transaction appeared improper.[336]

126.    On or about November 19, 2009, counsel to certain of the Noteholders approached Mr. Wedlake about amending this portion of the report to state that "the Trustee does not see any basis for consideration of the transaction as a preference or transfer for undervalue, and also notes that the transaction occurred outside of the three month preference review period under the Bankruptcy and Insolvency Act."[337]   Counsel to the Noteholders reiterated this request to Mr. Wedlake on December 24, 2009.[338]   But Mr. Wedlake declined to make the change, because he felt it was unnecessary and did not want creditors telling him how to write his report.[339]

**The Creditors Voted Against Appointing Inspectors**

127.    Under Canadian law, creditors may appoint "inspectors" to work with the bankruptcy trustee to administer the debtor's estate.[340]   Inspectors represent the interests of the

---

[335] *See id.*

[336] *Id.*

[337] *See* Def. Tr. Ex. 269

[338] *See* Def. Tr. Ex. 300.

[339] *See* Wedlake Direct Test. ¶ 40; Tr. 08/07/12 (Wedlake) 166:2-22.

[340] Wedlake Direct Test. ¶¶ 31-32, 42.

creditors, have a statutory obligation to the general body creditors, and are themselves often employees of creditors.[341]

128.    As reflected in the minutes of the first meeting of creditors, Mr. Steven Golick, an attorney acting on behalf of New GM, supported the appointment of inspectors, stating that inspectors would "help reduce the costs of administration and [] allow the trustee to administer the estate without the need for court approval."[342]  Ms. Pamela Huff, an attorney acting on behalf of the Noteholders, stated her position against the appointment of inspectors, indicating among other things that GM Nova Scotia's "primary asset to be pursued is a claim in the GM restructuring and that there is a relatively small and known creditor group."[343]   At the conclusion of the discussion, a motion resolving that no inspectors be appointed was put to a vote and carried.[344]

**GM Nova Scotia's Financial Statements and Sworn Statement of Affairs**

129.    Under BIA § 158(d) GM Nova Scotia was required to complete a statement of affairs (the "**Statement of Affairs**").  The Statement of Affairs is a statutory document that is sworn to and must be filed with the trustee, the superintendent of bankruptcy and the Court.[345]   It is an offense to file an untrue statement of affairs.[346]  After the 363 Sale, Old GM remained the owner of GM Nova Scotia, but did not and could not provide the information necessary to GM

---

[341] *Id*. ¶ 32.
[342] Def. Tr. Ex. 262.
[343] *Id.*
[344] *Id.*
[345] Tr. 08/07/12 (Wedlake) 16:13-17:5, 148:21-149:2.
[346] *Id.* 43:4-44:4.

Nova Scotia for it to complete its Statement of Affairs.[347]   As a result, based the Transition

Services Agreement entered into as part of the MSPA, New GM assisted in the preparation of the

Statement of Affairs.[348] Specifically, GM Canada personnel assisted in providing GM Nova

Scotia with the necessary information for the statement of affairs.[349]

130.    Mr. Wedlake has a particular software program designed to generate statements of

affairs for bankrupt Canadian entities.[350]   It is Mr. Wedlake's standard practice to have

representatives of the debtor entity provide Mr. Wedlake with the necessary information to be

entered into the software program to generate a statement of affairs.[351]   In keeping with this

practice, representatives of GM Nova Scotia sent data to Mr. Wedlake that he used to create the

Statement of Affairs.[352]   Several drafts were exchanged.[353]   At all times, GM Nova Scotia and its

representatives were the ultimate decision makers regarding the financial information set forth in

its Statement of Affairs.[354]   On or about November 23, 2009, GM Canada personnel, on behalf of

GM Nova Scotia, delivered GM Nova Scotia's final Statement of Affairs, which was sworn to be

accurate by former GM Nova Scotia director Maurita Sutedja.[355]   Mr. Wedlake had at least six

conversations with Ms. Sutedja concerning the Statement of Affairs.[356]

---

[347] Tr. 08/10/12 (Buonomo) 65:8-67:1.
[348] *Id.*
[349] *See id.* 146:9-147:13.
[350] Tr. 08/07/12 (Wedlake) 28:16-25.
[351] *Id.* 155:15-21.
[352] *Id.* 28:16-25, 155:15-21.
[353] *Id.* 22:14-29:9.
[354] *Id.* 155-15:156:3.
[355] Def. Tr. Ex. 305.
[356] Tr. 08/07/12 (Wedlake) 28:9-13.

