DICKSTEIN SHAPIRO LLP
Barry N. Seidel
Eric B. Fisher
Katie L. Weinstein
Mary Kim (admitted *pro hac vice*)
1633 Broadway
New York, New York 10019-6708
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Counsel for Motors Liquidation*
*Company GUC Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, *et al.,* f/k/a General Motors Corporation, *et al.,* | Case No.:  09-50026 (REG) (Jointly Administered) |
| Debtors. | |

-----------------------------------------------------------------------x

| | |
|---|---|
| MOTORS LIQUIDATION COMPANY GUC TRUST, Plaintiff, v. APPALOOSA INVESTMENT LIMITED PARTNERSHIP I, *et al.,* Defendants. | Adversary Proceeding Case No.:  12-09802 |

-----------------------------------------------------------------------x

**GUC TRUST'S POST-TRIAL BRIEF IN CONNECTION
WITH (I) OFFICIAL COMMITTEE OF UNSECURED
CREDITORS' FIRST AMENDED OBJECTION TO CLAIMS FILED
BY GREEN HUNT WEDLAKE, INC. AND NOTEHOLDERS OF GENERAL
MOTORS NOVA SCOTIA FINANCE COMPANY AND MOTION FOR OTHER
RELIEF (BANKR. DKT. NO. 7859) AND (II) MOTORS LIQUIDATION CO.
GUC TRUST V. APPALOOSA INVESTMENT LTD. PARTNERSHIP I, *ET AL.*__**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... vi

INDEX OF FOREIGN LAW AUTHORITIES ............................................................ xiv

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND .................................................................................... 3

I.    OLD GM'S NEGOTIATIONS WITH THE LOCK-UP NOTEHOLDERS ......................... 3

      A.    Old GM Struggles To Reach A Settlement With The Lock-Up
            Noteholders ............................................................................................ 3

      B.    The Terms Of The Lock-Up Agreement Richly Rewarded The
            Lock-Up Noteholders, Who Collectively Held Over 2/3 Of The
            Notes ...................................................................................................... 6

      C.    The Lock-Up Noteholders Achieved The Settlement By
            Manipulating Old GM's Prepetition Restructuring Efforts And
            Exploiting Old GM's Need To Restructure GM Canada ............................. 8

II.   THE LOCK-UP AGREEMENT .......................................................................... 12

      A.    The Terms Of The Lock-Up Agreement Were Not Reasonable .................. 12

      B.    The Lock-Up Agreement Was Tainted By Conflicts On The Part
            Of Those Responsible For Acting On Behalf Of Old GM .......................... 13

            1.    The Consent Fee Alone Exceeded Old GM's Analysis Of
                  What It Should Pay To Avoid A GM Canada Bankruptcy
                  Filing ........................................................................................... 14

            2.    The Consent Fee Is Many Orders Of Magnitude Greater
                  Than Any Commercially Reasonable Consent Fee .......................... 15

            3.    The Noteholders Released A Claim That Would Have Been
                  Worthless In Exchange For The Lock-Up Agreement
                  Benefits ........................................................................................ 15

III.    THE LOCK-UP AGREEMENT IS A POSTPETITION AGREEMENT
        FOR WHICH COURT APPROVAL WAS REQUIRED BUT NEVER
        SOUGHT OR OBTAINED ........................................................................16

        A.    The Lock-Up Agreement Was Finalized Postpetition .............................16

        B.    The Lock-Up Agreement Was Implemented Through
              Unauthorized Postpetition Transactions .................................................20

              1.    Old GM Amended The Trust Agreement For The $450
                    Million Loan After The Petition Was Filed Without Court
                    Approval ......................................................................................20

              2.    Old GM And GM Nova Scotia Consented To The Nova
                    Scotia Bankruptcy Case..............................................................23

              3.    Old GM Entered Into A $1 Billion Pension Escrow
                    Agreement After The Petition Was Filed Without Court
                    Approval ......................................................................................23

        C.    No Party Sought Court Approval For The Lock-Up Agreement.............26

              1.    The Lock-Up Agreement Parties Made A Deliberate Choice
                    Not To Seek Court Approval........................................................26

              2.    The Lock-Up Agreement Transactions Were Structured To
                    Evade Court Scrutiny ..................................................................27

IV.     THE NOVA SCOTIA BANKRUPTCY CASE .................................................27

        A.    Wedlake Was Deeply Intertwined With And Acted For The
              Benefit Of The Lock-Up Noteholders ....................................................28

        B.    Wedlake Failed To Investigate GM Nova Scotia's Statement Of
              Affairs, Despite Known Irregularities......................................................30

        C.    Wedlake Failed To Investigate The Claims Filed Against GM
              Nova Scotia.............................................................................................32

V.      THE NOVA SCOTIA TRUSTEE CLAIM .........................................................33

        A.    The Swap Claim Is Invalid ....................................................................34

              1.    Wedlake Included The Swaps In The Nova Scotia Trustee
                    Claim, Even Though Wedlake Had Not Determined The
                    Validity Of The New GM Swap Claim.........................................34

2.  The Swaps Are Not A Valid And Enforceable Claim
Against Old GM ........................................................................................37

3.  The New GM Swap Claim And Nova Scotia Trustee Claim
Overstate The Amount Of The Swap Claim By Over $200
Million ......................................................................................................39

B.  The Portion Of The Nova Scotia Trustee Claim Relating To The
Notes Is Duplicative Of The Guarantee Claims .....................................40

ARGUMENT ........................................................................................................................41

I.   SECTION 502(d) OF THE BANKRUPTCY CODE REQUIRES
DISALLOWANCE OF THE DISPUTED CLAIMS .........................................................41

A.  Payment Of The Consent Fee Is Avoidable...........................................42

1.  Payment Of The Consent Fee Was An Unauthorized
Postpetition Transfer Under Section 549 Of The Bankruptcy
Code..........................................................................................................42

2.  Even If The Consent Fee Was Not A Postpetition Transfer,
The Noteholders Still Received An Avoidable Transfer
Under Sections 547 Or 548 Of The Bankruptcy Code...................................45

B.  The Consent Fee Was Not Repaid ..........................................................46

II.  THE CLAIMS SHOULD BE EQUITABLY SUBORDINATED ......................................49

A.  Standard For Equitable Subordination....................................................49

B.  Wedlake And The Lock-Up Noteholders Are Insiders Of Old GM .......................50

C.  The Tainted Claims Should Be Equitably Subordinated .........................................52

D.  The Nova Scotia Trustee Claim Should Be Equitably Subordinated ......................54

III. THE LOCK-UP AGREEMENT IS A POSTPETITION AGREEMENT...........................55

A.  The Parties Intended To Be Bound Only By A Final Agreement ...........................55

B.  It Is Undisputed That The Final Agreement Was Created
Postpetition .............................................................................................58

IV.    THE LOCK-UP AGREEMENT IS VOID ........................................................59

    A.    The Lock-Up Agreement Is Void *Ab Initio* Because It Was An Extraordinary Postpetition Transaction Not Approved By This Court ....................................................................................................59

    B.    The Lock-Up Agreement And Related Transactions Are Violations Of The Automatic Stay ..........................................................................61

    C.    The Lock-Up Agreement Is Void For Failure To Comply With Bankruptcy Rule 9019 ............................................................................62

V.    THE CONSENT FEE PAYMENT SHOULD BE APPLIED TO REDUCE THE PRINCIPAL AMOUNT OF THE NOTES..............................................63

VI.    THE NOVA SCOTIA TRUSTEE CLAIM IS DUPLICATIVE OF THE GUARANTEE CLAIMS ........................................................................................66

    A.    The Nova Scotia Trustee Claim And Guarantee Claims Are Substitutes For Each Other ..........................................................................68

    B.    The Nova Scotia Trustee Claim And Guarantee Claims Are Not Allowable Concurrently Under U.S. Law................................................70

        1.    Allowance Of Both The Guarantee Claims And The Nova Scotia Trustee Claim To The Extent Of The Notes Violates The Equitable Principle That Creditors Are Entitled To Only One Recovery For One Loss ..........................................................70

        2.    Bankruptcy Courts Have Disallowed Multiple Claims For The Same Loss By Nominally Different Parties Where The Claims Are Asserted For The Benefit Of The Same Creditor ......................73

        3.    The Second Circuit's Holding In *Delta* Is Consistent With Disallowance Of The Nova Scotia Trustee Claim ..........................74

    C.    Canadian Law Prohibits Concurrent Enforcement Of The Nova Scotia Trustee Claim And The Guarantee Claims....................................77

    D.    The Nova Scotia Trustee Claim Must Be Disallowed Pursuant To Section 502(e) Of The Bankruptcy Code................................................78

    E.    The Disputed Claims, If Allowed At All, Must Be Disallowed To The Extent They Seek Recovery Of Postpetition Interest ........................80

    F.    The Nova Scotia Trustee Claim, If Allowed At All, Should Be Allowed As A "Net" Claim After Deduction Of Distributions On The Guarantee Claims................................................................................80

VII.    THE PORTION OF THE NOVA SCOTIA TRUSTEE CLAIM THAT IS
        BASED ON THE SWAPS SHOULD BE DISALLOWED ................................................81

        A.      New GM Has No Rights To The Swaps Because The Swaps Were
                Not Assumed And Assigned To New GM ............................................................81

        B.      Even If New GM Has Rights To The Swaps, It Has No Valid
                Claim .....................................................................................................................83

        C.      Alternatively, The Swaps Component Of The Nova Scotia Trustee
                Claim Should Be Reduced .....................................................................................84

CONCLUSION ...........................................................................................................................85

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St.*
  *Steakhouse, Inc.)*, 835 F.2d 427 (2d Cir. 1987), *cert. denied*, 485 U.S.
  1035 (1988) ...........................................................................................................61

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns*
  *Corp.)*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Adelphia*
  *Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008),
  *adhered to on reconsideration*, Nos. 05 Civ. 9050 (LMM), 03 MDL
  1529, 2008 WL 1959542 (S.D.N.Y. May 5, 2008) .........................................49, 50

*ADP Dealer Serv., Inc. v. Planet Automall, Inc.*, No. 09 Civ. 0185 (ILG)
  (RER), 2012 WL 95211 (E.D.N.Y. Jan. 12, 2012)..................................................71

*Ames Merch. Corp. v. Revere Mills Inc. (In re Ames Dep't Stores, Inc.)*,
  No. 01-42217 (REG), Adv. Pro. Nos. 03-03951, 03-08325 (REG),
  2010 WL 2403104 (Bankr. S.D.N.Y. June 10, 2010)..............................................45

*Antigonish (Town) v. Antigonish (County)*, 2006 NSCA 29.......................................69

*Bachrach Clothing, Inc. v. Bachrach (In re Bachrach Clothing, Inc.)*, 480
  B.R. 820 (Bankr. N.D. Ill. 2012) ............................................................................44

*Bank of Nova Scotia v. Janzen (Trustee of)* (1989), 90 NSR (2d) 67
  (NSSC)..................................................................................................................67

*Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401
  B.R. 598 (S.D.N.Y. 2009).......................................................................................57

*Berg-Bakis Ltd. v. City of Yonkers*, 455 N.Y.S.2d 645 (App. Div. 1982),
  *appeal dismissed*, 60 N.Y.2d 664 (1983), *appeal denied*, 64 N.Y.2d
  603 (1985)..............................................................................................................71

*Bozzuto's Inc. v. Vescio*, No. 00-5040, 234 F.3d 1261 (Table), 2000 WL
  1715281 (2d Cir. Nov. 13, 2000).............................................................................64

*Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604*
  *Columbus Ave. Realty Trust)*, 968 F.2d 1332 (1st Cir. 1992)..................................54

*Carter v. State of N.Y.*, 528 N.Y.S.2d 292 (Ct. Cl. 1988), *judgment aff'd*,
  154 A.D.2d 642 (App. Div. 1989) ..........................................................................71

*Chariot Grp. v. Am. Acquisition Partners*, 751 F. Supp. 1144 (S.D.N.Y.
  1990), *aff'd without opinion*, 932 F.2d 956 (2d Cir. 1991) ........................ 55, 56, 57

*Ciaramella v. Reader's Digest Ass'n.*, 131 F.3d 320 (2d Cir. 1997) ............................................. 56

*Conway v. Icahn & Co.*, 16 F.3d 504 (2d Cir. 1994) ..................................................... 71

*Curtis v. Walpole Tire & Rubber Co.*, 227 F. 698 (D. Mass. 1914) ........................................ 72, 73

*El Paso City of Tex. v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.),*
   217 F.3d 1161 (9th Cir. 2000) ....................................................................... 47

*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),*
   340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated sub nom. on other*
   *grounds, Enron Corp. v. Springfield Assoc., L.L.C. (In re Enron*
   *Corp.),* 379 B.R. 425 (S.D.N.Y. 2007) ......................................................... 41, 42

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R.
   425 (S.D.N.Y. 2007) ........................................................................... 47, 50

*First Nat'l. Bank of Beaumont v. Eason*, 149 F. 204 (5th Cir. 1906) .......................................... 72

*Fisher v. N.Y.C. Dep't of Hous. Pres. & Dev. (In re Pan Trading Corp.*
   *S.A.),* 125 B.R. 869 (Bankr. S.D.N.Y 1991) ................................................... 43, 60

*Glen Express Ltd., Re* [2000] B.P.I.R. 456 (Ch D) ................................................... 77

*GSGSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1160 (S.D.N.Y. 1994) ......................................... 55

*Gucci Am., Inc. v. Gucci*, No. 07 Civ 6820 (RMB) (JCF), 2009 WL
   440463 (S.D.N.Y. Feb. 20, 2009) ................................................................ 56

*Hamm v. R.H. Macy & Co.*, No. 93 Civ. 1446, 1994 WL 507717
   (S.D.N.Y. Sept. 13, 1994) ...................................................................... 61, 62

*Harbert v. Calpine Canada Energy Finance II ULC,* 2005 NSSC 211 ......................................... 53

*Harsh Inv. Corp. v. Bialac (In re Bialac)*, 712 F.2d 426 (9th Cir. 1983) .................................... 60

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir.1995) .............................................. 43

*Health-Chem Corp. v. Baker*, 915 F.2d 805 (2d Cir. 1990) ............................................. 58

*Hettinger v. Kleinman*, 733 F.Supp.2d 421 (S.D.N.Y. 2010) ........................................... 71

*IBT Int'l, Inc. v. Ne. (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689 (11th
   Cir. 2005) .................................................................................... 46

*In re Adler, Coleman Clearing Corp.*, 277 B.R. 520 (Bankr. S.D.N.Y.
   2002) ...................................................................................... 50, 51, 54

*In re AEG Acquisition Corp.*, 161 B.R. 50 (9th Cir. BAP 1993) ........................................... 51

*In re APCO Liquidating Trust*, 370 B.R. 625 (Bankr. D. Del. 2007)......................................78, 79

*In re Baldwin-United Corp.*, 55 B.R. 885 (Bankr. S.D. Ohio 1985) ............................................79

*In re Brinke Transp., Inc.*, No. 87-03785, 1989 WL 233147 (Bankr. D.N.J.
  Jan. 23, 1989), *aff'd*, Civ. Act. No. 89-1778, 135 L.R.R.M. 2800
  (D.N.J. 1989)....................................................................................................................74

*In re Clouse*, 446 B.R. 690 (Bankr. E.D. Pa. 2010).........................................................................61

*In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130 (Bankr. D. Me. 1991) ...............................60, 61

*In re Delta Air Lines, Inc.*, 370 B.R. 552 (Bankr. S.D.N.Y. 2007), *aff'd*,
  2008 WL 4444001 (S.D.N.Y Sept. 29, 2008), *vacated and remanded*,
  608 F.3d 139 (2d Cir. 2010).............................................................................................75

*In re Drexel Burnham Lambert Grp. Inc.*, 148 B.R. 982 (Bankr. S.D.N.Y.
  1992) ...............................................................................................................................79

*In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 1030420 (Bankr.
  S.D.N.Y. Apr. 6, 2006) ....................................................................................................73

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson &
  Casey*, 160 B.R. 882 (Bankr. S.D.N.Y. 1993) ................................................................74

*In re Flannery*, 51 B.R. 697 (Bankr. S.D. Ohio 1985) ...................................................................60

*In re Fleming Packaging Corp.*, No. 03-82408, Adv. Pro. No. 04-8166,
  2008 WL 682428 (Bankr. C.D. Ill. Mar. 7, 2008) ..........................................................62

*In re GCO Servs., L.L.C.*, 324 B.R. 459 (Bankr. S.D.N.Y. 2005) .................................................80

*In re Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009)...................................................45

*In re Gen. Motors Corp.*, 409 B.R. 24 (Bankr. S.D.N.Y. 2009).......................................................1

*In re Handy & Harman Ref. Grp., Inc.*, 304 B.R. 49 (Bankr. D. Conn.
  2004) ...............................................................................................................................62

*In re Int'l Zinc Coatings & Chem. Corp.*, 355 B.R. 76 (Bankr. N.D. Ill.
  2006) ...............................................................................................................................51

*In re Koneta*, 357 B.R. 540 (Bankr. D. Ariz. 2006)........................................................................60

*In re KRSM Prop. L.L.C.*, 318 B.R. 712 (9th Cir. BAP 2004) ......................................................51

*In re La Guardia Assoc., L.P.*, Nos. 04-34512 (SR), 04-34514 (SR), 2006
  WL 6601650 (Bankr. E.D. Pa. Sept. 13, 2006) ...............................................................51

*In re Lull Corp.*, 162 B.R. 234 (Bankr. D. Minn. 1993)....................................................80

*In re Lyondell Chem. Co.*, 442 B.R. 236 (Bankr. S.D.N.Y. 2011) ............................79, 80

*In re NextWave Pers. Commc'ns Inc.*, 244 B.R. 253 (Bankr. S.D.N.Y 2000) ................................................................................................................................61

*In re NMI Sys. Inc.*, 179 B.R. 357 (Bankr. D.D.C. 1995)..............................................51

*In re Nw. Airlines Corp.*, No. 05-17930, 2007 WL 2682129 (Bankr. S.D.N.Y. Sept. 12, 2007) ......................................................................................73

*In re Old CarCo L.L.C.*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010) ..................................43

*In re Oxford Health Investors*, L.L.C., Nos. 00–80676C–7D, 00–80677C– 7D, 00–80678C–7D, 00–80679C–7D, 00–80680C–7D, 00–80681C– 7D, 2002 WL 31031631 (Bankr. M.D. N.C. Sept. 3, 2002)....................................51

*In re Premier Entm't Biloxi, L.L.C.*, 413 B.R. 370 (Bankr. S.D. Miss. 2009) ........................................................................................................................64

*In re Rothewell*, 159 B.R. 374 (Bankr. D. Mass. 1993)................................................63

*In re Saint Vincent's Catholic Med. Ctrs.*, 445 B.R. 264 (Bankr. S.D.N.Y. 2011) ........................................................................................................................63

*In re Sharp Int'l.Corp.*, 403 F.3d 43 (2d Cir. 2005) ....................................................46

*In re Sierra-Cal*, 210 B.R. 168 (Bankr. E.D. Cal. 1997) .............................................47

*In re Simetco, Inc.*, No. 93-61772, 1996 WL 651001 (Bankr. N.D. Ohio Feb. 15, 1996) .......................................................................................................72

*In re Southmark Corp.*, 138 B.R. 831 (Bankr. N.D. Tex. 1992), *aff'd*, 993 F.2d 117 (5th Cir. 1993) ......................................................................................51

*In re Sterling, Ahrens & Co.*, 4 Hughes 553, 1 F. 167 (D. Md. 1880).........................72

*In re Tri-Union Dev. Corp.*, 314 B.R. 611 (Bankr. S.D. Tex. 2004)...........................79

*In re Wedtech Corp.*, 87 B.R. 279 (Bankr. S.D.N.Y. 1988) ........................................79

*In re Wise Shoes, Inc.*, 2 F. Supp. 521 (S.D.N.Y. 1932), *aff'd*, 64 F.2d 1023 (2d Cir. 1933)...........................................................................................72

*John Matthews, Inc., v. Knickerbocker Trust Co.*, 192 F. 557 (2d Cir. 1911) ........................................................................................................................71

*Katchen v. Landy*, 382 U.S. 323 (1966).................................................................63, 64

*Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340 (3d Cir. 2002) ...............................................64

*Leighty v. Brunn*, 510 N.Y.S.2d 174 (App. Div. 1986) ....................................................................71

*LFD Operating, Inc. v. Ames Department Stores, Inc. (In re Ames Department Stores, Inc.)*, 274 B.R. 600 (Bankr. S.D.N.Y. 2002), *order aff'd sub. nom.*, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *judgment aff'd*, 144 F. App'x. 900, 2005 WL 1916360 (2d Cir. 2005)...................................................64

*Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585 (2d Cir. 1991) .........................................................................................................................................64

*Longacre Master Fund, Ltd. v. ATS Automation Tooling Sys. Inc.*, 456 B.R. 633 (S.D.N.Y. 2011), *vacated in part on other grounds*, No. 11-3413-cv, 2012 WL 4040176 (2d Cir. Sept. 14, 2012) ...........................................................46

*LTV Corp. v. Pension Benefit Guar. Corp. (In re Chateaugay Corp.)*, 115 B.R. 760 (Bankr. S.D.N.Y. 1990), *aff'd*, 130 B.R. 690 (S.D.N.Y. 1991) *vacated by agreement of the parties*, Nos. 89 Civ. 6012, 90 Civ. 6048 (KTD), 1993 WL 388809 (S.D.N.Y. Jun. 16, 1993) ......................................................73

*Manuel v. Allen (In re Allen)*, 217 B.R. 952 (Bankr. MD. Fla. 1998).........................................42

*Mazzeo v. U.S. (In re Mazzeo)*, 131 F.3d 295 (2d Cir. 1997) ........................................................80

*Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379 (2d Cir. 1997) ........................................................................................................................59, 60

*Mercantile Factors Corp. v. Warner Bros. Pictures, Inc.*, 214 N.Y.S. 273 (App. Div.), *aff'd*, 244 N.Y. 504 (1926) ..................................................................................71

*N.Y. Trust Co. v. Palmer*, 101 F.2d 1 (2d Cir. 1939) ....................................................................71

*Netjets Aviation, Inc. v. LHC Commc'ns., L.L.C.*, 537 F.3d 168 (2d Cir. 2008) ...............................................................................................................................................70

*Nisselson, v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390 (Bankr. S.D.N.Y. 2007).................................................................................46

*Nisselson, v. Softbank Am. Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007).............................................................................50, 51

*Norpak Corp. v. In re Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 131 F.3d 1185 (6th Cir. 1997) ................................................................................79

*Nw. Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139 (2d Cir. 2010)...............................................................................74, 75, 76

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732 (Bankr. D. Del. 2003)...............................................52

*Olympia & York Developments (Re)*, [1998] OJ No. 4903, 4 CBR (4th) 189 (Ont. Bktcy.) .....................................................................................77, 78

*Orr v. Kinderhill Corp.*, 991 F.2d 31 (2d Cir.1993) ...................................43

*Owners of Steamship Enterprises of Panama Inc v Owners of SS Ousel (The Liverpool No 2)* [1963] P 64 (CA) ..................................................77

*People v. E. Remington & Sons (In re Oneida Nat'l. Bank)*, 54 Hun. 480, 8 N.Y.S. 31 (4th Dep't 1889), *aff'd*, 121 N.Y. 675 (1890)..........................................71

*People v. Granite State Provident Ass'n*, 15 E.H. Smith 492, 161 N.Y. 492, 55 N.E. 1053 (Ct. App. N.Y. 1900) ................................................67

*Pepper v. Litton, 308 U.S. 295 (1939)* ....................................................49, 64

*PNC Capital Recovery v. Mech. Parking Sys., 726 N.Y.S.2d 394 (App. Div. 2001), dismissing leave to appeal, 96 N.Y.2d 937 (2001), appeal dismissed, 98 N.Y.2d 763 (2002)* .............................................................73

*Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282 (2d Cir. 2003) ........................61

*R.G. Grp. v. Horn & Hardart Co.*, 751 F.2d 69 (2d Cir. 1984).....................57

*Reprosystem, B.V. v. SCM, Corp.*, 727 F.2d 257 (2d Cir. 1984), *cert. denied*, 469 U.S. 828 (1984) ...............................................................56

*Saccurato v. Masters, Inc. (In re Masters, Inc.)*, 149 B.R. 289 (Bankr. E.D.N.Y. 1992) ...................................................................................62

*Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574 (2d Cir. 1983) ................46

*Sang Lan v. AOL Time Warner, Inc.*, No. 11 Civ. 2870 (LBS) (JCF), 2012 WL 1633907 (S.D.N.Y. May 9, 2012) ................................................70

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.)*, 379 B.R. 5 (Bankr. E.D.N.Y. 2007)...................................................................44

*Spradlin v. Williams (In re Alma Energy, L.L.C.)*, No. 10-80-ART, 2010 WL 4736905 (E.D. Ky. Nov. 16, 2010)...................................................64

*Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152 (E.D.N.Y. 2000) ...........42

*Union Bank v. Wolas*, 502 U.S. 151 (1991).................................................67

*Union Nat'l. Bank of Johnstown, P.A. v. People's Sav. & Trust Co., of Pittsburg, P.A.*, 28 F.2d 326 (3d Cir. 1928)..................................................71

*United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609 (7th Cir. 2005), *cert. denied*, 547 U.S. 1003 (2006)..................................................64

*Wickham Contracting Co. v. Bd. of Educ.*, 715 F.2d 21 (2d Cir. 1983) ......................71

*Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir. 1985)......................57

*Zarcone v. Perry*, 434 N.Y.S.2d 437 (App. Div. 1980), *aff'd*, 55 N.Y.2d. 782 (1981), *cert. denied*, 456 U.S. 979 (1982) ......................71

## **Federal Statutes**

11 U.S.C. § 101(2)(B) ..................................................51

11 U.S.C. § 101(31) ..................................................50, 51

11 U.S.C. § 101(54)(D)..................................................43

11 U.S.C. § 362(a)(3)..................................................61

11 U.S.C. § 363(b)..................................................59, 60

11 U.S.C. § 363(b)(1) ..................................................59

11 U.S.C. § 365..................................................81

11 U.S.C. § 502(b)..................................................63

11 U.S.C. § 502(b)(1) ..................................................67

11 U.S.C. § 502(b)(2)..................................................80

11 U.S.C. § 502(d) ..................................................2, 41, 42, 46, 47

11 U.S.C. § 502(e) ..................................................78, 79

11 U.S.C. § 502(e)(1)(B) ..................................................78, 79, 80

11 U.S.C. § 510(c)..................................................49

11 U.S.C. § 547..................................................45

11 U.S.C. § 547(b)..................................................45

11 U.S.C. § 548..................................................45

11 U.S.C. § 548(a)(1)(A) ...................................................................................46

11 U.S.C. § 548(a)(1)(B) ...............................................................................45, 46

11 U.S.C. § 549.................................................................................................42

11 U.S.C. § 550.................................................................................................46

11 U.S.C. § 550(a) ............................................................................................46

28 U.S.C. § 157(b)(2)(A).................................................................................63

28 U.S.C. § 157(b)(2)(B) .................................................................................63

## **Rules**

Fed. R. Bankr. P. 6001....................................................................................42

Fed. R. Bankr. P. 9019....................................................................................62

## **Foreign Statutes**

*Nova Scotia Interpretation Act,* RSNS 1989, c. 235, s. 9(5) ....................................69, 70

*Companies Act*, RSNS 1989, c. 81, s. 135.....................................7, 67, 68, 69, 70, 76, 77, 79, 80

## **Other Authorities**

5 Collier on Bankruptcy, ¶ 550.02[1] (16th Ed. 2011) ..............................................46

K.P. McGuiness, *Canadian Business Corporations Law,*
*2nd ed.*(Markham: LexisNexis Canada, 2007) ............................................................69

L.C.B. Gower, *Gower's Principles of Modern Company Law,*
*5th ed.* (London: Sweet & Maxwell, 1992) ...............................................................69

## INDEX OF FOREIGN LAW AUTHORITIES

**Index No.**     **Description**

1.         *Harbert v. Calpine Canada Energy Finance II ULC,* 2005 NSSC 211

2.         *Bank of Nova Scotia v. Janzen (Trustee of)* (1989), 90 NSR (2d) 67 (NSSC)

3.         *Companies Act*, RSNS 1989, c. 81, s. 135

4.         K.P. McGuiness, *Canadian Business Corporations Law, 2nd ed.* (Markham: LexisNexis Canada, 2007)

5.         L.C.B. *Gower, Gower's Principles of Modern Company Law, 5th ed.* (London: Sweet & Maxwell, 1992)

6.         *Olympia & York Developments (Re),* [1994] OJ No. 1335 (Ont. Bktcy.)

7.         *Antigonish (Town) v. Antigonish (County)*, 2006 NSCA 29

8.         *Nova Scotia Interpretation Act,* RSNS 1989, c. 235, s. 9(5)

9.         *Glen Express Ltd., Re* [2000] B.P.I.R. 456 (Ch D)

10.        *Owners of Steamship Enterprises of Panama Inc v Owners of SS Ousel (The Liverpool No 2)* [1963] P 64 (CA)

11.        *Olympia & York Developments (Re)*, [1998] OJ No. 4903, 4 CBR (4th) 189 (Ont. Bktcy.)

