# Index No. 1

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297



2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

Harbert Distressed Investment Master Fund Ltd. v. Calpine Canada Energy Finance II ULC

HARBERT DISTRESSED INVESTMENT MASTER FUND, LTD. and WILMINGTON TRUST COMPANY (Applicants) and CALPINE CANADA ENERGY FINANCE II ULC, CALPINE CANADA RESOURCES COMPANY, CALPINE EUROPEAN FUNDING (JERSEY) LIMITED, CALPINE (JERSEY) LIMITED and CALPINE CORPORA-TION (Respondents)

Nova Scotia Supreme Court

Smith A.C.J.S.C.

Heard: July 6-8, 27, 2005
Judgment: August 2, 2005
Docket: S.H. 245975

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: John L. Finnigan for Applicant, Harbert Distressed Investment Master Fund, Ltd.

Elizabeth Pillon for Applicant, Wilmington Trust Company

Roderick H. Rogers for Respondents

Subject: Corporate and Commercial; Civil Practice and Procedure; International

Business associations --- Powers, rights and liabilities — Corporate borrowing — Rights and obligations of security holders — General principles

Oppression remedy — H Ltd. was investment fund specializing in distressed and high yield debt securities — W Co. was securities-holding trustee — C Co. group of companies included two companies registered under Nova Scotia Companies Act, Finance II and Resources — Finance II was holder of term debenture issued by Resources — In 2001, Resources had equity interest in natural gas-fired power plant in Yorkshire, England ("S facility") — In October of 2001, Finance II issued series of bonds to W Co. as trustee for investment funds — In 2004, C Co. group of companies issued preferred shares with respect to S facility — In order to effect sale of S facility, it was necessary to cause preferred shares to be re-deemed in priority to other security holders — On January 13, 2005, C Co. announced potential sale of S facility — On January 14, H Ltd. made its first purchase of Finance II bonds — At time of purchase, H Ltd. knew of issuance of pre-ferred shares — On January 20, C Co. group of companies issued second series of preferred shares with respect to S fa-cility — On April 13, H Ltd. sent letter to Finance II and Resources, suggesting that announcement of sale of S facility and issuance of second series of redeemable preferred shares was evidence of effort to strip value of S facility to preju-dice of Finance II's bondholders — H Ltd. and W Co., as trustee on behalf of H Ltd., applied for oppression remedy un-

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

der s. 5 of Third Schedule of Companies Act — Application dismissed — Issuance of preferred shares was detrimental to interests of Finance II's bondholders and contravened terms of term debenture between Finance II and Resource — However, H Ltd. knew that C Co. group of companies had issued preferred shares when H Ltd. bought Finance II bonds — Consequently, H Ltd. cannot claim that conduct of C Co. group of companies was oppressive.

Judges and courts --- Jurisdiction — Territorial jurisdiction — Residence or domicile — Of corporations

Oppression remedy — H Ltd. was investment fund specializing in distressed and high yield debt securities — W Co. was securities-holding trustee — C Co. group of companies included two companies registered under Nova Scotia Companies Act, Finance II and Resources — Neither H Ltd., W Co. nor C Co. was based in Nova Scotia — Finance II and Resources were registered under Nova Scotia Companies Act — H Ltd. and W Co., as trustee on behalf of H Ltd., applied for oppression remedy under s. 5 of Third Schedule of Companies Act against C Co. group of companies — C Co. cross-applied for declaration that Nova Scotia had no jurisdiction to hear matter — Cross-application dismissed — When dealing with jurisdiction, court first determines whether forum can assume jurisdiction given relationship between case, parties and forum (jurisdiction simpliciter) — While neither H Ltd., W Co. nor C Co. was registered or had head office in Nova Scotia, Finance II and Resources were Nova Scotia companies — Finance II and Resource acknowledged jurisdiction of Nova Scotia court to deal with application against them — Businesses of Finance II, Resource and C Co. were so intermingled that it was fair to state that C Co. had real and substantial connection to Nova Scotia.

Business associations --- Specific corporate organization matters — Shareholders — Shareholders' remedies — Relief from oppression — Standing to apply

"Complainant" — H Ltd. was investment fund specializing in distressed and high yield debt securities — W Co. was securities-holding trustee — C Co. group of companies included two companies registered under Nova Scotia Companies Act, Finance II and Resources — Neither H Ltd., W Co. nor C Co. was based in Nova Scotia — Finance II and Resources were registered under Nova Scotia Companies Act — H Ltd. and W Co., as trustee on behalf of H Ltd., applied for oppression remedy under s. 5 of Third Schedule of Companies Act against C Co. group of companies — C Co. cross-applied for declaration that H Ltd. and W Co. were not "complainants" as defined in s. 7(5)(b)(i) of Companies Act — Cross-application dismissed — "Complainant" is defined in s. 7(5)(b)(i) of Act to include registered holder or beneficial owner of security of company or any of its affiliates — Term "security" is not defined in Act — Term "security" can include bond — Consequently, holders of Finance II bonds, including H Ltd. and other bond holders represented by W Co., were registered holders or beneficial owners of security of company (Finance II) and they therefore satisfied definition "complainant" in s. 7(5)(b)(i) of Act.

Business associations --- Specific corporate organization matters — Shareholders — Shareholders' remedies — Relief from oppression — Miscellaneous issues

"Affiliate" — H Ltd. was investment fund specializing in distressed and high yield debt securities — W Co. was securities-holding trustee — C Co. group of companies included two companies registered under Nova Scotia Companies Act, Finance II and Resources — Neither H Ltd., W Co. nor C Co. was based in Nova Scotia — Finance II and Resources were registered under Nova Scotia Companies Act — H Ltd. and W Co., as trustee on behalf of H Ltd., applied for oppression remedy under s. 5 of Third Schedule of Companies Act against C Co. group of companies — C Co. cross-applied for declaration that it was not "affiliate" as referred to in Act and, accordingly, oppression remedy did not apply to it — Cross-application dismissed — Section 5(2) of Act deals with conduct of company or any of its affiliates — Term "affiliate" is not specifically defined in Act — Section 2(2) of Act indicates that company shall be deemed to be affiliate of another company if one of them is subsidiary of other or if both are subsidiaries of same company or if each of them is

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

controlled by same person — Broad remedial nature of oppression remedy provisions set out in Third Schedule of Act supported broad interpretation of term "affiliate" — C Co. was affiliate of Finance II and Resource — Term "affiliate" in s. 5(2) of Third Schedule of Act is not restricted to companies formed and registered in Nova Scotia or to "existing companies" as defined by Act.

### Cases considered by *Smith A.C.J.S.C.*:

*AMCU Credit Union Inc. v. Olympia & York Developments Ltd.* (1992), 7 B.L.R. (2d) 103, 1992 CarswellOnt 145 (Ont. Gen. Div.) — considered

*Ferguson v. Imax Systems Corp.* (1983), 43 O.R. (2d) 128, 150 D.L.R. (3d) 718, 1983 CarswellOnt 926 (Ont. C.A.) — referred to

*First Edmonton Place Ltd. v. 315888 Alberta Ltd.* (1988), 40 B.C.R. 28, 60 Alta. L.R. (2d) 122, 40 B.L.R. 28, 1988 CarswellAlta 103 (Alta. Q.B.) — considered

*First Edmonton Place Ltd. v. 315888 Alberta Ltd.* (1989), 45 B.L.R. 110, 71 Alta. L.R. (2d) 61, [1990] 2 W.W.R. 670, 1989 CarswellAlta 181 (Alta. C.A.) — referred to

*Ford Motor Co. of Canada v. Ontario (Municipal Employees Retirement Board)* (2004), 2004 CarswellOnt 208, 2004 D.T.C. 6224, 41 B.L.R. (3d) 74 (Ont. S.C.J. [Commercial List]) — considered

*Hunt v. T & N plc* (1993), [1994] 1 W.W.R. 129, 21 C.P.C. (3d) 269, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 37 B.C.A.C. 161, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 60 W.A.C. 161, *(sub nom. Hunt v. T&N plc)* 109 D.L.R. (4th) 16, 85 B.C.L.R. (2d) 1, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 161 N.R. 81, *(sub nom. Hunt v. T&N plc)* [1993] 4 S.C.R. 289, 1993 CarswellBC 1271, 1993 CarswellBC 294 (S.C.C.) — considered

*Incorporated Broadcasters Ltd. v. Canwest Global Communications Corp.* (2003), 2003 CarswellOnt 601, 223 D.L.R. (4th) 627, 31 B.L.R. (3d) 161, 63 O.R. (3d) 431, 30 C.P.C. (5th) 282, 169 O.A.C. 1 (Ont. C.A.) — considered

*Incorporated Broadcasters Ltd. v. Canwest Global Communications Corp.* (2003), 2003 CarswellOnt 5014, 2003 CarswellOnt 5015, 327 N.R. 196 (note), 195 O.A.C. 200 (note) (S.C.C.) — referred to

*LSI Logic Corp. of Canada Inc. v. Logani* (2001), 2001 ABQB 710, 2001 CarswellAlta 1100, 204 D.L.R. (4th) 443, [2001] 11 W.W.R. 740, 19 B.L.R. (3d) 101, 96 Alta. L.R. (3d) 162, 296 A.R. 201 (Alta. Q.B.) — considered

*Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077, 1990 CarswellBC 283, 1990 CarswellBC 767 (S.C.C.) — considered

*Muscutt v. Courcelles* (2002), 2002 CarswellOnt 1756, 213 D.L.R. (4th) 577, 160 O.A.C. 1, 60 O.R. (3d) 20, 13 C.C.L.T. (3d) 161, 26 C.P.C. (5th) 206 (Ont. C.A.) — followed

*Oakley v. Barry* (1998), 1998 CarswellNS 140, 158 D.L.R. (4th) 679, 166 N.S.R. (2d) 282, 498 A.P.R. 282, 25 C.P.C. (4th) 286 (N.S. C.A.) — considered

*Oakley v. Barry* (1998), 233 N.R. 397 (note), 175 N.S.R. (2d) 400 (note), 534 A.P.R. 400 (note) (S.C.C.) — referred to

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

*O'Brien v. Canada (Attorney General)* (2002), 2002 NSCA 21, 2002 CarswellNS 57, 210 D.L.R. (4th) 668, 201 N.S.R. (2d) 338, 629 A.P.R. 338 (N.S. C.A.) — considered

*Palmer v. Carling O'Keefe Breweries of Canada Ltd.* (1989), 41 B.L.R. 128, 67 O.R. (2d) 161, 56 D.L.R. (4th) 128, 32 O.A.C. 113, 1989 CarswellOnt 119 (Ont. Div. Ct.) — not followed

*Pente Investment Management Ltd. v. Schneider Corp.* (1998), 1998 CarswellOnt 4035, 113 O.A.C. 253, *(sub nom. Maple Leaf Foods Inc. v. Schneider Corp.)* 42 O.R. (3d) 177, 44 B.L.R. (2d) 115 (Ont. C.A.) — referred to

*People's Department Stores Ltd. (1992) Inc., Re* (2004), *(sub nom. Peoples Department Stores Inc. (Trustee of) v. Wise)* 244 D.L.R. (4th) 564, *(sub nom. Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Eng.), *(sub nom. Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Fr.), 4 C.B.R. (5th) 215, 49 B.L.R. (3d) 165, [2004] 3 S.C.R. 461, 2004 SCC 68, 2004 CarswellQue 2862, 2004 CarswellQue 2863 (S.C.C.) — referred to

*Piller Sausages & Delicatessens Ltd. v. Cobb International Corp.* (2003), 2003 CarswellOnt 2430, 35 B.L.R. (3d) 193 (Ont. S.C.J.) — considered

*Piller Sausages & Delicatessens Ltd. v. Cobb International Corp.* (2003), 2003 CarswellOnt 5167, 179 O.A.C. 290, 40 B.L.R. (3d) 88 (Ont. C.A.) — referred to

*Richardson Greenshields of Canada Ltd. v. Kalmacoff* (1995), 22 O.R. (3d) 577, 80 O.A.C. 98, 123 D.L.R. (4th) 628, 18 B.L.R. (2d) 197, 1995 CarswellOnt 324 (Ont. C.A.) — distinguished

*Rizzo & Rizzo Shoes Ltd., Re* (1998), 1998 CarswellOnt 1, 1998 CarswellOnt 2, 154 D.L.R. (4th) 193, 36 O.R. (3d) 418 (headnote only), *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 221 N.R. 241, *(sub nom. Adrien v. Ontario Ministry of Labour)* 98 C.L.L.C. 210-006, 50 C.B.R. (3d) 163, *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 106 O.A.C. 1, [1998] 1 S.C.R. 27, 33 C.C.E.L. (2d) 173 (S.C.C.) — referred to

*Royal Trust Corp. of Canada v. Hordo* (1993), 10 B.L.R. (2d) 86, 1993 CarswellOnt 147 (Ont. Gen. Div. [Commercial List]) — considered

*SCI Systems Inc. v. Gornitzki Thompson & Little Co.* (1997), 147 D.L.R. (4th) 300, 1997 CarswellOnt 1769, 36 B.L.R. (2d) 192, 1 C.B.R. (4th) 164, 29 O.T.C. 148 (Ont. Gen. Div.) — considered

*SCI Systems Inc. v. Gornitzki Thompson & Little Co.* (1998), 110 O.A.C. 160, 1998 CarswellOnt 2356 (Ont. Div. Ct.) — referred to

*Shoom v. Great-West Lifeco Inc.* (1998), *(sub nom. Shoom (in trust) v. Great-West Lifeco Inc.)* 40 O.R. (3d) 672, 1998 CarswellOnt 2192, 42 B.L.R. (2d) 25 (Ont. Gen. Div. [Commercial List]) — distinguished

*Shoom v. Great-West Lifeco Inc.* (1998), 1998 CarswellOnt 4993, 42 B.L.R. (2d) 40, 116 O.A.C. 278, *(sub nom. Shoom (in trust) v. Great-West Lifeco Inc.)* 42 O.R. (3d) 732 (Ont. C.A.) — distinguished

*Tolofson v. Jensen* (1994), [1995] 1 W.W.R. 609, 22 C.C.L.T. (2d) 173, 100 B.C.L.R. (2d) 1, 32 C.P.C. (3d) 141, 7 M.V.R. (3d) 202, 26 C.C.L.I. (2d) 1, 175 N.R. 161, 120 D.L.R. (4th) 289, *(sub nom. Lucas (Litigation Guardian of) v. Gagnon)* [1994] 3 S.C.R. 1022, 77 O.A.C. 81, 51 B.C.A.C. 241, 84 W.A.C. 241, 1994 CarswellBC 1, 1994 CarswellBC 2578 (S.C.C.) — referred to

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

*Westfair Foods Ltd. v. Watt* (1991), 79 Alta. L.R. (2d) 363, 115 A.R. 34, [1991] 4 W.W.R. 695, 79 D.L.R. (4th) 48, 5 B.L.R. (2d) 160, 1991 CarswellAlta 63 (Alta. C.A.) — referred to

*347883 Alberta Ltd. v. Producers Pipelines Inc.* (1991), [1991] 4 W.W.R. 577, 80 D.L.R. (4th) 359, 3 B.L.R. (2d) 237, 92 Sask. R. 81, 1991 CarswellSask 185 (Sask. C.A.) — considered

*820099 Ontario Inc. v. Harold E. Ballard Ltd.* (1991), 3 B.L.R. (2d) 113, 1991 CarswellOnt 141 (Ont. Div. Ct.) — considered

**Statutes considered:**

*Assignments and Preferences Act*, R.S.N.S. 1989, c. 25

    Generally — referred to

*Business Corporations Act*, R.S.O. 1990, c. B.16

    Generally — referred to

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44

    Generally — referred to

    s. 206 — referred to

*Companies Act*, R.S.N.S. 1989, c. 81

    Generally — referred to

    s. 2(1)(c) "company" — referred to

    s. 2(1)(h) "existing company" — referred to

    s. 2(2) — considered

    Sched. 3, s. 1 — referred to

    Sched. 3, s. 5 — considered

    Sched. 3, s. 5(1) — referred to

    Sched. 3, s. 5(2) — considered

    Sched. 3, s. 5(3) — referred to

    Sched. 3, s. 7(5)(b) "complainant" — considered

    Sched. 3, s. 7(5)(b) "complainant" (i) — referred to

*Fraudulent Conveyances Act*, 1571 (13 Eliz. 1), c. 5

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

Generally — referred to

**Rules considered:**

*Civil Procedure Rules*, N.S. Civ. Pro. Rules

R. 11.05 — referred to

R. 14.25 — referred to

APPLICATION by bondholder for oppression remedy under s. 5 of Third Schedule of *Companies Act*; CROSS-APPLICATION by respondents for declaration that court had no jurisdiction, that applicants were not complainants under *Act*, and that particular respondent was not affiliate under *Act*.

*Smith A.C.J.S.C.*:

1        This case involves an application under the Nova Scotia *Companies Act* for what is commonly known as an oppression remedy. The facts of the case are somewhat complex. The ultimate issue, however, is easily understood: that is, whether the Applicants have satisfied the Court that they are entitled to relief pursuant to section 5 of the Third Schedule of the *Companies Act*.

**Background**

*The Parties*

2        The Applicant, Harbert Distressed Investment Master Fund, Ltd. (hereinafter referred to as "Harbert") is an investment fund specializing in distressed and high yield debt securities. Harbert has its registered office in the Cayman Islands and its principal office in Dublin, Ireland. Its investment team carries on business from offices in New York, New York, U.S.A.

3        Howard P. Kagan gave evidence on behalf of Harbert. He is a Vice President and Director of Investments for a Harbert affiliate and was the analyst responsible for Harbert's investment in a series of senior notes or bonds which are the subject matter of this litigation. Mr. Kagan has been an investment analyst and financial advisor for over 20 years and has spent much of that time focussing on companies in the electric power sector.

4        The Applicant, Wilmington Trust Company (hereinafter referred to as "Wilmington") is a Delaware banking corporation. Wilmington is the Trustee in relation to the bonds in question.

5        Calpine Canada Energy Finance II ULC (hereinafter referred to as "Finance II") is an unlimited liability company under and pursuant to the provisions of the Nova Scotia *Companies Act*. This company has its registered office in Halifax in the province of Nova Scotia. Finance II issued the bonds in question.

6        Calpine Canada Resources Company (hereinafter referred to as "CCRC") is also an unlimited liability company under and pursuant to the provisions of the Nova Scotia *Companies Act*. CCRC has its registered office in Halifax in the province of Nova Scotia.

7        Calpine European Funding (Jersey) Limited (hereinafter referred to as "European Funding") is a corporation organized and existing under the laws of Jersey in the Channel Islands.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

8    Calpine (Jersey) Limited (hereinafter referred to as "Jersey") is also a corporation organized and existing under the laws of Jersey in the Channel Islands.

