# Index No. 6

*Indexed as:*

**Olympia & York Developments Ltd. (Re) (Ont. Ct. (Gen. Div.))**

IN THE MATTER OF The Companies Creditors Arrangement Act,
R.S.C. 1985, c. C-36
AND IN THE MATTER OF a plan of arrangement of Olympia & York
Developments Limited and all other corporations set out in
Schedule "A" attached hereto, with head offices in the City of
Toronto, Province of Ontario
Olympia & York Developments, et al., Applicants

[1994] O.J. No. 1335

Action No. B125/92

Ontario Court of Justice - General Division
Commercial List - Toronto, Ontario

**Farley J.**

Heard: March 4, 1994.
Judgment: March 14, 1994.

(11 pp.)

*Creditors and debtors -- Debtors' relief legislation -- Companies' creditors' arrangement legislation -- Arrangement, classes of creditors -- Valuation of shares for voting purposes.*

The Bank of Nova Scotia (BNS) appealed a decision of the Claims Officer. The Administrators of Olympia & York Canary Wharf Holdings (Canary Administrators) cross-appealed. Olympia & York Developments Ltd. (O&Y) had made a plan of arrangement under the Companies Creditors Arrangement Act. In January, 1993, the Claims Officer made a decision determining valuation of shares for voting purposes. The applicant BNS argued that the value of the Canary Administrators' claim should be eliminated, which would have the effect of giving the BNS a veto, enabling it to defeat the proposal.

HELD: The appeal and cross-appeal were dismissed. The court rejected BNS's argument that the Canary Administrators had no standing to file a proof of claim, commenting that the Canary

Administrators were the only persons who could act for O&Y at this point. Secondly, the court considered whether the claim would have only nominal value. The BNS had not advanced any evidence to dispute the material submitted by the Canary Administrators. There was nothing to show that the Canary Administrators' current plan of attack would not be implemented. For the purpose of valuation for voting, it was not reasonable to assume that the claim would be only nominal. Nor did the court see the possibility that some contributors may fail to pay or may be insolvent as an aspect of valuing security. Finally, the court rejected BNS's argument that a subsidiary should not be permitted to vote on a plan proposed by its parent.

**STATUTES, REGULATIONS AND RULES CITED:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, ss. 12, 54(3), 66, 121.
Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 12.
Insolvency Act, 1986 (UK), ss. 14(5), 22, 74, 79, 122, 141, 148, 149(1), 149(2), 150, 160, 165.

Patricia D. Jackson, for the Bank of Nova Scotia.
Robert J. Walker and Robert J. Wadden, for Olympia & York Canary Wharf Holdings in administration.
I. Berl Nadler, for the Applicant.
Nathan Cheifetz, for the Canadian Imperial Bank of Commerce.
William Horton, for the Royal Bank of Canada.
J.A. Carfagnini, for the National Bank of Canada.

---

**1**   **FARLEY J.**:-- The Bank of Nova Scotia ("BNS") appealed the January 22, 1993 decision of the Claims Officer, David Henry asking that it be varied in part and that the claim of the Administrators of Olympia & York Canary Wharf Holdings ("Canary Administrators") be deleted in its entirety for the purpose of voting on Class 35 (Olympia & York European Holdings Limited ("European") Unsecured Creditors). It was submitted that the Claims Officer had erred in deciding that (i) the claim of the Canary Administrators ("Claim") which had been listed on the Class 35 list should be so listed and entitled to vote; (ii) the Claim should have other than a nominal value; and (iii) the amount of the Claim should be increased from $431,646,401 to $862,246,089.97. The Canary Administrators cross appealed asking in the event of my determining that the Claims Officer had improperly exercised his discretion that I allow the Canary Administrators to vote the entire amount requested in the Canary Administrators' Proof of Claim in the amount of 1,088,365,708.69 pounds sterling ($2,520,463,817.90).

Background

**2**   The vote proceeded after the Claims Officer's determination. Based on the allowed valuation more than 75% in value of Class 35 voted in favour. If the value of the Canary Administrators' Claim had been eliminated, then the BNS would have been able to defeat the proposal as it would then have had a veto.

