# Index No. 10

ICLR: Probate/Family/1963/STEAMSHIP ENTERPRISES OF PANAMA INC., LIVERPOOL (OWNERS) v. OUSEL (OWNERS) AND OTHERS.  THE LIVERPOOL (No. 2). - [1963] P. 64

[1963] P. 64

## [COURT OF APPEAL]

## STEAMSHIP ENTERPRISES OF PANAMA INC., LIVERPOOL (OWNERS) v. OUSEL (OWNERS) AND OTHERS.  THE LIVERPOOL (No. 2).

**1959 Nov. 17, 18, 19; Dec, 7, 8, 9, 10, 11, 21.**

**Lord Merriman P.**

**1960 July 28.**

**Hodson, Ormerod and Harman L.JJ.**

*Shipping - Limitation of liability - Double proof - Claim of harbour authority for expenses of wreck-raising - Claim of owner of sunk vessel in respect of contingent claim by harbour authority for wreckraising expenses under powers contained in private Act - Mersey Docks and Harbour Board Act, 1954 (2 & 3 Eliz. 2, c. xlv), s. 3.*

*Ships' Names - The Liverpool.*

*Double proof, rule against - Applicability - Debts arising out of tort or under statute - Limitation action - Claims by harbour board under statute against wreck and by wreck in tort against colliding vessel.*

On January 8, 1957, the Ousel was sunk in the Port of Liverpool as a result of a collision with the *Liverpool*, whose owners admitted liability for the collision. On the same day the Mersey Docks and Harbour Board gave notice to the owners of the *Ousel* that the board had taken possession of the *Ousel* under powers contained in the Mersey Docks and Harbour Board Act, 1954, and that after raising, removing or destroying her they would sell any property recovered for the purposes of defraying their expenses. They also gave notice that if their expenses exceeded the proceeds of sale

they would claim the difference from the owners of the *Ousel* up to the limit of her liability under the Merchant Shipping Acts, 1894-1954.

The *Liverpool* obtained a decree under the Merchant Shipping Acts, 1894-1954, limiting her liability in respect of the collision. Among the claims made against the fund were a claim by the owners of certain cargo in the *Ousel*, a claim by the Mersey Docks and Harbour Board for expenses incurred and damage sustained in clearing the River Mersey of the wreck of the *Ousel*, and a claim by the owners of the *Ousel*, which included an (item 22)) in respect of "Mersey Docks and Harbour Board. Contingent claim of board in respect of wreck raising expenses, viz., statutory limit of *Ousel*." It was not disputed that the board's claim against the fund covered to some extent the same ground as the subject-matter of the board's statutory claim against the *Ousel* (which was limited to approximately £10,000), which in turn was the subject of item 22 of the *Ousel's* claim against the fund.

Lord Merriman P. held that only the *Ousel's* claim for £10,000 should be allowed, and that the board had to reduce its claim by a like amount.

The board appealed:-

*Held*, (1) that the board did not need to reduce its claim against the fund by giving credit for £10,000 which it was entitled to recover from the *Ousel* under its statutory power; the board had

————————

[Reported by D. R. ELLISON, Esq., Barrister-at-Law.]

*[1963] P. 64 Page  65*

that statutory right to recoup its expenses quite apart from the *Liverpool's* wrongdoing and there as no reason why it should give credit for the value of that right when proving against the fund (post, p. **84**).

*Morris Ltd. v. Perrott and Boulton* [1945] W.N. 148; [1945] 1 All E.R. 567, C.A. applied.

Dicta of Jessel M.R. in The Ettrick (1881) 6 P.D. 127, C.A.; and of Lord Inglis in *Burrell v. Simpson* (1876) 4 Rettie 177, 182; The Countess [1923] A.C. 345; 39 T.L.R. 302, H.L.; and *In the matter of John Plummer and William Wilson* (1841) 1 Ph. 56, 59 considered.

(2) That the rule against double proof of claims by rival claimants against an insufficient fund applied to a limitation action in Admiralty in the same manner as in bankruptcy, winding up or creditors' administration actions (post, p. **84**).

*In re Oriental Commercial Bank* (1871) L.R. 7 Ch. 99; *In re Hoey* (1918) 88 L.J.K.B. 273; *The Cheldale* [1947] A.C. 265; 63 T.L.R. 11; [1946] 2 All E.R. 696, H.L. applied.

(3) That both debts were the same, for the board's right against the *Liverpool* was the cost to which the board was put as a result of the collision which flowed from the *Liverpool's* wrongdoing, and the statutory liability of the *Ousel* was part of that same debt, and as the rule against double proof applied the fund could not be subjected to both claims (post, pp. **85-86**).

Dictum of Scrutton L.J. in *In re Melton* [1918] 1 Ch. 37, 60; 34 T.L.R. 20, C.A. applied.

(4) That of the two competing claims, the board had priority because it was out of pocket by the whole of its claim while the Ousel had not yet been obliged to pay, and accordingly, the board's claim against the fund would be allowed and that of the Ousel disallowed.

*In re Fenton* [1931] 1 Ch. 85; 46 T.L.R. 478, C.A. applied.

Decision of Lord Merriman P., post, p. **70**; [1960] 2 W.L.R. 541; [1960] 1 All E.R. 465 reversed.

**Preliminary points of law.**

On January 8, 1957, the Panamanian tanker *Liverpool* and the British coaster *Ousel* were in collision in the Port of Liverpool. As a result of the collision the *Ousel* was beached, and on the same day the Mersey Docks and Harbour Board gave notice to the owners of the *Ousel* that the *Ousel*, her cargo, furniture, tackle or apparel were, or were likely to become, an obstruction or impediment or danger to the safe and convenient navigation or use of the Port of Liverpool or the sea channels leading thereto, and that pursuant to section 3 of the Mersey Docks and Harbour Board Act, 1954,1 and all other powers in that behalf, the Board

---

1    Mersey Docks and Harbour Board Act, 1954, s. 3: "(1) ... the Board may take

possession of and raise remove blow up or destroy any vessel

*[1963] P. 64 Page  66*

had taken possession thereof and would proceed to raise, remove, blow up or destroy the same as might be deemed necessary. The notice also stated that any property recovered would be sold by the board and the proceeds applied as a common fund for the payment of the expenses incurred in connection with raising, removing, blowing up or destroying the obstruction, impediment or danger and with the detainer and sale of any such property, the surplus, if any, being returned to the persons entitled thereto. The notice provided further that if the expenses so incurred exceeded any proceeds of sale or other sum payable to the board, the difference, up to but not exceeding the amount prescribed by the Merchant Shipping Acts, 1894-1954, as the limit of liability to damages of an owner of a ship in respect of loss or damage to vessels, goods, merchandise or other things, was recoverable by the board from the owners of the *Ousel*.

