# Index No. 11

*Indexed as:*

## Olympia & York Developments (Re)


**IN THE MATTER OF the Bankruptcy of Olympia & York Developments Limited, a corporation incorporated under the laws of the Province of Ontario and having its principal place of business in the City of Toronto, in the Municipality of Metropolitan Toronto**

[1998] O.J. No. 4903

80 O.T.C. 369

4 C.B.R. (4th) 189

84 A.C.W.S. (3d) 15

Court File No. 97-CL-000161


Ontario Court of Justice (General Division)
In Bankruptcy

**Blair J.**

November 26, 1998.

(30 pp.)

[Ed. note: A Corrigendum was released by the Court December 17, 1998 and the correction has been made to the text.]

*Bankruptcy -- Claims provable -- What constitutes -- Creditors -- Rights, effect of bankruptcy of debtor -- Claims -- Severability -- Practice -- Evidence and proof -- Appeals -- From registrar's decision, nature of appeal -- Double proof.*

Appeal by the Trustee in Bankruptcy of Olympia and York Developments Limited from a decision by the Registrar that a claim by York's creditor, A&G Lenders, and the claim of the Olympia and York Resources Credit Corporation did not constitute a double proof. Both of these claims arose out of a jumbo loan transaction. Resources had been incorporated for the sole intent of giving effect to

the Jumbo Loan. The Registrar found that Resources had a separate corporate existence from York, that a genuine debtor and creditor relationship did exist between York and Resources, and that one payment would not discharge both claimants' claims against York. The Trustee argued that allowing both claims amounted to a double proof. It was admitted that the A&G Lenders comprised substantially all of the creditors of Resources. However, the Trustee for Resources had filed a proof of claim in the York bankruptcy. York's Trustee was prepared to acknowledge one claim, either by Resources or the A&G Lenders, and argued that there was in substance only one debt. The respondents argued that the claim by Resources on the York debt and the claim of the A&G Lenders on the guarantee of the Resources debt were not claims in relation to the same debt.

HELD: Appeal allowed. The order of the Registrar was set aside. An order was granted directing that the claims of the A&G Lenders and of Resources against the estate of York constituted a double proof against the estate. There was a declaration that the A&G Lenders and Resources were entitled to rank for payment of one dividend out of the estate of York. The loan from the A&G Lenders to Resources and the continuing loans of the same funds from Resources to York were in substance the same debt. There was an inseparable nexus between the obligation of Resources to pay the A&G Lenders and the obligation of York to make payments to Resources. The Registrar erred in law by finding that the existence of a separate corporate entity and a debtor and creditor relationship between the parent and the subsidiary meant that the same-debt-in-substance test could not be met.

**Statutes, Regulations and Rules Cited:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3.

**Counsel:**

Geoffrey B. Morawetz and Benjamin T. Glustein, for Pricewater-house Coopers Inc. (formerly Coopers & Lybrand Limited), in its capacity as the trustee in bankruptcy of Olympia & York Developments Limited.
Benjamin Zarnett, PricewaterhouseCoopers Inc., (fomerly Coopers & Lybrand Limited, in its capacity as the trustee in bankruptcy of Olympia & York Developments Limited.
John A. MacDonald and Arthur Peltomaa, for Credit Lyonnais Canada, in its capacity as security agent for the A&G Lenders, and Deloitte & Touche, in its capacity as trustee in bankruptcy of Olympia & York Resources Credit Corporation.

**BLAIR J.**:--

I.   OVERVIEW AND BACKGROUND

Overview

**1**   The issues on this appeal turn on what is known as the rule against double proof in bankruptcy matters.

**2**   Olympia & York Developments Limited ("OYDL") and Olympia & York Resources Credit Corporation ("OYRCC") are bankrupt corporations.[1] OYRCC is a wholly owned subsidiary of OYDL created for the single purpose of receiving the sum of US $2.5 billion by way of what was termed a "Jumbo Loan" from a syndicate of lenders known as the "A&G Lenders". Immediately upon receipt, the monies were advanced by OYRCC to OYDL, which gave back a Promissory Note and entered into a Repayment Agreement with OYRCC. OYDL also guaranteed the OYRCC indebtedness to the A&G Lenders.

**3**   It is admitted that the A&G Lenders comprise substantially all of the creditors of OYRCC. In fact, they are the only creditors who have filed proofs of claim in the OYRCC bankruptcy. All of the inspectors in that bankruptcy are representatives of the A&G Lenders.

**4**   Deloitte & Touche, the trustee in bankruptcy for OYRCC, has filed a proof of claim in the OYDL bankruptcy for the principal amount of the loan -- which remained outstanding in full at the time of the insolvency proceedings -- together with interest. At the same time, the A&G Lenders have also filed a proof of claim in the OYDL bankruptcy, based upon the OYDL guarantee of the OYRCC indebtedness, together with interest.

