HEARING DATE: TO BE DETERMINED

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg
Scott Davidson

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al*., | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., *et al*. | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

------------------------------------------------------------ x

| | | |
|---|---|---|
| MOTORS LIQUIDATION COMPANY GUC TRUST, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Adversary Proceeding |
| | : | Case No.: 12-09802 (REG) |
| v. | : | |
| | : | |
| APPALOOSA INVESTMENT LIMITED PARTNERSHIP, *et al*., | : | |
| | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------ x

## OBJECTION BY GENERAL MOTORS LLC TO THE MOTORS LIQUIDATION COMPANY GUC TRUST'S MOTION FOR RELIEF UNDER RULE 60(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE MADE APPLICABLE BY RULE 9024 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

RELEVANT FACTS ......................................................................................... 6

    A.    Timely Public Disclosures of the Three New GM Assets Were Made to, and Reviewed by, the Committee. ........................................................ 6

          1.    The Form S-4 Disclosed the Relevant Circumstances Relating to GM Nova Scotia, and the Committee Reviewed this Document............... 7

          2.    Weil Gotshal Made Relevant Disclosures at the First Day Hearing, and the Committee Reviewed the Transcript............................. 8

          3.    The June 1, 2009 8-K Disclosed the Lock-Up Agreement and the Committee Reviewed It ......................................................... 9

          4.    The Sellers' Disclosure Schedules to the MSPA Disclosed the Lock-Up Agreement and the Committee Reviewed It ......................... 10

          5.    The Committee Was Aware of the Nova Scotia Litigation that Was Settled Under the Lock-Up Agreement ..................................... 11

          6.    The Committee's Negotiation of the MSPA Indicates That It Knew the Swaps Were Being Assigned to New GM ......................... 12

          7.    The First Amendment to the DIP Facility Disclosed the Lock-Up Agreement, and the Committee Reviewed It........................... 13

          8.    The July 29, 2009 Phone Conversation Between Aurelius and Committee Counsel Reveals that the Committee Knew About the Lock-Up Agreement Before the 363 Sale Closed................................... 14

          9.    The August 7, 2009 8-K Disclosed the Lock-Up Agreement and the Committee Reviewed It ..................................................... 15

          10.    The Interim Report, Dated August 11, 2009, Disclosed the Lock-Up Agreement and the Committee Reviewed It ..................................... 15

    B.    The Committee Supported the 363 Sale and Consented to the Assumption and Assignment Procedures................................................ 16

    C.    The Committee Purposefully Paid Little Attention to GM Canada.................... 17

    D.    The Committee's Knowledge About the MSPA ................................. 17

POINT I  THE GUC TRUST IS NOT ENTITLED TO RELIEF BASED ON RULE 60(B)..... 18

    A.    The GUC Trust Cannot Satisfy Its Heavy Burden Under Rule 60(b) ................ 19

    B.    The GUC Trust Failed to Satisfy Rule 60(b)(1) -- Excusable Neglect............... 20

    C.    The GUC Trust Failed to Satisfy Rule 60(b)(2) -- Newly Discovered Evidence......................................................................... 21

D.      The GUC Trust Failed To Satisfy Rule 60(b)(3) -- Misconduct ........................ 22

E.      The GUC Trust Failed to Satisfy Rule 60(b)(6) -- Extraordinary
        Circumstances .................................................................................................. 23

F.      The Impact of the Three New GM Assets Is Overstated; Timely
        Disclosures Relating to the Three New GM Assets Are Understated ................ 25

        1.      Impact and Disclosures Relating to the Assignment of the Lock-Up
                Agreement .............................................................................................. 25

                a.      Lock-Up Agreement Assignment Impact .................................... 25

                b.      Lock-Up Agreement Disclosures .................................................. 26

        2.      Impact and Disclosures Relating to the Transfer of the Swaps .............. 29

                a.      Swaps Impact ............................................................................... 29

                b.      Swaps Disclosures ...................................................................... 30

        3.      Impact and Disclosures Relating to Intercompany Avoiding Power
                Claims .................................................................................................... 31

                a.      Intercompany Avoiding Power Claims Impact ............................ 31

                b.      Intercompany Avoiding Power Claims Disclosures .................... 32

G.      Granting Rule 60(b) Relief at This Juncture Would Impose an Undue
        Hardship on New GM; the Equitable Mootness Doctrine Applies ..................... 32

POINT II  THE GUC TRUST'S RULE 60(B) REQUEST IS UNTIMELY ............................. 34

POINT III  THE GUC TRUST IS NOT AUTHORIZED TO SEEK A MODIFICATION
        OF THE SALE ORDER ............................................................................................ 39

CONCLUSION .................................................................................................................... 40

## **TABLE OF AUTHORITIES**

**Page(s)**

<small>CASES</small>

*Alvarado v. Manhattan Worker Career Ctr.*,
   No. 01 Civ. 9288, 2003 WL 22462032 (S.D.N.Y. Oct. 30, 2003) ..........................................21

*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
   428 B.R. 43 (S.D.N.Y. 2010)......................................................................................................6

*Commer v. McEntee*,
   No. 00 Civ. 7913 (RWS), 2005 WL 1250214 (S.D.N.Y. May 27, 2005) ..............................21

*Dux v. Megasol Cosmetic GMBH*,
   03-CV-8820 (RO), 2006 WL 870462 (S.D.N.Y. Apr. 3, 2006) ..............................................21

*Golden Oldies, Ltd. v. Scorpion Auction Group, Inc.*,
   199 F.R.D. 98 (E.D.N.Y. 2001)...............................................................................................38

*In re Lehman Brothers Holdings Inc.*,
   445 B.R. 143 (Bankr. S.D.N.Y. 2011), *aff'd in part and rev'd in part on other*
   *grounds*, 478 B.R. 570 (S.D.N.Y. 2012) ..........................................................................19, 20

*In re Old Carco LLC*,
   423 B.R. 40 (Bankr. S.D.N.Y. 2010), *aff'd*, No. 2010 WL 3566908 (S.D.N.Y. Sept.
   14, 2010), *aff'd*, *Mauro Motors Inc. v. Old Carco LLC*, 420 Fed. App'x 89 (2d Cir.
   2011) ........................................................................................................................................19

*In re Olejnik*,
   No. 09-76714-AST, 2010 WL 4366183 (Bankr. E.D.N.Y. Oct. 28 2010).........................23, 38

*In re Teligent*,
   326 B.R. 219 (S.D.N.Y. 2005)........................................................................34, 38, 39, 40

*Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*,
   609 F.3d 122 (2d Cir. 2010)......................................................................................................22

*Judith Ripka Creations, Inc. v. Rubinoff Imp., Inc.*,
   No. 03 Civ. 9377 (BSJ), 2004 WL 1609338 (S.D.N.Y. July 16, 2004) ................................23

*Katz v. Mogus*,
   No. 07 Civ. 8314 (PKC)(KNF), 2012 WL 263462 (S.D.N.Y. Jan. 25, 2012).......................20

*Kurzweil v. Philip Morris Cos., Inc.*,
   No. 94 Civ. 2373, 1997 WL 167043 (S.D.N.Y. April 9, 1997)...............................................21

*Montco, Inc. v. Barr (In re Emergency Beacon Corp.),*
    666 F.2d 754 (2d Cir. 1981)...........................................................................24, 38

*Nemaizer v. Baker,*
    793 F.2d 58 (2d Cir. 1986)....................................................................19, 20, 23, 31

*New York v. Green,*
    420 F.3d 99 (2d Cir. 2005)...........................................................................................24

*Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.),*
    233 B.R. 619 (D.P.R. 1999)..........................................................................................34

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.),*
    430 B.R. 65 (S.D.N.Y. 2010), *motion to vacate denied,* No. 09 Civ 7794, 2010 WL
    3565494 (S.D.N.Y. Sept. 10, 2010)..........................................................................6, 34

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.,*
    507 U.S. 380 (1993)..................................................................................................20

*S.E.C. v. Wojeski,*
    752 F.Supp.2d 220 (N.D.N.Y. 2010), *aff'd, Smith v. S.E.C.,* 432 Fed. App'x 10 (2d
    Cir. 2011)..........................................................................................................22

*Sasso v. M. Fine Lumber Co., Inc.,*
    144 F.R.D. 185 (E.D.N.Y. 1992).............................................................................37, 38

*Scherer v. City of New York,*
    Nos. 03 Civ. 8445(RWS), 04 Civ. 2713(RWS), 2007 WL 2710100 (S.D.N.Y.
    September 07, 2007).................................................................................................22

*Shrader v. CSX Transp. Inc.,*
    70 F.3d 255 (2d Cir. 1995)..........................................................................................23

*Stupakoff v. Otto (In re Spiegel, Inc.),*
    269 Fed. App'x 56 (2d Cir. 2008), *cert. denied, Stupakoff v. Otto,* 555 U.S. 825
    (2008)..............................................................................................................38

*Thorpe v. Luisi,*
    No 00 Civ. 3144, 2005 WL 1863671 (S.D.N.Y. Aug. 4, 2005)...........................................21

*Vasquez v. Carey,*
    No. 03 Civ. 3905 (RJH), 2010 WL 1140850 (S.D.N.Y. March 24, 2010).......................19, 38

*Williams v. New York City Dep't of Corr,*
    219 F.R.D. 78 (S.D.N.Y. 2003)...................................................................................20

**STATUTES AND RULES**

11 U.S.C. § 363(f)........................................................................................................29

11 U.S.C. § 363(m) .....................................................................................................4, 5

11 U.S.C. § 365............................................................................................................18

11 U.S.C. § 502(d) .........................................................................................................1

Rule 60(b) of the Federal Rules of Civil

    Procedure .......................1, 3, 5, 6, 15, 18, 19, 20, 21, 22, 24, 25, 29, 31, 32, 34, 35, 36, 37, 38

Rule 60(b)(1) of the Federal Rules of Civil Procedure .............................20, 21, 24, 25, 29, 31, 37

Rule 60(b)(2) of the Federal Rules of Civil Procedure ...................................21, 24, 25, 29, 31, 37

Rule 60(b)(3) of the Federal Rules of Civil Procedure ...................................22, 24, 25, 29, 31, 37

Rule 60(b)(6) of the Federal Rules of Civil Procedure ...................................23, 24, 25, 29, 31, 37

Rule 60(c)(1) of the Federal Rules of Civil Procedure ................................................................34

**OTHER AUTHORITIES**

12 *Moore's Federal Practice*, § 60.41[1][c].............................................................................20

General Motors LLC ("**New GM**"), by its undersigned counsel, hereby submits this

objection to the *Motors Liquidation Company GUC Trust's Motion For Relief Under Rule 60(b)*

*Of The Federal Rules Of Civil Procedure Made Applicable By Rule 9024 Of The Federal Rules*

*Of Bankruptcy Procedure*, dated May 3, 2013 ("**Rule 60(b) Motion**").[1]

## PRELIMINARY STATEMENT

The GUC Trust argues that Rule 60(b) relief is necessary only in the event New GM

established at trial that, pursuant to the Sale Order, it (a) *validly* was assigned the Lock-Up

Agreement, (b) *validly* purchased the Swap Claims, or (c) *validly* acquired Intercompany

Avoiding Power claims ("**Three New GM Assets**"), which prohibited the GUC Trust from using

such claims, defensively, under Section 502(d) of the Bankruptcy Code, to reduce the

Noteholders' claims by the amount of the Consent Fee.  The GUC Trust claims that the need for

Rule 60(b) relief is "limited", and it only seeks such relief "protectively."[2]  If only that were true.

