AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Daniel H. Golden
Sean E. O'Donnell
Philip C. Dublin
Dean L. Chapman Jr.
William F. Mongan Jr.
*Counsel for Green Hunt Wedlake Inc.,*
*Trustee of General Motors Nova Scotia Finance Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY., *et al.*,<br>*f/k/a General Motors Corp., et al.*,<br><br>                Debtors. | Chapter 11<br><br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |
| MOTORS LIQUIDATION COMPANY GUC<br>TRUST,<br><br>                Plaintiff,<br><br>v.<br><br>APPALOOSA INVESTMENT LIMITED<br>PARTNERSHIP I, *et al.*,<br><br>                Defendants. | Adv. Proc. No. 12-09802 (REG) |

**POST-TRIAL MEMORANDUM OF GREEN HUNT WEDLAKE INC., TRUSTEE OF
GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.............................................................................................1

STATEMENT OF FACTS .................................................................................................3

ARGUMENT .....................................................................................................................3

I.    THE NOVA SCOTIA TRUSTEE's STATUTORY CLAIM IS NOT
DUPLICATIVE OF THE NOTEHOLDERS' GUARANTEE CLAIM ...........................3

    A.    The Extent to Which U.S. and Foreign Law Governs the Claims.........................3

    B.    Section 135 Makes Old GM Liable to GM Nova Scotia for Its Outstanding
Debts, Liability, and Costs of Winding Up .............................................................4

    C.    Old GM Could Have Contracted Around Section 135 But Did Not Do So ...........5

    D.    Old GM Obtained Substantial Tax Benefits by Forming GM Nova Scotia
as a Nova Scotia ULC..............................................................................................5

    E.    The Statutory Claim is Materially Distinct from the Guarantee Claim ..................7

    F.    Under the Second Circuit's Holding in Delta and Other Case Law, the
Statutory Claim is Not Duplicative of the Guarantee Claim in a Manner
Requiring Disallowance............................................................................................8

    G.    Associate Professor Khimji's Arguments Are Inapplicable and Wrong ...............11

        1.    The Stark Contrast in Qualifications Among the Experts.........................13

        2.    Khimji's Theory Contradicts Section 135's Unambiguous
Language...................................................................................................15

        3.    Khimji's Public Policy Arguments are Entitled to Very Little
Weight Because Section 135 is Unambiguous..........................................16

        4.    The Public Policy Considerations Identified by Khimji Actually
Support the Conclusion that Section 135 Liability is Owed to the
ULC Rather Than its Creditors .................................................................17

        5.    Khimji's Argument Violates the Well-Established Principle That a
Corporation Has a Legal Personality Separate and Apart from Its
Creditors...................................................................................................19

        6.    Khimji's Argument Is Contrary to the Unequivocal Language of
the BIA Which Expressly Provides that a Section 135 Claim is an
Asset of the ULC .....................................................................................20

        7.    Khimji is Wrong to Rely on the Canadian Insolvency Principle
Known as the Rule Against Double Proof.................................................21

        8.    Even if the Canadian Rule Against Double Proof Applied, It Would
Not Disallow the Assertion of Both the Statutory Claim and the
Guarantee Claim ......................................................................................23

i

H.    Section 502(e) is Inapplicable to the ULC Claim..................................................26

II.    THE NOVA SCOTIA TRUSTEE DID NOT ENGAGE IN ANY INEQUITABLE
CONDUCT AND ITS CLAIM SHOULD NOT BE SUBORDINATED,
DISALLOWED, OR RECHARACTERIZED .................................................................28

A.    The Law ..................................................................................................................28

B.    The Noteholders' Selection of the Nova Scotia Trustee was Entirely
Proper ....................................................................................................................29

C.    The Nova Scotia Trustee Had No Role or Involvement in the Timing of
the GM Nova Scotia Bankruptcy Filing ................................................................30

D.    The Nova Scotia Trustee's Administration of the GM Nova Scotia Estate
Has Been Entirely Consistent With the Proper Roles and Duties of a
Canadian Bankruptcy Trustee ................................................................................32

E.    The Decision of Whether to Appoint "Inspectors" to Act on Behalf of GM
Nova Scotia's Creditors Rested with Those Creditors, Not the Trustee ...............33

F.    There Was No Basis for the Nova Scotia Trustee to Further Investigate the
Lock-Up Agreement, the Consent Fee or the Intercompany Loan
Settlement ..............................................................................................................34

G.    The Nova Scotia Trustee Properly Vetted the Claims Against GM Nova
Scotia, Including the Swap Claim ..........................................................................35

H.    Mr. Wedlake Pursued and Recovered on Other Assets Besides the
Statutory Claim ......................................................................................................37

III.    THE SWAP AGREEMENTS WERE VALIDLY TERMINATED AND NEW
GM'S SWAP CLAIM WAS PROPERLY CALCULATED.............................................38

A.    The Swap Agreements Were Validly Terminated as of October 9, 2009 ..............38

1.    The Nova Scotia Trustee Had a Legal Obligation to Affirm or
Disclaim The Swap Agreements ................................................................39

2.    The Parties Amended the Swap Agreements to Allow for the Nova
Scotia Trustee's Disclaimer.......................................................................40

3.    Valuing the Swap Agreements as of October 9, 2009 is Entirely
Appropriate ................................................................................................42

B.    $564 Million is the Correct Value of the Swap Claim ..........................................42

1.    New GM's Valuation of the Swap Agreements Yields a Value of
$564 Million...............................................................................................43

2.    The Nova Scotia Trustee's Expert's Mark-to-Market Valuation of
the Swap Agreement is Nearly Identical to New GM's.............................44

3.    The So-Called Final Exchange Method Advocated by the GUC
Trust Has No Application to These Proceedings .......................................47

CONCLUSION.................................................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A. Marquette & Fils Inc. v. Mercure,*
[1977] 1 S.C.R. 547 (S.C.C.) ............................................................32

*Bausch & Lomb Inc. v. Bressler,*
977 F.2d 720 (2d Cir. 1992) ...............................................................43

*Can. Trustco Mortg. Co. v. Canada,*
[2005] 2 S.C.R. 601, 2005 S.C 54. .....................................................16

*Chem. Bank N. Y. Trust Co. v. Kheel,*
369 F.2d 845 (2d Cir. 1966) ...............................................................10

*In the Matter of Kaupthing Singer & Friedlander Ltd.,*
[2011] UKSC 48) .............................................................................22, 24

*In New Skeena Forest Products Inc. v. Don Hull Contracting,*
[2005] B.C.J. No. 546, 251 D.L.R. 4th 328 ........................................39

*In re APCO Liquidating Trust,*
370 B.R. 625 (Bankr. D. Del. 2007) ...................................................27

*In re Chemtura Corp.,*
436 B.R. 286 (Bankr. S.D.N.Y. 2010) ................................................26

*In re Christensen,*
95 B.R. 886 (Bankr. D. N.J. 1988) .......................................................4

*In re CSC Indus., Inc.,*
232 F.3d 505 (6th Cir. 2000) ...............................................................4

*In re GCO Servs., LLC,*
324 B.R 459 (Bankr. S.D.N.Y. 2005) .................................................27

*In re Lyondell Chemical Co.,*
442 B.R. 236 (Bankr. S.D.N.Y. 2011) ...........................................26, 27

*In re Missionary Baptist Found. of Am., Inc.,*
818 F.2d 1135 (5th Cir. 1987) .............................................................29

*In re Owens Corning,*
419 F.3d 195 (3d Cir. 2005) ...............................................................10

*In re RNI Wind Down Corp.,*
369 B.R. 174 (Bankr. D. Del. 2007) ...................................................26

*In re Smurfit-Stone Container Corp.,*
    444 B.R. 111 (Bankr. D. Del. 2011) ...................................................5, 7

*J.R. Loftus, Inc. v. White,*
    85 N.Y.2d 874 (1995) .........................................................................43

*N. Am. S.S. Ltd. (Re),*
    [2007] B.C.S.C. 267 .................................................................39, 43, 49

*Nw. Mut. Life Ins. Co. v. Delta Air Lines, Inc.* (*In re Delta Air Lines, Inc.*),
    608 F.3d 139 (2d Cir. 2010).........................................8, 9, 10, 11

*Re Polly Peck International Plc,*
    [1996] B.C.C. 486, 1 B.C.L.C. 428 (Ch. D.) ...............................24, 25

*Olympia & York,*
    1998 O.T.C. Lexis 2135..........................................................23, 24, 25

*Royal Bank of Can. v. Penex Metropolis Ltd.,*
    [2009] O.J. No. 3645 ..........................................................................39

*Sasso & Cronin v. D. & A. MacLeod Co. Ltd.,*
    [1991] O.J. No. 676, 3 O.R. (3d) 472 ...............................................40

*Simon v. Electrospace Corp.,*
    28 N.Y.2d 136 (1971) ........................................................................43

*Steamship Enterprises of Panama, Inc., Liverpool (Owners) v. Ousel (Owners),*
    [1963] P. 64, [1960] 3 All E.R. 307 ...........................................22, 49

*Union Sav. Bank v. Augie/Restivo Banking Co. (In re Augie/Restivo Banking Co.),*
    860 F.2d 515 (2d Cir. 1988).........................................................9, 10

*United States v. Frisk,*
    675 F.2d 1079 (9th Cir. 1982) ...........................................................26

*Webb v. Whiffin,*
    [1872] L.R. 5 (H.L.) 711....................................................................18, 19

**STATUTES**

11 U.S.C. § 502(e) ....................................................................25, 26, 27

*Assignment and Preferences Act (Nova Scotia),*
    R.S.N.S. 1989, c. 25 ...........................................................................31

*The Statute of Elizabeth,*
    150 (Imp.), 13 Eliz., c. 5 ....................................................................31

**OTHER AUTHORITIES**

4 COLLIER ON BANKRUPTCY, ¶ 502.06[2][d] (Alan N. Resnick & Henry J. Sommer eds.,
   16th ed. 2009) ........................................................................................................................27

BLACK'S LAW DICTIONARY (9th ed. 2009) ................................................................................26

David E. Baird, BAIRD'S PRACTICAL GUIDE TO THE COMPANIES' CREDITORS
   ARRANGEMENT ACT (Carswell, 2009) ....................................................................................14

Frank Bennett, BENNETT ON BANKRUPTCY (14th ed. 2012) ...................................................32, 33

H.R. Rep. No. 95-595 (1977)
   *reprinted in* 1978 U.S.C.C.A.N. 6309-6310 ...........................................................................27

22A NY Jur Contracts § 434...........................................................................................................43

RESTATEMENT [SECOND] OF CONTRACTS § 347 ............................................................................43

Ziegel, Jacob, "The Personal Liabilities of Insolvency Practitioners Under Insolvency
   Legislation" (University of Toronto, 2006).............................................................................40

## PRELIMINARY STATEMENT

On behalf of GM Nova Scotia,[1] the Nova Scotia Trustee has asserted a statutory claim

against the bankrupt estate of Old GM in the amount of $1,607,647,592.49 plus costs associated

with its winding up.  GM Nova Scotia is an Unlimited Liability Company organized under the

Nova Scotia Companies Act with Old GM as its sole shareholder.  Old GM formed GM Nova

Scotia as a ULC to take advantage of a variety of tax-related benefits, but in doing so, became

liable to GM Nova Scotia under Section 135 of the Companies Act for GM Nova Scotia's

outstanding debts, liabilities, and costs of winding up in the event GM Nova Scotia was declared

bankrupt.  GM Nova Scotia is now winding up, and thus the Nova Scotia Trustee has asserted the

Statutory Claim against Old GM for GM Nova Scotia's debts and liabilities, including amounts

owed by GM Nova Scotia to (i) the Noteholders in respect of the Notes (approximately $1.043

billion) and (ii) New GM in respect of the Swap Agreements (approximately $564 million).

The GUC Trust has challenged the Notes portion of the Statutory Claim as impermissibly

duplicative of the Guarantee Claim asserted by the Noteholders under both American and

Canadian law.  This contention should be rejected.  The Statutory Claim is the direct result of

Old GM structuring GM Nova Scotia as a Nova Scotia ULC, while the Guarantee Claim is the

result of Old GM guaranteeing the debt issued by GM Nova Scotia.  At the time it issued the

Notes, Old GM could have limited its liability to only the Guarantee, but did not do so.  Old GM

should be held to the terms that were offered to—and accepted by—the Noteholders.

The relevant Second Circuit law specifically permits distinct claims such as these to be

asserted, subject only to a maximum total recovery of 100% of the amount owed.  The fact that

---

[1] All defined terms used herein have the meaning ascribed to them in the Joint Statement of Facts of Certain
Noteholders, the GM Nova Scotia Trustee, and New GM.

the Noteholders are the ultimate economic beneficiaries of both the Guarantee Claim and a portion of the Statutory Claim is of no consequence where, as here, the alleged duplication is the result of the debtor's conscious choice.

The GUC Trust's alternative Canadian law theory put forth by its expert is convoluted and internally inconsistent, and should ultimately be rejected because it: (i) contradicts both the plain meaning of Section 135 and the Canadian Bankruptcy and Insolvency Act; (ii) relies on irrelevant 19th century English legal history, which, even if accepted as true, does not support the GUC Trust's theory; (iii) violates fundamental Canadian corporate law principles; and (iv) inappropriately inserts Canadian bankruptcy law principles (which do not support disallowance in any event) into this American proceeding.

With respect to the Swap Agreements, the GUC Trust has argued that their termination was improper and, alternatively, that their valuation was wrong. The GUC Trust's argument is borne of a mistaken belief that the only way the Swap Agreements could have been terminated was by New GM exercising its "Early Termination" right under the Swap Agreements upon GM Nova Scotia's bankruptcy. But this is something New GM refused to do. Instead, the Nova Scotia Trustee legally and prudently disclaimed the Swap Agreements in accordance with Canadian bankruptcy law, and New GM acknowledged this disclaimer and agreed to treat the Swap Agreements as terminated. Under New York law (which governs the Swap Agreements), the parties were then required to value the Swap Agreements by reference to their market value at the time of termination, which is exactly what they have done.

Finally, the GUC Trust has alleged that the Nova Scotia Trustee has engaged in inequitable conduct warranting the subordination or disallowance of the entire Statutory Claim. But there is absolutely no evidence to support this allegation. The evidence shows that the Nova

2

Scotia Trustee did not become materially involved in this matter until GM Nova Scotia was

declared bankrupt in October 2009, and that since that time the Nova Scotia Trustee's conduct

has been entirely in line with its statutory mandate to administer the GM Nova Scotia bankruptcy

estate as an officer of the Canadian Court, exercising its own independent judgment but acting

for the benefit of the estate's creditors.  The GUC Trust's allegations to the contrary reflect a

fundamental misunderstanding of Canadian bankruptcy law and the role of a Canadian

bankruptcy trustee under the BIA.

