**HEARING DATE: TO BE DETERMINED**

DICKSTEIN SHAPIRO LLP
Barry N. Seidel
Eric B. Fisher
Katie L. Weinstein
Mary Kim (admitted *pro hac vice*)
1633 Broadway
New York, New York 10019-6708
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Counsel for Motors Liquidation*
*Company GUC Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x
                                                    :
In re:                                              :      **Chapter 11**
                                                    :
MOTORS LIQUIDATION COMPANY, *et al.,*               :      **Case No.:  09-50026 (REG)**
f/k/a General Motors Corporation, *et al.,*         :
                                                    :      **(Jointly Administered)**
                          Debtors.                  :
                                                    :
----------------------------------------------------------------------x
MOTORS LIQUIDATION COMPANY GUC TRUST,               :
                                                    :
                          Plaintiff,                :      Adversary Proceeding
                                                    :      Case No.:  12-09802
              v.                                    :
                                                    :
APPALOOSA INVESTMENT LIMITED                         :
PARTNERSHIP I; *et al.,*                             :
                                                    :
                                                    :
                          Defendants.               :
                                                    :
----------------------------------------------------------------------x

**MOTORS LIQUIDATION COMPANY
GUC TRUST'S REPLY BRIEF IN FURTHER SUPPORT
OF ITS MOTION FOR RELIEF UNDER RULE 60(b) OF THE
FEDERAL RULES OF CIVIL PROCEDURE MADE APPLICABLE
<u>BY RULE 9024 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

I.      Relief Under Rule 60(b) Is Warranted
        Because the Disclosures Identified by the Objectors Are Inadequate ................... 4

        a.   Relief Under Rule 60(b)(1) Is Warranted
             Because the Creditors' Committee's "Neglect" Is "Excusable"....................... 7

        b.   Relief Under Rule 60(b)(2) Is
             Warranted Due to Newly Discovered Evidence .............................................. 11

        c.   Relief Under Rule 60(b)(3) Is Warranted Due to Misconduct ....................... 13

        d.   Extraordinary Circumstances Justify Rule 60(b)(6) Relief ........................... 14

II.     The GUC Trust's Request for Rule 60(b) Relief Is Timely................................... 16

III.    Rule 60(b) Will Not Impose Undue Hardship on the Parties ............................... 19

CONCLUSION......................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page(s)**

*Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*,
    605 F.2d 648 (2d Cir. 1979)...................................................................................................19

*Broadway v. City of New York*,
    No. 96 Civ. 2798 (RPP), 2003 WL 21209635 (S.D.N.Y. Mar. 21, 2003).............................19

*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    428 B.R. 43 (S.D.N.Y. 2010), *aff'd, Parker v. Motors Liquidation Co. (In re
    Motors Liquidation Co.)*, 430 B.R. 65, 81-2 (S.D.N.Y. 2010), *motion to
    vacate denied*, No. 09 Civ. 7794, 2010 WL 3565494
    (S.D.N.Y. Sept. 10, 2010)......................................................................................................20

*Catskill Dev. LLC v. Park Place Entm't Corp.*, ), *judgment reinstated*, 345 F.
    Supp. 2d 360 (S.D.N.Y. Nov. 15, 2004), *vacated and remanded, Catskill
    Litig. Trust v. Park Place Entm't Corp.*, 169 F. App'x 658 (2d Cir. 2006), *on
    remand to Debary v. Harrah's Operating Co., Inc.*, 465 F. Supp. 2d 250
    (S.D.N.Y. 2006), aff'd, 547 F.3d 115 (2d Cir. 2008), *cert. denied, Catskill
    Dev. LLC v. Harrah's Operating Co., Inc.*, 129 S. Ct. 1908 (2009).
    286 F. Supp. 2d 309 (S.D.N.Y. 2003)...............................................................................13, 14

*Chiulli v. I.R.S.*,
    No. 03 Civ. 6670 (HBP), 2006 WL 3008084 (S.D.N.Y. Oct. 20, 2006)................................19

*Commer v. McEntee*,
    No. 00 Civ. 7913 (RWS), 2005 WL 1250214 (S.D.N.Y. May 27, 2005) .............................13

*Cruickshank & Co. v. Dutchess Shipping Co.*,
    805 F.2d 465 (2d Cir. 1986)...................................................................................................16

*Dux v. Megasol Cosmetic GMBH*,
    No. 03-CV-8820 (RO), 2006 WL 870462 (S.D.N.Y. Apr. 3, 2006) ......................................13

*Fleming v. N.Y. Univ.*,
    865 F.2d 478 (2d Cir. 1989)...................................................................................................15

*Guishan, Inc. v. Arici*,
    635 F. Supp. 2d 187 (E.D.N.Y. 2009) ....................................................................................8

*In re Jack Kline Co., Inc.*,
    440 B.R. 712 (Bankr. S.D. Tex. 2010) ..................................................................................19

*In re Lehman Bros. Holdings Inc.*,
    445 B.R. 143 (Bankr. S.D.N.Y. 2011), *aff'd in part and rev'd in part on other
    grounds*, 478 B.R. 570 (S.D.N.Y. 2012) ............................................................................5, 6

*In re Olenek*,
No. 09-76714-AST, 2010 WL 4366183 (Bankr. E.D.N.Y. Oct. 28, 2010) ............................18

*In re Teligent, Inc*,
306 B.R. 752 (Bankr. S.D.N.Y. 2005), *aff'd, Teligent, Inc. v. Cigna
Healthcare, Inc. (In re Teligent, Inc.)*, 326 B.R. 219 (S.D.N.Y. 2005) ..................................20

*Ins. Co. of N. Am. v. Pub. Serv. Mut. Ins. Co.*,
609 F.3d 122 (2d Cir. 2010) .................................................................................................13

*JPMorgan Chase Bank, N.A. v. Rijo (In re Rijo)*,
Nos. 808-74607-REG, Adv. Pr. No. 09-8559-REG,
2012 WL 1309630 (Bankr. E.D.N.Y. Apr. 16, 2012) ............................................................15

*Judith Ripka Creations, Inc. v. Rubinoff Imps., Inc.*,
No. 03 Civ. 9377 (BSJ), 2004 WL 1609338 (S.D.N.Y. July 16, 2004) ...........................13, 14

*Katz v. Mogus*, No. 07 Civ. 8314 (PKC) (KNF),
2012 WL 263462 (S.D.N.Y. Jan. 25, 2012) ...........................................................................5

*Kellog v. Strack*,
269 F.3d 100 (2d Cir. 2001), *cert. denied*, 535 U.S. 932 (2002) ...........................................19

*Kurzweil v. Philip Morris Cos.*,
Nos. 94 Civ. 2373, 94 Civ. 2546 (MBM),
1997 WL 167043 (S.D.N.Y. Apr. 9, 1997) .............................................................................13

*Leonard v. Lowe's Home Ctrs., Inc.*,
83 F. App'x 402 (2d Cir. 2003) .............................................................................................15

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) ................................................................................................................5

*Link v. Wabash R. Co.*,
370 U.S. 626, *reh'g denied*, 371 U.S. 873 (1962) .................................................................10

*Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*,
666 F.2d 754 (2d Cir. 1981) ............................................................................................14, 16

*MTB Bank v. Fed. Armored Exp., Inc.*,
No. 93 Civ. 5594 (LBS), 1998 WL 43125 (S.D.N.Y. Feb. 2, 1998),
*appeal dismissed*, 175 F.3d 283 (2d Cir. 1999) ....................................................................12

*Nemaizer v. Baker*,
793 F.2d 58 (2d Cir. 1986) ....................................................................................................16

*Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*,
233 B.R. 619 (D.P.R. 1999) ..................................................................................................20

*Pasquino v. Lev Parkview Developers, LLC*,
    No. 09 Civ. 4255 (LMM), 2011 WL 4502205 (S.D.N.Y. Sept. 29, 2011)...............................5

*Sasso v. M. Fine Lumber Co., Inc.*,
    144 F.R.D. 185 (E.D.N.Y. 1992) ...........................................................................................19

