## EXHIBIT C

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-50026

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


GENERAL MOTORS CORPORATION, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - - -x


                    U.S. Bankruptcy Court

                    One Bowling Green

                    New York, New York


                    June 1, 2009

                    4:25 PM



B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

2

1

2 HEARING re Motion for Joint Administration; Motion of Debtors

3 for Entry of Order Directing Joint Administration of Chapter 11

4 Cases Pursuant to Fed. R. Bankr. P. 1015(b)

5

6 HEARING re Motion to Authorize Motion of Debtors for Entry of

7 Order Pursuant to 11 U.S.C. Sections 105 (a), 342(a), and

8 521(a)(1), Fed. R. Bankr. P. 1007(a) and 2002(a), (d), (f) and

9 (l), and Local Bankruptcy Rule 1007-1 (I) Waiving Requirement

10 to File Lists of Creditors and Equity Security Holders and (II)

11 Approving Form and Manner of Notifying Creditors of

12 Commencement of Debtors' Chapter 11 Cases and First Meeting of

13 Creditors

14

15 HEARING re Motion to Extend Time / Motion of Debtors for Entry

16 of Order Pursuant to 11 U.S.C. Section 521 and Fed. R. Bankr.

17 P. 1007(c) Extending Time to File Schedules of Assets and

18 Liabilities, Schedules of Executory Contracts and Unexpired

19 Leases, and Statement of Financial Affairs

20

21 HEARING re Motion to Authorize Motion of Debtors for Entry of

22 Order Pursuant to 11 U.S.C. Section 105(a) Enforcing Protection

23 of 11 U.S.C. Sections 362, 365(e)(1), and 525

24

25

09-50026-reg   Doc 974   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 4 of 126

3

HEARING re Motion to Authorize Motion of Debtors for Entry of

Order Pursuant to 11 U.S.C. Sections 363(c)(1) and 503(b)(1)(A)

Granting Administrative Expense Status to Undisputed

Obligations to Vendors Arising from Postpetition Delivery of

Goods and Services Ordered Prepetition and Authorizing Debtors

to Pay Such Obligations in Ordinary Course of Business


HEARING re Motion to Authorize Motion of Debtors for Entry of

Order Pursuant to 11 U.S.C. Sections 105(a), 345(b), 363(b) and

363(c) and 364(a), and Fed. R. Bankr. P. 6003 and 6004 (A)

Authorizing Debtors to (i) Continue Using Existing Cash

Management System, (ii) Honor Certain Prepetition Obligations

Related to Use of Cash Management System, and (iii) Maintain

Existing Bank Accounts and Business Forms; (B) Extending Time

to Comply with 11 U.S.C. Section 345(b); and (C) Scheduling a

Final Hearing


HEARING re Motion to Authorize Motion of Debtors for Entry of

Order Pursuant to 11 U.S.C. Sections 105(a), 363(b), and 507,

(I) Authorizing Debtors to (a) Pay Certain Employee

Compensation and Benefits and (b) Maintain and Continue Such

Benefits and other Employee-Related Programs and (II) Directing

Banks to Honor Prepetition Checks for Payment of Prepetition

Employee Obligations

4

1

2    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

3    U.S.C. Sections 105(a) and 363(b) (I) Authorizing Debtors to

4    Pay Prepetition Obligations to Foreign Creditors and (II)

5    Authorizing and Directing Financial Institutions to Honor and

6    Process Related Checks and Transfers

7

8    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

9    U.S.C. Sections 105(a) and 363 Authorizing Debtors to Honor

10   Prepetition Obligations to Customers, Dealers, and Trade

11   Customers and to Otherwise Continue Warranty, Credit Card,

12   Other Customer, Dealer, and Trade Customer Programs in the

13   Ordinary Course of Business

14

15   HEARING re Motion of Debtors for Entry of Order Pursuant to 11

16   U.S.C. Sections 105 and 546(c) Establishing and Implementing

17   Exclusive and Global Procedures for Treatment of Reclamation

18   Claims

19

20   HEARING re Motion of Debtors for Entry of Order Pursuant to 11

21   U.S.C. Sections 105(a) and 503(b)(9) Establishing Procedures

22   for the Assertion, Resolution, and Satisfaction of Claims

23   Asserted Pursuant to 11 U.S.C. Section 503(b)(9)

24

25

09-50026-reg   Doc 374   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 6 of 126

5

1

2    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

3    U.S.C. Sections 105 and 363(b) Authorizing Payment of Certain

4    Prepetition (I) Shipping and Delivery Charges for Goods in

5    Transit, (II) Customs Duties, and (III) Tooling and Mechanics

6    Lien Charges

7

8    HEARING re Motion of Debtors for Entry of Order Pursuant to 11

9    U.S.C. 363 (b), 507(a)(8), 541, and 105(a), Authorizing Debtors

10   to Pay Prepetition Taxes and Assessments

11

12   HEARING re Motion for Approval of Adequate Assurance of Payment

13   to Utility Services and Continuation of Service; Motion of

14   Debtors for Entry of Order Pursuant to 11 U.S.C. Sections

15   105(a) and 366 (I) Approving Debtors Proposed Form of Adequate

16   Assurance of Payment, (II) Establishing Procedures for

17   Resolving Objections By Utility Companies, and (III)

18   Prohibiting Utilities from Altering, Refusing, or Discontinuing

19   Service

20

21

22

23

24

25

6

HEARING re Motion to Approve Use of Cash Collateral; Motion of

Debtors for Entry of Orders Pursuant To 11 U.S.C. Sections 105,

361, 362, 363, and 507 (i) Authorizing Use of Cash Collateral,

(ii) Granting Adequate Protection to The Revolver Secured

Parties, (iii) Granting Adequate Protection to The Term Loan

Secured Parties, and (iv) Scheduling a Final Hearing Pursuant

to Bankruptcy Rule 4001


HEARING re Motion of Debtors for Entry of An Order Pursuant to

11 U.S.C. Sections 361, 362, 363, and 364 (i) Authorizing The

Debtors To Obtain Postpetition Financing, Including on an

Immediate, Interim Basis; (ii) Granting Superpriority Claims

and Liens; (iii) Authorizing The Debtors to Use Cash

Collateral; (iv) Granting Adequate Protection to Certain

Prepetition Secured Parties; (v) Authorizing The Debtors to

Prepay Certain Secured Obligations In Full Within 45 Days; and

(vi) Scheduling A Final Hearing Pursuant to Bankruptcy Rule

4001

7

HEARING re Motion of Debtors for Entry of Order Pursuant to 11
U.S.C. Sections 363(b), 503(b), and 105(a) and Fed. R. Bankr.
P. 6003 and 6004 (I) Authorizing Debtors to (a) Continue Their
Liability, Product, Property, and Other Insurance Programs and
(b) Pay All Obligations in Respect Thereof, and (II)
Authorizing and Directing Financial Institutions to Honor and
Process Checks and Transfers Related to Such Obligations

HEARING re Motion of Debtors for Entry of Order Pursuant to 11
U.S.C. Sections 105, 363, and 364 Authorizing Debtors to (I)
Pay Prepetition Claims of Certain Essential Suppliers, Vendors
and Services Providers Providers; (II) Continue Troubled
Supplier Assistance Program; and (III) Continue Participation
in The United States Treasury Auto Supplier Support Program

HEARING re Motion for Entry of Order Authorizing Debtors to
Enter Into, and Approving, Ratification Agreement with GMAC LLC

HEARING re Joint Motion of the Debtors and GMAC LLC for Entry
of Order Authorizing Them to File Documents Under Seal

09-50026-reg9    Doc 974    Filed 06/09/09    Entered 06/04/09 09:28:33    Main Document
Pg 9 of 125

8

HEARING re Motion of the Debtors Pursuant to 11 U.S.C. Sections

105(a) and 362 for Entry of (I) Interim and Final Orders

Establishing Notification Procedures Regarding Restrictions on

Certain Transfers of Interests in the Debtors and (II) Orders

Scheduling A Final Hearing


HEARING re Motion for Sale of Property under Section 363(b);

Debtors' Motion Pursuant to 11 U.S.C. Sections 105, 363(b),

(f), (k), and (m), and 365 and Fed. R. Bankr. P. 2002, 6004,

and 6006, to (I) Approve (A) The Sale Pursuant to The Master

Sale and Purchase Agreement with Vehicle Acquisition Holdings

LLC, A U.S. Treasury-Sponsored Purchaser, Free and Clear of

Liens, Claims, Encumbrances, and Other Interests; (B) The

Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases; and (C) Other Relief; and (II) Schedule Sale

Approval Hearing


HEARING re Motion by Debtors for Entry of Order Pursuant to

11 U.S.C. Section 365 Authorizing the Rejection of Aircraft and

Airport Lease Agreements and for Related Relief




Transcribed By:  Clara Rubin

9

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtor General Motors Corporation

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   HARVEY R. MILLER, ESQ.

9         STEPHEN KAROTKIN, ESQ.

10         JOSEPH H. SMOLINSKY, ESQ.

11         RONIT J. BERKOVICH, ESQ. (TELEPHONICALLY)

12

13

14    ALIXPARTNERS, LLC

15         Attorneys for Debtor

16         515 S. Flower Street

17         Suite 3050

18         Los Angeles, CA 90071

19

20    BY:   MICHELLE CAMPBELL, ESQ. (TELEPHONICALLY)

21

22

23

24

25

10

```
 1

 2    HONIGMAN MILLER SCHWARTZ AND COHN LLP

 3         Attorneys for Debtor/Defendant General Motors Corporation

 4         2290 First National Building

 5         660 Woodward Avenue

 6         Detroit, MI 48226

 7

 8    BY:   JOSEPH R. SGROI, ESQ. (TELEPHONICALLY)

 9          TRICIA A. SHERICK, ESQ. (TELEPHONICALLY)

10

11

12    OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.

13         Attorneys for GMAC LLC

14         230 Park Avenue

15         New York, NY 10169

16

17    BY:   JONATHAN N. HELFAT, ESQ.

18          MELANIE L. CYGANOWSKI, ESQ.

19          DANIEL WALLEN, ESQ.

20          STEVEN B. SOLL, ESQ.

21          KENNETH S. MILLER, ESQ.

22

23

24

25
```

```
 1

 2    ARENT FOX LLP

 3          Attorneys for The Timken Company, Superior Industries

 4             Inc., and Harman Becker Automotive Systems, Inc.

 5          1675 Broadway

 6          New York, NY 10019

 7

 8    BY:   JAMES M. SULLIVAN, ESQ.

 9

10

11    BINGHAM MCCUTCHEN LLP

12          Attorneys for Deutsche Bank AG

13          399 Park Avenue

14          New York, NY 10022

15

16    BY:   ERIN M. MAUTNER, ESQ.

17          JEFFREY S. SABIN, ESQ.

18

19    BUTZEL LONG

20          Attorneys for a Number of Suppliers to GM

21          380 Madison Avenue

22          22nd Floor

23          New York, NY 10017

24

25    BY:   BARRY N. SEIDEL, ESQ.
```

12

```
 1
 2    CADWALADER, WICKERSHAM & TAFT LLP
 3         Attorneys for U.S. Treasury Auto Task Force
 4         One World Financial Center
 5         New York, NY 10281
 6
 7    BY:   JOHN RAPISARDI, ESQ.
 8
 9    CAPLIN & DRYSDALE, CHARTERED
10         Attorneys for the Cooney & Cooney Asbestos Personal
11           Injury Claimants
12         375 Park Avenue
13         35th Floor
14         New York, NY 10152
15
16    BY:   RITA C. TOBIN, ESQ.
17
18    COHEN, WEISS AND SIMON LLP
19         Attorneys for United Auto Workers
20         330 West 42nd Street
21         New York, NY 10036
22
23    BY:   BABETTE CECCOTTI, ESQ.
24
25
```

13

COVINGTON & BURLIN LLP

    Attorneys for Union Pacific

    The New York Times Building

    620 Eighth Avenue

    New York, NY 10018


BY:  SUSAN POWER JOHNSTON, ESQ.



DICKINSON WRIGHT PLLC

    Attorneys for Magna International, Johnson Controls, and

     Visteon Corporation

    301 East Liberty, Suite 500

    Ann Arbor, MI 48104


BY:  MICHAEL C. HAMMER, ESQ.


DICKINSON WRIGHT PLLC

    Attorneys for Magna International, Johnson Controls, and

     Visteon Corporation

    500 Woodward Avenue, Suite 4000

    Detroit, MI 48226


BY:  JAMES A. PLEMMONS, ESQ.

09-50026-reg   Doc 974-4   Filed 06/09/09   Entered 06/09/09 09:28:33   Main Document
Pg 15 of 126

14

1

2    GIBSON, DUNN & CRUTCHER LLP

3         Attorneys for Wilmington Trust, as Indentured Trustee

4         200 Park Avenue

5         New York, NY 10166

6

7    BY:   MATTHEW J. WILLIAMS, ESQ.

8         DAVID M. FELDMAN, ESQ.

9

10   HODGSON RUSS LLP

11        60 East 42nd Street

12        New York, NY 10165

13

14   BY:   GARRY M. GRABER, ESQ.

15        DEBORAH J. PIAZZA, ESQ.

16

17   HUGHES HUBBARD & REED LLP

18        One Battery Park Plaza

19        New York, NY 10004

20

21   BY:   MICHAEL LUSKIN, ESQ.

22

23

24

25

15

1

2    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

3         Attorneys for Henry Case Class Plaintiffs

4         1350 Broadway

5         Suite 501

6         New York, NY 10018

7

8    BY:   EDWARD J. LOBELLO, ESQ.

9

10

11   ORRICK, HERRINGTON & SUTCLIFFE LLP

12        Attorneys for GM Unofficial Dealer Committee

13        Columbia Center

14        1152 15th Street, NW

15        Washington, DC 20005

16

17   BY:   ROGER FRANKEL, ESQ.

18

19

20   ORRICK, HERRINGTON & SUTCLIFFE LLP

21        Attorneys for GM Unofficial Dealer Committee

22        666 Fifth Avenue

23        New York, NY 10103

24

25   BY:   LORRAINE S. MCGOWEN, ESQ.

16

 1

 2    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

 3          Attorneys for Ad Hoc Bondholders Group

 4          1285 Avenue of the Americas

 5          New York, NY 10019

 6

 7    BY:   ANDREW N. ROSENBERG, ESQ.

 8          MARGARET A. PHILLIPS, ESQ.

 9          IAN J. POHL, ESQ. (TELEPHONICALLY)

10

11

12    SIMPSON THACHER & BARTLETT LLP

13          Attorneys for Citicorp USA, Inc., as Agent

14          425 Lexington Avenue

15          New York, NY 10017

16

17    BY:   PETER V. PANTALEO, ESQ.

18          DAVID MACK, ESQ.

19

20

21

22

23

24

25

17

 1

 2    UNITED STATES DEPARTMENT OF JUSTICE

 3         Office of the United States Trustee

 4         33 Whitehall Street

 5         21st Floor

 6         New York, NY 10004

 7

 8    BY:   DIANA G. ADAMS, UST

 9          LINDA A. RIFFKIN, AUST

10          TRACY HOPE DAVIS, AUST

11          ANDREW D. VELEZ-RIVERA, ESQ.

12          BRIAN S. MASUMOTO, ESQ.

13

14

15    UNITED STATES DEPARTMENT OF JUSTICE

16         U.S. Attorney's Office

17         86 Chambers Street

18         New York, NY 10007

19

20    BY:   DAVID S. JONES, AUSA

21          MATTHEW L. SCHWARTZ, AUSA

22

23

24

25

18

1

2  VEDDER PRICE P.C.

3       Attorneys for Export Development Canada

4       1633 Broadway

5       47th Floor

6       New York, NY 10019

7

8  BY:   MICHAEL J. EDELMAN, ESQ.

9       MICHAEL L. SCHEIN, ESQ.

10

11  ALLARD & FISH, P.C.

12       Attorneys for Creditor Severstal North America, Inc.

13       535 Griswold

14       Suite 2600

15       Detroit, MI 48226

16

17  BY:   DEBORAH L. FISH, ESQ. (TELEPHONICALLY)

18

19  BARNES & THORNBURG LLP

20       Attorneys for Creditor Continental AG

21       171 Monroe Avenue N.W.

