**CLOSING ARGUMENTS:  TO BE DETERMINED**

KING & SPALDING LLP

1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al*., | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., *et al*. | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

------------------------------------------------------------ x

| | | |
|---|---|---|
| MOTORS LIQUIDATION COMPANY GUC TRUST, | : : | |
| | : | |
| Plaintiff, | : | Adversary Proceeding |
| | : | Case No.: 12-09802 (REG) |
| v. | : | |
| | : | |
| APPALOOSA INVESTMENT LIMITED PARTNERSHIP, *et al*., | : : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------ x

## POST-TRIAL REPLY BRIEF
## BY GENERAL MOTORS LLC

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT .................................................................................................................................8

POINT I. THE GUC TRUST'S GRIEVANCES REGARDING THE LOCK-UP
AGREEMENT ARE WITHOUT MERIT ...................................................8

    A. The Grievances Fail Because the Lock-Up
Agreement Was a Prepetition Transaction .........................................................8

    B. No Postpetition Action Taken in Connection with the Lock-Up Agreement
Affected the Unsecured Creditors......................................................................10

        1. The Proceeds of the $450 Million Loan Never Went Into a Trust Account...............11

        2. The $450 Million Loan Agreement Was Amended Only Once Postpetition,
and that Amendment Had No Impact on the Unsecured Creditors ............................12

        3. The Subordination and Non-Setoff Provisions of the Swap Claim Were Not
Postpetition Acts .......................................................................................................13

        4. Old GM Did Not Use Its Corporate Powers Postpetition.....................................14

        5. The FX Transaction and Pension Escrow Agreement Were  Authorized and
Resulted in the Repayment of the $450 Million Loan ...............................................15

    C. The Consent Fee is Not an Avoidable Postpetition Transfer.............................19

        1. The Payment of the Consent Fee is Not Avoidable Pursuant to Section 549 of
the Bankruptcy Code..................................................................................................20

        2. The Collapsing Doctrine is Inapplicable..................................................................21

POINT II. THE NUMEROUS FACTUAL MISSTATEMENTS AND
INCONSISTENCIES CONTAINED IN THE GUC TRUST BRIEF.......................22

    A. The GUC Trust's Inconsistent Statements
Regarding GM Canada's Financial Condition....................................................22

    B. The Inconsistencies Relating to the
Committee's Knowledge of the Lock-Up Agreement .......................................23

    C. Distortions Respecting the Role of Old GM Employees and Advisors in the Lock-
Up Agreement Negotiations ..............................................................................26

    D. Old GM's Agreement to Support the Statutory Claim Was Not Improper ......................27

    E. The GUC Trust Distorts the Facts Relating to the Indifference Analysis .........................28

    F. The GUC Trust Distorts the Facts Relating to the Assignment of the Swaps .................29

CONCLUSION.............................................................................................................................30

## TABLE OF AUTHORITIES

Page(s)

CASES

*Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*,
   401 B.R. 598 (S.D.N.Y. 2009)................................................................................................8

*Ciaramella v. Reader's Digest Ass'n., Inc.*,
   131 F.3d 320 (2d Cir. 1997)..................................................................................................8

*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*,
   340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated sub nom. on other grounds*, *Enron
   Corp. v. Springfield Assoc., L.L.C. (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y.
   2007) ...................................................................................................................................19

*GSBSB, Inc. v. N.Y. Yankees*,
   862 F. Supp. 1160 (S.D.N.Y. 1994)......................................................................................8

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995)..................................................................................................21

*In re Ames Department Stores*,
   274 B.R. 600 (Bankr. S.D.N.Y. 2002) ................................................................................11

*In re Koneta*,
   357 B.R. 540 (Bankr. D. Az. 2006) ....................................................................................11

*In re NextWave Pers. Commc'ns Inc.*,
   244 B.R. 253 (Bankr. S.D.N.Y. 2000) ..........................................................................11, 20

*Longacre Master Fund, Ltd. v. ATS Automation Tooling Sys. Inc.*,
   456 B.R. 633 (S.D.N.Y. 2011)............................................................................................19

*McCord v. Agard (In re Bean)*,
   251 B.R. 196 (E.D.N.Y. 2000), *aff'd*, 252 F.3d 113 (2d Cir. 2001)....................................20

*Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*,
   114 F.3d 379 (2d Cir. 1997)................................................................................................11

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.
   (In re Sunbeam)*,
   284 B.R. 355 (Bankr. S.D.N.Y. 2002) ................................................................................21

*Reprosystem, B.V. v. SCM Corp.*,
   727 F.2d 257 (2d Cir. 1984)..................................................................................................8


STATUTES AND RULES

11 U.S.C. § 363.................................................................................................................11, 20

11 U.S.C. § 502(d) ...............................................................................................................19

11 U.S.C. § 549..................................................................................................................11, 20

Rule 9019 of the Federal Rules of Bankruptcy Procedure ............................................................7

Rule 30(b)(6) of the Federal Rules of Civil Procedure.................................................................25

Rule 60(b) of the Federal Rules of Civil Procedure .....................................................................2

## PRELIMINARY STATEMENT[1]

Regardless of how the GUC Trust has tried to contort this matter, bottom line, it is a claims objection proceeding.  The Noteholders filed claims based on a Guarantee, issued by Old GM in 2003.  JSF, ¶ 4.  The GM Nova Scotia Trustee filed a Statutory Claim, premised on GM Nova Scotia (wholly owned by Old GM) being organized as a Nova Scotia unlimited liability company ("**ULC**") in 2001.  JSF, ¶ 2.

Nevertheless, the trial was ***not*** focused on the validity of the Guarantee Claims or the Statutory Claim (collectively, "**Claims**").  Instead, the GUC Trust misdirected the focus on the Lock-Up Agreement,[2] which is only tangentially related to the Claims.  Under the Lock-Up Agreement, while Old GM agreed not to challenge the Claims, it preserved the right for the Committee and others to do so.  Also, while Old GM acknowledged that the Lock-Up Agreement would not impair the validity or amount of the Claims, it did not create new claims or purport to allow the Claims.  In other words, the Lock-Up Agreement had no impact on the *bona fides* of the Claims.

The GUC Trust's repeated incantation, never explained -- that the Lock-Up Agreement created over $2.6 billion of claims against Old GM[3] -- is demonstrably false.  Broken down to its components: (a) the Guarantee Claims against Old GM were created approximately six years ***before*** the Lock-Up Agreement; and (b) the Statutory Claim is based on the ULC structure,

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Joint Statement of Facts of Certain Noteholders, the GM Nova Scotia Trustee and New GM*, May 24, 2013 [ECF No. 12437] ("**Joint Statement of Facts**," or "**JSF**"), or in the *Opening Post-Trial Brief of General Motors LLC*, May 24, 2013 [ECF No. 12435] ("**New GM Brief**"), whichever is applicable.  The GUC Trust's Post-Trial Brief, filed on May 24, 2013 [ECF No. 12438] shall be referred to herein as the "**GUC Trust Brief**."

[2]  The essence of the Lock-Up Agreement was ***never*** the creation or allowance of claims against Old GM.  Rather it was to bind a substantial block of Noteholders to vote on an Extraordinary Resolution whereby, in exchange for the payment of a Consent Fee, they would agree that GM Nova Scotia could compromise the Intercompany Loans, which, in turn, allowed GM Canada to avoid filing for bankruptcy. Def. Tr. Ex. 187.

[3]  *See* GUC Trust Rule 60(b) Motion [ECF No. 12419], p. 7; GUC Trust Rule 60(b) Reply [ECF No. 12456] ("**Rule 60(b) Reply**"), pp. 4-5.

which was created approximately eight years **before** the Lock-Up Agreement. If there was **no** Lock-Up Agreement, GM Canada would have filed for bankruptcy, which unquestionably would have led to a GM Nova Scotia bankruptcy filing. Thus, the Lock-Up Agreement did not increase the likelihood of the ultimate assertion of the Statutory Claim. Similarly, if there was **no** Lock-Up Agreement, the Swaps portion of the Statutory Claim would still exist because the Swaps were created as part of the original 2003 transaction in which the Notes were issued, and the related claim against Old GM was created when Old GM sold the Swaps pursuant to the MSPA (not the Lock-Up Agreement).

