GREENBERG TRAURIG, LLP
Bruce R. Zirinsky, Esq.
John H. Bae, Esq.
Gary D. Ticoll, Esq.
Paul T. Martin, Esq.
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
E-mail: zirinskyb@gtlaw.com
        baej@gtlaw.com
        ticollg@gtlaw.com
        martinpt@gtlaw.com

GREENBERG TRAURIG, LLP
Kevin D. Finger, Esq.
Bevin M. Brennan, Esq.
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
E-mail: fingerk@gtlaw.com
        brennanb@gtlaw.com

GREENBERG TRAURIG, LLP
Joseph P. Davis III, Esq.
One International Place
Boston, MA 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001
E-mail: davisjo@gtlaw.com

*Attorneys for Elliott Management Corporation, Fortress
Investment Group LLC and Morgan Stanley & Co.
International plc, and/or entities managed by them,
including Drawbridge DSO Securities LLC, Drawbridge
OSO Securities LLC, FCOF UB Securities LLC, Elliott
International LP and The Liverpool Limited Partnership*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------- x
In re                                          :    Chapter 11
                                               :
MOTORS LIQUIDATION COMPANY, et al.,            :    Case No. 09-50026 (REG)
      f/k/a General Motors Corp., et al.,      :
                                               :
                      Debtors.                 :    (Jointly Administered)
-------------------------------------------------------------------- x
MOTORS LIQUIDATION COMPANY GUC TRUST,          :
                                               :
                      Plaintiff,               :    Adversary Proceeding
                                               :
          v.                                   :    Case No.: 12-09802
                                               :
APPALOOSA INVESTMENT LIMITED                   :
PARTNERSHIP I et al.                           :
                                               :
                      Defendants.              :
                                               :
-------------------------------------------------------------------- x
```

**POST-TRIAL REPLY BRIEF OF ELLIOTT MANAGEMENT CORPORATION,
FORTRESS INVESTMENT GROUP LLC AND
MORGAN STANLEY & CO. INTERNATIONAL PLC, AND/OR ENTITIES
MANAGED BY THEM, INCLUDING DRAWBRIDGE DSO SECURITIES LLC,
DRAWBRIDGE OSO SECURITIES LLC, FCOF UB SECURITIES LLC,
<u>ELLIOTT INTERNATIONAL LP AND THE LIVERPOOL LIMITED PARTNERSHIP</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

RESPONSE TO CERTAIN FACTS ...................................................................... 6

ARGUMENT ........................................................................................................... 9

I.     The GUC Trust's 502(d) Objection Should Be Overruled ................................. 9

     A.     There Was No Transfer of Estate Property ............................................ 9

          1.     Old GM Did Not Have a Residual Interest in the Proceeds of the $450 Million Loan ................................................................. 9

          2.     The Collapsing Doctrine Does Not Apply ............................... 12

     B.     The GUC Trust's 502(d) Objection Must Be Overruled Because GM Canada Repaid the $450 Million Loan in Full to Old GM ................................. 13

     C.     The GUC Trust Lacks Standing to Assert its 502(d) Objection Because Old GM Sold the Avoidance Actions to New GM ................................... 14

     D.     The Payment of the Consent Fee is Not Avoidable Under Section 547 ............... 15

     E.     The Payment of the Consent Fee Is Not Avoidable Under Section 548(a)(1)(B) ................................................................................ 16

     F.     The Payment of the Consent Fee Is Not Avoidable Under Section 548(a)(1)(A) ................................................................................ 16

     G.     The Payment of the Consent Fee is Not Avoidable Under Section 549 ............... 18

     H.     The Payment of the Consent Fee Qualifies for Section 546(e) Safe Harbor ........ 19

II.     The GUC Trust Has Failed to Provide a Legal or Factual Basis to Equitably Subordinate or Disallow the Claims ................................................................. 21

     A.     The Lock-Up Noteholders Are Not Insiders ......................................... 21

     B     The GUC Trust has Failed to Prove Inequitable Conduct ..................... 24

     C.     The GUC Trust Failed to Establish Injury or Unfair Advantage ......................... 29

     D.     The Request for Equitable Subordination is Inconsistent With Bankruptcy Law ................................................................................................. 29

III.     The GUC Trust Has Failed to Provide a Legal or Factual Basis to "Recharacterize" the Consent Fee as a Principal Payment or to Reduce Claims by the Amount of the Consent Fee ........................................................ 30

     A.     "Recharacterization" is Not Available Under Section 502(b) of the Bankruptcy Code ................................................................. 30

     B.     The Lock-Up Agreement is a Valid Prepetition Agreement ................. 32

IV.     The Court Should Not Grant New GM's Request for an Advisory Opinion ................... 40

CONCLUSION ...................................................................................................... 40

# TABLE OF AUTHORITIES

## Federal Cases

*1500 Mineral Spring Assocs., LP v. Gencarelli*,
  353 B.R. 771 (D.R.I. 2006) ................................................................ 31

*Am Int'l, Inc. v. DataCard Corp.*,
  167 B.R. 110 (N.D. Ill. 1994), *aff'd*, 106 F.3d 1342 (7th Cir. 1997) ..................... 17

*Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y. Inc. (In re Andrew Velez
  Constr., Inc.)*,
  373 B.R. 262 (Bankr. S.D.N.Y. 2007) ..................................................... 17

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
  222 F. Supp. 2d 423 (S.D.N.Y. 2002) ...................................................... 17

*Bachrach Clothing, Inc. v. Bachrach (In re Bachrach Clothing, Inc.)*,
  480 B.R. 820 (Bankr. N.D. Ill. 2012) ...................................................... 13

*Barkley v. West (In re West)*,
  474 B.R. 191 (Bankr. N.D. Miss. 2012) .................................................... 15

*Bear Stearns Inv. Prods, Inc. v. Hitachi Auto. Prods. (USA), Inc.*,
  401 B.R. 598 (S.D.N.Y. 2009) ............................................................. 38

*Bozzuto's, Inc. v. Vescio*,
  234 F.3d 1261, No. 00-5040, 2000 WL 1715281 (2d Cir. Nov. 13, 2000)
  (unpublished opinion) .................................................................... 32

*Chariot Group, Inc. v. Am. Acquisition Partners, L.P.*,
  751 F. Supp. 1144 (S.D.N.Y. 1990), *aff'd*, 932 F.2d 956 (2d Cir. 1991) ................. 38

*Ciaramella v. Reader's Digest Ass'n*,
  131 F.3d 320 (2d Cir. 1997) .............................................................. 38

*Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation)*, 318 B.R. 147 (B.A.P. 8th
  Cir. 2004) ............................................................................... 31

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
  379 B.R. 425 (S.D.N.Y. 2007), *motion to certify appeal denied*, 06 CIV. 7828(SAS),
  2007 WL 2780394 (S.D.N.Y. Sept. 24, 2007) .......................................... 13, 25

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
  651 F.3d 329 (2d Cir. 2011) ......................................................... 5, 19, 20

*Fabricators, Inc. v. Tech. Fabricators, Inc. (In the Matter of Fabricators, Inc.)*,
  926 F.2d 1458 (5th Cir. 1991) ............................................................ 22

*Flexco Microwave, Inc. v. Megaphase LLC*,
  Civ. Act. No. 04-1339(TJB), 2009 WL 649654 (D.N.J. Mar. 6, 2009) ...................... 37

*GMAC Mtg. LLC v. Blitz Holding Corp. (In re IFS Fin. Corp.)*,
  No. 08–03047, 2008 WL 4533713 (Bankr. S.D. Tex. Oct. 2, 2008) ....................... 15

*GSGSB, Inc. v. N.Y. Yankees*,
  862 F. Supp. 1169 (S.D.N.Y. 1994)............................................................... 37, 38

*Gucci Am., Inc. v. Gucci*,
  No. 07 Civ. 6820 (RMB), 2009 WL 440463 (S.D.N.Y. Feb. 20, 2009)................ 38

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ...................................... 12, 13

*Heath v. Am. Express Travel Related Servs. Co., Inc. (In re Heath)*, 331 B.R. 424 (B.A.P.
  9th Cir. 2005) ....................................................................................................... 31

*Herzog v. Leighton Holdings, Ltd.*,
  239 B.R. 497 (N.D. Ill. 1999) ................................................................................ 22

*In re AEG Acquisition Corp.*,
  161 B.R. 50 (9th Cir. BAP 1993) ........................................................................... 22

*In re Featherworks Corp.*,
  25 B.R. 634 (Bankr. E.D.N.Y. 1982), *aff'd*, 36 B.R. 460 (E.D.N.Y. 1984) .......... 22

*In re Fesco Plastics Corp., Inc.*,
  996 F.2d 152 (7th Cir. 1993) .................................................................................. 31

*In re IAC/Interactive Sec. Litig.*, 695 F. Supp. 2d 109 (S.D.N.Y. 2010)................... 22

*In re Kids Creek Partners, L.P.*,
  212 B.R. 898 (Bankr. N.D. Ill. 1997), *aff'd*, 233 B.R. 409 (N.D. Ill. 1999), 200 F.3d
  1070 (7th Cir. 2000).............................................................................................. 22

*In re Mid-Am. Waste Sys., Inc.*,
  284 B.R. 53 (Bankr. D. Del. 2002) ......................................................................... 22

*In re Mktg. Assocs. of Am., Inc.*,
  122 B.R. 367 (Bankr. E.D. Mo. 1991)..................................................................... 15

*In re Morales Travel Agency*,
  667 F.2d 1069 (1st Cir. 1981)................................................................................. 10

*In re N&D Props., Inc.*,
  799 F.2d 726 (11th Cir. 1986) ................................................................................ 22

*In re NMI Sus. Inc.*,
  179 B.R. 357 (Bankr. D.D.C. 1995) ....................................................................... 22

*In re Oxford Health Investors, L.L.C.*., No. 00-80676C-7D, 2002 WL 31031631 (Bankr.
