DICKSTEIN SHAPIRO LLP
Barry N. Seidel
Eric B. Fisher
Katie L. Weinstein
Mary Kim (admitted *pro hac vice*)
1633 Broadway
New York, New York 10019-6708
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Counsel for Motors Liquidation*
*Company GUC Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| MOTORS LIQUIDATION COMPANY, *et al.,* | : | Case No.:  09-50026 (REG) |
| f/k/a General Motors Corporation, *et al.,* | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : |  |

-----------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| MOTORS LIQUIDATION COMPANY GUC TRUST, | : |  |
|  | : |  |
| Plaintiff, | : | Adversary Proceeding |
|  | : | Case No.:  12-09802 |
| v. | : |  |
|  | : |  |
| APPALOOSA INVESTMENT LIMITED | : |  |
| PARTNERSHIP I, *et al.,* | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

-----------------------------------------------------------------------x

# GUC TRUST'S OMNIBUS POST-TRIAL REPLY BRIEF IN CONNECTION WITH (I) OFFICIAL COMMITTEE OF UNSECURED CREDITORS' FIRST AMENDED OBJECTION TO CLAIMS FILED BY GREEN HUNT WEDLAKE, INC. AND NOTEHOLDERS OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY AND MOTION FOR OTHER RELIEF (BANKR. DKT. NO. 7859) AND (II) MOTORS LIQUIDATION CO. GUC TRUST V. APPALOOSA INVESTMENT LTD. PARTNERSHIP I, *ET AL.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iv

INDEX OF FOREIGN LAW AUTHORITIES ........................................................................ xii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................. 3

I.     SECTION 502(d) REQUIRES DISALLOWANCE OF THE DISPUTED
      CLAIMS ........................................................................................................................ 3

     A.     Section 502(d) Is A Complete Defense To The Disputed Claims ......................... 3

     B.     Payment Of The Consent Fee Was An Avoidable Postpetition
            Transfer Under Section 549 ................................................................................... 7

           1.     The Proceeds Of The $450 Million Loan Were Property Of
                 The Estate ................................................................................................. 7

           2.     The Transfers Of The Consent Fee Proceeds Should Be
                 Collapsed ................................................................................................ 10

           3.     The $450 Million Loan Was Not Authorized ......................................... 13

           4.     Avoidance Claims Related To Payment Of The Consent Fee
                 Were Not Sold to New GM ...................................................................... 13

     C.     Alternatively, To The Extent The $450 Million Loan Is Deemed A
            Prepetition Transfer, The Consent Fee Is Nonetheless Avoidable
            Under Sections 547 And 548 Of The Bankruptcy Code........................................ 15

     D.     The Defenses Raised By The Noteholders As To The Avoidability
            Of The Transfers Are Without Merit ................................................................... 16

           1.     The Noteholders Did Not Take The Transfer "In Good
                 Faith" ...................................................................................................... 16

           2.     The Section 546(e) Safe Harbor Does Not Apply ................................... 17

           3.     The Lock-Up Agreement Was Not Assumed and Assigned .................... 18

     E.     The $450 Million Loan Was Not Repaid .............................................................. 19

II.    THE TAINTED CLAIMS AND THE NOVA SCOTIA TRUSTEE
      CLAIM SHOULD BE EQUITABLY SUBORDINATED ............................................. 26

A.    The GUC Trust Has Standing ...................................................26

B.    Defendants Have Failed To Prove Good Faith And Fairness ...................28

C.    The Lock-Up Noteholders Behaved Inequitably ...........................29

D.    The Nova Scotia Trustee Behaved Inequitably ...........................30

E.    The Subordination Defendants Injured Old GM's Creditors While
Unfairly Advantaging Themselves ...........................................32

F.    Equitable Subordination Is Consistent With Bankruptcy Law ...............34

III.    THE LOCK-UP AGREEMENT IS A POSTPETITION AGREEMENT ...........37

A.    The 10:37 Version Was Entered Into Postpetition ...................37

B.    The Lock-Up Agreement Was Still Being Revised When Old GM
Filed For Bankruptcy ...........................................................38

C.    The Parties Intended To Be Bound When The Lock-Up Agreement
Was Complete And Aspired, But Failed, To Complete The
Agreement Prepetition ...........................................................42

D.    No Oral Agreement Was Ever Contemplated ...........................44

IV.    THE LOCK-UP AGREEMENT IS VOID ...........................................46

V.    THE CONSENT FEE PAYMENT SHOULD BE APPLIED TO REDUCE
THE PRINCIPAL AMOUNT OF THE NOTES ...................................49

VI.    THE NOVA SCOTIA TRUSTEE CLAIM IS DUPLICATIVE OF THE
GUARANTEE CLAIMS AND SHOULD BE DISALLOWED TO THE
EXTENT OF THE NOTES ...........................................................51

A.    The Law of Every Applicable Jurisdiction Mandates That There
Can Be Only One Allowed Claim For One Loss ...........................51

1.    The Second Circuit's Holding In *Delta* Is Consistent With
The Long-Standing Principles Of New York And Second
Circuit Law That Creditors May Only Claim Once For One
Loss, Even If The Claims Are Asserted By Nominally
Different Claimants ...........................................................53

2.    The Rule Against Double Proof Is An Equitable Principle
That Prevents Concurrent Enforcement Of The Nova Scotia
Trustee Claim And The Guarantee Claims For Amounts
Due Under The Notes ...........................................................56

ii

B.      Section 135 Of The Nova Scotia Companies Act Does Not Entitle
        The Noteholders To Two Claims On Account Of One Loss ...................................60

        1.      The History And Purpose Of Section 135 Indicates
                Legislative Intent To Preclude Concurrent Enforcement Of
                The Nova Scotia Trustee Claim And The Guarantee Claims .......................60

C.      Disallowance Of The Nova Scotia Trustee Claim Does Not
        Impermissibly Disregard The Separate Legal Personality Of GM
        Nova Scotia ...........................................................................................................63

        1.      The Nova Scotia Trustee Claim Does Not Belong To GM
                Nova Scotia ...............................................................................................63

        2.      The Principle Of Separate Legal Personality Of GM Nova
                Scotia Does Not Support Allowance Of The Nova Scotia
                Trustee Claim To The Extent Of Duplication With The
                Guarantee Claims .......................................................................................64

D.      Wedlake Resorts To Baseless Attacks On Professor Khimji's
        Qualifications ........................................................................................................65

E.      The Nova Scotia Trustee Claim Must Be Disallowed Pursuant To
        Section 502(e) Of The Bankruptcy Code ..............................................................67

VII.    THE PORTION OF THE NOVA SCOTIA TRUSTEE CLAIM THAT IS
        BASED ON THE SWAPS SHOULD BE DISALLOWED ..................................................69

A.      The Swaps Were Not Assumed And Assigned To New GM ..................................69

B.      The Swaps Were Expressly Excluded From The 363 Sale To New
        GM .........................................................................................................................70

C.      The Swaps Are Not Purchased Assets Under The MSPA ......................................71

D.      Even If The Swaps Were Purchased Contracts, New GM Assumed
        The Swap Liability .................................................................................................72

E.      The Express Provisions Of The Swaps Govern Their Termination
        And Calculation Of Amounts Due ..........................................................................73

VIII.   THE JOINT STATEMENT OF FACTS
        RELIES ON EXHIBITS NOT IN EVIDENCE ..................................................................74

CONCLUSION .................................................................................................................................75

APPENDIX .............................................................................................................................. A-1

iii

# TABLE OF AUTHORITIES

**Cases**          **Page**

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
   169 B.R. 832 (Bankr. S.D.N.Y. 1994) ................................................................. 32

*Acton v. Fullmer (In re Fullmer)*, 323 B.R. 287 (Bankr. D. Nev. 2005) ................................. 39, 45

*Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008),
   *adhered to on reconsideration*, Nos. 05 Civ. 9050 (LMM), 03 MDL 1529,
   2008 WL 1959542 (S.D.NY. May 5, 2008). ....................................................... 37

*Adjustre Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543 (2d Cir. 1998) ................................. 44

*Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*,
   321 B.R. 308 (Bankr. M.D. Fla. 2005), *rev'd on other grounds*, 490 F.3d 1325
   (11th Cir. 2007) .................................................................................................... 14

*Bailey v. Glover*, 88 U.S. 342 (1874) ......................................................................................... 1

*Bankers Trust Co. v. Seidle (In re Airlift Int'l Inc.)*,
   70 B.R. 935 (Bankr. S.D. Fla. 1987) .................................................................. 39

*Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*,
   401 B.R. 598 (S.D.N.Y. 2009) ........................................................................... 39, 44

*Bozzuto's Inc. v. Vescio*, 234 F.3d 1261 (Table), No. 00-5040,
   2000 WL 1715281 (2d Cir. Nov. 13, 2000) ....................................................... 50

*Brown v. I.R.S. (In re Larry's Marineland of Richmond, Inc.)*,
   166 B.R. 871 (Bankr. E.D. Ky. 1993) ................................................................. 5

*Bruno Mach. Corp., v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)*,
   435 B.R. 819 (Bankr. N.D.N.Y. 2010) ............................................................... 17

*Canada Trustco Mortgage Co. v. R.*,
   2005 SCC 54 ........................................................................................................ 61

*Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust
   (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332 (1st Cir. 1992) ............. 30

*Central Trust Co. v. Rafuse*, [1986] 2 SCR 147 (SCC) ............................................................. 53

*Chariot Grp., Inc. v. Am. Acquisition Partners, L.P.*,
   751 F. Supp. 1144 (S.D.N.Y. 1990), *aff'd without opinion*,
   932 F.2d. 956 (2d Cir. 1991) .............................................................................. 39, 42, 44, 46

*Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320
(2nd Cir. 1997)..........................................................................................................40, 44, 45

*Clarkson Co. Ltd. v. Zhelka*, [1967] 2 OR 565 (HC) ...................................................................65

*Comm. of Unsecured Creditors v. Commodity Credit Corp.*
*(In re KF Dairies, Inc.)*, 143 B.R. 734 (B.A.P. 9th Cir. 1992)............................................4, 5

*Curtis v. Walpole Tire & Rubber Co.*, 227 F. 698 (D. Mass. 1915)............................................53

*Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp.*
*(In re Adelphia Commc'ns Corp.)*, 322 B.R. 509 (Bankr. S.D.N.Y. 2005)...........................36

*Durkin v. Shields (In re Imperial Corp. of Am.)*, No. 92-1003-IEG (LSP),
1997 WL 808628 (S.D. Cal. Aug. 20, 1997) ......................................................................14

*El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161
(9th Cir. 2000)....................................................................................................................4, 5

*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*,
340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated sub nom. on other grounds*
*Enron Corp. v. Springfield Assoc., L.L.C. (In re Enron Corp.)*, 379 B.R. 425
(S.D.N.Y. 2007) .....................................................................................................................4

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425
(S.D.N.Y. 2007), *motion to certify appeal denied*, Nos. 01-16034, 06 Civ. 7828,
07 Civ. 1957 (SAS), Adv Pro. No. 05-01025, 2007 WL 2780394 (S.D.N.Y.
Sept. 24, 2007) ...............................................................................................................29, 35

*F&K Supply, Inc. v. Willowbrook Dev. Co.*,
732 N.Y.S.2d 734 (App. Div. 3d Dep't 2001).......................................................................44

*Fisher v. N.Y.C. Dep't of Hous. Pres. & Dev. (In re Pan Trading Corp. S.A.)*,
125 B.R. 869 (Bankr. S.D.N.Y. 1991)................................................................................8, 9

*Friede Goldman Halter, Inc. v. Aircomfort, Inc.*
*(In re Consol. FGH Liquidating Trust)*, 392 B.R. 648
(Bankr. S.D. Miss. 2008) .......................................................................................................18

*Giacometti v. Arton Bermuda Ltd. (In re Sia)*,
349 B.R. 640 (Bankr. D. Haw. 2006) ....................................................................................36

*Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*,
380 B.R. 677 (Bankr. S.D.N.Y. 2008)....................................................................................36

*GSGSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1160 (S.D.N.Y. 1994) .............................................42

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ..........................................................11

*Health-Chem Corp. v. Baker*, 915 F.2d 805 (2d Cir. 1990) ........................................42

*Holloway v. I.R.S. (In re Odom Antennas, Inc.)*,
   340 F.3d 705 (8th Cir. 2003) ..................................................................5

*Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Invs., Inc.)*,
   155 B.R. 332 (Bankr. S.D.N.Y. 1993) ..................................................8, 16

*Husky Oil Operations Ltd. v. Minister of National Revenue*,
   [1995] 3 SCR 453 .....................................................................56, 58

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*,
   408 F.3d 689 (11th Cir. 2005) ................................................................14

*In re APCO Liquidating Trust*, 370 B.R. 625 (Bankr. D. Del. 2007)......................67, 69

*In re Badger Lines, Inc.*, 199 B.R. 934 (Bankr. E.D. Wis. 1996),
   *rev'd on other grounds*, 202 F.3d 945 (7th Cir. 2000) ....................................4

*In re Best Prods. Co.*, 157 B.R. 222 (Bankr. S.D.N.Y. 1993) .....................................10

*In re Chemtura Corp.*, 436 B.R. 286 (Bankr. S.D.N.Y. 2010) ....................................68

*In re Clouse*, 446 B.R. 690 (Bankr. E.D. Pa. 2010)..................................................47

*In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130 (Bankr. D. Me. 1991) .....................48

*In re Delta Air Lines, Inc.*, 370 B.R. 552 (Bankr. S.D.N.Y. 2007), *aff'd*, Nos. 05–17923
   (ASH), 07 Civ. 7745 (RMB), 07 Civ. 11437 (RMB), 08 Civ. 2411 (RMB), 08 Civ.
   2449 (RMB), 08 Civ. 6879 (RMB), 2008 WL 4444001 (S.D.N.Y Sept. 29, 2008),
   *vacated and remanded*, 608 F.3d 139 (2d Cir. 2010) ..............................54

*In re European Society Arbitration Acts*, (1878) 8 Ch D 679 ....................................67

*In re Eye Contact, Inc.*, 97 B.R. 990 (Bankr. W.D. Wis. 1989) ....................................4

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
   160 B.R. 882 (Bankr. S.D.N.Y. 1993) .......................................52, 54, 55

*In re GCO Servs., LLC*, 324 B.R. 459 (Bankr. S.D.N.Y. 2005).....................................67

*In re Ionosphere Clubs, Inc.*, 100 B.R. 670 (Bankr. S.D.N.Y. 1989).............................39

*In re Kaupthing Singer & Friedlander Ltd (in administration) (No 2)*,
   [2011] UKSC 48, [2012] 1 AC 804 .........................................................59

*In re Koneta*, 357 B.R. 540 (Bankr. D. Ariz. 2006)...................................................46

*In re Lyondell Chem. Co.*, 442 B.R. 236 (Bankr. S.D.N.Y. 2011) .........................67, 68

*In re McKenzie*, Nos. 11-cv-192, 11-cv-274, 12-cv-025, 2012 WL 4742708
(E.D. Tenn. Oct. 2, 2012)..........................................................................................4

*In re Mid Atl. Fund, Inc.*, 60 B.R. 604 (Bankr. S.D.N.Y. 1986).......................................4

*In re Motors Liquidation Co.*, 447 B.R. 198 (Bankr. S.D.N.Y. 2011) ...........................35

*In re NextWave Pers. Commc'ns Inc.*, 244 B.R. 253
(Bankr. S.D.N.Y. 2000) ........................................................................................46

*In re Paraguassu Steam Tramroad Co.*,
(1872) 8 Ch App 254 .............................................................................................59

*In re Randall's Island Family Golf Centers, Inc.*, 261 B.R. 96
(Bankr. S.D.N.Y. 2001), *aff'd*, 272 B.R. 521 (S.D.N.Y. 2002)............................45

*In re Rosenshein*, 136 B.R. 368 (Bankr. S.D.N.Y. 1992) .................................................8

*In re Saint Vincent's Catholic Med. Ctrs.*, 445 B.R. 264
(Bankr. S.D.N.Y. 2011) .........................................................................................49

*In re Sierra-Cal*, 210 B.R. 168 (Bankr. E.D. Cal. 1997) .................................................4

*In re Stoecker*, 143 B.R. 118 (Bankr. N.D. Ill.), *aff'd in part and rev'd in part and
remanded, on other grounds*, 143 B.R. 879 (N.D. Ill. 1992), *aff'd in part and vacated
in part and remanded*, 5 F.3d 1022 (7th Cir. 1993)..............................................5

*In re Whitehouse & Co.* (1878) 9 Ch D 595 ....................................................................63

*Independent Order of Foresters v. Trustees of Lethbridge Northern Irrigation Dist.*,
[1943] 3 W.W.R. 297, [1943] 4 D.L.R. 793, *reversed on other grounds*, [1944] 1
W.W.R. 206, [1944] 1 D.L.R. 660 (Alta. C.A.).....................................................56

*John Matthews, Inc. v. Knickerbocker Trust Co.*, 192 F. 557 (2d Cir. 1911)..................53

*Katchen v. Landy*, 382 U.S. 323 (1966).....................................................................49, 50

*Kendall v. Sorani (In re Richmond Produce Co.)*,
195 B.R. 455 (N.D. Cal. 1996) ..............................................................................14

*Kirschenbaum v. Nassau Cnty Dist. Attorney (In re Vitta)*,
409 B.R. 6 (Bankr. E.D.N.Y. 2009)........................................................................46

*Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340 (3d Cir. 2002).................................50

*Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585
(2d Cir. 1991)..........................................................................................................50

*Lustig v. Hickey (In re Hickey)*, 168 B.R. 840
(Bankr. W.D.N.Y. 1994)................................................................................16

*Manuel v. Allen (In re Allen)*, 217 B.R. 952
(Bankr. M.D. Fla. 1998).................................................................................7

*Martin v. McMullen* (1891), 18 OAR 559,
[1891] OJ No. 35...........................................................................................56

*McCord v. Agard (In re Bean)*, 252 F.3d 113 (2d Cir. 2001)..............................46

*Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379
(2d Cir. 1997)..........................................................................................46, 48

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520
(Bankr. S.D.N.Y. 2002) ..............................................28, 30, 33, 35, 41

*Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650 (2d Cir. 1996).....................42

*Musso v. N.Y. State Higher Educ. Sevs. Corp. (In re Royal Bus. Sch., Inc.)*,
157 B.R. 932 (Bankr. E.D.N.Y. 1993)...........................................................8

*New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.
(In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86
(2d Cir. 2003)...............................................................................................50

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*,
361 B.R. 369 (Bankr. S.D.N.Y. 2007)...........................................................29

*Northwestern Mutual Life Insurance Co. v. Delta Air Lines, Inc.
(In re Delta Air Lines, Inc.)*, 608 F.3d 139 (2d Cir. 2010) ............................54

*Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark
(In re Nat'l Forge Co.)*, 344 B.R. 340 (W.D. Pa. 2006).................................10

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In
re Sunbeam Corp.)*, 284 B.R. 355 (Bankr. S.D.N.Y. 2002), *appeal dismissed,* 287
B.R. 861 (S.D.N.Y. 2003)..............................................................................10

*Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc.
(In re KDI Holdings, Inc.)*, 277 B.R. 493 (Bankr. S.D.N.Y. 1999)...................36

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.
(In re Verestar, Inc.)*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006)..........................35

*Olympia & York Developments (Re)* (1998), 4 CBR (4th) 189,
[1998] O.J. No. 4903 (Ont. Bktcy.) ....................................57, 58, 59, 65

*Orr v. Kinderhill Corp.*, 991 F.2d 31 (2d Cir. 1993) ...........................................10

*Owners of Steamship Enterprises of Panama Inc. v. Owners of SS Ousel*
  *(The Liverpool No 2)* [1963] P 64 (CA)..............................................................56

*P.B. v. L.B.*, 885 N.Y.S.2d 836 (Sup. Ct. Richmond Cnty 2008) .................................47

*Parker N. Am. Corp. v. Resolution Trust Corp. (In re Parker N. Am. Corp.),*
  24 F.3d 1145 (9th Cir. 1994) ...........................................................................5

*Pepper v. Litton*, 308 U.S. 295 (1939) .................................................................49, 51

*Re Polly Peck International plc* [1996] 2 All ER 433, [1996] BCC 486 (Ch D) 1995
  (U.K.) .............................................................................................56, 57, 58, 59

*Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir. 1984), *cert. denied*,
  496 U.S. 828 (1984)........................................................................................44

*Rosen v. Gemini Title & Escrow, LLC (In re Hoang)*, 449 B.R. 850
  (Bankr. D. Md. 2011) .....................................................................................36

*Schoenfeld v. Masucci*, 613 N.Y.S.2d 682 (App. Div. 1994),
  *leave to appeal denied*, 621 N.Y.S.2d 516 (1994)..............................................45

*Seta Corp. of Boca, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.),*
  173 B.R. 858 (S.D.N.Y. 1994)...........................................................................5

*Silverman v. K.E.R.U Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5
  (Bankr. E.D.N.Y. 2007) ...........................................................................10, 11, 12

*Smart World Techs., LLC v. Juno Online Servs., Inc.*
  *(In Smart World Techs., LLC)*, 423 F.3d 166 (2d Cir. 2005)................................50

*Spradlin v. Williams (In re Alma Energy, LLC)*, No. 10-80-ART,
  2010 WL 4736905 (E.D. Ky. Nov. 16, 2010)........................................................50

*Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563
  (Bankr. S.D.N.Y. 2003) .............................................................................35, 36

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg, Inc.*, 487 F.3d 89
  (2d Cir. 2007).................................................................................................44

*Transamerica Life Insurance Co. of Canada v. Canada Life*
*Assurance Co.* (1996), 28 OR (d) 423 (Gen. Div.),
*aff'd* [1997] OJ No. 3754 (CA).................................................................................65

*U.S. Lines (S.A.) Inc. v. United States (In re McLean Indus., Inc.),*
  30 F.3d 385 (2d Cir. 1994), *cert. denied*, 513 U.S. 1126 (1995), *remanded to*
  184 B.R. 10 (Bankr. S.D.N.Y. 1995), *aff'd*, 196 B.R. 670 (S.D.N.Y. 1996) ...........6

*U.S. Lines, Inc. v. United States (In re McLean Indus., Inc.)*, 184 B.R. 10
(Bankr. S.D.N.Y. 1995), *aff'd*, 196 B.R. 670 (S.D.N.Y. 1996)................................................6

*U.S. Lines, Inc. v. United States (In re McLean Indus., Inc.)*,
196 B.R. 670 (S.D.N.Y. 1996)...................................................................................4, 6

*United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609
(7th Cir. 2005), *cert. denied*, 547 U.S. 1003 (2006) ............................................50

*Voest–Alpine Trading Corp. v. Vantage Steel Corp.*, 919 F.2d 206
(3d Cir. 1990)...........................................................................................................11

*Webb v. Whiffin*, (1872) 5 HL 711 ............................................................................63

*Weinman v. Allison Payment Sys., LLC (In re Centrix Fin., LLC)*,
434 B.R. 880 (Bankr. D. Colo. 2010) ......................................................................18

*Wilson v. United Sav. of Tex (In re Missionary Baptist Found. of Am., Inc.)*,
792 F.2d 502 (5th Cir. 1986) ...................................................................................8

*Winston v. Mediafare Entm't Corp.*, 777 F.2d 78 (2d Cir. 1985)..........................39, 45

## Federal Statutes

11 U.S.C. § 105.........................................................................................................49

11 U.S.C. § 363(b)(1) ...............................................................................................46

11 U.S.C. § 365.........................................................................................................18

11 U.S.C. § 502.........................................................................................................49

11 U.S.C. § 502(b).....................................................................................................49

11 U.S.C. § 502(d)...........................................................................2, 3, 4, 5, 6, 7, 12, 13

11 U.S.C. § 502(e)(1)(B) ...................................................................................67, 68, 69

11 U.S.C. § 541(a)(1).................................................................................................8

11 U.S.C. § 541(d).....................................................................................................8

11 U.S.C. § 546(e) ..........................................................................................17, 18, 51

11 U.S.C. § 547.....................................................................................................15, 16

11 U.S.C. § 548.........................................................................................................15

11 U.S.C. § 548(a)(1)(A) ......................................................................................15, 16

11 U.S.C. § 548(a)(1)(B) ....................................................................................15

11 U.S.C. § 549 ....................................................................................7, 12, 14, 15, 18

11 U.S.C. § 550(b) ....................................................................................16, 17

11 U.S.C. § 741(7) ....................................................................................18

11 U.S.C. § 1123(a)(4) ....................................................................................35

28 U.S.C. § 157(b)(2)(A) ....................................................................................49

28 U.S.C. § 157(b)(2)(B) ....................................................................................49

## **Rules**

Fed. R. Bankr. P. 6001 ....................................................................................7

## **Foreign Statutes**

*Bankruptcy and Insolvency Act*, RSC 1985, c. B-3, s. 65.11 ........................................73

*Bankruptcy and Insolvency Act*, RSC 1985, c. B-3, s. 77 ....................................................64

*Companies Act*, RSNS 1989, c. 81, s. 135 ........................52, 53, 55, 60, 61, 62, 63, 64, 65, 66, 67

*Interpretations Act*, RSNS 1989, c.235, s. 9(5) ....................................................................62

## **Other Authorities**

4 Collier on Bankruptcy, ¶ 502.05[2] [a] ....................................................................................5

Arthur Steinberg, Bankruptcy Code Section 502(d): Back Door to Avoidance?,
    28 UCC Law J. 73 (1995) ....................................................................................4

Edward Iacobucci, et al., *Cases, Materials and Notes on
    Partnerships and Canadian Business Corporations*
    5th ed. (Toronto: Thomson Reuters, 2011) ....................................................62, 65, 66

# INDEX OF FOREIGN LAW AUTHORITIES

**Index No.**      **Description**

1.    *Central Trust Co. v. Rafuse*, [1986] 2 SCR 147 at 176-177 (SCC)

2.    *Husky Oil Operations Ltd. v. Minister of National Revenue*, [1995] 3 SCR 453

3.    *Re Polly Peck International plc* [1996] 2 All ER 433, [1996] BCC 486 (Ch D) 1995 (U.K.)

