# Index No. 2



Page 1

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R.
(2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

Husky Oil Operations Ltd. v. Minister of National Revenue

WORKERS' COMPENSATION BOARD v. HUSKY OIL OPERATIONS LTD., R. IN RIGHT OF CANADA,
as represented by MINISTER OF NATIONAL REVENUE, R. IN RIGHT OF PROVINCE OF SASKAT-
CHEWAN, as represented by MINISTER OF HUMAN RESOURCES, LABOUR AND EMPLOYMENT, R. IN
RIGHT OF PROVINCE OF SASKATCHEWAN, as represented by MINISTER OF FINANCE, BANK OF
MONTREAL, ERIC ZIMMERMAN, GARTH PRICE, TREVOR BROWN, ARTHUR GINGRAS, KELLY
HOUSTON, DARCY KUZIO, HANS BOHLE, CHARLES PSHEBENICKI, TERRY SAPERGIA, SBW-
WRIGHT CONSTRUCTION INC., CAMPBELL WEST (1991) LTD., FULLER AUSTIN INSULATION INC.,
UNITED INDUSTRIAL EQUIPMENT RENTALS LTD., ATCO ENTERPRISES LTD. and DELOITTE &
TOUCHE INC., as Trustee in Bankruptcy of Estate of METAL FABRICATING & CONSTRUCTION LTD.,
ATTORNEY GENERAL FOR SASKATCHEWAN

ATTORNEY GENERAL FOR ONTARIO, ATTORNEY GENERAL FOR NEW BRUNSWICK, ATTORNEY
GENERAL OF BRITISH COLUMBIA, ATTORNEY GENERAL FOR ALBERTA, WORKERS' COMPENSA-
TION BOARD OF ONTARIO, WORKERS' COMPENSATION BOARD OF BRITISH COLUMBIA, WORK-
ERS' COMPENSATION BOARD OF ALBERTA and YUKON WORKERS' COMPENSATION HEALTH
AND SAFETY BOARD (Intervenors)

Supreme Court of Canada

Lamer C.J.C., La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory, McLachlin, Iacobucci and Major JJ.

Heard: January 25, 1995
Judgment: October 19, 1995
Docket: Doc. No 23936

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights re-
served.

Counsel: *Robert G. Richards* and *Evan L. Bennett*, for appellant.

*James S. Ehmann* and *Paul J. Harasen*, for respondent.

*Edward R. Sojonky, Q.C.*, and *Gordon Berscheid*, for respondent Attorney General of Canada.

*Thomson Irvine*, for respondent Attorney General for Saskatchewan.

*Brian J. Scherman*, for respondent Bank of Montreal.

*Hart Schwartz*, for intervenor Attorney General for Ontario.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 2

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

*Cedric L. Haines*, for intervenor Attorney General for New Brunswick.

*R. Richard M. Butler*, for intervenor Attorney General of British Columbia.

Written submission only by/argumentation écrite seulement par *Nolan D. Steed*, for intervenor Attorney General for Alberta.

Written submission only by *Elizabeth Kosmidis*, for intervenor Workers' Compensation Board of Ontario.

Written submission only by *Gerald W. Massing*, for intervenor Workers' Compensation Board of British Columbia.

Written submission only by *Douglas R. Mah*, for intervenor Workers' Compensation Board of Alberta.

Written submission only by *Bruce L. Willis, Q.C.*, for intervenor Workers' Compensation Health and Safety Board of Yukon.

Subject: Corporate and Commercial; Insolvency; Contracts; Labour and Employment; Public

Bankruptcy --- Bankruptcy and insolvency jurisdiction — Constitutional jurisdiction of Dominion and provinces — Paramountcy of federal legislation.

Construction Law --- Construction and builders' liens — Holdback.

Employment Law --- Workers' compensation legislation — Constitutional issues.

Constitutional law — Constitution Act, 1867 — Exclusive federal jurisdiction over bankruptcy — Project owner indebted to bankrupt construction company — Workers' Compensation Board suing owner under s. 133(1) of The Workers' Compensation Act for sum bankrupt owing board for unremitted employee payroll contributions — Owner claiming under s. 133(3) to set off moneys paid to board from moneys owing bankrupt — Section 133(1) and (3) should be read in tandem — Where s. 133(1) and (3) applying on facts s. 133 inapplicable in bankruptcy for intruding into exclusive federal sphere beyond ancillary effect — Section 97(3) of Bankruptcy and Insolvency Act allowing only party claiming set-off and not third party to recover ahead of its priority — Court presuming constitutionality and reading down s. 133 to extent of conflict with s. 136 of Bankruptcy and Insolvency Act — Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, s. 97(3), 136 — The Workers' Compensation Act, S.S. 1979, c. W-17.1, ss. 133(1), 133(3).

The Workers' Compensation Board gave a fabricating company a Notice of Assessment that it owed the board for unremitted employee payroll contributions. The fabricator then gave a bank a general assignment of book debts for bank loans it received, and the bank gave notice to a project owner with which the fabricator had contracted. The contract obliged the fabricator to indemnify the owner for non-performance of the contract. When the fabricator became bankrupt, the owner was indebted to it under the contract. The board sued the owner under s. 133(1) of *The Workers' Compensation Act* (Sask.) for the sum the fabricator owed the board. The owner claimed that, if it was required to pay the board under s. 133(1), then it was entitled to set off the payment against the amount it owed the fabricator. A chambers judge granted the owner a fiat of non-suit on the ground that s. 133 was constitutionally inoperative because it altered the federal *Bankruptcy and Insolvency Act's*

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

scheme of distribution. When the Saskatchewan Court of Appeal dismissed the board's appeal, it appealed to the Supreme Court of Canada.

**Held:**

The appeal was dismissed.

**Per Gonthier J. (Lamer C.J.C., La Forest, L'Heureux-Dubé and McLachlin JJ. concurring)**

Section 133 of *The Workers' Compensation Act* does not apply in bankruptcy, and s. 133(3) cannot by means of set-off effectively reorder the priorities contained in s. 136 of the *Bankruptcy and Insolvency Act*. The combined effect of the deemed debt in s. 133(1) and the set-off against the bankrupt's property in s. 133(3) is to secure the board's claim against the bankrupt's estate with the bankrupt's debtor acting merely as conduit. The bankrupt's estate is diminished, the board is correspondingly enriched, and the debtor's estate is unaffected. The board thus recovers against the bankrupt ahead of its federally mandated priority in s. 136(1)(*h*) of the *Bankruptcy and Insolvency Act*, creating an operational conflict. Section 97(3) of the *Bankruptcy and Insolvency Act* incorporating the provincial law of set-off does not apply. Section 97(3) allows only the party claiming set-off, and not a third party, to recover exceptionally ahead of its priority. The set-off allowed is a defence to the payment of a debt, and not a statutory security device securing the claims of third parties against the estate. Section 133 not only gives a priority to the debtor claiming set-off, which is permissible under s. 97(3), it also effectively secures the board's claim against the estate, which is not so permissible. Under the presumption of constitutionality, s. 133 should be read down to the extent of its conflict with s. 136 of the *Bankruptcy and Insolvency Act*. Accordingly, s. 133 is inapplicable in bankruptcy.

Parliament's exclusive power over bankruptcy and insolvency in s. 91(21) of the *Constitution Act, 1867* empowers it to rank bankruptcy creditors under s. 136 of the *Bankruptcy and Insolvency Act*. Section 136(1)(*h*) ranks a bankrupt's indebtedness under any worker's compensation legislation eighth in the list. Provinces cannot create priorities between creditors or change the distribution scheme in s. 136(1). While provincial law may validly affect priorities outside of bankruptcy, in bankruptcy s. 136(1) determines a claim's status and priority. The bankruptcy distribution scheme would otherwise vary from province to province, which would be unacceptable. Provinces also cannot affect how the terms such as "secured creditor" are defined for the *Bankruptcy and Insolvency Act*'s purposes. As the provinces may not do indirectly what they cannot do directly, the substance of the provincial interest created governs and not its form. Such provincial law is inapplicable even if the province does not intend to intrude into the bankruptcy sphere and conflict with the *Bankruptcy and Insolvency Act*'s priorities. It is enough if that is the law's effect. The assessment of the impugned law's applicability, even after its validity has been established, and the non-requirement of intention to intrude into a federal sphere distinguish the above propositions from the doctrine of colourability.

Under s. 133 the bankrupt's debtor is essentially the surety or guarantor of the bankrupt's obligation, with the board determining the debtor's indemnification from the withheld funds. When s. 133(1) and (3) operate in tandem as intended, the debtor is no worse off after having acted as the bankrupt's surety. The reality is that the bankrupt discharges its own liability to the board, mediated through the debtor's legally compelled agency. The exercise of set-off, triggered by the deemed debt, thus has the effect of creating a straightforward security device in favour of the debt and the right to withhold and set off against property of the bankrupt which secures the board's claim against the bankrupt's property. The constitutional validity of s. 133(1) must thus be examined in conjunction with that of s. 133(3).

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 4

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

The operation of set-off in bankruptcy confers on the claimant a security interest or quasi-lien against the bank-rupt's estate. Under s. 97(3) of the *Bankruptcy and Insolvency Act*, the law of set-off allows a bankrupt's debtor who is also the bankrupt's creditor to refrain from paying the full debt owing the bankrupt's estate. In this limited sense, such a claimant may use the law of set-off to reorder its priority in bankruptcy. However, the law of set-off may not be used to reorder the priority of any person other than the person claiming set-off against the estate. Any provincial law doing so is inapplicable in bankruptcy.

Where s. 133(1) and (3) both apply on the facts, s. 133 is inapplicable in bankruptcy for intruding into an exclus-ive federal sphere. Before bankruptcy, the security device created by s. 133(3) and triggered by s. 133(1) is with-in provincial jurisdiction. After bankruptcy, the subsections' combined effect is to secure the board's claim against the bankrupt's estate ahead of its priority under s. 136(1)(*h*) of the *Bankruptcy and Insolvency Act*. The two laws thus conflict in their operation. Apart from s. 133(1) and (3), s. 133(4) also has the effect of intruding into the exclusive federal bankruptcy sphere. That section empowers the board to determine the extent of its claim against the estate, and thus indirectly the estate remaining available for other creditors. A province cannot empower a bankrupt's creditor to determine the estate available for distribution. While otherwise valid, s. 133(4) also is inapplicable to bankruptcy. The court should only read down s. 133 insofar as its application conflicts with the *Bankruptcy and Insolvency Act*'s distribution scheme. Where s. 133(1) alone applies because the bank-rupt's debtor has retained no moneys allowing set-off, the board's claim against the debtor remains fully applic- able.

Section 133 must be declared inapplicable rather than inoperable in bankruptcy. Bankruptcy is an exclusive fed-eral domain rather than an area of joint or overlapping jurisdiction. As bankruptcy is carved from the provincial domain of property and civil rights, valid provincial legislation of general application continues to apply in bankruptcy until Parliament legislates under its exclusive jurisdiction. Provincial legislation conflicting with the federal law then becomes inapplicable only to the extent of the conflict.

When federal and provincial laws potentially conflict, the court must first determine whether they are respect-ively valid federal or provincial laws. If so, the court must then determine whether they are in operational con-flict. If so, the federal laws prevail and the provincial laws are without effect to the extent of this conflict. Pro-vincial laws will be inapplicable as being ultra vires to the extent that they conflict with an exclusive federal field. Provincial laws will be intra vires but inoperative if the operational conflict is within an area of concurrent or overlapping jurisdiction. To the extent that there is operational conflict, there is no room for a provincial law's incidental or ancillary effect. If there is no operational conflict, both federal and provincial laws continue to op-erate and have effect. Short of operational conflict, provincial law may validly affect bankruptcy. Here, there was operational conflict in that s. 133(1) and (3) subverted the federal order of priorities under the *Bankruptcy and Insolvency Act*. That intrusion into an exclusive federal sphere went far beyond an incidental and ancillary effect.

**Per Iacobucci J. (dissenting) (Sopinka, Cory and Major JJ. concurring)**

Where there is very clear operational conflict between valid federal and provincial legislation, the doctrine of paramountcy requires that the provincial legislation be declared inoperative to the extent of the conflict. Conflict is found where one cannot obey one level of government's law without disobeying the law of the other. Where possible, the court must read overlapping provincial and federal law in a complementary manner. A review of the history and purpose of workers' compensation statutes did not show that s. 133 of the *The Workers' Com-pensation Act* was enacted to improve the board's ranking in federal bankruptcy.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 5

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

Provincial laws are inoperative where they directly improve a claim's priority against the bankrupt's property over the priority under s. 136(1) of the *Bankruptcy and Insolvency Act*. A broad approach declaring inoperative any provincial law affecting the final result of a bankruptcy would risk nullifying the provincial legislation underpinning the *Bankruptcy and Insolvency Act*. Provincial law plays a critical role in defining both the number and type of participants in the bankruptcy process and the size of the bankrupt's estate. Section 72(1) of the *Bankruptcy and Insolvency Act* recognizes that provincial law will affect the bankruptcy process. Section 133 of *The Workers' Compensation Act* would only be inoperative if it actually reordered the priority scheme under s. 136(1) by directly creating interests in the bankrupt's property.

Section 133(1) is constitutionally valid. Section 136(1) encompasses a claim against the bankrupt's property. Section 133(1) has nothing to do with the bankrupt's property and thus is not in operational conflict with the bankruptcy scheme. It simply creates the bankrupt's debtor's third party guarantee that the bankrupt will pay its debts to the board. Section 133(1) only alters the board's recovery by allowing recovery from a solvent third party. Nothing in the *Bankruptcy and Insolvency Act* precludes a creditor from pursuing its remedies against a third party instead of pursuing its claim in bankruptcy. Here s. 133(1) validly created two debts that were independent although interconnected: the owner's debt to the board as surety; and the fabricator's debt to the owner for the sum the latter paid for the former's default. None of this altered the priorities under the *Bankruptcy and Insolvency Act*. Further, s. 133(1) is intra vires, and intra vires legislation may have an incidental and ancillary effect on a federal sphere.

As the components of s. 133 are severable, the court must evaluate s. 133(3) separately. Section 133(3) contains the remedies of set-off and indemnification. Section 97(3) of the *Bankruptcy and Insolvency Act* envisions that money may be withheld from the bankrupt's estate due to set-off. The focus here should be on equitable set-off because the fabricator's assignment of its book debts to the bank eliminated the availability of legal set-off. As s. 133(3) creates no new rights of set-off and merely confirms the availability of traditional equitable set-off, s. 133(3) is consistent with the *Bankruptcy and Insolvency Act*. Absent s. 133(3), a set-off claim would exist under the laws of restitution or contract. In restitution, a person may claim repayment of moneys he paid under compulsion of law if the payment discharged another's liability. As the owner was legally required to pay the board, thus releasing the fabricator, it could seek restitution from the fabricator. In contract, the fabricator's failure to pay gave the owner a claim under their contract. Equitable set-off may operate against an assignee where the debts are so closely connected that it would be unfair to enforce one without allowing the other to be set off. Although the fabricator had assigned its book debts to the bank, the owner was entitled to equitable set-off since its claim arose out of the same contract under which the funds were now owing the bank. Further, the main reason for the doctrine of equitable set-off is to promote fairness. As the fabricator had the main responsibility to pay the board, it was equitable and fair to allow the owner the right of set-off. Section 133(3) was fully operative here.

Section 133 should not be treated as indivisible. Section 133(1) is the key feature of s. 133, and operates apart from s. 133(3). Section 133(1) does not make a bankrupt's debtor's obligation to the board contingent on the debtor's ability to obtain indemnity or set-off under s. 133(3). Even if the debtor had no right of set-off under s. 133(3) or under the common law, the legislature could still pass s. 133(1).

**Cases considered:**

*Per Gonthier J. (Lamer C.J.C., La Forest, L'Heureux-Dubé and McLachlin JJ. concurring)*

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 6

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

*Atlantic Acceptance Corp. v. Burns & Dutton Construction (1962) Ltd.* (1970), [1971] 1 W.W.R. 84, 14 D.L.R. (3d) 175 (Alta. C.A.) — *referred to*

*Bank of Montreal v. Hall,* [1990] 1 S.C.R. 121, [1990] 2 W.W.R. 193, 9 P.P.S.A.C. 177, 104 N.R. 110, 65 D.L.R. (4th) 361, 46 B.L.R. 161, 82 Sask. R. 120 — *considered*

*Black Forest Restaurants Ltd., Re* (1981), *(sub nom. Nova Scotia (Director of Labour Standards) v. Trustee in Bankruptcy)* 38 C.B.R. (N.S.) 253, 126 D.L.R. (3d) 417, 47 N.S.R. (2d) 446, 90 A.P.R. 446 (C.A.) — *considered*

*British Columbia v. Henfrey Samson Belair Ltd.,* [1989] 2 S.C.R. 24, [1989] 5 W.W.R. 577, 38 B.C.L.R. (2d) 145, 75 C.B.R. (N.S.) 1, 34 E.T.R. 1, 59 D.L.R. (4th) 726, 97 N.R. 61, 2 T.C.T. 4263, [1989] 1 T.S.T. 2164 — *applied*

*Coughlin & Co., Re,* [1923] 3 W.W.R. 1177, 4 C.B.R. 294, 33 Man. R. 499, [1923] 4 D.L.R. 971 (C.A.) — *referred to*

*Crown Grain Co. v. Day,* [1908] A.C. 504 (P.C.) — *referred to*

*Deloitte, Haskins & Sells Ltd. v. Alberta (Workers' Compensation Board),* [1985] 1 S.C.R. 785, [1985] 4 W.W.R. 481, 38 Alta. L.R. (2d) 169, 55 C.B.R. (N.S.) 241, 60 N.R. 81, 19 D.L.R. (4th) 577, 63 A.R. 321 — *applied*

*Evelyn Stevens Interiors Ltd., Re* (1993), 46 C.C.E.L. 136, 18 C.B.R. (3d) 22, *(sub nom. Ontario (Workers' Compensation Board) v. Mandelbaum, Spergel Inc.)* 12 O.R. (3d) 385, *(sub nom. Ontario (Workers' Compensation Board) v. Evelyn Stevens Interiors Ltd. (Trustee of))* 100 D.L.R. (4th) 742, *(sub nom. Stevens (Evelyn) Interiors Ltd. (Bankrupt) v. Ontario (Workers' Compensation Board))* 61 O.A.C. 361, *(sub nom. Workers' Compensation Board v. Mandelbaum, Spergel Inc.)* 15 C.R.R. (2d) 97 (C.A.) — *not followed*

*Fredericton Co-operative Ltd. v. Smith* (1921), 2 C.B.R. 154 (N.B. K.B.) — *referred to*

*Invitation Prêt-à-Porter Inc., Re* (1979), 31 C.B.R. (N.S.) 54 (Que. S.C.) — *referred to*

*Lister v. Hooson,* [1908] 1 K.B. 174 (C.A.) — *considered*

*Madden v. Nelson & Fort Sheppard Railway,* [1899] A.C. 626 (P.C.)*considered*

*Melton, Re; Milk v. Towers,* [1918] 1 Ch. 37 (C.A.) — *considered*

*Parkland (County) v. Stetar* (1974), [1975] 2 S.C.R. 884, [1975] 1 W.W.R. 441, *(sub nom. Stetar v. Poirer)* 3 N.R. 311, 50 D.L.R. (3d) 376 — *referred to*

*Québec (Commission de la santé & de la sécurité du travail) c. Banque fédérale de développement,* [1988] 1 S.C.R. 1061, 84 N.R. 308, 50 D.L.R. (4th) 577, 68 C.B.R. (N.S.) 209, 14 Q.A.C. 140, [1988] R.D.I. 376 — *applied*

*Quebec (Deputy Minister of Revenue) c. Rainville,* [1980] 1 S.C.R. 35, *(sub nom. Bourgault, Re)* 33 C.B.R. (N.S.) 301, *(sub nom. Bourgault v. Quebec (Deputy Minister of Revenue))* 30 N.R. 24, 105 D.L.R. (3d) 270 — *applied*

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

*R. v. Morgentaler*, [1993] 3 S.C.R. 463, 157 N.R. 97, 25 C.R. (4th) 179, 125 N.S.R. (2d) 81, 349 A.P.R. 81, 85 C.C.C. (3d) 118, 107 D.L.R. (4th) 537 — *referred to*

*Royal Bank of Canada v. Larue*, [1928] A.C. 187, affirming [1926] S.C.R. 218, [1926] 2 D.L.R. 929 — *considered*

*Stein v. Blake*, [1995] 2 All E.R. 961 (H.L.) — *considered*

*Tennant v. Union Bank of Canada*, [1894] A.C. 31 (P.C.) — *referred to*

Per Iacobucci J. (dissenting) (Sopinka, Cory and Major JJ. concurring)

*Bank of Montreal v. Hall*, [1990] 1 S.C.R. 121, [1990] 2 W.W.R. 193, 9 P.P.S.A.C. 177, 104 N.R. 110, 65 D.L.R. (4th) 361, 46 B.L.R. 161, 82 Sask. R. 120 — *referred to*

*Black Forest Restaurants Ltd., Re* (1981), 37 C.B.R. (N.S.) 176, 74 N.S.R. (2d) 454, 90 A.P.R. 454, 121 D.L.R. (3d) 435 (S.C.) [affirmed *(sub nom. Nova Scotia (Director of Labour Standards) v. Trustee in Bankruptcy)* 38 C.B.R. (N.S.) 253, 126 D.L.R. (3d) 417, 47 N.S.R. (2d) 446, 90 A.P.R. 446 (C.A.)] — *referred to*

*British Columbia v. Henfrey Samson Belair Ltd.*, [1989] 2 S.C.R. 24, [1989] 5 W.W.R. 577, 38 B.C.L.R. (2d) 145, 75 C.B.R. (N.S.) 1, 34 E.T.R. 1, 59 D.L.R. (4th) 726, 97 N.R. 61, 2 T.C.T. 4263, [1989] 1 T.S.T. 2164 — *considered*

*Brooks Wharf & Bull Wharf Ltd. v. Goodman Brothers*, [1937] 1 K.B. 534, [1936] 3 All E.R. 696 (C.A.) — *considered*

*City National Leasing Ltd. v. General Motors of Canada Ltd.*, [1989] 1 S.C.R. 641, 43 B.L.R. 225, 24 C.P.R. (3d) 417, 58 D.L.R. (4th) 255, 93 N.R. 326, 32 O.A.C. 332 — *considered*

*Coba Industries Ltd. v. Millie's Holdings (Canada) Ltd.*, [1985] 6 W.W.R. 14, 65 B.C.L.R. 31, 36 R.P.R. 259, 20 D.L.R. (4th) 689 (C.A.) — *considered*

*Deloitte, Haskins & Sells Ltd. v. Alberta (Workers' Compensation Board)*, [1985] 1 S.C.R. 785, [1985] 4 W.W.R. 481, 38 Alta. L.R. (2d) 169, 55 C.B.R. (N.S.) 241, 60 N.R. 81, 19 D.L.R. (4th) 577, 63 A.R. 321 — *considered*

*Ecarnot (Trustee of) v. Western Credit Union Ltd.*, [1991] 5 W.W.R. 268, 7 C.B.R. (3d) 207, *(sub nom. Ecarnot, Re)* 93 Sask. R. 179 (C.A.) — *referred to*

*Estabrooks Pontiac Buick Ltd., Re* (1982), 44 N.B.R. (2d) 201, 116 A.P.R. 201, 144 D.L.R. (3d) 21, 7 C.R.R. 46 (C.A.) — *considered*

