# Index No. 3

All England Law Reports/1996/Volume 2 /Re Polly Peck International plc (in administration) - [1996] 2 All ER 433

[1996] 2 All ER 433

### Re Polly Peck International plc (in administration)

**CHANCERY DIVISION (COMPANIES COURT)**

**ROBERT WALKER J**

**22, 23, 24 NOVEMBER, 6 DECEMBER 1995**

*Company - Winding up - Proof and ranking of claims - Rule against double proof - Holding company using subsidiary to issue bonds and on-loan funds raised - Holding company and subsidiary both going into liquidation - Subsidiary and bondholders lodging claims under holding company's scheme of arrangement in respect of bond funds - Whether claims in respect of the same debt - Whether rule against double proof precluding payment of dividend to subsidiary.*

*Company - Corporate personality - Lifting corporate veil - Holding and subsidiary companies - Whether subsidiary the agent or nominee of holding company - Whether subsidiary and holding company should be treated as one economic unit.*

Between 1987 and 1990 a holding company, PPI, set up a special purpose, wholly-owned subsidiary in the Cayman Islands in order to raise finance to develop the group's business activities by means of a number of bond issues. The subsidiary, PPIF, issued the bonds to a group of foreign banks which managed the issues and also acted as principal paying agents. PPIF's repayment obligations were guaranteed by PPI and all funds received by PPIF were on-loaned to PPI. Each bond issue included inter alia a provision for PPI to be substituted for PPIF as the principal obligor and was formally documented by a public bond issue agreement, a guarantee agreement and a prospectus. In practice, once PPIF had formally joined in a bond issue, its subsequent involvement was minimal; in particular, it had no current account at a bank and all payments of interest, fees and costs in connection with the bonds were made by PPI. In October 1990 PPI went into administration and in May 1995 a scheme of arrangement was approved, which included a provision prohibiting any creditor from proving more than once in respect of any scheme claim. In March 1995 PPIF itself was placed in creditors voluntary liquidation in the Cayman Islands and its liquidators thereafter submitted a notice of claim to the scheme supervisors of PPI, claiming £485m in respect of the sums on-loaned. The banks as bondholders also lodged claims amounting to £85m against PPI pursuant to the guarantees. After admitting the bulk of the banks' claims, the supervisors applied to

the court seeking directions as to (i) whether PPIF was entitled to maintain a claim in the arrangement separate to those of the banks in respect of what was, in substance, the same debt, or alternatively (ii) whether the rule against double proof precluded PPIF from receiving a dividend in addition to that payable to the banks.

**Held** - In determining whether two claims were so closely connected as to be, in substance, claims in respect of the same debt, the court would look to the legal substance of the relevant transaction and not to the economic substance, if different. It was not open to the court to disregard the principle of separate corporate personality and to treat a closely-integrated group of companies as a single economic unit on the basis merely of perceived injustice, particularly where

*[1996] 2 All ER 433 at 434*

the separate legal existence of those companies assumed greater importance once they became insolvent. Having regard to the legal documents entered into on the occasion of each bond issue, it was impossible to conclude that a relationship of agency or nomineeship could be inferred between the companies, with the result that the on-loan could not be eliminated as a significant part of the composite transaction. Further, since PPIF was clearly more than a mere facade and there was no legal basis on which the PPI group could be regarded as a single economic unit, it followed that the claims were not, in substance, claims in respect of the same debt and were not precluded by the rule against double proof. Both claims would accordingly be admitted in full as scheme liabilities (see p 444 *d e j* to p 445 *a j* to p 446 *c j*, p 447 *g j* and p 448 *e* to *j*, post).

**Notes**

For provable debts and the rule against double proof to claims in respect of guarantees, see 7(2) *Halsbury's Laws* (4th edn reissue) paras 1747, 1758.

For piercing the corporate veil, see 7(1) *Halsbury's Laws* (4th edn reissue) para 90.

**Cases referred to in judgment**

*Adams v Cape Industries plc* [1991] 1 All ER 929, [1990] Ch 433, [1990] 2 WLR 657, Ch D and CA.

*AG Securities v Vaughan, Antoniades v Villiers* [1988] 3 All ER 1058, [1990] 1 AC 417, [1988] 3 WLR 1205, HL.

*Aslan v Murphy (Nos 1 and 2), Duke v Wynne* [1989] 3 All ER 130, [1990] 1 WLR 766, CA.

*Bank of Tokyo Ltd v Karoon* [1986] 3 All ER 468, [1987] AC 45, [1986] 3 WLR 414, CA.

*Barclays Bank Ltd v TOSG Trust Fund Ltd* [1984] 1 All ER 628, [1984] AC 626, [1984] 2 WLR 49, CA; *affd* [1984] 1 All ER 1060, [1984] AC 626, [1984] 2 WLR 650, HL.

*Canada Rice Mills Ltd v R* [1939] 3 All ER 991, PC.

*Chow Yoong Hong v Choong Fah Rubber Manufactory Ltd* [1961] 3 All ER 1163, [1962] AC 209, [1962] 2 WLR 43, PC.

*Ellis v Emmanuel* (1876) 1 Ex D 157, [1874-80] All ER Rep 1081, CA.

*Firestone Tyre and Rubber Co Ltd v Lewellin (Inspector of Taxes)* [1957] 1 All ER 561, [1957] 1 WLR 464, HL.

*Ford & Carter Ltd v Midland Bank Ltd* (1979) 129 NLJ 543, HL.

*Furniss (Inspector of Taxes) v Dawson* [1984] 1 All ER 530, [1984] AC 474, [1984] 2 WLR 226, HL.

*Gilford Motor Co Ltd v Horne* [1933] Ch 935, [1933] All ER Rep 109, CA.

*Helby v Matthews* [1895] AC 471, [1895-9] All ER Rep 821, HL.

*Hoey, Re, ex p Hoey* (1918) 88 LJKB 273, DC.

*IRC v Duke of Westminster* [1936] AC 1, [1935] All ER Rep 259, HL.

*Jones v Lipman* [1962] 1 All ER 442, [1962] 1 WLR 832.

