# Index No. 7

All England Law Reports/1984/Volume 1 /Barclays Bank Ltd and others v TOSG Trust Fund Ltd and others - [1984] 1 All ER 628

[1984] 1 All ER 628

### Barclays Bank Ltd and others v TOSG Trust Fund Ltd and others

**COURT OF APPEAL, CIVIL DIVISION**

**OLIVER, KERR AND SLADE LJJ**

**16, 17, 18, 19, 20, 23, 24, 25 MAY, 12 JULY 1983**

*Company - Winding up - Proof and ranking of claims - Rule against double proof - Test of whether rule against double proof applies - Application of rule against double proof - Guarantor's right of proof - Company taking out bond against insolvency - Banks paying over money under bonds when company becoming insolvent - Money used to pay creditors in part - Creditors assigning claims to third party - Banks proving for debt under bonds - Third party proving for debt under assignments - Whether both proofs admissible - If only one proof admissible, whether banks or third party having better right of proof.*

In 1970 a group of holiday tour operators, which included C Ltd, set up a scheme to alleviate the consequences to holidaymakers and customers of the insolvency of any of their number. The scheme required individual tour operators who were members of the scheme to take out a banker's bond whereby the bank agreed to pay a specified sum to a company (TOSG), formed as part of the scheme, in the event of the operator becoming insolvent and unable to fulfil its obligations to holidaymakers and customers. The purpose of TOSG was to use money paid to it under the bonds to look after and repatriate holidaymakers stranded abroad and to protect customers who had made prepaid bookings from suffering financial loss. Under the terms of the bonds TOSG was entitled to call in the bond moneys from the bank as soon as the operator concerned became insolvent. The bonds contained no restriction on how TOSG expended or disbursed moneys it received but TOSG was required to pay back to the bank any surplus remaining after the claims of customers had been met. In accordance with the scheme C Ltd arranged for a number of banks to enter into bonds on its behalf in return for the payment of commission and the execution of counter-indemnities under which C Ltd agreed to indemnify the banks against any loss which they sustained under the bonds. In 1974 C Ltd could no longer fulfil its obligations to its customers and went into liquidation. The bond moneys were called in from the banks by TOSG which, after rescuing C Ltd's customers who were stranded abroad, then had some £1·43268m to reimburse claims by customers who had paid for holidays which C Ltd was no longer able to provide. Since that amount was unlikely to be

sufficient to meet all such claims TOSG entered into an agreement with the Air Travel Reserve Fund Agency (a statutory body set up to compensate persons who lost holidays as a result of the collapse of tour operators) whereby TOSG would, to the extent the bond moneys made possible, reimburse customers who were owed money in return for such customers assigning to the agency their right to prove in the liquidation of C Ltd for the full amount of their claim and the agency would then satisfy customers' debts which remained unpaid by TOSG. In accordance with that agreement TOSG expended, and received assignments to the agency of claims amounting to, some £1·43268m while the agency satisfied the remaining claims, amounting to some £3·4309m. In the ensuing liquidation of C Ltd the banks proved under the counter-indemnities and the agency proved under the assignments for the £1·43268m paid out by TOSG. The liquidators took the view that the rule against double proof prevented the banks and the agency from both proving for the £1·43268m. The banks sought a declaration that they were entitled to prove for the £1·43268m but the judge held that the agency had the better right of proof, on the assumption that the rule against double proof applied, because the banks had in effect guaranteed C Ltd's liabilities to its customers and were therefore subject to the rule that the proof of a surety could not displace the proof of a creditor unless and until the surety fully discharged all his liabilities to the creditor, and therefore C Ltd's customers (and thus the agency) were entitled to prove as creditors

*[1984] 1 All ER 628 at  629*

for the whole of their debts in priority to the banks (and without giving credit for moneys received from the banks via TOSG) unless and until the whole of their debts were satisfied and, moreover, considerations of broad equity favoured the agency rather than the banks. The banks appealed, contending, inter alia, that they were entitled by subrogation to assume the rights of customers who had been paid out of the bond moneys.


**Held** - (1) (Per Oliver and Kerr LJJ) There could not be any subrogation between the banks and TOSG because there was no general principle that if money was lent or supplied by one person to another to enable that other to pay off a debt to a creditor the lender was automatically subrogated to the rights of the creditor, and there was no stipulation that TOSG was required to expend the bond moneys in a manner which entitled the banks to stand in TOSG's shoes (see p 638 *a* to *d f g* and p 649 *f g*, post); *Wylie v Carlyon* [1922] 1 Ch 51 and *Paul v Speirway Ltd (in liq)* [1976] 2 All ER 587 applied; *Brocklesby v Temperance Permanent Building Society* [1895] AC 173 explained.


(2) The effect of the bonds and counter-indemnities given by the banks was (i) that a debt due to the banks, provable in the liquidation of C Ltd, arose as soon as TOSG called in and was paid the bond moneys, and (ii) that, although TOSG was under no contractual obligation to the banks regarding the way in which it spent the bond moneys, nevertheless TOSG was required to refund to the banks any bond moneys which were not expended, thereby reducing pro tanto C Ltd's liability under the counter-indemnities. Furthermore, the effect of the payments by TOSG to customers who were owed money by C Ltd was that the customers' rights to prove in the liquidation of C Ltd were

limited to the balance, if any, of their debts still outstanding after the payments made to them by TOSG, and the effect of the assignments to the agency was that the agency was in no better position to prove in the liquidation than the customers or TOSG would have been. In those circumstances it followed that--

(a) (per Oliver LJ) the rule against double proof in a liquidation did apply. The test of whether the rule against double proof applied was whether the two competing claims were in substance claims for payment of the same debt twice over, and, furthermore, that was to be determined at the time of payment of the dividend, at which point the question to be asked was whether two dividends were being sought in the winding up for a liability which the debtor would discharge by one payment if it were solvent. Applying that test, if C Ltd had become solvent after the calling in of the bond moneys and had used its own money to discharge the debts due to its customers, then because the bond moneys would have remained unused and C Ltd would have been required to return them to the banks it would at the same time have discharged its liability to the banks and would thus have only made one payment in discharging both liabilities. Furthermore (Kerr LJ concurring), when the rule against double proof was applied the banks had the better right of proof over the agency because, by analogy with the position of a surety, the banks' position vis-à-vis the customers of C Ltd (and therefore the agency as the assignee of the customers) was akin to that of a surety who had guaranteed a fluctuating account (ie the amount owed by C Ltd to its customers) up to a specified limit and who, if he paid up to that limit, was entitled to that extent to stand in the shoes of the creditor (ie C Ltd's customers) and to prove in priority to him. Moreover, on broad equitable principles the banks had the better right of proof, since they were out of pocket to the full nominal amount of their claims whereas the customers (and therefore the agency) were out of pocket to less than their full nominal claims by reason of having received the banks' money (see p 636 *a* to *j*, p 637 *e* to *j*, p 640 *f*, p 641 *d j* to p 642 *a*, p 643 *c* to *e h j*, p 644 *f* to *j*, p 648 *d e j*, p 650 *e j*, p 651 *e g h* and p 652 *h j*, post); *Ex p Rushforth* (1805) 10 Ves 409, *Hobson v Bass* (1871) LR 6 Ch App 792, dictum of Mellish LJ in *Re Oriental Commercial Bank, ex p European Bank* (1871) LR 7 Ch App at 102 and *Gray v Seckham* (1872) LR 7 Ch App 680 applied; *Ellis v Emmanuel* [1874-80] All ER 1081 considered; *The Liverpool (No 2)* [1960] 3 All ER 307 distinguished;

(b) (per Slade LJ) having regard to the particular facts and the substance of the relevant liability and applying the principle that there could only be one dividend for what was

*[1984] 1 All ER 628 at 630*

in substance the same debt even though there may have been two contracts, the rule against double proof in a liquidation did apply, because if TOSG had itself taken assignments from C Ltd's customers and then sought to prove for the £1·43268m it would in substance have been proving for the same debt as the banks. Furthermore (Kerr LJ concurring), applying the rule against double proof, the banks had the better right of proof because the relevant comparison was not between the respective rights of proof of the banks and C Ltd's customers but between the respective rights of

proof of the banks and TOSG, and it could not reasonably be inferred that the parties intended at the time the bonding arrangements were made that TOSG would have the right to expend the bond moneys by purchasing assignments of debts from C Ltd's customers which would take priority over, and destroy, the banks' right to prove for the bond moneys in the liquidation of C Ltd, since such an inference was inconsistent with the nature of the bonding arrangements and produced an inequitable result (see p 649 *j*, p 650 *e f*, p 651 *d*, p 653 *b c e* to *j*, p 654 *d e*, p 655 *d* to *f h* to p 656 *c g h*, post); dictum of Mellish LJ in *Re Oriental Commercial Bank, ex p European Bank* (1871) LR 7 Ch App at 102 applied;

(c) (per Kerr LJ) the rule against double proof did not apply because the common intention of the parties concerned in setting up the bonding scheme was that the banks were to be able to prove to the full extent of the bond moneys paid over while each customer was to be able to prove only for the balance of his debt still outstanding after the bond moneys had been paid out, and therefore there was no basis for the application of the rule. However, if, the rule did apply then the banks had the better right of proof (see p 645 *h j*, p 647 *d* to *f*, p 648 *j* to 649 *b* and p 651 *a*, post).

(3) Accordingly, the banks had the right to prove in the liquidation of C Ltd for the £1·43268m to the exclusion of the agency. The banks' appeal would therefore be allowed (see p 645 *b*, p 650 *g h*, p 651 *a c* and p 656 *h*, post).

Per Oliver LJ. Where money is lent or supplied by one person to another to enable that other to pay off a debt to a creditor the lender has a right to be subrogated to the rights of the creditor only if there is an agreement between the supplier of the money and the payer of the debt that the money is to be used for that purpose or, on equitable principles, if the supplier of the money is deprived of his right of recovery, eg because of the incapacity of the person to whom the money was lent (see p 638 *b c e*, post).

**Notes**

For the rule against double proofs and its application to sureties, see 3 *Halsbury's Laws* (4th edn) paras 712, 728, and for cases on proofs by sureties against a bankrupt principal debtor, see 4 *Digest* (Reissue) 303-306, *2691-2720*.

**Cases referred to in judgments**

*Birkley v Presgrave* (1801) 1 East 220, 102 ER 86.

*Brocklesby v Temperance Permanent Building Society* [1895] AC 173, HL.

*Deering v Bank of Ireland* (1886) 12 App Cas 20, HL; *rvsg* sub nom *Re Killen, a bankrupt* (1885) 15 LR Ir 388, CA Ir.

*Dering v Earl of Winchelsea* (1787) 1 Cox Eq Cas 318, 29 ER 1184, [1775-1802] All ER Rep 140.

*Ellis v Emmanuel* (1876) 1 Ex D 157, [1874-80] All ER Rep 1081, CA.

*Fenton, Re, ex p Fenton Textile Association Ltd* [1931] 1 Ch 85, [1930] All ER Rep 15, CA.

*Gray v Seckham* (1872) LR 7 Ch App 680, LJJ.

*Hobson v Bass* (1871) LR 6 Ch App 792, LC.

*Hoey, Re, ex p Hoey* (1918) 88 LJKB 273, DC.

*Liverpool, The, (No 2)* [1960] 3 All ER 307, [1963] P 64, [1960] 3 WLR 597, CA; *rsvg* [1960] 1 All ER 465, [1963] P 64, [1960] 2 WLR 541.

*Melton, Re, Milk v Towers* [1918] 1 Ch 37, [1916-17] All ER Rep 672, CA.

*Midland Banking Co v Chambers* (1869) LR 4 Ch App 398, LJJ.

*Moss, Re, ex p Hallet* [1905] 2 KB 307, [1904-7] All ER Rep 713, DC.

*Oriental Commercial Bank, Re, ex p European Bank* (1871) LR 7 Ch App 99, LJJ.

*[1984] 1 All ER 628 at 631*

*Paul v Speirway Ltd (in liq)* [1976] 2 All ER 587, [1976] Ch 220, [1976] 2 WLR 715.

*Rushforth, Ex p* (1805) 10 Ves 409, 32 ER 903.

*Sass, Re, ex p National Provincial Bank of England* [1896] 2 QB 12.

*Wylie v Carlyon* [1922] 1 Ch 51.

**Cases also cited**

*Daunt, Re, ex p Joint Discount Co* (1871) LR 6 Ch App 455, LJJ.

*Liggett (B) (Liverpool) Ltd v Barclays Bank Ltd* [1928] 1 KB 48, [1927] All ER Rep 451.

*Orakpo v Manson Investments Ltd* [1977] 3 All ER 1, [1978] AC 95, HL.

*Rees, Re, ex p National Provincial Bank of England* (1881) 17 Ch D 98, CA.

*Wheeldon v Burrows* (1879) 12 Ch D 31, [1874-80] All ER Rep 669, CA.

