# Index No. 9

ICLR: Chancery Appeal/Volume 8 /In re PARAGUASSU STEAM TRAMROAD COMPANY. BLACK & CO.'S CASE. - (1872) L.R. 8 Ch.App. 254

(1872) L.R. 8 Ch.App. 254

[COURT OF APPEAL IN CHANCERY]

In re PARAGUASSU STEAM TRAMROAD COMPANY. BLACK & CO.'S CASE.

1872 Dec. 11.

LORD SELBORNE, L.C., SIR W. M. JAMES and SIR G. MELLISH, L.JJ.

*Company - Winding-up - Calls - Set-off.*

In winding up a company, debts cannot be set off against calls.

A contractor agreed with a company to supply them with steam-engines at a fixed price, and to take shares in the company, payment of the calls on which should not be enforced until at least two engines should have been paid for, and the contractor might set off against the calls the money due to him. The contractor took shares accordingly, and made two engines for the company, which were not taken by the company or paid for. The company was afterwards ordered to be wound up by the Court, and a call was made by the liquidator:-

*Held* (reversing the decision of *Bacon*, V.C.), that the contractor could not set off the amount due to him from the company under his agreement as damages or otherwise against the amount due by him on the calls.

*Brighton Arcade Company v. Dowling* (1) disapproved of.

> ON the 20th of October, 1868, Messrs. *Black & Co.*, engineers, made an agreement with the *Paraguassu Steam Tramroad Company* for the supply of locomotive engines to the company on the following terms:- That *Black & Co.* would, for ten years, make all locomotive engines which the company should require, at £1100 for each engine, to be paid as therein provided. That during each of the first five years the company would accept

at least four of such engines, and during each of the next two years two of such engines. That the first order was to be for two engines. That all engines should be paid for when the delivery notes of the same were presented at the offices of the company. That instead of paying cash the company might give acceptances as therein provided. That *Black & Co.* would, by themselves or their nominees, subscribe for at least 198 £20 shares in the company, and would pay £6 on each share, being the amount of calls then made; and that no further payment of calls should be enforced in respect of such shares until at least two engines should have been paid for in the manner thereinbefore provided; and during the continuance of this agreement *Black & Co.* might set off against the calls upon all or any of the said shares the

(1)   Law Rep. 3 C. P. 175.

*(1872) L.R. 8 Ch.App. 254 Page  255*

amount which was due to them or for which they held the company's acceptances. That the company should pay, by way of liquidated damages, the sum of £500 for each engine which they should order and not accept.

*Black & Co.*, in execution of this agreement, duly applied for and were allotted 198 shares, and paid £6 on each; and they were duly registered as shareholders. They then made two engines, and on the 6th of July, 1869, wrote to the company to say that they were ready. They received an answer that, pending advices from *Brazil*, the directors were anxious not to send out any engines. *Black & Co.* were not able to induce the company to take the engines, which remained in the hands of *Black & Co*.

On the 22nd of January, 1870, an order was made for winding up the company by the Court. An official liquidator was appointed, and a call of £12 a share was made.

*Black & Co.*, who had been placed on the list of contributories in respect of the 198 shares, claimed to be creditors of the company for, 1, the sum of £2200 and interest for the two engines made, and a sum of £38 for the cost of warehousing them; and, 2, £500 liquidated damages for each of twelve other engines not made, but, as they contended, ordered; and they claimed to set off these sums against the call made on them. They produced evidence that the engines could not be disposed of, being of an unusual gauge, and that they had

gone to the expense of machinery on purpose for making these engines.

The matter came before the Vice-Chancellor *Bacon* on summons, and His Honour made an order that *Black & Co.* were entitled to set off against the call, £1000 as liquidated damages for the two engines actually made, £10 for interest thereon, and £38 for the cost of warehousing the engines; and that *Black & Co.* were to be at liberty to prove for other damages by reason of the non-performance of the agreement by the company, and to set off the sum so proved against the amount payable by them under the call (1).

The company appealed.

(1)    1872. Nov. 7.

