# Index No. 10



## SUPREME COURT OF CANADA

**CITATION:** Canada Trustco Mortgage Co. *v.* Canada, [2005] 2     **DATE:** 20051019
S.C.R. 601, 2005 SCC 54                              **DOCKET:** 30290

**BETWEEN:**

Her Majesty the Queen
Appellant
v.
Canada Trustco Mortgage Company
Respondent

**CORAM:** McLachlin C.J. and Major, Bastarache, Binnie, LeBel, Deschamps, Fish, Abella and
Charron JJ.

**REASONS FOR JUDGMENT:**     McLachlin C.J. and Major J. (Bastarache, Binnie, LeBel,
(paras. 1 to 81)                    Deschamps, Fish, Abella and Charron JJ. concurring)

---



IACOBUCCI0000132

Canada Trustco Mortgage Co. v. Canada, [2005] 2 S.C.R. 601, 2005 SCC 54

**Her Majesty The Queen**                                                                 *Appellant*

*v.*

**Canada Trustco Mortgage Company**                                          *Respondent*

**Indexed as: Canada Trustco Mortgage Co. v. Canada**

**Neutral citation: 2005 SCC 54.**

File No.: 30290.

2005: March 8; 2005: October 19.

Present: McLachlin C.J. and Major, Bastarache, Binnie, LeBel, Deschamps, Fish, Abella and Charron JJ.

on appeal from the federal court of appeal

*Income tax — Tax avoidance — Interpretation and application of general anti-avoidance rule — Mortgage company claiming substantial capital cost allowance following sale-leaseback transactions involving trailers — Whether general anti-avoidance rule applicable to deny tax benefit — Income Tax Act, R.S.C. 1985, c. 1 (5th Supp.), s. 245.*

IACOBUCCI0000133

- 3 -

CTMC carries on business as a mortgage lender, and as part of its business operations, it obtains large revenues from leased assets. CTMC purchased a number of trailers which it then circuitously leased back to the vendor in order to offset revenue from its leased assets by claiming a substantial capital cost allowance ("CCA") on the trailers for the 1997 taxation year. This arrangement allowed CTMC to defer paying taxes on the amount of profits reduced by the CCA deductions, which would be subject to recapture into income when the trailers were disposed of at a future date. The Minister of National Revenue reassessed CTMC and disallowed the CCA claim. On appeal, the Tax Court of Canada set aside the Minister's decision. The court found that the transaction fell within the spirit and purpose of the CCA provisions of the *Income Tax Act*, and concluded that the general anti-avoidance rule ("GAAR") in s. 245 of the Act did not apply to deny the tax benefit. The Federal Court of Appeal affirmed the Tax Court's decision.

*Held*: The appeal should be dismissed.

The application of the GAAR involves three steps. It must be determined: (1) whether there is a tax benefit arising from a transaction or series of transactions within the meaning of s. 245(1) and (2) of the *Income Tax Act*; (2) whether the transaction is an avoidance transaction under s. 245(3), in the sense of not being "arranged primarily for *bona fide* purposes other than to obtain the tax benefit"; and (3) whether there was abusive tax avoidance under s. 245(4), in the sense that it cannot be reasonably concluded that a tax benefit would be consistent with the object, spirit or purpose of the provisions relied upon by the taxpayer. The burden is on the taxpayer to refute points (1) and (2), and on the Minister to establish point (3). Since the Crown has agreed with the Tax Court's finding that there was



IACOBUCCI0000134

- 4 -



a tax benefit and an avoidance transaction, the only issue in this case is whether there was abusive tax avoidance under s. 245(4). [17] [66-67]

Section 245(4) imposes a two-part inquiry. First, the courts must conduct a unified textual, contextual and purposive analysis of the provisions giving rise to the tax benefit in order to determine why they were put in place and why the benefit was conferred. The goal is to arrive at a purposive interpretation that is harmonious with the provisions of the Act that confer the tax benefit, read in the context of the whole Act. Second, the court must examine the factual context of the case in order to determine whether the avoidance transaction defeated or frustrated the object, spirit or purpose of the provisions in issue. Whether the transactions were motivated by any economic, commercial, family or other non-tax purpose may form part of the factual context that the courts may consider in the analysis of abusive tax avoidance allegations under s. 245(4). However, any finding in this respect would form only one part of the underlying facts of a case, and would be insufficient by itself to establish abusive tax avoidance. The central issue is the proper interpretation of the relevant provisions in light of their context and purpose. Abusive tax avoidance may be found where the relationships and transactions as expressed in the relevant documentation lack a proper basis relative to the object, spirit or purpose of the provisions that are purported to confer the tax benefit, or where they are wholly dissimilar to the relationships or transactions contemplated by the provisions. In the end, if the existence of abusive tax avoidance is unclear, the benefit of the doubt goes to the taxpayer. [55] [58] [66]



