override the specific provisions of the Act? Notwithstanding the interpretative challenges that the GAAR presents, we cannot find a basis for concluding that such a marked departure from judicial and interpretative norms was Parliament's intent.

42 Second, to search for an overriding policy of the *Income Tax Act* that is not anchored in a textual, contextual and purposive interpretation of the specific provisions that are relied upon for the tax benefit would run counter to the overall policy of Parliament that tax law be certain, predictable and fair, so that taxpayers can intelligently order their affairs. Although Parliament's general purpose in enacting the GAAR was to preserve legitimate tax minimization schemes while prohibiting abusive tax avoidance, Parliament must also be taken to seek consistency, predictability and fairness in tax law. These three latter purposes would be frustrated if the Minister and/or the courts overrode the provisions of the *Income Tax Act* without any basis in a textual, contextual and purposive interpretation of those provisions.

43 For these reasons we conclude, as did the Tax Court judge, that the determinations of "misuse" and "abuse" under s. 245(4) are not separate inquiries. Section 245(4) requires a single, unified approach to the textual, contextual and purposive interpretation of the specific provisions of the *Income Tax Act* that are relied upon by the taxpayer in order to determine whether there was abusive tax avoidance.

5.5.2 <u>Abusive Tax Avoidance: A Unified Interpretative Approach</u>



44 The heart of the analysis under s. 245(4) lies in a contextual and purposive interpretation of the provisions of the Act that are relied on by the taxpayer, and the application of the properly interpreted provisions to the facts of a given case. The first task is to interpret the provisions giving rise to the tax benefit to determine their object, spirit and purpose. The next task is to determine whether the transaction falls within or frustrates that purpose. The overall inquiry thus involves a mixed question of fact and law. The textual, contextual and purposive interpretation of specific provisions of the *Income Tax Act* is essentially a question of law but the application of these provisions to the facts of a case is necessarily fact-intensive.

45 This analysis will lead to a finding of abusive tax avoidance when a taxpayer relies on specific provisions of the *Income Tax Act* in order to achieve an outcome that those provisions seek to prevent. As well, abusive tax avoidance will occur when a transaction defeats the underlying rationale of the provisions that are relied upon. An abuse may also result from an arrangement that circumvents the application of certain provisions, such as specific anti-avoidance rules, in a manner that frustrates or defeats the object, spirit or purpose of those provisions. By contrast, abuse is not established where it is reasonable to conclude that an avoidance transaction under s. 245(3) was within the object, spirit or purpose of the provisions that confer the tax benefit.



46 Once the provisions of the *Income Tax Act* are properly interpreted, it is a question of fact for the Tax Court judge whether the Minister, in denying the tax benefit, has established abusive tax avoidance under s. 245(4). Provided the Tax Court judge has proceeded on a proper construction of the provisions of the Act and







on findings supported by the evidence, appellate tribunals should not interfere, absent a palpable and overriding error.

47 The first part of the inquiry under s. 245(4) requires the court to look beyond the mere text of the provisions and undertake a contextual and purposive approach to interpretation in order to find meaning that harmonizes the wording, object, spirit and purpose of the provisions of the *Income Tax Act*. There is nothing novel in this. Even where the meaning of particular provisions may not appear to be ambiguous at first glance, statutory context and purpose may reveal or resolve latent ambiguities. "After all, language can never be interpreted independently of its context, and legislative purpose is part of the context. It would seem to follow that consideration of legislative purpose may not only resolve patent ambiguity, but may, on occasion, reveal ambiguity in apparently plain language." See P. W. Hogg and J. E. Magee, *Principles of Canadian Income Tax Law* (4th ed. 2002), at p. 563. In order to reveal and resolve any latent ambiguities in the meaning of provisions of the *Income Tax Act*, the courts must undertake a unified textual, contextual and purposive approach to statutory interpretation.

