# Index No. 11

# CASES, MATERIALS AND NOTES ON PARTNERSHIPS AND CANADIAN BUSINESS CORPORATIONS

Puri, Anand, Daniels, Dhir, Iacobucci, Lee, MacIntosh, Waitzer & Ziegel

Fifth Edition

# CASES, MATERIALS AND NOTES ON PARTNERSHIPS AND CANADIAN BUSINESS CORPORATIONS

Fifth Edition

by

**Poonam Puri**
Associate Dean, Research,
Graduate Studies, and Institutional
Relations and Associate Professor
Osgoode Hall Law School York
University

**Edward M. Iacobucci**
Osler Chair and Professor
Faculty of Law
University of Toronto

**Anita I. Anand**
Associate Professor
Faculty of Law
University of Toronto

**Ian B. Lee**
Associate Professor
Faculty of Law
University of Toronto

**Ronald J. Daniels**
President
The Johns Hopkins University

**Jeffrey G. MacIntosh**
Toronto Stock Exchange
Professor of Capital Markets
Faculty of Law
University of Toronto

**Aaron A. Dhir**
Associate Professor
Osgoode Hall Law School
York University

**Edward J. Waitzer**
Jarislowsky Dimma Mooney Chair in
Corporate Governance and Professor
Osgoode Hall Law School
York University

**Jacob S. Ziegel**
Professor of Law Emeritus
Faculty of Law
University of Toronto

# CARSWELL®

© 2011 Poonam Puri, Anita I. Anand, Ronald J. Daniels, Aaron A. Dhir, Edward M. Iacobucci, Ian B. Lee, Jeffrey G. MacIntosh, Edward J. Waitzer, Jacob S. Ziegel

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior written consent of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

The paper used in this publication meets the minimum requirements of American National Standard for Information Sciences—Permanence of Paper for Printed Library Materials, ANSI Z39.48-1984.

A cataloguing record for this publication is available from Library and Archives Canada.

ISBN 978-0-7798-3701-4 (2011 edition)

**Printed in the United States by Thomson Reuters.**

Composition: Computer Composition of Canada Inc.


THOMSON REUTERS

CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED

| One Corporate Plaza | Customer Relations |
| --- | --- |
| 2075 Kennedy Road | Toronto 1-416-609-3800 |
| Toronto, Ontario | Elsewhere in Canada/U.S. 1-800-387-5164 |
| M1T 3V4 | Fax: 1-416-298-5082 |
| | www.carswell.com |
| | E-mail www.carswell.com/email |

# Chapter 2

# Evolution of Business Corporations Law and the Nature of Corporate Personality

## 1. INTRODUCTION

In this introductory part of the chapter, we begin with a description of the evolution of Canadian corporations law (subsection (a)) and of the constitutional basis for corporations law (b), before presenting the statutory provisions that establish the separate legal personality of corporations (c) and the classic decision of the House of Lords in *Salomon v. Salomon & Co.* (d).

### (a) History of Canadian Business Corporation Law

#### (i) British Origins

The evolution of Canadian corporations law has been much influenced by British and American law. The British influence is the older of the two. Since a knowledge of the history of British company law is also important for an understanding of the early Canadian developments, it will be appropriate to start with it here.

The common law recognizes two principal forms of incorporation, *viz.* (a) incorporation by exercise of the royal prerogative (usually referred to as incorporation by letters patent or, more colloquially, royal charter), and (b) incorporation by a private or general act of the legislature. Until well into the eighteenth century incorporation by royal charter was by far the most common method. Even it was used very sparingly until the sixteenth and seventeenth centuries to incorporate companies with commercial purposes such as the Hudson Bay Company, the London East India Company and the Levant Company for overseas trade and colonization of territories. These early charters were usually accompanied by monopolies of one description or another. Limited liability was not expressly conferred by these charters and limited liability for investors did not become a controversial issue until the early part of the nineteenth century.

