# Index No. 15

Westlaw.

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457



1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

Clarkson Co. v. Zhelka

Clarkson Co. Ltd. v. Zhelka et al.

Ontario High Court of Justice

Thompson, J.

Judgment: August 22, 1967
© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *R. S. Joy, Q.C.*, and *W. D. Lessmann*, for plaintiff.

*J. R. Denny, Q.C.*, and *J. H. Gardner*, for defendant Zhelka.

*W. J. Smith, Q.C.*, for defendant, Industrial Sites & Locations Ltd.

Subject: Corporate and Commercial

Corporations --- Nature of corporation — Distinct existence — From owner

Nature of corporation — Distinct existence — From owner — General — One man company — Whether alter ego or agent for incorporator — Liability of incorporator.

Plaintiff, trustee in bankruptcy of S., sought a declaration that certain land was held by defendants as trustee for plaintiff. I. was a private company organized by S., and had conveyed the land to defendant Z., a sister of S. living with him. She mortgaged it back to I. for a large amount on which no advances were in fact made. Plaintiff claimed that I. was a mere sham or alter ego for S. and it or Z. held the land as trustee for S. Held, the action should be dismissed. The evidence fell short of proving fraud or that I., although owned by S., was his mere alter ego. A controlling share interest did not in itself establish that the company was only an agent. In questions of property, of acts done, rights acquired or liabilities assumed, the company was an entity distinct from its incorporators. The company had not been formed for the express purpose of doing an illegal act nor had those in control expressly directed a wrongful thing to be done, so they were not personally liable.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457


**Thompson, J.:**

1    In this action the plaintiff as trustee of George Alexander Selkirk, a bankrupt (to whom for the sake of brevity, I shall refer as Selkirk), seeks a declaration that certain lands in the Township of North York in the Province of Ontario, described in the statement of claim, are held by the defendants, or one of them, as trustee for the plaintiff and that a certain mortgage thereupon from the defendant Zhelka to the defendant Industrial Sites and Locations Limited as mortgagee, bearing date May 2, 1960, does not constitute a valid charge. The plaintiff prays for consequential judgment vesting the lands in it as such trustee in bankruptcy, free and clear of encumbrance.

2    The determination of the issues involved revolves principally around a conveyance of the lands in question, which are of substantial value, by the corporate defendant to the individual defendant, dated May 2, 1960, and registered September 15, 1960, as No. 399806 for the Township of North York (ex. 5).

3    The defendant, Zhelka, is a sister of Selkirk, the bankrupt, and resides with him, his wife and his family of four children, at 299 Russell Hill Rd. in the City of Toronto. In fact the title to this residential property is in her name.

4    The plaintiff alleges that the corporate defendant, a private company incorporated under the laws of Ontario and promoted and organized by Selkirk, was and is to all intents and purposes, not an independent trading unit, but is and has been the mere agent of Selkirk and particularly with respect to the conveyance to Miss Zhelka.

5    It is urged in the alternative that the company, which for the purposes of convenience I refer to as "Industrial", is a mere sham, cloak, or front for or the *alter ego* of Selkirk, kept alive and operated by him for his own personal purposes and whose shareholders and directors, other than himself, are and have been his nominees and merely tools in his hands. The plaintiff goes further and argues that Industrial is but one of a group of some several similar corporations which constitute a Selkirk corporate family and whose business operations, interchange of assets, and interrelated dealings, are wholly controlled and directed by him personally to the prejudice and confusion of his personal creditors.

6    In essence, the Court is asked to rend the corporate veil, to pass beyond the line which separates Industrial as an artificial person from its creator and controller Selkirk, and to declare it to be in reality Selkirk or his mere agent and without legal entity as distinct from him, at least with relation to the lands involved.

7    The facts are complex and are made more so by the welter of contradiction throughout the evidence and the consistently inconsistent conduct of the bankrupt and the individual defendant.

8    It was said of Selkirk in the case of *Selkirk v. M.N.R.*, 63 D.T.C. 108 at p. 110 that:

   ... just about everyone who became associated with, or worked for, him suffered financially and would have been better off never to have met him.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

9      In the instant case, had he deliberately set out on a course of perplexity, he could not have done better than he in fact has. Be that as it may, the plaintiff's allegations are akin to those of fraud and the onus of proof lies heavily upon it.

