# Index No. 16

Westlaw.

Page 1

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146



1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co.

Transamerica Life Insurance Company of Canada (plaintiff / respondent) and The Canada Life Assurance Company and Canada Life Mortgage Services Ltd. (defendants / moving party)

Ontario Court of Justice (General Division)

Sharpe J.

Judgment: May 1, 1996
Docket: Toronto 92-CQ-27566

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Earl Cherniak, Q.C., Paul Bates* and *Simon Clements*, for plaintiff / respondent.

*Robert Armstrong, Q.C., Robert Rueter* and *Stephanie Willson*, for defendants / moving party.

Subject: Civil Practice and Procedure

Corporations --- Nature of corporation — Distinct existence — Lifting the corporate veil

Corporations — Nature of corporation — Distinct existence — Lifting the corporate veil — Defendant parent and wholly-owned subsidiary being completely separate entities — Parent company not having any control over subsidiary nor involved in any way with plaintiff's dealing with subsidiary — No basis existing for piercing corporate veil.

The plaintiff made 54 mortgage loans between 1983 to 1989 which had been arranged by the defendant. A number of those mortgages had fallen into default in an alleged loss of approximately $60 million. The plaintiff alleged that the defendants owed it a duty to do the underwriting for the loans and that it failed to do so. The plaintiff sued the defendants for damags for breach of contract, breach of fiduciary duty, fraud, misrepresentation and negligence. One of the defendants was the wholly owned subsidiary of the other. The plaintiff asserted that the parent company is liable for the wrongs of its subsidiary. The parent company moved for summary judgment dismissing the action against it on the basis that there was no triable issue as to its liability to the plaintiff. The plaintiff contended that there existed a

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

basis for piercing the corporate veil, and for holding the parent company liable as an accessory to a breach of fiduciary duty of its subsidiary and liable as an accesory for the alleged misrepresentation of the subsidiary.

**Held:**

The motion was granted.

The parent company satisfied the onus of demonstrating that there was no genuine issues for trial respecting its liability to the plaintiff. The subsidiary and parent companies had their own head offices and branch offices, their own bank accounts and were managed and operated independently of one another. There was an arm's length relationship between the defendants. There was no evidence that any officer, employee or agent of the parent company was in any way involved with the dealings between the plaintiff and the subsidiary. There was no basis for piercing the corporate veil as there existed no principal-agent relationship between the two defendants. The parent did not control the subsidiary and there was no evidence to indicate any involvement in the impugned transactions between the plaintiff and the parent company. The plaintiff failed to demonstrate that there existed any triable issues with respect to the parent company's liability on the basis of its being an accessory to a breach of fiduciary duty or a misrepresentation.

    **Cases considered:**

  *Air Canada v. M & L Travel Ltd. (1993), 50 E.T.R. 225, 159 N.R. 1, [1993] 3 S.C.R. 787, 67 O.A.C. 1, 15 O.R. (3d) 804 (note), 108 D.L.R. (4th) 592* — *considered*

  *Aluminum Co. of Canada v. Toronto (City), [1944] S.C.R. 267, [1944] 3 D.L.R. 609* — *referred to*

  *Australian Securities Commission v. A.S. Nominees Ltd. (1995), 133 A.L.R. 1* — *referred to*

  *B.G. Preeco I (Pacific Coast) Ltd. v. Bon Street Holdings Ltd. (1989), 4 R.P.R. (2d) 74, 37 B.C.L.R. (2d) 258, 43 B.L.R. 67, (sub nom. B.G. Preeco I (Pacific Coast) Ltd. v. Bon Street Developments Ltd.) 60 D.L.R. (4th) 30* (C.A.) — *applied*

  *Bank of Montreal v. Canadian Westgrowth Ltd. (1990), 102 A.R. 391, 72 Alta. L.R. (2d) 319* (Q.B.) [affirmed (1992), 2 Alta. L.R. (3d) 221, 135 A.R. 49, 33 W.A.C. 49 (C.A.)] — *referred to*

  *Barnes v. Addy (1874), 9 Ch. App. 244* (C.A.) — *referred to*

  *Clarkson Co. v. Zhelka, [1967] 2 O.R. 565, 64 D.L.R. (2d) 457* (H.C.) — *distinguished*

  *Covert v. Nova Scotia (Minister of Finance), [1980] 2 S.C.R. 774, 8 E.T.R. 69, (sub nom. Jodrey Estate v. Nova Scotia) 41 N.S.R. (2d) 181, 32 N.R. 275, (sub nom. Jodrey v. Nova Scotia (Minister of Finance)) [1980] C.T.C. 437* — *distinguished*

  *Gold v. Rosenberg (1995), 9 E.T.R. (2d) 93, 129 D.L.R. (4th) 152, 86 O.A.C. 116, 25 O.R. (3d) 601* (C.A.) —

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

*considered*

*Gregorio v. Intrans-Corp.* (1994), 4 M.V.R. (3d) 140, 18 O.R. (3d) 527, 72 O.A.C. 51, 115 D.L.R. (4th) 200, 15 B.L.R. (2d) 109 (C.A.) [additional reasons at (1994), 15 B.L.R. (2d) 109n (Ont. C.A.)] — *considered*

