# Index No. 17

(1878) 8 Ch. D. 679                                                     Page 1
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

## *679 In re European Society Arbitration Acts v

### Court of Appeal

L.   James, Baggallay,  and Thesiger

1878 Jan 28, 29; Feb. 1, 4, 26

Ultrà Vires—Purchase of Business by Company—Transfer to purchasing Company of Shares of selling Company.

The *B. N. Company* was an insurance company established with £10 shares, under a deed of settlement which provided that every instrument whereby the company became liable to pay money should contain a clause limiting the liability of shareholders to the amount payable on their shares. The deed contained a power to the company, with the sanction of an extraordinary general meeting, to purchase the business of any other company of a similar nature, upon such terms as the meeting should think fit. The company resolved to purchase the business of the *B. C. Company*, an insurance company whose capital was divided into £50 shares, on each of which £5 had been paid, and whose deed of settlement contained no power to sell the business. The transaction was completed by purchasing the shares of the *B. C. Company*, which were transferred to various officers of the *B. N. Company*. Subsequently a deed was executed by which those transferees transferred their shares to the *B. N. Company*, and thereupon that company was entered On the register of shareholders of the B. C. Company, and remained so registered for some years. This deed was never sanctioned by a general meeting of the *B. N.* shareholders. An order having been made for winding up the *B. C. Company*:—

that the transfer of the shares to the *B. N. Company* was ultrà *680 vires and invalid, and that the *B. N. Company* could not be placed on the list of contributories of the *B. C. Company*. By the European Arbitration Act, 1875 , it was enacted that as regards any determination or order given or made before the passing of the Act, no appeal should lie therefrom unless the arbitrator expressly certified in writing that by reason of differences between previous decisions on matters of principle it was desirable that an appeal should be brought:—

that a formal certificate from the arbitrator, and not a mere expression of opinion, was necessary to give the Court of Appeal jurisdiction; and that differences between previous decisions referred to decisions before the passing of the Act.

THIS was an appeal by the liquidators of the British Nation Life Assurance Association (hereinafter called the *British Nation* ) against the decision of Mr. *F. S. Reilly* , the arbitrator appointed under the *European Assurance Society Arbitration Acts* , 1872, 1873, and 1875, to the effect that the *British Nation* should be put on the list of contributories of *British Commercial Insurance Company* , and should be ordered to pay such call as might be necessary to discharge the *British Commercial* liabilities and the costs of the *British Commercial* liquidation; and that the liability of the *British Nation* in respect of such an call was unlimited, except so far as it was limited by the terms of the *British Commercial* policies and other contracts.

The *British Commercial* was established by a deed of settlement dated the 1st May, 1821, with a nominal capital of £1,000,000, divided into 200,000 shares of £50 each. 12,000 of those shares were subscribed for, and calls to the amount of £5 a share were made thereon. It was an unregistered company within Part VIII. of the Companies Act, 1862 . The deed of settlement contained the common clause providing for the insertion in its policies and other contracts of a provision that the contracting party should only look to the funds and uncalled capital of the company. And it did not contain any power enabling the company to transfer its business to another company.

© 2013 Thomson Reuters.

(1878) 8 Ch. D. 679 Page 2
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

The *British Nation* was established by a deed of settlement dated the 28th of February, 1855, with a nominal capital of £300,000, in shares of £1 each, subsequently altered to shares of £10 each. Its objects included all the usual business of a fire and life insurance company. It was completely registered under 7 & 8 Vict. c. 110 , and on the 3rd of November, 1862, was registered **\*681** under the Companies Act, 1862 . The provisions to which notice was called during the argument were the following:—

"44.That two extraordinary general meetings shall have full power to extend the objects of the association to the making or effecting insurances on ships or vessels and their cargoes against loss or damage by fire, and against capture and other sea risks, and to the undertaking of any other such business as is usually undertaken by underwriters, and to make new laws, regulations, and provisions for the association, or to amend, alter, or repeal, either wholly or in part, all or any of the existing laws, regulations, and provisions of the association, provided that such extensions of the objects of the association, and such new, amended, or altered laws and provisions shall have been previously recommended by the board, and do not extend to, amend, alter, or repeal any provisions hereby expressly declared to be unalterable, or any of the laws, regulations, or provisions hereby established for limiting the individual responsibility of shareholders, and subject in all cases to the provisions and regulations of 7 & 8 Vict. c. 110 , and these presents.

"45.That an extraordinary general meeting may accept or take a transfer of or purchase or acquire the business of any other associations, companies, or societies of a similar nature (wholly or in part) with the association hereby established, upon and under such terms, conditions, stipulations, and agreements as such meeting shall think fit."

"91.That the board shall, as respects every life policy and other policy issued by the association, and every grant of annuity by the association, and every other instrument whereby a liability to pay any sum or sums exceeding in the whole the sum of £5 shall be incurred by the association (except in the cases specially provided for in clause 187, and except in the case of the lease of any house or offices rented by the association), cause to be inserted therein, either in express words or by reference to this present clause, a declaration that the capital, stock, and funds of the association shall alone be liable to answer and make good all claims under such policy, grant of annuity, or other instrument (as the case may be), and all other claims whatsoever against the said association, and that no director, proprietor, or member of **\*682** the association shall in any manner be personally liable or subject to any such claims, or be bound by reason thereof to do anything more than (as respects a proprietor) to pay to the proper officers the association the amount (if any) due from him to the association in respect of instalments upon his share or shares in the capital of the association."

Clause 187 prohibited making or issuing promissory notes or bills of exchange in the name or on the behalf of the association, and it also forbade the acceptance of bills by the association, except bills drawn by persons abroad for moneys payable in respect of claims under policies. Such last mentioned bills were not to be subject to clause 91.

Clause 119 gave extensive powers of investing the moneys in hand which were not required to satisfy immediate claims, and, inter alia, it was provided that the board, with the consent of not less than three directors present, might invest "in the purchase of shares in any docks, canals, rivers, navigations, waterworks, bridges, piers, railways, or turnpike roads established by Act of Parliament … or in the purchase of any personal property of any nature or kind whatsoever, or of any debts, claims, and demands, or interests whatsoever, and of what nature or kind soever.

© 2013 Thomson Reuters.

(1878) 8 Ch. D. 679 Page 3
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

On the 17th of November, 1859, Henry Lake, the manager and secretary of the *British Nation*, in accordance with a resolution of the *British Nation* board of directors, passed on the same day, addressed the following letter to the directors of the *British Commercial* :—

"Gentlemen,—It has been suggested to the directors of this association and to myself that a union of the business of the *British Commercial Insurance Company* with this association would be advantageous to both institutions, and for the following reasons:

"First. The proprietary of the *British Commercial* might, if they so desired, be paid off at a price to be agreed upon—say 25s. per share, and transfer of such shares be taken by trustees to be appointed by this association.

