AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Daniel H. Golden
Sean E. O'Donnell
Philip C. Dublin
Dean L. Chapman Jr.
William F. Mongan Jr.
*Counsel for Green Hunt Wedlake Inc.,*
*Trustee of General Motors Nova Scotia Finance Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY., *et al.*,<br>*f/k/a General Motors Corp., et al.*,<br><br>        Debtors. | Chapter 11<br><br>Case No. 09-50026 (REG)<br><br>(Jointly Administered) |
| MOTORS LIQUIDATION COMPANY GUC TRUST,<br><br>        Plaintiff,<br><br>v.<br><br>APPALOOSA INVESTMENT LIMITED PARTNERSHIP I, *et al.*,<br><br>        Defendants. | Adv. Proc. No. 12-09802 (REG) |

**POST-TRIAL REPLY MEMORANDUM OF GREEN HUNT WEDLAKE INC.,
TRUSTEE OF GENERAL MOTORS NOVA SCOTIA FINANCE COMPANY**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...........................................................................................................................3

I. THE NOVA SCOTIA TRUSTEE's STATUTORY CLAIM IS NOT
DUPLICATIVE OF THE NOTEHOLDERS' GUARANTEE CLAIM .............................3

    A. Under the Second Circuit's Holding in *Delta* and Other Case Law, the
Statutory Claim Is Not Duplicative of the Guarantee Claim in a Manner
Requiring Disallowance ...............................................................................3

        1. Old GM Made a Contractual Promise to Pay GM Nova Scotia's
Debts and Liabilities in the Event of Winding Up. ......................................6

        2. The Dicta in *Delta* Relied on by the GUC Trust Does Not Support
Disallowance of the Statutory Claim ...........................................................7

        3. The Fact that the Noteholders Are the Ultimate Beneficiary of the
Notes Portion of the Statutory Claim Should Not Result in
Disallowance ................................................................................................9

    B. Canadian Law Does Not Support Disallowance of the Statutory Claim ...............12

        1. The GUC Trust Offers No Compelling Reason To Doubt That the
Statutory Claim Exists Under Section 135 of the Companies Act .............12

        2. Canadian Bankruptcy Law Is Inapplicable, and In Any Event, the
Statutory Claim Would Be Allowed in Full in a Canadian
Bankruptcy Proceeding ..............................................................................14

    C. Section 502(e) Is Inapplicable to the ULC Claim. ................................................15

    D. The GUC Trust's Arguments To Reduce the Notes Portion of the Statutory
Claim Also Fail .....................................................................................................17

        1. The Statutory Claim Does Not Seek Any Improper Postpetition
Interest ........................................................................................................17

        2. The Statutory Claim Should Not Be Reduced By Any Distributions
Paid Out In Respect of the Guarantee Claim .............................................18

II. THE NOVA SCOTIA TRUSTEE DID NOT ENGAGE IN ANY INEQUITABLE
CONDUCT AND ITS CLAIM SHOULD NOT BE SUBORDINATED,
DISALLOWED, OR RECHARACTERIZED ................................................................19

    A. The Nova Scotia Trustee Is Not an "Insider".......................................................20

    B. There is No Basis To Impute the Conduct of the Noteholders to the Nova
Scotia Trustee .......................................................................................................23

    C. The GUC Trust's Factual Contentions Against the Nova Scotia Trustee Do
Not Demonstrate Any Wrongful Conduct.............................................................25

1. The Noteholders' Selection of the Nova Scotia Trustee Was Entirely Proper, and the Nova Scotia Trustee Is Not "Controlled" By Them.................................................................................26

2. The Nova Scotia Trustee Had No Role or Involvement in the Timing of the GM Nova Scotia Bankruptcy Filing ..................................28

3. The Decision of Whether To Appoint "Inspectors" To Act on Behalf of GM Nova Scotia's Creditors Rested with Those Creditors, Not the Trustee ........................................................................29

4. There Was No Basis for the Nova Scotia Trustee To Further Investigate the Lock-Up Agreement, the Consent Fee, or the Intercompany Loan Settlement ................................................................30

5. The Nova Scotia Trustee Properly Vetted the Swap Claim .......................30

6. Any Irregularities That May Exist in the Statement of Affairs Are Not Attributable to the Nova Scotia Trustee .............................................34

III.   THE SWAP AGREEMENTS WERE VALIDLY TERMINATED AND NEW GM'S SWAP CLAIM WAS PROPERLY CALCULATED...............................................37

CONCLUSION..................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*,
   531 F.3d 1272 (10th Cir. 2008) ............................................................................21

*Bank of Montreal v. Crowell*
   (1980) 37 N.S.R. (2d) 292 (N.S.T.D.) ..................................................................29

*Canada (Minister of National Revenue – M.N.R.) v. Dworkin Furs (Pembroke) Ltd.*,
   [1967] S.C.J. No. 13, [1967] S.C.R. 223 ................................................................7

*Curtis v. Walpole Tire & Rubber Co.*,
   227 F. 698 (D. Mass. 1914) ....................................................................................5

*Herzog v. Leighton Holdings, Ltd.*,
   239 B.R. 497 (N.D. Ill. 1999) ...............................................................................22

*In re 201 Forest St. LLC*,
   409 B.R. 543 (Bankr. D. Mass. 2009) ...................................................................22

*In re 604 Columbus Ave. Realty Trust*,
   968 F.2d 1332 (1st Cir. 1992) ...............................................................................25

*In re AEG Acquisition Corp.*,
   161 B.R. 50 (B.A.P. 9th Cir. 1993) .......................................................................22

*In re Autobacs Strauss, Inc.*,
   473 B.R. 525 (Bankr. D. Del. 2012) ......................................................................22

*In re Brinke Transp., Inc.*,
   No. 87-03785, 1989 WL 233147 (Bankr. D. N.J. Jan. 23, 1989), *aff'd*, Civ. Act. No.
   89-1778, 135 L.R.R.M. 2800 (D. N.J. 1989) ........................................................10

*In re Delta Air Lines*,
   370 B.R. 552 (Bankr S.D.N.Y. 2007) .....................................................................6

*In re Delta Air Lines, Inc.*,
   608 F.3d 139 (2d Cir. 2010) .........................................................................5, 7, 8, 9

*In re Enron Corp.*,
   379 B.R. 425 (S.D.N.Y. 2007) ..............................................................................24

*In re Enron Corp.*,
   No. 01-16034 (AJG), 2006 WL 1030420 (Bankr. S.D.N.Y. Apr. 6, 2006)............10

*In re F.W.D.C. Inc.*,
 158 B.R. 523 (Bankr. S.D. Fla. 1993) .....................................................................................19

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
 160 B.R. 882 (Bankr. S.D.N.Y. 1993) ....................................................................................10

*In re Gessin*,
 668 F.2d 1105 (9th Cir. 1982) .................................................................................................19

*In re Herby's Foods, Inc.*,
 134 B.R. 207 (Bankr. N.D. Tex. 1991) *subsequently aff'd sub nom* .....................................22

*In re Jevic Holding Corp.*,
 08-11006 BLS, 2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ......................................23

*In re Kids Creek Partners*,
 200 F.3d 1070 (7th Cir. 2000) *aff'd sub nom* ........................................................................22

*In re Kids Creek Partners, L.P.*,
 212 B.R. 898 (Bankr. N.D. Ill. 1997) *aff'd*, 233 B.R. 409 (N.D. Ill. 1999) *aff'd sub
 nom* ..........................................................................................................................................22

*In re La Guardia Assoc., L.P.*,
 Nos. 04-34512 (SR), 04-34514 (SR), 2006 WL 6601650 (Bankr. E.D. Pa. Sept. 13,
 2006) .......................................................................................................................................22

*In re Mid-Am. Waste Sys., Inc.*,
 284 B.R. 53 (Bankr. D. Del. 2002) ..........................................................................................23

*In re Multiponics, Inc.*,
 622 F.2d 709 (5th Cir. 1980) ...................................................................................................24

*In re Nat'l Energy & Gas Transmission*,
 492 F.3d 297 (4th Cir. 2007) ...................................................................................................19

*In re New York Commercial Co.*,
 233 F. 906 (2d Cir. 1916) ........................................................................................................19

*In re NMI Sys. Inc.*,
 179 B.R. 357 (Bankr. D. D.C. 1995) .......................................................................................22

*In re Nw. Airlines Corp.*,
 No. 05-17930, 2007 WL 2682129 (Bankr. S.D.N.Y. Sep. 12, 2007)......................................10

*In re Owens Corning*,
 419 F.3d 195, 212-213 (3d Cir. 2005) ....................................................................................11

*In re Oxford Health Investors, L.L.C.,*
  Nos. 00-80676C-7D-00-806781C-7D, 2002 WL 31031631 (Bankr. M.D. N.C. Sep. 3,
  2002) .......................................................................................................................................22

*In re Southmark Corp.,*
  138 B.R. 831 (Bankr. N.D. Tex. 1992)..................................................................................22

*Ivanhoe Bldg. & Loan Ass'n of Newark v. Orr,*
  295 U.S. 243 (1935)...............................................................................................................19

*LTV Corp. v. Pension Benefit Guar. Corp.* (*In re Chateaugay Corp.*),
  115 B.R. 760 (S.D.N.Y. 1990), *aff'd* 130 B.R. 690 (S.D.N.Y. 1991) ...................................10

*Matter of Herby's Foods, Inc.,*
  2 F.3d 128 (5th Cir. 1993) .....................................................................................................22

*Nuveen Mun. Trust v. WithumSmith Brown,*
  692 F.3d 283 (3d Cir. 2012)...................................................................................................19

*Pan Am Corp. v. Delta Air Lines, Inc.,*
  175 B.R. 438 (S.D.N.Y. 1994)...............................................................................................23

*Theatre Amusement Co. v. Stone,*
  [1914] S.C.J. No. 31, 50 S.C.R. 32 at 36-37 (S.C.C.).............................................................7

*Union Sav. Bank v. Augie/Restivo Banking Co.* (*In re Augie/Restivo Banking Co.*),
  860 F.2d 515 (2d Cir. 1988)...........................................................................................11, 12

**STATUTES**

11 U.S.C.
  § 101(2)(A) ............................................................................................................................22
  § 101(2)(B)..............................................................................................................................22
  § 101(31)(B).............................................................................................................................21
  § 101(31)(E).............................................................................................................................21
  § 502(b)(2) ..............................................................................................................................17
  § 502(e) ...........................................................................................................................1, 3, 15

*Assignments and Preferences Act (Nova Scotia),*
  R.S.N.S. 1989, c. 25 ...............................................................................................................29

The Nova Scotia Companies Act
  § 24(1)........................................................................................................................................7
  § 135............................................................................................................................... passim

*The Statute of Elizabeth,*
  150 (Imp.), 13 Eliz., c. 5 ........................................................................................................29

**OTHER AUTHORITIES**

4 COLLIER ON BANKRUPTCY (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009)............16

Frank Bennett, BENNETT ON BANKRUPTCY (14th ed. 2012) .........................................................21

Sarah P. Bradley, NOVA SCOTIA COMPANIES ACT & COMMENTARY (LexisNexis Canada,
2012 ed.) ...............................................................................................................................7

Canadian Association of Insolvency and Restructuring Professionals Rules of
Professional Conduct Interpretation to Rule 4, point 6(a) .......................................................27

## PRELIMINARY STATEMENT

In its opening post-trial brief, the GUC Trust sets forth a litany of competing legal theories in support of its effort to disallow all or a portion of the Statutory Claim.[1]  Despite the sheer volume of legal theories asserted, none are compelling.

First, the GUC Trust sets forth a host of legal bases as to how and why the Notes portion of the Statutory Claim is duplicative of the Guarantee Claim.  After discussing *Delta* and related case law—the law truly relevant to deciding this issue—the GUC Trust urges the Court to consider Section 502(e) of the Bankruptcy Code, Canadian corporate law, and Canadian bankruptcy law, and failing that, to consider two other inapplicable legal theories aimed at reducing the recovery on the Statutory Claim.  The GUC Trust's inability to commit to a clear theory supported by applicable legal authority is telling.  Indeed, the law of the Second Circuit is clear that a debtor who has made promises to two separate parties must honor its obligations, and the fact that the a single party may be an ultimate economic beneficiary of both promises is of no consequence where, as here, the alleged duplication is the result of the debtor's conscious choice for which it received full consideration.

