Page 1

```
1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 09-50026-reg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5

6   In the Matter of:

7

8   MOTORS LIQUIDATION COMPANY,

9

10          Debtor.

11

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

13

14                  U.S. Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  August 1, 2013

19                  10:22 AM

20

21

22   B E F O R E :

23   HON ROBERT E. GERBER

24   U.S. BANKRUPTCY JUDGE

25
```

1   Doc. #12463 Motion to Compel Roger L. Thacker, Roger L.

2   Sanders, and Thomas J. Hanson to Participate in Mandatory

3   Mediation with Respect to Claim No. 27105 Pursuant to the

4   Second Amended ADR Order

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach

1    A P P E A R A N C E S :

2    HELMER, MARTINS, RICE & POPHAM CO., LPA

3        Attorneys for Roger L. Thacker, Roger L. Sanders,

4        and Thomas J. Hanson

5        600 Vine Street

6        Suite 2704

7        Cincinnati, Ohio 45202

8

9    BY:  JAMES B. HELMER, JR., ESQ.

10

11   WEIL, GOTSHAL & MANGES, L.P.

12       Attorneys for Motors Liquidation Company GUC Trust

13       767 Fifth Avenue

14       New York, New York 10153

15

16   BY:  JOSEPH H. SMOLINSKY, ESQ.

17       LORI L. PINES, ESQ.

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2              THE COURT:  All right.  I -- I think, even though

3    I may have to dictate something, GM Motors Liquidation is

4    going to be pretty short.  Why don't we come up on that one?

5              Let me get appearances from both sides and then I

6    have a couple of preliminary remarks.

7              MR. SMOLINSKY:  Good morning, Your Honor.  Joe

8    Smolinsky of Weil, Gotshal & Manges for the Motors

9    Liquidation Company GUC Trust. I'm here with my colleague,

10   Lori Pines.

11             THE COURT:  Okay.  Thank you, Mr. Smolinsky.

12             MR. HELMER:  Good morning, Your Honor.  James

13   Helmer of Cincinnati, Ohio.  I'm here on behalf of Mr.

14   Sanders, Mr. Thacker and Mr. Hanson on the relation of the

15   United States.

16             THE COURT:  Okay.  Folks, I've read the papers.  I

17   don't need you to repeat things.

18             Mr. Smolinsky, I'm going to ask you to lead off,

19   but only to the extent you need to tell me stuff you didn't

20   already say.  Same thing with you, Mr. Helmer.

21             Folks, the reason why we're here is a little hard

22   for me to say.  I think that even on the middle of the three

23   mediation orders, I plainly have the power to order

24   mediation of this.  And to the extent there was any doubt in

25   the second and the -- that the reasons eliminated by the

Page 5

1   third.  And to the extent there was still any ambiguity in

2   the third, I have this, I think you acknowledged it at

3   paragraph 22 of your submission, Mr. Helmer, that I have the

4   power to do it anyway.

5           We're talking about throwing the debtor into a

6   case that's been pending for 18 years, and if, as you can

7   well imagine, I do, I want to get money into the pockets of

8   GM's creditors.  The last thing I want to do is put it in a

9   land war in Asia and Cincinnati, or for that matter, before

10  me.

11          I gather from some of the stuff -- and I don't

12  want to get into 408 stuff -- that you weren't optimistic

13  about the ability to settle, Mr. Helmer.  But forgive me for

14  being cynical on matters of discretion before me, but I have

15  been in this court now for 13 years and people always start

16  by telling me that and you would be amazed how many times we

17  reach a settlement.

18          If I decided under the law, even if we don't have

19  the authority under the orders, and I think we plainly do, I

20  can order it.  So I'll hear from both side from that

21  perspective.

22          But I also have to tell you, Mr. Helmer, that when

23  I sign orders, I have an understanding of what I'm trying to

24  accomplish by them and the reason why the order dealing --

25  what I understand I was doing when I was carving out the

Page 6

```
 1    government -- and, by the way, it wasn't just the federal

 2    government.  It was the states and the tribe, and there was

 3    a reason why the tribe was in there.  I don't enter a lot of

 4    orders that talk about tribes.  The reason there was a tribe

 5    in there was it was -- at the time there was a whole bunch

 6    of environmental claims that I was hoping could be settled

 7    out, but might have to be litigated, and I didn't want to

 8    put burdens on those three governmental entities.

 9            And, of course, the governmental entities also had

10    lent a lot of money to the debtor and were talking about

11    super prize (sic) that they had to creditor recoveries.

12    Although it ultimately turned out after those orders were

13    entered into that I determined that the avoidance action

14    that the government was trying to grab by its super pry

15    lacked underlying merit.

16            So I'll hear argument on it, but I don't think I

17    need a lot, folks.

18            Okay.  Mr. Smolinsky, I'll hear from you first.

19            MR. SMOLINSKY:  Thank you, Your Honor.

20            I'm going to dispense with most of my comments

21    because I think Your Honor understands where we stand today.

22            This claims is one of only a handful of claims,

23    significant claims that remain to be reconciled.  There can

24    be no challenge to our assertion that the ADR procedures

25    have been enormously successful in this case.  Very few
```

Page 7

1    claims have had to be litigated.

