Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5    MOTORS LIQUIDATION COMPANY,              CASE NO. 09-50026-reg

6            Debtor.

7    - - - - - - - - - - - - - - - - - - x

8    MOTORS LIQUIDATION COMPANY GUC

9    TRUST,

10                  Plaintiff,              ADVERSARY PROCEEDING

11          v.                             CASE NO. 12-09802-reg

12   THE LIVERPOOL LIMITED PARTNERSHIP,

13   ET AL,

14                  Defendants.

15   - - - - - - - - - - - - - - - - - - x

16

17                     U.S. Bankruptcy Court

18                     One Bowling Green

19                     New York, New York

20                     October 21, 2013

21                     2:06 PM

22   B E F O R E :

23   HON ROBERT E. GERBER

24   U.S. BANKRUPTCY JUDGE

25   ECRO - MATTHEW

Page 2

1   HEARING RE:  Motion Approving Global Settlement of GUC Trust's

2   Objections and Adversary Proceeding Relating to Nova Scotia

3   Notes, Among other Matters

4

5   HEARING Re:  Doc. #12515 Motion of the Paulson Noteholders for

6   Allowance of Limited Payment of Professional Fees and Expenses

7   Incurred by the GM Nova Scotia Trustee in Connection with

8   Settlement and Request for Expedited Treatment

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sheila Orms and Melissa Looney

Page 3

1   A P P E A R A N C E S :

2   KING & SPALDING LLP

3        Attorneys for General Motors LLC and New GM

4        1185 Avenue of the Americas

5        New York, NY 10036-4003

6

7   BY:   ARTHUR J. STEINBERG, ESQ.

8        SCOTT DAVIDSON, ESQ.

9

10  GREENBERG TRAURIG

11        Attorneys for (Not Identified)

12        77 West Wacker Drive

13        Suite 2500

14        Chicago, IL   60601

15

16  BY:   KEVIN D. FINGER, ESQ.

17        BENN BRENNAN, ESQ.

18        BRUCE ZIRINSKY, ESQ.

19

20

21

22

23

24

25

Page 4

1   DICKSTEIN SHAPIRO LLP

2        Attorneys for GUC Trust

3        1633 Broadway

4        New York, NY  10019

5

6   BY:  KATIE L. WEINSTEIN, ESQ.

7        ERIC B. FISHER, ESQ.

8

9   AKIN GUMP STRAUSS HAUER & FELD, LLP

10        Attorneys for Green Hunt Wedlake, Inc.

11        One Bryant Park

12        New York, NY  10036

13

14   BY:  DEAN L. CHAPMAN, ESQ.

15        SEAN E. O'DONNELL, ESQ.

16

17   GIBSON DUNN & CRUTCHER LLP

18        Attorneys for MLC GUC Trust

19        200 Park Avenue

20        New York, NY  10166

21

22   BY:  MATTHEW J. WILLIAMS, ESQ.

23        KEITH R. MARTORANA, ESQ.

24

25

Page 5

1    CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP

2         Attorneys for Paulson Noteholders

3         101 Park Avenue

4         New York, NY  10178

5

6    BY:  STEVEN J. REISMAN, ESQ.

7         THERESA FOUDY, ESQ.

8

9    U.S. DEPARTMENT OF JUSTICE

10        Counsel for the U.S. Attorney's Office

11        Southern District of New York

12        86 Chambers Street

13        New York, NY  10007

14

15   BY:  DAVIS S. JONES, ESQ.

16

17   TELEPHONIC APPEARANCES:

18   COLIN ADAMS

19   GEORGE BRICKFIELD, THE SEAPORT GROUP

20   MARIA DOUVAS, PAUL HASTINGS LLP

21   MAUREEN F. LEARY, NEW YORK STATE OFFICE OF THE ATTORNEY

22        GENERAL

23   MAXWELL SAFFIAN

24   MICHAEL J. WALSH, BANK OF AMERICA

25   SAMUEL WECHSLER, RIVER BRICH CAPITAL

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  Have seats, please.  Or

3       afternoon, have seats, please.

4              Okay.  We're here on the GUC Trust motion for

5       approval of the settlement and thereafter, the 503(b)(3)

6       substantial contribution request.

7              The motion is unopposed, the first motion is

8       unopposed, the settlement motion is unopposed.  Nevertheless,

9       given the size of the matter, Mr. Fisher, if you or one of your

10      colleagues wants to make any statement in connection with it,

11      I'll give you an opportunity.

12             MR. FISHER:  Thank you, Your Honor.  Good afternoon.

13      Eric Fisher from Dickstein Shapiro on behalf of the GUC Trust.

14             Since as Your Honor pointed out, there are no

15      objections, I'll be heard just briefly in support of the

16      settlement.

17             The standard, as the Court well knows, is that the

18      settlement not fall below the lowest point in the range of

19      reasonableness.  Your Honor, I believe that the record here

20      amply supports this settlement and demonstrates that the

21      settlement is well within the range of reasonableness, and

22      therefore, warrants the Court's attention -- warrants the

23      Court's approval.

24             From the point of view of unsecured creditors of Old

25      GM, there's really one number I think that matters, and that

1    demonstrates why this is a reasonable compromise of this

2    litigation.  And the number that matters is the $1.55 billion

3    total allowed claim.

4         As Your Honor knows from having heard 16 days of

5    trial testimony including 11 fact witnesses, and 7 expert

6    witnesses, there were many substantial issues to be tried, and

7    ultimately decided by this Court.  And ultimately, we were

8    facing $2.67 billion in claims, and that's a combination of

9    claims that were guarantee claims asserted with respect to

10   these Nova Scotia notes, and then a $1.6 billion claim under

11   the Nova Scotia unlimited liability company statute that had

12   been asserted by the Nova Scotia trustee, which consisted of

13   guarantee claims, and then also a $564 million claim with

14   regard to swap liability, that New GM claimed ultimately was

15   owed to it.

16        Those two $2.67 billion of claims are being

17   compromised for an allowed claim that totals $1.55 billion.

18   And we submit that that's a reasonable compromise because of

19   all the litigation uncertainty that surrounds this case.  And

20   the litigation uncertainty is not trivial.  The arguments on

21   the other side of the GUC Trust are serious arguments, and the

22   swings are potentially very large swings.

23        So just to illustrate it with a simple example, if

24   the Court were to allow one time the face amount of the

25   guarantee, that's a $1.073 billion claim, and if the Court were

Page 8

1   to find that the noteholders here are not entitled to any kind

2   of double dip, but were to find that the swap claim should be

3   allowed in the amount asserted, that would be a litigation

4   result in excess of the $1.55 billion allowed claim.

5           That's just a simple illustration, and there are many

6   others, and people will assign different probabilities to

7   different outcomes, but that demonstrates how the allowed claim

8   here is well within the range of reasonableness.

9           Another component of the settlement, of course, is

10  that New GM has agreed as part of this compromise to pay $50

11  million, and that money is going to be used to pay fees

12  incurred by the Nova Scotia noteholders, and then the remainder

13  of that will be distributed to the Nova Scotia noteholders.

14          We're happy that New GM is part of the settlement,

15  because this truly is a global resolution of the issues that

16  were before this Court.  We are, from the point of view, of

17  looking out for the interests of unsecured creditors really

18  agnostic as to that payment because it doesn't bear directly on

19  recoveries to unsecured creditors.

20          The only thing that really matters to the unsecured

21  creditors is the $1.55 billion claim.  And the -- under the

22  settlement, in the event that it's approved by this Court,

23  there will be a distribution made to the Nova Scotia

24  noteholders, consistent with the allowance of $1.55 billion.

25  The mechanics of that distribution are laid out in the

Page 9

1    settlement agreement.

