UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OFNEW YORK

IN RE,

GENERAL MOTORS CORP., ET AL.,                    CASE# 09-50026

DEBTORS.

--------------------------------------/

*Endorsed Order: Denied, for failure to show a prima facie entitlement to relief*

*S/REG*
*USBJ*
*11/6/2013*

## MOTION FOR SUMMARY JUDGMENT

Comes now plaintiff/claimant, herein, Sheriif Rafik Kodsy, herein as pro'se, (Kodsy), files this motion pursuant to rule 9021, for an entry of judgment against the debtors.

Wherefore this motion is brought under 11 U.S.C. Section 105(a), a bankruptcy court "may issue any order, process, or judgments that is necessary or appropriate to carry out the provisions of this title." Section 105(a) gives the bankruptcy courts the power to stay actions that are not subject to the 11 U.S.C. Section 362(a) automatic stay but "threaten the integrity of bankrupt's estate," according to ***Canter v. Canter (In re Canter)***.

This motion is due to the debtors bad-faith and Malicious Actions depriving plaintiff/ claimant from a settlement and or a trial in a court of Law for the claims brought forth against it for the counts of Strict Liability & Negligence & conspired fraud, which resulted in multiple injuries and severe financial damages to

1

claimant, where the defendants' strived to conceal the elevated

vibration without quantifying its measurement in the subject

vehicle to conceal the existence of an actionable product defect

which that defect caused injuries to claimant herein, which was

documented by the defendants' <u>work orders</u>, which further states a

residual vibration is expected from a large 6.2 liters engine.

## SUMMARY OF THE CASE

1- Plaintiff's, last filing with this court was a hardship motion

according to the ADR procedures for a new mediation location,

relocation from Dallas, Texas, where plaintiff's injuries would not

allow traveling a distance by plane or car, because of the physically

exhausted tolerances from overexposure levels to elevated

vibration, from the subject vehicle, which could be fatal.

2- Instead the Circuit Court case in the Palm Beach 15TH Judicial

Circuit Court was reopened to proceed to trail, where the

defendants' counselor Steve I, Klein, in that court, acted

maliciously and provided manufactured and fraudulent documents,

to describe false facts about the subject vehicle's existing

manufacturing defect, which was not warned to cause injuries from

prolonged on road-use, where an elevated whole body vibration

exposure in a firm seating was dangerous to the occupants' health and safety, where a measurement and conformity was intentionally neglected by the defendants' to conceal the abnormal vibrations.

3- Further mr. Klein esq., argued other non relevant personal legal matters filed by Kodsy, after this suit, which were filed in a different court after this filing in April 2009, which was to prevent Kodsy, from representing himself as pro'se, herein, by further requesting a $35k security, after the Bankruptcy court had approved the ADR Procedures, to settle or go to trial for an obvious residual of elevated vibrations, which could not be eliminated or reduced.

4- Herein the defendants are preventing claimant herein from a day in Circuit Court on the merits of Strict Liability, Gross Negligence, Bad Faith, Fraud and Sustained Injuries, from an Unwarned and Defective 2008 Hummer H2, (Show Truck), which had an Elevated Vibration, which the subject vehicle did not posses an ON and OFF, switch, to alternate the On and Off road elevated performance features, where the subject vehicle was alleged to be a full time off road vehicle with residual elevated vibration features.

5- Claimant, herein was declared by the Circuit Court Judge to be a vexatious litigant requiring a $35,000 security, because

plaintiff was helpless, stressed, injured, discriminated upon by the defendants bad faith, which forced Kodsy, to pursue more cases within the past five years, after the first filing against General motors, which was also being pursued by plaintiff pro-se', for an expedient remedy, where the debtors declared bankruptcy soon after and halted Kodsy from an expedient resolution for an obvious defect not warned to cause injuries. See circuit court order, exhibit two.

6- Claimant, is disabled and injured without any current equity or income, plaintiff, borrowed money from family to pay for living expenses during recovery after excessive use of the subject vehicle in a short period of time, where claimant is unable to post a $35,000 security and claimant was and remains unable to hire an attorney in Palm Beach County to pursue this Bio-Mechanical Product Defect Case, hence claimant seeks relief from this court based upon the submitted and relevant material facts and evidence submitted in this proceeding.

7- Claimant was denied a fair and non discriminatory settlement proceeding as outlined in the ADR, and now plaintiff is being denied the Federal right to represent himself at trail, where there are no competent lawyers in Palm Beach county, Florida, who are

knowledgeable in auto and bio- mechanics and where there further
are no lawyers willing to prosecute a defendant that is in
Bankruptcy.

8- The bankruptcy stay, herein, delayed, complicated, limited
and injured Kodsy's personal life being matters, because of this civil
court filing being stayed for over three years, where plaintiff/
claimant, had to pursue other legal matters that further prevented
plaintiff from an amicable resolution, due to the discrimination that
evolved from this Bankruptcy proceeding, herein against GENERAL
MOTORS CORP..

<div align="center">A-       <u>INTRODUCTION AND BACKGROUND</u></div>

1- This case was filed in April of 2009, for the excessive vibrations
detected in the subject vehicle, which caused unforeseen injuries and after
effects, which almost killed plaintiff from the unwarned prolonged usage.

2- The General Motors Corporation, declared Bankruptcy in June of
2009.

3- The jury verdict from a Lemon Law trial, was partially in favor of
plaintiff, where the jury recognized that a defect or condition existed in the
subject vehicle, **which substantially impaired the subject vehicle's use,**
**value and safety**. Verdict exhibit form attached as exhibit three.

4- The second question responded to by the jury was did General Motors

eliminate the nonconformity and conform the 2008 Hummer H2, to its warranty after a reasonable number of attempts? Although the jury was deceived to believe that the limited warranty attempted repairs were successful, the defect of elevated vibrations remained, where the subject vehicle was not repaired according to the manufacturer's suggested specifications and full warranties as sold to plaintiff, where the alleged vibration repairs could not possibly eliminate or reduce the elevated vibration detected in the subject vehicle.

5- There were several independent inspections performed by plaintiff after the subject vehicle was allegedly repaired by the defendants' authorized agents,  which document a remaining excessive and elevated vibration in the subject vehicle, which was described by the defendants as a rail shake and was further described as a common trait for a 6.2 litre engine and an Off-road vehicle. Exhibit attached as exhibit four.

6- The defendants, PRODUCT ALLEGATION RESOLUTION PRELIMINARY INSPECTION OF STEERING, SUSPENSION, AXLE, TIRE AND WHEEL SYSTEMS, described the subject vehicle as **"ROUGH AND OVERLY FIRM AND IDLES ROUGH, AND TACH NEEDLE DROPS TO 0",** describing a miss in the subject vehicle's engine, after the alleged conformity repairs were completed. Exhibit attached as exhibit five.

7- Plaintiff did not request a Lemon Law trial, it was the defendants' only available option for relief available , to be decided by that jury, because of the Bankruptcy Stay.

8- Plaintiff, was forced to spend time and money herein, to entertain a Bankruptcy Stay, a Limited Warranty, and a Lemon Law proceeding hearing, where the Lemon Law Board members were attorneys, hired by the State Attorney's Office to vote for the manufacturer, where those board members, were not Bio-Mechanical Experts and were not Mechanics familiar with the Hummer H2, brand.

9- The defendants' are not innocent in manufacturing a defective vehicle and they are not innocent from concealing that defect, by wholesaling the subject vehicle at a dealers Georgia auction, sold to its sales agent from Coral Cadillac, inc., to conceal its defects, without first warning its consumer of the subject vehicle's defective and unsafe condition.

10- The factual evidence herein is undisputed, where the subject vehicle was not placed in the common stream of sales because of a defect or condition, which clearly establishes a motive to defraud with careless disregard to safety and health of the end user, herein, Sherif Rafik Kodsy.

11- Kodsy succeeded in convincing the jury that a disabling defect existed in the subject vehicle when it was sold to plaintiff.

12-    Argumenta, hence the allegation of attempted conformities

repairs by the defendants' is immaterial to the defendants' defenses, where

the fact that those repairs were attempted for a detected elevated vibration is

further evidence that the vehicle was defective, when it was sold to plaintiff,

which it required conformity repairs, where only limited repairs were

authorized. Exhibit of work orders attached as exhibit A.

13-    Further all of the elevated vibration, attempted repairs

completed by the defendants' could not had fixed a vibration defect as

described by the defendants', where it was not documented for its

Amplification Measurement, where the subject vehicle could not be

conformed to factory suggested settings in an after market setting, wherefore

the defendants' failed to conform the subject vehicle according to its

Machinery Directive and intended Manufacturer's Specifications, see exhibit

B, the machinery directive.

14-    Plaintiff, had spent much time and money to bring this case

forward before the court, where Kodsy, was deprived from a conformed

motor vehicle to use daily for business and personal commute, for over four

years, where plaintiff was further injured from accumulated and prolonged

unwarned continuous use of the subject vehicle, in a short period of time.

15-    Kodsy, is further seeking compensations, from the defendants'

for auto rentals, rented until present, where plaintiff's credit after the

purchase of the subject vehicle, prevented plaintiff from purchasing another

vehicle, where plaintiff's designated equity was used for the purchase of the

subject vehicle, where only very limited use of the subject vehicle was

reasonably possible without a fatal injury, where the subject vehicle sat in

plaintiff's driveway for over a year until after the Lemon Law trial,

then Kodsy, sold it to the Schummacker Hummer dealer for $7,000.00 less

not including financing charges and a ten thousand down payment, above

the purchase price.

16-      The defendants' Federal Bankruptcy, had prevented and limited

plaintiff herein from pursuing all and any available remedies of the Law, to

proceed for relief from a defective 2008 HUMMER H2,, the subject vehicle

herein, where it was further sold without warnings and under false pretenses.

### B-      THE DEFENDANTS' ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR DEFENSES

1-   This claim herein is pending before the court for the 2008 Hummer

H2, for Strict Liability and Gross Negligence, which could not be

previously tried, including other Florida statutes infractions that were not

previously decided upon, because the defendants' were sheltered by their

Bankruptcy Filing, which was to avoid liabilities to its debtors.

2- The Lemon Law Board Members, were not Bio-mechanical Experts, or Mechanics or Knowledgeable persons of a Hummer H2, characteristics, where the testimony of the board members alleged the subject vehicle was a BEAST, Lemon Law hearing transcript, indicating force and felt power was strong enough to be fit the size and look of the subject vehicle. Exhibit 6, from the Lemon Law transcript, pg. 85. 93.

3- To a lay person, that would sound befitting, however to an informed Hummer owner, it describes a non conformity that does not befit its name HUMMER H2, describing smoothness and performance quality and design. (SMOOTH AS WATER)

4- Where herein the board members drove the subject vehicle in a residential neighborhood not exceeding 25 miles per hour and for a duration less than five minutes, and still documented that the vibration complaint did not substantially impair the use, value or safety of the vehicle, that was a pure lay opinion where this court should not rely upon because their findings could not determine how prolonged and continued usage of such an elevated vibration would cause injuries at higher speeds and terrains, where the jury previously relied on unreliable testimony.

5- A five minute test drive does not prove anything other than that the subject vehicle was drivable.

6- Where the board members performed no quantitative measurement of the elevated vibration, to analyze severity, hence how could the board members know without a doubt that the continuous and prolonged exposures from driving the subject vehicle would not be dangerous to ones health or could be fatal or injurious, they could not, because they were not experts and they did not conducted any bio-mechanical measurements or testing.

7- The second amended complaint , exhibit C, alleges causes of action for negligence and strict liability, thereof, were based on documented facts, that an elevated vibration existed in the subject vehicle even after the alleged limited warranty repairs were completed, where it was documented by the defendants' authorized dealers and the manufacturer's product allegation resolution report, plus several independent inspections, indicating an abnormality of elevated vibrations.

8- The Scott May inspection, documented an elevated vibration, where mr. May, was a mechanic for over thirty years and owned and operated a full service auto and truck facility in Delray Beach, Florida, although Mr. May did not perform a vibration measurement and quantify the levels of Vibrations, however that does not erase the fact that an experienced mechanic observed and felt an abnormal elevated vibration, where the subject vehicle was under warranty, no repairs were possible, where

plaintiff was directed to go back to the dealer for further testing.

9- The defendants' authorized agents maliciously attempted to deceive plaintiff into accepting the elevated vibration as a normal trait for the subject vehicle without any bio-mechanical testing or any manufacturers suggested specifications verifications from the amplified vibration felt and seen, where no warnings were alerted from prolonged usage of the Subject vehicle, which the constant use developed migraine and profound headaches, chest and heart pains and it caused a left knee to collapse and tear and caused an umbilical hernia from the prolonged belly agitation in a firm seating being exposed to prolonged elevated amount of vibration, which further caused pains in the back of plaintiff's eyes where the eyes were caused a tear drop from a pain surge, where plaintiff was forced to immediately abandon the subject vehicle on the side of the road to turn off and exit the subject vehicle, which this later permanently affected Kodsy's vision, see Joe Bardill testimony, exhibit D.

10- The back and neck injuries are not part of this claim herein. However Kodsy, required treatments for headaches, soon after the purchase of the subject vehicle approx., two months after the out of state accident, where it is documented by the defendants work orders that a non conformity was present, when the subject vehicle was surrendered to the authorized

dealer to fix a non conformity of elevated vibration and a miss in the engine,

plus the transmission was missing and the brakes were squealing, evidence

of a "Show Truck" that was sitting, not intended for continuous use and

daily commute, which was not disclosed prior to its sale to plaintiff, this was

first discovered in the Lemon Law hearing about the subject vehicle being a

**show truck** for General Motors.

11-    Those  new injuries occurred from the prolonged use of the

subject vehicle and commenced soon after and during the unwarned and

continued use of the subject vehicle.

12-    Dr. Jefferey Zipper, testified that an elevated vibration

prolonged exposures can cause injuries, similar to the injuries sustained by

plaintiff commonly detected in truck drivers. See exhibit 7.

13-    Dr. Carl Salvatti, did not yet testify in this matter, where Dr

Salvatti, treated plaintiff for the migraine Headaches approx.. a  month

after the purchase of the subject vehicle and during the constant use of that

vehicle, where he advised plaintiff not to drive, where plaintiff was only

driving the subject vehicle at that time. See exhibit 8.

14-    Dr. Salvatti did not need to see or test the subject vehicle,

where it was obvious that the subject vehicle was causing after effects,

where Dr. Salvatti was experienced to know if you are being exposed to

elevated vibration from the subject vehicle than you need to stop driving it.

15-    There was not any state or local specific bio-mechanical

doctors or experts that solely conduct bio-mechanical testing, in the state of

Florida, hence it was the manufacturers' duty to perform such bio-

mechanical testing to warn its consumer, which was maliciously disregarded

by the Defendants' agents, because of the GM, Bankruptcy Stay filing.

16-    Dr. Carl salvatti, will be called to testify at trial, which he is

Further qualified to make a casual connection for injuries sustained by

plaintiff during the use of the subject vehicle, where he can further correlate

the after effects to elevated vibration exposures, where plaintiff was

complaining of the sustained new injuries, while only using the subject

vehicle daily, during that period of time for treatment.

17-    Kodsy does not speculate his injuries herein to the subject

vehicle as previously stated by the defendants, on the contrary, factual

common sense further attributes plaintiff to correlate his injuries to the

prolonged exposures of the unmeasured elevated vibrations, produced by the

subject vehicle, while using the subject vehicle, where there was no other

explanation for the after affects during the constant use of the subject

vehicle.

18-    Kodsy was getting migraine headaches after constant and

prolonged use of the subject vehicle, which it further caused and

developed new Muscleskelatel and Neurological injuries to Kodsy.

19-    Further OSHA and NIOSH documents, are available to the

public on the internet, which correlates the elevated vibration exposures to

the specific injuries, which plaintiff suffered from, hence it is undisputable

that prolonged elevated vibration exposures, does in-fact cause injuries and

discomforts identical to the injuries and discomforts that as plaintiff's claims

were a result of the constant use of a non-conformed motor vehicle, a

(SHOW TRUCK), not intended for daily use and commute with elevated

vibrations such as in the subject vehicle herein.

20-    Scott May, a 30 year experienced independent mechanic,

testified to the abnormal and elevated vibrations, detected in the subject

vehicle, he did not need to perform any other testing, where the subject

vehicle had a visible elevated vibration and was felt through the chassis,

where no after market repairs could cure that defect and where the subject

vehicle had a manufacturer's warranty, where he recommended to take the

subject vehicle back to the authorized dealer for further diagnostics, repairs

and  measurements after the defendants' agents alleged completed repairs.

21-    Due to the defendants, Bankruptcy Stay and After repeated

visits to the malicious authorized dealers from the Coral

Cadillac inc, and the Schumacker Hummer dealers, after the defendants'

Agents, they failed to fix and failed to conduct any Bio-Mechanical

testing and failed to quantify the level of vibration to warn its user, hence

after the Lemon Law trial , plaintiff sold the subject vehicle for non use

and a non-conformity, where it was documented an elevated vibration in

the subject vehicle without a specific measurement for the elevated

vibration, see exhibit E., letter from General Motors.

22-    The defendants' argument about not having the subject vehicle

bio-mechanical test, was their responsibility to produce and conduct such a

test, where they had multiple opportunities to do so, where their non

testing for the level of vibration being produced in the subject vehicle is

evidence of gross negligence, where they did not measure or try to

quantify the level of vibration, where they did not provide any objective

evidence of a non injurious vibration, where they failed to warn.

23-    The defendants' are maliciously trying to indicate that because

plaintiff's witnesses did not conduct any bio-mechanical testing in the

subject vehicle that plaintiff cannot claim injuries from the subject

vehicle, where it was the duty of the manufacturer's agents to perform

and conduct such measurements, where the defendants' negligence lies

from their failure to test, where they conspired to conceal the

non-conformity of elevated vibration, even after they documented a

vibration abnormality to exist in the subject vehicle.

24-    The defendants' negligence and careless disregard, to the

plaintiff's complaints of elevated vibrations and complaints of injuries

associated with elevated vibration exposures, warranted testing by the

manufacturer's agents, which was carelessly disregarded, where the

defendants' should be liable solely for not testing the subject vehicle

elevated vibrations, which resulted in their failure to warn about

prolonged use and after effects which could be fatal, where the subject

vehicle was in their possession for approx.. 30 days, for an elevated

vibration non conformity and warranty repairs.

**ARGUMENT TO THE DEFENDANTS' ALLEGATIONS OF
NECESSARY ELEMENTS TO ESTABLISH MANUFACTURE'S
LIABILITY FOR A PRODUCT DEFECT, UNDER FLORIDA
LAW.**
1- The defendants' stated in the landmark case of **West v. Caterpillar**

**Tractor co. , 336 So. 2d 80 (Fla 1976),** where herein plaintiff's injuries

correlate to the continuous exposures to whole body elevated vibrations

detected in the subject vehicle, where plaintiff could have died from the

defendants' negligence of not testing the vibration levels in the subject

vehicle, where a disclosure of a defect was not warned for its vibration

dangerous levels.

2- Although the Palm Beach Circuit court judge did not recognize

plaintiff as an expert, plaintiff had enough common sense as an expert in

Indoor Environments, to stop using that product, because after

continuous use of the subject vehicle, plaintiff suffered injuries and

physical discomforts, which was similar to plaintiff, going to do a **mold**

**inspection survey**, where plaintiff's primary over-exposures to Mold

made Kodsy more sensitive to the smell of mold, where when an

inspection was performed in a newly alerted setting Kodsy would

immediately recognize the smell and occasionally develop a temporary

headache if remained in that area unprotected, which is why Kodsy wears

a respirator on inspections, where air sampling is needed to identify the

count and species before and after remediations to be able to achieve and

document improvements, which was similar to in the subject vehicle.

3- Kodsy's vibration tolerances diminished after prolonged continuous

daily use and a physical after effect was evident after every drive in a very

short period of use, which with more use newer injuries developed, hence it

was further similar to a complaint of tightly fitted shoes, that as a result of

continuous use, the feet will ache and could get permanently injured,

certainly Kodsy did not need a doctor or expert to tell him that, an elevated

vibration similar to the use of a jack hammer was not to be performed daily

and for a prolonged period of time, these are facts of life, if the shoe does

not fit do not wear it, or if the elevated vibration is making you ill and

injured do not drive it, where herein plaintiff almost died from the unwarned

and the exhausting after effects produced by a large vehicle with a

noticeable and documented elevated whole body Vibration allegedly from

the large off-road 6.2 litre engine in the subject vehicle herein.

4- The defendants' had a statutory duty to test and quantify the level of

vibration in the subject vehicle, after a complaint for elevated vibration,

where the defendants feared to do such testing, so as not to document the

abnormal measurement, as a defense to the allegations of nonconformity,

hence the non testing was further evidence of a conspiracy to conceal the

abnormalities of elevated vibrations, where plaintiff was not warned and

plaintiff was further injured from the prolonged usage of unwarned elevated

vibration in the subject vehicle. See e.g., **St. john v. City of Naperville, 108**

**Ill.. app. 3d 519, 64 Ill. Dec. 83, 439 N.E.2d 12 (1982).**

5- The proximate cause of plaintiff's new injuries, herein, is from the

defendants negligence of not testing the subject vehicle, where the over

exposures to an elevated vibration that was factually present in the

subject vehicle had caused the injuries sustained, where those injuries can

be correlated to over use of the subject vehicle as described with its

abnormal and residual elevated vibrations.

6- **In Heston v. Lilly , 248 Ga. App. 856, 546 S.E.2d 816, 818 (2001),**

The court explains in clear and simple language the importance of the

issue of cause. The negligence claim for relief has four distinct elements.

The plaintiff must prove (1) duty, (2) breach, (3) injury, and (4) a casual

connection between the breach and injury, the presence of a breach and

duty, is not sufficient for recovery.

7- The defendants' were both the cause in fact for an elevated vibration,

negligence and the proximate cause of the injury, herein, where no

warnings of prolonged use was communicated, and where the subject

vehicle did not posses an Off and On switch for its elevated performance.

**Anderson v. Dreis & Krump Mfg. Corp, 48 Wash. App. 432, 739**

**P.2d 1177 (1987)** (Legal causation rests on consideration of logic,

common sense, justice, policy and precedent). "Proximate cause, is

causation substantial enough and close enough to the harm to be

recognized by law but a given proximate cause need not be, and

frequently is not, the exclusive proximate cause of harm."

**Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2750, 159 L.Ed. 2d 718,**

**736 (U.S. 2004).**

Particularly, but not exclusively, in the context of determining

whether an intervening cause-in-fact is isolating, foreseeability is the

prominent factor. See e.g., **Glick v. Prince Italian Foods of Saugaus,**

**Inc., 25 Mass. App. 901, 514 N.E.2d 100 (1987).**

It flows from the rule that a defendant is liable for the natural and

probable results of his acts **( Cooley v. Big Horn Harvestore Sys., 767**

**P.2d 740 (Colo. APP. (1988),** that much can depend on this aspect of

proof. A jury can rely on common experience and the usual course of

events in making a determination of foreseeability.

In **George v. International Soc'y for Krishna Consciousness of**

**Cal., 213 Cal. App. 3d 729, 262 Cal. Rptr. 217 (1989),** a finding that

the death of a father was a foreseeable result of defendants' conduct in

concealing the whereabouts of his child and subjecting the parents to

verbal and physical abuse, was upheld.

A " proximate cause" is defined by the law as a cause which, in natural

or continuous sequence, unbroken by any efficient intervening cause,

produces the injury and without which the injury would not have

occurred.

8-  WEST confirmed Florida courts would adopt the Strict Liability

concept as set forth in **Restatement second  torts, section 402(a)(1),**

"one who sells any product in a defective condition unreasonably

dangerous to the use or the consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or his property", where the defendants' herein were in the business of selling cars and trucks and sold such defective vehicle at auction because it was not suited for the common stream of sales, where it reached its consumer Sherif Kodsy, without any substantial change in the condition in which it was sold without warnings to its elevated design of a Show Truck, where it was not placed for sale in the common stream of sales.

9- **Plaintiff already established beyond a reasonable doubt that the subject vehicle did in-fact have an elevated vibration that required a repair and that it required several other miscellaneous repairs,** where the manufacturer was allowed a reasonable number of attempts to **bio-mechanically test the subject vehicle to document its elevated vibration,** conformity improvements to manufacturer specifications, **but they did not, to conceal the severity of the vibration,** where the subject vehicle could not be fixed locally or as they described fixing it.. **resulting in an intentional failure to warn.**

**Jones v. Washington metro. Area transit Auth., 946 F. Supp. 1011 (D.D.C. 1996) (used " but for" test); Aetna Cas. & Sur. Co. v. Leo A.**

**Daly co., 870 F. Supp. 925 (S.D. Iowa 1994) (actual cause is known as sine qua non); Walls v. Armour Pharmaceutical Co., 832 F. Supp. 1505 (M.D. Fla. 1993) (failure to warn of possible HIV from blood transfusion); Sorrentino v. All Seasons Servs., 245 Conn. 756, 717, A.2d 150 (1998) (compare "but for" and "substantial factor").**

10-      The fact that the defendants' negligence was a substantial factor in causing the damage, it becomes immaterial if an intervening cause qualifies as being a superseding cause. e.g. **Heitasch v. Hampton, 423 NW 2d 297 (Mich. App. 1998)**

11-      In **Lay v. Knapp, 993 Ill. App. 3d 855, 407 N.E. 2d 1099 (1981)**, plaintiff's right to recover damages for injuries and disability is not barred or to be limited in any way by the fact, if you find it to be a fact, that plaintiff's injuries and disability resulted from an aggravation of pre-existing condition by the occurrence  in question nor by reason of fact, if you find it to be a fact, that the plaintiff because of a preexisting physical condition was more susceptible to injury than other persons might have been.

## CONCLUSION

Plaintiff requests a judgment in its favor for the counter offer Negotiated amount of $7,500,000.00 according to the ADR settlement proceeding, where plaintiff herein previously filed a $15,000,000.00 secured claim, which was alleged to be unsecured from a product defect, where claimant was seeking punitive damages in addition to the unsecured $15,000,000.00

Alternatively, plaintiff requests that plaintiff be allowed to proceed to trial without providing a security, where the debtors should be the ones subsidizing their interests, where they are the ones that should be providing a security for their bad faith and conspired fraud, herein, which caused plaintiff a displacement of being able to reach a destination where the subject vehicle was Kodsy's only used motor vehicle during the first year, which caused extreme losses and damages, mental duress and anguish and extreme hardships and injuries from use and limited use of a defective motor vehicle a (2008 HUMMER H2) and from a lengthy legal proceeding for a fair resolution.

Thank you..

## CERTIFICATE OF SERVICE

ALL ASSERTIONS MADE IN THE FOREGOING REQUEST,

ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

AND BELIEF AND THAT A COPY WAS FILED AND SENT TO

THE DEFENDANTS ATTORNEY OF RECORD, BY EMAIL AND

U.S. MAIL ON October 14th , 2013 .

605 N. Riverside Dr.
POMPANO Bch. fl 3062

....................................................
**SHERIF RAFIK KODSY**
Individual/pro'se
~~HAMPTON PLACE~~
~~BOCA RATON,~~ **FLORIDA** ~~33434~~
**561-294-3046**

**COPY(S) TO:**
**WEIL, GOTSHAL & MANGES LLP., 767 FIFTH AVENUE**
**NEW YORK, NEW YORK 10153**

25

# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OFNEW YORK

IN RE,

**GENERAL MOTORS CORP., ET AL.,**          **CASE# 09-50026**

**DEBTORS.**

-------------------------------------/

## PLAINTIFF'S INDEX FOR SUMMARY JUDGMENT MOTION

## TABLE OF CONTENTS

**Summary of the case**..................................................................................**2**

**Introduction and background**................................................**5**

**The defendants' are not likely to prevail on the merits of their defenses**.........................................................................**9**

**Argument to the defendants' allegations of necessary elements to establish manufacturers liability for a product defect, under Florida Law**...........................................................................**17**

**CONCLUSION**...............................................................................**24**

## CITATIONS

*11 U.S.C. Section 105(a)*............................................................*1*

*Canter v. Canter (In re Canter)*..............................................*1*

*West v. Caterpillar Tractor co. , 336 So. 2d 80 (Fla 1976)*... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...*17*

*St. john v. City of Naperville, 108 Ill.. app. 3d 519, 64 Ill. Dec. 83, 439 N.E.2d 12 (1982)*... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ....*19*

*Heston v. Lilly , 248 Ga. App. 856, 546 S.E.2d 816, 818 (2001)*... ... ... ... ...*20*

*Anderson v. Dreis & Krump Mfg. Corp, 48 Wash. App. 432, 739 P.2d 1177 (1987)* ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ....... ... ...*20*

*Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2750, 159 L.Ed. 2d 718, 736 (U.S. 2004)*... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ....... ... ...*20*

*Glick v. Prince Italian Foods of Saugaus, Inc.*, 25 Mass. App. 901, 514
N.E.2d 100 (1987)... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ..... ... ....21

*Cooley v. Big Horn Harvestore Sys.*, 767 P.2d 740 (Colo. APP.
(1988)... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ..... ... ... ....21

*George v. International Soc'y for Krishna Consciousness of
Cal.*, 213 Cal. App. 3d 729, 262 Cal. Rptr. 217 (1989)... ... ... ... ... ... ... ....21

*Restatement second  torts, section 402(a)(1)*... ... ... ... ... ... ... ... ... ..... ....21

*Jones v. Washington metro. Area transit Auth.*, 946 F. Supp. 1011

(D.D.C. 1996) (used " but for" test); *Aetna Cas. & Sur. Co. v. Leo A.

