Jonathan L. Flaxer, Esq.
S. Preston Ricardo, Esq.
Dallas L. Albaugh, Esq.
Michael S. Weinstein, Esq.
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
Telephone:  (212) 907-7300
Facsimile:  (212) 754-0330

Alexander H. Schmidt, Esq.
Malcolm T. Brown, Esq.
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone:  (212) 545-4600
Facsimile:  (212) 545-4653

*Counsel for Plaintiffs*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION CORP., | : | Case No. 09-50026 (REG) |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------X

| | | |
|---|---|---|
| STEVEN GROMAN, ROBIN DELUCO | : | |
| ELIZABETH Y. GRUMET, ABC FLOORING, | : | |
| INC., MARCUS SULLIVAN, KATELYN | : | |
| SAXSON, AMY C. CLINTON, AND ALLISON | : | Adv. Pro. No. _____ |
| C. CLINTON, on behalf of themselves, and all | : | |
| others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| -v- | : | |
| | : | |
| GENERAL MOTORS LLC, | : | |
| | : | |
| Defendant. | : | |

---------------------------------------------------------------X

1991968.4

**COMPLAINT**

Dr. Steven Groman, Robin DeLuco, Elizabeth Y. Grumet, ABC Flooring, Inc., Marcus

Sullivan, Katelyn Saxson, Amy C. Clinton, and Allison C. Clinton, each individually and as a

class representative on behalf of all similarly situated persons (collectively, the "**Plaintiffs**"),

through their counsel, Golenbock Eiseman Assor Bell & Peskoe LLP and Wolf Haldenstein

Adler Freeman & Herz LLP, on knowledge as to their own status and actions and otherwise upon

information and belief, respectfully allege for their Complaint (the "**Complaint**") against

General Motors LLC ("**GM**"), as follows:

**Nature of Adversary Proceeding**

1.      Over a decade ago, GM discovered an ignition switch defect in millions of its

vehicles that rendered them unfit for their intended purpose – to provide safe, reliable

transportation – insofar as the defect could cause the vehicles' engines to shut off mid-ride,

resulting in a complete and sudden loss of power.  Instead of replacing the defective ignition

switch, or notifying the National Highway Traffic Safety Administration ("**NHTSA**"), vehicle

owners or the consuming public of the danger, GM made a business decision to conceal its

existence.  When GM eventually began to manufacture vehicles with the corrected part, it used

the same part number to avoid any notice of or questions about the change.

2.      Once GM could no longer conceal the existence of the ignition switch defect in

certain of its vehicles, it was forced to disclose that, by its own count, the defect is linked to at

least 31 accidents and 13 deaths.  According to the Center for Automotive Safety, data recorded

on NHTSA's Fatal Analysis Reporting System indicates that 303 fatalities have resulted.

3.      To make matters worse, during its 2009 chapter 11 case, GM fraudulently

concealed the ignition defect as it took billions of dollars in taxpayer money from the U.S.

Government and obtained the U.S. Government's sponsorship of a plan of reorganization that salvaged the company's very existence. During the bankruptcy case, GM crafted and obtained court approval of a sale order that permitted a newly-formed GM entity to buy substantially all of the old GM's assets "free and clear" of any claims, including product liability claims, that arose before court approval of the sale. Despite having long known about the ignition defect, GM did not disclose its existence to the Bankruptcy Court, to persons who owned or leased GM vehicles containing the defect as of that time, the U.S. Government, or to any other parties in interest. As a result, consumers did not have an opportunity to assert or have any reason to believe that they should try to assert any objections or claims in the bankruptcy case concerning damages caused by the defect.

4.       Now that the defect has been disclosed as a result of a nationwide recall, GM has taken the position that the claims related to the vehicles' unmerchantability, and its own misfeasance/malfeasance, are barred by this Court's 363 sale order. GM's argument suggests that the U.S. Government would have agreed to extend $40 billion of taxpayer money for GM's restructuring, and supported shielding it from liability through the sale order, had it known of GM's intentional misconduct.

5.       Plaintiffs, who have commenced class action complaints against GM on behalf of themselves and others for losses resulting from the defects, believe otherwise and bring this action to obtain an order declaring that the sale order cannot be used by GM to absolve it of any liability from Plaintiffs' defect claims.

## Jurisdiction and Venue

6.       This Court has subject matter jurisdiction over the Complaint pursuant to 28 U.S.C. §§ 1334(b) and 2201.

1991968.4

7.      The Complaint is brought pursuant to Fed. R. Bankr. P. 7001(2), (7), and (9), and

is a core proceeding under 28 U.S.C. 157(b)(2), including subsections (A), (K), (N), and (O)

thereof.

8.      Venue of the Complaint in the Southern District of New York is proper pursuant

to 28 U.S.C. § 1409(a).

### The Parties and the Class Action Complaints

9.      Plaintiff and proposed New York State Class Representative Dr. Steven Groman

("**Groman**") is a resident and citizen of the State of New York.   On April 8, 2014, Groman filed

a class action complaint against GM in the United States District Court for the Southern District

of New York, which is pending under Case No. 14-cv-02458 (JMF) (the "**Groman Action**").

10.     Plaintiff and proposed New York State Class Representative Robin DeLuco

("**DeLuco**") is a resident and citizen of the State of New York.   On April 16, 2014, DeLuco filed

a class action complaint against GM in the United States District Court for the Southern District

of New York, which is pending under Case No. 14-cv-02713 (the "**DeLuco Action**").

11.     Plaintiff and proposed California State Class Representative Elizabeth Y. Grumet

("**Grumet**") is a resident and citizen of the State of California.

