KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Richard C. Godfrey, P.C. (*pro hac vice* pending)
Andrew B. Bloomer, P.C. (*pro hac vice* pending)

*Attorneys for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------X

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | **Case No.: 09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

--------------------------------------------------------------x

**MOTION OF GENERAL MOTORS LLC PURSUANT**
**TO 11 U.S.C. §§ 105 AND 363 TO ENFORCE**
**THE COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION .............................................................................................................. 1

BACKGROUND STATEMENT OF FACTS ...................................................................... 5

I.  OLD GM FILED FOR PROTECTION UNDER THE BANKRUPTCY CODE IN
    JUNE 2009. ............................................................................................................ 6

    A.  Objectors to the Sale Motion Argued that New GM Should Assume
        Additional Liabilities of the Type Plaintiffs Now Assert in the Ignition
        Switch Actions. .............................................................................................. 6

    B.  The Court Issued Its Sale Order And Injunction, And The Product
        Liability Claimants And Others Appealed Because They Objected to the
        Fact That New GM Was Not Assuming *Their* Liabilities ...................................... 7

    C.  Upon Approval Of The MSPA And Issuance Of The Sale Order And
        Injunction, New GM Assumed Certain Narrowly Defined Liabilities, But
        The Bulk Of Old GM's Liabilities Remained With Old GM. .............................. 10

    D.  The Court's Sale Order And Injunction Expressly Protects New GM From
        Litigation Over Retained Liabilities. .................................................................. 11

II. NEW GM HAS RECALLED CERTAIN VEHICLES AND IN RESPONSE,
    PLAINTIFFS HAVE FILED MULTIPLE IGNITION SWITCH ACTIONS. ................. 14

NEW GM'S ARGUMENT TO ENFORCE THE COURT'S SALE ORDER AND
INJUNCTION ................................................................................................................. 16

I.  THIS COURT'S SALE ORDER AND INJUNCTION SHOULD BE
    ENFORCED. ......................................................................................................... 17

II. NEW GM CANNOT BE HELD LIABLE FOR OLD GM'S ALLEGED
    CONDUCT, EITHER DIRECTLY OR AS OLD GM'S ALLEGED
    "SUCCESSOR." ................................................................................................... 19

III. PLAINTIFFS' WARRANTY ASSERTIONS AND STATE LEMON LAW
     ALLEGATIONS DO NOT ENABLE THEM TO CIRCUMVENT THE
     COURT'S SALE ORDER AND INJUNCTION. ........................................................ 21

    A.  The Limited Glove Box Warranty is Not Applicable.  But As a Practical
        Matter, Plaintiffs Already Are Obtaining Such Relief As Part of the
        Recall. ........................................................................................................... 21

B.     Any Purported State Lemon Law Claims Are Premature At Best, And Cannot Be Adequately Pled. ................................................................... 22

**CONCLUSION** ....................................................................................................... **23**

**NOTICE AND NO PRIOR REQUESTS** ................................................................. **26**

# TABLE OF AUTHORITIES

**Cases**

*Ayers v. Gen. Motors*,
   234 F.3d 514, (11th Cir. 2000) ...................................................................... 11

*Back v. LTV Corp. (In re Chateaugay Corp.)*,
   213 B.R. 633 (S.D.N.Y. 1997).................................................................... 17

*Baker v. Chrysler Corp.*,
   Civ. A. No. 91–7092, 1993 WL 18099 (E.D. Pa. Jan. 25, 1993) ..................................... 23

*Burton v. Chrysler Group, LLC (In re Old Carco LLC)*,
   492 B.R. 392 (Bankr. S.D.N.Y. 2013)...................................................... 21, 23

*Callan v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
   428 B.R. 43 (S.D.N.Y. 2010)................................................................. 9, 10

*Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
   Adv. Proc. No. 09–00509, 2012 WL 1339496 (Bankr. S.D.N.Y. April 17, 2012), *aff'd*,
   500 B.R. 333 (S.D.N.Y. 2013).................................................................. 7, 18

*Celotex Corp. v. Edward*,
   *514 U.S. 300 (1995)* .......................................................................... 4, 16, 18

*DiVigenze v. Chrysler Corp.*,
   345 N.J. Super. 314, 785 A.2d 37 (App. Div. 2001) ....................................... 23

*GTE Sylvania, Inc. v. Consumers Union of U. S., Inc.*,
   445 U.S. 375 (1980)............................................................................ 18

*Handy v. Gen. Motors Corp.*,
   518 F.2d 786 (9th Cir 1975) ................................................................. 11

*Iams v. DaimlerChrysler Corp.*,
   174 Ohio App. 3d 537, 883 N.E.2d 466 (2007).............................................. 23

*In re Cont'l Airlines, Inc.*,
   236 B.R. 318 (Bankr. D. Del. 1999) ........................................................ 17

*In re Gen. Motors Corp.*,
   No. M 47 (LAK), 2009 WL 2033079 (S.D.N.Y. July 9, 2009) ..……………………………3

*In re Gen. Motors Corp.*,
   407 B.R. 463 (Bankr. S.D.N.Y. 2009) ..................................................... 7, 8, 9

*In re Gruntz*,
   202 F.3d 1074 (9th Cir. 2000) ......................................................... 19

*In re McGhan*,
   288 F.3d 1172 (9th Cir. 2002) ......................................................... 19

*In re Motors Liquidation Co.*,
   No. 09-50026 (REG), 2011 WL 6119664 (Bankr. S.D.N.Y. 2011) ................................. 17

*In re Wilshire Courtyard*,
   729 F.3d 1279 (9th Cir. 2013) ......................................................... 17

*McLaughlin v. Chrysler Corp.*,
   262 F. Supp. 2d 671 (N.D.W. Va. 2002) ......................................................... 23

*Palmer v. Fleetwood Enterp., Inc.*,
   Nos. C040161, C040765, 2003 WL 21228864 (Cal. Ct. App. May 28, 2003) ............... 23

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co).*,
   430 B.R. 65 (S.D.N.Y. 2010) ......................................................... 10

*Pratt v. Ventas, Inc.*,
   365 F.3d 514 (6th Cir. 2004) ......................................................... 19

*Sipe v. Fleetwood Motor Homes of Penn., Inc.*,
   574 F. Supp. 2d 1019 (D. Minn. 2008) ......................................................... 23

*Spartan Mills v. Bank of Am. Ill.*,
   112 F.3d 1251 (4th Cir. 1997) ......................................................... 19

*Tatum v. Chrysler Group LLC*,
   Adv. Proc. No. 11-09411 (Bankr. S.D.N.Y. Feb. 15, 2012) ........................................... 21

*Travelers Indem. Co. v. Bailey*,
   557 U.S. 137 (2009) ......................................................... 17

*Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
   Adv. Proc. No. 09–09803, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013).. 11, 18, 20

*Tulacro v. Chrysler Group LLC, et al.*,
   Adv. Proc. No. 11-09401 (Bankr. S.D.N.Y. Oct. 28, 2011) ........................................... 21

