# Exhibit K

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

CHARLES SILVAS and GRACE SILVAS,    (
Plaintiffs    (
   (
v.    (     Case No.: 2:14-cv-00089
   (
GENERAL MOTORS, LLC,    (     Jury Trial Demanded
Defendant    (

## PLAINTIFFS' SECOND AMENDED VERIFIED COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

     COME NOW Charles Silvas and Grace Silvas (together, "Plaintiffs") before the Honorable Judge of this Court and file this their Second Amended Complaint against General Motors, LLC, and in support would show the Court as follows:

## I.
## JURISDICTION AND VENUE

     1.    This Court has personal jurisdiction over Defendant because General Motors LLC ("New GM") conducts significant business within the State of Texas and therefore the Court has general jurisdiction for all purposes. Defendant removed this case to this Court pursuant to 28 U.S.C. § 1452(a) and 28 U.S.C. § 1441(b), subjecting itself, and consenting, to the Court's exercise of jurisdiction.

     2.    Pursuant to 28 U.S.C. § 1391(a)(2), venue is proper in this District because a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this District and Plaintiffs are residents of this District.

**Plaintiffs' Second Amended Complaint**

## II.
## PARTIES

3.  Plaintiff Charles Silvas is an individual who resides in Nueces County, Texas.

4.  Plaintiff Grace Silvas is an individual who resides in Nueces County, Texas.

5.  Defendant General Motors LLC (hereinafter referred to as "New GM") is a foreign company doing business in Texas. New GM is a Delaware limited liability company with its principal place of business in Detroit, Michigan. The sole member of New GM is General Motors Holdings, LLC, a Delaware limited liability company with its principal place of business in Michigan. General Motors Holdings, LLC's sole member is General Motors Company, a Delaware corporation with its principal place of business in Michigan. With respect to the facts alleged and claims asserted in this complaint, New GM is the corporate successor of General Motors Corporation ("Old GM"), which filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009. On July 10, 2009, New GM acquired substantially all of the assets and assumed certain liabilities of Old GM by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code. Plaintiffs' causes of action are brought only against New GM, and Plaintiffs do no assert any causes of action against Old GM. To the extent this Complaint mentions "Old GM," it is for background and reference purposes only. At all relevant times, New GM has been in the business of developing, producing and marketing cars and trucks worldwide. New GM has a network of authorized retailers that sell GM vehicles and parts throughout Texas, including in this district. General Motors LLC has appeared in this lawsuit.

**Plaintiffs' Second Amended Complaint**

## III.
## PRELIMINARY STATEMENT

6.     This lawsuit arises out of the common law and statutory obligations of New GM, and New GM's breach of those obligations by failing to disclose an ignition switch defect that was causing fatal accidents.  Specifically, New GM intentionally withheld, since July 2009, information showing that faulty ignition switches were cutting off engine power, thereby disabling critical functions needed to safely operate vehicles, such as power steering, power braking and airbags, in a number of GM model cars, including the 2005-2010 Chevrolet Cobalt, 2005-2010 Pontiac G5, 2003-2007 Saturn Ion, 2006-2011 Chevrolet HHR, 2005-2006 Pontiac Pursuit (Canada), 2006-2010 Pontiac Solstice and 2007-2010 Saturn Sky (hereinafter "Defective Vehicles").[1]

7.     Many of the Defective Vehicles were originally designed, manufactured, marketed, and placed into the stream of commerce by Old GM.  Old GM filed for bankruptcy in 2009.  In July 2009, the bankruptcy court approved the sale of Old GM to New GM," the Defendant herein.  Notwithstanding the prior bankruptcy or contractual obligations under the sale agreement, New GM is liable for its own conduct.  From its inception in 2009 and while extolling the safety and reliability of its vehicles, New GM had its own independent knowledge of the defects in its vehicles, yet chose to conceal them.

8.     Specifically, New GM has actual knowledge that, because of the way in which the ignition was designed and integrated into the Defective Vehicles, the ignition switch can suddenly fail during normal operation, cutting off engine power and certain electrical systems in

---

[1] All of the aforementioned vehicles have a common safety defect and are of a substantially similar design to one another with regard to their ignitions, as evidenced by the fact that GM has identified these specific models (other than certain 2008-2010 Cobalt vehicles) for recall for the same safety design defects. *See* Exhibit A, GM Recall Letter (March 2014).

**Plaintiffs' Second Amended Complaint**

the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

9.      The ignition defect in the Defective Vehicles have been linked to at least thirty-one crashes and thirteen deaths,[2] and New GM has recognized that the faulty ignition switch poses an "increas[ed] risk of injury or fatality" to occupants because the ignition switch may move out of the "run" position during operation.[3]

10.      Although New GM has, and has had, actual knowledge of safety defects in the Defective Vehicles for years, it fraudulently concealed and continues to fraudulently conceal material facts regarding the extent and nature of safety defects in the Defective Vehicles and what must be done to remedy the defects.

11.      In fact, New GM has not only fraudulently concealed material facts relating to the safety defects in the Defective Vehicles for years, but it has also made affirmative fraudulent and misleading statements, and it is continuing to make fraudulent and misleading statements to the public and to Plaintiffs regarding the nature and extent of the safety defects in the Defective Vehicles.

12.      While New GM has initiated a recall of identified vehicles in which it acknowledges a defect with the ignition switch itself, it knows - *and its own engineering documents reflect* - that the defects transcend just the ignition switch and also include the placement of the ignition switch, a lack of adequate protection of the ignition switch from forces

---

[2] *See* Exhibit A, GM Recall Letter.

[3] These numbers of crashes and deaths are taken from the GM Recall Letter, but news reports have suggested that the numbers of crashes and deaths associated with the defects in the Defective Vehicles likely is much higher. *See, e.g.,* March 13, 2014 Letter from the Center for Auto Safety to David J. Friedman, Acting Administrator, NHTSA, available at: http://www.cbsnews.com/htdocs/pdf/Friedman _Letter_ March _13 _2014 Full.pdf (last visited April 1, 2014).

of inadvertent driver contact, and the use of a different type of key. To fully remedy the problem and render the Defective Vehicles safe and of economic value to their owners again, additional design elements beyond a new ignition switch are needed.

