# Exhibit N

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**ADNAN JAWAD,**
individually and on behalf of
all similarly-situated persons,

**Case No**. 4:14-cv-11151
Hon. Mark A. Goldsmith

       Plaintiff,

v.

**GENERAL MOTORS LLC,**

       Defendant.

_____/

Kassem M. Dakhlallah (P70842)
AT LAW GROUP PLLC
Attorney for Plaintiff
1 Parklane Blvd, Ste 100
Dearborn, MI 48126
(313) 406-7606

_____/

> There is no other pending or resolved civil
> action in this Court arising out of the same
> transaction or occurrence alleged in this
> Complaint.
>
> /s/ Kassem M. Dakhlallah_____

## SECOND AMENDED CLASS ACTION COMPLAINT

**NOW COMES** the Plaintiff, ADNAN JAWAD ("Plaintiff"), and Class members, by

and through their attorneys, AT LAW GROUP, PLLC, and for their Second Amended Class

Action Complaint against the Defendant, GENERAL MOTORS LLC ("Defendant"), state as

follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Adnan Jawad is an individual who is a citizen of the State of

Michigan.[1]  Accordingly, Plaintiff is a citizen of Michigan for purposes of establishing

minimal diversity jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §

1332(d).

2.      Defendant General Motors LLC ("GM" or "Defendant") is a  Delaware

limited liability company, the sole member of which is General Motors Holdings LLC,

another Delaware limited liability company.  The sole member of General Motors Holdings

LLC is General Motors Company, which is incorporated in Delaware and has its "nerve

center," and therefore its principal place of business, in Michigan.  Accordingly, GM is a

citizen of both Delaware and Michigan for purposes of establishing minimal diversity

jurisdiction under CAFA.

3.      This is a nationwide class action lawsuit brought in minimal diversity between

the Class of Plaintiffs and Defendant GM, wherein jurisdiction lies under 28 U.S.C. §

1332(d).

4.      This class action lawsuit is properly before this Court under 28 U.S.C. § 1332(d)

because there are more than 100 class members and the amount in controversy is greater than

$5,000,000.00[2].

5.      The Plaintiff Class Members are citizens of each and every state in the United

States.  There is no state that has one-third or more of the Class Members as its citizens.  There

are more than 1,600,000 Class Members nationwide.  The citizenship of the Class Members is

---

[1] Plaintiff has lived in Michigan continuously since 1984; he has worked in Michigan continuously since 1984;
Plaintiff has obtained any and all medical treatment in Michigan since 1984; Plaintiff is registered to vote in
Michigan.  In short, there can be no factual dispute that Plaintiff is a citizen of Michigan.
[2] The amount in controversy is likely greater than $1,000,000,000.00.

divided in proportion to the population of each state in the United States such that no state has

more than about 10% of the Class Members as citizens and no state has less than about 0.2% of

the Class Members as citizens. Thus, no state has more than about 160,000 Class Members as

citizens and no state has less than about 3,200 Class Members as citizens. Michigan has as

citizens about 64,000 Class members, roughly 4% of the total Class membership. Therefore,

jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1332(d)(3), (4).

6.    Venue is proper in this Court under 28 U.S.C. §1391(b) because a substantial

number of the events and occurrences giving rise to this action occurred in the Eastern

District of Michigan and because a number of the Plaintiffs are located within the Eastern

District of Michigan and because the Defendant resides in Michigan.

## CLASS ACTION ALLEGATIONS

7.    Plaintiff incorporates all previous allegations by reference as if fully restated

herein.

8.    Plaintiff brings this action on behalf of a nationwide Class of individuals

who are owners or lessees of certain motor vehicles manufactured by GM.

9.    The Class is defined as all individuals who owned or leased any of the

following GM vehicles as of February 7, 2014:

     a.  2005-2007 Chevrolet Cobalt;

     b.  2006-2007 Chevrolet HHR;

     c.  2005-2006 Pontiac Pursuit;

     d.  2006-2007 Pontiac Solstice;

     e.  2007 Pontiac G5;

      f. 2003-2007 Saturn Ion; and

      g. 2007 Saturn Sky.

("Defective GM Vehicles").

    10.    Specifically excluded from the Class are all individuals claiming damages from personal injuries and any estates of any such individuals who have died as a result of the use of the Defective GM Vehicles.

    11.    Also specifically excluded from the Class are: GM (including its employees, agents, officers, members, directors, attorneys, successors, assigns, heirs, subsidiaries, affiliates); class counsel (including its employees); and any judge, magistrate or other court employee assigned to this case (including their family members).

    12.    The Class is numerous, currently estimated by GM as being greater than one million individuals[3]. Accordingly, joinder is impracticable.

