# Exhibit P

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| PEGGY SUE JONES, individually and on behalf of all others similarly situated, )<br>)<br>) | Civil Action No. _____ |
| Plaintiff, ) |  |
| ) | **CLASS ACTION COMPLAINT** |
| v. ) |  |
| ) |  |
| GENERAL MOTORS LLC, ) |  |
| ) | **JURY TRIAL DEMANDED** |
| Defendant. ) |  |

# **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................. 2

II.     JURISDICTION AND VENUE ............................................................ 7

III.    PARTIES ............................................................................................... 8

IV.     FACTUAL ALLEGATIONS ................................................................ 10

        A.      GM Corp and GM Market and Sell FIS Models as "Safe"
                and "Reliable" ......................................................................... 10

        B.      GM Corp and GM Learn of the Defect, But Fail to
                Disclose It ............................................................................... 11

        C.      GM Finally Acknowledges the Defects ................................. 17

        D.      GM Recalls Late Model Vehicles for Unrelated Defects ..... 18

        E.      The Faulty Ignition Switches and Related Quality
                Concerns Have Caused or Will Cause Values of FIS
                Models to Plummet ................................................................. 19

        F.      Successor Liability and Limitations Period Tolling ............. 23

V.      CLASS ACTION ALLEGATIONS ...................................................... 26

VI.     CLAIMS FOR RELIEF ........................................................................ 29

VII.    PRAYER FOR RELIEF ....................................................................... 40

# **COMPLAINT**

Plaintiff Peggy Sue Jones ("Plaintiff") brings this class action against General Motors LLC[1] ("GM" or "Defendant") for violations of federal law, various state statutes and common law duties between 2002 and the present (the "Class Period"), individually and on behalf of all persons in the U.S. who own, owned, lease or leased one or more of the following vehicles: the 2005-2007 Chevrolet Cobalt, 2005-2007 Pontiac G5, 2003-2007 Saturn Ion, 2006-2007 Chevrolet HHR, 2005-2006 Pontiac Pursuit (Canada), 2006-2007 Pontiac Solstice and 2007 Saturn Sky.  As detailed herein, Plaintiff and the Class suffered diminished market value of GM vehicles purchased by Plaintiff and the Class as a direct result of GM withholding and/or misleading Plaintiff and the Class about the safety and reliability of those vehicles.  The following allegations are based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to all other matters based on an investigation by counsel.[2]

---

[1]     The automotive business operations of General Motors Company (NYSE: GM) in the United States are conducted by its wholly owned subsidiary, Defendant General Motors LLC.  General Motors LLC is the successor entity to General Motors Corporation as a result of a bankruptcy reorganization finalized in late 2009, and which resulted in the new parent company called General Motors Company, not a defendant here.

[2]     Counsel's investigation includes an analysis of publicly available information, news articles, reports to federal regulators, other statistics and additional analysis.

## I.    **INTRODUCTION**

1.    Throughout the Class Period, GM and its predecessor marketed its vehicles as safe and reliable, but recently, in the words of Mary T. Barra, the chief executive of General Motors Company, "something went very wrong … and terrible things happened."[3]

2.    What "went wrong" was that GM and its predecessor intentionally withheld, since possibly as early as 2001, information showing that faulty ignition switches ("FISs") were cutting off engine power, thereby disabling critical functions needed to safely operate vehicles, such as power steering, power braking and airbags, in a number of GM model cars, including the 2005-2007 Chevrolet Cobalt, 2005-2007 Pontiac G5, 2003-2007 Saturn Ion, 2006-2007 Chevrolet HHR, 2005-2006 Pontiac Pursuit (Canada), 2006-2007 Pontiac Solstice and 2007 Saturn Sky (the "FIS Models").   Additionally, GM also sold vehicles with defective airbag wiring, faulty brake pumps and non-compliant unbelted passenger restraints (the "Late Model Recalls").

3.    With respect to the FIS Models, GM recently admitted that at least twelve deaths have been directly attributed to the FIS defect when airbags did not deploy in collisions after the ignition unexpectedly cut off.

---

[3]    *See* Bill Vlasic, *Something Went 'Very Wrong' at G.M., Chief Says*, THE NEW YORK TIMES, March 18, 2014, at B1.

4.      Far more deaths may be attributable to the defect.  According to data provided by the National Highway Traffic Safety Administration (the "NHTSA"), 303 people have died after the air bags failed to deploy in just two of the models that were recalled by GM.  Many of these tragedies could have been avoided. GM's predecessor ("GM Corp" as defined herein) attempted to surreptitiously repair the defect in 2005 in at least some of the FIS Models by instructing dealers to make minor adjustments.  However, customers were not informed about the potentially fatal defect until 2014.

5.      In a chronology of events submitted by GM to federal regulators on March 11, 2014 the Company admitted that it was alerted to the FIS flaws as early as 2001.

6.      GM and its predecessor were at all times under an affirmative duty to advise customers about known defects.  Specifically, under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[4] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects.[5]  If it is determined that the vehicle is defective, the manufacturer must notify vehicle

---

[4] 49 U.S.C. §§ 30101-30170.

[5] 49 U.S.C. § 30118(c)(1) & (2).

owners, purchasers, and dealers of the defect and must remedy the defect.[6]  This

duty existed throughout the Class Period.

7.      Notwithstanding this and other duties, and despite having specific

information showing that the ignition switches could fail, rendering the car

inoperable, and initiating a stealth fix for FISs throughout the Class Period, GM

and its predecessor continued to advertise its vehicles as "*safe and sound*" without

disclosing that known flaws could without warning turn the FIS Models into

potential deathtraps.

8.      Reports indicate that GM's utter disregard for the safety of customers

and their families has resulted in a criminal probe of its conduct[7] and a

Congressional investigation.[8]

9.      In February of 2014—more than a decade after first knowing about

the FIS defect—GM recalled 1.62 million vehicles.  Critically, based on GM's own

admissions, GM actively concealed information in its possession relating to FIS

defects from at least 2001 to 2014.  Notwithstanding GM's belated recall and its

---

[6] 49 U.S.C. § 30118(b)(2)(A) & (B).

[7] *See*, Emily Flitter, *Federal Prosecutors Open Criminal Probe of GM Recall: Source*, REUTERS, March 11, 2014, *available at* http://www.reuters.com/article/2014/03/11/us-autos-gm-recall-probe-idUSBREA2A1RZ20140311 (last visited Mar. 20, 2014).

[8] *See*, Sophie Yan, *Congress to Investigate GM Recall*, CNN, March 11, 2014, *available at* http://money.cnn.com/2014/03/11/autos/gm-recall-congress/ (last visited Mar. 20, 2014).

attempts to control the fallout from its potentially criminal conduct, the economic damage to the owners of the FIS Models is done.

10.     Plaintiff, like the multitude of owners of the recalled GM models, is left with the uncertainty of whether her car is safe to drive and the certainty that its value has been diminished.  Had Plaintiff known the truth about the problems with the FLS Models or GM's willingness to remain silent (while stealthily attempting to remedy some, but not all, FIS Models) she would not have purchased her GM vehicle or would have demanded a discount over the price she paid.

11.     Plaintiff considered safety and reliability to be a material factor before purchasing her GM car.  Catering to the centrality of safety in customers' decision to purchase any vehicle, GM and its predecessor advertised and promoted its vehicles to be safe and reliable since 2001, without disclosing to purchasers that they knew of a potential defect that could lead to serious injury and death and injury.  As a result, buyers did not get what they bargained for and were misled by GM's deceptive conduct.

12.     Defendant has injured to purchasers of the FIS Models, such as Plaintiff, who purchased a 2006 Saturn Ion, by unlawfully misrepresenting the safety and reliability of its vehicles and/or omitting known defects it had a duty to disclose, despite knowledge of a defect that could lead to injury and death, thereby decreasing the market value of the FIS Models.  As a direct result of Defendant's

actions, Defendant inflated the price of its vehicles and reaped substantial profits from its misrepresentations and omissions.

13.     Now that the defect has been disclosed, the owners of the recalled FIS Models will receive less money when they sell their cars and will receive less money when they trade them in for a new car.  Owners of FIS Models who will never sell or trade the vehicles are also damaged because they paid more than they otherwise would have had they known the truth.

14.     GM's predecessor, General Motors Corporation ("GM Corp") also violated disclosure requirements by designing and marketing vehicles with defective ignition switches, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents.  In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of GM Corp because GM has continued the business enterprise of GM Corp with full knowledge of the ignition switch defects.

15.     Defendant's conduct proximately and foreseeably caused Plaintiff and members of the Class, defined herein, to suffer economic injury by forcing Plaintiff and similarly situated owners to pay artificially inflated prices for the FIS Models throughout the Class Period.

16.    Plaintiff and the Class were also damaged by the acts and omissions of GM Corp for which GM is liable through successor liability because the FIS Models they purchased are worth less than they would have been without the ignition switch defects.

## II.    **JURISDICTION AND VENUE**

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims under federal law, namely the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*., on her own behalf and on behalf of a nationwide class.

18.    Separately, this Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because:

- this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure;

- there are thousands of potential Class members;

- the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000; and

- Defendant is a citizen of a State different from that of Plaintiff and, upon information and belief, more than two-thirds of the members of the Classes reside.

19.   Venue is proper in this district under 28 U.S.C. § 1391.  Defendant's headquarters are located in this District.  Moreover, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

### III.   PARTIES

20.   Plaintiff Peggy Sue Jones is a citizen of Tennessee.  Plaintiff owns a 2006 Saturn Ion subject to the FIS-related recall.  Plaintiff has experienced loss of vehicle power on several occasions while she was driving.  Had she known of the FIS defect, she would not have bought the 2006 Saturn Ion or she would not have paid as much for it.

21.   Plaintiff did not learn of the FIS defects in her car until March 2014. The recall letter Ms. Jones received is attached hereto as Exhibit A.

22.   Defendant General Motors LLC ("GM") is a Delaware company headquartered in Detroit, Michigan, conducts business in this District, and is responsible for the manufacture, distribution, and sale of all GM automobiles in the United States, as well as engineering design, development, research and development, and manufacturing activities in the U.S., Canada, and Mexico.  GM

is a wholly-owned subsidiary of General Motors Company, a Delaware corporation headquartered in Detroit, Michigan.

23. GM was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("GM Corp") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

24. Because GM acquired and operated GM Corp and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the FIS Models, GM is liable through successor liability for the deceptive and unfair acts and omissions of GM Corp, as alleged in this Complaint. Moreover, as explained below, *see* Section IV(f), GM is fully liable for all losses alleged herein.

25. Additionally, GM expressly retained certain liabilities and obligations after the bankruptcy, including:

> [1] [A]ll Liabilities arising under express written warranties of [GM Corp] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [GM Corp] or Purchaser prior to or after the Closing and . . . all obligations under Lemon Laws.

