# Exhibit R

Adam J. Levitt (to be admitted *pro hac vice*)
alevitt@gelaw.com
John E. Tangren (to be admitted *pro hac vice*)
jtangren@gelaw.com
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois 60602
Telephone: (312) 214-0000
Facsimile: (312) 214-0001

Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Isaac Miller (SBN 266459)
imiller@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698

Lance Cooper (to be admitted *pro hac vice*)
lance@thecooperfirm.com
THE COOPER FIRM
701 Whitlock Avenue, S.W.
Marietta, Georgia 30064
Telephone: (770) 427-5588
Facsimile: (770) 427-0010

Attorneys for Plaintiffs
*Additional Counsel Identified Below*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GALDINA MACIEL, DANIEL CORTEZ, CINDY WADE, ZACHARY DEWITT, ROBERTA CHERASO, DEMETRIUS SMITH, JENEE BYRD, ASUHAN LEYVA, JIM GRESIK, BARBARA ELLIS STEELE, MARIA RAYGOZA, BARBARA GRAY, and MICHELE BENNETT, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| GENERAL MOTORS, LLC, | |
| Defendant. | |

Class Action Complaint

1    Plaintiffs Galdina Maciel, Daniel Cortez, Cindy Wade, Zachary DeWitt, Roberta

2  Cheraso, Demetrius Smith, Jenee Byrd, Asuhan Leyva, Jim Gresik, Barbara Ellis Steele, Maria

3  Raygoza, Barbara Gray, and Michele Bennett (collectively, "Plaintiffs"), individually and on

4  behalf of the other members of the below-defined nationwide class and statewide classes they

5  respectively seek to represent (collectively, the "Class," unless otherwise identified herein), for

6  their Class Action Complaint (the "Complaint") allege against General Motors, LLC ("GM" or

7  "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other

8  matters upon information and belief, based upon the investigation made by the undersigned

9  attorneys, as follows:

10                              **NATURE OF THE CASE**

11    1.    Plaintiffs bring this class action seeking redress and remedy from GM on behalf

12  of themselves and the other Class members, each of whom purchased or leased one or more of

13  the following vehicles:  2005–2010 Chevrolet Cobalt, 2006–2007 Chevrolet HHR, 2006–2007

14  Pontiac Solstice, 2005–2007 Pontiac G5, 2003–2007 Saturn Ion, and 2007 Saturn Sky vehicles

15  (collectively, the "Defective Vehicles").

16    2.    Each of the Defective Vehicles contains a uniformly designed ignition switch,

17  which is substantially similar for all of the Defective Vehicles, with the key position of the lock

18  module on the steering column, and an ignition key with a slot for a key ring at the top

19  (hereinafter collectively referred to as the "Key System").  The Key System on these vehicles is

20  prone to fail during ordinary and foreseeable driving situations.[1]

21    3.    Specifically, GM has actual knowledge that, because of the way in which the Key

22  System was designed and integrated into the Defective Vehicles, the ignition switch can

23  suddenly fail during normal operation, cutting off engine power and certain electrical systems in

24

[1]  That all of the Defective Vehicles indeed have a common safety defect, and are of a
25  substantially similar design to one another in regard to their Key System, is evidenced by the fact
    that GM has identified these specific models (other than certain 2008-2010 Cobalt vehicles) for
26  recall for the same safety design defects.   *See* Exhibit A, GM Recall Letter (March 2014).
    Although GM contends that certain 2008-2010 Cobalt vehicles have different ignition switches,
27  these vehicles still have a defective Key System that is prone to fail during ordinary and
    foreseeable driving situations, making owners of these non-recalled vehicles, as well as owners
28  of recalled vehicles, proper Class members as well.

Class Action Complaint                        1

1  the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other

2  vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.[2]

3      4.    The Key System defects in the Defective Vehicles have been linked to at least

4  thirty-one crashes and thirteen deaths,[3] and GM has recognized that the Key System poses an

5  "increase[ed] risk of injury or fatality" to occupants because the ignition switch may move out of

6  the "run" position during operation.[4]

7      5.    Although GM has, and has had, actual knowledge of safety defects in the Key

8  System in the Defective Vehicles for years, it fraudulently concealed and continues to

9  fraudulently conceal material facts regarding the extent and nature of safety defects in the

10  Defective Vehicles and what must be done to remedy the defects in the Key System.

11      6.    In fact, GM has not only fraudulently concealed material facts relating to the

12  safety defects in the Key System in the Defective Vehicles for years, but it has also made

13  affirmative fraudulent and misleading statements, and it is continuing to make fraudulent and

14  misleading statements to the public and the Class regarding the nature and extent of the safety

15  defects in the Key System in the Defective Vehicles.

16      7.    While GM has initiated a recall of identified vehicles in which it acknowledges a

17  defect with the ignition switch itself, it knows – *and its own engineering documents reflect* –

18  that the defects transcend just the ignition switch and also include the placement of the ignition

19  switch, a lack of adequate protection of the ignition switch from forces of inadvertent driver

20  contact, and the use of a different type of key.  To fully remedy the problem and render the

21  Defective Vehicles safe and of economic value to their owners again, additional design elements

22  beyond a new ignition switch are needed.

23

24  [2] *See* Exhibit A, GM Recall Letter.

25  [3]  These numbers of crashes and deaths are taken from the GM Recall letter, but news reports
    have suggested the numbers of crashes and deaths associated with the Key System defects in the
26  Defective Vehicles likely is much higher.  *See, e.g.*, March 13, 2014 letter from the Center for
    Auto Safety to David J. Friedman, Acting Administrator, NHTSA, available at:
27  http://www.cbsnews.com/htdocs/pdf/Friedman_Letter_March_13_2014_Full.pdf (last visited
    March 21, 2014).

28  [4] *See id.*

8.  The fact that GM has, to date, issued a partial recall despite knowing the insufficiency thereof underscores GM's ongoing fraudulent concealment and fraudulent misrepresentation of the nature and extent of the defects, and makes this class action even more important to obtaining a proper remedy for Plaintiffs and the other Class members.

9.  GM's defective Key System design, combined with GM's past and ongoing failure to adequately warn of, or remedy, that design, and its past and ongoing fraudulent concealment and/or fraudulent misrepresentations of the full nature and extent of the defects in that design in the Defective Vehicles, has proximately caused and continues to cause Plaintiffs and the other Class members to suffer economic damages because they purchased or leased vehicles that: (a) have diminished value as they presently exist because the Key System cannot be operated safely without fear of a catastrophic event; and (b) require modification of the Key System, beyond that included in the recent GM recall of the Defective Vehicles, to be operated safely or sold to other buyers, as demonstrated by GM's own internal documents that have not been disclosed to the general public (but that are discussed below).

10.  Through this action, Plaintiffs, individually and on behalf of the other Class members, seek injunctive relief in the form of a repair to fully remedy the defects in the Key System such that the Defective Vehicles have their economic value restored and can be operated safely and/or damages to compensate them for the diminished value of their Defective Vehicles as a result of the defects and GM's wrongful conduct related to same.

## JURISDICTION AND VENUE

11.  This court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).  Plaintiffs allege and believe that the aggregate claims of the Class exceed $5,000,000 exclusive of interest and costs.  There are more than 100 Class members, and more than two-thirds of the Class is diverse from GM.

12.  This Court has personal jurisdiction over GM because GM's contacts with the State of California are systematic, continuous, and sufficient to subject it to personal jurisdiction in this Court.

13.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred within this District, and because Plaintiff Maciel is a resident of Sonoma County, California, which is in this District.

### Intradistrict Assignment

14.     Consistent with Northern District of California Local Rule 3-5(b), assignment to the San Francisco or Oakland Division is appropriate under Civil Local Rules 3-2(c) and 3-2(d), because acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District, in Sonoma County, California.

### PARTIES

### Plaintiffs

15.     Plaintiff Galdina Maciel is a citizen of California, and a resident of Santa Rosa, which is in Sonoma County, California.

16.     Plaintiff Maciel owns a 2010 Chevrolet Cobalt.

17.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Cobalt used on June 14, 2012 from Team Chevrolet in Vallejo, California. She paid $13,718 for the vehicle, not knowing that, as sold, it was defective.

18.     On or around December 2013 or January 2014, while Plaintiff Maciel was driving her Cobalt, suddenly, and without warning, it locked up. After this incident, concerned about this issue, Plaintiff Maciel let her Cobalt sit at her home for an extended period.

19.     GM should have disclosed the Key System defects when Plaintiff Maciel purchased the vehicle. Plaintiff Maciel would not have purchased the vehicle had she known of the defects.

20.     Plaintiff Daniel Cortez is a citizen of California, and a resident of Downey, which is in Los Angeles, California.

21.     Plaintiff Cortez owns a 2007 Chevrolet Cobalt.

---

Class Action Complaint                                           4

22.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left him without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Cortez purchased her Cobalt new from a Chevrolet dealership in Garden Grove, California.

23.     Plaintiff Cortez trusted GM to make a safe car. During the past seven years, her Cobalt has suddenly stopped on the freeway a number of times and her airbag light keeps going off. GM should have disclosed the Key System defects when Plaintiff Cortez purchased the vehicle. Plaintiff Cortez would not have purchased the vehicle had she known of the defects.

24.     Plaintiff Cindy Wade is a citizen of Arkansas, and a resident of Hot Springs, which is in Garland County, Arkansas.

25.     Plaintiff Wade owns a 2008 Chevrolet Cobalt.

26.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Wade purchased her Cobalt used in September 2009 from Teeter Chevrolet in Hot Springs. She paid approximately $15,000 for the vehicle, not knowing that, as sold, it was defective.

27.     GM should have disclosed the Key System defects when Plaintiff Wade purchased the vehicle. Plaintiff Wade is concerned about the defects, and as a result, she would not have purchased the vehicle had she known of the defects.

28.     Plaintiff Zachary DeWitt is a citizen of Missouri, and a resident of Sedalia, which is in Pettis County, Missouri.

29.     Plaintiff DeWitt owns a 2010 Chevrolet Cobalt.

30.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left him without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff DeWitt purchased his Cobalt used in mid-October from Town and Country Motors in Sedalia, Missouri. He paid $13,000 for the vehicle, not knowing that, as sold, it was defective.

31. Plaintiff DeWitt has experienced problems with the Key System in his Cobalt. GM should have disclosed the Key System defects when Plaintiff DeWitt purchased the vehicle. Plaintiff DeWitt would not have purchased the vehicle had he known of the defects.

32. Plaintiff Roberta Cheraso is a citizen of Ohio, and a resident of Chardon, which is in Geauga County, Ohio.

33. Plaintiff Cheraso owned a 2005 Chevrolet Cobalt.

34. Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Cobalt new on or around May 2005 from Classic Chevrolet in Mentor, Ohio, not knowing that, as sold, it was defective.

35. Plaintiff Cheraso experienced problems with the Key System in her Cobalt. Beginning in 2009, Plaintiff Cheraso had problems starting her vehicle. On January 31, 2014, the ignition control module in Plaintiff Cheraso's Cobalt was replaced.

36. On February 3, 2014, Plaintiff Cheraso traded her Cobalt in at Adventure Subaru in Painesville, Ohio. GM should have disclosed the Key System defects when Plaintiff Cheraso purchased the vehicle. Plaintiff Cheraso would not have purchased the vehicle had she known of the defects.

37. Plaintiff Demetrius Smith is a citizen of Texas, and a resident of Dallas, which is in Dallas County, Texas.

38. Plaintiff Smith owns a 2003 Saturn Ion.

39. Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Ion used on or around June 2012 from J&M Automotive in Richardson, Texas, and she paid approximately $4,000 for the vehicle, not knowing that, as sold, it was defective.

40. Plaintiff Smith's daughter experienced problems with the Key System in her Ion. On or around February 2014, Plaintiff Smith's daughter was driving from Austin Texas and the

1     car suddenly shut down on the freeway. Plaintiff Smith received a recall letter from GM, but the

2     parts are not yet available. GM should have disclosed the Key System defects when Plaintiff

3     Smith purchased the vehicle. Plaintiff Smith would not have purchased the vehicle had she

4     known of the defects.

