# Exhibit T

Daniel C. Girard (State Bar No. 114826)
Eric H. Gibbs (State Bar No. 178658)
David K. Stein (State Bar No. 257465)
Scott M. Grzenczyk (State Bar No. 279309)
dcg@girardgibbs.com
ehg@girardgibbs.com
ds@girardgibbs.com
smg@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94104
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

[Additional Counsel on Signature Page]

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEVORA KELLEY, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>      vs.<br><br>GENERAL MOTORS COMPANY,<br><br>            Defendant. | Case No. 8:14-cv-00465<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL<br><br>CLASS ACTION |

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

Plaintiff Devora Kelley, on behalf of herself and all others similarly situated, alleges the following against Defendant General Motors Company (GM).

## SUMMARY OF THE CASE

1.      Plaintiff brings this case on behalf of herself and a proposed class of other owners and lessees of 2005-2007 Chevrolet Cobalt, 2007 Pontiac G5, 2006-2007 Chevrolet HHR, 2003-2007 Saturn Ion, and 2007 Saturn Sky vehicles (collectively, the "Class Vehicles"). This lawsuit arises out of GM's breach of common law and statutory obligations between July 10, 2009, and February 2014.

2.      GM knew that as early as 2001, reports had surfaced about a defect in Class Vehicles that causes the vehicles' ignition switches to move out of the "run" position while the vehicles are in motion. The defect causes the vehicles to lose power, drivers to lose control, and airbags to fail to deploy.

3.      GM chose not to say anything to drivers until February 2014—four and a half years after it took over the General Motors brand—the whole time allowing Plaintiff and other drivers to continue driving and spending money on Class Vehicles that were not safe to operate.

4.      GM admits at least 12 deaths appear directly attributable to the defect. In all likelihood that number is significantly understated: The Center for Auto Safety has identified *more than three hundred deaths* in instances where Class Vehicles were in collisions, yet the airbags did not deploy.

5.      As GM's new CEO Marry Barra concedes, "[s]omething went wrong with our process . . . and terrible things happened." GM, unfortunately, had every financial incentive to conceal this danger as long as possible. Publicly disclosing the defect would have required GM to undertake expensive recall efforts, damaged its reputation and future sales, and decreased the sale of warranties and replacement parts. Instead, GM said nothing about the dangerous defect in over one million vehicles.

6.      Although GM has recently announced recalls of the vehicles, GM does not yet have a suitable repair available, and acknowledges that Class Vehicles are not safe to

1

drive.  In GM's words, the risk remains that "under certain conditions, … your ignition switch may move out of the 'run' position … turning off the engine….  If the ignition switch is not in the run position, the air bags may not deploy if the vehicle is involved in a crash."[1]  As a result, hundreds of thousands of consumers are left with Class Vehicles that can neither be safely driven nor reliably repaired, and the resale value of the vehicles is materially diminished.

7.      Plaintiff brings this action to provide relief to consumers like herself, and to hold GM accountable for its misconduct, including for negligence and violating the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, the Michigan Consumer Protection Act (the "MCPA"), Mich. Comp. L. Ann. § 445.901, *et seq*., and the California Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.

## PARTIES

8.      Plaintiff Devora Kelley is a citizen of California, residing in Lassen County, and the current owner of a 2007 Chevrolet Cobalt originally manufactured and sold by GM.

9.      Defendant GM is a Delaware corporation with its principal place of business in Detroit, Michigan.  With respect to the facts alleged and claims asserted in this complaint, GM is the corporate successor of General Motors Corporation ("Old GM"), which filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code on June 1, 2009.  On July 10, 2009, GM acquired substantially all of the assets and assumed certain of the liabilities of Old GM by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code.  At all relevant times, GM has been in the business of developing, producing and marketing cars and trucks worldwide.  GM has a network of authorized retailers that sell GM vehicles and parts throughout California, including in this district.

---

[1] http://www.gm.com/ignition-switch-recall.html.

