# Exhibit U

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRIS SHOLLENBERGER,** | : | |
| | : | **NO. _____** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **CLASS ACTION** |
| | : | |
| **GENERAL MOTORS, LLC,** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **Defendant.** | : | |

## PLAINTIFF'S CLASS ACTION COMPLAINT

## INTRODUCTION

1.      This class action lawsuit seeks recourse for consumers in the wake of a recall of some 1.6 million vehicles recently announced by Defendant General Motors, LLC ("Defendant" or "GM").  As discussed below, GM has essentially admitted that each of the Class Vehicles (defined below) suffer from a defectively designed ignition switch.

2.      The defectively designed ignition switch presents a serious safety concern for the operators of the Class Vehicles, as well as others on the road. As discussed below, the ignition systems in the Class Vehicles are defectively designed because they are predisposed to slipping out of the "on" position when the vehicle is in motion. When this occurs, the car's power steering, power brakes and/or air bags can be disabled.

3.     It has been widely reported that GM knew of the existence of this
ignition switch defect well before the recent recall – perhaps even before some of
the Class Vehicles were put on the market.  According to a March 24, 2014 article
in the *Wall Street Journal,* GM engineers decided to launch the 2005 Cobalt
notwithstanding their knowledge of the ignition switch defect because they
presumed that drivers could safely steer cars off of the road after a stall.[1]

4.     They were wrong; it has been reported that the defective ignition
switch has been linked to 31 car accidents and 13 fatalities.  In the aftermath of the
recall, the President of GM North America, Alan Batey, has publically
acknowledged that "[t]he chronology shows that the process employed to examine
this phenomenon was not as robust as it should have been," and "we are deeply
sorry."[2]

5.     Yet even following the recall, no suitable repair procedure has been
made available.  While the vehicles in question thus remain unsafe to drive (as GM
has tacitly acknowledged), GM has not told drivers that continuing to drive their
vehicles jeopardizes their lives and safety, or instructed them to refrain from

---

[1]
http://online.wsj.com/news/articles/SB10001424052702303949704579459783108
376974?mod=WSJ_hp_LEFTWhatsNewsCollection&mg=reno64-wsj (last visited
Mar. 25, 2014).
[2]
http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2
014/Feb/0225-ion.html(last visited Mar. 25, 2014).

driving their vehicles until an effective repair procedure is available. To the

contrary, GM has affirmatively stated that its engineers have determined "that the

vehicle is safe to drive" so long as "you use only the ignition key with no

additional items on the key ring."[3]

6.      The purpose of this lawsuit is to ensure that consumers affected by

this recall receive timely, complete and accurate notification about the safety risks

associated with the continued use of their vehicle.  Plaintiff also seeks to recover

economic damages for himself and the Class for, *inter alia,* the diminution in value

of the Class Vehicles (and in the value of their keys that can no longer be

connected to a key chain while in the ignition), all out of pocket expenses

associated with the ignition switch defect, and punitive and treble damages.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction of this action pursuant to the

Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d)(2) and (6)

because: (i) there are 100 or more class members, (ii) there is an aggregate amount

in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii)

there is minimal diversity because at least one plaintiff and one defendant are

citizens of different states.  This Court also has supplemental jurisdiction over the

state law claims pursuant to 28 U.S.C. § 1367.

---

[3] http://www.gm.com/ignition-switch-recall.html <last visited Mar. 27, 2014>

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant transacts substantial business in this district.  Defendant has advertised in this district and has received substantial revenue and profits from its services in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

9.      This Court has personal jurisdiction over the Defendant.  As set forth below, the facts relevant to Plaintiff occurred in this district.  In addition, Defendant has multiple authorized dealers located within the Commonwealth.

