# Exhibit AA

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-CV-21147-KMW

MARIA ELENA SANTIAGO, individually
and on behalf of all others similarly
situated,

       Plaintiff,

vs.

GENERAL MOTORS, LLC,

       Defendant.

_____/

**CLASS ACTION**
**<u>JURY TRIAL DEMANDED</u>**

### <u>AMENDED CLASS ACTION COMPLAINT</u>

Plaintiff Maria Elena Santiago, individually and on behalf of all similarly situated persons, brings this action against Defendant General Motors, LLC ("GM") for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), ("RICO"), asserts additional statutory and common law claims, and alleges as follows:

### NATURE OF THE CASE

1.    This case arises from GM's scheme to defraud GM consumers through its unconscionable failure to disclose and active concealment of a defect in certain GM vehicles that renders them unsafe to drive and has killed at least 12 innocent victims and possibly hundreds more.

2.    The defect involves the vehicles' ignition switch system, which is dangerously susceptible to failure during normal and foreseeable driving conditions (the "Ignition Switch Defect"). When the system fails, the switch turns from the "Run" (or "On") position to either the "Off" or the "accessory" position, which then results in a loss of power, speed control, and braking, as well as a disabling of the vehicle's airbags.

3.      The vehicles that have this defect ("Defective Vehicles") are:

- 2003-2007 Saturn Ion
- 2007 Saturn Sky
- 2005-2007 Pontiac G5
- 2006-2007 Pontiac Solstice
- 2005-2007 Chevrolet Cobalt
- 2006-2007 Chevrolet HHR

4.      So far, there are approximately 1.6 million Defective Vehicles.

5.      GM, acknowledging that "[s]omething went wrong with our process in this instance and terrible things happened," has recalled the Defective Vehicles to replace their ignition switch systems.  Merely replacing the ignition switch systems, however, will not completely solve the problem or make the Defective Vehicles safe, because the defect also includes the location of the ignition switch, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the type of key that is used.

6.      Plaintiff brings this action on behalf of a Class of all persons in the United States who currently own or lease one or more Defective Vehicles.

7.      Plaintiff also brings this action for a subclass of Florida residents who own or lease one or more Defective Vehicles.

8.      GM's scheme to defraud and gross misconduct have harmed Plaintiff and Class Members and caused them actual damages.   Plaintiff and Class Members did not receive the benefit of their bargains as purchasers and lessees, as they received vehicles that were less safe, less useful, of lower quality and less valuable than represented.   Plaintiff and Class Members contracted to purchase vehicles that do not unexpectedly turn off and become uncontrollable without airbag protection, but because of the Ignition Switch Defect, received defective vehicles that unexpectedly turn off and become uncontrollable without airbag protection.  Plaintiff and

Class Members thus overpaid for their vehicles or made lease payments that were too high. Plaintiff and Class Members would not have paid as much for their vehicles nor made as high lease payments had the Ignition Switch Defect been disclosed. As a result of publicity regarding the Ignition Switch Defect and GM's misconduct, the value of the Defective Vehicles has diminished, and GM's offer to replace the ignition switch system does not adequately address the diminished value of Plaintiff's and Class Members' vehicles.

## JURISCTION AND VENUE

9.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 class members, and more than two-thirds of the Class is diverse from Defendant. This Court also has original federal question jurisdiction because Plaintiff's first claim arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"), and the Court has supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendant has caused harm to Class Members residing in this District, including, but not limited to, Plaintiff.

## PARTIES

12.     Plaintiff Maria Elena Santiago is a resident of Cutler Bay, Miami-Dade County, Florida. Plaintiff owns a 2007 Saturn Ion Coupe, which she bought new. Plaintiff chose the

3

Saturn in part because she wanted a safely designed and manufactured vehicle and she understood that Saturns had a reputation for being high-quality, durable, and safe vehicles.   Plaintiff did not learn of the Ignition Switch Defect until about March 2014. However, a few years ago, when Plaintiff was driving her Saturn Ion on the entrance ramp to a highway, the vehicle unexpectedly stalled.  Had GM disclosed the Ignition Switch Defect, Plaintiff would not have purchased her Saturn Ion, or would have paid less than she did, and would not have retained the vehicle.

