# Exhibit DD

1   MARC M. SELTZER (054534)
    mseltzer@susmangodfrey.com
2   STEVEN G. SKLAVER (237612)
    ssklaver@susmangodfrey.com
3   KALPANA SRINIVASAN (237460)
    ksrinivasan@susmangodfrey.com
4   SUSMAN GODFREY L.L.P.
    1901 Avenue of the Stars, Suite 950
5   Los Angeles, California  90067-6029
    Telephone:  (310) 789-3100
6   Facsimile:  (310) 789-3150

7   Attorneys for Plaintiffs

8

9                  UNITED STATES DISTRICT COURT

10                CENTRAL DISTRICT OF CALIFORNIA

11                        WESTERN DIVISION

12

13   TAMMIE BALLS and JEFFERY A.          Case No.
     BALLS, individually and as class
14   representatives on behalf of all others
     similarly situated,                  **CLASS ACTION**

15                        Plaintiffs,     **CLASS ACTION COMPLAINT
                                          DAMAGES AND INJUNCTIVE**
16   vs.                                  **RELIEF**

17   GENERAL MOTORS LLC,                  **JURY TRIAL DEMANDED**

18                        Defendant.

19

20

21

22

23

24

25

26

27

28

1

# **TABLE OF CONTENTS**

2   I.    INTRODUCTION ............................................................................1

3   II.   JURISDICTION AND VENUE..................................................6
    III.  PARTIES ..........................................................................6
4   IV.   DEFENDANT'S WRONGFUL COURSE OF CONDUCT .........................8

5         A.    The Ignition Switch Defects in the Subject Vehicles ...........8
          B.    GM Knew of the Ignition Switch Defects for Years, but
6               Concealed the Defects from Plaintiffs and the Class.................8

7         C.    Old GM Promoted the Subject Vehicles as Safe and Reliable...........17
          D.    The Ignition Switch Defects have Harmed Plaintiffs and the
8               Class .........................................................18

9   V.    SUCCESSOR LIABILITY ...........................................19

10  VI.   TOLLING OF THE STATUTES OF LIMITATION ...................................19

    VII.  CLASS ALLEGATIONS................................................20
11
    VIII. CLAIMS FOR RELIEF ...........................................23
12        A.    FIRST CLAIM FOR RELIEF .......................................23

13              VIOLATIONS OF THE MICHIGAN CONSUMER
                PROTECTION ACT (The MCPA, MICH. COMP. L. ANN. §
14              44901, *et seq.*) ...........................................23

          B.    SECOND CLAIM FOR RELIEF .......................................26
15              FRAUDULENT CONCEALMENT................................................26

16        C.    THIRD CLAIM FOR RELIEF .......................................27

17              BREACH OF EXPRESS WARRANTY (Utah Code Ann. §
                70A-2-313).......................................................27

18        D.    FOURTH CLAIM FOR RELIEF .......................................28

19              UNJUST ENRICHMENT (Based on Utah Law)...............................28

    IX.   PRAYER FOR RELIEF...........................................30
20
          JURY TRIAL DEMAND...........................................32

21

22

23

24

25

26

27

28

1    Plaintiffs Tammie Balls and Jeffery A. Balls, individually and as class

2    representatives on behalf of all others similarly situated, bring this action against

3    Defendant General Motors LLC ("GM" or "the Company") and allege as follows:

4                    **I.    INTRODUCTION**

5    1.    GM has sold more than 2 million vehicles that have a serious safety

6    defect.    Millions of GM vehicles have defective "ignition switch torque

7    performance," which means the vehicle's ignition switch may move out of the

8    "run" position, turning off the engine and most of the electrical components on the

9    vehicle and causing air bags not to deploy depending on the time that the ignition

10   moved out of the "run" position.

11   2.    GM has now admitted that this safety defect is the cause of at least 13

12   deaths and numerous accidents over the past decade.  According to a memorandum

13   released by Congress, a 2001 pre-production report for the MY 2003 Saturn Ion

14   identified issues with the ignition switch.    In a section entitled "Root Cause

15   Summary," the report stated that the "two causes of failure" were "[l]ow contact

16   force and low detent plunger force."    The report stated that a design change

17   resolved the problem.

18   3.    In 2005, GM discussed two separate fixes for the ignition switch

19   defect but canceled both of them without taking action.  According to the memo,

20   GM engineers met in February 2005 to consider making changes to the ignition

21   switch defect after receiving reports it was moving out of position and causing cars

22   to stall.   But an engineer said the switch was "very fragile" and advised against

23   changes.   In March 2005, the GM engineering manager of the Chevrolet Cobalt

24   closed the case, saying an ignition switch fix would take too long and cost too

25   much, and that "none of the solutions represents an acceptable business case."   In

26   May 2005, the Company's brand quality division requested a new investigation into

27   ignitions turning off while driving, and a new review suggested changing the design

28

1

1   of the key so it would not drag down the ignition. That proposal was initially

2   approved but later cancelled.

3        4.    In May 2009, GM engineers again concluded that millions of cars that

4   GM sold had this serious safety defect. In the months and years that followed, as

5   the internal documents and studies increasingly confirmed the safety problems, GM

6   hid that information, but finally publicly disclosed the existence of those safety

7   problems in February 2014.

8        5.    GM began installing these ignition switch systems in models from

9   2002 through at least 2010. GM promised that these new systems would operate

10   safely and reliably. This promise turned out to be false in several material respects.

