# Exhibit HH

1    MARC M. SELTZER (054534)
    mseltzer@susmangodfrey.com
2    STEVEN G. SKLAVER (237612)
    ssklaver@susmangodfrey.com
3    KALPANA SRINIVASAN (237460)
    ksrinivasan@susmangodfrey.com
4    SUSMAN GODFREY L.L.P.
    1901 Avenue of the Stars, Suite 950
5    Los Angeles, California 90067-6029
    Telephone: (310) 789-3100
6    Facsimile: (310) 789-3150

7    LESTER L. LEVY
    llevy@wolfpopper.com
8    MICHELE F. RAPHAEL
    mraphael@wolfpopper.com
9    ROBERT S. PLOSKY
    rplosky@wolfpopper.com
10   WOLF POPPER LLP
    845 Third Avenue
11   New York, NY 10022
    Telephone: (212) 759-4600
12   Facsimile: (212) 486-2093

13   Attorneys for Plaintiffs

14

15            UNITED STATES DISTRICT COURT

16            CENTRAL DISTRICT OF CALIFORNIA

17               WESTERN DIVISION

18

| | |
|---|---|
| 19   SARA ROBINSON, JOHN HELCL, RICHARD LEWIS and DENISE PETERSEN, individually and on behalf of all other similarly situated, | Case No. |
| 20 | |
| 21            Plaintiffs, | **CLASS ACTION** |
| | **CLASS ACTION COMPLAINT** |
| 22         v. | **JURY TRIAL DEMANDED** |
| 23   GENERAL MOTORS LLC and DELPHI AUTOMOTIVE PLC, | |
| 24 | |
| 25           Defendants. | |

26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................. 1

II.    JURISDICTION AND VENUE ............................................................ 4

III.   PARTIES .............................................................................................. 5

IV.    FACTUAL ALLEGATIONS ................................................................ 7

     A.   GM's Defective Ignition Switch ............................................... 7

     B.   GM Learns About its Defective Ignition Switch ...................... 8

     C.   GM Redesigns its Defective Switch but Does Not Install the New Switch in Defective Vehicles or Disclose the Change to the Public .................................................................................. 11

     D.   GM Continues to Become Aware of Accidents Consistent With its Defective Ignition Switch Yet Continues to Do Nothing .............. 14

     E.   GM Receives Indisputable Evidence of its Defective Ignition Switch .................................................................................... 15

     F.   The Potential Fallout of GM's Repeated Failures ................... 16

     G.   GM Finally Issues a Recall, and Then Several More .............. 18

V.     CLASS ACTION ALLEGATIONS ..................................................... 21

VI.    CAUSES OF ACTION ....................................................................... 25

     FIRST CLAIM FOR RELIEF ............................................................ 25

     SECOND CLAIM FOR RELIEF ....................................................... 26

     THIRD CLAIM FOR RELIEF .......................................................... 28

     FOURTH CLAIM FOR RELIEF ....................................................... 30

     FIFTH CLAIM FOR RELIEF ........................................................... 31

     SIXTH CLAIM FOR RELIEF ........................................................... 32

     SEVENTH CLAIM FOR RELIEF ..................................................... 33

VII.   PRAYER FOR RELIEF ..................................................................... 34

     JURY TRIAL DEMAND .................................................................. 36

1      Plaintiffs Sara Robinson, John Helcl, Richard Lewis and Denise Petersen

2  (collectively, "Plaintiffs"), individually and on behalf of the members of the class

3  and subclasses they seek to represent (defined herein, but collectively referred to as

4  the "Class"), allege against General Motors LLC ("GM") and Delphi Automotive

5  PLC ("Delphi") (collectively, "Defendants"), upon personal knowledge as to

6  themselves and their own acts, and upon information and belief based upon the

7  investigation made by the undersigned counsel, as to all other matters, as follows:

8                    **I.   <u>INTRODUCTION</u>**

9      1.     This case arises from GM's marketing and sale of vehicles with a

10  defective ignition switch, causing those vehicles to, *inter alia*, lose power and

11  prevent the air bags from deploying.   Specifically, since 2001, GM has sold

12  millions of vehicles with ignition switches that were, and are, prone to slipping out

13  of the "on" position during operation, suddenly and unexpectedly cutting power to

14  the airbags, the power steering and the breaking systems.   In many instances,

15  drivers have been unable to control their vehicles after the power and electrical

16  systems shut down and have been involved in crashes where airbags did not deploy,

17  resulting in severe injuries and deaths.   Plaintiffs and Class members each

18  purchased or leased one or more of these vehicles: 2005-2010 Chevrolet Cobalt;

19  2007-2010 Pontiac G5; 2006-2010 Pontiac Solstice; 2006-2011 Chevrolet HHR;

20  2003-2007 Saturn Ion; and 2007-2010 Saturn Sky (collectively, the "Defective

21  Vehicles").

22      2.     For more than a decade, Defendants knew and had reason to know,

23  that the ignition switch had a dangerous defect.

24      3.     Finally, in February and March, 2014, GM recalled the Defective

25  Vehicles due to this ignition switch design ("the 2014 Recalls").

26      4.     GM admits that the Defective Vehicles manufactured prior to 2008

27  "were all equipped with the same ignition switch," that they bear the same part

28  number, and were manufactured by the same former GM subsidiary, Delphi.   GM

1

1    also admits that the Defective Vehicles manufactured in or after 2008 contained

2    replacement ignition switches that were also defective.

3         5.     While the precise number of accidents and deaths caused by the faulty

4    ignition switch is not yet known – GM admits to dozens of crashes and at least 13

5    fatalities, while consumer groups and independent investigators allege that the

6    death toll is in the hundreds – there is universal agreement that GM has been aware

7    of the faulty ignition switch issue for more than a decade and hid the issue from

8    consumers, including crash victims and their families, as well as federal safety

9    authorities.

10         6.     In a chronology of events GM filed with the National Highway

11    Transportation Safety Administration ("NHTSA") on March 11, 2014, GM

12    admitted that it first became aware of an issue with the ignition switches of its

13    vehicles back in 2001.[1]

14         7.     Had GM timely and properly addressed the ignition switch defect and

15    issued recalls when it first became aware of the problem, untold numbers of

16    accidents and deaths could have been prevented.  As GM's CEO Marry Barra

17    recently conceded: "Something went wrong with our process in this instance, and

18    terrible things happened."

