# Exhibit JJ

1   ROBBINS GELLER RUDMAN
       & DOWD LLP
2   PATRICK J. COUGHLIN
3   DAVID W. MITCHELL
     655 West Broadway, Suite 1900
4   San Diego, CA  92101
     Telephone:  619/231-1058
5   619/231-7423 (fax)
     patc@rgrdlaw.com
6   davidm@rgrdlaw.com
     - and –
7   JACK REISE
     STUART A. DAVIDSON
8   CULLIN A. O'BRIEN
     MARK DEARMAN
9   JESSE S. JOHNSON
     120 East Palmetto Park Road, Suite 500
10  Boca Raton, FL  33432
     Telephone:  561/750-3000
11  561/750-3364 (fax)
     jreise@rgrdlaw.com
12  sdavidson@rgrdlaw.com
     cobrien@rgrdlaw.com
13  mdearman@rgrdlaw.com
     jjohnson@rgrdlaw.com
14
15  Attorneys for Plaintiff
16

PARADIS LAW GROUP, PLLC
PAUL O. PARADIS
GINA M. TUFARO
570 Seventh Avenue
20th Floor
New York, NY  10018
Telephone: 212/986-4500
212-986-4501 (fax)

17              UNITED STATES DISTRICT COURT

18              CENTRAL DISTRICT OF CALIFORNIA

19                    EASTERN DIVISION

| | |
|---|---|
| 20   LARRY DARBY, Individually and on Behalf<br>of All Others Similarly Situated,    ) | Case No. 5:14-cv-00676 |
| 21                                        )<br>                    Plaintiff,    ) | <u>CLASS ACTION</u> |
| 22                                        )<br>        vs.                        ) | <u>CLASS ACTION COMPLAINT</u> |
| 23   GENERAL MOTORS LLC and DELPHI        )<br>AUTOMOTIVE PLC,                        ) | |
| 24                                        )<br>                    Defendants.    ) | |
| 25                                        ) | <u>JURY TRIAL DEMANDED</u> |

26

27

28

# TABLE OF CONTENTS

**Page**

JURISDICTION AND VENUE ...................................................................................1

INTRODUCTION ......................................................................................................1

PARTIES ...................................................................................................................3

TOLLING OF THE STATUTEs OF LIMITATIONS ...................................................4

    A.    Discovery Rule Tolling.............................................................................4

    B.    Fraudulent Concealment Tolling ..............................................................4

    C.    Estoppel...................................................................................................5

FACTUAL ALLEGATIONS ......................................................................................5

    A.    Defendants Possessed Knowledge of the Dangerous Design Defect for More
           than 10 Years .........................................................................................5

          a.    GM's October 2004 Inquiry into the Dangerous and Defectively
               Designed Ignition Switches ..........................................................7

          b.    GM's 2005 Bulletin Regarding the Dangerous and Defective Ignition
               Switches .......................................................................................8

          c.    GM's May 2005 Inquiry into the Defectively and Dangerously
               Designed Ignition Switches ..........................................................9

          d.    Consumer Complaints Regarding the Dangerous and Defectively
               Designed Ignition Switches Continue to Mount.........................10

          e.    GM's February 2009 Inquiry into the Dangerous and Defective
               Ignition Switches ........................................................................12

          f.    GM's Field Performance Evaluation .........................................13

Page

g.    GM's OnStar System Provided Data in Real Time Showing Ignition
System Defects..................................................................................13

B.    GM's Duty to Disclose the Known Safety Defects Related to the Defective
Ignition.........................................................................................................15

C.    Despite Its Knowledge of the Dangerous Design Defect, GM Touted the
Vehicles as Safe and Reliable .....................................................................15

D.    GM's Too Little, Too Late Approach to Address the Dangerous  Defect.............16

E.    Plaintiff and the Class Have Been Harmed............................................................18

SUCCESSOR LIABILITY ...............................................................................................18

CLASS ACTION ALLEGATIONS ..................................................................................19

COUNT I ............................................................................................................................22

COUNT II ...........................................................................................................................24

COUNT III..........................................................................................................................25

COUNT IV..........................................................................................................................27

COUNT V............................................................................................................................28

COUNT VI..........................................................................................................................30

PRAYER FOR RELIEF .....................................................................................................31

JURY DEMAND .................................................................................................................32

1    Plaintiff Larry Darby ("Plaintiff"), individually and on behalf of all others similarly situated,

2    brings this Class Action Complaint against Defendants General Motors LLC ("GM") and Delphi

3    Automotive PLC ("Delphi") (together, "Defendants") and alleges as follows:

4                              **JURISDICTION AND VENUE**

5    1.    This Court has jurisdiction over the instant lawsuit pursuant to 28 U.S.C. §1332(d)(2)

6    because the Plaintiff herein and the Defendants herein are citizens of different states, there are more

7    than 100 members of the class, and the aggregate amount in controversy exceeds $5,000,000.00,

8    exclusive of attorneys' fees, interest, and costs.

9    2.    Pursuant to 28 U.S.C. §1391(b), venue is proper in this District because a substantial

10   part of the events or omissions giving rise to the claims occurred in this District.

11                                  **INTRODUCTION**

12   3.    GM, one of the largest automakers in the U.S., and Delphi, one of GM's key parts

13   suppliers, risked the lives of millions of consumers by choosing to conceal a dangerous defect in the

14   design of the ignition switches installed in millions of GM vehicles, all in an attempt to drive home

15   profits.

16   4.    GM's defective Delphi-manufactured ignition switches have several common switch

17   points, including the "run" (or "on"), "off," and "acc" (for "accessory") positions.  In the "run" or

18   "on" position, the vehicle's engine is running and its electrical systems have been activated.  In the

19   "acc" position, the engine is turned off but electrical power is generally still supplied only to the

20   vehicle's entertainment system.  In the "off" position, both the vehicle's engine and electrical

21   systems are turned off.

22   5.    The defective ignition switches were improperly positioned and prone to becoming

23   loose, thus allowing an inadvertent switch from the "run"/"on" position to either "acc" or "off"

24   during normal operation of the affected vehicles, causing a loss of power to the vehicle's engine or

25   its electrical systems or both while the vehicle is being driven.  Failure of the electrical systems

26   would compromise the vehicle's power-assisted steering, anti-lock brakes, and safety-airbag

27   systems, putting the vehicle's drivers and passengers in grave danger.

28

6.  The ignition switch defect can occur during normal operation of the affected vehicles with catastrophic results such as loss of engine power, loss of power steering, loss of anti-lock braking, and/or loss of the safety airbag system.

7.  Despite learning of the potential for engine failure and/or loss of steering, braking, and/or airbag functionality as a result of defectively designed ignition switches, GM, for more than 10 years, took no steps to protect or even inform its consumers of the defect or its associated risks. Instead, GM chose to put its own interests – and profits – ahead of the interests of its consumers, leaving those consumers with vehicles that do not function safely or properly.

8.  GM's predecessor entity, General Motors Corporation ("Old GM"), took the same profits-first approach when it designed, manufactured, and marketed the affected vehicles but failed to disclose those vehicles' ignition switch defects even after it had become aware that such defects were causing serious and often fatal accidents.  Indeed, current GM Chief Executive Officer ("CEO") Mary Barra recently admitted on Capitol Hill, "In the past, we had more of a cost culture, and now we have a customer culture that focuses on safety and quality."  This juxtaposition is, to say the least, unsettling to Plaintiff and other Class members who purchased their vehicles based on representations that GM had *always* emphasized safety and quality.  In addition to the liability arising out of the statutory obligations assumed by GM, it is also subject to successor liability for the deceptive and unfair acts and omissions of Old GM because, as described below, Defendant has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.  In light of this continuing course of business, GM and Old GM together will be referred to as "GM" hereafter, unless noted otherwise.