131.    The liability section of the Statement of Affairs was consistent with the Proofs of

Claim previously submitted by the Noteholders and New GM.[357]  The liability on account of the

Swap Agreements described in the Statement of Affairs and sworn to by Ms. Sutedja matched

the figure certified by Mr. Buonomo and supported by documentary evidence in the Swap

Claim.[358]  The Statement of Affairs was also broadly consistent with GM Nova Scotia's books

and records and certain public filings, which Mr. Wedlake reviewed before filing any claim in

this Court.[359]  These documents include:  (i) GM Nova Scotia's December 31, 2008 financial

statement, which described bondholder liability in the approximate amount of USD $875 million

and a swap liability of approximately USD $516 million;[360] (ii) the Form S-4 indicated that, as of

March 31, 2009, GM Nova Scotia would owe a net liability of approximately CAD $632 million

to Old GM under the Swap Agreements if they were terminated as of that date;[361] and (iii) a

"periodic report" filed by Old GM on November 2, 2009 in these proceedings indicating total

liabilities of USD $1.58 billion for GM Nova Scotia and suggested a swap valuation of around

USD $530 million as of August 31, 2009.[362]

**The Nova Scotia Trustee Filed its Claim in These Proceedings**

132.    On or about November 25, 2009, in accordance with the creditor's instructions

and its statutory powers and obligations, and in close consultation with its counsel, Green Hunt

Wedlake filed a proof of claim (claim no. 65814) against Old GM in these proceedings in an

---

[357] *See* Wedlake Direct Test. ¶ 47.

[358] *See id.*

[359] *Id.* ¶¶ 47-49.

[360] Def. Tr. Ex. 398.

[361] Def. Tr. Ex. 75 at NGM000007377.

[362] *See* Def. Tr. Ex. 423.

amount not less than $1,607,647,592.49, pursuant to Section 135.[363] On or about November 30, 2009, Green Hunt Wedlake filed an amended claim (claim no. 66319), providing additional detail of its claim.[364] The Statutory Claim is based upon the proofs of claim filed with Green Hunt Wedlake, and thus consists primarily of amounts owing by GM Nova Scotia in respect of the Notes and the Swap Agreements.[365]

133.    In support of the Statutory Claim, Green Hunt Wedlake provided an attachment for this Court's review that contains considerable detail regarding the Nova Scotia Trustee's claim, including background on Section 135, and attaches copies of the GM Nova Scotia bankruptcy order, the Statement of Affairs, the Fiscal and Paying Agency Agreement, the Extraordinary Resolution, and the underlying Swap Agreement documentation, including the ISDA Master Agreement, the Schedule thereto, and the Confirmations.[366]

**The Disclaimer of the Swap Agreements**

134.    After filing its claim, the Nova Scotia Trustee began the process of terminating the Swap Agreements. GM Nova Scotia's bankruptcy filing constituted a breach under the Swap Agreements, entitling New GM, as the non-defaulting party, to declare an "Early Termination" by serving notice of its declaration of Early Termination upon GM Nova Scotia in writing.[367] After discussing the issue with counsel and the Noteholders, the Nova Scotia Trustee contacted

---

[363] *See* Wedlake Direct Test. ¶ 53.

[364] *See* Def. Tr. Ex. 422.

[365] *See id.*

[366] *Id.*; Wedlake Direct Test. ¶¶ 55-59.

[367] *See* Def. Tr. Ex. 422 at DEF8685.

New GM to see if it would exercise its early termination rights, but New GM refused to do so, and so informed counsel to the Nova Scotia Trustee by telephone.[368]

135.    Mr. Wedlake testified that it is incumbent upon him to either affirm or disclaim all executory contracts of the estate he represents, and that in this case he could not affirm the Swap Agreements because GM Nova Scotia will cease to exist following its bankruptcy proceeding.[369]    In addition, GM Nova Scotia, as the "out-of-the money" party to the Swap Agreements, did not possess sufficient assets to continue making annual payments, as it would almost certainly have been required to do absent the Nova Scotia Trustee's disclaimer of the Swap Agreements.[370]    Moreover, given the ongoing fluctuations of interest rates and exchange rates, the overall liability owed by GM Nova Scotia on the Swap Agreements could have continued to grow, and Mr. Wedlake understood that there is case law in Canada suggesting that, under such circumstances, the trustee may be held personally liable for any additional liability accruing to the estate on account of contracts that the trustee had failed to disclaim.[371]