The Motors Liquidation Company GUC Trust (the "**GUC Trust**") respectfully submits this post-trial brief in connection with (i) *Official Committee of Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief* (Bankr. Dkt. No. 7859); and (ii) *Motors Liquidation Co. GUC Trust v. Appaloosa Investment Ltd. Partnership I, et al.*, Adv. Pro. No. 12-09802.

## PRELIMINARY STATEMENT

The capstone to the successful rescue of GM was this Court's order, in which the sale of assets to New GM[1] was approved.  In considering the sale, this Court recognized the urgent need to protect the public from what would otherwise be staggering injury:

> This case involves not just the ability of GM creditors to recover on their claims . . . it involves the interests of 225,000 employees (91,000 in the U.S. alone); an estimated 500,000 retirees; 6,000 dealers and 11,500 suppliers.  If GM were to have to liquidate, the injury to the public would be staggering.  This case likewise raises the specter of systemic failure throughout the North American auto industry, and grievous damage to all of the communities in which GM operates.

*In re Gen. Motors Corp.*, 409 B.R. 24, 33 (Bankr. S.D.N.Y. 2009).

What was not known to the Court at the time that it entered the Sale Order was that, even as many constituents were racing against the clock to avoid the systemic failure of the auto industry, a small group of hedge funds (with the cooperation of a handful of conflicted GM employees and advisors) were racing against the clock to achieve a different purpose:  their unjust enrichment at the expense of all other unsecured creditors of Old GM.

---

[1]    Capitalized terms used but not defined in this preliminary statement shall have the meanings ascribed to them in the continuation of this brief.

All references herein to "Pl. Ex." and "Def. Ex." refer to the GUC Trust's and Defendants' exhibits admitted into evidence in connection with the trial in the above-captioned proceedings.  All references herein to "Decl." refer to the direct testimony affidavits submitted in connection with the above-captioned proceedings.

For too long, through a combination of non-disclosures and half-disclosures, the implications of the deal struck by these hedge funds were unknown, and the deal went unchallenged. Now that the trial of this matter has finally exposed the deal to the light of day, this Court has an opportunity to redress the harm inflicted upon all other creditors by this small faction of overreaching creditors. Among other revelations, the trial has shown that:

- the $367 million postpetition payment to the Noteholders was funded by Old GM with cash that belonged to the Old GM estate as of the filing of the petition, due to the parties' failure to satisfy express conditions in the trust agreement that governed the funds at issue;

- knowing that the Lock-Up Agreement deal was inequitable and would be vulnerable to challenge, the Lock-Up Noteholders worked with certain GM employees in an unsuccessful effort to shield the settlement from scrutiny and attack;

- even this small group of extremely successful distressed investors had never before been involved in a deal in which they were paid 36% of the face amount of their notes as a "Consent Fee";

- no party ever sought this Court's approval of the Lock-Up Agreement, even though Old GM is a party and it was not completed until after Old GM filed its petition on the morning of June 1, 2009; and

- following execution of the Lock-Up Agreement, the hedge funds that orchestrated the deal continued to pull all the strings to the detriment of Old GM's other creditors by, among other acts, manipulating the timing of the GM Nova Scotia bankruptcy filing in Canada in an effort to insulate the Consent Fee from challenge in Canada, blocking the appointment of inspectors for the GM Nova Scotia bankruptcy estate, and cajoling New GM and their hand-picked Nova Scotia bankruptcy trustee into asserting an improper swap claim against Old GM.

This Court has at its disposal various remedies to redress the harm to Old GM's unsecured creditors caused by this group. For reasons explained herein, this Court should disallow the claim of the Nova Scotia Trustee and the claims of the Noteholders in their entirety under section 502(d) of the Bankruptcy Code, because the claimants received avoidable transfers that they have not returned to Old GM. *See* Argument Section I below. This relief comes closest to achieving fairness for Old GM's unsecured creditors, but even this result leaves the

2

Noteholders better off than any other creditor.  Through the $367 million Consent Fee, which represents approximately 36% of the face amount of the Notes, this select group of Noteholders has already obtained a cash recovery greater than the percentage recovery of any other unsecured creditor.  Thus, while disallowing all of the claims at issue in full comes closest to righting this wrong to the estate, it still leaves the Noteholders in a better position than their fellow unsecured creditors.

Alternatively, if this Court does not altogether disallow the claims, this Court should equitably subordinate the claim of the Nova Scotia Trustee and the claims tainted by those Noteholders who engaged in the inequitable conduct proven at trial and described in detail herein.  *See* Argument Section II below.

Finally, as a third alternative form of relief and for the reasons described below in Argument Sections III through VII, the Court should disallow the Nova Scotia Trustee's claim in its entirety and disallow the Guarantee Claims, except for that portion of the Guarantee Claims that corresponds to the principal amount due on the Notes minus the Consent Fee, which should properly be considered as a payment against the principal amount of the Notes.  This third alternative form of relief translates into approximately $700 million in allowed claims, instead of the more than $2.67 billion in disputed claims currently asserted by, or for the benefit of, the Noteholders.

## FACTUAL BACKGROUND

## I.    OLD GM'S NEGOTIATIONS WITH THE LOCK-UP NOTEHOLDERS

### A.    Old GM Struggles To Reach A Settlement With The Lock-Up Noteholders

On the afternoon of Sunday, May 31, 2009, less than twenty-four hours before General Motors Corporation ("**Old GM**") filed its historic bankruptcy case (the "**Bankruptcy Case**") at 7:57 a.m. on June 1, 2009 (the "**Petition Date**"), a group of hedge funds (funds managed by

Appaloosa, Fortress, Elliott and Aurelius, collectively, the "**Lock-Up Noteholders**") gathered

with representatives of Old GM at the New York offices of Old GM's counsel, Weil, Gotshal &

Manges LLP ("**Weil Gotshal**").[2]  The purpose of this meeting was to negotiate and document a

settlement of the Lock-Up Noteholders' claims relating to two series of notes (the "**Notes**")

issued on July 10, 2003 by Old GM's wholly-owned subsidiary, General Motors Nova Scotia

Finance Company ("**GM Nova Scotia**") and guaranteed by Old GM.[3]  If Old GM failed to

negotiate a resolution with the Lock-Up Noteholders, it planned to file a Canadian insolvency

proceeding on the morning of June 1 for Old GM's wholly-owned subsidiary, General Motors of

Canada Limited ("**GM Canada**"), the entity to which GM Nova Scotia had loaned all the

proceeds of the Notes pursuant to two intercompany loan agreements (the "**Intercompany**

**Loans**").[4]

     In anticipation of a settlement with the Lock-Up Noteholders, Old GM, on Friday, May

29, 2009, the last business day before Old GM's bankruptcy filing, initiated a transfer of $450

million to GM Canada (the "**$450 Million Loan**").[5]  These funds were moved out of Old GM's

account in anticipation of Old GM's bankruptcy filing, even though there was no deal among the

parties as of May 29, 2009 and the amount of any settlement payment had not yet been agreed.[6]

Old GM and GM Canada documented this transfer by a promissory note dated May 29, 2009

(the "**Promissory Note**") and a trust agreement, dated May 29, 2009 (the "**Trust Agreement**"),

which provided that the funds could only be used to settle the Intercompany Loans and exchange

---

[2]    Joint Pretrial Submission, dated August 3, 2012, Section A, Statement of Uncontested Facts
("**Statement of Uncontested Facts**"), ¶¶ 28, 59.

[3]    *Id*. at ¶¶ 1, 2, 18.

[4]    *Id*. at ¶¶ 4, 6; Ammann Decl., ¶¶ 9, 23.

[5]    *See* Statement of Uncontested Facts, ¶ 36; Trial Tr. (8/9/2012), 69:15-17 (Buonomo).

[6]    Trial Tr. (8/9/2012), 69:15-70:7 (Buonomo).

the Notes into cash.[7]

With the funds transfer initiated, Weil Gotshal circulated a draft of an agreement in the early morning of Sunday, May 31, 2009,[8] outlining the terms of a potential settlement as the parties understood it at the time.[9]  Greenberg Traurig LLP ("**Greenberg Traurig**"), counsel for the Lock-Up Noteholders, circulated its revisions to Weil Gotshal's draft in the afternoon of May 31, 2009.[10]  In the words of Lawrence Buonomo, the Old GM in-house attorney leading the negotiations, the drafts were like "ships passing in the night in virtually every respect."[11]  The Greenberg Traurig draft contemplated adding Old GM, GM Canada and other GM entities as parties to the settlement, whereas Old GM's proposal included only one GM party – GM Nova Scotia, the issuer of the Notes.[12]  Further, the Old GM proposal required extinguishment of the Notes, whereas the Greenberg Traurig proposal left the Notes outstanding.[13]  Given the vast differences between the two drafts, when the parties met in the afternoon of May 31, 2009, it was clear that they faced an uphill battle to complete an agreement before Old GM filed for bankruptcy first thing in the morning on Monday, June 1, 2009.

---

[7]    Statement of Uncontested Facts, ¶ 37; Buonomo Decl., ¶ 44; Pl. Ex. 144 (steps list); Pl. Ex. 134, ¶ C (NGM000000602).

[8]    Statement of Uncontested Facts, ¶ 29; Truong Decl., ¶ 50; Gropper Decl., ¶ 65; Trial Tr. (8/8/2012), 48:23-49:5 (Zirinsky).  *See also* Pl. Ex. 7 (email from A. Woodworth to B. Truong, D. Gropper, D. Prieto, and others, dated May 31, 2009, attaching draft of Lock-Up Agreement); Trial Tr. (8/8/2012), 64-65 (Zirinsky) (explaining that certain documents as printed out reflect Central time as opposed to Eastern time); Def. Ex. 148 (email chain, dated May 31, 2009, showing 1:45 a.m. transmittal email for initial draft of Lock-Up Agreement).

[9]    *See* Bolin Decl., ¶ 44.

[10]    *See* Pl. Ex. 11 (email from A. Marsico, dated May 29, 2009, attaching revised Lock-Up Agreement).  *See also* Trial Tr. (8/8/2012), 66:19-25 (Zirinsky).

[11]    Trial Tr. (8/9/2012), 226:3-13 (Buonomo).

[12]    *Compare* Pl. Ex. 7 at AUR_GM025054, 62 (Weil draft) *and* Pl. Ex. 11 at ELL_GM001288, 1301 (Greenberg draft).  *See also* Trial Tr. (8/8/2012), 67:1-7 (Zirinsky).

[13]    *Compare* Pl. Ex. 7, ¶ 5 (AUR_GM025057-58) (Weil draft) (includes "full and final release" provision) *and* Pl. Ex. 11, ¶ 5 (ELL_GM001295) (Greenberg Traurig draft) (deletes "full and final release" provision).  *See also* Trial Tr. (8/8/2012), 67:14-23 (Zirinsky).

Faced with a deadline, the parties worked through the afternoon and then through the night, going through many versions of the Lock-Up Agreement, in order to finalize a deal.[14]  On the morning of June 1, 2009, more than an hour after Old GM's bankruptcy petition was filed, the parties finalized the Lock-Up Agreement.[15]

### B.    The Terms Of The Lock-Up Agreement Richly Rewarded The Lock-Up Noteholders, Who Collectively Held Over 2/3 Of The Notes

The Lock-Up Agreement provided that the holders of the Notes ("**Noteholders**") would receive, postpetition, a "consent fee" of approximately $367 million in cash (the "**Consent Fee**").[16]  This Consent Fee equaled approximately 36% of the face amount of the Notes.[17]  According to Old GM's Controller's office, this Consent Fee "effectively represent[ed] an actual return on the bondholders' investment,"[18] and Old GM personnel initially understood the Consent Fee to be a settlement of GM Nova Scotia's obligations to the Noteholders.[19]  Yet, under the terms of the Lock-Up Agreement, payment of the Consent Fee did not reduce the principal amount of the Notes by a single dollar.[20]  This Consent Fee was ultimately paid to the Noteholders on June 26, 2009 *pro rata* on the basis of their holdings, regardless of whether a

---

[14]    Statement of Uncontested Facts, ¶¶ 12, 18-28; Truong Decl., ¶¶ 42-48; Gropper Decl., ¶¶ 33-47; Bolin Decl., ¶¶ 32-45; Ammann Decl., ¶ 19-21; Trial Tr. (8/8/2012), 18:4-24:15, 33:1-10 (Zirinsky); Trial Tr. (8/9/2012), 46:16-47:1 (Buonomo); Trial Tr. (9/28/2012), 57:24-11 (Gropper).  *See generally* Pl. Ex. 3 at AUR_GM021446-4517 (Prieto Notebook).

[15]    *See* Factual Background Section III(A).

[16]    Pl. Ex. 16, ¶ 2 (WGM00000795) (executed copy of the Lock-Up Agreement), A-4 (WGM00000816) (extraordinary resolution).  *See also* Cederholm Decl., ¶ 56(A); Buonomo Decl., ¶ 49.

[17]    *See* Gropper Decl., ¶ 52; Pl. Ex. 607 at FOR_GM002643 (email from L. Cowen to B. Truong, May 30, 2009).  *See also* Pl. Ex. 16 (executed copy of the Lock-Up Agreement), ¶ 2 (WGM00000795), A-4 (WGM00000816) (extraordinary resolution).

[18]    Pl. Ex. 152 at NGM000017558 (email from NYTO Controller's Group to file, dated July 8, 2009).

[19]    Pl. Ex. 439 at NGM000030547.

[20]    *See* Pl. Ex. 16, ¶ 6(iv) (WGM0000800); Pl. Ex. 152 at NGM000017558.

6

particular Noteholder gave its consent.[21]  Although the Consent Fee was nominally paid by GM

Nova Scotia with funds it received from GM Canada in settlement of the Intercompany Loans,

such funds can, with absolute certainty, be traced back to Old GM's transfer of the $450 Million

Loan to GM Canada that was earmarked for this purpose.[22]

In addition to the $367 million Consent Fee, the Lock-Up Agreement provided that Old

GM would support allowed claims in its Bankruptcy Case for the benefit of the Noteholders of

over two-and-a-half times the face amount of the Notes.[23]  First, the Lock-Up Agreement

compelled Old GM to support allowed claims in its Bankruptcy Case for the full amount of the

Notes based on Old GM's guarantee of the Notes without any deduction for the Consent Fee (the

"**Guarantee Claims**").[24]  Second, the Lock-Up Agreement required Old GM, as sole shareholder

of GM Nova Scotia, to deliver its consent to an involuntary bankruptcy filing against GM Nova

Scotia, an unlimited liability company organized under the Nova Scotia Companies Act (the

"**Companies Act**").[25]  This consent was to be given for the sole purpose of permitting the Lock-

Up Noteholders to manufacture a claim under section 135 of the Companies Act, which requires

that Old GM, as GM Nova Scotia's sole shareholder, contribute to the assets of GM Nova Scotia

in an amount sufficient for payment of its debts and liabilities in the event of GM Nova Scotia's

winding up.[26]  In furtherance of this scheme and despite the fact that the Notes are subject to a

separate contractual guarantee, the Lock-Up Agreement required that Old GM support the

allowance in its Bankruptcy Case of a claim under section 135 of the Companies Act (the "**Nova**

---

[21]      Statement of Uncontested Facts, ¶¶ 33, 74.

[22]      *See* Pl. Ex. 16, ¶ 2 (WGM0000795); Pl. Ex. 144 at CC000135 (steps list); Pl. Ex. 277 (settlement
agreement between GM Nova Scotia and GM Canada); Buonomo Decl., ¶¶ 43, 44.

[23]      *Id.* at ¶ 6 (WGM00000799-800).

[24]      *Id.* at ¶¶ 6(a), (b)(ii).

[25]      *Id.* at ¶¶ 6(a), (b)(i); Statement of Uncontested Facts, ¶ 1.

[26]      *See* Companies Act, R.S.N.S., c. 81, s. 135.

Scotia Trustee Claim," and together with the Guarantee Claims, the "**Disputed Claims**" ).[27]

This claim was to include the full amount of the Notes plus the amounts purported to be due

under currency swaps (the "**Swaps**") entered into by Old GM and GM Nova Scotia when the

Notes were issued.[28]  Third, the Lock-Up Noteholders extracted an agreement from Old GM that

any amounts due on account of the Swaps would be subordinated in full to payment of the Notes

if any portion of the Nova Scotia Trustee Claim was disallowed in the Old GM Bankruptcy

Case.[29]

The cumulative effect of the Lock-Up Agreement is that, in addition to a cash payment of

approximately 36 cents per dollar outstanding on the Notes,[30] the Noteholders were permitted to

assert claims in the Old GM Bankruptcy Case exceeding two-and-a-half times the face amount of

the Notes.[31]  Because the Lock-Up Noteholders held over 2/3 of each series of the Notes,[32] most

of the Lock-Up Agreement benefits flowed to the Lock-Up Noteholders.

> ### C.    The Lock-Up Noteholders Achieved The Settlement By Manipulating Old GM's Prepetition Restructuring Efforts And Exploiting Old GM's Need To Restructure GM Canada

For the Lock-Up Noteholders, this extraordinary settlement was the culmination of a

series of actions they took in the weeks and months preceding the Old GM bankruptcy filing.

All Lock-Up Noteholders, with the exception of Fortress, began acquiring Notes in mid- to late

---

[27]    Pl. Ex. 16, ¶¶ 6(a), (b)(iii) (WGM00000799-800).

[28]    *Id.* at ¶¶ 6(a), (b)(iii).

[29]    *Id.* at ¶¶ 6(a), (b)(v).

[30]    Gropper Decl., ¶ 52; Trial Tr. (9/20/2012), 24:5-16 (Truong); Pl. Ex. 605 at FOR_GM002652-53 (email from B. Truong to P. Briger and others, dated May 30, 2009).

[31]    Trial Tr. (9/20/2012), 21:19-22:8, 25:4-16 (Truong) (Fortress' claim under the Lock-Up Agreement will be 2.25 times assuming the Nova Scotia Trustee Claim is allowed in full); Pl. Ex. 175 at FOR_GM002639 (email from B. Truong to P. Briger and others, dated May 30, 2009); Pl. Ex. 605 at FOR_GM002652-53 (email from B. Truong to P. Briger and others, dated May 30, 2009).

[32]    Ammann Decl., ¶ 22; Trial Tr. (8/9/2012), 41:13-17 (Buonomo).

2008,[33] near the time it became apparent that the automotive industry was in dire financial

difficulty,[34] and the Lock-Up Noteholders began positioning themselves to obtain maximum

leverage in their negotiations with Old GM.

In early 2009, certain creditors of Old GM formed an ad hoc committee (the "**Ad Hoc**

**Committee**") to pursue an out-of-court restructuring of Old GM's debts.[35]  Elliott and Fortress

were members of the steering committee (the "**Steering Committee**") for the Ad Hoc

Committee.[36]  From the outset, however, Bao Truong, the primary analyst responsible for

Fortress' investment in the Notes,[37] tried to rally the Steering Committee members to push for a

chapter 11 filing,[38] while positioning his fund to maximize its profit from such a filing.  Both

Fortress and Elliott held credit default swaps ("**CDS**") referencing Old GM, which insured the

holder of the CDS against an Old GM bankruptcy filing.  As holders of such CDS, Elliott and

Fortress received payment when Old GM filed its Bankruptcy Case.[39]  Neither Fortress nor

Elliott disclosed their CDS holdings in any public way; nor did they disclose their CDS holdings

in any of the Rule 2019 statements that their counsel, Greenberg Traurig, filed in the Old GM

Bankruptcy Case.[40]

---

[33]     *See* Cederholm Decl., ¶ 9 (Elliott initially purchased Notes in Sept. 2008); Bolin Decl., ¶ 9 (Appaloosa first purchased Notes on Oct. 16, 2008); Gropper Decl., ¶ 14 (Aurelius began acquiring Notes on June 24, 2008); Trial Tr. (9/20/2012), 13:9-15 (Truong) (Fortress first purchased Notes in 2006).

[34]     Def. Ex. 75 at NGM000007371 (form S-4 filed on April 27, 2009) (describing market conditions in the automotive industry and Old GM's restructuring efforts in 2008).

[35]     Statement of Uncontested Facts, ¶ 9.

[36]     *Id.*; Cederholm Decl., ¶ 16; Truong Decl., ¶ 24.

[37]     Truong Decl., ¶ 6.

[38]     Pl. Ex. 166 (email from B. Truong to M. Breckenridge, dated Jan. 22, 2009); Trial Tr. (9/20/2012), 71:4-72:12 (Truong).

[39]     Trial Tr. (9/20/2012), 15:18-16:1; 16:21-23, 79:9-12 (Truong); Trial Tr. (9/6/2012), 20:22-21:5; 21:12-20 (Cederholm).

[40]     Pl. Exs. 38, 53, 386, 387 (Greenberg Traurig's Rule 2019 statements); Trial Tr. (9/6/2012), 20:6-11, 21-23 (Cederholm); Trial Tr. (9/20/2012), 18:7-11 (Truong).  Bruce Zirinsky of Greenberg Traurig

Footnote continued on next page

9

On March 2, 2009, while the Ad Hoc Committee was active, Aurelius, Fortress and Appaloosa, as a group, commenced an action (the "**Oppression Action**") in the Supreme Court of Nova Scotia against Old GM, GM Nova Scotia, GM Canada and certain of their officers and directors, among others, claiming that two transfers in May 2008 from GM Nova Scotia to Old GM in the amount of $500,000 and CAD $16,000,000 (the "**May 2008 Transfers**") impaired the Noteholders' ability to recover on the Notes and, therefore, were oppressive under Canadian law.[41] This lawsuit – asserting a remedy that Elliott described as the "last refuge of scoundrels" that would permit a judge to "fashion remedies out of whole cloth"[42] – was meritless from the start.

At the time these Noteholders brought the Oppression Action, GM Nova Scotia had not missed any payments on the Notes.[43] Further, none of the Noteholders would have had any expectation that any funds would remain in GM Nova Scotia, as the offering circular for the Notes made clear that GM Nova Scotia existed solely as a financing vehicle for Old GM and its affiliates and that all the proceeds of the Notes would be provided, directly or indirectly, to Old GM.[44] In addition, the May 2008 Transfers were publicly disclosed in a special resolution filed with the Nova Scotia Office of Registrar of Joint Stock Companies in May 2008,[45] before

---

Footnote continued from previous page

readily admitted that his clients may have held securities other than those listed in the Rule 2019 statements. Trial Tr. (8/8/2012), 126:17-21 (Zirinsky). Elliott conceded that it held other securities not disclosed in Greenberg Traurig's Rule 2019 statements. Trial Tr. (9/6/2012), 20:18-21 (Cederholm).

[41]    Statement of Undisputed Facts, ¶ 11; Truong Decl., ¶¶ 28, 32; Bolin Decl., ¶¶ 10, 19; Pl. Ex. 382 at NGM000005440-41.

[42]    Pl. Ex. 54 at ELL_GM002484 (email from D. Miller of Elliott to D. Cederholm, dated Jan. 16, 2009).

[43]    Trial Tr. (9/27/2012), 27:13-16 (Bolin).

[44]    Def. Ex. 14 at 23 (NGM000012074), 26 (NGM000012077) (offering circular).

[45]    Trial Tr. (9/20/2012), 131:20-132:1 (Truong); Pl. Ex. 633, ¶¶ 23-25 (FOR_GM03955-56) (Gropper Affidavit filed in the Oppression Action).

Aurelius and Appaloosa purchased any Notes.[46]  Tellingly, Appaloosa, which claimed to have learned of the May 2008 Transfers in late October 2008 and claimed to be "oppressed" by the transfers, then went on to more than triple its holdings of the Notes in December 2008.[47]

While Aurelius, Fortress and Appaloosa continued to prosecute the Oppression Action, Old GM launched a public out-of-court exchange offer on April 27, 2009 for approximately $27.2 billion of its debts, including the Notes, in exchange for Old GM common stock (the "**Bond Exchange Offer**").[48]  Each of the Lock-Up Noteholders rejected the Bond Exchange Offer,[49] with Truong concluding that the Noteholders would never accept it.[50]  The Bond Exchange Offer expired on Tuesday, May 26, 2009, without achieving the required threshold for acceptances.[51]

With the failure of the Bond Exchange Offer, Old GM anticipated filing its Bankruptcy Case on the morning of June 1, 2009.[52]  If Old GM could not settle with the Noteholders, then Old GM planned to file an insolvency proceeding for GM Canada on June 1, 2009 simultaneous with Old GM's bankruptcy filing, in order to protect GM Canada from Noteholder-driven claims seeking to collect on the Intercompany Loans.[53]  Old GM also planned that the cornerstone of its

---

[46]     Bolin Decl., ¶ 9 (Appaloosa first purchased Notes on Oct. 16, 2008); Gropper Decl., ¶ 14 (Aurelius began acquiring Notes on June 24, 2008).

[47]     At the time that Bolin allegedly learned of the transfers, Appaloosa held £35 million of Notes. Trial Tr. (9/27/2012), 32:23-33:1 (Bolin); Bolin Decl., ¶ 9.  Appaloosa then purchased an additional £116 million of Notes in December 2008.  Trial Tr. (9/27/2012), 33:2-18 (Bolin); Bolin Decl., ¶ 11.

[48]     *See, e.g.,* Pl. Exs. 87, 382, 452-459, 511 (pleadings filed in the Oppression Action in May 2009); Statement of Uncontested Facts, ¶ 13.

[49]     Truong Decl., ¶ 38 (Fortress rejected); Bolin Decl., ¶ 29 (Appaloosa rejected); Cederholm Decl., ¶ 30 (Elliott rejected); Gropper Decl., ¶ 31 (Aurelius rejected).

[50]     Pl. Ex. 190 at FOR_GM001136 (Bloomberg chat between B. Truong and M. Chung of Arrowgrass on April 27, 2009); Trial Tr. (9/20/2012), 75:3-79:2 (Truong).

[51]     Statement of Uncontested Facts, ¶ 17.

[52]     Def. Ex. 75 at NGM000007359 (form S-4 filed on April 27, 2009).

[53]     Buonomo Decl., ¶ 16.

Bankruptcy Case would be a quick sale under section 363 of the Bankruptcy Code (the "**363 Sale**") of substantially all of its assets to a newly formed entity, General Motors LLC ("**New GM**").[54]  Appaloosa, Fortress and Aurelius were aware of this objective and formulated a plan to object to the 363 Sale if they did not reach a deal with Old GM.[55]  It was against this backdrop that the Lock-Up Agreement was negotiated.

## II.    THE LOCK-UP AGREEMENT

### A.    The Terms Of The Lock-Up Agreement Were Not Reasonable

The parties to the Lock-Up Agreement recognized that the Noteholders received a disproportionately rich deal.[56]  Buonomo, who along with Daniel Ammann, then of Morgan Stanley & Co., negotiated the agreement on behalf of the GM entities, knew that there would be objections down the road from Old GM's creditors.[57]  Dennis Prieto, an analyst for Aurelius and a participant in the Lock-Up negotiations, noted that that they "do not want to give GM US creditors more reasons to object."[58]  The parties, therefore, took care to structure the settlement in a way that they believed would not be subject to attack.[59]

---

[54]     Buonomo Decl., ¶ 3; Ammann Decl., ¶ 8.

[55]     Trial Tr. (9/20/2012), 73:24-74:24 (Truong) (Appaloosa, Fortress, and Aurelius discussed this option with a public relations firm and would have engaged the firm to oppose the sale if a settlement had not been reached).  *See also* Pl. Ex. 607 at FOR_GM002644-45 (email chain between P. Briger and B. Truong and others, dated May 30, 2009).

[56]     The Lock-Up Noteholders themselves boasted about the remarkable deal they received.  *See* Trial Tr. (10/3/2012), 150:10-15, 169:3-11 (Mayer) (Dan Gropper of Aurelius called Tom Mayer, counsel for the Official Committee of Unsecured Creditors (the "**Committee**"), weeks after the 363 Sale and bragged about what a great deal he received);  Pl. Ex. 178 at FOR_GM002977 (email from B. Truong of Fortress to M. Chung of Arrowgrass, on June 1, 2009, commenting "[y]our net recovery is higher than the US government's!");  Pl. Ex. 174 (email from B. Truong commenting "[t]his is a good deal.");  Pl. Ex. 179 at FOR_GM002982-83 (email chain between B. Truong and R. Pacholder of Sandell Management, dated June 1, 2009, in which Pacholder calls Truong a "rock star" for securing the deal and Truong replies ". . . I am pretty pleased with the negotiated outcome – esp. vis-à-vis other GM creditors . . .").

[57]     Trial Tr. (8/10/2012), 113:6-12 (Buonomo).

[58]     Pl. Ex. 3 at AUR_GM021453 (Prieto notebook).

[59]     *See* Pl. Ex. 3 at AUR_GM021457.