9    The Calpine Corporation (hereinafter referred to as "Calpine") is organized and exists under the laws of the state of Delaware. Calpine has its principal executive office in San Jose in the State of California, U.S.A. According to the evidence tendered on behalf of the Respondents, Calpine was established as a corporation in 1984 and is an integrated power company operating through a variety of divisions, subsidiaries and affiliates. Calpine is a publicly traded company on the New York Stock Exchange and is included in the S & P 500 Index. Calpine guaranteed the bonds in question.

10    Michael P. Thomas gave evidence on behalf of Calpine. He is the Senior Vice President and Corporate Treasurer of Calpine. According to Mr. Thomas' evidence, Calpine is engaged in the development, acquisition, ownership and operation of power generation facilities and the sale of electricity and steam in the United States, Canada and the United Kingdom.

11    The Respondents have provided the Court with a number of organizational charts depicting their corporate holdings. These charts indicate that Calpine is the ultimate, indirect parent of CCRC and Finance II and CCRC is the ultimate, indirect parent of European Funding and Jersey.

### The Transactions

12    In August of 2001, one of the companies in the Calpine group of companies purchased a natural gas-fired power plant in Yorkshire, England which is known as the Saltend facility. According to a press release issued by Calpine in January of 2005, the plant was purchased for approximately $800 million (U.S.).

13    According to Mr. Thomas, Saltend is owned by a company known as the Saltend Cogeneration Company Limited (hereinafter referred to as "Saltend Limited"). CCRC is the ultimate, indirect parent of Saltend Limited through a series of corporate holdings. At ¶ 30 of Mr. Thomas' affidavit sworn to June 13th, 2005 he confirms that Calpine indirectly owns CCRC and that CCRC indirectly owns Saltend Limited (which in turn owns the Saltend facility).

14    CCRC has an equity interest in the Saltend facility. This interest is listed as an asset on CCRC's May 31st, 2005 balance sheet having a value of $707,709,169.00 (U.S.).

15    As of August 22nd, 2001, Finance II (as borrower) had a $400 million (U.S.) bridge loan with certain commercial lending institutions. The money that was raised by this bridge loan was then loaned by Finance II to Calpine Canada Resources Ltd. (hereinafter referred to as "CCRL") which was the predecessor to CCRC. This latter loan was evidenced by a Term Debenture issued the 23rd day of August, 2001 between CCRL (as Issuer) and Finance II (as Holder). This Debenture is in the amount of £274,400,000.00 and has a due date of April 25th, 2021.

16    A complete copy of this Debenture was tendered into evidence at the time of the hearing. Appendix "A" attached hereto contains those portions of the Debenture that are most salient to this application. As will be seen from a review of Appendix "A", the advance made by Finance II to CCRL (now CCRC) was made for general corporate purposes. This Debenture included the following clauses:

### 4.1 Conduct of Business

The Issuer shall diligently conduct its business in a proper and efficient manner so as to preserve and protect its business and assets.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 278, 235 N.S.R. (2d) 297, 747 A.P.R. 297

. . . . .

### 4.14 Indebtedness

The Issuer shall not incur any Indebtedness unless such Indebtedness contains express terms, or is issued under a deed, indenture or other instrument which contains express terms, providing that it is unsecured and either subordinate to or ranks *pari passu* with the Indebtedness evidenced by this Debenture. The term **"Indebtedness"** means, with respect to the Issuer: (i) the principal (including redemption payments), premium, if any, interest and other payment obligations in respect of (x) indebtedness of the Issuer for money borrowed, and (y) indebtedness evidenced by securities, debentures, bonds, notes or other similar instruments issued by the Issuer, including any such securities issued under any deed, indenture or other instrument to which the Issuer is a party (including, for the avoidance of doubt, indentures pursuant to which subordinated debentures have been or may be issued), (ii) any capital, operating or other lease obligations of the Issuer, (iii) any obligations of the Issuer issued or assumed as the deferred purchase price of property, any conditional sale obligations of the Issuer, any hedging agreements and agreements of a similar nature thereto and all agreements relating to any such agreements, and all obligations of the Issuer under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business), (iv) any obligations of the Issuer for reimbursement on any letter of credit, banker's acceptance, security purchase facility or similar credit transaction, (v) all obligations of the type referred to in clauses (i) through (iv) above of other persons for the payment of which the Issuer is responsible or liable as obligor, guarantor, surety or otherwise, and (vi) all obligations of the type referred to in clauses (i) through (v) above of other persons secured by any lien on any property or asset of the Issuer (whether or not such obligation is assumed by the Issuer), in each case whether outstanding at the date of original issue of this Debenture or thereafter incurred.

17      Mr. Rogers, on behalf of the Respondents, has acknowledged that CCRC has assumed the obligations of CCRL under the terms of this Debenture.

18      In October of 2001, Finance II issued a series of bonds. The first offering was in the amount of £200 million (pounds sterling) at a rate of 8 7/8 %. The second offering was in the amount of 175 million (euros) at a rate of 8 3/8 %. Interest is payable on the bonds on April 15th and October 15th of each year. The outstanding principal amount of each series is due and payable in full on the maturity date (October 15th, 2011 for the first series in the amount of £200 million and October 15th, 2008 for the second series in the amount of 175 million). These bonds are "fully and unconditionally guaranteed" by Calpine. This guarantee is unsecured and ranks equally and ratably with all other unsecured and unsubordinated indebtedness of Calpine.

19      Calpine, Calpine Canada Energy Finance ULC (who are not a party to this application) and Finance II filed a Prospectus dated October 11, 2001 with the United States Securities and Exchange Commission (hereinafter referred to as the "SEC"). Appendix "B" attached hereto contains those portions of the Prospectus that are most salient to this application. As will be seen from a review of Appendix "B", the Prospectus indicated that Finance II is a special purpose financing subsidiary of Calpine that was formed solely as a financing vehicle for Calpine and its subsidiaries. The Prospectus further indicated that Finance II may issue a series of debt securities from time to time under one or more indentures between Finance II and Wilmington (as Trustee). These debt securities were said to be direct, unsecured obligations of the Issuer (Finance II).

20      The Prospectus disclosed that Calpine will fully and unconditionally guarantee the obligations of, *inter alia*, Finance II and the rights of holders of their debt securities. The Prospectus included the following clause:

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

Almost all of Calpine's operations are conducted through Calpine's subsidiaries and other affiliates. As a result, Calpine depends almost entirely upon their earnings and cash flow to service Calpine's indebtedness, including Calpine's ability to pay the interest on and principal of Calpine's debt securities, and on the debt securities of Energy Finance and Energy Finance II under the guarantees, if the guarantees are enforced. The non-recourse project financing agreements of certain of Calpine's subsidiaries and other affiliates generally restrict their ability to pay dividends, make distributions or otherwise transfer funds to Calpine prior to the payment of other obligations, including operating expenses, debt service and reserves. Each of Energy Finance and Energy Finance II is a special purpose financing subsidiary formed solely as a financing vehicle for Calpine and its subsidiaries. Therefore, the ability of Energy Finance and Energy Finance II to pay their obligations under the debt securities is dependent upon the receipt by them of payments from Calpine and its subsidiaries to which they have made loans or otherwise under agreements with them in connection with their respective financing activities. In addition, under Canadian law, the respective direct parent companies of Energy Finance and Energy Finance II will be liable for their subsidiary's indebtedness, including any debt securities issued by such subsidiary, upon a winding-up of that subsidiary. While each of Energy Finance and Energy Finance II believes that payments made to it in connection with its financing activities will be sufficient to pay the principal of, and interest on, any debt securities it issues, if the responsible parties were not able to make such payments for any reason, the holders of such debt securities would have to rely on the enforcement of Calpine's guarantee described below.

21      The Prospectus also contained, *inter alia*, the following clause:

**Use of Proceeds**

Unless otherwise specified in a prospectus supplement accompanying this prospectus, we will add the net proceeds from the sale of the securities to which this prospectus and the prospectus supplement relate to our general funds, which we will use, directly or indirectly, for financing power projects under development or construction, working capital, general corporate purposes and any other purpose specified in a prospectus supplement. We may conduct concurrent or additional financings at any time. The net proceeds from the sale of debt securities by Energy Finance or Energy Finance II to which this prospectus relates will be lent to Calpine or its affiliates by Energy Finance or Energy Finance II, as applicable, pursuant to one or more intercompany loans.

22      There is a section in this Prospectus entitled "Recent Developments". Numerous business activities are described therein including the following in relation to the Saltend facility:

On July 5, 2001, we announced an agreement to acquire a 1,200-megawatt natural gas-fired power plant at Saltend near Hull, Yorkshire, England from Entergy Wholesale Operations for up to approximately £562.5 million (approximately U.S. $800 million at current exchange rates). The Saltend facility, a cogeneration facility, provides electricity and steam for BP Chemical's Hull Works plant under a 15-year agreement. The balance of the Saltend facility's electricity output is sold into the deregulated UK power market. The Saltend transaction is our first acquisition of a power facility in Europe. The acquisition closed on August 24, 2001.

23      The Prospectus refers to various risk factors involved in investing in these securities. It also contains directions for obtaining additional information including copies of documents incorporated into the prospectus by reference. While the Prospectus contained detailed financial information concerning Calpine it stated the following in relation to Finance II:

Pursuant to Rule 3-10 of Regulation S-X promulgated by the SEC, Energy Finance II is not required to file separate reports with the SEC under the Securities Exchange Act and we are not required to include separate financial state-

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

ments for Energy Finance II in this prospectus because:

• all of the voting rights of Energy Finance II are owned by Calpine, either directly or through its wholly-owned subsidiaries, and Calpine files periodic and other reports with the SEC pursuant to the Securities Exchange Act;

• its sole operations are the investment of funds in Calpine and its subsidiaries; and

• Calpine will fully and unconditionally guarantee its obligations and the rights of holders under its debt securities and no subsidiary of Calpine will guarantee its obligations.

24       A Prospectus Supplement was also filed with the SEC. Appendix "C" attached hereto contains those portions of the Prospectus Supplement that are most salient to this application. Included in Appendix "C" is the following:

**Description of the Senior Notes and the Guarantees**

Calpine Canada Energy Finance II will issue each of the Sterling senior notes and the Euro senior notes under an indenture dated as of October 18, 2001 between Calpine Canada Energy Finance II and Wilmington Trust Company as trustee, as supplemented by the First Supplemental Indenture, dated as of October 18, 2001. The Sterling senior notes and the Euro senior notes shall each constitute a separate series of securities under the indenture. The related guarantees will be issued by Calpine under a Guarantee Agreement dated as of October 18, 2001, as supplemented by the First Amendment to Guarantee Agreement, dated as of October 18, 2001. Each series of senior notes will be issued in the form of one or more global securities registered in the name of a common depositary acting on behalf of Clearstream Banking, S.A., formerly Cedelbank ("Clearstream") and Euroclear System ("Euroclear") or its nominee.

The following description and the description in the accompanying prospectus is a summary of the material provisions of the senior notes and the guarantees and is subject to the detailed provisions of the indenture and guarantee agreement, copies of which are filed as exhibits to the Registration Statement of which this prospectus supplement is a part and are available upon request made to us. Whenever particular provisions of the indenture or guarantee agreement or terms defined therein are referred to, those provisions or definitions are incorporated by reference herein and such descriptions are qualified in their entirety by such reference. Calpine and Calpine Canada Energy Finance II urge you to read the indenture and the guarantee agreement because they, and not this description, define your rights as holders of the senior notes and the guarantees and describe every detail of the terms of the senior notes and the guarantees.

This description of the senior notes and the guarantees in this prospectus supplement replaces the description of the general provisions of the senior notes, the guarantee, the indenture and the guarantee agreement in the accompanying prospectus to the extent that it is inconsistent with the accompanying prospectus. The senior notes are "debt securities" as that term is used in the accompanying prospectus.

*Principal, Maturity and Interest; Listing*

The senior notes will be senior unsecured obligations of Calpine Canada Energy Finance II. Calpine will irrevocably and unconditionally guarantee the senior notes as to principal, premium, if any, interest and Additional Amounts (as defined below under "-Additional Amounts"), if any. There is no sinking fund for the senior notes.

25       This Prospectus Supplement contained detailed financial information relating to Calpine (the Guarantor of the bonds) but very little financial information relating to Finance II (the Issuer of the bonds). The following statement was

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

contained in the Prospectus Supplement:

Pursuant to Rule 3-10 of Regulation S-X promulgated by the SEC, Calpine Canada Energy Finance II is not required to file separate reports with the SEC under the Securities Exchange Act of 1934 and we are not required to include separate financial statements for Calpine Canada Energy Finance II in this prospectus supplement because:

• all of the voting rights of Calpine Canada Energy Finance II are owned by Calpine, either directly or through its wholly-owned subsidiaries, and Calpine files periodic and other reports with the SEC pursuant to the Securities Exchange Act;

• Calpine Canada Energy Finance II's sole operations are the investment of funds in Calpine and its subsidiaries; and

• Calpine will fully and unconditionally guarantee Calpine Canada Energy Finance II's obligations and the rights of holders under the senior notes and no subsidiary of Calpine will guarantee the obligations of Calpine Canada Energy Finance II.

26      The Prospectus Supplement does indicate that the only long term debt of Finance II that will be outstanding will be the senior notes (bonds) being issued, the net proceeds of which "will have been used" to repay amounts outstanding under the $400 million (U.S.) bridge credit loan referred to in ¶15 herein.

27      The Prospectus Supplement also contained warnings about the risks involved in investing in these bonds and advised prospective investors where they could obtain copies of the documents referred to in the Prospectus Supplement.

28      There is no reference in the Prospectus Supplement to the Saltend facility.

29      As indicated in the Prospectus Supplement, the bonds were issued under an Indenture dated as of the 18th day of October, 2001 between Finance II (as Issuer) and Wilmington (as Trustee). Appendix "D" contains those portions of the Indenture that are most salient to this application. As will be seen from Appendix "D", Finance II was entitled to assign its obligations under any series of securities to the Guarantor (Calpine) or any Significant Subsidiary of the Guarantor (as defined in the Indenture) provided that certain conditions were fulfilled.

30      The Indenture was amended by a First Supplemental Indenture also dated as of the 18th day of October, 2001. Appendix "E" contains that portion of the First Supplemental Indenture that is most salient to this application. As will be seen from a review of Appendix "E", Finance II agreed to comply in all respects with its obligations under section 7.1 of the Term Debenture for the benefit of the Finance II bond holders (s. 7.1 dealt with what would occur in the event of default under the Bridge Credit Agreement or any renewal, refinancing or extension thereof or replacement therefore including default under any debt securities issued in a public offering by Finance II. The effect of this section was that in such event, Finance II would be wound up and CCRL (now CCRC) would be liable for its indebtedness including any debt securities issued by Finance II).

31      In addition to the documents referred to above, Calpine executed a Guarantee Agreement also dated as of October 18th, 2001 which was in favour of the holders of the Finance II bonds and Wilmington (as Trustee). Appendix "F" contains those portions of the Guarantee Agreement that are most salient to this application. This Guarantee Agreement includes, *inter alia*, the following clause:

**ARTICLE THREE**

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

## CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

...........................

**SECTION 3.03. <u>Assignment to the Guarantor of the Company's Obligations</u>.**

It is acknowledged that, pursuant to Section 4.3 of the Indenture, the Company may assign is obligations under any Series of Securities and the Indenture to the Guarantor or any Subsidiary of the Guarantor in accordance with such Section 4.3 and, if the Company assigns its obligations to the Guarantor in accordance with such Section 4.3 with respect to any Series of Securities, all Guarantees of outstanding Securities of such Series shall automatically terminate and be discharged.

32    This Guarantee Agreement was amended by a document entitled First Amendment to Guarantee Agreement also dated as of October 18th, 2001 between Calpine (as Guarantor) and Wilmington (as Trustee). This document included, *inter alia*, the following term:

## ARTICLE II

## AMENDMENTS TO THE GUARANTEE AGREEMENT

### Section 2.1 <u>Amendment</u>.

(a) Article V of the Guarantee Agreement is amended to add the following new Section

**SECTION 5.06. <u>Performance by a Subsidiary of the Guarantor of Certain Covenants under Term Debenture</u>.**

Solely for the benefit of the Holders of Sterling 8-7/8% Notes and the Holders of Euro 8-3/8% Notes, the Guarantor shall cause Calpine Canada Resources Ltd., a wholly-owned subsidiary of the Guarantor, to comply in all respects with its obligations under Section 7.1 of the Term Debenture, dated August 23, 2001, between the Company and Calpine Canada Resources Ltd.

### *The Sally I Transaction*

33    On October 26th, 2004 Jersey issued $360 million(U.S.) of two year redeemable preferred shares. This is what has been referred to in this application and is hereinafter referred to as the "Sally I Transaction". According to the evidence of Mr. Thomas, the funds from this issuance were moved through a complex series of transactions up the Calpine corporate chain to a company known as Calpine European Finance, LLC which then returned what has been described as the "net proceeds" to CCRC by way of a return on capital. According to Mr. Thomas' evidence, CCRC utilized a portion of such net proceeds to make intercompany loans to a company known as Quintana Canada Holdings, LLC with a portion of the balance of such net proceeds used to repay intercompany debt owing by CCRC to Calpine Canada Energy Limited. According to a chart tendered into evidence by the Respondents, all of these corporations are part of the Calpine group of companies. Quintana is above CCRC in the corporate chain. Quintana gave CCRC unsecured promissory notes in relation to these intercompany loans.

34    These preferred shares must be redeemed by Jersey by October 15th, 2006 (their maturity date) if they have not already been redeemed prior to that date. According to Mr. Thomas' evidence the terms of certain loans relating to the Sally I Transaction do not permit the sale of the Saltend facility. Accordingly, in order to effect a sale of Saltend it is necessary to first prepay these loans and cause the preferred shares to be redeemed.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

35      In November of 2004, the Term Debenture between CCRL (as Issuer) and Finance II (as Holder) became available to the public.

36      On January 13th, 2005 Calpine announced the potential sale of the Saltend facility. A press release issued that day by Calpine indicated that the net proceeds of any sale of the facility would be used to redeem the existing $360 million (U.S.) Two Year Redeemable Preferred Shares (relating to the Sally I Transaction) with the remaining proceeds to be used in accordance with the asset sale provisions of Calpine's existing bond indentures.

37      On January 14th, 2005 Harbert made its first purchase of Finance II bonds. Harbert Distressed Investment Master Fund, Ltd. (as its name suggests) is in the business of purchasing or acquiring interests in distressed companies or distressed investments. Mr. Kagan confirmed that such investment generally involves acquiring interests in companies that are in part highly leveraged, may have difficulty meeting future obligations or may be in bankruptcy. Mr. Kagan also confirmed that generally Harbert is not involved in investment grade investments.