**3**   Olympia & York Canary Wharf Holdings ("CW") is "unusual" in the sense that it is an unlimited liability company. On liquidation, if the realized assets of such a company are not sufficient to meet its obligations, then its shareholders face the aspect of a call not only for the unpaid portion of their partly paid shares (if any) but also for the shortfall then determined. Such an "animal" does not appear to be present under Canadian corporate legislation as it is in the U.K. No reason was given for this type of vehicle being chosen for CW although one might suspect that there were certain tax or other advantages anticipated. European is the parent company of CW holding 95% of its shares; it is therefore open to such a call exposure.

**4**   How were the numbers above derived? The exchange rate utilized appears to be $2.31 equals 1 pound sterling (approximately). All further numbers given are approximate figures. The CW intercompany debt was indicated to be 393 million pounds sterling, mainly made up of 259 million pounds sterling owed to Olympia & York Contractors Limited, 113 million pounds sterling owed to Olympia & York (UK) Limited, 1/3 million pounds sterling to Canary Wharf Management Limited, 21 million pounds sterling to various O&Y companies (which claim was subsequently dropped) and some miscellaneous 2 pounds sterling items. These miscellaneous 2 pounds sterling amounts are all immaterial as well as the 1/3 million pounds sterling (given the magnitude of the other amounts involved) - except for the identification of one 2 pounds sterling amount being owed to European. It would seem that to the extent that European funded CW, only 2 pounds sterling was by way of debt (leaving the implication that the balance was funded by equity).

**5**   Dropping the 21 million pounds sterling claim, the intercompany indebtedness of CW was 373 million pounds sterling (or $862 million). For voting valuation purposes, it was proposed that half of this be allowed - or $431 million. It appears (although not directly) that the $2.5 billion figure is a larger shortfall expectation which includes the foregoing amounts.

Nature of Appeal and Practical Aspects

**6**   I would emphasize that the subject matter of this appeal is a valuation for voting purposes only. I also note that the BNS has to knock out most of the $431 million originally fought over in order to prevail with a veto. If it does not, then for all practical purposes it matters not whether the Claim is $862 million or $2.5 billion. On that basis alone, it would not seem necessary to deal with the Canary Administrators' cross appeal nor the appeal by the BNS against the Claims Officer's increase of the Claim from $431 million to $862 million. As the Claims Officer mentioned, this gets into an exercise of piling Ossa on Pelion - a half scoop of ice cream provides more than enough calories; there is no necessity to ask for a single or double scoop.

**7**   Let me now turn to whether the Canary Administrators should have been allowed to make a

Claim for voting purposes and, if so, should the Claim be allowed for more than a nominal amount?

Standard of Review

**8**   The Canary Administrators submit that the standard of review to be applied is that of Marleen Investments Ltd. v. McBride (1979), 23 O.R. (2d) 125 (H.C.J.). However it seems to me that in a situation such as this in which the determination is so knife edge vital to the end result that this case would more properly fall into the considerations as discussed in Stoicevski v. Casement (1983), 43 O.R. (2d) 436, 43 C.P.C. 178 (C.A.) and Westminer Canada Holdings Ltd. v. Coughlan (1990), 75 O.R. (2d) 405, 73 D.L.R. (4th) 584, 41 O.A.C. 377 (Div. Ct). I am in this regard mindful of the extreme time constraints and pressures that the Claims Officer and counsel were working under so that the vote could be held the next day I do not mean to say in mentioning this that this is a basis independent of itself, but rather one which might be considered as being a little atmosphere superadded to the vitality question. I pause to note that there seems to be an increasing number of "instantaneous" decisions that judicial officers have to make. To attempt to deal with this heavy burden those judicial officers must act alone but they must of necessity rely heavily upon the winnowing and distillation abilities of counsel together with their logic, practicability, wisdom, reasonableness and candour I believe that I am echoing the sentiments of the Claims Officer when I say that I appreciate how far counsel were able to go in this process before leaving me with the thorny questions above.

Standing to Make Claim

**9**   The BNS submits that the Canary Administrators have no standing to make the Claim. It relies upon the fact that under English insolvency law, a call for contribution from the shareholders of an unlimited company can be made after a winding up order has been made. See Insolvency Act, 1986 (UK) especially at sections 74, 14, 22, 122, 79, 149, 150 and 160. No such order has been made as to CW, but the Canary Administrators fully expect to request same in due course given CW's submarine status. In support of the assertion that the Canary Administrators have no standing to file a proof of claim, even if it is convenient for them to do so, the BNS relies on two of my decisions: Re Rizzo and Rizzo Shoes Ltd (1991), 6 O.R. (3d) 441 (Gen. Div.) at pp. 449-50 and Ontario (Registrar of Mortgage Brokers) v. Matrix Financial Court (unreported [1992] O.J. No. 1570, released July 24, 1992) at pp. 3 and 6.