which may have been or shall here after be sunk stranded or abandoned in any of the docks or elsewhere within the port of Liverpool or any of the sen channels leading thereto or the wreck of any such vessel and the whole or any part of the cargo furniture tackle or apparel of any such vessel or wreck ... if in the judgment of the marine surveyor for the time being of the Board ... the same shall be or be likely to become an obstruction or impediment or danger to the safe and convenient navigation or use of the dock port or sea channel. (2) The Board may sell in such manner as they may think fit any vessel wreck cargo matter article or thing which may be raised or removed or any cargo matter article or thing which may be saved from any vessel or wreck which may be blown up or destroyed and out of the proceeds of such sale (which when arising from any vessel or wreck ... shall be regarded as a common fund for the purpose) shall pay any duties and purchase tax payable to Her Majesty and may retain the expenses incurred by them in the exercise of their powers under this section and also any expenses incurred by them in marking buoying watching lighting or otherwise controlling the vessel wreck cargo matter article or thing or giving warning to shipping of the presence thereof and shall render the overplus (if any) to the person or persons entitled to the same. (3) If the proceeds of sale of the vessel or of the wreck of the vessel and the cargo furniture tackle and apparel thereof so raised removed blown up or destroyed are insufficient after paying the said duties and purchase tax to reimburse the Board for the said expenses the Board may recover the deficiency from the person who was the owner of the vessel

at the time of the sinking stranding or abandonment thereof ... as a debt in any court of competent jurisdiction: Provided that if the owner of the vessel so raised removed blown up or destroyed is not under the provisions of the Merchant Shipping Acts 1894 to 1952 as amended by any enactment for thetime being in force entitled to limit his liability in respect of the said deficiency that owner shall not be liable to pay to the Board in respect thereof a sum exceeding the amount prescribed in section 503 (1) (iii) ... of the Merchant Shipping Act 1894 as amended by any enactment for the time being in force as the limit of liability to damages of the owner of a ship in respect of loss or damage to vessels goods merchandise or other things. ..."

*[1963] P. 64 Page  67*

Liability for the collision was admitted by the owners of the *Liverpool*, who, on May 17, 1957, commenced proceedings in the Liverpool District Registry by which they claimed to limit their liability in accordance with the provisions of the Merchant Shipping Acts, 1894-1954, and on May 28, 1958, a decree of limitation was made limiting the liability of the owners of the *Liverpool* in respect of the collision to a sum of £106,226 12*s.* 10*d.* with interest thereon at 4 per cent. from the date of the collision.

A number of claims were made against the limitation fund, including a claim by the owners of certain cargo in the *Ousel* for £142,903 11*s.* 3*d.*, a claim by the owners of the *Ousel* for £70,765 5*s.* 1*d.* and a claim by the Mersey Docks and Harbour Board for £128,382 11*s.* 7*d.* for expenses incurred and damage sustained in connection with clearing the Mersey of the wreck of the *Ousel*. The board's claim against the limitation fund, which was a common law claim in tort founded on the admitted negligence of the *Liverpool* in causing the wreck of the *Ousel*, consisted of a sum of £188,742 5*s.* 10*d.*, representing the whole of the expenses incurred in removing the *Ousel* and her cargo, from which was deducted the sum of £60,359 14*s.* 3*d.* which had been realised by the board by the sale of part of the *Ousel's* cargo and equipment. The board made no deduction in their claim in respect of the sum of £10,835 12*s.* 0*d.*, which was agreed to be the statutory limit of the liability of the *Ousel* prescribed by section 503 (1) (ii) of the Merchant Shipping Act, 1894, and which the board were entitled to claim under the Mersey Docks and Harbour Board Act, 1954, as stated in the board's notice of January 8, 1957. It was not disputed that the board's claim to some extent covered the same ground as the subject-matter of the board's claim against the *Ousel* under the Mersey Docks and Harbour Board Act, 1954. This sum of £10,835 12*s.* 0*d.* was included in the claim of the owners of the *Ousel* against the *Liverpool* limitation fund as item 22 thereof, and was described therein as "Mersey Docks and Harbour Board. Contingent claim of board in respect of wreck raising expenses, viz., statutory limit of *Ousel*."

On December 4, 1958, the part cargo-owners filed objections to the claim of the Mersey
Docks and Harbour Board, and on December 29, 1958, the part cargo-owners filed
objections - to the claim of-the owners of the *Ousel*, including an objection to item 22 on
the ground that there was no evidence in support thereof. On February 10, 1959, the part
cargo-owners, in a letter addressed to the solicitors both for the owners of the *Ousel* and

*[1963] P. 64 Page  68*

for the Mersey Docks and Harbour Board, stated that their contentions relating to item 22
would be: "(a) That the owners of the *Ousel* are not entitled to include this item in their
claim against the fund unless - (i) it has actually been paid by them to the board, or
alternatively (ii) there is a reasonable certainty that it will be so paid. (b) That, if the
owners of the *Ousel* are entitled to include this item in their claim ... then the board's claim
against the fund must be reduced by the corresponding amount."

Accordingly on May 28, 1959, the part cargo-owners applied to the Liverpool District
Registrar for directions that they should be at liberty to raise as against the owners of the
*Ousel* and the Mersey Docks and Harbour Board by way of further objections the points of
law set out in the letter of February 10, 1959, but the registrar dismissed the application as
against the Mersey Docks and Harbour Board. On appeal to Karminski J. on June 22, 1959,
the registrar's order was varied to permit the part cargo-owners to raise the points of law set
out in the letter of February 10, 1959, against the Mersey Docks and Harbour Board as well
as against the owners of the *Ousel*, and it was ordered that the following two questions
(which had been agreed by counsel for the three parties) should be tried as separate issues
by a judge alone:

> "1.    Whether item 22 of the claim of the owners of the *Ousel* should be allowed notwithstanding that the liability to
> the Mersey Docks and Harbour Board to which such item relates is contingent only.

> "2.    Whether, if the said item 22 of the claim of the owners of the *Ousel* is allowed, the Mersey Docks and Harbour
> Board must give credit in their claim for an amount equivalent to the amount of the said item on the ground that
> otherwise there will not be a rateable distribution of the limitation fund among the several claimants."

During the course of the hearing Lord Merriman P. allowed question 1 to be amended in
the manner stated in his judgment.