**5**   OYDL's Trustee disallowed the claims on the ground that they constitute a double proof of claim against the estate for the same debt. It was, and is, prepared to acknowledge one claim, by either OYRCC or the A&G Lenders. The amount the Trustee is prepared to acknowledge is the sum of $1,759,108,979 (Cdn), representing the outstanding principal on the Jumbo Loan less the sum of $1,281,281,018 (Cdn) recovered by the A&G Lenders on security pledged to it to guarantee the Jumbo Loan by certain OYRCC subsidiaries.[2]

**6**   Both the A&G Lenders and the Trustee in Bankruptcy of OYRCC appealed the disallowances to the Registrar in Bankruptcy. On May 21, 1998, Registrar Ferron allowed the appeals, Re Olympia and York Developments Ltd., [1998] O.J. No. 2114. OYDL's Trustee now appeals from the decision of Registrar Ferron, and seeks,

> (a)   an Order setting aside the decision of the Registrar;
> (b)   an Order that the claims of the A&G Lenders and of OYRCC against the estate of OYDL ("the Claims") constitute a double proof against the estate;
> (c)   a declaration that the A&G Lenders and OYRCC may rank for payment of one dividend out of the estate of OYDL based on a claim in the sum of $1,759,108,979 (Cdn); and,
> (d)   costs.

Background

**7**   In December 1988, OYDL and the A&G Lenders began negotiations in respect of what was to become the $2.5 billion (U.S.) loan facility. A commitment letter from Credit Lyonnais to OYDL, dated December 1988, set out the initially proposed terms. The borrower for purposes of the loan facility was to be a wholly owned subsidiary of OYDL and OYDL was to guarantee the Loan. The proposal was that the Loan Agreement and other documents would contain covenants and other provisions "as are usual in Olympia & York loan agreements". The commitment letter concluded by saying that Credit Lyonnais was "very pleased to have this opportunity to provide this facility to Olympia & York and [looked] forward to the continuation of [their] mutually beneficial relations".

**8**   The negotiations eventually ripened into the Jumbo Loan transaction -- or, more accurately, series of transactions.[3] Except for US $500 million which was remitted directly to OYDL by one of the lenders upon the direction of OYRCC, the funds were advanced by the A&G Lenders to OYRCC. OYRCC, in turn and on the same day, "onloaned" the monies to OYDL. At the end of the day, OYDL had a loan facility of US $2.5 billion.

**9**   In exchange, OYDL (a) gave its guarantee of the OYRCC indebtedness to the A&G Lenders (the "OYDL Guarantee") not just as guarantor but also as principal debtor, (b) agreed to maintain a current value net worth of at least US $2.5 billion throughout the life of the facility, (c) executed a Promissory Note in the principal amount of US $2.5 billion in favour of OYRCC, and (d) entered into a Repayment Agreement in that regard with OYRCC. Apart from the OYDL Guarantee, the central underlying security which the A&G Lenders received from the Jumbo Loan consisted of a pledge of the shares that OYDL held (indirectly through subsidiaries) in Abitibi Price Inc. ("Abitibi") and in Gulf Canada Resources Limited ("Gulf").

**10**   The Jumbo Loan arrangements were somewhat complex, and had their business and tax driven aspects. For a schematic representation of the transaction, reference may be made to the diagram which is attached as Schedule "A" to these Reasons. In narrative terms, the specific arrangements were as follows:[4]

(a)   the shares of Abitibi and Gulf, formerly held by a number of corporations in the O&Y Group would be transferred to Olympia & York Forest Holding Limited ("Forest") and Olympia & York Energy Holdings Limited ("Energy"), respectively;
(b)   the shares of Forest and of Energy would be wholly owned by A&G Resources Corporation ("A&G Resources");
(c)   the shares of A&G Resources would be wholly owned by OYRCC;
(d)   the shares of OYRCC would be wholly owned by OYDL;
(e)   all existing loans secured prior to that date by Abitibi and Gulf shares owned by the O & Y Group would be repaid in an amount sufficient to release those shares from existing security;

 (f) the A&G Lenders would advance the Jumbo Loan;

 (g) the A&G Lenders would take indirect security over the Abitibi and Gulf shares by taking a pledge of the shares of A&G Resources from OYRCC;

 (h) A&G Resources would (i) guarantee OYRCC's obligations to the A&G Lenders, (ii) provide a negative pledge in respect of the Abitibi and Gulf shares held by Forest and Energy respectively, and (iii) pledge the shares of Forest and Energy in favour of the A&G Lenders;

 (i) OYDL would obtain the use of the funds advanced; and,

 (j) OYDL would guarantee the obligations of OYRCC to the A&G Lenders.

**11** In accordance with the agreements, OYRCC and its wholly owned subsidiary, A&G Resources, and its wholly owned subsidiaries, Forest and Energy, were all incorporated under the Business Corporations Act (Ontario). OYRCC is a single purpose subsidiary of OYDL, incorporated for the sole intent of giving effect to the Jumbo Loan. It has no source of income other than a 1/16th percentage spread on the interest rate paid by OYRCC to the A&G Lenders. Its only asset, apart from the shares of A&G Resources (which were pledged to the A&G Lenders as security for the Jumbo Loan), is its claim against OYDL. The A&G Lenders, as I have already noted, are substantially the only creditors of OYRCC.

**12** The terms of the Jumbo Loan, as between OYRCC and the A&G Lenders are set out in four separate Term Loan Agreements (one for each applicable lender or syndicate of lenders), and, symmetrically, OYDL provided four separate guarantees of OYRCC's obligations under the Jumbo Loan (collectively, "the OYDL Guarantee"). As between OYRCC and OYDL, the transactions are evidenced by the Promissory Note and the Repayment Agreement.