While the Rule 60(b) Motion speaks to invalidating the "assignment" of the Lock-Up

Agreement to New GM, as compared to voiding the Lock-Up Agreement *per se* (the issue

presented at trial), the rationale provided by the GUC Trust for taking both actions is the same --

the alleged failure by Old GM and Weil Gotshal to disclose to the Committee the Lock-Up

Agreement.  Essentially, the GUC Trust is using the "assignment" of the Lock-Up Agreement

pursuant to provisions in the Sale Order as the "hook" to challenge an order of the Court and,

thus, invoke Rule 60(b), all for the purpose of rearguing the same "non-disclosure" point,

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Joint Statement of Facts of Certain Noteholders, the GM Nova Scotia Trustee and New GM*, May 24, 2013 [ECF No. 12437] ("**Joint Statement of Facts**," or "**JSF**"), filed in connection with the trial ("**Nova Scotia Trial**") of this Adversary Proceeding and Contested Matter.  All references to "**Pl. Ex.**" and "**Def. Ex.**" refer to the GUC Trust's, or the Defendants' and New GM's exhibits admitted into evidence in connection with the Nova Scotia Trial.  All references to "**Tr.**" refer to the transcript of the Nova Scotia Trial.

[2]  Rule 60(b) Motion, at 17-18.

presumed to have been lost at trial. And, as demonstrated at trial, the Lock-Up Agreement was timely disclosed on numerous occasions, and the Committee received and reviewed those disclosures prior to the 363 Sale. Committee Counsel actually stated that if he had known of the facts contained in the June 1, 2009 8-K (which described the Lock-Up Agreement in detail) prior to the 363 Sale, "we would not have brought it to -- we would not have raised this as one of our issues, I don't think we would." Tr. 10/03/12 (Mayer) at 61:13-15. Significantly, Committee Counsel and the Chairman of the Committee ultimately admitted that the June 1, 2009 8-K was received and reviewed before the 363 Sale. *Id.* at 51:12-15; Tr. 11/27/12 (Vanaskey) at 53:25-54:2; 97:25-98:10.

Committee Counsel testified that the 363 Sale had broad bondholder support and, since the Petition Date, was like a "freight train coming down the tracks." Tr. 10/03/12 (Mayer) at 13:25-14:7. New GM was the only viable purchaser, and the only other alternative for Old GM was liquidation, which would have yielded no distribution to unsecured creditors. *Id.* at 13:25-14:7; Sale Approval Decision, at 5. The Committee's focus was "on other things that were doable with respect to the Treasury and New GM and not with respect to claims against the Estate." Tr. 10/03/12 (Mayer) at 60:12-14. The Committee clearly understood that its distribution was circumscribed to a minority equity position in New GM, cash needed to wind down Old GM, and the Term Loan Litigation. *See id.* at 13:15-17:10. Everything else went either to New GM or the DIP Lenders (the Governments). *Id.* at 16:4-17:10. The Committee further understood that the bankruptcy estate's "pot of consideration" could increase if total allowed unsecured claims exceeded a threshold amount. JSF, ¶ 74. The Committee made the determination that GM Canadian-related matters were not an issue of focus for it, or a material issue in the Old GM bankruptcy case. Tr. 10/03/12 (Mayer) at 22:22-23:13.

2

Four years after the Sale Order, the GUC Trust seems to have conveniently forgotten what it was entitled to receive under the MSPA. The GUC Trust's purpose for seeking to avoid the Lock-Up Agreement is anything but "protective"; it is an unabashed "money grab" intended primarily to invalidate the release of the Intercompany Loans given to a subsequently restructured GM Canada. Even if that was not its purpose, the consequences of granting any Rule 60(b) relief would, at a minimum, be an onset of litigation against New GM and GM Canada, focused on the direct and indirect effects arising from granting such relief. New GM is entitled to retain the benefits it acquired pursuant to the MSPA and the Sale Order, including the Three New GM Assets, and the purchase of GM Canada free and clear of the Intercompany Loans (that had already been compromised before the Sale Hearing).

Since the Sale Order, (a) the Governments invested *billions* of dollars in New GM and GM Canada, (b) New GM and GM Canada entered into *thousands* of transactions with their creditors, and (c) *billions* of dollars in New GM equity securities have been traded. These actions were predicated on the validity of the *entire* Sale Order and the release of the Intercompany Loans. It is way too late, and far too much has transpired in express reliance upon the Sale Order to grant the Rule 60(b) Motion.[3]

The GUC Trust accuses Old GM and its counsel, Weil Gotshal, of engaging in intentional misconduct by concealing the Lock-Up Agreement from the Committee and the Court. The GUC Trust has a very high burden for this type of Rule 60(b) relief, and it utterly failed to provide *any* evidentiary support for these inflammatory allegations, or justification for the Committee's failure to timely raise them with the Court.

---

[3]  The Nova Scotia Trial was supposed to be a claims objection proceeding. Any modification to the Sale Order, or granting other relief to the GUC Trust that goes beyond the claims filed by the Noteholders and the GM Nova Scotia Trustee, could have unintended consequences which might unjustly, negatively impact New GM and the rights acquired by it under the MSPA and Sale Order.

3

Even if, for example, Old GM had not disclosed the terms of the Lock-Up Agreement in a public securities filing on the day it was executed, there still would be no legal basis to deprive New GM of its Purchased Assets. At the time of the 363 Sale, New GM was an entity owned by the Governments; their goal was to invest in Old GM to the extent necessary to preserve the domestic North American automotive industry. Sale Approval Decision, at 14. Under the Sale Order, New GM was found to be a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code. Sale Order, ¶¶ R, 55. The MSPA, itself, makes clear that New GM did not assume responsibility for alleged misconduct by Old GM. Def. Ex. 226 (MSPA § 2.3(b)(xvi)(B)). The Rule 60(b) Motion does not raise any issue with respect to the conduct of New GM or the Governments, or the Court's "good faith purchaser" finding. Indeed, the Committee supported the approval of the 363 Sale. Tr. 10/03/12 (Mayer) at 78:19-79:3. The Committee never appealed the Sale Order. Instead, with admitted knowledge of what they now claim to be the alleged non-disclosures,[4] the Committee never intervened in the appeals of the Sale Order and allowed others to litigate the appeals and lose. Thereafter, the Committee readily accepted the above-market consideration paid by New GM under the 363 Sale. And now it seeks to prosecute the Rule 60(b) Motion, which is premised on the failed arguments raised by the objectors to the 363 Sale, and the appellants to the Sale Order.

An important foundation of the Sale Order, well understood by the Committee and expressly proclaimed in the Sale Order, was that New GM was different than Old GM (Sale Order, ¶ R) and, with the Governments' financial support, it would receive a fresh start after the 363 Sale. The Rule 60(b) Motion violates that fundamental principle and seeks to tarnish New

---

[4] The GUC Trust spent considerable time at trial focusing on the payment of the Consent Fee, while ignoring the fact that GM Canada effectively paid the Consent Fee; if it had not done so, the cost of the Consent Fee would have been borne by New GM (which would otherwise have acquired the cash) and the Governments (which lent Old GM the cash and expressly approved its use for this purpose).

GM with alleged misconduct of Old GM, while entirely ignoring the critical role played by the Governments. To add insult to injury, the GUC Trust claims to derive its standing to seek Rule 60(b) relief from Old GM, the alleged perpetrator of the misconduct.

If the Committee appealed the Sale Order, based on New GM's Section 363(m) "good faith purchaser" finding, any appellate relief directed at New GM's entitlement to retain the Three New GM Assets would have been "statutorily moot". Moreover, based on the long period of time that elapsed since the Sale Order, and the material change of circumstances that New GM experienced during such time, any appellate relief directed at New GM relating to the Three New GM Assets would have also been "equitably moot". The reasons that appeals of bankruptcy asset sales are found to be statutorily and equitably moot are equally compelling reasons that demonstrate why the Rule 60(b) relief requested by the GUC Trust is inappropriate. Moreover, here, the equitable mootness of the Rule 60(b) relief was exacerbated by the Committee/GUC Trust's own conduct; it decided as a matter of trial strategy to defer for many years the adjudication of its Rule 60(b) concerns.

Significantly, the Rule 60(b) request is a clear violation of the Sale Order, under which New GM acquired the Purchased Assets free and clear of any claims based on Old GM's conduct (acts or failures to act), during the bankruptcy case, whether known or unknown at the time. *See* Sale Order, ¶¶ AA, 7, 9, 10. The GUC Trust ignores this provision and predicates its Rule 60(b) relief on the alleged misconduct of Old GM.

Moreover, the Rule 60(b) Motion itself is a violation of paragraph 8 of the Sale Order. Under that section, all entities (*i.e.*, the Committee) with claims against the Purchased Assets arising prior to the 363 Sale are barred from asserting claims against New GM or the Purchased Assets. The GUC Trust does not get a free pass to violate the Sale Order.

Finally, at the heart of the Rule 60(b) Motion is the flawed premise that the GUC Trust

can cherry pick assets from New GM while maintaining that New GM pay the same purchase

price and suffer any other costs and consequences relating to such relief.  This form of relief is

expressly prohibited by the Sale Order which provides that all of the terms are non-severable and

mutually dependent on each other.  *See* Sale Order, ¶ 69.  It was also expressly rejected by the

District Courts in ruling on the appeals of the Sale Order.  *See Campbell v. Motors Liquidation

Co. (In re Motors Liquidation Co.)*, 428 B.R. 43, 52 (S.D.N.Y. 2010) ("the very nature of the

requested relief, to the extent it could even be granted, would result in an inequitable rewriting of

the Sale Order"); *see also id*. at 61 ("As a threshold matter, the requested remedy (characterized

as 'elective surgery' on the Sale Order to 'carve out' its offending provisions) is beyond the

power of this Court to grant" and that the "Bankruptcy Court could not have modified the Sale

Order without the parties' consent or written waiver"); *Parker v. Motors Liquidation Co. (In re

Motors Liquidation Co.)*, 430 B.R. 65, 81-2 (S.D.N.Y. 2010), *motion to vacate denied,* No. 09

Civ. 7794, 2010 WL 3565494 (S.D.N.Y. Sept. 10, 2010) ("***Parker***").

In **Part I** hereof, New GM will show that the GUC Trust's argument for Rule 60(b) relief

is without merit.  In **Part II**, New GM will demonstrate why the Rule 60(b) Motion is untimely.

And, in **Part III**, New GM will show why the GUC Trust lacks standing to make any Rule 60(b)

request.

## **RELEVANT FACTS**

### A.    **Timely Public Disclosures of the Three New GM Assets
Were Made to, and Reviewed by, the Committee.**

Contrary to the GUC Trust's assertions, the Lock-Up Agreement, the Swaps and the

Intercompany Avoiding Power Claims were not concealed; they were timely disclosed by Old

GM and Weil Gotshal, and the Committee actually reviewed the disclosures.

6

1.    **The Form S-4 Disclosed the Relevant Circumstances Relating to
GM Nova Scotia, and the Committee Reviewed this Document**

As part of Old GM's prepetition restructuring efforts, it publicly filed a Form S-4 with

the SEC less than five weeks before the Petition Date wherein both Old GM **and** GM Nova

Scotia jointly solicited all holders of their notes, aggregating approximately $27.2 billion, to

exchange them for Old GM common stock ("**Bond Exchange Offer**").  Def. Ex. 75.  The Form

S-4 contained a detailed section on GM Nova Scotia.  *Id.* at 12, 134.  It referenced the Notes, the

Guarantee, and what would happen if Old GM filed for bankruptcy and GM Nova Scotia was

"wound up" in a Nova Scotia insolvency proceeding.  The Form S-4 disclosed the possibility of

the Statutory Claim being asserted against Old GM by virtue of GM Nova Scotia being an

unlimited liability company ("**ULC**").  It also referred to the Intercompany Loans and explained

that GM Canada may need to file for bankruptcy in order to impair the Intercompany Loans.  *Id*.