## STATEMENT OF FACTS

The Nova Scotia Trustee respectfully refers the Court to the Joint Statement of

Facts of Certain Noteholders, the GM Nova Scotia Finance Trustee, and New GM filed

contemporaneously with this post-trial brief.

## ARGUMENT

## I.    THE NOVA SCOTIA TRUSTEE'S STATUTORY CLAIM IS NOT DUPLICATIVE OF THE NOTEHOLDERS' GUARANTEE CLAIM

The GUC Trust has wrongfully alleged that the portion of the Nova Scotia Trustee's

Statutory Claim in respect of the Notes is duplicative of the Guarantee Claim.  For the following

reasons, that theory should be rejected.

### A.    The Extent to Which U.S. and Foreign Law Governs the Claims

Determination of this issue requires consideration of New York, Nova Scotia, and U.S.

bankruptcy law.  The proofs of claim filed by the Noteholders demonstrate that the Guarantee

Claim arises from the unconditional Guarantee that Old GM provided under the Notes and the

Fiscal and Paying Agency Agreement, all of which are governed by New York law.[2]  In contrast,

---

[2] *See* Def. Tr. Ex. 15 (2023 Note) at 27 (AUR_GM021178) and "The Guarantee" (AUR_GM021181); Def. Tr. Ex. 16 (2015 Note) at 27 (AUR_GM021208) and "The Guarantee" (AUR_GM021211); Def. Tr. Ex. 21 (Fiscal & Paying Agency Agreement) § 26 (NGM000032005).

the Nova Scotia Trustee's Statutory Claim arises under Section 135 of the Nova Scotia

Companies Act.  Thus, the *existence* of both the Guarantee Claim and the Statutory Claim should

be decided, respectively, pursuant to New York and Nova Scotia law.  However, the *allowance*

and *amount* of the claims—including whether they are impermissibly duplicative—should be

determined solely in accordance with the U.S. Bankruptcy Code and related U.S. law.[3]

### B.    Section 135 Makes Old GM Liable to GM Nova Scotia for Its Outstanding Debts, Liability, and Costs of Winding Up

GM Nova Scotia is a ULC organized under the Nova Scotia Companies Act and is a

wholly-owned direct subsidiary of Old GM.[4]  GM Nova Scotia has been declared bankrupt in

Canada and is in the process of winding up its affairs.[5]  Under Section 135 of the Companies Act,

the members of the ULC (*i.e.*, Old GM) are liable to the ULC for the ULC's outstanding debts,

liability, and costs of winding up in the event that the ULC is wound up.  The full text of Section

135 is attached hereto as Appendix A.

As described by the Nova Scotia Trustee's expert on Canadian corporate law, Professor

Edward Iacobucci, Section 135 sets out eight qualifications (*i.e.*, exceptions) to the general rule

of member liability, none of which are applicable here.[6]  Even the GUC Trust's own expert on

Canadian corporate law, Associate Professor Mohammed Khimji, agrees that (i) Old GM is

statutorily liable under Section 135,[7] and (ii) none of the eight statutory exceptions are

---

[3] *See In re CSC Indus., Inc.*, 232 F.3d 505, 509 (6th Cir. 2000) ("While the validity of a claim might be a matter for nonbankruptcy law, bankruptcy courts have the statutory authority to determine the allowability and amount of the claim."); *In re Christensen*, 95 B.R. 886, 890 (Bankr. D. N.J. 1988) ("State law must be used to decide whether or not a claim exists.  Once the existence of the claim is established, questions concerning whether the claim will be administered through the bankruptcy estate are determined by federal law.").

[4] *See* Def. Tr. Ex. 5 (Memorandum of Articles of Associates of GM Nova Scotia); Statement of Uncontested Facts ¶ 1

[5] *See* Def. Tr. Ex. 241 (Nova Scotia Bankruptcy Order).

[6] *See* Iacobucci Direct Test. ¶ 10.

[7] *See* Trial Tr. 09/21/12 (Khimji) at 26:25-28:9, 35:12-36:2.

applicable.[8]  Thus, the statute unambiguously renders Old GM liable to GM Nova Scotia for GM

Nova Scotia's outstanding debts and winding up costs.[9]

### C.    Old GM Could Have Contracted Around Section 135 But Did Not Do So

It is important to observe that, if Old GM had wanted to avoid Section 135 liability, it

could easily have done so within the confines of the statute.  Section 135(f) allows the member to

contract out of Section 135 liability: "[N]othing in this Act shall invalidate any provision

contained in any contract whereby the liability of the individual members of the contract is

restricted."  Thus, if Old GM had wanted to limit its liability exclusively to the Guarantee, it

could have included a provision limiting its liability in the Notes, the Fiscal and Paying Agency

Agreement, or the Guarantee—and such a restriction would have been fully enforceable under

Section 135(f).  In fact, that is precisely what happened in a similar case, *In re Smurfit-Stone*

*Container Corp.*, 444 B.R. 111, 117 (Bankr. D. Del. 2011) (holding that language in indenture

restricted Section 135 liability under sub-section (f)).  But Old GM did not do so here.  It is

undisputed that nowhere in the Notes, the Fiscal and Paying Agency Agreement or the Guarantee

was Old GM's Section 135 liability restricted in any way.[10]

### D.    Old GM Obtained Substantial Tax Benefits by Forming GM Nova Scotia as a Nova Scotia ULC

It is no accident that Old GM opted to utilize the Nova Scotia ULC structure.  As testified

to at length by the Nova Scotia Trustee's expert in U.S./Canadian cross-border tax planning,

Professor Benjamin Alarie of the University of Toronto, at the time GM Nova Scotia was

created, the ULC structure was commonly used by U.S. companies in tax planning for

---

[8] *See* Def. Tr. Ex. 343 (Khimji Rebuttal Report) at 6 ("As Old GM is a current member of an NSULC, there is no qualification that limits the liability of Old GM.")  *See also* Trial Tr. 09/21/12 (Khimji) at 26:25-28:9.

[9] *See* Iacobucci Direct Test. ¶ 11.

[10] *See generally* Def. Tr. Exs. 15, 16 (the Notes, with the Guarantees appearing on the last page of each) and 21 (the Fiscal and Paying Agency Agreement).

investments in Canada because it afforded multi-national corporations like Old GM the opportunity to obtain significant tax savings.[11]  Specifically, hybrid entities such as Nova Scotia ULCs were classified as corporations for Canadian income tax purposes, yet were not classified as *per se* corporations for U.S. federal tax purposes.[12]  Instead, a ULC was considered a "disregarded" or flow-though entity for U.S. federal tax purposes.[13]  This arrangement afforded U.S. taxpayers with economic interests in Canada the opportunity to secure significant tax advantages.[14]

In his expert report, which also served as his direct testimony in this matter, Professor Alarie outlined eleven tax planning strategies available to Old GM by use of the ULC structure, three of which he discussed in greater detail.[15]  Specifically, Professor Alarie described how companies use ULCs: (i) as an alternative to a Canadian branch to flow-through losses; (ii) to claim a foreign tax credit for Canadian corporate taxes; and (iii) to finance Canadian operations of non-residents.[16]  For sake of space, we refer the Court to Professor Alarie's testimony for greater detail and observe that the GUC Trust has not rebutted Professor Alarie's findings.

The tax savings available to Old GM were not just hypothetical.  In fact, Old GM acknowledged the tax-efficient nature of its corporate structure.  For example, in its amended Notice of Defense in the Nova Scotia Litigation dated April 21, 2009, Old GM admitted that GM Nova Scotia "is a wholly owned subsidiary of GM US which functions within a larger corporate structure as part of a common form of tax-efficient borrowing structure to serve the interests of

---

[11] *See* Def. Tr. Ex. 352 (Alarie Report) ¶ 9.

[12] *See id.*

[13] *See id.*

[14] *See id.*

[15] *See id.* ¶¶ 9-10.

[16] *See id.* ¶¶ 11-21.

GM US."[17]  And the GUC Trust's own expert acknowledged at trial that, by electing to fund its

Canadian operations by use of the ULC form, Old GM was able to take advantage of certain tax

benefits.[18]

### E.    The Statutory Claim is Materially Distinct from the Guarantee Claim

As the foregoing analysis shows, the Nova Scotia Trustee's Statutory Claim arises as a

direct result of Old GM purposefully creating GM Nova Scotia as a ULC and making itself GM

Nova Scotia's sole member.  This allowed Old GM the opportunity to raise significant funds in

the public bond markets while reaping substantial tax benefits, but it also obligated Old GM to

contribute to the assets of GM Nova Scotia in the event that GM Nova Scotia was wound up.[19]

By contrast, the Guarantee Claim is a direct contract claim by the Noteholders against Old GM.

The Section 135 Claim is owed to GM Nova Scotia, while the Guarantee Claim is owed to the

Noteholders.  As Professor Iacobucci observed in his direct testimony:  "Whereas liability under

a personal guarantee is strictly contractual and could be deemed void or otherwise unenforceable

under existing contract law doctrines, liability under Section 135 is statutory and may only be

altered by legislative action."[20]  The Guarantee thus provides the Noteholders with an avenue of

recovery on the Notes in addition to their claims against GM Nova Scotia.[21]

---

[17] Def. Tr. Ex. 67 (Notice of Defense) ¶ 13.

[18] *See* Trial Tr. 09/21/12 (Khimji) at 127:9-129:7.

[19] *See* Iacobucci Direct Test. ¶ 11.

[20] *Id.* ¶ 25 (describing five separate ways in which Section 135 liability is fundamentally different from guarantee liability).

[21] *See also Smurfit-Stone*, 444 B.R. at 124 ("The plain language of the Indenture and the general structure of the transaction supports the Debtors' argument that [the ULC member's] guarantee liabilities under the Indenture are *separate and apart* from [the ULC member's] liabilities as [the ULC's] sole member.") (emphasis added).

7

**F.      Under the Second Circuit's Holding in *Delta* and Other Case Law, the Statutory Claim is Not Duplicative of the Guarantee Claim in a Manner Requiring Disallowance**

The mere fact that the Noteholders are the ultimate beneficiaries of both the Guarantee

Claim and a portion of the Statutory Claim does not render these claims impermissibly

duplicative.  Rather, according to the law of this Circuit, Old GM is bound to the corporate

structure it willfully entered into, and the allowance of both the Guarantee Claim and the

Statutory Claim is appropriate so long as the Noteholders do not receive more than 100%

payment on the Notes.[22]

The Second Circuit's holding in *Delta* is instructive, if not controlling.  In *Delta*, the

debtor objected to the claims filed by creditors who owned planes leased by the debtor to recover

money under tax indemnity agreements ("**TIAs**").[23]  The TIAs were negotiated to reimburse the

creditors for tax benefits lost upon foreclosure of the creditors' planes in the event that Delta

defaulted on its lease payments.[24]  The leases also provided that Delta pay a stipulated loss value

("**SLV**"), which similarly reimbursed the creditors for lost tax benefits if Delta defaulted on its

lease payments.[25]  Once Delta defaulted on the leases, the creditors filed claims in respect of the

SLVs and the TIAs.[26]  Delta objected to the claims on the basis that they were duplicative.[27]  The

Second Circuit, however, found that the parties intended that payment of the TIAs was mandated

only if the SLV was not paid in full.[28]  Acknowledging that, as a result of a bankruptcy,

unsecured creditors may receive less than a 100% recovery on account of their claims, the

---

[22] *See Nw. Mut. Life Ins. Co. v. Delta Air Lines, Inc.* (*In re Delta Air Lines, Inc.*), 608 F.3d 139, 147 (2d Cir. 2010).

[23] *See id.* at 144.

[24] *See id.* at 143.

[25] *See id.*

[26] *See id.* at 144.

[27] *See id.* at 149.

[28] *See id.*

Second Circuit allowed both the TIA claims and the SLV claims, subject to such claimants not recovering more than 100% on their claims.[29]

In so holding, the Second Circuit expressly rejected the argument being advanced here by the GUC Trust that "a single loss is entitled to only a single satisfaction."[30] The Second Circuit held that where two claims "arise under agreements (1) between different parties, (2) addressing different events, and (3) providing for different remedies," both claims are allowable.[31] The Second Circuit determined that:

> If a component of the SLV claim under the Lease is calculated by reference to the owner participant's tax consequences which are indemnified under the TIA (the 'overlap' Delta objects to), so be it. ***That is what Delta agreed to and what both the owner participant and the indenture trustee relied upon in negotiating the agreements***. If Delta has contracted to pay duplicative claims, then it must pay both – it cannot repudiate its duty to party A under contract A by asserting that it contracted to pay the same amount to party B under contract B.[32]

Cases addressing the issue of substantive consolidation are also instructive. As this Court is aware, substantive consolidation is an equitable power of the court that results in the pooling of assets and claims against multiple entities, such that claimants may only recover on a single claim against a single set of assets.[33] To the extent a creditor has claims against multiple debtors on account of a single debt obligation, before consolidating one of the creditor's claims into one against a single set of assets, the Second Circuit requires that a bankruptcy court consider "whether creditors dealt with the entities as a single economic unit and 'did not rely on their

---

[29] *See id.* at 147.

[30] *See* GUC Trust Pretrial Brief (Dkt. No. 148) at 16.

[31] *Delta Air Lines, Inc.*, 608 F.3d at 149.

[32] *Id.* (quoting *In re Delta Air Lines, Inc.*, 370 B.R. 552, 557 (Bankr. S.D.N.Y. 2007) (emphasis added)).