*Scherer v. City of New York,*
    Nos. 03 Civ. 8445 (RWS), 04 Civ. 2713 (RWS), 2007 WL 2710100
    (S.D.N.Y. Sept. 7, 2007) ......................................................................................................14

*SEC v. Wojeski*,
    752 F. Supp. 2d 220 (N.D.N.Y. 2010), *aff'd, Smith v. SEC*, 432 F. App'x 10
    (2d Cir. 2011)........................................................................................................................13

*Shrader v. CSX Transp., Inc.*,
    70 F.3d 255 (2d Cir. 1995)....................................................................................................15

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*,
    374 F.3d 158 (2d Cir. 2004), *cert. denied*, 543 U.S. 1177 (2005)...................................12, 15

*Stevens v. Miller*,
    676 F.3d 62 (2d Cir. 2012)...............................................................................................15, 16

*Stupakoff v. Otto (In re Spiegel, Inc.)*,
    269 F. App'x 56 (2d Cir. 2008), *cert. denied*, 555 U.S. 825 (2008)......................................19

*Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent, Inc.)*,
    326 B.R. 219 (S.D.N.Y. 2005).................................................................................................4

*United States v. Cirami*,
    563 F.2d 26 (2d Cir. 1977)....................................................................................................16

*United States v. Int'l Bd. of Teamsters*,
    247 F.3d 370 (2d Cir. 2001)..................................................................................................16

*Vector Capital Corp. v. Ness Techs., Inc.*,
    No. 11 CIV 6259 (PKC), 2012 WL 1948822 (S.D.N.Y. May 24, 2012) ..............................12

**Federal Rules**

Fed. R. Civ. P. 59 ..........................................................................................................................13

Fed. R. Civ. P. 60(b)(1)...................................................................................................7, 8, 11, 16

Fed. R. Civ. P. 60(b)(2)...............................................................................................11, 12, 13, 16

Fed. R. Civ. P. 60(b)(3)...............................................................................................13, 14, 16, 19

Fed. R. Civ. P. 60(b)(5)..................................................................................................................16

Fed. R. Civ. P. 60(b)(6)........................................................................................................14, 15, 16

The GUC Trust respectfully submits this reply brief in response to the objections filed by New GM (Bankr. Dkt. No. 12446; Adv. Pro. Dkt. 233)[1] and the Noteholders (Bankr. Dkt. No. 12447; Adv. Pro. Dkt. 234)[2] (collectively, the "**Objectors**"), and in further support of its motion for relief under Rule 60(b) (Bankr. Dkt. No. 12419; Adv. Pro. Dkt. 217) (the "**Motion**").[3]

### Preliminary Statement

Since the outset of this proceeding, the GUC Trust has consistently asserted its request for Rule 60(b) relief as a narrowly tailored, alternative remedy. Respecting the finality of judgments, the GUC Trust has sought only limited, alternative relief designed to minimize any disruption beyond what may be needed to ensure that the ends of justice have been served: the disallowance or subordination of the $2.67 billion of claims at issue in this proceeding. In response, the Objectors, and in particular New GM, persist in their hyperbolic, "the-sky-is-falling" exaggeration, attempting to create a false sense that the requested relief threatens to undermine the efficacy of the Sale Order.

The Objectors' overheated rhetoric is nothing more than a diversion intended to shift focus away from the fact that the Lock-Up Agreement and related transactions were never disclosed as part of the Sale Motion,[4] or for that matter any motion, before this Court. Rather than address this fundamental defect in the process that led to entry of the Sale Order – an order that, according to the Objectors, now puts key elements of the Noteholders' special deal largely beyond this Court's review – the Objectors contend that the disclosures were adequate because

---

[1]     Defined as "**NG Obj**."

[2]     Defined as "**NH Obj**."

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[4]     June 1, 2009 Sale Motion to Approve 363 Sale (Bankr. Dkt. No. 92 ) and June 1, 2009 Brief in Support of the Motion to Approve the 363 Sale (Bankr. Dkt. No. 105) (collectively, the "**Sale Motion**").

some of the terms of the Lock-Up Agreement were disclosed in a smattering of documents (most of which were not filed with this Court), and that these scattershot "disclosures" were somehow sufficient to apprise the Court and the Creditors' Committee of the transactions at issue.

The Objectors also suggest that, because the sale to New GM was like a "freight train coming down the tracks,"[5] the Noteholders probably would have managed to get away with their sweetheart deal anyway, even if it had been laid out before the Court (which they acknowledge it never was). The Objectors' self-serving, speculative counter-history of what might have happened had the parties been transparent about their agreements should carry no weight with this Court. Indeed, as this Court already has explained: had the Court known about the consequences of the Lock-Up Agreement, it "might well have refused to sign the order in its then existing form, and [...] would have insisted that the Lock-Up [A]greement not be insulated from judicial scrutiny no matter what threats the Nova Scotia [N]oteholders had made at the time."[6]

The Objectors' reliance on the statement by Harvey Miller, which New GM describes as "highly relevant," is just one telling example of the Objectors' attempt to twist and rewrite the history of these proceedings.[7] What Mr. Miller told an "overflowing courtroom"[8] on June 1, 2009 was that there "has [sic] been substantial advances made in resolving all of the issues relating to Canada over the last ten days to the point, Your Honor, that it is not necessary to institute any proceedings involving GMCO, which is the Canadian subsidiary."[9] The Objectors' suggestion that Mr. Miller's reference to the "issues relating to Canada" should have put this

---

[5]    NG Obj. 2.

[6]    New GM SJ Hr'g Tr. 93:14-18 attached hereto as <u>Exhibit A</u>.

[7]    NG Obj. 8.

[8]    *Id.*

[9]    *Id.*

Court and the Creditors' Committee on notice of the Lock-Up Agreement and its implications for

unsecured creditors is nothing short of preposterous.

Here is what might have been – but never was – said to the Court at the hearing on the

Sale Motion:

On the morning of June 1, 2009, Old GM, GM Canada, Nova Scotia Finance and the Lock-Up Noteholders executed an agreement pursuant to which the Noteholders were paid a Consent Fee of approximately $367 million. Although the Lock-Up Agreement was not finalized until a couple of hours after Old GM's bankruptcy petition was filed, all of the parties involved in negotiating the agreement consider the agreement to be a prepetition agreement.

The funds used to pay the Consent Fee on or about June 25, 2009 were wired out of Old GM's account on Friday, May 29, 2009 around 5:00 p.m., with instructions that the funds be wired to a GM Canada account, in order to transfer the funds out of Old GM's bank account before the bankruptcy filing. Old GM transferred these funds to assure the Lock-Up Noteholders that funds would be available to pay the Consent Fee without the need to seek Court approval of the payment. The transfer of funds from Old GM to GM Canada was subject to a trust agreement, which provided that the funds would immediately be returned to Old GM if the trust conditions were not satisfied. Although the trust conditions were not satisfied, the parties proceeded with payment of the Consent Fee without seeking Court approval or notifying the Court that Old GM was effectively waiving its rights to those funds.

Old GM, as sole shareholder of Nova Scotia Finance, has also consented to allow the Lock-Up Noteholders to petition Nova Scotia Finance into bankruptcy in Nova Scotia. The purpose of this consent is to smooth the way for the Noteholders to have a trustee appointed, who will assert a claim against Old GM for the full face amount of the Notes for the benefit of the Noteholders, in addition to the claims of the Noteholders against Old GM based upon Old GM's guarantee of the very same Notes. Neither of these claims will be reduced to account for the $367 million payment to the Noteholders.

Finally, to maximize the claims against Old GM, New GM plans to acquire swaps between Old GM and Nova Scotia Finance, as to which Old GM is the in-the-money party. After Nova Scotia Finance is petitioned into bankruptcy by the Lock-Up Noteholders, New GM will assert a claim under the swaps against Nova Scotia Finance. In turn, the Nova Scotia Finance trustee will assert the swap claim against Old GM for the ultimate benefit of the Noteholders. In this way, Old GM's in-the-money swaps will be transformed into a claim against Old GM for the ultimate benefit of the Noteholders. Notwithstanding the early termination methodology specified in the ISDA governing the swaps, New GM, in consultation with the Noteholders, plans to use a different method of valuing the swaps, in an effort to give rise to the greatest possible swap claim against Old GM.