22       Suite 1000

23       Grand Rapids, MI 49503

24

25  BY:   JOHN T. GREGG, ESQ. (TELEPHONICALLY)

19

1

2    DAVIS POLK & WARDWELL

3         Attorneys for Interested Party Ford Motor Company

4         450 Lexington Avenue

5         New York, NY 10017

6

7    BY:   BRIAN M. RESNICK, ESQ. (TELEPHONICALLY)

8

9    DLA PIPER LLP U.S.

10        Attorneys for Creditor Hewlett Packard

11        550 South Hope Street

12        Suite 2300

13        Los Angeles, CA 90071

14

15   BY:   KAROL K. DENNISTON, ESQ. (TELEPHONICALLY)

16

17   FROST BROWN TODD LLC

18        Interested Party

19        Lexington Financial Center

20        250 West Main

21        Suite 2800

22        Lexington, KY 40507

23

24   BY:   ROBERT V. SARTIN, ESQ. (TELEPHONICALLY)

25

20

```
 1
 2    GOLDBERG KOHN
 3         Attorneys for Creditor Wheels, Inc.
 4         55 East Monroe Street
 5         Suite 3300
 6         Chicago, IL 60603
 7
 8    BY:  JEREMY M. DOWNS, ESQ. (TELEPHONICALLY)
 9
10    GOULSTON & STORRS P.C.
11         Attorneys for Creditor 767 Fifth Partners, LLC
12         400 Atlantic Avenue
13         Boston, MA 02110
14
15    BY:  DOUGLAS B. ROSNER, ESQ. (TELEPHONICALLY)
16
17    HAYNES AND BOONE, LLP
18         Attorneys for Creditor Exxon Mobile Corp.
19         1 Houston Center
20         1221 McKinney
21         Suite 2100
22         Houston, TX 77010
23
24    BY:  BROOKS HAMILTON, ESQ. (TELEPHONICALLY)
25
```

**VERITEXT REPORTING COMPANY**

21

1

2    KASOWITZ BENSON TORRES & FRIEDMAN LLP

3        1633 Broadway

4        New York, NY 10019

5

6    BY:   ALAN LUNGEN, ESQ. (TELEPHONICALLY)

7

8

9    LAW OFFICES OF GABRIEL DEL VIRGINIA

10       Interested Party

11       641 Lexington Avenue

12       21st Floor

13       New York, NY 10022

14

15   BY:   GABRIEL DEL VIRGINIA, ESQ. (TELEPHONICALLY)

16

17

18   MILLER, CANFIELD, PADOCK AND STONE, P.L.C.

19       Attorneys for Creditor Ford Motor Company

20       150 West Jefferson

21       Suite 2500

22       Detroit, MI 48226

23

24   BY:   MARC N. SWANSON, ESQ. (TELEPHONICALLY)

25

22

```
 1

 2    PEPPER HAMILTON LLP

 3          Attorneys for Creditor SKF USA Inc.

 4          400 Berwyn Park

 5          899 Cassatt Road

 6          Berwyn, PA 19312

 7

 8    BY:   HENRY J. JAFFE, ESQ. (TELEPHONICALLY)

 9

10

11    RATH YOUNG AND PIGNATELLI, P.C.

12          Interested Party

13          54 Canal Street

14          Boston, MA 02114

15

16    BY:   GILBERT F. WHITTEMOORE, ESQ. (TELEPHONICALLY)

17

18

19    SQUIRE, SANDERS & DEMPSEY L.L.P.

20          Attorneys for Creditor Goodyear, et al.

21          221 E. Fourth Street

22          Suite 2900

23          Cincinnati, OH 45202

24

25    BY:   P. CASEY COSTON, ESQ. (TELEPHONICALLY)
```

09-50026-mg   Doc 12456-3   Filed 06/24/13   Entered 06/24/13 13:11:57   Exhibit G
09-50026-reg   Doc 974   Filed 06/09/09   Entered 06/09/09 09:28:33   Main Document
Pg 24 of 126

23

1

2    STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, A PROFESSIONAL

3    CORPORATION

4        Attorneys for Ad Hoc Committee of Unsecured Creditors

5        2323 Bryan Street

6        Suite 2200

7        Dallas, TX 75201

8

9    BY:  SANDER L. ESSERMAN, ESQ. (TELEPHONICALLY)

10        JO E. HARTWICK, ESQ. (TELEPHONICALLY)

11

12    THOMPSON & KNIGHT LLP

13        333 Clay Street

14        Suite 3300

15        Houston, TX 77002

16

17    BY:  DEMETRA L. LIGGINS, ESQ. (TELEPHONICALLY)

18

19    WHITE AND WILLIAMS LLP

20        Attorneys for Interested Party Siemens PLM

21        One Penn Plaza

22        250 W. 34th Street, Suite 4110

23        New York, NY 10119

24

25    BY:  KAREL S. KARPE, ESQ. (TELEPHONICALLY)

24

1

2    BNP PARIBAS

3          Creditor

4          787 Seventh Avenue

5          Suite 27

6          New York, NY 10019

7

8    BY:   GREN DAY, DIRECTOR (TELEPHONICALLY)

9

10

11   CITIGROUP

12         Creditor

13         New York, NY

14

15   BY:   ERIC GELLER (TELEPHONICALLY)

16

17

18   DEUTSCHE BANK AG

19         Creditor

20         60 Wall Street

21         New York, NY 10005

22

23   BY:   JAMES HOWARD MACINNIS, JR. (TELEPHONICALLY)

24

25

25

1

2      FARALLON CAPITAL MANAGEMENT, L.L.C.

3            Creditor

4            One Maritime Plaza

5            Suite 2100

6            San Francisco, CA 94111

7

8      BY:   MAX A. STRASBURG (TELEPHONICALLY)

9

10

11     JPMORGAN CHASE & CO.

12           Creditor

13           270 Park Avenue

14           New York, NY 10017

15

16     BY:   CONRAD FLAKE (TELEPHONICALLY)

17

18

19     MONARCH ALTERNATIVE CAPITAL LP

20           Interested Party

21           535 Madison Avenue

22           New York, NY 10022

23

24     BY:   ROBERT BURNS, ESQ. (TELEPHONICALLY)

25

26

1

2    ONEX CREDIT PARTNERS

3          Creditor, Bondholder

4          910 Sylvan Avenue

5          Englewood Cliffs, NJ 07632

6

7    BY:   STUART R. KOVENSKY, CO-CHIEF INVESTMENT OFFICER

8          (TELEPHONICALLY)

9

10   R3 CAPITAL PARTNERS

11         Interested Party

12         FL 39R

13         1271 Avenue of the Americas

14         New York, NY 10020

15

16   BY:   ROSS ROSENFELT (TELEPHONICALLY)

17

18   TACONIC CAPITAL ADVISORS LP

19         Interested Party

20         450 Park Avenue

21         9th Floor

22         New York, NY 10022

23

24   BY:   MARC SCHWARTZ, FINANCIAL ANALYST (TELEPHONICALLY)

25

27

1

2    WATERSHED ASSET MANAGEMENT, LLC

3         Creditor

4         One Maritime Plaza, Suite 1525

5         San Francisco, CA 94111

6

7    BY:   ERIN ROSS, ESQ. (TELEPHONICALLY)

8

9    UNITED STEELWORKERS OF AMERICA

10        Creditor

11        Five Gateway Center

12        Pittsburgh, PA 15222

13

14   BY:   DAVID JURY, ESQ. (TELEPHONICALLY)

15

16   DENNIS A. PRIETO, IN PRO PER (TELEPHONICALLY)

17        For Aurelius Capital

18

19   BAO TRUONG (TELEPHONICALLY)

20        Creditor

21        New York

22

23   ERIC G. UDOFF (TELEPHONICALLY)

24        Interested Party

25        New Jersey

28

1                    P R O C E E D I N G S

2          THE COURT:  Have seats, everybody.

3          Mr. Miller, good afternoon.

4          MR. MILLER:  Good afternoon, Your Honor.

5          THE COURT:  We're here on first-day motions on General

6     Motors Corp.

7          Mr. Miller, the 1007-2 that you submitted was one of

8     the most comprehensive I think I've ever seen.  But I wonder if

9     you want to make some preliminary observations before you get

10    into your motions.

11         MR. MILLER:  If I may, Your Honor.

12         THE COURT:  Go ahead.

13         MR. MILLER:  If Your Honor please, Harvey Miller,

14    Weil, Gotshal & Manges, together with Stephen Karotkin and

15    Joseph Smolinsky, who will be handling part of this hearing,

16    Your Honor.  First of all, Your Honor, let me thank you for

17    accommodating the debtors at this late hour.

18         THE COURT:  Would you pause, please, Mr. Miller?

19         Folks, we're trying to make these proceedings

20    available for overflow rooms and people on the phone.  We need

21    you to be quiet outside the courtroom.

22         Try again, Mr. Miller.

23         MR. MILLER:  First, Your Honor, I would like to thank

24    you very much for accommodating the debtors at this late hour

25    in the afternoon.  In the matter of this case, time is really

1    of the essence.

2         Second, Your Honor, I would like to introduce to

3    you -- in the courtroom today with us is Mr. Frederick

4    Henderson who is the president and chief executive officer of

5    General Motors Corporation, who is sitting right here, Your

6    Honor --

7         THE COURT:  Mr. Henderson, welcome.

8         MR. HENDERSON:  Thank you.

9         MR. MILLER:  -- Mr. Robert Osborne, who is the general

10   counsel of General Motors Corporation, Your Honor.

11        Today, Your Honor, is the culmination of the longest

12   day that started approximately two or three weeks ago.  The

13   hearing may be a little ragged, Your Honor, as a great many

14   people who are participating have been up for an extended

15   period of time.

16        For the purposes of the hearing, Your Honor, and as a

17   predicate for the relief requested in a number of the motions,

18   I would like to offer as part of the record Mr. Henderson's

19   affidavit pursuant to Rule 1007-2 and as the chief executive

20   officer and president of General Motors Corporation, which is

21   sworn to June 1, 2009 --

22        THE COURT:  Yes, that's customary.

23        MR. MILLER:  -- and the declaration, Your Honor, of

24   William C. Repko, a senior managing director of Evercore

25   Corporation -- Evercore Group, excuse me, LLC, dated May 31,

09-50026-reg   Doc 974   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 31 of 126

30

1    2009.

2          The date, time and venue for the commencement of these

3    Chapter 11 cases, Your Honor, has been the subject of so much

4    media attention and notoriety that today almost feels like the

5    second day.  This isn't -- there isn't a media source which has

6    not reported the commencement of these Chapter 11 cases in full

7    detail before they were actually filed, and it says something,

8    Your Honor, for the skill and acumen of the reporters and

9    commentators involved.

10          Be that as it may, Your Honor, the ultimate question

11   presented is, is this trip necessary?  To answer that question,

12   we need to look at the facts.  Historically, Your Honor,

13   General Motors has been an icon of the automotive industry.

14   Its brand names include Cadillac, Buick, Chevrolet, GMC and

15   others that have long resonated with the public as the standard

16   bearers of the American automotive industry.

17          Unfortunately, as the world has evolved and the United

18   States has entered into a global economy, facts and

19   circumstances changed with great velocity and often

20   circumscribed the ability to respond in an appropriate way.

21   Many basic American industries, as emerging nations have been

22   able to replicate and sometimes improve American production and

23   methods and technology, have come to the forefront as they are

24   not weighed down by cost and expenses that have become

25   encrusted over the years and have put companies such as General

31

1    Motors in a relatively noncompetitive position.

2         Undeniably, for the past few years, General Motors has

3    been buffeted by a series of exogenous events and circumstances

4    that have caused -- almost caused its termination of

5    operations, a termination, Your Honor, that would have occurred

6    but for the ability of General Motors in December 2008 to

7    negotiate and obtain financing from the United States Treasury

8    in December of 2008.  On December 31, 2008, General Motors

9    entered into a loan and security agreement with the United

10   States Treasury, pursuant to which the Treasury agreed to

11   advance up to 13.4 billion dollars over the term of that

12   agreement to enable General Motors to continue to maintain

13   operations while pursuing an effort to reshape itself into a

14   leaner, better, more efficient and economic business

15   enterprise.  There were no other lenders, financiers or

16   investors who came forward or who could be found to provide the

17   necessary financing.  There was no possible access to the

18   capital markets to enable General Motors to meet its liquidity

19   needs and maintain operations.

20        All prior efforts during the fall of 2008 to access

21   the capital markets or to sell sufficient assets to avoid a

22   meltdown were in vain.  The first drawer under the LSA, Your

23   Honor, was at 4 billion dollars made on December 31, 2008.  The

24   projected 13.4 billion dollars of borrowings from the United

25   States Treasury turned out to be inadequate as 2009 unfolded.

32

1    The automotive industry, including General Motors, continued to

2    be subjected to the effects of what was first thought to be a

3    mild recession, then advanced into a very serious recession and

4    soon began to be characterized by many as a depression.

5    Indeed, insofar as the automotive industry was concerned, it

6    was the worst of times since the end of World War II in 1945.

7         From the standpoint of the industry, Your Honor, the

8    deteriorating economic conditions that began during the

9    beginning of the spring and summer of 2008, as gas prices

10   escalated and caused consumers to change their driving habits,

11   exploded in the fall of 2008 with the collapse of Lehman

12   Brothers Holdings Inc. on September 15, 2008.

13        However, it was not so much the serious and damaging

14   effects on the financial markets per se that immensely impacted

15   General Motors but more importantly, Your Honor, the effects on

16   the consumer public.  As credit tightened and the negative

17   economic circumstances deepened, unemployment figures rose and

18   the value of home equities precipitously declined, resulting in

19   a monumental crisis of confidence.  In that environment, Your

20   Honor, the consumer effectively retreated from spending.  And

21   it appears from the habit of purchasing a car or a truck became

22   something to be deferred or suspended.

23        The crisis of confidence spread like wildfire.  It did

24   not only affect General Motors but essentially all of the

25   original equipment manufacturers.  Even the nondomestic

33

1 competitive giants like Toyota, Honda and Nissan were affected.

2 And each of these entities, despite substantially lower break-

3 even points, because of significantly lower legacy and other

4 costs, is reporting operating losses.

5   So where are we today, Your Honor?  Allow me to put it

6 into perspective.  General Motors is a global enterprise.  It

7 employs 235,000 persons worldwide as of March 31, 2009.  Of

8 that amount, 163,000, approximately, were -- are hourly

9 employees, and 71,000 salaried employees.  These Chapter 11

10 cases, Your Honor, only affect the U.S. operations of General

11 Motors.  That involves over 90,000 employees, of which

12 approximately 62,000 are hourly and represented primarily by

13 the United Auto Workers of America.  Less than one hundred

14 active employees are represented by other unions.

15   For the year end of December 31, 2008, the

16 consolidated enterprise had net sales and revenues of 149

17 billion dollars and reported losses from operations of 30.8

18 billion dollars.  Since 2005 and through the first quarter of

19 2009, the enterprise has reported cumulative net losses of 88

20 billion dollars.  For the same period it had negative

21 cumulative operating losses of 41.6 billion dollars.  As of

22 March 31, 2009, it reported consolidated assets totaling

23 82,290,000,000 dollars, and liabilities of 172,810,000,000

24 dollars.

25   Currently, industry sales in the United States are at

09-50026-mg   Doc 12456-2   Filed 06/24/13   Entered 06/24/13 13:11:57   Exhibit G
09-50026-reg   Doc 374   Filed 06/08/09   Entered 06/04/09 09:28:33   Main Document
Pg 35 of 126
Pg 34 of 165

34

1   their lowest levels since World War II.  And Europe, likewise,

2   has almost equally depressed levels of sales.  For the first

3   quarter of 2009, General Motors domestic automobile sales

4   dropped by 49 percent compared to the corresponding period in

5   2008.

6          To effectuate its business, General Motors relies upon

7   an effective dealer network; it is a critical part of the

8   General Motors business.  Currently, General Motors has almost

9   6,000 dealers and is engaged in a process to rationalize and

10  streamline and make that dealership network more effective

11  while at the same time alleviating the distress that may be

12  incurred by dealers that can no longer be part of that network.

13         General Motors is also critical to the maintenance of

14  the North American automotive supplier community.  It does

15  business with almost 11,500 suppliers of parts and components,

16  and expends on an annual basis from 30- to 50 billion dollars a

17  year -- 30- to 50 billion dollars for parts and components.  A

18  failure on the part of General Motors would result in severe

19  systemic consequences to that industry.

20         General Motors' total worldwide car and truck

21  deliveries for 2008 were 8.4 million units as compared to 9.4

22  (sic) units in 2007, a significant decline.  The economic facts

23  and circumstances of the recession and the shrinking global

24  economy have continued unabated as it affects the automotive

25  industry.  Yet, General Motors remains a basic component of the

09-50026-mg Doc 12456-2 Filed 06/24/13 Entered 06/24/13 17:11:57 Exhibit C
Pg 35 of 265

35

1   United States industrial complex, as President Obama said today

2   in his remarks to the public.

3          As a major direct employer and indirectly the support

4   for hundreds of other businesses and communities, its continued

5   existence and ability to resume its position as a successful

6   automotive manufacturing company is critical not only to itself

7   and to those directly involved but to the interests of the

8   country.  It is a key element in the maintenance of the North

9   American manufacturing base.  The federal government, the

10  governments of Canada and Ontario, through Economic (sic)

11  Development Canada, have recognized these facts.  They are

12  putting their taxpayer dollars on the line to support

13  transforming the assets to be sold in these cases to effectuate

14  the reinvention of a new and better General Motors.

15         The UAW and a high percentage of General Motors public

16  bondholders, and we believe more than 50 percent, Your Honor,

17  likewise now recognize the need to effectuate what is being

18  proposed in these Chapter 11 cases, Your Honor:  a transaction

19  pursuant to Section 363 of the Bankruptcy Code to sell

20  substantially all of the assets of these debtors to a

21  government-sponsored entity.

22         Canada, Germany and the Canadian Auto Workers all have

23  joined in support of this process.  And I might add at this

24  point, Your Honor, and I'm sure Your Honor has read in many

25  media -- saw from many media sources that it's not only what is

09-50026-mg    Doc 12456-3    Filed 06/24/13    Entered 06/24/13 13:11:57    Exhibit G
Page 37 of 126
09-50026-reg    Doc 374    Filed 06/03/09    Entered 06/04/09 09:28:33    Main Document
Pg 37 of 165

36

1    happening in the United States that is of such significance but

2    what is happening in Europe in connection with the potential

3    reinvestment and resuscitation of Opel, Vauxhall, which are

4    parts of the General Motor enterprise in which the German

5    government is providing a bridge loan of a billion and a half

6    euros to allow that process to go forward and the sale of those

7    assets so that that enterprise can continue.

8         And Canada, Your Honor, there has been substantial

9    advances made in resolving all of the issues relating to Canada

10   over the last ten days to the point, Your Honor, that it is not

11   necessary to institute any proceedings involving GMCO, which is

12   the Canadian subsidiary.

13        It is in that context, Your Honor, that we find

14   ourselves here in what in one sense is a sad event, and another

15   sense the occasion to mark the beginning of a new era for the

16   benefit of all parties-in-interest.  After consideration of all

17   options, and after good-faith and arm's-length negotiations

18   with its largest secured creditor, the United States Treasury,

19   with EDC and the UAW, and taking into account what is in the

20   best interest of the corporation and its residual stakeholders,

21   General Motors decided that this immense and difficult process

22   would have to be pursued.

23        The urgent need to create a new General Motors, not

24   overburdened by debt and other costs that made it essentially

25   noncompetitive, will be the result of a the process that has

37

 1    been initiated today if approved by the Court.  Together with

 2    the resolution of the European and Canadian issues, the success

 3    of the Section 363 transaction will result in the New General

 4    Motors that President Obama described today.  General Motors

 5    could no longer continue without the relief which it seeks in

 6    this Court.  Burdened by almost 27 billion dollars of secured

 7    debt and without any access to liquidity, it was incumbent upon

 8    General Motors to find the means to preserve the going-concern

 9    value of its assets to benefit all of the economic stakeholders

10    as well as the public interest.

11          It has not been an easy process.  Many parties have

12    worked 24/7 without rest and a Herculean effort to find a

13    solution to protecting and preserving the value of the assets

14    for the common good, assets which must be recognized as fragile

15    in the sense that any liquidation of General Motors would

16    substantially diminish their value.