The GUC Trust's misdirected focus on the Lock-Up Agreement had two obvious purposes. **First**, it allowed the GUC Trust to "concoct" its equitable subordination claims against the Noteholders. **Second**, it allowed the GUC Trust to manufacture a "hook" to undermine the release of the Intercompany Loans in favor of GM Canada in an improper effort to foment litigation between the purchaser under the 363 Sale and the Noteholders, with the potential by-product being additional 363 Sale consideration paid by New GM to the GUC Trust to make the problem go away. This latter reason -- a litigation tactic designed to retrade the terms of the 363 Sale -- is outside the scope of the GUC Trust's charter. It also necessitated New GM becoming an active participant in this claims proceeding.[4]

As in prior submissions, New GM will not address the merits of the Claims. Rather, its focus will be on clearing away the underbrush of irrelevant or misstated facts raised by the GUC Trust, primarily relating to the Lock-Up Agreement, so that, four years after the Sale Order,

---

[4]    In its Rule 60(b) Reply (p. 1 thereof), the GUC Trust refers to New GM's concerns as "overheated rhetoric." But, later on, (pp. 19-20 thereof), the GUC Trust reveals its true intentions against New GM by suggesting that, if this Court granted Rule 60(b) relief (or, presumably, other relief requested by the GUC Trust relating to the Lock-Up Agreement), it could potentially negate the settlement of the Intercompany Loans. And, according to the GUC Trust, if that occurred, the Court having exercised jurisdiction to grant such relief, would somehow not have jurisdiction to interpret the impact of its own ruling on the parties to the Lock-Up Agreement. That, in a nutshell, is **exactly** what New GM **does not want** to see happen here.

nothing is done in this claims proceeding to adversely affect the benefits obtained by New GM under the Sale Order.

The hodgepodge of belated "grievances" raised by the GUC Trust relating to the Lock-Up Agreement should be viewed through the prism of (a) whether the grievances ultimately impacted the consideration (the "**Unsecured Creditor Consideration**")[5] paid to Old GM's bankruptcy estate under the 363 Sale, and (b) whether they increased unsecured claims against Old GM. Since, as demonstrated below, the answers to these questions are ***no***,[6] the GUC Trust has no valid basis or reason to challenge the Lock-Up Agreement.

The GUC Trust's major grievance about the Lock-Up Agreement concerns the Consent Fee paid to the Noteholders. But, the inescapable conclusion is that the payment of the Consent Fee did not negatively impact the Unsecured Creditor Consideration, nor did it increase the unsecured claims against Old GM. The purchaser of Old GM's assets (the Governments and ultimately New GM) wanted to acquire GM Canada without the necessity of a Canadian bankruptcy proceeding. *See* Buonomo Direct Test., ¶ 29. This was accomplished by the Lock-Up Agreement and the result was a simplified acquisition structure whereby GM Canada was purchased in a stock transaction (instead of a separate bankruptcy asset sale). The MSPA, which was approved by the Court, reflects this outcome and structure. The GUC Trust has no standing to complain about this result which, in any event, has no bearing on the validity of the Claims.

The GUC Trust argues that various transactions relating to the payment of the Consent Fee should be "collapsed". GUC Trust Brief, pp. 43-44. But, even if there was a legal basis to

---

[5]    The Unsecured Creditor Consideration was: (a) a fixed amount of cash to wind down Old GM after the 363 Sale, (b) a minority equity interest in New GM, and (c) the Term Loan Avoidance Action. ***All*** other assets (except specifically identified Excluded Assets) were sold to New GM.

[6]    The fact that the GUC Trust's grievances do not impact the unsecured creditors underscores that they were raised for the improper, two-fold purpose set forth above. Rhetoric by the GUC Trust, such as that the Noteholders were "unjustly enriched at the expense of all other unsecured creditors" (GUC Trust Brief, p. 1), is simply hollow and without any basis.

do so (there is none), the Unsecured Creditor Consideration would not have increased. The funds used to pay the Consent Fee came from the Governments' loans to Old GM and, if returned, would simply have been turned over to New GM pursuant to the MSPA or to the DIP Lenders (the Governments) pursuant to the DIP Facility. JSF, ¶¶ 70, 80. Under no circumstances would those funds have been part of the Unsecured Creditor Consideration.

In addition, the GUC Trust complains that, because of the Consent Fee, the Noteholders obtained a greater recovery than the Old GM bondholders. That is true, but it was not inappropriate; the Noteholders were ***not*** similarly situated to Old GM bondholders. They had other sources of recovery from entities other than Old GM; specifically, GM Nova Scotia, and indirectly, from GM Canada, because of the Intercompany Loans. Moreover, it was the Governments who essentially paid the incremental amount to the Noteholders, and, for the reasons stated in the Sale Approval Decision (at pages 44-45 thereof), they, as the purchasers under the 363 Sale, had the indisputable right to do so.

Another meritless grievance is that the Old GM representatives who negotiated the Lock-Up Agreement were "tainted." But the GUC Trust never connects how that alleged "taint" negatively impacted the Unsecured Creditor Consideration or increased unsecured claims against Old GM. Certainly, nothing in the trial record suggests that Old GM's representatives were tainted in favor of the Noteholders. Rather, the insinuation is that they were tainted in favor of the Governments who would own New GM. But the GUC Trust never points to any provision in the Lock-Up Agreement which resulted from a "taint" in favor of the Governments. To be sure, employees of Old GM (who now work for New GM) participated in discussions with the Governments[7] in which it was decided that the Governments' collateral proceeds would be used

---

[7]    Indeed, Canadian and U.S. Government officials were on-site at Weil Gotshal on the evening of May 31, 2009 and received periodic reports on the Lock-Up Agreement negotiations. JSF, ¶ 45; Buonomo Direct Test., ¶ 40.

to fund the $450 Million Loan so that GM Canada would not have to file for bankruptcy. But, avoiding a GM Canada bankruptcy was favorable from the perspective of Old GM. Among other things, the going concern value of GM Canada's assets was maintained, significant tax attributes for Old GM were preserved, and the execution risk relating to the timing of the 363 Sale was substantially reduced. JSF, ¶ 22. Moreover, Old GM's equity in GM Canada was enhanced by the substantial discount achieved in the compromise of the Intercompany Loans.

Confronted with the fatal flaws in its primary arguments, the GUC Trust retreats to lashing out at the Governments. Ironically, the GUC Trust invokes the same arguments unsuccessfully asserted by hold-out bondholders at the Sale Hearing (they wanted the higher recovery paid to others). Indeed, throughout this proceeding, New GM has been required to defend against the GUC Trust's scattershot attacks on the conduct of entities who were not present at the trial. First it was Old GM and its counsel, Weil Gotshal, and the way they conducted the bankruptcy proceedings. Now, in its post-trial briefing, the additional targets (also not present at trial) are the Governments. But, the GUC Trust simply cannot ignore the critical, constructive role that the Governments had (a) in preserving Old GM as a going concern in the six months prior to the Petition Date by being the "lender of last resort" and making loans to Old GM in excess of $20 billion (Def. Tr. Ex. 158, ¶¶ 54, 65, 105), (b) in extending $33 billion in DIP financing to keep Old GM afloat until it could close the 363 Sale (Def. Tr. Ex. 213), and (c) in paying a substantially above market price for Old GM's assets, motivated not by economic gain, but in order to save the domestic auto industry in the United States and Canada (Sale Approval Decision, p. 15). As the Court recognized, if not for the Governments, Old GM would have liquidated and unsecured creditors would have *received nothing*. Sale Approval Decision, pp. 2-3, 14-15.

The GUC Trust now asserts that to point out that reality -- the Governments kept Old GM from a disastrous liquidation -- is the equivalent of saying the Governments "bullied" the Old GM creditors into accepting the 363 Sale terms.[8]  The GUC Trust supports that contention by taking Committee counsel's remarks describing the 363 Sale as a "freight train coming down the tracks" (Rule 60(b) Reply, p. 2) totally out of context.  Committee counsel used that phrase at his deposition (Tr. 10/03/12 (Mayer) at 13:25-14:7) with reference to the support, given just prior to the Petition Date, by the ad hoc group of bondholders for the 363 Sale proposed by the Governments.  *See* Form 8-K filed by Old GM, dated May 28, 2009.  With that level of support from key economic players, there was strong momentum to consummate the deal, as proposed.  As such, it was like a "freight train coming down the tracks."  Simply put, what the GUC Trust labels as a "taint" in order to attack the role of the Governments is what any reasonable person would laud as commendable behavior in preserving Old GM's "lifeline" so that a deal could be timely approved and consummated, and its business could survive as a going concern, through New GM, for the benefit of all constituencies.

The GUC Trust also makes the specious suggestion that New GM and the Noteholders were participants in a conspiracy to conceal the Lock-Up Agreement from the Committee and the Court.  No evidence whatsoever supports that contention.  Among other things, the Disclosure Schedules, which discuss the terms of the Lock-Up Agreement, and the July 29, 2009 conversation between Committee counsel and a Noteholder, in which the Lock-Up transaction was discussed, specifically contradict the "concealment" contention.  Further, it is ludicrous that the GUC Trust's "concealment" allegation is directed at the Purchaser under the 363 Sale and the Noteholders, neither of whom were involved in providing notice of, or disclosures regarding, the

---

[8]    Rule 60(b) Reply, p 6, n. 19.  In that same footnote, the GUC Trust conflates New GM with Old GM when it states that New GM (as compared to Old GM) had a "duty to the Court to disclose all of the material terms of the transaction."