  M.D.N.C. Sep. 3, 2002) ......................................................................................... 22

*In re Premier Enm't Biloxi, LLC*,
  413 B.R. 370 (Bankr. S.D. Miss. 2009).................................................................. 32

*In re Quebecor World (USA) Inc.*,
  No. 12-4270-bk, 2013 WL 2460726 (2d Cir. June 10, 2013)....................... 5, 19, 21

*In re Windsor Constructors, Inc.*,
  No. 03-36589 (ELF), 2006 WL 4005568 (Bankr. E.D. Pa. Jan. 10, 2007) ........... 31

*In re Windsor Plumbing Supply Co., Inc.*,
    170 B.R. 503 (Bankr. E.D.N.Y. 1994)...................................................... 39

*Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*,
    913 F.2d 846 (10th Cir. 1990) ............................................................. 20

*Klos v. Polskie Linie Lotnicze*,
    133 F.3d 164 (2d Cir. 1997)................................................................. 30

*Kool, Mann, Coffee & Co. v Coffey*,
    300 F.3d 340 (3d Cir. 2002).................................................................. 32

*Lawrence v. Aurora Loan Servs. LLC*,
    No. CV F 09-1598(LJO), 2010 WL 364276 (E.D. Cal. Jan. 25, 2010)................................. 10

*LFD Operating, Inc. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.)*,
    274 B.R. 600 (Bankr. S.D.N.Y. 2002), *aff'd*, No. 02 Civ 6271(SHS), 2004 WL
    1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 144 Fed. Appx. 900 (2d Cir. 2005)................. 9, 32

*Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.)*,
    949 F.2d 585 (2d Cir. 1991)................................................................. 32

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*,
    181 F.3d 505 (3d Cir. 1999), *cert. denied*, 528 U.S. 1021 (1999)........................ 20

*Lubrication & Maint., Inc. v. Union Resources Co, Inc.*,
    522 F. Supp. 1078 (S.D.N.Y. 1981).................................................. 36, 37

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002)................................................... 22

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007)................................................ 17, 18

*Official Comm. of Unsecured Creditors v. Am. Tower Corp. (In re Verestar, Inc.)*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006).............................................. 16, 17

*Official Comm. of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Motors
    Liquidation Co.)*,
    486 B.R. 596 (Bankr. S.D.N.Y. 2013).................................................... 33

*Orr v. Kinderhill Corp.*,
    991 F.2d 31 (2d Cir. 1993)................................................................. 12

*Picard v. Taylor (In re Park S. Sec., LLC)*,
    326 B.R. 505 (Bankr. S.D.N.Y. 2005)..................................................... 18

*Reprosystem, B.V. v. SCM Corp.*,
    727 F.2d 257 (2d Cir. 1984), *cert. denied*, 469 U.S. 828 (1984).......................... 38

*Salomon v. Kaiser (In re Kaiser)*,
    722 F.2d 1574 (2d Cir. 1983).............................................................. 18

*Seta Corp. of Boca, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*,
    173 B.R. 858 (S.D.N.Y. 1994)............................................................. 14

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
   403 F.3d 43 (2d Cir. 2005) .......................................................................... 17, 18

*Shron v. M&G Serv., Ltd.*,
   144 B.R. 656 (Bankr. S.D.N.Y. 1992), *aff'd*, 151 B.R. (S.D.N.Y. 1993) ............... 11

*Silva v. Miller*,
   No. 04-CV-8013 (KMK)(LMS), 2009 WL 4060946 (S.D.N.Y. Nov. 24, 2009) .......... 35

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.)*,
   379 B.R. 5 (Bankr. E.D.N.Y. 2007) ...................................................................... 13

*Teledyne Indus., Inc. v. Eon Corp.*,
   373 F. Supp. 191 (S.D.N.Y. 1974) ...................................................................... 10

*The Liquidation Trust v. Daimler AG (In re Old CarCo., L.L.C.)*,
   435 B.R. 169 (Bankr. S.D.N.Y. 2010) .................................................................. 13

*United Airlines, Inc. v. HSBC Bank USA, N.A.*,
   416 F.3d 609 (7th Cir. 2005), *cert. denied*, 547 U.S. 1003 (2006) ...................... 32

*United States v. Sanford (In re Sanford)*,
   979 F.2d 1511 (11th Cir. 1992) .......................................................................... 31

*Va. Motor Exp. v. Jimenez*,
   76 F.2d 694 (4th Cir. 1935) ............................................................................... 35

*Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C. (In re Vargas Enters., Inc.)*,
   440 B.R. 224 (S.D.N.Y. 2010) ............................................................................ 24

*Winston v. Mediafare Entm't Corp.*,
   777 F.2d 78 (2d Cir. 1985) ................................................................................. 38

## State Cases

*Express Indus. & Terminal Corp. v. N.Y. State Dept. of Transp.*,
   93 N.Y.2d 584 (1999), *reargument denied.* 93 N.Y.2d 1042 (1999) ................... 37

*Schozer v. William Penn Life Ins. Co. of N.Y.*,
   84 N.Y.2d 639 (1994), *leave to appeal denied*, 89 N.Y.2d 810 (1997) ................ 39

*Vasiliades v. Lehrer McGovern & Bovis, Inc.*,
   3 A.D.3d 400 (N.Y. App. Div. 2004) .................................................................... 38

## Foreign Cases

*BCE Inc. v. 1976 Debentureholders*,
   (2008) 3 S.C.R. 560 (SCC) ................................................................................. 27

## Federal Statutes

11 U.S.C. § 101(2)(B) ........................................................................................... 22

11 U.S.C. § 101(31) .............................................................................................. 24

11 U.S.C. § 101(49) ........................................................................................... 20

11 U.S.C. § 105 ................................................................................................... 30

11 U.S.C. § 105(a) ......................................................................................... 31, 32

11 U.S.C. § 502(b) ........................................................................................... 5, 30

11 U.S.C. § 502(b)(1) .................................................................................... 31, 32

11 U.S.C. § 502(b)(2) ........................................................................................... 31

11 U.S.C. § 502(b)(6) ........................................................................................... 31

11 U.S.C. § 502(d) ................................................................... 5, 9, 13, 14, 15, 19

11 U.S.C. § 502(e) ............................................................................................... 17

11 U.S.C. § 544 ................................................................................................... 19

11 U.S.C. § 546 ............................................................................................. 14, 15

11 U.S.C. § 546(a) ............................................................................................... 15

11 U.S.C. § 546(e) ......................................................................... 5, 19, 20, 21

11 U.S.C. § 547 ........................................................................... 5, 9, 13, 15, 19

11 U.S.C. § 547(b) ............................................................................................... 15

11 U.S.C. § 548 ........................................................................... 5, 9, 13, 17

11 U.S.C. § 548(a)(1)(A) ......................................................... 16, 17, 18, 19

11 U.S.C. § 548(a)(1)(B) ................................................................... 16, 19

11 U.S.C. § 549 ........................................................... 5, 9, 13, 18, 19

11 U.S.C. § 549(d) ............................................................................................... 15

11 U.S.C. § 550(b) ................................................................................................. 6

11 U.S.C. § 550(d) ............................................................................................... 14

11 U.S.C. § 702(a)(3) ........................................................................................... 24

11 U.S.C. § 741(7)(A)(i) ...................................................................................... 21

11 U.S.C. § 741(8) ............................................................................................... 20

11 U.S.C. § 1123(a)(4) ......................................................................................... 29

## Federal Rules

Fed. R. Bankr. P. 2019 ................................................................................... 26, 27

Fed. R. Bankr. P. 2019(a) ..................................................................................... 27

Fed. R. Bankr. P. 2019(c)(3)(B) ........................................................................... 26

Fed. R. Civ. P. 30(b)(6) ........................................................................................ 34

**Foreign Statutes**

*Assignment and Preferences Act* (Nova Scotia), R.S.N.S. 1989 ................................................... 28

*Bankruptcy and Insolvency Act* (Canada) 1992, C.27, S.2) ........................................................ 12

*The Statute of Elizabeth*, 150 (Imp.), 13 Eliz., c. 5 ...................................................................... 28

**Other Authorities**

Frank Bennett, BENNETT ON BANKRUPTCY 69 (14th ed. 2012) ...................................................... 23

Stanley Beck, "Minority Shareholders Rights in the 1980s," SPECIAL LECTURES OF THE
   LAW SOCIETY OF UPPER CANADA, 1982 .............................................................................. 27

Elliott Management Corporation, Fortress Investment Group LLC and Morgan Stanley & Co. International plc, and/or entities managed by them, including Drawbridge DSO Securities LLC, Drawbridge OSO Securities LLC, FCOF UB Securities LLC, Elliott International LP and The Liverpool Limited Partnership, as holders (collectively, the "**Noteholders**")[1] of Notes issued by General Motors Nova Scotia Finance Company, respectfully submit this post-trial reply brief in response to the GUC Trust's Post-Trial Brief, dated May 24, 2013 [Adv. Doc No. 225] (the "**GUC Trust Brief**").

## <u>PRELIMINARY STATEMENT</u>[2]

The GUC Trust[3] has had four years to produce evidence and legal authority to support its contentions in this case and has failed to do so.

In a misguided attempt to immediately cast the Noteholders in a negative light to sustain a claim for equitable subordination and delay recognition of valid claims, the GUC Trust first claimed that the Noteholders were "a band of hedge fund noteholders" that acted inequitably by waiting until the "eleventh-hour" to "pounce" on Old GM to extract an unconscionable agreement. (GUC Trust Compl. [Adv. Doc. No. 1] ¶ 2.) That allegation was soundly disproved by the testimony of Old GM and its advisors that it was Old GM that held off meeting with the Noteholders until the final days before bankruptcy and that the Lock-Up Agreement was negotiated in good faith at arms' length with the support of and funding by the Governments.

---

[1] The GUC Trust has named Morgan Stanley as a defendant only on Count II of the Complaint for equitable "recharacterization." Morgan Stanley did not acquire Notes until after Old GM filed its chapter 11 petition.

[2] The Noteholders hereby incorporate the Joint Statement of Facts of Certain Noteholders, the GM Nova Scotia Trustee, and New GM [Adv. Doc. No. 224] ("**SOF**"). Capitalized terms used herein not otherwise defined shall have the meanings ascribed to them in the SOF.

[3] The GUC Trust was created under the Plan and came into effect on March 30, 2011. Objections to the Noteholders' claims were originally filed by the Committee and taken over by the GUC Trust. Notably, Wilmington Trust, the Indenture Trustee for all of Old GM's bonds other than the GM Nova Scotia Notes, was chair of the Committee and is the sole administrator of the GUC Trust. David Vanaskey of Wilmington Trust has at all times before, during and after the chapter 11 case been the point person for Wilmington Trust. Counsel for the GUC Trust are also the same individuals who represented the Committee in this litigation.

The GUC Trust then tried to twist the facts to show that Old GM and the Noteholders conspired to injure Old GM's other creditors by withholding information about the Lock-Up Agreement and the $450 Million Loan from the creditors and the Court and by insulating the transactions from scrutiny. The incontrovertible evidence disproved any allegation about hiding the Lock-Up Agreement: Old GM disclosed the Lock-Up Agreement on June 1, 2009 in an 8-K, which Messrs. Vanaskey and Mayer each admit reading at the time, and other documents. They also admitted to having read disclosures about the $450 Million Loan in materials furnished to the Committee and its professionals four days later. The Noteholders had no knowledge of the $450 Million Loan until after it was made (and even then, not of its amount).

When confronted with this evidence and with similar evidence disproving its claims, the GUC Trust then made the surprising allegation that while the information was provided, the Committee and its professionals could not piece it together. Yet, Wilmington Trust, its independent counsel, and counsel for the Committee had all read Old GM's Form S-4, which laid out in precise detail all of the facts and circumstances relating to GM Nova Scotia, GM Canada, the GM Nova Scotia Notes, the Guarantee, the Statutory Claim under Nova Scotia law, and the Swap Claims. Indeed, the Form S-4 laid out a roadmap to follow,[4] and the additional disclosures provided all of the necessary information about subsequent events to the Committee.

The uncontroverted evidence also proves that, rather than conspiring to withhold information, the Noteholders insisted upon full disclosure of the Lock-Up Agreement and that Old GM's June 1, 2009 8-K did just that. The evidence also proves that it was Old GM, not the Noteholders, that made the decision not to seek court approval of the Lock-Up Agreement based on its bankruptcy counsel Weil Gotshal's advice. Despite their representations to this Court to

---

[4] And under no circumstance could anyone blame the Noteholders for the sufficiency of that roadmap because the nature and extent of the disclosures were decided by Old GM and its counsel.

the contrary, the Committee chair and its lead counsel admit that the Committee was in possession of all of the terms of the Lock-Up Agreement within a few days of its execution and had the ability to bring any issues relating to it to the Court's attention prior to the hearing on the Sale Motion if the Committee thought it appropriate. Yet it did nothing. The Noteholders did not in any way conspire with Old GM and the Governments to insulate the Lock-Up Agreement from Court scrutiny.

The evidence is undisputed that the Noteholders had no knowledge of the terms of the MSPA until it was filed with the Court after the bankruptcy filing and certainly had no role in the negotiations. Old GM, the Governments, and the Committee negotiated the terms of the MSPA that the GUC Trust challenges, including the sale of the Swap Claims, the assumption and assignment of the Lock-Up Agreement, and the sale of the avoidance claims.

Apparently recognizing that it has completely failed to prove any wrongdoing on the part of the Noteholders, the GUC Trust belatedly asserts that it needs only to satisfy a lower standard for its equitable subordination claims because the Noteholders became "insiders" of Old GM when the GM Nova Scotia bankruptcy case was filed on October 8, 2009.[5] As set forth *infra* and at greater length in the Nova Scotia Trustee's reply brief (defined *infra* in n.7), as a matter of law and common sense, neither the Nova Scotia Trustee nor the creditors who selected it are insiders of GM Nova Scotia or Old GM.[6] Moreover, the GUC Trust has not proven facts that would support a claim for equitable subordination under any standard.

---

[5] The GUC Trust did not allege in its Amended Complaint, dated June 11, 2012 [Adv. Doc. No. 37] (the "**Amended Complaint**") or GUC Trust Amended Objection to Claims, dated November 19, 2010 [Bankr. Doc. No. 7859] (the "**Amended Objection**") that the Noteholders were insiders of Old GM. The Court should not consider this new allegation.
[6] Of course, even according to the GUC Trust's argument, the Noteholders would not have become insiders until October 8, 2009, well after the time of the conduct alleged to be inequitable.

The GUC Trust also has never explained, let alone produced any evidence to prove, that the making of the $450 Million Loan to GM Canada or the payment of the Consent Fee injured any creditors of Old GM because these transactions did not do so. If the $450 Million Loan had never been made and if the Consent Fee had never been paid, not a single additional penny would have ended up in the estate or been paid to unsecured creditors. The funds transferred in connection with $450 Million Loan either would have reduced the DIP Loan or been transferred to New GM pursuant to the MSPA and the 363 Sale. The Committee's counsel knew and understood this at the time. And of course, the Guarantee Claims and the Statutory Claim would still have to be paid. But the Governments and Old GM would have failed in their mission to keep GM Canada out of bankruptcy, and Old GM and New GM could have lost significant value from GM Canada. The payment of the Consent Fee preserved GM Canada at full value to the estate.

Unlike other creditors that hold claims only against Old GM, the Noteholders hold two claims. One claim is against GM Nova Scotia as issuer, and one is against Old GM as guarantor. The GUC Trust has never advanced an argument that the Guarantee Claim is invalid. In addition, the Statutory Claim is an intercompany claim by GM Nova Scotia against Old GM, non-duplicative of the Guarantee Claims, and should be allowed in full. These rights were established upon the issuance of the Notes in 2003, and the Noteholders are entitled to realize the benefit of these rights, just as other unsecured creditors are entitled to rights connected to their lawful claims. Accordingly, permitting the Noteholders to realize the benefits of their different rights from other creditors is neither unfair nor the basis for an objection.

The GUC Trust has not carried its burden to prevail on its claim for equitable subordination. The GUC Trust has likewise failed to prove any facts to support a claim of

recharacterization. The GUC Trust abandoned that theory in its post-trial brief and now instead seeks to reduce the Noteholders' and Nova Scotia Trustee's claims on "equitable grounds," which is not permitted by section 502(b). The GUC Trust has produced no evidence that the payment was intended to be something different from what it was (a consent fee), that the payment was procured by fraud or mistake, or that it violated any statute or other law. The payment is reasonable and for good value where it was given in exchange for a consent to release a $1.3 billion intercompany obligation owed to GM Nova Scotia. The mere size of the payment is not legal grounds for granting the GUC Trust relief, and the GUC Trust has failed to identify any legally cognizable defense to the enforcement of the claims in full.

The GUC Trust has also failed to prove any of the facts required to sustain an objection under section 502(d). It has failed to produce any evidence of any transfer of any property by Old GM to any Noteholder or any of the elements of a voidable transfer under section 547, 548 or 549 with respect to the $450 Million Loan made by Old GM to GM Canada. Likewise, the GUC Trust has never addressed the Noteholders' defense under section 546(e), which provides a safe harbor for the payment of the Consent Fee. Notably, on June 10, 2013, in *In re Quebecor World (USA) Inc.*, No. 12-4270-bk, 2013 WL 2460726 (2d Cir. June 10, 2013), the Second Circuit reaffirmed its holding in *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 336-337 (2d Cir. 2011) and held that "[t]o the extent *Enron* left any ambiguity in this regard . . . a transfer may qualify for the section 546(e) safe harbor even if the financial intermediary is merely a conduit." *Id.* at *4. In addition to all of the other reasons stated, this controlling legal authority conclusively defeats any claim based on section 502(d).