4.    *Re Oriental Commercial Bank, Ex parte European Bank*, (1871) 7 Ch App 99

5.    *Martin v. McMullen* (1891) 18 OAR 559, [1891] OJ No. 35

6.    *Independent Order of Foresters v. Trustees of Lethbridge Northern Irrigation Dist.*,[1943] 3 W.W.R. 297, [1943] 4 D.L.R. 793, *reversed on other grounds*, [1944] 1 W.W.R. 206, [1944] 1 D.L.R. 660 (Alta. C.A.)

7.    *Barclays Bank Ltd. v. TOSG Trust Fund Ltd.* [1984] 2 WLR 49 (CA)

8.    *In re Kaupthing Singer & Friedlander Ltd (in administration) (No. 2)*, [2011] UKSC 48, [2012] 1 AC 804

9.    *In re Paraguassu Steam Tramroad Co.* (1872) 8 Ch App 254

10.    *Canada Trustco Mortgage Co. v. R.*, 2005 SCC 54

11.    Edward Iacobucci, et al., *Cases, Materials and Notes on Partnerships and Canadian Business Corporations* 5th ed. (Toronto: Thomson Reuters, 2011) (excerpts)

12.    *In re Whitehouse & Co.* (1878) 9 Ch D 595

13.    *Webb v. Whiffin* (1872) 5 HL 711

14.    *Bankruptcy and Insolvency Act*, RSC 1985, c. B-3, s. 77

15.    *Clarkson Co. Ltd. v. Zhelka*, [1967] 2 OR 565 (HC)

16.    *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co.*, 1996, 28 OR. (3d) 423 (Gen. Div.), *aff'd* [1997] OJ No. 3754 (CA)

17.    *In re European Society Arbitration Acts*, (1878) 8 Ch D 679

18.    *Bankruptcy and Insolvency Act*, RSC 1985, c. B-3, s. 65.11

The GUC Trust[1] respectfully submits this post-trial reply brief in response to the opening

post-trial briefs and Joint Statement of Facts filed by Wedlake, Paulson,[2] the Noteholders

(collectively, the "**Defendants**") and New GM.[3]

## PRELIMINARY STATEMENT

While the many lawyers involved in presenting this dispute to the Court have introduced

degrees of complexity, when all is said and done, this case turns on the most basic, and most

important, principle of bankruptcy law:  "equality of distribution."  *Bailey v. Glover*, 88 U.S.

342, 346 (1874).  If the Disputed Claims are allowed, that bedrock principle of bankruptcy law

will have been egregiously violated.

Manufactured complexity serves the interests of the Noteholders because it is only with

the aid of smoke and mirrors that one can suspend disbelief long enough to take seriously the

notion that $1 billion of Notes issued by an Old GM subsidiary could possibly give rise to $2.7

billion of claims against Old GM.  Once the smoke clears and the mirrors are removed, however,

it becomes clear that the Bankruptcy Code cannot possibly countenance such an outcome.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *GUC Trust's Post-Trial Brief In Connection With (I) Official Committee Of Unsecured Creditors' First Amended Objection To Claims Filed By Green Hunt Wedlake, Inc. And Noteholders Of General Motors Nova Scotia Finance Company And Motion For Other Relief (Bankr. Dkt. No. 7859) And (II) Motors Liquidation Co. GUC Trust v. Appaloosa Investment Ltd. Partnership I, et al.* (Bankr. Dkt. No. 12438; Adv. Pro. Dkt. No. 225) ("**GUC Brief**").  The following parties filed post-trial opening briefs: (1) Wedlake (Bankr. Dkt. No. 12449; Adv. Pro. Dkt. No. 222) ("**GHW Brief**"), (2) Paulson (Adv. Pro. Dkt. No. 220) ("**Paulson Brief**"), (3) Noteholders (Bankr. Dkt. No. 12436; Adv. Pro. Dkt. No. 223) ("**NH Brief**") and (4) New GM (Bankr. Dkt. No. 12435; Adv. Pro. Dkt. No. 221) ("**NG Brief**").  The Defendants and New GM also filed a joint statement of facts (Bankr. Dkt. No. 12437; Adv. Pro. Dkt. No. 224) ("**Joint Statement of Facts**" or "**JSF**").

[2]    "**Paulson**" refers to: (1) dbX – Risk Arbitrage 1 Fund, (2) Lyxor/Paulson International Fund Limited, (3) Paulson Enhanced Ltd., (4) Paulson International Ltd., (5) Paulson Partners Enhanced, L.P. and (6) Paulson Partners L.P., all of which are investment funds or accounts managed by Paulson & Co. Inc.

[3]    To avoid excessive repetition, not every point made in the GUC Brief will be reiterated in this reply.  Points raised in the GUC Brief, but not reiterated here, are not waived and are expressly preserved.

Had the claimants here not already been paid an avoidable transfer of $367 million – a percentage recovery in and of itself greater than the recovery of any other unsecured creditor in this bankruptcy case – and had the claimants not engaged in inequitable conduct, then they would have been entitled to a guarantee claim against Old GM for any amounts not paid by GM Nova Scotia with respect to the $1 billion due on account of the Notes issued by GM Nova Scotia. That situation, commonplace in chapter 11 cases, would have been fair to the Noteholders and also fair to other unsecured creditors of Old GM.

Because the Noteholders have retained the benefit of the $367 million avoidable transfer, however, under section 502(d), the claims asserted on their behalf must be disallowed in their entirety. Alternatively, if the Court does not disallow the claims, then at least the claims of those creditors who behaved inequitably should be subordinated to the claims of innocent creditors. And finally, if the Court does not disallow or subordinate the claims (as is warranted based on the trial record), then, at the very least, the claim against Old GM should only be allowed once and in its proper amount, which would require the Court to reduce the claim by the 36% paydown on the Notes already received by the Noteholders.

Besides equality of distribution, another vitally important principle at stake here is court supervision of Old GM's estate. The record amply demonstrates that the Lock-Up Agreement was a postpetition agreement requiring this Court's approval and, perhaps even more importantly, the record establishes that the $367 million Consent Fee was paid with Old GM's cash without this Court's approval. The parties' utter disregard for the Court's role in supervising the Old GM bankruptcy proceedings is shocking.

Indeed, even if this Court were to credit the demonstrably incredible version of the facts advanced jointly by the Noteholders and New GM, they do not come out looking much better.

2

In their telling, there was no need to apprise the Court of this matter because the agreement to make a $367 million postpetition payment from a trust account funded by Old GM, and as to which Old GM continued to have an interest, was reached at 7:35 a.m., approximately twenty two minutes before the Old GM bankruptcy petition was filed. Even if that were true, clearly, this Court and Old GM's creditors should have been provided with an opportunity to at least carefully consider this matter before the Sale Order was entered.

By returning to the overarching principles of equality of distribution and court supervision, we do not mean to oversimplify, but only to situate this case in its proper context. We well understand that the Noteholders and their allies have emptied many toner cartridges mounting numerous, complex defenses to this claims objection. In its opening brief and below, the GUC Trust addresses each of those arguments in turn. Now that this case has reached its conclusion, however, we respectfully submit that careful application of the key legal principles to the factual record compels the relief requested by the GUC Trust – relief that will serve the interests of fairness to *all* creditors and protect core values of our system of bankruptcy law.

## ARGUMENT

## I.    SECTION 502(d) REQUIRES DISALLOWANCE OF THE DISPUTED CLAIMS

### A.    Section 502(d) Is A Complete Defense To The Disputed Claims

Section 502(d) provides for disallowance of "any claim of any entity from which property is recoverable" as an avoidable transfer "unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable. . . ."[4] Section 502(d) does not condition disallowance on the filing of an avoidance action or even on the possibility that such an action against the transferee can or will be filed. The majority of the

---

[4]    11 U.S.C. § 502(d).

3

cases addressing the issue recognize that an avoidance action need not be filed to prevail on a

section 502(d) objection.

Without support in the text of section 502(d) and against the weight of the case law, the

Noteholders contend that section 502(d) is "only triggered after a trustee or debtor in possession

successfully prosecutes an avoidance action and obtains a judgment requiring the turnover of

property to the estate."[5]  This is not so.  Courts have recognized that a claim may be defeated by

the defensive assertion of section 502(d) without the filing of an avoidance action.[6]  Courts have

further held that section 502(d) may be asserted defensively to disallow a claim even when the

objecting party is barred from bringing an avoidance action, such as where the applicable statute

of limitations has expired.[7]  There is no prohibition against "asserting section 502(d) as an

affirmative defense to a claim of a creditor even if the trustee's claim is time-barred or otherwise

nonrecoverable."[8]

---

[5]      NH Brief at 35.

[6]      *See In re Eye Contact, Inc.*, 97 B.R. 990, 992 (Bankr. W.D. Wis. 1989) (disallowing claim under section 502(d) even though no avoidance action was filed).

[7]      *See U.S. Lines, Inc. v. United States (In re McLean Indus., Inc.)*, 196 B.R. 670, 676 (S.D.N.Y. 1996); *In re Mid Atl. Fund, Inc.*, 60 B.R. 604, 610 (Bankr. S.D.N.Y. 1986); *see also El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161, 1165-66 (9th Cir. 2000); *Comm. of Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.)*, 143 B.R. 734 (B.A.P. 9th Cir. 1992); *In re Badger Lines, Inc.*, 199 B.R. 934, 939-40 (Bankr. E.D. Wis. 1996), *rev'd on other grounds*, 202 F.3d 945 (7th Cir. 2000); *In re Sierra-Cal*, 210 B.R. 168, 173 (Bankr. E.D. Cal. 1997); *see also In re McKenzie*, Nos. 11-cv-192, 11-cv-274, 12-cv-025, 2012 WL 4742708, at *8 (E.D. Tenn. Oct. 2, 2012) (stating majority of courts allow a trustee to use section 502(d) defensively); Arthur Steinberg, Bankruptcy Code Section 502(d): Back Door to Avoidance?,  28 UCC Law J. 73, 75-76 (1995) ("The clear majority of cases hold that a trustee may object to the allowance of a claim on the ground that the claimant received an avoidable transfer, notwithstanding that under Section 546(a), the two-year limit for commencing an avoidance action has expired.").

[8]      *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180, 191 (Bankr. S.D.N.Y. 2006) (citations omitted), *vacated sub nom. on other grounds Enron Corp. v. Springfield Assoc., L.L.C. (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007); *see also In re KF Dairies, Inc.*, 143 B.R. at 737-38 ("Application of the time-bar to objections based on section 502(d) would undercut the statutory language, the purpose of the bankruptcy code, and the general rule that statutory time-bars are inapplicable to matters of defense, where no affirmative relief is sought."); *In re McLean*

4

Footnote continued on next page

The notion that an objection predicated upon section 502(d) is not dependent on the

assertion of an avoidance action is consistent with the overarching purpose of the statute:  to

restore the "equality of a distribution disturbed by the illicit [transfer]."[9]  "Claim objections and

avoidance actions . . . are separate and distinct proceedings which use different rules and

procedures to accomplish distinct and discrete portions of the administration of a bankruptcy

estate."[10]  The Noteholders' contention that the only purpose of section 502(d) is to "ensure the

compliance with judicial orders"[11] conflates these two "distinct and discrete" proceedings, and

disregards the core principle of equality of distribution among creditors.[12]  The Noteholders have

---

Footnote continued from previous page

*Indus., Inc.*, 196 B.R. at 676; *In re Am. W. Airlines, Inc.*, 217 F.3d at 1165-66 (holding transfer avoidable for 502(d) purposes even if the trustee is unable to recover such transfer from the transferee); *accord Brown v. I.R.S. (In re Larry's Marineland of Richmond, Inc.)*, 166 B.R. 871 (Bankr. E.D. Ky. 1993) (inability of trustee to obtain affirmative monetary recovery from IRS under section 106(b) of the Bankruptcy Code did not prevent trustee's use of 502(d)); *see generally Parker N. Am. Corp. v. Resolution Trust Corp. (In re Parker N. Am. Corp.)*, 24 F.3d 1145, 1155 (9th Cir. 1994) (noting that by invoking section 502(d) a party transforms an avoidance action into an affirmative defense to a proof of claim).

The cases cited by the Noteholders are inapposite.  In *Holloway v. I.R.S. (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003), for example, individual creditors sought to avoid a lien under section 502(d), and the Eighth Circuit uncontroversially held that affirmative relief was not available to them.  Here, of course, the GUC Trust has never sought affirmative relief against the Noteholders.  Rather, the GUC Trust has always confined section 502(d) to its proper claims disallowance function.  Additionally, *Seta Corp. of Boca, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*, 173 B.R. 858, 862 (S.D.N.Y. 1994), unlike here, involved a situation where the transferee-claimant had asserted defenses to avoidance of recoupment and setoff.  Defendants here have not asserted any such defenses.

[9]      *KF Dairies*, 143 B.R. at 736.

[10]     *In re Stoecker*, 143 B.R. 118, 133 (Bankr. N.D. Ill.), *aff'd in part and rev'd in part and remanded, on other grounds*, 143 B.R. 879 (N.D. Ill. 1992), *aff'd in part and vacated in part and remanded*, 5 F.3d 1022 (7th Cir. 1993).  The claims objection process is a mechanism by which a creditor's allowed claim is fixed for purposes of distribution.  An avoidance action, however, is a method used to return assets to a debtor's estate that were unlawfully diverted out of the estate, which can only occur through the commencement of an adversary proceeding.  Thus, allowing the defensive use of section 502(d) is consistent with the longstanding "general rule that statutory time-bars are inapplicable to matters of defense, where no affirmative relief is sought."  *In re KF Dairies, Inc.*, 143 B.R. at 737-38.

[11]     *See* NH Brief at 35; Paulson Brief at 6 ("statute seeks to 'coerce the return of assets obtained' by otherwise avoidable transfers.").

[12]     4 Collier on Bankruptcy, ¶ 502.05[2] [a], at 58 ("purpose of section 502(d) is to promote the pro-

Footnote continued on next page

retained the benefits of the avoidable $367 million Consent Fee paid to them, and thus the

Disputed Claims should be disallowed under section 502(d).

In an attempt to bolster their untenable position, the Noteholders misconstrue *U.S. Lines,*

*(S.A.) Inc. v. United States (In re McLean Indus., Inc.)*, 30 F.3d 385 (2d Cir. 1994), *cert. denied*,

513 U.S. 1126 (1995), *remanded to* 184 B.R. 10 (Bankr. S.D.N.Y. 1995), *aff'd*, 196 B.R. 670

(S.D.N.Y. 1996).   The Second Circuit's holding, however, as well as the subsequent history of

that case, contradicts the Noteholders' argument that section 502(d) requires the filing of an

avoidance action.   In *United States Lines*, the Second Circuit explicitly stated that it was not

addressing the issue of whether a section 502(d) objection could be maintained when the

underlying avoidance action could no longer be asserted, and remanded the case to the

bankruptcy court.[13]   On remand, both the bankruptcy court and the district court permitted the

defensive use of section 502(d), notwithstanding that the statute of limitations for the underlying

avoidance action had expired.[14]

---

Footnote continued from previous page

rata sharing of the bankruptcy estate among all creditors . . . Creditors who have received voidable transfers to the detriment of the pool should not be entitled to make additional demands on the assets of the estate.") (footnote omitted) (citations omitted).

[13]    *In re McLean Indus., Inc.*, 30 F.3d at 388 ("USL argues that the timeliness of its preference claim is irrelevant for the purposes of § 502(d), and that MARAD cannot benefit from its alleged preference and still make other claims against USL. . . . Because this issue has not been adequately briefed in this court and may require facts outside of the record, we express no opinion on this issue but remand to the bankruptcy court for the limited purpose of considering in the first instance USL's argument based upon § 502(d).").

[14]    *U.S. Lines, Inc. v. United States (In re McLean Indus., Inc.)*, 184 B.R. 10 (Bankr. S.D.N.Y. 1995), *aff'd*, 196 B.R. 670 (S.D.N.Y. 1996).   In the district court's decision, Judge Cote noted two contrary decisions from bankruptcy courts in other jurisdictions, but followed "the well-reasoned approach of Bankruptcy Judge Abram in *In re Mid Atlantic Fund, Inc.*, 60 B.R. 604 (Bankr. S.D.N.Y. 1986)," concluding that the plain meaning of section 502(d), its legislative history and its overarching purpose all pointed in the direction of permitting the defensive assertion of section 502(d), even where the underlying avoidance action could no longer be brought.   *In re McLean, Indus., Inc.*, 196 B.R. at 676-77.

6

**B.    Payment Of The Consent Fee Was An
Avoidable Postpetition Transfer Under Section 549**

Disallowance under section 502(d) is required because payment of the Consent Fee was

an unauthorized postpetition transfer of Old GM's property avoidable under section 549.  The

Noteholders and the Nova Scotia Trustee have failed to meet their burden of showing that this

postpetition transfer of estate property was valid.[15]

**1.    The Proceeds Of The $450 Million Loan Were Property Of The Estate**

The transfer of the $450 Million Loan that Old GM initiated prepetition to a GM Canada

bank account for the purpose of paying the Consent Fee was subject to the Trust Agreement, the

conditions of which were not satisfied as of the Petition Date.  Specifically, as explained in Fact

Section III(B)(1) of the GUC Brief and as conceded at trial by Mr. Buonomo, the Lock-Up

Deadline and Amended Lock-Up Deadline were not met.[16]  Thus, as of the filing of Old GM's

bankruptcy petition, Old GM still had an interest in the $450 million held in trust, and all

subsequent transfers of those proceeds were unauthorized postpetition transfers of Old GM's

property.

Ignoring the failure to satisfy the trust conditions, the Noteholders argue that the funds

used to pay the Consent Fee were not property of the estate because "[t]he proceeds of the $450

---

[15]    The Noteholders dispute that the transfer was a postpetition transfer.  While the GUC Trust bears
the initial burden of proving that the transfer occurred postpetition, once that burden is carried, then,
under Rule 6001 of the Federal Rules of Bankruptcy Procedure, it is the Noteholders' burden to show the
validity of the transfer.  *See Manuel v. Allen (In re Allen)*, 217 B.R. 952, 955 (Bankr. M.D. Fla. 1998) ("If
a transfer is established, the burden of proving the validity of the transfer rests with the defendants").

[16]    Trial Tr. (8/9/2012), 80:13-81:9 (Buonomo).  Indeed, New GM and the Noteholders concede that
the Amended Lock-Up Deadline of 7:00 a.m. EDT was not met.  *Compare* Trial Tr. (9/20/12), 85:16-20
(Truong) ("I held that signature until 7:00 a.m. after I received confirmation from Greg. . . . Only until
then did I provide our signatures.") *with* Trial Tr. (9/20/12), 81:10-12 (Truong) (recalling that Mr.
Gropper was the last to turn over his signature page).  *See* Trial Tr. (8/9/2012), 236:6-9 (Buonomo) ("I
was annoyed that we had gone over 7:30").

Million Loan were deposited in a GM Canada bank account"[17] prior to the filing of Old GM's

petition.  Property of the estate, however, is broadly construed and includes "all legal *or*

equitable interests of the debtor in property as of the commencement of the case."[18]  Under the

Trust Agreement, Old GM had "a right to the funds and incidents of ownership until the

conditions" of the Trust Agreement were satisfied.[19]  As of the filing of the petition, those

conditions were not, and could no longer be, satisfied.  Since "the contingency of the escrow was

not fulfilled prior to bankruptcy, the debtor holds an interest in the property," and this interest is

therefore property of the estate.[20]

New GM's contention that the GM Canada account to which the $450 Million Loan was

transferred was not "a trust or escrow account," but rather "a general account," is directly

contradicted by the numerous record cites in the footnote immediately below.[21]  An escrow is

---

[17]    NH Brief at 33.

[18]    11 U.S.C. § 541(a)(1) (emphasis added).  Property in which a debtor holds "only legal title and not an equitable interest" becomes property of the estate when the bankruptcy case is commenced.  *Id*. § 541(d).

[19]    *Fisher v. N.Y.C. Dep't of Hous. Pres. & Dev. (In re Pan Trading Corp. S.A.)*, 125 B.R. 869, 878 (Bankr. S.D.N.Y. 1991); *see also In re Rosenshein*, 136 B.R. 368, 372 (Bankr. S.D.N.Y. 1992).

[20]    *Wilson v. United Sav. of Tex (In re Missionary Baptist Found. of Am., Inc.)*, 792 F.2d 502, 506 (5th Cir. 1986).  Defendants rely on cases that are easily distinguished.  *See, e.g., Musso v. N.Y. State Higher Educ. Sevs. Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R. 932, 942 (Bankr. E.D.N.Y. 1993) (funds in the escrow account not property of the estate because escrow conditions to complete transfer from debtor were still capable of being satisfied as of the petition date); *Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Invs., Inc.)*, 155 B.R. 332, 338-39 (Bankr. S.D.N.Y. 1993) (transfer out of an escrow account was not a transfer of property of the estate when all conditions of the escrow had been met).  The conditions of the escrow at issue here were not, and could no longer be, met before Old GM's bankruptcy filing because the Notes were not exchanged for cash and the Lock-Up Agreement was not signed and delivered by either the Lock-Up Deadline or the Amended Lock-Up Deadline.  Upon the failure to meet the escrow conditions, Old GM was vested with an immediate possessory interest in the $450 million.  *See In re Missionary Baptist Found. of Am., Inc.*, 792 F.2d at 506.

[21]    On May 28 and May 29, GM Canada sought consent from Export Development Canada ("**EDC**") on several occasions to a proposed transaction with the Noteholders.  *See, e.g.*, Pl. Ex. 402 at NGM000021890; Pl. Ex. 238 at NGM000013385.  GM Canada represented to EDC in each consent solicitation that the loan from Old GM to GM Canada to fund a payment to the Noteholders "would be conditional upon GM Canada holding the funds *in trust* until certain conditions are met," which "*trust*

Footnote continued on next page

created when property is "delivered by the grantor, promisor, or obligor into the hands of a third

person, to be held by the latter until the happening of a contingency or performance of a

condition and then by him delivered to the grantee, promisee, or obligee."[22] Here, Old GM (the

grantor) transferred $450 million into the hands of GM Canada to be held until the conditions in

the Trust Agreement were satisfied, at which time GM Canada was to deliver the proceeds into

an account for the benefit of the Noteholders. As described above, these conditions failed before

Old GM filed for bankruptcy and could not be satisfied thereafter. Accordingly, the transfers

leading to payment of the Consent Fee – from Old GM to GM Canada, from GM Canada to GM

Nova Scotia, and from GM Nova Scotia to the Noteholders – are avoidable postpetition transfers

of Old GM's property.[23]

---

Footnote continued from previous page

conditions" included the requirement that GM Nova Scotia "use the settlement proceeds from GM Canada to settle and extinguish the [Notes]." Pl. Ex. 238 at NGM000013385 (emphasis added). Further, in setting up the trust account, Mr. Lopez communicated with TD Bank to ensure that the funds would "be segregated into a USD stand-alone account" and that such account would not be linked in any way to GM Canada's "[g]eneral" USD account. Pl. Ex. 765; *see also* Pl. Exs. 766 and 767. On May 29, 2009, in determining the amount of what would become the $450 Million Loan, Ms. Sutedja expressed her desire to get "[the] *trust* agreement finalized and executed" and that "[i]f the consensus is to flow US$450M to [GM Canada's] *trust account*" then she would reflect that amount in the Trust Agreement and Promissory Note. Pl. Ex. 237 at NGM000013346 (emphasis added). In connection with the $450 Million Loan, the parties entered into the Trust Agreement on May 29, 2009. *See, e.g.*, Pl. Ex. 144, ¶ 2 (CC000133) (steps list). The first paragraph of the Trust Agreement, entitled "Creation of Trust," provides that GM Canada shall hold the proceeds of the $450 Million Loan "*in trust*, separate and apart from all other" GM Canada funds. Pl. Ex. 134 at NGM0000603 (emphasis added). The second paragraph of the Trust Agreement, entitled "Release from Trust and Use of Proceeds," provides that GM Canada "shall be entitled to release the [p]roceeds *from trust*" after a successful vote to pass the "proposed amendment" (which is defined as an amendment to the Notes "to provide that such Notes will become mandatorily exchangeable into cash"). Pl. Ex. 134 at NGM0000602 (¶ C) and 603 (¶ 2) (emphasis added). On May 29, once Old GM initiated the transfer of the $450 million, Ms. Sutedja reported that the wire to GM Canada's "*trust account* has gone out." Pl. Ex. 238 at NGM000013383 (emphasis added).

[22]    *In re Pan Trading*, 125 B.R. at 878 (citations omitted).