*Evelyn Stevens Interiors Ltd., Re* (1990), 34 C.C.E.L. 103, 42 C.L.R. 74, 72 D.L.R. (4th) 712, 80 C.B.R. (N.S.) 135, reversed (1993), 46 C.C.E.L. 136, 18 C.B.R. (3d) 22, *(sub nom. Ontario (Workers' Compensation Board) v. Mandelbaum, Spergel Inc.)* 12 O.R. (3d) 385, *(sub nom. Ontario (Workers' Compensation Board) v. Evelyn Stevens Interiors Ltd. (Trustee of))* 100 D.L.R. (4th) 742, *(sub nom. Stevens (Evelyn) Interiors Ltd. (Bankrupt) v. Ontario (Workers' Compensation Board))* 61 O.A.C. 361, *(sub nom. Workers' Compensation Board v. Mandelbaum, Spergel Inc.)* 15 C.R.R. (2d) 97 (C.A.) — *considered*

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

*Federal Commerce & Navigation Ltd. v. Molena Alpha Inc.; "Nanfri" (The); "Benfri" (The); "Lorfri" (The)*,
[1978] Q.B. 927, [1978] 3 All E.R. 1066, affirmed in part [1979] A.C. 757, [1979] 1 All E.R. 307 (H.L.) —
*considered*

*French River Contracting Co., Re*, [1937] O.W.N. 665, 19 C.B.R. 89 (C.A.) — *considered*

*Hanak v. Green*, [1958] 2 Q.B. 9, [1958] 2 All E.R. 141 (C.A.) — *considered*

*Homeplan Realty Ltd. v. Avco Financial Services Realty Ltd.*, *(sub nom. Industrial Relations Board v. Avco
Financial Services Realty Ltd.)* [1979] 2 S.C.R. 699, 18 B.C.L.R. 23, 28 N.R. 140, 9 R.P.R. 231, 33 C.B.R.
(N.S.) 34, 98 D.L.R. (3d) 695 — *referred to*

*John M.M. Troup Ltd. v. Royal Bank*, [1962] S.C.R. 487, 3 C.B.R. (N.S.) 224, 34 D.L.R. (2d) 556 — *re-
ferred to*

*Lister v. Hooson*, [1908] 1 K.B. 174 (C.A.) — *considered*

*Manitoba Fisheries Ltd. v. R.*, [1979] 1 S.C.R. 101, [1978] 6 W.W.R. 496, *(sub nom. Manitoba Fisheries
Ltd. v. Canada)* 88 D.L.R. (3d) 462, 23 N.R. 159 — *referred to*

*Medwid v. Ontario (Minister of Labour)* (1988), 29 Admin. L.R. 160, 63 O.R. (2d) 578, 48 D.L.R. (4th) 272
(H.C.) — *considered*

*Moule v. Garrett* (1872), L.R. 7 Exch. 101 — *considered*

*Multiple Access Ltd. v. McCutcheon*, [1982] 2 S.C.R. 161, 18 B.L.R. 138, 138 D.L.R. (3d) 1, 44 N.R. 181
— *considered*

*Newfoundland Government v. Newfoundland Railway Co.* (1888), 13 App. Cas. 199 (P.C.) — *referred to*

*Ontario (Attorney General) v. Canada (Attorney General)*, [1894] A.C. 189 (P.C.) — *considered*

*Panamericana de Bienes y Servicios S.A. v. Northern Badger Oil & Gas Ltd.*, [1991] 5 W.W.R. 577, 81
Alta. L.R. (2d) 45, 8 C.B.R. (3d) 31, 81 D.L.R. (4th) 280, 7 C.E.L.R. (N.S.) 66, 117 A.R. 44 (C.A.)
[additional reasons at (1991), 84 Alta. L.R. (2d) 257, 8 C.B.R. (3d) 31 at 55, 86 D.L.R. (4th) 567, 3 C.P.C.
(3d) 100, 120 A.R. 309 (C.A.), leave to appeal to S.C.C. refused (1992), 8 C.B.R. (3d) 31n, 7 C.E.L.R.
(N.S.) 66n, 83 Alta. L.R. (2d) lxv, 86 D.L.R. (4th) 567n, 137 N.R. 394 (note), 127 A.R. 396 (note), 3 C.P.C.
(3d) 100n (S.C.C.)] — *considered*

*Québec (Commission de la santé & de la sécurité du travail) c. Banque fédérale de développement*, [1988] 1
S.C.R. 1061, 84 N.R. 308, 50 D.L.R. (4th) 577, 68 C.B.R. (N.S.) 209, 14 Q.A.C. 140, [1988] R.D.I. 376 —
*considered*

*Quebec (Deputy Minister of Revenue) c. Rainville*, [1980] 1 S.C.R. 35, *(sub nom. Bourgault, Re)* 33 C.B.R.
(N.S.) 301, *(sub nom. Bourgault v. Quebec (Deputy Minister of Revenue))* 30 N.R. 24, 105 D.L.R. (3d) 270
— *considered*

*R. v. Amway of Canada Ltd.*, *(sub nom. R. v. Amway Corp.)* [1989] 1 S.C.R. 21, 56 D.L.R. (4th) 309, 37
C.R.R. 235, 2 T.C.T. 4074, 18 C.E.R. 305, *(sub nom. Canada v. Amway Corp.)* 91 N.R. 18, [1989] 1 C.T.C.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

255, [1989] 1 T.S.T. 2058, 33 C.P.C. (2d) 163, 68 C.R. (3d) 97 — *referred to*

*Reference re Workers' Compensation Act, 1983 (Newfoundland)* (1987), 67 Nfld. & P.E.I.R. 16, 206 A.P.R. 16, 36 C.R.R. 112, 44 D.L.R. (4th) 501 (C.A.), af firmed [1989] 1 S.C.R. 922, 40 C.R.R. 135, 56 D.L.R. (4th) 765, *(sub nom. Reference re ss. 32 & 34 of the Workers' Compensation Act (Newfoundland))* 96 N.R. 227, 76 Nfld. & P.E.I.R. 181, 235 A.P.R. 181 — *considered*

*Robinson v. Countrywide Factors Ltd.,* [1978] 1 S.C.R. 753, [1977] 2 W.W.R. 111, *(sub nom. Kozan Furniture (Yorkton) Ltd. v. Countrywide Factors Ltd.)* 14 N.R. 91, 23 C.B.R. (N.S.) 97, 72 D.L.R. (3d) 500 — *considered*

*Royal Bank of Canada v. Larue*, [1928] A.C. 187 (P.C.), affirming [1926] S.C.R. 218, [1926] 2 D.L.R. 929 — *referred to*

*Serdula Construction Management Inc. v. Saskatchewan (Workers' Compensation Board)* (April 12, 1992), Doc. Q.B.M. 126/91, Lawton J. (Sask. Q.B.) — *considered*

*Telford v. Holt*, [1987] 2 S.C.R. 193, [1987] 6 W.W.R. 385, 54 Alta. L.R. (2d) 193, 46 R.P.R. 234, 21 C.P.C. (2d) 1, 78 N.R. 321, 81 A.R. 385, 41 D.L.R. (4th) 385, 37 B.L.R. 241 — *considered*

*TransGas Ltd. v. Mid-Plains Contractors Ltd.,* [1994] 3 S.C.R. 753, [1995] 1 W.W.R. 1, 18 C.L.R. (2d) 157, 25 C.R.R. (2d) 179, 120 D.L.R. (4th) 715 — *considered*

*Vapor Canada Ltd. v. MacDonald*, [1977] 2 S.C.R. 134, 7 N.R. 477, 22 C.P.R. (2d) 1, 66 D.L.R. (3d) 1 — *referred to*

*Vickery v. Nova Scotia (Prothonotary of the Supreme Court)*, [1991] 1 S.C.R. 671, 64 C.C.C. (3d) 65, 124 N.R. 95, 104 N.S.R. (2d) 181, 283 A.P.R. 181 — *referred to*

**Statutes considered:**

Bank Act, R.S.C. 1985, c. B-1.

Bankruptcy Act, S.C. 1919, c. 36 —

s. 51 [am. S.C. 1921, c. 17, s. 39]

Bankruptcy Act, R.S.C. 1970, c. B-3 —

s. 2 "secured creditor"

s. 47

s. 47(*a*)

s. 49(2)

s. 50(6)

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

s. 107

s. 107(1)

s. 107(1)(*h*)

s. 107(1)(*j*)

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 —

s. 2 "property"

s. 2 "secured creditor"

s. 17(1)

s. 67

s. 67(*a*)

s. 69(2)

s. 72(1)

s. 95

s. 97(3)

s. 136

s. 136(1)

s. 136(1)(*h*)

s. 136(1)(*j*)

s. 141

s. 148

s. 158(*a*)

s. 198(*a*)

Constitution Act, 1867 (U.K.), 30 & 31 Vict., c. 3 —

s. 91(21)

s. 92(13)

Contributory Negligence Act, The, R.S.S. 1978, c. 31 —

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

s. 3(2)

Employment Standards Act, S.B.C. 1980, c. 10 —

s. 19

Forest Act, R.S.B.C. 1979, c. 140 —

s. 142

Limitation of Civil Rights Act, The, R.S.S. 1978, c. L-16.

Retail Sales Tax Act, R.S.Q. 1964, c. 71 —

s. 30

Saskatchewan Farm Security Act, The, S.S. 1988-89, c. S-17.1 —

s. 44

Social Service Tax Act, R.S.B.C. 1979, c. 388 —

s. 18

Workers' Compensation Act, R.S.O. 1980, c. 539 —

s. 9(3)

s. 9(4)

Workers' Compensation Act, S.A. 1973, c. 87 —

s. 78(4)

s. 78(4)(a)

Workers' Compensation Act, 1979, The, S.S. 1979, c. W-17.1 —

s. 133

s. 133 [am. S.S. 1993, c. 63, s. 40]

s. 133(1)

s. 133(3)

s. 133(4)

Workmen's Compensation Act, S.O. 1914, c. 25 —

s. 10 [am. S.O. 1915, c. 25, s. 5; S.O. 1919, c. 34, s. 4(2)]

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

Workmen's Compensation Act, R.S.O. 1927, c. 179 —

s. 9

Workmen's Compensation Act, R.S.Q. 1977, c. A-3 —

s. 110(1)

Workmen's Compensation Act, The, S.S. 1910-11, c. 9 —

s. 9

Workmen's Compensation Act, 1929, The, S.S. 1928-29, c. 73 —

s. 11

Appeal from judgment reported at (1993), [1994] 1 W.W.R. 629, 22 C.B.R. (3d) 153, 116 Sask. R. 46, 108 D.L.R. (4th) 681, 11 C.L.R. (2d) 1 (C.A.), dismissing appeal from judgment (1992), 104 Sask. R. 225, 96 D.L.R. (4th) 495, 3 C.L.R. (2d) 194, 16 C.B.R. (3d) 290 (Q.B.) , granting fiat of non-suit on ground that s. 133 of *The Workers' Compensation Act* (Sask.) constitutionally inoperative

*Gonthier J. (Lamer C.J.C., La Forest, L'heureux-Dubé* **and** *McLachlin JJ.* **:**

1 I have had the benefit of the reasons of my colleague Justice Iacobucci. I respectfully disagree with his conclusion that s. 133 of *The Workers' Compensation Act, 1979,* S.S. 1979, c. W-17.1, is applicable in bankruptcy, and that provincial legislation can, through the operation of set-off in this manner, effectively reorder the priorities otherwise provided in the *Bankruptcy Act*, R.S.C. 1985, c. B-3.

2 In my opinion, the combined effect of the deemed debt in s.133(1) and set-off against property of the bankrupt in s. 133(3) is to secure the Workers' Compensation Board's claim against the estate of the bankrupt. When s. 133(1) and (3) operate in tandem as intended by the Legislature, the effect is that the Board's claim is satisfied with property of the bankrupt in the form of the monies withheld by the principal. The principal becomes nothing more than a conduit for transferring to the Board monies which form property of the bankrupt's estate. The end result is that the bankrupt's estate is diminished to the extent of the contractor's liability to the Board, and the Board is correspondingly enriched by an identical amount, thereby recovering its claim in full. On the other hand, the principal's estate or patrimony remains entirely unaffected. The Board's claim is thus secured against the bankrupt's estate, mediated through the legally compelled agency of the principal. In this way, the Board recovers against the estate ahead of the priority mandated by Parliament in s. 136(1)(*h*) of the *Bankruptcy Act*, creating an operational conflict.

3 Recourse to s. 97(3) of the *Bankruptcy Act*, which incorporates by reference the provincial law of set-off, does not provide much assistance to the Board in this case. It is true that set-off itself may give rise to a reordering of priorities in bankruptcy in the limited sense that the party claiming set-off will secure his or her claim against the estate rather than recover under the priority otherwise provided by the *Bankruptcy Act*. This much is acknowledged by Parliament in enacting s. 97(3). However, the real question is the extent to which Parliament has deferred to the relevant provincial law. Here, Parliament has deferred to the extent of allowing the party claiming set-off to recover exceptionally ahead of his priority. But Parliament has not deferred to the extent of allowing third parties the same benefit as a result of the operation of provincial legislation. Set-off, in other

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 13

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

words, is simply a defence to the payment of a debt, not a basis for validating statutory security devices which
have the effect of securing the claims of third parties against the estate ahead of the priority stipulated by Parlia-
ment. The question is thus not whether the province has created a proprietary interest, but rather, it is whether
that interest can have the effect of defeating the scheme of distribution under the *Bankruptcy Act*. Here, s. 133
not only gives a priority to the principal claiming set-off, which is permissible under s. 97(3), it also has the ef-
fect of securing the Board's claim against the estate, which most assuredly is impermissible. As a result, if s. 133
were applicable in bankruptcy, it would enter into conflict with the order of priorities required by the *Bank-
ruptcy Act*. Consistent with the presumption of constitutionality, it is my opinion that s. 133 should be read
down to the extent of the conflict; that is, s. 133 is inapplicable in bankruptcy. I would therefore dismiss the ap-
peal with costs throughout.

## I. Background Facts, Relevant Legislation and the Courts Below

4  Since my colleague Iacobucci J. has helpfully summarized the relevant factual and legislative background
together with the judgments of the courts below, I need not repeat that discussion. However, for reasons that will
become apparent, it is important to reproduce the impugned provision, s. 133 of the Saskatchewan *Workers'
Compensation Act*, in its entirety:

  133. — (1) Where a person, whether carrying on an industry included under this Act or not, in this section
  referred to as the principal, contracts with any other person, in this section referred to as the contractor, for
  the execution by or under the contractor of the whole or any part of any work for the principal, it is the duty
  of the principal to ensure that any sum that the contractor or any subcontractor is liable to contribute to the
  fund is paid and, where the principal fails to do so and the sum is not paid, he is personally liable to pay that
  sum to the board.

  (2) The board shall have the same powers and be entitled to the same remedies for enforcing payment under
  subsection (1) that it possesses in respect of an assessment under this Act.

  (3) Where the principal is liable to make payment to the board under subsection (1), he is entitled to be in-
  demnified by any person who should have made the payment and is entitled to withhold, out of any in-
  debtedness due to that person, a sufficient amount in respect of that indemnity.

  (4) All questions as to the right to and the amount of such indemnity shall be determined by the board.

## II. Issues on Appeal

5  The constitutional questions raised by this appeal were stated by the Chief Justice on September 14, 1994
as follows:

  1. Where a contractor as referred to in s. 133 of *The Workers' Compensation Act*, S.S. 1979, c. W-17.1, is in
  bankruptcy and but for the bankruptcy, the principal as referred to in s. 133 would be liable to pay the as-
  sessment due by the contractor under the Act, is s. 133 of the said Act inoperative or inapplicable in whole
  or in part, by reason of being in conflict with the *Bankruptcy Act*, R.S.C., 1985, c. B-3, and in particular ss.
  17(1), 67, 95, 136(1)(*h*), 148, 158(*a*) and 198(*a*) thereof?

  2. Was s. 133 of the said Act inoperative or inapplicable in the circumstances of this case?

6  I agree with my colleague Iacobucci J. that the parties before this Court focused their arguments on the al-

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

leged conflict between s. 133 of the Saskatchewan *Workers' Compensation Act* and s. 136(1)(*h*) of the *Bankruptcy Act*. Certainly, that is the gravamen of this appeal. However, I respectfully disagree with Iacobucci J.'s restatement of the issues in the constitutional questions posed by the Chief Justice. Iacobucci J.'s reasons adopt the appellant's reformulation of the issues and examine the constitutional validity of s. 133(1) and (3) separately. As will become apparent, in my view this manner of proceeding obscures the response to the constitutional questions. The question is not whether these provisions are independently valid, but rather, it is whether when combined they have the effect of reordering priorities in bankruptcy. When s. 133(1) is read together with s. 133(3), it is clear that the combined effect of the statutory deemed debt and the right to set-off against property of the bankrupt is to secure the Board's claim against the bankrupt's estate. In so doing, s. 133 *read as a whole* conflicts with Parliament's intention to accord the Board's claim the priority established in s. 136(1)(*h*) of the *Bankruptcy Act*.

### III. Analysis

7

### A. The Purposes of Federal Bankruptcy Legislation

8 At the outset, it is useful to remember that our bankruptcy system serves two distinct goals. The first is to ensure the equitable distribution of a bankrupt debtor's assets among the estate's creditors in ter se. As one commentator has noted (Aleck Dadson, "Comment" (1986) 64 Can. Bar Rev. 755, at p. 755):

> ... bankruptcy serves this goal by replacing a regime of individual action with a regime of collective action. While the pre-bankruptcy regime of individual action allows creditors to pursue their separate and competing claims to the debtor's assets, bankruptcy's regime of collective action sorts out those diverse claims and deals with the debtor's assets in a way which brings benefits to creditors as a group (reduced costs, increased recovery) ... The collectivization of insolvency proceedings can only be achieved by denying to creditors the use of pre-bankruptcy remedies.

See also Peter W. Hogg, *Constitutional Law of Canada* (3rd ed., 1992) (supplemented), at p. 25-3. The second goal of the bankruptcy system is the financial rehabilitation of insolvent individuals (Dadson, at p. 755). This goal is furthered through the opportunity for an insolvent individual's discharge from outstanding debts.

9 It has long been accepted that the first goal of ensuring an equitable distribution of a debtor's assets is to be pursued in accordance with the federal system of bankruptcy priorities. In the seminal case of *Royal Bank of Canada v. Larue*, [1928] A.C. 187, affirming [1926] S.C.R. 218, Viscount Cave L.C. confirmed that the exclusive federal power over bankruptcy and insolvency in s. 91(21) of the *Constitution Act, 1867* enables Parliament to provide for the ranking of creditors in bankruptcy. He observed at p. 197:

> In *Attorney-General of Ontario v. Attorney-General for Canada* [[1894] A.C. 189], Lord Herschell observed that a system of bankruptcy legislation might frequently require various ancillary provisions for the purpose of preventing the scheme of the Act from being defeated, and added: "It may be necessary for this purpose to deal with the effect of executions and other matters which would otherwise be within the legislative competence of the Provincial Legislature. Their Lordships do not doubt that it would be open to the Dominion Parliament to deal with such matters as part of a bankruptcy law, and the Provincial Legislature would doubtless be then precluded from interfering with this legislation inasmuch as such interference would affect the bankruptcy law of the Dominion Parliament." Taking these observations as affording assistance in

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

the construction of s. 91, head 21, of the Act of 1867, their Lordships are of the opinion that *the exclusive
authority thereby given to the Dominion Parliament to deal with all matters arising within the domain of
bankruptcy and insolvency enables that Parliament to determine by legislation the relative priorities of
creditors under a bankruptcy or an authorized assignment.* (Emphasis added.)

10 The power to determine the priorities of distribution of the bankrupt's assets thus confirmed, Parliament
has created an equitable distribution wherein the general rule is that creditors are to rank equally, with claims
provable in bankruptcy being paid rateably (*Bankruptcy Act*, s. 141). The rule of creditor equality is subject to
ten classes of debt which are accorded priority in a stated order, the so-called list of "preferred" creditors (s.
136). Included in these classes of exceptions is "all indebtedness of the bankrupt under any Workmen's Com-
pensation Act" in s. 136(1)(*h*), ranked eighth in the list. Lastly, the entire scheme of distribution is "subject to
the rights of secured creditors" (s. 136) which, as Professor Hogg has noted, "enables secured creditors to realize
their security as if there were no bankruptcy" (Hogg, at p. 25-9).

**B. The "Quartet" of Supreme Court Bankruptcy Decisions**

11 In recent years, the constitutional relationship between the scheme of distribution under the *Bankruptcy
Act* and various branches of provincial law governing property has received heightened scrutiny in the so-called
"quartet" of decisions of this Court. Since my interpretation of the quartet differs from Iacobucci J.'s, I hope that
I will be forgiven for re-canvassing that familiar terrain in order to explain the basis of my position.

**(i) Overview of the Quartet**

12 First, in *Quebec (Deputy Minister of Revenue) c. Rainville* (sub nom. *Re Bourgault*), [1980] 1 S.C.R. 35,
the trustee in bankruptcy sought to cancel a privilege registered by the Quebec Deputy Minister of Revenue on
the bankrupt's immovable property under the provincial *Retail Sales Tax Act*, R.S.Q. 1964, c. 71. The Quebec
Deputy Minister of Revenue argued that the province was a "secured creditor" under s. 2 of the *Bankruptcy Act*,
since the Quebec *Retail Sales Tax Act* provided that sums due to the Crown under the Act were "a privileged
debt ranking immediately after law costs".

13 Writing for the majority, Pigeon J. rejected the priority claimed by the province. In so doing, he offered
the following remarks on the interpretation of s. 107(1)(*j*) of the *Bankruptcy Act* (now s. 136(1)(*j*)) (at p. 44):

Accordingly, I find that the case turns upon the interpretation of para. 107(1)(*j*) ... It is abundantly clear that
this was intended to put on an equal footing all claims by Her Majesty in right of Canada or of a province
except in cases where it was provided otherwise, namely, para. (*c*), the levy, and para. (*h*), workmen's com-
pensation or unemployment insurance assessments and withholdings for income tax. Paragraph (*j*) ends with
the following words, "*notwithstanding any statutory preference to the contrary*". The purpose of this part of
the provision is obvious. Parliament intended to put all debts to a government on an equal footing; it there-
fore cannot have intended to allow provincial statutes to confer any higher priority. In my opinion, this is
precisely what is being contended for when it is argued that, because the Quebec statute creates a privilege
on immovable property effective from the date of registration, the Crown thereby becomes a "secured cred-
itor" and thus escapes the effect of the provision which gives it only a lower priority. (Emphasis in original.)

Pigeon J. later concluded at p. 46:

If the contention of the Deputy Minister of Revenue in the case at bar was upheld, it would mean that the

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

Quebec tax collector, provided his privilege was registered before the bankruptcy, would obtain a special preference on the proceeds of the sale of the immovable property in question, instead of having only the *pari passu* priority contemplated in the scheme of distribution established by the *Bankruptcy Act*. In my opinion, such result would be contrary to the intent of Parliament and no imperfection in drafting could justify it.

14 This Court confirmed and extended this approach to the relationship between the *Bankruptcy Act* and provincial law in *Deloitte, Haskins & Sells Ltd. v. Alberta (Workers' Compensation Board)*, [1985] 1 S.C.R. 785 . Section 78(4)(*a*) of the Alberta *Workers' Compensation Act*, S.A. 1973, c. 87, provided that the provincial Workers' Compensation Board retained a "charge upon the property or proceeds of property of the employer" for unpaid assessments under the Act. The question before the Court was whether this provision rendered the Board a secured creditor of the bankrupt employer for the purposes of the opening words of s. 107(1) of the *Bankruptcy Act* which subjected the list of preferred claims "to the rights of secured creditors", or whether the Board's claim was postponed to s. 107(1)(*h*) which expressly addressed "all indebtedness of the bankrupt under any Workmen's Compensation Act".