*Liverpool, The (No 2)* [1960] 3 All ER 307, [1963] P 64, [1960] 3 WLR 597, CA; *rvsg* [1960] 1 All ER 465, [1963] P 64 [1960] 2 WLR 541.

*McEntire v Crossley Bros Ltd* [1895] AC 457, [1895-9] All ER Rep 829, HL.

*Melton, Re, Milk v Towers* [1918] 1 Ch 37, [1916-17] All ER Rep 672, CA.

*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 3 All ER 918, [1995] 2 AC 500, [1995] 3 WLR 413, PC.

*Moss, Re, ex p Hallet* [1905] 2 KB 307, [1904-7] All ER Rep 713, DC.

*Oriental Commercial Bank, Re, ex p European Bank* (1871) LR 7 ChApp 99, LJJ.

*Palette Shoes Pty Ltd v Krohn* (1937) 58 CLR 1, Aust HC.

*[1996] 2 All ER 433 at 435*

*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354, [1982] Ch 204, [1982] 2 WLR 31, CA.

*Salomon v Salomon & Co Ltd, Salomon & Co Ltd v Salomon* [1897] AC 22, [1895-9] All ER Rep 33, HL.

*Sass, Re, ex p National Provincial Bank of England* [1896] 2 QB 12.

*Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148, CA.

*Woolfson v Strathclyde Regional Council* 1978 SLT 159, 1978 SC 90, HL.

**Cases also cited and referred to in skeleton arguments**

*British Eagle International Airlines Ltd v Cie Nationale Air France* [1975] 2 All ER 390, [1975] 1 WLR 758, HL.

*Company, Re a (No 002470 of 1988), ex p Nicholas* [1991] BCLC 480, Ch D; sub nom *Nicholas v Soundcraft Electronics Ltd* [1993] BCLC 360, CA.

*De Salaberry Realties Ltd v Minister of National Revenue* (1974) 46 DLR (3d) 100, Can Fed Ct.

*DHN Food Distributors Ltd v Tower Hamlets London Borough* [1976] 3 All ER 462, [1976] 1 WLR 852, CA.

*FG (Films) Ltd, Re* [1953] 1 All ER 615, [1953] 1 WLR 883.

*Holdsworth (Harold) & Co (Wakefield) Ltd v Caddies* [1955] 1 All ER 725, [1955] 1 WLR 352, HL.

*Revlon Inc v Cripps & Lee Ltd* [1980] FSR 85, Ch D and CA.

*Scottish Co-op Wholesale Society Ltd v Meyer* [1958] 3 All ER 66, [1959] AC 324, HL.

*Smith Stone & Knight Ltd v Birmingham Corp* [1939] 4 All ER 116.

### Summons

By summons dated 31 July 1995 Christopher John Barlow, Ian Douglas Barker Bond and Christopher Morris, the supervisors of a scheme of arrangement in respect of Polly Peck International plc (in administration) (PPI), sought directions under the scheme in relation to the notice of claim of the respondents, Polly Peck International Finance Ltd (PPIF) (a subsidiary of PPI, incorporated in the Cayman Islands) and the claims of Arab Banking Corporation-Daus & Co GmbH, appointed by the court on 1 August 1995 to represent a number of banks holding bonds issued by PPIF and guaranteed by PPI. On 5 September 1995 Mr Registrar Buckley ordered the hearing of a preliminary issue as to whether the respondent could maintain a separate claim in the arrangement from that of the bondholders, or whether the rule against double proof precluded it from receiving a dividend in addition to the dividend payable to the bondholders. The facts are set out in the judgment.

*Leslie Kosmin QC and David Chivers (instructed by Cameron Markby Hewitt) for the applicants.*

*Gabriel Moss QC (instructed by Lovell White Durrant) for the respondents.*

*Cur adv vult*

**6 December 1995. The following judgment was delivered.**

## ROBERT WALKER J.

### Polly Peck: the scheme of arrangement

In the late 1980s Polly Peck International plc (PPI) was the holding company of a fast-growing group with a diversified range of interests. The group's core activities were agriculture and food production but they extended to electrical

*[1996] 2 All ER 433 at 436*

consumer goods, textiles, pharmaceuticals, cosmetics and tourism. PPI had subsidiaries in many countries including England, north Cyprus, Turkey, Hong Kong, the United States, Switzerland and Liberia.

PPI ran into severe financial difficulties in 1990 and on 25 October 1990 it went into administration. The purposes of the administration order made by Morritt J were those specified in s 8(3)(a) and (d) of the Insolvency Act 1986, but it is now clear that PPI is not going to be able to trade out of its difficulties. The purposes of the administration have been extended to seeking approval of a scheme of arrangement, and after a creditors' meeting on 26 April 1995 a scheme of arrangement was approved on 11 May 1995 and took effect on 18 May.

The scheme provides (para 2) for the usual moratorium and (para 3) for the collection and realisation of PPI's assets. Scheme claims were to be notified to the scheme supervisors who could admit or reject them in whole or part, or refer them to the court. Paragraph 7(i) provides that the supervisors are not to admit any claim which would not be admissible in a liquidation if PPI had gone into compulsory liquidation on the date when the scheme took effect.

Paragraph 9 of the scheme provides for the distribution of the scheme assets (after provision for costs and preferential claims and subject to some special provisions as to the so-called club banks) rateably between scheme creditors whose claims have been admitted. Paragraph 9.9 is in these terms:

> 'No scheme creditor shall be entitled to receive an amount in the scheme which exceeds the amount of his scheme claim nor to prove more than once in respect of any scheme claim, and for the avoidance of doubt the rule against double proof shall apply in respect of all distributions and reserves made in the scheme.'

The scheme is therefore on familiar lines, providing for a sort of notional liquidation in advance of any actual liquidation, with a view to saving costs.

The matter which I have to decide is a preliminary issue (ordered by Mr Registrar Buckley on 5 September 1995) on a summons seeking directions under the scheme. The issue is as to the application of the rule against double proof. The circumstances in which the issue arises are connected with a subsidiary of PPI, Polly Peck International Finance Ltd (PPIF), which was incorporated in the Cayman Islands on 20 May 1987.