**Appeal**

The plaintiffs, Barclays Bank Ltd, Lloyds Bank Ltd, National Westminster Bank Ltd and Wintrust Securities Ltd (the banks), appealed against so much of the judgment of Nourse J given on 27 February 1981 and the order made on 26 June 1981 as dismissed the bank's action against the first defendant, TOSG Trust Fund Ltd (TOSG), the twelfth defendant, Air Travel Reserve Fund Agency (the agency), and the thirteenth defendant, Clarksons Holidays Ltd (Clarksons), in which they sought, inter alia, a declaration against those defendants that the banks were entitled to prove in the liquidation of Clarksons to the exclusion of the agency in respect of all bond moneys expended by TOSG in paying creditors of Clarksons, and declared on the agency's counterclaim that the joint liquidators of Clarksons were entitled and bound to admit in full the proof of debt lodged with them by the agency. The facts are set out in the judgment of Oliver LJ.

*Peter Millett QC and J B W McDonnell for the banks.*

*William Stubbs QC and Leslie Kosmin for TOSG and the agency.*

*David Oliver for the liquidators of Clarksons.*

*Cur adv vult*

**12 July 1983. The following judgments were delivered.**

**OLIVER LJ.**

This is an appeal by the plaintiffs against an order of Nourse J made on 26 June 1981 dismissing their action against the first, twelfth and thirteenth defendants, the respondents to this appeal, and declaring on the twelfth defendant's counterclaim that the joint liquidators of the thirteenth defendant, Clarksons Holidays Ltd, were entitled and bound to admit in full the proof of debt lodged with them by the twelfth defendant.

The appeal raises an interesting and unusual question with regard to the applicability and the manner of application of what is known as the rule against double proof in the liquidation of an insolvent estate. The facts are fully set out in the careful judgment of the judge and need only to be summarised here. The thirteenth defendant, to which I will refer as 'Clarksons', was a wholly-owned subsidiary of Court Line Ltd, which, together with its constituent companies, collapsed during the height of the holiday season of the year 1974. Clarksons was one of Court Line's more prominent tour-operating subsidiaries and was at the material time among the market leaders in the package holiday field. For some years prior to the collapse, anxiety had been expressed among tour operators about the effect on the public image of the industry of the failure of operators to provide holidays for which members of the public had made bookings and paid in advance, and in 1969 a group of the more prominent operators (including Clarksons) formed what was known as the Tour Operators Study Group to consider problems confronting the industry, one of which was the absence at that time of any central organisation which could provide guarantees against failure or cessation of business of tour operators. As a result of that group's deliberations, a company limited by guarantee was formed in 1970 and that is the first defendant, TOSG Trust Fund Ltd, to which I will refer as 'TOSG'. The purpose of this company was to be the recipient of

*[1984] 1 All ER 628 at 632*

moneys contemplated as becoming payable under bonds or similar provision made by the members in the event of a member becoming unable to fulfil its obligations to its customers and to dispense those moneys in such way as might be most expedient to meet the emergency thus created. The principal object of TOSG in cl 3(A) of its memorandum of association was as follows:

'To manage, utilise, employ and expend funds and moneys paid and/or to be paid to the Company under or by virtue of Bonds, Letters of Credit, Policies of Insurance or similar arrangements obtained by members of the Tour Operators Study Group and issued in favour of the Company each being in respect of a Tour Operator Study Group member and/or its tour operator subsidiaries ("the member Group") or otherwise paid to the Company by such members, in generally alleviating the consequences to such member Group's customers of the business failure of the Tour Operators Study Group member or any other member Group Company in respect of whom such funds or moneys are received by the Company and in particular (but without prejudice to the generality of the foregoing) in making arrangements to procure the expeditious return by an appropriate means of transport to their departure point from the United Kingdom or Ireland of persons stranded abroad as a result of such member Group's business failure, in procuring that persons in the course of holidays abroad at the date of such member Group's business failure are enabled to complete their holidays in suitable accommodation and to return to their departure point from the United Kingdom or Ireland by an appropriate means of transport, in making all necessary travel and accommodation arrangements for persons who have

> purchased from such member Group, and paid in full, for holidays abroad which, as at the date of the member Group's business failure, had not been commenced and in making such payments as the Company may in its absolute discretion think fit to persons who had paid deposits to such member Group in respect of future holidays abroad and who (being customers of the member Group) otherwise suffer financial loss by reason of the member Group's business failure.'

The members of the study group then established a bonding scheme under which they mutually agreed to provide bonds in favour of TOSG in a form acceptable to that company and they entered into an agreement with TOSG regulating the manner in which TOSG could call up the bonds. The bonds were renewed annually and their amount was to be reviewed in each year but in fact remained from 1971 onwards at a figure equivalent to 5% of the relevant tour operator's turnover for the previous year, that figure being assumed (erroneously as it turned out) to be adequate to cover any failure on the worst possible basis.

Pursuant to these arrangements Clarksons, in October 1973, arranged for bonds to a total value of £2·43226m to be issued by five banks, the four appellants and Williams & Glyn's Bank Ltd, which was the plaintiff in a separate action heard at the same time as the action in which this appeal arises.

Those bonds were for the following amounts:

| | |
|---|---|
| Williams & Glyn´s Bank | £873,000 |
| Lloyds Bank | £93,000 |
| Wintrust Securities | £260,000 |
| National Westminster Bank | £500,000 |
| Barclays Bank | £500,000 |

They were all in the same form, were issued to TOSG and provided that the bank concerned undertook to pay the specified sum but subject to a condition that the bond should be void unless during the period of 12 calendar months commencing on 1 October 1973 any one or more of six specified events should occur. I need not enumerate those in detail. They included the event of TOSG notifying the issuing bank that any company in the Clarkson group could not carry out its obligations, the presentation of a winding-up petition and cessation of payment of debts.

*[1984] 1 All ER 628 at 633*

I ought, however, to read the final provision of the document, which is in these terms:

> 'And in consideration of the issue of this Bond the Fund hereby covenants with the Obligor that upon payment of the said sum of £ specified above by the Obligor to the Fund the Fund will undertake in writing with the Obligor that the Fund will repay the Obligor on demand such part of the said sum as shall not be expended or required by the Fund in the performance and execution of its rights, duties, powers and discretions as set out in the Fund's Memorandum and Articles of Association, and that such Memorandum and Articles will not be altered during the currency of this Bond without the prior written consent of the Obligor (which shall not be unreasonably withheld) first obtained.'

At the same time each of the issuing banks obtained from Clarksons a counter-indemnity. The form of each indemnity was that normally used by the bank concerned. They are not identical and their precise terms do not matter, for it is not in issue that they created an obligation on Clarksons, in the event of the bond being called up, to indemnify the bank against any loss which it might sustain as a result of having executed the bond.

In August 1974 it became plain that the Court Line Group in general and Clarksons in particular were in such severe difficulties that operations could not continue, and on 15 August the Civil Aviation Authority withdrew Clarksons' civil aviation licence. At the same time Clarksons notified TOSG that it had ceased to trade and could no longer carry out its obligations to its customers. On the following day TOSG notified the banks in writing of the fulfilment of the pre-condition to the operation of the bond and called up the bond moneys immediately. These sums were paid to TOSG and Clarksons were notified by the paying banks. On the same day, 16 August, Clarksons presented its own petition for compulsory winding up and on 21 August Clarksons passed a special resolution to wind up voluntarily.

There then followed a hastily mounted rescue operation, the purpose of which was to enable those customers of Clarksons who were already abroad on holiday to complete their holidays and return to the United Kingdom, an operation which involved, of course, payment for hotel bills and for arrangements with air carriers. In this connection TOSG expended in round terms a sum of £956,000, as to which no question arises on this appeal. The question with which the court is now concerned related to the banks' share of a balance of some £1·43268m which remained in TOSG's hands and which was ultimately disbursed by TOSG in paying in full, so far as it would go, customers of Clarksons who had paid for holidays but had never had them.

TOSG had, under its memorandum of association, a complete discretion as to the manner in which it set about alleviating the losses of the holidaymakers, and clearly one approach, but by no means the only one, would have been simply to distribute the funds in its hands among all claimants pro rata to their claims, leaving them to prove for any balance unpaid in the liquidation. There were, however, a number of complications and the final determination and settlement of claims in this way might have taken a considerable time. In particular, there were a number of test cases pending, in cases where moneys had been paid to travel agents by customers and were still held by the agents at the time of the collapse, to determine whether the customer was entitled to a refund from the agent or whether the agent was accountable to the liquidator for the moneys held.

In the mean time, there had been a major development in the political scene, for the collapse had caused a major parliamentary stir and the government of the day was under pressure, and indeed was, I think, anxious, to make some permanent provision for safeguarding both the general public in the future and the victims of this particular disaster. Thus in 1975 there was passed the Air Travel

Reserve Fund Act 1975 which brought into being an air travel reserve fund, financed initially by government loan but ultimately by contributions from the industry, for the purpose of compensating persons who had lost their holidays as a result of the collapse of tour operators during 1974 and

*[1984] 1 All ER 628 at  634*

to provide against similar events in the future. The twelfth defendant (to which I will refer as 'the agency') was established to manage and administer the fund.

It will be convenient here to summarise the relevant provisions of the 1975 Act and the regulations made under it. Section 2(1) states the general application of the fund, which is to be applied in making payments to or for the benefit of customers of air travel organisers in respect of losses or liabilities incurred by them in connection with travel contracts. Subsection (3) restricts the losses and liabilities payable under sub-s (1) to those incurred in consequence of the inability of the air travel organiser to meet his commitments under contracts the time for performance of which fell after 1 April 1974. Subsection (6) deals with the position where there is a bonding scheme such as the present by providing that for the purposes of sub-s (3) a loss or liability shall be treated as having been incurred in consequence of the organiser's inability to meet his contractual commitments if, since the booking was made, the bond has become payable. Subsection (7) is important. That provides that where money is available under such a bond (a) no payment shall be made out of the fund until all the money so available has been paid to or for the benefit of the customers in question or any class or description of those customers, and (b) sub-s (1) shall not apply to any loss or liability so far as it has been reimbursed from such bond moneys. Section 3 empowers the Secretary of State to make rules as to the application of the fund (known as 'benefit rules') and those were in fact made in July 1975.

Rule 3(1) and (2) limits the amount of any payment, in effect, to the amount actually paid by the customer, but r 3(7) provides that, where a customer is eligible for a payment from the fund, the agency shall pay him the total amount permissible under the rules. Rule 3(6) is in the following terms:

> 'Where a customer of an air travel organiser has received any sum in liquidation or bankruptcy proceedings brought against the air travel organiser, being a sum paid in respect of losses or liabilities to which section 2(1) of the Act applies, that sum shall be deducted from any payment out of the Fund which would otherwise have been made to him in accordance with these Rules.'

Finally, r 4 deals with the conditions to be satisfied before payments are made (including, eg, method of submission and establishment of claims) and r 4(4) provides that the agency may, before making a payment, require the customer to assign to the agency any rights which he may have against the air travel organiser, whether in liquidation or bankruptcy or otherwise.

Well before the 1975 Act was passed negotiations had been in train between TOSG and the

Department of Trade with a view to agreeing arrangements under which payments to holidaymakers could be expedited, it having been apparent from the inception that the bond moneys were not going to be sufficient to meet all claims in full and that there would be a substantial balance for which the air travel reserve fund would become responsible when the 1975 Act came into force and the regulations made under it were promulgated. Those negotiations contemplated that, rather than waiting for the complete ascertainment and settlement of all claims, TOSG would settled in full as many undisputed claims as could be discharged out of its available resources, leaving the agency to settle the balance. The original suggestion was that TOSG should take assignments of their claims in the liquidation from those customers whose debts were then paid in full, but it was ultimately considered more convenient that all outstanding claims should be dealt with by the agency so that TOSG could conclude entirely its administration of the bond moneys. Accordingly, it was agreed in principle that as each claim was paid by TOSG the customer concerned should be required to execute an assignment of his rights in favour of the agency. This was intended at first to be subject to the agreement of the banks who had put up the bond moneys, but in fact the only bank which was informed of the proposal was Lloyds, who registered a strong objection. Despite this, however, when the 1975 Act received the royal assent and the agency was formed, an agreement along these lines was entered into between TOSG and the agency and it is this that gave rise to the present proceedings. In the result TOSG settled in full claims of customers to

*[1984] 1 All ER 628 at 635*

the extent of the moneys in its hands, each cheque sent out being conditional on the signature and return by the recipient of an assignment of his claims in the liquidation to the agency. The banks had, at any early stage, proved for the full sum of £2·43226m due to them under Clarksons' counter-indemnity when the bonds were issued and the agency now proved not only for the sums which it had disbursed in paying out claims of customers other than those paid out by TOSG but also in respect of the rights assigned by those customers who had been paid by TOSG.