SIR JAMES BACON, V.C., said that he did not think the 25th section of the *Companies Act*, 1867, and still less the decision of the Vice-Chancellor *Wickens* in *Cleland's Case* (Law Rep.

*(1872) L.R. 8 Ch.App. 254 Page 256*

Mr. ***Eddis, Q.C.***, and Mr. ***Jackson***, for the Appellants:-

We say that calls cannot be set off against debts unless the contract to do so is registered under the *Companies Act*, 1867 (30 & 31

———

14 Eq. 387), had anything to do with the matter before the Court. The statute prohibited the allotting of shares on any other terms than those of payment in cash; but that prohibition did

not apply to this case. This was an allotment of shares, and they were to be paid for in cash. There was no necessity for any registration of such a contract. The contract constituted by the allotment of the shares was a contract for the payment of money in respect of the shares. The question was, whether it was competent to the company, who were entitled to allot the shares and entitled to exact the payment for them in cash, to stipulate that when that payment in cash came to be made, then, by reason of other transactions between the parties, the amount of the debt due to the company should be set off against the payment in cash. His Honour did not find that *Cleland's Case* touched that question in the slightest degree. In *Cleland's Case*, a man to whom (let it be assumed) a debt was due, agreed to cancel that debt if the company would give him shares which he should not be required to pay for in cash. That was as directly in the teeth of the Act of Parliament as anything could be; but in neither of the subsequent cases, nor in any of the observations made by the Vice-Chancellor *Wickens*, was there anything which resembled or referred to a case like this.

The directors were perfectly at liberty to enter into this contract - a perfectly just, proper, and business-like contract. There was no money to pay with, and they entered into the contract with manufacturers for the supply of engines which were absolutely necessary for the accomplishment of the object of the company, agreeing to pay certain moneys at certain times in a certain way, and stipulating that the contractors should take shares in the company. There was a further stipulation that the company would not call upon the contractors for the payment in actual cash, and that if the company owed the contractors any money they should be at liberty to set it off against the cash due for the calls. What was there unreasonable in that? How did *Grissell's Case*, or any other case which had been cited, affect the question. It was a plain, simple, and honest contract, as to which his Honour saw no difficulty whatever.

To the extent of the liquidated damages there was a clear right of set-off.

The unliquidated damages stood on a different footing. His Honour agreed with *Black & Co*. that they might set off against the calls upon all or any of the shares the amount due to them or for which they held the company's acceptances; but the amount duo to them could only be ascertained and become due from the company when a jury, if it went to a jury, had determined the amount of the unliquidated damages to which they are entitled.

The £500 could not be taken as the right sum for damages.

After having heard further argument on this point, his Honour came to the conclusion that there must be an inquiry as to the amount of the unliquidated damages. The evidence was

*(1872) L.R. 8 Ch.App. 254 Page 257*

Vict. c. 131, s. 25): *Grissell's Case* (1). In *Brighton Arcade Company v. Dowling* (2) the company was voluntarily wound up, and, moreover, the debt was subsequent: *Cleland's Case* (3). In some cases, such as *Elkington's Case* (4), the company got the equivalent of cash: here they got nothing. The public are entitled to know that the whole capital called up actually comes to the hands of the company, either in money or in money's worth. Here the only claim of *Black & Co.* is for a tort committed by the company in not taking and paying for these engines. It is the very mischief which this clause in the Act is intended to prevent. The rules in Bankruptcy do not prevail in winding up.

Mr. ***Kay, Q.C.***, Mr. ***Higgins, Q.C.***, and Mr. ***C. Hall***, for *Black & Co.*:-

We only took our shares on the faith of this agreement, and if the company is not bound by the agreement, we are not bound to take the shares, and ought to be struck off the list: *Alabaster's Case* (5). At all events, we ask to set off the sums due to us at the date of the call. At law we should have a right to set off the sums actually due to us, and the Winding-up Acts make no difference in the legal rights of the shareholders and creditors, but only in the mode of administering these rights. The 98th and 103rd sections of the *Companies Act*, 1862, do not interfere with any rights which shareholders may have. The only alteration is, that the liquidator takes the place of the directors. It is not true that