Once the provisions of the *Income Tax Act* are properly interpreted, it is a question of fact for the Tax Court judge whether the Minister, in denying the tax

IACOBUCCI0000135

- 5 -

benefit, has established abusive tax avoidance under s. 245(4). Provided the Tax
Court judge has proceeded on a proper construction of the provisions of the Act and
on findings supported by the evidence, appellate tribunals should not interfere,
absent a palpable and overriding error. [46]

Here, the Tax Court judge's decision must be upheld. His conclusions
were based on a correct view of the law and were grounded in the evidence. The
transaction at issue was not so dissimilar from an ordinary sale-leaseback as to take
it outside the object, spirit or purpose of the relevant CCA provisions of the Act. The
purpose of the CCA provisions of the Act, as applied to sale-leaseback transactions,
was, as found by the Tax Court judge, to permit the deduction of a CCA based on the
cost of the assets acquired. This purpose emerges clearly from the scheme of the
Act's CCA provisions as a whole. The Minister's suggestion that the usual result of
the CCA provisions of the Act should be overridden by s. 245(4) in the absence of
real financial risk or "economic cost" in the transaction must be rejected. This
suggestion distorts the purpose of the CCA provisions by reducing them to apply
only when sums of money are at economic risk. The applicable CCA provisions of
the Act do not refer to economic risk. They refer only to "cost" and in view of the
text and context of the CCA provisions, they use "cost" in the well-established sense
of the amount paid to acquire the assets. Where Parliament has wanted to introduce
economic risk into the meaning of cost related to CCA provisions, it has done so
expressly. [74-75] [78] [80]

**Cases Cited**

IACOBUCCI0000136

- 6 -



**Not followed:** *OSFC Holdings Ltd. v. Canada*, [2002] 2 F.C. 288, 2001 FCA 260; **referred to:** *Mathew v. Canada*, [2005] 2 S.C.R. 643, 2005 SCC 55; *65302 British Columbia Ltd. v. Canada*, [1999] 3 S.C.R. 804; *Commissioners of Inland Revenue v. Duke of Westminster*, [1936] A.C. 1; *Shell Canada Ltd. v. Canada*, [1999] 3 S.C.R. 622; *Stubart Investments Ltd. v. The Queen*, [1984] 1 S.C.R. 536; *Craven v. White*, [1989] A.C. 398; *W. T. Ramsay Ltd. v. Inland Revenue Commissioners*, [1981] 1 All E.R. 865; *Hickman Motors Ltd. v. Canada*, [1997] 2 S.C.R. 336; *Water's Edge Village Estates (Phase II) Ltd. v. Canada*, [2003] 2 F.C. 25, 2002 FCA 291.

**Statutes and Regulations Cited**

*Budget Implementation Act, 2004, No. 2*, S.C. 2005, c. 19, s. 52.

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.), ss. 13(7.1), (7.2), 20(1)(a), 245(1) to (5), 248(10).

**Authors Cited**



Canada. Department of Finance. *Explanatory Notes to Legislation Relating to Income Tax*. Ottawa: Queen's Printer, 1988.

Duff, David G. "Judicial Application of the General Anti-Avoidance Rule in Canada: *OSFC Holdings Ltd. v. The Queen*" (2003), 57 I.B.F.D. Bulletin 278.

Hogg, Peter W., and Joanne E. Magee. *Principles of Canadian Income Tax Law*, 4th ed. Scarborough, Ont.: Carswell, 2002.

APPEAL from a judgment of the Federal Court of Appeal (Rothstein, Evans and Pelletier JJ.A.) [2004] 2 C.T.C. 276, 2004 D.T.C. 6119, [2004] F.C.J. No. 249 (QL), 2004 FCA 67, affirming a decision of Miller J.T.C.C., [2003]

- 7 -

4 C.T.C. 2009, 2003 D.T.C. 587, [2003] T.C.J. No. 271 (QL), 2003 TCC 215.
*Appeal dismissed.*

  *Graham Garton, Q.C., Anne-Marie Lévesque* and *Alexandra K. Brown,*
for the appellant.