48 As previously stated, the predominant issue in this and its companion appeal is what constitutes abusive tax avoidance. The Explanatory Notes state in part, at pp. 464-65:

> Subsection 245(4) recognizes that the provisions of the Act are intended to apply to transactions with real economic substance, not to transactions intended to exploit, misuse or frustrate the Act to avoid tax. It also recognizes, however, that a number of provisions of the Act either contemplate or encourage transactions that may seem to be primarily tax-motivated.... It is not intended that section 245 will apply to deny the tax benefits that result from these transactions as long as they are carried out within the object and spirit of the provisions of the Act read as a



IACOBUCCI0000158





> whole. Nor is it intended that tax incentives expressly provided for in the legislation would be neutralized by this section.
>
> Where a taxpayer carries out transactions primarily in order to obtain, through the application of specific provisions of the Act, a tax benefit that is not intended by such provisions and by the Act read as a whole, section 245 should apply. This would be the case even though the strict words of the relevant specific provisions may support the tax result sought by the taxpayer. Thus, where applicable, section 245 will override other provisions of the Act since, otherwise, its object and purpose would be defeated.
>
> . . . Thus, in reading the Act as a whole, specific provisions will be read in the context of and in harmony with the other provisions of the Act in order to achieve a result which is consistent with the general scheme of the Act.
>
> Therefore, the application of new subsection 245 must be determined by reference to the facts in a particular case in the context of the scheme of the Act. . . . This can be discerned from a review of the scheme of the Act, its relevant provisions and permissible extrinsic aids.

49 In all cases where the applicability of s. 245(4) is at issue, the central question is, having regard to the text, context and purpose of the provisions on which the taxpayer relies, whether the transaction frustrates or defeats the object, spirit or purpose of those provisions. The following points are noteworthy:



> (1) While the Explanatory Notes use the phrase "exploit, misuse or frustrate", we understand these three terms to be synonymous, with their sense most adequately captured by the word "frustrate".
>
> (2) The Explanatory Notes elaborate that the GAAR is intended to apply where under a literal interpretation of the provisions of the *Income Tax Act*, the object and purpose of those provisions would be defeated.







(3) The Explanatory Notes specify that the application of the GAAR must be determined by reference to the facts of a particular case in the context of the scheme of the *Income Tax Act*.

(4) The Explanatory Notes also elaborate that the provisions of the *Income Tax Act* are intended to apply to transactions with real economic substance.

50 As previously discussed, Parliament sought to address abusive tax avoidance while preserving consistency, predictability and fairness in tax law and the GAAR can only be applied to deny a tax benefit when the abusive nature of the transaction is clear.

51 The interpretation of the provisions giving rise to the tax benefit must, in the words of s. 245(4) of the Act, have regard to the Act "read as a whole". This means that the specific provisions at issue must be interpreted in their legislative context, together with other related and relevant provisions, in light of the purposes that are promoted by those provisions and their statutory schemes. In this respect, it should not be forgotten that the GAAR itself is part of the Act.

52 In general, Parliament confers tax benefits under the *Income Tax Act* to promote purposes related to specific activities. For example, tax benefits associated with business losses, CCA and RRSPs, are conferred for reasons intrinsic to the activities involved. Unless the Minister can establish that the avoidance transaction frustrates or defeats the purpose for which the tax benefit was intended to be conferred, it is not abusive.







53 Care must be taken in assessing the purposes for which the provisions at issue confer a tax benefit. "The [*Income Tax Act*] is a complex statute through which Parliament seeks to balance a myriad of principles" (*Shell*, at para. 43). The conferring of particular tax benefits can serve a variety of independent and interlocking purposes. These range from imposing fair business accounting principles and promoting particular kinds of commercial activity, to providing family and social benefits.

54 In interpreting the provisions of the *Income Tax Act*, the statutory language must be respected and should be interpreted according to its well-established legal meaning. In some cases, a contextual and purposive interpretation may add nuance to the well-established legal meaning of the statutory language. Section 245(4) does not rewrite the provisions of the *Income Tax Act*; it only requires that a tax benefit be consistent with the object, spirit and purpose of the provisions that are relied upon.