By the turn of the eighteenth century there was a lively trade in royal charters of companies, and this was accompanied by frenetic speculation in the shares of these companies. The South Sea Company was the most

notorious of them. It nearly collapsed in 1720 amidst much scandal and allegations of corruption in high places. That same year Parliament adopted the "*Bubble Act*" (6 Geo. 1, c. 18), an obscure piece of legislation, the only sure feature of which was that it substantially froze the development of British company law for over a century and generally cast commercial companies under a pall.

The beginning of the industrial revolution in the United Kingdom was accompanied by growing pressure for the repeal of the *Bubble Act* and a more accessible form of incorporation. The *Bubble Act* was repealed in 1825, but the first general Act for the incorporation of companies, the *Joint Stock Companies Act* (7 & 8 Vic. cc. 110 & 111), was not adopted until 1844. This Act introduced incorporation by registration, the method that has remained in dominant use in the U.K. since then and subsequently became the standard model of incorporation in most of the Commonwealth. However, the Act of 1844 still withheld the privilege of limited liability. The difficulties were compounded because the courts held that the joint stock companies were merely large partnerships and that each shareholder was a partner, even though the management of the companies was usually vested in directors or trustees.

The battle for limited liability was finally won in 1855 with the adoption of the *Limited Liability Act* (18 & 19 Vic., c. 133). This Act also introduced the requirement that incorporated companies with limited liability include the term "Limited" or "Ltd." as part of the company's name so as to warn the public of this "dangerous" new entity! The 1855 Act and earlier legislation were replaced in 1862 by the *Companies Act* (25 & 26 Vic., c. 89). This is the title by which all subsequent general companies legislation in the U.K. has come to be identified. The 1862 Act also became the model for several of the later Canadian provincial Acts.

(ii) Early Canadian Corporations Law

None of the Canadian provinces and territories adopted general incorporation legislation before the middle of the nineteenth century. Prior to this period, incorporation by private Act was the common procedure and was used substantially for the same purposes as in the U.K.

The first general legislation consisted of two Acts, both passed in 1849, one for Upper Canada and the other for Lower Canada. These authorized the incorporation of joint stock companies for the construction of roads and bridges. Both provided for incorporation by registration of appropriate documents with the registrar of the counties through which the road was to pass or in which the work was to be situated. The 1849 Acts were followed by a more broadly aimed Act of 1850 which permitted the incorporation of companies for "manufacturing, mining, mechanical and chemical purposes." This too was a registration Act and was modelled on a New York statute of 1848.

In 1860 another general Act was adopted for the incorporation of commercial companies and this provided for incorporation by judicial decree. In 1864, a third general Act, *viz.* by Letters Patent issued under the seal of the Governor in Council. According to Wegenast (*The Law of Canadian Companies* (1931)), the idea of incorporation by letters patent pursuant to a general Act may have been suggested by an English Act of 1844 for the incorporation of joint stock banks. The letters patent method of incorporation exerted great influence on the general incorporation Acts of other provinces and on federal corporate legislation. It was not abolished in Ontario until 1970, and not by the federal government until the adoption of the *Canada Business Corporations Act* (CBCA) in 1975.

The first general incorporation Act was adopted by the federal Parliament in 1869. This repealed the pre-Confederation legislation providing for incorporation by registration and judicial decree and re-enacted the Act of 1864. The 1864 Act also served as a model for the subsequent incorporation legislation of New Brunswick, Manitoba and Prince Edward Island. The other provinces (British Columbia, Alberta, Saskatchewan and Nova Scotia) adopted at different times the British method of incorporation by registration and also adopted many of the other provisions in the British Act of 1862. One of the unfortunate consequences of this schism was that at a crucial conceptual level Canada was divided into two camps, since the method of incorporation also brought in its train important substantive differences. A further difficulty arose because it was not always easy to determine how much of the English jurisprudence, built as it was around companies incorporated by registration, was relevant to companies incorporated by letters patent. That rift has only been healed (and only partly at that) over the past 30 years with the re-introduction of incorporation by registration.