10     The resolution of the present issues, in my view, can be arrived at only by a detailed consideration of the circumstances surrounding the attacked transaction between the defendants and the background facts relating to the relationship of Mr. Selkirk to Industrial.

11     The plaintiff's allegations or theories with respect to the conveyance to Miss Zhelka are that the lands were conveyed to her to hold in trust for her brother and there thus is a resulting trust in him; that the mortgage back from her is not genuine and a mere pretence; and that the whole transaction was voluntary and without consideration and was entered into with a view to preventing the property from falling into the bankrupt's estate and as a scheme between Selkirk and the defendants to that end.

12     As previously intimated, the plaintiff contends that for the purposes of the impeached transaction, the grantor, although nominally Industrial, is in reality Selkirk, or alternatively, that Industrial was merely his agent therein acting upon his direction.

13     In order to trace the relationship of Selkirk to Industrial one must go back some years.

14     Selkirk, sometimes known as Zhelka, alias George Alexander, according to his wife, is a promoter of land development. I prefer to call him simply a land trader.

15     For the purposes of carrying on such business he became a corporator of several companies. Statistically, the following appears from the evidence:

16     On August 18, 1952, Langstaff Land Development Limited was formed. This is referred to in the case of *Selkirk v. M.N.R., supra,* as being wholly owned by Selkirk, although his name does not appear as a director in the corporate returns made to the Government, the last of which was made or filed in 1958.

17     In March, 1956, Fidelity Real Estate Limited was incorporated, and, although not originally a director, the last return which was made in 1958 showed Selkirk, his father Fred Zhelka, and the defendant Cecile Zhelka, to be the directors.

18     On April 19, 1956, he promoted the incorporation of Britannia Memorial Gardens Limited. The original directors were Roy A. Dunn, John N. Dunn and Marilyn McIntyre. No departmental returns have been filed.

19     He was instrumental in the incorporation of St. George Developments Limited on August 2, 1957. Marilyn Edith Wooding (now his wife), Fedor Zhelka (apparently his father) and himself were named as the original directors. This company too has filed no annual returns.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

20     Industrial was incorporated on August 6, 1958. The petition for incorporation was presented by St. George Developments Ltd. which paid the incorporation fee. The first directors named were Joseph Daniel McNab, solicitor, Margaret de Jean and Anne Heron. No annual returns under the *Corporations Information Act*, 1953 (Ont.), c. 21 [now R.S.O. 1960, c. 72], have been filed and thus no change in directors indicated to the Government.

21     Despite the lack of information available from the public records, due to default in making returns, certain additional facts with respect to Selkirk's relationship to these companies do appear from the evidence of certain of their officers from time to time, including Mrs. Selkirk, the defendant Zhelka and three solicitors Mr. McIlwain, Mr. Mortimer and Mr. W. Scott Burrill, employed by Selkirk at different times to administer the companies, two of whom held offices therein.

22     In addition to the companies above named, Selkirk is said to have incorporated two or three other private corporations, including one operating in Nassau and one known as Concord Sand and Gravel Limited.

23     This action, as originally framed, was against the defendant Zhelka alone, and when the trial had substantially progressed, I deemed it necessary, by reason of the nature of the relief claimed, to add Industrial as a party defendant pursuant to Rule 136. Upon resuming, after the addition of Industrial as a defendant, it appeared that a good many of its books and records were not available for production; they were, for some undisclosed reason, under seizure by the Department of the Provincial Treasurer. This was so of the original minute book of the company and apparently of the share register, which Burrill said he at one time had prepared. Exhibit 44, purporting to be a minute book, is said to be only a partial duplicate copy of the original minute book and not at all complete.

24     Minutes of the meetings of directors of December 26, 1959, and of February 6, 1960, indicate that Selkirk was then president of the defendant company. Other evidence discloses that he never held or owned more than one qualifying share of stock.