*Kosmopoulos v. Constitution Insurance Co.*, 22 C.C.L.I. 296, [1987] 1 S.C.R. 2, *(*sub nom. *Kosmopoulos v. Constitution Insurance Co. of Can.)* [1987] I.L.R. 1-2147, 74 N.R. 360, 21 O.A.C. 4, *(*sub nom. *Constitution Insurance Co. of Can. v. Kosmopoulos)* 34 D.L.R. (4th) 208, *(*sub nom. *Kosmopoulos v. Constitution Insurance Co.)* 36 B.L.R. 233 — *considered*

*Pizza Pizza Ltd. v. Gillespie* (1990), 75 O.R. (2d) 225, 45 C.P.C. (2d) 168, 33 C.P.R. (3d) 515 (Gen. Div.) — *referred to*

*Royal Brunei Airlines Sdn Bhd v. Tan*, [1995] 3 W.L.R. 64 (P.C.) — *referred to*

*Salomon v. Salomon & Co.*, [1897] A.C. 22, [1895-99] All E.R. Rep. 33, 4 Mans. 89 (H.L.) — *applied*

*W.D. Latimer Co. v. Dijon Investments Ltd.* (1992), 12 O.R. (3d) 415 (Gen. Div.) — *referred to*

*801962 Ontario Inc. v. MacKenzie Trust Trust Co.*, [1994] O.J. 2105 [unreported] — *considered*

*1061590 Ontario Ltd. v. Ontario Jockey Club* (1995), 43 R.P.R. (2d) 161, 16 C.E.L.R. (N.S.) 1, 21 O.R. (3d) 547, 77 O.A.C. 196 (C.A.) — *referred to*

**Statutes considered:**

Competition Act, R.S.C. 1985, c. C-34

s. 36(4)*referred to*

s. 52(1)*considered*

MOTION for summary judgment dismissing action against moving party for disclosing no genuine triable issue.

*Sharpe J.*:

**Introduction**

1      In the period 1983 to 1989, the plaintiff, Transamerica Life Insurance Company of Canada, made fifty-four mortgage loans which were arranged by the defendant Canada Life Mortgage Services Ltd. ("CLMS"). A number of

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

the mortgages have fallen into default, resulting in an alleged loss of some $60 million. Transamerica asserts that CLMS owed it a duty to do the underwriting (due diligence, risk assessment and analysis) for these loans, that CLMS failed in that regard, and that Transamerica has suffered loss as a consequence. In its claim against CLMS, Transamerica pleads breach of contract, breach of fiduciary duty, fraud, misrepresentation and negligence. CLMS denies that it owed Transamerica any duty to underwrite the loans, asserts that it acted throughout simply as a mortgage broker, and contends that it was for Transamerica to do its own underwriting and due diligence with respect to the loans in question.

2      CLMS is the wholly owned subsidiary of The Canada Life Assurance Company. Transamerica asserts that Canada Life liable for the wrongs of CLMS on a variety of grounds and has joined Canada Life as a defendant to this lawsuit. Canada Life asserts that it had nothing to do with the mortgages in question and that there is no basis for the claim that it is legally responsible for the alleged wrongs of its wholly-owned subsidiary, CLMS. Canada Life brings this motion for summary judgment on the grounds that Transamerica had failed to show that there is a triable issue as to Canada Life's liability and asks that the action against it be dismissed.

**Issues**

3      Transamerica bases its claim against Canada Life on three grounds which, it asserts, permit the court to look behind the separate corporate existence of CLMS and attach liability to its sole shareholder, Canada Life. These assertions give rise to the following issues on this motion for summary judgment.

   1. Is there a basis for "piercing the corporate veil" and holding Canada Life liable for the acts of its wholly owned subsidiary, CLMS?

   2. Is there a basis for holding Canada Life liable as an accessory to a breach of fiduciary duty by CLMS?

   3. Is there a basis for holding Canada Life liable for the alleged misrepresentations of CLMS either at common law, or under the *Competition Act*?

**Facts**

4      CLMS was incorporated in 1974 to carry on business as a mortgage correspondent and general financial agent. Before the creation of CLMS, Canada Life had regularly invested in mortgages originated by its branch offices. The branches produced more mortgage investment opportunities than Canada Life could handle and Canada Life decided to incorporate CLMS to carry on the business of mortgage correspondent and to deal with both Canada Life and other institutional investors. As CLMS was to be a wholly owned subsidiary, governing legislation required Canada Life to obtain the consent of the Department of Insurance, now Office of the Superintendent of Financial Institutions ("OFSI"), to its incorporation. The Department of Insurance was satisfied that the proposed business of CLMS was ancillary to the business of insurance as required by s. 65 of the Canadian and British Insurance Companies Act. Henry Heft, the employee of the Department of Insurance who dealt with the CLMS matter, testified that under the legislation, the Department was not interested in the way in which CLMS carried on its business, but only that it was ancillary to the business of insurance, that Canada Life's investment was not unreasonable and properly accounted for,

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

and that CLMS did not exceed the powers it was given under its letters patent. It was Heft's understanding that the activity of a mortgage correspondent was to "be there for the service of people wanting to invest funds, and also for the service of people looking for the funds." The Department took no interest in whether the borrower or the lender paid CLMS a fee and knew that CLMS would be dealing with borrowers in all aspects of the proposed mortgage business. Para. (a)(ii) of the CLMS objects provides:

> to assist in the development, financing, construction and promotion of various real and immoveable properties, including research and feasibility studies relating to commercial, industrial, residential and public and private undertakings.