"Second. This association having a business of nearly £30,000 **\*683** a year at present arising from policies of an average of under three years would supply the older policies of the *British Commercial*, the element which alone is necessary to give force and value to its business. For the increased amount of the annual premium income would be better enabled to bear the certain claims which must arise from the older business of the British Commercial without, for many years to come, entrenching upon the assets reserved, thus protecting the company from the disastrous effects of a disturbed rate of mortality. A further negotiation for young life business, which, as your directors may be aware, carries with it invariably a large amount of future profit combined with greatly increased security, is pending, and on the very eve of completion, by which an addition of £20,000 a year will be made to the income of this association, forming a gross income of £50,000 per annum.

"Third. This association possesses a staff of nearly 1000 agents, now producing a large amount of new business, which is rapidly increasing, and all anxious to co-operate with the directors of this association in the effort to obtain an increased connection, and it may be fairly urged that with the business of the *British Commercial* in union with this association the agents of that company will be more likely to work with vigour for the combined institutions and to obtain more business in consequence than could be expected under existing circumstances from the agents of the *British Commercial* alone.

"Fourthly. The shareholders in this association are upwards of 300 in number, and they are prepared in every possible way to co-operate in the endeavour to increase the business of the institution, and from this circumstance also the *British Commercial* connection will derive an increased advantage, there being a reserve of actually subscribed capital amounting to £92,500.

"Under these circumstances the directors of this association would be glad if the directors of the *British Commercial* would consider this letter as a basis of a proposition for a union of the business of the *British Commercial* and *British Nation Companies* upon the following understanding:—

"The shareholders of the *British Commercial* should be paid off at the rate of 25s. per share, and their shares transferred.**\*684**

"That the directors of the *British Commercial*, with the consent of the shareholders, be paid a compensation of £1000 by this association.

"That the staff of the *British Commercial* be retained by the *British Nation*, and that the directors of the *British Nation* be at liberty to apply to any director or officer of the *British Commercial* to assist this association in the completion of such proposed arrangement after the shareholders have decided upon its adoption.

© 2013 Thomson Reuters.

(1878) 8 Ch. D. 679

(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679

**(Cite as: (1878) 8 Ch. D. 679)**

Page 4

"That the trustees should be appointed to hold the assets of the *British Commercial* pending the completion of the proposed arrangement.

"That an Act of Parliament should be forthwith applied for if agreed to be necessary to consolidate the proposed union.

"Thus a strong company may be formed, to the permanent benefit of all interested."

By a resolution passed on the 2nd of January, 1860, the directors of the *British Commercial* resolved that the directors of the *British Nation* should be informed that the board accepted the offer contained in the foregoing letter, subject to the approval of their shareholders, and also resolved that a special extraordinary meeting of the shareholders should be called on the 21st instant, to consider the offer of the *British Nation*, for its adoption or otherwise, and that the meeting should be advertised as therein mentioned. The meeting was advertised accordingly, and on the 6th of January, 1860, a circular was issued to the shareholders of the *British Commercial* as follows:—

"Sir,—Herewith you will receive a formal notice convening an extraordinary or special meeting of the proprietary for the 21st inst. The object of the meeting is to consider a proposal for the union with or transfer of the business liabilities and assets of this company to another company.

"I am instructed to inform you that the proposition above referred to has been under the consideration of the directors of this company for some time past, and after careful investigation they have arrived at the unanimous resolution to adopt and accept the same, subject to the approval and confirmation of the **\*685** shareholders. I may add that the proposition contains an offer of 25s. per share to the shareholders of the *British Commercial*, who will also be relieved of their liabilities in respect of such shares."

The notice referred to in this circular was for an extraordinary meeting on the 21st, for the following purposes, viz.:—

"1st. For the purpose of considering a proposal for the union or 're-assurance' with or transfer of the business liabilities and assets of this company to another company.

"2nd. For the purpose of adopting and accepting or otherwise the offer contained in the proposal for union or transfer above referred to.

"3rd. For the purposes of investing the directors with necessary powers to enable them to complete and forthwith to carry out such union or transfer, and for the purpose of dissolving the said *British Commercial Life Insurance Company*, should that course be deemed expedient."

At the meeting, of the *British Commercial*, held accordingly on the 21st of January, 1860, it was (amongst other things) resolved:—

"1st. That the proposal of the British Nation Life Assurance Association as contained in their letter of the 17th of November last, now read, be and is hereby adopted and accepted.

"2nd. That with a view of carrying out the last resolution for the union of the two companies, the shareholders of this company present at this meeting do approve of and accept the proposal made on behalf of certain members of the British Nation Life Assurance Association for the purchase of shares in this company at the price of 25s. per share.

"3rd. That the directors be and are hereby authorized and empowered to take such steps in accordance with the provisions of the deed of settlement of this company as may be necessary to carry such proposal into

© 2013 Thomson Reuters.

effect on behalf of the shareholders."

An extraordinary general meeting of the *British Nation* shareholders was convened for the 20th of January, 1860, by a notice stating that the meeting was to be held for the purpose of investing **\*686** the directors under the 45th clause of the deed of settlement with the necessary powers for taking to the business of another life assurance company, and for the purpose of making certain alterations in the deed of settlement, namely, as to the time of holding ordinary general meetings; as to voting by ballot; as to remuneration of auditors; as to the calling of general meetings; &c. The meeting was accordingly held on the 20th of January, and the notice convening it, and the *British Nation* manager's letter of the 17th of November, 1859, and the *British Commercial* directors' resolution of the 2nd of January, 1860, were read, and it was resolved:—

"[I.]That this meeting having heard the terms of the proposed arrangement with the *British Commercial Company* approves of the same, and hereby authorizes and empowers the directors of this company to take such steps as they may consider necessary for carrying the same into effect, and to issue in lieu of the payment of 25s. per share to such proprietors of the British Commercial Insurance Company as may elect to receive the same shares in this association either wholly or in part paid up to the extent of 30s. for each *British Commercial Insurance Company's* share so held by such proprietors as aforesaid.

"[II.]That George Bermingham, the chairman of this association, and the manager, *Henry Lake*, be and they are hereby appointed trustees of this association, with such trustee as may be named on the part of the *British Commercial Insurance Company*, for the purpose of holding the assets, &c., in trust of the British Commercial Insurance Company, and for other arrangements pending the complete transfer of that company to this association.

"[III.]That pending the completion of the arrangements with the *British Commercial Insurance Company* with this association the manager and secretary, Mr. *Lake*, be and he is hereby permitted and allowed to accept the appointment of manager to the *British Commercial Insurance Company*.

"[IV.]That the directors of this association be and they are hereby empowered to appoint from time to time such trustees, whether shareholders or others, as may in their discretion be necessary for holding such shares of the British Commercial Insurance Company as in the arrangements contemplated may be **\*687** required to be transferred, and that such trustees be and they are hereby indemnified from any liability in respect of the British Commercial shares so transferred save in their capacity of shareholders in this association."

These resolutions were confirmed at a second meeting on the 4th of February, 1860.