The GUC Trust follows a similar approach with respect to its equitable subordination claim, citing dozens of inconsequential facts in the hope that they may cumulatively amount to some semblance of inequitable conduct.  Its argument begins with the unsupportable (and untimely) proposition that the Nova Scotia Trustee, a court-appointed official in Halifax tasked with collecting on GM Nova Scotia's assets to distribute to creditors, is an "insider" exercising control over Old GM, formerly one of the largest corporations on earth.  It then attempts to argue

---

[1] All defined terms used herein have the same meaning assigned to them in either the Joint Statement of Facts of Certain Noteholders, the GM Nova Scotia Trustee, and New GM (the "**Joint Statement of Facts**") or the Post-Trial Memorandum of Green Hunt Wedlake Inc., Trustee of General Motors Nova Scotia Finance Company (the "**Nova Scotia Trustee Post-Trial Brief**").

that the conduct of the Noteholders should be imputed to the Nova Scotia Trustee, notwithstanding the high legal threshold for imputation and the fact that the Nova Scotia Trustee is fully independent from the Noteholders.  But the meat of the GUC Trust's equitable subordination argument is the fourteen pages of its brief devoted to the Nova Scotia Trustee's conduct in which it tells an exaggerated and at times false story about Mr. Wedlake's role in this litigation.  The evidence cited by the GUC Trust in support of its claims is at best piecemeal, taken out of context in order to create an impression of wrongdoing where none exists, and often meaningless, reflecting a fundamental misunderstanding of Canadian bankruptcy law and the role of a Canadian bankruptcy trustee.

Finally, the GUC Trust provides no legal or factual opposition to the Nova Scotia Trustee's longstanding position that the Swap Agreements were (i) validly terminated pursuant to the Nova Scotia Trustee's disclaimer which New GM agreed constituted a termination and (ii) properly valued in accordance with their actual market worth.  As shown at trial, although GM Nova Scotia's bankruptcy entitled New GM to declare an "Early Termination," New GM refused to do so because it would have reduced the monies owed to it under the Swap Agreements by more than $200 million.  Consequently, the Nova Scotia Trustee prudently disclaimed the Swap Agreements pursuant to Canadian bankruptcy law subject to three conditions.  New GM accepted those conditions and agreed the Swap Agreements were terminated.  As a result of the Nova Scotia Trustee's disclaimer, New GM was entitled under Canadian bankruptcy law to claim against the GM Nova Scotia estate for its damages, and because the Swap Agreements are governed by New York law, which treats a disclaimer as a breach of contract, New GM was entitled to (and did) claim its "expectation damages," i.e., the sum it would have received had GM Nova Scotia performed under the Swap Agreements.  The GUC Trust's analysis ignores the

2

propriety of this termination and does not even attempt to find flaw with the valuations offered

by either New GM or the Nova Scotia Trustee's expert.  The Statutory Claim should be allowed

in full.

## ARGUMENT

**I.   THE NOVA SCOTIA TRUSTEE'S STATUTORY CLAIM IS NOT DUPLICATIVE OF THE NOTEHOLDERS' GUARANTEE CLAIM**

In its post-trial brief, the GUC Trust continues to mistakenly contend that the portion of

the Statutory Claim in respect of the Notes should be disallowed as duplicative of the Guarantee

Claim.  The GUC Trust advances three separate bases for this alleged duplication: (i) the general

rule prohibiting double recoveries in U.S. bankruptcy proceedings; (ii) Canadian law (corporate

and bankruptcy); and (iii) Section 502(e) of the Bankruptcy Code.  All three positions are

without merit.

### A.   Under the Second Circuit's Holding in *Delta* and Other Case Law, the Statutory Claim Is Not Duplicative of the Guarantee Claim in a Manner Requiring Disallowance

Old GM made two promises.  First, when it elected to form GM Nova Scotia as a Nova

Scotia ULC, Old GM promised GM Nova Scotia that it would pay all of GM Nova Scotia's

outstanding debts, liabilities, and costs of winding up in the event GM Nova Scotia was wound

up.[2]  Second, when GM Nova Scotia issued the Notes, Old GM guaranteed them.[3]  Both

promises make Old GM independently liable for the full amount of the Notes.  As described at

length in the Nova Scotia Trustee's pre-trial brief and its opening brief, under *In re Delta Air*

*Lines, Inc.*, 608 F.3d 139 (2d Cir. 2010), a debtor who is obliged to pay the same debt to two

different parties must do so, subject only to the claimants receiving a maximum total recovery of

---

[2] *See* Nova Scotia Trustee Post-Trial Brief at 4-5 (Section I.B).

[3] *See* Joint Statement of Facts ¶ 4.

no more than 100% of the amount owed.[4]  And under the leading substantive consolidation cases

in the Second and Third Circuits, the fact that a single party may be an ultimate economic

beneficiary of both promises is of no consequence where the "double recovery" is the result of

the debtors' conscious choice.[5]

In its post-trial brief, the GUC Trust responds directly to the *Delta* case—while wholly

ignoring the arguments the Nova Scotia Trustee has made in its pre-trial and post-trial briefs in

respect of the substantive consolidation cases.  Significantly, the GUC Trust has conceded that,

under *Delta*, "where a debtor [makes] contractual promises to pay two different parties an

amount calculated by reference to the same event, the promisor's payment to one party will not

excuse the promised payment to the other."[6]  Although the GUC Trust calls this an

"unremarkable proposition,"[7] it is in fact a significant concession, since, like Delta, Old GM

made two promises to two different parties—the Noteholders under the Guarantee and GM Nova

Scotia by establishing it as a Nova Scotia ULC.[8]

*Delta*—the only controlling case on the issue of claims allowance where a debtor has

made two separate promises to pay the same debt to two different parties—undermines the GUC

Trust's excessively broad assertion that "Creditors Are Entitled to Only One Recovery For One

Loss."[9]  Although the GUC Trust cites dozens of cases dating back to the 19th century to support

---

[4] *See* Pre-Trial Memorandum of Green Hunt Wedlake Inc., Trustee of General Motors Nova Scotia Finance Company (the "**Nova Scotia Trustee Pre-Trial Brief**") at 28-32 (Section III.A); Nova Scotia Trustee Post-Trial Brief at 8-11 (Section I.F).

[5] *See id.*

[6] GUC Trust's Post-Trial Brief in Connection with (i) Official Committee of Unsecured Creditors' First Amended Objection to Claimed Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief (Bankr. Dkt. No. 7859) and (ii) Motors Liquidation Co. GUC Trust v. Appaloosa Investment Ltd. Partnership I, et al. (the "**GUC Trust Post-Trial Brief**") at 75.

[7] *Id.*

[8] *See* Nova Scotia Trustee Post-Trial Brief at 4-7 (Sections I.B, I.C, I.D, I.E).

[9] GUC Trust Post-Trial Brief at 70.

its contention that, generally speaking, courts only allow one recovery for a single loss, none of

them address the particular issue confronted by the Second Circuit in *Delta* applicable here:

whether a debtor must pay allegedly "duplicative" claims in circumstances where the debtor has

promised two separate parties it will do so.[10]  The Second Circuit's unequivocal answer in *Delta*

is yes.[11]  In fact, the bankruptcy court in *Delta* specifically rejected the "cosmic argument" made

---

[10] *See id.* at 70-73, ns. 341-345.

In footnotes 341 and 342, the GUC Trust cites to 12 different cases in which various federal and state courts have held that a single plaintiff asserting multiple causes of actions claiming damages based on the same underlying facts may recover only once.  These cases—none of which are bankruptcy cases or involve fact patterns even remotely similar to the one presented here—all address the rule that no plaintiff should ever recover more than 100% of its damages.  These cases are totally inapposite.  This is not a case where a single party is asserting multiple causes of action, but rather one in which two creditors have, pursuant to separate obligations, asserted claims against a bankrupt entity for monies owed to them.  In fact, the Nova Scotia Trustee fully concedes that the Noteholders should in no event recover more than 100% of the amount owed under the Notes.  The particular question here is bankruptcy-specific, involving two proofs of claims that reference a single debt, and the pertinent inquiry is determining under what circumstances relevant law supports allowance of both claims.

In footnotes 343-345, as well as on page 72 (the *Walpole* case), the GUC Trust cites to 12 cases in which courts have disallowed multiple claims by a single creditor based on a single debt.  With only two exceptions, the cases relied upon by the GUC Trust were all decided prior to 1940, including two 19th century state court opinions.  All of the cases pre-date the Second Circuit opinion in *Delta*—which specifically addressed and rejected the argument that "a single loss can only give rise to a single claim in bankruptcy"— by at least a dozen, and in some cases more than 100, years.  In any event, they are fundamentally distinguishable because all involve multiple claims by a single creditor for a single liability for which the debtor provided only a single consideration.  By contrast, here, there are two creditors (the Nova Scotia Trustee and the Noteholders) asserting independent claims (the Statutory Claim and the Guarantee Claim) based on two separate liabilities (Section 135 and the Guarantee) for which Old GM received separate consideration (favorable tax treatment and the proceeds of the Notes).

The *Walpole* case highlighted by the GUC Trust—a 1914 decision from the District Court of Massachusetts—is similarly inapposite.  There, a single creditor had asserted two claims against a debtor in respect of certain notes, the first based on the debtor's indorsement of the notes and the second based on the debtor having assumed all the liabilities of the issuer of the notes.  *See Curtis v. Walpole Tire & Rubber Co.*, 227 F. 698, 701 (D. Mass. 1914).  Significantly, the bank had also asserted a direct cause of action against the issuer of the notes in Massachusetts state court.  *See id.*  In its analysis, the District Court upheld the determination of the Court-appointed Special Master under which (i) only the claim based on the debtor's assumption of the issuer's liabilities would be allowed and (ii) the dividend paid in respect of that claim would only be to the extent of the deficiency between the amount the bank received in its state court action against the issuer and the debtor's full liability on the notes.  *See id.*  Thus, in *Walpole*, the creditor had asserted three claims—one against the issuer and two against the debtor-indorser (one of which was disallowed).  By contrast, here, the Noteholders have asserted one claim against the issuer (GM Nova Scotia) and just ***one*** against the debtor-guarantor (Old GM).  The Noteholders have not asserted two duplicative claims against the debtor-guarantor as in *Walpole*.  Here, the allegedly duplicative claim has instead been asserted by the Nova Scotia Trustee pursuant to statute.  *Walpole* has nothing to say about whether such a claim should be disallowed.

[11] *See Delta Air Lines, Inc.*, 608 F.3d at 149; Nova Scotia Trustee Post-Trial Brief at 8-9 (Section I.F).

by the GUC Trust that the law does not allow a claimant to recover for a single injury based on multiple legal theories.[12]

Ultimately, the GUC Trust attempts to distinguish *Delta* in three ways.  First, it argues that Old GM's promise to GM Nova Scotia was not explicitly contractual.[13]  Second, it cites to certain dicta in *Delta* to try and suggest that *Delta* actually supports disallowance.[14]  Third, it argues that, unlike in *Delta*, a single party (the Noteholders) is the ultimate economic beneficiary of both claims, and it is on this last point that the substantive consolidation cases are particularly instructive.[15]  For the reasons described below, none of these arguments alter the conclusion that the Statutory Claim should be allowed in full.

### 1.    Old GM Made a Contractual Promise to Pay GM Nova Scotia's Debts and Liabilities in the Event of Winding Up.

First, the GUC Trust's argument that, "[u]nlike the debtor in Delta, Old GM made only one *contractual* promise to pay (the Guarantee),"[16] misapprehends the nature of Old GM's liability under Section 135.  Even if Old GM had never explicitly promised to pay GM Nova Scotia's debts and liability in the event of winding up, the act of forming GM Nova Scotia as a ULC was a volitional act that is certainly analogous to signing a contract.  The formation constitutes a voluntary, unequivocal assumption of an obligation to pay, and the characterization of that obligation as "contractual" or whatever else should not alter its underlying significance.