2            What -- what -- what I'm encouraged by is the fact

3    that both parties here agree that it's time to -- to

4    liquidate this case -- this claim and to fix a dollar

5    amount.  And Your Honor may have seen that there were

6    pleadings filed in the last couple of days by Mr. Helmer

7    that he supports the estimation process.  And maybe at the

8    end of this hearing --

9            THE COURT:  Well, forgive me, Mr. Smolinsky.

10   Again, triaging my matters, I only read the stuff that I

11   need to read to deal with the crisis at the moment.  And I

12   haven't read anything other than the papers on this

13   particular controversy that you and Mr. Helmer have today.

14           MR. SMOLINSKY:  Maybe I can spend a minute because

15   I think it will be helpful to Your Honor.

16           The GUC Trust had filed a motion seeking

17   estimation of this claim.  We scheduled it many months in

18   advance so that we could hold a mediation in the interim,

19   and immediately upon serving the motion to estimate, we sent

20   out a notice to -- to start ADR proceedings.  That's when we

21   got into a dispute about whether mediation would be

22   appropriate in this case or whether it's a designated claim

23   under the ADR procedures.

24           So we didn't have a chance, obviously, yet, to

25   mediate the claim.  August 6th is the return date on our

Page 8

1    motion to seek estimation.

2             It would be a good idea --

3             THE COURT:  August 6th, Wednesday of next week?

4             MR. SMOLINSKY:  Yes.  Yes, Your Honor.  I think it

5    would be a good idea for Your Honor's time as well as Mr.

6    Helmer's travel schedule if we could spend a few minutes,

7    regardless of how this motion turns out, to just use it as a

8    pretrial to talk about the estimation process in the event

9    that the mediation is unsuccessful so that Mr. Helmer

10   doesn't have to --

11            THE COURT:  Well --

12            MR. SMOLINSKY:  -- travel back --

13            THE COURT:  -- pause, please, Mr. Smolinsky.  You

14   wouldn't be -- even if I granted your motion, you wouldn't

15   be proposing to mediate it between now and next Wednesday,

16   would you?

17            MR. SMOLINSKY:  No, Your Honor.  That's why we --

18   we would like to use today to -- to dispense of the need to

19   go forward on the 6th and that we just adjourn that motion

20   out to some future date, depending on whether or not Your

21   Honor orders the mediation.

22            THE COURT:  Now I'm with you.

23            Continue, please.

24            MR. SMOLINSKY:   And -- and based on a pleading

25   that was filed by Mr. Helmer a few days ago in response to

Page 9

1    our estimation motion, the good news is that Mr. Helmer

2    agrees that the motion should be granted and that we should

3    estimate the claim here before Your Honor.  There's been

4    some issues about lengths of -- length of briefs and things

5    of that nature that I'm sure we could work out.

6              But, obviously, from the debtors -- from the

7    debtors' perspective, from the GUC Trust's perspective it's

8    very important that we have an opportunity to mediate this

9    claim, to hear about what -- what the claimants' theories of

10   damages are in this case that's been going on for 18 years.

11   We've spent the time to get -- to delve into the trial that

12   -- that was held on this claim back in 2004, I believe.  And

13   -- and we're ready to start that mediation process.

14             I think Your Honor knows that this claim needs to

15   be mediated.  Your Honor has better time than to sit before

16   a hearing to estimate a claim if it's not necessary.  And

17   that's the only comments that I have.

18             THE COURT:  Very well.

19             Mr. Helmer, can I hear from you, please?

20             MR. HELMER:  Thank you, Your Honor.

21             In light of your comments, I just have a couple of

22   items that I want to say about the Court's orders just

23   because I have come a long way.  I read the orders in a

24   somewhat different fashion, obviously.  The -- I took the

25   word supplement to mean in addition to, not replacing, and

Page 10

```
 1    first -- for the first point, Your Honor.

 2              And, secondly, as I read the mediation orders and

 3    the arbitration orders, false claims act claim -- I don't

 4    find anywhere in any of those orders, which, of course, is

 5    what we have.  So I didn't think your orders covered this

 6    claim.  I thought it also -- your orders exempted the United

 7    States.  Two days ago in this court there's a decision by

 8    Judge Bernstein, Hopper Beach Craft, Inc. v United States

 9    Exrail Minges (ph).  It's 2013 Westlaw 3831671, and at page

10    13 Judge Bernstein talks about a non-intervening false

11    claims act claim and who that claim really belongs to.

12              And his finding, Your Honor, which is consistent

13    with what we presented to the Court, is that the -- my

14    clients, the relators, are really statutorily designated

15    agents of the United States; that the real party in interest

16    remains the United States and the underlying debt belongs to

17    the United States.  So that's what we thought your order

18    exempting the United States applied.  We brought that to the

19    attention of counsel.  They said, no.  We don't read it that

20    way.  There is another order.  We read that order.  We still

21    don't see the -- where this claim is covered.

22              THE COURT:  Pause, please, Mr. Helmer because I

23    don't think anybody's suggesting that you could be

24    criticized or sanctioned, or if they did I would throw

25    anybody making that suggestion out.  But as I understand the
```

Page 11

1     language of the middle of the three orders, it's language

2     that's in substance filed by the United States.

3            As  understand QTem (sic) actions, the government

4     gets the bulk of the benefits of the action that's been

5     brought by the private litigant, and the private litigant

6     gets a piece of the action.  Is that an unfair

7     characterization?