2           And the GUC Trust has been maintaining a reserve with

3    regard to this litigation, of distributable assets with regard

4    to $2.69 billion of claims.  Following the distribution to the

5    Nova Scotia noteholders, the GUC Trust expects to be able to

6    make what's called an excess distribution, based on the

7    difference between the 2.69 and the 1.55, and that, of course,

8    is a distribution that will be for the benefit of all

9    claimholders, and is a substantial benefit to unsecured

10   creditors.

11          For all those reasons, I believe that this is a

12   reasonable compromise that warrants this Court's approval.  I

13   also think that in considering the record on which this Court

14   should approve the case, that the Court -- it would be

15   appropriate for the Court to consider the entire trial record.

16   Because, Your Honor, no one is more familiar with the issues in

17   this case and with the risks, and the possibilities of

18   different outcomes than you are, having made yourself available

19   and presided over 16 days of trial, and voluminous briefs in

20   what is a very complicated case.  And we think that that

21   record, together with the motion papers forms a very solid

22   basis on which to grant approval of this motion.

23          I would be remiss, Your Honor, if in recommending the

24   settlement to you we didn't also acknowledge the extraordinary

25   efforts of your colleague, Judge Peck, who following on the

Page 10

1   heels of a failed effort to mediate this case, stepped in and

2   was extraordinarily persistent, subtle, and committed to

3   helping us all reach a settlement.  And without his efforts, I

4   don't think that we would have succeeded in reaching the

5   settlement that we did.

6           And I also want to specifically acknowledge the

7   efforts of my client, the GUC Trust, Wilmington Trust Company

8   as trust administrator, and FTI as trust monitor.  It was not

9   easy to stick with this litigation, and to show the resolve

10  that was necessary to see it through, when that kind of resolve

11  was necessary.  And when the time came to show flexibility and

12  compromise, Wilmington and FTI, as administrator and monitor,

13  were prepared to do that as well, ultimately all in service of

14  trying to achieve the best possible outcome for unsecured

15  creditors.

16          If Your Honor doesn't have questions, I'll leave my

17  remarks at that.

18          THE COURT:  All right.  No, I don't.  Thank you very

19  much, Mr. Fisher.

20          Does anybody else feel the need to be heard before I

21  rule?

22          Mr. Zirinsky?

23          MR. ZIRINSKY:  Thank you, Your Honor, Bruce Zirinsky

24  on behalf of certain Nova Scotia noteholders.

25          I just want to concur in Mr. Fisher's comments.  As

Page 11

1    Your Honor knows, this was a -- has been a tough long and very

2    hard-fought litigation from the prospective of all parties.

3              I think all parties felt that they had strong

4    arguments, and strong claims, and in the case of the GUC Trust,

5    they thought they had certain strong defenses.  There were many

6    issues in this case.  The parties devoted four years in

7    preparing for and litigating this case.  Your Honor had the

8    good fortune of having been an observer, and in large part, a

9    participant in all of this.

10             I do concur that it's a fair settlement.  We can

11   disagree as to, you know, whether we're at the bottom of our

12   range or the bottom of Mr. Fisher's range, but I think the most

13   important thing from the Court's perspective is that we all

14   finally were able to come together with the good offices of

15   Judge Peck to come to a closure on a settlement that everybody

16   was either reasonably happy with or reasonably unhappy with, as

17   the case may be.

18             And I also think from the perspective of my clients,

19   we want to thank the Court for the Court's patience over the

20   course of the past several years in listening to all of this.

21   We'd also like to thank all of the parties for finally coming

22   to the table I think in making the best good efforts to try to

23   avoid what would potentially be number one, a difficult

24   decision for Your Honor to write, and number two, I'm sure that

25   there likely would have been appeals, regardless of what Your

Page 12

1    Honor ultimately decided.  And I think approval of this

2    settlement not only represents a fair result, but also

3    eliminates the need for potentially another two or three years

4    of litigation and appeals.

5              And I think its best, and I think everybody agrees

6    that it's time to bring this to a conclusion.  Thank you.

7              THE COURT:  All right.  Thank you.

8              Okay.  Everybody had a chance to speak their peace?

9         (No response)

10             THE COURT:  Okay.  Everybody sit in place for a

11   moment.

12        (Pause)

13             THE COURT:  Ladies and gentlemen, in the matter

14   before me, the GUC Trust seeks approval of a settlement with

15   respect to the Nova Scotia bondholders' litigation, and all of

16   its various manifestations.

17             Understandably, the GUC Trust motion is unopposed.

18   Assuming without deciding that I have an independent duty to

19   review an unopposed settlement when the underlying controversy

20   is of the magnitude that we have here, I've reviewed the

21   settlement for reasonableness.  And after that review, I

22   determined that the settlement should be approved.

23             The bases for the exercise of my discretion in this

24   regard follow.  You all know the standards for approval of a

25   settlement, and I'll address them only briefly.

Page 13

1          The legal standard for determining the propriety of a

2     bankruptcy settlement is whether the settlement is in the best

3     interests of the estate.  See for example In Re Purified Down

4     Products Corporation, 150 B.R. at 523.

5          Here, I can easily make that finding.  In that

6     connection, of course, I find the considerations that cause a

7     settlement to be in the best interests or not in the best

8     interests of an estate apply equally to an entity such as the

9     GUC Trust that we have here, that stands in the shoes of the

10    unsecured creditor community and the Old GM estates.

11          The Supreme Court held in Protective Committee for

12    Independence Stockholders of TMT Trailer Ferry versus Anderson,

13    that to determine that a settlement is in the best interests of

14    the estate, the settlement must be fair and equitable.  Such a

15    finding is to be based on the probabilities of ultimate success

16    should the claim be litigated, and I'm quoting, an educated

17    estimate of the complexity, expense, and likely duration of

18    such litigation, the possible difficulties of collecting on any

19    judgment which might be obtained, and all other factors

20    relevant to a full and fair assessment of the wisdom of the

21    proposed compromise. Basic to this process in every instance,

22    of course, is the need to compare the terms of the compromise

23    with the likely rewards of litigation.

24          The bankruptcy court need not conduct an independent

25    investigation into the reasonableness of the settlement, but

Page 14

1    must only "canvass the issues and see whether the settlement

2    falls below the lowest point in the range of reasonableness."

3    In Re WT Grant Company, 699 F.2d at page 608, that's a decision

4    from the 2nd Circuit in 1983.

5          Nor, is it necessary for the Court to conduct a mini

6    trial of the facts or the merits underlying the dispute, see

7    Purified Down Products, rather the Court only need to be

8    apprised of those facts that are necessary to enable it to

9    evaluate the settlement, and to make a considered and

10   independent judgment about the settlement.  See for example,

11   Purified Down Products again, 150 B.R. at 522.

12         But here, of course, I've already conducted the

13   trial, had the benefit of the post-trial briefs, and have quite

14   a good sense of the underlying evidence, the legal issues, and

15   tentative leanings I would have had before going into oral

16   argument on the originally scheduled date, which if I recall

17   correctly, was on October 9.

18         So here I have the luxury not present in most of the

19   settlements I'm asked to review, of being unusually well

20   informed with respect to the evidence of the underlying issues,

21   and ranges of foreseeable outcomes, although many of these

22   issues would've been decided only after a hearing, oral

23   argument, and giving the matter supplemental thought in major

24   respects.

25         Here, because the settlement came only after so much

1   effort and expense, in the way of pretrial discovery, the trial

2   itself and pretrial and post-trial briefing, the cost analysis

3   is somewhat different than it would be in other cases, which

4   are settled in their earlier stages.

5           But it's obvious that with aggregate claims of

6   approximately $2.7 billion and the noteholders' desire to

7   protect the approximately $360 million that they'd already

8   received as part of the consent fee, any ruling I'd issue would

9   be subject to lengthy appeals by the noteholders, the GUC Trust

10  or both, and create expense to each.