Daly co.*, 870 F. Supp. 925 (S.D. Iowa 1994) (actual cause is known as

sine qua non); *Walls v. Armour Pharmaceutical Co.*, 832 F. Supp.

1505 (M.D. Fla. 1993) (failure to warn of possible HIV from blood

transfusion); *Sorrentino v. All Seasons Servs.*, 245 Conn. 756, 717,

A.2d 150 (1998) (compare "but for" and "substantial factor")... ... .....22-23

*Heitasch v. Hampton*, 423 NW 2d 297 (Mich. App. 1998)... ... ... ... ... .....23

*Lay v. Knapp*, 993 Ill. App. 3d 855, 407 N.E. 2d 1099 (1981)... ... ... ... .....23

# EXHIBITS

**EXHIBIT ONE,** BANKRUPTCY UNSECURED CLAIM

**EXHIBIT TWO**, CIRCUIT COURT ORDER, DECLARING PLAINTIFF A VEXATIOUS LITIGANT

**EXHIBIT THREE**, JURY VERDICT FROM LEMON LAW TRIAL

**EXHIBIT FOUR**, INDEPENDENT MECHANICAL INSPECTIONS AFTER THE DEFENDANTS' COMPLETED CONFORMITY REPAIRS

**EXHIBIT FIVE,** PRODUCT ALLEGATION RESOLUTION, PRELIMINARY INSPECTION, COMPLETED AFTER THE DEFENDANTS' COMPLETED REPAIRS

**EXHIBIT SIX**, LEMON LAW TRANSCRIPT PAGES 85 AND 93, TESTIMONY OF THE LEMON LAW BOARD MEMBERS

**EXHIBIT SEVEN**, DR. ZIPPER'S TESTIMONY

**EXHIBIT EIGHT**, DR. SALVATTI'S COMPREHENSIVE NEUROLOGICAL EVALUATION

**EXHIBIT A**, COMPLETTED SERVICE REPAIR ORDERS, COMPLETED BY THE DEFENDANTS' AGENTS

**EXHIBIT B,** THE MACHINERY DIRECTIVE

**EXHIBIT C,** SECOND AMENDED COMPLAINT

**EXHIBIT D,** JOE BARDILL TESTIMONY

**EXHIBIT E**, LETTER FROM GENERAL MOTORS

## CERTIFICATE OF SERVICE

ALL ASSERTIONS MADE IN THE FOREGOING REQUEST,

ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

AND BELIEF AND THAT A COPY WAS FILED AND SENT TO

THE DEFENDANTS ATTORNEY OF RECORD, BY EMAIL AND

U.S. MAIL ON October 16 th , 2013 .

605 N. Riverside Dr.
Pomp. Bch. Fl. 33062

**SHERIF RAFIK KODSY**
Individual/pro'se
, FLORIDA
**561-294-3046**

COPY(S) TO:
**WEIL, GOTSHAL & MANGES LLP., 767 FIFTH AVENUE
NEW YORK, NEW YORK 10153**

# Exhibit

## I

cappingletter[1] text

September 10, 2010

BY E-MAIL AND FIRST CLASS MAIL

Motors Liquidation Company
2101 Cedar Springs Road, Suite 1100
Dallas, TX 75201
Attn.: ADR Claims Team

claims@motorsliquidation.com

Re:
In re Motors Liquidation Company, et al. ("Debtors")
Case No. 09-50026 (REG) – Capping Claim Letter

Dear Motors Liquidation Company,

By this letter, I, the undersigned, am the below-referenced claimant, or an
authorized signatory for the below-referenced claimant, and hereby submit my claim
to the
capping procedures established in the Order Pursuant to 11 U.S.C. § 105(a) and
General Order
M-390 Authorizing Implementation of Alternative Dispute Procedures, Including
Mandatory
Mediation (the "ADR Procedures") [Docket No. 5037] entered by the United States
Bankruptcy
Court for the Southern District of New York on February 23, 2010.

Accordingly, I hereby propose to cap my claim at the amount specified below (the
"Claim Amount Cap"). $14,990,000.00

| Claimant's Name | Proof of Claim No. | |
| --- | --- | --- |
| | Original Filed Amount | Claim Amount Cap |
| SHERIF KODSY | 69683 | |
| | | $15,000,000.00 |

        I understand and agree that the Claim Amount Cap includes all damages and
relief to which I believe I am entitled, including all interest, taxes, attorney's
fees, other fees, and
costs. If the Claim Amount Cap is accepted by the Debtors, I understand that I am
required to
submit my claim to the ADR Procedures and acknowledge that my claim may be a
"Designated
Claim" as such term is used under the ADR Procedures.

Very truly yours,


-----------------------------------------------------------------
By SHERIF R. KODSY
Address 15968 LAUREL OAK CIRCLE, DELRAY BEACH
State, FLORIDA 33484

cc:
Pablo Falabella, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
pablo.falabella@weil.com

COPY

cappingletter(1).txt

September 10, 2015

BY E-MAIL AND FIRST CLASS MAIL

Motors Liquidation Company
2101 Cedar Springs Road, Suite 1100
Dallas, TX 75201
Attn: AlixPartners Claims Team

claims@motorsliquidation.com

Re:
In re Motors Liquidation Company, et al. ("Debtors")
Case No. 09-50026 (REG) – Capping Claim Letter

Dear Motors Liquidation Company,

By this letter, I, the undersigned, as the [illegible] claimant, or an authorized signatory for the below-referenced claimant, hereby submit my claim to the capping procedures established in the Order Pursuant to 11 U.S.C. § 105(a) and General Order [illegible] Authorizing Implementation of Alternative Dispute Procedures, Including Mandatory [illegible] Mediation (the "ADR Procedures") [Docket No. [illegible]] entered by the United States Bankruptcy Court for the Southern District of New York on [illegible], 2010.

Accordingly, I hereby propose to cap my claim [illegible] specified below (the "Claim Amount Cap") [illegible]:

| Claimant's Name | Proof of Claim No. | Original Filed Amount | Claim Amount Cap |
|---|---|---|---|
| [illegible] KOBSY | [illegible] | [illegible] | 1,[illegible],000.00 |

I understand and agree that the Claim Amount Cap includes all damages and relief to which I believe I am entitled, including [illegible] interest, taxes, attorney's fees, other fees, and costs. If the Claim Amount Cap is accepted by the Debtors, I understand that I am required to submit my claim to the ADR Procedures and acknowledge that my claim may be a "Designated Claim" as such term is defined under the ADR Procedures.

Very truly yours,

---

By: [illegible] KOBSY
Address: 15868 [illegible] OAK CIRCLE, [illegible] BEACH
[illegible], FLORIDA [illegible]

cc:
Pablo Falabella, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
pablo.falabella@weil.com

Page 1

cappingletter[1]_text[1]

OCTOBER, 13TH  2010

BY E-MAIL AND FIRST CLASS MAIL

Motors Liquidation Company
2101 Cedar Springs Road, Suite 1100
Dallas, TX 75201
Attn.: ADR Claims Team

claims@motorsliquidation.com

Re:
In re Motors Liquidation Company, et al. ("Debtors")
Case No. 09-50026 (REG) - Capping Claim Letter

Dear Motors Liquidation Company,

By this letter, I, the undersigned, am the below-referenced claimant, or an
authorized signatory for the below-referenced claimant, and hereby submit my claim
to the
capping procedures established in the Order Pursuant to 11 U.S.C. § 105(a) and
General Order
M-390 Authorizing Implementation of Alternative Dispute Procedures, Including
Mandatory
Mediation (the "ADR Procedures") [Docket No. 5037] entered by the United States
Bankruptcy
Court for the Southern District of New York on February 23, 2010.

"UNSECURED CLAIM"

Accordingly, I hereby propose to cap my claim at the amount specified below (the
"Claim Amount Cap"). $9,500,000.00

| Claimant's Name | Proof of Claim No. | |
| | Original Filed Amount | Claim Amount Cap |
| SHERIF KODSY | 69683 | |
| | $15,000,000.00 | |

        I understand and agree that the Claim Amount Cap includes all damages and
relief to which I believe I am entitled, including all interest, taxes, attorney's
fees, other fees, and
costs. If the Claim Amount Cap is accepted by the Debtors, I understand that I am
required to
submit my claim to the ADR Procedures and acknowledge that my claim may be a
"Designated
Claim" as such term is used under the ADR Procedures.

Very truly yours,


SHERIF KODSY
------------------------------------------------------------
By SHERIF R. KODSY
Address 15968 LAUREL OAK CIRCLE, DELRAY BEACH
State, FLORIDA 33484

cc:
Pablo Falabella, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Page 1

COPY

cappingletter[1]_text[1]

pablo.falabella@weil.com

♀

Exhibit

— 2 —

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

**CIRCUIT CIVIL DIVISION AH**
**CASE NO: 502009CA011174XXXXMB**

SHERIF RAFIK KODSY,
     Plaintiff,

vs.

GENERAL MOTORS CORP.,
and MOTORS LIQUIDATION CO.,
     Defendant(s).

_____/

## ORDER ESTABLISHING ATTACHED AND INCORPORATED COPY AS ORIGINAL

**THIS MATTER** is before the Court, *sua sponte*, on the Court's recent review of the court file, and the Court being fully advised, finds as follows:

1. On August 28, 2013, the Court issued its Order on Defendant MOTORS LIQUIDATION COMPANY's Motion to Declare Plaintiff a Vexatious Litigant and Order Plaintiff to Furnish Security. The Attached and Incorporated exact copy of the Order issued on August 28, 2013 is comprised of a total of eight (8) pages, including "Exhibit A" originally made a part of the Order; the Attached and Incorporated exact copy of the August 28, 2013 Order is hereafter referred as "The Order".

2. Plaintiff filed a Motion for Clarification of The Order on September 5, 2013, along with an exact photocopy of The Order. This Motion was filed and docketed in the court file at Docket Number 318, on September 6, 2013.

3. Another copy of Plaintiff's Motion for Clarification of The Order, along with another exact copy of The Order, was filed and docketed in the court file at Docket

Number 320 on September 10, 2013.

4. On September 9, 2013, this Court issued its Order Denying Plaintiff's Motion for Clarification which was docketed on September 10, 2013 at Docket Number 319.

5. When this Court entered The Order, the original Order was sent to the Clerk, with copies furnished to Sherif Rafik Kodsy, *Pro-Se* Plaintiff, and to Steven I. Klein, Esq., Counsel for Defendant. The Court also retained an exact copy of The Order.

6. The Court's recent review of the court file reflects that the original Order of August 28, 2013, issued August 28, 2013 was not filed and docketed in the court file.

Based on the foregoing, the Court concludes that the original Order of August 28, 2013 has been inadvertently and mistakenly misfiled, lost, or destroyed.

Accordingly, it is

**ORDERED AND ADJUDGED** that the Court hereby establishes the Attached and Incorporated copy of the original Order of August 28, 2013 as the original Court Order for all purposes; and the Clerk of Court is ordered to file this Order in the court file, as the Established Original Order of August 28, 2013.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida, on this 16th day of **SEPTEMBER, 2013.**

LUCY CHERNOW BROWN, Circuit Court Judge

Copies Furnished:
Sherif Rafik Kodsy, 9407 S. Hampton Place, Boca Raton, FL 33434
Sherif Rafik Kodsy, *Pro Se*, 605 North Riverside Drive, Pompano Beach, FL 33062
Steven I. Klein, Esq., P.O. Box 1873, Orlando, FL 32802
Clerk of Court, 205 N. Dixie Highway, 3rd Floor, West Palm Beach, FL 33401

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE NO.: 09-CA-011174

SHERIF RAFIK KODSY,

    Plaintiff,

vs.

GENERAL MOTORS COMPANY,
and MOTORS LIQUIDATION COMPANY,

    Defendants.

ORDER ON DEFENDANT, MOTORS LIQUIDATION COMPANY'S
MOTION TO DECLARE PLAINTIFF A VEXATIOUS
LITIGANT AND ORDER PLAINTIFF TO FURNISH SECURITY

THIS MATTER having come before the Court on August 27, 2013, with respect to

Defendant's Motion to Declare Plaintiff a Vexatious Litigant and Order Plaintiff to Furnish

Security and the Court having considered the matter, heard arguments of counsel and being

otherwise apprised of the circumstances, it is hereby

ORDERED AND ADJUDGED:

Defendant's Motion to Declare Plaintiff a Vexatious Litigant and Order Plaintiff to

Furnish Security is GRANTED. Pursuant to Florida Statutes Section 68.093 and the Court's

inherent power to prevent abuse of court procedure which interferes with the effective

administration of justice, it is ordered that within 30 days of this Order Plaintiff shall post

security in the amount of $ 35,000.00 to secure the payment of costs and expenses

likely to be incurred by Defendant in defending this action or this action shall be dismissed with

prejudice. This Order is based upon the following findings:

1.    On April 9, 2013, in Kodsy v. Spira, et al, Case No. 50201\1CA012996, Circuit

Judge Glenn D. Kelley issued an order finding that "Kodsy is a vexatious litigant pursuant to

*and Order Denying motion for (Reconsideration)*

§68.093." A copy of the Order is attached as Exhibit "A" By virtue of Judge Kelley's Order in *Spira*, Plaintiff is a vexatious litigant pursuant to Section 68.093(2)(d)(2).

2.    Plaintiff is also a vexatious litigant pursuant to Section 68.093(2)(d)(1) because he has commenced, pro se, at least five civil actions in Florida which have been finally and adversely determined against him. These cases include:

Kodsy v. Coral Cadillac (Broward County)
- CASE NUMBER: 09-33050 25
- DATE FILED: June 15, 2009
- DISPOSITION: Dismissed – Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint with Prejudice granted.
- APPEAL: Affirmed without opinion by 4th District Court of Appeals. Florida Supreme Court denied review based on lack of jurisdiction.

Kodsy v. General Motors Company (Palm Beach County)
- CASE NUMBER: 502009CA011174XXXXMB
- DATE FILED: March 31, 2009
- DISPOSITION: Final Judgment entered in favor of Defendant pursuant to jury verdict.
- APPEAL: Affirmed without opinion by 4th District Court of Appeals.

Kodsy v. Progressive (Palm Beach County)
- CASE NUMBER: CACE 05-16069 (09)
- DATE FILED: May 27, 2010
- DISPOSITION: Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint granted
- APPEAL: Affirmed without opinion by 4th District Court of Appeals. *See* Exhibit "G" attached.

Kodsy v. Florida Department of Business Regulation (Palm Beach County)
- CASE NUMBER: 502011CA019378XXXXMB
- DATE FILED: December 6, 2011
- DISPOSITION: Dismissed – Defendant's Motion to Dismiss granted.
- APPEAL: None.

Koppel v. Kodsy (Counterclaim filed pro se)(Broward County)[1]
- CASE NUMBER: 502011CA019378XXXXMB
- DATE FILED: Counterclaim filed pro se on April 26, 2010
- DISPOSITION: Counterclaim dismissed – Final Judgment entered in favor of Counter-Defendant.
- APPEAL: Dismissed for failure to comply with Order.

3.      The above cases do not include other unsuccessful *pro se* lawsuits filed by Plaintiff in the federal courts or other states within the past five years. *See e.g. Kodsy v. Florida Department of Business Regulation*, Case No. 9:2011-cv-80633 (Southern District Florida); *Kodsy v. City of Boynton Beach & Regions Bank*, Case No. 9:2011-cv-81340 (Southern District of Florida); and *Kodsy v. Michigan Department of Transportation*, Case No. 10-000012-MD (Michigan Court of Claims).

4.      Plaintiff's filings have placed a heavy burden on the courts' already limited resources as well as required defendants to spend substantial amounts of time and money defending themselves against Plaintiff's multitude of meritless claims. At least $56,706.50 in attorney's fees and costs have been awarded against Plaintiff and remain unpaid. Additionally, Plaintiff has been abusive towards defense counsel throughout this matter. Plaintiff has threatened defense counsel with a bar complaint and has repeatedly threatened to sue defense counsel after the conclusion of his case.

5.      Based upon the record and evidence presented, Plaintiff is not reasonably likely to prevail on the merits of his claim. This is not Plaintiff's first claim involving this vehicle or his defect allegations. Each of the prior matters, were decided against Plaintiff and affirmed, without opinion, by the Fourth District Court of Appeal.

---

[1] Section 68.093(d) states "If an action has been commenced on behalf of a party by an attorney licensed to practice law in this state, that action is not deemed to be pro se even if the attorney later withdraws from the representation and the party does not retain new counsel." Although Kodsy was initially represented by counsel, Kodsy filed a separate counterclaim on April 26, 2010 after his counsel withdrew. Accordingly, he commenced that action pro se and it falls outside the exception provided under 68.093(d).

6.    Plaintiff's Second Amended Complaint alleges causes of action against MLC for negligence and strict liability based upon claims that the vehicle is defective due to the existence of an alleged "elevated whole body vibration" in the subject vehicle.  Plaintiff claims that as a result of the alleged vibration, he sustained a knee injury, pain in the back of his eyes, migraine headaches, an umbilical hernia, heart and chest pains.  Plaintiff's claims require a determination as to whether or not the 2008 Hummer H2 was unreasonably dangerous due to an alleged vibration.  Plaintiff has no qualified expert with objective evidence of an injurious level of vibration and none of Plaintiff's doctors have observed the subject vehicle and cannot opine regarding the level of vibration in the vehicle.  Moreover, the potential for Plaintiff to obtain testimony of qualified experts in the future has likely been rendered impossible due to Plaintiff's voluntary disposal of the subject vehicle.  Plaintiff does not have, and does not appear likely to be able to obtain, the expert testimony necessary to establish the existence of any actionable product defect or prove that the alleged defect caused his injuries.

DONE and ORDERED in Chambers, West Palm Beach, Palm Beach County, Florida this 28ᵗʰ day of Aug, 2013.

LUCY CHERNOW BROWN, Circuit Judge

Copies furnished:
Sherif Rafik Kodsy, Pro Se Plaintiff
605 North Riverside Drive, Pompano Beach, Florida, 33062

Steven I. Klein, counsel for Defendant
Rumberger, Kirk & Caldwell, P. O. Box 1873, Orlando, FL 32802-1873

# EXHIBIT A

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

Case No. 502011CA012996 (DIV. RA)

SHERIF RAFIK KODSY,

    Plaintiff(s),

vs.

STANLEY SPIRA, etc.,

    Defendant(s).

## ORDER GRANTING MOTION TO DECLARE PLAINTIFF A VEXATIOUS LITIGANT

This matter came before the Court on the Defendant's Motion to Declare Plaintiff a Vexatious Litigant. A hearing was conducted on the Defendant's Motion on March 18, 2013. The Court has reviewed the submissions of the parties, and has heard the argument of counsel. Upon consideration, the Court makes the following findings.

Defendant, Stanley Spira, seeks an order declaring the Plaintiff, Sherif Kodsy, a vexatious litigant pursuant to Fla. Stat. §68.093. Mr. Kodsy, acting *pro se*, filed this action for damages against Mr. Spira for injuries allegedly suffered when Mr. Kodsy was required to "swerve" his car to avoid a collision on Military Trail. Mr. Kodsy alleges that his sudden evasive maneuver was required because Mr. Spira cut him off.

Mr. Kodsy is no stranger to the court system. He has prosecuted, unsuccessfully, numerous cases in state and federal court. Among the cases he has filed are the following:

*Kodsy v. Coral Cadillac,* Case No. 2009-33050 25 (17th Judicial Circuit 2009).

1

**Copies furnished by mail**

*Kodsy v. General Motors Corp.*, Case No. 2009CA011174 (15th Judicial Circuit (2009).

*Kodsy v. Progressive Insurance Company*, 2010CA014132, (15th Judicial Circuit (2010).

*Kodsy v. Florida Department of Business Regulation*, 2011CA019378 ((15th Judicial Circuit (2011).

*Kodsy v. Florida Department of Business Regulation*, Case No. 9:2011-CV-80633, (Southern District of Florida 2011).

*Kodsy v. City of Boynton Beach & Regions Bank*, Case No. 9:2011-CV-81340, (Southern District of Florida 2011).

Each of the cases listed above have been adversely decided against Mr. Kodsy. In each case, as in this case, Mr. Kodsy claims exemption from the filing fee based on indigent status. Despite filing for indigent status, he has testified in sworn depositions taken in this case that he had an income which belies his claim to indigence.

Mr. Spira seeks a protection from further action by Mr. Kodsy pursuant to Florida's so-called "Vexatious Litigant Law." §68.093, Fla. Stat. (2011). Having considered this matter, the Court concludes that Mr. Kodsy is a vexatious litigant pursuant to §68.093. In the past five years, Mr. Kodsy has brought more than five civil actions that have been decided adversely to him, and he is not likely to prevail in this action.

Based on the foregoing, it is hereby,

**ORDERED AND ADJUDGED** that Defendant's Motion to Declare Plaintiff a Vexatious Litigant is **GRANTED**. Plaintiff Sherif Rafik Kodsy is enjoined from filing

2

further *pro se* pleadings in this case unless he posts a bond in the amount of $25,000.00 to secure the payment of costs and expenses likely to be incurred by the Defendant in defending this action. The failure to post bond may result in the dismissal of this action with prejudice. Nothing in this Order shall prevent the Plaintiff from retaining an attorney licensed to practice law in the State of Florida to represent him in this matter.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida this _21_ day of April, 2013.

JUDGE GLENN D. KELLEY
CIRCUIT COURT JUDGE

Copies furnished to:

Gregory T. Anderson, Esq., 560 Village Blvd., Suite 150, West Palm Beach, Florida 33409

Sherif R. Koday, 605 North Riverside Drive, Pompano Beach, Florida 33062

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO.: 502011CA012996 "DIV. AA "

SHERIF RAFIK KODSY,

    Plaintiff(s),

vs.

STANLEY SPIRA, etc.,

    Defendant(s)

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION

This matter came before the Court on Plaintiff's Motion For Reconsideration of the
Court's Order Granting Motion to Declare Plaintiff a Vexatious Litigant entered on April 9,
2013. Having considered the Motion, it is hereby,

ORDERED AND ADJUDGED that the Motion is DENIED.

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida this _3-d_

day of May, 2013.

                             Glenn D. Kelley
                             Circuit Court Judge

Copies furnished to:

Gregory T Anderson, Esq., 560 Village Blvd., Suite 150, West Palm Beach, Florida 33409

Sherif R. Kodsy, 605 North Riverside Drive, Pompano Beach, Florida 33062

FILED
2013 MAY -3 PM 3: 53
SHARON R. BOCK
PALM BEACH COUNTY
CIRCUIT CIVIL 5

Exhibit

— 3 —

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR
PALM BEACH COUNTY, FLORIDA

SHERIF RAFIK KODSY,

    Plaintiff,

vs.                                                              CASE NO.: 09-CA-011174

GENERAL MOTORS COMPANY
and MOTORS LIQUIDATION COMPANY,

    Defendants.
_____/

## VERDICT

We the jury, return the following verdict:

### LEMON LAW

1.    **Was there a defect or condition in the 2008 Hummer H2 which substantially impaired its use, value, or safety?**

YES____✓____                                    NO_____

If your answer to Question 1 is NO, your verdict on the Lemon Law claim is for Defendant and you should proceed to Question 5. If your answer to Question 1 is YES, please answer Question 2.

2.    **Did General Motors eliminate the nonconformity and conform the 2008 Hummer H2 to its warranty after reasonable number of attempts?**

YES____✓____                                    NO_____

If your answer to Question 2 is YES, your verdict on the Lemon Law claim is for Defendant and you should proceed to question 5. If your answer to Question 2 is NO, your verdict on the Lemon Law claim is for Plaintiff and you should answer question 3.

CFN 20100416625, OR BK 24171 PG 1595,RECORDED 11/02/2010 14:50:29
Sharon R. Bock,CLERK & COMPTROLLER, Palm Beach County, NUM OF PAGES 3

3.    Did Plaintiff incur any incidental charges?

YES_____                    NO_____

If your answer to Question 3 is YES, please answer question 4.  If your answer to Question 3 is No, you should proceed to Question 5.

4.    What is the amount of Plaintiff's incidental charges?

$_____

Proceed to Question 5.

*BREACH OF WRITTEN WARRANTY*

5.    Did General Motors fail to fulfill the obligations of the written New Vehicle Limited Warranty?

YES_____                    NO_____✓_____

If your answer to Question 5 is NO, your verdict on the breach of written warranty claim is for Defendant and you should not proceed further except to date and sign this verdict form and return it to the courtroom.  If your answer to Question 5 is YES, please answer Question 6.

6.    Did General Motors' failure to fulfill the warranty obligations damage Plaintiff?

YES_____                    NO_____

If your answer to Question 6 is NO, your verdict on the breach of written warranty claim is for Defendant and you should not proceed further except to date and sign this verdict form and return it to the courtroom.  If your answer to Question 6 is YES, please answer Question 7.

2

7._____What is the amount of Plaintiff's damages as a result of the breach of warranty?

$_____

Please sign and date the verdict form and return it to the courtroom.

SO SAY WE ALL, this __28__ day of October, 2010.

Foreperson

3716291

CFN 20100416825 BOOK 24171 PAGE 1597, 3 OF 3

Exhibit
- 4 -

2334

**DUAL EXHAUST INC.**
MV-43043
401 NE 6th Avenue (Federal Hwy.)
DELRAY BEACH, FLORIDA 35485
(561) 272-0644
Fax (561) 272-7522

DATE: 05/04/09

| RB - REBUILT, U - USED, RC - RECONDITIONED |
| FW - FREE UNDER WARRANTY |
| RW - REDUCED COST UNDER WARRANTY |

Scan cc computer system
Note: block learn out of spec
fuel ratio out of spec

Cause, of this problem
comes from timing chain
installed wrong

fuel & timing problem/internal
engine problem

(Note) engine should be replaced
under factory warr. no OEM parts

This charge represents costs and profits to the motor vehicle repair facility
for MISCELLANEOUS SHOP SUPPLIES OR WASTE DISPOSAL.

(s.403.7158)                    (s.403.7159)
BATTERY DISPOSAL FEE _____ TIRE DISPOSAL FEE _____

TOTAL SHOP CHARGES
EPA / WASTE DISPOSAL

Sherif Ratik Korby
15968 Laurel Oak Cir

08 Hummer H2
5GRGN 23878 H 107653

SERVICES REQUESTED/DESCRIPTION OF WORK

① Inspect for vibration/miss

② ck for vibration on acceleration

WATSEN FRANCOIS
Notary Public - State of Florida
My Commission Expires Feb 8, 2011
Commission # DD 629858
Bonded Through National Notary Assn.

FL DL# M000-793-645-459-0   DOB 12/19/1964

PLEASE READ CAREFULLY, CHECK ONE OF THE STATEMENTS
BELOW, AND SIGN: I UNDERSTAND, THAT UNDER STATE LAW,
I AM ENTITLED TO A WRITTEN ESTIMATE IF MY FINAL BILL WILL
EXCEED $100.

☐ I REQUEST A WRITTEN ESTIMATE.
☑ I DO NOT REQUEST A WRITTEN ESTIMATE AS LONG AS THE
REPAIR COSTS DO NOT EXCEED $ 180.00 . THE SHOP
MAY NOT EXCEED THIS AMOUNT WITHOUT MY WRITTEN
OR ORAL APPROVAL.
☐ I DO NOT REQUEST A WRITTEN ESTIMATE.

SIGNED _____ DATE 05/04/2009

I hereby authorize the above repair work to be done along with the necessary materials. You and your
employees may operate vehicle for purposes of testing, inspection, or delivery at my risk. It is understood
that you will not be held responsible for loss or damage to vehicle or articles left in vehicle in case of fire,
theft or any other cause beyond your control.

TOTAL LABOR

TOTAL PARTS

GAS, OIL
AND GREASE

STORAGE

TOTAL SHOP CHARGES
EPA / WASTE DISPOSAL

TAX

TOTAL  180.00

# THE PALM BEACH GARAGE
FOREIGN & DOMESTIC SERVICE
2400 S. DIXIE HIGHWAY
WEST PALM BEACH, FL 33401
TEL: (561) 833-6622 • FAX: (561) 833-6633
pbgarage@bellsouth.net

MV - 35499

NAME  Sherif Kodsy

ADDRESS  1500 (Illegible) Oaks

CITY  Delray                STATE  FL          ZIP  33484

LICENSE TAG NO.