12.     Plaintiff and proposed Florida State Class Representative ABC Flooring, Inc.

("**ABC**") is a Florida corporation.

13.     Plaintiff and proposed Illinois State Class Representatives Marcus Sullivan

("**Sullivan**"), Amy C. Clinton ("**Amy Clinton**"), and Allison C. Clinton ("**Allison Clinton**"), are

residents and citizen of the State of Illinois.

14.     Plaintiff and proposed Michigan State Class Representative Katelyn Saxson

("**Saxson**") is a resident and citizen of the State of Michigan.

1991968.4

15.    On March 27, 2014, Plaintiffs Grumet, ABC, Sullivan, Amy Clinton, Allison Clinton, and Katelyn Saxson (collectively, the "**California Class Representatives,**" and together with Groman and DeLuco, the "**Class Representatives**") filed a class action complaint against GM in the United States District Court for the Southern District of California, which is pending under Case No. 14-cv-0713 (the "**California Action**," and together with the Groman Action and the DeLuco Action, the "**Class Action**").

16.    In the Class Action, the Class Representatives, on behalf of all similarly situated persons, each of whom own, owned, lease or leased one or more of the following vehicles: 2005-10 Chevrolet Cobalt; 2005-10 Pontiac G5; 2003-2007 Saturn Ion; 2006-11 Chevrolet HHR; 2005-2006 Pontiac Pursuit (Canada); 2006-10 Pontiac Solstice; and 2007-10 Saturn Sky (the "**GM Vehicles**"), filed complaints (collectively, the "**Class Action Complaints**") seeking to hold GM liable for damages that the class members have suffered as a result of the defective ignition switches installed in the GM Vehicles (the "**Defective Vehicle Claims**").  True and correct copies of the Class Action Complaints are attached hereto as **Exhibits 1 through 3**.

17.    Defendant General Motors LLC ("**GM**") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009 and, on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("**Old GM**") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

18.    Plaintiffs bring this action pursuant to Rules 23(a), (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, as incorporated by Rule 7023 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") on behalf of the following Classes:

    a.    All persons and entities that purchased or leased Defective Vehicles in the United States between 2002 and the present (the "**Class Period**") (the

5

"**<u>Nationwide Class</u>**").

b.      All persons and entities that purchased or leased Defective Vehicles during the Class Period in the State of New York (the "**<u>New York State Class</u>**").

c.      All persons and entities that purchased or leased Defective Vehicles during the Class Period in the State of California (the "**<u>California State Class</u>**").

d.      All persons and entities that purchased or leased Defective Vehicles during the Class Period in the State of Florida (the "**<u>Florida State Class</u>**").

e.      All persons and entities that purchased or leased Defective Vehicles during the Class Period in the State of Illinois (the "**<u>Illinois State Class</u>**").

f.      All persons and entities that purchased or leased Defective Vehicles during the Class Period in the State of Michigan (the "**<u>Michigan State Class</u>**," and together with the New York, California, Florida, and Illinois State Classes are, collectively, the "**<u>State Classes</u>**")

19.     Together, the Nationwide and State Classes shall be collectively referred to hereinafter as the "**<u>Class</u>**." The Class excludes GM and any entity in which GM has a controlling interest, and its officers, directors, legal representatives, successors and assigns. The Class also excludes any entity in which GM has or had a controlling interest, and its officers, directors, legal representatives, successors and assigns.

20.     The Class is so numerous that joinder of all members is impracticable.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

22.     The Class Representatives' claims are typical of the claims of the Class. As alleged herein, the Class Representatives and members of the Class all sustained damages arising out of GM's same course of unlawful conduct.

23.     There are questions of law and fact common to the Class, including but not limited to:

6

- Whether and when GM and its predecessor had knowledge of the defect prior to its issuance of the current safety recall;

- Whether GM and its predecessor concealed defects affecting the GM Vehicles;

- Whether GM bears liability for GM Vehicles that members of the Class purchased or leased after July 10, 2009;

- Whether the Sale Order (as defined below) was approved in violation of Presale Plaintiffs' (as defined below) due process rights, and as a result cannot bind the Presale Plaintiffs;

- Whether GM is precluded and estopped from invoking, any claimed protections provided by the Sale Order from Defective Vehicle Claims given that the same employees of Old GM who concealed the Defective Ignition Switch (as defined below in paragraph 37) from the Bankruptcy Court thereafter continued to do so as employees of GM, and, like Old GM, thereby prevented Plaintiffs from asserting their rights concerning the Defective Vehicle Claims in the Bankruptcy Case;

- Whether Presale Plaintiffs were denied an opportunity to protect their rights in connection with the 363 Sale (as defined below) as a result of Old GM's concealment and misconduct and, consequently, are entitled to obtain equitable relief from the Sale Order in order to assert their claims against the GM relating to the Defective Ignition Switch;

- Whether Plaintiffs are entitled to a declaration that the Sale Order is void and unenforceable to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims; and

- Whether Plaintiffs are entitled to a declaration that the Sale Order is void and unenforceable as a fraud on the Bankruptcy Court to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims.

24.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical and not practical.  The members of the Class have a high degree of similarity and are cohesive.  The Class Representatives anticipate no difficulty in the management of this matter as a class action.

25.    Class action status is also warranted under Federal Rules of Civil Procedure 23(b)(2) and Bankruptcy Rule 7023 because GM has acted or refused to act on grounds generally

1991968.4

applicable to the Class, thereby making appropriate final injunctive relief or corresponding

declaratory relief with respect to the Class as a whole.

26.     Class action status is also warranted under Federal Rules of Civil Procedure

23(b)(3) and Bankruptcy Rule 7023 because questions of law or fact common to the members of

the Class predominate over any questions affecting only individual members, and a class action

is superior to other available methods for the fair and efficient adjudication of this controversy.