*U.S. Lines, Inc. v. GAC Marine Fuels, Ltd. (In re McClean Indus., Inc.)*,
   68 B.R. 690 (Bankr. S.D.N.Y. 1986) ......................................................... 17

**Statutes and Rules**

11 U.S.C. § 105 ............................................................................................................... 17

11 U.S.C. § 363 ................................................................................................................. 8

11 U.S.C. § 363(m) ........................................................................................................... 8

49 C.F.R. § 554.1 ............................................................................................................. 14

49 U.S.C. § 30119 ........................................................................................................... 14

# INTRODUCTION

In June 2009, General Motors LLC ("**New GM**") was a newly formed entity, created by the U.S. Treasury, to purchase substantially all of the assets of Motors Liquidation Company, formerly known as General Motors Corporation ("**Old GM**"). Through a bankruptcy-approved sale process, New GM acquired Old GM's assets, free and clear of all liens, claims, liabilities and encumbrances of Old GM, other than liabilities expressly assumed by New GM under a June 26, 2009 Amended and Restated Master Sale and Purchase Agreement ("**MSPA**").[1] The Bankruptcy Court approved the asset purchase transaction and the terms of the MSPA in its "**Sale Order and Injunction**," dated July 5, 2009.[2]

This Motion to Enforce does not address any litigation involving an accident or incident causing personal injury, loss of life or property damage. Further, this Motion to Enforce does not involve whether New GM should repair the ignition switch defect. New GM has committed to replacing the defective ignition switch as a result of the recall being conducted under the supervision of the National Highway Traffic Safety Administration ("**NHTSA**"), the government agency with jurisdiction over recalls. Instead, this Motion to Enforce involves *only* litigation in which the plaintiffs seek economic losses against New GM relating to an Old GM vehicle or part, including, for example, for the claimed diminution in the vehicle's value, and for loss of use, alternative transportation, child care or lost wages for time spent in seeking prior repairs. Those types of claims were never assumed by New GM and are barred by the Court's Sale Order and Injunction.

---

[1] *See* Exhibit A, MSPA. Exhibits to this Motion are contained in the Compendium of Exhibits, filed simultaneously herewith.

[2] *See* Exhibit B, "Order (i) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (ii) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (iii) Granting Related Relief, entered by the Court on July 5, 2009."

Under the MSPA approved by the Court, New GM assumed only three expressly defined categories of liabilities for vehicles and parts sold by Old GM: (a) post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damage; (b) repairs provided for under the "Glove Box Warranty"— a specific written warranty, of limited duration, that only covers repairs and replacement of parts and (c) Lemon Law claims essentially tied to the failure to honor the Glove Box Warranty.[3] All other liabilities relating to vehicles and parts sold by Old GM were legacy liabilities that were retained by Old GM. *See* MSPA § 2.3(b).

New GM's assumption of just these limited categories of liabilities was based on the independent judgment of U.S. Treasury officials as to which liabilities, if paid, would best position New GM for a successful business turnaround. It was an absolute condition of New GM's purchase offer that New GM not take on all of Old GM's liabilities. That was the bargain struck by New GM and Old GM, and approved by the Court as being in the best interests of Old GM's bankruptcy estate and the public interest.

The primary objections to the sale were made by prepetition creditors who essentially wanted New GM to assume their liabilities. But the Court found that, if not for New GM's purchase offer, which provided for a meaningful distribution to prepetition unsecured creditors, Old GM would have liquidated and those creditors would have received nothing. Indeed, had the objectors been successful in opposing the Sale Order and Injunction, it would have been a pyrrhic victory, and disaster not only for them but for thousands of others who relied on the continued viability of the business being sold to New GM. Judge Lewis Kaplan aptly summarized the point: "No sentient American is unaware of the travails of the automobile

---

[3]   *See also* MSPA § 1.1, at p. 11 (defining "Lemon Laws" as "a state statute requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute.").

industry in general and of General Motors Corporation ([Old] GM) in particular. As the Bankruptcy Court found, [Old] GM will be forced to liquidate — with appalling consequences for its creditors, its employees, and our nation — unless the proposed sale of its core assets to a newly constituted purchaser is swiftly consummated." *In re Gen. Motors Corp.*, No. M 47 (LAK), 2009 WL 2033079, at *1 (S.D.N.Y. July 9, 2009).

One of the most vigorous groups that objected to Old GM's asset sale motion was a coalition representing Old GM vehicle owners. That group included State Attorneys General, individual accident victims, the Center for Auto Safety, Consumer Action and other consumer advocacy groups. The gist of their objections was: as long as New GM was assuming any of Old GM liabilities, then it should assume *all* vehicle owner liabilities as well. In particular, the objectors argued, unsuccessfully, that New GM should assume successor liability claims, all warranty claims (express and implied), economic damages claims based upon defects in Old GM vehicles and parts, and tort claims, in addition to the limited categories of claims that New GM already agreed to assume.

A critical element of protecting the integrity of the bankruptcy sale process, however, was to ensure that New GM, as the good faith purchaser for substantial value, received the benefit of its Court-approved bargain. This meant that New GM would be insulated from lawsuits by Old GM's creditors based on Old GM liabilities it did not assume. The MSPA and the Sale Order and Injunction were expressly intended to provide such protections. The Order thus enjoined such proceedings against New GM, and expressly reserved exclusive jurisdiction to this Court to ensure that the sale transaction it approved would not be undermined or collaterally attacked.

As this Court undoubtedly is aware, New GM recently sent notices to NHTSA concerning problems with ignition switches and ignition switch repairs in certain vehicles and parts manufactured by Old GM. Shortly after New GM issued the recall notice, numerous plaintiffs throughout the country sued New GM for claimed economic losses allegedly resulting from ignition switch defects in Old GM vehicles and parts — the very type of claims retained by Old GM for which New GM has no liability.

GM's Motion to Enforce thus presents a single, simple, overarching question for the Court to decide:

> **May New GM be sued in violation of this Court's Sale Order and Injunction for economic damages relating to vehicles and parts sold by Old GM?**

To ask the question is to answer it. In all of the cases based on the ignition switch defect that are the subject of this Motion to Enforce, plaintiffs assert claims for liabilities that, under the Sale Order and Injunction, were retained by Old GM. Plaintiffs apparently decided to not appear in this Court to challenge the Sale Order and Injunction — and with good reason: this Court has rejected prior challenges to that Order and it is now too late, as the Order has been affirmed by the appellate courts and has been a final Order for several years. Faced with a fundamental bar to many of their claims against New GM, the ignition switch plaintiffs simply have decided to ignore the Court's Sale Order and Injunction, and proceed as though it never existed. The law is settled, however, that persons subject to a Court's injunction do not have that option. As the United States Supreme Court explained in *Celotex Corp. v. Edwards*, the rule is "well-established" that "'persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.'" 514 U.S. 300, 306 (1995).