13.    The defective design, combined with New GM's past and ongoing failure to adequately warn of, or remedy, that design, and its past and ongoing fraudulent concealment and/or fraudulent misrepresentations of the full nature and extent of the defects in that design in the Defective Vehicles, has proximately caused and continues to cause Plaintiffs to suffer economic damages because they purchased a vehicle that: (a) has diminished value because vehicle cannot be operated safely without fear of a catastrophic event; and (b) requires modifications beyond that included in the recent New GM recall of the Defective Vehicles, to be operated safely or sold to other buyers, as demonstrated by New GM's own internal documents that have not been disclosed to the general public (but that are discussed below).

14.    Through this action, Plaintiffs seek injunctive relief requiring New GM to (1) tell drivers that continuing to drive their vehicles jeopardizes their lives and safety, and the lives and safety of Plaintiffs and the public at large; and/or (2) instructing drivers of the Defective Vehicles to refrain from driving their vehicles until an effective repair procedure is available. Plaintiffs further seek recovery for, among other things, the diminution in value of their GM vehicle as a result of the defects and New GM's wrongful conduct related to same.

## IV.
## BACKGROUND FACTS

### A.   Plaintiffs' Vehicles

#### 1.   Recall notices raise issues concerning GM vehicles

15.     On February 7, 2014, New GM filed a Defect Notice to recall 2005-2007 Model Year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The Defect Notice stated that the ignition switch torque performance in these vehicles might not meet specifications, resulting in the non-deployment of airbags in crash events.  The notice called for the recall of approximately six hundred thousand vehicles.

16.     Seventeen days later, on February 24, 2014, New GM issued a notice to the National Highway Traffic Safety Administration ("NHTSA") which expanded the recall to include 2003-2007 Saturn Ions, 2006-2007 Chevrolet HHRs, 2006-2007 Pontiac Solstices and 2007 Saturn Skys, bringing the number of vehicles affected by the recall to 1,367,146.  This NHTSA notice furnished information dating back 10 years, and dealt directly with New GM's recall obligations and product warranties, which have been known to New GM since July 2009. The notice dated February 24, 2014, provided a chronology that purportedly detailed New GM's knowledge and actions related to the ignition switch.

17.     On March 28, 2014, the recall was expanded to include the following vehicles: 2008-2010 Pontiac Solstices; 2008-2010 Pontiac G5s; 2008-2010 Saturn Skys; 2008-2010 Chevrolet Cobalts; and 2008-2011 Chevrolet HHRs.

#### 2.   Remarkably, Old GM knew of the condition since 2001

18.     As early as 2001, during pre-production development of the Ion, Old GM became aware of issues relating to ignition switch "passlock" system. The 2001 report stated the problem

included a "low detent plunger force" in the ignition switch.

19.     In 2003, before the launch of the 2005 Cobalt, Old GM became aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. An investigation was opened and, after consideration of lead-time required and the cost and effectiveness of potential solutions, the investigation was closed with no action taken.

20.     Throughout 2005, Old GM received similar field reports of vehicles losing engine power when the key moved out of the "run" position. A proposal was approved to redesign the key head, but later cancelled. Instead of recalling the vehicles to replace the defective ignition switches, Old GM issued a Service Bulletin (the "Bulletin"). The Bulletin recognized that there was a potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.

21.     Although Old GM developed an insert for the key ring that changed it from a slot design to a hole design, to prevent the key from easily jogging the ignition switch out of the run position, the redesigned ignition switch was not installed in vehicles until the 2007 model year.

22.     The defective ignition switch has been linked to numerous crashes and fatalities.

23.     Given the vast number of instances of sudden engine power loss and non-deployment of airbags related to the defective ignition switch and New GM's discovery or knowledge of many or all of the instances beginning with its inception in July 2009, New GM should have aggressively taken remedial measures to address these defects. New GM failed to do so. In fact, this first recall was not implemented until 2014 – nearly ten years after the first instances of engine power loss.

24.     The ignition switch defect in GM vehicles has adversely affected the company's

**Plaintiffs' Second Amended Complaint**

reputation as a manufacturer of safe, reliable vehicles with high resale value, as compared to vehicles made by its competitors. In the wake of the news reports about this serious problem, GM customers and consumers generally are – as they should be – skeptical about the quality and safety of GM vehicles.

25.    In the wake of the news about the ignition defects, consumers have also become rightfully skeptical about whether New GM is coming forth with truthful information about the sudden loss of power defect. Likewise, GM customers and the general public are left to wonder whether safety concerns about GM vehicles are limited to this particular problem.

26.    Moreover, some vehicle owners, including Plaintiffs, have driven their cars less than they otherwise would due to fear of being in an accident.

### 3.    The damage done

27.    Plaintiffs seek injunctive relief including: (i) repairs to remove the dangerous condition; (ii) an extension of warranty coverage covering components of the ignition switch system; and (iii) individual notice to each owner affected by the ignition switch recall disclosing the dangerous condition.

28.    Plaintiffs also seek damages suffered as a result of New GM's conduct, including but not limited to: (i) loss of use of the vehicles; (ii) reimbursement of out of pocket costs for, among other things, alternative transportation, prior repairs, etc.; (iii) diminution in resale value of the vehicles; and (iv) an increased risk of physical harm.

### B.    Plaintiffs' Experiences

29.    Plaintiffs own a 2006 Chevrolet Cobalt, a model that is subject to the ignition switch recall.  Plaintiffs purchased their Cobalt on July 20, 2009 from Champion Chevrolet Auto Nation, 6650 S.P.I.D. Corpus Christi, Texas 78413.

**Plaintiffs' Second Amended Complaint**

30.     Plaintiffs experienced incidents of sudden engine power loss beginning in 2010. The vehicle was inspected and upon information and belief, the ignition switch was replaced. Despite the repair, the Plaintiffs continue to experience incidents of sudden engine power loss.

31.     Plaintiffs chose the 2006 Chevrolet Cobalt over competing brands' vehicles, at least in part, because of the reputation GM vehicles have for higher resale values, as compared to vehicles manufactured by competitors.

32.     Plaintiffs have lost trust in the GM and Chevrolet brand names, and the Cobalt in particular. They are skeptical that their Cobalt will ever be reasonably safe.