    13.    Questions of law and/or fact predominate among all members of the Class in that any legal and/or factual issues relating to the rights of Plaintiff as an individual will be equally applicable to any and all Class members. The allegations are class-wide: GM manufactured and sold the Defective GM Vehicles that Plaintiff and all class members purchased; GM touted the Defective GM Vehicles as safe, reliable vehicles; Plaintiff and all the Class members relied upon GM's representations about the quality and safety of its vehicles when they purchased their vehicles; GM knew of the defects and took steps to conceal the defects from Plaintiff and all Class members; Plaintiff and the other members of the Class suffered damages in the form of diminution of value of the Defective GM Vehicles, loss of use of their vehicles, cost of repairs of their vehicles, cost of replacement

---

[3] Over 1.6 million by some estimates.

transportation and other costs.

14.     Plaintiff's claims are typical of the claims of the other members of the Class because he is the owner of a Defective GM Vehicle manufactured by GM and has suffered diminution in value, loss of use, costs of repairs and cost of replacement transportation as a result of GM's acts and omissions.

15.     Plaintiff will fairly and adequately represent the interests of the Class because: (a) he understands his duties and is willing and able to represent the proposed class; (b) he has every incentive to pursue this action to a successful conclusion; (c) his interests are not in any way antagonistic to those of the other class members; and (d) he has engaged qualified counsel to represent him.

16.     The maintenance of a class action is superior to other available methods of adjudication in promoting the convenient administration of justice because, *inter alia*:

    a.  the prosecution of separate actions would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would confront Defendant with incompatible standards of conduct;

    b.  the prosecution of separate actions would create a risk of adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

    c.  final declaratory and equitable relief is appropriate with respect to the class;

    d.  the action will be manageable as a class action;

    e.  in view of the complexity of the issues and the expense of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

    f.  it is probable that the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of

administering the action to justify a class action; and

g. individual class members do not have a significant interest in controlling the prosecution or defense of separate actions.

17. The Plaintiff Class is proper for certification under Fed. R. Civ. P. 23.

## **FACTUAL ALLEGATIONS**

18. Plaintiff incorporates all previous allegations by reference as if fully restated herein.

19. Plaintiff is the owner of a 2007 Chevrolet Cobalt.

20. In 2009, GM's predecessor filed Chapter 11 bankruptcy.

21. GM acquired the assets of its predecessor, assumed certain of its liabilities, and continued the business enterprise of its predecessor as its successor.

22. GM specifically agreed that it would comply with various laws and rules, including the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101 – 30170, the rules promulgated thereunder and the rules of the National Highway Traffic Safety Administration relating to recalls.

23. GM's predecessor, and then GM, took steps to fraudulently conceal – and succeeded in so doing – the defects in the Defective GM Vehicles.

24. GM's predecessor, and then GM, marketed the Defective GM Vehicles as safe and reliable vehicles while they had knowledge that this was, in fact, false.

25. For these and other reasons, GM remains liable for the acts and omissions of its predecessor relating to the Defective GM Vehicles.

26. All acts and omissions attributed to GM in this Complaint are also attributed to

6

its predecessor and vice versa.

27.    On February 7, 2014, GM filed a Defect Notice with the National Highway

Traffic Safety Administration to recall 2005-2007 Chevrolet Cobalt and 2007

Pontiac G5 vehicles. The Defect Notice stated in relevant part:

> General Motors has decided that a defect, which relates to motor vehicle
> safety, exists in 2005-2007 model year Chevrolet Cobalt and 2007 Pontiac
> G5 vehicles. The ignition switch torque performance may not meet
> General Motors' specification. If the torque performance is not to
> specification, and the key ring is carrying added weight or the vehicle goes
> off road or experiences some other jarring event, the ignition switch may
> inadvertently be moved out of the "run" position. The timing of the key
> movement out of the "run" position, relative to the activation of the
> sensing algorithm of the crash event, may result in the airbags not
> deploying, increasing the potential for occupant injury in certain kinds of
> crashes. Until this correction is performed, customers should remove non-
> essential items from their key ring.

See **Exhibit A – February 7, 2014 Defect Notice**.

28.    According to GM's February 7, 2014 Defect Notice, the defect affects 619,122

vehicles.  **Exhibit A**.

29.    On February 24, 2014 GM filed an Amended Defect Notice with the National

Highway Traffic Safety Administration which expanded the recall to include all of

the Defective GM Vehicles in the definition set forth above.   See **Exhibit B –

February 24, 2017 Defect Notice**.

30.    According to the February 24, 2014 Defect Notice, GM was aware of the

defects in the Defective GM Vehicles since 2004.  GM Actively sought to cover up the

defects while touting vehicle safety to its prospective customers – the Class members.

All the while, GM had information that the Defective GM Vehicles were involved in

crashes leading to fatalities, and did nothing to correct the problems or even to warn

the public.

31.    GM's proposed recall sets forth no specific dates and provides no specific actions as to what GM will do to cure the defects.