> [2] [C]ertification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent

9

applicable in respect of vehicles and vehicle parts manufactured or distributed by [GM Corp].

# IV.   FACTUAL ALLEGATIONS

### A.   GM Corp and GM Market and Sell FIS Models as "Safe" and "Reliable"

26.    In advertisements, GM and GM Corp said its cars were safe.

27.    For instance, an advertisement for a 2007 Saturn Ion, attached hereto as Exhibit B, claimed that the model is "safe and sound."

28.    The advertisement states, "The ION's designers accounted for almost everything but compromise.  It's nimble, yet strong.  Modern, but inviting.  Sporty, yet safe and sound.  Featuring the U.S. Government's highest possible front crash-test rating—five stars."

29.    As just a few examples, GM Corp promotional materials include the following claims of safety and reliability:

2003 Saturn Ion: "The ION sedan and quad coupe are designed to carry on the tradition of being at the top of the class when it comes to safety and security."

2006 and 2007 Saturn Ion: "Like all Saturns, the Ion was designed with an emphasis on safety and security."

2006 Pontiac G5: "The 2006 Pontiac G5 Pursuit offers a host of features for safety-minded consumers."

2006 Chevrolet HHR: "HHR is designed to protect occupants in the event of a crash."

2007 Saturn Sky: "Sky has a host of safety features… including dual stage frontal air bags… that use the latest sensing technology to turn the front passenger air bag on or off."

2005 - 2007 Chevrolet Cobalt: "Safety was a priority in the development of the Cobalt."  Cobalt's "rigid body structure… reinforces occupant safety." "The rigid body structure… reinforces its safety [and] load carrying capability for crash protection."

30.    Purchasers of the Ion and other FIS Models thus were led to believe the Ion and other FIS Models were safe, reliable vehicles.

### B.    GM Corp and GM Learn of the Defect, But Fail to Disclose It[9]

31.    GM's representations to purchasers about safety and reliability were demonstrably misleading.  Both GM Corp and GM knew of the FIS problems and their potentially fatal consequences, but concealed them from buyers.

32.    Before it even completed the design phase of the production of at least some of the FIS Models, GM Corp had been alerted to the defect that ultimately led to the recall.

33.    In a March 11, 2014 letter to NHTSA, attached hereto as Exhibit C, GM has acknowledged that it was made aware of the FIS issue as early as 2001. Specifically, a report initiated by GM Corp in 2001, during pre-production development of the Ion, addressed an issue relating to the ignition switch's "pass

---

[9] The information alleged in this Section is drawn from GM's admissions in its letters to the NHTSA dated March 11, 2014 and February 24, 2014 attached hereto as Exhibits C and D, respectively.

lock" system. The report stated that the causes of the problem included "low detent plunger force" in the ignition switch. *See* Exhibit C.

34.     A 2003 report documented an instance in which the service technician observed a stall while driving, noting that "[t]he owner had several keys on the key ring," and stated that "[t]he additional weight of the keys had worn out the ignition switch." In that instance, the technician replaced the ignition switch and the report was closed. *See* Exhibit C.

35.     Other reports at that time addressed customer complaints of not being able to start their Ions' engines, and *the warranty and technical assistance data collected in support of these reports included complaints of stalling*.

36.     In another letter dated February 24, 2014, attached hereto as Exhibit D, GM acknowledged that in 2004, around the time of the launch of the 2005 Chevrolet Cobalt, GM Corp learned of at least one incident in which a Cobalt lost engine power because the key moved out of the "run" position when the driver inadvertently contacted the key or steering column.

37.     According to the February 24, 2014 Letter, GM Corp employees were able to replicate this phenomenon during test drives. An engineering inquiry was opened to investigate the issue. Engineers believed that low key cylinder torque effort was an issue and considered a number of potential solutions. According to

GM, "[a]fter consideration of the lead time required, cost, and effectiveness of each of these solutions, the [inquiry] was closed with no action." *See* Exhibit D.

38.    Thus, despite being aware of reports in 2003 and 2004 (and even as early as 2001) that there were problems with the ignition switch, an engineering inquiry to address the issue "was closed with no action." *See* Exhibit D.

39.    Again in 2005, GM Corp employees received field reports of Chevrolet Cobalt vehicles losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. *See* Exhibit C.

40.    During the course of the review of an engineering inquiry opened in May 2005 in response to such reports, an engineer proposed that GM Corp redesign the key head from a "slotted" to a "hole" configuration. That proposal was initially approved, *but later cancelled*. *See* Exhibit C.

41.    The engineering inquiry led to GM Corp's issuing a service bulletin in December 2005 (the "2005 Service Bulletin"). *See* Exhibit C.

42.    The 2005 Service Bulletin provided "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs," and applied to a number of vehicles, including vehicles subject to the Ion, HHR, Solstice and Sky recall—specifically, 2003-06 Saturn Ion, 2006 Chevrolet HHR, and 2006 Pontiac

Solstice vehicles—all of which were equipped with the same ignition switch as the Cobalt. *See* Exhibit C.

43. The 2005 Service Bulletin informed dealers that: "there is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort"; "[t]he concern is more likely to occur if the driver is short and has a large and/or heavy key chain"; and "the customer should be advised of this potential and should take steps to prevent it-such as removing unessential items from their key chain." *See* Exhibit C.

44. Thus, rather than issue a recall which would have alerted the public to the FIS defect, GM Corp simply sent notices like the 2005 Service Bulletin telling their dealers that certain models' ignition switches could unexpectedly shut off, powering down their cars' engines. Dealers, in turn, were instructed to tell drivers to remove unessential items from their key chains. *See* Exhibit C.

45. Dealers were also provided with an insert to prevent keys from jostling. *See* Exhibit C.

46. Despite this, GM Corp continued to market its vehicles as safe and reliable, including in 2006 and 2007 in its advertising for the Saturn Ion which said the car was "safe and sound." *See* Exhibit B.

47. In 2006 the engineer in charge of the ignition switch approved a new design by the ignition switch supplier, but the new design continued to use the

14

same part number as the one it replaced.  That means it wouldn't have been obvious to the company or to a dealer or repair shop whether a switch was the older design or the, presumably safer, newer configuration.  *See* Exhibit C.

48.    In its March 2014 statements, GM says it *believes* that, as of the 2007 vehicle model year, the improved switch finally was being used on the assembly line for new cars, but says in its March 11, 2014 letter to NHTSA (Exhibit C) that it is not sure when the improved switch began being used.

49.    Also in 2007, a GM Corp investigating engineer learned from data from the vehicles' sensing and diagnostic modules ("SDM's") that the ignition was in the "accessory" position in four fatal crashes involving certain of the FIS Models.  *See* Exhibit C.

50.    Four years later, a meeting was finally held at GM involving legal staff and investigative personnel who would be involved in approving review of the FIS defect.  Soon thereafter, in August 2011, an engineer was assigned to move forward with an investigation of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not deployed during frontal impacts. *See* Exhibit C.

51.    In an attempt to explain further inaction until April 2013, GM discusses its byzantine investigative process that began in 2011 as follows:

"GM's [investigative] process consisted of several steps, beginning with investigation of the issue, then presentation of potential solutions to decision

makers, and culminating in a decision and implementation of that decision. At the outset of the process, investigating engineers worked to develop a technical understanding of the issue. They then presented their findings and proposed solutions to the Field Product Evaluation Recommendation Committee ("FPERC"). The FPERC's recommendations were then presented to the Executive Field Action Decision Committee ("EFADC"), which decided on a course of action. The FPERC and EFADC could request further analysis before making recommendations or decisions as to what, if any, field action was warranted." *See* Exhibit C.

52.     Shortly after April 2013, data gathered by an outside technical expert showed, consistent with the reports from 2003 and 2004, that: the ignition switches that he tested that had been installed in early-model Ion and Cobalt vehicles did not meet GM's torque specification; changes had been made to the ignition switch's detent plunger and spring several years after the start of production; and those changes most likely explained the variation from GM's specifications for torque performance observed in the original switches installed in 2007 and earlier model year vehicles. *See* Exhibit C.

53.     The findings were not presented and reviewed by high level committees until December of 2013. Even then, a second meeting had to be held in January of 2014 at which point GM decided to initiate a limited recall. *See* Exhibit C.

### C.    GM Finally Acknowledges the Defects

54.    Finally, on February 7, 2014, GM notified NHTSA of its decision to recall 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles on the basis of the severe safety problem relating to defects in the FIS.

55.    Following GM's announcement of the Cobalt and G5 recall on February 7, 2014, the decision was made to conduct "a more in-depth analysis" of additional vehicles.

56.    According to GM in its March 11, 2014 chronology, a PowerPoint demonstration was presented at the December 2013 and January 2014 meetings to the EFADC reflecting a proposed recall of only the Cobalt and G5 vehicles.  For these two meetings, a "backup" slide deck was prepared that also included information relating to the investigator's examination of key insert claims data for the Ion, HHR and Solstice vehicles.  The "backup" slide decks also included factual material relating to other vehicles, *including a copy of the April 26, 2006 document approving changes to the ignition switch proposed by the supplier*.  GM claims it does not know whether the "backup" slides were reviewed during these two meetings.  *See*, Exhibit C.

57.    Although not explained by GM, according to the Company, it eventually became aware of the fact that additional models were affected by the

17

FIS (a fact that would have been obvious had the "backup" powerpoint slides been seriously considered) and should be subject to the FIS recall.

58.    By letter dated February 24, 2014, GM notified NHTSA of its decision to recall all of the other FIS Models, specifically, the 2003-2007 model year Saturn Ion, 2006-2007 model year Chevrolet HHR, 2006-2007 Pontiac Solstice, and 2007 model year Saturn Sky vehicles, because these vehicles were equipped with the same defective FIS.  *See* Exhibit D.

59.    In a somewhat unsettling conclusion for owners of the FIS Models and other GM vehicles, GM represented to NHTSA that its "review of data and information relating to the recalled vehicles continues."

### D.    GM Recalls Late Model Vehicles for Unrelated Defects

60.    In addition to the FIS Models that have been recalled, GM has recently recalled over 1.5 million additional vehicles due to safety defects (the "Late Model Recalls").  These include the following:

61.    On March 17, 2014, GM recalled 1.33 million sport utility vehicles because of a wiring problem that could cause air bags not to deploy in a crash.

62.    The vehicles include Buick Enclaves and GMC Acadias from the 2008 to 2013 model years, Chevrolet Traverses from the 2009 to 2013 model years, and Saturn Outlooks from the 2008 to 2010 model years.

63.    GM said a wiring problem could cause the illumination of a "service air bag" warning.    Ignoring the warning will eventually result in the non-deployment of seat-mounted side air bags.

64.    Also on March 17, 2014, GM said it would recall 66,000 Cadillac XTS sedans, model years 2013 and 2014, because problems in a brake pump could possibly cause engine fires.    GM said it was aware of two fires related to the defect.