5          41.    Plaintiff Jenee Byrd is a citizen of Louisiana, and a resident of Baton Rouge,

6     which is in East Baton Rouge Parish, Louisiana.

7          42.    Plaintiff Byrd owns a 2010 Chevrolet Cobalt.

8          43.    Induced by GM's fraudulent concealment and misrepresentations about the

9     existence of a defect of the severity and extent of defects, which left her without knowledge of

10     the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff

11     purchased her Cobalt used from a Kia dealership in Baton Rouge. She paid approximately

12     $16,000 for the vehicle, not knowing that, as sold, it was defective.

13          44.    GM should have disclosed the Key System defects when Plaintiff Byrd purchased

14     the vehicle. Plaintiff Byrd is concerned about the defects, and as a result, she would not have

15     purchased the vehicle had she known of the defects.

16          45.    Plaintiff Asuhan Leyva is a citizen of Illinois.

17          46.    Plaintiff Leyva owns a 2007 Chevrolet Cobalt.

18          47.    Induced by GM's fraudulent concealment and misrepresentations about the

19     existence of a defect of the severity and extent of defects, which left her without knowledge of

20     the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff

21     Leyva purchased her Cobalt not knowing that, as sold, it was defective.

22          48.    Paintiff Leyva experienced problems with the Key System in her Cobalt. GM

23     should have disclosed the Key System defects when Plaintiff Leyva purchased the vehicle.

24     Plaintiff Leyva would not have purchased the vehicle had she known of the defects.

25          49.    Plaintiff Jim Gresik is a citizen of Illinois.

26          50.    Plaintiff Gresik owns a 2004 Saturn Ion 2.

27          51.    Induced by GM's fraudulent concealment and misrepresentations about the

28     existence of a defect of the severity and extent of defects, which left her without knowledge of

the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Gresik purchased his Saturn Ion 2 not knowing that, as sold, it was defective.

52.     Plaintiff Gresik experienced problems with the Key System in his Saturn Ion 2. GM should have disclosed the Key System defects when Plaintiff Gresik purchased the vehicle. Plaintiff Gresik would not have purchased the vehicle had he known of the defects.

53.     Plaintiff Barbara Ellis Steele is a citizen of Illinois.

54.     Plaintiff Ellis Steele owns a Chevrolet Cobalt.

55.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Ellis Steele purchased her Cobalt not knowing that, as sold, it was defective.

56.     Plaintiff Ellis Steele experienced problems with the Key System in her Cobalt. GM should have disclosed the Key System defects when Plaintiff Ellis Steele purchased the vehicle. Plaintiff Ellis Steele would not have purchased the vehicle had she known of the defects.

57.     Plaintiff Maria Raygoza is a citizen of Illinois.

58.     Plaintiff Raygoza owns a 2007 Chevrolet HHR.

59.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Raygoza purchased her HHR not knowing that, as sold, it was defective.

60.     Plaintiff Raygoza experienced problems with the Key System in her HHR. GM should have disclosed the Key System defects when Plaintiff Raygoza purchased the vehicle. Plaintiff Raygoza would not have purchased the vehicle had she known of the defects.

61.     Plaintiff Barbara Gray is a citizen of Vermont, and a resident of Brownsville, which is in Windsor County, Vermont.

62.     Plaintiff Gray owns a 2006 Saturn Ion.

Class Action Complaint                          8

63.    Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Ion used on or around October 2013. Plaintiff Gray purchased the Ion for her daughter to use. She paid approximately $2,200, not knowing that, as sold, it was defective.

64.    In the past fifteen months, Plaintiff Gray's Ion shut down approximately fifteen times. Plaintiff Gray's Ion has lost power steering many times as a result. Plaintiff Gray is concerned about the safety of her Ion. GM should have disclosed the Key System defects when Plaintiff Gray purchased the vehicle. Plaintiff Gray would not have purchased the vehicle had she known of the defects.

65.    Plaintiff Michele Bennett is a citizen of Georgia, and a resident of Woodstock, which is in Cherokee County, Georgia.

66.    Plaintiff Bennett owns a Defective Vehicle.

67.    Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Bennett purchased her Defective Vehicle on July 14, 2007. She paid $20,319.84 for the vehicle, not knowing that, as sold, it was defective. GM should have disclosed the Key System defects when Plaintiff Bennett purchased the vehicle. Plaintiff Bennett would not have purchased the vehicle had she known of the defects.

68.    Plaintiff Bennett experienced problems with the Key System in her Defective Vehicle. GM, however, failed to disclose the Key System defects to Plaintiff when she purchased the vehicle. Plaintiff paid GM the purchase price of the vehicle as a result of GM's fraud, and at that point, and now, owns a vehicle bought because of GM's concealment and fraud without knowledge that it was dangerous to operate.

**Defendant**

69.    GM is a Delaware limited liability company doing business in all fifty states (including the District of Columbia) with its principal place of business in Detroit, Michigan.

70.    GM, which is the successor GM entity resulting from the GM chapter 11 bankruptcy proceeding, contractually assumed liability for the claims in this lawsuit. The Defective Vehicles were originally designed, manufactured, marketed, and distributed into the stream of commerce by GM's predecessor, General Motors Corporation (sometimes referred to as "old GM"). General Motors Corporation filed for bankruptcy in 2009. In July 2009, the bankruptcy court approved the sale of General Motors Corporation to NGMCO, Inc., which was converted into Defendant General Motors, LLC (sometimes referred to as "new GM").

71.    The sale of old GM to new GM was reduced to an Amended and Restated Master Sale and Purchase Agreement ("the Agreement"), which includes definitions of "Purchased Assets" by new GM as well as "Liabilities" and "Assumed Liabilities" of new GM, the defendant here.

72.    As demonstrated by the fact that Defendant GM (a/k/a "new GM") has initiated and is conducting a recall of the Defective Vehicles (albeit an incomplete recall, as described herein), it is legally responsible for those vehicles still on the road and recognizes that it is responsible for those vehicles despite old GM's bankruptcy.

73.    Of particular relevance to this action, the "Purchased Assets" of new GM in the Amended and Restated Master Sale and Purchase Agreement include:

> (viii) all inventories of *vehicles*, raw materials, work-in-process, *finished goods*, supplies, stock, parts, packaging materials and other accessories related thereto (collectively, "Inventory"), *wherever located*, including any of the foregoing in the possession of manufacturers, suppliers, *customers*, dealers or others and any of the foregoing in transit or that is classified as returned goods; . .

> (xiv) *all* books, records, ledgers, *files*, *documents*, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (*in whatever form or medium*), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and

marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

Amended and Restated Master Sale and Purchase Agreement at Section 2.2 "Purchased and Excluded Assets" (Emphasis added).

74.     Thus, new GM, the Defendant here, is the owner of all "vehicles" and "finished goods" (such as cars) of old GM, "wherever [they are] located," and including any such vehicles or finished goods in the "possession of" "customers." In other words, the Defective Vehicles in the possession of GM customers were and are a "Purchased Asset" of Defendant GM under the Agreement.

75.     Under the Agreement, Defendant GM is also the owner of all of old GM's documents and has knowledge thereof. The contents of those documents are properly attributable or imputable to Defendant GM. Thus, notice of defects contained in documents of "old GM" is imputable to, attributable to, and part of, Defendant GM's composite knowledge as a corporation.

76.     Under the Agreement, Defendant GM not only "Purchased Assets," but "Assumed Liabilities," which included "all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing." (As previously noted, the vehicles in possession of customers are included as a "Purchased Asset," as defined by the Agreement.)

77.     Under the Agreement, "Liabilities" was a defined term meaning "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

Class Action Complaint                          11

78.     The claims in this case fall within the broad definition of "Liabilities" contained in the Agreement and, further, they arise out of, relate to, and are in connection with a "Purchased Asset" of Defendant GM – to wit, they are claims related to the Inventory of vehicles in the possession of GM customers, which includes the Defective Vehicles and, in particular, Plaintiffs' and the other Class members' vehicles.

79.     There is no provision in the Agreement that specifically releases or states that Defendant GM excluded liabilities for fraud, fraudulent concealment, or for a failure to continue to warn or act to remedy known defects which cause economic harm to consumers after closing.

80.     Second, in addition to Defendant GM's liability based on the Agreement, to Plaintiffs' knowledge and belief, Defendant GM, after completing the purchase of old GM, continued to utilize the substantially same brand names, logos, plants, offices, and a majority of the same leadership, personnel, engineers and employees, as old GM, such that it is liable under theories of successor liability in addition to, or in the alternative to, other bases of liability.

81.     Third, regardless of the prior bankruptcy, the Agreement, or any other prior events related to old GM, Defendant GM is liable for its own conduct. From its inception in 2009, new GM has had its own independent knowledge of defects in the Defective Vehicles and the need for multiple design steps to be undertaken to fully resolve those defects to as to prevent injury and economic harm to owners of GM vehicles.

82.     For all of these reasons, and others to be confirmed or which may emerge during the course of discovery, Defendant GM is the proper party against whom to assert the claims herein, and Plaintiff and the class will use the term "GM" from this point forward in the Complaint to refer collectively to both GM entities.

## FACTUAL BACKGROUND

### The Defective Vehicles Have Common Defects in their Key Systems, and GM Knew of these Defects for at Least a Decade and Concealed them

83.     In 2001, during developmental testing of the 2003 Saturn Ion, GM learned that the engines in those cars were stalling due to defects in the Key System therein. GM chose not

---

Class Action Complaint                     12

1   to fix these defects. Instead, in 2002, GM began manufacturing and selling 2003 Saturn Ions

2   with the defective Key System.

3       84.    In 2004, GM engineers reported that the ignition switch on the Saturn Ion was so

4   weak and so low on the steering column that the driver's knee could easily bump the key and

5   turn off the car.

6       85.    This defect was sufficiently serious for a GM engineer, in January 2004, as part of

7   GM's vehicle evaluation program, to affirmatively conclude, in writing, that "[t]his is a basic

8   design flaw and should be corrected if we want repeat sales."

9       86.    In 2004, GM began manufacturing and selling the 2005 Chevrolet Cobalt. The

10  Cobalt was a sister vehicle (essentially the same car with a different badge or name) to the Saturn

11  Ion. GM installed the same Key System on the 2005 Cobalt as it did on the Saturn Ion.

12      87.    On October 29, 2004, around the time of GM's market launch of the 2005 Cobalt,

13  Gary Altman – GM's program-engineering manager for the Cobalt – test drove the Cobalt with

14  the standard key and key fob. During the test drive, when Altman's knee bumped the key, the

15  engine turned off, causing the engine to stall. Altman reported this incident to GM.

16      88.    In response to Altman's report, GM launched an engineering inquiry to

17  investigate the potential for the key to move from the "run" to the "accessory/off" position

18  during ordinary driving conditions. This inquiry is known within GM as a Problem Resolution

19  Tracking System Inquiry ("PRTS").

20      89.    On February 1, 2005, as part of the PRTS, GM engineers concluded:

21          There are two main reasons that [sic] we believe can cause a lower
            effort in turning the key: 1. A low torque detent in the ignition
22          switch. 2. A low position of the lock module in the column.
            (PRTS – Complete Report N172404)
23
24      90.    As part of the PRTS, GM engineers also began looking into ways to solve the

25  problem of the key moving from the "run" to the "accessory/off" position during ordinary

26  driving.

27      91.    On February 18, 2005, GM engineers presented several possible solutions to the

28  Cockpit Program Integration Team ("CPIT"). GM engineers determined the only "sure solution"

Class Action Complaint                          13

to fixing the problem of the key inadvertently moving from the "run" to the "accessory/off" position required changing from a low mount to a high mount lock module, which would considerably reduce the possibility of the key/key fob being impacted by a driver.

92. According to GM engineers, this change in the key position on the lock module, **combined with** increasing the detent in the ignition switch, would be a "sure solution."

93. GM, however, through Altman, rejected this "sure solution," in part, because the cost to implement the solution would be too high.