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendant; there are more than 100 class members; and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

11.     This Court has personal jurisdiction over Defendant because GM conducts substantial business in this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides in this district.

## FACTUAL ALLEGATIONS

13.     When an automobile ignition switch spontaneously turns from the "run" position to the "accessory" or "off" position, it starts a chain reaction that can lead to accidents, injuries, and death.

14.     In the case of Class Vehicles, the ignition switch defects can cause the car's engine and electrical system to turn off, which in turn disables the power steering and power brakes, making the Class Vehicles more difficult to control and stop, increasing the likelihood of an accident.

15.     Without a functional electrical system, the Class Vehicles' airbags do not deploy in case of a crash, leading to serious injury and death of drivers and passengers.

16.     Old GM became aware of the ignition switch defect thirteen years ago.  GM admits that in 2001, during the development of the Saturn Ion, Old GM observed that the ignition switch could turn off easily.  GM claims that a design change resolved the problem before the Ion was sold publicly.[2]

17.     Again in 2003, an Old GM service technician observed an Ion's ignition switch off during vehicle operation, causing the engine to stall.  The technician replaced

---

[2] Danielle Ivory, *G.M. Reveals It Was Told of Ignition Defect in '01*, N.Y. Times, March 12, 2014.  Available at: http://www.nytimes.com/2014/03/13/business/gm-reveals-it-was-told-of-ignition-defect-in-01.html.

3

the worn switch and reported the incident. Old GM conducted an internal inquiry, but took no action and the inquiry was closed.

18.     During the launch of the 2005 Chevy Cobalt, Old GM learned of an incident where a Cobalt lost engine power because the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. Old GM employees replicated this phenomenon during test drives and opened a Problem Resolution Tracking System inquiry ("PRTS") to investigate the issue.

19.     Although solutions were considered, according to GM, "after consideration of the lead time required, cost, and effectiveness of each of these solutions, the PRTS was closed with no action."

20.     Throughout 2005, Old GM received numerous reports of Cobalts losing engine power after the key moved out of the "run" position. Old GM opened more PRTSs to examine the issue, which led Old GM to issue Information Service Bulletin 05-02-35-007. This Service Bulletin applied to the 2005-06 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005-06 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003-06 Saturn Ion. It notified dealers that "there is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," and "the customer should be advised of this potential and should take steps to prevent it – such as removing unessential items from their key chain." The Service Bulletin simply advised dealers that engineers had developed an insert for the key ring, to adjust it from a "slot" design to a "hole" design and presumably reduce stress on the fragile ignition system.

21.     According to a study by the Center for Auto Safety, in 2005 alone, there were 21 deaths of front seat occupants in Saturn Ions and Chevy Cobalts where the

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

airbags failed to deploy in a non-rear impact crash. The number would likely be higher if the other Class Vehicle models had been included in the study.[3]

22.    Old GM updated its earlier Service Bulletin in October 2006 to include the 2007 Chevrolet Cobalt and HHR; the 2007 Pontiac G5 and Solstice; and the 2007 Saturn Ion and Sky. According to GM's records, key inserts have been provided to only 474 customers who brought their vehicles in for service.

23.    Also in 2006, Delphi Mechatronics, the supplier of the ignition switch, proposed changes to the design of the ignition switch. The Old GM engineer responsible for the ignition switch in all Class Vehicles approved the proposed design change, though the approval document only referenced the Saturn Ion design platform. The approved changes included the use of a new "detent plunger and spring" that would increase "torque force in the ignition switch." Delphi began providing the re-designed ignition switch to Old GM for all Class Vehicles "at some point during the 2007 model year." Contrary to standard industry practice, the change in the ignition switch design was not accompanied by a corresponding change in the part number. A former General Motors engineer has described the failure to update the part number as a "cardinal sin" and an "extraordinary violation of internal processes."