## THE PARTIES

10.     Plaintiff Chris Shollenberger ("Plaintiff") is a resident of Myerstown, Pennsylvania.  In April of 2008, he purchased a 2006 model year Chevrolet Cobalt, vin number 1G1AK55F867808078, from the Klick Lewis Family Dealership in Palmyra, Pennsylvania.  Shortly after purchasing this vehicle, Plaintiff experienced the ignition switch defect.  Specifically, the car and its power steering would regularly turn itself off. Within a month or two of purchasing this vehicle, Plaintiff was involved in a one-car accident due to the ignition switch defect, wherein Plaintiff's vehicle was damaged.  Plaintiff then had to purchase replacement parts to repair his vehicle.  Plaintiff's arm was also injured and bruised in this accident. Plaintiff was afraid to drive the vehicle and significantly curtailed his use of it, using it only for necessities like traveling to work.  Plaintiff ultimately traded in the

vehicle but, due to the ignition switch defect, received significantly less for it than

he otherwise would have.  As a result of GM's conduct as alleged herein, Plaintiff

has been injured.

11.    Defendant GM is a limited liability company organized under

Delaware law with its principal office located at 300 Renaissance Center, Detroit

Michigan 48265.

12.    Defendant GM is the successor GM entity resulting from the GM

chapter 11 bankruptcy proceeding, contractually assumed liability for the claims in

this lawsuit.  The Defective Vehicles were originally designed, manufactured,

marketed, and distributed into the stream of commerce by GM's predecessor,

General Motors Corporation (sometimes referred to as "old GM").  General Motors

Corporation filed for bankruptcy in 2009. In July 2009, the bankruptcy court

approved the sale of General Motors Corporation to NGMCO, Inc., which was

converted into Defendant General Motors, LLC (sometimes referred to as "new

GM").

13.    The sale of old GM to new GM was reduced to an Amended and

Restated Master Sale and Purchase Agreement ("the Agreement"). Under the

Agreement, Defendant GM not only "Purchased Assets," but "Assumed

Liabilities," which included "all Liabilities arising out of, relating to, in respect of,

or in connection with the use, ownership or sale of the Purchased Assets after the

H0033906.                                    5

Closing."  In addition, Defendant GM (a/k/a "new GM") is the party that initiated

and is conducting a recall of the Class Vehicles; it is therefore legally responsible

for those vehicles still on the road.

## FACTUAL BACKGROUND

**A.  The Defective Ignition Switch and GM's Recall.**

14.     GM initiated a series of recalls after, on January 31, 2014, an internal

review committee directed that one be undertaken.  On February 13, GM

announced that it was recalling 778,000 vehicles.  This number later doubled - to a

total of 1.6 million vehicles - on February 24.

15.     GM explained that the recall was necessary because

> There is a risk, under certain conditions, that your ignition switch may move
> out of the "run" position, resulting in a partial loss of electrical power and
> turning off the engine. This risk increases if your key ring is carrying added
> weight (such as more keys or the key fob) or your vehicle experiences rough
> road conditions or other jarring or impact related events. If the ignition
> switch is not in the run position, the air bags may not deploy if the vehicle is
> involved in a crash, increasing the risk of injury or fatality.[4]

16.     The GM vehicle makes and models subject to the recall in the United

States (and which are the "Class Vehicles" for purposes of this case) are the

following:

- 2005-2007 Chevrolet Cobalt

- 2005-2007 Pontiac G5

---

[4] http://www.gm.com/ignition-switch-recall.html (last visited Mar. 25, 2014).

- 2003-2007 Saturn Ion

- 2006-2007 Chevrolet HHR

- 2006-2007 Pontiac Solstice and 2007 Saturn Sky.[5]

17.     Contrary to GM's description of the problem, the defect transcends just the ignition switch; it also includes the placement of the ignition switch, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the use of a different type of key. To fully remedy the problem and render the Class Vehicles safe and of economic value to their owners again, additional design elements beyond a new ignition switch are needed.

**B.  GM's Advance Knowledge of the Ignition Switch Defect.**

18.     GM was allegedly aware of the ignition switch defect as early as early as 2001 from its pre-production development of the Ion.  This was when GM reportedly became aware of issues relating to ignition switch "passlock" system.

19.     In 2003, before the launch of the 2005 Cobalt, GM became aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. An investigation was opened and, after consideration of

---

[5] GM's recall also included the 2005-2006 Pontiac Pursuit, which was sold in Canada only.