13.     Defendant GM is a limited liability company formed under the laws of Delaware with its principal place of business in Michigan. GM was incorporated in 2009, and on July 10, 2009, acquired substantially all the assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code, pursuant to a Master Sales and Purchase Agreement ("Agreement").

14.     Under the Agreement, GM expressly assumed the following obligation:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicles parts manufactured or distributed by [Old GM].

15.     GM also expressly assumed:

> All Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

16. GM is also liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint, because GM acquired and operated Old GM and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos, plants, offices, leadership, personnel, engineers, and employees, GM was aware from its inception of the Ignition Switch Defect in the Defective Vehicles, and GM and Old GM concealed the Ignition Switch Defect from the public, regulators, and the bankruptcy court. Because GM is liable for the wrongful conduct of Old GM, there is no need to distinguish between the conduct of Old GM and GM, and the complaint will hereinafter simply refer to GM as the corporate actor when describing the relevant facts.

## FACTUAL ALLEGATIONS

### A. GM's Decade of Concealment

17. In documents filed with the federal government, GM has admitted that it learned of the Ignition Switch Defect in 2001, during the pre-preproduction development of the Saturn Ion. At that time, an internal report indicated that the car was stalling due to problems with the ignition switch, which included "low detent plunger force" in the ignition switch. The report stated that "an ignition switch design change" solved the problem, but it obviously did not.

18. GM nonetheless began manufacturing and selling the Ion in 2002 (for the 2003 model year) with the defective ignition switch systems, which were manufactured by Delphi Automotive, PLC.

19. In 2003, an internal GM inquiry documented that a service technician observed the Saturn Ion stall after the ignition had switched off while driving. The technician noticed that "[t]he owner had several keys on the key ring," and the report stated that "[t]he additional weight

of the keys had worn out the ignition switch." The technician replaced the ignition switch, and the inquiry was closed without further action.

20.     In 2004, three GM employees driving production Ions reported that their cars had stalled from a loose ignition switch. "The switch should be raised at least one inch toward the wiper stalk . . . . This is a basic design flaw and should be corrected if we want repeat sales," one engineer reported.

21.     Despite these reports, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

22.     Even worse, when GM began manufacturing and selling the Chevrolet Cobalt in 2004 (for the 2005 model year), which was essentially the same car as the Saturn Ion, it installed the same ignition switch system as it installed in the Ion.

23.     Soon after the Cobalt entered the market, GM began receiving complaints about incidents of vehicles losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. Engineering inquiries, known within GM as Problem Resolution Tracking System ("PRTS") reports, were opened to assess the issue.

24.     In February 2005, GM engineers concluded that the problem had two causes: "a lower torque detent in the ignition switch . . . [and the] low position of the lock module on the [steering] column." Again, however, GM decided not to take action.

25.     On February 28, 2005, GM issued a Service Bulletin to its dealers addressing "the potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effect" in 2005 Cobalts and 2005 Pontiac Pursuits, which GM stated was "more likely to

occur if the driver is short and has a large heavy key chain." Notably, GM did not disseminate this information to Plaintiff and the Class members.

26.     The February 28, 2005 Service Bulletin directed the dealers to advise customers that "removing unessential items from their key chains" would prevent the ignition from being turned off inadvertently.

27.     But GM knew at that time that the problem was a result of design defects in the key and ignition system, and not short drivers using heavy key chains. Moreover, GM knew that the "fix" it directed dealers to offer customers was insufficient to prevent the problem with the ignition.

28.     GM transmitted the February 28, 2005 Service Bulletin to its dealers through the mail and/or wires.

29.     During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration. The slot design allowed the key chain to hang lower on the key, which placed more torque on the ignition switch when the chain was contacted or moved. The proposal was initially approved, but later cancelled.

30.     In June 2005, the *New York Times* reported that Chevrolet dealers were telling customers to lighten their key rings to prevent intermittent stalling and the loss of electrical power in their cars. The article included a statement from Alan Adler, GM's Manager for Safety Communications, in which he reassured the public that the problem only occurred in "rare cases when a combination of factors is present," that customers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings," and that "when [the stalling] happens, the Cobalt is still controllable" and the "engine can be restarted

after shifting to neutral." GM intended Adler's statement to be disseminated to the public through the mail and/or wires.