11   In reality, GM concealed a serious quality and safety problem in those vehicles,

12   which could have been avoided.

13        6.    From early 2000 to the present, GM has received a variety of reports

14   that put GM on notice of the serious safety issues presented by its ignition switch

15   system. Despite notice of the defect in its vehicles, GM did not disclose to

16   consumers that its vehicles – which GM for years had advertised as "safe" and

17   "reliable" – were in fact not safe or reliable.

18        7.    GM approved the defective ignition switch for use in these vehicles in

19   February 2002 despite being presented with testing results showing that it

20   repeatedly failed to meet the company's specifications, according to a letter sent to

21   GM on March 31, 2014 by a congressional committee. The switch was redesigned

22   in 2006 for use in 2007 and later model year cars were also approved by GM

23   despite again not meeting company specifications.

24        8.    GM's CEO, Mary Barra recently admitted that: "Something went

25   wrong with our process in this instance, and terrible things happened."

26        9.    This case arises from GM's breach of its obligations and duties,

27   including GM's failure to disclose that, as a result of defective ignition switch

28   design, at least 2.2 million GM vehicles had the propensity to shut down during

3109029v1/102516

1    normal driving conditions and created an extreme and unreasonable risk of

2    accident, serious bodily harm, and death which made the vehicles less valuable at

3    the time of purchase.

4          10.    GM's predecessor, General Motors Corporation ("Old GM") also

5    violated these rules by designing and marketing vehicles with defective ignition

6    switches, and then by failing to disclose that defect even after it became aware that

7    the ignition switch defect was causing fatal accidents.  (GM and Old GM are

8    sometimes referred to herein as "the Companies.")  In addition to the liability

9    arising out of the statutory obligations assumed by GM, GM also has successor

10   liability for the deceptive and unfair acts and omissions of Old GM because GM

11   has continued the business enterprise of Old GM with full knowledge of the

12   ignition switch defects.

13         11.    The defective ignition switches were manufactured by Delphi

14   Automotive PLC ("Delphi").  Once a subsidiary of Old GM, Delphi was spun-off

15   from Old GM in 1999, and was an independent publicly-held corporation.

16         12.    Delphi officials have admitted to Congress that it was "well

17   documented" in 2002 that testing results showed the ignition switch was far below

18   GM's specifications.  According to Delphi officials, GM began discussions with

19   Delphi about the need to modify and re-test the switch in mid-2005 but the results

20   again revealed the switches still did not meet GM's documented specifications.

21         13.    Delphi officials have confirmed to Congress that these testing results

22   mean the ignition switches currently in use in 2008-2011 vehicles also do not meet

23   GM performance specifications

24         14.    Plaintiffs allege based on information and belief, that Delphi knew its

25   ignition switches were defective, but nevertheless continued to manufacture and sell

26   the defective ignition switch systems, which it knew would be used in the vehicles

27   of Plaintiffs and the Class.

28

3109029v1/102516

15. Plaintiffs bring this action for a Class of all persons in the United States who currently own or lease one or more of the following GM vehicles: 2005-2010 Chevrolet Cobalts; 2006-2010 Pontiac Solstices; 2007-2010 Pontiac G5s; 2007-2010 Saturn Skys; 2006-2011 Chevrolet HHRs; and 2003-2007 Saturn Ions (hereinafter the "Subject Vehicles").

16. Plaintiffs believe that there are other GM vehicles which suffer from the same or substantially similar ignition switch defects as the Subject Vehicles identified above. Accordingly, Plaintiffs will supplement the list of Subject Vehicles to include additional GM vehicles that have defective ignition switches, which result in a loss of engine and electrical power, loss of vehicle speed control, loss of braking control, and airbag non-deployment.

17. Plaintiffs also sue for a subclass of Utah residents who own or lease one or more Subject Vehicles.

18. The Subject Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

    a. The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

    b. When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident;

    c. When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

19. The ignition switch defects make the Subject Vehicles unreasonably dangerous. Because of the defects, the Subject Vehicles are likely to be involved in accidents, and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants.

3109029v1/102516

20.     The Subject Vehicles have been linked to at least 31 crashes and 13 deaths, but the actual number is believed to be much higher.

21.     The ignition switch defects present a significant and unreasonable safety risk exposing Subject Vehicle owners and their passengers to a risk of serious injury or death.

22.     For many years, GM has known of the ignition switch defects that exist in millions of Subject Vehicles sold in the United States.  But, to protect its profits and maximize sales, GM concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

23.     Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170 and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects, 49 U.S.C. § 30118(c)(1) & (2).  If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect, 49 U.S.C. § 30118(b)(2)(A) & (B).

24.     In addition to the TREAD Act and other laws, GM violated the Michigan Consumer Protection Act (the "MCPA") and fraudulently concealed the deadly ignition switch defects from consumers, owners, and lessees of the Subject Vehicles.  GM also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects.  GM's violations of the TREAD Act also constitute violations of Utah state law.

25.     Plaintiffs and the Class have been damaged by GM's misrepresentations, concealment and non-disclosure of the ignition switch defects in the Subject Vehicles, as they are now in possession of dangerous vehicles the

3109029v1/102516

value of which has greatly diminished because of GM's failure to timely disclose the serious defect.

26.     Plaintiffs and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Subject Vehicles they purchased are worth less than they would have been without the ignition switch defects.

27.     Plaintiffs and the Class paid more for the Subject Vehicles than they would have had they known of the ignition defects or they would not have purchased the Subject Vehicles at all.