19         8.     Aside from the death and risk of bodily harm caused by the ignition

20    switch defects, consumers who purchased or leased the Defective Vehicles suffered

21    economic harm because they paid more for their GM vehicles than they would have

22

23    _____

[1]    *See* Letter from M. Carmen Benavides, Director, Product Investigations and
24    Safety Regulations, General Motors LLC, to Nancy Lewis, Associate Administrator
      for Enforcement, NHTSA (Mar. 11, 2014) available at http://www-
25    odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM451430/RCDNN-14V047-
      9346P.pdf.  GM also filed a similar letter with a prior version of the chronology on
26    February 24, 2014.  *See* Letter from M. Carmen Benavides, Director, Product
      Investigations and Safety Regulations, General Motors LLC, to Nancy Lewis,
27    Associate Administrator for Enforcement, NHTSA (Feb. 25, 2014) available at
      http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/ UCM450732/RCDNN-
28    14V047-7510.pdf.  Unless otherwise specified, both letters will be referred and
      cited to collectively herein as "<u>GM Letters to NHTSA</u>."

had the ignition switch defects been disclosed.  The resale value of the Defective Vehicles has also tumbled since the ignition switch problems have recently come to light.

9.    GM falsely and fraudulently marketed its Defective Vehicles as "safe" and "reliable," and touted GM's commitment to safety as a way to increase sales and maximize profits while the vehicles it was selling and leasing were anything but safe.  Consumers who purchased or leased the Defective Vehicles got far less than they bargained for and would not have chosen to purchase those vehicles had they known that they were materially defective.

10.    GM's knowledge of the ignition switch problem, its non-disclosure and cover-up of the problem, and its failure to take action to remedy the problem is the subject of private lawsuits, Congressional investigations and hearings, and a Department of Justice ("DOJ") criminal investigation.

11.    Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 3-1-1 *et. seq.*, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect.  If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.  GM did no such thing.

12.    GM violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects.  GM also fraudulently concealed the deadly ignition switch defects from consumers, owners, and lessees of the Defective Vehicles in violation of state consumer protection statutes as well as common law.

13.    GM's predecessor, General Motors Corporation ("Old GM") (referred to herein collectively as part of "GM" unless otherwise specified), likewise violated these federal and state rules by designing and marketing vehicles with defective

1    ignition switches, and by failing to disclose that defect even after it became aware

2    thereof.   GM also has successor liability for the deceptive and unfair acts and

3    omissions of Old GM because GM has continued the business enterprise of Old

4    GM with full knowledge of the ignition switch defects.

5         14.    Plaintiffs   and   the   Class   have   been   damaged   by   GM's

6    misrepresentations, concealment and non-disclosure of the ignition switch defects

7    in the Defective Vehicles, as they are now holding dangerous vehicles that have had

8    their value greatly diminished because of GM's failure to timely disclose the

9    serious defect.

10        15.    Plaintiffs and the Class were also damaged by the acts and omissions

11   of Old GM for which GM is liable through successor liability because the Defective

12   Vehicles they purchased are worth less than they would have been without the

13   ignition switch defects.

14                    **II.    JURISDICTION AND VENUE**

15        16.    This Court has diversity jurisdiction over this action under 28 U.S.C.

16   § 1332(a) and (d) because the amount in controversy for the Class exceeds

17   $5,000,000, and Plaintiffs and other Class members are citizens of a different state

18   than Defendants.

19        17.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs

20   submit to the Court's jurisdiction.   This Court has personal jurisdiction over

21   Defendants because Defendants conduct substantial business in this District, and

22   some of the actions giving rise to the Complaint took place in this District.

23        18.    Venue is proper in this District under 28 U.S.C. § 1391 because

24   Defendants, as corporations, are deemed to reside in any judicial district in which

25   they are subject to personal jurisdiction.  Additionally, Defendants transact business

26   within the District, and some of the events establishing the claims arose in this

27   District.

28

4

3115508v1/014242

### III.    **PARTIES**

1

2    19.    Plaintiff Sara Robinson is a resident and citizen of Lompoc, California.

3  Plaintiff Robinson owned a 2005 Saturn Ion and is financing a 2009 Chevrolet

4  HHR, both of which were part of the 2014 Recalls due to their defective ignition

5  switches.

6    20.    Plaintiff John Helcl is a resident and citizen of South St. Paul,

7  Minnesota.  Plaintiff Helcl owns a 2007 Chevrolet Cobalt that was part of the 2014

8  Recalls due to its defective ignition switch.

9    21.    Plaintiff Richard Lewis is a resident and citizen of Deer Park, New

10  York.  Plaintiff Lewis owns a 2005 Saturn Ion that was part of the 2014 Recalls due

11  to its defective ignition switch.

12    22.    Plaintiff Denise Petersen is a resident and citizen of Seymour, Texas.

13  Plaintiff Petersen owns a 2009 Chevrolet Cobalt that was part of the 2014 Recalls

14  due to its defective ignition switch.

15    23.    Plaintiffs Robinson, Helcl, Lewis, and Petersen are collectively

16  referred to in this Complaint as "Plaintiffs."

17    24.    Defendant General Motors LLC ("GM") is a limited liability company

18  formed under the laws of Delaware with its principal place of business located at

19  300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009 and on

20  July 10, 2009, acquired substantially all assets and assumed certain liabilities of

21  General Motors Corporation ("Old GM") through a Section 363 sale under Chapter

22  11 of the U.S. Bankruptcy Code.  Collectively, Old GM and GM are collectively

23  referred to herein as "GM."

24    25.    Among the liabilities and obligations expressly retained by GM after

25  the bankruptcy are the following:

26      From and after the Closing, Purchaser [GM] shall comply with the

27      certification, reporting and recall requirements of the National Traffic

28      and Motor Vehicle Act, the Transportation Recall Enhancement,

5

Accountability and Documentation Act, the Clean Air Act, the
California Health and Safety Code, and similar laws, in each case, to
the extent applicable in respect of vehicles and vehicle parts
manufactured or distributed by [Old GM].

26. GM also expressly assumed:

all Liabilities arising under express written warranties of [Old
GM] that are specifically identified as warranties and delivered
in connection with the sale of new, certified used or pre-owned
vehicles or new or remanufactured motor vehicle parts and
equipment (including service parts, accessories, engines and
transmissions) manufactured or sold by [Old GM] or Purchaser
prior to or after the Closing and (B) all obligations under Lemon
Laws.

27. Because GM acquired and operated Old GM and ran it as a continuing
business enterprise, and because GM was aware from its inception of the ignition
switch defects in the Defective Vehicles, GM is liable through successor liability
for the deceptive and unfair acts and omissions of Old GM, as alleged in this
Complaint.

28. Defendant Delphi Automotive PLC ("Delphi") is headquartered in
Gillingham, Kent, United Kingdom, and is the parent company of Delphi
Automotive Systems LLC, which is headquartered in Troy, Michigan.

29. Delphi began as a wholly-owned subsidiary of General Motors
Corporation, until it was launched as an independent publicly-held corporation in
1999.