9.  To date, GM has recalled nearly 2.6 million vehicles and has linked 13 deaths to the defectively designed ignition switches manufactured by Delphi.  However, GM continues to maintain that the vehicles are safe to drive despite its knowledge that the vehicles contain a very dangerous design defect that could result in the loss of steering, braking, or airbag functionality. Thus, GM continues to mislead the public regarding the gravity and seriousness of the design defect.

10.  Plaintiff brings this action on behalf of a Class of all persons in the United States who own or lease at least one of the following vehicles (collectively referred to herein as the "Vehicles"):

1   2003-2007 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet

2   HHR; 2006 -2010 Pontiac Solstice; and 2007-2010 Saturn Sky.

3       11.     GM designed, manufactured, marketed, advertised, and warranted that all of its

4   Vehicles were safe and reliable and fit for the ordinary purpose such Vehicles are used for, and were

5   free from defects in materials and workmanship.  This Complaint does not assert, and is not intended

6   to assert, wrongful death or personal injury claims, or any damages therefrom.

7       12.     Despite GM's many assertions to the contrary, the Vehicles were unsafe and

8   defective, as they contained defectively designed ignition switches that could inadvertently switch to

9   "acc" or even shut off the Vehicles during normal driving conditions, causing the Vehicles' power

10  steering and anti-lock brakes to shut down, and airbags to disable, creating serious risk of injury to

11  the driver and passengers.

12      13.     In fact, GM knew the risks associated with the defectively designed ignition switches

13  and received reports of numerous accidents that had occurred where a Vehicle's airbags failed to

14  deploy as a result of the defective design, but took more than 10 years to issue a recall of the

15  Vehicles.

16      14.     In order to reap profits and maximize sales, GM and Delphi actively concealed the

17  issues relating to the defective ignition switches from the consuming public.  Defendants' too little,

18  too late approach of addressing a dangerous design defect they had knowledge of for more than a

19  decade should not be permitted.

20                                      **PARTIES**

21      15.     Plaintiff Larry Darby is a resident and citizen of California and currently resides at

22  26065 Highland Palm Drive, Homeland, California 92548.  Plaintiff purchased a 2006 Chevrolet

23  HHR as a new vehicle at Inland Chevrolet in Hemet, California.  Plaintiff's Vehicle contains a

24  dangerous defect that allows the key to inadvertently turn to the "off" or "acc" position during

25  normal driving.  Plaintiff did not learn of this dangerous design defect until about March 2014.  GM

26  advertised its Vehicles as being safe and reliable.  Had Defendants disclosed the ignition switch

27  defect, Plaintiff would not have purchased his 2006 Chevrolet HHR.

28

16. Defendant General Motors LLC is incorporated in Delaware with its principal executive offices located at 300 Renaissance Center, Detroit, Michigan 48243. Defendant was incorporated in 2009 and, on July 10, 2009, acquired substantially all assets and assumed certain liabilities of Old GM through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code. GM designed, manufactured, and marketed the Vehicles at issue here.

17. Defendant Delphi Automotive PLC is headquartered in Gillingham, Kent, United Kingdom and is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan. Delphi began as a wholly-owned subsidiary of Old GM until it was launched as an independent publicly-held corporation in 1999. After GM emerged from bankruptcy in 2009, it purchased certain Delphi assets, including Delphi's steering assets and four Delphi plants to assist with its post-bankruptcy restructuring. In 2011, GM ended its ownership interest in Delphi by selling back the assets. Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the defective ignition switches at issue here.

## TOLLING OF THE STATUTES OF LIMITATIONS

### A. Discovery Rule Tolling

18. Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence that their GM Vehicles contained a design defect within the time period of any applicable statutes of limitation.

19. Among other things, Plaintiff and members of the Class did not know and could not have known that their GM Vehicles had design defects which made the Vehicles vulnerable to catastrophic engine, steering, braking, and/or airbag failure during normal driving.

### B. Fraudulent Concealment Tolling

20. Throughout the time period relevant to this action, GM concealed from Plaintiffs and the other Class members the design defect described herein. Indeed, GM intentionally kept Plaintiff and the other Class members ignorant of vital information essential to the pursuit of their claims, and as a result, neither Plaintiff nor the other Class members could have discovered the defect, even upon reasonable exercise of diligence.

21.     Specifically, and as discussed in greater detail below, GM and Delphi were aware of the defect in the design of the Vehicles' ignition switches as early as 2004. Despite their knowledge of the design defect, GM continued to manufacture, advertise, sell, lease, and purportedly warrant the Vehicles without disclosing the defect in design.

22.     GM and Delphi knew that the problems associated with the ignition switches were caused by a defect in design but failed to disclose this to consumers for many years. Rather, GM made statements that the issue was related to whether "the driver is short and has a large and/or heavy key chain" and not related to a design defect. Therefore, GM's affirmative statements concealed GM's knowledge of the underlying problem from Plaintiff and the other Class members.

23.     Thus, the running of all applicable statutes of limitation has been suspended with respect to any claims that Plaintiff and the other Class members have sustained as a result of the defectively designed ignition switches by virtue of the fraudulent concealment doctrine.

### C. Estoppel

24.     GM and Delphi were under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the Vehicles and their ignition switches.

25.     GM and Delphi knowingly, affirmatively, and actively concealed from consumers the true nature, quality, and character of the Vehicles and their ignition switches.

26.     Based on the foregoing, GM and Delphi are estopped from relying on any statutes of limitations in defense of this action.

## FACTUAL ALLEGATIONS

### A. Defendants Possessed Knowledge of the Dangerous Design Defect for More than 10 Years

27.     During the late 1990s to early 2000s, GM and its then supplier Eaton Mechatronics finalized the specifications for the ignition switches to be installed in the Saturn Ion.

28.     On March 31, 2001 Eaton Mechatronics sold its vehicle switch department, including the newly designed ignition switches, to Delphi.

- 5

29.     In 2002, GM began selling Vehicles installed with the newly designed ignition switches manufactured by Delphi.  However, prior to putting the Vehicles into the stream of commerce, Defendants knew that the ignition switches contained a dangerous design defect.  GM chose to ignore the defect and began selling the Vehicles to the consuming public knowing the dangers drivers and their passengers could face as a result of the defectively designed ignition switch.  GM concealed its knowledge of the design defect for more than 10 years.

30.     As early as 2001, a pre-production report for the model-year 2003 Saturn Ion identified issues with the ignition switch and stated that the "two causes of failure" were "[l]ow contact force and low detent plunger force."

31.     Then, in February of 2002, Delphi submitted a Production Part Approval Process ("PPAP") document for the ignition switches.  GM approved the PPAP despite the fact that sample testing of the ignition switch revealed that the torque was below the specifications set by GM.

32.     Delphi had knowledge that its ignition switches would be placed in the stream of commerce by way of installation in GM vehicles, and that the failure of an ignition switch can have catastrophic consequences.

33.     Beginning in 2004, engineers for GM reported that the ignition switch contained in the 2003 Saturn Ion was defective in that a driver's knee could easily bump the key and inadvertently turn off the car, causing the car to lose functioning of the power steering, anti-lock brakes, and airbags.

34.     In fact, in January 2004, a GM engineer reported that "[t]his is a basic design flaw and should be corrected if we want to repeat sales."  However, the dangerous defect was not corrected and was instead incorporated into Vehicles sold to millions of unsuspecting consumers.

35.     Although GM engineers reported that low-key cylinder torque was an issue, GM chose not to take a single step to inform or protect its consumers.