136.    Mr. Wedlake, accordingly, on behalf of the Nova Scotia Trustee, disclaimed the Swap Agreements, effective as of October 9, 2009 by sending a letter to New GM and its counsel stating: "The Trustee has reviewed and considered the Swap Agreements received from [New GM] and has determined that it is in the best interests of the Bankrupt's estate to disclaim them effective as of the Date of Bankruptcy" (the **"Disclaimer Letter"**).[372]    The Disclaimer

---

[368] Tr. 08/07/12 (Wedlake) 133:25-135:6; Tr. 08/10/12 (Buonomo) 90:11-91:2, 107:9-108:7; Wedlake Direct Test. ¶ 60; Def. Tr. Ex. 299.
[369] Wedlake Direct Test. ¶ 62.
[370] *Id.*
[371] *Id.*
[372] *See* Def. Tr. Ex. 303.

Letter explained that Green Hunt Wedlake's disclaimer of the Swap Agreements was based on the understanding that: (i) New GM would acknowledge that the Swap Agreements were terminated as of October 9, 2009; (ii) New GM would agree that its claim was to be calculated as of October 9, 2009; and (iii) New GM would acknowledge that, at that time, Green Hunt Wedlake was not accepting the Swap Claim as filed.[373]

137.    Before Mr. Wedlake sent the Disclaimer Letter, his counsel discussed Mr. Wedlake's decision to disclaim the Swap Agreements with New GM's Canadian counsel.[374] Pursuant to these discussions, New GM agreed that the disclaimer letter would constitute a termination of the Swap Agreements and that New GM's damages under the Swap Agreements would be calculated as of October 9, 2009.[375] Thus, on behalf of New GM, Mr. Buonomo found the points in the Disclaimer Letter acceptable and instructed his counsel to confirm New GM's agreement.[376] On January 15, 2010, counsel to New GM responded to Mr. Wedlake's letter, acknowledging the disclaimer of the Swap Agreements and agreeing to the three conditions.[377] The parties agreed that the Swap Agreements were terminated pursuant to the Nova Scotia Trustee's disclaimer.[378]

138.    Mr. Wedlake disclaimed the Swap Agreements as of October 9, 2009, the date of GM Nova Scotia's bankruptcy, for at least two reasons.[379] First, Canadian bankruptcy law

---

[373] *See id.*

[374] Tr. 08/10/12 (Buonomo) 90:14-22.

[375] *Id.*

[376] *See* Buonomo Direct Test. ¶ 83.

[377] Def. Tr. Ex. 307.

[378] Tr. 08/10/12 (Buonomo) 107:9-108:7; Tr. 08/07/12 (Wedlake) 81:12-22, 136:9-137:8.

[379] *See* Wedlake Direct Test. ¶ 64.

requires that claims be calculated as of the date of the debtor's bankruptcy to ensure that the estate's assets are distributed equitably among all claimants.[380]  Second, fixing October 9, 2009 as the proper date to value the swap agreements was consistent with Mr. Wedlake's duty to limit any additional liability from accruing to the GM Nova Scotia estate.[381]

**Further Investigation of the Swap Agreements by Green Hunt Wedlake**

139.    At the time of the disclaimer, Mr. Wedlake had not agreed to accept the Swap Claim as filed.[382]   Based on conversations with counsel, including experts in swaps, he understood the calculation of damages under the Swap Agreements to be complex and believed the calculation of damages under the Swap Agreements warranted further analysis.[383]   As a result, and in connection with advancing the Statutory Claim in this proceeding, the Nova Scotia Trustee's counsel retained an expert on currency swap agreements, Mr. Ken Shoji.[384]   Mr. Shoji's findings confirmed the swap valuation provided by New GM in its proof of claim almost exactly.[385]

**Confirmation of the Debtors' Plan**

140.    By Order dated March 29, 2011 [Docket No. 9941] ("**Confirmation Order**"), this Court confirmed the Debtors' Second Amended Joint Chapter 11 Plan, dated March 18, 2011 ("**Plan**").  The Plan created two post-confirmation trusts:

> The GUC Trust:  The Plan provides that the purpose of the GUC Trust was to "administer certain post-Effective Date responsibilities under the Plan, including,

---

[380] *Id.*; Tr. 08/07/12 (Wedlake) 137:9-140:22.
[381] Wedlake Direct Test. ¶ 64.
[382] *Id.* ¶ 67.
[383] *See id.*
[384] *Id.*
[385] *See* Def. Tr. Ex. 347.