### B.    The Lock-Up Agreement Was Tainted By Conflicts On The Part Of Those Responsible For Acting On Behalf Of Old GM

At the time Old GM entered into the Lock-Up Agreement, the individuals who negotiated the settlement on Old GM's behalf expected that they would transition to New GM at the close of the sale.[60]  As expected, both Buonomo and Maurita Sutedja of Old GM did transition to New GM immediately after the sale.[61]  After Morgan Stanley, Ammann, Old GM's outside financial advisor, joined New GM as its Treasurer and now serves as its Chief Financial Officer.[62]  The trial testimony demonstrates that the parties who negotiated the Lock-Up Agreement were tainted with self-interest and did not clearly separate and protect Old GM's interests.  Asked who he was working for when he negotiated this transaction, Buonomo replied, "[i]t's very hard for me to bifurcate myself and say it's one or the other.  We certainly knew, as we're negotiating this, that we were going to be on the other side of it when it was over.  It was a very complicated exercise from that perspective."[63]  Buonomo also acknowledged that Old GM's analysis of what would have been a reasonable settlement with the Noteholders was thought of as analyzing what it would be worth to *New GM* to avoid a GM Canada bankruptcy.[64]  Sutedja testified that they viewed the GM entities as an "enterprise" and did not differentiate their work among the various GM entities.[65]

---

[60]    *See, e.g.*, Trial Tr. (8/9/2012), 24:25-25:3 (Buonomo); M. Sutedja Depo. Tr. (5/31/2012), 10:3-2.

[61]    M. Sutedja Depo. Tr. (5/31/2012) (admitted by designation), 10:14-16; Trial Tr. (8/9/2012), 24:25-25:5 (Buonomo).

[62]    *See* Trial Tr. (9/27/2012), 178:5-8 (Ammann); Ammann Decl., ¶ 1.

[63]    Trial Tr. (8/10/2012), 36:3-8 (Buonomo).

[64]    *Id.* at 24:19-24.

[65]    M. Sutedja Depo. Tr. (5/31/2012) 112:4-5, 8-13.

13

### 1.    The Consent Fee Alone Exceeded Old GM's Analysis Of What It Should Pay To Avoid A GM Canada Bankruptcy Filing

The amount of the Consent Fee far exceeded Old GM's own analysis of what would be a reasonable settlement with the Noteholders.  In the weeks preceding the May 31 meeting, Old GM did a series of analyses (the "**Indifference Analyses**") to ascertain a reasonable amount for Old GM to pay to settle the Noteholders' claims and avoid a GM Canada bankruptcy filing.[66] These Indifference Analyses reflect the only effort by Old GM to quantify a reasonable settlement with the Noteholders.[67]  According to Ammann, Old GM made no other requests for analysis and there was, to his recollection, no written analysis of any of the qualitative judgments relevant to a GM Canada bankruptcy filing.[68]

Although there were multiple iterations of the Indifference Analyses, all versions showed that the "indifference point" – that is, the point at which Old GM, considering the transaction costs, tax implications and business impact of a GM Canada bankruptcy filing, would be indifferent as between filing bankruptcy for GM Canada and settling with the Noteholders[69] – was no more than $285 million in exchange for cancellation of the Notes.[70]  The Consent Fee alone exceeded the indifference point by over $82 million and was in exchange for a settlement that not only did not cancel the Notes, but provided for allowance of claims equal to more than two-and-a-half times the face amount of the Notes.

---

[66]    Pl. Exs. 126, 130, 211.

[67]    Trial Tr. (8/10/2012), 108:25-109:7 (Buonomo); Trial Tr. (9/27/2012), 76:1-77:19, 79:25-80:5, 80:13-15, 83:22-84:1, 102:5-8 (Ammann).

[68]    Trial Tr. (9/27/2012), 80:6-9, 169:15-25 (Ammann).

[69]    Trial Tr. (8/9/2012), 23:18-24:9 (Buonomo).

[70]    *See* Trial Tr. (9/27/2012), 96:18-21 (Ammann).  A $285 million payment represented a 178% premium to market on the Notes.  *See, e.g.*, Pl. Ex. 211 at 2 (email from D. Ammann dated May 18, 2009).

14

## 2.    The Consent Fee Is Many Orders Of Magnitude Greater Than Any Commercially Reasonable Consent Fee

The Consent Fee was outsized compared to consent fees paid in other distressed situations.  As Didric Cederholm of Elliott testified, although consent fees in distressed situations are typically somewhat higher than in non-distressed situations, consent fees in distressed scenarios are typically in the 2-3% range.[71]  In this case, the Consent Fee was approximately 36% of the face amount of the Notes.[72]  Prior to this deal, the largest consent fee with which Cederholm ever had experience was 8%, and Elliott had never been paid a consent fee on the order of magnitude of what it received under the Lock-Up Agreement.[73]

## 3.    The Noteholders Released A Claim That Would Have Been Worthless In Exchange For The Lock-Up Agreement Benefits

In exchange for the Consent Fee and Old GM's other concessions under the Lock-Up Agreement, the Noteholders agreed to release all of their purported claims relating to the Intercompany Loans.[74]  However, in releasing these claims, the Noteholders agreed to release claims belonging to GM Nova Scotia that were essentially worthless.  The Lock-Up Noteholders were made aware during Lock-Up Agreement negotiations that GM Canada would file for bankruptcy if the parties could not reach a settlement, and that in the event of a GM Canada bankruptcy, the Intercompany Loans would be worth nothing.[75]  GM Nova Scotia's only

---

[71]    Trial Tr. (9/6/2012), 28:21-29:1, 111:21-25 (Cederholm).

[72]    *See* Gropper Decl., ¶ 52; Pl. Ex. 607 at FOR_GM002643 (email from L. Cowen to B. Truong, dated May 30, 2009).  *See also* Pl. Ex. 16, ¶ 2 (executed copy of the Lock-Up Agreement) (WGM00000795), A-4 (extraordinary resolution).

[73]    Trial Tr. (9/6/2012), 31:9-14, 126:19-23 (Cederholm).

[74]    Pl. Ex. 16, ¶ 5(b) (WGM00000798).

[75]    Trial Tr. (8/9/2012), 44:24-45:1 (Buonomo); Trial Tr. (8/8/2012), 20:5-13 (Zirinsky); Trial Tr. (9/27/2012), 103:18-104:6 (Ammann); Pl. Ex. 124 (email from D. Ammann to R. Young, dated May 16, 2009); Pl. Ex. 3 at AUR_GM021446-47, 51 (Prieto notebook).

significant assets were the Intercompany Loans;[76] thus, the Noteholders' recovery depended

entirely on the extent to which GM Nova Scotia could recover on the Intercompany Loans.[77]

Indeed, all of Old GM's analyses produced in litigation show that in the event of a GM Canada

bankruptcy, the recovery on the Intercompany Loans would be zero.[78]  The settlement under the

Lock-Up Agreement therefore allowed the Noteholders to release worthless claims and, in

exchange, enrich themselves at the expense of the Old GM estate.

## III.    THE LOCK-UP AGREEMENT IS A POSTPETITION AGREEMENT FOR WHICH COURT APPROVAL WAS REQUIRED BUT NEVER SOUGHT OR OBTAINED

### A.    The Lock-Up Agreement Was Finalized Postpetition

All parties to the Lock-Up Agreement always intended that any settlement would require

a written agreement.[79]  In connection with the Lock-Up Agreement negotiations, each Lock-Up

Noteholder, Old GM and GM Nova Scotia signed a Non-Disclosure Agreement (the "**NDA**") on

or before May 31, 2009.[80]  This NDA was negotiated by Weil Gotshal and Greenberg Traurig[81]

and provided explicitly that the parties would not be bound to any agreement unless and until

there was a "definitive" agreement.[82]  Each draft of the Lock-Up Agreement and the final,

---

[76]    Trial Tr. (9/27/2012), 104:17-21, 106:5-7 (Ammann); Trial Tr. (8/9/2012), 34:7-18 (Buonomo).

[77]    *See* Trial Tr. (9/27/2012), 105:24-106:4 (Ammann).

[78]    Trial Tr. (8/9/2012), 34:3-6, 36:12-37:3 (Buonomo); Trial Tr. (9/27/2012), 106:22-107:5 (Ammann).  *See also* Pl. Ex. 121 (email from J. Holy at GM to D. Ammann and others, dated Feb. 22, 2009, attaching analysis of projected recovery on Intercompany Loans under various scenarios); Pl. Ex. 215 at NGM00013190 (email from J. Holy to M. Sutedja, dated May 18, 2009).

[79]    *See, e.g.,* Trial Tr. (9/6/2012), 64:18-22 (Cederholm); Trial Tr. (9/28/2012), 57:16-19 (Gropper); Trial Tr. (8/9/2012), 50:16-21 (Buonomo); Trial Tr. (8/8/2012), 17:17-18:3 (Zirinsky).

[80]    Statement of Uncontested Facts, ¶ 22; Bolin Decl., ¶ 36 (Appaloosa signed the NDA); Gropper Decl., ¶ 37 (the Noteholders executed the NDA); Trial Tr. (8/9/2012), 43:1-4 (Buonomo) (all four funds signed the NDA).

[81]    Gropper Decl., ¶ 36.

[82]    Pl. Ex. 256, ¶ 11 (ELL_GM000243) (copy of NDA executed by Elliott) ("The Recipient agrees that unless and until the Parties have entered into a definitive agreement with respect to the Transaction, neither the Company nor GM will be under any legal obligation of any kind whatsoever with respect to

Footnote continued on next page

16

executed copy of the Lock-Up Agreement contained (i) identical clauses providing that the written agreement supersedes all prior negotiations, and (ii) a clause providing that the agreement shall not become effective unless signature pages have been executed and delivered by each counterparty.[83]  The only written agreement between the parties is the Lock-Up Agreement.[84]  Thus, to be a valid prepetition agreement, the Lock-Up Agreement had to have been finalized and all signatures released prior to the time Old GM filed its Bankruptcy Case.

Not surprisingly, the parties to the Lock-Up Agreement insist that it was completed at some point before the petition was filed.  Critically, however, the testimony of those parties as to exactly when on June 1, 2009 the agreement was completed is inconsistent.[85]  And even more importantly, none of the parties has ever produced the copy of the Lock-Up Agreement that they contend was the final, executed agreement that existed prior to Old GM's bankruptcy filing.  All parties instead agree that the final, executed copy of the Lock-Up Agreement is the version circulated by Weil Gotshal at 10:37 a.m. on June 1, 2009 (the "**10:37 Version**").[86]  The forensic evidence, which is the only objective evidence on the timing of the Lock-Up Agreement,

---

Footnote continued from previous page

such a transaction by virtue of this or any written or oral expression with respect to such a transaction by any of the Company's or GM's respective directors, officers, employees, agents or any other representatives or their respective advisors or representatives thereof.").

[83]    *See* Pl. Ex. 289, ¶¶ 10, 20 (version 16 of the Lock-Up Agreement); Pl. Ex. 290, ¶¶ 10, 20 (version 17 of the Lock-Up Agreement); Pl. Ex. 291, ¶¶ 10, 20 (version 18 of the Lock-Up Agreement); Pl. Ex. 292, ¶¶ 10, 20 (version 19 of the Lock-Up Agreement); Pl. Ex. 293, ¶¶ 10, 20 (version 20 of the Lock-Up Agreement); Pl. Ex. 16, ¶¶ 10, 20 (final, executed copy of the Lock-Up Agreement).

[84]    Trial Tr. (9/28/2012), 58:12-18 (Gropper).

[85]    *Compare, e.g.,* Cederholm Decl., ¶ 45 (there was an agreement on all substantive terms by 2:00 a.m.) *with* Trial Tr. (9/27/2012), 141:4-12 (Ammann) (agreement was reached around 6:00 a.m.) *with* Bolin Decl., ¶ 50 (agreement was reached at approximately 7:00 a.m.).  *Compare, e.g.,* Trial Tr. (8/9/2012), 229:6-23 (Buonomo) (all parties released signature pages by 6:45 a.m. except possibly Aurelius) *with* Cederholm Decl., ¶ 52 (Elliott released its signature page between 7:00 a.m. and 7:30 a.m.).

[86]    *See* Pl. Ex. 16 at WGM0000791 ("All – Please find attached the final Lock Up Agreement executed by all parties this morning.").   Trial Tr. (8/8/2012), 51:10-53:22 (Zirinsky); Trial Tr. (9/20/2012), 19:15-19:3 (Truong); Trial Tr. (9/27/2012), 143:18-144:9 (Ammann).

establishes that edits to the Lock-Up Agreement continued postpetition and that the 10:37

Version of the Lock-Up Agreement was not created until well after Old GM filed its Bankruptcy

Case at 7:57 a.m. on June 1, 2009.[87]

A review of the internal document metadata of each version of the Lock-Up Agreement

and the metadata from Weil Gotshal's document management system ("**DMS**") shows that the

version of the Lock-Up Agreement that existed as of 7:57 a.m. was version 18.[88]  The 10:37

Version, which is the version the parties agree is the final, executed version of the Lock-Up

Agreement, is version 20.[89]  Version 20 contains significant differences from version 18[90] and

was created after 9:00 a.m. on June 1, 2009.[91]  The 10:37 Version was the result of edits made

after 7:57 a.m. on June 1, 2009.[92]  Plaintiff's Exhibit 687, which is a copy of the Lock-Up

Agreement emailed between Weil Gotshal attorneys Peter Godhard and Corey Chivers at 8:43

a.m. on June 1, 2009,[93] shows that numerous changes were made after 7:57 a.m. to the Lock-Up

---

[87]    *See* Jones Decl. (the GUC Trust's computer forensic expert), ¶¶ 6-7, Ex. A at 11 ("**Jones Report**").

[88]    Trial Tr. (9/4/2012), 39:25-40:4, 208:8-209:17 (Jones); Jones Report at 11.  The DMS metadata log and the internal metadata for the document show that version 19 was created both as a new version on the DMS system and as a new document on a personal computer at 9:10 a.m. on June 1, 2009, more than one hour after Old GM filed its Bankruptcy Case.  Trial Tr. (9/4/2012), 209:18-210:24 (Jones); Jones Report at 11, 15-19 (¶ 6).

[89]    Jones Report at 11, 15 (¶ 6.1.1); Jones Decl., ¶ 6.  The footer on the 10:37 Version itself indicates that this final version of the Lock-Up Agreement is at least version 19.  *See* Pl. Ex. 16 (footer: NY2:\1997354\19\16T6219!.DOC\72240.0637) (emphasis added).  Further, at least one Lock-Up Noteholder concedes that the final version was version 19, if not some subsequent version.  Trial Tr. (9/28/2012), 57:1-4 (Gropper).

[90]    Jones Report at 151-170 (Attach. 5) (comparison of version 18 and version 20).  *See also* Pl. Ex. 687 (copy of Lock-Up Agreement as of 8:43 a.m. on June 1, 2009 showing numerous track changes).

[91]    The DMS metadata log and the internal metadata for the document show that version 20 was created as a new version on a computer at 9:10 a.m. and uploaded onto the DMS as a new version at 9:21 a.m. Trial Tr. (9/14/2012), 212:16-213:6 (Jones); Jones Report at 11, 15-19 (¶ 6).

[92]    *See* Trial Tr. (8/10/2012), 119:11-15 (Buonomo); Trial Tr. (9/4/2012), 198:16-20 (Jones); Jones Decl., ¶ 6; Pl. Ex. 687 (copy of Lock-Up Agreement as of 8:43 a.m. on June 1, 2009 showing numerous track changes).

[93]    *See* Pl. Ex. 451 at 1 (letter from R. Berkovich to K. Cooperman, dated July 9, 2012 describing

Footnote continued on next page

Agreement, including the extraordinary resolution[94] (*i.e.*, the exhibit to the Lock-Up Agreement that was so integral that Buonomo characterized it as the "raison d'être" of the Lock-Up Agreement).[95]

The Lock-Up Noteholders' computer forensic expert, R. Christopher Racich, agrees with the GUC Trust's computer forensic expert, Keith J. Jones, that the 10:37 Version of the Lock-Up Agreement was, assuming that the internal document metadata and the DMS metadata reflects Eastern Daylight Time ("**EDT**"), created after 7:57 a.m.[96] and is the product of editing that occurred after Old GM filed its Bankruptcy Case.[97] All of the evidence in this case points to the conclusion that the internal document metadata and DMS metadata accurately reflect EDT. As both Jones and Racich testified, the internal document metadata reflects the clock times of the individual personal computers of the user of each version of the document,[98] while the DMS

---

Footnote continued from previous page

email from P. Godhard to C. Chivers sent at 8:43 a.m. (eastern time) on June 1, 2009 and attaching copy of email) and at WGM00296277 (email from P. Godhard to C. Chivers at 8:43 a.m. on June 1, 2009 attaching copy of Lock-Up Agreement). Godhard and Chivers are both Weil Gotshal attorneys. *See* Pl. Ex. 451; J. Smolinsky Depo. Tr., 12:2-9 (5/24/2012) (admitted by designation).

Pl. Ex. 687 is a copy of the Lock-Up Agreement attached to the 8:43 a.m. Godhard email showing track changes. *See* Pl. Ex. 686 at 1 (R. Berkovich letter to K. Cooperman, dated July 24, 2012).

[94]    Pl. Ex. 687 is attached as Exhibit E to the Jones Declaration and shows edits made after 7:57 a.m. Trial Tr. (9/4/2012), 197:10-198:20, 219:2-225:2 (Jones). *See* Pl. Ex. 687 at WGM0029316-17 (chart showing document changes and comments).

[95]    Trial Tr. (8/10/2012), 115:2-10 (Buonomo).

[96]    Trial Tr. (11/27/2012), 114:13-115:7; 117:7-118:8 (Racich) (assuming that Weil Gotshal's clock times were set to EDT on June 1, 2009, Racich agrees that the version of the Lock-Up Agreement that was in existence at 7:57 a.m. was version 18, that version 19 was created at 9:10 a.m. and that version 20 was also created after 9:00 a.m. on June 1, 2009).

[97]    Trial Tr. (11/27/2012), 118:24-123:12 (Racich) (assuming that the clock times were set to EDT, Pl. Ex. 687, the version of the Lock-Up Agreement emailed by Weil Gotshal at 8:43 a.m., shows that a number of changes as reflected on Pl. Ex. 687 were made to the Lock-Up Agreement after 7:57 a.m.). *See also* Trial Tr. (11/27/2012), 242:3-16 (Racich) (the postpetition changes reflected in Pl. Ex. 687 were incorporated into the 10:37 Version of the Lock-Up Agreement).

[98]    Trial Tr. (9/4/2012), 202:24-206:9 (Jones); Trial Tr. (11/27/2012), 127:21-25 (Racich).

metadata reflects the times on Weil Gotshal's servers.[99] Here, the internal metadata and DMS

metadata all correlate to EDT.[100] The forensic evidence, therefore, establishes that the Lock-Up

Agreement was completed postpetition.[101]

### B.    The Lock-Up Agreement Was Implemented Through Unauthorized Postpetition Transactions

#### 1.    Old GM Amended The Trust Agreement For The $450 Million Loan After The Petition Was Filed Without Court Approval

Even after the Lock-Up Agreement was finalized, there were many important steps that

remained to implement the settlement.[102] Old GM entered into two amendments to the Trust

---

[99]    Trial Tr. (9/4/2012), 202:24-206:9 (Jones); Trial Tr. (11/27/2012), 127:21-25 (Racich).

[100]    Trial Tr. (9/4/2012), 198:21-206:9 (Jones) (Jones testified that the evidence shows that the Weil Gotshal computers and servers were synched so the times reflected in the metadata are accurate reflections of EDT).

As of June 1, 2009, EDT was in effect by several months and computer systems are generally set up to automatically switch from EST to EDT when the clock changes. Trial Tr. (11/27/2012), 134:22-135:8 (Racich). Further, circumstantial evidence such as an accurately time-stamped email can be used to determine computer clock times by matching the email time stamp to events reflected on system metadata. Trial Tr. (11/27/2012), 128:23-129:14 (Racich). Here, Pl. Ex. 451, an email from Weil Gotshal attorney Peter Godhard to Weil Gotshal attorney Cory Chivers attaching a copy of the Lock-Up Agreement emailed from the DMS system, is time stamped 8:43 a.m. on June 1, 2009. *See* Pl. Ex. 451 at 1, and at WGM00296277 (Letter from R. Berkovich to K. Cooperman dated July 9, 2012). According to Weil Gotshal, this email was indeed sent by Godhard at 8:43 a.m. on June 1, 2009, *see id.*, and the DMS metadata shows that a copy of the Lock-Up Agreement was emailed at 8:43 a.m. by Godhard. *See* Pl. Ex. 688 at WGM00296327; Trial Tr. (11/27/2012), 135:13-139:6 (Racich). Thus, even by Racich's test, the evidence establishes that Weil Gotshal's clock times were accurately set to EDT on June 1, 2009.

[101]    The forensic evidence is consistent with Truong's contemporaneous email regarding the Lock-Up Agreement. Truong, at 7:55 a.m. on June 1, 2009, two minutes before Old GM filed its bankruptcy petition, sent an email stating that the "Canadian govt just approved the deal" and that he is "waiting for a copy of all executed forms." Pl. Ex. 177 at FOR_GM002899 (email chain between B. Truong and L. Cowen, dated June 1, 2009). He then wrote at 8:04 a.m., seven minutes after Old GM filed its bankruptcy petition, that the documents are "still being worked through." *See id. See also* Trial Tr. (9/20/2012), 89:6-14 (Truong) (the parties stipulate that the correct time on the top email of Pl. Ex. 177 is 8:04 a.m.). Truong's attempt to explain away this email now, *see* Truong Decl., ¶ 63, is simply not credible given his statements at the time he was negotiating the deal.

[102]    *See* Pl. Ex. 260 at NGM000001078 (email from L. Buonomo to T. Chandler, dated June 1, 2009) ("Again, thanks for your help on a very difficult transaction (recognizing [that] we're not done yet)"). *See generally* Pl. Ex. 16. Sutedja noted that the Consent Fee payment technically completed the Nova Scotia bonds settlement process. Pl. Ex. 262 at NGM000015306 (email from M. Sutedja to R. Young and others, dated June 26, 2009); Pl. Ex. 16; Pl. Ex. 144 (steps list); Trial Tr. (8/9/2012), 96: 2-13 (Buonomo).

Agreement, postpetition, in connection with the $450 Million Loan, in an after-the-fact attempt

to conform the Trust Agreement to the deal Old GM ultimately reached with the Lock-Up

Noteholders.[103]  As of May 29, the Trust Agreement between Old GM and GM Canada required

that the Notes be exchanged for cash and that Noteholders representing not less than 2/3 of the

principal amount of each series of Notes enter into the Lock-Up Agreement in a form attached to

the Trust Agreement on or before 11:30 p.m. EST on May 31, 2009 (the "**Lock-Up Deadline**").

If these conditions were not met, GM Canada was to immediately "repay the Promissory Note"

to Old GM *with the proceeds* that Old GM transferred on May 29.[104]  None of these conditions

was met.  Old GM therefore entered into an amendment to the Trust Agreement backdated to

May 31, 2009 (the "**First Trust Amendment**")[105] which required, as a condition of release of

funds, that Noteholders representing not less than 2/3 of the principal amount of each series of

Notes enter into the Lock-up Agreement in a form attached to the First Trust Amendment on or

before 6:00 a.m. EST (*i.e.*, 7:00 a.m. EDT) on June 1, 2009 (the "**Amended Lock-Up**

**Deadline**").[106]  These conditions also were not satisfied.[107]  Old GM then entered into a second

---

[103]     Trial Tr. (8/9/2012), 86:25-87:6 (Buonomo).  Old GM also amended the Promissory Note on June 12, 2009 to reduce the amount owed by a $78.5 million payment by GM Canada postpetition.  Trial Tr. (8/9/2012), 151:6-13 (Buonomo); Statement of Uncontested Facts, ¶ 39.

[104]     The Trust Agreement provides that if the conditions are not satisfied, GM Canada shall repay the $450 Million Loan to Old GM with the proceeds from the Promissory Note and that "[t]ime is of the essence."  *See* Pl. Ex. 134, ¶¶ 2(a), 3(a)-(b) (NGM000000603-04) (email from J. Zhou to W. Borst and others, dated May 29, 2009, attaching, among other things, the Trust Agreement).

[105]     Although the First Trust Amendment is dated "as of" May 31, 2009, the evidence supports an inference that the document was not executed by all parties prior to Old GM's bankruptcy filing.  *Compare* Pl. Ex. 136 at NGM000014944-53 (email from V. Graham, dated June 5, 2009, attaching unsigned copies of the First Trust Amendment and Second Trust Amendment, with a subject line that states "housekeeping matters") *with* Pl. Ex. 135 at NGM000012428-35 (email from I. Yoo, dated June 8, 2009, attaching signed copies of the First Trust Amendment and Second Trust Amendment, with a subject line that states "signed amendment documents").  *See also* Trial Tr. (8/9/2012), 85:25-86:5 (Buonomo) (the agreement was signed by at least Old GM on June 1, 2009, but L. Buonomo does not know whether the amendment was signed by all parties prior to 7:57 a.m. on June 1, 2009).

[106]     Pl. Ex. 135, ¶ 4(a)(i) (NGM000012429).

amendment to the Trust Agreement (the "**Second Trust Amendment**") after Old GM filed its

Bankruptcy Case[108] to add the provision that the funds could be used to pay certain fees of the

Lock-Up Noteholders.[109]

Because the release conditions of the First Trust Amendment were not satisfied[110] and the

release conditions were not amended prepetition,[111] GM Canada was not entitled, as of the

Petition Date, to release the proceeds of the $450 Million Loan.[112]  Instead, it was required to

immediately repay to Old GM the $450 million in proceeds that had been transferred.

Nevertheless, on June 25, 2009, upon the passage for the extraordinary resolution, GM Canada

entered into a settlement agreement with GM Nova Scotia releasing the Intercompany Loans,[113]

and paid $369 million of the $450 million to GM Nova Scotia, which then used the funds to pay

the Consent Fee to the Noteholders on June 26, 2009 ($367 million) and various legal fees of the

Noteholders ($2 million).[114]  Old GM did not seek Court approval for entry into the First Trust

Amendment or the Second Trust Amendment, even though they were postpetition agreements

that concerned the bankruptcy estate's rights to the $450 million.

---

Footnote continued from previous page

[107]     Trial Tr. (8/9/2012), 80:13-81:9 (Buonomo).

[108]     Buonomo does not know when the Second Trust Amendment was signed, other than it was after June 1, 2009.  Trial Tr. (8/9/2012), 79:7-17; 81:24-82:1 (Buonomo).

[109]     *See* Pl. Ex. 135 at NGM000012427 (email from I. Yoo, dated June 8, 2009, attaching First Trust Amendment and Second Trust Amendment); Trial Tr. (8/10/2012), 18:19-24 (Buonomo).

[110]     Trial Tr. (8/9/2012), 80:13-81:9 (Buonomo).

[111]     *See* Pl. Ex. 135 (email from I. Yoo, dated June 8, 2009, attaching First Trust Amendment and Second Trust Amendment);  Trial Tr. (8/9/2012), 79:7-17; 81:24-82:1 (Buonomo).

[112]     *See* Trial Tr. (8/9/2012), 77:14-20 (Buonomo).

[113]     Statement of Uncontested Facts, ¶ 34; Pl. Ex. 277 (settlement agreement between GM Nova Scotia and GM Canada).

[114]     Statement of Uncontested Facts, ¶¶ 33, 74; Pl. Ex. 144 at CC000135 (steps list).

### 2. Old GM And GM Nova Scotia Consented To The Nova Scotia Bankruptcy Case

As of June 1, 2009, GM Nova Scotia was paying its debts as they came due.[115]

Nonetheless, Old GM caused GM Nova Scotia to consent to a bankruptcy order, which GM

Nova Scotia delivered on June 4, 2009.[116]

### 3. Old GM Entered Into A $1 Billion Pension Escrow Agreement After The Petition Was Filed Without Court Approval

In July 2009, Old GM and GM Canada entered into a currency transaction pursuant to

which GM Canada sold CAD $1 billion to Old GM in exchange for USD $860,511,143.62 from

Old GM (the "**FX Transaction**").[117]  New GM asserts that Old GM was repaid the $450 Million

Loan in full through offsets to Old GM's USD $860,511,143.62 payment obligation to GM

Canada under the FX Transaction.[118]  However, Old GM never incurred a payment obligation to

GM Canada in connection with the FX Transaction because the evidence demonstrates that the

CAD $1 billion due to Old GM was never paid to Old GM.  Instead, as explained below, the

CAD $1 billion was paid to satisfy a pension obligation on behalf of GM Canada.  Because Old

GM did not validly incur any such obligation, the transfer did not in any way benefit Old GM.

Therefore, any offsets to Old GM's payment obligation to GM Canada under the FX Transaction

could not have fulfilled GM Canada's obligation to repay the $450 Million Loan.

---

[115]    As of March 2, 2009, GM Nova Scotia had not missed any payments due on the Notes.  Trial Tr. (9/27/2012), 27:13-16 (Bolin).  As of June 1, 2009, the next payments to be made on the Notes were not due until July and December 2009.  *See* Pl. Ex. 315, ¶ 3 (GHW0003641), ¶ 6 (GHW0003644) (schedule 1 to fiscal and paying agency agreement).  Further, no payments were due on the Swaps until December and July 2009.  *See id.*, Ex. E at GHW003738 (confirmation for the GBP 350,000,000 swap) and GHW0003743 (confirmation for the GBP 250,000,000 swap).

[116]    Bolin Decl., ¶ 63; Buonomo Decl., ¶ 78; Statement of Uncontested Facts, ¶ 58. *See also* Pl. Ex. 450 at NGM000004223 (email chain between J. Holy, L. Buonomo and others, dated April 20 and 21, 2010, attaching Old GM approval to GM Nova Scotia bankruptcy consent, dated "as of June 1, 2009" and faxed on June 8, 2009).