38      The evidence at the hearing establishes that on January 14th, 2005 Harbert made the following purchases of Finance II bonds:

### British Pound Denominated Notes

| Trade Date | Transaction Type | Master Quantity[FN1] | Price |
|---|---|---|---|
| 14/01/2005 | Margin Buy | 1,955,000 | 71.0 |
| 14/01/2005 | Margin Buy | 2,930,000 | 70.75 |
| 14/01/2005 | Margin Buy | 1,955,000 | 70.75 |

39      Throughout this decision, the figures under the heading "Master Quantity" represent the face value of the bonds in question which is basically the initial value of the bonds. The figures under the heading "Price" represent the percentage of the face value paid by Harbert for the bonds.

40      All of the bonds referred to in this decision as having been purchased by Harbert were purchased on what is known as the secondary market (if a bond holder wishes to sell their bonds they can do so on the secondary market). As will be seen, all of the Finance II bonds acquired by Harbert were purchased below face value.

41      Mr. Kagan reviewed the January 13, 2005 Calpine press release (announcing the potential sale of Saltend and the intention to use the net proceeds therefrom to redeem the shares relating to the Sally I transaction) before Harbert made its initial purchase of the Finance II bonds. He testified that the announcement that Saltend may be sold "pushed him over the edge" in terms of wanting to purchase the Finance II bonds. He said it was his view that if Saltend was sold, the proceeds would have to be used, first, to satisfy the Term Debenture referred to above, and then, ultimately, the Finance II bonds. He said he saw this as "an opportunity to buy the debt that was in the market to be able to create a par recovery in the relatively near term". That opportunity, according to Mr. Kagan, did not exist in quite that way until the company announced that it was considering selling Saltend.

42      On January 19th, 2005 Harbert purchased the following additional Finance II bonds:

### British Pound Denominated Notes

| Trade Date | Transaction Type | Master Quantity | Price |
|---|---|---|---|

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

| | | |
|---|---|---|
| 19/01/2005 Margin Buy | 1,465,000 | 71.5 |

*The Sally II Transaction*

43    On January 20th, 2005 Calpine issued a further press release which stated, *inter alia*:

Calpine Corporation (NYSE: CPN) today announced that Calpine European Funding (Jersey) Limited, a new, wholly owned subsidiary of Calpine, intends to commence an offering of $260 million of Redeemable Preferred Shares that will be due 180 days after issuance. This financing is a part of Calpine's recently announced plans to evaluate strategic financial alternatives for its 1,200-megawatt Saltend Energy Centre, including the potential sale of this facility.

The proceeds from the offering of the Redeemable Preferred Shares will initially be loaned to a holding company, which indirectly owns Calpine's Saltend cogeneration power plant. The net proceeds from this offering will ultimately be used as permitted by Calpine's existing bond indentures.

Net proceeds from any sale of the facility would be used to first redeem the existing $360 million, two-year redeemable preferred shares. And, second, to redeem the $260 million Redeemable Preferred Shares with the remaining proceeds to be used in accordance with the asset sale provisions of Calpine's existing bond indentures.

44    This preferred share issuance occurred on January 31st, 2005 and is commonly known as and is hereinafter referred to as "the Sally II Transaction". Mr. Kagan confirmed that he was aware of the intended Sally II Transaction by January 20th, 2005.

45    According to the evidence of Mr. Thomas, the net proceeds from the Sally II Transaction (after payment of applicable fees and expenses) were loaned by European Funding to a company known as Calpine European Funding (Jersey) Holdings Limited (not a party to this application) as a senior intercompany loan. That company in turn loaned the monies to Quintana Canada Holdings, LLC also as a senior intercompany loan. According to Mr. Thomas' evidence, the net proceeds of this loan (after payment of fees and expenses associated with the Sally II Transaction) were indirectly loaned and/or distributed to Calpine.

46    As part of the Sally II transaction, CCRC executed a Guarantee and Security Agreement. In addition, Finance II executed a consent and waiver form which consented to the execution of these documents by CCRC notwithstanding any provisions in the August 23rd, 2001 Term Debenture to the contrary. Mr. Thomas confirmed at the time of the hearing that clause 4.14 of the said Debenture would have prevented the execution of these documents by CCRC without the consent and waiver of Finance II. Mr. Thomas was unable to recall any benefit or consideration that Finance II received for executing this consent and waiver.

47    Mr. Thomas gave evidence that the terms of the original intercompany loan between European Funding and Calpine European Funding (Jersey) Holdings Limited provide that the sale of Saltend is not permitted unless the net proceeds of such sale are sufficient when aggregated with any cash available directly or indirectly from Calpine or any of its subsidiaries, to repay in full the amounts outstanding under the loans relating to the Sally I and Sally II Transactions, thereby causing the redemption in full of the preferred shares issued in relation thereto.

48    As indicated previously, CCRC has an equity interest in the Saltend facility. As a result of the Sally I and Sally II transactions, the flow of proceeds from these preferred share issuances and the redemption requirements upon the sale of the Saltend facility, much of CCRC's interest in the Saltend facility has flowed up out of the control of CCRC. During the course of this proceeding counsel referred to this as "upstreaming".

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

49    Between January 20th, 2005 and March 29th, 2005 Harbert purchased/sold the following Finance II bonds:

**British Pound Denominated Notes**

| Trade Date | Transaction Type | Master Quantity | Price |
|---|---|---|---|
| 20/01/2005 Margin Buy | | 2,075,000 | 68.5 |
| 20/01/2005 Margin Buy | | 5,565,000 | 68.5 |
| 31/01/2005 Margin Buy | | 4,400,000 | 69 |
| 02/02/2005 Margin Buy | | 2,930,000 | 69.5 |
| 09/02/2005 Margin Buy | | 3,910,000 | 70.25 |
| 14/02/2005 Margin Buy | | 3,420,000 | 69.5 |
| 17/02/2005 Margin Buy | | 980,000 | 69 |
| 23/02/2005 Margin Buy | | 2,930,000 | 67 |
| 01/03/2005 Margin Buy | | 975,000 | 68.5 |
| 03/03/2005 Margin Buy | | 900,000 | 70.5 |
| 08/03/2005 Margin Buy | | 9,750,000 | 73.5 |
| 08/03/2005 Margin Buy | | 4,580,000 | 73.75 |
| 11/03/2005 Margin Buy | | 5,555,000 | 71.75 |
| 28/03/2005 Margin Buy | | 2,630,000 | 68.5 |
| 29/03/2005 Margin Sell | | (1,950,000) | 70 |

**Euro Denominated Notes**

| Trade Date | Transaction Type | Master Quantity | Price |
|---|---|---|---|
| 28/01/2005 Margin Buy | | 2,930,000 | 73.00 |
| 28/02/2005 Margin Buy | | 980,000 | 74.5 |
| 04/03/2005 Margin Buy | | 1,930,000 | 73 |
| 04/03/2005 Margin Buy | | 2,200,000 | 74.25 |

50    On April 13th, 2005 Harbert sent a letter to the Respondents suggesting that the announcement of the sale of the Saltend facility and the issuance of the $260 million in redeemable preferred shares by European Funding was "evidence of an effort to strip the value of the Saltend Facility out of Calpine Jersey and, indirectly, its parent, Calpine Canada Resources Ltd. ("Resources"), to the prejudice of Finance II's bondholders". Mr. Kagan confirmed on discovery that he thought that the decision to send this letter was made in February or March of 2005 but it took some time to prepare it.

51    On May 4th, 2005 Harbert filed an Originating Notice (Application *Inter Partes*) in the Supreme Court of Nova Scotia seeking relief pursuant to section 5 of the Third Schedule of the Nova Scotia *Companies Act* as well as an Order pursuant to the *Statute of Elizabeth* and the *Assignments and Preferences Act*.

52    Between May 5th, 2005 (after this application was commenced) and the time of the hearing, Harbert purchased/sold the following Finance II bonds:

**British Pound Denominated Notes**

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

Page 16

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

| Trade Date | Transaction Type | Master Quantity | Price |
|---|---|---|---|
| 10/05/2005 | Margin Sell | (290,000) | 55 |
| 24/05/2005 | Margin Buy | 2,230,000 | 56 |
| 25/05/2005 | Margin Buy | 970,000 | 58.5 |
| 25/05/2005 | Margin Buy | 970,000 | 58.5 |
| 27/05/2005 | Margin Buy | 970,000 | 60.75 |

**Euro Denominated Notes**

| Trade Date | Transaction Type | Master Quantity | Price |
|---|---|---|---|
| 10/5/2005 | Margin Sell | (35,000) | 55 |
| 3/6/2005 | Margin Buy | 1,940,000 | 69 |
| 28/6/2005 | Margin Buy | 1,460,000 | 75 |
| 29/6/2005 | Margin Buy | 970,000 | 77 |
| 29/6/2005 | Margin Buy | 491,000 | 77 |

53      As will be seen from the above, Harbert bought millions of dollars worth of Finance II bonds knowing of the possible sale of the Saltend facility and of the plan to use the net proceeds thereof to redeem the preferred shares relating to the Sally I and the Sally II Transactions.

54      On May 31st, 2005 Calpine issued a further press release formally announcing the sale of the Saltend facility. The sale was said to be scheduled to close on or about July 26th, 2005 pending regulatory approval and other conditions of closing. The press release indicated that the gross proceeds of sale were expected to be approximately $925 million (U.S.).

55      On June 29th, 2005 a Consent Order was issued adding Wilmington as a Co-Applicant in this proceeding. As indicated previously, Wilmington is the Trustee under the Indenture and First Supplemental Indenture pursuant to which the Finance II bonds were issued. Wilmington has joined this application on behalf of all Finance II bond holders.

56      The hearing was held July 6th, 7th and 8th, 2005. At the conclusion of the hearing, the solicitors for Harbert and Wilmington confirmed that their clients are proceeding only with their claims for relief under the Third Schedule of the *Companies Act* and are no longer relying on the *Statute of Elizabeth* or the *Assignments and Preferences Act*. They also confirmed that the Applicants were not seeking to stop the sale of the Saltend facility or the redemption of the Sally I and Sally II preferred share issuances. They have asked the Court to order that the net proceeds of the sale of the Saltend facility (after the redemption of the Sally I and Sally II shares and the transaction costs and adjustments associated with the sale) be kept in the control of CCRC. They have further requested that Calpine be ordered to place in the control of CCRC an amount, which, when added to the net proceeds referred to above, will cover the face value of all Finance II bonds.

57      Counsel for both Applicants also advised that they were discontinuing their application against European Funding and Jersey. An Order formally discontinuing the application against these Respondents was issued by consent on July 20th, 2004. Accordingly, only Finance II, CCRC and Calpine remain Respondents to this application.

58      Subsequent to the conclusion of the hearing counsel for the Respondents advised the Court that the closing of the sale of the Saltend facility had been moved to July 28th, 2005. On July 27th, 2005 the Court granted an Interim Order requiring Calpine to put in the control of CCRC the net proceeds of the sale of the Saltend facility after (1) the redemption

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

of the $360 million (U.S.) preferred shares issued by Jersey on October 26th, 2004 including any interest associated with the redemption of those shares; (2) the redemption of the $260 million (U.S.) preferred shares issued by European Funding on January 31st, 2005 including any interest associated with the redemption of those shares and (3) the reasonable associated transaction costs and adjustments associated with the sale. The Court further ordered CCRC to diligently conduct its business in a proper and efficient manner so as to preserve and protect those net proceeds. The Interim Order was to remain in effect until the written release of the Court's final decision or ten days, whichever shall first occur.

**Issues**

59      Numerous issues have been raised by the parties. I will deal with these issues under the following general headings:

(1) Jurisdiction;

(2) Harbert's standing; and

(3) The oppression claim.

**Jurisdiction**

60      In the main brief filed on behalf of Harbert it is stated that "This is a case about the protection of creditors who brought [bought] publicly traded debt securities issued by a Nova Scotia Company with the expectation that certain assets were available to support the repayment obligations."

61      Finance II and CCRC have accepted the jurisdiction of the Nova Scotia Supreme Court to deal with the application against them. Calpine, however, disputes the jurisdiction of the Court on the basis of jurisdiction *simpliciter*. Calpine has made an interlocutory application pursuant to Civil Procedure Rule 11.05 to set aside the Originating Notice (Application *Inter Partes*) and has also applied under Civil Procedure Rule 14.25 to stay or dismiss the proceeding against it on the basis of jurisdiction. It was agreed by counsel that this interlocutory application would be heard at the commencement of the proceeding (recognizing that the Court would reserve its decision) followed by the hearing of the oppression remedy claim. It was further agreed that the participation of Calpine in the proceeding would not constitute submission or attornment to the jurisdiction.

62      As indicated above, Calpine takes the position that this Court does not have jurisdiction to deal with the proceeding against it on the basis of jurisdiction *simpliciter*. It submits that this Court should not assume jurisdiction over a foreign Respondent with no presence in the jurisdiction.

63      Calpine notes, *inter alia*, that neither the Applicants nor Calpine are incorporated pursuant to the Nova Scotia *Companies Act* and submit that neither the Applicants nor Calpine have business operations/offices in Nova Scotia.

64      Calpine makes reference to the fact that the majority of the documents in question indicate that they are to be governed by the laws of the state of New York or the laws of the state of New York without regard to the conflicts of laws rules thereof. The Term Debenture indicates that it shall be governed by and interpreted and enforced in accordance with the laws in force in the province of Alberta (excluding any conflict of laws rule or principle which might refer such construction to the laws of another jurisdiction). In addition, it indicates that each party thereto irrevocably submits to the non-exclusive jurisdiction of the courts of Alberta with respect to any matter arising thereunder or relating thereto.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

65      Calpine submits that the "real and substantial connection" test enunciated by the Supreme Court of Canada in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.); *Hunt v. T & N plc*, [1993] 4 S.C.R. 289 (S.C.C.) and *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 (S.C.C.) applies to the assumption of jurisdiction over a foreign Respondent and further submits that the application of this test to the case at Bar leads to the conclusion that this Court is without jurisdiction to hear this matter in relation to Calpine.

66      Capline suggests (correctly in my view) that an assumption of jurisdiction is less easily justified in an international case than in an interprovincial case. It argues that there is an insufficient connection or nexus between Nova Scotia and the claim that is being advanced to warrant an assumption of jurisdiction against Calpine.

67      It is important to note that Calpine has not argued *forum non conveniens* and bases its position solely on jurisdiction *simpliciter*.

68      Harbert and Wilmington agree that the issue of jurisdiction *simpliciter* is determined by the application of the "real and substantial connection" test which they submit is a flexible test that is guided by the requirements of order and fairness.

69      The Applicants submit that Calpine used two Nova Scotia companies (Finance II and CCRC) to raise money to pay for the Saltend facility and further submit that Calpine is now attempting to transfer the value of the Saltend facility to itself while disregarding the interests of the creditors of the Nova Scotia companies.

70      The Applicants note that there has been no objection made to the jurisdiction of the Nova Scotia Supreme Court over CCRC and Finance II and submit that in this regard, jurisdiction between Nova Scotia and the subject matter of the application has been established. They further suggest that since the application against CCRC and Finance II is proceeding regardless of the outcome of this jurisdictional challenge, the issue is more appropriately analyzed as a question of joinder rather than jurisdiction. They suggest that Calpine is a necessary and proper party to the application and accordingly, the Court should assume jurisdiction.

71      In addition, the Applicants submit that the business of Calpine and their Co-Respondent subsidiaries are inextricably intertwined and that this supports the Court assuming jurisdiction over all of the Respondents including Calpine.

72      Harbert and Wilmington submit that they should not be required to litigate in another country against Calpine when this litigation is proceeding in Nova Scotia against its subsidiaries and the evidence required for both applications would be largely the same. In addition, they noted that if jurisdiction was declined it would be impossible for them to bring a separate proceeding in another jurisdiction prior to the sale of the Saltend facility. Further, they take the position that they will lose a juridical advantage if they are not able to proceed against Capline in Nova Scotia.

73      The Applicants acknowledge that the assumption of jurisdiction is more difficult in a case with international considerations (as compared to interprovincial considerations) but suggest that this factor is minimized when the company involved is American.

74      As for the choice of law provisions in the various documents, the Applicants submit that none of the documents referred to by Calpine purport to take away, limit or curtail the Applicants' rights under the *Companies Act*. Further, they submit that these choice of law clauses merely give the party seeking to enforce the clause the right to prove, through expert evidence, the law of the territory it wishes to apply.

***Analysis and Conclusions Re: Jurisdiction***

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

75       In the 1990's the Supreme Court of Canada dramatically altered the law of jurisdiction and enforcement. In the case of *Morguard Investments Ltd. v. De Savoye*, *supra*, the Court developed what has become known as the "real and substantial connection" test. The Court recognized that nineteenth century English rules relating to jurisdiction and enforcement were out of keeping with modern reality, including national and international commerce and mobility. It also recognized, however, that a court must have reasonable grounds for assuming jurisdiction and that there must be limits on the exercise of jurisdiction against out-of-province defendants. The Court held that jurisdiction can be assumed if there is a real and substantial connection with the jurisdiction where the action is to take place.

76       In *Hunt v. T & N plc*, *supra*, La Forest, J. referred to this test at p. 328 where he stated:

..... courts are required, by constitutional restraints, to assume jurisdiction only where there are real and substantial connections to that place .....

77       At p. 325 of the same decision he stated:

In *Morguard*, a more accommodating approach to recognition and enforcement was premised on their being a 'real and substantial connection' to the forum that assumed jurisdiction and gave judgment. Contrary to the comments of some commentators and lower court judges, this was not meant to be a rigid test, but was simply intended to capture the idea that there must be some limits on the claims to jurisdiction ..... in a personal action a nexus may need to be sought between the subject-matter and the territory where the action is brought ..... The exact limits of what constitutes a reasonable assumption of jurisdiction were not defined, and I add that no test can perhaps ever be rigidly applied; no court has ever been able to anticipate all of these .....

78       At p. 326 of the same decision La Forest, J. stated:

..... Whatever approach is used, the assumption of and the discretion not to exercise jurisdiction must ultimately be guided by the requirements of order and fairness, not a mechanical counting of contacts or connections .....

79       See also *Tolofson v. Jensen*, *supra*.

80       The Nova Scotia Court of Appeal dealt with the "real and substantial connection" test in the case of *Oakley v. Barry* (1998), 166 N.S.R. (2d) 282 (N.S. C.A.), leave to appeal to the Supreme Court of Canada refused (1998), 175 N.S.R. (2d) 400 (note) (S.C.C.). In that case, Pugsley, J.A. concluded that the principles set out in *Morguard*, *supra*, should be applied in a flexible manner and that the concept of fairness in determining jurisdiction should be considered from the point of view of all parties to an action.