**10**   However it seems to me that one has to look at the foundation stones of the intent of the Companies' Creditors Arrangement Act ("CCAA") and the nature of the "claim" relating to CW Clearly CCAA is to be treated as remedial legislation which is to be liberally interpreted in the overall scheme of allowing those companies capable of reorganizing themselves to again become vital elements of our society and economy; see Nova Metals Products Inc. v. Comiskey (Trustee of) (1990), 1 C.B.R. (N.S.) 101 (Ont.C.A.). S. 12(1) CCAA provides:

> For the purposes of this Act, "claim" means any indebtedness, liability or obligation of any kind that, if unsecured, would be a debt provable in bankruptcy

within the meaning of the Bankruptcy Act [now Bankruptcy and Insolvency Act].

**11**   Under the English insolvency legislation, the administrator is deemed to act as the company's agent (s. 14(5)). After a wind up order has been made, the court may make an order for contribution; this is an order to pay "to the company" (s. 149(1)). While it is true that no liquidator has been appointed who would be able to request the court to make such a contribution order, it seems to me that any such claim is the company's claim, not the claim for the benefit of either an administrator or a liquidator. Who could advance such a claim at the present (keeping in mind the tripartite nature of s. 12 CCAA - (1) type of claim (2) determination of amount and (3) admitting for voting purposes while reserving the right to contest liability)? The simple answer appears to be the company - or in this case CW How can CW act? Of necessity, it appears that CW must act at this stage of events and time by way of the Canary Administrators acting on its behalf. Their powers to do so appear contemplated in the Schedule 1 powers under the English insolvency legislation (especially at items 20 and 23). As distinct from Rizzo and Matrix supra, the Canary Administrators are of necessity the only persons who can act for CW (at least in this regard); they are not volunteers who came in to "assist" the employee creditors (Rizzo) or mortgage holders (Matrix) who could still act on their own behalf.

**12**   The claim of a creditor under s. 12 CCAA incorporate the concepts of the Bankruptcy and Insolvency Act, RSC 1985, c. B-3 as amended ("BIA") and includes the contingent claim of a creditor for unliquidated damages (s. 121 BIA). A contingent or unliquidated liability is a debt provable in bankruptcy and may be valued for the "full amount", its value should be reduced only to the extent the creditor holds good security, so as to avoid the problem of "doubly proved claims"; see Re Film House Limited (1974), 19 C.B.R. (N.S.) 23 (Ont. S.C.) and Re J. Le Bar Seafoods Inc. (1981), 38 C.B.R. (N.S.) 64 (Ont. S.C.).

**13**   I accept the Claims Officer's characterization of the "future liability to a call under the UK statute is analogous to a guarantee under Canadian bankruptcy law which guarantee is unsecured."

Does the Claim Have Only a Nominal Value

     (a)    Will A Call Be Made?

**14**   It is understood that before European could be called upon to make a contribution as the shareholder of the unlimited company CW the following steps would have to take place:

    (i)    CW to be put into liquidation (at the request of the Canary Administrators to the court or alternatively by resolution of its shareholder European and its creditors);
    (ii)   a liquidator would have to be appointed;
    (iii)  the liquidator after appointment would have to determine if it were appropriate to make such a call for contribution and the amount; and

    (iv) assuming liquidation by court order, the court would have to grant leave to make the call.

(See Insolvency Act, 1986 (UK) ss. 122, 141, 148-150 and 165).

**15** The undisputed evidence is that the Canary Administrators will make a liquidation application to the court. I note the affidavit of Peter Garstang Totty sworn Nov. 13, 1992 at paragraph 15 where he swears:

> The decision is solely that of the joint administrators but there is a clear advantage, and no disadvantage, in moving from administration to liquidation in due course, and the administrators inform me, and I believe them, that their intention is to put the creditor into liquidation as soon as the usefulness of the administration has ended.

There would not seem to be any practical impediment why such application would not be granted.