**Eustace Roskill Q.C.** and **H. V. Brandon** for the part cargo-owners.

**Roland Adams Q.C.** and **R. F. Stone** for the owners of the Ousel.

**J. V. Naisby Q.C.** and **G. N. W. Boyes** for the Mersey Docks and Harbour Board.

*[1963] P. 64 Page 69*

The following authorities and cases were cited in argument in addition to those referred to in the judgment: Williams on Bankruptcy, 17th ed., pp. 151 and 183; Temperley's Merchant Shipping Acts, 5th ed., pp. 331, 333, 335, 339, 557 and 558; Scrutton on Charterparties and Bills of Lading, 14th ed., pp. 456, 461; Rowlatt's Law of Principal and Surety, 3rd ed., p. 309; Halsbury's Laws of England, 3rd ed., vol. 2, pp. 472-474; *In re Fenton*2; *The Disperser*3; *The Kronprinz Olav*4; *The American Jurist and Claycarrier*5; *Pilkington v. Wood*6; *The Byzantion*7; *The Victoria*8; *Prehn v. Bailey*, *The Ettrick*9; *The Emilie Millon*10; *Stonedale No. 1 (Owners) v. Manchester Ship Canal Co.*11; *Ex parte Rushforth*12; *Ex parte Cotton*13; *Dee Conservancy Board v. McConnell*14; *Midland Banking Co. v. Chambers*15; *In re Reis, Ex parte Clough*16; *In re Rissik*17; *In re Rowe, Ex parte Derenburg & Co.*18; *Morris v. Robinson*19; *Ex parte Kendall*20; *In the matter of John Plummer and William Wilson*21; *Ex parte West Riding Union Banking Co., In re Turner*22; *In re Melton, Milk v. Towers*23; *Commecial Bank of Australia Ltd. v. Official Assignee of the Estate of John Wilson & Co.*24; *Castellain v. Preston*25; *Cargo Ships El-Yam Ltd. v. Invoer-en-Transportonderneming Invotra N.V.*26; *C. A. Van Eijck and Zoon v. Somerville*27; *London Rangoon Trading Co. Ltd. v. Ellerman Lines Ltd.*28; *Ex parte Tayler, In the matter of Henry Houghton*29; *Standard Oil Co. of New York v. Clan Line Steamers Ltd.*30; *Hobson v. Bass*31; *In re Blackburne, Ex parte Strouts*32; *The Corchester*.33

Cur. adv. vult.

2    [1931] 1 Ch. 85.

3    [1920] P. 228; 36 T.L.R. 578.

4    [1921] P. 52.

5    [1958] 1 Lloyd's Rep. 423; [1958] 2 All E.R. 659.

6    [1953] Ch. 770; [1953] 3 W.L.R. 522; [1953] 2 All E.R. 810.

7    (1922) 38 T.L.R. 744; 16 Asp. M.L.C. 19.

8    (1888) 13 P.D. 125.

9    (1881) 6 P.D. 127.

10    [1905] 2 K.B. 817.

11    [1956] A.C. 1; [1955] 3 W.L.R. 203; [1955] 2 All E.R. 689.

12    (1805) 10 Ves. 409.

13    (1883) 11 Q.B.D. 301.

14    [1928] 2 K.B. 159.

15    (1869) L.R. 4 Ch. 398.

16    [1904] 2 K.B. 769; 20 T.L.R. 547; affirmed sub nom. *Clough v. Samuel* [1905] A.C.

442; 21 T.L.R. 702.


17    [1936] Ch. 68.


18    [1904] 2 K.B. 483.


19    (1824) 3 B. & C. 196.


20    (1811) 17 Ves. 514.


21    (1841) 1 Ph. 56.


22    (1881) 19 Ch.D. 105.


23    [1918] 1 Ch. 37; 34 T.L.R. 20.


24    [1893] A.C. 181; 9 T.L.R. 307.


25    (1883) 11 Q.B.D. 380.


26    Unreported, 1955 C. No. 3722, December 2, 1958.

27    [1906] A.C. 489; 22 T.L.R. 715.

28    (1923) 39 T.L.R. 284; 14 Ll.L. Rep. 497.

29    (1857) 1 De G. & J. 302.

30    [1924] A.C. 100; 40 T.L.R. 148.

31    (1871) L.R. 6 Ch. 792.

32    (1892) 9 Morr. 249.

33    [1957] P. 84; [1956] 3 W.L.R. 1090; [1956] 3 All E.R. 878.

*[1963] P. 64 Page  70*

Dec. 21. LORD MERRIMAN P. read the following judgment, in which he stated the facts and continued: The owners of the Ousel claim £10,835 12*s.* 0*d.* under the heading "Mersey Docks and Harbour Board contingent claim of Board in respect of wreckraising expenses; namely, statutory limit of 'Ousel.'" It is this claim, hereinafter called item 22, which is the subject of the present reference.

The part cargo-owners attack the inclusion of this item, both in the *Ousel's* claim and, in substance, also in the board's claim. On behalf of the *Ousel* it is contended that though the money has not actually been paid, in circumstances which I will discuss later, they have no escape from their liability to pay this sum to the board as being the deficiency referred to in section 3 (3) of the

Mersey Docks and Harbour Board Act, 1954, reduced to the amount of the limitation under the Merchant Shipping Acts.

The board, on the other hand, claim that they are entitled to recover in full the amount due under their private Act, if and when it suits them to do so, and also to claim a dividend, if I may so call it, from the fund on the full amount of their claim, with the proviso that the sum recovered from these two sources does not exceed the total amount of the board's claim against the *Liverpool*.

At the outset of his argument Mr. Naisby stated emphatically that he stood by this contention, and the board have never receded from this position.

It was ordered that this dispute should be tried as an issue in the reference, and two questions were agreed before Karminski J., in chambers for submission to the court, as follows: "It is ordered that the following two agreed questions be tried as separate issues by a judge alone: 1. Whether item 22 of the claim of the owners of the *Ousel* should be allowed notwithstanding that the liability to the Mersey Docks and Harbour Board to which such item relates is contingent only. 2. Whether, if the said item 22 of the claim of the owners of the *Ousel* is allowed, the Mersey Docks and Harbour Board must give credit in their claim for an amount equivalent to the amount of the said item on the ground that otherwise there will not be a rateable distribution of the limitation fund among the several claimants."

During the hearing, as there appeared to be some doubt whether question 1 was wide enough to ensure that the question of double proof was raised, I allowed that question to be amended in the following terms: "1. Whether item 22 of the claim of

*[1963] P. 64 Page 71*

the claimants the owners of the *Ousel* should be disallowed on the grounds: (a) that in substance it forms part of or is the same as part of the claim of the Mersey Docks and Harbour Board; (b) that the sum to which the said item relates has not yet been paid to the board by the claimants the owners of the *Ousel*; and (c) that accordingly, unless such item is disallowed, there will not be a rateable distribution of the limitation fund among the several claimants."

I allowed this amendment by virtue of R.S.C., Ord. 28, r. 12, so as to ensure the determination of the real issue raised by this proceeding.

Mr. Adams stated that he was specifically instructed not to raise question 2 as against the board. Mr. Naisby also disclaimed any intention of arguing question 1 against the *Ousel* unless he was driven to do so, if question 2 was answered against the board. This mutual abstention from attack on each

other by the rival claimants to the fund seemed to me to justify Mr. Roskill's observation that this looked like an agreement that the *Ousel* should be treated as having paid the board the amount of item 22, but that the board should be treated as not having received that amount. It is only fair to say, however, that the rigidity of this attitude was somewhat modified in the answers to Mr. Roskill's cogent reply, and after question 1 was amended.