**13** The Term Loan Agreements reflect the loan transaction as between the Borrower, OYRCC, and the particular lender or syndicate of lenders in question. They do not refer specifically to the back-to-back loan from OYRCC to OYDL. However, their provisions do reflect a connection with the OYDL Guarantee and with the security afforded by the pledge of the A&G Resources shares (and, indirectly, the pledge of the Abitibi and Gulf shares). These provisions include,

 \* cross-default clauses (a default under the OYDL Guarantee is a default under the Term Loan Agreements; the insolvency of OYDL is a default under the Terms Loan Agreements);

 \* a term that the Lenders must consent in writing to any amendment or waiver of any provision not only of the Term Loan Agreements but also of any document referred to therein (e.g., the OYDL Guarantee) and, in addition, must consent in writing to "any departure by the Borrower or any other O&Y Corporation"[5] which is a party to such a document from the terms of such a document; and, in this latter connection specifically, includes,

 \* a clause requiring written Lender consent to any agreement "to a reduction

       in the Required Net Worth (as that term is defined in the [OYDL] Guarantee").

**14**    The "Required Net Worth (as that term is defined in the [OYDL] Guarantee")" is a reference to the covenant of OYDL that its net worth would not fall below US $2.5 billion, i.e. the amount of the Jumbo Loan advance.

**15**    The contractual arrangements between OYRCC and OYDL reflect an integration with the Term Loan Agreements. The Repayment Agreement, the Promissory Note and the Term Loan Agreements are all dated on March 21, 1989, the same day the back-to-back loans were advanced. A reading of the Repayment Agreement and the Promissory Note together demonstrates that payments by OYDL under the Promissory Note and payments by OYRCC under the Term Loan Agreements are interrelated. For instance, the preamble to the Repayment Agreement states:

> AND WHEREAS it is the intention of OYDL and [OYRCC] that the unpaid principal amount of the Note shall at all relevant times be equal to the aggregate unpaid principal amounts of the Reference Tranches (as defined in the Note)[6].

**16**    The Promissory Note provides that the interest rates payable and the timing of the interest payments by OYDL, to OYRCC under the Promissory Note are a function of the interest rates payable by OYRCC under the Term Loan Agreements. The interest rate payable by OYDL to OYRCC is 1/16th% greater than the rate payable by OYRCC to the A&G Lenders. Moreover, the Note also stipulates that OYDL is obligated to pay additional sums to OYRCC that OYRCC itself may be required to pay under the Term Loan Agreements for such things as additional interest owing on account of late payments of principal or amounts owing with respect to an indemnity given to the A&G Lenders by OYRCC for costs incurred as a result of default.

**17**    Most significantly for purposes of the Appellant's argument here, sections 3 and 4 of the Repayment Agreement specify that:

> 3.    If it becomes known to [OYRCC] that the whole or any part of the principal amount of any Reference Tranche will be paid by it or will become or has become due and payable by it pursuant to [certain provisions in the Term Loan Agreements], then [OYRCC] shall so notify OYDL to the extent that notice of the particulars of such event has not already been given by it pursuant to [another provision of the Term Loan Agreement].
> 4.    OYDL shall make payments of principal under the Note to [OYRCC] at such time or times and in such amounts as payments of principal are made by [OYRCC] under the Term Loan Agreements. (emphasis added)

    The Registrar's Decision

**18**   Registrar Ferron held that the two claims did not constitute a double proof. In doing so, he focussed on the following factors as of particular importance (with the results indicated):

>  (a)   whether "a resulting genuine debtor/creditor relationship between OYDL and OYRCC in fact exist[ed] or whether, having regard to the close corporate relationship which existed between the parent and the subsidiary, the circumstances surrounding the genesis of the credit facility, the terms of repayment and the evidence of the loan, such a relationship could not have arisen" (the Registrar found that a genuine debtor/creditor relationship did exist);
>  (b)   whether one payment would discharge both claimants' debts against OYDL (he held it would not);
>  (c)   whether OYRCC had a separate corporate existence (he found that it did).

**19**   With respect to his finding on the last factor, the Registrar relied on an English decision, Re Polly Peck International plc (in administration) [1996], 2 All E.R. 433 (Ch. Div.) ("Polly Peck"), a case with facts similar to the case at bar.

   Positions of the Parties

**20**   The Respondents argue that the interrelationship which OYDL and OYRCC have set up between the Repayment Agreement, the Promissory Note and the Term Loan Agreements is irrelevant to the proof of claim issue and of no Concern to the A&G Lenders. They contend that there were two separate loans and thus, there are two separate debts. They argue that the Registrar correctly applied the rule against double proof in bankruptcies by concluding that the rule did not apply because the claim of OYRCC (on the OYDL debt) and the claim of the A&G Lenders (on the guarantee of the OYRCC debt) are not claims in relation to the same debt. Furthermore, he properly relied upon and applied the principles set out in Polly Peck.

**21**   The Trustee of OYDL submits that the Registrar erred in concluding that the OYRCC claim and the A&G claim did not amount to claims for the same debt twice over, thereby constituting a double proof. He says the Registrar misconstrued or failed to consider the constating documents relating to the Jumbo Loan and in particular, the provisions of the Promissory Note and the Repayment Agreement cited earlier in these Reasons. The Registrar erred in requiring a finding that OYRCC had no real separate corporate existence or that there was no genuine debtor/creditor relationship between OYDL and OYRCC before he could find that the claims were based on the same debt. The Trustee states that the substance of the transaction, not the form counts and here there is in substance only one debt, namely the US $2.5 billion Jumbo Loan.