With respect to the Swaps, it stated that GM Nova Scotia owed Old GM approximately C$632

million if the Swaps were terminated as of March 31, 2009.  *Id.*

Committee Counsel reviewed the Form S-4 shortly after the Petition Date.  Tr. 10/03/12

(Mayer) at 124:9-12; 152:13-15.  The representative for the chair of the Committee (Wilmington

Trust Company, which is now the GUC Trust Administrator), David Vanaskey, (a) also timely

reviewed the Form S-4 (Tr. 11/27/12 (Vanaskey) at 25:14-16); (b) expected his counsel (Gibson

Dunne) to have reviewed the Form S-4 (*id.* at 29:9-19); and (c) knew the Form S-4 disclosed the

Swaps and the C$632 million obligation owed to Old GM (*id.* at 74:18-76:7).

The bondholders solicited by the Bond Exchange Offer held claims representing

approximately 90% of the allowed unsecured claims in this case, and had the ability to review

the Form S-4.[5]  Thus, shortly before the bankruptcy, the circumstances relating to GM Nova

Scotia and its related impact on Old GM and GM Canada were made known, in a highly

publicized manner, to most of the holders of unsecured claims against Old GM.

**2.      Weil Gotshal Made Relevant Disclosures at the First Day
Hearing, and the Committee Reviewed the Transcript**

At the June 1, 2009 first day hearing, Harvey Miller from Weil Gotshal, counsel for Old

GM, in his opening presentation, as part of supplementing the First Day Affidavit filed by Fritz

Henderson, told an overflowing courtroom:

> And Canada, Your Honor, there has been substantial advances made in resolving
> all of the issues relating to Canada over the last ten days to the point, Your Honor,
> that it is not necessary to institute any proceedings involving GMCO, which is the
> Canadian subsidiary.

Transcript of Hearing held on June 1, 2009 [ECF No. 374] ("**First Day Hearings Tr.**"), at 36:8-

12.[6]  Mr. Miller's statement is highly relevant when coupled with the statement made in the

Form S-4, that GM Canada would need to file for bankruptcy to impair the Intercompany Loans.

To the Committee members and their counsel who received the Form S-4, as well as the

bondholders who received the Form S-4, a statement by Mr. Miller that GM Canada would not

be filing for bankruptcy because of very recent settlements should have indicated to them that a

deal had been made with the Noteholders to settle the Intercompany Loans.  Settlements of

liabilities to avoid bankruptcy by a company the size of GM Canada necessarily would involve

payments of significant money.  Clearly, Weil Gotshal was not trying to conceal that settlements

(such as the Lock-Up Agreement) were recently made.

---

[5]   *See* Def. Ex. 75; Pl. Ex. 488; Tr. 9/20/12 (Truong) at 126:4-9; Tr. 11/27/12 (Vanaskey) at 23:3-5; Motors
Liquidation Company GUC Trust Quarterly GUC Trust Reports as of December 31, 2012, dated February 14,
2013 [ECF No. 12328].

[6]   Wilmington Trust's counsel (Gibson Dunne), and certain attorneys that have been representing the GUC Trust
throughout this proceeding (currently at Dickstein Shapiro), attended the First Day Hearings.  *See* First Day
Hearing Transcript.

Committee Counsel acknowledged that it was in "the ordinary course" for it to review the First Day Hearing transcript. Tr. 10/03/12 (Mayer) at 27:8-11; 153:16-20. According to its time records, Committee Counsel reviewed both public documents (including SEC filings) and first day pleadings (which would include the transcript from the First Day Hearing) in early June 2009. Def. Ex. 301. Committee Counsel knew in June 2009 that GM Canada may have had to file for bankruptcy to impair the Intercompany Loans, and he knew GM Canada did not file for bankruptcy. Tr. 10/03/12 (Mayer) at 152:13-25. Nevertheless, Committee Counsel testified that, notwithstanding Mr. Miller's statement about very recent settlements made by GM Canada, the Committee made no further inquiry about GM Canada (*id.* at 153:1-5). Simply put, how creditors of non-Debtor subsidiaries were paid was not an issue of focus for the Committee. *Id.* at 82:10-13.

### 3. The June 1, 2009 8-K Disclosed the Lock-Up Agreement and the Committee Reviewed It

On June 1, 2009, Old GM filed a Form 8-K with the SEC ("**June 1, 2009 8-K**"), disclosing the Lock-Up Agreement signed early that morning. Def. Ex. 159. An 8-K filed on the same day as Old GM's historic bankruptcy (*i.e.*, the June 1 2009 8-K) had special public significance. The June 1, 2009 8-K described the Lock-Up Agreement as a ***Material Definitive Agreement***.[7] *Id.* It contained a description of: (i) the Notes, the Nova Scotia Proceeding, and the Extraordinary Resolution; (ii) the cash payment (*i.e.*, the Consent Fee) to be made to extinguish the Intercompany Loans; (iii) the fact that the cash payment would not reduce the Notes or affect the Guarantees; (iv) the possibility of a Statutory Claim in an amount sufficient

---

[7] The GUC Trust's argument that the June 1, 2009 8-K "downplays the Lock-Up Agreement" and focuses only on the settlement of the Nova Scotia Litigation (Rule 60(b) Motion, at 14) is belied by a cursory review of the securities filing.

for GM Nova Scotia to pay its debts; and (v) the possibility under certain circumstances that Old

GM's claims would be subordinated to the deficiency obligations. [8]  *Id.*

Time records for Committee Counsel indicate that they reviewed 8-Ks filed by Old GM.

Def. Ex. 301, at Bates Number 3948 and 3949.  Counsel for the Committee also testified that it

was a ***standard part of diligence*** for a Committee to review Form 8-Ks (Tr. 10/03/12 (Mayer) at

31:12-15) and that the June 1, 2009 8-K was "probably" reviewed (*id.* at 57:10-15).[9]  Mr.

Vanaskey also testified that (a) he reviewed public filings in June, 2009 (Tr. 11/27/12

(Vanaskey) at 42:23-43:4; 56:12-16; (b) he expected his counsel (both Gibson Dunne and

Kramer Levin) to have reviewed public filings (*id.* at 46:7-9); and (c) he ***actually*** reviewed the

June 1, 2009 8-K in June, 2009 (*id.* at 53:25-54:2; 97:25-98:10).[10]

### 4.    The Sellers' Disclosure Schedules to the MSPA Disclosed the Lock-Up Agreement and the Committee Reviewed It

The *Sellers' Disclosure Schedules* ("**Disclosure Schedules**") to the MSPA referenced the

Lock-Up Agreement ***not once but twice***.[11]  Def. Ex. 204.  ***First***, Schedule 4.6 provides that the

"Sellers have taken actions prior to the date hereof to effectuate the Nova Scotia Settlement (as

defined in Section 6.2 of this Sellers' Disclosure Schedule)."  *Id.* at CC005566.  ***Second***, Section

---

[8]    Articles written after the public filing of the June 1, 2009 8-K (such as in the commonly read "Debtwire" publication) establish that the press was aware of the Lock-Up Agreement and its significance.  *See* Pl. Ex. 614; Def. Ex. 189.  Counsel for the Committee certainly was tasked to monitor bankruptcy estate matters at least as closely as the press did.  The Notice of Meeting concerning the Extraordinary Resolution, which detailed many of the terms contained in the Lock-Up Agreement, was published in the Financial Times on June 3, 2009.  *See* Def. Ex. 193.  Committee Counsel testified that attorneys at his firm reviewed news reports and articles. Tr. 10/03/12 (Mayer) at 67:14-68:11.

[9]    Counsel for the Committee spent approximately 27 hours in June, 2009 reviewing SEC filings.  Tr. 10/03/12 (Mayer) at 36:12-16.

[10]   Mr. Vanaskey's admission that he read the June 1, 2009 8-K made perfect sense in light of his testimony that he had reviewed a Form 8-K that was dated June 3, 2009 -- two days after the June 1, 2009 8-K -- and that he had circulated a detailed notice describing the June 3 Form 8-K to Wilmington Trust's bondholder clients on June 8, 2009.  *See* Def. Ex. 440; Tr. 11/27/12 (Vanaskey) at 43:5-45:17.

[11]   The GUC Trust's statement that the Lock-Up Agreement should have been mentioned in multiple Disclosure Schedules (Rule 60(b) Motion, at 8) ignores the provision on the cover page of the Disclosure Schedules that states the same disclosure does not need to be repeated in multiple Schedules.  Def. Ex. 204, at CC005520.

6.2 of the Disclosure Schedules -- entitled "Conduct of Business" -- states that "Sellers may do all things necessary and appropriate in furtherance of consummation of the Nova Scotia Settlement." *Id.* at CC005655. Schedule 6.2 described Canadian Matters in general and the Nova Scotia settlement in particular to include: (i) the complete satisfaction of the Intercompany Loans in exchange for a cash payment; (ii) the meeting regarding the Extraordinary Resolution; (iii) the payment of an amount "in the form of a consent fee or otherwise" by GM Nova Scotia to all holders of the Notes as contemplated by the Lock-Up Agreement; (iv) the transfer of funds from Old GM to GM Canada, which funds will be used to pay the Consent Fee; (v) the subordination of the Swap Claims; and (vi) the agreement by Old GM not to set off the Swaps against any amount Old GM may owe GM Nova Scotia. *Id.* at CC005655-56.

Drafts of the Disclosure Schedules[12] were received by (i) Committee Counsel no later than June 5, 2009, and (ii) the financial advisor for the Committee[13] no later than June 10, 2009. Def. Ex. 204. Committee Counsel confirmed that the Disclosure Schedules were reviewed by his Firm. *See* Tr. 10/03/12 (Mayer) at 72:3-77:23.

### 5.    The Committee Was Aware of the Nova Scotia Litigation that Was Settled Under the Lock-Up Agreement

Committee Counsel was aware in June, 2009 that one of the Noteholders -- Aurelius Capital Partners LP ("**Aurelius**") -- was involved in the case as a "major litigation claimant," having made reference to Aurelius in its retention application.[14] Committee Counsel confirmed

---

[12]    The vast majority of the Disclosure Schedules contained lists of names or contracts. *See generally* Def. Ex. 204. Schedule 6.2, which described the Lock-Up Agreement, had more written text than any other Schedule. Schedule 6.2 was an important Schedule because of its subject matter. It listed those transactions that were "out of the ordinary course" which the Purchasers (*i.e.*, the Governments) were consenting to being performed by Old GM or the Purchased Subsidiaries prior to Closing.

Schedule 6.2 included not only "out of the ordinary course" transactions for Old GM, but also included out of the ordinary course transactions for non-Debtor **Purchased Subsidiaries**, such as GM Canada.

[13]    The financial adviser to the Committee, FTI, is now the monitor of the GUC Trust.

[14]    *See Retention Application of Kramer Levin*, June 17, 2009 [ECF No. 1744], Ex. A, Schedule 1 at p. 2.

that he was aware of the Nova Scotia Litigation and that Aurelius was a plaintiff.  Tr. 10/03/12

(Mayer) at 52:6-54:11; 112:17-23.  The Nova Scotia Litigation was settled as part of the Lock-

Up Agreement.[15]

### 6.    The Committee's Negotiation of the MSPA Indicates That It Knew the Swaps Were Being Assigned to New GM

The MSPA expressly provided that intercompany obligations owed to Old GM by a

subsidiary were being acquired by New GM, while intercompany obligations owed by Old GM

to an Excluded Subsidiary were not being assumed by New GM.  Def. Ex. 226 (MSPA), at §§

2.2(a)(iv), 2.3(a)(iii), 2.3(b)(ii).    The term "Excluded Subsidiary" encompassed only four

entities; one of them was GM Nova Scotia.  Def. Ex. 204, at CC005530.  Old GM had a claim

against GM Nova Scotia (the Swaps, which was disclosed in the Form S-4 and the Disclosure

Schedules) that was being acquired by New GM under the MSPA, and conversely Old GM had a

liability owed by it to GM Nova Scotia (the Statutory Claim, which was disclosed in the Form S-

4 and the June 1, 2009 Form 8-K) that was not being assumed by New GM under the MSPA.