[33] *See Union Sav. Bank v. Augie/Restivo Banking Co. (In re Augie/Restivo Banking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988).

separate identity in extending credit.'"[34] Thus, a lender's reasonable expectations of separate

corporate identity are entitled to deference. As the Second Circuit reasoned:

> [C]reditors who make loans on the basis of the financial status of a
> separate entity expect to be able to look to the assets of their
> particular borrower for satisfaction of that loan. ***Such lenders
> structure their loans according to their expectations regarding
> that borrower*** and do not anticipate either having the assets of a
> more sound company available in the case of insolvency or having
> the creditors of a less sound debtor compete for the borrower's
> assets. Such expectations create significant equities.[35]

In an analogous substantive consolidation case, the Third Circuit reached the same

conclusion, holding that the debtor "cannot now ignore, or have us ignore, the very ground rules

[it] put in place" when its subsidiaries provided guarantees of the debt it issued.[36] The Third

Circuit continued: "Playing by these rules means that obtaining the guarantees of separate

entities, made separate by [the debtor's] choice of how to structure the affairs of its affiliate

group of companies, entitles a lender, in bankruptcy or out, to look to any (or all) guarantor(s) for

payment when the time comes."[37]

What *Delta* and the substantive consolidation cases have in common is a recognition that

debtors in bankruptcy must live with the contracts and corporate structure they established pre-

bankruptcy. This case should be no different. In order to achieve certain tax benefits, Old GM

voluntarily chose to form GM Nova Scotia as a ULC, and in so doing, knowingly subjected itself

to unlimited liability to GM Nova Scotia in the event of a winding up. In connection with GM

---

[34] *Id.*

[35] *Id.* at 518–19 (emphasis added); *accord Chem. Bank N. Y. Trust Co. v. Kheel,* 369 F.2d 845, 848 (2d Cir. 1966)
("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite.")
(Friendly, J., concurring); *In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005) (recognizing the rights of
"creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate
entities").

[36] *Id.* at 212.

[37] *Id.* at 212-213.

Nova Scotia's issuance of the Notes, Old GM willfully provided the Noteholders with a

contractual Guarantee as a credit enhancement.  A purchaser of the Notes would reasonably have

expected that, in the event of a winding up, GM Nova Scotia would be able to look to Old GM,

under Section 135, to contribute to GM Nova Scotia's assets an amount sufficient to pay all of

GM Nova Scotia's unpaid debts and liabilities.  Indeed, the Noteholder witnesses in this case,

each of whom purchased on the secondary market, uniformly testified that their purchase of

Notes was premised at least in part on Old GM providing multiple avenues of recovery,

including both Section 135 and the Guarantee.[38]

Under *Delta*, Old GM is bound by the corporate structure it elected to use *and* the

Guarantee it provided in connection with the Notes offering.  The existence and enforceability of

both the Statutory Claim and the Guarantee Claims is the result of the structure that Old GM

intentionally devised to attract creditors and to obtain tax benefits in the U.S. and Canada.

Allowing the GUC Trust to avoid the consequences of that structure would be unfair and is

precisely the conduct precluded by the Second Circuit in *Delta* and the Second and Third

Circuits in the substantive consolidation cases.  These cases dictate that both claims should be

allowed, subject only to a net allowance of no greater than 100% of the value of the Notes.

### G.    Associate Professor Khimji's Arguments Are Inapplicable and Wrong

The preceding discussion should complete the analysis with respect to the GUC Trust's

duplicative claim allegation.  However, the GUC Trust has diverted the Court's attention to a

sideshow involving irrelevant expert testimony on Canadian law by the GUC Trust's retained

expert, Associate Professor Mohammed Khimji.  At trial, Associate Professor Khimji—an expert

on corporate law but not bankruptcy law—admitted that Section 135 liability had been

---

[38] *See* Bolin Direct Test. ¶¶ 8-9; Cederholm Direct Test. ¶¶ 9-10; Gropper Direct Test. ¶¶ 14-16; Truong Direct Test.¶¶ 13-16.

established and that the Section 135 claim exists alongside the Guarantee Claim.[39]  Thus, the

only remaining the legal question is whether the Statutory Claim and the Guarantee Claim are

both allowable.  But that question is an issue to be determined by bankruptcy law, not corporate

law.[40]  And as previously noted, because this is a U.S. bankruptcy proceeding, U.S. and not

Canadian bankruptcy law should govern.[41]  Foreign law only matters to the extent it shows that a

valid claim was created under Section 135—and Associate Professor Khimji has conceded that

such a claim does exist.[42]  That should end the analysis.

But Associate Professor Khimji instead argues that even though GM Nova Scotia has a

valid claim under Section 135,[43] and even though he does not contest the validity of the

Guarantee Claim, Canadian corporate law somehow bars the two claims from being asserted

simultaneously in this U.S. Bankruptcy Court.  First, based upon 19th century English legal

history, Associate Professor Khimji argues that a Section 135 claim belongs to a ULC's creditors

rather than the ULC.[44]  As detailed below, his theory is wrong for a host of reasons, including the

fact that it is flatly contradicted by the unambiguous language Section 135, which makes clear

that the claim belongs to GM Nova Scotia, not its creditors.  Next, Associate Professor Khimji

argues that because the claim belongs to GM Nova Scotia's creditors, which it does not, it is

duplicative of the Guarantee Claim under the Anglo/Canadian rule against "double proof," a

bankruptcy rule which Associate Professor Khimji deems an "overarching principle of Canadian

---

[39] *See* Trial Tr. 09/21/12 (Khimji) at 27:24-28:9, 35:16-36:14.

[40] As Professor Iacobucci points out in paragraphs 49-52 of his Direct Testimony, Associate Professor Khimji confuses the existence of a claim under Section 135 and recovery on that claim, the latter being a question of bankruptcy law, not corporate law.

[41] *See supra* at 4.

[42] *See* Trial Tr. 09/21/12 (Khimji) at 27:24-28:9, 35:16-36:14.

[43] *See id.*

[44] *See* Def. Tr. Ex. 333 (Khimji Expert Report) ¶¶ 9-10, 12-29.

law."[45]  He is wrong again.  Associate Professor Khimji admits that he is no expert in bankruptcy

law and, as detailed below, he apparently misunderstands how the rule against double proof

would impact this case if it were somehow applicable, which it is not.

Associate Professor Khimji's theory, which is invented from whole cloth, is flawed in at

least seven respects.  The first five (subheadings 2-6) all deal with Associate Professor Khimji's

reliance on 19th century English public policy to show that the ULC claim belongs to the ULC's

creditors rather than the ULC itself (despite the unambiguous wording of the statute), while the

last two (subheadings 7-8) relate to his reliance on the rule against double proof.

### 1.    The Stark Contrast in Qualifications Among the Experts

Because Associate Professor's argument rests upon Canadian corporate and bankruptcy

law, GM Nova Scotia retained two experts to respond to his argument.  With respect to Canadian

corporate law, the Nova Scotia Trustee retained Professor Iacobucci, a full professor at the

University of Toronto, arguably the top law school in Canada; in contrast, Associate Professor

Khimji only recently became an Associate Professor (middle level professorship) at a different

law school.[46]  Professor Iacobucci has taught corporate law as a visiting professor at law schools

throughout the United States including the University of Chicago and NYU.[47]  He graduated first

in his undergraduate class, attended Oxford University on a Rhodes scholarship, and then

attended the University of Toronto for law school, where he finished first in his class.[48]

Associate Professor Khimji, by contrast, graduated from college with "upper second class

---

[45] *See* Def. Tr. Ex. 333 (Khimji Expert Report) ¶¶ 11, 34-39.

[46] *See* Iacobucci Direct Test. ¶ 1; Khimji Direct Test. ¶ 1; Trial Tr. 09/21/2012 (Khimji) at 12:5-14:10, 15:11-15:23 (Toronto is the number one school in Canada according to Macleans).

[47] *See* Iacobucci Direct Test. ¶ 2.

[48] *See* Iacobucci Direct Test. ¶ 3.

honours" and did not graduate from law school with any distinction.[49]  Professor Iacobucci

clerked for the Supreme Court of Canada, while Associate Professor Khimji has never had a

clerkship.[50]  Professor Iacobucci has had more than 50 articles published in various law journals,

law reviews, treatises, and other legal publications—including a course book discussing Nova

Scotia ULCs which he teaches in class—while Associate Professor Khimji has published only

four articles in scholarly journals, none of which discuss either the Nova Scotia or UK

Companies Acts.[51]

As significant as this contrast is, the difference in credentials with respect to Canadian

bankruptcy law is even more drastic.  The Nova Scotia Trustee retained David Baird Q.C. as its

Canadian bankruptcy law expert.  Mr. Baird has more than 50 years of bankruptcy and

insolvency practice experience at leading Canadian law firms.[52]  He has represented debtors and

creditors in many of the largest liquidation or restructuring proceedings in Canada and was a

Director and President of the Insolvency Institute of Canada.[53]  His publication, David E. Baird,

BAIRD'S PRACTICAL GUIDE TO THE COMPANIES' CREDITORS ARRANGEMENT ACT (Carswell,

2009), is a leading treatise on the CCAA.[54]  By contrast, Associate Professor Khimji has no

experience in Canadian insolvency or bankruptcy law, and he specifically admitted at trial that he

---

[49] Def. Tr. Ex. 334 (Khimji Resume).

[50] *See* Iacobucci Direct Test. ¶ 3; Trial Tr. 09/21/12 (Khimji) at 16:3-17:9.

[51] *See* Iacobucci Direct Test. ¶ 4; Def. Tr. Ex. 334 (Khimji Resume); Def. Ex. 319 (Khimji Abitibi Deposition) at 34:15-35:11); Trial Tr. 11/26/12 (Iacobucci) at 40:1-41:10.

[52] *See* Baird Direct Test. ¶ 3.

[53] *See id.* ¶¶ 4-5.

[54] *See id.* ¶ 6.

is not a bankruptcy or insolvency expert.[55]  He also testified that Mr. Baird is a highly-regarded

practitioner who is one of the leading bankruptcy and insolvency lawyers in Canada.[56]

### 2.    Khimji's Theory Contradicts Section 135's Unambiguous Language

As set forth above and as discussed at length by Professor Iacobucci, the words of

Section 135—which set out a general rule of member liability "to contribute to the assets of the

company" and then set forth eight exceptions, none of which is applicable here—unambiguously

render the members of a ULC liable *to the ULC*.[57]  This should end the inquiry as to whom

Section 135 liability is owed.

Notwithstanding the plain text of Section 135, Associate Professor Khimji argues,

incorrectly, that words of Section 135 are in fact ambiguous.  In support of this argument,

Associate Professor Khimji testified that Section 135's ambiguity is "demonstrated by that fact

that Professor Iacobucci and [I] have a different opinion" as to the application of Section 135.[58]

But as Professor Iacobucci testified, this argument fails as a matter of logic, because it would

mean that any dispute regarding a statute would render the statute ambiguous.[59]  That makes no

sense.  In fact, the Canadian Supreme Court has spoken to this exact issue, concluding that, to

determine whether a statute is ambiguous, courts must look to the words of the statute, not to

whether people disagree over its meaning.[60]

Alternatively, Associate Professor Khimji argues that the language of Section 135 is not

precise and unequivocal because it does not answer the question of whether a member may be

---

[55] *See* Trial Tr. 09/21/12 (Khimji) at 53:23-55:13.

[56] *See id.* at 55:17-56:24.

[57] *See* Iacobucci Direct Test. ¶¶ 19-22; Trial Tr. 11/26/12 (Iacobucci) at 77:12-24.

[58] Trial Tr. 09/21/12 (Khimji) at 23:9-24:5.

[59] *See* Trial Tr. 11/26/12 (Iacobucci) at 19:23-21:16.

[60] *See id.* at 21:17-24:10.

liable under both Section 135 and a guarantee.[61]  But, as discussed at length above, Section

135(f) does address the question by providing a simple contractual mechanism to limit Section

135 liability.  Moreover, the fact that a statute doesn't specifically address a particular issue does

not render the statute ambiguous.  In this case, it simply creates a question about recovery, which

is a bankruptcy law issue to be decided on the rules of the relevant bankruptcy jurisdiction.[62]

### 3.   Khimji's Public Policy Arguments are Entitled to Very Little Weight Because Section 135 is Unambiguous

Associate Professor Khimji's interpretation of Section 135 is entitled to little or no

consideration because it rests primarily upon 19th century English public policy instead of the

unambiguous language of the statute.  As set forth at length in paragraphs 15-22 of Professor

Iacobucci's direct testimony, under Canada's "modern principle" of statutory interpretation,

when the wording of a statue is clear and unambiguous, its plain meaning is "dominant" in the

interpretive process.  This leaves almost no room for consideration of public policy concerns like

those advocated by Associate Professor Khimji.

A unanimous panel of the Supreme Court of Canada—the highest court in Canada—has

explicitly held that: "When the words of a provision are precise and unequivocal, the ordinary

meaning of the words play [sic] a dominant role in the interpretive process."[63]  The Merriam-

Webster dictionary defines "dominant" as "commanding, controlling all, or prevailing over all

others," and at trial, Associate Professor Khimji did not take issue with this definition.[64]  Thus,

where statutory language is precise and unequivocal, the context and purpose are less important.

---

[61] *See* Trial Tr. 09/21/12 (Khimji) at 24:6-25:12; 35:8-15; 41:5-16.

[62] *See supra* at 4.

[63] *Can. Trustco Mortg. Co. v. Canada*, [2005] 2 S.C.R. 601, 2005 S.C.C. 54 (Can.) at para. 10 (Def. Tr. Ex. 369).

[64] *See* Trial Tr. 09/21/12 (Khimji) at 19:23-21:9.

Only where statutory language is ambiguous will the context and purpose of the Act, including the Act's history and considerations of public policy, be significant considerations.[65]

This is especially true here where the particular public policy considerations Associate Professor Khimji urges the Court to consider come from another country and date back to 1862.[66] Associate Professor Khimji's public policy argument comes from England, not Nova Scotia.[67] It relates to public policy concerns surrounding the passage of the 1862 U.K. Act and does not even attempt to link these concerns with Nova Scotia's passage of the Companies Act in 1900. This critique of Associate Professor Khimji's theory is laid out in paragraphs 27-29 of Professor Iacobucci's testimony. In particular, Associate Professor Khimji identifies no evidence that in 1900 the Nova Scotia House of Assembly—the relevant legislative body for purposes of this analysis—acted upon the policy concerns he claims the U.K. Parliament addressed some four decades prior, or whether the concerns are significant in interpreting the statute today.[68]

### 4. The Public Policy Considerations Identified by Khimji Actually Support the Conclusion that Section 135 Liability is Owed to the ULC Rather Than its Creditors

But even if public policy concerns in England dating back to 1862 were somehow relevant, the concerns identified by Associate Professor Khimji actually support the position that Section 135 liability is owed to the ULC, not its creditors.[69]

Associate Professor Khimji contends that the 1862 U.K. Act was enacted, in part, to avoid the "chaos" that had previously existed in England because creditors were allowed to

---

[65] *See* Iacobucci Direct Test. ¶ 18.

[66] *See* Trial Tr. 11/26/12 (Iacobucci) at 81:22-82:10.

[67] *See* Def. Tr. Ex. 333 (Khimji Expert Report) ¶¶ 13-18.