The facts summarized above are all supported with record cites in the GUC Trust's

opening post-trial brief.  Importantly, almost none of these facts came to light until *after* the

Creditors' Committee obtained Court-authorized discovery related to the Lock-Up Agreement –

discovery that was largely opposed by the Nova Scotia Trustee, the Noteholders and New GM,

who contended that no discovery at all was needed in connection with this proceeding.[10]

Because the Court was not aware of the facts summarized above (including the existence of the

Lock-Up Agreement) at the time it entered the Sale Order, there was no way for this Court to

understand or evaluate the implications that the Sale Order would have with respect to the Lock-

Up Agreement.  Rule 60(b) is intended to remedy precisely this type of wrong, and such relief is

entirely warranted under the circumstances of this case.[11]

## I.    Relief Under Rule 60(b) Is Warranted Because the Disclosures Identified by the Objectors Are Inadequate

The Lock-Up Agreement involved a $367 million cash payment to the Noteholders from

funds advanced by Old GM, and, together with its related transactions, ultimately laid the

---

[10]    December 13, 2010 Response of Certain Noteholders in Opposition to the First Amended Objection 7-8 ("The Responding Parties submit that the Court can dispose of the Rule 60(b) Motion and the Objection without holding an evidentiary hearing …") (Bankr. Dkt. No. 8084); December 15, 2010 Status Hr'g Tr. 38:7-19; 40:25-41:8; 44:12-23 attached hereto as Exhibit B.

[11]    As a threshold matter, the GUC Trust has standing to seek relief under Rule 60(b). New GM cites *Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent, Inc.)*, 326 B.R. 219 (S.D.N.Y. 2005), in support of its argument that the GUC Trust is not authorized to seek Rule 60(b) relief. NG Obj. 39-40. In *Teligent*, the Court held that a creditor representative did not have standing to seek Rule 60(b) relief with respect to the assumption of an insurance contract by the reorganized debtor, the representative's predecessor-in-interest. *Id.* at 225.  The basis of the court's standing ruling was the representative's limited authorization under the plan of reorganization to "pursue the Chapter 5 Causes of Action and determine the validity, priority, and amount of the General Unsecured Claims…." *Id.*  In contrast, the Plan in this case empowers the GUC Trust to "administer certain Post-Effective Date responsibilities under the Plan, including, but not limited to, distributing New GM Securities and resolving outstanding Disputed General Unsecured Claims." Plan § 6.2(b). And, section 8.1(b) of the GUC Trust Agreement gives the GUC Trust powers "expressly set forth in the Plan, the Confirmation Order or this Trust Agreement and as otherwise provided by applicable law." Thus, the authority granted to the GUC Trust under the Plan is more expansive than that granted in *Teligent*, and Rule 60(b), on which the relief requested in the Motion is based, and which is being pursued in connection with the GUC Trust's First Amended Objection, most certainly constitutes "applicable law" within the meaning of Section 8.1(b) of the GUC Trust Agreement.

groundwork for the more than $2.67 billion in claims at issue in this proceeding. As this Court

succinctly put it: "this matter is huge."[12] Yet, the facts at the heart of this matter were never

disclosed, and thus came as a "shock" to the Court.[13] Significantly, none of the parties involved

in the Lock-Up Agreement ever informed the Court that the Sale Order "would have the purpose

or effect of authorizing the transactions that are said to be protected under" that order.[14]

Rule 60(b) "provides a procedure whereby, in appropriate cases, a party may be relieved

of a final judgment." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988).[15]

The Court has discretion to rescind or amend a final judgment under Rule 60(b) when a movant

comes forward with highly convincing evidence of "exceptional circumstances." *Katz v. Mogus*,

No. 07 Civ. 8314 (PKC) (KNF), 2012 WL 263462, at *3 (S.D.N.Y. Jan. 25, 2012).

Relying exclusively on *In re Lehman Brothers Holdings Inc.*, 445 B.R. 143 (Bankr.

S.D.N.Y. 2011), *aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012),

the Objectors contend that Rule 60(b) relief from the Sale Order is subject to a uniquely high

standard.[16] In *Lehman*, Judge Peck observed, but did not rule, that he views "final sale orders as

falling within a select category of court order that *may* be worthy of greater protection from

---

[12]    New GM SJ Hr'g Tr. 91:16.

[13]    *Id*. at 94:13-23. *See also id.* at 91:19-21 ("There was a lack of disclosure to the Court on [a] matter with the potential to injure Old GM creditors to the extent of hundreds of millions, if not billions of dollars.").

[14]    *Id*. at 92:18-23.

[15]    Contrary to the Noteholders' claim that the GUC Trust's "litigation objective" is to "inflict harm on New GM and the Noteholders" (NH Obj. 3), the sole objective here is to protect the interests of unsecured creditors from the consequences of a brazen overreach by a small faction of creditors. *Pasquino v. Lev Parkview Developers, LLC*, No. 09 Civ. 4255 (LMM), 2011 WL 4502205, at *5 n.3 (S.D.N.Y. Sept. 29, 2011) (Rule 60(b) is "a grand reservoir of equitable power to do justice in a particular case.") (citation omitted).

[16]    New GM also argues that a higher burden should be applied here because "the [Creditors'] Committee withdrew its objection to the Sale Motion and supported the Sale Order." NG Obj. 19 (citing *Vasquez v. Carey*, No. 03 Civ. 3905 (RJH), 2010 WL 1140850, at *6 (S.D.N.Y. Mar. 24, 2010)). As explained in the Motion, however, the Creditors' Committee did not know to object to the Sale Order, insofar as it may have concerned the Lock-Up Agreement and related transactions, because those transactions were not known to the Creditors' Committee.

being upset by later motion practice." *Id*. at 149 (emphasis added).  Judge Peck, however, went

on to explain that "the language of Rule 60(b) setting forth grounds for relief from a final order

has general application to all orders including sale orders and that no order is exempt from this

type of relief for cause shown." *Id*. at 149-50.

Notably, Judge Peck denied the request for Rule 60(b) relief from the *Lehman* sale order,

because "even if [the Court] had known all of the undisclosed facts at the time of the Sale

Hearing the Court still would have approved the sale to Barclays."  *Id*. at 205.  Here, in contrast,

the Court has already explained that "with appropriate disclosure [the Court] might well have

refused to sign the order in its then existing form."[17]  Thus, even if a party bears a higher burden

when it seeks relief from a sale order (an argument that is not supported by the text of Rule

60(b)), such a burden would be easily satisfied here.[18]

Because key facets of the Lock-Up Agreement and related transactions were never part of

the Sale Motion, or otherwise disclosed in connection with the sale to New GM, both the

Creditors' Committee and this Court were deprived of any opportunity to fully and fairly

evaluate the Lock-Up Agreement and related transactions with the Noteholders before entry of

the Sale Order.[19]  Thus, for the reasons stated in the Motion and in this Reply, the Creditors'

---

[17]      New GM SJ Hr'g Tr. 93:14-15.

[18]      Here, unlike in *Lehman*, there was ample time (more than four weeks) between the commencement of the Old GM case and Court consideration of the 363 Sale for the Debtors to have provided the Court and interested parties with full disclosure of material terms of the transaction.

[19]      New GM contends that creditors, even if they knew all of the deal terms, would have had no choice but to accept the deal.  NG Obj. 2.  New GM argues that it was effectively the only game in town and it was therefore able to dictate the terms of sale.  *Id*.  While New GM may have been able to bully creditors, it still owed a duty to the Court to disclose all of the material terms of the transaction.  That neither the buyer nor seller believed the Court had the right to know all material terms of the sale is what makes the Sale Order vulnerable to Rule 60(b) relief.