17          The car and truck manufacturing business is a cash and

18    labor-intensive business.  Its stability and progress is

19    dependent upon its sales and revenues.  In that perspective,

20    the business of General Motors cannot be compared to any other

21    distressed entities that find their way to this Court.  The

22    purchase of a car or a truck for most or almost all American

23    households is a major expenditure.  Generally it is the second

24    largest expenditure of such a household.  At purchase price

25    ranges of 10- to 25,000 dollars or more, it is a cost which is

09-50026-reg   Doc 974   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 39 of 126

38

1    only incurred after much consideration.  There are many choices

2    in the purchase of a car or truck.  Consumer confidence is a

3    critical element for a company such as General Motors.  The

4    consumer needs to be assured that the manufacturer is reliable,

5    will be there to honor warranties, services, and produce an

6    outstanding product that provides great value, including

7    ultimate resale value.

8         As an automobile manufacturer becomes entangled in

9    bankruptcy, it is the opinion of many, including General

10   Motors, that it will not have the ability to sell its products

11   during a prolonged bankruptcy case.  How many consumers will

12   make a major expenditure as long as the uncertainty of

13   bankruptcy looms like a black cloud over the company?  This was

14   the precise issue that was addressed by your brother in this

15   bankruptcy court in the Chapter 11 of Chrysler LLC over the

16   past ten days, which resulted in the decision that was filed

17   Sunday night, late Sunday night, approving the Section 363

18   transaction in that case.

19        Consequently, if there's going to be a recovery of

20   value for the assets of General Motors, it's necessary in an

21   absolute sense that the assets be sold as quickly as possible

22   to a purchaser who will immediately commence and resume the

23   operations of a new General Motors.  That is the primary

24   objective of these Chapter 11 cases and why General Motors has

25   elected to proceed pursuant to Section 363 of the Bankruptcy

1    Code to sell substantially all of its assets.

2         And in that connection, Your Honor, there is only one

3    prospective purchaser, and that is the Treasury-sponsored

4    Vehicle Acquisition Holdings LLC.  The debtors today have filed

5    a motion with the Court seeking approval of the proposed sale

6    to the Treasury-sponsored entity pursuant to that section of

7    the Bankruptcy Code and related provisions.

8         The United Treasury, Your Honor, is the largest

9    secured creditor of the debtors with a claim in excess of 19.4

10   billion dollars.  It has agreed to provide debtor-in-possession

11   financing under Section 364 of the Bankruptcy Code provided

12   that the proposed Section 363 transaction is approved no later

13   than July 10, 2009.  If the transaction is approved, then

14   within seventy-five days from the commencement of these cases

15   the transaction must close.

16        To ensure the preservation and value of the purchased

17   assets, the United Treasury, as debtor-in-possession financier,

18   will provide approximately 33.3 billion dollars to the debtors

19   to bridge the period to the consummation of the transaction if

20   approved.  Currently, Your Honor, General Motors has cash on

21   hand of approximately 2 billion dollars.  That is a minimal

22   amount of money in the context of these cases.  Accordingly,

23   it's urgent that the debtor-in-possession be put in place now,

24   and we are asking Your Honor to approve interim debtor-in-

25   possession financing today in the amount of 15 billion dollars.

09-50026-reg   Doc 374   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 41 of 126

40

1    And this financing, Your Honor, is being provided not only by

2    the United States Treasury but in part by the EDC on behalf of

3    the governments of Canada and Ontario.

4            And in addition, Your Honor, we are requesting today

5    that the Court approve the proposed sale procedures relative to

6    the Section 363 motion.  And I should point out, Your Honor,

7    this Section 363 motion is somewhat different than the 363

8    motions which have been popular over the past two or so years.

9    The government is not taking the characterization, Your Honor,

10   as a stalking horse.  It is making an offer to purchase.  It is

11   not asking for a breakup fee.  The only reimbursement of

12   expenses that would occur, Your Honor, is if the prospective

13   purchaser is outbid, which, I have to say, Your Honor, in all

14   reality is highly unlikely.  There is nobody else who has the

15   wherewithal -- or no entity that has the wherewithal to bid in

16   these cases.

17           And as part of this transaction, Your Honor, there is

18   outstanding today secured debt of almost 6 billion dollars, or

19   slightly more than 6 billion dollars.  As part of this

20   transaction, the U.S. Treasury will, in effect, refinance that

21   debt and take over that debt.  And that will be part of the

22   33.3 billion dollars of debtor-in-possession financing.

23           And I'm not going to go into the 363 motion at this

24   point, Your Honor.  All we are asking for from the Court today

25   is to set and approve the sale procedures.  And it will be

1    subject, Your Honor, although I think it is somewhat illusory,

2    to higher or better offers.  And what we are proposing, Your

3    Honor, because of the exigencies that are involved in this

4    case, is that, if it's convenient to the Court, that the sale

5    approval hearing be held on June 30, 2009, approximately thirty

6    days from today.

7            And we have, Your Honor, set up a schedule, subject to

8    Your Honor's approval, to fix the objection deadline for June

9    19 and the bid deadline for June 22nd.  That's one of the

10   first-day motions that is on the agenda for today, Your Honor.

11           THE COURT:  Um-hum.  And the motion for approval of

12   the 363 would be returnable on the 30th, Tuesday the 30th of

13   June?

14           MR. MILLER:  That's correct, Your Honor, if it's

15   convenient to Your Honor.

16           THE COURT:  Go on, please.

17           MR. MILLER:  With that introduction and those

18   comments, Your Honor, we have listed and submitted to the Court

19   a number of proposed first-day orders.  And with Your Honor's

20   permission, I would proceed with those orders under the

21   category of procedural or administrative.  And I --

22           THE COURT:  Yes, Mr. Miller, you could help us do our

23   jobs if you would handle joint admin first --

24           MR. MILLER:  That's number one on the list, Your

25   Honor.

09-50026-mg   Doc 12456-2   Filed 06/24/13   Entered 06/24/13 13:11:57   Exhibit G
09-50026-reg   Doc 974   Filed 06/08/09   Entered 06/04/09 09:28:33   Main Document
Pg 43 of 126

42

1        THE COURT:  -- which facilitates docketing; then your

2    procedural motions and your other motions that are almost

3    always granted in --

4        MR. MILLER:  Yes, sir.

5        THE COURT:  -- cases of this character.

6        MR. MILLER:  Yes, sir.  The first application, or

7    motion, is to -- pursuant to Bankruptcy Rule 1015(b), directing

8    that these four Chapter 11 cases be jointly administered.

9        THE COURT:  May I interrupt?

10       Anybody opposed to joint admin?

11       Granted.

12       MR. MILLER:  The second motion, Your Honor, is for an

13    order pursuant to Section 105(a) and related provisions and

14    Bankruptcy Rule -- Local Bankruptcy Rule -- I'm sorry,

15    Bankruptcy Rule 1007(a) and 2002 waiving the requirements to

16    file a list of creditors and equity securityholders, and

17    approving the forms and manner of notifying creditors of the

18    commencement of the debtor's cases.

19       THE COURT:  Pause, please.

20       Any opposition?

21       Granted.

22       MR. MILLER:  The next motion, Your Honor, is a request

23    for an order pursuant to Local Bankruptcy Rule 1007-2(e)

24    scheduling the initial case conference.

25       THE COURT:  I might be of a mind to waive it, but if

43

1   you think it would be helpful let's put it on a date you would

2   recommend, coordinated with other matters that this case is

3   also using.

4        MR. MILLER:  Yes, Your Honor.  May I suggest that -- I

5   understand from Ms. Adams, United States Trustee, that there

6   will be an organizational meeting of creditors this Wednesday.

7   And if it's convenient, Your Honor, we would discuss with the

8   creditors' committee what would be a convenient date for the

9   case conference.

10        THE COURT:  Ms. Adams, are you going to be speaking

11   for your folks today, or one of your colleagues, or --

12        MS. ADAMS:  Yes, Your Honor.

13        THE COURT:  Okay.  Did I understand Mr. Miller to say

14   that you're going to try to get an organizational meeting of

15   creditors on Wednesday, that's June 3rd, two days from now?

16        MS. ADAMS:  Your Honor, it's scheduled for Wednesday

17   June 3rd at 10 a.m. at the Hilton New York Hotel, 1335 6th

18   Avenue.

19        THE COURT:  Okay, that's fine.  I will need to ask you

20   and anybody else who's helping out, because there are people

21   listening in other rooms and on the phones, and this is a

22   crowded courtroom, to come over to a microphone so you can be

23   heard more loudly.  I think you announced an address.  I didn't

24   get it myself.

25        MS. ADAMS:  Yes, Your Honor.  I apologize.  Diana

44

1    Adams for the United States Trustee's Office.  The

2    organizational meeting will be held this Wednesday, June 3rd,

3    10 a.m., at the Hilton New York Hotel, 1335 6th Avenue, between

4    53rd and 54th Street.  And the ballroom will be on the

5    electronic bulletin board by the elevators as you enter.

6              THE COURT:  Very good.  Thank you.

7              Back to you, Mr. Miller, I'm sorry.

8              MR. MILLER:  I would also add, Your Honor, there is a

9    Web site that has been set up by the Garden City Group in

10   connection with this case, and access to that Web site will

11   carry all the information relative to the case.

12             THE COURT:  Okay.  That's very helpful.  Thank you.

13             MR. MILLER:  So we will get back to Your Honor with a

14   proposal date for the initial case conference.

15             THE COURT:  Good.

16             MR. MILLER:  The fourth application, Your Honor, is,

17   pursuant to Section 521 and Bankruptcy Rule 1007(c), extending

18   the time to file schedules of assets and liabilities, schedules

19   of executory contracts and unexpired leases, and statement of

20   financial affairs.

21             THE COURT:  On a case of this type, that's pretty

22   understandable.

23             Any objection by the U.S. Trustee's Office?

24             MS. ADAMS:  (No audible response).

25             THE COURT:  None.

45

1        Motion granted.

2        MR. MILLER:  The fifth motion, Your Honor, is for an

3   order, pursuant to Section 363(c)(1) and 503(b)(1)(A), granting

4   administration expense status to the debtors' undisputed

5   obligations to vendors arising from post-petition delivery of

6   goods and services that were ordered pre-petition but delivered

7   post-petition.

8        THE COURT:  Anybody want to be heard on this?

9        I'm going to grant this with just a word of

10  explanation.  Many people would be of the view you don't need

11  this.  This is a classic comfort order.

12       MR. MILLER:  Yes, sir.

13       THE COURT:  But it's my practice to give the vendor

14  community comfort that they have rights which many of us would

15  understand that they already have.  But this is an important

16  concern, and it's granted for that reason.

17       MR. MILLER:  Thank you, Your Honor.  The sixth motion,

18  Your Honor, again, is in the category of a comfort order.  It

19  is a request for an order pursuant to Section 105 enforcing the

20  protections of Sections 362, 365(e) and 525.  This is an order,

21  Your Honor, which is going to be sent out to vendors and other

22  persons interested in these estates, advising them of the

23  provisions of these sections.

24       THE COURT:  Granted for the same reason.  Having these

25  understandings clear has got to be helpful to everybody.

09-50026-mg    Doc 12456-2    Filed 06/24/13    Entered 06/24/13 13:11:57    Exhibit G
Pg 47 of 126
09-50026-reg    Doc 974    Filed 06/09/09    Entered 06/09/09 09:28:33    Main Document
Pg 47 of 126

46

1        MR. MILLER:  We now turn, Your Honor, to the

2    substantive orders.  And I will tell Your Honor, with the

3    permission of Ms. Adams, that we have reviewed with the Office

4    of the United States Trustee all of these first-day motions,

5    and we have taken into account all of the comments which have

6    been made on behalf of the Office of the United States Trustee.

7    And I would make one general representation, Your Honor, in

8    respect of Local Rule 6003:  The debtors will only pay during

9    the next twenty days those obligations which become due in the

10   regular course of that period of time and not beyond that.

11       THE COURT:  Okay.

12       MR. MILLER:  Okay, and in that connection, Your Honor,

13   and as to these substantive motions, we are going to play a

14   sort of tag game on them.

15       THE COURT:  Not a problem.

16       MR. MILLER:  Mr. Karotkin will take the cash

17   management.

18       THE COURT:  Mr. Karotkin, come on up, please.

19       MR. KAROTKIN:  Thank you, Your Honor.  Stephen

20   Karotkin, Weil, Gotshal & Manges, for the debtors.  The cash

21   management motion, Your Honor, as Mr. Miller indicated, we have

22   reviewed it in detail with the Office of the United States

23   Trustee.  They've only raised one issue and that's with respect

24   to the waiver of compliance with Section 345, which we've

25   agreed would be waived on an interim basis.  As the order

09-50026-reg   Doc 374   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 48 of 126

47

1   reflects, it is an interim order, and during the interim period

2   we would try to work with the Office of the United States

3   Trustee to address the 345 issue.

4        The motion is a relatively straightforward motion

5   which describes the debtors' cash management systems and

6   requests that debtors have authority to continue that system,

7   continue the maintenance of existing bank accounts and continue

8   transfer of funds among the debtors and their affiliates in the

9   ordinary course of business consistent with their pre-petition

10  practices.  It also requests that they be permitted to continue

11  to maintain their existing business forms.  And, of course,

12  since it is only interim relief, it does request that a final

13  hearing be scheduled.

14       Your Honor, the motion goes into excruciating detail

15  as to the debtors' cash management system and how it works both

16  in the United States as well as overseas.  I am more than happy

17  to explain it to you.  As I indicated, it is set forth in quite

18  a lot of detail.  Basically, the cash management system allows

19  the debtors and their affiliates to function as a unified

20  enterprise and to achieve value through consolidating their

21  various brands.  GM, as the parent corporation, derives its

22  strength as a brand and as a company from its subsidiaries.

23  Without the intercompany relationships among GM and its

24  subsidiaries, the ability to operate as a going concern would

25  be hindered.

09-50026-reg   Doc 374   Filed 06/09/09   Entered 06/09/09 09:28:33   Main Document
Pg 49 of 126

48

1    The cash management system is managed by the debtors'

2    Treasury personnel in New York with the assistance of certain

3    third-party processors and service providers.  And there are

4    two principal components; one is a U.S. cash management system,

5    which is an integrated, centralized cash management system in

6    the United States under which funds collected by the debtors

7    and certain of their domestic nondebtor subsidiaries are

8    transferred to concentration accounts and then disbursed to pay

9    operating expenses and fund other expenditures of the debtors

10   and their affiliates.

11       THE COURT:  Mr. Karotkin, can I interrupt you --

12       MR. KAROTKIN:  Sure.

13       THE COURT:  -- because I read your motion, although I

14   don't claim to have the same mastery of it that you do.  Before

15   I ask the couple of questions that I have, and I don't rule out

16   the possibility the answers are in your papers and I missed

17   them, anybody want to be heard in opposition to the cash

18   management system motion?

19       No objection.

20       Let me just ask my couple of questions, Mr. Karotkin.

21   The first you anticipated you were a step ahead of me on.  With

22   the lessons that we've learned from bank failures or

23   difficulties over the last couple of years, we pay more

24   attention to 345 compliance than we used to.  Did I understand

25   you to say that you're reviewing with the U.S. Trustee's Office

49

1    and with your management getting a debtor into 345 compliance

2    or otherwise giving us the comfort that your cash won't be at

3    risk in any depositories?

4            MR. KAROTKIN:  Yes, sir, that's what we've agreed to

5    do over the ensuing couple of weeks with the Office of the

6    United States Trustee.

7            THE COURT:  Okay.  Second, lessons we're hearing from

8    other cases on my watch.  When money goes back and forth

9    between affiliated debtors or affiliated companies, whether you

10   spend on behalf of another debtor it creates an intercompany

11   obligation.  Now, when debtors have guaranteed their funded

12   debt, that's not typically as big a deal or big an issue, but

13   what kind of arrangements do we have to protect individual

14   debtors or individual entities' identity on intercompany

15   obligations such as they're given some kind of superpri or a

16   junior lien?  Or is this something that you're working on and

17   you're going to get back to me on?

18           MR. KAROTKIN:  Your Honor, the order provides, and the

19   debtors certainly track all of the funds, how they move

20   intercompany.  Detailed books and records are kept with respect

21   to the transfers, and obviously we would continue to do it on

22   an ongoing basis.  We do not provide for any superpriority

23   claims with respect to intercompany transfers.  There are only

24   four debtors in this before you.  Most of the cash is generated

25   out of General Motors Corporation in the United States.

50

THE COURT:  So it's not likely to be a material issue

in this case, you're saying?

MR. KAROTKIN:  I don't believe so, sir.

THE COURT:  All right.  Well, I'm going to be

comfortable with that for now.  Let me simply ask you to keep

focusing on that between now and the time of final

consideration on this.

MR. KAROTKIN:  Very well, sir.  Thank you.

THE COURT:  Okay.

Anybody else want to be heard on this?

Cash management is approved subject to reconsideration

at the final.

MR. KAROTKIN:  Thank you, sir.

THE COURT:  Mr. Smolinsky, good afternoon.

MR. SMOLINSKY:  Good afternoon, Your Honor.  Moving to

number 8 on the agenda is the debtors' motion for authority to

pay pre-petition wages.

THE COURT:  Sure.

MR. SMOLINSKY:  Your Honor, the wage motion is

designed to preserve one of the debtors' most valuable assets:

its human capital.  GM, as we stated earlier, but I could

update those numbers from March 31st, GM employs approximately

224,000 employees around the globe who are dependent upon the

continued viability of the debtors.  Of this number, the

debtors employ approximately 80,000 employees, 53- of which are

09-50026-reg   Doc 974   Filed 06/09/09   Entered 06/09/09 09:28:33   Main Document
Pg 52 of 126

51

1    hourly employees, which are represented by unions.  In

2    addition, GM continues to support approximately 600,000

3    retirees and their dependents.

4         Throughout this presentation I'll refer to hourly

5    employees as union-represented employees and salaried employees

6    non-union representatives.

7         Your Honor, we apologize for the length of the wage

8    order.  To tell you the truth, I haven't seen one this long,

9    but we determined that it was important to cover all the bases

10   and full disclosure.  And I think the sheer number of benefit

11   plans and programs is, in large part, a function of the

12   different collective bargaining agreements and the different

13   programs that were created as a result of collective

14   bargaining.

15        We've reviewed the wage motion with the U.S. Trustee.

16   We've responded to a number of questions, and hopefully to

17   their satisfaction.