363 Sale.  Of course, it was Old GM and its counsel, Weil Gotshal, which made the decision not to seek Court approval of the Lock-Up Agreement.[9]  But, under any circumstance, the GUC Trust's "concealment" theory was totally "shot down" by Committee counsel's testimony in which he ultimately conceded that **all** relevant facts relating to the Lock-Up Agreement were disclosed to (and reviewed by) the Committee prior to the closing of the 363 Sale.[10]

In Part I hereof, New GM will, among other things, provide other illustrations as to why the GUC Trust's grievances relating to the Lock-Up Agreement are without merit.  As part of this analysis, New GM will show how far afield many of these grievances are to the claims at issue in this proceeding.  In Part II, New GM will correct factual misstatements or distortions made by the GUC Trust, and highlight certain inconsistencies in their arguments.

---

[9]  It is hard to leave this point without saying something in Weil Gotshal's defense, given that the GUC Trust's assertions are necessarily an attack on the firm's conduct.  The Lock-Up Agreement was, in Weil Gotshal's (and everyone else's) view, a prepetition transaction.  Smolinsky Dep., 15:10-16:11.  Thus, Bankruptcy Rule 9019 was not implicated.  In any event, Old GM was not paying anything under the Lock-Up Agreement, nor was it releasing or allowing claims.  The Lock-Up Agreement was consummated before the Sale Hearing (the Extraordinary Resolution was passed on June 25, 2009), so there was nothing explicit to be done at the Sale Hearing.  Prior to the Sale Hearing, Old GM filed the June 1, 2009 Form 8-K which described the Lock-Up Agreement, and also described the Lock-Up Agreement in Schedule 6.2 of the Disclosure Schedules to the MSPA.  Weil Gotshal undoubtedly assumed that the Committee had reviewed the documents (they did) and would have asked about the Lock-Up transaction if they wanted to.  During the pre and post-petition period, non-debtor subsidiaries were operating and paying their debts.  Accordingly, there was nothing inherently wrong with non-debtor GM Canada using its funds to compromise its intercompany debt with non-debtor GM Nova Scotia, particularly given that it was described in the Disclosure Schedules and Old GM had received Court permission to fund GM Canada and to borrow $33 billion under a DIP facility, in part, to support GM Canada.  With the benefit of hindsight, Weil Gotshal might wish that it had expanded on its remarks at the June 1, 2009 first day hearing about the recent GM Canada settlements, or at the June 25, 2009 hearing where a DIP Facility amendment was discussed (in part, to alleviate a default which might be caused by a Lock-Up Agreement provision).  But, June/July, 2009 was a frenetic period and all Estate participants were keenly focused on the paramount objective of consummating the 363 Sale and saving Old GM's business.  Given the disclosures made, Weil Gotshal had every reason to believe that Committee counsel was aware of the transaction.  This dynamic, and not an "imagined" attempt to conceal anything from the Court, is what caused the issues relating to the Lock-Up Agreement to evolve as they did.

[10]  *See* New GM Brief, pp. 36-38.

## ARGUMENT

## POINT I.

## THE GUC TRUST'S GRIEVANCES REGARDING
## THE LOCK-UP AGREEMENT ARE WITHOUT MERIT

### A.    The Grievances Fail Because the Lock-Up
### Agreement Was a Prepetition Transaction

*All* of the witnesses who were involved in negotiating the Lock-Up Agreement testified that *all* of its terms were agreed to and finalized, and the Lock-Up Agreement was fully executed, prior to Old GM filing for bankruptcy.  JSF, ¶¶ 49-54.  *All* parties to the Lock-Up Agreement testified that they intended to be bound by the terms of the Lock-Up Agreement upon the release of their signature pages, which indisputably took place prepetition.  JSF, ¶ 49.  The GUC Trust can point to no negotiations or requested changes concerning the Lock-Up Agreement after 7:35 a.m. on June 1, 2009.  JSF, ¶ 53.  That is because there were none.  Accordingly, given that there was a formal, written agreement that was executed by all parties prepetition, the GUC Trust's citation to cases that discuss a party's intention to be bound *prior to* execution of an agreement are irrelevant.[11]

Moreover, it is not surprising that, while the GUC Trust asserts that "numerous" changes were made to the Lock-Up Agreement postpetition (GUC Trust Brief, pp. 18-19), it never identifies what those changes were.  The reason is self-evident once the potential changes are examined.  Specifically, Revised Demonstrative No. 4 highlights the three immaterial changes that may have been made to the Lock-Up Agreement after the bankruptcy filing.  JSF, ¶ 60.  One

---

[11]    *See, e.g., GSBSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1160, 1172 (S.D.N.Y. 1994) (discussing the factors the Second Circuit reviews "to determine whether the parties intended to be bound prior to executing a written contract"); *Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*, 401 B.R. 598, 618-19 (S.D.N.Y. 2009) (discussing whether a party intended to be bound absent a writing); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261-62 (2d Cir. 1984) (discussing parties' intention to be "bound prior to the execution of a formal, written contract"); *Ciaramella v. Reader's Digest Ass'n., Inc.*, 131 F.3d 320, 323 (2d Cir. 1997) (discussing whether parties intended to be bound "in the absence of a document executed by both sides").

was the relocation of a phrase that was agreed to prepetition but, while the phrase was moved prepetition, the phrase arguably was not deleted in its original spot until a later time. *Id.* The phrase itself related to the impact of the termination of the Lock-Up Agreement -- something that never occurred. The second change concerned releases for individual defendants in the Nova Scotia Litigation -- there was no substantive difference in the two versions, and this change did not concern Old GM. *Id.* The last change -- "the" was changed to "each" -- simply has no practical significance. *Id*. While the GUC Trust lumps the Extraordinary Resolution exhibit (to be approved by the Noteholders, not Old GM) into its argument that "numerous" changes were made to the Lock-Up Agreement, the language of the Extraordinary Resolution was merely copied from the Lock-Up Agreement. JSF, ¶ 61. It is undisputed that, prior to the bankruptcy filing, the parties to the Lock-Up Agreement agreed that the terms of the Extraordinary Resolution would conform to the Lock-Up Agreement. JSF, ¶¶ 48, 61. Revised Demonstrative No. 4 establishes that this was all that was done.

From the unsecured creditors' perspective, there is no economic significance to this "grievance" anyway. Even if the Lock-Up Agreement was a postpetition transaction (which it was not), the Unsecured Creditor Consideration was not negatively impacted by the Lock-Up Agreement, and, no new claims against Old GM were created by the Lock-Up Agreement. Moreover, under the Cash Management Order and the Sale Order, Old GM was authorized to enter into postpetition transactions with GM Canada. Def. Tr. Ex. 226, ¶ 58; JSF, ¶ 77. Further, under the DIP financing, Old GM was authorized to borrow money for the benefit of GM Canada. JSF, ¶ 79. Indeed, the Canadian Governments contributed over $9 billion as part of the 363 Sale for the benefit of preserving GM Canada as a going concern. JSF, ¶ 79. Also, under the MSPA, New GM ultimately purchased all rights and claims relating to transfers to and from

GM Canada, in order to maintain post-sale continuity within the corporate structure being purchased. JSF, ¶¶ 69, 73. Finally, the assumption of the Lock-Up Agreement rendered the pre/postpetition distinction relating to the Lock-Up Agreement moot.

In reality, the GUC Trust grievance is not that GM Canada avoided filing for bankruptcy because of the Lock-Up Agreement, or that GM Canada compromised the Intercompany Loans at a substantial discount. Those things were unquestionably favorable from the perspective of Old GM. The GUC Trust's real grievance is that a group of noteholders with indirect claims against a critical non-debtor subsidiary (GM Canada) received a higher recovery than Old GM bondholders who lacked such claims. Certainly, the Governments (as purchasers) perceived that the two bondholders groups were not similarly situated. They were ultimately prepared to use their funds to solve the issues relating to GM Canada, and they had every right to do so.