Changing course once again after trial to try to salvage an avoidance claim, the GUC Trust now belatedly contends that the $450 Million Loan should be avoided because Old GM

made it with actual intent to hinder, delay and defraud Old GM's creditors. Of course, the GUC Trust implies that the Governments of the United States, Canada and Ontario are participants in this alleged fraud since the uncontradicted evidence is that their representatives approved Old GM's $450 Million Loan to GM Canada and closely monitored the negotiations of the Lock-Up Agreement. This defies credulity.

The GUC Trust has also failed to show that it has any right to assert any avoidance claims. Since all avoidance claims relevant to this case were transferred to New GM, the GUC Trust has no standing under the Plan to bring any avoidance claims, and the Court has no jurisdiction to consider them. Further, GM Canada repaid the $450 Million Loan in full to Old GM; section 550(b) precludes any further satisfaction once a transfer is repaid.

Neither the facts nor the law supports the GUC Trust's position in this case. Accordingly, the Court should enter judgment in the Noteholders' favor regarding the GUC Trust's objection to claims and the adversary proceeding.

## RESPONSE TO CERTAIN FACTS

Before delving into the numerous legal deficiencies in the GUC Trust's latest theories, the Noteholders must address some of the GUC Trust's factual misstatements or distortions, which permeate the entire narrative of its case and discredit its arguments. The following examples highlight just how unfounded the GUC Trust's assertions are:

- *GUC Trust Assertion: Old GM "initiated" a transfer of $450 million to GM Canada on May 29, 2009. (GUC Trust Br. at 4, 5.)*

  Fact: The transfer of funds was completed on May 29, 2009 as confirmed by the bank records introduced into evidence.  (SOF ¶¶ 37-40.)

- *GUC Trust Assertion: The Greenberg Traurig draft contemplated adding Old GM, GM Canada, and other GM entities as parties to the settlement, but Old GM's proposal included only GM Nova Scotia. (GUC Trust Br. at 5.)*

Fact: The initial round of drafts contemplated two agreements that had parties as appropriate to each agreement, including Old GM. (SOF ¶¶ 43-44.)

- *GUC Trust Assertion: The Lock-Up Agreement required Old GM, as sole shareholder of GM Nova Scotia, to deliver its consent to an involuntary bankruptcy filing against GM Nova Scotia.  (GUC Trust Br. at 7.)*

Fact: The Lock-Up Agreement required the Company (GM Nova Scotia), not Old GM, to deliver its consent, which it did. (Def. Tr. Ex. 187 ¶ 6(b)(i); SOF ¶ 115.)

- *GUC Trust Assertion: The consent was given for the sole purpose of permitting the Lock-Up Agreement Noteholders to "manufacture a claim" under Section 135 of the Companies Act.  (GUC Trust Br. at 7.)*

Fact: GM Nova Scotia was established as an unlimited company upon formation. When an unlimited company is wound up, the members are responsible for any deficiencies in the company's ability to pay its debts. The Noteholders did not "manufacture a claim" under the Companies Act. (SOF ¶¶ 2, 118.)

- *GUC Trust Assertion: The Noteholders were permitted to assert claims in the Old GM bankruptcy case exceeding two and one-half the face amount of the Notes. (GUC Trust Br. at 8.)*

Fact: No permission was needed to assert claims in the Old GM bankruptcy case. The Noteholders asserted a claim based on the Guarantee. The Trustee asserted a claim for deficiencies, which included the outstanding principal of the Notes and New GM's Swap Claims. (SOF ¶¶ 2, 4, 132, 133; Noteholders' Opening Post-Trial Brief, dated May 24, 2013 [Adv. Doc. No. 223] (the "**Opening Post-Trial Brief**") at 6-7.)

- *GUC Trust Assertion: The settlement was the culmination of a series of actions the Noteholders took in the weeks and months preceding the Old GM Bankruptcy filing. (GUC Trust Br. at 8.)*

Fact: Old GM controlled the process and timing of the negotiations with the Noteholders. In fact, Old GM consistently rejected even engaging in settlement negotiations in the weeks and months prior to the bankruptcy filing. (SOF ¶¶ 8, 11, 31-33.)

- *GUC Trust Assertion: The Nova Scotia Transfers were publicly disclosed in May 2008. (GUC Trust Br. at 10.)*

Fact: The Nova Scotia Transfers were published for the first time in October 2009 in the Royal Gazette. (Def. Tr. Ex. 37; Gropper Direct Test. ¶ 19.)

- *GUC Trust Assertion: The amount of the Consent Fee far exceeded Old GM's analysis of what would be a reasonable settlement with the Noteholders. The Indifference Analysis showed that no amount above $285 million for full cancellation of the Notes was reasonable. (GUC Trust Br. at 14.)*

Fact: The Indifference Analysis was not a qualitative assessment of any settlement, including the execution risk of dual bankruptcies. The Indifference Analysis had a range of values ($441 million was the top figure in the range) and did not include the

$1.6 billion Tax Refund, which was formalized on May 27, 2009, the same day negotiations with the Noteholders commenced. GM Canada was able to settle the Intercompany Loans with GM Nova Scotia for $78.5 million less than the $450 Million authorized by the Governments. (SOF ¶¶ 28-30.)

- *GUC Trust Assertion: The Noteholders agreed to release claims by GM Nova Scotia against GM Canada that were "essentially worthless." (GUC Trust Br. at 15.)*

  Fact: First, the GUC Trust took the opposite position in its Pre-Trial Brief, dated July 27, 2012 [Adv. Doc. No. 148] (the "**GUC Trust Pre-Trial Brief**"), in which it alleged that GM Canada was solvent. (GUC Trust Pre-Trial Brief at 3.)  Second, the Intercompany Loans were worth $1.3 billion. Unbeknownst to the Noteholders, GM Canada learned on May 27th that it would receive the Tax Refund in the amount of $1.6 billion. (SOF ¶¶ 22, 31.)

- *GUC Trust Assertion: On June 25, 2009, GM Canada entered into a Settlement Agreement with GM Nova Scotia and paid $369 million to GM Nova Scotia, which then used the funds to pay the Consent Fee to the Noteholders on June 26, 2009. (GUC Trust Br. at 22.)*

  Fact: On June 4, 2009, GM Canada transferred $367 million to an escrow account held for the benefit of GM Canada and GM Nova Scotia. After the approval of the Extraordinary Resolution, the funds were transferred to a second escrow account held for the benefit of Banque Générale du Luxembourg, the Fiscal and Paying Agent ("**Banque Générale**"), which then disbursed the funds to each Noteholder pro rata. (SOF ¶¶ 86-87.)

- *GUC Trust Assertion: Old GM did not have an obligation to fund GM Canada's pension plan and was not authorized to do so postpetition. (GUC Trust Br. at 24.)*

  Fact: The Final DIP Order and the DIP Facility authorized Old GM to backstop a portion of GM Canada's pension funding obligation. The Cash Management Order authorized the use of the FX transaction. (SOF ¶¶ 75-80, 93-94.)[7]

- *GUC Trust Assertion: On June 4, 2009, when GM Nova Scotia gave its consent to bankruptcy, there was no default under the Notes and the Noteholders could not have filed a bankruptcy. (GUC Trust Br. at 23.)*

  Fact: When Old GM filed chapter 11 on June 1, 2009, the event of default accelerated the Notes and any creditor could have filed an involuntary bankruptcy petition for GM Nova Scotia. (Buonomo Direct Test. ¶ 80; Trial Tr. 08/10/12 (Buonomo) 24:1-19.)

---

[7] This point is explained in detail in Section I.B.5 of New GM's Post-Trial Reply Brief ("**New GM Reply Brief**"). The Noteholders join in the New GM Reply Brief consistent with the Court's direction in the Endorsed Order [Adv. Docket No. 209]. The Noteholders also incorporate and join in the arguments contained in the Post-Trial Reply Memorandum of Green Hunt Wedlake Inc. (the "**NS Trustee Reply Brief**") and the Post-Hearing Reply Brief of the Paulson Noteholders (the "**Paulson Reply Brief**").

These are only some of the most blatant misstatements that are found in the GUC Trust's Post-Trial Brief. It is impossible for the Noteholders to address each and every one of the GUC Trust's assertions that are incorrect, misleading or only partially true. As will be discussed in further detail below throughout the Argument section, the GUC Trust ignores significant evidence that undermines its claims. The GUC Trust cannot ask this Court to just ignore what it finds inconvenient or to accept its skewed version of events. The full factual record, when examined in its entirety, exposes the fatal deficiencies in the GUC Trust's entire case.

## ARGUMENT

### I.    The GUC Trust's 502(d) Objection Should Be Overruled

A.  There Was No Transfer of Estate Property

Section 502(d) permits the court, under certain circumstances, to disallow a claim of an entity that is a transferee of an avoidable transfer *of estate property* under, *inter alia*, section 547, 548, or 549. *See* 11 U.S.C. §§ 502(d), 547, 548, 549. As described in detail in Section III.A of the Noteholders' Opening Post-Trial Brief, Old GM did not transfer any property to the Noteholders or GM Nova Scotia. In an effort to satisfy the requirement of a transfer of estate property, the GUC Trust erroneously contends that: (i) Old GM had a residual interest in the proceeds of the $450 Million Loan because the $450 Million Loan Agreement purportedly created a trust for the benefit of *GM Nova Scotia*; or (ii) alternatively, the transactions should be collapsed and Old GM should be deemed to have paid the Consent Fee. (*See* GUC Trust Br. at 42-44; Am. Obj. ¶ 40.) These contentions are wrong.

*1.  Old GM Did Not Have a Residual Interest in the Proceeds of the $450 Million Loan*

The $450 Million Loan Agreement did not create a trust, but merely a debtor-creditor relationship. The GUC Trust fails to cite any evidence or any authority for its contention that a trust was created. The mere use of the term "trust" in an agreement is unavailing. *See LFD*

*Operating, Inc. v. Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.)*, 274 B.R. 600, 616 n.12 (Bankr. S.D.N.Y. 2002), *aff'd*, No. 02 Civ. 6271(SHS), 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 144 Fed. Appx. 900 (2d Cir. 2005) (citing *In re Morales Travel Agency*, 667 F.2d 1069, 1072 (1st Cir. 1981)). A "***debt is not a trust.***" *Teledyne Indus., Inc. v. Eon Corp.*, 373 F. Supp. 191, 201 (S.D.N.Y. 1974) (emphasis added); *see also Lawrence v. Aurora Loan Servs. LLC*, No. CV F 09-1598(LJO), 2010 WL 364276, at *12 (E.D. Cal. Jan. 25, 2010) ("***A debt is not a trust*** and there is not a fiduciary relation between debtor and creditor as such.") (emphasis added) (quotations omitted). Section 1 of the $450 Million Loan Agreement provides that Old GM would lend $450 million to GM Canada pursuant to the Promissory Note. The $450 Million Loan Agreement created a debt, therefore, not a trust.

Moreover, assuming *arguendo* that a trust was created, the GUC Trust admits the beneficiary would be GM Nova Scotia, not Old GM. (Am. Obj. ¶ 40.) Nonetheless, the GUC Trust mistakenly asserts that Old GM had a residual interest in the funds, because, as of 7:57 a.m. on June 1, 2009, GM Canada purportedly had an obligation to return the loan proceeds to Old GM because the Lock-Up Agreement allegedly had not been completed by 7:00 a.m. (the "**Alleged 7:00 a.m. Condition**").[8] The evidence shows, however, that the Lock-Up Agreement was completed by 7:00 a.m. (*See, infra*, § III.B.) Therefore, even assuming *arguendo* that a trust was created, as of the filing of its chapter 11 petition, GM Canada did ***not*** have an obligation to return the loan proceeds to Old GM.

Likewise, assuming *arguendo* that the Lock-Up Agreement were completed after 7:00 a.m. on June 1, 2009, Old GM still would not have had an obligation to return the loan proceeds to Old GM. Section 20 of the Lock-Up Agreement provides that the Lock-Up Agreement

---

[8] The GUC Trust argues wrongly that the May 31, 2009 amendment was entered into postpetition. (*See* GUC Trust Br. at 21 n.105.) The evidence shows that the amendment was prepetition. (*See* Trial Tr. 08/09/12 (Buonomo) 78:13-15, 84:12-85:16, 85:25-86:5; *see also* New GM Reply Brief § I.B.2.)

10

supersedes all prior negotiations with respect to the subject matter of the Lock-Up Agreement. The subject matter of the Lock-Up Agreement is the repayment by GM Canada of the Intercompany Loans, which is also the subject matter of the $450 Million Loan Agreement. (Def. Tr. Ex. 121 (the $450 Million Loan Agreement) Recital D.) Old GM and GM Canada executed the $450 Million Loan Agreement and subsequently executed the Lock-Up Agreement, which served to amend any contrary requirements in the $450 Million Loan Agreement. Accordingly, by executing the Lock-Up Agreement, Old GM and GM Canada amended the $450 Million Loan Agreement to remove the Alleged 7:00 a.m. Condition. As a result, Old GM would not have been able to rely on its purported lapse to require the return of the proceeds.