[23]    The Defendants and New GM mischaracterize Mr. Mayer's testimony when they contend that "any funds used to pay the Consent Fee would never have gone to unsecured creditors." JSF, ¶ 70. Because they were hypothetical, Mr. Mayer was unable to answer the Noteholders' questions about what would have happened if "there had been an additional $450 million in cash in Old GM at time it filed" for bankruptcy. Trial Tr. (10/3/2012), 20:1-21:1 (Mayer).

## 2.    The Transfers Of The Consent Fee Proceeds Should Be Collapsed

Even if it is assumed, *arguendo*, that the Trust Agreement conditions had been satisfied,

the transactions that resulted in payment of the Consent Fee should be collapsed and deemed a

single, integrated transaction.  Old GM's payment of the proceeds of the $450 Million Loan to

GM Canada was the first step in a single, integrated transaction that directly resulted in payment

of the Consent Fee.[24]  The entire transaction should be recognized for what it is: an unauthorized

postpetition transfer of Old GM's property to pay the Consent Fee to the Noteholders.

The Noteholders do not dispute that payment of the Consent Fee was part of an integrated

transaction.  Instead, they argue in error that the standard for collapsing has not been satisfied.

Here, the appropriate test to determine whether the series of transactions leading to payment of

the Consent Fee should be collapsed is found in *Silverman v. K.E.R.U. Realty Corp. (In re Allou

Distributors, Inc.)*:[25]

> where the transactions, taken as a whole, diminish the value of the
> debtor's estate and are marked by either a transfer made by the
> debtor for less than fair consideration or a transfer made by the
> debtor with actual fraudulent intent, and the party from whom
> recovery is sought had actual or constructive knowledge of the
> entire scheme that renders the transfer fraudulent.[26]

---

[24]    *See, e.g.*, Trial Tr. (3/6/2013), 32:5-33:15 (Lopez) (noting that the proceeds from the $450
Million Loan "were earmarked for a specific purpose" which was to pay the Noteholders).

[25]    379 B.R. 5, 22 (Bankr. E.D.N.Y. 2007).

[26]    *Id.  See also Orr v. Kinderhill Corp.*, 991 F.2d 31, 36 (2d Cir. 1993); *In re Best Prods. Co.*, 157
B.R. 222, 229 (Bankr. S.D.N.Y. 1993) ("The ability of a court to collapse a series of steps into one
transaction depends upon the facts and circumstances of each case.  In reality, collapsing transactions is
little more than an effort on the part of the court to focus not on the formal structure of a transaction, but
rather on the knowledge or intent of the parties involved in the transaction."); *Official Comm. of
Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 348 (W.D. Pa.
2006) ("Among other things, courts consider whether all of the defendants were aware of the multiple
steps of the transaction . . . [and] whether each step would have occurred on its own or, alternatively,
whether each step depended upon the occurrence of the additional steps in order to fulfill the parties'
intent."); *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re
Sunbeam Corp.)*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) ("Although the concept of 'collapsing' a
series of transactions and treating them as a single integrated transaction has been applied primarily . . . in

Footnote continued on next page

10

In articulating this standard, the bankruptcy court in *Allou* built upon the Second Circuit's decision in *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995), adapting that standard to a situation where the debtor is the transferor (and not the sham transferee as was the case in *HBE Leasing*).[27]

Here, collapsing is warranted because (1) the series of transactions diminished Old GM's estate for less than fair consideration, and (2) the transferees had, at the very least, constructive knowledge of the entire scheme. The Noteholders contend, incorrectly, that the GUC Trust cannot "satisfy the *Allou* test as the Promissory Note was fair consideration for the loan and there is no evidence of fraudulent intent by the Debtor (or any other party)."[28] In fact, the Promissory Note had no value to Old GM because, at the time of the $450 Million Loan, Old GM knew that the right to be repaid under the Promissory Note would be conveyed to New GM. The only putative consideration received by Old GM was the worthless release from the Oppression Action.[29] Moreover, the trial record shows that the Consent Fee, in an amount of approximately 36% of the face amount of the Notes, was far in excess of what any Noteholder had ever received as a consent fee.[30]

Also, contrary to the Noteholders' argument, actual fraudulent intent is not required

---

Footnote continued from previous page

the context of a failed leveraged buy-out ('LBO'), it has also been utilized in other contexts."), *appeal dismissed*, 287 B.R. 861 (S.D.N.Y. 2003); *see also Voest–Alpine Trading Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 211–12 (3d Cir. 1990) (collapsing series of transactions as "sham").

[27]   *See In re Allou Distributors, Inc.*, 379 B.R. at 21-22 ("More generally, the first condition [under *HBE Leasing*] for collapsing a series of transactions is that the transactions, taken as a whole, diminish the value of the debtor's estate and are marked by either a transfer made by the debtor for less than fair consideration or a transfer made by the debtor with actual fraudulent intent.").

[28]   NH Brief at 40 n.16.

[29]   *See* GUC Brief at 12 n.56 (demonstrating Noteholders received a disproportionately rich deal under the Lock-Up Agreement).

[30]   *See* Trial Tr. (9/6/2012), 16:18-22, 126:19-23 (Cederholm).

under *Allou*.  The Noteholders had, at a minimum, constructive knowledge that the Consent Fee, and the related transfers that ultimately resulted in payment of the Consent Fee to them, were potentially avoidable.  Indeed, the Noteholders were active participants in structuring the transactions in an attempt to evade Court scrutiny and shelter the Consent Fee from avoidance.[31] As just one example, the Noteholders agreed to revise the escrow agreement to designate the account to which the Consent Fee would be paid as a GM Nova Scotia account because "otherwise, the repayment of the intercompany loan [between GM Canada and GM Nova Scotia] is at risk – which is the sole reason why we need the funds to momentarily land in Escrow Account #2."[32]

Accordingly, the series of transfers that began with Old GM and ended with payment of the Consent Fee to the Noteholders should be collapsed.  The transfer of the $450 million to GM Canada was the first step in a single, integrated transaction designed to put $367 million of Old GM's property into the hands of the Noteholders.[33]  The payment of the Consent Fee to the Noteholders, as well as the transfers leading up to that payment, were unauthorized postpetition transfers that are avoidable under section 549, and the Disputed Claims should therefore be disallowed under section 502(d).

---

[31]    *See* Pl. Exs. 66 and 67 (emails attaching Consent Fee escrow agreement copied to, and negotiated by, the Lock-Up Noteholders); Pl. Ex. 3 at AUR_GM021457 (Prieto notebook) ("the money is in a trust account in Canada where it is being held for this deal.  [D]oes not think that money will be attackable where it is now . . . the rights to this preference will be assumed by [New GM] in the 363 [Sale].  [T]hey will show us the trust document.").  Mr. Gropper interpreted Mr. Prieto's notebook entry to mean that "if the payment from GM U.S. to GM Canada is a preference, that the rights to that preference would be assumed by [New GM] in the 363 [S]ale."  Trial Tr. (9/28/2012), 65:6-13 (Gropper).

[32]    Pl. Ex. 67 at ELL_GM001701 (email from V. Graham, dated June 3, 2009).

[33]    *See* New GM SJ Hr'g Tr. (7/19/2012), 84:16-21 ("The GUC Trust has put forward evidence . . . to establish that GM Canada was merely a conduit and not the quote 'initial transferee of such transfer or the entity for whose benefit such transfer was made,' quote, as that expression is used in Section 550 of the Code.").

12

### 3.    The $450 Million Loan Was Not Authorized

The transfer of the Consent Fee was not an ordinary course transaction and therefore its payment required prior Court approval.  New GM argues that the Cash Management Order (defined below) authorized GM Canada to transfer Old GM's property to fund the Consent Fee because "[t]here was no 'ordinary course' limitation set forth in the applicable provision of the Cash Management Order."[34]  This argument is outrageous.  Old GM's cash management motion sought Court authorization only for ordinary course transactions, and thus the Cash Management Order by its terms only approved ordinary course transfers (eliminating the need for a purported "ordinary course" limitation in the order itself).[35]  But in any event, the transfer of the Consent Fee was not an "ordinary" or customary transfer, in either amount or purpose, and would under no circumstance be able to qualify as an authorized ordinary course transfer.[36]

### 4.    Avoidance Claims Related To Payment Of The Consent Fee Were Not Sold to New GM

As already explained above, to prevail on its section 502(d) objection, the GUC Trust need not file, or even be able to file, an avoidance action to recover the Consent Fee. Nonetheless, for the sake of completeness, the GUC Trust will respond to arguments advanced by the Noteholders and New GM that the avoidance actions related to payment of the Consent

---

[34]    NG Brief at 31.

[35]    Pl. Ex. 750 at 12 (Bankr. Dkt. No. 30, cash management motion) (seeking order authorizing "the continued transfers of funds among the Debtors and their affiliates in the ordinary course of business"); Pl. Ex. 751 at 3 (Bankr. Dkt. No. 2542, order granting cash management motion "**Cash Management Order**").

[36]    *See* New GM SJ Hr'g Tr. (7/19/2012), 85:25-86:6 ("I'm surprised that New GM would even suggest . . . that a transaction of this character could have been authorized under my first day cash management order when its effect, if not also [sic] purpose, was to use GM Canada as the conduit for the $367 million in Old GM funds that found their way into the hands of certain noteholders."); *see also infra* note 48 (demonstrating extraordinary size of Consent Fee).

13

Fee, including claims under section 549, were sold to New GM. For the following reasons, these arguments lack merit.

Under the MSPA, Old GM sold to New GM only the avoidance actions "arising from, relating to or in connection with, any payments by or to . . . any Purchased Subsidiary."[37] As explained above, the series of transfers that put the Consent Fee into the Noteholders' hands should be collapsed and properly recognized as a transfer from Old GM to the Noteholders. Transfers from Old GM to the Noteholders were not sold to New GM – and no one argues that they were. Further, to the extent that the transfers are considered transfers to GM Nova Scotia, those transfers also were not sold to GM Nova Scotia because it was not a "Purchased Subsidiary" – and no one argues that it was. The fact that Old GM's payment to the Noteholders was funneled through GM Canada does not transform the avoidance action into a claim purchased by New GM.[38]

---

[37]    MSPA § 2.2(b)(xi); *Notice Of Filing Of The Amended Master Sale And Purchase Agreement And Certain Exhibits And Sections Of The Disclosure Schedule Thereto* at Disclosure Sch. 2.2(b)(xi) (Bankr. Dkt. No. 2649).

[38]    The Noteholders argue in error that the GUC Trust must first obtain a judgment against GM Canada establishing that the transfer is avoidable before seeking recovery from the Noteholders. This argument misses the mark for a number of reasons. First, as explained above, to prevail on its section 502(d) objection, the GUC Trust need not pursue an avoidance action at all. Second, even if such an action were necessary, this is a blatant misstatement of the law on avoidable transfers because the trustee "may seek to recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is made." *Kendall v. Sorani (In re Richmond Produce Co.)*, 195 B.R. 455, 463 (N.D. Cal. 1996); *see also IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 704 (11th Cir. 2005) (same); *Durkin v. Shields (In re Imperial Corp. of Am.)*, No. 92-1003-IEG (LSP), 1997 WL 808628, at *3 (S.D. Cal. Aug. 20, 1997) (same); *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 321 B.R. 308, 328 (Bankr. M.D. Fla. 2005), *rev'd on other grounds*, 490 F.3d 1325 (11th Cir. 2007) (same). Finally, because GM Canada served as a mere conduit for the transfer to GM Nova Scotia and then to the Noteholders, there would not be any reason to seek recovery of the transfer from GM Canada. *See In re Int'l Admin. Servs., Inc.*, 408 F.3d at 705 (courts have "created a more malleable approach to § 550(a), recognizing that such a 'mere conduit' cannot be considered an 'initial recipient' for purposes of avoidance action.").

14

### C. Alternatively, To The Extent The $450 Million Loan Is Deemed A Prepetition Transfer, The Consent Fee Is Nonetheless Avoidable Under Sections 547 And 548 Of The Bankruptcy Code

As already explained above, the Consent Fee is avoidable under section 549 as an unauthorized postpetition transfer. Nonetheless, if for some reason payment of the Consent Fee is deemed a prepetition transfer, as the Noteholders argue, it is still avoidable as either a fraudulent transfer or a preference.

The Consent Fee is avoidable as a constructively fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code, because Old GM, while insolvent, received less than reasonably equivalent value for its transfer of the proceeds of the $450 Million Loan.[39] As demonstrated at trial, Old GM's own internal analysis confirmed that the Consent Fee was disproportionate to any benefit Old GM received.[40]

The Noteholders argue, without basis, that the Indifference Analysis, which was prepared by Old GM in consultation with its financial advisor, Morgan Stanley, is not reliable. This argument should be rejected. The Indifference Analysis was a contemporaneous analysis performed by Old GM and was the basis for Old GM's and Mr. Ammann's communications with U.S. Treasury about the Lock-Up Agreement. It is the only reasoned analysis prepared by any party that addresses the economics of a potential settlement with the Noteholders from Old GM's perspective.[41] There is no credible evidence on the topic except for the Indifference Analysis, which shows that a settlement with the Noteholders did not make economic sense at levels

---

[39]    11 U.S.C. § 548(a)(1)(B).

[40]    Trial Tr. (9/27/2012), 96:18-21 (Ammann). A $285 million payment represented a 178% premium to market on the Notes. *See, e.g.*, Pl. Ex. 211 at 2 (email from D. Ammann, dated May 18, 2009).

[41]    Trial Tr. (8/10/2012), 108:25-109:7 (Buonomo); Trial Tr. (9/27/2012), 76:1-77:19, 79:25-80:5, 80:13-15, 83:22-84:1, 102:5-8 (Ammann).

15

beyond a $285 million payment in exchange for extinguishing the Notes. Here, the Noteholders

were paid $367 million, retained their Notes without any reduction of principal, and are the

potential beneficiaries of approximately $2.7 billion in claims against Old GM.[42] Old GM

therefore did not receive reasonably equivalent value, and payment of the Consent Fee is

avoidable as a constructively fraudulent transfer.[43]

### D.    The Defenses Raised By The Noteholders As To The Avoidability Of The Transfers Are Without Merit

#### 1.    The Noteholders Did Not Take The Transfer "In Good Faith"

The evidence at trial showed that the Noteholders' receipt of the $367 million Consent

Fee was not "in good faith" within the meaning of section 550(b). Section 550(b) provides a

defense to "(1) a transferee that takes . . . in good faith, and without knowledge of the voidability

of the transfer avoided; or (2) any immediate or mediate good faith transferee of such

transferee." 11 U.S.C. § 550(b).[44] A transferee has "knowledge" of a transfer's voidabililty

---

[42]    The Noteholders contend, incorrectly, that the Indifference Analysis is a range in which the Consent Fee falls. NH Brief at 41; JSF, ¶ 29. In fact, the Indifference Analysis was always expressed internally and to U.S. Treasury as a point, not a range. Pl. Ex. 126 ("point of indifference"); Pl. Ex. 130 ("point of indifference analysis"); Pl. Ex. 211 ("the indifference point is quite high"). As Mr. Buonomo testified, the indifference point refers to the number that "above this is too much, below this is favorable." Trial Tr. (8/9/2012), 22:13-23 (Buonomo). He also testified that the phrase "walk away" is the "*point* at which we should just . . . say no and file a bankruptcy in Canada." *Id.* at 29:2-7 (emphasis added). Regardless, every version of the Indifference Analysis was premised on an "all in" settlement with the Noteholders. *Id.* at 32:11-16. Mr. Buonomo concedes that the assumption in every draft of the Indifference Analysis was "payment for cancellation of the [N]otes, so all in colloquially." *Id.* at 108:17-24. Pl. Ex. 133 (seeking approval from UST for an "all-in offer" to the Noteholders). Finally, the parties argue that the Indifference Analysis "changed over time." JSF, ¶ 29. The evidence shows, however, that the indifference point changed only once and never exceeded $285 million. *See, e.g.*, Pl. Exs. 211 ($285 million), 126 ($234 million) and 130 ($285 million).

[43]    For the reasons already set forth in the GUC Brief, the Consent Fee is also avoidable as a preference under section 547 and as an actual fraudulent transfer under section 548(a)(1)(A).

[44]    Cases have reached different conclusions on the issue of whether the plaintiff carries the burden of proof to show the absence of a defense under section 550(b), or whether it is the defendant's burden to affirmatively establish the defense. *Compare In re Hooker Invs., Inc.*, 155 B.R. at 337 (stating that the party seeking to preclude trustee from recovering voidable transfer has burden of proof under section 550(b)) *with Lustig v. Hickey (In re Hickey)*, 168 B.R. 840, 850 (Bankr. W.D.N.Y. 1994) ("The trustee

Footnote continued on next page

when the transferee is aware of the potential grounds for avoidance of the transfer; a complete understanding of the facts is not required.[45]  There is no question that the Noteholders were aware of the potential grounds for avoidance.  Among other evidence, Dennis Prieto's notebook entry demonstrates his understanding that the $450 Million Loan was potentially "attackable" as a "preference."[46]  Additionally, the Noteholders were involved in structuring the Lock-Up Agreement, including payment of the Consent Fee, in a manner designed to evade this Court's scrutiny.[47]  The Noteholders were also well aware that the amount of the Consent Fee was many orders of magnitude greater than any other consent fee with which they had ever been involved.[48]  Because the Noteholders did not receive payment of the Consent Fee in good faith, their section 550(b) defense is without merit.

### 2.    The Section 546(e) Safe Harbor Does Not Apply

The Noteholders further argue that the Consent Fee is shielded from avoidance under the section 546(e) safe harbor for certain transfers made "in connection with a securities contract."  This defense does not apply because, by its express terms, section 546(e) only applies to certain transfers made in connection with a securities contract that are "made before the commencement

---

Footnote continued from previous page

has the burden of proving that the defendant should not have the benefit of the shelter provided by Section 550(b)(1)").  The Court need not decide this issue, however, because the GUC Trust has nonetheless proven that the Noteholders lacked good faith by a preponderance of the evidence.

[45]    *Bruno Mach. Corp., v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)*, 435 B.R. 819, 849 (Bankr. N.D.N.Y. 2010).

[46]    Pl. Ex. 3 at AUR_GM021457 (Prieto notebook).

[47]    *See supra* note 31.

[48]    Prior to this deal, the largest consent fee with which Mr. Cederholm ever had experience was 8% of the face value of the notes and in this case the Noteholders received approximately 35% of the face value.  Trial Tr. (9/6/2012), 31:9-14; 126:19-23 (Cederholm); *see* Gropper Decl., ¶ 52; Pl. Ex. 607 at FOR_GM002643 (email from L. Cowen to B. Truong, dated May 30, 2009).

of the case."[49]   Section 546(e) is therefore not a defense to a postpetition transfer avoidable under section 549, such as the Consent Fee here.[50]

### 3.   The Lock-Up Agreement Was Not Assumed and Assigned

The Noteholders also argue that transfers made pursuant to the Lock-Up Agreement are not subject to challenge because the Lock-Up Agreement was assumed and assigned under section 365 of the Bankruptcy Code.  To prevail on this argument, the Noteholders bear the burden of proving by a preponderance of the evidence that the Lock-Up Agreement was validly assumed and assigned.[51]  For the reasons set forth in the GUC Brief (see GUC Brief at 26 n.129), the Noteholders cannot satisfy this burden.  The evidence shows that the Lock-Up Agreement was not, and could not have been, assumed by Old GM under the MSPA because (1) the Lock-Up Agreement is void as an unauthorized postpetition agreement; (2) even if the Lock-Up Agreement was a prepetition agreement, it was not assumed because Old GM failed to comply with the assumption procedures mandated by the Sale Order;[52] and (3) the Lock-Up Agreement is an "Excluded Contract" which was not sold to New GM.[53]

---

[49]     As discussed in Section V below, it is telling that the Noteholders themselves characterize the Consent Fee as a payment in connection with a securities contract – namely, the Notes.  NH Brief at 42-43.  This only further demonstrates that, in substance, the Consent Fee was a payment on the Notes.

[50]     Alternatively, if the Consent Fee is considered a prepetition payment, the section 546(e) safe harbor still would not apply, because the Consent Fee was a principal payment on the Notes and did not involve a "securities contract" within the meaning of the Bankruptcy Code.  See 11 U.S.C. § 741(7) (defining "securities contract" as a "contract for the purchase, sale or loan of a security").

[51]     See Friede Goldman Halter, Inc. v. Aircomfort, Inc. (In re Consol. FGH Liquidating Trust), 392 B.R. 648, 665 (Bankr. S.D. Miss. 2008) (defendant failed to meet burden of proving assumption and was therefore precluded from arguing that avoidance of preferential transfers is barred by assumption under section 365); see also Weinman v. Allison Payment Sys., LLC (In re Centrix Fin., LLC), 434 B.R. 880, 888 (Bankr. D. Colo. 2010) (recognizing contract assumption as an affirmative defense).

[52]     To the extent the Court finds that Old GM's only obligation under the Lock-Up Agreement was the "cooperation" obligation as argued by New GM, then even if the Lock-Up agreement was a prepetition agreement, it was not assumed because it was not executory.  See Memorandum Of Law In Support Of Motion By General Motors LLC For Summary Judgment (Bankr. Dkt. No. 11849) at 37 ("Old GM's only continuing obligation after the Petition Date with respect to the Lock-Up Agreement was the

Footnote continued on next page

18

### E.    The $450 Million Loan Was Not Repaid

The Noteholders, relying on New GM, contend that the $450 Million Loan was repaid in full.  The evidence does not support this contention and, in fact, strongly supports the conclusion that it was *not* repaid.  On three different occasions, New GM tried and failed to prove that the $450 Million Loan was repaid.[54]  After New GM failed to prove repayment the first two times, the Court gave New GM one last chance, adjourning the trial and permitting testimony from a previously unidentified witness.  On its final attempt to prove repayment of the $450 Million Loan, New GM's hand-picked witness, Tyrone Lopez, proved to be incompetent to testify about the issue.

First, the evidence shows that Mr. Lopez was away at the time of the repayment transaction.  Although he claims to have been "personally involved in the drafting, review and arranging for the execution of the D&A Memo," which is dated as of July 7, 2009, Mr. Lopez was out of the office from July 6 through July 10, 2009.[55]  On Wednesday July 1, Mr. Lopez emailed a list of special transactions for the preceding month to his colleagues in the accounting department "just in case there are any issues as I will be away next week."[56]  Consistent with his

---

Footnote continued from previous page

Cooperation Provision.").  However, the GUC Trust disputes New GM's contention because, as described more fully in the GUC Brief and herein, Old GM had numerous obligations under the Lock-Up Agreement.

[53]    MSPA § 2.2(v)(ii).

[54]    New GM attempted to prove repayment with Mr. Buonomo on August 9, 2012, and again with Mr. Ammann on September 27, 2012.  As the Court noted, "[i]t was obvious to anybody sitting in this courtroom" that Mr. Buonomo "could not of his own knowledge say what actually happened."  Further, it was foreseeable that an objection to Mr. Ammann "testifying about stuff that he didn't know except by hearsay would likewise be sustained."  Trial Tr. (11/26/2012), 10:10-18 (Iacobucci).

[55]    Lopez Decl., ¶ 5.

[56]    Pl. Ex. 733 (email from T. Lopez to J. Ogle and P. Gupta, dated July 1, 2009).

19

being away, Mr. Lopez did not send a *single* email during the week of July 6.[57]

Second, Mr. Lopez was entirely unfamiliar with critical facts required to prove New GM's convoluted repayment theory. A key piece of New GM's argument involves the transfer of CAD $1 billion into an escrow account with CIBC (the "**CIBC Escrow Account**"), pursuant to an escrow agreement between, among others, Old GM and CIBC (the "**CIBC Escrow Agreement**"). New GM contends, and the GUC Trust disputes, that the CIBC Escrow Account was an Old GM account. While Mr. Lopez was aware that the CIBC Escrow Account was set up for General Motors Company (*i.e.*, New GM), he did not know who owned the CIBC Escrow Account because that was not part of his job.[58] Mr. Lopez was not involved in establishing the account and did not know if the account was for Old GM or New GM.[59]

---

[57]    As shown by the emails admitted at trial, Tyrone Lopez did not send a single email from July 6, 2009 through July 10, 2009. *See* Pl. Ex. 643 (July 6, 2009 from J. Halbridge); Pl. Ex. 711 (July 6, 2009 from A. Raj); Pl. Ex. 712 (July 6, 2009 from A. Hartog); Pl. Ex. 713 (July 6, 2009 from J. McCabe); Pl. Ex. 714 (July 6, 2009 from S. Subramanian); Pl. Ex. 734 (July 6, 2009 from C. Albino); Pl. Ex. 735 (July 6, 2009 from N. Soori); Pl. Ex. 764 (July 6, 2009 from A. Hartog); Pl. Ex. 774 (July 6, 2009 from A. Sundaram); Pl. Ex. 181 (July 7, 2009 from J. Goldrath); Pl. Ex. 646 (July 7, 2009 from B. Truong); Pl. Ex. 693 (July 7, 2009 from V. Fiege); Pl. Ex. 694 (July 7, 2009 from A. Sundaram); Pl. Ex. 715 (July 7, 2009 from S. Subramanian); Pl. Ex. 717 (July 7, 2009 from A. Hartog); Pl. Ex. 757 (July 7, 2009 from D. Crawley); Pl. Ex. 775 (July 7, 2009 from D. Crawley); Pl. Ex. 776 (July 7, 2009 from D. Crawley); Pl. Ex. 439 (July 8, 2009 from L. Buonomo); Pl. Ex. 718 (July 8, 2009 from A. Hartog); Pl. Ex. 747 (July 8, 2009 from B. Neuman); Pl. Ex. 758 (July 8, 2009 from R. Burshtine); Pl. Ex. 647 (July 9, 2009 from A. Fratila); Pl. Ex. 719 (July 9, 2009 from J. McCabe); Pl. Ex. 720 (July 9, 2009 from S. Di Cresce); Pl. Ex. 759 (July 9, 2009 from A. Hartog); Pl. Ex. 20 (July 10, 2009 from D. Prieto); *see also* Def. Ex. 431 (July 6, 2009 from S. Subramanian); Def. Ex. 435 (July 6, 2009 from S. Subramanian); Def. Ex. 472 (July 6, 2009 from E. Xiong); Def. Ex. 473 (July 6, 2009 from N. Lall); Def. Ex. 514 (July 6, 2009 from C. Albino); Def. Ex. 515 (July 6, 2009 from S. Subramanian); Def. Ex. 516 (July 6, 2009 from C. Timbrell); Def. Ex. 517 (July 6, 2009 from M. Sutedja); Def. Ex. 518 (July 6, 2009 from M. Schein); Def. Ex. 477 (July 7, 2009 from N. Soori); Def. Ex. 478 (July 7, 2009 from D. Crawley); Def. Ex. 479 (July 7, 2009 from D. McCarroll); Def. Ex. 480 (July 7, 2009 from V. Fiege); Def. Ex. 481 (July 7, 2009 from A. Sundaram); Def. Ex. 482 (July 7, 2009 from N. Soori); Def. Ex. 483 (July 7, 2009 from D. Crawley); Def. Ex. 484 (July 7, 2009 from D. McCarroll); Def. Ex. 521 (July 7, 2009 from R. Burshtine); Def. Ex. 522 (July 7, 2009 from A. Sundaram); Def. Ex. 523 (July 7, 2009 from A. Sundaram); Def. Ex. 524 (July 7, 2009 from C. Timbrell); Def. Ex. 485 (July 9, 2009 from S. Di Cresce).