15 A majority of the Court ruled that the Board was not a secured creditor and could only recover under s. 107(1)(*h*) of the *Bankruptcy Act*. Speaking for the majority on this point, Wilson J. cited approvingly (at pp. 804-805) the following remarks of Jones J.A. in *Re Black Forest Restaurants Ltd.* (1981), *(*sub nom. *Nova Scotia (Director of Labour Standards) v. Trustee in Bankruptcy)* 38 C.B.R. (N.S.) 253 (N.S. C.A.), at p. 260, on the ratio of the *Re Bourgault* decision:

> *Mr. Justice Pigeon made it abundantly clear that priorities of provincial claims must be determined in accordance with s. 107(1) priorities of the Bankruptcy Act notwithstanding any statutory preference to the contrary*. Debts under the Workers' Compensation Act fall under s. 107(1)(*h*) of the Act. Claims for wages are governed by s. 107(1)(*d*). With deference, it is not open to the province to provide any higher or more extensive priority for wages in view of the express provisions contained in that clause. *It is clear from Rainville that the provincial Crown cannot claim as a secured creditor under the Bankruptcy Act, notwithstanding the form of the provincial legislation, where the claim is governed by s. 107(1) of the Bankruptcy Act*. (Emphasis added.)

16 In the same vein, Wilson J. later added the following important comments at p. 806:

> With respect, the issue in *Re Bourgault* [*Rainville*] and *Re Black Forest Restaurant Ltd*. was not whether a proprietary interest has been created under the relevant provincial legislation. It was whether provincial legislation, even if it did create a proprietary interest, could defeat the scheme of distribution under s. 107(1) [now s. 136(1)] of the *Bankruptcy Act*. These cases held that it could not, that while the provincial legislation could validly secure debts on the property of the debtor in a non-bankruptcy situation, once bankruptcy occurred s. 107(1) determined the status and priority of the claims specifically dealt with in the section. It was not open to the claimant in bankruptcy to say: By virtue of the applicable provincial legislation I am a secured creditor within the meaning of the opening words of s. 107(1) of the *Bankruptcy Act* and therefore the priority accorded my claim under the relevant paragraph of s. 107(1) does not apply to me ... [This position] cannot be supported as a matter of statutory interpretation of s. 107(1) since, if the section were to be read in this way, it would have the effect of permitting the provinces to determine priorities on a bankruptcy, a matter within exclusive federal jurisdiction.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

17 Having concluded that the case was governed by *Re Bourgault*, the majority of the Court considered the question of the appropriate response to the constitutional question: Was the provincial legislation inapplicable or inoperative? Wilson J. (McIntyre J. and Lamer J. (as he then was) concurring) noted that by virtue of the presumption of constitutionality, a province should be presumed to be legislating within its competence rather than outside it. As a result, she concluded that there was no conflict between s. 78(4) of the *Workers' Compensation Act* and s. 107(1)(*h*) of the *Bankruptcy Act* since the former should be construed or read down as simply having no application in the event of bankruptcy (at p. 808). By contrast, Chouinard J. (Dickson C.J.C. and Beetz J. concurring) agreed with the body of Wilson J.'s reasons but ruled that s. 78(4) was inoperative in the event of bankruptcy since it conflicted with s. 107(1)(*h*) of the *Bankruptcy Act* (at pp. 788-89).

18 This Court's decision in *Deloitte, Haskins* is thus "significant because it confirms that any statutory lien conferred by a province on creditors listed in [s. 136] will nonetheless be inoperative [or inapplicable] in bankruptcy proceedings" (Dadson, at p. 758).

19 The third decision in the bankruptcy quartet is *Québec (Commission de la santé et de la sécurité du travail) c. Banque fédérale de développement*, [1988] 1 S.C.R. 1061 ("*F.B.D.B.*"). Subject to certain restrictions, s. 49(2) of the *Bankruptcy Act*, R.S.C. 1970, c. B-3 (now s. 69(2)), entitled a secured creditor to "realize or otherwise deal with his security in the same manner as he would have been entitled to realize or deal with it if this section had not been passed". The question before the Court was whether federal or provincial law determined the order of priorities of distribution when a secured creditor availed himself of s. 49(2) to liquidate his security outside of the bankruptcy proceedings. Interestingly, the provincial security interest was a privilege registered on the debtor's immovable property by the Commission de la santé et de la sécurité du travail under s. 110(1) of the Quebec *Workmen's Compensation Act*, R.S.Q. 1977, c. A-3, which ranked its privilege as a claim "ranking immediately after law costs without registration".

20 Speaking for the Court, Lamer J. noted at p. 1066 that this provincial legislation was in direct conflict with the *Bankruptcy Act*:

> If the provincial law rules prevail, respondent is a secured creditor and its debt ranks before that of the trustee. If on the other hand the *Bankruptcy Act* has priority, the scheme of distribution set out in s. 107 of the Act determines the priority ranking. According to the decision of this Court in *Deloitte, supra*, respondent would then lose the benefit of its privilege and become merely a preferred creditor, since its claim is dealt with by s. 107(1)(*h*) ...

21 After concluding that the immovable property remained "property of the bankrupt" within the meaning of s. 47 (now s. 67) of the *Bankruptcy Act* notwithstanding its seizure by the bankrupt's trustee and mandatary (at p. 1068), Lamer J. stated at p. 1069:

> The issue then is to determine what legislation, provincial or federal, applies here. A problem of the same type came before this Court in *Re Bourgault* and *Deloitte, supra*. In *Re Bourgault*, this Court held that in a bankruptcy matter s. 107(1)(*j*) of the *Bankruptcy Act* determines the priority of any claim covered by that provision. *A provincial statute cannot override the scheme of distribution set out in s. 107 of the Act*. To borrow the words of Pigeon J. (at p. 44), *"Parliament intended to put all debts to a government on an equal footing; it therefore cannot have intended to allow provincial statutes to confer any higher priority*." Similarly, the majority of the Court in *Deloitte* held that a creditor who holds a privilege under a provincial statute cannot claim the status of a secured creditor within the meaning of the *Bankruptcy Act* so as to avoid the

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 18

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

order of distribution of s. 107 of the Act. *In the event of bankruptcy, priorities are exclusively a matter for federal jurisdiction.* (Emphasis added.)

22 It is important to stress that the respondent in *F.B.D.B.* sought to distinguish the Court's earlier decisions of *Re Bourgault* and *Deloitte, Haskins*. Lamer J. stated the respondent's argument thus (at p. 1070):

... respondent is arguing that, as the hypothecated property was liquidated outside the bankruptcy proceeding, without involvement by the trustee in bankruptcy, the solution must be sought not in federal but in Quebec law. Respondent added that, as the trustee chose to realize his security himself outside the bankruptcy, he must bear the consequences of that choice and accept the order of collocation determined by provincial statutes.

But the Court rejected this attempt to circumvent the order of priorities required by the *Bankruptcy Act*. Lamer J. ruled at p. 1071:

... I feel that the decisions in *Re Bourgault* and *Deloitte* are conclusive as to the fate of the appeal. These cases stand for the following proposition: *in a bankruptcy matter, it is the Bankruptcy Act which must be applied. If a bankruptcy occurs, the order of priority is determined by that ranking in s. 107 of the Act, and any debt mentioned in that provision must therefore be given the specified priority.* (Emphasis added.)

23 As a result, Lamer J. classified the respondent as a preferred creditor in s. 107(1)(*h*) of the *Bankruptcy Act*. He accepted, at p. 1072, that this result might encourage secured creditors "to bring about the bankruptcy of their debtor in order to improve their title". Nevertheless, he was mindful that "this solution has obvious advantages". As he explained at p. 1072:

As soon as the bankruptcy occurs the *Bankruptcy Act* will be applied: *the mere fact that a creditor is mentioned in s. 107 of the Act suffices for such creditor to be ranked as a preferred creditor and in the position indicated in that provision.* As provincial statutes cannot affect the priorities created by the federal statute, *consistency in the order of priority in bankruptcy situations is ensured from one province to another.* (Emphasis added.)

24 Finally, in *British Columbia v. Henfrey Samson Belair Ltd.*, [1989] 2 S.C.R. 24, at issue was whether the deemed statutory trust created by s. 18 of the British Columbia *Social Service Tax Act*, R.S.B.C. 1979, c. 388, in favour of the province for provincial sales tax collected was a valid trust within the meaning of s. 47(*a*) (now s.67(*a*)) of the *Bankruptcy Act*. Section 47(*a*) exempted "property held by the bankrupt in trust for any other person" from "the property of a bankrupt divisible among his creditors". A majority of the Court ruled that this deemed statutory trust was not a valid trust. Instead, the province's claim for the monies collected under the purported trust was really a Crown preferred claim under s. 107(1)(*j*) of the *Bankruptcy Act*, which covered "claims of the Crown ... in right of Canada or of any province".

25 Speaking for the majority, McLachlin J. noted at p. 30 that the impugned deemed statutory trust lacked the essential attributes of a trust under general principles of trust law, namely the possibility of being identified and traced. She stated at p. 33:

To interpret s. 47(*a*) as applying not only to trusts as defined by the general law, but to statutory trusts created by the provinces lacking the common law attributes of trusts, would be to permit the provinces to create their own priorities under the *Bankruptcy Act* and to invite a differential scheme of distribution on bank-

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 19

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

ruptcy from province to province.

26 Significantly, McLachlin J. also stated, at pp. 33-34, the Court's preference for an interpretation of s. 47(*a*) consistent with "the clear intention of Parliament, in enacting the *Bankruptcy Act*, of setting up a clear and orderly scheme for the distribution of the bankrupt's assets".

27 Moving to the nature of the legal interests created by s. 18 of the *Social Service Tax Act*, McLachlin J. noted at p. 34 that at the moment of collection the "trust property is identifiable and the trust meets the requirements for a trust under the principles of trust law". However, she was cautious to note that the trust monies are soon mingled with other money in the hands of the merchant and converted to other property, and as a result they could not be traced. She observed at p. 34:

> ... as the presence of the deeming provision tacitly acknowledges, the reality is that after conversion the statutory trust bears little resemblance to a true trust. There is no property which can be regarded as being impressed with a trust. Because of this, *s. 18(2) goes on to provide that the unpaid tax forms a lien and charge on the entire assets of the collector, an interest in the nature of a secured debt*. (Emphasis added.)

McLachlin J. was thus at pains to stress that the reality of the property interest created by the province ought to govern over the form, and as a result the province's claim necessarily failed.

28 McLachlin J. also addressed the province's contention that it remained sovereign over the definition of what constitutes a trust. She made the following important observations at p. 35:

> The province ... argues that it is open to it to define "trust" however it pleases, property and civil rights being matters within provincial competence. The short answer to this submission is that the definition of "trust" which is operative for purposes of exemption under the *Bankruptcy Act* must be that of the federal Parliament, not the provincial legislatures. *The provinces may define "trust" as they choose for matters within their own legislative competence, but they cannot dictate to Parliament how it should be defined for purposes of the Bankruptcy Act: Deloitte Haskins and Sells Ltd. v. Workers' Compensation Board.* (Emphasis added.)

29 As a result, McLachlin J. ruled that the provincial legislation was inapplicable in bankruptcy and that the province's claim was governed by s. 107(1)(*j*) of the *Bankruptcy Act*.

**(ii) The Principles and Philosophy Embodied in the Quartet**

30 What principles should be distilled from the quartet?The intervener Attorney General for Saskatchewan suggested that there are two possible interpretations of these decisions: what it called a broader "bottom line" approach which posits that "any time provincial law affects the final result of a bankruptcy, the province is improperly attempting to alter the priorities of distribution"; and a narrower "jump the queue" approach to the effect that "the province cannot attempt to alter the position of a person within the scheme of distribution created by Parliament, vis-à-vis the other creditors who are claiming from the bankrupt's estate".

31 My colleague Iacobucci J. properly rejects the broader "bottom line" approach since, as he indicates, such an approach "risks nullifying the broad array of provincial legislation underpinning the *Bankruptcy Act*" (at para. 142). It is trite to observe that the *Bankruptcy Act* is contingent on the provincial law of property for its operation. The Act is superimposed on those provincial schemes when a debtor declares bankruptcy. As a result,

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

provincial law necessarily affects the "bottom line", but this is contemplated by the *Bankruptcy Act* itself. Indeed, it is no exaggeration to say that there is no "bottom line" without provincial law. The "bottom line" approach is therefore not the appropriate characterization of the quartet.

32 However, even rejecting the simplistic "bottom line" approach, I do not agree that the quartet stands for the sole proposition that the provinces cannot "jump the queue". In my opinion, the quartet embodies a consistent and general philosophy as to the purposes of the federal system of bankruptcy and its relation to provincial property arrangements. That philosophy cannot be captured in the pithy but limited proposition that the provinces cannot "jump the queue".

33 The quartet is better stated, in my view, as standing for a number of related propositions which are themselves part of a consistent philosophy. In their lucid and thorough study of the quartet, "The Conflict Between Canadian Provincial Personal Property Security Acts and the Federal Bankruptcy Act: The War is Over" (1992) 71 Can. Bar Rev. 77, at pp. 78-79, Andrew J. Roman and M. Jasmine Sweatman state that the quartet stands for the following four propositions:

(1) provinces cannot create priorities between creditors or change the scheme of distribution on bankruptcy under s. 136(1) of the Bankruptcy Act;

(2) while provincial legislation may validly affect priorities in a non-bankruptcy situation, once bankruptcy has occurred section 136(1) of the Bankruptcy Act determines the status and priority of the claims specifically dealt with in that section;

(3) if the provinces could create their own priorities or affect priorities under the Bankruptcy Act this would invite a different scheme of distribution on bankruptcy from province to province, an unacceptable situation; and

(4) the definition of terms such as "secured creditor", if defined under the Bankruptcy Act, must be interpreted in bankruptcy cases as defined by the federal Parliament, not the provincial legislatures. Provinces cannot affect how such terms are defined for purposes of the Bankruptcy Act. [Footnote omitted.]

34 See also for concurrence with Roman and Sweatman's general conclusions drawn from the quartet, Jacob S. Ziegel, "Personal Property Security and Bankruptcy: There Is No War! — A Reply to Roman and Sweatman" (1993) 72 Can. Bar Rev. 44, at p. 45.

35 My colleague Iacobucci J. states at para. 141 that the quartet "stands for the position that only those provincial laws which *directly* improve the priority of a claim upon the actual property of the bankrupt over that accorded by the *Bankruptcy Act* are inoperative" (emphasis added). This statement falls within Roman and Sweatman's proposition (1). However, as my summary of those cases has hopefully indicated, the quartet is clearly not limited to provincial "laws which directly improve the priority of a claim". To quote Roman and Sweatman, at p. 78:

... the reasoning in [the quartet] is not limited to trusts, nor to situations of colourable legislation attempting to give an artificial preference to government. Rather, these rulings are broad enough to encompass any potential area of conflict between provincial power to legislate in the area of property and civil rights, and exclusive federal jurisdiction over bankruptcy and insolvency.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 21
1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

In a similar vein these authors add at p. 81:

> The Supreme Court of Canada's quartet of decisions, although dealing with provincial statutory trusts which affected priorities in bankruptcy, has progressively and finally provided a definite ruling on the relationship between priorities under the Bankruptcy Act and *any* other provincial statute which directly or indirectly affects priorities. (Emphasis in original.) [Footnote omitted.]

Importantly, they conclude at p. 105:

> The law, in our opinion, is settled by these four judgments of the Supreme Court of Canada. In all four cases the issues were not whether the provinces could directly and blatantly attempt to alter the scheme of interests of secured and other creditors under what is now section 136(1) of the Bankruptcy Act. Rather, the issue was whether a province could indirectly influence priorities under the Bankruptcy Act. Even in this weaker version of influence, the Supreme Court of Canada has held that the provinces could not.

And in so concluding, they are also quick to caution at p. 106:

> It is also incorrect to state that in all four cases the provinces attempted to redistribute or change priorities by explicitly elevating one of the lower ranked claims to a higher rank. As seen from an examination of the dissenting judgments in *Deloitte Haskins* and *Henfrey*, the provinces were not attempting specifically to target the bankruptcy situation but, rather, to create a general priority. [Footnote omitted.]

36 As a result, the "jump the queue" or "directly improve bankruptcy priorities" approach captures only part of the reasoning of the quartet. As Roman and Sweatman noted, in the *Deloitte, Haskins* and *Henfrey Samson* cases, for example, the provinces were not directly or intentionally attempting to influence bankruptcy priorities. Rather, the provinces enacted laws of general application which sought to create a general priority not necessarily targeted to bankruptcy, but which had the *effect* of altering bankruptcy priorities. This Court nevertheless ruled that such provincial laws were inapplicable in the event of bankruptcy.

37 I underline that the "effect" which Roman and Sweatman speak of is the effect on bankruptcy *priorities* (Roman and Sweatman, at pp. 81-105). Consequently, clear conflict, that is an inconsistent or mutually exclusive result, which in this case entails a *reordering* of federal *priorities*, is necessary in order to declare a provincial law to be inapplicable in bankruptcy.

38 I also think it is important to emphasize the importance of Roman and Sweatman's proposition (3). While I agree with my colleague Iacobucci J. that complete standardization of the distribution of property in bankruptcies is not possible across Canada having regard to the diversity of provincial laws relating to property and civil rights, yet the value of a national bankruptcy system is confirmed by the placing of bankruptcy under exclusive federal jurisdiction. As Professor Hogg has explained (at pp. 25-1 and 25-2):

> ... debtors may move from one province to another, and may have property and creditors in more than one province. A national body of law is required to ensure that all of a debtor's property is available to satisfy his debts, that all creditors are fairly treated, and that all are bound by any arrangements for the settlement of their debtor's debts. Indeed, without these assurances, lenders would be reluctant to extend credit to persons who could evade their obligations simply by removing themselves or their assets across a provincial boundary.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

Furthermore, as my overview of the quartet hopefully indicated, the goal of maintaining a nationally homogen-
eous system of bankruptcy priorities has properly been a constant concern of this Court. Were the situation oth-
erwise, "Canada [would] have a balkanized bankruptcy regime which [would] diminish the significance of the
exclusivity of federal jurisdiction over bankruptcy and insolvency ... Otherwise there could be a different
scheme in every jurisdiction; ten different bankruptcy regimes would make ordinary commercial affairs ex-
tremely complex, unwieldy and costly, not only for Canadians but also for our international trading partners"
(Roman and Sweatman, at pp. 80, 104). This is a prospect which this Court has been acutely mindful of in the
past, and its vigilance has ensured the continuing vitality of our nation's bankruptcy legislation. In my view, its
past vigilance commends itself to the present and, barring an amendment to s. 91(21) of the *Constitution Act,
1867,* also to the future.

39 In this regard, I agree with Iacobucci J., at para. 127, that a bankruptcy priority is a category, and also
that provincial law may result in the content of such categories being different from province to province.
However, provincial law does not and cannot define the content of bankruptcy priorities or categories without
limitation. Indeed, crucial limitation is imposed by the order of priorities in the *Bankruptcy Act* itself. Thus,
while individual provinces can define and rank categories such as "secured creditor" and "trust" as they each
have their own purposes, those provincial laws which enter into conflict with the provisions of the *Bankruptcy
Act* are simply without application in bankruptcy. Such, indeed, was this Court's unequivocal holding in *Re
Bourgault, Deloitte, Haskins,* and *F.B.D.B.* with respect to "secured creditors" and in *Henfrey Samson* with re-
spect to "trusts".

40 Finally, I would observe that while in agreement with the above four propositions as embodying the reas-
oning of the quartet, in my view the list would be more complete with the addition of a fifth and sixth, as fol- lows:

> (5) in determining the relationship between provincial legislation and the *Bankruptcy Act,* the form of the
> provincial interest created must not be allowed to triumph over its substance. The provinces are not entitled
> to do indirectly what they are prohibited from doing directly;

> (6) there need not be any provincial intention to intrude into the exclusive federal sphere of bankruptcy and
> to conflict with the order of priorities of the *Bankruptcy Act* in order to render the provincial law inapplic-
> able. It is sufficient that the *effect* of provincial legislation is to do so.

41 I would hope that these propositions need little if any explanation or defence. They are clearly important
principles at work in McLachlin J.'s reasons for the majority of the Court in *Henfrey Samson* in concluding that
while the province was clearly entitled to define "trust" as it chose for the purposes of provincial law, the *sub-
stance* of the interest created was what was really relevant for the purpose of applying the *Bankruptcy Act.* Fur-
thermore, there was no suggestion in that case that the province intended to subvert the scheme of distribution of
the *Bankruptcy Act.* Instead, it had simply enacted a valid law of general application pursuant to its exclusive
jurisdiction in relation to property and civil rights in the province, and was attempting to give itself a general
priority with respect to collected but unpaid sales tax revenues. The Court ruled that the legislation was only in-
applicable upon the occurrence of bankruptcy, because it was then that, if it had been applicable, it would have
had the effect of conflicting with the scheme of distribution of the *Bankruptcy Act.*

42 What is more, these fifth and sixth propositions bear a close family resemblance to the doctrine of col-
ourability. In describing the colourability doctrine, Professor Hogg has observed (at pp. 15-17):

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

The courts are, of course, concerned with the substance of the legislation to be characterized and not merely its form. The "colourability" doctrine is invoked when a statute bears the formal trappings of a matter within jurisdiction, but in reality is addressed to a matter outside jurisdiction.

See also *R. v. Morgentaler*, [1993] 3 S.C.R. 463 at pp. 496-97, Sopinka J. for the Court. The concern raised by colourable legislation has also been phrased thus: "it is a very familiar principle that you cannot do that indirectly what you are prohibited from doing directly" (*Madden v. Nelson & Fort Sheppard Railway*, [1899] A.C. 626 at pp. 627-28; see also *Laskin's Canadian Constitutional Law*, vol. 1 (5th ed., 1986), by Neil Finkelstein, at p. 310).

43 There are, however, two fundamental differences between the doctrine of colourability and the above propositions (5) and (6). First, the doctrine of colourability is a concept which is only applicable in assessing the threshold question of the *validity* of the impugned legislation, which is to say, its pith and substance. The above propositions, by contrast, continue to apply after having determined the validity of the impugned provincial law when assessing its applicability in the exclusive federal sphere of bankruptcy (see Hogg, at pp. 15-25). In the case at bar, it has been accepted that the provincial law is valid within its sphere; the question is as to its *applicability* outside its sphere, when it intrudes into the exclusive federal sphere of bankruptcy and conflicts with federal bankruptcy legislation.

44 In light of this distinction, it will be evident that none of the quartet cases were concerned with colourable provincial legislation. There was no question as to the validity of the impugned legislation in any of the quartet. Those cases are devoid of *any* suggestion that the impugned laws were anything other than provincial laws of general application, and thus validly enacted laws under the provinces' ex clusive jurisdiction in relation to property and civil rights. Instead, those cases were only concerned with the applicability of provincial laws in bankruptcy, not their validity.

45 This last observation is also an important additional reason why I respectfully believe that it is inaccurate to interpret the quartet as only prohibiting legislation which "directly improves the priority of a claim". Such a characterization suggests that the quartet was concerned with the validity of the impugned laws. However, if the provinces had been attempting to improve the priority of their claims in bankruptcy *directly*, presumably this Court would simply have declared their laws to be ultra vires and invalid for being in relation to an exclusive federal matter, and no question of applicability or operability would ever have arisen.