**The bond issues**

Between June 1987 and February 1990 there were no fewer than eight bond issues which raised a total of SwF 665m and DM 100m--a total of over £400m at current exchange rates--for the PPI group. Except for some points of difference summarised below, all eight issues were arranged on the same general lines: they comprised unsecured, unsubordinated fixed-rate bearer bonds issued by PPIF and guaranteed by PPI. The lead manager for the Swiss franc issues was SG Warburg Soditic SA (Warburg SA) and for the single DM issue, Arab Banking Corporation-Daus & Co GmbH (ABC-Daus). ABC-Daus assumed the position of trustee for the bondholders under the DM issue. Each of these lead managers also acted as principal paying agent.

*[1996] 2 All ER 433 at 437*

The eight bond issues were as follows.

| Amount | | Payment date | Rate | Redemption |
|---|---|---|---|---|
| 1 | SwF 65m | 7 July 1987 | 3% | 1997 |
| 2 | SwF 75m | 13 Aug 1987 | 6% | 1992 |
| 3 | SwF 50m | 19 Nov 1987 | 61/4% | 1990 |
| 4 | SwF 100m | 7 April 1988 | 53/4% | 1993 |
| 5 | DM 100m | 20 April 1988 | 6% | 1993 |
| 6 | SwF 125m | 20 Sept 1989 | 55/8% | 1994 |
| 7 | SwF 100m | 1 March 1989 | 61/4% | 1996 |
| 8 | SwF 200m | 1 March 1990 | 83/4% | 1997 |

In the event only SwF 150m was raised under the last issue.

There were two main differences between the issues. The first issue was convertible into ordinary shares of PPI (a right reflected in the interest rate) and the whole issue was in fact converted into PPI ordinary shares, or (as to a small balance) redeemed, before PPI crashed. The first issue is nevertheless significant because in other respects it set the pattern for later issues. The DM issue was established with ABC-Daus as a trustee--a feature not found in the SwF issues--and it did not in terms provide for PPI to be liable as a principal obligor (although PPI's obligations as guarantor

were stated in cl 3 of the guarantee agreement to be 'autonomous and independent'). It is however common ground that nothing turns on any difference between PPI's obligations under the SwF issues (which were governed by Swiss law) and its obligations under the DM issue (which was governed by German law).

The first issue was discussed at a meeting at 42 Berkeley Square, London W1 (then PPI's head office) on 5 May 1987. It was chaired by Mr David Fawcus, then PPI's finance director, and attended by representatives of Warburg SA, two firms of London solicitors, and Stoy Hayward (PPI's auditors) as well as by PPI personnel. It considered a board paper (prepared by Mr Wood, the group treasurer) which proposed 'that the bonds be issued in the name of a new Cayman Islands subsidiary under the guarantee of [PPI]' in order to avoid onerous listing requirements in London, and achieve certain tax advantages. The board paper estimated the costs of the issue:

> 'In simple terms, front end costs are likely to be about £1.6m or just under 4% of total raised. Annual costs will be about 3·433% or 6·430%, inclusive of hedging expenses, for tranche A and B respectively.'

(The two tranches had different coupons and conversion terms.) The board paper assumes, but does not refer to the proceeds of the issue being lent on to PPI.

PPI, through its London solicitors, then took advice from Cayman attorneys as to the formation and use of a Cayman financial vehicle. The Cayman attorneys gave full written advice in a faxed letter dated 11 May 1987. Their advice included

*[1996] 2 All ER 433 at  438*

the following advice as to the on-loan from PPIF (as it was named on its incorporation) to PPI:

> 'It is usually the case that commercial paper issues and traditional forms of Eurocurrency financing can be structured so as not to constitute "banking business". However, some care needs to be paid to the manner in which funds are raised and are then on-lent to the parent or other companies within the relevant group. Thus, the on-lending arrangements should be evidenced by appropriate documentation (which can of course be relatively brief given the in-house nature of the transactions). In particular those on-lending arrangements should be structured so that the repayment of the loans is not simply on a demand basis. Other clients at this firm have not met any difficulty meeting these parameters. Cayman Islands' Companies Law follows English legal principles. Thus a company should only enter into transactions intended for its benefit and the directors must act in good faith in the interests of the company. As a result, the financing arrangements should be structured so as to produce a profit (albeit small) for the Cayman Islands' company. Generally-speaking this is achieved by the company charging a rate of interest when on-lending these funds which is higher than the rate it pays on the borrowed funds or by the company charging a fee.'

On 13 May 1987 there was a board meeting of PPI at 42 Berkeley Square attended by Mr Asil Nadir (the chairman and chief executive of PPI), Mr Ellis (a senior executive), Mr Fawcus (the finance director) and others. The board considered the paper on the convertible SwF issue and approved it, subject to approval by certain other interests. PPIF was then incorporated with Mr Moon (a Cayman attorney), Mr Nadir, Mr Ellis and Mr Fawcus as its directors. It had an authorised

capital of SwF 1m, divided into shares of SwF 1; 25,000 of them were issued and credited as fully paid. PPIF has always been a wholly-owned subsidiary of PPI. Mr Moon resigned as a director at the first board meeting of PPIF held on 28 May 1987. Thereafter the board of PPIF consisted solely of individuals who were also PPI directors, meeting at 42 Berkeley Square. There was never any attempt to argue that PPIF's directing mind was outside the United Kingdom or that the company was non-resident for United Kingdom tax purposes (indeed, its residence in the United Kingdom was necessary for purposes of group relief).

There are some features common to all the bond issues which call for mention, because they were relied on by counsel in their submissions. Each of the bond issues stated in its prospectus that the proceeds of the issue were to be used for refinancing and development of the Polly Peck group's business activities. The form of words used varied to some extent (the exact words of each prospectus are quoted in para 16 of an affidavit sworn on 27 September 1995 by Mr David Kidd, a partner in the firm of solicitors acting for the scheme supervisors); but the general effect did not vary much.

Each of the Swiss bond issues also included in its conditions a provision for PPI or another non-Swiss subsidiary of PPI to be substituted for PPIF as the principal obligor, with the consent of Warburg SA, such consent not to be unreasonably withheld so long as the bondholders' interests were adequately protected (especially as regards tax). The DM bond issue contained a similar provision for substitution in a manner satisfactory to ABC-Daus.