There is no dispute that the banks are entitled to prove in the liquidation of Clarksons for that part of the sums paid by them under the bonds which is represented by the payments made for repatriating customers (£956,000) but it is the liquidators' contention that the balance of £1·43268m paid out to customers and thus reflected in the agency's proof is subject to the rule against double proof and that one or other of the two sets of proofs must be reduced accordingly.

At the trial before Nourse J it was common ground that the rule against double proof applied to the situation with which the court was confronted and the contest was simply one between the banks on the one hand and TOSG and the agency on the other as to who had the better right, in these circumstances, to prove for the moneys which had in fact been applied in or towards discharging the customers' claims. That is, perhaps, a simplification, because there were other issues of ultra vires and misfeasance which fell to be decided but are not in issue on the present appeal. So far as this court is concerned, there is no dispute either that it was intra vires TOSG to deal with the bond

moneys in the way in which it did deal with them (including the procuring of assignments by customers to the agency) or that the agency was acting intra vires in arranging for and taking those assignments. There has, however, in this court been raised a further issue not argued in the court below, because shortly before the hearing of the appeal began the banks amended their notice of appeal in order to raise the question whether the rule against double proof applied at all. An application to strike that amendment out was refused by this court (although on terms as to costs) because, although the point was a new one, we took the view that, assuming it to be good, it would be inappropriate that this court should be put in the position, because of a concession in the court below, of deciding the appeal on a basis which, on that hypothesis, would be wholly wrong in law. It has thus been argued before us and should logically be dealt with first. It is put by counsel for the banks in two ways. First, he submits that the correct time for ascertaining whether the rule is to apply is at the date of the liquidation. This case is not an orthodox case of principal and surety. It is a case in which there were created as a matter of fact two quite distinct contracts with the debtor which had no necessary connection at all. As soon as the collapse occurred the condition of the bonds was fulfilled and the moneys became payable to TOSG. At that moment Clarksons became subject to a liability under the counter-indemnity which was quite independent of its liability to its customers. True the bond moneys or part of them might, in due course, if TOSG chose, be applied in paying to the customers what was due to them from Clarksons, but they might not. The whole fund might have to be expended, for instance, in a repatriation exercise. Thus, it is argued, the two liabilities were quite independent at the inception, and each creditor, be he bank or customer, can prove for his own debt. The mere fact that some part of the moneys provided by the banks may subsequently have been applied in paying out the customer liabilities cannot make the case one of double proof when it was not originally so. Thus, counsel for the banks submits, the liquidators should entertain proofs both from the banks and from the agency, even though that will, of course, be highly prejudicial to the other unsecured creditors.

His alternative formulation results in the banks alone being able to prove because, it is said, the agency has, so far as its proof rests on the assignments from customers paid out by TOSG, nothing for which it can prove. That is said to be so for one of two reasons. First, it is said that immediately the banks' moneys were paid to the customers, the banks stood, by subrogation, in the shoes of the customers whose debts had been paid so that, the customers' rights having, eo instanti, passed to the banks, there was nothing on which the assignments could operate. The second way of putting it is slightly different but the

*[1984] 1 All ER 628 at 636*

result is the same. It is said that for TOSG to arrange with the customers to keep the customers' debts alive notwithstanding the receipt by them of an equivalent sum of money was, and was known to the agency to be, contrary to an implied term to be deduced from the bonds and the counter-indemnities taken in conjunction.

I can deal with these submissions quite shortly, for, speaking for myself, I am unable to accept any of them. Counsel for the banks first way of putting his case is, in my judgment, based on two fundamentally wrong assumptions. In the first place, I am unable to accept that the proper time for determining whether or not the rule against double proof is to apply is the date of the liquidation. I accept the submission of counsel for TOSG and the agency that the rule ought more properly to be styled the rule against double dividends, for its object is to absolve the liquidator from paying out two dividends on what is essentially the same debt. That is a matter which very frequently, for instance in the case of principal and surety, cannot be determined until a payment to the creditor is made. No doubt it can be predicted at the commencement of the liquidation that a case for the application of the rule may arise or that it can never arise, but it may well be impossible to determine at that stage whether it will in fact.

Second, it is, as I think, a fallacy to argue, and this is really the basis of the argument of counsel for the banks, that, because overlapping liabilities result from separate and independent contracts with the debtor, that, by itself, is determinative of whether the rule can apply. The test is in my judgment a much broader one which transcends a close jurisprudential analysis of the persons by and to whom the duties are owed. It is simply whether the two competing claims are, in *substance*, claims for payment of the same debt twice over. It will be necessary to look more closely at the substance of the transactions which have given rise to the problems in the context of which claimant has the better right, but for the moment I accept the broad general proposition of counsel for TOSG and the agency that the rule against double proof in respect of two liabilities of an insolvent debtor is going to apply wherever the existence of one liability is dependent on and referable only to the liability to the other and where to allow both liabilities to rank independently for dividend would produce injustice to the other unsecured creditors.

The rule has nothing to say on the question of which of two proving creditors has the better right to claim a dividend in respect of his debt. It bears merely on the question whether both are to be admitted for dividend and stems from the fundamental rule of all insolvency administration that, subject to certain statutory priorities, the debtor's available assets are to be applied pari passu in discharge of the debtor's liabilities. One way of testing the matter is to ask, in relation to any liability for which proof has been lodged, whether it arises as a result of a payment made in discharge or partial discharge of another liability for which a proof has also been lodged. If the answer to that is affirmative, then it is clear that a distortion of the pari passu principle would occur if both proofs are admitted in full. A simpler test, perhaps, is to postulate the question: what would the position be as regards the payment of the liabilities in respect of which proofs have been lodged if the debtor were now solvent?

Counsel for the liquidator gives by way of illustration what I find a compelling example. Suppose that the insolvent debtor has two creditors, one for £40,000 and one for £20,000, the liability to the latter being guaranteed by a third party to the extent of £10,000. The surety is called on to pay and

pays, thus giving rise to a liability in the debtor to indemnify him. Now if the debtor were in fact solvent the amount required to be found to satisfy all his liabilities would be £60,000; but, if the surety is admitted to prove for £10,000 alongside the principal creditor's proof for £20,000, the total liabilities in the insolvency will be £70,000. Thus for the purposes of the liquidation the claims of creditors are computed at a figure in excess of the amount required to discharge them, to the prejudice of the remaining creditor for £40,000. The rule is designed to prevent this occurring. This method of testing the position emerges from the judgment of Mellish LJ in *Re Oriental Commercial Bank, ex p European Bank* (1871) LR 7 Ch App 99. There bills of exchange were accepted by the European Bank against an undertaking by the Oriental Bank to provide funds to meet them on maturity. They were then handed to the Oriental Bank as agent for the drawer and indorsed by them and discounted. Both banks became

*[1984] 1 All ER 628 at  637*

insolvent and the Agra Bank, the holder of the bill, in fact recovered the amount of the bills by proving in their respective liquidations. The European Bank then sought to lodge a proof in the insolvency of the Oriental Bank for, in effect, damages for breach of the undertaking by the latter to provide funds to meet the bills. In rejecting that proof Mellish LJ observed (at 102):

> 'It appears to me clearly that it is substantially the same debt: because if all parties had been solvent, whatever sums the *Oriental Commercial Bank* might have paid to the *Agra Bank*, although they would have paid it, no doubt, for the purpose of performing the contract they had entered into by their indorsement, yet, substantially, whatever sums they might have paid to the *Agra Bank* would have gone in reduction of the sum which the *Oriental Commercial Bank* had promised to pay to the *European Bank*. In that case the *Oriental Commercial Bank* could never have been called upon to pay these bills twice over. It would have made no difference that they had entered into two contracts with two separate parties that they would pay the bills ... It is clear that they would have performed both contracts by paying the bills once ... '

The true principle, he observed at the end of his judgment (at 103), is 'that there is only to be one dividend in respect of what is in substance the same debt'.

Similar reasoning is to be found in the dissenting judgment of Porter MR in Ireland in *Re Killen, a bankrupt* (1885) 15 LR Ir 388 (subsequently approved by the House of Lords sub nom *Deering v Bank of Ireland* (1886) 12 App Cas 20), where the cumulative proofs of the claimant in respect of different obligations arising out of the same transaction would have resulted in the amount claimed exceeding the amount of the principal debt.

Now, if, as in my judgment these cases show, the true rule is that there are not to be two dividends in respect of what is in substance the same debt, I can see no logical justification for seeking to fix the position at the commencement of the insolvency. One has, as it seems to me, to look at the position at the point at which the dividend is actually about to be paid and to ask the question then whether two payments are being sought for a liability which, if the company were solvent, could be discharged as regards both claimants by one payment.

Tested in this way, the instant case is, in my judgment, one where the rule against double proof does apply and the concession made in the court below was, in my opinion, properly made. It is, of course, true that, if one goes back to the inception of the liquidation, there were two quite separate liabilities. Clarksons owed the holidaymakers the amount which they had paid for a consideration which had wholly failed. It was also liable to the banks for the loss sustained as a result of the calling up of the bonds, the amount of which would depend on the extent to which the bond moneys would in fact be required to meet the holidaymakers' claims. If and so far as those claims were discharged from other sources, the bond moneys would not be required to meet them and, on the terms of the bonds, would fall to be refunded to the banks, thus reducing pro tanto the liability of Clarksons on the counter-indemnities. Thus if Clarksons became solvent in the course of the liquidation (if, for instance, inability to meet commitments which resulted in the bonds being called up had been due merely to a temporary liquidity crisis) the discharge by Clarksons of the debts due to its customers would, as in the *Oriental Commercial Bank* case, at the same time discharge the liability to the banks, disregarding any interest and expense factors, since the bond moneys would then be refunded to them. Thus if bond moneys are in fact applied towards the discharge or partial discharge of the customers' debts the allowance of proofs of debt both for the amount of bond moneys and for the full amount of the customers' debts necessarily involves the liabilities on which dividends are to be declared being computed at a figure in excess of the amount required to discharge those liabilities.

I turn, therefore, to the alternative submissions of counsel for the banks, the first of which is based on a right of subrogation which it is submitted arises from the fact that the debts due to the holidaymakers paid off by TOSG were in fact paid with moneys derived from the banks. It is said that *Brocklesby v Temperance Permanent Building Society* [1895] AC 173 is authority for the proposition that, where A's money is used to pay B's debt, A is subrogated to the rights of the creditor. For my part, I am unable to deduce any such wide principle from that case, which appears to me to rest on a quite different principle, namely that, where a landowner puts another in possession of his title deeds with authority to raise money on them as his agent, he is not entitled to rely on limitations on the authority of the agent which are not brought to the notice of the lender. Indeed, *Wylie v Carlyon* [1922] 1 Ch 51 is, I think, a clear authority against the wide proposition that a right of subrogation stems from the mere fact that B's debt has been discharged with money in fact derived from A. One has to find, in the contract between the supplier of the money and the payer of the debt, some provision that the money is to be applied for that purpose. I can find nothing of this sort in the contract between the banks and TOSG. No doubt the payment of sums due to the holidaymakers was within TOSG's powers and no doubt this was known to the banks, but that is to say no more than that the banks paid the bond moneys to TOSG for whatever purpose TOSG might see fit to use them within its corporate powers, the only stipulation being that any moneys not so applied should be refunded. It was an out and out payment with, for relevant purposes, no reservations of any sort and was, in my judgment, no different in kind from the payment in *Paul v Speirway Ltd (in liq)* [1976] 2 All ER 587, [1976] Ch 220, save that here there was no obligation on TOSG to repay, other than in relation to moneys not required for its corporate purposes. When one

comes to consider the position as between Clarksons and the banks, the case is, I think, a fortiori. Here there was an express right to indemnity giving a direct right of recovery to the banks. Leaving aside the insurance cases (which form a category of their own) and cases of express or implied contract, a right of subrogation arises on equitable principles where otherwise the payer might be deprived of any right of recovery, for instance where money has been lent to an infant and used to discharge debts incurred for necessaries or where money has been borrowed ultra vires or has been paid in discharge of a person's debts without his authority, and I am far from convinced, all other considerations apart, that the equitable principle applies where the payer has already a full and independent right of recovery against the debtor. But, whether that be so or not, I can see no such right in the present case, where TOSG was given an entirely free hand with the bond moneys. One can, perhaps, best test the matter in this way. Suppose that no counter-indemnity had been sought or given and disregard altogether Clarksons' insolvency. The banks undertake, for what they no doubt regard as an adequate consideration, to provide moneys to a third party in a certain event. If the event occurs and if some part of the moneys are applied in fact in paying debts of Clarksons, by what title could the banks claim, in effect, a recoupment for which they never stipulated as part of the original consideration? I can see none.