---

that *Black & Co.* had made preparation for the execution of these orders, and had sustained a loss in consequence of not completing them, and they would probably have a right to compensation for the loss which they had sustained by reason of their not being able to complete their engines, and by reason of the default of the company in taking the whole number of engines. *Grissell's Case* had decided that for any debt a shareholder could not, in

the absence of special agreement, set off any call, but must come in and prove as a creditor. The 158th section of the Act of 1862 provided for all claims against the company, present or future, certain or contingent, ascertained or sounding only in damages; and the 25th Rule of the Gen. Ord. of 11th November, 1862, provided for valuing the claim as at the date of the order to wind up, the meaning of which was that there should be no after-claims.

(1)   Law Rep. 1 Ch. 528.

(2)   Ibid. 3 C. P. 175.

(3)   Ibid. 14 Eq. 387.

(4)   Ibid. 2 Ch. 511.

(5)   Ibid. 7 Eq. 273.

*(1872) L.R. 8 Ch.App. 254 Page  258*

shareholders must always pay: *Elkington's Case* (1); *Pellatt's Case* (2). The case of unliquidated damages is expressly provided for by sect. 158 of the Act of 1862. It is not pretended that the agreement was not valid and within the powers of the directors; and the Act of 1867, with the exception perhaps of the 25th section, actually extends the powers of the directors: *In re Baglan Hall Colliery Company* (3). If the directors had given *Black & Co.* a mortgage on the calls, that would have been valid, and this is exactly the same. The agreement to take shares was part of the original agreement, and the company cannot hold *Black & Co.* to one part of the agreement and repudiate the other part. Whatever may be the case as to the damages for the other engines, the right of *Black & Co.* as to the two engines made is undeniable.

**LORD SELBORNE, L.C. :-**

The argument of the Respondents has extended to two points, one of which was and the other was not the subject of the decision of the Vice-Chancellor.

I propose first to advert to that point which was not the subject of decision by the Vice-Chancellor.

It has been argued that unless the Respondents are entitled to the set-off which they claim, they are entitled to be entirely exonerated from the liability of shareholders, and to have their names taken off the list of contributories. For that contention I can find no ground whatever, the facts being simply these:- [His Lordship then stated the facts of the case.] I should have thought, until I heard this argument, that it was much too late for any one to suggest that in a question with creditors, a registered shareholder could possibly be taken off the list on the ground of anything contained in such an agreement as that of the 20th of October. That is not the contract between himself and the company under which he was constituted a shareholder, but is a collateral and preliminary contract, though no doubt made in the expectation of his becoming a shareholder in consequence of the arrangement then made. The case of *Oakes v. Turquand* (4) decided that when a man has, under the 123rd section of the Act of

(1)   Law Rep. 2 Ch. 511.

(2)   Ibid. 527.

(3)   Law Rep. 5 Ch. 346.

(4)   Ibid. 2 H. L. 325.

*(1872) L.R. 8 Ch.App. 254 Page  259*

1862, with his own consent, become fully a legal shareholder by registration of shares which he has agreed to take, equities which might be good as between the shareholder and the company cannot,

after a winding-up, be set up against the creditors of the company. In this case, putting the argument of Mr. *Kay* and Mr. *Higgins* at the highest, it would be simply this, that we ought to set up an equity to rescind and avoid the contract for shares, on the ground that the consideration for that contract had more or less failed. In *Oakes v. Turquand* the House of Lords held that down to the very day of the winding-up, that is to say, the day which is to be considered under the Act of Parliament as the commencement of the winding-up, the contract was voidable at the option of the parties. But they further decided, that that option not having been exercised so as to avoid the contract before winding-up, it then ceased to be capable of being avoided as against creditors; and putting the argument of the Respondents at the highest, it could not be carried beyond that point. This is a question with creditors, and creditors only, and it arises after the winding-up, no attempt having been made to have their names withdrawn from the register before the commencement of the winding-up.