  *Al Meghji, Monica Biringer* and *Gerald Grenon,* for the respondent.

  The judgment of the Court was delivered by

  THE CHIEF JUSTICE AND MAJOR J. —

## 1. Introduction

1   This appeal and its companion case, *Mathew v. Canada,* [2005] 2 S.C.R.
643, 2005 SCC 55 (hereinafter "*Kaulius*"), raise the issue of the interplay between the
general anti-avoidance rule ("GAAR") and the application of more specific
provisions of the *Income Tax Act,* R.S.C. 1985, c. 1 (5th Supp.). The Act continues
to permit legitimate tax minimization; traditionally, this has involved determining
whether the taxpayer brought itself within the wording of the specific provisions
relied on for the tax benefit. Onto this scheme, the GAAR has superimposed a
prohibition on abusive tax avoidance, with the effect that the literal application of
provisions of the Act may be seen as abusive in light of their context and purpose.
The task in this appeal is to unite these two approaches in a framework that reflects
the intention of Parliament in enacting the GAAR and achieves consistent, predictable
and fair results.

IACOBUCCI0000138

- 8 -



2.    <u>Facts</u>

2

        The respondent, Canada Trustco Mortgage Company ("CTMC"), carries on business as a mortgage lender. As part of its business operations, CTMC enjoyed large revenues from leased assets. In 1996 it purchased a number of trailers which it then circuitously leased back to the vendor, in order to offset revenue from its leased assets by claiming considerable capital cost allowance ("CCA") on the trailers in the amount of $31,196,700 against $51,787,114 for the 1997 taxation year. The essence of the transaction is explained in the memorandum of Michael Lough, CTMC's officer in charge of the recommendation to proceed: "The transaction provides very attractive returns by generating CCA deductions which can be used to shelter other taxable lease income generated by Canada Trust." This arrangement allowed CTMC to defer paying taxes on the amount of profits reduced by the CCA deductions which would be subject to recapture into income when the trailers were disposed of at a future date and presumably in excess of the amount claimed as CCA.



3

        The details of the transaction are complex and described in greater detail in the Appendix. Briefly stated, on December 17, 1996, CTMC, with the use of its own money and a loan of approximately $100 million from the Royal Bank of Canada, purchased trailers from Transamerica Leasing Inc. ("TLI") at fair market value of $120 million. CTMC leased the trailers to Maple Assets Investments Limited ("MAIL") who in turn subleased them to TLI, the original owner. TLI then prepaid all amounts due to MAIL under the sublease. MAIL placed on deposit an amount equal to the loan for purposes of making the lease payments and a bond was pledged as security to guarantee a purchase option payment to CTMC at the end of

IACOBUCCI0000139

- 9 -

the lease. These transactions allowed CTMC to substantially minimize its financial risk. They were also accompanied by financial arrangements with various other parties, not relevant to this appeal.

4          On October 18, 2002, the Minister of National Revenue reassessed CTMC on its 1997 taxation year and denied the CCA claim of $31,196,700 on the basis that CTMC had not acquired title to the trailers and, in the alternative, that the GAAR applied to deny the deduction. CTMC appealed to the Tax Court of Canada.

5          The Crown abandoned the argument that CTMC had failed to obtain title to the trailers and the appeal before the Tax Court proceeded solely on the issue of whether the GAAR applied to deny the deduction. A similar reassessment with respect to CTMC's 1996 taxation year was statute-barred. The Tax Court found in favour of CTMC, as did the Federal Court of Appeal. For the reasons that follow, we would dismiss the Crown's appeal.

3.    Legislative Provisions

6          This appeal and its companion case *Kaulius* were brought and argued under s. 245 of the *Income Tax Act*. The relevant provisions of the Act, as they applied to the parties, read in part:

> 245. (1) [Definitions] In this section,
>
> "tax benefit" means a reduction, avoidance or deferral of tax or other
>     amount payable under this Act or an increase in a refund of tax or
>     other amount under this Act;
>
> . . .
>
> "transaction" includes an arrangement or event.



- 10 -

(2) [General anti-avoidance provision] Where a transaction is an avoidance transaction, the tax consequences to a person shall be determined as is reasonable in the circumstances in order to deny a tax benefit that, but for this section, would result, directly or indirectly, from that transaction or from a series of transactions that includes that transaction.