55 In summary, s. 245(4) imposes a two-part inquiry. The first step is to determine the object, spirit or purpose of the provisions of the *Income Tax Act* that are relied on for the tax benefit, having regard to the scheme of the Act, the relevant provisions and permissible extrinsic aids. The second step is to examine the factual context of a case in order to determine whether the avoidance transaction defeated or frustrated the object, spirit or purpose of the provisions in issue.

56 The Explanatory Notes elaborate that the provisions of the *Income Tax Act* are intended to apply to transactions with real economic substance. Although the expression "economic substance" may be open to different interpretations, this



statement recognizes that the provisions of the Act were intended to apply to transactions that were executed within the object, spirit and purpose of the provisions that are relied upon for the tax benefit. The courts should not turn a blind eye to the underlying facts of a case, and become fixated on compliance with the literal meaning of the wording of the provisions of the *Income Tax Act*. Rather, the courts should in all cases interpret the provisions in their proper context in light of the purposes they intend to promote.

57 *Courts have to be careful not to conclude too hastily that simply because* a non-tax purpose is not evident, the avoidance transaction is the result of abusive tax avoidance. Although the Explanatory Notes make reference to the expression "economic substance", s. 245(4) does not consider a transaction to result in abusive tax avoidance merely because an economic or commercial purpose is not evident. As previously stated, the GAAR was not intended to outlaw all tax benefits; Parliament intended for many to endure. The central inquiry is focussed on whether the transaction was consistent with the purpose of the provisions of the *Income Tax Act* that are relied upon by the taxpayer, when those provisions are properly interpreted in light of their context. Abusive tax avoidance will be established if the transactions frustrate or defeat those purposes.

58 Whether the transactions were motivated by any economic, commercial, family or other non-tax purpose may form part of the factual context that the courts may consider in the analysis of abusive tax avoidance allegations under s. 245(4). However, any finding in this respect would form only one part of the underlying facts of a case, and would be insufficient by itself to establish abusive tax avoidance. The central issue is the proper interpretation of the relevant provisions in light of their

context and purpose. When properly interpreted, the statutory provisions at issue in a given case may dictate that a particular tax benefit may apply only to transactions with a certain economic, commercial, family or other non-tax purpose. The absence of such considerations may then become a relevant factor towards the inference that the transactions abused the provisions at issue, but there is no golden rule in this respect.

59 Similarly, courts have on occasion discussed transactions in terms of their "lack of substance" or requiring "recharacterization". However, such terms have no meaning in isolation from the proper interpretation of specific provisions of the *Income Tax Act*. The analysis under s. 245(4) requires a close examination of the facts in order to determine whether allowing a tax benefit would be within the object, spirit or purpose of the provisions relied upon by the taxpayer, when those provisions are interpreted textually, contextually and purposively. Only after first, properly construing the provisions to determine their scope and second, examining all of the relevant facts, can a proper conclusion regarding abusive tax avoidance under s. 245(4) be reached.

60 A transaction may be considered to be "artificial" or to "lack substance" *with respect to specific provisions* of the *Income Tax Act*, if allowing a tax benefit would not be consistent with the object, spirit or purpose of those provisions. We should reject any analysis under s. 245(4) that depends entirely on "substance" viewed in isolation from the proper interpretation of specific provisions of the *Income Tax Act* or the relevant factual context of a case. However, abusive tax avoidance may be found where the relationships and transactions as expressed in the relevant documentation lack a proper basis relative to the object, spirit or purpose of the





provisions that are purported to confer the tax benefit, or where they are wholly dissimilar to the relationships or transactions that are contemplated by the provisions.

61 A proper approach to the wording of the provisions of the *Income Tax Act* together with the relevant factual context of a given case achieve balance between the need to address abusive tax avoidance while preserving certainty, predictability and fairness in tax law so that taxpayers may manage their affairs accordingly. Parliament intends taxpayers to take full advantage of the provisions of the Act that confer tax benefits. Parliament did not intend the GAAR to undermine this basic tenet of tax law.