(iii)  Modern Canadian Corporations Law

Until the 1960s, Canadian corporation law developments largely consisted of fleshing out and amending the nineteenth century legislation, and there were few basic conceptual changes. A new era in corporate legislation was introduced in 1970 with the adoption of an entirely new Act, the Ontario *Business Corporations Act* (OBCA) (R.S.O. 1970, c. 53). The Act largely implemented the recommendations of the Interim Report of the Select Committee on Company Law ("Report of the Lawrence Committee") which was published in 1967. The new Ontario Act replaced incorporation by letters patent with incorporation by registration, permitted the incorporation of one-person corporations, largely immunized third parties from the effects of the *ultra vires* doctrine, regularized pre-incorporation contracts, introduced a new regulatory framework for the issuance and transfer of investment securities, partially codified the duties of directors and officers, regulated insider trading in the corporation's securities, permitted derivative actions and improved minority shareholder protection in other important respects.

peers in construing legislation and therefore much less reluctant to give words their ordinary meaning even if this leads to anomalous results. Second, there were prominent barristers such as Francis B. Palmer, the author of a leading company law text that is still widely used in England, who thought British partnership law constituted a trap for the unwary investor and who welcomed the 1856 Act as a solution to these difficulties. Palmer published in 1877 an influential text, *Private Companies: Their Formation and Advantages*, which did much to encourage the incorporation of private companies. Third, the "Great Depression," which hit Victorian England and lasted from 1873-1896, reminded the business community of the vulnerability of unincorporated partnerships and made incorporation and the limited liability it conferred very attractive.

These cumulative factors presumably influenced the law lords in *Salomon* in deciding to reverse the Court of Appeal's decision. The House of Lords' decision also appears to have won widespread approval. The report of the Loreburn Committee in 1906 on company law amendments recommended the formal recognition of private companies and their being relieved from several onerous requirements incumbent on public companies. These recommendations were implemented in the *Companies Act* of 1907.

## 2. LIMITED LIABILITY AND CREDITOR PROTECTION

### (a) Statutory Provisions

In *Salomon*, the creditors of Salomon & Co. could look only to the corporation, and not to its shareholder Aron Salomon, for payment of what they were owed. The protection of their personal assets from liability is, as Lord Macnaghten observed, one of the reasons why entrepreneurs use the corporate form rather than carrying on business as an unincorporated proprietorship or partnership.

In most jurisdictions, the limited liability of shareholders is today provided for by statute. For instance, s. 45(1) of the CBCA and s. 87(1) of the BCBCA provide that, with some exceptions (discussed below), a shareholder is not liable for the obligations of the corporation. Limited liability does not inevitably flow from the proposition that the corporation is a separate entity. Some early general incorporations statutes provided for unlimited shareholder liability. Today, three jurisdictions permit the formation of companies with unlimited shareholder liability: see BCBCA, part 2.1; and *Business Corporations Act*, R.S.A. 2000, c. B-9, part 2.1; and *Nova Scotia Companies Act*, R.S., c. 81, s. 9(c).

## 3. PIERCING THE CORPORATE VEIL

### (a) What is Piercing the Corporate Veil?

The expression "piercing the corporate veil" or "lifting the corporate veil" can refer to two distinct legal phenomena each of which may be described, loosely, as "disregard[ing] the separate legal personality of a corporation" (*642947 Ontario Ltd. v. Fleischer*, 2001 CarswellOnt 4296, 56 O.R. (3d) 417 (Ont. C.A.)). First, the expression can refer to the imposition of liability upon the shareholders of a corporation for the obligations of the corporation. A person wronged by an impecunious corporation might ask a court to hold the corporation's shareholders liable for her loss — that is, to pierce the corporate veil.