25     The minutes of December 26, 1959, further indicate that stock was allotted to the following persons in consideration of past services during the years 1958 and 1959:

To Marilyn Selkirk, 100 shares, of the value of $200;

To Edna Heron [a secretary in the employ of Selkirk],

    10 shares, of the value of $20; and

To Cecile Zhelka, 125 shares, of the value of $250.

26     The company never had money in its treasury by way of subscribed capital. Its one and only asset was a tract of some 86 acres of land on Steeles Ave. between Dufferin and Keele Sts. in the Township of North York, a portion of which are the lands now called into question.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

27     This it acquired through the negotiations of Selkirk, by grant from one Rosati on January 6, 1959 (ex. 39). An option to purchase had originally been taken in the name of the secretary, Miss Heron, and which was assigned by her to Industrial.

28     The affidavit of land transfer tax appended to the Rosati deed, indicates that the consideration for the transfer was $342,122.26, of which $90,000 was paid in cash, $121,075 by way of the assumption of existing encumbrances and the balance by way of mortgage back to the vendor. Industrial, being without money or other assets at the time of the purchase, the moneys paid for the option and the extensions thereof were advanced by the associate company St. George Developments Ltd. This was applied upon the purchase price and the balance of cash paid on closing of $60,000 was advanced by another of the associated companies, Langstaff Land Developments Ltd. Promissory notes or agreements for repayment (ex. 17), were given by Industrial to these associates and signed by Selkirk.

29     A further advance by another of the Selkirk companies, Britannia Memorial Gardens Ltd., in the sum of $21,000 was made in March, 1960, to Industrial to assist it in its operations (ex. 18).

30     There is no indication that any of these advances were repaid as such, although Mrs. Selkirk testifies that the Langstaff company did receive approximately $60,000 from Industrial in the year 1961, which was used by it in the reduction of a mortgage to one Gotfrid upon lands in the Township of Markham, upon which mortgage he had commenced foreclosure proceedings. These moneys were the proceeds of a mortgage upon the lands in question made by the defendant Zhelka to one Max Gelberg (ex. 6).

31     In the meantime, in March, 1960, through the offices of Selkirk, Industrial sold and conveyed to the Municipality of Metropolitan Toronto some 45 acres of the 85-acre parcel (ex. 3). The proceeds of this sale, some $260,000, was used in discharging the existing encumbrances upon the land and in paying off a lien to the Province of Ontario for arrears under the *Corporations Tax Act*, R.S.O. 1960, c. 73.

32     Then followed the conveyance from Industrial to Miss Zhelka on May 2, 1960 (ex. 5).

33     The property retained remained clear of encumbrance until the Gelberg mortgage was given by her on January 21, 1961 (ex. 6).

34     Subsequently, Mr. Gelberg in an action for redemption by Miss Zhelka, took foreclosure proceedings upon his mortgage by way of counterclaim. That action was settled, following a sale to the Sun Oil Company Limited, negotiated by Selkirk and approved of by the Court, of a 20-acre parcel of the lands for $150,000. This money was paid into Court. The Gelberg mortgage and a further lien for corporation taxes to the Province of Ontario were satisfied. The sum of $9,249.32 by way of adjustment of interest was paid to the defendant Zhelka. This in some unexplained manner found its way into the general bank account of Fidelity Real Estate Ltd. (ex. 20).

35     I presume that the balance of the Sun Oil purchase price remains in Court. The parties to this action were all parties in the Gelberg action (ex. 21).

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

36      The defendant Zhelka pleads that the lands in question were conveyed to her as a trustee by her co-defendant and in consideration of the sum of $120,000 as evidenced by a promissory note dated May 2, 1960, given by her to Industrial. Her co-defendant, Industrial, pleads that the lands were conveyed to her in consideration of the mortgage for $120,000 from her and a further promissory note made by her in its favour for $120,000. The corporate defendant further pleads, in the alternative, that she holds the lands for it as trustee.

37      It is admitted that no moneys were advanced under the mortgage and from the evidence it appears that no moneys have been paid upon the promissory note which is said to have been drawn for two years.