Heft understood this to refer to providing or obtaining financing for owners of real estate, in other words, borrowers.

5     It was Heft's evidence that the Department was not concerned about CLMS engaging in the business of assisting borrowers. Heft also testified that the Department did not address the particular matter of whether the due diligence review, analysis and risk assessment was the function of the insurance company lender or CLMS as mortgage broker. It was, however, his own personal understanding that this would be the responsibility of the lender.

6     In March 1981, Transamerica and CLMS established a "Master Agreement" to govern their relationship, and in the period to 1989, Transamerica invested in 54 mortgages originated by CLMS pursuant to this agreement. The terms of this agreement do not specifically provide that CLMS is to perform any underwriting function on Transamerica's behalf. CLMS takes the position that the agreement excludes this duty and asserts that is does not engage in the business of underwriting mortgage loan proposals for any lender. CLMS has an agreement with Canada Life in terms virtually identical to the Transamerica agreement and Canada Life does its own due diligence, review and risk assessment of proposed loans and does not look to CLMS to perform this function. The interpretation of the agreement and the nature of the relationship between CLMS and Transamerica is hotly disputed as Transamerica takes the position that CLMS was responsible for the underwriting function with respect to the loans it made.

7     The relationship between CLMS and Canada Life is as follows. CLMS has its own head office and branch offices distinct from those of Canada Life. CLMS has its own bank accounts. It is and was managed and operated independently of Canada Life. CLMS management exercises independent discretion in conducting the business of CLMS. Apart from the president, the senior management of CLMS is independent of Canada Life. Two vice-presidents have overall responsibility for the affairs of CLMS. The president of CLMS is a Canada Life employee. He spends a very small percentage of his time on CLMS business and he plays no role on the day to day management of CLMS. While his salary is paid by Canada Life, the portion of it attributable to the time he spends on CLMS business is charged back to CLMS. Canada Life does provide CLMS with certain administrative services, including payroll, salary records and legal services. The cost of these services is billed to CLMS by Canada Life, and responsibility for hiring, promotion and remuneration of CLMS employees remains that of CLMS management. All members of the CLMS board of directors and the president of CLMS are senior executives of Canada Life.

8     Canada Life and CLMS take the position that the exigencies of the market required there to be an arm's length relationship between the two companies. They contend that prospective lenders, including Transamerica, were concerned that Canada Life would be in a favoured position and "cherry-pick" the best investments, and for that reason,

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

CLMS was operated as a business entirely separate and independent of Canada Life.

9      The individual who dealt directly with Transamerica during the relevant period, Stuart Pearson, was the branch manager of the Toronto Regional Branch. He reported to Tom Deegan, one of the two vice-presidents. Pearson and Deegan were both employees of CLMS and neither had any duties or responsibilities to Canada Life. The affidavit of J. Gordon Fleming, President and Chairman of the Board of CLMS from 1984 to 1994 describes the involvement, or lack thereof, of Canada Life in the dealings between CLMS and Transamerica:

> All business dealings between CLMS and Transamerica were conducted by CLMS employees directly with Transamerica employees. There has been absolutely no involvement in the business dealings between CLMS and Transamerica by directors, officers or employees of Canada Life other than the presence of representatives of Canada Life in discussion with Transamerica about this litigation commencing in 1992. There was never any involvement in the actual business dealings between CLMS and Transamerica that gives rise to this litigation by the directors, officers or employees of Canada Life not indeed was there even any knowledge of it by them.

10     There is no evidence, subject to what follows relating to certain meetings in 1989, that Mr. Fleming or any other Canada Life officer or employee were involved in any way in the dealings between CLMS and Transamerica. The relationship between CLMS and Transamerica was not discussed by the Board of Directors of CLMS. Apart form six letters from the legal department of Canada Life, acting in the capacity of solicitors for CLMS, there is no evidence of any communication whatsoever between Canada Life and Transamerica in relation to the transactions at issue in this suit prior to the initiation of proceedings.