Two deeds, dated respectively the 8th of February and the 7th of June, 1860, were executed for carrying into effect the arrangement authorized by the foregoing resolutions;

The deed of the 8th of February, 1860, was an indenture expressed to be made between *Bermingham* and *Lake* of the first part, the persons named in the first part of the schedule thereto (being individual shareholders in the *British Commercial*) of the second part, and the persons named in the second part of the schedule being joint owners of shares in the *British Commercial* of the third part. It recited that *Bermingham* and *Lake* had agreed to purchase from the parties of the second and third parts their respective shares at 25s. per share; and by the witnessing part the parties of the second and third parts covenanted, on payment of that price for their respective shares, to transfer them to *Bermingham* and *Lake*, or their nominees; and *Bermingham* and *Lake* covenanted that

© 2013 Thomson Reuters.

they would, by themselves or their nominees, accept transfer of the shares, and would before the 1st of July, 1860, concur in all acts requisite to cause the shares purchased to be transferred out of the names of the persons in whose names they were standing into the names of some other persons, and would pay the purchase-money in manner therein mentioned. The deed contained a proviso for avoiding it if the holders of five-sixths of the shares in the *British Commercial* did not enter into it before the 25th of March then next.

The deed of the 8th of February, 1860, was executed, between the 10th of February and the 23rd of June, 1860, by 174 shareholders of the *British Commercial* , holding in the aggregate 11,014 shares. Of these 174 shareholders, seven, who held in all seventy-nine shares, did not at any time execute any transfer of any of their shares in pursuance of that deed or of the amalgamation arrangement, but 167, holding in all 10,135 shares, executed between the 17th of December, 1859, and the 23rd of February, **\*688** 1865, under the amalgamation arrangement, transfers of their shares in the *British Commercial* , either to *Bermingham* and *Lake* , or one of them, or to persons nominated for that purpose by *Bermingham* and *Lake* .

After the execution of the deed of the 8th of February, 1860, but before the 21st of April, 1865, seventeen shareholders of the *British Commercial* who did not execute the deed of the 8th of February, 1860, holding in the aggregate 776 shares, executed, under the amalgamation arrangement, transfers of those shares to *Bermingham* and *Lake* , or one of them, or to other persons nominated for that purpose by the *British Nation* .

All the transfers mentioned above were in the common form, and nearly all the transferees were officers or servants of the *British Nation* , and executed the deed of the 7th of June, 1860. This latter deed was an indenture expressed to be made between the parties executing in the schedule, including *Bermingham* and *Lake* of the first part, *Bermingham* and *Lake* of the second part, and the *British Nation* of the third part. This deed recited the deed of the 8th of February, 1860, and that in further pursuance of the above arrangements the persons named in the first column of the schedule had transferred their shares in the *British Commercial* to *Bermingham* and *Lake* , or to the other parties thereto of the first part as their nominees. The parties of the first part then declared that they would stand possessed of the shares so transferred to them in trust for the *British Nation* . And by the same indenture the *British Nation* covenanted with each of the parties of the first part that the *British Nation* would indemnify them, their heirs, executors, and administrators, from all liability in respect of the shares so transferred to them. This deed was not submitted to or approved by the *British Nation* shareholders in general meeting. None of the *British Commercial* shareholders who executed, under the amalgamation arrangement, transfers of their shares gave the directors any such notice of transfer as was required by the *British Commercial* deed of settlement, nor did any of their transferees execute such deeds of covenant as were required to be executed by purchasers of shares binding them to observe the stipulations of the deed of settlement.

Twenty-three shareholders of the *British Commercial* , holding **\*689** in the aggregate 210 shares, executed neither the deed of the 8th of February, 1860, nor any transfer of their shares.

On the 30th of January, 1860, the secretary of the *British Commercial* issued a circular to the shareholders therein, informing them of the result of the meeting of the 21st of January, 1860, and inclosing a copy of the resolutions passed at it.

On the 23rd of March, 1860, the *British Nation* manager issued a circular to the *British Commercial* shareholders in which he appointed a day for the payment of the first two-fifths of the price of the *British Commercial* shares, and inclosed two alternative forms for signature, by one of which the share-

© 2013 Thomson Reuters.

holder signing would agree to take the price of his shares in cash, and by the other of which the shareholder signing would agree to take the price of his shares in shares of the *British Nation* . Fourteen *British Commercial* shareholders holding 1020 shares took British Nation shares under the amalgamation arrangement. All the *British Commercial* shareholders who executed, under the amalgamation arrangement, transfers of their shares, received the consideration for them according to that arrangement.

After the deed of the 8th of February, 1860, the business of the *British Commercial* continued for some time to be carried on as a separate business, and that company issued new policies down to the 29th of May, 1862, after which day no contract was made or fresh liability incurred by it. It paid claims down to the 19th of March, 1863. After April, 1863, it had no office separate from the office of the *British Nation* . On the amalgamation arrangement, *Lake* , the manager and secretary of the *British Nation* , became also the manager of the *British Commercial* , and the secretary of the *British Commercial* was employed in the office of the *British Nation* , and attended to any matters connected with the *British Commercial* .

After the 1st of January, 1860, only two general meetings of the *British Commercial* shareholders were held, namely, on the 12th of March and the 22nd of May, 1861, at the former of which new directors were appointed. The last memorial of the names of *British Commercial* directors inrolled under the *British Commercial* Act of Parliament was inrolled on the 13th of February, 1865. The company, however, was never dissolved. ***690**

On the 22nd of December, 1864, an extraordinary court of directors of the *British Commercial* was held, when it was resolved:

"That the existing amalgamation of the business of this company with the business of the *British Nation Life Assurance Association* be adopted and confirmed, and that the trustees of this company be directed to take such steps and do such acts and execute such instruments as might be considered necessary with a view to perfecting such amalgamation and legally vesting the assets of this company in the said association."

On the 29th of December, 1864, the *British Nation* board of directors resolved:

"That the existing amalgamation of the business of the *British Commercial Insurance Company* with the business of this association be adopted and confirmed, and that the deed, a copy of which has been submitted to and approved of by this board, is a proper deed for carrying the said amalgamation into effect, and that the seal of this association be accordingly affixed thereto."

These resolutions were carried into effect by a deed of the 31st of December, 1864, indorsed—Deed of Amalgamation. By this deed the holders of 9892 shares, which had been transferred to them as trustees for the *British Nation* , purported to transfer them to the *British Nation* , and the *British Nation* covenanted to indemnify the transferors from all debts in respect of the engagements of the *British Commercial* , subject to a proviso that only the subscribed capital of the *British Nation* should be liable under the covenant. This deed of amalgamation was not submitted to or approved by the *British Nation* shareholders in general meeting.

The transfers of *British Commercial* shares made under the amalgamation arrangement, and the general assignment of British Commercial shares made by the deed of the 31st of December, 1864, were from time to time entered in the share ledger of the *British Commercial* . The form of entry as to shares assigned by the latter deed was, "By deed dated the 31st of December, 1864, the above shares were assigned by the

© 2013 Thomson Reuters.