But this is all beside the point, because Old GM did in fact contract to pay all of GM Nova Scotia's debts and liabilities in the event of a winding up.[17]  The formation of GM Nova

---

[12] *See In re Delta Air Lines*, 370 B.R. 552, 556-58 (Bankr S.D.N.Y. 2007).

[13] *See* GUC Trust Post-Trial Brief at 76.

[14] *See id.* at 75-76.

[15] *See id.* at 76.

[16] *Id.* (emphasis added).

[17] *See* Nova Scotia Trustee Post-Trial Brief at 4-5 (Section I.B).

Scotia as a Nova Scotia ULC was documented in GM Nova Scotia's Memorandum and Articles

of Association which specifically states that "[t]he liability of the members is unlimited."[18]

Under Section 24(1) of the Nova Scotia Companies Act, a company's Articles of Association

"shall, when registered, bind the company and the members thereof to the same extent as if they

respectively had been signed and sealed by each member, and contained covenants on the part of

each member, his heirs, executors and administrator, to observe all the provisions of the

memorandum and of the articles."  Indeed, the Canadian Supreme Court has specifically held

that, "***the articles of association constitute a contract between the company and the***

***shareholders*** . . . ."[19]

It is a result of this contract between Old GM, as sole member of GM Nova Scotia, and

GM Nova Scotia, that the Nova Scotia Trustee has brought the Statutory Claim pursuant to

Section 135, and under *Delta*, such contractual liability must be honored: "[T]he general legal

principle that precludes double liability for a single injury or loss has ***never*** been applied by any

court to void separate contract obligations owed to different parties under different contracts."[20]

### 2.    The Dicta in *Delta* Relied on by the GUC Trust Does Not Support Disallowance of the Statutory Claim

Second, the GUC Trust cites to certain dicta at the very end of the *Delta* opinion to argue

that *Delta* in fact supports disallowance.[21]  By way of background, in that case, Delta had agreed

that, in the event it defaulted on its aircraft leases, it would (i) reimburse certain Owner

---

[18] Def. Tr. Ex. 5 at GHW0000583.

[19] *Canada (Minister of National Revenue – M.N.R.) v. Dworkin Furs (Pembroke) Ltd.*, [1967] S.C.J. No. 13, [1967] S.C.R. 223 at 233 (S.C.C.) (emphasis added) *citing Theatre Amusement Co. v. Stone*, [1914] S.C.J. No. 31, 50 S.C.R. 32 at 36-37 (S.C.C.); *see also* Sarah P. Bradley, Nova Scotia Companies Act & Commentary (LexisNexis Canada, 2012 ed.) at pp. 4-5 (Under Canadian law, "the articles of association are deemed to be a contract between and among the corporation and its members . . . .  [It is a] fundamental tenet that the articles of association are not only . . . binding on the company itself, but also . . . binding on all of the members of the company personally.").

[20] *Delta Air Lines, Inc.*, 608 F.3d at 150 *citing In re Delta Air Lines, Inc.*, 370 B.R. at 557 (emphasis added).

[21] *See* GUC Trust Post-Trial Brief at 75-76.

Participants for the tax benefits lost upon foreclosure of their planes and (ii) pay a stipulated loss value ("**SLV**") to certain Indenture Trustees.[22]  The SLV included the tax benefits separately promised to the Owner Participants.[23]  Delta's bankruptcy gave rise to claims from both the Owner Participants and the Indenture Trustees.[24]  The latter set of claims were settled under the so-called "Bingham Term Sheet" in which Delta agreed to pay the Indenture Trustees the full value of the SLV, including the portion duplicative of the Owner Participants' tax benefits.[25]  The dispute regarding the claims of the Owner Participants, however, went forward.[26]

In the closing sentences of the opinion which the GUC Trust cites to, the Court is responding to Delta's argument that allowance of the Owner Participants' claims "would violate the bankruptcy policy of equality of distribution among creditors."[27]  Specifically, the Court is chiding Delta for belatedly making this argument, observing that, if Delta had wanted to avoid this problem, it should not have agreed to pay the "overlap" under the Bingham Term Sheet.[28]  In stating, "the proper remedy was disallowance of the claims of the Indenture Trustee to the extent they were predicated on the Owner Participants' [tax benefit] entitlements," the Court is simply saying that Delta could have avoided the problem it now complains of when it negotiated the Bingham Term Sheet by not agreeing to pay the duplicative portion of the SLV in the first place. Delta cannot now be heard to complain since "it is Delta's own fault."[29]

---

[22] *See Delta Air Lines, Inc.*, 608 F.3d at 142.

[23] *See id.*

[24] *See id.* at 143-44.

[25] *See id.*

[26] *See id.* at 144.

[27] *Id.* at 150.

[28] *Id.*

[29] *Id.*

In this paragraph, the Court is focusing on Delta's own conduct.  Contrary to the GUC

Trust's contention, it is not suddenly ruling—in a single sentence at the very end of the opinion,

without any analysis or consideration of the issue—that, if Delta had not agreed to the Bingham

Term Sheet and the Court had been asked to adjudicate the claims of the Indenture Trustees,

disallowance of the "duplicative" portion of those claims would have been proper.  In fact, as

described above, the primary holding of *Delta*—that if a debtor contracts to pay duplicative

claims, then it must pay both[30]—explicitly counsels against disallowance of the Indenture

Trustees' claims if an objection had been raised.  It is impossible to reconcile this fundamental

holding with the GUC Trust's reading of the dicta at the end of the opinion.

### 3.    The Fact that the Noteholders Are the Ultimate Beneficiary of the Notes Portion of the Statutory Claim Should Not Result in Disallowance

The fact that the Noteholders are the ultimate beneficiary of the Notes portion of the

Statutory Claim does not support disallowance.  The GUC Trust attempts to distinguish *Delta* on

this ground, pointing out that "[u]nlike in *Delta*, the economic beneficiaries with respect to the

[Statutory] Claim and the Guarantee Claims are the same parties (the Noteholders)."[31]  As a

factual matter, this is true—at least as it relates to the portion of the Statutory Claim that is based

upon the Notes.  But the GUC Trust's argument—which is equitable and not legal in nature—

should nevertheless be rejected.

In support of its argument, the GUC Trust cites to a variety of cases for the proposition

that claims should be disallowed where they are asserted for the benefit of the same creditor,

even if the claimants themselves are distinct parties.[32]  But all of those cases are fundamentally

---

[30] *See id.* at 149.

[31] GUC Trust Post-Trial Brief at 76.

[32] *See id.* at 73-74.

distinguishable because none involve a situation where, as here, a debtor had voluntarily taken on two separate obligations to two separate claimants.[33] Unlike Old GM, which separately made promises to both GM Nova Scotia and the Noteholders, these cases involve debtors who only made a single underlying promise to pay. This difference is essential. For example, in the *Finley, Kumble* case highlighted by the GUC Trust, the Pension Benefit Guarantee Corporation (the "**PBGC**") and the trustee of the debtor's pension plan both sought to recover the debtor's unpaid pension obligations.[34] Because the debtor had only made one underlying promise (to contribute to its pension plan), the Court noted that each claimant was seeking "an identical recovery" for "an identical injury," and ruled that, among other things, the claim of the trustee was disallowed to the extent it duplicated the PBGC's unfunded obligation claim.[35] Neither party in *Finley Kimble*, however, argued that the claims at issue were not duplicative or that they were distinct. Moreover, there was no evidence that the debtor had contracted or structured its business to result in multiple claims or that it had received any benefit from adopting the structure which resulted in multiple claims; instead, the competing claims were the result of multiple parties filing claims based on the debtor's single promise to fund its pension plan.

---

[33] *See In re Nw. Airlines Corp.*, No. 05-17930, 2007 WL 2682129, at *2 (Bankr. S.D.N.Y. Sep. 12, 2007) (merging individual claims with claims of union representing those individuals where both claims sought to recover on the same underlying judgment); *In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 1030420, at *2 (Bankr. S.D.N.Y. Apr. 6, 2006) (finding claim asserted by individual for unpaid wages and benefits duplicative of claim filed by individual's union on his behalf for same unpaid wages and benefits); *LTV Corp. v. Pension Benefit Guar. Corp.* (*In re Chateaugay Corp.*), 115 B.R. 760, 783-784 (S.D.N.Y. 1990), *aff'd* 130 B.R. 690, 698 (S.D.N.Y. 1991) (finding two claims asserted by the PBGC (one in its individual capacity and one in its capacity as successor plan trustee) for certain unpaid pension contributions duplicative); *In re Brinke Transp., Inc.*, No. 87-03785, 1989 WL 233147, at *2-*3 (Bankr. D. N.J. Jan. 23, 1989), *aff'd*, Civ. Act. No. 89-1778, 135 L.R.R.M. 2800 (D. N.J. 1989) (finding that claim asserted by the National Labor Relations Board based on violations of a collective-bargaining agreement subsumed individual claims of certain unions to the extent union claims were predicated on the same violations of collective-bargaining agreement).

[34] *See In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 887 (Bankr. S.D.N.Y. 1993).

[35] *Id.* at 893-94.

The facts of the cases cited by the GUC Trust simply don't resemble those presented here. The more apt analogy is to the doctrine of substantive consolidation which deals with the question of whether to consolidate a creditor's claims against multiple debtors on account of a single debt obligation. In the Second Circuit, before consolidating, a bankruptcy court must consider "whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit.'"[36] As described in greater length in the Nova Scotia Trustee's pre-trial and opening post-trial briefs, the leading substantive consolidation cases in the Second and Third Circuits hold that debtors should be bound by their "choice of how to structure the affairs of [their] affiliate group of companies" and "cannot . . . ignore [in bankruptcy] . . . the very ground rules [they] put in place" when they issued debt.[37]

This principle is directly applicable here. In order to achieve certain tax benefits and raise funds from the public bond markets, Old GM voluntarily chose to form GM Nova Scotia as a ULC, and in so doing, knowingly subjected itself to unlimited liability to GM Nova Scotia in the event of a winding up.[38] In connection with GM Nova Scotia's issuance of the Notes, Old GM knowingly provided the Noteholders with a contractual Guarantee as a credit enhancement.[39] Although Old GM could have (i) refused to offer the Guarantee or (ii) contracted out of its Section 135 liability when GM Nova Scotia issued the Notes under Section 135(f),[40] it did not do so. The Notes, as packaged by Old GM, were accepted by the Noteholders. This arrangement, in the words of the Second Circuit, "create[s] significant

---

[36] *Union Sav. Bank v. Augie/Restivo Banking Co.*, (*In re Augie/Restivo Banking Co.*), 860 F.2d 515, 518 (2d Cir. 1988) (*citing* COLLIER ON BANKRUPTCY § 110.6 at 1100-33).

[37] *See* Nova Scotia Trustee Pre-Trial Brief at 30-32 (Section III.A); Nova Scotia Trustee Post-Trial Brief at 9-11 (Section I.F) (*citing In re Owens Corning*, 419 F.3d 195, 212-13 (3d Cir. 2005)).

[38] *See* Nova Scotia Trustee Post-Trial Brief at 4-7 (Sections I.B, I.C, I.D).

[39] *See* Joint Statement of Facts ¶ 4.

[40] *See* Nova Scotia Trustee Post-Trial Brief at 5 (Section I.C).

equities."[41]  It would be inequitable to disallow the Notes portion of the Statutory Claim simply

because the Noteholders are the ultimate economic beneficiaries.  Old GM has made clear and

unequivocal promises to GM Nova Scotia and the Noteholders and has itself reaped significant

tax advantages in return.  This Court should hold Old GM to its bargain.