8            MR. HELMER:  It is not, Your Honor.  Some people

9     refer to it as a bounty hunting statute.  It's a reward

10    that's paid by the United States for private citizens taking

11    on the obligation to pursue and prosecute these cases.

12           THE COURT:  And that's what your guys have done.

13           MR. HELMER:  For 18 years, Your Honor.

14           THE COURT:  Okay.  And I don't doubt that there's

15    been a lot of work done over those 18 years.  The question

16    is the extent to which we want to subject the other side

17    and, for that matter, you.  Well, you'll probably have to do

18    it against the other guys anyway.  I'm sure you're going to

19    prosecute your claim against those other than GM.  I gather

20    there are entities under GM --

21           MR. HELMER:  Our -- our trial has now been

22    scheduled, Your Honor, for March of 2014, which is exactly

23    nine years since we tried the case the first time and 19

24    years since we filed it.

25           THE COURT:  Yeah.  Well, I think Dickens wrote

Page 12

1   books about stuff like that.

2         MR. HELMER:  Yeah.  I'm -- I'm living it, Your

3   Honor.

4      (Laughter)

5         THE COURT:  But the -- the issue before me is a

6   legal matter, although eventually we get to matters in my

7   discretion as well.

8         Is -- you fit within the second order, the middle

9   of the three, if your claim, even though it's for the

10  benefit of the government in principal part, was filed by

11  your guys, which by the textual analysis of the Supreme

12  Court tells me to file -- to follow would suggest that the

13  middle order does apply.  And the purpose of the third order

14  was to broaden the mediation power to -- to put it crudely,

15  to give less things out of the litigation process.  And as

16  you acknowledged at paragraph 22 of your responsive papers,

17  I got the power to do it under 360 anyhow.

18        So I -- I got to tell you that I'm hardly going to

19  find fault with you and what you did, but I think you sense

20  where I'm coming from.

21        MR. HELMER:  I do, Your Honor.  And if I could

22  just make a couple of comments about we did represent to the

23  Court that you can -- you have the authority to compel

24  mediation no matter what your other orders say and you've

25  now told me that you interpret the orders in a way that I

Page 13

1    didn't read them, but they're your orders.  They mean what

2    you say they mean.  But I would like to make a couple of

3    comments on why I don't think you should exercise your

4    discretion to direct mediation in this particular class.

5            THE COURT:  Sure.  Go ahead.

6            MR. HELMER:  The first point I would like to make

7    to Your Honor is that we did mediate this claim.  We brought

8    in a mediator that was selected by General Motors, paid him

9    $10,000 a day to come to Cincinnati.  He spent three days in

10   Cincinnati.  After two hours it was pretty clear that --

11   that this case was not going to get resolved, but we still

12   spent three days with him to go through the process to see

13   if there was some common ground here.

14           That was several years ago.  The case did not

15   settle obviously, Your Honor.  But then what happened is --

16   and my clients were --

17           THE COURT:  Pause, please.  I remember that it was

18   a while ago.

19           MR. HELMER:  Yes, it was.

20           THE COURT:  It -- it was, what, about 2004 or

21   thereabouts?

22           MR. HELMER:  Mr. Smolinsky has represented that,

23   Your Honor.  Frankly, I just -- I don't remember.  That

24   sounds about right to me.

25           THE COURT:  But I -- I take it you and he would

1    agree, at least to the extent that it was way before this

2    bankruptcy was filed.

3              MR. HELMER:  Absolutely, Your Honor.  The

4    bankruptcy is 2009.  It was way before that.

5              But then what happened after -- and, of course, my

6    clients attended this mediation.  Then what happened after

7    that, Your Honor, is we went through the litigation process

8    as you noted, including a five-week trial, two trips to the

9    Sixth Circuit Court of Appeals, a argument before the United

10   States Supreme Court and a decision -- a second effort to

11   get the case before the Supreme Court, which was rejected

12   two weeks ago, a trip to Congress twice to have the statute

13   amended which has now been determined by our court in

14   Cincinnati, the Sixth Circuit in Cincinnati to be a

15   constitutional enactment that applies to this case.  All

16   right.

17             Most of that -- most of that litigation process

18   was financed and driven by General Motors.  Again, different

19   General Motors than who is before Your Honor, but it's the

20   same General Motors as far as my clients are concerned in

21   terms of driving this case and the expenditure of literally

22   tens of millions of dollars in legal fees on this dispute.

23             THE COURT:  Pause, please, because I'm taking

24   everything you said as very, very true.  The only

25   qualification being that I think the trip to the Sixth

Page 15

1    Circuit is to another room at Fifth Street in Cincinnati,

2    isn't it?

3                MR. HELMER:  I'm sorry, Your Honor.  Could you

4    repeat that?

5                THE COURT:  That -- that the Cincinnati District

6    Court in the circuit -- Sixth Circuit Court of Appeals are

7    in the same courthouse in Cincinnati, aren't they?

8                MR. HELMER:  You're correct, Your Honor.  The

9    Cincinnati District Court is, but this case was not tried in

10   the Cincinnati District Court.  It was tried in Dayton,

11   Ohio.

12               THE COURT:  Oh, it was tried in Dayton.

13               MR. HELMER:  Yes, Your Honor.

14               THE COURT:  See, also Southern District of Ohio.

15               MR. HELMER:  Also Southern District.

16               THE COURT:  Fifteen miles up the road.

17               MR. HELMER:  That's -- that's correct, Your Honor.

18               THE COURT:  Okay.

19               MR. HELMER:  By -- by the way if you've ever been

20   to Dayton in February --

21               THE COURT:  I was in the Air Force in Dayton in

22   February and I know Dayton in February, but I've also argued

23   in what I think is that same building on Fifth Street in

24   Cincinnati where the Sixth Circuit Court of Appeals sits.

25               MR. HELMER:  Yes, Your Honor.

1          THE COURT:  I've argued unsuccessfully, but argued

2     in the Sixth Circuit.