11          To the extent that the GUC Trust was successful in

12  the proceedings before me, it's a near certainty given the

13  amount of -- at stake, that my decision would've been appealed

14  by the noteholders with that appellate litigation going up to

15  the district court, and more likely than not, to the circuit.

16  The converse is likely also true.

17          It is also foreseeable that we would have to had

18  further proceedings in this court, as to whether assignees of

19  debt would be subject to defenses in equitable subordination

20  concerns that would've been applicable to the assignors, which

21  is a matter as to which no binding authority now exists, and

22  which could also be expected to be appealed by one side or the

23  other, and go up at least one appellate level, if not also

24  more.

25          Here, of course, the settlement was negotiated at

Page 16

1    arm's length by sophisticated counsel on each side, and is the

2    result of the extraordinary mediation efforts by my colleague,

3    Judge Peck, whose efforts not only made settlement possible,

4    but also gives me greater confidence as to the quality of the

5    settlement process.

6           And Old GM's unsecured creditors will benefit greatly

7    by reason of this settlement, partly by reason of the success

8    of the GUC Trust in reducing claims in the estate by over $1

9    billion, but also importantly freeing up the value that had

10   been reserved to satisfy claims of such enormous size that now

11   becomes available for distribution to Old GM's creditors.

12          Canvassing the issues here, there never was any

13   possibility of the 2009 sale to New GM being undone in its

14   entirety, as some pundits surprisingly have suggested.  There

15   is speculation in that regard demonstrated a failure to

16   understand what the GUC Trust was asking for, and of course, a

17   rather striking ignorance of the law in this area.

18          At most, we would've been talking about whether

19   elements of the 2009 order approving the sale should be

20   modified.  But even such a request would have run head on into

21   principles making it exceedingly difficult to selectively

22   modify a sale and confirmation orders, as exemplified by

23   decisions like Judge Buchwald's on the tort litigants 2009

24   appeal of the sale order.  But the other issues were much more

25   debatable.

Page 17

1          The dynamics of the underlying transactions, what was

2    said and done at a time when the auto industry was an extremist

3    were extraordinarily damning for the claimants.  The so-called

4    oppression action some of them brought was very troublesome to

5    me.  The greed and arrogance that several of them displayed at

6    a time when the future of the entire auto industry was at

7    stake, was and is, surprising to me even to this day.

8          The effective appointment of the Nova Scotia trustee,

9    Green Hunt Wedlake, and the degree to which its principal

10   worked with the hedge funds or at least arguably at their

11   direction was extremely troublesome to me as well.  And how a

12   swap as to which the Old GM estate was in the money to the

13   extent of approximately $632 million was transmogrified into a

14   liability against the Old GM estate, to the extent of $564

15   million boggles my mind to this day.

16         But ultimately the issues would've been decided under

17   the law, and the legal issues were and remain difficult.  These

18   issues would've included exactly how much objectionable conduct

19   at the expense of all of the debtors' other creditors goes over

20   the line in justifying equitable subordination.

21         On other fronts, the GUC Trust had to confront the

22   fact that as a general matter, guarantees are respected in

23   multi-obligor Chapter 11 cases, even though they typically have

24   the effect of double recoveries for those who are the

25   beneficiaries of those guarantees.

Page 18

1        But then on the other hand, the testimony of the GUC

2   Trust expert Kim Gee (ph) with respect to the English and

3   Canadian rule of double proof, which would've prevented a

4   double recovery on the Nova Scotia notes was quite persuasive,

5   and I was not of a mind to discount it by reason of his

6   relative youth.  And the evidence was quite strong that the

7   requirements for a valid assignment of the swap were not

8   complied with.

9        Thus, though, equitable subordination would've been

10  perhaps, at best, jump ball, the claims against the estate

11  would still have to be reduced considerably, probably down to

12  about half of the amount by which they were asserted.

13        Even assuming that I determined that the conduct of

14  the hedge funds in the pre-June 2009 period was sufficiently

15  egregious to cause me to believe that their claim should be

16  subordinated, I'd have a difficult decision as how to deal with

17  Paulson and any other entities who acquired the claims later.

18        Of course, the Paulson entities were blameless with

19  respect to the prepetition activities that were so offensive.

20  But it's more likely than not that I would've agreed with the

21  ruling by Chief Gonzales in Enron, back when he was still on

22  the bench, to the effect that one can't launder one's exposure

23  to defenses on notes by selling them to someone else.  Contrary

24  to the ruling by a district judge on that matter which was

25  binding on Judge Gonzales, but wouldn't be binding on other

1    bankruptcy and other district courts in the Southern District

2    of New York.

3             I think it is likely, if not certain, that if this

4    issue had to be decided by me, whoever lost it, would take it

5    up to the district court, if not also eventually to the

6    circuit.

7             The evidence as to whether the lock-up agreement was

8    finalized before or after the time of filing of Old GM's

9    Chapter 11 petition was disputed.  Very possibly I would've

10   found that while edits to the typed form of the agreement were

11   made after the time of filing, the agreement was finalized in

12   any and all material respects at an earlier time, at which the

13   signatories released their signature pages.

14            It's also more likely than not that if I had to

15   review the transaction as a post-petition transaction, I would

16   have approved it, notwithstanding how expensive it turned out

17   to be to the unsecured creditor community.

18            As unfair as that payment was to Old GM's other

19   creditors, the decision to pay it would've been a classic

20   matter of business judgment, and would've fairly easily passed

21   muster under the business judgment rule.  A very, very strong

22   showing was made as to the importance of keeping GM Canada out

23   of insolvency proceedings, and of the need to avoid having

24   parallel insolvency proceedings going on in two countries at

25   the same time.

Page 20

1          The evidence also was leaning in favor of the view

2    that the lock-up payment was made by GM Canada using funds that

3    were lent by Old GM but later paid back.  Thus, if the payment

4    of the so-called consent fee was wrongful, it would've been an

5    offense mainly against GM Canada, and not against Old GM, which

6    at least arguably wasn't damaged thereby.

7          The views of pundits as to this once again are silly;

8    evidence at the trial show that the lock-up agreement was

9    disclosed in an 8K that was available to the investing public.

10   That shows one thing, but not another.  It tends to show that

11   Old GM's management and counsel were not in any way trying to

12   hide anything, and that they at least seemingly complied with

13   Old GM's 34 Act reporting duties.

14          It does not show, however, despite suggestions by

15   some to the contrary, that I, as a judge, was on notice of it,

16   or should've been on notice of it.  The implication that a

17   judge should have on notice of something not in the record, not

18   called to the judge's attention, and not said to be relevant to

19   any judicial decision then before the Court is puzzling.

20          On matters involving disputed issues of fact, judges

21   limit their rulings to matters in the record, or as to which

22   they can take judicial notice under Federal Rule of Evidence

23   201.  On matters involving their discretion, they can and do

24   use their life and judicial experience to achieve the most

25   sensible result.  But they're doing so is limited to deciding

Page 21

1   matters then before them.

2          Stepping back, we see that except for issues on the

3   periphery, or which would've led to factual findings, but

4   findings that were then subject to substantial debate as to the

5   laws' application to them, this was a very, very close case

6   with a bundle of issues that could've gone either way, and even

7   though as my canvassing of the issues suggest, I've thought

8   about these, could still have swung in either direction with

9   what Mr. Fisher properly identified as dramatic consequences.

10         Ultimately, the negotiated result approximates the

11  result that likely would have been the outcome before the

12  appeals and cross appeals, if I'd been forced to rule, and

13  perhaps after all of those appeals and cross appeals were

14  concluded as well, it falls within the range of reasonableness

15  and it will be approved.