PHONE  737-8992

**TOTAL SUBLET REPAIRS**

THIS CHARGE REPRESENTS COSTS AND PROFITS TO THE
MOTOR VEHICLE REPAIR FACILITY FOR MISCELLANEOUS
SHOP SUPPLIES AND/OR WASTE DISPOSAL.

TIME AND   3 MONTHS/3000 MILES
MILEAGE

ENVIRO
CHARGE   $ 5.00

PLEASE READ CAREFULLY, CHECK ONE
OF THE STATEMENTS BELOW AND SIGN.

☐ I REQUEST A WRITTEN ESTIMATE.

☐ I DO NOT REQUEST A WRITTEN ESTIMATE AS
LONG AS THE REPAIR COSTS DO NOT EXCEED
THE AMOUNT WITHOUT MY WRITTEN OR ORAL APPROVAL.

☐ I DO NOT REQUEST A WRITTEN ESTIMATE.

SIGNED

DATE

Page

**HAGEN RANCH TEXACO**
7450 West Boynton Beach Blvd
Boynton Beach, FL 33437-0000
Shop Phone: (561) 732-1323

Invoice
5232
Estimate Ref #5,671
Date Printed: 01/02/2009
Printed Time: 12:29 pm
MV R2915

THANK YOU FOR CHOOSING HAGEN RANCH TEXACO

Name:
RODBY, SHERIF

2008 HUMMER H2 V8 6.2L 6199CC 378CID FI GAS N 8 L92
VIN: 5GRGN23878H108652

| | | | | | |
|---|---|---|---|---|---|
| License: | | Mileage In: 9,101 | Date Written: 01/02/2009 | | |
| Home: | Work: | Unit #: | Mileage Out: 9,101 | Written By: | |
| Cell: | | DOM: | | | |

Job #1
BILLY

| Labor | Rate 1 | Work Requested - CHECK CAR&TEST DRIVE ,CAR HAS VIBRATION | 0.00 | 82.00 | 0.00 |
|---|---|---|---|---|---|

Job Total:    0.

# THANK YOU FOR YOUR CONTINUED BUSINESS!!

**WARRANTY 1 YEAR PARTS 90 DAYS LABOR.   EXCLUDING ELECTRICAL PARTS**

*NEEDS TO BRING BACK TO DEALER FOR FURTHER REPAIR &WARRANTY*

| | |
|---|---|
| Parts: | $0 |
| Labor: | $0 |
| Sublet: | $0 |
| Misc: | $0 |
| Hazmat: | $0 |
| Supplies: | $0 |
| Tax: | $0 |
| **Total:** | **$0.** |
| Less Paid: | 0. |
| Balance Due: | $0. |

**Maroone**
**CHEVROLET OF DELRAY**
*"We are a Complete Full Service*
*Parts & Service Facility"*
1111 LINTON BLVD. · DELRAY BEACH, FLORIDA 33444
PHONE: (561) 454-3900 · TOLL FREE 800-929-5213
REGISTRATION NO. MV-33283
PARTS & SERVICE HOURS:
MON-FRI 7AM-7PM · SAT: 8AM-5PM · SUN: 9AM-5PM
www.maroone.com

TOMER #: 4754077

**447738**

**INVOICE**

SHERIF KODSY
15968 LAUREL OAK CIRCLE
DELRAY BEACH, FL 33484
HOME:561-737-8998 CONT:N/A
BUS:                    CELL:

**PAGE 1**

SERVICE ADVISOR: 9228 STEVEN BRENIS

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|-------|------|-----------|-----|---------|-----------------|-----|
|  | 08 | HUMMER H2 | 5GRGN23878H107653 |  | 18540/18540 |  |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|-----------|-----------|-----------|----------|--------|------|---------|-----------|
| 06JUN08 IS |  |  | 19:00 12NOV09 |  | 0.00 | CASH | 12NOV09 |
| 06JUN08 DD |  |  |  |  |  |  |  |

| R.O. OPENED | READY | OPTIONS: DLR:26200 ENG:6.2_Liter_MPFI_OHV |
|-------------|-------|----|
| 12:58 12NOV09 | 13:01 12NOV09 |  |

| LINE | OPCODE | TECH | TYPE | HOURS |  | LIST | NET | TOTAL |
|------|--------|------|------|-------|--|------|-----|-------|

A C/S VIBRATION AT IDLE AND ON ACCLERATION-VISIBLE VIBRATION FROM
   ENGINE
   06 DID NOT ADDRESS FURTHER WITH DIAG AT THIS TIME

|  |  | 1417 | C |  |  |  | 0.00 | 0.00 |

PARTS:    0.00   LABOR:    0.00   OTHER:    0.00   TOTAL LINE A:    0.00

*************************************************
Open Sundays starting November 1st

---

PLEASE SEE THE LIMITED WARRANTY ON THE REVERSE SIDE OF THIS
REPAIR INVOICE.

SHOP SUPPLIES AND HAZARDOUS MATERIALS CHARGES: We have added
a charge equal to 12% of the cost of parts & labor up to a maximum of
$59.75. "This charge represents costs and profits to the motor repair facility
for miscellaneous shop supplies or waste disposal." (s.559.905 (I) (h))

The State of Florida requires a $1.00 fee to be collected for each new tire
sold in the state (s.403.718), and a $1.50 fee to be collected for each new
or remanufactured battery sold in the state, (s.403.7185).

X _____
CUSTOMER SIGNATURE

**ALL PARTS INSTALLED ARE NEW UNLESS OTHERWISE INDICATED**

| PAYMENT METHOD | |
|---|---|
| CASH | AMERICAN EXPRESS |
| CHECK | VISA |
| DISCOVER | MASTERCARD |
| INTERNAL | OTHER |

STATE OF FLORIDA
REGISTRATION NUMBER
#MV - 33283

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 0.00 |
| PLEASE PAY THIS AMOUNT | 0.00 |

DCAP ©2006 ADP (01-04)

**CUSTOMER COPY**

**EXHIBIT A**



RDH  Repair Document Archive

---- CUSTOMER ----

RO#: 447738
Opened: 11/12/09
Closed: 11/12/09
SWR#: 228
Type: P
HAT#:
Mileage: 8540

# 4754077
KODSY,SHERIF
15968 LAUREL OA
5GRGN23878M107653
08 H2
HUMMER

| | CP | WA | INT |
|---|---|---|---|
| Labor: | 0 | 0 | 0 |
| Parts: | 0 | 0 | 0 |
| Sublet: | 0 | 0 | 0 |
| Misc: | 0 | 0 | 0 |
| Tax: | 0 | 0 | 0 |
| TOTAL: | 0 | 0 | 0 |

| LINE | Service Request |
|---|---|
| | C/S VIBRATION AT IDLE AND ON ACCLERATION-VISIBLE VIBRATION F |
| C | Customer Pay |

(F)orward (B)ack (S)croll Detail (M)isc/Sublet/Shop Chg (E)xit:

F1-Help    Scroll    Misc/Sublet/Shop Supplies

Exhibit

— 5 —

1 of 8

## PRODUCT ALLEGATION RESOLUTION
### PRELIMINARY INSPECTION
#### STEERING, SUSPENSION, AXLE, TIRE AND WHEEL SYSTEMS

| | | | |
|---|---|---|---|
| Customer's Name: | Sherif Kodsy | Inspection Date: | 1/21/2009 |
| Vehicle Brand: | 2008 Hummer | Model: | H2 |
| File # | 71-693377188 | VIN: | 5GRGN23878H107652 |

Mileage at Inspection: **10,808**

Inspection Location: **Schumacher Buick Hummer
West Palm Bch, FL 33409**

Inspector's phone number: **954-749-3637**

Inspected By: **Jim Daugherty  EAA**

---

| Section 1 | INSPECTION SUMMARY |
|---|---|

**BRIEFLY Describe the customer's ALLEGATION below:**
Owner stated that the vehicle ride was jerky and rough. He also stated that the engine did not idle smoothly.
{

**Following the inspection, summarize the facts and observations:** *(Additional cmts may be 33409placed in section 9)*
Inspected the vehicle undercarriage and tires and wheels. Checked tires pressure for over inflation and damage to wheels or tires. None was noted. Road tested vehicle for several miles with the dealer service director. Vehicle did not appear to ride improperly for this type of chassis and tire combination. Selected another vehicle form stock with identical engine, tires, and wheel combination. Road test indicated that ride was similar to owner's vehicle. Engine idle appeared normal with only a slight quiver in the tachometer needle as the fuel injection made minor adjustment to the fuel/air mixture. Second vehicle idled similarly.
{
{
{
{
{
{
{
{
{

---

| Section 2 | INTERVIEW - INCIDENT DETAILS |
|---|---|

Obtain all of the information for this section from the Driver/Claimant

**Provide a complete description of the incident according to the DRIVER / CLAIMANT**

Interview mode:    ☐ By Telephone    X In Person    Incident Date and Time: **Not applicable**
    Interview date: **1/21/2009**
**No accident involved.**
{
{
{
{

Driver/other occupant's physical description (include name, gender, height, weight, & disabilities ):
**Sherif Kodsy 5' 8" tall, 190lbs, DOB 4/27/1964, No disabilities**
If there was a collision:
Describe extent of any injuries to the Driver: **States that rough ride increases his medical problems**
{
Describe where other occupants were seated & extent of any injuries: **N/A**
{



What was the exact location of the incident. **N/A**
Driving conditions at the time of the incident:
Confidential GM/PAR


Rev 04-19-2004



# PRODUCT ALLEGATION RESOLUTION
## PRELIMINARY INSPECTION
### STEERING, SUSPENSION, AXLE, TIRE AND WHEEL SYSTEMS

| | | | |
|---|---|---|---|
| **Customer's Name:** | **Sherif Kodsy** | **Inspection Date:** | **1/21/2009** |
| **Vehicle Brand:** | **2008 Hummer** | **Model:** | **H2** |
| **File #** | **71-693377188** | **VIN:** | **5GRGN23878H107652** |

Weather conditions & Visibility: **N/A** Approximate Temp (°F): {

Road Surface: ☐ Concrete ☐ Asphalt ☐ Gravel ☐ Crushed rock ☐ Dirt

Road Condition: ☐ Dry ☐ Wet ☐ Icy ☐ Other: {

Shoulder ☐ Curb ☐: ☐ Concrete ☐ Asphalt ☐ Gravel ☐ Crushed rock ☐ Dirt

Shoulder/Curb Condition: ☐ Dry ☐ Wet ☐ Icy ☐ Other: {

Posted Speed Limit {

Any objects in the road? (rocks, scrap metal, pothole, speed bump, etc.) **Normal asphalt pavement**

*Length of Drive Prior to Incident:*

Total Time (hrs. & mins.): **N/A** Distance (miles): {

Estimate of vehicle speed: {___ mph Source of est. {

Estimated vehicle speed at impact: {___ mph Source of est. {

(Do Not report speed information from the Vetronix data here)

**If the driver/claimant description of the vehicle operation prior to and during the incident does not include the following information, please obtain it.**

| | | | | |
|---|---|---|---|---|
| **Steering** | Normal X | Other ☐ | Describe { | |
| **Suspension** | Normal ☐ | Other X | Describe | Rough and overly firm |
| **Brakes** | Normal X | Other ☐ | Describe { | |
| **Engine** | Normal ☐ | Other X | Describe | Idles rough and tach needle drops to 0 |
| **Electrical** | Normal X | Other ☐ | Describe { | |

Were any warning lights illuminated or driver information center messages displayed? ☐ Yes   X No If "Yes", get the details and describe the event(s).

Has the vehicle behavior noted during this incident ever been noted prior to this incident? X Yes   ☐ No   If "Yes", get the details and describe the event(s). Operated this was since new

Also, determine whether there were any warning lights illuminated, messages on driver information panel, unusual noises, smoke or steam observed. **None noted**

Describe any evasive action: ☐ Turning   ☐ Braking   ☐ Accelerating   ☐ Other:
{ **N/A**

Describe cargo (in the vehicle interior, trunk and/or trailer (if any): **None noted**
Estimated total weight of cargo: {                    Estimated weight of the trailer, if any. {

If a trailer was being towed, photograph the hitch structure, both on the trailer and towing vehicle.

Did the vehicle leave the roadway? ☐ Yes   X No Describe: {
Objects impacted: {
{
{
{

| Section 3 | INTERVIEW - VEHICLE HISTORY |
|---|---|

*Source of information (name, address, phone number, & relationship), if other than claimant:*

Confidential GM/PAR

Rev 04-19-2004

3 of 8

# PRODUCT ALLEGATION RESOLUTION
## PRELIMINARY INSPECTION
### STEERING, SUSPENSION, AXLE, TIRE AND WHEEL SYSTEMS

| | | | |
|---|---|---|---|
| **Customer's Name:** | Sherif Kodsy | **Inspection Date:** | 1/21/2009 |
| **Vehicle Brand:** | 2008 Hummer | **Model:** | H2 |
| **File #** | 71-693377188 | **VIN:** | 5GRGN23878H107652 |

**Comments:**   *(Additional cmts may be placed in section 5)*
Dealer service director stated that they had recently replaced three of the vehicle tires and installed the spare as a fourth tire to try to satisfy the owner. No appreciable change was seen in the vehicle ride.

Did the owner purchase the vehicle new? X Yes   ☐ No   Date 6/11/2008 Used? ☐ Yes   ☐ No   Date_____

## VEHICLE MODIFICATIONS / ALTERATIONS
Are any vehicle modifications or alterations present, and has any after-market equipment been installed?
(e.g., objects attached to the steering wheel or instrument panel, controls for disabled persons, shock absorbers, springs, modified body, electrical components, powertrain, wheels or tires, after-market seats, etc..) Describe:
None noted

## VEHICLE REPAIR / SERVICE HISTORY
Prior electrical system service? X No   ☐ Yes   If yes, describe:

Prior collision repair? X No   ☐ Yes   If yes, describe:

Repaired by whom? (name, address, phone)

Prior chassis system service, repair, or replacement? ☐ No   X Yes   If yes, describe what was done:
3 new tires
Prior electrical system components serviced, repaired, or replaced by whom? ( name, address, phone number)

Any other pertinent vehicle history information (from interview, GM warranty or dealership history files)? X No   ☐ Yes
If yes, describe:

| Section 4 | VEHICLE INSPECTION – VISUAL/PHOTO |
|---|---|

*THE VEHICLE VISUAL INSPECTION DOCUMENTS THE PHYSICAL EVIDENCE USING PHOTOS AND WRITTEN OBSERVATIONS. RECORD YOUR OBSERVATIONS IN THE APPROPRIATE SECTION.*
*PHOTOGRAPH THE EXTERIOR OF THE VEHICLE AS FOLLOWS: VIN PLATE, QUARTER VIEWS FROM LEFT FRONT, RIGHT REAR ARE REQUIRED, AND DOCUMENT FURTHER EXTERIOR DAMAGE WITH MANY PHOTOS.*

### DESCRIBE ANY DAMAGE TO THE VEHICLE BODY:
None

**UNDERBODY / FRAME / CHASSIS AREA:** Describe any damage to the underside of the vehicle. Note the condition of the bumpers, frame, suspension, tires, wheels, brake and fuel lines & engine mount(s)/crossmember. Photograph and comment on any contact between vehicle components and the underbody. Photograph if damage is present.
None

## CORNER ASSEMBLIES
| | | |
|---|---|---|
| Struts/shocks | Ball joints | Tire/wheel assemblies |
| Springs | Steering knuckles | |
| Control arms | Axle assemblies | |

Comments: No damage noted

Rev 04-19-2004

Confidential GM/PAR

## PRODUCT ALLEGATION RESOLUTION
### PRELIMINARY INSPECTION
### STEERING, SUSPENSION, AXLE, TIRE AND WHEEL SYSTEMS

| | | | |
|---|---|---|---|
| **Customer's Name:** | **Sherif Kodsy** | **Inspection Date:** | **1/21/2009** |
| **Vehicle Brand:** | **2008 Hummer** | **Model:** | **H2** |
| **File #** | **71-693377188** | **VIN:** | **5GRGN23878H107652** |

### UNDERHOOD
    Engine compartment                  Power steering lines, hoses, clamps and connections
    Brake fluid level and condition         Power steering fluid level and condition

Comments:
None noted

### GENERAL OBSERVATIONS
    Photograph and comment on any aftermarket equipment found, vehicle modifications or items that are unusual or out of place.

Comments:
None noted

| Section 5 | VEHICLE INSPECTION - PASSENGER COMPARTMENT |
|---|---|

### INTERIOR
    Instrument panel                 Odometer
    Controls                           Steering wheel and column
    Overall view of seat position        Driver and passenger seat back angle (inclinometer measurement)
    Photo of options label-glove box/trunk   Sunvisors and headliner
    Personal items/cargo

### INTERIOR INSPECTION (Describe any damage and photograph )
None

| Section 6 | STEERING, SUSPENSION, TIRE AND WHEEL SYSTEM INSPECTION |
|---|---|

*Use the following table to identify what you did and what you found during the inspection. Identify the tests and test results for the applicable items. Describe anything relevant to the allegation that is not in normal working condition, does not function properly or is a non production part. Take appropriate photographs.*



*Confidential GM/PAR*

Rev 04-19-2004

# PRODUCT ALLEGATION RESOLUTION
## PRELIMINARY INSPECTION
### STEERING, SUSPENSION, AXLE, TIRE AND WHEEL SYSTEMS

| | | | |
|---|---|---|---|
| **Customer's Name:** | Sherif Kodsy | **Inspection Date:** | 1/21/2009 |
| **Vehicle Brand:** | 2008 Hummer | **Model:** | H2 |
| **File #** | 71-693377188 | **VIN:** | 5GRGN23878H107652 |

| ITEM | OBSERVATIONS/TEST RESULTS |
|---|---|
| Steering system-Are all components in place and connected in a normal manner? Can the steering wheel be rotated lock to lock with appropriate movement of the front wheels. Is there any binding, sticking or uneven feel? | Normal appearance and operation |
| Steering linkage-Is the linkage free from cracks, bends, fractures, etc. Are there any scrapes, abrasions, signs of contact with any of the linkage? | Normal appearance and operation |
| Gear/rack and pinion-Any sign of leakage, damage to boots on the rack, contact by foreign objects? | Normal appearance |
| Steering column, ignition switch, intermediate shaft. Does the column unlock with the ignition key "on"? Is the steering column properly fastened to the dash? | Normal operation |
| Steering pump, drive, hoses, connections, flow, pressure. If possible, start the engine and rotate the steering wheel lock to lock. Is power assist normal? If not, it may be necessary to check pressure and flow. | Belt tight – Normal operation |
| PS fluid level and condition-Color, contamination, odor | Reservoir full – fluid clear – no odor- |
| Steering knuckle-All attachments secure and proper? | Normal appearance |
| Suspension components – LF Strut attachments, springs intact; control arms properly attached, deformed, broken, scraped, etc. Sway bars properly attached. | Normal appearance |
| Strut attachments, springs intact; control arms properly attached, deformed, broken, scraped, etc.    RF | Normal appearance |
| Strut attachments, springs intact; control arms properly attached, deformed, broken, scraped, etc Rear sway bars, | Normal appearance |



## PRODUCT ALLEGATION RESOLUTION
### PRELIMINARY INSPECTION
### STEERING, SUSPENSION, AXLE, TIRE AND WHEEL SYSTEMS

| | |
|---|---|
| Customer's Name: | **Sherif Kodsy** |
| Vehicle Brand: | **2008 Hummer** |
| File # | **71-693377188** |

| | |
|---|---|
| Inspection Date: | **1/21/2009** |
| Model: | **H2** |
| VIN: | **5GRGN23878H107652** |

| | |
|---|---|
| trailing arms properly attached and undamaged.          LR | |
| Strut attachments, springs intact; control arms properly attached, deformed, broken, scraped, etc.          RR | Normal appearance |
| Rear axle assembly-deformed, signs of impact, properly located, etc. | No damage noted |
| Deformation to the frame | No damage noted |
| Describe and photograph evidence of axle/ suspension/ tire contact with frame, body or components | None noted |
| Describe and photograph contact of the under- carriage with the road surface (road, shoulder, curb, or grass) | None noted |
| Stability Enhancement system/components-check for codes with Tech II | None stored |
| Engine (normal, other)-Obtain codes using a Tech II. | Normal operation — no codes stored |
| Electrical (normal, other) | Normal operation |
| Warning lights/messages displayed? Describe and obtain codes using a Tech II | None |
| Anything components missing? | None noted |
| Other | { |

If the vehicle is driveable, conduct a road test to evaluate the concern expressed by the customer.  Describe the results of the road test.  If the concern is observed during the road test, it would be desirable to get a Tech II "snapshot".
See previous comments

If the vehicle is equipped with an ABS/Traction Control/Stability Enhancement System, use a Tech II to obtain any codes stored as current and/or history.  Document via photos and include the code description.  Follow the procedures in the service manual to determine the cause of each stored code which relates to the allegation.  State which procedures were followed, record results of each test and state the root cause of each code.  Consult with the CRM or Team Manager of the PAR group if this process leads to a disassembly of components.  Follow the procedure in the General Guidelines for parts that need to be assembled for evaluation.

Inspect the system wiring, connections and components for damage.  Note if the damage was the result of the incident.

### TIRE AND WHEEL INSPECTION



Confidential GM/PAR

Rev 04-19-2004

## PRODUCT ALLEGATION RESOLUTION
### PRELIMINARY INSPECTION
### STEERING, SUSPENSION, AXLE, TIRE AND WHEEL SYSTEMS

| | | |
|---|---|---|
| **Customer's Name:** Sherif Kodsy | **Inspection Date:** | 1/21/2009 |
| **Vehicle Brand:** 2008 Hummer | **Model:** | H2 |
| **File #** 71-693377188 | **VIN:** | 5GRGN23878H107652 |

## 1. IDENTIFICATION:

| | TIRE BRAND (Goodyear) | TIRE TYPE (Eagle GA) | TIRE SIZE (P205/70R15) | PRESSURE (psi) | AVE. TREAD DEPTH 32nds of inch | DOT Numbers |
|---|---|---|---|---|---|---|
| LF | B F Goodrich | All Terrian | 315/70 R17 | 44 | 17 | — |
| RF | " | " | " | 44 | 17 | — |
| LR | " | " | — | 44 | 17 | — |
| RR | " | —" | " | 44 | 16 | — |

Note: DOT numbers may be found on the inside of each tire adjacent to the rim.

Describe and photograph any damage to tires and wheels, such as scrapes, marks due to impact, cuts, tread separation, flat spots, bead separation, embedded grass/dirt, etc. Photographs should include inner and outer views of the damaged tire/wheel assemblies with chalk marks on each assembly to denote position on vehicle (RF, LF, RR and LR).

LF
__None__

RF
__None__

LR
__None__

RR
__None__

## 2. TIRE PLACARD DATA:
Record the following data: (located on driver's door edge or inside the decklid)

| | SIZE | PRESSURE (psi) | PRESSURE AT MAXIMUM LOAD(psi) |
|---|---|---|---|
| TIRES | 315/70 R 17 | 45 | — |
| SPARE TIRE | Not recorded | — | — |

| Section 7 | SITE INSPECTION |
|---|---|

### SITE INSPECTION - PERFORM THE FOLLOWING IF ADDITIONAL INFORMATION MAY BE FOUND:
➤ Check the incident scene for tire marks, gouges in the pavement, debris, or any other marks. Measure location and photograph.

 

Confidential GM/PAR



Rev 04-19-2004

8 of 8

## PRODUCT ALLEGATION RESOLUTION
### PRELIMINARY INSPECTION
### STEERING, SUSPENSION, AXLE, TIRE AND WHEEL SYSTEMS

| | | | |
|---|---|---|---|
| **Customer's Name:** | Sherif Kodsy | **Inspection Date:** | 1/21/2009 |
| **Vehicle Brand:** | 2008 Hummer | **Model:** | H2 |
| **File #** | 71-693377188 | **VIN:** | 5GRGN23878H107652 |

Identify evidence of whether the vehicle left the road prior to, during, or after the incident. Document all locations, distances, stationary objects (guard rails, telephone poles, fences, buildings, etc), nearest posted speed limit signs in the direction of travel, etc...

➤ Identify evidence & photograph any object struck by the vehicle on or off the road prior to, during or after incident.

➤ Inspect roadway & shoulder surfaces in the area of the incident site for telltale signs of loss of control, excessive speed, severe braking, etc.

**Photograph the scene and property if involved.**

**Comments:**
[
[
[
[
[

| Section 8 | COMMENT OVERFLOW |
|---|---|

**Please use this page if needed for additional comments from the inspection form.  Please note the section and area the comments are continued from prior to each comment.**

[
[
[
[
[

| Section 9 | OTHER REPORT INFORMATION |
|---|---|

☐ **Check here if there was evidence of a "Fire-Related" event.**
According to NHTSA, "fire" means combustion or burning of material in or from a vehicle as evidenced by flame. The term also includes, but is not limited to, thermal events and fire-related phenomena such as smoke, sparks or smoldering, but does not include events and phenomena associated with a normally functioning vehicle, such as combustion of fuel within an engine or exhaust from an engine.

**Attachments: (Check all that apply)**
X **Photographs**       X **Data Downloads**       ☐ **Other Records**


Confidential GM/PAR

Rev 04-19-2004

Exhibit

- 6-

1        liter.

2             MR. TUCK:  Any other questions?

3             MR. LOPEZ:  No more questions.

4             MR. TUCK:  Do you have any questions of

5        this witness?

6             MR. KODSY:  Just one to confirm what

7        Joe what has said.  You did isolate the

8        starter as per Bob Martin and the fly wheel

9        bolts and restart the engine to isolate

10       vibration, still has vibration with fly

11       wheel disconnected?

12            MR. BARDILL:  Correct.

13            MR. KODSY:  Okay.  I just wanted to

14       confirm that.

15            MR. WOLFER:  Can I just ask one

16       question?  The repair order dated December

17       23rd, it says, "Vehicle exhibits some rail

18       snake characteristics."  What is that?

19            MR. BARDILL:  Rail shake.

20            MR. WOLFER:  I'm sorry, rail shake.

21            MR. BARDILL:  Rail shake is terminology

22       that we use for the pick-up trucks and just

23       about any of the SUV's, about 45 miles an

24       hour down typical roads like Federal

25       Highway, you get a little bit of vibration

1        MR. FERNANDEZ: Sure. I participated

2   in the drive. I heard the sound of the

3   engine quite louder.. I heard the squeaking

4   brakes intermittent, but more often than

5   not. I don't know if my fellow Board

6   members heard this, but at the end of the

7   drive I was with Mr. Kodsy and we heard

8   momentarily exactly from the rear end,

9   knock, knock, knock, and then it stopped.

10       I believe, like Mr. Thornton said, it

11  is a beast, a beautiful beast, but it is a

12  beast nevertheless.

13       MS. SIMMONS: Mr. Fernandez, where were

14  you seated?

15       MR. FERNANDEZ: I was seated in the

16  right rear passenger.

17       MS. SIMMONS: Okay.

18       MR. WOLFER: I drove the vehicle.

19  Before driving the vehicle, I walked around

20  and I inspected all the tires. I really

21  expected to see hot marks or bounce marks or

22  flat spots on the tires because the consumer

23  really complained that the vehicle hopped

24  all along. I observed all four tires and

25  the one tire that was not replaced looked

Exhibit

- 7 -

Dr. Zipper
testimony

Kodsy v. GM – Vol. 3

19    It doesn't say what's covered about defects
20    or --
21         THE COURT:  Fine, but you can put that in
22    if you want to.  In other words, if it's
23    accurate, where it comes from doesn't matter.
24    So, take a look at it and see if it's accurate.
25    If you think it's incomplete, then you can

0280
1     introduce the whole thing if you want to.  You
2     know, where it's printed out doesn't really
3     matter.  The question is --
4          MR. KODSY:  Oh, it has his version of it,
5     too.
6          MR. KLEIN:  Okay.  That's fine.
7          THE COURT:  So, in other words, he just
8     wants to emphasize those parts.  I think that's
9     okay.
10         MR. KLEIN:  That's fine, your Honor.
11         THE COURT:  So, I'll overrule your
12    objection.
13         (Plaintiff's Exhibit No. 4 was admitted
14    into evidence.)
15         THE COURT:  Okay.  Please be back at 20
16    after, okay, ready to go with your next
17    witness.  Thank you.
18         THE BAILIFF:  Court's in recess.
19         (A recess was held at 11:13 a.m. until
20    11:21 a.m.)
21         THE COURT:  All right.  Let's go get the
22    jury and get going.
23         THE BAILIFF:  Jury entering.
24         (The jury entered the room at 11:22 a.m.)
25         THE COURT:  Please have a seat.  Who would

0281
1     you like to call as your next witness?
2          MR. KODSY:  Dr. Jeffrey Zipper.
3          THE COURT:  Doctor, why don't you come up,
4     be sworn in and have a seat.
5     THEREUPON,
6               DR. JEFFREY ZIPPER,
7     called as a witness by the Plaintiff, having been
8     first duly sworn by the Clerk, in answer to
9     questions propounded, was examined and testified as
10    follows:
11         THE WITNESS:  Yes, I do.
12              DIRECT EXAMINATION
13    BY MR. KODSY:
14    Q    Dr. Zipper, thank you for coming.
15    A    You're welcome.
16    Q    Can you tell us what your specialty is?
17    A    Yes, I'm a physician.  I specialize in,
18    and I'm board certified, in physical medicine and
19    rehabilitation as well as interventional pain
20    management.
21    Q    And how many years have you been doing
22    that?
23    A    I've been practicing for 20 years.
24    Q    Twenty years.
25         Is it true that I was your patient?