### Factual Background

***Old GM Files for Bankruptcy and Reorganizes with the Backing
Of, and Extensive Financial Support From, the U.S. Government***

27.      In late 2008, while in the midst of a severe liquidity crisis, Old GM was

compelled to seek financial assistance from the U.S. Government in order to continue operations

and reorganize.  Between December 2008 and May 2009, the U.S. Government provided Old

GM with billions of dollars of taxpayer money in the form of short-term, emergency funding and

working capital loans as Old GM finalized a restructuring plan.

28.     On June 1, 2009 (the "**Petition Date**"), Old GM filed a petition under chapter 11

of the Bankruptcy Code (the "**Bankruptcy Case**") in this Court (the "**Bankruptcy Court**").  At

the time of its filing, Old GM's largest secured creditor was the United States Treasury.

29.     On the Petition Date, Old GM filed its motion for approval (the "**Sale Motion**")

to sell substantially all of its assets to a U.S. Treasury-sponsored purchaser via a Master Sale and

Purchase Agreement dated as of the Petition Date (the "**363 Sale**").

30.     On June 3, 2009, the U.S. Government provided Old GM with $30.1 billion in

debtor-in-possession financing.

8

31.     As Old GM stated in its filings with the Bankruptcy Court, restoring consumer

confidence in GM was critical to its restructuring plan and a fundamental premise of the U.S.

Treasury program:

- In the Sale Motion, Old GM stated that the "363 Transaction will restore
confidence on the part of consumers that they can purchase a GM vehicle without
concerns regarding residual value, replacement parts, warranty obligations, and
maintenance."

- In its Disclosure Statement, Old GM stated that: ". . . a fundamental premise of
the U.S. Treasury program was to revive consumer confidence in [Old] GM
products and services for the benefit of [Old] GM's employees, its extended
supplier and dealer network, and the families and communities that depend on
[Old] GM operations.  Knowing that [Old] GM's business would exist and be
supported in the form of GM, consumers would have the confidence that if they
purchased a GM vehicle, there would be a dealer network and U.S. Government
support to assure parts, warranty service, and a market for future used GM vehicle
trade-ins."

32.     On July 5, 2009, only a month after the Petition Date, the Bankruptcy Court

entered an order approving the sale of substantially all of Old GM's assets to newly-created GM

(the "**Sale Order**"), which for all practical purposes is the same as Old GM, under the Amended

and Restated Master Sale and Purchase Agreement ("**MPA**"), dated as of June 26, 2009, by and

among Old GM and its debtor subsidiaries, as sellers, and GM, the purchaser sponsored by the

U.S. Treasury.

33.     The Sale Order purported to transfer substantially all of Old GM's valuable

operating assets to GM (the "**Assets**") "free and clear" of claims, including claims for successor

liability.  Specifically, Paragraphs 7-10 of the Sale Order provide:

> Except for the Assumed Liabilities,[1] pursuant to sections 105(a) and
> 363(1) of the Bankruptcy Code, the Purchased Assets shall be transferred
> to the Purchaser in accordance with the MPA, and, upon Closing, shall be
> free and clear of all liens, claims, encumbrances, and other interests of any
> kind or nature whatsoever (other than Permitted Encumbrances), including
> rights or claims based on any successor or transferee liability, and all such

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Sale Order.

9

liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their priority, with the same validity, force and effect that they now have as against the Purchased Assets, subject to any claims and defenses a Seller or any other party in interest may possess with respect thereto.

Except as expressly permitted or otherwise specifically provided by the MPA or [the Sale] Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined (with respect to future claims or demands based on exposure to asbestos, to the fullest extent constitutionally permissible) from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor liability.

[The Sale] Order (a) shall be effective as a determination that, as of the Closing, (i) no claims other than Assumed Liabilities, will be assertable against the Purchaser, its affiliates, their present or contemplated members or shareholders, successors, or assigns, or any of their respective assets (including the Purchased Assets); (ii) the Purchased Assets shall have been transferred to the Purchaser free and clear of all claims (other than Permitted Encumbrances); and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities . . .

The transfer of the Purchased Assets to the Purchaser pursuant to the MPA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title and interest of the Sellers in and to the Purchased Assets free and clear of any all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

34.    On March 29, 2011 (the "**Confirmation Date**"), the Court entered an order confirming Old GM's Second Amended Joint Chapter 11 Plan (the "**Plan**").  The Plan became effective on March 31, 2011.

35.    The Plan established post-confirmation trusts to administer creditor claims and make plan distributions to creditors.  The Motors Liquidation Company GUC Trust (the "**GUC Trust**") was formed for the benefit of general unsecured creditors, and the MLC Asbestos PI Trust (the "**Asbestos Trust**") was formed for the benefit of asbestos personal injury claimants. All claimants against Old GM as of the Confirmation Date received a beneficial interest in the GUC Trust or the Asbestos Trust.

36.    In or about April of 2011, Old GM announced that 97% of creditor claims had been resolved, and distributed more than 75% of the Stock and Warrants that Old GM owned in GM to unsecured creditors.

***Old GM and GM Have Collectively Known About, Yet***
***Failed to Disclose, the Defective Ignition Switch for Over a Decade***

37.    Since 2002, many years before the Bankruptcy Case, GM has sold millions of GM Vehicles throughout the world that had a life-threatening defect that it knew could cause their engines to shut down during normal operation without warning.   Namely, in GM Vehicles, the ignition switch, if jostled or if the key had ornaments hanging from it, could unintentionally shift the ignition of a moving car from the run position to "accessory" power mode, which results in a sudden and complete loss of power (the "**Defective Ignition Switch**").   Once the engine and electrical system shut down, the vehicle's power steering and power brakes fail, and the vehicle's airbags disengage, creating a substantial risk that the vehicle will be involved in an accident that maims or kills the passengers and potentially others.