Based on this Court's prior proceedings and Orders, New GM has brought this Motion to Enforce to require the plaintiffs (collectively, the "**<u>Plaintiffs</u>**") in the actions listed in Schedule 1 attached hereto ("**<u>Ignition Switch Actions</u>**") to comply with the Court's Sale Order and Injunction by directing Plaintiffs to (a) cease and desist from further prosecuting against New GM claims that are barred by the Sale Order and Injunction, (b) dismiss with prejudice those void claims because they were brought by the Plaintiffs in violation of the Sale Order and Injunction, and (c) show cause whether they have any claims against New GM not otherwise already barred by the Sale Order and Injunction.[4]

## BACKGROUND STATEMENT OF FACTS

1.      In June 2009, in the midst of a national financial crisis, Old GM was insolvent with no alternative other than to seek bankruptcy protection to sell its assets. New GM, a newly created, government-sponsored entity, was the only viable purchaser, but it would not purchase Old GM's assets unless the sale was free and clear of all liens and claims (except for the claims it expressly agreed to assume). The Court approved this sale transaction, which set the framework for New GM to begin its business operations. During the last five years, New GM has operated its business based on the fundamental structure of the MSPA and Sale Order and Injunction — that its new business enterprise would not be burdened with liabilities retained by Old GM. The Ignition Switch Actions represent a collateral attack on this Court's Sale Order and Injunction. The Plaintiffs may not rewrite, years later, the Court-approved sale to a good faith purchaser, which was affirmed on appeal, and which has been the predicate ever since for literally millions of transactions between New GM and third parties.

---

[4]     New GM reserves the right to supplement the list of Ignition Switch Actions contained in Schedule 1 in the event additional cases are brought against New GM after the filing of this Motion to Enforce that implicate similar provisions of the Sale Order and Injunction.

## I. OLD GM FILED FOR PROTECTION UNDER THE BANKRUPTCY CODE IN JUNE 2009.

2.      On June 1, 2009, Old GM and certain of its affiliates filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Old GM simultaneously filed a motion seeking approval of the original version of the MSPA ("**Original MSPA**"), pursuant to which substantially all of Old GM's assets were to be sold to New GM ("**Sale Motion**"). The Original MSPA (like the MSPA) provided that New GM would assume only certain specifically identified liabilities (*i.e.*, the "**Assumed Liabilities**"); all other liabilities would be retained by Old GM (*i.e.*, the "**Retained Liabilities**").

### A. Objectors to the Sale Motion Argued that New GM Should Assume Additional Liabilities of the Type Plaintiffs Now Assert in the Ignition Switch Actions.

3.      Many objectors, including various State Attorneys General, certain individual accident victims ("**Product Liability Claimants**"), the Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizens (collectively, the "**Consumer Organizations**"), the Ad Hoc Committee of Consumer Victims, and the Official Committee of Unsecured Creditors challenged various provisions in the Original MSPA relating to actual and potential tort and contract claims held by Old GM vehicle owners. These objectors argued that the Court should not approve the Original MSPA unless New GM assumed additional Old GM liabilities (beyond the Glove Box Warranty), including those now being asserted by the Plaintiffs in the Ignition Switch Actions.

4.      The Original MSPA was amended so that New GM would assume (for vehicles and parts sold by Old GM) Lemon Law claims, as well as personal injury, loss of life and

property damage claims for accidents taking place after the closing of the sale.[5]  Product Liability Claimants and the Consumer Organizations were not satisfied and pressed their objections, arguing that New GM should assume broader warranty-related claims as well as successor liability claims.[6]  Representatives from the U.S. Treasury declined to make further changes.  *See* Hr'g Tr. 151:1 – 10, July 1, 2009.  The Court found that New GM would not have consummated the "[t]ransaction (i) if the sale . . . was not free and clear of all liens, claims, encumbrances, and other interests . . . , including rights or claims based on any successor or transferee liability or (ii) if [New GM] would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability (collectively, the 'Retained Liabilities'), other than, in each case, the Assumed Liabilities."  *See* Sale Order and Injunction ¶ DD.  The Court ultimately overruled the objectors on these issues.  *See id.*, ¶ 2.

**B.**    **The Court Issued Its Sale Order And Injunction, And The Product Liability Claimants And Others Appealed Because They Objected to the Fact That New GM Was Not Assuming *Their* Liabilities**

5.    The Court held a three-day hearing on the Sale Motion, then issued its Sale Decision on July 5, 2009, finding that the only alternative to the immediate sale to New GM pursuant to the MSPA was a liquidation of Old GM, in which case unsecured creditors, such as the Plaintiffs now suing New GM, would receive nothing.  *See In re Gen. Motors Corp.*, 407

---

[5]    Assumption of the Glove Box Warranty was provided for in the Original MSPA.

[6]    As noted in the Court's *Castillo* decision, numerous State Attorneys General also objected, seeking to expand the definition of New GM's Assumed Liabilities to include implied warranty claims. *Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.),* Adv. Proc. No. 09–00509, 2012 WL 1339496, at *5 (Bankr. S.D.N.Y. April 17, 2012), *aff'd,* 500 B.R. 333 (S.D.N.Y. 2013).

B.R. 463, 474 (Bankr. S.D.N.Y. 2009).  The Court analyzed the law of successor liability, devoted several pages of its opinion to this issue (*id.* at 499-506), and ruled that: "[T]he law in this Circuit and District is clear; the Court will permit (Old) GM's assets to pass to the purchaser (New GM) *free and clear of successor liability claims*, and in that connection, will issue the requested findings and associated injunction."  *Id.* at 505-06 (emphasis added).

6.      In approving the sale, the Court specifically found that New GM was a "good faith purchaser, for sale-approval purposes, and also for the purpose of the protections section 363(m) provides." *Id.* at 494 (citing 11 U.S.C. § 363(m)).  The Sale Order and Injunction expressly enjoined parties (like the Plaintiffs in the Ignition Switch Actions) from proceeding against New GM with respect to Retained Liabilities at any time in the future.  *See* Sale Order and Injunction, ¶¶ 8, 47.  This Court well understood the circumstances of accident victims (who are not the subject of this Motion to Enforce), and that if they could not look to New GM as an additional source of recovery, they would recover only modest amounts on their claims from Old GM.  *See Gen. Motors*, 407 B.R. at 505.  But the Court also recognized that if a Section 363 purchaser like New GM did not obtain protection against claims against Old GM, like successor liability claims, it would pay less for the assets because of the risks of known and unknown liabilities.  *Id.* at 500; *see* 11 U.S.C. § 363.  The Court further recognized that, under the law, a Section 363 purchaser could choose which liabilities of the debtors to assume, and not assume (*id.* at 496), and that the U.S. Treasury, on New GM's behalf, could rightfully condition its purchase offer on its refusal to assume the liabilities now being asserted by Plaintiffs in the Ignition Switch Actions.

7.      Old GM, the proponent of the asset sale transaction, presented evidence that established that if the MSPA was not approved, Old GM would liquidate.  If it did, objecting

creditors seeking incremental recoveries would end up with nothing, given that the book value of Old GM's global assets was $82 billion, the book value of its global liabilities was $172 billion (s*ee Gen. Motors*, 407 B.R. at 475), and that, in a liquidation, the value of Old GM's assets was probably less than 10% of stated book value (*id.*).