33.     Plaintiffs believe that the resale value of their Chevrolet Cobalt will decrease and diminish due to general consumer skepticism about GM and Chevrolet vehicles. They believe Defendant's actions and omissions have caused economic harm to them, namely damage to their property and devaluation of their Chevrolet Cobalt.

34.     Plaintiffs are concerned for their safety and the safety of others.

35.     Plaintiffs resided in Nueces County at the time their causes of action accrued.

**V.**
**CAUSES OF ACTION AGAINST NEW GM**

**A.     Negligence**

36.     Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

37.     The Plaintiffs hereby assert a cause of action for negligence strictly and solely against "New GM." That is, each and every act of negligence asserted herein by the Plaintiffs are asserted against the New GM only and not the Old GM.

38.     New GM owed Plaintiffs a duty to detect known safety defects in GM vehicles.

39.     New GM owed Plaintiffs a duty, once it discovered safety defects, such as the

ignition switch defect, to provide thorough notice of the defect, including a warning that the defective vehicles should not be driven until an appropriate repair procedure is developed and performed.

40.     New GM owed Plaintiffs a duty, once it discovered the ignition switch defect, to ensure that an appropriate repair procedure was developed and made available to drivers.

41. New GM knew that its customers, such as Plaintiffs, expect that the company will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

42.     New GM's efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of Plaintiffs and other drivers of GM vehicles. New GM was aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, GM had a responsibility to Plaintiffs and other drivers to take the reasonable measures listed above.

43.     Between July 10, 2009, and January 2014, New GM breached its duties to Plaintiffs by failing to provide appropriate notice of and repair procedures for the ignition switch defect in Plaintiffs' vehicle. In doing so, New GM departed from the reasonable standard of care required of it.

44.     It was foreseeable that if New GM did not provide appropriate notice and repair procedure for the defect, that Plaintiffs and other drivers would be endangered, and that when news of the defect became widespread, that the value of Plaintiffs' vehicle and other defective vehicles would be diminished.

45.     Plaintiffs have suffered injury by, among other things, being stuck with a defective vehicle with no known appropriate fix, and with a diminished value. Plaintiffs are thus

**Plaintiffs' Second Amended Complaint**

deprived of the use and enjoyment of their vehicle as well as the ability to sell their vehicles for the value they would have had if New GM had not concealed and failed to develop a repair procedure for the defect. In addition, Plaintiffs and other drivers have been and continue to be endangered by New GM's refusal to state unequivocally that the vehicles should not be driven in their current state. New GM's failure to provide an appropriate notice and repair was the direct and proximate cause of Plaintiffs' injuries, and led directly and predictably to the harm suffered.

46.     Plaintiffs' injuries were reasonably foreseeable to New GM.

47.     Plaintiffs could not through the exercise of reasonable diligence have prevented the injuries caused by New GM's negligence.

48.     Plaintiffs seek an order enjoining New GM from its continued negligence, including to require New GM to provide appropriate notice to drivers (including instructions to drivers to park the vehicle); to pay for a rental car while the necessary repairs are conducted; and to extend warranty coverage covering components of the ignition system.

49.     Plaintiffs also seek to recover their damages caused by New GM, including for the loss of the use of their vehicle; reimbursement of out of pocket costs for, among other things, alternative transportation and prior repairs to defective ignition switches; and diminution in value of their vehicle.

## B. Violation of the Texas Deceptive Trade Practices-Consumer Protection Act, Bus. & C. § 17.41, *et seq.*

50.     Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

51.     The Plaintiffs hereby assert a cause of action under the DTPA strictly and solely against "New GM." That is, each and every deceptive or fraudulent act asserted herein by the Plaintiffs are asserted against the New GM only and not the Old GM.

**Plaintiffs' Second Amended Complaint**

52.    Plaintiffs and GM are both "persons" within the meaning of § 17.45(3).

53.    New GM's business of selling and leasing vehicles, providing notice of automotive defects, selling replacement parts and warranties, and developing repair procedures falls within the definition of "goods" and "services" of § 17.45(1), (2).

54.    Plaintiffs are "consumers" within the meaning of § 17.45(4); they are not a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more.

55.    This case involves New GM's conduct in the context of "trade" and "commerce" as defined in § 17.45(6).

56.    Plaintiffs suffered "economic damages" as a result of New GM's unlawful conduct, including paying to maintain and repair their vehicles when they would not otherwise have done so.

57.    As set forth herein, New GM caused damages to Plaintiffs:

   a.  Through the use or employment of a false, misleading, or deceptive act or practice: Namely, New GM intentionally failed to disclose information concerning goods or services which was known at the time of the transaction, inducing Plaintiffs' detrimental reliance;

   b.  Through the breach of the applicable express warranty; and

   c.  Through New GM's unconscionable actions and course of action set forth herein.

58.    New GM's false, misleading, deceptive, and unconscionable conduct, includes:

   a.  Between July 10, 2009, and January 2014, New GM knew about the ignition switch defect and the dangers it posed.

   b.  New GM also knew that many drivers, such as the Plaintiffs, would be returning

> to dealerships periodically for repairs, and that New GM profits from the sale of
> replacement parts.

    c.   Rather than warning Plaintiffs and other drivers of the existence of the defect and
the fact that no reliable repair procedure existed, New GM failed to disclose that
information, thus causing Plaintiffs and others to continue to spend money on
maintenance and repairs that would not safeguard them from the dangers inherent
in the defect.

    d.   Plaintiffs relied on New GM's failure to disclose the ignition switch defect and
continued to spend money that they would not otherwise have spent.

    e.   By failing to disclose the full extent of its knowledge, New GM has caused and
continues to cause drivers of the defective vehicles to risk their lives and safety by
driving vehicles that cannot presently be made reasonably safe to drive.

59.     Pursuant to § 17.50(b) and (d), Plaintiffs seek a declaration that New GM's conduct violates the Texas Deceptive Trade Practices-Consumer Protection Act and an order enjoining New GM from the unlawful practices described herein, including to require New GM to provide appropriate notice to drivers (including instructions to drivers to park the vehicle); to pay for a rental car while the necessary repairs are conducted; and to extend warranty coverage covering components of the ignition system. Plaintiffs also seek reasonable attorney's fees and costs of litigation.

### C.    Fraud by Non Disclosure

60.     Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

61.     The Plaintiffs hereby assert a cause of action for fraud by non-disclosure strictly and solely against "New GM." That is, each and every act constituting fraud by non-disclosure

**Plaintiffs' Second Amended Complaint**

asserted herein by the Plaintiffs are asserted against the New GM only and not the Old GM.