32.    Although GM had knowledge that there were many instances of sudden engine power loss and non-deployment of airbags associated with the ignition switch failure in the Defective GM Vehicles, GM did not attempt to cure the defects until 10 years after it first learned of them – and not until there were over a million Defective GM Vehicles on the road.  GM should have taken swift and decisive corrective action to cure the defect ten years ago[4] when it learned of the problem.

33.    The defect in the Defective GM Vehicles has created doubt in the minds of the public about GM's ability to manufacture safe and properly-functioning vehicles that hold their value.  Thus, the resale value of GM vehicles has been diminished.

34.    Further, given that GM knew about and covered up the defects for over ten years, the public is rightfully skeptical that the information it is receiving about the defects is full and forthright.  That is, GM continued to cover up the defects and manufacture and sell the Defective GM Vehicles even after knowing that people had been injured and had died as a result of its actions.  Given this information, it is dubious that GM is now disclosing the full extent of the defects in its vehicles.  This has further eroded the value of Plaintiff's vehicle and the vehicles of the Class members.

35.    In addition, Plaintiff and some Class members have used their vehicles less than they otherwise would have due to their fear of being in an accident due to the defects.

36.    Plaintiffs seek damages suffered by the Class as a result of GM's conduct,

---

[4] Or even longer ago, according to some reports.

8

including but not limited to: (a) loss of use of the vehicles; (b) reimbursement of out of pocket costs for, among other things, alternative transportation, prior repairs, etc.; (c) diminution in resale value of the vehicles; and (d) an increased risk of physical harm.

37.    Plaintiffs also seeks injunctive relief including: (a) repairs to remove the dangerous defect; (b) an extension of warranty coverage covering components of the ignition switch system; (c) reliable and safe alternative transportation; and (d) individual notice to each owner effected by the ignition switch recall disclosing the full extent of the dangerous condition in detail.

## COUNT I
## NEGLIGENCE

38.  Plaintiff re-alleges and incorporates all previous allegations as if fully restated herein.

39.  At all times Plaintiff properly used and maintained his Defective GM Vehicle.

40.  GM designed, manufactured, tested, inspected, marketed, labeled and sold the Defective GM Vehicles which were intended to be used as a safe and reliable method of transportation, but were inadequate and unsafe for their purpose.

41.  GM owed Plaintiff a duty of care in the design, manufacture, testing, inspection, marketing, labeling and sale of its products.

42.  At all times material and relevant to this Complaint, GM breached its duties to Plaintiff in the following ways:

      a. Failure to exercise reasonable care in designing the Defective GM Vehicles;

b.  Failure to exercise reasonable care in manufacturing the Defective GM Vehicles;

c.  Failure to prevent or adequately reduce the risk of ignition switch failure in the Defective GM Vehicles;

d.  Failure to adequately warn users of the risk of injury associated with the Defective GM Vehicles;

e.  Failure to adequately warn learned intermediaries of the risk of injury associated with the Defective GM Vehicles;

f.  Failure to adequately test the Defective GM Vehicles to evaluate the hazards associated with them;

g.  Failure to issue a recall sufficient to prevent Plaintiff from receiving the Defective GM Vehicle after knowledge of the defect;

h.  Any and all other negligence that becomes known throughout the course of litigation.

43.  Each of the aforesaid acts and omissions of GM was a legal cause of Plaintiff's damages.

44.  As a direct and proximate result of GM's conduct, Plaintiff and the Class members suffered the injuries and compensable damages set forth in the Damages section below.

45.  At all times material and relevant, Plaintiff was free of comparative negligence.

## COUNT II

### BREACH OF IMPLIED WARRANTY/STRICT LIABILITY

46.  Plaintiff re-alleges and incorporates all previous allegations as if fully restated herein.

47.  The Defective GM Vehicles were defective at the time they left GM's control and were not reasonably safe for the reasonably foreseeable uses to which they would be used.

48.  GM is in the business of manufacturing, designing, distributing, marketing, selling and/or supplying into the stream of commerce the Defective GM Vehicles.

49.  At the time GM designed, manufactured, marketed, sold, and/or distributed Defective GM Vehicles for use by Plaintiff, GM knew of the use for which Defective GM Vehicles were intended and impliedly warranted the product to be of merchantable quality and safe for such use.

50.  Plaintiff reasonably relied upon the skill and judgment of GM as to whether Defective GM Vehicles were of merchantable quality and safe for their intended use and upon GM's implied warranty as to such matters.

51.  GM breached its implied warranty in the design of Defective GM Vehicles such that the damages suffered by Plaintiff was foreseeable by GM, the likelihood of the occurrence of the damage suffered by Plaintiff was foreseeable by GM at the time it distributed Defective GM Vehicles, there was a reasonable alternative design available, and such alternative design was practicable and would have reduced the foreseeable risk of harm posed by GM's product, and the omission of the available and practicable

reasonable alternative design rendered GM's product not reasonably safe for use by a consumer.