65.    The automaker will also recall 354,000 full-size vans that do not comply with requirements for head impacts for unbelted occupants. The vehicles are Chevrolet Express and GMC Savannah vans from the model years 2009 to 2014.

**E.    The Faulty Ignition Switches and Related Quality Concerns Have Caused or Will Cause Values of FIS Models to Plummet**

66.    A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car known to be subject to the risk of a possibly life-threatening failure of an ignition switch that renders the airbag inoperable.    A car purchased under the assumption that it was produced in conformity to high safety standards is worth more than a car produced in a system that promotes expedience over quality and safety and hides known defects. Moreover, car owners (and lessees) have a reasonable expectation that car

manufacturers will abide by federal state and common law obligations to affirmatively disclose known defects in a timely manner.

67.    This did not happen and, as a result, all purchasers of the FIS Models overpaid for their cars at the time of purchase.  As news of the FIS defect and GM's quality control issues surfaced in February 2014, the value of GM vehicles has diminished and will continue to do so.

68.    National and regional media outlets around the country have reported extensively regarding the FIS in recent days, raising public awareness of the defect and its safety implications.  Among the news negatively affecting the value of the FIS Models are the following reports that have been widely read.

69.    For example, on March 14, 2014 a news article reported that a 29-year-old woman died on her birthday after her vehicle—a Chevrolet Cobalt—spun out of control and caused a collision with another vehicle.[10]  Only four days prior to the incident, the woman's vehicle reportedly turned off unexpectedly while she was driving, disengaging her power steering and brakes.  The woman took her car to a dealership for repairs following the earlier incident, but an expert's examination of her vehicle's "black box" allegedly revealed that her key had

---

[10] Gabe Gutierrez et al., *Parents 'Boiling With Anger' After Daughter's Death in GM Car*, NBC NEWS, March 14, 2014, *available at* http://www.nbcnews.com/storyline/gm-recall/parents-boiling-anger-after-daughters-death-gm-car-n52316 (last visited March 20, 2014).

moved from the "on" position to the "accessory" position three seconds before the accident.

70. A separate article published on March 18, 2014 discussed the overall death toll of the FIS defect.[11] That article stated that "303 deaths could have been caused by a defect that recently prompted General Motors to recall 1.6 million cars[.]" The article continued, "[t]he number of fatalities increased while GM and the NHTSA delayed seriously addressing the issue for years[.]"

71. News outlets have also reported on GM Chief Executive Officer Mary Barra's "campaign" to reassure consumers about the safety of GM's vehicles. One article in *The Wall Street Journal* quoted Barra, who admitted "Clearly this took too long."[12] In somewhat of a contradiction, Barra further stated, as set forth in the article, "It's a complex situation and we have to wait on [our internal investigator's] report before drawing any conclusions." The article noted that

---

[11] David Undercoffler, *As Many as 303 Deaths Linked to Faulty Ignition Switches in Recalled GM Cars*, LOS ANGELES TIMES, March 18, 2014, *available at* http://www.latimes.com/business/autos/la-fi-hy-autos-303-deaths-linked-to-recall-gm-20140313,0,4720511.story#axzz2wXy972jF (last visited March 20, 2014).

[12] Jeff Bennett, *GM CEO Apologizes for Recall Delay, Vows Change*, THE WALL STREET JOURNAL, March 18, 2014, *available at* http://online.wsj.com/news/articles/SB10001424052702304017604579447151127194412?mg=reno64-wsj (last visited March 20, 2014).

Barra denied having prior knowledge of the FIS.  A separate article cited Barra's "new GM apology" that "terrible things happened."[13]

72.    Other reports have focused on the United States Government's investigation of the FIS issue and in particular the interest taken by top-ranking officials.  For instance, one recent report announced that United States Senator Richard Blumenthal asked NHTSA to turn over its records relating to automobile collisions linked to recalled GM vehicles.[14]  Senator Blumenthal was quoted in the article, "Since 2003, too many unnecessary deaths have occurred due to known airbag and ignition deficiencies.  These accidents were well-documented and logged in NHTSA's complaints database[.]"  Senator Blumenthal was further quoted, "NHTSA, GM, and Congress have the duty to ensure a failure of this magnitude is prevented in the future and in order to do so, it is necessary to have a full understanding as to why a failure [to investigate sooner] occurred with this case."

---

[13] Chris Isidore, *Barra on Recall: 'Terrible things happened'*, CNN MONEY, March 18, 2014, *available at* http://money.cnn.com/2014/03/17/news/companies/gm-recall-barra/ (last visited March 20, 2014).

[14] David Shepardson, *Senator Wants NHTSA Records on GM Ignition Deaths*, THE DETROIT NEWS, March 20, 2014, *available at* http://www.detroitnews.com/article/20140320/AUTO0103/303200112/Senator-wants-NHTSA-records-GM-ignition-deaths (last visited March 20, 2014).

09-50026-mg   Doc 12621-16   Filed 04/21/14   Entered 04/21/14 20:24:57   Exhibit
4:14-cv-11191-MAG-DRG   Doc 1   Filed 03/21/14   Pg 25 of 49   Pg ID 25

Pg 26 of 70

73.    Another report, published on March 20, 2014, revealed that sixteen year-old Megan Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees.  NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact.  According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they began communicating.  As she stated, "I don't understand why [GM] would wait 10 years to say something. And I want to understand it but I never will."[15]

74.    These reports, along with tens of others detailing the utter lack of regard for customers' safety exhibited by GM for over a decade, have materially negatively impacted the value of the FIS Models, including Plaintiff's vehicle.

F.    **Successor Liability and Limitations Period Tolling**

75.    GM was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of GM Corp through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.  Bankruptcy does not immunize GM from liability here.  Specifically, GM expressly assumed certain

---

[15] Eric Beech, *Owners of Recalled GM Cars Feel Angry, Vindicated*, Reuters Mar. 17, 2014, *available at* http://www.reuters.com/article/2014/03/16/us-gm-recall-victims-idUSBREA2F0AT20140316, (last visited Mar. 20, 2014).

obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

76.    GM also expressly assumed liability for warranty claims in the Master Sale and Purchase Agreement of June 26, 2009, and this assumption of liability includes the Classes' claims pursuant to Tennessee and other state statutes.

77.    Moreover, GM has successor liability for GM Corp's acts and omissions in the marketing and sale of the FIS Models during the Class Period because GM has continued the business enterprise of GM Corp, for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as GM Corp;

- GM retained the bulk of the employees of GM Corp;

- GM acquired owned and leased real property of GM Corp, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of GM Corp; and

- GM acquired all goodwill and other intangible personal property of GM Corp.

78. GM and GM Corp did not report information within their knowledge to federal authorities (NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that GM Corp and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this action was filed.

79. GM Corp instructed its service shops to provide FIS Model owners with a new key ring if they complained about unintended shut down rather than admit what it knew—that the ignition switches were dangerously defective and warranted replacement with a properly designed and built ignition system.

80. GM Corp and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiff and the Class the true character, quality, and nature of the FIS Models; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the FIS Models.

81. Because of the active concealment by GM Corp and GM, any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled.

## V.    CLASS ACTION ALLEGATIONS

82.    Plaintiff brings this action pursuant to Federal Rules of Civil

Procedure 23(a), (b)(2) and/or (b)(3) on behalf of the following Classes:

> All persons and entities who purchased or leased FIS
> Models in the United States up to and including the
> present (the "Nationwide Class").

> All persons or entities who purchased or leased FIS
> Models in the State of Tennessee up to and including the
> present (the "Tennessee Class").

> All persons or entities who purchased or leased FIS
> Models in the states of Alaska, Arizona, Arkansas,
> California, Colorado, Connecticut, Delaware, District of
> Columbia, Florida, Georgia, Hawaii, Idaho, Illinois,
> Indiana, Iowa, Kansas, Kentucky, Maine, Maryland,
> Massachusetts, Michigan, Minnesota, Missouri,
> Nebraska, Nevada, New Hampshire, New Jersey, New
> Mexico, New York, North Carolina, North Dakota, Ohio,
> Oklahoma, Oregon, Pennsylvania, Rhode Island, South
> Dakota, Texas, Utah, Vermont, Virginia, Washington,
> West Virginia, Wisconsin and Wyoming up to and
> including the present (the "Consumer Protection Statute
> Class").

83.    The Classes exclude Defendant and any entity in which Defendant has

a controlling interest, and their officers, directors, legal representatives, successors

and assigns.  The Classes also exclude General Motors Company, GM Corp and

any entity in which these entities have or had a controlling interest, and their

officers, directors, legal representatives, successors and assigns.

84.    The Classes are so numerous that joinder of all members is

impracticable.

85.    A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

86.    Plaintiff's claims are typical of the claims of the Classes.  As alleged herein, Plaintiff and members of the Classes all sustained damages arising out of the Defendant's same course of unlawful conduct.

87.    There are questions of law and fact common to the Classes, including but not limited to:

- Whether GM and its predecessor had knowledge of the defect prior to its issuance of the current safety recall;

- Whether GM and its predecessor concealed defects affecting the FIS Models;

- Whether GM and its predecessor misrepresented the safety of the FIS Models;

- Whether GM and its predecessor's misrepresentations and omissions regarding the safety and quality of its vehicles were likely to deceive a reasonable person;

- Whether a reasonable customer would pay less for a car that had an FIS;

- Whether a reasonable customer would pay less for a vehicle that did not conform to GM and its predecessor's assurances of quality;

- Whether GM and its predecessor breached its express or implied warranties;

- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

- Whether injunctive relief enjoining the reoccurrence of Defendant's conduct and/or declaratory relief that such conduct is unlawful, is warranted.

88.    The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical.  The Classes have a high degree of similarity and are cohesive.  Prosecution of the action through multiple representatives would be objectionable and Plaintiff anticipates no difficulty in the management of this matter as a class action.

89.    Class action status is also warranted under Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

90.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM
**Violation of Magnuson-Moss Warranty Act,
15 U.S.C. § 2301, *et seq.*
On behalf of the Nationwide Class**

91.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.    Plaintiff asserts this claim on behalf of herself and all persons or entities who purchased or leased an FIS Model from GM, GM Corp, or a GM or GM Corp dealership.

93.    Plaintiff and each member of the Class is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

94.    GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

95.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

96.    GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The FIS Models' implied warranties are covered under 15 U.S.C. § 2301(7).

97.    GM breached these warranties as described in more detail above, but generally by providing FIS Models in non-merchantable condition, which are not

fit for the ordinary purpose for which vehicles are used, and which are not fully operational, safe, or reliable.

98.    Plaintiff and the Class have had sufficient direct dealings with Defendant and its agents to establish privity of contract with Defendant. Nevertheless, privity is not required in this case because the FIS Models are dangerous instrumentalities due to the aforementioned defects and nonconformities.