94. During this PRTS, GM also considered changing the key from a slot to a hole as a way to attempt to contain this problem, but not as a solution to the problem.

95. Changing the key from a slot to a hole would reduce the lever arm of the key and the key chain. With the slot design, the key chain would hang lower on the key which would increase the torque force on the ignition switch when the chain was contacted or moved in any way. GM engineers determined this key change would significantly reduce the chance of the key inadvertently moving from the "run" to the "accessory/off" position during ordinary driving maneuvers.

96. A GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle.

97. GM, however, rejected this proposed key change and, on March 9, 2005, Altman directed GM to close the PRTS with no action *since none of the solutions presented "an acceptable business case."*

98. On February 28, 2005, GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

99. The February 28, 2005 bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.

100. In the February 28, 2005 bulletin, GM provided the following recommendations/instructions to its dealers – *but not to Plaintiffs, the other Class members, or the public in general*:

Class Action Complaint                                      14

There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.

In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.

In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.

Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

101. At that time, however, GM knew that the inadvertent turning off of the ignition in the Defective Vehicles was due to design defects in the Key System in those vehicles, and *was not* limited to short drivers using large heavy key chains.

102. GM failed to disclose and, in fact, concealed, the February 28, 2005 bulletin – and/or the information contained therein – to Cobalt and Pursuit owners/lessees, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a "sure solution" to the problem, and GM's knowledge of it.

103. Indeed, rather than disclosing this serious safety problem that uniformly affected all of the Defective Vehicles, GM, instead, concealed and obscured the problems, electing to wait until customers brought their cars to a dealership after an engine-stalling incident, and offered even its own dealers only an incomplete, incorrect, and insufficient description of the defects and the manner in which to actually remedy them.

104. As of February 2005, GM engineers knew that the Saturn Ion and Chevrolet Cobalt vehicles had the safety-related defects discussed in this Complaint.

105. Pursuant to 49 C.F.R. § 573.6 – which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect...related to motor vehicle safety," GM had a

1  duty, no later than February 2005 to disclose the safety-related defects in the Saturn Ion and

2  Chevrolet Cobalt vehicles.

3      106.   Instead of complying with its legal obligations, however, GM fraudulently

4  concealed the Key System defect from the public – including Plaintiffs and the other Class

5  members – and continued to manufacture and sell Ions and Cobalts with these known safety

6  defects, causing Plaintiffs and the other Class members to purchase and own, and continue to

7  own, vehicles that contained a defective and dangerous system.

8      107.   Although it had actual knowledge of safety defects that it was concealing, GM

9  continued to sell hundreds of thousands of Defective Vehicles, reaping profits from those sales

10  from purchasers who were never informed the vehicles they were purchasing had a defective

11  Key System and, therefore, were unable to consider that information in deciding whether to

12  purchase or lease the Defective Vehicles.

13      108.   In March 2005, following its receipt of a customer complaint that his/her Cobalt

14  vehicle ignition turned off while driving, GM opened another PRTS – Complete Report

15  (0793/2005-US)

16      109.   During the March 2005 PRTS, GM engineers decided not to reconsider any of the

17  proposed solutions discussed during the February 2005 PRTS.  Instead, the GM engineers

18  leading the PRTS recommended that sole corrective action GM should recommend would be to

19  advise customers to remove excess material from their key rings, *even though GM knew that the*

20  *inadvertent turning off of the ignition in the Defective Vehicles was due to design defects in*

21  *the Key System in those vehicles, and was not limited to drivers having excess key ring*

22  *materials*.

23      110.   In May 2005, GM, following its receipt of another customer complaint that

24  his/her Cobalt vehicle ignition turned off while driving, it opened another PRTS.

25      111.   During the May 2005 PRTS, GM decided to redesign the key in order to reduce

26  the possibility that a driver may inadvertently turn the key from the "run" to the "accessory/off"

27  position during ordinary driving.

28

Class Action Complaint                    16

112.    Despite this initial safety/redesign commitment, however, GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public – including Plaintiffs and the other Class members – to the Defective Vehicles' serious safety risks.

113.    At or about this same time, GM, through Alan Adler, GM's Manager, Product Safety Communications, issued the following statement on with respect to the Chevrolet Cobalt's inadvertent shut-off problems, affirmatively representing that:[5]

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.
>
> When this happens, the Cobalt is still controllable. The engine can be restarted after shifting to neutral.
>
> GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off.
>
> Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.
>
> Ignition systems are designed to have "on" and "off" positions, and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to accessory or off position.

GM's Statement on Chevrolet Cobalt Inadvertent Shut-offs. GM's statement, however, was demonstrably false and misleading.

114.    Contrary to GM's above-referenced statement, GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob. GM knew that these incidents were not caused by heavy key chains or a driver's size and seating position. GM knew that removing the non-essential material from key rings would not "virtually

---

[5] *See* http://www.nytimes.com/2005/06/19/automobiles/19KEYS.html?pagewanted=print (last visited March 21, 2014).

1    eliminate" the possibility of inadvertent bumping of the ignition key from the "run" to the

2    "accessory/off" position while the car is running.

3         115.   GM's above-referenced statement was further demonstrably false and misleading

4    because GM knew that these incidents were ultimately caused by the safety-related defects in the

5    Key System identified in the February 2005 PRTS.

6         116.   But GM's affirmative concealment of the problems with the Defective Vehicles

7    did not end there.

8         117.   On July 29, 2005, Amber Marie Rose, a 16 year old Clinton, Maryland resident,

9    was driving a 2005 Cobalt when she drove off the road and struck a tree head-on.  Amber's

10   driver's side frontal airbag did not deploy and she died as a result of the injuries she sustained in

11   the crash.

12        118.   GM received notice of Amber's incident in September 2005 and opened an

13   internal investigation file pertaining to this incident shortly thereafter.

14        119.   During its investigation of the incident, GM learned that the key in Amber's

15   Cobalt was in the "accessory/off" position at the time of the crash.

16        120.   During its investigation of the incident in which Amber was killed in her Cobalt

17   vehicle, GM also knew that the driver's side frontal airbag should have deployed given the

18   circumstances of the crash.  Upon information and belief, GM subsequently entered into a

19   confidential settlement agreement with Amber's mother.

20        121.   In December 2005, shortly after it commenced its internal investigation into the

21   incident leading to Amber's death, GM issued a Technical Service Bulletin (05-02-35-007) (the

22   "TSB").

23        122.   The TSB, which GM affirmatively represented applied to 2005–2006 Chevrolet

24   Cobalts, 2006 Chevrolet HHRs, 2005–2006 Pontiac Pursuit, 2006 Pontiac Solstices, and 2003–

25   2006 Saturn Ions, provided, "Information on Inadvertent Turning of Key Cylinder, Loss of

26   Electrical System and no DTCs," provided the following service information:

27                      There is potential for the driver to inadvertently turn off the
                  ignition due to low ignition key cylinder torque/effort.

28

Class Action Complaint                         18

The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documents and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.

In cases that fit this profile, question the customer thoroughly to determine if this may the cause. The customer should be advised of this potential and should take steps to prevent it - such as removing unessential items from their key chain.

Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design. As a result, the key ring cannot move up and down in the slot any longer - it can only rotate on the hole. In addition, the previous key ring has been replaced with a smaller, 13 mm (0.5 in) design. This will result in the keys not hanging as low as in the past.

123. An image of the insert changing the "slot" design to a "hole" design appears as follows:



124. As with its prior statement regarding the Defective Vehicles (see above), the information GM provided in this TSB was also false and misleading.

125. In the two PRTSs GM issued before it issued the TSB, GM engineers never represented that short drivers or heavy key chains were the reasons why these incidents were happening.

---

Class Action Complaint                              19

126.    Indeed, at the time it issued the TSB, GM knew that these incidents were happening to drivers of all sizes using keys with the standard key fobs.

127.    In other words, GM knew these incidents were not caused by short drivers with heavy key chains, but because of the safety-related defects in the Key System of its Defective Vehicles.

128.    In 2005, GM began buying back Cobalts from certain customers who were experiencing engine stalling incidents.  GM never told the public – including Plaintiffs and the other Class members – that it was buying back Cobalts under these circumstances.  GM refused to buy back Cobalts from other customers who had also experienced engine stalling incidents.  In fact, for many of the customers who complained about experiencing engine-stalling incidents, GM never informed these customers of the TSB and/or the availability of the key insert.

129.    On November 17, 2005 – shortly after Amber's death and immediately before GM's issuance of the TSB – there was *another* incident involving a 2005 Cobalt in Baldwin, Louisiana.  In that incident, the Cobalt went off the road and hit a tree.  The frontal airbags did not deploy in this accident.  GM received notice of this accident, opened a file, and referred to it as the "Colbert" incident.

130.    On February 10, 2006, in Lanexa, Virginia – shortly after GM issued the TSB – a 2005 Cobalt flew off of the road and hit a light pole.  As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well.  The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash.  GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.

131.    On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole.  The frontal airbags did not deploy in this incident.  The download of the SDM showed the key was in the "accessory/off" position at the time of the crash.  GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident.

132.    In its February 24, 2014 letter to NHTSA regarding Recall No. 13454, GM, *for the first time*, acknowledged that changes were made to the ignition switches in the Defective Vehicles during the 2007 model year.

---

Class Action Complaint           20

1        133.    Specifically, in its February 24, 2014 letter, GM represented that "[o]n April 26,

2   2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document

3   approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The

4   approved changes included, among other things, the use of a new detent plunger and spring that

5   increased torque force in the ignition switch." Ray DeGiorgio was the GM design engineer

6   responsible for the ignition switch in the Defective Vehicles. At no time prior to February 24,

7   2014 did GM disclose this fact, despite its clear knowledge thereof.

8        134.    On August 1, 2006, following its receipt of a customer complaint about a Cobalt

9   stalling while driving, GM opened yet another PRTS relating to this issue. GM closed this PRTS

10  on October 2, 2006 however, without taking any action.

11       135.    On December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the

12  road and hit a tree. The frontal airbags failed to deploy in this incident. GM received notice of

13  this incident, opened a file, and referred to it as the "Frei" incident.

14       136.    On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off

15  the road and struck a truck. Despite there being a frontal impact in this incident, the frontal

16  airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off"

17  position. GM received notice of this incident, opened a file, and referred to it as the "White"

18  incident.

19       137.    On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a

20  truck. The frontal airbags failed to deploy. GM received notice of this incident, opened a file,

21  and referred to it as the "McCormick" incident.

22       138.    On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control

23  and struck a guardrail. Despite there being a frontal impact in this incident, the frontal airbags

24  failed to deploy. GM received notice of this incident, opened a file, and referred to it as the

25  "Gathe" incident.

26       139.    On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit

27  a tree. The frontal airbags failed to deploy. GM received notice of this incident, opened a file,

28  and referred to it as the "Breen" incident.

Class Action Complaint               21

140. On April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident.

141. On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Wild" incident.

142. On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident.

143. On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Harding" incident.

144. On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident.

145. On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident.

146. In February 2009, GM opened yet another PRTS with respect to the Defective Vehicles -- this time to investigate why the slot in the key in Cobalts allowed the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of the vehicles.

147.    Through this PRTS, GM determined that changing the key from a slot to a hole would significantly reduce the likelihood of inadvertent turning off the ignition switch.

148.    In March 2009, GM approved of the design change in the key from the slot to a hole.  According to GM, this redesigned change was implemented in model year 2010 Cobalts.  GM, however, chose not to provide these redesigned keys the owners or lessees of any of the vehicles implicated in the TSB (*see* Paragraph 122, above), including the 2005–2007 Cobalts.

149.    This timeline gives a short overview of some key points between 2004 and the present, as discussed above:

**2005-2009**
GM learns of hundreds of field reports of Key System failures and multiple fatalities.

**2010-2014**
GM learns of more field reports of Key System failures and additional fatalities.

**2001-2004**
GM learns Key Systems are defective.

**2005**
GM engineers' proposed fix rejected; Amber Rose dies after airbag in Cobalt fails to deploy.

**2009**
GM declares and emerges from bankruptcy.

**2014**
GM issues inadequate recall over 10 years after learning its Key Systems are defective.

150.    Throughout this entire time period, GM was selling the Defective Vehicles to consumers for full price, and consumers were purchasing them believing that the vehicles were non-defective, but all the while GM concealing the extent and nature of the defects in the Defective Vehicles.