24.    In the meantime, accident reports involving the Class Vehicles were arriving at GM on a regular basis.

25.    In October 2006, two more teenagers were killed when another 2005 Cobalt crashed into a tree. The NHTSA investigated the crash and found that the key moved from "run" to "accessory," which turned the engine off. The vehicle's airbags did not deploy upon impact.

26.    According to the Center for Auto Safety study, in 2006 there were an additional 29 deaths of front seat occupants in Saturn Ions and Chevy Cobalts where the

---

[3] *See* Center for Auto Safety, Letter to NHTSA, March 13, 2014. Available at: http://www.autosafety.org/sites/default/files/imce_staff_uploads/Friedman%20Letter%20March%2013%202014%20Full.pdf.

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

airbags failed to deploy in a non-rear impact crash.  The number would likely be higher if the other Class Vehicle models had been included in the study.

27.    In 2007 NHTSA investigators met with a group of Old GM employees and informed them of a fatal crash in Maryland in July 2005.  The NHTSA representative described the frontal collision and the airbag failure.  NHTSA also informed Old GM that data retrieved from the car's sensing and diagnostic module ("SDM") indicated that the car's power mode was "accessory."

28.    In response, Old GM assigned an investigating engineer to track Cobalts involved in frontal impact collisions where the airbags did not deploy.  By the end of 2007, Old GM had identified at least ten such crashes.  Sensing and diagnostic module data was available for nine of the ten crashes – and the ignition was in the "accessory" position for four of those nine crashes.

29.    According to the Center for Auto Safety study, in 2007 there were an additional 41 deaths of front seat occupants in Saturn Ions and Chevy Cobalts where the airbags failed to deploy in a non-rear impact crash.  In 2008 there were 31 deaths and in 2009, there were 43 deaths.  These numbers would likely be higher for each year if the other Class Vehicle models had been included in the study.[4]

30.    Although consumer complaints continued to pour in and the death and injury numbers continued to mount, Old GM did not make any further remedial changes to the ignition design until February 2009, when the key design was finally changed from a "slot" to a "hole."  Yet this change was not implemented until the 2010 model year Cobalts.

31.    On June 1, 2009, Old GM filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code.  On July 10, 2009, GM acquired substantially all of the assets and assumed certain of the liabilities of Old GM by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code.  As a part of the Section 363 sale, GM specifically acquired the obligation to comply with the certification, reporting, and recall

[4] *Id.*

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

requirements of all applicable federal and state regulations with respect to vehicles and parts manufactured or distributed by Old GM. And GM also assumed all of Old GM's written warranty obligations and all obligations under state lemon laws.

32.     From the time of its formation, GM was aware of the ignition switch defect and the investigations, reports, part modifications, and deaths associated with the defect that had occurred before it acquired Old GM. Despite knowing of the defect, GM failed to issue a recall, warn drivers of the danger, or begin developing an appropriate repair procedure.

33.     Throughout the ensuing years, reports, investigations, accidents, and fatalities continued to pile up.

34.     In 2010, there were an additional 47 deaths of front seat occupants in Saturn Ions and Chevy Cobalts where the airbags failed to deploy in a non-rear impact crash. The number would likely be higher if the other Class Vehicle models had been included in the Center for Auto Safety study.[5]

35.     In 2011 GM initiated an extensive field performance evaluation process to review crash data. But even then, knowing that a number of different vehicles from different model years shared the same ignition design, GM limited the field performance evaluation to only 2005-2007 model year Cobalts and only to incidents where the airbags did not deploy.

36.     In May 2012, the GM engineer assigned to the FPE finally began a forensic study of steering columns and ignition switches from Cobalts, HHRs, Pontiac G5s, and Saturn Ions in model years ranging from 2003-2010. These steering columns and ignition switches were tested for torque performance at a salvage yard, and certain of these switches, particularly those in 2007 model year and earlier vehicles, exhibited particular performance shortfalls.