09-5002  Case 1:14-cv-00582-YK  Doc 12631-21  Filed 04/21/14  Entered 04/21/14 20:34:57  Exhibit
Document 1  Filed 03/27/14  Page 8 of 23
Pg 9 of 24

lead-time required and the cost and effectiveness of potential solutions, the

investigation was closed with no action taken.

     20.    Throughout 2005, GM received similar field reports of vehicles losing

engine power when the key moved out of the "run" position. A proposal was

approved to redesign the key head, but later cancelled. Instead of recalling the

vehicles to replace the defective ignition switches, GM issued a Service Bulletin

(the "Bulletin"). The Bulletin recognized that there was a potential for the driver to

inadvertently turn off the ignition due to low ignition key cylinder torque/effort.

     21.    According to an article titled "General Motors Misled Grieving

Families on a Lethal Flaw" published in the *New York Times* on March 25, 2014,

engineers at GM verified at a meeting held on May 15, 2009 that "data in the black

boxes of Chevrolet Cobalts confirmed a potentially fatal defect existed in hundreds

of thousands of cars."[6]  Notwithstanding this knowledge, GM has allegedly "told

the families of accident victims and other customers that it did not have enough

evidence of any defect in their cars…"[7]  GM even reportedly "threatened to come

after" the family of one accident victim that had filed a lawsuit.

     22.    Although GM developed an insert for the key ring that changed it

from a slot design to a hole design, to prevent the key from easily jogging the

---

[6] http://www.nytimes.com/2014/03/25/business/carmaker-misled-grieving-families-on-a-lethal-flaw.html?hp&_r=0 (last visited Mar. 25, 2014).
[7] *Id.*

ignition switch out of the run position, the redesigned ignition switch was not

installed in vehicles until the 2007 model year.

23.     Given the vast number of instances of sudden engine power loss and

non-deployment of airbags related to the defective ignition switch and GM's

knowledge of many or all of the instances, GM should have aggressively taken

remedial measures to promptly address these defects. GM failed to do so.

**C.     Harm to Plaintiff and Class Members.**

24.     While GM has assured consumers that it will repair the defective

ignition switch defect, it has also acknowledged that it does not currently have the

capability to do so. According to its website: "[w]e are working as quickly as

possible to obtain parts, and expect to have parts beginning in April of this year.

We will contact affected customers as soon as parts are available so that they can

schedule an appointment with their dealer to have their vehicle repaired."[8]

25.     In the meantime, both GM and the National Highway Traffic Safety

Administration ("NHTSA") recommend that owners of the Class Vehicles "'use

only the ignition key with nothing else on the key ring' and get repairs as soon as

parts are available from GM."[9]  Specifically, GM advises consumers that "[u]ntil

the recall repairs have been performed, it is very important that you remove all

---

[8] http://www.gm.com/ignition-switch-recall.html (last visited Mar. 25, 2014).
[9] http://www.nhtsa.gov/ (last visited Mar. 25, 2014).

items from your key ring, leaving only the vehicle key. The key fob (if

applicable), should also be removed from your key ring."[10]

26. Images on the website of the NHTSA's website illustrate GM's single

key recommendation with respect to the recall:[11]



27. The ignition switch defect in GM vehicles has adversely affected the

company's reputation as a manufacturer of safe, reliable vehicles with high resale

value, as compared to vehicles made by its competitors. In the wake of the news

reports about this serious problem, GM customers and consumers generally are –

as they should be – skeptical about the quality and safety of GM vehicles.

28. Moreover, some vehicle owners, including Plaintiff, have driven their

cars less than they otherwise would due to fear of being in an accident.

## TOLLING OF STATUTES OF LIMITATION

29. Any applicable statute of limitations has been tolled by GM's

knowing and active concealment of its deceptive practices and of the defect in the

---

[10] http://www.gm.com/ignition-switch-recall.html (last visited Mar. 25, 2014).
[11] http://www.nhtsa.gov/ (last visited Mar. 25, 2014).