31. These statements were false because GM's internal documents showed that these incidents occurred when drivers were using keys with the standard key fob, and that removing non-essential items from the key ring would not "virtually eliminate" the risk of an incident.

32. In July 2005, Amber Marie Rose, who was 16-years old, was killed when she drove her 2005 Cobalt off the road and struck a tree. Her driver's side airbag did not deploy, even though it should have given the circumstances of the head-on crash, and the car's ignition switch was in the "accessory/off" position at the time of the crash. GM learned of these facts in 2005 and documented them in an internal investigation file.

33. Instead of fixing the defect, in December 2005, GM issued a service bulletin to its dealers that reiterated much of the same deceptive message Adler delivered earlier in the year. It indicated that the possibility of the driver inadvertently turning off the ignition was more likely to occur if the driver is short and has a large or heavy key chain, and recommended that drivers remove unessential items from key chains. In addition, it informed dealers that it had developed an insert for the key ring to prevent it from moving up and down in the slot, and that the key ring had been replaced with a smaller design that would not hang as low as in the past. The service bulletin applied to 2003-06 Saturn Ions, 2005-06 Chevrolet Cobalts, the 2006 Chevrolet HHR, and the 2006 Pontiac Solstice, all of which were equipped with the same defective ignition switch system. GM issued the December 2005 Service Bulletin to its dealers through the mail and/or wires.

34. In October 2006, GM updated its December 2005 Service bulletin to include the 2007 Saturn Ion, the 2007 Saturn Sky, the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the

2007 Pontiac G5, and the 2007 Pontiac Solstice.  GM issued this update to its dealers through the mail and/or wires.

35.    In 2006, at least two fatal accidents involving Cobalts occurred in which the cars' data recorders indicated that the ignition switches were in the "accessory" position and the front airbags failed to deploy.  GM learned of this information in 2006.

36.    In 2007 and 2008, GM became aware of at least four more such fatal accidents.

37.    NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbag failed to deploy in non-rear impact crashes.

38.    GM finally made some changes to the design of the ignition switch system in 2006 to include a new detent plunger and spring.  The new switch, however, did not receive a new part number, which is considered a "cardinal sin" in the engineering community, and further concealed the defect in the switch that was installed in the Defective Vehicles.

39.    In 2012, GM engineers studied 44 vehicles across a range of make and model years, and results revealed that vehicles tested from model years 2003 through 2007 exhibited torque performance below the original specifications established by GM.   Rather than immediately notify NHTSA of the results of this study or conduct a recall, GM continued to conceal the nature of the Ignition Switch Defect.

40.    In April 2013, GM hired an outside engineering consulting firm to investigate the ignition switch system.  The external report concluded that ignition switches installed in early model Cobalt and Ion vehicles did not meet GM's torque specification.  Rather than immediately notify NHTSA of the results of this report, GM continued to conceal the nature of the Ignition Switch Defect.

41.     Despite its utter disregard for public safety, GM vehicles have been marketed based on safety from 2002 through the present.  For example, in 2005, Chevrolet emphasized on its website that "[y]our family's safety is important to us . . . . That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind."  Likewise, in advertisements for Saturns, GM utilized the slogan, "Saturn. People First," and stated that, "[i]n cars, it's about things like reliability, durability, and of course, safety. That's where we started when developing our new line of cars."

**B.      GM Finally Discloses the Ignition Switch Defect**

42.     It was not until February of 2014 – almost thirteen years after first recognizing the defect – that GM finally admitted publicly that the ignition switch system is defective and agreed to recall the Defective Vehicles to replace the old ignition switch with the re-designed version.

43.     In a February 14, 2014 letter to the NHTSA regarding the recall, GM finally acknowledged – in contrast to its prior representations to the agency – that changes were made to the ignition switches during the 2007 model year.  Specifically, GM stated that on "April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch  proposed by the supplier, Delphi Mechatronics."  The GM design engineer referenced was Ray DeGiorgio.

44.     GM's recall is insufficient because it does not address the location of the ignition switch system or how low the key fob hangs on the steering column, all of which create a risk of inadvertent driver contact and an inadvertent turning of the switch.

45.     Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer

must promptly disclose the defects. If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect. GM repeatedly violated the TREAD Act by actively concealing information about the Ignition Switch Defect for more than a decade.