## II.     JURISDICTION AND VENUE

28.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

29.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs hereby submit to the Court's jurisdiction.  This Court has personal jurisdiction over GM because GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

30.     Venue is proper in this District under 28 U.S.C. § 1391 because GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, GM transacts business within the District, and some of the events establishing the claims arose in this District.

## III.     PARTIES

31.     Plaintiffs Tammie Balls and Jeffery Balls are residents and citizens of Kaysville, Utah.  Plaintiffs own a 2007 Saturn ION.  Plaintiffs chose the Saturn in part because they wanted a safely designed and manufactured vehicle.  Plaintiffs did not learn of the ignition switch defects until about March 2104.  Had Old GM

disclosed the ignition switch defects, Plaintiffs would not have purchased their Saturn, or would have paid less than they did.

32.    Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM.") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

33.    Among the liabilities and obligations expressly retained by GM after the bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

34.    GM also expressly assumed:

> all Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

35.     Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Subject Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

## IV.     DEFENDANT'S WRONGFUL COURSE OF CONDUCT

### A.     The Ignition Switch Defects in the Subject Vehicles

36.     Given the importance that a vehicle and its electrical operating systems remain operational during ordinary driving conditions, it is imperative that a vehicle manufacturer ensure that its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle.  With respect to the Subject Vehicles, GM has failed to do so.

37.     In the Subject Vehicles, the ignition switch defects can cause the car's engine and electrical system to shut off, disabling the power steering and power brakes and causing the non-deployment of the vehicle's airbags in the event of a crash.

38.     The Subject Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Subject Vehicles, as well as to other vehicle operators and pedestrians.

### B.     GM Knew of the Ignition Switch Defects for Years, but Concealed the Defects from Plaintiffs and the Class

39.     Both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences for many years, but concealed their knowledge from Subject Vehicle owners.  The following chronology makes Old GM and GM's misconduct clear, as further detailed in a March 30, 2014 memorandum by the majority staff of the Committee on Energy and Commerce, within the United States House of Representatives, in advance of the April 1, 2014 congressional hearings

8

1    entitled "The GM Ignition Switch Recall: Why Did It Take So Long?" A letter to

2    GM from the Committee dated March 31, 2014 also demonstrates that GM knew its

3    switches failed to meet internal company specifications.

4       40.    Late 1990s/Early 2000s: GM and supplier Eaton Mechatronics

5    finalized the specifications for the ignition switch for the Saturn Ion. Eaton

6    Corporation sold its Vehicle Switch/Electronic Division to Delphi Automotive

7    Systems LLC ("Delphi Automotive" or "Delphi") on March 31, 2001.

8       41.    2001: A pre-production report for the MY 2003 Saturn Ion identified

9    issues with the ignition switch. In a section entitled "Root Cause Summary," the

10    report states that the "two causes of failure" were "[l]ow contact force and low

11    detent plunger force." The report stated that a design change resolved the problem.

12       42.    February 2002: Delphi, GM's ignition switch supplier for the recalled

13    vehicles, submitted a Production Part Approval Process (PPAP) document for the

14    switch. During a briefing, Delphi officials told the Congressional Committee staff

15    that GM approved the PPAP *even though sample testing of the ignition switch*

16    *torque was well below the original specifications set by GM*.

17       43.    November 2004: GM opened an engineering inquiry, Problem

18    Resolution Tracking System N172404 ("2004 PRTS"), to examine the complaint

19    "vehicle can be keyed off with knee while driving" in a 2005 Chevrolet Cobalt

20       44.    February 2005: As part of the 2004 PRTS, GM engineers met to

21    consider possible solutions to address low key torque - the force required to turn the

22    switch. The PRTS document indicates that the engineers considered increasing or

23    changing the ignition switch "torque effort," but were advised by the ignition

24    switch engineer that it is "close to impossible to modify the present ignition switch"

25    as the switch is "very fragile and doing any further changes will lead to mechanical

26    and/or electrical problems." The 2004 PRTS document indicates that potential

27    solutions were developed for consideration. After internal evaluations, engineers

28

3109029v1/102516

were directed to look into a key slot change as a "containment," including developing cost and timing estimates.

45. <u>March 2005</u>: The Cobalt Project Engineering Manager's (PEM) "directive" was to close the 2004 PRTS "with no action." The main reasons cited for the decision were "lead-time for all solutions is too long," "tooling cost and piece price are too high," and "[n]one of the solutions seems to fully countermeasure the possibility of the key being turned (ignition turned off) during driving." The PRTS entry concluded that "none of the solutions represents an acceptable business case."

46. <u>May 2005</u>: A new Problem Resolution Tracking System (PRTS N182276 or "2005 PRTS") is opened to examine the 2005 Chevrolet Cobalt a customer complaint that the "vehicle ignition will turn off while driving." The 2005 PRTS document noted that the same issue was addressed in the 2004 PRTS (N172404) and closed, but "[d]ue to the level of buyback activity that is developing in the field, Brand Quality requests that the issue be reopened." One proposed solution was changing the key ring slot to a hole and using a smaller key ring. In the chronology attached to the GM February 24, 2014, Letter to NHTSA, GM acknowledges that this proposal was approved but later cancelled.

47. <u>July 2005</u>: A 2005 Chevrolet Cobalt crashes in Maryland, killing the driver. On August 15, 2005, NHTSA Special Crash Investigations Program assigned Calspan to conduct a SCI, which found that the frontal airbag system did not deploy. The SDM data indicated that the "vehicle power mode status" was in "Accessory."