30. In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from
bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's
steering assets, and four Delphi plants to assist with its post-bankruptcy

6

restructuring.  In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

31.    At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

32.    GM and Delphi are collectively referred to in this Complaint as "Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    GM's Defective Ignition Switch

33.    As per GM, the ignition switches installed in the Defective Vehicles were not properly manufactured to meet GM's specifications for "torque performance," which is the ability of the switch to hold the ignition key firmly in place during vehicle operation.  GM Letters to NHTSA.  Lacking such torque performance, the ignition switch allows the key to rotate in the ignition slot, for example, when inadvertently contacted by the driver's body or jostled by bumpy road conditions thereby turning off the engines and electrical power systems and preventing airbags from deploying in a crash.

34.    GM has described this problem in GM Letters to NHTSA:

The ignition switch torque performance may not meet General Motors' specifications.  If the torque performance is not to specification, the ignition switch may unintentionally move from the "run" position to the "accessory" or "off" position with a corresponding reduction or loss of power.  This risk may be increased if the key ring is carrying added weight or if the vehicle goes off road or experiences some other jarring event.  The timing of the key movement out of the "run" position . . . may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

7

**B.    GM Learns About its Defective Ignition Switch**

35.    GM first detected problems with the ignition switch of its vehicles in 2001, during pre-production of the Saturn Ion.  As per GM engineers, the ignition switch exhibited "low detent plunger force," which GM later revealed to be a cause of the switch's low "torque performance" issues that prompted the 2014 Recalls. GM Letters to NHTSA.

36.    GM claims that in 2001 it changed the ignition switch design and "resolved the problem."  But this claim is belied by the fact that numerous accidents subsequent to 2001 involving GM vehicles – including the Saturn Ion – have been linked to the same defective ignition switch problem and the same "low detent plunger force."  Moreover, the 2014 Recalls include every Saturn Ion model ever produced and sold (there were no model year 2001 or 2002 Saturn Ions) and all of the recalled Defective Vehicles contained the same ignition switch part with the same part number.

37.    GM did not disclose the fact that it had observed the ignition switch problem in 2001, but rather waited until March 2014, 13 years after the fact.

38.    There is no indication that in or around 2001 GM notified Delphi, the ignition switch manufacturer, nor that Delphi created or issued a replacement ignition switch with the design change.  Delphi officials have blamed GM for approving a design for the Cobalt's ignition switch in 2002 even after testing showed that the switch did not meet GM's specifications.

39.    In 2001, GM did not implement an ignition switch design change to the pre-production Saturn Ion and/or implemented a design change that it knew was incapable of remedying the defect.  GM continued to market and sell cars with the same defective ignition switch, including the Saturn Ion released the following year (for the 2003 model year).

40.    In 2003, a GM service technician witnessed a car stall after the ignition turned off while driving.  The technician noticed that the weight of the key ring had

3115508v1/014242

"worn out" the switch and the switch was replaced.  An internal inquiry was opened, and then closed, without any further action taken.  At the time, GM did not publicly disclose this incident.

41.     After 2003, GM continued to observe defective ignition switches, yet did not advise customers to have their ignition switches replaced prior to the 2014 Recalls.  It merely advised customers to avoid using heavy key chains, and offered certain customers key "inserts" that changed the shape of the key chain hole – a "band-aid" approach to fixing a serious and dangerous problem that reflects GM's reckless indifference to public safety.

42.     In 2004, around the time of the launch of its 2005 Chevrolet Cobalt, GM learned "of at least one incident in which a Cobalt lost engine power because the key moved out of the 'run' position when the driver inadvertently contacted the steering column."  <u>GM Letters to NHTSA</u>.

43.     GM recognized that this incident was not a fluke because its employees "were able to replicate this phenomenon during test drives."  *Id.*  GM engineers opened an investigation into the causes and possible solutions for this problem.  They quickly determined that the inadvertent engine shut down problem was likely caused by "low key cylinder torque effort" – the same cause described in the 2014 Recalls.  *Id.*

44.     Although the engineers suggested "a number of possible solutions," GM declined to implement any of them, citing cost and time considerations.  *Id.*  GM closed the investigation and took "no action."  *Id.*

45.     The ignition switch problem was neither fixed nor disclosed to the public and the 2005 model Chevrolet Cobalt was launched with the same defective ignition switch that was not recalled until 2014.

46.     In 2005, GM continued to receive reports of Cobalt engines inadvertently shutting off during vehicle operation.  GM reopened its 2004 investigation "to re-assess this issue."  *Id.*  The engineers drew the same

9

conclusions about the potential for engines to inadvertently "turn off" when ignition keys shifted during vehicle operation due to "low ignition key cylinder torque/effort." *Id.* They also concluded that the ignition switch problem affected not just GM's Cobalt model, but also its HHR, Solstice, and Ion models. *Id.* (Later, in 2006, GM expanded the list of affected vehicles to include all of the Defective Vehicles subject to the 2014 Recalls.)

47.  During the 2005 investigation to "re-assess" the ignition switch issue, GM engineers proposed another solution to the ignition switch problem that required GM to "redesign the key head from a 'slotted' to a 'hole' configuration." *Id.* This design change would not have wholly fixed the ignition switch's "low torque" problem (as the scope of the 2014 Recalls, which requires a full ignition switch replacement makes clear) – but it could have minimized the chance that the ignition key could rotate by reducing the force exerted on the key through back-and-forth movement of the key chain during driving. The fix could also have reduced the likelihood that objects on the key chain would come into contact with drivers' limbs by raising the height of the objects hanging on the key chain. Although this minimal-cost solution "was initially approved," it was "later canceled" for reasons that GM did not disclose in its Letters to NHTSA. *Id.*

48.  In September 2005, GM was informed about a death linked to its defective ignition switches. In July 2005, 16-year-old Amber Marie Rose died after her 2005 Cobalt crashed and the airbags failed to deploy. An investigator hired by Ms. Rose's family determined that the airbags could not deploy because at the time of the crash the ignition switch was off and had shut down the vehicle's electrical system. The family sued GM and GM's legal staff opened a file on the case, but the parties settled out-of-court.

49.  Although its legal department was aware of Ms. Rose's death and the ensuing lawsuit, it was not until 2007, during a meeting with NHTSA, that other GM employees were made aware of Ms. Rose's crash. At that meeting, (*discussed*

3115508v1/014242

*infra)*, NHTSA regulators confirmed that Ms. Rose's engine was off at the time of her crash.

50.     Despite investigating numerous, easily replicable incidents involving the same ignition switch defect, and being sued by the family of a deceased driver whose death was attributed to said defect, GM did not publicly disclose the problem or implement any of the solutions its own engineers had suggested.

51.     In December 2005, GM sent its dealers a technical service bulletin informing them about the potential ignition switch issue and told them to advise owners to remove "unessential items from their key chains." *Id.*

52.     GM also told dealers that if customers brought their vehicles in for service, after experiencing a sudden loss of power during operation, those customers should be provided with key ring "inserts" to change the shape of the ignition key hole.  This was the "fix" that GM had declined to implement on a global level.