36.     GM knew that a loss of engine power also meant a loss of power steering, anti-lock brakes, and loss of airbag functionality.  GM knew the risks and dangers its consumers faced and chose to deliberately ignore them, all while GM continued to tout the safety and reliability of its Vehicles.

37.     Thus, by at least early 2004, GM knew of the defect and could have taken action to protect its consumers.  However, GM chose instead to conceal the defect in the design of the ignition switches and the dangerous risks drivers and their passengers faced while driving the Vehicles under normal conditions.

        **a.     GM's October 2004 Inquiry into the Dangerous and Defectively Designed Ignition Switches**

38.     On or about October of 2004, GM began manufacturing and selling the 2005 Chevrolet Cobalt containing the same defectively designed ignition switch as installed in the 2003 Saturn Ion.  At the time of manufacturing, GM knew of the defects and associated risks, but chose to install the defective and dangerous parts anyway.

39.     Almost immediately after the 2005 Cobalt went to market, GM began receiving complaints of engines shutting off while driving.

40.     In a February 24, 2014 letter to the National Highway Traffic Safety Administration (the "NHTSA Letter"), GM stated that in 2004, "[a]round the time of the launch of the 2005 Chevrolet Cobalt, GM learned of at least one incident in which a Cobalt lost engine power because the key moved out of the 'run' position when the driver inadvertently contacted the key or steering column."  GM also noted that "GM employees were able to replicate this phenomenon during test drives."

41.     After receiving reports of incidents in which the Cobalt lost power due to the key being inadvertently moved out of the "run" position, and the reoccurrence of this phenomenon during test drives of the Vehicle, GM launched a "Problem Resolution Tracking System Inquiry" to investigate the issue.  During this inquiry, GM engineers identified the issue and even began looking for ways to address the dangerous defect.

42.     GM engineers presented various possible solutions to the ignition defect and its resulting low key torque.  Ultimately however, despite the known risks, GM closed the Problem Resolution Tracking System Inquiry without making any changes to the defectively designed ignition switches or taking any steps to inform consumers of the associated risk of steering, braking, and/or airbag failure that could result, leaving its consumers to bear the risks of the defective design.

- 7

43.     The main reasons cited for GM's decision to take no action to protect its consumers despite the known risks associated with the design defect include: "tooling cost and piece price are too high" and "none of the solutions seems to fully countermeasure the possibility of the key being turned (ignition turned off) during driving."  Ultimately, GM decided that "none of the solutions represent an acceptable business case."

44.     Thus, rather than putting the interests and safety of its consumers first and developing a solution to the issue, GM favored the "cost culture" cited by CEO Mary Barra and chose not to take any action whatsoever to inform or protect consumers from the dangerous design defect.

**b.      GM's 2005 Bulletin Regarding the Dangerous and Defective Ignition Switches**

45.     On February 28, 2005, GM issued a bulletin to its dealers  addressing the potential of the ignition switches inadvertently turning off due to low key ignition cylinder torque (the "February 2005 Bulletin").  The February 2005 Bulletin confirms that GM was well aware of the issue with the ignition switches: "There is potential for the driver to inadvertently turn off the ignition due to low ignition cylinder torque/effort."

46.     However, GM attempted to soften the seriousness of the defect by stating that "[t]he concern is more likely to occur if the driver is short and has a large heavy keychain."  But GM knew at the time of issuing the February 2005 Bulletin that the issue was a result of a design defect in the ignition switches and was not limited to situations where the driver was short or had a heavy keychain as the February Bulletin implied.

47.     Notably missing from the February 2005 Bulletin is any mention of the potential dangers of the design defect including the risk of steering, braking, and/or airbag failure under normal driving conditions.  Furthermore, GM took no steps to remedy the known design defect and instead continued to manufacture and sell Vehicles containing the dangerously designed ignition switches.

48.     Instead of proactively informing consumers and addressing the issue as it should have done as soon as it was discovered, GM chose to conceal the defect and to wait to address the issue

- 8

until a customer brought a Vehicle to a dealership after experiencing a problem, and even then GM's solution did not fix the problem.

       **c.**     **GM's May 2005 Inquiry into the Defectively and Dangerously Designed Ignition Switches**

49.     In May 2005, GM opened another Problem Resolution Tracking System Inquiry after receiving new field reports of Chevrolet Cobalts losing engine power when the key or steering column was inadvertently contacted (the "May 2005 Inquiry"). During this inquiry, a GM engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration in an attempt to reduce the possibility of the ignition inadvertently turning to the "off" position while driving.

50.     Unfortunately for consumers, GM closed the inquiry without taking any action to fix the problem. Rather, it continued to take affirmative steps to conceal the dangerous design defect.

51.     Around the time of GM's May 2005 Inquiry, GM's Manager of Product Safety Concerns, Alan Adler, issued a materially false and misleading statement regarding the defectively designed ignition switches of the Chevrolet Cobalt. In his statement, Mr. Adler explained that "GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off."

52.     This information was false and misleading as GM knew that the issue was a result of a design defect and not the fault of the driver. Mr. Adler continued: "Service advisors are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings."

53.     This statement minimized the gravity and seriousness of the design defect and left consumers with the impression that the issue could be resolved by merely removing items from their keychain. GM knew, however, that the issue was related to a design defect that could not be remedied by merely removing items from the keychain.

54.     Notably, there was no mention in Adler's statement of the safety risks associated with the defective ignition switches or of the numerous accidents that had occurred as a result.

55.     Meanwhile, on June 19, 2005, the *New York Times* published an article entitled "Making a Case for Ignitions That Don't Need Keys."  The article explained that Chevrolet dealers were telling Cobalt owners to lighten their key rings to prevent intermittent stalling and the loss of electrical power in their cars.[1]

**d.     Consumer Complaints Regarding the Dangerous and Defectively Designed Ignition Switches Continue to Mount**

56.     Between 2005 and 2009, myriad complaints were sent to GM regarding the defectively designed ignition switches.

57.     In fact, GM received at least 133 complaints regarding the ignition switch defect between June 2003 and June 2012, all while choosing to do nothing to fix the issue.  Meanwhile, people suffered injuries and even death as a result of the dangerous design defect.

58.     In fact, on July 29, 2005 – just months after GM opened the May 2005 Inquiry – a 16-year-old girl crashed her 2005 Chevrolet Cobalt and died as a result of injuries sustained in the crash. Unfortunately, the Vehicle's airbags did not deploy as the ignition was in "accessory" mode rather than "on" at the time of the crash as a result of the design defect.

59.     If GM had addressed the issue when it had first learned of the design defect and its potentially dangerous consequences, the 16-year-old likely would have survived the accident.

60.     GM continued to deny the existence of the defect and seemed to take the position that it was driver error causing the problem.  In fact, an entry in GM's complaint tracking system following up on an October 2005 complaint from a Cobalt owner reads: "There is nothing mechanically wrong with the vehicle," and "[i]t is the customer's driving habits. They hit the ignition key slot."

61.     Meanwhile, accidents as a result of the design defect continued to occur.  On November 17, 2005, another incident occurred involving the crash of a 2005 Cobalt.  Once again, the frontal airbags did not deploy.

62.     Shortly after these July and November 2005 incidents, GM issued another misleading Technical Service Bulletin (the "December 2005 Bulletin") providing "Information on Inadvertent

---

[1]     http://www.nytimes.com/2005/06/19/automobiles/19KEYS.html?

- 10

1    Turning of Key Cylinder, Loss of Electrical System and no DTCs."  The December 2005 Bulletin

2    once again minimized the seriousness and dangerousness of the design defect, and left the

3    impression that the defect was caused by unessential items on drivers' key chains and could be

4    addressed by removing such items.