but not limited to, distributing New GM Securities and resolving outstanding Disputed General Unsecured Claims to determine the amount of Allowed General Unsecured Claims that will be eligible for distribution of their Pro Rata Share of New GM Securities under the Plan. If the Residual Wind-Down Assets are transferred to the GUC Trust upon dissolution of MLC, then the GUC Trust shall administer the resolution of all Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims." Plan § 6.2(b); and

The Avoidance Action Trust: The Plan provides that the purpose of the Avoidance Action Trust was to administer the "Avoidance Action Trust Assets." Plan, § 6.5(b). "Avoidance Action Trust Assets" were defined in the Plan as "the (i) Term Loan Avoidance Action transferred to the Avoidance Action Trust and any proceeds thereof (for the benefit of the Term Loan Avoidance Action Beneficiaries), (ii) the Avoidance Action Trust Administrative Cash, and (iii) the remaining assets of [Old GM] transferred to the Avoidance Action Trust upon the dissolution of [Old GM] as set forth in Section 6.10 hereof." Plan § 1.23.

141.    Neither the Plan nor the governing documents for the GUC Trust provides that the GUC Trust has the power to bring any Avoidance Actions (as defined in the Plan).[386]

142.    Section 6.10 of the Plan provides that all Avoidance Actions not transferred to the Avoidance Action Trust "shall be deemed abandoned by the Debtors for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors." No Avoidance Actions, other than the Term Loan Avoidance Action, were transferred to or commenced by the Avoidance Action Trust within the statutory deadlines.[387]

143.    With respect to defenses based on recharacterization and subordination, the Plan provides that the GUC Trust may assert such defenses only after "obtaining any applicable consent from MLC or Post-Effective Date MLC, as the case may be, and any necessary approval

---

[386] *See generally*, Plan § 6.2; Def. Tr. Ex. 316 Article VIII.

[387] *See* Motors Liquidation Company GUC Trust Quarterly GUC Trust Reports as of December 31, 2012, dated February 14, 2013 [Dkt. No. 12328] ("GUC Trust Quarterly Report") at 5 ("Only one Avoidance Action, [the Term Loan Avoidance Action], was commenced prior to the statutory deadline for commencing such actions."); *see also* Tr. 10/03/12 (Mayer) 17:11-22.

69

of the Bankruptcy Court . . . ."[388]    Neither the Committee nor the GUC Trust obtained

Bankruptcy Court approval to assert defenses to disputed claims based on recharacterization or

subordination.

144.    The Debtors attempted to transfer to the GUC Trust through a purported

Assignment and Assumption Agreement (GUC Trust), dated as of December 15, 2011, any and

all defenses they may have to disputed unsecured claims, including "all defenses and claims for

avoidance, recharacterization, . . . [and] subordination . . . ."    The Assignment was never filed

with the Court and does not appear on the Docket.    Nor were the Noteholders given notice of the

Assignment at the time it was purportedly made.[389]

---

[388]  Plan § 6.2(f); *see also* GUC Trust Agreement § 8.1(b)(iv).
[389]  Pl. Tr. Ex. 283.

Dated:  New York, New York

      May 24, 2013

Respectfully submitted,

KING & SPALDING LLP

By: /s/ *Arthur J. Steinberg*__
    Arthur J. Steinberg
    Scott I. Davidson
1185 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Counsel to General Motors LLC*

GREENBERG TRAURIG, LLP

By: /s/ *Bruce R. Zirinsky*__
    Bruce R. Zirinsky
    Kevin D. Finger (Chicago)
    Bevin M. Brennan (Chicago)
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400

*Counsel for Elliott Management Corporation, Fortress Investment Group LLC, Morgan Stanley & Co. International PLC (and each of their managed fund entities)*

AKIN GUMP STRAUSS HAUER & FELD LLP

By: /s/ *Sean E. O'Donnell*__
    Daniel H. Golden
    Sean E. O'Donnell
    Philip C. Dublin
    Dean L. Chapman, Jr.
    William F. Mongan

One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Counsel for Green Hunt Wedlake, Inc., as Trustee for General Motors Nova Scotia Finance Company*

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

By: /s/ *Steven J. Reisman*__
    Steven J. Reisman
    Theresa A. Foudy
101 Park Avenue
New York, NY 10178
Telephone:  (212) 696-6000
Facsimile:  (212) 697-1559

*Counsel for dbX-Risk Arbitrage 1 Fund, Lyxor/Paulson International Fund Limited, Paulson Enhanced Ltd., Paulson International Ltd., Paulson Partners Enhanced, L.P. and Paulson Partners L.P.*