[117]    Lopez Decl., ¶ 5; Def. Ex. 425 (the "**Direction & Acknowledgement**").

[118]    Trial Tr. (3/6/2013), 53:9-25 (Lopez); Lopez Decl., ¶ 5.

While a debtor-in-possession, in July 2009, Old GM entered into a postpetition pension

escrow agreement, pursuant to which Old GM seemingly agreed to fund a pension obligation of

GM Canada of over CAD $1 billion.[119]  Prior to this purported agreement, Old GM had no

obligation whatsoever with respect to GM Canada's pension plan.  No Court approval was

sought or obtained for Old GM's entry into this agreement.  The validity of this unauthorized,

postpetition CAD $1 billion purported obligation is the lynchpin of New GM's and the

Noteholders' contention that the $450 Million Loan was repaid through a series of offsetting

transactions.

Tyrone Lopez of GM Canada testified that GM Canada wired the CAD $1 billion under

the FX Transaction in order to fund payment of a pension obligation of GM Canada.[120]  This

obligation, however, was intended to be an obligation of *New GM*, as reflected in various drafts

of the pension escrow agreement that were circulated prior to the entry of the Court's order

approving the 363 Sale on July 5, 2009 (the "**Sale Order**").[121]  An escrow account was

established at CIBC as a New GM account for this transaction.[122]  However, because the parties

did not anticipate that the Sale Order would include a five day stay of the order,[123] Old GM was

substituted at the last minute on July 6, 2009 for New GM as the counterparty to the pension

---

[119]     Pl. Ex. 717 (email from A. Hartog to A. Sundaram and others, dated July 7, 2009, attaching executed copy of the Pension Escrow Agreement); Trial Tr. (3/6/2013), 40:12-15 (Lopez).

[120]     Trial Tr. (3/6/2013), 40:12-15; 63:1-64:3 (Lopez).

[121]     *Id.* at 39:12-40:6; 42:19-43:18.  *See* Pl. Ex. 707 (email from A. Hartog to A. Sundaram and others, dated July 2, 2009, attaching draft pension escrow agreement as of July 2, 2009 with General Motors Company as a party); Pl. Ex. 709 (email from A. Hartog to A. Sundaram and others, dated July 3, 2009, attaching draft escrow agreement as of July 3, 2009 that references NGMCo., Inc.).

[122]     *See* Pl. Ex. 708 at NGM000040485 (email from G. Krowles at CIBC, dated July 3, 2009, to A. Hartog and others sending wiring instructions for "GM Company" pension escrow account); Pl. Ex. 710 at NGM000043437 (email from A. Sundaram to T. Lopez and others, dated July 4, 2009, discussing "CIBC preferences for C$1B NewCo escrow"); Pl. Ex. 764 at NGM000040841 (email from A. Sundaram to G. Krowles at CIBC, dated July 6, 2009, discussing timing of funding for "the C$1B escrow under GM New Co").

[123]     *See* Sale Order, ¶ 70 [Bankr. Dkt. No. 2968].

escrow agreement.[124]  Thus, without ever seeking or obtaining Court approval, Old GM

purportedly incurred a postpetition pension liability of over CAD $1 billion on behalf of GM

Canada that was always intended to be a New GM obligation.

While Old GM was substituted for New GM as the pension obligor, there is no evidence

that Old GM was similarly substituted for New GM on the CIBC escrow account into which GM

Canada paid the CAD $1 billion under the FX Transaction.  Lopez testified that Old GM's usual

account for foreign currency transactions was at JPMorgan, and the CIBC account was set up for

the escrow transaction.[125]  Lopez made no inquiry as to who owned the account and he does not

know whether the account was for the benefit of New GM or Old GM.[126]  The documentary

evidence, on the other hand, supports an inference that the CIBC account remained a New GM

account.[127]  Subsequent amendments to the pension escrow agreement ensured that the return of

the CAD $1 billion from the escrow account went to New GM for payment of the pension

obligation and not Old GM,[128] and no funds were ever returned to Old GM.

---

[124]    Trial Tr. (3/6/2013), 45:21-46:10 (Lopez) (Old GM was substituted for New GM); Pl. Ex. 712 (email from A. Hartog to A. Sundaram and others, dated July 6, 2009, regarding substituting New GM for Old GM as a party and attaching revised pension escrow agreement); Pl. Ex. 764 (email from A. Sundaram to G. Krowles, dated July 6, 2009:  "Due to the stay provision in the 363 Sale Order passed last night . . . we may need to have an escrow GM Old Co, which need to move to NewCo for the C$1B"). *See also* Pl. Ex. 717 (email from A. Hartog to A. Sundaram and others, dated July 7, 2009, attaching an executed copy of the pension escrow agreement).

[125]    Trial Tr. (3/6/2012), 61:18-23, 63:1-14, 65:19-25, 67:19-69:5 (Lopez).

[126]    *Id.* at 64:10-25, 65:1-13, 66:7-9.

[127]    *See* Pl. Ex. 710 at NGM000043437 (email from A. Sundaram to T. Lopez and others, dated July 4, 2009, discussing "CIBC preferences for C$1B NewCo escrow"); Pl. Ex. 764 (email from A. Sundaram to G. Krowles at CIBC, dated July 6, 2009, discussing timing of funding for "the C$1B escrow under GM New Co"). *See also* Pl. Ex. 717 at WGM00150626-30 (the escrow account terms and conditions attached to the executed copy of the pension escrow agreement reference "General Motors Company" (*i.e.*, New GM)).

[128]    *See* Pl. Ex. 720 (email, dated July 9, 2009 from S. Di Cresce to G. Krowles and others attaching a fully executed copy of the amending agreement to the pension escrow agreement); Pl. Ex. 724 (email, dated September 2, 2009, from M. Arias to A. Hartog and others attaching executed second amending agreement to the pension escrow agreement).

**C.    No Party Sought Court Approval For The Lock-Up Agreement**

**1.    The Lock-Up Agreement Parties Made A
Deliberate Choice Not To Seek Court Approval**

Although the Lock-Up Agreement was finalized and implemented postpetition and

provided for use of Old GM's property outside of the ordinary course of business, neither the

Lock-Up Agreement nor the transactions thereunder were disclosed to the Court, much less

presented for Court approval.[129]  The parties discussed obtaining bankruptcy court approval

during the Lock-Up Agreement negotiations, but decided against it.[130]  Zirinsky concluded that

perhaps Court approval was "not so important."[131]  Prieto noted on May 30, 2009 that the deal

would not require Court approval because Old GM was "not a party to the agreement"[132] as of

May 30.  Even though Old GM was added as a party to the Lock-Up Agreement after Prieto's

May 30 note, no party ever sought Court approval for the Lock-Up Agreement.  Indeed, as

Buonomo testified, he is not aware of any specific effort having been made to even disclose the

---

[129]    New GM now contends that the Lock-Up Agreement and the transactions thereunder are outside of the review of this Court because the agreement was allegedly acquired by New GM as part of the 363 Sale.  The evidence, however, establishes that the Lock-Up Agreement was not an executory contract and, even if it was, it was never assumed and assigned or otherwise transferred to New GM.  In particular, the assumption and assignment procedures were not followed with respect to the Lock-Up Agreement.  *See* Pl. Ex. 275, ¶ 10  (June 2, 2009 order approving the June 1, 2009 master sale and purchase agreement (the "**Sale Procedures Order**") (Bankr. Dkt. No. 274) (as a condition precedent to the assumption of an executory contract, Old GM was required to provide an assumption and assignment notice containing an objection deadline to the contracting counterparty, in the form attached as Exhibit D to the Sale Procedures Order, with instructions for how to access the assumption and assignment database); Pl. Ex. 154 (email from S. Webber to L. Buonomo, dated Nov. 19, 2009, informing Buonomo that no assumption notice was ever sent because the Lock-Up Agreement was "submitted without a mailing address").  Even if the Lock-Up Agreement was somehow transferred to New GM, such transfer does not immunize the agreement and its transactions from this Court's review.

[130]    *See* Trial Tr. (8/8/2012), 22:13-21 (Zirinsky); Gropper Decl., ¶ 67; Trial Tr. (9/28/2012), 58:24-59:21 (Gropper).

[131]    Pl. Ex. 4 (email from B. Zirinsky to D. Gropper and others, dated May 30, 2009, stating "perhaps court approval isn't so importnat [sic]"; Trial Tr. (8/8/2012), 30:7-31:1 (Zirinsky).

[132]    *See also* Pl. Ex. 3 at AUR_GM021454 (Prieto notebook) ("GM is not a party to the agreement, do not envision this being approved by the Bankruptcy Court").

Lock-Up Agreement to the Court.[133]

## 2.    The Lock-Up Agreement Transactions Were Structured To Evade Court Scrutiny

The Lock-Up Noteholders wanted to ensure that the Consent Fee funds were not in an Old GM account when it filed for bankruptcy.[134]  Therefore, funds were transferred from Old GM on May 29 in contemplation of payment to the Noteholders, although there was no Lock-Up Agreement, and thus no deal at the time.[135]  Zirinsky wanted to be comfortable that the transaction would be structured in a way to avoid potential attack.[136]  On a call on May 31, 2009 with Old GM and counsel, the parties discussed how to shield the settlement from scrutiny.  The plan was described as follows in Prieto's notes: "the money is in a trust account in Canada where it is being held for this deal – does not think that money will be attackable where it is now . . . the rights to this preference will be assumed by NewCO [sic] in the 363."[137]

## IV.    THE NOVA SCOTIA BANKRUPTCY CASE

The Lock-Up Agreement paved the way for the Lock-Up Noteholders to petition GM Nova Scotia into a bankruptcy proceeding in Canada (the "**Nova Scotia Bankruptcy Case**"), which would not be contested or otherwise challenged by Old GM, thus manufacturing the "winding up" necessary under Nova Scotia law to assert the Nova Scotia Trustee Claim.  The Lock-Up Noteholders hand-picked a trustee, Green Hunt Wedlake, Inc. ("**Wedlake**" or "**Nova**

---

[133]    Trial Tr. (8/10/2012), 132:12-15 (Buonomo).  Buonomo is also unaware of any instance in which the existence or assignment of the Swaps was specifically disclosed to the Court.  *Id.* at 131:19-132:6.

[134]    Trial Tr. (8/8/2012), 41:7-43:12, 44:9-14 (Zirinsky).  *See also* Trial Tr. (9/28/2012), 66:9-12 (Gropper) (it was important that funds not be in a GM account at the time of GM's bankruptcy petition).

[135]    Trial Tr. (8/9/2012), 69:15-70:7 (Buonomo).

[136]    Trial Tr. (8/8/2012), 38:15-18 (Zirinsky) ("[W]e wanted to be comfortable that the way this transaction was going to be structured would do so, would do it in the right way so that there wouldn't be any potential attack.").

[137]    *See* Pl. Ex. 3 at AUR_GM021457.

Scotia Trustee") to assert this claim,[138] impressing upon Wedlake that its "most important"
activity would be to pursue the Nova Scotia Trustee Claim.[139]  On October 9, 2009, GM Nova
Scotia was adjudicated bankrupt and Wedlake was appointed as bankruptcy trustee.[140]

### A. Wedlake Was Deeply Intertwined With And Acted For The Benefit Of The Lock-Up Noteholders

Wedlake was not a stranger to the Lock-Up Noteholders, with whom it had worked for
months prior to the Petition Date, first as a proposed receiver for the assets of GM Nova Scotia
in the Oppression Action,[141] and later as a proposed replacement monitor nominated by Aurelius,
Appaloosa and Fortress in a potential Canadian bankruptcy proceeding for GM Nova Scotia.[142]
Wedlake never disclosed to the Superintendent of Bankruptcy in Canada that it was asked to
serve as interim receiver in the Oppression Action or that it was asked to serve as replacement
monitor.[143]  Wedlake was also represented in the Old GM Bankruptcy Case by Greenberg
Traurig, who until after the Committee filed its initial objection, represented both Wedlake and
the Lock-Up Noteholders simultaneously.[144]  The original Rule 2019 statement filed by
Greenberg Traurig did not disclose that Greenberg Traurig represented Wedlake in addition to
the Lock-Up Noteholders.[145]

---

[138]    Wedlake Decl., ¶ 13 (Wedlake consented to being proposed as bankruptcy trustee for GM Nova Scotia).

[139]    *See* Pl. Ex. 460 at GHW00003351 (email from P. Huff to P. Wedlake, dated June 24, 2009).

[140]    Wedlake Decl., ¶ 19.

[141]    Bolin Decl., ¶ 21; Gropper Decl., ¶ 23; Wedlake Decl., ¶¶ 7, 11.

[142]    Trial Tr. (8/7/2012), 62:1-11, 65:19-66:3 (Wedlake).  *See also* Pl. Ex. 202 at GHW0000751 (email from P. Huff to P. Wedlake, dated June 2, 2009) ("Looking forward to working with you, first proposed receiver, then proposed replacement monitor, now trustee in bankruptcy.  I think this retainer is going to stick.").

[143]    Trial Tr. (8/7/2012), 66:24-67:12 (Wedlake).

[144]    Trial Tr. (8/8/2012), 119:14-21 (Zirinsky).

[145]    *Compare* Pl. Ex. 386 at Ex. A and Ex. B (initial Rule 2019 statement) *with* Pl. Ex. 387 at ¶ 3 (amended Rule 2019 statement); Trial Tr. (8/8/2012), 123:24-125:15 (Zirinsky).

Wedlake continued to work with Greenberg Traurig in other cases involving Nova Scotia unlimited liability companies and U.S. parent company guarantees.  Greenberg Traurig represented Wedlake in the bankruptcy cases of *In re AbitibiBowater, Inc., et al.* (Case No. 09-11296) (Bankr. D. Del.) and *In re Smurfit Stone Container Corporation, et al.,* (Case No. 09-10235) (Bankr. D. Del.) in which Wedlake, as it did in this case, acted as trustee for Nova Scotia unlimited liability companies that were subsidiaries of U.S. debtors and asserted claims under section 135 of the Companies Act against the parent-guarantors in the parents' U.S. bankruptcy cases.[146]  Lock-Up Noteholder Aurelius was a noteholder in both the *Smurfit* and *AbitibiBowater* matters,[147] and Zirinsky represented both Wedlake and Aurelius in those cases.[148]

Wedlake acted, since the inception of the Nova Scotia Bankruptcy Case, to preserve the Lock-Up Noteholders' control over the Nova Scotia Bankruptcy Case and to maximize all possible benefits for the Lock-Up Noteholders.  Wedlake was aware that the initiation of the Nova Scotia Bankruptcy Case was within the Lock-Up Noteholders' control from and after June 2009[149] and that the Lock-Up Noteholders purposely waited three months following receipt of the Consent Fee to initiate GM Nova Scotia's bankruptcy.[150]  Wedlake knew that the reason for this was to shield the Consent Fee from preference review,[151] but Wedlake failed to act on this

---

[146]     Wedlake Decl., ¶ 23; Tr. (8/7/2012), 57:14-59:10 (Wedlake); Trial Tr. (9/28/2012), 46:18-47:5 (Gropper).

[147]     Trial Tr. (9/28/2012), 46:18-47:5  (Gropper).

[148]     Trial Tr. (8/7/2012), 58:6-14, 58:24-59:2 (Wedlake); Trial Tr. (8/8/2012), 128:23-129:1 (Zirinsky).  *See also* Pl. Ex. 64 (email from D. Cederholm to Q. Koffey, dated Dec. 7, 2010) ("Bruce Zirinsky, aka Double Dip Defender of the year").

[149]     Trial Tr. (8/7/2012), 63:25-64:4 (Wedlake); Pl. Ex. 202 (email from P. Huff to P. Wedlake, June 2, 2009) ("We wanted to consent in hand now, so the timing is in our control."); Wedlake Decl., ¶ 14.

[150]     Wedlake Decl., ¶ 18; Trial Tr. (8/7/2012), 93:9-20 (Wedlake); Pl. Ex. 32 at GHW0003353 (email from P. Huff to P. Wedlake, Sept. 8, 2009).  *See also* Trial Tr. (9/28/2012), 71:17-72:18 (Gropper) (Noteholders waited at least 90 days after the extraordinary resolution was passed before petitioning GM Nova Scotia into bankruptcy).

[151]     Trial Tr. (8/7/2012), 93:18-94:19, 98:1-7 (Wedlake).  *See also* Pl. Ex. 440 (email from J. Holy to
Footnote continued on next page

29

knowledge.[152]  Further, Wedlake, against the wishes of New GM[153] and against his own

judgment,[154] capitulated to the Lock-Up Noteholders' insistence that no inspectors be appointed

to supervise the Nova Scotia Bankruptcy Case.[155]

### B.    Wedlake Failed To Investigate GM Nova Scotia's Statement Of Affairs, Despite Known Irregularities

GM Nova Scotia was a "virtual" company with no employees, and at the time of the

filing of its bankruptcy case, no officers or directors.[156]  To fill this void, New GM, with

assistance from GM Canada employees, prepared GM Nova Scotia's Statement of Affairs, a

statutorily required summary of the debtor's assets and liabilities.[157]  Maurita Sutedja, a former

director of GM Nova Scotia, signed and delivered the Statement of Affairs for GM Nova Scotia

on or about November 23, 2009.[158]  At the time she signed this statement, she was employed by

New GM,[159] which purported to be a creditor of GM Nova Scotia, and she had no role at GM

---

Footnote continued from previous page

G. Upton, dated July 13, 2009, regarding "[b]ackground discussion on waiting to file GMNS into bankruptcy to allow the 'preference period' to run-out, presumably . . . 3 months.").

[152]    Under Canadian law, Wedlake is authorized to bring claims for transfers under value.  Trial Tr. (8/7/2012), 95:4-12 (Wedlake).  It occurred to him that the Lock-Up Agreement and Consent Fee could be transfers under value, but he did not pursue such claims.  Trial Tr. (8/7/2012), 95:13-24 (Wedlake).

[153]    Trial Tr. (8/7/2012), 106:5-17 (Wedlake).  *See also* Pl. Ex. 45 (email from D. Prieto to M. Brodsky, dated Nov. 12, 2009) ("GM objected to only one of the resolutions (i.e., that no Inspectors be appointed), but we outvoted them."); Trial Tr. (9/28/2012), 78:16-23 (Gropper).

[154]    Trial Tr. (8/7/2012), 106:5-17 (Wedlake).

[155]    Trial Tr. (9/28/2012), 78:6-13 (Gropper) (discussing Aurelius' position); Trial Tr. (9/27/2012), 45:3-18 (Bolin) (Wedlake, using Appaloosa's proxy, made a motion that no inspectors be appointed); Wedlake Decl., ¶ 43 (Aurelius seconded that motion).  The Noteholders did not want inspectors appointed because they were worried about being able to continue to trade without running afoul of SEC regulations.  Trial Tr. (8/7/2012), 108:3-19 (Wedlake).

[156]    Trial Tr. (8/7/2012), 20:9-19, 98:22-99:13 (Wedlake).

[157]    Trial Tr. (8/7/2012), 29:4-9 (Wedlake).  *See also* Trial Tr. (8/9/2012), 146:21-23 (Buonomo).

[158]    Wedlake Decl., ¶ 46; Trial Tr. (8/7/2012), 19:11-19 (Wedlake).

[159]    M. Sutedja Depo. Tr. (5/31/2012), 10:14-16; Trial Tr. (8/7/2012), 21:2-5 (Wedlake).

Nova Scotia.[160]  The Statement of Affairs should have been prepared by a current officer or

director of GM Nova Scotia or by Old GM, the sole shareholder.  Instead, it was prepared by a

New GM employee (a former Old GM employee until the 363 Sale) in order to implement the

postpetition steps required by the Lock-Up Agreement.

The Statement of Affairs as delivered did not comply with Canadian law.  Under

Canadian law, the Statement of Affairs was due within five days of GM Nova Scotia's

bankruptcy filing.[161]  The Statement of Affairs in this case was not submitted until over one

month later.[162]  Canadian law also requires that the Statement of Affairs list the addresses of each

creditor.[163]  However, the Statement of Affairs for GM Nova Scotia does not list the addresses of

the Noteholders or their names.[164]  The only address listed in the statement is Sutedja's address

at New GM.[165]

The Nova Scotia Trustee Claim reflects debts stated in the Statement of Affairs.[166]

Despite the irregularities in the statement, and the fact that a purported creditor of the debtor

prepared the document, Wedlake never spoke with Sutedja about what she did to satisfy herself

that the Statement of Affairs was accurate.[167]  Nor did he learn what she reviewed to prepare the

---

[160]    Trial Tr. (8/7/2012), 21:6-13 (Wedlake).

[161]    *Id*. at 22:21-25.

[162]    *Id*. at 22:21-23:7.  *See* Pl. Ex. 467 at GHW0001134-35 (email chain between D. Prieto and P. Wedlake, and others, dated Oct. 28 and 29, 2009, discussing the slow pace at which information regarding GM Nova Scotia was being provided).

[163]    Trial Tr. (8/7/2012), 33:12-15 (Wedlake).

[164]    *Id*. at 33:16-21.

[165]    *Id*. at 34:5-9.

[166]    *See* Pl. Ex. 315 at Attach., ¶ 7 (GHW0003596) (Nova Scotia Trustee Claim) (". . . Claimant claims payment from the Debtor [for] the full amount of the liabilities of Finance disclosed in Exhibit B [GM Nova Scotia's Statement of Affairs]").

[167]    Trial Tr. (8/7/2012), 29:24-25 (Wedlake).

statement.[168]  Further, he never conducted an examination of the debtor with regard to the

Statement of Affairs although he has the authority to do so.[169]  All of the above demonstrates that

the choreographed bankruptcy of GM Nova Scotia, which the Lock-Up Noteholders controlled,

was designed to benefit New GM and the Noteholders while imposing all of the costs on Old

GM's creditors.

### C.    Wedlake Failed To Investigate The Claims Filed Against GM Nova Scotia

Wedlake consulted with the Lock-Up Noteholders and New GM (and their counsel) and

assisted them in preparing their proofs of claim to be filed in the Nova Scotia Bankruptcy

Case.[170]  The only claims filed in the Nova Scotia Bankruptcy Case were those of the

Noteholders on account of amounts due under the Notes and the claim filed by New GM on

November 9, 2009 on account of New GM's alleged acquisition of Old GM's position under the

Swaps  (the "**New GM Swap Claim**").[171]  Because under the Lock-Up Agreement, any recovery

on the Swaps is subordinated to the claims of the Noteholders if any amount of the Nova Scotia

Trustee Claim is disallowed,[172] all claims filed in the Nova Scotia Bankruptcy Case inure to the

benefit of the Noteholders.  Further, because Wedlake included in the Nova Scotia Trustee Claim

all the claims filed in the Nova Scotia Bankruptcy Case,[173] the larger the claims in the Nova

Scotia Bankruptcy Case, the larger the Nova Scotia Trustee Claim in the Old GM Bankruptcy

---

[168]      *Id*. at 30:1-2.

[169]      *Id*. at 22:7-17.

[170]      Wedlake Decl., ¶¶ 27-29.

[171]      *See* Pl. Ex. 315 at Ex. B (GHW0003606) (creditors are the Noteholders, New GM, and Osler, Hoskin & Harcourt, LLP); Trial Tr. (8/7/2012), 186:9-17 (Wedlake) (Osler never filed a proof of claim).

New GM Filed a claim in the amount of $564,493,957 based upon alleged liability arising under the Swaps.  Statement of Uncontested Facts, ¶ 64; Wedlake Decl., ¶ 29.  *See* Pl. Ex. 139 (New GM Swap Claim).

[172]      Pl. Ex. 16, ¶ 6(v) (WGM00000800).

[173]      Trial Tr. (8/7/2012), 186:25-187:3 (Wedlake).

Case and the larger the potential recovery to the Noteholders.[174]

Wedlake, though empowered to object to claims under the Canadian Bankruptcy and Insolvency Act,[175] did not object to any claim in the Nova Scotia Bankruptcy Case.[176]  Moreover, as discussed below, he did not investigate the validity of those claims prior to including them in the Nova Scotia Trustee Claim.

## V.    **THE NOVA SCOTIA TRUSTEE CLAIM**

On November 30, 2009, Wedlake filed the Nova Scotia Trustee Claim in the Old GM Bankruptcy Case, seeking not less than $1,607,647,592.49.[177]  This is the largest proof of claim Wedlake has ever filed,[178] and represents the sum total of all the claims that Wedlake contends were filed in the Nova Scotia Bankruptcy Case.[179]  The Nova Scotia Trustee Claim consists of (1) a claim for the unpaid principal and interest purportedly owed on the Notes as of October 9, 2009; and (2) a claim in the amount of USD $564,493,957, which purports to represent amounts owed by GM Nova Scotia to New GM under the Swaps.[180]

---

[174]    *See* Trial Tr. (9/28/2012), 25:11-22 (Gropper) (the larger the swap claim, the more benefit the Noteholders would have).

[175]    Trial Tr. (8/7/2012),79:4-7 (Wedlake).

[176]    *Id*. at 80:16-22.

[177]    *Id*. at 14:2-7; Pl. Ex. 315 (Nova Scotia Trustee Claim).

[178]    Trial Tr. (8/7/2012), 14:8-13 (Wedlake).

[179]    *Id*. at 23:8-24:1; Pl. Ex. 315 at Attach., ¶ 7 (GHW0003596) (Nova Scotia Trustee Claim).

[180]    Pl. Ex. 315 at Attach., ¶¶ 5-7 (GHW0003594-96).

A.    **The Swap Claim Is Invalid**

1.    **Wedlake Included The Swaps In The
Nova Scotia Trustee Claim, Even Though Wedlake Had
Not Determined The Validity Of The New GM Swap Claim**

The Swaps make up more than half a billion dollars of the Nova Scotia Trustee Claim.[181]

Because the Nova Scotia Trustee Claim is simply the sum total of the purported liabilities of GM

Nova Scotia, the validity of the Nova Scotia Trustee Claim depends on the validity of the

underlying claims against GM Nova Scotia.  Wedlake, however, had not determined whether the

New GM Swap Claim was valid prior to including its face amount in the Nova Scotia Trustee

Claim.[182]  Although Wedlake expended millions to administer the Nova Scotia Bankruptcy

Case,[183] it will not make a final determination on the validity of any claim filed in the Nova

Scotia Bankruptcy Case unless and until Old GM makes a distribution on the Nova Scotia

Trustee Claim.[184]

There was a view at New GM that the Swaps should not be included when calculating the

Nova Scotia Trustee Claim.[185]  Nevertheless, Aurelius recommended that the swap liability be

included,[186] and Wedlake succumbed to this request.  Wedlake, having no particular familiarity

with swap agreements and having never been involved with calculating liability under a swap

---

[181]    *See* Pl. Ex. 315 at Attach., ¶¶ 5-7 (GHW0003594-96); Trial Tr. (8/7/2012), 57:7-10 (Wedlake).

[182]    *See* Trial Tr. (8/7/2012), 56:22-57:10 (Wedlake).

[183]    Wedlake Decl., ¶¶ 51-52. *See also* Trial Tr. (8/7/2012), 111:24-112:24 (Wedlake) (Wedlake recovered over $2.3 million in assets for GM Nova Scotia, which was used to pay for the administration of the GM Nova Scotia estate, including legal fees for Wedlake's counsel, Greenberg Traurig and Akin Gump.).

[184]    *See* Trial Tr. (8/7/2012), 79:12-80:1 (Wedlake).

[185]    *See* Pl. Ex. 248 at AUR_GM039690-R (05-2012) (email from D. Prieto to D. Gropper, dated July 27, 2009).

[186]    Trial Tr. (9/28/2012), 84:13-22 (Gropper).

contract,[187] relied on Aurelius[188] and Greenberg Traurig,[189] who prepared Wedlake's proof of

claim.[190]   Although a draft of the Nova Scotia Trustee Claim initially did not include a claim for

the Swaps[191] and a later draft included a claim for the Swaps with the caveat that the amounts are

claimed "to the extent such [s]wap [c]laim is valid" and that Wedlake has not verified the claim

or the amounts due thereunder,[192] the final, filed document simply asserts a claim for

$564,493,957 on account of the Swaps with no qualifying language.[193]

Wedlake had – and continues to have – reason to doubt the validity and amount of the

New GM Swap Claim.  Notably, Wedlake included the Swaps in the Nova Scotia Trustee Claim

without ever seeing signed copies of the governing swap documents,[194] having been told that

such copies could not be located.[195]   Wedlake was aware there would be valuation issues with

---

[187]     Trial Tr. (8/7/2012),  37:8-10, 41:3-6 (Wedlake).

[188]     Trial Tr. (9/28/2012), 44:12-16; 45:5-8 (Gropper); Pl. Exs. 475 and 476 (D. Prieto is copied on the emails in Nov. 2009 and the drafts reflect Prieto's input); Pl. Ex. 463 (email chain between D. Prieto and P. Wedlake in Oct. 2009, discussing the Nova Scotia Trustee Claim).  In fact, Aurelius received information regarding the Swaps back in July 2009 and copies of the governing swap documents which were not publicly available.  Trial Tr. (9/28/2012), 41:18-42:6  (Gropper); Pl. Ex. 248 (email from D. Prieto to D. Gropper, dated July 27, 2009, discussing Swaps); Pl. Ex. 468 (email from P. Wedlake to D. Prieto, dated Nov. 2, 2009, attaching swap documents).