81       In *O'Brien v. Canada (Attorney General)* (2002), 201 N.S.R. (2d) 338 (N.S. C.A.) Hallett, J.A. speaking for the Nova Scotia Court of Appeal stated at p. 344:

.... The concept of order and fairness is integral to the question of determining whether there is a real and substantial connection between the cause of action and the forum province. This Court has held in **Oakley** that it is not inappropriate for a court to consider as a component of the test, the fairness to the parties in determining if there is a real and substantial connection between the cause of action and the forum province that warrants a finding that the court has jurisdiction simpliciter.

82       In *Muscutt v. Courcelles* (2002), 60 O.R. (3d) 20 (Ont. C.A.) the Ontario Court of Appeal reviewed the development of the law of jurisdiction *simpliciter*. It pointed out that when dealing with jurisdiction the Court first determines whether the forum can assume jurisdiction given the relationship between the case, the parties and the forum (jurisdiction

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

*simpliciter*). The Court may then go on to consider the discretionary doctrine of *forum non conveniens* which recognizes that there may be more than one forum capable of assuming jurisdiction. Sharpe, J.A. stated at ¶44 of this decision that this residual discretion "provides both a significant control on assumed jurisdiction and a rationale for lowering the threshold required for the real and substantial connection test". The Court in that case then went on to identify eight factors to consider when assessing whether the real and substantial connection test has been met. They are as follows:

(1) The connection between the forum and the plaintiff's claim;

(2) The connection between the forum and the defendant;

(3) Unfairness to the defendant in assuming jurisdiction;

(4) Unfairness to the plaintiff in not assuming jurisdiction;

(5) The involvement of other parties to the suit;

(6) The Court's willingness to recognize and enforce an extra-provincial judgment rendered on the same jurisdictional basis;

(7) Whether the case is interprovincial or international in nature; and

(8) Comity and the standards of jurisdiction, recognition and enforcement prevailing elsewhere.

83    The Court noted that none of the above factors are determinative and that all relative factors should be considered and weighed together. In addition, the Court held at ¶ 44 that the "real and substantial connection test requires only *a* real and substantial connection, not *the most* real and substantial connection" [emphasis in the original].

84    I have carefully reviewed the case law put before me by counsel as well as the factors referred to in *Muscutt*, *supra*, and have concluded that the facts of the present case support the assumption of jurisdiction against Calpine.

85    The case before me is unusual in that neither the Applicants nor Calpine are registered or have a head office in this province. Having said that, both Finance II and CCRC (which are both part of the Calpine chain of companies) are Nova Scotia companies with head offices here in Halifax, Nova Scotia.

86    In the Prospectus filed with the SEC in relation to the bonds in question, it is stated (at page 21) that almost all of Calpine's operations are conducted through its subsidiaries and affiliates. Mr. Thomas, in his affidavit sworn to on June 13, 2005 confirmed at ¶ 26 that Calpine is the ultimate, indirect parent of both CCRC and Finance II through a series of corporate holdings. On discovery, Mr. Thomas confirmed that two senior officers and board members of Calpine are also on the board of Finance II and CCRC. He also confirmed that Finance II (a Nova Scotia company) is a "conduit" or "financing vehicle" for Calpine and its various subsidiaries and affiliates and that CCRC is a holding company or "conduit" for all of Calpine's activities "in and around that subsidiary". Further Calpine has unconditionally guaranteed the bonds in question that were issued by Finance II. All of this satisfies me that the business of Calpine, Finance II and CCRC is intertwined and that Calpine, while now being registered in this province, does have a real and substantial connection to the case, the parties and the forum, such that jurisdiction should be assumed against it.

87    As indicated previously, Finance II and CCRC have acknowledged the jurisdiction of this Court to deal with the applications against them. As a result, this case is proceeding in Nova Scotia in relation to those two Respondents regard-

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

less of my conclusion in relation to jurisdiction over Calpine. I see little reason to require the Applicants to bring a separate proceeding elsewhere recognizing that the facts that would be advanced in such an application would likely be the same as those advanced in this proceeding. This would result in increased costs to all of the parties and would introduce the possibility of inconsistent results in different jurisdictions. In addition, from the Applicants' perspective it could render the application moot in relation to Calpine since they would not be able to have an application heard in California prior to the proceeds of sale of the Saltend facility being disbursed.

88      In the brief filed on behalf of Calpine reference was made to the Ontario Court of Appeal decision in *Incorporated Broadcasters Ltd. v. Canwest Global Communications Corp.* (2003), 223 D.L.R. (4th) 627 (Ont. C.A.) leave to appeal to the Supreme Court of Canada dismissed at (2003), 327 N.R. 196 (note) (S.C.C.). The Court in that case found at ¶ 38 that the dominant consideration in applying the "real and substantial connection" test was that four of the five defendants had a presence in Ontario and, subject to a *forum non conveniens* argument, the trial would take place there. It therefore served the requirements of order and fairness to try the foreign claim together with the other claims that were rooted in Ontario. In the case at Bar, the applications against two of the remaining three Respondents (Finance II and CCRC) are being dealt with in Nova Scotia. This supports the assumption of jurisdiction by this Court over Calpine.

89      It should be noted that in the case of *Incorporated Broadcasters Ltd. v. Canwest Global Communications Corp.*, *supra*, the Court went on to conclude that Manitoba was the more convenient forum to hear the matter. In the case at bar, Calpine has not relied on the doctrine of *forum non conveniens*.

90      In the brief filed by Calpine in relation to this interlocutory application, the Court was referred to a number of cases that indicate that matters relating to the internal affairs or management of a foreign corporation are subject to the law of the corporation's domicile and that the court should not, under its own laws and procedures, purport to affect the status and internal affairs of a foreign corporation. In my view, this line of authority does not prevent the Court from assuming jurisdiction in the circumstances of this case if the real and substantial connection test is satisfied.

91      Calpine's interlocutory application pursuant to Civil Procedure Rules 11.05 and 14.25 is hereby dismissed.

## Harbert's Standing

92      The Indenture between Finance II and Wilmington contains a "no-action" clause which places limitations on the commencement of actions by individual security holders. The Respondents submit that Harbert has failed to meet the conditions in the Indenture which would allow it to bring this application and have requested that Harbert's application be dismissed due to a lack of standing.

93      The Applicants take the position that this issue is moot in light of the fact that the Trustee has now been joined as a party and is bringing the application on behalf of all Finance II bond holders (including Harbert).

94      In my view, it is unnecessary for the Court to decide this issue in light of the Trustee's involvement in the case on behalf of all bond holders and in light of the conclusions that I have reached in relation to the oppression remedy claim.

## The Oppression Claim

95      The Applicants' claim for relief is brought pursuant to s. 5 of the Third Schedule to the Nova Scotia *Companies Act* which provides:

    5(1) A complainant may apply to the court for an order under this Section.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

(2) If, upon an application under subsection (1) of this Section, the court is satisfied that in respect of a company or any of its affiliates

(a) any act or omission of the company or any of its affiliates effects a result;

(b) the business or affairs of the company or any of its affiliates are or have been carried on or conducted in a manner; or

(c) the powers of the directors of the company or any of its affiliates are or have been exercised in a manner,

that it is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer, the court may make an order to rectify the matters complained of.

96    Section 5(3) of the Third Schedule deals with the types of relief available upon an application pursuant to s. 5(1) and indicates that the Court may make any interim or final Order that it sees fit. Section 5(3) provides:

5(3) In connection with an application under this Section, the court may make any interim or final order it thinks fit including, without limiting the generality of the foregoing,

(a) an order restraining the conduct complained of;

(b) an order appointing a receiver or receiver-manager;

(c) an order to regulate a company's affairs by amending the memorandum or articles;

(d) an order directing an issue or exchange of securities;

(e) an order appointing directors in place of or in addition to all or any of the directors then in office;

(f) an order directing a company, subject to subsection (5) of this Section, or any other person, to purchase securities of a security holder;

(g) an order directing a company, subject to subsection (5) of this Section, or any other person, to pay a security holder any part of the monies paid by him for securities;

(h) an order varying or setting aside a transaction or contract to which a company is a party and compensating the company or any other party to the transaction or contract;

(i) an order requiring a company, within a time specified by the court, to produce to the court or an interested person financial statements in the form required under the Act or an accounting in such other form as the court may determine;

(j) an order compensating an aggrieved person;

(k) an order directing rectification of the registers or other records of a company required under the Act;

(l) an order liquidating and dissolving the company;

(m) an order directing an investigation pursuant to Section 116 of the Act;

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

(n) an order requiring the trial of any issue.

97      It appears from the oral submissions given at the conclusion of the hearing that the Applicants do not object *per se* to the sale of the Saltend facility or to the preferred share issuances. However, they submit that by upstreaming or permitting the upstreaming of the proceeds of the Sally I and Sally II transactions and accepting, in return, unsecured promissory notes (in relation to the Sally I transaction), CCRC is divesting itself of a hard asset (the proceeds of the Sally I and Sally II transactions, its interest in the Saltend facility or the proceeds from the sale of the Saltend facility) and getting nothing in return or an asset of questionable value (the unsecured promissory notes). The Applicants further suggest that the Respondents are removing from CCRC the only meaningful asset that it controls and that such actions will render both CCRC and Finance II insolvent and unable to meet their obligations to the holders of the Finance II bonds. The Applicants submit that these actions only benefit Calpine and provide no benefit to CCRC, Finance II or their creditors.

98      The Applicants take the position that the terms of the Debenture between CCRL (now CCRC) and Finance II were part of the documents relating to the bond issuance. In support of this suggestion they refer to the Prospectus Supplement which indicates that Finance II will comply in all respects with its obligations under s. 7.1 of the Term Debenture. They also refer to s. 3.9 of the First Supplemental Indenture which indicates that, solely for the benefit of the bond holders in question, Finance II shall comply in all respects with its obligations under s. 7.1 of the Term Debenture and to the First Amendment to Guarantee Agreement which indicates that solely for the benefit of the bond holders in question, Calpine shall cause CCRL (now CCRC) to comply in all respects with its obligations under the said section of the Term Debenture.

99      The Applicants further suggest that Finance II is failing to enforce its rights under the terms of the Debenture issued August 23rd, 2001 between Finance II and CCRL (now CCRC) and in particular under clause 4.1 (requiring CCRL to diligently conduct its business in a proper and efficient manner so as to preserve and protect its business and assets) and under clause 4.14. They take the position that these transactions are oppressive and unfairly prejudicial to the bond holders in question and unfairly disregard their interests. They therefore seek relief under the Third Schedule of the *Companies Act*.

100      Finally, the Applicants submit that Calpine's financial position has deteriorated significantly since the Finance II bonds were issued in October of 2001. They suggest that Calpine is in the midst of a liquidity crisis and note that the value of Calpine's shares has dropped significantly since the bonds were originally issued in October of 2001. (On October 12th, 2001 Calpine's shares were trading at $27.47. Accordingly to Mr. Thomas' evidence these shares were trading at $3.54 at the close of the market on June 21st, 2005.) They also refer to the fact that Calpine's corporate debt has never been rated lower than it is at the present time.

101      The Respondents dispute the allegations made by Harbert and Wilmington and state that the transactions complained of are permitted under the documents governing the issuance of the bonds. They note that these documents do not contain any negative or restrictive convenants that would prevent intercompany loans, the sale of the Saltend facility or the ability to use the proceeds from this sale as the Respondents see fit. They suggest that if any such restrictions were intended they would have been included in the bond documents.

102      The Respondents state that the bonds were sold solely on the credit of Calpine and that investors were not invited to, nor could they reasonably rely on the separate credit of CCRC, Finance II or any assets held by either of them including the Saltend facility. They note that the bond issuance documentation did not describe either Finance II or CCRC as owning any significant assets nor did they include any financial statements or statements of net worth for either

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

Finance II or CCRC. In addition, they submit that none of the bond holders could have a reasonable expectation in relation to clause 4.1 of the Term Debenture as this document was not publicly disclosed until November of 2004.

103     The Respondents note that the bonds are in good standing (all interest payments have been made as required) and the outstanding principal is not due and payable until October 15, 2008 (for the euro denominated series) and October 15, 2011 (for the pound sterling series). While the Respondents appear to acknowledge facing financial challenges they deny the suggestion that they are in the midst of a liquidity crisis or that they will be unable to meet their obligations under the Finance II bonds when due.

104     The Respondents note that Harbert (who initiated this proceeding) did not begin purchasing the bonds in question until after the Sally I Transaction occurred in October of 2004 and after the possible sale of the Saltend facility was announced by Calpine on January 13, 2005 (the press release that announced the potential sale indicated that the net proceeds of any such sale would be used to redeem the preferred shares issued in the Sally I transaction with the remaining proceeds to be used in accordance with the asset sale provisions of Calpine's existing bond indentures). They further note that Harbert continued to buy the bonds in question after the Sally II Transaction was announced and it was disclosed that the net proceeds from the potential sale of Saltend would also be used to redeem the preferred shares issued in the Sally II transaction. The Respondents question the motives of Harbert and submit that it purchased the bonds in question for the express purpose of taking opportunistic advantage of the issues that have been raised in this proceeding in order to maximize profit on a short term basis.

### Analysis and Conclusions Re: The Oppression Claim

105     Prior to the enactment of the oppression remedy provisions in the *Canada Business Corporations Act* and other similar provisions in provincial legislation, the rights of minority shareholders and creditors were minimal as compared to the rights of those that control a corporation. The introduction of statutory provisions which allow remedies against acts or omissions that are oppressive, unfairly prejudicial or that unfairly disregard the interests of others was a major change in corporate law and the courts involvement in corporate affairs. In relation to creditors, the oppression remedy provisions of the various statutes in Canada are said to "grant the broadest rights to creditors of any common law jurisdiction" (see: *People's Department Stores Ltd. (1992) Inc., Re* (2004), 244 D.L.R. (4th) 564 (S.C.C.) at ¶ 48).

106     While the Court has the ability, in appropriate circumstances, to grant relief from conduct that is oppressive, unfairly prejudicial or that unfairly disregards the interests of others, it must be careful not to inappropriately intrude into the legitimate conduct of a company's business.

107     Oppression cases are fact driven. Conduct that is considered oppressive, unfairly prejudicial or that unfairly disregards the interests of others in one case may not be so in the slightly different setting of another (*Ferguson v. Imax Systems Corp.* (1983), 150 D.L.R. (3d) 718 (Ont. C.A.).

108     In *Piller Sausages & Delicatessens Ltd. v. Cobb International Corp.* (2003), 35 B.L.R. (3d) 193 (Ont. S.C.J.) affirmed at (2003), 40 B.L.R. (3d) 88 (Ont. C.A.) the Court analyzed the oppression remedy and stated at ¶ 17-22:

17 'Oppressive' has been interpreted as meaning burdensome, harsh or wrongful: *Scottish Co-operative Wholesale Society Ltd. v. Meyer* (1958), [1959] A.C. 324 (U.K. H.L.); *Burnett v. Tsang* (1985), 29 B.L.R. 196 (Alta. Q.B.).

18 'Unfairly prejudicial' has been held to mean 'acts that are unjustly or inequitably detrimental': *Diligenti v. RWMD Operations Kelowna Ltd.* (1976), 1 B.C.L.R. 36 (B.C.S.C.).

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

19 'Unfairly disregards' has been held to mean 'unjustly or without cause, pay no attention to, ignore or treat as of no importance the interests of security holders, creditors, directors or officers': *Stech v. Davies* (1987), 53 Alta. L.R. (2d) 373 (Alta. Q.B.).

20 It appears that the progression from 'oppressive' to 'unfairly prejudicial' to 'unfairly disregards' involves decreasingly stringent requirements: *Journet c. Superchef Food Industries Ltd.* (1984), 29 B.L.R. 206 (Que. S.C.).

21 An applicant need not show mala fides on the part of the respondents, as it is the effect of their actions, rather than their intent, which is material: *Brant Investments Ltd. v. KeepRite Inc.* (1991), 3 O.R. (3d) 289 (Ont. C.A.); *Palmer v. Carling O'Keefe Breweries of Canada Ltd.* (1989), 67 O.R. (2d) 161 (Ont. Div. Ct.).

22 Jurisprudence shows that these provisions of the CBCA are remedial and should be interpreted broadly in considering a complainant's interest. Each such application is fact specific. The reasonable expectations of the parties, the nature of the acts complained of and the methods by which they were carried out must be all considered.

. . . . .

109    Fairness is an integral consideration in any oppression case. Whether conduct is unfair will be determined by a number of factors. In *First Edmonton Place Ltd. v. 315888 Alberta Ltd.* (1988), 40 B.L.R. 28 (Alta Q.B.) appeal adjourned at (1989), 45 B.L.R. 110 (Alta C.A.) McDonald, J. stated at p. 57:

..... In deciding what is unfair, the history and nature of the corporation, the essential nature of the relationship between the corporation and the creditor, the type of rights affected, and general commercial practice should all be material. More concretely, the test of unfair prejudice or unfair disregard should encompass the following considerations: the protection of the underlying expectation of a creditor in its arrangement with the corporation, the extent to which the acts complained of were unforeseeable or the creditor could reasonably have protected itself from such acts, and the detriment to the interests of the creditor. The elements of the formula and the list of considerations as I have stated them should not be regarded as exhaustive. Other elements and considerations may be relevant, based upon the facts of a particular case.

110    When analyzing fairness the Court considers, *inter alia*, the reasonable expectations of the parties. Whether expectations are reasonable will be determined on an objective basis (*Pente Investment Management Ltd. v. Schneider Corp.* (1998), 44 B.L.R. (2d) 115 (Ont. C.A.) at ¶ 68.)

111    In *SCI Systems Inc. v. Gornitzki Thompson & Little Co.* (1997), 36 B.L.R. (2d) 192 (Ont. Gen. Div.) affirmed at (1998), 110 O.A.C. 160 (Ont. Div. Ct.) the Court stated at ¶ 36:

I agree that the oppression remedy is designed to protect reasonable expectations. However, one of the most reasonable of all expectations of those dealing with corporations must be that the directors will manage the company in accordance with their legal obligations. Some of these obligations are specifically prescribed by statute. Others are more generally derived from the common law. However, they essentially add up to the same thing: namely, to act honestly and in good faith in the best interests of the corporation and to exercise the diligence expected of a reasonably prudent person.

### The Applicants Status as "Complainants"

112    The Applicants submit that they qualify as "complainants" in relation to s. 5(1) of the Third Schedule of the *Companies Act*. Section 7(5)(b) of the Third Schedule provides as follows:

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

7(5) For the purposes of Sections 4, 5, 6 and this Section

. . . . .

(b) "complainant" means

(i) a registered holder or beneficial owner, and a former registered holder or beneficial owner, of a security of a company or any of its affiliates,

(ii) a director or an officer or a former director or officer of a company or of any of its affiliates,

(iii) the Registrar, or

(iv) any other person who, in the discretion or the court, is a proper person to make an application under this Section.