**16** In this regard I note the affidavit of Alan Robert Bloom, one of the Canary Administrators, sworn January 19, 1993 at paragraph 5 where he swears concerning CW in administration:

> [CW in administration] is merely a holding company its only assets are shares in its subsidiary companies. It owns no land or buildings and therefore, subject to preliminary reconstruction of those assets for tax planning purposes, there is no obstacle to placing [CW in administration] into liquidation. To the best of my knowledge and belief, this will not affect any proposed reconstruction or reorganization of other companies within the UK group of Olympia & York companies and I confirm that it is the Joint Administrators' present intention to place [CW in administration] into liquidation to enable the claim against European Holdings to be pursued.

"The claim against European Holdings" is of course the call against European to make good on the deficiency which CW will with virtual certainty experience. Mr. Bloom goes on to say at paragraph 6:

> On the best information currently available to the Joint Administrators, it is estimated that in the event of a liquidation the shortfall to the unsecured creditors would be, at the very least 372 million pounds sterling and any such shortfall would need to be made good by [CW's] shareholders.

**17** The BNS did not advance any evidence to dispute the material submitted by the Canary Administrators. It seems to me that at a minimum the BNS would have to have rebutted the "standard" procedures available in pursuing ACW's call against European. There was nothing set out to show that it was improbable that the Canary Administrators' current plan of attack would not

be implemented - or permitted to be implemented. There was nothing to suggest that the plan would be abandoned because the costs, procedural complexities or time delays involved would not merit acting on it vis-à-vis expected recoveries from European (see s. 150(2)). That CW may recover less than the amount called upon does not appear to be the appropriate basis for valuing the claim (based on the call); the valid amount of the claim and what might be recovered are different measurement results.

**18**  I therefore conclude that for the purpose of valuation for voting, it is reasonable to assume that there will be a call by CW (through a future appointed liquidator) upon European. At this stage there would not appear to be any compelling reason why that liquidator would not make a call for the full deficiency although there may well be a shortfall in recovery from European.

    (b)    Set off

**19**  The following subsections of the Insolvency Act, 1986 (UK) are of note:

> 149 Debts due from contributor company
>
> (1)  The court may, at any time after making a winding-up order, make an order on any contributory for the time being on the list of contributories to pay in manner directed by the order; any money due from him (or from the estate of the person who he represents) to the company, exclusive of any money payable by him or the estate by virtue of any call in pursuance of the Companies Act or this Act.
> (2)  The court in making such an order -
>
>     (a)    in the case of an unlimited company, allow to the contributory by way of set-off any money due to him or the estate which he represents from the company on any independent dealing or contract with the company, but not any money due to him as a member of the company in respect of any dividend or profit.

**20**  There is of course a first hurdle that there was not any evidence as to what the English law of set-off would be. However there was cited the English case of Federal Commerce and Navigation Co. Ltd. v. Molena Alpha Inc., [1978] 1 Q.B. 927, [1978] 3 W.L.R. 309, [1978] 3 All E.R. 1066 (C.A.). This was referred to in Holt v. Telford, [1987] 2 S.C.R. 193. Lord Denning at pp. 974-5 of the Federal case discussed the concepts of set-off and cross-claims at common law and in equity. He stated:

> But the courts of equity, as was their wont, came in to mitigate the technicalities of the common law. They allowed deductions by way of equitable set-off -

whenever there were good equitable grounds for directly impeaching the demand which the creditor was seeking to enforce: ... We have to ask ourselves: what should we do now so as to ensure fair dealing between the parties?... This question must be asked in each case as it arises for decision: and then, from case to case, we shall build up a series of precedents to guide those who come after us. But one thing is quite clear: it is not every cross-claim which can be deducted. It is only cross-claims that arise out of the same transaction or are closely connected with it. And it is only cross-claims which go directly to impeach the plaintiff's demands, that is, so closely connected with his demands that it would be manifestly unjust to allow him to enforce payment without taking into account the cross-claim.