On behalf of the part cargo-owners it was argued by Mr. Roskill that the inclusion of item 22, both in the *Ousel's* claim and in substance in the board's claim, gave rise to the issue of double proof, so that either the contingent claim of the *Ousel* should be disallowed, or, if allowed, that the board should be compelled to give credit against their claim for the same amount.

Alternatively, it was contended that the board should deduct item 22 from their claim against the *Liverpool*, on the principle that they ought, as reasonable persons, to mitigate their loss; or, alternatively, on the ground that their failure to take the reasonable step of recovering the amount of item 22 prevented that part of their loss from flowing from the wrongdoing of the *Liverpool*.

The rule against double proof is very clearly stated in *In re Oriental Commercial Bank*[1] by Mellish L.J.: after saying that the rule applies in the Court of Chancery as well as in the Court of Bankruptcy, and therefore would apply equally where companies are being wound up, he said[2]: "It seems to me that the principle is a perfectly sound one." Then, after an immaterial

1    (1871) L.R. 7 Ch. 99.

2    Ibid. 103.

*[1963] P. 64 Page  72*

reference to the application of the rule to joint and separate estates, he continues: "But the principle itself - that an insolvent estate, whether wound up in Chancery or in Bankruptcy, ought not to pay two dividends in respect of the same debt - appearsto me to be a perfectly sound principle. If it were not so, a creditor could always manage, by getting his debtor to enter into several distinct contracts with different people for the same debt, to obtain higher dividends than the other creditors, and perhaps get his debt paid in full. I apprehend that is what the law does not allow; the true principle

is, that there is only to be one dividend in respect of what is in substance the same debt, although there may be two separate contracts."

This statement of the principle was followed by Horridge and Roche JJ. in *In re Hoey*,3 a case in which the bankrupt had charged his property direct to mortgagees and had conveyed to his wife and another the equity of redemption of the property, with a covenant that he would discharge the mortgage liability within a certain period. This was held to raise the principle of double proof on the ground that he had entered into covenants both with the mortgagee and with his wife, but that they were both covenants to pay the same debt, and if they were both allowed to prove in respect of that debt higher dividends would be paid in respect of that debt than in respect of the debts of other creditors.

There has been a very full and exhaustive examination by Mr. Naisby of the bankruptcy law relating to contracts of guarantee, the suggestion being that as several of the cases relating to double proof were cases dealing with suretyship, the law relating to such cases could conveniently be applied to any case in which the question of double proof arises.

One such rule is that where the surety guarantees the whole debt with a limit of the amount for which he is to be liable under his guarantee, the principal creditor, even though the surety has already paid the limited amount due from him, can prove in the bankruptcy of the debtor for the whole of his debt without taking into account that which he has received from the surety: see, for example, *In re Sass*4 and *In re Houlder*.5 On the other hand, if the surety guarantees part of the debt only, the creditor must give credit, in proving against the bankrupt's estate, for that which he has received from the surety; or, if he is able to prove for the whole amount because he has not yet recovered from the

3    (1918) 88 L.J.K.B. 273.

4    [1896] 2 Q.B. 12; 12 T.L.R. 333.

5    [1929] 1 Ch. 205.

surety, he must account for the proportionate part of the dividend to the surety on payment being made subsequently by the latter.

From this it was argued by analogy that the effect of the Mersey Docks and Harbour Board Act, 1954, in the present case is that the deficiency mentioned in section 3 (3) is the whole debt, while a limit is imposed on the recovery by the proviso; thus leading to the conclusion that the board, as creditor, can prove in full against the limitation fund, without giving credit for the amount of item 22.

It is true that some of the cases of double proof arise out of contracts of guarantee; but it does not seem to me to follow from this that all cases of double proof are governed by the law relating to cases of guarantee.

In *Ellis v. Emmanuel*6 Blackburn J., delivering the judgment of Cairns L.C., Brett J. and himself, after a full review of all the cases on the subject, said7: "I think in such a case it is a question of construction on which the court is to say whether the intention was to guarantee the whole debt with a limitation on the liability of the surety, or to guarantee a part of the debt only."

The present case is not one of suretyship at all, but if it is to be treated as such by analogy, and if the construction of the Mersey Docks and Harbour Board Act, 1954, is to decide whether the intention was to guarantee the whole debt with a limitation on the liability of the surety, or to guarantee a part of the debt only, my opinion is that the latter is the correct view.

The debt which the *Ousel* in the supposed capacity of surety is to pay under the Mersey Docks and Harbour Board Act, 1954, is, in my opinion, the debt constituted by section 3 (3) and the proviso combined; that is to say, the portion of the deficiency calculated with reference to section 503 (1) (ii) of the Merchant Shipping Act, 1894.

In my opinion the suggestion that the *Ousel* as the supposed surety guarantees the whole deficiency under section 3 (3) subject to a limit by the proviso arises from the failure to distribute the two senses in which the word "limitation" is used in connection with the principle of limitation of liability in Admiralty and in the analysis of the suretyship cases by Blackburn J. to which I have referred.

On behalf of the board it was argued that nearly all the reported cases of double proof were cases in which what was held

6    (1876) 1 Ex.D. 157.

7    Ibid. 169.

*[1963] P. 64 Page  74*

to be in substance the same debt arose out of contract, though not necessarily out of the same contract.

Nevertheless, the object of the principle being to avoid the payment of two dividends in respect of what is in substance the same debt, I do not see why the principle should not apply to a debt arising out of a tort - see Professor Glanville Williams on Joint Torts and Contributory Negligence, p. 173, s. 49.

Nor, on the other hand, does it seem to me to matter that the subject of the rival proof arises out of the Mersey Docks and Harbour Board Act. The point, as it seems to me, is that item 22 is in effect co-extensive with part of the board's claim against the fund, and that both arise directly out of the same subject-matter; namely, the wreck of the *Ousel* in the Mersey, and the expense incurred by the board in clearing the Mersey of obstruction by the wreck.

The fact that the board's claim against the *Liverpool* is a common law claim in tort, while the board's claim against the *Ousel* results from their private Act, seems to me to be immaterial. It is true that in *In re Oriental Commercial Bank*,8 Mellish L.J. used the words "although there may be two separate contracts" in respect of what he held to be in substance the same debt. But that was a case of two separate contracts. On the other hand, in *In re Moss*,9 Bigham J., quoting with approval the judgment of the county court judge whose decision was under appeal, said10: "there clearly would be a double proof in respect of the same sum in substance although the nature of the liability in each case assumes a different form." These words are wide enough to cover the present case.

In my opinion, there is no obligation to reject one claimant rather than the other in applying the rule of double proof.