II.   LAW AND ANALYSIS

   Standard of Review

**22**   An appeal from the Registrar in Bankruptcy is a true appeal, and not a hearing de novo. The appellant must satisfy this Court that the Registrar arrived at an incorrect result in law. Rosenberg J. summarized this standard of review in the following fashion, in Re Kenny (1997), 149 D.L.R. (4th) 508 (Ont. Gen. Div.), at pp. 514-515:

> An appeal under s. 192(4) of the BIA from an "order" of a Registrar is a true appeal and not a hearing de novo. Accordingly, the appellant must satisfy the court that the Registrar erred in principle or in law in the way he has applied or exercised his discretion or that he omitted the consideration of, or misconstrued some fact (citations omitted).

### The Rule Against Double Proof

**23**   The rule against double proof in bankruptcy matters prohibits two proofs of claim in the same estate for the same debt. That the two claims may be based on separate contracts is of no matter, provided they are in respect of the same debt. Sir G. Mellish L.J. put the concept very succinctly in Re Oriental Commercial Bank; Ex parte European Bank (1871), 7 L.R. Ch. App. 99, where he stated (at pp. 103-104):

> [T]he true principle is, that there is only to be one dividend in respect of what is in substance the same debt, although there may be two separate contracts. (Emphasis added)

**24**   See also, Barclays Bank Ltd. v. TOSG Trust Fund Ltd., [1984] 1 All E.R. 628 (C.A.), at pp. 636-637, affirmed on different grounds [1984] 1 All E.R. 1060 (H.L.); Houlden & Morawetz, Bankruptcy and Insolvency Law of Canada 3rd ed., at paragraph G-40; Re Melton; Milk v. Towers [1918] 1 Ch 37, at p. 47.

**25**   There is a reason for this rule. It was developed to ensure the pari passu distribution of the assets of the bankrupt on a pro rata basis amongst the unsecured creditors -- the central tenet of bankruptcy legislation.[7] In the words of Oliver L.J. in Barclays Bank, supra, at p. 653:

> p.   653 ... The purpose of the rule is, of course, to ensure pari passu distribution of the assets comprised in the estate of an insolvent in pro rata discharge of his liabilities. The payment of more than one dividend in respect of what is in substance the same debt would give the relevant proving creditors a share of the available assets larger than the share properly attributable to the debt in question.

**26**   The Parties do not disagree as to the foregoing statement of the rule against double proof, or as to the rationale underlying it. They simply disagree as to its application in the circumstances of this case.

The Authorities

**27**   Whether or not a "double proof" has been lodged with respect to what is in substance the same debt is a matter to be determined on the facts of each individual case. From my understanding of the authorities, the underlying principles which should frame this analysis in group corporate insolvency situations may be summarized as follows. First, where the interests of different creditors of the various corporate entities come into play, the courts should be careful to respect the axiom regarding separate corporate existence enunciated by the House of Lords in Salomon v. Salomon [1897] A.C. 22. At the same time, however, the courts should strive to give effect to the ethic of pari passu distribution and to the fundamental underlying principle of justice as between all creditors. Balancing these sometimes competing principles calls for a consideration of the true nature of the transaction, and the relationship between, and the presumed common intention of the parties. Finally, in seeking a just solution in novel situations the court may engage in an analysis which, while not ignoring the separate corporate being of the members of the corporate group, nonetheless transcends the mere legal fact of that existence. See in particular, as to the foregoing summary, Ford & Carter Ltd. v. Midland Bank Ltd. (1979) 129 NLJ 543, per Lord Wilberforce at p. 544; Polly Peck, supra, at pp. 444-445; and Barclays Bank, supra, per Kerr L.J., at pp. 645 and 647-648, and per Oliver L.J. at pp. 636 and 640.

**28**   In insolvency cases -- as in, for example, tax cases -- the court will not allow technicalities to obscure the essence of the transaction. This includes, in my opinion, not being either too dazzled or too immobilized by intricate corporate footwork which is designed to accomplish legitimate business and tax purposes, but which may not be as directly dispositive in resolving insolvency cases. This point was emphasized by Oliver L.J. in Barclays Bank at pp. 640 and 636:

> p. 640: This argument is perfectly intelligible, and indeed almost unanswerable if one regards the payment of those customers who were paid to TOSG as an entirely separate transaction isolated from any other arrangement made with the agency, but to my mind it ignores the reality. If one is to look for analogies, it is, I think, essential first to analyse what the total effect of the arrangements was and the reasoning behind them. All the cases stress that in relation to the rule against double proofs it is the substance and not the form that is to be regarded (see eg Re Melton, Milk v. Towers [1918] 1 Ch 37, at 60, [1916-17] All ER Rep 672 at 683, Re Oriental Commercial Bank (1871) LR 7 Ch App 99). (emphasis added)
>
> p. 636: I accept the submission of counsel for TOSG and the agency that the rule ought more properly to be styled the rule against double dividends, for its object is to absolve the liquidator from paying out two dividends on what is essentially the same debt ... (emphasis added)

> Second, it is, I think, a fallacy to argue ... that, because overlapping liabilities result from separate and independent contracts with the debtor, that, by

itself, is determinative of whether the rule can apply. The tests is in my judgment a much broader one which transcends a close jurisprudential analysis of the persons by and to whom the duties are owed. It is simply whether the two competing claims are, in substance, claims for payment of the same debt twice over. (Italics in original; underlining added)

Application of the Rule in the Circumstances of this Case

**29**  To adopt the language of Oliver L.J., then, what is "the total effect of the arrangements ... and the reasoning behind them" in the circumstances of this case? In my view, a careful reading of all of the documentation including in particular, the Repayment Agreement, supports the conclusion that the "loan" from the A&G Lenders to OYRCC and the "on-loaning" of the same funds from OYRCC to OYDL are in substance the same debt.