At a June 14, 2009 meeting attended by Old GM, the Committee and the Governments,

after disclosures had been made and reviewed by the Committee relating to the Swaps and the

Statutory Claim, the Committee asked to have these provisions modified so that there would be

reciprocity: that being, if New GM purchased the asset owed to Old GM by the Excluded

Subsidiary, it would assume the liability owed by Old GM to that Excluded Subsidiary.  Tr.

10/03/12 (Mayer) at 158:19-161:10; Def. Ex. 430.  The Governments and Old GM turned down

the Committee's request, and the Committee acquiesced.  Def. Ex. 430.  At trial, the only

---

[15]    It seems obvious that, in order to assess whether the conflict mandated special counsel, the status of the litigation needed to be reviewed, at which point, the fact that the litigation was settled by the Lock-Up Agreement would have been confirmed.

example provided in which the "lack of reciprocity" would have mattered to the Committee

related to GM Nova Scotia and the Swaps.  Tr. 10/03/12 (Mayer) at 158:19-161:10.

7.    **The First Amendment to the DIP Facility Disclosed the
Lock-Up Agreement, and the Committee Reviewed It**

The First Amendment to the DIP Facility, dated June 25, 2009, filed with the Court prior

to the Sale Order, specifically referenced the Lock-Up Agreement.   In particular, the First

Amendment described the requirement contained in Section 6(b) of the Lock-Up Agreement that

GM Nova Scotia consent to an order under the Bankruptcy and Insolvency Act (Canada).  Def.

Ex. 213, at DEF0664.   Committee Counsel participated in negotiations related to the DIP

amendment. Tr. 10/03/12 (Mayer) at 85:21-92:14. At a June 25, 2009 hearing related to the DIP,

counsel for the Committee stated:

> We need to negotiate an amendment to the DIP credit facility to make it
> appropriate for a wind down.  Right now, there are a number of covenants and
> events of default that are a little stricter than what we would like to see on a
> going forward basis.  And it's our understanding that the parties intend to do this
> prior to closing of the sale.

Transcript of Final DIP Hearing, held on June 25, 2009 [ECF No. 2595], at 25:14 - 25:20

(statements by Amy Caton, Esq., counsel for the Committee).

Significantly, the Committee looked at "loosening up" some of the default clauses, and

the reference to the Lock-Up Agreement in the First Amendment was in the default clause

section.  Def. Ex. 213, at DEF0664.  The text of the First Amendment was only three pages, and

there were only two amendments to the default clause -- one of them referenced the Lock-Up

Agreement.  Mr. Vanaskey expected his counsel and financial advisor to review DIP finance

documents (Tr. 11/27/12 (Vanaskey) at 58:19-59:11), and it was his practice to read documents

relating to DIP financing, including amendments (*id.* at 58:16-18, 59:2-4).

8.    **The July 29, 2009 Phone Conversation Between Aurelius
and Committee Counsel Reveals that the Committee Knew
About the Lock-Up Agreement Before the 363 Sale Closed**[16]

Committee Counsel testified that he had communications with a principal of Aurelius (Dan Gropper) on July 29, 2009 regarding GM Nova Scotia, the Notes and the settlement reached between Old GM and the Noteholders. Tr. 10/03/12 (Mayer) at 108:20-114:1. Specifically, Mr. Mayer acknowledged that (i) he knew about the Notes at the time of his communications with Aurelius (*id.* at 112:7-16) and, in fact, he was aware of them in June, 2009 (*id.* at 24:4-6); (ii) he knew the Notes were against a ULC (*id.*, at 112:4-16) and he was familiar with that structure since he previously had represented parties in another case asserting a similar position to that of the Noteholders (*id.* at 11:11-13:14); (iii) he was aware that Aurelius held some of those Notes, and he "knew that Aurelius was a plaintiff in an action for oppression" (*id.* at 111:18-22; 112:17-22); (iv) he knew enough to say that the Old GM bankruptcy presented a better circumstance for the Noteholders to collect (directly and indirectly) on two claims than the *Smurfit Stone* situation (*id.* at 113:4-6; 113:20-25); and (v) Mr. Gropper "mentioned that there had been a settlement with the Noteholders and Old GM " and that he "bragged" about the "good deal" he received (*id.* at 113:7-15; 152:4-12). Mr. Gropper testified that it was actually Mr. Mayer who said that the Noteholders got "too good a deal" in the GM case (Tr. 9/28/12 (Gropper) at 95:16-96:6); and Mr. Mayer ***was aware of the terms of the Lock-Up Agreement*** (*id.* at 96:7-9).

---

[16]    This conversation took place after the 363 Sale closed on July 10, 2009. There was no new disclosure of the Lock-Up Agreement during the 19-day interval between July 10, 2009 and July 29, 2009. Accordingly, Mr. Mayer's knowledge of the Lock-Up Agreement terms must have been derived from the pre-363 Sale closing disclosures of the Lock-Up Agreement referenced herein.

9.      **The August 7, 2009 8-K Disclosed the Lock-Up
        Agreement and the Committee Reviewed It**

On August 7, 2009, New GM filed with the SEC a Form 8-K ("**August 7, 2009 8-K**")

which included as an exhibit the entire Lock-Up Agreement.   Def. Ex. 234.   Counsel for the

Committee testified that the August 7, 2009 8-K was reviewed in August, 2009, and it was an

important document to the Committee since it was "material to the market value of our equity

securities."   Tr.  10/03/12 (Mayer) at 113:5-117:12.    Moreover, Vanaskey testified that the

August 7, 2009 8-K was the type of document that he expected his counsel and financial adviser

to review.  Tr. 11/27/12 (Vanaskey) at 66:5-67:23.[17]

10.     **The Interim Report, Dated August 11, 2009, Disclosed
        the Lock-Up Agreement and the Committee Reviewed It**

On August 11, 2009, the Debtors filed with the Court a *Notice of Interim Report*

("**Interim Report**") which specifically referenced the Lock-Up Agreement, the Guarantee

Claims and the Statutory Claim.   *See* Def. Ex. 235 (Interim Report, Exhibit "A," ¶ 10(a) (iii) and

(iv) (pp. 7-8)).   Counsel for the Committee was "sure" he reviewed the Interim Report when it

was filed, and recalled having conversations with Old GM's counsel about it because the

Committee "had questions regarding its content . . . ."   Tr. 10/03/12 (Mayer) at 117:19-121:15.

The Interim Report erroneously stated that the Guarantee Claims and the Statutory Claim were

allowed.  Def. Ex. 235, at DEF1417.  If true, this would have constituted the allowance of over

$2 billion in claims against Old GM.  The Committee never raised any issue with respect to this

---

[17]   Documents filed after the Sale Order have relevance to the extent that the Committee falsely claims not to have
       known about the Lock-Up Agreement until October 2009.  Rule 60(b) Motion, at 16.  It simply is not credible
       for Committee Counsel and the representative from the Chair of the Committee to continue to claim that they
       did not know about the Lock-Up Agreement and Swaps prior to October 2009, given the number of documents
       that reference the Lock-Up Agreement and Swaps that were publicly filed or provided directly to the Committee
       months prior to October 2009.

       Documents filed after the Sale Order are also relevant to debunk any notion that Old GM and Weil Gotshal
       "concealed" the Lock-Up Agreement.  Moreover, they are relevant to demonstrate that the GUC Trust's
       requested Rule 60(b) relief is untimely.

aspect of the Interim Report. Mr. Vanaskey testified that he expected his counsel and financial

adviser to have reviewed the Interim Report. Tr. 11/27/12 (Vanaskey) at 64:6-22.

**B.** **The Committee Supported the 363 Sale and Consented**
   **to the Assumption and Assignment Procedures**

Procedures respecting the assumption and assignment of executory contracts

("**Assumption and Assignment Procedures**") were approved by a June 2, 2009 Order of the

Court [ECF No. 274] ("**Sale Procedures Order**"), and reaffirmed, as modified, in the Sale

Order. Def. Ex. 226. The Debtors had over 400,000 contracts that were subject to the

Assumption and Assignment Procedures, and providing notice of the decision to assume and

assign a specific contract was not feasible. First Day Hearings Tr., at 93:20 -96:14. As the Court

noted at the First Day Hearing:

> [i]n a case of this type, there's so much on the line we have to keep our eye on the
> ball, which is, saving the business, saving as many jobs as we can, saving as many
> suppliers as we can, saving as many dealers as we can. And though I'm sensitive
> to people's individual needs and concerns, we have to strike a fair balance
> between fairness and procedural due process, and not driving the debtor nuts, and
> not imposing requirements that are going to take money out of the pockets of
> creditors.

*Id.* at 96:17-25.

The Committee supported the Sale Order, which found that the Assumption and

Assignment Procedures were fair and reasonable. Sale Order, ¶ GG. These procedures

recognized that the Committee would not receive notice when an Executory Contract was

assumed and assigned to New GM, and did not grant the Committee access to the contract

database so that it could review which contracts were assumed and assigned to New GM. *See*

Sale Procedures Order, ¶ 10; *see also* Tr. 8/10/12 (Buonomo) at 48:7-49:1. At trial, counsel for

the Committee confirmed the Committee's lack of participation on this issue (Tr. 10/03/12

(Mayer) at 107:9-108:4), stating that (a) the Committee did not have an interest in knowing

which contracts were to be assumed and assigned (*id.* at 106:17-107:18); (b) the notice was for the benefit of the counterparty to the contract, not the Committee (*id.* at 108:5-7); and (c) the Committee did not have standing to contest an assignment of any contract (*id.* at 108:8-13).

**C.      The Committee Purposefully Paid Little Attention to GM Canada**

The Committee knew that the GM Canadian operations were sold to New GM, and that this was accomplished through a stock sale of GM Canada.  Tr. 10/03/12 (Mayer) at 22:12-18. The Committee also knew that GM Canada was a significant part of GM's North American manufacturing operations (*id.* at 22:12-24:3), that GM Canada had not filed for bankruptcy (*id.* at 23:14-21), and that the Canadian Governments were DIP lenders and Purchasers, and had agreed to contribute in excess of $9 billion to Old GM and the 363 Sale, in order to maintain the going concern value of GM Canada (*id.* at 17:15-20; 86:3-10; Sale Approval Decision, at 1).  The Committee, having reviewed the DIP Facility, knew that the $33 billion DIP Facility could be used to support GM Canada's operations, and having reviewed the Cash Management Order, knew that Old GM likely had made intercompany loans to GM Canada prior to Old GM's bankruptcy and would continue to do make such loans during Old GM's bankruptcy.

Debtors' counsel confirmed that Old GM had no record of any inquiry by the Committee regarding GM Canada.  *See* Deposition of Joseph Smolinsky, dated May 24, 2012 ("**Smolinsky Dep.**"), at 40:7-16.  The Committee chose not to focus on GM Canada because it understood that New GM was acquiring GM Canada, and that it did not directly impact the limited and well-defined unsecured creditor recovery.  The Committee's view was that issues pertaining to Canada were not a ***material*** part of the Old GM bankruptcy case. Tr. 10/03/12 (Mayer) 23:11-13.