[68] *See* Iacobucci Direct Test. ¶ 28. In fact, Associate Professor Khimji has conceded this point and admitted that he was unable to come across any history of similar "chaos" existing in Nova Scotia at the time of the statute's enactment despite having tried. *See* Trial Tr. 09/21/12 (Khmiji) at 37:25-39:15, 39:25-40:3, 42:12-17.

[69] This argument is spelled out in greater detail in paragraphs 30-41 of Professor Iacobucci's testimony and Trial Tr. 11/26/12 (Iacobucci) at 79:5-80:25.

commence multiple direct actions against a debtor's members for unpaid company debts.[70]

According to Associate Professor Khimji, this incentivized "(a) creditors to try to 'win the race' by bringing claims against individual members at the earliest opportunity, and (b) members to dispose of their assets and leave the jurisdiction."[71] Associate Professor Khimji further contends that, as a result of this chaotic financial environment, "Parliament . . . began to explore alternative ways in which to preserve the liability of members of unlimited companies for company debts without the unfairness that so often resulted from direct creditor actions."[72] Because Section 135 derives from the 1862 U.K. Act, Associate Professor concludes that the member's obligation to the company in what is now Section 135 is in substance an obligation to creditors; the interposition of the company is merely a "procedural mechanism."[73]

But even accepting for the sake of argument that the statutory reform in Nova Scotia in 1900 was designed to streamline creditor collections, it accomplished this by assigning the authority to collect unpaid debts from members to the company itself.[74] Thus, under Associate Professor Khimji's theory, it was precisely because direct creditor claims created "chaos" that the statute gave the company, not creditors, the ability to collect from members.[75] The historical policy considerations that Associate Professor Khimji offers therefore imply that the law should take seriously the requirement that members are liable to the company, not its creditors, under Section 135.[76]

The leading English case on this subject directly supports this position. That case, *Webb*

---

[70] *See* Def. Tr. Ex. 333 (Khimji Expert Report) ¶¶ 13-18.

[71] *Id.* ¶ 15.

[72] *Id.*

[73] Def. Tr. Ex. 333 (Khimji Expert Report) ¶ 20.

[74] *See* Iacobucci Direct Test. ¶ 32.

[75] *See id.*

[76] *See id.*

*v. Whiffin*,[77] required the House of Lords to determine whether claims for unpaid shares against

past members under an analogous provision to Section 135 were assets of the company or were

assets of the company's creditors.[78]  In its decision, the House of Lords emphatically concluded

that the statute created an obligation of members to the company, not to particular creditors.[79]

Lord Cairns, basing his conclusion on the plain wording of the statute, stated: "It appears to me,

my Lords, beyond all doubt, that all unpaid calls, whether from members or ex-members, are

part of the property and assets of the company . . . ."[80]

> **5.    Khimji's Argument Violates the Well-Established Principle That a
> Corporation Has a Legal Personality Separate and Apart from Its
> Creditors**

Moreover, Associate Professor Khimji's hypothesis that the ULC claim belongs to the

ULC's creditors rather than the ULC itself is entirely inconsistent with the well-established

principle that a corporation has a legal personality separate and apart from its creditors.  This

argument is laid out in greater detail in paragraphs 42-48 of Professor Iacobucci's testimony and

at 2548:17-2551:23 of the trial transcript.

As Professor Iacobucci observes, the principle that a corporation has a legal personality

separate and apart from its creditors and shareholders is well-established in Canadian and Nova

Scotia company law.[81]  And as Associate Professor Khimji has conceded, the assets of a

company do not belong to a company's members or its creditors, but to the company itself.[82]  But

---

[77] [1872] L.R. 5 (H.L.) 711 (Def. Tr. Ex. 375).

[78] *See* Iacobucci Direct Test. ¶ 36.

[79] *See id.* ¶ 37.

[80] *Webb v. Whiffin,* L.R. 5. J.L. at 735 (Def. Tr. Ex. 375).

[81] *See* Iacobucci Direct Test. ¶ 43.

[82] *See* Trial Tr. 09/21/2013 (Khimji) at 42:23-44:7.  Despite acknowledging at the outset of his testimony that separate legal personality is a fundamental corporate law concept, Associate Professor Khimji nevertheless went onto argue that it "has been doubted and is still doubted today."  Trial Tr. 09/21/2013 (Khimji) at 124:24-125:8. This is an intellectually dishonest position that was fully refuted by Professor Iacobucci who, quoting a respected treatise on Company Law, testified unequivocally that "[s]ince the *Salomon* case [in 1897], the complete separation

19

Associate Professor Khimji effectively ignores the principle of separate legal personality when

he argues that the Court should treat Section 135 liability as a claim owed to GM Nova Scotia's

creditors rather than to GM Nova Scotia itself.  His analysis rests in part on the idea that one may

disregard separate corporate personality in interpreting Section 135 given that the economic

benefit of Section 135 liability rests with the creditors of an insolvent ULC.[83]  This reasoning is

inconsistent with the bedrock principle of Canadian and Nova Scotia company law that a

company has its own distinct legal personality.  The identity of the ultimate recipient of the

economic benefits of company activity does not affect legal respect for the company's separate

personality.[84]  This is as true for a Nova Scotia ULC as it is for any company whose creditors

might ultimately reap the economic benefits of a corporate asset.[85]

> **6.     Khimji's Argument Is Contrary to the Unequivocal Language of the
> BIA Which Expressly Provides that a Section 135 Claim is an *Asset of
> the ULC***

Finally, Associate Professor Khimji's theory that the ULC claim belongs to the ULC's

creditors is wrong because it directly contradicts the BIA itself.  Section § 77(2) of the BIA

provides that the amount a member is liable to contribute to a bankrupt "shall be deemed an asset

of the corporation and a debt payable to the trustee forthwith on the bankruptcy of the

corporation."[86]  Associate Professor Khimji's argument that the amount owed to GM Nova

Scotia by Old GM is not an asset of GM Nova Scotia goes against the plain meaning of this

statute.  As Mr. Baird points out in paragraph 52 of his direct testimony, in situations governed

---

of the company and its members has never been doubted." *See* Trial Tr. 11/26/2012 at 31:13-35:5 *citing* L.C.B.
Gower, *GOWER'S PRINCIPLES OF MODERN COMPANY LAW*, 4th ed. at 100 (Def. Tr. Ex. 384).

[83] *See* Iacobucci Direct Test. ¶ 46.

[84] *See id.* ¶ 47.

[85] *See id.* ¶ 48.

[86] Def. Tr. Ex. 1 (BIA) § 77(2).

by the BIA, a claim that is "deemed" to be an asset of the estate and a debt payable to the Trustee

in Bankruptcy plainly "shall" be an asset of the estate.

When presented with this statute at trial, Associate Professor Khimji argued that being

deemed a company asset is not the same thing as being a company asset, though he could not cite

any case, statute, or act in Canada for that proposition.[87]  In fact, Associate Professor Khimji's

conclusion that the use of the word "deeming" in Section 77 of the BIA means that the Section

135 claim is not really an asset of the estate is "based on the objective of Section 135," rather

than an analysis of the BIA itself.[88]  This peculiar approach is unsurprising given that Associate

Professor Khimji is not qualified to render opinions on the BIA and has admitted he is only

testifying on the BIA "to the extent to which it's relevant to understanding Section 135."[89]

### 7.    Khimji is Wrong to Rely on the Canadian Insolvency Principle Known as the Rule Against Double Proof

The second half of Associate Professor Khimji's theory is focused on his contention that

the Canadian rule against double proof bars recovery on both the Statutory Claim and the

Guarantee Claim.  The rule against double proof is an English and Canadian rule of claims

administration applicable to the distribution of an insolvent debtor's assets, and Associate

Professor Khimji is totally unqualified to discuss it.[90]  The rule against double proof is applicable

only in a Canadian or English insolvency proceeding to determine creditor recoveries.  As

described above, the relevant inquiry in this proceeding is whether the claims are duplicative

under U.S. law.

Faced with this significant impasse, Associate Professor Khimji argues that the rule

---

[87] *See* Trial Tr. 09/21/12 (Khimji) at 66:1-17.
[88] Def. Ex. 321 (Abitibi Tr. Test.) at 235:18-25.
[89] Trial Tr. 09/21/12 (Khimji) at 49:5-50:1.
[90] *See supra* at 14-15; *see also* Def. Ex. 319 (Khimji Abitibi Deposition) at 34:15-35:11 (admitting he has never published anything about insolvency principles or the rule against double proof).

against double proof is an "overarching principle" of Canadian law rather than just a principle applicable only in insolvency proceedings.[91]  By conceiving of the rule this way, Associate Professor Khimji seeks to make it somehow applicable to his own commercial law expertise so that he can argue the claims are duplicative.  This position is clearly wrong.

As Mr. Baird testified, "the rule against double proof is not a substantive defence to statutory or contractual liabilities but rather is a rule of claims administration in proceedings concerning insolvency and is relevant as between creditors, not as between a debtor and its creditors."[92]  The rule against double proof—which seeks to prevent two claims for the same debt from being admitted in an insolvency proceeding—is inherently irrelevant in the absence of insolvency.[93]  As recently stated by the Supreme Court of the United Kingdom, the rule against double proof is a "long-standing principle of insolvency law."[94]  Mr. Baird's position is laid out in greater detail at paragraphs 14-25 of his Direct Testimony.  In particular, Mr. Baird explains why the various authorities relied on by Associate Professor Khimji to argue that the rule against double proof is an "overarching principle," in fact show no such thing.[95]

When asked at his deposition to identify any case or authority showing the application of the rule against double proof outside an insolvency context, Associate Professor Khimji was unable to come up with any response.[96]  At trial, however, he cited the case of *Steamship Enterprises of Panama, Inc., Liverpool (Owners) v. Ousel (Owners)*, [1963] P. 64, [1960] 3 All

---

[91] Trial Tr. 09/21/12 (Khimji) at 57:8-58:24.

[92] Baird Direct Test. ¶ 14.

[93] *See id.* ¶ 16.

[94] *In the Matter of Kaupthing Singer & Friedlander Ltd.*, [2011] UKSC 48), [1] (Def. Tr. Ex. 318).

[95] Baird Direct Test. ¶¶ 17-22.

[96] *See* Trial Tr. 09/21/12 (Khimji) at 58:9-58:24.

E.R. 307 ("*Liverpool*") as an example,[97] but a plain reading of the case proves otherwise.
Tellingly, this case was cited for a different proposition in Associate Professor Khimji's rebuttal
report, which he produced a mere eight days prior to being deposed, and, at that time, he failed to
identify it as a case applying the rule against double proof outside an insolvency context.  Indeed,
on cross-examination, Associate Professor Khimji admitted that *Liverpool* involved multiple
claims against an insufficient fund—which he admitted was the exact definition of insolvency.[98]
To date, Associate Professor Khimji has yet to identify a single case applying the rule against
double proof except in cases of insolvency.  It is a rule beyond his area of expertise.

In arguing that the rule against double proof is an overarching common law principle,
Associate Professor Khimji may be confusing it with the Canadian common law principle that a
plaintiff who has obtained a judgment against a defendant on alternate theories of liability in
respect of the same debt may not recover more than 100% in respect of the debt owed.[99]  While
there is no dispute that the American equivalent to this rule operates here to preclude the
Noteholders from recovering more than 100% of value of the Notes, the rule against double
proof has no application to this proceeding.

**8.      Even if the Canadian Rule Against Double Proof Applied, It Would
         Not Disallow the Assertion of Both the Statutory Claim and the
         Guarantee Claim**

Even if the "rule against double proof" were applicable here, which it is not, it would not
preclude the allowance of both the Statutory Claim and the Guarantee Claim.[100]  As Mr. Baird's
testimony and the other evidence demonstrates, this case is readily distinguishable from *Olympia*

---

[97] *See id.* at 57:8-25.  Associate Professor Khimji testified that *Liverpool* is the only case he has found in Canada or
the United Kingdom that deals with the rule against double proof outside the context of insolvency/bankruptcy.  *See
id.* at 78:11-16.

[98] *See id.* at 61:18-62:10.

[99] *See* Baird Direct Test. ¶¶ 26-27.

[100] *See id.* ¶¶ 28-51.

& York Developments Ltd.(Bankrupt), Re, 1998 O.T.C. Lexis 2135, (Ont. Ct. (Gen. Div.)1998), 4

C.B.R. (4th) 189, 80 O.T.C. 369, the primary case relied upon by Associate Professor Khimji in

support of his "double proof" argument.[101]   The application of the "rule against double proof" in

*Olympia & York* is a product of the particular facts of that case in which a subsidiary lent funds

to an affiliate subsidiary pursuant to an intercompany loan agreement which was guaranteed by

the parent; the claims in respect of the intercompany loan agreement and the guarantee were

essentially identical.[102]   By contrast, as described *supra*, the Statutory Claim and the Guarantee

Claims are distinct, asserted by different parties and premised upon totally independent theories

of liability.   A discussion of the many factors distinguishing *Olympia & York* from the instant

case may be found at paragraphs 38-46 of the Baird Declaration.

A more pertinent and analogous case to the present one is *Re Polly Peck International*

*Plc*,[103] a United Kingdom decision from the Chancery Division of the High Court of Justice, the

reasoning of which was recently affirmed by the Supreme Court of the United Kingdom.[104]

*Polly Peck* is discussed in greater detail in the Baird Declaration at paragraphs 30-34.   In that

case, the Court found no violation of the rule against double proof where bondholders claimed

against a parent corporation on a guarantee of a subsidiary corporation's bond obligations and the

subsidiary bond issuer claimed against its parent for repayment of intercompany loans made with

the proceeds of the bonds.[105]   Of particular note, the court observed that the purpose of the "rule

against double proof" is to prevent a creditor from "'getting his debtor to enter into several

---

[101] *See id.* ¶¶ 35-47.

[102] *See Olympia & York,* 1998 O.T.C. Lexis 2135 ¶¶ 2, 7, 9, 12 (Def. Tr. Ex. 4).

[103] [1996] B.C.C. 486, 1 B.C.L.C. 428 (Ch. D.) (Def. Tr. Ex. 3).  In Canada, the reasoning in UK case law is highly respected and often is very persuasive.  *See* Baird. Direct Test. ¶ 31-32 & n.10.

[104] *See In the Matter of Kaupthing Singer & Friedlander Ltd.*, [2011] UKSC 48) (Def. Tr. Ex. 318).