Committee's failure to object to the Sale Order is excusable, and Rule 60(b) relief is appropriate

under the circumstances.[20]

### a. Relief Under Rule 60(b)(1) Is Warranted Because the Creditors' Committee's "Neglect" Is "Excusable"

Most of the Objectors' briefs are devoted to a recitation of the disclosures about the

Lock-Up Agreement that were supposedly known to representatives of the Creditors'

Committee.  The Objectors strain to argue that Mr. Mayer or Mr. Vanaskey had "actual

knowledge" of the few references to the Lock-Up Agreement that preceded entry of the Sale

Order, but the record simply does not support such an assertion.  At most, the trial record shows

that Mr. Mayer would have expected someone on his team to review some of the documents

identified by the Objectors,[21] and that Mr. Vanaskey would have expected the Creditors'

Committee's counsel, or some other Committee representative, to review those documents.[22]

---

[20]    The Noteholders contend that the GUC Trust "misleads this Court when it claims that courts consistently grant relief pursuant to Rule 60(b)." NH Obj. 3.  To level this accusation, the Noteholders selectively misquote the Motion, which reads, in relevant part:  "courts consistently grant Rule 60(b) relief … *[for] failures to disclose information that, if known, would have altered the final judgment or order in question.*"  Motion 21 (emphasis added).  This is a fair, accurate summary of the law.

[21]    Mayer Tr. 36:18-24 (10/3/2012) (Mayer did not know if any of his colleagues reviewed the June 1, 2009 Form 8-K as part of their due diligence after being retained); 50:16-18 (Mayer did not know with certainty if anyone at Kramer Levin reviewed the June 1, 2009 Form 8-K in June of 2009); 50:23-24 (Mayer did not personally review the June 1, 2009 Form 8-K until October 2009); 57:10-15 (Mayer assumed the Form 8-K was read by someone on his team); 51:10-14 (the memos Mayer received from his team did not discuss the June 1, 2009 Form 8-K until October 2009); 38:8-10 (Mayer did not know for a fact if any of his colleagues reviewed the Form S-4 as part of their due diligence after being retained); 48:15-20 (same); 57:16-22 (Mayer did not know with certainty if any of his colleagues read the First Day Hearing transcript); 68:12-22 (Mayer did not know if anyone at Kramer Levin read the June 3, 2009 Notice of the Meeting Concerning the Extraordinary Resolution that appeared in the Financial Times).

[22]    Vanaskey Tr. 29:16-19 (11/27/2012) (Vanaskey would have expected counsel to read the Form S-4); 42:13-15 (testifying that Kramer Levin reviewed documents that had been publicly filed by Old GM); 42:23-25 (testifying that he looked at some public filings himself); 45:22-24 (testifying that he generally reviewed public filings in June of 2009); 46:7-9 (testifying that he would have expected counsel to review public filings); 46:10-13 (testifying that he would have expected Gibson Dunn to review the June 3, 2009 Form 8-K); 49:8-10 (testifying that he reviewed the MSPA); 49:18-50:5 (testifying that he would have expected Kramer Levin and Gibson Dunn to review the MSPA and its schedules in June 2009); 54:13-22 (testifying that he would expect his counsel to review the June 1, 2009 Form 8-K); 54:23-55:6 (testifying the he expected his counsel to review filings with the Court); 55:12-18 (testifying that he personally reviewed filings made with the Court in June 2009); 56:17-57:4 (testifying that he did not personally review the First Day Affidavit but expected that his counsel did); 58:8-11 (testifying that he did not recall whether or not he reviewed the DIP financing documents); 58:19-21 (testifying that he expected his

In any event, the debate about whether these documents were, or should have been, reviewed by Creditors' Committee representatives is entirely beside the point.  Even if the Creditors' Committee's representatives had reviewed these scattered, piecemeal "disclosures," the information contained in the referenced documents was incomplete and wholly inadequate to place the Creditors' Committee on notice of the material terms of the Lock-Up Agreement and related transactions, or the corresponding implications for unsecured creditors.  These so-called "disclosures" do not defeat the request for Rule 60(b)(1) relief, which permits relief from a final judgment based on the "excusable neglect" of the party seeking relief from the order.  *Guishan, Inc. v. Arici*, 635 F. Supp. 2d 187, 192 (E.D.N.Y. 2009).

Most of the "disclosures" the Objectors identify were never filed on the docket,[23] and many of them either pre-date the Lock-Up Agreement (and thus with absolute certainty it can be said that they do not relate to the Lock-Up Agreement)[24] or post-date entry of the Sale Order (and thus with absolute certainty it can be said that they were not known to the Creditors' Committee before entry of the Sale Order).[25]

---

counsel to review the DIP financing documents); 95:13-20 (testifying that he did not review the June 1, 2009 Form 8-K); 96:4-5 (testifying that he does not recall discussing the matters of the Lock-Up Agreement before October 2009).

[23]     *See, e.g.*, Def. Ex. 75 (Apr. 27, 2009 Form S-4); Pl. Ex. 29 (June 1, 2009 Form 8-K); Def. Ex. 189 (Debtwire Publication); Def. Ex. 193 (June 3, 2009 Notice of the Meeting Concerning the Extraordinary Resolution); Def. Ex. 234 (Aug. 7, 2009 Form 8-K); Pl. Ex. 265 at CC005520-5664 (Disclosure Schedules to the MSPA.  Further, the First DIP amendment was not attached to the DIP Order when it was entered.  June 2, 2009 Interim Order Approving DIP Credit Facility ¶ 22(C) at 23 (Bankr. Dkt. No. 292) (requiring notice of amendments be provided to the Court).

[24]     *See, e.g.*, Def. Ex. 75 (Apr. 27, 2009 Form S-4).

[25]     *See, e.g.*, Def. Ex. 234 (Aug. 7, 2009 Form 8-K); Def. Ex. 235 (Aug. 11, 2009 Interim Report).  The Objectors also suggest that Mr. Mayer should have understood the importance of the Lock-Up Agreement based on a July 29, 2009 conversation about a different case with Dan Gropper of Aurelius.  During the call, Mr. Gropper said he had gotten a "good deal" in the Old GM bankruptcy.  Beyond this, no further details of the Lock-Up Agreement were shared because the focus of the conversation was on another case entirely.  Mayer Tr. 113:11-18, 114:10-13, 152:4-9 (10/3/2012).  In any event, the Objectors' effort to make much of this isolated conversation demonstrates the extent to which they are grasping at straws when it comes to trying to prove adequate disclosure.

Moreover, while some of the disclosures say something about the Lock-Up Agreement, even when considered collectively, they do not come close to disclosing the consequences the Lock-Up Agreement and related transactions would have for unsecured creditors.  For example, before the Sale Order was entered, the following critical information was not disclosed: (i) that on May 29, 2009 Old GM initiated the $450 million transfer to GM Canada; (ii) that the $450 million transfer of proceeds from Old GM was subject to a Trust Agreement, the conditions of which were not satisfied; (iii) that the Trust Agreement was purportedly amended, postpetition, without this Court's authorization; (iv) that under the Lock-Up Agreement, Old GM had agreed to consent to the bankruptcy of Nova Scotia Finance; and (v) that the bankruptcy of Nova Scotia Finance, together with New GM's purported acquisition of the swaps and assertion of a claim under the swaps against Nova Scotia Finance, would lead to the assertion of a total of more than $2.67 billion in claims against Old GM.[26]  Thus, even if, for the sake of argument, the Creditors'

---

[26]    The pre-Sale Order "disclosures" referenced by the Objectors, individually and collectively, were inadequate:

- The April 27, 2009 Form S-4 does not disclose the terms of the Lock-Up Agreement because it predates the Lock-Up Agreement.  *See* Def. Ex. 75.

- The Lock-Up Agreement was not mentioned at the First Day Hearing.  *See* First Day Hr'g Tr. 36:8-12 (Bankr. Dkt. No. 374) attached hereto as Exhibit C.

- The June 1, 2009 Form 8-K does not disclose GM Nova Scotia's consent to bankruptcy and the contemplated assertion of a duplicative claim with respect to the Notes.  *See* Pl. Ex. 29 at AUR_GMO 14280-81.  It also does not disclose the Swaps nor does it mention Old GM's transfer of $450 million to GM Canada.  *Id.*; Ammann Tr. 87:6-8 (9/27/2012); Buonomo Tr. 139:10-14 (8/9/2012).