18        To hit some high notes, Your Honor, all salaried

19   employees are fully paid --

20        (Conversation from speakerphone inadvertently left open)

21        THE COURT:  Continue, please, Mr. Smolinsky.

22        MR. SMOLINSKY:  Yes.  All salaried employees are fully

23   paid through May 31st.  So, accordingly, for the salaried

24   employees there is no pre-petition unpaid compensation.

25        And I'm also relieved to report this is the first time

09-50026-reg   Doc 374   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 53 of 126

52

1   in my career that every non-union employee is actually subject

2   to direct deposit.  So we will not have the issue of --

3          THE COURT:  Clearing their checks?

4          MR. SMOLINSKY:  -- checks in float.

5          With respect to union employees, I can represent, at

6   the request of the U.S. Trustee, that we will not pay any union

7   employees over the statutory cap for pre-petition compensation

8   at this juncture.  And I don't believe that anyone would fall

9   into that category.  So I was able to make that representation.

10         A few more high notes, Your Honor.  With respect to

11  incentive compensation, of which there really hasn't been any

12  in the last year in any meaningful amount, there are no CRP

13  (ph.) in place.  Moreover, while we're seeking authority to

14  continue to pay severance, which are period severance payments,

15  in the ordinary course, there are no insiders in this category

16  as the U.S. Treasury, as part of their conditions of making the

17  loan, has prohibited severance for the top twenty-five highly

18  compensated executives.

19         Your Honor, I don't intend to walk through the entire

20  motion, unless Your Honor would like me to.  I'm certainly

21  available for any questions.  There is one further

22  representation that we agreed to accommodate the U.S. Trustee,

23  and that's that during at least the initial twenty-day period

24  that the U.S. Trustee would be able to review any individual

25  business expenses that are in excess of 2,500 dollars,

53

1    excluding airfare.  And we would make the further

2    representation that there will be no first-class airfare.

3           THE COURT:  Okay.

4           Anybody want to be heard on this?

5           UNIDENTIFIED SPEAKER (TELEPHONICALLY):  He's hinting

6    on private jets.

7           THE COURT:  Is somebody cracking jokes in a pretty

8    serious hearing here?  I'm going to say this once more, folks.

9    If people listening on phone aren't on mute, I'm going to

10   disconnect everybody off the telephone.  And if everybody

11   cracks any jokes about this, I'm going to disconnect everybody

12   from the phone.  This is serious to a lot of people's lives,

13   and I would have thought people would understand that.

14          Yes?

15          MS. CECCOTTI:  Good afternoon, Your Honor.  I just

16   took a moment to confer and clarify with Mr. Smolinsky --

17          THE COURT:  Pause, please.

18          MS. CECCOTTI:  I'm sorry.

19          THE COURT:  For the transcript, I need identifications

20   on the record the first time.

21          MS. CECCOTTI:  Yes.  Babette Ceccotti, Cohen, Weiss

22   and Simon, for the auto workers.

23          THE COURT:  Sure, go ahead, Ms. Ceccotti.

24          MS. CECCOTTI:  Just in light of the representation

25   that Mr. Smolinsky made regarding the compensation cap of

09-50026-mg    Doc 12456-2    Filed 06/24/13    Entered 06/24/13 17:11:57    Exhibit G
09-50026-reg    Doc 974    Filed 06/03/09    Entered 06/04/09 09:28:33    Main Document
Pg 55 of 126

54

1    10,950 at the request of the United States Trustee, I was

2    asking debtors' counsel if he would clarify that that amount

3    applies to compensation for ongoing employees as opposed to a

4    category of payments that is described in some detail in the

5    motion with respect to attrition programs.

6         THE COURT:  Could you say that again a little bit

7    slower, please, Ms. Ceccotti?

8         MS. CECCOTTI:  Certainly.  I was going to ask if the

9    debtors could clarify for us on the record with respect to the

10   representation that Mr. Smolinsky made regarding the 10,950

11   dollar cap applicable to employee compensation.  My

12   understanding, I believe, and I would ask debtors' counsel to

13   confirm, is that that cap would not apply to a category of

14   payments which is described in the motion with respect to

15   attrition programs for employees who, over the course of time,

16   have taken voluntary -- either early retirement or voluntary

17   termination under programs that involved dollar payments to

18   them.

19        THE COURT:  Your point being that they might be nailed

20   by the cap otherwise?

21        MS. CECCOTTI:  Correct.

22        THE COURT:  Mr. Smolinsky?

23        MR. SMOLINSKY:  Your Honor, we could let the U.S.

24   Trustee speak.  It was not my intention to modify any

25   collective bargaining plan.  So it was meant to only cover

55

1   compensation.

2         MS. ADAMS:  Diana Adams, the U.S. Trustee's Office.

3   We did not intend that any collective bargaining agreements be

4   modified, Your Honor.  So that's --

5         THE COURT:  Okay.  Does that give you the comfort you

6   need, Ms. Ceccotti?

7         MS. CECCOTTI:  It does, thank you very much, Your

8   Honor.

9         THE COURT:  Sure.  Okay.

10         Anybody else want to be heard on wages?

11         All right, this motion's going to be granted for the

12   reasons by which motions of this character have been routinely

13   granted every Chapter 11 case in my career.  It's essentially

14   impossible to reorganize a company without doing right by your

15   employees, at least to the extent that you can under the law,

16   and to the extent that you can given your resources.  And this

17   is one of the easier motions I've been asked to grant.  It's

18   granted, Mr. Smolinsky.

19         MR. SMOLINSKY:  Thank you, Your Honor.  The next

20   matter, number 9, on the agenda is the critical vendor motion.

21   This is an extremely important motion for GM.  We're seeking

22   here today, only on an interim basis, approval of several

23   components comprising an overall approach to critical vendors.

24   GM has spent untold hours analyzing the potential impacts of a

25   Chapter 11 filing on its supplier base:  vendors that have

56

1    already been struggling with the precipitous drop in automotive

2    sales and now facing a temporary shutdown of substantially all

3    of GM's facilities other than two, which continue to operate.

4    The others are on staggered program but several have been

5    closed from, I believe, May 18th and will not reopen until July

6    20th, I believe.

7         So we've already seen a number of tier 1 suppliers

8    filing for chapter 11 in recent weeks; I doubt that we've seen

9    the last.  And it would be truly a shame after all the work

10   that we have done to preserve the going-concern value of the

11   company that the value would be eroded as a result of a failure

12   to maintain a viable supplier base.

13        Due to the size of GM, a number of suppliers rely on

14   GM for a substantial portion of their business.  And even a

15   hint that receivables from GM are not collectible could turn

16   into a real liquidity crunch caused by their lenders, putting

17   reserves on these receivables.

18        So there are a number of programs that have already

19   been put in place or are sought to be established that we're

20   seeking approval of today, and these include three specific

21   programs, Your Honor.  The first is the Troubled Supplier

22   Program.  GM has always maintained a program under which they

23   provide a number of accommodations -- a variety of

24   accommodations for suppliers who are unable to operate without

25   financial assistance.  And with due respect to my colleague

1    Mr. Miller who said that we would only pay obligations as they

2    come due, I think this is the one exception to that rule if

3    Your Honor was inclined to approve this program going forward,

4    because this is the program where if General Motors sees one of

5    its critical suppliers going down that it will step in, because

6    it could take weeks, if not months, to resource a particular

7    sole-source part for a variety of reasons.  First, the debtors

8    would have to go out and get more tooling, which takes months.

9    Second, there may not be capacity for that part.  And third, a

10   part needs to be tested for quality controls, which is a

11   process which takes a substantial period of time.  So,

12   oftentimes General Motors, through its Troubled Supplier

13   Program, will step in and will take the necessary steps to make

14   sure that its assembly lines continue to roll.

15        Your Honor, I think Delphi is a good example of a

16   supplier that is receiving substantial financial aid.  And any

17   cessation of that support, if this motion was not granted,

18   would -- could certainly lead to irreparable harm of the

19   debtors.  So we're seeking authorizing to continue to provide

20   that support through the Troubled Supplier Program in the

21   ordinary course.

22        The second is the United States Treasury Supplier

23   Program.  In response to concerns raised by suppliers that the

24   government funding of the OEMs were not sufficiently assisting

25   troubled suppliers, a program was instituted whereby the OEMs

1  would establish a finance company and that would be funded, in

2  part, by the OEMs.  And suppliers could effectively sell their

3  receivables into the finance entity and either get paid on an

4  accelerated basis at a discount or continue to get paid over

5  time with the guarantee of the United States Treasury.  This

6  has become a popular program for GM suppliers.

7        THE COURT:  The OEMs being companies like General

8  Motors?

9        MR. SMOLINSKY:  Yes, Your Honor, original equipment

10  manufacturers.

11        THE COURT:  Or the Chryslers of the world and the

12  like?

13        MR. SMOLINSKY:  Exactly, Your Honor.

14        THE COURT:  And, in substance, you're acting as

15  factoring banks?

16        MR. SMOLINSKY:  That's right, Your Honor, with a

17  guarantee.

18        THE COURT:  Okay.  Continue.

19        MR. SMOLINSKY:  So without the continued availability

20  of this program, many additional suppliers would see their own

21  credit tightened to reflect the uncertainty of payment.  And

22  although the Chapter 11 filing would ordinarily be a

23  termination event under this program, the U.S. Treasury is

24  prepared to waive any default and to keep this process of

25  processing receivables in the ordinary course.  In fact, the

59

1    proposed master purchase and sale agreement requires continued

2    performance under this program.  So with this motion the

3    debtors seek authorization to continue with the program.

4         The third portion is the critical vendor, the

5    traditional critical vendor that we've all come to know.  And

6    the debtors have expended significant resources in developing a

7    very disciplined process of evaluating the supplier base to

8    determine which vendors, if not paid, could cause irreparable

9    harm to the debtors' to operate as a going concern.

10        As previously stated, everyone recognizes the unique

11   problems that could befall an OEM as large as GM if even one

12   supplier refuses or cannot perform their obligations to

13   continue to supply goods and services on a daily basis.  The

14   loss of one critical vendor could easily cascade due to this

15   just-in-time manufacturing process into a complete shutdown of

16   an assembly line.  And critical vendor motions in the

17   automotive space have often referred to the proverb "For want

18   of a nail, the kingdom was lost."  And that's what I think

19   we're talking about here, Your Honor.

20        So the purchaser of this company, the proposed

21   purchaser, the DIP lenders, certainly understand the reliance

22   on every -- on all critical vendors.  They've provided DIP

23   funding under the DIP facility in order to satisfy these needs

24   with certain cushions in case the unexpected happens.

25        And I just, Your Honor, want, just for the record, for

09-50026-mg   Doc 12456-2   Filed 06/24/13   Entered 06/24/13 13:11:57   Exhibit G
Page 61 of 126
09-50026-reg   Doc 974-5   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 61 of 265

60

1    you to consider as part of this motion a few things.  Number

2    one, the vast majority of the outstanding supplier claims are

3    for sales of goods that are used directly for the production of

4    automobiles.  These suppliers are all paid up for goods shipped

5    through the end of April.  They are on what's called the MNS2

6    system; so they get paid, effectively, sixty days later.  For

7    some suppliers, the ability to get paid for May shipment is

8    critical to their ability to purchase raw materials so that

9    when the temporary shutdown is over they will be able to

10   restart production.

11          Number two, for the most part this is a timing issue.

12   You'll hear throughout this case that the company has between

13   400- and 500,000 contracts that are going to be assumed and

14   assigned as part of the sale process.  And so, assuming that

15   the sale goes forward as planned, many of these obligations

16   would be paid just a few months later as part of the assumption

17   process.

18          THE COURT:  As cure amounts?

19          MR. SMOLINSKY:  As cure amounts, Your Honor.  The

20   third and last issue for your consideration is that there's a

21   significant overlap between the critical suppliers that we're

22   talking about here and other motions that we're seeking relief

23   here today, such as the 503(b)(9).  The amount of claims that

24   would fall under the 503(b)(9) motion is approximately 1.1

25   billion dollars.  That's the amount of goods that have been

61

1    sold in the last twenty days.  So with that -- if those sales

2    do have administrative priority, then, again, we're only

3    talking about a timing issue.

4         Your Honor, the debtors intend, as part of the

5    critical vendor motion, to get extremely beneficial trade

6    terms.  We have attached to our motion a form of trade

7    agreement which provides, in exchange for critical vendor

8    payment, to get continued credit on beneficial terms and to

9    adopt into a streamlined dispute resolution program, among

10   other benefits.

11        As evidentiary support, I'd point your attention to

12   the Frederick Henderson affidavit, particularly paragraph 25

13   through 27 which talk about the importance of maintaining a

14   viable supplier base and the irreparable harm that could come

15   from not being able to pay critical vendors in the exercise of

16   their business judgment.

17        THE COURT:  Okay.  Anybody want to be heard on this

18   one?

19        No response.  Mr. Smolinsky, I'm granting your motion

20   in all three of its respects and just taking a moment to

21   explain the bases for the exercise of my discretion in this

22   regard.  The Troubled Supplier Program and U.S. Treasury

23   Supplier Program components of your motion are, in substance,

24   exercises of your 363 power, your power to use estate assets

25   for the betterment of the business.  For the reasons stated in

62

1    your motion, the Henderson affidavit and your oral

2    supplementation, it's obvious to me that payments of that

3    character are in the best interests of the company and are

4    plainly appropriate.

5          Vis-a-vis the critical vendor portion, that is not so

6    much a 363 analysis in my mind but a classic doctrine-of-

7    necessity analysis.  And I once more think you set forth a

8    satisfactory basis for that in your motion and in your

9    Henderson affidavit.  And in your earlier remarks you talked

10   about "for want of a nail".  Particularly for a company that

11   uses just-in-time inventory control and whose production lines

12   can be impaired by your inability to get product from your

13   suppliers, a stronger-than-average showing was made on the

14   critical vendor component as well.

15         All granted, and take care of the paperwork at the

16   conclusion of the hearing.

17         MR. SMOLINSKY:  Thank you, Your Honor.  If I could ask

18   your indulgence, number 10 on the agenda --

19         THE COURT:  I got to confess to you that in my pile of

20   papers I lost the agenda.  Just tell me which motion you're --

21         MR. SMOLINSKY:  Your Honor, we're going to skip over

22   the foreign trade --

23         THE COURT:  Wait, Mr. Smolinsky, I'm getting help.

24         Go ahead, please.

25         MR. SMOLINSKY:  We're going to skip over the foreign

63

1    trade creditor motion and come back to that and go to number

2    11, which is the warranty and customer practice motion.

3           THE COURT:  Go on, please.  You can start talking

4    while I'm looking.

5           MR. SMOLINSKY:  Thank you, Your Honor.  The warranty

6    and customer practice motion seeks authorization to continue

7    programs in place to honor obligations and benefits of the

8    debtor to its direct and indirect customers.  The debtors

9    maintain several distribution outlets for their products.

10   These include:  the sales of vehicles to dealers for ultimate

11   sales to consumers; the sale of vehicles directly to fleet

12   customers; and, finally, the sale of parts and accessories to

13   trade customers.

14          Given the high cost value of the debtors' products,

15   it's absolutely crucial to maintain various types of warranties

16   and customer programs in order to nurture and enhance customer

17   loyalty and customer satisfaction.  I don't think that there's

18   a more important time than today in order to demonstrate to the

19   world that we manufacture very reliable vehicles, that we're

20   willing to stand behind them and provide the best warranties in

21   the business.

22          Your Honor, just to go through a couple of the

23   details, and I don't want to jump too far into it, but there is

24   a typical warranty portion which includes recall programs.

25   We're seeking authority to continue a GM Cash Rewards Program,

09-50026-reg9    Doc 974    Filed 06/09/09    Entered 06/04/09 09:28:33    Main Document
Pg 65 of 126

64

1    which is credit cards issued by banks, although GM administers

2    a reward program where parties can earn points and then redeem

3    them for discounts on General Motors vehicles.

4            Your Honor, there's a sales incentive program which is

5    very important to our dealers.  In the ordinary course, and I

6    think this is true of all OEMs, there's a tremendous amount of

7    money that goes back and forth between the OEM and dealers in

8    the form of rebates, in the form of credits, incentives for

9    particular vehicles.  And so the sum and substance of this

10   motion is to seek authority to continue to grant rebates back

11   to the dealers, to grant incentives that ultimately get passed

12   on to the consumer.  And unless we have the authority to do

13   that, number one, the dealers can't remain competitive in the

14   market because they can't pass along incentives, and number

15   two, we're going to start seeing dealers in financial trouble

16   because of the cessation of payments from the OEM, from GM.

17   And so it's very important that we keep this.

18           We are currently, as was indicated earlier, going

19   through a program to rationalize our dealer base.  And all of

20   this is part and parcel of that program, not only to provide

21   incentives to those dealers that are going ahead with us but

22   also dealers that are going to be winding down.  These

23   incentives are very important so that they can sell their

24   inventory in the ordinary course.

25           So, Your Honor, unless you have questions, that is the

09-50026-reg   Doc 974   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 66 of 126

65

1    customer practice motion.

2         THE COURT:  I don't.

3         Anybody want to be heard on this one?

4         The record will reflect no response.

5         I'm granting this one as well, Mr. Smolinsky.  This is

6    another one whose wisdom is obvious.  I can think of very few

7    things that are as important as maintaining the confidence of

8    our consumers and doing right by them and honoring your

9    warranties and the like.  It's granted.

10        MR. SMOLINSKY:  Thank you, Your Honor.  Your Honor,

11   the next motion is the reclamation motion.  This is largely

12   procedural.  Under the proposed procedure, the reclamation

13   claimants would serve on the debtors a demand, the debtors

14   would investigate the claim, and no later than 120 days file a

15   reclamation notice listing which would list each claimaint in

16   the amounts that the debtors find to be valid under the statute

17   for a valid reclamation claim.  Any party that wishes to object

18   to the debtors' findings would have twenty days to file an

19   objection.  And then the debtors would try to work out a

20   resolution with the creditor.  And if something can't be worked

21   out within ninety days, then the debtors may file a motion

22   before Your Honor in order to fix the allowed amount of the

23   claim.

24        If a settlement is reached, Your Honor, the settlement

25   stipulation would be circulated to a group of notice parties

66

1    and they will have the right to object within ten days.  If no

2    objection is filed, then the stipulation will be effective.

3    And if there is an objection filed within ten days, then the

4    parties will try to resolve it within the next thirty days.

5    And if no resolution is reached, then we would come back to

6    Your Honor for a hearing on the amount of the reclamation

7    claim.