**B.      No Postpetition Action Taken in Connection with the
Lock-Up Agreement Affected the Unsecured Creditors**

The GUC Trust creates a pointless diversion by referring to certain alleged postpetition acts by Old GM, which they label as unauthorized. The GUC Trust refers to the following actions: (a) the proceeds of the $450 Million Loan were supposed to be put in a trust account by GM Canada (they never were), and, after the Petition Date, Old GM allegedly still had an interest in those funds (GUC Trust Brief, pp. 42-43); (b) the $450 Million Loan Agreement was amended after the Petition Date, and somehow (although it is never stated) those changes impacted the unsecured creditors (*id.* at pp. 59-60); (c) since, under the Lock-Up Agreement, distributions under the Swap Claim from the GM Nova Scotia estate were subject to subordination under certain conditions, and Old GM waived the right to offset the Swap Claim as against the Statutory Claim, somehow, some unspecified postpetition act based on these provisions impacted the unsecured creditors (*id.* at p. 60); (d) Old GM allegedly used its

10

corporate powers postpetition to cause GM Nova Scotia to file for bankruptcy and to cause GM

Nova Scotia to enter into a settlement that released GM Canada from its obligations under the

Intercompany Loans (*id.*); and (e) Old GM's funding of the Pension Escrow Agreement and the

FX Transaction that resulted in the repayment of the $450 Million Loan were allegedly

unauthorized postpetition acts (*id.* at pp. 47-49).  As demonstrated below, some of these acts

never occurred and none had any significance to unsecured creditors.[12]

### 1.      The Proceeds of the $450 Million Loan Never Went Into a Trust Account

The trial testimony was clear that the GM Canada account that received the $450 Million

Loan was a general account; not any type of trust or escrow account.  Old GM did not have any

dominion or control over this account.  It belonged exclusively to GM Canada, and was not

property of the Old GM estate.  JSF, ¶ 39.  Since GM Canada had control over the account where

the $450 Million Loan was transferred, the case law is clear that a debtor/creditor relationship

(and not a trust relationship) was established between Old GM and GM Canada.  *See, e.g.*, *In re*

*Ames Department Stores*, 274 B.R. 600, 623 (Bankr. S.D.N.Y. 2002).

Even if the proceeds had been put in a trust or escrow account, under the Cash

Management Order, Old GM was authorized, postpetition, to consummate trust and escrow

arrangements.  JSF, ¶ 77.  Further, even if the proceeds of the $450 Million Loan were

---

[12]  For the reasons set forth in New GM's Opening Brief, Section 363 of the Bankruptcy Code is inapplicable in this matter.  New GM Brief, pp. 21-25.  Clearly there was no postpetition "sale" or "lease" of property of the Old GM estate.  In addition, the GUC Trust cannot point to any property of the estate that was "used" by Old GM that would have required notice and hearing.  The cases cited by the GUC Trust are inapposite.  *See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (cancellation of insurance policy, which clearly was property of the estate, without notice and hearing was void); *In re Koneta*, 357 B.R. 540, 542-44 (Bankr. D. Az. 2006) (even though one out of two post-petition modifications was not in the ordinary course and required court approval, the entire agreement was not void; the version of the earlier agreement remained valid and enforceable).  In *In re NextWave Pers. Commc'ns Inc.*, 244 B.R. 253 (Bankr. S.D.N.Y. 2000), the court was never confronted with a postpetition "use" of property.  Instead, the court set forth the uncontroversial finding that the debtor could not make a postpetition payment to the FCC based on a prepetition claim in the ordinary course of business.  *Id.* at 275.  While the *NextWave* court did state that "[a]ctions which violate Section 363 are 'void,'" it further stated that "unauthorized postpetition payments . . . on account of [a] prepetition claim would be ***avoidable*** . . . under Section 549."  *Id.* at 275-76 (emphasis added).

immediately returned to Old GM, the loan proceeds would have reduced the DIP borrowing or eventually would have gone to New GM. *Id.*, ¶ 70. They would **not** have been paid to the unsecured creditors. Further, under the DIP Loan, Old GM was authorized to lend to GM Canada. *Id.*, ¶ 79. So, if the loan proceeds were actually returned to Old GM, it was authorized to immediately lend the same amount back to GM Canada. And, the bottom line is that the $450 Million Loan was repaid. *Id.*, ¶¶ 95-105. Thus, there is no purpose to further analyze why the loan was not repaid in June 2009, when it was repaid five weeks later, on July 7, 2009.

### 2. The $450 Million Loan Agreement Was Amended Only Once Postpetition, and that Amendment Had No Impact on the Unsecured Creditors

There was only one postpetition amendment to the $450 Million Loan Agreement, not two. JSF, ¶¶ 46, 85. The only purpose of the June 3, 2009 postpetition amendment (the second amendment), as acknowledged by the GUC Trust, was to add a provision that the $450 Million Loan proceeds could be used by GM Canada to pay certain fees of the Noteholders. GUC Trust Brief, p. 21-22. The amendment did not relate to the use of Old GM's funds -- rather, it related to how GM Canada could use its funds. At this point, it is hard to conceive what is the purpose of the GUC Trust raising this issue, since the $450 Million Loan was repaid approximately four years ago. How the loan proceeds were actually used during the five weeks that the loan was extant is, as a practical matter, irrelevant.

The first amendment to the $450 Million Loan Agreement was a prepetition agreement and the GUC Trust's citation to the trial testimony of Mr. Buonomo does not support a contrary conclusion. Specifically, the first citation to Mr. Buonomo's testimony provides: "Q And the first amendment, what do you know about when it was signed? A From personal knowledge I can only say two things. One, I recall seeing it signed by at least one side that evening, and two, I was told it was consummated. That's what I know." Tr. 08/09/12 (Buonomo) at 85:25-86:5.

12

The second citation to Mr. Buonomo's testimony does not concern the timing of the first amendment. *Id.* at 86:25-87:6. Tellingly, the GUC Trust fails to cite Mr. Buonomo's testimony where he states that it was his belief that the first amendment was executed on May 31, 2009 (*id.* at 78:13-15), and that he was informed contemporaneously on June 1, 2009 that the amendment had been signed (*id.* at 84:12-85:16).

There similarly is no evidence that the first amendment was "backdated". The only purported "evidence" that the GUC Trust points to are two e-mails that have as attachments the amendments to the $450 Million Loan Agreement. Neither of these e-mails contain text explanations, nor do they state when the amendments were actually executed. *See* Pl. Tr. Exs. 135, 136. The first amendment to the $450 Million Loan Agreement discusses a 6:00 a.m. June 1, 2009 deadline to finalize the Lock-Up Agreement. Def. Tr. Ex. 150 (at NGM000004811). It makes no sense that a document would have been signed, postpetition, with a prepetition timing condition that was not met. In any event, the parties who signed the Lock-Up Agreement also signed the first amendment to the $450 Million Loan Agreement, so when their signature pages were released around 7:00 a.m. on June 1, 2009, the 6:00 a.m. deadline had been effectively overridden. Finally, putting aside the merits of the argument, it is unclear why this issue is important to unsecured creditors. As noted, the $450 Million Loan was repaid, and even if it was not, New GM, as the purchaser of Cash and Intercompany Obligations, acquired the economic interest in this intercompany transfer. JSF, ¶ 69. This was never an unsecured creditor issue.

### 3. The Subordination and Non-Setoff Provisions of the Swap Claim Were Not Postpetition Acts

There has not been a distribution from the GM Nova Scotia estate, so no postpetition action has ever been taken regarding the subordination provision relating to the Swaps. Nor has

13

the condition triggering subordination of the Swaps occurred.[13]  Moreover, the Swaps were sold

to New GM (New GM Brief, pp. 33-5), so this is not an Old GM issue.

Similarly, the Statutory Claim was not asserted until after the 363 Sale, and, thus, there

was no postpetition act prior to the 363 Sale relating to setoffs because there was nothing

asserted against Old GM to be setoff.  And, since the Swaps were sold to New GM as part of the

363 Sale, this is not an Old GM issue.

### 4.    Old GM Did Not Use Its Corporate Powers Postpetition

There is no evidence to suggest that Old GM ever used its corporate powers, postpetition,

to cause GM Nova Scotia to deliver its consent to the GM Nova Scotia bankruptcy proceeding.

The evidence that the GUC Trust points to for this assertion is Sections 6(a) and (b)(i) of the

Lock-Up Agreement.  GUC Trust Brief, p. 7 n. 25.  Section 6(a), however, does not concern the

consent needed for the GM Nova Scotia bankruptcy proceeding; it is the provision that contains

Old GM's acknowledgement of the Claims "to the fullest extent permitted under applicable

laws." Def. Tr. Ex. 187, ¶ 6(a).  Section 6(b)(i) of the Lock-Up Agreement does reference a

consent for the GM Nova Scotia bankruptcy proceeding.  However, this provision provides that

"the Company [defined in the Lock-Up Agreement as GM Nova Scotia – *not Old GM*] shall

provide the Holders with a consent to a bankruptcy order . . . ." *Id*., ¶ 6(b)(1).    Nowhere in

Section 6(b)(i) of the Lock-Up Agreement is there a requirement that Old GM use its corporate

powers to cause GM Nova Scotia to consent to the GM Nova Scotia bankruptcy proceeding.

That was patently unnecessary, given that GM Nova Scotia was itself a party to the Lock-Up

---

[13]    The subordination is triggered by a reduction in the Statutory Claim.  Def. Tr. Ex. 187, ¶ 6(b)(v).  The Lock-Up
Agreement does not fix the amount of the Statutory Claim, so the Agreement is imprecise as to when a
reduction in the Statutory Claim actually occurs.  In any event, the GUC Trust has not sought to invalidate the
Statutory Claim by "one penny", which was one of the irrelevant hypotheticals raised by the GUC Trust.  GUC
Trust Brief, p. 51 n. 268.  The GUC Trust has argued that the *entire* claim is duplicative of the Guarantee
Claims.  If the GUC Trust loses on this issue, the subordination provision is not triggered, and the Noteholders
will not receive the benefit of the Swaps component of the Statutory Claim.