Finally, even if GM Canada had an obligation to return the loan proceeds to Old GM (it did not), it was a contractual obligation to repay a debt and not an interest in property. To support its claim that such an obligation would constitute property of the estate, the GUC Trust relies on a single case for the proposition that if the conditions of an *escrow* are not satisfied, the debtor's residual interest is property of the estate. (GUC Trust Br. at 43.) This proposition has no relevance here as the GUC Trust does not even contend that the $450 Million Loan was an escrow.[9]

As of the time Old GM filed its chapter 11 petition, Old GM had no interest in the proceeds of the $450 Million Loan, which belonged to GM Canada. For all of these reasons, the Court should overrule the GUC Trust's 502(d) objection because no estate property was transferred to the Noteholders.[10]

---

[9] An escrow is properly formed if, among other things, "property is delivered to a third party by the grantor." *Shron v. M&G Serv., Ltd.*, 144 B.R. 656, 660 (Bankr. S.D.N.Y. 1992), *aff'd*, 151 B.R. (S.D.N.Y. 1993). Here, no property was delivered to a third party.

[10] The GUC Trust also contends that the Lock-Up Agreement violated the automatic stay because the: (i) payment of the Consent Fee was a distribution of estate property; and (ii) the Lock-Up Agreement required Old GM to "exercise of its rights as shareholder of GM Nova Scotia." (*See* GUC Trust Br. at 62.) The GUC Trust's contentions are without merit. First, the automatic stay was not in effect when the Lock-Up Agreement was entered into prior to the

2.  *The Collapsing Doctrine Does Not Apply*

The collapsing doctrine does not apply to this case. (*See* Opening Post-Trial Brief § III.H.) The GUC Trust cannot satisfy the requirement of *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) that the debtor's property must first be reconveyed by the debtor for less than fair consideration or with fraudulent intent because Old GM received the Promissory Note from GM Canada as consideration for the $450 Million Loan and did *not* reconvey it. Moreover, GM Canada repaid the $450 Million Loan in full with interest to Old GM. (Opening Post-Trial Brief § III.B.; SOF ¶¶ 95-106.)

None of the cases cited by the GUC Trust provides a basis to apply the "collapsing doctrine" to this case. (GUC Trust Br. at 43-44 n.241-42.) In *Orr v. Kinderhill Corp.*, 991 F.2d 31, 32 (2d Cir. 1993), a parent company deeded a property to its wholly-owned subsidiary and then distributed the stock of the subsidiary to its shareholders for no consideration. Although the defendant argued that the transfer of the property to the subsidiary correspondingly increased the value of the shares of the subsidiary held by the parent, the court viewed the two steps as a single, integrated transaction for purposes of its fraudulent conveyance analysis where the property was reconveyed by the subsidiary for no consideration, thereby depriving the debtor of the value it had received upon the initial transfer. *Id.* at 35. In this case, unlike *Orr*, Old GM retained the Promissory Note, the value it received for its transfer of the $450 million to GM Canada. Although *Orr* predates *HBE Leasing*, the fact pattern in *Orr* satisfies the *HBE Leasing*

---

filing of Old GM's bankruptcy case. Second, as demonstrated above, payment of the Consent Fee was not made from estate property. Finally, the GUC Trust fails to identify any postpetition exercise of shareholder rights that were required of Old GM under the Lock-Up Agreement, and there is no such requirement under the Lock-Up Agreement. If the GUC Trust is referring to the consent to the GM Nova Scotia bankruptcy, that consent was signed by the directors of GM Nova Scotia and was not an exercise of Old GM's shareholder rights. (Def. Tr. Ex. 198.) Moreover, the filing of Old GM's chapter 11 case was an event of default under the Fiscal and Paying Agency Agreement which accelerated the Notes. (*See* Def. Tr. Ex. 21 (Fiscal and Paying Agency Agreement, Schedule 1 § 9(e)).) Accordingly, as of Old GM's filing, any Noteholder could have brought an application for bankruptcy against GM Nova Scotia, and no consent was required. (*See* Def. Tr. Ex. 1 (Section 43 of the *Bankruptcy and Insolvency Act* (Canada) 1992, C.27, S.2) ("**BIA**").)

test and does not provide any support for collapsing the transactions in this case. *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.)*, 379 B.R. 5, 21 (Bankr. E.D.N.Y. 2007), is the only reported case in the Second Circuit where a court collapsed transactions where the fact pattern differed from *HBE Leasing*. The *Allou* court held that the first prong of the *HBE Leasing* test should be read to require "that the transactions, taken as a whole, diminish the value of the debtor's estate **and** are marked by either a transfer made by the debtor for less than fair consideration or a transfer made by the debtor with actual fraudulent intent." *Id.* at 21-22 (emphasis added). Even if this Court were to follow *Allou*, the GUC Trust cannot – and does not attempt to – satisfy the *Allou* test as: (i) the transactions taken as a whole did not diminish the value of Old GM's estate; (ii) the Promissory Note was fair consideration[11] for the $450 Million Loan;[12] and (iii) there is no evidence of fraudulent intent by Old GM (or any other party).[13] Accordingly, the collapsing doctrine does not apply in this case, and section 502(d) is not available to the GUC Trust because there was no transfer of estate property.

B.  The GUC Trust's 502(d) Objection Must Be Overruled Because GM Canada Repaid the $450 Million Loan in Full to Old GM

Section 502(d) permits the court to disallow a claim of an entity that is a transferee of an avoidable transfer under, *inter alia*, section 547, 548 or 549, **"unless such entity has paid the amount"** for which such entity is liable. 11 U.S.C. § 502(d) (emphasis added); *see also Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 435 (S.D.N.Y. 2007), *motion to certify appeal denied*, 06 CIV. 7828(SAS), 2007 WL 2780394 (S.D.N.Y. Sept. 24,

---

[11] In its pre-trial brief, the GUC Trust asserted that GM Canada was solvent and could have paid the Intercompany Loans in full. (GUC Trust Pre-Trial Br. at 3.) The GUC Trust thereby conceded that the Promissory Note was worth full value, and for that reason alone, there can be no fraudulent transfer.

[12] Indeed, GM Canada repaid the $450 Million Loan in full with interest. (SOF ¶¶ 95-106.)

[13] The other two cases cited by the GUC Trust do not support the GUC Trust's collapsing theory. In *The Liquidation Trust v. Daimler AG (In re Old CarCo., L.L.C.)*, 435 B.R. 169, 185 (Bankr. S.D.N.Y. 2010), the plaintiffs unsuccessfully sought to separate a single transaction into two transactions. In *Bachrach Clothing, Inc. v. Bachrach (In re Bachrach Clothing, Inc.)*, 480 B.R. 820, 853 (Bankr. N.D. Ill. 2012), the court refused to apply the "collapsing doctrine" to a leveraged buy-out scenario.

2007) (citation omitted); *Seta Corp. of Boca, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*, 173 B.R. 858, 862 (S.D.N.Y. 1994).

Prior to the closing of the 363 Sale, GM Canada repaid the $450 Million Loan, in full with interest, to Old GM. (SOF ¶¶ 95-106.) As described in detail in Section I.B.5 of the New GM Reply Brief, the FX Transaction and Pension Escrow Agreement were authorized, and the CIBC Account (the pension escrow account) was for the benefit of Old GM, not New GM. As a result, the GUC Trust's section 502(d) objection fails in its entirety. The GUC Trust also makes the remarkable assertion that the repayment of the $450 million by GM Canada is not a defense for the Noteholders. (*See* GUC Trust Br. at 46-47.)[14] As shown in Section I.B of the Paulson Reply Brief, it does not matter who repaid the funds to the estate. Section 550(d) bars more than a single recovery on account of an avoidance claim. Because the recipient of the alleged avoidable transfer was GM Canada, which repaid the $450 Million Loan in full, section 502(d) is unavailable to the GUC Trust.

C.  The GUC Trust Lacks Standing to Assert its 502(d) Objection Because Old GM Sold the Avoidance Claims to New GM

The GUC Trust lacks standing to object under section 502(d) to the Statutory Claim or the Guarantee Claims based on the payment of the Consent Fee because New GM purchased the avoidance claims at issue. (*See* Opening Post-Trial Brief § III.C.) In an effort to circumvent this fatal defect, the GUC Trust relies on a line of cases holding that a trustee may use section 502(d) when the underlying avoidance action was time-barred under section 546 of the Bankruptcy Code. (*See* GUC Trust Br. at 42 n.236.) Although the Noteholders submit that these cases are

---

[14] All of the cases cited by the GUC Trust are inapposite as they all involve situations where the avoidable transfer had ***not*** been repaid. (*See* GUC Trust Br. at 46-47 n.253-255.)

wrongly decided, [15] to the extent they have any viability, they are not applicable to the facts here,

where the estate knowingly sold and assigned the avoidance actions to a third party and retained

no interest in the actions. Unlike a statute of limitations, which does not vitiate the underlying

claim but only entitles a defense if timely and affirmatively raised and not waived, divestment of

a claim bars the prior owner (and any purported successor in interest) from bringing the claim at

all. Because Old GM sold the underlying avoidance claims to New GM and the GUC Trust lacks

standing to prosecute them, the GUC Trust's 502(d) objection must be overruled.

    D.  <u>The Payment of the Consent Fee is Not Avoidable Under Section 547</u>

        Under section 547 of the Bankruptcy Code, the trustee may avoid a transfer of an interest

in the debtor in property if, *inter alia*, the transfer was: (i) to or for the benefit of a creditor;

(ii) for or on account of an antecedent debt owed by the debtor before such transfer was made;

and (iii) enabled the creditor to receive more than it would have received in a chapter 7

liquidation. 11 U.S.C. § 547(b). The GUC Trust failed to present any evidence to establish any of

the requirements of section 547, relying only on the conclusory statement that it "satisfie[d] each

of the elements of section 547(b)." (*See* GUC Trust Br. at 45.)[16] As shown in detail in Section

III.E of the Opening Post-Trial Brief, the GUC Trust has failed to satisfy its burden of proof with

respect to any of the three requirements of section 547, and the GUC Trust cannot invoke

section 547 to support its section 502(d) objection.

---

[15] In Section III.D of the Opening Post-Trial Brief, the Noteholders demonstrated that section 502(d) is unavailable to the GUC Trust because the alleged avoidable transfer has not been adjudicated. It follows that a trustee may not use section 502(d) if the time limits prescribed by section 546 have lapsed. *See In re Mktg. Assocs. of Am., Inc.*, 122 B.R. 367, 369 (Bankr. E.D. Mo. 1991) (holding that permitting the trustee to circumvent the two-year time limit by utilizing section 502(d) where no preference action had been brought would be an unjust "procedural windfall"); *see also Barkley v. West (In re West)*, 474 B.R. 191, 199 (Bankr. N.D. Miss. 2012) (holding that "the trustee simply cannot recover the property or avoid the transfers since he is time-barred from doing so pursuant to § 546(a) and § 549(d)"); *GMAC Mtg. LLC v. Blitz Holding Corp. (In re IFS Fin. Corp.)*, No. 08–03047, 2008 WL 4533713, at *5 (Bankr. S.D. Tex. Oct. 2, 2008) (holding that a trustee could not use section 502(d) after the expiration of the section 546 limitation period).

[16] The GUC Trust contends that, "in his notebook, Prieto refers to the Consent Fee as a "preference." (*See* GUC Trust Br. at 45 n.246 (citing Pl. Tr. Ex. 3 at AUR_GM021457).) The scribbled notes of a junior analyst have no relevance to the GUC Trust's burden to satisfy each of the required elements under section 547.

E.    The Payment of the Consent Fee Is Not Avoidable Under Section 548(a)(1)(B)

Under applicable state law and section 548(a)(1)(B) of the Bankruptcy Code, the trustee may avoid a transfer of an interest in the debtor in property if, *inter alia*, the debtor received less than reasonably equivalent value in exchange for such transfer. *See* 11 U.S.C. § 548(a)(1)(A); *Official Comm. of Unsecured Creditors v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 468 (Bankr. S.D.N.Y. 2006). Again, as shown above, there was no transfer of estate property, and there is no valid section 548(a)(1)(B) claim.

Further, Old GM received reasonably equivalent value for the funds it transferred pursuant to the $450 Million Loan: a promissory note of equal value, which the GUC Trust ignores. (*See* GUC Trust Br. at 45 n.247; SOF ¶ 37.)[17] As shown in detail in Section III.F of the Opening Post-Trial Brief, the GUC Trust has failed to discharge its burden of proof with respect to any of the requirements of section 548(a)(1)(B) and cannot invoke section 548(a)(1)(A) to support its section 502(d) objection. Indeed, in its pre-trial brief, the GUC Trust argued that GM Canada was solvent. (GUC Trust Pre-Trial Br. at 3.)[18]

F.    The Payment of the Consent Fee Is Not Avoidable Under Section 548(a)(1)(A)

Although the GUC Trust's Pre-Trial Brief did not include a fraudulent conveyance claim under section 548(a)(1)(A), the GUC Trust attempts improperly to assert that claim in its post-trial brief, with a single paragraph that fails even to state the stringent requirements for the

---

[17] In addition, the GUC Trust did not cite any evidence (because there is none) in support of its allegation that the release of the claims under the Nova Scotia Litigation was "worthless." (GUC Trust Br. at 45.)

[18] Although the GUC Trust does not include it in its discussion of reasonably equivalent value, in the "fact" section of its brief, the GUC Trust contends that "in the event of a GM Canada bankruptcy, the Intercompany Loans would be worth nothing." (GUC Trust Br. at 15.) This assertion is astonishing as the GUC Trust contended that GM Canada was solvent in its pre-trial brief in support of its equitable subordination claim – that if GM Nova Scotia had not released GM Canada's Intercompany Loan obligations pursuant to the Lock-Up Agreement, the proceeds of the loans would have satisfied the Notes in full and there would be no claims against Old GM. (GUC Trust Pre-Trial Brief at 3.) And in support of its current contention, the GUC Trust merely points to statements made by Old GM to the Noteholders in the context of negotiations and the "indifference point" analysis, which did not include, among other things, the $1.6 billion Tax Refund. (*Id.* at 14-16.) The Court should not countenance this game-playing by the GUC Trust.