[58]    Trial Tr. (3/6/2013), 40:20-22; 64:10-18; 65:9-13 (Lopez).

[59]    *Id*. at 66:1-9.

Further, Mr. Lopez had no involvement with the CIBC Escrow Agreement.[60] He did not concern himself with agreements related to the GM U.S. parent company because, again, that was not his job.[61] He knows nothing about why or how Old GM came to be a party to the CIBC Escrow Agreement.[62] In fact, the obligations related to the CIBC Escrow Agreement are "completely foreign" to Mr. Lopez, and he had no idea if the obligations belonged to Old GM or New GM.[63] As Mr. Lopez testified, "[w]hat was happening in the U.S., what step they were in, that's completely out of my purview."[64]

Finally, even if Tyrone Lopez were competent to testify regarding the alleged repayment, which he was not, his testimony should nevertheless be afforded no weight because he is not a credible witness. In addition to having been away from the office at the time of the purported repayment transaction, Mr. Lopez was not honest about having altered an email that he sent to TD Bank and an email that he received from TD Bank, before forwarding both emails in their altered forms to his supervisors at GM Canada.[65] Mr. Lopez's explanation as to why his email to TD Bank, sent at 9:14 a.m., contains text that is different than the version of this email, also

---

[60]    *Id.* at 38:21-39:3.

[61]    *Id.* at 45:4-10.

[62]    *Id.* at 47:6-18.

[63]    According to Mr. Lopez, "[w]hether it was Old GM, New GM, from my perspective I look at this, I see the parent company" and "it[']s not [sic] job to know" whether it was Old GM or New GM. *Id.* at 48:10-49:1.

[64]    *Id.* at 58:23-24.

[65]    *See* Trial Tr. (3/6/2013), 20:17-30:15 (Lopez). *Compare* Pl. Exs. 376, 699 (email from T. Lopez to D. McCarroll, dated June 1, 2009 at 9:14 a.m., "I was wondering if you could confirm receipt of the [$450 Million Loan]"); *with* Pl. Ex. 375 (T. Lopez forwarding email chain to his superiors containing purported email from T. Lopez to D. McCarroll, dated June 1, 2009 at 9:14 a.m., "Could you please confirm receipt of the [$450 Million Loan] . . . *on Friday afternoon*" and telling his superiors "We're good!") (emphasis added). *Compare* Pl. Exs. 376, 700 (email from D. McCarroll dated June 1, 2009 at 9:33 a.m., "Tyrone, do you have an idea of what day this week, funds will leave the account? Thanks"); *with* Pl. Ex. 375 (T. Lopez forwarding email chain to his superiors containing purported email from D. McCarroll dated June 1, 2009 at 9:33 a.m., "Tyrone, *As requested*, Thanks" and telling his superiors "We're good!") (emphasis added).

21

purportedly sent at 9:14 a.m. and that he forwarded to his superiors, is not credible. Here is Mr.

Lopez's testimony:

> what likely happened, and I honestly don't have direct recollection,
> . . . I typed the email, sent it out, the computer froze, I did control
> alt delete, . . . basically retyped the email, and didn't say obviously
> the same words . . . and resent . . . What likely happened is that my
> original email was likely in the outbox when the process runs that
> actually sends out all the emails. Both emails went out.[66]

When asked how it is that TD Bank's responses, both purportedly sent at 9:33 a.m., also seem to

have different texts, Mr. Lopez speculated that TD Bank could have separately replied to each of

his purported 9:14 a.m. emails.[67] Mr. Lopez's testimony on this issue was simply not credible

and calls into question the overall reliability of his testimony. But even if every word of Mr.

Lopez's testimony were to be credited, the evidence simply does not support an inference that

the $450 Million Loan was repaid.

As of early July 2009, the balance owed to Old GM on the $450 Million Loan was $372

million. The intercompany transaction through which the balance of the $450 Million Loan was

purportedly repaid is described in the Direction & Acknowledgement. According to the

Direction & Acknowledgement, in July 2009, Old GM and GM Canada entered into the FX

Transaction pursuant to which GM Canada agreed to sell CAD $1 billion to Old GM in exchange

for the U.S. dollar equivalent (approximately $860 million) from Old GM.[68] Figure 1, below,

illustrates the FX Transaction:

---

[66]    Trial Tr. (3/6/2013), 23:23-25:3 (Lopez).

[67]    Trial Tr. (3/6/2013), 80:9-14 (Lopez).

[68]    Lopez Decl., ¶ 5; Def. Ex. 425 (Direction & Acknowledgement). As a threshold matter, Old GM
was not authorized to enter into the FX Transaction because it was not an "ordinary course" transaction.
As Mr. Lopez testified, it was the largest foreign exchange transaction between Old GM and GM Canada
he is aware of, and the only such transaction where Old GM's JPMorgan London account was not
utilized. Trial Tr. (3/6/2013), 61:13-23 (Lopez).



Old GM fulfilled its part of the FX Transaction.  As shown in Figure 2 below, Old GM

provided $860 million of value to GM Canada, consisting of (1) Old GM's forgiveness of the

$374 million tax refund owed by GM Canada to Old GM, (2) Old GM's forgiveness of the $372

million balance owed by GM Canada to Old GM on the $450 Million Loan, and (3) a cash

transfer from Old GM to GM Canada in the approximate amount of $114 million.[69]  So far, so

good.



---

[69]    *Id*. at 57:17-19.  To be precise, Old GM's forgiveness of the $450 Million Loan was in the
amount of $372,589,733.33, its forgiveness of the tax refund was in the amount of $374,487,000.00 and
its cash transfer to GM Canada was in the amount of $113,434,410.29.  *See, e.g.*, Def. Ex. 425.

23

But, there is a problem with the repayment argument.  In the end, the transaction turned

out to be a one-legged swap, because GM Canada never transferred the CAD $1 billion due to

Old GM or otherwise provided value in that amount to Old GM.  Instead, at the direction of Old

GM employees (who were soon to be New GM employees), the CAD $1 billion that should have

been paid to Old GM was paid into the CIBC Escrow Account to provide funding support for

GM Canada's pension.  These funds were purportedly directed by Old GM into the CIBC

Escrow Account for the benefit of GM Canada's pension, even though Old GM was not legally

obligated to make that payment, and even though this Court never approved this purported CAD

$1 billion postpetition obligation.[70]  Right up until July 6, 2009, the draft CIBC Escrow

Agreement showed that this CAD $1 billion pension support obligation was always intended to

be a New GM obligation.[71]  In fact, the CIBC account into which the CAD $1 billion was

deposited was established by New GM.[72]  Old GM never received any benefit on account of the

---

[70]    *See* Pl. Ex. 717 (email from A. Hartog to A. Sundaram, and others, dated July 7, 2009, attaching executed copy of the CIBC Escrow Agreement); Trial Tr. (3/6/2013), 40:12-15 (Lopez).

[71]    As reflected in the various drafts of the CIBC Escrow Agreement that were circulated prior to the Sale Order, New GM was the intended party to the CIBC Escrow Agreement.  *See* Pl. Ex. 707 (email from A. Hartog to A. Sundaram, and others, dated July 2, 2009, attaching draft CIBC Escrow Agreement as of July 2, 2009 with General Motors Company as a party); Pl. Ex. 709 (email from A. Hartog to A. Sundaram, and others, dated July 3, 2009, attaching draft CIBC Escrow Agreement as of July 3, 2009 that references NGMCO., Inc.).  Old GM was substituted at the last minute for New GM as the counterparty to the CIBC Escrow Agreement in an effort to get around this Court's five-day stay of the effective date of the Sale Order.  *See* Sale Order, ¶ 70 (Bankr. Dkt. No. 2968); *see also* Pl. Ex. 712 (email from A. Hartog to A. Sundaram, and others, dated July 6, 2009, regarding substituting New GM for Old GM as a party and attaching revised CIBC Escrow Agreement); Pl. Ex. 764 (email from A. Sundaram to G. Krowles, dated July 6, 2009:  "Due to the stay provision in the 363 Sale Order passed last night . . . we may need to have an escrow GM Old Co, which need to move to NewCo for the C$1B.").

[72]    *See* Pl. Ex. 708 at NGM000040485-86 (email from G. Krowles at CIBC, to A. Hartog, and others, dated July 3, 2009, sending wiring instructions for "GM Company" pension escrow account); Pl. Ex. 710 at NGM000043437 (email from A. Sundaram to T. Lopez, and others, dated July 4, 2009, discussing "CIBC preferences for C$1B NewCo escrow"); Pl. Ex. 764 at NGM000040841 (email from A. Sundaram to G. Krowles at CIBC, dated July 6, 2009, discussing timing of funding for "the C$1B escrow under GM New Co").

escrow funds, and, not surprisingly, upon release of the escrow funds, the CAD $1 billion went

directly to New GM. *See* Figure 3.



Thus, New GM – not Old GM – received the CAD $1 billion to which Old GM was entitled.

Accordingly, the Old GM side of the FX Transaction was not fulfilled, and the $372 million

balance on the $450 Million Loan was never repaid.

Finally, Figure 4 depicts the Direction & Acknowledgement transaction as a whole,

clearly demonstrating that Old GM received no benefit in exchange for its payment of $860

million to GM Canada.[73]

---

[73]    During Mr. Lopez's examination, New GM's counsel asked questions about various sections of
the $33 billion secured super-priority debtor-in-possession credit agreement dated as of June 3, 2009 (the
"**DIP Agreement**"), as approved by final order of this Court dated June 25, 2009 (the "**DIP Order**").
Trial Tr. (3/19/2013), 6:14-12:5 (Lopez); *see generally* Def. Ex. 213 (DIP Order and DIP Agreement).
Mr. Lopez was not competent to testify about, and thus did not testify about, the DIP Agreement, which
he had never seen.  The GUC Trust anticipates that New GM will argue that section 4.3(b) of the DIP
Agreement, and the related DIP Order, in some way authorized Old GM to enter into the CIBC Escrow
Agreement and fund the CIBC Escrow Account.  There is no evidence in the record on the topic.  But, in
any event, the argument does not make sense, because at the time of the DIP Order and up until July 6,
2009, the plan was for New GM – not Old GM – to be party to the CIBC Escrow Agreement.  *See supra*
note 71.  It was only because of this Court's stay of its sale order that Old GM was purportedly
substituted for New GM at the eleventh hour without this Court's approval.  *Id.*



Figure 4: Alleged Repayment Transactions

## II. THE TAINTED CLAIMS AND THE NOVA SCOTIA TRUSTEE CLAIM SHOULD BE EQUITABLY SUBORDINATED

### A. The GUC Trust Has Standing

Contrary to the arguments of the Noteholders, the GUC Trust, through Wilmington Trust Company, as GUC Trust Administrator ("**WTC**"), has standing to assert claims for equitable subordination or disallowance and recharacterization (the "**GUC Trust Claims**")[74] because the Confirmation Order,[75] Plan[76] and GUC Trust Agreement[77] preserved these claims for, and transferred them to, the GUC Trust.

Paragraph 31 of the Confirmation Order, entitled "Role of GUC Trust Administrator,"

---

[74]    The Noteholders do not contest the GUC Trust's standing with respect to any claims or objections asserted by the GUC Trust other than the GUC Trust Claims.

[75]    "**Confirmation Order**" refers to *Findings Of Fact, Conclusions Of Law, And Order Pursuant To Sections 1129(a) And (b) Of The Bankruptcy Code And Rule 3020 Of The Federal Rules Of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter 11 Plan* (Bankr. Dkt. No. 9941).

[76]    "**Plan**" refers to the *Debtors' Second Amended Joint Chapter 11 Plan* (Bankr. Dkt. No. 9836).

[77]    "**GUC Trust Agreement**" refers to the Motors Liquidation Company GUC Trust Agreement, annexed as Exhibit D to the Plan.

provides that the "GUC Trust Administrator shall . . . (d) have the power and authority to

prosecute and resolve (x) objections to [Disputed Claims[78]] and (y) subject to obtaining any

applicable consent from [Old GM], and any necessary approval of the Bankruptcy Court, any

claims for equitable subordination and recharacterization in connection with such objections."[79]

Section 6.2(f) of the Plan contains language identical to paragraph 31 of the Confirmation

Order.[80]

    Similarly, section 8.1(b)(iv) of GUC Trust Agreement also preserves the GUC Trust

Claims and transfers them to the GUC Trust.  Section 8.1(b)(iv) authorizes WTC, in furtherance

of the purpose of the GUC Trust, to "object to and/or withdraw objections to [Disputed Claims],

and manage, control, prosecute and/or settle on behalf of the GUC Trust, (x) objections to

---

[78]    The *Official Committee Of Unsecured Creditors' Objection To Claims Filed By Green Hunt Wedlake, Inc. And Noteholders Of General Motors Nova Scotia Finance Company And Motion For Other Relief* (Bankr. Dkt. No. 6248) (the "**Initial Objection**") contains, among other things, claims for equitable subordination and recharacterization as well as the defensive assertion of avoidance actions in the context of section 502(d) and has been pending since July 2, 2010, well before Plan confirmation.  Section 4.3(g) of the Plan states that "[n]otwithstanding anything to the contrary in the Plan, the [Guarantee Claims] and the Nova Scotia [Trustee] Claim shall be treated as [Disputed Claims]."  The Initial Objection was, without a doubt, preserved and transferred to the GUC Trust.

[79]    Confirmation Order, ¶ 31.  Paragraph 31 of the Confirmation Order goes on to say that "[a]s of the conclusion of the Confirmation Hearing, the GUC Trust Administrator shall have the power and authority to take such actions and perform such acts as may be necessary, desirable, or appropriate to comply with or implement the Plan or the GUC Trust Agreement and shall have the authority to take all actions as may be necessary, desirable, or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan or the GUC Trust Agreement." *Id.*

[80]    Section 6.2(f) of the Plan, entitled "Role of GUC Trust Administrator," provides "[i]n furtherance of and consistent with the purposes of the GUC Trust and the Plan, the GUC Trust Administrator shall . . . (iv) have the power and authority to prosecute and resolve (x) objections to [Disputed Claims] and (y) subject to obtaining any applicable consent from [Old GM], . . . and any necessary approval of the Bankruptcy Court, any claims for equitable subordination and recharacterization in connection with such objections." Plan, § 6.2(f).  On March 29, 2011, the Plan was confirmed pursuant to this Court's Confirmation Order.  The Defendants' contention that section 6.2(f)(iv)(y) of the Plan (which, among other things, preserved claims for equitable subordination) was added to the Plan on March 8, 2011 is unsupported by the record but nonetheless wholly irrelevant.  Paragraph Z of the Confirmation Order is a finding by the Court that changes to the December 8, 2010 amended plan did not materially adversely affect the treatment of any claims, including the Disputed Claims.  Thus, Defendants' argument is unfounded.

[Disputed Claims], and (y) subject to obtaining any applicable consent from [Old GM] and any

necessary approval of the Bankruptcy Court, any claims for equitable subordination and

recharacterization in connection with such objections."[81]

Finally, the Noteholders contend, incorrectly, that the assumption and assignment

agreement entered into on December 15, 2011 between Old GM and the GUC Trust (the

"**Assignment Agreement**") is a "flagrant violation" of the Plan and Confirmation Order.[82]  The

Assignment Agreement simply reflects what was already provided for in the Plan.

### B.    Defendants Have Failed To Prove Good Faith And Fairness

As insiders of Old GM, the Lock-Up Noteholders and the Nova Scotia Trustee

(collectively, the "**Subordination Defendants**") bear the burden of proving that the Lock-Up

Agreement was a good-faith and fair transaction.[83]

The Subordination Defendants cannot satisfy their burden here because, as explained

above and in the GUC Brief, in exchange for an essentially worthless release from the

Oppression Action, the Lock-Up Noteholders received $367 million, retained their Notes and

---

[81]    Pursuant to the Confirmation Order, Plan and GUC Trust Agreement, the GUC Trust was not required to seek Old GM's consent or Bankruptcy Court approval before asserting the GUC Trust Claims, unless such consent was required as a matter of law, which is why the words "any applicable" modify consent, and "any necessary" modify Bankruptcy Court approval in each of those three documents. Consequently, upon confirmation of the Plan, neither Old GM's consent nor Bankruptcy Court approval was a condition to the assertion of the GUC Trust Claims.

[82]    NH Brief at 48.

[83]    *See, e.g., Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 564 (Bankr. S.D.N.Y. 2002).  As explained in Argument Section II(B) of the GUC Brief, the Lock-Up Noteholders are insiders of Old GM due to the level of control they exercised over GM Nova Scotia and their access to non-public information about both Old GM and GM Nova Scotia.  GUC Brief at 51-52 ns. 268-76.  The Nova Scotia Trustee is an insider of Old GM because Wedlake is an insider of Old GM's affiliate – and wholly owned subsidiary – GM Nova Scotia.  GUC Brief at 50 n.267.  Even if the Court finds that the Subordination Defendants are not insiders, which they are, equitable subordination is nonetheless available with respect to claims asserted by non-insiders.  *See, e.g., In re Adler, Coleman Cleaning Corp*, 277 B.R. at 565-66 (even if claimant "were no more than an 'outsider' with special access and privileges, he would still be subject to equitable subordination.").

asserted approximately $2.7 billion in claims against Old GM.  The Noteholders' contention that the Lock-Up Agreement was fair is contrary to the evidence.

### C.    The Lock-Up Noteholders Behaved Inequitably

Under the doctrine of equitable subordination, a court may subordinate a creditor's claim that, although "not lacking a lawful basis[,] nonetheless results from inequitable behavior on the part of that creditor."[84]  Inequitable conduct "encompasses conduct that may be lawful but is nevertheless contrary to equity and good conscience."[85]

The Tainted Claims should be equitably subordinated because the Lock-Up Noteholders engaged in inequitable conduct that conferred an unfair advantage on them.  As set forth in Argument Section II(C) of the GUC Brief, among other things, certain Lock-Up Noteholders:

- threatened to tie up Old GM's bankruptcy unless they received the commercially unreasonable Consent Fee, which they knew would be paid to them postpetition with funds that were property of Old GM's estate;[86]
- increased their holdings the day after they entered into the Lock-Up Agreement in order to receive a larger portion of the Consent Fee and solidify total control over the Nova Scotia Bankruptcy Case, before the pertinent facts were known to other creditors of Old GM;[87]
- commenced the meritless Oppression Action to extract the rich recovery ultimately reflected in the Lock-Up Agreement;[88]
- consistently misrepresented to the Court and the public that the Lock-Up Agreement was a prepetition agreement, even though they knew that the agreement was not completed until after Old GM's bankruptcy petition was filed;[89]
- failed to disclose their trading history of CDS referencing Old GM in the Rule

---

[84]    *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 432-33 (S.D.N.Y. 2007), *motion to certify appeal denied*, Nos. 01-16034, 06 Civ. 7828, 07 Civ. 1957 (SAS), Adv Pro. No. 05-01025, 2007 WL 2780394 (S.D.N.Y. Sept. 24, 2007).

[85]    *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 386 (Bankr. S.D.N.Y. 2007) (citations omitted).

[86]    GUC Brief at 12, 27 ns.55, 137.

[87]    *Id.* at 9, 53 ns.35 through 40, 279.

[88]    *Id.* at 53 n.282.

[89]    *Id.* at 53 n.283.

2019 statements filed with the Court;[90] and

- manipulated the date and method by which GM Nova Scotia would be put into bankruptcy in order to insulate the Consent Fee and Lock-Up Agreement from challenge and ensure that a "winding up" event would trigger section 135 of the Companies Act.[91]

Thus, the Lock-Up Noteholders engaged in inequitable conduct warranting subordination of the Tainted Claims.

### D.    The Nova Scotia Trustee Behaved Inequitably

Likewise, Wedlake's conduct warrants equitable subordination of the Nova Scotia Trustee Claim.[92]  As set forth in Fact Section II(D) of the GUC Brief, Wedlake acted inequitably in numerous respects including: (i) failing to adequately investigate possible "transfers at under value;"[93] (ii) failing to have inspectors appointed for the GM Nova Scotia estate, as is customary in such a proceeding and contrary to his own best judgment;[94] (iii) knowingly consenting to the Lock-Up Noteholders' manipulation of the timing of the Nova Scotia Bankruptcy Case;[95] (iv) submitting an inflated and false claim against Old GM in reliance upon calculations performed at the direction of the Lock-Up Noteholders and without undertaking any independent investigation;[96] and (v) failing to investigate the Statement of Affairs, despite Wedlake's

---

[90]    *Id*. at 9 ns.35 through 40.

[91]    *Id*. at 29 ns.149 through 151.

[92]    As stated in the GUC Brief, the inequitable conduct of those Lock-Up Noteholders who hand-picked and controlled Wedlake should be imputed to Wedlake.  *See Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1356 (1st Cir. 1992).

[93]    Trial Tr. (8/7/2012), 95:13-21 (Wedlake).

[94]    *Id*. at 106:5-20.

[95]    *Id*. at 63:25-64:4; Pl. Ex. 202 (email from P. Huff to P. Wedlake, dated June 2, 2009); Wedlake Decl., ¶ 14; *see also* Wedlake Decl., ¶ 18; Trial Tr. (8/7/2012), 93:7-20 (Wedlake); Pl. Ex. 32 (email from P. Huff to P. Wedlake, dated Sept. 8, 2009).

[96]    *See* GUC Brief at 32-37 ns.170 through 206; *see also In re Adler, Coleman Clearing Corp.*, 277 B.R. at 567.

awareness that it was riddled with irregularities.[97]

In particular, Wedlake performed no investigation and exercised no independent judgment over the Nova Scotia Bankruptcy Case.  For example, Wedlake expected that the outstanding amount of the Notes to be reflected in the Statement of Affairs would not include interest.[98]  But when the Noteholders directed the inclusion of interest, Wedlake did not ask any questions before including such interest in the Nova Scotia Trustee Claim.  Moreover, Wedlake admits that it relied on a GM Nova Scotia December 31, 2008 financial statement that lists the outstanding amount of the Notes as $875 million but, inexplicably, Wedlake filed the claim for a much larger amount.[99]

Wedlake also improperly relied on New GM, the purported claimant under the Swaps, to identify New GM as the purported swap counterparty.  On July 20, 2009, months before the New GM Swap Claim was filed, Wedlake's counsel received a list of creditors of GM Nova Scotia that identified Old GM as the claimant under the Swaps.[100]  On October 29, 2009, Mr. Prieto of Aurelius revised the list of creditors of GM Nova Scotia which still showed Old GM as the proper swap counterparty.[101]  On November 10, 2009, Wedlake received the New GM Swap Claim asserted by New GM.  Although at that time, the documents available to Wedlake

---

[97]     See GUC Brief at 30-32 ns.156 through 169.  New GM and the Defendants contend, incorrectly, that GM Nova Scotia and its representatives were the "ultimate" decision makers "[a]t all times" regarding the Statement of Affairs.  JSF, ¶ 130.  In fact, Wedlake knew that that Ms. Sutedja, who signed the Statement of Affairs on November 23, 2009, resigned before GM Nova Scotia was petitioned into bankruptcy in October of 2009 and worked for New GM at the time she signed the Statement of Affairs.  Trial Tr. (8/7/2012), 20:3-21:5 (Wedlake).  At that time, GM Nova Scotia had no officers, directors or employees.  Id.

[98]     Pl. Ex. 465 (email from P. Wedlake to P. Huff and R. Mackeigan, dated Oct. 28, 2009).

[99]     JSF, ¶ 131.  See Pl. Ex. 315, Attach. ¶ 5 ("Noteholders having an unsecured claim of [CAD] $1,088,542,512.01").