46 The second crucial distinction between the doctrine of colourability and the above propositions (5) and (6) is that the doctrine of colourability often connotes a legislative *intention* to intrude into an exclusive federal sphere (see Elizabeth Edinger, "Comment" (1985) 63 Can. Bar Rev. 203, at pp. 206-11, and Albert S. Abel, "The Neglected Logic of 91 and 92" (1969) 19 U.T.L.J. 487, at p. 494). But even without such an intention, provincial legislation can quite evidently have the *effect* of trespassing onto an exclusive federal domain, and would thus be equally subject to an examination as to its applicability in the federal sphere. Were the situation otherwise, our constitutional law would countenance the absurd situation that valid provincial legislation of general application which entered into clear conflict with a valid federal law promulgated in an exclusive federal sphere would be exempt from constitutional challenge. In short, a legislative intention to intrude into an exclusive federal sphere is neither necessary nor sufficient to scrutinize the applicability of provincial law. It is the fact of intrusion, and not the intention to intrude, which is determinative for division of powers purposes.

47 As a result, the inquiry in the case at bar must be limited to assessing whether, if applied in bankruptcy,

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 24

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

the *effect* of s. 133 of the Saskatchewan *Workers' Compensation Act* would be to conflict with the scheme of distribution in the *Bankruptcy Act*. It is this question which I now address.

### C. Application of the Quartet to s. 133 of the Saskatchewan Workers' Compensation Act

48

### (i) The Nature of the Legal Interest Created by s. 133

49 As I indicated earlier, it is important to examine the operation of s. 133 as a whole in order to address the issue raised in this appeal. This provision creates a curious scheme of liability. Section 133(1) imposes a duty on a principal to ensure that its contractor pays into the Workers' Compensation fund, and declares the principal absolutely liable for those payments in the event of the contractor's default. Using the language of the Civil Law, one might say that the principal (or owner) is under an obligation of diligence or means to ensure that the contractor makes its payments, and in the event of the contractor's default the principal is under an obligation of guarantee to the Board for those payments (see Paul-André Crépeau, *L'intensité de l'obligation juridique ou des obligations de diligence, de résultat et de garantie* (1989), at pp. 8-14). Section 133(3) then entitles the principal to withhold and indemnify itself from any funds owing to the contractor if the principal is deemed liable for the contractor's debt to the Board. In other words, it entitles a principal to set-off against monies owing to the contractor the principal's claim for having paid the contractor's assessments. Finally, s. 133(4) empowers the Board to determine all questions as to the right and amount of the principal's indemnity for discharging the contractor's obligation.

50 In essence, under this scheme the principal is the surety or guarantor *of the contractor's obligation*, with the right and extent of the principal's indemnification from the withheld funds being determined by the provincial Workers' Compensation Board. It is abundantly clear that it is the contractor's obligation which is primarily in issue, since s. 133(3) entitles the principal to be indemnified "by any person *who should have made the payment*" (emphasis added).

51 Furthermore, when s. 133(1) and (3) operate in tandem as intended by this legislation, the principal's right to withhold and be indemnified from monies owing to the contractor in the event that the principal is deemed responsible *for the contractor's liability* means that the principal will ultimately *not* be responsible for that liability. Instead, the debt to the Board is effectively discharged with property of the contractor when the principal exercises its right of set-off. Differently put, when s. 133(1) and (3) operate together, the principal is no worse off after having acted as the contractor's surety. The principal's estate or, to use Civil Law terminology, its patrimony remains entirely unaffected even after discharging its "personal" liability to the Board. As a result of the principal's right of set-off against monies owing to the contractor, it is the contractor's estate or patrimony — which is diminished to the extent of the assessments owing to the Board. The reality of this scheme, then, is that the contractor discharges its own liability to the Board, mediated through the legally compelled agency of the principal.

52 I would add that this is not a scheme of joint and several liability, since the principal and the contractor are not joint co-debtors at the outset. Nor does the Board have an unfettered choice as to which party to sue for recovery for outstanding fund payments, as it would if the principal and contractor were jointly and severally liable for the assessments. (See, for the accepted definitions of joint and several liability, G.H.L. Fridman, *The Law of Torts in Canada*, vol. 2 (1990), at pp. 350-51; Glanville Williams, *Joint Torts and Contributory Negligence* (1951), at pp. 49-50; *Parkland (County) v. Stetar* (1974), [1975] 2 S.C.R. 884 at p. 899 (per Dickson J., as

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 25

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

he then was).)Instead, upon default a personal liability of the principal is created for the amount owed by the contractor. As a result, the principal is compelled by statute to act as the surety for the contractor's obligation to the Board. I therefore believe that it is more accurate to characterize this provision as creating a form of involuntary, statutory suretyship. It is of course arguable that when the Board deems the principal liable for the contractor's default, they are jointly and severally liable for the assessment, even though the provision does not so specify expressly. But even this would only be an incident of the statutory suretyship in s. 133.

53 It is also clear that while formally the contractor is potentially liable for two debts, namely the debt to the Board for the unpaid assessment and the potential debt to the principal if the principal pays the contractor's assessment, the reality is that these are one and the same *as against the contractor*. The contractor cannot be liable for both cumulatively. There is thus an inseparable nexus between the Board's claim against the contractor and the principal's potential claim against the contractor. This point was well stated by Swinfen Eady L.J. in discussing the nature of suretyship in *Re Melton; Milk v. Towers*, [1918] 1 Ch. 37 at pp. 47-48, followed in *Re Coughlin & Co.* (1923), 4 C.B.R. 294 at p. 300 (Man. C.A.):

> It may well be that technically there are two claims against the debtor in respect of the transaction and two separate liabilities of the debtor arising out of the transaction. One of these is the debtor's liability to the bank for the money that he owed. The other, which is a separate liability arising out of the contract of guarantee, is the debtor's liability to indemnify the sureties in respect of their liability to the principal creditor. *Technically, they are two separate liabilities, but in substance they are the same*; and in respect of that liability there could not be double proof against the estate. (Emphasis added.)

54 As a result, in light of the wording of s. 133 creating a form of involuntary suretyship, I would respectfully qualify Iacobucci J.'s characterization of this provision as imposing joint and several liability on the principal and the contractor for the unpaid assessments (see paras. 129, 183, 184 [pp. 57, 73, 73, post).

55 With these preliminary remarks on the structure of the scheme of liability in s. 133 in mind, it is clear that when s. 133(1) operates in combination with s. 133(3), the effect is to secure the claim of the Saskatchewan Workers' Compensation Board against assets of the contractor. This is accomplished through the *combined* operation of the statutory deemed debt imposed on the principal in the event of the contractor's default *and* the right of the principal to withhold and be indemnified from monies owing to the contractor. Thus, the combined effect of the deemed debt in s. 133(1) and set-off in s. 133(3) secures the Board's claim against the contractor's assets.

56 Read in this way, s. 133 creates a straightforward security device. This device secures the claim of the Workers' Compensation Board. When s. 133(1) operates in tandem with s. 133(3), the principal becomes nothing more than a conduit for transferring to the Board monies which are otherwise owed to the contractor. In other words, the principal essentially transfers an asset of the contractor (i.e., monies owing from the principal to the contractor) to the Board. This is because it is the *contractor's* liability for unpaid assessments which is imposed on the principal, and the *contractor's* monies which are withheld as security in order to be paid to the Board for the contractor's default. While s. 133(1) speaks of the principal's personal liability in the event of the contractor's default, the reality of the matter is that it is the contractor who is still liable, since as a result of s. 133(3) monies owing to the contractor are used to satisfy the debt owing to the Board. The contractor's patrimony is diminished to the extent of the liability to the Board for the unpaid assessment, whereas the size of the principal's patrimony remains unaffected. The net effect is thus that the contractor's liability is discharged out of its own property, and not from any property of the principal. The exercise of set-off, triggered by the deemed debt, thus has the effect of securing the Board's claim against the contractor's assets.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 26

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

### (ii) Does s. 133 Apply in Bankruptcy?

57 It is apparent that it is the set-off component of this device, s. 133(3), which effects a security interest in property of the contractor. But the right to set-off is triggered — and thus the security interest created — by the Board when it decides to create a deemed debt and impose liability on the principal for the contractor's liability. This right is, of course, perfectly valid outside of bankruptcy. The question is whether it continues to apply or operate in bankruptcy. In order to answer this question, a few words about the operation of set-off in bankruptcy are in order.

### (a) The Operation of Set-Off in Bankruptcy

58 In *Lister v. Hooson*, [1908] 1 K.B. 174 (C.A.), Fletcher Moulton L.J. stated what has become one of the most accepted rationales for allowing set-off in bankruptcy (at p. 178):

> The right of set-off in bankruptcy has been dealt with by various statutes, but takes its origin from the fact that the jurisdiction in bankruptcy was from the first an equitable jurisdiction. The successive statutory formulations of the consequence of this principle, embodied in the clauses as to mutual credit, dealings, &c., have never altered this fundamental principle, and, speaking for myself, I cannot see any ground why in the present instance the injustice should be perpetrated of making a person who in the balance is not a debtor to the estate pay in full the sum due to the estate and receive only a dividend on the sums due from the estate.

(See also *Fredericton Co-operative Ltd. v. Smith* (1921), 2 C.B.R. 154 (N.B. K.B.), at pp. 157-58; *Atlantic Acceptance Corp. v. Burns & Dutton Construction (1962) Ltd.* (1970), 14 D.L.R. (3d) 175 (Alta. C.A.), at p. 184; and, for a particularly thorough and helpful discussion of the issues relating to set-off in bankruptcy and insolvency, see Kelly R. Palmer, *The Law of Set-Off in Canada* (1993), at pp. 157-223.)

59 In the bankruptcy context, a right to set-off necessarily has the effect of securing the claim of the party claiming set-off against assets of the bankrupt's estate. This was recently recognized in unambiguous terms by Lord Hoffmann in his speech for the unanimous House of Lords in *Stein v. Blake*, [1995] 2 All E.R. 961. His Lordship stated [p. 964]:

> Bankruptcy set-off ... affects the substantive rights of the parties by enabling the bankrupt's creditor to use his indebtedness to the bankrupt as a form of security. Instead of having to prove with other creditors for the whole of his debt in the bankruptcy, he can set off pound for pound what he owes the bankrupt and prove for or pay only the balance.

60 The security character of set-off is also borne out in several academic authorities. John A.M. Judge and Margaret E. Grottenthaler note in their article "Legal and Equitable Set-Offs" (1991) 70 Can. Bar Rev. 91, in discussing equitable set-off, which alone operates in the context of an assignment (at p. 92):

> The application of equitable set-off answers, in whole or in part, the plaintiff's claim. In this sense it has a self-help remedial aspect. *Because equitable set-off applies as against an assignee, a security interest is effectively created in favour of the defendant which takes priority over the claim of the assignee.* (Emphasis added.)

They later add (at p. 117):

> If successful on his equitable set-off, the defendant's claim will be paid in full, or at least to the extent of the

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 27
1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

plaintiff's claim. Therefore, equitable set-off in effect gives an unsecured defendant priority over all secured and unsecured creditors.

Similarly, Palmer notes (at p. 204):

> ... by allowing set-off to operate in a bankruptcy, an otherwise unsecured creditor can obtain a secured status and so can be paid the full value of the debt owed by the bankrupt before the general distribution of the estate to unsecured creditors.

Palmer also observes that the operation of set-off has been described as creating a "quasi-lien" against the cross-demand of the estate (Palmer, at p. 206). The operation of set-off in bankruptcy can therefore be said to confer on the party claiming set-off a security interest or "quasi-lien" against assets of the bankrupt's estate.

61 Indeed, as a result of creating a type of security interest in the estate, the operation of set-off in bankruptcy has been the subject of academic criticism: see Palmer, at pp. 204-207; Judge and Grottenthaler, at p. 117; John C. McCoid, "Setoff: Why Bankruptcy Priority?" (1989) 75 Va. L. Rev. 15, and for counterpoint, Philip T. Lacy, "Setoff and the Principle of Creditor Equality" (1992) 43 S. Cal. L. Rev. 951. The central criticism has been that while outside of bankruptcy set-off strikes a fair balance between two parties with mutual obligations, in bankruptcy the material inquiry should be the rights of the estate's creditors inter se. An inquiry which considers the rights of creditors inter se must necessarily consider a broader range of interests than an inquiry limited to ensuring fairness between only two parties (McCoid, supra, at p. 43). Thus, allowing set-off in bankruptcy has been considered as unfairly limiting the class of relevant interests. The concern has also been voiced that allowing set-off in bankruptcy (Judge and Grottenthaler, at p. 117):

> ... is disruptive of a complex and sophisticated system developed for establishing priorities amongst creditors of various types, particularly where registration of a secured interest is required.

This second concern is thus to the effect that allowing set-off gives a claimant the benefit of a security interest without imposing the important concomitant obligation of registering that interest.

62 While this academic debate is undoubtedly interesting, the fact remains that our Parliament has recognized in s. 97(3) of the *Bankruptcy Act* that the "law of set-off applies to all claims made against the estate of the bankrupt". As a result, in the bankruptcy context, the law of set-off allows a debtor of a bankrupt who is also a creditor of the bankrupt to refrain from paying the full debt owing to the estate, since it may be that the estate will only fulfil a portion, if that, of the bankrupt's debt. Consequently, in this limited sense the party claiming set-off has Parliament's blessing for the "reordering" of his priority in bankruptcy by virtue of the operation of the law of set-off.

63 But there is an inherent limit to this deference to the provincial law of set-off. While the operation of set-off is permitted to allow for *the party claiming set-off* to recover from the estate ahead of the stipulated order of his claim under the *Bankruptcy Act*, it most emphatically is not permitted to allow for the operation of provincial legislation to reorder the priorities of third parties against the estate — and by "third parties" I do of course mean the priority of any person other than the person who claims set-off against the estate. If provincial legislation were to have this effect, on the consistent authority of the quartet it must be declared inapplicable in bankruptcy.

64 Indeed, the existence of such an intrinsic constitutional limit to the application of provincial law in rela-

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

tion to property and civil rights has also been found in the context of defining secured creditors. The *Bankruptcy Act* defines "secured creditor" in s. 2, but defers to provincial law for the purpose of creating secured claims. The quartet of cases in this Court decided that the provinces are entitled to define secured creditors as they wish for their own purposes, but in bankruptcy those definitions which have the effect of reordering the priorities in the *Bankruptcy Act* are simply without application. In the same vein, the law of set-off is permitted to operate, but only to the extent that provincial legislation purporting to create a set-off does not have the effect of reordering federal priorities with respect to the claims of third parties against the estate. Federal deference to provincial law is thus necessarily limited by the order of priorities in the *Bankruptcy Act*.

65 Differently put, to paraphrase Wilson J. in *Deloitte, Haskins*, supra, at p. 806 (who in turn was discussing the ratio of this Court's decision in *Rainville*, supra), the question in the case at bar is not whether a proprietary interest has been created under the relevant provincial legislation by combining the instruments of deemed debt and set-off. It is whether the provincial legislation, even if it has created a proprietary interest, can defeat the scheme of distribution under s. 136 of the *Bankruptcy Act*. In the case at bar, it will defeat that scheme if it secures against the estate the claims of third parties whom Parliament has given a lower priority under s. 136.

66 The question in this appeal thus reduces to the following: does the operation of s. 133 have the effect of reordering federal priorities with respect to the claims of any third parties against the estate?

### (b) Does s. 133 Affect Bankruptcy Priorities?

67 Prior to bankruptcy, the security device created by s. 133(3) and triggered by s. 133(1) is, of course, perfectly within the province's jurisdiction. However, if applicable in the event of bankruptcy, it would enter into conflict with the scheme of distribution under the *Bankruptcy Act*. Parliament has expressly indicated in s. 136(1)(*h*) that "all indebtedness of the bankrupt under any Workmen's Compensation Act" is to rank eighth in the list of preferred claims, to be distributed after the claims of secured creditors. By contrast, the combined effect of s. 133(1) and 133(3) of the Saskatchewan *Workers' Compensation Act* is to secure the Board's claim *against the bankrupt's estate* ahead of its priority under the *Bankruptcy and Insolvency Act*. The two laws in their operation give rise to different and inconsistent orders of priority and are thereby in conflict. They operate as contrary directives as to the way assets on bankruptcy are to be distributed.

68 To explain how this result is effected, it is first important to remember that monies owing to the contractor but withheld by the principal are debts due to the bankrupt. They are thus unquestionably "property of the bankrupt" under the *Bankruptcy Act*, since s. 2 of the Act defines "property" to include "obligations". The monies held back are simply accounts receivable of the bankrupt (see, for example, *Re Invitation Prêt-à-Porter Inc.* (1979), 31 C.B.R. (N.S.) 54 at p. 58 (Que. S.C.); L.W. Houlden and C.H. Morawetz, *Bankruptcy and Insolvency Law of Canada*, vol. 1 (3rd ed., revised 1993), at F§45; Lewis Duncan and John D. Honsberger, *Bankruptcy in Canada* (3rd ed., 1961), at pp. 307-308).

69 Next, it is accepted that where the principal retains monies owing to the contractor, the Board's decision to deem the principal liable for the contractor's assessment has the effect of allowing the principal a right of set-off against the bankrupt estate. This right of set-off allows the principal to realize on a security interest or "quasi-lien" against the estate. However, this process of realization has the *effect* of securing the Board's claim *against the estate*. The estate is diminished to the extent of the contractor's liability to the Board, and the Board is correspondingly enriched by an identical amount. The principal's estate or patrimony remains unaffected. The Board's claim has thus been secured *against the bankrupt estate*, mediated through the legally compelled agency

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

of the principal.

70 Nor, incidentally, can this process be justified by reference to the law of set-off. While the law of set-off
incorporated by reference in s. 97(3) of the *Bankruptcy Act* would permit the principal to secure its own claim
against the estate, it does not permit the province to enact legislation which confers the same benefit on a third
party, in this case the Board, since such legislation would have the effect of reordering priorities with respect to
an entire class of preferred claims. We have consistently held that the deference to provincial law in the *Bank-
ruptcy Act* does not extend to the reordering of claims against the estate. At that point, provincial law simply
ceases to apply for intruding into an exclusive federal sphere. Such, then, must also be the fate of the impugned
legislation in this appeal.

71 I therefore respectfully disagree with the conclusion of the Ontario Court of Appeal in *Re Evelyn Stevens
Interiors Ltd.* (1993), (sub nom. *Ontario (Workers' Compensation Board) v. Evelyn Stevens Interiors Ltd.
(Trustee of))* 100 D.L.R. (4th) 742 at pp. 748-49, in holding that s. 9(3) and (4) of the Ontario *Workers' Com-
pensation Act*, R.S.O. 1980, c. 539 (equivalent to Saskatchewan's s. 133(1), (3) and (4)) are applicable in bank-
ruptcy. The court reasoned (at pp. 748-49):

> The principle is simple. The money owing under s. 9(3) is not property of the bankrupt and never comes in-
> to the hands of the trustee. The board is not required to make a claim under s. 136 of the *Bankruptcy Act*.
> The money comes to it under s. 9 of the *Workers' Compensation Act*. It is the *Bankruptcy Act* itself and not
> the provincial legislation that recognizes rights of set-off ...

> A valid set-off, as defined under provincial law, would inevitably alter the priorities in a bankruptcy but that
> is what the *Bankruptcy Act* itself contemplates ...

> The money in the case at bar has never (or should never have) come into the hands of the trustee. It is
> money that has been (and should remain) in the hands of the principals to compensate them for money that
> they are (or will be) bound to pay to the board.

72 The court thus concluded, first, that the principal paid the Board out of its own funds and not from prop-
erty of the bankrupt. But this is only true in a trivial sense. When the set-off is effected, the estate is diminished
to the extent of the indemnity and the principal's patrimony is entirely unaffected. The principal's "personal" li-
ability is thus converted by set-off to a mere bookkeeping entry, and the debt satisfied by the estate. As a result,
with respect, here the Ontario Court of Appeal has chosen form over substance.

73 Second, the court appeared to attach considerable importance to the fact that the monies owing should
never have come into the "hands of the trustee". But with respect, the relevant question was simply whether
these monies were *property of the bankrupt*, and not whether they were or should have been in the hands of the
trustee. And since such monies are unquestionably property of the bankrupt, the Board has in effect secured its
claim *against the estate*.

74 Third, and perhaps most importantly, the Ontario Court of Appeal concluded that the *Bankruptcy Act* it-
self recognizes set-off, and this will inevitably alter priorities in bankruptcy. With respect, the Court of Appeal's
statement is overly broad. As already indicated, it is true that s. 97(3) allows the principal to secure his claim
against the estate, whatever his priority under s. 136. In this limited sense, a "valid set-off, as defined under pro-
vincial law, would inevitably alter the priorities in a bankruptcy". Here, however, the effect is much broader, and
entails securing by legislation the claim of a third party against the estate, thereby circumventing the order of

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 30

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

priorities in the *Bankruptcy Act*.

75 Differently put, in the bankruptcy context, the law of set-off simply allows a debtor of a bankrupt who is
also a creditor of the bankrupt to refrain from paying the full debt owing to the estate, since it may be that the
estate will only fulfil a portion, if that, of the bankrupt's debt. Set-off is simply a defence to the payment of a
debt, not a basis for validating statutory security devices which have the effect of securing the claims of *third
parties* against the estate. Indeed, the defensive character of set-off is reflected in the wording of s. 97(3) which
stipulates that set-off applies to "all claims made against the estate of the bankrupt and also to all actions insti-
tuted by the trustee for the recovery of debts due to the bankrupt".

76 As a result, with the greatest respect, the reasoning of the Ontario Court of Appeal is flawed for applying
provincial legislation which has the effect of securing against the estate an entire class of claims specifically giv-
en a lower priority by the *Bankruptcy Act*.

77 What is more, if the Ontario Court of Appeal's interpretation of s. 97(3) were correct, the consequences
would be far-reaching. The provinces would, in effect, be entitled to create property interests which have the ef-
fect of subverting the federal scheme of distribution by purporting to validate them as set-offs. Nor is there any
reason in principle why the provinces would be limited to rearranging federal priorities with respect to unpaid
workers' compensation assessments. Each and every province would be licensed to create similar security
devices to secure claims of their choosing, and thereby subvert entirely Parliament's chosen scheme of distribu-
tion. This prospect was repudiated by this Court in each of the cases in the bankruptcy quartet. The concerns
voiced in those cases apply with equal force to this appeal. To rule otherwise would be to invite a balkanization
of the scheme of bankruptcy priorities across the country and to tolerate the evisceration of Parliament's exclus-
ive jurisdiction over bankruptcy conferred by our Constitution. The provinces are not entitled to so proceed, and
thereby do indirectly what they are prohibited from doing directly. Our courts must therefore be vigilant to scru-
tinize the substance of the interests created and not rest content with merely examining their form.

78 I would add that apart from the security device created by the combined effect of s. 133(1) and (3), s.
133(4) also has the effect of intruding into the exclusive federal sphere of bankruptcy. It will be recalled that s.
133(4) states that "all questions as to the right to and the amount of such indemnity shall be determined by the
board". If allowed to apply in bankruptcy, this provision would have the effect of empowering a creditor of the
estate (here the Board) to determine unilaterally the extent of its claim against the estate. As a result, the Board
would be empowered to decide the size of the estate which is to remain available for the other secured, preferred
and ordinary creditors. A province cannot empower a creditor of a bankrupt to determine the extent of a bank-
rupt's estate which is to be available for distribution. Thus, while otherwise perfectly valid provincial law, s.
133(4) is also inapplicable in the event of bankruptcy.