**The on-loan from PPIF to PPI**

The Cayman attorneys' advice that the on-lending arrangements should be evidenced by appropriate (if brief) documentation was not carried through, so far

*[1996] 2 All ER 433 at 439*

as the administrators' scrutiny of PPI's papers has revealed. In October 1987 London solicitors sent instructions to tax counsel to settle a draft loan agreement for the on-loan from PPIF to PPI. That was after the second SwF issue had been completed and when the third issue was about to be completed. After some supplementary instructions had been sent and a consultation had been held in January 1988, tax counsel settled the draft agreement on 29 February 1988 in a form which recited an on-loan from PPIF to PPI of approximately SwF 135·4315m, the balance of SwF 4·4385m (representing the costs of the first two SwF issues totalling SwF 140m) being treated as an arrangement fee payable by PPI to PPIF. The draft provided in advance for similar treatment of future costs of the first two issues. (The lawyers were in fact being rather overtaken by events, because by the time the draft was settled the third SwF issue had also been completed and the fourth SwF issue, and the DM issue, must have been in the pipeline.) The draft loan agreement provided for the on-loan to carry interest--

'payable half-yearly at the rate of 1/4 per cent above the rate of interest payable by PPIF in respect of the corresponding tranche of the Bonds [viz the first two issues] or at such other rate or rates as shall from time to time be agreed between the parties.'

As I have said, no executed loan agreement between PPIF and PPI (either in the above or in any other form) has been found and there is no evidence (either in the form of board minutes or in any other form) that any such loan agreement ever existed. The draft settled by tax counsel provides some evidence at least as to the transaction having had the character of a loan.

In practice, once PPIF had formally joined in a bond issue, its involvement in the subsequent management of the issue seems to have been minimal. It had no current account at a bank (though the proceeds of each issue do seem to have been held briefly to an account in PPIF's name at the lead manager's bank.) In practice all payments of interest, fees and costs in connection with the bonds seem to have been made by PPI, and the state of account between PPI and PPIF can be determined only by internal accounting records kept at PPI's offices and from PPIF's financial statements. There are financial statements of PPIF for the accounting period to 31 December 1988, signed by Mr Nadir and Mr Fawcus and audited by Stoy Hayward, which show PPIF as having a revenue reserve of SwF 696,000 at 31 December 1988. This appears to reflect the 1/4% turn (provided for in the draft loan agreement) on outstanding bonds to the amount of about SwF 435m; this was on the basis that PPI had borne initial costs of bond issues which by then amounted to SwF 10m. PPI's practical responsibility for servicing the bonds was also reflected in communications from the principal paying agents: Warburgs SA sent demands for interest direct to PPI, and ABC-Daus sent them to PPIF 'care of' PPI.

Another scrap of evidence is a letter that Mr Spencer of Stoy Hayward wrote to Mr Fawcus on 29 September 1987. Mr Spencer referred to an election under the Income and Corporation Taxes Act 1970, s 256 (group relief) which was outstanding and advised that--

'if you are funding the interest payment from PPI it is important initially that this will be in the form of an interest-free advance which can be set off against the interest payment due and payable once we have formally received clearance from the Inland Revenue.'

Mr Fawcus wrote on the letter a manuscript note to Mr Wood:

*[1996] 2 All ER 433 at 440*

'A lot of garbage. Just note that PPI should not pay interest to PPIF until tax status of PPI is cleared. Until then payments should take the form of an advance.'

So despite his initial comment Mr Fawcus seems to have understood and accepted the essential

point of the advice.

Apart from its involvement in the bond issues PPIF was a party to two other group transactions. On 4 November 1987 it provided security to Banque Paribus (Suisse) SA for an advance of SwF 15m. On or about 19 October 1987 it joined with PPI in a joint and several guarantee to a Hong Kong group creditor, BSR International plc. Both these seem to have been short-term transactions which give rise to no continuing liability.

I have gone into these factual matters at what would be, in other circumstances, excessive detail because of the submission made to me by Mr Leslie Kosmin QC (who appears with Mr David Chivers for the supervisors) that PPIF was, in relation to the bond issues, a cipher, agent or nominee. That submission is controverted by Mr Gabriel Moss QC, who appears for both the respondents, PPIF and ABC-Daus. They have a common interest in resisting the conclusion that this is a case of double proof (if they fail in that their interests will diverge as to which claim should be rejected; but the order for a preliminary issue recognises that that second stage may not be reached).

Before making any finding on the secondary issues of fact (that is whether PPIF was a cipher, agent or nominee) I must summarise the claims that have been put in, and then turn to the questions of law that have been argued before me.

**The notices of claim**

PPIF was placed in creditors' voluntary liquidation in the Cayman Islands on 23 March 1995. It has two chartered accountants as joint liquidators, one practising in the Cayman Islands and one in London. On 24 May 1995 the London-based liquidator, Mr Beirne, submitted to the scheme supervisors a notice of claim (as at 15 May 1995) approximately as follows:

|           | SwF   | DM    | total (£) |
|-----------|-------|-------|-----------|
| principal | 600m  | 100m  | 361m      |
| interest  | 209m  | 32m   | 124m      |
| total     | 809m  | 132m  | 485m      |

The claim for interest was based on the bond rates, plus 1/4%, for periods starting in late 1989 or in 1990.

On 9 June 1995 ABC-Daus gave notice of a claim (as at 15 May 1995) for about £64·4365m, about £44m of which represented principal (the rest was for interest, including £7m default interest under the German civil code, and £170,000 legal costs). It has been agreed that Warburg SA should act as agent for the Swiss bondholders, who have claims against both PPIF and PPI. The total claims

against PPI so far notified by Warburg SA amount to about £421m.

When Mr Kidd swore his affidavit on 27 September 1995 the position was that the bulk of the ABC-Daus claim had been admitted by the scheme supervisors,

*[1996] 2 All ER 433 at  441*

apart from the default interest, and the Warburg SA claim had been admitted almost in its entirety. Mr Moss tells me, no doubt correctly, that the default interest has since been admitted. Bondholders' admitted claims against PPI as guarantor are therefore of the order of £485m. PPIF's unadmitted claim is approximately the same size. Apart from these claims and the 'club bank' claims, there are other scheme claims against PPI amounting to a sum of the order of £1bn. The double proof point does therefore have a significant effect on the distribution of assets.