The alternative proposition of counsel for the banks is expressed thus. Where A provides money to B at C's request for the purpose, inter alia, of paying C's creditors and on terms that C will indemnify A, and B in fact applies the money for that purpose, B cannot keep the claims of C's creditors alive for his own benefit to the prejudice of A and C. He must either extinguish those claims or allow A to be subrogated to them. This is, however, a proposition which makes a number of assumptions and begs a number of questions; and, in the ultimate analysis, counsel for the banks was compelled to justify it by reference, not to any general principle of law, but to an implied term in the contract between A and B (the banks and TOSG) that B will do nothing to impede A's right of subrogation so far as the money is used to pay off debts. I find insuperable difficulties in this. In the first place, it assumes the right of subrogation, and for the reasons stated above, I can find none. But, second, I find it impossible to see any material from which such a term can be implied. There was no restriction at all on the use which TOSG might make of the bond moneys save those imposed by TOSG's own corporate constitution. It was certainly within TOSG's power, if it wished to, to buy up debts and apply any proceeds for its corporate purposes. Whence, then, is any such term to be implied? The banks' obligation was to pay in the stated events. TOSG's only express obligation was to repay anything not required for its corporate purposes; and there is simply no material

*[1984] 1 All ER 628 at 638*

from which one can infer, as a matter of business efficacy, an undertaking that the corporate powers would only be used in a certain way or would not be used in a particular way.

In my judgment, therefore, the problem has to be approached, as it was by Nourse J in the court

below, on the footing that, subject to the operation of the rule against double proof, the assignments to the agency were effective and that the question of which of the two claimants has the better right to prove has to be resolved by the application of equitable principles. Nourse J approached this problem in two quite distinct ways. He recognised that the situation with which the liquidators were faced was an unusual one both by reason of the arrangements made between Clarksons and the banks and TOSG, which does not fit precisely within the framework of any of the decided cases, and by reason of the unusual feature that arrangements were made for the express purpose of keeping the claims of creditors alive for the benefit of someone other than the payer after they had in fact received 100p in the pound on the amounts of their respective claims. It was pointed out to him, however, that apart from a few authorities to which I shall have to refer briefly, all the learning on the subject of priority between rival claimants in respect of the same indebtedness is contained in a series of decisions governing the relationship of principal and surety, as, indeed, is not altogether surprising, for that is normally where the contest arises, and he therefore took those cases as governing by analogy the instant case. Quite apart from that, however, he approached the case on the basis of what he referred to as the 'broad equity', arrived at by a consideration of which claimant had the better claim having regard to the intentions of the parties as deducible from their contractual rights and duties and the purpose for which those rights and duties were acquired or assumed. Counsel for the banks attacks the judge's conclusion on both grounds. As to the former, he says that if (which he challenges) it is right to take the cases of principal and surety as analogous at all, the judge drew the wrong conclusion about the category into which, as a matter of analogy, the instant case fell. As to the latter, counsel for the banks says that there was no material on which the judge was entitled to arrive at the conclusion at which he did arrive, namely that the claim of the agency was to be preferred to that of the banks.

The instant case is not, of course, literally a case of suretyship, for that involves a contract between creditor and surety. Here there is, of course, no contract between the banks and the holidaymakers or between TOSG and the holidaymakers. There are, however, obvious similarities. The liability of the banks was only to arise if Clarkson failed to fulfil its obligations to its customers; the funds provided by the banks were applicable in alleviating that failure; and the banks were, ultimately, to have recourse to Clarksons for what they had paid. The principal argument in the court below sought, however, to avoid this analogy and to apply, as a test of who had the prior right to prove, the question 'who is out of pocket?' That, in essence, rested on *The Liverpool (No 2)* [1960] 3 All ER 307, [1963] P 64. There are, in fact, a number of cases in which questions of priority have arisen in double proof situations not arising from the discharge by a surety of his obligations under a guarantee. Apart from *The Liverpool (No 2)*, however, they are all cases where, in addition to the principal debt, it has been sought to prove an additional and subsidiary liability, either to the principal debtor himself or to a third party (whether or not a surety) to maintain the value of the security or to indemnify against the failure to maintain it (see *Re Hoey, ex p Hoey* (1918) 88 LJKB 273, *Re Killen, a bankrupt* (1885) 15 LR Ir 388, *Re Moss, ex p Hallet* [1905] 2 KB 307, [1904-7] All ER Rep 713). They are useful illustrations of the test previously propounded of whether the proof under consideration will have the effect of computing the amount of the liabilities in an

insolvent estate beyond the figure which would be required to extinguish the liabilities if the debtor were solvent, but they are otherwise of little help with the problem raised by this appeal. *The Liverpool (No 2)*, however, stands by itself and is prayed in aid by counsel for the banks as providing a guide in the circumstances of the instant case. There the tanker Liverpool, by negligent navigation, sank the coaster Ousel in the port of Liverpool. Liability was admitted, but the Liverpool obtained a decree limiting its liability under the Merchant Shipping Act 1894 and the question arose what claims could

*[1984] 1 All ER 628 at 639*

be admitted to prove against the limitation fund. One of the claims against the Liverpool was a claim in tort by the Mersey Docks and Harbour Board for the cost of raising and moving the Ousel in accordance with their statutory duties. The board also had a statutory remedy for the expenses against the Ousel which they exerted to the limited extent permitted by the Merchant Shipping Acts. The Ousel in its proof against the limitation fund included the amount of the board's limited statutory claim against it (in respect of which it had not, at that time, made any payment) and the question before the court was whether this claim could stand having regard to the board's claim, which made no allowance for anything recoverable from this source. At first instance, Lord Merriman P, applying the analogy of the surety cases, regarded the Ousel as being a surety for part of a debt of ascertained amount and held that the board's claim must be pro tanto reduced (see [1960] 1 All ER 465, [1963] P 64). This was reversed on appeal. Harman LJ found the principal and debtor analogy of little help in a case where there was no principal debtor, but applied it to this extent, that the authorities quite clearly established that a surety who has not paid is not permitted to prove for his contingent debt in competition with the principal creditor (see *Re Fenton, ex p Fenton Textile Association Ltd* [1931] 1 Ch 85, [1930] All ER Rep 15). The salient feature of *The Liverpool (No 2)* was that the Ousel had not in fact paid anything. Harman LJ expressed it thus ([1960] 3 All ER 307 at 314, [1963] P 64 at 86):

> 'In our judgment the answer is that the board has priority because it is actually out of pocket by the whole of its claim, whilst the Ousel is not because she has not yet been obliged to pay.'

This, it is argued, is the closest analogy with the instant case. Here the customers have received 100p in the pound on their debts from TOSG using the bank's money. The agency paid nothing for the assignments to it. Thus, if one is to look for the person who is out of pocket, there can be only one answer. The banks having paid must have the prior right of proof.

This argument is perfectly intelligible, and indeed almost unanswerable if one regards the payment of those customers who were paid to TOSG as an entirely separate transaction isolated from any other arrangement made with the agency, but to my mind it ignores the reality. If one is to look for analogies, it is, I think, essential first to analyse what the total effect of the arrangements was and the reasoning behind them. All the cases stress that in relation to the rule against double proofs it is the substance and not the form that is to be regarded (see eg *Re Melton, Milk v Towers* [1918] 1 Ch

37 at 60, [1916-17] All ER Rep 672 at 683, *Re Oriental Commercial Bank* (1871) LR 7 Ch App 99). When regard is had to what actually happened in the instant case, it is, I think, entirely clear that the transaction by which TOSG paid a certain number of customers in full cannot be treated as a transaction on its own isolated from the payment by the agency of the claims of the remaining unpaid customers. The fact is that, if one looks at the reality of the position and asks, 'Who is out of pocket?', the answer is that both the banks and the agency are out of pocket and in that situation *The Liverpool (No 2)* provides no help, since it provides no guidance as to what would have happened if the Ousel had paid either the whole or a part of its liability and the court declined to express any opinion on whether in exerting its claim against the Ousel the board could be compelled to give credit for any part of the sums received as a result of its claims against the Liverpool.

That the reality is as I have described it seems to me inescapable. Under the Air Travel Reserve Fund Act 1975 and the benefit rules the agency was obliged to pay any balance due to customers after taking into account the bond moneys and anything received by way of dividend in the liquidation, but it could not pay anything at all until the bond moneys were exhausted. A year had already passed during which customers were out of their money and since there were still outstanding claims which were the subject of test actions a further lengthy period would have to elapse before anybody could receive anything unless arrangements could be made to expedite payment to those customers whose claims were beyond dispute. It was in these circumstances that TOSG and the

*[1984] 1 All ER 628 at 640*

agency came to the very sensible arrangement that the bond moneys should be expended in full in paying out customers so that the pre-condition for the agency's making payments was satisfied. This could have been done in several ways. TOSG could have made pro rata payments to customers, leaving it to them either to prove for the balance and to bring into account any dividends received when the agency came to make payments in pursuance of its statutory obligation or to assign such rights of proof as they had to the agency against payment to them of any balance not paid out of the bond moneys.

In the event, it was an accident of administrative convenience rather than anything else which dictated the manner in which the problem was in fact dealt with. There was no difference in kind between the customers paid by TOSG and those paid by the agency and the reality is that a single class of creditors was receiving payments on account of their debts from both TOSG and the agency, the latter's contribution in the case of those customers paid by TOSG being indirectly provided by the assumption by the agency of the full responsibility for paying the others.

It was against this background that the judge felt it appropriate to apply the analogy of the suretyship cases and, in my judgment, he was right to do so. The assignments were mere machinery and what fell to be regarded was in reality a partial payment by TOSG of the totality of the

obligation owed by Clarksons to all its customers as a single class. The position therefore fell to be tested as between the banks on the one hand, whose money had provided the payments, and the customers as a whole on the other hand, for the assignments could not assign any greater rights than the customers themselves had at the moment when they were paid.

The principles which emerge from the suretyship cases have been helpfully summarised both in the judgment of Nourse J and in the skeleton arguments prepared by counsel for the guidance of this court. The starting position is that a creditor is entitled in an insolvency to prove for the whole sum due to him at the date of the liquidation or receiving order without any obligation to give credit for any sum which he has since received from a third party, unless and until he has received 100p in the pound on his debt. That entitlement, however, may fall to be modified by reason of the rule against double proof where the third party is himself a creditor in the insolvency for the sum which he has paid, as in the case of a surety. Whether it is or not depends on whether the payment entitles the payer to be subrogated, to the extent of his payment, to the creditor's right and it is in relation to this question that a number of clearly established rules are deducible from the surety cases.

The basic rule is that the proof of a surety cannot displace the proof of the principal creditor unless and until the surety has fully discharged all his liabilities to the creditor. A fortiori it cannot do so where no payment has been made and the liability to the surety remains contingent *(Re Fenton* [1931] 1 Ch 85, [1930] All ER Rep 15). So long as any liabilities of the surety are outstanding the creditor remains entitled to prove for the full amount of the debt due to him at the date of commencement of the winding up or the receiving order and the surety's proof is excluded.

It is here that there has grown up a distinction, which depends on the construction of the contract of suretyship and which is not altogether easy to understand, between cases where the surety guarantees part of an ascertained debt and cases where he is held to have guaranteed the whole debt but subject to a limitation of his liability to less amount than the whole. In the former case, the payment of the amount guaranteed entitles the surety to stand, pro tanto, in the creditor's shoes in the insolvency, since he has discharged the whole of his liability to the creditor. In the latter case, so long as any part of the whole debt remains outstanding, the surety, although he has paid up to the limit of his financial liability, is treated as not having discharged his liability to the creditor, presumably on the footing that there nevertheless remains an outstanding obligation on him to see that the whole debt is paid. The distinction may seem over-subtle, but it is clearly established by authority: see the judgment of Blackburn J in *Ellis v Emmanuel* (1876) 1 Ex D 157, [1874-80] All ER Rep 1081, where the authorities are reviewed.

This rule is, however, subject to a qualification. Where the guarantee is of the whole

of a fluctuating balance (eg as in the case of a guarantee of the debtor's current account with a bank) with a limit on the liability of the surety, such a guarantee is to be construed as a guarantee of part only of the debt and the surety paying up to the limit of his liability will be entitled to that extent to stand in the creditor's shoes and prove in priority to him (see *Ex p Rushforth* (1805) 10 Ves 409, 32 ER 903, *Gray v Seckham* (1872) LR 7 Ch App 680). The right of the surety in these circumstances to prove in priority to the principal creditor can, however (as it normally is in bank guarantees), be excluded by the express terms of the contract of guarantee. A provision that the guarantee is to be in addition and without prejudice to any other securities held from or on account of the debtor and that it is to be a continuing security notwithstanding any settlement of account is probably sufficient for this purpose (see *Re Sass, ex p National Provincial Bank of England* [1896] 2 QB 12) but at least there must be some express clause in the contract which can fairly be construed as a waiver by the surety of his rights in favour of the principal creditor (contrast *Hobson v Bass* (1871) LR 6 Ch App 792 with *Midland Banking Co v Chambers* (1869) LR 4 Ch App 398). Such a provision will not readily be inferred merely from the form which the transaction takes (see *Gray v Seckham)*.