*Pellatt's Case* (1) has really no application whatever. There, according to the view the Court took of the facts, the liability of the alleged contributory to be treated as a shareholder rested *in fieri*. There had been no registration of him as a shareholder with his consent, and there can be no doubt that in that state of things creditors can have no better right than the company to the specific performance of an unexecuted contract with a person whose name is not duly upon the register. In those cases, what is a defence against the company is a defence against the creditors, because the alleged contributory is not a member, and cannot be made so except upon the terms of the contract, if any, by which he has agreed to become one.

*Elkington's Case* (2) is, in its circumstances, very similar to *Pellatt's Case*, with the exception that there Messrs. *Elkington* had, besides making the original agreement, at the same time applied for shares, had received notice of allotment, and had been registered in due course as shareholders. That case was decided the other

---

(1)    Law Rep. 2 Ch. 527.

(2)    Law Rep. 2 Ch. 511.

*(1872) L.R. 8 Ch.App. 254 Page 260*

way, and it was held that, being complete legal shareholders, they could not, as against creditors, be released on the ground of anything collateral which might be contained in any other agreement. *Stace and Worth's Case* (1) has no application at all. There the shares, in respect of which alone the man could be made a shareholder, were held not to be well created.

I pass, therefore, from that portion of the case, and now come to the other. The Vice-Chancellor has here held, apparently upon the ground that an agreement had been made between the parties expressly to that effect, that calls made in the winding-up, and under the powers of the Act of Parliament, should be set off against the debt claimed by the shareholders, who are also creditors of the company. His Honour has gone further, and has said that this doctrine applies not only to the debt, but also to any unliquidated damages in respect of a breach of contract to be ascertained under the winding-up; and he has held that calls might be set off because there was a special agreement to that effect, though this is not merely a voluntary winding-up (if that would make any difference), but a winding-up by the Court. The point, therefore, which his Honour has decided is simply this: that a company may contract with one of its shareholders, so as to take him, in case of a winding-up, out of the law laid down in *Grissell's Case* (2), and give him, in substance, a right to be paid out of his own calls in preference to other creditors; which right, but for such special contract, he would not have had. It is probably enough to say that the law generally has been settled by *Grissell's Case* upon the interpretation of the Act of Parliament, and of the rules laid down in that Act of Parliament, as to the mode in which, under a winding-up, the money arising from calls is to be applied in payment of the debts of the creditors, *pari passu*, and without preference.

That case (being decided by an authority which we ought to treat as binding on ourselves, even if we doubted that it was right) has determined that in general such a set-off is not to be allowed. That decision being founded upon the interpretation of the Act of Parliament, it is very difficult to understand how it can be seriously argued that a company and one of its shareholders can, by

(1)   Law Rep. 4 Ch. 682.

(2)   Law Rep. 1 Ch. 528.

*(1872) L.R. 8 Ch.App. 254 Page  261*

any agreement they choose to enter into between themselves, over-ride, and relieve themselves from the operation of the Act of Parliament. The principle of the winding-up enactments is like that of the Bankruptcy Acts. It is a particular statutory mode of doing justice between the members and the creditors of companies which have ceased to carry on business, and which, generally speaking, are insolvent. It is to be observed that, if the company is not insolvent, the law laid down in *Grissell's Case* (1) will do the shareholder no harm, because, if there is a surplus after paying all the debts in full, of course his debt will be paid among the rest, and the right of set-off will not be wanted to do justice between him and the other shareholders. That being so, it is impossible to entertain the idea that, if the law is as laid down in that case, any company can, by any private contract, take a particular creditor, who is also a shareholder, out of the operation of that law unless the contract comes within the permissive portion of the 25th section of the Act of 1867. But in this case the course prescribed by that section has not been followed, and I do not propose to say more on the subject, except that I greatly doubt whether that Act does not supply additional reason against holding that the set-off in this case can be allowed.

I think it right, rather in consequence of what was said by the Court of Common Pleas in the case of the *Brighton Arcade Company v. Dowling* (2) than for any other reason, to observe that I entertain no doubt whatever that *Grissell's Case* was decided on the soundest principles. What is the ordinary law of set-off? It is what in the civil law was called compensation, and simply means this: that when you have got two cross demands of a nature substantially the same, and due to and from *A*. and *B*. in the same right, that is to say, when the one is a creditor in his own right and debtor also in his own right to the other, the one debt may be set off against the other at the option of the party from whom payment is demanded. But it is essential in such cases that the rights should be substantially the same. If they were apparently the same at law but different in equity, set-off would not be allowed here; nor do I suppose that, in the present state of the law, it would be allowed at common law either. But here the rights

(1)   Law Rep. 1 Ch. 528.