(3) [Avoidance transaction] An avoidance transaction means any transaction

(*a*) that, but for this section, would result, directly or indirectly, in a tax benefit, unless the transaction may reasonably be considered to have been undertaken or arranged primarily for *bona fide* purposes, other than to obtain the tax benefit; or

(*b*) that is part of a series of transactions, which series, but for this section, would result, directly or indirectly, in a tax benefit, unless the transaction may reasonably be considered to have been undertaken or arranged primarily for *bona fide* purposes other than to obtain the tax benefit.

(4) [Where s. (2) does not apply] For greater certainty, subsection (2) does not apply to a transaction where it may reasonably be considered that the transaction would not result directly or indirectly in a misuse of the provisions of this Act or an abuse having regard to the provisions of this Act, other than this section, read as a whole.



(5) [Determination of tax consequences] Without restricting the generality of subsection (2),

(*a*) any deduction in computing income, taxable income, taxable income earned in Canada or tax payable or any part thereof may be allowed or disallowed in whole or in part,

(*b*) any such deduction, any income, loss or other amount or part thereof may be allocated to any person,

(*c*) the nature of any payment or other amount may be recharacterized, and

(*d*) the tax effects that would otherwise result from the application of other provisions of this Act may be ignored,

in determining the tax consequences to a person as is reasonable in the circumstances in order to deny a tax benefit that would, but for this section, result, directly or indirectly, from an avoidance transaction.

. . .

248. . . .

IACOBUCCI0000141

- 1 F -

(10) [Series of transactions] For the purposes of this Act, where there is a reference to a series of transactions or events, the series shall be deemed to include any related transactions or events completed in contemplation of the series.

7        A recent amendment to s. 245 (*Budget Implementation Act, 2004, No. 2*, S.C. 2005, c. 19, s. 52) has no application to the judgments under appeal. Although this amendment was enacted to apply retroactively, it cannot apply at this stage of appellate review, *after the parties argued their cases and the Tax Court judge rendered his decision on the basis of the GAAR as it read prior to the amendment*. Furthermore, even if this amendment were to apply, it would not warrant a different approach to the issues on appeal. In our view, this amendment to s. 245 serves *inter alia* to make it clear that the GAAR applies to tax benefits conferred by Regulations enacted under the *Income Tax Act*. The Tax Court judge in the instant case proceeded on this assumption, which was not challenged by the parties in submissions before us.

4.    Judicial Decisions

4.1   *Tax Court of Canada*, [2003] 4 C.T.C. 2009, 2003 TCC 215

8        The Tax Court judge found an avoidance transaction giving rise to a tax benefit under s. 245(1) and (3) of the Act. He inquired into the purpose of the CCA provisions of the *Income Tax Act* as applied to sale-leaseback arrangements, in order to determine if the transaction was abusive under s. 245(4) of the Act. He held that the purpose of the CCA provisions permitted the deduction of CCA based on the "cost" of the trailers, as defined by the transactions documents. He went on to conduct a detailed analysis of the legal transactions. He found that CTMC had acquired title and became the legal owner of the trailers, and declined to

IACOBUCCI0000142

- 12 -



recharacterize the legal nature of the transaction. The transactions in issue, in his view, amounted to an ordinary sale-leaseback. The Tax Court judge found that the transaction fell within the spirit and purpose of the CCA provisions of the Act, and concluded that the GAAR did not apply to disallow the tax benefit.

4.2    *Federal Court of Appeal*, [2004] 2 C.T.C. 276, 2004 FCA 67

9          The Federal Court of Appeal unanimously dismissed the appeal, relying on the reasons in *OSFC Holdings Ltd. v. Canada*, [2002] 2 F.C. 288, 2001 FCA 260 ("*OSFC*"), in which the court had set out a two-stage analysis for abuse under the GAAR, focussed first on interpretation of the specific provisions at issue, second on the overarching policy of the *Income Tax Act*. Evans J.A., for the court, held that the Tax Court judge had not erred in concluding that, for the purposes of s. 245(4) of the Act, the transactions at issue did not constitute a misuse of a provision of the Act or an abuse of the CCA scheme as a whole. He noted that counsel for the appellant did not seek to recharacterize the transactions and did not allege that they were a sham, but argued instead that the policy underlying s. 20(1)(*a*) and the CCA provisions as a whole was "to permit taxpayers to claim CCA in respect of the 'real' or 'economic' cost that they incurred in acquiring an asset, and not the 'legal' cost, that is, on the facts of this case, the purchase price paid by the taxpayer" (para. 2). Going on to consider policy, Evans J.A. found that there was no clear and unambiguous policy underlying s. 20(1)(*a*) or the CCA scheme read as a whole that rendered the transaction a misuse or abuse of those provisions.