62 The GAAR may be applied to deny a tax benefit only after it is determined that it was not reasonable to consider the tax benefit to be within the object, spirit or purpose of the provisions relied upon by the taxpayer. The negative language in which s. 245(4) is cast indicates that the starting point for the analysis is the assumption that a tax benefit that would be conferred by the plain words of the Act is not abusive. This means that a finding of abuse is only warranted where the opposite conclusion — that the avoidance transaction was consistent with the object, spirit or purpose of the provisions of the Act that are relied on by the taxpayer — cannot be reasonably entertained. In other words, the abusive nature of the transaction must be clear. The GAAR will not apply to deny a tax benefit where it may reasonably be considered that the transactions were carried out in a manner consistent with the object, spirit or purpose of the provisions of the Act, as interpreted textually, contextually and purposively.



5.6 *Burden of Proof*





63 The determination of the existence of a tax benefit and an avoidance transaction under s. 245(1), (2) and (3) involves factual decisions. As such, the burden of proof is the same as in any tax proceeding where the taxpayer disputes the Minister's assessment and its underlying assumptions of facts. The initial obligation is on the taxpayer to "refute" or challenge the Minister's factual assumptions by contesting the existence of a tax benefit or by showing that a *bona fide* non-tax purpose primarily drove the transaction: see *Hickman Motors Ltd. v. Canada*, [1997] 2 S.C.R. 336, at para. 92. It is not unfair to impose this burden, as the taxpayer would presumably have knowledge of the factual background of the transaction.

64 By contrast, the inquiry into abusive tax avoidance under s. 245(4) involves a textual, contextual and purposive analysis of the provisions on which the tax benefit is based. We see no reason to maintain the distinction between a theoretical and practical perspective on the burden of proof, adopted by the majority of the Federal Court of Appeal in *OSFC*. The Federal Court of Appeal held that there is no burden on either party at the stage of interpreting the provisions at issue, since this is a question of law, which is ultimately for the court to decide. It went on to state at para. 68 that "from a practical perspective, . . . [t]he Minister should set out the policy with reference to the provisions of the Act or extrinsic aids upon which he relies".



65 For practical purposes, the last statement is the important one. The taxpayer, once he or she has shown compliance with the wording of a provision, should not be required to disprove that he or she has thereby violated the object, spirit or purpose of the provision. It is for the Minister who seeks to rely on the GAAR to



identify the object, spirit or purpose of the provisions that are claimed to have been frustrated or defeated, when the provisions of the Act are interpreted in a textual, contextual and purposive manner. The Minister is in a better position than the taxpayer to make submissions on legislative intent with a view to interpreting the provisions harmoniously within the broader statutory scheme that is relevant to the transaction at issue.

5.7 *Summary*

66 The approach to s. 245 of the *Income Tax Act* may be summarized as follows.

1. Three requirements must be established to permit application of the GAAR:

(1) A *tax benefit resulting from a transaction* or part of a series of transactions (s. 245(1) and (2));

(2) that the transaction is an *avoidance transaction* in the sense that it cannot be said to have been reasonably undertaken or arranged primarily for a *bona fide* purpose other than to obtain a tax benefit; and

(3) that there was *abusive tax avoidance* in the sense that it cannot be reasonably concluded that a tax benefit would be consistent with the object, spirit or purpose of the provisions relied upon by the taxpayer.

2. The burden is on the taxpayer to refute (1) and (2), and on the Minister to establish (3).

3. If the existence of abusive tax avoidance is unclear, the benefit of the doubt goes to the taxpayer.

4. The courts proceed by conducting a unified textual, contextual and purposive analysis of the provisions giving rise to the tax benefit in order to determine why they were put in place and why the benefit was conferred. The goal is to arrive at a purposive interpretation that is harmonious with the provisions of the Act that confer the tax benefit, read in the context of the whole Act.



5. Whether the transactions were motivated by any economic, commercial, family or other non-tax purpose may form part of the factual context that the courts may consider in the analysis of abusive tax avoidance allegations under s. 245(4). However, any finding in this respect would form only one part of the underlying facts of a case, and would be insufficient by itself to establish abusive tax avoidance. The central issue is the proper interpretation of the relevant provisions in light of their context and purpose.