Second and more generically, the expression can refer to the non-recognition of the separate personality of a corporation where the correct construction of a statutory or other legal standard so requires. Sometimes, for instance, in construing words that might be thought to refer to a single legal person (such as "owner," or "employer" or "taxpayer"), a court will decide that the relevant unit of analysis is not a corporation in isolation but a corporation together with other entities such as its parent, subsidiary or shareholders. For instance, in *De Salaberry v. Minister of National Revenue*, excerpted below, the Federal Court took into account the conduct of a group of corporations under common ownership in characterizing the actions of one of them of tax purposes, rather than viewing the taxpayer's conduct in isolation.

### (b) What is the Basis for Piercing the Corporate Veil?

At first glance, corporations statutes are clear in providing that the corporation is a legal person separate and distinct from its shareholders and that the latter are not liable for the obligations of the former. For instance, the CBCA provides, at s. 45, that "the shareholders of a corporation are not, as shareholders, liable for any liability, act or default of the corporation" (except in three specific circumstances not relevant here). Nevertheless, courts have repeatedly stated that, sometimes, the legal personality of the corporation may be disregarded for the purpose of imposing liability directly upon shareholders or if necessary for the correct construction or application of a legal standard.

What is the legal justification for doing so? The jurisprudence has been criticized (including by judges themselves) for incoherence — in *Clarkson Co. Ltd. v. Zhelka*, excerpted below, Thompson J. stated that the cases on veil-piercing "illustrate no consistent principle." He went on to offer, as an approximation of the underlying principle, that the separate personality of a corporation will not be upheld where it would produce results "flagrantly opposed to justice." But "justice" is a vague concept. As you study the decisions excerpted in this part of the chapter, try to flesh the concept out by (i) identifying the facts that courts have treated as material in determining

apply equally to the corporation and its directors, officers, shareholders, agents and employees. For applications of similar provisions, see *Corkery v. Foster Wedekind* (1987), 45 D.L.R. (4th) 159, 1987 CarswellAlta 262 (Q.B.) and *Sandilands v. Powell*, 2003 ABCA 162, 2003 CarswellAlta 956, 330 A.R. 92 (Alta. C.A.).

It appears that interest in professional corporations in Canada is (or was) largely motivated by tax considerations. Fundamentally, the benefits associated with professional corporations versus limited liability partnerships vary by type of professional, size of firm, and objective of incorporation (Vern Krishna, "Professional Corporations" (2005) 25:9 Lawyers Weekly (QL)).

### (e) Unlimited Liability Companies

Alone among Canadian jurisdictions, Nova Scotia permits the incorporation of "unlimited liability companies" ("ULCs"), which are corporations without limits on the liability of their members (see *Companies Act*, R.S.N.S. 1989, c. 81, s. 9(c)). A ULC's name may not include the words "limited" or "incorporated", although it can use the words "company" or "Co." and identify itself as a ULC. The liability of members of a ULC is unlimited, but, unlike partners who bear direct liability to creditors on an ongoing basis, the liability of ULC members arises only on the winding up of the ULC in the event that its assets are insufficient to meet its obligations. Members can limit their personal liability to third parties by contract, and there are numerous limitations on the liability of former members (*Companies Act*, s. 135). In addition, investors in a ULC typically insulate themselves from unlimited personal liability by interposing a limited liability corporation or limited partnership between themselves and the ULC.

The principal reason for using a ULC is the fact that US tax rules permit the ULC to elect to be taxed as a partnership in the US, even though it is a corporation for all purposes (including tax) in Canada.

## 6. CORPORATE NAMES

One of the more important matters that must be decided upon in the incorporation process is the selection of a corporate name. The legislation in all jurisdictions seeks to regulate the use of corporate names, primarily with a view to ensuring that the public will not be misled by confusingly similar corporate names. The statutory provisions vary from province to province, both in the degree of their complexity and in the detail of their requirements. The relevant statute must be consulted in each case to determine the appropriate requirements. See, for example, *CBCA* ss. 10–13 and *OBCA* ss. 8-12. There may be additional statutory requirements outside of the corporation law statutes. For example, in Ontario, a corporation must comply with the *Business Names Act* R.S.O. 1990 c. 17 (*BNA*) in order to register its name. Per s. 7(1) of the *BNA*, a corporation must comply with