38      The mortgage document, ex. 7, bears date May 2, 1960, but was not registered until January 15, 1963. It first came to light, apart from what knowledge the immediate parties to it may have theretofore had of it, if any, when Industrial sought to prove a claim upon it as second mortgagee in the Master's Office in the Gelberg action in February, 1963. This claim was supported by the affidavit of Mrs. Selkirk who purported to be president of Industrial at that time.

39      Strenuous attacks are made upon this instrument by the plaintiff. Its authenticity is called into question, the plaintiff contending that the signatures of the Commissioner taking the affidavits endorsed thereupon or appended thereto, Mr. Scott Burrill, are simulated or feigned. Considerable evidence of handwriting experts was adduced in this respect with a not uncommon contradictory result. Mr. Burrill, however, swears that the signatures are his and are genuine. Both he and Mrs. Selkirk testify that the mortgage was not sooner registered as efforts were being made to raise money upon the land by way of mortgage elsewhere and it was desired that no prior encumbrance should appear upon the title. This is consistent of course with the fact that the mortgage was a mere pretence.

40      While I entertain some skepticism about this document, I am not prepared, in the light of the contradictory evidence presented, to hold that it was not genuinely executed or that it was an afterthought.

41      However that may be, I am convinced from the evidence which I accept that this instrument was never intended to operate as a mortgage or as a genuine security upon the lands for any sum of money whatsoever.

42      I am satisfied that it was intended as a mere device, as was also the promissory note of the individual defendant, to be used in case of necessity for the purpose of defeating, hindering or delaying the creditors or prospective creditors of Industrial from recovery of their claims.

43      Mrs. Selkirk, who became president of the company shortly thereafter, and Burrill, who became the secretary, both testify that Industrial was involved in extensive litigation and that as a result of this, it was determined to convey the lands to Miss Zhelka and that she holds them for the company as a trustee. Miss Zhelka herself states, in one instance, that her brother informed her that this was the reason these lands were being transferred to her.

44      I unhesitatingly conclude that the conveyance to Miss Zhelka and the entire transaction with her was without consideration and voluntary and entered into with the intention of protecting the lands against resort thereto by the creditors and others having claims against Industrial. Undoubtedly, Selkirk was the moving factor behind the whole plan.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

45      The weak attempt of Mrs. Selkirk to explain the reason for the mortgage and promissory note was deplorable in view of her previous affidavit in support of Industrial's claim.

46      Miss Zhelka's many contradictory assertions as to the reason for the conveyance and as to the capacity in which she holds the lands served only to convince me that she had little idea of what the entire matter was about, but that she was prepared to go to any length to do her brother's bidding and to meet what she considered to be his convenience or advantage.

47      No doubt her statement upon cross-examination in the Gotfrid action to the effect that she held the lands in question for her brother has sparked this entire litigation (ex. 11). She, of course, now states at trial that she holds as a trustee for Industrial.

48      It is significant that the instrument of conveyance itself (ex. 5) is absolute in form and that the expressed consideration is nominal. The affidavit of land transfer tax is made by Selkirk; no mortgage back is mentioned; and the explanation therein given is that the grantor has held the lands as trustee for the grantee and is now transferring title. Mr. Burrill states that he drew the affidavit and that this explanation was inserted by him at Selkirk's dictation, but that he, Burrill, made an error in that he reversed or transposed the terms "grantor" and "grantee". I do not accept this statement. To give effect to it would render the explanation unintelligible. As it stands it is consistent with the avowed purpose of the transaction so that it might be indicated to others that Industrial held only as trustee and had no beneficial interest in the lands which might be exigible.

49      It is my view that there is a resulting trust in Industrial and that it never was intended that Miss Zhelka should take any beneficial interest in the property conveyed; and that despite the fact that she subsequently mortgaged the lands to Gelberg for the convenience of one of the associated companies.