11     As noted already, the president of CLMS, Mr. Fleming and his predecessor, R.D. Radford, were the only officers of CLMS who were also officers of Canada Life. There is no evidence to suggest that Mr. Radford was aware of or involved with Transamerica. Fleming's involvement prior to the initiation of proceedings was as follows. In 1989, senior officers from Transamerica's parent came to Toronto to conduct a review of the mortgage investment practices and procedures of Transamerica. The inferences to be drawn from this review is a matter of dispute between CLMS and Transamerica. Transamerica takes the position that this review should have made it apparent to CLMS that Transamerica was relying on CLMS for underwriting advise in relation to the mortgages in which it was investing. CLMS takes the position that the review suggested otherwise and points to the fact that a report of the review recognized that Transamerica should not be relying on CLMS for underwriting but rather should ensure it had internal capacity to perform that function. The significance of this review will be an issue for trial as between CLMS and Transamerica. For the purposes of this motion, Transamerica argues that there is evidence that Fleming became aware of the review and that his failure to set the record straight as to the nature of the service being provided by CLMS to Transamerica is sufficient to fix liability on Canada Life. The only evidence of Fleming's awareness is as follows. The defendants have produced an extract from a minute of a CLMS management meeting of June 28, 1989, of Fleming and the two vice-presidents, Curtin and Deegan:

> Mr. Fleming was advised of a visit from the Senior Vice-President of Transamerica who was conducting an "underwriting audit" of their mortgage dealings in Canada. Attending the meetings were Joseph Barbieri, Bob Clarke and myself.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

> Transamerica was interested in mortgage financing in Canada and their questions were mainly directed to types of financings, building construction, appraisals, etc. There was no criticism or our services either from the branch or head office.

12     Transamerica takes the position that this is sufficient to fix Fleming, and through Fleming, Canada Life, with knowledge of the breach of contract, breach of fiduciary duty, and misrepresentations alleged against CLMS. In my view, this assertion reads far more into the minute than is warranted by the minute itself and by the balance of the evidence surrounding the meetings of the visiting Transamerica executives. Fleming denies that he was told that Transamerica thought that CLMS was doing the underwriting. It was his evidence that during the course of a meeting that lasted about two minutes, he was told that CLMS had had a visit from Transamerica. He stated that he is almost certain that this was the first time he learned that CLMS was doing business with Transamerica and that he considered it to be a routine matter for an investor to come to learn more about the mortgage market in Canada. He agreed that if he had been made aware that Transamerica was operating under the mistaken impression that CLMS was doing the underwriting for the loans, he would have instructed the CLMS staff to set the matter straight, but the information he was given did not convey that information.

**Analysis**

***1. Is there a basis for "piercing the corporate veil" and holding Canada Life liable for the acts of its wholly owned subsidiary, CLMS?***

13     On behalf of Transamerica, Mr. Bates submits that the applicable legal test for piercing the corporate veil can be stated no more precisely that this: the corporate veil will be pierced when it is "just and equitable" to do so. As authority for that proposition, reliance is placed on the following passage from the judgment of Wilson J. in *Constitution Insurance Co. v. Kosmopolous*, [1987] 1 S.C.R. 2 at pp. 10-11:

> As a general rule a corporation is a legal entity distinct from its shareholders: Salomon v. Salomon & Co. [1897] A.C. 22 (H.L.). The law on when a court may disregard this principle by "lifting the corporate veil" and regarding the company as a mere "agent" or "puppet" of its controlling shareholder or parent corporation follows no consistent principle. The best that can be said is that the "separate entities" principle is not enforced when it would yield a result "too flagrantly opposed to justice, convenience or the interests of the Revenue": L.C.B. Gower, Modern Company Law (4th ed. 1979) at p. 112. I have no doubt that theoretically the veil could be lifted in this case to do justice ... But a number of factors lead me to think it would be unwise to do so.

14     If accepted, the argument advanced by Transamerica would represent a significant departure from the principle established in *Salomon v. Salomon & Co.*, [1897] A.C. 22 (U.K. H.L.) at 51 per Lord Macnaughten:

> The company is at law a different person altogether from the subscribers to the memorandum; and, though it may be that after incorporation the business is precisely the same as it was before, and the same persons are managers, and the same hands receive the profits, the company is not in law the agent of the subscribers or trustee for them. Nor are the subscribers as members liable, in any shape or form, except to the extent and in the manner provided by the Act.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

15      In my view, the argument advanced by Transamerica reads far too much into a dictum plainly not intended to constitute an in depth analysis of an important area of the law or to reverse a legal principle which, for almost 100 years, has served as a cornerstone of corporate law.

16      It was conceded in argument that no case since Kosmopolous has applied the preferred "just and equitable" test. In Kosmopolous itself, the Supreme Court, including Wilson J., rejected the submission that the corporate veil be lifted. Moreover, it will be noted that Wilson J. does not use the phrase "just and equitable" but rather quotes a passage from an English text which describes the test in must more stringent terms.

17      Two recent judgments of this court have refused to read the Kosmopolous dictum as granting carte blanche to lift the corporate veil absent fraudulent or improper conduct: *W.D. Latimer Co. v. Dijon Investments Ltd.* (1992), 12 O.R. (3d) 415 (Gen. Div.); *801962 Ontario Inc. v. MacKenzie Trust Co.*, [1994] O.J. No. 2105 [unreported]. In the MacKenzie case, Spence J. reviewed the case-law in detail and concluded:

> These decisions do not support a claim that the test in Salomon v. Salomon has been superseded by a new "business entity" or "single business entity" test. They merely illustrate the principle that, in particular fact situations, where the nature of the legal issue in dispute makes it appropriate to have regard to the larger business entity, the court is not precluded by Salomon v. Salomon from doing so. In a few cases, there are statements that the court will lift the corporate veil "where injustice would otherwise result." I am not able to conclude that such statements are intended to remove the authority of the Salomon principle. I think they may be more in the nature of a shorthand formulation reflecting the approach of the courts in the cases discussed above.