(1878) 8 Ch. D. 679    Page 8
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

above-named to the British Nation Life Assurance Association, their successors and assigns."

Memorials of the names of the assignees under the last-mentioned transfers and assignment were from time to time inrolled **\*691** in the Court of Chancery, the inrolments being expressed to be made pursuant to the *British Commercial* Act of Parliament. The last of those memorials was inrolled on the 1st of September, 1865, and gave the *British Nation* as the assignee of the bulk of the shares.

The *British Nation* went into voluntary liquidation under a resolution passed on the 18th of January, 1872; and that liquidation was by order dated the 29th of January, 1872, continued under the supervision of the Court under the provisions of the Companies Acts. On the 19th of July, 1872, the *British Commercial* was, on the petition of a creditor, ordered to be wound up under the Companies Acts. These liquidations went on under the European Society's Arbitration Acts. The whole of the subscribed share capital of the *British Nation* was called up, and a further call of £4 a share was made for costs and expenses of the liquidation of that company.

In Rivington's Case it was decided that *William Rivington* , who was a holder at the date of the amalgamation of 200 shares in the *British Commercial* , and who executed the deed of the 8th of February, 1860, and a transfer of his shares thereunder to *Bermingham* , was not to be settled on the list of contributories of the *British Commercial* in respect of those 200 shares, for any purpose whatever, even as regarded liabilities of the *British Commercial* incurred before he executed the transfer, or as regarded the costs of winding up that company.

In Lawson's Case , Lord *Romilly* decided that *Lawson* , to whom, as one of the nominees of the *British Nation* , shares in the British Commercial had been transferred as part of the amalgamation arrangement, and who had executed a declaration of trust of those shares for the *British Nation* , was not a contributory of the British Commercial in respect of those shares.

In Chatteris' Case , Lord *Romilly* decided that *Chatteris* , one of the seven shareholders of the *British Commercial* , who executed the deed of the 8th of February, 1860, but did not execute transfers of their *British Commercial* shares under the amalgamation arrangement, was not a contributory of the *British Commercial* .

In Edwards' Case , Lord *Romilly* decided that *Edwards* , one of the twenty-three shareholders of the *British Commercial* , who did **\*692** not execute the deed of the 8th of February, 1860, or any transfer of their shares under the amalgamation arrangement, was not a contributory of the *British Commercial* .

The result of the above decisions was that none of the shareholders of the *British Commercial* were liable to be put on the list of contributories of that company, and that persons to whom shares had been transferred in trust for the *British Nation* were not contributories. Unless, therefore, the *British Nation* could be put on the list of contributories there was no contributory at all.

The case before the arbitrator sought to make the British Nation, and also *Lawson, Chatteris* , and *Edwards* , liable as contributories of the *British Commercial* , and the case as against these three persons was reheard, notwithstanding Lord *Romilly's* previous decisions in their favour. The arbitrator held the *British Nation* liable and the other Respondents not liable.

The arbitrator certified for an appeal, but did not give the special certificate applicable to the case of previous conflicting decisions.

An appeal was at the same time brought from the decisions in the cases of *Chatteris, Lawson* , and

© 2013 Thomson Reuters.

(1878) 8 Ch. D. 679 Page 9
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

*Edwards* , although the arbitrator had not given a written certificate as required by the Arbitration Act, 1875 . The appeal was heard on the 28th and 29th of January, and the 1st and 4th of February, 1878.

*Bagshawe* , Q.C., *Cookson* , Q.C., and *Lemon* , for the British Nation, in support of this appeal:—

It is made a fundamental principle of the constitution of the *British Nation* by sect. 91 that no contracts shall be entered into on behalf of the company which impose on the shareholders unlimited liability. It is quite against this that the company should become a shareholder in another company, and indeed it is quite beyond the scope of a joint stock company to become a shareholder in another company unless authority is expressly given for that purpose. We say, then, that the deed of the 31st of December, 1864, by which it is alleged that the *British Nation* became legal holders of shares, is ultrà vires and invalid, and that the British Nation never became a shareholder. The shares no doubt were held by trustees for the *British Nation* , but that does not make **\*693** the *British Nation* a contributory, and it cannot be held such. In Peek's Case 1 there was a complete contract to take shares, and this is necessary: King's Case 2 . The trustee, not the cestui que trust, must be on the list: Williams Case 3 . If a man is not liable to creditors he cannot be a contributory: Bright v. Hutton 4 . The arbitrator thought that sect. 200 of the Companies Act, 1862 , made a person liable to be put on the list of contributories through having agreed to take shares without putting forward his own name, and no doubt in many cases this is so; but if shares are duly vested in a trustee for *A. B.* , that does not make A. B. a contributory. He is liable to indemnify his trustee, but that does not enable you to take the short cut of making him a contributory. None of the *British Commercial* shareholders can complain on the ground of the *British Nation* not being put on the list. They are of three classes: first, those who under the arrangement covenanted to transfer, and did transfer, to trustees for the *British Nation* . They are released from liability. *Rivington* is a type of that class. Then there are those who did not covenant, but did transfer; they are free from all liability. Then there are those who neither covenanted to transfer nor transferred; they were strangers to the transaction, and cannot have any complaint to make. In order to make out the *British Nation* to be a contributory, it must be shewn, 1, that it became a shareholder at law; or, 2, that it contracted to become such so as to be a shareholder in equity; or, 3, that, under the Companies Act, 1862, s. 200 , it is liable to be settled as a contributory by reason of being liable at law or in equity to contribute to pay off the debts of the *British Commercial* . Now, did the *British Nation* contract to become a shareholder? One company registered under the Act of 1862 can take shares in another: In re Barned's Banking Company 5 , but only if authorized by its articles to do so; and here the *British Nation* had no such power. Its deed being completely registered, was notice to all the world. Now, clause 119, which is the only clause authorizing the taking shares of any kind, does not authorize the taking shares in a limited company. Clause 45 **\*694** does not authorize it, for taking shares is quite different from taking to a business. The deed of the 8th of February, 1860, is a deed to which the *British Nation* was not a party; it could not be bound by that to become a shareholder. The deed of the 7th of June, 1860, was never approved by the company in general meeting, nor does it follow from any resolution of a general meeting, it therefore cannot bind the company. The transfer was made when the *Commercial* company was virtually dissolved, and is therefore void: Chappell's Case 6 ; Lankester's Case 7 ; Allin's Case 8 . The arbitrator seems to have been influenced by the view that a cestui que trust can be put on the list in place of the trustee by reason of his obligation to indemnify him; and Hemming v. Maddick 9 was referred to as establishing this, but rightly understood the case goes quite the other way. The authorities are clear that the trustee must be on the list, not the cestui que trust: Chapman and Barker's Case 10 ; Ex parte Challis 11 .