### B.    Canadian Law Does Not Support Disallowance of the Statutory Claim

As set forth in the Nova Scotia Trustee's opening post-trial brief, the GUC Trust's

duplicative claim allegation should be decided in accordance with U.S. bankruptcy law.[42]

Nevertheless, in its post-trial brief the GUC Trust continues to push the Canadian law arguments

advanced by its expert, Associate Professor Mohammed Khimji, who inappropriately cites to (i)

19th century English history which he misinterprets, and (ii) Canadian bankruptcy law principles

beyond his expertise, to inexplicably argue that the claims are duplicative as a matter of Nova

Scotia corporate law.  These Canadian law considerations are irrelevant, and in any event, do not

support disallowance.

### 1.    The GUC Trust Offers No Compelling Reason To Doubt That the Statutory Claim Exists Under Section 135 of the Companies Act

As the Nova Scotia Trustee argued in its opening brief, according to the plain language of

Section 135, the Nova Scotia Trustee has a valid claim against Old GM, and the relevant legal

inquiry in these proceedings is whether recovery on the Notes portion of that claim is duplicative

of recovery on the Guarantee Claim under U.S. bankruptcy law.[43]  Rather than just concede this

point, the GUC Trust leads off its argument as to why the claims are duplicative by relying on

Associate Professor Khimji to argue that the Guarantee Claim and the Statutory Claim are

---

[41] *Augie/Restivo*, 860 F.2d at 519.

[42] *See* Nova Scotia Trustee Post-Trial Brief at 3-4 (Section I.A) and 11-12 (Section I.G).

[43] *See id.* at 3-5 (Sections I.A, I.B, I.C) and 11-12 (Section I.G).

"substitutes for each other."[44]  It then relies on Associate Professor Khimji to argue that

"enforcement of the guarantee should be in lieu of, and not in addition to, enforcement of a claim

under section 135" as a matter of Canadian corporate law.[45]

        With respect to the argument that the two claims are substitutes, this is true only in a

general, non-legal sense, and in fact the claims differ in many key respects.  The GUC Trust

twice alleges that the Nova Scotia Trustee's Canadian corporate law expert, Professor Edward

Iacobucci, "conceded" that the claims are substitutes.[46]  But the GUC Trust's citation of

Professor Iacobucci's testimony is misleading.  Far from "conceding" any crucial point,

Professor Iacobucci merely agreed with the unremarkable proposition advanced by the GUC

Trust that both a guarantee and Section 135 provide greater assurance to creditors that they will

be repaid, and can be considered "functional" substitutes in a "not legal, but just sort of casual"

sense.[47]  Indeed, in his direct testimony, Professor Iacobucci describes five critical differences

between Section 135 liability and a personal guarantee.[48]  In any event, the fact that they could

be considered "functional" substitutes is meaningless.  For example, a guarantee issued in

respect of a debt could be considered a "substitute" for the issuer's underlying promise to pay in

the sense that it also provides security to the lender—but that doesn't mean that the guarantee

somehow replaces the issuer's own liability.

        But perhaps even more critically, the fact that both a guarantee and Section 135 provide

creditors with greater assurance of repayment doesn't make them mutually exclusive.  As

Professor Iacobucci testified, "[i]f a party wishes to offer an additional avenue for enforcing a

---

[44] GUC Trust Post-Trial Brief at 68-69.

[45] *Id.* at 69-70.

[46] *Id.* at 41, 69.

[47] Trial Tr. 11/26/12 (Iacobucci) 57:18-58:19.

[48] *See* Iacobucci Direct Test. ¶ 25.

debt, it does not follow as a matter of logic or law that it is closing off an existing avenue."[49] The GUC Trust completely ignores the possibility that an issuer of debt may want to offer enhanced security or that a creditor may demand it.

With respect to the argument that disallowance is required as a matter of Nova Scotia law because the claims are "substitutes," the GUC Trust makes the same logical mistake that Associate Professor Khimji makes, conflating the question of the existence of a claim with recovery on that claim. Because it is undisputed that Section 135 liability has been established and that the Section 135 claim exists alongside the Guarantee Claim,[50] the discrete question to be answered is whether recovery under both Section 135 and the Guarantee is appropriate. This is a question that finds its answer in the bankruptcy law of the relevant jurisdiction in which the claims are asserted.[51] Instead, the GUC Trust tries to answer that question by delving into Associate Professor Khimji's misguided analysis of Section 135.[52] The Nova Scotia Trustee went to great effort in its opening brief to explain the many ways in which Associate Professor Khimji's theory is fatally flawed, not least of which is that it contradicts the plain language of Section 135. For all the many reasons described at length in the Nova Scotia Trustee's opening brief, the GUC Trust's argument should be rejected in full.[53]

> ### 2. Canadian Bankruptcy Law Is Inapplicable, and In Any Event, the Statutory Claim Would Be Allowed in Full in a Canadian Bankruptcy Proceeding

The GUC Trust also continues to press its argument concerning the Canadian rule against double proof, adopting Associate Professor Khimji's arguments and concluding that the Notes

---

[49] *Id.* ¶ 25.

[50] *See* Trial Tr. 9/21/12 (Khimji) 27:24-28:9, 35:16-36:14.

[51] *See* Nova Scotia Trustee Post-Trial Brief at 3-4 (Section I.A) and 11-12 (Section I.G); Iaocbucci Direct Test. ¶¶ 49-52.

[52] *See* GUC Trust Post-Trial Brief at 69-70.

[53] *See* Nova Scotia Trustee Post-Trial Brief at 11-25 (Section I.G).

portion of the Statutory Claim "is a double proof" and thus not enforceable under Canadian law.[54]  The Nova Scotia Trustee dealt with this issue in full in its opening brief, and respectfully refers the Court to those arguments.[55]  In particular, the Nova Scotia Trustee argued that the rule against double proof is a rule of claims administration applicable only in a Canadian or English insolvency proceeding, and that in this proceeding, American bankruptcy law, not Canadian bankruptcy law should be applied.[56]  In addition, even if Canadian bankruptcy law did apply to these proceedings, it would permit recovery on the Statutory Claim in full.[57]

     **C.**     **Section 502(e) Is Inapplicable to the ULC Claim.**

The GUC Trust also argues in its post-trial brief that the Statutory Claim must be disallowed pursuant to Section 502(e) of the Bankruptcy Code.[58]  As described in the Nova Scotia Trustee's post-trial brief, a party seeking to disallow a claim pursuant to Section 502(e)(1)(B) must establish, among other things, that the claim is (i) a claim for contribution or reimbursement and (ii) contingent at the time of allowance.[59]  The GUC Trust cannot establish either.

First, a claim for contribution or reimbursement is one where the liability itself does not arise unless and until a payment is made to a third party.[60]  But here, the Statutory Claim is being asserted precisely because GM Nova Scotia lacks any funds to pay the Noteholders, and if it had such funds, the claim would in fact disappear.[61]  In response, the GUC Trust notes that Section

---

[54] GUC Trust Post-Trial Brief at 77-78.

[55] *See* Nova Scotia Trustee Post-Trial Brief  at 21-25 (Sections I.G(7), I.G(8)).

[56] *See id.* at 3-4 (Section I.A) and 21-23 (Section I.G(7)).

[57] *See id.* at 23-25 (Section I.G(8)).

[58] *See* GUC Trust Post-Trial Brief at 78-80.

[59] *See* Nova Scotia Trustee Post-Trial Brief at 26-27 (Section I.H).

[60] *See id.* at 26 (Section I.H).

[61] *See id.*

135 literally requires Old GM to "contribute to the assets" of GM Nova Scotia, which in the GUC Trust's opinion is sufficient to create a claim for "contribution."[62]  But Section 135 is using the word "contribute" only in its ordinary sense—i.e., to give to a common fund—not in the particular legal sense relevant to 502(e)(1)(B).  For example, the statute could just as easily use the word "add" and the meaning of the Section 135 would be unchanged.  By contrast, if the statute required Old GM to "reimburse the assets" of GM Nova Scotia, it would make no sense, because Old GM is only required to contribute to the assets of GM Nova Scotia if GM Nova Scotia lacks sufficient funds to wind up.

Second, the Statutory Claim is not a contingent claim because it is completely fixed as of the date of GM Nova Scotia's bankruptcy and will not change in the future.[63]  There is no "future event" that will trigger the liability.[64]  The GUC Trust's argument that the claim remains contingent until payment misstates the relevant law.  As described in the Nova Scotia Trustee's opening brief, contingency until payment is confined to circumstances where the underlying liability is somehow indeterminate or subject to change.[65]  That is not the case here.

Section 502(e)(1)(B) simply has no application to this fact pattern.  As Collier's has noted:

> [S]ection 502(e)(1)(B) is applicable to a debt owed by the debtor to a creditor which has been guaranteed by a third party.  If the primary obligee seeks payment from its guarantor, the guarantor may seek reimbursement or contribution from the debtor . . . .  By disallowing the guarantor's contingent claim for reimbursement or contribution, section 502(e)(1)(B) insures that the estate will not be liable to the primary obligor and the guarantor for the same debt.[66]

---

[62] *See* GUC Trust Post-Trial Brief at 79.

[63] *See* Nova Scotia Trustee Post-Trial Brief at 27 (Section I.H).

[64] *Cf.* GUC Trust Post-Trial Brief at 80.

[65] *See* Nova Scotia Trustee Post-Trial Brief at 27 (Section I.H).

[66] 4 COLLIER ON BANKRUPTCY, ¶ 502.06[2][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009).

The relevant analogy to this case would be a GM Nova Scotia bankruptcy proceeding in which the Noteholders had asserted direct claims against both GM Nova Scotia and Old GM, and Old GM had in turn asserted a contribution/reimbursement claim against GM Nova Scotia.  If Section 502(e)(1)(B) were applicable to such a proceeding—which it wouldn't be because GM Nova Scotia is in bankruptcy in Canada governed by the BIA—it would operate to bar the claim asserted by Old GM until such time as Old GM had made payment to the Noteholders.  This is simply not the fact pattern here.

### D.    The GUC Trust's Arguments To Reduce the Notes Portion of the Statutory Claim Also Fail

In the alternative, the GUC Trust presses two other arguments: (i) the Statutory Claim should be disallowed to the extent it seeks post-petition interest and (ii) the Statutory Claim should be discounted based on any recovery received on the Guarantee Claim.  The Nova Scotia Trustee disputes each of the GUC Trust's arguments for the reasons stated below.

### 1.    The Statutory Claim Does Not Seek Any Improper Postpetition Interest

The GUC Trust argues that even if the Notes portion of the Statutory Claim is allowed, it improperly includes unmatured interest accruing between June 1, 2009 (the date of Old GM's bankruptcy) and October 9, 2009 (the date of GM Nova Scotia's bankruptcy) which must be disallowed under Bankruptcy Code Section 502(b)(2).[67]  But the Statutory Claim does not include any "unmatured interest."  The portion of the Statutory Claim seeking payment of GM Nova Scotia's liability under the Notes arose under Section 135 of the Companies Act upon GM Nova Scotia's winding up, and no such winding up occurred until October 9, 2009.[68]  Indeed, the

---

[67] See GUC Trust Post-Trial Brief at 80.
[68] See Nova Scotia Trustee Post-Trial Brief at 4-5 (Section I.B); Joint Statement of Facts ¶ 117.

Canadian Bankruptcy and Insolvency Act provides that all debts to which the bankrupt is subject

on the date of bankruptcy are deemed to be claims provable in the bankruptcy proceeding, and as

a result, the interest owing to the time of bankruptcy is the amount claimable.[69]  As of June 1,

2009, the date of Old GM's bankruptcy, the Statutory Claim had not accrued, and on October 9,

2009 when the Statutory Claim finally did accrue, all interest in respect of GM Nova Scotia's

Notes obligations was fully matured.[70]

> ### 2.    The Statutory Claim Should Not Be Reduced By Any Distributions Paid Out In Respect of the Guarantee Claim

Finally, the GUC Trust argues that the Statutory Claim should be reduced by any amounts

recovered under the Guarantee Claim, because Section 135 is a "net claim."[71]  Putting aside the

fact that this proposal would be challenging to implement given that unsecured claimants in this

matter will not recover cash but instead a mix of (i) shares and (ii) warrants to acquire additional

shares (at various prices), this argument is in direct violation of the fundamental rule that the

amount of a ULC's debts and liabilities is fixed as of the date the ULC is declared bankrupt.[72]

The Statutory Claim may well be a "net" claim, but it is fixed as of the date of the ULC's

bankruptcy, October 9, 2009, and the GUC Trust has offered no authority to the contrary.  This

result is consistent with the long-standing bankruptcy rule that a creditor may assert the full

amount of its claims against both a principal obligor and a guarantor—regardless of whether or

---

[69] *See* Def. Tr. Ex. 1 (BIA) § 121(1).