3          MR. HELMER:  Yes, Your Honor.  It's across the

4     street from my offices.  I'm very familiar with it.  I did a

5     clerkship that took me through there, also.

6          In any event, Your Honor, again, Mr. Smolinsky has

7     clients that he has to deal with and has to satisfy that

8     he's operating in a fashion that's in their best interest,

9     but so do I.  And when I go to my clients and say, this is

10    what's been suggested; that you must go to mediation in

11    Chicago.  You must pay for another mediator, at least half

12    for another mediator to mediate this -- this claim again,

13    and they say, okay.  Well, what are our chances of success,

14    and I point out the offer that was made -- and by the way,

15    Your Honor, I do want to correct one thing that was not on

16    my papers.

17         I didn't divulge that to the Court.  The trust

18    did.  It's attached in two different places to their motion

19    to --

20         THE COURT:  You mean the big nest in the mediation

21    process.

22         MR. HELMER:  I'm sorry.

23         THE COURT:  You mean the big nest in the mediation

24    process?

25         MR. HELMER:  Yes, Your Honor.

Page 17

1          THE COURT:  Okay.

2          MR. HELMER:  You'll find it at page 75 and again

3     at page 81 of their initial filing.  I wasn't the one that

4     disclosed it, but I did comment on it.

5          But in any event, Your Honor, that's a -- where I

6     apply myself.  I have to go to my clients and say to them,

7     this -- this is where you are.  There's this kind of offer

8     that's on the table.  You've been through this process

9     before.  You litigated with General Motors for the better

10    part of two decades, and now they want you to go to Chicago

11    and sit down with somebody else for the reason that Mr.

12    Smolinsky says, and I'm going to quote him here, "to hear

13    the damage theories in the case."

14          Well, I have two comments I want to make about

15    that, and I'm -- I'm just about finished, Your Honor.

16          First, we tried the case for five weeks.  I got my

17    whole case in in those five weeks and much of the defense

18    case was also put in through the witnesses that we called.

19    There's transcripts of that.  Twenty-four days of trial

20    testimony, there's transcripts of that and what our damage

21    theories were.

22          Next, the Sixth Circuit has two leading cases on

23    how you calculate damages in a false claims act case.  There

24    is Compton versus Midwest Specialties, which was a case the

25    government handled and won on summary judgment, and the

Page 18

1    second case is U.S. Extra (sic) Robey (ph) versus Boeing,

2    which I handled, which deals with how you calculate damages

3    in one of these false claim act lawsuits.

4           So the legal parameters are set forth and

5    established very well, at least in -- in our jurisdiction.

6           Third, Mr. Smolinsky wants more information about

7    our damage theories.  I don't have any problem sharing that

8    information with him so he can give it to his clients.  I

9    think I've already done that.  But if he wants me to point

10   him to places in the record, point him to exhibits, point

11   him to case law, I'm -- I'm very well content to do that,

12   Your Honor, so that he gets the information that he says he

13   needs a mediator to get out of me.  I'll give it to him.

14   I'll give it to him.

15          I think that's only fair for somebody that has the

16   burden of proof in the case to let the other side know what

17   it is you want and why you think you're entitled to it.

18          Let me make one final comment about the damages in

19   this case, Your Honor.  We do have a proof of claim in this

20   case, a substantial one.  As I understand, it's one of the

21   last remaining large ones on the Court's docket.  And, by

22   the way, I would be remiss if I didn't congratulate the

23   Court for the four years of effort you put into this case

24   and all the claims that you have been able to resolve in

25   moving this case forward.  I have read a number of your

1    transcripts.  There are people in Cincinnati that know you

2    and speak very highly of you, and I can see why.

3              But this claim, Your Honor, we -- when we asked

4    for $50 million in our proof of claim, a very substantial

5    amount, it is a fraction, it is a fraction of the damages

6    that were caused to the United States by General Motors'

7    conduct in failing to build the nation's destroyers in a

8    fashion that the Navy --

9              THE COURT:  You mean on the Burke (ph) list -- on

10   the Burke class of vessels, the Arlene Burke class vessels.

11             MR. HELMER:  Yes, Your Honor.  They are -- they

12   are the most powerful war ships ever built.

13             THE COURT:  I -- I know a little bit about

14   cruisers.  It's a cruiser, not a --

15             MR. HELMER:  No, Your Honor.

16             THE COURT:  It's a -- or is it a destroyer?

17             MR. HELMER:  It's a destroyer.  It's 500 feet

18   long, has a crew of about 450, and if you're interested,

19   Your Honor, I was in Norfolk two weeks ago looking at them.

20   Twenty-three of them are tied up because they're sequestered

21   that are not --

22             THE COURT:  Well, I --

23             MR. HELMER:  -- patrolling.

24             THE COURT:  -- I have my own problems with

25   sequestering.