16         Mr. Fisher, I don't know whether you've worked with

17  the other parties to draft up a settlement approval order, or

18  whether you considered that presumptuous before today, but what

19  I would like you to do at your earliest convenience is to draft

20  one up, run it by the other parties to the settlement, and when

21  you can give me an e-mail of transmittal, you can provide me

22  with the order in word processing format as an attachment to

23  the e-mail, with representation that the parties to the

24  settlement are comfortable with it, it will be signed without

25  further hearing and notice.

Page 22

1          With that, we go on to the second issue.  I'm going

2    to take a brief recess to allow anybody who was here only on

3    the first matter and doesn't care about the substantial

4    contribution application to leave.

5          We'll be back out here, it's now 2:40, be back here

6    in ten minutes, please, 10 of 3.  We're in recess.

7          (Recessed at 2:40 p.m.; reconvened at 3:05 p.m.)

8          THE COURT:  Have seats, please.

9          Okay.  Mr. Reisman, I'll hear from you momentarily.

10   I also assume I'll hear from Mr. Jones on behalf of the

11   government.

12         Gentlemen, make your presentations as you see fit,

13   but there are two things that I want you to cover by the time

14   you're done, especially by you, Mr. Reisman.  One is to confirm

15   my understanding that the settlement that I just approved is

16   not dependent on the outcome of this motion, and that this

17   doesn't tie my hands in any way or my desire, or my belief that

18   the settlement is a good one, doesn't impair my ability to do

19   that, which I think is right.

20         The second is a statutory issue, not addressed by

21   either side, which is the requirements of 503(b)(3)(D) that the

22   expenses be actual and that they be incurred by the applicant,

23   and the showing that I have before me is to the extent to which

24   putting aside whether there was a substantial contribution,

25   that statutory requirement has been satisfied.

Page 23

1          Okay.  Go ahead, Mr. Reisman.

2          MR. REISMAN:  Thank you, Your Honor.  Good afternoon.

3   Steven Reisman with Curtis, Mallet-Prevost, Colt & Mosle LLP

4   representing Paulson & Co and various affiliated funds which

5   hold the notes that were at issue in the underlying litigation,

6   which we are pleased that Your Honor approved today; the

7   settlement of which Your Honor approved today.

8          I want to respond to Your Honor's two questions,

9   first and foremost.  First, I would never, ever tie Your

10  Honor's hands with respect to tying in a substantial

11  contribution request and agreed upon relief with a settlement

12  motion.  It is in no way, the approval of this motion, we will

13  abide by what Your Honor should rule with respect to this.  The

14  approval of this motion is -- was agreed in the settlement that

15  the GUC Trust would not object to the relief, but it in no way

16  binds Your Honor with respect to any decision that Your Honor

17  should make with respect to it, whether Your Honor should be

18  inclined to grant the relief, or decline to grant the relief,

19  we would never look to do that in this motion, nor in any

20  motion that we would make.  That's the first point.

21          The second, with respect to the statutory issue, and

22  I'll get to that probably a little bit more in the

23  presentation, but I will represent to the Court that the fees

24  and expenses incurred by Paulson & Co with respect to this

25  litigation well exceed the $1.5 million that is being requested

Page 24

1   here.

2            The way we came up with the number, it was really to

3   defray costs and expenses that we believed that we were going

4   to have with respect to noticing and obtaining approvals in

5   Canada.  My understanding as I represent to Your Honor, and

6   these are rough numbers so -- and I am not a Canadian lawyer,

7   nor qualified in any respect to speak to what the costs are in

8   Canada, but with respect to the distribution that's going to be

9   made by the Nova Scotia trustee when the settlement is

10  implemented, there is approximately $600,000 or so, probably a

11  little bit more in taxes, and I call them taxes, but in

12  obligations that have to be paid to a non-noteholders in order

13  to make the distribution in Nova Scotia, and that is a

14  requirement of the law in Nova Scotia.

15           There's also the costs and expenses of the Nova

16  Scotia trustee, and their counsel, there are a number of

17  hearings, there was a procedural hearing, there's a

18  noteholder's meeting, there's a formal hearing, there's motions

19  that are as thick, if not thicker than the ones that have been

20  filed before Your Honor, with respect to approval of this

21  settlement.

22           And there's also the fees and expenses of Akin Gump

23  which were capped, and stopped based upon the settlement that

24  was reached with respect to documenting of the settlement

25  agreement, and obtaining approval of the settlement agreement

Page 25

1   before this Court and in Nova Scotia.  And those fees and

2   expenses and that number coincidentally, and I mean this truly

3   coincidentally totals approximately $1.5 million.

4          THE COURT:  What confused me, Mr. Reisman, is that my

5   understanding of the underlying settlement agreement, the one I

6   approved 15 minutes ago, had led me to believe that of the $50

7   million that New GM had put up, that about 17 million of it was

8   earmarked for the payment of fees, including, as best I recall,

9   2 and a half million for your client, and 1 and a half million

10  for the Nova Scotia trustee, which I understood to be a

11  different 1 and a half million than the one that's the subject

12  of this application.

13          But I also heard you say, from what you just said,

14  that we're still talking about future payments rather than past

15  payments.

16          MR. REISMAN:  They are past payments, but the 1 and a

17  half million dollars that we're seeking is going to -- it's

18  going to be distributed -- our request is that it be

19  distributed directly to the Nova Scotia trustee, and flow

20  through that waterfall.  That -- we're asking for a substantial

21  contribution, the Paulson noteholders are asking for that, but

22  we're asking for the money to be paid to the Nova Scotia

23  trustee.  We're not asking it go directly into our pockets.

24          Indirectly some of it is going to come back to the

25  Paulson noteholders, it's going to come back to Morgan Stanley,

1    it's going to come back to all of the noteholders that are

2    here.  It's also going to defray the costs or some of that will

3    be used, dollars are fungible as Your Honor is well aware, the

4    money is going to be used to pay the costs of Nova Scotia

5    counsel and the tax that's in -- is being imposed in Nova

6    Scotia.

7         THE COURT:  I've had some dealings with Canadian law,

8    but mainly in Ontario, not in Nova Scotia.  To what extent is

9    Canadian law similar to U.S. law that people like trustees and

10   their counsel get paid out of the estates for which they

11   provide services?

12        MR. REISMAN:  Your Honor, my experience with Canadian

13   law is similar to yours.  I spent a lot of time before Judge --

14   Honorable Justice Farley when he was on the bench and the

15   Honorable Justice Holden before then, and the Honorable Justice

16   Morowitz in Toronto, and so I do not have experience in Nova

17   Scotia, though I've been to Nova Scotia and it's a beautiful

18   place, and I will likely be back.

19        THE COURT:  I have as well, and I agree with you on

20   how beautiful Nova Scotia is, although I wouldn't want to

21   exclude Prince Edward Island from that as well.

22        MR. REISMAN:  Or the west.

23        THE COURT:  But one thing which you probably do know

24   or know from its absence, they can't assess your client for the

25   expenses.  Your client's recovery may be reduced as a

Page 27

1    consequence of any fees that may be paid, but your client

2    doesn't have to write out a check to the Nova Scotia trustee;

3    am I correct?

4              MR. REISMAN:  Correct, Your Honor, correct.  What --

5    the expenses of the Nova Scotia trustee were being borne by --

6    I'm not trying to create any arguments, or have Mr. Steinberg

7    stand up in any way and if I say anything out of line, I know

8    he'll correct me, but I'm trying to talk in a very general

9    expense.