0282
1     A    Yes.
2     Q    And when was the first time that I paid
3     you a visit?

Page 20

Kodsy v. GM - Vol. 3

4      A    I first saw you on October 7th, 2008.
5      Q    Okay.  Do you know -- well, what -- can
6  you tell us a little about the chief complaint
7  and ...
8      A    Certainly.  You were referred to me by --
9  from a Dr. Carl Sabotya, a local neurologist.  You
10  had presented to me with complaints -- chief
11  complaint of low back pain after having been
12  involved in a motor vehicle accident on July 1st,
13  2008.
14      Q    And was there any other complaints that
15  you addressed as well?
16      A    Well, at that time that was the primary
17  complaint.
18      Q    Right.
19      A    And in the history, when I took more of a
20  detailed history, you were also experiencing pain in
21  the sacral iliac region bilaterally, which is the
22  upper buttock region, pain into the left groin into
23  your left foot.  You told me your pain was
24  aggravated by sitting, standing, bending, carrying
25  and lifting and relieved somewhat by use of some

0283
1  pain medication that you were taking.
2      Q    Okay.  And was there new injuries as well
3  that developed during that time?
4      A    Well, I had seen you on October 7th, 2008.
5  At that time my initial diagnosis was that of a
6  lumbar sprain/strain injury and a sprain/strain of
7  the sacrum as well.
8      I -- I did understand at the time that you
9  had had an MRI of the lumbar spine as well as some
10  electrodiagnostic testing, including EMG and nerve
11  conduction studies, and I wanted to review those
12  before I expanded the diagnosis.
13      At that time I started you on -- I
14  increased your pain medicine and started you on a
15  muscle relaxant as well.  I saw you -- I also
16  referred you for physical therapy.
17      I continued to see you.  I saw you on
18  November 4th, 2008, and overall at that time your
19  symptoms had been unchanged, but I had an
20  opportunity to review some of the previous imaging
21  scans.  At that point you were noted to have a broad
22  based central disc herniation at the L3-4 level, as
23  well as some findings on electrodiagnostic testings
24  consistent with a left L-5 neuropathy.
25      We continued to see each other.

0284
1      Eventually you came to me with some complaints of
2  pain in your knee.  On 4/7/09 we did a workup.  We
3  found that you had a partial tear of the medial
4  collateral ligament and medial meniscus.
5      Eventually we saw that you started to
6  complain of some increase in pain as noted on my
7  visit on February 1st, 2010, that you were
8  complaining of exacerbation of your pain in the neck
9  and lumbar region as a result of vibration that was
10  occurring in your vehicle.
11      Q    Can you tell us if the vibration or
12  exposure -- prolonged exposure to vibration hopping
13  and bouncing on the road in a stiff, aggressive
14  vehicle, would that cause these type of injuries?

Page 21

Page 23

```
 1   the vehicle?
 2      A   I do not.
 3      Q   Do you know whether it's more or less than
 4   any other vehicle might be?
 5      A   I do not.
 6      Q   So as you're sitting here, your opinions
 7   that Mr. Kodsy may have had his injuries exacerbated
 8   by vibration of the vehicle, that's based on
 9   speculation from what Mr. Kodsy's telling you
10   based on what he's told me.
```

0289

```
25      Q   Do you know what level of vibration is in
         No.
24
23   vehicle?
22      Q   And have you actually observed Mr. Kodsy's
21   even if you're walking.
20   lumbar spine than there is in an upright position or
19   position there is greater pressure actually on the
18      A   It could, possible, because in a seated
17   a person's back pain based on your diagnoses?
16      Q   would driving any motor vehicle exacerbate
15      A   Correct.
14   of back pain?
13      Q   And at that time Mr. Kodsy was complaining
12      A   Correct.
11   purchased in August of 2005, would that be right?
10      Q   And that's obviously not the vehicle the
 9      A   Correct.
 8   motor vehicle accident in July of 2007?
 7      Q   And that was because he had been in a
 6      A   Correct.
 5   2008, is that correct?
 4      Q   You first saw Mr. Kodsy in October of
 3      A   Good morning.
 2      Q   Good morning, Dr. Zipper.
 1   BY MR. KLEIN:
```

0288

```
25   CROSS-EXAMINATION
24              THE WITNESS:  Okay.
23   you a few questions.
22              THE COURT:  we'll let the other side ask
21              THE WITNESS:  Certainly.
20              MR. KODSY:  Thank you, Doctor.
19              THE COURT:  Okay.  Thanks.
18              MR. KODSY:  That's all I have.
17   musculoskeletal injury.
16   not know that vibration can lead to a
15      A   Most the general population probably would
14      Q   You wouldn't know?
     BY MR. KODSY:
13   your injury, and that would be unlikely.
12   whether this vibration could be exacerbating
11   question is whether or not you would have known
10              THE WITNESS:  Actually I believe your
 9              THE COURT:  Overruled.
 8   speculation.
 7              MR. KLEIN:  Objection; calls for
 6   able to correlate those injuries to a vibration?
 5   prior knowledge or warning, would a normal person be
 4   and is experiencing these vibrations, so without
 3   However, for a normal person who doesn't know this
 2   that vibration can cause and would cause an injury.
```

0287

Exhibit

-8-

# Carl Salvati, M.D., F.A.C.P., F.A.A.N.

Board Certified in Neurology

13455 Military Trail, Suite A
Delray Beach, Florida 33484
Telephone: 561-495-4644
Fax: 561-495-5191

## COMPREHENSIVE NEUROLOGICAL EVALUATION

**PATIENT:**     SHERIF KODSY

**DATE:**     09/25/2008

On 09/25/2008, I evaluated Mr. Sherif Kodsy, a 44-year-old right-handed man, who was involved in a motor vehicle accident on 07/01/08. During the incident, he was the seat-belted driver of a Hummer H2 that was broad-sided on the passenger side. It flipped the Hummer over onto its driver's side. He was jarred inside. He has no recollection of head trauma. He was taken to a nearby emergency room in Michigan where he was visiting his mother. He came under the neurology care of Dr. Siddiqui. He had various tests done, including an MRI of his back and an EMG nerve conduction study, the reports of which are not available.

His main complaints are the following:

1. He gets numbness of his left foot. He had some left leg numbness which improved.
2. He has pain in the left groin area. At times this can be severe.
3. He has low back pain which at times can be severe.
4. He has some neck pain.
5. He gets headaches intermittently since the accident.
6. He had a syncopal episode this past weekend which came on suddenly. There was no seizure stigmata associated with it. He has had no further syncopal episodes.

His neurologic review is otherwise unremarkable.

**REVIEW OF SYSTEMS:**
The patient denies memory changes, headache, blurred vision, incontinence, change in smell, diplopia, dizziness and vertigo, ataxia or epilepsy, lacrimation, otalgia, tinnitus, dysphagia, otorrhea, chest pain, leg swelling, palpitations, murmurs, shortness of breath, difficulty breathing, dyspnea on exertion, wheezing, fevers, diarrhea, constipation, blood in stool, dyspepsia, GERD, nausea, weight loss or gain, dysuria, hematuria, malodorous urine, impotence, discharge, itching, rash, ulceration, diabetes, thyroid disorder, excessive hunger or thirst, hot or cold intolerance, bleeding disorders, anemia, lymphoma, leukemia, leg edema, lymph node swelling, immunologic symptoms, depression, anxiety.

CARL A. SALVATI, M.D., P.A.

SHERIF KODSY
09/25/2008
Page 2 of 3

**PAST MEDICAL HISTORY:** He had left biceps surgery and left shoulder arthroscopic surgery in 1996. He had a motor vehicle accident in 2004 with a fractured right toe. Four years ago, he had a laceration to the right inner part of his distal leg. He has no history of cancer, diabetes, hypertension, hypercholesterolemia, MI, stroke, gout, glaucoma, ulcers, asthma, thyroid disease or osteoporosis.

**ALLERGIES:** He has no known medication allergies.

**MEDICATIONS:** His only medicine is p.r.n. Percocet.

**SOCIAL HISTORY:** He is a contractor, single. He doesn't drink. He smokes 1-1/2 packs of cigarettes a day. He is trying to quit. He is totally aware of the long-term consequences.

**FAMILY HISTORY:** His mother is 65 and doing well. She is working. His father died at 45 from a stroke.

**PHYSICAL EXAMINATION:** On physical examination, his blood pressure is 132/84. Heart rate is 78 and regular. Respirations are 14. Head is atraumatic. ENT exam is unremarkable. Lungs are clear. Abdomen is soft, nontender. Extremities are unremarkable. No clubbing or cyanosis is present. Cervical and thoracolumbar spine exams are unremarkable. Straight leg raising was negative. No carotid bruits are heard. This is a 44-year-old man who appears somewhat anxious but is in no acute distress.

**NEUROLOGICAL EXAMINATION:**
**MENTAL STATUS:** This patient is awake, alert, cooperative and responds appropriately to all questions asked. Language and speech are unremarkable.
**CRANIAL NERVES:** Cranial nerves II-XII were tested and found to be intact. Fundi are benign. Fields are full. Extraocular movements are intact. His face moves symmetrically. Pupils react equally and briskly to light. No nystagmus was present. Lower cranial nerve function is normal. The remainder of the cranial nerve exam is unremarkable.
**MOTOR EXAMINATION:** There is 5/5 strength throughout, proximally and distally. No muscle wasting or weakness is noted.
**SENSORY EXAMINATION:** Primary sensory modalities appear normal.
**DEEP TENDON REFLEXES:** Reflexes are +2 and symmetric. No Babinski signs are present. No myelopathic signs are present.
**CEREBELLAR:** There is no evidence of ataxia.
**STATION AND GAIT:** Both station and gait appear normal.

**IMPRESSION:**

1. Lumbar pain – probable sprain. Rule out lumbar disc herniation with radiculopathy.
2. Cervical pain – probable sprain injury.
3. Syncopal episode – Further evaluation is in order.

SHERIF KODSY
09/25/2008
Page 3 of 3

**PLAN**:

1. Regarding the left groin pain, a CT of the pelvis will be done to exclude any fracture.
2. Reports of the MRI of the lumbar spine and EMG, as well as Dr. Siddiqui's consult reports, etc., will be requested.
3. A pain evaluation will also be obtained.
4. An MRI of the brain and an EEG will be done regarding his syncopal episode and his headaches.
5. A cardiology evaluation is also advised as soon as possible.
6. He was told, understands and agrees not to drive a motor vehicle.
7. I will see him back in three weeks. He will call as needed if there is any change, should he have any questions or if I can be of further assistance at any point prior to his follow-up here.

Various questions were asked and answered.

Carl A. Salvati, M.D., F.A.C.P.
CAS/ll

(Dictated but not proofread)

# Carl Salvati, M.D., F.A.C.P., F.A.A.N.

Board Certified in Neurology

13455 Military Trail, Suite A
Delray Beach, Florida 33484
Telephone: 561-495-4644
Fax: 561-495-5191

**PATIENT:**          **SHERIF KODSKY**

**FOLLOW-UP VISIT:**          **11/07/2008**

The patient returns for follow-up. He is seeing Dr. Zipper. His CPK is elevated at 314. He has sinusitis seen on the MRI of the brain. There are no further syncopal episodes.

**NEUROLOGIC EXAMINATION:** His neurologic exam is nonfocal and unchanged. Reflexes are symmetric. He ambulates well. He continues to have right-sided cervical pain.

**IMPRESSION:**

1. Status post one episode of syncope.
2. Sinusitis.
3. Increased CPK.
4. Right-sided neck pain.
5. Lumbar HNP at L3-4 = see MRI scan.

**PLAN:**

1. He will follow up from a pain standpoint with Dr. Zipper.
2. An ENT evaluation regarding his sinusitis is advised.
3. A repeat CPK and a sed rate will be obtained.
4. A cardiology evaluation is strongly advised. A name and phone number was given.
5. I will see him in two weeks. He will call as needed if there is any change, should he have any questions or if I can be of further assistance prior to his follow-up here.
6. He must follow up with his internist regarding his lymphadenopathy seen in the inguinal area on the CT of the pelvis.
7. Copies of all reports were given to him to take to other treating physicians.

Various questions were asked and answered. The patient is in agreement with the present plan.

Carl A. Salvati, M.D., F.A.C.P.
CAS/ll

(Dictated but not proofread)

CARL A. SALVATI, M.D., P.A.

# Carl Salvati, M.D., F.A.C.P., F.A.A.N.

Board Certified in Neurology

13455 Military Trail, Suite A
Delray Beach, Florida 33484
Telephone: 561-495-4644
Fax: 561-495-5191

**PATIENT:**　　　　　**SHERIF KODSY**

**FOLLOW-UP VISIT:**　　　**11/26/2008**

The patient returns for follow-up. His main complaint is that of neck and low back pain. At times, he gets pain in the left inguinal area. He had an injury from a prior accident but this was back in 1996 and he was doing well since then.

**NEUROLOGIC EXAMINATION:** His neurologic exam is nonfocal and unchanged. He ambulates well. Reflexes are symmetric and unchanged.

**IMPRESSION:**

1. Cervical HNPs by MRI scan.
2. Lumbar HNP by MRI scan.
3. Inguinal adenopathy on pelvic CT – see report.
4. Significant sinusitis on MRI of the brain – see report.
5. Increased CPK which needs follow-up.

**PLAN:**

1. He will have a spine evaluation with Dr. Dorcil and an ENT evaluation with Dr. Light.
2. He must go to an internist to have an evaluation regarding his inguinal adenopathy as to why he has it. I made this clear to the patient that this needs to be evaluated.
3. We will repeat a CPK, aldolase and sed rate.
4. He will keep his follow-up with Dr. Zipper from a pain standpoint.
5. I will see him in four weeks. He will call as needed if there is any change, should he have any questions or if I can be of further assistance prior to his follow-up here.

Various questions were asked and answered.

Carl A. Salvati, M.D., F.A.C.P.
CAS/ll

(Dictated but not proofread)

CARL A. SALVATI, M.D., P.A.

# Carl Salvati, M.D., F.A.C.P., F.A.A.N.

Board Certified in Neurology

13455 Military Trail, Suite A
Delray Beach, Florida 33484
Telephone: 561-495-4644
Fax: 561-495-5191

**PATIENT:**          **SHERIF KODSY**

**FOLLOW-UP VISIT:**          **01/29/2009**

The patient returns for follow-up. He saw an orthopedist, Dr. Neustin, regarding his cervical and low back complaints. I had referred him to Dr. Dorcil, a spine specialist. He saw an ENT specialist regarding his sinusitis who he was not very pleased with. He then went to an allergist, Dr. Simone, who gave him a Z-Pak and nose drops regarding the sinusitis. He saw his internist, Dr. Nelson Lopez, regarding his enlarged inguinal lymph node. He never repeated the CPK and sed rate as I had previously requested. The last one was October.

**NEUROLOGIC EXAMINATION:** His neurologic exam is nonfocal and unchanged. He ambulates quite nicely. Reflexes remain symmetric and unchanged.

**IMPRESSION:**

1. Cervical and lumbar HNPs by MRI scan.
2. Increased CPK – This needs a follow-up.

**PLAN:**

1. I will request again a sed rate, CPK and aldolase level. I gave him information on Cover Florida insurance that is available.
2. He understands he must follow up with his orthopedist regarding his cervical and lumbar complaints, his allergist and his internist.
3. He requested I fill out a form to not work. I told him he is able to sit or stand but cannot lift.
4. I will see him in three weeks. He will call as needed if there is any change, should he have any questions or if I can be of further assistance prior to his follow-up here.

Various questions were asked and answered.

Carl A. Salvati, M.D., F.A.C.P.
CAS/lt

(Dictated but not proofread)

CARL A. SALVATI, M.D., P.A.

**elray Diagnostics**
01 N W 1st Ave
elray Beach, FL 33444

To : CARL SALVATI, M.D.
13455 MILITARY TRAIL  SUITE A
DELRAY BEACH, FL  33484
Fax: 561-495-5191

ione: 561-272-4770
ix: 561-272-0811

me:  SHERIF KODSY
RN #: DD002378
am Start: 11/12/08  8:38 pm

Phone:  561-737-8998
DOB:  04/27/1964
Gender:  Male

**Exam:**          MRI of the Cervical Spine
**CPT Code(s):**      72141 - MAGNETIC RESONANCE (EG, PROTON) IMAGING, SPINAL CANAL AND
                 CONTENTS, CERVICAL; WITHOUT CONTRAST MATERIAL
**Laterality:**
**Clinical:**       **723.4** NECK PAIN, RADICULOPATHY S/P MVA

**INDICATIONS:**  This patient has neck pain and upper extremity radiculopathy.

**PROCEDURE:**  A coronal scout series was followed by T1, proton density and T2 weighted imaging sequences
in sagittal and axial planes.

**FINDINGS:**

All vertebral bodies are well maintained in vertical height and have normal signal characteristics.  No evidence of
fracture or marrow replacement disease.  The soft tissues adjacent to the cervical vertebral bodies are normal.  No
evidence of anterior/paraspinal mass and no paravertebral abnormal process.  There are no hemorrhages and no
fluid collections.

The spinal canal is normal in appearance with ample subarachnoid fluid surrounding the spinal cord.

Each foramen is widely patent with normal nerve roots traversing the foramen.  The lateral recesses are clear at
each cervical level.

At C2-C3, there is a normal disc and a normal vertebral segment.  No evidence of cord compression or
compression/displacement of the exiting nerve root.

At C3-C4, there is a right central disc herniation and right foramen stenosis.

At C4-C5, the thecal sac and nerve root are widely patent.  No evidence of cord compression or
compression/displacement of the exiting nerve root at this level.

At C5-C6, there is a focal midline disc herniation.  There is impression on the dural sac but no cord compression or
foramen stenosis.

At C6-C7, there is a left central disc herniation and left foramen stenosis.

At C7-T1, the thecal sac and foramen are widely patent and there is no evidence of cord compression or
displacement of the exiting nerve root.

All other aspects of this study are normal.

# Delray Diagnostics
101 N W 1st Ave
Delray Beach, FL 33444

Phone: 561-272-4770
Fax: 561-272-0811

To : CARL SALVATI, M.D.
13455 MILITARY TRAIL SUITE A
DELRAY BEACH, FL 33484
Fax: 561-495-5191

Name: SHERIF KODSY
MRN #: DD002378
Exam Start: 10/31/08 11:54 am

Phone: 561-737-8998
DOB: 04/27/1964
Gender: Male

**Exam:**    MRI of the Brain With and Without Contrast

**CPT Code(s):**    70553 - MAGNETIC RESONANCE (EG, PROTON) IMAGING, BRAIN (INCLUDING BRAIN STEM); WITHOUT CONTRAST MATERIAL, FOLLOWED BY CONTRAST MATERIAL(S) AND FURTHER SEQUENC

**Laterality:**

**Clinical:**    HEADACHES

**PROCEDURE:**    This study consists of a variety of pulse sequences acquired in multiple imaging planes which include the entire brain and upper cervical spine. Axial and coronal images were obtained both before and after intravenous contrast administration.

**FINDINGS:**    Exam of the brain demonstrates a normal size and configuration of the ventricular system with no evidence of intracranial mass effect or hydrocephalus. Subarachnoid cisterns and cortical sulci are normal in size as well.

The brain parenchyma is entirely normal in appearance with no evidence of mass effect or alteration of signal intensity. The brain stem and cerebellum appear normal as well. Following intravenous contrast infusion, there are no abnormal areas of contrast enhancement within the brain.

Normal flow voids are demonstrated within the intracranial, vertebrobasilar, and carotid circulations.

Exam of the mastoids is normal. There is evidence of mucosal thickening and fluid levels of the paranasal sinuses. The orbits and optic nerves are well visualized and are normal in appearance. The pituitary is also normal in size and configuration. Both internal auditory canals have a normal symmetric appearance.

**CONCLUSION:**    Sinusitis.

Otherwise normal MR examination of the brain with and without contrast enhancement.

Interpreting Radiologist

Printed: 11/4/2008 12:06 pm              KODSY, SHERIF  (Exam 95703)                    Page 2 of 3

Exhibit
- A -

**CUSTOMER #: 105741**

540280

**CORAL CADILLAC**
*The Dealer In It*

**INVOICE**

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 3306
BROWARD: 428-1800   TOLL FREE: 930-2672

**RIF RAPIK KODSY**
**9393 LAUREL GREEN DRIVE**
**BOYNTON BEACH, FL 33437**
**HOME:561-758-9858 CONT:N/A**
**BUS:           CELL:**

**PAGE 1**

NOBODY OUT
CADILLACS
CORAL CADILLAC

GM
Parts

**SERVICE ADVISOR: 207 MICHAEL STANWYCK**

| COLOR | YEAR | MAKE/MODEL | | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|------------|--|-----|---------|----------------|-----|
| BLUE | 08 | HUMMER H2 | | 5GRGN23878H107653 | | 5224/5228 | T3816 |

| DEL DATE | PROD DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|----------|-----------|------------|----------|--------|------|---------|-----------|
| 19AUG08 DD | 11JUN2012 | 17:00 22OCT08 | | | | CASH | 23OCT08 |

| R.O. OPENED | READY | OPTIONS: | STK: P08372 DLR:21038 1)DD CHECKED |
|-------------|-------|----------|-----|
| 16:19 20OCT08 | 16:06 23OCT08 | | |

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|------|--------|------|------|-------|--|------|-----|-------|

A CUSTOMER STATES ENGINE WON'T STAY RUNNING
CAUSE: MAS AIR FLOW SENSOR SHORTED OUT SET PO172 P0175 RICK CODES
  J5670 MASS AIRFLOW SENSOR REPLACEMENT
           47   WH2                                        (N/C)
    1 15904068 SENSOR AS                                   (N/C)
    FC: 6G
    PARTS: 15904068
    COUNT: 1
    CLAIM TYPE:
    AUTH CODE:   E
      OJ
    J6354 POWERTRAIN CONTROL MODULE ENGINE
      REPROGRAMMING WITH SPS
           47   WH2
    FC: 93 PART#: COUNT: 0                                 (N/C)
    CLAIM TYPE:
    AUTH CODE:   E
      MA

PARTS:    0.00   LABOR:    0.00   OTHER:    0.00   TOTAL LINE A    0.00

5228 MAS AIR FLOW SENSOR SHORTED OUT SET PO172 P0175 RICK CODES
REPLACED MAS AIR FLOW SENSOR AND CLEARED AND REPROGRAMMED ECM WITH
UPDATED WCC 1114D FOR ECM R/R SPARK PLUGS AND CLEAN FROM MAS AIR FLOW
FAULED OKOLH FOR PROGRAM AND R/R SPARK PLUGS 1.1 OK 18618318 OK #18

B 08080 SERVICE UPDATE INVENTORY ONLY - TRANS CONTROL MODULE REPGM
CAUSE: TCM UPDTAED PROGRAM WCC 18P45
   V1741 Reprogram Transmission Control Module (TCM)
           47   WH2                                        (N/C)
    FC: 93 PART#: COUNT: 0
    CLAIM TYPE:
    AUTH CODE:

**DISCLAIMER OF WARRANTIES:**
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY FOR THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY INSPECTION."
CUSTOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE COPY HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X _____
  CUSTOMER SIGNATURE

**PLAINTIFF'S EXHIBIT**


**CUSTOMER COPY**

**CUSTOMER #: 105741**

540280

**CORAL CADILLAC**
*The Dealer In It*

**INVOICE**

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 3306
BROWARD: 426-1800  TOLL FREE: 930-2872

RIF RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME: 561-758-9858 CONT: N/A
BUS:               CELL:

**PAGE 2**

NOBODY OUT
CADILLACS
*CORAL CADILLAC*

GM
Parts

**SERVICE ADVISOR:** 207 MICHAEL STANWYCK

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|---|---|---|---|---|---|---|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 5224/5228 | T3816 |

| DEL DATE | PROD. DATE | WARR. EXP | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 19AUG08 DD | | 11JUN2012 17:00 22OCT08 | | | | CASH | 23OCT08 |

| R.O. OPENED | READY | OPTIONS: STK: P08372 DLR: 21038 1) DD CHECKED |
|---|---|---|
| 16:19 20OCT08 | 16:06 23OCT08 | |

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|
| MA | | | |

PARTS:     0.00  LABOR:     0.00  OTHER:     0.00   TOTAL LINE B:     0.00

5228 TCM UPDTAED PROGRAM WCC 18F45 REPROGRAMMED TCM AND CLEARED ALL
CODES

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

C COURTESY SERVICE WASH
   ISW COURTESY SERVICE WASH
      837   ISH                                              (N/C)
PARTS:     0.00  LABOR:     0.00  OTHER:     0.00   TOTAL LINE C:     0.00

5224 ISW DONE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

D\*\* CUSTOMER STATES CD PLAYER INOP
CAUSE: RADIO SHORTED OUT WON,T PLAY ANY CDS
   R0760 RADIO, REMOVE AND REPLACE
      47   WH2                                               (N/C)
      1 EX RADIO                                             (N/C)
      FC: 80C00
      PART#:
      COUNT: 0
      CLAIM TYPE:
      AUTH CODE:
      OJ

PARTS:     0.00  LABOR:     0.00  OTHER:     0.00   TOTAL LINE D:     0.00

5228 RADIO SHORTED OUT WON,T PLAY ANY CDS REPLACED RADIO AND
PROGRAMMED WCC 80C00 AND SET AS NEEDED
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

E\*\* CUSTOMER STATES EXCESSIVE RUST UNDER FRONT OF VEHICLE

**DISCLAIMER OF WARRANTIES:**
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY CTION."
STOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE PY HEREOF.

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X _____
   CUSTOMER SIGNATURE

CUSTOMER COPY                    2

CUSTOMER #: 105741

540280

INVOICE

PAGE 3

**CORAL CADILLAC**
*The Dealer Is In*
5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 330[illegible]
BROWARD: 426-1800 TOLL FREE: 930-2672

NOBODY OUT CADILLACS
*CORAL CADILLAC*

GM Parts

[illegible]ERIF RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME:561-758-9858 CONT:N/A
BUS: CELL:

SERVICE ADVISOR: 207 MICHAEL STANWYCK

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|---|---|---|---|---|---|---|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 5224/5228 | T3816 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 19AUG08 DD | | 11JUN2012 | 17:00 22OCT08 | | | CASH | 23OCT08 |

| R.O. OPENED | READY | OPTIONS: |
|---|---|---|
| 16:19 20OCT08 | 16:06 23OCT08 | STK:P08372 DLR:21038 1)DD CHECKED |

```
LINE OPCODE TECH TYPE HOURS                          LIST      NET      TOTAL
CAUSE: R/R BOTH FRONT AXLE AND TIE ROD ENDS RUSTING
    E8040 TIE ROD, INNER RIGHT REPLACE  R+R (10) 10/23
             47  WH2                                                    (N/C)
       1 12345327 PAINT                                                 (N/C)
          FC: 5W PART#: COUNT: 0
          CLAIM TYPE:
          AUTH CODE:
          VD
    E8041 TIE ROD, INNER LEFT REPLACE  R+R (10) 10/23
             47  WH2                                                    (N/C)
          FC: 5W PART#: COUNT: 0
          CLAIM TYPE:
          AUTH CODE:     B
          VD

PARTS:      0.00  LABOR:        0.00  OTHER:        0.00  TOTAL LINE E:      0.00

5228 R/R BOTH FRONT AXLE AND TIE ROD ENDS RUSTING R/R BOTH FRONT
AXLES AND COATED WITH POR 15 RUST #PIT3749B: Underbody Corrosion AND
COATED TIE ROD ENDS AS WELL
          **************************************************
F*** FOUND DURING REPAIR, BEFORE RADIO WAS REPLACED, L/CENTER A/C
       DEFLECTOR IS COMING APART
CAUSE: LEFT CENT A/C VENT LOOSE AND WON,T HOLD POSTION
    C2313 INSTRUMENT PANEL CLUSTER TRIM PLATE BEZEL
          REPLACEMENT
             47  WH2                                                    (N/C)
       1 25954826 BEZEL                                                 (N/C)
          FC: 4N
          PART#: 25954826
          COUNT: 1
          CLAIM TYPE:
          AUTH CODE:
```

DISCLAIMER OF WARRANTIES:
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY [illegible]HE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY [illegible]ECTION."
[illegible]STOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE [illegible]PY HEREOF.