1991968.4

38.    Old GM installed the Defective Ignition Switch in its cars from 2001 to 2009. GM continued designing and manufacturing vehicles with the Defective Ignition Switch through 2011.

39.    Between 2001 and the present, Old GM – and subsequently GM – have received hundreds of complaints that GM Vehicles were prone to sudden shut-off.  Despite these complaints and their knowledge about the Defective Ignition Switch, and at all relevant times, Old GM and GM have advertised and promoted the GM Vehicles as highly reliable and safe.

40.    GM itself has already linked the Defective Ignition Switch to 31 accidents and 13 deaths.[2]

41.    On March 12, 2014, *The New York Times* revealed that GM has known since 2001 that one of the GM Vehicles had serious safety problems involving the Defective Ignition Switch.  In a chronology submitted to regulators, GM has admitted that during the development of the Saturn Ion in 2001, it learned that the ignition switch could turn off inadvertently.  While GM insisted that the issue was resolved at that time, a 2003 internal inquiry indicated otherwise.[3]

42.    As another example of Old GM's long-held knowledge of the Defective Ignition Switch, engineers employed by Old GM determined as early as 2004 that a defect in the ignition switch meant a key could be unintentionally jostled out of the "Run" position to the "Accessory" or "Off" position by a heavy key ring or by a nudge from a driver's leg, and that with the ignition switch in the "Accessory" or "Off" position, causing the car to stall and shut down power to the

---

[2] Hilary Stout, *A Bid to Park Recalled G.M. Cars is Denied*, The New York Times, Apr. 17, 2014, http://www.nytimes.com/2014/04/18/business/ move-to-ban-recalled-gm-cars-from-roads-is-denied.html.

[3] Hilary Stout, Bill Vlasic, Danielle Ivory, and Rebecca R. Ruiz, *Carmaker Misled Grieving Families on a Lethal Flaw*, The New York Times, Mar. 25, 2014, http://www.nytimes.com/2014/03/25/business/carmaker-mislead-grieving-families-on-a-lethal-flaw.html.

1991968.4

engine and electrical system, and also disable the airbags so that any accident ensuing from the
sudden and unexpected stall would not deploy the airbag safety devices, which would leave the
vehicle's occupants exposed to grave bodily harm.

43.    After identifying the Defective Ignition Switch, the Old GM engineers proposed a
fix.  Old GM executives, however, decided that the cost was prohibitive and declined to take
remedial action.  It has been reported that the 2004 proposed fix was actually less than $12 per
vehicle.  Thus, to save a few dollars per vehicle, Old GM elected not to recall the vehicles or
replace the Defective Ignition Switch and, instead, deliberately chose to put millions of defective
GM Vehicles on the road and expose its customers and millions of other Americans to mortal
danger every time one of the GM Vehicles was on the roadways.

44.    Reports detailing sudden ignition turn off continued through 2005; another fix
was considered by Old GM but not implemented.[4]   Instead, Old GM sent dealers a technical
service bulletin about the 2005-06 Cobalt warning about a stalling problem related to heavy key
rings.  At that time, an Old GM executive explained, "in rare cases when a combination of
factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently
bumping the ignition key to the accessory or off position while the car is running.  Service
advisers are telling customers they can virtually eliminate this possibility by taking several steps,
including removing nonessential material from their key rings."[5]

45.    In or about 2006, Old GM considered using the switch with the Defective Ignition
Switch in its redesigned 2007 Cadillac SRX station wagon.  However, after Old GM test

---

[4] *See* Christopher Jensen, *In GM Recalls Inaction and Trails of Fatal Crashes*, The New York Times, Mar. 12, 2014,
http://www.nytimes.com/2014/03/03/business/in-general-motors-recalls-inaction-and-trail-of-fatal-crashes.html.

[5] Id.

13

engineers complained that they could hit the ignition key with a knee and turn off the vehicle, Old GM chose a different design.[6]

46.     In late 2006, Old GM implemented a new ignition switch design to correct the Defective Ignition Switch in parts to be used in later models.  But Old GM chose not to issue a new part number for the non-defective part.[7]

47.     During and prior to 2007, Old GM conducted an extensive review of electronically captured data retrieved from sensing modules removed from wrecked cars. Premised upon a review of this information, *The New York Times* stated that by the end of 2007, Old GM recognized for certain the "link between a faulty switch and deactivated air bags":

> And an even bigger communication gap on the Cobalt appeared to exist between the engineers in Warren, Mich., and the company lawyers in downtown Detroit. The most glaring example was that GM officials meeting with federal regulators in March 2007 did not know about a fatal Cobalt wreck in 2005 – even though GM's legal department had had an open file on the case for almost two years.

> Within the product development system was an isolated, subgroup of engineers assigned to Cobalt safety tests.  According to the chronology GM has submitted to federal safety regulators, an unknown number of engineers were involved in opening – and closing – four separate inquiries on the Cobalt between 2004 and 2009.   Engineers also performed four other analyses.

> By the end of 2007, GM had examined data from nine "sensing and diagnostic modules" of crashed vehicles. In four cases, the ignition was in the accessory position.[8]

---

[6] Hilary Stout, *A Bid to Park Recalled G.M. Cars is Denied*, The New York Times, Apr. 17, 2014, http://www.nytimes.com/2014/04/18/business/ move-to-ban-recalled-gm-cars-from-roads-is-denied.html.