8.      Objectors also presented evidence that the book value of certain contingent liabilities was about $934 million.  *Id.* at 483.  The Court noted that contingent liabilities were "difficult to quantify."  *Id.*  And, if the book value of all contingent liabilities was understated, that simply meant Old GM was even more insolvent — an even greater reason for New GM to decline to assume the liabilities retained by GM.

9.      Whether Old GM presented evidence regarding a particular claim or specific defect was not germane to this Court's approval of the Sale Order and Injunction.  Indeed, as the Court found in the Sale Order and Injunction, the proper analysis for approving the asset sale is whether Old GM obtained the "highest or best" available offer for the Purchased Assets.  *See* Sale Order and Injunction, ¶ G.  In contrast, the quantification of liabilities left behind with Old GM (*i.e.*, the Retained Liabilities) was pertinent to a different phase of the bankruptcy case (the claims process) which did not involve New GM.

10.      New GM's refusal to assume a substantial portion of Old GM's liabilities was fundamental to the sale transaction and was widely disclosed by Old GM to all interested parties. Indeed, the Product Liability Claimants objected to and appealed the Sale Order and Injunction to specifically challenge this aspect of the sale.  *See Callan v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43 (S.D.N.Y. 2010).  Although on appeal, the District Court focused on the appellants' failure to seek a stay of the Sale and on equitable mootness principles, the District Court also found that this Court had jurisdiction to enjoin successor liability claims.

*See id.* at 59-60.  Indeed, the Sale Order and Injunction was affirmed on appeal by two different

District Court Judges.  *Id.; Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430

B.R. 65 (S.D.N.Y. 2010).  There were no further appeals.

> **C.     Upon Approval Of The MSPA And Issuance Of The Sale Order And Injunction, New GM Assumed Certain Narrowly Defined Liabilities, But The Bulk Of Old GM's Liabilities Remained With Old GM.**

11.     Under the MSPA and the Sale Order and Injunction, New GM became

responsible for "Assumed Liabilities."   *See* MSPA § 2.3(a).   These included New GM's

assumption of liability claims for post-sale accidents and Lemon Law claims, as well as the

Glove Box Warranty—a written warranty of limited duration (typically three years or 36,000

miles, whichever comes first) provided at the time of sale, for repairs and replacement of parts.

The Glove Box Warranty expressly excludes economic damages.[7]  New GM assumed no other

Old GM warranty obligations, express or implied:

> The Purchaser is assuming the obligations of the Sellers pursuant to and subject to conditions and limitations contained in their express written warranties, which were delivered in connection with the sale of vehicles and vehicle components prior to the Closing of the 363 Transaction and specifically identified as a "warranty."   ***The Purchaser is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials.***

Sale Order and Injunction, ¶ 56 (emphasis added).

12.     Independent of the Assumed Liabilities under the MSPA, New GM covenanted to

perform Old GM's recall responsibilities under federal law.  *See* MSPA ¶ 6.15(a).  But there

were no third party beneficiary rights granted under the MSPA with respect to that covenant (*see*

MSPA § 9.11), and there is no private right of action for third parties to sue for a breach of a

---

[7]     A copy of a typical Glove Box Warranty is annexed in the Compendium of Exhibits as Exhibit C.

recall obligation.  *See Ayers v. Gen. Motors*, 234 F.3d 514, 522-24 (11th Cir. 2000); *Handy v. Gen. Motors Corp*., 518 F.2d 786, 787-88 (9th Cir 1975).  Thus, New GM's recall covenant does not create a basis for the Plaintiffs to sue New GM for economic damages relating to a vehicle or part sold by Old GM.

13.    All liabilities of Old GM not expressly defined as Assumed Liabilities constituted "Retained Liabilities" that remained an obligation of Old GM.    MSPA §§ 2.3(a), 2.3(b). Retained Liabilities include economic damage claims relating to vehicles and parts manufactured by Old GM (the primary claims asserted by the Plaintiffs in the Ignition Switch Actions) such as:

> (a)    liabilities "arising out of, relating to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers."  MSPA § 2.3(b)(xvi), *see also* MSPA ¶ 6.15(a). This would include liability based on state consumer statutes, except Lemon Law claims.

> (b)    All liabilities (other than Assumed Liabilities) of Old GM based upon contract, tort or any other basis.  MSPA § 2.3(b)(xi).  This covers claims based on negligence, concealment and fraud.

> (c)    All liabilities relating to vehicles and parts sold by Old GM with a design defect (*i.e*., the ignition switch).[8]

> (d)    All Liabilities based on the conduct of Old GM including any allegation, statement or writing attributable to Old GM. This covers fraudulent concealment type claims.  *See* Sale Order and Injunction, ¶ 56.

> (e)    All claims based on the doctrine of "successor liability."  *See, e.g.,* Sale Order and Injunction, ¶ 46.

**D.    The Court's Sale Order And Injunction Expressly Protects New GM From Litigation Over Retained Liabilities.**

14.    On July 10, 2009, the parties consummated the Sale.   New GM acquired substantially all of the assets of Old GM free and clear of all liens, claims and encumbrances,

---

[8]    *See* Sale Order and Injunction, ¶ AA; *see also Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 09–09803, 2013 WL 620281, at *2 (Bankr. S.D.N.Y. Feb. 19, 2013).

except for the narrowly defined Assumed Liabilities. In particular, paragraphs 46, 9 and 8 of the Sale Order and Injunction provide that New GM would have no responsibility for any liabilities (except for Assumed Liabilities) relating to the operation of Old GM's business, or the production of vehicles and parts before July 10, 2009:

> Except for the Assumed Liabilities expressly set forth in the [MSPA] . . . [New GM] . . . shall [not] have any liability for any claim that arose prior to the Closing Date, ***relates to the production of vehicles prior to the Closing Date***, or otherwise is assertable against [Old GM] . . . prior to the Closing Date . . . . Without limiting the foregoing, [New GM] shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims, including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity . . . and products . . . liability, ***whether known or unknown*** as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

Sale Order and Injunction, ¶ 46 (emphasis added); *see also id.*, ¶ 9(a) ("(i) no claims other than Assumed Liabilities, will be assertable against the Purchaser; (ii) the Purchased Assets [are] transferred to the Purchaser free and clear of all claims (other than Permitted Encumbrances) . . ."); and *id.*, ¶ 8 ("All persons and entities . . . holding claims against [Old GM] or the Purchased Assets arising under or out of, in connection with, or in any way relating to [Old GM], the Purchased Assets, ***the operation of the Purchased Assets*** prior to the Closing . . . are forever barred, estopped, and permanently enjoined . . . from asserting [such claims] against [New GM]. . . .") (emphasis added).