62.     As set forth above, from July 2009 to the present, New GM intentionally concealed or failed to disclose material facts from the Plaintiffs, the public and NHTSA.

63.     New GM had a duty to disclose the facts to the Plaintiffs and New GM knew: (1) the plaintiffs were ignored of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the plaintiffs did not have an equal opportunity to discover the material facts that GM did not disclose and/or intentionally concealed.

64.     By failing to disclose these material facts, New GM intended to induce Plaintiffs to take some action or refrain from acting.

65.     Plaintiffs relied on New GM's non-disclosure and the Plaintiffs were injured as a result of acting without knowledge of the undisclosed facts.

**D. Intentional Infliction of Emotional Distress**

66.     Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

67.     The Plaintiffs hereby assert a cause of action for intentional infliction of emotional distresss strictly and solely against "New GM." That is, each and every act constituting the intentional infliction of emotional distress asserted herein by the Plaintiffs are asserted against the New GM only and not the Old GM.

68.     New GM's intentional and/or reckless conduct, outlined above, was both extreme and outrageous, causing Plaintiffs to suffer severe emotional distress. Specifically, New GM's conduct, as described above, was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community, and the emotional distress suffered by Plaintiffs was so severe that no reasonable person could be expected to endure it.

**Plaintiffs' Second Amended Complaint**

## VI.
## DAMAGES AND INJUNCTIVE RELIEF

69.     Plaintiffs seek damages suffered as a result of New GM's common law violations, including but not limited to:

(i)     loss of use of the vehicles;

(ii)    reimbursement of out of pocket costs for, among other things, alternative transportation, prior repairs to defective ignition switches; and

(iii)   diminution in value of their vehicle.

70.     New GM recently admitted that at least twelve deaths have been directly attributed to the ignition switch defect when airbags failed to deploy during collisions after the ignition unexpectedly cut off.  For these reasons and in a desperate attempt to prevent further injury and death, Plaintiffs also seek injunctive relief, including:

(i)     repairs to remove the dangerous condition;

(ii)    an extension of warranty coverage covering components of the ignition system; and

(iii)   individual notice to each owner affected by the dangerous condition, which includes instructions to the owner or lessor to park the vehicle and order that GM pay for a rental car while the necessary repairs are conducted.

71.     A bond is not necessary in this instance.  A district court issuing a preliminary injunction or a restraining order has the discretion to dispense with the security requirement of Rule 65(c) if a party lacks the financial resources to post a bond or when granting injunctive relief carries no risk of monetary loss to the party enjoined or restrained.  In the instant case, there is no risk of monetary loss to the party enjoined or restrained.

**Plaintiffs' Second Amended Complaint**

## VII.
## PRE- AND POST-JUDGMENT INTEREST

72.     Plaintiffs seek pre- and post-judgment interest as allowed by law.

## VIII.
## JURY DEMAND

73.     Plaintiffs request a trial by jury for all issues of fact.  A jury fee has been paid.

## IX.
## PRAYER

For these reasons, Plaintiffs pray for judgment against Defendant General Motors, LLC, for the all legal claims asserted herein, that this case proceed to trial before a jury, and that Plaintiffs recover a judgment of and from the Defendant for damages in such an amount as the evidence may show and the jury may determine to be proper, together with pre-judgment and post-judgment interest, court costs, and such other and further relief Plaintiff may show themselves to be entitled, whether at law or in equity.

Respectfully Submitted,

HILLIARD MUÑOZ GONZALES LLP

By: /s/ Robert C. Hilliard
    Robert C. Hilliard
    State Bar No. 09677700
    Federal ID No. 5912
    bobh@hmglawfirm.com
    Rudy Gonzales, Jr.
    State Bar No. 08121700
    Federal ID No. 1896
    rudyg@hmglawfirm.com
    Catherine D. Tobin
    State Bar No. 24013642
    Federal ID No. 25316
    catherine@hmglawfirm.com
    Marion Reilly
    Texas Bar No. 24079195

**Plaintiffs' Second Amended Complaint**

Federal I.D. No. 1357491
marion@hmglawfirm.com

719 S. Shoreline Boulevard,
Suite 500
Corpus Christi, TX  78401
Telephone No.:  (361) 882-1612
Facsimile No.:   (361) 882-3015

-and-

By: /s/ Thomas J. Henry
Thomas J. Henry
State Bar No. 09484210
Greggory A. Teeter
State Bar No. 24033264
Travis Venable
State Bar No. 24068577
Federal I.D. No. 1531849

**THOMAS J. HENRY INJURY ATTORNEY**
521 Starr St.
Corpus Christi, Texas 78401
Telephone No.:  (361) 985-0600
Facsimile No.:  (361) 985-0601

-and-

/s/ Eric H. Gibbs
Daniel Girard
California State Bar No. 114826
dcg@girardgibbs.com
Eric Gibbs
California State Bar No. 178658
ehg@girardgibbs.com
Dave Stein
California State Bar No. 257465
ds@girardgibbs.com

**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94104
Telephone: (415) 981-4800

Facsimile: (415) 981-4846
-and-

*/s/ Shelby Jordan*
Shelby A. Jordan
Fed Bar # 2195
State Bar # 11016700

**JORDAN, HYDEN, WOMBLE AND
CULBRETH, P.C.**
900 Bank of America North
500 N. Shoreline,
Corpus Christi, Texas, 78471
Telephone No.:  (361) 884-5678
Facsimile No.:  (361) 888-5555
sjordan@jhwclaw.com


**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that on April 1, 2014 a true and correct copy of the foregoing was served upon counsel of record electronically and by facsimile, as follows:

Edward L. Ripley
Eric M. English
KING & SPALDING, LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
713.751.3290 fax

Arthur Steinberg
Scott Davidson
KING & SPALDING, LLP
New York, NY 10036-2601
212.556.2222 fax

Darrell L. Barger
HARTLINE DACUS BARGER DREYER LLP
800 North Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
361.866.8039 fax

Kyle H. Dreyer
HARTLINE DACUS BARGER DREYER LLP
6688 N. Central Expressway, Suite 1000
Dallas, Texas 75206
214.267.4214 fax

/s/ Robert C. Hilliard
Robert C. Hilliard

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

CHARLES SILVAS and GRACE SILVAS,         (
Plaintiffs                               (
                                         (
v.                                       (        Case No.: 2:14-cv-00089
                                         (
GENERAL MOTORS, LLC,                     (        Jury Trial Demanded
Defendant                                (

### VERIFICATION

STATE OF TEXAS          §
NUECES COUNTY           §

Before me, the undersigned notary, on this day personally appeared Grace Silvas, the affiant, a person whose identity is known to me. After I administered an oath, affiant testified:

"My name is Grace Silvas. I have read Plaintiffs' Second Amended Verified Complaint and Application for Injunctive Relief. The facts stated in it are within my personal knowledge and are true and correct.