52.   GM breached its implied warranty in the manufacturing of Defective GM Vehicles such that the Defective GM Vehicles product was unreasonably dangerous, not fit for the ordinary purpose for which it was intended, and not manufactured in such a way to eliminate unreasonable risks of foreseeable injury. Furthermore, GM failed to make reasonable inspections or conduct adequate testing of Defective GM Vehicles. And, after knowing of the problems associated with the Defective GM Vehicles, GM took no action for ten years to cure the defects.

53.   GM breached its implied warranty in the labeling of Defective GM Vehicles such that GM knew or should have known that the product was unreasonably dangerous and created significant risks of serious harm and/or death, yet it failed to provide adequate warnings to consumers of such significant risks of serious harm and/or death.

54.   The Defective GM Vehicles manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by GM was defective in its manufacture, construction, design and labeling as described above at the time it left GM's control.

55.   As a direct and proximate result of Plaintiff's purchase, use and ownership of Defective GM Vehicles as manufactured, designed, sold, supplied and introduced into the stream of commerce by GM, Plaintiff has suffered harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

56.   The defects then present were a legal and/or proximate cause of Plaintiff's harm, damages and economic loss.

57.  Plaintiff did not know that the Defective GM Vehicles was defective and dangerous until after he owned it.

58.  As a direct and proximate result of GM's conduct, Plaintiff and the Class members suffered the injuries and compensable damages set forth in the Damages section below.

**COUNT III**

**BREACH OF IMPLIED CONTRACT**

59.  Plaintiff re-alleges and incorporates all previous allegations as if fully restated herein.

60.  The Defective GM Vehicles were defective at the time they left GM's control and were not reasonably safe for the reasonably foreseeable uses to which it would be used.

61.  The essential elements of an implied contract are an offer, acceptance, and consideration. The existence and terms of the contract are implied by the conduct of the parties.

62.  An offer, acceptance, and consideration for the sale of vehicles existed, evidenced by the fact that Plaintiff and the Class paid money to and/or for the benefit of GM in exchange for vehicles. The act of exchanging money for vehicles was an offer and acceptance. The money and vehicles constituted consideration.

63.   An implied term of the sale was that GM would provide vehicles that did not contain an unreasonably dangerous defect. There was a meeting of the minds regarding the absence of unreasonably dangerous defect.

64.  GM's intent to provide safe vehicles was evidenced by, among other things, its advertising and marketing materials emphasizing the safety qualities of its vehicles.

65.   The absence of unreasonably dangerous defects was a material term to the contracts. Plaintiff and the Class members would not have purchased the vehicles, or would not have paid the purchase price had they known of the ignition switch defect.

66.   GM breached the implied terms of their contracts by providing vehicles that contained unreasonably dangerous defects.

67.   As a direct and proximate result of GM's conduct, Plaintiff and the Class members suffered the injuries and compensable damages set forth in the Damages section below.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

68.   Plaintiff re-alleges and incorporates all previous allegations as if fully restated herein.

69.   GM knew at the time it sold vehicles to the Plaintiffs that such vehicles would be used for the specific purpose of, among other things, providing safe and reliable transportation.

70.   GM knew at the time it sold vehicles to the Plaintiff and the Class members that those individuals chose to buy their vehicles from GM at least in part because of the reputation of GM cars and trucks as safe vehicles with high resale value, as compared to cars and trucks manufactured by GM's competitors.

71.   GM knew that Plaintiff and the Class members were relying on GM's skill and judgment in furnishing and/or recommending vehicles that were purportedly suitable for providing safe transportation and that enjoyed high resale value, as compared to cars and trucks manufactured by GM's competitors.

72.   Defendant GM breached the implied warranty of fitness for a particular purpose because the Defective GM Vehicles contained an unreasonably dangerous condition and were not suitable for providing safe and reliable transportation. Likewise, the unreasonably dangerous condition of the vehicles has resulted in a substantial diminishment in the resale value of those vehicles.

73.   As a direct and proximate result of GM's conduct, Plaintiff and the Class members suffered the injuries and compensable damages set forth in the Damages section below.

**DAMAGES**

74.   Plaintiff and the Class members seek damages suffered as a result of GM's conduct, including but not limited to:

(a)   loss of use of the vehicles;

(b)   reimbursement of out of pocket costs for, among other things, alternative transportation, prior repairs to defective ignition switches; and

(c)   diminution in value of the vehicles.