99.    Plaintiff and the Class seek, where applicable, to revoke their acceptance of the FIS Models, or in the alternative, all damages, including diminution of value of the FIS Models.

## SECOND CLAIM
**Breach of Express Warranty,**
**Tenn. Code Ann. § 47-2-313**
**On behalf of the Tennessee Class**

100.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.   Defendant is and was at all times "sellers" as defined by Tenn. Code Ann. § 47-2-103.

102.   Defendant expressly affirmed through its statements and advertisements that the FIS Models were of high quality, and, at a minimum, would work properly and safely.  These affirmations became part of the basis of the bargains between the Class members and GM.

103.   Defendant breached this warranty by knowingly selling to Plaintiff
and the Class vehicles with dangerous defects and which were not of high quality.

104.   Plaintiff and the Class have been damaged as a direct and proximate
result of the breaches by Defendant in that the FIS Models purchased by Plaintiff
and the Class were and are worth far less than what Plaintiff and the Class paid to
purchase, which was reasonably foreseeable to Defendant.

105.   Plaintiff and the Class were unaware of these defects and could not
have reasonably discovered them when they purchased their vehicles from GM.

106.   Plaintiff and the Class are entitled to damages, including the
diminished value of their vehicles and the value of the non-use of the vehicles
pending successful repair, in addition to any costs associate with purchasing safer
vehicles, incidental and consequential damages, and all other damages allowable
under the law, including such further relief as the Court deems just and proper.

### THIRD CLAIM
### Breach of Implied Warranty of Merchantability,
### Tenn. Code Ann. § 47-2-314
### On behalf of the Tennessee Class

107.   Plaintiff repeats and realleges each and every allegation contained
above as if fully set forth herein.

108.   Defendant impliedly warranted that their vehicles were of good and
merchantable quality and fit, and safe for their ordinary and intended use—namely,

transporting the drive and passengers in reasonable safety during normal operation without unduly endangering them or members of the public.

109.   As described above, there were dangerous defects in the FIS Models manufactured, distributed, and sold by Defendant, which Plaintiff and the Class purchased or leased, including ignition mechanism defects that caused the vehicles to suddenly turn off.

110.   These dangerous defects existed at the time the vehicles left Defendant's manufacturing facilities and at the time they were sold to Plaintiff and the Class.  Furthermore, because of these dangerous defects, Plaintiff and the Class did not receive the benefit of their bargain and the vehicles have suffered a diminution in value.

111.   These dangerous defects were the direct and proximate cause of damages to the Plaintiff and the Class.

## FOURTH CLAIM
**Common Law Breach of Contract and Breach of Warranty**
**On behalf of the Nationwide Class and the Tennessee Class**

112.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113.   In the alternative to the statutory claims alleged above, Plaintiff pleads this claim under common law warranty and contract law.

114.   GM breached its warranty and contract obligations by tendering to Plaintiff and the Classes vehicles that were defective as to their ignition mechanism, causing the FIS Models to suddenly and unexpectedly turn off.

115.   The ignition mechanism defect present in the FIS Models did not constitute merely a minor breach, as the potential for a sudden loss of engine power placed Plaintiff and the Classes at an unreasonable risk of suffering serious bodily injury.  As such, Plaintiff and the Classes would not have purchased the FIS Models at the price that they did pay, had they known of the ignition mechanism defect.

116.   As a direct and proximate result of Defendant's breach of contract or warranty, Plaintiff and the Classes have suffered damages.

### FIFTH CLAIM
**Fraudulent Misrepresentation & Fraudulent Concealment
On behalf of the Tennessee Class and the Nationwide Class**

117.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118.   As described above, Defendant made material omissions and affirmative misrepresentations regarding the FIS Models.

119.   Defendant knew these representations were false when made.

120.   The vehicles purchased or leased by Plaintiff and the Classes were defective, unsafe, and unreliable because the vehicles were subject to an ignition mechanism defect that would unexpectedly turn off a FIS Model's engine.

121.   Defendant had a duty to disclose that these vehicles were defective, unsafe, and unreliable in that the vehicles were subject to an ignition mechanism defect that would unexpectedly turn off a FIS Model's engine.

122.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the Classes would not have bought or leased the vehicles at the same price, or would not have bought or leased the vehicles at all.

123.   The aforementioned representations were material because they were facts that would typically be relied upon by a person purchasing or leasing a new motor vehicle.  Defendant knew or recklessly disregarded that its representations as to the FIS Models were false.  Defendant intentionally made the false statements in order to sell vehicles.

124.   Plaintiff and the Classes relied upon GM's reputation and its failure to disclose the ignition mechanism problems in purchasing or leasing the FIS Models.

125.   As a result of their reliance, Plaintiff and the Classes have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

126.   Defendant's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs.  Plaintiff and the Classes are therefore entitled to an award of punitive damages.

## SIXTH CLAIM
### Unjust Enrichment,
### On behalf of the Tennessee Class and the Nationwide Class

127.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

128.   Plaintiff and the Classes paid the value of vehicles that are not defective, would not be compromised by the need for repairs, and could be safely operated, but were provided with vehicles that are defective, needed repairs, and could not be safely operated.

129.   As such, Plaintiff and the Classes conferred a windfall upon GM, which knew of the windfall and has unjustly retained such benefits.

130.   As a direct and proximate result of GM's unjust enrichment, Plaintiff and the Classes have suffered and continue to suffer various damages, including, but not limited to, restitution of all amounts by which Defendant was enriched through its misconduct.

## SEVENTH CLAIM
### Violations of State Consumer Protection
### and Unfair Competition Statutes
### On behalf of the Consumer Protection Statute Class

131. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

132. Defendant engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices with respect to the sale of the FIS Models in violation of the following state consumer protection and unfair competition statutes.

133. Defendant has violated Alaska Stat. 45-50-471 *et seq.*

134. Defendant has violated Ariz Rev. Stat. § 44-1521 *et seq.*

135. Defendant has violated Arkansas Code § 4-88-101 *et seq.*

136. Defendant has violated Cal. Civ. Code § 1770 *et seq.*, Cal. Bus. & Prof. Code § 17200 *et seq.*, and Cal. Bus. & Prof. Code § 17070.

137. Defendant has violated Colo. Rev. Stat. § 6-1-101 *et seq.*

138. Defendant has violated Conn. Gen. Stat. § 42-110A, *et seq.*

139. Defendant has violated 6 Del. Code § 2513 *et seq.* and 6 Del. Code § 2532 *et seq.*

140. Defendant has violated D.C. Code Ann. § 28-3901 *et seq.*

141. Defendant has violated Florida Stat. § 501.201 *et seq.*

142. Defendant has violated Ga. Code Ann. § 10-1-370 *et seq.*

143. Defendant has violated Haw. Rev. Stat. Ann. § 481A-3.

144. Defendant has violated Idaho Code § 48-601 *et seq.*

145.   Defendant has violated 815 Ill. Comp. Stat. 505/1 *et seq.* and 815 Ill. Comp. Stat. 510/1 *et seq.*

146.   Defendant has violated Ind. Code § 24-5-0.5-3.

147.   Defendant has violated Iowa Code § 714H.1 *et seq.*

148.   Defendant has violated Kan. Stat. Ann. § 50-623 *et seq.*

149.   Defendant has violated Ky. Rev. Stat. § 367.110 *et seq.*

150.   Defendant has violated Me. Rev. Stat. Ann. Tit. 5 § 205-A *et seq.*

151.   Defendant has violated Md. Code Com. Law § 13-101 *et seq.*

152.   Defendant has violated Mass. Gen. Laws chapter 93A § 1 *et seq.*

153.   Defendant has violated Mich. Comp. Laws § 445.901.

154.   Defendant has violated Minn. Stat. § 325F.69 *et seq.* and Minn. Stat. § 325D.43 *et seq.*

155.   Defendant has violated Mo. Ann. Stat. 407.020.

156.   Defendant has violated Neb. Rev. Stat. § 87-302 and Neb. Rev. Stat. § 59-1601 *et seq.*

157.   Defendant has violated Nev. Rev. Stat. § 598.0903 *et seq.*

158.   Defendant has violated New Hampshire Rev. Stat. § 358-A:1 *et seq.*

159.   Defendant has violated N.J. Stat. Ann. § 56:8-1, *et seq.*

160.   Defendant has violated New Mexico Stat. Ann. § 57-12-1 *et seq.*

161.   Defendant has violated N.Y. Gen. Bus. Law § 349 *et seq.*

162.    Defendant has violated North Carolina Gen. Stat. § 75-1.1 *et seq.*

163.    Defendant has violated N.D. Cent. Code § 51-15-02.

164.    Defendant has violated Ohio Rev. Code Ann. § 1345.01 *et seq.* and
Ohio Rev. Code Ann. § 4165.01 *et seq.*

165.    Defendant has violated Okla. Stat. Tit. 15 § 751 *et seq.* and 78 Okla.
Stat. Ann. § 51 *et seq.*

166.    Defendant has violated Or. Rev. Stat. § 646.605 *et seq.*

167.    Defendant has violated 73 P.S. § 201-1 *et seq.*

168.    Defendant has violated Rhode Island Gen. Laws § 6-13.1-1 *et seq.*

169.    Defendant has violated S.D. Codified Laws § 37-24-6 *et seq.*

170.    Defendant has violated Tex. Bus. & Com. Code § 17.41 *et seq.*

171.    Defendant has violated Utah Code Ann. 13-11-1 *et seq.*

172.    Defendant has violated Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*

173.    Defendant has violated Va. Code Ann. 59.1-200 *et seq.*

174.    Defendant has violated Rev. Code Wash. Ann. § 19.86.010 *et seq.*

175.    Defendant has violated W. Va. Code § 46A-1-101 *et seq.*

176.    Defendant has violated Wisc. Stat. § 100.18 *et seq.*

177.    Defendant has violated Wyo. Stat. § 45-12-105 *et seq.*

178.    Defendant's misrepresentations and omissions regarding the safety
and reliability of its vehicles as set forth in this Complaint were likely to deceive a

reasonable consumer, and the information would be material to a reasonable consumer.

179.  Defendant's intentional and purposeful acts, described above, were intended to and did cause Plaintiff and the Class to pay artificially inflated prices for FIS Models purchased in the states listed above.

180.  As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and Class members have been injured in their business and property in that they paid more for FIS Models than they otherwise would have paid in the absence of Defendant's unlawful conduct.

181.  All of the wrongful conduct alleged herein occurred in the conduct of Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct that was perpetrated nationwide.

182.  Plaintiff and Class members are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including but not limited to, actual damages, injunctive relief, attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendant as a result of its unlawful conduct.