**Old GM's Marketing Represented to the Public
that the Defective Vehicles Were Safe**

151.    In a section called "safety," Old GM's Chevrolet website stated:[6]

**OUR COMMITMENT**

---

[6] *See* http://web.archive.org/web/20050507180553/http://www.chevrolet.com/safety (last visited March 21, 2014).

Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe — from the start of your journey to your destination.

That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

152.   Similarly, old GM promoted its Saturn vehicle line on television with statements like "Putting people first," and "Saturn. People First."[7]

153.   Saturn's print ad campaign featured advertisements like the following, which stated, among other things, "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars":



154.   In sum, in order to increase sales, old GM touted the safety of its vehicles.

155.   But, when the time came for the company to stay true to its words, neither old GM, nor GM disclosed its knowledge about the dangerous Key System defects to its customers.

---

[7] *See* http://www.youtube.com/watch?v=PcddX1UkLhE (last visited March 21, 2014).

**Meet the New GM, Same as the Old GM**

156.   In 2009, GM declared bankruptcy, and, weeks later, it emerged from bankruptcy. Both before and after GM's bankruptcy, the ignition switches in the Defective Vehicles continued to fail and GM, in all iterations, continued to conceal the truth.

157.   On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-lane highway in Paulding County, Georgia. While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off. After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car. Brooke was killed in the crash.

158.   On March 22, 2011, Ryan Jahr, a GM engineer, downloaded the SDM from Brooke's Cobalt. The information from the SDM download showed that the key in Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash. On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against GM.

159.   On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position.  GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

160.   On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

161.   On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

Class Action Complaint                    25

162.    These incidents are not limited to vehicles of model year 2007 and before. According to GM's own investigation, there have been over 250 crashes involving 2008-2010 Chevrolet Cobalts in which the airbags failed to deploy.

**GM Investigates Further, but Continues to Conceal the Defect**

163.    In 2010, GM began a formal investigation of the frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s. GM subsequently elevated the investigation to a Field Performance Evaluation ("FPE").

164.    In August 2011, GM assigned Engineering Group Manager, Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation.

165.    In Spring 2012, Stouffer asked Jim Federico, a high level executive and chief engineer at GM, to oversee the FPE investigation. Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

166.    In May 2012, GM engineers tested the torque on the ignition switches for Cobalt, G5, HHR, and Ion vehicles in a junkyard. The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet GM's minimum torque specification requirements. These results were reported to Stouffer and other members of the FPE.

167.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective Key System. The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

168.    During the field-performance-evaluation process, GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

Class Action Complaint                              26

169.    Indeed, the GM engineers identified several additional ways to actually fix the problem.  These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run.  GM rejected each of these ideas.

170.    The photographs below are of a GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents.



171.    These photographs show the dangerous condition of the position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off of the steering column.  GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the steering column which causes the key to be inadvertently turned from the run to accessory/off position.  The photographs show why the GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem.  It also shows why GM engineers believe that the additional changes to the Key System (such as the shroud) were necessary to fix the defects with the Key System.

172.    The GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem but GM concealed – and continued to conceal – from the public, the nature and extent of the defects.

173. By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Ion, the Cobalt, and the G5 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off" position while driving these vehicles. They also knew that when this happened the airbags would no longer work in frontal crashes.

174. Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects had caused or contributed to numerous accidents and multiple fatalities. Despite this knowledge, GM chose to conceal this information from the public, including Plaintiffs and the other Class members.

175. Under 49 C.F.R. ¶ 573.6, GM had a duty in 2012 to disclose the safety-related defects in the Ion, Cobalt, and G5. Rather than comply with their legal obligations, GM continued to fraudulently conceal these defects from the public and the U.S. government.

176. In December 2012, in Pensacola, Florida, Ebram Handy, a GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch. At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt.

177. At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below GM's minimum torque performance specifications. Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

178. In January 2013, Handy, in preparation for his Rule 30(b)(6) deposition in the *Melton* case, spoke with several GM engineers, including DeGiorgio and Stouffer. At that time, Handy knew that, based on the testing he had observed, the original ignition switch in the 2005 Cobalt failed to meet GM's minimum torque performance specifications and that GM had redesigned the ignition switches that were being sold as replacement switches. GM knew that an

1    ignition switch that did not meet its minimum torque performance requirements was a safety-

2    related defect.

3        179.    GM engineers integrally involved with this situation have admitted that GM never

4    should have sold the Defective Vehicles with ignition switches that did not meet its minimum

5    torque performance requirements.

6        180.    On June 12, 2013, Mr. Altman, the Cobalt program engineering manager, testified

7    as follows during his deposition in *Melton v. GM*:

8            Q.    And the vehicle never should have been sold if it didn't meet
             GM's minimum torque specifi – performance requirements, should
9            it?

10           MR. FRANKLIN:  Object to form.

11           THE WITNESS:  That's correct.

12           Q.    And the reason is is because that could be dangerous under
             certain situations, because the key can move from run to
13           accessory?

14           MR. FRANKLIN:  Object to form.

15           THE WITNESS:  Yes.

     (Gary Altman Depo, pp. 23-24)

16       181.    All of these incidents – as well as all of the GM documents that were included as

17   the "Purchased Assets" for new GM – gave Defendant GM actual knowledge of the defects in

18   the Key System in the Defective Vehicles.   Notwithstanding those facts, coupled with its

19   successor liability based on the above-described fraudulent concealment of the problems with the

20   Defective Vehicles, Defendant GM continued to fraudulently conceal the nature and extent of the

21   defects from the public, inducing customers to reasonably continue to own or purchase Defective

22   Vehicles with no knowledge of the existence of these serious and uniform defects.

23

24

25

26

27

28

Class Action Complaint                              29

**GM Issues a Recall – Ten Years Too Late**

182.    On February 7, 2014, GM, in a letter from Carmen Benavides, Director – Product Investigations and Safety Regulations for GM, informed NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.

183.    In its February 7, 2014 letter to NHTSA, GM represented that as replacement ignition switches became available, GM would replace the ignition switches on the Defective Vehicles.

184.    On February 19, 2014, a request for timeliness query of General Motors' Safety Recall 13454 was sent to NHTSA ("timeliness query"). The timeliness query pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.

185.    The February 19, 2014 timeliness query also asked NHTSA to investigate GM's failure to fulfill its legal obligation to report the safety defects in the Defective Vehicles to NHTSA within five days of discovering the defect.

186.    On February 24, 2014, GM sent a letter to Ms. Benavides and informed NHTSA it was expanding the recall to include 2006-2007 model year (MY) Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.

187.    On March 17, 2014, Mary T. Barra, General Motors' chief executive issued an internal video, which was broadcast to employees.[8] In the video, Ms. Barra admits:

> . . . Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration. As of now, two congressional committees have announced that they will examine the issue. And it's been reported that the Department of Justice is looking into this matter. . . . *These are serious developments that shouldn't surprise anyone.* After all, *something went wrong with our process in this instance and terrible things happened.* . . . The bottom line is, *we will be better because of this tragic situation,* if we seize the opportunity. . . . I ask everyone to stay focused on making today's GM the best it can be.

---

[8] *See* http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/mar/0317-video.html (last visited March 21, 2014) (emphasis added).

Class Action Complaint                         30

188.    Not only is GM's recall ten years too late, it is completely insufficient to correct the safety-related defects in the Defective Vehicles.

189.    Since at least 2005, GM has known that simply replacing the ignition switches on the Defective Vehicles is not a solution to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in these vehicles.

190.    Additionally, GM's recall fails to address the design defect that causes the key fob/chain to hang too low on the steering column.

191.    Thus, even when the ignition switches are replaced, this defective condition would still exist in the Defective Vehicles and there continues to be the potential for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

192.    The recall is further insufficient because, through this recall, GM is not replacing all of the keys in the Defective Vehicles with the redesigned key with a hole instead of a slot. GM provided these keys to owners/lessees of the 2010 Cobalt with the understanding that the redesigned key would reduce the chance that the key could be inadvertently turned from the "run" to the "accessory/off" position.

193.    The recall also fails to address the design defects in the Defective Vehicles which disables the airbag immediately upon the engine shutting off.

194.    Although GM contends that it changed the ignition switch in some 2007 Cobalts and all of the 2008-2010 Cobalts, there continue to be non-deployment events in the later model Cobalts. Undermining GM's position is GM's own investigation into the non-deployment events in Cobalts identifies over 250 non-deploy crashes involving 2008-2010 Cobalts.

195.    GM's engineers understood that increasing the detent in the ignition switch alone was not a solution to the problem, but GM concealed – and continues to conceal from the public, including Plaintiff and the other Class members, the nature and extent of the defects, which the current recall will not cure.

**CLASS ACTION ALLEGATIONS**

196.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and all others similarly situated. Plaintiffs seek to represent a class (the "Nationwide Class") initially defined as:

> All current and former owners and lessees of a Defective Vehicle (as defined herein) in the United States.

197.    Additionally, Plaintiffs seek to represent the following statewide classes (the "Statewide Classes") defined as follows:

> (a)    All current and former owners and lessees of a Defective Vehicle (as defined herein) in California (the "California State Class");
>
> (b)    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Arkansas (the "Arkansas State Class");
>
> (c)    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Georgia (the "Georgia State Class");
>
> (d)    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Illinois (the "Illinois State Class");
>
> (e)    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Louisiana (the "Louisiana State Class");
>
> (f)    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Missouri (the "Missouri State Class");
>
> (g)    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Ohio (the "Ohio State Class").
>
> (h)    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Texas (the "Texas State Class");
>
> (i)    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Vermont (the "Vermont State Class").

198.    Excluded from each of the Nationwide and Statewide Classes are GM, as well as GM's employees, affiliates, officers, and directors, including franchised dealers, any individuals

who experienced physical injuries as a result of the defects at issue in this litigation, and the judge and court staff to whom this case is assigned. Plaintiff reserves the right to amend the definition of the class if discovery or further investigation reveals that the class should be expanded or otherwise modified.

199. **Numerosity and impracticality of joinder.** The members of the Nationwide and Statewide Classes are so numerous that joinder of all members is impractical. Millions of Nationwide and Statewide Class members purchased or leased class vehicles. The members of the Nationwide and Statewide Classes are easily and readily identifiable from information and records in GM's possession, custody, or control.

200. **Commonality and predominance.** There are common questions of law and fact that predominate over any questions affecting the individual members of the Nationwide and Statewide Classes. Common legal and factual questions include, but are not limited to:

    (a)    whether GM breached the duty of reasonable care it owed to the Nationwide and Statewide Classes;

    (b)    whether GM's breach of its duties directly and proximately caused the Nationwide and Statewide Classes' damages;

    (c)    whether GM omitted, misrepresented, concealed, or manipulated material facts from Plaintiffs and the Nationwide and Statewide Classes regarding the defects, the actions taken to address the defects, and the result of those actions;

    (d)    whether GM had a duty to disclose the defects to Plaintiffs and the other Nationwide and Statewide Class members;

    (e)    whether GM engaged in fraud, fraudulent concealment, and made fraudulent representations to the public;

    (f)    whether Plaintiff and the other Nationwide and Statewide Class members are entitled to damages; and

    (g)    whether Plaintiff and the other Nationwide and Statewide Class members are entitled to equitable relief or other relief, and the nature of such relief.