37.     The investigation continued, and in 2013 GM retained outside assistance to conduct a comprehensive survey and assessment of the various ignition switches. The

_____
[5] *Id.*

7

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

data gathered by the outside technical expert revealed that early model ignition switches made by Delphi did not meet GM's torque specifications and that the changes to the detent plunger and spring in 2006-2007 most likely explained the difference in performance in later model ignition switches. In short, GM blamed the supplier for the faulty switch design.

38.     GM admits to twelve deaths related to the ignition switch defects in the Class Vehicles. In fact, there appear to hundreds of deaths and injuries attributable to the ignition switch defects.[6]

39.     The assessments performed by GM and the outside expert revealed faults in the Class Vehicles that could no longer be ignored and in early 2014 GM's Executive Field Action Decision Committee finally directed the first safety recall.

40.     On February 10, 2014, the NHTSA received a letter from GM stating that it was ordering a recall of some vehicles due to a defect in the vehicles' ignition switch. GM announced the recall on February 13, 2014.[7]

41.     The February 13, 2014 recall, however, only covered the 2005-2007 Chevy Cobalt and Pontiac G5.

42.     Eventually GM's Executive Field Action Decision Committee expanded the recall. On February 24, 2014, GM added the 2006-2007 Chevy HHR and Pontiac Solstice, the 2003-2007 Saturn Ion, and the 2007 Saturn Sky.

43.     GM notified its dealers of the recalls on February 26, 2014, and March 4, 2014, and mailed letters to current owners of the Class Vehicles on March 10 and March 11, 2014. The recall directs dealers to replace the ignition switch. However, GM does not yet have a suitable repair procedure for the defective part, and replacement ignition switches will not be available until April 2014 at the earliest.

---

[6] Center for Auto Safety, Letter to NHTSA, March 13, 2014.

[7] Danielle Ivory, *G.M. Reveals It Was Told of Ignition Defect in '01*, N.Y. Times, March 12, 2014. Available at: http://www.nytimes.com/2014/03/13/business/gm-reveals-it-was-told-of-ignition-defect-in-01.html?_r=1

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

44.     GM admits the Class Vehicles are unsafe to drive.  GM notes in the Q&A section of its recall webpage, in answer to the question "Are the recalled vehicles safe to drive?"  that "there is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine… If the ignition switch is not in the run position, the air bags may not deploy if the vehicle is involved in a crash."[8]

45.     In addition to the recall, GM now faces an investigation by the NHTSA, hearings in both houses of Congress, and a probe by the Department of Justice.

46.     GM's CEO Mary Barra admitted that GM's actions and inactions relating to the ignition switch defect were improper:  "Something went terribly wrong in our processes in this instance, and terrible things happened."[9]

47.     GM has appointed a new Vehicle Safety Chief, yet at least 1.4 million Class Vehicles remain on the road, and other vehicles not covered by the recall may also have the deadly ignition switch defects.  Until the Class Vehicles are repaired, they remain a danger to the public.

48.     Since its acquisition of Old GM, GM has possessed knowledge and information superior to that of consumers about the design and function of the ignition switches in the Class Vehicles and the existence of the defects in those vehicles.  Yet GM never informed consumers about the ignition switch defects until it publicly announced the recalls.

49.     These defects have caused damage to Plaintiff and other members of the proposed class because a vehicle with a serious safety defect is worth less than a comparable vehicle without the defect.  A vehicle purchased, leased, or retained under the

---

[8] http://www.gm.com/ignition-switch-recall.html.

[9] Bill Vlasic and Christopher Jensen, *Something Went 'Very Wrong' at G.M., Chief Says*, N.Y. Times, March 17, 2014.  Available at:
http://www.nytimes.com/2014/03/18/business/gm-chief-barra-releases-video-on-recalls.html.

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

reasonable assumption that it is safe is worth more than a vehicle known to have an unreasonable risk of a catastrophic accident because of the ignition switch defects. Plaintiff and other members of the proposed class are now burdened with unsafe vehicles that are worth less than they would have been but for GM's failure to disclose the defects.