Class Vehicles.  Plaintiff and members of the class could not have reasonably

discovered the true extent of the defective Class Vehicles practices until shortly

before this class action litigation was commenced and the widespread recalls were

publically announced.

30.    As a result of the fraudulent concealment by GM, any and all

applicable statutes of limitations otherwise applicable to the allegations herein

have been tolled.

## CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this suit as a class action on behalf of himself and on

behalf of all others similarly situated pursuant to FED. R. CIV. P. 23(a), 23(b)(2)

and 23(b)(3).  Subject to additional information obtained through further

investigation and/or discovery, the foregoing definition of the Class may be

expanded or narrowed by amendment or otherwise.  Plaintiff seeks to represent the

following Class:

>    All persons in the United States who purchased one or more
>    Class Vehicle (the "Nationwide Class").

32.    In the alternative to the Nationwide Class, Plaintiff seeks to represent

the following state specific class:

>    All persons in Pennsylvania who purchased one or more Class
>    Vehicle (the "Pennsylvania Class").

33.     This action has been brought and may be properly maintained as a class action for the following reasons:

34.     **Numerosity**:  Members of the Class are so numerous that their individual joinder is impracticable.  GM admits that there are in excess of a million vehicles subject to the recall.  The precise size (and identity and contact information) of the Class can be readily determined from documents and records maintained by GM and its dealers.

35.     **Existence and Predominance of Commons Questions of Fact and Law**:  Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

    i.      Whether GM knowingly failed to disclose (or to timely disclose) the existence of the ignition switch defect to Plaintiff and Class members;

    ii.     Whether the ignition switch defect is a safety issue;

    iii.    Whether GM's recall of the Class Vehicles is sufficient to compensate or make whole Plaintiff and Class Members;

    iv.     Whether Defendant's actions constituted a breach of warranty and/or unlawful business practice;

iv.     Whether Defendant was unjustly enriched when it received

and retained funds rightfully belonging to Plaintiff and those similarly

situated;

v.     Whether the value of the Class Vehicles (and their car

keys) has been diminished due to the conduct of GM as alleged herein;

vi.     The appropriate nature of any class-wide equitable relief;

and

viii.     The appropriate measurement of restitution and/or

measure of damages to award to Plaintiff and members of the Class.

These and other questions of law or fact which are common to the members

of the Class predominate over any questions affecting only individual members of

the Class.

36.     **Typicality**:  Plaintiff's claims are typical of the claims of the Class.

By definition, Plaintiff and all members of the Class purchased one or more of the

Class Vehicles.  Plaintiff is advancing the same claims and legal theories on behalf

of himself and all absent Class members.

37.     **Adequacy**:  Plaintiff is an adequate representative of the Class

because his interests do not conflict with the interests of the Class that he seeks to

represent; he has retained counsel competent and highly experienced in complex

class action litigation; and he intends to prosecute this action vigorously.  The

interests of the Class will be fairly and adequately protected by Plaintiff and his

counsel.

38. **Superiority**: A class action is superior to other available means of

fair and efficient adjudication of the claims of Plaintiff and members of the Class.

The injury suffered by each individual Class member is relatively small in

comparison to the burden and expense of individual prosecution of the complex

and extensive litigation necessitated by Defendant's conduct. It would be virtually

impossible for members of the Class individually to redress effectively the wrongs

done to them. Even if the members of the Class could afford such individual

litigation, the court system could not. Individualized litigation presents a potential

for inconsistent or contradictory judgments. Further, individualized litigation

increases the delay and expense to all parties, and to the court system, presented by

the complex legal and factual issues of the case. By contrast, the class action

device presents far fewer management difficulties, and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by a single

court.

39. GM has acted, and has refused to act, on grounds generally applicable

to the Class, thereby making appropriate final injunctive relief with respect to the

Class as a whole; and

40.     In the absence of a class action, GM would be unjustly enriched

because it would be able to retain the benefits and fruits of its wrongful conduct.