46. On March 17, 2014, Mary T. Barra, GM's CEO issued an internal video to employees, wherein she admits that "[t]hese are serious developments that shouldn't surprise anyone. After all, something went wrong with our process in this instance and terrible things happened."

47. Throughout the relevant period, GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function on the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

48. The Ignition Switch Defect has caused actual damages to Plaintiff and the Class.

49. A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect.

50. A vehicle purchased, leased or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

51. Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed. Plaintiff and the Class overpaid for their Defective Vehicles. Because of the concealed Ignition Switch Defect, Plaintiff and Class Members did not receive the benefit of their bargains.

52.      Additionally, as a result of publicity regarding the Ignition Switch Defect and GM's misconduct, the value of the Defective Vehicles has diminished, and GM's offer to replace the ignition switch system does not adequately address the diminished value of Plaintiff's and Class Members' vehicles.  Plaintiff and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's wrongful conduct.

## TOLLING OF THE STATUTES OF LIMITATION

53.      All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the Ignition Switch Defect.  GM has been aware of the Ignition Switch Defect since at least 2001, and has concealed from Plaintiff, Class Members, the public, and the government the complete nature of the Ignition Switch Defect.

54.      Even now, after the Defective Vehicles have been recalled, GM continues to engage in its scheme to defraud by downplaying the significance, danger, and nature of the Ignition Switch Defect.

55.      Plaintiff and Class members did not discover and could not have discovered with reasonable diligence the facts that would have caused a reasonable person to suspect that the Ignition Switch Defect existed or that GM did not report information within its knowledge regarding the existence of a dangerous defect to federal authorities or consumers until shortly before this class action was filed.

56.      GM was and remains under a continuing duty to disclose to NHTSA, Plaintiff and Class Members the true character, quality, and nature of the Defective Vehicles.  GM actively concealed the true character, quality, and nature of the Defective Vehicles.  Plaintiff and Class Members relied on GM's active concealment of these facts.  GM is therefore estopped from relying on any statutes of limitation in this action.

## CLASS ALLEGATIONS

57.     Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and a Class initially defined as follows:

> All persons in the United States who currently own or lease one or more of the following GM vehicles: 2003-07 Saturn Ion; 2005-07 Chevrolet Cobalt; 2005-07 Pontiac G5; 2006-07 Chevrolet HHR; 2006-07 Pontiac Solstice; and 2007 Saturn Sky (the "Defective Vehicles").

58.     Included within the Class is a subclass of Florida residents who own or lease Defective Vehicles (the "Florida Subclass").

59.     Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case. Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Defective Vehicles.

60.     The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

61.     As there are approximately 1.6 million Defective Vehicles, the number of Class Members is great enough that joinder is impracticable.

62.     The claims of Plaintiff are typical of the claims of the Class, as Plaintiff and Class Members alike purchased or leased Defective Vehicles and were harmed in the same way by GM's uniform misconduct.

63.     Plaintiff will fairly and adequately protect the interests of the other members of the Class and Subclass.  Plaintiff's counsel has substantial experience in prosecuting class actions.  Plaintiff and her counsel are committed to vigorously prosecuting this action, have the financial resources to do so, and do not have any interests adverse to the Class.

64.     There are numerous questions of law and fact that are common to the Class and the Subclass and predominate over questions affecting only individual members, including the following:

(a) Whether GM, as part of a racketeering scheme to defraud, concealed information about the dangerous and defective condition of the relevant vehicles from Plaintiff and the other Class members;

(b) Whether GM, through its RICO Enterprise, as described below, used the mail and/or wires in furtherance of its scheme to defraud;

(c) Whether the Defective Vehicles suffer from Ignition Switch Defects;

(d) Whether GM concealed the defects;

(e) Whether GM misrepresented that the Defective Vehicles were safe;

(f) Whether GM owed Plaintiff and Class Members a duty to disclose the Ignition Switch Defect;

(g) Whether GM engaged in fraudulent concealment;

(h) Whether GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches; and

(i)   Whether GM's unlawful, unfair and/or deceptive practices harmed Plaintiff and the members of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable.  Likewise, because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

66.     The prosecution of separate actions by the individual Class members would also create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

## COUNT I

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(c))

67.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth at length herein.