48. <u>August 2005</u>: NHTSA begins the Special Crash Investigation of the July 2005 accident. Documents produced to the Committee indicate that GM reported this crash in its Third Quarter 2005 EWR to NHTSA. NHTSA responded to the report on March 1, 2006, and requested certain information which GM provided.

49. <u>December 2005</u>: GM issued a Service Bulletin 05-02-35-007 with the subject "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs" for the Chevrolet Cobalt and HHR, Saturn Ion, and Pontiac Solstice and Pursuit (Canada only). In the GM February 24, 2014 chronology, GM states that the 2005 PRTS process led to this bulletin. The Service Bulletin informed the dealer of the identified issue with the ignition and recommended potential remedies including removing heavy items from key rings. According to February 24, 2014, chronology submitted to NHTSA, "GM concluded in December 2005 that the service bulletin and field service campaign were the appropriate response to the reported incidents, given that the car's steering and braking systems remained operational even after a loss of engine power, and the car's engine could be restarted by shifting the car into either neutral or park."

50. <u>April 26, 2006</u>: A GM design engineer responsible for the ignition switch in the recalled vehicles signed a form entitled "General Motors Commodity Validation Sign-Off" authorizing Delphi to implement changes in the ignition switch. The form explained that a "new detent plunger . . . was implemented to increase torque performance in the switch." According to Delphi officials, sample testing prior to this approval suggested a significant increase in torque performance but the values were still below GM's original specifications. The modified ignitions began to appear in 2007 model year vehicles for all models affected by the recall. In its chronology submitted to NHTSA on February 24, 2014, GM acknowledged that the new ignition switch, however, was not reflected in a corresponding change in part number.

51. <u>October 2006</u>: A 2005 Chevrolet Cobalt crashes in Wisconsin, killing the driver. NHTSA SCI Program assigned Indiana University Transportation Research Center to investigate the crash, and the contractor inspected the vehicle on November 6, 2006.45 GM reported this crash in its Fourth Quarter 2006 EWR filing. On May 7, 2007, NHTSA requested additional information from GM which

1    it provided on June 7, 2007.  GM then updated the December 2005 Service Bulletin

2    (05-02-35-007) to include additional models and model years: the 2007 Saturn Ion

3    and Sky, 2007 Chevrolet HHR, and 2007 Pontiac Solstice and G5.  As a result of

4    the Service Bulletins, GM provided key inserts to 474 customers who brought their

5    vehicles to the dealer for service.

6    52.    <u>March 2007</u>: NHTSA and GM met to discuss occupant restraint

7    systems.  To date, the Committee has received limited documentation associated

8    with this meeting.  GM's February 24 chronology indicates that a NHTSA

9    representative informed GM about a July 29, 2005 fatal crash.  It appears this is the

10   same crash that was the subject of the SCI.  After the meeting, GM began tracking

11   front impact crashes involving Cobalts where the air bags did not deploy in order to

12   track similarities in the incidents.  GM identified 10 incidents by the end of 2007.

13   In four cases the ignition had moved into the "accessory" position.  Comparable

14   information was unavailable for the Saturn Ion because the SDM sensors installed

15   in these vehicles did not record whether the engine was running.

16   53.    <u>April 25, 2007</u>: Indiana University submitted its draft of the 2006 SCI

17   to the NHTSA SCI Program.  The SCI report stated that the "crash is of special

18   interest because the vehicle was equipped with . . . dual state air bags that did not

19   deploy."  The SCI report concluded that the airbags did not deploy "as a result of

20   the impact with the clump of trees, possibly due to the yielding nature of the tree

21   impact or power loss due to the movement of the ignition switch just prior to

22   impact." The event data recorder (EDR) for the vehicle indicated that the power

23   node status was "accessory" at the time of impact.  The report also noted that the

24   investigation revealed that contact with the ignition switch could result in "engine

25   shut down and loss of power," and cited the service bulletin issued on October 25,

26   2006.  The report stated that it was unclear what role "if any" the ignition switch

27   issue played in the non-deployment of the airbags.

28

54.  <u>August 2007</u>: GM met with its SDM supplier, Continental, to review SDM data from a crash of a 2005 Chevrolet Cobalt where the airbags failed to deploy.

55.  <u>September 2007</u>: The Chief of the Defects Assessment Division (DAD) within ODI emailed other ODI officials and proposed an investigation of "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion." The Chief of the Defects Assessment Division went on to state that the "issue was promoted by a pattern of reported non-deployments in VOQ [Vehicle Owners' Questionnaire] complaints that was first observed in early 2005.  Since that time, [the Defects Assessment Division] has followed up on the complaints, enlisted the support of NCSA's Special Crash Investigations (SCI) team, discussed the matter with GM, and received a related EWD Referral.  Notwithstanding GM's indications that they see no specific problem pattern, DAD perceives a pattern of non-deployments in these vehicles that does not exist in their peers . . . ."

56.  <u>November 15, 2007</u>: ODI IE panel reviewed the proposal to open an investigation into non-deployment of airbags in 2003-2006 Cobalts and Ions.  A PowerPoint presentation prepared by the DAD and dated November 17, 2007, states that its review was prompted by 29 Complaints, 4 fatal crashes, and 14 field reports.  During a briefing with Committee staff, ODI officials explained that the panel did not identify any discernable trend and decided not to pursue a more formal investigation.