53.     As a result of the distribution of the bulletin to dealers and the limited "fix" for customers who experienced the problem – hundreds of drivers received the key "inserts." *Id.*  (GM identified 474 such drivers).  This represented only a fraction of the millions of drivers of Defective Vehicles who had yet to experience the problem and/or did not realize that the sudden loss of power they experienced was due to a mechanical defect that necessitated altering the vehicle.

54.     Albeit aware of the ignition switch problem, GM did not disclose the same to the public at large, to regulators, nor did it implement a system-wide fix.

**C.     GM Redesigns its Defective Switch but Does Not Install the New Switch in Defective Vehicles or Disclose the Change to the Public**

55.     In or around April 2006, Delphi proposed a change to the design of the subject ignition switch in the Defective Vehicles which would increase its torque performance by installing a new detent plunger and spring to prevent the key from slipping.

11

56. GM did not ask Delphi to redesign the ignition switch.

57. Delphi knew about the defect, yet waited until 2006 to try to correct it.

58. Despite the foregoing, GM claims that the only documentation it had about the ignition switch redesign is a single authorization form, signed in April 2006, by the GM engineer who designed the original version installed in all Defective Vehicles. GM Letters to NHTSA. GM also claims that it could not locate this form, or any other documentation memorializing the change, until 2013.

59. As per GM, Delphi began providing the re-designed ignition switch to GM "at some point during the 2007 model year." *Id.* Yet, GM was forced to recall more than a million Defective Vehicles produced **after** the 2007 model year. As per GM, because the part number on the defective switches was not changed when the switch was redesigned (*see infra*), GM cannot not track which newer cars had replacement switches installed.

60. GM did not retroactively apply the ignition switch redesign to its vehicle models issued prior to 2008, nor otherwise disclose the change to the public.

61. Even though GM and Delphi knew that a defective ignition switch was installed in millions of its vehicles issued between 2003 and 2007, and knew that the problem could only be resolved through a total design change and the installation of a new ignition switch, they took no steps to make such a change in those vehicles until the 2014 Recalls.

62. GM's now-current excuse as to why it was unable to find evidence of the ignition switch design change until 2013 is that Delphi did not issue a new part number for the redesigned switch, and that it is impossible to identify by sight any differences between the ignition switch in the Defective Vehicles and the redesigned ignition switches installed in vehicle models issued after 2007.

3115508v1/014242

63.   This excuse does not exonerate GM or Delphi for failing to retroactively implement the design change or otherwise disclose the problem/change at that time.

64.   In any event, former GM engineers doubt GM's explanation. According to those engineers, the failure to change the part number would have been a major breach in standard operating procedure:  "'Changing the fit, form or function of a part without making a part number change is a cardinal sin.  It would have been an extraordinary violation of internal processes.'"  "'*Cardinal sin*': *Former GM engineers say quiet '06 redesign of faulty ignition switch was a major violation of protocol*," <u>Automotive News</u> (Mar. 24, 2014) ("<u>Cardinal Sin</u>").  As per another GM engineer:  "'Failure to change a part number, at best, suggests sloppiness on both the part of the supplier and GM.'"  *Id.*  Furthermore, the engineers explained, a part supplier is not supposed to ship a redesigned part pursuant to an old part number. *Id.*

65.   Former GM engineers interviewed by <u>Automotive News</u> also questioned GM's claim that the design change was approved by a single engineer and recorded in a single document signed in 2006.  *Id.*  They explained that redesigning a part could not have been undertaken unilaterally by a single engineer.  *Id.*  Any alteration of a part, especially a safety-critical component that had been identified as flawed, would have gone through a robust evaluation:  "'It's not like one or two guys can just lob things into the system.'"  *Id.*  The change would need to have been vetted by numerous additional engineers, supervisors, review boards, and even purchasing departments before it could have been implemented.  *Id.*

66.   GM claims that the April 2006 document authorizing the ignition switch design change was signed by "the design engineer responsible for the ignition switch installed in all of the vehicles subject to the [2014 Recalls]," but GM has not yet disclosed the engineer's name.  <u>GM Letters to NHTSA</u>.

67.     The man who claims to have been the lead design engineer for the ignition switch, Ray DeGiorgio, has repeatedly insisted that he was never made aware of such a design modification. <u>Cardinal Sin</u>.

68.     In April 2013, DeGiorgio was deposed in a lawsuit filed by the estate of a Georgia woman who died when her Cobalt's ignition moved to "accessory" mode seconds before another car crashed into hers.  DeGiorgio testified that he "was not aware of the detent plunger switch change" and "certainly did not approve [such] . . . a design change."  *Id.*  DeGiorgio also confirmed that "if any such change was made, it was made without [his] knowledge and authorization."  *Id.*

69.     Irrespective of whether GM was aware of the part change prior to 2013, and irrespective of whether a change occurred, GM did not tell federal regulators that it was aware of any design defect in the Defective Vehicles or that its ignition switch was responsible for accidents and deaths.

### D.     <u>GM Continues to Become Aware of Accidents Consistent With its Defective Ignition Switch Yet Continues to Do Nothing</u>

70.     In March 2007, NHTSA investigators met with GM employees and informed GM of Amber Rose's fatal July 2005 crash.  According to NHTSA, Ms. Rose's 2005 Cobalt was involved in a frontal collision, the airbags did not deploy, and data retrieved from the car's sensing and diagnostic module ("SDM") indicated that at the time of the crash the car's ignition was in the "accessory" position, rather than the "on" position.

71.     As of the filing of this complaint, GM has admitted that by the end of 2007, it knew of at least 10 similar incidents - involving frontal crashes of Cobalts wherein the airbags did not deploy - and that in more than half of them for which SDM data was available, at the time of the crash the ignition switch was in the "accessory" position rather than the "on" position.

72.     In February 2009, GM opened another crash incident report investigation, which found that "customers with substantially weighted key

14

chains/additional keys hanging from ignition key have experienced accidental ignition shut-off." <u>GM Letters to NHTSA</u>. To remedy this situation, GM now recommended the fix - changing the key ring hole from a "slot" to a "hole" design to "reduce downward force and the likelihood of this occurrence." According to GM, "[t]his key design change was implemented in model year 2010 Cobalts," but not made retroactive to pre-2010 models. *Id.*

**E.  GM Receives Indisputable Evidence of its Defective Ignition Switch**

73. On May 15, 2009, GM engineers met with representatives of Continental, the supplier of the SDMs used in the Cobalt and "learned that data in the black boxes of Chevrolet Cobalts confirmed a potentially fatal defect existed in hundreds of thousands of cars." *"General Motors Misled Grieving Families on a Lethal Flaw,"* <u>The New York Times</u> (Mar. 24, 2014) (online edition) ("<u>GM Lethal Flaw</u>"). Specifically, the GM engineers were informed that in fifty percent of the recorded Cobalt frontal impact crashes where airbags failed to deploy, the vehicles' ignitions were switched to the "accessory" position instead of the "on" position.