5         63.    GM knew, however, that this was not the case, and that this would not remedy the

6    issue.  Additionally, the December 2005 Bulletin described an insert for the key ring so that it goes

7    from a "slot" design to a hole design.  According to GM, as a result of this insert, "the key ring

8    cannot move up and down in the slot any longer."  Relatedly, in the NHTSA Letter, GM stated that

9    its dealers have provided key inserts to only approximately 474 of the millions of consumers affected

10   by the design defect.

11        64.    Notably missing from the December 2005 Bulletin, once again, is any mention of the

12   accidents that GM knew had occurred as a result of this defect, or the risk that the steering, braking,

13   and airbag systems could be disabled by a loss of engine power.

14        65.    Much like the February 2005 Bulletin, the December 2005 Bulletin failed to disclose

15   any of the potentially dangerous consequences of the design defect and stated that the concern is

16   more likely to occur if the driver is short and has a large and/or heavy keychain, despite GM

17   possessing knowledge that the defect could affect a person of any size with any sized key chain.

18        66.    Furthermore, this Bulletin was not provided to consumers or to the public.

19   Consumers were to only be advised of the potential for the driver to inadvertently turn off the

20   ignition if the consumer came to a dealership, and even then consumers were only advised to prevent

21   the issue by removing unessential items from their keychain.  Thus, GM continued to conceal the

22   dangerous design defect to the consuming public and failed to take any steps to address the issue.

23        67.    Meanwhile, consumers, albeit unknowingly, continued to drive Vehicles containing a

24   dangerous design defect.  More incidents occurred.  Shortly after GM issued the December 2005

25   Bulletin, a driver of a 2005 Cobalt crashed, and, once again, the airbags did not deploy because the

26   key had been turned to the "accessory/off" position at the time of the crash.

27

28

68.     However, GM chose not to address the deadly design defect and decided instead that a Service Bulletin and field service campaign was the appropriate remedy.  Meanwhile, consumers were left driving Vehicles containing a dangerous design defect.

69.     Another accident occurred in March 2006 wherein a driver of a 2005 Cobalt hit a pole and the frontal airbags did not deploy as a result of the defective design.  The key was once again in the "accessory/off" position at the time of the crash.  The incidents continued to occur from 2006 through 2009.  In fact, GM has acknowledged 13 deaths and 34 crashes caused by the defective ignition switches.  All the while, GM knew and actively concealed the defect, choosing to ignore the issue in order to continue to earn profits from the sale of the Vehicles.

70.     In late 2006, GM began quietly incorporating a newly designed ignition switch into its 2007 and later model year cars.  The design change was made so discreetly that, contrary to GM's own internal processes, the newly designed part was not given a new part number.  These changes included the use of a new detent plunger and spring, which increased the torque force in the ignition switch.

71.     Unfortunately, however, GM made no change to ignition switches installed in earlier model Vehicles and took no action to inform the public of the dangerous defect.  Additionally, by failing to assign a new part number to the newly designed ignition switch, GM stymied its own efforts and investigation into the Vehicle's design defect, as now GM is unable to determine which Vehicles contain the newly designed ignition switch.

### e.     GM's February 2009 Inquiry into the Dangerous and Defective Ignition Switches

72.     After numerous incidents occurred as a result of the defectively designed ignition switches, GM opened another Problem Resolution Tracking System Inquiry to address the issue in February 2009.  GM determined that changing the key from a "slot" design to a "hole" design would significantly reduce the likelihood that the ignition would be inadvertently switched to the "acc" or "off" position while driving normally.

73.     GM incorporated this design change into the 2010 model year Chevrolet Cobalts.

1    74.    This change in the design of the top of the key did not remedy the problem as the key

2    could still be moved inadvertently as a result of the defectively designed ignition switch.

3    Additionally, GM chose to ignore the millions of Vehicles it had sold and/or leased containing the

4    defectively designed ignition switches and did nothing to address the issue in existing Vehicles.

5    **f.    GM's Field Performance Evaluation**

6    75.    In August 2011, a GM engineer was tasked with conducting a Field Performance

7    Evaluation of a group of crashes in which airbags contained in GM's 2005-2007 model year

8    Chevrolet Cobalts and a 2007 Pontiac G5 failed to deploy during a frontal impact.

9    76.    The engineer studied a cross-section of steering columns and ignition switches from

10    various Vehicles with model years ranging from 2003-2010.  The engineer concluded that the

11    majority of the ignition switches tested exhibited torque performance below the level specified by

12    GM for the ignition switch.  Still, nothing was reported to the public.

13    77.    Shortly thereafter, GM retained an outside engineer to conduct a comprehensive

14    ignition switch survey assessment.  The engineer found that the ignition switches that had been

15    installed in early model Cobalts did not meet GM's torque specifications.

16    78.    It was not until February 13, 2014 – more than 10 years after GM had discovered the

17    dangerous defect – that it issued its first safety recall calling for dealers to replace the defective

18    ignition switches.

19    79.    GM stated in the NHTSA Letter that GM was aware of at least 23 frontal-impact

20    crashes involving 2005-2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the defective

21    ignition switches may have caused or contributed to the airbag failure.

22    80.    Despite this knowledge, GM did nothing to protect its consumers or even inform

23    them of the dangerous defect and the associated risk of steering or braking malfunction or airbag

24    non-deployment for over 10 years.

25    **g.    GM's OnStar System Provided Data in Real Time Showing Ignition
              System Defects**

26

27    81.    GM also had actual knowledge of the dangerous ignition switch defect by way of its

28    OnStar System, which wirelessly communicates highly detailed performance information from every

1   GM vehicle equipped with the OnStar System.  Regardless of whether that vehicle's owner chooses

2   to subscribe to the OnStar service, the OnStar System components installed in the vehicle maintain a

3   constant communications link with GM to feed this data in real time.

4          82.     More specifically, the "OnStar Enterprise Component Implementation/Integration

5   View" is a software design specification that details the functionality of the OnStar System that was

6   used to program the OnStar Systems installed in GM's vehicles.  According to this design

7   specification, the OnStar System has a "Vehicle Inquiry Service" component that constantly

8   monitors the performance and functional capability of critical and non-critical systems throughout

9   the vehicle.  The ignition system is considered a critical system in the vehicles, and is accordingly

10  constantly monitored by the OnStar "Vehicle Inquiry System," which transmits the performance data

11  from each vehicle back to GM so that GM can learn about and investigate any failures of critical

12  systems in its vehicles.

13         83.     In particular, there are two sub-components to the "Vehicle Inquiry System" –

14  namely, the "Vehicle Service" module and "Audit Service" module.  These systems flow real-time

15  performance data back to GM through the "Chordiant Java Connector Architecture Adapter."

16  Specifically, these two sub-components flow real-time vehicle performance information to GM via

17  the "VehComm VDUQueue." As a result of the operational functionality of these system

18  components, GM had actual knowledge of the ignition system failure in all of its OnStar-equipped

19  Vehicles.

20         84.     GM also had actual knowledge of all of the related diagnostic information related to

21  these failures at the same time because this information was also transmitted to GM by the OnStar

22  Systems installed in these Vehicles.  Thus, as a result of having been provided with real-time data

23  from the OnStar Systems installed in all OnStar-equipped Vehicles, GM knew, but failed to disclose,

24  the existence of the critical safety defect in the ignition systems of the Vehicles.

25

26

27

28

## B. GM's Duty to Disclose the Known Safety Defects Related to the Defective Ignition

85.    An automobile manufacturer like GM is required to promptly report any defect that is related to motor vehicle safety to the National Highway Traffic Safety Administration ("NHTSA") under the Transportation Recall Enhancement, Accountability and Documentation Act (the "TREAD Act"). *See* 49 U.S.C. §30118(c)(1)&(2). Therefore, as soon as GM became aware of the ignition switch defect that allowed the Vehicles' ignitions to inadvertently turn to the "off" or "acc" position, thereby disabling power steering, power brakes and air-bag functionality, it had a duty to report this defect to the NHTSA.