[189]     Trial Tr. (8/7/2012), 44:16-45:2 (Wedlake); Trial Tr. (8/2/2012), 96:21-97:16 (Zirinsky).

[190]     Wedlake Decl., ¶ 53; Trial Tr. (8/7/2012), 16:10-12, 194:23-195:2 (Wedlake).

[191]     See Pl. Ex. 476 at GHW0001402-06 (email chain between N. Mitchell of Greenberg Traurig and D. Prieto and others, forwarded to P. Wedlake, between Oct. 30 and Nov. 4, 2009, attaching draft of the Nova Scotia Trustee Claim prepared by Greenberg Traurig); Trial Tr. (8/7/2012), 49:6-14 (Wedlake).

[192]     Pl. Ex. 475, ¶ 6, n.3 (GHW0002240) (Nova Scotia Trustee Claim attached to email from N. Mitchell, dated Nov. 16, 2009).

[193]     Compare Pl. Ex. 315 at Attach., ¶ 6 (GHW0003595) with Pl. Ex. 475, ¶ 6, n.3 (GHW0002240). See also Trial Tr. (8/7/2012), 55:12-17 (Wedlake).

[194]     Aurelius told Wedlake that without seeing a signed copy of the swap agreements, they could not be sure what the governing documents were.  Trial Tr. (8/7/2012), 73:6-10 (Wedlake).  See also Pl. Ex. 199 (email from D. Prieto to P. Wedlake, dated Nov. 12, 2009); Pl. Ex. 468 (email from D. Prieto to P. Wedlake, dated Nov. 3, 2009).

[195]     Trial Tr. (8/9/2012), 101:25-102:2 (Buonomo); Trial Tr. (8/7/2012), 37:1-7 (Wedlake).

the Swaps,[196] and knew the Lock-Up Noteholders' Canadian counsel acknowledged that the

actual amounts owed on the Swaps would be less than the amount asserted in the New GM Swap

Claim.[197]  Wedlake also knew that the New GM Swap Claim calculated the amount due by the

mark-to-market method, contrary to the terms of the Swap Documents,[198] and was aware the

Swaps had not been terminated at the time Wedlake included the Swaps in the Nova Scotia

Trustee Claim.[199]  Before submitting the claim, Wedlake had also seen a GM Nova Scotia

balance sheet that showed a dash rather than a value for the swap liability,[200] but did not question

the entry (which can only mean zero).[201]

Despite these facts, Wedlake does not recall having any conversations with Sutedja

regarding the dollar amount of the New GM Swap Claim,[202] and did not consult with any outside

experts prior to submitting the Nova Scotia Trustee Claim.[203]  Rather, Wedlake asserts that it

relied on the New GM Swap Claim itself and the Statement of Affairs to verify the amounts that

were due under the Swaps and to determine who holds the Swap claim against GM Nova

Scotia.[204]  Both the New GM Swap Claim and the Statement of Affairs, however, were prepared

---

[196]    Pl. Ex. 202 (email from P. Huff to P. Wedlake, dated June 2, 2009, in which Huff states "there may be some valuation issues over that [swap] claim"); Trial Tr. (8/7/2012), 66:13-18 (Wedlake).

[197]    *See* Pl. Ex. 145 at GHW0002553-54 (email from R. MacKeigan to P. Huff, dated Dec. 16, 2009) (R. MacKeigan notes that P. Huff stated that "the amount owed to [New] GM would then be somewhat less than the amount stated in its proof of claim").

[198]    Trial Tr. (8/7/2012), 76:11-16 (Wedlake); Pl. Ex. 468 (email from D. Prieto to P. Wedlake, dated Nov. 3, 2009 noting that the amount of the Final Exchange is paid upon early termination of the Swaps).

[199]    *See* Pl. Ex. 316 (email from S. Golick to P. Wedlake and others, dated Jan. 15, 2010, and correspondence from P. Wedlake, dated January 12, 2010, purporting to terminate the Swaps).

[200]    *See* Pl. Ex. 249 at GHW0001375 (GM Nova Scotia balance sheet as of Sept. 30, 2009, with dashes inserted for the Swaps' value).  "Typically a dash will represent zero."  M. Sutedja Depo. Tr. (5/31/2012), 167:5-20.

[201]    Trial Tr. (8/7/2012), 120:25-121:7 (Wedlake).

[202]    *Id*. at 34:21-23.

[203]    *Id*. at 45:3-5.

[204]    *Id*. at 187:23-188:6.

by New GM,[205] the very party purporting to claim under the Swaps. Further, Wedlake knew that New GM actually revised the Statement of Affairs to conform to the New GM Swap Claim.[206]

### 2. The Swaps Are Not A Valid And Enforceable Claim Against Old GM

#### a. The Swaps Were Not Acquired By New GM

New GM has no rights under the Swaps because the Swaps were not transferred to New GM as part of the 363 Sale. The Swaps are governed by an unsigned 1992 ISDA Master Agreement, a Schedule to the ISDA Master Agreement dated October XX, 2001 and two confirmations dated July 10, 2003 (collectively, the "**Swap Documents**").[207] The only swap agreement listed in the assumption and assignment database is an "ISDA Master Agreement dated October 15, 2001."[208] There is no ISDA Master Agreement dated October 15, 2001 applicable to the Swaps.[209] Because the applicable Swap Documents were not listed in the assumption and assignment database pursuant to this Court's assumption and assignment procedures, the Swaps were not assumed and assigned to New GM.[210]

---

[205]    *Id.* at 43:21-44:3, 180:21-181:12.

[206]    *Id.* at 188:16-189:20; Pl. Ex. 449 at NGM000016111 (email from M. Munro to P. Wedlake, dated Nov. 12, 2009).

[207]    Pl. Ex. 315 at Ex. E (GHW00003705-46) (Nova Scotia Trustee Claim).

[208]    Pl. Ex. 281 (email to R. Berkovich from K. Cooperman, dated May 20, 2010, attaching excerpt from assumption and assignment database) (last page).

[209]    *See* Pl. Ex. 315; Trial Tr. (8/9/2012), 132:13-21 (Buonomo).

The Swaps not having been assumed and assigned is consistent with Pl. Ex. 22 (email from L. Buonomo to D. Prieto, July 30, 2009) in which Buonomo states: "I inquired with Weil Gotshal, which reminded me that inasmuch as the Swap was not assigned this decision rests with Motors Liquidation Company (Oldco), which apparently has it under review."

[210]    The Swaps are also not "Purchased Assets" under the Amended and Restated Master Sale and Purchase Agreement ("**MSPA**") and were not sold to New GM as part of the 363 Sale. Under the MSPA, a "Purchased Asset" is determined as it "exist[s] as of the Closing." *See* Def. Ex. 226 at MSPA § 2.2(a) (Sale Approval Order attaching MSPA and its amendments) (Bankr. Dkt. No. 2968). An "Intercompany Obligation" is defined as one "owed or due, directly or indirectly, to" Old GM by its subsidiary. *Id.* at MSPA § 2.2(a)(iv). Thus, whether an obligation falls under the definition of "Intercompany Obligation" is determined as of the "Closing" of the 363 Sale (July 10, 2009). Here, as of July 10, 2009, there was no

Footnote continued on next page

37

### b.    The Swaps Were Not Terminated

To the extent that the Swaps were acquired by New GM, which they were not, it is the termination of the Swaps that crystalizes liability and gives rise to a claim.[211]  Under the ISDA Master Agreement, the bankruptcy of GM Nova Scotia constituted an event of default entitling the non-defaulting party (*i.e.*, New GM) to terminate the Swaps by issuing a notice.[212]  New GM never sent any notice terminating the swaps.[213]  Indeed, Aurelius believed that "[t]here may be a benefit in [the Noteholders] sending the termination notice to [New] GM rather than the other way around,"[214] and Wedlake was informed that New GM was not inclined to terminate the Swaps.[215]  The idea of terminating the Swaps ultimately came from Aurelius.[216]  Wedlake kept Aurelius advised as Wedlake discussed termination of the Swaps with New GM.[217]  On January 12, 2010, Wedlake sent a letter to counsel for New GM stating that it was disclaiming the Swaps under three conditions:  (i) that New GM will "acknowledge" that the Swaps are terminated as of October 9, 2009, the date of GM Nova Scotia's bankruptcy petition; (ii) that New GM will agree

---

Footnote continued from previous page

obligation outstanding under the Swaps.  Accordingly, the Swaps are not "Intercompany Obligations" between New GM and GM Nova Scotia.

     Even if the Swaps are subsumed in the definition of "Intercompany Obligations" (which they are not), they still would not be "Purchased Assets" because they are "Excluded Contracts" which are excluded from the definition of "Purchased Assets."  *Id*. at MSPA § 2.2(a)(x).  "Excluded Contracts" includes prepetition contracts that are not assumed contracts.  *Id*. at MSPA § 2.2(b)(vii).

[211]    Trial Tr. (9/28/2012), 20:18-21:8, 22:2-18 (Gropper); Pl. Ex. 20 (email from D. Prieto to M. Brodsky, dated July 7, 2009).

[212]    *See* Pl. Ex. 315 at Ex. E, ¶¶ 5(a)(vii) (GHW0003710), 6(a) (GHW0003712) (ISDA Master Agreement attached to the Nova Scotia Trustee Claim).

[213]    Trial Tr. (8/7/2012), 46:25-47:2, 69:15-17 (Wedlake).

[214]    Pl. Ex. 28 at GHW0002044 (email from D. Prieto to P. Wedlake and others, dated Nov. 12, 2009).

[215]    Trial Tr. (8/7/2012), 81:19-22 (Wedlake); Wedlake Decl., ¶ 60.  *See also* Pl. Ex. 145 at GHW0002553 (email from R. MacKeigan to P. Huff, dated Dec. 16, 2009).

[216]    Trial Tr. (8/7/2012), 82:19-23 (Wedlake).

[217]    *Id*. at 88:6-16.  *See, e.g.,* Pl. Ex. 146 (email from R. MacKeigan to D. Prieto, dated Jan. 12, 2010).

that its claim will be calculated as of October 9, 2009; and (iii) that New GM will acknowledge

that Wedlake had not, as of that time, accepted the New GM Swap Claim as filed.[218]  By email

dated January 15, 2010, New GM agreed to Wedlake's conditions.[219]  This procedure, however,

was not sufficient under the Swap Documents to terminate the Swaps.

### 3.    The New GM Swap Claim And Nova Scotia Trustee Claim Overstate The Amount Of The Swap Claim By Over $200 Million

Even if the New GM Swap Claim and Swaps component of the Nova Scotia Trustee

Claim were valid, the amount of the claim is overstated by more than $200 million.  The Swaps

were to terminate by their terms on December 7, 2015[220] and July 10, 2023.[221]  If terminated in

January 2010, the Swaps would have been terminated years before their contractual termination

dates.  The confirmations to the Swaps control what payments are due upon early termination.[222]

In this case, the confirmations to the Swaps specified that upon early termination, "the Market

Quotation Method will not hold" and instead, the parties shall pay each other the "amounts of the

Final Exchange plus any accrued and unpaid amounts" (the "**Final Exchange Method**").[223]  The

New GM Swap Claim, however, calculated the purported swap liability using the Market

Quotation Method,[224] which is the method expressly rejected by the parties to the Swaps and

---

[218]    Statement of Uncontested Facts, ¶ 68; Wedlake Decl., ¶¶ 63, 66; Buonomo Decl., ¶ 83; Pl. Ex. 316.

[219]    Statement of Uncontested Facts, ¶ 69; Buonomo Decl., ¶ 83; Wedlake Decl., ¶ 66; Trial Tr. (8/7/2012), 81:12-18 (Wedlake); Pl. Ex. 316.

[220]    Pl. Ex. 315 at Ex. E (GHW0003738) (confirmation for GBP 350,000,000 swap).

[221]    *Id*. at Ex. E (GHW0003743) (confirmation for GBP 250,000,000 swap).

[222]    Pl. Ex. 315 at Ex. E (GHW00003737, 3742) (Nova Scotia Trustee Claim); Overdahl Decl., Ex. A at 14 ("**Overdahl Report**").

[223]    Pl. Ex. 315 at Ex. E (GHW00003737, 3742) (Nova Scotia Trustee Claim); Overdahl Report at 14.

[224]    Trial Tr. (8/9/2012), 110:4-7, 116:9-14 (Buonomo). *See also* Trial Tr. (8/7/2012), 76:11-16 (Wedlake).

which yielded an amount $200 million higher than under the Final Exchange Method.[225]

Although New GM's internal documents suggested a claim amount that was $200 million lower

than its asserted claim,[226] New GM chose the Market Quotation methodology among the

alternative methodologies suggested by New GM's Finance staff,[227] which yielded the higher

claim amount.

Under the Final Exchange Method in accordance with the Swap Documents, the New

GM Swap Claim would be no more than $351,192,405 assuming a termination date of October

9, 2009 (the date of GM Nova Scotia's bankruptcy filing) and $331,504,266 assuming a

termination date of January 15, 2010 (the date of acknowledgement of early termination by New

GM).[228]

### B.    The Portion Of The Nova Scotia Trustee Claim
### Relating To The Notes Is Duplicative Of The Guarantee Claims

On or about November 30, 2009, the Noteholders filed the Guarantee Claims in the Old

GM Bankruptcy Case asserting claims on account of Old GM's guarantee of the Notes in the

collective amount of $1,072,557,531.72, representing the alleged unpaid principal and interest

owed on the Notes as of October 9, 2009.[229]  Both the Nova Scotia Trustee Claim and the

Guarantee Claims assert claims of over $1 billion for amounts due under the Notes.  There is no

dispute that the portion of Wedlake's claim[230] relating to the Notes is on account of the same

---

[225]    Trial Tr. (8/10/2012), 106:11-14 (Buonomo); Overdahl Report  at 14-17.

[226]    Trial Tr. (8/9/2012), 120:1-14 (Buonomo); Pl. Ex. 141 (email from L. Buonomo to S. Golick, dated Nov. 9, 2009, attaching a range of swap calculations for early termination payments from $170 million to $332 million based on different dates).  *See also* Pl. Ex. 144 at CC00135 (steps list) (describing swap liability as CAD $258 million).

[227]    Trial Tr. (8/9/2012), 127:6-12 (Buonomo).

[228]    Overdahl Decl., ¶ 5; Overdahl Report, p. 14-17; Trial Tr. (11/26/2012), 180:6-181:2 (Shoji).

[229]    Statement of Uncontested Facts, ¶ 67.

[230]    Although nominally asserted by the Nova Scotia Trustee, the Nova Scotia Trustee Claim is for

Footnote continued on next page

liability as the Guarantee Claims.[231]    Thus, the component of the Nova Scotia Trustee Claim

relating to the Notes represents an attempt to recover two times for one claim.[232]    The Nova

Scotia Trustee's own expert conceded at trial that the Guarantee Claims and a claim under

section 135 serve the same purpose and that these claims are functional equivalents of each

other.[233]    Further, Old GM's books and records indicate that there is no accounting impact of the

guarantee because accounting for the primary bond obligation and the guarantee would

"effectively double count" the obligation.[234]

## ARGUMENT

## I.    SECTION 502(d) OF THE BANKRUPTCY CODE
##       REQUIRES DISALLOWANCE OF THE DISPUTED CLAIMS

Section 502(d) promotes the *pro rata* sharing of the bankruptcy estate among all creditors

by precluding claimants that received avoidable transfers from sharing in the distribution of the

assets of the estate.[235]    Section 502(d) provides, in relevant part, that "the court *shall disallow*

any claim of any entity from which property is recoverable under section . . . 550 . . . or that is a

transferee of a transfer avoidable under section . . . 547, 548, [or] 549 . . . unless such entity or

transferee has paid the amount, or turned over any such property. . . ."   11 U.S.C. § 502(d)

---

Footnote continued from previous page
the benefit of the creditors of GM Nova Scotia.   Trial Tr. (8/7/2013), 159:18-160:1 (Wedlake). The
Noteholders viewed this claim as belonging to them.   *See* Pl. Ex. 17, ¶ 2 (AUR_GM020473) (draft
stipulation prepared by Greenberg Traurig, which states "parties agree that the [h]olders of the Notes
have . . . the deficiency claim. . . .").

[231]    *Compare* Def. Ex. 290 at Attach., ¶¶ 1-2 (DEF3163) (Aurelius' Guarantee Claim) *with* Pl. Ex.
315 at Attach., ¶ 5 (GHW0003594) (Nova Scotia Trustee Claim).

[232]    *See* Pl. Ex. 383 at MS&CO_GM_A_0001212 (email from D. Ammann to C. Liddell at Morgan
Stanley, dated Jan. 22, 2010).

[233]    Trial Tr. (11/26/2012), 57:18-58:19 (Iacobucci).

[234]    Trial Tr. (8/9/2012), 141:20-142:2 (Buonomo); Pl. Ex. 152 at NGM000017558 (email from
NYTO Controller's Group to file, dated July 8, 2009).

[235]    *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180, 191
(Bankr. S.D.N.Y. 2006), *vacated sub nom. on other grounds*, *Enron Corp. v. Springfield Assoc., L.L.C.
(In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007).

(emphasis supplied).  Thus, disallowance is mandatory if a court finds that a claimant received

an avoidable transfer and has failed to return it to the estate.  Because Old GM's payment of the

Consent Fee is an avoidable transfer, and that property has not been returned to the estate, the

Disputed Claims should be disallowed.[236]

### A.    Payment Of The Consent Fee Is Avoidable

#### 1.    Payment Of The Consent Fee Was An Unauthorized Postpetition Transfer Under Section 549 Of The Bankruptcy Code

A transfer of property of the estate that occurs after the petition date and is not authorized

by the court is avoidable under section 549 of the Bankruptcy Code.[237]  Here, the $450 million

transfer is avoidable because it was an unauthorized postpetition transfer.

The $450 million transferred from Old GM to GM Canada was subject to the Trust

Agreement, and that transfer was made for the sole purpose of paying the Consent Fee.[238]  The

---

[236]    We anticipate that the Defendants will argue that the GUC Trust cannot object under section 502(d) because the avoidance actions at issue were purportedly sold to New GM.  This argument is misguided because the case law conclusively establishes that a claim may be disallowed under section 502(d) regardless of whether the claim for avoidance has been, or could be, brought.  *See Enron Corp.*, 340 B.R. at 191 ("[T]here is no prohibition against the trustee's asserting section 502(d) as an affirmative defense to a claim of a creditor even if the trustee's claim is time-barred or otherwise nonrecoverable.").  In any event, the underlying avoidance actions were not sold to New GM.  First, a debtor cannot sell section 549 claims and thereby attempt to place questionable postpetition transactions beyond the supervision of the Court.  New GM SJ Hr'g Tr. (7/19/2012), 83:18-22 (Court stating "[s]ection 363(b) and 549 would be renders [sic] nugatory by the simple act of assigning the right to bring the 549 action outside of the estate.  That cannot be the law.  Neither I, nor I think any other judge, could ever subscribe to such a suggestion.").  Second, for the reasons discussed below, under the collapsing theory, payment of the Consent Fee was effectively a payment by Old GM to GM Nova Scotia for the benefit of the Noteholders.  *Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152, 160 (E.D.N.Y. 2000).  Because GM Nova Scotia is not a "purchased subsidiary" under the MSPA, claims in connection with transfers to GM Nova Scotia were not sold to New GM.

[237]    "Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof."  Fed. R. Bankr. P. 6001; *see Manuel v. Allen (In re Allen)*, 217 B.R. 952, 955 (Bankr. MD. Fla. 1998) (noting once *prima facie* case is established, burden shifts to defendant to prove validity of transfer).

[238]    Pl. Ex. 134 at NGM000000596 (Trust Agreement) ($450 Million Loan "conditioned on premise that funds be used solely to settle bond obligation of" GM Nova Scotia); *see also id.* at NGM000000602 ("GMC is desirous of providing a loan . . . the proceeds of which GM Nova Scotia shall use for the sole purpose of funding" an amendment to "the global securities representing the Notes to provide that such

Footnote continued on next page

$450 million remained property of Old GM's estate because, as explained above, the conditions set forth in the Trust Agreement and the First Trust Amendment (even assuming it was a valid prepetition amendment, which it was not) were not met as of the filing of the petition.[239] *Fisher v. N.Y.C. Dep't of Hous. Pres. & Dev. (In re Pan Trading Corp. S.A.)*, 125 B.R. 869, 878 (Bankr. S.D.N.Y 1991) (if the agreed-upon escrow conditions are not satisfied, the debtor's residual interest is property of the estate).  Indeed, as of the filing of the petition, it was impossible for those conditions to ever be satisfied because the Lock-Up Deadline and the Amended Lock-Up Deadline had already passed without having been further extended, and the Lock-Up Agreement was not signed and delivered by either of those deadlines.  Therefore, as of the filing of Old GM's bankruptcy petition, Old GM still possessed a residual interest in the $450 million held in trust, and GM Canada's subsequent transfer of the Consent Fee to GM Nova Scotia, and all subsequent transfers of the Consent Fee thereafter, constituted unauthorized postpetition transfers of Old GM's property.[240]

Alternatively, even if the Court disregards the express conditions in the Trust Agreement (which it should not), the Court should still find that payment of the Consent Fee was an avoidable postpetition transfer by Old GM to the Noteholders.  In substance, this series of transfers was a single transaction whereby Old GM paid the Consent Fee to the Noteholders.[241]

---

Footnote continued from previous page
Notes will become mandatorily exchangeable into cash").

[239]    *Id*. at NGM000000602; Pl. Ex. 135 at NGM000012428-29 (Amending Agreement). *See supra* notes 103 through 114.

[240]    The Bankruptcy Code expressly provides that the transfer need not be made directly by the debtor to be avoidable.  11 U.S.C.  § 101(54)(D) (defining a transfer to include indirect dispositions).

[241]    *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir.1995); *see also Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.1993) ("[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications") (citations and quotations omitted); *In re Old CarCo L.L.C.*, 435 B.R. 169, 185 (Bankr. S.D.N.Y. 2010) (courts may look beyond the formal structure presented and labels attached to make transactions appear distinct).

In this case, collapsing this series of transfers ensures that the true substance and purpose of the transfers will not be obscured by their technical structure (which was designed to evade scrutiny), and that substantial justice will be done.[242]

The evidence at trial proves that Old GM's transfer of the $450 million to GM Canada, and the postpetition payment of the Consent Fee to the Noteholders on June 26, 2009, was intended to be part of a single integrated transaction. The sole purpose of Old GM's transfer to GM Canada was to fund the Consent Fee.[243] Significantly, the Noteholders played an integral part in structuring this transfer to obscure its true purpose: their unjust enrichment.[244]

In sum, whether due to failure to satisfy the Trust Agreement conditions or under the collapsing doctrine, payment of the Consent Fee to the Noteholders was a postpetition payment by Old GM for which there was no prior Court authorization. Thus, the Court should find that payment of the Consent Fee was an avoidable transfer.

---

[242]    *Bachrach Clothing, Inc. v. Bachrach (In re Bachrach Clothing, Inc.)*, 480 B.R. 820, 853 (Bankr. N.D. Ill. 2012) ("The 'collapsing' doctrine is essentially an equitable doctrine allowing a court to dispense with the structure of a transaction or a series of transactions.") (citations omitted); *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.)*, 379 B.R. 5, 21 (Bankr. E.D.N.Y. 2007) (stating that the Court should not "'turn a blind eye to the reality' of the substance of a series of transactions. . . .").

[243]    *See* Pl. Ex. 129 at NGM000010611 ("plan where [Old GM] makes a loan to [GM Canada] which is intended for the purpose of paying down the GMNS bonds."); Pl. Ex. 396 (email from I. Yoo to N. Ramdev and A. Kibe, dated May 22, 2009, discussing "options to getting funds to [GM Canada] to pay down the loan from GMNS in order for GMNS to pay the external bondholders"); Pl. Ex. 132 ("can you send me a schematic of the related funding requirements (i.e., loan from GM to [GM Canada], [GM Canada] pay-down of NP to GMN[S], GMN[S] call of NS Bonds and payment to bonholders [sic], etc.)."); Pl. Ex. 133 (email from M. Feldman dated May 26, 2009); Pl. Ex. 138 (email from J. Stapleton to A. Mistry and M. Sutedja, dated May 27, 2009, forwarding letter to Export Development Canada stating Old GM to provide loan to GM Canada for purpose of paying bondholders).

[244]    *See* Trial Tr. (8/9/2012), 86:25-87:05 (Buonomo) (Trust Agreement amended to conform to deal with Noteholders); Pl. Ex. 134 at NGM000000603 (conditions to release of funds held in trust required participation by Noteholders representing not less than 2/3 of the principal amount of each series of Notes).

**2.      Even If The Consent Fee Was Not A Postpetition
Transfer, The Noteholders Still Received An Avoidable
Transfer Under Sections 547 Or 548 Of The Bankruptcy Code**

Alternatively, to the extent payment of the Consent Fee is determined to have occurred

prepetition notwithstanding the evidence introduced at trial, Old GM's $450 million transfer to

GM Canada for the benefit of the Noteholders is nonetheless avoidable as a preferential payment

under section 547.[245]  First, the $450 million transfer from Old GM to GM Canada, made for the

benefit of the Noteholders on account of the Notes, satisfies each of the elements of section

547(b) of the Bankruptcy Code and is a preferential payment.[246]

The Consent Fee is also avoidable as a constructively fraudulent transfer under section

548(a)(1)(B) of the Bankruptcy Code because Old GM, while insolvent, received less than

reasonably equivalent value for its transfer of the Consent Fee and the obligations it incurred

under the Lock-Up Agreement.  11 U.S.C. § 548(a)(1)(B).  As stated above in Factual

Background Section II(B)(3), it is evident that the obligations Old GM incurred under the Lock-

Up Agreement were grossly disproportionate to the worthless release Old GM received with

respect to the Oppression Action.[247]  Indeed, even payment of the Consent Fee alone was far in

excess of what was commercially reasonable, and, when the agreement to allow the more than

$2.67 billion in claims for the benefit of the Noteholders is added to the mix, there can be no

doubt that Old GM did not receive anything close to reasonably equivalent value.  The Consent

---

[245]      A preferential transfer under section 547(b) is a transfer made: (1) to or for the benefit of a
creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) while the debtor was insolvent; (4) within 90 days prior to the filing for bankruptcy; and (5) that
enabled the creditor to receive more than such creditor would receive in a chapter 7 liquidation.  *Ames
Merch. Corp. v. Revere Mills Inc. (In re Ames Dep't Stores, Inc.)*, No. 01-42217 (REG), Adv. Pro. Nos.
03-03951, 03-08325 (REG), 2010 WL 2403104, *4 (Bankr. S.D.N.Y. June 10, 2010).

[246]      The Court has determined that Old GM was insolvent as of the Petition Date.  *In re Gen. Motors
Corp.*, 407 B.R. 463, 475 (Bankr. S.D.N.Y. 2009).  Moreover, in his notebook, Prieto refers to the
Consent Fee as a "preference."  *See* Pl. Ex. 3 at AUR_GM021457.

[247]      This release is the only consideration Old GM received under the Lock-Up Agreement.

Fee is, therefore, avoidable as a fraudulent transfer under section 548(a)(1)(B), and recoverable from the Noteholders and Wedlake as subsequent transferees under section 550.[248]

Moreover, the Consent Fee is avoidable as an actual fraudulent transfer under section 548(a)(1)(A) of the Bankruptcy Code because Old GM paid the Consent Fee with full knowledge that such payment would hinder recoveries to Old GM's other general unsecured creditors.  11 U.S.C. § 548(a)(1)(A).[249]  Old GM's conduct demonstrates an intent to place $450 million of its cash beyond the reach of its unsecured creditors.[250]  It was only in discovery in connection with this case that the Committee learned that the Consent Fee was paid with Old GM's money.  It is obvious that Old GM and the Noteholders tried to conceal, to the disadvantage of Old GM's unsecured creditors, that Old GM was the source of the funds for the Consent Fee.[251]  Accordingly, the Consent Fee is avoidable as an actual fraudulent transfer under section 548(a)(1)(A), and recoverable from the Noteholders and Wedlake as subsequent transferees under section 550.[252]

### B.    The Consent Fee Was Not Repaid

Section 502(d) specifically requires that the *transferee* repay the avoidable transfer to avoid claim disallowance.[253]  There is no dispute in this case that the Noteholders have not

---

[248]    11 U.S.C. § 550(a).  *See IBT Int'l, Inc. v. Ne. (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 708 (11th Cir. 2005); 5 Collier on Bankruptcy, ¶ 550.02[1] at 550–6 (16th ed. 2011) (noting majority view provides that "a recovery may be had from a subsequent transferee without suing the initial transferee.").

[249]    *See Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 403 (Bankr. S.D.N.Y. 2007) ("[I]t is well accepted that intent to hinder or delay creditors is sufficient, and intent to defraud need not be proven.").

[250]    Actual intent may be inferred from the actions of Old GM and the GUC Trust is entitled to prove such intent by relying upon circumstantial evidence.  *See In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005); *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983).

[251]    *See generally* Pl. Ex. 29 (June 1, 2009 8-K) (failing to disclose that Old GM funded the Consent Fee).

[252]    *See supra* note 248.