113    The term "security" is not defined in the *Act*. The Applicants note that in the *Canada Business Corporations Act* and the Ontario *Business Corporations Act* the term "security" is defined to include a "debt obligation". Further, a "debt obligation" is defined to include a bond, debenture, note or similar obligation whether secured or unsecured. The Applicants' submit that in the absence of a compelling reason to the contrary similar legislation should be interpreted harmoniously. They further submit that the oppression remedy is a remedial remedy and that these provisions should be given a broad and liberal interpretation to ensure the attainment of the objects of the *Act*.

114    The Respondents acknowledge that while in certain circumstances a creditor may be a proper complainant for the purposes of a Nova Scotia oppression claim they submit that in the circumstances of this case, the Applicants are not "proper" complainants entitled to advance such a claim.

115    I am satisfied that both Harbert and Wilmington are "complainants" as defined in s. 7(5)(b) of the Third Schedule of *Companies Act*.

116    A "complainant" is defined in s. 7(5)(b)(i) to include a registered holder or beneficial owner, and a former registered holder or beneficial owner, of a security of a company or any of its affiliates. As indicated above, the term "security" is not defined in the *Act*. In *Black's Law Dictionary*, seventh edition, West Group, 1999: St. Paul, Minn.) the definition of "security" includes:

..... An instrument that evidences the holder's ownership rights in a firm (e.g., a stock), the holder's creditor relationship with a firm or government (e.g., **a bond**) or the holder's other rights (e.g. an option). [emphasis added]

117    In my opinion, the term "security" can include a bond.

118    I am satisfied that the holders of the Finance II bonds (including Harbert and the other bond holders that are represented by Wilmington) are registered holders or beneficial owners of a security of a company (Finance II) and that they therefore satisfy the definition "complainant" in s. 7(5)(b)(i) of the Third Schedule of the *Act*.

**Is Calpine an "Affiliate"?**

119    The Respondents submit that Calpine is not an "affiliate" as referred to in the *Act* and, accordingly, the oppression remedy does not apply to that entity.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

120      Section 5(2) deals with the conduct of a company *or any of its affiliates*. Section 1 of the Third Schedule of the *Act* provides that "unless the context otherwise requires, the expressions defined in the Companies Act, or any statutory modification thereof in force at the date at which this Schedule becomes applicable to a company, shall have the meanings so defined ....."

121      The term "company" is defined in s. 2(1) of the *Act* as "a company formed and registered under this Act, or an existing company". An "existing company" is defined in s. 2(1) to mean "a company registered under Chapter 128 of the Revised Statutes, 1900, Chapter 19 of the Acts of 1921 or Chapter 174 of the Revised Statutes, 1923, and still so registered in the office of the Registrar on the first day of August, 1935". Calpine is not a "company" as defined by the Nova Scotia *Companies Act*.

122      The term "affiliate" is not specifically defined in the *Act*. However, s. 2(2) of the *Act* indicates that a company shall be deemed to be an affiliate of another company if one of them is the subsidiary of the other or if both are subsidiaries of the same company or if each of them is controlled by the same person.

123      The Respondents do not appear to dispute that Finance II and CCRC are subsidiaries of Calpine but, rather, base their argument on the fact that Calpine is not a "company" as defined by the *Act*. Counsel for the Respondents notes that s. 2(2) provides that "a *company* shall be deemed to be an affiliate of another *company* if ..." [emphasis added]. In other words they take the position that an affiliate must be a "company" (as defined in the *Act*) of another "company" (as defined in the *Act*) in order to be an "affiliate". Since Calpine is not a "company" as defined in the *Act* — they take the position that they cannot be an "affiliate".

124      In the memorandum filed on behalf of the Respondents at ¶ 134 it is stated:

It is well-established by the jurisprudence of the Supreme Court of Canada that the preferred approach to statutory interpretation is set out by *E.A. Driedger in Construction of Statutes* (2nd Ed., 1983), at p. 87:

Today there is only one principle or approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament.

See *Rizzo & Rizzo Shoes Ltd., Re,* 1998 CarswellOnt 1 (S.C.C.) at para. 21.

125      In my view, the broad remedial nature of the oppression remedy provisions set out in the Third Schedule of the *Companies Act* support a broad interpretation of the term "affiliate" referred to therein.

126      It is important to note that the term "affiliate" is not specifically defined in the *Act*. While s. 2(2) provides that a company shall be deemed to be an affiliate in certain circumstances, in my view, this provision does not restrict the definition of the term "affiliate".

127      In *Black's Law Dictionary*, *supra*, the definition of the term "affiliate" includes the following:

A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation .....

128      I am satisfied, based on the evidence before me, that Calpine is an affiliate of Finance II and CCRC. I am further satisfied that the term "affiliate" in s. 5(2) of the Third Schedule of the *Act* is not restricted to companies formed and registered under the Nova Scotia *Companies Act* or to "existing companies" as defined by the *Act*.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

***Is the Conduct in the Present Case Oppressive, Unfairly Prejudicial or Does It Unfairly Disregard the Interests of the Applicants as Bond Holders?***

129      I am satisfied that the actions of Finance II, CCRC and Calpine have unfairly disregarded the interests of the Finance II bond holders.

130      When considering an application such as this it is appropriate for the Court to review the "documents of the deal" (as put by the Respondents' solicitor) to assist in determining the reasonable expectations of the parties. While in my view, these documents are not necessarily determinative of the matter, they are clearly relevant.

131      The bonds in question were issued by Finance II and are the direct unsecured obligation of Finance II. While Calpine has guaranteed the bonds (also on an unsecured basis) that does not diminish the primary obligation of Finance II under the bonds.

132      Finance II's only material balance sheet asset is the Term Debenture issued August 23rd, 2001 (between Finance II and CCRL (now CCRC)). Pursuant to clause 4.1 of that Debenture, CCRL agreed to diligently conduct its business in a proper and efficient manner so as to preserve and protect its business and assets. It also agreed pursuant to clause 4.14 not to incur any secured or higher ranking debt than the debt under the Debenture. CCRC has assumed the obligations of CCRL under the terms of the Debenture.

133      Clauses 4.1 and 4.14 were not, in my view, part of the bond issuance documentation. While the Prospectus Supplement, the First Supplemental Indenture and the First Amendment to Guarantee Agreement do make reference to s. 7.1 of the Term Debenture they do not make reference to any other terms of the Debenture including clause 4.1 and 4.14. These clauses (or for that matter the entire Term Debenture) could easily have been referred to if they were to form part of the documentation relating to the bond issuance. I also note that the Term Debenture was not made public until November of 2004, long after the bond issuance occurred.

134      The fact that clauses 4.1 and 4.14 of the Term Debenture were not part of the bond issuance documentation does not, in my view, prevent the Court from considering it when analyzing whether the acts complained of are oppressive. When dealing with oppression claims "*all* the words and deeds of the parties are relevant to an assessment of reasonable expectations, not necessarily only those consigned to paper, and not necessarily only those made when the relationship first arose" (*Westfair Foods Ltd. v. Watt* (1991), 79 D.L.R. (4th) 48 (Alta. C.A.) at p. 54 emphasis in the original). When dealing with an oppression claim the Court is not restricted solely to the documents of the deal but must consider all relevant evidence to determine the reasonable expectations of the parties on an objective basis.

135      I am satisfied from the evidence before me that CCRC has taken its interest in a valuable asset (the proceeds it received from the Sally I transaction) and is substituting therefore an asset of more dubious value (unsecured promissory notes). This, in my view, constitutes a breach of clause 4.1 of the Term Debenture. There is no evidence that Finance II has taken any action to insure that this does not occur.

136      I am further satisfied that CCRC is acquiescing in the upstreaming of the funds from the Sally II transaction out of its control despite the fact that the result will be that it will lose control of its most meaningful asset with no direct benefit to CCRC. This, in my view, also constitutes a breach of clause 4.1 of the Term Debenture. Again, there is no evidence that Finance II has taken any action to ensure that this does not occur.

137      I am also satisfied that Finance II waived clause 4.14 of the Term Debenture in order to permit the Sally II transaction. Mr. Thomas was unable to recall any benefit or consideration that Finance II received for giving this waiver.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

138    In my view, by not enforcing its rights under the Term Debenture, Finance II has unfairly disregarded the in-terests of the Finance II bond holders. In addition, CCRC (an affiliate of Finance II's) is unfairly disregarding the bond holders' interests (who's interests they are fully aware of) by failing to preserve and protect its assets despite the fact that it has an obligation to do so under clause 4.1 of the Term Debenture. While the Applicants are not a party to this Deben-ture and, accordingly, are not able to sue directly on the Debenture, I am nevertheless satisfied that the Court can con-sider the terms of the Debenture and CCRC's conduct in light of the Debenture when considering an oppression claim. When dealing with such a claim regard should be had to all of the surrounding circumstances (*Ford Motor Co. of Canada v. Ontario (Municipal Employees Retirement Board)* (2004), 41 B.L.R. (3d) 74 (Ont. S.C.J. [Commercial List] at ¶ 219).

139    Finally, Calpine is unfairly disregarding the interests of the bond holders through its involvement in the conduct complained of. The closely held nature of these companies must be recognized. Calpine is the ultimate, indirect parent of both Finance II and CCRC. CCRC is the direct parent of Finance II. Two of the senior officers and board members of Calpine are also on the board of Finance II and CCRC.

140    I am satisfied that the bond holders in question would reasonably expect Finance II to enforce its rights under the Term Debenture. In addition, the said bond holders would reasonably expect Finance II and its affiliates not to act in a manner that unfairly disregarded the bond holders' interests.

141    The Respondents refer to the documents of the deal (including the Prospectus, the Prospectus Supplement and the Indenture) and state that the bonds were sold solely on the credit of Calpine and that investors were not invited to, nor could they reasonably rely on the separate credit of Finance II or CCRC. This argument by the Respondents ignores the fact that Finance II issued the bonds in question and that the bonds are the direct unsecured obligation of Finance II. Calpine chose to organize this bond issuance through Finance II and it cannot now ignore the very corporate structure that it elected to proceed under.

142    The evidence satisfies me that Calpine's financial condition has diminished since the bonds were originally is-sued in 2001. It is only reasonable that in these circumstances the bond holders would look more closely to the ability of Finance II (and possibly its parent company CCRC) to respond to the bond obligations as they become due.

143    The Respondents have referred to the section of the Indenture which allows Finance II (in certain circumstances) to assign its obligations under the bonds to Calpine or a significant subsidiary thereof without the consent of the bond holders. As a preliminary matter, it must be noted that this did not occur. Even if it had occurred, in my view, the entity that assumed the obligations of Finance II would have the same obligation that Finance II has not to unfairly disregard the interests of the bond holders.

144    During the course of this proceeding much evidence was given concerning the issue of whether Calpine is in the midst of a liquidity crisis and whether Finance II (and possibly CCRC or Calpine) will be in a position to deal with the bond obligations as they mature. In my view, it is unnecessary for the Court to make any findings in this regard. I have found that the Respondents' actions have unfairly disregarded the interests of the bond holders. These actions have resul-ted in the bond holders being put in a more vulnerable position than would otherwise be the case if CCRC preserved and protected its assets as required by s. 4.1 of the Term Debenture and if Finance II enforced its rights under the Term Debenture. In my view, it is unnecessary for the Applicants to prove that the Respondents will be unable to respond to the bonds in order to succeed with a remedy under s. 5 of the Third Schedule of the *Act.*

145    Finally, the Respondents argue that this application is premature. They suggest that there is no evidence that shows on a balance of probabilities or otherwise that Finance II or Calpine will be unable to repay the Finance II bonds when they mature in 2008 or 2011. Accordingly, they submit that this application is premature. They further suggest that

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

s. 5 of the Third Schedule of the *Companies Act* does not allow for anticipatory claims.

146     In my view, this application is not premature or anticipatory in nature. The Respondent companies have already unfairly disregarded the interests of the Finance II bond holders. As indicated above, their actions have left the bond holders in a more vulnerable position than would otherwise be the case if CCRC preserved and protected its assets and Finance II enforced its rights under the Term Debenture. It is unnecessary to wait and see if the obligations to the bond holders are actually met when the bonds mature. The unfair conduct has already occurred.

147     That takes me to the issue of whether a remedy should be granted in the circumstances of this case.

148     Section 5(2) of the Third Schedule of the *Act* indicates that if the Court is satisfied that conduct as set out in that section is oppressive, unfairly prejudicial to or unfairly disregards the interest of a security holder the Court *may* make an Order to rectify the matters complained of. Whether relief should be granted depends on the circumstances of the case.

149     Harbert acknowledges knowing of the Sally I transaction and the possible sale of the Saltend facility prior to purchasing any of the bonds in question. However, they deny knowing of the upstreaming of the funds above or out of the control of CCRC until seeing Mr. Thomas' affidavit sworn to on June 13th, 2005. As indicated previously, the Applicants do not object *per se* to the sale of the Saltend facility. It is the upstreaming of the proceeds of the Sally I and Sally II transactions and the waiver of clause 4.14 of the Term Debenture for no or insufficient consideration that they take issue with.

150     I am satisfied from the evidence presented (including the excerpts from Mr. Kagan's examination for discovery) that prior to its initial purchase of Finance II bonds, Harbert was aware that CCRC and Calpine had upstreamed or planned to upstream the proceeds from the Sally I transaction out of the control of CCRC. I accept that they did not know the exact specifics of how the upstreaming was accomplished until reading Mr. Thomas' affidavit of June 13th, 2005. I find, however, that they had knowledge that CCRC and Calpine had upstreamed or planned to upstream the proceeds of this preferred share issuance prior to purchasing any of the bonds in question. In other words, I find that they were aware of the conduct that they now complain of prior to purchasing any Finance II bonds.

151     On January 20th, 2005 (within a week of making their first purchase) Harbert read the announcement of the Sally II transaction and of Calpine's plan to pay off the Sally II preferred share issuance from a potential sale of the Saltend Facility. In Mr. Kagan's discovery evidence he indicated that he and his boss thought it was "incredible that Calpine would be pursuing this course of action". Nevertheless, Harbert purchased more Finance II bonds.

152     As indicated previously, on April 13th, 2005 Harbert sent a letter to the Respondents suggesting there was evidence that the value of the Saltend facility was being indirectly stripped out of CCRC to the prejudice of the Finance II's bond holders. Harbert continued to purchase more Finance II bonds.

153     Harbert eventually learned from Mr. Thomas' June 13th, 2005 affidavit complete particulars of how the upstreaming occurred. Despite this knowledge, Harbert continued to buy Finance II bonds and, in fact, continued to buy bonds within days of the hearing of this matter.

154     Should the Court grant Harbert relief in these circumstances?

155     Harbert suggests that complainants are entitled to pursue an oppression claim even if they became security holders after they have knowledge of the conduct complained of. In support of this position they have referred the Court to the cases of *Palmer v. Carling O'Keefe Breweries of Canada Ltd.* (1989), 67 O.R. (2d) 161 (Ont. Div. Ct.) and *347883*

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

*Alberta Ltd. v. Producers Pipelines Inc.* (1991), 80 D.L.R. (4th) 359 (Sask. C.A.).

156      The Respondents note that when analyzing an oppression remedy claim the Court takes into account the reasonable expectations of the parties in order to determine what is fair. They submit that an applicant that knows of the impugned conduct prior to becoming a security holder is not a proper complainant and should not be granted relief under the oppression remedy provisions of the Third Schedule of the *Companies Act*. They suggest that the date that the Applicant became a security holder is relevant in determining whether they are proper complainants and rely on the cases of *LSI Logic Corp. of Canada Inc. v. Logani*, [2001] 11 W.W.R. 740 (Alta Q.B.) and *Ford Motor Co. of Canada v. Ontario (Municipal Employees Retirement Board)*, *supra*, in support thereof.

157      In my view, the case law on this issue is not fully developed.

158      In *Royal Trust Corp. of Canada v. Hordo*, [1993] O.J. No. 1560 (Ont. Gen. Div. [Commercial List]) Farley, J. stated at ¶ 14:

> In my view a person who is a shareholder is not automatically ensured status to bring an oppression proceeding simply because he owns or formally owned shares in a corporation. In my opinion the court retains a discretion to deny status to such a person where the shares were purchased with a view to bringing an application under the oppression remedy or in full awareness of the circumstances alleged to constitute oppression.

159      The decision in *Hordo*, *supra*, was not followed by the Ontario Court of Appeal in the case of *Richardson Greenshields of Canada Ltd. v. Kalmacoff* (1995), 22 O.R. (3d) 577 (Ont. C.A.) which was a case involving a derivative action where the conduct complained of was alleged to be *ultra vires* the company. In that case the applicant purchased shares of the company in order to bring a derivative action. The Court of Appeal had no difficulty finding that the applicant qualified as a proper complainant to bring the action and was not concerned by the motives of the applicant in buying the shares in order to have standing. As noted, however, by Cumming, J. in *Ford Motor Co. of Canada v. Ontario (Municipal Employees Retirement Board)* , *supra*, "Robins, J. A.'s comments and the *ratio* of *Richardson* were directed at the derivative action before the Court of Appeal and at Farley, J.'s finding in the court below in respect of that derivative action, not at Farley, J.'s finding in *Hordo* relating to an oppression action."

160      In *Ford Motor Co. of Canada v. Ontario (Municipal Employees Retirement Board)*, *supra*, Cumming, J. dealt with the difference between a derivative action and an oppression claim at ¶ 240 when he stated:

> However, the situation of an oppression action is different from that of a derivative action. The latter allows the complainant to sue in the name of the corporation for a loss sustained through a wrong to the corporation. There is no requirement that the status of the complainant shareholder be contemporaneous with the impugned conduct because the court proceeding would be on behalf of the corporation, rather than being a personal action. In contrast, *an oppression action is a personal remedy premised upon there being prejudice to the interests of the complainant shareholder.*

> [Emphasis added]

161      In addition, there is a difference in my view between a proceeding involving a company whose actions are alleged to be illegal (*ultra vires* the company) such as in *Richardson Greenshields*, *supra*, and in a case where the actions are said to be wrong based on the reasonable expectations of the parties (an oppression claim). In the former case the impugned conduct is wrong (illegal) *per se*. In the latter situation the conduct is wrong because of the reasonable expectations of the parties.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

162    There are also cases dealing with dissenting shareholders involved in take-over bids where the Court has not been concerned by the fact that the complainant purchased the shares in question after knowing of the take-over bid. For example in *Shoom v. Great-West Lifeco Inc.* (1998), 40 O.R. (3d) 672 (Ont. Gen. Div. [Commercial List]) affirmed at (1998) 42 O.R. (3d) 732 (Ont. C.A.) the Court was not concerned by the fact that the party in question (a sophisticated arbitrageur) had purchased shares after the announcement of a take-over bid. In that case, the Court was dealing with a shareholder that had a right to a statutory remedy under s. 206 of the *Canada Business Corporations Act*. That right exists regardless of the shareholders reasonable expectations.