**21**   Wilson J. in delivering judgment for the court in Holt supra apparently adopted the general principles concerning equitable set-off drawn by Macfarlane J.A. from his review of the English authorities:

1. The party relying on a set-off must show some equitable ground for being protected against his adversary's demands: Rawson v. Samuel, [1841] Cr. & Ph. 161; 41 E.R. 451 (L.C.).
2. The equitable ground must go to the very root of the plaintiff's claim before a set-off will be allowed: ... [Br. Anzani (Felixstowe Ltd. v. Int. Marine Mgmt (U.K.) Ltd., [1980] Q.B. 137, [1979] 3 W.L.R. 451, [1979] 2 All E.R. 1063].
3. A cross-claim must be so clearly connected with the demand of the plaintiff that it would be manifestly unjust to allow the plaintiff to enforce payment without taking into consideration the cross-claim: ... [Fed. Commerce and Navigation Co. v. Molena Alpha Inc, [1978] Q.B. 927, [1978] 3 W.L.R. 309, [1978] 3 All E.R. 1066].
4. The plaintiff's claim and the cross-claim need not arise out of the same contract: Bankes v. Jarvis, [1903] 1 K.B. 549 (Div. Ct.); Br. Anzani.
5. Unliquidated claims are on the same footing as liquidated claims: [Nfld. v. Nfld. Ry Co., [1888] 13 App. C. 199 (P.C.)].

**22**   Even if we were to look at the question of set-off in this case on that basis, I am not persuaded by the BNS's position that there is some ear tagging involved of the amount to be claimed from European on the call being monies (or assets) provided in the first instance to CW by European. With respect I do not follow this argument (and that in some way this allows the defeat of creditors who have not been funded directly or indirectly by European). It may be true that European has advanced great amounts of money to CW; apparently as noted above mostly by equity since only 2 pounds sterling was shown as a debt. Others have loaned money to CW The sad result is that in liquidation there will be a substantial shortfall. Contrary to the concepts involved in a limited liability company in an unlimited liability company the shareholders are exposed to a call for the

shortfall notwithstanding whatever amount may have been subscribed and paid for as an equity investment. S. 149(2) of the Insolvency Act, 1986 (Uk) only allows for set-off in the case of an unlimited company of "any money due to" the shareholder. While this provision does raise the question of whether the frog can ever get out of the well by making a half leap every time, it is clear that money subscribed by way of equity is not money that could be considered as due to European. I do not see any basis upon which European would be able to claim equitable set-off based on the material before me. The closest one could get any linkage would be contrary to the position of the BNS - i.e. unfortunately the value of CW's assets deteriorated (or CW did not get value for its money on its original investment) so that it could be said that European did not fund it sufficiently to withstand the storm.

      (c)    European Insolvency

**23**    I have previously alluded to s. 150 of the Insolvency Act, 1986 (UK) as to the court taking into consideration in making a call "the probability that some of the contributories may partly or wholly fail to pay it" (s. 150(2)). The BNS asserts that since European is insolvent, it may fail, at least in part, to pay up on a call and therefore the claim should be assigned a nominal value. Again I think this confuses claim and recovery I do not see this as an aspect of valuing security.

Question of Related Party Having a Claim Voting

**24**    The BNS asserts that under CCAA, a subsidiary is not permitted to vote on a plan proposed by its parent. It cited as authority for that proposition: Re Northland Properties Ltd. (1988), 73 C.B.R. (N.S.) 166 (B.C.S.C.) at p. 170; Re Dairy Corporation of Canada Limited, [1934] O.R. 436 (C.A.) at p. 441; Re The Wellington Building Corporation Ltd., [1934] O.R. 653 (H.C.J.) as well as s. 54(3) BIA. Aside from the interplay between the BIA and CCAA as provided in s. 66 BIA, it would not seem that there is provision for a direct importation of s. 54(3) BIA into a CCAA situation. There is of course the principle of the cited cases which involves the aspect of a corporation not being able to in effect stuff the ballot boxes in its own favour. However it seems to me that when one looks at the present situation the potential for that abuse is eliminated. The Canary Administrators are in control of CW; they are appointees of the English court and not beholden to or at the beck and call of European (or other Olympia & York companies). I would presume that they were acting in the best interests of CW as determined by their own independent assessment. If inappropriately they favour one party or group, they could be called to task before the UK court.

**25**    In my view the claim of CW (based on its probable future call upon European as its shareholder for the shortfall) should not be put in at a nominal amount. For the practical reasons discussed before I do not think it necessary to discuss the question of $431 million as opposed to $862 million nor to get into the question of increasing the claim to $2.5 billion.

Conclusion

**26**    In the end result, I do not find it necessary to disturb the decision of the Claims Officer.

FARLEY J.

09-50026-mg    Doc 12438-6    Filed 05/24/13    Entered 05/24/13 17:52:45    Index 6
Pg 11 of 11

Page 10