I think that as Lord Uthwatt said in *Morrison Steamship Co. Ltd. v. Greystoke Castle (Cargo Owners)*,11 when considering the rival claims of cargo and the carrying ship against the colliding ship in respect of general average expenses, "the reality of the situation dictates the choice to be made."12

Here the owners of the *Ousel*, once the board had served the notice and taken possession under their private Act, had no escape from the obligation to pay the board the amount of item 22. To debar them, therefore, from proving against the limitation fund the item of loss which plainly results from the *Liverpool's*

8    L.R. 7 Ch. 99, 103, 104.

9    [1905] 2 K.B. 307.

10    Ibid. 312.

11    [1947] A.C. 265; 63 T.L.B. 11; [1946] 2 All E.R. 696.

12    [1947] A.C. 265, 309.

*[1963] P. 64 Page 75*

wrongdoing would be harsh indeed. On the other hand, the board, quite rightly and properly, have decided to put in train the enforcement of their rights under the private Act, and can at any moment

receive the fruits of doing so.

In *Morris Ltd. v. Perrott and Boulton*13 Lord Goddard, delivering the judgment of the Court of Appeal, said14: "If the causes of action are different, judgment without satisfaction against one is no bar to an action against the other, and this is so even if the plaintiff deliberately refrains from proceeding to execution on the first judgment."

But, in my opinion, this is not a case of deliberately refraining from proceeding to execution. On the contrary, it is a case of avowed intention to collect item 22, the fruits of the steps that the board have taken under their private Act, but to postpone collection, if possible, until the limitation fund has been distributed.

I can see no reason why the principle of double proof should not apply to a limitation action, as well as to bankruptcy and winding up.

The desirability of avoiding the payment of two dividends in respect of what is, in substance, the same debt, applies equally to a limitation fund. In this context it is, perhaps, worth noting that in *The Stoomvaart Maatschappij Nederland v. P. & O. Steam Navigation Co.*,15 Lord Selborne L.C. treated bankruptcy and the statutory limitation of liability in Admiralty as being on the same footing in equity.16

If the rule against double proof applies at all, it seems to me that the reality of the situation indicates that the board should be debarred from proving for a dividend for that part of their loss in respect of which they can recover in full from the *Ousel*; that is to say, the answer to question 1, both in its original and its amended form, is that item 22 of the claim of the *Ousel* should be allowed; and the answer to question 2 is that the board must give credit in their claim for an amount equivalent to the amount of item 22.

At one stage of the argument it was suggested that to make this order would be to confiscate the sum legitimately due to the board as the result of their private Act. This suggestion of confiscation is taken from the opinion of Lord Finlay in *Mersey*

13    [1945] 1 All E.R. 567; [1945] W.N. 148.

14   [1945] 1 All E.R. 567, 569.


15   (1882) 7 App.Cas. 795.


16   Ibid. 801.


*[1963] P. 64 Page  76*

*Docks and Harbour Board v. Hay, The Countess.*17 But that was a case where the particular claimant had a possessory lien, notwithstanding which it was argued that he must prove as an unsecured claimant. Seeing that it was decided that rateable distribution does not affect priorities and that the respective rights must be considered qualitatively as well as quantitatively (*per* Lord Birkenhead L.C.18, to deprive the claimant of his priority and reduce him to the level of an unsecured claimant against the fund would truly have been to confiscate his priority.

Reduced from rhetoric to hard fact, it now appears that the so-called confiscation means that the board will get about £1,200 less than the full amount, after taking into account that the amount of item 22 is deducted from the board's claim on the basis that the board has received, or must be taken to have received, that amount, and that the *Ousel* is entitled to prove for the amount of item 22.

This, no doubt, is very unfortunate, but so is the fact that there are other innocent victims of the *Liverpool's* ability to limit her liability for her admitted wrongdoing. I do not think that I can decide this case solely on an assessment of the comparative merits of innocent victims.

However the matter may stand in connection with the rule against double proof, there is, in my opinion, a simpler solution to the problem; namely, the obligation which rests upon the board to mitigate the loss which they have sustained by the wrongful act of the *Liverpool*; I was myself responsible for introducing this aspect of the matter into the discussion, but Mr. Roskill adopted it, and the topic has been fully argued.

Let me say at once that this is not a question of one tortfeasor making the hopeless attempt to insist that another tortfeasor shall be sued first, or at all, as a condition of determining his own liability;

or, indeed, of the tortfeasor dictating to the board whom else they shall sue, or in what order.

In this case notice under the Mersey Docks and Harbour Board Act was served by the board on the owners of the *Ousel* on the very day on which, as the result of the collision for which the *Liverpool* has accepted the sole blame, the *Ousel* was driven ashore in such a way as to block the Mersey Channel, for the upkeep of which the board are responsible.

This notice was given in pursuance of the rights of the board under their private Act. It has been suggested, indeed it has

17    [1923] A.C. 345, 363; 39 T.L.R. 302.

18    Ibid. 356.

*[1963] P. 64 Page  77*

almost been assumed in the course of the argument, that the Act not merely gives the board the right but imposes the duty to act as they have done. I am not so sure about that; nor, in my opinion, does it matter. Plainly they have the right, and whether there is also the duty or not the board must at least have an option about the time when the steps laid down in the Act are taken.

In this case they acted at once, and in doing so they plainly acted of their own volition. From the giving of the notice everything proceeded through the prescribed stages; from the board taking possession of the *Ousel*, the sale of the cargo, the blowing up of the ship, down to the calculation of the "deficiency," and, finally, to the reduction of the amount of the "deficiency," to the amount for which alone the *Ousel* was liable under the limitation provided by section 3 (3) and the proviso combined.

On January 26, 1959, the board stated explicitly that it was their intention to enforce liability under their private Act against the *Ousel*. ] About the amount there has been complete certainty since the exchange of letters between the parties respectively in June, 1959.

So far, I repeat, the actions of the board were at their own volition and were in no way dictated by any third party. All that is lacking, therefore, is the actual payment of the money.

I find as a fact that from the moment when the amount was ascertained the owners of the *Ousel* have been ready and willing to pay the money due, but the board have persistently maintained what I regard as the farce of refraining from taking the money. This action also is entirely of their own volition, and the refusal was emphatically repeated in the course of the argument, when Mr. Adams, on behalf of his clients, was instructed to offer immediate payment, or to pay the money into court.

Accordingly, as I was advised that there was no machinery for payment into court by a defendant in the course of a reference arising out of a limitation action, it was arranged that Messrs. Walton would act as stake-holders of the amount of item 22 for whom it might concern.

In these circumstances, the question how the matter stands is one of law.