**30**  Notwithstanding the complex structure of the arrangement from a commercial/corporate/tax perspective, the economic and financial reality of the Jumbo Loan deal -- its substance, if you will -- is simple and clear: a US $2.5 billion loan facility was lent by the A&G Lenders to OYDL on the strength of (a) the OYDL covenant and, (b) the security of the Abitibi and Gulf shares. In my opinion, in the particular circumstances of this case, the legal substance of the transaction is to he same effect[8].

**31**  The documents in this case demonstrate that, from the perspective of the A&G Lenders, the loan facility was backed by the OYDL covenant and by the security of the Abitibi and Gulf shares. Moreover, while the funds were being advanced, technically, to OYRCC, it is clear from the Credit Lyonnais commitment letter that the lenders were providing the facility to OYDL. The A&G Lenders were not privy to the internal fashion in which the Olympia & York corporations structured the deal. Nevertheless, the structure suggests a closely intended connection between the obligation of OYDL to make payments to OYRCC and the obligation of OYRCC to make payments to the A&G Lenders.

**32**  In this latter regard, particular reference may be made to the requirement in the Repayment Agreement that payments of principal under the Note are to be made "at such time or times and in such amounts as payments of principal are made by [OYRCC] under the Term Loan Agreements". Furthermore,

> \* The funds were initially advanced by the A&G Lenders and "on-loaned" to OYDL on the same date that the Term Loan Agreements, the Promissory Note, the Repayment Agreement were executed;

> \* OYRCC was incorporated for the sole purpose of receiving the funds from the A&G Lenders and forwarding those funds to OYDL, and, apart from the receipt of the 1/16th% spread on the interest rate, OYRCC did not transact any other

> business;
>
> * the timing and rate of interest payments under the Promissory Note were directly tied to the interest payments to be paid by OYRCC under the Term Loan Agreements;
>
> * OYDL agreed under the Promissory Note to pay additional sums to OYRCC that may be payable by OYRCC to the A&G Lenders in certain circumstances such as default in interest; and, finally,
>
> * the Repayment Agreement states in its recitals that it was the intention of OYDL and OYRCC that the unpaid principal amount of the Promissory Note would be equal to the aggregate unpaid principal amounts under the Term Loan Agreements.

**33** There is thus an "inseparable nexus"[9] between the obligation of OYRCC to pay the A&G Lenders and the obligation of OYDL to make payments to OYRCC. The agreements contemplate the former will occur before the latter are called for. The circle is closed, it seems to me, with OYDL's agreement to be bound as principal debtor and by the fact that, for all practical purposes, the A&G Lenders are the only creditors of OYRCC.

**34** To my mind these circumstances lead to the inescapable inference that the parties intended that there would be a single US $2.5 billion loan facility made available to OYDL on the strength of the OYDL covenant and the security of the Abitibi and Gulf shares, and that the A&G Lenders would look to OYDL ultimately and primarily, if not solely, for payment. It was not the common intention of the parties that in the event of the bankruptcy of both OYDL and OYRCC, the A&G Lenders would be able to recover a dividend based upon 200% of their claim, which would be the effect if the claims put forward by ARCH and the A&G Lenders are both allowed to stand.

> The Registrar's Decision and the "Genuine Debtor-Creditor", "Separate Corporate Existence", and "Group Enterprise" Issues

**35** Registrar Ferron concluded that there existed a genuine debtor-creditor relationship between OYDL and OYRCC and that there was nothing in the circumstances which would allow him to disregard the separate corporate existence of OYRCC. In my view, these conclusions are simply mirror images of each other. Registrar Ferron said:

> If one acceded to the position taken by the trustee of OYDL and concluded that OYRCC's loan to its parent company was of no significance, the transaction involving the loan from the A&G Lenders would have to be seen as something of

a sham and that [the] A&G Lenders were misled in loaning funds to OYRCC which until this point no one denied. [OYRCC] had a corporate existence separate and distinct from its parent including the capacity to borrow and loan funds.

**36**   While the latter observation is accurate, it is not conclusive; and, in my respectful view, the learned Registrar erred in law in deciding that once he found the existence of a separate corporate entity and a debtor-creditor relationship between parent and subsidiary, the same-debt-in-substance test could not be met. The case law illustrates that the existence of separate and distinct claims or liabilities is not determinative of the double proof issue. The crucial question is whether or not the separate and distinct claims relate in substance to the same debt. For the reasons that I have outlined, I am satisfied that they do.

**37**   In concluding that a separate corporate existence was dispositive of the double proof issue, the Registrar relied heavily upon the decision of the English Court of Chancery in Polly Peck. This decision warrants careful consideration, although in the end I am satisfied that it is distinguishable from the circumstances of this case and, in any event, not dispositive or the issues to be determined.