**D.      The Committee's Knowledge About the MSPA**

Having reviewed the MSPA, the Committee knew that:  (a) except for Wind-Down cash, all other cash was transferred to New GM; (b) Intercompany Obligations owed by GM Canada to

17

Old GM (whether they were based on pre or postpetition transfers by Old GM to GM Canada)

were sold to New GM; (c) Intercompany Avoiding Power Claims based on transfers from Old

GM to GM Canada (whether such transfers were based on pre or postpetition transfers by Old

GM) were sold to New GM; (d) all contracts (whether or not they were covered by Section 365

of the Bankruptcy Code) were transferred to New GM, if New GM selected them for assumption

and assignment; (e) all of Old GM's assets that were not specifically designated as Excluded

Assets were Purchased Assets under the MSPA; (f) New GM would pay the bankruptcy estate a

variable consideration for the Purchased Assets (up to 2% of additional equity in New GM) if

allowed unsecured claims against Old GM exceeded $35 billion; and (g) New GM would have

an indemnity claim, entitled to an administrative expense priority against the bankruptcy estate,

if it did not retain ownership of the Purchased Assets (*i.e.*, the Three New GM Assets) (Def. Ex.

226 (MSPA § 9.1 and Sale Order, ¶ 54)).[18]

## **ARGUMENT**

## **POINT I**

### **THE GUC TRUST IS NOT ENTITLED TO RELIEF BASED ON RULE 60(b)**

This section will first set forth the applicable law under Rule 60(b) and show why the

GUC Trust failed to meet its high burden based on the evidence adduced at trial.  Then, it will

demonstrate that the GUC Trust grossly overstated the impact of the Three New GM Assets on

the bankruptcy estate, and understated the numerous disclosures made of the Three New GM

Assets.  Thereafter, it will show the severe prejudice to New GM that compels the denial of Rule

60(b) relief relating to the Sale Order.

---

[18]    The fact that New GM would have an administrative priority damage claim for being stripped of the Three New GM Assets negates any benefit to seeking Rule 60(b) relief for such assets.

A.    **The GUC Trust Cannot Satisfy Its Heavy Burden Under Rule 60(b)**

Rule 60(b) provides for "extraordinary judicial relief". It may only be granted in the "most exceptional of circumstances" or "extreme and undue hardship." *In re Old Carco LLC*, 423 B.R. 40, 45 (Bankr. S.D.N.Y. 2010), *aff'd*, No. 2010 WL 3566908 (S.D.N.Y. Sept. 14, 2010), *aff'd, Mauro Motors Inc. v. Old Carco LLC*, 420 Fed. App'x 89 (2d Cir. 2011).

The GUC Trust bears the burden of demonstrating that (i) the supporting evidence is "highly convincing;" (ii) there is good cause for its failure to act sooner; and (iii) granting Rule 60(b) relief will not impose undue hardship on other parties. *Id.* "(F)inal judgments should not 'be lightly reopened.' . . . The Rule may not be used as a substitute for a timely appeal." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986) (citations omitted). Moreover, "[w]here the parties have submitted to an agreed-upon disposition rather than seeking a resolution on the merits, the burden to obtain Rule 60(b) relief is heavier than if one party proceed(ed) to trial, lost, and failed to appeal." *Vasquez v. Carey*, No. 03 Civ. 3905 (RJH), 2010 WL 1140850, at *6 (S.D.N.Y. Mar. 24, 2010). Here, the Committee withdrew its objection to the Sale Motion and supported the Sale Order. It has an extremely heavy burden to undo provisions of an order it actively supported.

In addition, given that the GUC Trust is seeking to upset a sale order, its burden is even greater. As stated by Judge Peck in *In re Lehman Brothers Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011), *aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012):

> This tension relating to finality naturally exists to some extent in every motion under Rule 60(b) but the Court views final sale orders as falling within a select category of court orders that may be worthy of greater protection from being upset by later motion practice. Sale orders ordinarily should not be disturbed or subjected to challenges under Rule 60(b) unless there are truly special circumstances that warrant judicial intervention and the granting of relief from the binding effect of such orders.

*Lehman*, 445 B.R. at 149-50.  In *Lehman*, it was proven that significant information was omitted from the record of the sale hearing; facts that the Court "in a more perfect hearing" would have liked to have known.  *Id.* at 150.  However, Judge Peck found that, "[d]espite what in retrospect appears to be a glaring problem of flawed disclosure," the movants had not carried their burden in establishing a right to relief from the Sale Order under Rule 60(b).  *Id.*  As shown below, the same result applies here.

**B.    The GUC Trust Failed to Satisfy Rule 60(b)(1) -- Excusable Neglect**

To satisfy Rule 60(b)(1), the movant must (i) provide highly convincing evidence, (ii) show good cause for not acting sooner, and (iii) demonstrate no prejudice to the non-moving party.  *Williams v. New York City Dep't of Corr*, 219 F.R.D. 78, 84 (S.D.N.Y. 2003).  A party's deliberate or willful conduct will never justify Rule 60(b)(1) relief.  *See* 12 *Moore's Federal Practice*, § 60.41[1][c] (Matthew Bender 3d Ed. 2012; *see also Nemaizer*, 793 F.2d at 62 ("Mere dissatisfaction in hindsight with choices deliberately made by counsel is not grounds for finding the mistake, inadvertence, surprise or excusable neglect necessary to justify Rule 60(b)(1) relief."); *Katz v. Mogus*, No. 07 Civ. 8314 (PKC)(KNF), 2012 WL 263462, at *3 (S.D.N.Y. Jan. 25, 2012).  Factors considered in assessing "excusable neglect" include (a) prejudice to the non-moving party, (b) length of and reason for the delay in seeking such relief, and (c) whether the movant acted in good faith.  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 395 (1993).

Here, the GUC Trust utterly failed to meet its burden with respect to Rule 60(b)(1) -- there was no "excusable neglect."  For example:  (a) the GUC Trust purposefully waited years to ask for an adjudication of Rule 60(b) relief; (b) approximately four years has transpired since the Sale Order; (c) New GM would suffer great prejudice if the Sale Order was modified; (d) the Committee acknowledged it made a deliberate choice not to focus on anything related to GM

Canada (Tr. 10/03/12 (Mayer) at 22:22-23:13); (e) the GUC Trust's reason to seek Rule 60(b) relief is for the improper purpose of compelling a now restructured GM Canada to pay a second time for the already released Intercompany Loans; and (f) there is an absence of highly convincing evidence to justify setting aside the Sale Order with respect to the Three New GM Assets, especially in light of the disclosures which the Committee actually received and reviewed.  To the extent the GUC Trust is asserting that the Committee was too busy to focus on GM Canada and/or the Three New GM Assets during the first month of this case, such argument is meritless.  *See Thorpe v. Luisi*, No 00 Civ. 3144, 2005 WL 1863671, at *2 (S.D.N.Y. Aug. 4, 2005) (quoting *U.S. v. Cirami*, 535 F.2d 736, 739 (2d Cir. 1976) (the "Second Circuit . . . regularly refuses to vacate judgments pursuant to Rule 60(b)(1) due to an attorney's 'inability to effectively manage his caseload,' whether for personal or professional reasons"); *see also Alvarado v. Manhattan Worker Career Ctr.*, No. 01 Civ. 9288, 2003 WL 22462032, at *2 (S.D.N.Y. Oct. 30, 2003).

**C.    <u>The GUC Trust Failed to Satisfy Rule 60(b)(2) -- Newly Discovered Evidence</u>**

Rule 60(b)(2) establishes an "onerous standard."  *Commer v. McEntee*, No. 00 Civ. 7913 (RWS), 2005 WL 1250214, at *2 (S.D.N.Y. May 27, 2005).  The movant must show (a) newly discovered evidence is of facts existing at the time of the decision, (b) the moving party is excusably ignorant of the facts despite using due diligence to learn about them, (c) newly discovered evidence would change the outcome of the former ruling, and (d) the newly discovered evidence is not cumulative of evidence already offered.  *Dux v. Megasol Cosmetic GMBH*, 03-CV-8820 (RO), 2006 WL 870462 (S.D.N.Y. Apr. 3, 2006).  If evidence was "in the possession of the party before the judgment [or order] was rendered it is not newly discovered and does not entitle the party to relief."  *Kurzweil v. Philip Morris Cos., Inc.*, No. 94 Civ. 2373,

21

1997 WL 167043, at *4 (S.D.N.Y. April 9, 1997); *see also Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*, 609 F.3d 122, 131 (2d Cir. 2010).

Here, the Committee was in possession of all of the evidence needed to ascertain the import of the Three New GM Assets prior to the Sale Hearing.  Of significance, the Committee actually reviewed the disclosures and admitted that if it had knowledge of the Lock-Up Agreement (which it did), it would not have objected to the Sale Order.  Tr. 10/03/12 (Mayer) at 61:6-61:18.

## D.    The GUC Trust Failed To Satisfy Rule 60(b)(3) -- Misconduct

Rule 60(b)(3) is unavailable[19] because the alleged "lack of disclosure" complained of does not rise to the level of "misconduct" that would implicate Rule 60(b)(3).  "To be entitled to relief under Rule 60(b)(3), the movant must show misconduct by clear and convincing evidence and that the misconduct substantially interfered with the movant's ability to present the case fully and fairly."  *Scherer v. City of New York*, Nos. 03 Civ. 8445(RWS), 04 Civ. 2713(RWS), 2007 WL 2710100, *6 (S.D.N.Y. September 07, 2007).   In *S.E.C. v. Wojeski*, 752 F.Supp.2d 220 (N.D.N.Y. 2010), *aff'd, Smith v. S.E.C.*, 432 Fed. App'x 10 (2d Cir. 2011) -- a case cited by the GUC Trust -- the SEC was entitled to reconsideration pursuant to Rule 60(b)(3) of an order denying its request for a preliminary injunction freezing assets because the defendants had failed to disclose the existence of an annuity agreement called for in the SEC's discovery requests, and defendants' statements regarding same were not truthful.  *Id.* at 231 n. 17.

---

[19]    New GM believes that the Court dismissed this claim as part of its summary judgment ruling.  *See* Transcript of Summary Judgment Hearing, July 19, 2012 ("**SJ Hearing Transcript**") [ECF No. 146], at 91:22 - 92:4 ("Based on the record so far issues of fact would exist with respect to whether the GUC Trust could establish an entitlement to 60(b) relief on three of the four Rule 60(b) subsections upon which the GUC Trust relies.  I've seen no evidence to support the fourth.  Fraud in procuring the sale order, especially since I consider fraud to require scienter as contrasted to mere non-disclosure.").

This case is not even close to that situation.  Here, there was no intentional act to deceive.

Decisions relating to disclosure were made with the active participation of Weil Gotshal.  Tr.

8/08/12 (Zirinsky) at 30:7-31:1.  The Three New GM Assets were voluntarily disclosed by Old

GM and Weil Gotshal in numerous public filings prior to the Sale Order, and no party ever made

any untruthful statements regarding the Three New GM Assets.[20]  The Committee decided not to

focus on GM Canada.  It cannot transform that decision into affirmative "misconduct" on the

part of others.