[105] *See Polly Peck*, 1 BCLC at 430-444 (Def. Tr. Ex. 3).

distinct contracts with different people for the same debt, to obtain higher dividends than the other creditors and perhaps get his debt paid in full.'"[106]  This concern is not present here.  If anything, the reverse is true, because Old GM, by deciding to incorporate GM Nova Scotia as a ULC in order to obtain tax and other benefits, voluntarily assumed a statutory obligation pursuant to Section 135 to contribute to GM Nova Scotia in the event of a winding up.[107]

Finally, as described by Mr. Baird in his Declaration at paragraphs 48-51, the "one payment" test advocated by Associate Professor Khimji based on *Olympia & York*—which asks whether the debtor, if solvent, could discharge both debts by a single payment—is inapplicable here.  As Mr. Baird testified, *Polly Peck* warned against application of the "one payment" test in situations where its application may violate the principle of separate legal personality.[108]  The *Polly Peck* Court emphasized that a court should look to the legal substance of the relevant transactions and not the economic substance, if different, so that the principle of separate corporate personality is not disregarded:  "[W]e are concerned not with economics but with law."[109]  Here, separate legal personality concerns dictate rejection of the "one payment" test.  As described at length above, Old GM structured GM Nova Scotia as a ULC to obtain significant tax advantages, and the Noteholders lent money to GM Nova Scotia pursuant to an agreement which in no way restricted GM Nova Scotia's Section 135 liability.  This structure, whereby Old GM obtained benefits and the Noteholders received increased security on their loan, should be respected.

---

[106] *Id.* at 437 (*quoting Re Oriental Commercial Bank, Ex parte European Bank* (1871) 7 Ch.App.99 at 103-104).

[107] *See* Baird Direct Test. ¶ 34.

[108] *See id.* ¶ 49.

[109] *Polly Peck*, 1 BCLC at 440 (Def. Tr. Ex. 3); *see also* Baird Direct Test. ¶ 50.

H.    **Section 502(e) is Inapplicable to the ULC Claim.**

Finally, in its pre-trial brief, the GUC Trust alleged for the first time that the Note portion

of the Statutory Claim should be disallowed under § 502(e) of the Bankruptcy Code.  This

argument lacks merit.  Case law provides that a party seeking to disallow a claim pursuant to §

502(e)(1)(B) must establish three elements: (i) the party asserting the claim must be liable with

the debtor on the claim of a third party; (ii) the claim must be contingent at the time of its

allowance or disallowance; and (iii) the claim must be for reimbursement or contribution.[110]

"All three elements must be satisfied for the claim to be disallowed, and [the objecting party] has

the burden of proof on each element."[111]  At a minimum, the GUC Trust cannot establish either

the second or third elements.

First and most significantly, the Statutory Claim is not a claim for contribution or

reimbursement.[112]  A claim for contribution or reimbursement is one "where the liability itself

does not arise unless and until the payment is made to the third party."[113]  The opposite fact

pattern is at play here.  The Nova Scotia Trustee is asserting its claim under Section 135

precisely because it lacks any funds to pay the Noteholders.  Indeed, in the event that the Nova

Scotia Trustee actually had funds to pay the Noteholders, that would actually eliminate the ULC

claim; by contrast, a claim for contribution or reimbursement would only ripen once payment

---

[110] *See In re Lyondell Chemical Co.*, 442 B.R. 236, 243 (Bankr. S.D.N.Y. 2011) (disallowing contingent environmental liability claims).

[111] *In re RNI Wind Down Corp.*, 369 B.R. 174, 181 (Bankr. D. Del. 2007) (internal citations omitted).

[112] Contribution is "the right that gives one of several persons who are liable on a common debt the ability to recover ratably from each of the others when that one person discharges the debt for the benefit of all."  BLACK'S LAW DICTIONARY 378 (9th ed. 2009).  Reimbursement is the right of a guarantor that pays, or is compelled to pay, a borrower's obligations to recover the amount paid from the borrower.  *See United States v. Frisk*, 675 F.2d 1079, 1082 n.6 (9th Cir. 1982) (noting that "upon payment of the debt, the guarantor . . . has a right of action against the principal for reimbursement of the amount paid plus interest").

[113] *In re Chemtura Corp.*, 436 B.R. 286, 297 (Bankr. S.D.N.Y. 2010) (*quoting In re RNI Wind Down Corp.*, 369 B.R. at 184).

was made.[114]  Section 502(e)—the purpose of which is to ensure that the estate will not be liable

to the primary obligor and the guarantor for the same debt[115]—is simply not applicable to claims

such as the Statutory Claim.

Second, even if the Court were to somehow conclude that the ULC claim was for

contribution/reimbursement, the claim is not contingent at the time of allowance/disallowance.

A claim is contingent so long as "it is dependent upon some future event that may never

happen."[116]  But here, the amount due on the Notes is fixed as of the date of GM Nova Scotia's

bankruptcy.  It will not change.  The theory that a claim is contingent until payment is made is

inapplicable here.[117]  That theory was established in cases dealing with CERCLA environmental

remediation where future environmental remediation was still required, the exact cost of which

was impossible to predict.[118]  In fact, in the *Lyondell* decision, this Court explicitly rejected the

proposition that claims are necessarily contingent until the underlying payment has been

made.[119]  Instead, the theory is generally confined to circumstances where the underlying

liability is somehow indeterminate or subject to change.[120]  But as discussed above, the ULC

claim is completely fixed as of October 9, 2009 and cannot and will not change in the future.

Section 502(e)(1)(B) is thus inapplicable to the Statutory Claim.

---

[114] While it is true that Section 135 uses the word "contribute," it is using the word in the ordinary sense, and not in the particular legal sense applicable to 502(e)(1)(B).

[115] *See* 4 COLLIER ON BANKRUPTCY, ¶ 502.06[2][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009); *see also* H.R. Rep. No. 95-595, at 354 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 6309-6310 (section 502(e)(1)(B)) "requires disallowance of the claim for reimbursement or contribution of a codebtor, surety or guarantor of an obligation of the debtor, unless the claim of the creditor on such obligation has been paid in full.  The provision prevents competition between a creditor and his guarantor for the limited proceeds in the estate.").

[116] *In re GCO Servs., LLC*, 324 B.R 459, 466 n. 15 (Bankr. S.D.N.Y. 2005).

[117] *See, e.g., In re APCO Liquidating Trust*, 370 B.R. 625, 636 (Bankr. D. Del. 2007) ("The contingency contemplated by [section] 502(e)(1)(B) relates to both payment and liability.").

[118] *See id.*; *In re Lyondell Chemical Co.*, 442 B.R. at 249-250.

[119] *See id.* at 247-248.

[120] *See id.*

**II.    THE NOVA SCOTIA TRUSTEE DID NOT ENGAGE IN ANY INEQUITABLE CONDUCT AND ITS CLAIM SHOULD NOT BE SUBORDINATED, DISALLOWED, OR RECHARACTERIZED**

In its Amended Complaint and pre-trial brief, the GUC Trust alleges that the Nova Scotia Trustee engaged in inequitable conduct warranting equitable subordination, disallowance, or recharacterization of its claim.  The Nova Scotia Trustee refutes this allegation entirely.  The Nova Scotia Trustee, through Peter Wedlake, an officer of the Supreme Court of Nova Scotia and past President of the Canadian Association of Insolvency and Restructuring Professionals, has administered the bankrupt estate of GM Nova Scotia in good faith, consistent with his obligations under Canadian law as a trustee in bankruptcy, and in accordance with applicable U.S., Canadian, and Nova Scotia law.[121]

**A.    The Law**

With respect to the law governing equitable subordination, disallowance, and recharacterization, the Nova Scotia Trustee respectfully refers the Court to Section I of the Post-Trial Brief of Elliott Management Corp, Fortress Investment Group, and Morgan Stanley & Co. Int'l, and joins in the argument that, among other things, (i) equitable subordination and equitable disallowance are "drastic" and "draconian" remedies that are inapplicable here, and (ii) there is no legal basis to support the GUC Trust's recharacterization claim.  The Nova Scotia Trustee has not engaged in any inequitable conduct, let alone the type of conduct that would be required to support a claim for equitable subordination, disallowance, or recharacterization.

Given the lack of any inequitable conduct by the Nova Scotia Trustee, there is a concern that, in pursuing this claim, the GUC Trust is in fact trying to impute the conduct of Old GM, New GM, or the Noteholders onto the Nova Scotia Trustee.  Although the Nova Scotia Trustee

---

[121] *See* Wedlake Direct Test. *generally.*

does not believe these parties have engaged in any wrongful conduct, no such imputation should be allowed in any event. There is absolutely no precedent for applying the conduct of third parties to a holder of an independent claim, and courts actually warn against such imputation.[122]

While it is true that a substantial portion of Old GM's liability to GM Nova Scotia relates to a debt obligation to the Noteholders, that liability arises from GM Nova Scotia's issuance of the Notes, an act that took place in 2003 and is entirely independent of the Lock-Up Agreement or any of the other conduct that the GUC Trust alleges should serve as the basis of equitable subordination. The Nova Scotia Trustee was not even appointed to his role until more than four months after the Lock-Up Agreement was executed and approximately three months after this Court's approval of the MSPA.[123] It is undisputed that the Nova Scotia Trustee had no involvement with the negotiation, execution, or disclosure of the Lock-Up Agreement, and that the Nova Scotia Trustee's substantive involvement in this case did not commence until after Green Hunt Wedlake's appointment.[124]

### B.    The Noteholders' Selection of the Nova Scotia Trustee was Entirely Proper

Throughout these proceedings, the GUC Trust has questioned the Noteholders' selection of Mr. Wedlake to serve as Nova Scotia Trustee. Most recently, in its pre-trial brief, the GUC Trust complained that Mr. Wedlake was "hand-picked by the Lock-Up Noteholders, some of whom had previously worked with him on similar investment schemes," adding that "Mr. Wedlake had already worked with three of the four Lock-Up Noteholders in connection with litigation they commenced . . . earlier in 2009."[125] The evidence proves the allegation that Mr.

---

[122] *See*, *e.g., In re Missionary Baptist Found. of Am., Inc.*, 818 F.2d 1135, 1146 (5th Cir. 1987) (denying imputation of inequitable conduct from one partner to another).

[123] *Cf.* Def. Tr. Ex. 241 (Order of Appointment) with Def. Tr. Exs. 174 (Lock-Up Agreement) and 226 (Sale Order).

[124] *See* Wedlake Direct Test. *generally*.

[125] GUC Trust Pretrial Brief at 4.

Wedlake had previously worked with the Noteholders on "similar investment schemes" to be demonstrably false. Prior to being interviewed as a potential receiver with regard to the Nova Scotia Litigation, Mr. Wedlake had zero interaction with any of the Noteholders.[126] He did not know who they were.[127] And Mr. Wedlake was never even appointed as a receiver in that litigation.[128]

Further, the GUC Trust's allegations that Mr. Wedlake was "hand-picked" by the Noteholders to serve as trustee is meaningless, because it is standard practice in Canada for creditors to select the trustee.[129] Upon issuing a bankruptcy order, Canadian courts are required to appoint a licensed trustee, and the creditor seeking that bankruptcy order is required to provide the court with the consent of a licensed trustee, because no trustee can be compelled to accept an appointment.[130]

### C.    The Nova Scotia Trustee Had No Role or Involvement in the Timing of the GM Nova Scotia Bankruptcy Filing

The GUC Trust has also made noise about the fact that the Petitioning Creditors waited more than three months after payment of the Consent Fee to petition GM Nova Scotia into bankruptcy and has argued that the Nova Scotia Trustee "was aware of and consented to the Lock-Up Noteholders' manipulation of the timing of the Nova Scotia Finance bankruptcy."[131] This, too, is wrong. As a matter of Canadian bankruptcy law, the timing of a bankruptcy

---

[126] *See* Wedlake Direct Test. ¶¶ 8-9; Bolin Direct Test. ¶ 21; Gropper Direct Test. ¶ 23.

[127] *See* Wedlake Direct Test. ¶¶ 8-9.

[128] *See id.* ¶ 12.

[129] *See id.* ¶ 15.

[130] *See* Def. Tr. Ex. 1 (BIA) at §§ 43(9), 14.06(1).

[131] GUC Trust Pretrial Brief at 5, 22.

application is determined by the bankrupt's creditors, and a licensed trustee has no official role until appointed by the Canadian court.[132]

In this case, the Nova Scotia Trustee had no idea and no say regarding the filing of the GM Nova Scotia bankruptcy. As of June 2, 2009, Mr. Wedlake thought that the bankruptcy filing would happen "in due course," and in a June 24, 2009 email, described that date as being the "eve of bankruptcy."[133] Having heard nothing further from the Noteholders or the Court, on September 4, 2009, Mr. Wedlake reached out to the Noteholders' counsel by email to ask what was happening, and only then did he learn for the first time about the decision to wait three months.[134] There is simply no contrary evidence.

Moreover, the Noteholders' decision to wait 90 days in no way shielded the Consent Fee from scrutiny from the Canadian bankruptcy court, Mr. Wedlake, or the OSB.[135] Soon after Green Hunt Wedlake was appointed as trustee, Mr. Wedlake prepared the Preliminary Report to Creditors, which he shared with the Canadian Office of the Superintendent of Bankruptcy, identifying the Lock-Up Agreement and the settlement of the Intercompany Loans as potential "Preferences and Transfers at Undervalue."[136] And relevant Canadian law would have allowed for these transactions to be challenged even if they took place more than 90 days prior to GM Nova Scotia being declared bankrupt.[137]

---

[132] *See* Def. Tr. Ex. 1 (BIA) §§ 43(1) (noting that the creditors of a company apply for a bankruptcy order) and 43(9) (specifying that a trustee is appointed upon a bankruptcy order being made).

[133] Def. Tr. Ex. 211 (6/24/09 Wedlake email); Trial Tr. 08/07/2012 (Wedlake) at 64:10-15, 105:1-14.

[134] *See* Def. Tr. Ex. 236; Wedlake Direct Test. ¶ 18.

[135] *See* Trial Tr. 08/07/12 (Wedlake) at 162:22-163:5.

[136] *See infra* at 34.

[137] Unlike the federal BIA, the relevant Nova Scotia provincial statutes allow a trustee to attack preferences and transfers at undervalue regardless of timing. *See The Statute of Elizabeth*, 150 (Imp.), 13 Eliz., c. 5; the *Assignment and Preferences Act* (Nova Scotia), R.S.N.S. 1989, c. 25.