- The Disclosure Schedules to the MSPA do not disclose the amount of the Swaps, the amount of the Consent Fee or the amount of the $450 Million Loan.  *See* Pl. Ex. 265 at CC005517-664; Buonomo Tr. 100:18-24 (8/9/2012).  The final version of the Disclosure Schedules attached to the MSPA does not disclose the $450 million transfer at all.  *Compare* Pl. Ex. 265 (Schedule 6.2, ¶ 3 at C005655-656) *with* Bankr. Dkt. No. 8087 (Schedule 6.2, ¶ 2 at 106-107).

- The June 3, 2009 Notice of the Meeting Concerning the Extraordinary Resolution does not disclose the amount of the Consent Fee, the amount of the Guarantee or ULC Claims, or the existence of the $450 Million Loan.  *See* Def. Ex. 193.  Further, such notice cannot be read without a magnifying glass.  *Id.* at 8.

- The June 25, 2009 First Amendment to the DIP facility mentions the Lock-Up Agreement and the consent to put GM Nova Scotia Finance into bankruptcy, but otherwise provides no details about the Lock-Up Agreement or the Swaps.  *See* Def. Ex. 213 at DEF0664.

Committee's representatives had located and pored over the "disclosures" identified by the

Objectors (which they had no reason to know that they should do), they still would not have

known critical information necessary to evaluate the impact of the Lock-Up Agreement and the

related transactions upon Old GM's unsecured creditors.[27]

As Mr. Mayer testified, even if he had actually known about the facts contained in the

Form 8-K (which he did not), he would not have raised any issues on behalf of the Creditors'

Committee "because [the Form 8-K] doesn't contain certain *other* facts that came to light *later*

about the timing of the payment and where the payment actually came from …" and because

"the first time the entire package of the Nova Scotia settlement was brought to our attention" was

not until October 2009.[28]

Citing an incomplete, and therefore out-of-context, portion of Mr. Mayer's testimony, the

Objectors contort the record to make it seem as though the Creditors' Committee and its counsel

understood the significance of the Lock-Up Agreement and Swaps, and deliberately chose not to

raise issues concerning those matters in connection with the Sale Order.[29]   The record plainly

---

[27]      The Noteholders argue that "[w]here the facts are in the possession of a party's counsel," the court cannot make a finding of excusable neglect. NH Obj. 6.  This argument fails, because, as explained above, the key facts were not in the possession of Kramer Levin – they were never disclosed.  Furthermore, the Supreme Court case cited by the Noteholders in support of this argument expressly states twice that the Court there was not deciding a Rule 60(b) motion.  *See Link v. Wabash R. Co.*, 370 U.S. 626, 632 & 635, *reh'g denied*, 371 U.S. 873.

[28]      Mayer Tr. 60:8-19 (10/3/2012) (Mr. Mayer's testimony comes from his deposition which was read into evidence at trial by the Noteholders' counsel) (emphasis added).  Notably, Mr. Mayer testified that the Creditors' Committee was unaware of the June 1, 2009 Form 8-K, which was filed *before* the Creditors' Committee came into existence.  *Id*. at 50:23-24; 148:11-13 (10/3/2012); Vanaskey Tr. 52:19-53:2 (11/27/2012). Mr. Vanaskey also testified that he did not personally review the June 1, 2009 Form 8-K.  Vanaskey Tr. 95:13-20 (11/27/2012).  And, Mr. Vanaskey testified that he did not discuss the Lock-Up Agreement with anyone prior to October 2009.  *Id*. at 96:1-5 (11/27/2012).

[29]      The Objectors cite several cases for the proposition that a party is bound by the deliberate choices of its lawyer and that a lawyer's inability to manage his caseload does not support a finding of excusable neglect.  NG Obj. 20-21; NH Obj. 5-7.  These cases are inapposite because Kramer Levin's lack of knowledge was not a deliberate choice or the product of an overwhelming caseload.  Kramer Levin did not appreciate the significance of the Lock-Up Agreement, because the facts available at the time were inadequate to alert them to its significance.

contradicts this characterization.  Mr. Mayer, like this Court, was shocked when he finally

learned of the potential ramifications of the Lock-Up Agreement for the Old GM estate, and for

good reason:  those ramifications could not possibly be discerned from the meager "disclosures"

about the Lock-Up Agreement that the Objectors rely upon.  Further, as Mr. Mayer explained to

Mr. Karotkin after learning about the scope of this matter:  "You're telling me you expected a

$2.6 billion claim settlement and a 350 million cash payment to be done with adequate notice by

8-K without actually bringing it to court for approval on notice to parties?  You got to be

kidding."[30]

Accordingly, the Creditors' Committee's failure to object to the Lock-Up Agreement and

related transactions before entry of the Sale Order is the product of excusable neglect, and Rule

60(b)(1) relief is therefore warranted.

### b.  Relief Under Rule 60(b)(2) Is Warranted Due to Newly Discovered Evidence

In essence, the Objectors contend that no important new facts regarding the Lock-Up

Agreement, the Swaps or their related transactions have come to light since entry of the Sale

Order in July 2009.[31]  This contention is baseless.  Some of the more significant facts that

became known only after entry of the Sale Order include the following:

- The Lock-Up Agreement was completed after Old GM's petition was filed on June 1, 2009.  *See* Jones Decl. (GUC Trust's computer forensic expert) ¶¶ 6-7, Ex. A at 11.

- The Consent Fee was funded by a $450 million transfer from Old GM to GM Canada on May 29, 2009.  *See* Ammann Tr. 85:18-86: 2 (9/27/2012); Buonomo Decl. ¶ 43.

---

[30]     Mayer Tr. 173:10-23 (10/3/2012).

[31]     NG Obj. 21; NH Obj. 8-10.  New GM makes the argument that the "good faith" finding in the Sale Order should insulate the Sale Order from Rule 60(b) relief.  NG Obj. 4.  That argument fails.  As an initial matter, the finding of good faith was not contested at the Sale Hearing.  Moreover, with respect to the matters at issue here, the Sale Order, and the findings in it, were predicated on a flawed process where material facts remained unknown to the Court and creditors; thus, even if New GM is in fact a good faith purchaser, Rule 60(b) relief is not precluded.

11

- The $450 million transfer was subject to a Trust Agreement, which provided that the funds would be immediately repaid to Old GM if the trust conditions were not satisfied. Those trust conditions were never satisfied. *See* Aug. 3, 2012 Pretrial Submission ¶ 37; Buonomo Decl. ¶ 44; Pl. Ex. 144 (steps list); Pl. Ex. 134 ¶ C (NGM000000602); Pl. Ex. 134 ¶¶ 2(a), 3(a)-(b) (NGM000000603-04) (email from J. Zhou to W. Borst and others, dated May 29, 2009, attaching, among other things, the Trust Agreement); Buonomo Tr. 80:3-81:9 (8/9/2012).

- Old GM consented to allow the Noteholders to petition Nova Scotia Finance into bankruptcy, paving the way for the Nova Scotia Trustee to assert a claim for payment of the full face amount of the Notes and a guarantee claim for those same Notes against Old GM for the benefit of the Noteholders. *See* Wedlake Tr. 93:9-20 (8/7/2012); Pl. Ex. 32 at GHW0003353 (email from P. Huff to P. Wedlake, Sept. 8, 2009); Gropper Tr. 71:17-72:18 (9/28/2012).

- New GM purportedly acquired the Swaps between Old GM and Nova Scotia Finance (even though Nova Scotia Finance is not a subsidiary that was purchased by New GM), and asserted a claim under the Swaps against Nova Scotia Finance. In turn, the Nova Scotia Finance Trustee asserted a claim based on the Swaps against Old GM for the benefit of the Noteholders. *See* Buonomo Decl. ¶¶ 22, 23; Pl. Ex. 139 ¶ 3 (GHW0004659). Through this mechanism, a claim as to which Old GM was "in the money" was transformed into a more than half-billion dollar claim against Old GM.