8         THE COURT:  All right, pause, please, Mr. Smolinsky.

9         Anybody want to be heard on this one?  Yes, sir, come

10   on up, please.  Actually, a couple of people.  The man ahead of

11   Mr. Sidell -- all right, Mr. Sidell, you got the high ground.

12   Come on up.

13        Remember, folks, we need full appearances on the

14   record.

15        MR. SIDELL:  Good morning, Your Honor -- good

16   afternoon, Your Honor.  Barry Seidel, Butzel Long, on behalf of

17   a number of suppliers to GM.  In this matter, I'm appearing on

18   behalf of Inteva Products.  Inteva called me up today and was

19   reviewing these procedures for reclamation, and Inteva was

20   interested in making a reclamation demand.  And when we went

21   through this motion and the proposed order, I did notice that

22   this order would expand or would decrease the rights of

23   reclamation parties.  Under UCC reclamation, a reclaiming

24   creditor has to notify the debtor and identify the goods it

25   wishes to reclaim.  Under the proposal that the debtors lay out

1    before Your Honor, they suggest that the reclaiming creditor

2    needs to deliver to GM purchase orders and the like.  And when

3    speaking to my client today, they tell me it could be days

4    before they can obtain copies of those purchase orders.

5         THE COURT:  Your point being that would impair your

6    ability to provide the notice before the time for a notice runs

7    out?

8         MR. SEIDEL:  Correct, Your Honor.

9         THE COURT:  Okay.  Before I give Mr. Smolinsky a

10   chance to respond, I'll hear any other folks who want to be

11   heard.

12        MR. SULLIVAN:  Your Honor, James Sullivan of Arent

13   Fox, counsel for Timken, Superior Industries International, and

14   Harman.  My comment is similar.  The requirements of the motion

15   impose fairly burdensome obligation of the reclaiming creditor;

16   in addition to a description of the goods subject to

17   reclamation, requires:  to name the name of the debtor towards

18   the goods that were delivered; copies of any purchase orders

19   and invoices relating to such goods; evidence regarding the

20   dates such goods were shipped to and received by the debtors.

21   In these types of automotive cases it's not uncommon that the

22   parties might have difficulty establishing, for example, which

23   debtor somebody shipped a good to, because a lot of these

24   things are done on an automated basis.  It's not necessarily

25   always done with paperwork.

68

1        The other thing, a lot of these documents often will

2    just say "General Motors" and it's not always easy to tell, for

3    example, whether the transaction is with one debtor versus

4    another.

5        So it just seems unnecessary to impose such harsh

6    requirements just for the filing of a reclamation demand as

7    opposed to establishing a procedure later on if the reclamation

8    demand ends up being contested.  It certainly would be more

9    reasonable to only require at a later time that such document-

10   intensive requirements be satisfied.

11       The other thing that this procedures doesn't do is set

12   procedures for what happens if a reclamation demand has already

13   been served.  For example, at least one of my clients has

14   already served a reclamation demand earlier today.  And so are

15   they going to have another reclamation demand to the extent it

16   didn't comply with these procedures?  Are they going to have to

17   recomply with it?  And when would such a reclamation demand

18   actually have become effective?

19       So those are my concerns, Your Honor.

20       THE COURT:  Okay.

21       Mr. Smolinsky?

22       MR. SMOLINSKY:  Your Honor, just to address some of

23   those points, with respect to the detail that's required, I

24   mean, I think that that is the detail required by the statute,

25   which is quite specific as to what needs to be delivered.  I am

69

1    sympathetic to the timing, but I think the most important thing

2    that we could do here is to put these procedures in process,

3    because you'll note if you look at the specific order

4    provisions there are notice places.  The company has gone to

5    great strides to set up a command center in Michigan where

6    there are phone banks to address supplier issues, to address

7    contract issues, employee issues.  And it's important that

8    everything gets funneled.  This is a very large corporation.

9    The statement that they don't know which debtor they sold it

10   to, it's all General Motors; that's the only operating company

11   that's making cars.

12         So I think it's more important that we get the

13   procedure in place where everyone knows where to send the

14   notice to that when the notice comes in we know that we have to

15   contact the specific person at the plant to check the inventory

16   and to start working on the data that we need to demonstrate

17   whether this is a valid or invalid reclamation claim.  If

18   people are going to start sending reclamation notices all over

19   the world, we're not going to be able to comply with what is, I

20   think, a strict statutory requirement in order to validate a

21   priority claim.

22         THE COURT:  All right.

23         Everybody had a chance to speak their piece?

24   Ms. Adams?

25         MS. ADAMS:  Thank you, Your Honor.  For this motion,

1    and actually the next motion, which involves a procedure for

2    503(b)(9) claims, we would just recommend that both these

3    motions be heard after the appointment of a creditors'

4    committee so the committee can have their input on the motions.

5         THE COURT:  I hear you, Ms. Adams, but the UCC imposes

6    deadlines for the submission of a reclamation demand.  And as a

7    creditor might be at risk if it doesn't comply with the time

8    periods, do I have the luxury of waiting that long?

9         MS. ADAMS:  It would only be to --

10        THE COURT:  Leaving -- don't I need to decide at least

11   part of this at a sooner time?

12        MS. ADAMS:  I would think that Your Honor could --

13   well, I don't know, obviously, Your Honor's schedule, and if

14   the matter could be heard Wednesday, but we will be appointing

15   the committee Wednesday, and hopefully they will be choosing

16   counsel.

17        MR. MILLER:  Your Honor, it could be without prejudice

18   to whatever the committee comes up with.

19        THE COURT:  Yeah, I think you're reading my mind,

20   Mr. Miller.

21        Does anybody else want to be heard?

22        And I'm going to issue an interim ruling on this now.

23        MS. ADAMS:  That would be satisfactory, Your Honor.

24        THE COURT:  Okay.

25        Folks, I'm going to grant the debtors' motion on an

09-50026-reg   Doc 974   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 72 of 125

71

1    interim basis subject to fine-tuning in one or two respects,

2    and the following are the bases for the exercise of my

3    discretion in this regard:

4          Anybody who's been around reclamation motions in an 11

5    where there are material vendor sales to a debtor knows that

6    reclamation litigation, if not properly managed, can have a way

7    of bogging down a debtor and its management and, for that

8    matter, vendors themselves in the early days of an 11.  The

9    debtors' approach to getting one's arms around reclamation

10   litigation, especially since reclamation vendors so rarely

11   actually want their goods reclaimed and so rarely want them

12   back, and because so many of them are settled, clearly makes

13   setting up some kind of reclamation mechanism appropriate.

14         The principle concern that I heard, which is that the

15   debtor may be asking for information that's more extensive than

16   the UCC reclamation demand requires, I'm going to rule that

17   people can -- can and should -- make their reclamation demands,

18   file them at the place designated by the debtor so it can

19   manage them within the times that the UCC provides.  From then

20   on, the debtor's more extensive motions -- mechanisms, excuse

21   me, for getting the information it needs to evaluate a

22   settlement, if possible, and to set up a gameplan for teaming

23   them up if they can't be consensually resolved can then kick

24   in.

25         Anybody who thinks he, she or it has a reclamation

72

1    demand should get it in by that time, and I'm going to permit

2    those things to be filed -- in fact, require them to be filed

3    at the place the debtor designates.  Then the debtor's

4    mechanisms will be put in place so that the debtor's not going

5    nuts trying to manage reclamation demands and so that vendors

6    don't have to pay their lawyers a lot of money to deal with

7    things that can be easily consensually resolved.

8           This entire mechanism's without prejudice of the

9    rights of the creditors' committee or other parties-in-interest

10   to put their noodles together with the debtor to find a more

11   mechanically practical arrangement.

12          MR. SMOLINSKY:  Absolutely, Your Honor.

13          THE COURT:  Okay.

14          MR. SMOLINSKY:  Thank you.

15          THE COURT:  Anything else on reclamations?

16   Okay.  Thank you.

17          MR. SMOLINSKY:  Thank you.

18          THE COURT:  Mr. Seidel?

19          MR. SEIDEL:  Just a point of clarification.  If my

20   client can't put its reclamation demand together because it

21   takes three days or four days to collect the data, is my client

22   prejudiced, or shall I or can I file whatever the UCC requires

23   today and fill it in in due course?

24          THE COURT:  When you're talking about what the UCC

25   requires, you're talking about what might be helpful to meet

09-50026-reg   Doc 374   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 74 of 126

73

1    the debtors' requirements, because if it's what the UCC

2    requires I think you got to do it.  If it's -- if the debtor is

3    trying to put you through anything that's beyond what the UCC

4    requires, I think I should cut you some slack on that.  But a

5    reclamation demand puts your client ahead of other vendors

6    similarly situated, which is your right under the UCC and under

7    540 -- I think it's 6.  But I can't rewrite the UCC.  I don't

8    think I should rewrite the UCC, at least without opportunity

9    for parties to be heard.

10        MR. SEIDEL:  Your Honor, I couldn't agree with you

11   more, but my issue really is a little bit different, Your Honor

12   focused on it before, and that is if the UCC would allow me to

13   make a demand without giving purchase orders, that would be a

14   good --

15        THE COURT:  Whatever -- I ain't changing the UCC.

16        MR. SEIDEL:  Thank you, Your Honor.

17        THE COURT:  So whatever you're prepared to do in

18   compliance with the UCC, I wouldn't be the one to change that.

19        MR. SEIDEL:  Thank you, Your Honor.

20        THE COURT:  But it's without prejudice to the rights

21   of the debtor and the creditors' committee who thinks you

22   didn't comply with the UCC to be heard and your opportunity to

23   oppose.

24        MR. SEIDEL:  Thank you.

25        THE COURT:  Okay.

1          Mr. Karotkin?

2          MR. KAROTKIN:  Thank you, sir.  Your Honor, I'd like

3    to address the motion for the payment of foreign vendors.

4          THE COURT:  Um-hum.

5          MR. KAROTKIN:  Your Honor, the foreign vendor motion

6    is really an extension of the critical vendor motion.  It has

7    all the issues Mr. Smolinsky alluded to in addition to the

8    fact, as you well know, that notwithstanding the universal

9    application of the automatic stay, it's difficult, if not

10   impossible, to enforce it in foreign jurisdictions.  The issue

11   also applies not only to vendors but to foreign governmental

12   entities that might take remedial action and seize assets,

13   including goods and supplies that would be necessary to be

14   shipped to the United States for use in the debtors'

15   manufacturing operations.

16         For the reasons stated in the motion, as well as the

17   paragraphs of the Mr. Henderson affidavit to which

18   Mr. Smolinsky alluded, I believe there's ample basis for the

19   relief we're seeking.

20         THE COURT:  All right.  Pause, please, Mr. Karotkin.

21         Anybody want to be heard on foreign vendors or

22   governments?

23         No response.

24         Mr. Karotkin, this one, too, is granted.  Folks who

25   have represented debtors or have been allied with them, like

 1    their creditors' committees, know the difficulty in enforcing

 2    the automatic stay.  And the rights under the Bankruptcy Code

 3    are broad.  Preliminarily appropriate under the doctrine of

 4    necessity.  It's granted.

 5          MR. KAROTKIN:  Thank you, sir.  The next motion, Your

 6    Honor, is with respect to establishing procedures under Section

 7    503(b)(9) of the Bankruptcy Code as to the resolution and

 8    satisfaction of claims asserted under that provision of the

 9    statute.  The motion, Your Honor, is purely procedural.  It

10    sets forth procedures to be followed by people or vendors

11    seeking rights under 503(b)(9).  It is self-explanatory,

12    relatively easy to comply with.  And I'm happy to describe what

13    the procedures are if the Court would like, but, again, it's

14    simply procedural.  And I would just ask that the Court grant

15    the relief requested.

16          THE COURT:  Anybody want to be heard on it?

17          No response.  Granted.

18          MR. KAROTKIN:  Thank you, sir.  The next motion seeks

19    authorization for the payment of certain pre-petition shipping

20    and delivery charges for goods in transit, custom duties and

21    tooling and mechanics' lien charges.  Just give me a moment,

22    Your Honor, to find the motion.

23       (Pause)

24          MR. KAROTKIN:  Your Honor, at any given time, based on

25    the nature of the debtors' operation, there are countless

1    shipments en route to and from the debtors' various facilities.

2    Therefore, obviously, various shippers and warehousemen

3    currently are in possession of the debtors' goods that are

4    vital to their operations and, under applicable state law, have

5    rights as either mechanics' liens, shippers' liens or

6    warehousemen liens.  So, effectively they are secured

7    creditors.

8         There are similar issues with respect to customs

9    duties that, if they are not timely paid, customs authorities

10   may demand liquidated damages, assess interest or impose other

11   sanctions.

12        And with respect to tooling, which is critical to the

13   ongoing business of the debtors, again, the suppliers who

14   furnish tooling under various state laws also have rights as

15   mechanics' liens or toolmakers' liens, and again would be

16   treated as secured creditors.  Particularly with respect to

17   tooling, that item is vital to the ongoing operations of the

18   debtors.  And, in fact, at the current time, there is tooling

19   related to two new vehicle launches, which the debtor certainly

20   must be in a position to be able to pay to make sure that that

21   launch is not held up.

22        Again, the basis for the relief is similar to critical

23   vendor type relief, critical to the ongoing operation of the

24   business and to maintain its value.

25        THE COURT:  Anybody want to be heard on this one?

09-50026-reg   Doc 974   Filed 06/05/09   Entered 06/04/09 09:28:33   Main Document
Pg 78 of 265

77

1         Granted.  Doctrine of necessity.  The same reasons as

2    we've gone over before, and also because it's giving away ice

3    in the winter when you're talking about making a payment to

4    somebody who's got a lien to protect them anyway.

5         MR. KAROTKIN:  Thank you, sir.  The next motion

6    relates to the payment of insurance obligations.  This motion,

7    Your Honor, seeks authority to continue to pay premiums for the

8    debtors' normal liability property coverage insurance in the

9    ordinary course of business.  There is a very de minimis amount

10   outstanding with respect to this insurance relating to the pre-

11   petition period.  And in order to avoid any potential for the

12   termination of service -- I'm sorry, the termination of

13   insurance coverage, we would simply request authority to

14   maintain the existing insurance, be able to pay the premiums so

15   that we avoid any disruption.

16        THE COURT:  Anybody want to be heard on it?

17        No response.  Granted.  To the extent it's not a

18   comfort order, it's appropriate under the doctrine of

19   necessity.

20        MR. KAROTKIN:  Thank you, sir.  The next motion, Your

21   Honor, relates to the payment of sales taxes, use taxes, gross

22   receipts taxes and similar type taxes which are outstanding

23   with respect to the pre-petition period.  A number of these tax

24   obligations, Your Honor, impose personal liability on officers

25   and directors.  And under the circumstances, the debtors don't

78

1    think it's appropriate to submit those officers and directors

2    to that type of risk.  It's common relief granted in most

3    Chapter 11 cases.  The motion explains in a fair amount of

4    detail the outstanding tax obligations we're talking about.

5    Unless Your Honor has any questions, I would -- in my view, the

6    motion establishes the basis for the relief.

7                THE COURT:  I don't have questions.

8                Anybody want to be heard on it?

9                No response.  I have never seen a case, at least in

10   this court, where such a motion wasn't granted.  It's granted,

11   Mr. Karotkin.

12               MR. KAROTKIN:  Thank you, sir.

13               THE COURT:  I should qualify my last remark.  I don't

14   think I've seen a motion anywhere where it hasn't been granted.

15               MR. KAROTKIN:  The next motion, Your Honor, relates to

16   the preservation of the debtors' tax benefits and net operating

17   loss carry-forwards.  That motion, again, explains in great

18   detail procedures involved to assure that the debtors' net

19   operating loss carry-forwards and other tax attributes,

20   including a substantial amount of foreign tax credits, are

21   protected and that that value is preserved for the benefit of

22   the estate.  I will confess I don't purport to be able to

23   explain to you exactly the rationale and how it works --

24               THE COURT:  What it takes to protect your 382 rights?

25               MR. KAROTKIN:  -- and I hope you don't ask me any

09-50026-reg   Doc 974   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 80 of 165

79

1    questions.

2          THE COURT:  Well, you've got the advantage that a lot

3    of your predecessor Chapter 11 debtors have plowed the fields

4    for you in this regard.

5          MR. KAROTKIN:  Yes, I did know that.  And I'm glad you

6    know that.

7          THE COURT:  Some of them, I think, may be in this

8    room.

9          MR. KAROTKIN:  But, again, it is self-explanatory.  It

10   doesn't --

11        (Unanimous laughter)

12         THE COURT:  All right, I'm going to grant this motion

13   on an interim basis.  In this circuit, NOLs are plainly

14   protected as property of the debtor.  And courts in this

15   district have very routinely provided for mechanisms to do a

16   stop, look and listen before any trading in claims or interest

17   may blow the debtor's NOLs.

18         This order is without prejudice to consideration to

19   see if anybody thinks that the order can be fine-tuned down the

20   road and without prejudice of anybody's ability to show that

21   any contemplated actions wouldn't adversely affect the debtors'

22   ability to protect its NOLs.  But for now it's absolutely

23   essential to the welfare of everybody in this room, and many

24   who aren't this room, to have those NOLs protected.

25         MR. KAROTKIN:  Thank you, sir.

80

1        THE COURT:  It's granted.

2        MR. KAROTKIN:  Thank you.

3        THE COURT:  Mr. Smolinsky?

4        MR. SMOLINSKY:  Thank you, Your Honor.  Number 18 on

5   the agenda is the utility motion.  Your Honor, this motion is

6   consistent with other motions utilized in this court in order

7   to comply with the newfangled utility statutes as a result of

8   the amendments in 2005.

9        Your Honor, the proposal is that we would pay a

10   deposit to those requesting utilities equal to two weeks of

11   utility services, which are calculated based on historical

12   average over the last twelve months.  So we're not going to tag

13   them for the fact that our plants have been idled, or many of

14   them have been idled for the recent past.  It'll be on a

15   twelve-month average.

16        Adequate assurance will be provided only if they make

17   a request that they don't already hold a deposit of at least

18   two weeks and they're not currently getting paid in advance for

19   utilities.

20        So, Your Honor, the process and the procedure -- and

21   the order has certain dates to be filled in if Your Honor is

22   inclined to approve the motion -- that we would be prepared to

23   mail out a notice to each of the utilities by tomorrow.  They

24   would have approximately two weeks, at Your Honor's discretion,

25   to request a deposit.  The utility -- if the utility believes

1    that the deposit offered is not adequate, the utility could

2    file an objection by, I guess, the same period of time.  And

3    then a hearing would be held to determine whether or not the

4    utility deposit is adequate.  And, obviously, we would use due

5    care to try to resolve those issues before coming back to

6    court.