Agreement.  In fact, the consent that accompanied the application to declare GM Nova Scotia bankrupt was executed by the directors of GM Nova Scotia -- not Old GM.  JSF, ¶ 115.[14]

In any event, the GUC Trust has never addressed the indisputable reality that, absent the Lock-Up Agreement, GM Canada would have filed for bankruptcy and, thereafter, would have had no ability to service the Intercompany Loans, leaving GM Nova Scotia without resources to pay the Notes.  Necessarily, that would have led to the bankruptcy of GM Nova Scotia and the assertion of the Statutory Claim.  Moreover, Old GM's bankruptcy filing accelerated the Notes (Def. Tr. Ex. 21), and the Noteholders themselves could have put GM Nova Scotia in an insolvency proceeding for this independent reason.

The GUC Trust references the June 25 Agreement as the basis for its argument that Old GM used its corporate powers, postpetition, for the settlement of the Intercompany Loans.  GUC Trust Brief, p. 60.  However, Old GM was not a party to the June 25 Agreement; the only parties to that agreement were GM Canada and GM Nova Scotia.  JSF, ¶ 87.  Thus, the GUC Trust has no evidentiary support for this assertion either.

### 5. The FX Transaction and Pension Escrow Agreement Were Authorized and Resulted in the Repayment of the $450 Million Loan

At trial, the GUC Trust essentially conceded that the balance of the $450 Million Loan was repaid by GM Canada on July 7, 2009, when it admitted that  the FX Transaction described in the D&A Memo actually occurred.  Tr. 3/06/13 (Lopez) at 151:7-152:22.  The D&A Memo described that Old GM received its share of the FX Transaction (CAD $1 billion) by the transfer

---

[14]  The GUC Trust references a consent to a bankruptcy order for GM Nova Scotia executed by Old GM as of June 1, 2009, referring to a facsimile header on the consent that indicates that it was faxed on June 8, 2009.  GUC Trust Brief, p. 23 n. 116; Pl. Tr. Ex. 450.  The fact that the consent was faxed by someone on June 8, 2009 is irrelevant since it does not demonstrate when the consent was actually executed.  Nonetheless, even if Old GM's consent was somehow required (it was not), as demonstrated in New GM's Opening Brief (pp. 23-24 thereof), at least two other Old GM subsidiaries commenced their bankruptcy cases months after the Petition Date, Old GM did not file any type of motion in connection with same, and the Committee never raised any issue about it.  *See* New GM Brief, pp. 23-24.

to the CIBC Account.  Def. Tr. Ex. 425.  As for GM Canada's share of the FX Transaction, it was relieved of two intercompany obligations owed to Old GM (the balance due on the $450 Million Loan, and the balance due on the Tax Refund), and it also received a transfer of approximately $113 million.  *Id.*; *see also* Lopez Direct Test., ¶ 7.  The contemporaneous books and records of GM Canada and Old GM evidence the repayment of the $450 Million Loan pursuant to the FX Transaction.  JSF, ¶ 105.

As described herein, the repayment of the $450 Million Loan effectively nullified most of the GUC Trust's arguments relating to the Lock-Up Agreement.  Now, in the post-trial briefing stage, the GUC Trust, in thrashing around for an alternative argument, asserts that (a) the FX transaction was unauthorized (GUC Trust Brief, p. 48), and (b) Old GM's support of a GM Canada obligation was unauthorized (*id.* at pp. 47-48).  Leaving aside the fact that a claims proceeding is not the proper forum to raise such allegations as to Old GM's conduct, the GUC Trust, as described below, is wrong on both arguments.

The Cash Management Order clearly permitted Old GM to enter into FX transactions with GM Canada and third parties.  JSF, ¶¶ 76, 77.  All that occurs in a FX transaction is that Old GM receives the equivalent amount in another currency (*i.e.*, CAD) that it had in U.S. dollars.  There is an exchange, not a transfer, of value.

The Old GM obligation to partially backstop GM Canada's pension obligation in the amount of CAD $1 billion was discussed by Old GM with the Governments prior to the Petition Date, when the Canadian Governments were attempting to address GM Canada's underfunded pension obligations.  Pl. Tr. Ex. 703.  The DIP Facility (in which the Canadian Governments were DIP Lenders) was expressly structured so that Old GM could borrow to pay for GM Canada obligations.  With respect to Old GM's obligation to backstop a portion of GM Canada's

16

pension obligations, the DIP Facility had a specific provision that the EDC (one of the DIP Lenders) would fund a CAD $1 billion Tranche "B" DIP advance for the specific purpose of making the Old GM pension escrow obligation. *See* Def. Tr. Ex. 213, at DEF0621 (discussing a $1 billion DIP draw to be advanced by the EDC that was to be converted into CAD $1 billion and placed into escrow); *see also* Pl. Tr. Ex. 708 and Tr. 3/06/13 (Lopez) at 176:18-179:1.[15]

The Cash Management Order also authorized the transfer of the CAD $1 billion to the CIBC Account. The Debtors explained in the Cash Management Motion that it was necessary to fund their subsidiaries so that they did not decrease in value, which would have caused significant harm to them. JSF, ¶ 75. Intercompany funding had the effect of maintaining GM Canada's value, and satisfying the Canadian Governments who were advancing over $9 billion as part of the 363 Sale. *Id.* Moreover, the Sale Order authorized transfers between Old GM and its subsidiaries in contemplation of the 363 Sale closing. Def. Tr. Ex. 226 (Sale Order), ¶ 58.

Thus, to succinctly answer the GUC Trust's allegation, (a) the Final DIP Order and DIP Facility; (b) the Cash Management Order; and (c) the Sale Order, all expressly provided for the funding by Old GM to backstop GM Canada's pension obligation.

Prior to executing the FX Transaction, GM Canada had received express written directions from an authorized officer of Old GM to transfer the CAD $1 billion to the CIBC Account in satisfaction of Old GM's pension escrow obligation to the EDC.[16] *See generally* Lopez Direct Testimony (and the exhibits referenced therein). Once those funds were transferred to CIBC, GM Canada no longer had an interest in them. Tr. 3/06/13 (Lopez) at 142:19-23. In

---

[15] Tyrone Lopez testified that the only CAD $1 billion escrow account that he was aware of at this time concerned the Pension Escrow Agreement. Tr. 3/19/13 (Lopez) at 12:9-15:5. The DIP Facility was not only for the benefit of Old GM, but was also expressly made for the benefit of, among other North American subsidiaries, GM Canada. JSF, ¶ 79.

[16] Old GM's obligation to the EDC to backstop GM Canada's pension obligation is well understood when viewed against EDC's commitment to fund over $9 billion as part of the 363 Sale transaction.

short, once the CAD $1 billion was transferred to the CIBC Account at Old GM's direction, the

FX Transaction was completed and the $450 Million Loan was repaid.

After the Sale Order was entered and, in preparation for the 363 Sale closing, there was

some confusion as to when and how Old GM's $1 billion pension escrow obligation would be

funded. Def. Tr. Ex. 516. As it turned out, when the $1 billion Tranche B DIP draw was drawn

by Old GM, it had already been decided by Old GM to fund its pension escrow obligation with

the FX Transaction. Def. Tr. Ex. 425. Accordingly, at the EDC's request, Old GM sent the

EDC a letter, acknowledging receipt of the $1 billion Tranche B DIP draw, and agreeing not to

use such funds in any way, until the EDC received satisfactory confirmation from CIBC that the

CIBC Account was fully funded by CAD $1 billion. Def. Tr. Ex. 519 (at WGM00174273-274).

After CIBC acknowledged to the EDC receipt of the CAD $1 billion on July 7, 2009 from the

FX Transaction, Old GM had unfettered use of the Tranche B $1 billion advance. Def. Tr. Ex.

524. Effectively, the Canadian Governments funded Old GM's Pension Escrow obligation

through advances made under the DIP Facility.

The GUC Trust's argument that the CIBC Account was a New GM account is wrong.

The GUC Trust cites to exhibits that pre-date the Pension Escrow Agreement. GUC Trust Brief,

p. 24 n. 122. While, at one point, it was originally contemplated that New GM would enter into

the Pension Escrow Agreement, as acknowledged by the GUC Trust, this never occurred. GUC

Trust Brief, pp. 24-25. Thus, referencing documents when New GM was contemplated as the

party to the agreement are irrelevant. The Pension Escrow Agreement, itself, provides that the

CIBC Account was for the benefit of Old GM, and not New GM. Def. Tr. Ex. 474. Only upon

the closing of the 363 Sale, did the CIBC Account get transferred to New GM as a Purchased

Asset.  Ultimately, when the CIBC Account was disbursed in September, 2009, the funds were returned to New GM, as the then-distributee under the Pension Escrow Agreement.