16

finding it seeks.[19] (*See* GUC Trust Br. at 46.) To prove actual fraud under section 548 of the Bankruptcy Code, the GUC Trust must demonstrate that Old GM's transfer of $450 million to GM Canada was made with *actual intent* to hinder, delay, or defraud creditors. *See Verestar*, 343 B.R. at 468.[20] As "actual intent to hinder, delay, or defraud" constitutes fraud, it must be pled with specificity. *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005). Moreover, the GUC Trust must prove actual intent by "clear and convincing evidence." *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 401-02 (Bankr. S.D.N.Y. 2007).[21]

The GUC Trust's conclusory allegation that "[i]t is obvious" from the June 1, 2009 8-K that Old GM tried to conceal the source of funds for the Consent Fee cannot support a finding of actual intent to conceal. (*See* GUC Trust Br. at 46.)[22] Indeed, the extent of that disclosure and all that followed compel the opposite conclusion. Nor do the cases cited by the GUC Trust support its argument. For example, in *In re MarketXT*, the court found the plaintiff had satisfied its burden of demonstrating intent to delay or defraud by clear and convincing evidence because: (i) the debtor's principal **admitted** that the transactions were designed to delay creditors' receipt of funds; and (ii) the existence of several badges of fraud, including concealment of facts and false pretenses by the transferor and an **unconscionable** discrepancy between the value of the property

---

[19] The section 548(a)(1)(A) claim should be stricken because the GUC Trust failed to plead it in its pre-trial brief. *See Am Int'l, Inc. v. DataCard Corp.*, 167 B.R. 110, 113 (N.D. Ill. 1994), *aff'd*, 106 F.3d 1342 (7th Cir. 1997) ("Because AMI's purported defense under §502(e) of the Bankruptcy Code was not made part of the final pretrial order's trial brief, it cannot be raised for the first time in its post trial brief and is stricken").

[20] It is the debtor's intent that is relevant to the analysis. 11 U.S.C. § 548(a)(1)(A); *see also Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y. Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007).

[21] "The Supreme Court has defined 'clear and convincing' evidence as that which gives the finder of fact 'an abiding conviction that the truth of [the proponent's] factual contentions [is] 'highly probable.'" *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 562 (S.D.N.Y. 2002) (citation omitted).

[22] By this allegation, the GUC Trust implies that the Governments of the United States, Canada and Ontario are participants in this alleged fraud since the uncontradicted evidence is that their representatives approved Old GM's $450 Million Loan to GM Canada and worked closely with Old GM in its negotiations of the Lock-Up Agreement. (*See* SOF ¶¶ 37, 50.) This defies credulity.

17

transferred and the consideration received. 376 B.R. 390 at 403-05.[23] Those are not the facts

here. In this case, the transactions were designed to benefit creditors by avoiding delay and

maximizing distributions to Old GM's creditors by permitting GM Canada to restructure out of

court without the risks and delays that could have occurred if it had to file a Canadian

bankruptcy proceeding. (SOF ¶¶ 22, 26.) As to the badges of fraud: (a) there was no

concealment: the June 1, 2009 8-K disclosed, among other things, the existence of the Lock-Up

Agreement and the Consent Fee (SOF ¶ 81) and Old GM disclosed the source of the $450

Million Loan four days later in the Disclosure Schedules (SOF ¶¶ 88-89); and (b) there was no

discrepancy in value as Old GM received the Promissory Note of equal value (which was

subsequently repaid in full) from GM Canada.[24] (SOF ¶¶ 95-106.)

The GUC Trust has fallen woefully short of showing any evidence, let alone "clear and

convincing evidence," that the circumstances around Old GM's $450 Million Loan were

fraudulent as to creditors to satisfy section 548.

G.  The Payment of the Consent Fee is Not Avoidable Under Section 549

The GUC Trust premises its claim that there was a postpetition transfer of estate property

on the flawed assertion that the $450 Million Loan Agreement created a trust for the benefit of

GM Nova Scotia in which Old GM purportedly had a residual interest. (*See* GUC Trust Br. at

42-43.) As demonstrated in Section I.A.1, *supra*, the $450 Million Loan Agreement created a

creditor/debtor relationship, not a trust. Even if there were a trust, Old GM did not have a

---

[23] The other cases cited by the GUC Trust are also inapposite. *See Sharp*, 403 F.3d at 56 (noting that the "burden of proving 'actual intent' is on the party seeking to set aside the conveyance" and affirming the dismissal of section 548(a)(1)(A) claim) (citation omitted); *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1583 (2d Cir. 1983) (affirming a bankruptcy court finding of intent to defraud creditors where debtor transferred two properties to wife for no consideration while retaining the possession, use, and benefit of the properties and treating them as his own, created dummy corporation to hide his assets, and concealed the assets in his bankruptcy petition).

[24] Other "badges of fraud" may include, for example: (i) the use of dummies or fictitious parties; and (ii) the retention of control of property by the transferor after the conveyance. *See, e.g., Picard v. Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505, 518 n.11 (Bankr. S.D.N.Y. 2005). Neither of these is present here, nor has the GUC Trust alleged any other badges of fraud to support its 548(a)(1)(A) claim.

residual interest.[25] Thus, there was no postpetition transfer of estate property and the GUC Trust

cannot invoke section 549 to support its section 502(d) objection.[26]

### H. The Payment of the Consent Fee Qualifies for Section 546(e) Safe Harbor

The payment of the Consent Fee qualifies for the safe harbor provision of section 546(e),

which provides in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the
> trustee may not avoid a transfer [1] that is a margin payment . . . or settlement
> payment . . . made by or to (or for the benefit of) a . . . financial institution, . . . or
> [2] that is a transfer made by or to (or for the benefit of) a . . . financial institution
> . . . in connection with a securities contract, as defined in section 741(7) . . . that
> is made before the commencement of the case . . . .

11 U.S.C. § 546(e).[27] After the filing of opening post-trial briefs in this case, the Second Circuit

Court of Appeals issued its decision in *Quebecor*, 2013 WL 2460726, expanding on its prior

holding in *Enron*, 651 F.3d at 336-337. In *Enron*, the Second Circuit held that a financial

intermediary need not have a beneficial interest in a transfer to satisfy the requirement under

section 546(e) that the transfer be "by or to (or for the benefit of) a . . . financial institution . . . ."

651 F.3d at 338-39. In *Quebecor*, the Second Circuit clarified that "[t]o the extent *Enron* left any

ambiguity in this regard, we expressly follow the Third, Sixth, and Eighth Circuits in holding

that a transfer may qualify for the section 546(e) safe harbor even if the financial intermediary is

merely a conduit." *Quebecor*, 2013 WL 2460726 at *4. Here, the Consent Fee initially was

transferred by GM Nova Scotia to a financial institution, Banque Générale, which subsequently

---

[25] Stephen Karotkin of Weil Gotshal stated on the record that there are no section 549 issues here. (*See* Hr'g Tr. 11/20/2009 20:11-12.)

[26] Alternatively, the GUC Trust erroneously contends that the Court should apply the collapsing doctrine and find that Old GM's transfer of $450 million was postpetition. (*See* GUC Trust Br. at 43-44.) As demonstrated in Section III.H of the Opening Post-Trial Brief and in Section I.A.2 herein, the collapsing doctrine is not applicable in this case. However, even if it were, the GUC Trust provides no authority (because none exists) for the extraordinary proposition that, in applying the collapsing theory, the Court should deem the indisputably prepetition transfer from Old GM to GM Canada to be a postpetition transfer.

[27] Section 546(e) protects the payment of the Consent Fee from avoidance under sections 544, 547 or 548(a)(1)(B). For the reasons explained in Section I.F. *supra*, the payment of the Consent Fee cannot be avoided pursuant to section 548(a)(1)(A).

paid *pro rata* shares to the Noteholders. (SOF ¶ 87.) Accordingly, payment of the Consent Fee qualifies for the section 546(e) safe harbor under binding Second Circuit law, as both a settlement payment and a payment made in connection with a securities contract.

The payment of the Consent Fee qualifies for the section 546(e) exemption because it is a "settlement payment . . . made by or to (or for the benefit of) a financial institution . . . ." 11 U.S.C. § 546(e). The term "settlement payment" as defined in section 741(8) refers to the transfer of cash or securities made to complete a securities transaction. *Enron*, 651 F.3d at 336-337; *accord Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999), *cert. denied*, 528 U.S. 1021 (1999); *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 849 (10th Cir. 1990). The term "security" includes notes and bonds. 11 U.S.C. §§ 101(49)(i), (iii). The definition of "settlement payment" in section 741(8) is "extremely broad." *See Enron*, 651 F.3d at 336 ("The phrase 'commonly used in the securities industry' thus is properly read as modifying only the term 'any other similar payment.' The phrase is not a limitation on the definition of settlement payment, but rather, as our sister circuits have held, it is 'a catchall phrase intended to underscore the **breadth** of the § 546(e) exemption.'") (emphasis added) (citation omitted). The *Enron* court also rejected the notion that the completion of a securities transaction requires a purchase or sale of securities. *Id.* at 338 ("Because we find no basis in the Bankruptcy Code or the caselaw for a purchase or sale requirement . . . we decline to impose a purchase or sale requirement on § 741(8)."). Accordingly, the payment of the Consent Fee was a settlement payment made to and by a financial institution that is exempt from avoidance under section 546(e).

The payment of the Consent Fee also qualifies for the section 546(e) exemption because it was a payment in connection with a securities contract, made to and by a financial institution.

Section 741(7) of the Bankruptcy Code defines a "securities contract" as "a contract for the purchase, sale, *or* loan of a security . . . ." 11 U.S.C. § 741(7)(A)(i) (emphasis added). The payment of the Consent Fee fits squarely within the plain wording of the securities contract exemption, as it was a "transfer made by or to (or for the benefit of ) a . . . financial institution . . . in connection with a securities contract." 11 U.S.C. § 546(e). GM Nova Scotia transferred funds to Banque Générale in the amount and manner prescribed by the Fiscal and Paying Agency Agreement.[28] The Fiscal and Paying Agency Agreement is a "securities contract" because it provides for the original purchase of the Notes.[29] Accordingly, the payment of the Consent Fee was a transfer made by and to a financial institution in connection with a securities contract that is exempt from avoidance under section 546(e). *See Quebecor*, 2013 WL 2460726 at *3 (holding that a contract that provided for the original purchase of notes was a securities contract and a transfer was made "in connection with a securities contract" where the securities contract prescribed the manner and amount of the transfer).

Accordingly, the payment of the Consent Fee is exempt from avoidance under section 546(e) both as a settlement payment and a payment made in connection with a securities contract.

## II.    The GUC Trust Has Failed to Provide a Legal or Factual Basis to Equitably Subordinate or Disallow the Claims

### A.  The Lock-Up Noteholders Are Not Insiders

The GUC Trust wrongly contends that the Noteholders that executed the Lock-Up Agreement (the "**Lock-Up Noteholders**") were "insiders" of GM Nova Scotia and therefore

---

[28] Section 7 of the Fiscal and Paying Agency Agreement requires GM Nova Scotia to make any payments in respect of the Notes to Banque Générale and further requires Banque Générale to make the payments to the Noteholders. Schedule 4 to the Fiscal and Paying Agency Agreement incorporates the Provisions for Meetings of Noteholders, in which Section 5 provides for modifications of the Notes and the Fiscal and Paying Agency Agreement by Extraordinary Resolution. (*See* Def. Tr. Ex. 21.)

[29] *See id.* § 3.

purportedly insiders of Old GM.[30] As an initial matter, although GM Nova Scotia may be an

"affiliate" of Old GM under section 101(2)(B), courts do not consider a subsidiary an insider of

the debtor parent for purposes of an equitable subordination analysis, except in circumstances

where there is evidence that the subsidiary controls the debtor. *See In re Kids Creek Partners,*

*L.P.*, 212 B.R. 898, 929 (Bankr. N.D. Ill. 1997), *aff'd*, 233 B.R. 409 (N.D. Ill. 1999), 200 F.3d

1070 (7th Cir. 2000); *Herzog v. Leighton Holdings, Ltd.*, 239 B.R. 497 (N.D. Ill. 1999)

("Moreover, it was clear from the evidence at trial that [non-insider] had no control over the

Debtor.").[31] Here, there is no evidence that GM Nova Scotia controlled Old GM (because it did

not). Therefore, GM Nova Scotia is not an insider of Old GM, and the Lock-Up Noteholders are

not – and cannot be – insiders of Old GM.

In addition, a creditor is an insider for purposes of an equitable subordination analysis

*only* if the creditor was an insider of the debtor at the time of the allegedly inequitable conduct.

*See In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 69 (Bankr. D. Del. 2002) ("The most important

factor in determining if a claimant has engaged in inequitable conduct for the purposes of

equitable subordination is whether the claimant was an insider or outsider in relation to the

debtor ***at the time of the act***.") (footnote omitted) (emphasis added); *see also Fabricators, Inc. v.*

*Tech. Fabricators, Inc. (In the Matter of Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991);

*In re N&D Props., Inc.*, 799 F.2d 726, 732 (11th Cir. 1986); *In re Featherworks Corp.*, 25 B.R.

---

[30] This argument should be stricken because the GUC Trust never pled it in its Amended Complaint or Amended Objection. *See In re IAC/Interactive Sec. Litig.*, 695 F. Supp. 2d 109, 124 (S.D.N.Y. 2010) ("It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs.") (citation omitted). In any event, the three-prong *Mobile Steel* test is applicable whether the claim being sought to subordinate is that of an insider or a non-insider. When the creditor is an insider, the dealings are subjected to greater scrutiny. *See Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 564 (Bankr. S.D.N.Y. 2002).