[100]    Pl. Ex. 648 (email from N. Cheifetz to recipients, dated July 20, 2009).

[101]    Pl. Exs. 466 and 467 (emails from D. Prieto to P. Wedlake and others, dated Oct. 29, 2009).

indicated that Old GM was the proper swap counterparty, Wedlake made no inquiry.  Two days

later, when New GM directed that Wedlake adjust the Statement of Affairs to conform it to the

New GM Swap Claim, Wedlake complied.[102]

In connection with the Swaps, and with its activities as trustee of GM Nova Scotia in

general, Wedlake claims to have relied on Ms. Sutedja, who admits she "didn't really do any

related business activities with" GM Nova Scotia.[103]  Ms. Sutedja admits that she knows nothing

about the Swaps, other than that one existed.[104]  And while Peter Wedlake claims to have spoken

to Ms. Sutedja six times, Ms. Sutedja does not remember ever having spoken with him.[105]

### E.    The Subordination Defendants Injured Old GM's Creditors While Unfairly Advantaging Themselves

As a prerequisite to the equitable subordination of claims, courts require that the

inequitable conduct either result in injury to creditors or confer an unfair advantage on the

claimant.  This element is satisfied where the general creditors are less likely to collect their

debts as a result of the alleged inequitable conduct.[106]  As a result of the inequitable conduct

proven at trial, the Subordination Defendants have asserted unjustifiably inflated claims in Old

GM's bankruptcy case which, if not disallowed or subordinated, will certainly diminish

---

[102]    Pl. Ex. 449 (email from M. Munro to P. Wedlake, dated November 12, 2009).  Wedlake's claim that New GM must be the proper party because Old GM did not file a claim related to the Swaps does not make sense; neither does Wedlake's contention that it determined that New GM purchased the Swaps as executory contracts that were assumed and assigned after it read the NG Brief filed on May 24, 2013.

[103]    M. Sutedja Depo. Tr. (5/31/2012), 15:5-13.

[104]    *Id.* at 31:13-17.

[105]    *Id.* at 159:25-160:7; 161:9-11.

[106]    *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),* 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) ("If the misconduct results in harm to the entire creditor body, the objecting party . . . need only show that the creditors were harmed in some general, concrete manner . . . [and] it is sufficient to allege that the general creditors are less likely to collect their debts") (citations omitted).

recoveries by other creditors.[107]

Without a doubt, the Noteholders' sweetheart deal has been a major cost to the estate, even over and above the cost of the deal itself.  Both Wedlake and the Noteholders have been active litigants throughout Old GM's bankruptcy, including in connection with Plan confirmation, disclosure statement proceedings and other matters.[108]  It should also not be forgotten that this litigation was always anticipated by New GM and the Lock-Up Noteholders, because they knew that they were engaged in inappropriately aggressive conduct (to say the least).  As Mr. Buonomo testified, he "accurately predicted the future, and predicted" that the GUC Trust would be arguing against allowance of the Disputed Claims.[109]  Mr. Prieto, a copious note taker during the Lock-Up Agreement negotiations, noted that that they "do not want to give GM US creditors more reasons to object."[110]

The deal with the Noteholders was financed by Old GM for the benefit of the Noteholders, GM Canada and GM Canada's creditors.[111]  The Defendants' suggestion that Old GM's creditors somehow benefitted from the Lock-Up Agreement because it allegedly staved off a GM Canada bankruptcy is based on mere conjecture, and finds no support in the record.  No evidence whatsoever was presented as to the "disruption, cost, risk, delay, and loss of value that

---

[107]    *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 567 (inflation of claim where there is a limited pot from which to satisfy claims is prejudicial to other creditors).

[108]    *See, e.g.*, Bankr. Dkt. Nos. 11369, 8526, 8974, 9272, 7325, 4412, 4484, 7314, 8528, 8535, 8794, 9020, 9207, 11370.

[109]    Trial Tr. (8/10/2012), 114:3-6 (Buonomo).

[110]    Pl. Ex. 3 at AUR_GM021453 (Prieto notebook).

[111]    GM Canada would have been insolvent had it remained obligated to repay the billion-dollar Intercompany Loans due to GM Nova Scotia.  Old GM, in effect, paid for and was saddled with the costs of the Lock-Up Agreement (*i.e.*, the Consent Fee).  *See* Pl. Ex. 121 at 2 (shows 0% recovery to GM Canada's unsecured creditors in all scenarios).

33

would have resulted from a GM Canada bankruptcy filing."[112]  Further, no evidence was introduced to show how Old GM benefitted from GM Canada's preservation of NOLs and tax refunds that supposedly "could have been lost" if GM Canada filed for bankruptcy.[113]  The Defendants' hypothetical arguments deserve no consideration.

The Subordination Defendants were unquestionably given an unfair advantage over other unsecured creditors of Old GM.  Among other things, no other unsecured creditor knew when the Consent Fee would be paid, or when the Nova Scotia Bankruptcy Case would be commenced, or that the Lock-Up Noteholders would be provided with a signed consent to bankruptcy of GM Nova Scotia, drafted by counsel to the Lock-Up Noteholders.[114]  This unequal access to information allowed the Lock-Up Noteholders to purchase more Notes to ensure their control over the Nova Scotia Bankruptcy Case and Wedlake and, they hoped, to enlarge their ultimate recovery from Old GM's estate.[115]  Further, certain Noteholders analyzed the Swap Documents before they were publicly available to value the Swaps for Wedlake.[116]  Again, these Noteholders were in the know and therefore aware of, if not directly responsible for, the inflated claim under the Swaps.  The Noteholders who received the Consent Fee also gained an unfair advantage over other creditors because they have already received a recovery greater than what other general unsecured creditors have recovered on account of their allowed claims in this case.

F.    **Equitable Subordination Is Consistent With Bankruptcy Law**

The third prong of the equitable subordination test requires that subordination be

---

[112]    NH Brief at 16.

[113]    *Id*.

[114]    Pl. Ex. 524 at AUR_GM038120-R (05-2012) (Noteholders and Old GM reached a deal that "bankruptcy would follow the [extraordinary] resolution.").

[115]    *See, e.g.*, Pl. Ex. 38 (Rule 2019 statement).

[116]    GUC Brief at 35 n.188.

consistent with bankruptcy law.  As this Court has recognized, "[i]f the misconduct results in harm to the entire creditor body, the [trustee] need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner"[117] and "[i]t is hardly inconsistent with bankruptcy policy to deny creditors equal status as a response to actions taken on their behalf to give them an unfair advantage."[118]

The Subordination Defendants' contention that equitably subordinating the Tainted Claims and the Nova Scotia Trustee Claim would violate section 1123(a)(4) of the Bankruptcy Code is nonsensical.  As an initial matter, this Court has already found that the "Plan provides for the same treatment by the Debtors for each Claim or Equity Interest in each respective Class."[119]  More importantly, this Court has already explained, in response to objections to Plan confirmation raised by the Noteholders and Wedlake, that the requirement of section 1123(a)(4) that a plan provide the same treatment for each claim of a particular class "means, as [a] practical matter, that all *allowed* claims within a particular class should get the same treatment."[120]

The Noteholders' contention that the defense of *in pari delicto* bars the GUC Trust from equitably subordinating the Tainted Claims and the Nova Scotia Trustee Clam is equally misguided.[121]  According to the Subordination Defendants, the defense of *in pari delicto* bars the

---

[117]    *In re Enron Corp.*, 379 B.R. at 434 (2d alteration in original).

[118]    *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 567.

[119]    Confirmation Order, ¶ 4.

[120]    *In re Motors Liquidation Co.*, 447 B.R. 198, 215 (Bankr. S.D.N.Y. 2011) (emphasis in original).

[121]    It should be noted that avoidance action claims are not barred by *in pari delicto*.  *See, e.g., Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563, 580 (Bankr. S.D.N.Y. 2003) (noting, with respect to payments made in violation of section 549, "[i]t would be turning the Wagoner Rule and concepts of *in pari delicto* on their heads to hold that the Trustee lacks standing to recover such payments."); *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 480 n.19 (Bankr. S.D.N.Y. 2006) ("It should be noted that *in pari delicto* is not a defense to a fraudulent conveyance suit.") (citing *In re Mediators*, 105 F.3d 822, 825 (2d Cir. 1997)).

GUC Trust's equitable subordination claim because any misconduct by Old GM in connection

with the Lock-Up Agreement should be imputed to the GUC Trust.  The Subordination

Defendants, however, cannot point to any authority barring actions by an estate representative

against third parties based on an *in pari delicto* defense that seeks to impute postpetition

misconduct of the debtor.  That is because courts have consistently held that postpetition

wrongful conduct by the debtor should not be imputed to the trustee or other estate

representative.[122]

The *in pari delicto* defense also does not apply here because the Subordination

Defendants are insiders.[123]  But even if the *in pari delicto* defense is available to the

Subordination Defendants, which it is not, the adverse interest exception precludes imputation of

the conduct at issue.  Under the adverse interest exception, wrongful conduct of a corporate

---

[122]    *See, e.g., Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 695 (Bankr. S.D.N.Y. 2008) (failing to impute postpetition acts of a debtor to the trustee where debtor's principals "lacked authority to sell estate assets outside the ordinary course of business" because the 'fundamental principle of agency that the misconduct of managers *within the scope of their employment* will normally be imputed to the corporation'" would not apply to bar the trustee's suit) (emphasis added) (citation omitted); *see also Rosen v. Gemini Title & Escrow, LLC (In re Hoang)*, 449 B.R. 850, 856 (Bankr. D. Md. 2011) (holding that wrongful acts committed by the debtor postpetition while serving as a debtor-in-possession will not be imputed to a trustee so as to bar recovery under the doctrine of *in pari delicto* and noting "[t]he determinative factor here . . . is that the actions occurred after the filing of the petition."); *Giacometti v. Arton Bermuda Ltd. (In re Sia)*, 349 B.R. 640, 655 (Bankr. D. Haw. 2006) ("The debtor's postpetition unclean hands do not impair the ability of the trustee in bankruptcy to pursue the . . . debtor's co-conspirators. . . . timing—whether the trustee's claims are based upon prebankruptcy or postpetition activities of the conspirators—is critical.").    Even if the Subordination Defendants could impute postpetition actions of Old GM to the GUC Trust, only such actions which occurred before the closing of the 363 Sale on July 10, 2009 could be imputed.    After the closing, the individuals involved were employees of New GM.

[123]    "Otherwise, a trustee could never sue the debtor's insiders on account of their own wrongdoing . . . [and] only the trustee has standing to sue insiders . . . for injuries to a corporation or a limited partnership arising from their waste, mismanagement or breach of fiduciary duty."  *In re Hampton Hotel Investors, LP*, 289 B.R. at 577 n.23; *see also Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999) ("the *in pari delicto* doctrine is inapplicable where a cause of action is brought against an insider."); *Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 322 B.R. 509, 529 n.18 (Bankr. S.D.N.Y. 2005) (same).

officer will not be imputed to the corporation if the officer's interests were adverse to the

corporation and the conduct was not for the benefit of the corporation.[124]  Here, the conduct of

the conflicted Old GM employees and advisor (*i.e.*, Mr. Buonomo, Ms. Sutedja and Mr.

Ammann) should not be imputed to Old GM because their interests were adverse to Old GM's

creditors, to whom they owed fiduciary duties.  They acted for the benefit of New GM, not Old

GM.[125]  As a result, even if the defense of *in pari delicto* applied, which it does not, the adverse

interest exception precludes imputation of the conduct at issue to the GUC Trust.

## III.    THE LOCK-UP AGREEMENT IS A POSTPETITION AGREEMENT

### A.    The 10:37 Version Was Entered Into Postpetition

All parties agree that *the* Lock-Up Agreement to which they are bound is the 10:37

Version, which is identified as version 20 in Weil Gotshal's document management system.[126]

Every draft of the Lock-Up Agreement conditions the effectiveness of the parties' rights and

obligations on execution and delivery of signature pages to "*[t]his Agreement*."[127]  Both forensic

experts conclude that the 10:37 Version was created after 9:00 a.m. on June 1, 2009, more than

---

[124]    *See Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64, 79 (S.D.N.Y. 2008), *adhered to on reconsideration*, Nos. 05 Civ. 9050 (LMM), 03 MDL 1529, 2008 WL 1959542 (S.D.NY. May 5, 2008).

[125]    Mr. Buonomo acknowledged that Old GM's analysis of what would have been a reasonable settlement with the Noteholders was thought of as analyzing what it would be worth to *New GM* to avoid a GM Canada bankruptcy.  Trial Tr. (8/10/2012), 24:19-24 (Buonomo).  Ms. Sutedja testified that they viewed the GM entities as an "enterprise" and did not differentiate their work among the various GM entities. M. Sutedja Depo. Tr. (5/31/2012), 112:4-13.

[126]    New GM and the Defendants claim that "all the witnesses with personal knowledge testified that the final executed Lock-Up Agreement that was circulated by Weil Gotshal by email at 10:37 a.m. was the same as the Lock-Up Agreement that they had agreed to and executed prior to the filing of Old GM's petition."  JSF, ¶ 54.  However, it is absolutely impossible, as established by the forensic evidence, that any party signed the 10:37 Version before Old GM's bankruptcy filing at 7:57 a.m. because such version did not exist until after 9:00 a.m.  Moreover, no party has ever identified a prepetition version of the Lock-Up Agreement that is "the same as" the 10:37 Version because no such version has ever existed.  *Id.*

[127]    GUC Brief at 56 n.294 (emphasis added).

one hour after Old GM filed its bankruptcy petition.[128]  It is undisputed that, as of Old GM's

bankruptcy filing at 7:57 a.m., version 18 was still being edited, and neither version 19 nor

version 20 yet existed.[129]  Thus, the forensic evidence conclusively establishes that the final,

binding version of the Lock-Up Agreement was not even created, and certainly not completed,

until after the filing of Old GM's bankruptcy petition, and that the Lock-Up Agreement was still

being revised as of, and after, the bankruptcy filing.

**B.    The Lock-Up Agreement Was Still Being
Revised When Old GM Filed For Bankruptcy**

In an effort to explain away the forensic evidence, the Defendants assembled "revised

demonstrative exhibit no. 4," by which they attempt to reverse engineer what they say the Lock-

Up Agreement looked like at the time of the bankruptcy filing at 7:57 a.m. as compared to the

10:37 Version.  Based on this demonstrative, the Noteholders contend that the changes made

after Old GM's bankruptcy filing are "minor postpetition modifications" and "non-material

wordsmithing" to the body of the Lock-Up Agreement, and "conforming" changes to the

extraordinary resolution that is annexed as an exhibit to the Lock-Up Agreement.[130]

As an initial matter, the existence of even minor revisions belies the Noteholders' claim

---

[128]    Trial Tr. (11/27/2012), 114:13-18 (Racich).  The Noteholders' concession that they executed the 10:37 Version is an admission that they signed the Lock-Up Agreement after Old GM's bankruptcy filing.

[129]    At 8:43 a.m., Peter Godhard of Weil Gotshal circulated a draft of the Lock-Up Agreement that includes "track changes" made by Andrew Woodworth to version 18 from approximately 7:34 a.m. through 8:11 a.m. (the "**8:43 Version**").  Pl. Exs. 686 and 687.  This fact is corroborated by the metadata which shows that Peter Godhard attached a copy of version 18 to an email at 8:43:33 a.m.  *See* Pl. Ex. 688 at WGM00296327 (line corresponding to 8:43:33 that says COR: Mail-Attach Copy, an action that had previously been identified as "user defined" in Pl. Ex. 299); *see also* Trial Tr. (11/27/2012), 137:21-138:9 (Racich).  As acknowledged by Racich, the 8:43 Version shows what changes were made by whom and when.  *Id.* at 119:19-23.  The contents of the 8:43 Version are also consistent with New GM's assertion that the version of the Lock-Up Agreement that existed "in the 7 a.m. range of June 1, 2009 was a form of version 18 of the Lock-Up Agreement."  Trial Tr. (9/27/2012), 65:23-25 (Ammann).

[130]    NH Brief at 29; JSF, ¶ 60.

that the supposed prepetition version of the Lock-Up Agreement purportedly signed and

delivered before the bankruptcy was the same as the 10:37 Version.  For a document to be final,

all revisions to the document must be complete – even if minor.[131]  As the Second Circuit

recognized in *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 82-83 (2d Cir. 1985), the parties'

insistence on the continual redrafting of specific terms of a proposed agreement establishes that

"the changes made must be deemed important enough to the parties to have delayed final

execution and consummation of the agreement."[132]  Even if only "correcting typos" or

"documenting the noncontroversial details remains," the parties will not be bound until all such

details have been completed.[133]  Thus, revised demonstrative exhibit no. 4 further drives home

the point that the Lock-Up Agreement was not finished when Old GM filed for bankruptcy.[134]

        In addition to the forensic evidence, the parties' contemporaneous communications show

---

[131]        *See Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598, 619 (S.D.N.Y. 2009).

[132]        As a result, the Noteholders' argument that Jones lacks knowledge of when the parties agreed to any particular Lock-Up Agreement terms or whether the postpetition edits had been agreed to earlier or existed elsewhere is not relevant.  NH Brief at 26.  Further, the Noteholders' contention that "when a Weil Gotshal typist may have created a copy of an agreement on a computer system is not relevant" is misleading.  *Id.*  The final version of the Lock-Up Agreement, (*i.e.*, the document identified as version 20 on Weil Gotshal's DMS) was not a copy because there is no other version identical to it.  Further, Mr. Woodworth, the Weil Gotshal attorney who drafted the Lock-Up Agreement, was the so-called "typist" referred to by the Noteholders.

[133]        NH Brief at 28-30; NG Brief at 13-14.  *See Chariot Grp., Inc. v. Am. Acquisition Partners, L.P.*, 751 F. Supp. 1144, 1150 (S.D.N.Y. 1990) ("It is not for the court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so 'minor' or 'technical' that the contract was binding despite the parties' unwillingness to have it executed and delivered.") (citations omitted), *aff'd without opinion*, 932 F.2d 956 (2d Cir. 1991).

[134]        Defendants cite these cases to support their claim that only postpetition modifications that alter estate obligations require approval:  *In re Ionosphere Clubs, Inc.*, 100 B.R. 670 (Bankr. S.D.N.Y. 1989); *Bankers Trust Co. v. Seidle (In re Airlift Int'l Inc.)*, 70 B.R. 935 (Bankr. S.D. Fla. 1987); *Acton v. Fullmer (In re Fullmer)*, 323 B.R. 287 (Bankr. D. Nev. 2005).  But this case is not about a purported prepetition agreement that was "corrected" or "modified" postpetition.  There is no prepetition agreement in this case.  As described above, this case is about when the Lock-Up Agreement reached its final form because only after that time did "[t]his Agreement . . . become effective and binding. . . ."  Pl. Ex. 16, ¶ 10 (WGM00000801).

that the Lock-Up Agreement was still being revised when Old GM filed for bankruptcy. At 8:04

a.m. on June 1, 2009, Mr. Truong, then of Fortress, sent an email referring to the Lock-Up

Agreement that said: "Still being worked through, but yes final docs will be sent around."[135]

Mr. Truong testified that he stayed at Weil Gotshal's offices after sending this email until

between 9 and 10 a.m. so he could get a copy of the final version of the Lock-Up Agreement.[136]

At trial, Mr. Truong testified that "still being worked through likely represents, or refers to, the

getting that hard copy, or getting a photocopy" of the Lock-Up Agreement. Mr. Truong's weak

and half-hearted explanation is simply not credible. Mr. Truong does not even remember

whether he left Weil Gotshal that morning with a copy or not. And, it bears noting that no hard

copy of the Lock-Up Agreement has ever been produced from his files.[137] The obvious, and

more plausible, meaning of Mr. Truong's "still-being-worked-through" email is that, as of 8:04

a.m. he was still waiting for the agreement to be completed.

    The Noteholders rely on the testimony of Mr. Gropper to support their argument about

the existence of some agreement to "conform" the extraordinary resolution to the Lock-Up

Agreement text.[138] As discussed above, the need for even minor changes to a written agreement

will prevent that agreement from being considered final.[139] Nevertheless, even if the Court finds

---

[135]    Pl. Ex. 177 at FOR_GM002899 (email from B. Truong to L. Cowen, dated June 1, 2009).

[136]    Trial Tr. (9/20/2012), 38:23-39:21; 89:12-90:5 (Truong).

[137]    Trial Tr. (9/20/2012), 89:12-90:5; 113:15-19 (Truong).

[138]    New GM and the Defendants contend that Mr. Gropper circulated a blacklined version of the
Lock-Up Agreement at 5:57 a.m. and another version at 6:30 a.m. (i.e., Def. Ex. 183), and that the "6:30
a.m. draft circulated by Mr. Gropper set forth the parties' agreement that the language of the
Extraordinary Resolution, Exhibit A to the Lock-Up Agreement, would 'conform' to the language in the
body of the Lock-Up Agreement." JSF, ¶ 48.

[139]    Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 325 (holding that terms remained to be
negotiated where the final draft of the agreement contained a sample copy of a letter attached as Exhibit B
to which parties had not yet agreed).

40

Mr. Gropper's testimony to be relevant (which it should not), his testimony should be

disregarded because it is not credible.  At trial, Mr. Gropper acknowledged that, at his

deposition, he testified as follows about the 6:30 a.m. draft he supposedly circulated:

> Q    What is the attachment to [Def. Ex. 183]?
> A    I don't know.
> Q    Does looking at the title of the attachment on the first page of this exhibit which
>      says GM lock up agreement, does that refresh your recollection as to what this
>      attachment is?
> A    No.
> Q    Do you have any reason to doubt that this is a draft of the lock up agreement as of
>      6:30 a.m. on Monday, June 1st?
> A    Yes.
> Q    And why do you doubt that?
> A    Because I don't know who produced it.  It could've been a mark-up from
>      Canadian counsel who wasn't in the room.  It could've been a mark-up from one
>      of the clients who wasn't in the room.  It could've been a mark-up from someone
>      who wasn't a party to negotiations.  I have no idea whether this was the current
>      state of the document at that time."[140]

New GM's contention that Mr. Woodworth from Weil Gotshal received Mr. Gropper's

comments to the Lock-Up Agreement at 7:30 a.m., went back to his office and "made a bunch of

changes," printed the revised Lock-Up Agreement and brought it back to the conference room by

7:35 a.m. is not plausible.[141]  As shown by the 8:43 Version, there is no dispute that Mr.

Woodworth was making changes to the Lock-Up Agreement nearly every minute from *7:34 a.m.*

*until 8:12 a.m.*[142]  If Mr. Buonomo's testimony is to be believed, it would mean that Mr.

---

[140]    Trial Tr. (9/28/2012), 50:10-51:22 (Gropper).  As this Court noted in *In re Adler, Coleman Clearing Corp.*, "[a]ssuming that [Defendant] was telling the truth at the time of his deposition testimony, his testimony at trial cannot be regarded as reliable or credible.  While the converse is also true, and the Court cannot rule out the possibilities that [Defendant] suffered a convenient lapse of memory when he was deposed, or was not as prepared for his deposition as he might have been, the Court considers it appropriate, on balance, to credit the deposition testimony and reject the trial testimony, especially with all of the trial testimony's newly acquired detail.  Common sense tells the Court that witnesses' memories dim with time, not improve."  *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 531.

[141]    Trial Tr. (8/9/2012), 61:14-24 (Buonomo).

[142]    *See* Pl. Ex. 687 at WGM00296316-17 (emphasis added).

41

Woodworth took Mr. Gropper's comments, revised and printed the Lock-Up Agreement, brought it back to the conference room and then went back to his office, all in less than four minutes.

### C.    The Parties Intended To Be Bound When The Lock-Up Agreement Was Complete And Aspired, But Failed, To Complete The Agreement Prepetition

Under New York law, "a contract is unenforceable if the parties did not intend to be bound until after the execution of a formal written agreement[,]" even if the parties have agreed upon all the terms.[143]  The language of the parties' agreement is of critical importance in determining when they intend to be bound.  The Second Circuit has recognized that "[t]he language the parties use in their draft agreements and in their contemporaneous communications is the most important indication of whether a signed writing is required before the parties are bound."[144]  As described in the GUC Brief, the express terms of the NDA and the Lock-Up Agreement unambiguously confirm the parties' intention not to be bound until the agreement was completed and executed.[145]

---

[143]    *See GSGSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1160, 1171-72 (S.D.N.Y. 1994) (citations omitted); *see also Chariot Grp.*, 751 F. Supp. at 1149 (S.D.N.Y. 1990).

[144]    *Chariot Grp.*, 751 F. Supp. at 1149.