79 At this point, I should perhaps stress that nothing I have said detracts from a province's authority to im-
pose liability on a third party for a bankrupt's debt. What a province cannot do, however, is create a statutory se-
curity device which has the effect of reordering the priorities of distribution of the assets in the bankrupt's estate.
In such a case, what is otherwise valid provincial legislation is simply without application upon the occurrence
of bankruptcy. To repeat, it is the *combined effect* of the statutory deemed debt *and* the right to withhold (and
then set off against) property of the bankrupt which secures the Board's claim against property of the bankrupt.
It is for this reason that examining the constitutional validity of s. 133(1) separately from s. 133(3) fundament-
ally obscures the nature of the legal interest created. Such an approach misses that this is nothing but a straight-
forward security device triggered by the province for securing the Board's claim against the estate, in exactly the

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 31

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

same way that breaking a contract of pledge into debt and bailment and examining the validity of these legal interests separately would obscure the essential character of pledge as a security device.

80 It is therefore my conclusion that s. 133 is inapplicable in bankruptcy for intruding into an exclusive federal sphere.

81 In the foregoing, I have proceeded on the basis that s. 133(1) operates in tandem with s. 133(3), that is, that the principal has monies owing to the contractor which it can use as a basis for set-off when the Board deems it liable for the contractor's assessment. Where a principal has such monies owing, it was clearly the Legislature's intention that such a right to set-off be exercised in order that the contractor ultimately be responsible for its own assessment. In this sense, where both s. 133(1) and (3) potentially apply on the facts of a given case, it was clearly the Legislature's intention that the right to set-off be exercised. As a result, in such a case s. 133 is inapplicable in toto against the bankruptcy.

82 However, there may be instances where the principal does not hold or retain any monies owing to the contractor. While the Court did not have the benefit of extensive submissions on this point, I believe it is quite plausible to conclude that the principal can then claim from the estate as a preferred creditor under s. 136(1)(*h*), since its claim is comprehended within "indebtedness of the bankrupt under any Workmen's Compensation Act". This would appear to be permis sible because on its plain wording s. 136(1)(*h*) specifies only the nature of the claim and not the identity of the claimant. As a result, if only s. 133(1) applies, the Board has not secured its claim against the estate but recovers only from the principal. The scheme of distribution of assets in the estate is thereby unaffected. In such a case, there is no constitutional reason why full effect should not be given to provincial law within its legitimate sphere of operation. I would therefore only read down s. 133 to the extent that in application it enters into conflict with the scheme of distribution in the *Bankruptcy Act*. Where s. 133(1) alone is engaged in a given case, the Board's claim against the principal continues to be fully applicable.

### (c) The Appropriate Remedy: Is s. 133 Inapplicable or Inoperative?

83 I have already concluded that the impugned legislation must be declared inapplicable rather than inoperable in bankruptcy. I should perhaps explain that this is preferable for the simple reason that bankruptcy is an exclusive federal domain within which provincial legislation does not apply, as distinguished from areas of joint or overlapping jurisdiction where federal legislation will prevail, rendering provincial legislation inoperable to the extent of any conflict. However, as bankruptcy is carved out from the domain of property and civil rights of which it is conceptually a part, valid provincial legislation of general application continues to apply in bankruptcy until Parliament legislates pursuant to its exclusive jurisdiction in relation to bankruptcy and insolvency. At that point, provincial legislation which conflicts with federal law must yield to the extent of the conflict (*Tennant v. Union Bank of Canada*, [1894] A.C. 31 (P.C.); *Crown Grain Co. v. Day*, [1908] A.C. 504 (P.C.)) and it becomes inapplicable to that extent. Consistent with the presumption of constitutionality — that the enacting body is presumed to have intended to enact provisions which do not transgress the limits of its constitutional powers — the provincial law should be read down to the extent of the conflict. In other words, it should be interpreted so as not to apply to the matter that is outside the jurisdiction of the enacting body.

84 This, I believe, has been the trend of this Court's approach to matters of applicability and operability. For example, in refusing to apply the paramountcy doctrine in *Deloitte, Haskins*, Wilson J. explained (at p. 807):

I think rather that the applicable principle is the one stated by Laskin C.J. in *Quebec North Shore Paper Co. v. Canadian Pacific Ltd.*, [1977] 2 S.C.R. 1054, at p. 1065, to the effect that "if the provincial legislation is

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

of general application, it will be construed so as not to apply to such enterprises", *i.e.*, those within federal competence.

She concluded at p. 808:

> I believe that the trend of the more recent authorities favours a restrictive approach to the concept of "conflict" and a construction of impugned provincial legislation, where this is possible, so as to avoid operational conflict with valid federal legislation. Where this is done both provisions can stand and have their own legitimate spheres of operation. In this sense I find no conflict between s. 107(1) of the *Bankruptcy Act* and s. 78(4) of *The Workers' Compensation Act*. I would accordingly answer the question as framed by stating that s. 107(1)(*h*) of the *Bankruptcy Act* applies to determine priorities on a bankruptcy and s. 78(4) of *The Workers' Compensation Act* has no application in such a situation.

85 Another way of explaining this approach is simply to say, with Lamer J. in *F.B.D.B.*, that "in a bankruptcy matter, it is the *Bankruptcy Act* which must be applied" (supra, at p. 1071).

86 This was also the Court's approach in *Bank of Montreal v. Hall*, [1990] 1 S.C.R. 121. The case concerned the relationship between *Bank Act* security interests and the provincial procedural requirements for seizure under the Saskatchewan *Limitation of Civil Rights Act*. Speaking for the Court, La Forest J. found the federal and provincial legislation to conflict in operation. However, he added at p. 155:

> I have dealt with this case on the basis of paramountcy to meet the arguments put forward by counsel. *But the issue can, I think, be answered more directly. At the end of the day, I agree with counsel for the Attorney General of Canada that this is simply a case where Parliament, under its power to regulate banking, has enacted a complete code that at once defines and provides for the realization of a security interest. There is no room left for the operation of the provincial legislation and that legislation should, accordingly, be construed as inapplicable to the extent that it trenches on valid federal banking legislation.*

> In response to the third question, then, I would hold that ss. 19 to 36 of *The Limitation of Civil Rights Act*, if interpreted to include a s. 178 security, conflict with ss. 178 and 179 of the *Bank Act* so as to render ss. 19 to 36 inoperative in respect of the security taken pursuant to s. 178 by a chartered bank. To put it another way, ss. 19 to 36 of *The Limitation of Civil Rights Act* are inapplicable to security taken pursuant to ss. 178 and 179 of the *Bank Act*. (Emphasis added.)

87 I fully endorse this approach, and am of the opinion that my colleague La Forest J.'s remarks apply mutatis mutandis to the present appeal. Parliament has enacted a complete code in the *Bankruptcy Act*, one which necessarily calls upon provincial law for its operation. But Parliament's invitation stipulates an important limitation at the threshold of its domain, namely, that provincial law simply cannot apply when to do so would entail subverting the federal order of priorities in the *Bankruptcy Act*.

88 I therefore agree with the submissions of the Attorney General for Canada and find that s. 133 is inapplicable in bankruptcy when s. 133(1) operates together with s. 133(3) as it trenches on valid federal bankruptcy legislation.

89 In view of Iacobucci J.'s statement that "[provincial] legislation that is intra vires is permitted to have an incidental and ancillary effect on a federal sphere", I think it appropriate in concluding to summarize my view as to the proper constitutional analysis where federal and provincial legislation potentially conflict. One must first

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 33

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

determine whether the laws are respectively valid federal or provincial legislation. If so, the actual operation of the laws must be examined to determine whether they are in operational conflict, that is, inconsistent or incapable of being fully complied with in a given situation. If they are in operational conflict, the federal legislation prevails and the provincial legislation is without effect to the extent of this conflict. If the operational conflict is in a field of exclusive federal jurisdiction, the provincial legislation will be inapplicable as being ultra vires to that extent. If the conflict is in an area of concurrent or overlapping jurisdictions, the provincial legislation will remain intra vires but be inoperative. To the extent that there is operational conflict, there is no room for an incidental or ancillary effect of provincial legislation. If, on the other hand, there is no operational conflict, then both laws continue to operate and both continue to have effect to the extent that operational conflict does not arise. Short of operational conflict, provincial law may validly have an effect on bankruptcy, as I have indeed acknowledged in observing that there is no bankruptcy "bottom line" without provincial law (at para. 122). In the present case, I have found clear operational conflict in that s. 133(1) and (3) in their operation together entail a reordering or subverting of the federal order of priorities under the *Bankruptcy Act*. Such an intrusion into an exclusive federal sphere necessarily goes far beyond an incidental and ancillary effect. I believe this proposition runs through my reasons.

**D. Residual Issues**

90 Finally, as my colleague Iacobucci J. notes, before this Court the Bank of Montreal raised factual and legal issues which had not been raised in the courts below. Specifically, the Bank argued that Husky was not liable under s. 133 for payment of Metal Fab's assessments since the Board was obliged to issue a demand against Metal Fab before issuing one against Husky. Similarly, the Board and the Bank argued that Husky cannot indemnify itself out of funds owing to Metal Fab since Husky received the demand from the Board after Metal Fab had given notice of assignment of its book debts to the Bank of Montreal. Since, as outlined, it is my opinion that s. 133 simply has no application in the event of bankruptcy, these threshold factual questions need not be addressed.

91 With respect to Husky's further argument that it was not in breach of its statutory duty under s. 133 to ensure payment by Metal Fab, again this question need not be addressed since s. 133 has no application upon the occurrence of bankruptcy.

92 The Bank also argued that s. 133 should be interpreted to limit Husky's liability to unpaid workers' compensation assessments with respect to the specific work performed for Husky by Metal Fab, and not for all Metal Fab's outstanding unpaid assessments which includes work for other principals. While it is not necessary to answer this question given my disposition of this appeal, I agree with Iacobucci J. that the liability under s. 133 is limited to unpaid assessments in respect of work performed for Husky. This less Draconian interpretation is confirmed by the recent clarifying amendment to s. 133 which inserted the words "pursuant to this Act with respect to that work" after "contribute to the fund" (*The Workers' Compensation Amendment Act, 1993*, S.S. 1993, c. 63, s. 40).

**IV. Disposition**

93 For the above reasons, I would answer the constitutional questions posed by Lamer C.J.C. as follows:

*Question*: 1. Where a contractor as referred to in s. 133 of *The Workers' Compensation Act*, S.S. 1979, c. W-17.1, is in bankruptcy and but for the bankruptcy, the principal as referred to in s. 133 would be liable to pay the assessment due by the contractor under the Act, is s. 133 of the said Act inoperative or inapplicable in

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 34

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

whole or in part, by reason of being in conflict with the *Bankruptcy Act*, R.S.C., 1985, c. B-3, and in particular ss. 17(1), 67, 95, 136(1)(*h*), 148, 158(*a*) and 198(*a*) thereof?

*Answer*: Yes. Section 133 is inapplicable in bankruptcy when s. 133(1) operates in tandem with s. 133(3).

*Question*: 2. Was s. 133 of the said Act inoperative or inapplicable in the circumstances of this case?

*Answer*: Yes. Section 133 was inapplicable when Metal Fab entered bankruptcy.

94 I would therefore dismiss the appeal with costs throughout.


*Iacobucci J.* **(dissenting) (*Sopinka, Cory* and *Major JJ.* concurring):**

95 The broad issue in this appeal is the extent to which a provincial statutory instrument can constitutionally assert itself in the bankruptcy context without entering into operational conflict with the federal *Bankruptcy Act*, R.S.C. 1985, c. B-3. The specific question at issue relates to the constitutional validity of ss. 133(1) and (3) of the Saskatchewan *Workers' Compensation Act, 1979*, S.S. 1979, c. W-17.1. These provisions permit the Workers' Compensation Board ("the Board"), in a situation where a contractor has failed to pay its Injury Fund contributions, to obtain these amounts from a principal of the contractor (subs. (1)). Subsection (3) permits the principal to indemnify itself from the delinquent contractor. It is argued in this case that s. 133(1) and (3) are constitutionally non-operational in a situation where the contractor is bankrupt, especially when that bankrupt has assigned its estate to a secured creditor.

**I. Background**

96 Husky Oil Operations Ltd. (the principal, hereinafter "Husky") is an owner of a Bi-Provincial Heavy Oil Upgrader at Lloydminster, Saskatchewan. Husky entered into six contracts with Metal Fabricating & Construction Ltd. (the contractor, subsequently the bankrupt, hereinafter "Metal Fab") respecting the construction of the Upgrader. Metal Fab made an assignment in bankruptcy before completing five of those contracts. At the time, Husky owed approximately $800,000 to Metal Fab in the form of hold-backs and contractual debt. These sums were paid into court upon the commencement of the instant legal proceedings.

97 Metal Fab had not paid its required Workers' Compensation Fund contribution for the employees on its payroll. It was alerted to this effect by the Workers' Compensation Board on March 2, 1992 by a Notice of Assessment showing that $208,850.50 was due and payable to the Board. Soon thereafter, the Bank of Montreal (the assignee) acquired a general assignment of book debts from Metal Fab for loans advanced to it. On March 12, 1992, Husky was notified of the Bank's security interest and told that it must pay to the Bank any amounts payable to Metal Fab. The Board was apprised of the ceasing of operations of Metal Fab on March 16, 1992. The Board then looked to Husky since s. 133(1) of *The Workers' Compensation Act* made Husky personally liable in respect of the amounts that Metal Fab had not paid to the Board, but, pursuant to the terms of subs. (3), Husky could recover those sums from Metal Fab. Metal Fab made an assignment in bankruptcy on March 19, 1992. The co-respondent, Deloitte & Touche, was appointed trustee in bankruptcy. Subsequent audits conducted by the Board revealed the amount owing by Metal Fab to the Injury Fund to be $246,745.26. Husky was advised of this increased amount by a letter, dated July 6, 1992. Under the assignment in bankruptcy, Metal Fab assigned a secured debt to the Bank of Montreal in the amount of $1,745,837.

98 Husky and Metal Fab's creditors submit that the operation of s. 133 conflicts with s. 136 of the federal

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

*Bankruptcy Act*, which sets out the priorities of creditors on bankruptcy. Normally in bankruptcy the amount owed by Husky to Metal Fab would be used to satisfy lienholders and the secured creditor Bank of Montreal according to the priorities established in the *Bankruptcy Act*. In the appeal at bar, the Board, given its lower priority, would effectively recover none of the money owed to it by Metal Fab. However, s. 133 of the *Workers' Compensation Act* permits the Board to recover its debt directly from Husky and allows Husky, in turn, to set this off from the amount owed to the bankrupt, thereby effectively reducing the amount of money available to the secured creditor and, it is submitted, improperly affecting the priority scheme established by the *Bankruptcy Act*.

99 The aims of the litigants can be summarized as follows:

(1) Husky wants to avoid the operation of s. 133(1) but, if this provision is found to be valid, argues that s. 133(3) is also operative and, thus, Husky can set off the monies paid to the Board from the monies it owes the bankrupt.

(2) The Bank's position is influenced by the fact that, since it is the principal secured creditor, any funds set-off to Husky are wholly funds that, in the absence of the intervention of the Board, would accrue to the Bank. Consequently, the Bank is principally preoccupied with affirming the non-operability of s. 133(3), realizing, however, that were Husky not to have any liability to the Board then there would be no set-off issue in the first place.

(3) The Board seeks the sums that the bankrupt should have paid to it all along. It relies on s. 133(1) of the provincial legislation and its creation of joint and several liability between the principal and contractor to this effect.

100 By a fiat, dated September 9, 1992, Wedge J. of the Court of Queen's Bench of Saskatchewan held that s. 133 of *The Workers' Compensation Act* was constitutionally inoperative because it altered the scheme of distribution specified in the *Bankruptcy Act*, the ordering of this scheme falling entirely within the legislative competence of Parliament. The Saskatchewan Court of Appeal dismissed the Appellant Board's appeal from that decision. On May 26, 1994, leave to appeal was granted to this Court.

## II. Relevant Constitutional and Statutory Provisions

101

### Constitution Act, 1867

91. It shall be lawful for the Queen, by and with the Advice and Consent of the Senate and House of Commons, to make laws for the Peace, Order, and good Government of Canada, in relation to all Matters not coming within the Classes of Subjects by this Act assigned exclusively to the Legislatures of the Provinces; and for greater Certainty, but not so as to restrict the Generality of the foregoing Terms of this Section, it is hereby declared that (notwithstanding anything in this Act) the exclusive Legislative Authority of the Parliament of Canada extends to all Matters coming within the Classes of Subjects next hereinafter enumerated; that is to say, —

(21) Bankruptcy and Insolvency.

92. In each Province the Legislature may exclusively make laws in relation to Matters coming within the

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

Classes of Subjects next herein-after enumerated; that is to say, —

(13) Property and Civil Rights in the Province.

**The Workers' Compensation Act, 1979, S.S. 1979, c. W-17.1**

133. — (1) Where a person, whether carrying on an industry included under this Act or not, in this section referred to as the principal, contracts with any other person, in this section referred to as the contractor, for the execution by or under the contractor of the whole or any part of any work for the principal, it is the duty of the principal to ensure that any sum that the contractor or any subcontractor is liable to contribute to the fund is paid and, where the principal fails to do so and the sum is not paid, he is personally liable to pay that sum to the board.

(3) Where the principal is liable to make payment to the board under subsection (1), he is entitled to be indemnified by any person who should have made the payment and is entitled to withhold, out of any indebtedness due to that person, a sufficient amount in respect of that indemnity.

**Bankruptcy Act, R.S.C. 1985, c. B-3**

97 ...

(3) The law of set-off applies to all claims made against the estate of the bankrupt and also to all actions instituted by the trustee for the recovery of debts due to the bankrupt in the same manner and to the same extent as if the bankrupt were plaintiff or defendant, as the case may be, except in so far as any claim for set-off is affected by the provisions of this Act respecting frauds or fraudulent preferences.

136. (1) Subject to the rights of secured creditors, the proceeds realized from the property of a bankrupt shall be applied in priority of payment as follows:

(*h*) all indebtedness of the bankrupt under any Workmen's Compensation Act, under any Unemployment Insurance Act, under any provision of the *Income Tax Act* creating an obligation to pay to Her Majesty amounts that have been deducted or withheld, rateably.

**III. Judgments Below**

*(i) Court of Queen's Bench of Saskatchewan, per Wedge J., (1992), 104 Sask. R. 225*

102 This decision consisted of a fiat on a non-suit application by Husky that s. 133 of the *Workers' Compensation Act* was inapplicable to it.

103 Wedge J. first reviewed the facts and found that s. 133(1) made Husky personally liable for the payments to the Board yet authorized it to recover these payments from Metal Fab, the contractor. The trial judge then went on to note that the questions at hand were: (1) whether, in a bankruptcy situation, s. 133 encroached upon the exclusive federal jurisdiction over bankruptcy; and (2) whether, if it did not, Husky was entitled to set off the amount it must pay to the Workers' Compensation Board against the monies held in court.

104 Wedge J. answered the first question in the affirmative. She found assistance, in reaching her conclusion, in the decisions of this Court in *Quebec (Deputy Minister of Revenue) c. Rainville*, (sub nom *Re Bourgault*)

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

[1980] 1 S.C.R. 35 (later referred to by Wakeling J.A. as *Bourgault v. Quebec (Deputy Minister of Revenue)*), *Deloitte, Haskins & Sells Ltd. v. Alberta (Workers' Compensation Board)*, [1985] 1 S.C.R. 785. *Québec (Commission de la santé et de la sécurité du travail) c. Banque fédérale de développement*, [1988] 1 S.C.R. 1061 ("*F.B.D.B.*"), and *British Columbia v. Henfrey Samson Belair Ltd.*, [1989] 2 S.C.R. 24, colloquially referred to as the "quartet". While acknowledging that [p. 228] "... these decisions are not directly on point where, as here, the claim by the provincial body is against a third party — not the bankrupt", Wedge J. still felt they offered some guidance. In fact, the quartet, combined with some academic authority, led her to conclude that provincial legislative initiatives are invalid simply when they affect the bankruptcy scheme.

105 Reference was also made to the Ontario case of *Re Evelyn Stevens Interiors Ltd.* (1990), 80 C.B.R. (N.S.) 135, where, according to Wedge J. at p. 228, McKeown J. "relied upon the judgment of Madam Justice Wilson in *Deloitte Haskins* for the principle that provincial legislation cannot disturb the priority scheme in s. 136(1) of the *Bankruptcy Act*." It was noted that McKeown J.'s reasoning in *Re Evelyn Stevens Interiors Ltd.* was adopted by Lawton J. in *Serdula Construction Management Inc. v. Saskatchewan (Workers' Compensation Board)*, Q.B.M. 126/91 (April 12, 1992), a case which also involved a claim under s. 133 of *The Workers' Compensation Act*. In *Serdula*, Lawton J. acknowledged that the *Evelyn Stevens* case was being appealed [(1993), 100 D.L.R. (4th) 742], but considered that McKeown J. had been correct. Wedge J. found the facts of the case at bar to be indistinguishable from those in *Serdula*. Ultimately, Wedge J. held that s. 133 of the *Workers' Compensation Act* has no application in a bankruptcy scenario.

106 Wedge J. then turned to the second issue and questioned whether the set-off issue could be separated from the s. 133(1) issue. She concluded at p. 229:

> If Husky does not have to pay the Board out of the monies in court, the amount available to the Trustee is not diminished, the priority scheme in the *Bankruptcy Act* is not altered and there is no conflict between the provincial and federal legislation. It is only subs. (3) of s. 133, taken together with subs. (1) which would have the effect of disturbing the priority scheme. Thus the whole of s. 133 is under attack in the constitutional issue.

107 Wedge J. went on to reject the argument that the set-off provision in s. 133(3) is not in conflict with the *Bankruptcy Act* because, in s. 97(3), the Act itself recognizes rights of set-off. She reasoned at pp. 229-30:

> To interpret the general right of set-off in s. 97(3) as overriding the specific reference to Workers' Compensation payments in the order of priorities would, in my view, ignore the intention of the federal legislation, i.e. the standardization of bankruptcy priorities across Canada.

108 In the end, Wedge J. agreed with Lawton J. in *Serdula*. In the circumstances, she also found it unnecessary to decide the second issue given the interconnection between s. 133(1) and (3), such that the invalidity of the former necessarily triggered the inoperation of the latter.

### *(ii) Saskatchewan Court of Appeal, per Wakeling J.A. (1993), 116 Sask. R. 46*

109 The Court of Appeal for Saskatchewan dismissed the appeal by the Workers' Compensation Board.

110 Wakeling J.A. commenced his analysis by noting, at p. 47, that "this appeal probes the extent to which provincial legislation may affect federal legislation relating to bankruptcy." It was noted that were s. 133 not to exist, the claim of the Board would rank eighth in priority and in many cases would go unpaid; if s. 133 is valid,

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

the claim of the Board would be paid by the owner who would then have a claim against the bankrupt estate. According to Wakeling J.A. [p. 48], "the net result is a clear advantage to the W.C.B. as it has managed to assure payment of its claim and leave it to the owner to struggle for repayment under the *Act* either claiming right of set-off or ranking at the bottom of the list of priorities as an unsecured creditor."

111 The observation was then made that the provinces are dissatisfied with the degree of priority s. 136 of the *Bankruptcy Act* provides them. Wakeling J.A., at p. 48, characterized this appeal as but one more attempt by a province "to circumvent the restriction which s. 136 of the *Act* has imposed on the ability of the W.C.B. to collect its claim."