A dividend of 1·431p in the pound has already been paid under compromise arrangements approved by Mr Registrar Buckley on 19 October 1995. The scale of further dividends will, I understand, depend on the outcome of pending litigation.

The issue which I have to decide is put this way in para 44 of Mr Kidd's affidavit.

> 'Having investigated PPIF's claim in the Scheme, the Supervisors have become concerned that, due to what appeared to them to be the lack of separate corporate personality on the part of PPIF, the Court might hold that the corporate veil should be lifted so preventing PPIF from maintaining a claim separate from the bondholders' claims against PPI. Alternatively, even if PPIF is entitled to a separate claim, such a claim might be held to arise out of what is, in substance, the same debt (being the debt to the bondholders), so that PPIF would be barred from receiving a dividend in addition to that payable to the bondholders by the rule against double proof. In these circumstances the Supervisors have decided, on the basis of legal advice that they should seek directions from the Court before paying any dividends to both the bondholders and PPIF.'

**The rule against double proof**

The rule against double proof is a long-standing principle of the law of bankruptcy, and has applied in the winding up of companies since the Companies Act 1862 (see *Re Oriental Commercial Bank, ex p European Bank* (1871) LR 7 Ch App 99). It has often been described in terms of straightforward and obvious fairness, depending on substance, not form. Thus in that case Mellish LJ said (at 103-104):

> 'But the principle itself--that an insolvent estate, whether wound up in Chancery or in Bankruptcy, ought not to pay two dividends in respect of the same debt--appears to me to be a perfectly sound principle. If it were not so, a creditor could always manage, by getting his debtor to enter into several distinct contracts with different people for the same debt, to obtain higher dividends than the other creditors, and perhaps get his debt paid in full. I apprehend that is what the law does not allow; the true principle is, that there is only to be one dividend in respect of what is in substance the same debt, although there may be two separate contracts.'

See also *Re Moss, ex p Hallet* [1905] 2 KB 307 at 312, [1904-7] All ER Rep 713 at 715, *Re Melton, Milk v Towers* [1918] 1 Ch 37 at 60, [1916-17] All ER Rep 672 at 682-683, *Re Hoey, ex p Hoey* (1918) 88 LJKB 273 at 274, *The Liverpool (No 2)* [1960] 3 All ER 307 at 313, [1963] P 64 at 84 and *Barclays Bank Ltd v TOSG Trust Fund Ltd* [1984] 1 All ER 628 at 636 and 653-654, [1984] AC 626 at 636 and 659-660 per Oliver and Slade LJJ respectively. In the last case Kerr LJ said ([1984] 1 All ER 628 at 645, [1984] AC 626 at 649):

*[1996] 2 All ER 433 at 442*

> 'The rule against double proof is highly technical in some facets of its application, but ultimately it is based on what the court regards as justice between all the creditors.'

It appears that the most technical facet which Kerr LJ had in mind was the distinction (discussed in the judgment of Oliver LJ ([1984] 1 All ER 628 at 641-642, [1984] AC 626 at 643-644), between the guarantee of a part of a debt, and the guarantee of the whole debt subject to a limitation on the guarantor's liability. I will call this the *Ellis v Emmanuel* distinction (see *Ellis v Emmanuel* (1876) 1 Ex D 157, [1874-80] All ER Rep 1081; also, *Re Sass, ex p National Provincial Bank of England* [1896] 2 QB 12). In *Barclays Bank Ltd v TOSG Trust Fund* the Court of Appeal had the difficult task of applying the *Ellis v Emmanuel* distinction, by analogy, to unusual and complicated facts (on which the House of Lords then took a different view, so that no question of double proof arose).

Much the commonest situation in which the rule against double proof applies is that of suretyship. Indeed it has been said that it applies only in a situation which actually is, or is analogous to, that of suretyship (the latter category includes the old cases on negotiable instruments considered in *Re Oriental Commercial Bank, ex p European Bank)*. It is therefore convenient to set out some very elementary rules as to suretyship, shorn of complications arising from the provision of security or from the *Ellis v Emmanuel* distinction. In what follows, C is the principal creditor, D the principal debtor, and S the surety (and all are companies).

(1) So long as any money remains due under the guaranteed loan, C can proceed against either D or (after any requisite notice) S.

(2) If D and S are both wound up, C can prove in both liquidations and hope to receive a dividend in both, subject to not recovering in all more than 100p in the pound.

(3) S's liquidator can prove in D's liquidation (under an express or implied right of indemnity) only if S has paid C in full (so that C drops out of the matter and S stands in its place).

(4) As a corollary of (3) above, S's liquidator cannot prove in D's liquidation in any way that is in

competition with C; though S has a contingent claim against D (in the event of C being paid off by S), S may not make that claim if it has not in fact paid off C.

The situation in (2) above is what insolvency practitioners call a 'double-dip', which is permissible; the situation in (4) above is the simplest case of what would be double proof, which is not permissible.

So far as the basis of the rule needs (or indeed allows of) further explanation it is that the surety's contingent claim is not regarded as an independent, free-standing debt, but only as a reflection of the 'real' debt--that in respect of the money which the principal creditor had loaned to the principal debtor. Similarly in the cases analogous to a suretyship situation: in *Re Hoey* the only true debt, in substance, was to the mortgagee, Mr O'Brien, and Dr Hoey's covenant with his wife (when he conveyed the mortgaged property to her) to pay off the mortgage was merely a reflection of his existing liability to Mr O'Brien, and of his aspiration that he (Dr Hoey) would bear it, in exoneration of the mortgaged property. Similarly in *The Liverpool (No 2)* (the most distant analogy for application of the rule, since it was an admiralty case) the Court of Appeal concluded that the only true liability, in substance, was that arising from the negligent navigation of the tanker, and that the claim against the owners of the beached coaster (which the Mersey Docks and Harbour Board had under its statutory powers) was in

*[1996] 2 All ER 433 at  443*

substance a partial reflection of the primary liability--in short, part of the same debt.