Those being the principles, how are they to be applied by analogy to the instant case? Nourse J regarded the case as one where the proper analogy was that of a guarantor who guarantees the whole of a debt of fixed amount with a limitation on the amount of his liability, so that even after payment of the whole of the surety's liability the creditor remains entitled to prove for the whole sum. The reasoning behind this conclusion was that the object of TOSG was to alleviate the consequences of Clarksons' business failure. TOSG had a discretion about how this was to be done, but one way of carrying out the object was to recoup any shortfall remaining after the customers had received all available dividends in Clarksons' liquidation. Thus, it was argued, since the obligation of the banks was to be answerable for any balance remaining after all moneys available from other sources had been applied in reduction of the debt, the guarantee was a guarantee of the whole debt, subject only to a limitation on the amount which the banks were to pay. This feature of the relationship appears to have convinced the judge that the case of the guarantor of the whole of a fluctuating balance with a limitation on the amount of liability (as in *Hobson v Bass)* was not to be applied and as I understand his reasoning it was this.

The reason why that case is treated differently from the case of the debt of fixed amount is that it is considered inequitable in the creditor, who is at liberty to increase the balance or not, to increase it at the expense of the surety (see *Ellis v Emmanuel* (1876) 1 Ex D 157 at 163-164, [1874-80] All ER Rep 1081 at 1083). Since, the argument runs, it was contemplated that Clarksons would be entitled to take on liabilities to customers without limitation and since in the event of Clarksons' insolvency TOSG *could* apply the bond moneys in discharging any balance remaining after the disappointed customers had received their dividends in the liquidation, there was in fact nothing inequitable in such indebtedness being increased and accordingly the case is to be treated in the same way as the guarantee of the whole of a debt of ascertained amount.

With respect to the judge and to counsel for TOSG and the agency, from whom the argument originated, I find an element of circularity in this reasoning, which really begs the question of priority by starting from an assumption that it must be decided in favour of the customers. Of course, factually and dependent on the order in which events take place, any surety may find himself paying, up to the amount of this liability, any balance remaining due to the creditor after he has received a dividend on the whole of his debt in the insolvency of the principal debtor. But the mere fact that the creditor may have received a dividend on the whole is not determinative at all of how that dividend falls to be treated when it comes to settling the accounts between the creditor and the surety who, ex hypothesi, has not been able to prove because he has not paid (see, for instance, *Gray v Seckham*, where the creditor had received his dividend before calling up the guarantees, and *Hobson v Bass*, where the sureties had paid but had not themselves proved in the bankruptcy).

It is, of course, true that in the instant case the moneys paid by the banks were paid, not to the creditors in the first instance, but to a third party, TOSG, against whom there

*[1984] 1 All ER 628 at 642*

would be no recourse for dividends received by the customers, but by the same token, the moneys having actually been paid by the banks, they would themselves have a right of proof under their counter-indemnity in the insolvency for the full amount paid, subject only to reduction of that amount by reason of the rule against double proof. As a practical matter, of course, the liquidator, who was faced with proofs both by the banks and by the customers, and knowing that some part of the bond moneys was bound to be paid in discharge of the indebtedness to the customers, would be bound to defer paying dividends on either until the question of double proof had been cleared up and it had been determined who had the better right to prove. Thus, to say that the bond moneys could be used by TOSG in discharging what was due to the customers after they had proved and received dividends in the liquidation begs the question of the extent to which their proofs should be allowed. It cannot itself be prayed in aid as solving the question. Nor can I, for my part, follow why the contemplation that Clarksons should be entitled to incur obligations without limit should take the case out of the ordinary rule. If the arrangements made in this case are to be treated, as I think they are, as analogous to a guarantee by the banks of Clarksons' liabilities to its customers, they appear to me clearly to be analogous to a guarantee of a balance which is going to fluctuate from time to time but subject to a limit on the surety's liability, and exactly the same considerations as apply in that case to prevent the surety's right of proof being prejudiced by the debtor's increasing his indebtedness appear to me to apply here. If that is right, then the question is whether there can be spelt out of the arrangement some express or implied term to the effect that, in the event of the debtor's insolvency, the banks would not prove for the amount which they had paid under their bonds until the customers had been paid in full. Certainly there is no express term to that effect and, speaking for myself, I am unable to find in the documents or the circumstances in which the bonds were given any such implied term. So far as the banks were concerned, their contract with Clarksons was that they would put up the bond moneys in consideration of the agreed fee and of a right of counter-indemnity which clearly contemplated a proof of debt for the moneys paid in the

only likely event in which they would become payable. There is simply no room for any such implication here.

So far as TOSG was concerned, the banks simply entered into an obligation to pay over moneys for TOSG's complete disposition in the stated events. In its defence the agency plead an implied term arising under the bonds that TOSG should be entitled to utilise the bond moneys in any transaction authorised by its constitution and that in such event the banks 'would do nothing to hinder any such transaction or to prevent any such transaction from being effectual'. Speaking for myself I find it impossible to see from what material it is sought to make this implication, but in any event, as was pointed out in the course of the argument, such a term does not assist in the present context. It is said that it was within TOSG's powers to procure assignments to the agency of such rights of proof as the customers had but nothing done by the banks in the least interfered with that. To assist the agency it would, I think, be necessary to imply a term that the banks would not, by proving in the liquidation of Clarksons, do anything which might impede in any way the maximum alleviation possible of the customers' losses. By any ordinary test for the implication of contractual terms, this is fanciful.

If, therefore, the analogy of the surety cases is treated as conclusive of the present case, then, in my judgment, the banks are in the position of the surety under the ordinary form of guarantee of a fluctuating account with a limit on the guarantor's liability and no term excluding the equity which ordinarily arises from that relationship. It would follow that as between the banks and the customers, the banks have the prior right of proof and that, that right must prevail against the agency, which cannot be in any better position than its assignors.

There remains, however, the judge's primary ground of decision. He pointed out that a decision of the case did not necessarily rest on which of two categories of suretyship case bore the closer affinity to it. The determinative factor was the application of equitable principles as applied to a true construction of the parties' intentions. He concluded:

> 'But in the end I do not need to rely on the analogy at all. I agree with [counsel

*[1984] 1 All ER 628 at 643*

> for TOSG and the agency] that the decisive feature of the present case is the trust fund's power to recoup to the customers any shortfall remaining after they had received all available dividends in Clarksons' liquidation. Once you get to that stage it is apparent that it would indeed be most inequitable for the banks to claim, as against the customers, a rateable proportion of any dividends receivable or received by them. This is not a narrow equity but a broad one. And it is a surer basis for decision than any mere analogy.'

It will be observed that in arriving at the broad equity the judge is here relying on precisely the same argument as that which led him to assimilate the banks' position to that of guarantors of the whole

of an ascertained indebtedness. In doing so, it seems that he was much influenced by some figures produced by the chairman of the agency, Sir Kenneth Selby, which were designed to contrast the position as it might have been with the position as it actually was. These figures demonstrated that the total amount due to customers was £4,357,677. On the footing that they all proved and assuming a dividend of 12½p in the pound they would receive £544,710. If they were then paid by TOSG the bond moneys actually paid out (£1,267,759), the agency's liability in pursuance of its statutory duties would then have been £2,545,208. What the agency actually paid to customers was £3,089,918. Thus, it was argued, by adopting the method of paying out first against assignments, the agency would have spent more than its statutory liability to the extent it was unable to recover the customers' proofs of debt assigned to it, a sum of £158,470, on the footing that the banks are admitted to prove in priority to the customers paid by them. That figure, of course, includes the share of Williams & Glyn's Bank, which is not an appellant.

As an exercise in arithmetic this, of course, is admirable, but the assertion that the actual method of dealing with the claims involves an expenditure in excess of the agency's liability rests on the same assumption as the proposition which I have already ventured to criticise. The agency was under a statutory liability to make good anything not met from dividends or bond moneys, but the assertion that it would have expended less if it had waited until the customers received their dividends assumes that there is no question of double proof and therefore begs the question of what dividends were in fact available. These figures demonstrate the arithmetic. They do not, in my judgment, demonstrate the equity, and I cannot, for my part, share the judge's view that there is anything inequitable in allowing the banks who have paid real money to recover a dividend on the sums which they have paid and in reducing the proofs of the customers, who have received real money in priority to other creditors, by the amounts which they have in fact received. Leaving aside, for the moment, the suretyship analogy, if the amounts of the customers' claims had been equal to or less than the bond moneys, there could be no question whatever that the banks were entitled to prove for what they had paid. What is there then in the fact that the customers' debts exceed the amount of the bond moneys that displaces the banks claims? It is only the rule against double proof and that brings one back to the suretyship analogy. If one discards that as a guide, one is left with competitive claims between a class of creditors (the banks) who are out of pocket to the full nominal amount of their claims and a class of creditors (the customers) who are in fact out of pocket to an extent less than the full nominal amount of their claims because of their receipt of the banks' money. Unless there can be found in the arrangements under which the money was put up some implied term which precludes the payers from exerting the limited right of recoupment which they were careful to reserve against the debtor when those arrangements were made, I can see no equity which dictates that the customers' claims should be preferred. It is said that it is illogical that the banks should enter into bonds which they knew were designed to alleviate losses to holidaymakers whilst at the same time reserving the right to 'claw back' from the holidaymakers what they might otherwise have got in the liquidation. This I find an emotive description of what seems to me a perfectly commonsense business arrangement and it really comes back to seeking to imply an intention on the part of the banks not simply that the bond money should be used to alleviate the

losses of customers in such way as TOSG might think fit but that such losses should be alleviated to the maximum extent possible by

*[1984] 1 All ER 628 at 644*

eliminating the rights which the banks had reserved against the debtor. I find no material for any such implication and I cannot think that it would have occurred for one moment to any bystander, officious or otherwise, who was present when the arrangements were made.

I find myself, therefore, unable to reach the same conclusion as the judge. In my judgment both the suretyship analogy and the broad equity of the position favour the banks' claim as against that of the agency, and I would allow the appeal.

**KERR LJ.**

For convenience I will refer to the parties as 'Clarksons', 'the banks', 'TOSG', 'the holidaymakers', 'the agency' and 'the liquidators'. The issue on this appeal concerns the right to prove in Clarksons' liquidation for part of the 'bond moneys' provided by the four appellant banks to TOSG. The competing claimants for payment of a dividend by the liquidators on the amount of the bond moneys are the four banks and the agency. However, this is to some extent an over-simplification: each of the banks with which this appeal is concerned seeks to prove for the fixed amount of the bond which it has provided, viz Barclays for £500,000, Lloyds for £93,000, National Westminster for £500,000 and Wintrust for £260,000, and the agency is disputing each of these claims to proof. For convenience it may be simpler to treat the total bond moneys as one composite sum. But in analysing the position one must also constantly bear in mind that each of the banks is a separate claimant in respect of the amount of its bond, even though their claims must stand or fall together. Further, although it is convenient to refer to the bond moneys compendiously, the competing claims are in fact confined to the sums paid by TOSG to holidaymakers directly, to the exclusion of the repatriation costs as to which the banks' right to proof is not in dispute.

There are only three possible solutions. (1) The banks are entitled to prove to the exclusion of the agency. (2) The agency is entitled to prove to the exclusion of the banks. (3) The banks and the agency can both prove.

Either of the first two solutions would follow from the application of the so-called rule against double proof, though, in my view, they also fall to be considered independently from this rule. The third solution can only be correct if this rule has no application to the unusual situation in this case.

Before Nourse J the case proceeded on the basis that the rule against double proof was on all sides assumed to apply. He therefore had to choose between the first two solutions, but on this appeal we have to consider all three. To my mind this provides a better approach to seeking the solution which most closely accords with justice and the presumed intention of the parties concerned. The rule against double proof is highly technical in some facets of its application, but ultimately it is based on what the court regards as justice between all the creditors. Exceptionally it may fall to be applied in unforeseeable situations such as *The Liverpool (No 2)* [1960] 3 All ER 307, [1963] P 64, where the priority between competing claims has to be determined without reference to the parties' presumed intentions before the occurrence of the insolvency. Generally, however, it applies in cases in which there is something in the nature of a debtor-creditor-surety situation which precedes the insolvency. In such cases, the solutions at which the courts have arrived, as illustrated by the decisions to which Oliver LJ has referred, have taken account, expressly or tacitly, of what the parties concerned are to be regarded as having intended. It is on this basis that they have generally decided whether or not the rule applies and, if so, with what consequences as regards priorities. I think that this is particularly important in the present case, since its unusual feature is that Clarksons, in conjunction with the banks and TOSG, set up the bonding arrangements with the express intention that they should take effect in the event of Clarksons' possible insolvency for the benefit of a particular class of creditors. I therefore feel that the safest course is to begin by examining the presumed intentions of the various parties at the time when the bonding arrangements were made.