(2)   Law Rep. 3 C. P. 175.

*(1872) L.R. 8 Ch.App. 254 Page 262*

are substantially different. The moment that the winding-up takes place, the whole administration is

carried on with a view to the payment of the debts of the creditors, and in the first instance to payment *pari passu*. The different sections of the Act - those which define the liability of limited companies, the 7th, 8th, 23rd, and 38th - those which deal with the administration of assets, the 98th, 101st, and 133rd - those which give the power to make calls, not in the ordinary way, but specially for the purposes of this Act, the 102nd and 133rd - all have in view the payment, pari passu and equally, of the debts due to the creditors; and the hand which receives the calls necessarily receives them as a statutory trustee for the equal and rateable payment of all the creditors. The result of this contention, that one particular creditor may pay himself in full by retaining his own calls and not paying them, would, in effect, be to give him a preference, and to exonerate him from his obligation as a shareholder to contribute towards the payment of the debts of the other creditors. That appears to me to be utterly opposed to the whole principle of the law of set-off, and to all the provisions of the Act which bear on the subject.

As the case in the Common Pleas substantially is not before us I think it wiser and better not to say more on that subject than this: that, although recognizing the soundness of *Grissell's Case* (1), when the winding up is by the Court, or voluntary under the supervision of the Court, and professing not to depart from it, the Court of common Pleas has thought it inapplicable to a case of voluntary liquidation where the Court has not intervened; and, in order to arrive at that conclusion, has certainly shaken, by some of the observations made, a portion of the foundation for the conclusion in *Grissell's Case* - I mean that part of the judgment of Lord *Chelmsford* which relates to the 133rd section. The Court of Common Pleas apparently thought that a voluntary liquidation under the Act is a matter in which the shareholders merely are concerned. Whenever that subject shall be required to be reviewed and further considered, I hope attention will be paid to several sections in the Act, to which, as far as I can see, attention was not particularly directed on that occasion. I own that I am rather at a loss to see how that application of the

---

(1)    Law Rep. 1 Ch. 528.

*(1872) L.R. 8 Ch.App. 254 Page 263*

assets in payment of all the debts *pari passu*, which the 133rd section expressly requires, can be made if one creditor is to retain the whole of his debt out of his calls in a way which will give him a preference over others. Yet that section is one which expressly applies to every voluntary liquidation; and if it should be said that creditors have no interest in a voluntary liquidation because the company may be presumed to be solvent, I hope, whenever that question comes to be considered again, attention may be directed to the third branch of the 129th section, which shews

that the pecuniary difficulties of the company are contemplated as one of the reasons for voluntary liquidation. I hope attention will also be directed to the 135th section, which, in a case of voluntary liquidation without reference to supervision, enables the meeting to delegate the liquidation to its creditors; also to the 152nd and 161st sections, which, in cases of voluntary liquidation, enable a majority of creditors to bind the minority by an arrangement which they make with the liquidators. Attention should also be directed to the 158th section, which introduces new rules as to proveable debts and liabilities, which are equally applicable to the case of voluntary liquidation; and, further, to the 138th section, which introduces in those cases, if an application is made to the Court, all the power which the Court would have in a case where it was itself winding up the company. This, in my judgment, would include, if proper applications were made, the power to allow a set-off in certain cases and not in others, as specified in the 101st section, and also the power to stay the actions of creditors.