5.    <u>Analysis</u>

IACOBUCCI0000143

- 13 -

## 5.1   General Principles of Interpretation

10          It has been long established as a matter of statutory interpretation that "the
words of an Act are to be read in their entire context and in their grammatical and
ordinary sense harmoniously with the scheme of the Act, the object of the Act, and
the intention of Parliament": see *65302 British Columbia Ltd. v. Canada*, [1999] 3
S.C.R. 804, at para. 50.  The interpretation of a statutory provision must be made
according to a textual, contextual and purposive analysis to find a meaning that is
harmonious with the Act as a whole.  When the words of a provision are precise and
unequivocal, the ordinary meaning of the words play a dominant role in the
interpretive process.  On the other hand, where the words can support more than one
reasonable meaning, the ordinary meaning of the words plays a lesser role.  The
relative effects of ordinary meaning, context and purpose on the interpretive process
may vary, but in all cases the court must seek to read the provisions of an Act as a
harmonious whole.

11          As a result of the Duke of Westminster principle (*Commissioners of
Inland Revenue v. Duke of Westminster*, [1936] A.C. 1 (H.L.)) that taxpayers are
entitled to arrange their affairs to minimize the amount of tax payable, Canadian tax
legislation received a strict interpretation in an era of more literal statutory
interpretation than the present. There is no doubt today that all statutes, including the
*Income Tax Act*, must be interpreted in a textual, contextual and purposive way.
However, the particularity and detail of many tax provisions have often led to an
emphasis on textual interpretation. Where Parliament has specified precisely what
conditions must be satisfied to achieve a particular result, it is reasonable to assume

IACOBUCCI0000144



- 14 -

that Parliament intended that taxpayers would rely on such provisions to achieve the
result they prescribe.

12          The provisions of the *Income Tax Act* must be interpreted in order to
achieve consistency, predictability and fairness so that taxpayers may manage their
affairs intelligently.  As stated at para. 45 of *Shell Canada Ltd. v. Canada*, [1999] 3
S.C.R. 622:

> [A]bsent a specific provision to the contrary, it is not the courts' role to
> prevent taxpayers from relying on the sophisticated structure of their
> transactions, arranged in such a way that the particular provisions of the
> Act are met, on the basis that it would be inequitable to those taxpayers
> who have not chosen to structure their transactions that way. [Emphasis
> added.]

See also *65302 British Columbia*, at para. 51, *per* Iacobucci J. citing P. W. Hogg and
J. E. Magee, *Principles of Canadian Income Tax Law* (2nd ed. 1997), at pp. 475-76:

> It would introduce intolerable uncertainty into the Income Tax Act if clear
> language in a detailed provision of the Act were to be qualified by
> unexpressed exceptions derived from a court's view of the object and
> purpose of the provision.



13          The *Income Tax Act* remains an instrument dominated by explicit
provisions dictating specific consequences, inviting a largely textual interpretation.
Onto this compendium of detailed stipulations, Parliament has engrafted quite a
different sort of provision, the GAAR. This is a broadly drafted provision, intended
to negate arrangements that would be permissible under a literal interpretation of
other provisions of the *Income Tax Act*, on the basis that they amount to abusive tax
avoidance. To the extent that the GAAR constitutes a "provision to the contrary" as



IACOBUCCI0000145

- 15 -

discussed in *Shell* (at para. 45), the Duke of Westminster principle and the emphasis on textual interpretation may be attenuated. Ultimately, as affirmed in *Shell*, "[t]he courts' role is to interpret and apply the Act as it was adopted by Parliament" (para. 45). The court must to the extent possible contemporaneously give effect to both the GAAR and the other provisions of the *Income Tax Act* relevant to a particular transaction.

### 5.2    Interpretation of the GAAR

14    The GAAR was enacted in 1988, principally in response to *Stubart Investments Ltd. v. The Queen*, [1984] 1 S.C.R. 536, which rejected a literal approach to interpreting the Act. At the same time, the Court rejected the business purpose test, which would have restricted tax reduction to transactions with a real business purpose. Instead of the business purpose test, the Court proposed guidelines to limit unacceptable tax avoidance arrangements. Parliament deemed the decision in *Stubart* an inadequate response to the problem and enacted the GAAR.