6. Abusive tax avoidance may be found where the relationships and transactions as expressed in the relevant documentation lack a proper basis relative to the object, spirit or purpose of the provisions that are purported







to confer the tax benefit, or where they are wholly dissimilar to the relationships or transactions that are contemplated by the provisions.

7. Where the Tax Court judge has proceeded on a proper construction of the provisions of the *Income Tax Act* and on findings supported by the evidence, appellate tribunals should not interfere, absent a palpable and overriding error.

6. Application to the Facts of This Case

67 The appellant Crown agreed with the finding of the Tax Court judge that there was a tax benefit and an avoidance transaction. Therefore, the only issue is whether there was abusive tax avoidance under s. 245(4).

68 The respondent purchased and leased trailers in order to generate CCA deductions, which were then used to shelter other taxable lease income generated by CTMC. It is common ground that on their face, the CCA provisions permit the deductions claimed. It is also common ground that a standard sale-leaseback transaction, involving qualifying assets, where the vendor is also the lessee, is consistent with the object, spirit or purpose of the CCA provisions. However, the appellant submits that the manner in which the respondent structured and financed the purchase, lease and sublease of the trailers contravened the object, spirit or purpose of the CCA regime and resulted in abusive tax avoidance under s. 245(4) of the *Income Tax Act*.



69 As discussed above, the practical burden of showing that there was abusive tax avoidance lies on the Minister. The abuse of the Act must be clear, with the result that doubts must be resolved in favour of the taxpayer. The analysis focusses on the purpose of the particular provisions that on their face give rise to the benefit, and on whether the transaction frustrates or defeats the object, spirit or purpose of those provisions.

70 The appellant submits that the object and spirit of the CCA provisions are "to provide for the recognition of money spent to acquire qualifying assets to the extent that they are consumed in the income-earning process", relying on the reasons of Noël J.A. in *Water's Edge Village Estates (Phase II) Ltd. v. Canada*, [2003] 2 F.C. 25, 2002 FCA 291, at para. 44. The appellant submits that the transaction involved no real risk and that CTMC thus did not actually spend $120 million to purchase the trailers from TLI. In the appellant's view, CTMC created a "cost for CCA purposes that is an illusion" without incurring any "real" expense. This, the appellant argues, contravenes the object and spirit of the CCA provisions and constitutes abusive tax avoidance within s. 245(4) of the Act. The appellant summarizes its main submission as follows:

> In this case, the pre-ordained series of transactions misuses and abuses the CCA regime because it manufactures a cost for CCA purposes that does not represent the real economic cost to CTMC of the trailers. CTMC borrowed $97.4 million from the Royal Bank, but . . . the loan was effectively repaid in its entirety on the day it was made. The assignment by CTMC to the Bank of MAIL's rent payments under the lease continued the circular flow of money . . . . <u>There was no risk at all that the rent payments would not be made.</u> Even the $5.9 million that CTMC apparently paid in fees was fully covered as it, along with the rest of CTMC's contribution of $24.9 million in funding, will be reimbursed when the $19 million bond pledged to CTMC matures in December 2005 at $33.5 million.





CTMC incurred no real economic cost, and thus was not entitled to any "recognition for money spent to acquire qualifying assets". [Emphasis added; paras. 80-81.]

71 The respondent takes a different view of the purpose of the CCA provisions and the transaction. It relies on the Tax Court judge's conclusion that the transaction was a profitable commercial investment and fully consistent with the object and spirit of the Act. The respondent submits that its deductions were permitted under the "Leasing Property Rules" and the "Specified Leasing Property Rules" of the Act. It argues that the specific rules enacted by Parliament to address CCA on leased assets are plainly a vital part of the statutory scheme, and that the GAAR cannot be utilized to change the scope of those rules. The respondent submits that it is the policy of the Act that "cost" means the price that the taxpayer gave up in order to get the asset, except in specific and precisely prescribed circumstances not here applicable. The respondent argues that the GAAR cannot be used to override Parliament's explicit policy decision to limit the scope of the rules.