50      I have no doubt that the conveyance is open to attack by the creditors of Industrial under the Statute of Elizabeth, 13 Eliz., c. 5, now the *Fraudulent Conveyances Act*, R.S.O. 1960, c. 154. The Court would not lend its assistance, however, to the grantor in the recovery of the property, were it sought by Industrial upon the principle of the maxim *in pari delicto, potior est conditio possidentis: Mundell v. Tinkis (1883), 6 O.R 625; Scheuerman v. Scheuerman (1915), 10 W.W.R. 379, 52 S.C.R. 625, 28 D.L.R. 223.*

51      Even if the plaintiff were successful in its contention that Industrial is merely the agent or the *alter ego* of Selkirk, it is doubtful whether the plaintiff claiming through Selkirk, the bankrupt, could acquire any greater rights than he could in the face of the maxim quoted. It is also questionable as to whether, in that event, it could avoid the transaction under the general policy of the bankruptcy law or as a "settlement" within the meaning of s. 60 of the *Bankruptcy Act*, R.S.C. 1952, c. 14. It would, however in such event, be open to attack by the trustee as a conveyance fraudulent as against creditors of the debtor.

52      These considerations, however, become academic by reason of the fact that the plaintiff does not attack the transaction as a settlement or otherwise under the *Bankruptcy Act*, nor as a conveyance fraudulent against the debtor's creditors. The case is framed upon the premise that the property is held by the defendants or one of them as agent or

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

trustee for the debtor and that it constitutes part of his estate or property passing to the plaintiff upon bankruptcy.

53    Such considerations become still more academic in the light of the view I ultimately adopt as to the relationship between the debtor Selkirk and Industrial.

54    There can be little doubt that the companies forming Selkirk's corporate structure were interrelated in the sense that there were transfers of assets from one to another or advances of money as between them, although none of them was a subsidiary of another in the true sense of the word.

55    It equally appears from the evidence that the only person to benefit financially from or to receive moneys arising from their operation was Selkirk himself.

56    The picture as to their procedures, however, is not altogether clear. The absence of records leaves substantial gaps in the evidence. Selkirk, himself, the one who, if he would, could have thrown much light upon the scene, was not called as a witness. Too much has been left to unsafe conjecture and frequently that which might have developed into proof has become arrested on the border of suspicion.

57    It does appear that Selkirk resigned as president of Industrial on May 31, 1960. His resignation was accepted at a meeting of the shareholders on June 2, 1960, the minutes of which recite that his qualifying share had been turned in for cancellation and had been transferred to W. Scott Burrill in order to maintain the required minimum number of shareholders.

58    Burrill states that there was no consideration passing for the transfer. Selkirk was adjudged a bankrupt on September 29, 1960, upon a petition filed on June 21, 1960. It may well be that this transfer of his share is void as against the trustee, the plaintiff, and that Selkirk's interest in the company, whatever it may be passes as part of his property to his trustee.

59    After his resignation as president, the defendant Zhelka, already a shareholder, was elected a director. Following his resignation, Selkirk was named as manager of the company and a resolution of the directors of October 20, 1961 purports to confer upon him wide powers with relation to the company's business and even goes so far as to purport to reinstate him as a director and officer in the event that he should be successful in a pending appeal from the receiving order against him.

60    He is even found, despite his resignation and his disqualification as a director by reason of his bankruptcy, signing the Gelberg mortgage in January, 1961, as president of the company.

61    With respect to the associated companies, Selkirk appears as a director of St. George Developments Ltd. in 1957 and as a director of Fidelity Real Estate Ltd. in 1958. His interest by way of stock in any of the other companies, except Industrial, is not disclosed by the evidence. There is some indication that he was at times the sole signing officer of Langstaff Land Development Ltd. and St. George Developments Ltd.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

62      It would appear from the report of the decision in *Selkirk v. M.N.R., supra*, that in 1952, the Langstaff company was wholly owned by him and that he conveyed a portion of the Markham Township land acquired by him to it, for a consideration, a large part of which had not been paid by April, 1960. It is there stated that in 1952 Langstaff had no money. This, however, was not the situation by the year 1959, for at that time Langstaff advanced to Industrial some $60,000 to enable it to purchase the Steeles Ave. property.