18      The proposition that the dictum of Wilson J in Kosmopolous suggests a fundamental shift in the law was also rejected by the British Columbia Court of Appeal in *B.G. Preeco I (Pacific Coast) Ltd. v. Bon Street Holdings Ltd.* (1989), 37 B.C.L.R. (2d) 258 (C.A.). Seaton J. observed (at 267) that the passage quoted in Kosmopolous from Gower, Modern Company Law, concluded with a passage which disapproved of the free-wheeling "just and equitable" approach:

> The most that can be said is that the courts' policy is to lift the veil if they think that justice demands it and they are not constrained by contrary binding authority. The results in individual cases may be commendable, but it smacks of palm-tree justice rather than the application of legal rules.

Seaton J.A. went on to quote a Canadian text, Welling, Corporate Law in Canada (1984) at p. 129, which disapproved of the approach of some American cases to adopt a general fairness test:

> Little need be said about this rationale, other than that it simply will not do. There are, so far as we know, no such broadly enforceable standards of "fair play and good conscience," at least in Canadian corporate law.

19      It should also be noted that the most recent edition of Gower, Modern Company Law, (5th ed., 1992) puts the test for lifting the corporate veil in much more stringent terms. The authors review the decision of the English Court of

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

Appeal in Adams v. Cape Industries plc, [1991] 1 All E.R. 433 which, they state (at p. 125) "subjected lifting the veil to the most exhaustive treatment that it has yet received in the English (or Scottish) courts." The authors conclude that the Adams decision significantly attenuates the grounds for lifting the veil, and they make no suggestion, as they did in the earlier edition cited in Kosmopolous, that the test is anything like a "just and equitable standard: (at 132-133)

>   There seem to be three circumstances only in which the courts can do so. These are:
>
>   > (1) When the court is construing a statute, contract or other document.
>   >
>   > (2) When the court is satisfied that a company is a "mere facade" concealing the true facts.
>   >
>   > (3) When it can be established that the company is an authorized agent of its controllers or its members, corporate or human.

20      In a recent judgment of the Ontario Court of Appeal, *Gregorio v. Intrans-Corp.* (1994), 18 O.R. (3d) 527 (C.A.) at 536, Laskin J.A. restated the legal principles relating to the liability of a parent company for the acts of its subsidiary as follows:

>   Generally, a subsidiary, even a wholly owned subsidiary, will not be found to be the alter ego of its parent unless the subsidiary is under the complete control of the parent and is nothing more that a conduit used by the parent to avoid liability. The alter ego principle is applied to prevent conduct akin to fraud that would otherwise unjustly deprive claimants of their rights.

21      There are undoubtedly situations where justice requires that the corporate veil be lifted. The cases and authorities already cited indicate that it will be difficult to define precisely when lifting the corporate veil is to be lifted, but that lack of a precise test does not mean that a court is free to act as it pleases on some loosely defined "just and equitable" standard. There may be a principal-agent relationship between two related corporations which leads to liability despite separate legal personalities: see *Gower, supra*; *Clarkson Co. v. Zhelka*, [1967] 2 O.R. 565 (H.C.) at 578. It is also the case that the courts will look behind corporate structures where necessary to give effect to legislation, especially taxation statutes: see *Gower, supra*; *Covert v. Nova Scotia (Minister of Finance)*, [1980] 2 S.C.R. 774. Neither of these two exceptions applies to the situation of the case at bar.

22      As just indicated, the courts will disregard the separate legal personality of a corporate entity where it is completely dominated and controlled and being used as a shield for fraudulent or improper conduct. The first element, "complete control", requires more than ownership. It must be shown that there is complete domination and that the subsidiary company does not, in fact, function independently: *Aluminum Co. of Canada v. Toronto (City)*, [1944] S.C.R. 267 at 271; *Bank of Montreal v. Canadian Westgrowth Ltd.* (1990), 72 Alta. R. (2d) 319 (Q.B.). The evidence before me indicates that the relationship between Canada Life and CLMS was that of a typical parent and subsidiary. While CLMS is wholly owned by Canada Life and its board of directors is comprised of Canada Life executives, I have found that it does have an independent management and conducts a business separate and distinct from that of its parent. There is, in my opinion, no evidence sufficient to give rise to a triable issue that CLMS is the mere puppet of Canada Life.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

23      The second element relates to the nature of the conduct: is there "conduct akin to fraud that would otherwise unjustly deprive claimants of their rights?" In my view, while Transamerica has alleged fraud against CLMS, there is no evidence to suggest that Canada Life has any involvement in that alleged fraud, apart form the fact that CLMS is its wholly-owned subsidiary. The officers and employees of Canada Life were not involved in the dealings between CLMS and Transamerica, and no evidence has been advanced sufficient to give rise to a triable issue that Canada Life is somehow using CLMS as a shield for some nefarious purpose.