Sir *H. Jackson* , Q.C., and *Whitehorne* , for the Eu-

(1878) 8 Ch. D. 679                                                                        Page 10
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

ropean Society, took no part in the argument.

*Higgins*, Q.C., and *Romer*, for the liquidators of the British Commercial:—

The claims established against the *British Commercial* amount to about £180,000, and if this appeal be simply allowed they will be worthless. There must be a liability to contribute somewhere. It has been decided that the transferors of the *Commercial* shares are not liable, nor the transferees who transferred to the British Nation, and it necessarily follows that the *British Nation* must be. Now, as to the objection that any contract imposing an unlimited liability on the shareholders was ultrà vires, we contend that it was perfectly competent to the shareholders by mutual consent to annul the clause imposing this restriction on contracts, and that the shareholders did so. At the commencement of the winding-up of the *Commercial* the *British Nation* was on the publicly inrolled list of members, and had been there for years. **\*695**

The process of this amalgamation was unique. No attempt was made to produce a novation. The policy-holders were not consulted. The *Commercial Company* was kept alive. The Bank of London Case 12 has no application. The amalgamation in our case, as it was effected, was quite intrà vires. In the Albert Case the clause limiting the powers of the company to alter the rules was stronger than in our case. There was no power to amalgamate at all: the *British Nation* deed gives power to amalgamate. But in truth no power is necessary. There is nothing that a general meeting cannot alter if all the shareholders consent. Even if limited liability be a fundamental principle of the company, the shareholders may consent to alter it. If all the shareholders can alter the laws as they please, a majority may do so, if the minority acquiesce. If the minority protest, it may be different; but if they acquiesce, they must be taken as consenting. Our positions are—1. At the commencement of the winding-up of the *Commercial* in 1872, the *Nation* was on the list of shareholders, and had been there for seven or eight years, and their name was put on by their own consent, without any intervention of the Commercial, by which the creditors of the *Commercial* cannot be prejudiced. 2. The onus is on the *British Nation* to have its name removed from the list of members, and it cannot now get the register rectified. Even if there were no formal difficulty, It has no equity to do so. The Appellants say, first, that the *British Nation* had no power to take shares, and, secondly, that it did not take any. We say that it had power to take, and did take, shares. 3. We rely on the effect of the 200th section. There was a contract to take shares, and the company became equitable shareholders. 4. We rely on the authorities as to the effect of acquiescence Assuming that there was an informality, the acts of the British Nation render it impossible for them to take advantage of it. As to the first and second propositions, Oakes v. Turquand 13 shews that there are many cases where persons who are on the register at the time of the winding-up cannot get their names taken off, although they might have done so before the winding-up. There is nothing in the nature of a company which in itself prevents it from holding shares in another company. The Act of 1862 **\*696** assumes that it may be done: In re Barned's Banking Company 14 ; Royal Bank of India's Case 15 . It is not for us to shew a special power in the articles of the *British Nation* to take shares, provided it is in accordance with the general objects of the company; and even if there was anything against it in the articles of the company, a general meeting had power to alter it, and did alter it. Power is given by clauses 44 and 45. Clause 91, which says that the liability is to be limited in all contracts, only applies to acts done by the directors, and the reservation in clause 44 means that no alteration may be made which shall give power to the directors to pledge the unlimited liability of the shareholders, but a general meeting had power to do what has been done: Greenwood's Case 16 ; Agar v. Athenæum Assurance Society 17 ; Prince of Wales Assurance Society v. Athenæum Assurance Society 18 ; Ernest v. Nicholls 19 . This was an unregistered company, and therefore the constitution could be altered with the consent of all the shareholders, ex-

© 2013 Thomson Reuters.

press or implied: *Lindley* on Partnership 20 ; Webb v. Herne Bay Commsssioners 21 ; Lane's Case 22 .

3. As to the effect of sect. 200 of the Companies Act, 1862 , there was a bargain between the two companies that the *Commercial* shares should be bought up on behalf of the *Nation* ; that the *Nation* should be liable for the debts of the *Commercial* , and that the *Nation* should take the shares and should indemnify the trustees. The *Nation Company* was therefore the real owner of the shales, and a contributory of the *Commercial Company* under sect. 200 : Williams' Case 23 .

4. As to the acquiescence of the shareholders of the British Nation, we say that the shareholders confirmed the transaction, even if it was ultrà vires : Re Era Company 24 ; Evans v. Smallcombe 25 ; Phosphate of Lime Company v. Green 26 . The Court will not interfere to stop acts which are ultrà vires, if there has been acquiescence on the part of the body of the shareholders, ***697** unless they are contrary to the fundamental purposes of the company: Anglo-Australian Assurance Company v. British Provident Life Assurance Society 27 . In this case the *British Nation Company* has enjoyed the benefit of the agreement. They have taken all the premiums since 1860: Re Phoenix Life Assurance Company 28 ; Re Sea, Fire, and Life Assurance Company 29 . A third party is not bound to examine into the question whether a company has observed all the conditions imposed by its articles: Royal British Bank v. Turquand 30 . Sect. 47 gives power to purchase on such terms as the directors think fit.

[JAMES, L.J.:—That would not authorize anything which in substance altered the constitution of the company.]

Taking shares must have been contemplated, for in no other way could the business be acquired.

[JAMES, L.J.:—Buying shares is quite a different thing from buying a business. The shares are not the property of the selling company.]

The power was created before the *Companies Acts* , and must be taken to authorize the acquiring the business of a private partnership, which could only be acquired by transfer of the shares of the partners.

[JAMES, L.J.:—No. The partners together would convey the entire property.]

There is power to invest in the purchase of personal property.

[JAMES, L.J.:—How could such a power authorize becoming a partner in a business?]

The provision as to limited liability is merely a regulation for the shareholders inter se, and does not affect third parties: Greenwood's Case 31 . Where there is a direct contract between the company whose shares are held and the beneficiary, the beneficiary is the person responsible: Reaveley's Case 32 .

On the appeals in the cases of *Chatteris, Lawson* , and *Edwards* , being opened, ***698**

*Hemming* , Q.C., and *Millar* , for *Chatteris* , took a preliminary objection:—

The decision in Chatteris' Case was made by Lord *Romilly* under the European Arbitration Act of 1872 . By the 16th section of that Act, after directing how applications are to be made to the arbitrator, it was enacted "that the opinion or decision of the arbitrator on any such application, or with respect to the costs thereof, or on any matter or thing within his jurisdiction, shall not be subject to any review or appeal." Then the European Arbitration Amendment Act, 1875, sect. 3 , provides that the Court of Appeal in Chancery shall have jurisdiction and power to entertain an appeal from any determination or order of the

© 2013 Thomson Reuters.

arbitrator given or made before or after the passing of this Act. And then it goes on to enact that, "An appeal shall lie from any determination or order of the arbitrator accordingly, subject to the foregoing provisions (among others): "(1)As regards any determination or order given or made before the passing of this Act, an appeal shall not lie therefrom unless the arbitrator expressly certifies in writing that by reason of differences between previous decisions on matters of principle relating to cases of novation or of liability of contributories, it is desirable that an appeal be brought."