[70] *See* Def. Tr. Ex. 422 (the Statutory Claim) ¶ 5 (listing the amount due by GM Nova Scotia under the Notes as of Oct. 9, 2009).

[71] GUC Trust Post-Trial Brief at 80-81.

[72] *See* Nova Scotia Trustee Post-Trial Brief at 42 (Section III.A(3)) (demonstrating that "it is a general principle of Canadian bankruptcy law that claims against the bankruptcy estate should be valued as of the date of bankruptcy to ensure that the estate's assets are distributed equally among all claimants").

not any partial payments have been made—provided only that the creditor's total recovery for

the two claims may not exceed the full amount of the debt.[73]

## II.  THE NOVA SCOTIA TRUSTEE DID NOT ENGAGE IN ANY INEQUITABLE CONDUCT AND ITS CLAIM SHOULD NOT BE SUBORDINATED, DISALLOWED, OR RECHARACTERIZED

The Nova Scotia Trustee, through Mr. Wedlake, has administered the bankrupt estate of

GM Nova Scotia in good faith, consistent with his obligations under Canadian law as a trustee in

bankruptcy and in accordance with all applicable law.  Nevertheless, in its post-trial brief, the

GUC Trust argues that the Statutory Claim should be equitably subordinated or equitably

disallowed, claiming that (i) the Nova Scotia Trustee is an "insider" of Old GM, (ii) the conduct

of the "Lock-Up Noteholders" should be imputed to the Nova Scotia Trustee, and (iii) the Nova

Scotia Trustee acted inequitably in numerous respects.[74]  For all the reasons described below, the

GUC Trust misstates the relevant law and falls far short of alleging facts sufficient to make out a

claim for equitable subordination or disallowance.[75]

---

[73] *See Nuveen Mun. Trust v. WithumSmith Brown*, 692 F.3d 283, 295-96 (3d Cir. 2012) (reaffirming principle in *Ivanhoe Bldg. & Loan Ass'n of Newark v. Orr*, 295 U.S. 243 (1935) that a creditor may file a proof of claim against a debtor even if it may recover all or a portion of that amount from a non-debtor); *In re Nat'l Energy & Gas Transmission*, 492 F.3d 297, 301 (4th Cir. 2007) (*citing Ivanhoe* for the proposition that "a creditor need not deduct from his claim in bankruptcy an amount received from a non-debtor third party in partial satisfaction of an obligation," and declining "as a matter of bankruptcy law" to reduce the claim asserted even though an actual recovery had already been made); *In re Gessin*, 668 F.2d 1105, 1107 (9th Cir. 1982) ("It has long been established that a creditor is entitled to pursue his claims against others liable on the same debt to the full extent of the amount owed on that debt."); *In re New York Commercial Co.*, 233 F. 906, 909 (2d Cir. 1916) (same); *In re F.W.D.C. Inc.*, 158 B.R. 523, 528 (Bankr. S.D. Fla. 1993) (allowing a creditor, who postpetition had recovered a portion of its debt from the borrower after the guarantor's bankruptcy, to prove the total amount of the debt against the guarantor-debtor, noting that such creditor may not ultimately collect more than the total amount of the indebtedness).

[74] *See* GUC Trust Post-Trial Brief at 49-55.

[75] Alternatively, the GUC Trust argues that the portion of the Statutory Claim in respect of the Notes should be reduced by the amount of the Consent Fee.  *See* GUC Trust Post-Trial Brief at 63-66.  With respect this attempt to "recharacterize" the Consent Fee as a payment against principal, the Nova Scotia Trustee respectfully refers the Court to  the Post-Trial Reply Brief of Elliott Management Corp., Fortress Investment Group, and Morgan Stanley & Co. Int'l (the "**GT Noteholders Post-Trial Reply Brief**") at 30-32 (Section III.A) and the Post-Hearing Reply Brief of the Paulson Noteholders (the "**Paulson Noteholders Post-Trial Reply Brief**") ¶¶ 30-34 (Section III), and joins in their argument.

## A.    The Nova Scotia Trustee Is Not an "Insider"

Given that it cannot possibly meet the high standard required to equitably subordinate the

Statutory Claim,[76] the GUC Trust seeks to lessen its burden by alleging that the Nova Scotia

Trustee is an "insider" of Old GM.[77]   The Court should reject this argument.  As an initial matter,

the GUC Trust never alleged that the Nova Scotia Trustee was an "insider" in its Amended

Objection, Complaint, or Amended Complaint, and only first made the allegation in a footnote in

its pre-trial brief filed on the eve of trial.[78]  As a result, the Nova Scotia Trustee was deprived of

the ability to defend itself fully against the allegation, unaware until the very last minute that

evidence related to the Nova Scotia Trustee's control (or lack of control) over either GM Nova

Scotia or Old GM (the significance of which is discussed *infra*) would be relevant.  As a result,

the Court should decline to consider the GUC Trust's belated argument.  Such a conclusion

would be consistent with this Court's ruling at the outset of trial barring the GUC Trust from

presenting evidence of insider trading.[79]  There, the GUC Trust had failed to allege in any

pleading that the Noteholder defendants had engaged in insider trading, and as a result, the Court

granted a motion *in limine* to exclude any such evidence at trial, noting that "claims of that sort

stray too far from those that were raised in the complaint and . . . come too late after discovery

has been concluded"[80] and that "allegations need to be made in a complaint with appropriate

---

[76] *See* Post-Trial Brief of Elliott Management Corp., Fortress Investment Group, and Morgan Stanley & Co. Int'l at 8-20 (Section I).

[77] *See* GUC Trust Post-Trial brief at 50-51.

[78] *See* GUC Trust's Pre-Trial Brief in Connection with (i) Official Committee of Unsecured Creditors' First Amended Objection to Claimed Filed by Green Hunt Wedlake, Inc. and Noteholders of General Motors Nova Scotia Finance Company and Motion for Other Relief (Bankr. Dkt. No. 7859) and (ii) Motors Liquidation Co. GUC Trust v. Appaloosa Investment Ltd. Partnership I, et al. at 21, n. 5.

[79] *See* 7/17/12 Hrg. Tr. Regarding Noteholders' Motion In Limine To Preclude Certain Evidence or, in the Alternative, to Adjourn the Trial Date [Dkt. No. 136].

[80] *Id.* at 39:9-11.

opportunity for those with differing legal or factual perspectives to defend themselves and be heard."[81]

In the event the Court nevertheless decides to consider the "insider" allegation, the GUC Trust must show (i) that the Nova Scotia Trustee is an insider of GM Nova Scotia, and (ii) that GM Nova Scotia is an affiliate of Old GM.[82]  With respect to the first prong, to be considered an "insider" of GM Nova Scotia, the Nova Scotia Trustee would need to be considered a "person in control."[83]  Moreover, "a creditor may only be a non-statutory insider of a debtor when the creditor's transaction of business with the debtor is not at arm's length."[84]  Here, the Nova Scotia Trustee is not "in control of" GM Nova Scotia in the manner contemplated by Section 101(31)(B), and has never dealt with GM Nova Scotia in a manner not at arm's length.  Rather, he is "an administrative official required [by statute] to gather in and realize on the bankrupt's assets and then distribute the proceeds according to the priorities under the [BIA]."[85]  Although, as a practical matter, the Nova Scotia Trustee has had contact with representatives of GM Nova Scotia with respect to gathering information about the company and completing the Statement of Affairs, he has always dealt with them at arm's length and can hardly be said to be an insider in the way that, for example, a director, officer, or general partner (the statutorily-defined "insiders") would be.[86]  Indeed, under the GUC Trust's reasoning, every Chapter 7 Trustee in America would be a corporate insider.

---

[81] *Id.* at 44:8-11.

[82] *See* 11 U.S.C. § 101(31)(E) (providing that insiders of a debtor include any insider of a debtor's affiliate).

[83] *See* 11 U.S.C. § 101(31)(B).

[84] *Anstine v. Carl Zeiss Meditec AG* (*In re U.S. Medical, Inc.*), 531 F.3d 1272, 1280 (10th Cir. 2008).

[85] Frank Bennett, BENNETT ON BANKRUPTCY 69 (14th ed. 2012).

[86] *See* 11 U.S.C. § 101(31)(B).

With respect to the second prong, because GM Nova Scotia is 100% owned by Old GM, the Nova Scotia Trustee does not dispute that GM Nova Scotia qualifies as an affiliate under 11 U.S.C. § 101(2)(B) as a wholly-owned subsidiary.  But it is critical to note that most cases considering insiders in connection with an equitable subordination claim have instead relied on 11 U.S.C. § 101(2)(A), the statute defining "affiliate" to mean an entity that owns 20% or more of the debtor.[87]  In fact, courts have never invoked 11 U.S.C. § 101(2)(B) to equitably subordinate claims of an affiliate subsidiary, except in circumstances where there is evidence that the subsidiary controls the debtor-parent.[88]  This makes sense: a parent company is far more likely to be able to influence or control a subsidiary than the other way around.  That is especially true here where the parent company is Old GM, at the time of its bankruptcy one of the largest corporations in the world,[89] and the subsidiary is a wholly-owned financing entity, created for tax purposes to serve the needs of the Old GM global enterprise.[90]  Thus, even if the Nova Scotia Trustee could somehow be said to be an insider of GM Nova Scotia, it does not

---

[87] *See, e.g.*, *In re Kids Creek Partners, L.P.*, 212 B.R. 898, 929 (Bankr. N.D. Ill. 1997) *aff'd*, 233 B.R. 409 (N.D. Ill. 1999) *aff'd sub nom*; *In re Kids Creek Partners*, 200 F.3d 1070 (7th Cir. 2000) *aff'd sub nom*; *Herzog v. Leighton Holdings, Ltd.*, 239 B.R. 497 (N.D. Ill. 1999) ("Moreover, it was clear from the evidence at trial that [non-insider] had no control over the Debtor."); *In re Herby's Foods, Inc.*, 134 B.R. 207, 211 (Bankr. N.D. Tex. 1991) *subsequently aff'd sub nom*; *Matter of Herby's Foods, Inc.*, 2 F.3d 128 (5th Cir. 1993); *In re 201 Forest St. LLC*, 409 B.R. 543, 573 (Bankr. D. Mass. 2009); *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 582-583 (Bankr. D. Del. 2012).

[88] The cases cited by the GUC Trust to support its contention that "[c]ourts have held that wholly-owned subsidiaries are insiders" are misleading and not on point.  Neither *In re La Guardia Assoc., L.P.*, Nos. 04-34512 (SR), 04-34514 (SR), 2006 WL 6601650 (Bankr. E.D. Pa. Sept. 13, 2006) nor *In re Southmark Corp.*, 138 B.R. 831 (Bankr. N.D. Tex. 1992) considered whether a wholly-owned subsidiary was an insider in the context of equitable subordination (they are preference cases).  The subsidiaries in *In re Oxford Health Investors*, *L.L.C.*, Nos. 00-80676C-7D-00-806781C-7D, 2002 WL 31031631 (Bankr. M.D. N.C. Sep. 3, 2002) were insiders because they were part of a corporate family that potentially controlled the debtor.  The Court in *In re NMI Sys. Inc.*, 179 B.R. 357 (Bankr. D. D.C. 1995) found that a wholly-owned subsidiary was an insider where the parent company was a mere holding company, employing many of the same officers and directors as the subsidiary.  Last, the "insider" in *In re AEG Acquisition Corp.*, 161 B.R. 50 (B.A.P. 9th Cir. 1993) was the parent; debtor AEG was the wholly-owned subsidiary.