1        (Laughter)

2             THE COURT:  Including the 5:00 curfew we have in

3    this courthouse.  But I think parties could be upset or the

4    taxpayers would, if I went on field trips on the government

5    dime.  So -- but I take your point.  I -- you -- you regard

6    your allegations as very serious and, in substance, you're

7    arguing that the government got ripped off.  But that's a

8    fact that needs to be tried by the ultimate trier of fact,

9    which may or may not be me.

10            MR. HELMER:  Well, Your Honor, if -- if I could

11   pick up on something Mr. Smolinsky said.  We absolutely

12   agree with the trust that estimation is appropriate.  His

13   procedure that he's suggested to the Court, we even agree

14   with that with a tweak or two here or there on the length of

15   the briefs and on the fact that we think you should make the

16   call based on what's submitted to you and that that should

17   be the end of this.  We don't think it should -- should --

18   the litigation should continue after that point.  We think

19   the plan gives you that authority and that -- we point that

20   out in the papers that you haven't looked at yet.

21            But with those two exceptions that we think --

22            THE COURT:  To estimate a claim for allowance

23   purposes is contested to stuff like feasibility, voting,

24   reserves, that kind of thing?

25            MR. HELMER:  Your Honor, you have mentioned some

 1    comments that are foreign to me.  I -- I'm sorry.  I'm not a

 2    bankruptcy practitioner.  I'm a trial lawyer and I don't

 3    quite understand what you just said, so I'm not sure it

 4    would --

 5              THE COURT:  Fair enough.

 6              MR. HELMER:  -- be appropriate for me to comment.

 7              THE COURT:  Okay.

 8              All right.  Anything else?

 9              MR. HELMER:  No, Your Honor.  Thank you so much.

10              THE COURT:  Thank you.

11              Mr. Smolinsky, briefly, please.

12              MR. SMOLINSKY:  Your Honor, the reason why these

13    destroyers are the most powerful destroyers in the world is

14    that because these generators have been working without

15    incident since 1985 --

16              THE COURT:  Okay.  They're --

17              MR. SMOLINSKY:  So when you talk about --

18              THE COURT:   But I take it there's a dispute

19    between you and Mr. Helmer on that issue or --

20              MR. SMOLINSKY:  When I talk about --

21              THE COURT:  -- will be --

22              MR. SMOLINSKY:  -- that --

23              THE COURT:  -- if the case gets tried.

24              MR. SMOLINSKY:  Yes.  When I talk about damage

25    theories I mean how you calculate how -- how the government

1    has been harmed.

2            Just to -- just to close the record, we believe

3    these claims fall within the categories of claims that are

4    subject to the ADR order.  That covers product liability

5    claims which are very similar to these types of claims as

6    well as tort claims.

7            The District Court in Massachusetts has found that

8    false claims act are statutory tort claims.  I'll cite the

9    U.S. Exrail West Morlin (ph) versus Amjen (ph), case 738 F.

10   Supp. 2d 267, District of Massachusetts, 2010.

11           In regards to the -- Judge Bernstein's recent

12   decision in Hawker (ph), I'll note and I think Your Honor

13   understands that what he found was that false claims act or

14   QTem (sic) claims are claims brought on behalf of the United

15   States, not by the United States, and that's a distinction

16   that we're making here with respect to the second amended

17   ADR order.

18           And, again, with respect to the estimation

19   procedures, we can talk about them at -- after Your Honor

20   makes a ruling which will shed light into the timing of when

21   an estimation procedure would have to commence.

22           Thank you, Your Honor.

23           THE COURT:  Okay.  Thank you.

24           Folks, sit in place for a moment, would you,

25   please?

Page 23

1          (Pause)

2               THE COURT:  Folks, Mr. Helmer, you've more than

3    easily satisfied me that your position was taken in good

4    faith; that there are plausible readings that could support

5    your position vis-à-vis the orders, and that sanctions would

6    be silly.

7               But on the underlying issue as to whether or not

8    your guys should be regarded -- required to mediate or if

9    you should be required to -- required to mediate on their

10   behalf, I'm concluding that you should be so required.  And

11   my findings of fact, conclusions of law and bases for the

12   exercise of my discretion for coming to that view will

13   follow.

14               In summary, I believe that claims of the nature

15   that you wish to bring were covered by the second of the

16   three orders, and even more clearly by the third.  But that,

17   also, in any event, the residual authority I have under

18   Southern District of New York General Order M-360 would give

19   me that power, even if I hadn't previously had it.

20               So we then get to the second question that you

21   properly identified, which is whether I should do so in the

22   exercise of my discretion.

23               In my view, a full-blown litigation in either the

24   Ohio District Court or before me would be very time

25   consuming and expensive, at least if I wanted to give due

Page 24

1    process to both sides, appropriate due process to both sides

2    which I always want to do.  And it would be an inappropriate

3    drain on the resources of the GM estate which insofar as

4    possible I want to get into the hands of creditors.  And

5    would also impede a timely and responsible winding up of the

6    GM estate.

7           It's facts I find that in November of 2009 the

8    claimants, as relators under the false claims act, filed a

9    $50 million claim in this Chapter 11 case.  The allegations

10   occurred with the subject of the pending prepetition action

11   that's been going on for many, many years.  I was told 18

12   years in the Southern District of Ohio.  I thought it was

13   Cincinnati where the Southern District also sits, but I was

14   corrected to understand that it's in Dayton.  And also the

15   Sixth Circuit and even the U.S. Supreme Court.

16          The claim seeks damages and civil penalties

17   allegedly owed by the debtors to the U.S., but under the

18   false claims act private litigants have the ability to

19   effectively carry the sword for the U.S.  The U.S. gets the

20   bulk of the recovery and is plainly a party in interest with

21   a beneficial interest in the outcome.   But the relators,

22   the folks who are carrying the sword, have, as we all agree,

23   a piece of the action in that recovery and have the

24   incentive to bring it on behalf of the government.