10             The -- expenses of the Nova Scotia trustee were being

11   borne by or the reasonable fees and expenses of the Nova Scotia

12   trustee were being borne by GM, throughout the case.  And when

13   we reached the settlement --

14             THE COURT:  By New GM?

15             MR. REISMAN:  By New GM, that is correct, Your Honor.

16             UNIDENTIFIED:  GM Canada.

17             MR. REISMAN:  Sorry.

18             UNIDENTIFIED:  GM Canada.

19             MR. REISMAN:  Thank you.  I'm corrected, Your Honor,

20   it's by GM Canada, not --

21             THE COURT:  But not a debtor on my watch.

22             MR. REISMAN:  Not a debtor on your watch.  They were

23   being borne.  That as a result of the settlement, that stopped.

24   And the expenses continued to be incurred, and therefore, this

25   is part of that type of, you could say, indentured trustee

Page 28

1    reimbursement type concept, because the number that is going to

2    likely go to the Nova Scotia trustee, counsel in Canada, and

3    counsel in the U.S., is the 1.5 million which is set forth in

4    the settlement agreement, and is also by coincidence, one could

5    say or not really, the 1.5 million that I stand before Your

6    Honor seeking on behalf of the Paulson noteholders to be

7    distributed to the Nova Scotia trustee, to go through the

8    waterfall and to pay off the top the expenses of the Nova

9    Scotia trustee.

10            I don't know the law, Your Honor, but my

11   understanding of how the money will flow is, I believe, in line

12   with what you previously said, which is the fees and expenses

13   get paid off the top, and that individual holders don't come

14   out of pocket.

15            THE COURT:  Uh-huh.  Go on, please.

16            MR. REISMAN:  Okay.  Your Honor, you have the -- as

17   you said before, when you were approving the motion and reading

18   into the record your order, you have the luxury of being well

19   informed here.

20            I truly wish you could've been less well informed,

21   and this could've been resolved a lot earlier.  And I think you

22   know from the very first day we got involved on behalf of the

23   Paulson noteholders, I believe at the very first hearing, I had

24   suggested the possibility of -- the very first time I said

25   before you on behalf of the Paulson noteholders, I had stood

1    before you and mentioned the possibility of mediation or trying

2    to resolve this.

3           At the time, the parties were not inclined to do so.

4    Nevertheless, we continued to press forward in that regard, and

5    we were successful.  I don't think anyone will doubt or rise up

6    to say that what I'm saying is not true, which is the Paulson

7    noteholders were the party that was pushing throughout the

8    process for a resolution through mediation.  And we were the

9    party that brought together the first mediation, with a private

10   mediator, and Your Honor is well aware of my letter and the

11   subsequent phone call.  My letter to you of May 30th, 2013 and

12   the subsequent phone call with all the parties involved where

13   we requested court-ordered mediation with the assistance of

14   Judge Peck.

15          That's been my objection from the beginning.  Don't

16   get me wrong.  The objective was to win for the client, but

17   sometimes winning for the client is settling the matter, and

18   that's how I looked at the matter when I saw the enormous

19   complexity -- enormous and complex issues that would've had to

20   have been decided by Your Honor.

21          So I point that out to Your Honor.  We filed our

22   motion, you have our reply, you have the objection, I think the

23   record is pretty full.  I just want to point out a couple of

24   things.  One is that the notice of this motion was served on

25   all creditors and parties in interest, and there's only one

Page 30

1    objection.  It's a serious objection, it's by the Office of the

2    United States Attorney for the Southern District of New York,

3    and we take it as a serious objection to the relief that has

4    been granted.

5              But nevertheless, the U.S. Attorney was not involved

6    in this case, was not -- and readily admits in their objection

7    that they have no first-hand knowledge of the efforts made by

8    the Paulson noteholders, or the matters that preceded before

9    Your Honor.

10             Your Honor, I believe that the -- that Section 503(b)

11   of the Bankruptcy Code would approve the reimbursement if

12   applied, would approve the reimbursement of the actual

13   necessary expenses incurred by us in making this substantial

14   contribution to the estate.

15             What is the substantial contribution?  The

16   substantial contribution is a number of items.  One, it's

17   getting the parties to the mediation, and in fact, having the

18   mediation, both the private mediation which formed, I would say

19   the foundation for the settlement that at least poured the

20   concrete, some of it in the ground for building the settlement

21   which Judge Peck was able to build.

22             The second is, obtaining the contribution from New GM

23   or of GM Canada of the $50 million, which Your Honor, I will

24   tell you having been involved in those settlement negotiations,

25   this matter would not have settled.  There is no chance, zero,

Page 31

```
 1    but for the contribution of a third party, New GM/GM Canada.

 2    That $50 million contribution, which inures to the benefit of

 3    all of the creditors here.  It inures to the benefit of all of

 4    the creditors of the GUC Trust in a number of ways.

 5              One, it resolves this litigation.  Two, it frees up

 6    approximately $1.14 billion for an excess distribution to be

 7    made.  Three, it saves a tremendous amount of time and expense.

 8              Your Honor stated in his ruling that you thought that

 9    there would likely be one level of appeal, you're well familiar

10    with the parties that are involved in this litigation, and they

11    are some of the toughest advocates and litigious parties that I

12    have dealt with over the years.  They are very strong in their

13    belief and their conviction.  And I believe that the mediation

14    process truly is the only way that we would've reached the

15    settlements here, and that Judge Peck, and that's why I

16    specifically asked for Judge Peck because of his unique

17    abilities in bringing the parties to a settlement.  And I

18    thought that his unique abilities, from my experience, having

19    him as a mediator in several other matters, MF Global being one

20    of them, he really used his skill, his knowledge, his

21    persuasion, and his expertise as a former bankruptcy

22    practitioner, and as a now sitting federal bankruptcy judge,

23    and the experience he has there, to bring the parties to the

24    settlement.

25              I believe I made the point, but just to state it
```

1    again, that the GUC Trust will undoubtedly save millions and

2    millions of dollars in fees as a result of the settlement that

3    was reached here, and the efforts of the Paulson noteholders in

4    pushing the parties to a mediation, getting them to a

5    settlement.

6            I just want to end, Your Honor, by just quoting

7    paragraph 38 of the motion that was made by the GUC Trust for

8    approval of the settlement.

9            THE COURT:  Well, the underlying settlement.

10           MR. REISMAN:  The underlying settlement.  And it's a

11   statement that was made by the GUC Trust, as to why the

12   settlement should be approved, but I think it's helpful here,

13   as to the benefit to all general unsecured creditors.  And do I

14   -- is this in the self-interest of the noteholders?  Surely.

15   But it's also in the interests of all what we've done here, the

16   overall settlement is in the interests of all the unsecured

17   creditors.  And the efforts that we made resulted in a clear

18   benefit to all of the unsecured creditors.

19           Be it that, it would've taken another $50 million of

20   value; i.e., approximately $150 million of allowed claim to get

21   this settlement approved, which we obtained from a third party.

22           THE COURT:  Well, there's another alternative, isn't

23   there, that those on the claiming side of the litigation

24   could've just taken $50 million less.

25           MR. REISMAN:  There is, that's correct.  But I will

Page 33

1    tell you, that wasn't going to happen.  And --

2              THE COURT:  Because they wanted more.

3              MR. REISMAN:  That wasn't going to happen because --

4    well, I don't want to get into the mediation but --

5              THE COURT:  No, don't give me 408 stuff, but --

6              MR. REISMAN:  But I do want to -- I believe that all

7    of the parties that were involved in the mediation process

8    believed that while not what they wanted, what's the line, you

9    know, sometimes, you don't always get what you want, but you

10   get what you need, not to quote the Rolling Stones, but --

11             THE COURT:  I'm old enough to remember that.

12             MR. REISMAN:  But I believe that all of the parties

13   that were involved in that mediation process would agree in

14   that fact.