X ____________________
CUSTOMER SIGNATURE

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

CUSTOMER COPY

**CUSTOMER #: 105741**

540280

**CORAL CADILLAC**
*The Dealer in it*

**INVOICE**

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 3306
BROWARD: 426-1900   TOLL FREE: 930-2872

ERIP RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME: 561-758-9858 CONT: N/A
BUS:                    CELL:

**PAGE 4**

NOBODY OUT
CADILLACS
CORAL CADILLAC

GM

**SERVICE ADVISOR:   207 MICHAEL STANMYCK**

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|-----------|-----|---------|----------------|-----|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 5224/5228 | T3816 |

| DEL DATE | PROD DATE | WARR EXP | PROMISED | SOLD | RATE | PAYMENT | INV DATE |
|----------|-----------|----------|----------|------|------|---------|----------|
| 19AUG08 DD | 11JUN2012 | 17:00 | 22OCT08 | | | CASH | 23OCT08 |

R.O. OPENED              READY              OPTIONS:   STK: P08372 DLR: 21038 1)DD CHECKED

16:19 20OCT08 | 16:06 23OCT08

LINE OPCODE TECH TYPE HOURS                          LIST        NET        TOTAL

---

| PARTS: | 0.00 | LABOR: | 0.00 | OTHER: | 0.00 | TOTAL LINE F: | 0.00 |

5228 LEFT CENT A/C VENT LOOSE AND WON,T HOLD POSTION REPLACED
COMPLETE RADIO BEZEL ASSEMBLY WITH BOTH A/C VENTS
*************************************************************

G** CUSTOMER CAME BACK TO DEALERSHIP AND STATED L/F SEAT HEATER IS INOP
       AT TIMES AND WILL GOFF OFF AFTER BEING ON FOR 5 MINUTES
   2000 VEHICLE IS OPERATING TO SPECIFICATIONS AT
       THIS TIME.                                                    (N/C)

| PARTS: | 0.00 | LABOR: | 0.00 | OTHER: | 0.00 | TOTAL LINE G: | 0.00 |

5224 WORK AS DESIGN AT THIS TIME NO BULLTIENS NO UPDATED PROGRAMS
FOR HEATER MODULE
*************************************************************

H** REPAIR DINGS ON L/R DOOR AND R/F DOOR ANS PER JACK GARDNER
   3050 SUBLET REPAIRS
       309 SUBLET TECH LIC#   256
           IUCI                                                      (N/C)
SUBL PO#540280 PAINTLESS DENT REPAIR, REPAIR DENTS
   PO#540280
           IUCI                                                      (N/C)

| PARTS: | 0.00 | LABOR: | 0.00 | OTHER: | 0.00 | TOTAL LINE H: | 0.00 |

*************************************************************

DISCLAIMER OF WARRANTIES:
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any
implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes
nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or
product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL
MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY
THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY
ECTION."
STOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE
COPY HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X _____
CUSTOMER SIGNATURE

**CUSTOMER COPY**

CUSTOMER #: 105741

540280

**CORAL CADILLAC**
*The Dealer Is In*





**INVOICE**

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 3308A
BROWARD: 426-1800    TOLL FREE: 930-2872

RIF RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME:561-758-9858 CONT:N/A
BUS:                CELL:

PAGE 5

**NOBODY OUT**
**CADILLACS**
*CORAL CADILLAC*

**SERVICE ADVISOR:** 207 MICHAEL STANWYCK

| COLOR | YEAR | MAKE/MODEL | | VIN | LICENSE | MILEAGE IN/ OUT | TAG |
|-------|------|------------|--|-----|---------|-----------------|-----|
| BLUE | 08 | HUMMER H2 | | 5GRGN23878H107653 | | 5224/5228 | T3816 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|----------|-----------|------------|----------|--------|------|---------|-----------|
| 19AUG08 DD | | 11JUN2012 | 17:00 22OCT08 | | | CASH | 23OCT08 |

| R.O. OPENED | READY | OPTIONS: | STK:P08372 DLR:21038 1)DD CHECKED |
|-------------|-------|----------|-----------------------------------|
| 16:19 20OCT08 | 16:06 23OCT08 | | |

| LINE OPCODE TECH TYPE HOURS | | LIST | NET | TOTAL |
|---|---|---|---|---|
| REPAIR 2 DOOR DINGS PER GET | ***** STATE OF FLA. REG # MV-00488 ********* | | | |
| READY PER JACK G | OUR GOAL IS 100% CUSTOMER SATISFACTION. IF | | | |
| | YOU HAVE ANY QUESTIONS I CAN BE REACHED AT | | | |
| | (954) 426-1800 ext 389 JOE BARDILL | | | |
| | SERVICE DIRECTOR. **PARTS MARKED W/"W" ARE | | | |
| | COVERED BY A LIFE TIME WARRANTY. | | | |
| | ************ www.coralcadillac.com *********** | | | |

**DISCLAIMER OF WARRANTIES:**
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY ECTION."
STOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE OPY HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | 0.00 |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | 0.00 |

X _____
   **CUSTOMER SIGNATURE**

**CUSTOMER COPY**

**CORAL CADILLAC**
*The Dealer In It*

CUSTOMER #: 105741

541007

INVOICE

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 3306
BROWARD: 426-1800    TOLL FREE: 930-2872

GRIF RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME:561-758-9858 CONT:N/A
BUS:              CELL:

PAGE 1

NOBODY OUT
CADILLACS
*CORAL CADILLAC*

GM Parts

SERVICE ADVISOR: 207 MICHAEL STANWYCK

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|-----------|-----|---------|----------------|-----|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 6526/6553 | T3913 |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|-----------|-----------|-----------|----------|--------|------|---------|-----------|
| 19AUG08 DD | | 11JUN2012 | 17:00 05NOV08 | | | CASH | 12NOV08 |

R.O. OPENED            READY        OPTIONS:    STK:P08372 DLR:21038 1)DD CHECKED

12:51 05NOV08 | 14:46 12NOV08

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|------|--------|------|------|-------|--|------|-----|-------|
| A | CUSTOMER STATES BRAKES SQUEEL WHEN BRAKING AT HWY SPEEDS | | | | | | | |

CAUSE: NO PARTS ON BACK ORDER

    2050 SPECIAL ORDER PART ON BACK ORDER
         26 GILROY,TREVOR LIC#: 256
                    IP                                        (N/C)
         1 25924485 PAD KIT                                   (N/C)
         1 63501 QUIET/BRAKE                                  (N/C)

PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE A:    0.00

6526 NO PARTS ON BACK ORDER NO PARTS AVAILABLE AT THIS TIME
***************************************************************

B CUSTOMER STATES ENGINE RUNS ROUGH AND BUZZES THRU IPC, SEE JOE B
USE: EXHAUST VIBRATION

    L2004 EXHAUST SYSTEM ALIGN
         26 GILROY,TREVOR LIC#: 256
                    WH2                                       (N/C)
         1 10199232 DAMPNER A                                 (N/C)
         1 10199232 DAMPNER A                                 (N/C)
         2 PO#169202 CLAMPS                                   (N/C)
         FC: 2E
         PART#: 10199232
         COUNT: 4
         CLAIM TYPE:
         AUTH CODE:    E
         PQ

PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE B:    0.00

6553 EXHAUST VIBRATION ENGINE FIRING PULSES TRANSFERING INTO
VEHICLE. INSTALL EXHAUST WEIGHT TO PIPE ,NECESSARY FOR VIBRATION IN
INTERIOR. 1.8 OLH FOR DIAGNOSTIC TIME PER #18. 18319318
***************************************************************

C BASIC 6,000 MILE SERVICE. CHG ENG OIL & FILTER. CHECK FLUIDS, INSPT

DISCLAIMER OF WARRANTIES:
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY ECTION."
STOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE OPY HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X _____
   CUSTOMER SIGNATURE

CUSTOMER COPY

CUSTOMER #: 105741

541007

**CORAL CADILLAC**
The Dealer to Be

INVOICE

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 33064
BROWARD: 426-1800    TOLL FREE: 930-2672

ARIF RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME:561-758-9858 CONT:N/A
BUS:                  CELL:

PAGE 2

NOBODY OUT
CADILLACS
CORAL CADILLAC

GM

SERVICE ADVISOR: 207 MICHAEL STANNYCK

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|-----------|-----|---------|----------------|-----|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 6526/6553 | T3913 |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO N2 | RATE | PAYMENT | INV. DATE |
|-----------|-----------|-----------|----------|-------|------|---------|-----------|
| 19AUG08 DD | 11JUN2012 | 17:00 05NOV08 | | | | CASH | 12NOV08 |

| R.O. OPENED | READY | OPTIONS: | STK:P08372 DLR:21038 1) DD CHECKED |
|-------------|-------|----------|-------|
| 12:51 05NOV08 | 14:46 12NOV08 | | |

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|------|--------|------|------|-------|--|------|-----|-------|

TIRES & PRESS, MULTI PNT INSPT, ROTATE 4 TIRES, INSTL WASHER
        FLUID
CAUSE: MAINTENANCE
      6KH3 BASIC 6,000 MILE SERV, CHG ENG OIL & FILTER.
        CHK & FILL ALL FLUIDS, MULTI PNT INSPT
      INSPT TIRES & FILL TO PROPER PRESSURE,
      ROTATE 4 TIRES, INSTALL WASHER FLUID
        26 GILROY,TREVOR LIC#: 256
              CMH2                                      56.15    56.15
      1 89017524 FILTER                        14.67    6.60     6.60
LUBE OIL
              CMH2                                      19.20    19.20
PTS:    6.60   LABOR:    56.15  OTHER:    19.20  TOTAL LINE C:  81.95

652B MAINTENANCE PERFORM 6K SERVICE MAINTENANCE
****************************************************
D COURTESY RENTAL TRANSPORTATION
CAUSE:
      27901 1 DAYS RENTAL, GOLD KEY COURTESY
        TRANSPORTATION
        309 SUBLET TECH LIC#: 256
              WH2                                                (N/C)
      FG1 98 PARTS COUNT: 0
      CLAIM TYPE:
      AUTH CODE:
      MJ

PARTS:    0.00   LABOR:    0.00   OTHER:    0.00   TOTAL LINE D:    0.00

****************************************************
E CUSTOMER STATES TRANS WON'T SHIFT WHEN ACCELERATING AT HWY SPEEDS,
      APPR: JOE B
CAUSE: TRANSMISSION CONTROL MODULE

DISCLAIMER OF WARRANTIES:
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any
implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes
nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or
product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL
MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY
THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY
SECTION."
CUSTOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE
COPY HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X _____
    CUSTOMER SIGNATURE

CUSTOMER COPY

**CORAL CADILLAC**
*The Dealer to Be*

**CUSTOMER #: 105741**

**541007**

**INVOICE**

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 3306
BROWARD: 426-1800 TOLL FREE: 830-2672

RIF RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME:561-758-9858 CONT:N/A
BUS:          CELL:

**PAGE 3**

NOBODY OUT
CADILLACS
*CORAL CADILLAC*

GM

**SERVICE ADVISOR: 207 MICHAEL STANWYCK**

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|-----------|-----|---------|----------------|-----|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 6526/6553 | T3913 |

| DEL DATE | PROD DATE | WARR EXP | PROMISED | PO NO. | RATE | PAYMENT | INV DATE |
|----------|-----------|----------|----------|--------|------|---------|----------|
| 19AUG08 DD | 11JUN2012 | 17:00 05NOV08 | | | | CASH | 12NOV08 |

| R.O. OPENED | READY | OPTIONS: STK:P08372 DLR:21038 1)DD CHECKED |
|-------------|-------|---|
| 12:51 05NOV08 | 14:46 12NOV08 | |

| LINE | OPCODE | TECH | TYPE | HOURS | | | | LIST | NET | TOTAL |
|------|--------|------|------|-------|--|--|--|------|-----|-------|

K4562 CONTROL SOLENOID VALVE AND TRANSMISSION
CONTROL MODULE ASSEMBLY REPLACEMENT
26 GILROY,TREVOR LIC#: 256

WH2                                                  (N/C)
1 24241896 VALVE                                     (N/C)
1 500FRT CHARGES                                     (N/C)
1 24243997 E-SEAL KIT                                (N/C)
FC: 6C
PART# 24241896
COUNT: 2
CLAIM TYPE:
AUTH CODE:     E
OV

**PARTS:    0.00   LABOR:     0.00   OTHER:     0.00    TOTAL LINE E:     0.00**

6553 TRANSMISSION CONTROL MODULE T.A.C CASE #10583778 11/12/08 .
PERFORM DIAG SYS CHECK, INSTALL TECH2 AND ROAD TEST TRUCK,COMMAND ALL
SHIFT WHILE DRIVING  OK, PART THROTTLE DOWN SHIFT TO 4th GEAR ENGINE
FLAIR/UP & DOES NOT INCREASE SPEED ON HIGHWAY  NO CODES C, CHECK TRANS
FLUID LEVEL OK,ATTEMPT TO RECALIBRATE MODULE HAS CURRENT UPDATE. R & I
PAN, NECESSARY TO REPLACE TRANS MODULE , AFTER TRANS MODULE REPLACE TECH
COULD NOT REPROGRAM NEW MODULE ,  CODE #U0101 LOOS COMMUNICATIONCALL
TECH LINE , FOR INFO.  CLAIM CODE #18F45 11/12/08  MULTIPLE ATTEMPT
BEFORE MODULE TAKES PROGRAM. 1.9 OLH FOR DIAGNOSIS AND TIME TO PROGRAM
PER PIE  15310719
**************************************************

F L/WIPER STREAKS
CAUSE: WORN INSERT
H1783 WINDSHIELD WIPER BLADE REPLACEMENT
26 GILROY,TREVOR LIC#: 256

WH2                                                  (N/C)
1 88944326 INSERT                                    (N/C)

DISCLAIMER OF WARRANTIES:
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any
implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes
nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or
product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL
MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY
THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY
ECTION."
USTOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE
COPY HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X _____
CUSTOMER SIGNATURE

**CUSTOMER COPY**

(8)

CUSTOMER #: 105741                541007                 **CORAL CADILLAC**
                                                          The Dealer Is for

                                      INVOICE            5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 33064
                                                          BROWARD: 426-1800    TOLL FREE: 930-2672

**ARIF RAFIK KODSY**                                                      NOBODY OUT
**9393 LAUREL GREEN DRIVE**            PAGE 4                             CADILLACS       GM
**BOYNTON BEACH, FL 33437**                                           CORAL CADILLAC
HOME:561-758-9858 CONT:N/A
BUS:                CELL:            SERVICE ADVISOR:  207 MICHAEL STANWYCK

| COLOR | YEAR | MAKE/MODEL | VIN | R.O.# | MILEAGE IN/OUT | TAG |
|-------|------|------------|-----|-------|----------------|-----|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 6526/6553 | T3913 |

| DEL DATE | PROD DATE | WARR. EXP. | PROMISED | P.O. NO | RATE | PAYMENT | INV. DATE |
|----------|-----------|------------|----------|---------|------|---------|-----------|
| 19AUG08 DD | 11JUN2012 | 17:00 05NOV08 | | | | CASH | 12NOV08 |

R.O. OPENED                READY        OPTIONS:   STK:P08372 DLR:21038 1)DD CHECKED

12:51 05NOV08 | 14:46 12NOV08

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|------|--------|------|------|-------|---|------|-----|-------|

        PART#: 88944326
        COUNT: 1
        CLAIM TYPE:
        AUTH CODE:
        OJ

PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE E:    0.00

6553 WORN INSERT REPLACE LS WIPER INSERT
    **********************************************
COURTESY SERVICE WASH
    ISW COURTESY SERVICE WASH
        CIZ, EDWARD TRAVIS LICH: 0
            ISH                                                           (N/C)
PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE G:    0.00

6553 Isw done
    **********************************************
                ***** STATE OF FLA. REG # MV-00453 *******
                OUR GOAL IS 100% CUSTOMER SATISFACTION. IF
                YOU HAVE ANY QUESTIONS I CAN BE REACHED AT
                (954) 426-1800 ext 389 JOE BARDILL
                SERVICE DIRECTOR. *(PARTS MARKED W/**) ARE
                COVERED BY A LIFE TIME WARRANTY.
                ********** www.coralcadillac.com **********

**DISCLAIMER OF WARRANTIES:**
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY ECTION.
CUSTOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE COPY HEREOF.

| DESCRIPTION | TOTAL |
|-------------|-------|
| LABOR AMOUNT | 56.15 |
| PARTS AMOUNT | 6.60 |
| GAS, OIL, LUBE | 19.20 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 3.14 |
| TOTAL CHARGES | 85.09 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 5.11 |
| PLEASE PAY THIS AMOUNT | 90.20 |

X _____
   CUSTOMER SIGNATURE

                            CUSTOMER COPY                          (9)

CUSTOMER #: 105741                    541391            **CORAL CADILLAC**
                                    ACCOUNTING         5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 33064
                                                       BROWARD: 426-1800        TOLL FREE: 930-2672

ARIF RAFIK KODSY                                                  NOBODY OUT
9393 LAUREL GREEN DRIVE                                           CADILLACS
BOYNTON BEACH, FL 33437                          PAGE 1           *CORAL CADILLAC*
HOME:561-758-9858 CONT:N/A
BUS:              CELL:           SERVICE ADVISOR: 207 MICHAEL STANNYCK

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|------------|-----|---------|----------------|-----|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 6608/6656 | T3967 |

| DEL DATE | PROD DATE | WARR EXP | PROMISED | P.O. NO. | RATE | PAYMENT | INV DATE |
|----------|-----------|----------|----------|----------|------|---------|----------|
| 19AUG08 DP | | 11JUN2012 | 17:00 13NOV08 | | | CASH | 24NOV08 |

17:08 12NOV08   13:40 21NOV08   OPTIONS:   STK:P08372 DLR:21038 1)DD CHECKED

LINE OPCODE TECH TYPE A/HRS S/HRS   COST   SALE  COMP   LIST       NET       TOTAL
A CUSTOMER STATES ENGINE HAS CONSTANT VIBRATION ON DECELLERATION,
DECCELERATION,
CAUSE: NOISE VIBRATION AT IPC
     D9737 08-01-39-002 Reposition A/C Compressor
          Discharge Line
               26 GILROY,TREVOR LIC#: 256
               WH2  0.00  0.30   810   3300                      33.00    33.00
          FC: 93 PART#: COUNT: 0
          CHAIN TYPE:
          AUTH CODE:
          WC:
                              0      0 TPARTS
                             810   3300 TLABOR
PARTS:      0.00   LABOR:   33.00   OTHER:   0.00   TOTAL LINE A:    33.00

VERSION 1 (EMP# 26,19NOV08 12:10): 6656 NOISE VIBRATION AT IPC
D9737 0.93 PERFORM DOC#2049909 OPERATION RELOCATE A/C HIGH PRESURE HOSE
FROM WHEEL WELL AREA
VERSION 2 (EMP# 18,20NOV08 12:00): 6656 NOISE VIBRATION AT IPC
D9737 0.93 PERFORM DOC#2049909 OPERATION RELOCATE A/C HIGH PRESURE HOSE
FROM WHEEL WELL AREA.
VERSION 3 (EMP# 18,20NOV08 12:21): 6656 NOISE VIBRATION AT IPC
D9737 0.93 PERFORM DOC#2049909 OPERATION RELOCATE A/C HIGH PRESURE HOSE
FROM WHEEL WELL AREA. AFTER ABOVE REPAIR STILL HAD SOME VIBRATION IN
STEERING WHEEL AND SEAT. COMPARED WITH LIKE VEHICLE HAD SAME VIBRATION.
FILED REPORT WITH BOB MARTIN H2 BOM.
VERSION 4 (EMP# 26,21NOV08 12:10): 6656 NOISE VIBRATION AT IPC.
D9737 0.90 PERFORM DOC#2049909 OPERATION RELOCATE A/C HIGH PRESURE HOSE
FROM WHEEL WELL AREA. AFTER ABOVE REPAIR STILL HAD SOME VIBRATION IN
STEERING WHEEL AND SEAT. COMPARED WITH LIKE VEHICLE HAD SAME VIBRATION.
FILED REPORT WITH BOB MARTIN H2 BOM. R & I STARTER AS PER BOB MARTIN
REMOVE FLYWHEEL BOLTS AND RESTART ENGINE TO ISULATE VIBRATION, STILL
HAS VIBRATION WITH FLY WHEEL DISCONNECTED . 1.6 ODH FOR DIAGNOSTIC TIME
PER #18. 18769316

DISCLAIMER OF WARRANTIES:
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any
implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes
nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or
product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL
MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY
THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY
INSPECTION."
CUSTOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE
COPY HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X_____
   CUSTOMER SIGNATURE

ACCOUNTING COPY

(10)

**CUSTOMER #: 105741**          541391          **CORAL CADILLAC**
*The Dealer Is It"*

**INVOICE**

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 3306
BROWARD: 426-1800    TOLL FREE: 930-2672

**RIF RAFIK KODSY**
**9393 LAUREL GREEN DRIVE**
**BOYNTON BEACH, FL 33437**          **PAGE 1**
HOME:561-758-9858 CONT:N/A
BUS:          CELL:

NOBODY OUT
CADILLACS
*CORAL CADILLAC*          GM

**SERVICE ADVISOR: 207 MICHAEL STANWYCK**

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|---|---|---|---|---|---|---|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 6608/6656 | T3967 |

| DEL.DATE | PRODATE | WAR.EXP | PROMISED | PO NO. | N/A | PAYMENT | INV.DATE |
|---|---|---|---|---|---|---|---|
| 19AUG08 DD | | 11JUN2012 | 17:00 13NOV08 | | | CASH | 24NOV08 |

| R.O. OPENED | READY | OPTIONS: | STK:P08372 DLR:21038 1)DD CHECKED |
|---|---|---|---|
| 17:08 12NOV08 | 13:40 21NOV08 | | |

LINE OPCODE TECH TYPE HOURS                          LIST      NET      TOTAL

A CUSTOMER STATES ENGINE HAS CONSTANT VIBRATION DURING ACCELERATION AND
  DECCELERATION.
CAUSE: NOISE VIBRATION AT IPC
     D9737 08-01-39-002 Reposition A/C Compressor
          Discharge Line
          26 GILROY,TREVOR LIC#: 256
                  WAR                                                    (N/C)
     FC: 93 PART#: COUNT: 0
     CLAIM TYPE:
     AUTH CODE:
     MH

PARTS:     0.00  LABOR:     0.00  OTHER:     0.00   TOTAL LINE A:     0.00

6656 NOISE VIBRATION AT IPC D9737 0.90 PERFORM DOC#2049909
OPERATION RELOCATE A/C HIGH PRESURE HOSE FROM WHEEL WELL AREA. AFTER
ABOVE REPAIR STILL HAD SOME VIBRATION IN STEERING WHEEL AND SEAT.
COMPARED WITH LIKE VEHICLE HAD SAME VIBRATION. FILED REPORT WITH BOB
MARTIN H2 BOM. R & I STARTER AS PER BOB MARTIN REMOVE FLYWHEEL BOLTS
AND RESTART ENGINE TO ISULATE VIBRATION, STILL HAS VIBRATION WITH FLY
WHEEL DISCONNECTED , 1.6 OLH FOR DIAGNOSTIC TIME PER #18. 18769316
               **********************
B CUSTOMER STATES VEHICLE RIDES ROUGH AT ALL SPPEDS OVER 50 MPH
CAUSE: NO FAULT FOUND
     2000 VEHICLE IS OPERATING TO SPECIFICATIONS AT
          THIS TIME
          26 GILROY,TREVOR LIC#: 256
                  ISM                                                    (N/C)
PARTS:     0.00  LABOR:     0.00  OTHER:     0.00   TOTAL LINE B:     0:00

6656 NO FAULT FOUND PERFORM ROAD TEST , COULD NOT DUPLICATE
CONDITION AT THIS TIME, NORMAL CHARACTERISTIC OPERATION OF TRUCK,
COMPARE TO ANOTHER "H2" SAME CONDITION.

DISCLAIMER OF WARRANTIES:
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any
implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes
nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or
product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL
MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY
THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY
"ECTION."
STOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE
PY HEREOF.

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X _____
     CUSTOMER SIGNATURE

**CUSTOMER COPY**

**CORAL CADILLAC**
*The Dealer Is In*

CUSTOMER #: 105741     541391

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 3306
BROWARD: 426-1800  TOLL FREE: 930-2872

**INVOICE**

ARIF RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME:561-758-9858 CONT:N/A
BUS:     CELL:

**PAGE 2**

NOBODY OUT
CADILLACS
*CORAL CADILLAC*

GM Parts

SERVICE ADVISOR: 207 MICHAEL STANWYCK

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/ OUT | TAG |
|-------|------|------------|-----|---------|-----------------|-----|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 6608/6656 | T3967 |

| DEL DATE | PROD. DATE | WARR. EXP | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|----------|------------|-----------|----------|--------|------|---------|-----------|
| 19AUG08 DD | | 11JUN2012 | 17:00 13NOV08 | | | CASH | 24NOV08 |

| R.O. OPENED | READY | OPTIONS: | | | |
|-------------|-------|----------|--|--|--|
| 17:08 12NOV08 | 13:40 21NOV08 | STK:P08372 DLR:21038 1) DD CHECKED | | | |

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|

C CUSTOMER STATES TRANS KICKS ON ACCEL AFTER COAST
CAUSE: REPROGRAM E.C.M
    J6354 POWERTRAIN CONTROL MODULE ENGINE
        REPROGRAMMING WITH SPS
            26 GILROY,TREVOR LIC#: 256
                WH2                (N/C)
      FC: 111AD
      PART#:
      COUNT: 0
      CLAIM TYPE:
      AUTH CODE:
      OJ

PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE C:    0.00

6656 REPROGRAM E.C.M PERFORM E.C.M TO COLLABORATE WITH TRANS MODULE
CLAIM CODE #111AD 11/18/08
*************************************************
D CUSTOMER STATES NOISE FROM DASH AREA AT HWY SPEEDS
CAUSE: WIND NOISE "A"PILLOR MOLDINGS
    B7570 MOLDING, WINDSHIELD SIDE PILLAR REVEAL
        RIGHT R&R OR REPLACE
            26 GILROY,TREVOR LIC#: 256
                WH2                (N/C)
      1 25869091 MOLDING             (N/C)
      FC: 4N
      PART#: 25869091
      COUNT: 1
      CLAIM TYPE:
      AUTH CODE:
      N3
    B7571 MOLDING, WINDSHIELD SIDE PILLAR REVEAL LEFT
        R&R OR REPLACE

**DISCLAIMER OF WARRANTIES:**
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY ECTION."
CUSTOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE PY HEREOF.

X _____
CUSTOMER SIGNATURE

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

**CUSTOMER COPY**

**CORAL CADILLAC**
*The Dealer In Is!*

CUSTOMER #: 105741

541391

**INVOICE**

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 33064
BROWARD: 426-1800    TOLL FREE: 930-2672

ERIF RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME:561-758-9858 CONT:N/A

PAGE 3

NOBODY OUT
CADILLACS
*CORAL CADILLAC*

**GM** Parts

BUS:            CELL:
SERVICE ADVISOR: 207 MICHAEL STANWYCK

| COLOR | YEAR | MAKE/MODEL | | VIN | | LICENSE | MILEAGE IN/OUT | TAG |
|---|---|---|---|---|---|---|---|---|
| BLUE | 08 | HUMMER H2 | | 5GRGN23878H107653 | | | 6608/6656 | T3967 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 19AUG08 DD | | 11JUN2012 | 17:00 13NOV08 | | | CASH | 24NOV08 |

| R.O. OPENED | READY | OPTIONS: STK:P08372 DLR:21038 1)DD CHECKED |
|---|---|---|
| 17:08 12NOV08 | 13:40 21NOV08 | |

| LINE OPCODE TECH TYPE HOURS | | LIST | NET | TOTAL |
|---|---|---|---|---|
| 26 GILROY,TREVOR LIC#: 256 | | | | |
| WH2 | | | | (N/C) |
| 1 25869092 MOLDING | | | | (N/C) |
| FC: 4N | | | | |
| PART#: 25869092 | | | | |
| COUNT: 1 | | | | |
| CLAIM TYPE: | | | | |
| AUTH CODE: | | | | |
| N3 | | | | |

PARTS:     0.00    LABOR:     0.00    OTHER:     0.00    TOTAL LINE D:     0.00

6656 WIND NOISE "A"PILLOR MOLDINGS REPLACE BOTH "A"PILLOR MOLDINGS
WIND NOISE TAG #101803 11/19/08
*************************************************

E COURTESY RENTAL TRANSPORTAION
CAUSE: .
    Z7901 1 DAYS RENTAL; GOLD KEY COURTESY
        TRANSPORTATION
        309 SUBLET TECH LIC#: 256
        WH2                                                    (N/C)
    FC: 98 PART#: COUNT: 0
    CLAIM TYPE:
    AUTH CODE:
    MJ

PARTS:     0.00    LABOR:     0.00    OTHER:     0.00    TOTAL LINE E:     0.00

*************************************************

F COURTESY SERVICE WASH
    ISW COURTESY SERVICE WASH
        613    ISH                                             (N/C)

| | DESCRIPTION | TOTALS |
|---|---|---|
| | LABOR AMOUNT | |
| | PARTS AMOUNT | |
| | GAS, OIL, LUBE | |
| | SUBLET AMOUNT | |
| | MISC. CHARGES | |
| | TOTAL CHARGES | |
| | LESS INSURANCE | |
| | SALES TAX | |
| | PLEASE PAY THIS AMOUNT | |

**DISCLAIMER OF WARRANTIES:**
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY ECTION."
CUSTOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE COPY HEREOF.