[7] *See* Rich Gardella & Talesha Reynolds, *Document: GM Engineer OK'd No New Part Number in Ignition Switch Fix*, NBC News, Apr. 11, 2014, http://www.nbcnews.com/storyline/gm-recall/document-gm-engineer-okd-no-new-part-number-ignition-switch-n78566.

[8] Christopher Jensen, *In GM Recalls Inaction and Trails of Fatal Crashes*, The New York Times, Mar. 12, 2014, http://www.nytimes.com/2014/03/03/business/in-general-motors-recalls-inaction-and-trail-of-fatal-crashes.html.

14

48.     Subsequently, at a May 15, 2009 meeting, Old GM confirmed from the data retrieved from the "black box" of a Cobalt during a post-accident examination that the Defective Ignition Switch had caused the accident.

49.     Despite all these events and known data, Old GM continued to conceal the Defective Ignition Switch problem and continued to subject millions of Americans to possible injury or death resulting from a failure of the Defective Ignition Switch.

***Old GM and New GM Fraudulently Concealed the Existence of the Defective Ignition Switch from the U.S. Government, the Bankruptcy Court, Plaintiffs, and the Public***

50.     Nowhere in the Sale Motion or in any of Old GM's filings did it disclose the Defective Ignition Switch.  Old GM also never disclosed the Defective Ignition Switch during the extensive, multi-day hearing on the Sale Motion.

51.     Pursuant to an Order of this Court dated June 2, 2009, Old GM was required to give notice to all known creditors of the 363 Sale.  Old GM could have reasonably ascertained the Class members through reasonably diligent efforts.  Old GM, however, did not notify the Class members of the Sale Motion or the Defective Ignition Switch despite its obligation to do so.

52.     In fact, it appears that Old GM intentionally and fraudulently concealed the Defective Ignition Switch from the Bankruptcy Court and parties in interest.

53.     Upon information and belief, in March 2009, the U.S. Government told Old GM that it would not support a reorganization and would force Old GM to liquidate unless Old GM presented a viable reorganization plan within sixty days.   Hence, Old GM had ample motive to conceal any issue that may have interfered with a viable reorganization plan.

54.     GM has already litigated one concealed liability that could have interfered with a reorganization in that time frame.  In 2012, the GUC Trust brought an adversary proceeding

15

asserting that Old GM had defrauded the Bankruptcy Court by concealing a post-petition transaction with numerous hedge funds and other holders of certain Old GM bonds that would have prevented Old GM from producing a reorganization plan acceptable to the U.S. Government had the facts underlying the transaction been disclosed pre-petition.  As this Court noted at the time, "[t]here was a lack of disclosure to the court on the matter with the potential to injure [GM] creditors to the extent of hundreds of millions if not billions of dollars."

55.    Old GM's concealment of the Defective Ignition Switch was similarly necessary to a viable reorganization in the timeframe established by the U.S. Government.  Old GM initially proposed a sale that would have completely absolved GM of all claims relating to vehicles acquired prior to the sale.  Thirty seven state Attorneys General opposed Old GM's efforts to completely absolve GM of all warranty or liability claims for vehicles designed and sold prior to the 363 Sale.  Only through the efforts of these state Attorneys General did the Sale Order provide a remedy to consumers who purchased vehicles prior to the 363 Sale for injuries or property damage that occurred after the 363 Sale and for certain statutory violations under "Lemon Laws."  Undoubtedly, the Attorneys General would have put substantial additional pressure on Old GM to convey liabilities relating to the GM Vehicles to GM had those liabilities been disclosed.

56.    Moreover, by concealing the Defective Ignition Switches, Old GM avoided the significant costs and negative reputational damage that coincide with a recall.  Old GM's failure to disclose the Defective Ignition Switch problem would have been magnified because the ongoing investigation into such failures has revealed that Old GM (and subsequently GM) had a pattern and practice of concealing serious safety issues, like the Defective Ignition Switch, by favoring a lesser measure of issuing service bulletins to its dealers about defects rather than

16

issuing recalls.[9]  If Old GM's pattern and practice of not recalling vehicles with serious safety defects had been revealed during the bankruptcy proceeding, it could have seriously impacted the U.S. Government's willingness to assist in the reorganization.

57.    Old GM directors and executives, moreover, had an independent motive to conceal facts that were potentially harmful to GM's successful reorganization, such as the Defective Ignition Switch, because they would have lost hundreds of thousands to millions of dollars in Old GM stock had Old GM liquidated.  While technically their stock was cancelled as part of the Plan, GM has since replaced (and in some cases even enhanced) the value of those officers and directors' lost stock holdings by issuing new GM stock and stock options to those very same directors and executives.

58.    Before and after the Petition Date, despite knowing about the Defective Ignition Switch and that it was linked to horrific accidents that included fatalities, Old GM and GM both vehemently and publicly denied any culpability for accidents involving the GM Vehicles.

59.    GM employed a harsh litigation strategy when dealing with the claims brought by those who were harmed and the families of the deceased.  For example, according to *The New York Times*, "in one case, GM threatened to come after the family of an accident victim for reimbursement of legal fees if the family did not withdraw its lawsuit.  In another instance, it dismissed a family with a terse, formulaic letter, saying there was no basis for claims."[10]

60.    GM also threatened injured parties with retaliatory lawsuits and asserted that the earlier bankruptcy barred these people from pursing claims.  In fact, in multiple proceedings

---

[9] Danielle Ivory, Rebecca R. Ruiz, and Bill Vlasic, *Sending Alerts Instead, G.M. Delayed Car Recalls*, The New York Times, Apr. 19, 2014, http://www.nytimes.com/2014/04/18/business/ move-to-ban-recalled-gm-cars-from-roads-is-denied.html.