15. Anticipating the possibility that New GM might be wrongfully sued for Retained Liabilities, the Sale Order and Injunction contains an injunction permanently enjoining claimants from asserting claims of the type made in the Ignition Switch Actions:

> [A]ll persons and entities . . . holding liens, claims and encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against [Old GM] or the Purchased Assets (whether legal or equitable, secured or unsecured, ***matured or unmatured***, ***contingent or noncontingent***, senior or subordinated), ***arising under or out of, in connection with, or in any way relating to [Old GM], the Purchased Assets, the***

> ***operation of the Purchased Assets prior to the Closing . . . are forever barred, estopped, and permanently enjoined . . . from asserting against [New GM] . . . such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability***.

Sale Order and Injunction, ¶ 8 (emphasis added); *see also id.*, ¶ 47.

16.     The Court specifically found that the provisions of the Sale Order and Injunction, as well as the MSPA, were binding on all creditors, ***known and unknown*** alike.  *See* Sale Order and Injunction, ¶ 6 ("This [Sale] Order and M[S]PA "shall be binding in all respects upon the Debtors, their affiliates, ***all known and unknown creditors*** of, and holders of equity security interests in, any Debtor, including any holders of liens, claims, encumbrances, or other interests, including rights or claims based on any successor or transferee liability . . . ." (emphasis added)); *see also id.*, ¶ 46.  In short, except for Assumed Liabilities, claims based on Old GM vehicles and parts remained the legal responsibility of Old GM, and are not the responsibility of New GM.

17.     Finally, paragraph 71 of the Sale Order and Injunction makes this Court the gatekeeper to enforce its own Order. It provides for this Court's ***exclusive jurisdiction*** over matters and claims regarding the Sale, including jurisdiction to protect New GM against any Retained Liabilities of Old GM:

> ***This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the M[S]PA,*** all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, . . ., in all respects, including, but not limited to, ***retaining jurisdiction to . . . (c) resolve any disputes arising under or related to the M[S]PA,*** except as otherwise provided therein, (d) ***interpret, implement, and enforce the provisions of this Order, (e) protect the Purchaser against any of the Retained Liabilities*** or the assertion of any lien, claim, encumbrance, or other interest, of any kind or nature whatsoever, against the Purchased Assets . . . .  (Emphasis added.)

## II. NEW GM HAS RECALLED CERTAIN VEHICLES AND IN RESPONSE, PLAINTIFFS HAVE FILED MULTIPLE IGNITION SWITCH ACTIONS.

18.     Consistent with its obligations under the Sale Order and Injunction, New GM informed NHSTA on February 7, 2014, of a problem with ignition switches in certain vehicles and parts manufactured by Old GM, and that a recall would be conducted by New GM to replace the ignition switches (at no cost to the owners).  (*See* Exhibit D.)  A short time later, New GM sent NHTSA a second letter, dated February 24, 2014, which gave NHTSA additional information about the ignition switch and the defect, and what owners should do to ameliorate the problem while waiting for their vehicles to be repaired.  (*See* Exhibit E.)  GM sent recall notices approved by NHTSA to all vehicle owners subject to the recall (Exhibit F), which informed owners about how to safely drive the vehicles prior to the recall.

19.     In March 2014, New GM sent another notice to NHTSA concerning a problem with Old GM ignition switches that may have been installed during repairs to certain Old GM and New GM vehicles, and that a recall would be conducted for those vehicles.  (Exhibit G.) The notice contained the same safety instruction, and the same repair and reimbursement statements made by New GM for the earlier recall.  New GM expects that only a small fraction of the cars being recalled for potentially faulty repairs actually have the defective ignition switch part in them at this time.[9]

20.     The recall is underway and New GM already has started to replace the ignition switches.  NHTSA, as the government agency responsible for overseeing the technical and highly-specialized domain of automotive safety defects and recalls, administers the rules concerning the content, timing, and means of delivering a recall notice to affected motorists and

---

[9]     In April 2014, New GM sent a recall notice to NHTSA concerning an ignition cylinder lock issue that is different than the issue presented in the Ignition Switch Actions.

dealers.  *See* 49 C.F.R. § 554.1;  49 U.S.C. § 30119.  Other governmental agencies and the Congress are also examining various issues relating to the ignition switch recall.

21.    Since the recall was announced, numerous Ignition Switch Actions have been filed against New GM based upon vehicles and parts sold by Old GM, and virtually each day, additional cases are being filed.  (*See* Schedule 1, attached to this Motion.)  These cases include over 50 class actions and two individual actions.  The Ignition Switch Actions have been brought in over 20 federal courts and two state courts.  Plaintiffs in some of those actions have filed motions with the Judicial Panel for Multidistrict Litigation ("**MDL**") to consolidate at least 19 actions for pre-trial purposes.  It is expected that the number of Ignition Switch Actions identified to the MDL Panel for consolidation will grow.[10]

22.    The Ignition Switch Actions assert claims that are barred by the MSPA and the Sale Order and Injunction.  The primary claims at issue are for economic losses premised on alleged defects in vehicles and components designed and sold by Old GM, which are unrelated to any accident causing personal injury, loss of life or property damage.  In their complaints, the Plaintiffs conflate Old GM and New GM, but the Sale Order and Injunction is clear that New GM is a separate entity from Old GM (*see* Sale Order and Injunction, ¶ R), and is not liable for successor liability claims (*see, e.g.*, *id.*, ¶¶ 46, 47).  To be sure, the causes of action asserted by the Plaintiffs in the Ignition Switch Actions are varied, and in some instances, because of the imprecise factual allegations, it is unclear whether there might be a viable cause of action (of the many) being asserted against New GM.  What is clear, however, is that the crux of virtually all of Plaintiffs' claims is a problem in the ignition switch in vehicles and parts sold by Old GM.

---

[10]    The MDL Panel has scheduled a hearing on the motions for May 29, 2014.

Claims based on that factual predicate are Retained Liabilities and may not be brought against New GM.[11]

23.     This Court is uniquely situated to enforce its own Order and interpret what the parties to the MSPA agreed to, and what issues were raised and resolved in connection with the asset sale.  This Motion to Enforce respectfully requests that the Court enforce the Sale Order and Injunction by directing Plaintiffs to cease and desist from pursuing claims for Retained Liabilities of Old GM against New GM, direct Plaintiffs to dismiss with prejudice those void claims that are barred by the Sale Order and Injunction, and direct Plaintiffs to show cause whether there is any claim that they may properly pursue against New GM that is not in violation of the Court's Sale Order and Injunction.

**NEW GM'S ARGUMENT TO ENFORCE THE COURT'S**
**SALE ORDER AND INJUNCTION**

24.     The Plaintiffs do not have the choice of simply ignoring the Court's Sale Order and Injunction.  As the Supreme Court expressed in its *Celotex* decision:  "If respondents believed the Section 105 Injunction was improper, they should have challenged it in the Bankruptcy Court, like other similarly situated bonded judgment creditors have done . . . Respondents chose not to pursue this course of action, but instead to collaterally attack the Bankruptcy Court's Section 105 Injunction in the federal courts in Texas.  This they cannot be permitted to do without seriously undercutting the orderly process of the law."  514 U.S. at 313. These settled principles bind Plaintiffs in the Ignition Switch Actions.  Those who purchased vehicles or parts from Old GM before the Sale, whether they were a known or unknown creditor

---

[11]     The allegations and claims asserted in the Ignition Switch Actions include Retained Liabilities, such as implied warranty claims, successor liability claims, and miscellaneous tort and statutory claims premised in whole or in part on the alleged acts or omissions of Old GM.  *See* para. 39 *infra*, and Schedule 2, attached to this Motion to Enforce, for a sample of such statements, allegations and/or causes of action.

at the time, are subject to the terms of the Court's Sale Order and Injunction, and are barred by

this Court's Injunction from suing New GM on account of Old GM's Retained Liabilities.