_____
Grace Silvas

SWORN TO AND SUBSCRIBED before me by Grace Silvas on April___|5|__, 2014.

_____
Notary Public in and for the State of Texas

**Kelly McQuary**
NOTARY PUBLIC
STATE OF TEXAS
MY COMM EXP 08-01-2015

**Plaintiffs' Second Amended Complaint**

19.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

CHARLES SILVAS and GRACE SILVAS,    (
Plaintiffs                          (
                                    (
v.                                  (          Case No.: 2:14-cv-00089
                                    (
GENERAL MOTORS, LLC,                (          Jury Trial Demanded
Defendant                           (

## VERIFICATION

STATE OF TEXAS        §
NUECES COUNTY         §

Before me, the undersigned notary, on this day personally appeared Charles Silvas, the affiant, a person whose identity is known to me. After I administered an oath, affiant testified:

"My name is Charles Silvas. I have read Plaintiffs' Second Amended Verified Complaint and Application for Injunctive Relief. The facts stated in it are within my personal knowledge and are true and correct.

_____
Charles Silvas

SWORN TO AND SUBSCRIBED before me by Charles Silvas on April ___|___, 20 14.

Notary Public in and for the State of Texas

Kelly McQuary
NOTARY PUBLIC
STATE OF TEXAS
MY COMM EXP 08-01-2015

Plaintiffs' Second Amended Complaint

20.

# EXHIBIT

# "A"

**GM**  GENERAL MOTORS LLC
Vehicle Safety and Crashworthiness

14V-047
(10 pages) Supplemental

March 11, 2014

Ms. Nancy Lewis
Associate Administrator for Enforcement
National Highway Traffic Safety Administration
Recall Management Division (NVS-215)
1200 New Jersey Avenue, SE – Room W45-306
Washington, DC 20590

     Re:   NHTSA Recall No. 14V-047

Dear Ms. Lewis:

This letter supersedes General Motors' letter of February 25, 2014, and is submitted pursuant to the requirements of 49 CFR 573.6 as it applies to a determination by General Motors to conduct a safety-related recall for 2006-2007 model year (MY) Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.

573.6(c)(1): General Motors Company; Chevrolet, Pontiac and Saturn Brands.

573.6(c)(2),(3),(4): This information is shown on Attachment A.

573.6(c)(5): General Motors has decided that a defect which relates to motor vehicle safety exists in 2006-2007 MY Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles. The ignition switch torque performance may not meet General Motors' specification. If the torque performance is not to specification, the ignition switch may unintentionally move from the "run" position to the "accessory" or "off" position with a corresponding reduction or loss of power. This risk may be increased if the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event. The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

Until the recall repairs have been performed, it is very important that customers remove all items from their key rings, leaving only the vehicle key. The key fob (if applicable), should also be removed from the key ring.

573.6(c)(6): As permitted by the provisions of 49 C.F.R. 573.6(b), and pursuant to the requirements of 49 C.F.R. 573.6(c)(6), General Motors now submits the attached chronology of principal events that were the basis for the determination that the defect related to motor vehicle safety. See Attachment B. This chronology refers to numerous engineering inquiries, known within General Motors as Problem Resolution Tracking System ("PRTS") inquiries. As stated in the enclosed document, General Motors is prepared to share with

Mail Code: 480-210-2V
30001 Van Dyke Road • Warren, MI 48090-9020
N140063 573 Letter Revised.docx



09-50026-mg cv Doc 13621-11 Filed 04/21/14 Entered 04/21/14 20:24:57 Exhibit
Case 2:14-cv-00089 Document 1-1 Filed in TXSB on 04/01/14 Page 3 of 11
Pg 25 of 33

Letter to Ms. Nancy Lewis
N140063 573 Letter
March 11, 2014
Page 2

NHTSA upon request the PRTS reports referenced therein, as well as other documentation related to this recall.

573.6(c)(8): Dealers are to replace the ignition switch.

GM provided dealers notification of the recall on February 26, 2014 and March 4, 2014. GM will be providing a recall service bulletin to dealers on or about April 7, 2014. In addition, GM mailed the owner letters on March 10 and 11, 2014.

Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on or before ten days after the owner mailing is completed, according to the plan submitted on May 23, 2013.

573.6(c)(10): GM will provide copies of the dealer bulletin under separate cover. GM has previously provided a copy of the owner letter.

573.6(c)(11): GM's assigned recall number is 14063.

Sincerely,

M. Carmen Benavides, Director
Product Investigations and Safety Regulations

14063
Attachment

Attachment A - 573.6(c)(2),(3),(4)

## VEHICLES POTENTIALLY AFFECTED BY MAKE, MODEL, AND MODEL YEAR
## PLUS INCLUSIVE DATES OF MANUFACTURE

| MAKE | MODEL SERIES | MODEL YEAR | NUMBER INVOLVED | INCLUSIVE MANUFACTURING DATES (FROM) | (TO) | DESCRIPTIVE INFO. TO PROPERLY IDENT. VEH. | EST. NO. W/CONDITION |
|------|-------------|-----------|----------------|-------------------------------------|------|-------------------------------------------|---------------------|
| Chevrolet | A | 2006 | 113,911 | 04/11/2005 | 06/22/2006 | HHR | * |
| Chevrolet | A | 2007 | 99,672 | 05/15/2006 | 06/23/2007 | HHR | " |
| Pontiac | M | 2006 | 18,750 | 03/16/2005 | 06/23/2006 | Solstice | " |
| Pontiac | M | 2007 | 21,310 | 06/05/2006 | 06/15/2007 | Solstice | " |
| Saturn | A | 2003 | 96,358 | 06/01/2002 | 07/24/2003 | Ion | " |
| Saturn | A | 2004 | 121,107 | 04/29/2003 | 08/07/2004 | Ion | " |
| Saturn | A | 2005 | 71,024 | 04/27/2004 | 06/06/2005 | Ion | " |
| Saturn | A | 2006 | 96,227 | 04/13/2005 | 05/05/2006 | Ion | " |
| Saturn | A | 2007 | 94,118 | 04/05/2006 | 03/28/2007 | Ion | " |
| Saturn | M | 2007 | 15,547 | 12/06/2005 | 06/14/2007 | Sky | " |
| | | GM Total: | 748,024 | | | | |

* All involved vehicles will be corrected as necessary.