**INJUNCTIVE RELIEF**

75.   Plaintiff and the Class members seek injunctive relief, including but not limited to:

(a)   repairs to remove the dangerous defect;

(b)   an extension of warranty coverage covering components of the ignition system;

(c)   provision of reliable and safe alternative transportation;

and

(d)    individual and detailed notice to each owner affected by the dangerous defect,

which includes instructions to the owner or lessor to park the vehicle and order that GM

pay for a rental car while the necessary repairs are conducted.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated,

respectfully requests that this Honorable Court enter an Order:

A.    Certifying the proposed Class under Fed. R. Civ. P. 23(b)(2) and (3) and

appointing Plaintiff and Plaintiff's counsel to represent the Class;

B.    Finding that Defendant is liable under all legal claims asserted herein;

C.    Awarding damages to the Class under the claims set forth herein and all other

available claims, including compensatory and consequential damages as set forth above,

exemplary damages, punitive damages, and any other damages provided under the law;

D.    Ordering injunctive relief as set forth above;

E.    Awarding attorneys' fees and litigation costs; and

F.    Awarding any other legal or equitable relief as justice so requires.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

AT LAW GROUP PLLC


/s/ Kassem M. Dakhlallah
Kassem M. Dakhlallah (P70842)
Attorney for Plaintiffs
1 Parklane Blvd, Ste 100
Dearborn, MI 48126
(313) 406-7606

Dated:  March 21, 2014.

16



**GENERAL MOTORS LLC**
Vehicle Safety and Crashworthiness

**RECEIVED**
By Recall Management Division at 6:41 am, Feb 10, 2014

February 7, 2014

Ms. Nancy Lewis
Associate Administrator for Enforcement
National Highway Traffic Safety Administration
Recall Management Division (NVS-215)
1200 New Jersey Avenue, SE – Room W45-306
Washington, DC 20590

Dear Ms. Lewis:

The following information is submitted pursuant to the requirements of 49 CFR 573.6 as it applies to a determination by General Motors to conduct a safety related recall for certain 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.

573.6(c)(1): General Motors Company; Chevrolet and Pontiac Brands

573.6(c)(2),(3),(4): This information is shown on the attached sheet.

573.6(c)(5): General Motors has decided that a defect, which relates to motor vehicle safety, exists in 2005-2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The ignition switch torque performance may not meet General Motors' specification. If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the "run" position. The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

Until this correction is performed, customers should remove non-essential items from their key ring.

573.6(c)(6): The issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall.

573.6(c)(8): Dealers are to replace the ignition switch.

GM will provide the dealer bulletin and owner letter mail dates when available.

Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on or before ten days after the owner mailing is completed, according to the plan submitted on May 23, 2013.

Mail Code: 480-210-2V1
30001 Van Dyke Road • Warren, MI 48090-9020
N130454 573 Letter.docx



Letter to Ms. Nancy Lewis
N130454 573 Letter
February 7, 2014
Page 2

573.6(c)(10): GM will provide copies of the dealer bulletin and owner letter under separate
cover.

573.6(c)(11): GM's assigned recall number is 13454.

Sincerely,

M. Carmen Benavides, Director
Product Investigations and Safety Regulations

13454
Attachment

573.6(c)(2)(3)(4)

## VEHICLES POTENTIALLY AFFECTED BY MAKE, MODEL, AND MODEL YEAR PLUS INCLUSIVE DATES OF MANUFACTURE

| MAKE | MODEL SERIES | MODEL YEAR | NUMBER INVOLVED | INCLUSIVE MANUFACTURING DATES (FROM) | (TO) | DESCRIPTIVE INFO. TO PROPERLY IDENT. VEH. | EST. NO. W/CONDITION |
|---|---|---|---|---|---|---|---|
| Chevrolet | A | 2005 | 140,978 | 08/03/2004 | 06/17/2005 | Cobalt | * |
| Chevrolet | A | 2006 | 229,578 | 04/05/2005 | 06/09/2006 | Cobalt | : : |
| Chevrolet | A | 2007 | 215,667 | 04/20/2006 | 08/16/2007 | Cobalt | : : |
| Pontiac | A | 2007 | 32,899 | 04/20/2006 | 08/06/2007 | G5 | :: |
| | GM Total: | | 619,122 | | | | |

* All involved vehicles will be corrected as necessary.

**573.6(c)(2)(iv):** Delphi Packard Electrical/Electronic Architecture
5725 Delphi Drive
M/C 483.400.301
Troy, Michigan 48098

Tel: [1] 248.813.2334
Fax: [1] 248.813.2333

The involved parts are manufactured in Mexico.

13454


**GENERAL MOTORS LLC**
Vehicle Safety and Crashworthiness

14V-047
(8 pages) - Amended

**RECEIVED**
By Recall Management division at 9:39 am, Feb 25, 2014

February 24, 2014

Ms. Nancy Lewis
Associate Administrator for Enforcement
National Highway Traffic Safety Administration
Recall Management Division (NVS-215)
1200 New Jersey Avenue, SE – Room W45-306
Washington, DC  20590

      Re:    NHTSA Notification Campaign No. 14V-047

Dear Ms. Lewis:

This letter supersedes General Motors' letter of February 7, 2014, and is submitted pursuant to the requirements of 49 CFR 573.6 as it applies to a determination by General Motors to conduct a safety-related recall for 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.  Specifically, the information submitted pursuant to 49 CFR 573.6(c)(5) and 573.6(c)(6) below supersedes information included in General Motors' letter of February 7, 2014.