## VII.   <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendant and in favor of Plaintiff and the Classes and award the following relief:

A.    That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Classes and Plaintiff's counsel as counsel for the Classes;

B.    That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

D.    Compensatory, consequential, and general damages in an amount to be determined at trial;

E.    Costs and disbursements of the action;

F.    Restitution and/or disgorgement of Defendant's ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Classes;

G.    Pre- and post-judgment interest;

H.    Reasonable attorneys' fees;

I.    That Defendant be enjoined from the conduct challenged herein;

J.    Such monetary, injunctive other relief to each of the subclasses that is provided for by the state statutes pursuant to each Count alleged; and

K.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated March 21, 2014                    Respectfully submitted,

                                         /s/ E. Powell Miller
                                        **THE MILLER LAW FIRM, P.C.**
                                        E. Powell Miller (P39487)
                                        Marc L. Newman (P51393)
                                        Casey A. Fry (P72332)
                                        Miller Building,
                                        950 West University Drive, Suite 300
                                        Rochester, MI 48307
                                        Tel:  (248) 841-2200
                                        Fax:  (248) 652-2852

                                        **KESSLER TOPAZ MELTZER
                                           & CHECK, LLP**
                                        Joseph H. Meltzer
                                        Edward W. Ciolko
                                        Peter A. Muhic
                                        Mark K. Gyandoh
                                        280 King of Prussia Road
                                        Radnor, PA  19087
                                        Tel: (610) 667-7706
                                        Fax: (610) 667-7056

                                        *Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

## <u>INDEX OF EXHIBITS</u>

Exhibit A        Recall Letter

Exhibit B        Advertisement for a 2007 Saturn Ion

Exhibit C        March 11, 2014 Letter to NHTSA

Exhibit D        Letter Dated February 24, 2014

# EXHIBIT A



# IMPORTANT SAFETY RECALL

March 2014

Peggy Jones
## REDACTED

Dear Peggy Jones:

This notice is sent to you in accordance with the National Traffic and Motor Vehicle Safety Act.

General Motors has decided that a defect which relates to motor vehicle safety exists in 2005-2007 model year (MY) Chevrolet Colbalt, 2006-2007 MY Chevrolet HHR, 2005-2006 MY Pontiac Pursuit, 2006-2007 MY Pontiac Solstice, 2007 MY Pontiac G5, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles. As a result, GM is conducting a recall. We apologize for this inconvenience. However, we are concerned about your safety and continued satisfaction with our products.

---

## IMPORTANT

- This notice applies to your 2006 model year Saturn ION,
  **VIN** REDACTED . It is involved in safety recall 14063.

- **Until the recall repairs have been performed, it is <u>very</u> important that you remove all items from your key ring, leaving only the vehicle key. The key fob (if applicable), should also be removed from your key ring.**

- When parts become available, GM will notify you to schedule an appointment with your General Motors dealer.

- The recall repairs will be performed for you at **no charge.**

---

**Why is your vehicle being recalled?**
There is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine. This risk increases if your key ring is carrying added weight (such as more keys or the key fob) or your vehicle experiences rough road conditions or other jarring or impact related events. If the ignition switch is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality.

**Until the recall repairs have been performed, it is <u>very</u> important that you remove all items from your key ring, leaving only the vehicle key. The key fob (if applicable), should also be removed from your key ring.**

**What will we do?**
PARTS ARE NOT CURRENTLY AVAILABLE, but when parts are available, your General Motors dealer will replace the ignition switch on your vehicle. This service will be performed for you at **no charge.** Because of scheduling

**GM**

requirements, it is likely that your dealer will need your vehicle longer than the actual service correction time of approximately 40 minutes.

We are working as quickly as possible to obtain parts, and expect to have parts beginning in April of this year. We will contact you as soon as parts are available so that you can schedule an appointment with your dealer to have your vehicle repaired.

**What should you do?** When GM notifies you that parts are available, you should contact your General Motors dealer to arrange a service appointment. In the meantime, remove all items other than the vehicle key from your key ring.

**Did you already pay for this repair?** When GM notifies you that parts are available, GM will also provide instructions for you to request reimbursement if you paid for repairs for the recall condition previously.

**Do you have questions?** If you have questions or concerns that your dealer is unable to resolve, please contact the Saturn Customer Assistance Center at 1.800.553.6000 (TTY 1.800.833.6000).

If after contacting your dealer and the Customer Assistance Center, you are still not satisfied we have done our best to remedy this condition without charge and within a reasonable time, you may wish to write the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE., Washington, DC 20590, or call the toll-free Vehicle Safety Hotline at 1.888.327.4236 (TTY 1.800.424.9153), or go to http://www.safercar.gov. The National Highway Traffic Safety Administration Campaign ID Number for this recall is 14V-047.

Federal regulation requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

Jim Moloney
General Director – Customer & Relationship Services

GM Recall #14063

# EXHIBIT B



# 2007 SATURN ION

The ION's designers accounted for almost everything but compromise. It's nimble, yet strong. Modern, but inviting. Sporty, yet safe and sound. Featuring the U.S. Government's highest possible front crash-test rating — five stars.* For added power and punch, the ION•3 is available with a 175-hp, ECOTEC 2.4L VVT engine, which we've paired with antilock brakes and a sport-tuned suspension. Meanwhile, the Quad Coupe's rear access doors, split-folding rear seatbacks and fold-flat front passenger seat keep it committed to style yet flexible on function. Visit saturn.com.

*Five-star rating is for the driver and passenger in the frontal crash test. Government star ratings are part of the National Highway Traffic Safety Administration's (NHTSA) New Car Assessment Program (safercar.gov).

Saturn ION•3 Sedan in Storm Grey shown with optional equipment.

# EXHIBIT C

**RECEIVED**

By Recall Management Division at 12:04 pm, Mar 12, 2014



**GM** **GENERAL MOTORS LLC**
Vehicle Safety and Crashworthiness

14V-047
(10 pages) Supplemental

March 11, 2014

Ms. Nancy Lewis
Associate Administrator for Enforcement
National Highway Traffic Safety Administration
Recall Management Division (NVS-215)
1200 New Jersey Avenue, SE – Room W45-306
Washington, DC  20590

Re:    NHTSA Recall No. 14V-047

Dear Ms. Lewis:

This letter supersedes General Motors' letter of February 25, 2014, and is submitted pursuant to the requirements of 49 CFR 573.6 as it applies to a determination by General Motors to conduct a safety-related recall for 2006-2007 model year (MY) Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.

573.6(c)(1): General Motors Company; Chevrolet, Pontiac and Saturn Brands.

573.6(c)(2),(3),(4): This information is shown on Attachment A.

573.6(c)(5): General Motors has decided that a defect which relates to motor vehicle safety exists in 2006-2007 MY Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.  The ignition switch torque performance may not meet General Motors' specification.  If the torque performance is not to specification, the ignition switch may unintentionally move from the "run" position to the "accessory" or "off" position with a corresponding reduction or loss of power.  This risk may be increased if the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event.  The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

Until the recall repairs have been performed, it is <u>very</u> important that customers remove all items from their key rings, leaving only the vehicle key.  The key fob (if applicable), should also be removed from the key ring.

573.6(c)(6): As permitted by the provisions of 49 C.F.R. 573.6(b), and pursuant to the requirements of 49 C.F.R. 573.6(c)(6), General Motors now submits the attached chronology of principal events that were the basis for the determination that the defect related to motor vehicle safety.  <u>See</u> Attachment B.  This chronology refers to numerous engineering inquiries, known within General Motors as Problem Resolution Tracking System ("PRTS") inquiries.  As stated in the enclosed document, General Motors is prepared to share with



Letter to Ms. Nancy Lewis
N140063 573 Letter
March 11, 2014
Page 2

NHTSA upon request the PRTS reports referenced therein, as well as other documentation related to this recall.

573.6(c)(8): Dealers are to replace the ignition switch.

GM provided dealers notification of the recall on February 26, 2014 and March 4, 2014.  GM will be providing a recall service bulletin to dealers on or about April 7, 2014.  In addition, GM mailed the owner letters on March 10 and 11, 2014.

Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on or before ten days after the owner mailing is completed, according to the plan submitted on May 23, 2013.

573.6(c)(10): GM will provide copies of the dealer bulletin under separate cover.  GM has previously provided a copy of the owner letter.

573.6(c)(11): GM's assigned recall number is 14063.

Sincerely,

M. Carmen Benavides, Director
Product Investigations and Safety Regulations

14063
Attachment

Attachment A - 573.6(c)(2),(3),(4)

VEHICLES POTENTIALLY AFFECTED BY MAKE, MODEL, AND MODEL YEAR
PLUS INCLUSIVE DATES OF MANUFACTURE

| MAKE | MODEL SERIES | MODEL YEAR | NUMBER INVOLVED | INCLUSIVE MANUFACTURING DATES (FROM) | (TO) | DESCRIPTIVE INFO. TO PROPERLY IDENT. VEH. | EST. NO. W/CONDITION |
|------|------|------|------|------|------|------|------|
| Chevrolet | A | 2006 | 113,911 | 04/11/2005 | 06/22/2006 | HHR | * |
| Chevrolet | A | 2007 | 99,672 | 05/15/2006 | 06/23/2007 | HHR | " |
| Pontiac | M | 2006 | 18,750 | 03/16/2005 | 06/23/2006 | Solstice | " |
| Pontiac | M | 2007 | 21,310 | 06/05/2006 | 06/15/2007 | Solstice | " |
| Saturn | A | 2003 | 96,358 | 06/01/2002 | 07/24/2003 | Ion | " |
| Saturn | A | 2004 | 121,107 | 04/29/2003 | 08/07/2004 | Ion | " |
| Saturn | A | 2005 | 71,024 | 04/27/2004 | 06/06/2005 | Ion | " |
| Saturn | A | 2006 | 96,227 | 04/13/2006 | 05/05/2006 | Ion | " |
| Saturn | A | 2007 | 94,118 | 04/05/2006 | 03/28/2007 | Ion | " |
| Saturn | M | 2007 | 15,547 | 12/06/2005 | 06/14/2007 | Sky | " |
|  |  | GM Total: | 748,024 |  |  |  |  |

* All involved vehicles will be corrected as necessary.

573.6(c)(2)(iv):    Delphi Packard Electrical/Electronic Architecture
5725 Delphi Drive
M/C 483.400.301
Troy, Michigan 48098

Tel: [1] 248.813.2334
Fax: [1] 248.813.2333

The involved parts are manufactured in Mexico.

14063

<u>ATTACHMENT B - 573.6(c)(6)</u>

**CHRONOLOGY**
**Re: Recall of 2006-2007 Chevrolet HHR and Pontiac Solstice,**
**2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles**

On February 7, 2014, General Motors ("GM") notified the National Highway Transportation Safety Administration ("NHTSA") of its decision to recall 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles. By letter dated February 24, 2014, GM submitted to NHTSA a chronology of principal events that were the basis for the determination that the defect related to motor vehicle safety, with respect to the recall of the Cobalt and G5 vehicles ("the Cobalt and G5 recall").