1      201.  **Typicality.**  Plaintiffs' claims are typical of the claims of the other Nationwide

2  and Statewide Class members because Plaintiffs and the other Nationwide and Statewide Class

3  members purchased vehicles that contain defective parts.  Neither Plaintiffs nor the other

4  Nationwide and Statewide Class members would have purchased the Defective Vehicles had

5  they known of the defects in the vehicles. Those defects also pose an unreasonable risk of harm

6  to Plaintiffs and the other Nationwide and Statewide Class members.  Plaintiffs and the other

7  Nationwide and Statewide Class members suffered damages as a direct proximate result of the

8  same wrongful practices that GM engaged in.  Plaintiffs' claims arise from the same practices

9  and course of conduct that give rise to the claims of the other Nationwide and Statewide Class

10  members.  Plaintiffs' claims are based upon the same legal theories as the claims of the other

11  Nationwide and Statewide Class members.

12      202.  **Adequacy.**  Plaintiffs will fully and adequately protect the interests of the other

13  members of the Nationwide and Statewide Classes and have retained class counsel who are

14  experienced and qualified in prosecuting class actions, including consumer class actions and

15  other forms of complex litigation. Neither Plaintiffs nor their counsel have interests that conflict

16  with the interests of the other Nationwide and Statewide Class members.

17      203.  **Declaratory and Injunctive Relief.**  GM has acted or refused to act on grounds

18  generally applicable to Plaintiffs and the other members of the Nationwide and Statewide

19  Classes, thereby making appropriate final injunctive relief and declaratory relief, as described

20  below, with respect to the Nationwide and Statewide Class members as a whole.

21      204.  **Superiority.** A class action is superior to all other available methods for the fair

22  and efficient adjudication of this controversy because, among other things: it is economically

23  impracticable for members of the Nationwide and Statewide Classes to prosecute individual

24  actions; prosecution as a class action will eliminate the possibility of repetitious and redundant

25  litigation; and, a class action will enable claims to be handled in an orderly, and expeditious

26  manner.

27

28

Class Action Complaint           34

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of the Magnuson-Moss Warranty Act (Federal "Lemon Law")
### 15 U.S.C. §§ 2301 *et seq.*
### (Brought on behalf of the Nationwide Class)

205. Plaintiffs Galdina Maciel, Daniel Cortez, Cindy Wade, Zachary DeWitt, Roberta Cheraso, Demetrius Smith, Jenee Byrd, Asuhan Leyva, Jim Gresik, Barbara Ellis Steele, Maria Raygoza, Barbara Gray, and Michele Bennett ("Plaintiffs," for the purposes of the Nationwide Class's claims) repeat and reallege paragraphs 1 through 204 as if fully set forth herein.

206. Plaintiffs bring this Count on behalf of the Nationwide Class ("Class," for the purposes of this Count).

207. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

208. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

209. GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

210. The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

211. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

212. GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

213. GM breached these warranties as described in more detail above. Without limitation, the Defective Vehicles share a common design defect in that they are equipped with defective Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. GM has admitted that the Defective Vehicles are defective in issuing its recall.

214.     Plaintiffs and each of the other Class members have had sufficient direct dealings with either GM or its agents (dealerships) to establish privity of contract between GM, on the one hand, and Plaintiffs and each of the other Class members, on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Finally, privity is also not required because the Defective Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

215.     Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  At the time of sale or lease of each Defective Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

216.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Defective Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Vehicles by retaining them.

217.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
#### Fraudulent Concealment
#### (Brought on behalf of the Nationwide Class)

218.     Plaintiffs Galdina Maciel, Daniel Cortez, Cindy Wade, Zachary DeWitt, Roberta Cheraso, Demetrius Smith, Jenee Byrd, Asuhan Leyva, Jim Gresik, Barbara Ellis Steele, Maria Raygoza, Barbara Gray, and Michele Bennett ("Plaintiffs," for the purposes of the Nationwide Class's claims) hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

219.     Plaintiffs bring this Count on behalf of the Nationwide Class ("Class," for purposes of this Count).

220.     GM intentionally concealed material facts from Plaintiffs, the other Class members, the public, and NHTSA.  GM knew that the Defective vehicles were designed and manufactured with Key System defects, but GM concealed those material facts.  Although the Defective vehicles contain material safety defects that GM knew of, or should have known of, at the time of distribution, GM recklessly manufactured and distributed those vehicles to consumers in the United States.  Those consumers had no knowledge of the defects.

221.     GM had a duty to disclose the facts to Plaintiffs, the other Class members, the public, and NHTSA, but failed to do so.

222.     GM knew that Plaintiffs and the other Class members had no knowledge of those facts and that neither Plaintiffs nor the other Class members had an equal opportunity to discover the facts.  GM was in a position of superiority over Plaintiffs and the other Class members. Indeed, Plaintiffs and the other Class members trusted GM not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

223.     By failing to disclose these material facts, GM intended to induce Plaintiffs and the other Class members to purchase or lease the Defective Vehicles.

224.     Plaintiffs and the other Class members reasonably relied on GM's nondisclosure.

225.     Plaintiffs and the other Class members would not have purchased or leased the class vehicles had they known of the ignition-switch defect, or certainly would not have paid as much as they did.

---

Class Action Complaint                                     37

226.    GM reaped the benefit of the sales and leases of Defective Vehicles as a result of its nondisclosure.

227.    As a direct and proximate result of GM's wrongful conduct, Plaintiffs and the other Class members have suffered or will suffer damages, including the cost of repairing the Key Systems in their vehicles to fully remedy the defects such that the Defective Vehicles can be operated safely, and the diminished value of their Defective Vehicles as a result of the defects and GM's wrongful conduct related to same.

228.    GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members, such that punitive damages are appropriate.

### THIRD CAUSE OF ACTION
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(Brought on behalf of the California State Class)**

229.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

230.    Plaintiffs Maciel and Cortez bring this Count on behalf of the California State Class ("Class," for purposes of this Count).

231.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."

232.    GM has violated the unlawful and unfair prongs of § 17200 because the Defective Vehicles share a common design defect in that they are equipped with defective Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.  GM has admitted that the Defective Vehicles are defective in issuing its recall.

233.    GM failed to adequately disclose and remedy this issue.

234.    GM's conduct offends established public policy, as the harm GM caused to consumers greatly outweighs any benefits associated with those practices.

235.    Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.

Class Action Complaint                                    38

236.    GM has violated the fraudulent prong of § 17200 because GM misrepresented the quality, safety, and reliability of the Defective Vehicles.

237.    California Plaintiffs relied on the misrepresentations and/or omissions of GM with respect to the quality, safety, and reliability of the Defective Vehicles. California Plaintiffs and the other Class members would not have purchased or leased their Defective Vehicles and/or paid as much for them but for GM's misrepresentations and/or omissions.

238.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California.

239.    California Plaintiffs, individually and on behalf of the other Class members, request that this Court enjoin GM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 334.

**FOURTH CAUSE OF ACTION**
**Violation of the California False Advertising Law**
**Cal. Civil Code §§ 17500 *et seq.***
**(Brought on behalf of the California State Class)**

240.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

241.    Plaintiffs Maciel and Cortez bring this Count on behalf of the California State Class ("Class," for purposes of this Count).

242.    California Business and Professions Code § 17500 states:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

243.    Through advertising, marketing, and other publications, GM caused statements to be disseminated that were untrue or misleading, and that were known, or that by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

244.    GM has violated § 17500 because its misrepresentations and omissions regarding the safety and reliability of its Defective Vehicles were material and likely to deceive a reasonable consumer.

245.    Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Defective Vehicles, Plaintiffs and each of the other Class members relied on the misrepresentations and/or omissions of GM with respect to the safety and reliability of the Defective Vehicles.

246.    GM's representations turned out to be false because the Defective Vehicles share a common design defect in that they are equipped with defective Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.  Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

247.    Accordingly, Plaintiffs and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain.

248.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business.  GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California.

249.    Plaintiffs, individually and on behalf of the other Class members, requests that this Court enjoin GM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief as is appropriate.

### FIFTH CAUSE OF ACTION
#### Violation of the Song-Beverly Consumer Warranty Act
#### (California's "Lemon Law") for Breach of Express Warranty
#### Cal. Civ. Code ¶§ 1790 *et seq.*
#### (Brought on behalf of the California State Class)

250. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

251. Plaintiffs Maciel and Cortez bring this Count on behalf of the California State Class ("Class," for purposes of this Count).

252. Plaintiffs and the other Class members who purchased their Defective Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

253. The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

254. GM is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code § 1791(j).

255. Plaintiffs and the other Class members bought/leased new motor vehicles manufactured by GM.

256. GM made express warranties to Plaintiffs and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, in its warranty, manual, and advertising, as described above.

257. The Defective Vehicles share a common design defect in that they are equipped with defective Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. GM has admitted that the Defective Vehicles are defective in issuing its recall.

258. The Defective Vehicles are covered by GM's express warranties. The defects described herein substantially impair the use, value, and safety of the Defective Vehicles to reasonable consumers, including Plaintiffs and the other Class members.

259. GM was provided notice of these issues and defects by a letter dated March 24, 2014 to GM on behalf of Plaintiffs and through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

---

Class Action Complaint 41

260.   GM has had the opportunity to cure the defect in the Defective Vehicles but it has chosen not to do so. GM has had ample warning of the defect through various complaints, filed both in court with the NHTSA and directly with GM, and it has failed to remedy the defect. Giving GM a chance to cure the defect simply is not practicable in this case and would serve only to delay this litigation, and thus is not necessary.

261.   As a result of GM's breach of its express warranties, Plaintiffs and the other Class members received goods whose dangerous condition substantially impairs their value to Plaintiffs and the other Class members.  Plaintiffs and the other Class members have been damaged as a result of the diminished value of GM's products, the products' malfunctioning, and the nonuse of their Defective Vehicles.

262.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their Defective Vehicles.

263.   Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

## SIXTH CAUSE OF ACTION
### Violation of the Song-Beverly Consumer Warranty Act
### (California's "Lemon Law") for Breach of Implied Warranty
### Cal. Civ. Code §§ 1790 *et seq.*
### (Brought on behalf of the California State Class)

264.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

265.   Plaintiffs Maciel and Cortez brings this Count on behalf of the California State Class ("Class," for purposes of this Count).

266.   Plaintiffs and the other Class members who purchased Defective Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

267.   The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

268.   GM is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code § 1791(j).

269.   GM impliedly warranted to Plaintiffs and the other Class members that the Defective Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, the Defective Vehicles do not have the quality that a buyer would reasonably expect.

270.   Cal. Civ. Code § 1791.1(a) states:  "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)   Pass without objection in the trade under the contract description.

(2)   Are fit for the ordinary purposes for which such goods are used.

(3)   Are adequately contained, packaged, and labeled.

(4)   Conform to the promises or affirmations of fact made on the container or label.

271.   The Defective Vehicles would not pass without objection in the automotive trade because they share a common design defect in that they are equipped with defective Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.  GM has admitted that the Defective Vehicles are defective in issuing its recall.

272.   Because of their defective Key Systems, the Defective Vehicles are not safe to drive and thus not fit for ordinary purposes.

273.   The Defective Vehicles are not adequately labeled because the labeling fails to disclose the defects described herein.

274.   GM breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles that are defective.  Furthermore, this defect has caused Plaintiffs and the other Class members to not receive the benefit of their bargain and have caused the Defective Vehicles to depreciate in value.

275. GM was provided notice of these issues and defects by a letter dated March 24, 2014 to GM on behalf of Plaintiffs and through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

276. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the other Class members received goods whose dangerous condition substantially impairs their value to Plaintiffs and the other Class members.

277. Plaintiffs and the other Class members have been damaged as a result of the diminished value of GM's products.

278. Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

279. Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

## SEVENTH CAUSE OF ACTION
### Violation of the California Consumer Legal Remedies Act
### Cal. Civ. Code §§ 1750 *et seq.*
### (Brought on behalf of the California State Class)

280. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

281. Plaintiffs Maciel and Cortez brings this Count on behalf of the California State Class ("Class," for purposes of this Count).

282. Plaintiffs Maciel and Cortez and the other Class members were deceived by GM's failure to disclose that the Defective Vehicles share a common design defect in that they are equipped with defective Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. GM has admitted that the Defective Vehicles are defective in issuing its recall.

283. GM intended for Plaintiffs and the other Class members to rely on it to provide safe, adequately designed, and adequately manufactured automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

284.    GM intentionally failed or refused to disclose the defect to consumers and, instead, allowed consumers to believe the representations it had made about the Defective Vehicles.