50.     Plaintiff and other members of the proposed class have also been damaged by their inability to use their vehicles pending the availability of replacement parts and the costs incurred to repair damage done to their vehicles as a result of the defect.  In addition, Plaintiff and/or members of the proposed class have spent money they would not otherwise have spent on items such as warranties, repairs, and the Class Vehicles themselves, some of which money accrued to GM as a result of GM's concealment of the defect.

## PLAINTIFF'S EXPERIENCE

51.     Plaintiff Devora Kelley purchased a 2007 Chevrolet Cobalt in August 2009 in Redding, California.  At the time of purchase, Ms. Kelley's vehicle had been driven approximately 34,000 miles.

52.     Ms. Kelley purchased the vehicle as a family car; she has often driven her children in the vehicle and she bought the vehicle to drive around town for errands and to commute to and from work.

53.     Within the past year or so, Ms. Kelley's 2007 Cobalt has shut off on its own at least three times.  In each instance, the vehicle shut off as Ms. Kelley was driving on a bumpy road or some other situation that caused jostling.

54.     When she purchased the vehicle, Ms. Kelley believed she was buying a safe and reliable car with no known safety defects.  Ms. Kelley, like any reasonable consumer, expected that if GM knew the vehicle had a dangerous defect, that GM would have disclosed that danger and recalled the vehicles.  Until GM announced its recall in early 2014, however, Ms. Kelley did not know that the ignition switch was defective, that GM had long known of the defect, or that people had died as a result.

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

55. Had Ms. Kelley known of the defect, she would not have purchased the vehicle. Now, Ms. Kelley is left with a vehicle with an acknowledged safety hazard and no suitable repair has been offered.

## CLASS ACTION ALLEGATIONS

56. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and:

      a.    A class ("Class") initially defined as:

All persons in the United States who owned or leased a Class Vehicle as of February 13, 2014; and

      b.    A subclass ("Subclass") initially defined as:

All persons who owned or leased any of the Class Vehicles in California as of February 13, 2014 ("California Subclass").

57. Excluded from the proposed Class and California Subclass are GM and any parent, affiliate, or subsidiary of GM; any entity in which GM has a controlling interest; any of GM's officers or directors; any successor or assign of GM; anyone employed by counsel for Plaintiff; any Judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons; and any individual claiming damages for personal injuries allegedly arising from the Class Vehicles.

58. <u>Numerosity of the Class – Fed. R. Civ. P. 23(a)(1)</u>. Defendant's recent filings with the National Highway Traffic Safety Administration state that Old GM manufactured and sold in the United States almost 1.4 million of the Class Vehicles, meaning that Class members are far too numerous to practically join in a single action. Class members can be identified using registration records, sales records and other information maintained by GM or non-parties in the ordinary course of business.

59. <u>Existence and Predominance of Common Questions– Fed. R. Civ. P. 23(a)(2), 23(b)(3)</u>. Common questions of law and fact exist as to all Class members and

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

predominate over questions affecting only individual Class members.  These common questions include the following:

      a.  Whether the Class Vehicles are defective;

      b.  When GM became aware of the defect;

      c.  Whether the defect is material;

      d.  Whether GM failed to disclose the defect;

      e.  Whether GM profited from its concealment of the defect;

      f.  Whether GM's conduct, as alleged, harmed Plaintiff and the members of the Class;

      g.  Whether GM violated the Michigan Consumer Protection Act and what remedies are available for Plaintiff and the Class if it did;

      h.  Whether GM violated the California Unfair Competition Law, and what remedies are available for Plaintiff and the California Subclass if it did;

      i.  Whether GM acted negligently by failing to disclose the ignition switch defect and failing to promptly develop an appropriate repair procedure; and

      j.  Whether Plaintiff and the members of the Class are entitled to equitable or injunctive relief.