## VIOLATIONS ALLEGED

## COUNT I

### VIOLATION OF THE PENNSYLVANIA
### UNFAIR TRADE PRACTICES ACT
### (On Behalf of the Pennsylvania Class)

41.     Plaintiff incorporates the allegations in the preceding paragraphs. This

Count is brought on behalf of the Pennsylvania Class**.**

42.     The conduct alleged above constitutes unfair methods of competition

or unfair or deceptive acts or practices in violation of Section 201-2(4)(v),(vii),

(xiv) and (xxi) of the UTPCPL, 73 Pa.C.S.A. §§ 201-1, *et seq*.

43.     The UTPCPL applies to the claims of Plaintiff and the other members

of the Pennsylvania Class because the conduct which constitutes violations of the

UTPCPL by the Defendant occurred in substantial part within the Commonwealth

of Pennsylvania.

44.     Plaintiff and the other members of the Pennsylvania Class are

consumers who purchased Class Vehicles primarily for personal, family or

household purposes within the meaning of 73 Pa.C.S.A. § 201-9.2.

45.     GM used and employed unfair methods of competition and/or unfair

or deceptive acts or practices within the meaning of 73 Pa.C.S.A. §§ 201-2 and

201-3.

46.    GM'S concealment, omission, deception and conduct was likely to

deceive and likely to cause misunderstanding and/or in fact caused Plaintiff and the

other members of the Pennsylvania Class to be deceived.

47.    GM intended that Plaintiff and the other members of the Pennsylvania

Class would rely on its misrepresentations, concealment, warranties, deceptions

and/or omissions.

48.    Plaintiff and the other members of the Pennsylvania Class have been

damaged as a proximate result of GM's violations of the UTPCPL and have

suffered actual, ascertainable losses.

49.    As a direct and proximate result of GM's violations of the UTPCPL as

set forth above, Plaintiff and the other members of the Pennsylvania Class have

suffered an ascertainable loss of money and are therefore entitled to relief,

including damages, plus punitive and/or triple damages, costs and attorney's fees

under Section 201-9.2 of the UTPCPL.

50.    To the extent that justifiable reliance is required to be plead, Plaintiff

has justifiably relied on GM's warranties, conduct and omissions.

## COUNT II

### BREACH OF EXPRESS WARRANTY
### (On behalf of the Nationwide Class or, alternatively, Pennsylvania Class)

51.　　Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

52.　　GM expressly warranted that the Class Vehicles were of high quality and, at minimum, would actually work properly.  GM also expressly warranted that it would repair and/or replace defects in material and/or workmanship free of charge that occurred during the warranty period.

53.　　To the extent it is required, Plaintiff relied on GM's express warranty when purchasing his Class Vehicles.

54.　　GM breached this warranty by selling to Plaintiff and the Class members the Class Vehicles with known ignition switch defects, which are not of high quality, and which are predisposed to fail prematurely and/or fail to function properly.

55.　　As a result of Defendants' actions, Plaintiff and the Class members have suffered economic damages.

56.　　Any attempt by GM to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.  Specifically, GM' warranty limitation is unenforceable because it knowingly

sold a defective product without informing consumers about the serious safety
defect.

57.     The time limits contained in GM's warranty period were also
unconscionable and inadequate to protect Plaintiff and members of the Class.
Among other things, Plaintiff and Class members had no meaningful choice in
determining these time limitations the terms of which unreasonably favored GM.
A gross disparity in bargaining power existed between GM and the Class members,
and GM knew or should have known that the Class Vehicles were defective at the
time of sale and would fail well before their useful lives.

58.     Plaintiff and the Class members have complied with all obligations
under the warranty, or otherwise have been excused from performance of said
obligations as a result of Defendants' conduct described herein.

## COUNT III

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (On behalf of the Nationwide Class or, alternatively, Pennsylvania Class)

59.     Plaintiff and the Class incorporate by reference each preceding and
succeeding paragraph as though fully set forth herein.

60.     At all times mentioned herein, GM manufactured and/or supplied the
Class Vehicles, and prior to the time these goods were purchased by Plaintiff and

the putative Class, GM impliedly warranted to Plaintiff that they would be

merchantable (*i.e.,* they would safely transport passengers).