68.     This claim is brought on behalf of the nationwide Class.

69.     GM violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the "RICO Enterprise" through a "pattern of racketeering activity."

70.     At all times relevant, GM, its associates-in-fact, Plaintiff, and the Class members were and are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

71.     At all times relevant, Plaintiff and each Class member were and are a "person injured in his or her business or property by reason of a violation of RICO within the meaning of 18 U.S.C. § 1964(c).

72.     At all times relevant, GM was and is a "person" who participated in or conducted the affairs of the RICO Enterprise through the pattern of racketeering activity described below. While GM participated in the RICO Enterprise, it has existence separate and distinct from the Enterprise.  Further, the RICO Enterprise is separate and distinct from the pattern of racketeering activity in which GM has engaged and is engaging.

73.     At all times relevant, GM was associated with, operated or controlled, the RICO Enterprise, and participated in the operation and management of the affairs of the RICO Enterprise, through a variety of actions described herein.  GM's participation in the RICO Enterprise was necessary for the successful operation of its scheme to defraud.

## The RICO Enterprise

74.     Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

75.     The following persons, and others presently unknown, have been members of and constitute the "enterprise" within the meaning of RICO, which are referred to herein collectively as the RICO Enterprise:

        a.      Defendant General Motors, LLC;

        b.      GM's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates-in-fact in the Enterprise to deceive Plaintiff and other Class members into purchasing dangerous and

defective vehicles, and actively concealing the danger and defect from Plaintiff and the other Class members, including, but not limited to Alan Adler, GM's Manager for Safety Communications who, in June of 2005, issued the deceptive public statement regarding the ignition problem; Ray DeGiorgio, GM's design engineer who signed off on the ignition switch change that was never disclosed; and Mary T. Barra, GM's current CEO;

c.     <u>Delphi Automotive PLC</u> ("Delphi"), who, at all times material, manufactured the defective ignition switch system for GM, even though it knew that the system did not meet GM's own design specifications. Delphi also manufactured the ignition switch system after the 2007 change implemented by GM without reflecting a corresponding change in part number;

d.     <u>GM's Dealers</u>, who GM instructed to present false and misleading information to Plaintiff and other members of the Class, through, *inter alia*, multiple Service Bulletins, and who did in fact present such false and misleading information.

76.     The RICO Enterprise of GM, GM's officers, executives, and engineers, Delphi, and GM's dealers, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein. The RICO Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the

pattern of racketeering activity in which GM has engaged and is engaging. The RICO Enterprise was and is used as a tool to effectuate the pattern of racketeering activity.

77. The members of the RICO Enterprise all had a common purpose: to increase and maximize GM's revenues by deceiving Plaintiff and other Class members into purchasing dangerous and defective vehicles, and actively concealing the Ignition Switch Defect from Plaintiff and the other Class members. The members of the RICO Enterprise shared the bounty of their enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the RICO Enterprise benefited from the common purpose of the scheme to defraud: GM sold or leased more vehicles with the Ignition Switch Defect, Delphi sold more of the defective ignition switches, and GM's dealers sold and serviced more vehicles with the Ignition Switch Defect.

78. GM conducted and participated in the affairs of this RICO Enterprise through a pattern of racketeering activity that lasted more than a decade, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

79. As part and in furtherance of the scheme to defraud, GM's deceptive scheme to increase revenue depended on actionable deceptive conduct. GM actively concealed the dangerous and defective condition of its vehicles from its customers by omitting material information and deceptive misrepresentations.

### Predicate Acts: Mail and Wire Fraud

80. Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act that is in indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

81.     As set forth below, to carry out, or attempt to carry out its scheme to defraud, GM has engaged in, and continues to engage in, the affairs of the RICO Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.     GM, with the assistance and collaboration of the other persons associated in fact with the enterprise devised and employed a scheme or artifice to defraud by use of the telephone and internet and transmitted, or caused to be transmitted, by means of wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including GM's website, Service Bulletins to dealers, and communications with other members of the Enterprise, for the purpose of executing such scheme or artifice to defraud, in violation of 18 U.S.C. § 1341 and §1343.

b.     As part of the scheme to defraud, the RICO Enterprise utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the false pretenses and artifice to defraud, as described herein.

c.     The concealment of the dangerous and defective condition of the defective GM vehicles is the core purpose of the underlying racketeering offense. The Enterprise had an ascertainable structure by which GM operated and managed the association-in-fact by using its Dealers and Delphi to concoct, obfuscate, carry out, and attempt to justify the fraudulent scheme described herein.