57.  <u>February 2009</u>: GM opened another investigation into the ignition resulting in a redesign of the ignition key for model year 2010 Cobalt.

58.  <u>April 2009</u>: A 2005 Chevrolet Cobalt crashed in Pennsylvania, killing the Cobalt driver and front-seat passenger.  NHTSA SCI Program assigned the Calspan Crash Data Research Center to investigate the crash, and the contractor inspected the vehicle on April 6 and 7, 2009.61

3109029v1/102516

59. May 15, 2009: GM again met with its SDM supplier, Continental, and requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.

60. February 2010: Calspan Crash Data Research Center submitted its 2009 SCI Report, finding that the airbags did not deploy at the time of the crash and that the "cause of the air bag non-deployment in this severe crash could not be determined." The data from the Cobalt's SDM indicated that the Vehicle Power Mode Status was in "Accessory."

61. 2010: ODI again considered Cobalt trend information on non-deployment but determined the data did not show a trend.

62. August 2011: GM initiated a Field Performance Evaluation (FPE) to examine a group of frontal impact crashes involving the 2005-2007 Chevrolet Cobalt and the 2007 Pontiac G5 and airbag non-deployment. The FPE included a review of information related to the Ion, HHR and Solstice.

63. May 2012: GM engineers tested the torque performance of 44 vehicles across a range of make and model years. Results revealed that the majority of vehicles tested from model years 2003 to 2007 exhibited torque performance at or below 10 Newton cm (N-cm), below the original specifications established by GM. The results also revealed a shift in torque performance beginning in MY2007 vehicles built late in 2006 and all subsequent model years. The torque performance for these vehicles ranged from just below 15 N-cm to 20 N-cm. At the time, GM engineers could not explain the shift or discrepancies in torque performance.

64. September 2012: A GM Field Performance Assessment Engineer emailed a GM Red X Engineer to request assistance in examining the changes between the 2007 and 2008 Chevrolet Cobalt Models. Based on a briefing with GM, Committee staff's understanding is that GM Red X engineers are assigned to find the root cause of engineering or technical problems.

3109029v1/102516

65. <u>April 2013</u>: GM learned there was a difference in the torque performance of a GM service part ignition switch purchased after 2010 compared to the original ignition switch installed in a 2005 Cobalt. In response, GM hired an outside engineering firm to conduct a thorough ignition switch investigation. The external expert concluded that ignition switches installed in early model Cobalt and Ion vehicles did not meet GM's torque specification and that a change to the switch made several years later provided a likely explanation for the variance in torque performance. Data within the external report also indicated that vehicles with the modified ignition switch exhibited torque performance consistent with GM's design specification.

66. <u>October 2013</u>: GM received documentation from Delphi demonstrating that a change to the ignition switch in the Cobalt and other vehicles was made in April 2006.

67. <u>December 2013</u>: The Field Performance Assessment Engineer presented the results of their analysis to the Field Product Evaluation Recommendation Committee (FPERC) and the Executive Field Action Decision Committee (EFADC).

68. <u>December 17, 2013</u>: The EFADC met to review the findings. Questions were raised at the meeting that prompted additional analysis.

69. <u>January 31, 2014</u>: A second EFADC meeting was convened and resulted in a decision to conduct a safety recall of model year 2005-2007 Chevrolet Cobalt and Pontiac G5 vehicles. At the time, the EFDAC was only asked to consider a recall of these vehicles.

70. <u>February 2014</u>: Additional analysis was performed of data related to the Saturn Ion, Chevrolet HHR, and Pontiac Solstice and Sky vehicles. This analysis revealed earlier reports of concerns with the ignition switch in Ion vehicles.

71. <u>February 13, 2014</u>: GM announced a recall of 2005-2007 model year Chevrolet Cobalt and Pontiac G5 vehicles to address a fault with the ignition switch

that may permit the key to inadvertently turn to the "off" or "accessory" position, resulting in a loss of power to the engine and many electrical components in the vehicle.

72.    February 24, 2014: GM submitted a detailed timeline to NHTSA pertaining to the Cobalt and Pontiac G5 recall.

73.    February 24, 2014: GM convened another EFADC meeting to review additional analysis related to the Saturn Ion and Sky, Chevrolet HHR, and Pontiac Solstice.  The EFADC ordered a safety recall for certain model years of these vehicles.

74.    February 25, 2014: GM expanded the recall to include additional 2003-2007 model year vehicles.  These include the MY 2003-2007 Saturn Ion, MY 2006-2007 Chevrolet HHR and Pontiac Solstice, and MY 2007 Saturn Sky.  As a result of this expansion, the total number of vehicles subject to the recall rose to approximately 1.6 million worldwide, including more than 1.3 million in the United States.  GM also  acknowledged the importance of the specification for setting torque in the recall notice, stating:  "If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position."

75.    March 4, 2014: NHTSA opened Timeliness Query TQ14-001 "to evaluate the timing of GM's defect decision-making and reporting of the safety defect to NHTSA."

76.    March 11, 2014: GM submitted a detailed timeline to NHTSA related to the subsequent recall of the Saturn Ion, Saturn Sky, Chevrolet HHR and Pontiac Solstice.

77.    March 28, 2014: GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States.  This second expansion of

16

the ignition switch recall covers an additional 824,000 vehicles in the U.S., bringing the number of recalled vehicles to 2,191,146.