74. According to <u>The New York Times</u>, "[t]his appears to be the first proven link between a faulty switch and deactivated air bags." *Id.* These definitive findings were never disclosed to consumers.

75. Two weeks later, GM filed for bankruptcy. Following the bankruptcy, and continuing over the next several years, GM received complaints about accidental ignition shut-offs and continued to investigate frontal crashes where airbags failed to deploy.

76. Since the May 15, 2009 meeting with Continental, GM has reported to NHTSA at least 23 fatal crashes (resulting in 26 deaths) involving its recalled models that were blamed on vehicle defects. <u>GM Lethal Flaw</u>. Yet despite having definitive evidence that accidents and deaths were linked to faulty ignition switches, GM continued to conceal the defect from consumers.

77.     In mid-2011, GM investigated crashes involving 2005-2007 model year Chevrolet Cobalts, a 2007 Pontiac G5, certain Ion HHR, and Solstice vehicles where airbags had failed to deploy during frontal impacts.  GM learned that the ignitions in some of the vehicles had been either in the "accessory" or "off" positions at the time of the crashes.

78.     In May 2012, GM conducted a study that revealed that the ignition switch installed in the now-recalled Defective Vehicles "exhibited torque performance below that specified by GM for the ignition switch."  GM Letters to NHTSA.  Albeit the precise explanation GM provided to NHTSA with respect to its 2014 Recalls, GM did not issue the recall or disclose its findings to the public.

79.     Following the May 15, 2009 meeting when GM was told of its defective ignition switch, and while conducting further studies that confirmed the existence of such defect, GM continued to deny to customers and families of accident victims that it had any evidence of such a systemic mechanical defect.

80.     GM also pressured families of crash victims to drop lawsuits blaming the accidents on defective ignition switches and forced others to settle without making public disclosures.  According to The New York Times, "In one case, G.M. threatened to come after the family of an accident victim for reimbursement of legal fees if the family did not withdraw its lawsuit.  In another instance, it dismissed a family with a terse, formulaic letter, saying there was no basis for claims."  GM Lethal Flaw.

### F.     The Potential Fallout of GM's Repeated Failures

81.     As of the filing of the complaint GM admits that it is "currently aware" of at least 34 separate frontal impact crashes since 2005 involving the recalled Defective Vehicle models where the ignition switch defect "caused or contributed to the airbags' non-deployment."  GM Letter to NHTSA.  These 34 crashes resulted in at least 13 deaths and 9 injuries to "frontal occupants" (i.e., drivers and passengers sitting adjacent to airbags that did not deploy).  In over one-third of

16

these crashes, GM was able to confirm through SDM data that the ignition switches in the vehicles were in the "accessory" or "off" positions at the time of impact. *Id.*

82.     An analysis conducted for the Center for Automotive Safety ("CAS") found that between 2002 and 2012 "at least 303 deaths" were reported involving "front seat occupants in recalled 2005-07 Cobalts and 2003-07 Ions where the airbag failed to deploy in non-rear impact crashes."[2]  According to CAS, these accidents are "fully consistent with" the defective ignition switch defect at issue, and while its examination "did not include the other five models recalled," if it had, "the number of deaths without airbag deployment would have been higher."  CAS Study.

83.     As of the filing of this Complaint, GM admits that its employees "became aware of many of [the 34 crashes it has identified since 2005] within a month of the dates on which they occurred," and that GM was "involved in claims and lawsuits in which allegations were made regarding the ignition switch issue that is the subject of the recall."  GM Letters to NHTSA.

84.     As GM's North America president, Alan Batey, conceded, "the process employed to examine this [ignition switch defect] phenomenon was not as robust as it should have been."

85.     However, the lack of "robust" examination is not the sole problem. GM had enough information to issue a recall since at least 2004, yet failed to take any action to remedy or disclose the problem.

_____

[2] *See* Friedman Research Corporation Study performed for CAS, available at http://www.autosafety.org/sites/default/files/imce_staff_uploads/Friedman%20Research%20%20Airbag%20Non-Deployment%20in%20Saturn%20Ion%20and%20Chevrolet%20Cobalt%20Vehicles.pdf and CAS's March 13, 2014 Letter to NHTSA about the Friedman Research Corporation Study, available at http://www.autosafety.org/sites/default/files/imce_staff_uploads/Friedman%20Letter%20March%2013%202014%20Full.pdf (collectively, "CAS Study").

17

### G.     GM Finally Issues a Recall, and Then Several More

86.     On February 7, 2014, GM filed a Part 573 Defect Notice to recall 619,122 of its 2005-2007 Chevrolet Cobalt and 2007 Pontiac G5 model vehicles in the U.S.  The defect notice mandated that dealers "are to replace the ignition switch" on the recalled vehicles due to the ignition switch defect discussed herein.

87.     On February 19, 2014, an attorney for the family of one of the deceased crash victims caused by a defective ignition switch sent the NHTSA a request for timeliness query letter related to the February 7, 2014 recall (the "RFT").  The RFT stated that there were two main problems with the recall.  First, the recall did not cover all of GM's vehicle models containing the defective ignition switch even though GM had identified the additional vehicles with defective ignition switches in its 2005 dealer service bulletin.  Second, GM's explanation of the defect failed to warn that the defective ignition switch could also cause the key to slip from the "run" to "accessory" or "off" positions under normal driving conditions, even when the key ring was not carrying added weight.

88.     On February 24, 2014, GM filed a second Part 573 Defect Notice, expanding its first recall to include the additional vehicles discussed in the RFT, including 748,024 of its 2006-2007 Chevrolet HHR; 2006-2007 Pontiac Solstice; 2003-2007 Saturn Ion; and 2007 Saturn Sky model vehicles in the U.S.  The second defect notice also mandated that dealers "are to replace the ignition switch" on the recalled vehicles and included a substantially similar explanation of the ignition switch defect as the first notice.

89.     On March 17, 2014 (prior to announcing the third recall), GM's CEO, Mary T. Barra, stated in a video message to GM employees:

> . . . Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration.   As of now, two congressional committees have announced that they will examine the issue.

3115508v1/014242

And it's been reported that the Department of Justice is looking into this matter. . . . ***These are serious developments that shouldn't surprise anyone. After all, something went wrong with our process in this instance, and terrible things happened***. . . . The bottom line is, we will be better because of this tragic situation, if we seize the opportunity. . . . I ask everyone to stay focused on making today's GM the best it can be.[3]

90. In another video posted on March 26, 2014 to respond to customer questions and concerns, Ms. Barra admits that GM waited too long to issue its 2014 Recalls. When asked "Why the delay announcing the recall?," Ms. Barra responded:

***Well clearly the fact that it took over 10 years [to issue the recall] indicates we have work to do to improve our process.*** And we are dedicated to doing that. That is why we hired Anton Valukas who is a former U.S. district attorney to help us investigate this process . . . so we get ever lesson learned. And I can commit to you that we will put all these processes and learnings [*sic*] in place to make sure this never happens again.[4]

91. On March 28, 2014, GM announced that it was expanding its first and second recalls to include additional vehicles for model years after 2007, including 824,000 of its 2008-2010 Chevrolet Cobalt; 2008-2010 Pontiac G5; 2008-2011 Chevrolet HHR; 2008-2010 Pontiac Solstice; and 2008-10 Saturn Sky model vehicles in the U.S. This third recall was supposedly announced "[o]ut of an abundance of caution" after GM recognized that thousands of these newer model

---

[3] *See* http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/mar/0317-video.html (last visited Mar. 28, 2014) (emphasis added).