86.    Despite its knowledge of the dangerous and defective ignition switches installed in the Vehicles, GM chose to ignore its legal obligation to report this dangerous defect to the NHTSA and took no action to address the problem. Even worse, GM continued to manufacture and sell Vehicles containing the dangerous and defective ignition switches and did not inform unsuspecting consumers of the risks.

87.    In fact, Clarence Ditlow, the Executive Director of the Center for Auto Safety, stated that "GM bears complete responsibility for failing to recall these vehicles by 2005, when it knew what the defect was and how to fix it …"

## C. Despite Its Knowledge of the Dangerous Design Defect, GM Touted the Vehicles as Safe and Reliable

88.    In order to increase sales and drive profits, GM repeatedly touted the safety and reliability of its Vehicles.

89.    In fact, on July 6, 2011, while GM possessed knowledge of the dangerous design defect, its website stated: "Quality and safety are at the top of the agenda at GM," and "[U]nderstanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive. Our engineers thoroughly test our vehicles for durability, comfort and noise minimization before you think about them. The same quality process ensures our safety technology performs when you need it."

- 15

90.     Currently, GM's website states: "Leading the way is our seasoned leadership team who set high standards for our company so that we can give you the best cars and trucks. This means that we are committed to delivering vehicles with compelling designs, flawless quality and reliability, and leading safety, fuel economy and infotainment features."

91.     The website continues: "Safety and Quality First: Safety will always be a priority at GM. We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers. That is why our vehicles go through extreme testing procedures in the lab, on the road and in our production facilities prior to being offered to customers."

92.     Even now that GM has recalled over two million Vehicles containing the dangerous design defect, GM continues to tout the Vehicles as safe to drive despite its knowledge of the many accidents and even deaths that have occurred as a result of the defective design. Yet, according to CEO May Barra, "We are taking no chances with safety."

### D. GM's Too Little, Too Late Approach to Address the Dangerous Defect

93.     For over 10 years, GM knew that the Vehicles contained a dangerous design defect but did nothing to address the issue – leaving its consumers to bear the risks. Despite possessing knowledge of at least 23 crashes and 12 fatalities as a result of the dangerous ignition switches, GM did not issue a safety recall until 2014.

94.     It was not until February 7, 2014 that GM for the first time informed the NHTSA that it had determined that a defect existed in certain Vehicles, despite having discovered that defect more than a decade earlier. GM announced its initial recall for the first time on February 13, 2014. That recall applied to 619,122 vehicles.

95.     However, at the time GM issues its initial recall, it knew that the defectively designed ignition switch was installed in many more of its Vehicles but failed to recall those additional defective Vehicles.

- 16

96.     Two weeks later, GM expanded the recall to include an additional 748,024 Vehicles. Once again, GM knew that still other Vehicles contained the dangerous and defectively designed ignition switch but took no action as to those other Vehicles.

97.     Then, on March 28, 2014, GM once again expanded the recall to cover an additional 824,000 Vehicles that could contain the design defect.  In total, GM has now recalled  2.6 million Vehicles.

98.     Prior to issuing the recall, GM concealed the defect and never once informed consumers about the defect or the potential for steering, braking, and/or airbag failure that could result.  In fact, GM failed to communicate at all with consumers about the issue unless the consumer brought the Vehicle to a dealership with a  related complaint.  Thus, for more than 10 years after discovering the design defect, GM did nothing to protect or inform consumers of the risks.

99.     Meanwhile, in at least 12 instances, GM bought back Cobalts from customers who reported frequent incidents of stalling that dealers could not fix.  However, up until the recall, GM did nothing to address the issue for the remaining Vehicle owners or to inform the public of the dangerous risks associated with the design defect.

100.    Additionally, despite knowledge of the dangers that could result from driving a Vehicle containing the defect, GM continues to maintain that the Vehicles are safe to drive until the ignition switches are replaced.  In fact, a company representative has stated: "People have been driving them all along," and "[t]here should be no issues with driving the [V]ehicles."  This is almost the same message given to consumers in the December 2005 Service Bulletin and continues to minimize the dangers associated with the design defect.

101.    However, GM knows that the design defect makes the Vehicles unsafe to drive as there is a risk that engine failure could cause the steering and braking systems to fail, and the airbags not to deploy in the case of a crash.  The recall issued by GM is insufficient and does not provide an adequate remedy to owners and lessees of the Vehicles.

102.    First, the recall fails to acknowledge that the defective ignition switch could cause the key to inadvertently turn the engine to "off" or "acc" under normal driving conditions, even when the key ring is not carrying added weight.

103.    The recall is also insufficient as it does not compensate drivers for money previously expended to address the issue.  Additionally, the recall does not compensate consumers for the time and inconvenience in having to replace the ignition switch.

104.    Furthermore, the recall does not call for consumers to stop driving the Vehicles until the ignition switch is replaced, leaving consumers operating Vehicles that GM knows are unsafe.

105.    Finally, GM has already faced problems in providing rental cars to consumers while the ignition switch is being replaced, and it is unlikely that GM will be able to provide a rental car to drivers of the more than two million Vehicles that have been recalled.

106.    Thus, GM's too little, too late approach to addressing this dangerous design defect should not be permitted.

### E.  Plaintiff and the Class Have Been Harmed

107.    The ignition switch defects have caused damage to Plaintiff and the Class.  A vehicle purchased, leased, or retained with a serious safety defect is worth less than an equivalent vehicle purchased, leased, or retained without the defect.

108.    Plaintiff and the Class paid more for the Vehicles than they would have paid had the ignition switch defects been disclosed.  Plaintiff and other members of the Class overpaid for their Vehicles because of the concealed ignition switch defects.

109.    If GM had timely disclosed the ignition switch defects as required, Plaintiff's and other Class members' Vehicles would now be worth more.

110.    Plaintiff and any other reasonable consumer would not have purchased or leased the Vehicles had they known of the ignition switch defect.

### SUCCESSOR LIABILITY

111.    GM expressly assumed certain obligations under, *inter alia*, the TREAD ACT and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

112.    Among the liabilities and obligations expressly retained by GM after the Old GM's bankruptcy:

From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

113.    Further, GM expressly assumed

all Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

114.    Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the Vehicles' ignition switch defects, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged herein.

**CLASS ACTION ALLEGATIONS**

115.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b) on behalf of himself and all others similarly situated as members of the following Class:

All persons in the United States who formerly or currently own or lease one or more of the following Vehicles: 2003-2007 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky.  This list may be supplemented to include additional GM Vehicles that contain defective ignition switches.

116.    Alternatively, Plaintiff seeks to represent a subclass of all California residents who formerly or currently own or lease a Vehicle (the "California Subclass").

- 19

117.    Specifically excluded from the proposed Class are the Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by the Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with the Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

118.    **Numerosity**.  The members of the Class are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains many hundreds of thousands of members.  The precise number of Class members is unknown to Plaintiff.  The true number of Class members is known by the Defendants, however, and thus, may be notified of the pendency of this action by first class mail, electronic mail, and by published notice.

119.    **Existence and Predominance of Common Questions of Law and Fact**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)    Whether GM engaged in the conduct alleged herein;

(b)    Whether GM's alleged conduct violates applicable law;

(c)    Whether GM was negligent in the design, manufacturing, and distribution of the Vehicles;

(d)    Whether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed defectively designed Vehicles into the stream of commerce in the United States;

(e)    Whether GM misled Class members about the safety and quality of the Vehicles;

(f)    Whether GM actively concealed the design defects contained in the Vehicles;

(g)    Whether GM's misrepresentations and omissions regarding the safety and quality of the Vehicles were likely to deceive Class members in violation of the consumer protection statutes alleged herein;

1    (h)  Whether Class members overpaid for their Vehicles as a result of the defects

2 alleged herein;

3    (i)  Whether Class members are entitled to damages.