[253]    *Longacre Master Fund, Ltd. v. ATS Automation Tooling Sys. Inc.*, 456 B.R. 633, 640-41

Footnote continued on next page

repaid the Consent Fee. The Disputed Claims should be disallowed because the Noteholders, as the direct claimants under the Guarantee Claims and the beneficiaries of the Nova Scotia Trustee Claim, have not repaid the amount of the avoidable transfer.[254] Disallowance is a personal disability of the entity that receives an avoidable transfer.[255] Thus, Defendants cannot rely on any alleged repayment by GM Canada as a defense to the GUC Trust's objection. Under section 502(d), the Defendants have the option of either keeping their avoidable transfer or surrendering their transfers and sharing ratably with other creditors – but not both.

Even if the Court finds that repayment for purposes of section 502(d) can be made by a party other than the claimant, however, the evidence does not support the contention that GM Canada repaid the $450 million to Old GM. At trial, New GM and the Noteholders contended that the transactions described in the Direction & Acknowledgment[256] demonstrated that the $450 million transferred by Old GM was repaid. This is not so.

The contention that the $450 million transfer was repaid through the internal transfers and offsets described in the Direction & Acknowledgement rests on three flawed premises. First, the Direction & Acknowledgement assumes that Old GM was obligated to contribute CAD $1 billion pursuant to the pension escrow agreement. As shown at trial, that purported obligation was supposed to be an obligation of New GM, and Old GM was only made a party to the

---

Footnote continued from previous page

(S.D.N.Y. 2011) (adopting *In re Enron Corp.*), *vacated in part on other grounds*, No. 11-3413-cv, 2012 WL 4040176 (2d Cir. Sept. 14, 2012); *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 443 (S.D.N.Y. 2007); *see also El Paso City of Tex. v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161, 1166 (9th Cir. 2000) (upholding lower court's decision to disallow claim because claimant refused to relinquish its avoidable transfer).

[254]    *See generally In re Sierra-Cal*, 210 B.R. 168, 173 (Bankr. E.D. Cal. 1997) ("The statutory language 'the court shall disallow' leaves no latitude for the court once the predicate rights are determined.").

[255]    *Enron Corp.*, 379 B.R. at 443.

[256]    *See* Def. Ex. 425.

47

agreement on July 6, 2009, the day before the escrow account was funded. The reason for this

eleventh hour change was to circumvent this Court's stay of the Sale Order.[257] Old GM

purportedly incurred this postpetition billion-dollar obligation without any approval from this

Court. Thus, it was never a valid obligation of Old GM and cannot serve as a valid offset to the

other transactions described in the Direction & Acknowledgement. Accordingly, the $450

Million Loan was not repaid through the transactions described in the Direction &

Acknowledgement.

Second, the FX Transaction that is central to the argument that the $450 Million Loan

was repaid is also an extraordinary transaction that was not authorized by this Court.[258] Because

the FX Transaction was an unauthorized postpetition transaction, it cannot serve as a valid offset

to the transactions described in the Direction & Acknowledgement, and, as a consequence, the

$450 Million Loan was not repaid.

Finally, as explained above in Factual Background Section III(B)(3), the evidence shows

that the account to which Old GM transferred CAD $1 billion on July 7, 2009 was a New GM

account that was always intended to, and did, benefit New GM – not Old GM. Thus, the $450

Million Loan was not repaid to Old GM. In fact, adding insult to injury, as a result of the

transactions described in the Direction & Acknowledgment, Old GM paid $113 million in cash

---

[257]    *See* Pl. Ex. 710 (emails from June 29, 2009 to July 4, 2009, discussing investment preferences for "C$1B NewCo escrow"); Pl. Ex. 764 (emails between A. Hartog, R. Burshtine, and G. Krowles, dated July 6, 2009, discussing timing of funding for the "C$1B escrow under GM New Co"); Pl. Ex. 720 and 724 (replacing New GM with Old GM in pension escrow agreement).

[258]    The FX Transaction was substantially larger than any other foreign exchange transaction conducted internally between Old GM and GM Canada. Trial Tr. (3/6/2013), 59:7-61:17 (Lopez). Additionally, other than this FX Transaction, every foreign exchange between the two entities involved GM Canada wiring the Canadian proceeds to Old GM's JPMorgan London account. *Id.* at 61. In this case, however, no money was ever transferred to such account. *Id.* at 63. Rather, the proceeds were transferred directly to a "GM Company" escrow account at CIBC Mellon, which was never disclosed to the Court in either Old GM's Cash Management Motion or otherwise. *See* Pl. Ex. 750 and 751 (Cash Management Motion and Order) (Bankr. Dkt. Nos. 30 and 2542); Trial Tr. (3/6/2013), 62-64 (Lopez).

to GM Canada, in addition to paying CAD $1 billion into an escrow account owned by, and

established for the benefit of, New GM.[259]

## II.    THE CLAIMS SHOULD BE EQUITABLY SUBORDINATED

### A.    Standard For Equitable Subordination

If the Court does not disallow the Disputed Claims in their entirety for the reasons set

forth above in Argument Section I, then, in the alternative, it should equitably subordinate the

Nova Scotia Trustee Claim and the Tainted Claims (defined below).[260]  The doctrine of equitable

subordination, codified in section 510(c) of the Bankruptcy Code, permits a court to consider

whether, despite the "apparent legal validity" of a claim, "the conduct of the claimant in relation

to other creditors . . . was such that it would be unjust or unfair to permit the claimant to share

*pro rata* with the other claimants of equal status."[261]  Equitable subordination is warranted

where, as in this case, "(a) the claimant engaged in some type of 'inequitable conduct'; (b) the

misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and

---

[259]    Under the terms of the Direction & Acknowledgement, after deducting various offsets that GM Canada owed to Old GM (*i.e.*, the tax refund and $450 Million Loan), Old GM owed GM Canada US $113 million for its "purchase" of CAD $1 billion.  This CAD $1 billion went directly from GM Canada to the pension escrow account belonging to New GM.  Eventually, the CAD $1 billion was transferred to New GM after GM Canada funded in full its own pension account (at no time was the CAD $1 billion ever deposited into an Old GM bank account).

[260]    Alternatively, this Court has recognized equitable disallowance as a separate and valid basis for the expungement of claims.  *See* Pre-Trial Conf. Tr. (7/17/2012); Pre-Trial Conf. Tr. (4/23/2012), 11:23-12:1 ("Even though section 510(c) of the code expressly authorizes only equitable subordination, equitable disallowance is as permissible as equitable subordination, is, though it is imposed less commonly.").  Like equitable subordination, equitable disallowance is appropriate where, as here, the claimant engages in inequitable conduct.  *Pepper v. Litton*, 308 U.S. 295, 306 (1939).  Consequently, equitable disallowance provides a basis for disallowance of the Tainted Claims as an alternative to the remedy of equitable subordination and, in this case, applying either principle will yield the same result.

[261]    *See Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 68 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, Nos. 05 Civ. 9050 (LMM), 03 MDL 1529, 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (citations and quotations omitted).  Section 510(c) provides, in relevant part, that a "court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."  11 U.S.C. § 510(c).

(c) equitable subordination of the claim is consistent with bankruptcy law."[262]

The potential range of conduct warranting the remedy of equitable subordination is broad and varied.[263]  Inequitable conduct is generally viewed as conduct that "shocks one's good conscience" and includes, among other things, "a secret or open fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by . . . chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct."[264]

In determining whether to equitably subordinate claims, courts subject the conduct of insiders to especially rigorous scrutiny.[265]  When a claim for equitable subordination challenges a transaction entered into with an insider, the burden is on the insider to prove the good faith of the transaction and also to show its inherent fairness from the viewpoint of the debtor.[266]

**B.    Wedlake And The Lock-Up Noteholders Are Insiders Of Old GM**

GM Nova Scotia, as an affiliate and wholly-owned subsidiary of Old GM, is an insider of Old GM.[267]  By definition, Wedlake, therefore, is an insider of Old GM because Wedlake is an

---

[262]    *In re Adelphia Commc'ns Corp.*, 365 B.R. at 68.

[263]    *See generally In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002) (citing *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994)).

[264]    *Id.* (quoting *In re 80 Nassau Assocs.*, 169 B.R. at 837).  With regard to the first prong, "[o]ther courts have described the type of conduct that warrants equitable subordination as including: (i) fraud, illegality, or breach of fiduciary duty; (ii) undercapitalization of the debtor; and (iii) control or use of the debtor as a vehicle to benefit the creditor in preference other general creditor body."  *Nisselson v. Softbank Am. Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 386 (Bankr. S.D.N.Y. 2007) (citations omitted).  The second prong is met where the general creditors are less likely to collect their debts as a result of the alleged inequitable conduct.  *Enron Corp.*, 379 B.R. at 434.  As to the third prong, "[i]f the misconduct results in harm to the entire creditor body, the [trustee] need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner.").  *Id.*

[265]    *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 564 (citations and quotations omitted).

[266]    *Id.*

[267]    Section 101(31) of the Bankruptcy Code defines an insider of a corporate debtor as including a
Footnote continued on next page

insider of Old GM's affiliate – and wholly-owned subsidiary – GM Nova Scotia.  *Id.*

The Lock-Up Noteholders are also insiders of GM Nova Scotia due to the level of control

they exercised over GM Nova Scotia.  For example, the Lock-Up Noteholders, who were the

only creditors of GM Nova Scotia,[268] controlled the entire GM Nova Scotia bankruptcy

process.[269]  In particular, certain Lock-Up Noteholders: (i) hand-picked a trustee they could (and

did) control;[270] (ii) petitioned GM Nova Scotia into bankruptcy at a date and time designed to

shield their receipt of the Consent Fee from preference review;[271] (iii) voted down the

---

Footnote continued from previous page

person in control of the debtor, an affiliate of the debtor or an insider of an affiliate as if such affiliate
were the debtor.  11 U.S.C. § 101(31).  Section 101(2)(B) of the Bankruptcy Code defines affiliate as a
corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned,
controlled, or held with power to vote, by the debtor.  A corporation is broadly defined in section 101(9)
of the Bankruptcy Code to include "a wide variety of business and non-business entities."  *In re Int'l Zinc
Coatings & Chem. Corp.*, 355 B.R. 76, 83 (Bankr. N.D. Ill. 2006).  The Bankruptcy Code's definition of
corporation is "a term of art that is broader than the ordinary meaning of that word."  *In re KRSM Prop.
L.L.C.*, 318 B.R. 712, 717 n.5 (9th Cir. BAP 2004) (concluding that an LLC falls "comfortably" within
the Bankruptcy Code's definition of "corporation").  It should be noted, however, that courts are not
limited to the list set forth in section 101(31) and may consider whether one is an insider in light of the
totality of the circumstances.  *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 564 (citations omitted).
Courts have held that wholly-owned subsidiaries are insiders.  *See In re La Guardia Assoc., L.P.*, Nos.
04-34512 (SR), 04-34514 (SR), 2006 WL 6601650, at *36 (Bankr. E.D. Pa. Sept. 13, 2006); *see also In
re AEG Acquisition Corp.*, 161 B.R. 50, 56 n.7 (9th Cir. BAP 1993); *In re Oxford Health Investors*,
L.L.C., Nos. 00–80676C–7D, 00–80677C–7D, 00–80678C–7D, 00–80679C–7D, 00–80680C–7D, 00–
80681C–7D, 2002 WL 31031631, at *6 (Bankr. M.D. N.C. Sept. 3, 2002); *In re NMI Sys. Inc.*, 179 B.R.
357, 359 (Bankr. D.D.C. 1995); *In re Southmark Corp.*, 138 B.R. 831, 833 (Bankr. N.D. Tex. 1992)
("SPS, as a wholly owned subsidiary of Southmark, is an insider."), *aff'd*, 993 F.2d 117 (5th Cir. 1993).

268    The New GM Swap Claim is subordinated to the claims of the Noteholders if even one penny of
the Nova Scotia Trustee Claim is disallowed, leaving the Noteholders as the only real creditors of GM
Nova Scotia.

269    *See In re MarketXT Holdings Corp.*, 361 B.R. at 387 (noting that the term insider applies to "one
who has sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny
than those dealing at [arm's] length with the debtor.") (citations omitted).  A creditor who does not deal at
arm's length with debtor, but who has a special relationship with debtor through which it can compel
payment of its claim, has sufficient control over debtor to be deemed an "insider," for preference-
avoidance purposes.

270    *See supra* notes 138 through 148, 170 through 176.

271    *See supra* notes 150 through 152.

appointment of inspectors who would have had oversight over their hand-picked trustee;[272] (iv) were intimately involved with all aspects of the Nova Scotia Bankruptcy Case;[273] (v) directed Wedlake with respect to the termination and calculation of the Swaps;[274] and (vi) directed Wedlake with respect to the calculation and assertion of the Nova Scotia Trustee Claim against Old GM.[275]  Further, certain Lock-Up Noteholders also had access to non-public information about GM Nova Scotia (and Old GM), including copies of the Swaps before they were ever publicly available.[276]  *See Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*,  B.R. 732, 744 (Bankr. D. Del. 2003) (finding insider status where creditor had access to material, non-public information that other creditors did not have).  Because the Noteholders are insiders of GM Nova Scotia, the Noteholders are, by definition, insiders of Old GM.

### C.    The Tainted Claims[277] Should Be Equitably Subordinated

The Tainted Claims should be equitably subordinated because the Lock-Up Noteholders engaged in inequitable conduct that conferred an unfair advantage on them.  Among other things, the Lock-Up Noteholders threatened to tie up Old GM's bankruptcy unless they received the commercially unreasonable Consent Fee, which they knew would be paid to them postpetition with funds that were property of Old GM's estate.[278]  In order to receive a larger chunk of the Consent Fee and solidify total control of the Nova Scotia Bankruptcy Case, certain Lock-Up

---

[272]     *See supra* notes 153 through 155.

[273]     *See supra* notes 156 through 170.

[274]     *See supra* notes 186, 193, 214, 216 through 217.

[275]     *See supra* notes 185 through 193.

[276]     *See supra* note 188.

[277]     The "**Tainted Claims**" constitute all Guarantee Claims asserted by the Lock-Up Noteholders, as well as all Guarantee Claims asserted by entities who acquired Notes after the Petition Date, directly or indirectly, from the Lock-Up Noteholders.

[278]     *See supra* notes 55, 137.

Noteholders increased their holdings the day after they entered into the Lock-Up Agreement, before the pertinent facts were known to other creditors of Old GM.[279]  Certain Lock-Up Noteholders – Fortress and Elliott – failed to disclose their trading history of CDS referencing Old GM in the Rule 2019 statements filed with this Court.[280]  If the CDS had been disclosed, then other creditors would have known that Fortress and Elliott stood to profit upon Old GM's bankruptcy filing, despite their participation in a prepetition Steering Committee that was supposedly vested in the success of an out-of-court restructuring of Old GM.[281]

Moreover, by the Oppression Action, certain Lock-Up Noteholders (Fortress, Aurelius, and Appaloosa) commenced a meritless litigation in Canada to extract the rich recovery ultimately reflected in the Lock-Up Agreement.[282]  The Lock-Up Noteholders also consistently misrepresented to the Court and the public that the Lock-Up Agreement was a prepetition agreement, even though they knew that the agreement was not completed until after Old GM's bankruptcy petition was filed.[283]  Finally, the Lock-Up Noteholders manipulated the date by which GM Nova Scotia would be put into bankruptcy in order to insulate the Consent Fee and Lock-Up Agreement from challenge.[284]

The prepetition and postpetition actions of the Lock-Up Noteholders, which allowed

---

[279]    *See* Pl. Exs. 38, 53, 386, 387 (Rule 2019 statements).

[280]    *See supra* notes 39 through 40.

[281]    *See supra* notes 35 through 38.

[282]    *See Harbert v. Calpine Canada Energy Finance II ULC*, 2005 NSSC 211 (finding that a complainant who decided to become a security holder and knew or should have known that the impugned conduct was occurring cannot be said to have had reasonable expectations to the contrary and cannot maintain that it has been oppressed) (attached hereto as Index No. 1).

[283]    *See supra* notes 101, 102, 116.  *See, e.g., Response of Certain Noteholders in Opposition to Official Committee of Unsecured Creditors' First Amended Objection to Claims Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief* at 8 (Bankr. Dkt. No. 8084) ("the Lock-Up Agreement was entered into pre-petition.").

[284]    *See supra* notes 149 through 151.

them to enrich themselves at the expense of other general unsecured creditors of Old GM,

constitute inequitable conduct by any objective measure.  The Court should, therefore,

subordinate the Tainted Claims to the claims of other unsecured creditors.

### D.  The Nova Scotia Trustee Claim Should Be Equitably Subordinated

Likewise, Wedlake's conduct warrants equitable subordination of the Nova Scotia

Trustee Claim.  First, Wedlake was hand-picked by certain Lock-Up Noteholders and is

controlled by them, and the inequitable conduct of those Lock-Up Noteholders should therefore

be imputed to Wedlake.[285]

In addition, Wedlake also acted inequitably in numerous respects including: (i) failing to

adequately investigate possible "transfers at undervalue";[286] (ii) failing to have inspectors

appointed for the GM Nova Scotia estate, as is customary in such a proceeding and contrary to

his own best judgment;[287] (iii) knowingly consenting to the Lock-Up Noteholders' manipulation

of the timing of the Nova Scotia Bankruptcy Case;[288] (iv) submitting an inflated and false claim

against Old GM in reliance upon calculations performed at the direction of the Lock-Up

Noteholders and without undertaking any independent investigation;[289] and (v) failing to

---

[285]     Wedlake Decl., ¶ 13.  *See also Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1356 (1st Cir. 1992) (applying the principle of equitable subordination and noting that "any inequity that would result from imputing bank officials' misconduct to the federal receiver would be outweighed by adoption of a federal common law rule that would entirely prevent the debtor/borrower or its creditors from benefitting from the remedy of equitable subordination.").

[286]     Trial Tr. (8/7/2012), 95:13-21 (Wedlake).

[287]     Trial Tr. (8/7/2012), 106:5-17 (Wedlake).

[288]     *Id.* at 63:25-64:4; Pl. Ex. 202 (email from P. Huff to P. Wedlake, dated June 2, 2009); Wedlake Decl., ¶ 14.  *See also* Wedlake Decl., ¶ 18; Trial Tr. (8/7/2012), 93:7-20 (Wedlake); Pl. Ex. 32 (email from P. Huff to P. Wedlake, dated Sept. 8, 2009).

[289]     *See supra* notes 170 through 206; *see also In re Adler, Coleman Clearing Corp.*, 277 B.R. at 567 (noting that the inflation of a claim in a situation where there is a limited pot from which to satisfy claims is prejudicial to other creditors).

investigate GM Nova Scotia's Statement of Affairs, despite Wedlake's awareness that it was riddled with irregularities.[290]

The foregoing wrongful conduct warrants equitable subordination of the Nova Scotia Trustee Claim. This inequitable conduct has prejudiced other creditors, and equitable subordination of the Nova Scotia Trustee Claim to the claims of other creditors is consistent with bankruptcy law and necessary to redress the harm that Wedlake and the Lock-Up Noteholders have inflicted upon the Old GM estate.

## III.    THE LOCK-UP AGREEMENT IS A POSTPETITION AGREEMENT

### A.    The Parties Intended To Be Bound Only By A Final Agreement

Under New York law, "if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then."[291]  To determine whether parties intended to be bound before executing a final contract, courts in this Circuit consider four factors: (i) whether any party has expressly reserved the right not to be bound absent a written agreement; (ii) partial performance of the contract; (iii) whether all terms have been agreed upon such that nothing is left to negotiate; and (iv) whether the agreement at issue is the type of contract that is generally committed to writing.[292]  An analysis of these four factors based on the evidence in this case leaves no doubt that the parties did not intend to be bound by the Lock-Up Agreement before it was final.

First, the parties expressly agreed not to be bound until a completed agreement was executed.  Section 11 of the NDA, signed just days before the Lock-Up Agreement, provides that

---

[290]    *See supra* notes 156 through 169.

[291]    *See GSGSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1160, 1171-72 (S.D.N.Y. 1994) (citations omitted); *see also Chariot Grp. v. Am. Acquisition Partners*, 751 F. Supp. 1144, 1149 (S.D.N.Y. 1990), *aff'd without opinion*, 932 F.2d 956 (2d Cir. 1991).

[292]    *GSGSB*, 862 F. Supp. at 1172.

Old GM will not be "under any legal obligation of any kind whatsoever" unless and until the parties have entered into a "definitive agreement."[293] Further, every draft of the Lock-Up Agreement (i) conditions the effectiveness of the parties' rights and obligations upon execution and delivery of signature pages to "[t]his Agreement"; (ii) contains a clause providing that "[t]his Agreement" supersedes all prior negotiations; and (iii) requires that all modifications be in a writing signed by all parties.[294] These provisions show that "the parties placed great importance on the formalities of execution," and that they intended not to be bound prior to the execution of a formal document.[295] The Second Circuit has recognized that this type of language, "in the context of negotiations over drafts of written agreements, indicates that the parties are working towards the goal of a written, signed contract and protects them from being bound until due execution." *Chariot Grp.*, 751 F. Supp. at 1150 (citations omitted); *see also Reprosystem, B.V. v. SCM, Corp.*, 727 F.2d 257, 262 (2d Cir. 1984) (mutual intent not to be bound prior to execution of formal documents was conclusively established when neither party took exception to provision in drafts which stated that "when executed and delivered, this . . . Agreement . . . will be a valid and binding agreement"), *cert. denied*, 469 U.S. 828 (1984).[296]

Consideration of the next relevant factor – whether all terms were agreed upon and whether anything was left to negotiate – further confirms the parties' intent not to be bound to

---

[293]    Pl. Ex. 256, ¶ 11 (ELL_GM 000243) (copy of NDA executed by Elliott).

[294]    *See* Pl. Ex. 289, ¶¶ 10, 20 (version 16 of the Lock-Up Agreement); Pl. Ex. 290, ¶ ¶10, 20 (version 17 of the Lock-Up Agreement); Pl. Ex. 291, ¶¶ 10, 20 (version 18 of the Lock-Up Agreement); Pl. Ex. 292, ¶¶ 10, 20 (version 19 of the Lock-Up Agreement); Pl. Ex. 293, ¶¶ 10, 20 (version 20 of the Lock-Up Agreement); Pl. Ex. 16, ¶¶ 10, 20 (final, executed copy of the Lock-Up Agreement).

[295]    *See id.* at 1173.

[296]    *See also Ciaramella v. Reader's Digest Ass'n.*, 131 F.3d 320, 324 (2d Cir. 1997) (agreement is effective at the time the parties intended to be bound); *Gucci Am., Inc. v. Gucci*, No. 07 Civ 6820 (RMB) (JCF), 2009 WL 440463, at *4 (S.D.N.Y. Feb. 20, 2009) ("[W]here the parties to a proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed.") (citation omitted).

the Lock-Up Agreement until it was final.[297]  Here, the parties' relentless revisions to the Lock-

Up Agreement – including the extraordinary resolution described as the agreement's "raison

d'être" – continued, and were not completed, until well after Old GM's bankruptcy petition was

filed.  For a document to be final, all revisions to the document must be complete – even if

minor.  *See Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598, 619

(S.D.N.Y. 2009).  As the Second Circuit recognized in *Winston v. Mediafare Entertainment

Corp.*, 777 F.2d 78, 82-83 (2d Cir. 1985), the parties' insistence on the continual redrafting of

specific terms of a proposed agreement establishes that "the changes made must be deemed

important enough to the parties to have delayed final execution and consummation of the

agreement."  *See also Chariot Grp.*, 751 F. Supp. at 1150 ("It is not for the court to determine

retrospectively that at some point in the evolution of a formal document that the changes being

discussed became so 'minor' or 'technical' that the contract was binding despite the parties'

unwillingness to have it executed and delivered.") (citations and quotations omitted).

Finally, the Lock-Up Agreement is the type of contract that is generally committed to

writing.  Given the significant amount of money at stake and the parties' tireless editing of the

Lock-Up Agreement, it cannot reasonably be disputed that the parties intended not to be bound

until there was a completed, written agreement.  *See, e.g., R.G. Grp. v. Horn & Hardart Co.*, 751

F.2d 69, 77 (2d Cir. 1984) (noting that, in evaluating the fourth factor, "most telling is the fact

that the parties were talking about an initial investment of some two million dollars" and

damages of "'at least' eighty million dollars"); *see also GSGSB*, 862 F. Supp. at 1175

(substantial redrafting shows that agreement was the type that required a writing).

---

[297]      The second factor identified above, partial performance, is not applicable here.

57

### B.    It Is Undisputed That The Final Agreement Was Created Postpetition

The document that all parties consider to be, and hold out to the public as, the final and binding version of the Lock-Up Agreement is the one identified as version 20 in Weil Gotshal's document management system (*i.e.*, the 10:37 Version).  The GUC Trust's digital forensic expert confirmed that version 20 of the Lock-Up Agreement was not created until 9:21 a.m. on June 1, 2009, more than one hour after Old GM filed its bankruptcy petition.[298]  This expert opinion is corroborated by the metadata associated with the Lock-Up Agreement that was produced by Weil Gotshal.

As explained in Factual Background Section III(A) above, according to that metadata, version 18 of the Lock-Up Agreement was still being edited as of and through the filing of Old GM's bankruptcy petition at 7:57 a.m. on June 1, and neither version 19 nor version 20 yet existed as of the filing of the petition.  Further, a prior draft of the Lock-Up Agreement circulated among Weil Gotshal attorneys contains "track changes" and shows the corresponding time that such changes were made, many of which were subsequent to 7:57 a.m.  The forensic evidence therefore establishes conclusively that the final, binding version of the Lock-Up Agreement was not even created until after the filing of Old GM's bankruptcy petition, and that as of the time of the filing, an earlier version was still being edited.[299]  Thus, the Lock-Up Agreement was not complete and binding until after Old GM filed its bankruptcy petition.

---

[298]    Jones Report at 11, 15 (¶ 6.1.1).

[299]    *See Health-Chem Corp. v. Baker*, 915 F.2d 805, 811 (2d Cir. 1990) ("[w]hen the parties to a contract enter into a new agreement that expressly supersedes the previous agreement, the previous agreement is extinguished. . . .") (citations and quotations omitted).

## IV.    THE LOCK-UP AGREEMENT IS VOID

### A.    The Lock-Up Agreement Is Void *Ab Initio* Because It Was An Extraordinary Postpetition Transaction Not Approved By This Court

The evidence demonstrates that the postpetition Lock-Up Agreement was the type of extraordinary transaction that required this Court's approval. Section 363(b)(1) of the Bankruptcy Code authorizes a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate," but only *after* notice and a hearing. 11 U.S.C. § 363(b).

The Lock-Up Agreement and related transactions were clearly transactions outside of Old GM's "normal, daily business,"[300] and was certainly the kind of agreement that creditors ordinarily expect to be presented to the court for approval on notice.[301] Significantly, Old GM concedes that the Lock-Up Agreement was a postpetition, extraordinary event, as evidenced by Old GM's inclusion of a description of the settlement with the Noteholders in a non-public, confidential disclosure schedule to the master sale and purchase agreement, which listed exceptions from Old GM's covenant to conduct its business in the ordinary course after the filing of the petition and through the closing of the 363 Sale.[302]

Making matters worse, the Lock-Up Agreement was not only an unauthorized postpetition agreement, but also required Old GM to take various postpetition actions to implement the agreement that involved unauthorized uses of estate property outside of Old GM's ordinary course of business. These actions included Old GM's (i) execution of two postpetition

---

[300]    *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne),* 114 F.3d 379, 384 (2d Cir. 1997).

[301]    *See Id.* at 384-85 ("touchstone of 'ordinariness' is interested parties' reasonable expectations of what transactions a debtor in possession is likely to enter in ordinary course of its business"). When the Committee first learned about the Lock-Up Agreement, Old GM's counsel indicated that an 8-K filed on the Petition Date "showed we were doing this," to which Mr. Mayer replied "you're telling me you expected a $2.6 billion claim settlement and a 350 million cash payment to be done with adequate notice by 8-K without actually bringing it to court for approval on notice to parties? You got to be kidding." Trial Tr. (10/13/12), 173:19-23 (Mayer).

[302]    *See* Pl. Ex. 265 at CC005555-56 (disclosure schedule, section 6.2).

amendments to the Trust Agreement which, among other things, facilitated payment of the

Consent Fee postpetition,[303] (ii) subordination of its claim under the Swaps and forfeiture of its

right to set off the liability owed to it under the Swaps,[304] (iii) postpetition use of its corporate

powers, including causing GM Nova Scotia to deliver its consent to a GM Nova Scotia

bankruptcy, and (iv) postpetition use of its corporate powers to cause GM Nova Scotia to enter

into a settlement that released GM Canada from its obligations under the Intercompany Loans.[305]

Accordingly, Old GM's entry into the Lock-Up Agreement, and the actions taken by Old

GM to implement that agreement, were postpetition transactions outside the "ordinary course of

business" that required this Court's approval.  11 U.S.C. § 363(b); *In re Lavigne*, 114 F.3d at

384.[306]  The failure to seek or secure this Court's approval of the Lock-Up Agreement renders

the agreement void *ab initio*.[307]

---

[303]    The Consent Fee constitutes property of the estate because, as of the Petition Date, the conditions of the Trust Agreement had not been met.  Under New York law, before an escrow can be effectuated, the agreed-upon conditions must be fulfilled.  Only after the requisite conditions are satisfied will an escrow be fully transferred to a grantee.  Until such time, the depositor retains the legal right to the property placed in escrow.  *See, e.g.*, *In re Pan Trading Corp.*, 125 B.R. at 878; *see also In re Flannery*, 51 B.R. 697, 699-700 (Bankr. S.D. Ohio 1985).