163    In the case at Bar, we are dealing with an oppression remedy claim. Fairness is an integral consideration in any oppression case. When analyzing fairness the Court considers the reasonable expectations of the parties. This, in my view, distinguishes cases such as *Richardson Greenshields*, *supra*, and *Shoom*, *supra*.

164    How have the Courts dealt with this issue in relation to oppression remedy claims? The two cases relied on by the Applicants (*347883 Alberta Ltd.*, *supra* and *Palmer*, *supra*) appear to support the suggestion that even in an oppression case the applicants' knowledge of the matters complained prior to becoming a security holder may not be relevant when deciding whether they are a "proper" complainant or are entitled to relief.

165    In my view, the majority decision in *347883 Alberta Ltd.*, *supra*, is distinguishable from the case at Bar in a number of ways. First, it appears that the shareholder in that case purchased its shares for the purpose of a take-over bid (page 409). In addition, the conduct complained of was said to be beyond the powers of the directors (illegal *per se*). Finally, the majority noted that the shares were purchased *prior* to the actions occurring which were found to be beyond the powers of the directors. All of these factors, in my view, distinguish that case from the case at Bar.

166    The majority in *347883 Alberta Ltd.*, *supra*, went on, however, in *obiter* to agree with the comments of Southey, J. in *Palmer v. Carling O'Keefe Breweries of Canada Ltd.*, *supra*, which indicates that an applicant's prior knowledge of the matters complained of may not preclude them from claiming relief for oppression.

167    In *Palmer v. Carling O'Keefe Breweries of Canada Ltd.*, *supra*, the Court stated at pp. 169-170:

I am unimpressed with the argument that no relief should be given in respect of shares purchased after the intention to amalgamate became known. The submission was that, in respect of those shares, the purchasers 'bought into the oppression'. If relief is given to anyone in these proceedings, it will mean that the applicant correctly appreciated the legal rights of the preference shareholders. If the applicant and others could not take advantage of those rights with respect to the shares they were bold enough to purchase while those rights were still in dispute, it would mean that less sanguine owners would be deprived of the advantage of selling their shares during the pending litigation at prices reflecting the purchasers' estimate of the chances of success. Any such rule would place a new and, in my view, unwarranted restriction on the price of shares that are traded on a stock exchange.

The conduct of the applicant and those associated in the same interest will either turn out to have provided an effective check on unlawful acts by the directors, or it will prove to have been a very expensive exercise in tilting at windmills. The owners of small numbers of shares probably could not afford to run the risks involved in providing such check.

168    As noted by Cumming, J. in *Ford Motor Co. of Canada v. Ontario (Municipal Employees Retirement Board)*, *supra*, it appears that in *Palmer*, *supra*, the complainants were purchasers *prior* to the act of amalgamation which was the actual impugned act of oppression. In the case at Bar, the upstreaming of the Sally I proceeds out of *CCRC* (which is part of the impugned conduct) began prior to Harbert's initial purchase of Finance II bonds.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

169     In any event, to the extent that *Palmer*, *supra*, may be at variance with my opinion in this decision, I am not prepared to follow it. In my view, a complainant who seeks equitable relief pursuant to s. 5 of the Third Schedule of the *Companies Act* must be oppressed, prejudiced or harmed by the conduct complained of. In my further view, as a general rule, a complainant that decides to become a security holder knowing that the impugned conduct was occurring cannot be said to have had reasonable expectations to the contrary and consequently, in the circumstance of the very act or conduct that was expected, maintain that it has been oppressed.

170     In *LSI Logic Corp. of Canada Inc. v. Logani*, *supra*, (which was decided after *347883 Alberta Ltd.*, *supra*, and *Palmer*, *supra*) Fruman, J. stated at ¶ 127:

> ..........................a shareholder who purchased LSI shares after the disposition of the Korean interests could not bring an oppression application in respect of that disposition because the shareholder could not claim to have bought the shares with the legitimate expectation that the company would not dispose of the Korean interests. The date each of the Shareholders acquired their shares is particularly relevant in determining whether they are proper complainants.

171     Further, in *Ford Motor Co. of Canada v. Ontario (Municipal Employees Retirement Board)*, *supra*, (which was also decided after *347883 Alberta Ltd.*, *supra* and *Palmer*, *supra*) Cumming, J. stated at ¶ 231:

> In *LSI*, *supra*, Fruman, J. emphasized that the date of acquiring shares is particularly relevant to determining whether a shareholder is a proper complainant. This seems appropriate and fair from a policy standpoint. The oppression remedy is protective of reasonable expectations by shareholders while considering the relevant circumstances. A shareholder should not be able to claim oppression in respect of an asserted reasonable expectation if it did not exist at the time of his or her share purchase. Arguably, the reasonable expectations of a new shareholder generally pertain to the future decision - making of management unless there are past and continuing misrepresentations, which create false expectations at the point of purchase of the shares.

172     Harbert is a very sophisticated investor. I have found that prior to their initial purchase of Finance II bonds they were aware that CCRC and Calpine had upstreamed or planned to upstream the proceeds from the Sally I transaction out of the control of CCRC. They may not have known the exact specifics of the upstreaming, but I am satisfied that they were on notice that it was occurring. I am also satisfied from the evidence presented that they were aware that this conduct may constitute a breach of the Term Debenture. Despite this knowledge, Harbert purchased Finance II bonds.

173     As indicated previously, within a week of making their first purchase of Finance II bonds Harbert read the announcement of the Sally II transaction and of Calpine's plan to pay off the Sally II preferred share issuance from a potential sale of the Saltend facility. Mr. Kagan thought it was "incredible that Calpine would be pursuing this course of action". Nevertheless, Harbert purchased more Finance II bonds.

174     Mr. Kagan testified on discovery that one of the reasons that Harbert purchased additional bonds after the press release announcing the Sally II transaction was so that Harbert would be sure they had a large enough position to pursue their rights. Section 5.6 of the Indenture dated October 18th, 2001 provides as follows:

**SECTION 5.6 <u>Limitation on Suits</u>.**

A Securityholder of a Series may pursue a remedy with respect to this Indenture, the Guarantee Agreement or the Securities of such Series only if:

(a) the Holder gives to the Trustee written notice of a continuing Event of Default with respect to that Series;

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

Page 34

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

(b) the Holders of at least 25% in principal amount of the Securities of such Series make a written request to the Trustee to pursue the remedy;

(c) such Holder or Holders offer to the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense;

(d) the Trustee does not comply with the request within 60 days after receipt of the notice, request and the offer of security or indemnity; and

(e) the Holders of a majority in principal amount of the Securities of such Series do not give the Trustee a direction inconsistent with the request during such 60-day period.

A Securityholder may not use this Indenture or the Guarantee Agreement to prejudice the rights of another Securityholder or to obtain a preference or priority over another Securityholder.

175      I have difficulty accepting Mr. Kagan's suggestion that one of the reasons Harbert purchased additional bonds was to ensure that they had a large enough position to pursue their rights under the Indenture. As a preliminary matter, s. 5.6 of the governing Indenture does not require that a single bond holder hold at least 25% of the securities in question in order to make a written request to the Trustee to pursue a remedy. It is the holders of at least 25% of the bonds that must make that request. Harbert could have contacted other bond holders and suggested that they collectively make such a request to the Trustee.

176      While Harbert could have been concerned about clause 5.6(e) there was no evidence that any bond holders were giving the Trustee directions which were inconsistent with Harbert's interest in pursuing the matter. In fact, it does not appear that Harbert was dealing with the Trustee in relation to this matter until May of 2005.

177      Finally, I note that after the January 20th, 2005 announcement (relating to the Sally II transaction) Harbert started to buy the euro denominated bonds. They own a very small portion of these bonds so it is unlikely that they were purchasing these bonds in order to pursue their rights.

178      Mr. Kagan was asked on discovery what other reasons Harbert had for purchasing the bonds in questions. He responded:

We thought that after speaking with counsel, that we were correct that Calpine did not have the right to do this. That it either would not occur or would not stand, at which point the value of the Canada bonds would be reflected in the market, and those bonds would become far more valuable than the market was viewing them at the time. So, we thought after reviewing all the materials that we were right and that this couldn't happen.

179      Harbert had no realistic basis to think that the Sally II transaction would not occur. Calpine announced their intention to proceed with the Sally II transaction on January 20th, 2005 and there was no evidence to suggest that an alternate intention was announced. The evidence satisfies me, on a balance of probabilities, that Harbert was of the view that it would be improper for Calpine and its subsidiaries to proceed in the manner announced but they nevertheless continued to buy Finance II bonds.

180       The oppression remedy is based on principles of equity and fairness and the reasonable expectations of the parties. It is important to note that this is not a situation where a company's conduct is alleged to be illegal such as in *Richardson Greenshields*, *supra*, (where the company's actions were alleged to be *ultra vires*) nor is this a case where a security holder is enforcing a statutory right to specific relief (such as in s. 206 of the *Canada Business Corporations Act*

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

). This is a situation where a company's conduct is said to unfairly disregard the interests of a security holder based on the reasonable expectations of the parties. In my view, a security holder's knowledge of the conduct complained of and its decision to become a security holder after obtaining such knowledge is relevant when deciding whether they are a "proper" complainant or a security holder that should be granted relief.

181    The burden is upon Harbert to satisfy me that they are entitled to the relief claimed. In the circumstances of this case they have not fulfilled this burden and their application for relief is hereby dismissed.

182    In *Palmer*, *supra*, the Court referred to the fact that allowing applications by complainants who become security holders after the conduct complained of becomes known could provide an effective check on unlawful acts by directors. The Court went on to state that the owners of small numbers of shares probably could not afford to run the risks involved in providing such check. While these comments may have applicability in cases involving conduct that is wrong *per se* (illegal), in my view, they are not applicable to a claim that is based, at least in part, on the reasonable expectations of the parties.

183    That takes me to the issue of the remaining bond holders. Counsel for the Respondents submits that the only evidence before me concerning reasonable expectations relates to Harbert and another company that Harbert purchased for each time Finance II bonds were acquired by Harbert. I have no evidence about any of the other bond holders including their identity, the dates that they purchased the bonds in question, their knowledge of the matters complained of et cetera. The Respondents invite the Court to dismiss the remainder of the application based on the comments of Farley, J. in *AMCU Credit Union Inc. v. Olympia & York Developments Ltd.* (1992), 7 B.L.R. (2d) 103 (Ont. Gen. Div.) where the Court stated at ¶ 3:

> A troubling feature of this application (which being an oppression remedy application and based upon the expectations of the applicants) is that none of the applicants have provided material which directly indicates what their expectations were. Nor have they indicated what the state of their knowledge was at the time of purchasing the notes and thereafter. It would be of interest to know if they purchased directly for full value or if they acquired the notes in the aftermarket at a substantial discount. What can be said of their sophistication in the commercial paper market?............................Schroeder testified as to what he thought was the profile of a commercial paper buyer in this instance. I find this far from satisfactory. While it is true I indicated obiter in *Ballard* (1991), 3 B.L.R. (2d) 113 at 123 that shareholder expectations in a widely held corporation might have to be assumed or proxied if they are to be discerned at all, it is important not to take this comment out of context. A representative shareholder(s) applicant(s) in a multi-applicant oppression case or more especially in a derivative action situation would still have to give evidence. I also note that in the subject case, the applicants are but 26 in number and appear to be in number and dollar amount substantially all of the non-OYDL and non-bank holders of notes. One would expect that a number of this relatively small number (i.e., not widely held) would give direct evidence of expectations which would be submitted as the complete spectrum of expectations and knowledge. I would conclude that the applicants have not established any base for their claim.

184    In *820099 Ontario Inc. v. Harold E. Ballard Ltd.* [1991 CarswellOnt 141 (Ont. Div. Ct.)], *supra*, Farley, J. when dealing with an oppression remedy claim stated at ¶ 129:

> Shareholder interests would appear to be intertwined with shareholder expectations. It does not appear to me that the shareholder expectations which are to be considered are those that a shareholder has as his own individual 'wish list'. They must be expectations which could be said to have been (or ought to have been considered as) part of the compact of the shareholders............................

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

185    He went on to state at ¶ 135:

> In my view, one cannot regard expectations as a static matter. Expectations may well evolve from the situation of the shareholder going into the corporation (by way of setting up the corporation or by way of gift — or by way of purchasing previously issued shares). Certainly these original expectations may strongly influence the evolutionary process. As well, in a closely held corporation, it will be much easier to consider the 'factual' expectations of the shareholders; in a widely held corporation, these expectations will have to be assumed or proxied if they are to be discerned at all. I would think that the expectations that count are those that are reasonable and which are in existence as the directors make their decisions from time to time...........................

186    In this case I have extensive evidence concerning the bond issuance, the documents of the deal, the subsequent preferred share issuances, et cetera. I am satisfied that from these documents I can determine on an objective basis the reasonable expectations of Finance II bond holders (i.e: the reasonable expectation that Finance II would enforce its rights under the Term Debenture and that the Respondent companies would not unfairly disregard their interests). I am further satisfied, however, that the dates that the bonds were purchased (prior to or after the conduct complained of) and the knowledge of the bondholders alleged to have been oppressed are relevant to the matters at issue in this proceeding. I do not have any evidence in this regard over and above the evidence provided by Harbert.

187    According to Mr. Kagan's discovery evidence the Sally I transaction and the fact that the use of the proceeds therefrom would be available to Calpine was announced to the market in September or October of 2004. A specific date was not given. The earliest date (if the announcement was made in September or October of 2004) would have been September 1st, 2004.

188    In my view, in order to determine whether a bond holder who purchased Finance II bonds after September 1st, 2004 had been oppressed, the Court would need to have evidence concerning their identity and their state of knowledge at the time of purchasing the bonds. The Trustee has not provided evidence in this regard in relation to any bond holder other than Harbert and another company that Harbert purchased for. In relation to Harbert and this other company, I am satisfied that relief should not be granted pursuant to s. 5 of the Third Schedule of the *Companies Act* due to Harbert's knowledge of the matters complained of.

189    In my view, the Trustee has failed to prove its claim in relation to any other bond holders that purchased bonds from September 1st, 2004 onward as it has failed to identify these individuals and to give evidence concerning their state of knowledge at the time of purchasing the bonds. However, I am satisfied on a balance of probabilities, that with the exception of the Respondent companies themselves (who do presently own some of the bonds in question), bond holders that purchased Finance II bonds prior to September 1st, 2004 would not have known of the conduct now complained of. Accordingly, it is not necessary for the Court to receive evidence concerning their state of knowledge.

190    In my view, a remedy should be granted for any bond holder (other than the Respondent companies) that purchased Finance II bonds prior to September 1st, 2004 and that continues to hold those bonds today. The Trustee shall have until August 31st, 2005 to provide the Respondents and the Court with a list of all Finance II bond holders that fulfil this criteria as well as the face value of the said bonds. An Order will then issue requiring Calpine to maintain in the control of CCRC sufficient proceeds from the sale of the Saltend facility to cover the said value. If there are insufficient proceeds from the said sale to fulfil this requirement then Calpine shall be obliged to place in the control of CCRC an additional amount, which, when added to the net proceeds referred to above, will cover the face value of all such bonds. The Order will further provide that CCRC shall diligently conduct its business in a proper and efficient manner so as to preserve and protect its business and assets. This Order shall remain in effect for as long as the said bonds remain out-

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

standing. I hereby reserve the right to determine the specific amounts that must be placed in the control of CCRC.

191      In the meantime, a further Interim Order is hereby granted pursuant to which Calpine shall maintain in the control of CCRC the net proceeds of the sale of the Saltend facility (as defined in my Interim Order issued July 28th, 2005) until the Court's final Order is issued. Further, CCRC shall diligently conduct its business in a proper and efficient manner so as to preserve and protect its business and assets.

192      I appreciate that as a result of my decision some of the Finance II bond holders will be treated differently than other Finance II bond holders. In my view, there is nothing improper with such a result in light of the fact that the oppression remedy deals with the reasonable expectations of parties. There will be cases where some parties have different expectations than others for very good reason (beyond just a subjective "wish" or view of the matter). In those cases, different security holders may well be treated differently.

193       In my view, the parties to this application have had mixed success. I am hopeful that counsel will be able to agree on the issue of costs. If not, I am prepared to receive written submissions in this regard.

"Appendix A"

**TERM DEBENTURE**

**CALPINE CANADA RESOURCES LTD.**, a corporation subsisting under the laws of the Province of Alberta, Canada (**"Issuer"**)

£274,400,000

Due: April 25, 2021

**THIS DEBENTURE** is issued this 23rd day of August, 2001 by the Issuer, whose principal office or place of business is located at Suite 1000, 350 — 7th Avenue S.W., Calgary, Alberta, to Calpine Canada Energy Finance II ULC, an unlimited liability company subsisting under the laws of the Province of Nova Scotia (the **"Holder"**) with a registered office at Suite 800, Purdy's Wharf Tower One, 1959 Upper Water Street, P.O. Box 997, Halifax, Nova Scotia.

**WHEREAS** this Debenture is issued to Calpine Canada Energy Finance II ULC, the initial Holder, as consideration for an advance made by Holder to Issuer for general corporate purposes;

**AND WHEREAS** it is intended that this Debenture may be used by the Holder to arrange its financing and may be held by the Holder, or sold, assigned, pledged as security from time to time by the Holder, (or otherwise used or transferred by the Holder) in connection with the Holder's financing activities;

**NOW THEREFORE** for good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the Issuer covenants, acknowledges, represents and warrants as follows:

. . . . .

**ARTICLE 4**

**COVENANTS OF THE ISSUER**

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

### 4.1 Conduct of Business

The Issuer shall diligently conduct its business in a proper and efficient manner so as to preserve and protect its business and assets.

. . . . .

### 4.9 General Indemnity

The Issuer will indemnify the Holder and save it fully harmless of and from all loss, cost, damage, expense, claims and liability which it may suffer or incur in connection with (i) the exercise by the Holder of its remedies and powers hereunder, (ii) any breach of the representations or warranties contained herein, or (iii) any failure by the Issuer to perform any of its covenants or obligations under this Debenture.

. . . . .

### 4.11 Maintain Existence

The Issuer will at all times maintain its corporate existence and carry on its business in a proper and efficient manner.

. . . . .

### 4.13 Use of Proceeds

The Issuer will use the proceeds of amounts borrowed pursuant to this Debenture for general corporate purposes.