It has been common ground in this case that the classic statement about mitigation of loss by Viscount Haldane L.C. in his speech in the *British Westinghouse Electric and Manufacturing Co. Ltd. v. Underground Electric Railways Company of*

*[1963] P. 64 Page  78*

*London Ltd.*,19 although made in an action arising out of a breach of contract, applies equally, mutatis mutandis, to tort. I will preface the citation from the *Westinghouse* case by a short passage from the judgment of Scrutton L.J. in *Payzu Ltd. v. Saunders*,20 when he said21: "Whether it be more correct to say that a plaintiff must minimise his damages, or to say that he can recover no more than he would have suffered if he had acted reasonably, because any further damages do not reasonably follow from the defendant's breach, the result is the same. The plaintiff must take [quoting Lord Haldane L.C. in the *Westinghouse case*22] 'all reasonable steps to mitigate the loss consequent on the breach,' and this principle 'debars him from claiming any part of the damage which is due to his neglect to take such steps.'"

After this passage, Lord Haldane L.C.22 quoted James L.J. in *Dunkirk Colliery Co. v. Lever*23 as follows: "'The person who has broken the contract is not to be exposed to additional cost by reason of the plaintiffs not doing what they ought to have done as reasonable men, and the plaintiffs not being under any obligation to do anything otherwise than in the ordinary course of business.'"

Lord Haldane continued24: "As James L.J. indicates, this second principle does not impose on the plaintiff an obligation to take any step which a reasonable and prudent man would not ordinarily take in the course of his business. But when in the course of his business he has taken action arising

out of the transaction, which action has diminished his loss, the effect in actual diminution of the loss he has suffered may be taken into account even though there was no duty on him to act."

Then, after citing *Staniforth v. Lyall*25 as an illustration of this rule, Lord Haldane continued26: "I think that this decision illustrates a principle which has been recognised in other cases, that, provided the course taken to protect himself by the plaintiff in such an action was one which a reasonable and prudent person might in the ordinary conduct of business properly have taken, and, in fact did take whether bound to or not, a jury or an arbitrator may properly look at the whole of the facts and ascertain the result in estimating the quantum of damage."

19    [1912] A.C. 673, 688-690.

20    [1919] 2 K.B. 581; 35 T.L.R. 657.

21    [1919] 2 K.B. 581, 589.

22    [1912] A.C. 673, 689.

23    (1878) 9 Ch.D. 20, 25.

24    [1912] A.C. 673, 689.

25    (1830) 7 Bing. 169.

26    [1912] A.C. 673, 690.

Both Bankes and Scrutton L.JJ. in *Payzu Ltd. v. Saunders*27 emphasised that the duty imposed on the plaintiff involved a conclusion of fact, to be arrived at on a consideration of all the circumstances of the case.28

Applying these observations, the "transaction" is the grounding of the *Ousel* in the Mersey Channel. The action taken by the board, whether they were bound to take it or not, under their private Act was reasonable and prudent, and one which they would ordinarily take in the course of their business. This action has diminished their loss, inasmuch as item 22 is receivable by the board in full, and is not the subject of proof on which a mere dividend out of the fund is recoverable. If the fact that the board have chosen not to receive the amount of item 22 makes any difference, and they are not to be treated as having received it, or are not estopped from saying that they have not received it, I regard their refusal to receive payment as unreasonable. They are deliberately refraining from accepting the money so as not to be prevented from alleging, for what it is worth, that they have not received it.

Accordingly, to the extent that the amount of item 22 is included in the board's claim against the fund, I do not consider that the fact that they have not actually received it follows reasonably from the wrongdoing of the *Liverpool*. On the contrary, it flows in my opinion, from the unreasonable refusal of the board to receive the amount of item 22 from the *Ousel*. Putting it the other way, they have been able to minimise the damage in that respect at any moment since the precise amount was ascertained and agreed.

For these reasons, also, as well as on the issue of double proof, I think that question 2 must be answered against the board.

> *Judgment for the part cargo-owners. Costs of part cargo-owners and owners of the "Ousel" to be paid by the Mersey Docks and Harbour Board. Leave to appeal granted to Mersey Docks and Harbour Board.*

Solicitors: *Waltons & Co.; Weightman, Pedder & Co., Liverpool; R. H. Bransbury, Liverpool*.

The board appealed.

27    [1919] 2 K.B. 581; 35 T.L.R. 657.


28    [1919] 2 K.B. 581, 589.


*[1963] P. 64 Page  80*

**J. V. Naisby Q.C., G. H. Newsom Q.C.** and **G. N. W. Boyes** for the Mersey Docks and Harbour Board. The consequences of the decision of Lord Merriman P. would be very far reaching. The question in the appeal is whether the effect of a decree of limitation of liability, limiting the liability of the owners of the *Liverpool*, would affect the position of the Board. The effect of the judgment might well be that, quite apart from any question of limitation, a harbour authority would be bound to proceed against the innocent owner of a wreck rather than the wrongdoer who had caused the damage. It is submitted that there was no duty on the Board to proceed against an innocent party in order to diminish the loss payable by a wrongdoer. There was no legal obligation upon a creditor to pursue his remedies in any particular order to benefit one of his debtors. The rule of double proof should not be applied to the present case. There are material differences between bankruptcy or winding-up proceedings and limitation proceedings.


**Eustace Roskill Q.C.** and **H. V. Brandon** for the part cargo-owners. It is submitted that for all practical purposes a limitation fund is the same as a statutory insolvency or statutory bankruptcy. It is akin to the estate of a bankrupt, who had insufficient funds to meet his liabilities, or the estate of a company in liquidation, which could not meet its liabilities.


**Roland Adams Q.C.** and **R. F. Stone** for the owners of the *Ousel*. The simple question before the court is whether the claim of the *Ousel* is allowable, notwithstanding that it is only contingent.


1960. July 28. HODSON L.J. The judgment of the court will be read by Harman L.J.


HARMAN L.J. This is an appeal from a decision of the President delivered on December 21, 1959, on two issues raised in an action in the Admiralty Court under which the plaintiffs, the owners of the steamship *Liverpool* (which was wholly responsible for a collision within the area of that port) have been allowed to limit their liability under sections 503 and 504 of the Merchant Shipping Act, 1894. The sum paid into court under this order amounts to some £112,000. The aggregate of the claims against the fund greatly exceed this sum and the dividend payable is likely to be in the region

of 6*s.* in the oe. All the facts are agreed and are sufficiently stated in the judgment of Lord
Merriman P., and we need not repeat them beyond saying that the issue here is a tripartite one
between three of the claimants.

First of these is the Mersey Docks and Harbour Board, in which the area of the port is vested under
its Act of 1857 and which, under its latest Act of 1954, is empowered by section 3 to take
possession of any vessel sunk, stranded or abandoned within the limits of the port, and to dispose of
it as it thinks fit. The board is also empowered by the same section to sell any chattel salved from
the vessel and to set the proceeds against the expenses incurred in its operations. This it has done
and has thus reduced its gross expense to a sum just under £130,000, which is the amount claimed.