**38**   The factual situation in Polly Peck, on the surface, is remarkably similar to this case. It involved a large multi-national group of companies (the "PPI Group"), the use of a special purpose subsidiary as a financial vehicle for the raising of funds for the Group ("PPIF"), a resulting intra-corporate indebtedness with the initial loan to the special purpose subsidiary being guaranteed by the parent ("PPI") and the funds being "on-loaned" to the parent by the subsidiary. It also involved the insolvency of both the parent company and the special purpose subsidiary. Robert Walker J. reviewed all of the arguments which have been put forward in this case. He rejected the argument that the special purpose subsidiary had no separate corporate existence and was in effect an agent or nominee of the parent, or, that it was a mere façade, on the basis of the well-known principles of separate legal identity established in Salomon v. Salomon, supra. He also rejected the argument that in circumstances such as these, a closely-integrated group of companies should be considered as a single economic unit -- saying that he found those submissions of counsel "most persuasive", but concluding that he was "not ultimately persuaded by them": supra, p. 447. His reasons in this regard are carefully considered, and I quote them in full (supra, pp. 447-448):

> The arguments for considering a closely-integrated group of companies as a single economic unit were fully considered (principally in the context of corporate presence as founding jurisdiction) in Adams v. Cape Industries plc [1991] 1 All ER 929 at 965, [1990] Ch 433 at 476-477, both by Scott J and, with a full citation of authority, in the judgment of the Court of Appeal (see [1991] All ER 929 at 1016-1020, [1990] Ch 433 at 532-537). Both passages merit careful study. The Court of Appeal concluded that --

'save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of Salomon v. Salomon & Co Ltd, [1897] AC 22, [1895-9] All ER Rep 33 merely because it considers that justice so requires.' (See [1991] 1 All ER 929 at 1019, [1990] Ch 433 at 536.

Mr. Kosmin seeks to add to these exceptions (turning on particular statutes or contracts) a further exception where a rule of law founded in public policy (the rule against double proof) would be frustrated by ignoring the economic reality of the single group. In that submission Mr. Kosmin can and does call in aid the words of Oliver LJ in Barclays Bank Ltd. v. TOSG Trust Fund Ltd [1984] 1 All ER 628 at 636-7, [1984] AC 626 at 636 that the test is 'a much broader one which transcends a close jurisprudential analysis of the persons by and to whom the duties are owed'.

Nevertheless I am not persuaded by the argument. I can accept that as a matter of economic reality the bondholders (whose presumed intentions may be material) must have intended to rely on the credit-rating and covenant of PPI, whether as guarantor or (after substitution) as principal obligor. It is doubtful whether even the most farsighted of them can have calculated that in the event of a crash, PPIF might have fewer unsecured creditors than PPI, and a claim against PPI on the loan. It was perfectly possible, consistently with each prospectus, that the proceeds of some or all of the bond issues would be loaned on, not to PPI, but to other group subsidiaries. It is also possible, though less likely, to imagine a situation in which PPIF lent on to another subsidiary, with PPI guaranteeing that borrowing also, and the second subsidiary then lending on to PPI. Each of those sequences of events would be likely to produce a different result in the event of a crash of the whole group, whether or not the rule against double proof has any application. The possibility of there being subsidiaries which were not wholly owned subsidiaries adds to the range of imaginable variations.

Were I to accede to Mr. Kosmin's submission it would create a new exception unrecognised by the Court of Appeal in Adams v. Cape Industries plc and that is not open to me. Moreover I think that Mr. Kosmin is in one sense assuming what he seeks to prove, since the unjust or inequitable result which he asserts does not occur unless the group is recognised as being in substance a single economic entity, whose constituent members' internal rights and obligations are to be disregarded. But the authorities to which I have already referred show that substance means legal substance, not economic substance (if

different), and that legal existence of group companies is particularly important when creditors become involved. Injustice may be in the eye of the beholder, but I do not perceive any obvious injustice -- certainly not such as the court can remedy -- the unpredictable consequences that may follow from the unforeseen insolvency of a large international group of companies such as the Polly Peck group.

**39**    Polly Peck is distinguishable from this case in a number of ways, however. In Polly Peck, Robert Walker J. specifically noted the exception alluded to in Adams v. Cape Industries plc, supra, involving "cases which turn on the wording of particular statutes or contract". In that case, there was no evidence of an inseparable legal nexus between the two loans in the structure of the transaction. Thus, the parent's obligation to pay under the "onloaned" transaction was not dependent upon the subsidiary's payments being made under the underlying transaction structured between the lender and the subsidiary, which is the situation in this case. Additionally, while in Polly Peck the parent had the option of substituting itself as a principal obligor, it was not obliged to do so. Here OYDL had committed itself as a principal obligor in the Jumbo Loan, and accordingly, as a matter of law it had become a "full-fledged principal debtor with all of the duties and obligations that term implies": Manulife Bank of Canada v. Carlin, supra, pp. 436-437. Finally -- and significantly -- the lenders in Polly Peck were not the only substantial creditors of the subsidiary corporation, PPIF, whereas in this case, under the structure of the transaction, the A&G Lenders would only ever be the substantial creditors of OYRCC.