**E.      The GUC Trust Failed to Satisfy Rule 60(b)(6) -- Extraordinary Circumstances**

Clause (6) of Rule 60(b) provides that relief may be granted for "any other reason

justifying relief from the operation of the judgment."  This portion of the Rule is properly

invoked only when "there are extraordinary circumstances justifying relief [citation omitted],

when the judgment may work an extreme and undue hardship [citations omitted], and when the

asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule."  *Nemaizer*, 793 F.2d

at 63.  "The standard for granting such a motion is strict, and reconsideration will generally be

denied unless the moving party can point to controlling decisions or data that the court

overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion

reached by the court."  *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

---

[20]    The other cases cited by the GUC Trust are also factually distinguishable.  *See In re Olejnik*, No. 09-76714-AST, 2010 WL 4366183 (Bankr. E.D.N.Y. Oct. 28 2010) (unlike here, the debtor completely failed to disclose an interest in real property and misrepresented his assets); *Judith Ripka Creations, Inc. v. Rubinoff Imp., Inc.*, No. 03 Civ. 9377 (BSJ), 2004 WL 1609338 (S.D.N.Y. July 16, 2004) (defendants affirmatively misrepresented the amount of profits from the sale of jewelry and failed to produce documents in discovery that would have shown additional profits).

The GUC Trust referred to a December 2009 letter from Kramer Levin requesting, on a voluntary basis, certain information from New GM.  Rule 60(b) Motion, at 16.  Kramer Levin never followed up on its request and within 30 days withdrew from all matters relating to the Lock-Up Agreement based on a conflict of interest.  Substitute counsel at Butzel Long (now at Dickstein Shapiro) never followed up with New GM on this voluntary request.

Rule 60(b)(6) relief is mentioned generally in the Rule 60(b) Motion but never specifically with regard to any of the Three New GM Assets. The Rule 60(b)(6) argument is a rehash of the GUC Trust's argument (presumed to have been lost at trial) that the Lock-Up Agreement is void. In any event, it is a misguided argument in the Rule 60(b) context as it relates to the Sale Order, since the Sale Order never approved the Lock-Up Agreement *per se*. Moreover, the same meritless arguments made pursuant to Section (1), (2) and (3) of Rule 60(b) are repeated for this section, which is impermissible. Rule 60(b)(6) cannot be used as a basis to reargue failed arguments made under other sections of Rule 60(b). *See New York v. Green*, 420 F.3d 99, 108 n. 3 (2d Cir. 2005).

The single case highlighted by the GUC Trust in its Rule 60(b)(6) section -- *Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*, 666 F.2d 754 (2d Cir. 1981) -- is obviously distinguishable. There, the secured creditor made a motion for a certificate of indebtedness which the court never granted. Nevertheless, a proposed order was submitted that authorized the issuance of the certificate of indebtedness, and the court mistakenly signed the order. Two years later, the trustee sought to vacate that portion of the order that authorized the issuance of the certificate of indebtedness, and the court granted the request pursuant to Rule 60(b)(6).

Here, no relief was added to the Sale Order that was expressly discussed with and denied by the Court. To the contrary, (i) Old GM affirmatively sought approval of the Assumption and Assignment Procedures, with the consent and approval of the Committee; (ii) Old GM expressly sought to sell the Intercompany Avoiding Power Claims as part of the MSPA, and highlighted this in the Sale Motion as an "Extraordinary Provision;" and (iii) Old GM expressly sought to sell all assets of Old GM unless expressly excluded by the MSPA. This included the Swaps and

24

the ability to designate contracts for assumption and assignment. All of this relief was granted

by the Court with the full knowledge and consent of the Committee.

**F.      The Impact of the Three New GM Assets Is Overstated; Timely**
**Disclosures Relating to the Three New GM Assets Are Understated**

In its futile effort to obtain Rule 60(b) relief with respect to the Three New GM Assets,

the GUC Trust grossly exaggerates the impact of the Three New GM Assets on the bankruptcy

estate, and ignores the widespread disclosures made with respect to the Three New GM Assets.

**1.      Impact and Disclosures Relating to the**
**Assignment of the Lock-Up Agreement**

The GUC Trust seeks relief from the Sale Order with respect to the assignment of the

Lock-Up Agreement pursuant to Rule 60(b)(1) (excusable neglect), (b)(2) (newly discovered

evidence), (b)(3) (misconduct), and (b)(6) (extraordinary circumstances).

**a.      Lock-Up Agreement Assignment Impact:**  New GM acquired thousands

of contracts as part of the Assumption and Assignment Procedure.  The Committee agreed it

would be carved out of the assumption/assignment process, that it would have no standing to

object to any assignment, that it would not have any access to the Contract Database, and that it

would not get notice of any assignments.  The Committee's non-involvement in the

assumption/assignment process reflected the reality that, under the MSPA, New GM paid for the

right to acquire any contract it wanted. The Committee knew that New GM could designate any

contract for assignment. *See* Smolinsky Dep. at 247:4-20.

At the end of July 2009, when the Lock-Up Agreement was assigned to New GM, Old

GM had already received the primary benefit of the Lock-Up Agreement.  Specifically, the

Lock-Up Agreement settled the Intercompany Loans, thereby preserving the going concern value

of GM Canada (which was shared with the bankruptcy estate by virtue of its equity interest in

New GM).  In addition, the compromise of the Intercompany Loans eliminated the need for a

GM Canada bankruptcy filing which substantially reduced the execution risk for the 363 Sale.  In

contrast, at the time of the assignment of the Lock-Up Agreement, there was only one obligation

to be performed by Old GM thereunder -- the Cooperation Provision.  New GM wanted to make

sure that it was complied with so the Noteholders could not claim a breach of the Lock-Up

Agreement and thereby undermine the compromise of the Intercompany Loans.  The primary

consequence that occurred by the assignment of the Lock-Up Agreement was the shifting of the

Cooperation Provision from Old GM to New GM, thereby benefitting the bankruptcy estate by

relieving it of an obligation with no corresponding monetary benefit.

Significantly, neither the Lock-Up Agreement itself, nor its assignment to New GM, (a)

created any new claims for the Noteholders or GM Nova Scotia, (b) "allowed" any of their

claims in Old GM's bankruptcy proceeding, or (c) provided for the transfer of the Swaps.  The

underlying premise of the Rule 60(b) Motion is the unsupportable statement that the  Lock-Up

Agreement created a $2.6 billion obligation for the bankruptcy estate, and that it was damaged

by the assignment to New GM.  There is no evidence to support this false assertion, and

continuous repetition by the GUC Trust of the same meritless argument does not ultimately make

it valid.  Whether or not there was a Lock-Up Agreement, (a) the Noteholders would still have

their Guarantee Claims which date back to 2003, (b) the GM Nova Scotia Trustee would still

have the Statutory Claim which is based on GM Nova Scotia being a ULC, and (c) New GM

would still be making a claim under the Swaps, which it acquired under the MSPA.

> **b.**      **Lock-Up Agreement Disclosures**:  Counsel for the Committee knew, at

the time of the assignment of the Lock-Up Agreement to New GM (late July, 2009), that Old

GM had a Nova Scotia ULC subsidiary, he was aware of the Nova Scotia Litigation (which was

settled pursuant to the Lock-Up Agreement), and he was sufficiently aware of Old GM's

transaction with the Noteholders that he could tell Dan Gropper of Aurelius, who was allegedly "bragging" about the good deal he got in GM (Tr. 10/03/12 (Mayer) at 152:4-12), that Smurfit Stone's creditors did not deserve as good a deal as that received by the Noteholders. By comparing a different transaction with the GM Nova Scotia resolution, Committee Counsel confirmed Mr. Gropper's testimony that he knew the terms of the Lock-Up Agreement at this time.

As noted, Committee Counsel and Mr. Vanaskey both reviewed the June 1, 2009 8-K. Mr. Mayer testified that his Firm reviewed the Disclosure Schedules to the MSPA, which described the terms of the Lock-Up Agreement. He also admitted that his Firm reviewed the First Amendment to the DIP Facility which modified one of the default clauses therein by cross-referencing a provision in the Lock-Up Agreement. Clearly, in order to understand what was being modified by the DIP amendment, Committee Counsel had to have looked at the Lock-Up Agreement. Mr. Mayer also said that his Firm reviewed the June 1, 2009 transcript of the First Day Hearing where Weil Gotshal stated that deals had been made in the last 10 days at GM Canada such that it would not have to file for bankruptcy. Shortly before, in the context of the Bond Exchange Offer (reviewed by Committee Counsel), Old GM indicated that GM Canada may need to file for bankruptcy in order to impair the Intercompany Loans.

During the trial, Committee Counsel claimed that the disclosures were "spotty" and did not highlight the dramatic impact on the bankruptcy estate of the Lock-Up Agreement. There is no evidence that Old GM and Weil Gotshal ever refused to provide the Committee with any information requested, including the Lock-Up Agreement. Further, by the time Committee Counsel finished testifying, he had admitted that in June 2009, the documents received and reviewed by his Firm were anything but spotty. They revealed the essence of the Lock-Up

Agreement, including: (a) the existence of the Lock-Up Agreement, (b) the existence of the

Guarantee Claims and the separate Statutory Claim; (c) the payment of the Consent Fee from

funds provided by Old GM, (d) that the payment of the Consent Fee would not reduce the

principal of the Notes or the Statutory Claim, and (e) the existence of the Swaps and the potential

subordination of a distribution made by Old GM on account thereof under certain conditions.  Tr.

10/03/12 (Mayer) at 129:6-130:10.    In short, there was no "excusable neglect" or "newly

discovered evidence" that with reasonable diligence could not have been discovered, relating to

the Lock-Up Agreement.    And, there was no evidence presented to show that Old GM or Weil

Gotshal tried to hide the Lock-Up Agreement from the Committee.[21]

　　　　While the Committee acknowledged that it had no standing to challenge the assignment

of an executory contract, the GUC Trust nevertheless argues, without any legal or evidentiary

support, that the Committee should have received notice of the assignment of the Lock-Up

Agreement anyway because of the "consequences" of such assignment.  Rule 60(b) Motion, at

9.[22]  However, there was no detrimental consequence to the bankruptcy estate by the assignment,

and even if there were, that was the deal struck by the parties.  Assuming *arguendo* that there

was some ground to vacate a portion of the Sale Order that would result in the Lock-Up

Agreement being returned to Old GM, such relief would not benefit the GUC Trust's

constituency.    Old GM has dissolved; it is not in a position to comply with the one remaining

obligation -- the Cooperation Provision.  Even if it could, there would be no positive monetary

---

[21]    The GUC Trust's "concealment" argument is shameful, given the volume of undisputed disclosures and the absence of any evidence that Weil Gotshal let a client dictate what its ethical disclosure obligations to the Court should be.  It is hard to believe that the GUC Trust actually believes its concealment allegation given that it currently uses Weil Gotshal as its counsel on certain matters.

[22]    Since a large portion of the Executory Contracts was assumed and assigned after the Sale Order, the GUC Trust is essentially challenging the Assumption and Assignment Procedures, not the Sale Order *per se*.  Any modification to the Sale Order, and the assets purchased by New GM would potentially call into question the thousands of other contracts that Old GM assumed and assigned to New GM.

benefit for it to do so.  In reality, what the GUC Trust really wants to do is to reverse the assignment of the Lock-Up Agreement so that it can then ***breach*** the agreement.  That result does not mandate Rule 60(b) relief and, in any event, would not be beneficial to the GUC Trust's constituency.  It simply would create new claims against the bankruptcy estate.[23]

### 2.    Impact and Disclosures Relating to the Transfer of the Swaps

While the GUC Trust references the Swaps in passing in its arguments based on Rule 60(b)(1), (2), and (6), there is no real discussion of the application of these sections to the Swaps, except to say that the Swaps were not adequately disclosed to the Committee.  Although the GUC Trust references the Swaps in the heading to the section discussing Rule 60(b)(3), the Swaps are never mentioned in this section of the Rule 60(b) Motion.