### D.    The Nova Scotia Trustee's Administration of the GM Nova Scotia Estate Has Been Entirely Consistent With the Proper Roles and Duties of a Canadian Bankruptcy Trustee

Further, the GUC Trust's criticisms about how the Nova Scotia Trustee has administered the GM Nova Scotia estate reflect a fundamental misunderstanding about the role and function of a Canadian bankruptcy trustee.  The GUC Trust has alleged throughout this litigation that "the [] Noteholders directed [the Nova Scotia Trustee] in ways designed to secure every advantage for themselves," and that the Nova Scotia Trustee "is controlled by" the Noteholders.[138]  But this means nothing.  The Supreme Court of Canada has confirmed that a bankruptcy trustee's duty is owed *to the creditors*.[139]  Indeed, it is settled law in Canada that the Nova Scotia Trustee has a legal obligation to act on behalf of its creditors through its "dual role" as both a representative of the debtor and the creditors.[140]  A trustee is "an administrative official required to gather in and realize on the bankrupt's assets and then to distribute the proceeds according to the priorities under the [BIA]."[141]

It is unsurprising, then, that the Nova Scotia Trustee has acted for the benefit of the Noteholders—but this in no way means that Mr. Wedlake was unduly "controlled" by them or unable to exercise his own judgment.  In his testimony, Mr. Wedlake confirmed that he is not obligated to honor every request or direction from GM Nova Scotia's creditors,[142] and in one very prominent instance, he clearly acted against the wishes of the Noteholders.  After receiving the Preliminary Report to Creditors, which identified the Lock-Up Agreement and release of the

---

[138] GUC Trust Pretrial Brief at 5, 22.

[139] *See A. Marquette & Fils Inc. v. Mercure*, [1977] 1 S.C.R. 547 (S.C.C.) ¶ 9 (noting that a Canadian bankruptcy trustee is "the representative of all the general creditors to the extent that he can even act on their behalf against the debtor").

[140] *See* Frank Bennett, BENNETT ON BANKRUPTCY 69 (14th ed. 2012).

[141] *Id.* at 70.

[142] *See* Wedlake Direct Test. ¶ 22.

Intercompany Loans as potential "Preferences and Transfers at Undervalue," counsel for the

Noteholder Aurelius contacted Mr. Wedlake on several occasions, requesting that he amend his

report.[143]  Mr. Wedlake refused to do so, and he explained why at trial: "[Be]cause I felt what I

had set out in the report was accurate.  And you know I wasn't about to have you know creditors

tell me how to write my reports."[144]

### E.    The Decision of Whether to Appoint "Inspectors" to Act on Behalf of GM Nova Scotia's Creditors Rested with Those Creditors, Not the Trustee

The GUC Trust's lack of understanding regarding the role and function of a Canadian

bankruptcy trustee is also shown by its argument that Mr. Wedlake did not insist on the

appointment of "Inspectors" for the GM Nova Scotia estate.  In its pre-trial brief, for example,

the GUC Trust alleges that the Noteholders "directed [Mr. Wedlake] not to appoint inspectors"

and criticizes Mr. Wedlake for "fail[ing] to have inspectors appointed."[145]  The GUC Trust's

argument implies that if inspectors were appointed they would have somehow acted against or

independent from the interests of the Noteholders.  But the role of an inspector in a Canadian

bankruptcy is to act *for the benefit of the estate's creditors*.[146]  Indeed, inspectors have a statutory

obligation to the general body of creditors and are themselves often employees of creditors.[147]

Thus, the lack of inspectors is in no way evidence of a "scheme" to further the Noteholders'

interests.

The GUC Trust also does not appreciate that it is for the creditors, not the trustee, to

decide whether inspectors will be appointed.  Similar to the process of appointing an official

---

[143] *See* Def. Tr. Exs. 269 (11/19/09 Huff email), 300 (12/24/09 Huff email).

[144] Wedlake Direct Test. ¶ 40; Trial Tr. 08/07/12 (Wedlake) at 166:2-22.

[145] GUC Trust Pretrial Brief at 5, 22.

[146] *See* BENNETT ON BANKRUPTCY 430–32 (stating that inspectors are "statutory officials appointed under subsection 116(1) of the [BIA] to represent the creditors" and are "generally representatives of the larger creditors" who have a fiduciary obligation to the creditors of the bankrupt estate).

[147] *See* Wedlake Direct Test. ¶ 32; Trial Tr. 08/07/12 (Wedlake) at 172:19-173:13.

committee under the Bankruptcy Code, where creditors are unwilling to serve as inspectors, the

trustee cannot require inspectors.[148]  Here, a vote was held at the First Meeting of Creditors on

whether to appoint inspectors, and the creditors voted not to do so.[149]

> **F.      There Was No Basis for the Nova Scotia Trustee to Further Investigate the
> Lock-Up Agreement, the Consent Fee or the Intercompany Loan Settlement**

The GUC Trust also alleges, incorrectly, that the Noteholders "directed" the Nova Scotia

Trustee "not to investigate potential challenges to the Consent Fee and Lock-Up Agreement,"

and that the Nova Scotia Trustee "failed to adequately investigate possible preferential

transfers."[150]  These allegations are not borne out by the facts.  Again, during the First Meeting of

Creditors, Mr. Wedlake presented his Preliminary Report to creditors and to Mr. Stephen Dickey,

an Official Receiver employed by the OSB.[151]  The Preliminary Report contained a summary of

the analysis Mr. Wedlake performed, based on a review of the Lock-Up Agreement and the

settlement of the Intercompany Loan, with respect to potential "Preferences and Transfers at

Undervalue."[152]  After careful consideration and consultation with counsel, Mr. Wedlake decided,

without any input or coercion by the Noteholders, that it would be inappropriate to pursue any

claim.[153]

There were at least four reasons why Mr. Wedlake did not pursue a claim regarding the

Lock-Up Agreement or the settlement of the Intercompany Loan.[154]  First, as Mr. Wedlake stated

in the Preliminary Report, "all of the known creditors of [GM Nova Scotia] were either a

---

[148] *See* Def. Tr. Ex. 1 (BIA) § 116(1); Wedlake Direct Test. ¶ 32.

[149] *See id.* ¶¶ 42-43; Def. Tr. Ex. 262 (Minutes of First Meeting of Creditors); Gropper Direct Test. ¶¶ 98-99.

[150] GUC Trust Pretrial Brief at 5, 22.

[151] *See* Wedlake Direct Test. ¶¶ 34-35.

[152] *See id.* ¶ 37;  Def. Tr. Ex. 256 (Preliminary Report to Creditors).

[153] *See* Wedlake Direct Test. ¶ 38.

[154] *See id.* ¶ 38.

beneficiary of the transaction or consented to and/or participated in the transaction."[155]

Moreover, the debtor itself, GM Nova Scotia, was party to both the Lock-Up Agreement and the

settlement of the Intercompany Loan, and GM Nova Scotia's sole shareholder, Old GM, which

had overseen the entire transaction, was a party to the Lock-Up Agreement.[156] Collectively,

every single party of interest—the debtor, its shareholder, and its creditors, all supported the

underlying transaction. Second, no creditors of GM Nova Scotia requested that Mr. Wedlake

perform any additional investigation, meaning he was under no obligation to do so.[157] Third, Mr.

Wedlake testified that, had he pursued a claim, he understood that he would have been opposed

by his entire creditor constituency, equity, possibly the U.S. and Canadian governments, and

others.[158] And finally, Mr. Dickey of the OSB, who chaired the First Meeting of Creditors and

drafted the meeting minutes, declined to instruct Mr. Wedlake to investigate the matter further,

even though the OSB had the power to do so and has done so historically if a transaction appears

improper.[159]

For all these reasons, Mr. Wedlake validly opted not to expend additional estate resources

on further investigating or pursuing a claim related to the Lock-Up Agreement or the settlement

of the Intercompany Loans.[160]

> **G.      The Nova Scotia Trustee Properly Vetted the Claims Against GM Nova
> Scotia, Including the Swap Claim**

The GUC Trust has also put at issue the Nova Scotia Trustee's diligence of the Swap

Claim, alleging that the Nova Scotia Trustee submitted its claim in these proceedings "without

---

[155] Def. Tr. Ex. 256 (Preliminary Report to Creditors) at 6.
[156] *See* Wedlake Direct Test. ¶ 38.
[157] *See id.* ¶ 38.
[158] *See id.* ¶ 38.
[159] *See id.* ¶ 38; Trial Tr. 08/07/12 (Wedlake) at 164:23-166:1.
[160] See Wedlake Direct Test. ¶ 39.

undertaking any independent investigation" of the Swap Agreements.[161]  This argument is also

belied by the record.  As he did with the Noteholders, Mr. Wedlake consulted with New GM (and

its counsel) and provided assistance as New GM drafted its proof of claim.[162]  When he received

the Swap Claim, he reviewed it to confirm that it was *prima facie* valid and allowable for voting

purposes at the first meeting of creditors, while reserving his rights to challenge the claim in all

other respects.[163]  Significantly, the Swap Claim included a certified and witnessed declaration

from Mr. Buonomo setting forth the damages calculation (including a back-up spreadsheet) and

describing how New GM had acquired all rights in the Swap Agreements.[164]

　　　　But the Nova Scotia Trustee did not rely solely on Mr. Buonomo's certification and

supporting proof of claim.  Mr. Wedlake consulted with both Canadian and U.S. counsel,

including counsel with expertise in swap agreements to verify New GM's swap calculations.[165]

He also relied on GM Nova Scotia's Statement of Affairs—which is a statutory document that

the bankrupt must file with the trustee, the Superintendent of Bankruptcy, and the Nova Scotia

Court.[166]  The Statement of Affairs must be sworn to as being true and accurate,[167] and it is an

offense to file an untrue Statement of Affairs punishable by fine and/or imprisonment.[168]  Here,

GM Nova Scotia's Statement of Affairs was sworn to by former director Maurita Sutedja and

listed a swap liability that matched the amount claimed in New GM's Proof of Claim.[169]  Ms.

---

[161] GUC Trust Pretrial Brief at 22.

[162] *See* Wedlake Direct Test. ¶¶ 26-27.

[163] *See id.*

[164] *See* Def. Tr. Ex. 251 (Swap Claim); Wedlake Direct Test. ¶ 29.  New GM's calculation is discussed in greater detail *infra*.

[165] *See* Trial Tr. 08/07/12 (Wedlake) at 41:7-24, 44:16-45:5, 56:10-57:6, 147:8-19.

[166] *See id.* at 148:21-149:2.

[167] *See id.*

[168] *See* Def. Tr. Ex. 1 (BIA) s. 198(1)(b); Trial Tr. 08/07/12 (Wedlake) at 43:4-44:4.

[169] *See* Def. Tr. Ex. 305 (Statement of Affairs); Wedlake Direct Test. ¶ 47.

Sutedja's signature was given only after counsel and numerous other parties had reviewed the swap calculation,[170] and Mr. Wedlake had no reason to doubt Ms. Sutedja's competency and knowledge.[171]  In fact, he spoke with Ms. Sutedja about the Statements of Affairs on approximately six separate occasions.[172]

Mr. Wedlake also compared the amount of the Swap Claim with various other records in which the Swap Claim was valued and found them all to be consistent.[173]  These documents included a December 31, 2008 GM Nova Scotia Financial Statement which described a swap liability of $516 million;[174] an April 27, 2009 S-4 filed by Old GM which indicated a swap liability of CDN $632 million as of March 31, 2009;[175] and a Periodic Report filed by Old GM in these proceedings on November 2, 2009 which described GM Nova Scotia's total liability as of 8/31/09 as $1.58 billion, which—if the value of the Notes was subtracted out—would equate to a swap liability of around $530 million.[176]

### H.    Mr. Wedlake Pursued and Recovered on Other Assets Besides the Statutory Claim

Finally, the GUC Trust argued in its pre-trial brief that the Noteholders directed the Nova Scotia Trustee "not to . . . pursue any other assets of [GM Nova Scotia] other than the ULC claim against Old GM."[177]  The Nova Scotia Trustee is unaware of any evidence to support this claim. Moreover, the record is clear that Mr. Wedlake did in fact pursue other assets, and ultimately

---

[170] *See* Sutedja Dep. at 59:1-9, 161:12-162:20, 163:25-164:7.

[171] *See* Trial Tr. 08/07/12 (Wedlake) at 29:16-31:25.

[172] *See id.* at 28:9-13.

[173] *See id.* at 157:5-159:10.

[174] *See* Def. Tr. Ex. 398 (GM Nova Scotia Financial Statement); Wedlake Direct Test. ¶ 47.

[175] *See* Def. Tr. Ex. 75 (4/27/09 S-4) at NGM000007377; Wedlake Direct Test. ¶ 48.

[176] *See* Def. Tr. Ex. 423 (Periodic Report); Wedlake Direct Test. ¶ 49.

[177] GUC Trust Pretrial Brief at 5.

recovered corporate tax refunds in the amount of CAD $2.7 million.[178]  His recovery was the

result of many hours investigating GM Nova Scotia's affairs and working with Canadian

government officials.[179]

### III.    THE SWAP AGREEMENTS WERE VALIDLY TERMINATED AND NEW GM'S SWAP CLAIM WAS PROPERLY CALCULATED

The Swap Claim asserted by New GM against GM Nova Scotia and in turn asserted by

the Nova Scotia Trustee in these proceedings for amounts owed under the Swap Agreements

should be allowed in full.  In opposition, the GUC Trust has argued that (i) New GM does not

possess the right to assert the Swap Claim; (ii) the Swap Agreements were not properly

terminated; and (iii) the swap liability as stated in the Swap Claim is inflated by more than $200

million.[180]  The GUC Trust is wrong on all counts.  With respect to the first point, the Nova

Scotia Trustee has reviewed New GM's argument that the Swap Agreements were purchased by

New GM as an executory contract that was properly assumed and assigned, and finds it

compelling.[181]  Moreover, Old GM, the party to whom the swap liability would otherwise be

owed, has not filed any such claim in the GM Nova Scotia Bankruptcy.[182]  The Nova Scotia

Trustee's response to the GUC Trust's second and third arguments is as follows.

### A.    The Swap Agreements Were Validly Terminated as of October 9, 2009

GM Nova Scotia's bankruptcy constituted a default under the Swap Agreements, entitling

New GM, as the non-defaulting party, to serve notice and declare an "Early Termination."[183]  Mr.

---

[178] *See* Wedlake Direct Test. ¶¶ 50-52.

[179] *See id.*

[180] *See* GUC Trust Pretrial Brief at 18-20.

[181] *See* Opening Post-Trial Brief by General Motors, LLC at 33-35.

[182] *See* Trial Tr. 08/07/12 (Wedlake) at 195:24-196:4.  The assertion of such a claim would not be an empty gesture. As described *supra*, the Nova Scotia Trustee has recovered certain assets in the form of tax refunds to which all claimants of the GM Nova Scotia estate are entitled to their *pro rata* share.