Disregarding that all of these facts were learned only after entry of the Sale Order, the Noteholders argue that, at the time of the Sale Order, the Creditors' Committee was in "possession" of evidence relevant to the Lock-Up Agreement and Swaps and is therefore foreclosed from relief under Rule 60(b)(2).[32] In support of this contention, the Noteholders cite cases that stand for the uncontroversial proposition that, when a movant or his counsel is in physical possession of evidence, that evidence is not considered "newly discovered." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 178 (2d Cir. 2004), *cert. denied*, 543 U.S. 1177 (2005); *Vector Capital Corp. v. Ness Techs., Inc.*, No. 11 CIV 6259 (PKC), 2012 WL 1948822, at *10 (S.D.N.Y. May 24, 2012); *MTB Bank v. Fed. Armored Exp., Inc.*, No. 93 Civ. 5594 (LBS), 1998 WL 43125, at *4 (S.D.N.Y. Feb. 2, 1998), *appeal dismissed*, 175 F.3d 283 (2d Cir. 1999). For the reasons already explained in the Motion and above, the

---

[32]    NH Obj 9-10.

Creditors' Committee's counsel did not possess facts sufficient to alert it to the significance of

the Lock-Up Agreement and its impact on Old GM's creditors.[33]  Evidence concerning the

significance of the Lock-Up Agreement and the Swaps was not discovered until well after entry

of the Sale Order, therefore justifying relief under Rule 60(b)(2).

### c.   Relief Under Rule 60(b)(3) Is Warranted Due to Misconduct

The failure to adequately disclose the terms of the Lock-Up Agreement and Swaps to the

Creditors' Committee or this Court prior to entry of the Sale Order is misconduct that warrants

Rule 60(b)(3) relief.  The Objectors argue that the GUC Trust's request for Rule 60(b)(3) relief

fails because the GUC Trust has not shown that there was an intent to conceal the terms of the

Lock-Up Agreement and the Swaps.[34]  To that end, the Objectors focus on only one of several

cases cited in the Motion – *SEC v. Wojeski*, 752 F. Supp. 2d 220, 231 n.17 (N.D.N.Y. 2010),

*aff'd*, *Smith v. SEC*, 432 F. App'x 10 (2d Cir. 2011) (granting Rule 60(b)(3) relief based on fraud

and misconduct).[35]  The Objectors ignore two other decisions cited by the GUC Trust – *Judith

Ripka Creations, Inc. v. Rubinoff Imports, Inc.*, No. 03 Civ. 9377 (BSJ), 2004 WL 1609338, at

*4 (S.D.N.Y. July 16, 2004) and *Catskill Development LLC v. Park Place Entertainment Corp.*,

286 F. Supp. 2d 309 (S.D.N.Y. 2003)[36] – both of which make clear that Rule 60(b)(3) does not

---

[33]     New GM's objection also fails to support its argument that the GUC Trust is not entitled to relief under Rule 60(b)(2), because the courts in the cases relied on by New GM either granted Rule 60(b) relief or were not deciding Rule 60(b) motions.  NG Obj. 21-22.  *See Ins. Co. of N. Am v. Pub. Serv. Mut. Ins. Co.*, 609 F.3d 122, 127 (2d Cir. 2010) (affirming district court decision granting Rule 60(b)(2) motion); *Dux v. Megasol Cosmetic GMBH*, No. 03-CV-8820 (RO), 2006 WL 870462, at *1 (S.D.N.Y. Apr. 3, 2006) (denying Rule 59 motion, not Rule 60(b) motion, because "new" evidence was available prior to entry of the order underlying the motion); *Commer v. McEntee*, No. 00 Civ. 7913 (RWS), 2005 WL 1250214, at *2-3 (S.D.N.Y. May 27, 2005) (granting Rule 60(b) motion); *Kurzweil v. Philip Morris Cos.*, Nos. 94 Civ. 2373, 94 Civ. 2546 (MBM), 1997 WL 167043, at *1 (S.D.N.Y. Apr. 9, 1997) (granting Rule 60(b) motion).

[34]     NG Obj. 22-23; NH Obj. 11.

[35]     NG Obj. 22-23; NH Obj. 10-11.

[36]     *Catskill Dev. LLC v. Park Place Entm't Corp.*, 286 F. Supp. 2d 309 (S.D.N.Y. 2003), *judgment reinstated*, 345 F. Supp. 2d 360 (S.D.N.Y. Nov. 15, 2004), *vacated and remanded*, *Catskill Litig. Trust v. Park Place Entm't Corp.*, 169 F. App'x 658 (2d Cir. 2006), *on remand to Debary v. Harrah's Operating Co., Inc.*, 465 F. Supp. 2d 250

require a showing of bad intent. *Judith Ripka Creations, Inc.*, 2004 WL 1609338 at *4 (granting

Rule 60(b)(3) relief, in part, for "misconduct" and noting "that I do not need to find intentional

bad faith on the part of the Defendants in order to vacate the judgment under Rule 60(b)(3)");

*Catskill Dev. LLC*, 286 F. Supp. 2d at 315 (granting relief under Rule 60(b)(3) for a mere

mistake).[37]   These cases make clear that, even if the failure to disclose key facts about the Lock-

Up Agreement and Swaps was unintentional, Rule 60(b)(3) relief is justified.[38]

### d.  Extraordinary Circumstances Justify Rule 60(b)(6) Relief

The failure to properly disclose key facts about the Lock-Up Agreement and Swaps

during the sale process constitutes "extraordinary circumstances" justifying Rule 60(b)(6) relief.

In opposition, the Objectors argue that *Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*,

666 F.2d 754 (2d Cir. 1981) ("***Montco***"), is distinguishable from this case on the ground that the

order as to which Rule 60(b) relief was granted in *Montco* erroneously granted relief that had

been specifically requested and denied.[39]   According to the Objectors, this case is different

because "no relief was added to the Sale Order that was expressly discussed with and denied by

the Court."[40]   This distinction is absurd.  That the Objectors would seek to enforce an order of

---

(S.D.N.Y. 2006), *aff'd*, 547 F.3d 115 (2d Cir. 2008), *cert. denied*, *Catskill Dev. LLC v. Harrah's Operating Co., Inc.*, 129 S. Ct. 1908 (2009).

[37]   The authority cited by New GM is also readily distinguishable.  NG Obj. 22.  In *Scherer v. City of New York*, Nos. 03 Civ. 8445 (RWS), 04 Civ. 2713 (RWS), 2007 WL 2710100, at *6 (S.D.N.Y. Sept. 7, 2007), although the relief asserted was under Rule 60(b)(3), the court commented in its decision that, "it is clear from the Notice of Motion that the claim is also being asserted as one for fraud against the Court."  Again, the GUC Trust is not asserting fraud, but rather misconduct.

[38]   New GM argues incorrectly that this Court already denied the GUC Trust's claim for relief under Rule 60(b)(3) at the July 19, 2012 New GM Summary Judgment Hearing.  NG Obj. 22 n.19.  New GM's motion was denied on ripeness grounds, and thus this Court did not rule on the underlying issue of Rule 60(b) relief.  New GM SJ Hr'g Tr. 79:1-11.  It is true that the Court commented that, when seeking Rule 60(b)(3) relief because of *fraud*, the movant must prove scienter.  *Id*. at 92:1-4.  However, as explained above, the "misconduct," as opposed to the "fraud," prong of Rule 60(b)(3) does not require a showing of bad faith.

[39]   NG Obj. 24; NH Obj. 13.

[40]   NG Obj. 24.

14

this Court in a manner that would have consequences *never* disclosed to the Court, under

circumstances where the Court had no opportunity to consider or evaluate those consequences

because they were never even disclosed to the Court, is, by any measure, truly "extraordinary."[41]

The Objectors also contend that the GUC Trust has not presented "data that the court

overlooked . . . that might reasonably be expected to alter the conclusion reached by the court."[42]

Again, the Objectors are just wrong.  Had the Court been made aware of the pertinent facts at the

time the Sale Order was entered, it might reasonably be expected that the Old GM estate would

not now be facing $2.67 billion of claims from a group of Noteholders that already have been

paid $367 million on $1 billion of Notes.  Thus, the previously undisclosed facts that the GUC

Trust has now uncovered is material information that might "alter the conclusions" reached by

this Court.  *Shrader*, 70 F.3d at 257.