7            THE COURT:  All right.  Anybody want to be heard on

8    this, on the 366 motion?

9            No response.

10           Mr. Smolinsky, the two weeks that you propose is

11   what's become customary in the Southern District of New York.

12   But with that said, in accordance with the majority rule in

13   this area, I think I got to give the utilities a hearing date

14   within the first thirty days to give me a chance to rule if

15   they don't agree with your recommendation.

16           So your motion is granted with the understanding that

17   you're going to get a date from Ms. Blum, my courtroom deputy,

18   within the first thirty days of the case before -- on or before

19   June 30th.  Try to go a couple of days before that, if you can.

20   And it may be on a day separate from June 30th, which might be

21   used for other things, to give any utility that thinks its ox

22   is gored by your recommendation a chance to get judicial

23   rulings from me.

24           With that understanding, your motion's granted.

25           MR. SMOLINSKY:  Thank you, Your Honor.  So we will

09-50026-reg   Doc 374   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 83 of 126

82

1    fill in, for the date upon which they would have to request,

2    somewhere around the 14th of June.

3            THE COURT:  Well, you can tell them that they got to

4    respond to you.  But as I understand 366, even as amended under

5    BAPCPA, the debtor, the estate, everybody other than the

6    utilities, has a right to get a judicial determination from me

7    as to the appropriate size of the deposit if you regard the

8    utilities request as overreaching.  And, of course, during that

9    thirty days they can't turn off the lights because they don't

10   like what you're proposing.

11           So, massage your order to put in that concept and

12   it'll be approved.

13           MR. SMOLINSKY:  Thank you, Your Honor.

14           THE COURT:  Okay.

15           Mr. Miller?

16           MR. MILLER:  If Your Honor please, Harvey Miller.  The

17   next motion, Your Honor, is a request for an order, pursuant to

18   Section 363 and related provisions, in connection with the

19   debtors' motion to approve sale procedures for the sale of

20   substantially all of its assets pursuant to the master sale and

21   purchase agreement with Vehicle Acquisition Holdings LLC, a

22   U.S. Treasury-sponsored purchaser.

23           All we're asking for here, Your Honor, is,

24   procedurally, for Your Honor to set the dates, as I explained

25   before.  The dates that we have requested, Your Honor, is

83

1    objections -- my -- excuse me -- June 19th, a bid deadline of

2    June 22nd, and a hearing date on June 30th, convenient to the

3    Court.

4            THE COURT:  In addition to approving the times, you

5    also want me to approve the bidding procedures that was an

6    attachment or somewhere --

7            MR. MILLER:  Yes, Your Honor.

8            THE COURT:  -- in your motion?

9            MR. MILLER:  Yes, Your Honor.

10           THE COURT:  Okay.

11           Anybody want to be heard on that one?

12           MR. JONES:  Yes, Your Honor.

13           THE COURT:  Come on up, please.

14           MR. JONES:  May it please the Court, Your Honor.

15   David Jones, Assistant U.S. Attorney for the Southern District

16   of New York, representing the United States in this matter.

17   With me at counsel table is Assistant U.S. Attorney Matthew

18   Schwartz, who's also going to be point counsel for the

19   government in this matter, and John Rapisardi of Cadwalader

20   Wickersham & Taft LLP, counsel to the presidential Automotive

21   Task Force.

22           I rise in specific support of the sale procedure

23   motion to convey the government's full support of that motion

24   and, more broadly, to convey the government's strong support of

25   debtor and its first-day motions as a whole.  And, Your Honor,

84

1    I'm just picking this as a relevant hook to say that.  And I

2    just have a very few remarks.

3            The President of the United States today, Your Honor,

4    addressed the importance of this case to the nation's economy

5    to a multitude of American families and businesses and to the

6    government as it seeks to advance the common good.  In light of

7    that broad public importance, the United States has devoted

8    enormous public resources in an attempt to achieve a

9    revitalized General Motors.  Toward that end, the United

10   States, GM and numerous other stakeholders have engaged in

11   months of intensive arm's-length negotiations concerning the

12   terms on which the government is willing to provide both pre-

13   petition emergency financing and debtor-in-possession financing

14   now on terms that greatly benefit the estate.

15           The United States, therefore, is a critical

16   participant in these proceedings because it holds roughly 19

17   billion dollars in senior secured pre-petition debt as a result

18   of that pre-existing emergency financing that it has already

19   extended and also because the government has agreed on certain

20   conditions to provide an additional 33.3 billion dollars in

21   debtor-in-possession financing to the debtors.

22           Now, for purposes of the Bankruptcy Code, the United

23   States' participation in these cases is proper as well as vital

24   because it maximizes value to the estate and, indeed, confers a

25   great benefit on the estate that's not available from any other

85

1    source.

2         Quite simply, Your Honor, as debtors have amply

3    demonstrated, no other debtor-in-possession financing is

4    available.  Thus, absent the United States' participation as

5    DIP lender, GM would face immediate liquidation.  The United

6    States is willing to invest public money in debtor-in-

7    possession financing to avoid that result because a liquidation

8    would be devastating to our nation's economy and to many

9    individuals and businesses.

10         The government's willingness to provide this financing

11    is conditioned on there being a clear and effective roadmap

12    under which General Motors can be reconstituted into a viable

13    and thriving entrant in the automotive marketplace.  GM is now

14    experiencing continuous losses that cannot be sustained, and

15    the government is not willing to bear those losses.

16         Thus, the government supports the sale procedure

17    motion immediately before the Court and the interrelated DIP

18    financing applications that will be presented.  The

19    government's support is conditioned on this case reaching

20    clearly defined mileposts by dates that, while not easy to

21    achieve, are attainable.

22         Specifically, General Motors has determined, and the

23    United States agrees, that the best and only way for GM's

24    operations to continue and for the bankruptcy estate to achieve

25    maximum value is through a swift 363 sale process.  Under that

86

1    process, GM's liable assets would be acquired by a government-

2    sponsored enterprise.  The acquisition would be, at least in

3    large part, achieved through a credit bid.  And the estate

4    would retain significant cash or equivalence to permit orderly

5    administration of the estate.  This path is far and away the

6    best available way to maximize value for the estate.

7         For these reasons, the United States strongly supports

8    GM in these Chapter 11 cases.  Time is of the essence, and we

9    urge prompt approval of the sale procedure motion to which I'm

10   immediately speaking and, more broadly, of the proposed debtor-

11   in-possession applications which will be before Your Honor

12   shortly.  Thank you.

13        THE COURT:  Sure.

14        Come on, please.

15        MR. ROSENBERG:  Thank you.  I think I'll be the last

16   "Good afternoon" of the day, Your Honor, before we head into

17   "Good evening".  Andrew Rosenberg, Paul, Weiss, Rifkind,

18   Wharton & Garrison, on behalf of the ad hoc bondholders group.

19   Like the Treasury, I think this is just a good opportunity to

20   introduce ourselves and make our position clear.  GM has

21   outstanding 27.2 billion dollars worth of bonds, face amount,

22   plus accrued interest, which brings it close to 28 billion

23   dollars.  This makes the bondholders the largest unsecured

24   creditor group in this case.

25        Since December, my firm, Paul Weiss, has been

09-50026-reg9   Doc 374   Filed 06/03/09   Entered 06/04/09 09:23:33   Main Document
Pg 88 of 126

87

1    representing an ad hoc group of GM bondholders holding

2    approximately 20 percent of GM's debt -- or bond, excuse me,

3    and we've been in contact with billions more during that

4    period.

5         MR. ROSENBERG:  Over the last week or so, we

6    negotiated a deal with the President's Auto Task Force and GM

7    providing for equity and warrants of what we'll refer to as New

8    GM to be distributed to bondholders and other general unsecured

9    creditors if the proposed sale goes through.  The terms of this

10   are set forth in a term sheet between the Auto Task Force and

11   the bondholders.  This term sheet was then attached to support

12   letters executed by holders of approximately 5.44 billion

13   dollars of GM bond debt through which those holders agreed to

14   support the proposed 363 sale on the terms set forth in the

15   term sheet.

16        Thereafter, a summary version of the term sheet was

17   filed by GM as an 8-K last Thursday morning.  Our firm then

18   conducted what is best described as an e-mail poll of GM

19   bondholders asking if they supported the proposed 363 sale on

20   those terms.  In just two days, approximately 1,000 holders who

21   held about over 5 billion dollars in GM bond debt --

22        THE COURT:  Did you say 5 billion?

23        MR. ROSENBERG:  -- indicated their support.  Five

24   billion, Your Honor, and that was in just two days.  And

25   additional, what I'll call, support letters are still coming in

09-50026-reg    Doc 374    Filed 06/03/09    Entered 06/04/09 09:28:33    Main Document
Pg 89 of 105

88

1    each day.

2          In addition, GM had previously distributed, pursuant

3    to an S-4, an out-of-court exchange offer on far inferior terms

4    to those proposed by Treasury which offered -- we were told it

5    was accepted by approximately 15 percent of GM's bondholders

6    before it expired without being accepted by GM on 5/26.  We

7    assume that those people who had accepted the offer on the S-4,

8    which is similar to the current offer but also far inferior,

9    would support the new offer proposed by Treasury.  Essentially,

10   the new offer just adds substantially to the old offer but is

11   similar in that it's equity-based.

12         Now, all told, when you combine the holdings of those

13   who executed support letters, provided e-mail support or

14   accepted the S-4 exchange, that makes about 54 percent of GM

15   bondholders who we believe can say support the proposed 363

16   sale and, most importantly, would like to see it concluded

17   quickly.

18         That being said, obviously we've not had an

19   opportunity yet to review the actual sales contract and other

20   documents that will be implementing this deal.  But, as far as

21   support is somewhat conditional, but we're confident, between

22   now and the time of the final sale hearing, that those deals

23   will be worked out and any conditionality to our support will

24   be gone.  Thank you, Your Honor.

25         THE COURT:  Okay, thank you.

1        Mr. Sullivan, is it?

2        MR. SULLIVAN:  Yes.

3        THE COURT:  Come up, please.

4        MR. SULLIVAN:  James Sullivan, again, of Arent Fox,

5   counsel for Timken, Superior and Harman.  I just have two very

6   minor tweaks, Your Honor, that I would request.  One is that

7   any contract assumption and assignment notice be served upon

8   counsel of record.  That was a change that was made to the

9   bidding procedures order in the Chrysler matter, and I would

10  hope that a similar provision could be interlineated in this

11  order.

12       THE COURT:  Pause, please, Mr. Sullivan.  You mean on

13  counsel of record as contrasted to the underlying business

14  entity?

15       MR. SULLIVAN:  No, in addition to, Your Honor.

16       THE COURT:  Oh, in addition to?

17       MR. SULLIVAN:  Oftentimes, in my experience,

18  especially in connection with the Delphi case, Your Honor, my

19  experience was that a lot of the notices were sent to offices

20  where there might have been manufacturing facilities, or

21  really, was sent to places where people didn't really know what

22  to do with them.  So I think that a simple fix to that is by

23  having a mechanism whereby counsel of record is also notified,

24  and that would help avoid a lot of confusion.

25       THE COURT:  Uh-huh.  Continue, please.

90

1          MR. SULLIVAN:  The second one, Your Honor, is I

2     noticed that there's a procedure in place for the payment of

3     cure payments by the closing of the sale or as soon as

4     practicable thereafter.  I noticed there's no outside deadline.

5     I thought, similar to the Chrysler sale, perhaps a deadline of

6     perhaps ten days could be imposed as an outside deadline just

7     to make sure that it doesn't drag on.

8          THE COURT:  On loan cure payments or payments where

9     you got to do some caucusing or study to find out what the

10    exact cure payment is?

11         MR. SULLIVAN:  These would be undisputed, Your Honor.

12    I think there's a mechanism in place for resolution of disputed

13    claims, and so that's not what I'm contemplating here, Your

14    Honor.

15         THE COURT:  Um-hum.  Okay.  Before I give the debtors

16    a chance to comment on Mr. Sullivan's thoughts, does anybody

17    else want to be heard for the first time?

18         Ms. Ceccotti, is it?

19         MS. CECCOTTI:  Yes, Your Honor, Babette Ceccotti for

20    the auto workers.  This is actually in the nature of

21    administrative.  But among the notices that the Court is being

22    asked to approve in connection with the bidding procedures

23    order is notice with respect to UAW-represented retirees.  And

24    in looking at the materials as filed today, we noticed some

25    edits that we think need to be made.  But rather than take up

09-50026-reg   Doc 974   Filed 06/09/09   Entered 06/09/09 09:28:33   Main Document
Pg 92 of 126

91

1    the time here, my suggestion would be that we confer with

2    debtors' counsel regarding the edits that we think are needed.

3    And before they submit the paperwork, I just wanted to make

4    sure that we had made that notation.  I don't see the need --

5         THE COURT:  Well, can I throw out the suggestion that

6    you would caucus with the debtors?  And I sense from the tone

7    about what you said that you're pretty comfortable that you can

8    work it out.

9         MS. CECCOTTI:  I think so, yes.

10        THE COURT:  And if you can't, you can get on the phone

11   with me.

12        MS. CECCOTTI:  Yes, I think that'll be fine, Your

13   Honor.

14        THE COURT:  Okay.

15        MS. CECCOTTI:  Thanks.

16        THE COURT:  Okay.

17        Ms. Adams?

18        MS. ADAMS:  Your Honor, during earlier discussions

19   with Mr. Miller, I believe he was going to make some statement

20   about reserving the rights of the creditors' committee to have

21   discussions or alter or amend the procedural motion.

22        THE COURT:  All right, maybe after everybody speaks

23   the first time, that can be clarified or confirmed.

24        MS. ADAMS:  Thank you, Your Honor.

25        THE COURT:  Okay.

09-50026-reg Doc 12456-3 Filed 06/24/13 Entered 06/24/13 13:11:57 Exhibit G
Pg 93 of 126
09-50026-reg Doc 974 Filed 06/03/09 Entered 06/04/09 09:28:33 Main Document
Pg 93 of 265

92

1          And -- yes, sir?

2          MR. EDELMAN:  Your Honor, Michael Edelman for Export

3    Development Canada.

4          THE COURT:  I'm sorry --

5          MR. EDELMAN:  Oh, sorry.

6          THE COURT:  -- Edmond was it?

7          MR. EDELMAN:  No, Michael Edelman --

8          THE COURT:  Oh, I'm sorry, Mr. Edelman.  Okay.

9          MR. EDELMAN:  -- from Vedder Price, representing

10   Export Development Canada.

11         THE COURT:  Right.

12         MR. EDELMAN:  We also support the 363 sale process.

13   We believe that this is the optimal means to assure the

14   continuation of the General Motors business, the preservation

15   of the employment of hundreds of thousands of people both

16   within GM and across many industries and companies.  This

17   preserves an icon both in the United States and in Canada, and

18   all of North America, and actually in many other countries.

19   This preserves the manufacturing base.

20         In sum, we think this is a very optimal motion and

21   support a quick sales procedure.  Export Development Canada is

22   supporting the debtors here and has committed to make over

23   3 billion dollars of debtor-in-possession financing here and is

24   providing multibillion-dollar support prior to the sale in

25   Canada and affiliated companies.  So we support the process.

09-50026-reg   Doc 974-5   Filed 06/09/09   Entered 06/04/09 09:28:33   Main Document
Pg 94 of 165

93

1          THE COURT:  Okay.

2          MR. EDELMAN:  Thank you.

3          THE COURT:  Thank you, Mr. Edelman.

4          All right, before I give Mr. Miller a chance to

5     comment, anybody else want to be heard for the first time?

6     Okay, Mr. Miller, looks like we just have some nits and gnats

7     here to resolve.

8          MR. MILLER:  Well, first, Your Honor, we sincerely

9     appreciate the support of everybody who stood up, and in

10    particular the ad hoc bondholders committee, which, I think, is

11    a monumental step forward from where we were ten days ago.

12         Your Honor, in connection with the service upon

13    attorneys of record, I'm not sure I quite understand the tweak

14    that is required.  Is it an attorney of rec --

15         THE COURT:  I think he's nervous that if you send a

16    notice to a lockbox or businesspeople that they're not going to

17    respond quickly enough, and that if you know who to send the

18    cure notice to -- I mean, if you send it to a lawyer it's going

19    to get more thoughtful attention.

20         MR. MILLER:  The only problem, Your Honor, there's

21    over 400,000 contracts.  And if we're just limiting it -- I

22    don't know whether this is the case, Your Honor.  Do we just

23    limit it to attorneys who file a notice of appearance in this

24    proceeding?  Or what is the definition of "attorney of record"?

25         THE COURT:  Well, I'm not sure if Mr. Sullivan

94

1    clarified that in his comments, but if you're looking for the

2    ability to narrow it down to a fixed group and not have to send

3    400,000, I'm sensitive to that concern and I would think we

4    could skin that cat.

5            MR. MILLER:  We would not have a problem, Your Honor,

6    if attorneys representing Timken, or whoever, sent us a notice

7    of designation, or whatever you want to call it, and we will

8    see to it that they get service of whatever papers and

9    pleadings are appropriate.

10           THE COURT:  Is it possible for you to provide an

11   e-mail address or a snail-mail address for them if they want

12   you to give the notice to a lawyer --

13           MR. MILLER:  Absolutely.

14           THE COURT:  -- where you can receive it?

15           MR. MILLER:  Absolutely.

16           THE COURT:  Okay.

17           MR. MILLER:  We'll undertake to do that.

18           THE COURT:  Mr. Sullivan, I'll give you a chance when

19   Mr. Miller's done.

20           MR. MILLER:  Okay, in terms of the paying of the cure

21   amounts, Your Honor, there is a procedure set up in the motion

22   that is spelled out.  I don't necessarily believe, Your Honor,

23   that everything that was done in Chrysler has to be done here.