Clearly, the $450 Million Loan was repaid.  But, even if it were not, the economic impact of the failure to repay the $450 Million Loan was on New GM, which bought Intercompany Obligations and Cash.  The Unsecured Creditor Consideration was not impacted by this issue.

## C.    The Consent Fee is Not an Avoidable Postpetition Transfer

The trial evidence was clear that the proceeds of the $450 Million Loan were transferred from Old GM to GM Canada on May 29, 2009 -- three days before the Petition Date.  JSF, ¶¶ 37-39.  The funds went into a GM Canada operating account, not a trust or escrow account.  JSF, ¶ 39.  GM Canada used the funds to settle the Intercompany Loans at a substantial discount.  GM Nova Scotia transferred those funds to the Fiscal and Paying Agent, who paid the Noteholders the Consent Fee.[17]  No estate property of Old GM was ever used to pay the Consent Fee.  GM Canada, as the recipient of the $450 Million Loan, was not a conduit to pay the Noteholders. GM Canada had a substantial obligation to GM Nova Scotia and used the loan proceeds to settle that obligation.  GM Canada repaid the $450 Million Loan in full within five weeks.  From Old GM estate's perspective, the repayment of the $450 Million Loan moots all financial issues relating to the $450 Million Loan.[18]

---

[17]    In its Opening Brief, New GM demonstrated why the GUC Trust cannot use Section 502(d) of the Bankruptcy Code defensively or otherwise because the avoiding power claims it seeks to use were sold to New GM pursuant to the MSPA.  *See* New GM Brief, pp. 26-28.  The cases cited by the GUC Trust are inapposite: they do not concern a situation where an avoiding power claim was sold by the debtor.  *See Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180, 191 (Bankr. S.D.N.Y. 2006), *vacated sub nom. on other grounds*, *Enron Corp. v. Springfield Assoc., L.L.C. (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007) (discussing use of Section 502(d) when the trustee's avoidance claim is time-barred; the holder of the claim, not the debtor, assigned the claim to a third party); *Longacre Master Fund, Ltd. v. ATS Automation Tooling Sys. Inc.*, 456 B.R. 633, 640-41 (S.D.N.Y. 2011) (discussing an avoidance action where the claimant had assigned its claim; the debtor did not sell the avoidance action).

[18]    The GUC Trust improperly contends that "Old GM Controller's office acknowledged that the Consent Fee 'effectively represented an actual return on the bondholders' investment.'"  GUC Trust Brief, p. 65 and n. 323 (citing to Pl. Tr. Ex. 152).  However, the full text of the relevant section of this exhibit provides as follows: "***While*** this payment ***may*** effectively represent an actual return on the bondholder's investment due to [GM

     **1.**     **The Payment of the Consent Fee is Not Avoidable**
            **Pursuant to Section 549 of the Bankruptcy Code**

If the Consent Fee was a postpetition payment, it would be, at most, a Section 549 issue, and not a Section 363 issue. As such, it is beyond debate that the relevant issue is whether the payment of the Consent Fee was "avoidable," not "void". *See McCord v. Agard (In re Bean)*, 251 B.R. 196, 204 (E.D.N.Y. 2000), *aff'd*, 252 F.3d 113 (2d Cir. 2001); *In re NextWave Pers. Commc'ns Inc.*, 244 B.R. at 275-76. Section 549 Avoidance Claims by or to any Purchased Subsidiary were sold to New GM as part of the 363 Sale. Thus, even assuming the transaction that resulted in the payment of the Consent Fee was somehow avoidable (it was not), it was never voided prior to being transferred to New GM as part of the 363 Sale.

The GUC Trust attempts to rely on language in the $450 Million Loan Agreement as a basis for the Court to find that Section 549 of the Bankruptcy Code is implicated. But the GUC Trust mis-cites the relevant language. Contrary to the GUC Trust's contention, the sole purpose of the $450 Million Loan was ***not*** to pay the Consent Fee, but was clearly stated as being for "the sole purpose of settlement and extinguishment of all amounts owing under the Loan Agreements to GM Nova Scotia . . . ." Pl. Tr. Ex. 134, at NGM000000602.[19] That, of course, was what Old GM and the Governments cared about and sought to accomplish by the Lock-Up Agreement. Moreover, the fact that certain elements of the $450 Million Loan Agreement may or may not

---

Nova Scotia's] expected bankruptcy, ***the bondholders still have a full, unimpaired claim***. [GM Nova Scotia] ***remains fully and legally liable under the terms of the outstanding notes***, and therefore this debt should not be reduced." Pl. Tr. Ex. 152 (emphasis added). What the Controller's office acknowledged was that the Noteholders had a full, unimpaired claim based on the Notes.

[19] The GUC Trust cites to Pl. Ex. 134 at NGM000000596, asserting that this is a copy of the $450 Million Loan Agreement (GUC Trust Brief, p. 42 n. 238); it is not. It is a copy of the Approval Note for the $450 Million Loan. Moreover, the Approval Note clearly states, on the same page referenced by the GUC Trust, that "GM Corp [is] to loan [GM Canada] funds necessary to settle [GM Canada's] obligations with [GM Nova Scotia]. In turn, [GM Nova Scotia] will use proceeds to settle obligations with bondholders resulting from bond exchange." Next, the GUC Trust cites to Pl. Ex. 134 at NGM000000602, but it uses ellipses to omit critical language. The full quote is as follows: "[Old GM] is desirous of providing a loan to [GM Canada] ***for the sole purpose of settlement and extinguishment of all amounts owing under the Loan Agreements*** to GM Nova Scotia on the terms and conditions herein, the proceeds of which GM Nova Scotia shall use for the sole purpose of funding the Proposed Amendment." (Emphasis added.)

have been satisfied as of the Petition Date is of no moment.  The $450 Million Loan was repaid

four years ago.  And, even if the $450 Million Loan was not repaid, upon the closing of the 363

Sale, such claim belonged to New GM.  JSF, ¶¶ 69, 70.

### 2.    The Collapsing Doctrine is Inapplicable

While the GUC Trust refers to the "collapsing" doctrine as support for its argument that

the payment of the Consent Fee is avoidable, it never articulates the actual test for that doctrine.

As set forth by New GM in its Opening Brief, under the collapsing doctrine,

> the consideration received from the first transferee must be reconveyed by the
> debtor for less than fair consideration or with an actual intent to defraud creditors.
> If, instead, the debtor retains the proceeds from the first exchange, reconveys
> them for fair consideration, or uses them for some other legitimate purpose,
> including the preferential repayment of pre-existing debt, and if the debtor does
> not make the subsequent transfer with actual fraudulent intent, then the entire
> transaction, even if "collapsed," cannot be a fraudulent conveyance, because it
> does not adversely affect the debtor's ability to meet its overall obligations.

*HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).  The GUC Trust's conclusory

allegations aside, the purpose of the $450 Million Loan was to provide GM Canada with enough

funds to settle the Intercompany Loans at one-third of their value – this was unquestionably a

"legitimate purpose."  *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan

Stanley & Co., Inc. (In re Sunbeam)*, 284 B.R. 355, 371 (Bankr. S.D.N.Y. 2002).  Moreover, in

exchange for the $450 Million Loan, Old GM received a valid promissory note from GM

Canada.  JSF, ¶ 37.  Lastly, the $450 Million Loan was ultimately repaid in full prior to the

closing of the 363 Sale.   As there was nothing left to avoid, the collapsing doctrine is

inapplicable to this situation.

Finally, even if one could collapse the transaction, the recovery belongs to the DIP

lenders, not the unsecured creditors.  Simply put, the GUC Trust should not be able to use a

claim, even defensively, when that claim was previously transferred to a third party, whether that third party is New GM or the DIP Lenders.

## POINT II.
## THE NUMEROUS FACTUAL MISSTATEMENTS AND INCONSISTENCIES CONTAINED IN THE GUC TRUST BRIEF

This section will highlight misstatements and inconsistencies which undercut the GUC Trust's arguments.

**A.      The GUC Trust's Inconsistent Statements Regarding GM Canada's Financial Condition**

In its pre-trial brief, the GUC Trust claimed that it would demonstrate at trial that, in June 2009, GM Canada was solvent and could have paid the Intercompany Loans in full.  GUC Trust Pre-Trial Brief, p. 3.  Left unstated but implied was the meritless assertion that, somehow, Old GM was at fault, in its business judgment, for convincing the Governments to lend it money so that a "solvent" GM Canada could get the benefit of a 65% discount on a substantial contractual debt.