[31] The cases cited by the GUC Trust are inapposite. *See In re AEG Acquisition Corp.*, 161 B.R. 50 (9th Cir. BAP 1993) (holding that the parent of the debtor was insider); *In re Oxford Health Investors, L.L.C..*, No. 00-80676C-7D, 2002 WL 31031631 (Bankr. M.D.N.C. Sep. 3, 2002) (holding that the insiders were part of a corporate family that potentially controlled the debtor); *NMI Sus. Inc.*, 179 B.R. 357 (Bankr. D.D.C. 1995) (holding that a subsidiary was an insider where the parent company was a mere holding company, employing many of the same officers and directors as the subsidiary).

634, 640 (Bankr. E.D.N.Y. 1982), *aff'd,* 36 B.R. 460 (E.D.N.Y. 1984). None of the alleged actions support a claim of "control" under the Bankruptcy Code during the allegedly inequitable conduct, or provides any support for a claim that the Lock-Up Noteholders were insiders of GM Nova Scotia or Old GM at any time. In fact, the evidence shows the exact opposite: the Lock-Up Noteholders were not provided with significant information regarding GM Canada. (Trial Tr. 8/9/12 (Buonomo) 197:22-199:5; Pl. Tr. Ex. 29 at AUR_GM014285; Def. Tr. Ex. 446; Trial Tr. 3/6/13 (Lopez) 126:1-127:15 (discussing the need to keep hidden, "on the down and low," the imminent receipt by GM Canada of the $1.6 billion Tax Refund).)  For that reason, the GUC Trust does not allege that the Lock-Up Noteholders were insiders of GM Nova Scotia prior to the appointment of Peter Wedlake as trustee on October 9, 2009. The alleged inequitable conduct cited by the GUC Trust involves events that occurred prior to that date, such as the filing of the Nova Scotia Litigation on March 2, 2009 and the negotiation and finalization of the Lock-Up Agreement on June 1, 2009. Thus, the Lock-Up Noteholders are not insiders for the purpose of the equitable subordination analysis.

The GUC Trust argues that the exercise of their routine creditor rights under Canadian law (such as selecting a trustee and voting on the appointment of inspectors) made the Lock-Up Noteholders insiders of GM Nova Scotia. (GUC Trust Br. at 51-52.) First, the GUC Trust erroneously conflates GM Nova Scotia with the Nova Scotia Trustee who is not an insider of GM Nova Scotia but "an administrative official required [by statute] to gather in and realize on the bankrupt's assets . . . ." Frank Bennett, BENNETT ON BANKRUPTCY 69 (14th ed. 2012).[32] For example, creditors select a trustee as a standard practice in Canada. (Wedlake Direct Test. ¶¶ 8-9.) Canadian courts are required to appoint a licensed trustee, and the creditors seeking the bankruptcy order are ***required*** to provide the court with the consent of a licensed trustee. (Def.

---

[32] *See also* NS Trustee Reply Brief § II.A.

Tr. Ex. 1 (BIA) §§ 43(9), 14.06(1).) The process in Canada is similar to that in the U.S. for selection of a chapter 7 trustee. Under section 702(a)(3) of the Bankruptcy Code, *non-insider* creditors elect the chapter trustee. If the GUC Trust were correct, by voting to select a chapter 7 trustee, such non-insiders would be transformed into insiders, ineligible to vote. The Lock-Up Noteholders' compliance with their obligations under Canadian law by selecting Peter Wedlake as trustee cannot constitute the exercise of undue control over GM Nova Scotia.

The GUC Trust also has not explained how any of the alleged actions caused injury to any creditors of Old GM, or GM Nova Scotia for that matter. As described in Sections II and III.A of the Post-Trial Memorandum of Green Hunt Wedlake Inc., dated May 24, 2013 [Adv. Doc. No. 222] and Sections II.B and II.C of the NS Trustee Reply Brief, the Lock-Up Noteholders did not control or direct the Nova Scotia Trustee, who at all times made his own independent determinations. Therefore, the Lock-Up Noteholders are not insiders of Old GM.

### B.  The GUC Trust Failed to Prove Inequitable Conduct

Unless the claimant controls the debtor, "the proponent of equitable subordination must show wrongful conduct involving *fraud, illegality, or some other breach of a legally recognized duty.*" *Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C. (In re Vargas Enters., Inc.)*, 440 B.R. 224, 241 (S.D.N.Y. 2010) (citation omitted) (emphasis added). The Lock-Up Noteholders are not insiders of Old GM, nor did they control it.[33] Although the GUC Trust has made numerous inflammatory allegations of wrongdoing, it failed to present *any* evidence of misconduct, much less evidence of fraud, illegality, or breach of a legally recognized duty.

---

[33] The GUC Trust does *not* allege that the Noteholders controlled Old GM. Rather it alleges that the Lock-Up Noteholders are insiders of Old GM under section 101(31) of the Bankruptcy Code by virtue of their alleged control of GM Nova Scotia. (*See* GUC Trust Br. at 51-52.) As shown above, the Lock-Up Noteholders did not control GM Nova Scotia, and thus are not, and cannot be, insiders of GM Nova Scotia or its parent, Old GM.

The GUC Trust makes six allegations to support its equitable subordination claim. (GUC Trust Br. at 52-53.) An examination of each of the allegations shows how badly the GUC Trust has failed to satisfy the rigorous standard required for the "drastic and unusual" remedy it seeks. *See Springfield*, 379 B.R. at 434 (S.D.N.Y. 2007) (citation omitted).

The GUC Trust recklessly asserted that a "band" of Noteholders threatened to force GM Canada into bankruptcy to extract an unreasonable Consent Fee and other unfair terms under the Lock-Up Agreement from Old GM on the eve of its bankruptcy. (*See* GUC Trust Pre-Trial Brief at 1.) In its post-trial brief, the GUC Trust revised this contention into the equally unsupported allegation that the Lock-Up Noteholders "threatened to tie up" Old GM's bankruptcy unless they were paid the "commercially unreasonable Consent Fee." (*See* GUC Trust Br. at 52.) None of the three pieces of evidence cited by the GUC Trust provides any support for its allegation. (*See id.* at 52 n.278.) First, an *internal* communication among employees of one Lock-Up Noteholder about employing a public relations firm cannot possibly constitute a threat to Old GM, especially when it was never communicated to Old GM. (Pl. Tr. Ex. 607 at FOR_GM002644-45.) Second, an internal discussion (also never communicated to Old GM) regarding a possible objection to the 363 Sale cannot constitute a threat to Old GM. (Trial Tr. 9/20/2012 (Truong) 73:24-74:24.) It is well within a creditor's rights to object to a 363 sale. The third piece of evidence cited by the GUC Trust is totally irrelevant to supposedly "tie up the bankruptcy." (Pl. Tr. Ex. 3 at AUR_GM021457 (hand-written notes purportedly summarizing a 5/31/2009 telephone call with "GM and lawyers" in which Old GM informed the Noteholders that "on Friday Old GM loaned the funds required for the Lock-Up Agreement to GM Canada, which issued a three-year note to

Old GM.").) There is no evidence that the Lock-Up Noteholders ever threatened – or considered – "tying up" Old GM's bankruptcy.[34]

Next, in violation of this Court's July 2, 2012 ruling, the GUC Trust wrongly contends that in order to "receive a larger chunk of the Consent Fee and solidify total control of the Nova Scotia Bankruptcy Case, certain Lock-Up Noteholders increased their holdings the day after they entered into the Lock-Up Agreement, before the pertinent facts were known to other creditors of Old GM." (GUC Trust Br. at 52-53.)[35] The GUC Trust fails to provide any evidentiary basis for this allegation, citing solely to four Rule 2019 statements filed in this case by Greenberg Traurig. (See GUC Trust Br. at 53 n.279.) While Appaloosa and Fortress made modest purchases of Notes on June 2, 2009, there is no evidence that the purpose of these purchases was to solidify total control of the GM Nova Scotia bankruptcy case. (Pl. Tr. Ex. 38.) The GUC Trust never elicited any testimony or other evidence about why any Noteholder made any purchase. The exercise of a legal right to trade in the Notes after the issuance of the June 1, 2009 8-K did not breach any duty or constitute misconduct of any nature.

The GUC Trust incorrectly alleges that two of the Lock-Up Noteholders, Fortress and Elliott, acted wrongfully by not disclosing alleged holdings of credit default swaps in their Rule 2019 statement. (GUC Trust Br. at 53.) Rule 2019 only requires the disclosure of certain economic interests held at the time the statement is filed. See FED. R. BANKR. P. 2019(c)(3)(B). No credit default swaps even existed at the time of the filing of any of the Rule 2019 statements, their termination having been triggered when Old GM filed its chapter 11 petition on June 1,

---

[34] Even if there were any truth to the allegations of misconduct against Fortress or any other individual Lock-Up Noteholders, such allegations would not support a finding of inequitable subordination against any other Lock-Up Noteholders, much less any other Noteholders generally.

[35] This allegation violates the Court's order granting the Motion *in limine*, dated July 20, 2012. (Hr'g Tr. 7/17/12 39:5-9 [Adv. Doc No. 136].) It also should be stricken because the GUC Trust never made this argument in its Amended Objection or Amended Complaint. (*See supra* n.30.) To raise it now emphasizes how weak the entire claim is.

2009, a "credit event" under the credit default swaps. (Trial Tr. 09/06/12 (Cederholm) 107:10-16, 107:24-108:6; Trial Tr. 09/20/12 (Truong) 98:7-12.) In addition, even had credit default swaps existed at the time the Rule 2019 statements were filed, the version of Bankruptcy Rule 2019 operative at that time did not require the disclosure of the holdings of derivatives, including credit default swaps. *See* Fed. R. Bankr. P. 2019(a), 2011 Amendment Advisory Committee Note. Moreover, the settlement of the credit default swaps was among private parties and in no way had any effect on Old GM or its estate. (Trial Tr. 09/20/12 (Truong) 102:17-22.) Accordingly, there was no requirement that credit default swaps be included in the Rule 2019 statement.

There is also no merit to the GUC Trust's allegation that the filing of the Nova Scotia Litigation by Fortress, Aurelius, and Appaloosa (collectively, the "**Plaintiff Noteholders**") constituted inequitable conduct. (GUC Trust Br. at 53.) The GUC Trust has failed to present any evidentiary or legal support as to why the filing of a lawsuit to protect one's interest constitutes inequitable conduct. (SOF ¶¶ 8-10.) The Plaintiff Noteholders, with the advice of Canadian counsel, commenced litigation only after their efforts to initiate a dialogue with Old GM were rebuffed. (*Id.* ¶ 8.) That the defendants in that action filed a motion to dismiss the Nova Scotia Litigation does not establish it was meritless. (Am. Obj. ¶ 31.) Indeed, Mr. Buonomo testified that New GM recognized that the outcome of the Nova Scotia Litigation was uncertain. (SOF ¶ 13.)[36] Tellingly, although the GUC Trust retained an expert to opine on other Canadian law issues, it did not even try to offer any expert testimony on Canadian law on oppression claims.

---

[36] The GUC Trust cannot seriously contend, based on the trial evidence, that this Court can determine that the Nova Scotia Litigation lacked merit. The oppression remedy in Nova Scotia and other Canadian statutes is very broad. According to one esteemed commentator on Canadian law, the oppression remedy is "beyond question, the broadest most comprehensive and most open-ended shareholder remedy in the common law world . . . unprecedented in its scope." Stanley Beck, "Minority Shareholders Rights in the 1980s," Special Lectures of the Law Society of Upper Canada, 1982 at 312. It is a fact-driven, contextual analysis. *See BCE Inc. v. 1976 Debentureholders* (2008) 3 S.C.R. 560 (SCC).

Nor did the Lock-Up Noteholders make misrepresentations to the Court and the public by stating their honest and well-founded belief that the Lock-Up Agreement is a prepetition agreement. (GUC Trust Br. at 53.)[37] The evidence shows, as demonstrated in Section II.C of the Noteholders' Opening Post-Trial Brief and Section III.B *infra*, that the Lock-Up Agreement *is* a prepetition agreement. Moreover, it is uncontroverted that the Lock-Up Noteholders and all the other parties who participated in the negotiations and executed the Lock-Up Agreement (including Old GM, Weil Gotshal, Morgan Stanley, and the Governments of the United States, Canada, and Ontario) believed – and continue to believe – it is a prepetition agreement. (*See, supra,* § III.B.) Further, in its October 2009 8-K, Old GM stated that the Lock-Up Agreement was a prepetition agreement. (SOF ¶ 114.)

Finally, the timing of the GM Nova Scotia bankruptcy was not inequitable and did not insulate the Consent Fee or Lock-Up Agreement from challenge. (*See* GUC Trust Br. at 53.) The Lock-Up Agreement and the payment of the Consent Fee were subject to scrutiny by the Nova Scotia Trustee, the Canadian Office of the Superintendent of Bankruptcy, and the Canadian Bankruptcy Court. Under applicable Nova Scotia law, these transactions could be challenged regardless of whether they occurred more than 90 days prior to GM Nova Scotia being declared bankrupt. *See The Statute of Elizabeth*, 150 (Imp.), 13 Eliz., c. 5; the *Assignment and Preferences Act* (Nova Scotia), R.S.N.S. 1989, c.25. Mr. Wedlake testified that he considered but decided against pursuing challenges for several reasons (none of which included the timing of the bankruptcy petition). (Wedlake Direct Test. ¶¶ 38-39.) Moreover, a Canadian court is supervising the Canadian bankruptcy proceeding. The GUC Trust cannot ask this Court to

---

[37] It is notable that the GUC Trust cites only a single instance in support of its contention that the Lock-Up Noteholders "consistently" stated that the Lock-Up Agreement is a prepetition agreement: a statement made in the Noteholders' Response to the Amended Objection. (*See* GUC Trust Br. at 53 n.283.) There is no evidence that, prior to responding to the GUC Trust's claims objection, any Noteholder made any statement to the Court or the public regarding the timing of the Lock-Up Agreement.