[145]    The Noteholders mistakenly contend that, as a result of the clause providing that "this [A]greement" supersedes all prior negotiations, the Lock-Up Agreement, once signed, superseded the NDA.  The Noteholders are incorrect, however, because such clause only states that prior negotiations with respect to the subject matter of the Lock-Up Agreement are superseded.  In any event, even if the Lock-Up Agreement is held to supersede the NDA, the NDA is still evidence of the parties' intent to be bound only by a definitive agreement.  Further, to the extent the Defendants are claiming that the 10:37 Version was a modification of a pre-filing version they allegedly signed before Old GM filed for bankruptcy, such an earlier, phantom version would be superseded by the 10:37 Version upon execution.  Regardless, other than those of Appaloosa, there is only one set of signature pages so it is impossible that both a pre-bankruptcy filing version and the 10:37 Version were signed and delivered.  *See Health-Chem Corp. v. Baker*, 915 F.2d 805, 811 (2d Cir. 1990) ("[w]hen the parties to a contract enter into a new agreement that expressly supersedes the previous agreement, the previous agreement is extinguished. . . .") (citations omitted).  Further, as this Court is aware, on August 6, 2012 the GUC Trust submitted a motion *in limine* requesting that the Court exclude testimony at trial about the content of the supposed version of the Lock-Up Agreement, which has never been produced, that some witnesses contend was laying on a conference room table at Weil Gotshal on the morning of June 1, 2009 before Old GM filed for bankruptcy.  *See* GUC Trust's Motion *in Limine* (Bankr. Dkt. No. 11999; Adv. Pro. No. 167).  Any such testimony should also be given no weight because it is parol evidence.  *See Mizuna, Ltd.*

Footnote continued on next page

42

Despite the clear evidence to the contrary, the Defendants contend that the parties

intended to be bound to the Lock-Up Agreement before Old GM filed for bankruptcy, and recite

certain facts which they say indicate that intent (notwithstanding that the parties' express intent

was to only be bound to the final, written agreement). For example, the Defendants claim that

the Lock-Up Agreement was binding prepetition because: (i) several witnesses testified that all

parties had signed off on the terms of the Lock-Up Agreement and executed the document before

Old GM filed its bankruptcy petition,[146] (ii) Mr. Bolin, of Appaloosa, left Weil Gotshal's offices

before Old GM's bankruptcy filing (although there is no evidence that Brian Pfeiffer,

Appaloosa's counsel from Fried, Frank, Harris, Shriver & Jacobson LLP, left Weil Gotshal

before Old GM's bankruptcy filing),[147] and (iii) the deal was reported to superiors at Old GM

before the bankruptcy filing, who reported it to the Canadian government.[148]

But these facts in no way disprove the parties' express intention to only be bound by the

---

Footnote continued from previous page

*v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 660 (2d Cir. 1996) ("parol evidence to show contemporaneous oral agreement is inadmissible, in part because it contradicts explicit notation that no oral arrangement or modification was to be binding upon the parties.") (citations omitted) (internal quotation marks omitted); *see also* Pl. Ex. 16, ¶ 10 (Lock-Up Agreement clause precluding oral modifications).

[146]    The Defendants incorrectly assert that all of the parties testified that they executed the Lock-Up Agreement and released their signature pages prior to 7:15 a.m. on June 1, 2009. In fact, Mr. Cederholm testified that the final, executed version of the Lock-Up Agreement was signed between "seven and eight in the morning" on June 1. Trial Tr. (9/6/2012), 80:4-8 (Cederholm). As to the GM parties, there is no testimony about when Old GM, GM Nova Scotia or GM Canada released their signature pages. As acknowledged by Mr. Zirinsky at trial when asked about the signatures of the GM representatives, he "didn't personally go around and inspect every document to make sure that everybody had signed." Trial Tr. (8/8/2012), 148:20-21 (Zirinsky).

[147]    The fact that Mr. Bolin left Weil Gotshal's office between 7 and 7:30 a.m. is not evidence that the Lock-Up Agreement was complete. Even in Mr. Buonomo's account of events, the agreement was not completed until after Mr. Bolin left Weil Gotshal. Trial Tr. (8/9/2012), 236:6-9 (Buonomo) ("and I do recall the only time in this whole thing as to which I have any degree of *precision* is that 7:35 time because *I was annoyed that we had gone over 7:30 with anything*. So I was conscious of that 7:35" time) (emphasis added). In fact, all parties agree that revisions to the Lock-Up Agreement were made after 7:00 a.m. JSF, ¶ 52.

[148]    NG Brief at 12.

final agreement.  *See, e.g., Chariot Grp.*, 751 F. Supp. at 1151 (noting that, although the parties

had executed signature pages, given that further revisions occurred after execution, the parties

"should have understood, that delivery of the signature pages . . . was contingent on . . .

satisfaction with the draft of the Agreement.").  While the GUC Trust does not dispute that the

parties aspired to complete the Lock-Up Agreement before Old GM filed for bankruptcy –

probably because they knew the agreement would be void if it were not completed prepetition –

and may have in fact executed signatures pages before the filing, the evidence proves that the

Lock-Up Agreement was not completed until after Old GM filed for bankruptcy.[149]

### D.    No Oral Agreement Was Ever Contemplated

According to the Second Circuit, "the sending back and forth of draft agreements,

suggests strongly, if not conclusively, that the parties intended to be bound only once they had

executed" the agreement.[150]  Here, it is undisputed that the parties never intended to be bound by

---

[149]    *See, e.g., Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261-62 (2d Cir. 1984), *cert. denied*, 496 U.S. 828 (1984) ("because the documents and testimony clearly showed that the intent of both parties was not to be bound prior to the execution of a formal, written contract[,]" the parties were "not bound by the 'agreement in principle', by the 'final drafts', or by any claimed oral understanding reached in the course of the extended negotiations."); *Bear Stearns Inv. Prods., Inc.*, 401 B.R. at 619 ("negotiating 'numerous' contract drafts" suggests the intention to remain unbound pending the completion of formal documentation); *Ciaramella*, 131 F.3d at 321 (holding that the parties intended to be bound only upon a written agreement despite counsel's verbal expression "we have a deal," where drafts of the agreement specifically stated it would not become effective until signed.); *Chariot*, 751 F. Supp. at 1150-51 (contracting parties "view the signed written instrument . . . as 'the contract', not as a memorialization of an oral agreement previously reached.") (citation omitted).

Defendants' reliance on a line of cases dealing with whether a contract is enforceable rather than when a contract becomes enforceable is misplaced.  *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89 (2d Cir. 2007) (analyzing whether agreement was enforceable notwithstanding open terms); *F&K Supply, Inc. v. Willowbrook Dev. Co.*, 732 N.Y.S.2d 734 (App. Div. 3d Dep't 2001) (finding contract too vague and ambiguous as to material terms to be enforceable).  The cases are clear, including those cited by the Defendants, that when parties intend to be bound only by a final agreement, they will not be bound before then.  *See, e.g., Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 549 (2d Cir. 1998) (holding that agreement was not binding in the absence of a final instrument even though "all of the material terms of the transaction were negotiated and incorporated into the . . . document and that there was nothing left to negotiate but the 'legal phraseology.'").

[150]    *Chariot Grp.*, 751 F. Supp. at 1150.  Defendants' reliance on a line of cases dealing with offer
Footnote continued on next page

any oral understanding reached with regard to the Notes.[151]  Although the Noteholders contend

that "agreement on the material terms" was reached before Elliott became involved in the

negotiations, this statement is belied by the factual record.[152]  According to Mr. Cederholm,

when he arrived at Weil Gotshal late in the afternoon on Sunday May 31, the parties were in the

midst of negotiating the terms of the Lock-Up Agreement, most of the terms were still open for

negotiation and there were still many drafting issues in the document that the parties were

discussing.[153]  Although Mr. Truong claims that the parties reached an oral agreement as to the

business terms of a settlement on May 30, he concedes that the agreement was subject to the

drafting and execution of the Lock-Up Agreement, which was heavily-negotiated.[154]  The parties

had numerous discussions about various drafts, after which a Weil Gotshal attorney would go off

and work on the document and then come back with a new version for review.[155]  Where it is

contemplated that an agreement would be in the form of a formal written document, duly

---

Footnote continued from previous page

and acceptance is misplaced.  Defendants cite *Schoenfeld v. Masucci*, 613 N.Y.S.2d 682 (App. Div. 1994), *leave to appeal denied*, 621 N.Y.S.2d 516 (Table) (1994) and *In re Randall's Island Family Golf Centers, Inc.*, 261 B.R. 96 (Bankr. S.D.N.Y. 2001), *aff'd*, 272 B.R. 521 (S.D.N.Y. 2002) for the proposition that an offeree's assent which contains immaterial differences from the original offer will bind the parties and are not considered counter offers.  These cases deal with whether a contract was formed and not when a contract is entered into in circumstances where the parties express their intent to be bound only by a final, written document.  In fact, the Noteholders have not cited a single case concerning when a contract is entered into.  Under New York law, if either party to an alleged contract communicates an intention not to be bound absent a fully executed document, then no amount of negotiation or oral agreement as to specific terms will result in formation of a binding contract.  *See Winston*, 777 F.2d at 80; *Ciaramella*, 131. F.3d at 322.  Defendants also cite *In re Fullmer*, 323 B.R. at 297-99, in support of their contention that "[m]inor postpetition modifications to an agreement do not require court approval. . . ."  NH Brief at 29.  Unlike *Fullmer*, however, the issue here is not postpetition modifications to a prepetition agreement; rather, this case is about an agreement that was not completed until postpetition.

151    Trial Tr. (9/6/2012), 64:18-22 (Cederholm).

152    JSF, ¶¶ 42-43.

153    Trial Tr. (9/6/2012), 71:17-72:5 (Cederholm).

154    Trial Tr. (9/20/2012), 23:14-24:4; 80:16-18 (Truong).

155    *Id.* at 81:20-82:5.

executed, "until such a document was executed and delivered, regardless of the state of

negotiations, drafts of the agreement [are] nothing more than drafts."[156]

## IV.    THE LOCK-UP AGREEMENT IS VOID

Old GM's failure to seek or secure this Court's approval of the Lock-Up Agreement

renders the agreement void *ab initio* because entry into the Lock-Up Agreement, and the actions

taken by Old GM to implement that agreement, were postpetition transactions outside Old GM's

"ordinary course of business."  11 U.S.C. § 363(b)(1); *Medical Malpractice Ins. Ass'n v. Hirsch

(In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997).[157]  New GM's contention that such actions are

voidable, but not void, is incorrect.[158]

Further, this Court should reject New GM's meritless "no-harm-no-foul" argument that

the estate would not benefit from establishing that the Lock-Up Agreement is void.  Specifically,

New GM concludes without any factual basis that the proceeds from the $450 Million Loan

---

[156]    *Chariot*, 751 F. Supp. at 1149.

[157]    *See In re NextWave Pers. Commc'ns Inc.*, 244 B.R. 253, 275 (Bankr. S.D.N.Y. 2000), *subsequent mandamus proceeding*, 208 F.3d 137 (2d Cir. 2000) ("Actions which violate Section 363 are 'void.'") (citation omitted); *Kirschenbaum v. Nassau Cnty Dist. Attorney (In re Vitta)*, 409 B.R. 6, 16 (Bankr. E.D.N.Y. 2009) ("An agreement by a debtor to transfer property of the estate without prior notice and a hearing is void and of no force and effect.") (citation omitted).

[158]    The Second Circuit has explicitly held that unauthorized postpetition transactions are "null and void."  *See In re Lavigne*, 114 F.3d at 384; *accord In re Koneta*, 357 B.R. 540, 543-44 (Bankr. D. Ariz. 2006) ("[t]he usual effect of a sale or lease of property of the estate, conducted outside of the ordinary course of business but without adherence to the notice and hearing requirements of [section] 363(b)(1), is that any sale held is rendered null and void.") (1st alteration in original) (citation omitted).  New GM's reliance on *McCord v. Agard (In re Bean)*, 252 F.3d 113 (2d Cir. 2001), is misplaced.  As an initial matter, in *In re Bean*, the Second Circuit did not squarely address the issue of whether a postpetition transfer is void (as opposed to voidable), as it did in its holding in *In re Lavigne* and as the *Koneta* court did in that case.  Further, the decision in *In re Bean* was clearly driven by the fact that the trustee there had abused his discretion by punitively suing to avoid a transfer as to which he had already recovered the value for the estate.  *In re Bean*, 252 F.3d at 116 ("it is the rare bankruptcy trustee that has the audacity to bring such a claim").  Here, unlike *In re Bean*, the value of the Consent Fee has not been recovered for the Old GM estate from any source.

"never would have gone" to Old GM's creditors.[159]   New GM's argument ignores the fact that

the Committee was unaware of the $450 Million Loan at the time the Sale Order was approved,

and, had it been aware of this massive eve of bankruptcy transfer, it may have (as it did with the

term loan) negotiated a carve out for such potential recovery.   More importantly, had this Court

been aware of Old GM's transfer of funds to pay the Consent Fee, it might have insisted on such

a carve out.[160]

New GM incorrectly argues that voiding the Lock-Up Agreement would only affect three

particular Old GM obligations under the Lock-Up Agreement.   To start with, New GM's

argument makes no sense given how integral Old GM is to all aspects of the Lock-Up

Agreement.[161]   Even if true, such obligations do, in fact, involve property of Old GM's estate

which should be distributed to Old GM's creditors.   As just one example, but for Old GM's

agreement to forgo its set-off right as to the Swaps, the Nova Scotia Trustee Claim would have

been at least *$1 billion less* than it is today because:   (i) the Nova Scotia Trustee Claim would not

have included the Swaps (*i.e.*, it would have only included the Notes); and (ii) Old GM would

---

[159]    NG Brief at 15.

[160]    As the Court stated, it "might well have refused to sign the order in its then existing form, and
[. . .] would have insisted that the Lock-Up [A]greement not be insulated from judicial scrutiny no matter
what threats the Nova Scotia [N]oteholders had made at the time."  New GM SJ Hr'g Tr. 93:14-18.

[161]    New GM contends incorrectly that pursuant to the severability clause in the Lock-Up Agreement,
only those clauses that contained postpetition modifications would be unenforceable.  NG Brief at 15.  As
already explained above, however, these were not "postpetition modifications" to a completed agreement,
but rather postpetition revisions that were part of the effort to finalize the agreement in the first place.
Further, in characterizing the postpetition revisions as minor, New GM ignores all of the edits to the
extraordinary resolution (*i.e.*, the exhibit to the Lock-Up Agreement that was so integral that Mr.
Buonomo characterized it as the "raison d'être" of the Lock-Up Agreement).   Trial Tr. (8/10/2012),
115:2-10 (Buonomo).   Finally, the argument that the postpetition revisions should simply be severed and
struck from the agreement is without merit.  It is true that where a provision in an agreement is invalid,
courts enforce severability clauses.  *P.B. v. L.B.*, 855 N.Y.S.2d 836, 844 (Sup. Ct. Richmond County
2008).   However, where a clause that goes to the heart of an agreement is invalid, so too is the entire
agreement.  *See In re Clouse*, 446 B.R. 690, 705 (Bankr. E.D. Pa. 2010) ("if the invalid (void) portions of
the [a]greement are essential or integral to the primary purpose of the [a]greement, the entire [a]greement
must fall as invalid (void).") (citation omitted).

have asserted the swap liability against GM Nova Scotia as an offset to the Nova Scotia Trustee Claim.[162]

Finally, as set forth in the GUC Brief, Old GM's postpetition actions to implement the Lock-Up Agreement involved unauthorized uses of estate property outside of Old GM's ordinary course of business. These actions included Old GM's (i) execution of two postpetition amendments to the Trust Agreement which, among other things, facilitated payment of the Consent Fee postpetition; (ii) subordination of its claim under the Swaps and forfeiture of its right to set-off the liability owed to it under the Swaps; (iii) postpetition use of its corporate powers to cause GM Nova Scotia to deliver its consent to the Nova Scotia Bankruptcy Case and to the Lock-Up Agreement;[163] and (iv) postpetition use of its corporate powers to cause GM Nova Scotia to enter into a settlement that released GM Canada from its obligations under the Intercompany Loans.[164]

---

[162]    For the reasons discussed below, the Swaps were not assigned to New GM. As a consequence, New GM's argument that "bankruptcy estate issues" relating to the Swaps "are moot" must fail. NG Brief at 16 n.23.

[163]    New GM's contention that Old GM's consent was not required for GM Nova Scotia to take the actions contemplated by the Lock-Up Agreement, including its entry into the June 25 settlement agreement with GM Canada, is mistaken. NG Brief at 23. Pursuant to the Lock-Up Agreement, GM Nova Scotia represented and warranted that (a) "[i]t has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement"; and (b) "[t]he execution and delivery of this Agreement by it and the performance of its obligations hereunder have been duly authorized by all necessary action on its part." Pl. Ex. 16, ¶ 4(a)-(b). Further, Old GM stipulated and acknowledged that GM Nova Scotia would deliver a consent to the Nova Scotia Bankruptcy Case. *Id.* at ¶ 6(b)(i). As such, the Lock-Up Agreement created the Nova Scotia Trustee Claim, contrary to the Defendants' contention otherwise. JSF, ¶ 65. As the sole shareholder of GM Nova Scotia, Old GM's consent to the foregoing was absolutely required. *See* Pl. Ex. 135 at NGM000012436 (Old GM's consent, as sole shareholder of GM Nova Scotia, to the Lock-Up Agreement and related transactions).

[164]    *See In re Lavigne*, 114 F.3d at 384 (citation omitted); *see also In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130, 140-41 (Bankr. D. Me. 1991) (use of debtor's shares in its wholly-owned subsidiary to authorize chapter 11 petition for a subsidiary is a "use of" estate property outside the ordinary course).

## V.    THE CONSENT FEE PAYMENT SHOULD BE APPLIED
## TO REDUCE THE PRINCIPAL AMOUNT OF THE NOTES

As explained in the GUC Brief, the facts demonstrate that the Consent Fee was in fact a

payment of principal, and therefore Disputed Claims should be reduced to reflect such payment.

In response, the Noteholders argue that:  (1) this Court does not have the authority to

characterize the Consent Fee as a payment of principal; (2) a determination by the Court that the

Consent Fee is a principal payment on the Notes would result in the "rewriting" of the terms of

the Lock-Up Agreement;[165] and (3) the Court lacks subject matter jurisdiction to decide the true

character of the Consent Fee.  These arguments are without merit.

First, the Court's power to determine that the Consent Fee is a payment of principal is

based directly on its authority to determine the allowance and amount of claims against Old

GM's bankruptcy estate under section 502.[166]  The authority to allow and disallow claims is a

fundamental power of a bankruptcy court, and one that is integral to the court's administration of

the bankruptcy estate.[167]  As this Court has recognized, "nothing is more directly at the core of

bankruptcy administration . . . than the quantification of all liabilities of the debtor."[168]  The

Court's authority to determine the allowance of claims against Old GM is further supplemented

by the court's equitable powers under section 105 of the Bankruptcy Code.[169]

Here, the Court's authority to allow or disallow the Disputed Claims includes the "full

---

[165]    NH Brief at 20.

[166]    *See* 11 U.S.C. § 502(b); 28 U.S.C. § 157(b)(2)(A) and (B).

[167]    *See Katchen v. Landy*, 382 U.S. 323, 329 (1966) (the power to allow and disallow claims is of basic importance in the administration of the bankruptcy estate).

[168]    *In re Saint Vincent's Catholic Med. Ctrs.*, 445 B.R. 264, 269 (Bankr. S.D.N.Y. 2011) (internal quotation marks omitted).

[169]    *See Pepper v. Litton*, 308 U.S. 295, 305, 308-09 (1939) (equitable powers are to be exercised by bankruptcy courts regarding the allowance of claims).

49

power to inquire into the validity of any alleged debt or obligation[s] of the bankrupt upon which

a demand or a claim against the estate is based."[170]   Accordingly, it is well within the purview of

this Court to consider the entirety of the circumstances regarding the amounts alleged to be

owing under the Notes, including payment of the Consent Fee.   The Court's proper

characterization of the Consent Fee does not offend the principle that a bankruptcy court's

powers "must and can only be exercised within the confines of the Bankruptcy Code."[171]

Second, the Court's determination that the Consent Fee was in fact a payment of

principal would not involve an impermissible "rewriting" of the Lock -Up Agreement.   As an

initial matter, and for the reasons set forth in the GUC Brief and herein, the Lock-Up Agreement

is void, and there is no need for the Court to consider the language in that agreement that the

Consent Fee does not "reduce, limit or impair" the Notes.   But even if that language were not

contained in a void agreement, it would certainly not be dispositive, because this Court is not

bound by the labels or descriptions that interested parties use to describe their transactions.[172]

Bankruptcy courts are, without question, authorized "to sift the circumstances surrounding any

---

[170]    *Katchen*, 382 U.S. at 329 (internal quotation marks omitted).

[171]    *See Smart World Techs., LLC v. Juno Online Servs., Inc. (In Smart World Techs., LLC)*, 423 F.3d
166, 184 (2d Cir. 2005); *New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart
Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003).

[172]    *See Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 364 (3d Cir. 2002) (notwithstanding the
terms of an underlying promissory note, prepetition interest payments made by the debtor pursuant to a
promissory note should be recharacterized as payments of principal because of the creditor's conduct in
connection with the transaction); *Bozzuto's Inc. v. Vescio*, 234 F.3d 1261 (Table), No. 00-5040, 2000 WL
1715281, at *2 (2d Cir. 2000) (recharacterizing rental concessions as payments on debt); *Liona Corp. v.
PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 597 (2d Cir. 1991) (recharacterizing a sale-leaseback
transaction as an equitable mortgage); *see also United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d
609, 618 (7th Cir. 2005) (recharacterizing a purported lease as a secured loan), *cert. denied*, 547 U.S.
1003 (2006); *Spradlin v. Williams (In re Alma Energy, LLC)*, No. 10-80-ART, 2010 WL 4736905, at *1
(E.D. Ky. Nov. 16, 2010) (noting that "[s]ome situations simply call for a closer look" and remanding
action to uphold creditor's claim for amounts based upon prepetition settlement for further scrutiny).

claim to see that injustice or unfairness is not done in administration of the bankrupt estate."[173]

Indeed, in light of their argument that the Consent Fee is sheltered from avoidance under the safe

harbor provision of section 546(e), it appears that even the Noteholders themselves understand

the Consent Fee to be a payment on the Notes.[174]

Finally, it cannot seriously be argued that this Court lacks subject matter jurisdiction to

determine this issue.  Contrary to the Noteholders' suggestion, the determination of the proper

treatment of the Consent Fee does not require this Court to "adjudicate the amount the

Noteholders should be permitted to recover against GM Nova Scotia under the Notes."[175]  While

that claim is one to be decided by the Nova Scotia court, the matter before this Court is the

allowance of the Disputed Claims, which necessarily involves a determination of the remaining

amounts due and owing under the Notes.  This Court certainly has jurisdiction to determine the

validity and amount of claims that have been asserted against Old GM's estate.

## VI.    THE NOVA SCOTIA TRUSTEE CLAIM IS DUPLICATIVE OF THE GUARANTEE CLAIMS AND SHOULD BE DISALLOWED TO THE EXTENT OF THE NOTES

### A.    The Law of Every Applicable Jurisdiction Mandates That There Can Be Only One Allowed Claim For One Loss

Both the Nova Scotia Trustee Claim and the Guarantee Claims seek recovery on the

principal and interest due on the Notes.  Neither Wedlake nor the Noteholders can reasonably

deny that the Nova Scotia Trustee Claim and the Guarantee Claims, to the extent of amounts

---

[173]    *Pepper*, 308 U.S. at 308.

[174]    The Noteholders' insistence that the Consent Fee was in settlement of the Intercompany Loans, and not a payment on the Notes, is entirely inconsistent with their argument that the Consent Fee payment is exempt from avoidance under the safe harbor provision of section 546(e) of the Bankruptcy Code. NH Brief at 42-43.  Although, for the reasons set forth above, the section 546(e) safe harbor provision does not apply under the circumstances of this case, the Noteholders' argument that it does is a tacit admission that the Consent Fee was a payment on the Notes.

[175]    NH Brief at 23.

sought under the Notes, are both asserted against Old GM on account of the same debt.  Nor can

they reasonably deny that it is the Noteholders that are the ultimate beneficiaries of both the

Nova Scotia Trustee Claim and the Guarantee Claims.[176]  Centuries of law in every applicable

jurisdiction – Nova Scotia, Canada, New York, and the United States – clearly establish that

there can only be a single distribution for the same debt for the benefit of the same parties.

Courts in the Second Circuit are consistent that one loss will merit only one allowed

claim even if separate claims are asserted by nominally different claimants, where the ultimate

beneficiary of the claims is the same person or entity.  *See, e.g., In re Finley, Kumble, Wagner,*

*Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 885-86 (Bankr. S.D.N.Y. 1993)

(disallowing claim of pension trustee to the extent of duplication with the PBGC's claim).[177]

Wedlake's focus on the supposed "separateness" of the Nova Scotia Trustee Claim and the

Guarantee Claims is misplaced as a matter of law.  Both claims arise from the same facts (the

issuance and non-payment of the Notes) and both seek the same damages (the amounts due

under the Notes), and as such are duplicative.[178]  As discussed in greater detail in the expert

report of Professor Mohamed F. Khimji, and as conceded by Wedlake's expert, Professor

Edward Iacobucci, a claim for contribution under section 135 and a claim for a contractual

guarantee for the same underlying debt are functional substitutes for each other.[179]  The relevant

inquiry is not whether two claims are brought under different legal theories, but whether a

---

[176]    Although the Nova Scotia Trustee Claim also asserts a purported claim by New GM for amounts due under the Swaps, the Lock-Up Agreement stipulates that any distribution on account of the Swaps shall be subordinated to payment in full of the Notes if any amount of the Nova Scotia Trustee Claim is disallowed.  *See* Pl. Ex. 16, ¶ 6(b)(v) (WGM00000800) (executed version of the Lock-Up Agreement). The Noteholders, therefore, are effectively the only beneficiaries of the Nova Scotia Trustee Claim.

[177]    *See also* GUC Brief at 73 n.347.

[178]    *See  Id*. at 70 n.341.