112 Wakeling J.A referred to the "quartet" decisions discussed by Wedge J. and held, at p. 50, that "it is apparent from these cases that the Supreme Court has determined that where the federal powers over bankruptcy have been exercised in the [*Bankruptcy*] *Act*, it is not possible for provincial legislation to change the scheme of distribution which the *Act* has established." Wakeling J.A. rejected the argument according to which s. 133 does not threaten the bankruptcy scheme since it merely permits a right of recovery against a third party surety, not the estate of the bankrupt. He noted that any third party caught by the Board order will want to seek repayment and will use the set-off and indemnification provisions to this effect, thereby interfering with the distribution of the bankrupt's estate. He disagreed with the approach taken by the Ontario Court of Appeal in *Stevens*, supra, in which it was decided that similar legislation which had been contained in the Ontario *Workers' Compensation Act* for many years was not in conflict with the federal bankruptcy scheme. As Wakeling J.A. elaborated, at p. 51:

> It [the Ontario Court of Appeal] concluded that the provincial legislation worked to require the principal to make payment to the Board so that the Board having received payment had no claim under the *Act* against the bankrupt so it did not need to rely on s. 136. The principal then had a right to set off what it had paid the W.C.B. against what it would otherwise pay the trustee in bankruptcy but that the right of set-off did not constitute a conflict with the *Act* as it was specifically provided for under [s. 97(3) of the *Bankruptcy and Insolvency Act*] ...

113 In Wakeling J.A.'s view, s. 97(3) was intended only to acknowledge and accept the application of the common law right of set-off as it has been developed over the years. To read more than a common law right of set-off into s. 97(3) would conflict with the *Belair* decision. Furthermore, he observed that the Ontario Court of Appeal in *Stevens* referred to only three members of the "quartet", failing to make reference to the *F.B.D.B.* case which, in his mind, has considerable relevance to this case. Wakeling J.A. added that the *F.B.D.B.* judgment applied the *Bourgault*, *Belair* and *Deloitte* reasoning to parties not directly involved in a bankruptcy.

114 In the end, Wakeling J.A. concluded, at pp. 52-53, that "there is no way that the bankruptcy pie can be cut as a consequence of this legislation without disturbing the scheme of distribution established under s. 136 of the *Act*." In fact, he held that it could hardly be disputed that without the legislation the distribution would be different.

115 Deeming s. 133(1) to be invalid, Wakeling J.A. basically affirmed the approach taken by Wedge J. regarding the severance of the set-off provision. He found that the provision was to be struck as a whole, given that there is no apparent justification for a conclusion that the legislators would have intended the principal to pay in full whether or not a right of set-off was available.

**IV. Issues on Appeal**

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 39
1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

116 The issues in this appeal are set out in the constitutional questions stated by the Chief Justice on
September 14, 1994:

1. Where a contractor as referred to in s. 133 of the *Workers' Compensation Act*, S.S. 1979, c. W-17.1, is in
bankruptcy and but for the bankruptcy, the principal as referred to in s. 133 would be liable to pay the as-
sessment due by the contractor under the *Act*, is s. 133 of the said Act inoperative or inapplicable in whole
or in part, by reason of being in conflict with the *Bankruptcy Act*, R.S.C., 1985, c. B-3, and in particular ss.
17(1), 67, 95, 136(1)(*h*), 148, 158(*a*) and 198(*a*) thereof?

2. Was s. 133 of the said Act inoperative or inapplicable in the circumstances of this case?

117 In my view, the gist of the appeal comes down to the following questions, as proposed by the appel- lants:

(a) Is section 133(1) of *The Workers' Compensation Act* inoperative by reason of inconsistency with the
*Bankruptcy Act*?

(b) Is section 133(3) of *The Workers' Compensation Act* inoperative by reason of inconsistency with the
*Bankruptcy Act*?

(c) If section 133(3) is inoperative, does that render section 133(1) inoperative as well?

**V. Analysis**

118 For the reasons that follow, I would allow the appeal. Section 133(1) is valid even in a situation where
the contractor is or becomes bankrupt; s. 133(3) is also valid in the bankruptcy context and permits the principal
to set off the amount paid to the Board from funds that it owes to the bankrupt or assignee thereof. Although I
am aware of the fact that the set-off involves monies constituting the property of the bankrupt and that it poten-
tially interferes with the order of priorities established by s. 136, I find that s. 97(3) of the *Bankruptcy Act* elim-
inates any operational conflict between s. 133(3) and the Act since the cause of action contemplated by s. 133(3)
is ordinarily available at law and equity. Further, when s. 133(3) is used simply for purposes of indemnification
and this is pursued by the principal joining the ranks of the unsecured creditors then I believe any resultant inter-
ference with the bankruptcy scheme to be so incidental that it falls outside of the scope of the "clear conflict" re-
quired to trigger invalidation through the paramountcy doctrine.

119 At the outset, I note that the respondent's submissions that s. 133 is in conflict with ss. 17(1), 67, 95,
148, 158(*a*) and 198(*a*) of the *Bankruptcy Act* are of little, if any, merit. Nor were they seriously pleaded before
us. The crux of this appeal involves s. 136(1) of the *Bankruptcy Act* and it is on this provision that I shall focus
my attention.

**A. Paramountcy Doctrine**

120 Section 133 of the *Workers' Compensation Act* is valid provincial legislation enacted pursuant to s.
92(13) of the *Constitution Act, 1867*. Similarly, the *Bankruptcy Act* is intra vires the legislative purview of Par-
liament, specifically s. 91(21) of the Constitution: *Ontario (Attorney General) v. Canada (Attorney General)*,
[1894] A.C. 189 (P.C.), at p. 197; *Royal Bank of Canada v. Larue*, [1928] A.C. 187, affirming [1926] S.C.R. 218
. To this end, the constitutional issue herein asks whether s. 133 of the *Workers' Compensation Act* is rendered
inoperative by virtue of a conflict with the *Bankruptcy Act*. In a situation where there is clear operational con-

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

flict between valid federal and provincial legislation, the doctrine of paramountcy requires that the provincial legislation be, to the extent of the conflict, declared inoperational. It is upon this doctrine that the respondent re- lies.

121 I underscore that, in order to be triggered, the doctrine of paramountcy requires very clear conflict. As noted by Dickson J. (as he then was) in *Multiple Access Ltd. v. McCutcheon*, [1982] 2 S.C.R. 161 at p. 191:

In principle, there would seem to be no good reasons to speak of paramountcy and preclusion except when there is actual conflict in operation as where one enactment says "yes" and the other says "no" ...

122 Conflict for purposes of paramountcy analysis is found when compliance with the enactment of one level of government entails defiance with that of the other: *McCutcheon*, supra, at p. 191. There must be a situation where one cannot be able to obey the law of one level of government without disobeying the law of the other level of government: *Bank of Montreal v. Hall*, [1990] 1 S.C.R. 121.

123 The requirement that clear operational conflict be found effectively narrows the situations in which federal legislation will be deemed to be paramount over provincial enactments. The rationale behind this restrictive use of paramountcy is self evident: governmental regulation in Canada operates through a complex web of federal and provincial legislation. The regimes structuring many areas of public policy, such as bankruptcy, actively involve both levels of government. To this end, barring a situation where obeying the enactment of one level places a citizen in disobeyance of the legislation of the other level, an attempt must be made to read overlapping provincial and federal legislation in a complementary manner.

124 I am buttressed in this approach by the general comments of Dickson C.J.C. in *City National Leasing Ltd. v. General Motors of Canada Ltd.*, [1989] 1 S.C.R. 641. Although the *GM* case specifically involved validating legislation under the federal trade and commerce power, I find the following passage from Dickson C.J.C.'s reasons (at pp. 669-70) to be apposite to this appeal:

... it should be remembered that in a federal system it is inevitable that, in pursuing valid objectives, the legislation of each level of government will impact occasionally on the sphere of power of the other level of government; overlap of legislation is to be expected and accommodated in a federal state. Thus a certain degree of judicial restraint in proposing strict tests which will result in striking down such legislation is appropriate ... Both provincial and federal governments have equal ability to legislate in ways that may incidentally affect the other government's sphere of power.

125 In the case at bar, the courts below did not demonstrate the appropriate level of judicial restraint in their application of paramountcy doctrine. In my view, courts should carefully look for co-existence, not strive to find conflict.

## B. The History and Purpose of Workers' Compensation Legislation in Canada

126 The disposition of this appeal requires not only a sensitivity to the true nature of the paramountcy doctrine, but also an appreciation of the history and purpose of workers' compensation legislation.

127 Workers' compensation legislation creates a "no fault" system of benefits whereby injured workers are guaranteed compensation in connection with their injuries. As noted by the Workers' Compensation Board of Alberta, the concept of workers' compensation in Canada was introduced in order to elevate Canadian society

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 41

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

from an industrial "state of nature".

128   In *Medwid v. Ontario (Minister of Labour)* (1988), 48 D.L.R. (4th) 273 (Ont. H.C.), at pp. 280-81,
Montgomery J. described this "state of nature" as follows:

> ... in the years before there was workers' compensation. Economic necessity compelled people to work long
> hours, under conditions more hazardous than they would freely choose and without any opportunity to
> provide for their own personal safety. The physical conditions, equipment and work methods of the day of-
> ten increased the likelihood of accidents and decreased the likelihood of recovery in tort. As many as half of
> the work place accidents were found to result from the hazards of the work place, not from anyone's fault.
> When an employer was at fault, he could erect the common law defences of contributory negligence and
> voluntary assumption of risk to insulate himself from liability. Both of those defences, though available
> generally, operated with particular harshness in the work place, because despite the dangers of the work
> place and the work tasks there were no real alternatives open to the worker. In addition, employers alone
> could assert the defence of common employment to neutralize claims based on the fault of a worker's fellow
> employees. All of these defences operated as absolute bars to recovery; all remain part of Ontario law, ex-
> cept where suppressed or modified by statute. Finally, even successful worker-plaintiffs had no assurance of
> meaningful recovery. Wealthy employers could often exhaust the worker's resources in a series of appeals.
> Legal fees and other costs reduced the amount realized from any award. Impecunious employers often could
> not pay the judgments against them. For slow developing industrial disease claims, workers might find their
> employers had gone out of business or disappeared.

129   In effect, the workers' compensation system involves an historic compromise. On the one hand, em-
ployees give up their rights of action against employers and other workers in exchange for benefits regardless of
fault. On the other hand, employers are relieved of certain liabilities involving their employees but are obliged to
fund wholly the burden of compensating injured workers through assessments paid to the Injury Fund. This
compromise emanated from the 1913 Meredith Report, which constitutes the conceptual base for all workers'
compensation legislation in Canada. In *Reference re Workers' Compensation Act, 1983 (Newfoundland)* (1987),
44 D.L.R. (4th) 501, affirmed [1989] 1 S.C.R. 922, the Newfoundland Court of Appeal, at p. 509, summarized
the funding scheme proposed by Meredith as follows:

> ... Meredith recommended that Ontario model its legislation after the German system which emphasized the
> duty of the state to provide sustenance and support to injured workers through a collective, no-fault, in-
> dustry-funded insurance scheme by means of a regulated accident fund ...

130   The strength of the fund is thus key to the viability of the workers' compensation system. In turn, the
financial integrity of the Workers' Compensation program depends on an effective means of ensuring that suffi-
cient monies are paid into the Injury Fund. It is here that s. 133 plays a key role. It, along with other devices
such as statutory liens, ensures that the Injury Fund continues to be replenished and remains solvent. This is ac-
complished by holding principals liable for the unpaid dues of contractors because, from the perspective of the
workers, both contractors and principals are "employers". Moreover, from the point of view of rudimentary eco-
nomic analysis, both gain from the surplus value of the workers' labour. Without the existence of effective meth-
ods to finance the Injury Fund, the workers' compensation system is emptied of any content and the "historical
compromise" is rendered meaningless. Provisions such as s. 133 further the policy choice to shift losses for un-
paid premiums from the Board and workers to principals. Workers' compensation legislation strives to visit the
costs of industrial disease, death and injury on the employer community which exposes its workforce to those

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 42

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

risks. An attempt is made to spread responsibility for those costs amongst multiple employers engaged in a single project.

131 On a related note, I would, with respect, expressly reject Wakeling J.A.'s characterization at p. 48 of this case as "... one more attempt by a province to circumvent the restriction which s. 136 of the *Act* has imposed on the ability of the W.C.B. to collect its claim." To the extent that Wakeling J.A.'s remarks are aimed at criti-cizing the province for enacting the impugned legislation with that object in mind, I cannot agree. There is no basis in law or history to ascribe such a pejorative intent to s. 133 of the *Workers' Compensation Act*. I note that the original precursor to s. 133 was enacted in 1911 (*The Workmen's Compensation Act*, S.S. 1910-11, c. 9, s. 9), well before the introduction of the *Bankruptcy Act* in 1919 (S.C. 1919, c. 36) and of the original version of s. 136(1)(*h*) which was enacted in 1921 (*The Bankruptcy Act Amendment Act, 1921*, S.C. 1921, c. 17, s. 39).

132 From another angle, the present wording of s. 133 is essentially unchanged from the modifications made to s. 9 of the 1910 Act in the 1929 *Workmen's Compensation Act*, S.S. 1928-29, c. 73, s. 11. Now, s. 11 of the 1929 Act was modelled directly on the contemporaneous provisions of the Ontario *Workmen's Compensation Act*, R.S.O. 1927, c. 179, s. 9, these being originally enacted in 1915 and 1919: S.O. 1914, c. 25, s. 10, as amended by S.O. 1915, c. 24, s. 5, and S.O. 1919, c. 34, s. 4(2). The creation of joint and several liability as between contractors and principals for the contractor's unpaid compensation debts (as well as the concomitant right to indemnification) thus pre-dates the scheme of priorities established by bankruptcy legislation. Con-sequently, there could not have been, at the time of enacting workers' compensation legislation, a desire to un-dermine federal bankruptcy arrangements nor circumvent the priority scheme.

133 It is helpful to recall that s. 133 is not addressed specifically to situations in which the contractor is bankrupt, although such a situation may occasionally arise on the facts as it does here. Principally, s. 133 is aimed at granting the Board an alternate route to obtain the funds that, but for the delinquency, absconding or unscrupulousness of the contractor, it would ordinarily have received. Clearly, when the contractor and principal have a working relationship, it is easier for the principal to recover the monies from the contractor than it is for the Board since it is the principal who pays the contractor for work completed.

134 This review of the legislative history and purpose of workers' compensation statutes fails to unearth any indication that s. 133 was enacted for the purpose of improving the ranking of the Board in a bankruptcy. See *Stevens*, supra, at p. 747 for a similar conclusion within the Ontario context.

**C. Paramountcy in the Context of Bankruptcy: The "Quartet"**

135 On four occasions, this Court has been called upon to affirm the paramountcy of the *Bankruptcy Act* over provincial enactments which directly interfered with the scheme of priorities established by s. 136 of the federal legislation. As was mentioned above, these four cases are commonly referred to as the "quartet". Al-though they are not directly on all fours with the appeal at bar (since they do not involve the provincial body claiming against a third-party, only the bankrupt), I agree with Wedge J. that they are of significant interpretive assistance.

136 In *Bourgault*, supra, this Court considered s. 30 of the Quebec *Retail Sales Tax Act*, R.S.Q. 1964, c. 71, which provided that "every sum due to the Crown" under that Act constituted "a privileged debt ranking imme-diately after law costs". The facts of the *Bourgault* case, put briefly, are as follows. Upon the bankruptcy of a debtor, the Deputy Minister of Revenue of Quebec maintained that, by virtue of s. 30 of the *Retail Sales Tax Act*, he was a "secured creditor" within the meaning of the *Bankruptcy Act*, R.S.C. 1970, c. B-3, and was therefore

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

entitled to greater priority than normally available for Crown claims under the bankruptcy scheme. This Court rejected the claim on the grounds that s. 107 [now s. 136] of the *Bankruptcy Act* established an elaborate scheme of distribution of a bankrupt's assets, intending to confer a certain priority on Crown claims, and that provincial statutes which attempted to confer a higher priority were inconsistent with the Act. Specifically, Pigeon J., writing for a majority of the Court, stated at p. 44:

> Accordingly, I find that the case turns upon the interpretation of para. 107(1)(*j*) [of the *Bankruptcy Act*] ... It is abundantly clear that this was intended to put on an equal footing all claims by Her Majesty in right of Canada or of a province except in cases where it was provided otherwise, namely, para. (*c*), the levy, and para. (*h*), workmen's compensation or unemployment insurance assessments and withholdings for income tax. Paragraph (*j*) ends with the following words, "*notwithstanding any statutory preference to the contrary* ". The purpose of this part of the provision is obvious. Parliament intended to put all debts to a government on an equal footing; it therefore cannot have intended to allow provincial statutes to confer a higher priority. In my opinion, this is precisely what is being contended for when it is argued that, because the Quebec statute creates a privilege on immovable property effective from the date of registration, the Crown thereby becomes a "secured creditor" and thus escapes the effect of the provision which gives it only a lower priority [Emphasis in original.]

137 Similarly, in *Deloitte, Haskins & Sells Ltd. v. Alberta (Workers' Compensation Board)*, supra, this Court considered s. 78(4)(*a*) of the Alberta *Workers' Compensation Act*, S.A. 1973, c. 87, which provided that any amount owed to the Workers' Compensation Board by an employer constituted a priority charge on that employer's assets. The Court concluded that this provision did not apply in bankruptcy in that it could not provide the Workers' Compensation Board with a security interest within the meaning of the opening words of s. 107(1) of the *Bankruptcy Act*, R.S.C. 1970, c. B-3, so as to defeat the lower priority accorded to claims by Workers' Compensation Boards by s.107(1)(*h*) of the *Bankruptcy Act*. Specifically, Wilson J. (on behalf of herself and two other judges, with Chouinard J. and two others concurring separately) relied on *Re Bourgault*, supra, and *Re Black Forest Restaurants Ltd.* (1981), 37 C.B.R. (N.S.) 176 (N.S. S.C.), in concluding at p. 806 that:

> With respect, the issue in *Re Bourgault* and *Re Black Forest Restaurant Ltd.* was not whether a proprietary interest has been created under the relevant provincial legislation. It was whether provincial legislation, even if it did create a proprietary interest, could defeat the scheme of distribution under s. 107(1) of the *Bankruptcy Act*. These cases held that it could not, that while the provincial legislation could validly secure debts on the property of the debtor in a non-bankruptcy situation, once bankruptcy occurred s. 107(1) determined the status and priority of the claims specifically dealt with in that section. It was not open to the claimant in bankruptcy to say: By virtue of the applicable provincial legislation I am a secured creditor within the meaning of the opening words of s. 107(1) of the *Bankruptcy Act* and therefore the priority accorded my claim under the relevant paragraph of s. 107(1) does not apply to me. In effect, this is the position adopted by the Court of Appeal and advanced before us by the respondent. It cannot be supported as a matter of statutory interpretation of s. 107(1) since, if the section were to be read in this way, it would have the effect of permitting the provinces to determine priorities on a bankruptcy, a matter within exclusive federal jurisdiction.

> How then should the constitutional question stated by the Chief Justice be answered?Does s. 107(1)(*h*) of the *Bankruptcy Act* conflict with s. 78(4) of *The Workers' Compensation Act* so as to render the latter provision inoperable?I do not believe so. Section 78(4) does not purport to deal with a bankruptcy situation and, by virtue of the presumption of constitutionality, the provincial legislature is presumed to be legislating

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 44

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

within its competence rather than outside it. Faced with the choice of construing the provincial legislation in a way which would cause it to invade the federal sphere, thereby attracting the doctrine of paramountcy, or construing it in accordance with the presumption of constitutionality, I prefer the latter course. I believe also that it accords better with the more recent authorities on the scope of the paramountcy doctrine.

138 In *Québec (Commission de la santé et de la sécurité du travail) c. Banque fédérale de développement*, supra, this Court found that, where a secured creditor took advantage of s. 49(2) of the *Bankruptcy Act*, R.S.C. 1970, c. B-3, and liquidated his security outside the bankruptcy proceedings, the property constituting the security was still property of the bankrupt and the order of payment of creditors from the proceeds of the sale of the security was to be determined by the priorities specified in the *Bankruptcy Act* and not by the provisions of provincial law governing the order of collocation. Writing for the Court, Lamer J. (as he then was) stated at p. 1071:

> In any event, I feel that the decisions in *Re Bourgault* and *Deloitte* are conclusive as to the fate of the appeal. These cases stand for the following proposition: in a bankruptcy matter, it is the *Bankruptcy Act* which must be applied. If a bankruptcy occurs, the order of priority is determined by the ranking in s. 107 of the Act, and any debt mentioned in that provision must therefore be given the specified priority.

Lamer J. went on to note that as provincial statutes cannot affect the priorities created by the federal statute, consistency in the order of priority in bankruptcy situations is ensured from one province to another.

139 Finally, in *British Columbia v. Henfrey Samson Belair Ltd.*, supra, this Court reiterated its position in the three previous cases, holding that a deemed statutory trust created by s. 18(1) of the British Columbia *Social Service Tax Act*, R.S.B.C. 1979, c. 388, over all amounts collected as taxes under the Act could not give the province priority over other creditors under the *Bankruptcy Act*, R.S.C. 1970, c. B-3. The issue was whether the deemed statutory trust could qualify as a trust within s. 47(*a*) of the *Bankruptcy Act* so as to exclude the amounts so held from the property of the bankrupt and instead require them to be given entirely to the provincial government. McLachlin J., writing for the majority, held at p. 33 that:

> To interpret s. 47(*a*) as applying not only to trusts as defined by the general law, but to statutory trusts created by the provinces lacking the common law attributes of trusts, would be to permit the provinces to create their own priorities under the *Bankruptcy Act* and to invite a differential scheme of distribution on bankruptcy from province to province.

140 In *Belair*, no common law trust was found since the monies in the impugned trust had been mixed with other monies. Consequently, the s. 47(*a*) definition of trust was not triggered. However, the important point to be taken from *Belair* is that if the province were to have drafted its tax collection legislation in a way that created a valid trust under the terms of the *Bankruptcy Act*, that money would have been excluded from the property of the bankrupt. From another perspective, the province would be able to affect the outcome of the bankruptcy; yet, because it would not have altered the priorities of distribution, the legislation would have survived paramountcy analysis. In *Belair*, Cory J. dissented regarding the applicability of the questions of law to the specific facts at hand, holding that a valid trust was created and that there was no conflict between the provincial and federal legislation since the *Bankruptcy Act* specifically gave priority to a trust.

141 In my view, the quartet has given rise to two interpretations. One is broad, the other narrow.

142 The respondents in the instant appeal advocate the broad interpretation, according to which any time provincial law affects the final result of a bankruptcy, the province is improperly attempting to alter the priorit-

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 45

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

ies of distribution. The Attorney General for Saskatchewan refers to this as the "bottom line" approach. Under such an approach, s. 133, since it affects the end result of the bankruptcy process, would be deemed invalid.

143 The appellants, on the other hand, advocate a narrower interpretation: the quartet precludes a province only from altering the position of a creditor vis-à-vis the other creditors claiming from the same estate within the scheme of distribution created by s. 136(1). In other words, the only thing the province cannot do is "jump the queue" set up by Parliament. Consequently, in order to impugn a provincial law affecting the bankruptcy process, there must be an attempt to reallocate the priority scheme by directly creating interests in the property of the bankrupt.