In *Barclays Bank Ltd v TOSG Trust Fund Ltd* (where the Court of Appeal were also ready to extend the suretyship analogy some way, though on a view of the facts which the House of Lords held to be mistaken) Oliver LJ said in a passage which I have referred to but not yet set out ([1984] 1 All ER 628 at 636, [1984] AC 626 at 636), that it was a fallacy to argue--

> 'that, because overlapping liabilities result from separate and independent contracts with the debtor, that, by itself, is determinative of whether the rule can apply. The test is in my judgment a much broader one which transcends a close jurisprudential analysis of the persons by and to whom the duties are owed. It is simply whether the two competing claims are, in *substance*, claims for payment of the same debt twice over.' (Oliver LJ's emphasis.)

**'Substance', corporate personality and the corporate veil**

Mr Kosmin relied strongly on this passage in contending that the bond issues by PPIF (guaranteed by PPI) and PPIF's on-lending to PPI were so closely connected as to result in the bondholders' claim against PPI as guarantor and PPIF's claim against PPI as principal creditor being 'in substance, claims for payment of the same debt twice over'. Mr Kosmin developed his argument in various ways which naturally involved some overlap; but I hope I can fairly summarise the way he

put his case as follows: (1) that on a correct view of the facts, PPIF was in effecting the bond issues (a) an agent or nominee for PPI or alternatively (b) a cipher or facade for PPI; (2) that even if PPIF acted as an independent principal, the on-lending within the Polly Peck group was still so much a part of the same composite transaction as not to rank, in substance, as a separate debt. Mr Kosmin accepted that there is no authority illustrating the application of the rule against double proof in this sort of situation (that is, indebtedness within a group of companies) but called in aid the words of Kerr LJ in *Barclays Bank Ltd v TOSG Trust Fund Ltd* [1984] 1 All ER 628 at 647-648, [1984] AC 626 at 652:

> '... sometimes, in new situations, the court has to find a just solution which stems simply from the nature of the transaction, the relationship between the parties and their presumed common intention.'

Mr Moss for his part says, rightly, that this sort of transaction of guaranteed borrowing and on-lending by a special-purpose financial vehicle is a commonplace occurrence in capital markets (this point is borne out by the letter from the Cayman attorneys, which seems to be giving fairly standard advice in a fairly standard situation). Mr Moss goes on to submit that the double proof point, if sound, would introduce a new and alarming element of uncertainty into capital markets. I think this argument in terrorem may be a bit overstated, since investors in unsecured bonds issued in this way must be relying on the credit rating of the guarantor, and not on some calculation of the chances of a 'double-dip' against the guarantor and the financial subsidiary in the event of default. Nevertheless the point raised is a novel point of some commercial importance.

Before I examine more closely the different ways in which Mr Kosmin puts his case it may be helpful to make some preliminary points. First, as to substance. In *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148 at 185

*[1996] 2 All ER 433 at 444*

Staughton LJ said (in the context of deciding whether a commercial document effected a sale or a charge):

> 'The problem is not made any easier by the variety of language that has been used: substance, truth, reality, genuine are good words; disguise, cloak, mask, colourable device, label, form, artificial, sham, stratagem and pretence are "bad names", to adopt the phrase quoted by Dixon J in *Palette Shoes Pty Ltd v Krohn* (1937) 58 CLR 1 at 28. It is necessary to discover, if one can, the ideas which these words are intended to convey. One can start from the position that statute law in this country, when it enacts rules to be applied to particular transactions, is in general referring to the legal nature of a transaction and not to its economic effect. The leading authority on this point, albeit in a case from Malaya, is the advice of Lord Devlin in *Chow Yoong Hong v Choong Fah Rubber Manufactory Ltd* [1961] 3 All ER 1163 at 1167, [1962] AC 209 at 216: "There are many ways of raising cash besides borrowing ... If in form it is not a loan, it is not to the point to say that its object was to raise money for one of them or that the parties could have produced the same result more conveniently by borrowing and lending money."'

Those were statutory contexts (registration of charges and regulation of moneylending) but I think they also support the general proposition that when the law is looking for the substance of a matter,

it is normally looking for its legal substance, not its economic substance (if different). As Robert Goff LJ put it in *Bank of Tokyo Ltd v Karoon* [1986] 3 All ER 468 at 486, [1987] AC 45 at 64, we are concerned not with economics but with law.

Second, the House of Lords affirmation in *Salomon v Salomon & Co Ltd, Salomon & Co Ltd v Salomon* [1897] AC 22, [1895-9] All ER Rep 33 of the separate legal personality of even a 'one-man' company does not of course mean that registered companies have all the characteristics of, and no characteristics not shared by, natural persons. One aspect of this has recently been explained by Lord Hoffmann in giving the opinion of the Privy Council in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 3 All ER 918, [1995] 2 AC 500. Another aspect is that whereas natural persons do not (since the abolition of slavery and the passing of the Married Women's Property Acts) own the persons or property of other human beings, commercial companies do have owners. Their shareholders have an economic interest in their commercial success. Although the shareholders do not own their company's assets, a wrong to the company (if uncompensated) may cause them economic loss. But in general the shareholders will have no direct right of action in respect of such loss (see *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354 at 367, [1982] Ch 204 at 223). This point was not mentioned in argument, being neither controversial nor directly relevant; but I think it worth mentioning both in order to identify and distinguish another corporate 'double recovery' problem which does not arise here, and because it leads on to the topic of intra-group indebtedness, which is directly relevant in this case.

The third point is that where there is a group of companies and they are all solvent, a claim by one group company against another, even though sound in law, is likely to have only marginal economic effects (it may have some, for instance in connection with taxation). But as soon as both companies go into insolvent liquidation, any claim between them assumes much greater importance (unless by an extraordinary coincidence both have identical creditors with identical claims, which is certainly not the case here). That is, I think, the point

*[1996] 2 All ER 433 at 445*

that Lord Wilberforce must have had in mind when he said in *Ford & Carter Ltd v Midland Bank Ltd* (1979) 129 NLJ 543 at 544:

> 'When creditors become involved, as they do in the present case, the separate legal existence of the constituent companies of the group has to be respected.'