**The parties' intentions**

The background can be summarised as follows. In order to strengthen their position

*[1984] 1 All ER 628 at  645*

as reliable tour operators in the eyes of members of the public who might book holidays with them, Clarksons, together with other major tour operators, wanted to set up a fund whose existence would be publicised and which would be immediately available to these customers in the event of Clarksons becoming insolvent, at least to the extent that they might run into cash-flow difficulties and become unable to meet their commitments to them, as had notoriously happened in a number of other cases. They therefore combined to set up TOSG as a vehicle for the receipt and application of a fund to be available for this purpose outside their possible liquidation. The main objectives of this fund appear from cl 3(A) of TOSG's memorandum of association. These were to 'alleviate' the consequences of any insolvency to the holidaymakers in two main respects, (i) to enable them to complete their holidays and to bring them home more or less as they had planned, and (ii) to refund to them any prepaid deposits, or prepayments made in full, so that these moneys would be available to them for making alternative holiday arrangements. The total amount of the bond moneys to be provided by Clarksons for these purposes was computed on the basis of 5% of their annual turnover, because it was hoped that, by and large, this could be sufficient to cover what might turn out to be Clarksons' maximum exposure in this respect. However, there was no requirement that Clarksons were to take any account of the total amount of the bond moneys in accepting bookings from their

customers; and there was also no suggestion that the banks had any knowledge or concern about the relationship between the amounts which, individually and collectively, they agreed to guarantee by issuing the bonds and the amounts which might at any time be required to meet Clarksons' commitments within the objectives of cl 3(A).

There is also no indication, I think, that in issuing the bonds, the banks acted otherwise than individually to the extent of the various amounts which they undertook to pay to TOSG in the event of Clarksons' insolvency. However, this is of no importance, since, apart from whatever commission which may have been agreed with Clarksons for issuing the bonds, each bank required a counter-indemnity for the bond moneys from Clarksons in the usual way. Each such counter-indemnity was to take effect if and when the bonds were called by TOSG. It was common ground that TOSG, as well as the agency, when it came into existence later on, were well aware of the counter-indemnities.

Against this background, one can then ask oneself the first material question concerning the intention of the parties which set up the bonding arrangements: 'In the event of the bonds being called up, due to Clarksons' insolvency, was it envisaged that the banks would be entitled to prove for the amounts of their respective bonds in Clarksons' liquidation?' To this there can only be one answer: 'Yes, obviously, by reason of the counter-indemnities.' The common intention in this regard can be expressed by each bank saying, in effect, with the assent of Clarksons and TOSG: 'In the event of the bonds being called, we will immediately provide cash to TOSG to the extent of our bond. This will be applied by TOSG for the benefit of Clarksons' customers in accordance with TOSG's memorandum of association, and in particular cl 3(A). Any balance which is not needed for these purposes will be refunded to us. To the extent that there is no refund, we will be left with a claim in Clarksons' liquidation under our counter-indemnity.'

Since this was clearly the common intention of the parties concerned in setting up the bonding arrangements, I am bound to say that, right from the outset, I find it difficult to accept that any answer to the complex problems of this case can be correct in so far as it precludes the banks from proving in Clarksons' liquidation to the full extent of their counter-indemnities. Whatever may be the effect of the mysteries of the rule against double proof, to which I turn later, it would be strange indeed if it led to any other result.

I realise, however, that this approach is too simple and that, in ascertaining the parties' intentions, one must go on and pose a further, more complex, question to the parties who set up the bonding scheme, on the following lines: 'But, suppose that the bond moneys, or their residue after paying for the repatriation of stranded holidaymakers, are paid to customers of Clarksons who have paid deposits or prepaid for their holidays in full, but the bond moneys are found to be insufficient to reimburse them in full, what would then be the rights of the holidaymakers?' I think that the instant

answer would be: 'Well, of course, they can claim in the liquidation of Clarksons for the balance.' This,

*[1984] 1 All ER 628 at  646*

I think, is the right answer from every commonsense point of view, and it ought to be the right answer in law. However, suppose that the questioner then explained the rule against double proof and repeated the question, somewhat on the following lines: 'But, you see, the position is this. The bond moneys have been provided by the banks, at Clarksons' request and expense, to be applied by TOSG, at any rate as to the relevant part, in order to meet the debts owed by Clarksons to the holidaymakers, who will be one class of Clarksons' creditors in the event of Clarksons' insolvency. In a sense, therefore, the banks are in a position of sureties for the holidaymakers. In general, however, to simplify a legal rule called "the rule against double proof", a creditor can claim against the debtor the full amount of his debt, without having to give credit for anything received from a surety until he has had his debt repaid in full; and, in cases where the rule applies, the creditor can generally claim the full amount of his debt against the insolvent debtor to the exclusion of the surety. Alternatively, if there are competing claims by two creditors for what is in substance the same debt, then one must have priority over the other, because it would not be fair to the general body of creditors of the insolvent debtor that two dividends should be paid for what is in substance the same debt. What then?'

The intelligible part of the answer, no doubt after a good deal of head scratching, would in my view have been somewhat as follows: 'Well, I still think the same. I don't see how the banks can in any event be precluded from claiming on their counter-indemnities. They agreed to pay over the bond moneys for the benefit of the holidaymakers in the event of Clarksons becoming insolvent, but only on the basis that they would then be entitled to claim in Clarksons' liquidation under the counter-indemnities. I don't see how they can lose this right. I can see that Clarksons' liquidators should not pay a dividend on the bond moneys both to the banks and the holidaymakers. But the banks have paid out the bond moneys, and the holidaymakers will have received them, all as had been intended. The holidaymakers will find that they are fortunate to get these sums. And, after all, indirectly the bond moneys will have been made available to the holidaymakers by Clarksons themselves. Why, then, having received them with one hand, should the holidaymakers still be able to claim them from Clarksons' liquidators with the other? So, as I say, the banks should be entitled to a dividend on the bond moneys, and the holidaymakers to a dividend on the balance of their debt after giving credit for what they will have received out of the bond moneys. In so far as I understand your rule against double proof, I don't think that it was ever intended to apply here. But, if it does, then the banks must have the better claim.'

Those, I think, would have been the answers of the persons concerned in setting up the bonding arrangements to the problems raised by this case before the advent of the agency and the complications created by the assignments, to which I come later. I shall also have to deal with the

inevitably much more sophisticated answers to these problems in the contrary sense given in the judgment of Nourse J and elaborated in the able argument of counsel for TOSG and the agency on this appeal. Meanwhile, however, in considering the presumed intentions of the various parties before Clarksons' insolvency, one should perhaps also bear in mind two other classes of persons in so far as they dealt with Clarksons in the knowledge of the bonding arrangements: the general body of Clarksons' creditors at any time, and in particular the holidaymakers themselves, who may well have made bookings with Clarksons partly in reliance on these arrangements. But, in my view, their answers would have been precisely to the same effect. The reason is that, from the point of view of justice and common sense, I do not see how they could have been different.

**The original effect of the bonding arrangements**

After giving answers on the foregoing lines, the holidaymakers would no doubt have added: 'Of course, if the law allows us more, then we would like to have it.' In my view, however, these answers were in accordance with the legal position at the stage when the bonds were established. None of the counsel who appeared on this appeal were able to refer us to any case in which an analogous position had been considered. But sometimes, in new situations, the court has to find a just solution which stems simply from the nature of the transaction, the relationship between the parties and their presumed

*[1984] 1 All ER 628 at 647*

common intention. For instance, the rules concerning rights and obligations of contribution in general average were originally based simply on 'common principles of justice' (see *Birkley v Presgrave* (1801) 1 East 220 at 227, 229, 102 ER 86 at 88, 89), and these rules were then applied by analogy in laying down the principles of contribution between co-sureties (see *Dering v Earl of Winchelsea* (1787) 1 Cox Eq Cas 318 at 322, [1775-1802] All ER Rep 140 at 143). In my view, the same approach applies here.

However, Nourse J reached a diametrically opposite conclusion, though under the constraint of the applicability of the rule against double proof, since the case before him proceeded on this basis. Having dealt with the analogy of the banks' position as sureties, to which I come later, he said:

> 'But in the end I do not need to rely on the analogy at all. I agree with [counsel for TOSG and the agency] that the decisive feature of the present case is TOSG's power to recoup to the customers any shortfall remaining after they had received all available dividends in Clarksons' liquidation. Once you get to that stage it is apparent that it would indeed be most inequitable for the banks to claim, as against the customers, a rateable proportion of any dividends receivable or received by them. That is not a narrow equity, but a broad one. And it is a surer basis for decision than any mere analogy.'

With the greatest respect, I find myself wholly in disagreement with this for a number of reasons. First, and quite generally, I think that every principle of 'broad equity' points in the directly opposite

direction, for the reasons already mentioned. Second, I think that this definition of the 'decisive feature' begs the question. What is meant by 'all available dividends'? Are they the dividends payable after the banks have also proved for the bond moneys? Or is the assumption that the banks will have been excluded from proof? The test appears to me to be circular, since the question is whether or not the banks are entitled to prove. In this connection it must be borne in mind that the banks' prima facie right of proof will have arisen as soon as the bonds were called, so that, even if all the holidaymakers had then also proved at once for their full debts, the liquidators would have been faced with both claims to prove in full, as they are now. I therefore cannot see how this formulation can provide any answer to the problem. Third, I think that its premise in no way corresponds to the realities of what had been intended, and indeed happened. The whole purpose of the bonds was to provide a fund which, on Clarksons' insolvency, would be immediately available to TOSG for the benefit of the holidaymakers. It was never envisaged that the fund would be distributed only after the holidaymakers had proved in the liquidation and it was known what dividends the holidaymakers would receive. I appreciate, of course, that there could in theory have been an immediate partial distribution, with a reserve being held back until after completion of the liquidation. But this possibility seems to be too artificial to provide any sound basis, at any rate for the purpose of raising any 'broad equity'. The common intention, as well as the objects of TOSG, surely envisaged that every penny of the bond moneys should (apart from administrative expenses) be applied, as quickly as possible, to whatever extent was necessary to alleviate the plight of Clarksons' customers. The possibility of a reserve could only have arisen if there had been a surplus. I can see that, on that assumption, the test posed by Nourse J could have arisen, though subject to the reservations which I have already expressed about it, in deciding whether or not to return the surplus to the banks under the terms of the bonds. But where, as in the present case, the fund in fact proves to be insufficient to meet all the needs of the holidaymakers, it seems to me that this test provides no realistic basis in any event for arriving at a just solution of the problem.

It follows that in my view, leaving aside for the moment the advent of the agency and the effect of the assignments, the correct solution, on the basis of the parties' intentions and 'common principles of justice', is that the banks were to be entitled to prove for the full amount of the bonds, and that each holidaymaker was to be entitled to prove for the balance of his debt after giving credit for whatever he or she may have received out of the bond moneys. I formulate my conclusion at this stage in this way, because, but for

*[1984] 1 All ER 628 at 648*

the advent of the agency, the available bond moneys would no doubt have been distributed pari passu between the relevant holidaymakers, as had indeed been TOSG's original intention; but this assumption does not affect what I would respectfully regard as the correct solution in principle. Accordingly, when the bonding scheme was set up, it was intended to operate in a way in which there would be no basis for the application of the rule against double proof.

**The effect of the subsequent events**

However, I must then turn to what in fact happened when the balance of the bond moneys was distributed by TOSG after the repatriation costs had been met. The facts have already been stated by Oliver LJ, and I need not repeat them. The agreement between TOSG and the agency was, if I may respectfully say so, an extremely sensible one, since it enabled the balance of the bond moneys, together with the new funds available to the agency, to be used to compensate all the relevant holidaymakers in full as quickly and conveniently as possible. However, what was the legal effect, if any, of TOSG paying one category of holidaymakers in full, until the bond moneys became exhausted, but subject in each case to taking an assignment in favour of the agency of these holidaymakers' debts, or of their right to prove in Clarksons' liquidation? This category consisted of those who had made prepayments to Clarksons direct, whereas it was thought that those who had made payments to travel agents would have to await the outcome of a test case. Subsequently they, together with those who had not been paid by TOSG out of the bond moneys, had their prepayments reimbursed by the agency in full. During the argument before us it was found convenient in this connection to refer to the holidaymakers paid by TOSG as 'the Browns' and to those paid by the agency as 'the Smiths', and to refer to the general body of both categories as 'the Brown-Smiths'. I will use the same terminology. The issue therefore turns on whether the banks are entitled to prove in Clarksons' liquidation to the extent of the sums paid to 'the Browns' to the exclusion of the agency, or vice versa, or whether the banks and the agency can both claim a dividend on these sums. It is of course not in dispute that the agency can prove in any event in respect of the payments which it made to 'the Smiths'.

I must begin by dealing shortly with two submissions put forward by counsel for the banks. The first was that the banks had a right to be subrogated to 'the Browns' as soon as 'the Browns' were paid out of the moneys provided by the banks, and that the assignments could not destroy this right of subrogation. In the same way as Oliver LJ I cannot accept this submission. Given the existence of the express counter-indemnities, of which both TOSG and the agency were aware at all times, and the unrestricted powers of TOSG, I cannot see any scope for any parallel implication of a right of subrogation to the same effect as the counter-indemnities.