I have thought it right to say so much, because it does seem to me a matter of great importance that a distinction tending to introduce different principles of administration, so far as creditors are concerned, between the cases of voluntary winding-up and winding up under supervision or by the Court, may not be finally established unless it be on very full consideration of everything in the statute that is material. It does not seem to me, I confess, a very satisfactory mode of arriving at such a distinction to say that the creditors may always go to the Court and get an order for supervision or for a compulsory winding-up, and that if they do not they may be considered as having no substantial interest

*(1872) L.R. 8 Ch.App. 254 Page  264*

in what is going on. This Court has on many occasions shewn a great disposition to encourage and support, as far as may be right and proper, the practice of voluntary winding-up. If creditors under a voluntary winding-up are in substantially a different position, there are probably very few cases in which it would not be expedient for them to induce the Court to interfere. If they are entitled fully to the same rights, they probably will not think it necessary to apply to the Court unless there is some reason to distrust the way in which the affairs are being conducted. Here, however, that point is not before us, because this is not the case of a voluntary winding-up. The circumstances are exactly those which happened in *Grissell's Case* (1). It is, in fact, that case over again.

I am clearly of opinion that it is not competent for any persons whatever, by any antecedent contract, to alter the administration of the assets of the company under such a winding-up. I am not at all sure that, on the construction of this particular contract, it is necessary to hold that there has been any attempt to do so; but even if there was an attempt, my judgment would be that that attempt is necessarily ineffectual, because it would be an attempt, by private agreement, to get out of and over-ride an Act of Parliament.

**SIR W. M. JAMES, L.J. :-**

I am of the same opinion; and I desire it to be understood that I concur in the doubts which the Lord Chancellor has expressed whether the case in the Common Pleas can be reconciled with *Grissell's Case*.

**SIR G. MELLISH, L.J. :-**

I am of the same opinion. The effect of the 38th section of the Act of 1862 is clearly to make every person who is at the time of the winding-up a shareholder, liable to contribute to the debts of the company, that liability being limited to the amount unpaid upon his shares. If there be an amount which at the time of the winding-up is unpaid on his shares, then he is liable to contribute that amount towards payment of the debts of the company.

(1)    Law Rep. 1 Ch. 528.

*(1872) L.R. 8 Ch.App. 254 Page  265*

In the present case that was plainly the position of *Black & Co*. at the time when the winding-up order was made. Then the 98th section says that the assets, which clearly include the unpaid portions of all shares, are to be applied in discharge of the liabilities. If the case stood upon that section alone it might be a very considerable question whether the meaning was not that the money was to be called up and applied among all the creditors, so that the shareholder should only receive his share of his debt; but that is, in my judgment, made quite clear by the 101st section. Although that section does not in terms say that there is to be no set-off, yet it shews that the Legislature, in framing that section, thought it had already been enacted that there should be no set-off, because in the 101st section they proceed to say that where there is unlimited liability, then, in the case of any independent contract, there may be a set-off. The reasonable distinction between a company with unlimited and limited liability is obvious. In the case of unlimited liability the reason of allowing the set-off in respect of one particular call is, that it does not at all prejudice the rights of the other creditors, because all the shareholders are liable to the fullest amount of everything they possess, and therefore if that call does not pay the creditors all their debts in the case of an unlimited company, then another call may be made on the shareholders, including this particular shareholder, and so on, until the shareholders have been made to pay everything they can pay and the debts are

satisfied. Therefore it appears to me to be plainly enacted that the assets are to be so dealt with, and it is quite clear that the company cannot, by making an agreement with a particular shareholder, save him from that liability which the Act of Parliament has imposed upon him.

*Then as to the question whether this is ultrà vires, I am disposed to think that the contract is not really ultrà vires. It is only that the statute has put a certain construction upon it. Certain persons had agreed that there should be a set-off, and then the Act of Parliament says that that set-off shall not prevent the liability to pay up all the unpaid calls upon shares, but shall be binding as between the particular shareholder and the other shareholders after the creditors have been paid in full. The contract, as it appears to me, must be construed with reference to*

*(1872) L.R. 8 Ch.App. 254 Page 266*

*the provisions of the Act of Parliament, and the effect therefore is, that without being ultrà vires it cannot prevent those who plainly are contributories from being liable to be called upon in respect of the unpaid sums due from them.*

Solicitors: Messrs. *Williamson, Hill, & Co.*; Messrs. *Wansey & Bowen*.