15    The *Explanatory Notes to Legislation Relating to Income Tax* issued by the Honourable Michael H. Wilson, Minister of Finance (June 1988) ("Explanatory Notes") are an aid to interpretation. The Explanatory Notes state at the outset that they "are intended for information purposes only and should not be construed as an official interpretation of the provisions they describe". They state the purpose of the GAAR at p. 461:

> New section 245 of the Act is a general anti-avoidance rule which is intended to prevent abusive tax avoidance transactions or arrangements but at the same time is not intended to interfere with legitimate commercial and family transactions. Consequently, the new rule seeks to

IACOBUCCI0000146

- 16 -

distinguish between legitimate tax planning and abusive tax avoidance and to establish a reasonable balance between the protection of the tax base and the need for certainty for taxpayers in planning their affairs.

16          The GAAR draws a line between legitimate tax minimization and abusive tax avoidance. The line is far from bright. The GAAR's purpose is to deny the tax benefits of certain arrangements that comply with a literal interpretation of the provisions of the Act, but amount to an abuse of the provisions of the Act. But precisely what constitutes abusive tax avoidance remains the subject of debate. Hence these appeals.



17          The application of the GAAR involves three steps. The first step is to determine whether there is a "tax benefit" arising from a "transaction" under s. 245(1) and (2). The second step is to determine whether the transaction is an avoidance transaction under s. 245(3), in the sense of not being "arranged primarily for *bona fide* purposes other than to obtain the tax benefit". The third step is to determine whether the avoidance transaction is abusive under s. 245(4). All three requirements must be fulfilled before the GAAR can be applied to deny a tax benefit.

### 5.3  *Tax Benefit*

18          The first step in applying the GAAR is to determine whether there is a tax benefit arising from a transaction or series of transactions of which the transaction is part.

19          "Tax benefit" is defined in s. 245(1) as "a reduction, avoidance or deferral of tax" or "an increase in a refund of tax or other amount" paid under the Act.



IACOBUCCI0000147

- 17 -

Whether a tax benefit exists is a factual determination, initially by the Minister and on review by the courts, usually the Tax Court. The magnitude of the tax benefit is not relevant at this stage of the analysis.

20          If a deduction against taxable income is claimed, the existence of a tax benefit is clear, since a deduction results in a reduction of tax. In some other instances, it may be that the existence of a tax benefit can only be established by comparison with an alternative arrangement. For example, characterization of an amount as an annuity rather than as a wage, or as a capital gain rather than as business income, will result in differential tax treatment. In such cases, the existence of a tax benefit might only be established upon a comparison between alternative arrangements. In all cases, it must be determined whether the taxpayer reduced, avoided or deferred tax payable under the Act.

5.4   *Avoidance Transaction*

21          The second requirement for application of the GAAR is that the transaction giving rise to the tax benefit be an avoidance transaction within s. 245(3). The function of this requirement is to remove from the ambit of the GAAR transactions or series of transactions that may reasonably be considered to have been undertaken or arranged primarily for a non-tax purpose. The majority of tax benefits claimed by taxpayers on their annual returns will be immune from the GAAR as a result of s. 245(3). The GAAR was enacted as a provision of last resort in order to address abusive tax avoidance, it was not intended to introduce uncertainty in tax planning.

IACOBUCCI0000148

-18.-



22        A "transaction" is defined under s. 245(1) to include an arrangement or event. Section 245(3) specifically defines "avoidance transaction" as a transaction that results in a tax benefit, either by itself or as part of a <u>series of transactions</u>, "unless the transaction may reasonably be considered to have been undertaken or arranged <u>primarily for *bona fide* purposes</u> other than to obtain the tax benefit". These two underlined expressions warrant further discussion.

5.4.1   <u>Series of Transactions</u>

23        Section 245(2) reads:

> (2) [General anti-avoidance provision] Where a transaction is an avoidance transaction, the tax consequences to a person shall be determined as is reasonable in the circumstances in order to deny a tax benefit that, but for this section, would result, directly or indirectly, from that transaction or from a <u>series of transactions</u> that includes that transaction.



24        Section 245(3) reads in part:

> (3) [Avoidance transaction] An avoidance transaction means any transaction
>
> (*a*) that, but for this section, would result, directly or indirectly, in a tax benefit . . .; or
>
> (*b*) that is part of a <u>series of transactions</u>, which series, but for this section, would result, directly or indirectly, in a tax benefit . . . .