72 The respondent argues that the transaction was consistent with the object and spirit of the legislation. The Act's inclusion of specific provisions that take "cost" to mean the amount "at risk" in limited circumstances illustrates the general policy of the Act that the term "cost" outside of those specific provisions means cost as understood at law, namely the amount paid. A cost is not reduced to reflect a mitigation of economic risk. In the result, the respondent argues that on the facts of this case "it may reasonably be considered that the transaction would not result directly or indirectly in a misuse . . . or an abuse . . ." under s. 245(4).



73 We are of the view that the appellant's arguments do not reflect a proper interpretation of the GAAR and that the respondent's position should prevail. We are led to this conclusion by a textual, contextual and purposive interpretation of the relevant provisions of the *Income Tax Act*.

74 Textually, the CCA provisions use "cost" in the well-established sense of the amount paid to acquire the assets. Contextually, other provisions of the Act support this interpretation. Finally, the purpose of the CCA provisions of the Act, as applied to sale-leaseback transactions, was, as found by the Tax Court judge, to permit deduction of CCA based on the cost of the assets acquired. This purpose emerges clearly from the scheme of the CCA provisions within the Act as a whole. The appellant's argument was not that the purpose of these provisions was unclear, but rather that the GAAR ought to override their accepted purpose and effect, for reasons external to the provisions themselves.



75 The appellant suggests that the usual result of the CCA provisions of the Act should be overridden in the absence of real financial risk or "economic cost" in the transaction. However, this suggestion distorts the purpose of the CCA provisions by reducing them to apply only when sums of money are at economic risk. The applicable CCA provisions of the Act do not refer to economic risk. They refer only to "cost". Where Parliament wanted to introduce economic risk into the meaning of cost related to CCA provisions, it did so expressly, as, for instance, in s. 13(7.1) and (7.2) of the Act, which makes adjustments to the cost of depreciable property when a taxpayer receives government assistance. "Cost" in the context of CCA is a well-understood legal concept. It has been carefully defined by the Act and the jurisprudence. Like the Tax Court judge, we see nothing in the GAAR or the object



of the CCA provisions that permits us to rewrite them to interpret "cost" to mean "amount economically at risk" in the applicable provisions. To do so would be to invite inconsistent results. The result would vary with the degree of risk in each case. *This would offend the goal of the Act to provide sufficient certainty and predictability* to permit taxpayers to intelligently order their affairs. For all these reasons, we agree with the Tax Court judge's conclusion that the "cost" was $120 million, not zero as argued by the appellant.

76 The appellant's submissions on this point amount to a narrow consideration of the "economic substance" of the transaction, viewed in isolation from a textual, contextual and purposive interpretation of the CCA provisions. It did not focus on the purpose of the CCA provisions read in the context of the Act as a whole, to determine whether the tax benefit fell outside the object, spirit or purpose of the relevant provisions. Instead, it simply argued that since there was (as it alleged) no "real economic cost", the GAAR must apply. As discussed earlier, the application of the GAAR is a complex matter of statutory interpretation in which the object, spirit and purpose of the provisions giving rise to the tax benefit are assessed in light of the requirements and wording of the GAAR. While the "economic substance" of the transaction may be relevant at various stages of the analysis, this expression has little meaning in isolation from the proper interpretation of specific provisions of the Act. Any "economic substance" must be considered in relation to the proper interpretation of the specific provisions that are relied upon for the tax benefit.

77 The appellant originally suggested that the GAAR should be used to override the usual effect of the CCA provisions for a second reason — namely that the relationships and transactions that are expressed in the documents are abusive of the



provisions of the *Income Tax Act* and should be set aside. It properly abandoned this argument and the submission that the transaction was a sham before the Federal Court of Appeal. Here the documents detailing the transaction left no uncertainty as to the relationships between the parties. CTMC paid $120 million to TLI for the equipment, partly with borrowed funds and partly with its own money. Having become the owner of the equipment, it leased it to MAIL. MAIL then subleased it back to the vendor, TLI. The relationships between the parties as expressed in the relevant documentation were not superfluous elements; they were the very essence of the transaction.