63      While the reported reasons for judgment of the Tax Appeal Board in that case indicate that Langstaff, for the purposes of the matters there being considered, was but the agent of Selkirk rather than functioning as a separate entity, this was not one of the issues raised nor was it argued as such and is mere *obiter*. As appears from the evidence in the instant case, and as already stated, that situation, in any event, had been altered by the year 1959. In fact the witness Mr. Lloyd A. May, a solicitor who acted in the Gotfrid action, states that by the year 1961, the Markham Township property, which had been originally owned by Selkirk, had found its way into the hands of St. George Developments Ltd., not Langstaff, with the exception of two lots which were then owned by the defendant Zhelka.

64      The evidence clearly demonstrates that George A. Selkirk always had and retained in fact complete control over all these companies upon which the evidence touches. He dictated the corporate policy in each case and was the moving and directing force in all of their business operations. The directors and officers, and particularly in the case of Industrial, were his nominees, including members of his immediate household and family, and were subject to his influence and I have no doubt to his domination. To all intents and purposes Industrial and its associated companies were one-man companies.

65      In reaching such conclusions, I am, I may say, quite uninfluenced by any alleged admissions or statements said to have been made by Selkirk. There are instances throughout the evidence of statements alleged to have been made to others by him. He is not a party to the action and such could not form admissible evidence for the plaintiff. Either one must consider them as entirely hearsay or as self-serving statements.

66      We are here, of course, primarily concerned only with Selkirk's relationship to Industrial. His connection with the other companies and their interconnection with Industrial is only of importance in so far as it may tend to establish a pattern of conduct. Industrial, despite its default in Government returns and irregularity in its proceedings, was regularly incorporated and has been kept alive as a corporate entity. Its charter has not been revoked under s. 326 of the *Corporations Act*, R.S.O. 1960, c. 71, although, apparently, it has been under departmental investigation. In 1963, it was still being taxed and some $14,000 levied against it under the *Corporations Tax Act* (ex. 21).

67      There is no evidence to indicate that when Industrial was incorporated in 1958, that Selkirk was insolvent; and nowhere is evidence to be found tracing any of Selkirk's personal assets into the hands of Industrial. The only indication that any of his personal assets passed into any of his companies is in the dictum in *Selkirk v. M.N.R.* earlier referred to. There is no intimation that at that time Selkirk was insolvent or that the transfer was in any way irregular or questionable. It does appear that later the Langstaff company advanced moneys to Industrial, but by the same token, it appears that Industrial still later advanced or repaid to Langstaff an approximately equal sum. I can see nothing unlawful or illegal *per se*, as against the personal creditors of Selkirk, in these interchanges of funds between companies. Even if there were an unlawful element, the only persons who were injured or damnified would be the shareholders or creditors of the companies involved. It is true that Selkirk has benefited personally from activities of his companies in

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

dealings or transactions of questionable validity.

68      Industrial seldom had a bank account. Rental from the buildings upon the lands in question was received by his nominee or nominees rather than by Industrial. None of it, however, has been traced into his own hands, although one might suspect that some of it at least did reach him. In any event, only a small portion of it accrued due and was paid before his bankruptcy.

69      Fidelity Real Estate Ltd. appears recently to be the only one of the companies operating with a bank account and Industrial was indirectly the recipient of some of its funds.

70      The moneys paid to Miss Zhelka upon the settlement of the Gelberg action, some $9,249, went into the Fidelity bank account. These were really the funds of Industrial. Out of that account were paid some of Selkirk's personal bills for clothing, a retaining fee to a solicitor acting for him upon a criminal charge or charges of fraud pending against him and a sum offered by him by way of restitution in connection with such charge.

71      Whether Selkirk was entitled to moneys by way of salary or otherwise from Fidelity does not appear. If he was, at the time of such payments, a director of Fidelity as he once was, and the moneys were merely a loan or an advance to him, the transaction of course would fall within the prohibition of the *Corporations Act* respecting loans to shareholders.

72      The sum and substance of all this is that Selkirk has received some comparatively minor benefits from the operation of his companies and at times in a manner which, so far as regularity is concerned, is questionable. An aura of suspicion has been cast about him. I have no doubt that where his personal advantage is concerned he would go a long way.

73      But the question remains, in what way has his association with his corporate offspring injured, defeated or prejudiced his personal creditors? Apart from a small portion of the rents which he may have received, if any, from the buildings on the Steeles Ave. lands, it would appear that all benefits have accrued since his bankruptcy and really fall into the category of after-acquired property, to which recourse by the trustee is under the provisions of the *Bankruptcy Act*.