24      It is submitted that this is a developing area of the law, and that it would be wrong for me to grant summary judgment and thereby preclude having the issue fully considered at trial in light of all the evidence. As I have already indicated, it is my view that the law in this area is not developing at anything close to the extent submitted by Mr. Bates. Moreover, there is nothing in the facts of this case to suggest that this would be a case where the court might be tempted to lift the corporate veil in the interest of doing justice between the parties. Transamerica has simply not been able to make out a triable issue or arguable case that the court should look behind the corporate veil. There has been extensive discovery, cross-examination on affidavits and this motion has been pending for almost an entire year. Transamerica has had the fullest possible opportunity to advance its case. It is clearly established that on a motion for summary judgment, a party is no longer entitled to sit back and rely on the possibility that more favourable facts may develop at trial. To avoid summary judgment, a party is required to put its best foot forward. The onus remains on the moving party to show that there is no genuine issue for trial, but the responding party must "lead trump or risk losing": *Pizza Pizza Ltd. v. Gillespie* (1990), 75 O.R. (2d) 225 (Gen. Div.); *1061590 Ontario Ltd. v. Ontario Jockey Club* (1995), 21 O.R. (3d) 547 (C.A.). In my view, Transamerica has failed to present evidence to indicate that there is a triable issue on this point and Canada Life has met the onus of showing that it should be granted summary judgment on this issue.

*2. Is there a basis for holding Canada Life liable as an accessory to a breach of fiduciary duty by CLMS?*

25      In my view, Transamerica has failed to demonstrate that there is a triable issue on the claim that Canada Life is liable as an accessory to a breach of fiduciary duty.

26      This area of the law was canvassed at length in the recent decision of the Supreme Court of Canada, *Air Canada v. M. & L. Travel Ltd.*, [1993] 3 S.C.R. 787. That case affirms the principle that a stranger to a trust may become personally liable for a breach of trust committed by the trustee. It involved the liability of directors of a closely held corporation for a breach of trust committed by the corporation. On the surface, this is analogous to the case at bar where Transamerica alleges that Canada Life should be held to account for a breach of fiduciary duty committed by its wholly owned subsidiary, CLMS. However, it should be noted that in the Air Canada case, the directors were directly and personally involved in the misappropriation of trust funds. The Supreme Court of Canada found that to support a claim against an accessory, the plaintiff must show a breach of trust of a fraudulent or dishonest nature. An innocent breach of trust will not suffice. The opinion of Iacobucci J. also makes it clear that the stranger to the trust must be involved in the breach with actual knowledge, recklessness or wilful blindness. Iacobucci J. expressly excludes the possibility of liability on the basis of constructive knowledge (knowledge of circumstances which would indicate the facts to an honest person or put an honest person on inquiry). This conclusion is consistent with a long line of authority with respect to accessorial liability for breach of trust. In an early leading case, cited with approval by Iacobucci J., it

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

was stated that persons who "assist with knowledge in a dishonest and fraudulent design on the part of the trustees" will be held liable: *Barnes v. Addy* (1874), 9 Ch. App. 244 (U.K. C.A.) at 252. The statement of the principle cited by Transamerica is that from the judgment of Finn J. in *Australian Securities Commission v. A.S. Nominees Ltd. (1995), 133 A.L.R. 1* at 19:

> For present purposes, that liability rule can be formulated (conservatively) as one which exposes a third party to the full range of equitable remedy available against the trustee if that person knowingly or recklessly assists in or procures a breach of trust or of fiduciary duty by a trustee.

27    The recent judgment of the Privy Council in *Royal Brunei Airlines Sdn Bhd v. Tan*, [1995] 3 W.L.R. 64 (P.C.) describes the level of misconduct required as "dishonesty": "A liability in equity to make good resulting loss attaches to person who dishonestly procures or assists in a breach of trust or fiduciary obligation" (at 76 per Lord Nicholls). The Ontario Court of Appeal has also recently had occasion to review the law in this area. In *Gold v. Rosenberg* (1995), 25 O.R. (3d) 601 (C.A.), Laskin J.A. held that the Supreme Court of Canada's decision in the *Air Canada* case, supra, had "settled" two crucial questions in this area, first, whether the trustee's breach had to be fraudulent and dishonest, and second, whether the agent must have actual knowledge to be held liable or whether constructive knowledge is sufficient. As Laskin J.A. observed, the judgment of Iacobucci J. *Air Canada* makes it clear that the breach of trust must be fraudulent or dishonest and the agent must have actual knowledge of the breach.