In the present case, Mr. *Reilly* , the present arbitrator, has not given any certificate that it is desirable that there should be an appeal. The Court, therefore, has no jurisdiction to hear the appeal. The fact that the arbitrator has made these persons Respondents to the special case is not sufficient without a formal certificate.

*Bevir* , Q.C., and *Bissell* , for *Lawson* , and *J. Pearson* , Q.C., and *Millar* , for *Edwards* , took similar objections.

*Higgins* , Q.C., and *Romer* , for the Appellants:—

These Respondents are not in the same position as if a final award had been made before the passing of the Act of 1875. Although Lord *Romilly* had given his decision upon their cases, it was open to him or his successor to reconsider those decisions at any time before the final award. That was the view that Lord ***699** Cairns took in the *Albert Arbitration* . And Lord *Romilly* , in this arbitration, reheard a case which had been decided by Lord *Westbury* . The words "previous decisions" mean decisions before the appeal is brought, not necessarily before the passing of the Act of 1875. And there cannot be a doubt that, in the words of this Act, there have been "differences between previous decisions on matters of principle" relating to the questions now before the Court. If, therefore, the arbitrator has not given a certificate, it is only the omission of a form, which we could get rectified. But, in fact, the form of the special case to which these Respondents are made parties, and in which the judgment of the Court of Appeal is asked, "What other decision should be given either as between the Appellants and Respondents, or any of them, or as among the several Respondents," amounts in itself to a certificate that the appeal in the case of these Respondents is desirable.

Feb. 1. JAMES, L.J.:—

The absence of the certificate is to my mind conclusive. The arbitrator has not given the certificate required by the Act of Parliament. We have heard a very long argument to shew that if he had not given the certificate in words he had done so in effect, and that he meant to say there had been that difference of opinion. As at present advised, I see no ground for that contention. I think it right to say that the 16th section of the first Act of Parliament is one to which effect must be given according to its plain meaning. Nobody can doubt that that 16th section says that application shall be made to the arbitrator in such manner and form, and shall be heard and disposed of as the arbitrator shall direct, and every decision of the arbitrator upon any such application, shall not be subject to review or appeal. Then Messrs. *Chatteris, Lawson* , and *Edwards* say: "We have a decision by the arbitrator in our favour, and that decision was by the Act of Parliament made final." The further clause in the *Amendment Act* , which has been relied upon, must be construed very strictly in favour of the gentlemen who rely on the 16th section of the old Act. The Amendment Act, after a recital that, in some cases of great importance as affecting the liquidations of ***700** the companies subject to the arbitration, the second arbitrator had differed in opinion from and varied the determinations and orders of the first arbitrator, and difficulty had ensued therefrom in the conduct of the administrative business of the arbitration, contains a clause that, in certain cases, an appeal shall lie from

© 2013 Thomson Reuters.

(1878) 8 Ch. D. 679 Page 13
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

any determination or order of the arbitrator, subject to the following provisions, the first being: "As regards any determination or order given or made before the passing of this Act an appeal shall not lie therefrom unless the arbitrator expressly certifies in writing that by reason of differences between previous decisions on matters of principle relating to cases of novation or of liability of contributories it is desirable that an appeal be brought." Now, the meaning of these words "between previous decisions" must be decisions previously acted upon. I think, therefore, that the arbitrator purposely abstained from giving a certificate.

BAGGALLAY, L.J.:—

I am of the same opinion. We are bound to come to a decision on the objections raised on behalf of these gentlemen to the hearing of an application in the nature of an appeal against the former decisions in this case, and as far as they are concerned we are bound to deal with that objection irrespective of any inconveniences that may be occasioned to other parties by reason of the mode in which we deal with it. Each of these three gentlemen has had a determination in his favour by one of the previous arbitrators. At the time when those determinations were arrived at, an Act of Parliament was in force which declared that they should be final and conclusive, and not open to review or appeal, and before the Act of 1875 was passed, these gentlemen were entitled to rely upon these determinations as being final and conclusive. When the Act of 1875 was passed, it recited, as was the fact, that in the course of the liquidations of these companies by the two preceding arbitrators there had been differences of opinion on matters of principle, and it went on to recite, that, though there was an imperative provision in the former Act of Parliament that their decisions should be without appeal, it was proper that in certain cases there should be a power of appeal, but the enacting **\*701** part limits the right of appeal, as far as regards any determination or order given or made before the passing of the Act of 1875, to cases in which the arbitrator expressly certifies in writing that it is desirable that an appeal should be brought by reason of differences between the previous decisions. No language could be more clear, having regard to the previous recital, though I should have thought it sufficiently clear without it, to express that the conflict of principle must have been in connection with some determination or order arrived at before the Act of 1875 was passed. It would be convenient, no doubt—I do not mean to say that the arbitrator is bound to do so, but it would be convenient—if he did expressly certify, in each particular case, that by reason of such differences in principle an appeal should be brought, and that he should specify himself; on the certificate, what those differences in principle are on which he thinks it desirable that there should be an appeal. However, I say no more on that. With regard to its being desirable that such an appeal should be brought, I feel quite clear that we are hound to have, on his responsibility, a distinct statement in writing that he considers there is a proper case for appeal. We have here no such clear case and no such certificate. Now, it has been suggested that though the certificate does not exist, there may be the means and the opportunity of procuring it. I am far from saying that in no possible case would this Court give the opportunity for a certificate being obtained after the appeal was lodged, but it must certainly be an extreme case to justify it. At the present moment I see no reason for giving that leave, or allowing the matter to stand over in order that such certificate should be obtained. As far as I am able to trace the decisions arrived at by Lord *Westbury* in *Rivington's Case* , and Lord *Romilly* in the cases which are represented before us to-day, I can see no difference in matter of principle. It is possible, and it may be so urged, that a principle applied in an earlier case was applied also in a later to which it was not properly applicable, but that is not a difference in principle. It may be at the outside an error of judgment as regards the application of a recognised principle. I think, therefore, that the objections that are taken on behalf of Messrs. *Edwards, Chatteris* , and *Lawson* , are well founded. **\*702**

© 2013 Thomson Reuters.

(1878) 8 Ch. D. 679                                              Page 14
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

THESIGER, L.J.:—

I am also of opinion that the preliminary objection that is taken is well founded. I ground my judgment on the absence of the certificate by the arbitrator. At the same time I may say that nothing which I have heard has satisfied me that there has been any difference of principle between the decisions of Lord Romilly and Lord *Westbury* on the point which we have to deal with. Also, I am not satisfied that there has been any difference between the decision of Mr. *Reilly* , in point of principle, and the previous decisions of Lord *Romilly* and Lord *Westbury* . And, although I was very much struck with the ingenuity of the argument of Mr. *Romer* , founded on the meaning of the words "between previous decisions," I am not satisfied that, even if we were to give any decisions which were contrary to the previous decisions of Lord *Romilly* and Lord *Westbury* , that that would enable those decisions, given, as they were, before the passing of the Act, to be reviewed on appeal, even if a certificate were given.