[89] *See, e.g.*, Decision on Debtors' Motion For Approval of (1) Sale of Assets to Vehicle Acquisition Holdings LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry Into UAW Retiree Settlement Agreement (Dkt. No. 2967) at 1-6.

[90] *See* Joint Statement of Facts ¶ 2; Def. Tr. Ex. 67 (Notice of Defense) ¶ 13.

follow that he had even the slightest control or influence over Old GM in a manner supporting

his designation as an "insider."[91]

Finally, even if the Nova Scotia Trustee was deemed an "insider" (which he is not), he

was not an "insider" until his appointment as trustee on October 9, 2009, and thus none of the

alleged inequitable conduct occurring prior to that time—for example, "knowingly consenting to

the Lock-Up Noteholders' manipulation of the timing of the Nova Scotia Bankruptcy Case"—

may be evaluated under an "insider" standard for purposes of the equitable subordination

claim.[92]

### B.    There is No Basis To Impute the Conduct of the Noteholders to the Nova Scotia Trustee

The GUC Trust also argues that any inequitable conduct of the "Lock-Up Noteholders"

should be imputed to the Nova Scotia Trustee for the purposes of equitably subordinating the

Statutory Claim because they "hand-picked" him and "control[]" him.[93]  Although the Nova

Scotia Trustee does not believe the GUC Trust has put forth any evidence of inequitable conduct

by the Noteholders, even if they had, the Noteholders' conduct should not be imputed to the

Nova Scotia Trustee.

---

[91] *Cf. Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 500 (S.D.N.Y. 1994) *citing Matter of Teltronics Servs., Inc.*, 29 B.R. 139, 171 (Bankr. S.D.N.Y. 1983) ("Before a creditor will be found to be an 'insider' to a debtor for purposes of considering whether that creditor's claim should be equitably subordinated, the creditor must be shown to have been able 'to command the debtor's obedience to [the creditor's] policy directives' to such an extent 'that there has been ... a merger of identity.  Unless the creditor has become, in effect, the alter ego of the debtor, he will not be held to an ethical duty in excess of the morals of the marketplace.'").

[92] *See In re Jevic Holding Corp.*, 08-11006 BLS, 2011 WL 4345204, at *14 (Bankr. D. Del. Sept. 15, 2011) (quoting *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53 (Bankr. D. Del. 2002) ("The most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor *at the time of the act*.") (emphasis added).

[93] GUC Trust Post-Trial Brief at 54.

Courts "consistently have focused on the claimant, rather than the claim, for purposes of applying equitable subordination,"[94] and the standard for imputation is high. *In re Multiponics, Inc.*, 622 F.2d 709 (5th Cir. 1980) is instructive. There, the claimant—a corporation—had an insider who had engaged in inequitable conduct with respect to the debtor.[95] Even though the insider owned 100% of the claimant's stock, the Fifth Circuit held that not enough evidence had been produced to cause it to disregard the formalities of the separate entity and impute the insider's conduct to the claimant.[96]

Here, the evidence in support of the Noteholders' "control" of the Nova Scotia Trustee is nowhere near as considerable as what the Court rejected as insufficient in *Multiponics*. The Nova Scotia Trustee is independent from the Noteholders. Although statutorily required to act on behalf of GM Nova Scotia's creditors, including the Noteholders, the Nova Scotia Trustee has conducted its own examinations, and has exercised its own independent judgment.[97] Moreover, the Nova Scotia Trustee is supervised by and reports to the Canadian Office of the Superintendent of Bankruptcy ("**OSB**"), a representative of which chaired the First Meeting of Creditors at Mr. Wedlake's request.[98] Additionally, much of the Noteholder conduct that is complained of occurred well before Mr. Wedlake became Nova Scotia Trustee, and Mr. Wedlake had no role in or knowledge of any of it.[99] Thus, there can be no basis to impute their conduct to Mr. Wedlake.

---

[94] *In re Enron Corp.*, 379 B.R. 425, 441 (S.D.N.Y. 2007).

[95] *See In re Multiponics, Inc.*, 622 F.2d at 722.

[96] *See id.* at 725; *see also Enron*, 379 B.R. at 441 (summarizing *Multiponics*).

[97] *See* Nova Scotia Trustee Post-Trial Brief at 32-33 (Section II.D).

[98] *See* Wedlake Direct Test. ¶¶ 34-35; Trial Tr. 08/07/12 (Wedlake) at 162:22-163:5, 164:23-166:1.

[99] *See* Nova Scotia Trustee Post-Trial Brief at 29 (Section II.A).

The case relied on by the GUC Trust—*In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332 (1st Cir. 1992)—does not lead to a contrary conclusion.  There, the FDIC had assumed control of a failed bank, and had asserted a claim on its behalf.[100]  That court held that the inequitable conduct of the predecessor-in-interest bank could be imputed to the FDIC standing in its shoes.[101]  But here, Mr. Wedlake is serving as trustee for GM Nova Scotia, not the Noteholders.  The proper analogy to *604 Columbus Ave.* would be imputing to the Nova Scotia Trustee the inequitable conduct of GM Nova Scotia, not the Noteholders.  Since there is no allegation or evidence that GM Nova Scotia has done anything wrong, *604 Columbus Ave.* is simply inapplicable.

### C.    The GUC Trust's Factual Contentions Against the Nova Scotia Trustee Do Not Demonstrate Any Wrongful Conduct

Next, in support of its argument to equitably subordinate or disallow the Statutory Claim, the GUC Trust alleges that the Nova Scotia Trustee acted inequitably "in a number of respects."[102]  Many of these arguments were made previously by the GUC Trust and addressed in the Nova Scotia Trustee's pre-trial and opening post-trial briefs, while others are new.  In sum, the GUC Trust has not successfully alleged any inequitable conduct by the Nova Scotia Trustee, and much of what it does allege is the result of either an exaggerated reading of the record or a fundamental misunderstanding about the role and purpose of a Canadian bankruptcy trustee.  The Nova Scotia Trustee's response to each particular set of allegations is as follows.

---

[100] *See 604 Columbus Ave.*, 968 F.2d at 1335-41.

[101] *See id.* at 1356.

[102] GUC Trust Post-Trial Brief at 54.

1.    **The Noteholders' Selection of the Nova Scotia Trustee Was Entirely Proper, and the Nova Scotia Trustee Is Not "Controlled" By Them**

In its post-trial brief, the GUC Trust repeatedly calls into question the relationship between the Noteholders and the Nova Scotia Trustee, including the Nova Scotia Trustee's appointment.[103]  But there is nothing improper about this relationship.

First, the GUC Trust alleges that, "[t]he Lock-Up Noteholders hand-picked a trustee, Green Hunt Wedlake . . . to assert this claim."[104]  But for all of the reasons stated in the Nova Scotia Trustee's pre-trial and opening post-trial briefs, it is completely ordinary for creditors to select the trustee, and thus this fact is of no consequence.[105]

Second, the GUC Trust alleges that "Wedlake . . . had worked for [the Noteholders] for months prior to the Petition Date . . . ."[106]  In fact, Mr. Wedlake had not "worked" with the Noteholders "for months" prior to his appointment, and the GUC Trust's citations at footnote 142 of its brief do not support any claim that he did.  The only material interaction Mr. Wedlake had with the Noteholders was in connection with the Nova Scotia Litigation in which he (i) was interviewed to potentially serve as receiver, (ii) was selected to have his name put forward as receiver in the event a receiver was appointed, and (iii) executed a consent to serve as a receiver.[107]  It is misleading for the GUC Trust to suggest that these minimal interactions constitute a months-long working relationship.  While it is true that Mr. Wedlake worked with

---

[103] *See id.* at 27-28, 51.

[104] *Id.* at 27-28.

[105] *See* Nova Scotia Trustee Pre-Trial Brief at 17 (Section I.C); Nova Scotia Trustee Post-Trial Brief at 30 (Section II.B).

[106] GUC Trust Post-Trial Brief at 28.

[107] *See* Wedlake Direct Test. ¶¶ 10-11.

certain of the Noteholders on two other litigations, both were ***subsequent*** to his involvement

with GM Nova Scotia.[108]

Next, the GUC Trust alleges that "Wedlake never disclosed to the Superintendent of

Bankruptcy in Canada that it was asked to serve as interim receiver in the Oppression Action or

that it was asked to serve as replacement monitor."[109]  Although this is true, it is meaningless.

Under the rules governing the conduct of Canadian bankruptcy trustees, Mr. Wedlake would

have been required to make a disclosure only if (i) he had been appointed as receiver, and (ii) a

conflict of interest existed.[110]  Here, neither condition was satisfied because (i) Mr. Wedlake was

never appointed as receiver, and (ii) the same creditors nominated him as both receiver and

trustee.  Moreover, there is absolutely no evidence that Mr. Wedlake tried to hide anything from

the OSB.  To the contrary, Mr. Wedlake invited a representative of the OSB to attend and chair

the First Meeting of Creditors and presented his report to him.[111]

Finally, the GUC Trust argues that the Nova Scotia Trustee is controlled by the

Noteholders.[112]  The GUC Trust made this same argument in advance of trial, and the Nova

Scotia Trustee dealt with it fully in its pre-trial and opening post-trial briefs, which demonstrate

that the Nova Scotia Trustee has a duty to recover assets for the benefit of the estate's creditors,

---

[108] *See id.* ¶ 9.

[109] GUC Trust Post-Trial Brief at 28.

[110] *See* Def. Tr. Ex. 1 (BIA) §13.3(2)(b) ("No trustee shall act as a trustee in relation to the estate of a debtor where the trustee is already . . . the receiver . . . of the property of any person related to the debtor, without making, at the time of being appointed as trustee in relation to the estate of the debtor and at the first meeting of creditors, full disclosure of that fact and of the potential conflict of interest."); Canadian Association of Insolvency and Restructuring Professionals Rules of Professional Conduct Interpretation to Rule 4, point 6(a), stating in relevant part: "A [trustee] shall not permit himself to be placed or remain in a position where a conflict of interest may exist, or may appear to exist, without making full disclosure, and obtaining written consent of all interested parties; in keeping with this principle, a [trustee] shall not accept any appointment . . . as trustee under the Bankruptcy and Insolvency Act where the member has already accepted an appointment as receiver . . . without having first made disclosure of such prior appointment to the Bankruptcy Court or the Official Receiver, as the case may be . . . ."

[111] *See* Wedlake Direct Test. ¶¶ 34-35.

[112] *See* GUC Trust Post-Trial Brief at 51.

including the Noteholders, but that Mr. Wedlake nevertheless exercised his own judgment in

administering the GM Nova Scotia estate, including specifically rejecting a significant edit to his

Preliminary Report suggested by counsel to the Noteholders.[113]  As an additional example,

although a representative of Aurelius had told him to "hold" off from inquiring with New GM

about the termination of the Swap Agreements, Mr. Wedlake (with his Canadian counsel)

nevertheless reached out to New GM's counsel to ask whether or not New GM would terminate

without first seeking permission from any Noteholder.[114]

> **2.    The Nova Scotia Trustee Had No Role or Involvement in the Timing of the GM Nova Scotia Bankruptcy Filing**

The GUC Trust next alleges that "Wedlake was aware that the initiation of the Nova

Scotia Bankruptcy Case was within the Lock-Up Noteholders' control from and after June 2009

and that the Lock-Up Noteholders purposely waited three months following receipt of the

Consent Fee to initiate GM Nova Scotia's bankruptcy.  Wedlake knew that the reason for this

was to shield the Consent Fee from preference review, but Wedlake failed to act on this

knowledge."[115]  The Nova Scotia Trustee responded fully to this general allegation in its pre-trial

and opening post-trial briefs.[116]  In particular, Mr. Wedlake had no role in, control over, or

contemporaneous knowledge of the timing of the GM Nova Scotia bankruptcy filing, and there

was nothing he could have done to alter the situation.[117]  In any event, the underlying

transactions were not shielded from either Mr. Wedlake's review or the Court's review, because

the law of the province of Nova Scotia allows for these transactions to be challenged even if they

---

[113] *See* Nova Scotia Trustee Pre-Trial Brief at 18-19 (Section I.E); Nova Scotia Trustee Post-Trial Brief at 32-33 (Section II.D).