25          On February 23rd, 2010, that's three-and-a-half-

Page 25

1    years ago now already, I entered an order authorizing the

2    implementation of ADR procedures, alternate dispute

3    resolution procedures, authorizing alternative dispute

4    resolution for certain "designated claims."

5            At that time they included personal injury claims,

6    wrongful death claims, tort claims, product liability

7    claims, all of the type that car companies get a lot of and,

8    also, damages arising from the rejection of executory

9    contracts, indemnity claims, certain kinds of lemon law

10   claims, certain warranty claims and class action claims.

11   They were later expanded to cover patent claims.

12           In October of that year, about eight months later,

13   I entered the first mediation -- amended mediation order

14   which provided that the procedures I just talked about

15   wouldn't apply to claims filed by the United States of

16   America or its agencies.

17           I had an understanding as to what I was

18   accomplishing by that order.  By the way, I should say that

19   while what I just quoted is the portion that's relevant

20   here, it also covered the states and the tribe.  And I knew

21   at the time that there were a lot of environmental actions

22   that were being brought by the U.S. government itself and

23   also by the EPA and also by the state AG's of many states

24   and by the -- at least one tribe of Indians in upstate New

25   York who had environmental issues.  And I didn't want to put

Page 26

1    those guys through mediation at the time.  That was what I

2    had in mind when I put that into place.

3            On June 4th, 2012, I entered a second amended

4    mediation order which lacked the language exempting claims

5    filed by the U.S. and also stated that the first amended

6    mediation order was "supplemented, just provided herein."

7    The purpose of that second order was to expand the scope of

8    ADR because, frankly, this case, which has in the ballpark

9    70,000 claims, would swamp us even before sequestration and

10   even more so now.

11           The issues before me boil down to issues of two

12   types:  One of construction of orders and with respect to

13   the power I have to order it, and the second is whether,

14   assuming I have the power, that I should exercise that power

15   in the exercise of my discretion.

16           On the first issue, I determined that I do have

17   the power to do it and I've had that power under orders I've

18   entered at least since the second order of the three, and

19   that I also have the power under M-360.  I indicated what I

20   meant by the purpose of carving out the government.

21           In any event, even if I'm not allowed to look to

22   my understanding of the purpose, I look to the textural

23   analysis plain meaning interpretation that the Supreme Court

24   has told me that I'm supposed to do in cases like Ron Pare

25   (ph).  And filed by is not the same as for the benefit of

1    the U.S. government.  Plainly, the U.S. government would get

2    the lion's share of any successful recovery in the QTem

3    action, but the action wasn't filed by the U.S. government.

4    It was filed by the private individuals, the folks who were

5    carrying the sword for the U.S. government and pursuing the

6    claims that are the subject of the controversy between GM

7    and the individual relators.

8            I also appreciate the candor reflected by Mr.

9    Helmer in paragraph 22 of his submission where he recognized

10   that even if it wasn't covered by the earlier orders, or at

11   least orders number 2 and 3, it would still be within my

12   power to order under M-360.

13           So then we get to the second issue which is

14   whether I should still order it in the exercise of my

15   discretion.  I don't regard that as particularly close.

16   While I do acknowledge, as Mr. Helmer pointed out, that the

17   earlier efforts at a consensual resolution through mediation

18   many years before the filing of this bankruptcy case -- Mr.

19   Smolinsky says it was 2004.  Mr. Helmer says it may have

20   been 2004, but he's not sure -- but both sides agree that it

21   was way, way before 2009 when this 11 was filed.  It wasn't

22   successful then, but the parties were negotiating, were

23   mediating in a different environment in those days.

24           The bleak house aspects of the litigation in Ohio

25   and Washington, D.C., when it went up to the Supreme Court,

1    were only partly apparent at that point.  And the debtor did

2    not then have the motivation to bring this Chapter 11 case

3    to an end and to get further distributions to its unsecured

4    creditor community.

5           Also, frankly, the GM that was litigating back in

6    2004, while technically the same entity as Motors

7    Liquidation Company, or at least seemingly such, may have

8    had a different mindset of its financial condition than GM

9    has now.  I can't predict, of course, the success of any

10   further negotiation or mediation.  But I think there is more

11   recent belief or hope that any mediation would be successful

12   now.

13          Also, to be frank, the costs of continuing to do

14   battle to both sides are likely to be monstrous, and if it

15   were to be litigated in this court as claims for other than

16   personal injury, matters normally it would be, the burdens

17   on this court, which is already up to its eyeballs not just

18   by reason of GM, but in no small part because of GM, not all

19   of those claims being of the type we have here, of course,

20   are enormous.

21          Conversely, if I were to send this case out with

22   the relief from the stay to be liquidated elsewhere would

23   place very great demands on the GM Motors Liquidation

24   unsecured creditor committee.

25          So for all of those reasons, I am exercising my

Page 29

1    discretion to see if we can get this resolved by mediation.