15             So just reading paragraph 38, Your Honor, "approval

16   of the settlement will result in the allowance of a $1.55

17   billion claim and release of more than $1.14 billion of

18   unsecured claims reserves.  The release of the $1.14 billion of

19   unsecured claims reserves will provide for an excess

20   distribution, that will result in improved recoveries for all

21   general unsecured creditors.  The settlement will achieve

22   certainty, and cost savings for unsecured creditors in

23   connection with this litigation that will otherwise likely

24   continue for years, and will permit the GUC Trust to release

25   reserves for the benefit of all general unsecured creditors.

Page 34

1    The settlement thus serves the paramount interest of the

2    general unsecured creditors of Old GM."

3              THE COURT:  Okay.  Thank you.

4              MR. REISMAN:  Thank you, Your Honor.

5              THE COURT:  Mr. Jones.

6              MR. JONES:  Thank you, Your Honor.  May it please the

7    Court, David Jones from the U.S. Attorney's office.

8              At the outset, I just want to answer the Court's

9    questions.  We too were concerned about whether filing an

10   objection could interfere with finalization of the settlement,

11   and made inquiries, and were assured that the answer was no,

12   that the two are independent, and Mr. Reisman has confirmed

13   that now.

14             As to the statutory issue the Court raised, we had

15   not independently considered that, and obviously don't have

16   information about the basis for the fees asserted, so we'll

17   defer to Mr. Reisman's answer on that.  Although I do notice

18   that his explanation kept gravitating to the 1.5 million that

19   will be incurred by the Nova Scotia trustee in the future in

20   implementing this.  But I take it at his word that -- and I'm

21   sure it's the case, that his client have incurred that much or

22   more in fees to date based on other work they've done on the

23   litigation.

24             THE COURT:  Course, that's not what he's asking for

25   the money for.  He's not asking for checks that Paulson has

1    written.  He's asking for future payments of the Nova Scotia

2    trustee, if I understood his original pleadings, and the

3    further explanation he gave me today.

4            MR. JONES:  I think since I'm untainted by actual

5    knowledge, I should just defer to Mr. Reisman's explanation and

6    the Court's reading of the papers, but I think that is correct.

7            If I can circle back to one of the fundamental

8    reasons why the United States appeared and filed this

9    objection, as the Court knows, the Treasury Department along

10   with Canada was the DIP lender in this case, and as such, the

11   government continues to have a lien or reversionary interest in

12   administrative funds held by the GUC, so that if it -- and I

13   understand those funds are what would be drawn upon by this fee

14   application.

15           So we do have a, at least potential financial

16   interest in the funds at issue here.  The government's

17   commitment throughout this case, as the Court knows, has been

18   to fund the estate through its liquidation as is appropriate

19   and required under law, but again not to pay more than is

20   required or necessary to achieve the orderly wind down of the

21   estate.

22           And so we wanted to reality test how that proposition

23   and that commitment applies to this application.  We did

24   carefully read the moving papers, and again carefully read the

25   reply papers, and we simply don't see how any of the supposed

Page 36

1   benefits or contributions conferred to the estate differ in

2   kind from any of the benefits that an estate ordinarily would

3   realize, when a creditor stops contesting a disputed matter and

4   settles a claim dispute or litigation with the estate.

5           So, of course, the intensity of this litigation is

6   very great, and the dollar stakes are enormous.  And we have no

7   dispute.  We, of course, expressed no dispute with the

8   settlement of the dispute.  But when one says that the estate

9   benefits because it will incur no further litigation expenses

10  or legal fees because we've stopped litigating, that's again

11  true of any settlement of a claim.

12          Likewise, permitting the release of reserves that are

13  held on account of these now settled claims is a consequence of

14  an any claim resolution, and so I don't understand as a

15  principled or theoretical matter why those things, although

16  large here, would justify a substantial contribution fee award.

17          Likewise, the movants emphasized their role in or

18  participation in mediation.  Again, as we fully concede, we

19  weren't first hand participants in that, but ordinarily a

20  mediation is a bilateral or multi-lateral process where each

21  side bears their expenses, in an attempt to achieve resolution

22  of a dispute.  That appears to be what happened here, and so

23  I'm not sure what makes that, in these circumstances, a

24  substantial contribution to the estate as a whole.

25          Likewise, with the expenses that will be incurred by

Page 37

1    the Canadian trustee, and Your Honor's questions I think

2    brought this out, or the answers to Your Honor's questions,

3    evidently the trustee ordinarily has to do whatever the trustee

4    needs to do to serve the needs of noteholders under Canadian

5    law, and the expenses of doing that are borne by the corpus of

6    the notes whose interests are being represented.  And so if

7    that's the case, again, I don't understand why that expense

8    should be rightly under the law shifted to the estate here.

9            And finally, as to the contributions of New GM, the

10   $50 million recovered from New GM, again a settlement could

11   have been achieved if the noteholders would've accepted less

12   money, as is true, although they may not have, and it may well

13   be the case that that last incremental value was indispensable

14   to them.  But at one point Mr. Reisman did acknowledge that --

15   or characterized one benefit to the estate as the fact that

16   achieving that 50 million recovery allowed them to drop their

17   demand of an allowed claim amount against the estate by 150

18   million, given the payout rates present here.

19           That again suggests that what we're really looking

20   at, at least in economic substance, is simply a recovery of

21   value that was of importance to a creditor group, and they were

22   able to recover some value from a non-estate source, but that

23   doesn't make the paradigm here or the basic relationship of the

24   parties any different from any other creditor/estate

25   relationship.

1         So for those reasons, and I should say by the way,

2    Your Honor, we do fully concede that we are not personally

3    familiar, I'm not personally familiar with the conduct of the

4    litigation.  If the Court perceives that there was substantial

5    benefit conferred that I'm not apprehending, we'll have no

6    problem with that.  But given our concerns in light of having

7    read two sets of papers from the movants, we wanted to at least

8    call these issues to the Court's attention, and seek the

9    Court's ruling in light of our observations.  Thank you.

10         THE COURT:  All right.  Thank you.

11         Mr. Reisman, reply?

12         MR. REISMAN:  Your Honor, very quickly, I'm not one

13    who normally takes on the role of representing noteholders in

14    these situations, though I've done it before.  And as Your

15    Honor aptly notes we bought these claims.  We didn't get the

16    consent fee.  We were not involved in the process early on.

17         I'm also not one -- I can't think of any time in my

18    career where I've ever made a substantial contribution

19    application.  And it's mostly because -- it's not that I

20    haven't been asked to make it, but I don't feel, in most

21    instances that the work that we did and the value that we

22    brought to the situation merited that.  I do feel that here and

23    I share that with you.

24         I also want to clarify a couple of points.  One is

25    that GM Canada was paying for the fees and expenses of the Nova

Page 39

1   Scotia trustee.  And they were going to pay for the fees and

2   expenses of the Nova Scotia trustee on a go forward basis.  As

3   a result of the settlement, clearly, they stopped $50 million

4   that's it, not a penny more.  And the parties will abide by and

5   have agreed to abide by that.

6          THE COURT:  Pause please, Mr. Reisman, because

7   obviously I tried to get myself knowledgeable about the

8   settlement, but when you get into particular subcomponents, my

9   memory of the detail falters.

10         MR. REISMAN:  Sure.

11         THE COURT:  Am I right that after the amounts of the

12  various claimants were reduced and allowed under the settlement

13  I approved now a half an hour ago, the GM Nova Scotia trustee

14  still gets in the order a magnitude of 500 million bucks in the

15  way of an allowed claim?

16         MR. REISMAN:  The GM Nova Scotia trustee -- yeah.

17         THE COURT:  What is the reduced and allowed amount of

18  the GM Nova Scotia trustee?  Mr. O'Donnell wants to pass you a

19  piece of paper.  That's fine.  I thought it was about $500

20  million, about half of what he had originally asked for.