X _____
    CUSTOMER SIGNATURE

CUSTOMER COPY

(12)

**CUSTOMER #: 105741**

541391

**CORAL CADILLAC**
*The Dealer Is It*

**INVOICE**



5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 3308
BROWARD: 426-1800   TOLL FREE: 930-2672

ARIF RAFIK KODSY
9393 LAUREL GREEN DRIVE
BOYNTON BEACH, FL 33437
HOME:561-758-9858 CONT:N/A
BUS:                    CELL:

**PAGE 4**

NOBODY OUT
CADILLACS
*CORAL CADILLAC*

**SERVICE ADVISOR: 207 MICHAEL STANWYCK**

| COLOR | YEAR | MAKE/MODEL | | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|------------|--|-----|---------|----------------|-----|
| BLUE | 08 | HUMMER H2 | | 5GRGN23878H107653 | | 6608/6656 | T3967 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|----------|-----------|------------|----------|--------|------|---------|-----------|
| 19AUG08 DD | | 11JUN2012 | 17:00 13NOV08 | | | CASH | 24NOV08 |

R.O. OPENED              READY              OPTIONS:   STK:P08372 DLR:21038 1)DD CHECKED

17:08 12NOV08   13:40 21NOV08

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|-----------------------------|------|-----|-------|
| PARTS:    0.00   LABOR:    0.00   OTHER:    0.00   TOTAL LINE P. | | | 0.00 |

6656 isw done

```
*************************************************
***** STATE OF FLA. REG. # MV-00488 *********
OUR GOAL IS 100% CUSTOMER SATISFACTION. IF
YOU HAVE ANY QUESTIONS I CAN BE REACHED AT
(954) 426-1800 ext 389 JOE BARDILL
SERVICE DIRECTOR. **PARTS MARKED W/"W" ARE
COVERED BY A LIFE TIME WARRANTY.
********** www.coralcadillac.com **********
```

**DISCLAIMER OF WARRANTIES:**
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY. THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY ECTION."
...STOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE OPY HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | |
| SALES TAX | 0.00 |
| PLEASE PAY THIS AMOUNT | 0.00 |

X _____
CUSTOMER SIGNATURE

**CUSTOMER COPY**

(10)

# SCHUMACHER

**CUSTOMER #: 240290**

443188

3001-3031 Okeechobee Blvd.
West Palm Beach, FL 33409
www.SchumacherAuto.com

**\*INVOICE\***

**ERIF KODSY**
15968 LAUREL OAK CIRCLE
DELRAY BEACH, FL 33484
HOME:561-737-8998 CONT:N/A
BUS:               CELL:

PAGE 1

Schumacher Buick-Pontiac    (561) 615-3270
Schumacher Saab             (561) 615-3298
Schumacher Volkswagen       (561) 615-3345
Hummer of the Palm Beaches  (561) 656-6010

Registration No. MV-15868  MV-39987  MV-53731

**SERVICE ADVISOR:  940396 DOUG BRADY**

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|---|---|---|---|---|---|---|
| | 08 | HUMMER H2 | 5GRGN23878H107653 | | 7198/7214 | TH931 |

| DEL DATE | PROD DATE | WARR EXP | PROMISED | PO NO | RATE | PAYMENT | INV DATE |
|---|---|---|---|---|---|---|---|
| 11JUN08 DD | | | 10:45 01DEC08 | | | CASH | 03DEC08 |

| R.O. OPENED | READY | | |
|---|---|---|---|
| 10:42 01DEC08 | 12:48 03DEC08 | OPTIONS: | ENG:6.2_Liter_MPFI_OHV |

| LINE | OPCODE | TECH | TYPE | HOURS | | | LIST | NET | TOTAL |
|---|---|---|---|---|---|---|---|---|---|

A· AT HWY SPEEDS THERE IS A ROARING AND HOPING FELT AT NEARLY ALL SPEEDS
CAUSE: ROAD TESTED TIRE VIBRATION 45MPH & UP
       E0435 TIRE, B F GOODRICH REPLACE
            1001  WSH                                                       (N/C)
       3 89031270 BF3157017                                                 (N/C)
       3 9591585 F-WT-.75OZ                                                 (N/C)
       3 WASTE EPA DISPOSAL                                                 (N/C)
    OLH RODE FORCE
            1001  WSH                                                       (N/C)
PARTS:  0.00  LABOR:      0.00  OTHER:      0.00  TOTAL LINE A:      0.00

7214 ROAD TESTED TIRE VIBRATION 45MPH & UP ROAD TESTED TIRE
VIBRATION 45MPH & UP 13HZ .090'S CHECK RIMS, HUB BEARINGS BALANCE &
LOAD FORCE LF18 RF 31 RR40 LR37 INDEX 3 TIRES 30 36 35 ORDER 3 B F
GOODRICH TIRES MOUT 3 TIRES BALANCE & DO ROAD FORCE LF 11 RF7 RR17 LR18
*******************************************
B HUMMER SERVICE WASH
    HUMMERSERVWASH HUMMER SERVICE WASH
            8/7217  IHP                                                     (N/C)
PARTS:  0.00  LABOR:      0.00  OTHER:      0.00  TOTAL LINE B:      0.00
*******************************************
C RENTAL VEHICLE C/P
CAUSE: F
       RENTAL RENTAL VEHICLE C/P
            8888  WSH                                                       (N/C)
FC: PARTS  COUNT
    CLAIM TYPE:
    AUTH CODE:

BODU HERTZ
            WSH                                                             (N/C)

ALL PARTS ARE NEW UNLESS IDENTIFIED BY: LKQ USED; OR NPN IN THE PART NUMBER OR DESCRIPTION.
ALL GENUINE ORIGINAL EQUIPMENT REPLACEMENT PARTS ARE COVERED BY A MANUFACTURER
WARRANTY OF 12 MONTHS OR 12,000 MILES, WHICHEVER COMES FIRST.

**STATEMENT OF DISCLAIMER**
The factory warranty constitutes all of the warranties with respect to the sale of this item\items.
The Seller hereby expressly disclaims all warranties either express or implied, including any implied
warranty of merchantability or fitness for a particular purpose. Seller neither assumes nor
authorizes any other person to assume for it any liability in connection with the sale of this
item\items.

X_____
CUSTOMER SIGNATURE

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

(15)

CUSTOMER COPY

# SCHUMACHER

**CUSTOMER #: 240290**

443188

3001-3031 Okeechobee Blvd.
West Palm Beach, FL 33409
www.SchumacherAuto.com

**\*INVOICE\***

ERIF KODSY
15968 LAUREL OAK CIRCLE
DELRAY BEACH, FL 33484
HOME:561-737-8998 CONT:N/A
BUS:                    CELL:

PAGE 2

| | | |
|---|---|---|
| Schumacher Buick-Pontiac | (561) 615-3270 |
| Schumacher Saab | (561) 615-3298 |
| Schumacher Volkswagen | (561) 615-3345 |
| Hummer of the Palm Beaches | (561) 656-5010 |

Registration No. MV-15866 MV-39987 MV-53731

**SERVICE ADVISOR: 940396 DOUG BRADY**

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT | TAG |
|---|---|---|---|---|---|---|
| | 08 | HUMMER H2 | 5GRGN23878H107653 | | 7198/7214 | TH931 |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 11JUN08 DD | | | 10:45 01DEC08 | | | CASH | 03DEC08 |

| R.O. OPENED | READY | OPTIONS: | ENG:6.2 Liter MPFI OHV |
|---|---|---|---|
| 10:42 01DEC08 | 12:48 03DEC08 | | |

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|
| PARTS:    0.00  LABOR:    0.00  OTHER:    0.00   TOTAL LINE C: | | | 0.00 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ALL PARTS ARE NEW UNLESS IDENTIFIED BY: LKQ USED; OR NPN IN THE PART NUMBER OR DESCRIPTION. ALL GENUINE ORIGINAL EQUIPMENT REPLACEMENT PARTS ARE COVERED BY A MANUFACTURER WARRANTY OF 12 MONTHS OR 12,000 MILES, WHICHEVER COMES FIRST.

**STATEMENT OF DISCLAIMER**

The factory warranty constitutes all of the warranties with respect to the sale of this item\items. The Seller hereby expressly disclaims all warranties either express or implied, including any implied warranty of merchantability or fitness for a particular purpose. Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this item\items.

X
CUSTOMER SIGNATURE

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| SUBLET AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 0.00 |
| **PLEASE PAY THIS AMOUNT** | 0.00 |

CUSTOMER COPY

(16)

# SCHUMACHER

CUSTOMER #: 240290

443510

*3001-3031 Okeechobee Blvd.*
*West Palm Beach, FL 33409*
*www.SchumacherAuto.com*

RIF KODSY
68 LAUREL OAK CIRCLE
DELRAY BEACH, FL 33484
HOME:561-737-8998 CONT:N/A
BUS:                        CELL:

**\*INVOICE\***

DUPLICATE 1
PAGE 1

SERVICE ADVISOR:  940396 DOUG BRADY

Schumacher Buick-Pontiac        (561) 615-3270
Schumacher Saab                 (561) 615-3298
Schumacher Volkswagen           (561) 615-3345
Hummer of the Palm Beaches      (561) 656-5010

Registration No. MV-16866  MV-39987  MV-53731

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|-----------|-----|---------|---------------|-----|
| | 08 | HUMMER H2 | 5GRGN23878H107653 | | 7245/7245 | TH981 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|----------|-----------|-----------|----------|--------|------|---------|-----------|
| 11JUN08 DD | | | 17:30 05DEC08 | | | CASH | 05DEC08 |

| R.O. OPENED | READY | OPTIONS:  ENG:6.2_Liter_MPFI_OHV |
|-------------|-------|----------|
| 12:34 05DEC08 | 17:16 05DEC08 | |

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|------|--------|------|------|-------|---|------|-----|-------|

A AT IDLE THERE IS A VIBRATION FELT THROUGH THE TRUCK
CAUSE: NPF
   S111 MISC BODY
     97263 CSH                                      0.00    0.00
PARTS:   0.00  LABOR:   0.00  OTHER:   0.00  TOTAL LINE A:     0.00

7245 NPF NO DTC OR BULLETINS TO UPDATE
   ***********************************************

B RENTAL VEHICLE C/P
CAUSE: F
   RENTAL RENTAL VEHICLE C/P
     8888 WSH                                              (N/C)
   FC: PARTS: COUNT: 0
   CLAIM TYPE:
   AUTH CODE:

PARTS:   0.00  LABOR:   0.00  OTHER:   0.00  TOTAL LINE B:     0.00

   ***********************************************
C** C/S THERE IS STILL A HOPE AS DRIVING OVER 25 MPH
CAUSE: NPF
   S111 MISC BODY
     9688 CSH                                         0.00    0.00
PARTS:   0.00  LABOR:   0.00  OTHER:   0.00  TOTAL LINE C:     0.00

7245 NPF C/S STILL A HOP AFTER NEW TIRES NO CURRENT BULLETIN FOR
THIS ITEM
   ***********************************************

ALL PARTS ARE NEW UNLESS IDENTIFIED BY: LKQ USED; OR NPN IN THE PART NUMBER OR DESCRIPTION. ALL GENUINE ORIGINAL EQUIPMENT REPLACEMENT PARTS ARE COVERED BY A MANUFACTURER WARRANTY OF 12 MONTHS OR 12,000 MILES, WHICHEVER COMES FIRST.

**STATEMENT OF DISCLAIMER**

The factory warranty constitutes all of the warranties with respect to the sale of this item\items. The Seller hereby expressly disclaims all warranties either express or implied, including any implied warranty of merchantability or fitness for a particular purpose. Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this items.

X _____
CUSTOMER SIGNATURE

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 0.00 |
| PLEASE PAY THIS AMOUNT | 0.00 |

CUSTOMER #: 105741

543204

**CORAL CADILLAC**
*The Dealer Is In*

INVOICE

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 33064
BROWARD: 426-1800    TOLL FREE: 930-2672

ERIF RAFIK KODSY
968 LAUREL OAK CIR
DELRAY BEACH, FL 33484-5539
HOME:561-758-9858 CONT:N/A
BUS:                    CELL:

PAGE 1

NOBODY OUT
CADILLACS
*CORAL CADILLAC*

GM Parts

SERVICE ADVISOR: 207 MICHAEL STANWYCK

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|-------|------|------------|-----|---------|----------------|-----|
| BLUE | 08 | HUMMER H2 | 5GRGN23878H107653 | | 9016/9022 | T3184 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|----------|-----------|-----------|----------|--------|------|---------|-----------|
| 19AUG08 DD | | 11JUN2012 | 17:00 23DEC08 | | | CASH | 23DEC08 |

OPTIONS:  STK:P08372 DLR:21038 1)DD CHECKED

| R.O. OPENED | READY |
|-------------|-------|
| 09:21 22DEC08 | 13:25 23DEC08 |

LINE OPCODE TECH TYPE HOURS

| | | | LIST | NET | TOTAL |
|--|--|--|------|-----|-------|

A CUSTOMER STATES VIBRATION AT HWY SPEEDS 45-55
    2000 VEHICLE IS OPERATING TO SPECIFICATIONS AT
        THIS TIME.
        517  ISH                                                        (N/C)

PARTS:      0.00  LABOR:      0.00  OTHER:      0.00  TOTAL LINE A:      0.00

9022 ROAD TESTED O.K. VEHICLE EXHIBITS SOME RAIL SHAKE
CHRACTERISTIC OF SUV'S.
*********************************************

B CUSTOMER STATES BRAKES SQUEEL
CAUSE: front brakes squeel
    H0042 PADS, DISC BRAKE FRONT R&R OR REPLACE
        517  WH2                                                        (N/C)
    1 25924485 PAD KIT                                                  (N/C)
        FC: 02R03
        PART#: 25924485
        COUNT: 1
        CLAIM TYPE:
        AUTH CODE:
        NV

PARTS:      0.00  LABOR:      0.00  OTHER:      0.00  TOTAL LINE B:      0.00

9016 front brakes squeel nec to replace front pads see doc 2128875.
labor op h0042
*********************************************

C CUSTOMER STATES ENGINE IDLES ROUGH
    2000 ROAD TESTED 6 MILES. VEHICLE EXHIBITS NORMAL
        IDLE QUALITY FOR 6.2 LITRE ENGINE.
        PREVIOUSLY COMPARED WITH LIKE VEHICLE.
        517  ISH                                                        (N/C)

PARTS:      0.00  LABOR:      0.00  OTHER:      0.00  TOTAL LINE C:      0.00

DISCLAIMER OF WARRANTIES:
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any
implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes
nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or
product.
(P.L. 93-637).
*I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL
MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY
BY THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY
INSPECTION."
TOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE
Y HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X _____
CUSTOMER SIGNATURE

CUSTOMER COPY

CORAL CADILLAC
*The Dealer & 3x*

**CUSTOMER #: 105741**

543204

**INVOICE**

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 33064
BROWARD: 428-1800    TOLL FREE: 930-2872

NOBODY OUT
CADILLACS
CORAL CADILLAC

GM

RIF RAFIK KODSY
968 LAUREL OAK CIR
DELRAY BEACH, FL 33484-5539
HOME:561-758-9858  CONT:N/A
BUS:              CELL:

**PAGE 2**

**SERVICE ADVISOR: 207 MICHAEL STANWYCK**

| COLOR | YEAR | MAKE/MODE | | VIN | | MILEAGE IN/OUT | TAG |
|-------|------|-----------|--|-----|--|----------------|-----|
| BLUE | 08 | HUMMER H2 | | 5GRGN23878H107653 | | 9016/9022 | T3184 |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|-----------|-----------|-----------|----------|--------|------|---------|-----------|
| 19AUG08 DD | 11JUN2012 | | 17:00 23DEC08 | | | CASH | 23DEC08 |

R.O. OPENED
09:21 22DEC08  READY  13:25 23DEC08

OPTIONS:  STK:P08372 DLR:21038 1)DD CHECKED

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|

9022 ROAD TESTED 6 MILES. VEHICLE EXHIBITS NORMAL IDLE QUALITY FOR
6.2 LITRE ENGINE. PREVIOUSLY COMPARED WITH LIKE VEHICLE.

D COURTESY RENTAL TRANSPORTAION
CAUSE:
    Z7901 1 DAYS RENTAL; GOLD KEY COURTESY
       TRANSPORTATION
       309 SUBLET TECH LIC#: 256                              (N/C)
       WBZ
    FC: 98 PART#: COUNT: 0
    CLAIM TYPE:
    AUTH CODE:
    MJ

PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE D:    0.00

*********************************************************

E CUSTOMER STATES TRANS HESITATES/SHIFTS HARSH ON ACCCEL, SEE JOB
    2000 VEHICLE IS OPERATING TO SPECIFICATIONS AT
    THIS TIME                                                (N/C)
       517 ISH
PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE E:    0.00

9022 ROAD TESTED O.K. PREVIOUSLY REPROGRAMMED W/SOFTWARE UPDATE
*********************************************************

F** COURTESY SERVICE WASH
    ISW COURTESY SERVICE WASH                                (N/C)
       817 ISH
PARTS:    0.00  LABOR:    0.00  OTHER:    0.00  TOTAL LINE F:    0.00

9022 isw done
*********************************************************

**DISCLAIMER OF WARRANTIES:**
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY BY THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY INSPECTION."
    TOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE BY HEREOF.

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | |
| PARTS AMOUNT | |
| GAS, OIL, LUBE | |
| SUBLET AMOUNT | |
| MISC. CHARGES | |
| TOTAL CHARGES | |
| LESS INSURANCE | |
| SALES TAX | |
| PLEASE PAY THIS AMOUNT | |

X _____
CUSTOMER SIGNATURE

(19)

**CUSTOMER COPY**

CUSTOMER #: 105741

543204

INVOICE

**CORAL CADILLAC**
The Dealer In It!

5101 NORTH FEDERAL HIGHWAY POMPANO BEACH, FL 33064
BROWARD: 426-1800    TOLL FREE: 930-2872

ERIF RAFIK KODSY
968 LAUREL OAK CIR
DELRAY BEACH, FL 33484-5539
HOME:561-758-9858 CONT:N/A
BUS:                CELL:

PAGE 3

NOBODY OUT
CADILLACS
*CORAL CADILLAC*

GM Parts

ASE

SERVICE ADVISOR: 207 MICHAEL STANWYCK

| COLOR | YEAR | MAKE/MODEL | | VIN | LICENSE | MILEAGE IN/ OUT | TAG |
|-------|------|------------|---|-----|---------|-----------------|-----|
| BLUE | 08 | HUMMER H2 | | 5GRGN23878H107653 | | 9016/9022 | T3184 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|----------|------------|------------|----------|--------|------|---------|-----------|
| 19AUG08 DD | | 11JUN2012 | 17:00 23DEC08 | | | CASH | 23DEC08 |

R.O. OPENED | READY | OPTIONS: STK:P08372 DLR:21038 1)DD CHECKED

09:21 22DEC08  13:25 23DEC08

LINE OPCODE TECH TYPE HOURS                    LIST    NET    TOTAL

```
***** STATE OF FLA. REG. # MV-00488 *********
OUR GOAL IS 100% CUSTOMER SATISFACTION. IF
YOU HAVE ANY QUESTIONS I CAN BE REACHED AT
(954) 426-1800 ext 389 JOE BARDILL
SERVICE DIRECTOR. **PARTS MARKED W/"W" ARE
COVERED BY A LIFE TIME WARRANTY.
************ www.coralcadillac.com ***********
```

**DISCLAIMER OF WARRANTIES:**
The seller, CORAL CADILLAC, hereby expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and CORAL CADILLAC, neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of the vehicle or product.
(P.L. 93-637).
"I UNDERSTAND THAT ALL PARTS AND ACCESSORIES SOLD OR USED ARE SUBJECT TO THE FEDERAL MAGNUSON MOSS ACT AND THE CONSUMER MERCHANDISE PURCHASED IS UNDER LIMITED WARRANTY BY THE MANUFACTURER AND THE WRITTEN TERMS AND CONDITIONS THEREOF ARE AVAILABLE FOR MY INSPECTION."
..TOMER HEREBY ACKNOWLEDGES RECEIPT OF ABOVE MENTIONED VEHICLE, AND RECEIPT OF INVOICE PY HEREOF.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | |
| SALES TAX | 0.00 |
| PLEASE PAY THIS AMOUNT | 0.00 |

X _____
CUSTOMER SIGNATURE

**CUSTOMER COPY**

Exhibit

- B -

Keynote Presentation

# EUROPEAN LEGISLATION AND STANDARDISATION FOR THE CONTROL OF RISKS FROM VIBRATION AT WORK

Chris Nelson
Health and Safety Executive, United Kingdom

## Introduction

Two pieces of European Union (EU) legislation together establish requirements for protection against risks from vibration at work. The vibration directive[1] specifies duties of employers to protect workers from risks from exposure to vibration; the machinery directive[2], specifies duties of manufacturers and suppliers regarding the safety of machinery marketed in the EU. This paper discusses both directives and the standardisation programmes that support them. It also addresses the implementation of these requirements in Great Britain.

### Employers' duties: the vibration directive

This directive requires employers to assess and control risks to health and safety arising from hand-arm vibration (HAV) and whole-body vibration (WBV). Member States were required to implement the directive in national legislation by 6 July 2005.

Employers are required to eliminate vibration risk at source, or reduced to a minimum. The duties include: assessing risk and exposure; planning and implementing the necessary risk control measures; providing and maintaining suitable work equipment; providing workers with information and training on risks and their control; and monitoring and reviewing the effectiveness of the risk control programme. Daily exposure exceeding a specified action value triggers a requirement for a programme of technical and organisational measures to minimise vibration exposures and the resulting risk, and the provision of health surveillance. Exposures above a specified limit value are prohibited.

When conducting their risk assessments, employers are required to "assess and, if necessary, measure" the vibration exposure of workers, for comparison with the action and limit values. Vibration measurement in the workplace is not expected in all cases and the use of vibration information from equipment manufacturers is specifically mentioned. This provides a link with the machinery directive (see below).

### Manufacturers' and suppliers' duties: The machinery directive

The machinery directive, first introduced in 1989, is intended to remove barriers to trade. It puts duties on manufacturers and suppliers who place machinery on the European market to design their products to eliminate or reduce risks to health and safety and to warn the user of any residual risks, providing information required for safe use (for example, operator training, maintenance and selection of consumables). There are specific requirements for minimising risk from vibration in the design and construction of the machine and, in the case of hand-held, hand-

9

guided and mobile machines, for declaring the vibration emission. If the declared emission of a machine is representative of the vibration in real-world use, it can be adequate to inform the user of residual vibration risks.

## Standards supporting the two directives

The vibration directive contains two annexes (for HAV and WBV respectively) which define the metrics for daily vibration exposure by reference to ISO 5349-1:2001 for HAV and ISO 2631-1:1997 for WBV. The European Standards bodies (CEN and CENELEC) have no mandate from the European Commission to produce any standards in support of the vibration directive. However, CEN had, in 2001, adopted both parts of ISO 5349, and has also chosen to prepare a new standard providing guidance on assessing daily WBV exposures using the "A(8)" method.

The machinery directive is supported by a set of harmonized standards, mostly prepared by CEN and CENELEC under a work programme mandated by the European Commission. Where appropriate, this is done in partnership with ISO so that the relevant international standard is used to support the directive in Europe. The harmonized standards define safety requirements for various categories of machine (including the provision of user information); conformity with the relevant standard carries a presumption of conformity with the directive. The standards include test codes for vibration emission; some of those dealing with hand-operated equipment do not adequately describe the vibration in typical use and require revision.

## Controlling risks from vibration at work in Great Britain

Both directives are implemented as regulations in the British legal system and are enforced by the Health and Safety Executive (HSE). HSE's work programme includes targeted inspections of high-risk activities (currently focusing on construction, foundries and steel fabrication) to ensure that HAV risks are properly controlled. Visits to tool manufacturers and suppliers are also undertaken, to secure improved provision of information on vibration risks. This front-line work is supported by the production of guidance material and activities to communicate HSE's messages on preventing vibration-related ill-health[3].

## References

1. European Parliament and the Council of the European Union (2002) Directive 2002/44/EC on the minimum health and safety requirements regarding the exposure of workers to the risks arising from physical agents (vibration). Official Journal of the European Communities, OJ L177, 6.7.2002, 13.

2. Council of the European Union (1998) Council Directive 98/37/EC on the approximation of the laws of the Member States relating to machinery. Official Journal of the European Communities, OJ L207, 23.7.98, 1-46.

3. HSE's vibration web pages. www.hse.gov.uk/vibration



**Hand – Arm – Vibration
Guideline for Employers**

Status 15.11.2004

# Implementation of the European Directive Physical Agents (Vibration) 2002/44/EC

The EC - Directive 2002/44/EG requests that employers carryout a risk assessment of the vibration exposure of their employees with the aim of reducing the  health risks. This guideline gives a simplified method for this risk assessment. The method is based on a Technical Report of CEN/TC 231 and the essential content of the European Directive 2002/44/EC.

This guideline has been developed by those members of EUROMOT (European Association of Internal Combustion Engine Manufacturers) who are involved in the manufacture of handheld power tools.

It is intended that the guideline will improve  the communication between employers and manufacturers of power tools with respect to the compliance with the Directive 2002/44/EC and shall assist the employers when they conduct the risk assessment.

This guideline refers solely to the determination of the daily exposure action value and the daily exposure limit value in Guideline 2002/44/EC. In case of diverging national laws or ordinances, this guideline cannot be applied.

The contents of this guideline represent is intended to inform employers on how to meet the requirements of the Directive, it is not intended that it should be used as a risk assessment for individual cases. Especially as variables peculiar to individual workplaces such as working methods, temperatures and other aspects have to be considered. EUROMOT cannot take any liability for the results achieved with this method or for any conclusion reached in each single application. Any questions should be addressed to the relevant Health and Safety Consultant. Manufacturers can supply further details of their products if required.

**List of content:**

1. What is new?

2. Measures

3. Necessary activities

4. Compliance and recommendations

5. Simplified procedure for the determination of the operators daily vibration exposure

---

## 1. What is new?

The EU Directive „Vibration" refers directly to the Standards EN ISO 5349-1:2001 and EN ISO 5349-2:2001, which incorporate the state-of-the-art concerning the measurement and assessment of vibration at the workplace.

These standards and the requirements of the Vibration Directive provide several amendments and changes. Among others they require a risk assessment (Article 4), informing employees (Article 6) and the initiation of a program for the reduction of vibration exposure (if required, see, Article 5).

According to existing test standards, vibration is measured as frequency weighted acceleration on the handles of the power tool.

The assessment of the vibration exposure is calculated in relation to a standardised 8 h daily exposure level A(8). Advice on measurement is given in an Annex of the Directive. A simplified method is described in this brochure.

Depending on the daily exposure action value and the daily exposure limit value, the Directive requires different action by the employer. If an operators daily exposure to vibration is kept below the Exposure Action Level it should help him to avoid vibration related diseases.

If an operators daily exposure exceeds the Exposure Limit Value then there is a significant increase in the risk of developing vibration related diseases to the operator.

Whenever an employee is affected by a vibration exposure A(8) exceeding the daily exposure action level of 2,5 m/s². The employer has to carry out a risk assessment of the operation that the employee is carrying out and introduce control measures.