[10] Hilary Stout, Bill Vlasic, Danielle Ivory, and Rebecca R. Ruiz, *Carmaker Misled Grieving Families on a Lethal Flaw*, The New York Times, Mar. 25, 2014, http://www.nytimes.com/2014/03/25/business/carmaker-mislead-grieving-families-on-a-lethal-flaw.html.

brought by consumer plaintiffs, GM has filed motions indicating that it plans to ask the

Bankruptcy Court to bar any legal action stemming from the Defective Ignition Switch before

the Sale Order.   *See* Case No. 2:14-cv-89, Dkt. Nos. 2, 53 (S.D. Tex); Case No. 4:14-cv-01339,

Dkt. No. 20 (N.D. Cal.).

### *GM Finally Admits to the Defective Ignition Switch*

61.     Despite years of warnings and mounting evidence that the GM Vehicles were

prone to a sudden and inadvertent electrical shutdown that threatened the lives of passengers and

occupants of other vehicles with which the GM Vehicles may collide, Old GM and GM

nevertheless advertised that the GM Vehicles were safe and reliable.

62.     On February 14, 2014, after years of denying the existence of any problem with

the GM Vehicles despite its knowledge to the contrary, GM disclosed in a report posted on the

NHTSA's website, dated February 7, 2014, that it would recall 619,000 cars in the United States

because either a heavy key ring or a "jarring event" such as running off the road could cause the

ignition to shut off and possibly prevent the air bags from deploying in a crash.  In a separate

news release, GM said it knew of at least six deaths in five crashes in which the front air bags did

not deploy.

63.     The February 7, 2014 GM letter to NHTSA, detailed the problem as follows:

> The ignition switch torque performance may not meet General Motors'
> specification. If the torque performance is not to specification, and the key
> ring is carrying added weight or the vehicle goes off road or experiences
> some other jarring event, the ignition switch may inadvertently be moved
> out of the "run" position. The timing of the key movement out of the "run"
> position, relative to the activation of the sensing algorithm of the crash
> event, may result in the airbags not deploying, increasing the potential for
> occupant injury in certain kinds of crashes. Until this correction is
> performed, customers should remove non-essential items from their key
> ring.

1991968.4

Dealers are to replace the ignition switch.[11]

64.      On February 25, 2014, GM announced it would double the size of the recall

stemming from the Defective Ignition Switch in the GM Vehicles.  GM conceded in the release

that it was aware of the deaths of at least 12 front-seat occupants in crashes where the front air

bags did not deploy.  While GM had recently recalled 619,000 vehicles in the United States,

including Chevrolet Cobalts from the 2005-07 model years and 2007 Pontiac G5 models, GM

added 2003-07 Saturn Ions, 2006-07 Chevrolet HHRs and 2006-07 Pontiac Solstice and Saturn

Sky models.[12]

65.      On March 28, 2014, GM announced it was expanding the recall to cover ignition

switches in all model years of its Chevrolet Cobalt and HHR, Pontiac G5 and Solstice, and

Saturn Ion and Sky in the United States since the Defective Ignition Switch may have been used

in those vehicles.  The recall now covers over 2.6 million GM Vehicles.

***Upon Discovery of GM's Concealment of the Defective Ignition Switch, the U.S. Government
Launches Criminal and Civil Investigations Into GM's Conduct***

66.      NHTSA has opened an investigation into GM's failure to notify it of the

Defective Ignition Switch and to conduct a timely recall.

67.      On April 1-2, 2014, Mary Barra, GM's CEO, testified before the House of

Representatives concerning GM's concealment of the Defective Ignition Switch.  At that

hearing, Congress asked questions concerning Old GM's and GM's concealment of, and failure

to correct, the Defective Ignition Switch.

---

[11] Letter from General Motors LLC to Nancy Lewis, Assoc. Admin. for Enforcement, Nat'l Hwy. Traffic Safety Admin., Recall Management Division (NVS-215), (Feb. 7, 2014), http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM450012/RCDNN-14V047-1347P.pdf.

[12] Christopher Jenson, *GM to Expand Small Car Recall to 1.4 Million Vehicles*, The New York Times, Feb. 25, 2014, http://www.nytimes.com/2014/02/26/automobiles/gm-to-expand-small-car-recall-to-1-4-million-vehicles.html.

68.     On April 11, 2014, five United States Senators sent a letter to the United States

Department of Justice ("**DOJ**") requesting that the DOJ intervene in the pending consumer

lawsuits because "[g]iven the crucial role the United States government played in creation of the

current General Motors Corporation, we believe the federal government has a moral, if not legal,

obligation to take all necessary steps to protect innocent consumers."[13]   Further, the senators

requested the DOJ's intervention because "[a]s a consequence of this fraudulent and

reprehensible concealment, the United States Bankruptcy Court unknowingly authorized a

purchase of GM's assets by the 'new GM,' which seemingly shielded this new GM from legal

responsibility for these product defects or other illegality occurring prior to 2009.  This shield

from legal responsibility was granted – with the federal government's support – despite vehement

opposition from consumer advocates, as well as from state attorneys general who warned that

this blanket shield from all liability would prove unfair and unwise."[14]

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment and Rule 60(b)(4) of the Federal Rules of Civil Procedure – Violation of Due Process)

69.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 68, as though

fully set forth herein.

70.     A subclass of Plaintiffs owned GM Vehicles with a Defective Ignition Switch

during a time that includes, but is not limited to, commencement of the Bankruptcy Case through

approval of the Sale Order (the "**Presale Plaintiffs**").