## I.    THIS COURT'S SALE ORDER AND INJUNCTION SHOULD BE ENFORCED.

25.    It is well settled that a "Bankruptcy Court plainly ha[s] jurisdiction to interpret

and enforce its own prior orders." *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009);

*In re Wilshire Courtyard*, 729 F.3d 1279, 1290 (9th Cir. 2013) (affirming bankruptcy court's

post-confirmation jurisdiction to interpret and enforce its orders; "[i]nterpretation of the Plan and

Confirmation Order is the only way for a court to determine the essential character of the

negotiated Plan transactions in a way that reflects the deal the parties struck in chapter 11

proceedings"); *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 326 (Bankr. D. Del. 1999) ("In the

bankruptcy context, courts have specifically, and consistently, held that the bankruptcy court

retains jurisdiction, *inter alia*, to enforce its confirmation order."); *U.S. Lines, Inc. v. GAC

Marine Fuels, Ltd. (In re McClean Indus., Inc.)*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("[a]ll

courts, whether created pursuant to Article I or Article III, have inherent contempt power to

enforce compliance with their lawful orders.  The duty of any court to hear and resolve legal

disputes carries with it the power to enforce the order.").  In addition, Section 105(a) of the

Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out" the Bankruptcy Code's provisions, and this section

"codif[ies] the bankruptcy court's inherent power to enforce its own orders." *Back v. LTV Corp.

(In re Chateaugay Corp.)*, 213 B.R. 633, 640 (S.D.N.Y. 1997); 11 U.S.C. § 105(a).

26.    Consistent with these authorities, this Court retained subject matter jurisdiction to

enforce its Sale Order and Injunction.  Indeed, this is not the first time that this Court has been

asked to enforce its injunction against plaintiffs improperly seeking to sue New GM for Old

GM's Retained Liabilities.  *See In re Motors Liquidation Co.*, No. 09-50026 (REG), 2011 WL

6119664 (Bankr. S.D.N.Y. 2011) (ordering various plaintiffs to dismiss with prejudice civil actions in which they had brought claims against New GM that are barred by the Sale Order and Injunction); *Castillo v. Gen. Motors Co. (In re Motors Liquidation Co.)*, Adv. Proc. No. 09-00509 (Bankr. S.D.N.Y.), Hr'g Tr. 9:3-9:14, May 6, 2010 ("when you are looking for a declaratory judgment on an agreement that I approved [*i.e.*, the MSPA] that was affected by an order that I entered [*i.e.*, the Sale Order and Injunction], and with the issues permeated by bankruptcy law as they are, and which also raise issues as to one or more injunctions that I entered, how in the world would you have brought this lawsuit in Delaware Chancery Court. I'm not talking about getting in personam jurisdiction or whether you can get venue over a Delaware corporation in Delaware. I'm talking about what talks and walks and quacks like an intentional runaround of something that's properly on the watch of the U.S. Bankruptcy Court for the Southern District of New York."); *Castillo*, 2012 WL 1339496 (entering judgment in favor of New GM) (affirmed by 500 B.R. 333, 335 (S.D.N.Y. 2013)); *see also Trusky*, 2013 WL 620281, at *2 (finding that "claims for design defects [of 2007-2008 Chevrolet Impalas] may not be asserted against New GM and that "New GM is not liable for Old GM's conduct or alleged breaches of warranty").

27.     Contrary to New GM's bargained for rights under the MSPA and the Court's Sale Order and Injunction, Plaintiffs in the Ignition Switch Actions are suing New GM for defects in Old GM vehicles and/or parts in courts across the country. Plaintiffs may not simply ignore the Court's injunction through these collateral attacks, especially when the Sale Order and Injunction is a final order no longer subject to appeal. *See Celotex Corp.*, 514 U.S. at 306, 313 ("'persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed'") (quoting *GTE Sylvania, Inc. v. Consumers Union of U. S., Inc.*,

445 U.S. 375, 386 (1980)); *Pratt v. Ventas, Inc.*, 365 F.3d 514, 520 (6th Cir. 2004) (applying doctrine to dismiss suits filed in violation of injunction in confirmation order entered by bankruptcy court); *In re McGhan*, 288 F.3d 1172, 1180-81 (9th Cir. 2002) (applying doctrine to enforce discharge order in favor of debtors and holding that only the bankruptcy court could grant relief from the order); *see also In re Gruntz*, 202 F.3d 1074, 1082 (9th Cir. 2000) (applying this doctrine in the context of an automatic stay entered by the bankruptcy court); *Spartan Mills v. Bank of Am. Ill.*, 112 F.3d 1251, 1255 (4th Cir. 1997) (applying doctrine to bankruptcy court order approving sales of assets free and clear of liens).

## II.    NEW GM CANNOT BE HELD LIABLE FOR OLD GM'S ALLEGED CONDUCT, EITHER DIRECTLY OR AS OLD GM'S ALLEGED "SUCCESSOR."

28.    Plaintiffs acknowledge that most of the vehicles and parts at issue in the Ignition Switch Actions were manufactured, marketed, and sold by Old GM prior to the Sale Order and Injunction.  *See, e.g.*, *Benton* Compl., ¶ 31 (discussing Plaintiff's alleged review of Old GM advertisements and purchase of a 2005 Chevy Cobalt); *Ponce* Compl., ¶ 35 ("In or about 2007 or early 2008, Plaintiff purchased a 2007 Chevrolet HHR in Southern California."); *Maciel* Compl., ¶¶ 21, 25, 33, 38, 46, 50, 58, 62 (alleging named plaintiffs own, among other vehicles, 2005, 2007 and 2008 Chevrolet Cobalts; a 2007 Chevrolet HHR; and 2003, 2004, 2006 Saturn Ions); *Jawad* Compl., ¶ 8; *Jones* Compl., preamble paragraph at p. 1; *Maciel* Compl., ¶¶ 1, 196-97.

29.    Many of the complaints in the Ignition Switch Actions are similar, and while several reflect an effort to plead around the Court's Sale Order and Injunction, in fact they all generally assert the same underlying allegations made about Old GM:  that it designed and sold vehicles with a defective ignition switch.  (*See* Schedules 1 and 2 attached hereto.)  And, they all seek to hold New GM liable for economic damages based on Old GM's conduct — claims that are prohibited by the Sale Order and Injunction.  In short, New GM did not agree, and this Court

previously held, that New GM did not assume any economic injury liabilities based on design defects in any of Old GM's vehicles and parts. *See Trusky*, 2013 WL 620281, at *2.