573.6(c)(2)(iv):   Delphi Packard Electrical/Electronic Architecture
5725 Delphi Drive
M/C 483.400.301
Troy, Michigan 48098

Tel: [1] 248.813.2334
Fax: [1] 248.813.2333

The involved parts are manufactured in Mexico.

14063

**ATTACHMENT B - 573.6(c)(6)**

**CHRONOLOGY**
**Re: Recall of 2006-2007 Chevrolet HHR and Pontiac Solstice,**
**2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles**

On February 7, 2014, General Motors ("GM") notified the National Highway Transportation Safety Administration ("NHTSA") of its decision to recall 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles. By letter dated February 24, 2014, GM submitted to NHTSA a chronology of principal events that were the basis for the determination that the defect related to motor vehicle safety, with respect to the recall of the Cobalt and G5 vehicles ("the Cobalt and G5 recall").

In making this recall determination, GM's Executive Field Action Decision Committee ("EFADC") was asked to consider a proposed recall only of the Cobalt and G5 vehicles. The submissions to the EFADC did not propose a recall of the Ion, HHR, Solstice and Sky vehicles. Following GM's announcement of the Cobalt and G5 recall on February 7, 2014, as will be discussed in more detail below, the decision was made to conduct a more in-depth analysis of information related to the vehicles that were listed on Service Bulletins 05-02-35-007 and 05-02-35-007A, but were not included in the February 7, 2014 recall submission to NHTSA.

By letter dated February 25, 2014, GM notified NHTSA of its decision to recall all of the other vehicles listed in the aforementioned Service Bulletins—specifically, 2003-2007 model year Saturn Ion, 2006-2007 model year Chevrolet HHR and Pontiac Solstice, and 2007 model year Saturn Sky vehicles ("the Ion, HHR, Solstice and Sky recall"). Because these vehicles were equipped with the same ignition switch installed in the 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles, the chronology submitted on February 24, 2014, with respect to the Cobalt and G5 recall is relevant to GM's decision to issue the Ion, HHR, Solstice and Sky recall. In addition to the events set forth in the chronology submitted to NHTSA regarding the Cobalt and G5 recall, the following describes the principal events that were the basis for the determination, relating to the Ion, HHR, Solstice and Sky recall, that the defect related to motor vehicle safety. GM's review of data and information relating to the recalled vehicles continues.

\*   \*   \*

**2005.** GM employees received field reports of Chevrolet Cobalt vehicles losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. Engineering inquiries, known within GM as Problem Resolution Tracking System ("PRTS") reports, were opened to assess this issue. During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration. That proposal was initially approved, but later cancelled. The PRTS process led to GM's issuing Information Service Bulletin 05-02-35-007 in December 2005. This Service Bulletin provided "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs," and applied to a number of vehicles, including vehicles subject to the Ion, HHR, Solstice and Sky recall—specifically, 2003-06 Saturn Ion, 2006 Chevrolet HHR,

and 2006 Pontiac Solstice vehicles—all of which were equipped with the same ignition switch as the Cobalt. The Service Bulletin informed dealers that: "there is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort"; "[t]he concern is more likely to occur if the driver is short and has a large and/or heavy key chain"; and "the customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain." In addition, the Service Bulletin advised that "Engineering has come up with an insert for the key ring so that it goes from a 'slot' design to a hole design. As a result, the key ring cannot move up and down in the slot any longer—it can only rotate on the hole." The Service Bulletin further stated that, "[i]n addition, the previous key ring has been replaced with a smaller, 13 mm design. This will result in the keys not hanging as low as in the past."

Certain of the reported incidents that pre-dated GM's issuance of Service Bulletin 05-02-35-007 and GM's public response to inquiries about those incidents were chronicled in newspaper articles that appeared in THE NEW YORK TIMES, THE PLAIN DEALER (Cleveland, OH), and THE DAILY ITEM (Sunbury, PA). GM concluded in December 2005 that the Service Bulletin and field service campaign were the appropriate response to the reported incidents, given that the car's steering and braking systems remained operational even after a loss of engine power, and the car's engine could be restarted by shifting the car into either neutral or park.

**2006.** On April 26, 2006, the GM design engineer responsible for the ignition switch installed in all of the vehicles subject to the Cobalt and G5 recall and the Ion, HHR, Solstice and Sky recall signed a document approving changes to the ignition switch proposed by the supplier. This document referred to the "GMX 357" vehicle platform, which was GM's internal designation for the Saturn Ion. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM for all of the recalled vehicles at some point during the 2007 model year.

In May 2006, a field evaluation inquiry, known within GM as a Field Performance Report ("FPR"), was opened to address customer complaints that their Saturn Ion vehicles would neither crank nor start. Attached to this FPR was a document bearing the logo of the ignition switch supplier, titled "PROPOSED PCB [printed circuit board] LAYOUT." Under "[p]roblem description," the document stated, "[s]witch presents Contact Bounces & contact permanent deformation," "[c]ustomer rejects switches," and "[f]unctional Problem when car starts." The "[p]roposed actions from Product Engineering" included "[c]hange PCB design to remove via holes from contact traces," "[e]nlarge PCB vias to avoid contactors being in via limits," and "[d]etent plunger to increase torque force to be within spec." Under "[c]urrent status for PCB," the document stated, among other things, "1.-Validation for Torque & Angle for timing corrections ~ DONE," "2.-GM RDE approve GM3660 ~ DONE," and "6.-SOP @ Condura for new PCB & Spring/Plunger ~ 6/30/06." The FPR was closed, citing Technical Service Bulletin 06-02-35-017.