573.6(c)(1): General Motors Company; Chevrolet and Pontiac Brands.

573.6(c)(2),(3),(4): This information is shown on Attachment A.

573.6(c)(5): General Motors has decided that a defect which relates to motor vehicle safety exists in 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles. The ignition switch torque performance may not meet General Motors' specification.  If the torque performance is not to specification, the ignition switch may unintentionally move from the "run" position to the "accessory" or "off" position with a corresponding reduction or loss of power.  This risk may be increased if the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event.  The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

Until the recall repairs have been performed, it is <u>very</u> important that customers remove all items from their key rings, leaving only the vehicle key.  The key fob (if applicable), should also be removed from the key ring.

573.6(c)(6):  As permitted by the provisions of 49 C.F.R. 573.6(b), and pursuant to the requirements of 49 C.F.R. 573.6(c)(6), General Motors now submits the attached chronology of principal events that were the basis for the determination that the defect related to motor vehicle safety.  <u>See</u> Attachment B.  This chronology refers to numerous engineering



Letter to Ms. Nancy Lewis
N130454 573 Letter
February 24, 2014
Page 2

inquiries, known within General Motors as Problem Resolution Tracking System ("PRTS")
inquiries. As stated in the enclosed document, General Motors is prepared to share with
NHTSA upon request the PRTS reports referenced therein, as well as other documentation
related to this recall.

573.6(c)(8): Dealers are to replace the ignition switch.

GM will provide the dealer bulletin and owner letter mail dates when available.

Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on
or before ten days after the owner mailing is completed, according to the plan submitted on
May 23, 2013.

573.6(c)(10): GM will provide copies of the dealer bulletin and owner letter under separate
cover.

573.6(c)(11): GM's assigned recall number is 13454.

Sincerely,

M. Carmen Benavides, Director
Product Investigations and Safety Regulations

13454
Attachments

Attachment A - 573.6(c)(2),(3),(4)

## VEHICLES POTENTIALLY AFFECTED BY MAKE, MODEL, AND MODEL YEAR PLUS INCLUSIVE DATES OF MANUFACTURE

| MAKE | MODEL SERIES | MODEL YEAR | NUMBER INVOLVED | INCLUSIVE MANUFACTURING DATES (FROM) | INCLUSIVE MANUFACTURING DATES (TO) | DESCRIPTIVE INFO. TO PROPERLY IDENT. VEH. | EST. NO. W/CONDITION |
|------|------|------|------|------|------|------|------|
| Chevrolet | A | 2005 | 140,978 | 08/03/2004 | 06/17/2005 | Cobalt | * |
| Chevrolet | A | 2006 | 229,578 | 04/05/2005 | 06/09/2006 | Cobalt | :: |
| Chevrolet | A | 2007 | 215,667 | 04/20/2006 | 08/16/2007 | Cobalt | :: |
| Pontiac | A | 2007 | 32,899 | 04/20/2006 | 08/06/2007 | G5 | :: |
| | GM Total: | | 619,122 | | | | |

* All involved vehicles will be corrected as necessary.

573.6(c)(2)(iv):  Delphi Packard Electrical/Electronic Architecture
5725 Delphi Drive
M/C 483.400.301
Troy, Michigan 48098

Tel: [1] 248.813.2334
Fax: [1] 248.813.2333

The involved parts are manufactured in Mexico.

13454

**ATTACHMENT B - 573.6(c)(6)**

**2004.** Around the time of the launch of the 2005 Chevrolet Cobalt, GM learned of at least one incident in which a Cobalt lost engine power because the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. GM employees were able to replicate this phenomenon during test drives. An engineering inquiry, known within GM as a Problem Resolution Tracking System inquiry (hereinafter "PRTS"), was opened to investigate the issue.[1] Engineers believed that low key cylinder torque effort was an issue and considered a number of potential solutions. After consideration of the lead time required, cost, and effectiveness of each of these solutions, the PRTS was closed with no action.

**2005.** GM employees received new field reports of Cobalts losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. Further PRTS's were opened to re-assess this issue. During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration. That proposal was initially approved, but later cancelled. The PRTS process led to GM's issuing an Information Service Bulletin 05-02-35-007 in December 2005. This Service Bulletin provided "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs," and applied to 2005-06 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-06 Pontiac Pursuits (Canada only), 2006 Pontiac Solstices, and 2003-06 Saturn Ions. These vehicles were all equipped with the same ignition switch. The Service Bulletin informed dealers that: "there is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort"; "[t]he concern is more likely to occur if the driver is short and has a large and/or heavy key chain"; and "the customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain." In addition, the Service Bulletin advised that "Engineering has come up with an insert for the key ring so that it goes from a 'slot' design to a hole design. As a result, the key ring cannot move up and down in the slot any longer—it can only rotate on the hole." The Service Bulletin further stated that, "[i]n addition, the previous key ring has been replaced with a smaller, 13 mm design. This will result in the keys not hanging as low as in the past."