In making this recall determination, GM's Executive Field Action Decision Committee ("EFADC") was asked to consider a proposed recall only of the Cobalt and G5 vehicles. The submissions to the EFADC did not propose a recall of the Ion, HHR, Solstice and Sky vehicles. Following GM's announcement of the Cobalt and G5 recall on February 7, 2014, as will be discussed in more detail below, the decision was made to conduct a more in-depth analysis of information related to the vehicles that were listed on Service Bulletins 05-02-35-007 and 05-02-35-007A, but were not included in the February 7, 2014 recall submission to NHTSA.

By letter dated February 25, 2014, GM notified NHTSA of its decision to recall all of the other vehicles listed in the aforementioned Service Bulletins—specifically, 2003-2007 model year Saturn Ion, 2006-2007 model year Chevrolet HHR and Pontiac Solstice, and 2007 model year Saturn Sky vehicles ("the Ion, HHR, Solstice and Sky recall"). Because these vehicles were equipped with the same ignition switch installed in the 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles, the chronology submitted on February 24, 2014, with respect to the Cobalt and G5 recall is relevant to GM's decision to issue the Ion, HHR, Solstice and Sky recall. In addition to the events set forth in the chronology submitted to NHTSA regarding the Cobalt and G5 recall, the following describes the principal events that were the basis for the determination, relating to the Ion, HHR, Solstice and Sky recall, that the defect related to motor vehicle safety. GM's review of data and information relating to the recalled vehicles continues.

\*        \*        \*

**2005.** GM employees received field reports of Chevrolet Cobalt vehicles losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. Engineering inquiries, known within GM as Problem Resolution Tracking System ("PRTS") reports, were opened to assess this issue. During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration. That proposal was initially approved, but later cancelled. The PRTS process led to GM's issuing Information Service Bulletin 05-02-35-007 in December 2005. This Service Bulletin provided "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs," and applied to a number of vehicles, including vehicles subject to the Ion, HHR, Solstice and Sky recall—specifically, 2003-06 Saturn Ion, 2006 Chevrolet HHR,

and 2006 Pontiac Solstice vehicles—all of which were equipped with the same ignition switch as the Cobalt. The Service Bulletin informed dealers that: "there is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort"; "[t]he concern is more likely to occur if the driver is short and has a large and/or heavy key chain"; and "the customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain." In addition, the Service Bulletin advised that "Engineering has come up with an insert for the key ring so that it goes from a 'slot' design to a hole design. As a result, the key ring cannot move up and down in the slot any longer—it can only rotate on the hole." The Service Bulletin further stated that, "[i]n addition, the previous key ring has been replaced with a smaller, 13 mm design. This will result in the keys not hanging as low as in the past."

Certain of the reported incidents that pre-dated GM's issuance of Service Bulletin 05-02-35-007 and GM's public response to inquiries about those incidents were chronicled in newspaper articles that appeared in THE NEW YORK TIMES, THE PLAIN DEALER (Cleveland, OH), and THE DAILY ITEM (Sunbury, PA). GM concluded in December 2005 that the Service Bulletin and field service campaign were the appropriate response to the reported incidents, given that the car's steering and braking systems remained operational even after a loss of engine power, and the car's engine could be restarted by shifting the car into either neutral or park.

**2006.** On April 26, 2006, the GM design engineer responsible for the ignition switch installed in all of the vehicles subject to the Cobalt and G5 recall and the Ion, HHR, Solstice and Sky recall signed a document approving changes to the ignition switch proposed by the supplier. This document referred to the "GMX 357" vehicle platform, which was GM's internal designation for the Saturn Ion. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM for all of the recalled vehicles at some point during the 2007 model year.

In May 2006, a field evaluation inquiry, known within GM as a Field Performance Report ("FPR"), was opened to address customer complaints that their Saturn Ion vehicles would neither crank nor start. Attached to this FPR was a document bearing the logo of the ignition switch supplier, titled "PROPOSED PCB [printed circuit board] LAYOUT." Under "[p]roblem description," the document stated, "[s]witch presents Contact Bounces & contact permanent deformation," "[c]ustomer rejects switches," and "[f]unctional Problem when car starts." The "[p]roposed actions from Product Engineering" included "[c]hange PCB design to remove via holes from contact traces," "[e]nlarge PCB vias to avoid contactors being in via limits," and "[d]etent plunger to increase torque force to be within spec." Under "[c]urrent status for PCB," the document stated, among other things, "1.-Validation for Torque & Angle for timing corrections ~ DONE," "2.-GM RDE approve GM3660 ~ DONE," and "6.-SOP @ Condura for new PCB & Spring/Plunger ~ 6/30/06." The FPR was closed, citing Technical Service Bulletin 06-02-35-017.

2

GM updated Service Bulletin 05-02-35-007 in October 2006 to include additional vehicles and model years, including the vehicles subject to the Ion, HHR, Solstice and Sky recall—specifically, the 2007 Saturn Ion, the 2007 Chevrolet HHR, the 2007 Pontiac Solstice, and the 2007 Saturn Sky and the 2007 Pontiac G5. GM's warranty records indicate that GM dealers have provided key inserts to 474 customers who brought their vehicles into dealers for service.

**2007.** A GM investigating engineer was tasked with tracking crashes in which Cobalts were involved in frontal impacts and the airbags did not deploy, in order to try to identify common characteristics of these crashes. Data from the vehicles' sensing and diagnostic modules ("SDM's") were available for nine of the crashes, and that data showed that the ignition was in the "run" position in five of the crashes and in the "accessory" position in four of the crashes. Such information was not available for Saturn Ion vehicles because they were equipped with an SDM that was not designed to record when the engine was not running.

GM discontinued production of the Ion at the end of the 2007 model year, as previously planned.

**2011.** In late July 2011, a meeting was held at GM involving Legal Staff, Field Performance Assessment ("FPA") and Product Investigations personnel who would be involved in the Field Performance Evaluation ("FPE") process. Soon thereafter, in August 2011, a Field Performance Assessment Engineer ("FPAE") was assigned to move forward with an FPE investigation of a group of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not deployed during frontal impacts, which also included a review of information related to the Ion, HHR and Solstice vehicles. This FPE investigation did not identify frontal-impact crashes involving 2004 model year Saturn Ion vehicles that resulted in fatalities in which the recall condition may have caused or contributed to the airbags' non-deployment. These crashes have since been identified and are included below in the number of crashes identified based on the data and information collected and reviewed to date.

During the course of the FPE investigation, the FPAE's analyses included the following: reviewing data relating to complaints of stalling in the Ion for all model years; reviewing data relating to crashes involving Ions from certain model years in which airbags had not deployed; testing the torque performance of ignition switches from salvage yard vehicles, including Ions, HHRs, Cobalts and G5s (but not Solstice or Sky vehicles); measuring the difference among a wide variety of GM vehicles in the distance between a driver's knee and the ignition; and studying vehicles' different steering columns and shrouds, including those of the Ion and the Cobalt.

GM's FPE process consisted of several steps, beginning with investigation of the issue, then presentation of potential solutions to decision makers, and culminating in a decision and implementation of that decision. At the outset of the process, investigating engineers worked to develop a technical understanding of the issue. They then presented their findings and proposed solutions to the Field Product Evaluation Recommendation Committee ("FPERC"). The FPERC's recommendations were then presented to the Executive Field Action Decision Committee ("EFADC"), which decided on a course of action. The FPERC and EFADC could request further analysis before making recommendations or decisions as to what, if any, field action was warranted.

3

**2012.** Based on the information accessed and collected by the FPAE, the investigation sought, among other things, to determine whether there were known engineering reasons that would explain why certain reported non-deployment crashes involved 2007 and earlier model year Ion vehicles. In May 2012, the assigned FPAE studied a cross-section of steering columns and ignition switches from Chevrolet Cobalts, Chevrolet HHRs, Pontiac G5s, and Saturn Ions, in model years ranging from 2003 through 2010. The FPAE accessed, inspected, and tested these steering columns and ignition switches for torque performance at a salvage yard. Some of these ignition switches—including a number for model year 2004-2007 Ion and model year 2006-2008 HHR vehicles—exhibited torque performance below that specified by GM for the ignition switch. Because the Ion was discontinued after model year 2007, no Ion vehicles from later model years could be tested for torque performance.

The FPE investigation focused on determining the cause of these variations in torque performance by model year. A review of GM's records by those involved in the investigation did not identify design changes to the ignition switch that would explain the variations in torque performance for the 2007 and earlier model year vehicles and that of the 2008 and later model year vehicles, with the exception of the Ion which ceased production after the 2007 model year. GM also considered other components that might potentially influence the torque performance of the ignition switches, including changes made to the Cobalt's anti-theft system at the beginning of the 2008 model year. Again, no explanation was discovered. GM engineers conducted separate studies using the "Red X" and "Design for Six Sigma" problem-solving methodologies, in hopes of better understanding the differences in observed torque performance, but those, too, produced inconclusive results. These latter studies were concluded in November 2012 and January 2013, respectively.

The FPAE collected some data relating to certain Saturn Ion crashes in which airbags did not deploy and where injuries occurred, and discussed the data with at least one other investigator to evaluate whether the ignition switch in Ion vehicles may have caused or contributed to airbag non-deployment. This analysis identified two crashes involving Ion vehicles—from model years 2005 and 2007—in which the FPAE concluded that the ignition switch torque performance could potentially have resulted in airbag non-deployment upon frontal impact. These two crashes did not result in fatalities.

**2013.** In late April 2013, the FPAE learned that the torque performance of a GM service part ignition switch purchased after 2010 differed substantially from that of an ignition switch that was original equipment installed on a 2005 Cobalt. He also learned that others had observed and documented that the detent plunger and spring used on the service part switch differed from those used on the original equipment switch installed on the 2005 Cobalt. Shortly thereafter, GM retained outside engineering resources to conduct a comprehensive ignition switch survey and assessment. That investigation included torque performance testing, ignition switch teardowns, and x-ray analyses of ignition switches in used production vehicles both before and after the 2007 model year. The data gathered by GM's outside technical expert showed that: the ignition switches that he tested that had been installed in early-model Ion and Cobalt vehicles did not meet GM's torque specification; changes had been made to the ignition switch's detent plunger and spring several years after the start of production; and those changes most likely explained the variation from GM's specifications for torque performance observed in the original switches installed in 2007 and earlier model year vehicles.

4

On October 29, 2013, after dialogue with the supplier, GM was provided with supplier records showing that changes had in fact been made to the detent plunger and spring late in the 2006 calendar year. Those changes increased the switch's torque performance. Testing and analysis further determined that whether a key moves from the "run" to "accessory" position and how that key movement affects airbag deployment depends on a number of factors, including: vehicle steering inputs and path of travel immediately before key movement; the weight and load on the key ring immediately before key movement; whether the installed ignition switch meets the torque specifications that GM provided to its supplier; and the timing of the movement of the key out of the "run" position relative to the activation of the airbag's sensing algorithm of the crash event.