285.    GM's conduct and deceptive omissions were intended to induce Plaintiffs and the other Class members to believe that the Defective Vehicles were safe, adequately designed, and adequately manufactured automobiles.

286.    GM's conduct constitutes unfair acts or practices as defined by the California Consumer Legal Remedies Act (the "CLRA").

287.    Plaintiffs and the other Class members have suffered injury in fact and actual damages resulting from GM's material omissions and misrepresentations because they paid an inflated purchase price for the Defective Vehicles.  However, Plaintiffs and the other Class members reserve any claim for damages under the CLRA and by this Complaint bring only an action for injunctive relief under the CLRA pursuant to § 1782(d) of the Act.

288.    Plaintiffs and the other Class members' injuries were proximately caused by GM's fraudulent and deceptive business practices.  However, Plaintiffs and the other Class members reserve any claim for damages under the CLRA and by this Complaint bring only an action for injunctive relief under the CLRA pursuant to § 1782(d) of the Act.

289.    GM's conduct described herein is fraudulent, wanton, and malicious.

290.    Pursuant to California Civil Code § 1782(d), Plaintiffs, individually and on behalf of the other Class members, seeks a Court order enjoining the above-described wrongful acts and practices of GM.  Plaintiffs and the other Class members reserve any claim for restitution, disgorgement, or damages under the CLRA pursuant to § 1782(d) of the Act.

291.    Pursuant to § 1782 of the Act, Plaintiffs provided GM with written notice of its violations of the CLRA on March 24, 2014 and demands that GM rectify the problems associated with the actions detailed above and give notice to all affected consumers of GM's intent to so act.

292.    If GM fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written

Class Action Complaint                          45

1  notice pursuant to § 1782 of the Act, Plaintiffs will amend this complaint to add claims for

2  actual, punitive and statutory damages, restitution, and disgorgement under the CLRA as

3  appropriate, under the California Civil Code § 1780, pursuant to California Civil Code § 1782(d)

4  ("Not less than 30 days after the commencement of an action for injunctive relief, and after

5  compliance with subdivision (a), the consumer may amend his or her complaint without leave of

6  court to include a request for damages.").

7      293.   Pursuant to § 1780(c) of the Act, attached hereto as Exhibit B is the affidavit

8  showing that this action has been commenced in the proper forum.

## EIGHTH CAUSE OF ACTION
### Violation of Georgia's Uniform Deceptive Trade Practices Act
### Ga. Code Ann. §§ 10-1-370 *et seq.*
### (Brought on behalf of the Georgia State Class)

       294.   Plaintiffs hereby incorporate by reference the allegations contained in the
preceding paragraphs of this Complaint, as if fully set forth herein.

       295.   Plaintiff Bennett brings this Count on behalf of the Georgia State Class ("Class,"
for purposes of this Count).

       296.   The conduct of GM as set forth herein constitutes unfair or deceptive acts or
practices, including, but not limited to, GM's manufacture and sale of Defective Vehicles with
defective Key Systems.

       297.   GM's actions as set forth above occurred in the conduct of trade or commerce.

       298.   GM's actions impact the public interest because Plaintiff and the other Class
members were injured in exactly the same way as millions of others purchasing and/or leasing
Defective Vehicles as a result of GM's generalized course of deception.

       299.   All of the wrongful conduct alleged herein occurred, and continues to occur, in
the conduct of GM's business.

       300.   Plaintiff and the other Class members were injured as a result of GM's conduct.

       301.   Plaintiff and the other Class members overpaid for their Defective Vehicles and
did not receive the benefit of their bargain, and their Defective Vehicles have suffered a
diminution in value.

---

Class Action Complaint                          46

1    302.   GM's conduct proximately caused the injuries to Plaintiff and the other Class

2  members.

3    303.   Plaintiff and the other Class members are likely to be damaged as a result of the

4  foregoing wrongful conduct of GM.   Ga. Code Ann. § 10-1-373 permits the Court to enter

5  injunctive relief to require GM to stop the unfair and deceptive conduct alleged herein and to

6  assess costs and attorneys' fees against GM for its willful deceptive trade practices.

7
                            **NINTH CAUSE OF ACTION**
8      **Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
                            **815 ILCS 505/1 et seq.**
9              **(Brought on behalf of the Illinois State Class)**

10   304.   Plaintiffs hereby incorporate by reference the allegations contained in the

11  preceding paragraphs of this Complaint, as if fully set forth herein.

12   305.   Plaintiffs Leyva, Gresik, Ellis Steele, and Raygoza bring this Count individually

13  and on behalf of the other members of the Illinois State Class (the "Class," for purposes of this

14  Count).

15   306.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill.

16  Comp. Stat. 505/2 prohibits unfair or deceptive acts or practices in connection with any trade or

17  commerce, including, among other things, "the use or employment of any deception, fraud, false

18  pretense, false promise, misrepresentation or the concealment, suppression or omission of any

19  material fact, . . . whether any person has in fact been misled, deceived, or damaged thereby."

20  The Act also prohibits suppliers from representing that their goods are of a particular quality or

21  grade they are not.

22   307.   The Defective Vehicles at issue are "merchandise" as that term is defined in the

23  Act, 815 Ill. Comp. Stat. 505/1(b).

24   308.   GM is a "person" as that term is defined in the Act, 815 Ill. Comp. Stat. 505/1(c).

25   309.   Plaintiffs and each of the other Class members are "consumers" as that term is

26  defined in the Act.  815 Ill. Comp. Stat. 505/1(e).

27   310.   The conduct of GM, as set forth herein, constitutes unfair and deceptive acts and

28  practices, including but not limited to, GM's manufacture and sale and/or lease of the Defective

Class Action Complaint                    47

Vehicles that share a common design defect in that they are equipped with defective Key

Systems that can suddenly fail during normal operation, leaving occupants of the Defective

Vehicles vulnerable to crashes, serious injury, and death. GM has admitted that the Defective

Vehicles are defective in issuing its recall.

311.   GM intended for Plaintiffs Leyva, Gresik, Ellis Steele, and Raygoza and the other

Class members to rely on its aforementioned unfair and deceptive acts and practices, and such

unfair and deceptive acts and practices occurred in the course of conduct involving trade or

commerce.

312.   As a result of the foregoing wrongful conduct of GM, Plaintiffs Leyva, Gresik,

Ellis Steele, and Raygoza and the other Class members have been damaged in an amount to be

proven at trial, including, but not limited to, actual damages, and reasonable costs and attorneys'

fees pursuant to 815 Ill. Comp. Stat. 505/1, *et seq.*

313.   GM's conduct in this regard was wanton, willful, outrageous, and in reckless

indifference to the rights of Plaintiffs Leyva, Gresik, Ellis Steele, and Raygoza and the other

Class members and, as such, warrants the imposition of punitive damages.

314.   815 Ill. Comp. Stat. 505/7 permits the Court to enter injunctive relief to require

GM to stop the unfair and deceptive conduct alleged herein.

## TENTH CAUSE OF ACTION
### Violation of the Illinois Uniform Deceptive Trade Practices Act
### 815 ILCS 510/1 *et seq.*
### (Brought on behalf of the Illinois State Class)

315.   Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint, as if fully set forth herein.

316.   Plaintiffs Leyva, Gresik, Ellis Steele, and Raygoza bring this Count individually

and on behalf of the other members of the Illinois State Class (the "Class," for purposes of this

Count).

317.   815 Ill. Comp. Stat. 510/2 provides that a:

person engages in a deceptive trade practice when, in the course of his or her
business, vocation, or occupation, the person:  . . . (2) causes likelihood of
confusion or of misunderstanding as to the source, sponsorship, approval, or
certification of goods or services; . . . (5) represents that goods or services have
sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities

that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; ... (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; ... (9) advertises goods or services with intent not to sell them as advertised; ... [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

318.   GM is a "person" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

319.   The Defective Vehicles sold or leased to Plaintiffs Leyva, Gresik, Ellis Steele, and Raygoza and the other Class members were not of the particular characteristics, uses, benefits, or qualities represented by GM.

320.   The Defective Vehicles sold or leased to Plaintiffs Leyva, Gresik, Ellis Steele, and Raygoza and the other Class members were not of the particular standard, quality, and/or grade represented by GM.

321.   Plaintiffs Leyva, Gresik, Ellis Steele, and Raygoza and the other Class members are likely to be damaged as a result of the foregoing wrongful conduct of GM.  815 Ill. Comp. Stat. 505/7 permits the Court to enter injunctive relief to require GM to stop the unfair and deceptive conduct alleged herein and to assess costs and attorneys' fees against GM for its willful deceptive trade practices.

## ELEVENTH CAUSE OF ACTION
### Breach of Express Warranty
### 815 ILCS 5/2-313
### (Brought on behalf of the Illinois State Class)

322.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

323.   Plaintiffs Leyva, Gresik, Ellis Steele, and Raygoza bring this Count individually and on behalf of the other members of the Illinois State Class (the "Class," for purposes of this Count).

324.   GM is and was at all relevant times a merchant with respect to motor vehicles.

325.   In the course of selling the Defective Vehicles, GM expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by GM.  GM has not repaired or adjusted the Defective Vehicles' materials and workmanship defects described herein.

Class Action Complaint                    49

326.    GM also expressly warranted through statements and advertisements that the Defective Vehicles were of high quality, and at a minimum, would actually work properly and safely.

327.    These warranties were made, *inter alia*, in advertisements and in uniform statements made by GM to the public and consumers of the Defective Vehicles.  These affirmations and promises were part of the basis of the bargain between GM, on the one hand, and Plaintiffs and the other Class members, on the other hand.

328.    GM breached these warranties by knowingly selling or leasing to Plaintiffs and the other Class members the Defective Vehicles with dangerous defects, and that were not of high quality.

329.    Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole.

330.    Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

331.    GM has actual knowledge of the dangerous defects alleged herein.  Moreover, GM was provided notice of these issues and defects by a letter dated March 24, 2014 to GM on behalf of Plaintiffs and through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.  Nevertheless, GM has failed to correct these defects in the Defective Vehicles.

332.    Plaintiffs and the other Class members have been damaged as a direct and proximate result of the breaches by GM in that the Defective Vehicles purchased or leased by Plaintiffs and the other Class members were and are worth far less than what Plaintiffs and the other Class members paid to purchase or lease, which was reasonably foreseeable to GM.

333.    As a direct and proximate result of GM's breach of the warranties, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**
**Violation of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. §§ 407.010 et seq.**
**(Brought on behalf of the Missouri State Class)**

334.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

335.   Plaintiff DeWitt brings this Count on behalf of the Missouri State Class ("Class," for purposes of this Count).

336.   The conduct of GM as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, GM's manufacture and sale and/or lease of the Defective Vehicles that share a common design defect in that they are equipped with defective Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.  GM has admitted that the Defective Vehicles are defective in issuing its recall.

337.   GM's actions as set forth above occurred in the conduct of trade or commerce.

338.   GM's actions impact the public interest because Plaintiff and the other Class members were injured in exactly the same way as millions of others purchasing and/or leasing Defective Vehicles as a result of GM's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business.

339.   Plaintiff and the other Class members were injured as a result of GM's conduct.

340.   Plaintiff and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.

341.   GM's conduct proximately caused the injuries to Plaintiff and the other Class members.

342.   GM is liable to Plaintiffs and the other Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

343.   Pursuant to Mo. Rev. Stat. § 407.010, Plaintiff, individually and on behalf of the other Class members, will serve the Missouri Attorney General with a copy of this complaint as Plaintiff, individually and on behalf of the other Class members, seeks injunctive relief.

Class Action Complaint                                    51

### THIRTEENTH CAUSE OF ACTION
**Breach of Express Warranty**
**Mo. Rev. Stat. § 400.2-313**
**(Brought on behalf of the Missouri State Class)**

344.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

345.    Plaintiff DeWitt brings this Count on behalf of the Missouri State Class ("Class," for purposes of this Count).

346.    GM is and was at all relevant times a merchant with respect to motor vehicles.

347.    In the course of selling the Defective Vehicles, GM expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by GM. GM has not repaired or adjusted the Defective Vehicles' materials and workmanship defects described herein.