60.   <u>Typicality – Fed. R. Civ. P. 23(a)(3)</u>.  Plaintiff's claims are typical of the claims of the Class members because, among other things, she purchased a Class Vehicle in August 2009, and continued to own it as of February 13, 2014.

61.   <u>Adequacy of Representation – Fed. R. Civ. P. 23(a)(4)</u>.  Plaintiff is an adequate representative because her interests are aligned with those of the Class members she seeks to represent.  Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously on Class members' behalf.

62.   <u>Superiority – Fed. R. Civ. P. 23(b)(3)</u>.  The action may be certified under Rule 23(b)(3) because common questions predominate as described above and because a

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

class action is the best available method for the fair and efficient adjudication of this controversy. This litigation involves technical issues that will require expert testimony and targeted discovery of a sophisticated defendant, and could not practically be taken on by individual litigants. In addition, individual litigation of Class members' claims would be impracticable and unduly burdensome to the court system and has the potential to lead to inconsistent results. A class action presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

63.    In the alternative to class certification under Rule 23(b)(3), the proposed Class may be certified under Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory appropriate with respect to the Class as a whole.

### **TOLLING**

64.    Any applicable statute of limitations that might otherwise bar any Class member's claims has been tolled by GM's knowing and active concealment of the facts alleged above. Plaintiff and the members of the Class were ignorant of vital information essential to the pursuit of their claims. Plaintiff and members of the Class could not reasonably have discovered that their GM vehicles were defective because GM did not provide relevant information about the defects to the NHTSA or to vehicle owners/lessors, denied that there was a defect and concealed the truth from the public until shortly before this action was filed.

### **FIRST CAUSE OF ACTION**
### **(Violations of the Michigan Consumer Protection Act,**
### **Mich. Comp. L. Ann. § 445.901 *et seq.*)**

65.    Plaintiff Kelley, on behalf of herself and the Class, realleges as if fully set forth, each and every allegation set forth herein.

66.    GM and Plaintiff are persons under Mich. Comp. L. Ann. § 445.902(d).

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

67.     GM's business of selling and leasing vehicles, providing notice of automotive defects, selling replacement parts and warranties, and developing repair procedures falls within the definition of "trade or commerce" in Mich. Comp. L. Ann. § 445.902(g).

68.     GM committed unfair and deceptive acts as defined in Mich. Comp. L. Ann. § 445.903.

69.     Between July 10, 2009, and February 2014, GM knew about the ignition switch defect in Class Vehicles, but did not reveal that the Class Vehicles had defective ignition switches or that no appropriate repair procedure existed.  Plaintiff and the Class were misled and deceived by GM's omission.  The existence of the defect could not reasonably have been discovered by consumers until GM announced its recalls of the vehicles in February and March of 2014.  GM thus violated Michigan's Consumer Protection Act by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."  Mich. Comp. L. Ann. § 445.903 (s). .

70.     As a direct and proximate result of GM's unfair and deceptive acts, as alleged herein, Plaintiff  Kelley and Class members have suffered damages in that they spent more money on Class Vehicles and related purchases than they otherwise would have and are left with Class Vehicles that cannot be safely driven and which are of diminished value.  Meanwhile, GM has generated more revenue connected with Class Vehicles, including through the sale of warranties and replacement parts, than it otherwise could have and charged inflated prices for warranties and parts, unjustly enriching itself thereby.

71.     Plaintiff and Class members are entitled to actual damages or statutory damages of $250 per person (whichever is higher), equitable relief, attorney's fees and costs, declaratory relief, and a permanent injunction enjoining GM from its unfair and deceptive practices.

---

14

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

## SECOND CAUSE OF ACTION

### (For Unlawful, Unfair, and Fraudulent Business Practices under Business and Professions Code § 17200 *et seq.*)

72.     Plaintiff Kelley, on behalf of herself and the California Subclass, realleges as if fully set forth, each and every allegation set forth herein.