61.    The Class Vehicles were unfit for their intended use and were not of

merchantable quality, as they contained a safety defect. This amounted to a breach

of said warranty.

62.    GM also breached this warranty because the ignition switch will now

require repairs, during which time the Class Vehicles cannot be operated.

63.    As a direct and proximate result of the breach, Plaintiff and the

putative Class suffered and will continue to suffer losses as alleged herein in an

amount to be determined at trial.

64.    Any attempt by GM to disclaim or limit these implied warranties vis-

à-vis consumers is unconscionable and unenforceable under the circumstances

here.  Specifically, GM' warranty limitation is unenforceable because it knowingly

sold a defective product without informing consumers about the serious safety

defect.

65.    The time limits contained in GM's warranty period were also

unconscionable and inadequate to protect Plaintiff and members of the Class.

Among other things, Plaintiff and Class members had no meaningful choice in

determining these time limitations the terms of which unreasonably favored GM.

A gross disparity in bargaining power existed between GM and the Class members,

H0033906.                                    19

and GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

## COUNT IV

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
**(On behalf of the Nationwide Class or, alternatively, Pennsylvania Class)**

66.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

67.     Plaintiff and Defendant had a valid contract, the essential terms of which are set forth herein. A covenant of good faith and fair dealing is implied in every contract.

68.     Plaintiff and the Class members have performed all conditions and promises required by them to be performed in accordance with the terms and conditions of the contract.

69.     GM breached its contractual duties by, *inter alia*, selling Class Vehicles with a known safety defect and failing to timely recall them. This breach was material.

70.     As a direct and proximate result of GM's breaches of contract, Plaintiff and the Class have sustained, and will continue to sustain, substantial harm, in an amount to be determined at trial.

## COUNT V

### UNJUST ENRICHMENT
**(On behalf of the Nationwide Class or, alternatively, Pennsylvania Class)**

71.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein. This allegation is being pled in the alternative to the breach of contract claim pursuant to FED. R. CIV. P. 8(a)(3).

72.     Plaintiff and members of the Class conferred a benefit on Defendant by, *inter alia*, purchasing its vehicles.

73.     GM has retained the monies that it acquired from the sale of the Class Vehicles. GM knows of and appreciated this benefit.

74.     GM was and continues to be unjustly enriched at the expense of Plaintiff and Class members.  As such, it would be unjust to permit retention of these monies by GM under the circumstances of this case without the payment of restitution to Plaintiff and Class members.

75.     Defendant should be required to disgorge this unjust enrichment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, on behalf of himself and members of the Class, that this Court:

A.      determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of

Civil Procedure, and issue an order certifying the Class as defined

above;

B.      award all actual, general, special, punitive, treble, incidental,

statutory, and consequential damages to which Plaintiff and Class

members are entitled.  This includes, without limitation, compensation

for (i) loss of use of the Class Vehicles; (ii) reimbursement of out of

pocket costs for, alternative transportation, prior repairs, etc.; (iii)

diminution in resale value of the vehicles; and (iv) an increased risk of

physical harm.

C.      award pre-judgment and post-judgment interest on such monetary

relief;

D.      grant appropriate injunctive and/or declaratory relief, including

appropriate curative notice to affected Class Members;

E.      award reasonable attorney's fees and costs; and

F.      grant such further and other relief that this Court deems appropriate.

/
/
/
/

H0033906.

Dated: March 27, 2014                    Respectfully submitted,


                                         _____
                                         Joseph G. Sauder
                                         Matthew D. Schelkopf
                                         Benjamin F. Johns
                                         Joseph B. Kenney
                                         CHIMICLES & TIKELLIS LLP
                                         One Haverford Centre
                                         361 West Lancaster Avenue
                                         Haverford, PA 19041
                                         Telephone: (610) 642-8500
                                         Facsimile: (610) 649-3633
                                         E-mail: JGS@chimicles.com
                                                 MDS@chimicles.com
                                                 BFJ@chimicles.com
                                                 JBK@chimicles.com

                                         *Attorneys for Plaintiff*