19

82.     GM's February 28, 2005 Service Bulletin was issued in furtherance of its scheme to defraud.  It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class.  The February 28, 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

83.     In 2005, in furtherance of its scheme to defraud, GM emphasized on its Chevrolet website that "[y]our family's safety is important to us . . . . That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind."  This false statement, maintained on the internet through the wires, constitutes a violation of 18 U.S.C. § 1343.

84.     In June of 2005, GM issued a public statement through the mail and wires in furtherance of its scheme to defraud.  The statement provided the public, including Plaintiff and the other Class members, with false and misleading information about the dangerous and defective condition of the defective vehicles, and sought to conceal that condition by minimizing the issue and offering an ineffective fix.  As such, the statement constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

85.     GM's December 2005 Service Bulletin was issued in furtherance of its scheme to defraud.  It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class – namely, that the issue could be resolved by removing items from key chains.  The December 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

86.     In October of 2006, GM issued an update to its December 2005 Service Bulletin in furtherance of its scheme to defraud.  The update repeated the instruction to GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class.  The update to the December 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

87.     In furtherance of its scheme to defraud, GM communicated with Delphi via the mail and/or wires regarding the manufacture of the defective ignition switch system.  Through those communications, GM instructed Delphi to continue manufacturing the defective part even though it did not meet GM's own specifications.  Through those communications, GM also instructed Delphi to make a change to the defective ignition switch system in 2006, and to fraudulently conceal the change by not assigning a new part number.  GM's communications with Delphi constitute repeated violations of 18 U.S.C. §§ 1341 and 1343.

88.     GM's conduct in furtherance of this scheme was intentional.  Plaintiff and the other Class members were harmed in that they relied to their detriment on GM's conduct and, as a result, purchased dangerous and defective vehicles for significantly more money than they would have paid absent GM's scheme to defraud.  GM unfairly reaped millions of dollars in excessive sales revenue as a result of this scheme and its conduct in furtherance of this scheme.

89.     As described throughout this Complaint, GM engaged in a pattern of related and continuous predicate acts for over a decade:  the scheme began sometime in or around 2000 and continued until approximately March 2014.

90.     The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the Enterprise and with the common purpose of defrauding Plaintiff and other

21

Class members and obtaining significant funds while providing defective vehicles worth significantly less than the purchase price paid by customers. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

91.     The predicate acts all had the purpose of generating significant revenue and profits for GM at the expense of Plaintiff and the other Class members, who were never informed of the Ignition Switch Defect in their defective vehicles. The predicate acts were committed or caused to be committed by GM, through its participation in the RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and all other Class members' funds.

92.     Count I seeks relief pursuant to 18 U.S.C. § 1964(c) from GM for violation of 18 U.S.C. § 1962(c).

## COUNT II
## VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### (The MCPA, Michigan Comp. Laws Ann. § 445, *et seq.*)

93.     Plaintiff and the Class incorporate by reference paragraphs 1-66 as though fully set forth at length herein

94.     This claim is brought on behalf of the nationwide Class.

95.     Plaintiff and Class Members are all "persons" under the Michigan Consumer Protection Act ("MCPA"), M.C.L.A. § 445.902(1)(d).

96.     GM was a "person" engaged in "trade or commerce" under the MCPA, M.C.L.A. § 445.902(1)(d) and (g).

97.     The MCPA prohibits any "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L.A. § 445.903(1).

98.     GM's conduct, as alleged in the preceding paragraphs, constitutes unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.  In particular, GM violated the MCPA by

a.     "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer," M.C.L.A. § 445.903(s);

b.      "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is," M.C.L.A. § 405.903(bb); and

c.     "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner," M.C.L.A. § 405.903(cc).