78.   GM continues to face an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

79.   While GM has now appointed a new Vehicle Safety Chief, on information and belief at least 2.2 million Subject Vehicles remain on the road to this day; and, on information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defects.

### C.   Old GM Promoted the Subject Vehicles as Safe and Reliable

80.   On information and belief, in marketing and advertising materials, Old GM consistently promoted the Subject Vehicles as safe and reliable.

81.   For example, one Cobalt ad promised that "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

82.   An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

83.   A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically engineered for whatever is next."  Another 2003 spot closed with the tagline "Saturn.  People first."

84.   A 2001 print ad touting the launch of the Saturn focused on safety:

> Need is where you begin.  In cars, it's about things like reliability, durability and, of course, safety.  That's where we started when developing our new line of cars.  And it wasn't until we were satisfied that we added things….

85.   Old GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Subject Vehicles were defective.

3109029v1/102516

86.     Throughout the relevant period, Old GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Subject Vehicles and the existence of the defects in those vehicles.

87.     Old GM never informed consumers about the ignition switch defects.

**D.      The Ignition Switch Defects Have Harmed Plaintiffs and the Class**

88.     The ignition switch defects have caused damage to Plaintiffs and the Class.

89.     A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect.

90.     A vehicle purchased, leased or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

91.     Purchasers and lessees paid more for the Subject Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed.  Plaintiffs and the Class overpaid for their Subject Vehicles.  Because of the concealed ignition switch defects.  Plaintiffs did not receive the benefit of the bargain.

92.     Plaintiffs and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition switch defects.

93.     GM admits to at least 13 deaths resulting from accidents linked to the ignition switch defects in the Subject Vehicles.  However, Plaintiffs believe that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignitions switch defects.

3109029v1/102516

94.    If Old GM or GM had timely disclosed the ignition switch defects as required by the MCPA, TREAD Act, and Utah law, all Class members' vehicles would now be worth more.

## V.    SUCCESSOR LIABILITY

95.    As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

96.    GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Subject Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

> (a) GM admits that it knew of the ignition system defects from the very date of its formation;
>
> (b) GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;
>
> (c) GM retained the bulk of the employees of Old GM;
>
> (d) GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;
>
> (e) GM acquired the contracts, books, and records of Old GM; and
>
> (f) GM acquired all goodwill and other intangible personal property of Old GM.

## VI.    TOLLING OF THE STATUTES OF LIMITATION

97.    All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein. Plaintiffs and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old GM and GM did not report

1   information within their knowledge to federal authorities (NHTSA) or consumers,

2   nor would a reasonable and diligent investigation have disclosed that Old GM and

3   GM had information in their possession about the existence and dangerousness of

4   the defect and opted to conceal that information until shortly before this class action

5   was filed.

6        98.    Indeed, Old GM instructed its service shops to provide Subject Vehicle

7   owners with a new key ring if they complained about unintended shut down, rather

8   than admit what Old GM knew – that the ignition switches were dangerously

9   defective and warranted replacement with a properly designed and built ignition

10  system.

11       99.    Old GM and GM were, and GM remains, under a continuing duty to

12  disclose to NHTSA, Plaintiffs, and the Class the true character, quality, and nature

13  of the Subject Vehicles; that this defect is based on dangerous, inadequate, and

14  defective design and/or substandard materials; and that it will require repair, poses a

15  severe safety concern, and diminishes the value of the Subject Vehicles.

16       100.  Because of the active concealment by Old GM and GM, any and all

17  limitations periods otherwise applicable to Plaintiffs' claims have been tolled.

18  ### VII.  CLASS ALLEGATIONS

19       101.  Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil

20  Procedure, Plaintiffs bring this action on behalf of themselves and a Class initially

21  defined as follows:

22            All persons in the United States who currently own or lease one

23            or more of the following GM vehicles:  2005-2010 Chevrolet

24            Cobalt; 2006-2010 Pontiac Solstices; 2007-2010 Pontiac G5;

25            2007-2010 Saturn Skys; 2006-2011 Chevrolet HHR; and 2003-

26            2007 Saturn Ions.  This list will be supplemented to include

27            other GM vehicles that have the defective ignition switches,

28

1         which inadvertently turn off the engine and vehicle electrical

2         systems during ordinary driving conditions.

3     102.   Included within the Class is a subclass of Utah residents who own or

4 lease Subject Vehicles (the "Utah Subclass").

5     103.   Excluded from the Class are GM, its employees, co-conspirators,

6 officers, directors, legal representatives, heirs, successors and wholly or partly

7 owned subsidiaries or affiliated companies; class counsel and their employees; and

8 the judicial officers and their immediate family members and associated court staff

9 assigned to this case, and all persons within the third degree of relationship to any

10 such persons. Also excluded are any individuals claiming damages from personal

11 injuries allegedly arising from the Subject Vehicles.

12     104.   Plaintiffs are informed and believe that Old GM manufactured and

13 sold to consumers at least 2.2 million of the Subject Vehicles nationwide and

14 hundreds-of-thousands of Subject Vehicles in the State of Utah. Individual joinder

15 of all Class or Subclass members is impracticable.

16     105.   The Class can be readily identified using registration records, sales

17 records, production records, and other information kept by GM or third parties in

18 the usual course of business and within their control.