[4] *See* http://www.gm.com/ignition-switch-recall/videos.html (last visited Mar. 28, 2014) (emphasis added).

1   vehicles likely had defective ignition switches installed as replacement parts and
2   GM was unable to track the part change.

3        92.   On March 31, 2014, GM announced yet another recall of 1.5 million
4   vehicles worldwide to fix power steering system problems causing vehicles to
5   suddenly lose power steering control while in operation.  This latest recall affects
6   some of the Defective Vehicles included in the ignition switch recalls, including the
7   Saturn Ion, Chevrolet HHR, and Chevrolet Cobalt models.  GM said that some of
8   the recalled cars had been recalled before for the same issue, but GM was asking
9   drivers to bring them in again because "we did not do enough" last time.

10        93.   Despite the fact that GM waited nearly a decade (or longer) than it
11   should have to issue its three "safety-related recall[s]" covering nearly 2.2 million
12   Defective Vehicles in the U.S. (and several hundred thousand abroad), its
13   customers must wait until at least April 7, 2014 (and possibly into the fall of 2014)
14   to have their ignition switches replaced.

15        94.   On March 26, 2014, GM CEO Barra released a series of videos
16   responding to customer questions and concerns about GM's ignition switch recall.
17   In answer to the question "Is my car safe to drive?," Ms. Barra stated:

18              ***The simple answer to that question is yes***.  The GM engineers
19              have done extensive analysis to make sure if you only have the
20              key or only the key on a ring, the vehicle is safe to drive.  In
21              fact, when they presented this to me, the very first question I
22              asked is would you let your family, your spouse, your children
23              drive these vehicles in this condition and they said yes…"[5]

24        95.   On April 1, 2014, the House of Representatives Committee on Energy
25   and Commerce Subcommittee on Oversight and Investigations (the "House

26

27   _____
     [5] *See* http://www.gm.com/ignition-switch-recall/videos.html (last visited Mar. 28,
28   2014) (emphasis added).

1 Committee") held a hearing titled, "The GM Ignition Switch Recall: Why Did It
2 Take So Long?"

3      96.    In her prepared testimony released prior to the House Committee
4 hearing, Ms. Barra stated: "Sitting here today, I cannot tell you why it took years
5 for a safety defect to be announced . . . ."

6 ## V.   CLASS ACTION ALLEGATIONS

7      97.    Plaintiffs bring this lawsuit as a class action on their own behalf and on
8 behalf of all other persons similarly situated pursuant to Federal Rule of Civil
9 Procedure 23. This action satisfies the numerosity, commonality, typicality,
10 adequacy, predominance, and superiority requirements of those provisions.

11      98.    The Class is defined as:

12      All persons in the United States who purchased or leased a
13      Defective Vehicle (2005-2010 Chevrolet Cobalt; 2007-2010
14      Pontiac G5; 2006-2010 Pontiac Solstice; 2006-2011 Chevrolet
15      HHR; 2003-2007 Saturn Ion; and 2007-2010 Saturn Sky), and
16      any other GM vehicle model containing the same ignition switch
17      as those Defective Vehicle models. Excluded from the Class are
18      those persons who have suffered personal injuries as a result of
19      the facts alleged herein and are claiming damages related to
20      such injuries.

21      99.    Plaintiffs also bring this action on behalf of the following State
22 Subclasses:

23      **California Subclass**: All Class Members who reside in and
24      purchased or leased a Defective Vehicle in the State of
25      California ("California Subclass").

26      **Minnesota Subclass**: All Class Members who reside in and
27      purchased or leased a Defective Vehicle in the State of
28      Minnesota ("Minnesota Subclass").

3115508v1/014242

**New York Subclass**: All Class Members who reside in and purchased or leased a Defective Vehicle in the State of New York ("New York Subclass").

**Texas Subclass**: All Class Members who reside in and purchased or leased a Defective Vehicle in the State of Texas ("Texas Subclass").

100.　Although the exact numbers of Class and Subclass members are uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of the Class and Subclasses in a single action will provide substantial benefits to all parties and to the Court. The Class and Subclass members are readily identifiable from information and records in GM's possession, custody, or control.

101.　The claims of the representative Plaintiffs are typical of the claims of the Class and Subclasses in that the representative Plaintiffs, like all Class and Subclass members, purchased or leased a Defective Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiffs, like all Class and Subclass members, have been damaged by Defendants' misconduct. Furthermore, the factual bases of Defendants' misconduct are common to all Class and Subclass members and represent a common thread of misconduct resulting in injury.

102.　Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

103.　Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and Subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class or Subclasses.

104. There are numerous questions of law and fact common to Plaintiffs and Class and Subclass members that predominate over any question affecting only individual Class and Subclass members, the answers to which will advance resolution of the litigation as to all Class and Subclass members. These common legal and factual issues include:

    a. whether the Defective Vehicles have a defective ignition switch;

    b. whether Defendants knew or should have known about the ignition switch defect, and, if yes, how long Defendants have known of the defect;

    c. whether the defective nature of the Defective Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Defective Vehicle from GM;

    d. whether and when Defendants had a duty to disclose the defective nature of the Defective Vehicles to Plaintiffs and the Class and Subclasses;

    e. whether Defendants omitted and failed to disclose material facts about the Defective Vehicles;

    f. whether Defendants' concealment of the true nature of the Defective Vehicles induced Plaintiffs and the Class and Subclasses to act to their detriment by purchasing the Defective Vehicles;

    g. whether Defendants violated the applicable state consumer protection statutes;

    h. whether the Defective Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

3115508v1/014242

i.   whether Plaintiffs and the Class and Subclass members are entitled to a declaratory judgment stating that the ignition switches in the Defective Vehicles are defective and/or not merchantable;

j.   whether Plaintiffs and the Class and Subclass members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction preventing Defendants from selling vehicles with the defective ignition switch; and

k.   the amount of damages.

105.   Plaintiffs and the Class and Subclass members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

106.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

107.   Absent a class action, most Class and Subclass members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy.  Given the relatively small size of the each individual Class and Subclass members' claims in relation to litigating against GM, it is likely that only a few Class and Subclass members could afford to seek legal redress for Defendants' misconduct.