4   120.  **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class in

5 that the Defendants manufactured, sold, warranted, and marketed defectively designed Vehicles to

6 Plaintiff, like all other members of the Class.

7   121.  **Adequacy of Representation.** Plaintiff will fairly and adequately protect the

8 interests of the members of the Class.  Plaintiff has retained counsel highly experienced in complex

9 consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff

10 has no adverse or antagonistic interests to those of the Class.

11   122.  **Superiority.** A class action is superior to all other available means for the fair and

12 efficient adjudication of this controversy.  The damages or other financial detriment suffered by

13 individual Class members is relatively small compared to the burden and expense that would be

14 entailed by individual litigation of their claims against the Defendants.  It would thus be virtually

15 impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to

16 them.  Furthermore, even if Class members could afford such individualized litigation, the court

17 system could not.  Individualized litigation would create the danger of inconsistent or contradictory

18 judgments arising from the same set of facts.  Individualized litigation would also increase the delay

19 and expense to all parties and the court system from the issues raised by this action.  By contrast, the

20 class action device provides the benefits of adjudication of these issues in a single proceeding,

21 economies of scale, and comprehensive supervision by a single court, and presents no unusual

22 management difficulties under the circumstances here.

23   123.  In the alternative, the Class may be also certified because:

24    (a)  the prosecution of separate actions by individual Class members would create

25 a risk of inconsistent or varying adjudication with respect to individual Class members that would

26 establish incompatible standards of conduct for the Defendants;

27    (b)  the prosecution of separate actions by individual Class members would create

28 a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the

- 21

1    interests of other Class members not parties to the adjudications, or substantially impair or impede

2    their ability to protect their interests; and/or

3              (c)    Defendants have acted or refused to act on grounds generally applicable to the

4    Class thereby making appropriate final declaratory and/or injunctive relief with respect to the

5    members of the Class as a whole.

6          124.    The claims asserted herein are applicable to all consumers throughout the United

7    States who purchased the Vehicles.

8          125.    Adequate notice can be given to Class members directly using information

9    maintained in Defendants' records or through notice by publication.

10          126.    Damages may be calculated from the claims data maintained in Defendants' records,

11    so that the cost of administering a recovery for the Class can be minimized.  However, the precise

12    amount of damages available to Plaintiff and the other members of the Class is not a barrier to class

13    certification.

**COUNT I**

**Fraud by Concealment Asserted on Behalf of the Class**
**Against Defendants**

127.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

128.    As set forth above, Defendants concealed and/or suppressed material facts concerning

the safety, quality, dependability and reliability of the Vehicles and ignition switches.

129.    Defendants had a duty to disclose these safety, quality, dependability and reliability

issues because they consistently marketed the Vehicles as safe and proclaimed that safety is one of

their highest corporate priorities. Once Defendants made representations to the public about safety,

quality, dependability and reliability, Defendants were under a duty to disclose these omitted facts,

because where one does speak, one must speak the whole truth and not conceal any facts which

materially qualify those facts stated.

130.    In addition, Defendants had a duty to disclose these omitted material facts because

they were known and/or accessible only to Defendants, who have superior knowledge and access to

the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and

- 22

the Class.  These omitted facts were material because they directly impact the safety, quality and reliability of the Vehicles and their ignition switches.  Whether or not the ignition switches were defectively designed is a material safety concern.  Whether a vehicle is a quality and reliable product and has been manufactured and designed according to industry standards are material facts for a reasonable consumer.  Defendants possessed exclusive knowledge of the defects and quality control issues rendering the Vehicles inherently more dangerous and unreliable than similar vehicles.

131.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class to purchase Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

132.    Defendants still have not made full and adequate disclosure and continue to defraud Plaintiff and the Class.

133.    Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiff and the Class acted in a justifiable manner.  Defendants were in exclusive control of the material facts and such facts were not known to the public or the Class.

134.    As a result of the concealment and/or suppression of the facts, Plaintiff and the Class sustained damage.  For Class members who elect to affirm the sale, these damages include the difference between the actual value of that which Plaintiff and the Class paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.  For Class members who want to rescind the purchase, they are entitled to restitution and consequential damages.

135.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Classes' rights and well-being, to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

# COUNT II

### Violations of the Michigan Consumer Protection Act
### (Mich. Comp. L. Ann. §44901, *et seq.*)
### Asserted on Behalf of the Class Against Defendants

136. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

137. At all times relevant to this suit, Defendants were conducting trade or commerce as defined under Michigan Compiled Laws ("MCL") 445.902(1)(g), which is also known as the Michigan Consumer Protection Act ("MCPA").

138. At all relevant times hereto, Defendants were "persons" engaged in "trade or commerce" within the meaning of the MCPA § 445.902(1)(d).

139. The MCPA holds unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L.A § 445.902(1).

140. A party to a transaction covered under the MCPA must provide the other party the promised benefits of the transaction.

141. The practices of Defendants violate the MCPA for, *inter alia*, one or more of the following reasons:

(a) Defendants represented that the Vehicles had approval, characteristics, uses, and benefits that they do not have;

(b) Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data, and other information to consumers regarding the safety, reliability, performance, quality, and nature of the Vehicles;

(c) Defendants represented that the Vehicles were of a particular standard, quality, or grade, when they were of another;

(d) Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Vehicles, which misled Plaintiff and the Class;

(e) Defendants failed to reveal facts about the ignition switch defect that were material to the transaction and which they intended that Plaintiff and members of the Class would rely on.

- 24

142.   Defendants committed these and other unfair and deceptive acts with regard to the marketing and sale and/or lease of the Vehicles.

143.   Defendants knew that the Vehicles contained a dangerous design defect.

144.   Defendants concealed and/or failed to warn Plaintiff and Class members that the Vehicles contained a dangerous design defect.

145.   Such concealment and/or failure to warn constitutes an unfair, unconscionable, or deceptive act or practice within the meaning of the MCPA.

146.   The unfair, unconscionable, and deceptive acts committed by Defendants caused damages to Plaintiff and Class members.

147.   Plaintiff and members of the Class are entitled to compensatory damages, injunctive/equitable relief, and attorneys' fees under the MCPA.

148.   The allegations made by Plaintiff and members of the Class meet the requirements of MCL §445.911(11)(3) because GM's acts and/or practices violate MCL §445.903, have been declared unlawful by an appellate court of the state which is either officially reported or made available for public dissemination in accordance with the MCPA, and/or have been declared by a circuit court and/or the United States Supreme Court to constitute unfair or deceptive acts under the specified standards set forth by the FTC.

149.   On its face, the MCPA purports to (i) deprive non-residents of bringing class (but not individual) actions under the MCPA; and (ii) allow individuals (but not class members) the ability to recover a penalty of $250 per person if that amount is greater than their actual damages.  However, any such prohibitions imposed in class actions are trumped and superseded by Rule 23 of the Federal Rules of Civil Procedure, which imposes no such restrictions.

## COUNT III

### Violations of the Consumers Legal Remedies Act
### (Cal. Civ. Code §1750, *et seq.*)
### Asserted on Behalf of the California Subclass Against Defendants

150.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

151.   The members of the California Subclass are "consumers" (Cal. Civ. Code §1761(d)).

152.   Defendants are "persons" (Cal. Civ. Code §1761(c)).

- 25

153.    Plaintiff's and each and every California Subclass members' purchase and/or lease of the Vehicle constitute a "transaction" (Cal. Civ. Code §1761(e)).