Here, the Trust Agreement required that Noteholders representing not less than two-thirds of the principal amount of each series of Notes sign and deliver a copy of the Lock-Up Agreement by the Lock-Up Deadline.  Accordingly, as of 11:31 p.m. EST on May 31 2009 when the foregoing conditions had not been met, the Consent Fee reverted back to Old GM.  Assuming, arguendo, that the First Trust Amendment was executed before the Petition was filed, which it was not, the result would be the same.  The First Trust Amendment extended the Lock-Up Deadline to 6:00 a.m. EST on June 1.  As of 6:01 a.m., the Lock-Up Agreement had still not yet been signed and delivered, at which time the Consent Fee reverted back to Old GM.  In any case, as of the filing of Old GM's bankruptcy petition, the Consent Fee constituted property of the estate.

[304]    *See, e.g., Harsh Inv. Corp. v. Bialac (In re Bialac)*, 712 F.2d 426, 430 (9th Cir. 1983).

[305]    *See In re Lavigne*, 114 F.3d at 384 (citation omitted); *see also In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130, 140-41 (Bankr. D. Me. 1991) (use of debtor's shares in its wholly-owned subsidiary to authorize chapter 11 petition for a subsidiary is a "use of" estate property outside the ordinary course).

[306]    *See* New GM SJ Hr'g Tr. (7/19/2012), 82:2-83:2 ("[A]cquiescence to the allowance of more than $2 billion in claims, cannot be regarded as having been entered into in the ordinary course of business. . . . [I]t's at least arguably, if not plainly, a postpetition transaction that was not authorized by the Bankruptcy Court.").

[307]    *See In re Koneta*, 357 B.R. 540, 543-44 (Bankr. D. Ariz. 2006) ("[T]he usual effect of a sale or
Footnote continued on next page

**B.    The Lock-Up Agreement And Related
       Transactions Are Violations Of The Automatic Stay**

The filing of a bankruptcy petition operates as a stay, applicable to all entities, of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). It is well settled in the Second Circuit that acts taken in violation of the stay are void and without effect.[308] Entering into a postpetition agreement that distributes estate property has been held to violate the automatic stay. *See In re Clouse*, 446 B.R. 690, 705 (Bankr. E.D. Pa. 2010) (postpetition agreement that distributed estate property was violation of automatic stay).

Here, the postpetition entry into the Lock-Up Agreement, and the implementation of its terms, violated the automatic stay because, among other things, (i) payment of the Consent Fee was a distribution of estate property,[309] and (ii) the Lock-Up Agreement required Old GM's postpetition exercise of its rights as shareholder of GM Nova Scotia, which rights are property of the estate.[310] These unauthorized postpetition actions violated the automatic stay and are thus

---

Footnote continued from previous page

lease of property of the estate, conducted outside of the ordinary course of business but without adherence to the notice and hearing requirements of section 363(b)(1), is that any sale held is rendered null and void.") (citation omitted); *see also In re NextWave Pers. Commc'ns Inc.*, 244 B.R. 253, 275 (Bankr. S.D.N.Y 2000) ("Actions which violate Section 363 are 'void.'") (citation omitted).

[308]    *See, e.g., Hamm v. R.H. Macy & Co.*, No. 93 Civ. 1446, 1994 WL 507717, at *1 (S.D.N.Y. Sept. 13, 1994) ("[I]n this circuit, any proceedings or actions described in § 362 that occur after the automatic stay are void and without any effect.") (citation omitted); *see also 48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987) (lease termination notice was in violation of automatic stay and void), *cert. denied*, 485 U.S. 1035 (1988).

[309]    *See In re Clouse,* 446 B.R. at 705.

[310]    *See In re Consol. Auto Recyclers, Inc.*, 123 B.R. at 140-41. It should be noted that when action taken against a non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, such action is barred by the automatic stay. *See 48th Street Steakhouse*, 835 F.2d at 430-31; *see also Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 288 (2d Cir. 2003) (holding that the automatic stay applies to non-bankrupt entity because it is "wholly owned by [the debtor], and adjudication of the claim against [the non-bankrupt entity] will have an immediate adverse economic impact on" the debtor). Because all actions taken in furtherance of the Nova Scotia Bankruptcy Case would inevitably have an adverse impact on Old GM, as sole shareholder, such actions violate the automatic stay and are void.

61

void and without legal effect.[311]  Because the GM Nova Scotia bankruptcy proceeding is the

direct result of an automatic stay violation and the other inequitable conduct discussed above, for

purposes of claim allowance in this case, the Court should refuse to recognize the GM Nova

Scotia bankruptcy as a proper winding-up event, and disallow the Nova Scotia Trustee Claim in

full.

C.    **The Lock-Up Agreement Is Void For
Failure To Comply With Bankruptcy Rule 9019**

As a postpetition settlement and compromise of, among other things, the Oppression

Action, the Lock-Up Agreement and related transactions also required approval under Rule 9019

of the Federal Rules of Bankruptcy Procedure.  Absent approval by the bankruptcy court, debtors

cannot bind their estates to compromises. Fed. R. Bank. P. 9019.[312]  The scope of Rule 9019 is

broad, and it is intended "to prevent the making of concealed agreements which are unknown to

the creditors and unevaluated by the court,"[313] and to protect creditors "against bad deals" made

between a debtor and another creditor.[314]

Indeed, Rule 9019 is intended to prevent exactly what the Noteholders attempted to

accomplish here.  The Lock-Up Agreement involved, among other things, the worthless release

of the claims asserted in the Oppression Action, which was a meritless litigation that posed no

genuine risk to Old GM.  That agreement further provided the Noteholders with the $367 million

"consent fee" that ostensibly does not reduce the principal amount of the Notes, and gave the

Noteholders claims equal to more than two-and-a-half times the face amount of the Notes.

---

[311]    *See, e.g., Hamm*, 1994 WL 507717, at *1.

[312]    *See, e.g., In re Handy & Harman Ref. Grp., Inc.*, 304 B.R. 49, 53 (Bankr. D. Conn. 2004); *Saccurato v. Masters, Inc. (In re Masters, Inc.)*, 149 B.R. 289, 291 (Bankr. E.D.N.Y. 1992).

[313]    *In re Masters, Inc.*, 149 B.R. at 292 (citation omitted).

[314]    *In re Fleming Packaging Corp.*, No. 03-82408, Adv. Pro. No. 04-8166, 2008 WL 682428, at *2 (Bankr. C.D. Ill. Mar. 7, 2008).

Because no notice of the agreement was given to other creditors and no court approval was obtained, the Lock-Up Agreement is void.[315]

## V.    THE CONSENT FEE PAYMENT SHOULD BE APPLIED TO REDUCE THE PRINCIPAL AMOUNT OF THE NOTES

In the event that the Court does not disallow the Disputed Claims entirely for the reasons set forth in Argument Section I above, or equitably subordinate the Nova Scotia Trustee Claim and the Tainted Claims consistent with Argument Section II above, then the Court should reduce the Disputed Claims by the amount of the Consent Fee.  Because the Lock-Up Agreement is void for the reasons stated above, there is no need to consider, or give any effect to, the language in that agreement stating that "the Consent Fee payment does not reduce, limit or impair the Notes, the Guarantee" Claims or the Nova Scotia Trustee Claim.  Accordingly, Old GM's obligations under the Notes should be reduced by the amount of the Consent Fee and, as a result, so should the Disputed Claims, including that portion of the Nova Scotia Trustee Claim that is based on the Notes.  But even if, for the sake of argument, the unauthorized postpetition entry into the Lock-Up Agreement did not render that agreement void *ab initio*, the overall circumstances, and in particular the economic substance of the payment, require that the Consent Fee be treated as a payment of principal on the Notes.[316]

---

[315]    *See, e.g., In re Rothewell*, 159 B.R. 374, 379 (Bankr. D. Mass. 1993) (failure to comply with Rule 9019 renders the settlement "without effect").

[316]    To the extent it is even necessary to "recharacterize" the Consent Fee in this case, the Court's authority to grant such relief is firmly based on its authority to determine the allowance and amount of claims against the estate.  11 U.S.C. § 502(b); 28 U.S.C. § 157(b)(2)(A) and (B).  Indeed, the allowance of claims is a fundamental power that is integral to the court's administration of the bankruptcy estate. *See Katchen v. Landy*, 382 U.S. 323, 329 (1966) (the power to allow and disallow claims is of basic importance in the administration of the bankruptcy estate); *In re Saint Vincent's Catholic Med. Ctrs.*, 445 B.R. 264, 269 (Bankr. S.D.N.Y. 2011) (citing *In re BKW Sys., Inc.*, 66 B.R. 546, 548 (Bankr. D.N.H. 1986) for the proposition that "nothing is more directly at the core of bankruptcy administration . . . than the quantification of all liabilities of the debtor.") (quotations omitted).  This authority is further

Footnote continued on next page

As the Supreme Court recognized in *Katchen v. Landy*, the power of a bankruptcy court to allow or disallow a claim includes "full power to inquire into the validity of any alleged debt or obligation of the bankrupt upon which a demand or a claim against the estate is based." *Katchen*, 382 U.S. at 329 (quotations omitted).[317]  Accordingly, bankruptcy courts may (and do) look beyond the written terms of the parties' agreement to determine the proper characterization and allowed amounts of claims asserted against a bankruptcy estate, regardless of the labels or descriptions self-interested creditors assign to the relevant transaction.[318]  For example, in *LFD Operating, Inc. v. Ames Department Stores, Inc. (In re Ames Department Stores, Inc.)*, 274 B.R. 600, 615, 631 (Bankr. S.D.N.Y. 2002), *order aff'd sub. nom.*, 2004 WL 1948754, (S.D.N.Y. Sept. 1, 2004), *judgment aff'd*, 144 F. App'x. 900, 2005 WL 1916360 (2d Cir. 2005), this Court rejected a creditor's argument that the unambiguous terms of a contract conclusively established that certain sale proceeds were property of the creditor rather than the debtor, and determined that, based on the true character of the transaction and the parties' relationship, those proceeds were property of the debtor's estate.  *Id*. at 615, 631.[319]

---

Footnote continued from previous page

supplemented by the exercise of the court's equitable powers under section 105 of the Bankruptcy Code. *See Pepper,* 308 U.S. at 308-09 (equitable powers are to be exercised by bankruptcy courts regarding the allowance of claims).

[317]    *See also Pepper*, 308 U.S. at 308 ("[T]he bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate."); *Spradlin v. Williams (In re Alma Energy, L.L.C.)*, No. 10-80-ART, 2010 WL 4736905, at *1 (E.D. Ky. Nov. 16, 2010) (noting that "[s]ome situations simply call for a closer look" and remanding action to uphold creditor's claim for amounts based upon prepetition settlement for further scrutiny); *In re Premier Entm't Biloxi, L.L.C.*, 413 B.R. 370, 374 (Bankr. S.D. Miss. 2009) (disallowing claim for liquidated damages).

[318]    *See Bozzuto's Inc. v. Vescio*, No. 00-5040, 234 F.3d 1261 (Table), 2000 WL 1715281, at *2 (2d Cir. Nov. 13, 2000) (recharacterizing rental concessions as payments on debt); *Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 597-600 (2d Cir. 1991) (recharacterizing a sale-leaseback transaction as an equitable mortgage); *see also United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 618 (7th Cir. 2005) (recharacterizing a purported lease as a secured loan), *cert. denied*, 547 U.S. 1003 (2006).

[319]    *See also Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 364 (3d Cir. 2002) (notwithstanding
Footnote continued on next page

Similarly, the Court here should look beyond the terms and labels used by the parties,

consider the following relevant facts and properly characterize the $367 million Consent Fee as a

payment of principal:

- The amount of the Consent Fee is approximately 36% of the face amount of the Notes,[320] far in excess of consent fees typically paid in distressed transactions.[321]

- At the time the parties entered into the Lock-Up Agreement, no payments were due under the terms of the Notes.[322]

- The Old GM Controller's office acknowledged that the Consent Fee "effectively represented an actual return on the bondholders' investment."[323]

- Old GM personnel initially understood the Consent Fee to be a settlement of GM Nova Scotia's obligations under the Notes.[324]

- The Consent Fee was paid to the Noteholders *pro rata* on the basis of their holdings regardless of whether they consented to the passage of the extraordinary resolution and even if they voted against it.[325]

- The amount of the Consent Fee exceeded by more than $82 million Old GM's own Indifference Analyses of what would be a reasonable amount to pay the Noteholders to extinguish the Notes in full.[326]

---

Footnote continued from previous page

the terms of an underlying promissory note, prepetition interest payments made by the debtor pursuant to a promissory note should be recharacterized as payments of principal because of the creditor's conduct in connection with the transaction).

[320]   Gropper Decl., ¶¶ 52, 82.  *See also* Pl. Ex. 16, ¶ 2 (WGM00000795) (executed copy of the Lock-Up Agreement), A-4 (WGM00000816) (extraordinary resolution).

[321]   Trial Tr. (9/6/2012), 28:21-29:1, 31:9-14, 111:21-25, 126:19-23 (Cederholm).

[322]   The 2015 Notes mature on December 7, 2015 with interest payable annually in arrears on December 7.  Pl. Ex. 315, Ex. C ¶ 3 (GHW0003641), ¶ 6 (GHW0003644) (schedule 1 to fiscal and paying agency agreement).  The 2023 Notes mature on July 10, 2023 with interest payable annually on July 10. *Id*.  While the Notes had accrued interest as of June 1, 2009, no amounts were due and payable until July 10, 2009 and December 7, 2009, the next interest payment dates.

[323]   Pl. Ex. 152 at NGM000017558 (email from NYTO Controller's Group to file dated July 8, 2009).

[324]   Pl. Ex. 439 (email from G. Upton to H. Kiefer, dated July 8, 2009).

[325]   Statement of Uncontested Facts, ¶¶ 33, 74; Buonomo Decl., ¶ 55 (extraordinary resolution was binding on all holders of Notes).

[326]   Trial Tr. (8/10/2012), 108:25-109:7 (Buonomo); Trial Tr. (9/27/2012), 76:1-77:15, 79:25-80:5, 80:13-15; 83:22-84:1, 102:5-8 (Ammann); Pl. Exs. 126, 130, 133, 211.

Based on these facts, the Court should find that the true character of the Consent Fee was a payment of principal, and reduce the Noteholders' claims accordingly.

## VI.    THE NOVA SCOTIA TRUSTEE CLAIM IS DUPLICATIVE OF THE GUARANTEE CLAIMS

In addition to reducing the Nova Scotia Trustee Claim and the Guarantee Claims by the amount of the Consent Fee, this Court should also not allow the Noteholders' assertion of duplicate claims. Established law, in both the United States as well as Canada, recognizes that only a single distribution may be paid on account of what is, in substance, a single debt. The Nova Scotia Trustee Claim and the Guarantee Claims both seek recovery against Old GM on account of the Notes for the benefit of the Noteholders, and to that extent the claims are duplicative. Accordingly, the Nova Scotia Trustee Claim must be disallowed to the extent of its duplication of the Guarantee Claims.

Wedlake, in his Nova Scotia Trustee Claim, seeks recovery against Old GM of more than $1 billion for the unpaid principal due and interest accrued under the Notes.[327] Wedlake asserts this claim in his capacity as a fiduciary for the benefit of the creditors of GM Nova Scotia.[328] Any distribution Wedlake receives from Old GM on the Nova Scotia Trustee Claim would necessarily be distributed to the Noteholders, who are effectively the only creditors of GM Nova Scotia.[329] The Noteholders, through their Guarantee Claims, have also asserted separate claims

---

[327]    *See* Pl. Ex. 315 (Nova Scotia Trustee Claim).

[328]    Trial Tr. (8/7/2012), 159:18-160:1 (Wedlake); Trial Tr. (9/21/2012), 141:2-8 (Khimji); Trial Tr. (11/26/2012), 67:13-68:12 (Iacobucci).

[329]    New GM has asserted a claim against GM Nova Scotia for alleged liability under the Swaps. *See* Pl. Ex. 307 (New GM Swap Claim). However, under the terms of the Lock-Up Agreement, any distribution on account of the Swaps is subordinated to payment in full of the Notes should any portion of the Nova Scotia Trustee Claim be disallowed (if only one cent), effectively making the Noteholders the only creditors of GM Nova Scotia. *See* Pl. Ex. 16, ¶ 6(b)(v) (WGM00000800) (executed version of the Lock-Up Agreement).

against Old GM seeking recovery on the same liability as Wedlake, *i.e.*, more than $1 billion of unpaid principal and interest due under the Notes.[330]  Thus, the Noteholders, by manufacturing the Nova Scotia Trustee Claim for their benefit and asserting the Guarantee Claims are, as one Morgan Stanley analyst described it, attempting to drink from "two straws in one milkshake."[331]

There is no dispute that the liability underlying the Nova Scotia Trustee Claim with respect to the Notes and the liability underlying the Guarantee Claims are identical:  both seek recovery of the same unpaid amounts due to the Noteholders under the Notes.[332]  Further, the Noteholders are the ultimate beneficiaries of any distribution by Old GM on account of the Nova Scotia Trustee Claim.  It necessarily follows that if the portion of the Nova Scotia Trustee Claim that relates to the Notes and the Guarantee Claims are both allowed, the Noteholders will recover twice for a single loss, in derogation of long-established law prohibiting such a recovery, and contrary to the fundamental bankruptcy and insolvency principle of equality of distribution among creditors.[333]

Under 11 U.S.C. § 502(b)(1), a claim must be disallowed if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  The Nova Scotia Trustee Claim is based upon section 135 of the Companies Act, a

---

[330]    *See, e.g.,* Def. Ex. 290 (Aurelius' Guarantee Claim).

[331]    *See* Pl. Ex. 383 at MS&CO_GM_A_0001212 (email from D. Ammann attaching presentation, dated Jan. 22, 2010).

[332]    *Compare* Pl. Ex. 315 *with* Def. Ex. 290.

[333]    *See, e.g., Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (noting that the prime bankruptcy policy is equality of distribution among creditors of the debtor); *People v. Granite State Provident Ass'n*, 15 E.H. Smith 492, 495, 161 N.Y. 492, 495, 55 N.E. 1053, 1054 (Ct. App. N.Y. 1900) ("All creditors of a corporation, wherever residing, are entitled, in cases of insolvency, to have the general assets distributed among them upon principles of perfect equality."); *Bankr of Nova Scotia v. Janzen (Trustee of)* (1989), 90 NSR (2d) 67, 230 APR 67 (NSSC) ("There is an overriding principle in bankruptcy law that creditors are to be accorded equal and fair treatment and share pro rata in the assets of the estate.") (attached hereto as Index No. 2).

Nova Scotia statute.[334]  The Guarantee Claims are based upon Old GM's guarantee, which is

governed by New York law.[335]  The rule, however, is the same under both U.S. and Canadian

law:  there can be only one recovery for the same debt against the same debtor for the benefit of

the same parties.[336]  Accordingly, the Nova Scotia Trustee Claim, to the extent it seeks recovery

of amounts owed on account of the Notes, must be disallowed.

###     A.     The Nova Scotia Trustee Claim And
               Guarantee Claims Are Substitutes For Each Other

As explained in greater detail in the expert testimony of Professor Mohamed F.

Khimji,[337] the Nova Scotia Trustee Claim, to the extent it seeks payment of amounts owing

under the Notes, is a substitute for the contractual Guarantee Claims, and cannot be concurrently

allowed with the Guarantee Claims.  The Nova Scotia Trustee Claim asserts a right to payment

from Old GM for GM Nova Scotia's liability under the Notes under section 135 of the Nova

Scotia Companies Act.  That statute provides that in the event an unlimited liability company (a

"**ULC**"), such as GM Nova Scotia, is wound up, every present and past member shall, subject to

section 135, "be liable to contribute to the assets of the company to an amount sufficient for

payment of its debts and liabilities and the costs, charges, and expenses of the winding up . . ."

RSNS 1989, c. 81, s. 135.[338]  Contrary to the Noteholders' assertions, section 135 does not

---

[334]    *See* Pl. Ex. 315 at Attach., ¶ 3 (GHW0003593) (Nova Scotia Trustee Claim).

[335]    *See id*. at Ex. C ¶ 16 (GHW0003658) (Nova Scotia Trustee Claim, fiscal and paying agency agreement, schedule 1) (providing that the fiscal and paying agency agreement, the Notes, and the guarantee shall be governed and construed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of laws).

[336]    There is no case in which a court has allowed recovery against a member both on account of a claim under section 135 of the Nova Scotia Companies Act and on account of a claim under a separate contractual guarantee for the unlimited liability company's debt.  Trial Tr. (11/26/2012), 120:17-22 (Baird).

[337]    *See generally* Khimji Decl. and exhibits thereto; Trial Tr. (9/21/2012) (Khimji).

[338]    A copy of section 135 of the Nova Scotia Companies Act is attached as Tab 34 of Exhibit C to the Khimji Decl. and hereto as Index No. 3.

supplant established law in both Canada and the United States that precludes creditors, such as the Noteholders here, from being paid on the basis of two claims for the same underlying loss.

Unlimited member liability under section 135 functions as a "substitute for a shareholder guarantee," K.P. McGuiness, Canadian Business Corporations Law, 2nd ed. (Markham: LexisNexis Canada, 2007) at 78 (attached hereto as Index No. 4), and members have been described as "in effect guarantors of [a ULC's] obligations without any restriction." L.C.B. Gower, Gower's Principles of Modern Company Law, 5th ed. (London: Sweet & Maxwell, 1992), at 88 (attached hereto as Index No. 5). *See also* Khimji Decl., Ex. A at n.36 (hereinafter "**Khimji Report**") (citing *Olympia & York Developments (Re),* [1994] OJ No. 1335 (Ont. Bktcy.) (attached hereto as Index No. 6)). As conceded by Wedlake's expert, Professor Edward Iacobucci, a claim under section 135 and a claim under a contractual guarantee serve the same purpose and are functional equivalents of each other.[339] Thus, where a member separately guarantees a ULC's debts, as in the present case, enforcement of the guarantee should be in lieu of, and not in addition to, enforcement of a claim under section 135. Khimji Report, ¶ 32.

While section 135 is silent on whether a member may be held liable both under section 135 and under a separate guarantee for the same debt, disallowance of the Nova Scotia Trustee Claim to the extent of the amount of the Notes is consistent with both the history and purpose of section 135 (as well as other applicable law).[340] *See* Khimji Report, ¶¶ 12-33. Section 135 does

---

[339]    Trial Tr. (11/26/2012), 57:18-58:19 (Iacobucci).

[340]    The principles of statutory construction in Canada require that, when interpreting a statute, "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense, harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament." *See Antigonish (Town) v. Antigonish (County),* 2006 NSCA 29 (¶ 24) (citing E.A. Driedger and cases) (attached as Tab 1 to Exhibit C of the Khimji Decl. and attached hereto as Index No. 7). When interpreting a Nova Scotia statute, the Nova Scotia Interpretations Act directs that the court consider, among other things, (i) the circumstances existing at the time it was passed; (ii) the object to be attained; (iii) the former law, including other enactments upon the same or similar subjects; (iv) the consequences of a particular interpretation; and (v) the history of legislation on the subject. *See Nova Scotia*

Footnote continued on next page

not create new debt.  Khimji Report, ¶¶ 3, 18, 28.  Rather, member contribution claims under

section 135 arise as a result of the debts already owed by the ULC.  The legislative intent of

section 135, and its predecessor statute, section 38 of the U.K. Companies Act of 1862, is to

provide a centralized mechanism for the orderly collection of member contributions to satisfy the

ULC's existing debts by channeling the right to collect such contributions to a liquidator, trustee

or receiver.  Khimji Report, ¶¶ 18, 27.  There is nothing in the statute or legislative history, or

that of its predecessor statutes, to even suggest that by enacting these provisions, the legislature

intended that a ULC member that contractually guaranteed a ULC's debts be liable twice.  Such

an outcome would overturn firmly established law that prohibits double recoveries on account of

a single loss.

> **B.**     **The Nova Scotia Trustee Claim And Guarantee**
>          **Claims Are Not Allowable Concurrently Under U.S. Law**
>
> **1.**     **Allowance Of Both The Guarantee Claims And**
>            **The Nova Scotia Trustee Claim To The Extent Of**
>            **The Notes Violates The Equitable Principle That**
>            **Creditors Are Entitled To Only One Recovery For One Loss**

The Nova Scotia Trustee Claim and the Guarantee Claims arise under the same set of

facts (the issuance and non-payment of the Notes), both allege the same damages (the amounts

due under the Notes) against the same party (Old GM), and as such are duplicates of each

other.[341]  Allowing both claims is contrary to the bedrock principle of U.S. law that a claimant is

entitled to one recovery for one loss, even if that loss can be proven under multiple legal

---

Footnote continued from previous page
*Interpretation Act,* RSNS 1989, c. 235, s. 9(5) (attached as Tab 33 to Exhibit C of the Khimji Decl. and attached hereto as Index No. 8).

[341]     *See Sang Lan v. AOL Time Warner, Inc.,* No. 11 Civ. 2870 (LBS) (JCF), 2012 WL 1633907 (S.D.N.Y. May 9, 2012) (dismissing plaintiff's breach of fiduciary duty claim because it arises from the same facts and seeks the same relief as her invasion of privacy claim and is therefore duplicative); *Netjets Aviation, Inc. v. LHC Comm'ns., L.L.C.,* 537 F.3d 168, 175 (2d Cir. 2008) (citing *Sitar v. Sitar,* 854 N.Y.S.2d 536, 538 (2d Dep't 2008), two claims are duplicative of each other if they "arise from the same facts . . . and do not allege distinct damages").

theories.[342]  This principle holds even if the creditor extracts multiple promises to pay from the

same debtor, because "[a]ny rule that would permit the proof of two notes for one indebtedness

would permit the proof of a dozen and would substitute for pro rata distribution among real

creditors, distribution in accordance with the ability of the bankrupt to make manifold

obligations for single debts."[343]  Applying these fundamental principles, courts disallow claims

where a creditor, or a party on the creditor's behalf, asserts multiple claims against an estate on

account of the same underlying debt, to prevent allowance of a double liability against the

---

[342]    *See, e.g., Conway v. Icahn & Co.*, 16 F.3d 504, 511 (2d Cir. 1994) (citing *Wickham Contracting Co. v. Bd. of Educ.*, 715 F.2d 21, 28 (2d Cir. 1983), "Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed"); *Wickham Contracting Co., Inc. v. Bd. of Educ.*, 715 F.2d 21, 29 (2d Cir. 1983) (only a single recovery will be allowed as damages for the same illegal acts under different legal theories); *ADP Dealer Serv., Inc. v. Planet Automall, Inc.,* No. 09 Civ. 0185 (ILG) (RER), 2012 WL 95211, at *7 (E.D.N.Y. Jan. 12, 2012) (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 218 (3d Cir. 1992), *cert. denied*, 507 U.S. 921 (1993), "Simply because [plaintiff] was able to wrap that loss into several different legal theories of recovery does not entitle it to recoup twice."); *Hettinger v. Kleinman*, 733 F. Supp. 2d 421, 449 (S.D.N.Y. 2010) (a plaintiff seeking compensation for the same injury under different legal theories is only entitled to one recovery); *Carter v. State of N.Y.*, 528 N.Y.S.2d 292 (Ct. Cl. 1988), *judgment aff'd*, 154 A.D.2d 642 (N.Y. App. Div. 1989) (the equitable principle is that a claimant may not obtain a double recovery for the same injury and damages; *Leighty v. Brunn*, 510 N.Y.S.2d 174, 175 (App. Div. 1986) ("[I]t is beyond cavil that a plaintiff is entitled to only one recovery with respect to an identical damage claim."); *Berg-Bakis Ltd. v. City of Yonkers*, 455 N.Y.S.2d 645, 646 (App. Div. 1982) ("The plaintiffs sustained a single injury and are entitled to one recovery only.  Indeed, to allow the plaintiffs to recover separate damages on each of the two causes of action, or additional damages simply because they had proved both causes of action which had the same elements, would result in a proscribed double recovery."), *appeal dismissed*, 60 N.Y.2d 664 (1983), *appeal denied*, 64 N.Y.2d  603 (1985); *Zarcone v. Perry*, 434 N.Y.S.2d 437, 443 (App. Div. 1980), *aff'd*, 55 N.Y.2d. 782 (1981), *cert. denied*, 456 U.S. 979 (1982) (judicial policy forbids double recovery for one injury).