### 4.14 Indebtedness

The Issuer shall not incur any Indebtedness unless such Indebtedness contains express terms, or is issued under a deed, indenture or other instrument which contains express terms, providing that it is unsecured and either subordinate to or ranks *pari passu* with the Indebtedness evidenced by this Debenture. The term **"Indebtedness"** means, with respect to the Issuer: (i) the principal (including redemption payments), premium, if any, interest and other payment obligations in respect of (x) indebtedness of the Issuer for money borrowed, and (y) indebtedness evidenced by securities, debentures, bonds, notes or other similar instruments issued by the Issuer, including any such securities issued under any deed, indenture or other instrument to which the Issuer is a party (including, for the avoidance of doubt, indentures pursuant to which subordinated debentures have been or may be issued), (ii) any capital, operating or other lease obligations of the Issuer, (iii) any obligations of the Issuer issued or assumed as the deferred purchase price of property, any conditional sale obligations of the Issuer, any hedging agreements and agreements of a similar nature thereto and all agreements relating to any such agreements, and all obligations of the Issuer under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business), (iv) any obligations of the Issuer for reimbursement on any letter of credit, banker's acceptance, security purchase facility or similar credit transaction, (v) all obligations of the type referred to in clauses (i) through (iv) above of other persons for the payment of which the Issuer is responsible or liable as obligor, guarantor, surety or otherwise, and (vi) all obligations of the type referred to in clauses (i) through (v) above of other persons secured by any lien on any property or asset of the Issuer (whether or not such obligation is assumed by the Issuer), in each case whether outstanding at the date of original issue of this Debenture or thereafter incurred.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

. . . . .

**ARTICLE 7**

**GENERAL**

**7.1 Additional Covenants**

The Issuer and the Holder agree, for so long as any event of default under the Bridge Credit Agreement or any re-newal, refinancing or extension thereof or replacement therefore, including without limitation any debt securities is-sued in a public offering or private placement by the Holder, has occurred and is continuing (giving effect to all ap-plicable grace and cure periods), as follows:

(a) the Issuer and the Holder shall take all actions and do all things necessary within its control to ensure that the Holder remains an unlimited liability company subsisting under the laws of Nova Scotia, and shall not amend the constating documents of the Holder or enter into (or cause the Holder to enter into) any amalgamation, mer-ger, statutory arrangement or other transaction pursuant to which the Holder would cease to be an unlimited li-ability company subsisting under the laws of Nova Scotia.

(b) the Issuer shall remain the beneficial and record owner of 100% of the issued and outstanding shares and other equity interests in the Holder; and

(c) in connection with any default or event of default that occurs or is declared pursuant to the terms of the Bridge Credit Agreement or any agreement, indenture or instrument relating to indebtedness incurred by the Holder in connection with any renewal, refinancing or extension thereof or replacement therefor (including without limitation any debt securities issued in a public offering or private placement by the Holder), the Holder, failing which, the Issuer, shall promptly take all actions and do all things necessary within their respective con-trol to effect or cooperate with the filing of a petition for the winding-up or liquidation of the Holder under ap-plicable law.

. . . . .

**7.6 Governing Law**

This Debenture shall be governed by, and interpreted and enforced in accordance with, the laws in force in the Province of Alberta (excluding any conflict of laws rule or principle which might refer such construction to the laws of another jurisdiction). Each party hereto irrevocably submits to the non-exclusive jurisdiction of the courts of Al-berta with respect to any matter arising hereunder or related hereto.

**7.7 Entire Agreement**

There are no representations, warranties, conditions, other agreements or acknowledgments, whether direct or collat-eral, express or implied, (including any representation, warranty, condition, agreement or acknowledgment in any other agreement or document delivered in connection with or in any manner related to this Debenture, unless ex-pressly otherwise provided herein), that form part of or affect this Debenture or the Obligations, other than as set forth herein.

. . . . .

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

## SCHEDULE "B"

### Interest Rate Determinations

**"Bridge Credit Agreement"** means the Bridge Credit Agreement, dated as of August 22, 2001, among Calpine Canada Energy Finance II ULC, as Borrower, the commercial lending institutions party thereto, as Lenders, Credit Suisse First Boston, as Co-Arranger and Documentation Agent, Bayerische Landesbank Girozentrale, as Lead Arranger and Syndication Agent, and the Bank of Nova Scotia, as Lead Arranger and Administrative Agent, as amended from time to time.

**"Bridge Refinancing Date"** means the date on which the indebtedness outstanding under the Bridge Credit Agreement is repaid in full using the proceeds of a public offering or private placement of debt securities of Calpine Canada Energy Finance II ULC (the **"Refinancing Securities"**).

. . . . .

**"Reference Rate"** means (i) in respect of all Interest Periods through and including the Interest Period ending on the Bridge Refinancing Date, the rate of interest borne by loans outstanding under the Bridge Credit Agreement during each such Interest Period, which rate shall be communicated to the Issuer by the Holder promptly after each determination thereof, (ii) in respect of the Interest Period commencing on the Bridge Refinancing Date and all Interest Periods thereafter through and including the Interest Period ending on the Initial Reset Date, the rate per annum borne by the debt securities issued by Calpine Canada Energy Finance II ULC in the issuance which results in the occurrence of the Bridge Refinancing Date, which rate shall be communicated by the Holder to the Issuer promptly after the determination thereof, and (iii) in respect of the Interest Period commencing on the Initial Reset Date and all Interest Periods thereafter, until altered by an Interest Reset, the per annum interest rate established from time to time by the Holder from time to time pursuant to an Interest Reset Notice.

### PROSPECTUS

### Calpine Corporation

Common Stock

Preferred Stock

Debt Securities

### Calpine Canada Energy Finance ULC

Debt Securities Fully and Unconditionally

Guaranteed by Calpine Corporation

### Calpine Canada Energy Finance II ULC

Debt Securities Fully and Unconditionally

Guaranteed by Calpine Corporation

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

. . . . .

**ABOUT THIS PROSPECTUS**

This document is called a prospectus and is part of a joint registration statement that Calpine Corporation, Calpine Canada Energy Finance ULC and Calpine Canada Energy Finance II ULC, which we refer to as "Energy Finance" and "Energy Finance II," respectively, filed with the Securities and Exchange Commission (the "SEC") using a "shelf" registration or continuous offering process. Under this shelf process, Calpine may from time to time sell any combination of its common stock, preferred stock and debt securities described in this prospectus, and Energy Finance and Energy Finance II may from time to time sell their respective debt securities fully and unconditionally guaranteed by Calpine described in this prospectus, in one or more offerings which will aggregate up to a total dollar amount of $2,775,000,000, which amount includes over-allotment options with regard to certain securities. Unless otherwise indicated, references in this prospectus to "$" are to the lawful currency of the United States.

Pursuant to Rule 3-10 of Regulation S-X promulgated by the SEC, we are not required to include separate financial statements of Energy Finance or Energy Finance II in this prospectus because:

  • all of the voting rights of each of Energy Finance and Energy Finance II are owned by Calpine, either directly or through wholly-owned subsidiaries of Calpine, which files periodic and other reports with the SEC pursuant to the Securities Exchange Act of 1934, as amended;

  • neither Energy Finance nor Energy Finance II has operations other than the investment of funds in Calpine or its subsidiaries; and

  • Calpine will fully and unconditionally guarantee the obligations of Energy Finance and Energy Finance II, and the rights of holders of their debt securities, and no subsidiary of Calpine will guarantee the obligations of Energy Finance or Energy Finance II.

. . . . .

Unless we have indicated otherwise, in this prospectus references to 'Calpine' are to Calpine Corporation, references to 'Energy Finance' are to Calpine Canada Energy Finance ULC, references to 'Energy Finance II' are to Calpine Canada Energy Finance II ULC and references to 'we', 'us' and 'our' or similar terms are, collectively, to Calpine Corporation and its consolidated subsidiaries excluding Calpine Capital Trust III, Calpine Capital Trust II and Calpine Capital Trust

. . . . .

**Recent developments**

. . . . .

On July 5, 2001, we announced an agreement to acquire a 1,200-megawatt natural gas-fired power plant at Saltend near Hull, Yorkshire, England from Entergy Wholesale Operations for up to approximately £562.5 million (approximately U.S. $800 million at current exchange rates). The Saltend facility, a cogeneration facility, provides electricity and steam for BP Chemical's Hull Works plant under a 15-year agreement. The balance of the Saltend facility's electricity output is sold into the deregulated UK power market. The Saltend transaction is our first acquisition of a power facility in Europe. The acquisition closed on August 24, 2001.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

. . . . .

**CALPINE CANADA ENERGY FINANCE II ULC**

Energy Finance II is an unlimited liability company organized in July 2001 under the laws of Nova Scotia, Canada. It is an indirect wholly-owned special purpose finance subsidiary of Calpine that engages in financing activities to raise funds for the business operations of Calpine and its subsidiaries. Its direct parent company is Calpine Canada Resources Ltd., an Alberta, Canada corporation. Energy Finance II will issue debt securities, which will be fully and unconditionally guaranteed by Calpine.

Pursuant to Rule 3-10 of Regulation S-X promulgated by the SEC, Energy Finance II is not required to file separate reports with the SEC under the Securities Exchange Act and we are not required to include separate financial statements for Energy Finance II in this prospectus because:

• all of the voting rights of Energy Finance II are owned by Calpine, either directly or through its wholly-owned subsidiaries, and Calpine files periodic and other reports with the SEC pursuant to the Securities Exchange Act;

• its sole operations are the investment of funds in Calpine and its subsidiaries; and

• Calpine will fully and unconditionally guarantee its obligations and the rights of holders under its debt securities and no subsidiary of Calpine will guarantee its obligations.

The registered office of Energy Finance II is Suite 800, Purdy's Wharf, Tower 1, 1959 Upper Water Street, P.O. Box 997, Halifax, Nova Scotia B3J 3N2, telephone: (902) 420-3335.

**RISK FACTORS**

Investing in our securities involves risk. Please see the risk factors described in Calpine's Annual Report on Form 10-K for the year ended December 31, 2000, Calpine's Quarterly Reports on Form 10-Q for the Quarters ended March 31, 2001 and June 30, 2001 and Calpine's Current Report on Form 8-K, filed on September 10, 2001, each of which is incorporated by reference in this prospectus. Before making an investment decision, you should carefully consider these risks as well as other information contained or incorporated by reference in this prospectus. The risks and uncertainties described are not the only ones facing us. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations.

. . . . .

**USE OF PROCEEDS**

Unless otherwise specified in a prospectus supplement accompanying this prospectus, we will add the net proceeds from the sale of the securities to which this prospectus and the prospectus supplement relate to our general funds, which we will use, directly or indirectly, for financing power projects under development or construction, working capital, general corporate purposes and any other purpose specified in a prospectus supplement. We may conduct concurrent or additional financings at any time. The net proceeds from the sale of debt securities by Energy Finance or Energy Finance II to which this prospectus relates will be lent to Calpine or its affiliates by Energy Finance or Energy Finance II, as applicable, pursuant to one or more intercompany loans.

. . . . .

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

**DESCRIPTION OF THE DEBT SECURITIES**

The following is a general description of the debt securities to which this prospectus and any prospectus supplement may relate. The particular terms relating to each debt security will be set forth in a prospectus supplement. Unless otherwise stated, the senior debt securities and the subordinated debt securities are together referred to as the "debt securities."

**General**

Calpine may issue from time to time one or more series of debt securities under one or more separate indentures between Calpine and Wilmington Trust Company, as trustee; .................... and Energy Finance II may issue from time to time one or more series of debt securities under one or more indentures between Energy Finance II and Wilmington Trust Company, as trustee.

. . . . .

The debt securities will be direct, unsecured obligations of the issuer. The senior debt securities will rank equally with all other senior debt of the issuer. The indentures will not limit the amount of debt securities which the issuer may issue. The subordination provisions of any subordinated debt securities will be described in an applicable prospectus supplement.

Almost all of Calpine's operations are conducted through Calpine's subsidiaries and other affiliates. As a result, Calpine depends almost entirely upon their earnings and cash flow to service Calpine's indebtedness, including Calpine's ability to pay the interest on and principal of Calpine's debt securities, and on the debt securities of Energy Finance and Energy Finance II under the guarantees, if the guarantees are enforced. The non-recourse project financing agreements of certain of Calpine's subsidiaries and other affiliates generally restrict their ability to pay dividends, make distributions or otherwise transfer funds to Calpine prior to the payment of other obligations, including operating expenses, debt service and reserves. Each of Energy Finance and Energy Finance II is a special purpose financing subsidiary formed solely as a financing vehicle for Calpine and its subsidiaries. Therefore, the ability of Energy Finance and Energy Finance II to pay their obligations under the debt securities is dependent upon the receipt by them of payments from Calpine and its subsidiaries to which they have made loans or otherwise under agreements with them in connection with their respective financing activities. In addition, under Canadian law, the respective direct parent companies of Energy Finance and Energy Finance II will be liable for their subsidiary's indebtedness, including any debt securities issued by such subsidiary, upon a winding-up of that subsidiary. While each of Energy Finance and Energy Finance II believes that payments made to it in connection with its financing activities will be sufficient to pay the principal of, and interest on, any debt securities it issues, if the responsible parties were not able to make such payments for any reason, the holders of such debt securities would have to rely on the enforcement of Calpine's guarantee described below.

Calpine's subsidiaries and other affiliates are separate and distinct legal entities and will have no obligation to pay any amounts due on the debt securities issued by Calpine hereunder, and will not guarantee the payment of interest on or principal of the debt securities issued by Calpine hereunder. Calpine's subsidiaries and other affiliates (other than Energy Finance (in the case of debt securities issued by Energy Finance) and Energy Finance II (in the case of debt securities issued by Energy Finance II) and their direct parent companies, respectively, in the case of the winding-up of its subsidiary) will not have any obligation to pay any amounts due on the debt securities issued by Energy Finance or Energy Finance II hereunder and none of Calpine's subsidiaries or other affiliates will guarantee the payment of interest on or principal of the debt securities issued by Energy Finance or Energy Finance II hereunder. The

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

right of Calpine's debt security holders to receive any assets of any of Calpine's subsidiaries or other affiliates upon Calpine's liquidation or reorganization will be subordinated to the claims of any subsidiaries' or other affiliates' creditors (including trade creditors and holders of debt issued by Calpine's subsidiaries or affiliates, including Energy Finance and Energy Finance II). Similarly, the right of holders of Energy Finance's or Energy Finance II's debt securities to receive any assets of any of Calpine's subsidiaries or other affiliates upon Calpine's liquidation or reorganization will be subordinated to the claims of any subsidiaries' or other affiliates' creditors (including trade creditors and holders of debt issued by Calpine's subsidiaries or affiliates). As of June 30, 2001, Calpine's subsidiaries had approximately $1.8 billion of project financing. Calpine intends to utilize project financing when appropriate in the future, and this financing will be effectively senior to the debt securities and the guarantees.

The following description of the debt securities is subject to the detailed provisions of each indenture, a copy of each of which is filed as an exhibit to the Registration Statement of which this prospectus is a part and is available upon request made to us. Whenever particular provisions of any indenture or terms defined therein are referred to, those provisions or definitions are incorporated by reference herein and such descriptions are qualified in their entirety by such reference. We urge you to read the forms of indentures because they, and not this description, describe every detail of the terms of the debt securities. The summary below of the general terms of the debt securities will be supplemented by the more specific terms in a prospectus supplement. Unless otherwise stated herein or in an applicable prospectus supplement, the following indenture description will apply to both senior and subordinated debt securities.

. . . . .

**Ranking**

. . . . .

Unless otherwise provided in the prospectus supplement relating to such securities, debt securities issued by Energy Finance or Energy Finance II will be:

  • senior unsecured obligations of Energy Finance or Energy Finance II, as applicable, and will rank equally and ratably with all of its other unsecured and unsubordinated indebtedness, and

  • guaranteed on a senior unsecured basis by Calpine, which guarantee will rank equally and ratably with all other unsecured and unsubordinated indebtedness of Calpine, including Calpine's indebtedness described above including the other indebtedness of its subsidiaries guaranteed by Calpine.

The subordinated debt securities issued by Calpine will be subordinate and junior in right of payment to all of Calpine's senior indebtedness, including any guarantee by Calpine of senior debt securities of Energy Finance and Energy Finance II. The subordinated debt securities of Energy Finance and Energy Finance II will be subordinate and junior in right of payment to all of their respective senior indebtedness.

**Guarantees**

Calpine will fully and unconditionally guarantee to each holder of a debt security issued by Energy Finance or Energy Finance II and authenticated and delivered by the trustee the due and punctual payment of the principal of, and any premium and interest on, the debt security, when and as it becomes due and payable, whether at maturity, upon acceleration, by call for redemption, repayment or otherwise in accordance with the terms of the debt securities and

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

of the related indenture. The claims of holders under the guarantee by Calpine will be effectively subordinated to the claims of creditors of Calpine's subsidiaries other than Energy Finance or Energy Finance II, as applicable.

Under its guarantee agreement, Calpine will:

> • agree that, if an event of default occurs under the debt securities, its obligations under the guarantees will be absolute and unconditional and will be enforceable irrespective of any invalidity, irregularity or unenforceability of any series of the debt securities or the related indenture or any supplement thereto, and

> • waive its right to require the trustee or the holders to pursue or exhaust their legal or equitable remedies against Energy Finance or Energy Finance II before exercising their rights under the guarantees.

. . . . .

**Actions by Holders**

A holder of any series of debt securities may not pursue any remedy with respect to the indentures or the debt securities of such series (except a registered holder of a series of debt securities may bring an action for payment of overdue principal, premium, if any, or interest on that series), unless:

> • the registered holder has given notice to the trustee of such series of a continuing Event of Default,

> • registered holders of at least 25% in principal amount of that series of debt securities have made a written request to the trustee of such series to pursue such remedy.

> • such registered holder or holders have offered the trustee of such series security or indemnity reasonably satisfactory to the trustee against any loss, liability or expense,

> • the trustee of such series has not complied with such request within 60 days of such request and offer, and

> • the registered holders of a majority in principal amount of that series of debt securities have not given the trustee of such series an inconsistent direction during that 60-day period.

. . . . .

**Governing Law**

The laws of the State of New York will govern the indentures and each series of debt securities.

*Application dismissed; cross-application dismissed.*

**Appendix "B"**

. . . . .

**Appendix "C"**

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

Appendix "D"

Appendix "E"

Appendix "F"

**[Prospectus Supplement]**

. . . . .