The next claimants are the owners of the sunken vessel, the *Ousel*, whose claim amounts to just
over £70,000, of which about £60,000 is agreed, and the last £10,000 is the subject-matter of the
present dispute. This last sum represents a claim to be indemnified against the sum payable by the
owners of the *Ousel* to the board as hereafter explained.

Thirdly, there are claimants to cargo and so on, whose claims amount to £170,000.

Certain of the cargo claimants have raised the instant question which arises out of the right
conferred on the board by the Act of 1954 apart from its common law claim for damages in tort
against the *Liverpool*, now represented by the fund in court, to claim over against the owners of the
*Ousel* any deficiency in the amount recovered after giving such credits as the Act enjoins. This
deficiency, having regard to the proviso to section 3 (3), which entitles the *Ousel* to limit its
liability, amounts to the £10,000 already mentioned. The cargo-owners allege that this sum is being
in effect claimed twice against the fund, first by the board and second by the *Ousel*.

The President's decision was that the claim by the owners of the *Ousel* for the £10,000 should be
allowed, but that the board must reduce its claim against the fund by a like amount. There thus arise,
as we apprehend, the following questions: Can both the board and the *Ousel* prove for the £10,000
against the fund, and if not which of them is to give way? The President decided that only one proof
should be admitted to rank - and that the *Ousel's*. The board appeals.

It seems to us that logically the first question to decide is whether the board should reduce its claim.
The President's answer in the affirmative rested on two considerations, first that the board by letter
dated January 8, 1957, gave notice to the owners of the *Ousel* that any deficiency was recoverable
by them from the owners, and secondly, that by letter dated January 26,

1959, the board gave further notice to the owners of the *Ousel* in these terms: "So far as concerns the main question contained in your letter, it is clear that whether the board makes a claim upon your clients, and if so for what sum, must depend upon the amount of the share that they may receive of the limitation fund. As matters stand at present it appears that the board's prospective share will still leave them with a deficiency on their wreck expenses greatly exceeding the amount of your clients' statutory liability under section 3 of the board's Act of 1954, and in such case the board will, of course, look to your clients for payment of the sum for which they are liable under the statute." The President held that by taking these steps the board had in effect mitigated its damages in tort against the *Liverpool* by the amount it was in a position to recover from the *Ousel* under its statutory power. He further held that the board ought in reason to mitigate its loss by enforcing this claim, and that not to do so is unreasonable and, therefore, to the extent of the £10,000 the damages do not flow from the wrongdoing. In so deciding the President followed the principles as to mitigation of damages laid down in *British Westinghouse Electric and Manufacturing Co. Ltd. v. Underground Electric Railways Co. of London Ltd*.1

In our judgment, the first part of the President's decision does not fit the facts. Let it be conceded that if the board had recovered the £10,000 from the *Ousel* under its statutory power that would have been satisfaction pro tanto of the damages; still the fact is that the board has not recovered this sum, and, in our judgment, there is no duty upon it to do so. It is true that at the trial of the issue the *Ousel* owners declared themselves ready to pay and in fact tendered the money, which is now on deposit with stakeholders, but we cannot see that this makes any difference, for the tender has never been accepted. The passage from the judgment of Lord Goddard in *Morris Ltd. v. Perrott* and *Boulton*2 cited by the President shows quite clearly that even if the board had obtained judgment against the *Ousel* there would have been no duty upon it to proceed to execution in alleviation of the *Liverpool*, which is a tortfeasor. Here, in fact, no claim for payment has ever been made. The letter of January 26, 1959 (from which I have read), is merely an intimation that a claim may be made hereafter.

As to the second part of the President's decision, this case,

1    [1912] A.C. 673, 688.

2    [1945] 1 All E.R. 567, 569.

in our judgment, has nothing to do with the duty to mitigate damages. It concerns the board's legal rights, and no duty rests on it at the demand of a tortfeasor to satisfy part of the damages by resorting to another tortfeasor; still less by resorting to an innocent party made liable merely by statute.

If it were otherwise there would be no necessity for the Law Reform (Married Women) and Tortfeasors Act, 1935, and the law about contributions between tortfeasors, for any tortfeasor could oblige the creditor to sue the other debtors in order to alleviate his burden. The President in fact recognises this in his judgment in these words3: "Let me say at once that this is not a question of one tortfeasor making the hopeless attempt to insist that another tortfeasor shall be sued first, or at all, as a condition of determining his own liability; or, indeed, of the tortfeasor dictating to the board whom else they shall sue, or in what order."

If there be no duty on the board to enforce its rights against the *Ousel* it can prove for its whole debt against the *Liverpool* without taking those rights into account. It is true that the claim is not being made against the *Liverpool* herself because she has taken advantage of the right to limit her liability, but she remains nevertheless the tortfeasor and the principle applies, in our opinion, to a claim arising out of the tortfeasor's wrongdoing: see in this connection the observations of Jessel M.R. in *The Ettrick*4, where he was construing section 54 of the Merchant Shipping Act, which gave a right to a shipowner in default to limit his liability. It has been argued that, having paid the money into court, the owner was no longer a wrongdoer, but this the Master of the Rolls denied saying5 "It" (that is to say, the Act) "does not make his acts right if they were previously wrongful."

Limitation in its Admiralty significance results in a position not unlike that in bankruptcy, and has, indeed, been said by Lord President Inglis, in *Burrell v. Simpson & Co.*6 to be analogous to a statutory insolvency. See also *The Countess*7, where all their Lordships insisted that distribution of the fund is to be made rateably, and Lord Sumner approved Lord Inglis' observations. This is the position in bankruptcy (see the Bankruptcy Act, 1914, s. 33 (2) and (7)), and in liquidation of an insolvent limited company (see the Companies Act, 1948, ss. 302 and 317).

3    Ante, p. 76; [1960] 2 W.L.R. 541, 551.

4    (1881) 6 P.D. 127.


5    Ibid. 132.


6    (1876) 4 R. 177, 182.


7    [1923] A.C. 345, 382; 39 T.L.R. 302.


*[1963] P. 64 Page  84*

It is a well-known rule in bankruptcy that a creditor having a security against the estate of the debtor must either surrender his security and prove for the whole debt, or value his security and prove for the balance, but it has never been the law that a creditor having a security against a third party for his debt must give credit for that when proving in the bankruptcy: see, for instance, *In the matter of John Plummer and William Wilson.*8

So here the board has a statutory right to recoup its expenses quite apart from the *Liverpool's* wrongdoing, but we see no reason why it should give credit for the value of that right when proving against the fund.

The first question should therefore be answered by saying the board need not reduce its claim by giving credit for the £10,000.

The second question is whether the *Ousel* can enforce its claim to the £10,000 which is the agreed amount of its liability to the board under the Act of 1954. This is a contingent claim, for the *Ousel* is not yet out of pocket by that or any other sum under this head. There is no reason, however, why a contingent claim should not rank just as it does in any other case where there are rival claimants against an insufficient fund. Such a claim must be valued.