**40**    In my view, it is not necessary to be overly concerned in this case about "piercing the corporate veil", "separate corporate entity", or whether concepts such as a "group enterprise theory" or a "single economic unit" theory should be considered. The case does not fall to be decided on any of these bases. It falls squarely into one of the recognized exceptions to the principle of Salomon v. Salomon. It is a case which turns on the wording of a particular contract, or contracts.

**41**    Moreover, the reality flowing from the fact that the A&G Lenders are the only creditors of OYRCC for these purposes (and for practical purposes would only ever be) is that the A&G Lenders will recover a dividend in the OYDL bankruptcy on the basis of 200% of the debt owing to them whereas other creditors of OYDL will be obliged to accept solace on the basis of only the amount of their claims. This result is fundamentally contrary to the foremost underlying principal of bankruptcy legislation, and should be resisted. It is in reality, a double proof, and accordingly cannot be allowed.

**42**    Notwithstanding that this motion may be determined on the particular wording of the overall governing contractual documentation, I do not hesitate to say that in my view it is appropriate for the Court to have regard to the intra-corporate group aspects of the Jumbo Loan for purposes of assessing the overall nature of the transaction from a legal perspective. This is not a case of piercing the corporate veil, of arguing agency or sham, or of denying the existence of separate corporate vehicles in the same group enterprise. It is not a question of attempting to fasten some corporate

entity with a liability attributable on Salomon v. Salomon principles to some other corporate entity simply because they both belong to the same enterprise of economic unit. It is simply a question of looking at the total picture in order to determine "total effect of the arrangements", or, to put it another way, to determine the legal substance of the transaction.

**43**   This approach is well accepted, for instance, in tax cases, where it is necessary for the Court to sort out what is the essence of a transaction: see, for example, De Salaberry Realties Ltd. v. Minister of National Revenue (1974), 46 D.L.R. (3d) 100 (Fed.Ct., T.D.); Alberta Gas Ethylene Co. v. R. (1988), 41 B.L.R. 117 (Fed.Ct., T.D.). In the latter case, where the facts were strikingly similar to those here, Reed J., in refusing to ignore the separate corporate entity of a subsidiary made the following observation:

> ... I do not interpret the jurisprudence as ignoring the existence of subsidiary corporations per se. Rather, it seems to me that the jurisprudence proceeds on the basis that in certain circumstances, consequences will be drawn despite the legal existence of separate subsidiary corporations. (Emphasis added)

**44**   I agree. Here, at least for purposes of assessing proofs of claim in the parent company's bankruptcy, the consequences of the circumstances as they exist -- the "total effect of the arrangements" -- are that the Jumbo Loan is a same debt transaction "despite the legal existence" of the separate subsidiary, OYRCC.

   Other Issues

   One Payment for Discharge of Both Debts

**45**   In Barclays Bank, supra, Oliver L.J. postulated, as a test for determining whether there was a double proof, "the question whether two payments are being sought for a liability which, if the company were solvent, could be discharged as regards both claimants by one payment". (Emphasis added)

**46**   Registrar Ferron considered this test for determining whether the rule against double proof had been contravened, and concluded that the test was not met on the facts of this case. He said:

> If OYDL were to pay the A&G Lenders under the guarantee this could not affect the loan due to OYRCC under its note. Similarly, if OYDL were to pay OYRCC and thus discharge the Promissory Note, the obligation under the guarantee would still exist and be enforceable. One payment would not discharge both claimants' debts against OYDL and accordingly, on the test suggested by Oliver, L.J. the rule is not offended.

**47**   I respectfully disagree. The Registrar's conclusion flows from a misunderstanding of the constating documents which frame the Jumbo Loan deal. Suppose, for example, that OYDL

remained solvent, but that OYRCC had become insolvent and unable to pay the A&G Lenders. One payment by OYDL to the A&G Lenders would satisfy its liability on the OYDL Guarantee, and would eliminate the liability as between the A&G Lenders and OYRCC. There would accordingly be no further payments to be made by OYRCC under the Term Loan Agreements; and, since OYDL's obligation under the Note is to pay interest on the principal at the times provided in the Term Loan Agreements, and under the Repayment Agreement is "to make payments of principal under the Note to [OYRCC] under the Term Loan Agreements", OYDL could have no more liability to OYRCC under the Promissory Note. Thus, one payment would discharge both debts, having regard to the total contractual framework of the arrangement.

**48** Working the single payment analysis from the other direction, namely by means of a payment by OYDL to OYRCC on the Note is a little less clear and more cumbersome. From a practical point of view, however, the effect would have been the same. No payment of principal was called for by OYDL to OYRCC until, and to the extent that, OYRCC had made payments on the loan. Accordingly, the liability of OYDL to the A&G Lenders on the OYDL Guarantee would have been reduced in the same amount. Even though OYDL technically had the right to prepay OYRCC under the terms of the Promissory Note and there is nothing specific in the agreements requiring OYRCC to remit payment to the A&G Lenders in return in such event, one payment would unquestionably discharge all debts if made by OYDL via the A&G Lender route, as I have indicated, and that, in my view, is sufficient to meet the "same debt" test. I see nothing in the decision in Barclays Bank mandating a contrary conclusion.

Creating a 'Double Proof' in the OYRCC Bankruptcy?