#### a.    Swaps Impact:  The transfer of all assets of value to New GM and the

retention by Old GM of associated liabilities (unless specifically assumed by New GM) was an intended and disclosed consequence of the MSPA.  Old GM was selling its assets to New GM pursuant to Section 363(f) of the Bankruptcy Code.  Under that provision, assets are typically transferred to the purchaser, and liabilities are left behind for the seller.

The agreed-upon structure of the 363 Sale was for Old GM to receive a variable consideration depending on the allowed amount of claims against the bankruptcy estate.  JSF, ¶ 74.  The fact that the Swaps liability, when added to the other allowed claims, is less than the $35 billion threshold which determined the variability of the consideration to be paid by New GM, was the deal that was made and approved by the Committee.  Stated differently, the increase in the Statutory Claim caused by the sale of the Swaps to New GM was a shared risk for New GM

---

[23]  New GM timely filed an administrative expense claim that would encompass any damages incurred by it if the GUC Trust's Rule 60(b) request is granted.  To date, the GUC Trust objected to the administrative expense claim on "timeliness grounds" only.  The matter is fully briefed and oral argument has been adjourned to closing argument on the Nova Scotia Trial.

in the event that the Statutory Claim pushed the overall allowed claims against the bankruptcy estate over $35 billion. What the GUC Trust is complaining about is no different than a 363 sale wherein the purchaser acquires leases for a fixed consideration, and the seller pays the cure amount associated with the assignment of the leases. In both situations, the purchaser acquired an asset of value, and the cost associated with the assignment is paid by the seller from the sale consideration.[24]

      **b.**     <u>**Swaps Disclosures:**</u> New GM bought all assets of value from Old GM. If an asset did not fall within any category of Excluded Assets, it was, by definition, a Purchased Asset. Def. Ex. 226 (MSPA), §§ 2.2(a), 2.2(b). Specificity was required only in respect of Excluded Assets -- what was being left behind for Old GM. No other disclosures as to any specific asset purchased by New GM (whether it be the Swaps or something else) was required.

Mr. Mayer testified that his Firm reviewed documents in June, 2009 that disclosed the Swaps. Tr. 10/03/12 (Mayer) at 129:6-130:10. The Form S-4, which was reviewed by the Committee, described the amount owed by GM Nova Scotia to Old GM under the Swaps. Def. Ex. 75. The Disclosure Schedules reviewed by the Committee referenced the Swaps. Def. Ex. 204. There is no "newly discovered evidence" by the Committee relating to the Swaps. Moreover, the Committee knew about the issue it now is complaining about and conceded that there would be no reciprocity (JSF, ¶ 92); assets were purchased by New GM from Excluded Subsidiaries (Swaps) and liabilities owed to the Excluded Subsidiaries by Old GM (Statutory Claim) were not assumed by New GM. *See* Def. Ex. 430. All of the facts relevant to the Swaps were available to the Committee prior to the Sale Order. Even if the Committee simply

---

[24] New GM's retention of the Swap claims was added protection in the event the GM Nova Scotia Trustee ever asserted a claim against it. New GM is not aware of any such claim, but acquiring the Swaps gave it an offset right, if the need arose.

misunderstood the implications of the Sale Order as it relates to the Swaps, which is not the case, that misunderstanding cannot form the basis for Rule 60(b) relief. *See Nemaizer*, 793 F.2d at 62.

### 3.    Impact and Disclosures Relating to Intercompany Avoiding Power Claims

Although the GUC Trust seeks relief from the Sale Order with respect to the sale of the Intercompany Avoiding Power Claims, it never sets forth a basis for such relief. The discussions surrounding the application of Rule 60(b)(1), (2), (3)[25] and (6) in the Rule 60(b) Motion never identify the transfer of Intercompany Avoiding Power Claims, or why Rule 60(b) relief is warranted. As noted by the Second Circuit in *Nemaizer,* the failure to "evaluate carefully the legal consequences of a chosen course of action provides no basis for relief from a judgment." 793 F.2d at 62.

### a.    Intercompany Avoiding Power Claims Impact: Under the MSPA, New

GM purchased Intercompany Obligations as well as Intercompany Avoiding Power Claims. While the Rule 60(b) Motion is focused on only Intercompany Avoiding Power Claims, Intercompany Obligations and Intercompany Avoiding Power Claims are "two sides of the same coin"; they both include transfers made by Old GM to Purchased Subsidiaries. New GM acquired both categories of assets under the MSPA for essentially the same reason -- under the 363 Sale, New GM was buying the GM corporate structure; the Purchased Subsidiaries were being acquired as stock acquisitions (not asset purchases). JSF, ¶ 73. New GM wanted to preserve corporate continuity; it did not want any action taken by the bankruptcy estate after the 363 Sale to disturb earlier transfers made or obligations incurred among Old GM and the Purchased Subsidiaries.

---

[25]    The GUC Trust did not seek Rule 60(b) relief with respect to the Intercompany Avoiding Power Claims in the Original Claims Objection. The first time the GUC Trust sought such relief was in the Amended Claims Objection, filed in November, 2010 -- 16 months after the entry of the Sale Order. Relief pursuant to Rule 60(b)(1), (2) or (3) must be requested within one year of the entry of the order. To the extent the GUC Trust is seeking relief pursuant to any of these subsections, such request is untimely.

The Committee knew that the bankruptcy estate had no interest in this type of asset. Aside from the Term Loan Avoidance Action, the Committee did not have an interest in Avoiding Power Claims. This asset would have been transferred to the DIP Lenders -- not the unsecured creditors -- assuming the asset was not transferred to New GM under the MSPA. In New GM's main post-trial brief, it explained why its purchase of Intercompany Avoiding Power Claims prevented the GUC Trust from using those claims defensively. For the same reasons, even if New GM did not purchase Intercompany Avoiding Power Claims, the Avoiding Power Claims belonged to the DIP Lenders -- not the bankruptcy estate. The same rationale applies to the inability of the GUC Trust to defensively use claims belonging to the DIP Lenders. Thus, there is no benefit for the GUC Trust in seeking such relief.

       **b.**     **Intercompany Avoiding Power Claims Disclosures:** The Sale Motion disclosed as an "extraordinary provision" that Intercompany Avoiding Power Claims were being sold. Mr. Mayer testified he was aware of this provision. Tr. 10/03/12 (Mayer) at 17:23-18:4; 95:20-96:5. The Committee also would have known, by the Cash Management Motion and the DIP Facility, that Old GM had made prior to its bankruptcy filing, and could make after its bankruptcy filing, transfers to GM Canada. JSF, ¶¶ 75-79.

**G.**    **Granting Rule 60(b) Relief at This Juncture Would Impose an Undue Hardship on New GM; the Equitable Mootness Doctrine Applies**

Application of Rule 60(b) relief at this juncture would impose a severe undue hardship on New GM. Specifically, New GM and the Governments relied on the release of GM Canada referenced in the Lock-Up Agreement and the enhanced value of GM Canada (free of the Intercompany Loans) when it purchased substantially all of the assets from Old GM as a stock purchase (as compared to an asset purchase). The testimony was clear that if there was no

release of the Intercompany Loans by June 1, 2009, GM Canada would have filed for bankruptcy

to accomplish the transfer of GM Canada's assets to New GM.  JSF, ¶¶ 23, 24, 26.

The Canadian Governments (one of New GM's major shareholders) contributed over $9

billion to Old GM for the benefit of GM Canada after June 1, 2009, based on the Intercompany

Loans being released.   The majority of the $9 billion was contributed by the Canadian

Governments after the Extraordinary Resolution was passed.  Sale Approval Decision 14 n. 10.

The Governments -- as the sponsor of the 363 Sale purchaser -- were prepared to invest in Old

GM's business, not because of the economics of the transaction, "but rather to address the

underlying societal interests in preserving jobs in the North American auto industry, the

thousands of suppliers to that industry, and the health of the communities, in the U.S. and

Canada, in which GM operates."  *Id.* at 15.  Despite Old GM's assets having a liquidation value

of between $6 and $10 billion (*id.* at 15), the Governments agreed to provide consideration ***five***

***times*** that much in order to save the North American auto industry (*id.* at 18).  Only by the

Governments doing so were the unsecured creditors able to obtain a distribution in this case; it is

undisputed that absent the Governments-sponsored purchase by New GM, Old GM would have

liquidated leaving unsecured creditors with nothing.  *Id.* at 5.  To allow the unsecured creditors

to keep the consideration paid, and change the terms of the 363 Sale retroactively in an adverse

manner for New GM, is unjust and highly prejudicial to New GM, thus mandating the denial of

the Rule 60(b) Motion.

GM Canada implemented numerous other restructuring measures (including resolution of

issues with its dealers and unionized work force) premised upon GM Canada not filing for

bankruptcy.  JSF, ¶¶ 23-24.  New GM has relied on this circumstance for almost four years.  To

grant the relief requested by the Committee now has the potential of negatively affecting the

33

value of GM Canada, which, in turn would unjustly deprive New GM of the benefit of the

bargain struck with Old GM. *See In re Teligent*, 326 B.R. 219, 228 (S.D.N.Y. 2005) (Rule 60(b)

relief should not be granted and the court should not vacate an order where intervening rights

have vested in reliance on that order); *see also Parker*, 430 B.R. at 82 (request to modify Sale

Order would "'knock the props out' from under the transactions that have occurred since the sale

[of assets from Old GM to New GM] was consummated").

More than two years ago, the District Court dismissed appeals of the Sale Order as being

equitably moot. Now, two years after the District Court decisions, there is even a greater basis

for equitable mootness, and the GUC Trust's attempt to vacate the Sale Order should suffer the

same fate. *See Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619, 624

(D.P.R. 1999) (affirming denial of motion to vacate sale order under Rule 60(b) where "the

general doctrine of equitable mootness bars [] consideration of the relief requested" and "[t]o

vacate said sale at this juncture would run counter to the essential principal of finality that is

particularly important in the bankruptcy context").

## POINT II

## <u>THE GUC TRUST'S RULE 60(b) REQUEST IS UNTIMELY</u>

Pursuant to Rule 60(c)(1): "[a] motion under Rule 60(b) must be made within a

reasonable time -- and for reasons (1), (2), and (3) no more than a year after the entry of the

judgment or order or the date of the proceeding." The GUC Trust did not file a motion within

one year, nor did it do so in a reasonable time after the entry of the Sale Order and, thus, the Rule

60(b) Motion is untimely and must be denied. In any event, the GUC Trust never diligently

pursued Rule 60(b) relief and, for this independent reason, the Rule 60(b) Motion must fail.

On July 2, 2010 -- three days before the one-year anniversary of the entry of the Sale

Order -- the Committee filed with this Court the so-called original Claims Objection ("**<u>Original</u>**

**Claims Objection**"), which was over 20 pages long and contained 72 paragraphs.  Buried at the end of the Original Claims Objection (paragraph 70) was the following assertion:  "Finally, for the reasons already set forth above in paragraphs 48 to 50, the Committee requests an order voiding the Assumption Order [Sale Order] under Rule 60(b) of the Federal Rules of Civil Procedure and Rule 9024 of the Federal Rules of Bankruptcy Procedure, but only to the extent that the Assumption Order (Sale Order) authorized the Debtors to assume and/or assign the Lock-Up Agreement and any other obligations incident thereto, including those concerning the Swap Transactions."  No subsections of Rule 60(b) were set forth, and the Committee did not otherwise explain the basis for its requested relief.  Old GM, through its counsel, Weil Gotshal, the party who obtained the Sale Order, did not make an appearance on this issue, presumably because it did not believe any Rule 60(b) request was actually made.