[183] *See* Def. Tr. Ex. 422 (Statutory Claim) at DEF8683 (ISDA Master Agreement § 5(a)(vii)) and DEF 8685 (ISDA Master Agreement § 6(a)).

Wedlake was aware of this possibility, and after discussing the matter with his counsel,

approached New GM to inquire whether it intended to exercise its Early Termination Rights.[184]

But New GM understood that declaring an "Early Termination" under the Swap Agreements

would have reduced the monies owed to it by GM Nova Scotia under the Swap Agreements.[185]

Not surprisingly, New GM refused to do so.[186]  But this does not end the analysis.

### 1. The Nova Scotia Trustee Had a Legal Obligation to Affirm or Disclaim The Swap Agreements

Although New GM declined to declare an Early Termination, Mr. Wedlake was

determined to end the contracts.  Under Canadian law, a bankruptcy trustee must elect to either

affirm or disclaim executory contracts belonging to the debtor within a reasonable time after

appointment.[187]  Indeed, in a leading decision, the British Columbia Supreme Court confirmed

that the trustee must either affirm or disclaim executory contracts, stating: "***The trustee cannot***

***choose to do nothing***.  It must elect between the two alternatives . . . ."[188]

Mr. Wedlake wanted to disclaim the Swap Agreements for several reasons.[189]  First, GM

Nova Scotia will cease to exist following the conclusion of its bankruptcy proceedings, and

hence it is necessary for the Nova Scotia Trustee to wind up all of its affairs now.[190]  Second, GM

---

[184] *See* Trial Tr. 08/10/12 (Buonomo) at 90:14-22; Trial Tr. 08/07/12 (Wedlake) at 136:9-21.

[185] *See* Trial Tr. 08/10/12 (Buonomo) at 90:14-91:2.

[186] *See id.* at 90:14-91:2, 107:20-22; Wedlake Direct Test. ¶ 60; Trial Tr. 08/07/12 (Wedlake) at 81:19-22, 136:9-21. Representatives of Aurelius Capital Management which was, at that time, a creditor of GM Nova Scotia for amounts owing under the Notes, were kept apprised of these events, but contrary to the GUC Trust's suggestions at trial, did not dictate those events.  *See* Trial Tr. 08/07/12 (Wedlake) at 82:16-23, 133:25-134:23; Trial Tr. 09/28/12 (Gropper) at 39:1-40:12.

[187] *See In New Skeena Forest Products Inc. v. Don Hull Contracting*, [2005] B.C.J. No. 546, 251 D.L.R. 4th 328, para. 30 (B.C.C.A.) ("[The] power [to disclaim executory contracts] has been relied on for many years by trustees, and in the absence of a clear statutory provision overriding the common law, in my view trustees should have this power to assist them fulfill the duties of their office."); *see also N. Am. S.S. Ltd. (Re)*, [2007] B.C.S.C. 267; *Royal Bank of Can. v. Penex Metropolis Ltd.*, [2009] O.J. No. 3645, 180 ACWS (3d) 258.

[188] *N. Am. S.S. Ltd. (Re)*, [2007] B.C.S.C. 267 para. 18 (emphasis added).

[189] *See* Wedlake Direct Test. ¶ 62; Trial Tr. 08/07/12 (Wedlake) at 81:23-82:2.

[190] *See* Wedlake Direct Test. ¶ 62; Trial Tr. 08/07/12 (Wedlake) at 82:3-7.

Nova Scotia, the "out of the money" party to the Swap Agreements, did not possess sufficient assets to continue making annual payments, as it would almost certainly have been required to do absent a disclaimer.[191]  And third, given the ongoing fluctuations of interest rates and exchange rates, the overall liability owed by GM Nova Scotia on the Swap Agreements could have continued to grow.[192]  This would not only be contrary to the interests of the GM Nova Scotia estate, but, as testified to at trial, Mr. Wedlake understood that he might have been personally liable for any additional liability accruing to the estate on account of contracts that the trustee failed to disclaim.[193]

The Nova Scotia Trustee's disclaimer of the Swap Agreements was thus both prudent and consistent with its obligation under Canadian law.

## 2. The Parties Amended the Swap Agreements to Allow for the Nova Scotia Trustee's Disclaimer

After New GM refused to declare an "Early Termination," the Nova Scotia Trustee's Canadian counsel discussed with New GM's Canadian counsel Mr. Wedlake's decision to disclaim the Swap Agreements.[194]  Pursuant to these discussions, New GM agreed that the disclaimer would constitute a termination of the Swap Agreements and that New GM's claim

---

[191] *See* Wedlake Direct Test. ¶ 62; Trial Tr. 08/07/12 (Wedlake) at 136:4-8.  Under the terms of the Swap Agreement related to the 2015 Notes, depending on movements in the GBP/CAD exchange rate, GM Nova Scotia may have had to make an annual payment to New GM on December 7, 2009 and on each year thereafter until December 7, 2015.  Under the terms of the Swap Agreement related to the 2023 Notes, depending on movements in the GBP/CAD exchange rate, GM Nova Scotia may have had to make an annual payment to New GM on July 10, 2010 and on each year thereafter until July 10, 2023.

[192] *See* Wedlake Direct Test. ¶ 62.

[193] *See* Trial Tr. 08/07/12 (Wedlake) at 82:8-15.  Multiple Canadian authorities confirm that Mr. Wedlake's fear was justified.  *See, e.g.*, *Sasso & Cronin v. D. & A. MacLeod Co. Ltd.*, [1991] O.J. No. 676, 3 O.R. (3d) 472 (Ont. Ct. Gen. Div.) (holding trustee personally liable for unpaid rent accruing after trustee's appointment due to trustee's failure to disclaim commercial lease agreement); Ziegel, Jacob, "The Personal Liabilities of Insolvency Practitioners Under Insolvency Legislation" (University of Toronto, 2006) (observing that Canadian bankruptcy trustees are not immune from liability for, among other things, breach of fiduciary duty, claims in negligence or conversion, or other types of tort).

[194] *See* Trial Tr. 08/10/12 (Buonomo) at 90:14-22.

under the Swap Agreements would be valued as of October 9, 2009 (GM Nova Scotia's

bankruptcy date).[195]

To memorialize the parties' agreement regarding the Nova Scotia Trustee's disclaimer,

Mr. Wedlake sent a letter to Lawrence Buonomo of New GM, which formally disclaimed the

Swap Agreements upon three conditions and sought New GM's acknowledgement and

agreement (the "**Disclaimer Letter**").[196]   The three conditions were (1) the Swap Agreements

would be terminated as a result of the Nova Scotia Trustee's disclaimer effective as of the date of

GM Nova Scotia's bankruptcy (*i.e.*, October 9, 2009); (2) New GM would value its claim as of

October 9, 2009; and (3) the agreement would not constitute a formal acceptance by the Nova

Scotia of New GM's proof of claim as filed.[197]   Notably, the inclusion of this last condition by

the Nova Scotia Trustee rebuts any inference that the Nova Scotia Trustee's disclaimer and New

GM's acknowledgment thereof was some surreptitious way for the parties to fix the swap claim

at a higher value; in fact, the Nova Scotia Trustee conditioned its very disclaimer on the premise

that no valuation was, at that time, agreed to.

Mr. Buonomo found the points in the Disclaimer Letter acceptable and instructed his

counsel to confirm New GM's agreement.[198]   Thereafter, by email dated January 15, 2010,

counsel to New GM responded to Mr. Wedlake's letter, acknowledging the disclaimer of the

Swap Agreements and agreeing to the three conditions, thus bringing the parties' obligations

---

[195] *See id.*

[196] *See* Def. Tr. Ex. 303 (Disclaimer Letter); Trial Tr. 08/07/12 (Wedlake) at 137:9-138:4.

[197] *See* Def. Tr. Ex. 303 (Disclaimer Letter).

[198] *See* Buonomo Direct Test. ¶ 83.

under the Swap Agreements to a close.[199]  As testified to both swap experts, an agreement to

amend the underlying swap documentation is fully permissible.[200]

### 3.    Valuing the Swap Agreements as of October 9, 2009 is Entirely Appropriate

Valuing the Swap Agreements as of October 9, 2009 was entirely appropriate and wholly

consistent with Canadian bankruptcy practice.  By making the disclaimer effective as of the date

of GM Nova Scotia's bankruptcy, the Nova Scotia Trustee appropriately sought to prevent any

additional liability from accruing to the GM Nova Scotia estate it was administering.[201]

Moreover, it is a general principle of Canadian bankruptcy law that claims against the

bankruptcy estate should be valued as of the date of bankruptcy to ensure that the estate's assets

are distributed equitably among all claimants.[202]  Indeed, in keeping with this practice, the draft

proof of claim the Nova Scotia Trustee circulated to all creditors at the outset of the bankruptcy

told creditors to value their claims as of the date of bankruptcy and provided a statutory form

reflecting an October 9, 2009 valuation date.[203]

### B.    $564 Million is the Correct Value of the Swap Claim

The GUC Trust also challenges New GM's, and in turn, the Nova Scotia Trustee's

valuation of the Swap Agreements.  Canadian bankruptcy law holds that a party to a contract that

has been disclaimed by a Canadian bankruptcy trustee "may claim as an unsecured creditor of

---

[199] *See* Def. Tr. Ex. 307 (1/15/10 Golick Email).

[200] *See* Def. Tr. Ex. 422 (Statutory Claim) at DEF8689 (ISDA Master Agreement at § 9(b)) noting that parties may amend the ISDA Master Agreement by exchange of letters and/or emails; Trial Tr. 09/25/12 (Overdahl) at 23:25-25:5, 40:1-17, 60:17-23, 62:21-24; Trial Tr. 11/26/12 (Shoji) at 178:8-12, 179:10-24.

[201] *See* Wedlake Direct Test. ¶ 64; Trial Tr. 08/07/12 (Wedlake) at 138:9-19.

[202] *See* Def. Tr. Ex. 1 (BIA) § 124 (noting that creditors have to file a proof of claim in the prescribed form); BIA Form 31 (prescribed form of proof of claim requires the value of the claim as of the date of the bankruptcy) available at http://www.ic.gc.ca/eic/site/bsf-osb.nsf/vwapj/Form31_July2006_E.pdf/$FILE/Form31_July2006_E.pdf.

[203] *See* Def. Tr. Ex. 244 (Initial Letter to Creditors); Wedlake Direct Test. ¶ 64; Trial Tr. 08/07/12 (Wedlake) at 138:20-140:22.

the bankrupt in respect of the damages suffered by it."[204]   Because the Swap Agreements are

governed by New York law, the damages flowing therefrom should be determined in accordance

with New York law which treats a disclaimer or repudiation as the equivalent of a breach.[205]   The

proper measure of damages for breach of contract is "expectation damages,"[206] which are

designed to "[place] the aggrieved party in the same economic position it would have been in had

both parties fully performed."[207]   The approximately $564 million claimed by New GM in the

GM Nova Scotia bankruptcy and, in turn, by the Nova Scotia Trustee in these proceedings,

complies with this legal standard, because it reflects both the actual amount New GM would

have received had GM Nova Scotia performed (discounted to present value) and the actual mark-

to-market value of the Swap Agreements.

1.    **New GM's Valuation of the Swap Agreements Yields a Value of $564 Million**

The Swap Claim sets forth a detailed valuation of the amount it was owed on the Swap

Agreements at the time of GM Nova Scotia's bankruptcy.[208]   New GM's valuation was

performed by experts in New GM's treasury department, with the advice of Canadian counsel

and at the direction of various supervisors.[209]   The calculation is described in a table which (i)

sets forth all future payment streams owing on the Swap Agreements through maturity (*i.e.*,

payments from GM Nova Scotia to New GM in CAD and payments from New GM to GM Nova

Scotia in GBP); (ii) converts the CAD payments to GBP using Forward FX rates (*i.e.*, the

---

[204] *N. Am. S.S.*, [2007] B.C.S.C. para. 16.

[205] *See* 22A NY Jur Contracts § 434 ("An absolute renunciation of a contract by a party to the contract constitutes a breach thereof . . . .").

[206] *See J.R. Loftus, Inc. v. White*, 85 N.Y.2d 874, 877, (1995); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971); RESTATEMENT [SECOND] OF CONTRACTS § 347.

[207] *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728–29 (2d Cir. 1992).

[208] *See* Def. Tr. Ex. 251 (Swap Claim) at GHW0004659-4662.

[209] *See* Buonomo Direct Test. ¶ 82; Trial Tr. 08/09/12 (Buonomo) at 115:14-116:2.

projected exchange rate applicable on the future date on which the payments are to be made)

obtained from Bloomberg; (iii) determines the net amount owed by GM Nova Scotia on each

future payment date by subtracting the amount of GBP it will receive from the amount of GBP it

must pay; (iv) discounts those amounts to present value using discount rates obtained from

Bloomberg; (v) adds up all these future payments; and (vi) converts that number from GBP to

USD using the October 9, 2009 USD/GBP exchange rate obtained from Bloomberg.[210]   The

calculation is thus an accurate reflection of the amount New GM would have received had GM

Nova Scotia performed.

The GUC Trust has never attacked the accuracy of this calculation.  Instead, the GUC

Trust has pointed to evidence showing that New GM discussed the valuation of the Swap

Agreements with the Noteholders.[211]  Without more, such discussions are meaningless,

particularly in light of the uncontroverted testimony that the Noteholders did not tell New GM

how to value the Swap Agreements.[212]

### 2. The Nova Scotia Trustee's Expert's Mark-to-Market Valuation of the Swap Agreement is Nearly Identical to New GM's

As part of its ongoing efforts to administer the GM Nova Scotia estate and in connection

with advancing its claim in this proceeding, the Nova Scotia Trustee retained an expert in swap

agreements to perform an independent valuation of the Swap Agreements.  The expert the Nova

Scotia Trustee retained, Mr. Ken Shoji, has over 25 years of experience in capital markets as a

---

[210] *See* Def. Tr. Ex. 251 (Swap Claim) at GHW0004662.

[211] *See* Trial Tr. 08/09/12 (Buonomo) at 126:14-127:3; Trial Tr. 08/10/12 (Buonomo) at 106:15-107:3.  The GUC Trust has also argued that both New GM and Aurelius performed valuations of the Swap Agreements that resulted in values less than $564 million, but it is undisputed that those valuations were based on different termination dates (*i.e.*, not October 9, 2009, the day of GM Nova Scotia's bankruptcy and the proper day on which to value claims in a Canadian bankruptcy proceeding).  *See* Trial Tr. 08/09/12 (Buonomo) at 121:8-122:3; Trial Tr. 09/28/12 (Gropper) at 35:6-36:19.