The Objectors also misstate the law as to a party's right to seek relief under multiple

subsections of Rule 60(b).  The Noteholders contend that a movant cannot seek Rule 60(b)(6)

relief if it has also moved for relief under one of the first five subsections of the rule.[43]  This is

not correct.  If the grounds for relief fit within one of the first five subsections of Rule 60(b),

---

[41]      The Noteholders also suggest that the Motion is an improper attempt by the GUC Trust to relitigate the 363 Sale or to bring what would otherwise be an untimely appeal.  NH Obj. 2.  In support of this argument, the Noteholders describe the Creditors' Committee as "an informed participant in the 363 Sale [P]rocess."  *Id*. at 2.  As already explained, as to the Lock-Up Agreement, the Creditors' Committee was a decidedly uninformed participant. Accordingly, Rule 60(b) relief is warranted because the merits of the Sale Order have never been fully or fairly litigated.  *See State St. Bank & Trust Co.*, 374 F.3d at 176 (denying Rule 60(b) motion where underlying order was fully and fairly litigated); *Fleming v. N.Y. Univ.*, 865 F.2d 478, 485 (2d Cir. 1989) (denying Rule 60(b) relief where new evidence did not undermine the underlying order).  All of the Noteholders' authority is factually distinguishable.  *See Stevens v. Miller*, 676 F.3d 62, 68 (2d Cir. 2012) (denying Rule 60(b) motion because party lost opportunity to appeal because of its own negligence); *Leonard v. Lowe's Home Ctrs., Inc.*, 83 F. App'x 402, 403 (2d Cir. 2003) (seeking Rule 60(b)(1) relief based on judicial mistake of law); *JPMorgan Chase Bank, N.A. v. Rijo (In re Rijo)*, Nos. 808-74607-REG, Adv. Pr. No. 09-8559-REG, 2012 WL 1309630, at *1 (Bankr. E.D.N.Y. Apr. 16, 2012) (denying Rule 60(b)(1) motion where debtor made a "conscious decision" to abandon the litigation).

[42]      NG Obj. 23 (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).  Notably, *Shrader*, 70 F.3d at 257 is not a Rule 60(b) case, but rather affirms a lower court's decision to grant a motion for reconsideration. Like here, the data identified in *Shrader* was expected to "alter the conclusion reached by the court."  *Id.*

[43]      NH Obj. 12.

15

then this Court may not grant relief under Rule 60(b)(6); however, there is no bar to a movant

seeking relief under all potentially available grounds. *United States v. Cirami*, 563 F.2d 26, 32

(2d Cir. 1977). This point is clearly articulated in the cases cited, but incorrectly summarized, by

the Noteholders.[44] Indeed, courts often entertain motions brought on the basis of multiple

subsections of Rule 60(b) and then grant relief under Rule 60(b)(6) when appropriate. *See, e.g.*,

*Montco*, 666 F.2d at 759 (considering a motion for relief under Rule 60(b)(1), (2), (3) and (6),

and granting the motion under subsection (6)). Thus, in the event that the Court finds that the

other three subsections are inapplicable here, the GUC Trust has shown extraordinary

circumstances by highly convincing evidence, and relief under Rule 60(b)(6) is warranted.[45]

## II.    The GUC Trust's Request for Rule 60(b) Relief Is Timely

In the Motion, the GUC Trust demonstrated that its request for Rule 60(b) relief was

timely. The Objectors argue to the contrary, claiming that the GUC Trust "buried" its request for

Rule 60(b) relief in its Initial and First Amended Objections and has never been clear about what

relief it is seeking.[46] These arguments should be rejected.

---

[44]    *See Stevens*, 676 F.3d at 67-68 ("Where a party's Rule 60(b) motion is premised on grounds fairly classified as mistake, inadvertence, or neglect, relief under Rule 60(b)(6) is foreclosed."); *United States v. Int'l Bd. of Teamsters*, 247 F.3d 370, 391-92 (2d Cir. 2001) ("Controlling cases have held that if the reasons offered for relief from judgment can be considered in one of the more specific clauses of Rule 60(b), such reasons will not justify relief under Rule 60(b)(6)"); *Cruickshank & Co. v. Dutchess Shipping Co.*, 805 F.2d 465, 467 (2d Cir. 1986) (noting that, if the movant prevails on its motion for Rule 60(b)(5) relief, Rule 60(b)(6) is foreclosed); *Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir. 1986) ("(b)(6) applies only when no other subsection is available"); *Cirami*, 563 F.2d at 32 (reversing dismissal of Rule 60(b)(6) motion and stating, "As the language of the rule makes clear, relief under clause (6) is available only when the movant … asserts a ground justifying relief that is not a ground encompassed within any of the first five clauses.").

[45]    The Noteholders also mischaracterize the manner in which the GUC Trust seeks Rule 60(b)(6) relief. The Noteholders seem to suggest the GUC Trust is seeking relief under subsections (1), (2), (3) and (6) concurrently, which is not so. NH Obj. 13. The GUC Trust states in its Motion that it seeks Rule 60(b)(6) relief only if the "[C]ourt find[s] that the other subsections of Rule 60(b) are inapplicable." Motion 25-26.

[46]    NG Obj. 35-36.

As an initial matter, the GUC Trust's Rule 60(b) request was not "buried." It appears in a numbered paragraph in its July 2, 2010 Initial Objection.[47] Further, "buried" or not, the Objectors cannot deny that they were aware of the request from and after the time it was made. Ever since it was asserted, the request has been a lightning rod for criticism from New GM and the Noteholders. Indeed, the Noteholders, joined by New GM, argued to this Court in December 2010 that the Rule 60(b) motion could be disposed of without an evidentiary hearing.[48] It is thus disingenuous to claim that the request for relief was not immediately known to the Noteholders and New GM.

Moreover, from the date of that filing, through the last day of trial and until today, the GUC Trust has been consistent in describing the request for Rule 60(b) relief as an alternative remedy that will only be necessary in certain circumstances.[49] Specifically, there will be no need for Rule 60(b) relief if the Court decides: (1) the Lock-Up Agreement was not assumed by the Debtors and assigned to New GM; (2) the Swaps were not assumed and assigned, or otherwise transferred to New GM; and (3) the avoidance actions related to payment of the Consent Fee were not sold to New GM (and even if they were, Rule 60(b) relief would only be necessary if the Court rules that the section 502(d) objection cannot be asserted by the GUC Trust absent potential standing to bring the avoidance actions).[50]

---

[47]    Initial Obj. ¶ 70.

[48]    December 15, 2010 Status Hr'g Tr. 38:7-19; 40:25-41:8; 44:12-23.

[49]    Initial Obj. ¶ 70; First Am. Obj. ¶ 73 ("This request for relief is asserted protectively."); December 15, 2010 Status Hearing 52:8-13 (Bankr. Dkt. No. 8626) ("[T]o the extent that the sale order and the assumption order can be construed to be a judicial finding to that effect, we might need [Rule 60(b)] relief from such an order."); July 27, 2012 GUC Trust Pre-Trial Brief at 25 n.6 (Adv. Pr. Dkt. 148) (reserving its rights to seek Rule 60(b) relief); Lopez Tr. 68:3-69:16 (3/19/2013).

[50]    It is absurd for the Objectors to suggest they were unfamiliar with the GUC Trust's grounds for relief until May 2013 because the Rule 60(b) claim was fully briefed on summary judgment roughly a year ago. NG Obj. 36; June 8, 2012 Memorandum of Law in Support of New GM's Motion for Summary Judgment (Adv. Pr. Dkt. 33); July 11, 2012 Reply Brief in Support of New GM's Motion for Summary Judgment (Adv. Pr. Dkt. 95).