24   There is a very detailed procedure that is set out.  If there

25   are problems with that, Your Honor, we have no problem about

95

1    sitting down with Mr. Sullivan or whoever and trying to work

2    those things out.  But there is a process that has been

3    successful in other cases, and that's what we adapted, Your

4    Honor.

5            THE COURT:  Um-hum.  Why don't you just deal with

6    Ms. Adams' concerns.

7            MR. MILLER:  Ms. Adams is absolutely correct, Your

8    Honor.  This is an interim order.  It's without prejudice and

9    full reservation of rights on behalf of the committee, which

10   I'm sure, if there are any tweaks or any problems with the

11   committee, we will be able to iron them out, just as we will,

12   Your Honor, with the UAW.

13           THE COURT:  Okay.

14           Mr. Sullivan?

15           MR. SULLIVAN:  Your Honor, I think you've actually

16   pretty well addressed my concerns, but I had one more

17   suggestion which I think might be helpful to some.  Perhaps

18   with very little effort the debtors could file some document on

19   ECF which indicates that notices were sent out, and just have a

20   listing of all the suppliers.

21           THE COURT:  400,000 of them?

22           MR. SULLIVAN:  No, I don't believe that there's that

23   many suppliers, Your Honor.  I bet you, there's probably less

24   than a thousand or --

25           MR. MILLER:  It's over 400,000 contracts.

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

09-50026-mg   Doc 12456-2   Filed 06/24/13   Entered 06/24/13 17:11:57   Exhibit G
Doc 974   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 97 of 126

96

1      MR. SULLIVAN:  Right, but how --

2      MR. MILLER:  We're talking about assumption and

3   rejection of contracts.

4      MR. SULLIVAN:  Yeah, I wasn't suggesting that they

5   actually list out all the contracts, Your Honor, but just list

6   out maybe -- if it's too diffi -- if the other way's easier,

7   that's fine, Your Honor, but I was just suggesting that if they

8   know, for example, that there's 800 suppliers to whom they sent

9   notices to, if they just happen to file, like, a --

10      THE COURT:  All right.

11      MR. SULLIVAN:  -- certificate of service listing out

12   the entities, and then the lawyers who represent those entities

13   can take whatever steps they feel are appropriate to try to

14   make sure that they get a copy of the notices.

15      THE COURT:  Yeah, folks, you have to understand that I

16   personally am not in a position to come and play Let's Make a

17   Deal.  In a case of this type, there's so much on the line we

18   have to keep our eye on the ball, which is, saving the

19   business, saving as many jobs as we can, saving as many

20   suppliers as we can, saving as many dealers as we can.  And

21   though I'm sensitive to people's individual needs and concerns,

22   we have to strike a fair balance between fairness and

23   procedural due process, and not driving the debtor nuts, and

24   not imposing requirements that are going to take money out of

25   the pockets of creditors.

1          What I am prepared to do is to require the debtor to

2     make publicly available, such as by an ECF filing, an address

3     or e-mail address or some place or person to whom anybody who

4     wants what you're looking for can send a request.

5          Mr. Sullivan, you can send it to that address, and

6     your needs and concerns will be satisfied.  And if there's

7     anybody else who feels the way you do, then the debtor isn't

8     going to have to go through 400,000 contracts or focus on 1,000

9     individual vendors to meet needs that can be handled more

10    expeditiously.  That's my ruling.

11         MR. SULLIVAN:  I appreciate it, Your Honor.

12         THE COURT:  Thank you.

13         MR. SULLIVAN:  My goal was just to make it easier.  I

14    was not trying to create --

15         THE COURT:  I understand, and I place no particular

16    fault with you.  It's just -- and I hope I'm not being brusque

17    by this, but I do think that in this case we have to keep our

18    eye on the ball.

19         MR. SULLIVAN:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         Mr. Miller?

22         MR. MILLER:  Thank you, Your Honor.  I would just

23    note, Your Honor, we have to get this order entered and this

24    process started within the next two days or it's actually a

25    default under the DIP.  So we will work as efficiently, but the

98

1    direction that Your Honor just gave in terms of the

2    publication, could that be the subject of a separate order?

3         THE COURT:  Oh, sure.

4         MR. MILLER:  Okay.  All right.  And we will deal, Your

5    Honor, with Ms. Babette (sic).

6         THE COURT:  I'm not talking about a publication in the

7    sense of newspaper publication.

8         MR. MILLER:  No.

9         THE COURT:  I'm talking about a one-page filing --

10        MR. MILLER:  On a Web site, Your Honor.

11        THE COURT:  -- to give a first-year associate to say

12    if you've got a desire to be heard on a cure amount send it to

13    whoever you designate.

14        MR. MILLER:  I would also add, Your Honor, as

15    Mr. Smolinsky noted, the company has set up an enormous

16    communication system.  There are people who will deal with

17    dealers; there are people who will deal with suppliers.  It is

18    one of the most comprehensive communication systems I have ever

19    seen in a Chapter 11 case.

20        So any supplier, such as Timken, can call GM.  There

21    are people there who will be there on the business side of it,

22    on the legal side of it, and get this -- there will be enormous

23    amount of information available, Your Honor.  But we will --

24        THE COURT:  Okay.

25        MR. MILLER:  - follow Your Honor's direction and enter

09-50026-mg   Doc 12456-2   Filed 06/24/13   Entered 06/24/13 13:11:57   Exhibit G
09-50026-reg   Doc 974   Filed 06/08/09   Entered 06/09/09 23:33   Main Document
Pg 100 of 126

99

1    a separate order.

2              THE COURT:  You can bifurcate them, if you wish.

3              MR. MILLER:  Thank you, Your Honor.  The next matters,

4    Your Honor, are numbers 20 and 21, Your Honor.  They relate --

5    both of them relate -- they're both requests for interim orders

6    in connection with the granting of the use of cash collateral

7    and granting adequate protection.  The first one, Your Honor --

8              THE COURT:  Would it be a problem for you if you dealt

9    with cash collateral first?

10             MR. MILLER:  Cash collateral?

11             THE COURT:  Yes.

12             MR. MILLER:  Yes, Your Honor.  The first one relates

13   to the revolver debt, which is held -- or is agented by

14   Citigroup -- or Citibank.  The total outstanding amount there

15   is approximately 4. -- I'm rounding it off, Your Honor, 4.6

16   billion dollars plus some hedging obligations.

17             The proposal, Your Honor, is that the debtors-in-

18   possession would be able to use cash collateral subject to

19   certain terms and conditions which are agreeable, Your Honor,

20   to the secured creditors.  Under the proposed transaction under

21   Section 363, Your Honor, the revolving credit banks will be

22   refinanced out, and the U.S. Treasury will take over that

23   position.

24             So it's a fairly simple one.  Within forty-five days,

25   Your Honor, post-petition, they have to be taken out,

1   essentially.

2         THE COURT:  The cash collateral is a very clean order.

3   It's much better than some of those that I've seen recently.  I

4   just have one or two questions on particular issues, and I

5   wonder of Mr. Pantaleo is the best guy to come up to answer

6   those questions.

7         MR. MILLER:  On a revolver, absolutely, Your Honor.

8         THE COURT:  Well, I think the same language is on the

9   term -- is Mr. Toder (ph.) here, or one of his partners?

10        MR. MILLER:  Mr. Toder is always here, Your Honor.

11        THE COURT:  All right, Mr. Toder, you can get ready.

12   If Pantaleo doesn't answer the questions to your satisfaction,

13   maybe you can try to do better.

14        MR. TODER:  I'm moving up, Your Honor.

15        MR. PANTALEO:  Good evening, Your Honor.  Peter

16   Pantaleo, Simpson Thatcher, for Citicorp as agents under the

17   first-lien revolver facility.

18        THE COURT:  Mr. Pantaleo, as I indicated, this is a

19   far better cash collateral order than I usually see.  You

20   and/or the debtor and/or Mr. Toder properly made the adequate

21   protection payments tied to the diminution in the collateral

22   value.  And then you also provided, as is customary for secured

23   lenders, that under the name of adequate protection we pay

24   current interest, attorneys' fees, miscellaneous costs and the

25   like.

09-50026-reg   Doc 974-4   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 102 of 125

101

1          MR. PANTALEO:  That's right.

2          THE COURT:  In the last half dozen or so cash

3    collateral orders that I've looked at and approved in mega

4    cases, I've authorized payments of interest and attorneys' fees

5    as part of the adequate protection process, but we've written

6    into the order that those payments would be on account of the

7    adequate protection obligation.  And I'm wondering if there's

8    some reason why you might have a problem with that.

9          As I said, that was how it turned out.  If you're

10   oversecured, as you seem to be, and especially if you get

11   cashed out in forty-five days, I think what I'm asking for is

12   going to be immaterial.  But history has taught me that every

13   time that I or one of my colleagues approves something in a DIP

14   order or a cash collateral order, it becomes inscribed in the

15   history of this Court for the next matter.  And as long as you

16   get the money, do you care?

17         MR. PANTALEO:  I don't think so.  I think -- if I can

18   make certain I understand what Your Honor said, I think what

19   Your Honor is saying is that we would receive adequate

20   protection payments that would be equal to an amount that

21   tracks interest, et cetera.  But you are not making a

22   particular finding that we are actually getting paid interest?

23         THE COURT:  Yes, sir, and I'm not making a finding

24   that that is equivalent to the diminution in your collateral

25   value.

1          MR. PANTALEO:  No, that is fine, Your Honor.

2          THE COURT:  Right.

3          MR. TODER:  Agreed.

4          THE COURT:  Very good.  Thank you, Mr. Toder.

5          Lastly, and I have the U.S. government here in a

6     different capacity, and if they're telling me they can act for

7     the entire U.S. government and not just Treasury, that may moot

8     this.  But as is customary, again, you and Mr. Toder asked for

9     CERCLA findings and that you're not a control entity.  I

10    normally don't grant those without notice to the EPA, which

11    happens to be the U.S. Attorney's Office in the Southern

12    District of New York most of the time.  Do you guys want

13    special notice of that?  Do you care?  Otherwise, I would say,

14    subject to the opportunity for the U.S. government to be heard

15    at the final, you get the CERCLA protection.

16          MR. JONES:  Your Honor, we have been discussing

17    language and have equivalent language in the DIP -- or have

18    been talking, at least, about the insertion of equivalent

19    language in the DIP provisions.  I guess what I'd like to do,

20    and I didn't have the opportunity to speak to Mr. Pantaleo, is

21    carry the possibility of curative language on this issue over,

22    for now --

23          THE COURT:  If you're asking for that protection in

24    your hat as a DIP lender, I assume that the interests in your

25    EPA hat that you're trying to protect aren't as critical.

103

1      MR. JONES:  Your Honor --

2      THE COURT:  But if you want to have the dialogue with

3  Mr. Pantaleo and Mr. Toder, maybe what I'll say is whatever you

4  guys can consensually resolve is okay with me.

5      MR. JONES:  I'm sorry.  Your Honor, I should be clear.

6  In our capacity as DIP lender, we asked for less protection.

7  We asked for the limitation on responsible party --

8      THE COURT:  Okay, well, that makes it more relevant.

9      MR. JONES:  -- versus exclusions that ordinarily --

10  that were written in.  All I'm saying is, for purposes of the

11  cash collateral order, in my capacity as lawyer for the United

12  States as a whole, as opposed to Treasury and the Auto Task

13  Force, this is an issue that has been identified and not nailed

14  down as to where we're going to go.  We'd appreciate the

15  opportunity simply, for whatever happens today, to be without

16  prejudice to possibly revisiting that.

17      THE COURT:  Mr. Toder or Mr. Pantaleo.

18      MR. TODER:  Yeah, I think so, Your Honor.  I would

19  just comment that if there's one case that we're dealing with

20  GM where there's not a CERCLA issue in terms of our control of

21  the entity, it's got to be GM.  So this one ought to be easy

22  and won't act as precedent for too many other cases.  John, of

23  all people, you know that.

24      We'll leave it that way, and if you have a problem,

25  let us know.

104

1          THE COURT:  I hope you guys understood what Mr. Toder

2     just said.

3          MR. PANTALEO:  No idea.

4          THE COURT:  I understand the underlying issue, and I

5     understood what the lenders were looking for.  And I must say

6     that after the EPA is given notice, I don't think I've ever

7     denied it on a final.  But with that said, if the concept is

8     that it's going to be in there now but subject to

9     reconsideration at the final, is that what's proposed?

10          MR. PANTALEO:  That's fine, Your Honor.

11          THE COURT:  Okay.

12          Is the government okay with it?

13          MR. JONES:  Yes, Your Honor.  Thank you, that's fine.

14     And it may be a nothing, but we're just not certain.

15          THE COURT:  Okay.

16          And, folks, that's all I had on the cash collateral

17     order.

18          MR. PANTALEO:  Your Honor, if I just -- a couple of

19     brief comments on this, if it's okay with Your Honor.

20          THE COURT:  Yeah, certainly.

21          MR. PANTALEO:  First, just to explain the forty-five

22     days so Your Honor has context, Mr. Miller had described that

23     the expectation is that if not the actual -- it's a working

24     understanding is that the lenders would be refinanced in full

25     within forty-five days.  Just so Your Honor understands the

09-50026-reg   Doc 974   Filed 06/08/09   Entered 06/08/09 23:33   Main Document
Pg 106 of 126

105

1    context, before bankruptcy, in discussions with both government

2    and with General Motors, we had agreed to amend our revolving

3    credit facility to effectively, for a forty-five day period,

4    waive default interest, which under our facility is five

5    percent, fairly --

6            THE COURT:  Five percent over the --

7            MR. PANTALEO:  Exactly.

8            THE COURT:  -- circled rate?

9            MR. PANTALEO:  Exactly.  Five percent.  And so we had

10   agreed that for a forty-five day period the default rate

11   wouldn't apply provided that at the end of that period, either

12   from proceeds from DIP financing or a sale, we don't really

13   care, the first lien facility is paid indefeasibly in full and

14   in cash at that point.  And that's the genesis behind the

15   forty-five day provision.

16           And, Your Honor, this -- for a similar reason, this

17   cash collateral order, by its terms, is only a forty-five day

18   order; the expectation was that.  And not to take away from the

19   compliment I think Your Honor may have been paying us about a

20   clean order, the expectation is that we could afford a clean

21   order, a simple order, because this is a forty-five day

22   process.  We didn't seem to need to belabor it with a lot of

23   other provisions.

24           If the unlikely happens, and it turns out we need a

25   much more lengthy period of consent for cash collateral, there

09-50026-reg   Doc 974   Filed 06/08/09   Entered 06/09/09 09:28:33   Main Document
Pg 107 of 265

106

1   may be, in fact, a few provisions that we would request in here

2   in exchange for an extension of that forty-five day period.

3   But I just wanted to mention that to Your Honor so that Your

4   Honor isn't surprised if we come in with something that's a

5   little bit more complicated after forty-five days.  Thank you,

6   Your Honor.

7          THE COURT:  Okay.

8          MR. TODER:  Let me just add, I think he --

9          THE COURT:  Mr. Toder.

10          MR. TODER:  -- I think Mr. Pantaleo said it just

11   perfectly.  I'd just note that the same five percent default

12   rate of interest is contained in the term loan documentation,

13   and indeed the provision on the forty-five days is contained in

14   the order which is before Your Honor at this time.

15          THE COURT:  Uh-huh.

16          Mr. Miller?

17          MR. MILLER:  The lenders are so gracious, Your Honor.

18          THE COURT:  All right.

19          MR. MILLER:  I think that was the shortest brief --

20          THE COURT:  You can continue.  I think where we left

21   off is that I had just approved the cash collateral order

22   subject to the tweaking in the respects -- Mr. Sullivan?

23          MR. SULLIVAN:  Your Honor, I'm sorry.  I wanted to be

24   heard briefly, if you don't mind.

25          THE COURT:  On the cash collateral order?

09-50026-reg   Doc 374   Filed 06/09/09   Entered 06/09/09 23:33:14   Main Document
Pg 107 of 125

1            MR. SULLIVAN:  Very briefly.  It also pertains to the

2      DIP financing, so I may as well address it together, my small

3      concern.  The concern, obviously, Your Honor, is with respect

4      to the setoff rights and reclamation rights of trade vendors.

5      To the extent that either the cash collateral order or the DIP

6      financing order were to impair those rights and those rights

7      had value, we would just request either that nothing in the

8      order, at least on an interim basis, affect those rights, or

9      that such rights receive some form of adequate protection, such

10     as a junior lien or an administrative claim, to the extent of

11     any such diminution in the value.

12            THE COURT:  Well, I don't think you need the debtor to

13     respond on this, unless it wants to.  There's a lot of case law

14     on the extent to which financings can, on the one hand, trump

15     the reclamation rights so the others cannot.  I'll give you a

16     reservation of rights to argue whatever you think the law is,

17     and everybody else's rights to argue to the contrary.  But I

18     see no basis for giving you adequate protection or anything of

19     that sort.

20            And if in lieu of getting whatever you think you want

21     in adequate protection at the final, you can ask for it then,

22     I'll broaden your reservation of rights to get that.  But aside

23     from the fact, at the very least, that assuming, arguendo, that

24     there is ever an entitlement to adequate protection for a

25     reclamation right and that it can trump the rights of secured

09-50026-reg   Doc 374   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 109 of 126

108

1    lenders, wouldn't you think you'd have to show your entitlement

2    under the UCC to a reclamation claim?

3            MR. SULLIVAN:  Your Honor, I wasn't suggesting that

4    any such rights were senior to any senior secured creditor,

5    Your Honor, with respect to reclamation.  With respect to

6    set --

7            THE COURT:  Well, if that's true, then you've got the

8    government's 33 million bucks or there -- or actually it's 15

9    at this point -- of DIP financing ahead of you.  There are 19.4

10   in pre-petition -- 19.4 billion in pre-petition ahead of you?

11   I think there are some junior secured?  And -- look, if you

12   want the reservation of rights, you can have it.  I am kind of

13   telegraphing the questions that I would be asking at the

14   beginning of any oral argument if we ever got to a further

15   litigation over this issue.

16           MR. SULLIVAN:  I'm well aware of the issues, Your

17   Honor.  And no investigation has been done.  I'm just here

18   basically trying to preserve my rights with respect to the

19   reclamation issue.  With respect to the setoff issue, there's

20   really no reason why -- and to be fair, I only was looking at

21   the motion on the way down here; I haven't had a chance to

22   study the agreement thoroughly.  But I don't think that there's

23   any reason why any of the cash collateral or DIP financing

24   motions should impair setoff rights to the extent that any such

25   rights are valid with respect to any contracts.  Those

109

1    contracts should not be impaired by this.  And to the extent

2    that they are somehow impaired, there's no reason why such

3    rights could not receive some form of adequate protection

4    similar to the rights of the secured lenders in the cash

5    collateral order.