In a complete reversal of its previous position, the GUC Trust, in advancing an equitable subordination argument against the Noteholders in its Post-Trial Brief, now argues that GM Canada was hopelessly insolvent, and the Intercompany Loans were worthless and would have been paid nothing.  GUC Trust Brief, pp. 15-16.  Therefore, the payment of the Consent Fee was a wasteful expenditure.  These diametrically opposite statements cannot be reconciled.

Moreover, there is no basis to upset the judgment of the Governments that their goals were furthered by authorizing and funding the Lock-Up Agreement transaction.  While Old GM did tell the Noteholders during the course of negotiating the Lock-Up Agreement that, if GM Canada was forced to file for bankruptcy protection in Canada on June 1, 2009, GM Canada's intention was to not pay GM Nova Scotia any distribution on account of the Intercompany

Loans, Old GM knew that such a course of action would have been met by strenuous opposition

by the Noteholders (JSF, ¶ 26), and there was no assurance that GM Canada's position would be

vindicated consistent with the schedule mandated by the Governments to conclude the 363 Sale.

The Governments, as lenders to Old GM and GM Canada, and as the Purchaser of Old GM's

assets, decided to eliminate this execution risk and fund the settlement of the Intercompany

Loans embodied in the Lock-Up Agreement. JSF, ¶ 27.  As the Governments funded that

settlement, it was manifestly their decision to make.  In any event, that settlement benefitted

unsecured creditors.

**B.**    **The Inconsistencies Relating to the**
**Committee's Knowledge of the Lock-Up Agreement**

The GUC Trust repeatedly invokes the purported statement of Committee counsel,

Thomas Mayer ("**October 2009 Statement**"), in which he allegedly told a senior partner at Weil

Gotshal (Steven Karotkin): "You're telling me you expected a $2.6 billion settlement and a $350

million cash payment to be done with adequate notice by 8-K without actually bringing it to

court for approval on notice to parties? You got to be kidding." GUC Trust Brief, p. 59 n. 301;

Rule 60(b) Reply, p. 11.  The next month, in November 2009, Committee counsel filed a

pleading [ECF No. 4452] ("**November 2009 Pleading**") falsely stating that (a) the Committee

never heard of the Lock-Up Agreement until October, 2009, and (b) never read the June 1, 2009

8-K which described the Lock-Up Agreement until October, 2009.  *See* November 2009

Pleading, ¶¶ 8, 9.  After the trial evidence, one would have expected the GUC Trust to excise

that unsupportable statement from its argument, rather than continually referring back to it like it

was an excerpt from a learned treatise.

Breaking down the October 2009 Statement into its components, the first segment -- the

"alleged $2.6 billion settlement" -- is clearly wrong.  There was no $2.6 billion settlement.  The

Committee is challenging the Guarantee Claims and the Statutory Claim, and the Lock-Up Agreement preserved its right to do so. What is more, Committee counsel testified that he closely read the Interim Report issued by Old GM in August, 2009, which erroneously stated that the Claims were "allowed." Tr. 10/03/12 (Mayer) at 117:19-120:23. The Committee did nothing after reading that provision.[20] In addition, Committee counsel testified at trial that if the Committee had known of the Lock-Up Agreement in June, 2009 (it actually did), it would ***not*** have objected to the Sale Order.[21] *Id.* at 61:6-18.

The second component of the October 2009 Statement is the "$350 million payment." Committee counsel testified at trial that New GM bought cash, and if the Consent Fee was never paid, the cash would have gone to New GM or the DIP Lenders; it would not have gone to the unsecured creditors. JSF, ¶ 70. In other words, the payment of the $350 million did not affect the Unsecured Creditor Consideration.

The third component was the notice provided by the June 1, 2009 8-K. The implication, which is confirmed in the November 2009 Pleading, is that the Committee never read the June 1, 2009 8-K. Except, at trial, the Committee Chairman admitted that he read the June 1, 2009 8-K,[22] and Committee counsel said it was a standard form of diligence to review such documents

---

[20]  The Committee's inaction is particularly telling considering that the Interim Report was issued less than two weeks after a Noteholder allegedly "bragged" about the settlement obtained from Old GM.

[21]  The GUC Trust argued that Mr. Mayer's statement was made at his deposition and was read into the record at trial (Rule 60(b) Reply, p. 10 n. 28), as contrasted to Mr. Mayer having made the statement at trial. That is a distinction without a difference. Mr. Mayer was under oath at his deposition and the statement has inherent veracity since it was against the GUC Trust's interest for him to have made this telling admission.

[22]  The GUC Trust plays games when they cite to Mr. Vanaskey's testimony where he claims not to have read the June 1, 2009 8-K. Rule 60(b) Reply, p. 10 n. 28. The sequence of events is that Mr. Vanaskey first admitted on adverse direct that he read the June 1, 2009 8-K (Tr. 11/27/12 (Vanaskey) at 53:25-54:2), then on cross examination by the GUC Trust (right after the lunch break), he "volunteered" that he was mistaken (*id.* at 95:13-20), and then on re-direct he recanted and admitted that he read the June 1, 2009 8-K (*id.* at 97:25-98:9).

(Tr. 10/03/12 (Mayer) at 31:12-15), and that he assumed that lawyers at his firm read the June 1, 2009 8-K (*id.* at 57:10-15).[23]

The fourth component of the October 2009 Statement, that the Lock-Up Agreement was not set forth as part of the 363 Sale, was also disproved. The Lock-Up Agreement was discussed in detail in the Disclosure Schedules, which were part of the MSPA (Def. Tr. Exs. 204, 226). The Disclosure Schedules were reviewed by Committee counsel. Tr. 10/03/12 (Mayer) at 72:3-77:23. The GUC Trust now concedes the point that the Committee counsel refused to concede at trial: Schedule 6.2 of the Disclosure Schedules sets forth the "out of the ordinary course" transactions that New GM consented could be performed prior to the closing of the 363 Sale. GUC Trust Brief, p. 59. Of course, that makes Schedule 6.2 an important schedule because of its subject matter, and as such, it would have been carefully reviewed by Committee counsel and the Committee's financial adviser (FTI) when they received the Disclosure Schedules in early June, 2009.

The GUC Trust also reverses field when it argues that the reference to the Lock-Up Agreement in this Schedule is significant because that means the Lock-Up Agreement is an "out of the ordinary course" transaction. But in order to make its point, the GUC Trust conveniently glosses over the fact that the Lock-Up Agreement is referred to in Schedule 6.2 under the heading "Canadian Matters," and that it was included therein because Section 6.2 of the MSPA applied to, not just Old GM's business, but also "out of the ordinary course" transactions for GM Canada. Def. Tr. Ex. 204, at CC005655-56.

---

[23] The GUC Trust's attempt to emphasize Mr. Mayer's equivocation on what he actually knew is not helpful to its position. Rule 60(b) Reply, p. 7 n. 21. Mr. Mayer was the Rule 30(b)(6) deposition witness for his firm, even though others at his firm logged more hours on the Committee assignment during the relevant time period. Def. Tr. Ex. 301; Tr. 10/03/12 (Mayer) at 150:1-6. Mr. Mayer never fulfilled his obligations as a Rule 30(b)(6) witness by asking others at his firm what they actually did. Tr. 10/03/12 (Mayer) at 9:22-10:7. The GUC Trust's attempt to take advantage of Mr. Mayer's lack of knowledge caused by his failure to fulfill his duty as a Rule 30(b)(6) witness should not be countenanced.

The fifth component of the October 2009 Statement, the "you got to be kidding" remark, is more appropriately directed at the GUC Trust. In advancing an equitable subordination argument against the Noteholders, the GUC Trust refers to the July 29, 2009 conversation between a Noteholder (Dan Gropper of Aurelius) and Committee counsel. GUC Trust Brief, p. 12 n. 56. Specifically, the GUC Trust refers to Mr. Mayer's version of the conversation (which, at first, he could not recall) in which Dan Gropper allegedly "bragged" about the good deal that he received pursuant to the Lock-Up Agreement. *Id.* But, omitted by the GUC Trust was Committee counsel's further testimony that he told the Noteholder that it did not deserve the same deal in *Smurfit Stone* as it got from Old GM, thus revealing his knowledge at the time (months before the October 2009 Statement) about the existence of the Lock-Up Agreement (Tr. 10/03/12 (Mayer) at 113:3-114:1), and, according to Dan Gropper's testimony, the terms of the Lock-Up Agreement (Tr. 9/28/12 (Gropper) at 96:7-9).

**C.    Distortions Respecting the Role of Old GM Employees
and Advisors in the Lock-Up Agreement Negotiations**

Old GM's employees and advisors who negotiated the Lock-Up Agreement were not conflicted or motivated by self-interest. It is undisputed that each of them was employed or retained by Old GM prior to the bankruptcy and they acted at the direction of senior management to get the deal to the finish line for the purpose of preserving the business, avoiding liquidation, and securing a distribution to the unsecured creditors.