violate principles of comity and its own confirmation order by making determinations regarding GM Nova Scotia's bankruptcy proceeding. (*See* Confirmation Order [Bankr. Doc. No. 9941] ¶ 56.)[38]

The evidence presented at trial completely refutes all of the GUC Trust's allegations that the Lock-Up Noteholders engaged in *any* wrongful or inequitable conduct, let alone any that could possibly warrant the extraordinary remedy of equitable subordination of any Noteholder claims.[39] In addition, the GUC Trust has elected not to pursue its prior request to equitably disallow the Claims in its post-trial brief, so that request should be deemed abandoned and denied.

### C.  The GUC Trust Failed to Establish Injury or Unfair Advantage

The GUC Trust fails to even address the second prong of the equitable subordination analysis, other than to make the erroneously conclusory statement that the Lock-Up Noteholders enriched themselves at the expense of other unsecured creditors. (GUC Trust Br. at 53-54.) This unsupported statement cannot and does not satisfy the second prong of the *Mobile Steel* test.

### D.  The Request for Equitable Subordination is Inconsistent With Bankruptcy Law

In the Opening Post-Trial Brief, Section I.A.3, and in its Pre-Trial Brief, dated July 27, 2012 [Adv. Doc. No. 154] (the "**Pre-Trial Brief**"), Section III.A.3, the Noteholders demonstrated that the subordination of the claims is impermissible as it would violate section 1123(a)(4) and conflict with bankruptcy law. The GUC Trust ignores the third prong of the *Mobile Steel* test. The GUC Trust's claim for equitable subordination must be dismissed because

---

[38] The GUC Trust's allegation is particularly inappropriate here as Old GM is not a creditor of GM Nova Scotia, and Old GM was not impaired in any manner by the timing of the GM Nova Scotia filing, the absence of inspectors, or any of the other purported improprieties that the GUC Trust alleges occurred in the GM Nova Scotia bankruptcy proceeding.

[39] Although the GUC Trust does not reference it in its argument, in its "fact" section it erroneously claims that Fortress tried to "rally" the ad-hoc "steering committee" of all GM bondholders to push for a bankruptcy filing. (*See* GUC Trust Br. at 9.) All of the holders of GM indebtedness, not just the Nova Scotia Noteholders, rejected the Bond Exchange Offer. (SOF ¶ 31.)

it is inconsistent with bankruptcy law and for failure to satisfy any of the *Mobile Steel* requirements.

### III. The GUC Trust Has Failed to Provide a Legal or Factual Basis to "Recharacterize" the Consent Fee as a Principal Payment or to Reduce Claims by the Amount of the Consent Fee

There is no basis under New York law to "recharacterize" the Consent Fee as a payment of principal or to reduce the claims by the amount of the Consent Fee. As described in Section II.A of the Opening Post-Trial Brief, under New York Law, a contract should be interpreted "to give effect to the expressed intentions of the parties." *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997). Under the Lock-Up Agreement, the parties expressly agreed that "the Consent Fee payment does not reduce, limit or impair the Notes, the Guaranty Claim[s] or the [Statutory] Claim." (SOF ¶ 63.) That was the intent of the parties and the economic substance of the settlement agreement. As there is no basis under New York law to alter the terms of the Lock-Up Agreement, the Court cannot "recharacterize" the payment of the Consent Fee as a payment of principal. Nevertheless, the GUC Trust wrongly contends that the Court has authority to effect the same result under sections 105 and 502(b) to do so. (*See* GUC Trust Br. at 63 n.316.)[40]

### A. "Recharacterization" is Not Available Under Section 502(b) of the Bankruptcy Code[41]

In relevant part, section 502(b) states:

---

[40] As demonstrated in the Opening Post-Trial Brief, Section II.A, the GUC Trust's "recharacterization" claim is actually a disguised request that the Court change the substantive terms of the Lock-Up Agreement. The GUC Trust appears to have abandoned its request for "recharacterization" and is now asking the Court to reduce (*i.e.* partially disallow) the Claims by the amount of the Consent Fee based on section 502(b) "supplemented" by the Court's equitable powers. (*See* GUC Trust Br. at 63 & n.316.) Regardless of how the GUC Trust characterizes its current claim, as described herein and in Section II of the Opening Post-Trial Brief, there is no basis under section 502(b) and/or section 105 for the Court to reduce the Claims.

[41] The GUC Trust never claimed in its Amended Objection, Amended Complaint or pre-trial brief that the Court could recharacterize the Consent Fee pursuant to section 502(b). This omission requires that the argument be disregarded. (*See* n.30, *supra*.)

> [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . [one of nine specifically enumerated conditions warrants disallowance].

11 U.S.C. § 502(b). The nine exceptions listed in section 502(b) are exclusive. *See, e.g.*, *Heath v. Am. Express Travel Related Servs. Co., Inc. (In re Heath)*, 331 B.R. 424, 435 (B.A.P. 9th Cir. 2005); *Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation)*, 318 B.R. 147, 150-51 (B.A.P. 8th Cir. 2004). Courts have consistently refused to expand the scope of Bankruptcy Code section 502(b) on equitable grounds in determining creditors' allowed claims. *See, e.g.*, *In re Fesco Plastics Corp., Inc.*, 996 F.2d 152, 154-58 (7th Cir. 1993) (holding that a bankruptcy court may not use equitable powers to carve a new exception under Bankruptcy Code section 502(b)(2)).[42] The GUC Trust has failed to cite a single case that supports its contention that the Consent Fee should be "recharacterized" or the claims should be reduced by the amount of the Consent Fee.

The six cases cited by the GUC Trust on this point are all inapposite – all involve straightforward applications of state law, not an exercise of equitable powers or an expansion of the grounds for disallowance under section 502(b). (GUC Trust Br. at 63-64 (citing *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 617-18 (7th Cir. 2005), *cert. denied*, 547 U.S. 1003 (2006) (applying state law to determine that a purported lease was actually a secured loan); *Kool, Mann, Coffee & co. v Coffey*, 300 F.3d 340, 364 (3d Cir. 2002) (applying state law to treat payments as interest where extensive fraud made it impossible to determine the amount,

---

[42] *See also United States v. Sanford (In re Sanford)*, 979 F.2d 1511, 1513-14 (11th Cir. 1992) (finding the court could not use its equitable powers to reduce a tax claim given the requirements of section 502(b)(1)); *1500 Mineral Spring Assocs., LP v. Gencarelli*, 353 B.R. 771, 785 (D.R.I. 2006) (declining to utilize equitable authority under section 105(a) to disregard the cap of a lease claim under section 502(b)(6) in order to avoid a "windfall" to the debtor); *In re Windsor Constructors, Inc.*, No. 03-36589 (ELF), 2006 WL 4005568, at *6 (Bankr. E.D. Pa. Jan. 10, 2007) (declining to disallow a creditor's claim under section 502(b)(1) as there was no basis under applicable non-bankruptcy law for negating the creditor's claim and declining to utilize equitable authority under section 105(a) to disregard the requirements of Bankruptcy Code section 502(b)(1)).

if any, of contractual interest due); *Bozzuto's, Inc. v. Vescio*, 234 F.3d 1261, No. 00-5040, 2000 WL 1715281, at *2 (2d Cir. Nov. 13, 2000) (unpublished opinion) (summarily interpreting lease contract provisions and following *Liona Corp., Inc. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 597 (2d Cir. 1991); *Liona*, 949 F.2d at 597 (applying state law to determine that a purported sale-leaseback transaction was actually an equitable mortgage); *In re Premier Enm't Biloxi, LLC*, 413 B.R. 370, 374-375 (Bankr. S.D. Miss. 2009) (disallowing a lessor's claim for liquidated damages under section 502(b)(1) as contrary to applicable state law and subject to the 502(b)(6) cap.); *Ames*, 274 B.R. at 623-25) (applying state law to determine that a trust was not created by a contract providing that sales proceeds be held "in trust"). Under applicable New York law, the payment of the Consent Fee did not reduce the principal amount owing on the Notes. (*See* Opening Post-Trial Brief § II.A.)

The Lock-Up Agreement is governed by New York law and, applying New York law, this Court is required to enforce the parties' agreement. Section 105(a), section 502(b), or any other provision of the Bankruptcy Code does not confer on the Court authority to "recharacterize" the payment of the Consent Fee as a payment of principal or reduce the principal amount of the claims. (*See id*. §§ II.A, B.)

B.    The Lock-Up Agreement is a Valid Prepetition Agreement

The GUC Trust wrongly contends that the Lock-Up Agreement was not complete and binding until after Old GM filed for bankruptcy on June 1, 2009. (GUC Trust Br. at 55-58.) As an initial matter, the Lock-Up Agreement provides that the parties to the agreement became bound upon execution and delivery of signature pages to the agreement. (Def. Tr. Ex. 174 ¶ 10.) The GUC Trust admits this. (GUC Trust Br. at 17.) Each and every participant in the negotiations (on both sides) who testified stated that the all parties executed and delivered

32

signature pages before Old GM filed its chapter 11 petition. Individuals in varying roles representing all the parties to the agreement testified to exactly that:[43]

- ✓ <u>Larry Buonomo (Old GM)</u>: "The signature pages to the Lock-Up Agreement were exchanged and presented to Canadian Government representatives by all the parties prior to Old GM commencing its bankruptcy case. At that time, all parties to the Lock-Up Agreement were bound to each other." (Buonomo Direct Test. ¶ 18(i).)

- ✓ <u>Dan Amman (Old GM Financial Advisor)</u> ". . . . I responded at 6:49 a.m. on June 1, 2009 that '[w]e are done.' It was shortly before this point that I believed the Lock-Up Agreement was fully executed and completed." (Ammann Direct Test. ¶ 25.)

- ✓ <u>Bao Truong (Fortress)</u>: "I kept Mr. Dakolias' signature page until approximately 7 a.m. on June 1, 2009, when we had finished revising the Lock-Up Agreement. At that time, I released his signature page to someone at Weil's offices, although I do not recall to whom I gave the signature page. I believed Fortress was bound to the Lock-Up Agreement once I released Mr. Dakolias' signature page." (Truong Direct Test. ¶¶ 59-60.)

- ✓ <u>Jim Bolin (Appaloosa)</u>: "I considered all the parties to the Lock-Up Agreement, including Appaloosa, to be bound to the Lock-Up Agreement at the time they executed and delivered their signature pages, prior to the review by the Canadian government discussed above. Because a final, binding agreement was reached between all the parties by approximately 7:00 a.m., and signature pages had been executed, released and approved, I left Weil's offices between approximately 7:00 a.m. and 7:30 a.m. on June 1, 2009, prior to Old GM's bankruptcy filing." (Bolin Direct Test. ¶ 50.)

- ✓ <u>Aurelius (Dan Gropper)</u>: "I signed the Lock-Up Agreement at approximately 7:00 a.m. EDT, June 1, 2009. I recall releasing my signature pages to another individual at about 7:15 a.m. EDT, but I cannot remember whom specifically. I considered Aurelius bound by the terms of the Lock-Up Agreement when I released my signature pages. The Lock-Up Agreement was executed and delivered by all parties before [Old GM] filed its bankruptcy petition." (Gropper Direct Test. ¶¶ 73-74, 76, 79.)

- ✓ <u>Didric Cederholm (Elliott)</u>: "Between 7:00 and 7:30 a.m., the Elliott signature page was released. Also between 7:00 and 7:30 a.m., I left the conference room where the Noteholders sat and went to another conference room at Weil Gotshal's offices to inspect the Lock-Up Agreement and the signature pages thereto. I walked into the conference room with Mr. Truong, who reviewed the final document with me. I flipped pages of the Lock-Up Agreement for a few minutes

---

[43] The only changes made to the Lock-Up Agreement after it was executed and delivered were made prepetition and consisted of minor corrections that had previously been agreed upon by the parties, but omitted inadvertently. No further changes to the Lock-Up Agreement were authorized after that time, and no further negotiations took place. (SOF ¶¶ 52-53.)

to confirm that the Lock-Up Agreement was complete and that the signature pages for all parties to the agreement were assembled. . . . The Lock-Up Agreement was negotiated, drafted, signed, and delivered prior to [Old GM's] bankruptcy filing." (Cederholm Direct Test. ¶¶ 52, 53, 55.)[44]

The GUC Trust does not offer any affirmative evidence to contradict this testimony but asks the Court to ignore the uncontroverted testimony based on purported inconsistencies fabricated by conflating and misstating snippets of testimony of a few witnesses. (GUC Trust Br. at 17.) Mr. Cederholm's testimony that "there was an agreement on all substantive terms by 2:00 a.m." is consistent with the testimony of others that the agreement was finalized later that morning. (*Id.* at 17 n.85.) Importantly, Mr. Cederholm did *not* testify that the Lock-Up Agreement was finalized, executed, and delivered at 2:00 a.m. (Cederholm Direct Test. ¶ 45.) In this portion of his testimony, Mr. Cederholm testified that agreement on the terms was reached by *6:00 a.m.*, without "any subsequent substantive or material changes" after that time, which is "round about" the same time that Mr. Amman testified that the Lock-Up Agreement was final. (*Id.* ¶¶ 49-50; Trial Tr. 9/27/2012 (Amman) 141:2-22.) For his part, Mr. Bolin testified that he "signed the Lock-Up Agreement between 6:00 a.m. and 7:00 a.m., and released [his] signature pages to Old GM at that time." (Bolin Direct Test. ¶ 47.) The testimony of Messrs. Ammann, Cederholm, and Bolin is consistent.