[179]    Trial Tr. (11/26/2012), 57:18-58:19 (Iacobucci); Def. Ex. 321 (Hr'g Tr., *In re AbitibiBowater, Inc.*, et al. (12/9/2011), 135:7-23 (Iacobucci)); Khimji Report, ¶ 30.

claimant, or another on its behalf, seeks multiple payments for the same loss. Both the Canadian and U.S. courts hold that a claimant may receive only a single distribution on account of one loss, even if that loss can be proven under multiple legal theories.[180]

This principle of one payment for one loss holds even if a creditor can claim multiple promises to pay from the same debtor.[181] Thus, under well-established law, a creditor may not recover against a debtor on account of both a guarantee and the underlying debt, even if the debtor is both the guarantor and separately assumes the liability of the original maker of the note.[182] Therefore, the Nova Scotia Trustee Claim must be disallowed to the extent it seeks payment for amounts due under the Notes.

**1.    The Second Circuit's Holding In *Delta* Is Consistent
With The Long-Standing Principles Of New York And Second
Circuit Law That Creditors May Only Claim Once For One Loss,
Even If The Claims Are Asserted By Nominally Different Claimants**

Given the well-established principle that creditors may not recover on two claims on account of one loss from the same debtor, it is unsurprising that there is no case anywhere in any relevant jurisdiction in which a court has allowed a claim under section 135 of the Nova Scotia Companies Act and under a guarantee for the same underlying debt of the unlimited liability company to be enforced concurrently.[183] Wedlake and the Noteholders, however, insist that the

---

[180]    GUC Brief at 71 n.342; *see also Central Trust Co. v. Rafuse*, [1986] 2 SCR 147 at 176-177 (SCC) (attached as Tab 6 to Khimji Decl., Ex. C and attached hereto as Index No. 1).

[181]    This is so because "[a]ny rule which would permit the proof of two notes for one indebtedness would permit the proof of a dozen, and would substitute for pro rata distribution among real creditors, distribution in accordance with the ability of the bankrupt to make manifold obligations for single debts." *John Matthews, Inc. v. Knickerbocker Trust Co.*, 192 F. 557 (2d Cir. 1911). *See also* GUC Brief at 71 n.343.

[182]    *See Curtis v. Walpole Tire & Rubber Co.*, 227 F. 698, 703 (D. Mass. 1915) (disallowing indorsement claim by creditor because the debtor was already liable on the underlying note by acquisition of the original maker of the note).

[183]    Trial Tr. (11/26/2012), 120:17-22 (Baird).

Second Circuit, in *Northwestern Mutual Life Insurance Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.),* 608 F.3d 139 (2d Cir. 2010) ("*Delta*"), has overturned the fundamental principle prohibiting enforcement of duplicative claims against the same debtor, such that the Nova Scotia Trustee Claim is now allowable together with the Guarantee Claims. *Delta* does not so hold. Quite to the contrary, *Delta* cited with approval and relied upon the Bankruptcy Court's opinion, which analyzed *Finley, Kumble*, and noted "[n]ot surprisingly, the Bankruptcy Court disallowed the claims [of the PBGC and the pension plan trustee] to the extent that they sought compensation for the same underfunding of the pension plan."[184] Thus, in rendering its decision, the Second Circuit in no way disturbed the principle that double liability is precluded for a single injury or loss.[185]

Here, unlike in *Delta*, the ultimate beneficiaries of both claims are the Noteholders. Although the Guarantee Claims are asserted directly by the Noteholders and the Nova Scotia Trustee Claim is asserted by Wedlake in its fiduciary capacity on behalf of the Noteholders, both the Nova Scotia Trustee Claim and the Guarantee Claims, are, as a matter of substance, being asserted by the same parties (the Noteholders). Wedlake relies on this nominal difference in claimants to assert that the Noteholders are entitled to two recoveries under *Delta* because the claims asserted are being asserted by two "different" entities. This position is nonsensical. All trustees act in representative capacities, but this does not mean that trustees have claims that are

---

[184]    *In re Delta Air Lines, Inc.*, 370 B.R. 552, 556-57 n.1 (Bankr. S.D.N.Y. 2007), *aff'd*, Nos. 05–17923 (ASH), 07 Civ. 7745 (RMB), 7 Civ. 11437 (RMB), 8 Civ. 2411 (RMB), 08 Civ. 2449 (RMB), 08 Civ. 6879 (RMB), 2008 WL 4444001 (S.D.N.Y Sept. 29, 2008), *vacated and remanded*, 608 F.3d 139 (2d Cir. 2010).

[185]    As explained in the GUC Brief, *Delta* involved very particular facts that are not like those here. Indeed, the Second Circuit recognized that, were it not for the peculiar fact of the "Bingham Term Sheet," the proper remedy would have been disallowance of the duplicate claim of the party that did not actually incur the loss at issue.

54

independent of those beneficiaries on whose behalf they act, thereby entitling the beneficiaries to two recoveries.[186]

In this case, unlike in *Delta*, Old GM made only one contractual promise to pay:  the guarantee.  Wedlake attempts to construe the incorporation of GM Nova Scotia as an unlimited liability company as akin to a separate contractual promise by Old GM to pay, despite the utter lack of any evidence in the record that Old GM actually made or intended to make a promise to the Noteholders to pay twice on account of their one loss.[187]  On the contrary, Wedlake's argument finds no support in either the offering circular for the Notes or the terms and conditions of the Notes themselves.  The documents provide, for example, that GM Nova Scotia may reorganize, with no requirement that GM Nova Scotia remain a ULC and that GM Nova Scotia may be merged into Old GM, thus eliminating any possibility of a section 135 claim; and that all the proceeds of the Notes would be for the benefit of Old GM.[188]  Given these terms and disclosures, no reasonable purchaser could have construed Old GM's membership interest in GM Nova Scotia as equivalent to a separate promise to pay on a section 135 claim on top of the contractual guarantee.[189]

---

[186]    *See In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. at 899.  *See supra* note 177.

[187]    GHW Brief at 8, 10-11.

[188]    *See* Def. Ex. 14 at 18-19, § 11 (NGM000012069-70) (offering circular) ("Consolidation, Merger or Sale of Assets"); Def. Ex. 297 at DEF3866 (schedule 1 to fiscal and paying agency agreement).

[189]    The terms of the Notes and offering circular also undermine Wedlake's argument that the law of substantive consolidation allows the Noteholders to claim twice on account of their one loss.  *See* GHW Brief at 10-11.  No reasonable Noteholder could have relied on the separate corporate structures of GM Nova Scotia and Old GM in extending credit in light of these disclosures.  Further, as a matter of law, substantive consolidation, which seeks to consolidate the assets and liabilities of two separate debtors, has no applicability here.  No party disputes that the Noteholders have a claim against Old GM under the guarantee and that they also have a claim against GM Nova Scotia under the Notes.  The issue here is whether the Noteholders are entitled to a *third* claim (*i.e.*, a *second* guarantee claim) against Old GM.

2.     **The Rule Against Double Proof Is An Equitable Principle That Prevents Concurrent Enforcement Of The Nova Scotia Trustee Claim And The Guarantee Claims For Amounts Due Under The Notes**

In Canada, the long-standing rule against double proof embodies the same principle that one loss merits one distribution and prevents claimants from recovering on the basis of two claims for one underlying debt against the same debtor.[190]  The purpose of this rule is to prevent the exact result the Noteholders are attempting to achieve here; that is, obtain higher dividends than other creditors by asserting rights to payment under different theories of recovery for amounts owing under the Notes against Old GM.[191]  This rule is an equitable one[192] applicable in any context in which creditors attempt to assert multiple claims against one debtor on account of what is, in substance, the same debt, and contrary to Wedlake's assertions, is not limited to Canadian bankruptcy cases.[193]

---

[190]     *See, e.g., Husky Oil Operations Ltd. v. Minister of National Revenue*, [1995] 3 SCR 453, ¶ 53 (Supreme Court of Canada, 1995) (attached as Tab 8 to Khimji Decl., Ex. C and attached hereto as Index No. 2) ("It may well be that technically there are two claims against the debtor in respect of the transaction and two separate liabilities of the debtor arising out of the transaction. . . . *Technically, they are two separate liabilities, but in substance they are the same*; and in respect of that liability there could not be a double proof against the estate.") (emphasis added) (citations omitted).

[191]     *See Re Polly Peck International plc.* [1996] 2 All ER 433, [1996] BCC 486 (Ch D) 1995 (U.K.) (attached as Tab 26 to Khimji Decl., Ex. C and attached hereto as Index No. 3) (quoting *Re Oriental Commercial Bank, Ex parte European Bank* (1871) 7 Ch App 99 at 103-104, attached as Tab 16 to the Khimji Decl., Ex. C and attached hereto as Index No. 4) (the purpose of the rule against double proof is to prevent a creditor from "getting his debtor to enter into several distinct contracts with different people for the same debt, to obtain higher dividends than the other creditors, and perhaps get his debt paid in full.").

[192]     *Martin v. McMullen* (1891), 18 OAR 559 at 565, [1891] OJ No. 35 (attached hereto as Index No. 5) ("the principle involved seems to be a general principle of equity, applicable to all cases of suretyship.").

[193]     *See, e.g., Owners of Steamship Enterprises of Panama Inc. v. Owners of SS Ousel (The Liverpool No 2)* [1963] P 64 (CA) at 84 (attached as Tab 28 to Khimji Decl., Ex. C and attached to the GUC Brief as Index No. 10) (applying the rule against double proof in an admiralty case); *Independent Order of Foresters v. Trustees of Lethbridge Northern Irrigation Dist.*, [1943] 3 W.W.R. 297, [1943] 4 D.L.R. 793, *reversed on other grounds*, [1944] 1 W.W.R. 206, [1944] 1 D.L.R. 660 (Alta. C.A.) (attached hereto as Index No. 6) (applying the rule against double proof in a garnishment proceeding under the Execution Creditors Act and noting that "[t]he principle is not limited to bankruptcy.").

*Polly Peck*, a case relied upon by Wedlake, acknowledged that *Liverpool* is not a bankruptcy

Footnote continued on next page

56

The Nova Scotia Trustee Claim and the Guarantee Claims may not be concurrently

enforced against Old GM under the rule against double proof because both claims are asserted on

account of the same debt.  The relevant test, as articulated by an Ontario court in the leading

Canadian case on the rule against double proof, is "whether two payments are being sought for a

liability which, if the company were solvent, could be discharged as regards both claimants by

one payment" (the "**O&Y Test**").[194]  The court emphasized that, in evaluating whether two

claims are on account of the same debt, the court looks to the *substance* of the underlying debt,

not the form, and noted the following:

> it is . . . a fallacy to argue . . . that, because overlapping liabilities
> result from separate and independent contracts with the debtor,
> that, by itself, is determinative of whether the rule can apply.  The
> test is in my judgment a much broader one which transcends a
> close jurisprudential analysis of the persons by and to whom the
> duties are owed.  It is simply whether the two competing claims
> are, in substance, claims for payment of the same debt twice
> over.[195]

The court in *Olympia & York* focused on whether there was an "inseparable nexus"

between the two alleged debts on account of which the creditors sought recovery and held that

there was such a nexus because of the "total effect of the arrangements . . . and the reasoning

---

Footnote continued from previous page

case, characterizing *Liverpool* as "the most distant analogy for the application of the rule, since it was an admiralty case."  [1996] 2 All ER 433, [1996] BCC 486 (Ch D) at 443.  Wedlake argues that the rule against double proof is irrelevant here because it is only a rule of claims administration in bankruptcy and there is no pending bankruptcy case of Old GM in Canada.  *See* GHW Brief at 21.  However, its own expert, David Baird, conceded at trial that the rule applies in any situation where there are competing claims to an insufficient fund and he concedes that the case of Old GM is one in which there are competing claims to an insufficient fund.  Trial Tr. (11/26/2012), 113:2-10 (Baird).

[194]    *See Olympia & York Developments (Re)* (1998), 4 CBR (4th) 189, [1998] OJ No. 4903 (Ont. Bktcy.) at ¶ 45 ("*Olympia & York*") (attached as Tab 25 to Khimji Decl., Ex. C and attached to the GUC Brief as Index No. 11) (citing *Barclays Bank Ltd v. T.O.S.G. Trust Fund Ltd.* [1984] 2 WLR 49 (CA), attached as Tab 2 to Khimji Decl., Ex. C and attached hereto as Index No. 7).

[195]    *Id.* at ¶ 28 (quoting *Barclays Bank* at 636).

behind" what were, in that case, facially two debts.[196] Here, the substance of the debt underlying

both the Nova Scotia Trustee Claim and the Guarantee Claims, to the extent of the amounts

owed under the Notes, is the same debt. Thus, even more so than in *Olympia & York*, there is an

"inseparable nexus" between the Nova Scotia Trustee Claim and the Guarantee Claims. To the

extent of their overlap, they are claims for exactly the same debt. If Old GM were solvent,

payment of the Guarantee Claims would discharge the Nova Scotia Trustee Claim to the extent

of the amounts sought for the Notes and payment of the Nova Scotia Trustee Claim would

discharge the Guarantee Claims in full; thus the two claims cannot be concurrently enforced

against Old GM.

Wedlake cites to *Polly Peck*, an English case, and argues that the O&Y Test is not

applicable but that even if it was applicable, it is not satisfied in this case.[197] These arguments

are meritless. First, *Polly Peck* is an English case, not a Canadian case, and while English cases

are influential in Canada, *Olympia & York* remains good law in Canada. Indeed, the court in

*Olympia & York* considered *Polly Peck* in detail and held that it was factually distinguishable

from *Olympia & York* and therefore declined to follow it.[198] Second, Wedlake argues that the

O&Y Test does not apply because, according to Wedlake, *Polly Peck* disavowed the O&Y

Test.[199] Contrary to Wedlake's assertion, the court in *Polly Peck* did not disavow the O&Y Test,

but merely cautioned that in a group insolvency situation, it "may not be a wholly reliable

---

[196]    *Id*. at ¶ 28. *See also Husky Oil* at ¶ 53 (holding that a contractor cannot be held liable for two
claims concurrently because there is an inseparable nexus between the two claims).

[197]    Wedlake relies heavily on *Polly Peck*, which, like *Olympia & York*, did not involve a ULC. Trial
Tr. (11/26/2012), 121:24-123:4 (Baird). The holding of *Polly Peck* was based on the specific facts of that
case. *Id*. at 129:14-130:11 (Baird).

[198]    *See Olympia & York* at ¶ 39 (p. 14).

[199]    GHW Brief at 25. Wedlake also argues that disallowing the Nova Scotia Trustee claim would
disregard the separate legal personality of GM Nova Scotia. This argument is similarly without merit and
is addressed in greater detail in Section VI(C), *infra*.

test."[200]  Significantly, neither *Polly Peck* nor *Olympia & York* involved a claim for contribution from a member of a ULC but rather involved two claims arising from a parent company guarantee of its subsidiary's debt, and the intercompany liability resulting from the subsidiary's loaning the proceeds of that debt to the parent.[201]  Whether a "double proof" has been lodged on account of what is in substance the same debt turns on the facts of each particular case.[202]  The Court in *Olympia & York* considered *Polly Peck*, and the group insolvency issue under the facts before it, and held that the two claims in *Olympia & York* were double proofs.  Here, there is no second debt as section 135 explicitly refers to debts owed by the company to its creditors (*i.e.*, amounts owing by GM Nova Scotia under the Notes), and both the Nova Scotia Trustee Claim and the Guarantee Claims assert liability under the same debt.

Wedlake also argues that a solvent Old GM's payment in full of the Nova Scotia Trustee Claim would not automatically discharge liability under the Nova Scotia Trustee Claim and the Guarantee Claims because such discharge depends upon the Nova Scotia Trustee actually making a distribution to the Noteholders.[203]  Both of Wedlake's experts, however, concede that if Wedlake receives a distribution on account of the Nova Scotia Trustee Claim, it would be duty-bound to distribute that to GM Nova Scotia's creditors.[204]  Given that the rule against double

---

[200]    *Polly Peck* at 445; Trial Tr. (11/26/2012), 129:1-16 (Baird).

[201]    Similarly, *In re Kaupthing Singer & Friedlander Ltd* [2011] UKSC 48, [2012] 1 AC 804 (attached as Tab 13 to Khimji Decl., Ex. C and attached hereto as Index No. 8), also cited by Wedlake, does not involve a ULC.  Trial Tr. (11/26/2012) 121:34-123:4 (Baird).

[202]    *Olympia & York*, ¶ 37.

[203]    *Id.* at 115:25-116:21.

[204]    *See* Trial Tr. (11/26/2012), 67:13-68:12 (Iacobucci); Trial Tr. (11/26/2012), 116:22-117:1 (Baird).  Mr. Baird further concedes that the distribution from Wedlake to the Noteholders is a "mechanical" step.  Trial Tr. (11/26/2012), 117:2-120:7 (Baird).  *See also In re Paraguassu Steam Tramroad Co.* (1872) 8 Ch App 254 at 262 (attached as Tab 17 to Khimji Decl., Ex. C and attached hereto as Index No. 9) ("The different sections of the Act . . . all have in view the payment, pari passu and

Footnote continued on next page

proof looks to the substance, not the form, the mere existence of this "mechanical" step cannot overcome the conclusion that the Nova Scotia Trustee Claim and the Guarantee Claims are double proofs and cannot be concurrently enforced.

### B. Section 135 Of The Nova Scotia Companies Act Does Not Entitle The Noteholders To Two Claims On Account Of One Loss

#### 1. The History And Purpose Of Section 135 Indicates Legislative Intent To Preclude Concurrent Enforcement Of The Nova Scotia Trustee Claim And The Guarantee Claims

The history and purpose of section 135 are clear that section 135 is a means of enforcing a ULC's existing debts to its creditors and does not itself create any new debt owed to the ULC.[205] The legislative intent of this statute is to channel rights to collect a ULC's debts to a trustee[206] in order to promote an orderly and efficient winding up of the ULC's affairs.[207] Neither the plain language of the statute nor its legislative history indicate that the legislature intended to overturn firmly established law and permit the creditors of a ULC holding a contractual guarantee from a member for a ULC's debt to claim, by virtue of section 135, twice on account of their single debt. Disallowance of the Nova Scotia Trustee Claim to the extent of the amount of the Notes is consistent with section 135.[208]

Wedlake's focus on the eight statutory qualifications under section 135(a) through (g) is

---

Footnote continued from previous page

equally, of the debts due to the creditors; and the hand which receives the calls necessarily receives them as a statutory trustee for the equal and ratable payment of all the creditors.").

[205]    Khimji Report, ¶¶ 3, 18, 28.

[206]    Wedlake mischaracterizes Professor Khimji's testimony and claims that Professor Khimji argues that section 135 channels the right to collect a ULC's debts to the *company*. GHW Brief at 18. Professor Khimji has made clear in his report that the right to collect is channeled to a *trustee for the benefit of the creditors of the ULC, not to the company itself*. Khimji Report, ¶ 27; Khimji Decl. Ex. B ("**Khimji Rebuttal Report**") at 3-5. Thus, Wedlake's argument that the history of section 135 supports a finding that a claim under section 135 is owed to the company is meritless. GHW Brief at 17-19.

[207]    Khimji Report, ¶¶ 18, 27.

[208]    *See* Khimji Report, ¶¶ 12-33.

misleading.  As discussed in greater detail in pages 6-7 of Professor Khimji's rebuttal report, Old

GM does not attempt to qualify (in other words, limit) its liability under the Notes and the issue

here is not whether Old GM is liable for amounts owing under the Notes.  Rather, the issue is

whether Old GM is liable twice for the amounts owing under the Notes.  Under these

circumstances, Old GM's liability on the Notes is unlimited (*i.e.*, not qualified) for the purposes

of section 135 and the contractual guarantee is simply a privately agreed-upon mechanism for the

enforcement of that same debt.[209]

Wedlake faults Professor Khimji's statutory analysis, asserting that Canadian law accords

almost no deference to legislative history when interpreting statutes.[210]  Wedlake misconstrues

both Canadian and Nova Scotia law and the testimony of its own expert, Professor Iacobucci.

The Canadian Supreme Court has made clear that, when interpreting a Canadian statute, "the

words of an Act are to be read in the entire context and in their grammatical and ordinary sense,

harmoniously with the scheme of the Act, the object of the Act, and the intention of

Parliament."[211]  Thus, Professor Iacobucci concedes that even where the words of a statute are

"precise and unequivocal," as he wrongly asserts is the case here, Canadian law requires

consideration of matters other than the plain language of the statute, including the scheme and

---

[209]    *Id*.  Further, even assuming that Professor Iacobucci is correct that the eight qualifications under section 135 should be interpreted as "exceptions" to the general rule of member liability, Old GM's giving of a contractual guarantee should be interpreted as a separate contractual limitation of its section 135 liability under qualification (f).  *See* NSCA 135(f) (attached to the GUC Brief as Index No. 3) ("nothing in this Act shall invalidate any provision contained in any contract whereby the liability of the individual members of the contract is restricted"); Khimji Rebuttal Report at 7.  Similarly, the provisions in the offering circular and the Notes that GM Nova Scotia may reorganize with no requirement that it remain a ULC, and that GM Nova Scotia may be merged into Old GM contractually limit Old GM's section 135 liability and should be interpreted as a section 135(f) limitation.  *See* Def. Ex. 14 at 18-19, § 10 (NGM000012069-70); Def. Ex. 297 at DEF3866.

[210]    GHW Brief at 16.

[211]    *Canada Trustco Mortgage Co. v. R.*, 2005 SCC 54 at ¶ 10 (p. 13) (internal quotation marks omitted) (attached hereto as Index No. 10).

object of the act and the intent of Parliament in enacting the law.[212]  This is precisely the analysis

Professor Khimji undertook and Professor Iacobucci did not.

Wedlake also criticizes Professor Khimji's attention to the history of section 38 of the

1862 U.K. Companies Act, which Professor Iacobucci concedes is "the same statute" as section

135 of the Nova Scotia Companies Act.[213]  However, as Professor Iacobucci's course-book

indicates, because the 1862 Companies Act was the model for the provincial acts of several

Canadian provinces and continues to be for Nova Scotia, "knowledge of the history of the British

company law is also important for an understanding of the early Canadian developments."[214]

Wedlake's criticism is particularly puzzling in light of the Nova Scotia Interpretations Act,

which requires that, when interpreting a Nova Scotia statute, a court consider, among other

things, the former law, including other enactments upon the same or similar subjects and the

history of legislation on the subject.[215]  It is telling that Professor Iacobucci offers no opinion on

the accuracy of Professor Khimji's historical and legislative history analysis, having not done the

research himself.[216]  The legislative history of section 135 of the Nova Scotia Companies Act

and section 38 of the U.K. Companies Act demonstrate that the scheme and object of section 135

and the intent of the legislature are that where a separate contractual guarantee exists,

---

[212]     Trial Tr. (11/26/2012), 50:6-51:6 (Iacobucci).

[213]     *Id*. at 55:12-56:3 ("They must have copied 38 when they drafted 135. . . .").

[214]     *See* Edward Iacobucci, et al., *Cases, Materials and Notes on Partnerships and Canadian Business Corporations*, 5th ed. (Toronto: Thomson Reuters, 2011) at 47-49 (attached hereto as Index No. 11).

[215]     *See* Section 9(5) of the *Interpretation Act*, RSNS 1989, c. 235 (attached as Tab 33 to Khimji Decl., Ex. C and attached to the GUC Brief as Index No. 8); *see also* Trial Tr. (11/26/2012), 53:18-55:11 (Iacobucci).

[216]     *Id*. at 56:4-57:4.

enforcement of that guarantee is instead of, and not in addition to, enforcement of a claim under section 135.[217]

### C.    Disallowance Of The Nova Scotia Trustee Claim Does Not Impermissibly Disregard The Separate Legal Personality Of GM Nova Scotia

#### 1.    The Nova Scotia Trustee Claim Does Not Belong To GM Nova Scotia

Wedlake's assertion that the Nova Scotia Trustee Claim belongs to GM Nova Scotia and that disallowance of the Nova Scotia Trustee Claim, therefore, would impermissibly disregard the separate legal personality of GM Nova Scotia should be rejected.  As an initial matter, this assertion is entirely inconsistent with the Noteholders' position in this case that it is they, as the only real creditors of GM Nova Scotia, and not GM Nova Scotia itself, who (purportedly) gave consideration for the release of the Intercompany Loans.[218]  Further, as a matter of law, liability under section 135 is not a debt owed to the ULC[219] and, therefore, is not an asset of the ULC.[220]

*Webb v. Whiffin*,[221] which Wedlake cites for the proposition that a section 135 claim belongs to the ULC, is distinguishable.  *Webb* dealt with a claim against a member for unpaid capital.[222]  Professor Iacobucci concedes that a claim for unpaid capital is not like a section 135 contribution claim because a ULC's corporate powers with respect to a claim for unpaid capital

---

[217]    Khimji Report, ¶ 32.

[218]    NH Brief at 10.

[219]    The statute provides that a member is "liable to contribute to the assets of the company." N.S.C.A. § 135.

[220]    Khimji Report, ¶ 28 (section 135 does not create a separate and independent claim owned by the ULC).  *See also In re Whitehouse & Co.* (1878) 9 Ch D 595 at 599-600 (attached as Tab 18 to Khimji Decl., Ex. C and attached hereto as Index No. 12) ("It is a mistake to call [the liability of a contributor in winding-up under the 1862 U.K. Companies Act] a debt due to the company.  It is no such thing.  It is not, as has been supposed, in any shape or way a debt due to the company, but it is a liability to contribute to the assets of the company; and when we look further into the Act, it will be seen that it is a liability to contribution to be enforced by the liquidator.").