144 In my opinion, the second interpretation is the correct one. The quartet stands for the position that only those provincial laws which directly improve the priority of a claim upon the actual property of the bankrupt over that accorded by the *Bankruptcy Act* are inoperative. This accords with the facts of the cases in the quartet. In each case, the provincial governments endeavoured to change the priorities of preferred creditors in s. 136(1) by elevating a lower ranked claim to a higher rank. In *Re Bourgault* and *Belair*, the province attempted to "queue jump" claims of the Crown ranked last by s. 136(1)(*j*) by declaring such debts to be "privileges" (*Re Bourgault*) or deeming them to be "trust money" and hence outside the distribution scheme (*Belair*). In *Deloitte*, the province attempted to elevate its claim through a proposed security interest and, finally, in *F.B.D.B.*, the province once again endeavoured to use the mechanism of a privilege/lien.

145 In many ways, the broad approach propounded by the respondents would produce unacceptable results since it risks nullifying the broad array of provincial legislation underpinning the *Bankruptcy Act*. I am sensitive to the arguments by the Saskatchewan Attorney General that provincial legislation is deeply involved in determining the priority, registration, and amount of indebtedness in the bankruptcy process. In fact, the proprietary and contractual rights that are regulated by the bankruptcy process are usually created by virtue of provincial law. All of these enactments somehow affect the "bottom line".

146 For example, provincial personal property security legislation establishes security interests (such as that relied upon by the Bank of Montreal in the instant appeal) that create secured creditors and validate claims against the estate of the bankrupt. Of similar import is builders' and mechanics' lien legislation that has been held to be constitutionally valid in *TransGas Ltd. v. Mid-Plains Contractors Ltd.*, [1994] 3 S.C.R. 753; see also *Ecarnot (Trustee of) v. Western Credit Union Ltd.* (1991), 7 C.B.R. (3d) 207 (Sask. C.A.), *John M.M. Troup Ltd. v. Royal Bank*, [1962] S.C.R. 487 at p.494, per Judson J.

147 Other valid provincial legislation invariably affecting the "bottom line" includes: consumer protection and warranties legis lation; land titles statutes; sale of goods laws; and a further array of specific statutes such as *The Saskatchewan Farm Security Act*, S.S. 1988-89, c. S-17.1, s. 44 (protecting and exempting farmland and farm equipment from the property of the bankrupt's estate), the *Forest Act*, R.S.B.C. 1979, c. 140, s. 142, and the *Employment Standards Act*, S.B.C. 1980, c. 10, s. 19.

148 The fact that federal bankruptcy legislation is often contingent on provincial initiatives in the area of property and civil rights has been noted by Professor Hogg (*Constitutional Law of Canada* (3rd. ed., 1992), at p. 639):

The term "secured creditor" is defined [in federal bankruptcy legislation] ... in terms so general that the validity and effect of "a mortgage, pledge, charge, lien or privilege" is left to be determined under provincial law relating to secured transactions. For example, if a creditor claims to hold a first mortgage on land in

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 46

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

> Ontario, the trustee in bankruptcy ... will look to Ontario's law of mortgages to determine whether the creditor is indeed a secured creditor and, if so, the extent to which the creditor can resort to the land in priority to all other creditors. *In this way, provincial law has a profound, albeit indirect, effect on the distribution of the bankrupt's assets*. (Emphasis mine.)

To my mind, there is nothing inherently undesirable about this interplay between federal and provincial statutory initiatives in the regulation of the bankruptcy process.

149 The Alberta Court of Appeal has, for its part, also demonstrated a reluctance to invalidate provincial legislation which simply touches upon bankruptcy proceedings. In *Panamericana de Bienes y Servicios S.A. v. Northern Badger Oil & Gas Ltd.*, [1991] 5 W.W.R. 577, the issue before the court was whether the *Bankruptcy Act* prevented a court-appointed receiver-manager of an insolvent and bankrupt oil company from complying with an order requiring that receiver-manager, in the interests of environmental integrity, carry out proper abandonment procedures on seven suspended oil wells. That work would be done at the expense of the secured creditors' entitlement under the *Bankruptcy Act*. At p. 599, Laycraft C.J.A. held for the court:

> In my view, there is no ... direct conflict in this case. The Alberta legislation regulating oil and gas wells in this province is a statute of general application within a valid provincial power. It is general law regulating the operation of oil and gas wells, and safe practices relating to them, for the protection of the public. It is not aimed at subversion of the scheme of distribution under the *Bankruptcy Act* although it may incidentally affect that distribution in some cases. It does so, not by a direct conflict in operation, but because compliance by the receiver with the general law means less money will be available for distribution.

*Northern Badger* thus echoes the proposition that provincial laws of general application continue to apply in bankruptcy even though they may incidentally alter the amount of proceeds available in the bankrupt's estate for distribution.

150 Provincial law plays a critical role in defining both the number and type of participants in the bankruptcy process and the size of the bankrupt's estate. A number of this Court's decisions have emphasized the value of standardizing bankruptcy priorities across the country. But it is important to remember that a bankruptcy priority is a category. The precise content of that category can and does vary to some extent from one province to the next. It seems to me that s. 72(1) of the *Bankruptcy Act* is an example of the recognition of provincial diversity. Section 72(1) reads as follows:

> 72. (1) The provisions of this Act shall not be deemed to abrogate or supersede the substantive provisions of any other law or statute relating to property and civil rights that are not in conflict with this Act, and the trustee is entitled to avail himself of all rights and remedies provided by that law or statute as supplementary to and in addition to the rights and remedies provided by this Act.

151 Because the federal legislation already contemplates that provincial law will impact upon the bankruptcy process, the respondents must do more than simply show that s. 133 has an effect on a particular bankruptcy. Indeed, in *Robinson v. Countrywide Factors Ltd.* (1977), [1978] 1 S.C.R. 753, Beetz J., commenting on the precursor to s. 72(1) [s. 50(6)], wrote (at pp. 808-809):

> ... I am of the view that s. 50, subs. (6) of the *Bankruptcy Act* [R.S.C. 1970, c. B-3], *provides a clear indication that Parliament*, far from intending to depart from the rule of operational conflict, *did in fact aim at the highest possible degree of legal integration of federal and provincial laws* ... (Emphasis added.)

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

152 I conclude that within the context of the bankruptcy process judicial authority and common sense milit-
ate in favour of a guarded approach to invalidation under the paramountcy doctrine. When this analysis is ap-
plied to the case at bar, it obliges the respondents, in order to prevail, to demonstrate that s. 133 of the impugned
provincial Act actually reorders the federally established priority scheme with regard to the property of the
bankrupt Metal Fab by directly creating interests therein. I now turn to this issue.

**D. Application of the Law to s. 133 of the Saskatchewan Workers' Compensation Act**

*(i) Validity of s. 133(1)*

153 I reproduce s. 133(1), with its important portion underscored:

> 133. — (1) Where a person, whether carrying on an industry included under this Act or not, in this section
> referred to as the principal, contracts with any other person, in this section referred to as the contractor, for
> the execution by or under the contractor of the whole or any part of any work for the principal, it is the duty
> of the principal to ensure that any sum that the contractor or any subcontractor is liable to contribute to the
> fund is paid and, where the principal fails to do so and the sum is not paid, *he is personally liable to pay* that
> sum to the board. (Emphasis added.)

154 In my opinion, s. 133(1) has nothing to do with the property of the bankrupt. It creates a strict in perso-
nam obligation from the principal owing to the Board. The property of the principal is in no way subject to the
*Bankruptcy Act*. The bankrupt is not even involved: there is no concern for the specific monies held by Husky
for Metal Fab or owing by Husky to Metal Fab. The provision simply creates a third party guarantee by the prin-
cipal that the contractor will pay its debts to the Board.

155 The respondent Husky alleges that, regardless of the fact that s. 133(1) does not involve the property of
the bankrupt, it remains in operational conflict with the *Bankruptcy Act* since it may have the effect of allowing
the Workers' Compensation Board to recover more money for the Injury Fund than it likely could have done by
proving a claim in bankruptcy and relying on s. 136. It is suggested that s. 133 permits the Board to jump from
eighth place (under s. 136(1)(*h*) of the *Bankruptcy Act*) to first, thereby circumventing the priorities in bank- ruptcy.

156 In response, I note that s. 133(1) only alters the Board's recovery by permitting it to recover from a non-
bankrupt third party. There is no direct conflict within the meaning of the quartet or of paramountcy doctrine
more generally between s. 133(1) and the *Bankruptcy Act*. There is nothing in the *Bankruptcy Act* which pre-
cludes any creditor, even if specifically mentioned in s. 136, from pursuing its remedies against a third-party as
well as or instead of proving a claim in bankruptcy, although double recovery would certainly be frowned upon.

157 The Attorney General for Saskatchewan takes this analysis one step further by suggesting two common-
place and intuitively reasonable examples of situations in which third-party liability operates in concordance
with a bankruptcy: a situation involving a personal guarantee by a third party, and a plaintiff's claim in an action
for negligence against two co-defendants. The Attorney General reasons as follows:

> (a) A lender may loan money on the condition of receiving a personal guarantee from a third party. If the
> borrower goes bankrupt, the lender has every right to pursue the third party under the guarantee, and may
> recover the full amount owing. The lender then will have "advanced its position rather dramatically", com-
> pared to what it could have received through the bankruptcy process. The net result is a "clear advantage" to

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 48

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

the lender, who "has managed to assure payment of its claim and leave it to the [third party guarantor] to struggle for repayment under the *Act*," probably as an unsecured creditor of the bankrupt

(b) In the claim of a plaintiff in an action for negligence against two co-defendants, if the plaintiff's claim succeeds there is a judgment owing against the two defendants. The two defendants are jointly and severally liable for the judgment. If one defendant goes bankrupt, the plaintiff is fully entitled to proceed against the other defendant for the full amount of the judgment, and ignore the bankruptcy process entirely. Again, the net result is a "clear advantage" to the plaintiff, authorized by provincial statute: *Contributory Negligence Act*, R.S.S. 1978, c. C-31, s. 3(2).

158 In this case, we are not really dealing with the debt of Metal Fab any more. The legislation has validly created two debts that, although interconnected, are independent: the debt from Husky to the Board as surety of the Injury Fund, and then the debt of Metal Fab to Husky for the sums paid by the latter for the delinquency of the former. There is a great difference between altering the priorities under the *Bankruptcy Act* and statutorily empowering the Board to seek relief from more than one creditor.

159 I do not accept the respondents' submission, supported by Wakeling J.A. on appeal, that the *F.B.D.B.* case extended the "no interference" principle to the relationship between a creditor and a third-party to the bankruptcy. The *F.B.D.B.* decision involved a bank seizing the property of Structal Inc. pursuant to a security agreement. Subsequent to this seizure, Structal made an assignment in bankruptcy. The Workers' Compensation Board of Québec then tried to claim a priority interest *in the seized property* by relying on a provision of the workers' compensation legislation which stipulated that assessments for which the employer Structal was liable amounted to a privileged claim on all the property of the employer. This Court, noting that the property in question was still part of the estate of the bankrupt, deemed the Québec WCB's order to amount to a reordering of the bankruptcy priorities. On this point, Lamer J., held at pp. 1066-67:

In this Court [the Workers' Compensation Board] argued, *inter alia*, that the order of priority set out in ... the *Bankruptcy Act* is not applicable, as the immovable in Royal Trust's possession at the time of the bankruptcy was not part of the estate which passed to the trustee in bankruptcy ...

With respect, I cannot accept this reasoning. The immovable, encumbered to [F.B.D.B.] and seized by *the* trustee, is part of the "property of a bankrupt" mentioned in ... the *Bankruptcy Act*. [Emphasis added.]

160 Regarding the proper interpretation of the *F.B.D.B.* decision, I agree with the following submissions by the Attorney General for British Columbia and the appellant Board, respectively:

[In *F.B.D.B.*] the parties in question were seeking to realize, albeit outside of the bankruptcy proceedings, against property of the bankrupt. But that property was nevertheless subject to the Act and so, therefore, were the creditors who sought to realize against it. Accordingly, the *Federal Business Development Bank* decision does not purport to extend the scheme of priorities of proven claims under the *Bankruptcy Act* to recovery of the underlying indebtedness from a third party.

That [*F.B.D.B.*] analysis does not take the cases "one step further" and apply [them] to parties or property not involved in bankruptcy. To the contrary, it specifically involves a situation where provincial legislation directly creates an interest in the property of the bankrupt. This is very different from the situation involved in this case where Husky's liability under s. 133(1) ... is strictly personal and involves no claim whatsoever against either Metal Fab or the property of Metal Fab. Accordingly, it is submitted that the reasoning of the

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

Court of Appeal is a significant and unwarranted extension of the principles established by the leading cases.

161 Section 133(1) does not involve property that is related to or part of the estate of the bankrupt and it is consequently not in operational conflict with the bankruptcy scheme. I am strengthened in this conclusion by the decision of the Ontario Court of Appeal in *Stevens*, supra, and the case of *Re French River Contracting Co.*, [1937] O.W.N. 665. In fact, I prefer the *Stevens* approach over that of both the Saskatchewan Court of Appeal in its decision in the case at bar and the Saskatchewan Court of Queen's Bench in *Serdula Construction Management Inc. v. Saskatchewan (Workers' Compensation Board)*, supra, per Lawton J.

162 In *Stevens*, supra, at p. 748, Grange J.A. held:

The principle is simple. The money owing under s. 9(3) [Ontario equivalent to s. 133(1)] is not property of the bankrupt and never comes into the hands of the trustee.

163 The Bank of Montreal submits that *Stevens* can be distinguished on the facts. Its argument revolves around the observation that in *Stevens* there was a trustee overseeing a group of unsecured creditors. On the other hand, in the case at bar, there has been an assignment to a secured creditor and the set-off would deplete the funds normally accruing to this secured creditor. I agree that this difference is noteworthy. However, I am not convinced that this difference is sufficient to undermine the persuasive authority of the *Stevens* decision. The *Stevens* court did not mention that the absence of secured creditors affected in any way its decision to uphold the validity of the impugned provision.

164 In sum, s. 136(1)(*h*) encompasses a claim against the property of the bankrupt. The Board claim under s. 133(1) targets a solvent principal. The two provisions are co-extensive, not mutually exclusive. Use of s. 133(1) does not displace s. 136(1)(*h*); it complements it.

165 In closing, although I find there to be no conflict between s. 133(1) and the *Bankruptcy Act*, I posit that, even if there were to be some element of conflict, this must be evaluated in light of the fact that the provincial legislation is intra vires. Legislation that is intra vires is permitted to have an incidental and ancillary effect on a federal sphere. I would emphasize again that this Court has traditionally declined to invoke the paramountcy doctrine in the absence of actual operational conflict. I am uncomfortable with the "water-tight" approach to federal bankruptcy legislation propounded by the respondents. To interpret the quartet as requiring the invalidation of provincial laws which have any effect on the bankruptcy process is to undermine the theory of co-operative federalism upon which (particularly post-war) Canada has been built. In *Deloitte*, supra, at pp. 807-808, Wilson J. recognized it to be appropriate to adopt as narrow a definition of operational conflict as possible in order to allow each level of government as much area of activity as possible within its respective sphere of authority.

166 On a related note, a rather weak argument has been made to the effect that s. 133(1) is inoperative simply because it increases the total amount of the claims being made by creditors. I would respond that even if this were true on the facts, many pieces of provincial legislation achieve precisely the same goal. In fact, as discussed earlier, most claims against a bankrupt's estate are grounded in provincial legislation; I do not see why the *Workers' Compensation Act* should be impugned because it may add a creditor to the list, when nearly all of the other creditors will have been added by virtue of other provincial statutes. Neither increasing the number of claims made nor decreasing the amount of assets in the estate is activity necessarily commensurate with altering the priorities of distribution among the creditors.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 50

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

167 To this end, a principal's liability under s. 133(1) is not extinguished by the bankruptcy of the contract- or.

### (ii) The Validity of s. 133(3)

168 I find s. 133(1) to be constitutionally valid but because I believe (for reasons outlined infra) that the
components of s. 133 are severable, I must evaluate s. 133(3) separately. As mentioned earlier, this provision en-
gages a more direct interference with the bankruptcy scheme since it is the actual property of the bankrupt that is
involved in the restitutionary claim launched by the principal. It constitutes, to my mind, the only linkage
between the property of the principal and the estate of the bankrupt contractor. Section 133(3) reads as follows:

> (3) Where the principal is liable to make payment to the board under subsection (1), he is entitled to be in-
> demnified by any person who should have made payment and is entitled to withhold, out of any indebted-
> ness due to that person, a sufficient amount in respect of that indemnity.

169 Before proceeding any further, I believe it necessary to subdivide s. 133(3) into two parts because the
provision enshrines two different remedies: that of set-off as well as that of indemnification. Clearly, set-off is
the more intrusive of the two since it permits the principal to stand first in the priority scheme by taking away
the property of the bankrupt before it enters the estate. As to indemnification, any such claim by the principal
might have but an ancillary effect on the estate of the bankrupt since it only permits the principal to join the
ranks of the unsecured creditors. On this latter point, I note that it has been submitted that s. 136(1)($h$) might
cover the amount owing to the principal; if so, then the principal would rank well above the unsecured creditors.
Although it is not necessary to decide this issue, I shall simply assume that s. 136(1)($h$) does not have such a
wide ambit.

170 As will soon become evident, this sub-dividing of s. 133(3) is important: given that paramountcy doc-
trine operates to invalidate only to the extent of the operational conflict, it could be that because of their varying
effects, the "set-off" claim could be struck while the indemnification claim remains operational: *Robinson*,
supra, at p. 808; *Vapor Canada Ltd. v. MacDonald*, [1977] 2 S.C.R. 134; Hogg, at p. 434.

171 However, at this point in the analysis we come to s. 97(3) of the *Bankruptcy Act*. Neither claim will be
invalid if s. 97(3) of the *Bankruptcy Act* can be interpreted in a way that will reconcile the priority scheme of the
Act with the common law of set-off (and, implicitly, of indemnification) *and* if the claims embodied in s. 133(3)
can be found to be merely reflective of those common law causes of action. Section 97(3), which provides that
the law of set-off is to persist in bankruptcy, reads as follows:

> (3) *The law of set-off applies to all claims made against the estate of the bankrupt* and also to all actions in-
> stituted by the trustee for the recovery of debts due to the bankrupt in the same manner and to the same ex-
> tent as if the bankrupt were plaintiff or defendant, as the case may be, except in so far as any claim for set-
> off is affected by the provisions of this Act respecting frauds or fraudulent preferences. (emphasis mine)

172 Section 97(3) thus specifically envisions that there will be cases where money owing to the bankrupt
will not enter the bankrupt's estate because it will have been set off against a debt owed by the bankrupt to that
individual. As Grange J.A. noted in *Stevens* (at p. 748), the money comes to the Board by virtue of the *Workers'
Compensation Act*: "it is the *Bankruptcy Act* itself and not the provincial legislation that recognizes rights of set-
off". I note in passing that the right of set-off in s. 97(3) includes both legal and equitable set-off: Houlden and
Morawetz, *Bankruptcy Law of Canada* (3d ed.) at pp. 4-90 and 4-91. This Court has recognized that legal set-off

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 51

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

does not operate within the context of an assignment since that assignment destroys the mutuality of the cross-obligations between the parties: *Telford v. Holt*, [1987] 2 S.C.R. 193. In the case at bar, Metal Fab assigned its book debts to the Bank, thereby presumptively eliminating the availability of legal set-off. To this end, my focus shall be limited to equitable set-off.

173  The fundamental question at this juncture is whether s. 133(3) is merely declaratory of the rights to set-off and indemnification that existed at equity. If s. 133(3) creates no new rights of set-off and merely confirms the availability of traditional equitable set-off, it is consistent with the *Bankruptcy Act*. In this regard, I rely on the *Belair* case. In *Belair*, McLachlin J. suggested (at pp. 34-35) that if the statutory device (in that case a trust) shared the characteristics of its common law counterpart, the former would be compatible with the *Bankruptcy Act* even if it affected the distribution scheme. On the other hand, if the statutory device was wider in scope than that available at law or equity, there would be conflict and the device would need to be declared a nullity. In *Belair*, the Court found that the statutory trust shared none of the characteristics of a trust established under the general principles of law; accordingly, it was susceptible to invalidation on the ground of interference with the order of priorities. In this regard (and as shall become evident infra), *Belair* is distinguishable from the case at bar. No "deeming" is necessary to bring Husky within the four corners of the "law of set-off" as that term is used in s. 97(3).

174  I note that set-off operated within the bankruptcy context as early as the time of Elizabeth I. The first specific statutory set-off clause was codified in a 1705 statute: Wood, *English and International Set-Off*, at p. 282. The rationale behind the use of set-off in the bankruptcy context is aptly summarized by Fletcher Moulton L.J. in *Lister v. Hooson*, [1908] 1 K.B. 174 (C.A.), at p. 178:

> The right of set-off in bankruptcy has been dealt with by various statutes, but takes its origin from the fact that the jurisdiction in bankruptcy was from the first an equitable jurisdiction. The successive statutory for-mulations of the consequence of this principle, embodied in the clauses as to mutual credit, dealings &c., have never altered this fundamental principle, and, speaking for myself, I cannot see any ground why in the present instance the injustice should be perpetrated of making a person who in the balance is not a debtor to the estate pay in full the sum due to the estate and receive only a dividend on the sums due from the estate.

175  In my opinion, s. 133(3) is duplicative of the law of equitable set-off as delineated by this Court in *Telford*, supra, and confers a right that does not go beyond what would be ordinarily available at law or equity. Moreover, under s. 92(13) of the *Constitution Act, 1867*, a province has the competence to codify legal and equitable rules related to set-off. Ostensibly, the motivation behind the codification of these rules in s. 133(3) is to facilitate recovery by principals, many of whom would be more familiar with the terms of a statute than the intricacies of the common law.

176  Regarding the declaratory nature of Husky's claim against the now assigned estate of the bankrupt, I note that, absent s. 133(3), such a claim would exist according to the law of restitution or the law of contract. In terms of restitution, it is settled that a person may claim for recoupment or reimbursement of monies expended by him under compulsion of law if the effect of such a payment is to discharge the liability of another. In other words, A will be allowed to recover from B by way of set-off where A has been required to make a payment to C on B's behalf. I am supported in this conclusion by the following passage cited from *Moule v. Garrett* (1872), L.R. 7 Exch. 101 at p. 104:

> Where the plaintiff has been compelled by law to pay, or, being compellable by law, has paid money which

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 52

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

the defendant was ultimately liable to pay, so that the latter obtains the benefit of the payment by the discharge of his liability; under such circumstances the defendant is held indebted to the plaintiff in the amount.

177 This point was addressed in a more detailed manner in the decision of Lord Wright M.R. in *Brooks Wharf & Bull Wharf Ltd. v. Goodman Brothers*, [1937] 1 K.B. 534 (C.A.), at p. 544:

> The essence of the rule is that there is a liability for the same debt resting on the plaintiff and the defendant and the plaintiff has been legally compelled to pay, but the defendant gets the benefit of the payment, because his debt is discharged either entirely or pro tanto, whereas the defendant is primarily liable to pay as between himself and the plaintiff. *The case is analogous to that of a payment by a surety which has the effect of discharging the principal's debt and which, therefore, gives a right of indemnity against the principal*. (Emphasis added.)

178 In the case at bar (assuming that the order was validly made and limited to the liabilities arising from Metal Fab's work for Husky), Husky is eligible for set-off since Husky's liability to pay arose only as a consequence of Metal Fab's default regarding its requirement to make payments to the Injury Fund. Payment by Husky would have the obvious effect of releasing Metal Fab of its liability to the Board. Thus, in light of the fact that Husky is under a clear legal obligation to make the payments in question, it follows that this is a circumstance where Husky is entitled to seek restitution from Metal Fab. In this connection, the Workers' Compensation Board of British Columbia points out that the B.C. legislation does not include an explicit recognition of set-off, but still the B.C. courts appear to have read it in according to the general principles of restitution.