This important effect of group insolvency needs to be underlined because it has sometimes been suggested (eg in *Barclays Bank Ltd v TOSG Trust Fund Ltd* [1984] 1 All ER 628 at 637-637, [1984] AC 626 at 636-637 per Oliver LJ) that it is useful to test a disputed case of double proof by reference to the situation as it would be if all parties were solvent. In circumstances of all-round

group insolvency that may not be a wholly reliable test. It is not now open to PPI's administrators to pay off the bondholders in full and, by doing so, to discharge its obligation to PPIF (and, simultaneously, PPIF's obligation to the bondholders).

**Issue 1(a): was PPIF an agent or nominee?**

In *Salomon v Salomon & Co* the House of Lords roundly rejected the conclusion of the lower courts that Salomon & Co was a 'mere nominee or agent' of Mr Aron Salomon, or his 'alias', or that his fellow shareholders were 'dummies' (see [1897] AC 22 at 35, 42, 43, [1895-9] All ER Rep 33 at 39, 43). There are of course many cases in which it has been held, on the facts, that a company has acted as an agent or nominee, either for its principal shareholder or for some other party, and several of them were cited to me (eg *Canada Rice Mills Ltd v R* [1939] 3 All ER 991 and *Firestone Tyre and Rubber Co Ltd v Lewellin (Inspector of Taxes)* [1957] 1 All ER 561, [1957] 1 WLR 464). But neither agency nor nomineeship--nor, still less, sham or something akin to sham--is to be inferred simply because a subsidiary company has a small paid-up capital and has a board of directors all or most of whom are also directors or senior executives of its holding company.

Mr Kosmin does not, as I understand his submissions, contend that the arrangements between PPI, PPIF and the lead mangers were a sham (I will return below to 'cipher' and 'facade'). He does contend that a variety of factors lead to an inference of agency or nomineeship. The most important of these factors (which are all set out in the detailed skeleton argument prepared by Mr Kosmin and Mr Chivers) are the following: (i) PPIF was incorporated solely for the purpose of the bond issues; (ii) it had no separate, independent management; (iii) it had a very small paid-up capital; (iv) it did not pay the costs of the transactions and could not have done so; (v) it had no normal bank account and no separate financial records (in practice PPI saw to everything and acted as PPIF's banker and bookkeeper); (vi) the terms of the on-loan were not independently negotiated, did not serve any commercial purpose and in any case were never finally agreed, nor was the 1/4% turn paid otherwise than as a paper transaction; and (vii) no lender could or would have relied on PPIF's covenant, as opposed to PPI's (which could substitute itself as principal debtor if it got the approval of the principal paying agents).

In short, Mr Kosmin submits that PPIF had only a nominal role in the arrangements, and that as a matter of substance PPI should be recognised as having borrowed direct from the original bondholders, so depriving the on-loan of any legal significance (or indeed existence). To come to that conclusion I would have to find that that was the effect, not merely of what was informally arranged in the boardroom at 42 Berkeley Square, but also of the formal legal documents which were entered into on the occasion of each bond issue. On the second SwF issue (which is typical since it was the first issue of non-convertible bonds) the

*[1996] 2 All ER 433 at 446*

formal documents consisted of (i) a public bond issue agreement between PFIF, PPI and Warburg SA as lead managers on behalf of a consortium including 26 other banks (the agreement annexed the form of the bearer bonds and the terms of their issue); (ii) a guarantee agreement between PPI, Warburg SA and the consortium; and (iii) a 42-page prospectus. All these documents made clear that the bond issue was to be made by PPIF and that PPIF's obligations were to be guaranteed by PPI subject to the provision for substitution which I have already mentioned. The documentation on the later loans was essentially similar, subject to small variations (already mentioned) on the DM issue.

In the face of these documents I find it impossible to conclude that the factors that Mr Kosmin relies on establish a relationship of agency or nomineeship. Mr Moss referred me to some passages from the speeches in *McEntire v Crossley Bros Ltd* [1895] AC 457, [1895-9] All ER Rep 829 quoted by Dillon LJ in *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148 at 160-161. Lord Herschell LC said:

> '... there is no such thing, as seems to have been argued here, as looking at the substance, apart from looking at the language which the parties have used. It is only by a study of the whole of the language that the substance can be ascertained.' (See [1895] AC 457 at 463, [1895-9] All ER Rep 829 at 831.)

Similarly Lord Watson said:

> 'The substance of the agreement must ultimately be found in the language of the contract itself. The duty of the court is to examine every part of the agreement, every stipulation which it contains, and to consider their mutual bearing upon each other; but it is entirely beyond the function of a court to discard the plain meaning of any term in the agreement unless there can be found within its four corners other language and other stipulations which necessarily deprive such term of its primary significance.' (See [1895] AC 457 at 467, [1895-9] All ER Rep 829 at 834.)

(It is interesting to note that less than three weeks after judgment was given in *McEntire v Crossley Bros*, Lord Herschell LC said almost exactly the same thing in another well-known case, *Helby v Matthews* [1895] AC 471 at 475, [1895-9] All ER Rep 821 at 823; and it was his observations in the latter case that were cited to and discussed by the House of Lords in the leading tax case on the substance of a transaction, *IRC v Duke of Westminster* [1936] AC 1 at 20, [1935] All ER Rep 259 at 268. The on-loan in this case might be thought to have at least a passing resemblance to the on-transfer that was considered by the House of Lords in another leading tax case, *Furniss (Inspector of Taxes) v Dawson* [1984] 1 All ER 530, [1984] AC 474. But neither counsel suggested that I could get any guidance from that specialised and difficult area of authority, and probably they were right not to do so.)

Some of the factors on which Mr Kosmin relies do tend to show that the Polly Peck personnel who were concerned with the matter at 42 Berkeley Square were (to say the least) less than meticulous in their administrative procedures. I make no specific finding about that. But even blatant and

reprehensible 'cutting of corners' (if it occurred) could not, it seems to me, retroactively alter the character of the transactions embodied in the formal documents by which the bond issues were effected. The factors which Mr Kosmin relies on cannot and do not in my judgment establish PPIF's role as that of agency or nomineeship, and so they do not eliminate the on-loan as a significant part of the composite transaction.