Second, counsel for the banks submitted that, by requiring the assignments in favour of the agency, TOSG was in breach of some term to be implied as between TOSG and the banks, or possibly, as I understood him, in breach of trust to the banks, and that the banks could rely on these breaches against the agency, since it was in the position of an equitable assignee with notice. Again, I think that these submissions go too far. If one regards the agency as representing all 'the Smiths', I can see, as submitted by counsel for TOSG and the agency, that under the terms of the bonds, which incorporated the wide objects of TOSG, TOSG was entitled to do anything which might be of benefit to 'the Smiths'. Even on this assumption, however, there remains the question whether the assignments had the effect of excluding the banks' right of proof under the counter-indemnities or whether the banks and the agency can both prove. In my view the assignments have no effect on the conclusions which I have already expressed, for a number of alternative reasons which all lead to

this result.

The first point in this connection is that I cannot accept any of the arguments of counsel for the banks, which in the end he did not strongly maintain, to the effect that the banks and the agency can both prove and receive a dividend in respect of the payments made by TOSG to 'the Browns'. This would be unfair to the general body of Clarksons' creditors and inconsistent with the principle of the rule against double proof, whether or not this rule is strictly applicable in the circumstances of this case.

*[1984] 1 All ER 628 at  649*

Second, as it seems to me, since 'the Browns' were paid by TOSG in full, out of the bond moneys which had been specifically arranged to be provided by Clarksons for their benefit in the event of Clarksons' insolvency, 'the Browns' had no right of proof thereafter, and nothing which they could effectively assign to the agency. There were then no debts owed by Clarksons to 'the Browns' which remained to be assigned. Council for TOSG and the agency countered this by submitting that 'the Browns' cannot for this purpose be considered in isolation, but that, having regard to the reasons which underlay the agreement between TOSG and the agency, the division between 'Browns' and 'Smiths' should be ignored, and that the position should be tested by reference to 'the Brown-Smiths' as a whole, as though TOSG had made a partial payment towards the debts of all the relevant holidaymakers pari passu and had then taken assignments from all of them in favour of the agency. I was at first greatly attracted by this argument, but on reflection it seems to me again that it displaces reality in favour of theoretical possibilities, though on this occasion in a different context. Why should the legal effects of the assignments not be judged by reference to what actually happened? Admittedly, the agreement between TOSG and the agency could have been framed differently, and less conveniently, by each party paying all 'the Brown-Smiths' pari passu, and all of them could then have effected assignments in favour of the agency in consideration of the payments made to all of them by TOSG. But, since this did not in fact happen, why should the effect of the assignments fall to be determined on this hypothetical basis?

Third, however, let it be assumed that this is wrong, and that each transaction between TOSG and one of 'the Browns' is to be regarded as valid and effective in the sense that it constituted a purchase of each debt by TOSG in consideration of its assignment to the agency, and not a payment which extinguished the debt. What is the position then?

The first answer in my view is that the assignments would still have no substantial effect, because they would not entitle the agency to prove in Clarksons' liquidation in competition with the banks. For the reasons stated in the judgment of Slade LJ, which I have seen and with which I respectfully agree, the agency cannot, as TOSG's assignee, be in any better position than TOSG itself. However, it cannot possibly have been in the contemplation of any of the parties, when the bonding scheme was set up, that TOSG might be entitled to buy up the debts of the holidaymakers in order to seek to

acquire claims in the liquidation which would rank in priority over the claims of the banks under the counter-indemnities. Any such suggestion as to the rights of TOSG would transgress the common intention of the parties to the bonding scheme to an even greater extent than in relation to the rights of the holidaymakers themselves, with which I have dealt at the beginning of this judgment.

Nevertheless, I can see the force of the argument, though to my mind only a technical one, that the correct analysis resulting from the assignments on these assumptions is that they have the effect of bringing the rule against double proof into operation between the agency and the banks. On that basis, however, it seems to me to be clear, for the reasons explained in the judgment of Oliver LJ, that the effect of the rule in the circumstances of this case is that the banks can prove to the exclusion of the agency. Here again I respectfully differ from Nourse J. He said:

> 'In all the circumstances, if the suretyship analogy is to be applied and carried through, the case is clearly one where there was a guarantee of the whole debt, subject to a limitation on the liability of the surety in the amount of the bond moneys.'

In my view, however, there was clearly no guarantee of the whole debt by the banks, either collectively or, as is more relevant, individually. If the language of the authorities concerning the rule against double proof is to be used at all, then each bank guaranteed, to use the word loosely and I think inaccurately, an indeterminate part of an unknown fluctuating balance up to the limit of its bond. With the greatest respect to Nourse J, I cannot begin to see how the terms of the bonds, albeit that they incorporated all the terms of TOSG's memorandum of association, can be regarded as having guaranteed the whole of any debt or debts whatever. I have already set out earlier in this judgment what appears to me to be a clear formulation of the position of the banks in this regard.

*[1984] 1 All ER 628 at 650*

Accordingly, even if the rule against double proof is applicable, it follows from the analysis of the authorities in the judgment of Oliver LJ that the banks can prove to the exclusion of the agency.

For all these reasons I would allow this appeal.

**SLADE LJ.**

I agree that this appeal should be allowed. Oliver LJ has stated the facts and I will not repeat them, save to the extent necessary to explain my own conclusions.

I think that the task of Nourse J was made more difficult by the fact that no argument was addressed to him in support of the contention that the rule against double proof has no application in the

present case and that there is accordingly no reason why both the four plaintiff banks and Air Travel Reserve Fund Agency (the agency) should not prove in respect of the relevant debts. In this court we have had the assistance of submissions by counsel for the banks (albeit in the alternative) in support of this contention, and submissions from counsel for TOSG and the agency and counsel for the liquidators of Clarksons in opposition to it. In the end, for reasons which I will state, I have been convinced that the contention is unsustainable. Nevertheless, a substantial part of the argument in this court has centred round it and I have found it helpful in finally identifying what I regard as the important signposts in this jungle of obscure legal territory.

I have had the advantage of reading in draft the judgments of Oliver and Kerr LJJ. Since I agree with their conclusions that the rule against double proof does apply and that the claim of the banks takes priority to that of the agency, I hope that it will not appear discourteous if I deal less specifically than they have done with the able and multifarious arguments which all counsel have addressed to us. I propose to do little more than explain the route which leads me to these conclusions.

As soon as the banks paid the bond moneys to TOSG on 16 August 1974, they became immediately entitled to prove in the liquidation of Clarksons in respect of the full amounts so paid, by virtue of the counter-indemnities given them by Clarksons. Under the express provisions of the bonds, they had a right to demand repayment by TOSG of such part of the bond moneys as should not be expended by TOSG in the performance and execution of its rights, duties, powers and discretions as set out in TOSG's memorandum and articles of association. This right, however, was more theoretical than substantial, since Clarksons was hopelessly insolvent and there was no real prospect of TOSG failing to expend the whole of the bond moneys in this manner.

The banks, in my judgment, had a contractual right (arising by necessary implication from the terms of the bonds) to prevent TOSG from expending the bond moneys otherwise than in the performance and execution of its rights, duties, powers and discretions as set out in TOSG's constitution. Subject to this limitation, however, the choice was that of TOSG as to how it should spend the bond moneys and the banks could not, as a matter of contract, complain about such expenditure, even though it would inevitably prejudice pro tanto the banks' theoretical rights of subsequently obtaining recoupment by TOSG of unexpended bond moneys.

TOSG, having received the bond moneys, in accordance with the powers given it by its memorandum, expended some £956,000 in repatriating customers of Clarksons. The banks make no complaint about this expenditure. Though it diminished the banks' theoretical rights of recoupment against TOSG, TOSG were plainly entitled to effect it and it did not prejudice the banks' right of proof in the liquidation.

The dispute in the present case has arisen because of the arrangements made by TOSG and the agency in July 1975 for dealing with the residue of the bond moneys held by TOSG, in respect of the bonds provided by Clarksons. These arrangements have been set out more fully by Oliver LJ in his judgment, so I need only refer to their contents quite briefly.

The agreement of 23 July 1975 (the assignment agreement) made between the agency and TOSG provided, inter alia, that TOSG would pay out 'non-T.C. claims' (non test-case claims) in full as soon as reasonably practical, until the bond moneys (less a retention fund) were exhausted or until all non-TC claims had been paid in full, and that, when paying any claim, TOSG would obtain an assignment in favour of the agency from the

*[1984] 1 All ER 628 at 651*

payee of his right to prove in the liquidation of Clarksons for the full amount of his claim.

This provision was duly implemented in the manner contemplated by the assignment agreement. TOSG drew cheques amounting to about £1·43268m in favour of customers presenting non-TC claims, which were expressed as not to be honoured unless the assignment form on the back had been signed by the payee; and this form effected an assignment to the agency of all the customer's rights to prove in the liquidation of Clarksons in respect of overseas holidays, which proofs he had lodged with the joint liquidators.

It would have been possible for the agency and TOSG so to arrange matters so that, when TOSG paid over cheques in respect of the claims in question, it did so on the terms that the customers released all their claims in the liquidation, so that such claims were extinguished. However, the arrangements actually made were, instead, clearly intended to have the effect of operating as assignments of the relevant choses in action, consisting of the customers' rights to prove in the liquidation, and thus to keep the claims alive.

In the court below, it was submitted by the banks, inter alia, that the assignment agreement was ultra vires TOSG, in so far as it provided for the claims in the liquidation of customers who were paid by TOSG to be assigned to the agency. Nourse J, in my opinion, correctly rejected this submission and it has not been pursued in this court. At one stage in the argument before us, counsel for the banks sought to argue that TOSG, in arranging for the claims of customers who were paid by it to be assigned to the agency, was in breach of an implied term of the contract entered into between TOSG and the banks when the bonding arrangements were concluded. In my opinion, however, this contention is not well founded. I think that, as a matter of contract, the banks could not complain if TOSG used the bond moneys in any manner authorised by TOSG's constitution.

However, merely because TOSG was acting neither ultra vires nor in breach of contract in arranging these assignments, it does not follow that the assignments had the legal effect of substantially impairing the banks' rights of proof in the liquidation. For that is the effect of the claim of the agency. It boldly asserts not only that, by virtue of the assignments, it has become entitled to prove in the place of the relevant holidaymakers for the £1·43268m but that the banks' previously existing rights of proof have in effect pro tanto been wholly extinguished, because the rule against double proof applies and the agency's proof takes priority to that of the banks.

In considering this claim of the agency, I would begin by making these observations. The agency is itself a body set up by statute under the Air Travel Reserve Fund Act 1975, with the broad intention of mitigating the losses suffered by holidaymakers on account of the inability of air travel organisers to meet their financial commitments. Furthermore, it has unquestionably done much to assist those disappointed customers of Clarksons who were not repatriated or paid by TOSG. Nevertheless, these points and the identity of the agency as assignee of the relevant rights of proof are, in my opinion, immaterial for present purposes.

On their true legal analysis, in my opinion, the effect of the relevant transactions was that: (a) TOSG purchased for £1·43268 m the rights of proof of the respective holidaymakers in question (whom I will call 'the assigning holidaymakers'); (b) TOSG directed that the respective purchases should be completed by assignments, not to itself but to the agency.

In these circumstances, and I regard this as a point of crucial importance, the agency, in my opinion, stands in the position in which TOSG would now find itself if it had taken the assignments in favour of itself. Though it is common ground that rights of proof are in principle assignable as choses in action, TOSG manifestly could not have conferred on the agency better rights of proof in respect of the debts of the assigning holidaymakers than it could have obtained for itself. The fact that the assignee happens to be the agency is immaterial.

At this point I find my approach to this case rather different from that of the judge. In the course of his judgment, after saying that the rule against double proof prevented both the banks and the agency from together proving, he said:

*[1984] 1 All ER 628 at  652*

'[Counsel for the banks] accepts that the agency, as the assignee of the customers' rights to prove in the liquidation is in the same position vis-à-vis the banks as the customers themselves would have been. Accordingly, the only question which I have to decide is whether, at the material time, the banks or the customers had the better right of proof. The reduction of the question to that simple form does not mean that the answer is simple.'

As will appear from what I have already said, I look at the matter rather differently. Though I agree that the rights of proof of TOSG, through which the agency claims, could not have been *better* than those of the assigning holidaymakers through which TOSG would have claimed, I do not think it should be assumed that the rights of TOSG to prove in competition with the banks would necessarily have been as good as those of the assigning holidaymakers. For reasons which will appear, I think it was only the expenditure of moneys by TOSG in purchasing the relevant rights of proof in such manner as to keep the relevant debts of the holidaymakers alive which caused a double proof situation to crystallise. If such purchase had never taken place and the assigning holidaymakers had been left to prove in respect of their own debts, I think it possible that no question of double proof would have arisen as between them and the banks. Accordingly, in my judgment, the relevant inquiry is: what would have been the position of TOSG vis-à-vis the banks in relation to proof if the assignments had been taken by TOSG in favour of itself? Two questions thus fall to be answered. (1) On the footing that the relevant rights of proof had been assigned to TOSG itself, would the rule against double proof have applied so as to prevent TOSG and the banks from proving in competition with one another? (2) If the answer to question (1) is Yes, would TOSG or the banks have had the better right of proof?