25        The meaning of the expression "series of transactions" under s. 245(2) and (3) is not clear on its face. We agree with the majority of the Federal Court of Appeal in *OSFC* and endorse the test for a series of transactions as adopted by the House of



IACOBUCCI0000149

- 19 -

Lords that a series of transactions involves a number of transactions that are "pre-ordained in order to produce a given result" with "no practical likelihood that the pre-planned events would not take place in the order ordained": *Craven v. White*, [1989] A.C. 398, at p. 514, *per* Lord Oliver; see also *W. T. Ramsay Ltd. v. Inland Revenue Commissioners*, [1981] 1 All E.R. 865.

26          Section 248(10) extends the meaning of "series of transactions" to include "related transactions or events completed in contemplation of the series". The Federal Court of Appeal held, at para. 36 of *OSFC*, that this occurs where the parties to the transaction "knew of the . . . series, such that it could be said that they took it into account when deciding to complete the transaction". We would elaborate that "in contemplation" is read not in the sense of actual knowledge but in the broader sense of "because of" or "in relation to" the series. The phrase can be applied to events either before or after the basic avoidance transaction found under s. 245(3). As has been noted:

> It is highly unlikely that Parliament could have intended to include in the statutory definition of "series of transactions" related transactions completed in contemplation of a subsequent series of transactions, but not related transactions in the contemplation of which taxpayers completed a prior series of transactions.
>
> (D. G. Duff, "Judicial Application of the General Anti-Avoidance Rule in Canada: *OSFC Holdings Ltd. v. The Queen*" (2003), 57 I.B.F.D. Bulletin 278, at p. 287)

### 5.4.2 Primarily for *Bona Fide* Purposes

27          According to s. 245(3), the GAAR does not apply to a transaction that "may reasonably be considered to have been undertaken or arranged primarily for

- 20 -

*bona fide* purposes other than to obtain the tax benefit". If there are both tax and non-tax purposes to a transaction, it must be determined whether it was reasonable to conclude that the non-tax purpose was primary. If so, the GAAR cannot be applied to deny the tax benefit.

28        While the inquiry proceeds on the premise that both tax and non-tax purposes can be identified, these can be intertwined in the particular circumstances of the transaction at issue. It is not helpful to speak of the threshold imposed by s. 245(3) as high or low. The words of the section simply contemplate an objective assessment of the relative importance of the driving forces of the transaction.

29        Again, this is a factual inquiry. The taxpayer cannot avoid the application of the GAAR by merely stating that the transaction was undertaken or arranged primarily for a non-tax purpose. The Tax Court judge must weigh the evidence to determine whether it is reasonable to conclude that the transaction was not undertaken or arranged primarily for a non-tax purpose. The determination invokes reasonableness, suggesting that the possibility of different interpretations of the events must be objectively considered.

30        The courts must examine the relationships between the parties and the actual transactions that were executed between them. The facts of the transactions are central to determining whether there was an avoidance transaction. It is useful to consider what will not suffice to establish an avoidance transaction under s. 245(3). The Explanatory Notes state, at p. 464:

>        Subsection 245(3) does not permit the "recharacterization" of a transaction for the purposes of determining whether or not it is an



IACOBUCCI0000151

- 21 -

avoidance transaction. In other words, it does not permit a transaction to
be considered to be an avoidance transaction because some alternative
transaction that might have achieved an equivalent result would have
resulted in higher taxes.

31          According to the Explanatory Notes, Parliament recognized the Duke of

Westminster principle "that tax planning — arranging one's affairs so as to attract the

least amount of tax — is a legitimate and accepted part of Canadian tax law" (p. 464).

Despite Parliament's intention to address abusive tax avoidance by enacting the

GAAR, Parliament nonetheless intended to preserve predictability, certainty and

fairness in Canadian tax law. Parliament intends taxpayers to take full advantage of

the provisions of the *Income Tax Act* that confer tax benefits. Indeed, achieving the

various policies that the *Income Tax Act* seeks to promote is dependent on taxpayers

doing so.

32          Section 245(3) merely removes from the ambit of the GAAR transactions

that may reasonably be considered to have been undertaken or arranged primarily for

a non-tax purpose. Parliament did not intend s. 245(3) to operate simply as a business

purpose test, which would have considered transactions that lacked an independent

*bona fide* business purpose to be invalid.

33          The expression "non-tax purpose" has a broader scope than the expression

"business purpose". For example, transactions that may reasonably be considered to

have been undertaken or arranged primarily for family or investment purposes would

be immune from the GAAR under s. 245(3). Section 245(3) does not purport to

protect only transactions that have a real business purpose. Parliament wanted many

schemes that do not have any business purpose to endure. Registered Retirement

Savings Plans (RRSPs) are one example. Parliament recognized that many provisions

- 22 -

of the Act confer legitimate tax benefits notwithstanding the lack of a real business purpose. This is apparent from the general language used throughout s. 245, as opposed to language which would have adopted a broad anti-avoidance test subject to exemptions for specific schemes like RRSP transactions.