78 As the Tax Court judge concluded, under the CCA scheme, "[l]eases of such [exempt] properties will continue to be viewed as acceptable means of providing lower cost financing" (para. 67). TLI's use of the money ultimately reduced the risk, but a company in the financing business is expected to do what it can to reduce risk. Therefore, the way the borrowed money was used provided no grounds for concluding that there was abusive tax avoidance. The Tax Court judge, after considering all the circumstances, found that the transaction was not so dissimilar from an ordinary sale-leaseback to take it outside the object, spirit or purpose of the relevant CCA provisions of the Act and Regulations.

79 In determining the result in this appeal, the Tax Court judge's conclusions on matters of fact should not be displaced provided that they are based on the correct legal analysis and find support in the evidence.

80 The Tax Court judge's analysis on the issue of abuse under s. 245(4) is largely consistent with the approach to the application of the GAAR we have adopted. He rejected the two-stage overriding-policy approach to abuse and misuse. He went



on to inquire into the policy or purpose underlying the CCA treatment in sale-leaseback arrangements. Construing the CCA provisions as a whole, he rejected the submission that "cost" in the relevant provisions of the Act should be reread as "money at risk", and he also rejected the argument that the "economic substance" of the transaction determined that there was abusive tax avoidance. He conducted a detailed analysis of the transactions to determine whether they fell within the object, spirit or purpose of the CCA provisions. In the end, he concluded that a tax benefit was consistent with the object, spirit and purpose of the CCA provisions and held that the GAAR could not apply to disallow the tax benefit. These conclusions were based on a correct view of the law and were grounded in the evidence. They should be confirmed.

7. Conclusion

81 We would dismiss the appeal with costs.

APPENDIX

1. The following parties weave through the multiple transactions at one point or another:

Canada Trustco Mortgage Company ("CTMC" or "Purchaser" or "Lessor" or "Borrower"), respondent, was a large diversified financial institution carrying on business in Canada.

Royal Bank of Canada (Canadian branch) ("RBC" or "Lender").





Transamerica Leasing Inc. ("TLI" or "Vendor" or "Sublessee"), a corporation in the United States.

Maple Assets Investments Limited ("MAIL" or "Lessee" or "Sublessor"), a limited liability company incorporated under the laws of England.

Maple Assets Charitable Trust ("MACT" or "Trust"), constituted by an instrument of trust dated December 17, 1996, owns 100 percent of the shares in MAIL.

Royal Bank of Canada Trust Company (Jersey) Limited ("RBC Jersey" or "Trustee") is the trustee of MACT and is a wholly owned subsidiary of RBC, incorporated in Jersey.



Royal Bank of Canada Trust Corporation Limited ("RBCTC" or "Manager"), a company incorporated in England, undertook to manage and fulfil the affairs and obligations of MAIL under the relevant transactions and to provide the directors and officers of MAIL.

Transamerica Finance Corporation ("TFC" or "Guarantor"), the parent corporation of TLI, who guaranteed to MAIL the performance of all TLI's obligations under the sublease agreement and to CTMC all TLI's obligations under the "Equipment Purchase Agreement".

Macquarie Corporate Finance (USA) Inc. ("Lease Arranger").





II. CTMC held as part of its ongoing business a portfolio of loans and leases to generally larger corporations and government agencies. CTMC testified that it was looking for a leasing arrangement in the range of $100 million. It specified the type of equipment (long-term assets that were easy to value, such as tractors or trailers), the duration of the lease and the strength of the proposed lessee. The structure of the leasing arrangement was left to the Lease Arranger. The trailers remained in the possession of TLI and CTMC continued to own the trailers, to lease them out, and to earn income from them. CTMC previously entered into similar arrangements to the one implemented in this case. The Lease Arranger arranged the TLI deal which was approved by CTMC's Board of Directors. The key transactions proceeded as follows:

*The Purchase and Sale of the Trailers*

III. On December 17, 1996, CTMC and TLI entered into an agreement for the purchase and sale of trailers at a fair market value of $120 million. TLI agreed to sell and CTMC agreed to purchase the trailers absolutely and ownership in the trailers passed from TLI to CTMC.