74      This is not a case where a debtor or a prospective debtor has transferred his own assets to a corporation of his making for the purpose of avoiding existing personal liabilities or obligations; nor is it a case where he has personally made a secret or clandestine profit by such a transfer.

75      There is here no claim or complaint by any creditor, if such there now be, of Industrial or its associated companies, nor by any director or shareholder.

76      In a critical analysis of the situation, one asks oneself just where is any fraud upon Selkirk's personal creditors being perpetrated by the operation of his companies and his conduct with relation thereto? To me the evidence falls short of establishing that.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

77      No doubt his creditors are disappointed at their inability to have access to his corporate assets and particularly where he himself is reaping some financial benefit therefrom. But that must of necessity be, so long as the Legislature provides for and encourages the formation of private corporations. Without such, of course, enterprise and business adventure would be stifled. Limited liability is one of the landmarks of incorporation.

78      The plaintiff as trustee in bankruptcy for some reason apparently has not seen fit to follow any funds reaching the hands of his debtor as after-acquired property nor to intervene with respect thereto.

79      The cases in which the Courts, both in this Province and in England, have seen fit to disregard the corporate entity or personality, and instead to consider the economic realities behind the legal facade, fall within a narrow compass. The Legislature, in the fields of revenue and taxation, and particularly with respect to true subsidiaries, has made much greater departure in this respect. Such cases as there are, illustrate no consistent principle. The only principle laid down is that in the leading case of *Salomon v. Salomon & Co., Ltd.*, [1897] A.C. 22; and in general such principle has been rigidly applied. Briefly stated, it is that the legal *persona* created by incorporation is an entity distinct from its shareholders and directors and that even in the case of a one-man company, the company is not an alias for the owner.

80      The exceptions would appear to represent refusals to apply the logic of the *Salomon* case where it would be flagrantly opposed to justice.

81      Counsel have presented me with an exhaustive review of these authorities. I can see no useful purpose in here reiterating it. The conclusions to be drawn from the cases as a whole were well stated by Mr. Justice Masten in his article on "'One Man Companies' and their Controlling Shareholders" at 14 *Can. Bar Rev.* 663 (1936), where he discusses the authorities.

82      In questions of property and capacity, of acts done and rights acquired or liabilities assumed, the company is always an entity distinct from its corporators. It is not an alias or a sham and the principle of the *Salomon* case stands unimpaired.

83      If a company is formed for the express purpose of doing a wrongful or unlawful act, or, if when formed, those in control expressly direct a wrongful thing to be done, the individuals as well as the company are responsible to those to whom liability is legally owed.

84      In such cases, or where the company is the mere agent of a controlling corporator, it may be said that the company is a sham, cloak or *alter ego*, but otherwise it should not be so termed.

85      Whether an individual has constituted the company his agent is a question of fact in each case. A controlling or total share interest does not in itself establish such agency. Due regard must be had to law of principal and agent relating to the formation of the relationship.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1967 CarswellOnt 144, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457

86      Although the instant case may be close to the line, the plaintiff has failed to satisfy me that I should declare Industrial to be his *alter ego* or his mere agent for the conduct of his personal business or for the purposes of the conveyance in question to the defendant Zhelka. In the result, the action must be dismissed.

87      As I have previously intimated, I think the defendant Zhelka has invited these proceedings. I fail to see how the plaintiff, as trustee for the creditors of Selkirk, could afford to stand idly by in the face of her earlier statement in the Gotfrid action that she was holding the lands in question for her brother. It was, as events have proven, a false statement, or at least a totally irresponsible one; but the plaintiff in my view on the strength of it was justified in seeking judicial investigation of the whole matter.

88      In view of the relationship between the defendants and of the fact that the alternative plea by the corporate defendant that Miss Zhelka holds the lands in trust for it is virtually a plea asserting its own fraud against its creditors, I do not feel that it should have costs.

89      Under the circumstances there will be no order as to costs and the action will therefore be dismissed without costs.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works