28    The nature of the breach alleged against CLMS is essentially an allegation that CLMS had a contractual obligation to perform certain duties with respect to underwriting the loans and that it breached those contractual duties by failing to perform as it had promised. Mr. Cherniak submits that where the contract is such as to give rise to a fiduciary duty, the party complaining of the breach is clearly entitled to ground its claim in equity if that is more beneficial. Accepting that proposition still leaves Transamerica well short of a fraudulent or dishonest breach of trust of the kind contemplated by *Air Canada* and *Gold v. Rosenberg* as being necessary to support a claim for the liability if the accessory. But even if the claim of Transamerica against Canada Life could survive that first hurdle, there is no evidence to support the allegation that Canada Life knowingly assisting CLMS in committing a breach of trust or breach or fiduciary duty. Certainly, there is no evidence of "dishonesty" (said to be necessary by the Privy Council in *Royal Brunei Airlines Sdn Bhd v. Tan*) on the part of Canada Life. As indicated above, until 1989, no Canada Life officer or employee knew that CLMS had dealings with Transamerica, let alone that CLMS was acting in breach of trust or breach of fiduciary duty. Transamerica relies on the undertaking given to OSFI at the time of CLMS's incorporation. That undertaking was not given to or even known by Transamerica and the evidence of Heft, the party who received the undertaking, is clear that there is no basis to support the very specific meaning and significance Transamerica seeks to attribute to it. The information conveyed to Fleming in relation to the visit from the senior executives of Transamerica's parent in 1989 falls well short of evidence capable of grounding a triable issue on this point. In my view, the contentions of Transamerica on this point are wholly unsupported by the evidence and there is no triable issue of liability of Canada Life. It is apparent that this argument amounts to an attempt to overcome the limitation of liability created by the separate corporate existence of Canada Life and CLMS. It is also apparent from the *Air Canada* case and the other authorities already cited that without proof of knowing involvement in the breach of trust, the law does not impose equitable liability simply on the basis that the targeted defendant is the owner of the corporate entity which committed the equitable wrong.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

***3. Is there a basis for holding Canada Life liable for the alleged misrepresentations of CLMS either at common law or under the Competition Act?***

29      In the statement of claim, Transamerica contends that CLMS represented to it that Canada Life "would stand behind CLMS and ensure that it discharge its obligations to Transamerica" and that "CLMS' business for Transamerica was that of a mortgage correspondent acting on behalf of Transamerica in the acquisition and servicing of the mortgage investments." With respect to Canada Life, it is pleaded:

> Canada Life knew or ought to have known that the [above] representations ... were made by CLMS to Transamerica for the purpose of inducing Transamerica to do business with, and to continue to do business with, CLMS pursuant to the Mortgage Correspondent Agreement. Canada Life caused, and consented to, the making of these representations for the purpose of realizing economic gain conducted by CLMS with Transamerica.

In response to a demand for particulars of these allegations against Canada Life, Transamerica was unable to specify any communication from Canada Life. On this motion for summary judgment, no evidence has been offered that Canada Life "caused" any misrepresentation to be made to Transamerica. Nor has any evidence been offered to support the allegation that Canada Life "consented to" any such misrepresentation if, indeed, "consenting" to such a statement would give rise to liability.

30      Transamerica submits that it is entitled to succeed against Canada Life on the theory that it must have known of certain misrepresentations made by CLMS. It is submitted that these alleged misrepresentations give rise to a common law cause of action and to an action under the *Competition Act* s. 52(1):

> 52(1) No person shall, for the purpose of promoting, directly or indirectly, the supply or use of a product or for the purpose of promoting, directly or indirectly, any business interest, by any means whatever,
>
>    (a) make any representation to the public that is false or misleading in a material respect.

31      This argument was essentially based upon three marketing brochures which describe the activities of CLMS and its relationship to Canada Life. In addition, reliance was placed on the fact that the CLMS financial statements are consolidated with those of Canada Life.

32      The first of the marketing brochures relied upon was in use for 1976 to 1978, well before Transamerica had any dealings with CLMS and Transamerica has been unable to produce a copy of this brochure from its records. Transamerica does state, however, that its officers saw and relied upon certain statements in the brochure, in particular, that CLMS would act as "the investor's own Mortgage and Real Estate Department" and that CLMS was a "Canada Life company". The second brochure was in use for the period 1982-85 and the third was released in 1989. All the brochures clearly indicate that CLMS provides services to both borrowers and lenders. They also refer to the fact that CLMS in a wholly owned subsidiary of Canada Life.

33      Radford saw the first brochure, signed a letter contained in the second as "Chairman of the Board and Presi-

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

dent" of CLMS, and Fleming saw the third brochure. Apart from that, there is no evidence that any officer or employee of Canada Life had any involvement with the writing, printing or distribution of these brochures.

34      In my view, the allegations based on these brochures fail to give rise to a triable issue against Canada Life. I will deal first with the issue of the definition of the role of CLMS. The language of the brochures is, at best, ambiguous with respect to the role of CLMS. It is difficult to give credence to the suggestion that at the relevant time, Transamerica attached to these brochures the significance it now does for the purposes of this action. Transamerica was investing millions of dollars in mortgages and had a detailed written agreement with CLMS to govern their dealings. It strains credibility to imagine that a sophisticated institutional investor would rely on marketing materials of this nature as the basis for defining the legal obligations of CLMS and Canada Life.

35      However, assuming for present purposes that the brochures contain statements which are capable of grounding a claim for deceit, misrepresentation or breach of the provisions of the *Competition Act*, is there evidence to suggest a triable issues that liability should attach to Canada Life? In my view, there is not. They were prepared, printed and distributed by CLMS. In cross-examination, Fleming stated that the authority to put forward marketing materials

> existed within the subsidiary itself. This was their brochure, not Canada Life's. So there would be no need for approval from Canada Life. They wouldn't know it existed. So it was a CLMS document. And they produced it and had the authority to produce it themselves for their own corporate purpose.