On the appeal of the *British Nation* their Lordships reserved their judgment.

Feb. 26. JAMES, L.J., now delivered the judgment of the Court ( *James, Baggallay* , and *Thesiger* , L.JJ.):—

The circumstances under which this appeal has been brought, and the facts on which it has to be decided, are sufficiently stated on the special case, settled by the arbitrator, and the appendix thereto.

In some respects, by reason of the decisions of former arbitrators, the question has assumed a very peculiar aspect. The question immediately before us is whether the British Nation Association, in its quasi corporate character, is or is not liable to be placed on the list of contributories of the British Commercial Company. That company, at the commencement of the transactions out of which this question has arisen, consisted of 174 shareholders, holding 11,014 shares, seventeen other shareholders holding 776 shares, and twenty-three other shareholders holding 210 shares. The differences in the position of these several classes of shareholders **\*703** appear in the special case. By decisions in the arbitration all these several persons were declared not to be liable as contributories.

In the course of the transactions 184 shareholders executed transfers of, in the aggregate, 11,711 shares to persons who were directors, officers, servants, or other nominees of the *British Nation* as its trustees, and by a deed, dated the 31st of December, 1864, shares, amounting in the aggregate to 9892, were expressed to be assigned to the *British Nation* itself by the persons to whom they had previously been transferred as such trustees.

In Lawson's Case it was decided by Lord *Romilly* , as arbitrator, that such last-mentioned persons were not liable to be put on the list of contributories. And it was contended before us that it followed logically from those decisions that the *British Nation* was, as the ultimate transferee, the shareholder in respect of those shares. The original shareholders were, it was said, exonerated by reason of their having got rid of their shares, and the intermediate transferees were in like manner exonerated by reason of their having transferred their shares to the *British Nation* . Either, therefore, it was urged, the previous decisions, or one of them, were or was wrong, or the *British Nation* must be liable as transferee. And in this view of the case the persons who had obtained the decisions in their favour were made respondents to this appeal with the view, if possible, of having the whole matter determined by this Court as to who ought to have been, and who ought to be, placed on the list of contributories. But it was contended by such respondents, and we decided, that under the Acts regulating the arbitration no such appeal was competent, and that the decision in their favour was absolute and final. And, on the other hand, it was contended by the shareholders of the *British Nation* that they were no parties

to the previous decisions, that there was, so far as they were concerned, no *res judicata*, and that they were entitled to have their case decided wholly unprejudiced by the former decisions. This contention is, we think, not to be gainsayed. Their argument on the merits may be very shortly stated. The deed by which their officers and trustees affected to divest themselves of their shares, and to vest them in the association, is, they say, ultrà vires and void. **\*704**

The association was formed for the purposes mentioned in Article 3 of their deed of settlement, such purposes to be carried into effect and the business to be managed by boards of directors and by general meetings in manner there prescribed. Primâ facie there is nothing more inconsistent with the whole scope and character of such a body than that it should enter into a contract of partnership with any other person or persons in any other business whatever. It would require very clear powers to enable a man's partner or partners, or, in a joint stock company, his delegated officers, or the majority of his co-shareholders, to make him a partner with any other person or a shareholder in any other society. But if the society, in its *quasi* corporate character. could take shares in another partnership or body, it would in effect be to make every shareholder a partner or shareholder in such partnership or body. In the deed of settlement in this case there is express power to invest the funds of the society not immediately required in shares. But the language of that clause goes far to negative any such power to invest generally in shares or in a partnership. It is only as an investment of surplus funds that it is permitted to purchase shares, and shares only in docks, &c., things that are mentioned in the articles, established by Act of Parliament, in substance, interests in real estate; nothing, in fact, like a partnership in some other business speculation or adventure. It was put to counsel in the course of the argument whether it could possibly be contended that such a society as this could take shares, or become a partner in a society or partnership for brewing or mining, or buying and selling of merchandise, and it was admitted that it would be difficult so to contend. But in truth, the more or less similarity of the objects, or even absolute identity of the objects, does not affect the principle. It is the entering into a new contract of partnership with new persons under a new constitution, which is absolutely ultrà vires and void, unless specially provided for and authorized.

But it is suggested that there is such special provision and authority in this case. By the 45th article of the deed of settlement it is provided, "that an extraordinary general meeting may accept or take a transfer of or purchase or acquire the business of any other associations, companies, or societies of a similar nature **\*705** wholly or in part with the association hereby established, upon and under such terms, conditions, stipulations, and agreements as such meeting shall think fit."

It is said that it was, and in truth it appears to have been, competent for the society to purchase the business of the *Commercial*, and that it vas a proper term and condition of the purchase of an entire business, that the purchasing company should take the shares of the selling company. It would probably be sufficient to say that it was not one of the terms and conditions of the agreement that the association should take, itself, a transfer of the shares.

Neither the selling company nor the buying company nor the transferring shareholders contemplated such a mode of dealing with the matter. The latter, probably, would have been advised to have nothing to do with such an attempt. What was done was to find individual transferees capable clearly of accepting and holding the shares. And the latter were the officers and managers of the society and their friends, who were anxious to promote the scheme, and were willing to take what they probably then thought an inappreciable risk, having the indemnity of their own association. That was the transaction as it was arranged, and as it was carried out.

© 2013 Thomson Reuters.

But it must be held, we think, that the power to take a transfer of or to purchase a business on such terms, conditions, stipulations, and agreements as the meeting should think fit, could not, under the guise of a condition or stipulation, sanction every dealing and transaction that it might be thought fit to enter into contemporaneously with it. It could not under that guise sanction something so entirely at variance with the whole constitution and principle of the association as to make those shareholders who had carefully limited their liability so far as they could do it to £10 per share, shareholders in another society with a liability to £50 a share. By their constitution it was stipulated that every document binding them shall contain certain express reference to the provision making the funds and property and subscribed capital of the society alone liable, and declaring that the shareholders should only be in fact liable to pay calls on their subscribed capital. Even the power given to two successive general meetings to **\*706** amend the laws was carefully guarded so as not to extend to any alteration enlarging the individual responsibility of the shareholders. And it would be against all reason to hold that a general meeting purchasing a business from another society should have the power to accept, either in terms, or by implication, a condition or stipulation that in respect of such purchased business the shareholders should be liable to a totally different extent, and on a totally different principle, from the liability under which they stood on business of the same kind originally entered by their own officers. If such a condition were expressed in terms it would at once shock the mind of any person to whom it was submitted.

The transaction as it was carried out was reasonable enough. The purchasing company was to the whole extent of its funds and property liable to discharge the liabilities of the selling company, just as it was liable to satisfy its own similar contracts, and there being no novation, the mode in which it assumed that liability was by giving an indemnity to the selling company and its shareholders.