[114] *See* Trial Tr. 8/7/12 (Wedlake) 132:23-134:23.

[115] GUC Trust Post-Trial Brief at 29-30.

[116] *See* Nova Scotia Trustee Pre-Trial Brief at 18 (Section I.D); Nova Scotia Trustee Post-Trial Brief at 30-31 (Section II.C).

[117] *See id.*

took place more than ninety days prior to GM Nova Scotia being declared bankrupt.[118]  The

ninety-day argument is a red herring.

> **3.**     **The Decision of Whether To Appoint "Inspectors" To Act on Behalf
> of GM Nova Scotia's Creditors Rested with Those Creditors, Not the
> Trustee**

Amazingly, in its post-trial brief, the GUC Trust continues to argue that the non-

appointment of inspectors in the Nova Scotia Bankruptcy Proceeding somehow suggests

inequitable conduct by the Nova Scotia Trustee.  Specifically, the GUC Trust alleges that Mr.

Wedlake "capitulated to the Lock-Up Noteholders' insistence that no inspectors be appointed to

supervise the Nova Scotia Bankruptcy Case."[119]  But the sources cited by the GUC Trust at

footnote 155 do not support this allegation.  Indeed, these sources show only that a vote was

conducted at the First Meeting of Creditors and that the Noteholders voted against appointment,

while New GM voted for appointment.[120]  As described in the Nova Scotia Trustee's pre-trial and

opening post-trial briefs, the decision to appoint inspectors—representatives of the creditors and

often employees of the creditors—was exclusively that of the creditors and the majority voted

not to do so.[121]

---

[118] *See id.*  The relevant Nova Scotia provincial statutes are *The Statute of Elizabeth*, 150 (Imp.), 13 Eliz., c. 5, and
the *Assignments and Preferences Act* (Nova Scotia), R.S.N.S. 1989, c. 25.  The former has been determined to be
part of the common law of Nova Scotia notwithstanding its subsequent repeal in England.  *See Bank of Montreal v.
Crowell* (1980) 37 N.S.R. (2d) 292 (N.S.T.D.).

[119] GUC Trust Post-Trial Brief at 30.

[120] *See id.* at 30, n. 155 *citing* Trial Tr. 9/27/12 (Bolin) 45:3-18; Trial Tr. 9/28/12 (Gropper) 78:6-13; Wedlake Direct
Test. ¶ 43.

[121] *See* Nova Scotia Pre-Trial Brief at 19-20 (Section I.F); Nova Scotia Trustee Post-Trial Brief at 33-34 (Section
II.E).

    **4.**    **There Was No Basis for the Nova Scotia Trustee To Further Investigate the Lock-Up Agreement, the Consent Fee, or the Intercompany Loan Settlement**

The GUC Trust also argues that "[The Nova Scotia Trustee] . . . did not object to any claim in the Nova Scotia Bankruptcy Case."[122]  The Nova Scotia Trustee addressed this argument in full in its pre-trial and opening post-trial briefs, and rests on that argument, namely that the Nova Scotia Trustee considered the underlying validity of the claims to the point of including a section in his Preliminary Report about them, but ultimately decided that no further investigation, and certainly no formal objection, was appropriate, in part because the OSB, a representative of which chaired the First Meeting of Creditors, did not instruct Mr. Wedlake to further investigate.[123]

    **5.**    **The Nova Scotia Trustee Properly Vetted the Swap Claim**

In its post-trial brief, the GUC Trust devotes significant time to the Nova Scotia Trustee's efforts in investigating the Swap Claim prior to filing the Statutory Claim.  The GUC Trust's complaints can be broken down into five basis categories, which are discussed in turn below.

First, the GUC Trust inappropriately tries to tie the Nova Scotia Trustee to Aurelius, alleging that "Wedlake succumbed to [Aurelius's] request" that the swap liability be included in the Statutory Claim,[124] and that Mr. Wedlake "relied on Aurelius" in connection with the Swap Agreements.[125]  In fact, there is no support for either of these allegations.  With respect to the allegation that Mr. Wedlake "succumbed" to Aurelius's request, the GUC Trust doesn't provide

---

[122] GUC Trust Post-Trial Brief at 33.

[123] *See* Nova Scotia Trustee Pre-Trial Brief at 20 (Section I.G); Nova Scotia Trustee Post-Trial Brief at 34-35 (Section II.F).  The Nova Scotia Trustee also joins in the argument made by the GT Noteholders and the Paulson Noteholders that, to the extent New GM is asking the Court to find that the settlement of the Intercompany Loans and the dismissal of the Nova Scotia Litigation is valid even if the Court otherwise invalidates the Lock-Up Agreement, such request is not properly before the Court.  *See* GT Noteholders Post-Trial Reply Brief at 49 (Section IV); Paulson Noteholders Post-Trial Reply Brief ¶¶ 34-35 (Section IV).

[124] GUC Trust Post-Trial Brief at 34.

[125] *Id.* at 35.

any citation.  With respect to Mr. Wedlake's alleged "reliance" on Aurelius, the GUC Trust's

supporting citations in footnote 188 show only that Aurelius consulted with Mr. Wedlake and that

Aurelius weighed in with comments—nothing more.[126]  In fact, as described in the Nova Scotia

Trustee's pre-trial and opening post-trial briefs, Mr. Wedlake made his own independent

judgment to include the Swap Claim based on the proof of claim filed by New GM, the

Statement of Affairs, other supporting documents including a public filing by Old GM in

November 2009, and consultation with counsel.[127]

Second, the GUC Trust points to the fact that the initial draft of the Statutory Claim did

not include a claim for amounts owed under the Swap Agreements, while a subsequent draft

included certain qualifying language that is omitted from the final version.[128]  But this evolution

makes perfect sense when put in chronological context.  The initial draft the GUC Trust points

to, current as of November 3, 2009, pre-dated New GM filing the Swap Claim, so of course it

was not included in the draft Statutory Claim at that time.[129]  The subsequent draft, current as of

November 16, 2009, came into existence after the filing of the Swap Claim but prior to the filing

of GM Nova Scotia's Statement of Affairs.[130]  As a result, the Swap Claim was included along

with the qualifying language stating "claimant is in the process of reviewing swap claim and has

not yet verified the validity of such claim or the appropriate amount."[131]  By the time the final

Statutory Claim was filed on November 30, 2009, the Statement of Affairs had been finalized

and sworn to—and was even attached to the Statutory Claim itself—and Mr. Wedlake had

---

[126] *See* Pl. Tr. Exs. 463, 475, 476; Trial Tr. 9/28/12 (Gropper) 44:12-16, 45:5-8.

[127] *See* Nova Scotia Trustee Pre-Trial Brief at 20-21 (Section I.H); Nova Scotia Trustee Post-Trial Brief at 36-37 (Section II.G).

[128] *See* GUC Trust Post-Trial Brief at 35.

[129] *See* Pl. Tr. Ex. 476.  The Swap Claim was filed on November 9, 2009.  *See* Def. Tr. Ex. 248.

[130] *See* Pl. Tr. Ex. 475.  The Statement of Affairs was filed on November 23, 2009.  *See* Def. Tr. Ex. 305.

[131] Pl. Tr. Ex. 475; Trial Tr. 8/7/12 (Wedlake) 148:12-149:13.

reviewed it and other supporting documentation, as well as consulted with counsel, and thus the qualifying language was removed.[132]

The GUC Trust next claims that Mr. Wedlake should have given greater weight to a "balance sheet that showed a dash rather than a value for the swap liability" that was sent to him on November 3, 2012.[133]  There is no merit to this argument.  As testified to at trial by Mr. Buonomo, the dashes are simply an accounting technique employed by New GM which is currently accounting for the Swap Agreements as a "gain contingency at zero."[134]  Moreover, the same GM Canada employee who sent Mr. Wedlake the document with the dashes sent him new information only a week later listing the swap liability as $696,641,189.14.[135]  And as described in the Nova Scotia Trustee's opening brief, every other piece of available evidence showed that the Swap Agreements had some positive value of around $564 million, including a public filing by Old GM only weeks before the Nova Scotia Trustee filed the Statutory Claim.[136]  In light of the totality of the evidence, Mr. Wedlake was right not to give any weight to this unaudited balance sheet.

Fourth, the GUC Trust claims that the "governing swaps documents" were unsigned, implying that Mr. Wedlake should not have relied on them.[137]  But this is misleading.  While it is true that representatives of GM Nova Scotia were unable to locate a signed version of the ISDA Master Agreement, both of the Confirmations were signed and dated and specifically referenced

---

[132] *See* Nova Scotia Trustee Post-Trial Brief at 35-37 (Section II.G); Trial Tr. 8/7/12 (Wedlake) 149:14-150:6.
[133] GUC Trust Post-Trial Brief at 36.
[134] Trial Tr. 8/9/12 (Buonomo) 109:19-21.
[135] *See* Def. Tr. Ex. 399; Trial Tr. 8/7/12 (Wedlake) 156:4-157:4.
[136] *See* Nova Scotia Trustee Post-Trial Brief at 37 (Section II.G).
[137] GUC Trust Post-Trial Brief at 35.

the "Master Agreement of the parties dated October 15, 2001."[138]  Moreover, each Confirmation

incorporates the "definitions and provisions" of the ISDA Master Agreement, and states:  "This

Confirmation constitutes a binding agreement between you and us and will supplement, form

part of, and be subject to the ISDA [Master] Agreement . . . ."[139]

Finally, the GUC Trust makes a series of other misstatements about Mr. Wedlake's

diligence and knowledge of the Swap Agreements in an attempt to try and create wrongdoing

where none exists.  First, the GUC Trust states that "Wedlake was aware there would be

valuation issues with the swaps."[140]  But the only evidence the GUC Trust points to in support of

this allegation is an email from the Noteholders' Canadian counsel (Ms. Huff) stating that there

"may" be issues with the valuation, and to trial testimony in which Mr. Wedlake testified he had

no idea what that Ms. Huff was talking about.[141]  Second, the GUC Trust states that "Wedlake . .

. knew the Lock-Up Noteholders' Canadian counsel acknowledged that the actual amounts owed

on the Swaps would be less than the amount asserted in the New GM Swap Claim."[142]  This is a

total misstatement of the underlying evidence.  The underlying email the GUC Trust cites to is

nothing more than the Nova Scotia Trustee's Canadian counsel stating his "belie[f]" that the

Noteholders' Canadian counsel had previously said that, under a certain scenario, the swap

valuation may be "somewhat less."[143]  Plus, the email was not sent until December 16, 2009,

meaning that Mr. Wedlake hadn't even seen it at the time he filed the Statutory Claim.  And

lastly, the GUC Trust states that "Wedlake also knew that the New GM Swap Claim calculated

---

[138] Def Tr. Ex. 422 at DEF8710, DEF8715.  This is consistent with the Schedule to the ISDA Master Agreement provided by New GM dated October XX, 2001.  *See id.* at DEF8702.

[139] *Id.* at DEF8710, DEF8715.

[140] GUC Trust Post-Trial Brief at 35-36.

[141] *See id.* at 36, n. 196 *citing* Pl. Tr. Ex. 202; Trial Tr. 8/7/12 (Wedlake) 66:13-18.

[142] GUC Trust Post-Trial Brief at 36.

[143] Pl. Tr. Ex. 145.

the amount due by the mark-to-market method, contrary to the terms of the Swap Documents . . .