2    If the mediation is unsuccessful, as both my orders provide

3    and as all old-fashion due process would require, it's

4    without prejudice to the rights of the parties to agree to

5    disagree and tee it up for a judicial determination whether

6    I finally determine that it should be heard.

7           Now by reason of that, folks, and I'm going to so

8    order the record, but you can follow with a written order if

9    you want, Mr. Smolinsky.  If you do that, I would ask that

10   you work out its form with Mr. Helmer in a mutually

11   satisfactory way and that you settle it only if you're

12   unsuccessful in doing that.

13          Then we get to the matter of claims estimation.

14   My tentative, subject to your rights to be heard, is that I

15   should defer consideration of claims estimation until you

16   guys have tried to mediate and we see where that goes, and

17   we see whether that is successful.

18          I could, at your recommendation, then, either deny

19   the estimation motion without prejudice or merely continue

20   it with simply a holding date, and I would like both sides

21   to weigh in on what's the best way to proceed in that

22   connection.

23          First you, Mr. Smolinsky.

24          MR. SMOLINSKY:  Thank you, Your Honor.

25          We don't need an order.  So ordering the record is

1    fine with us.  It's -- Mr. Helmer, it's up to him whether he

2    wants an order.  I can't imagine he has any appellate

3    interest, but we'll do an order if he wants to, otherwise

4    we'll just stick with the record and start the mediation

5    process.

6            In terms of the estimation, I think -- I think it

7    makes sense to defer discussion about what that would entail

8    until after the mediation process.  We believe that the

9    estimation -- the mediation will probably conclude around

10   the week of September 16th.  So perhaps we schedule a -- an

11   adjourn date for the estimation motion until the week after,

12   see where we are, and Mr. Helmer and I will make efforts to

13   work out a schedule -- a scheduling order for the estimation

14   subject to Your Honor's views to be discussed at that

15   adjourned hearing.

16           THE COURT:  Uh-huh.  Mr. Helmer, may I get your

17   perspective, please?

18           MR. HELMER:  I have a couple of comments, Your

19   Honor.

20           I understood you.  We don't need an order from the

21   Court.  I think your record that you've made is sufficient,

22   first.

23           Secondly, I -- I don't have a problem with

24   delaying the decision on the estimation until we see how

25   mediation works out.  If you want to just hold in abeyance

1    the pending motion, that's -- that's fine with us because as

2    I pointed out earlier, we support the position of the trust

3    for the most part in that -- that motion.

4            Third, Your Honor, in terms of scheduling this, I

5    am currently scheduled for two trials in the month of

6    September, both happen to be in -- one's in Indiana and

7    one's in Kentucky.  It might be difficult for me to --

8            THE COURT:  Kentucky near Covington, close to

9    Cincinnati or farther away in Kentucky?

10           MR. HELMER:  It originally started in Warsaw.

11   It's now in Boone County, which is right on the line between

12   the two counties, Boone County Common Police Court.  It's a

13   triple fatality, so it's been going on for several years

14   also.  We're trying to get it wrapped up.

15           So September may be a problem, but -- but I will

16   endeavor to find time in August to address this if Mr.

17   Smolensk's calendar will accommodate that.

18           Fourth, Your Honor, and finally, since Mr.

19   Smolinsky raised the issue of exchanging information for

20   this mediation, there is a filing that was made in this

21   court by the trust that attached the asset purchase

22   agreement between Rolls Royce Company and General Motors

23   when they bought the Allison Engine Company in 1993, I

24   believe.

25           For some reason, that asset purchase agreement,

Page 32

```
 1    which was an exhibit, is no longer available to the public.

 2    I have been unable to get the document from the clerk's

 3    office and have not been able to get the document from the

 4    trust.  I think I'm entitled to see it.  I think it bears on

 5    the mediation because it will tell me what assets and

 6    liabilities were accepted by Rolls Royce when they took over

 7    the Allison Engine Company.

 8            If you remember, Your Honor, Allison -- there's --

 9    had three bodies here.  During the first 16 destroyers,

10    General Motors owned Allison Engine.  During a period after

11    that for about 14 months, Allison was a stand-alone company.

12    Then after that in 1995 Allison was purchased by Rolls Royce

13    Company.  So we have destroyers built during all three of

14    those categories with different ownership of Allison Engine

15    Company.

16            I want to see what's in the asset purchase

17    agreement to see what Rolls Royce took on from General

18    Motors.  In fact, I was very surprised to see they took on

19    anything.  I thought Allison had been a stand-alone company

20    for over a year when Rolls Royce entered the picture.

21            So I'm asking the Court -- it was publicly filed.

22    I cannot find any order in which you sealed it.  I cannot

23    find any order in which you withdrew it, but it's not

24    available to me.

25            THE COURT:  Uh-huh.
```

1              Mr. Smolinsky, if there had been a sealing order,

2      chances are Mr. Helmer would have found it.  Was that

3      intentionally kept out of the public eye?

4              MR. SMOLINSKY:  Yes, Your Honor.  After we filed

5      the motion, there was a discussion.  Rolls Royce raised

6      certain confidentiality issues.  If I recall correctly, we

7      reached out to chambers at the time and simply did it

8      together, cooperatively, and -- and amended the document on

9      the ECF system to -- to redact that entire agreement.