21         MR. REISMAN:  Correct.

22         THE COURT:  But I may be mistaken.

23         MR. REISMAN:  477,000, I was remembering --

24         THE COURT:  477 million.

25         MR. REISMAN:  477 million, correct, Your Honor, yeah,

Page 40

 1    thanks.  Thank you.

 2            THE COURT:  Okay.  And are claims in the GM estate

 3    now delivering value at roughly 25 or 30 cents on the dollar?

 4            MR. REISMAN:  I don't, you know, I try not to follow

 5    the market in that regard, but if I could just have -- if I

 6    could have one moment I believe there are parties that do know.

 7            THE COURT:  Yeah.

 8        (Pause)

 9            MR. REISMAN:  As of about three weeks ago, Your

10    Honor, I'm advised by Mr. Steinberg to his recollection they

11    were about 34 cents on the dollar.

12            THE COURT:  34?

13            MR. REISMAN:  A compliment to the fine job that Mr.

14    Fisher and his team, Mr. Sidell have done in managing the GUC

15    Trust.

16            THE COURT:  And also possibly the value of the New GM

17    stock that people get as part of the distribution?

18            MR. REISMAN:  And that's a compliment to Mr. Bonomo

19    (ph) and the GM team.

20            UNIDENTIFIED SPEAKER:  That's the primary driver.

21            MR. REISMAN:  That is, in fact, the primary driver.

22            THE COURT:  Okay.  Continue, please.

23            MR. REISMAN:  The point I was going to make was

24    approximately $550,000 to $600,000 of the attorney's fees that

25    have been incurred to date by the GM Nova Scotia trustee.  I

Page 41

1   don't want you to think this is a million and a half on a go

2   forward basis.

3           The fees and expenses were originally all -- of the

4   GM Nova Scotia trustee were going to all going to be paid by GM

5   Canada.  As a result of the settlement, that stopped.  Now

6   there's going to be a million and a half dollars that are going

7   to have to be borne by the noteholders as a whole and that does

8   tie into the number that we're requesting.

9           I point out that at the time that we worked -- that

10  we've worked on the settlement agreement that number had not in

11  fact been finalized and we did not know what that number is.

12  That's why I say coincidentally.

13          I do represent to Your Honor that we incurred, you

14  know, substantial legal fees in this case upwards of the $2.5

15  million.  I haven't done the last bills as of yet and we're

16  unclear as to what Your Honor is going to, in fact, rule today

17  and the work that continues to remain.  But those are caps,

18  Your Honor, on terms of what the professionals have agreed they

19  will recover off the top here.

20          Your Honor, I do think that we've made a substantial

21  contribution to the estate.  I do think that we made a

22  substantial contribution to all of the unsecured creditors that

23  remain in the GUC Trust and for those reasons and the reasons

24  set forth in the papers and my argument, I would respectfully

25  ask that Your Honor approve the requested relief.  Thank you.

Page 42

1         THE COURT:  Thank you.

2         All right folks sit in place for a moment please.

3     (Pause)

4         THE COURT:  All right.  Ladies and gentlemen, in the

5    second motion before me, six of funds managed by the Paulson

6    Family of Funds who call themselves the Paulson noteholders

7    seek allowance under Section 503(b)(3)(D) of the Code of an

8    administrative expense claim in the amount of $1.5 million

9    based on an asserted substantial contribution to the case by

10   the Paulson noteholders, Elliott, Fortress and Morgan Stanley

11   who Paulson calls certain noteholders and Green Hunt of Wedlake

12   the GM Nova Scotia trustee.

13         Paulson's motion is objected to by the United States

14   Government represented by the U.S. Attorney's office here in

15   the Southern District of New York.  The Government's objection

16   is sustained and the motion is denied.

17         The motion fails to show that the requested sums are

18   "actual," or are incurred by, "Paulson" or for that matter the

19   others Elliott, Fortress and Morgan Stanley, and fails

20   therefore to provide me with the fundamentals that must be

21   found before I reach the issue as to the extent to which the

22   contribution was made and was substantial.  And apart from

23   that, I cannot find that the requirements for establishing a

24   substantial contribution have been satisfied.

25         The Paulson noteholders' effort, while a refreshing

Page 43

1    contrast to the actions of other noteholders in the case were

2    still principally in their self-interest.  Efforts by the

3    others, Elliott, Fortress, Morgan Stanley and Green Hunt

4    Wedlake were likewise.  And efforts by several were actually

5    destructive to the interests of the estate and to other

6    creditors in the case.

7            My first problem, which is effectively a threshold

8    issue, is its failure to bring the application within the range

9    of my discretionary power under the statutes.  As relevant

10   here, Section 503(b)(3)(D) authorizes allowance of an

11   administrative expense for the actual necessary expenses, other

12   than compensation and reimbursement specified in paragraph 4 of

13   this subsection incurred by a creditor in making a substantial

14   contribution in a case under Chapter 9 or 11.  I omitted

15   certain irrelevant portions.

16           Before one gets to, "substantial contribution," one

17   must satisfy the requirements of the key words, "actual," and

18   "incurred by."  Each requires payment of the actual and

19   necessary expenses or in the view of some, a contractual

20   obligation to pay them.  Here there has been a showing of

21   neither.

22           The expenses claimed by the Paulson noteholders are

23   said to be "expenses incurred by the GM Nova Scotia trustee in

24   connection with the mediations and consummation of the

25   settlement agreement."  Motion in paragraph 26.

Page 44

1          Putting aside the fact that the expenses are so

2     vaguely described and putting aside matters like timesheets

3     would still never pass muster under a normal fee app, there's

4     no showing that the expenses have yet been incurred.  Paragraph

5     18 of the reply suggests that they haven't and Mr. Reisman's

6     very candid responses to my question led me to believe that

7     most if not all of them are yet to be incurred, nor is there a

8     showing that the Paulson noteholders paid the requested

9     expenses or are contractually obligated to pay them or for that

10    matter even wish to write out voluntary checks to pay them.

11          To the extent it matters -- and I'm not sure that it

12    does since Elliott, Fortress and Morgan Stanley are not

13    themselves movants, there has been no showing that any of

14    Elliott, Fortress and Morgan Stanley is any different.  And the

15    GM Nova Scotia trustee is not a movant either.  And if it were,

16    its obligation would suffer from the other deficiencies just

17    mentioned.

18          The showing such as it is, is instead that at some

19    unstated time in the future, Paulson, the certain noteholders

20    and presumably other of GM Nova Scotia noteholders, "would have

21    to bear those expenses of the GM Nova Scotia trustee."  Motion

22    paragraph 29.

23          It appears to be the case that in Canada as in the

24    U.S. the way that would happen would be that the GM Nova Scotia

25    trustee would be compensated from the in rem corpus of the GM

Page 45

1    Nova Scotia estate either after submission of the fee

2    application or perhaps by merely sending in a bill.  But

3    certainly no showing has been made that individual creditors of

4    GM Nova Scotia are liable for the GM Nova Scotia trustee's

5    fees.

6             Nor has there been a showing that after GM Nova

7    Scotia gets its distribution on its now allowed claim, I think

8    I heard $477 million, I'm confident that it's more than $450

9    million, there will be insufficient funds in the GM Nova Scotia

10   estate to pay its trustee's fees, if indeed, that would give

11   rise to a duty on the part of creditors in the Canadian

12   insolvency to pay them.

13            But my problem is not just a technical one assuming

14   arguendo that require in compliance with the terms of a

15   statute, especially when compliance comes at the expense of

16   innocent Old GM creditors or the United States Government or

17   U.S. taxpayers is merely a technical one.  I cannot find the

18   requisite substantial contribution.