Hand-Arm Vibration Exposure Values:

Daily exposure limit value A(8) = 5 m/s²

Daily exposure action value A(8) = 2,5 m/s²

Vibration total value $a_{hv}$: For the determination of the daily exposure values of hand-arm vibration A(8) frequency weighted acceleration values are used, which combine all three measuring axis at each handle.

Equivalent vibration value $a_{hv,eq}$: Each operation normally includes several different modes, such as idling or cutting with full load. They may be combined in an equivalent vibration value $a_{hv,eq}$.

## 2. Measures

If the daily exposure action value of 2.5 m/s$^2$ is exceeded the employer shall implement a program of technical and organisational measures taking into account in particular

- the vibration risk is analysed adequately (Article 4)
- the choice of appropriate work equipment producing the least possible vibration (Article 5 (2)(b)
- suitable accessories and protective clothing provided such as handles with vibration damping features, heating handle system or protective gloves (Article 5 (2)(c)/(f)),
- appropriate maintenance programmes for the work equipment (Article 5 (2)(d)
- limitation of the duration and intensity of the vibration exposure  (Article 5 (2)(g))
- adequate rest periods (Article 5 (2)8h))
- employees are informed and trained (Article 6)
- a medical surveillance program is installed (Article 8)


## 3. Necessary activities

Comparison values for typical vibration exposure values may be available in data base systems of  Workers Compensation Boards such as VIBEX, in the data base KARLA (www.liaa.de/karla) , in official publications and especially  from information  in the literature of manufacturers.

When using any of these data sources it is important you check that:

- the data was measured according to valid test standards

- The test standard uses the same reference data such as the equivalent vibration value

- whether the data source is honourable and reliable. The most reliable data are those from type approvals performed by an accredited test laboratory

If suitable values are unavailable or if the specific working conditions differ from those in the measuring standards significantly, specific measurements have to be conducted under representative working conditions at the work place .

## 4. Compliance and recommendations

Some hints for the compliance with the EU Directive „Vibration", which should be considered already today

· the national implementation of the Directive will be implemented before 6 July 2005,
· a risk analysis shall be initiated as soon as possible, if necessary the required measurement shall be performed before this date,
· exposed employees shall be informed completely about risks associated with hand-arm vibration
· all equipment shall be maintained according to the instructions of the manufacturer in order to maintain the performance of the machine
· dull cutting tools shall be sharpened, repaired or taken out of service,
· vibration data shall be accumulated from technical literature
· when new equipment is purchased, machines with significantly lower vibration should be preferred if the purchase criteria and technical performance are equivalent or better
· vibration reduction programs , technical and organisational measures  should be initiated immediately
· provision of personal protective equipment should be considered, including approved antivibration gloves, heated handles or gloves that will keep the operators hands warm and dry during work in  cold weather

**5. Simplified procedure for the determination of the operators daily vibration exposure**

This section describes a simplified method for the determination of the daily vibration exposure A(8). This method can be used where the test standard used to provide the vibration level quoted by the manufacturer reflects the work being undertaken by the operator.

Premises are:

1   the manufacturer provides data of the relevant machine(s) which correspond to the applicable standards (normally identified by a clear reference to the test code and technical data given as "Vibration Total Value $a_{hv}$ or as "Equivalent Vibration Value $a_{hv,eq}$")
2     the working conditions are identical or similar to those used by the manufacturer (check the information of the manufacturer or contact the manufacturer if you have any doubts
3     the equipment used by the employee is in a good condition and conforms to the recommendations of the manufacturer
4     the machines and their accessories are similar to those used by the manufacturer when performing the vibration test.
For the determination of the daily vibration exposure not only the vibration data but also the actual daily exposure time is required.
The actual daily exposure time is the time period during which vibrations are transmitted from the machine into the hands of the operator. This time period has to be evaluated during a representative working day or can be taken from Table 1 as standard exposure time. This standard exposure time has been acquired under field conditions based on statistical principles such that the majority of all applications would fall into this range. If a specific machine is not listed, it may be appropriate to choose the exposure time from a similar machine.
The vibration data required  is the equivalent vibration value $a_{hv,eq}$, which includes all typical operation modes of the machine. If the manufacturer has only given vibration data from each single operating mode, the various modes have to be weighted according to their percentage of the total exposure time. The European Technical Report CEN/TR 231064 gives a typical distribution of operating modes for some machines. See  Table 2.
Usually, only the risk class will be important for the employer since the class itself gives an indication what measures have to be taken.
In order to avoid complicated calculations, it may be sufficient to go directly  to Table 3, which allows an immediate reading of vibration exposure points based on the exposure duration and the Equivalent Vibration Total value. This gives an indication to which vibration exposure class the machine belongs. Or if necessary the employer can convert exposure points directly into the daily vibration exposure A(8) by using Figure 1.

Basically there are three alternatives:
a.     the exposure points $P_E$ are not greater than 100: no measures have to be initiated by the employer
b.     the exposure points are above 100 and not greater than 400: the equipment may be used, however with the measures described above
c.     the exposure points are above 400: the use of the equipment is only permitted if the exposure time is reduced or other measures have been performed

 If the employee uses several tools simultaneously on one working day, the exposure points can be determined separately and added into one single overall value. This overall value must then be compared with one of the three vibration exposure classes.

**Table 1 – Typical exposure times of representative handheld power tools with combustion engines**

| Machine type | Application | Typical daily run time $_{exp}$ |
|---|---|---|
| Top handle chain saws | Tree service | 2.4 h |
| Prof. saws < 80 cm³ | Logging, farming, landscaping | 3.7 h |
| Prof. saws ≥ 80 cm³ | Heavy logging | 3.7 h |
| Grass trimmers | Landscaping | 4 h |
| Brushcutters | Road maintenance, land-scaping | 3.5 h |
| Hedge trimmers | Landscaping | 3.5 h |
| Longshaft hedge trimmers | Landscaping, municipalities | 2.0 h |
| Backpack blowers | Municipalities | 3 h |
| Handheld blowers | Municipalities | 1.5 h |
| Vacuum cleaner | Municipalities | 1.0 h |
| Lawn edgers | Landscaping | 3 h |
| Power pruner | Tree maintenance | 0.5 h |
| Power broom | Landscaping, construction | 2.0 h |
| Mist blowers | Agriculture | 1.0 h |
| Fruit harvester (flap type) | Agriculture | 3 h |
| Olive harvester (hook type) | Agriculture | 3 h |
| Motor hoe | Agriculture | 2 h |
| Hand drill (combustion) | Agriculture | 1 h |
| Earth auger | Agriculture, municipalities | 3 h |
| Cut-off machines (handheld) | Construction | 1 h |
| Cut-off machines (carriage) | Construction | 2.5 h |
| Electric hedge trimmer | Landscaping, municipalities | 1.5 h |
| Electric blower | Landscaping, municipalities | 1.0 h |
| Electric lawn trimmer | Landscaping, municipalities | 1.0 h |
| Electric edger | Landscaping, municipalities | 1.0 h |
| Electric pruner | Landscaping, municipalities | 0.5 h |
| Electric longshaft hedge trimmer | Landscaping, municipalities | 1.0 h |
| Electric chain saws | Construction | 0.5 h |

Remark: The given exposure times were determined under representative conditions. It is estimated that 90% of all applications will have shorter exposure times, in the remaining 10% of all applications longer exposure times will occur. In those cases, a work-site specific analysis must be performed.

**Table 2: Time sequences of the operating modes for chain saws and other power tools t $_i$**

| Machine type | Idling | Rated speed | Nominal max. speed | Reference standard |
|---|---|---|---|---|
| Tree service chain saws | 1/3 T | 1/3 T | 1/3 T | EN ISO 22868 |
| Prof. saws < 80 cm³ | 1/3 T | 1/3 T | 1/3 T | EN ISO 22868 |
| Prof. saws > 80 cm³ | ½ T | ½ T | | EN ISO 22868 |
| Grass trimmers | ½ T | | ½ T | EN ISO 22868 |
| Brushcutters | ½ T | | ½ T | EN ISO 22868 |
| Hedge trimmers | 1/5 T | | 4/5 T | EN 774 |
| Longshaft hedge trimmer | 1/5 T | | 4/5 T | EN 774 |
| Backpack blowers | 1/7 T | | 6/7 T | |
| Handheld blowers | 1/7 T | | 6/7 T | |
| Vacuum cleaners | 1/7 T | | 6/7 T | |
| Mist blowers | 1/7 T | | 6/7 T | |
| Lawn edgers | ½ T | | ½ T | ISO 11789 |
| Power pruner | ½ T | | ½ T | EN ISO 11680 |
| Power broom | 1/7 T | | 6/7 T | |
| Fruit harvester (flap type) | 1/7 T | | 6/7 T | |
| Olive harvester (hook type) | ½ T | ½ T | | |
| Motor hoe | 1/7 T | | 6/7 T | EN 709 |
| Hand drill (combustion) | 1/5 T | | 4/5 T | |
| Earth auger | 1/5 T | | 4/5 T | |
| Cut-off machines (handheld) | 1/7 T | | 6/7 T | EN ISO 19432 |
| Cut-off machines (carriage) | 1/7 T | | 6/7 T | |
| Electric hedge trimmer | | | * | EN 60745-2-15 |
| Electric blower | | | * | EN 60335-2-100 |
| Electric lawn trimmer | | | * | ISO 10518 |
| Electric Edger | | | * | |
| Electric pruner | | | * | EN 60745 |
| Electric chain saw | | | * | EN 60745-2-13 |
| Electric longshaft hedge trimmer | | | * | EN 60745-2-15 |

**Table 3: Determination of vibration exposure points from the equivalent vibration total value and the associated exposure duration**

| Equivalent vibration total value $a_{hv,eq}$ [m/s²] | | Exposure duration | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | [hours] | 0.1 | 0.2 | 0.5 | 1 | 2 | 3 | 4 | 5 | 6 | 8 |
| | [min] | 6 | 12 | 30 | 60 | 120 | 180 | 240 | 300 | 360 | 480 |
| 2.5 | | 1 | 3 | 6 | 13 | 25 | 38 | 50 | 63 | 75 | 100 |
| 3 | | 2 | 4 | 9 | 18 | 36 | 54 | 72 | 90 | 108 | 144 |
| 3.5 | | 2 | 5 | 12 | 25 | 49 | 74 | 98 | 123 | 147 | 196 |
| 4 | | 3 | 6 | 16 | 32 | 64 | 96 | 128 | 160 | 192 | 256 |
| 4.5 | | 4 | 8 | 20 | 41 | 81 | 122 | 162 | 203 | 243 | 324 |
| 5 | | 5 | 10 | 25 | 50 | 100 | 150 | 200 | 250 | 300 | 400 |
| 5.5 | | 6 | 12 | 30 | 61 | 121 | 182 | 242 | 303 | 363 | 484 |
| 6 | | 7 | 14 | 36 | 72 | 144 | 216 | 288 | 360 | 432 | 576 |
| 6.5 | | 8 | 17 | 42 | 85 | 169 | 254 | 338 | 423 | 507 | 676 |
| 7 | | 10 | 20 | 49 | 98 | 196 | 294 | 392 | 490 | 588 | 784 |
| 7.5 | | 11 | 23 | 56 | 113 | 225 | 338 | 450 | 563 | 675 | 900 |
| 8 | | 13 | 26 | 64 | 128 | 256 | 384 | 512 | 640 | 768 | 1024 |
| 8.5 | | 14 | 29 | 72 | 145 | 289 | 434 | 578 | 723 | 867 | 1156 |
| 9 | | 16 | 32 | 81 | 162 | 324 | 486 | 648 | 810 | 972 | 1296 |
| 9.5 | | 18 | 36 | 90 | 181 | 361 | 542 | 722 | 903 | 1083 | 1444 |
| 10 | | 20 | 40 | 100 | 200 | 400 | 600 | 800 | 1000 | 1200 | 1600 |
| 10.5 | | 22 | 44 | 110 | 221 | 441 | 662 | 882 | 1103 | 1323 | 1764 |
| 11 | | 24 | 48 | 121 | 242 | 484 | 726 | 968 | 1210 | 1452 | 1936 |
| 11.5 | | 26 | 53 | 132 | 265 | 529 | 794 | 1058 | 1323 | 1587 | 2116 |
| 12 | | 29 | 58 | 144 | 288 | 576 | 864 | 1152 | 1440 | 1728 | 2304 |
| 12.5 | | 31 | 63 | 156 | 313 | 625 | 938 | 1250 | 1563 | 1875 | 2500 |
| 13 | | 34 | 68 | 169 | 338 | 676 | 1014 | 1352 | 1690 | 2028 | 2704 |
| 13.5 | | 36 | 73 | 182 | 365 | 729 | 1094 | 1458 | 1823 | 2187 | 2916 |
| 14 | | 39 | 78 | 196 | 392 | 784 | 1176 | 1568 | 1960 | 2352 | 3136 |
| 14.5 | | 42 | 84 | 210 | 421 | 841 | 1262 | 1682 | 2103 | 2523 | 3364 |
| 15 | | 45 | 90 | 225 | 450 | 900 | 1350 | 1800 | 2250 | 2700 | 3600 |
| 15.5 | | 48 | 96 | 240 | 481 | 961 | 1442 | 1922 | 2403 | 2883 | 3844 |
| 16 | | 51 | 102 | 256 | 512 | 1024 | 1536 | 2048 | 2560 | 3072 | 4096 |
| 16.5 | | 54 | 109 | 272 | 545 | 1089 | 1634 | 2178 | 2723 | 3267 | 4356 |
| 17 | | 58 | 116 | 289 | 578 | 1156 | 1734 | 2312 | 2890 | 3468 | 4624 |
| 17.5 | | 61 | 123 | 306 | 613 | 1225 | 1838 | 2450 | 3063 | 3675 | 4900 |
| 18 | | 65 | 130 | 324 | 648 | 1296 | 1944 | 2592 | 3240 | 3888 | 5184 |
| 18.5 | | 68 | 137 | 342 | 685 | 1369 | 2054 | 2738 | 3423 | 4107 | 5476 |
| 19 | | 72 | 144 | 361 | 722 | 1444 | 2166 | 2888 | 3610 | 4332 | 5776 |
| 19.5 | | 76 | 152 | 380 | 761 | 1521 | 2282 | 3042 | 3803 | 4563 | 6084 |
| 20 | | 80 | 160 | 400 | 800 | 1600 | 2400 | 3200 | 4000 | 4800 | 6400 |

Risk class:

Exposure points <100: Daily exposure value < 2.5 m/s², by this the action value is not exceeded

Exposure points 100-400: Daily exposure value 2.5 - 5 m/s², by this the action level is exceeded

**Advise for the usage of Table 3:**

**1. Uneven exposure times**

If the equivalent vibration total value and the exposure duration is known go into the relevant lines and column, take the Exposure Points and compare these Exposure Points with the applicable Risk Class on the bottom of the table.
If the exposure duration is an uneven number, such as 3,7 h for the standard exposure time for chain saws , the precise Exposure Points can be determined by a simple addition of smaller fractions of the exposure time.
Example for a given equivalent vibration total value of 7.5 m/s :

| | |
|---|---|
| 3 h | EP = 338 |
| 0,5 h | EP =  56 |
| 0.1 h | EP =  11 |
| 0.1 h | EP =  11 |
| SUM: 3.7 h | EP =   416 |

These exposure points would indicate that the daily limit value is exceeded.

**2. Unknown exposure time**

Table 3 could be also used to determine a permitted exposure time. The equivalent vibration total value is known and the permitted exposure time shall be evaluated for the threshold value of the daily exposure limit value (EP = 400).
Example for a given equivalent vibration total value of 7.5 m/s :
EP= 338    Exposure time is 3 hours
EP= 56    Exposure time is 0.5 hours
Sum EP = 394, i.e. below 400, the permitted exposure time is 3.5 hours

**3. Multiple used power tools on one working day**

If multiple power tools are used on one working day one after the other, the risk class will be achieved by adding the exposure points of each application. For this task, each exposure duration and each equivalent vibration value has to be accumulated from existing literature. Again Table 3 delivers the exposure points for each application. The sum will be then compared with the vibration exposure class.

*Example 1: 4 different power tools will be used on a typical working day*
*EP from Table 1:*

| | $a_{hv,eq}$ | $t$ | EP |
|---|---|---|---|
| Tool 1 | 12,0 m/s² | 6 min | 29 |
| Tool 2 | 8,0 m/s² | 12 min | 26 |
| Tool 3 | 6,0 m/s² | 12 min | 14 |
| Tool 4 | 5,0 m/s² | 30 min | 25 |
| *Sum EP:* | | | 94 |

*Result: the total vibration exposure points are not exceeding 100, by this the daily vibration action value of 2.5 m/s² is not exceeded. No further measures are required*

*Example 2: 4 different power tools will be used on a typical working day*

*EP from Table 1:*

|        | $a_{hv,eq}$ | $t$    | EP   |
|--------|-------------|--------|------|
| Tool 1 | 6,0 m/s²    | 6 min  | 7    |
| Tool 2 | 8,0 m/s²    | 12 min | 26   |
| Tool 3 | 3,5 m/s²    | 60 min | 25   |
| Tool 4 | 13,0 m/s²   | 30 min | 169  |
| **Sum EP:** |        |        | **227** |

*Result: the total vibration exposure points are above 100, by this, the daily vibration action value is exceeded. Measures for the reduction of vibration exposure are necessary*

*Example 3: 3 different power tools will be used on a typical working day*

*EP from Table 1:*

|        | $a_{hv,eq}$ | $t$     | EP  |
|--------|-------------|---------|-----|
| Tool 1 | 12.0 m/s²   | 60 min  | 288 |
| Tool 2 | 8.0 m/s²    | 120 min | 256 |
| Tool 3 | 11.0 m/s²   | 30 min  | 121 |
| total RM: |          |         | 665 |

*Result: the total exposure points are above 400, by this the daily vibration limit value is exceeded. The tools are not permitted under the given premises.*

**Conversion of the exposure points EP into the daily vibration exposure A(8)**

Sometimes it may be appropriate to convert the abstract vibration exposure points EP into realistic daily vibration exposure values. This can be helpful if you want to compare the daily vibration exposure values with the given limits.

The vibration exposure points EP are marked on the horizontal line in Figure 1. Go from the known exposure points vertically to the curve and from the intersection with the curve to the left to the vertical line, which indicated the daily vibration exposure value A(8).

**Figure 1 – Conversion of the exposure points EP  into the daily vibration exposure A(8)**



**Additional information:**

[1] 2002/44/EC, Directive of the European Parliament and of the Council of 25 June 2002 on the minimum health and safety requirements regarding the exposure of workers to the risks arising from physical agents (vibration) (sixteenth individual Directive within the meaning of Article 16(1) of Directive 89/391/EEC)
http://europa.eu.int/eur-lex/pri/en/oj/dat/2002/l_177/l_17720020706en00130019.pdf

[2] Übersicht Ermittlung und Bewertung von Vibrationsbelastungen (BIA-Report 2/2003, S. 224 – 233)

[3] VDI 2057 *Human exposure to mechanical vibrations*

[4] EN ISO 5349-1:2001 Mechanical vibration — Measurement and evaluation of human exposure to hand-transmitted vibration — Part 1: General requirements (ISO 5349-1:2001)

[5] EN ISO 5349-2:2001 Mechanical vibration — Measurement and evaluation of human exposure to hand-transmitted vibration — Part 2: Practical guidance for measurement at the workplace (ISO 5349-2:2001)

[6] Technical Report CEN/TR 231064 Guideline for the assessment of exposure to hand-transmitted vibration based on information provided by manufacturers of machinery

[7] CR 1030-1:1995; CR 1030-2:1995 Hand-arm vibration — Guidelines for vibration hazards reduction — Part 1: Engineering methods by design of machinery; Part 2: Management measures at the workplace

[8] Christ, E.: Vibrationseinwirkung am Arbeitsplatz – Gefährdungsbeurteilung und Prävention. In: „Die BG", Heft 5/2002

[9] Hand-arm vibration of chainsaws – comparison with vibration exposure, Health and Safety Laboratory Buxton, Draft May 2004

[10] "Hand-arm vibration" HSG88, "Vibration Solutions" HSG 170, Leaflets INDG 126, INDG 175 and INDGD 338

[11] Proposals for new Control of Vibration at Work Regulations Implementing the Physical Agents (Vibration) Directive 2002/44/EC, Hand-arm Vibration, Health & Safety Executive, Draft March 2004

Exhibit

- C -

# IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA

**SHERIF RAFIK KODSY**

   **PLAINTIFF**

**VS.**

        **CASE NO: 09-CA-011174**

**GENERAL MOTORS CORPORATION
AND MOTORS LIQUIDATION COMPANY**

   **DEFENDANT(S)**
_____/

## SECOND AMENDED COMPLAINT

Comes now plaintiff Sherif Rafik Kodsy, herein as pro'se , files his

Second amended complaint, pursuant to this honorable court's order.

The amended complaint herein, is for the remaining counts four and five

of the original complaint , herein as count one, Civil Conspiracy, count

two Negligence, count three, Strict Liability and an added fourth count of

Comparative Fault.

A pending appeal was for the previous counts of Fraud, Breach of

Implied Warranty and Bad Faith.

## INTRODCTION

1-  Plaintiff, purchased a 2008 HUMMER H2,( adventure series, SUV),

from the Coral Cadillac, inc., on 8/19/2008, as used with 230 miles on the

odometer, where the subject vehicle was not previously titled.

2- The subject vehicle was sold as used to conceal its suspected defects, which was not warned to plaintiff of any manufacturer defects, where the subject vehicle was sold as is with a four year / 50, 000 mile manufacturer's full warranty.

3- The defendants' and their accomplice from Coral Cadillac, inc., Attempted multiple of documented repairs, which describe the irregularity of the subject conformity for an elevated whole body vibration defect.

4- The defect could not possibly be fixed as the defendants' described, as it could not be conformed to published manufacturer's specifications as intended for safe daily on road use, where the subject vehicle's non conformity was dangerously emitting surges of increased vibrations not commonly expected in the subject luxury SUV, and was not warned to cause injury(ies).

5- The subject vehicle was a manfacturers' reject, sold at a Georgia auction, without any disclosures of a suspected defect, which was the cause for its sale in an auction, where the SUV, Herein, had an elevated vibration for SHOW, not intended for direct distribution into the stream of sales.

6- The subject vehicle title transfer was from the GENERAL MOTORS CORPORATION as the sole previous owner of the subject vehicle, before

plaintiff took possession of the subject vehicle through its representatives

from Coral Cadillac, inc., herein.

7-The sales contract although it was signed, it was not previously read by

plaintiff prior to the subject vehicles purchase, because plaintiff was not

warned about a defect or a suspect nonconformity and plaintiff never

suspected that a manufacturer's agent would pass on a suspect vehicle

without any warnings or disclosures.

8- Herein plaintiff was induced into the purchase of a suspect

manufacturer's defect without a choice, as it was not disclosed to be a

suspect defective and non conformed vehicle, previously bought at auction.

## I- COUNT ONE, CIVIL CONSPIRACY

1- The defendants' conspired with Coral Cadillac, inc., to inject the

subject defective vehicle into the stream of sales through malice and non

disclosures of the suspect vehicle's expected defects, which was maliciously

sold as used.

2- The defendants', the General motors corporation, the manufacturers of

the subject vehicle, a Hummer H2, had formed a number of joint task forces

and service warranty centers for the express purpose of servicing its

HUMMER brand to conceal its products environmental and biomechanical

health hazards from the public which is caused from excessive vibrations

3

detected in its HUMMER vehicles, designed for **off-road** but intended to be used **on-road.**

3- The defendant, the manufacturer also conspired to deceive Government regulators and the public about these Hazards of whole body vibration vs. the off road capabilities, where the subject vehicle's emissions herein was unregulated and dangerous to ones health.

4- The defendants' General Motors, primarily conspired to sell a non conformed vehicle, with their authorized dealer, Coral Cadillac, inc., through an out of state undisclosed Georgia auction and then sell such defective vehicle under false pretenses into the stream of sales locally, to be delivered to an ultimate end user of the product without warnings and disclosures.

5- Plaintiff had relied on the fraudulent misrepresentation and fraudulent concealment of a defect, which was present in the subject vehicle, when indirectly placed in the stream of sales, by the manufacturer, which was sold to plaintiff, through its authorized service center, the Coral Cadillac inc., without warnings of a risk and without disclosures of a suspected inherent defect, where the manufacturer conspired to sell the subject vehicle at auction without disclosures of a risk and without disclosures of nonconformities, which the sale file contains no documents alleging a risk or

4

a defect disclosure sheet from the manufacturer.

6- The defendants' participated in a conspiracy to conceal information about the health risks from prolonged exposures to the elevated whole body vibrations, which was detected in the subject vehicle.

7- Plaintiff was injured as a result of the defendant's malice and continuous unregulated repairs, extended from the manufacturers' agents at Coral Cadillac, inc., and with their other service authorized dealers from MAROONE CHEVROLET and SCHUMMACKER HUMMER, supervised by TOM THORNTON, the General Motors Service Manager , which he advanced to conceal the nonconformities and to refuse further warranty diagnostic repairs.

8- Plaintiff, had at least three other independent inspections completed which refute the defendants' conspired allegations of repairing the vibrations nonconformity.

9- The defendants' conspired and continued acts of dishonesty, resulted in defrauding plaintiff from his designated equity and caused plaintiff loss of work, as a 24HR Water Damage Recovery Contractor and an Indoor Environmental Building Contractor, from the excessive, unwarned use and prolonged exposure of the subject vehicle.

10-      The fraudulent inducement to purchase the subject vehicle As

Is, resulted in the plaintiff's purchase of a **manufacturer's risk vehicle** not

intended for the direct stream of sales, As Is. which was not intended for

regular daily use, As Is.

11-      Plaintiff was physically injured from the excessive and

prolonged use of the subject vehicle and was forced to many financial

hardships from non use, where plaintiff was forced to rent a car and further

suffer many irregularities and discomforts of pains and anxieties of

insecurity and despair.

## II- COUNT TWO, NEGLIGENCE

12-      The GENERAL MOTORS CORPORATION, was negligent in

the design of the subject vehicle as it did not have an ON/OFF, switch to

alienate the motor vehicle's uses of  when used ON-ROAD vs. OFF-ROAD,

and were negligent in the after-market repairs that could not possibly fix a

design defect.

13-      It was documented from the work orders completed by the

defendant's agents and authorized dealers, that several repairs were in

fact needed, and alleged to have been completed without any specifications

or drawings of  BIOMECHANICAL conformities to correlate to the

suggested manufacturer's intended specification as published for its design.

14-      The subject vehicle was sold with defects not warned or

repaired **prior** to its sale into the stream of sales.

15-     Plaintiff, was physically injured from the unwarned and negligent attempted repairs, which caused plaintiff to suffer from NEUROLOGICAL AND MUSCLESKELTAL DISORDERS AND RELATED INJURIES.

16-     Plaintiff suffered great financial injuries from the disabling effects, where plaintiff was on the edge of increased fatigue and bedside for weeks and months with migraine headaches and the increased unease of posture and tingling of hands, which continuously was felt as electrical pulses from the vibrations being emitted through the **subject vehicle's steering wheel and the chassis cabin.**

III-  **STRICT LIABILITY**

17-     The subject vehicle's elevated vibrations were suspected to be a risk by the manufacturer which sold its designed product at auction where it knew or should have known that who ever uses that suspect rejected product could be injured or die from excessive exposures of elevated biomechanical vibrations, without first conforming such defect.

18-     The manufacturer did not warn about a risk from use of its product instead it conspired to conceal the expected risk of injury, which was not warned before its sale or during its attempted alleged repairs when

extended, rendering the product "unreasonably dangerous and unreliable, when transferred the subject vehicle to plaintiff, to use.

19-    The defendants' acted maliciously and careless with the foreknowledge of A risk from the elevated defective design and the elevated whole body vibration presence in the subject vehicle, which it put such a product into the stream of commerce without considering the hazards as well as the utility of the machine.

20-    The defendants' Liability is based upon the defendant's failure to exercise reasonable care, which failure DID foreseeably result in the harm which actually occurred to the plaintiff, SHERIF RAFIK KODSY.

21-    The defendants' did not perform a biomechanical vibration measurement, even after it had discovered the subject vehicle's elevated vibrations, which it was recognized by their agents to be abnormal and their diagnosis was for the visible elevated vibrations, which caused them to act, where it could have and should have warned plaintiff, instead of discriminating against plaintiff's health, auto knowledge  and professional being.

22-    Plaintiff, suffered from a knee injury, due to the extensive exposures of elevated vibrations with the left knee resting on the door chassis, which caused the left knee to collapse after a five hour continuous

ride of 400 miles, after its alleged completed repairs, which injury was not warned at any time before or after the attempted repairs.

23-    Plaintiff, suffered from piercing pains in the back of his eyes and blurry vision from the prolonged exposures to the elevated vibration, in the subject vehicle, hence now plaintiff's vision was compromised.