---

[13] Letter from Richard Blumenthal, Barbara Boxes, Robert P. Casey, Jr., Mazie K. Hirono, and Edward J. Markey to Eric J. Holder, Jr., United States Attorney General, http://www.markey.senate.gov/news/press-releases/markey-blumenthal-colleagues-call-on-doj-to-intervene-in-gm-recall.

[14] Id.

1991968.4

71.     Before approval of the Sale Order, GM knew or could have reasonably

ascertained through reasonably diligent efforts that Presale Plaintiffs owned GM Vehicles with a

Defective Ignition Switch.

72.     The Sale Order purports to permit the conveyance of Old GM's Assets to GM free

and clear of the Defective Vehicle Claims.

73.     At no time before approval of the Sale Order or immediately thereafter did

Presale Plaintiffs receive notice from Old GM of the proposed 363 Sale or that their GM

Vehicles had a Defective Ignition Switch.  To the contrary, Old GM and GM fraudulently

concealed the existence of the Defective Ignition Switch from Presale Plaintiffs, the Bankruptcy

Court, the United States government, and the public.

74.     Because Presale Plaintiffs were not given such notice, they were deprived of due

process, and thus the ability to present their objections to the 363 Sale, to pursue their Defective

Vehicle Claims against the bankruptcy estate of Old GM, and to otherwise obtain adequate

protection or any other appropriate relief.

75.     By reason of the foregoing, the Sale Order was approved in violation of Presale

Plaintiffs' due process rights, and as a result cannot bind the Presale Plaintiffs.

76.     There is a justiciable, actual, real, and substantial controversy between Presale

Plaintiffs and GM concerning whether the Sale Order is valid and enforceable against Presale

Plaintiffs so as to preclude them from seeking legal recourse against GM for the Defective

Vehicle Claims, and a declaration by this Court will have the immediate effect of determining

whether the Sale Order bars the Defective Vehicle Claims against GM, solely to the extent such

claims are based upon conduct occurring before the Sale Order.

1991968.4

77.    Based on the foregoing, Presale Plaintiffs are entitled to a declaration that the Sale Order is void and unenforceable to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment and Rule 60(d)(3) of the Federal Rules of Civil Procedure – Fraud on the Court)

78.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 77, as though fully set forth herein.

79.    Presale Plaintiffs seek relief from those parts of the Sale Order that might be construed as precluding them from obtaining legal recourse against GM for the Defective Vehicle Claims on the grounds that Old GM deliberately concealed the Defective Ignition Switch during its Bankruptcy Case, thereby perpetrating a fraud on the Bankruptcy Court.

80.    When Old GM sought approval of the proposed 363 Sale to GM, one of the paramount issues that the Bankruptcy Court had to decide as part of the approval process was which liabilities of Old GM would be retained by the bankruptcy estate of Old GM and which would be assumed by GM.  These liabilities included, without limitation, litigation liabilities for acts and omissions by Old GM that occurred before the 363 Sale.

81.    Before the Bankruptcy Court approved the 363 Sale, and, indeed, as early as 2001, Old GM knew that millions of the vehicles it had manufactured and sold to consumers, including Presale Plaintiffs, contained the Defective Ignition Switch.

82.    In seeking approval of the 363 Sale, Old GM intentionally concealed the existence of the Defective Ignition Switch from the Bankruptcy Court by, *inter alia*, (i) hiding the fact that in 2006, Old GM considered using the switch with the Defective Ignition Switch in its redesigned Cadillac SRX station wagon, but chose a different design after Old GM engineers

22

complained they could hit the ignition key with a knee and turn off the vehicle, (ii) hiding the

fact that in late 2006 it implemented a new design to correct the Defective Ignition Switch in

parts to be used in later vehicle models while not changing the part number, and (iii)

surreptitiously deciding not to recall the millions of earlier models that Old GM knew were

defective and instead willfully putting millions of people at continuing risk of death and damage

through use of the defective GM Vehicles.

83.    Old GM knew the foregoing facts and had a duty, as a debtor-in-possession and

officer of the court, to ensure that the Bankruptcy Court was informed about these and related

facts that were pertinent to approval of the 363 Sale.  In fact, one of the primary duties of a

debtor-in-possession is to make full, fair, and complete disclosure to the Bankruptcy Court and

all parties in interest.

84.    The U.S. Government, which facilitated GM's acquisition of Old GM's assets

through billions of dollars in taxpayer-funded financing, was, like the Bankruptcy Court, left

equally in the dark by Old GM – and by GM after its formation – about the Defective Ignition

Switch until this year.

85.    Since the Defective Ignition Switch has been exposed and subjected to public

scrutiny, the U.S. Government has launched a criminal inquiry into GM's conduct, while

Congress and regulatory agencies embark upon and continue their own investigations of GM's

knowledge about the Defective Ignition Switch and its response thereto.  Members of Congress

have expressed their outrage at Old GM's conduct in connection with the 363 Sale and GM's

apparent intent to invoke the fraudulently-induced "free and clear" provisions of the Sale Order

as a shield from the Defective Vehicle Claims.

86.     Upon information and belief, had the U.S. Government known the foregoing facts, it would have requested that GM agree to, and that the Bankruptcy Court enter a sale order ensuring, the assumption of liabilities by GM for Defective Vehicle Claims or some other meaningful alternative relief for Plaintiffs.

87.     Had the Bankruptcy Court known the foregoing facts, it would not have approved the 363 Sale through entry of a sale order that might be construed as not providing relief for Defective Vehicle Claims, or it would have provided some other meaningful alternative relief for Plaintiffs as part of the proposed 363 Sale.