30.     Similarly, various Plaintiffs attempt to impose "successor" liability upon New GM, but New GM is not a successor to Old GM and did not assume any liabilities in connection with successor or transferee liability. This is expressly provided by the Court's Sale Order and Injunction:

> ***The Purchaser shall not be deemed***, as a result of any action taken in connection with the M[S]PA or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, ***to:*** ***(i) be a legal successor***, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchased Assets from and after the Closing); ***(ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors***. Without limiting the foregoing, the Purchaser (New GM) shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims, including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity, environmental, labor and employment, and products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or unliquidated.

Sale Order and Injunction ¶ 46 (emphasis added); *see also id.*, ¶¶ AA, BB, DD, 6, 7, 8, 10 and 47; MSPA § 9.19.

31.     Plaintiffs' express successor liability allegations are simply a violation of this Court's Sale Order and Injunction. But whether or not Plaintiffs' claims expressly allege successor liability, their claims against New GM based on Old GM's conduct are essentially successor liability claims cast in a different way and are precluded by that Order.

**III.    PLAINTIFFS' WARRANTY ASSERTIONS AND STATE LEMON LAW ALLEGATIONS DO NOT ENABLE THEM TO CIRCUMVENT THE COURT'S SALE ORDER AND INJUNCTION.**

**A.    The Limited Glove Box Warranty is Not Applicable.  But As a Practical Matter, Plaintiffs Already Are Obtaining Such Relief As Part of the Recall.**

32.    The Glove Box Warranty is for a limited duration and virtually all of the vehicles that are the subject of the Ignition Switch Actions were sold more than three years ago.  Thus, the Glove Box Warranty has expired.  In any event, the Glove Box Warranty provides only for repairs and replacement parts; the economic losses asserted by Plaintiffs in the Ignition Switch Actions are of an entirely different character and are expressly barred by the Glove Box Warranty.  This distinction is not unique to Old GM's Sale.  In the Chrysler bankruptcy case, the court likewise found that the assumed liabilities were limited to the standard limited warranty of repair issued in connection with sales of vehicles.  *See, e.g., Burton v. Chrysler Group, LLC (In re Old Carco LLC)*, 492 B.R. 392, 404 (Bankr. S.D.N.Y. 2013) ("New Chrysler did agree to honor warranty claims — the Repair Warranty.  None of the statements attributed to New Chrysler state or imply that it assumed liability to pay consequential or other damages based upon pre-existing defects in vehicles manufactured and sold by Old Carco.").[12]  Finally, as a practical matter, New GM will make the necessary ignition switch repairs as part of the recall, which is all that the Glove Box Warranty would have required New GM to do anyway.  Hence, any claims, if they existed, are moot.

33.    Similarly, the MSPA and the Sale Order and Injunction provide that the implied warranty and other implied obligation claims asserted by Plaintiffs here are Retained Liabilities for which New GM is not responsible.  *See* Sale Order and Injunction, ¶ 56 (New GM "is not

---

[12]    *See also*; *Tulacro v. Chrysler Group LLC, et al.*, Adv. Proc. No. 11-09401 (Bankr. S.D.N.Y. Oct. 28, 2011) [Dkt. No. 18] (Exhibit H, Compendium of Exhibits); *Tatum v. Chrysler Group LLC*, Adv. Proc. No. 11-09411 (Bankr. S.D.N.Y. Feb. 15, 2012) [Dkt. No. 73] (Exhibit I, Compendium of Exhibits).

assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, *including implied warranties* and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs and point of purchase materials." (emphasis added)); *see also* MSPA § 2.3(b)(xvi) (one of the Retained Liabilities of Old GM was any liabilities "arising out of, related to or in connection with any (A) *implied warranty* or other *implied obligation arising under statutory or common law* without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to [Old GM]." (emphasis added)).

34.     In short, any breach of warranty claims Plaintiffs pursue relating to Old GM vehicles or parts (whether express or implied) improperly seek damages against New GM in violation of the Sale Order and Injunction.

**B.     Any Purported State Lemon Law Claims Are Premature At Best, And Cannot Be Adequately Pled.**

35.     In an apparent attempt to circumvent the Court's Sale Order and Injunction, certain of the Ignition Switch Actions purport to assert claims based on alleged violations of state Lemon Laws.  But merely referencing state Lemon Laws is not sufficient.  Plaintiffs must actually plead facts giving rise to Lemon Law liability as defined by the MSPA.  Even a cursory review of the complaints reveals they have not done so.

36.      New GM agreed to assume Old GM's "obligations under state 'lemon law' statutes, which require a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute, after a *reasonable number of attempts* as further defined in the statute, and other related regulatory obligations under such statutes."  Sale Order and Injunction, ¶ 56 (emphasis added).  None of the Plaintiffs has alleged that New GM has not conformed the vehicle "after a reasonable number of

attempts." And not only is New GM in the process of conforming the vehicles (through the recall), but the statutes of limitations on Lemon Law claims as defined in the MSPA have expired.

37.     As Judge Bernstein found in *Old Carco*, whether claimants can assert a valid Lemon Law claim "depends on the law that governs each plaintiff's claim and whether the plaintiff can plead facts that satisfy the requirements of the particular Lemon Law." 492 B.R. at 406.  He further held as follows:

> With some variation, the party asserting a Lemon Law claim must typically plead and ultimately prove that (1) the vehicle does not conform to a warranty, (2) the nonconformity substantially impairs the use or value of the vehicle, and (3) the nonconformity continues to exist after a reasonable number of repair attempts.[13]

Judge Bernstein ultimately found that the claimants there did "not plead that any of the[m] brought their vehicles in for servicing, or that New Chrysler was unable to fix the problem after a reasonable number of attempts." *Id.* at 407.  As was the case in *Old Carco*, none of the Plaintiffs here have pled that they brought their vehicles in to be fixed and, after a reasonable number of attempts, that they could not be fixed.  They merely base their claims on the recall notices and letters to owners that New GM previously issued.

## CONCLUSION

38.     New GM was created to purchase the assets of Old GM pursuant to the MSPA. The limited category of liabilities it agreed to assume as part of the purchase was the product of a negotiated bargain, which was approved by this Court in July 2009.  Plaintiffs in the Ignition Switch Actions have essentially ignored this; they wrongfully treat New GM and Old GM

---

[13]     *Old Carco*, 492 B.R. at 406 (citing *Sipe v. Fleetwood Motor Homes of Penn., Inc.*, 574 F. Supp. 2d 1019, 1028 (D. Minn. 2008); *McLaughlin v. Chrysler Corp.*, 262 F. Supp. 2d 671, 679 (N.D.W. Va. 2002); *Baker v. Chrysler Corp.*, Civ. A. No. 91–7092, 1993 WL 18099, at *1–2 (E.D. Pa. Jan. 25, 1993); *Palmer v. Fleetwood Enterp., Inc.*, Nos. C040161, C040765, 2003 WL 21228864, at *4 (Cal. Ct. App. May 28, 2003); *Iams v. DaimlerChrysler Corp.*, 174 Ohio App. 3d 537, 883 N.E.2d 466, 470 (2007); *DiVigenze v. Chrysler Corp.*, 345 N.J. Super. 314, 785 A.2d 37, 48 (App. Div. 2001)).

interchangeability and are pursuing Old GM claims that they cannot lawfully pursue against New GM.