GM updated Service Bulletin 05-02-35-007 in October 2006 to include additional vehicles and model years, including the vehicles subject to the Ion, HHR, Solstice and Sky recall—specifically, the 2007 Saturn Ion, the 2007 Chevrolet HHR, the 2007 Pontiac Solstice, and the 2007 Saturn Sky and the 2007 Pontiac G5.  GM's warranty records indicate that GM dealers have provided key inserts to 474 customers who brought their vehicles into dealers for service.

**2007.**  A GM investigating engineer was tasked with tracking crashes in which Cobalts were involved in frontal impacts and the airbags did not deploy, in order to try to identify common characteristics of these crashes.   Data from the vehicles' sensing and diagnostic modules ("SDM's") were available for nine of the crashes, and that data showed that the ignition was in the "run" position in five of the crashes and in the "accessory" position in four of the crashes.  Such information was not available for Saturn Ion vehicles because they were equipped with an SDM that was not designed to record when the engine was not running.

GM discontinued production of the Ion at the end of the 2007 model year, as previously planned.

**2011.**  In late July 2011, a meeting was held at GM involving Legal Staff, Field Performance Assessment ("FPA") and Product Investigations personnel who would be involved in the Field Performance Evaluation ("FPE") process.  Soon thereafter, in August 2011, a Field Performance Assessment Engineer ("FPAE") was assigned to move forward with an FPE investigation of a group of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not deployed during frontal impacts, which also included a review of information related to the Ion, HHR and Solstice vehicles.  This FPE investigation did not identify frontal-impact crashes involving 2004 model year Saturn Ion vehicles that resulted in fatalities in which the recall condition may have caused or contributed to the airbags' non-deployment.  These crashes have since been identified and are included below in the number of crashes identified based on the data and information collected and reviewed to date.

During the course of the FPE investigation, the FPAE's analyses included the following: reviewing data relating to complaints of stalling in the Ion for all model years; reviewing data relating to crashes involving Ions from certain model years in which airbags had not deployed; testing the torque performance of ignition switches from salvage yard vehicles, including Ions, HHRs, Cobalts and G5s (but not Solstice or Sky vehicles); measuring the difference among a wide variety of GM vehicles in the distance between a driver's knee and the ignition; and studying vehicles' different steering columns and shrouds, including those of the Ion and the Cobalt.

GM's FPE process consisted of several steps, beginning with investigation of the issue, then presentation of potential solutions to decision makers, and culminating in a decision and implementation of that decision.  At the outset of the process, investigating engineers worked to develop a technical understanding of the issue.  They then presented their findings and proposed solutions to the Field Product Evaluation Recommendation Committee ("FPERC").  The FPERC's recommendations were then presented to the Executive Field Action Decision Committee ("EFADC"), which decided on a course of action.  The FPERC and EFADC could request further analysis before making recommendations or decisions as to what, if any, field action was warranted.

3

**2012.** Based on the information accessed and collected by the FPAE, the investigation sought, among other things, to determine whether there were known engineering reasons that would explain why certain reported non-deployment crashes involved 2007 and earlier model year Ion vehicles. In May 2012, the assigned FPAE studied a cross-section of steering columns and ignition switches from Chevrolet Cobalts, Chevrolet HHRs, Pontiac G5s, and Saturn Ions, in model years ranging from 2003 through 2010. The FPAE accessed, inspected, and tested these steering columns and ignition switches for torque performance at a salvage yard. Some of these ignition switches—including a number for model year 2004-2007 Ion and model year 2006-2008 HHR vehicles—exhibited torque performance below that specified by GM for the ignition switch. Because the Ion was discontinued after model year 2007, no Ion vehicles from later model years could be tested for torque performance.

The FPE investigation focused on determining the cause of these variations in torque performance by model year. A review of GM's records by those involved in the investigation did not identify design changes to the ignition switch that would explain the variations in torque performance for the 2007 and earlier model year vehicles and that of the 2008 and later model year vehicles, with the exception of the Ion which ceased production after the 2007 model year. GM also considered other components that might potentially influence the torque performance of the ignition switches, including changes made to the Cobalt's anti-theft system at the beginning of the 2008 model year. Again, no explanation was discovered. GM engineers conducted separate studies using the "Red X" and "Design for Six Sigma" problem-solving methodologies, in hopes of better understanding the differences in observed torque performance, but those, too, produced inconclusive results. These latter studies were concluded in November 2012 and January 2013, respectively.

The FPAE collected some data relating to certain Saturn Ion crashes in which airbags did not deploy and where injuries occurred, and discussed the data with at least one other investigator to evaluate whether the ignition switch in Ion vehicles may have caused or contributed to airbag non-deployment. This analysis identified two crashes involving Ion vehicles—from model years 2005 and 2007—in which the FPAE concluded that the ignition switch torque performance could potentially have resulted in airbag non-deployment upon frontal impact. These two crashes did not result in fatalities.

**2013.** In late April 2013, the FPAE learned that the torque performance of a GM service part ignition switch purchased after 2010 differed substantially from that of an ignition switch that was original equipment installed on a 2005 Cobalt. He also learned that others had observed and documented that the detent plunger and spring used on the service part switch differed from those used on the original equipment switch installed on the 2005 Cobalt. Shortly thereafter, GM retained outside engineering resources to conduct a comprehensive ignition switch survey and assessment. That investigation included torque performance testing, ignition switch teardowns, and x-ray analyses of ignition switches in used production vehicles both before and after the 2007 model year. The data gathered by GM's outside technical expert showed that: the ignition switches that he tested that had been installed in early-model Ion and Cobalt vehicles did not meet GM's torque specification; changes had been made to the ignition switch's detent plunger and spring several years after the start of production; and those changes most likely explained the variation from GM's specifications for torque performance observed in the original switches installed in 2007 and earlier model year vehicles.

4

On October 29, 2013, after dialogue with the supplier, GM was provided with supplier records showing that changes had in fact been made to the detent plunger and spring late in the 2006 calendar year. Those changes increased the switch's torque performance. Testing and analysis further determined that whether a key moves from the "run" to "accessory" position and how that key movement affects airbag deployment depends on a number of factors, including: vehicle steering inputs and path of travel immediately before key movement; the weight and load on the key ring immediately before key movement; whether the installed ignition switch meets the torque specifications that GM provided to its supplier; and the timing of the movement of the key out of the "run" position relative to the activation of the airbag's sensing algorithm of the crash event.