Certain of the reported incidents that pre-dated GM's issuance of Service Bulletin 05-02-35-007 and GM's public response to inquiries about those incidents were chronicled in newspaper articles that appeared in the *NEW YORK TIMES*, the *CLEVELAND PLAIN DEALER*, and *THE DAILY ITEM* (Sunbury, PA). GM concluded in December 2005 that the Service Bulletin and field service campaign was the appropriate response to the reported incidents, given that the car's steering and braking systems remained operational even after a loss of engine power, and the car's engine could be restarted by shifting the car into either neutral or park.

GM updated the Service Bulletin in October 2006 to include additional vehicles and model years—specifically, the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007

---

[1] GM is prepared to share with NHTSA upon request the PRTS reports referenced in this document.

Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky.[2] GM's warranty records indicate that GM dealers have provided key inserts to 474 customers who brought their vehicles into dealers for service.

**2006.** On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

A PRTS was opened on August 1, 2006, after a customer complained of stalling after the car's ignition switch had been replaced. This PRTS indicated that the condition could not be duplicated after more than 100 miles of driving and the PRTS was canceled on October 2, 2006.

**2007.** On March 29, 2007, a group of GM employees met with NHTSA representatives in Washington, D.C. to discuss occupant restraint systems. During this meeting, a NHTSA representative informed the GM employees of a fatal crash that occurred on July 29, 2005, in which a 2005 Cobalt was involved in a frontal collision, the airbags did not deploy, and data retrieved from the car's sensing and diagnostic module ("SDM") indicated that the car's power mode status was "accessory" (hereinafter "the July 29, 2005 crash"). While GM Legal Staff opened a file relating to this crash in September 2005, the GM employees meeting with NHTSA on this occasion were not aware of the crash at the time of the meeting. After this meeting, a GM investigating engineer was tasked with tracking crashes in which Cobalts were involved in frontal impacts and the airbags did not deploy, in order to try to identify common characteristics of these crashes. By the end of 2007, GM had notice of ten such incidents. SDM data was available for nine of the ten crashes, and that data showed that the ignition was in the "run" position in five of the crashes and in the "accessory" position in four of the crashes.

**2009.** In February 2009, another PRTS was opened and resulted in the top of the key being changed from a "slot" design to a "hole" design. According to the PRTS, "[c]ustomers with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off. Changing from a slot to a hole will significantly reduce downward force and the likelihood of this occurrence." This key design change was implemented in model year 2010 Cobalts.

On or about May 15, 2009, several GM engineers met with representatives of Continental, the supplier of the SDMs used in the Cobalt. In the fourteen frontal-impact crashes for which SDM data was then available, the ignition was recorded in "run" for seven of the crashes and in the "accessory" position for the other seven. Prior to this meeting, GM had provided Continental with

---

[2] GM's records contain references to a second update of the Service Bulletin in July 2011, which covered the same models and model years as the first update in October 2006. However, upon investigation, GM believes that the Service Bulletin was not updated in July 2011.

2

two SDMs from crashes involving a 2005 Cobalt and a 2006 Cobalt in which the airbags had not deployed and the SDM data indicated that the car's ignition switch was in the "run" position at the time of the crash. During this meeting, Continental representatives informed the GM engineers that, according to further stored data inaccessible to GM engineers but retrieved by Continental, the SDM's sensing algorithm had been disabled at the time of the crash, and discussed reasons why this may have happened. Although GM engineers had identified other crashes in which airbags had not deployed and the ignition switch was recorded in the "run" position at the time of the crash, GM engineers were not able to obtain the SDMs from the vehicles involved in these crashes for further interrogation by Continental.

**2010.** During the summer of 2010, GM discontinued production of the Cobalt at the end of the 2010 model year, as previously planned.

**2011.** In late July 2011, a meeting was held at GM involving Legal Staff, Field Performance Assessment ("FPA") and Product Investigations personnel who would be involved in the Field Performance Evaluation ("FPE") process. Soon thereafter, in August 2011, a Field Performance Assessment Engineer ("FPAE") was assigned to move forward with an FPE investigation of a group of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not deployed during frontal impacts.

Then as now, GM's FPE process consisted of several steps, beginning with investigation of the issue, then presentation of potential solutions to decision makers, and culminating in a decision and implementation of that decision. At the outset of the process, investigating engineers work to develop technical understanding of the issue. They then present their findings and proposed solutions to the Field Product Evaluation Recommendation Committee ("FPERC"). The FPERC's recommendations are then presented to the Executive Field Action Decision Committee ("EFADC"), which decides on a course of action. The FPERC and EFADC may request further analysis before making recommendations or decisions as to what, if any, field action is warranted.