Upon completion of this analysis, the issue was presented to the Field Performance Evaluation Review Committee ("FPERC") and the Executive Field Action Decision Committee ("EFADC"). These two committees reviewed the findings in early December, culminating in an EFADC meeting on December 17, 2013. Factual questions were raised at that meeting that required further analysis, the findings of which were presented at a second EFADC meeting on January 31, 2014, on which date the EFADC directed a safety recall of the Chevrolet Cobalt and Pontiac G5 for model years 2005 through 2007.

As part of the FPE analysis, PowerPoint documents were prepared for purposes of presenting the investigative findings and recommendation to the EFADC on December 17, 2013, and January 31, 2014. The PowerPoint documents reflect the fact that the EFADC was asked to consider a proposed recall of only the Cobalt and G5 vehicles. The members of the EFADC received a primary slide deck in advance of the meeting. For these two meetings, a "backup" slide deck was prepared so that additional slides could be presented, as necessary, in order to respond to questions posed by EFADC members. The primary slide decks for these meetings include information relating to the FPAE's examination of the Ion and HHR vehicles and the results of field testing of vehicles' ignition switch torque performance, which reflected a number of model year 2004-2007 Ion and model year 2006-2008 HHR vehicles that were below GM specifications. The "backup" decks for these two meetings also include information relating to the FPAE's examination of key insert claims data for the Ion, HHR and Solstice vehicles, and proffered differences between the Cobalt, Ion and HHR vehicles that could explain a perceived absence of the recall condition in the Ion and HHR vehicles. These documents do not contain any information relating to the Sky vehicles. The "backup" slide decks also included factual material relating to other vehicles, including: (1) a chart, which in part reflects "Ignition Switch Position from SDM Download – Airbag Non-Deployment Incidents," and which identifies two crashes involving Ion vehicles—from model years 2005 and 2007—in which the ignition switch torque performance could potentially have resulted in airbag non-deployment upon frontal impact (also referred to as "unconfirmed reports")[1] and a statement that there were no such incidents for the HHR; (2)the review of Vehicle Owner Questionnaires ("VOQ's") for Ion and HHR vehicles; (3) photographs comparing the steering columns in Ion and Cobalt vehicles; and (4) a copy of the April 26, 2006 document approving changes to the ignition switch proposed by the supplier. It is not clear which of the backup slides were reviewed during these two meetings.

_____

[1] These two crashes did not result in fatalities.

5

The submissions to the EFADC did not propose a recall of the Ion, HHR, Solstice and Sky vehicles. The data collected by the FPAE did not include the crashes involving model year 2004 Ion vehicles that resulted in fatalities in which the recall condition may have caused or contributed to the airbags' non-deployment. As stated above, these crashes have since been identified. GM has provided copies of these PowerPoint documents to NHTSA.

**2014.** Additional analyses were conducted in February 2014 relating specifically to the Ion, HHR, Solstice and Sky vehicles. These analyses included a collection and review of data regarding crashes involving these vehicles and allegations of airbag non-deployment. The analyses also included a search for and review of FPR and PRTS reports relating to these vehicles, regardless of model year; a number of these, initiated in 2003 and 2006, addressed complaints of stalling in Ion vehicles.[2] One report initiated in 2001, during pre-production development of the Ion, addressed an issue relating to the ignition switch's "passlock" system. The report stated that the causes of the problem included "low detent plunger force" in the ignition switch, and stated that an ignition switch design change had resolved the problem. A 2003 report documented an instance in which the service technician observed a stall while driving, noted that "[t]he owner had several keys on the key ring," and stated that "[t]he additional weight of the keys had worn out the ignition switch." In that instance, the technician replaced the ignition switch and the FPR was closed. Other reports primarily addressed customer complaints of not being able to start their Ions' engines, but the warranty and technical assistance data collected in support of these reports included complaints of stalling.

An EFADC meeting was held on February 24, 2014, on which date the EFADC directed a safety recall of the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, Saturn Ion for model years 2003 through 2007, and the Saturn Sky for model year 2007.

The dealers are to replace the ignition switch. GM provided dealers notification of the recall on February 26, 2014 and March 4, 2014. GM will be providing a recall service bulletin to dealers on or about April 7, 2014. GM mailed the owner letters on March 10 and 11, 2014. Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on or before ten days after the owner mailing is completed.

Based on the data and information collected, reviewed, and analyzed to date, GM has identified eight frontal-impact crashes in the United States involving 2003 to 2007 model year Saturn Ion vehicles in which the recall condition may have caused or contributed to the airbags' non-deployment. Of these eight crashes, GM is currently aware of four involving the Saturn Ion that resulted in four fatalities (all of which involved 2004 model year vehicles) and six injuries of frontal occupants (which involved 2004, 2005, 2006 & 2007 model year vehicles). GM is currently aware of three frontal-impact crashes in the United States involving 2006 to 2007 model year Chevrolet HHR vehicles in which the recall condition may have caused or contributed to the airbags' non-deployment. These three crashes resulted in three injuries to frontal occupants. GM

---

[2] GM is prepared to share with NHTSA upon request the PRTS and FPR reports referenced in this document.

6

is not currently aware of any frontal-impact crashes in the United States involving 2006-2007 model year Pontiac Solstice or 2007 model year Saturn Sky vehicles in which the recall condition may have caused or contributed to the airbags' non-deployment. It is important to emphasize that GM continues to review data and information relating to the recalled vehicles in order to evaluate, among other things, whether there were any other crashes involving the recalled vehicles in which the recall condition may have caused or contributed to the airbags' non-deployment.

GM employees became aware of most of the aforementioned crashes within two weeks of the dates on which they occurred. As GM learned of these crashes, employees undertook to investigate the underlying facts and circumstances to determine, among other things, why the airbags had not deployed. Throughout this period, GM was involved in claims and lawsuits with respect to the Ion and HHR vehicles where the non-deployment of airbags may have been caused by the ignition switch condition. These eleven crashes in the United States are out of a total U.S. population of 748,024 vehicles subject to the Ion, HHR, Solstice and Sky recall. GM's review of data and information relating to the recalled vehicles continues.

7

4:14-cv-11197-MAG-DRG    Doc # 1-3 / Filed 03/23/14    Pg 1 of 9    Pg ID 61

# EXHIBIT D

14V-047
(8 pages) - Amended

**GM** **GENERAL MOTORS LLC**
Vehicle Safety and Crashworthiness

**RECEIVED**
By Recall Management division at 9:39 am, Feb 25, 2014

February 24, 2014

Ms. Nancy Lewis
Associate Administrator for Enforcement
National Highway Traffic Safety Administration
Recall Management Division (NVS-215)
1200 New Jersey Avenue, SE – Room W45-306
Washington, DC 20590

Re: NHTSA Notification Campaign No. 14V-047

Dear Ms. Lewis:

This letter supersedes General Motors' letter of February 7, 2014, and is submitted pursuant to the requirements of 49 CFR 573.6 as it applies to a determination by General Motors to conduct a safety-related recall for 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles. Specifically, the information submitted pursuant to 49 CFR 573.6(c)(5) and 573.6(c)(6) below supersedes information included in General Motors' letter of February 7, 2014.

573.6(c)(1): General Motors Company; Chevrolet and Pontiac Brands.

573.6(c)(2),(3),(4): This information is shown on Attachment A.

573.6(c)(5): General Motors has decided that a defect which relates to motor vehicle safety exists in 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles. The ignition switch torque performance may not meet General Motors' specification. If the torque performance is not to specification, the ignition switch may unintentionally move from the "run" position to the "accessory" or "off" position with a corresponding reduction or loss of power. This risk may be increased if the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event. The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

Until the recall repairs have been performed, it is <u>very</u> important that customers remove all items from their key rings, leaving only the vehicle key. The key fob (if applicable), should also be removed from the key ring.

573.6(c)(6): As permitted by the provisions of 49 C.F.R. 573.6(b), and pursuant to the requirements of 49 C.F.R. 573.6(c)(6), General Motors now submits the attached chronology of principal events that were the basis for the determination that the defect related to motor vehicle safety. <u>See</u> Attachment B. This chronology refers to numerous engineering

Mail Code: 480-210-2V1
30001 Van Dyke Road • Warren, MI 48090-9020
N130454 573 Letter Revised.docx



Letter to Ms. Nancy Lewis
N130454 573 Letter
February 24, 2014
Page 2

inquiries, known within General Motors as Problem Resolution Tracking System ("PRTS")
inquiries. As stated in the enclosed document, General Motors is prepared to share with
NHTSA upon request the PRTS reports referenced therein, as well as other documentation
related to this recall.

573.6(c)(8): Dealers are to replace the ignition switch.

GM will provide the dealer bulletin and owner letter mail dates when available.

Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on
or before ten days after the owner mailing is completed, according to the plan submitted on
May 23, 2013.

573.6(c)(10): GM will provide copies of the dealer bulletin and owner letter under separate
cover.

573.6(c)(11): GM's assigned recall number is 13454.

Sincerely,

M. Carmen Benavides, Director
Product Investigations and Safety Regulations

13454
Attachments

Attachment A - 573.6(c)(2),(3),(4)

VEHICLES POTENTIALLY AFFECTED BY MAKE, MODEL, AND MODEL YEAR
PLUS INCLUSIVE DATES OF MANUFACTURE

| MAKE | MODEL SERIES | MODEL YEAR | NUMBER INVOLVED | INCLUSIVE MANUFACTURING DATES (FROM) | (TO) | DESCRIPTIVE INFO. TO PROPERLY IDENT. VEH. | EST. NO. W/CONDITION |
|------|--------------|------------|-----------------|-------------------------------------|------|-------------------------------------------|----------------------|
| Chevrolet | A | 2005 | 140,978 | 08/03/2004 | 06/17/2005 | Cobalt | * |
| Chevrolet | A | 2006 | 229,578 | 04/05/2005 | 06/09/2006 | Cobalt | * |
| Chevrolet | A | 2007 | 215,667 | 04/20/2006 | 08/16/2007 | Cobalt | * |
| Pontiac | A | 2007 | 32,899 | 04/20/2006 | 08/06/2007 | G5 | * |
| | GM Total: | | 619,122 | | | | |

* All involved vehicles will be corrected as necessary.

573.6(c)(2)(iv):    Delphi Packard Electrical/Electronic Architecture
5725 Delphi Drive
M/C 483.400.301
Troy, Michigan 48098

Tel: [1] 248.813.2334
Fax: [1] 248.813.2333

The involved parts are manufactured in Mexico.