348.    GM also expressly warranted through statements and advertisements that the Defective Vehicles were of high quality, and at a minimum, would actually work properly and safely.

349.    These warranties were made, *inter alia*, in advertisements and in uniform statements made by GM to the public and consumers of the Defective Vehicles. These affirmations and promises were part of the basis of the bargain between GM, on the one hand, and Plaintiff and the other Class members, on the other hand.

350.    GM breached these warranties by knowingly selling or leasing to Plaintiff and the other Class members the Defective Vehicles with dangerous defects, and that were not of high quality.

351.    Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

352.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

---

353.    GM has actual knowledge of the dangerous defects alleged herein. Moreover, GM was provided notice of these issues and defects by a letter dated March 24, 2014 to GM on behalf of Plaintiff and through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis. Nevertheless, GM has failed to correct these defects in the Defective Vehicles.

354.    Plaintiff and the other Class members have been damaged as a direct and proximate result of the breaches by GM in that the Defective Vehicles purchased or leased by Plaintiff and the other Class members were and are worth far less than what Plaintiff and the other Class members paid to purchase or lease, which was reasonably foreseeable to GM.

355.    As a direct and proximate result of GM's breach of the warranties, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

### FOURTEENTH CAUSE OF ACTION
**Violation of the Ohio Consumer Sales Practices Act**
**Ohio Rev. Code §§ 1345.01 *et seq.***
**(Brought on behalf of the Ohio State Class)**

356.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

357.    Plaintiff Cheraso brings this Count on behalf of the Ohio State Class ("Class," for purposes of this Count).

358.    At all times relevant to this suit, GM was a "supplier[s]," as defined in the Ohio Consumer Sales Practice Act, Ohio Rev. Code § 1345.01.

359.    At all times relevant to this suit, Plaintiff and the other Class members were "consumers," as defined in the Ohio Consumer Sales Practice Act, Ohio Rev. Code § 1345.01.

360.    At all times relevant to this suit, Plaintiff and the other Class members purchased or leased their Defective Vehicles as part of a "consumer transaction," as defined by Ohio Rev. Code § 1345.01(A).

361.    As a result of placing defective products into the stream of commerce, GM breached its implied warranty in tort. A vehicle manufacturer's breach of an implied warranty has previously been declared by Ohio courts to be an unfair and deceptive act, as defined in Ohio

1　Rev. Code § 1345.09(B).　*Mason v. Mercedes Benz USA, LLC*, No. 85031, 2005 Ohio App.

2　Lexis 3911 (8th Dist. Aug. 18, 2005).

3　　　362.　GM committed unfair and deceptive acts in violation of Ohio's Consumer Sales

4　Practice Act including, but not limited to, GM's manufacture and sale and/or lease of the

5　Defective Vehicles that share a common design defect in that they are equipped with defective

6　Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective

7　Vehicles vulnerable to crashes, serious injury, and death.　GM has admitted that the Defective

8　Vehicles are defective in issuing its recall.

9　　　363.　Further, GM, as reflected by the facts alleged elsewhere in this Complaint, made

10　representations and/or public statements about the quality, safety, and reliability of the Defective

11　Vehicles, which are unfair and deceptive in violation of Ohio law.

12　　　364.　GM committed these and other unfair and deceptive acts with regard to the

13　marketing and sale of the Defective Vehicles.　GM is liable to Plaintiff and the other Class

14　members under Ohio Rev. Code § 1345.09 for damages for economic loss suffered by Plaintiff

15　and the other Class members as a result of the defect.

16　　　365.　Plaintiff and the other Class members are entitled to compensatory damages,

17　injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code § 1345.09.

18　　　366.　The Ohio Attorney General made available for public inspection prior state court

19　decisions which have held that the acts and omissions of GM as detailed in this Complaint,

20　including, but not limited to, the failure to honor both implied warranties and express warranties,

21　the making and distribution of false, deceptive, and/or misleading representations, and the

22　concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in

23　violation of Ohio's Consumer Sales Practices Act.　These cases include, but are not limited to,

24　the following:

25　　　　　　a.　*State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

26　　　　　　b.　*State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF

27　　　　　　　　#10002025);

28

Class Action Complaint　　　　　　　　　54

c.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

d.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

e.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

f.   *Mark J. Cranford, et al v. Joseph Airport Ford, Inc.* (OPIF #10001586);

g.   *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

h.   *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

i.   *Khouri v. Don Lewis* (OPIF #100001995);

j.   *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

k.   *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

l.   *Brown v. Spears* (OPIF #10000403).

## FIFTEENTH CAUSE OF ACTION
### Breach of Express Warranty
### Ohio Rev. Code § 1302.26
### (Brought on behalf of the Ohio State Class)

367.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

368.   Plaintiff Cheraso brings this Count on behalf of the Ohio State Class ("Class," for purposes of this Count).

369.   GM is and was at all relevant times a merchant with respect to motor vehicles.

370.   In the course of selling the Defective Vehicles, GM expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by GM. GM has not repaired or adjusted the Defective Vehicles' materials and workmanship defects described herein.

371.   GM also expressly warranted through statements and advertisements that the Defective Vehicles were of high quality, and at a minimum, would actually work properly and safely.

372.    These warranties were made, *inter alia*, in advertisements and in uniform statements made by GM to the public and consumers of the Defective Vehicles. These affirmations and promises were part of the basis of the bargain between GM, on the one hand, and Plaintiff and the other Class members, on the other hand.

373.    GM breached these warranties by knowingly selling or leasing to Plaintiff and the other Class members the Defective Vehicles with dangerous defects, and that were not of high quality.

374.    Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

375.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

376.    GM has actual knowledge of the dangerous defects alleged herein. Moreover, GM was provided notice of these issues and defects by a letter dated March 24, 2014 to GM on behalf of Plaintiff and through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis. Nevertheless, GM has failed to correct these defects in the Defective Vehicles.

377.    Plaintiff and the other Class members have been damaged as a direct and proximate result of the breaches by GM in that the Defective Vehicles purchased or leased by Plaintiff and the other Class members were and are worth far less than what Plaintiff and the other Class members paid to purchase or lease, which was reasonably foreseeable to GM.

378.    As a direct and proximate result of GM's breach of the warranties, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

Class Action Complaint

## SIXTEENTH CAUSE OF ACTION
### Violation of the Texas Deceptive Trade Practices Act
### Tex. Bus. & Com. Code §§ 17.41 *et seq.*
### (Brought on behalf of the Texas State Class)

379. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

380. Plaintiff Smith brings this Count on behalf of the Texas State Class ("Class," for purposes of this Count).

381. GM's above-described acts and omissions constitute false, misleading, or deceptive acts or practices under the Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 *et seq.* ("Texas DTPA").

382. By failing to disclose and actively concealing the dangerous risk of Key System failure during normal operation in the Defective Vehicles, GM engaged in deceptive business practices prohibited by the Texas DTPA, including (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising the Defective Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving the Defective Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) failing to disclose information concerning the Defective Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

383. As alleged above, GM made numerous material statements about the safety and reliability of the Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of GM's unlawful advertising and representations as a whole.

384. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true safety and reliability of the Defective Vehicles.

385. In purchasing or leasing their Defective Vehicles, Plaintiff and the other Class members relied on the misrepresentations and/or omissions of GM with respect of the safety and reliability of the Defective Vehicles. GM's representations turned out not to be true because the

Defective Vehicles are equipped with defective Key Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. Had Plaintiff and the other Class members known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

386.  GM also breached express and implied warranties to Plaintiff and the other Class members, as set out above, and are therefore liable to them for damages under §§ 17.50(a)(2) and 17.50(b) of the Texas DTPA. GM's actions also constitute an unconscionable action or course of action under § 17.50(a)(3) of the Texas DTPA.

387.  Plaintiff and the other Class members sustained damages as a result of GM's unlawful acts and are, therefore, entitled to damages and other relief provided for under § 17.50(b) of the Texas DTPA. Because GM's conduct was committed knowingly and/or intentionally, Plaintiff and the other Class members are entitled to treble damages.

388.  Plaintiff, individually and on behalf of the other Class members, has provided GM with written notice of its violations of the Texas DTPA, pursuant to § 17.505. The notice was transmitted to GM on March 24, 2014.

389.  Notwithstanding any allegation in this Complaint, Plaintiff, individually and on behalf of the other Class members, does not seek monetary or other damages under the Texas DTPA at this time, but will amend this Complaint to seek all relief available under the Texas DTPA, if GM does not remedy its violations.

## SEVENTEENTH CAUSE OF ACTION
### Breach of Express Warranty
### Tex. Bus. & Com. Code § 2.313
### (Brought on behalf of the Texas State Class)

390.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

391.  Plaintiff Smith brings this Count on behalf of the Texas State Class ("Class," for purposes of this Count).

392.  GM is and was at all relevant times a merchant with respect to motor vehicles.

393.  In the course of selling the Defective Vehicles, GM expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by GM. GM has

not repaired or adjusted the Defective Vehicles' materials and workmanship defects described herein.

394.    GM also expressly warranted through statements and advertisements that the Defective Vehicles were of high quality, and at a minimum, would actually work properly and safely.

395.    These warranties were made, *inter alia*, in advertisements and in uniform statements made by GM to the public and consumers of the Defective Vehicles.    These affirmations and promises were part of the basis of the bargain between GM, on the one hand, and Plaintiff and the other Class members, on the other hand.

396.    GM breached these warranties by knowingly selling or leasing to Plaintiff and the other Class members the Defective Vehicles with dangerous defects, and that were not of high quality.

397.    Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

398.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

399.    GM has actual knowledge of the dangerous defects alleged herein.    Moreover, GM was provided notice of these issues and defects by a letter dated March 24, 2014 to GM on behalf of Plaintiff and through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.    Nevertheless, GM has failed to correct these defects in the Defective Vehicles.

400.    Plaintiff and the other Class members have been damaged as a direct and proximate result of the breaches by GM in that the Defective Vehicles purchased or leased by Plaintiff and the other Class members were and are worth far less than what Plaintiff and the other Class members paid to purchase or lease, which was reasonably foreseeable to GM.

1    401.   As a direct and proximate result of GM's breach of the warranties, Plaintiff and

2    the other Class members have been damaged in an amount to be proven at trial.

3                              **EIGHTEENTH CAUSE OF ACTION**
4                          **Violation of the Vermont Consumer Fraud Act**
                                    **Vt. Stat. Ann. tit. 9, § 2451**
5                          **(Brought on behalf of the Vermont State Class)**

6    402.   Plaintiffs hereby incorporate by reference the allegations contained in the

7    preceding paragraphs of this Complaint, as if fully set forth herein.

8    403.   Plaintiff Gray brings this Count on behalf of the Vermont State Class ("Class," for

9    purposes of this Count).

10   404.   The Vermont Consumer Fraud Act ("VCFA") makes unlawful "[u]nfair methods

11   of competition in commerce, and unfair or deceptive acts or practices in commerce...." Vt. Stat.

12   Ann. tit. 9, § 2453(a).

13   405.   GM is a seller within the meaning of the VCFA. Vt. Stat. Ann. tit. 9, § 2451a(c).

14   406.   In the course of GM's business, it willfully failed to disclose and actively

15   concealed the dangerous risk of Key System failure in the Defective Vehicles.   This was a

16   deceptive act in that GM represented that the Defective Vehicles have characteristics, uses,

17   benefits, and qualities which they do not have; represented that the Defective Vehicles are of a

18   particular standard and quality when they are not; and advertised the Defective Vehicles with the

19   intent not to sell them as advertised.   GM knew or should have known that its conduct violated

20   the VCFA.

21   407.   GM engaged in a deceptive trade practice under the VCFA when it failed to

22   disclose material information concerning the Defective Vehicles that was known to GM at the

23   time of the sale or lease.   GM deliberately withheld the information about the Key System

24   defects in order to ensure that consumers would purchase or lease its Class Vehicles and to

25   induce the consumer to enter into a transaction.