73.     GM's acts and practices, as alleged in this complaint, constitute unlawful, unfair and/or fraudulent business practices, in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

74.     Between July 10, 2009, and February 2014, GM violated the Unfair Competition Law by failing to disclose that the ignition switch on the Class Vehicles is defective and poses a safety hazard, by continuing to profit from the sale of warranties and replacement parts, and by failing to develop an appropriate repair procedure.

75.     GM engaged in unlawful business practices by violating the TREAD Act, 49 U.S.C. §§ 30101, *et. seq.*, and its implementing regulations.  GM failed to timely notify vehicle owners, purchasers, and dealers about the ignition switch defect, in violation of 49 U.S.C. §§30118(c).  GM also failed to notify the National Highway Traffic Safety Administration (NHTSA) within 5 working days of discovering the ignition switch defect, in violation of 49 CFR § 573.6.

76.     GM also engaged in unfair business practices by, among other things:

        a)      Engaging in conduct where the utility of that conduct is outweighed by the gravity of the consequences to Plaintiff and other members of the Class;

        b)      Engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and other members of the Class; and

        c)      Engaging in conduct that undermines or violates the stated policies underlying the TREAD Act, which seeks to reduce traffic accidents and deaths and injuries resulting from traffic accidents.

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

77.    GM engaged in fraudulent business practices by engaging in conduct that was and is likely to deceive a reasonable consumer.

78.    As a direct and proximate result of GM's unlawful, unfair, and fraudulent business practices as alleged herein, Plaintiff  Kelley and Class members have suffered injury in fact and lost money or property, in that they purchased Class Vehicles, warranties, and replacement parts they otherwise would not have, and are left with Class Vehicles that cannot be safely driven and which are of diminished value.  Meanwhile, GM has generated more revenue connected with Class Vehicles, including through the sale of warranties and replacement parts, than it otherwise could have and charged inflated prices for warranties and parts, unjustly enriching itself thereby.

79.    Plaintiff and Class members are entitled to equitable relief, including restitutionary disgorgement of all profits accruing to GM because of its unlawful, unfair, and fraudulent, and deceptive practices, attorney's fees and costs, declaratory relief, and a permanent injunction enjoining GM from its unlawful, unfair, fraudulent, and deceitful activity.

**THIRD CAUSE OF ACTION**
**(Negligence)**

80.    Plaintiff Kelley, on behalf of herself and the Class, realleges as if fully set forth, each and every allegation set forth herein.

81.    GM owed Plaintiff and Class members a duty to provide thorough notice of known safety defects, such as the ignition switch defect, including a warning that the defective vehicles should not be driven until an appropriate repair procedure is developed and performed.  GM also owed Plaintiff and class members a duty, once it discovered the ignition switch defect, to ensure that an appropriate repair procedure was developed and made available to drivers.

82.    GM owed a duty to Plaintiff and class members not to engage in fraudulent or deceptive conduct, including the knowing omission of material information such as the

16

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

existence of the ignition switch defect.  This duty is independent of any contractual duties GM may owe or have owed.

83.    GM also owed an independent duty to Plaintiff and class members to disclose the ignition switch defect under the TREAD Act, 49 U.S.C. §§ 30101, *et. seq*., and its implementing regulations.  GM is required to send notice to owners, purchasers, and dealers of Class Vehicles whenever it "learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety."  49 U.S.C. §§30118(c).  GM was aware of the ignition switch defect at the time it acquired Old GM, yet failed to timely notify vehicle owners, purchasers, and dealers about the defect.  This duty is independent of any contractual duties GM may owe or have owed.

84.    GM also had a duty to notify the National Highway Traffic Safety Administration (NHTSA) of the ignition switch defect within 5 working days of discovering the defect.  49 CFR § 573.6.   GM was aware of the ignition switch defect at the time it acquired Old GM, yet failed to timely notify the NHTSA.  This duty is independent of any contractual duties GM may owe or have owed.