99.     GM's practices that violated the MCPA include, without limitation, the following:

a.     GM represented that the Defective Vehicles had safety characteristics that they do not have;

b.     GM represented that the Defective Vehicles were of a particular standard, quality, or grade, when they are not;

c.     GM knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature, even though GM knew that such information was material to the transaction in light of GM's prior representations;

d.     GM failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, Class Members, the public, and the government, the omission of which would tend

to mislead or deceive consumers, and which could not be reasonably known to Plaintiff, Class Members, the public, and the government;

    e.  GM intended for Plaintiff, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiff and Class Members would purchase or lease the Defective Vehicles; and

    f.  GM repeatedly violated the TREAD Act.

100. GM's acts and practices were unfair and unconscionable, because its acts and practices offend established public policy, and because the harm GM caused consumers greatly outweighs any benefits associated with its acts and practices. GM's conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiff and the Class from making fully informed decisions about whether to lease, purchase, and/or retain Defective Vehicles.

101. While GM knew of the Ignition Switch Defect by 2001, and knew that the defect caused the Defective Vehicles to have an unreasonable propensity to shut down and become uncontrollable, it continued to design, manufacture, and market the Defective Vehicles until at least 2007.

102. Plaintiff and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices. Had Plaintiff and the Class known about the full extent of the Ignition Switch Defect, they would either not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles. Plaintiff and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of here.

103.    All of the wrongful conduct alleged here occurred, and continues to occur, in the conduct of GM's business.

104.    Plaintiff requests that this Court: enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; require GM to repair Plaintiff's and Class Members vehicles to completely eliminate the Ignition Switch Defect; provide to Plaintiff and each Class either their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under the MCPA.

105.    Plaintiff also seeks punitive damages against GM because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others. GM intentionally, willfully, and repeatedly misrepresented the reliability and safety of the Defective Vehicles, and continued to conceal material facts that only it knew, even while numerous innocent victims were being killed as a result of its conduct. GM's unlawful conduct constitutes malice, oppression, and fraud justifying punitive damages.

## COUNT III
## FRAUD BY CONCEALMENT

106.    Plaintiff and the Class incorporate by reference paragraphs 1-66 as though fully set forth at length herein.

107.    This claim is brought on behalf of the nationwide Class.

108.    GM concealed and suppressed material facts concerning the Ignition Switch Defect.

109.    GM had a duty to disclose the Ignition Switch Defect because it consistently represented that its vehicles were reliable and safe and proclaimed that it maintained the highest safety standards, and the defect was known and/or accessible only to GM, which had superior

knowledge and access to the facts, and GM knew that the facts were not known to or reasonably discoverable by Plaintiff and the Class. These omitted and concealed facts were material because they directly impact the safety of the Defective Vehicles, and GM's prior representations regarding the safety of its vehicles became materially misleading when GM concealed facts regarding the Ignition Switch Defect.

110. GM actively concealed and/or suppressed these material facts, in whole or in part, to induce Plaintiff and Class Members to purchase or lease the Defective Vehicles at high prices, and to protect its profits and avoid a costly recall, and it did so at the expense of Plaintiff and the Class.

111. Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and the Class's actions were justified.

112. Because of the concealment and/or suppression of the facts, Plaintiff and the Class sustained damages, including the difference between the actual value of that which Plaintiff and Class Members paid and what they received. The value of the Defective Vehicles has been diminished by GM's wrongful conduct.

113. GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT IV
### VIOLATIONS OF THE FLORIDA UNFAIR & DECEPTIVE TRADE PRACTICES ACT
### (FDUTPA, Fla. Stat. § 501.201, *et seq.*)

114. Plaintiff and the Class incorporate by reference paragraphs 1-60 as though fully set forth at length herein.

115.    This Count is brought on behalf of the Florida Subclass.

116.    Plaintiff is a "consumer" under FDUTPA, § 501.203(7), Fla. Stat.

117.    GM engaged in "trade or commerce" within the meaning of FDUTPA, § 501.203(8), Fla. Stat.

118.    Under the TREAD Act, 49 U.S.C. § 30101, *et seq.*, and its corresponding regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect, and must promptly notify vehicle owners, purchasers, and dealers of the defect and remedy the defect. The TREAD Act also requires manufacturers to file various reports and notify NHTSA within days of learning of a defect.

119.    From at least as early as 2001, GM was aware of the Ignition Switch Defect. But it waited until February 7, 2014, to finally send a letter to NHTSA confessing that it knew of the Ignition Switch Defect and that the defect could cause vehicles to lose power and control and cause the airbags not to deploy.