19     106.   Questions of law and fact are common to the Class and the Subclass

20 and predominate over questions affecting only individual members, including the

21 following:

22         (a)   Whether the Subject Vehicles suffer from ignition

23     switch defects

24         (b)   Whether Old GM and GM concealed the defects;

25         (c)   Whether Old GM and GM misrepresented that the

26     Subject Vehicles were safe;

27         (d)   Whether Old GM and GM engaged in fraudulent

28     concealment;

3109029v1/102516

(e)     Whether Old GM and GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Subject Vehicles were designed, manufactured, and sold with defective ignition switches;

(f)     Whether the alleged conduct by GM violated laws as Plaintiffs allege;

(g)     Whether Old GM's and GM's unlawful, unfair and/or deceptive practices harmed Plaintiffs and the members of the Class

(h)     Whether GM violated the Michigan Consumer Protection Act ("MCPA"), MICH. COMP. L. ANN. § 445.901, *et seq*. and, if so, what remedies are available for the Class under MICH. COMP. L. ANN. § 445.911.

(i)     Whether GM violated Utah law, including UTAH CODE ANN. § 70A-2-313 and UTAH CODE ANN. § 70A-2-314, and if so, what remedies are available for the Utah Subclass;

(j)     Whether Plaintiffs and the members of the Class are entitled to equitable and/or injunctive relief; and

(k)     Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM.

107.   Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by GM and Old GM.  The relief Plaintiffs seek are typical of the relief sought for the absent Class members.

108.   Plaintiffs will fairly and adequately represent and protect the interests of all absent Class members.  Plaintiffs are represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

3109029v1/102516

109.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable.  Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

110.  The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

111.  Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Plaintiffs anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

# VIII.  CLAIMS FOR RELIEF

## A.  FIRST CLAIM FOR RELIEF

## VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT

### (The MCPA, MICH. COMP. L. ANN. § 44901, *et seq.*)

112.  Plaintiffs and the Class incorporate by reference each preceding and following paragraph as though fully set forth at length herein.

113.  This claim is brought on behalf of the nationwide Class.

114.  Old GM, GM, and Plaintiffs are each "persons" under MICH. COMP. L. ANN. § 445.902(d).

115.  The sale of the Subject Vehicles to Plaintiffs and the Class occurred within "trade and commerce" within the meaning of MICH. COMP. L. ANN. §

23

445.902(d), and both GM and Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

116. The MCPA makes unlawful any "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce," as more specifically defined in the MCPA. MICH. COMP. L. ANN. § 445.903 (1). GM has engaged in unfair, unconscionable, and deceptive methods, acts and practices violation of the MCPA, and also has successor liability for the unfair, unconscionable, and deceptive methods, acts and practices of Old GM as set forth above.

117. Both Old GM and GM violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." MICH. COMP. L. ANN. § 445.903(s).

118. As alleged above, both Companies knew of the safety ignition defect, while Plaintiffs and the Class were deceived by the Companies' omission into believing the Subject Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

119. Old GM also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is." MICH. COMP. L. ANN. § 405.903(bb). For example, Old GM represented that the Subject Vehicles were safe such that reasonable people believed the represented or suggested state of affairs to be true; namely, that the Subject Vehicles were safe.

120. Old GM also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. L. ANN. § 405.903(cc). Old GM represented that the Subject Vehicles were safe, which made it even more incumbent on Old GM to reveal the material fact of the ignition switch defects.

24

121. Old GM's and GM's acts and practices were unfair and unconscionable, because their acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and the Companies' failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, contravene established public policy, and because the harm the Companies caused consumers greatly outweighs any benefits associated with those practices. The Companies' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the Class from making fully informed decisions about whether to lease, purchase, and retain Subject Vehicles.

122. While Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Subject Vehicles until 2007.

123. All the while, Old GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

124. Plaintiffs and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices. Old GM and GM failed to inform NHTSA, and therefore failed to inform consumers, that its vehicles had a defective ignition switch that could lead to injury and death. Had Plaintiffs and the Class known this, they would either not have purchased their vehicles at all or would have paid less for them, and would not have retained their Subject Vehicles. Plaintiffs and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of herein.

125. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Companies' business.

126. Plaintiffs request that this Court: enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; provide to Plaintiffs and each Class either their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable

1   attorneys' fees; and provide other appropriate relief under MICH. COMP. L. ANN. §

2   445.911.

3    127. Plaintiffs acknowledge that, on its face, the MCPA purports to (i)

4   deprive non-residents of bringing class (but not individual) actions under the

5   MCPA; and (ii) allows individuals (but not class members) the ability to recover a

6   penalty of $250 per person if that amount is greater than their actual damages.

7   After the United States Supreme Court's decision in *Shady Grove Orthopedic Ass.,*

8   *P.A. v. Allstate Ins. Co.*, 589 U.S. 393 (2010), however, any such prohibitions

9   imposed in class actions (but not in individual actions) are trumped and superseded

10  by Fed. R. Civ. P. 23, which imposes no such restrictions.

11     **B.** **<u>SECOND CLAIM FOR RELIEF</u>**

12       **FRAUDULENT CONCEALMENT**

13   128. Plaintiffs and the Class incorporate by reference each preceding and

14  following paragraph as though fully set forth at length herein.

15   129. This claim is brought on behalf of the nationwide Class.

16   130. GM concealed and suppressed material facts concerning the ignition

17  switch defects, and GM also has successor liability for the acts of concealment and

18  oppression of Old GM as set forth above.