108.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

109.   Defendants have already admitted that all Defective Vehicles manufactured prior to 2008 contained the same defective ignition switches and that thousands of Defective Vehicles manufactured thereafter contained replacement

ignition switches that were the defective ignition switches. Defendants have also admitted that all of the defective ignition switches bear the same part number and were manufactured by Defendant Delphi. Defendants have also sent identical recall letters and notices to all Class and Subclass members.

110. Classwide declaratory, equitable, and injunctive relief is appropriate because Defendants have acted on grounds that apply generally to the Class and Subclasses, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class and Subclass members to protect their interests. Classwide relief assures fair, consistent, and equitable treatment and protection of all Class and Subclass members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the defective ignition switches.

## VI.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

#### FRAUDULENT CONCEALMENT

**Asserted on Behalf of the Class**

111. Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

112. Defendants concealed and/or suppressed material facts concerning the safety of the Defective Vehicles even though they had a duty to disclose known safety issues because they consistently marketed their vehicles as reliable and safe and proclaimed that they maintain the highest safety standards.

113. Once Defendants made representations to the public about safety, they were under a duty to disclose these omitted facts, because where one speaks one must speak the whole truth and not conceal any facts which materially qualify those facts stated.

114. Defendants had a duty to disclose the material problems with the ignition switch because they were known and/or accessible only to Defendants who

3115508v1/014242

1    have superior knowledge and access to the facts, and Defendants knew they were

2    not known to or reasonably discoverable by Plaintiffs and the Class.

3            115.   These omitted facts about the ignition switch's propensity to leave the

4    "on" position were material because they directly impact the safety of the Defective

5    Vehicles.

6            116.   Defendants possessed exclusive knowledge of the defects rendering

7    the Defective Vehicles inherently more dangerous and more unreliable than similar

8    vehicles.

9            117.   Defendants actively concealed and/or suppressed these material facts,

10    in whole or in part, with the intent to induce Plaintiffs and Class members to

11    purchase Defective Vehicles at a higher price for the vehicles, which did not match

12    the vehicles' true value.

13            118.   Plaintiffs and Class members were unaware of these omitted material

14    facts and would not have acted as they did if they had known of the concealed

15    and/or suppressed facts.  Plaintiffs' and Class members' actions were justified.

16    Defendants were in exclusive control of the material facts concerning the defective

17    ignition switches and such facts were not known to the public or the Class

18    members.

19            119.   As a result of the concealment and/or suppression of facts, Plaintiffs

20    and Class members have sustained and will continue to sustain damages, including,

21    but not limited to, the difference between the value of that which Plaintiffs and the

22    Class members paid and the actual value of that which they received.

23                           **SECOND CLAIM FOR RELIEF**

24             <u>VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT</u>

25                  (Mich. Comp. L. Ann. § 445.901, et seq.)

26                      **Asserted on Behalf of the Class**

27            120.   Plaintiffs hereby incorporate the allegations contained in the preceding

28    paragraphs of this Complaint as if full set forth herein.

121.  Plaintiffs and Defendants are "person[s]" under Mich. Comp. L. Ann. § 445.902(d).

122.  Defendants' business of selling and leasing vehicles, providing notice of automotive defects, selling replacement parts and warranties, and developing repair procedures falls within the definition of "trade or commerce" in Mich. Comp. L. Ann. § 445.902(g).

123.  Defendants committed unfair and deceptive acts as defined in Mich. Comp. L. Ann. § 445.903.

124.  For years, Defendants knew about the ignition switch defect in the Defective Vehicles, but did not reveal the same to Plaintiffs and the other members of the Class, who were misled and deceived by Defendants' omission.  The existence of the defect could not reasonably have been discovered by consumers until the 2014 Recalls.  Defendants thus violated Michigan's Consumer Protection Act by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. L. Ann. § 445.903 (s).

125.  As a direct and proximate result of Defendants' unfair and deceptive acts, as alleged herein, Plaintiffs and Class members have suffered damages in that they, *inter alia*, spent more money on their Defective Vehicles and related purchases than they otherwise would have and are left with Defective Vehicles that cannot be safely driven and which are of diminished value.  Meanwhile, Defendants have generated more revenue connected with Defective Vehicles, including through the sale of warranties and replacement parts, than they otherwise could have and charged inflated prices for warranties and parts, unjustly enriching themselves thereby.

126.  Plaintiffs request that this Court:  enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; provide to Plaintiffs and each Class either their actual damages as the result of GM's unfair, unlawful, and deceptive

3115508v1/014242

trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under Mich. Comp. L. Ann. § 445.911.

127.   Plaintiffs acknowledge that, on its face, the MCPA purports to (i) deprive non-residents of bringing class (but not individual) actions under the MCPA; and (ii) allows individuals (but not class members) the ability to recover a penalty of $250 per person if that amount is greater than their actual damages. After the United States Supreme Court's decision in *Shady Grove Orthopedic Ass., P.A. v. Allstate Ins. Co.*, 589 U.S. 393 (2010), however, any such prohibitions imposed in class actions (but not in individual actions) are trumped and superseded by Fed. R. Civ. P. 23, which imposes no such restrictions.

## THIRD CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

(Cal. Bus. & Prof. Code § 17200, et seq.)

**Asserted on Behalf of the California Subclass by Plaintiff Robinson**

128.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

129.   California Business and Professions Code section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." As described herein, Defendants engaged in conduct that violated each of this statute's enumerated prohibited acts.

130.   Defendants committed an unlawful business act or practice by violating the National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C. § 30101, *et seq*., and its regulations. Under the TREAD Act, 49 U.S.C. § 30101, *et seq*, and its accompanying regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect. 49 U.S.C. § 30118(c)(1)&(2).

28

131.  Defendants committed fraudulent business acts as a result of their misrepresentations and omissions regarding the safety and reliability of the Defective Vehicles.  Touting the vehicles' safety and failing to disclose the dangers inherent in the ignition switch design, as set forth in this Complaint, were likely to deceive a reasonable consumer as to the safety of the vehicles.  Such safety information would be material to a reasonable consumer deciding whether to purchase or lease those vehicles.

132.  Defendants engaged in unfair and deceptive advertising practices by manufacturing and selling Defective Vehicles and failing to adequately investigate, disclose and remedy said defect.  Defendants' conduct impaired competition within the automotive vehicles market and prevented Plaintiff from making fully informed decisions about whether to purchase or lease Defective Vehicles and/or the price to be paid to purchase or lease such Defective Vehicles.

133.  Plaintiff Robinson has suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  Had Plaintiff Robinson known that her vehicle was defective she would not have purchased or leased and/or paid as much for it.  As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiff Robinson and California Subclass members have suffered and will continue to suffer actual damages.

134.  Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

3115508v1/014242

## FOURTH CLAIM FOR RELIEF

<u>VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW</u>

(Cal. Bus. & Prof. Code § 17500, et seq.)