154.    The Vehicles are "goods" (Cal. Civ. Code §1761 (a)).

155.    Defendants' acts and practices as discussed throughout this Complaint constitute "unfair or deceptive acts or practices" by Defendants that are unlawful, as enumerated in California Civil Code §1770(a).

156.    By failing to address or disclose the risk of ignition switch movement, engine shutdown, and disabled steering, braking, and/or safety airbags in the Vehicles, defects Defendants knew of for many years, Defendants engaged in unfair and deceptive trade practices.

157.    Despite their duty to disclose any safety-related defect, Defendants concealed the ignition switch defect for more than 10 years, leaving Plaintiff and the Class driving Vehicles that are unsafe to operate.

158.    Such misconduct materially affected the purchasing decisions of Plaintiff and the members of the California Subclass as Plaintiff and the California Subclass relied on Defendants' misstatements and omissions regarding the Vehicles' safety and/or reliability when purchasing or leasing the Vehicles.

159.    Plaintiff and the members of the California Subclass seek restitution and injunctive relief in the form of restitution and/or disgorgement of funds paid to Defendants, adequately repairing the Vehicles at no charge, and an award of attorneys' fees pursuant to California Civil Code §1780(d).

160.    Under California Civil Code § 1780(b), Plaintiff seeks an additional award against Defendants of up to $5,000 for each California Subclass member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Defendants knew or should have known that their conduct was directed to one or more California Subclass members who are senior citizens or disabled persons. Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more California Subclass members who are senior citizens or disabled persons are substantially

- 26

1   more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired

2   understanding, restricted mobility, or disability, and each of them suffered substantial physical,

3   emotional, or economic damage resulting from Defendants' conduct.

4        161.    Pursuant to California Civil Code §1782(a) of the CLRA, Plaintiff's counsel on

5   behalf of Plaintiff will serve Defendants with notice of their alleged violations of Cal. Civ. Code §

6   1770(a) and demand that Defendants either correct, repair, replace, or rectify the violation set forth

7   in the notice within a reasonable time.  If Defendants fail to do so, Plaintiff will amend this

8   Complaint to seek compensatory and other monetary damages, under the Consumer Legal Remedies

9   Act, to which Plaintiff and the Class are entitled.

10       162.    Attached as Exhibit "A" is Plaintiff 's declaration that demonstrates that venue is

11  proper in this District, pursuant to CAL. CIV. CODE § 1780(d).

12                              **COUNT IV**

13          **Violations of the California Unfair Competition Law**
            **(Cal. Bus. & Prof. Code §17200, *et seq.*)**
14      **Asserted on Behalf of the California Subclass Against Defendants**

15       163.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

16       164.    The Unfair Competition Law (the "UCL") defines unfair business competition to

17  include any "unfair," "unlawful," or "fraudulent" business act or practice.  The UCL also provides

18  for injunctive relief, restitution, and disgorgement of profits for violations.

19       165.    These violations include, but are not limited to, the following: unlawful violations of

20  the TREAD Act by failing to timely disclose the safety-related ignition switch defect to the NHTSA

21  or to consumers.  Defendants allowed Vehicles it knew contained a dangerous defect to be sold to

22  unsuspecting consumers and failed to inform consumers such as Plaintiff and the California Subclass

23  members of the existence of the defect.  Further, Defendants touted the safety and reliability of its

24  Vehicles despite possessing knowledge that many of the Vehicles contained a defectively designed

25  ignition switch that allowed the ignition to move from the "run" position to the "accessory" or "off"

26  position while the Vehicle is in operation and/or to inadvertently shutoff and disable power steering,

27  braking, and/or airbag functionality.  Despite their  knowledge of numerous accidents and injuries

28

1   that had occurred as a result of the defect, Defendants did not repair the problem or inform

2   consumers for over 10 years.

3      166.   In addition to the above, Defendants' conduct constitutes violations of California

4   Civil Code §§1572-1573, 1709, 1711, and 1770 and the common law.   Furthermore, Defendants'

5   practices violate the declared legislative policies as set forth by the federal government in 40 C.F.R.

6   §600.307(a)(ii)(A); and §§600.302-08(b)(4) and 16 C.F.R. §259.2(a).  Plaintiff reserves the right to

7   allege other violations of law, which constitute other unlawful business acts or practices.  Such

8   conduct is ongoing and continues to this date.

9      167.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures

10   alleged herein also constitute "unfair" business acts and practices within the meaning of the UCL in

11   that Defendants' conduct is substantially injurious to consumers, offends public policy, and is

12   immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any

13   alleged benefits attributable to such conduct.

14      168.   Plaintiff asserts violations of the public policy by failing to take action to protect

15   consumers from a design defect they knew could lead to loss of engine power and power steering,

16   braking, and airbag functionality in order to profit from the sale of the Vehicles.  The conduct

17   constitutes violations of the unfair prong of the UCL.  There were reasonably available alternatives

18   to further Defendants' legitimate business interests, other than the conduct described herein.

19      169.   Plaintiff and the California Subclass have been damaged by said practices in that they

20   relied on Defendants' misrepresentations and omissions regarding the Vehicles' safety and reliability

21   when purchasing or leasing the Vehicles.  Pursuant to California Business and Professions Code

22   §§17200 and 17203, Plaintiff, on behalf of himself and all others similarly situated, seek relief as

23   prayed for below, including judgment and equitable relief against Defendants and an order requiring

24   Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices.

25                 **COUNT V**

26         **Violation of the Magnuson-Moss Warranty Act**
                  **(15 U.S.C. §2301, *et seq.*)**

27        **Asserted on Behalf of the Class Against GM**

28      170.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

1       171.    This Court has jurisdiction to decide claims brought under 15 U.S.C. §2301 by virtue

2  of 28 U.S.C. §1332 (a)-(d).

3       172.    Plaintiff and the Class are "consumers" within the meaning of the Magnuson-Moss

4  Warranty Act, 15 U.S.C. §2301(3).

5       173.    GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss

6  Warranty Act, 15 U.S.C. §2301(4)-(5).

7       174.    The Vehicles are "consumer products" within the meaning of the Magnuson-Moss

8  Warranty Act, 15 U.S.C. § 2301(1).

9       175.    15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged

10  by the failure of a warrantor to comply with a written or implied warranty.

11       176.    GM's express warranties are written warranties within the meaning of the Magnuson-

12  Moss Warranty Act, 15 U.S.C. §2301(6).  The Vehicles' implied warranties are covered under 15

13  U.S.C. §2301(7).

14       177.    GM breached these express and implied warranties as described in more detail above,

15  because the Vehicles do not perform as GM represented or were not fit for their intended use; GM

16  did not repair the Vehicles' materials and workmanship defects; GM provided Vehicles in a non-

17  merchantable condition, which present an unreasonable risk of danger and bodily harm as a result of

18  the defectively designed ignition switches not fit for the ordinary purpose for which vehicles are

19  used; GM provided Vehicles that were not fully operational, safe, or reliable; and GM failed to cure

20  defects and nonconformities once they were identified.

21       178.    Plaintiff and Class members have had sufficient direct dealings with either GM or its

22  agents (dealerships) to establish privity of contract between Plaintiff and the Class members.

23  Notwithstanding this, privity is not required in this case because Plaintiff and Class members are

24  intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the

25  intended beneficiaries of GM's implied warranties.  The dealers were not intended to be the ultimate

26  consumers of the Vehicles and have no rights under the warranty agreements provided with the

27  Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers

28

only.  Finally, privity is also not required because Plaintiff's and Class members' Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

179.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

180.    Resorting to any informal dispute settlement procedure and/or affording GM another opportunity to cure these breaches of warranties is unnecessary and/or futile.  Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as GM has failed to remedy the problems associated with the Vehicles, and, as such, have indicated they have no desire to participate in such a process at this time.  Any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiff resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

181.    As a result of GM's breaches of warranty, Plaintiff and the other Class members have sustained damages and other losses in an amount to be determined at trial.  Plaintiff and the other Class members are entitled to recover damages, specific performance, costs, attorneys' fees, rescission, and/or other relief as is deemed appropriate.