[343]    *John Matthews, Inc. v. Knickerbocker Trust Co.*, 192 F. 557 (2d Cir. 1911).  *See, e.g., N.Y. Trust Co. v. Palmer*, 101 F.2d 1, 9 (2d Cir. 1939) (a debtor's multiple promises to pay do not give rise to allowance of multiple claims against an insolvent debtor); *Mercantile Factors Corp. v. Warner Bros. Pictures, Inc.*, 214 N.Y.S. 273 (App. Div.), *aff'd*, 244 N.Y. 504 (1926) ("[A] debtor cannot, by adding another obligation of his own to that which he is already obligated to pay, create a second obligation as collateral to the first."); *People v. E. Remington & Sons (In re Oneida Nat'l Bank)*, 54 Hun. 480, 8 N.Y.S. 31, 34 (4th Dep't 1889), *aff'd*, 121 N.Y. 675 (1890) (citing *Third Nat'l Bank of Boston v. E. Railroad Co.*, 122 Mass 240, 242 (1877), "[a] debtor's liability to his creditor, where other creditors are concerned, is not increased by increasing the number of his promises to pay the same debt, in whatever form he may make them.  To hold otherwise would be to enable the debtor to incumber [sic] his assets by a new method, greatly to the prejudice of all other creditors.").  *See also Union Nat'l Bank of Johnstown, P.A. v. People's Sav. & Trust Co., of Pittsburg, P.A.*, 28 F.2d 326 (3d Cir. 1928) (holding that a corporate debtor's giving of an additional note as further evidence of the original debt does not entitle the creditor to multiple claims).

estate.[344]

The case of *Curtis v. Walpole Tire & Rubber Co.*, 227 F. 698, 703 (D. Mass. 1914), is

instructive. In *Curtis*, the court held that a creditor could not assert two claims against a debtor

for amounts owed under a promissory note, where the creditor sought to recover from the debtor

as both the indorser of the note *and* as the purchaser of the assets and liabilities of the original

maker of the note. The creditor was the holder of a promissory note made by the Massachusetts

Chemical Company ("**Mass. Chemical**") and indorsed by the Walpole Company ("**Walpole**").

*Id.* at 701. Walpole later acquired both the assets and liabilities of Mass. Chemical in a purchase

transaction, and thereby assumed the liability of Mass. Chemical under the note. *Id.* In

Walpole's receivership proceeding, the creditor asserted a claim against Walpole on account of

Walpole's indorsement of the note, and on account of Mass. Chemical's primary liability on the

notes, which liability Walpole separately assumed. *Id.* The court disallowed the indorsement

claim because the creditor's claim on account of the primary obligation under the note had

already been allowed against Walpole. The court held that to allow the indorsement claim in

addition to the primary note claim would permit the creditor to receive two dividends in respect

of what was in substance the same debt. *Id.* at 703.

The same conclusion is required here. Old GM is asserted to be liable for the amounts

---

[344]      *See, e.g., First Nat'l Bank of Beaumont v. Eason*, 149 F. 204, 204-05 (5th Cir. 1906) (a creditor
may not prove two claims against a bankruptcy estate, thereby establishing "double liability" because
"[t]here was only one consideration, really only one debt, and the appellant is entitled to only one
satisfaction."); *In re Simetco, Inc.*, No. 93-61772, 1996 WL 651001, at *3 (Bankr. N.D. Ohio Feb. 15,
1996) (disallowing PBGC's minimum funding contribution claim to the extent of overlap with its
unfunded benefit liability claim, because multiple recoveries for the same loss "would violate the
principles of ratable distribution and offend the notions of uniform treatment for creditors."); *In re Wise
Shoes, Inc.*, 2 F. Supp. 521, 523-24 (S.D.N.Y. 1932) (denying claim for face amount of surety bond which
bankrupt failed to obtain where claim for rent accrued and unpaid was allowed because "it is evident that
to allow a claim also for failure to give bond would be to permit double proof on the same debt, contrary
to the settled rule."), *aff'd*, 64 F.2d 1023 (2d Cir. 1933); *In re Sterling, Ahrens & Co.*, 4 Hughes 553, 1 F.
167, 169 (D. Md. 1880) ("One sound and well established rule applicable to the settlement of insolvent
estates is that the estate must never pay two dividends in respect of the same claim.").

due on the Notes under two guarantees of the same obligation:  under its contractual obligation

as a guarantor, and under its statutory guarantee as a member of a ULC.  But these two

obligations, as in *Curtis*, are for a single loss, which is the amount owed under the Notes.

Because the loss for the two claims is identical, the Court must disallow the claims asserted to

the extent necessary to prevent a double recovery against the Old GM estate.[345]

> **2.      Bankruptcy Courts Have Disallowed Multiple Claims For
> The Same Loss By Nominally Different Parties Where The
> Claims Are Asserted For The Benefit Of The Same Creditor**

Although the Nova Scotia Trustee Claim is nominally asserted by Wedlake and not the

Noteholders, the claim is being asserted for the benefit of the Noteholders.[346]  Thus, the real

claimants under both the Nova Scotia Trustee Claim and the Guarantee Claims are, in equity and

in substance, the Noteholders, and the fact that the Nova Scotia Trustee Claim is asserted by

Wedlake on the Noteholders' behalf does not transform this claim into a non-duplicative claim.

Indeed, courts considering proofs of claims in bankruptcy cases filed by individual claimants and

their representatives for the same loss have consistently held that both claims cannot be allowed

against the estate.[347]

---

[345]      *See also PNC Capital Recovery v. Mech. Parking Sys*., 726 N.Y.S.2d 394, 396-97 (App. Div. 2001) (noting the illogicality of interpreting a contract to make a debtor guarantee its own indebtedness), *dismissing leave to appeal*, 96 N.Y.2d 937 (2001), *appeal dismissed*, 98 N.Y.2d 763 (2002).

[346]      *See* Khimji Report, ¶ 27; Trial Tr. (8/7/2012), 159:18-60:1 (Wedlake); Trial Tr. (9/21/2012), 141:2-8 (Khimji); Trial Tr. (11/26/2012), 67:13-68:12 (Iacobucci).   The evidence in this case also establishes that Wedlake not only acts on behalf of the Noteholders, but is controlled by the Noteholders. *See* Argument Section II(B).

[347]      *See, e.g., In re Nw. Airlines Corp*., No. 05-17930, 2007 WL 2682129 (Bankr. S.D.N.Y. Sept. 12, 2007) (disallowing, as duplicative, claim of individual claimant where union filed a claim with respect to the same amounts claimed); *In re Enron Corp*., No. 01-16034 (AJG), 2006 WL 1030420 (Bankr. S.D.N.Y. Apr. 6, 2006) (disallowing, as duplicative, claim of individual claimant for unpaid wages and benefits under collective bargaining agreement where claimant's union filed claim on behalf of all union members for unpaid wages and benefits); *LTV Corp. v. Pension Benefit Guar. Corp. (In re Chateaugay Corp.)*, 115 B.R. 760 (Bankr. S.D.N.Y. 1990), *aff'd* 130 B.R. 690, 698 (S.D.N.Y. 1991) (holding that claim by PBGC for unpaid contributions will be disallowed to the extent that any amount duplicated other claims allowed for unpaid contributions) *vacated by agreement of the parties*, Nos. 89 Civ. 6012, 90 Civ.

Footnote continued on next page

For example, in *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 160 B.R. 882 (Bankr. S.D.N.Y. 1993), this Court held that where a pension plan trustee and the Pension Benefit Guarantee Corporation ("**PBGC**") each filed claims for amounts necessary to satisfy the debtor's obligations arising under its pension plan and the Employee Retirement Income Security Act, the pension plan trustee's claim would be disallowed to the extent it duplicated the PBGC's claim. *Id.* at 893. In doing so, the Court noted that in a bankruptcy, multiple recoveries for identical injuries are not permitted, and that to allow one creditor (or multiple creditors) to assert two dollars in claims for one dollar of loss from the same debtor would violate the principles of ratable distribution and offend the notion of uniform treatment of creditors. *Id.* (citing *In re Chateaugay*, 115 B.R. at 783-84).

Similarly, the Nova Scotia Trustee Claim and the Guarantee Claims, although asserted by nominally different claimants, assert claims for the same loss for the benefit of the same claimants, the Noteholders. Allowing both claims in this case would permit assertion of two dollars in claims for every one dollar of loss against Old GM. As such, the Nova Scotia Trustee Claim should be disallowed to the extent it seeks payment of amounts owed under the Notes.

### 3.    The Second Circuit's Holding In *Delta* Is Consistent With Disallowance Of The Nova Scotia Trustee Claim

The Second Circuit's holding in *Northwestern Mutual Life Insurance Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139 (2d Cir. 2010) ("***Delta***") affirms the fundamental principle prohibiting duplicate claims against the same debtor for the same debt. The holding in *Delta*, which was based on facts very different than those presented here, does

---

Footnote continued from previous page
6048 (KTD), 1993 WL 388809 (S.D.N.Y. Jun. 16, 1993); *In re Brinke Transp., Inc.,* No. 87-03785, 1989 WL 233147, at *3 (Bankr. D.N.J. Jan. 23, 1989) (striking claims filed by pension fund and union based on violation of collective bargaining agreement where the claims "substantially overlap" with that filed by the NLRB for unfair labor practices on the same facts.), *aff'd*, Civ. Act. No. 89-1778, 135 L.R.R.M. 2800 (D.N.J. 1989).

not, as the Noteholders and Wedlake suggest, entitle them to a double recovery on the
Noteholders' single loss.

*Delta* involved leveraged leases for the purchase and lease-back of aircraft and claims
relating to certain payments owed in connection with lost tax benefits. *Id.* at 141. In *Delta*, the
owner participants, who provided a portion of the funding for the acquisition of aircraft, filed a
"TIA" claim for certain tax benefits they lost as a result of the bankruptcy filing. *Id.* at 144. The
owner participants were to be reimbursed for these lost tax benefits pursuant to a prepetition
contract with the debtor. *Id.* at 142. In its aircraft leases, which were assigned as security to
certain lenders who provided additional funding to purchase aircraft, the debtor also agreed to
pay the lenders an amount calculated by reference to the tax loss as additional security against
default (the "SLV" claim). *Id.* The debtor in *Delta* objected to the claim of the owner
participants, who incurred the tax loss, while allowing the claim of the lenders, who did not
actually incur the tax loss. *Id.* at 143-144. The Second Circuit ruled that the objection was not
valid. *Id.* at 150.

The Second Circuit's holding is premised on the unremarkable proposition that where a
debtor made contractual promises to pay two different parties an amount calculated by reference
to the same event, the promisor's payment to one party will not excuse the promised payment to
the other. Consistent with established law, *Delta* does not implicitly or explicitly permit a
creditor to recover on multiple claims for one loss.[348] Moreover, the Second Circuit

---

[348]    The Bankruptcy Court's opinion in *Delta*, which the Second Circuit cites with approval, *see*
*Delta*, 608 F.3d at 149, specifically addresses *Finley, Kumble* and notes "[n]ot surprisingly, the
Bankruptcy Court disallowed the claims [of the PBGC and the pension plan trustee] to the extent that they
sought compensation for the same underfunding of the pension plan." *In re Delta Air Lines, Inc.*, 370
B.R. 552, 556-57, n.1 (Bankr. S.D.N.Y. 2007), *aff'd*, 2008 WL 4444001 (S.D.N.Y Sept. 29, 2008),
*vacated and remanded*, 608 F.3d 139 (2d Cir. 2010).

acknowledged that even under the circumstances presented, the proper remedy would have been
to disallow the claim of the party who did not actually incur the loss:

> To the extent that this is true [*i.e.*, that the allowance of both the TIA claim and SLV claim allowed the claimants to receive more than their pro rata share of distributions], it is Delta's own fault: the problem exists because Delta (and the creditors' committee) agreed, under the Bingham Term Sheet, the other restructured lease agreements, and Delta's plan of reorganization, to pay the Indenture Trustees [sic] more than they were entitled to – namely, their share *and* the Owner Participants' share.  While Delta is correct that the aggregate amounts claimed by the Owner Participants and the Indenture Trustees exceeded their proper aggregate share to the extent of the duplication of the Owner Participants' claims under the TIAs, the proper remedy was disallowance of the claims of the Indenture Trustees to the extent they were predicated on the Owner Participants' TIA entitlements.

*Id.* (emphasis added).

Old GM owes only one debt – payment of the approximately $1 billion under the Notes.
Unlike the debtor in *Delta*, Old GM made only one contractual promise to pay (the Guarantee).
There is only one loss in this case,[349] and the Noteholders are the only ones who incurred that
loss.  Unlike in *Delta*, the economic beneficiaries with respect to the Nova Scotia Trustee Claim
and the Guarantee Claims are the same parties (the Noteholders).  Under these facts, *Delta* would
not permit allowance of both the Nova Scotia Trustee Claim and the Guarantee Claims.
Accordingly, the Court should disallow the Nova Scotia Trustee Claim to the extent of
duplication with the Guarantee Claims, consistent with *Delta* and the existing case law in the
Second Circuit, all of which consistently prohibit two recoveries for a single loss from the same
entity.

---

[349]   As explained above, section 135 of the Companies Act is simply a mechanism to enforce the existing debts of a ULC and does not create a new debt.

### C. Canadian Law Prohibits Concurrent Enforcement Of The Nova Scotia Trustee Claim And The Guarantee Claims

Likewise, section 135 does not supplant established Canadian law that precludes creditors, such as the Noteholders, from being compensated on the basis of two claims for the same underlying loss.[350]    The common law rule against double proof prohibits concurrent allowance against Old GM of the Guarantee Claims and the Nova Scotia Trustee Claim to the extent of the Notes.    The rule against double proof is a long-standing principle of English[351] and Canadian law that is designed to ensure *pari passu* distribution to creditors by preventing the payment of claims that, although asserted under different theories or by different parties, are, in substance, on account of the same debt.    Khimji Report, ¶ 35.    Although the rule against double proof is often invoked in the context of bankruptcy proceedings, the rule itself is an overarching principle of Canadian law and is not limited to bankruptcy or insolvency proceedings.[352]    *See* Khimji Report, ¶ 35.

The dispositive question under the rule against double proof is whether two claims are asserted on account of the same debt.    *See Olympia & York Developments (Re),* [1998] OJ No. 4903, 4 CBR (4th) 189 (Ont. Bktcy.) ("**Olympia & York**") at ¶ 36 (attached hereto as Index No. 11).    In determining whether two asserted claims are, in substance, for the same debt the Ontario Court of Justice in *Olympia & York* set forth the following test: "the question [is] whether two payments are being sought for a liability which, if the company were solvent, could be

---

[350]    Khimji Report, ¶¶ 26, 34-39.

[351]    English law, while not binding upon Canadian courts, is persuasive authority in Canada.    *See* Trial Tr. (9/21/2012), 60:12-17 (Khimji); Baird Decl. at 14, n.10.

[352]    *See Glen Express Ltd., Re* [2000] B.P.I.R. 456 (Ch D) at p. 4 (attached as Tab 10 to Exhibit C of the Khimji Decl. and attached hereto as Index No. 9); *Owners of Steamship Enterprises of Panama Inc. v. Owners of SS Ousel (The Liverpool No 2)* [1963] P 64 (CA) at p. 84 (applying the rule against double proof in an admiralty case) (attached as Tab 28 to Exhibit C of the Khimji Decl. and attached hereto as Index No. 10).

discharged as regards both claimants by one payment" (the "**O&Y Test**").  *Id.* at ¶ 45.

In *Olympia & York*, the issue was whether the claim of a syndicate of lenders on account of the parent's guarantee of a loan made to its wholly-owned subsidiary, and the claim of the subsidiary for an intercompany loan made by the subsidiary to the parent with the proceeds of the loan, should both be allowed concurrently against the parent.  *Id.* at ¶¶ 2-6.  In applying the O&Y Test, the court concluded that, under the facts of that case, the two claims were double proofs, and that claimants were entitled to a single dividend out of the parent's estate.  The same result follows in this case, as it is undisputed that a full payment on the Guarantee Claims, assuming that Old GM is solvent, would discharge in full the amount of the Nova Scotia Trustee Claim attributable to the Notes.  As such, the Nova Scotia Trustee Claim to the extent of the Notes is a double proof and would not be enforceable together with the Guarantee Claims under Canadian law.

### D.    The Nova Scotia Trustee Claim Must Be Disallowed Pursuant To Section 502(e) Of The Bankruptcy Code

The purpose of section 502(e)(1)(B) is "to preclude redundant recoveries on identical claims against insolvent estates in violation of the fundamental Code policy fostering equitable distribution among all creditors of the same class."  *In re APCO Liquidating Trust*, 370 B.R. 625, 634 (Bankr. D. Del. 2007).  Section 502(e)(1)(B) of the Bankruptcy Code therefore requires the disallowance of the Nova Scotia Trustee Claim, because it is a contingent claim that is being asserted to recover the same debt asserted under the Guarantee Claims.  Specifically, section 502(e)(1)(B) precludes the allowance of the Nova Scotia Trustee Claim because it is a claim: (1) for contribution or reimbursement; (2) of an entity that is liable with the debtor for the debt; and (3) that is contingent.  11 U.S.C. § 502(e)(1)(B).  Because each of these elements is satisfied, the Nova Scotia Trustee Claim must be disallowed.

First, both Old GM and GM Nova Scotia are liable for the underlying debt on the Notes.

Co-liability is interpreted broadly for purposes of section 502(e), and includes any type of shared

liability, regardless of its basis. *In re Drexel Burnham Lambert Grp. Inc.*, 148 B.R. 982, 986

(Bankr. S.D.N.Y. 1992); *In re Baldwin-United Corp.*, 55 B.R. 885, 890 (Bankr. S.D. Ohio 1985).

The statute covers claims based on two entirely different grounds of liability, provided the

underlying liability is the same. *See Norpak Corp. v. In re Eagle-Picher Indus., Inc. (In re

Eagle-Picher Indus., Inc.*), 131 F.3d 1185, 1190 (6th Cir. 1997); *In re Tri-Union Dev. Corp.*, 314

B.R. 611 (Bankr. S.D. Tex. 2004). In the present case, GM Nova Scotia issued the Notes, and

Old GM guaranteed payment of the Notes, and therefore both are liable for repayment of the

same debt.

Second, the Nova Scotia Trustee Claim is a claim for contribution or reimbursement.

The determination of a claim's status as one for reimbursement or contribution is based on its

characterization under applicable non-bankruptcy law. *In re APCO Liquidating Trust*, 370 B.R.

at 631. Here, the applicable non-bankruptcy law is provided by section 135, which calls for a

member of an unlimited company – such as Old GM in the present case – to "contribute to the

assets of the company" under the circumstances described in the statute. N.S. Companies Act at

§ 135. A claim under section 135 is therefore explicitly based on a "contribution." Further, the

concept of "reimbursement" under section 502(e) is broadly construed to include "whatever

claims a co-debtor has which entitle him to be made whole for monies he has expended on

account of a debt for which he and the debtor are both liable." *In re Wedtech Corp.*, 87 B.R.

279, 287 (Bankr. S.D.N.Y. 1988); *see also In re Lyondell Chem. Co.*, 442 B.R. 236, 256 (Bankr.

S.D.N.Y. 2011). The Nova Scotia Trustee Claim therefore constitutes a claim for contribution

and/or reimbursement under section 502(e).

Finally, the Nova Scotia Trustee Claim is a contingent claim.  A claim is contingent if the legal duty to pay does not come into existence until triggered by the occurrence of a future event. *Mazzeo v. U.S. (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997); *In re GCO Servs., L.L.C.*, 324 B.R. 459, 466 (Bankr. S.D.N.Y. 2005); *In re Lull Corp.*, 162 B.R. 234, 239 (Bankr. D. Minn. 1993).  Even where liability has been established, courts have found claims to be contingent where it is unclear whether payment will need to be made.  *In re Lyondell Chem. Co.*, 442 B.R. at 250.  Until such time as GM Nova Scotia pays the Notes, the Nova Scotia Trustee Claim is contingent.  Because the Nova Scotia Trustee Claim is contingent, and because each of the elements of section 502(e)(1)(B) is satisfied, the Nova Scotia Trustee Claim must be disallowed.

### E.    The Disputed Claims, If Allowed At All, Must Be Disallowed To The Extent They Seek Recovery Of Postpetition Interest

The Disputed Claims seek recovery of principal and interest due on the Notes through October 9, 2009, the date of GM Nova Scotia's bankruptcy.[353]  The Disputed Claims are unsecured claims against Old GM governed by section 502 of the Bankruptcy Code.  Under section 502(b)(2) of the Bankruptcy Code, claims for unmatured interest as of June 1, 2009, Old GM's Petition Date, shall be disallowed.  *See* 11 U.S.C. § 502(b)(2).  Thus, the Disputed Claims, if allowed at all, should be disallowed to the extent of any interest claimed for the periods from and after Old GM's Petition Date.

### F.    The Nova Scotia Trustee Claim, If Allowed At All, Should Be Allowed As A "Net" Claim After Deduction Of Distributions On The Guarantee Claims

A claim under section 135 of the Companies Act is, by its nature, a net claim.  If a creditor receives payment from another source on the ULC's debts, the "debts and liabilities" of the ULC are reduced, and so is the claim under section 135.  *See* RSNS 1989, c. 81, s. 135.  The Nova Scotia Trustee Claim asserts a section 135 claim without any deduction for the amounts the

---

[353]    *See* Pl. Ex. 315 at Attach., ¶ 5 (GHW0003594-95).

Noteholders will recover under the Guarantee Claims. If the Nova Scotia Trustee Claim is allowed at all against Old GM, it should be allowed only as a net claim after deduction of the amounts paid to the Noteholders on account of the Guarantee Claims.

## VII.    THE PORTION OF THE NOVA SCOTIA TRUSTEE CLAIM THAT IS BASED ON THE SWAPS SHOULD BE DISALLOWED

### A.    New GM Has No Rights To The Swaps Because The Swaps Were Not Assumed And Assigned To New GM

As of the filing of the petition, Old GM owned the "in the money" side of the Swaps. In fact, as of just two months before the Petition Date, GM Nova Scotia owed Old GM approximately CAD $632 million under the Swaps.[354] Through the Lock-Up Agreement, and the postpetition machinations of the Lock-Up Noteholders acting in concert with the same conflicted Old GM employees who became employed by New GM, the Noteholders now contend that the Swaps create a $564 million claim for their benefit. For the reasons set forth herein, the portion of the Nova Scotia Trustee Claim that is based on the Swaps should be disallowed.

The Swaps mature by their terms in 2015 and 2023, respectively.[355] Old GM's bankruptcy filing constituted an "event of default" under the Swaps but did not operate to terminate the Swaps.[356] As executory contracts, the Swaps constituted property of Old GM's bankruptcy estate, subject to assumption or rejection in accordance with the Bankruptcy Code and procedures authorized by the Court. 11 U.S.C. § 365.

---

[354]    As disclosed by Old GM, as of March 31, 2009, GM Nova Scotia would owe a net liability of approximately CAD $632 million to Old GM under the Swaps, if the Swaps were terminated as of such date. Def. Ex. 75 at NGM000007377 (form S-4 filed on April 27, 2009).

[355]    *See* Pl. Ex. 315, confirmation ¶ 2 (GHW0003743) (termination date listed as July 10, 2023), confirmation ¶ 2 (GHW0003738) (termination date listed as December 7, 2015) (Nova Scotia Trustee Claim).

[356]    *See id.* at ¶ 5(a)(vii) (GHW0003710), ¶ 6(a)  (GHW0003712) (Nova Scotia Trustee Claim).

The Swaps were not assumed and assigned to New GM.  In the order approving the 363 Sale this Court set forth the exclusive procedures for the assumption and assignment of contracts in this case.  Those procedures were not followed with respect to the Swaps.[357]  In particular, notice was never sent to GM Nova Scotia, and none of the Swap Documents were listed in the assumption and assignment database.[358]  Consistent with the above, New GM has acknowledged that it does not believe it has a right to the Swaps.[359]

New GM is not an assignee of, and has no rights to, the Swaps, and, therefore has no claim against GM Nova Scotia arising from the Swaps.  The right to assert a claim against GM Nova Scotia for liabilities under the Swaps belongs solely to Old GM, and Old GM has not asserted that claim.[360]  Accordingly, the portion of the Nova Scotia Trustee Claim that is based on the Swaps should be disallowed.

---

[357]    *See* Pl. Ex. 275, ¶ 10 (Sale Procedures Order) (Bankr. Dkt. No. 274) (as a condition precedent to the assumption of an executory contract, Old GM was required to provide an assumption and assignment notice containing an objection deadline to the contracting counterparty, in the form attached as Exhibit D to the Sale Procedures Order, with instructions for how to access the assumption and assignment database).

[358]    Pl. Ex. 281 (Email from R. Berkovich to E. Fisher dated April 22, 2010, attaching excerpt from assumption and assignment database).

[359]    The key individuals at New GM did not always believe that the Swaps had been assumed and assigned to New GM.  *See* Pl. Ex. 248 ("there is a view [at GM] that [the] swap claim is not included when calculating the wind-up claim."); Pl. Ex. 22 ("I inquired with Weil Gotshal, which reminded me that inasmuch as the [Swaps were] not assigned this decision rests with Motors Liquidation Company (Oldco)").  Moreover, in the New GM Swap Claim, Buonomo certifies that New GM "acquired rights in the account as of July 10, 2009 pursuant to its acquisition of substantially all of the assets of" Old GM).  Subsequently, New GM took the position that the Swaps were assumed and assigned.  Trial Tr. (8/9/2012) 106:5-7 (Buonomo) ("[The Swaps] were designated for assumption according to the procedures in place. . . .").  However, when asked about the language in the New GM Swap Claim that he signed, Mr. Buonomo testified that "the date would be wrong if [the Swaps are] deemed an executory contract subject to that process. If they're deemed an executory contract, it should have been as of whatever the date [of] the assumption through that process." *Id.* at 113:11-15.

[360]    The Swaps were rejected, at the latest, pursuant to *Debtors' Second Amended Joint Chapter 11 Plan* (Bankr. Dkt. No. 9836a, § 8.1).

**B.    Even If New GM Has Rights To
The Swaps, It Has No Valid Claim**

Even if the Swaps had been assigned to New GM, the portion of the Nova Scotia Trustee

Claim that is based on the Swaps is, in any event, invalid because the Swaps were not

terminated.  Rather, GM Nova Scotia, the defaulting party upon its bankruptcy filing, purported

to "disclaim" the Swaps as of October 9, 2009, by letter dated January 12, 2010.  This

"disclaimer," however, did not effect an early termination under the ISDA Master Agreement,

which expressly requires, among other things, that the *non-defaulting party* issue a termination

notice specifying the default and designating a *future* early termination date – not a date before

the time such notice is effective.[361]  Here, the only way that the Swaps could have been

terminated in advance of the applicable maturity dates was by following the termination

procedures set forth in the Swap Documents.

The termination of the Swaps is what crystalizes liability and gives rise to a claim.[362]  It is

undisputed that New GM has never issued a termination notice relating to the Swaps.  For

reasons that New GM has refused to disclose based on the assertion of privilege, it simply

decided that it "was not inclined to terminate" the Swaps.[363]  Absent proper termination by the

non-defaulting party, no payment is due under the Swaps.  The portion of the Nova Scotia

Trustee Claim that is based on the Swaps should therefore be disallowed on this basis.

Finally, even if the Swaps did somehow constitute "Purchased Contracts" under the

MSPA, Old GM would still have no liability to New GM (or any other entity) with respect to the

---

[361]     *See* Pl. Ex. 315 at Ex. E, ¶ 6(a) (GHW0003712) (ISDA Master Agreement).

[362]     Trial Tr. (9/28/2012), 20:18-25; 21:1-8; 22:2-18 (Gropper); Pl. Ex. 20.

[363]     Trial Tr. (8/7/2012), 81:19-22 (Wedlake); Wedlake Decl., ¶ 60; *see also* Pl. Ex. 145.  The only logical explanation as to why New GM would not be inclined to terminate is that it did not believe it was legally permitted to terminate.  As described above, Mr. Buonomo was reminded that the Swaps were not assigned to New GM, and he was aware of the view that the Swaps were not to be included when calculating the Nova Scotia Trustee Claim.

83

Swaps because, pursuant to the Sale Order, Old GM has been "forever released from any and all liability under the Purchased Contracts."[364]  Thus, regardless of whether New GM has any rights in the Swaps, the portion of the Nova Scotia Trustee Claim that is based on the Swaps is invalid and should be disallowed.

### C.    Alternatively, The Swaps Component Of The Nova Scotia Trustee Claim Should Be Reduced

If the portion of the Nova Scotia Trustee Claim that is based on the Swaps is not disallowed in its entirety (as it should be), the claim should be reduced by at least $233 million.[365]  Assuming that the January 12, 2010 letter somehow constituted a termination, it would have been an early termination because the Swaps do not mature by their terms until 2015 and 2023.[366]  The confirmations to the Swaps, which dictate the payments that are due upon early termination, specify that the Final Exchange Method governs the calculation.[367]  According to both the GUC Trust's swap expert and Wedlake's swap expert, the amount of the Nova Scotia Trustee Claim that is based on the Swaps (if any), applying the Final Exchange method, would be $331,504,266.[368]

---

[364]    *See* Sale Order, ¶ GG [Bankr. Dkt. No. 2968].

[365]    *See supra* note 228.

[366]    *See supra* note 221.

[367]    *See supra* note 222, 223.

[368]    *See supra* note 228.

## <u>CONCLUSION</u>

WHEREFORE, the GUC Trust respectfully requests entry of a judgment disallowing the

Disputed Claims in full, and granting such other relief as the Court deems just and proper.

Dated: New York, New York
   May 24, 2013

Respectfully submitted,

By: /s/ Eric B. Fisher         
  Barry N. Seidel
  Eric B. Fisher
  Katie L. Weinstein
  Mary Kim (admitted *pro hac vice*)
  DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, New York 10019-6708
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Counsel for the Motors Liquidation*
*Company GUC Trust*