## CALPINE CORPORATION

We are a leading independent power company engaged in the development, acquisition, ownership and operation of power generation facilities and the sale of electricity and steam in the United States, Canada and the United Kingdom. We have experienced significant growth in all aspects of our business over the last five years. Currently, we own interests in 61 power plants having a net capacity of 11,085 megawatts. We also have 30 gas-fired projects under construction having a net capacity of 16,673 megawatts and have announced plans to develop 26 gas-fired projects (power plants and expansions of current facilities) with a net capacity of 14,915 megawatts. Upon completion of the projects under construction, we will have interests in 87 power plants located in 22 U.S. states, three Canadian provinces and the United Kingdom, having a net capacity of 27,758 megawatts. Of this total generating capacity, 97% will be attributable to gas-fired facilities and 3% will be attributable to geothermal facilities. As a result of our expansion program, our revenues, EBITDA, earnings and assets have grown significantly over the last five years, as shown in the table below.

. . . . .

We are a corporation organized and existing under the laws of the State of Delaware. Our principal executive office is located at 50 West San Fernando Street, San Jose, California 95113. Our registered office is located at 9 East Loockerman Street, Dover, Delaware 19901, c/o National Registered Agents, Inc.

## CALPINE CANADA ENERGY FINANCE II ULC

Calpine Canada Energy Finance II is an unlimited liability company organized in July 2001 under the laws of Nova Scotia, Canada. It is an indirect wholly-owned special purpose finance subsidiary of Calpine that engages in financing activities to raise funds for the business operations of Calpine and its subsidiaries. Its direct parent company is Calpine Canada Resources Ltd., an Alberta, Canada corporation. Calpine Canada Energy Finance II will issue the senior notes, which will be fully and unconditionally guaranteed by Calpine.

The registered office of Calpine Canada Energy Finance II is Suite 800, Purdy's Wharf, Tower 1, 1959 Upper Water Street, P.O. Box 997, Halifax, Nova Scotia B3J 3N2, telephone: (902) 420-3335.

. . . . .

The net proceeds from the sale of the senior notes by Calpine Canada Energy Finance II to which this prospectus

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

supplement relates will be lent to Calpine and its affiliates by Calpine Canada Energy Finance II pursuant to one or more intercompany loans. The net proceeds from the sale of the senior notes by Calpine Canada Energy Finance ULC described above will be lent to Calpine and its affiliates by Calpine Canada Energy Finance ULC pursuant to one or more intercompany loans. Calpine expects to use the net proceeds from the Concurrent Offerings as follows: (i) to refinance the $275,000,000 Bridge Credit Agreement, dated as of August 15, 2001, among Calpine, as borrower, certain commercial lending institutions parties thereto as lenders, Credit Suisse First Boston, as co-arranger and documentation agent, Bayerische Landesbank Girozentrale, as lead arranger and syndication agent, and The Bank of Nova Scotia, as lead arranger and administrative agent; (ii) to refinance the $525,000,000 Bridge Credit Agreement, dated as of August 20, 2001, among Calpine Canada Energy Finance ULC, as borrower, certain commercial lending institutions parties thereto as lenders, Credit Suisse First Boston, as co-arranger and documentation agent, Bayerische Landesbank Girozentrale, as lead arranger and syndication agent, and The Bank of Nova Scotia, as lead arranger and administrative agent; (iii) to refinance the $400,000,000 Bridge Credit Agreement, dated as of August 22, 2001, among Calpine Canada Energy Finance II, as borrower, certain commercial lending institutions parties thereto as lenders, Credit Suisse First Boston, as co-arranger and documentation agent, Bayerische Landesbank Girozentrale, as lead arranger and syndication agent, and The Bank of Nova Scotia, as lead arranger and administrative agent (the Bridge Credit Agreements referred to in clauses (i), (ii) and (iii) above are collectively referred to in this prospectus supplement as the "Bridge Credit Facilities"); and (iv) the balance for working capital and general corporate purposes, including repayment of outstanding borrowings under Calpine's construction loan credit facilities. The weighted average interest rate of outstanding advances under the Bridge Credit Facilities at October 10, 2001 was 4.89% per annum and such advances had various scheduled maturity dates. The indebtedness under the Bridge Credit Facilities was incurred to finance acquisitions recently consummated by Calpine. Each of the Bridge Credit Facilities shall terminate upon the consummation of the respective refinancings described above.

. . . . .

Pursuant to Rule 3-10 of Regulation S-X promulgated by the SEC, Calpine Canada Energy Finance II is not required to file separate reports with the SEC under the Securities Exchange Act of 1934 and we are not required to include separate financial statements for Calpine Canada Energy Finance II in this prospectus supplement because:

• all of the voting rights of Calpine Canada Energy Finance II are owned by Calpine, either directly or through its wholly-owned subsidiaries, and Calpine files periodic and other reports with the SEC pursuant to the Securities Exchange Act;

• Calpine Canada Energy Finance II's sole operations are the investment of funds in Calpine and its subsidiaries; and

• Calpine will fully and unconditionally guarantee Calpine Canada Energy Finance II's obligations and the rights of holders under the senior notes and no subsidiary of Calpine will guarantee the obligations of Calpine Canada Energy Finance II.

. . . . .

**Calpine Canada Energy Finance II**

As of the date of this prospectus supplement: (i) Calpine Canada Energy Finance II has 500,000,000 shares of common stock of no par value authorized and 1,000 shares of common stock outstanding; (ii) Calpine Canada Energy

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

Finance II's paid-in capital is $1,000; (iii) no shares of preferred stock are authorized or outstanding; (iv) Calpine Canada Energy Finance II has incurred no short-term debt or medium-term debt; and (v) the only long-term debt of Calpine Canada Energy Finance II that will be outstanding will be the senior notes being issued hereunder, the net proceeds of which will have been used to repay amounts outstanding under the $400,000,000 Bridge Credit Agreement, dated as of August 22, 2001, among Calpine Canada Energy Finance II, as borrower, certain commercial lending institutions parties thereto as lenders, Credit Suisse First Boston, as co-arranger and documentation agent, Bayerische Landesbank Girozentrale, as lead arranger and syndication agent, and The Bank of Nova Scotia, as lead arranger and administrative agent.

## DESCRIPTION OF THE SENIOR NOTES AND THE GUARANTEES

Calpine Canada Energy Finance II will issue each of the Sterling senior notes and the Euro senior notes under an indenture dated as of October 18, 2001 between Calpine Canada Energy Finance II and Wilmington Trust Company as trustee, as supplemented by the First Supplemental Indenture, dated as of October 18, 2001. The Sterling senior notes and the Euro senior notes shall each constitute a separate series of securities under the indenture. The related guarantees will be issued by Calpine under a Guarantee Agreement dated as of October 18, 2001, as supplemented by the First Amendment to Guarantee Agreement, dated as of October 18, 2001. Each series of senior notes will be issued in the form of one or more global securities registered in the name of a common depositary acting on behalf of Clearstream Banking, S.A., formerly Cedelbank ("Clearstream") and Euroclear System ("Euroclear") or its nominee.

The following description and the description in the accompanying prospectus is a summary of the material provisions of the senior notes and the guarantees and is subject to the detailed provisions of the indenture and guarantee agreement, copies of which are filed as exhibits to the Registration Statement of which this prospectus supplement is a part and are available upon request made to us. Whenever particular provisions of the indenture or guarantee agreement or terms defined therein are referred to, those provisions or definitions are incorporated by reference herein and such descriptions are qualified in their entirety by such reference. Calpine and Calpine Canada Energy Finance II urge you to read the indenture and the guarantee agreement because they, and not this description, define your rights as holders of the senior notes and the guarantees and describe every detail of the terms of the senior notes and the guarantees.

This description of the senior notes and the guarantees in this prospectus supplement replaces the description of the general provisions of the senior notes, the guarantee, the indenture and the guarantee agreement in the accompanying prospectus to the extent that it is inconsistent with the accompanying prospectus. The senior notes are "debt securities" as that term is used in the accompanying prospectus.

### Principal, Maturity and Interest; Listing

The senior notes will be senior unsecured obligations of Calpine Canada Energy Finance II. Calpine will irrevocably and unconditionally guarantee the senior notes as to principal, premium, if any, interest and Additional Amounts (as defined below under "-Additional Amounts"), if any. There is no sinking fund for the senior notes.

. . . . .

### *Compliance with Term Debenture*

Calpine Canada Energy Finance II will comply in all respects with its obligations under Section 7.1 of the term

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

debenture between Calpine Canada Energy Finance II and Calpine Canada Resources Ltd. Calpine will cause Calpine Canada Resources Ltd. to comply in all respects with its obligations under Section 7.1 of the same term debenture. If Calpine Canada Energy Finance II or Calpine defaults in the performance of their respective convenant regarding the term debenture and the default continues for 30 days after notice of such default, such default will constitute an Event of Default (as described under the caption "Description of the Debt Securities — Events of Default" in the accompanying prospectus) under the indenture.

. . . . .

**CALPINE CANADA ENERGY FINANCE II ULC**

**and**

**WILMINGTON TRUST COMPANY, Trustee**

**Indenture**

**Dated as of October 18, 2001**

**Debt Securities**

**Fully and Unconditionally Guaranteed**

**by Calpine Corporation**

INDENTURE, dated as of October 18, 2001, between Calpine Canada Energy II Finance ULC, an unlimited liability company organized under the laws of Nova Scotia, Canada (the"Company"), and Wilmington Trust Company, a Delaware banking corporation (the "Trustee").

. . . . .

WHEREAS, Calpine Corporation, the parent corporation of the Company, has agreed to fully and unconditionally guarantee the debt securities issued by the Company hereunder; and

WHEREAS, the Trustee desires to act as Trustee with respect to such securities;

. . . . .

**ARTICLE I**

**DEFINITIONS AND INCORPORATION BY REFERENCE**

. . . . .

"Guarantee" means, as applied to any obligation, contingent or otherwise, of any Person, (i) a guarantee, direct or indirect, in any manner, of any part or all of such obligation (other than by endorsement of negotiable instruments for collection in the ordinary course of business) and (ii) an agreement, direct or indirect, contingent or otherwise, the practical effect of which is to insure in any way the payment or performance (or payment of damages in the event of nonperformance) of any part or all of such obligation, including the payment of amounts drawn down under letters of

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

credit. With respect to the Guarantor, "Guarantee" shall include the guarantee by the Guarantor of the Securities pursuant to the Guarantee Agreement.

"Guarantee Agreement" means the guarantee agreement made by the Guarantor and accepted and agreed to by the Trustee, in substantially the form annexed hereto as Exhibit D, as the same may be amended or supplemented from time to time in accordance with the applicable provisions thereof.

"Guarantor" means Calpine Corporation, a Delaware corporation until a successor replaces it pursuant to the terms and conditions of the Guarantee Agreement and thereafter means the successor.

"Holder" or "Securityholder" means the Person in whose name a Security is registered on the Registrar's books.

. . . . .

**ARTICLE II**

**THE SECURITIES**

**SECTION 2.1 Securities Issuable in Series.**

Securities may be issued hereunder in one or more series, the Securities of each series (a "Series") having identical terms but for authentication date and public offering price. Securities of any one Series need not be issued at the same time and, unless specifically provided otherwise, a Series may be reopened, without the consent of the Holders, for issuances of additional Securities of such Series. All Securities shall be fully and unconditionally guaranteed by the Guarantor pursuant to the Guarantee Agreement. Initial Securities of a Series shall be treated as a single class and series with Exchange Securities issued in exchange for such Initial Securities.

. . . . .

**ARTICLE III**

**COVENANTS**

**SECTION 3.1 Payment of Securities.**

The Company shall pay the principal of, and interest on the Securities of each Series on the dates and in the manner provided in such Securities. The Company shall pay interest on overdue principal at the rate borne by or provided for in such Securities; it shall pay interest on overdue installments of interest at the rate borne by or provided for in such Securities to the extent lawful. Principal and interest shall be considered paid on the date due if the Trustee or the Paying Agent (other than the Company or a Subsidiary or an Affiliate of the Company) has received from or on behalf of the Company money sufficient to pay all principal and interest then due in accordance with Section 2.5.

. . . . .

**ARTICLE IV**

**CONSOLIDATION, MERGER, SALE AND LEASE**

. . . . .

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

**SECTION 4.3 <u>Assignment by the Company to the Guarantor or Its Significant Subsidiaries</u>.**

(a) The Company may assign its obligations under any series of Securities to the Guarantor or any Significant Subsidiary of the Guarantor (the "Affiliate Assignee") and such Affiliate Assignee shall be treated as the successor to the Company with respect to such series of Securities; provided that: (i) the Affiliate Assignee expressly assumes in an assumption agreement or supplemental indenture hereto, executed and delivered to the Trustee, the due and punctual payment of the principal of and any premium and interest on such Securities and the performance or observance of every convenant of this Indenture on the part of the Company to be performed or observed with respect to such Series; (ii) immediately after giving effect to such assignment and assumption, no Event of Default with respect to such Series and no event which, after notice or lapse of time or both, would become an Event of Default with respect to such Series, shall have occurred and be continuing; (iii) the Affiliate Assignee shall deliver to the Trustee an opinion of an independent counsel or a tax consultant of recognized standing that the Holders will not recognize income, gain or loss for United States federal income tax purposes as a result of such assignment and assumption; and (iv) the Affiliate Assignee shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel stating that such assignment and assumption and such assumption agreement comply with this Article and that all conditions precedent herein provided for relating to such assignment and assumption have been complied with.

(b) Upon any assignment and assumption of Securities pursuant to Section 4.3(a) above, the Affiliate Assignee shall succeed to, and be substituted for, and may exercise every right and power of, the Company under such Securities and this Indenture with respect to such Series with the same effect as if the Affiliate Assignee has been named as the Company herein, and the Company shall be released from its liability as obligor upon such Securities and under this Indenture with respect to such Securities and, if the Affiliate Assignee is the Guarantor and the Guarantor has assumed the obligations of the Company under an outstanding series of Securities and the Indenture with respect to such Securities in accordance with (a) above, all outstanding Guarantees of such series of Securities shall automatically terminate and be discharged.

**ARTICLE V**

**DEFAULTS AND REMEDIES**

. . . . .

**SECTION 5.6 <u>Limitation on Suits</u>.**

A Securityholder of a Series may pursue a remedy with respect to this Indenture, the Guarantee Agreement or the Securities of such Series only if:

(a) the Holder gives to the Trustee written notice of a continuing Event of Default with respect to that Series;

(b) the Holders of at least 25% in principal amount of the Securities of such Series make a written request to the Trustee to pursue the remedy;

(c) such Holder or Holders offer to the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense;

(d) the Trustee does not comply with the request within 60 days after receipt of the notice, request and the offer of security or indemnity; and

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

(e) the Holders of a majority in principal amount of the Securities of such Series do not give the Trustee a direction inconsistent with the request during such 60-day period.

A Securityholder may not use this Indenture or the Guarantee Agreement to prejudice the rights of another Securityholder or to obtain a preference or priority over another Securityholder.

**SECTION 5.7** **Rights of Holders to Receive Payment.**

Notwithstanding any other provision of this Indenture or the Guarantee Agreement, the right of any Holder of a Security to receive payment of principal and interest on the Security, on or after the respective due dates expressed or provided for in the Security, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of the Holder.

. . . . .

**ARTICLE X**

**MISCELLANEOUS**

. . . . .

**SECTION 10.11** **Governing Law.**

The laws of the State of New York govern this Indenture and the Securities, without regard to the conflicts of laws rules thereof.

. . . . .

**FIRST SUPPLEMENTAL INDENTURE**

**Dated as of October 18, 2001**

**Between**

**CALPINE CANADA ENERGY FINANCE II ULC,**

**AS ISSUER**

**and**

**WILMINGTON TRUST COMPANY,**

**AS TRUSTEE**

**Supplementing the Indenture**

**Dated as of October 18, 2001**

. . . . .

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

## ARTICLE II

## AMENDMENTS TO THE INDENTURE

**Section 2.1** _Amendments_.

. . . . .

(d) Article III of the Indenture is amended to insert the following as new Section 3.9:

**SECTION 3.9** _Performance by the Company of Certain Convenants under Term Debenture_.

Solely for the benefit of the Holders of Sterling 8-7/8% Notes and the Holders of Euro 8-3/8% Notes, the Company shall comply in all respects with its obligations under Section 7.1 of the Term Debenture, dated August 23, 2001, between the Company and Calpine Canada Resources Ltd.

**GUARANTEE AGREEMENT**

**made by**

**CALPINE CORPORATION**

**as Guarantor of Debt Securities Issued by**

**CALPINE CANADA ENERGY FINANCE II ULC**

**dated as of**

**October 18, 2001**

. . . . .

## ARTICLE TWO

## GUARANTEE

**SECTION 2.01** _Unconditional Guarantee_.

The Guarantor hereby unconditionally guarantees to each Holder of a Security authenticated by the Trustee and to the Trustee and its successors and assigns that: the principal of, premium thereon (if any) and interest on the Securities of each Series will be promptly paid in full when due, subject to any applicable grace period, whether at maturity, by acceleration or otherwise, and interest on the overdue principal and interest on any overdue interest on the Securities of each Series and all other obligations of the Company to the Holders or the Trustee hereunder or under the Indenture or the Securities of such Series will be promptly paid in full or performed, all in accordance with the terms hereof and thereof. The Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Securities of each Series or of the Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Securities of any Series or the Trustee with respect to any provisions hereof, of the Indenture or of the Securities, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable dis-

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 342, 2005 NSSC 211, 7 B.L.R. (4th) 276, 235 N.S.R. (2d) 297, 747 A.P.R. 297

charge or defense of the Guarantor. The Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require proceeding first against the Company, protest, notice and all demands whatsoever and covenants that the Guarantee will not be discharged except by complete performance of the obligations contained in the Indenture and the Securities of each Series. If any Holder or the Trustee is required by any court or otherwise to return to the Company or the Guarantor, or any custodian, trustee, liquidator or other similar official acting in relation to the Company or the Guarantor, any amount paid by the Company or the Guarantor to the Trustee or such Holder, the Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect. The Guarantee constitutes a guarantee of payment and not of collection.

. . . . .

**ARTICLE THREE**

**CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE**

. . . . .

**SECTION 3.03.** <u>**Assignment to the Guarantor of the Company's Obligations**</u>.

It is acknowledged that, pursuant to Section 4.3 of the Indenture, the Company may assign is obligations under any Series of Securities and the Indenture to the Guarantor or any Subsidiary of the Guarantor in accordance with such Section 4.3 and, if the Company assigns its obligations to the Guarantor in accordance with such Section 4.3 with respect to any Series of Securities, all Guarantees of outstanding Securities of such Series shall automatically terminate and be discharged.

. . . . .

**ARTICLE SIX**

**MISCELLANEOUS**

. . . . .

**SECTION 6.06.** <u>**Governing Law**</u>.

This Agreement and the Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of laws rules thereof.

. . . . .

FN1 According to the evidence of Mr. Kagan another company in the Harbert group of companies was also purchasing Finance II bonds each time that Harbert made a purchase. Mr. Kagan testified that that company is a different entity than the Applicant in this proceeding and accordingly, I have not referred to that company's purchases.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works