The objection of the other claimants is that to allow the claim to rank would be to allow two claims in respect of the same debt: this rasises the question of double proof. The principle is best explained in Mellish L.J.'s judgment in *In re Oriental Commercial Bank.*9 The relevant passage has already

been cited in the President's10 judgment and we do not repeat it here. A further good illustration is provided by *In re Hoey,*11 also alluded to by the President. Does this principle apply in a limitation action in Admiralty? There seems to us no reason why not. The principle must, as it seems to us, as a matter of justice, apply wherever there are rival claimants against an insufficient fund, as it does in bankruptcy, winding-up, and creditors' administration actions.

A good deal of time was spent in the court below in the search for analogies. First was that of principle and surety, where different rules prevail according to whether the guarantee is of the whole debt subject to a limit or is of a part of the debt (see, for instance, *In re Sass*12): we do not pretend to follow the reasons for this distinction, and are of opinion that the analogy is of no

8    (1841) 1 Ph. 56. 59.

9    (1871) 7 Ch.App. 99. 103.

10    Ante, p. 71; [1960] 2 W.L.R. 547.

11    (1918) 88 L.J.K.B. 273.

12    [1896] 2 Q.B. 12; 12 T.L.R. 333.

*[1963] P. 64 Page  85*

help here where there is no principal debtor and no surety. Similarly we forbear to discuss cases on negotiable instruments (such as *In re Blackburne*, *Ex parte Strouts*13 where equally abstruse reasoning has been applied and fine distinctions taken.

It is true that the reported cases appear to arise out of contract, and indeed it is difficult to think of a case other than one like the present to which the rule might apply in cases of tort, though perhaps *The Cheldale*14 supplies a parallel. The principle is that the fund must not be saddled with two proofs where the two creditors are both seeking to enforce the same debt.

Are the two debts the same? This seems to us to be the difficult part of the case. The board's right against the *Liverpool* is the cost to which the board as owner of the port has been put as a result of the collision. The damage that flows from the *Liverpool's* wrongdoing is the reasonable cost of removing the obstruction: see *Dee Conservancy Board v. McConnell*.15 Now this cost was some £60,000 more than the amount claimed, and, in our judgment, the board might have claimed for the full amount and was not bound to exercise its statutory right to sell the salvaged chattels. It might have returned them to their owners, who then would have been obliged to give credit for their value when quantifying their claims against the fund. The board, however, did exercise its right of sale and has, in our judgment, rightly given credit for the sums realised. This is an instance of mitigating damages.

The £10,000 for which the *Ousel* seeks to prove is agreed as to quantity and has been called "the statutory limit of the *"Ousel."* It arises out of the proviso to section 3 (3) of the Act of 1954, and is the "deficiency" in the amount recovered by the board from sales of salved material against "expenses" incurred by it in exercise of its statutory powers under the section. These are the very same expenses as are claimed as damages in tort against the *Liverpool:* the two claims would be of the same amount but for the proviso to section 3 (3), which enables the owners of the wrecked vessel to limit their liability by reference to her tonnage. This has been done here, so that only £10,000 of the £130,000 expenses can be claimed against the *Ousel* and by her by way of indemnity against the *Liverpool*. That is, in fact, a part of the same debt, and in our judgment if both sums can be proved for, the same debt will have been proved for twice to

13   (1802) 9 Morr. 249, D.C.

14   [1947] A.C. 265; 63 T.L.R. 11; [1946] 2 All E.R. 696.

15   [1928] 2 K.B. 159, C.A.

*[1963] P. 64 Page  86*

the extent of £10,000. It was pointed out by Scrutton L.J. in *In re Melton*16 that in considering the rule against double proof technicalities are not to be regarded. These are his words16: "To these two sets of legal principles I have mentioned it remains to add the fact of the debtor's bankruptcy, and in particular the rule in bankruptcy that there must not be a double proof for the same debt, with the further explanation that, in determining whether the two proofs are in respect of the same debt, regard must be had, not to technicalities, but to the substance, as was pointed out in *In re Oriental Commercial Bank.*"17

In our judgment, therefore, the fund is not to be subjected to both liabilities.

If we are right so far, the further question arises: which of the competing claimants may prove? In our judgment, the answer is that the board has priority because it is actually out of pocket by the whole of its claim, whilst the *Ousel* is not because she has not yet been obliged to pay. Authority for this is to be found in *In re Fenton*.18 That was a very different case from the present, but is of assistance. Fenton was guarantor of certain debts to banks of an association in which he was interested. Both he and the association were insolvent. He had paid nothing under his guarantee, but claimed to prove in the liquidation of the association in respect of his liability, which was a contingent debt and, as Lord Romer pointed out,19 would have been provable as such but for the rule against double proof, for the banks as principal creditors had already proved for the same debt, and had priority because they were out of pocket while Fenton was not.

The result may appear harsh to the *Ousel*, which was, after all, an innocent victim of the *Liverpool's* wrongdoing, but it flows from the wrongdoer's statutory right to limit her liability which results in loss to all the claimants.

If, having received its dividend, the board, being, as it will be, still out of pocket, seeks to enforce its statutory right against the *Ousel*, the interesting question will arise whether the latter will be able to resist this claim to the extent of the dividend recovered by the board in respect of the £10,000 on some such principle as is illustrated in *In re Sass*20 and *In re Houlder*.21 This is not a question which is raised here. It has not been

16    [1918] 1 Ch. 37, 60; 34 T.L.R. 20.


17    7 Ch.App. 99.


18    [1931] 1 Ch. 85.


19    Ibid. 120.


20    [1896] 2 Q.B. 12; 12 T.L.R. 333.


21    [1929] 1 Ch. 205.


*[1963] P. 64 Page  87*

argued and we do not propose to attempt to answer it. It is, however, to be observed that if the *Ousel* can maintain a defence on these lines, exactly the same result will have been achieved as that which flows from the President's decision: a result, it may well be thought, consonant with justice and good sense.


For the reasons we have indicated, while agreeing with the President on the question of double proof and that of whether the two debts are the same, we have arrived at a different conclusion and this appeal must be allowed and declarations substituted to the following effect: (a) that the claim of the board against the fund ought to be allowed at its full amount, and (b) that the claim of the owners of the *Ousel* ought to be disallowed.

*Appeal allowed. Declarations (a) that the board's claim against the fund be allowed to the full amount, and (b) that the claim of the owners of the Ousel be disallowed. The owners of the Ousel to pay half the costs of the board and the full costs of the part cargo-owners on the appeal and in the court below. Leave to appeal to the House of Lords.*

Solicitors: *R. H. Bransbury, Liverpool; Waltons & Co.; Weightman, Pedder & Co., Liverpool.*