**49** The Respondents argue that to accede to the "double proof' submissions of OYDL's Trustee would be to sanction a double proof situation in the OYRCC bankruptcy. This would be so because OYDL would in effect be receiving full credit for its indebtedness down to its subsidiary, OYRCC. This would deprive OYRCC's creditors (including those other than the A&G Lenders) of a right to share in that asset of OYRCC; and, at the same time, it would unjustifiably advantage OYDL's creditors by providing more money for them at the parent level.

**50** The short answer to this submission is that it is premised on the proposition OYRCC had or might have had other creditors. However, that is not the case. The A&G Lenders are the only creditors of OYRCC, for these purposes. Given the contractual framework established for the Jumbo Loan, there would never be any other creditors of OYRCC with claims of any significance relative to those of the A&G Lenders, since OYRCC was limited in its ability to create further indebtedness which would exceed 1% of the Jumbo Loan. Thus, in the circumstances of this case, the "double proof" lies in the OYDL estate and not in the OYRCC estate.

Reduction of Claims on Account of Recoveries from Third Parties

**51** The A&G Lenders have recovered the sum of $1,281,281,018 (Cdn) through their efforts to realize on the security pledged in relation to the Abitibi and Gulf shares. On a motion for directions

which resulted in orders made on February 13 and April 14, 1997, Farley J. required the A&G Lenders to deduct such amounts from their claims on the OYDL Guarantee. His orders were affirmed on appeal. It is therefore accepted that these sums must be deducted from the A&G Lenders side of the claim in the OYDL bankruptcy.

**52**    The Respondents submit, however, that if the claim of OYRCC in the OYDL estate is permitted to proceed -- even if the A&G Lender claim on the OYDL Guarantee is not -- it should be permitted to proceed without any similar deduction being made. This result might well follow, I think, if the view to be taken of the matter were that expressed by the learned Registrar. For the reasons I have outlined above, however, I am respectfully of the opinion that the view of the Registrar constituted an error in law and reflected a misapprehension of the factual and contractual basis underlying this case.

**53**    Because the amount still owing to the A&G Lenders has been reduced by the amount of the recovery on its other security, OYRCC's obligations to the A&G Lenders have been reduced by a similar amount. Under the Repayment Agreement, OYRCC is only able to call upon OYDL to make payments under the Promissory Note when, and to the extent that, it has itself made payments under the Jumbo Loan. In the circumstances now existing, it cannot be called upon to make payments which have already been made in the form of recovery on other security. Thus, it cannot have a claim against OYDL for more than what remains as the outstanding amount of the Jumbo Loan.

**54**    Therefore, in my view, to the extent that the OYRCC Claim in the OYDL bankruptcy is put forward it must be reduced by the amounts recovered by the A&G Lenders on their other security.

### III.    CONCLUSION

**54a**    Accordingly,

    a)    the order of the Registrar is set aside;
    b)    an order is granted directing that claims of A&G Lenders and of OYRCC against the estate of OYDL constitute a double proof against the estate;
    c)    a declaration is granted that the A&G Lenders and OYRCC may rank for payment of one dividend out of the estate of OYDL based on a claim in the sum of $1,759,108,979.00 (Cdn.); and,
    d)    the Appellant is entitled to its costs of the appeal and of the proceeding before the Registrar.

[The Court did not number this paragraph. QL has assigned the number 54a.]

BLAIR J.

[Editor's note: Schedule "A" could not be reproduced online.]

cp/s/aaa/mjb/DRS/qlsxs

1 The bankruptcies followed an earlier re-structuring of OYDL and some 28 of its directly and indirectly owned subsidiaries, under the Companies' Creditors Arrangement Act (the "CCAA").

2 In separate proceedings and by Orders dated February 13 and April 14, 1997, Farley J. held that the A&G Lenders were required to deduct the sums recovered on such security from the amount of their claim. His Orders were upheld by the Court of Appeal in a decision released on September 1, 1998, Olympia & York Developments Ltd. (trustee of) v. National Bank of Canada, [1998] O.J. No. 3482 (C.A.).

3 The lending syndicate was comprised of the following lenders, to the extent of the following advances: Credit Lyonnais and other European lenders (US $1.25 billion); Hongkong and Shanghai Banking Corporation (US $ 750 million); Dai-Ichi Kango Bank, Ltd. (US $250 million); Royal Bank of Canada (US 250 million).

4 Summary taken from the admitted recitation of facts in the Appellant's factum.

5 A defined term in the Term Loan Agreement, meaning OYDL, or any of its subsidiaries, or any successor guarantors (or their subsidiaries).

6 Reference Tranches" as defined in the Note are portions of the advances made under the Term Loan Agreements.

7 As contemplated in section 141 of the Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, as amended (the "BIA").

8 See, Polly Peck, supra, at p. 444 and Tokyo Ltd. v. Karoon [1986] 3 All ER 468 at p. 486, for the general proposition that courts are concerned the law and not with economics when looking at the substance of matters.

9 To borrow a phrase used by Gonthier J. in Husky Oil Operations Ltd. v. M.N.R. [1995] 3 S.C.R. 453, at p. 491, albeit in a slightly different context. Husky Oil was a constitutional case, but Gonthier J. drew upon "double proof" concepts in considering the claims of a creditor and a statutory surety, who had made payments to the creditor on behalf of the debtor, against the estate of a principal debtor. The particular question he addressed was whether the statutory suretyship created a joint and several liability as between the debtor and the statutory surety for the debt (he concluded it did not).