Thereafter, on November 19, 2010 (over 16 months after the Sale Order), the Committee filed the so-called "Amended Claims Objection," which was 24 pages long and contained 75 paragraphs.  Buried in paragraph 73 was essentially the same language used in paragraph 70 of the Original Claims Objection, plus the following sentence:  "This request for relief is asserted protectively, in anticipation of the need to respond to the Noteholders' argument that the purported assumption of the Lock-Up Agreement by Old GM, or the transfer of the swap claim to New GM, or the transfer of certain avoidance actions to New GM bars any challenge to the Claims."  Again, no subsections of Rule 60(b) were set forth, and the Committee did not otherwise explain the basis for, what it then termed "protective" relief.  Moreover, the Amended Claims Objection, *for the first time*, sought Rule 60(b) relief in connection with the transfer of "certain avoidance actions," which were never identified.  Again, Old GM and Weil Gotshal did

not make an appearance presumably because they still did not think a Rule 60(b) request was actually made.

Until the GUC Trust filed its Rule 60(b) Motion,[26] it was never clear what the Committee/GUC Trust wanted to do with respect to Rule 60(b). New GM requested permission and filed its summary judgment motion based primarily on Mr. Vanaskey's deposition in which he stated that the GUC Trust was trying to vacate the Sale Order so that GM Canada would pay the Notes. In response, the GUC Trust stated that New GM's motion should be "denied because there was not yet a controversy with regard to Rule 60(b) and there may never be one."[27] At the hearing on New GM's Summary Judgment Motion, this Court found that the Rule 60(b) issue was not "ripe for decision yet and won't be until and unless we know that the GUC Trust *will be in fact seeking 60(b) relief from the sale order*, *and we know the nature of the relief the GUC Trust seeks*." SJ Hearing Transcript, at 79:5 - 79:8 (emphasis added).

Thereafter, in its pre-trial brief filed in connection with the Nova Scotia Trial, the GUC Trust finally clarified its position by abandoning any pretext of asserting a Rule 60(b) request, stating that the "GUC Trust has not briefed, but reserves all of its rights in connection with, any *future requests for relief* from the Sale Order under" Rule 60(b).[28] At the conclusion of the Nova Scotia Trial, even though the GUC Trust's pre-trial brief indicated that the GUC Trust had abandoned its Rule 60(b) relief, the GUC Trust, in a procedurally defective manner, claimed, once again, to be requesting this relief in the "alternative." Tr. 3/19/13, at 68:3-69:16. As no

---

[26] In the Rule 60(b) Motion, *for the first time*, the GUC Trust seeks Rule 60(b) relief not only in connection with the Sale Order, but also in connection with the Sale Procedures Order. Rule 60(b) Motion, at 1 n. 3. Any relief from the Sales Procedures Order now -- *four years after its entry* -- is clearly untimely and unwarranted. In addition, the expansion of the GUC Trust's requested relief highlights that it never made a motion for Rule 60(b) relief until the filing of its Rule 60(b) Motion on May 3, 2013.

[27] *GUC Trust's Memorandum of Law in Opposition to Summary Judgment Motion filed by General Motors LLC*, dated June 29, 2012 [ECF No. 72], at ¶ 8.

[28] *GUC Trust's Pretrial Brief*, dated July 27, 2012 [ECF No. 148], at 25 n. 6 (emphasis added).

motion had been made and New GM did not know what the specific basis for the Rule 60(b) relief was, the GUC Trust was directed to file a Rule 60(b) motion, and did so, *for the first time*, on May 3, 2013. Given that the Rule 60(b) Motion was first filed *almost four years* after the entry of the Sale Order, any relief now requested by the GUC Trust pursuant to subsections (1), (2) or (3) of Rule 60(b) is untimely because such relief was not requested within one year of the entry of the Sale Order.

Moreover, the relief requested pursuant to Rule 60(b)(6) is also untimely as it was not requested within a "reasonable time" after the Sale Order. The Committee did not file the Original Claims Objection until July 2, 2010.[29] Thus, the Committee delayed seeking any relief, even arguably under Rule 60(b), for nearly one year after the Sale Order. The only ground the GUC Trust asserts for its failure to timely seek Rule 60(b) relief is that it was not provided with adequate notice of the Lock-Up Agreement or the Swaps. The Committee's professed "ignorance" does not justify its failure to act sooner.[30] The filing of a motion seeking Rule 60(b) relief within the one-year limitation period does not *per se* establish that the motion was timely filed. Rather, as "the delay in making the motion approaches one year there should be a corresponding increase in the burden that must be carried to show that the delay was 'reasonable.'" *Sasso v. M. Fine Lumber Co., Inc.*, 144 F.R.D. 185, 188-89 (E.D.N.Y. 1992) (internal quotations omitted) (citing *Amoco Overseas Oil Co. v. Compagnie Nationale*

---

[29]    As the Sale Procedures Order was entered on June 2, 2009 and the Committee did not file the Original Claims Objection until July 2, 2009 (13 months later), even if the Committee could somehow relate back to the Original Claims Objection (which it cannot), any request for relief from the Sale Procedures Order made pursuant to Rule 60(b)(1), (2) or (3) is untimely as it was made after one year from the entry of the Sale Procedures Order.

[30]    In its Rule 60(b) Motion, the GUC Trust continually lumps the Committee together with the Court when it argues that there was "inadequate" disclosure of the Lock-Up Agreement and the Swaps. Yet, it is the Committee -- not the Court -- that is charged with the "watchdog" function in the case. It is the Committee's job to raise issues with the Court. Here, the Committee cannot claim ignorance about the Lock-Up Agreement and the Swaps when all of the facts were made available to it, and the Committee reviewed the disclosures prior to the Sale Order. Moreover, Committee Counsel admitted that, if the Committee had known about the Lock-Up Agreement, it would not have objected to the Sale Order.

*Algerienne de Navigation*, 605 F.2d 648, 656 (2d Cir. 1979)). A motion under Rule 60(b) "is not

a substitute for a timely appeal" of an order, particularly where "intervening rights have vested in

reliance on" such an order. *See, e.g., Teligent*, 326 B.R. at 227-28.

The GUC Trust admits that the Committee began actively reviewing and analyzing the

Lock-Up Agreement, and the issues associated therewith (including the Swaps), in early

October, 2009. Further, the Committee authorized its counsel to file pleadings objecting to the

Statutory Claim and Guarantee Claims in December, 2009. Tr. 10/03/12 (Mayer) at 138:14-17.

Yet, the Original Claims Objection was not filed by the Committee until ***almost nine months***

***after the alleged discovery***. Such an extended delay cannot possibly satisfy Rule 60(b)'s timing

requirements. In addition, even though the GUC Trust contends that the Committee actively

began to address the issues associated with the Lock-Up Agreement in October, 2009, the

Committee was made aware of these issues well before that time (see Relevant Facts section

herein). In short, the Rule 60(b) Motion is untimely.[31] *See, e.g., Stupakoff v. Otto (In re Spiegel,*

*Inc.)*, 269 Fed. App'x 56, 58 (2d Cir. 2008)*, cert. denied, Stupakoff v. Otto*, 555 U.S. 825 (2008)

(delay in filing a Rule 60(b) motion to modify debtor's plan seven months after becoming aware

of its existence was unreasonable); *Sasso*, 144 F.R.D. at 188-89 (denying Rule 60(b) motion

where movant failed to file motion until nine months after entry of judgment of which it was

aware); *Teligent*, 326 B.R. at 228 (denying estate representative's Rule 60(b) motion to unwind

---

[31]    The cases cited by the GUC Trust in support of its timeliness argument are inapposite. *See Montco v. Barr*, 666 F.2d 754 (two-year delay in seeking Rule 60(b) relief was caused by the fact that (i) the trustee was a "stand-by" trustee only who was not closely involved in the case, and (ii) a proof of claim implicating the order at issue was not filed until two years after that order was entered); *Golden Oldies, Ltd. v. Scorpion Auction Group, Inc.*, 199 F.R.D. 98 (E.D.N.Y. 2001) (defendant's evasion of service of process for almost two years justified Rule 60(b)(6) relief); *Vasquez v. Carey*, No. 03 Civ. 3905 (RJH), 2010 WL 1140850 (S.D.N.Y. Mar. 24, 2010)(*pro se* incarcerated plaintiff was denied the ability to take certain discovery that would have uncovered the identity of the correct defendant that assaulted plaintiff); *In re Olejnik*, 2010 WL 4366183 (seven-month delay in seeking to reopen bankruptcy case was not too long where debtor failed to disclose an interest in property in his schedules and did not provide notice to creditor of the debtor's bankruptcy case). In each of these cases, the party seeking Rule 60(b) relief could not bring a motion sooner. That was not the case here. Indeed, the GUC Trust purposefully delayed the adjudication of this issue by the Court.

assumption of executory contract made less than seven months following order approving such assignment, finding that representative knew of the assumption order and failed to appeal).

**POINT III**

**THE GUC TRUST IS NOT AUTHORIZED TO**
**SEEK A MODIFICATION OF THE SALE ORDER**

Pursuant to the Plan and GUC Trust Agreement, the GUC Trust does not have standing to vacate the Sale Order. Specifically, the Plan provides the purpose of the GUC Trust is to "administer certain post-Effective Date responsibilities under the Plan, including, but not limited to, distributing New GM Securities and resolving outstanding Disputed General Unsecured Claims to determine the amount of Allowed General Unsecured Claims that will be eligible for distribution of their Pro Rata Share of New GM Securities under the Plan." Plan, § 6.2(b). Article VIII of the GUC Trust Agreement sets forth the powers and limitations of the GUC Trust. Section 8.1(b) states that the "GUC Trust Administrator shall have only such rights, powers and privileges expressly set forth in the Plan, the Confirmation Order or this Trust Agreement and as otherwise provided by applicable law." Nowhere in the Plan or the GUC Trust Agreement is there a provision that authorizes the GUC Trust to seek to vacate a prior order of the Court, especially one as important to the case as the Sale Order.

Further, the Sale Order provides that the Plan cannot derogate from the provisions of the MSPA or the Sale Order. Sale Order, ¶ 6. Creating a trust under the Plan, or providing for rights to be transferred to the trust, for the purpose of, *inter alia*, vacating the Sale Order, violates this provision.

This case is similar to an issue confronted by Judge Koeltl in *Teligent*. There, a trust was established under the debtor's plan of reorganization to pursue avoidance actions and to determine the validity and amount of general unsecured claims. Despite the limited powers of

39

the trust in *Teligent*, it sought to vacate an assumption order previously entered by the bankruptcy court.  Judge Koeltl stated that there was "a strong argument that the plain terms of the Plan did not authorize the [trust] to bring motions to challenge the Assumption Order because the Assumption Order involved contracts that were purposely retained by Reorganized Teligent." *Teligent*, 326 B.R. at 225.  The rationale applied in *Teligent* is equally applicable here.  The Plan and the GUC Trust Agreement did not provide the GUC Trust with the ability to vacate prior orders of the Bankruptcy Court, and the GUC Trust should not now be permitted to do so.

## CONCLUSION

For all of the foregoing reasons, New GM respectfully requests that the Court not take any action which would undermine the benefits given to it under the MSPA and Sale Order.  Accordingly, New GM seeks an order (i) denying the relief requested in the Rule 60(b) Motion in its entirety; and (ii) granting New GM such other and further relief as is just and proper.

Dated:     New York, New York
           June 10, 2013                      Respectfully submitted,


                                                /s/ Arthur Steinberg
                                              Arthur Steinberg
                                              Scott Davidson
                                              KING & SPALDING LLP
                                              1185 Avenue of the Americas
                                              New York, New York  10036
                                              Telephone:  (212) 556-2100
                                              Facsimile:  (212) 556-2222

                                              *Attorneys for General Motors LLC*