[212] *See* Trial Tr. 08/10/12 (Buonomo) at 124:9-11.

trader, structurer and marketer of derivatives across all asset classes.[213]  Among other things, Mr.

Shoji has served as a Managing Director and the Americas Head of the Alternative Investment

Group for Dresdener Kleinwort, an international investment bank, and during his time at J.P.

Morgan, served as Head of Derivatives and Structured Products for the Private Bank, Head of

Emerging Markets Equity Derivatives, and held positions in Equity and Fixed Income

Derivatives.[214]  Significant to this analysis, Mr. Shoji was directly involved in trading, marketing

and structuring of swaps for fifteen years, and over the course of his career, has valued several

thousand currency swaps, including hundreds of CAD-GBP currency swaps.[215]  He has been

asked to provide "market quotations" (the relevance of which is discussed *infra*) hundreds of

times in his career, all in the context of real transactions where a counterparty either needed to

determine a closeout or replacement value or because the counterparty simply wanted to know

what the swap was worth in the marketplace.[216]  Mr. Shoji was also retained to rebut the

testimony of the GUC Trust swap expert, Dr. James Overdahl, a gentleman with an impressive

record in academia and public service, but no experience trading or structuring actual swaps or

managing a trading desk.[217]

In both his declaration of direct testimony and his expert report, Mr. Shoji provided a

mark-to-market valuation of the Swap Agreements that yielded a nearly identical number as that

produced by New GM.  In performing his analysis, Mr. Shoji put himself in the position of a

reference market-maker, performing the steps necessary to provide a "Market Quotation."[218]  The

---

[213] *See* Shoji Direct Test. ¶ 2.
[214] *See id.* ¶ 3.
[215] *See* Trial Tr. 11/26/12 (Shoji) at 189:23-190:5; 197:7-198:1.
[216] *See* Trial Tr. 11/26/12 (Shoji) at 190:6-191:1.
[217] *See* Trial Tr. 09/25/12 (Overdahl) at 12:9-14.
[218] *See* Trial Tr. 11/26/12 (Shoji) at 175:15-23.

process of obtaining different Market Quotations to value swaps is known as the Market

Quotation Method.[219]  Under ISDA definitions, the Market Quotations must reflect the

"replacement value" of the swaps—in other words, the amount that a disinterested third party

would either pay or receive for stepping into the position of one of the parties and assuming the

remaining swap obligations of that party.[220]  Because it is grounded in the actual market price at

which swap counterparties can terminate or transfer swap contracts to other market participants,

the Market Quotation Method is the "standard" method used to value swaps, a point conceded by

Dr. Overdahl.[221]  It is also a reliable method in the sense that it reflects the amount professional

traders would be willing to pay.[222]

    Mr. Shoji valued the Swap Agreements using Bloomberg, and a thorough description of

Mr. Shoji's valuation, along with supporting documentation showing the various inputs Shoji

selected to value the Swap Agreements, may be found in his declaration of direct testimony.[223]

He ultimately concluded that, as of October 9, 2009, the Swap Agreements should be valued at

$564,686,121—only $200 different from the number reached by New GM's in-house experts.[224]

The fact that Mr. Shoji's valuation was nearly identical to that of New GM, despite the fact that

---

[219] *See* Shoji Direct Test. ¶¶ 15-16.

[220] *See id.* ¶¶ 18-20.  Dr. Overdahl conceded this point at trial.  *See* Trial Tr. 09/25/12 (Overdahl) at 12:23-13:20.

[221] *See* Shoji Direct Test. ¶¶ 14, 15, 20; Trial Tr. 09/25/12 (Overdahl) at 16:12-17:3.  Dr. Overdahl testified that the "Loss Method" is also a "standard" methodology, but conceded that in all his experience he had never actually seen it used.  *See* Trial Tr. 09/25/12 (Overdahl) at 13:8-16:3.  The so-called Close-Out Method, which no expert testified is "standard," involves calculating the economic value or mark-to-market value of the swap as of the termination date—which is the same goal as the Market Quotation Method and is exactly what Shoji did in this case.  *See* Trial Tr. 11/26/12 (Shoji) at 186:18-188:12, 202:17-203:6.

[222] *See* Trial Tr. 11/26/12 (Shoji) at 195:1-9.  At trial, Dr. Overdahl stated that the Market Quotation Method is unreliable in certain circumstances where reference market-makers would be unwilling or unable to offer quotes.  *See* Trial Tr. 09/25/12 (Overdahl) at 13:21-14:18, 56:16-57:6.  But such concerns only apply in exceptionally rare circumstances and are totally inapplicable to these "plain vanilla swaps" in "two of the most liquid currencies in the world."  *See* Trial Tr. 11/26/12 (Shoji) at 196:1-198:1, 203:19-204:13.

[223] *See* Shoji Direct Test. ¶¶ 21-24.  Mr. Shoji used the appropriate yield curves for fixed-fixed GBP/CAD swaps such as the ones at issue here.  *See* Trial Tr. 11/26/12 (Shoji) at 171:7-172:2, 199:1-25.

[224] *See* Shoji Direct Test. ¶ 24.

the two parties used different methodologies, strongly supports the inference that the market

value of the Swap Agreements is right around $564 million.[225]  And this is entirely in line with

the conclusion reached by Dr. Overdahl in his expert report that, "[New GM's] method of

valuing swaps will produce values close to the values that would be produced under the Market

Quotation Method as defined in the Master Agreement."[226]  Remarkably, the GUC Trust has

proffered no counter mark-to-market valuation of the Swap Agreements at any time during this

litigation and has produced no evidence that Mr. Shoji exercised his discretion in valuing the

Swap Agreements inappropriately.

### 3.    The So-Called Final Exchange Method Advocated by the GUC Trust Has No Application to These Proceedings

The mark-to-market replacement values generated by both New GM and Mr. Shoji are

the proper way to value the Swap Agreements under New York law governing breach of contract.

Nevertheless, the GUC Trust rejects valuing the Swap Agreements by reference to their market

value.  Instead, the GUC Trust has advocated that the Swap Agreements should be valued in

accordance with the so-called Final Exchange Method, which is based on certain provisions

found in the Confirmations which apply exclusively to an "Early Termination."[227]  But no "Early

Termination" occurred here.

As described above, New GM contemplated declaring an Early Termination, but

ultimately did not do so.[228]  "Early Termination" is defined in Section 6(a) of the ISDA Master

Agreement which makes clear that, for an "Early Termination" to have occurred, certain

---

[225] *See* Trial Tr. 11/26/12 (Shoji) at 193:5-194:25.

[226] Def. Tr. Ex. 337 (Overdahl Expert Report) at 13.

[227] *See* Def. Tr. Ex. 422 (Statutory Claim) at DEF8710, DEF8715 (Confirmations).

[228] *See supra* at 38-39.

procedures must be followed.[229]  "Early Termination" requires that an Event of Default, such as

GM Nova Scotia's bankruptcy, must occur, and in that event, the non-defaulting counterparty, in

this case New GM, would be entitled to terminate early.[230]  To effectuate the "Early

Termination," New GM would have to provide notice to the defaulting counterparty, and that

notice would have to specify the relevant event of default and designate a day not earlier than the

date such notice is effective as an early termination date.[231]  Here, it is undisputed that New GM

never provided any notice of termination, let alone the specific notice that it would have been

required to give in order to effect an "Early Termination."[232]

The GUC Trust's swap expert, Dr. Overdahl, actually concedes all of these points.[233]  But

despite this significant concession, he nevertheless concluded in his expert report—without any

support—that an "Early Termination" had occurred because "in my view, any agreement to

terminate the swaps prior to their intended maturity date means that the swaps were terminated

early."[234]  Dr. Overdahl—who is not a lawyer and has no experience or knowledge regarding the

effect of a disclaimer by a Canadian bankruptcy trustee—is entirely unqualified to state any

opinion about this subject which is clearly legal in nature.[235]  In fact, at trial, Dr. Overdahl

backed away from his conclusion, stating, "I am not offering an expert opinion on whether early

---

[229] *See* Def. Tr. Ex. 422 (Statutory Claim) at DEF8685 (Section 6(a) of ISDA Master Agreement).

[230] *See id.*

[231] *See id.*

[232] *See supra* at 38-39; Trial Tr. 08/07/12 (Wedlake) at 46:25-47:2; Def. Tr. Ex. 337 (Overdahl Expert Report) at 12 stating: "The record I have reviewed does not include a formal notice."; Trial Tr. 09/25/12 (Overdahl) at 36:2-6.

[233] *See* Def. Tr. Ex. 337 (Overdahl Expert Report) at 12; Trial Tr. 09/25/12 (Overdahl) at 28:10-29:19, 31:19-32:7.

[234] Def. Tr. Ex. 337 (Overdahl Expert Report) at 13.

[235] *See* Trial Tr. 09/25/12 (Overdahl) at 36:23-37:18 (admitting he is not a lawyer; has no experience or knowledge regarding the effect of a disclaimer by a Canadian bankruptcy trustee; has no expertise in the area of Canadian bankruptcy law; has no awareness of case law suggesting that the trustee's failure to disclaim certain contracts could result in personal liability; and in all his experience, had never seen a situation analogous to this with respect to how the Swap Agreements were terminated); *id.* at 37:19-38:3 (admitting he is not offering an expert opinion on this subject); *id.* at 62:8-19 (admitting he is "not qualified to say" whether the exchange of letters constitutes an "Early Termination" under the ISDA Master Agreement).

termination occurred," and admitted that he had merely "assume[d]" that an "Early Termination" occurred in order "to drive the analysis."[236] Dr. Overdahl also testified that his assumption of "Early Termination" was based on the Disclaimer Letter and New GM's response thereto, yet he also admitted that these letters "do[] not appear to have followed the notice requirement . . . outlined in [Section 6(a) of] the ISDA Agreement."[237]

Moreover, Dr. Overdahl's layman's conclusion that any agreement to terminate prematurely is an "Early Termination," is undermined by the opinion in *North American Steamship* in which the British Columbia Supreme Court held that an "Early Termination" provision in an ISDA Master Agreement is only triggered if the non-defaulting party invokes it. In that case, a Canadian bankruptcy trustee for an estate that was party to an "in the money" swap argued that his obligation to affirm or disclaim the swaps had not ripened because the bankruptcy declaration had triggered the "Early Termination" provisions of the 1992 ISDA Master Agreement.[238] Specifically, the trustee argued that the contracting parties had already "turned their minds to the possibility of one of them becoming bankrupt and provided a remedy for the protection of the non-bankrupt party."[239] The Court flatly rejected this argument, finding that the non-defaulting party's unexercised right to terminate early did not somehow alter or impact the parties' other rights and obligations: "While [the non-defaulting party has] the option of terminating the Swap Agreements as a result of the bankruptcy . . . nothing turns on whether

---

[236] *Id.* at 37:19-38:3.

[237] *Id.* at 34:13-36:1.

[238] *See N. Am. S.S.*, 2007 B.C.S.C. para. 13.

[239] *Id.*

the bankruptcy of one of the contracting parties does constitute a breach of the contract or otherwise entitles the other party to terminate the contract."[240]

Ultimately, the Final Exchange Method has no application to the case at bar. The Court is not required to apply it under any contractual theory because an Early Termination did not occur, and it should play no role in the Court's determination of the proper expectation damages to which New GM is entitled, because it is a poor approximation of the true value of the Swap Agreements. The so-called Final Exchange Method is not a method recognized by the ISDA, and neither expert had ever seen it used before this case.[241] As expounded upon by Mr. Shoji in his direct testimony and as agreed to by Dr. Overdahl at trial, it dramatically understates the value of the Swap Agreements because it completely ignores payments falling due between the termination date and the final payments.[242] The understatement is more than $200 million.[243] The Final Exchange Method thus does not produce a payment amount that is reflective of the mark-to-market value of the Swap Agreements.[244]

## CONCLUSION

For the foregoing reasons, the Nova Scotia Trustee respectfully requests that the Court (i) allow the Statutory Claim in its entirety and (ii) grant such other and further relief to the Nova Scotia Trustee as the Court deems just and proper.

---

[240] *Id.* ¶¶ 13-14.

[241] *See* Shoji Direct Test. ¶¶ 25-27; Trial Tr. 09/25/12 (Overdahl) at 19:14-19; 26:11-18.

[242] *See* Shoji Direct Test. ¶¶ 25-27; Trial Tr. 09/25/12 (Overdahl) at 25:17-26:10.

[243] *See* Shoji Direct Test. ¶ 32.

[244] *See* Shoji Direct Test. ¶¶ 25-27.

Dated: May 24, 2013

Respectfully Submitted,

/s/      Sean E. O'Donnell
Daniel H. Golden
Sean E. O'Donnell
Philip C. Dublin
Dean L. Chapman Jr.
William F. Mongan Jr.
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

*Counsel for Green Hunt Wedlake Inc.*
*Trustee of General Motors Nova Scotia Finance*
*Company*

51

## Appendix A
### Section 135 of the Nova Scotia Companies Act

In the event of a company being wound up, every present and past member shall, subject to this Section, be liable to contribute to the assets of the company to an amount sufficient for payment of its debts and liabilities and the costs, charges, and expenses of the winding up and for the adjustments of the rights of the contributories among themselves, with the qualifications following:

(a)     a past member shall not be liable to contribute if he has ceased to be a member for one year or upwards before the commencement of the winding up;

(b)     a past member shall not be liable to contribute in respect of any debt or liability of the company contracted after he ceased to be a member;

(c)     a past member shall not be liable to contribute unless it appears to the court that the existing members are unable to satisfy the contributions required to be made by them in pursuance of this Act;

(d)     in the case of a company limited by shares, no contribution shall be required from any member exceeding the amount, if any, unpaid on the shares in respect of which he is liable as a present or past member;

(e)     in the case of a company limited by guarantee, no contribution shall be required from any member exceeding the amount undertaken to be contributed by him to the assets of the company in the event of its being wound up;

(ea)    in the case of an unlimited company, no contribution exceeding the amount, if any, unpaid on the shares in respect of which the member is liable as a past member, shall be required from a past member who was not a member of the company at any time on or after the time the company became unlimited;

(f)     nothing in this Act shall invalidate any provision contained in any contract whereby the liability of the individual members of the contract is restricted, or whereby the funds of the company are alone made liable in respect of the policy or contract;

(g)     a sum due to any member of a company, in his character of a member, by way of dividends, profits or otherwise, shall not be deemed to be a debt of the company, payable to that member in a case of competition between himself and any other creditor not a member of the company, but any such sum may be taken into account for the purpose of the final adjustment of the rights of the contributories among themselves.