The Objectors also argue that there was an unreasonable delay in seeking Rule 60(b)

relief.[51] This argument is yet another example of the Objectors' efforts to rewrite history. It was

not until October 2009 that the Creditors' Committee first recognized the potential implications

of the Lock-Up Agreement for unsecured creditors of the Old GM estate. Thereafter, Kramer

Levin commenced an investigation and requested information about the agreement from the

Nova Scotia Finance Trustee and New GM. New GM and the Noteholders concede that this

request was ignored.[52] After the investigation had begun, Butzel Long, as conflicts counsel, took

over the matter, familiarized itself with the facts, completed the investigation, presented its

findings to the Creditors' Committee and secured the Creditors' Committee's authorization to

pursue Rule 60(b) relief.

The Noteholders make light of the investigation that ensued, stating "it took a while."[53]

But as the record in this case reflects, the transactions at issue here are rife with complexities, as

to which new information continued to come to light even after the trial had commenced,

requiring this Court to reopen discovery in October 2012.[54] Given the complexities of this

matter, the lack of disclosure, and the need to involve conflicts counsel, it is perfectly reasonable

that an investigation commenced in October 2009 did not culminate in the filing of an objection

until July 2010. *See, e.g., In re Olenek*, No. 09-76714-AST, 2010 WL 4366183, at *4 (Bankr.

---

[51]    NH Obj. 16-17; NG Obj. 37-36.

[52]    The Objectors claim that internal wrangling between American and Canadian counsel for the Nova Scotia Trustee over costs delayed any response to Kramer Levin's request for information, but the Objectors do not deny that the Nova Scotia Trustee never responded. NH Obj. 16 n.5; NG Obj. 23 n.20; Wedlake Tr. 123:15-18 (8/7/2012) (Fisher: "And in fact, Mr. Wedlake, in response to this request from the creditors committee you did not provide any information right?" Answer: "Not that I recall no."). New GM also ignored Kramer Levin's request for information. Pl. Ex. 157 (Dec. 8, 2009 email from Kramer Levin to Lawrence Buonomo attaching information request); Buonomo Tr. 103:20-22 (8/10/2012) (Fisher: "You never provided any information to Ms. Macksoud, did you?" Answer: "Not directly, I don't believe so.").

[53]    NH Obj. 16.

[54]    Iacobucci Tr. 6:14-7:12 (11/26/2012) (reopening discovery on the issue of repayment of the $450 Million Loan).

E.D.N.Y. Oct. 28, 2010) (almost seven month delay in seeking Rule 60(b) relief justified because

of a failure of disclosure and a failure of notice).[55]

### III.   Rule 60(b) Will Not Impose Undue Hardship on the Parties

The GUC Trust seeks a narrow modification of the Sale Order only as to the Lock-Up

Agreement and Swaps, and the transfer of certain avoidance actions.[56]  This relief will not

impose undue hardship, assuming the Court is even required to reach the Rule 60(b) issues.

New GM argues that it should not be denied the benefit of the bargain it struck under the

Sale Order, because, in reliance on the Sale Order, it has engaged in thousands of transactions

with creditors and billions of dollars in equities have been traded.[57]  New GM's point about the

scale of the 363 Sale to New GM is a *non sequitur*.  The Rule 60(b) relief requested here will

affect the Noteholders' claims against the Old GM estate.[58]  However, whether this Court's grant

of the requested Rule 60(b) relief would affect the release of the CAD 1.3 billion intercompany

---

[55]      The cases cited by the Objectors in support of their argument that the Motion is untimely are easily distinguished.  NG Obj. 37; NH Obj. 14-15.  *See Stupakoff v. Otto (In re Spiegel, Inc.)*, 269 F. App'x 56, 58 (2d Cir. 2008) (denying Rule 60(b) motion because motion was brought beyond one year time limit), *cert. denied*, 555 U.S. 825 (2008); *Kellog v. Strack*, 269 F.3d 100, 104 (2d Cir. 2001) (finding motion untimely after 26 month delay), *cert. denied*, 535 U.S. 932 (2002); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 656 (2d Cir. 1979) (finding motion untimely where no reason for 12 month delay was provided); *Chiulli v. I.R.S.*, No. 03 Civ. 6670 (HBP), 2006 WL 3008084, at *3 (S.D.N.Y. Oct. 20, 2006) (denying Rule 60(b) relief because movant waited nearly a year before bringing motion *and* made arguments that could have been made sooner); *Broadway v. City of New York*, No. 96 Civ. 2798 (RPP), 2003 WL 21209635, at *4 (S.D.N.Y. Mar. 21, 2003) (denying Rule 60(b) motion after a five year delay); *Sasso v. M. Fine Lumber Co., Inc.*, 144 F.R.D. 185, 188-89 (E.D.N.Y. 1992) (movant *chose* to ignore the litigation until the specter of personal liability appeared).

[56]      Citing two cases that do not even concern Rule 60(b), New GM argues in error that this Court cannot modify only a portion of the Sale Order.  *See* NG Obj. 6.  New GM's argument is contrary to the case law on this point.  *See In re Jack Kline Co., Inc.*, 440 B.R. 712, 729-31 (Bankr. S.D. Tex. 2010) (amending sale order under Rule 60(b)(3), because creditors, in settling claim against the debtor, failed to disclose that they intended to charge and collect post-petition attorney's fees (and interest) from the proceeds of the sale of certain property).  Finally, the cases recognizing the court's power to grant partial relief from an order are consistent with the whole point of Rule 60(b), which is precisely to afford a means of relief from only those offending portions of an order.  The Objectors' contention that Rule 60(b) would require this Court to throw the baby out with the bathwater is just another example of the extreme positions they assert.

[57]      NG Obj. 3 & 33-34.

[58]      Though they argue that they could be prejudiced were the Rule 60(b) relief to be granted, the Noteholders' only "prejudice" would be that the GUC Trust would be able to fight their claims on the merits, rather than be hamstrung by booby traps, hidden and undetected, in the sale approval process.   NH Obj. 18.

loan between GM Canada and Nova Scotia Finance is a matter that is hotly disputed – and, in

any event, likely not a matter that will ever be decided in the Old GM bankruptcy proceedings.

Regardless, Mr. Ammann, who is currently New GM's CFO, made clear at trial that, even a

liability of that magnitude would not pose any undue hardship for New GM.[59]

Finally, there is no reason why this Court should preserve for the benefit of New GM an

aspect of the Sale Order that was improperly secured on the backs of Old GM's unsecured

creditors without this Court's knowledge.  Rule 60(b) is there precisely to ensure that such a

result can be avoided.[60]

## CONCLUSION

The GUC Trust respectfully requests that the Court enter an order granting the Motion for

relief under Rule 60(b), and granting such other and further relief as this Court deems just and

proper.

Dated: New York, New York                   Respectfully submitted,
      June 24, 2013

                                  By: /s/ Eric B. Fisher
                                      Barry N. Seidel
                                      Eric B. Fisher
                                      Katie L. Weinstein
                                      Mary Kim (admitted *pro hac vice*)
                                      DICKSTEIN SHAPIRO LLP
                                    *Counsel for the Motors Liquidation*
                                    *Company GUC Trust*

---

[59]     Ammann Tr. 125:16-126:23 (9/27/2012).

[60]     The Objectors also argue that the GUC Trust's request for Rule 60(b) relief is equitably moot.  NG Obj. 34.
This argument fails because the doctrine of equitable mootness is not typically applied in Rule 60(b) cases.  Except
for *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619, 623 (D.P.R. 1999), the cases cited by
the Objectors in support of the equitable mootness argument are appeal cases – not Rule 60(b) cases. *See, e.g.,*
*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43, 52 (S.D.N.Y. 2010), *aff'd, Parker*
*v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 81-2 (S.D.N.Y. 2010), *motion to vacate*
*denied*, No. 09 Civ. 7794, 2010 WL 3565494 (S.D.N.Y. Sept. 10, 2010).  Further, in *Palermo*, a case from outside
this district, the movant, unlike the Creditors' Committee in this case, was given a full and fair opportunity to be
heard on his objections to the sale order in that case.  *In re Teligent, Inc.*, 306 B.R. 752, 757-58 (Bankr. S.D.N.Y.
2004), *aff'd*, 326 B.R. 219 (S.D.N.Y. 2005) considers, but does not decide, whether equitable mootness applies to
Rule 60(b).