6            THE COURT:  Well, I don't know.  Mr. Miller, do you

7    want to respond to it now, his latter point, or --

8            MR. MILLER:  No, Your Honor.  I think Your Honor said

9    it much better than I could say it.  If he wants to have a

10   reservation of rights, whatever those rights may be, which I

11   think are highly suspect --

12           THE COURT:  Mr. Sullivan, let his -- and come closer

13   to the microphone, please --

14           MR. MILLER:  -- which I think are highly suspect,

15   that's fine, Your Honor.  I think we should move on.

16           THE COURT:  All right.  I think we need to move on as

17   well.  You got the reservation of rights by consent.  And if

18   this is still an issue at the time of the final, both of you or

19   your designees can address it then.

20           MR. MILLER:  Thank you, Your Honor.

21           MR. SULLIVAN:  Thank you, Your Honor.

22           THE COURT:  Okay.  Oh, DIP financing?

23           MR. MILLER:  We can go to DIP financing, Your Honor.

24           THE COURT:  Or did you -- at your pleasure,

25   Mr. Miller.

09-50026-mg Doc 12456-2 Filed 06/24/13 Entered 06/24/13 13:11:57 Exhibit G
09-50026-reg Doc 974 Filed 06/08/09 Entered 06/04/09 09:28:33 Main Document
Pg 111 of 126

110

1      MR. MILLER:  We're on the subject, Your Honor, so we

2  might as well --

3      THE COURT:  Okay.

4      MR. MILLER:  -- take -- it's item 24.  There's an

5  extensive motion that has been filed for the DIP financing.  As

6  previously alluded to, the contemplated DIP financing is 33.3

7  billion dollars.  What we are asking for here, Your Honor, is

8  interim financing of a maximum of 15 billion dollars for the

9  next twenty or twenty-one days, depending on what day Your

10  Honor picks for the final hearing on the DIP.

11      We have reviewed the motion, Your Honor, with the

12  Office of the United States Trustee.  I think there are still

13  several issues outstanding -- am I correct -- in terms of the,

14  let me call them the burial expenses.

15      THE COURT:  Come to the main mic, please, Ms. Adams.

16      MS. ADAMS:  After speaking briefly with Mr. Rapisardi,

17  I think we have come to an agreement on all of our issues, and

18  the order just has to be modified.

19      THE COURT:  Okay.  Are they of a level that would hit

20  my radar screen, or do you want to talk about them, or are they

21  just the wordsmithing that careful lawyers do?

22      MS. ADAMS:  Your Honor, one would be expenses for --

23  in case a trustee were ever appointed, there'll be a

24  carve-out --

25      THE COURT:  So that's just adding the carve-out, of

111

1    that character?

2          MS. ADAMS:  Exactly, Your Honor.  And a turnover of

3    the expense records for the attorneys for the DIP lenders.  I'm

4    trying to think is there another one.  And the no lien on the

5    avoidance actions under Chapter 5, pending the final order.

6          THE COURT:  Um-hum.

7          Mr. Rapisardi, do you want to comment on what

8    Ms. Adams said yet, or -- oh, I'm sorry, Mr. Jones?

9          MR. JONES:  Oh, I'm sorry, Your Honor.

10         THE COURT:  You're the spokesman for your --

11         MR. JONES:  Yeah, Your Honor --

12         THE COURT:  -- colleagues?

13         MR. JONES:  Yes, Your Honor.  Poor Mr. Rapisardi is

14   silenced by the fact that Congress says only the Justice

15   Department can represent the government.  But I can confirm

16   that that agreement is in place.

17         THE COURT:  Well, you want to hand off to

18   Mr. Schwartz?  I guess he can do it too.

19         MR. JONES:  Yeah, I'm sure he'll have his day, and

20   perhaps more than one.  But, for now, we can just confirm that

21   that agreement is in place as described.  Thank you.

22         THE COURT:  Fair enough.

23         Mr. Miller?

24         MR. MILLER:  With that, Your Honor, I don't believe

25   there's any objection to the interim DIP.

112

1        THE COURT:  Okay.  Mr. Edelman, do you want to be

2    heard on DIP?

3        MR. EDELMAN:  We support the DIP.  We would just

4    like -- we're a co-DIP lender, and we just haven't seen those

5    modifications.  If we could just see those?

6        MR. MILLER:  We'll talk through these --

7        MR. EDELMAN:  Yeah --

8        MR. MILLER:  -- before an order submitted.

9        THE COURT:  Okay.

10       All right, anybody else want to be heard on the DIP?

11       Okay.  Subject to making a conforming change on the

12   DIP on the adequate protection on account of, this DIP is also

13   approved.

14       MR. MILLER:  Thank you, Your Honor.

15       THE COURT:  And, Mr. Miller, I realize that I -- I

16   apologize, I never gave you a formal ruling on your sale

17   procedures motion.

18       MR. MILLER:  I thought you did.  I'm sorry, Your

19   Honor.

20       THE COURT:  But it is approved.

21       MR. MILLER:  Thank you.  You had me nervous there for

22   a moment, Judge.

23       THE COURT:  No.  We got sidetracked somehow.  But it

24   is approved, and put in the dates you recommended.

25       MR. MILLER:  Thank you, Your Honor.

09-50026-reg    Doc 374    Filed 08/09/09    Entered 08/09/09 09:28:33    Main Document Pg 114 of 126

113

1          THE COURT:  Okay.

2          Mr. Smolinsky?

3          MR. SMOLINSKY:  Your Honor, Joe Smolinsky of Weil

4    Gotshal & Manges.  Before I tackle what I believe are the last

5    two items today, I have one housekeeping item.  I would like to

6    move for the admission of Robert Weiss and Tricia Sherick, both

7    of the firm of Honigman Miller Schwartz and Cohn LLP.  We filed

8    earlier today a motion and certification with respect to their

9    admission.  They are acting as special counsel and conflict

10   counsel in certain regards in this case.  And before we

11   overstay our welcome, they need to file some papers.  So I'd

12   like to get them admitted.  And I have some orders with me.

13         THE COURT:  All right.  They're duly admitted in some

14   other jurisdiction?

15         MR. SMOLINSKY:  Yes.  Michigan, Your Honor.

16         THE COURT:  Fair enough.  Welcome.  Where are they?

17         Welcome, folks.

18         MR. SMOLINSKY:  If I may?

19         THE COURT:  Yes.  Well, give them to Ms. Blum when

20   we're all done, Mr. Smolinsky.

21         MR. SMOLINSKY:  Thank you, Your Honor.

22         THE COURT:  Okay.

23         MR. SMOLINSKY:  There are two related motions relative

24   to the debtors' interactions with GMAC LLC.  One is a motion to

25   seal certain agreements.  And, Your Honor, this morning, maybe

1    late this morning, we delivered to your chambers a binder of

2    the agreements that we're seeking to seal today.  We believe

3    that these agreements contain confidential commercial

4    information.  We have no desire to keep these agreements from

5    the committee, for example, Your Honor, but believe that we

6    would like to protect them from certain distributions.

7            THE COURT:  Okay, on the sealing matter, anybody want

8    to be heard on that?

9            Ms. Adams, I think I know what you're going to say.  I

10   dealt with this issue with Ms. Nakano in a couple of my other

11   cases.

12           MS. ADAMS:  Maybe it's a pleasant surprise, Your

13   Honor.  It appears to us to fall within the confines of Section

14   107.

15           THE COURT:  Okay.  That's likely to make the issue go

16   away.

17           The sealing motion is granted, but we're going to put

18   the language in the sealing order that I've customarily

19   required to respond to earlier U.S. Trustee's objections.

20   You're authorized to file whatever under seal, subject to

21   further order of the Court, and that the order is without

22   prejudice to the rights of any party-in-interest or the U.S.

23   Trustee to seek to declassify and make public any portion of

24   the material filed under seal and the rights of any other

25   party-in-interest to approve such a request.

115

1          This seems to be a no-brainer circumstance where

2     sealing it is appropriate, but in other cases, not this one,

3     we've had some issues vis-a-vis overclassification,

4     oversealing.  And especially in cases of public importance, we

5     judges have to have the ability to protect what needs to be

6     protected and to revisit that which doesn't need to be

7     protected.

8          So the sealing motion's granted.  And until and unless

9     I rule to the contrary, it stays under seal.

10          MR. SMOLINSKY:  Thank you, Your Honor.  Moving to the

11     substantive motion, as set forth in the motion, a significant

12     portion of the debtors' wholesale, retail and other related

13     product financing received by GM dealers and their customers

14     are provided through GMAC.  Related thereto, GM and GMAC are

15     parties to dozens of agreements that govern their longstanding

16     financing and operating relationship.  These are commonly known

17     to us as the operative documents.

18          Your Honor, I could safely say, after sitting in rooms

19     with GMAC for quite some time, that despite being former

20     affiliates we entered our discussions on our ongoing

21     relationship at arm's length and certainly in good faith.

22          THE COURT:  Knowing GMAC's counsel, I don't doubt

23     that.

24          MR. SMOLINSKY:  Your Honor, I think we all knew going

25     into our discussions that one could take the argument that

09-50026-reg Doc 12456-2 Filed 06/24/13 Entered 06/24/13 17:11:57 Exhibit G
09-50026-reg Doc 974 Filed 06/09/09 Entered 06/09/09 09:28:33 Main Document
Pg 117 of 126

116

1    these agreements are financial accommodations.  I think we all

2    understood that GMAC needs GM, and GM needs GMAC.  And from

3    GM's perspective, and I think Mr. Henderson's affidavit speaks

4    volumes, there really is no alternative to the level of

5    financing that is provided by GMAC.

6         So what we decided to do is to enter into a

7    ratification agreement, which will bridge to a sale and that --

8    so we wouldn't have to deal with some of the issues of

9    premature assumption.  All that the ratification agreement

10   provides is that the respective parties will continue to

11   perform under those agreements post-petition.

12        We did give GMAC the protection that if we make

13   payments to them in the ordinary course under the agreements

14   that those payments will not be subject to later disgorgement

15   or returned so that they're not increasing their exposure as a

16   result of continuing to provide credit under these agreements.

17        Your Honor, the agreement further provides that, upon

18   an assumption -- upon a sale closing, that the GMAC agreements,

19   the operative documents, will be assumed and assigned to New

20   GM.  And as part of that assumption and assignment, GMAC has

21   agreed that they would have no further claims against Old GM

22   and that we would agree that the estate has no claims against

23   GMAC.

24        So those are the terms upon which we want to go ahead.

25   We want to continue to make our payments.  We want to continue

09-50026-mg   Doc 12456-2   Filed 06/24/13   Entered 06/24/13 13:11:57   Exhibit C
09-50026-reg   Doc 374   Filed 06/03/09   Entered 06/04/09 09:28:33   Main Document
Pg 118 of 126

117

1    to get the same level of financing from GMAC.  And, in fact,

2    we're speaking about getting further financing.  We don't know

3    what's going to happen with the twenty to twenty-five percent

4    of dealers that don't have GMAC financing.  And GMAC may very

5    well pick up the slack.  And you may see papers in front of you

6    shortly in that regard.

7              So, Your Honor, we'd ask that you approve the

8    ratification agreement, which would allow the company to

9    continue to operate under its existing agreements with GMAC.

10             THE COURT:  Okay.  Anybody want to be heard in

11   opposition?

12             I see no response.

13             Mr. Helfat, I assume you're just being careful in case

14   somebody does rise in opposition?

15             MR. HELFAT:  And if you had any questions, Your Honor.

16             THE COURT:  Actually I don't.  So -- I'm looking once

17   more.  There is no opposition.  I'm granting the motion, and

18   I'm making the finding under 6003 that a financial commitment

19   of this type is necessary to avoid immediate and irreparable

20   harm to the estate.

21             MR. SMOLINSKY:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             Okay.  Where are we now?  Mr. Miller.

24             MR. MILLER:  Your Honor, the next item is picking a

25   date for the next hearing on General Motors matters, including,

1    Your Honor, the final hearing on the DIP financing.

2             THE COURT:  Okay.

3             Is Ms. Blum still here?

4             MR. MILLER:  If I might, Your Honor, I would suggest

5    June 25, which is a Thursday?  Actually, Your Honor, we got

6    that from Ms. Blum, I think.

7             THE COURT:  Oh, okay.  Yes, June 25 is fine, then.

8             MR. MILLER:  That's fine, Your Honor.  What time, Your

9    Honor?

10            THE COURT:  I would say 9:45, unless you think we're

11   going to have so many matters we should start earlier.

12            MR. MILLER:  We're subject to whatever Your Honor

13   thinks is appropriate.

14            THE COURT:  I'll try to give you --

15            MR. MILLER:  I would suggest, Your Honor, just to be

16   safe, how about 9 a.m.?

17            THE COURT:  9 a.m. it'll be.  Okay.

18            MR. MILLER:  That concludes all the matters the

19   debtors have, Your Honor.  And again, once again, Your Honor,

20   we express our appreciation --

21            THE COURT:  I think Mr. Karotkin's trying to telegraph

22   you.

23        (Discussion between counsel)

24            MR. MILLER:  In the DIP order, the objections?

25            THE COURT:  Oh, yes, that's a good point,

119

1    Mr. Karotkin.  I could -- I'd like to have all papers in on

2    anything that has the potential of being contested at least a

3    full day in advance.  And if you're going to want to reply,

4    which you often do, then I would recommend that you, depending

5    on how much time you want to reply, require the objections

6    shortly before that.  Since the motion's pretty much in Macy's

7    window, how about the 19th as a time for objections to come

8    in --

9              MR. MILLER:  That's fine.

10             THE COURT:  -- and you or your colleagues getting me

11    any reply, if you choose to do one, by the close of --

12             MR. MILLER:  How about the --

13             THE COURT:  Maybe 6 o'clock on the 23rd?  Will that

14    work for you?

15             MR. MILLER:  That's fine, Your Honor.

16             THE COURT:  Okay.

17             MR. MILLER:  Thank you, Your Honor.

18             THE COURT:  Very good.

19             MR. MILLER:  And once again, appreciation for taking

20    this hearing so late in the afternoon, Your Honor.

21             THE COURT:  Very well.

22             All right, thank you, folks.  Good luck with this

23    case.  We're adjourned.

24             IN UNISON:  Thank you, Your Honor.

25         (Proceedings concluded at 6:38 PM)

120

1                    I N D E X

2

3                  R U L I N G S

4    DESCRIPTION                          PAGE      LINE

5    Debtors' motion for joint administration of    42        11

6    the four Chapter 11 cases granted

7    Debtors' motion for order waiving              42        21

8    Requirement to file list of creditors and

9    equity securityholders, and approving

10   form and manner of notifying creditors of

11   commencement of debtors' cases, approved.

12   Debtors' motion for order extending time       45         1

13   to file schedules of assets and liabilities,

14   schedules of executory contracts and unexpired

15   leases, and statement of financial affairs

16   granted

17   Debtors' motion for order granting             45        16

18   administration expense status to the

19   debtors' undisputed obligations to

20   vendors arising from post-petition delivery

21   of goods and services that were ordered

22   pre-petition but delivered post-petition

23   granted

24

25

121

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion for order pursuant to Section 105 enforcing the protections of Sections 362, 365(e) and 525 granted | 45 | 24 |
| Debtors' motion for interim order authorizing continued use of their cash management system and to continue to maintain their existing business forms granted | 50 | 11 |
| Debtors' motion for authority to pay pre-petition wages granted | 55 | 18 |
| Debtors' motion for interim order authorizing:  A) continuation of Troubled Supplier Program, B) continuation of U.S. Treasury Supplier program, and C) payment of critical vendors granted | 61 | 19 |
| Debtors' warranty and customer practice motion/motion to continue the GM Cash Rewards Program granted | 65 | 5 |
| Debtors' reclamation motion granted on an interim basis | 70 | 25 |
| Debtors' motion for payment of foreign vendors granted | 74 | 24 |

122

```
 1
 2    DESCRIPTION                              PAGE      LINE
 3    Debtors' motion establishing procedures    75        17
 4    under Section 503(b)(9) of the Bankruptcy
 5    Code as to the resolution and satisfaction
 6    of claims asserted under that provision of
 7    the statute granted
 8    Debtors' motion seeking authorization for   77         1
 9    the payment of certain pre-petition shipping
10    and delivery charges for goods in transit,
11    custom duties and tooling and mechanics'
12    lien charges granted
13    Debtors' motion seeking authority to        77        17
14    continue to pay premiums for the debtors'
15    normal liability property coverage
16    insurance in the ordinary course of
17    business granted
18    Debtors' motion seeking authority for the   78        10
19    payment of sales taxes, use taxes, gross
20    receipts taxes and similar type taxes
21    which are outstanding with respect to the
22    pre-petition period granted
23
24
25
```

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

123

| DESCRIPTION | PAGE | LINE |
| --- | --- | --- |
| Debtors' motion regarding the preservation of the debtors' tax benefits and net operating loss carry-forwards granted on an interim basis | 79 | 12 |
| Debtors' utility motion granted | 81 | 16 |
| Debtors' motion for request for an order, pursuant to Section 363 and related provisions, in connection with the debtors' motion to approve sale procedures for the sale of substantially all of its assets, pursuant to the master sale and purchase agreement with Vehicle Acquisition Holdings LLC approved | 112 | 20 |
| Debtors' motion for interim order in connection with the granting of the use of cash collateral granted | 106 | 21 |
| Subject to conforming change, DIP order approved | 112 | 12 |
| Debtors' motion for admission of Robert Weiss, Esq. and Tricia Sherick, Esq. as special counsel and conflicts counsel granted | 113 | 16 |

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion to seal certain agreements granted, subject to language in the order | 114 | 17 |
| Debtors' motion to approve the ratification agreement which would allow the company to continue to operate under its existing agreements with GMAC granted | 117 | 17 |

125

```
1

2                    C E R T I F I C A T I O N

3

4       I, Clara Rubin, certify that the foregoing transcript is a true

5   and accurate record of the proceedings.

6       Clara Rubin

7   _____

8   Clara Rubin

9   AAERT Certified Transcriber (CET**D-491)

10

11  Veritext LLC

12  200 Old Country Road

13  Suite 580

14  Mineola, NY 11501

15

16  Date:  June 3, 2009

17

18

19

20

21

22

23

24

25
```

Digitally signed by Clara Rubin
DN: cn=Clara Rubin, c=US
Reason: I am the author of this document
Date: 2009.06.03 16:58:29 -04'00'