The GUC Trust distorts Mr. Buonomo's testimony (page 12 of the GUC Trust Brief), when it asserts that Mr. Buonomo "knew that there would be objections down the road [to the Lock-Up Agreement] from Old GM's creditors." When asked by the GUC Trust's counsel if he "knew that some day someone like me would be up here arguing against the lock-up agreement," Mr. Buonomo responded that he "knew some day someone like you would be up there arguing

26

about the *claims*. I must admit I ***did not*** foresee the arguments that we're dealing with." Tr. 08/10/12 (Buonomo) at 113:6-12 (emphasis added). The GUC Trust's argument that Mr. Ammann was tainted with self-interest is particularly disingenuous, given that he did not begin working for New GM until April, 2010 -- 10 months after the Petition Date. Tr. 09/27/12 (Ammann) at 114:11-114:17. Mr. Ammann was employed by Morgan Stanley prior to the Petition Date as financial advisor to Old GM and that assignment was substantially concluded by July 7, 2009. *Id*. at 181:18-23. There is no evidence that Mr. Ammann knew, as of the Petition Date, that he would later be employed by New GM.

The GUC Trust also argues that the Statement of Affairs for GM Nova Scotia should have been prepared by a current officer or director of GM Nova Scotia, or by Old GM, and not by New GM. New GM would have preferred that as well. But, as the GUC Trust well knows, all of the officers and directors of GM Nova Scotia (an Excluded Subsidiary) had previously resigned from GM Nova Scotia; there simply were no "current" officers or directors to complete this task. GUC Trust Brief, p. 30; Tr. 8/07/12 (Wedlake) at 99:8-13. In addition, pursuant to the Transition Services Agreement between Old GM and New GM that was approved pursuant to the Sale Order, New GM agreed to provide these types of services to Old GM. Tr. 8/10/12 (Buonomo) at 64:10-67:1. Accordingly, it was necessary and entirely consistent with the terms of the MSPA that New GM (with the assistance of GM Canada personnel) provide these services. Tr. 8/09/12 (Buonomo) at 146:6-23.

**D.**    **Old GM's Agreement to Support the Statutory Claim Was Not Improper**

The GUC Trust appears to take issue with the fact that the Lock-Up Agreement provided that Old GM would support the allowance of the Statutory Claim. GUC Trust Brief, p. 7. But the fact that it agreed to do so did not, in any way, limit the Committee's ability to contest this

claim on all appropriate grounds. The record of the Adversary Proceeding and claims proceeding is ample evidence of this.[24]

### E.      The GUC Trust Distorts the Facts Relating to the Indifference Analysis

The GUC Trust cites to the Indifference Analysis prepared by Old GM weeks before the execution of the Lock-Up Agreement, arguing that this analysis somehow demonstrates that the amount of the Consent Fee was too large, even though the upper limit of the range set forth in the Indifference Analysis was $441 million (over $70 million more than the Consent Fee). JSF, ¶ 29. The GUC Trust implies that this analysis considered the universe of relevant factors. (GUC Trust Brief, p. 14) Of course, the trial testimony demonstrated that was not true. While the Indifference Analysis was a "loosely defined attempt" to quantify an in-court versus out-of-court restructuring for GM Canada (JSF, ¶ 28), the analysis did not take into account numerous important factors, such as (i) the value of the Tax Refund; (ii) the Execution Risk; (iii) the Business Demand Risk; or (iv) the CAMI Financing Default. *Id.*, ¶ 30. The GUC Trust's argument also fails to recognize that Old GM sought approval to loan up to $490 million to GM Canada on May 29, 2009, which is over $200 million more than the indifference point. *Id.*, ¶ 37. At the end of the day, however, the Indifference Analysis is irrelevant. The decision respecting the amount of the $450 Million Loan evolved over time, and was made with the approval of the Governments. That the Governments (as the Purchaser of Old GM's assets) ultimately proved willing to pay more to keep GM Canada out of bankruptcy was their decision to make, and, as discussed above, not one that adversely effected the unsecured creditors in any way.

---

[24]    It is also surprising that the GUC Trust has taken issue with Old GM for agreeing to support the allowance of the Statutory Claim since the Chair of the Committee (Wilmington Trust), as well as Committee Counsel, each testified that they have, in other cases, supported the legal positions taken by the Noteholders in this case with respect to the Claims. Tr. 10/03/12 (Mayer) at 12:8-13:4; Tr. 11/27/12 (Vanaskey) at 78:16-20, 80:14-83:14.

**F.      The GUC Trust Distorts the Facts Relating to the Assignment of the Swaps**

The GUC Trust now admits that, as of the Petition Date, Old GM "owned the 'in the money' side of the Swaps," and that "two months before the Petition Date, GM Nova Scotia *owed* Old GM approximately CAD $632 million under the Swaps."[25]   GUC Trust Brief, p. 81 (emphasis added).   In addition, the GUC Trust admitted that "payments were *due* on the Swaps [in] December and July, 2009."   *Id.* at p. 23 n. 115 (emphasis added).   These admissions by the GUC Trust directly contradict statements made earlier by the GUC Trust that there was no outstanding obligation under the Swaps as of July 10, 2009.   *Id.* at p. 37 n. 210.   As now admitted by the GUC Trust, GM Nova Scotia did *owe* GM Canada an obligation under the Swaps as of the closing of the 363 Sale.   Thus, it cannot now be disputed that the Swap Claim was an Intercompany Obligation and, thus, a Purchased Asset under the MSPA that was transferred to New GM pursuant to the 363 Sale.[26]

The GUC Trust, however, still takes issue with the assignment of the Swaps to New GM. As explained in New GM's Opening Brief, the ISDA Master Agreement, the Schedules and the Confirmations were all one integrated agreement.   The Confirmations expressly provided that they constitute transactions pursuant to the ISDA Master Agreement, dated October 15, 2001. JSF, ¶ 111.   The ISDA Master Agreement was set forth on the Contract Database.   *Id.*   All

---

[25]   The amount owed by GM Nova Scotia to Old GM is corroborated by GM Nova Scotia's December 31, 2008 financial statement (Def. Tr. Ex. 398), the Form S-4 (Def. Tr. Ex. 75) and a periodic report filed by Old GM in its bankruptcy case on November 2, 2009 (Def. Tr. Ex. 423).   *See* JSF, ¶ 131.   The amount owed New GM pursuant to the Swap Claim is aptly demonstrated by the GM Nova Scotia Trustee in his post-trial briefs. Suffice it to say, the amount New GM believes is owed on the Swap Claim is set forth in its proof of claim filed in the GM Nova Scotia bankruptcy proceeding.   The evidence cited by the GUC Trust concerning New GM's purported view of the Swap Claim -- an e-mail by Dennis Prieto, who is affiliated with one of the Noteholders and not New GM (GUC Trust Brief, p. 34 n. 185) -- is irrelevant for this issue.

[26]   The GUC Trust can point to no provision of the MSPA that would demonstrate that the Swaps were an Excluded Contract.   The GUC Trust's shorthand description of Section 2.2(b)(vii) of the MSPA is inaccurate. That Section provides, in relevant part, that Excluded Contracts include "all prepetition Executory Contracts . . . that have not been designated as or deemed to be Assumable Executory Contracts in accordance with Section 6.6 or Section 6.31, or that are determined, pursuant to the procedures set forth in the Sale Procedures Order, not to be assumable and assignable to Purchaser . . . ."   As the Swaps were designated as Assumable Executory Contracts, they fall outside of this provision of the MSPA.

parties to the Swaps (Old GM, New GM and the GM Nova Scotia Trustee) acknowledge that the notation on the Contract Database concerns the Swaps and that same were assigned to New GM.[27]  *Id.*  In addition, as with the Lock-Up Agreement, the GUC Trust does not have standing to contest the assignment of the Swaps to New GM.

## CONCLUSION

For all of the foregoing reasons and for the reasons set forth in New GM's Opening Brief, New GM respectfully requests that the Court enter judgment, denying the relief requested in the Adversary Proceeding and in the Amended Claims Objection that affects New GM, and for such other and further relief as may be just and proper.  In particular, New GM requests that the Court not make any finding that would negatively impact the release given by GM Nova Scotia to GM Canada, and the dismissal of the Nova Scotia Litigation.

Dated:  New York, New York
      July 11, 2013

Respectfully submitted,


/s/ Arthur Steinberg
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Attorneys for General Motors LLC*

---

[27] The GUC Trust's reliance on Pl. Tr. Ex. 22 is clearly misplaced.  That exhibit contains an e-mail, dated July 30, 2009, wherein Mr. Buonomo indicates that the Swaps had not been assumed and assigned.  What the GUC Trust does not state is that the Swaps were designated as Assumable Executory Contracts on the Contract Database on August 3, 2009.  JSF, ¶ 111.  Mr. Buonomo's statements in the July 30, 2009 e-mail are entirely consistent with the uncontroverted facts.