The GUC Trust identifies only one other purported inconsistency in the testimony: that Mr. Cederholm testified that Elliott released its signature page between 7:00 a.m. and 7:30 a.m., while Mr. Buonomo allegedly testified that all parties released signature pages by 6:45 a.m., except possibly Mr. Gropper. (GUC Trust Br. at 17 n.85.) In fact, Mr. Buonomo testified that "it's really hard on the times" and "by **roughly** 6:45 I think everyone had delivered signature

---

[44] In addition to the individual participants in the negotiations, Joseph Smolinsky testified, as Weil Gotshal's Fed. R. Civ. P. 30(b)(6) witness, that it was his belief that the Lock-Up Agreement was entered into prepetition. (Dep. Tr. 05/24/2012 (Smolinsky) 15:10-16:11.)

pages except possibly Mr. Gropper who was proofreading, needed more time." (Trial Tr. 8/9/2012 (Buonomo) 229:6-23 (emphasis added).) There is no inconsistency.

All of the so-called discrepancies in the testimony raised by the GUC Trust are non-substantive and do not provide any basis to impugn the credibility of any of the parties who participated in the Lock-Up Agreement negotiations. *See Silva v. Miller*, No. 04-CV-8013 (KMK)(LMS), 2009 WL 4060946, at *1 (S.D.N.Y. Nov. 24, 2009) ("Minor discrepancies between the testimony of witnesses is not sufficient to show that a witness's testimony was incredible as a matter of law.") (citation omitted); *see also Va. Motor Exp. v. Jimenez*, 76 F.2d 694, 695 (4th Cir. 1935) ("Trial experience extending over some years teaches us that small differences in exact details in the accounts of events which have happened very rapidly frequently occur, although all of the witnesses may be honestly trying to tell the truth. Exact agreement in minute detail would be so rare that it might create doubt as to the bona fides of the testimony."). The witnesses here cannot be found to lack credibility because of slight and inconsequential differences in their recollection of events that occurred more than three years earlier.

The evidence cited by the GUC Trust itself demonstrates that the Lock-Up Agreement circulated by Weil Gotshal at 10:37 a.m. on June 1, 2009 is a copy of the Lock-Up Agreement that the parties finalized, and delivered executed signature pages to, prior to the filing of Old GM's chapter 11 case (the "**10:37 Copy**"), refuting the GUC Trust's contention that no copy of the prepetition Lock-Up Agreement was ever produced. (*See* GUC Trust Brief at 17 n. 86.)

When asked, all of the witnesses agree that the 10:37 Copy contains the final agreement executed by the parties that morning. (Pl. Ex. 16 at WGM0000791; Trial Tr. 8/8/2012 (Zirinsky) 51:10-53:22; Trial Tr. 9/20/2012 (Truong) 18:15-19:3; Trial Tr. 9/27/2012 (Ammann) 143:18-

144:9.) There is no evidence (or even an argument) that the 10:37 Copy differed materially in any respect.[45] Thus, the Lock-Up Agreement, memorialized in the 10:37 Copy, is a valid and enforceable agreement that was reached and effective prepetition. It is this content that governs the inquiry, not in what container Weil Gotshal saved the content in its computer system. Faced with the uncontroverted testimony and documents demonstrating that the parties to the Lock-Up Agreement finalized and executed it prior to 7:57 a.m. on June 1, 2009, the GUC Trust relies on its expert, Keith Jones, who opined that the 10:37 Copy was created on Weil Gotshal's DocsOpen system no earlier than 9:21 a.m. on June 1, 2009. (GUC Trust Br. at 58.) When a Weil Gotshal associate may have created a new copy of the Lock-Up Agreement, however, is not relevant under New York law, and has no effect on the validity or effectiveness of the agreement.

The facts and legal findings in *Lubrication & Maint., Inc. v. Union Resources Co, Inc.*, 522 F. Supp. 1078, 1079 (S.D.N.Y. 1981) are directly on point. There, the parties executed a marked-up purchase and sale agreement (dated February 1, 1980) with the understanding that a clean copy of the agreement would be retyped and re-executed. *Id.* Fifteen days later, the defendant retyped the agreement changing its form but not its substance, executed the retyped agreement, and sent it to the plaintiff. *Id.* The plaintiff then inserted a new provision in the retyped agreement and returned it to the defendant. *Id.* The defendant argued that there was no valid agreement because the plaintiff had made a material change to the agreement by inserting the new provision. The court found that a binding agreement existed when the parties executed the original marked-up copy of the agreement, and that the subsequently retyped agreement was "simply a clean typewritten copy of their previously signed agreement," and noted that if the

---

[45] Notably, although the GUC Trust wrongly contends that certain changes were made to the Lock-Up Agreement postpetition, as shown in Section II.C of the Opening Post-Trial Brief, none of the alleged postpetition changes would constitute material changes (much less material changes to Old GM's obligations). (Opening Post-Trial Brief at 29-30; *see also* Def. Demo. Ex. No. 4.) The GUC Trust does not even attempt to argue why the alleged changes could be considered material.

parties "had decided not to have a 'clean' copy, there could not be the slightest basis for any claim that a binding agreement was not in effect." *Id.* at 1079-80; *see also Flexco Microwave, Inc. v. Megaphase LLC*, Civ. Act. No. 04-1339(TJB), 2009 WL 649654, at *1, 4 (D.N.J. Mar. 6, 2009) (holding that, where an executed marked-up agreement was subsequently retyped, the agreement was reached and effective when the parties finalized the marked-up copy, and the retyped copy was enforceable – subject to striking one material change – notwithstanding certain other differences which were either consistent with the marked-up document or not material.)[46] Therefore, the Lock-Up Agreement, memorialized in the 10:37 Copy, is a valid and enforceable agreement that was reached and effective prepetition.

The GUC Trust never contends that the parties actually negotiated any terms after 7:57 a.m. nor that any of the purported edits it contends were made in Weil Gotshal's DocsOpen system after 7:57 a.m. are material in any way. Instead, the GUC Trust essentially argues that parties cannot be bound to an executed and signed agreement unless and until a perfectly pristine version exists. (GUC Trust Br. at 55-57.) This position reflects neither the terms of the Lock-Up Agreement nor the law. (Opening Post-Trial Brief § II.C.) None of the cases cited by the GUC Trust supports this extraordinary proposition.

In every case cited by the GUC Trust, the parties did *not* have any fully signed and executed contract. In *GSGSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1169, 1171 (S.D.N.Y. 1994), the parties exchanged draft proposals and a series of letters, but no agreement existed that either party considered final or that had been executed by the parties. *GSGSB* does not address or consider the question of whether minor corrections affect the validity of a contract; in fact, the

---

[46] New Jersey law on contract formation is substantially similar to New York law. *Compare Flexco Microwave, Inc. v. Megaphase LLC*, Civ. Act. No. 04-1339(TJB), 2009 WL 649654, at *3 (D.N.J. Mar. 6, 2009), *with Express Indus. & Terminal Corp. v. N.Y. State Dept. of Transp.*, 93 N.Y.2d 584, 589-90 (1999), *reargument denied*. 93 N.Y.2d 1042 (1999).

court focused on the need for a "formal signing . . . intended to give rise to a binding contract" – exactly what the parties did in this case. *Id.* at 1172. Similarly, in *Bear Stearns Inv. Prods, Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598, 619 (S.D.N.Y. 2009), no documents were ever finalized and executed. The GUC Trust's remaining citations are all irrelevant to the case at hand for this same reason: a party sought to enforce an unexecuted agreement based on drafts or other ancillary documents.[47] Not a single case cited by the GUC Trusts suggests that a court would deem unenforceable a signed, executed agreement containing minor, non-material corrections that may have occurred after signing. New York courts do not impose the strict and absolute requirements sought by the GUC Trust, requirements that would open the door to undo many contracts.

The validity of the Lock-Up Agreement is not affected by the fact that Weil Gotshal may have disposed of, or lost, the copy of the Lock-Up Agreement that the parties executed.[48] Under New York law, a binding agreement exists even when the original contract has been lost. *See Vasiliades v. Lehrer McGovern & Bovis, Inc.*, 3 A.D.3d 400, 402 (N.Y. App. Div. 2004) ("Even though the parties apparently lost the written contract between Bovis and General, the affidavit

---

[47] *See Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 324 (2d Cir. 1997) (finding no binding agreement where "the parties contemplated that the moment of signing [was] the point when the settlement would become binding"); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262-63 (2d Cir. 1984), *cert. denied*, 469 U.S. 828 (1984) (finding no enforceable contract where the parties never executed an agreement); *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 82-83 (2d Cir. 1985) (holding there was no binding agreement where there was no executed agreement as evidenced by "unwillingness to have [document] executed and delivered"); *Chariot Group, Inc. v. Am. Acquisition Partners, L.P.*, 751 F. Supp. 1144, 1151 (S.D.N.Y. 1990), *aff'd*, 932 F.2d 956 (2d Cir. 1991) (holding that a party expressed its intention not to be bound because it never directed its attorney to release and deliver its signature from escrow, particularly). *Gucci Am., Inc. v. Gucci*, No. 07 Civ. 6820 (RMB), 2009 WL 440463 (S.D.N.Y. Feb. 20, 2009) is completely irrelevant, as the court there did not need to decide whether an unexecuted agreement was binding, as at most it would be "a license agreement that was subject to a condition precedent, the condition being that [one of the parties] prevail in this case." *Id.* at *4.

[48] Weil Gotshal indisputably was the custodian of the documents during the drafting process, and lost or destroyed the original copy. Weil Gotshal took extensive steps to search for that copy and other drafts of the Lock-Up Agreement and produced copies of everything it found. (*See* Pl. Tr. Ex. 686.) Tellingly, despite ample opportunity to do so, the GUC Trust never called a witness from Weil Gotshal to testify that the Lock-Up Agreement was finalized and executed postpetition. Its failure to present any factual evidence to rebut the witnesses' testimony should be deemed an admission that there is none.

of a Bovis officer with personal knowledge of the existence of the contract and the specific provisions of its indemnification clause was sufficient to warrant summary judgment on the third-party claims for contractual indemnification against General, particularly since General has not denied the existence of the contract or the terms as related by Bovis."); *see also Schozer v. William Penn Life Ins. Co. of N.Y.*, 84 N.Y.2d 639, 644 (1994), *leave to appeal denied*, 89 N.Y.2d 810 (1997) ("[A] strict requirement of the original writing would serve to extinguish otherwise valid legal claims or defenses where a party has, through no mischief or bad faith, lost or destroyed an original. As stated by one commentator, the failure to excuse the loss of an original 'would in many instances mean a return to the bygone and unlamented days in which to lose one's paper was to lose one's right.'") (citation omitted). Nor can the Noteholders be penalized because Weil Gotshal did not produce or retain the copy of the Lock-Up Agreement that the parties completed at about 7:00 a.m. on June 1, 2009.

The GUC Trust is not a party to the Lock-Up Agreement, did not participate in the negotiations of the Lock-Up Agreement, did not review the prepetition copy, and has no standing to assert its baseless and self-serving claims that the Lock-Up Agreement is invalid, in particular years after the Lock-Up Agreement was executed and performed. *See In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 522 (Bankr. E.D.N.Y. 1994) (noting that the court could not find any case law allowing a stranger to a contract to contest its validity unquestioned by the contracting parties). Mr. Jones' testimony does not refute the testimony of any of the other witnesses, and all of the testimony shows that the Lock-Up Agreement was agreed to and fully executed before the bankruptcy filing. Any other finding would be contrary to all of the testimony and New York law.

## IV.    The Court Should Not Grant New GM's Request for an Advisory Opinion

New GM has asks this Court to hold that, regardless of the outcome of the current litigation, the "release given by GM Nova Scotia to GM Canada, and the dismissal of the Nova Scotia Litigation is valid and remains in force in its entirety." (Opening Post-Trial Brief by General Motors LLC, dated May 24, 2013 [Adv. Doc. No. 221] at 40.) As discussed in the Paulson Reply Brief, these issues are not before this Court, have not been litigated, and the Court should not render advisory opinions on matters which are not at issue; moreover, the Court does not have jurisdiction over a hypothetical dispute between two Canadian non-Debtors. (*See* Paulson Reply Brief § IV.)

### CONCLUSION

For all the foregoing reasons and the reasons described in the Noteholders' Opening Post-Trial Brief, the Noteholders respectfully request the Court overrule the Objection, grant judgment in favor of the Noteholders on the Amended Complaint, dismiss the Amended Complaint with prejudice, allow the Guarantee Claims and the Statutory Claim in full, and grant such other and further relief as is just.

Dated: July 11, 2013                          GREENBERG TRAURIG, LLP

                                              By: */s/ Bruce R. Zirinsky*
                                              Bruce R. Zirinsky, Esq.
                                              John H. Bae, Esq.
                                              Gary D. Ticoll, Esq.
                                              Paul T. Martin, Esq.
                                              MetLife Building
                                              200 Park Avenue
                                              New York, NY 10166
                                              Telephone: (212) 801-9200
                                              Facsimile: (212) 801-6400
                                              Email: zirinskyb@gtlaw.com
                                                     baej@gtlaw.com
                                                     ticollg@gtlaw.com
                                                     martinpt@gtlaw.com

Kevin D. Finger, Esq.
Bevin M. Brennan, Esq.
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
E-mail: fingerk@gtlaw.com
        brennanb@gtlaw.com

Joseph P. Davis III, Esq.
One International Place
Boston, MA 02110
Telephone: (617) 310-6000
Facsimile: (617) 310-6001
E-mail: davisjo@gtlaw.com

*Attorneys for Elliott Management Corporation,
Fortress Investment Group LLC and Morgan
Stanley & Co. International plc, and/or entities
managed by them, including Drawbridge DSO
Securities LLC, Drawbridge OSO Securities
LLC, FCOF UB Securities LLC,  Elliott
International LP and The Liverpool Limited
Partnership*