[221]    (1872) LR 5 HL 711 (attached as Tab 29 to Khimji Decl., Ex. C and attached hereto as Index No. 13).

[222]    *Id*. at 735-36.

is very different from its powers with respect to a section 135 contribution claim.[223]  Thus, *Webb*

does not support the conclusion that a section 135 claim is a claim of the ULC and not

effectively a claim of the ULC's creditors.[224]

> ### 2.  The Principle Of Separate Legal Personality Of GM Nova Scotia Does Not Support Allowance Of The Nova Scotia Trustee Claim To The Extent Of Duplication With The Guarantee Claims

That Old GM and GM Nova Scotia have separate legal personalities is not disputed.  The

issue in this case is whether GM Nova Scotia is liable twice for amounts owing under the Notes.

Section 135 creates a procedural mechanism for the enforcement of a ULC's debts owed to its

creditors against members, but does not create a new debt for the benefit of the ULC.[225]

Therefore, both the Guarantee Claims and the Nova Scotia Trustee Claim relate to the same debt

against the same debtor for the benefit of the same party and the principle of separate legal

personalities is simply not relevant to a determination of whether both claims should be

concurrently allowed against Old GM.[226]

Even if, as Wedlake argues, the Nova Scotia Trustee Claim is construed to be an asset of

---

[223]    *See* Trial Tr. (11/26/2012), 63:23-66:12 (Iacobucci) (a claim for unpaid capital shares is an asset of the ULC, which the ULC may pledge as security for a company debt, but a claim for contribution under section 135 cannot be pledged); *see also* Def. Ex. 321 (Hr'g Tr., *In re Abitibibowater, Inc., et al.* (12/9/2011), 123:24-125:5 (Iacobucci)) (same).

[224]    Wedlake also argues that section 77(2) of the Canadian *Bankruptcy and Insolvency Act*, RSC 1985, c. B-3 (attached as Tab 32 to Khimji Decl., Ex. C and attached hereto as Index No. 14), – which provides that the amount that a member is liable to contribute on his unpaid shares of capital or in his liability to the corporation, its members or creditors "shall be deemed" an asset of the corporation and a debt "payable to the trustee," BIA, § 77(2) – transforms a contribution claim into an asset of the ULC. However, being "deemed" an asset of the ULC means the opposite of actually being an asset of the ULC. Trial Tr. (9/21/2012), 114:1-10 (Khimji) (Black's Law Dictionary defines "deemed" to treat something as (1) if it were really something else, or (2) qualities that it does not have; the deeming provision of the BIA does not mean that a contribution claim is an asset of the ULC, but that it is treated as such for a particular purpose).  Thus, section 77(2) of the BIA does not support the conclusion that the Nova Scotia Trustee Claim belongs to GM Nova Scotia.

[225]    Khimji Report, ¶ 9-10.

[226]    Trial Tr. (9/21/2012), 123:10-125:13 (Khimji).

GM Nova Scotia, the disallowance of the Nova Scotia Trustee Claim to the extent of duplication with the Guarantee Claims would not violate the principle of separate legal personality. The rule against double proof applies to prevent even *different creditors* from proving multiple claims for the same debt against the same debtor.[227]

Finally, although not necessary in this case, separate legal personalities may be disregarded where it is necessary to properly apply a statute or to prevent an unjust result. Wedlake's own expert's course-book notes that "courts have repeatedly stated that, sometimes, the legal personality of the corporation may be disregarded for the purpose of imposing liability directly upon shareholders or if necessary for the correct construction or application of a legal standard."[228] The court in *Olympia & York* specifically considered whether the existence of a separate legal personality prevented disallowance of a duplicative claim and concluded that it did not.[229] While courts should be careful to respect separate corporate existence, this principle does not trump the importance of *pari passu* distribution to all creditors.[230] Thus, though not necessary here for reasons already discussed above, this Court may, applying Canadian law and interpreting section 135, look beyond the purported separate legal personality of GM Nova Scotia and disallow the Nova Scotia Trustee Claim.

D.    **Wedlake Resorts To Baseless
Attacks On Professor Khimji's Qualifications**

Since the law is not on Wedlake's side, Wedlake resorts to meritless attacks on the

---

[227]    Khimji Report, ¶ 34-35.

[228]    Iacobucci, et al., *supra*, at 87. Courts may disregard separate legal personalities if it would produce results "flagrantly opposed to justice," *Clarkson Co. Ltd. v. Zhelka*, [1976] 2 OR 565 (HC) at ¶ 80 (attached hereto as Index No. 15), or when "construing *a statute*, contract or other document." *Transamerica Life Ins. Co. of Canada v. Canada Life Assurance Co.* (1996), 28 OR (3d) 423 (Gen. Div.), *aff'd* [1997] OJ No. 3754 (CA) at ¶ 19 (emphasis added) (attached hereto as Index No. 16).

[229]    *Olympia & York*, ¶ 36.

[230]    *Id.* at ¶ 27.

65

qualifications of Professor Khimji.[231]  In doing so, Wedlake ignores the fact that Professor

Khimji was qualified as an expert witness on the exact matters in dispute here, not just by this

Court in this case, but previously by the bankruptcy court for the District of Delaware in the case

of *In re AbitibiBowater* (Case No. 09-11296).[232]  Wedlake also ignores the fact that Professor

Khimji, unlike either of its experts, taught business associations and commercial law at a Nova

Scotia law school and has consulted for the Government of Nova Scotia on amendments to the

Nova Scotia Companies Act.[233]  Wedlake's criticism that Professor Khimji is not a bankruptcy

expert is simply irrelevant given that the rule against double proof is not limited to bankruptcy,[234]

and because Professor Khimji has previously testified as a qualified expert on the rule against

double proof to the extent it implicates claims under section 135 of the Nova Scotia Companies

Act.[235]

At the same time, Wedlake exaggerates the qualifications of its own expert.  Wedlake

touts the "more than 50 articles" Professor Iacobucci has published,[236] but neglects to mention

that none of these publications involved the Nova Scotia Companies Act.[237]  The "course book

discussing Nova Scotia ULCs which he teaches in class," *id.*, turns out to be an 829 page course-

book containing cumulatively less than one page on Nova Scotia ULCs.[238]

---

[231]    GHW Brief at 13-15.

[232]    *See* Khimji Report, ¶ 4.

[233]    *Id.* at ¶¶ 1, 3; Trial Tr. (11/26/2012), 41:11-17 (Iacobucci).

[234]    *See* Section VI(A)(2), *supra*.

[235]    *See generally* Def. Ex. 321 (Hr'g Tr., *In re Abitibibowater, Inc., et al.* (12/9/2011), 176:16-254:14 (Khimji)); *see also* Trial Tr. (9/21/2012), 114:18-114:24 (Khimji) (Professor Khimji is qualified to opine on the section 135 and double liability issues relevant to this case even if the issues are related to bankruptcy or insolvency).

[236]    GHW Brief at 14.

[237]    Trial Tr. (11/26/2012), 40:10-16 (Iacobucci).

[238]    *See* Iacobucci, et al., *supra*, at 65, 158; *see also* Trial Tr. (11/26/2012), 40:18-41:10 (Iacobucci).

### E.    The Nova Scotia Trustee Claim Must Be Disallowed
### Pursuant To Section 502(e) Of The Bankruptcy Code

Pursuant to section 502(e)(1)(B), a claim must be disallowed if the following three

elements are established:  (1) the party asserting the claim must be liable with the debtor on the

claim of a third party; (2) the claim must be contingent at the time of its allowance or

disallowance; and (3) the claim must be for reimbursement or contribution.[239]  Wedlake does not

dispute, and thus concedes, that the first element – that Old GM and GM Nova Scotia are co-

debtors who are jointly liable under the Notes – is satisfied.[240]  Instead, Wedlake focuses on the

latter two elements, and argues that the Nova Scotia Trustee Claim is neither a claim for

contribution nor a contingent claim.  Wedlake's arguments do not withstand scrutiny.

First, Wedlake's argument that the Nova Scotia Trustee Claim is not a claim for

contribution ignores the plain language of the very statute that gives rise to its claim.  As this

Court has recognized, "[w]hether a Claim is one for reimbursement or contribution depends on

its characterization under state or federal statutory law or common law."[241]  Here, section 135

expressly provides that, upon a winding up, a member of a ULC is to "*contribute* to the assets of

the company."[242]  Wedlake's puzzling suggestion that the word "contribute" is used in the statute

in the "ordinary" sense, and not in the "particular sense applicable to 502(e)(1)(B)," finds no

support in the law.  To the contrary, it is recognized that "[t]he plain meaning of the [1862

Companies] Act is a legal or equitable liability to contribute in the character of a partner."[243]

---

[239]    *In re Lyondell Chem. Co.*, 442 B.R. 236, 243 (Bankr. S.D.N.Y. 2011).

[240]    *See* GHW Brief at 26.

[241]    *In re GCO Servs., LLC*, 324 B.R. 459, 465 (Bankr. S.D.N.Y. 2005) (quoting L. King, et al., Collier on Bankruptcy, ¶ 502.06[2][a] (15th ed. Rev. 2003)); *see also In re APCO Liquidating Trust*, 370 B.R. 625, 631 (Bankr. D. Del. 2007).

[242]    N.S. Companies Act at § 135 (emphasis added).

[243]    *In re European Society Arbitration Acts*, (1878) 8 Ch D 679, at 708 (attached hereto as Index No.

Footnote continued on next page

Wedlake cites to this Court's decision in *In re Chemtura Corp.*, 436 B.R. 286 (Bankr. S.D.N.Y. 2010), in support of its argument that the Nova Scotia Trustee Claim is not a claim for contribution within the meaning of section 502(e)(1)(B) because GM Nova Scotia has not yet paid its underlying debt on the Notes.[244]  This argument is illogical.  The payment of the underlying debt is not necessary to establish a contribution claim against a co-debtor.  Indeed, in *Chemtura*, the Court held that the contribution claims at issue there satisfied each of the elements of section 502(e)(1)(B), notwithstanding that the underlying claims had not yet been paid – a fact that rendered the claims contingent.[245]

Further to this point, the Nova Scotia Trustee Claim is also most certainly a contingent claim.  As this Court recognized in *Lyondell*, "until and unless amounts *are actually paid*, the claims for reimbursement or contribution with respect to those amounts remain contingent for 502(e)(1)(B) purposes."[246]  Faced with the fact that GM Nova Scotia has not paid the Notes, Wedlake is left to argue that the "theory that a claim is contingent until payment is made is inapplicable here."[247]  But Wedlake's attempt to limit such a "theory" to CERCLA environmental remediation cases where the underlying liability is subject to change finds no basis in the law, and is contrary to the very purpose of section 502(e)(1)(B).

Indeed, Wedlake acknowledges in its brief that the purpose of the statute is "to ensure that the estate will not be liable to the primary obligor and the guarantor for the same debt," and

---

Footnote continued from previous page

17).  As discussed in Section VI(B)(I), *supra*, the 1862 U.K. Companies Act was the model for the provincial acts of several Canadian provinces, and continues to be for Nova Scotia.

[244]      *See* GHW Brief at 26.

[245]      *In re Chemtura Corporation*, 436 B.R. at 297.

[246]      *In re Lyondell*, 442 B.R. at 248.

[247]      GHW Brief at 27.

to "prevent competition between a creditor and his guarantor for the limited proceeds in the estate."[248]   Simply put, Wedlake's recognition of the purpose of section 502(e)(1)(B) cannot be squared with its argument that the statute does not require disallowance of the Nova Scotia Trustee Claim.   Accordingly, because it is a contingent claim for contribution that is being asserted to recover the same debt asserted under the Guarantee Claims, the Nova Scotia Trustee Claim must be disallowed pursuant to Section 502(e)(1)(B) of the Bankruptcy Code.

## VII.   THE PORTION OF THE NOVA SCOTIA TRUSTEE CLAIM THAT IS BASED ON THE SWAPS SHOULD BE DISALLOWED

### A.   The Swaps Were Not Assumed And Assigned To New GM

The Swaps were not assumed and assigned to New GM.   The Sale Order sets forth the "exclusive" procedures for the assumption and assignment of contracts in this case.[249]   Those procedures were not followed with respect to the Swaps.[250]   In particular, notice was never sent to GM Nova Scotia.   Of greater significance, however, is *New GM's failure to identify the Swap Documents in the assumption and assignment database.*[251]   All parties agree that there are four

---

[248]    *Id*. at n.115; *see In re APCO Liquidating Trust*, 370 B.R. at 634 ("The sole purpose served by section 502(e)(1)(B) is to preclude redundant recoveries on identical claims against insolvent estates in violation of the fundamental Code policy fostering equitable distribution among all creditors of the same class.'") (quoting *Juniper Dev. Grp. v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 923 (1st Cir. 1993)).

[249]    As New GM specifically stated to the Court, the assumption and assignment procedures approved in the Sale Order are the "exclusive procedures for the assumption and assignment of designated executory contracts and unexpired leases."   *See Motion (I) For Declaratory Relief Regarding The Status Of A Certain Sublease Or, In The Alternative, Relief From The Assumption And Assignment Of A Certain Sublease To GM Pursuant To Rule 60(b) And (II) To Rescind The Agreement To Resolve Objection To Cure Notice Between GM And Knowledge Learning Corporation Dated August 14, 2009* at ¶ 8 (Bankr. Dkt. No. 4895).

[250]    *See* Pl. Ex. 275, ¶ 10 (Sale Procedures Order) (Bankr. Dkt. No. 274) (as a condition to the assumption of an executory contract, Old GM was required to provide an assumption and assignment notice containing an objection deadline to the contracting counterparty, in the form attached as Exhibit D to the Sale Procedures Order, with instructions for how to access the assumption and assignment database).

[251]    Pl. Ex. 281 (email from R. Berkovich to E. Fisher dated Apr. 22, 2010, attaching excerpt from

Footnote continued on next page

69

Swap Documents related to the Swaps: (i) a 1992 ISDA Master Agreement that is *unsigned and undated*; (ii) a schedule to the ISDA Master Agreement dated as of October XX, 2001; (iii) a July 10, 2003 confirmation relating to one series of Notes; and (iv) a July 10, 2003 confirmation relating to the other series of Notes.[252]  New GM suggests that the identification of an "ISDA Master Agreement dated October 15, 2001" in the assumption database sufficiently identified the Swaps at issue here for assumption.[253]  But that document has no relation to these Swaps and is presumably related to some earlier swap.[254]  Consistent with the above, New GM initially acknowledged that it did not believe it had a right to the Swaps.[255]

## B.    The Swaps Were Expressly Excluded From The 363 Sale To New GM

Under the MSPA, Old GM retained all of its "right, title and interest in and to" and did not "sell, transfer, assign, convey or deliver" to New GM, certain assets (the "**Excluded Assets**").[256]  The Swaps and swap liability constitute Excluded Assets under the MSPA. Schedule 2.2(b)(iv) identifies 142 entities that were excluded from the sale to New GM (the "**Excluded Entities**").[257]  GM Nova Scotia is identified as an Excluded Entity, and Excluded

---

Footnote continued from previous page
assumption and assignment database).

[252]    *See* Pl. Ex. 315 (Nova Scotia Trustee Claim, Exhibit E (GHW0003704), copies of the swap agreements (ISDA Master Agreement at GHW0003705; schedule at GHW0003729; confirmations at GHW0003737 and GHW0003742)); *see also* Def. Ex. 22 (Weil notes that the "Master Agreement is just the standard form 1992 ISDA"); Trial Tr. (8/7/2012), 35:3-36:25 (Wedlake).

[253]    NG Brief at 33-34.

[254]    *See* JSF, ¶ 6 (citing to Def. Ex. 11, the October 15, 2001 swap confirmation that all parties agree is not one of the four Swap Documents relevant to this case).

[255]    GUC Brief at 82 n.359.

[256]    MSPA § 2.2(b).  The MSPA makes clear that "the Purchased Assets shall not, and shall not be deemed to, include the" Excluded Assets.  *Id*.

[257]    *See Notice Of Filing Of The Amended Master Sale And Purchase Agreement And Certain Exhibits And Sections Of The Disclosure Schedule Thereto* at Disclosure Sch. 2.2(b)(iv), ¶ 55 (Bankr. Dkt. No. 2649).  New GM incorrectly states that only four entities were excluded from the sale.  NG Brief at 34 n.44.

Entities are within the definition of Excluded Assets.[258]

Section 2.2(b)(v)(ii) of the MSPA defines "Excluded Contracts" as all prepetition executory contracts "that have not been designated as or deemed to be Assumable Executory Contracts . . . or that are determined, pursuant to the procedures set forth in the Sale Procedures Order, not to be assumable and assignable to" New GM (collectively, the "**Excluded Contracts**"), "*including any accounts receivable arising out of or in connection with any Excluded Contact.*"[259]  Because the Swaps were not assumed and assigned, they are Excluded Contracts.  As a result, the swap liability constitutes an account receivable arising out of or in connection with the Swaps, and such receivable was expressly excluded from the sale to New GM.

Further, section 2.2(b)(iii) of the MSPA states that Excluded Assets include all receivables other than "Intercompany Obligations" (which the Swaps were not) "exclusively related to any Excluded Assets."[260]  Because the swap liability is purportedly an amount that would, in the future, become due by GM Nova Scotia to Old GM, such amount constitutes a receivable related to GM Nova Scotia.  As a result, for this separate reason, the swap liability is an Excluded Asset.[261]

## C.    The Swaps Are Not Purchased Assets Under The MSPA

New GM argues that the Swaps somehow constitute Purchased Assets under sections 2.2(a)(iv) and (xiii) of the MSPA.  This argument fails.  Section 2.2(a) provides, in relevant part,

---

[258]    MSPA § 2.2(b)(iii).

[259]    *Id*. at § 2.2(b)(vii) (emphasis added).

[260]    *Id*. at § 2.2(b)(iii).  The Swaps were not "Intercompany Obligations" because no amount was owed or due under the Swaps as of the closing of the 363 Sale.

[261]    Moreover, all claims relating exclusively to the Excluded Assets (*i.e.*, all claims relating to GM Nova Scotia or the Swaps) and all "financial arrangements" relating exclusively to the Excluded Assets were not sold to New GM.  *See Id*. at §§ 2.2(b)(x) and (xii).

71

that the Purchased Assets "shall consist of the right, title and interest that" Old GM possesses in

certain assets "as the same may exist as of the Closing" but "in every case, excluding the

Excluded Assets."

New GM's contention that the swap liability constitutes an "intercompany obligation"

under section 2.2(a)(iv) of the MSPA "owed or due" to Old GM as of July 10, 2009 is

incorrect.[262]  It is undisputed that the swap liability was not owed or due as of such date.  This

fact is confirmed by Wedlake's admission that one reason for its purported "disclaimer" of the

Swaps in 2010 was because GM Nova Scotia's liability related to the Swaps "could have

continued to grow."[263]

New GM's contention that claims under the Swaps were purchased under section

2.2(a)(xiii) of the MSPA is also incorrect.  Section 2.2(a)(xiii) excludes from the universe of

Purchased Assets all claims that relate exclusively to the Excluded Assets.  Because claims under

the Swaps relate exclusively to GM Nova Scotia, such claims were not included in the sale to

New GM.

**D.    Even If The Swaps Were Purchased
Contracts, New GM Assumed The Swap Liability**

New GM contends that the Swaps were validly assumed and assigned, and, as a result,

the Swaps are deemed Purchased Contracts under section 2.2(a)(x) of the MSPA.[264]  Purchased

Contracts include all contracts other than the Excluded Contracts, including any executory

contract that was assumed and assigned.  Assuming, *arguendo*, that the Swaps were assumed and

assigned and are therefore deemed to be Purchased Contracts, New GM necessarily assumed all

---

[262]    NG Brief at 34.

[263]    GHW Brief at 40.

[264]    *See Statement Of Undisputed Material Facts In Support Of Motion For Summary Judgment Filed By General Motors LLC* at 29, ¶ 69(v) (Bankr. Dkt. No. 11851).

72

liabilities under each Purchased Contract pursuant to section 2.3(a)(ii) of the MSPA.

It makes perfect sense that Old GM would be released from all obligations with respect to Purchased Contacts that New GM acquired. This idea is confirmed by the language in the Sale Order, which provides that Old GM has been "forever released from any and all liability under the Purchased Contracts." Thus, regardless of whether New GM has any rights in the Swaps, the portion of the Nova Scotia Trustee Claim that is based on the Swaps is invalid and should be disallowed.

### E.    The Express Provisions Of The Swaps Govern Their Termination And Calculation Of Amounts Due

A separate and independent basis to disallow the Swaps is that they were not terminated in accordance with their terms. Absent proper termination by the non-defaulting party (New GM), no payment is due under the Swaps.[265]

Wedlake admits that the termination provisions set forth in the Swaps were not followed.[266] Instead, Wedlake contends that it is permitted under Canadian law to disclaim the Swaps and thus disregard their express terms.[267] Wedlake's contention is disingenuous, however, because Canadian law *precludes* the disclaimer of "eligible financial contract[s]" (*e.g.*, Swaps).[268] Further, Wedlake's argument that it feared ongoing or personal liability is a fallacy because, most importantly, Wedlake knew that it could not be exposed to any liability whatsoever based on the Swaps due to the fact that, as discussed above, New GM assumed the

---

[265]    As discussed in Argument Section VII(B) of the GUC Brief, GM Nova Scotia's purported disclaimer in January of 2010 did not effect an early termination under the ISDA Master Agreement entitling New GM to a claim for payment, because the ISDA expressly requires, among other things, that the non-defaulting party issue a termination notice specifying the default and designating a *future* early termination date – not a date before the time such notice is effective.

[266]    GHW Brief at 38-39.

[267]    *Id.* at 39-40.

[268]    *Bankruptcy and Insolvency Act*, RSC 1985, c. B-3, s. 65.11 (attached hereto as Index No. 18).

swap liability in connection with the 363 Sale.[269]  Moreover, a non-defaulting counterparty's failure to promptly terminate a swap agreement amounts to a waiver of that right and precludes such party from a chance to "play the market" once an event of default has occurred.[270]  By sitting on its termination rights, New GM waived them.

Finally, if, for the sake of argument only, New GM does have a claim under the Swaps against GM Nova Scotia, it certainly does not have a claim in the amount asserted.  There is simply no authority to suggest that a court will ignore the termination or damages provisions of a contract solely because it was disclaimed in bankruptcy, and Wedlake has not cited a single case in support of such a theory.  As explained in the GUC Brief, New GM's claim under the Swaps disregards the contractually specified method for calculating amounts due in an effort to improperly inflate the claim against Old GM.

## VIII.   THE JOINT STATEMENT OF FACTS RELIES ON EXHIBITS NOT IN EVIDENCE

As set forth in the Appendix hereto, Defendants' and New GM's post-trial submissions improperly rely upon certain exhibits that are not admitted into evidence.

---

[269]      *Id.* at 40.

[270]      *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (JMP), Hr'g Tr. at 111:23-112:2 (Dkt. No. 5261) (Sept. 15, 2009) (oral ruling on motion to compel Metavante Corp. to perform under an executory contract).

## CONCLUSION

WHEREFORE, the GUC Trust respectfully requests entry of a judgment disallowing the

Disputed Claims in full, and granting such other relief as the Court deems just and proper.

Dated:  New York, New York
        July 11, 2013

Respectfully submitted,

By: /s/ Eric B. Fisher
    Barry N. Seidel
    Eric B. Fisher
    Katie L. Weinstein
    Mary Kim (admitted *pro hac vice*)
    DICKSTEIN SHAPIRO LLP

    *Counsel for the Motors Liquidation
    Company GUC Trust*

## **APPENDIX**

References to the following exhibits in the Joint Statement of Facts should be struck as these exhibits are not in evidence:

1.    Def. Ex. 123 (p. 20, n. 106)
2.    Def. Ex. 141 (p. 29, n. 164)
3.    Def. Ex. 149 (p. 29, n. 164)
4.    Def. Ex. 151 (p. 29, n. 164)
5.    Def. Ex. 152 (p. 29, n. 164)
6.    Def. Ex. 157 (p. 29, n. 164)
7.    Def. Ex. 181 (p. 29, n. 164)
8.    Def. Ex. 185 (p. 29, n. 164)
9.    Def. Ex. 187 (pgs. 33, 34, n. 191, 201)[1]
10.   Def. Ex. 496 (p. 21, n. 109)[2]

In addition, references to the following exhibits in the Joint Statement of Facts, which are not in evidence, should be replaced with the exhibit numbers for duplicate exhibits that are in evidence:

1.    Def. Ex. 111 (p. 18, n. 91) – replace with Pl. Ex. 93.
2.    Def. Ex. 171 (p. 29, n. 164) – replace with Pl. Exs. 297 and 298.
3.    Def. Ex. 172 (p. 29, n. 164) – replace with Pl. Ex. 421 (different Bates number but the same email).
4.    Def. Ex. 173 (p. 29, n. 164) – replace with Pl. Ex. 114 (different Bates number but the same email).
5.    Pl. Ex. 701 (p. 21, n. 113) – replace with Def. Ex. 498.

---

[1]    Def. Ex. 187 was used in the examination of Mr. Racich, but not moved into evidence.

[2]    Def. Ex. 496 was used in the deposition of Mr. Lopez, but not moved into evidence.

A-1