179 The second ground for set-off independent of s. 133(3) arises from the contractual relationship between Metal Fab and Husky. The contracts binding the parties, in cls. 12.01 and 13.01, oblige the contractor to "comply with all laws" and indemnify the principal from any expense arising from the "negligent performance, purported performance or non-performance of the Contract" by the contractors. Given this language, Metal Fab's failure to pay amounts owing to the Board constituted a breach of its contractual obligations to Husky. An indemnification claim rises concomitantly. This claim stands apart from s. 133(3).

180 It is submitted that the fact that the property of the bankrupt has been assigned to the Bank and, thus, that the debt is no longer technically owed to Metal Fab but to the Bank of Montreal, militates against a finding that the law of set-off applies in this case. I disagree. Equitable set-off (unlike legal set-off) can operate within the context of an assignment, even of book debts: *Telford*, supra, at pp. 206-209, affirming *Newfoundland Government v. Newfoundland Railway Co.* (1888), 13 App. Cas. 199 (P.C.). The only prerequisite to set-off against the assignee is that the claim against the assignee is to arise out of the same contract or series of events which gave rise to the original claim or be closely connected with that contract or series of events. As noted by Wilson J. in *Telford*, supra, at p. 211:

> ... cases involving [set-off] debts that arise from the same contract or closely inter-related contracts form an exception to the general rule. In these cases a debt arising out of the contract or closely interrelated contracts may be set-off against the assignee even if the debt accrues after the notice of the assignment.

181 In *Telford*, the two debts arose out of a land-swap. The Telfords and Canadian Stanley Development Ltd. exchanged lands of equal value, each paying the other a different cash sum and each taking back a first mortgage or a second mortgage. The end result of the transaction was that on closing Canadian Stanley would pay the Telfords $50,000 which the Telfords would use for the purpose of financing the construction of a resid-

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 53
1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

ence on their new land. Five days prior to the closing of its deal with the Telfords, Canadian Stanley assigned its mortgage to the Holts to secure the balance of the purchase price on a piece of land the Holts had sold to Canadian Stanley, but failed to notify the Telfords about this assignment before the transaction with them was closed. The Telfords later agreed to a postponement of the Canadian Stanley mortgage resulting in the priority of that mortgage moving from second to third place on title. The Telfords only learned about Canadian Stanley's assignment after trying to tender their first payment on the mortgage. They then indicated that a court application for a discharge of the mortgage would be made. Shortly thereafter, the Holts demanded the payment then due ($50,000 plus interest, for a total of $50,886.60) and filed a statement of claim against the Telfords for the entire amount owing (this being $150,000, independent of the amount owing on the mortgage). This claim was based upon a clause in the Telford mortgage which provided that upon default of any payment of the principal the whole amount would become payable. After receiving notice of the Holts' statement of claim, the Telfords paid the $50,886.60 into court and then counter-claimed for a discharge of the mortgage, alleging that they had the right to set off the debt owed to them by Canadian Stanley against the assignee Holts' claim.

182 Wilson J. permitted the Telfords to use of the doctrine of equitable set-off. It was duly noted that the debts did not accrue until after the assignment. However, Wilson J. did find that equitable set-off could operate since the debts were so closely connected that it would have been unfair to enforce one without allowing the setting off of the other.

183 The specific assignment and the specific bankruptcy extant in the case at bar satisfy the *Telford* test. I note that the debt from Metal Fab to Husky accrued on the date of the demand to Husky by the Board (March 16, 1992). This was four days after Husky was given notice of the assignment to the Bank yet before the occurrence of the actual assignment. However, the *Telford* test is met since Husky's indemnity claim arose out of the very contracts pursuant to which funds are now owing to the Bank of Montreal; in fact, Husky has a direct interest in the bankrupt's property which, by force of the assignment, is now held by the Bank. Moreover, the nexus between the amounts Husky seeks to set off and the assigned debt can be said to be more direct than it has been in other cases where equitable set-off has been allowed: *Hanak v. Green*, [1958] 2 All E.R. 141 (C.A.); *Coba Industries Ltd. v. Millie's Holdings (Canada) Ltd.*, [1985] 6 W.W.R. 14 (B.C. C.A.); *Federal Commerce & Navigation Ltd. v. Molena Alpha Inc.; "Nanfri" (The); "Benfri" (The); "Lorfri" (The)*, [1978] 3 All E.R. 1066, affirmed [1979] A.C. 757 (H.L.).

184 The cause of action specifically contemplated by Husky (i.e., a principal seeking restitution from an assignee for book debts from a assignor whose delinquency prompted the principal's liability in the first place) is of a sufficiently interconnected nexus so as to fit the "closeness" criteria mandated by the *Telford* test. This is especially the case when the assignee knew about the outstanding debts before receiving assignment of the estate. I am not persuaded by the Bank's submission that equitable set-off is not available because the right to indemnification did not arise under the contract. This analysis ignores the essential characterization of the debts. The basis of the indemnification in the appeal at bar is the debt paid by Husky on behalf of Metal Fab which related to the contracts signed between those two parties. Furthermore, according Husky the ability to set off also fulfils what is likely the principal raison d'être of the doctrine of equitable set-off in the first place, namely the promotion of fairness.

185 Lord Denning, in the *Federal Commerce* case, remarks at p. 1078 (C.A.):

We have to ask ourselves: what should we do now so as to ensure fair dealing between the parties ... This question must be asked in each case as it arises for decision ...

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

186  I recognize that, in the appeal at bar, Husky is liable under the terms of s. 133(1). Moreover, s. 133(1) entrenches an absolute liability standard in order to create joint and several responsibility among all employers for the sums that one of them has left unpaid. The question then arises why it would remain "fair" to allow Husky to, in the end, escape the effects of this liability by permitting all of the unpaid dues to flow from the estate of the insolvent bankrupt, to the detriment of the other creditors.

187  My response is twofold: (1) although s. 133 renders the principal and the contractor jointly and severally liable to the Board, as between the principal and contractor it is clear that the primary liability reposes with the contractor and, consequently, the solicitation of contribution for payments made on behalf of that contractor by the principal is consonant with commercial fairness; and (2) Husky's insistence that the contract contain terms obliging Metal Fab to make the payments to the Board and its decision to hold-back funds (this being a standard industry practice), although certainly not relieving it of liability under s. 133, does militate in favour of a finding that Husky's conduct was such that it would be equitable and fair to allow it the right of set-off.

188  Apart from United Kingdom jurisprudence, the most persuasive authority cited to us on the s. 133(3) issue is the Ontario Court of Appeal's decision in *Stevens*. Grange J.A., after reviewing the authorities, concluded that equitable set-off was available to a principal who had become fixed with liability for the contractor's unpaid debts. He concluded at p. 749:

> Whether or not the money was due to the principal before the bankruptcy, it most assuredly "arose out of or was closely connected with the same contract or series of events."

189  The Bank of Montreal also submits that s. 97(3) is not applicable to a situation where there are secured creditors who own the funds of the bankrupt. To this end, although s. 97(3) may have been applicable to the facts in *Stevens*, it is not so to the case at bar. In response, I note that s. 97(3) deems the law of set-off to operate in relation to *all claims made against the estate of the bankrupt*. There is no distinction made regarding the types of claims. And the Bank is the owner of nothing less and nothing more than the "estate of the bankrupt".

190  I thus find that, since s. 97(3) encapsulates the rights ordinarily available to Husky at equity, s. 133(3) is fully operative in the case at bar, as well as to all situations in bankruptcy where the principal would fall within the *Telford* test as I have interpreted it.

### (iii) Does the Partial or Total Invalidity of s. 133(3) Render s. 133(1) Inoperative?

191  It is not necessary to consider this issue since I find that subs. (3) is constitutionally valid. However, I would like to offer certain comments on the interplay between s. 133(1) and (3).

192  It is important to recognize that s. 133(1) does not make the principal's obligation to the Board in any way contingent upon the principal's ability to obtain indemnity (through set-off or otherwise) under s. 133(3). There may be many cases in which there is either no indebtedness between the principal and the contractor or insufficient indebtedness to cover the full liability involved. Yet, in either of these situations, s. 133(1) is still fully applicable. To this end, not only does s. 133(1) operate in isolation of the bankruptcy, it also operates in dependently from s. 133(3). Section 133(1) is the key feature of s. 133 as a whole. It aims at preserving the integrity of the Injury Fund. Section 133(3) is clearly secondary in this regard. Consequently, I do not accept Husky's argument that s. 133(1) was intended solely to operate in conjunction with s. 133(3). Although I might be prepared to find that s. 133(3) and the equitable rights it codifies cannot operate independently from s. 133(1), I have no doubt that s. 133(1) can operate independently from s. 133(3). The legislature contemplated that s. 133(3) may

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

not always be available to assist a principal to recoup sums paid under subs. (1).

193  The argument was raised that s. 133(1) cannot stand alone since, without the accompaniment of s. 133(3), it is a draconian, unreasonable provision tantamount to an expropriation. But the point of the matter is that, since s. 133(3) is merely declaratory of law and equity, s. 133(1) does not exist without a right to indemnification (or to set-off).

194  If s. 133(3) were invalid and if the law did not incorporate the equitable right of set-off (as discussed supra), then s. 133(1) would operate to guarantee the Board payment from the principal without a corresponding restitutionary recourse on behalf of the latter. Although this may seem a difficult burden to bear, in a sense it is simply the cost of doing business in a context where, for public policy reasons, the yoke of the contractor's delinquency is placed on the principal's shoulders instead of those of the workers. Although heavy, this burden, in my mind, is not draconian. It is partly attenuated by the fact that Husky, as a sophisticated employer, can be safely assumed to be well-versed in the practice of obtaining clearance certificates to protect itself from principal's liability under s. 133(1). These certificates allow a principal to determine in advance of releasing funds to a contractor whether that contractor has outstanding indebtedness to the Board. However, even if it created a draconian burden, there is nothing barring the legislature from passing such legislation. The following passage from La Forest J.A. (as he then was) in *Re Estabrooks Pontiac Buick Ltd.* (1982), 44 N.B.R. (2d) 201 at p.214, is pertinent:

> The courts should not ... place themselves in the position of frustrating regulatory schemes or measures obviously intended to reallocate rights and resources simply because they affect vested rights. For legislation almost invariably affects vested rights.

195  The legislature can even pass expropriation legislation (much more onerous that s. 133(1)) as long as the language is clear: *TransGas Ltd.*, supra; *Manitoba Fisheries Ltd. v. R.* (1978), [1979] 1 S.C.R. 101.

196  There are also policy reasons as to why s. 133(1) ought to be viewed as operating independently from s. 133(3). The Workers' Compensation Board of Alberta argues convincingly:

> ... it is submitted that to not construe section 133(1) ... separately from section 133(3) would allow mischief to creep into industrial practices. An unscrupulous employer could incorporate a subcontractor to provide all its labour services. Thereafter if that former employer (now a principal) could not be held liable under section 133(1) where the subcontractor is allowed to go into or assigns itself into bankruptcy, the Accident [Injury] Fund is at risk. Ultimately, if such a practice became widespread, the efficacy of the workers' compensation system could be undermined.

197  In sum, I respectfully disagree with the trial judge's and Court of Appeal's conclusions that s. 133 is to be treated as an indivisible whole. Although this finding is not necessary to dispose of this appeal, I hope that it may settle any extant, and preclude any future, confusion regarding the operation of s. 133, as well as its counterparts in the laws of the provinces other than Saskatchewan.

**E. Some Residual Issues**

198  The view of this Court was principally solicited for the purpose of answering the constitutional questions. However, several of the parties raise threshold factual issues which were not pleaded at trial which I should like to address, albeit briefly.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

199 The Bank of Montreal submits that Husky was not liable under s. 133 for payment of Metal Fab's assessments. Husky itself raises a similar issue. This follows, it is alleged, from the following argument: within the context of s. 133, assessments should relate only to the work done by the delinquent contractor for the impugned principal. In the case at bar, it is submitted that there is no indication the assessments against Husky were specific only to the work completed for Husky by Metal Fab; in fact, some affidavit evidence is now tendered to the contrary. This evidence alleges that the assessment sent to Metal Fab by the Board was not related to any particular work, but calculated in accordance with an annual payroll estimate supplied by the contractor to the Board.

200 In response, I note that both the trial judge and the appeal judges found that the order under s. 133 had been validly issued. This finding was not contested in the courts below. Leave was not granted by this Court to hear this issue. For these reasons, I believe that this issue should not now be heard for the first time. The general practice of this Court is, given the lack of considered reasons of the courts below, to refuse to consider new matters raised for the first time, especially where, had the issue actually been raised, the parties may have been in a position to present relevant evidence and submissions: *Vickery v. Nova Scotia (Prothonotary of the Supreme Court)*, [1991] 1 S.C.R. 671; *R. v. Amway of Canada Ltd.*, *(sub nom. R. v. Amway Corp.)* [1989] 1 S.C.R. 21.

201 A far preferable procedure would be to permit this argument to be raised at the new trial that, given the constitutionality in bankruptcy of s. 133, shall be ordered pursuant to the disposition of the instant appeal. At that point, evidence can be adduced as to the exact sources of the $246,745.26 allegedly owed by Metal Fab to the Board. A trial judge, when properly presented with all of the material evidence, will be in a far better position to sift through the records and ascertain the true amount of Metal Fab's unpaid contributions for which Husky could be held liable. Although it could very well be that the extant assessments reveal Husky's true liability, at this juncture I am not prepared to make such a finding.

202 However, although not in a position to determine whether the assessments made against Husky by the Board involved unpaid contributions stemming from work Metal Fab completed for principals other than Husky, this Court can, as a question of law, determine whether s. 133 could permit the recovery of such amounts. I find it does not. The liability of the principal is to be limited to the specific work that was completed for it by the delinquent contractor.

203 It is unfortunate that the wording of s. 133 in the 1979 version of the statute was amended in an ambiguous form. In cases of ambiguity, courts are to rely on the principle of statutory interpretation according to which statutes purporting to pay the debts of one person out of the property of another are to be given a restrictive interpretation: *Driedger on the Construction of Statutes* (3rd ed.), at p. 370; *Homeplan Realty Ltd. v. Avco Financial Services Realty Ltd.*, *(sub nom. Industrial Relations Board v. Avco Financial Services Realty Ltd.)* [1979] 2 S.C.R. 699.

204 I am further fortified in this regard by the fact that the grandfather of s. 133, s. 9 of the 1910 *Workmen's Compensation Act*, limited the principal's liability to the actual work executed for it by the delinquent contractor: see also s. 11 of the 1928 legislation. In any event, gauging from the submissions made before this Court by the Appellants and some of the Interveners, such appears to be the practice of the provincial Boards when issuing notices under s. 133 and its companion provisions. This accords with common sense, as it would appear counter-intuitive to hold Husky liable for *all* of Metal Fab's outstanding debts to the Board. Under such a regime, liability could be virtually limitless since it might encompass all of the shortfall accruing to the contractor independent of the particular principal under whose contracts that shortfall actually arose.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 57
1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

205 However, I note that, although relevant to the amount of the assessment in the appeal at bar, this issue is not of wide public importance given that the Saskatchewan legislation was once again amended in 1993 (S.S. 1993, c. 63, s. 40) to provide expressly that the liability be limited to the specific work performed. As I see it, the 1993 amendment supports my conclusion that the liability of the principal be limited to the unpaid funds arising out of the specific work completed for it since this amendment appears to be intended as a clarification of the law, not as a substantive change.

206 I also find that limiting s. 133(1) to the debts arising out of the actual work completed for the principal permits the subsection to operate in tandem with subs. (3). As was discussed supra, subs. (3), in order to be valid in the bankruptcy context, must be interpreted to permit only set-off to the extent allowed at law or equity. I believe that the law of set-off would only allow the restitution of the sums paid by the principal to the Board that actually involved monies that the delinquent contractor was liable to pay by virtue of its nexus with the princip- al.

207 The Workers' Compensation Board and the Bank of Montreal raise a further issue. It is suggested that s. 133(3) does not entitle Husky to indemnify itself out of funds owing to Metal Fab because it received the demand for payment from the Board after it had been notified that Metal Fab had given notice of assignment of book debts to the Bank of Montreal. There was thus no "indebtedness towards the contractor", but only towards the assigned party.

208 Again, I note that this issue was not argued fully in the courts below; in fact, no questions were raised regarding the factual ability of Husky to indemnify itself from the property of the bankrupt. It thus comes as no surprise that the factual record to which this Court can turn to resolve this question is somewhat bare. I therefore conclude that this issue should not be decided at this point. It is better left to be determined by a trial court, perhaps even by fiat. I would suggest, however, that the fact that s. 133(3) is but declaratory of equitable set-off (as discussed supra), in which set-off can operate after the assignment has occurred, be seriously taken into account in the eventual disposition of this issue.

209 Husky argues that it did not breach its statutory duty to ensure payment by the contractor under s. 133(1) because it held back certain sums (in excess of the unpaid assessments) and ensured that Metal Fab would be contractually bound to pay the WCB fund. Until this point in the litigation, it was settled that Husky was, barring the non-operation of the statute, liable to pay the Board. There is no reason for this Court now to review the findings of the trial and appellate judges in this matter, especially, once again, given the paucity of the factual record advanced in favour of this proposition.

210 In any event, I note that the duty created by s. 133(1) is not one of due diligence. The statutory language has encumbered the principal with absolute liability. Nothing short of actually ensuring payment will discharge the duty. Husky's reading of s. 133(1) ignores the true purpose of the provision, namely the maintenance of the viability of the Injury Fund through the creation of joint and several liability among employers for the contributions.

211 Finally, on a related note, it is submitted that once the property passed into the hands of the assigned Bank, Husky was no longer in any position of control or supervision over Metal Fab. Therefore it no longer operated under the statutory duty to ensure that Metal Fab paid its assessments. For this reason, the ability of the Board to collect under s. 133(1) could not be invoked. Husky also submits that, were it to encourage the bankrupt to pay the amounts due to the Board, it would infringe s. 158 (obligation of a bankrupt to deliver all of the

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 58

1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d) 131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

property to the trustee) and thereby effectively aid and abet in the commission of an offence contrary to s. 198(*a*) of the *Bankruptcy Act*. I reject this submission. A bankrupt's obligations under s. 158 are necessarily qualified by other provisions of the Act such as s. 72(1) (allowing interplay with provincial legislation) and s. 97(3) (recognizing rights of set-off against the bankrupt's estate). There is no operational conflict between ss. 133(1) and 158(*a*). I also note that s. 133(1) creates a situation in which, ab initio, the principal is liable for any debt owed to the Board by the contractor. It does not matter whether, ex post facto, control over the contractor's estate passes into other hands.

## VI. Conclusions and Disposition

212 By way of summary, it may be helpful to state my conclusions:

1. There is no conflict between s. 133(1) of the Act and the *Bankruptcy Act*. Consequently, s. 133(1), although not primarily designed for the bankruptcy context, is applicable and operative if and when the contractor whose delinquency gave rise to the Board's order against the principal files an assignment in bankruptcy.

2. There is no conflict, as the term is understood in paramountcy analysis, between s. 133(3) and the *Bankruptcy Act*, regardless of whether s. 133(3) is used for purposes of set-off or indemnification from the estate of the bankrupt. Section 133(3) is declaratory of the equitable right of set-off and indemnification. Such an equitable right arises upon the facts of this case and is reconcilable with the *Bankruptcy Act* by virtue of s. 97(3).

3. In terms of constitutional analysis, the simple fact that a provincial undertaking may have an effect upon a bankruptcy does not necessarily mean that such an undertaking is to be nullified under paramountcy analysis. Further, the fact that the Board might be able to recover more money as a result of s. 133 does not mean that this provision is in operational conflict with the *Bankruptcy Act*. Operational conflict means that compliance with the provincial statute means offending the federal one. But the two pieces of legislation involved here are complementary.

4. The Court of Appeal erred in law in asserting that the "quartet" of Supreme Court of Canada cases, *Bourgault*, *Deloitte*, *Belair*, and *F.B.D.B.*, are to be interpreted as invalidating any provincial law that affects the outcome of a bankruptcy.

213 I would answer the constitutional questions as follows:

1. Where a contractor as referred to in section 133 of the *Workers' Compensation Act*, S.S. 1979, c. W-17, is in bankruptcy and but for the bankruptcy, the principal as referred to in s. 133 would be liable to pay the assessment due by the contractor under the *Act*, is section 133 of the said *Act* inoperative or inapplicable in whole or in part, by reason of being in conflict with the *Bankruptcy Act*, R.S.C. 1985, c. B-3, and in particular sections 17(1), 67, 95, 136(1)(h), 148, 158(a) and 198(a) thereof?

No.

2. Was section 133 of the said *Act* inoperative or inapplicable in the circumstances of this case?

No.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

Page 59
1995 CarswellSask 739, 35 C.B.R. (3d) 1, [1995] 10 W.W.R. 161, 128 D.L.R. (4th) 1, 188 N.R. 1, 24 C.L.R. (2d)
131, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, J.E. 95-1945, EYB 1995-67967

214 Consequently, I would allow the appeal with costs throughout and set aside the judgment of the Saskat-chewan Court of Appeal. I would remit the matter to trial in order to determine whether, on the facts of this case, the Board notice to pay was properly tendered under s. 133(1), whether Husky can (despite the assignment and the timing of the notice thereof) indemnify itself from the property of the bankrupt, and whether the amounts as-sessed were actually those which arose out of Metal Fab's work for Husky. If so, then the Board is statutorily en-titled to recover the unpaid contributions from Husky and Husky, in turn, can set off these amounts from the hold-backs it has regarding the property of the bankrupt, which has been assigned to the Bank of Montreal. In the unlikely event of a shortfall between the contributions owing and the amount held back, Husky is entitled to file a claim for this shortfall as an unsecured creditor, unless it wishes to present legal submissions as to why it should be able to claim under s. 136(1)(*h*).

215 After these reasons were prepared, I had the benefit of reading the reasons of my colleague Gonthier J. I would like to offer a response on certain points. I am uncomfortable with reliance upon secondary sources — even sources as allegedly succinct and helpful as the article by Roman and Sweatman — for *interpretation* of this Court's decisions. I believe that it is preferable to refer directly to the decisions, particularly when I find that the article in question advances propositions which I find problematic in the so-called "effect" aspect, which I will now discuss.

216 My understanding of the concept of "effect" in this Court's federalism jurisprudence is that both *vires* and paramountcy analyses hinge upon the *extent* of the effect. "An" effect on a federal sphere is, by itself, insuf-ficient to invalidate provincial legislation. Rather, there must be a relatively substantial effect (i.e., an effect that is more than incidental or ancillary). Where this is so, the operational conflict must be express, as I have men-tioned in these reasons; upon finding such an operational conflict, the provincial legislation will yield to the fed-eral legislation to the extent of the conflict. In so far as my colleague has introduced some further refinements on this traditional analysis, dealing with exclusive as opposed to concurrent or overlapping jurisdictions, and invok-ing a separate concept or doctrine of "applicability" in this context, I, with respect, find this somewhat confus-ing. In short, it seems to me to confuse the doctrines of vires and paramountcy, as these have been traditionally understood, and I do not read the *Deloitte, Haskins* and *Bank of Montreal* cases as supporting such a departure.

*Appeal dismissed.*

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works