*[1996] 2 All ER 433 at 447*

**Issue 1(b): sham, pretence, cipher, facade**

My conclusion that there was no conventional relationship of agency or nomineeship is not conclusive of the case, because Mr Kosmin had further submissions. On what I have called his point (1)(b) and his point (2) I was referred to quite a lot of authority touching on what is sometimes called lifting (or piercing) the corporate veil. That is a vivid but imprecise metaphor which has possible application in several different contexts, some far removed from this case. The most relevant, it seems to me, is where corporate personality is (in the words of Lord Keith in *Woolfson v Strathclyde Regional Council* 1978 SLT 159 at 161) used as 'a mere facade concealing the true facts'.

Sham, pretence, cipher and facade are all (as was said by Dixon J in the passage already quoted) 'bad names' implying a value judgment of disapprobation. 'Sham' was at least half way to becoming a term of art (requiring an intention common to all parties) but has now, it seems, been supplanted (at least in the context of licence or tenancy) by 'pretence' (see *Aslan v Murphy (Nos 1 and 2), Duke v Wynne* [1989] 3 All ER 130 at 133, [1990] 1 WLR 766 at 770 and *AG Securities v Vaughan, Antoniades v Villiers* [1988] 3 All ER 1058 at 1067-1069, [1990] 1 AC 417 at 462-465). Mr Kosmin did not rely on sham or pretence. He did submit (orally) that PPIF was a 'cipher' and (in his skeleton argument) that it was a 'facade'. I think that his use of 'cipher' was to add colour and force to his submission on agency or nomineeship (which I have already considered). 'Facade' (or 'cloak' or 'mask') is perhaps most aptly used where one person (individual or corporate) uses a company either in an unconscionable attempt to evade existing obligations *(Gilford Motor Co Ltd v Horne* [1933] Ch 935, [1933] All ER Rep 109 and *Jones v Lipman* [1962] 1 All ER 442, [1962] 1 WLR 832) or to practise some other deception (a sort of unilateral sham, since the corporate facade has no independent mind). In *Adams v Cape Industries plc* [1991] 1 All ER 929, [1990] Ch 433 the establishment and interposition of the Liechtenstein corporation referred to as AMC was a facade in this sense, and 'no more than a corporate name', though the new Illinois corporation, CPC, was not. But the notion that regular sales of large volumes of South African asbestos to an United States purchaser were being effected through a lawyer's office in Vaduz is to my mind of a quite different order of artificiality from the function of PPIF as a single-purpose financial vehicle (I am not overlooking the two other isolated transactions entered into by PPIF; but they add little to its independent reality). In my judgment PPIF was more than a mere facade.

**Issue (2): single economic unit**

It is on this part of the case that I have found Mr Kosmin's submissions most persuasive, though I am not ultimately persuaded by them. The arguments for considering a closely-integrated group of companies as a single economic unit were fully considered (principally in the context of corporate presence as founding jurisdiction) in *Adams v Cape Industries plc* [1991] 1 All ER 929 at 965, [1990] Ch 433 at 476-477, both by Scott J and, with a full citation of authority, in the judgment of the Court of Appeal (see [1991] 1 All ER 929 at 1016-1020, [1990] Ch 433 at 532-537). Both passages merit careful study. The Court of Appeal concluded that--

> 'save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of *Salomon v Salomon & Co Ltd* [1897] AC 22, [1895-9] All ER Rep 33 merely because it considers that justice so requires.' (See [1991] 1 All ER 929 at 1019, [1990] Ch 433 at 536.)

*[1996] 2 All ER 433 at  448*

Mr Kosmin seeks to add to these exceptions (turning on particular statutes or contracts) a further exception where a rule of law founded in public policy (the rule against double proof) would be frustrated by ignoring the economic reality of the single group. In that submission Mr Kosmin can and does call in aid the words of Oliver LJ in *Barclays Bank Ltd v TOSG Trust Fund Ltd* [1984] 1 All ER 628 at 636-637, [1984] AC 626 at 636 that the test is 'a much broader one which transcends a close jurisprudential analysis of the persons by and to whom the duties are owed'.

Nevertheless I am not persuaded by the argument. I can accept that as a matter of economic reality the bondholders (whose presumed intentions may be material) must have intended to rely on the credit-rating and covenant of PPI, whether as guarantor or (after substitution) as principal obligor. It is doubtful whether even the most far-sighted of them can have calculated that in the event of a crash, PPIF might have fewer unsecured creditors than PPI, and a claim against PPI under an on-loan. It was perfectly possible, consistently with each prospectus, that the proceeds of some or all of the bond issues would be loaned on, not to PPI, but to other group subsidiaries. It is also possible, though less likely, to imagine a situation in which PPIF lent on to another subsidiary, with PPI guaranteeing that borrowing also, and the second subsidiary then lending on to PPI. Each of those sequences of events would be likely to produce a different result in the event of a crash of the whole group, whether or not the rule against double proof has any application. The possibility of there being subsidiaries which were not wholly-owned subsidiaries adds to the range of imaginable variations.

Were I to accede to Mr Kosmin's submission it would create a new exception unrecognised by the Court of Appeal in *Adams v Cape Industries plc* and that is not open to me. Moreover I think that Mr Kosmin is in one sense assuming what he seeks to prove, since the unjust or inequitable result which he asserts does not occur unless the group is recognised as being in substance a single economic entity, whose constituent members' internal rights and obligations are to be disregarded. But the authorities to which I have already referred show that substance means legal substance, not economic substance (if different), and that (as Lord Wilberforce said in *Ford & Carter Ltd v*

*Midland Bank Ltd)* the separate legal existence of group companies is particularly important when creditors become involved. Injustice may be in the eye of the beholder, but I do not perceive any obvious injustice--certainly not such as the court can remedy--in the unpredictable consequences that may follow from the unforeseen insolvency of a large international group of companies such as the Polly Peck group.

**Conclusion**

For these reason I will answer the question posed in para (1) of the preliminary issue in terms of sub-para (i)--that is, that both claims should be admitted in full as scheme liabilities.

As I understand it para (2) then also falls to be answered in terms of sub-para (i)--that is that a dividend should be paid on both claims. But I do not recall any submissions specifically directed to para (2), and if there is some subtlety that I have missed, counsel will no doubt explain it to me.

*Order accordingly.*

Carolyn Toulmin Barrister.