As to question (1) above, the true principle of the rule against double proof, stated by Mellish LJ in *Re Oriental Commercial Bank, ex p European Bank* (1871) LR 7 Ch App 99 at 103, is that--

'there is only to be one dividend in respect of what is in substance the same debt, although there may be two separate contracts.'

Earlier in the same passage of his judgment, Mellish LJ had likewise made it plain that the rule is directed against payment of more than one dividend in respect of the same debt, rather than against presentation of more than one proof. In many cases, such as the present, where more than one proof has been presented, one may find what was sometimes described in argument as a 'potential double proof situation', which can only be finally resolved at a later stage, having regard to the facts subsisting at the time when a dividend is about to be paid (for example, having full regard to the arrangements made pursuant to the assignment agreement in the present case). The purpose of the rule is, of course, to ensure pari passu distribution of the assets comprised in the estate of an insolvent in pro rata discharge of his liabilities. The payment of more than one dividend in respect of what is in substance the same debt would give the relevant proving creditors a share of the available assets larger than the share properly attributable to the debt in question.

Difficulty may well arise in determining whether, in any given case, two proofs are in respect of what is in substance the same debt. Though various broad tests have been canvassed by both Bar and Bench in argument in this case, I have, for my own part, found none of them wholly satisfactory. The question can, I think, only be determined by reference to the particular facts of the case before the court, bearing in mind that it is the substance of the relevant liability, rather than the

form, on which attention must be concentrated.

On the facts of the present case, I have come to the clear conclusion that, if TOSG had itself taken assignments of the rights of proof of the assigning holidaymakers and had then sought to prove in respect of the debts of those holidaymakers, it would have been proving for what were in substance the same debts as an equivalent part (£1·43268m) in respect of which the banks were proving. The matter may be tested this way. TOSG would unquestionably have been claiming in respect of the debts owed by Clarksons to

*[1984] 1 All ER 628 at 653*

the assigning holidaymakers. Though in form the banks' claims arise under the counter-indemnities given them by Clarksons in respect of the bond moneys, in substance they are attributable to the debts owed by Clarksons to the assigning holidaymakers, because: (i) it was only the actual expenditure of bond moneys by TOSG which pro tanto finally crystallised the liability of Clarksons to indemnify the banks, because it finally destroyed any possibility of the banks obtaining recoupment from TOSG; (ii) the particular expenditure of bond moneys by TOSG which finally crystallises the liability of Clarksons to indemnify the banks in respect of the £1·43268m was expenditure in the purchase of these very same debts owed by Clarksons to the assigning holidaymakers.

In short, in the contingency now under discussion, the joint liquidators would find themselves faced with two competing proofs, namely one at the suit of TOSG in respect of the debts of the assigning holidaymakers and one at the suit of the banks which arose as a result of TOSG purchasing those very same debts. Subject to the rule against double proof, the substantial effect of the purchase of the debts by TOSG was, I think, to increase the provable liabilities of Clarksons by £1·43268m because, until that event, it was always possible that the banks would, in due course, recoup this amount from TOSG, and accordingly would not be entitled to receive any dividend in respect of it in the liquidation of Clarksons.

In these circumstances, regarding the matter as one of substance, I find it impossible to say that if TOSG had itself taken assignments of the rights of proof of the assigning holidaymakers and had then sought to prove for the £1·43268m, its proof and the banks' proofs for the equivalent amounts would not have been in respect of the same debts. It would not, in my view, have been open to TOSG and the assigning holidaymakers, even with the consent of the banks (which was never obtained), to prejudice the general body of creditors by effecting transactions of this kind.

If this be correct, it can make no difference in the context of the rule against double proof that TOSG in fact directed the assignments to be made in favour of the agency. The rule must still apply for the protection of the general body of creditors, whichever of the banks and the agency is entitled

to invoke it, so as to exclude the other.

I now revert to question (2) above. On the hypothesis that TOSG had taken assignments of the relevant debts in favour of itself, who would have been entitled to the better rights of proof as between itself and the banks? The judge considered that the substance of the relationship between Clarksons, its customers, TOSG and the banks was that the banks were sureties for Clarksons' indebtedness to one class of its creditors, namely its holidaymaker customers. He recognised that the interposition of TOSG between the banks and the customers gave rise to a distinction, but thought that it was not one which affected the substance of the relationship. As he put it: 'TSOG was merely a trustee or, if you prefer it, in the broad sense an agent, for the customers.' On the footing that the banks were to be treated as sureties for Clarksons' indebtedness to its customers, he then proceeded to draw certain analogies with the suretyship cases.

As I have already mentioned, the judge regarded the crucial question for decision as being whether at the material time the banks or the holidaymakers had the better right of proof. On this assumption and on the footing that in substance the banks were sureties for Clarksons' indebtedness to the assigning holidaymakers, I recognise that some assistance might fall to be derived from the suretyship cases, by way of analogy.

Nevertheless, for reasons which I have tried to explain, I think that for the purpose of determining priorities in the liquidation, attention must be focused not so much on the relationship between the banks and the holidaymakers as on that between the banks and TOSG. Indeed, I do not think that the banks can be treated as having had any relationship at all with the holidaymakers. When the bonding arrangements were originally made, the banks did, of course, know and contemplate that, if Clarksons' business failed, and the bond moneys became payable to TOSG, TOSG would use them, so far as necessary, to alleviate the consequences to Clarksons' customers of such failure. If, however, at the time when the bonding arrangements had been made, it had been suggested to the banks that, in the event of the liquidation of Clarksons, the banks' rights in the liquidation would have fallen to be determined on the footing that they were sureties for Clarksons'

*[1984] 1 All ER 628 at 654*

liabilities to its holidaymakers, I think they would have replied, and would have been justified in replying, that their relationship was solely with TOSG and Clarksons. The banks would have appreciated that, if Clarksons went into liquidation and they became obliged to pay the bond moneys to TOSG, TOSG would be entitled to spend them for the benefit of Clarksons' holidaymakers in accordance with its constitution and that they would not be entitled to complain if it did. Nevertheless, the holidaymakers would have had no rights against the banks and would have owed them no duties. The banks themselves would have had no rights against the holidaymakers and owed them no duties. In the event of the banks becoming obliged to pay the bond moneys to TOSG, their relevant rights would have been simply: (a) a right to prevent TOSG from spending the

moneys otherwise than in accordance with its constitution; (b) a right to recover from TOSG any of the moneys not expended by it; (c) a right to prove in the liquidation of Clarksons in respect of the debts which arose in the banks' favour under the counter-indemnities, immediately the bond moneys were paid to TOSG, giving credit for any moneys which might thereafter be recouped to them by TOSG. This brief analysis, to my mind, illustrates how far removed from the relationship of creditor, surety and debtor was the relationship of TOSG, the banks and Clarksons at the time when the bonding arrangements were concluded. The suretyship analogy can only give firm guidance in determining the order of priorities of the banks and TOSG (through whom the agency claims) in the liquidation of Clarksons if one identifies TOSG with the holidaymakers and this, in my opinion, is not a justifiable process.

Nevertheless, the many suretyship cases to which we have been referred do, in my opinion, show that, where both principal creditor and surety are seeking to prove in a bankruptcy in respect of what is in substance the same debt, so that a double proof situation arises, the court will seek to determine the priorities of the two supposed rights of proof by reference to the expressed or presumed intentions of the parties, as manifested in the contract by which the surety undertook his liability. In particular, it will not allow a creditor, who is at liberty to increase the balance due from the debtor, to rely on any such increase in such a manner as to prejudice the surety's rights of proof in the bankruptcy of the debtor, where to do so would be inequitable having regard to the expressed or presumed intentions of the parties as so manifested (see, for example, *Ellis v Emmanuel* (1876) 1 Ex D 157 at 163-164, [1874-80] All ER Rep 1081 at 1083 per Blackburn J). To this limited extent, I think that the suretyship cases do afford some guidance by analogy in the present case for the purpose of determining the respective priorities of the rights of proof of the banks and TOSG (through whom the agency claims) in respect of the £1·43268m.

I, therefore, revert to a consideration of the expressed and presumed intentions of the banks and TOSG as at the date when the bonding arrangements were concluded. I do not think it is disputed that TOSG, when it entered into these arrangements, was well aware of the counter-indemnities which had been or were to be given by Clarksons to the banks in respect of any moneys that might become payable by the banks to TOSG. These counter-indemnities were, I think, part of the essential background of the bonding arrangements. Since the events on which the moneys were expressed to become payable under the bonds all presupposed that Clarksons would already be in, or on the verge of, an insolvent liquidation, TOSG must have well known that the banks intended to prove in the liquidation of Clarksons in respect of any such moneys. The present contention of the agency seems to me, on analysis, by necessary implication to involve the proposition that TOSG would have been at liberty (a) to expend the entirety of the bond moneys in purchasing debts of disappointed holidaymakers, (b) then to inform the banks that not a penny was repayable to them by TOSG under the bonds, because all the bond moneys had been properly spent, and (c) then to assert that the banks had no rights to prove for anything whatever in the liquidation, since they would be proving in respect of the same debts as TOSG, and TOSG had the prior right of proof.

I would accept propositions (a) and (b) but find myself quite unable to accept proposition (c). I accept that the purchase by TOSG of debts of disappointed holidaymakers would not actually have involved any breach by TOSG of any express or implied

*[1984] 1 All ER 628 at 655*

contractual term of the arrangements. Nevertheless, the parties to the bonding arrangements cannot, in my opinion, reasonably be supposed to have contemplated, at the date when they were concluded, that TOSG would have the right to expend bond moneys in such manner as to elevate itself into the position of a proving creditor in Clarksons' liquidation, while at the same time finally destroying the subsisting rights of the banks both (i) to obtain any recoupment from TOSG in respect of the bond moneys, and (ii) to prove in the liquidation. Such an inference would, in my opinion, have been inconsistent with the nature of the bonding arrangements and would have produced a thoroughly inequitable result.

Accordingly, I conclude that the double proof rule applies in respect of the £1·43268m and that, if TOSG had taken an assignment of the assigning holidaymakers' debts in favour of itself, the banks would have had a better right of proof in respect of this sum. As I have already explained, I think that the agency can be in no better position than TOSG itself would have been. The banks, in my judgment, therefore have the better right of proof.

Nourse J, in reaching the contrary conclusion, relied in part on possible analogies with the reported cases concerned with principal and surety. I have already referred to this point. However, he attached greater importance on the fact that the power of TOSG 'to alleviate the consequences and so forth of Clarksons' business failure clearly enabled TOSG to recoup to the customers any shortfall remaining *after* they had received all available dividends in Clarkson's liquidation'. He concluded that in the end he did not need to rely on the analogy with the cases relating to principal and surety at all. He said:

> 'I agree with [counsel for TOSG and the agency] that the decisive feature of the present case is TOSG's power to recoup to the customers any shortfall remaining after they had received all available dividends in Clarksons' liquidation. Once you get to that stage it is apparent that it would indeed be most inequitable for the banks to claim, as against the customers, a rateable proportion of any dividends receivable or received by them. That is not a narrow equity, but a broad one. And it is a surer basis for decision than any mere analogy.'

With great respect to the judge, I am not able to agree with this reasoning for two reasons. First, the amount of the dividends available to Clarksons' customers in its liquidation must partially depend on the resolution of the very questions which are in issue in the present litigation. I find it difficult to see how in practice TOSG could possibly have awaited the completion of the liquidation of Clarksons before taking such steps as it was entitled and bound to take under its constitution for the relief of Clarksons' holidaymakers. Second, as I have already indicated, I think that, when broader questions of equity fall to be considered, the relevant comparison is not between the respective

rights of proof of the banks and of the holidaymakers, but between the respective rights of proof of the banks and TOSG. When the latter comparison is made, for the reasons which I hope will have already appeared, I am of the clear opinion that any broader considerations of equity favour the banks in preference to TOSG and likewise in preference to the agency, which claims through TOSG.

For all these reasons. I would concur in allowing this appeal.

*Appeal allowed. Leave to appeal to House of Lords granted on condition that if and to the extent that the liquidators are incurred with costs in the House of Lords the agency will pay the liquidators on an indemnity basis.*

*Solicitors: Wilde Sapte (for the banks); Norton Rose Botterell & Roche (for TOSG and the agency); Stephenson Harwood (for the liquidators of Clarksons).*

Mary Rose Plummer Barrister.