34          If at least one transaction in a series of transactions is an "avoidance transaction", then the tax benefit that results from the series may be denied under the GAAR. This is apparent from the wording of s. 245(3). Conversely, if each transaction in a series was carried out primarily for *bona fide* non-tax purposes, the GAAR cannot be applied to deny a tax benefit.



35          Even if an avoidance transaction is established under the s. 245(3) inquiry, the GAAR will not apply to deny the tax benefit if it may be reasonable to consider that it did not result from abusive tax avoidance under s. 245(4), as discussed more fully below.

5.5    *Abusive Tax Avoidance*

36          The third requirement for application of the GAAR is that the avoidance transaction giving rise to a tax benefit be abusive. The mere existence of an avoidance transaction is not enough to permit the GAAR to be applied. The transaction must also be shown to be *abusive* under s. 245(4).



37          It is this requirement that has given rise to the most difficulty in the interpretation and application of the GAAR. A number of features have provoked judicial debate. The section is cast in terms of a double negative, stating that the

IACOBUCCI0000153

- 23 -

GAAR does "not apply to a transaction where it may reasonably be considered that
the transaction would not result directly or indirectly in a misuse . . . or an abuse".
It is tempered by the word "reasonably", suggesting some ministerial and judicial
leeway in determining abuse.    It does not precisely define abuse or misuse.    To
further complicate matters, the English and French versions of s. 245(4) differ.
Overarching these particular difficulties is the central issue of the relationship
between the GAAR and more specific provisions of the Act.

### 5.5.1 "Misuse and Abuse"; Two Different Concepts?

38          We turn first to the debate about "misuse" and "abuse" which has arisen
from the different English and French versions of s. 245(4). This arises from the
apparently disjunctive version of the subsection in English ("misuse of the provisions
of this Act" or "abuse having regard to the provisions of this Act . . . read as a
whole") and the non-disjunctive French version ("*d'abus dans l'application des
dispositions de la présente loi lue dans son ensemble*"). This discrepancy led the
majority of the Federal Court of Appeal to conclude in *OSFC* that s. 245(4) mandates
two different inquiries. The first was whether there was a misuse of the particular
provisions of the Act that were relied upon to achieve the tax benefit. The second
was whether there was an abuse of any policy of the Act read as a whole. The term
"policy" was used to refer collectively to purpose, object, spirit, scheme or policy
(*OSFC*, at para. 66).

39          With respect, we cannot agree with this interpretation of s. 245(4).
Parliament could not have intended this two-step approach, which on its face raises
the impossible question of how one can abuse the Act as a whole without misusing

IACOBUCCI0000154

- 24 -

any of its provisions. We agree with the Tax Court judge, in the present case, at para.
90, that "[i]n effect, the analysis of the misuse of the provisions and the analysis of
the abuse having regard to the provisions of the *Act* read as a whole are inseparable."
As discussed more fully below, the interpretation of specific provisions of the Act
cannot be separated from contextual considerations arising from other provisions.
The various provisions of the *Income Tax Act* must be interpreted in their contextual
framework, so that the Act functions as a coherent whole, with respect to the
particular statutory scheme engaged by the transactions.

40        There is but one principle of interpretation: to determine the intent of the
legislator having regard to the text, its context, and other indicators of legislative
purpose. The policy analysis proposed as a second step by the Federal Court of
Appeal in *OSFC* is properly incorporated into a unified, textual, contextual, and
purposive approach to interpreting the specific provisions that give rise to the tax
benefit.



41        The courts cannot search for an overriding policy of the Act that is not
based on a unified, textual, contextual and purposive interpretation of the specific
provisions in issue. First, such a search is incompatible with the roles of reviewing
judges. The *Income Tax Act* is a compendium of highly detailed and often complex
provisions. To send the courts on the search for some overarching policy and then to
use such a policy to override the wording of the provisions of the *Income Tax Act*
would inappropriately place the formulation of taxation policy in the hands of the
judiciary, requiring judges to perform a task to which they are unaccustomed and for
which they are not equipped. Did Parliament intend judges to formulate taxation
policies that are not grounded in the provisions of the Act and to apply them to



IACOBUCCI0000155