IV. On December 17, 1996, for administrative convenience, CTMC appointed TLI as trustee and agent of CTMC to hold in TLI's name, the certificate of title, certificate of ownership, registration and like documentation in respect of the trailers.



*Lease of the Trailers to MAIL and the Option to Purchase*





V. The terms of the Lease between CTMC and MAIL included the following:

1. the term was for an initial period ending December 1, 2014;

2. the rent payments under the Lease were based upon an effective interest rate of 8.5 percent;

3. MAIL, as lessee, was required to make semi-annual payments to CTMC; and

4. MAIL was provided with an option to purchase the trailers, $84 million being the First Option Value on December 1, 2005 and another option exercisable at the fair market value on December 1, 2014.



*Sublease of the Trailers to TLI*

VI. Most of the terms of the Sublease to TLI are similar to those in the Lease to MAIL. The Sublease provided TLI with purchase options similar to those provided to MAIL.

*Security for the Sublease*

VII. On December 17, 1996, pursuant to the terms of the Sublease, TLI prepaid all amounts due to MAIL under the Sublease (approximately $120 million). As a result of the prepayment, TLI had no ongoing Sublease



payment obligations and there was no credit risk to MAIL under the terms of the Sublease. TLI maintained certain obligations with respect to indemnities and early termination. TLI retained a net present value benefit of 3.35 percent of the cost of the trailers being the difference between the payment TLI received from CTMC for the sale of the trailers and the prepayment of rent TLI paid to MAIL.

*Security for the Lease*

VIII. On December 17, 1996, MAIL applied the prepayment it received from TLI as follows:

1. MAIL placed on deposit with the RBC an amount equal to the Loan (approximately $100 million); and

2. MAIL paid the balance of the prepayment (approximately $20 million) to RBC Jersey on the condition that RBC Jersey use these funds to purchase a Government of Ontario Bond ("Bond"), maturing on December 1, 2005.

IX. On December 17, 1996, the Bond was pledged to CTMC as security for MAIL's obligation to pay the Purchase Option Payments or the Termination Values under the Lease. The risk of the inability of MAIL to pay the First Option Value was removed by the acquisition of the Bond and the provision to CTMC of a security interest in the Bond.





*Security for the Loan*

X. On December 17, 1996, CTMC assigned to RBC the rent payments owed to CTMC from MAIL under the Lease. CTMC also provided MAIL with an irrevocable instruction to pay the assigned rent payments to RBC such that RBC would apply the rent payments directly to the installment payments due by CTMC to RBC under the terms of the Loan Agreement. RBC's recourse under the Loan was limited to the rent payments assigned to it by CTMC.

XI. The rent payments under the Lease and a portion of the First Option Value would be applied to pay off the RBC loan and the remainder of the purchase option price would be covered by the Bond.



*The Effect of Non-Recourse Debt on Regulatory Capital Requirements*

XII. The use of non-recourse debt to finance the purchase of the trailers significantly improved CTMC's management of regulatory capital requirements.

*Guarantees*

XIII. On December 18, 1996, TFC, the parent corporation of TLI, unconditionally and irrevocably guaranteed to MAIL and to CTMC the performance of TLI's obligations under the relevant transactions.





*Reversibility of the Transactions*

XIV. The transactions in issue could be unwound if there were adverse changes affecting CTMC.

*Return on Investment*

XV. CTMC would realize a before-tax return of approximately $8.5 million from the transactions.

*Appeal dismissed with costs.*

*Solicitor for the appellant: Deputy Attorney General of Canada, Ottawa.*

*Solicitors for the respondent: Osler, Hoskin & Harcourt, Toronto.*