This is entirely consistent with the rest of the evidence as to the independent management of CLMS and there is no evidence to suggest that Canada Life had any greater involvement in the preparation of the brochures. As indicated, the only involvement of any Canada Life officer or employees was that 1) Radford saw the first brochure; 2) in his capacity as Chairman of the Board and President of CLMS, Radford signed the second brochure; and 3) Fleming saw the third brochure. In my view, this minimal involvement by these two individuals, acting in their capacity with CLMS, falls well short of a factual basis for finding liability on the part of Canada Life.

36      The second issue is the claim that the brochures represent Canada Life as being legally responsible for the acts of CLMS. In addition to the brochures, it is submitted that the consolidated financial statements of Canada Life and CLMS and led Transamerica to believe that Canada Life would "stand behind" CLMS. The evidence with respect to the financial statements is as follows. In June, 1989, as part of its review of the mortgage investment procedures of its subsidiary, a representative of the parent of Transamerica asked CLMS to provide its financial statements. This request was answered by letter from RF Clarke of CLMS dated June 27, 1989:

> As you requested in your recent visit to our office, I have enclosed a copy of the Financial Statements of the Canada Life Assurance Company (which includes Canada Life Mortgage Services in its consolidation).

The consolidation of CLMS' financial statements with those of its parent corporation is in accordance with accepted accounting principles, a matter well known to Transamerica as it follows precisely the same practice with respect to its statements.

37      In my view, the evidence advanced to support this claim is insufficient to give rise to a triable issue. The

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

brochures accurately state that CLMS is a wholly owned subsidiary of Canada Life and the financial statements reflect accepted accounting practice. While from a business perspective, the relationship between CLMS and Canada Life was undoubtedly significant to Transamerica, it is inconceivable that a sophisticated corporate entity such as Transamerica would read such statements in a marketing brochure to amount to a representation that Canada Life would be legally liable for any wrongs committed by CLMS. The affidavit of James Roszak is carefully crafted. His statement that Transamerica "understood that Canada Life would stand behind CLMS and ensure that it discharged its obligations" falls well short of a sworn statement that he or anyone else at Transamerica actually thought that when Transamerica dealt with CLMS, that from a legal perspective, it was dealing with Canada Life or that legal liability would attach to Canada Life for the acts of CLMS.

38     In argument, Mr Armstrong placed particular emphasis with respect to this area of the case on the fact Transamerica has failed to adduce any evidence from Ken Hennessy, the officer of Transamerica who was responsible for the day to day dealings with CLMS. In view of the failure of Transamerica to come forward with evidence from Hennessy to say that when he was dealing with Pearson and CLMS, he thought he was really dealing with Canada Life, Mr. Armstrong submits that an adverse inference can be drawn.

39     Mr. Cherniak resists this point on the basis that the Roszak affidavit is based in part upon information from Hennessy. It was also argued that as Hennessy is now a party to the action, having been added as a third party by Canada Life, Transamerica cannot be expected to adduce his evidence.

40     In my view, the failure of Transamerica to provide any evidence on this motion from Hennessy is telling. He is without question the individual with the most direct and immediate knowledge of the dealings between CLMS and Transamerica. It is difficult to imagine how Transamerica could make out its case at trial that when it dealt with CLMS, it honestly thought it was dealing with Canada Life, without strong evidence from this individual. While he has recently been made a third party, this motion for summary judgment has been pending for over one year, and his involvement as a third party does not explain why his evidence was not adduced. I have already indicated the significant weakness in the evidence adduced by Transamerica on the misrepresentation issue. The failure of Transamerica to lead any evidence from Hennessy or to provide an adequate explanation for the fact that no such evidence has been adduced provides a further basis for granting summary judgment on this point.

41     A further point was raised by the defendants, namely, that the claim under the *Competition Act* is statute barred in light of s. 36(4) which requires that any action be brought within "two years from the day on which the conduct was engaged in". This matter was raised in reply argument, and as the limitation defence had not been pleaded, a motion was made to amend the statement of defence. In view of my finding with respect to the misrepresentation claim, it is not necessary for me to deal with this point in relation to the summary judgment motion brought by Canada Life. However, as the action is proceeding against CLMS and the plaintiff asserts a cause of action under the *Competition Act*, I grant leave to amend the statement of defence to plead the limitation defence.

**Conclusion**

42     For the foregoing reasons, I conclude that the moving party, Canada Life, has met the onus of demonstrating that there is no genuine issue for trial. The responding party, Transamerica, has had full opportunity to come forward

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 1699, 28 O.R. (3d) 423, 2 O.T.C. 146

with evidence to show that there is a genuine issue for trial but has failed to do so. Accordingly, Canada Life is entitled to summary judgment dismissing the action against it. The remaining defendant CLMS is hereby granted leave to amend the statement of defence to plead the limitation defence pursuant to s. 36(4) of the *Competition Act*. I may be spoken to with respect to costs.

*Motion allowed.*

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works