As part of the same indemnity, it became liable to save harmless its own nominees who took transfers of shares in order to facilitate the purchase. But that was only the same liability in another form, namely, the liability to discharge the contracts connected with the transferred business out of the same funds, property and capital, out of which all their other contracts were to be satisfied. That was how things stood when the deed of 1864 was made, and when it was attempted thereby to vest the shares in the association itself. Where was there any authority for that deed? The expressed object of the deed was in fact not to vest the shares, qua existing and continuing shares in the association, but to merge and extinguish the shares, and it is not unworthy of notice that in that very deed the covenant to indemnify such transferring shareholders is expressly limited to the funds and property of the association. It is beyond all question that the trustees, directors, and managers of the association could not by their own act, by means merely of their own physical possession of the common seal, alter their position towards their cestui que trust. The deed of 1864 was an entirely internal matter. Before the execution of that **\*707** deed the shareholders, parties thereto, were liable as such, with an indemnity out of the funds. They had no power, as between them and the association, to transfer their own liability to the latter. And no other person or body of persons could be prejudiced or benefited or affected by an instrument to which they were absolutely strangers, such instrument being void as between the parties to it.

It was argued, however, that this transaction became binding by reason of the entry of the association as owners of the shares in the books of the *Commercial*, and by the inrolment in Chancery of a memorial of the assignment to the association and the acquiescence of the *British Nation* shareholders therein. It was said that this was like Peek's Case [33], that the *British Nation* were at the time of winding-up de facto the shareholders, and that, whatever equity they might have had before the winding-up to be relieved from

their shares, they could not, after the winding-up, assert such equity.

That case, however, has no application if the preceding reasoning is sound; this is not the case of a person induced to become a shareholder, and who had become a shareholder by fraud—but of persons who say truly they never were shareholders.

They never accepted their shares, and if that be so, the entries in the books of the company and the inrolment of the memorial in Chancery were wholly inoperative as to them.

Such entries and memorial are as void as the transaction itself. It is not unimportant to observe that the entries in the books are without date; and that the memorial was not inrolled until the 1st of September, 1865, several months after both the *Commercial* and the *British Nation* had practically ceased to exist, the latter having on the 16th of March, 1865, become amalgamated with, and merged in, the *European* .

And with regard to the alleged acquiescence there are no facts from which any such acquiescence can be inferred. It is found in the case that the deed of 1864 was not submitted to any general meeting, and it is not found, and does not appear, that it was in any other manner made known to the shareholders generally, or that anything was ever done by any one on the faith of or in reliance ***708** on such deed, or in consequence of it, except the above-mentioned entries and memorial which have been already dealt with.

But it is lastly contended that the *British Nation* became equitably liable as contributories. It is said that, under the 200th section of the Act of 1862, all persons legally or equitably liable to contribute to the assets are contributories, and may be put on the list as such. It is impossible to hold that any person who is a debtor to the company in liquidation can be put on the list of contributories. He is bound to pay moneys, which moneys, when paid, will be part of the assets of the company, and in that sense he is liable to contribute to the assets, but that does not make him a contributory within the meaning of the Act. Again, a person who has taken shares in the name of a trustee is, as between him and his own trustee, the person liable to contribute, but that does not make him a contributory as between him and the company. The company may get at him, as it has in several instances, through and in the name of the trustees. But still the equitable liability is to the trustee only, and there is no privity or direct right of any kind as between the company and the cestui que trust . If an officer of the company has misappropriated assets, he may be made to refund them to the liquidator as part of the assets, but that does not make him a contributory. The plain meaning of the Act is a legal or equitable liability to contribute in the character of a partner. A person who has not taken shares may have become bound in equity to the company to take shares. A person who has by some device or contrivance got rid of his shares may be made to take them again. These are instances of the equitable liability to which the Act refers.

But if the *British Nation* did not become actual legal shareholder, it never became under any equitable obligation to the *Commercial* to take shares. It never dealt with the *Commercial* at all in its *quasi* corporate character in respect of the shares. The shares were dealt with by the individual owners of the shares, who alone had a right so to deal.

There was, however, a very substantial equity as between the two companies arising out of the transaction itself. As between the selling company and the purchasing company, the latter became primarily liable to fulfil the contracts of the former, which ***709** has a right to enforce such liability. But as between two such bodies, each of which must be taken to have known the constitution of the other, and indeed without such knowledge, the equitable liability could not extend beyond the legal liability which it would have been intrà vires to give by express covenant,

© 2013 Thomson Reuters.

(1878) 8 Ch. D. 679 Page 18
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

namely, a liability to fulfil such contracts pari passu with its other contracts and out of the same funds.

And that liability has, we are told, been actually so dealt with in the winding-up, that is to say, the policies and other obligations of the *Commercial* have been let in to participate pari passu in the distribution of the assets of the *British Nation* .

The result will be to allow the appeal and discharge the order of the arbitrator putting the *British Nation* on the list of contributories of the *British Commercial* .

The arbitrator will deal with the costs of the appeal as he has done in other cases.

---

1. Law Rep. 4 Ch. 532 .

2. Ibid. 6 Ch. 196 .

3. 1 Ch. D. 576 .

4. 3 H. L. C. 341 .

5. Law Rep. 3 Ch. 105 .

6. Law Rep. 6 Ch. 902 .

7. Ibid. 905, n.

8. Law Rep. 16 Eq. 449 .

9. Law Rep. 9 Eq. 175; Ibid. 7 Ch. 395 .

10. Law Rep. 3 Eq. 361 .

11. 16 W. R. 451 .

12. Albert Arb. Part I. App. B.

13. Law Rep. 2 H. L. 325 .

14. Law Rep. 3 Ch. 105 .

15. Ibid. 4 Ch. 252 .

16. 3 D. M. & G. 459 .

17. 3 C. B. (N.S.) 725 .

18. Ibid. 756, n.

19. 6 H. L. C. 401 .

20. Vol. i. p. 263.

21. Law Rep. 5 Q. B. 642 .

22. 1 D. J. & S. 504 .

23. Law Rep. 9 Eq. 225 , n.

24. 1 H. & M. 672 .

25. Law Rep. 3 H. L. 249 .

26. Law Rep. 7 C. P. 43 .

27. 3 Giff. 521; 4 D. F. & J. 341 .

28. 2 J. & H. 441 .

29. 5 D. M. & G. 465 .

30. 6 E. & B. 327 .

© 2013 Thomson Reuters.

(1878) 8 Ch. D. 679 Page 19
(1878) 8 Ch. D. 679 (1878) 8 Ch. D. 679
**(Cite as: (1878) 8 Ch. D. 679)**

[31]. 3 D. M. & G. 459 .

[32]. 1 De G. & Sm. 550 .

[33]. Law Rep. 4 Ch. 532 .

END OF DOCUMENT

© 2013 Thomson Reuters.