.”[144]  The evidence the GUC Trust cites for this proposition is testimony in which Mr. Wedlake

says that the "mark-to-market method" is not the same as the "Final Exchange Method" and an

email from Aurelius stating that the amount of the Final Exchange is paid upon "Early

Termination" of the Swap Agreements.[145]  There is no evidence that Mr. Wedlake "knew" that

the "mark-to-market method" was contrary to the terms of the Swap Agreements, and in fact, as

described at length in the Nova Scotia Trustee's opening brief, the Swap Agreements should in

fact be valued in accordance with their market value and not the "Final Exchange Method."[146]

6.    **Any Irregularities That May Exist in the Statement of Affairs Are Not Attributable to the Nova Scotia Trustee**

Finally, the GUC Trust identifies a number of alleged irregularities in the Statement of

Affairs and suggests that Mr. Wedlake is to blame.  The GUC Trust makes these allegations

despite the fact that (i) Mr. Wedlake's role in the preparation of the Statement of Affairs was

limited to inputting information provided to him by representatives of GM Nova Scotia into the

software program at his office,[147] and (ii) GM Nova Scotia was the decision-maker concerning

all content.[148]

In its post-trial brief, the GUC Trust complains that "[t]he Statement of Affairs should

have been prepared by a current officer or director of GM Nova Scotia or by Old GM, the sole

shareholder,"[149] but that the Statement of Affairs was instead "prepared by New GM, the very

---

[144] GUC Trust Post-Trial Brief at 36.

[145] *See id.* at 36, n. 198 *citing* Pl. Tr. Ex. 468; Trial Tr. 8/7/12 (Wedlake) 76:11-16.

[146] *See* Nova Scotia Trustee Post-Trial Brief at 42-50 (Section III.B).

[147] *See* Trial Tr. 8/7/12 (Wedlake) 28:16-25, 155:15-156:3.

[148] *See id.* at 155:15-156:3.

[149] GUC Trust Post-Trial Brief at 31.

party purporting to claim under the Swaps."[150]  This would be a fair criticism, except that, as the

GUC Trust itself points out, it *couldn't* be prepared by any current officer or director of GM

Nova Scotia because none existed as of GM Nova's Scotia's bankruptcy.[151]  The Nova Scotia

Trustee did not acquiesce in this.  The minute he heard that the GM Nova Scotia directors were

resigning, Mr. Wedlake expressed concern about this and made clear that they could not absolve

themselves of their duties under the BIA by resigning on the eve of bankruptcy.[152]  Ultimately,

the Statement of Affairs was executed by a former director of GM Nova Scotia.[153]  As for Old

GM, at that time it was run by Alix Partners who was approached to provide assistance, but

refused to comply.[154]  Even if it had wanted to cooperate, Alix Partners would have had to look

to New GM because operational control for GM Nova Scotia had always been vested in GM

Canada which was a New GM subsidiary.[155]  As a result, based on the Transition Services

Agreement entered into as part of the MSPA, New GM assisted in the preparation of the

Statement of Affairs.[156]

Second, the GUC Trust contends that, "[u]nder Canadian law, the Statement of Affairs

was due within five days of GM Nova Scotia's bankruptcy filing," and notes that, in fact, the

Statement of Affairs wasn't filed until more than a month later.[157]  While it is true that the

Statement of Affairs was not filed by GM Nova Scotia within five days of its bankruptcy, Mr.

Wedlake was not to blame.  In fact, as information was slow to arrive, Mr. Wedlake went so far

---

[150] *Id.* at 36-37.

[151] *See id.* at 30.

[152] *See* Def. Tr. Ex. 211; Wedlake Direct Test. ¶ 17; Trial Tr. 8/7/12 (Wedlake) 99:25-100:15.

[153] *See* Def. Tr. Ex. 305 (Statement of Affairs).

[154] *See* Trial Tr. 8/9/12 (Buonomo) 147:5-147:13.

[155] *See* Trial Tr. 8/10/12 (Buonomo) 65:8-67:1.

[156] *See id.*

[157] GUC Trust Post-Trial Brief at 31.

as to advise the Canadian Superintendent of Bankruptcy that GM Nova Scotia was delinquent in

completing the Statement of Affairs.[158]

Third, the GUC Trust contends that the Statements of Affair does not list the addresses of

the Noteholders or their names as required under Canadian law.[159]  While it is true that the

Statement of Affairs does not list the addresses of each creditor, representatives of GM Nova

Scotia, not the Nova Scotia Trustee, specifically chose to omit the addresses on the advice of

counsel, because "it [was their] understanding that some [Noteholders] may have assigned their

positions after the Lockup Agreement was signed."[160]

Finally, in its post-trial brief, the GUC Trust cherry-picks certain snippets of Mr.

Wedlake's testimony to make it appear that his interactions with Ms. Sutedja, the former GM

Nova Scotia director who executed the Statement of Affairs, were insufficient.[161]  In fact, Mr.

Wedlake's interactions with Ms. Sutedja were substantive, and he was justified in relying on her.

Indeed, Mr. Wedlake spoke with Ms. Sutedja on six separate occasions,[162] and never had reason

to doubt her competency and knowledge.[163]  For her part, Ms. Sutejda testified that her signature

was given only after counsel and numerous other parties had reviewed the swap calculation.[164]

Moreover, even if Mr. Wedlake's interactions with Ms. Sutedja were somehow lacking, she was

not the only GM Nova Scotia representative with whom Mr. Wedlake dealt regarding the

Statement of Affairs.  In fact, Neil MacDonald, another former GM Nova Scotia director with

whom Mr. Wedlake interacted, was supposed to sign the Statement of Affairs but could not

---

[158] *See* Trial Tr. 8/7/12 (Wedlake) 111:14-23.

[159] *See* GUC Trust Post-Trial Brief at 31.

[160] Def. Tr. Ex. 399.

[161] *See* GUC Trust Post-Trial Brief at 31-32, ns. 167-168, and 36, n. 202.

[162] *See* Trial Tr. 8/7/12 (Wedlake) 28:9-13.

[163] *See id.* at 29:16-23, 31:18-25.

[164] *See* Sutejda Dep. Tr. 59:1-9, 161:12-162:20, 163:25-164:7.

because he was out of town.[165]  New GM's Canadian counsel, Steven Golick, was also involved

in preparation of the Statement of Affairs,[166] as was counsel to GM Canada, Ms. Marianne Emig

Munro.[167]  In sum, Mr. Wedlake more than satisfied his obligations to diligence the Statement of

Affairs.

## III.    THE SWAP AGREEMENTS WERE VALIDLY TERMINATED AND NEW GM'S SWAP CLAIM WAS PROPERLY CALCULATED

With respect to the termination of the Swap Agreements and New GM's valuation

thereof, the GUC Trust argued in its post-trial brief exactly as the Nova Scotia Trustee expected

it would—that the only way the Swap Agreements could be terminated is through New GM

exercising its Early Termination rights, leading to the application of the so-called "Final

Exchange Method."[168]  It is undisputed that no such "Early Termination" occurred.[169]

The GUC Trust alleges that New GM has refused to disclose its motivations for not

declaring an "Early Termination" and speculates that "[t]he only logical explanation as to why

New GM would not be inclined to terminate is that it did not believe it was legally permitted to

terminate."[170]  In fact, not only was there a very logical reason for New GM not to exercise its

"Early Termination" rights, but Mr. Buonomo testified to it: New GM understood that doing so

would have reduced the monies owed to it.[171]  Declaration of an "Early Termination" would only

have made sense if New GM was the out-of-the-money party to the swaps, in which case it

would have led to New GM owing less money.  But here, as in the in-the-money-party, there was

---

[165] *See* Def. Tr. Ex. 399; Trial Tr. 8/7/12 (Wedlake) 18:25-19:3.

[166] *See* Trial Tr. 8/7/12 (Wedlake) 109:20-110:3.

[167] *See* Def. Tr. Exs. 271, 398-399; Trial Tr. 8/7/12 (Wedlake) 117:12-17, 151:22-152:5, 180:24-181:4.

[168] GUC Trust Post-Trial Brief at 83.

[169] *See* Nova Scotia Trustee Post-Trial Brief at 39 (Section III.A); GUC Trust Post-Trial Brief at 83.

[170] GUC Trust Post-Trial Brief at 83, n. 363.

[171] *See* Trial Tr. 8/10/12 (Buonomo) 90:14-91:2.

no incentive for New GM to declare an "Early Termination" and receive fewer damages.

Instead, the prudent (and obvious) choice was to do nothing, leaving GM Nova Scotia with the

obligation to keep making payments.  As Mr. Buonomo testified, New GM could always

terminate later on if it felt necessary.[172]

As explained in the Nova Scotia Trustee's opening brief, the lack of an "Early

Termination" does not end the analysis.  Regardless of New GM's actions, the Nova Scotia

Trustee had a legal obligation to affirm or disclaim the Swap Agreements, and prudently chose to

disclaim them, subject to three conditions, as of October 9, 2009.[173]  New GM agreed that the

Nova Scotia Trustee's disclaimer would constitute a termination of the Swaps, accepting the

three conditions upon which the Nova Scotia Trustee premised its disclaimer.[174]  Because no

"Early Termination" occurred, the so-called Final Exchange Method of calculating damages was

never triggered.[175]  Instead, under Canadian bankruptcy law, the Nova Scotia Trustee's

disclaimer allowed New GM, as counterparty, to claim damages as an unsecured creditor.[176]

Those damages were measured under New York law which governs the Swap Agreements and

treats a disclaimer as a breach of contract, allowing New GM to claim its "expectation

damages."[177]  The Swap Agreements were thus valued in accordance with their market value,

which both New GM and the Nova Scotia Trustee's expert have shown is approximately $564

---

[172] *See id.*

[173] *See* Nova Scotia Trustee Post-Trial Brief at 38-42 (Sections III.A(1), (2), (3)).

[174] *See id.* at 40-42 (Section III.B(2)).

[175] *See id.* at 47-50 (Section III.B(3)).  In the fact section of its post-trial brief, the GUC Trust appears to argue that any termination of the Swap Agreements prior to their contractual termination date constitutes an "Early Termination" requiring application of the so-called Final Exchange Method.  *See* GUC Trust Post-Trial Brief at 39, n. 222.  Notably, the GUC Trust continues to cite its expert on this issue, despite the fact that he has conceded he has absolutely no expertise on this legal question and only "assumed" an Early Termination occurred in his analysis. *See* Nova Scotia Trustee Post-Trial Brief at 48-49 (Section III.B(3)).  The Nova Scotia Trustee fully refutes this argument in Section III.B(3) of its post-trial brief, and respectfully refers the Court to that analysis.

[176] *See id.* at 42-43 (Section III.B).

[177] *See id.*

million.[178]  In its post-trial brief, the GUC Trust does not contest in any way either New GM's valuation approximating the actual amount New GM would have received had GM Nova Scotia performed (discounted to present value) or the Nova Scotia Trustee's expert's mark-to-market valuation of the Swap Agreements.

The Nova Scotia Trustee otherwise respectfully refers the Court to Section III of its post-trial brief for a full analysis of the Swap Agreements, with one exception.  In its post-trial brief, the GUC Trust argues for the first time that, if the Swap Agreements were "Purchased Contracts" under the MSPA, Old GM would have no liability on them because the Sale Order grants Old GM a release "from any and all liability under the Purchased Contracts."[179]  This argument is flawed because Old GM's liability does not arise under the Swap Agreements, but rather under Section 135 of the Companies Act which rendered Old GM, as GM Nova Scotia's sole member, liable for all of GM Nova Scotia's outstanding debts and liabilities upon its winding up.[180] Section 135 is not a "Purchased Contract."

## CONCLUSION

For the foregoing reasons, the Nova Scotia Trustee respectfully requests that the Court (i) allow the Statutory Claim in its entirety and (ii) grant such other and further relief to the Nova Scotia Trustee as the Court deems just and proper.

---

[178] *See id.* at 42-47 (Section III.B).

[179] *See* GUC Trust Post-Trial Brief at 83-84.

[180] *See* Nova Scotia Trustee Post-Trial Brief at 4-5 (Section I.B).

Dated: July 11, 2013

Respectfully Submitted,

/s/      Sean E. O'Donnell
Daniel H. Golden
Sean E. O'Donnell
Philip C. Dublin
Dean L. Chapman Jr.
William F. Mongan Jr.
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

*Counsel for Green Hunt Wedlake Inc.*
*Trustee of General Motors Nova Scotia Finance*
*Company*