10             Since Mr. Helmer raised the issue, we did reach

11     out to Rolls Royce to ask them whether they would

12     cooperatively allow us to share that document with Mr.

13     Helmer under confidentiality, if necessary.  We have not

14     heard -- received a response yet, but we'll continue to --

15             THE COURT:  Okay.

16             MR. SMOLINSKY:  -- work on that.

17             THE COURT:  Well, I -- I think your instincts were

18     sound in assuming that it was a document appropriately to be

19     given to Mr. Helmer, although, also, under a suitable

20     confidentiality order that he would take it as a

21     confidential document.

22             It -- I haven't seen the document and I have no

23     idea whether it would be relevant to Mr. Helmer's needs and

24     concerns, but it's not all that different analytically from

25     the fact that when you have a tort litigation, insurance

Page 34

```
 1    policies are normally producible even though they don't go

 2    to the merits of the underlying controversy because they --

 3    their disclosure frequently facilities settlement.

 4           What I want you to do is this, Mr. Smolinsky.  I

 5    want you to send a piece of paper to Rolls Royce, copy to

 6    Mr. Helmer, copy to counsel for the GUC Trust saying, notice

 7    of intention to disclose to Mr. Helmer X document.  It's

 8    also to say that he will get it if, but only if he enters

 9    into a reasonably satisfactory confidentiality agreement.

10           Set a deadline.  See if you and Mr. Helmer can

11    agree on what's fair to him and fair to Rolls Royce for them

12    to object to me.  If they object to me, I'll decide it with

13    an on the record conference call.  If they don't object,

14    then you give it to Mr. Helmer under a confidentiality  stip

15    or agreement.

16           Will that work for both sides?

17           MR. SMOLINSKY:  Yes, Your Honor.

18           THE COURT:  Mr. Helmer?

19           MR. HELMER:  Your Honor, I need it before the

20    mediation.  I --

21           THE COURT:  Oh, I well understand.  And that

22    reminds me of one other thing I was also going to say,

23    subject to your rights to be heard.

24           This mediation, if it's going to be successful,

25    it's going to cut off at least as far as GM is concerned 18
```

Page 35

1    years of litigation.  You are going to have to set the

2    mediation at a time that works for Mr. Helmer, and if that

3    requires kicking the mediation back a few weeks or even a

4    month or two, it's time well spent.

5              So I am ordering mediation, but I'm also saying it

6    has to be at a time reasonably satisfactory to Mr. Helmer.

7              MR. SMOLINSKY:  Under -- understood, Your Honor.

8    We recognize that putting together mediation statements in

9    this case are going to take some time as well.  So we'll

10   work out a schedule.

11             THE COURT:  Okay.

12             Mr. Helmer, does that additional qualification

13   that I added help you vis-à-vis the timing of the agreement?

14             MR. HELMER:  It does, Your Honor.  And if I could

15   impose upon the Court on one additional matter.  Having the

16   mediation in Cincinnati or Dayton, since counsel will have

17   to travel anyway, would also help us as opposed to having us

18   to go to Detroit, San Francisco, New York or wherever else

19   it -- the mediators are.

20             THE COURT:  Does that present any problem, Mr.

21   Smolinksy?

22             MR. SMOLINSKY:  Obviously, I don't have my client

23   here.  We prefer to do it at the mediation sites, but I'm

24   sure that we can work -- work things out.  I will say that

25   we have mediators on our panel throughout the United States

Page 36

1  that have various levels of expertise.  We have a mediator

2  in San Francisco that has very specific QTem and false

3  claims act experience.

4          So, again, we'll -- I'm sure that we'll be able to

5  work out an agreeable location and an agreeable mediator.

6          THE COURT:  Okay.  I don't like to micromanage my

7  cases.

8          I do care about the mediator knowing what he's

9  doing, what she's doing.  I think that that helps get better

10  settlements.  But beyond that, I don't care what you guys

11  agree upon.  I do think that sooner rather than later is for

12  you to get into and work cooperatively, let us reason

13  together mode.

14          Okay.  So let's make it happen.

15          Anything else on GM?  I've got a lot of people

16  that have been waiting a long time on another matter.

17          MR. SMOLINSKY:  No.  Thank you very much, Your

18  Honor.

19          THE COURT:  Okay.  Thank you.

20          MR. HELMER:  Thank you, Your Honor.

21          THE COURT:  Okay.  Have a good day.

22      (Whereupon, these proceedings were concluded at 11:22

23  a.m.)

24

25

Page 37

1                    I N D E X

2

3                     RULINGS

4                                        Page      Line

5   Doc. #12463 Motion to Compel Roger L.

6   Thacker, Roger L. Sanders, and Thomas J.

7   Hanson to Participate in Mandatory

8   Mediation with Respect to Claim No.

9   27105 Pursuant to the Second Amended

10  ADR Order                              23        7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 38

1               C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6
     Sherri L         Digitally signed by Sherri L Breach
7                      DN: cn=Sherri L Breach, o, ou,
     Breach            email=digital1@veritext.com, c=US
8                      Date: 2013.08.02 15:34:45 -04'00'

     SHERRI L. BREACH
9

     AAERT Certified Electronic Reporter & Transcriber
10

     CERT*D -397
11

12

13

     Veritext
14

     200 Old Country Road
15

     Suite 580
16

     Mineola, NY 11501
17

18

19

20

     Date:  August 2, 2013
21

22

23

24

25