19            It has long been the law in this district as the

20   Government properly observes in its objection that to be

21   eligible for compensation by the estate for substantial

22   contribution to a case, the applicant must have performed a

23   service leading to an actual and demonstrable benefit to the

24   debtor's estate and its creditors.  See Granite Partners 213

25   B.R. at 446 a decision by Chief Judge Bernstein.

Page 46

1        As Judge Bernstein further observed, "the substantial

2   contribution provisions must be narrowly construed and services

3   calculated primarily to benefit the client do not justify an

4   award even if they also confer an indirect benefit on the

5   estate."  Id at 446.

6        We all know, of course, that Paulson's counsel

7   encouraged to put the -- me to put the matter into mediation.

8   He did so more than once.  He was a voice of sanity and good

9   sense and he accurately described in his papers the earlier

10  submissions and communications that he made to the Court.  I

11  appreciate that, but that was good lawyering.

12       Paulson's counsel was doing little more than acting

13  in the best interest of his client, and to the extent the

14  Paulson noteholders did anything themselves, they were once

15  again acting in their self-interest.  Without the settlement,

16  they would have had to wait years for a distribution for a

17  decision from me for a foreseeable litigation over whether

18  their assignor's misconduct could be imputed to them and for

19  the inevitable appeals.

20       They also locked in for themselves a recovery that

21  could have been lower or even zero if they had not settled the

22  matter.  Their counsel was smart to do what he did, but it is

23  indisputable that what he did was, as Judge Bernstein put it,

24  "primarily to benefit the client."

25       It's also the case as Mr. Jones on behalf of the

Page 47

1    Government properly observed that a matter of its character,

2    except for its enormous size does not differ in concept from

3    any time that a claimant has a massive claim against the estate

4    and enters into a settlement to reduce and allow it in a lower

5    sum.

6              Any such effort inherently is adverse to the

7    remainder of the creditor community and is a manifestation of

8    the understandable desire by claimants to get as much as they

9    can on claims and to lock in their reduce and allow amounts in

10   an amount that meets their needs and concerns.  Estates

11   indirectly benefit from that because they're no longer at risk

12   of paying even more.  But the principle argued before me today

13   if taken to its logical conclusion, would subject the future

14   estates of the world to a -- an unending stream of similar

15   substantial contribution requests when people make demands and

16   then are willing to take a little less than their demands or

17   even a lot less than their demands.

18             That is inconsistent with the legal principle Judge

19   Bernstein articulated which is one of the underpinnings of the

20   juris prudence on Chapter 11 cases on my watch if not other

21   cases elsewhere in this District.

22             Further, getting New GM to pony up funds to bankroll

23   the settlement, including to pay $16 million in legal fees of

24   which 2.5 million was for counsel for the Paulson noteholders

25   themselves and another 1.5 million was for the GM Nova Scotia

Page 48

1    trustee and his counsel was not a benefit to the Old GM estate.

2            In earlier comments to me, Mr. Fisher explained that

3    he was agnostic on anything New GM might pay and by extension

4    GM Canada, the import being that this is not assets that are on

5    my watch with a duty for me to protect for the benefit of the

6    stakeholders in Old GM.

7            In the U.S. legal fees are not awarded to parties in

8    litigation in the absence of authorizing litigation and

9    especially before a party has prevailed.  If people want to

10   voluntarily write out checks for legal fees or if they agree to

11   pay them for goals of their own, they are free to do so and

12   apparently either New GM or GM Canada was willing to do so

13   here.

14           I don't rule out the possibility that the efforts by

15   New GM or GM Canada to do so facilitated the settlement, but

16   the important thing is that whatever was paid by that means was

17   not a sum for which all GM creditors were on the hook.

18           Another matter.  The fact that the application seeks

19   to rely upon asserted substantial contributions by Elliott and

20   Fortress weakens the application, not strengthens it, though I

21   would have the same problems with the application if those

22   entities were silent beneficiaries without Paulson having gone

23   to bat for them in the public way that it did.

24           This whole controversy we've been litigating for four

25   years arose by reason of the efforts of the Nova Scotia

Page 49

1    bondholders to get what they unabashedly refer to variously as

2    a double dip or even a triple dip from the Old GM estate.  See

3    the testimony by Elliott's Cedar Home (ph) at the trial of

4    September 6, 2012, trial transcript at pages 46 to 47.

5              Cedar Home referred to his counsel as the "double dip

6    defender of the year."  See Plaintiff's Exhibit 64.  Aurelius'

7    Groper, and Fortress' Truong, T-r-o-u-n-g, bragged amount the

8    remarkable deal they had received and Truong responded after

9    being congratulated as a "rock star" for securing the lockup

10   deal, "I am pretty pleased with the negotiated outcome,

11   especially vis-à-vis other GM creditors."  And now I'm being

12   told that these guys made a substantial contribution to the Old

13   GM estates?

14             What is more troublesome still is the evidence I

15   heard in the trial that Appaloosa, Fortress and Aurelius

16   formulated a plan to object to the 363 sale if their demands

17   before GM's Chapter 11 case was files weren't met.  See trial

18   transcript of September 20, 2012 at pages 73 to 74.

19             These are not the makings of a substantial

20   contribution to the success of GM's Chapter 11 case.  The

21   totality of the evidence I heard in the trial made it

22   unmistakably clear that the parties who negotiated the lock up

23   agreement were trying to make a profit off the distress in the

24   U.S. auto industry, not trying to assist it in anyway and were

25   looking out for no one but themselves.

1          It may be -- may well be that conduct and motivations

2    of that sort are not sufficient to justify equitable

3    subordination, but they do not amount to a substantial

4    contribution.  And it's no answer to say that the applicants

5    who are seeking substantial contribution compensation not for

6    the entirety of the four year controversy but for their efforts

7    at the end to settle it.

8          That's tantamount to saying, and there are many

9    things you can say it's tantamount to saying, I'll use a more

10   restrained one, that after so many steps to enrich oneself at

11   the expense of Old GM's other creditors, an entity should be

12   rewarded for being willing to enrich itself for a little less.

13         So while the settlement is approved and while I

14   welcome it, the application for substantial contribution is

15   denied.

16         Mr. Jones, you're to settle an order that states in

17   substance that for the reasons set forth on the record, the

18   motion was denied.

19         The time to appeal from this determination will run

20   from the date of the ensuing order and not from the date that I

21   am dictating it.

22         MR. JONES:  Thank you, Your Honor.  I have to be at

23   another matter, so I won't be able to turn to the order until

24   tomorrow if that's acceptable?

25         THE COURT:  That will be just fine.

Page 51

1            Am I correct that we have no further business,

2    anybody?

3        (No response)

4            THE COURT:  Then we're adjourned.  Have a good day.

5    (Proceedings concluded at 4:00 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                        R U L I N G S

4

5      DESCRIPTION                                      PAGE

6      Motion Approving Global Settlement of GUC          12

7      Trust's Objections and Adversary Proceeding

8      Relating to Nova Scotia Notes, Among other Matters

9

10     Doc. #12515 Motion of the Paulson Noteholders       42

11     for Allowance of Limited Payment of Professional

12     Fees and Expenses Incurred by the GM Nova Scotia

13     Trustee in Connection with Settlement and Request

14     for Expedited Treatment

15

16

17

18

19

20

21

22

23

24

25

Page 53

1                    C E R T I F I C A T I O N

2

        I, Sheila G. Orms, certify that the foregoing is a correct

3     transcript from the official electronic sound recording of the

4     proceedings in the above-entitled matter.

5

6     Dated:  October 22, 2013

7     Shelia G. Orms          Digitally signed by Shelia G. Orms
                              DN: cn=Shelia G. Orms, o=Veritext, ou,
8                             email=digital@veritext.com, c=US
                              Date: 2013.10.22 15:37:58 -04'00'

9      Signature of Approved Transcriber

10

11

      Veritext

12

      200 Old Country Road

13

      Suite 580

14

      Mineola, NY 11501

15

16

17

18

19

20

21

22

23

24

25