24-    Plaintiff suffered from profound migraine headaches, after prolonged usage of the subject vehicle after a few days of constant use.

25-    Plaintiff, was caused to be injured by the excessive use of the subject vehicle's elevated vibrations, which caused an umbilical hernia.

26-    Plaintiff, suffered from heart and chest pains, after the alleged completed repairs were performed, which the defendants' did not warn plaintiff from prolonged use of the subject vehicle after or before the attempted repairs.

## COUNT FOUR, COMPARITIVE FAULT, FL Stat. 768.81(1)(d)

27-    Plaintiff, relied on the false misrepresentations, that the subject vehicle was safe to use, ON-ROAD, which permanent injuries were a result of the daily normal use of 8-10 hours of continues use of the subject vehicle, on-road.

28-    The defendants' negligence, was from the time they released the subject vehicle for sale without warnings, when it knew the vehicle was

9

a risk as designed for show and awe, not for daily use, and released it with

out any warnings to an ultimate end user.

29-    Plaintiff, was forced to close his business down due to health

reasons, where plaintiff was continuously tired with migraine headaches

soon after the purchase and continuous use of the subject vehicle, which

other injuries and discomforting and piercing pains developed soon after.

30-    Plaintiff, is seeking economic and non economic damages

exceeding a million dollars.

31-    Plaintiff is seeking any additional relief this Honorable court

could allow.

## CERTIFICATE OF SERVICE

I CERTIFY THAT A TRUE AND CORRECT COPY OF THE

FOREGOING INSTRUMENT WAS MAILED BY U.S. MAIL TO THE

DEFENDANTS' COUNSEL OF RECORD, ON FEBRUARY 4TH , 2013.

---

SHERIF R. KODSY
PLAINTIFF/ PRO'SE
**605 NORTH RIVERSIDE DRIVE**
**POMPANO BEACH FLORIDA 33062**
**561-294-3046**

**STEVEN I. KLEIN, ESQ. / CHARLES P. MITCHELL, ESQ., P.O. BOX 1873**
**ORLANDO, FLORIDA 32802-1873**

10

Exhibit

- D -

Joe BARdill
testimony

Kodsy v. GM - Vol. 5

```
18            MR. KODSY:  Thank you.
19                 CROSS-EXAMINATION
20   BY MR. KODSY:
21        Q    How you doing, Joe?
22        A    Hi.
23        Q    Mr. Bardill, what happened?
24        A    Trimming my tree, fell off a ladder.
25        Q    Excuse me?
0566
1         A    Fell off a ladder trimming a tree.
2         Q    You got to be more careful.  Sorry it
3    happened.
4              Back to this Hummer H2, you said when you
5    got a customer that keeps coming back with the same
6    problem you call that a repeat repair?
7         A    Yes, sir.
8         Q    Okay.  And what does that actually tell
9    you?  Once it's been denied before, does that mean
10   you're excused for that alleged repair?
11             The nonconformity, is it always going to
12   be denied because you already noted it that it was
13   similar to another vehicle, as in this case?
14        A    I guess are you asking would I still be
15   involved and still look at the vehicle?
16        Q    Would you repair the vehicle if you've
17   already got documented similar to another?
18        A    There would be nothing to repair.
19        Q    Okay.  So, you deny any further repairs
20   alleged similar to previously?
21        A    Yes, there would be nothing -- nothing to
22   repair.
23        Q    Okay.  That's my point.
24             So, you would deny those repairs, you
25   would not do anything else, is that correct?
0567
1         A    Yes.
2         Q    Okay.  As far as your testimony said
3    you -- this was your first 2008 Hummer?
4         A    The first one that I drove with this
5    concern.  I believe I actually even told you that as
6    we were driving.
7         Q    Okay.  So, it was your first 2008 Hummer
8    with a 6.2 liter?
9         A    No, the first one I drove for this
10   concern.  I'm not saying it's the first one I ever
11   drove for any reason.  I don't know.  I can't tell
12   you yes or no, but yours was the first one I ever
13   drove for that concern.  And I think I even
14   commented to you about the six speed transmission,
15   you know, coming from the Escalade to the H2.
16        Q    Obviously, you know, I'm a consumer.  So
17   if I went out and bought --
18             THE COURT:  Okay.  Let's just ask
19        questions, sir, no commenting.
20   BY MR. KODSY:
21        Q    So, you had never experienced that with a
22   6.2 liter engine before, is that correct --
23        A    In a --
24        Q    -- for vibration?
25        A    In a Hummer H2.  Certainly in the
0568
1    Escalades because the Escalades had it previous.
2         Q    The Escalade had what?
```

Page 27

Kodsy v. GM - Vol. 5

```
 3        A     The 6.2 liter before the Hummer did.
 4        Q     What, that was since 2007, correct?
 5        A     Yes.
 6        Q     Okay.  And this is 2008.  So, it's the
 7   same engine, is that correct?
 8        A     Yes.  But we did have customers with
 9   Escalades complaining of the vibration at idle until
10   they got used to it.
11        Q     So it's an inherent defect, is that
12   correct?
13        A     No, it's the trade off for the horsepower.
14   It's got that little vibration.
15        Q     So, from the manufacturer because it's got
16   increased horsepower it's got a vibration, is that
17   correct?
18        A     Well, if -- if it was a defect, as you're
19   saying a defect, we've got a lot of cars out there
20   that nobody's complaining of it.
21        Q     Right.  I mean, it's not obvious to
22   everybody.
23              But you're telling everybody here that
24   because we got a 6.2 liter engine with 20 horsepower
25   more than 2006, then you have that vibration, is
0569
 1   that correct?
 2        A     No, what I'm saying is in the 6.2 liter
 3   there's a 20 percent increase in horsepower, which
 4   is approximately 70 horsepower, and that the
 5   vibration is a characteristic of that engine.
 6        Q     Have you ever had any other Chevy vehicles
 7   with a 6.2 liter engine?
 8        A     Yes.
 9        Q     Okay.  Are they also having that vibration
10   problem?
11        A     I've never had a customer complain, but we
12   are not a Chevrolet dealership.
13        Q     But you have run across it before in a 6.2
14   Cadillac Escalade, is that correct?
15        A     Yes.
16        Q     So, allegedly your testimony states that
17   it's normal, is that correct?
18        A     Yes.
19        Q     Okay.  Why did you take the vehicle apart
20   and do all these repairs trying to eliminate this
21   vibration that is normal?
22        A     Well, like I said, first of all, we did
23   not take the vehicle apart.
24        Q     You didn't?
25        A     We put -- we put weights on the exhaust
0570
 1   system.  That engine was never disassembled.
 2        Q     What about disconnecting the fly wheel
 3   from the engine.
 4        A     Okay.  I do apologize.  Yes, Bob Martin
 5   asked us to do that, yes.
 6        Q     Who's Bob Martin, sir?
 7        A     He's the brand quality -- he was the brand
 8   quality manager for Hummer at the time.
 9        Q     He's not now?
10        A     No, he's no longer there.
11        Q     Why is that?
12              THE COURT:  Sorry, sir, I've already ruled
13        on it.  Let's go ahead.
```

Page 28

BY MR. KODSY:
14
15      Q      Okay.  So, you actually did take --
16  disconnect the engine from the fly wheel, which is
17  the transmission, is that correct?
18      A      Correct.
19      Q      So, you did disconnect that?
20      A      Basically at that -- what we're doing
21  there is we're just isolating the engine.
22      Q      Okay.
23      A      So that the only thing -- the only thing
24  that could be emitting the vibration would be the
25  engine.
0571
1      Q      Correct.  So, if it was normal you
2  wouldn't do that though?
3      A      Well, we -- at this point, remember, I
4  didn't put the -- I was still not thinking about it
5  being a 6.2 liter.
6      Q      But your 2007 Escalades have had similar
7  problems and they have that 6.2 liter?
8      A      Yes.
9      Q      So you're already aware of this?
10      A      Right, it's a normal --
11      Q      And you still took this engine apart?
12      THE COURT:  Wait, wait, let him talk.
13      THE WITNESS:  It's a normal characteristic
14  of a 6.2.  But, again, I was not thinking that
15  your vehicle had a 6.2.  The six liter did not
16  idle the same as the 6.2.
17  BY MR. KODSY:
18      Q      And -- all right.  Never the less, you did
19  dismantle some major components on that vehicle
20  and --
21      THE COURT:  Listen, this is repetitive.
22  You already said it.  So, let's go on to
23  something else, something new.
24      MR. KODSY:  I'm just highlighting, your
25  Honor.
0572
1  BY MR. KODSY:
2      Q      Tell us about those weights that you put
3  in.  Is that a factory option?
4      A      No.  Actually -- obviously it is a GM part
5  number.  It was an application and a PI for a
6  different vehicle used years ago, but the same --
7  it's the same theory.  But there is nothing in the
8  service information that suggests we try that on
9  your vehicle.  That's something I took upon myself
10  to do.
11      Q      Because of the vibration?
12      A      Yes.  Again, remember, I'm thinking that
13  it's a six liter and, again, I didn't know what the
14  firing frequencies of the engine were.
15      Q      So -- all right.  Then you got -- how did
16  you figure out that the vibration is normal?
17      I mean, did you do any biomechanical
18  testing?  What kind of actual testing did you do to
19  make that determination?
20      A      Well, unfortunately the vibration is not
21  severe enough to even be registered on the EVA,
22  which is the Electronic Vibration Analyzer.
23      Q      What is it?
24      A      Electronic Vibration Analyzer.  It would

Page 29

Kodsy v. GM - Vol. 5

25   not -- we tried that on your vehicle just to give us
0573
1   some basis to score by to see if we're making an
2   improvement. Because when you're just sitting in a
3   car you may think you made an improvement, but if
4   you're already tune to that vibration, you make an
5   improvement, you're like is it better or is it not.
6          So, we hooked up the EVA to your steering
7   column and it was not even measurable. The
8   vibration was not even measurable by the Electronic
9   Vibration Analyzer. So, there was not a number we
10   could put on to see if we improved upon it or not
11   basically. So, at that point we just compared it to
12   the other 2008 and then further down the road with
13   four -- four other vehicles.
14      Q      All right. Tell me about that instrument
15   that you use, sir, because I'm not familiar with it.
16   I don't think any of us is.
17          THE COURT: Just ask your questions. No
18      talking to the jury, please. Just ask
19      questions and leave it at that. Thank you.
20   BY MR. KODSY:
21      Q      Tell us about that.
22      A      It's a required tool by General Motors
23   that we use to diagnose vibration concerns.
24      Q      Okay. And how does that register?
25      A      It has a sensor that we put depending on
0574
1   the type of vibration.
2      Q      Where do you put it?
3      A      Again, it depends on the vibration. If
4   you're talking about vibration at highway speeds,
5   you're gonna probably put it on a seat frame.
6          In your case, you were concerned with the
7   vibration through the steering column. So, we put
8   it on the column and it would not measure it.
9      Q      What's the capacity of it? From one to a
10   thousand?
11      A      No.
12      Q      What's the capacity?
13      A      It reads in G force. It will read .003
14   G's.
15      Q      What does that mean?
16      A      Well, one -- a G force -- one G force is
17   the weight of your body applied one time. It's
18   reading .003. It wasn't even registering .003.
19   Basically we are not supposed to even attempt a
20   repair on a vehicle if it reads less than -- more
21   than -- unless it reads more than .006 G's.
22      Q      Are you familiar with an HZ value?
23      A      Hertz frequency.
24      Q      Hertz frequency?
25      A      Sure, certainly.
0575
1      Q      You do not have that type of device, do
2   you?
3      A      Yeah. Same -- same piece of equipment.
4   It measures frequency, yes.
5      Q      It measures frequency?
6      A      Yes. That's how we determine whether it's
7   a first tire or drive line, by the frequency.
8      Q      And you're aware that the HZ is actually
9   reflective of the RPM's in the vehicle.
Page 30

Kodsy v. GM - Vol. 5

```
10    A    Yes, the RPM would be a frequency.
11    Q    How many RPM's to reach HZ is that?
12    A    It would be 60.
13    Q    60.
14         So, what are the specs for that vehicle,
15    sir?
16    A    There is no spec.
17    Q    There's no specs?
18    A    No.
19    Q    There's no HZ frequency for that -- for
20    that vehicle or any other vehicle?
21    A    No, no.
22    Q    You sure about that?
23    A    Yeah.
24    Q    So, if it didn't register, what was the
25    RPM's on the vehicle when you inspected it?
0576
1     A    I don't recall.  It was idle, but I don't
2     recall.
3     Q    You then put down here -- I mean, this is
4     obviously -- if it's relevant to the HZ, you
5     wouldn't document it and say to the customer, wow,
6     we did this test and it didn't register or this is
7     the amount?  Did you have anything here, sir?
8     A    No, I didn't have anything.
9     Q    Did you write these up, these invoices?
10    A    No, service technicians.
11    Q    Were you the actual mechanic on this
12    truck?
13    A    No.  I worked with them though.
14    Q    You work with them?
15    A    I work with them as well --
16    Q    In what way?
17         THE COURT:  Wait a minute.  Let him
18    finish.
19         Go ahead.
20         THE WITNESS:  I work with them as well as
21    my foreman.
22    BY MR. KODSY:
23    Q    As a foreman?
24    A    With -- as well as my foreman.  There was
25    both of us involved, as well as the technician.
0577
1     Q    But you did not actually put any type of
2     measurements or reference to your alleged test, is
3     that correct?
4     A    No, myself and my foreman sat in it with
5     EVA.
6     Q    But there's nothing here?
7     A    No, there was nothing to put in there.
8     Q    You were aware that the initial complaint
9     for all these repairs was a vibration, is that
10    correct?
11    A    We used the EVA at the same time we put
12    the weights on because we wanted to see if there was
13    a number that we could measure to see if we made an
14    improvement.  That was the whole reason of using the
15    EVA.  There was -- we wanted to get a number.  So,
16    if we saw .006 and put the weights on it and it went
17    down to .003, we'd say, okay, we made an
18    improvement, instead of just going by what we felt.
19         Again, like I said, when you tune into
20    something, you may make an improvement, you may not.
```

Page 31

Kodsy v. GM - Vol. 5

```
  6      A     It does come with underbody protection.
  7  That does not mean that it will not rust.  It's just
  8  surface rust.
  9      Q     Sir, when you did this repair you were
 10  talking about how many miles were on that vehicle?
 11      A     5,000.
 12      Q     Okay.  5,000 approximately.  5,224, does
 13  that sound right?
 14      A     Right.
 15      Q     So, at 5,000 miles you have to do some
 16  major waterproofing, is that correct?
 17      A     No, it wasn't waterproofing.
 18      Q     Well, rust --
 19          THE COURT:  Sir, one question at a time,
 20  please.
 21          THE WITNESS:  It's a paint.  It's a paint
 22      that they use in automotive restoration.  It's
 23      a rust inhibiting paint.
 24  BY MR. KODSY:
 25      Q     Yeah, I understand what you're saying,
0581
  1  it's a rust inhibitive.  But shouldn't that vehicle
  2  already come with it already there from the factory,
  3  because it says so on the sticker, is that correct?
  4      A     Yes, and it does.
  5      Q     But it wasn't -- it necessitated your
  6  additional work, is that correct?
  7      A     It was strictly aesthetic, strictly
  8  aesthetic.
  9      Q     What was that?
 10      A     Your complaint was strictly aesthetics.
 11      Q     Aesthetics?
 12      A     Yes.  You didn't like the brown look on
 13  certain suspension parts.
 14      Q     It was rust, is that correct?
 15      A     Yes.
 16      Q     Okay.  So, it's not really brown, it's
 17  rust?
 18      A     But it was aesthetic.  It's not
 19  functional.  It didn't effect the functionality.
 20      Q     Isn't that truck an off road truck?
 21      A     Yes.
 22      Q     So it's made to get wet, is that correct?
 23      A     Yes.
 24      Q     So it's not supposed to have rust, is that
 25  correct?
0582
  1      A     No.  You can't prevent rust.
  2      Q     Okay.  You tried to, right?
  3      A     Uh-huh.
  4      Q     Okay.  But that's --
  5      A     We tried to satisfy you.
  6      Q     Okay.  But does this sticker says
  7  underbody protection?
  8      A     Yes, it does.
  9      Q     And what does that tell you?
 10          What does that actually mean?  Shouldn't
 11  that mean that it should have --
 12      A     Well, the metal has a coating on it.
 13      Q     Excuse me?
 14      A     The metal has a coating on it.
 15      Q     So, which part did you paint?
 16      A     Whatever was rusting.  I don't recall.
```

Page 33

Kodsy v. GM - Vol. 5

17   Whatever you were complaining --
18.       Q     Was it metal?
19            THE COURT:  Sir, wait a minute.  Let him
20       finish talking before you ask another question.
21       Go ahead.
22            THE WITNESS:  I guess it was metal, yes.
23   BY MR. KODSY:
24       Q     How many other vehicles did you have to
25   disconnect and try to isolate the vibration on a
0583
1    vehicle?  How many other times did you do that?
2        A     I don't know.  I don't know.
3        Q     Was that the first time?
4        A     No, no definitely not, no.
5        Q     Okay.  So you've done that before?
6        A     Yes.
7        Q     And what was the end result of that?
8        A     Well, it's strictly done to isolate
9    what -- where the vibration is coming from to see if
10   it's in the engine or some other place.
11       Q     And if it was in the engine, what would
12   you do?
13       A     In your case, it's normal characteristics.
14       Q     I'm just asking you a general question.
15   If it was in the engine, what would you do?
16       A     It just gives us the direction to look.
17   It's telling us it's in the engine.
18       Q     And then as a remedy, what would you do?
19       A     We'd proceed to diagnose it.
20       Q     In what way?
21       A     Do you rebuild engines over there?
22       A     Yes, sir.
23       Q     And doesn't that void the warranty once
24   you open up the engine?
25       A     No.
0584
1        Q     It doesn't?
2        A     We would do it -- when you say rebuild, if
3    we have an engine, a mechanical failure under
4    warranty, we have the capability to completely
5    rebuild that engine.
6        Q     Do you do it there on the premises?
7        A     Yes.
8        Q     And isn't there a separate repair shop now
9    that's handling all that?
10       A     No, never have.  I've had the same --
11       Q     Was it --
12       A     I've had the same engine technician since
13   1996.
14       Q     So, what kind of specs did you have on the
15   air and fuel ratio for that vehicle?
16       A     I don't know.  Remember, I wasn't involved
17   in the repair when the mass air flow sensor failed.
18       Q     I mean, don't you document stuff like that
19   for the customer to say, look, you know, here's G
20   force or here's your air specs and -- don't you do
21   anything like that?
22       A     Well, they documented the DTC's on the
23   ticket.
24       Q     What was that?
25       A     They documented the DTC's on the ticket.
0585
1        Q     What is a DTC, sir?

Page 34

Kodsy v. GM - Vol. 5

2      A     That's the trouble code, diagnostic
3  trouble code.
4      Q     Okay.  And if you do not have a trouble
5  code and you still have a problem, how do you
6  proceed?
7      A     As far as -- we would address the problem,
8  what would the complaint be.
9      Q     Okay.  In this case you didn't have a
10 trouble code for the vibration, is that correct?
11     A     Never had a trouble code for the
12 vibration.
13     Q     Never had a trouble code?
14     A     No.  The vehicle was stalling when it came
15 in with a trouble code.
16     Q     But yet you did add weights, allegedly you
17 added weights, you did dismantle the fly wheel from
18 the engine, and you didn't have no trouble codes, is
19 that correct?
20     A     Correct.
21     Q     Is it true that the oxygen sensors are the
22 ones that usually send the trouble code?
23     A     No, not at all.
24     Q     How is the oxygen level usually measured?
25     A     By the oxygen sensor.
0586
1      Q     Okay.  And that will tell you the fuel and
2  air ratio, is that correct?
3      A     Right.  But that doesn't mean that the
4  sensor is failing.  The sensor is doing its job.  If
5  a sensor fails, it can't tell it's going to be fixed
6  at a certain number.  That's how an oxygen sensor
7  fails.
8      Q     So it won't really give you a trouble
9  code?
10     A     Yes, it will because it's seeing that it's
11 not moving high and low assuming it's a fixed value.
12     Q     Aren't those sensors have a wide range of
13 detecting the measurement?
14     A     Yes, yes.  And they -- they very seldom
15 fail anymore.  It's not like years ago where they
16 failed quite frequently.
17     Q     Oh, okay.
18           Isn't it true that all these new vehicles,
19 fuel injected, they have these new sensors with a
20 wide range so they don't fail very often?
21     A     The sensor is only -- the sensor's like a
22 battery.  It produces the voltage with the amount of
23 oxygen that's in the exhaust system.  So, how the
24 oxygen sensors used to fail, is they would just get
25 to a fixed value of half a volt, that's the applied
0587
1  voltage, and there would be no change.  I'm not sure
2  exactly what you're asking me.
3      Q     Okay.  I'm going to clarify it some more
4  for you because I don't understand what you're
5  telling me.
6           The oxygen sensor, it's a sensor, correct?
7      A     Correct.
8      Q     Okay.  It detects what, a measurement,
9  correct?
10     A     Yes, oxygen, it creates a voltage.
11     Q     Correct me if I'm wrong.  It's an oxygen
12 sensor, is that correct?

Page 35

Kodsy v. GM - Vol. 5

```
13     A   Yes.
14     Q   So that entails gas and air, is that
15         correct?
16     A   Yes.
17     Q   Okay.  So, now, what are the -- before we
18         go further, let me ask you what's the standard for a
19         fuel injected vehicle air and fuel ratio?
20     A   14:7:1.
21     Q   Okay.  Perfect.
22         Now, the sensor, what is its capacity from
23         14:7 to what or where?
24     A   I think you don't --
25     Q   Doesn't it have a reading for that?
```

0588

```
1      A   No, I think you don't quite understand how
2          it works.  That -- the 14:7:1, that's what the
3          combustion engine performs best at.  It's the PCM,
4          the power control module, that tries to keep the
5          fueling at 14:7:1.
6              It looks at the information that the
7          oxygen sensor's giving, as well as other
8          information, and adds or detracts injector on time.
9          And that's the fuel trim number that we get.  It's
10         gonna be a plus or a minus or a zero, zero being
11         ideal, zero being 14:7:1.
12             If it's a minus number, that means the
13         computer is taking away injector pulses to keep it
14         at 14:7:1.  So, you're still running at 14:7:1, but
15         the computer's adjusting the fueling to keep it at
16         14:7:1.
17             When that number gets so far out of range --
18         like about 10 percent, it's gonna turn the engine
19         light on and say, hey, we got a problem, I can't
20         keep this thing at 14:7:1.
21     Q   Isn't it true that the new sensors
22         provided on all these new vehicles are -- range from
23         9:1 to 18:17
24     A   That would be --
25     Q   There is no zero because obviously the
```

0589

```
1          motor wouldn't run?
2              That would be millivolts.  Sensors are in
3          millivolts.  That's what you're looking at.  Or a
4          lambda number.  You're probably looking at a lambda
5          number.
6      Q   Okay.  So, what was the exact measurement
7          when inspected?  Because obviously you're saying you
8          tested it, is that correct?
9      Q   We didn't check the oxygen sensors.
10         you did not?
11     A   No.
12     Q   You did replace the mass air flow sensor?
13     A   Correct.
14     Q   Okay.  What -- isn't that for the air and
15         the fuel mixture?
16     A   Correct.
17     Q   Okay.  And you did not get a measurement
18         on that?
19     A   No.  They didn't -- I don't know.  I
20         wasn't involved in the repair.  They -- that's
21         measured in grams.  They didn't put it on the repair
22         order, but it's not really necessary to put it on
23         the repair order because it's going to be varying
```

Page 36

Rodsy v. GM - Vol. 5

24    with the throttle, RPM and everything else.
25      Q    Right.  I believe that -- Okay.
0590
1           So, this was not done?
2      A    No.  And there really would be no reason
3  to.
4      Q    And you never took it upon yourself to
5  even check it?
6      A    I was not even involved.  But, yeah, I
7  would have looked at it at idle to see what it was,
8  but obviously it fixed the vehicle.
9      Q    Okay.  If the fuel and air sensor
10  registered a 12.4, how would that vehicle run?
11      At idle?
12      A    At idle or all times.  Most likely at
13  idle.
14           If it's reading a 12.4 at idle, it would
15  be running too rich.
16      Q    oh, rich.
17           So, would that also have a vibration?
18      A    It's hard to say.  It would probably be
19  chugging and blowing black smoke, stalling, you
20  know.
21      Q    But it wouldn't give you a code either,
22  would it?
23      A    yes, it would have, oh, yes.
24      Q    Not if the sensor is gauged for more
25  leaner and higher?
0591
1      A    No, if you're reading 12.7 at idle you're
2  gonna to turn a light on.
3      Q    It depends on the sensor, is that right?
4      A    No.  On any vehicle if you're reading 12.7
5  at idle, you're gonna turn a light on.
6      Q    But you're not sure about that because you
7  haven't tested it?
8      A    Haven't tested what?
9      Q    You haven't done that test.
10      A    I'm just --
11      Q    That's not something you commonly do?
12      A    When you have the mass air flow concern,
13  I'm sure they looked to see what the number was.
14      Q    Who?
15      A    The technician that worked on the vehicle.
16      Q    Which technician was that, sir?  Do you
17  have that in front of you?
18      A    Yeah.  Do you need his name or --
19      Q    Yeah, yeah.  Tell us his name and what you
20  know about him.
21      A    That was Brian Penny, who was my shop
22  foreman.
23      Q    He actually worked on the vehicle?
24      A    Yes.
25      Q    okay.  when you say he's a shop foreman,
0592
1  what kind of qualifications gives him to work on
2  anybody's vehicle?
3      A    Well, he has very similar qualifications
4  to me.  And actually I would say that he's more
5  skilled than I am.
6      Q    And you have not gotten any type of
7  measurements from him either, is that correct?
8      A    I'm sure he checked them.  He didn't
                                    Page 37

Exhibit

- E -



General Motors Corporation
VSSM Southeast Region
11700 Great Oaks Way
Alpharetta, GA 30022

March 26, 2009

Mr. Sherif Rafik Kodsy
15968 Laurel Oak Circle
Delray Beach, Fl., 33484                    **VIA CERTIFIED U.S.MAIL**

Dear Mr. Kodsy:

This letter is being written to confirm receipt by our Business Resource Center of your written certified mail dated March 17, 2009 filed with the Florida Lemon Law Board regarding your 2008 Hummer H2, VIN 5GRGN23878H107653.

In your letter you indicate that a non-GM authorized dealer, in particular the Boca Raton Tire Center, a Good Year Store in Boca Raton, Florida prepared a diagnostic check for which you paid for with your vehicle showing 11, 658 miles before test, 11, 658 miles after test and you provided us with said diagnosis copy.

In said diagnosis this particular tire center  states they scanned the vehicle computerized system, found no codes in it, but they do feel a rough idle and engine vibration, that vehicle shifts hard intermittently, also checked brakes for noise noticing scuff marks on rotors. They also indicate found a Technical Service Bulletin (TSB) for cleaning out injectors and that they recommend taking back to the dealer for further inspection and warranty repairs. You state in your letter and we copy:
"The consumer Sherif Rafik Kodsy, hereby requests that the manufacturer provide its warranties as alleged by completing the service as needed and listed in the technical service bulletin 03-06-04-030E (section 06-engine/propulsion system). Fuel injector cleaning is needed and required for the SUV's proper performance without prejudice."

In order to comply, as we always have done so with the terms of our limited warranty still in effect with your Hummer H2, we have contacted Mr. Joe Bardill, dealer Service Manager of your sales and servicing dealer Coral Cadillac-Hummer, and our GM District Service Manager Mr. Thomas Thornton to inspect/check and repair your vehicle under the limited warranty terms if any warrantable item covered by our limited warranty is found to be defective after an authorized General Motors diagnosis is performed. As you know any service or maintenance needed resulting from our inspection which is not covered by our limited warranty after a diagnosis is rendered will be notified to you and quoted for your approval or declination of the same. If no service is needed it will also be notified to you.

Cont. P 2

Please contact Mr. Joe Bardill, Service Manager of Coral Cadillac-Hummer at your earliest convenience and provide him with three possible appointment dates for the week days of April 6 to April 9, 2009 in order to coordinate your visit that week at Coral Cadillac-Hummer to review your concerns.

Thank you for sharing your concerns with us and be of assistance once more.

Sincerely,

Jorge R. López Gonzalez
Regional Business Resource Support Mgr.
GM Southeast Region
11700 Great Oaks Way
Alpharetta, GA 30022
Office:  813-480-1388
Fax:    813-991-0437


Cc: Mr. Joe Bardill, Service Manager, Coral Cadillac-Hummer, Pompano Beach, Florida
    Mr. Thomas Thornton, GM District Service Manager