88.     The employees of Old GM who had knowledge of and concealed the Defective Ignition Switch from the Bankruptcy Court became employed by GM in substantially similar roles after the 363 Sale.  Those persons also continued to conceal the Defective Ignition Switch while employed by GM.

89.     GM cannot invoke, and is precluded and estopped from invoking, any claimed protections provided by the Sale Order from Defective Vehicle Claims given that the same employees of Old GM who concealed the Defective Ignition Switch from the Bankruptcy Court thereafter continued to do so as employees of GM, and, like Old GM, thereby prevented Plaintiffs from asserting their rights concerning the Defective Vehicle Claims in the Bankruptcy Case.

90.     There is a justiciable, actual, real, and substantial controversy between Plaintiffs and GM concerning whether the Sale Order is valid and enforceable against Plaintiffs so as to preclude them from seeking legal recourse against GM for the Defective Vehicle Claims, and a declaration by this Court will have the immediate effect of determining whether the Sale Order

24

bars the Defective Vehicle Claims against GM, solely to the extent such claims are based upon

conduct occurring before the Sale Order.

91.    Based on the foregoing, Plaintiffs are entitled to a declaration that the Sale Order

is void and unenforceable as a fraud on the Bankruptcy Court to the extent it purports to

preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle

Claims.

**THIRD CLAIM FOR RELIEF**
**(Declaratory Judgment and Rule 60(d)(1) of the Federal Rules of Civil Procedure –**
**Independent Action for Relief)**

92.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 91, as though

fully set forth herein.

93.    If Presale Plaintiffs are not entitled to relief pursuant to Federal Rules of Civil

Procedure 60(b)(4) and 60(d)(3) from those parts of the Sale Order that might be construed as

precluding them from seeking legal recourse against GM for the Defective Vehicle Claims, then

they have no other available or adequate remedy for redress other than this independent claim for

equitable relief pursuant to Federal Rule of Civil Procedure 60(d)(1).

94.    The Plan provides that March 29, 2011, the confirmation date for the Plan, was

the record date for claims against the bankruptcy estate of Old GM.  On the Effective Date, all

such claims received beneficial interests in the GUC Trust or Asbestos Trust in satisfaction of

their claims against the bankruptcy estate of Old GM.

95.    For the reasons set forth above, Presale Plaintiffs did not know about the

Defective Ignition Switch and were denied an opportunity to protect their rights in connection

with the 363 Sale.  As a result of Old GM's concealment and misconduct, Presale Plaintiffs are

no longer able to assert any claims against the bankruptcy estate of Old GM and have no other

available remedy for claims relating to the Defective Ignition Switch other than to obtain the relief from the Sale Order sought herein.

96.     As set forth above, no fault, neglect, or carelessness by Plaintiffs created the circumstances from which they now require equitable relief.  Rather, Old GM created, and GM perpetuated, Plaintiffs' need for the equitable relief sought herein by fraudulently concealing the Defective Ignition Switch and failing to provide Presale Plaintiffs with notice and an opportunity to be heard in connection with the 363 Sale.

97.     There is a justiciable, actual, real, and substantial controversy between Plaintiffs and GM concerning whether the Sale Order is valid and enforceable against Plaintiffs so as to preclude them from seeking legal recourse against GM for the Defective Vehicle Claims, and a declaration by this Court will have the immediate effect of determining whether the Sale Order bars the Defective Vehicle Claims against GM, solely to the extent such claims are based upon conduct occurring before the Sale Order.

98.     Based on the foregoing, Plaintiffs are entitled to a declaration that the Sale Order is void and unenforceable to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims.

WHEREFORE, the Trustee respectfully requests that the Bankruptcy Court enter judgment against the Counterclaim Defendant and Third Party Defendants and award the following relief:

A.     On the First Claim for Relief, a judgment declaring that the Sale Order was approved in violation of Presale Plaintiffs' due process rights and is therefore void and unenforceable to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims;

1991968.4

B.      On the Second Claim for Relief, a judgment declaring that the Sale Order is void

and unenforceable as a fraud on the Bankruptcy Court to the extent it purports to preclude

Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims;

C.      On the Third Claim for Relief, if Plaintiffs are not entitled to relief from those

parts of the Sale Order that might be construed as precluding them from seeking legal recourse

against GM for the Defective Vehicle Claims on the grounds that the Sale Order was approved in

violation of due process and/or as a result of a fraud on the Bankruptcy Court, then a judgment

should be entered declaring that Presale Plaintiffs have no other available or adequate remedy for

redress other than an independent claim for equitable relief pursuant to Federal Rule of Civil

Procedure 60(d)(1) and that the Sale Order is void and unenforceable to the extent it purports to

preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle

Claims;

D.      On all claims, allowing reasonable attorneys' fees as allowed by law; and

E.      On all claims, awarding such other relief as is just and proper.

27

Dated:  New York, New York
        April 21, 2014


**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLP**


 /s/ Alexander H. Schmidt_____

Alexander H. Schmidt, Esq.
Malcolm T. Brown, Esq.
270 Madison Avenue
New York, NY 10016
Telephone:  (212) 545-4600
Facsimile:  (212) 545-4653

*Counsel for Plaintiffs*


**GOLENBOCK EISEMAN ASSOR**
   **BELL & PESKOE LLP**


 __/s/ Jonathan L. Flaxer_____

Jonathan L. Flaxer, Esq.
S. Preston Ricardo, Esq.
Dallas L. Albaugh, Esq.
Michael S. Weinstein, Esq.
437 Madison Avenue
New York, New York 10022
Telephone: (212) 907-7327
Facsimile: (212) 754-0777

*Counsel for Plaintiffs*

1991968.4