39.     Schedule 2 provides examples of allegations that on their face relate to the Retained Liabilities asserted by the Plaintiffs in the Ignition Switch Actions.  Set forth below are illustrations of what Plaintiffs have improperly alleged in such Actions.

(a)     **Express Warranty, other than the Glove Box Warranty**.  *See, e.g.*, Ashbridge Compl., ¶¶ 164-65 (New GM's "express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act" and New GM "breached these express . . . warranties as described in more detail above."); Maciel Compl., ¶¶ 212-13 (same) and fifth, eleventh, thirteenth, and fifteenth, seventeenth, and nineteenth causes of action assert claims for breach of express warranty); Balls Compl., ¶¶ 137-141 (alleging a breach of an express warranty); Cox Compl., ¶¶ 124-127 (the third cause action asserts a breach of express warranty).

(b)     **Implied Warranty**.  *See, e.g.*, DePalma Compl. (Count IV asserts a breach of implied warranty of merchantability); Jawad Compl. ¶¶ 41, 42 (alleging New GM "breached its implied warranty in the design of the Defective GM Vehicles" and that New GM "breached its implied warranty in the manufacturing of Defective GM Vehicles"); Ross Compl., ¶¶ 124-125 (asserting that "GM gave an implied warranty . . . namely, the implied warranty of merchantability" and that GM "breached the implied warranty of merchantability"); Maciel Compl., ¶¶ 274 (New GM "breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles that are defective.").

(c)     **Implied Obligations under Statute or Common Law**.  *See, e.g.*, Heuler Compl. (asserting causes of action under state consumer protection statutes); Jones Compl. (asserting violations of numerous state consumer protection and unfair competition statutes); Benton Compl., (asserting violations of numerous state consumer protection and unfair competition statutes); Maciel Compl., (asserting violations of numerous state consumer protection and unfair competition statutes).

(d)     **Successor Liability**.  *See, e.g.*, Malaga Compl., ¶ 117 (alleging that New GM "has successor liability for GM Corporation's acts and omissions in the marketing and sale of the Defective Vehicles"); McConnell Compl., ¶ 12 (alleging that New GM "has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defect"); Phillip Compl., ¶ 50 (alleging that "[b]ecause GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability . . ."); Maciel Compl. ¶¶ 70, 80 ("GM, which is the successor GM entity resulting from

the GM chapter 11 bankruptcy proceeding, contractually assumed liability [in the MSPA] for the claims in this lawsuit" and "is liable under theories of successor liability in addition to, or in the alternative to, other bases of liability.").

(e) **Design Defect**.  *See, e.g.*, Brown Compl. (the fifth cause of action is premised on a design defect theory); Stafford Compl. (the fifth cause of action is premised on a design defect theory); Ramirez Compl., ¶ 150(f) (alleging that had "Plaintiff and other Class Members known that the Class Vehicles had the Ignition Switch Defect, they would not have purchased a Class Vehicle"); Maciel Compl. ¶¶ 213, 232, 257, 271, 282, 310, 336, 362 (first, third, fifth, sixth, seventh, ninth, twelfth, and fourteenth causes of action are premised on claim that "the Defective Vehicles share a common design defect").

(f) **Tort, Contract or Otherwise**.  *See, e.g.*, Ashworth Compl., ¶¶ 519-523 (second cause of action asserts a claim based on, among other things, common law breach of contract); Ratzlaff Compl. (Count II asserts a fraudulent concealment theory); Shollenberger Compl., ¶ 69 (alleging that New GM "breached its contractual duties by, inter alia, selling Class Vehicles with a known safety defect and failing to timely recall them"); Maciel Compl. ¶¶ 218-28 (second cause of action asserts fraudulent concealment theory).

(g) **The Conduct of Old GM**.  *See, e.g.*, Brandt Compl., ¶ 48 (asserting that "GM knew at the time they sold the vehicles to the Plaintiffs that such vehicles would be used for" a specific purpose); Darby Compl., ¶ 131 (alleging that "Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class to purchase Vehicles at a higher price for the vehicles, which did not match the vehicles' true value"); DeSutter Compl., ¶¶ 12, 67(e) (alleging that the Named Plaintiffs own a 2006 Saturn Ion or a 2006 Chevrolet Cobalt, that such vehicles were purchased new, and that "GM intended for Plaintiffs, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiffs and Class Members would purchase or lease the Defective Vehicles"); Maciel Compl. ¶ 155 (alleging that "neither old GM, nor GM disclosed its knowledge about the dangerous Key System defects to its customers."

40.     New GM has no liability or responsibility for these Retained Liability claims and, under the Sale Order and Injunction, Plaintiffs in the Ignition Switch Actions are enjoined from bringing them against New GM.  *See, e.g.,* Sale Order and Injunction, ¶¶ 8, 47.  Accordingly, the Court should enforce the terms of its Sale Order and Injunction by ordering Plaintiffs to promptly dismiss all of their claims that violate the provisions of that Order, to cease and desist from all efforts to assert such claims against New GM that are void because of the Sale Order

and Injunction, and to show cause whether they have any claims that are not already barred by this Court's Sale Order and Injunction.

## NOTICE AND NO PRIOR REQUESTS

41.     Notice of this Motion to Enforce has been provided to (a) counsel for Plaintiffs in each of the Ignition Switch Actions, (b) counsel for Motors Liquidation Company General Unsecured Creditors Trust, and (c) the Office of the United States Trustee.  New GM submits that such notice is sufficient and no other or further notice need be provided.

42.     No prior request for the injunctive relief sought in this Motion has been made to this or any other Court.

WHEREFORE, New GM respectfully requests that this Court:   (i) enter an order substantially in the form set forth as Exhibit "J" in the Compendium of Exhibits, granting the relief sought herein; and (ii) grant New GM such other and further relief as the Court may deem just and proper.

Dated: New York, New York          Respectfully submitted,
       April 21, 2014


                                   /s/ Arthur Steinberg
                                   Arthur Steinberg
                                   Scott Davidson
                                   KING & SPALDING LLP
                                   1185 Avenue of the Americas
                                   New York, New York  10036
                                   Telephone:     (212) 556-2100
                                   Facsimile:     (212) 556-2222

                                   Richard C. Godfrey, P.C. (*pro hac vice* pending)
                                   Andrew B. Bloomer, P.C. (*pro hac vice* pending)
                                   KIRKLAND & ELLIS LLP
                                   300 North LaSalle
                                   Chicago, IL 60654
                                   Telephone: (312) 862-2000
                                   Facsimile: (312) 862-2200

                                   *Attorneys for General Motors LLC*