Upon completion of this analysis, the issue was presented to the Field Performance Evaluation Review Committee ("FPERC") and the Executive Field Action Decision Committee ("EFADC"). These two committees reviewed the findings in early December, culminating in an EFADC meeting on December 17, 2013. Factual questions were raised at that meeting that required further analysis, the findings of which were presented at a second EFADC meeting on January 31, 2014, on which date the EFADC directed a safety recall of the Chevrolet Cobalt and Pontiac G5 for model years 2005 through 2007.

As part of the FPE analysis, PowerPoint documents were prepared for purposes of presenting the investigative findings and recommendation to the EFADC on December 17, 2013, and January 31, 2014. The PowerPoint documents reflect the fact that the EFADC was asked to consider a proposed recall of only the Cobalt and G5 vehicles. The members of the EFADC received a primary slide deck in advance of the meeting. For these two meetings, a "backup" slide deck was prepared so that additional slides could be presented, as necessary, in order to respond to questions posed by EFADC members. The primary slide decks for these meetings include information relating to the FPAE's examination of the Ion and HHR vehicles and the results of field testing of vehicles' ignition switch torque performance, which reflected a number of model year 2004-2007 Ion and model year 2006-2008 HHR vehicles that were below GM specifications. The "backup" decks for these two meetings also include information relating to the FPAE's examination of key insert claims data for the Ion, HHR and Solstice vehicles, and proffered differences between the Cobalt, Ion and HHR vehicles that could explain a perceived absence of the recall condition in the Ion and HHR vehicles. These documents do not contain any information relating to the Sky vehicles. The "backup" slide decks also included factual material relating to other vehicles, including: (1) a chart, which in part reflects "Ignition Switch Position from SDM Download – Airbag Non-Deployment Incidents," and which identifies two crashes involving Ion vehicles—from model years 2005 and 2007—in which the ignition switch torque performance could potentially have resulted in airbag non-deployment upon frontal impact (also referred to as "unconfirmed reports")[1] and a statement that there were no such incidents for the HHR; (2) the review of Vehicle Owner Questionnaires ("VOQ's") for Ion and HHR vehicles; (3) photographs comparing the steering columns in Ion and Cobalt vehicles; and (4) a copy of the April 26, 2006 document approving changes to the ignition switch proposed by the supplier. It is not clear which of the backup slides were reviewed during these two meetings.

---

[1] These two crashes did not result in fatalities.

5

The submissions to the EFADC did not propose a recall of the Ion, HHR, Solstice and Sky vehicles. The data collected by the FPAE did not include the crashes involving model year 2004 Ion vehicles that resulted in fatalities in which the recall condition may have caused or contributed to the airbags' non-deployment. As stated above, these crashes have since been identified. GM has provided copies of these PowerPoint documents to NHTSA.

**2014.** Additional analyses were conducted in February 2014 relating specifically to the Ion, HHR, Solstice and Sky vehicles. These analyses included a collection and review of data regarding crashes involving these vehicles and allegations of airbag non-deployment. The analyses also included a search for and review of FPR and PRTS reports relating to these vehicles, regardless of model year; a number of these, initiated in 2003 and 2006, addressed complaints of stalling in Ion vehicles.[2] One report initiated in 2001, during pre-production development of the Ion, addressed an issue relating to the ignition switch's "passlock" system. The report stated that the causes of the problem included "low detent plunger force" in the ignition switch, and stated that an ignition switch design change had resolved the problem. A 2003 report documented an instance in which the service technician observed a stall while driving, noted that "[t]he owner had several keys on the key ring," and stated that "[t]he additional weight of the keys had worn out the ignition switch." In that instance, the technician replaced the ignition switch and the FPR was closed. Other reports primarily addressed customer complaints of not being able to start their Ions' engines, but the warranty and technical assistance data collected in support of these reports included complaints of stalling.

An EFADC meeting was held on February 24, 2014, on which date the EFADC directed a safety recall of the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, Saturn Ion for model years 2003 through 2007, and the Saturn Sky for model year 2007.

The dealers are to replace the ignition switch. GM provided dealers notification of the recall on February 26, 2014 and March 4, 2014. GM will be providing a recall service bulletin to dealers on or about April 7, 2014. GM mailed the owner letters on March 10 and 11, 2014. Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on or before ten days after the owner mailing is completed.

Based on the data and information collected, reviewed, and analyzed to date, GM has identified eight frontal-impact crashes in the United States involving 2003 to 2007 model year Saturn Ion vehicles in which the recall condition may have caused or contributed to the airbags' non-deployment. Of these eight crashes, GM is currently aware of four involving the Saturn Ion that resulted in four fatalities (all of which involved 2004 model year vehicles) and six injuries of frontal occupants (which involved 2004, 2005, 2006 & 2007 model year vehicles). GM is currently aware of three frontal-impact crashes in the United States involving 2006 to 2007 model year Chevrolet HHR vehicles in which the recall condition may have caused or contributed to the airbags' non-deployment. These three crashes resulted in three injuries to frontal occupants. GM

---

[2] GM is prepared to share with NHTSA upon request the PRTS and FPR reports referenced in this document.

is not currently aware of any frontal-impact crashes in the United States involving 2006-2007 model year Pontiac Solstice or 2007 model year Saturn Sky vehicles in which the recall condition may have caused or contributed to the airbags' non-deployment. It is important to emphasize that GM continues to review data and information relating to the recalled vehicles in order to evaluate, among other things, whether there were any other crashes involving the recalled vehicles in which the recall condition may have caused or contributed to the airbags' non-deployment.

GM employees became aware of most of the aforementioned crashes within two weeks of the dates on which they occurred. As GM learned of these crashes, employees undertook to investigate the underlying facts and circumstances to determine, among other things, why the airbags had not deployed. Throughout this period, GM was involved in claims and lawsuits with respect to the Ion and HHR vehicles where the non-deployment of airbags may have been caused by the ignition switch condition. These eleven crashes in the United States are out of a total U.S. population of 748,024 vehicles subject to the Ion, HHR, Solstice and Sky recall. GM's review of data and information relating to the recalled vehicles continues.