GM's initial investigation of these crashes had revealed that the SDM data available from the involved vehicles showed that some of the ignitions were recorded as having been in the "run" position, while others were recorded as having been in either the "accessory" or "off" positions, at the time of the crash. Because many of the crashes known to GM at the time involved violent off-road impacts occurring under widely varying circumstances and because many involved excessive speeds, different theories had been offered as to why the airbags had not deployed in the various incidents. The assigned FPAE was asked to assess whether common issues or concerns might explain some or all of the non-deployment crashes.

**2012.** Based on the information then available, the investigation sought, among other things, to determine whether there were known engineering reasons that would explain why these reported non-deployment crashes involved 2007 and earlier model year vehicles. In May 2012, the assigned FPAE studied a cross-section of steering columns and ignition switches from Chevrolet Cobalts, Chevrolet HHRs, Pontiac G5s, and Saturn Ions, in model years ranging from 2003 through 2010. The FPAE accessed, inspected, and tested these steering columns and ignition switches for torque performance at a salvage yard. Certain of these ignition switches exhibited torque performance below that specified by GM for the ignition switch. The most prevalent shortfalls in performance

3

were observed on ignition switches found in 2007 and earlier model year vehicles. The FPE investigation focused on determining the cause of these variations in torque performance by model year. A review of GM's records by those involved in the investigation did not identify design changes to the ignition switch that would explain the variations in torque performance for the 2007 and earlier model year vehicles and that of the 2008 and later model year vehicles. GM also considered other components that might potentially influence the torque performance of the ignition switches, including changes made to the car's theft system at the beginning of the 2008 model year. Again, no explanation was discovered. GM engineers conducted separate studies using the "Red X" and "Design for Six Sigma" problem-solving methodologies, in hopes of better understanding the differences in observed torque performance, but those, too, produced inconclusive results. These latter studies were concluded in November 2012 and January 2013, respectively.

**2013.** In late April 2013, the FPAE learned that the torque performance of a GM service part ignition switch purchased after 2010 differed substantially from that of an ignition switch that was original equipment installed on a 2005 Cobalt. He also learned that others had observed and documented that the detent plunger and spring used on the service part switch differed from those used on the original equipment switch installed on the 2005 Cobalt. Shortly thereafter, GM retained outside engineering resources to conduct a comprehensive ignition switch survey and assessment. That investigation included torque performance testing, ignition switch teardowns, and x-ray analyses of ignition switches used in production vehicles both before and after the 2007 model year. The data gathered by GM's outside technical expert showed that: the ignition switches that he tested that had been installed in early-model Cobalts did not meet GM's torque specification; changes had been made to the ignition switch's detent plunger and spring several years after the start of production; and those changes most likely explained the variation from GM's specifications for torque performance observed in the original switches installed in 2007 and earlier model year vehicles.

On October 29, 2013, after dialogue with the supplier, GM was provided with supplier records showing that changes had in fact been made to the detent plunger and spring late in the 2006 calendar year. Those changes increased the switch's torque performance. Testing and analysis further determined that whether a key moves from the "run" to "accessory" position and how that key movement affects airbag deployment depends on a number of factors, including: vehicle steering inputs and path of travel immediately before key movement; the weight and load on the key ring immediately before key movement; whether the installed ignition switch meets the torque specifications that GM provided to its supplier; and the timing of the movement of the key out of the "run" position relative to the activation of the airbag's sensing algorithm of the crash event.

Upon completion of this analysis, the issue was presented to the Field Performance Evaluation Review Committee ("FPERC") and the Executive Field Action Decision Committee ("EFADC"). These two committees reviewed the findings in early December, culminating in an EFADC meeting on December 17, 2013. Factual questions were raised at that meeting that required further analysis, the findings of which were presented at a second EFADC meeting on January 31, 2014, on which date the EFADC directed a safety recall.

4

The dealers are to replace the ignition switch. GM will provide the dealer bulletin and owner letter mail dates when available. Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on or before ten days after the owner mailing is completed.

Between 2005 and the date of this submission, GM is currently aware of 23 frontal-impact crashes involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the recall condition may have caused or contributed to the airbags' non-deployment. During that same timeframe, of these crashes, GM is currently aware of six that resulted in eight fatalities of frontal occupants. GM employees became aware of many of these crashes within a month of the dates on which they occurred. As GM learned of these crashes, employees undertook to investigate the underlying facts and circumstances to determine, among other things, why the airbags had not deployed. With respect to 22 of the 23 frontal-impact crashes referenced above, the data retrieved from the vehicles' SDMs indicated that the ignition switches were in the "run" position in nine of the crashes, in the "accessory" position in twelve of the crashes, and in the "off" position in one of the crashes.[3] Throughout this period, GM was involved in claims and lawsuits in which allegations were made regarding the ignition switch issue that is the subject of the recall. These 23 crashes are out of a total U.S. population of 619,122 vehicles subject to the pending recall.

[3] In one of the 23 crashes referenced above, SDM information could not be retrieved from the vehicle.

5