13454

## ATTACHMENT B - 573.6(c)(6)

**2004.** Around the time of the launch of the 2005 Chevrolet Cobalt, GM learned of at least one incident in which a Cobalt lost engine power because the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. GM employees were able to replicate this phenomenon during test drives. An engineering inquiry, known within GM as a Problem Resolution Tracking System inquiry (hereinafter "PRTS"), was opened to investigate the issue.[1] Engineers believed that low key cylinder torque effort was an issue and considered a number of potential solutions. After consideration of the lead time required, cost, and effectiveness of each of these solutions, the PRTS was closed with no action.

**2005.** GM employees received new field reports of Cobalts losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. Further PRTS's were opened to re-assess this issue. During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration. That proposal was initially approved, but later cancelled. The PRTS process led to GM's issuing an Information Service Bulletin 05-02-35-007 in December 2005. This Service Bulletin provided "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs," and applied to 2005-06 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-06 Pontiac Pursuits (Canada only), 2006 Pontiac Solstices, and 2003-06 Saturn Ions. These vehicles were all equipped with the same ignition switch. The Service Bulletin informed dealers that: "there is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort"; "[t]he concern is more likely to occur if the driver is short and has a large and/or heavy key chain"; and "the customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain." In addition, the Service Bulletin advised that "Engineering has come up with an insert for the key ring so that it goes from a 'slot' design to a hole design. As a result, the key ring cannot move up and down in the slot any longer—it can only rotate on the hole." The Service Bulletin further stated that, "[i]n addition, the previous key ring has been replaced with a smaller, 13 mm design. This will result in the keys not hanging as low as in the past."

Certain of the reported incidents that pre-dated GM's issuance of Service Bulletin 05-02-35-007 and GM's public response to inquiries about those incidents were chronicled in newspaper articles that appeared in the *NEW YORK TIMES,* the *CLEVELAND PLAIN DEALER,* and *THE DAILY ITEM* (Sunbury, PA). GM concluded in December 2005 that the Service Bulletin and field service campaign was the appropriate response to the reported incidents, given that the car's steering and braking systems remained operational even after a loss of engine power, and the car's engine could be restarted by shifting the car into either neutral or park.

GM updated the Service Bulletin in October 2006 to include additional vehicles and model years—specifically, the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007

---

[1] GM is prepared to share with NHTSA upon request the PRTS reports referenced in this document.

Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky.[2] GM's warranty records indicate that GM dealers have provided key inserts to 474 customers who brought their vehicles into dealers for service.

**2006.** On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

A PRTS was opened on August 1, 2006, after a customer complained of stalling after the car's ignition switch had been replaced. This PRTS indicated that the condition could not be duplicated after more than 100 miles of driving and the PRTS was canceled on October 2, 2006.

**2007.** On March 29, 2007, a group of GM employees met with NHTSA representatives in Washington, D.C. to discuss occupant restraint systems. During this meeting, a NHTSA representative informed the GM employees of a fatal crash that occurred on July 29, 2005, in which a 2005 Cobalt was involved in a frontal collision, the airbags did not deploy, and data retrieved from the car's sensing and diagnostic module ("SDM") indicated that the car's power mode status was "accessory" (hereinafter "the July 29, 2005 crash"). While GM Legal Staff opened a file relating to this crash in September 2005, the GM employees meeting with NHTSA on this occasion were not aware of the crash at the time of the meeting. After this meeting, a GM investigating engineer was tasked with tracking crashes in which Cobalts were involved in frontal impacts and the airbags did not deploy, in order to try to identify common characteristics of these crashes. By the end of 2007, GM had notice of ten such incidents. SDM data was available for nine of the ten crashes, and that data showed that the ignition was in the "run" position in five of the crashes and in the "accessory" position in four of the crashes.

**2009.** In February 2009, another PRTS was opened and resulted in the top of the key being changed from a "slot" design to a "hole" design. According to the PRTS, "[c]ustomers with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off. Changing from a slot to a hole will significantly reduce downward force and the likelihood of this occurrence." This key design change was implemented in model year 2010 Cobalts.

On or about May 15, 2009, several GM engineers met with representatives of Continental, the supplier of the SDMs used in the Cobalt. In the fourteen frontal-impact crashes for which SDM data was then available, the ignition was recorded in "run" for seven of the crashes and in the "accessory" position for the other seven. Prior to this meeting, GM had provided Continental with

---

[2] GM's records contain references to a second update of the Service Bulletin in July 2011, which covered the same models and model years as the first update in October 2006. However, upon investigation, GM believes that the Service Bulletin was not updated in July 2011.

two SDMs from crashes involving a 2005 Cobalt and a 2006 Cobalt in which the airbags had not deployed and the SDM data indicated that the car's ignition switch was in the "run" position at the time of the crash. During this meeting, Continental representatives informed the GM engineers that, according to further stored data inaccessible to GM engineers but retrieved by Continental, the SDM's sensing algorithm had been disabled at the time of the crash, and discussed reasons why this may have happened. Although GM engineers had identified other crashes in which airbags had not deployed and the ignition switch was recorded in the "run" position at the time of the crash, GM engineers were not able to obtain the SDMs from the vehicles involved in these crashes for further interrogation by Continental.

**2010.** During the summer of 2010, GM discontinued production of the Cobalt at the end of the 2010 model year, as previously planned.

**2011.** In late July 2011, a meeting was held at GM involving Legal Staff, Field Performance Assessment ("FPA") and Product Investigations personnel who would be involved in the Field Performance Evaluation ("FPE") process. Soon thereafter, in August 2011, a Field Performance Assessment Engineer ("FPAE") was assigned to move forward with an FPE investigation of a group of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not deployed during frontal impacts.

Then as now, GM's FPE process consisted of several steps, beginning with investigation of the issue, then presentation of potential solutions to decision makers, and culminating in a decision and implementation of that decision. At the outset of the process, investigating engineers work to develop technical understanding of the issue. They then present their findings and proposed solutions to the Field Product Evaluation Recommendation Committee ("FPERC"). The FPERC's recommendations are then presented to the Executive Field Action Decision Committee ("EFADC"), which decides on a course of action. The FPERC and EFADC may request further analysis before making recommendations or decisions as to what, if any, field action is warranted.

GM's initial investigation of these crashes had revealed that the SDM data available from the involved vehicles showed that some of the ignitions were recorded as having been in the "run" position, while others were recorded as having been in either the "accessory" or "off" positions, at the time of the crash. Because many of the crashes known to GM at the time involved violent off-road impacts occurring under widely varying circumstances and because many involved excessive speeds, different theories had been offered as to why the airbags had not deployed in the various incidents. The assigned FPAE was asked to assess whether common issues or concerns might explain some or all of the non-deployment crashes.

**2012.** Based on the information then available, the investigation sought, among other things, to determine whether there were known engineering reasons that would explain why these reported non-deployment crashes involved 2007 and earlier model year vehicles. In May 2012, the assigned FPAE studied a cross-section of steering columns and ignition switches from Chevrolet Cobalts, Chevrolet HHRs, Pontiac G5s, and Saturn Ions, in model years ranging from 2003 through 2010. The FPAE accessed, inspected, and tested these steering columns and ignition switches for torque performance at a salvage yard. Certain of these ignition switches exhibited torque performance below that specified by GM for the ignition switch. The most prevalent shortfalls in performance

3

were observed on ignition switches found in 2007 and earlier model year vehicles. The FPE investigation focused on determining the cause of these variations in torque performance by model year. A review of GM's records by those involved in the investigation did not identify design changes to the ignition switch that would explain the variations in torque performance for the 2007 and earlier model year vehicles and that of the 2008 and later model year vehicles. GM also considered other components that might potentially influence the torque performance of the ignition switches, including changes made to the car's theft system at the beginning of the 2008 model year. Again, no explanation was discovered. GM engineers conducted separate studies using the "Red X" and "Design for Six Sigma" problem-solving methodologies, in hopes of better understanding the differences in observed torque performance, but those, too, produced inconclusive results. These latter studies were concluded in November 2012 and January 2013, respectively.

**2013.** In late April 2013, the FPAE learned that the torque performance of a GM service part ignition switch purchased after 2010 differed substantially from that of an ignition switch that was original equipment installed on a 2005 Cobalt. He also learned that others had observed and documented that the detent plunger and spring used on the service part switch differed from those used on the original equipment switch installed on the 2005 Cobalt. Shortly thereafter, GM retained outside engineering resources to conduct a comprehensive ignition switch survey and assessment. That investigation included torque performance testing, ignition switch teardowns, and x-ray analyses of ignition switches used in production vehicles both before and after the 2007 model year. The data gathered by GM's outside technical expert showed that: the ignition switches that he tested that had been installed in early-model Cobalts did not meet GM's torque specification; changes had been made to the ignition switch's detent plunger and spring several years after the start of production; and those changes most likely explained the variation from GM's specifications for torque performance observed in the original switches installed in 2007 and earlier model year vehicles.

On October 29, 2013, after dialogue with the supplier, GM was provided with supplier records showing that changes had in fact been made to the detent plunger and spring late in the 2006 calendar year. Those changes increased the switch's torque performance. Testing and analysis further determined that whether a key moves from the "run" to "accessory" position and how that key movement affects airbag deployment depends on a number of factors, including: vehicle steering inputs and path of travel immediately before key movement; the weight and load on the key ring immediately before key movement; whether the installed ignition switch meets the torque specifications that GM provided to its supplier; and the timing of the movement of the key out of the "run" position relative to the activation of the airbag's sensing algorithm of the crash event.

Upon completion of this analysis, the issue was presented to the Field Performance Evaluation Review Committee ("FPERC") and the Executive Field Action Decision Committee ("EFADC"). These two committees reviewed the findings in early December, culminating in an EFADC meeting on December 17, 2013. Factual questions were raised at that meeting that required further analysis, the findings of which were presented at a second EFADC meeting on January 31, 2014, on which date the EFADC directed a safety recall.

4

The dealers are to replace the ignition switch. GM will provide the dealer bulletin and owner letter mail dates when available. Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on or before ten days after the owner mailing is completed.

Between 2005 and the date of this submission, GM is currently aware of 23 frontal-impact crashes involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the recall condition may have caused or contributed to the airbags' non-deployment. During that same timeframe, of these crashes, GM is currently aware of six that resulted in eight fatalities of frontal occupants. GM employees became aware of many of these crashes within a month of the dates on which they occurred. As GM learned of these crashes, employees undertook to investigate the underlying facts and circumstances to determine, among other things, why the airbags had not deployed. With respect to 22 of the 23 frontal-impact crashes referenced above, the data retrieved from the vehicles' SDMs indicated that the ignition switches were in the "run" position in nine of the crashes, in the "accessory" position in twelve of the crashes, and in the "off" position in one of the crashes.[3] Throughout this period, GM was involved in claims and lawsuits in which allegations were made regarding the ignition switch issue that is the subject of the recall. These 23 crashes are out of a total U.S. population of 619,122 vehicles subject to the pending recall.

---

[3] In one of the 23 crashes referenced above, SDM information could not be retrieved from the vehicle.

5