26   408.   The information withheld was material in that it was information that was

27   important to consumers and likely to affect their choice of, or conduct regarding the purchase or

28   lease of their vehicles.   GM's withholding of this information was likely to mislead consumers

---

Class Action Complaint                           60

acting reasonably under the circumstances. The existence of the Key System defect was material to Plaintiff and the other Class members. Had Plaintiff and the other Class members known that their Defective Vehicles had these serious safety defects, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

409. GM's conduct has caused or is to cause a substantial injury that is not reasonably avoided by consumers, and the harm is not outweighed by a countervailing benefit to consumers or competition.

410. Plaintiff and the other Class members have suffered injury and damages as a result of GM's false or fraudulent representations and practices in violation of § 2453. Plaintiff and the other Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain.

411. Plaintiff and the other Class members are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

## NINETEENTH CAUSE OF ACTION
### Breach of Express Warranty
### Vt. Stat. Ann. tit. 9A, § 2-313
### (Brought on behalf of the Vermont State Class)

412. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

413. Plaintiff Gray brings this Count on behalf of the Vermont State Class ("Class," for purposes of this Count).

414. GM is and was at all relevant times a merchant with respect to motor vehicles.

415. In the course of selling the Defective Vehicles, GM expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by GM. GM has not repaired or adjusted the Defective Vehicles' materials and workmanship defects described herein.

416.   GM also expressly warranted through statements and advertisements that the Defective Vehicles were of high quality, and at a minimum, would actually work properly and safely.

417.   These warranties were made, *inter alia*, in advertisements and in uniform statements made by GM to the public and consumers of the Defective Vehicles. These affirmations and promises were part of the basis of the bargain between GM, on the one hand, and Plaintiff and the other Class members, on the other hand.

418.   GM breached these warranties by knowingly selling or leasing to Plaintiff and the other Class members the Defective Vehicles with dangerous defects, and that were not of high quality.

419.   Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

420.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

421.   GM has actual knowledge of the dangerous defects alleged herein. Moreover, GM was provided notice of these issues and defects by a letter dated March 24, 2014 to GM on behalf of Plaintiff and through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis. Nevertheless, GM has failed to correct these defects in the Defective Vehicles.

422.   Plaintiff and the other Class members have been damaged as a direct and proximate result of the breaches by GM in that the Defective Vehicles purchased or leased by Plaintiff and the other Class members were and are worth far less than what Plaintiff and the other Class members paid to purchase or lease, which was reasonably foreseeable to GM.

423.   As a direct and proximate result of GM's breach of the warranties, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

(a)     That the Court certify this action as a class action, appointing Plaintiffs as class representative and appointing Plaintiffs' counsel as lead class counsel;

(b)     That the Court enjoin GM from continuing the unfair business practices alleged in this Complaint and requiring GM to repair the Defective Vehicles;

(c)     That the Court award Plaintiffs and the other Class members compensatory damages in an amount to be proven at trial;

(d)     That the Court award Plaintiff and the other Class members punitive damages in an amount to be proven at trial;

(e)     That the Court award Plaintiff and the other Class members attorneys' fees, costs, and expenses; and

(f)     That the Court award Plaintiff and the other Class members all other and further relief as the Court deems appropriate and just under the circumstances.

**DEMAND FOR JURY TRIAL**

Plaintiffs request trial by jury on all issues so triable.

Dated: March 24, 2014                    Respectfully submitted,

                            /s/ Roland Tellis
                            Roland Tellis (SBN 186269)
                            rtellis@baronbudd.com
                            Mark Pifko (SBN 228412)
                            mpifko@baronbudd.com
                            Isaac Miller (SBN 266459)
                            imiller@baronbudd.com
                            BARON & BUDD, P.C.
                            15910 Ventura Boulevard, Suite 1600
                            Encino, California 91436
                            Telephone: (818) 839-2333
                            Facsimile: (818) 986-9698

1                              Adam J. Levitt (to be admitted *pro hac vice*)
alevitt@gelaw.com

2                              John E. Tangren (to be admitted *pro hac vice*)
jtangren@gelaw.com

3                              GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200

4                              Chicago, Illinois 60602
Telephone: (312) 214-0000

5                              Facsimile: (312) 214-0001

6                              Lance Cooper (SBN 151800) (to be admitted *pro hac vice*)

7                              lance@thecooperfirm.com
THE COOPER FIRM

8                              701 Whitlock Avenue, S.W.
Marietta, Georgia 30064

9                              Telephone: (770) 427-5588
Facsimile: (770) 427-0010

10                            Scott B. Cooper (SBN 174520) (to be admitted *pro hac vice*)

11                            scott@cooper-firm.com
THE COOPER LAW FIRM, P.C.

12                            2030 Main Street, Suite 1300
Irvine, California 92614

13                            Telephone: (949) 724-9200
Facsimile: (949) 724-9255

14

15                            Cale H. Conley (to be admitted *pro hac vice*)
cale@conleygriggs.com

16                            Ranse M. Partin (to be admitted *pro hac vice*)
ranse@conleygriggs.com

17                            Andre T. Tennille III (to be admitted *pro hac vice*)
dre@conleygriggs.com

18                            CONLEY GRIGGS PARTIN LLP
The Hardin Building

19                            1380 West Paces Ferry Road, N.W., Suite 2100
Atlanta, Georgia 30327

20                            Telephone: (404) 467-1155
Facsimile: (404) 467-1166

21                            James R. Bartimus (to be admitted *pro hac vice*)

22                            jb@bflawfirm.com
Edward D. Robertson, Jr. (to be admitted *pro hac vice*)

23                            crobertson@bflawfirm.com

24                            BARTIMUS, FRICKLETON, ROBERTSON
& GOZA, P.C.

25                            11150 Overbrook Road, Suite 200
Leawood, Kansas 66211

26                            Telephone: (913) 266-2300
Facsimile: (913) 266-2366

27                            Mark DiCello (to be admitted *pro hac vice*)

28                            madicello@dicellolaw.com

Class Action Complaint                   64

Robert F. DiCello (to be admitted *pro hac vice*)
rfdicello@dicellolaw.com
THE DICELLO LAW FIRM
Western Reserve Law Building
7556 Mentor Avenue
Mentor, Ohio  44060
Telephone:  (440) 953-8888
Facsimile:  (440) 953-9138

Joseph J. Siprut (to be admitted *pro hac vice*)
jsiprut@siprut.com
SIPRUT P.C.
17 North State Street, Suite 1600
Chicago, Illinois  60602
Telephone:  (312) 236-0000
Facsimile:  (312) 948-9212

Niall A Paul (to be admitted *pro hac vice*)
npaul@spilmanlaw.com
SPILMAN THOMAS & BATTLE, PLLC
300 Kanawha Boulevard, East (25301)
Post Office Box 273
Charleston, West Virginia  25321
Telephone:  (304) 340-3800
Facsimile:  (304) 340-3801

Sharon L. Potter (to be admitted *pro hac vice*)
spotter@spilmanlaw.com
SPILMAN THOMAS & BATTLE, PLLC
Century Centre Building
1233 Main Street, Suite 4000
Wheeling, West Virginia 26003
Telephone: (304) 230-6950
Facsimile: (304) 230-6951

Nathan B. Atkinson (to be admitted *pro hac vice*)
natkinson@spilmanlaw.com
SPILMAN THOMAS & BATTLE, PLLC
110 Oakwood Drive, Suite 500
Winston-Salem, North Carolina 27103
Telephone: (336) 725-4710
Facsimile: (336) 725-4476

Guy R. Bucci (to be admitted *pro hac vice*)
Gbucci@BBJLC.com
Timothy C. Bailey (to be admitted *pro hac vice*)
Timbailey@BBJLC.com
Lee Javins (to be admitted *pro hac vice*)
Ljavins@BBJLC.com
BUCCI BAILEY & JAVINS L.C.
213 Hale Street
Charleston, West Virginia 25301
Telephone: (304) 932-4639
Facsimile: (304) 345-0375

---

Class Action Complaint                    65

# Exhibit A



**GENERAL MOTORS LLC**
Vehicle Safety and Crashworthiness

RECEIVED
By ... call Management Division at 6:41 am, Feb 10, 2014

February 7, 2014

Ms. Nancy Lewis
Associate Administrator for Enforcement
National Highway Traffic Safety Administration
Recall Management Division (NVS-215)
1200 New Jersey Avenue, SE – Room W45-306
Washington, DC 20590

Dear Ms. Lewis:

The following information is submitted pursuant to the requirements of 49 CFR 573.6 as it applies to a determination by General Motors to conduct a safety related recall for certain 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.

573.6(c)(1): General Motors Company; Chevrolet and Pontiac Brands

573.6(c)(2),(3),(4): This information is shown on the attached sheet.

573.6(c)(5): General Motors has decided that a defect, which relates to motor vehicle safety, exists in 2005-2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The ignition switch torque performance may not meet General Motors' specification. If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the "run" position. The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

Until this correction is performed, customers should remove non-essential items from their key ring.

573.6(c)(6): The issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall.

573.6(c)(8): Dealers are to replace the ignition switch.

GM will provide the dealer bulletin and owner letter mail dates when available.

Pursuant to 577.11(e), GM will provide reimbursement to owners for repairs completed on or before ten days after the owner mailing is completed, according to the plan submitted on May 23, 2013.

Mail Code: 480-210-2V1
30001 Van Dyke Road • Warren, MI 48090-9020
N130454 573 Letter.docx



**Exhibit A**

Letter to Ms. Nancy Lewis
N130454 573 Letter
February 7, 2014
Page 2

573.6(c)(10): GM will provide copies of the dealer bulletin and owner letter under separate cover.

573.6(c)(11): GM's assigned recall number is 13454.

Sincerely,

M. Carmen Benavides, Director
Product Investigations and Safety Regulations

13454
Attachment

573.6(c)(2),(3),(4)

## VEHICLES POTENTIALLY AFFECTED BY MAKE, MODEL, AND MODEL YEAR
## PLUS INCLUSIVE DATES OF MANUFACTURE

| MAKE | MODEL SERIES | MODEL YEAR | NUMBER INVOLVED | INCLUSIVE MANUFACTURING DATES (FROM) | (TO) | DESCRIPTIVE INFO. TO PROPERLY IDENT. VEH. | EST. NO. W/CONDITION |
|------|-------------|-----------|-----------------|--------------------------------------|------|-------------------------------------------|----------------------|
| Chevrolet | A | 2005 | 140,978 | 08/03/2004 | 06/17/2005 | Cobalt | * |
| Chevrolet | A | 2006 | 229,578 | 04/05/2005 | 06/09/2006 | Cobalt | ** |
| Chevrolet | A | 2007 | 215,667 | 04/20/2006 | 08/16/2007 | Cobalt | ** |
| Pontiac | A | 2007 | 32,899 | 04/20/2006 | 08/06/2007 | G5 | ** |
| GM Total: | | | 619,122 | | | | |

* All involved vehicles will be corrected as necessary.

573.6(c)(2)(iv):    Delphi Packard Electrical/Electronic Architecture
5725 Delphi Drive
M/C 483.400.301
Troy, Michigan 48098

Tel: [1] 248.813.2334
Fax: [1] 248.813.2333

The involved parts are manufactured in Mexico.

13454

# Exhibit B

## DECLARATION OF GALDINA MACIEL PURSUANT
## TO CALIFORNIA CIVIL CODE SECTION 1780(d)

I, Galdina Maciel, declare:

1.    I am a Plaintiff in this action.   The following is based upon my personal knowledge and if called upon as a witness to testify in this matter, I could and would testify competently thereto.

2.    I make this Declaration pursuant to California Civil Code section 1780(d) so as to state facts showing that this action has been commenced in the proper venue.

3.    Defendant General Motors LLC does business in Sonoma County, California, a county within the Northern District of California where I reside, through several dealerships located in this county.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 21, 2014.

Galdina Maciel

3-21-14

**Exhibit B**