85.    A finding that GM owed a duty to Plaintiff and Class members would not significantly burden GM.  GM has the means to efficiently notify drivers of GM vehicles about dangerous defects.  The cost borne by GM for these efforts is insignificant in light of the dangers posed to Plaintiff and Class members by GM's failure disclose the ignition switch defect and provide an appropriate notice and repair.

86.    Between July 10, 2009, and February 2014, GM failed to disclose and deceptively concealed the ignition switch defect to the NHTSA, Plaintiff, and other drivers of Class Vehicles, and failed to provide appropriate notice of and repair procedures for the ignition switch defect.  GM departed from the reasonable standard of care and breached its duties to Plaintiff and other drivers of GM vehicles.

87.    GM's conduct was morally blameworthy.  GM knew about the ignition switch defect and knew it was dangerous.  Yet GM concealed the defect, placing drivers of Class Vehicles at unnecessary risk and resulting in serious injuries and death.

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

88.    GM's conduct was contrary to public policy favoring the disclosure of defects that may affect customer safety and the prevention of accidents, injuries, and deaths due to defective automobiles.  These policies are embodied in the TREAD Act, 49 U.S.C. § 30101, and defect notifications provisions of 49 C.F.R. § 573.1, *et seq*.

89.    As a direct, reasonably foreseeable, and proximate result of GM's failure to exercise reasonable care, inform Plaintiff and other Class members of the defect, and provide appropriate repair procedures for the defect, Plaintiff  Kelley and Class members have suffered damages in that they spent more money on Class Vehicles and related purchases than they otherwise would have and are left with Class Vehicles that cannot be safely driven and which are of diminished value.

90.    Plaintiff could not through the exercise of reasonable diligence have prevented the injuries caused by GM's negligence.  Neither Plaintiff nor other Class members contributed to GM's failure to provide appropriate notice and repair procedures.

91.    Plaintiff seeks to recover her damages caused by GM.  In addition, since GM acted fraudulently, and with wanton and reckless misconduct, in conscious disregard of the safety of Plaintiff and other Class members, Plaintiff also seeks an award of exemplary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on Plaintiff's own behalf and on behalf of the Class, prays for judgment as follows:

a.    For an order certifying the Class and appointing Plaintiff and her counsel to represent the Class;

b.    For an order awarding Plaintiff and the members of the Class damages, statutory damages, and consequential damages;

c.    For an order awarding Plaintiff and the members of the Class exemplary damages;

d.    For an order awarding Plaintiff and the members of the Class restitution, disgorgement, or other equitable relief as the Court deems proper;

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

e.     For an order enjoining GM from continuing to engage in unlawful business practices as alleged herein;

f.     For an order awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest;

g.     For an order awarding Plaintiff and the members of the Class reasonable attorney's fees and costs of suit, including expert witness fees; and

h.     For an order awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, on behalf of herself and on behalf of the Class, demands a trial by jury on all issues so triable.


Dated: March 26, 2014           Respectfully Submitted

**GIRARD GIBBS LLP**

By:    /s/ Eric H. Gibbs

Daniel C. Girard
Eric H. Gibbs
David K. Stein
Scott M. Grzenczyk
601 California Street, 14th Floor
San Francisco, California 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

Robert C. Hilliard
Rudy Gonzales, Jr.
Catherine D. Tobin
Marion Reilly
**HILLIARD MUÑOZ GONZALES LLP**
719 S. Shoreline Boulevard, Suite 500
Corpus Christi, Texas 78401

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465

Telephone : (361) 882-1612
Facsimile: (361) 882-3015

Thomas J. Henry
Greggory A. Teeter
Travis Venable
**THOMAS J. HENRY INJURY ATTORNEY**
521 Starr Street
Corpus Christi, Texas 78401
Telephone: (361) 985-0600
Facsimile: (361) 985-0601

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT
CASE NO.: 8:14-cv-00465