120.    GM's failure to disclose and active concealment of the Ignition Switch Defect violated the TREAD Act, and thereby violated FDUTPA.

121.    GM also violated FDUTPA by engaging in the following practices:

        a.      GM represented that the Defective Vehicles had safety characteristics that they do not have;

        b.      GM represented that the Defective Vehicles were of a particular standard, quality, or grade, when they are not;

       c.     GM knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature, even though GM knew that such information was material to the transaction in light of GM's prior representations;

       d.     GM failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, the Florida Subclass, the public, and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to Plaintiff, Class Members, the public, and the government; and

       e.     GM intended for Plaintiff, the Florida Subclass, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiff and the Florida Subclass would purchase or lease the Defective Vehicles.

122.    Plaintiff and the Florida Subclass were injured as a result of GM's misconduct. Plaintiff and the Florida Subclass overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

123.    Plaintiff seeks damages and an order enjoining GM's unfair or deceptive acts or practices and an order requiring GM to completely remedy the defect in Plaintiff's and the Florida Subclass Members' vehicles, and attorneys' fees, and any other just and proper relief available under FDUTPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM, and grant the following relief:

A.    Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3) and or 23(b)(2), or alternatively certify all issues and claims

that are appropriately certified; and designate and appoint Plaintiff as Class and Subclass Representative and Plaintiff's chosen counsel as Class Counsel;

B.      Declare, adjudge and decree that GM violated 18 U.S.C. § 1962(c) by conducting the affairs of the RICO Enterprise through a pattern of racketeering activity;

C.      Declare, adjudge and decree the conduct of GM as alleged herein to be unlawful, unfair and/or deceptive, and enjoin any such future conduct;

D.      Declare, adjudge, and decree that the ignition switches in the Defective Vehicles are defective;

E.      Declare, adjudge, and decree that GM must disgorge, for the benefit of Plaintiff, Class Members, and Subclass Members all or part of the ill-gotten gains it received from the sale or lease of the Defective Vehicles;

F.      Award Plaintiff, Class Members, and Subclass Members actual, compensatory damages, or, in the alternative, statutory damages, as proven at trial;

G.      Award Plaintiff and the nation-wide Class Members treble damages pursuant to 18 U.S.C. § 1964(c).

H.      Alternatively, if elected by Plaintiff, Class Members, and Subclass Members, require GM to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

I.      Award Plaintiff, Class Members, and Subclass Members punitive damages in such amount as proven at trial;

J.      Award Plaintiff, Class Members, and Subclass Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

K.     Award Plaintiff, Class Members, and Subclass Members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all the legal claims alleged in this Complaint.

Respectfully submitted,

PODHURST ORSECK, P.A.
*Counsel for Plaintiff*
25 West Flagler Street, Suite 800
Miami, Florida 33130
Telephone: 305-358-2800
Facsimile: 305-358-2382

By:_____/s/ Peter Prieto_____
        Peter Prieto
        Florida Bar No. 501492
        pprieto@podhurst.com
        John Gravante, III
        Florida Bar No. 617113
        jgravante@podhurst.com
        Matthew Weinshall
        Florida Bar No. 84783
        mweinshall@podhurst.com

KOZYAK, TROPIN, & THROCKMORTON P.A.
*Counsel for Plaintiff*
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Telephone: (305) 372-1800
Facsimile: (305) 372-3508

By: /s/Harley S. Tropin_____
        Harley S. Tropin
        Florida Bar No. 241253
        hst@kttlaw.com
        Adam M. Moskowitz
        Florida Bar No. 984280
        amm@kttlaw.com
        Thomas A. Tucker Ronzetti
        Florida Bar No. 965723
        tr@kttlaw.com

HIGER, LICHTER, & GIVNER LLP
*Counsel for Plaintiff*
18305 Biscayne Blvd.,Suite 302
Aventura, Florida 33160
Telephone: 305-933-9970
Facsimile: 305-933-0998


By:____/s/ David H. Lichter_____
       David H. Lichter
       Florida Bar No. 359122
       dlichter@hlglawyers.com
       Michael J. Higer
       Florida Bar No. 500798
       mhiger@hlglawyers.com