19   131. The Companies had a duty to disclose the ignition switch defects

20  because they were known and accessible only to the Companies who had superior

21  knowledge and access to the facts, and the Companies knew they were not known

22  to or reasonably discoverable by Plaintiffs and the Class. These omitted and

23  concealed facts were material because they directly impact the safety of the Subject

24  Vehicles. Whether an ignition switch was designed and manufactured with

25  appropriate safeguards is a material safety concern.

26   132. The Companies actively concealed and/or suppressed these material

27  facts, in whole or in part, to protect their profits and avoid a costly recall, and they

28  did so at the expense of Plaintiffs and the Class.

133.   On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Class and conceal material information regarding the defects that exist in the Subject Vehicles and other GM vehicles.

134.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class's actions were justified. The Companies were in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Class.

135.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they purchased and retained vehicles that are now diminished in value from what they would have been had the Companies timely disclosed the ignition switch defects.

136.   The Companies' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich the Companies. The Companies' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**C.     THIRD CLAIM FOR RELIEF**

**BREACH OF EXPRESS WARRANTY**

**(Utah Code Ann. § 70A-2-313)**

137.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

138.   GM is and was at all relevant times a merchant as defined by the Uniform Commercial Code.

139.   In the course of selling its vehicles, GM expressly warranted in writing that the Subject Vehicles were covered by a Basic Warranty.

27

140. GM breached the express warranty to repair and adjust to correct defects in material and workmanship of any party supplied by GM. GM has not repaired or adjusted, and has been unable to repair or adjust, the Subject Vehicles' materials and workmanship defects.

141. GM was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by members of the putative class before or within a reasonable amount of time after GM issued the recall and the allegations of the vehicle defects became public.

**D.  FOURTH CLAIM FOR RELIEF**

**UNJUST ENRICHMENT**

**(Based on Utah Law)**

142. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

143. Under the TREAD Act, 49 U.S.C. §§ 30101, *et seq*., and its accompanying regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect. 49 U.S.C. § 30118(c)(1) & (2).

144. In acquiring Old GM, GM expressly assumed the obligations to make all required disclosures under the TREAD Act.

145. GM also has successor liability for the deceptive and unfair acts and omissions of Old GM.

146. Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect. 49 U.S.C. § 30118(b)(2)(A) & (B).

147. Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a

motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b). At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

148. The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect. 49 C.F.R. § 276.6(b) & (c).

149. The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government. The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000." 49 C.F.R. § 578.6(c).

150. From at least 2001, Old GM had knowledge of the ignition switch defect, but hid the problem for the remainder of its existence until 2009.

151. From its creation on July 10, 2009, GM knew of the ignition switch problem because of the knowledge of Old GM and continuous reports up until the present.

152. GM admits the defect in the ignition switch has been linked to at least 13 accident-related fatalities. But other sources have reported that hundreds of deaths and serious injuries are linked to the faulty ignition switches.

153. Despite being aware of the ignition switch defects ever since its creation on July 10, 2009, GM waited until February 7, 2014, before finally sending

3109029v1/102516

a letter to NHTSA confessing its knowledge of the ignition switch defects which could cause the vehicles to lose power, and in turn cause the airbags not to deploy. GM initially identified two vehicle models, along with the corresponding model years, affected by the defect -- the 2005-2007 Chevrolet Cobalt and the 2007 Pontiac G5. On February 25, 2014, GM amended its letter to include four additional vehicles, the 2006-2007 Chevrolet HHR, 2006-2007 Pontiac Solstice, 2003-2007 Saturn Ion, and the 2007 Saturn Sky. In March 2014, GM expanded the recall to additional model years of the foregoing vehicles.

154. By failing to disclose and by actively concealing the ignition switch defect, and by selling vehicles while violating the TREAD Act and other conduct as alleged herein, Old GM and GM charged a higher price for their vehicles than the vehicles' true value and obtained monies which rightfully belong to Plaintiffs and the Class.

155. Old GM and GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Class, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Old GM and GM to retain these wrongfully obtained profits.

156. Plaintiffs, therefor, seek an order establishing GM as constructive trustee of the profits unjustly obtained, plus interest.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf all others similarly situated, respectfully request that this Court enter a judgment against GM and in favor of Plaintiffs and the Class, and grant the following relief:

A.   Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen counsel as Class Counsel;

30

B.    Declare, adjudge and decree the conduct of GM as alleged herein to be unlawful, unfair and/or deceptive, and enjoin any such future conduct;

C.    Award Plaintiffs and Class members actual, compensatory damages, or, in the alternative, statutory damages, as proven at trial;

D.    Alternatively, if elected by Plaintiffs and the Subclass, require GM to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

E.    Award Plaintiffs and the Utah Subclass restitution of all monies paid to Old GM;

F.    Award Plaintiffs and the Class members exemplary damages in such amount as proven;

G.    Award Plaintiffs and the Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

H.    Award Plaintiffs and the Class members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

Dated:  April 1, 2014

MARC M. SELTZER
STEVEN G. SKLAVER
KALPANA SRINIVASAN

SUSMAN GODFREY L.L.P.

By:  /s/ Marc M. Seltzer

Marc M. Seltzer
Attorneys for Plaintiffs

3109029v1/102516

# JURY TRIAL DEMAND

Plaintiffs request a trial by jury on the legal claims, as set forth herein.

Dated:  April 1, 2014

MARC M. SELTZER
STEVEN G. SKLAVER
KALPANA SRINIVASAN

SUSMAN GODFREY L.L.P.


By:  */s/ Marc M. Seltzer*

Marc M. Seltzer
Attorneys for Plaintiffs