**Asserted on Behalf of the California Subclass by Plaintiff Robinson**

135.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

136.   California Business and Professions Code § 17500 makes it "unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

137.   Defendants caused to be made or disseminated to consumers throughout California and the United States, advertising, marketing and other publications, statements about the Defective Vehicles that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to the Defendants, to be untrue and misleading.

138.   Defendants violated California Business and Professions Code § 17500 because the misrepresentations and omissions regarding the safety and reliability of the Defective Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

139.   Plaintiff and California Subclass members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices.  Plaintiff and California Subclass members

3115508v1/014242

overpaid for their Defective Vehicles and did not receive the benefit of their bargain.

140.   Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices with respect to the marketing and sale of the Defective Vehicles, and for such other relief as set forth below.

**FIFTH CLAIM FOR RELIEF**

<u>VIOLATION OF THE MINNESOTA UNIFORM</u>

<u>DECEPTIVE TRADE PRACTICES ACT</u>

(Minn. Stat. § 325D.44, *et seq.*)

**Asserted on Behalf of the Minnesota Subclass by Plaintiff Helcl**

141.   Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-137 of this Complaint as if fully set forth herein.

142.   Defendants engaged in – and continue to engage in – conduct that violates the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, *et seq*.

143.   Defendants violated Minn. Stat. § 325D.44(5) by representing the Defective Vehicles as having characteristics, uses, and benefits of safe and mechanically sound vehicles while knowing that the statements were false.

144.   Defendants violated Minn. Stat. § 325D.44(7) by representing the Defective Vehicles as a non-defective product of a particular standard, quality, or grade while knowing the statements were false.

145.   Defendants violated Minn. Stat. § 325D.44(9) by advertising, marketing, and selling the Defective Vehicles as reliable and without a known defect while knowing those claims were false.

146.   Defendants violated Minn. Stat. § 325D.44(13) by creating a likelihood of confusion and/or misrepresenting the safety of the Defective Vehicles.

31

147.   As a direct and proximate result of Defendants' deceptive conduct and violation of Minn. Stat. § 325D.44, *et seq*., the Minnesota Subclass members have sustained, and will continue to sustain, economic losses and other damages for which they are entitled to declaratory relief and compensatory and equitable damages in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**

<u>VIOLATION OF THE NEW YORK</u>

<u>DECEPTIVE ACTS OR PRACTICES STATUTE</u>

(N.Y. Gen. Bus. Law § 349)

**Asserted on Behalf of the New York Subclass by Plaintiff Lewis**

148.   Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-137 of this Complaint.

149.   New York General Business Law § 349 makes unlawful materially "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

150.   Defendants failed to disclose the dangerous ignition switch defect in the Defective Vehicles.  As such, they made materially untrue, deceptive or misleading representations of material facts and/or omitted or concealed material facts which reasonable consumers would have considered in determining whether to purchase or lease one of the Defective Vehicles.

151.   The New York Subclass members were deceived by Defendants into believing the Defective Vehicles were safe.  They would not have purchased the Defective Vehicles had they known of the propensity of the ignition switch to leave the "on" position during vehicle operation causing the vehicle to shut down and preventing deployment of the airbags.

152.   The New York Subclass members suffered injury as a result of Defendants' deceptive conduct in violation of § 349.  They overpaid for their Defective Vehicles and their vehicles have suffered a diminution in value.

3115508v1/014242

153. The New York Subclass members seek recovery of actual and/or statutory damages and attorneys' fees in accordance with § 349 (h).

### SEVENTH CLAIM FOR RELIEF

<u>VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT</u>

(Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

**Asserted on Behalf of the Texas Subclass by Plaintiff Petersen**

154. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-137 of this Complaint.

155. Defendants' conduct, described herein, constitutes false, misleading or deceptive acts or practices under the Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq.* ("Texas DTPA").

156. By failing to disclose and/or actively concealing the ignition switch problem in the Defective Vehicles, Defendants engaged in deceptive business practices in violation of the Texas DTPA.

157. As alleged above, Defendants made numerous material statements about the safety and reliability of the Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive nature of Defendants' unlawful advertising and representations as a whole.

158. Defendants' unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including the Texas Subclass members, about the true nature, safety and reliability of the Defective Vehicles.

159. In purchasing and/or leasing their Defective Vehicles, the Texas Subclass members relied on the misrepresentations of Defendants with respect of the safety and reliability of the vehicles. Had the Texas Subclass members been advised of the ignition defect, they would not have purchased or leased their Defective Vehicles and/or paid as much for them, and/or they would not have retained and continued to use them.

3115508v1/014242

160.   Defendants are liable to the Texas Subclass members for damages under §§ 17.50(a)(2) and 17.50(b) of the Texas DTPA.

161.   Defendants' improper conduct as alleged herein, also constitutes an unconscionable action or course of action under § 17.50(a)(3) of the Texas DTPA.

162.   Pursuant to the Texas DTPA, the Texas Subclass seeks all just and proper relief available thereunder.

## VII.   **PRAYER FOR RELIEF**

163.   Plaintiffs, on behalf of themselves and the Class and Subclasses, respectfully request this Court  enter judgment against Defendants, and grant the following relief:

A. certifying the Class and State Subclasses and  designating Plaintiffs as the representatives thereof, and designating the undersigned as Class Counsel;

B. declaring that the ignition switches in the Defective Vehicles are defective;

C. requiring Defendants to notify all Class and Subclass members about the defective nature of the Defective Vehicles;

D. enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Defective Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Defective Vehicles to eliminate the ignition switch defect;

E. awarding Plaintiffs and Class and Subclass members compensatory, exemplary, and/or statutory damages, including interest, in an amount to be proven at trial;

F. awarding Plaintiffs and the Class and Subclass attorneys' fees, costs, and pre-judgment and post-judgment interest; and

3115508v1/014242

1      G. awarding such other relief as the Court may deem appropriate

2   under the circumstances.

3

4   Dated:  April 2, 2014                           MARC M. SELTZER
                                                    STEVEN G. SKLAVER
5                                                   KALPANA SRINIVASAN
                                                    SUSMAN GODFREY L.L.P.
6
                                                    LESTER L. LEVY
7                                                   MICHELE F. RAPHAEL
                                                    ROBERT S. PLOSKY
8                                                   WOLF POPPER LLP

9                                             By:   /s/ Marc M. Seltzer

10                                                  Marc M. Seltzer
                                                    Attorneys for Plaintiffs
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3115508v1/014242

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues so triable of right.

Dated:  April 2, 2014

MARC M. SELTZER
STEVEN G. SKLAVER
KALPANA SRINIVASAN
SUSMAN GODFREY L.L.P.

LESTER L. LEVY
MICHELE F. RAPHAEL
ROBERT S. PLOSKY
WOLF POPPER LLP

By:  */s/ Marc M. Seltzer*

Marc M. Seltzer
Attorneys for Plaintiffs

3115508v1/014242