**COUNT VI**

**Violation of the Song-Beverly Warranty Act and**
**Breach of Implied Warranty of Merchantability**
**(Cal. Civ. Code §§1791.1 and 1793.2(d))**
**Asserted on Behalf of the California Subclass Against GM**

182.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

183.    Plaintiff and California Subclass members who purchased the Vehicles in California are "buyers" within the meaning of Cal. Civ. Code §1791.

184.    The Vehicles are "consumer goods" within the meaning of Cal. Civ. Code §1791(a).

185.    Each Defendant is a "manufacturer" and/or "distributor" of the Vehicles within the meaning of Cal. Civ. Code §§1791(e) and (j).

186.    GM made implied warranties to Plaintiff and the members of the California Subclass within the meaning of Cal. Civ. Code §1791.2(a).

187.    GM impliedly warranted to Plaintiff and the California Subclass members who purchased and/or leased the Vehicles that the Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§1791.1(a) & 1972.

188.    The Vehicles are not merchantable as a result of the ignition switch defects that cause the Vehicles to inadvertently shut down during normal driving conditions, leading to potentially catastrophic results.  Moreover, GM failed to disclose the ignition switch defects and failed to advise Plaintiff and members of the California Subclass about the dangerous defect.

189.    The Vehicles are not of the quality that a buyer would expect and are not merchantable.  Because the Vehicles are not merchantable, GM breached the implied warranty of fitness within the meaning of Cal. Civ. Code §§1791.1 (b) and 1792.1.

190.    As a proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the California Subclass members sustained damages.  Pursuant to Cal. Civ. Code §§179l.l(d), 1794(a), and (b)(2), Plaintiff and the California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase/lease price of the Vehicles or any diminution in value.  Plaintiff and the California Subclass members are also entitled to costs and attorneys' fees pursuant to Cal. Civ. Code §1794.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief and judgment against Defendants as follows:

A.    Certification of this action as a class action, appointment of Plaintiff as the Class representative and the undersigned counsel as Class counsel;

B.    An order declaring the actions complained of herein to be in violation of the statutory law set forth above, including a preliminary injunction enjoining Defendants from further acts in violation of the CLRA and California Business and Professions Code §17200, pending the outcome of this action;

1       C.     An order enjoining and restraining Defendants from any further acts in violation of

2 the CLRA and California Business and Professions Code §§17200 and 17500, as set forth above;

3       D.     An order requiring Defendants to notify Class members about the inaccuracies and to

4 provide correct information to the Class;

5       E.     An award of compensatory damages, statutory damages, and all other forms of

6 monetary and non-monetary relief recoverable under state law;

7       F.     An award of pre-judgment and post-judgment interest;

8       G.     An award of injunctive relief;

9       H.     An award of costs, including, but not limited to, discretionary costs, expert fees,

10 attorneys' fees and expenses incurred in prosecuting this case; and

11       I.     Grant such other and further relief as the Court deems just and proper.

12 **JURY DEMAND**

13     Plaintiff, on behalf of himself and all others similarly situated, hereby demands a jury trial on

14 all issues so triable.

15 DATED: April 4, 2014           ROBBINS GELLER RUDMAN

16                           & DOWD LLP
                          PATRICK J. COUGHLIN

17                           DAVID W. MITCHELL

18

19                               *s/ David W. Mitchell*
                              DAVID W. MITCHELL

20                         655 West Broadway, Suite 1900
                        San Diego, CA 92101

21                         Telephone: 619/231-1058
                        619/231-7423 (fax)

22

23

24

25

26

27

28

1

2                                 ROBBINS GELLER RUDMAN
                                         & DOWD LLP

3                                 JACK REISE
                                 STUART A. DAVIDSON

4                                 CULLIN A. O'BRIEN
                                 MARK DEARMAN

5                                 JESSE S. JOHNSON
                                 120 East Palmetto Park Road, Suite 500

6                                 Boca Raton, FL  33432
                                 Telephone:  561/750-3000

7                                 561/750-3364 (fax)

8                                 PARADIS LAW GROUP, PLLC

9                                 PAUL O. PARADIS
                                 GINA M. TUFARO

10                                570 Seventh Avenue, 20th Floor
                                New York, NY  10018

11                                Telephone:  212/986-4500
                                212-986-4501 (fax)

12

13                               Attorneys for Plaintiff
S:\CptDraft\Consumer\Cpt GM.docx

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | ROBBINS GELLER RUDMAN
  & DOWD LLP
2 | PATRICK J. COUGHLIN
DAVID W. MITCHELL
3 | 655 West Broadway, Suite 1900
San Diego, CA 92101
4 | Telephone: 619/231-1058
619/231-7423 (fax)
5 | patc@rgrdlaw.com
davidm@rgrdlaw.com
6 |
ROBBINS GELLER RUDMAN
7 |   & DOWD LLP
JACK REISE
8 | STUART A. DAVIDSON
CULLIN A. O'BRIEN
9 | MARK DEARMAN
*Attorneys for Plaintiffs*

JESSE S. JOHNSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sdavidson@rgrdlaw.com
cobrien@rgrdlaw.com
mdearman@rgrdlaw.com
jjohnson@rgrdlaw.com

PARADIS LAW GROUP, PLLC
PAUL O. PARADIS
570 Seventh Avenue, 20th Floor
New York, NY 10018
Telephone: 212/986-4500
212-986-4501 (fax)

10

UNITED STATES DISTRICT COURT

11

CENTRAL DISTRICT OF CALIFORNIA

12

EASTERN DIVISION

13

| | |
|---|---|
| 14   LARRY DARBY, Individually and on Behalf of All Others Similarly Situated,    ) | |
| 15               Plaintiff,     ) | **DECLARATION OF LARRY DARBY** |
| 16      vs.     ) | |
| 17   GENERAL MOTORS LLC, GENERAL MOTORS COMPANY, DELPHI    ) | |
| 18   AUTOMOTIVE PLC,    ) | |
| 19               Defendants.    ) | |
| 20 | |

21

22

23

24

25

26

27

28

1    I, Larry Darby, declare as follows:

2    1.    I am the Plaintiff in the case styled *Larry Darby v. General Motors LLC, et al*, filed in

3    the U.S. District Court for the Central District of California.  If called as a witness, I could and

4    would competently testify thereto to all facts within my personal knowledge.

5    2.    I am filing this declaration pursuant to California Civil Code §1780(d).

6    3.    I understand that the complaint that my attorneys filed on my behalf, and on behalf of

7    those similarly situated, includes claims against General Motors LLC and Delphi Automotive PLC

8    for violations of California Civil Code §1750, and more specifically, California Civil Code §1770(a).

9    4.    My attorneys filed this action in the Central District of California because I reside in

10   Riverside County, within the State of California, and based on my belief that General Motors LLC

11   and Delphi Automotive PLC conduct a substantial amount of business within this District.  Upon

12   information and belief, this District is a proper place for a trial of this action.

13   5.    I declare under penalty of perjury under the laws of the United States of America that

14   the foregoing is true and correct.  Executed this ___ day of April 2014 in Homeland California.

15

16

17   _____
     LARRY DARBY

18   4/4/14

19

20

21

22

23

24

25

26

27

28

DECLARATION OF LARRY DARBY -

- 1 -