# Exhibit MM

1   JOSEPH W. COTCHETT (SBN 36324)
2   jcotchett@cpmlegal.com
    FRANK M. PITRE (SBN 100077)
3   fpitre@cpmlegal.com
    PHILIP L. GREGORY (SBN 95217)
4   pgregory@cpmlegal.com
5   ALEXANDRA A. HAMILTON (SBN 280834)
    ahamilton@cpmlegal.com
6   FRANK C. DAMRELL, JR. (SBN 37126)
7   fdamrell@cpmlegal.com
8   **COTCHETT, PITRE & McCARTHY, LLP**
    840 Malcolm Road
9   Burlingame, CA 94010
10  Tel: (650) 697-6000 / Fax: (650) 697-0577

11  *Attorneys for Plaintiffs*

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14  **CAMLAN, INC.**, a California | CASE NO. ___SACV14-00535 JLS (ANx) |
| 15  corporation; **SALVADOR R. MARQUEZ**, an individual; | **CLASS ACTION COMPLAINT FOR:** |
| 16  **RANDALL PINA**, an individual; and **AMALIA M. BROOKS**, an | 1) **BUS. & PROF. CODE § 17200** *et seq.* |
| 17  individual; and on behalf of all others similarly situated, | 2) **BUS. & PROF. CODE § 17500** *et seq.* |
| 18 | |
| 19              Plaintiffs, | 3) **CIVIL CODE § 1750** *et seq.* |
| 20 | 4) **BREACH OF IMPLIED WARRANTY** |
| 21      v. | |
| 22  **GENERAL MOTORS LLC**, a | 5) **BREACH OF EXPRESS WARRANTY** |
| 23  corporation, | 6) **UNJUST ENRICHMENT** |
| 24              Defendant. | 7) **FRAUDULENT CONCEALMENT** |
| 25 | |
| 26 | 8) **NEGLIGENCE** |
| 27 |              **JURY TRIAL DEMANDED** |
| 28 | |

**CLASS ACTION COMPLAINT**

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

# **TABLE OF CONTENTS**

**Page**

I.  **INTRODUCTION** .................................................................. 1

II.  **JURISDICTION AND VENUE** .......................................... 4

III.  **PARTIES** ............................................................................. 5

    A.  **PLAINTIFFS** ............................................................. 5

    B.  **DEFENDANT** ............................................................ 8

IV.  **CLASS ACTION ALLEGATIONS** .................................... 8

    A.  **NUMEROSITY OF THE CLASS** ............................. 9

    B.  **EXISTENCE AND PREDOMINANCE OF COMMON QUESTIONS OF LAW AND FACT** ........................ 10

    C.  **TYPICALITY** ........................................................... 11

    D.  **ADEQUACY OF REPRESENTATION** ................... 11

    E.  **PROPER MAINTENANCE OF CLASS** ................. 11

    F.  **SUPERIORITY** ......................................................... 11

V.  **FACTUAL BASIS FOR THE CLAIMS ASSERTED** ........ 12

    A.  **MODELS RECALLED** ............................................ 12

    B.  **GM'S IGNITION SWITCH DEFECT TIMELINE** ..... 12

    C.  **GM'S LEGAL STAFF OPENS A FILE ON THE CRASH** ........ 14

    D.  **GM'S "COMMITMENT TO SAFETY"** .................. 22

    E.  **OVERSIGHT AND INVESTIGATIONS SUBCOMMITTEE HEARING ON APRIL 1, 2014** ............... 23

    F.  **GM'S POSITION ON THE DEFECTIVE VEHICLES CHANGES OVER TIME** ........................... 25

    G.  **GM IN 2002 APPROVED AN IGNITION SWITCH KNOWING IT DID NOT MEET COMPANY SPECIFICATIONS** ............... 33

1      **H.    THE MODIFIED SWITCHES USED IN 2007-2011 VEHICLES**
2               **WERE ALSO APPROVED BY GM DESPITE NOT MEETING**
3               **COPANY SPECIFICATIONS** .......................................**34**
4      **I.    GM VIOLATED THE TREAD ACT BY FAILING TO NOTIFY**
5               **THE NATIONAL HIGHWAY TRAFFIC SAFETY**
6               **ADMINISTRATION OF THE KNOWN DEFECTS** ..................**37**

7  **VI.   SUCCESSOR LIABILITY** .........................................**39**

8  **VII.  TOLLING OF THE STATUTE OF LIMITATIONS** .................**39**

9  **VIII. CAUSES OF ACTION** .............................................**41**

10  **FIRST CAUSE OF ACTION**
11     **(Unfair Competition Law: Bus. & Prof. Code § 17200 et seq.)** ..............**41**

12  **SECOND CAUSE OF ACTION**
13     **(False Advertising Act: Bus. & Prof. Code § 17500 *et seq.*)** ....................**44**

14  **THIRD CAUSE OF ACTION**
15     **(Consumer Legal Remedy Act: Civil Code § 1750, et seq.)** ....................**47**

16  **FOURTH CAUSE OF ACTION**
17     **(Breach of Implied Warranty)** ..........................................**49**

18  **FIFTH CAUSE OF ACTION**
19     **(Breach of Express Warranty)** ........................................**51**

20  **SIXTH CAUSE OF ACTION**
21     **(Unjust Enrichment)** ...................................................**52**

22  **SEVENTH CAUSE OF ACTION**
23     **(Fraudulent Concealment)** .............................................**52**

24  **EIGHTH CAUSE OF ACTION**
25     **(Negligence)** ..........................................................**53**

26  **IX.   PRAYER FOR RELIEF** ...........................................**54**

27  **X.    JURY DEMAND** ................................................**55**

28

Plaintiffs Camlan, Inc., a California corporation, Salvador R. Marquez, Randall Pina, and Amalia M. Brooks, ("Plaintiffs"), individually and on behalf of the Class described below, bring this action for damages and injunctive relief pursuant to California's Unfair Business Practices Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*; California's Legal Remedy Act, Cal. Civil Code §§ 1750, *et seq.*; and for violations of California common law against Defendant General Motors LLC ("GM"). Plaintiffs complain and allege upon information and belief based, *inter alia*, upon investigation conducted by Plaintiffs and Plaintiffs' counsel, except as to those allegations pertaining to Plaintiffs personally, which are alleged upon personal knowledge:

## I.   **INTRODUCTION**

1.      In the last fifteen years, GM has designed, manufactured, promoted, marketed, and sold defective vehicles that pose known and significant dangers to unsuspecting drivers, passengers, motorists, and pedestrians. GM allowed these dangers to persist without taking adequate measures to eliminate the dangers or to notify the government or public of the design defects. By doing so, GM jeopardized public safety and fostered a corporate culture of complete disregard to the safety concerns of its customers.

2.      As far back as 2001, GM learned that vehicles designed, manufactured, promoted, and sold by GM contained defective ignition switches (the "Defective Vehicles"). However, GM took no action to remedy, mitigate, and/or minimize the danger inherent in this faulty system to motorists, passengers, or pedestrians. Instead of making an effort to repair these known defects, GM hid this information. These issues have been known to GM since 2001 and have caused at least thirteen (13) deaths and thirty-one (31) crashes. By ignoring safety concerns, GM suppressed the dangers of defective ignition switches from the

**CLASS ACTION COMPLAINT**                                                                 1

1    public and the government and continued to design, manufacture, promote, and sell

2    vehicles with defective ignition switches.

3          3.      The ignition switch in the Defective Vehicles has several common

4    switch points, including "RUN" or "ON," "OFF," and "ACC" or "accessory."

5    When the ignition switch is in the "RUN" position, the vehicle's motor engine is

6    running and the electrical systems have been activated. When the ignition switch

7    is in the "ACC" position, the motor is turned off but electrical power is activated,

8    generally only supplying electricity to the vehicle's entertainment system. When

9    the ignition is in the "OFF" position, both the engine and electrical systems are

10    turned off. In most vehicles, a driver must intentionally turn the key in the

11    ignition switch to move to each position.

12          4.      Because of the defects in the design, manufacture, and/or assembly,

13    the ignition switches installed in the Defective Vehicles are loose and improperly

14    positioned, making the switches susceptible to failure during normal and expected

15    conditions. Due to its defective design and improper position, the ignition switch

16    can unexpectedly and suddenly move from the "ON" or "RUN" position to the

17    "OFF" or "ACC" position (the "Ignition Switch Defect"). When this ignition

18    switch failure occurs, the motor engine and certain electrical components, such as

19    power-assisted steering, anti-lock brakes, and airbags, are abruptly turned off.

20          5.      The Ignition Switch Defect can occur at any time during normal and

21    proper operation of the Defective Vehicles, making driving a game of Russian

22    roulette. The ignition can suddenly switch to "OFF" while the Defective Vehicle

23    is moving at high speeds, such as 65 mph on the freeway, leaving the driver

24    unable to control the vehicle, compromising the safety airbag system, and

25    endangering the vehicle occupants, other motorists, and pedestrians.

26          6.      Although it knew of the Ignition Switch Defect, GM designed,

27    manufactured, promoted, and sold over **2.6 million** Defective Vehicles, including

28    the following models:

**CLASS ACTION COMPLAINT**         2

- 2005-2011 Chevrolet Cobalt;
- 2006-2011 Chevrolet HHR;
- 2006-2011 Pontiac Solstice;
- 2003-2007 Saturn Ion;
- 2007-2011 Saturn Sky; and
- 2005-2011 Pontiac G5.

7.     More egregious than the technical failures, however, was the fact that GM senior management kept those failures secret for years.  In 2013, a GM Senior Manager identified eighty (80) customer complaints that Chevrolet Cobalts had unexpectedly stopped or stalled since 2005.  Despite numerous customer complaints, GM disregarded, ignored, hid, and disparaged the safety risks that the Defective Vehicles presented to the unsuspecting public.  As a result of GM's actions, millions of lives were put at risk.

8.     On April 1, 2014, GM Chief Executive Officer Mary Barra testified before the House Oversight and Investigations Subcommittee and called GM's slow response to at least 13 deaths linked to faulty ignition switches "unacceptable." However, Ms. Barra was unable to give U.S. lawmakers any answers as to why GM continued to sell Defective Vehicles.

9.     During the April 2014 testimony, GM admitted that the cost to rectify the Ignition Switch Defect and to eliminate the significant risk created by the defect was a mere **$0.57 per Defective Vehicle**.  When questioned why GM did not spend the money to fix the Ignition Switch Defect, Ms. Barra stated that GM "had more of a cost culture" rather than a customer safety culture.

10.     In order to save 57 cents per Defective Vehicle, GM turned a blind eye to the defects.  GM waited nearly a decade to recall 2.6 million of the Defective Vehicles over the Ignition Switch Defect, knowing full well that a jarring of or too much weight on the ignition key could cause the switch to move

1  from the "ON" to the "ACC" position, thereby cutting power to air bags, steering,

2  and brakes.

3       11.   GM's disclosures and depositions leading to the recall suggest a

4  cultural landscape during the prior decade where employees worked in silos,

5  isolated from other departments and critical information. GM's Chief Executive

6  Officer Mary Barra told Congress that people in one part of GM "didn't recognize

7  information that would be valuable in another part of the company."

8       12.   GM's misconduct has endangered drivers, passengers, motorists, and

9  pedestrians.  GM claims that "[s]afety will always be a priority at GM.  We

10  continue to emphasize our safety-first culture in our facilities, and as we grow our

11  business in new markets. Our safety philosophy is at the heart of the development

12  of each vehicle. In addition to safety, delivering the highest quality vehicles is a

13  major cornerstone of our promise to our customers."  GM violated this principle

14  by jeopardizing the lives and safety of millions of Americans when it sold

15  defective automobiles to consumers for many years.  The extent of the defects is

16  still being discovered.

17  **II.    <u>JURISDICTION AND VENUE</u>**

18       13.   This Court has subject matter jurisdiction under 28 U.S.C. § 1332

19  (d)(2) (the "Class Action Fairness Act") because the amount in controversy

20  exceeds the sum or value of $5,000,000, exclusive of interest and costs, and

21  members of the proposed Class are citizens of a state different than that of

22  Defendant.

23       14.   This Court has personal jurisdiction over Defendant and venue is

24  proper because a substantial portion of the wrongdoing alleged in this Complaint

25  took place in this State and Defendant is authorized to do business here and

26  conducts business here.  Defendant has sufficient minimum contacts with this

27  State, because Defendant intentionally availed itself of markets in this State by

28  promoting, marketing, and selling of its products and services in this State,

including the Defective Vehicles, to render the exercise of jurisdiction by this

Court permissible under traditional notions of fair play and substantial justice.

15.    In particular, Defendant marketed, advertised, and sold automotive

vehicles in this State.  The advertisements and other wrongful business practices at

issue in this litigation were, at least in part, directed at this State, rendering the

exercise of jurisdiction by this Court permissible.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)

because the injury was suffered in this District and because a substantial part of

the events or omissions giving rise to Plaintiffs' claims occurred in this District.

17.    This case should be assigned to the Central District of California since

there are more GM dealerships, more Defective Vehicles, more GM owners and

lessors, more consumers harmed, and more recall letters in California than any

other state.  In addition, GM's headquarters for its Western Region is in Thousand

Oaks, Ventura County, within the Central District of California.  The vast

majority of the sales and inventory of GM in the United States go through the

Southern California regional headquarters, which directs wholesale sales, service,

and parts teams working with dealers in Washington, Oregon, California, Arizona,

New Mexico, Nevada, Utah, Colorado, Wyoming, Montana, Idaho, Alaska, and

Hawaii.  Venue in the Central District of California is therefore the most

appropriate venue for this case.  This Court has diversity jurisdiction over this

action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for

the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens

of a different state than Defendant.

## III.    PARTIES

### A.    PLAINTIFFS

18.    Plaintiff **CAMLAN, INC.** is a California corporation, located at 2977

Ygnacio Valley Rd., #446, Walnut Creek, California. Scott Lane is the President

of Camlan, Inc.

**CLASS ACTION COMPLAINT**                                          5

Case 09-50026-mg   Doc 12621-39   Filed 04/21/14   Entered 04/21/14 20:24:57   Exhibit
Case 8:14-cv-00538-JVS-AN   Document 1   Filed 04/07/14   Page 9 of 70   Page ID #:9

Pg 10 of 71

19.   On <u>April 16, 2009</u>, Camlan, Inc. purchased a 2007 Chevrolet HHR, one of the cars recently identified by GM as a Defective Vehicle.  On <u>February 21, 2012</u>, an employee of Camlan, Inc. was the victim of an auto accident while driving the 2007 Chevrolet HHR.  The employee was proceeding along Marsh Creek Rd. in Clayton, CA, when another vehicle came around the bend, crossed over the yellow line and, as a result, the 2007 Chevrolet HHR was in a collision.  During the course of the collision, the engine of the 2007 Chevrolet HHR immediately shut off and the air bags did not deploy.  The employee of Camlan, Inc. was injured in the accident.  The 2007 Chevrolet HHR was seriously damaged and had to be sold for salvage.  As a result, Plaintiff not only overspent on a lower quality product, but also acquired a vehicle that posed an undisclosed risk to the health and safety of Plaintiff.  One of GM's main selling points has been the efficiency, cost effectiveness, and safety of its vehicles.  Plaintiff's purchase was based, in significant part, on these representations and assertions by GM.  GM failed to disclose that most of its models over the last few years have contained defective ignition switches that pose a serious risk of injury and death to the driver and occupants, as well as other motorists and pedestrians on the road.  If GM had disclosed the nature and extent of its problems, Plaintiff would not have purchased a vehicle from GM, or would not have purchased that the vehicle for the price paid.

20.   On <u>March 23, 2010</u>, Camlan, Inc. purchased a 2008 Chevrolet HHR, one of the cars recently identified by GM as a Defective Vehicle. Since the purchase of that 2008 Chevrolet HHR, employees of Camlan, Inc. have had numerous problems with the ignition. In particular, it is difficult to turn the ignition switch into the "ON" position, as the ignition often locks up and refuses to turn.

21.   Plaintiff **SALVADOR R. MARQUEZ** resides in Salinas, CA.

22.     On or about <u>August 7, 2013</u>, Mr. Marquez purchased a 2006 Chevrolet HHR, which he still owns.  Plaintiff's 2006 Chevrolet HHR is one of the cars recently identified by GM as a Defective Vehicle.  Plaintiff not only overspent on a lower quality product, but also acquired a vehicle that posed an undisclosed risk to the health and safety of Plaintiff.  One of GM's main selling points has been the efficiency, cost effectiveness, and safety of its vehicles.  Plaintiff's purchase was based, in significant part, on these representations and assertions by GM.  GM failed to disclose that most of its models over the last few years have contained defective ignition switches that pose a serious risk of injury and death to the driver and occupants, as well as other motorists and pedestrians on the road.  If GM had disclosed the nature and extent of its problems, Plaintiff would not have purchased a GM vehicle, or would not have purchased the vehicle for the price paid.

23.     Plaintiff **RANDALL PINA** resides in Soledad, CA.

24.     In <u>April 2011</u>, Mr. Pina purchased a 2011 Chevrolet HHR in Fresno, CA.  Pina still owns the 2011 Chevrolet HHR.  Plaintiff's vehicle is one of the cars recently identified by GM as a Defective Vehicle.  Plaintiff not only overspent on a lower quality product, but also acquired a vehicle that posed an undisclosed risk to the health and safety of Plaintiff.  One of GM's main selling points has been the efficiency, cost effectiveness, and safety of its vehicles.  Plaintiff's purchase was based, in significant part, on these representations and assertions by GM.  GM failed to disclose that most of its models over the last few years have contained defective ignition switches that pose a serious risk of injury and death to the driver and occupants, as well as other motorists and pedestrians on the road.  If GM had disclosed the nature and extent of its problems, Plaintiff would not have purchased a vehicle from GM, or would not have purchased that the vehicle for the price paid.

25.     Plaintiff **AMALIA M. BROOKS** resides in Los Banos, CA.

26.     In <u>December 2007</u>, Ms. Brooks purchased a 2006 Chevrolet HHR in Boise, ID.  Plaintiff still owns the HHR.  Plaintiff's vehicle is one of the cars recently identified by GM as a Defective Vehicle.  Plaintiff not only overspent on a lower quality product, but also acquired a vehicle that posed an undisclosed risk to the health and safety of Plaintiff.  One of GM's main selling points has been the efficiency, cost effectiveness, and safety of its vehicles.  Plaintiff's purchase was based, in significant part, on these representations and assertions by GM.  GM failed to disclose that most of its models over the last few years have contained defective ignition switches that pose a serious risk of injury and death to the driver and occupants, as well as other motorists and pedestrians on the road.  If GM had disclosed the nature and extent of its problems, Plaintiff would not have purchased a vehicle from GM, or would not have purchased the vehicle for the price paid.

**B.     DEFENDANT**

27.     Defendant **GENERAL MOTORS LLC** ("GM") is a limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in <u>2009</u>.  On <u>July 10, 2009</u>, GM acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("GM Corporation") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

28.     Because GM acquired and operated GM Corporation and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of GM Corporation, as alleged in this Complaint.

**IV.     CLASS ACTION ALLEGATIONS**

29.     This action is brought by Plaintiffs, individually and on behalf of all others similarly situated, pursuant to California's Unfair Competition Law and

1  False Advertising Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.,* and 17500, *et*
2  *seq.,* and for violations of California common law.  Plaintiffs bring this action
3  pursuant to Federal Rule of Civil Procedure 23, on behalf of Plaintiffs and others
4  similarly situated.  The Class is defined as followed:

**All persons in the United States who currently own or lease one or more of the following GM vehicles: (a) 2005-2011 Chevrolet Cobalt; (b) 2006-2011 Chevrolet HHR; (c) 2006-2011 Pontiac Solstice; (d) 2003-2010 Saturn Ion; (e) 2007-2011 Saturn Sky; or (f) 2005-2011 Pontiac G5.  To the extent warranted, this list will be supplemented to include other GM vehicles that have the defective ignition switches.  Excluded from the Class are Defendant herein and its legal representatives, parents, affiliates, heirs, successors, assigns, and any other person who engaged in the improper conduct described herein (the "Excluded Persons").**

15  30.  Plaintiffs seek to recover damages for Plaintiffs and the Class under
16  the Unfair Business Practices Act, Business & Professions Code §§ 17200, *et*
17  *seq.;* False Advertising Law, Business & Professions Code §§ 17500, *et seq.,*
18  Civil Code §§ 1750, *et seq.* and for violations of California common law.
19  Plaintiffs also seek an injunction prohibiting Defendant from continuing to engage
20  in the practices described herein.

21  **A.  <u>NUMEROSITY OF THE CLASS</u>**

22  31.  The Class is so numerous that joinder of all members is impracticable.
23  While the exact number of Class members is unknown at this time, Plaintiffs are
24  informed and believe that the number of individuals who have purchased
25  Defective Vehicles in the last ten years in the United States alone is over two
26  million (2,000,000) people.

27
28

## B. EXISTENCE AND PREDOMINANCE OF COMMON QUESTIONS OF LAW AND FACT

32. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common questions include:

a. Whether GM engaged in a deceptive and unlawful advertising and marketing campaign by concealing serious defects in its vehicles;

b. Whether and to the extent GM breached its express warranties relating to the safety and quality of its vehicles;

c. Whether and to the extent GM breached any implied warranties relating to the safety and quality of its vehicles;

d. Whether and to the extent GM engaged in unfair, false, misleading, or deceptive acts or practices regarding its marketing and sale of its vehicles;

e. Whether the conduct complained of herein constitutes deceptive and misleading advertising in violation of Business & Professions Code section 17200, *et seq.*;

f. Whether the conduct complained of herein constitutes an unfair, illegal, and/or fraudulent business practice, in violation of Business & Professions Code section 17500, *et seq.*;

g. Whether GM has been unjustly enriched as a result of the conduct complained of herein;

h. Whether GM's conduct complained of herein is intentional and knowing; and

i. Whether Plaintiffs and members of the Class are entitled to damages, restitution, disgorgement of profits, declaratory relief, punitive damages, and/or injunctive relief, as a result of GM's conduct complained of herein.

1  **C.      TYPICALITY**

2       33.    Plaintiffs' claims are typical of the claims of other members of the

3  Class in that Plaintiffs and other Class members received the same standardized

4  misrepresentations, warranties, and nondisclosures about the safety and quality of

5  GM's vehicles.  GM's misrepresentations were made pursuant to a standardized

6  policy and procedure implemented by GM.  Plaintiffs are members of the Class

7  that Plaintiffs seek to represent and have suffered harm due to the unfair,

8  deceptive, unreasonable, and unlawful practices of GM.

9  **D.      ADEQUACY OF REPRESENTATION**

10       34.    Plaintiffs will fairly and adequately represent the interests of the

11  Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the

12  Class that Plaintiffs seek to represent.  Plaintiffs are represented by experienced

13  and able attorneys, who intend to prosecute this action vigorously for the benefit

14  of Plaintiffs and all Class members.  Plaintiffs and Plaintiffs' counsel will fairly

15  and adequately protect the interests of the Class members.

16  **E.      PROPER MAINTENANCE OF CLASS**

17       35.    Defendant has acted or refused to act, with respect to some or all

18  issues presented in this Complaint, on grounds generally applicable to the Class,

19  thereby making it appropriate to provide relief with respect to the Class as a

20  whole.

21  **F.      SUPERIORITY**

22       36.    A class action is the best available method for the efficient

23  adjudication of this litigation because individual litigation of Class members'

24  claims would be impracticable and unduly burdensome to the courts, and have the

25  potential to result in inconsistent or contradictory judgments.  There are no

26  unusual difficulties likely to be encountered in the management of this litigation

27  as a class action.  A class action presents fewer management problems and

28

provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## V. FACTUAL BASIS FOR THE CLAIMS ASSERTED

37. Ignoring known defects, GM suppressed the dangers of defective ignition switches from the public and the government and continued to design, manufacture, promote, and sell the Defective Vehicles, risking public safety to increase corporate profits.

### A. MODELS RECALLED

38. The ignition-switch recall covers more than 2.5 million cars. At this time, GM has issued recalls for the following models:

**February 13, 2014 and February 25, 2014:**

- 2005 – 2007 Chevrolet Cobalt;
- 2005 – 2007 Pontiac G5;
- 2003 – 2007 Saturn Ion;
- 2006 – 2007 Chevrolet HHR;
- 2006 – 2007 Pontiac Soltice; and
- 2007 Saturn Sky.

**March 28, 2014:**

- 2008 - 2011 Pontiac Solstice;
- 2008 - 2011 Pontiac G5;
- 2008 - 2011 Saturn Sky;
- 2008 - 2011 Chevrolet Cobalt; and
- 2008 - 2011 Chevrolet HHR.

### B. GM'S IGNITION SWITCH DEFECT TIMELINE

39. Since 2001, GM has known that the vehicles it designed, manufactured, promoted, marketed, and sold contained the Ignition Switch Defect. For over thirteen years, GM dismissed, ignored, concealed, and

disparaged these defects, selling over 2.6 million Defective Vehicles containing the Ignition Switch Defect.

40.   **2001**: GM determined a defect exists on the key system during pre-production testing of the Saturn Ion.  A pre-production report for the 2003 Saturn Ion identified "two causes of failure" with the ignition switch: "[l]ow contact force and low detent plunger force."

41.   **2002**:  In <u>February 2002</u>, Delphi Automotive Systems, GM's supplier, informed GM in a Production Part Approval Process document that the ignition switch did not meet GM's specifications.  Despite the warning, GM <u>still</u> approved the ignition switch design.

42.   **2003**:  A service technician reported to GM that a Saturn Ion stalled while driving, and that the weight of the owner's keys had worn down the ignition switch.

43.   **2004:**  During the time of the release of the 2005 Chevrolet Cobalt, GM learned of an incident in which a 2005 Chevrolet Cobalt lost engine power because the key moved out of the "RUN" position when the driver inadvertently contacted the key or steering column.

44.   GM employees were able to replicate the issue during test drives.  An engineering inquiry, known within GM as a Problem Resolution Tracking System (PRTS), was opened to investigate the complaint that the "vehicle can be keyed off with knee while driving."  Engineers believed that the low key cylinder torque effort was an issue and considered a number of potential solutions.  After GM considered the time required, cost, and effectiveness of each of these solutions, the PRTS was closed with **no action**.

45.   **2005:**  GM engineers met to consider making changes to the ignition switch after receiving new field reports of Chevrolet Cobalts losing engine power.  The proposal was initially approved but was later cancelled.  In dismissing the proposed changes, a GM ignition switch engineer stated that the switch is "very

1    fragile and doing any further changes will lead to mechanical and/or electrical

2    problems."  The approved proposal was canceled because "lead-time for all

3    solutions is too long," "tooling cost and piece price are too high," and "[n]one of

4    the solutions seems to fully countermeasure the possibility of the key being turned

5    (ignition turned off) during driving."

6       46.    After another complaint of the vehicle turning off while driving, a

7    GM engineer advised the Company to redesign its key head, but the proposal was

8    ultimately rejected.  GM posted a $1.1 billion first quarter loss, blaming it on

9    union overhead and high gas prices harming SUV sales.

10      47.    In July 29, 2005, Amber Marie Rose, 16, died in a frontal crash in her

11   2005 Chevrolet Cobalt in Maryland.  Contractors hired by the National Highway

12   Traffic Safety Administration ("NHTSA") found that the Chevrolet Cobalt's

13   ignition had moved out of the "RUN" position and into the "ACC" position,

14   which cut off power to power steering the air bags.

15      **C.    GM'S LEGAL STAFF OPENS A FILE ON THE CRASH**

16      48.    In December 2005, GM issued an Information Service Bulletin

17   entitled "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical

18   System and No DTCs," which applied to 2005-06 Chevrolet Cobalts, 2006

19   Chevrolet HHR, 2005-06 Pontiac Pursuits (Canada only), 2006 Pontiac Solstice,

20   and 2003-06 Saturn Ions which all had the same ignition switch.  The Service

21   Bulletin informed dealers that "there is a potential for the driver to inadvertently

22   turn off the ignition due to low ignition key cylinder torque/effort"; and "the

23   customer should be advised of this potential and should take steps to prevent it,

24   such as removing unessential items from their key chain."

25      49.    **2006:**  On April 26, 2006, the GM design engineer responsible for the

26   Cobalt's ignition switch signed a document approving changes to the ignition

27   switch proposed by the supplier, Delphi.  The approved changes included, among

28   other things the use of a new detent plunger and spring that increased torque force

in the ignition switch.  The new design was implemented into cars from the 2007 model and later.



Exemplar Chevrolet Cobalt Switch Detent Plungers

50.    On October 24, 2006, seventeen-year-old Wisconsin resident Megan Phillips was driving her 2005 Chevrolet Cobalt with two passengers, eighteen-year-old Natasha Weigel and fifteen-year-old Amy Rademaker.  According to a police report, the Cobalt left the road and struck a telephone junction box and two trees while traveling 48 miles per hour.  The police report stated that shortly after the vehicle left the roadway and before the collision, the ignition switch was turned from the "RUN" position to the "ACC" position.  Ms. Phillips and her two passengers were not wearing seat belts. A subsequent investigation by the Wisconsin State Police found the air bags did not deploy.  As a result of the collision, the two passengers were tragically killed while Ms. Phillips, now twenty-four years old, was critically injured and suffered permanent and severe brain damage.

51.    In October 2006, GM updated its December 2005 Service Bulletin to include additional models and years, including the 2007 Saturn Ion and Sky, 2007

Chevrolet HHR, and 2007 Pontiac Solstice. GM also provided key inserts to approximately 475 customers who brought their vehicle in to the dealer for service.

52. **2007:** On <u>March 29, 2007</u>, GM employees met with NHTSA representatives in Washington, D.C. to discuss occupant restraint systems. During the meeting, NHTSA informed GM employees of the <u>2005</u> fatal crash of Amber Marie Rose. GM investigative engineers began tracking frontal impact crashes that involved Chevrolet Cobalts and airbags that did not deploy to identify similar characteristics in the crashes. By the end of <u>2007</u>, GM found ten (10) such incidents, sensing and diagnostic module (SDM) data was available for nine (9) of the ten (10) crashes, and that data showed that the ignition was in the "RUN" position in five (5) of the crashes and in the "ACC" position in four (4) of the crashes.

53. A <u>2007</u> report by Indiana University of the <u>October 2005</u> crash revealed that contact with the ignition switch could result in "engine shut down and loss of power"

54. **2009:** In <u>February 2009</u>, another PRTS was opened and resulted in the top of the key being changed from a "slot" design to "hole" design to reduce downward force. The new key design was implemented in 2010 Chevrolet Cobalt models – the last year the Cobalt was sold.



GM's original key could accommodate multiple rings.



GM's redesigned key could hold just one ring.

55.     In <u>April 2009</u>, a 2005 Chevrolet Cobalt crashed in Pennsylvania, killing the Cobalt driver and front-seat passenger where the airbags failed to deploy.  The report from the investigation stated that the ignition was in the "accessory" position.

56.     On <u>June 12, 2009</u>, 18-year-old Christopher Hamberg was killed — not quite a month after the critical <u>May 15</u> meeting of GM engineers about the ignition data.  Driving his 2007 Chevrolet Cobalt home before dawn in Houston, he lost control at 45 miles per hour and hit a curb, then a tree, according to the police report.

57.     On <u>Dec. 13, 2009</u>, twenty-year-old Benjamin Hair crashed into a tree in Charlottesville, Va., while driving home in a Pontiac G5.  As of that date, GM records indicate GM had conducted five (5) internal studies about the ignition problem.  Though Mr. Hair used his seatbelt, he died after the vehicle's air bags failed to deploy.  "The police couldn't tell us what caused the accident," said Brenda Hair, his mother.  The Hairs contacted GM, providing accident reports but no vehicle data, because the car's black box had been destroyed.  "They came back and said they'd presented it to their board of engineers, and they couldn't say it was related" to a defect, Ms. Hair said.

58.     **2010**:  In <u>January 2010</u>, twenty-one-year-old Kelly Erin Ruddy burned to death in a car crash.  Her mother, Mary Ruddy, said Kelly knew something was

1    wrong with her 2005 Chevy Cobalt.  Three months after the crash, the car was

2    recalled for a power steering problem. Mrs. Ruddy said GM "dismissed us."

3          59.    In <u>February 2010</u>, NHTSA again recommended a probe into problems

4    with air bags in Chevrolet Cobalts, and the Office of Defects Investigation again

5    decided that there is no correlation and dropped the matter.

6          60.    In <u>March 2010</u>, Jennifer Brooke Melton of Georgia took her

7    Chevrolet Cobalt in for service because the engine shut off while she was driving.

8    Four days later, she died in a collision.

9          61.    During depositions in their suit last year, the Meltons learned from

10   GM engineers that the Company had been aware of potential problems with its

11   ignition systems before Brooke purchased her car in <u>2005</u>.  The Meltons' lawyers

12   also found evidence that GM had altered the design of ignition switches after

13   Brooke purchased her Cobalt, but had done so <u>without</u> either notifying federal

14   regulators or car owners or changing the part number.  The change, which

15   apparently occurred in <u>2006</u>, increased the size of the detent plunger and spring, a

16   pair of parts that hold the ignition key in position – a change that an engineer hired

17   by the lawyers said seemed intended to increase the "torque force" holding the

18   key in place.

19         62.    When deposed by Melton's attorneys, GM engineer Ray DeGiorgio

20   testified that he was lead engineer for the ignition switch.  When asked if he had

21   signed off on the change in the part, which was supplied by Delphi Mechatronics,

22   Mr. DeGiorgio said he did <u>not</u> recall authorizing such a change.  Yet according to

23   a document obtained by NBC News, Mr. DeGiorgio signed off on a change to the

24   ignition switches supplied by Delphi Mechatronics on <u>April 26, 2006</u>.  The reason

25   given for the change on the document was "to increase torque force in the switch."

26         63.    In <u>March 2010</u>, Amy Kosilla died in an accident after the air bags in

27   her Chevrolet Cobalt failed to deploy.  "We sent the paperwork for the car to them

28

1    and they said there's nothing to this," said Neil Kosilla. "They said we had

2    nothing."

3        64.    **2011:** GM launched a new investigation into 2005 – 2007 Chevrolet

4    Cobalts and the 2007 Pontiac G5 to determine why the air bags did not deploy in

5    crashes. According to GM, the results of the investigation were inconclusive.

6        65.    In one of those cases, the company settled a lawsuit brought by the

7    family of twenty-five-year-old Hasaya Chansuthus, who crashed her 2006

8    Chevrolet Cobalt in Murfreesboro, Tennessee. After first resisting, the Company

9    negotiated a deal even though Ms. Chansuthus's blood-alcohol level was more

10    than twice the legal limit. Data from the black box — which records vehicle

11    systems information — showed that the key was in the accessory or off position,

12    according to court documents, and the air bags did <u>not</u> deploy.

13        66.    **2012:** GM began to widen its investigation. However, once again

14    GM closed the investigation without reaching a conclusion.

15        67.    Also in <u>2012</u>, GM identified four (4) crashes and four (4)

16    corresponding fatalities (all involving 2004 Saturn Ions) along with six (6) other

17    injuries from four (4) other crashes attributable to the Ignition Switch Defect.

18        68.    **2013:** Mary Barra is named as the new CEO of General Motors.

19        69.    In <u>June 2013</u>, a deposition by a Chevrolet Cobalt program engineer

20    says the Company made a "business decision not to fix this problem," raising

21    questions of whether GM consciously decided to launch the Cobalt despite

22    knowing of the Ignition Switch Defect.

23        70.    In the fall of <u>2013</u>, months after an eighth internal study on the

24    Ignition Switch Defect had been issued, GM moved to cut off the flow of

25    damaging depositions related to one accident by settling the Melton wrongful-

26    death suit.

27        71.    When Lance Cooper, a lawyer for the Melton family, deposed Victor

28    Hakim, a senior manager at GM, Mr. Cooper read more than 80 customer

complaints into the official record that were filed with GM beginning in <u>2005</u> about Chevrolet Cobalts that had unexpectedly stopped and stalled.  On <u>September 13, 2013</u>, GM settled the case.  Under the terms of the settlement, the details are confidential.

72.    That same month, lawyers representing GM wrote to the lawyer in another wrongful-death case demanding that the lawsuit be withdrawn. The family of Allen Ray Floyd had sued GM after Mr. Floyd lost control of a 2006 Chevrolet Cobalt in daylight near Loris, South Carolina. Two weeks earlier, his sister had lost control of the same vehicle on the same road; she had it towed.  The Company contended the suit was "frivolous" because the accident occurred in <u>July 3, 2009</u>, a week before the Company's bankruptcy agreement took effect, which meant GM was not liable for damages.

73.    **2014**:  In <u>January 2014</u>, a GM committee approved a recall of some of the Defective Vehicles.

74.    On <u>January 31, 2014</u>, Ms. Barra learned of the Ignition Switch Defect, according to GM.

75.    On <u>February 6, 2014</u>, GM issued its 10-K to the Securities and Exchange Commission, which stated in part: "The costs and effect on our reputation of product recalls could materially adversely affect our business.  From time to time we recall our products to address performance, compliance or safety-related issues.  The costs we incur in connection with these recalls typically include the cost of the part being replaced and labor to remove and replace the defective part.  In addition product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products.  Any costs incurred or lost sales caused by future product recalls could materially adversely affect our business. Conversely not issuing a recall or not issuing a recall on a timely basis can harm our reputation and cause us to lose customers for the same reasons as expressed above."

76.     The February 6, 2014 10-K for GM also included the following statements:

>     a.     "In the U.S. if a vehicle or vehicle equipment does not comply with a safety standard or if a vehicle defect creates an unreasonable safety risk the manufacturer is required to notify owners and provide a remedy."

>     b.     "We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and safety…."

77.     On February 7, 2014, GM notified NHTSA "that it determined that a defect, which relates to motor vehicle safety, exists in 619,122 cars."

78.     On February 13, 2014, GM recalled 780,000 compact cars, including Chevrolet Cobalts, Pontiac G5s, and Pontiac Pursuits (Canada only) from 2005-2007 models.

79.     On February 25, 2014, GM expanded its recall to include Saturn Ions and three other vehicles, totaling 1.6 million vehicles worldwide.

80.     On March 5, 2014, NHTSA demanded that GM turn over documents that related to ignition switch problems.

81.     On March 10, 2014, a House subcommittee announced it will hold a hearing, eventually set for April 1, 2014.  The Justice Department also announced it was conducting a criminal probe. Also, GM hired two law firms to investigate into the recall, with Anton "Tony" Valukas, who investigated Lehman Brothers after the firm's 2008 Collapse, leading the internal probe.

82.     On March 18, 2014, Ms. Barra issued an apology on behalf of GM and appointed a new global safety chief.

83.     On March 28, 2014, GM expanded the small car recall to include 971,000 vehicles from the 2008-2011 model years, which may have had the defective switches installed as replacement parts.  To date, GM has recalled 2.6 million vehicles.

84.     On <u>April 1-2, 2014</u>, Ms. Barra and NHTSA acting chief David Friedman testified before the House Energy and Commerce Committee's Subcommittee on Oversight and Investigations.

85.     On <u>April 7, 2014</u>, GM expects replacement switches to be available at dealerships.  The Company said the repairs could take until <u>October</u>.

**D.      GM'S "COMMITMENT TO SAFETY"**

86.     GM claims that "[s]afety will always be a priority at GM.  We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers."  GM violated this principle by jeopardizing the lives and safety of millions of Americans when it sold defective automobiles to American consumers for many years.

87.     Despite choosing corporate profits over safety, GM repeatedly touted safety as a huge priority to the Company as stated on their website below:



### E.    OVERSIGHT AND INVESTIGATIONS SUBCOMMITTEE HEARING ON APRIL 1, 2014

88.    General Motors Chief Executive Officer Mary Barra went before the Oversight and Investigations Subcommittee on <u>April 1, 2014</u> and called GM's slow response to at least 13 deaths linked to faulty ignition switches "unacceptable," but was unable to give U.S. lawmakers any answers as to what went wrong based on GM's internal investigation. **GM management was slammed at the hearing when members of Congress claimed that people died because GM failed to fix what amounted to a 57-cent problem.** Rep. Diana DeGette, D-Colo, said, "We know GM made a series of terrible decisions, and we know that this tragedy has exposed significant gaps in federal law that allowed them to do so."

89.    GM first learned of the problem with its ignition switches on Chevrolet Cobalts, Saturn Ions, and other models in <u>2001</u>, according to documents, but no action was taken until <u>February 2014</u>. Lawmakers inquired how GM could have missed or ignored so many red flags that faulty ignition switches could unexpectedly turn off engines during operation and leave airbags, power steering, and power brakes inoperable. Ms. Barra could not give a clear and concise answer and could only say that GM was now doing a better job of overseeing the quality of its products.

90.    David Friedman on behalf of The National Highway Traffic Safety Administration ("NHTSA") also went before the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations. Mr. Friedman said that NHTSA is pursuing an investigation of whether GM met its timeliness responsibilities to report and address the defect under Federal law – an investigation that will end with holding GM accountable if it failed in those responsibilities. According to Mr. Friedman's statement, "NHTSA is working to ensure that GM has accounted for the full scope of vehicles that may be covered

1   by the recall, is ensuring that consumers receive the needed remedy as soon as

2   possible, and is providing consumers information and resources essential to keep

3   them safe until the vehicles can be fixed."

4        91.    GM first provided NHTSA with a chronology of events on <u>February

5   24, 2014</u>.  The information in GM's chronology raised serious questions as to the

6   timeliness of GM's recall.  As a result, NHTSA opened its current investigation

7   into GM's timeliness on <u>February 26, 2014</u>.  On <u>March 4, 2014</u>, NHTSA issued a

8   special order seeking documents and answers, submitted under oath, to questions

9   relevant about how quickly GM acted on information about the defect.

10        92.    GM and NHTSA opted multiple times not to open a formal

11   investigation or declare a recall to address the faulty ignition switch.  Mr.

12   Friedman was asked why NHTSA officials in <u>2007</u> overruled an agency employee

13   who said a formal defect investigation of the switches should be started.  Mr.

14   Friedman responded that air-bag failures discovered after several fatal accidents

15   involving Chevrolet Cobalts did not necessarily indicate a defect because the

16   devices were designed not to deploy in certain situations.  Mr. Friedman said, "We

17   need a better understanding between the vehicle's power and air bags going off…

18   This connection is clearly something that has raised a lot of questions for us."

19        93.    Playing the blame game, Mr. Friedman said that NHTSA would have

20   acted decisively if GM had provided them with some of the facts that are now just

21   coming out.  "If GM did not follow the law in getting information to us quickly,

22   we're going to hold them accountable," said Mr. Friedman.

23        94.    GM had plenty of information to justify notifying the NHTSA earlier.

24   House investigators said in a memo that consumers complained to GM dealers

25   133 times about cars unexpectedly stalling or turning off when they went over

26   bumps or nudged the ignition key.  GM technicians linked many of those

27   customer complaints to faulty ignition switches, at a time the Company was

28   denying a defect existed, according to the memo, which was based on an analysis

**CLASS ACTION COMPLAINT**           24

of GM's warranty-claims database. GM still has not reported most of those cases to regulators.

95. GM's Board of Directors failed its essential purpose. The Board has a Public Policy Committee. The principal purpose of GM's Public Policy Committee is to provide oversight and guidance to management on, among other things, "business responsibilities of the Company." The Public Policy Committee's "primary responsibility is to review and provide counsel on issues that significantly affect the Company's corporate reputation," including "vehicle safety, manufacturing safety, and corporate social responsibility." By failing to insist on safety as a priority, GM allowed <u>a culture of cost savings over safety</u> to control the operations of the Company.

## F. GM'S POSITION ON THE DEFECTIVE VEHICLES CHANGES OVER TIME

96. Immediately prior to the <u>April 1, 2014</u> hearing, House investigators released an internal GM document (dated <u>April 26, 2006</u>) that showed a GM engineer approved a critical change to a faulty ignition switch that had been linked to thirteen (13) deaths.

97. In <u>April 2013</u>, Ray DeGiorgio, the chief engineer on the Chevrolet Cobalt, was deposed in a case involving a Georgia woman who was killed in a Chevrolet Cobalt in <u>2009</u>. Mr. DeGiorgio was asked about the differences between the original switch and the replacement switch. Mr. DeGiorgio testified that he saw the differences but could not explain why the part had been changed. Mr. DeGiogio also testified he had not approved the part change. But, according to the <u>April 26, 2006</u> internal GM document, Mr. DeGiorgio did indeed sign off on the change. The reason given for the change on the document was "to increase torque force in the switch."

Attorney: *"So if such a change was made, it was made without your knowledge and authorization?"*

DeGiorgio: *"That is correct"*

Later in the deposition, DeGiorgio said, *"I can certainly tell you, I was not aware of this change."*

98.     According to House investigators, documents show GM altered the design of the ignition switches, but the alteration was done without either notifying federal regulators or car owners or changing the part number.  The change apparently occurred in 2006 and increased the size of the detent plunger and spring, a pair of parts that hold the ignition key in position.



Exemplar Chevrolet Cobalt Switch Detent Plungers

2005 Model Year — 5.9 mm — 10.6 mm — 9.24 N-cm RUN-to-ACC Torque Value

New Service Replacement Part — 12.2 mm — 7.0 mm — 17.57 N-cm RUN-to-ACC Torque Value

MCSWAIN ENGINEERING

99.     House committee members said the redesigned switch still did not meet GM's minimum specifications, citing testing done at the time by the supplier, Delphi Automotive.  This means the switches installed in 2008-2011 model year vehicles were still defective which contradicted GM's statements that only switches produced before the 2006 redesign were faulty and potentially linking the defect to deaths.

100.  On <u>March 28, 2014</u>, GM recalled the 2008-2011 vehicles, but said the recall was done only to ensure that defective ignition switches were not installed as replacement parts during their repair work.  GM said that about 5,000 defective switches had been used for repairs in those vehicles.

101.  However, on <u>March 27, 2014</u>, members of Congress on the House Energy and Commerce Committee met with Delphi officials and said there was more to the story than what GM was disclosing.  A <u>March 31, 2014 </u>letter sent to GM signed by Reps. Henry Waxman, Diana DeGette, and Jan Schakowsky stated: "Delphi confirmed that these testing results mean that the ignition switches currently in use in 2008-2011 vehicles do not meet GM performance specifications."

102.  In <u>February 2014</u>, GM disclosed to federal regulators that it knew of problems with its ignition switches as early as <u>2001</u>. GM told NHTSA that a design engineer responsible for the Cobalt's ignition switch "signed a document approving changes to the ignition switches proposed by the supplier, Delphi Mechatronics."

103.  A prepared chronology by GM wrote: "The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch… This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch.  GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year."

104.  Hours before the <u>April 1, 2014</u> hearing, Congressman Henry Waxman, D. California, said his staff had counted 133 cases between <u>June 2003</u> and <u>June 2012</u> when consumers told dealers that their cars were shutting off when they went over bumps or brushed against the ignition.  These 133 cases are:

| **MODEL** | **MODEL YEAR** | **VEHICLE MILES** | **COMPLAINT DATE** |
|-----------|----------------|-------------------|---------------------|
| **ION** | 2003 | 3,474 | 6/6/2003 |
| **ION** | 2003 | 9,300 | 7/1/2003 |
| **ION** | 2003 | 10,027 | 7/14/2003 |
| **ION** | 2003 | 10,639 | 7/21/2003 |
| **ION** | 2003 | 10,639 | 7/21/2003 |
| **ION** | 2003 | 7,807 | 3/15/2004 |
| **ION** | 2003 | 18,568 | 3/15/2004 |
| **ION** | 2003 | 16,108 | 4/8/2004 |
| **ION** | 2003 | 16,192 | 4/12/2004 |
| **ION** | 2003 | 9,554 | 4/22/2004 |
| **ION** | 2003 | 15,031 | 5/1/2004 |
| **ION** | 2003 | 17,222 | 6/21/2004 |
| **ION** | 2004 | 18,209 | 6/24/2004 |
| **ION** | 2004 | 138 | 9/21/2004 |
| **ION** | 2004 | 6,583 | 3/1/2005 |
| **ION** | 2004 | 12,883 | 3/17/2005 |
| **ION** | 2004 | 8,182 | 4/20/2005 |
| **ION** | 2004 | 10,387 | 5/7/2005 |
| **ION** | 2004 | 7,945 | 6/29/2005 |
| **ION** | 2005 | 16,767 | 7/18/2005 |
| **ION** | 2004 | 19,963 | 7/22/2005 |
| **ION** | 2004 | 13,743 | 8/18/2005 |
| **ION** | 2004 | 31,456 | 8/25/2005 |
| **ION** | 2006 | 2,470 | 9/19/2005 |
| **HHR** | 2006 | 445 | 10/24/2005 |

| **MODEL** | **MODEL YEAR** | **VEHICLE MILES** | **COMPLAINT DATE** |
|---|---|---|---|
| **ION** | 2004 | 17,185 | 12/5/2005 |
| **ION** | 2004 | 13,716 | 12/13/2005 |
| **ION** | 2005 | 12,420 | 1/9/2006 |
| **ION** | 2004 | 32,688 | 1/10/2006 |
| **ION** | 2006 | 10,221 | 1/27/2006 |
| **ION** | 2006 | 3,468 | 2/23/2006 |
| **ION** | 2005 | 7,042 | 6/14/2006 |
| **ION** | 2005 | 17,375 | 7/11/2006 |
| **ION** | 2005 | 17,375 | 7/11/2006 |
| **ION** | 2006 | 9,057 | 7/25/2006 |
| **ION** | 2003 | 53,753 | 7/26/2006 |
| **ION** | 2005 | 13,929 | 7/29/2006 |
| **HHR** | 2006 | 13,464 | 8/3/2006 |
| **ION** | 2006 | 9,112 | 8/7/2006 |
| **ION** | 2004 | 36,911 | 10/16/2006 |
| **ION** | 2005 | 25,505 | 11/2/2006 |
| **ION** | 2004 | 12,850 | 11/29/2006 |
| **ION** | 2004 | 12,850 | 11/29/2006 |
| **ION** | 2006 | 30,439 | 1/16/2007 |
| **Cobalt** | 2005 | 15,123 | 3/5/2007 |
| **ION** | 2004 | 34,084 | 4/9/2007 |
| **HHR** | 2007 | 2,143 | 4/30/2007 |
| **Cobalt** | 2005 | 32,096 | 5/2/2007 |
| **Cobalt** | 2006 | 17,214 | 5/7/2007 |
| **ION** | 2006 | 26,819 | 5/19/2007 |

| **MODEL** | **MODEL YEAR** | **VEHICLE MILES** | **COMPLAINT DATE** |
|---|---|---|---|
| **ION** | 2006 | 22,937 | 5/21/2007 |
| **ION** | 2006 | 15,791 | 5/30/2007 |
| **ION** | 2006 | 17,025 | 6/7/2007 |
| **Solstice** | 2006 | 9,749 | 6/20/2007 |
| **ION** | 2006 | 31,500 | 7/2/2007 |
| **HHR** | 2006 | 25,940 | 7/19/2007 |
| **ION** | 2005 | 17,303 | 8/2/2007 |
| **ION** | 2006 | 24,741 | 8/2/2007 |
| **ION** | 2006 | 24,741 | 8/2/2007 |
| **Cobalt** | 2005 | 29,551 | 8/6/2007 |
| **ION** | 2006 | 11,161 | 8/6/2007 |
| **HHR** | 2006 | 35,804 | 8/7/2007 |
| **ION** | 2006 | 25,486 | 8/10/2007 |
| **ION** | 2005 | 28,000 | 8/11/2007 |
| **ION** | 2004 | 21,814 | 8/16/2007 |
| **ION** | 2004 | 21,814 | 8/16/2007 |
| **ION** | 2006 | 8,638 | 8/21/2007 |
| **HHR** | 2007 | 13,982 | 8/28/2007 |
| **ION** | 2006 | 30,221 | 8/29/2007 |
| **ION** | 2007 | 12,257 | 9/10/2007 |
| **Cobalt** | 2006 | 18,460 | 9/12/2007 |
| **ION** | 2006 | 12,421 | 9/20/2007 |
| **HHR** | 2006 | 23,241 | 10/9/2007 |
| **ION** | 2007 | 7,884 | 10/12/2007 |
| **ION** | 2006 | 33,477 | 10/15/2007 |

| **MODEL** | **MODEL YEAR** | **VEHICLE MILES** | **COMPLAINT DATE** |
|---|---|---|---|
| **HHR** | 2006 | 29,383 | 10/23/2007 |
| **HHR** | 2006 | 40,859 | 10/24/2007 |
| **HHR** | 2006 | 49,914 | 10/30/2007 |
| **ION** | 2004 | 57,642 | 10/30/2007 |
| **ION** | 2005 | 31,006 | 11/7/2007 |
| **HHR** | 2006 | 29,358 | 12/12/2007 |
| **Cobalt** | 2006 | 23,058 | 1/3/2008 |
| **ION** | 2006 | 23,883 | 1/17/2008 |
| **HHR** | 2006 | 30,808 | 1/31/2008 |
| **ION** | 2006 | 29,725 | 2/8/2008 |
| **ION** | 2007 | 15,247 | 2/13/2008 |
| **ION** | 2007 | 15,247 | 2/13/2008 |
| **ION** | 2006 | 20,513 | 2/25/2008 |
| **HHR** | 2006 | 24,811 | 2/28/2008 |
| **ION** | 2007 | 26,043 | 3/6/2008 |
| **ION** | 2007 | 7,538 | 3/10/2008 |
| **HHR** | 2006 | 24,955 | 3/14/2008 |
| **ION** | 2006 | 28,568 | 3/14/2008 |
| **ION** | 2007 | 11,594 | 3/17/2008 |
| **ION** | 2005 | 21,919 | 3/24/2008 |
| **ION** | 2006 | 21,942 | 5/21/2008 |
| **ION** | 2006 | 21,942 | 5/21/2008 |
| **ION** | 2006 | 21,942 | 5/21/2008 |
| **HHR** | 2006 | 27,363 | 6/19/2008 |
| **ION** | 2006 | 29,177 | 6/25/2008 |

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|---|---|---|---|
| Cobalt | 2006 | 32,014 | 6/28/2008 |
| ION | 2006 | 23,889 | 7/9/2008 |
| Cobalt | 2005 | 62,512 | 7/22/2008 |
| Cobalt | 2006 | 49,509 | 8/22/2008 |
| Cobalt | 2006 | 49,509 | 8/26/2008 |
| Cobalt | 2007 | 24,357 | 9/2/2008 |
| ION | 2006 | 32,805 | 11/29/2008 |
| ION | 2007 | 13,696 | 12/2/2008 |
| ION | 2007 | 28,760 | 12/5/2008 |
| ION | 2007 | 35,611 | 12/5/2008 |
| Cobalt | 2006 | 21,310 | 12/18/2008 |
| ION | 2007 | 19,342 | 12/29/2008 |
| G5 | 2007 | 27,270 | 1/5/2009 |
| Cobalt | 2006 | 35,514 | 6/1/2009 |
| ION | 2006 | 49,934 | 7/21/2009 |
| HHR | 2007 | 23,203 | 8/24/2009 |
| ION | 2003 | 36,770 | 8/24/2009 |
| Cobalt | 2006 | 26,040 | 8/28/2009 |
| Cobalt | 2007 | 31,328 | 12/18/2009 |
| HHR | 2007 | 32,629 | 2/15/2010 |
| G5 | 2007 | 36,226 | 7/28/2010 |
| Cobalt | 2006 | 49,186 | 8/5/2010 |
| HHR | 2006 | 54,499 | 8/6/2010 |
| HHR | 2006 | 35,939 | 9/2/2010 |
| Cobalt | 2006 | 47,432 | 9/8/2010 |

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|-------|-----------|---------------|----------------|
| Cobalt | 2007 | 24,443 | 9/29/2010 |
| ION | 2006 | 40,820 | 11/4/2010 |
| Cobalt | 2005 | 70,380 | 6/15/2011 |
| HHR | 2006 | 51,404 | 9/12/2011 |
| Cobalt | 2007 | 58,321 | 9/13/2011 |
| HHR | 2006 | 39,692 | 9/28/2011 |
| Cobalt | 2006 | 48,568 | 6/25/2012 |

105. This data was obtained from the General Motors' warranty database which is not reported to NHTSA. As pointed out by the House Committee staff during the April 1, 2014 hearing, the warranty database "can provide an early warning of vehicle defects." The staff went through 150,000 records to find the claims relating to the ignition switch. The staff quoted from the report's comments that read: "When bumping ignition switch area vehicle will shut off"; and "vehicle stalls out when hitting bump/pothole in road, noticed at 50 MPH."

## G. GM IN 2002 APPROVED AN IGNITION SWITCH KNOWING IT DID NOT MEET COMPANY SPECIFICATIONS

106. On March 27, 2014, the House Committee staff had a two-and-a-half-hour briefing on issues related to the faulty ignition switch from Delphi Automotive key staff members. Delphi officials informed the Committee of important new information regarding the process by which production of the switch was approved and accepted by GM. Delphi explained the general process, known as the Production Part Approval Process (PPAP), used when the supplier works with large customers like GM. GM would provide a design and set of specifications and Delphi would then build the product and test it against

1  specifications and present the results of the testing to GM for final production
2  approval.

3      107.  Delphi representatives told the Committee that the ignition switch was
4  designed, built, and then approved in <u>February 2002</u> by GM via the PPAP
5  process.  Delphi was unable to provide full documentation associated with the
6  PPAP process but did have documentation regarding the torque performance
7  testing results conducted as part of the PPAP.  Delphi officials stated that it was
8  "well documented" in <u>2002</u> that the ignition switch did not meet the required
9  minimum torque specifications.  The testing results were far below GM's
10  specifications.  There were 12 torque performance tests conducted on the ignition
11  switch at the time, and most tests showed a torque of between 4 and 10 N-cm, and
12  that only two of the 12 tests showed the ignition switch surpassing 10 N-cm.
13  GM's specifications called for torque levels between 15 and 25 N-cm,
14  significantly above the results of the performance tests.  Delphi said that despite
15  these results, GM officials still approved the ignitions switch for production and
16  that this ignition switch was used in the recalled vehicles in model years 2003-
17  2007.

18      **H.    THE MODIFIED SWITCHES USED IN 2007-2011 VEHICLES**
19              **WERE ALSO APPROVED BY GM DESPITE NOT MEETING**
20              **COPANY SPECIFICATIONS**

21      108.  Delphi representatives also told Committee members about the
22  redesign of the ignition switch that was produced beginning in <u>April 2006</u>.
23  According to Delphi officials, GM began discussions with Delphi about needing
24  to modify and re-test the ignition switch in <u>mid-2005</u>.  Delphi agreed to modify
25  the design of the ignition switch and when presented to GM, got approval on a
26  design with a longer spring, and had Delphi produce prototypes and conduct
27  testing as part of a new PPAP that was approved by GM on <u>April 26, 2006</u>.  This
28  document was signed by lead design engineer for GM, Ray DeGiorgio.  Delphi

1  again could not provide complete documentation for the 2006 PPAP process but
2  did having testing results available.  According to Delphi, most torque test results
3  for the 2006 ignition switches were in the 10 to 15 N-cm range, higher than the
4  older models, but still not meeting GM's documented specifications.  These
5  results meant that the ignition switches used in 2008-2011 vehicles do not meet
6  GM's performance specifications.

7  　　　109.  In response to this revelation, GM countered that it was "unaware of
8  any reports of fatalities with this group of vehicles where a frontal impact
9  occurred, the front air bags did not deploy, and the ignition is in the 'accessory' or
10  'off' position."  An analysis of NHTSA's Early Warning Report data shows that
11  there were fourteen (14) fatal crashes in the recalled 2008-2011 vehicles involving
12  a potential problem with an airbag, steering, electrical, or unknown component.
13  The Center for Auto Safety also identified a similar set of crashes in earlier GM
14  vehicles as those that "could indicated the ignition airbag defect."

15  　　　110.  GM and GM engineers have reportedly stressed the importance of
16  meeting the torque specifications on 15-25 N-cm.  In a deposition for a Georgia
17  case involving a defective ignition switch in a 2005 Chevrolet Cobalt, Gary
18  Altman, the GM program engineer for the Chevrolet Cobalt, was asked:

19  　　　Q:　　"*And the vehicle never should have been sold if it didn't meet GM's*
20  　　　　　　*minimum torque performance requirements, should it? ...*"

21  　　　Altman:　　"*That's correct.*"

22  　　　Q;　　"*And the reason is because that could be dangerous under certain*
23  　　　　　　*situations because the key can move from run to accessory? ...*"

24  　　　Altman:　　"*Yes.*"

25  In the same case, GM engineer Ray DeGiorgio was asked,

26  　　　Q:　　"*Why do you have a minimum torque requirement from run to*
27  　　　　　　*accessory?*"

28

DeGiorgio: "*It's a design feature that is required. You don't want anything flopping around.*"

Q: "*...the intent was also to make sure that when people were using the vehicle under ordinary driving conditions, that if the key was in the run position, it wouldn't just move to the accessory position?*"

DeGiorgio: "*That is correct.*"

111. Brian Stouffer, another GM engineer also indicated in a deposition that the torque values of the ignition switches on the later model vehicles were not significantly different from the torque values on the older models. Stouffer testified*: "The values are not substantially higher on the '08s and '09s... there's a slight trend upwards, but '08s and '09s are not drastically different. The highest was only – we were never higher than 20 newton centimeters. We never had one exceed that... there is a slight trend upward [in torque values] from '07, but there's definitely not separation. They overlap. The ranges [of ignition torque in pre-2007 and post 2007 vehicles] overlap.*" If what Mr. Stouffer said is true, there could be significant risk from the ignition switches in the 2008-2011 vehicles.

112. Documents provided to the Congressional Committee confirm that top GM officials knew of the out-of-spec ignition switches for 2008-2011 vehicles for at least several months before announcing the recall. A presentation for GM's December 17, 2013 high-level Executive Field Action Decision Committee meeting showed that torque performance measurements for five of twelve 2008-2010 model year vehicles ignition switches were below the minimum GM required specifications. GM again acknowledged the importance of this specification in the March 28, 2014 recall notice, which read:

> "*If the torque performance is not to specification, and the key ring is carrying added weight of the vehicle goes off road or experiences some other jarring event, the ignition*

*switch may inadvertently be moved out of the 'run'*

*position."*

## I. GM VIOLATED THE TREAD ACT BY FAILING TO NOTIFY THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION OF THE KNOWN DEFECTS

113.  Under the Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. §§ 30101, *et seq.*, and the Transportation Recall Enhancement, Accountability, and Documentation Act (the "Tread Act"), 49 U.S.C. § 30170, GM is required to recall and repair motor vehicle defects related to safety.

114.  If a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must inform the Secretary of Transportation. 49 U.S.C. § 30118(c)(1) & (2).

115.  The Safety Act requires that manufacturers inform NHTSA within five (5) working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." The report to NHTSA must immediately include the following information:

   a.    The manufacturer's name;

   b.    The identification of the vehicles or equipment containing the defect, including:

   - The make, line, model year, and years of manufacturing;
   - A description of the basis for the determination of the recall population;
   - How those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and
   - A description of the defect.

116.  The manufacturer must also inform NHTSA, as soon as possible, regarding:

a.    The total number of vehicles or equipment potentially containing the defect;

b.    The percentage of vehicles estimated to contain the defect;

c.    A chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with their dates of receipt; and

d.    A description of the plan to remedy the defect.

117.  If the Secretary of Transportation determines that the vehicle is defective, it will require the manufacturer to notify the owners, purchasers, and dealers of the defect and require it to remedy the defect or noncompliance. 49 U.S.C. § 30118(b)(2)(A) & (B).

118.  Under the Tread Act, any manufacturer who violates 29 U.S.C. § 30166 must pay a civil penalty to the U.S. Government at $7,000 per violation per day with a maximum penalty "for a related series of daily violations [of] $17,350,000." 49 C.F.R. § 578.6(c).

119.  As described in detail above, since at least <u>2001</u>, GM has known about the defective ignition switches in its vehicles. Despite being aware of the ignition switch defects, GM waited until <u>February 7, 2014</u> before finally notifying NHTSA that it manufactured and sold vehicles with ignition switch defects that could disengage the vehicle's power and airbags.

120.  Notwithstanding its duty to do so, Defendant has known for many years, but has not disclosed to NHTSA or the public, how to fix the defects. GM failed to inform NHTSA about known defects in the Defective Vehicles. As a result, the public, including Plaintiffs and the Class, received no notice of the ignition switch defects until <u>February 2014</u>.

## VI.     SUCCESSOR LIABILITY

121. From the date of its formation, GM expressly assumed certain obligations, including those obligations under the Tread Act, and is liable for its nondisclosure and concealment of the Ignition Switch Defect from the date of its formation to the present.

122. GM also has successor liability for GM Corporation's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of GM Corporation.

123. A significant number of GM Corporation employees remained employed at GM, including managers, directors, and/or members of the Board, demonstrating a continuity of knowledge. For example, GM's current CEO, Mary Barra, was employed by GM Corporation in 1980. In February 2008, Ms. Barra was appointed Vice President of Global Manufacturing Engineering – a position in which she knew or should have known of the Ignition Switch Defect. Victor Hakim, GM's Rule 30(b)(6) deponent concerning the Ignition Switch Defect, began at GM Corporation in 1971. Mr. Hakim is now a Senior Manager/Consultant in GM's Field Performance Assessment Department.

124. GM has continued to design, manufacture, promote, market, and sell the same products as GM Corporation, including the Defective Vehicles.

125. GM acquired real property, contracts, books, records, goodwill, and other intangible personal property of GM Corporation.

## VII.     TOLLING OF THE STATUTE OF LIMITATIONS

126. GM is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentations of the true facts concerning the Ignition Switch Defect in the Defective Vehicles. GM was, at all relevant times, aware of the nature and existence of the defects in the subject vehicles, but at all times continued to design, manufacture, certify, market, advertise, distribute, and sell the Defective Vehicles without revealing the true facts concerning the defects,

1    in order to sell cars, to avoid bad publicity, and to avoid the expense of recalls.

2    The true facts about the Defective Vehicles continue to be concealed from the

3    public, including Plaintiffs.

4         127.  All applicable statutes of limitation have been tolled by GM's

5    knowing and active fraudulent concealment and denial of the facts alleged herein.

6    Plaintiffs had no knowledge of, nor any reason to suspect, GM's concealment of

7    the Ignition Switch Defect in the Defective Vehicles.  Plaintiffs had no knowledge

8    of facts sufficient to place Plaintiffs on inquiry notice of the claims set forth in this

9    Complaint, until shortly before this Complaint was filed.

10        128.  Nor could Plaintiffs and the members of the Class have discovered the

11   violations through the exercise of reasonable diligence earlier than that time

12   because Defendant concealed the nature of its unlawful conduct and acts and

13   fraudulently concealed its activities through various other means and methods

14   designed to avoid detection.

15        129.  Under the Tread Act, GM is required to inform NHTSA within five

16   (5) working days of discovering "a defect in a vehicle or item of equipment has

17   been determined to be safety related, or a noncompliance with a motor vehicle

18   safety standard has been determined to exist." In addition, GM is required to recall

19   and repair motor vehicle defects related to safety.

20        130.  As described in detail above, since at least 2001, GM has known

21   about the defective ignition switches in its vehicles. Despite being aware of the

22   Ignition Switch Defect, GM waited until February 7, 2014 before finally notifying

23   NHTSA that it manufactured and sold vehicles with ignition switch defects that

24   could disengage the vehicle's power and airbags.

25        131.  Due to its violations of the Tread Act and consumer protection laws

26   and its active concealment of pertinent information related to the Ignition Switch

27   Defect, any and all limitations periods otherwise applicable to Plaintiffs' claims

28   have been tolled.

# VIII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Unfair Competition Law: Bus. & Prof. Code § 17200 et seq.)

132.  Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

133.  The Unfair Competition Law, California Business and Professions Code § 17200, provides that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" the False Advertising Act, California Business and Professions Code § 17500.  The Unfair Competition Law provides that a Court may order injunctive relief and restitution as remedies for any violation of the False Advertising Act.

134.  Plaintiffs may pursue a representative claim on behalf of others in that Plaintiffs meet the standing requirements of California Business and Professions Code Section 17204 and complies with Section 382 of the California Code of Civil Procedure.

135.  At all times herein, Defendant has engaged in unfair and unlawful business practices.  Defendant's business practices include, without limitation:

a.  Selling to Plaintiffs and the Class vehicles which contain defects or design flaws which make them inherently more dangerous than other similar vehicles;

b.  Failing to disclose to Plaintiffs and the Class that the vehicles sold to such consumers contain a defect or design flaw which makes them inherently more dangerous than other similar vehicles;

c.  Failing to remedy the defects or design flaws which made Defendant's vehicles inherently more dangerous than other similar vehicles;

d.     Failing to design, manufacture, distribute, and sell a product which would perform in a safe manner when used in a reasonably foreseeable manner by a reasonable customer;

e.     Failing to timely inform NHTSA and vehicle owners, purchasers, and dealers of the ignition switch defects and to timely recall the Defective Vehicles; and

f.     Violating the other statutes and common law causes of action as alleged in this Complaint.

136.  The business acts and practices of Defendant, as hereinabove described, constitute an unlawful business practice in violation of the Unfair Competition Law for the reasons set forth below, without limitation:

a.     The acts and practices violate California Civil Code §§ 1709 and 1710 and are therefore unlawful;

b.     The acts and practices violate California Civil Code § 1750, *et seq.*, and are therefore unlawful; and

c.     The acts and practices violate the Tread Act, 49 U.S.C. § 30101, *et seq.*, and are therefore unlawful.

137.  The business acts and practices of Defendant as herein described also constitute an unfair business practice in violation of the Unfair Competition Law in that such acts and practices are substantially injurious to consumers and offensive to established California public policy.

138.  The business acts and practices of Defendant as herein described constitute a fraudulent business practice in violation of the Unfair Competition Law in that such acts and practices are likely to deceive California consumers as to their legal rights and obligations.

139.  Defendant's conduct has further injured Plaintiffs and the Class by impairing competition within the automotive vehicle markets, failing to disclose the defect to the NHTSA, and preventing Plaintiffs and the Class from discovering

that their vehicles were unsafe and unreliable and making fully informed decisions about whether or not to lease, purchase, and/or retain the Defective Vehicles and/or the price to be paid to lease and/or purchase the Defective Vehicles.

140.  Plaintiffs and the Class have suffered harm as a proximate result of the wrongful conduct of Defendant alleged herein, and therefore bring this claim for restitution and disgorgement.  Plaintiffs and the Class have suffered injury in fact and have suffered an economic loss by, *inter alia*, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use.  Plaintiffs have suffered injuries in fact and have lost money as a result of such unfair competition.

141.  In leasing and/or purchasing the vehicles from Defendant, Plaintiffs and the Class reasonably believed and/or depended on the material false and/or misleading information provided by Defendant with respect to the safety and quality of the vehicles manufactured and sold by Defendant.  In other words, Defendant induced Plaintiffs and the Class to purchase the Defective Vehicles through the acts and omissions alleged herein.

142.  Unless restrained and enjoined, Defendant will continue in the acts and practices alleged above.  Accordingly, the Court must issue an injunction restraining and enjoining Defendant from advertising, selling, or otherwise disseminating false and misleading information about its products or failing to disclose relevant information.  Plaintiffs and the Class further request an order restoring any money or property, real or personal, which may have been lost by means of Defendant's unfair and deceptive business practices.

143.  In addition, pursuant to California Code of Civil Procedure Section 1021.5, Plaintiffs are entitled to recover Plaintiffs' reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

## SECOND CAUSE OF ACTION

### (False Advertising Act: Bus. & Prof. Code § 17500 *et seq.*)

144.  Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

145.  California Business and Professions Code § 17500, *et seq.*, the False Advertising Act, prohibits any person, firm, corporation, or association, or any employee thereof, with the intent to dispose of real or personal property, from performing services or inducing the public to enter into any obligation relating to property or services, disseminating an untrue or misleading statement concerning such property or services which the defendant knew, or in the exercise of reasonable care should have known, was untrue or misleading.  A court may order injunctive relief and restitution to affected members as remedies for any violations of California Business and Professions Code Section 17500 as part of the Unfair Competition Law.

146.  At all times herein, Defendant has engaged in disseminating false and misleading communications which misrepresent the characteristics, nature, quality, and safety of the Defective Vehicles and have failed to disclose the true quality and defects of these products.  Defendant's business practices include, without limitation:

a.    Selling to Plaintiffs and the Class vehicles which contain defects or design flaws which make them inherently more dangerous than other similar vehicles;

b.    Failing to disclose to Plaintiffs and the Class that the vehicles sold to such consumers contain a defect or design flaw which makes them inherently more dangerous than other similar vehicles;

c.    Failing to remedy the defects or design flaws which made Defendant's vehicles inherently more dangerous than other similar vehicles;

d.    Failing to design, manufacture, distribute, and sell a product which would perform in a safe manner when used in a reasonably foreseeable manner by a reasonable customer;

e.    Failing to timely inform NHTSA and vehicle owners, purchasers, and dealers of the ignition switch defects and to timely recall the Defective Vehicles; and

f.    Violating the other statutes and common law causes of action as alleged in this complaint.

147. Defendant engaged in the advertising and the failure to disclose the defects and design flaws in its products herein alleged with the intent to induce Plaintiffs and the Class to purchase Defendant's products.

148. Defendant caused to be made or disseminated throughout California and the United States, through advertising, marketing, and other publications, statements that are untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue or misleading to consumers and Plaintiffs. Defendant's advertising was untrue or misleading and likely to deceive the public in that the true characteristics and nature of the vehicles sold by GM were not as advertised.

149. In purchasing the vehicles from Defendant, Plaintiffs and the Class reasonably believed and/or depended on the material false and/or misleading information provided by Defendant with respect to the quality and safety of the vehicles being sold. In other words, Defendant induced Plaintiffs and the Class to purchase GM automotive products through the acts and omissions alleged herein.

150.  In making and disseminating the statements herein alleged, Defendant knew, or by the exercise of reasonable care should have known, that the statements were and are untrue or misleading and so acted in violation of California Business and Professions Code Section 17500.  Moreover, Plaintiffs and the Class were exposed to Defendant's advertising and its false and misleading statements and were affected by the advertising in that Plaintiffs and the Class believed it to be true and/or relied on it when making purchasing decisions.

151.  The business acts and practices of Defendant herein described also constitute an unfair business practice in violation of the Unfair Competition Law in that such acts and practices are substantially injurious to consumers and offensive to established California public policy.

152.  In addition, the business acts and practices of Defendant as herein described constitute a fraudulent business practice in violation of the Unfair Competition Law in that such acts and practices are likely to deceive consumers as to their legal rights and obligations with respect to the purchase of vehicles from GM.

153.  Plaintiffs and the Class have suffered injury in fact and have suffered an economic loss by, *inter alia*, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use.  Accordingly, the Court must issue an injunction restraining and enjoining Defendant from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of vehicles from Defendant.  Plaintiffs and the Class further request an order restoring any

money or property, real or personal, which may have been lost by means of Defendant's false advertising.

154.  In addition, pursuant to California Code of Civil Procedure Section 1021.5, Plaintiffs are entitled to recover Plaintiffs' reasonable attorneys' fees, costs and expenses incurred in bringing this action.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

### THIRD CAUSE OF ACTION

### (Consumer Legal Remedy Act: Civil Code § 1750, et seq.)

155.  Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

156.  The Consumer Legal Remedies Act, California Civil Code § 1750, *et seq.* (hereinafter "CLRA"), was designed to protect consumers from unfair and deceptive business practices.  To this end, the CLRA sets forth a list of unfair and deceptive acts and practices that are specifically prohibited in any transaction intended to result in the sale or lease of goods or services to a consumer.

157.  Defendant is a "person" within the meaning of Civil Code §§ 1761(c) and 1770, and sells "goods" within the meaning of Civil Code §§ 1761(b) and 1770.

158.  Plaintiffs are consumers within the meaning of Civil Code § 1761(d).

159.  The subject vehicles constitute "goods" under California Civil Code § 1761(a).

160.  The lease and/or purchase of vehicles by Plaintiffs and the Class from Defendant constitutes a transaction within the meaning of Civil Code §§ 1761(e) and 1770.

161.  California Civil Code § 1770(a) provides that "[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by

any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful," including:

    a.    In violation of § 1770(a)(2) of the CLRA, GM "misrepresent[ed] the source, sponsorship, approval, or certification of goods."

    b.    In violation of § 1770(a)(5) of the CLRA, GM "represent[ed] that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

    c.    In violation of § 1770(a)(7) of the CLRA, GM represented that goods are of a particular standard, quality, or grade when they are of another.

    d.    In violation of § 1770(a)(9) of the CLRA, GM advertised goods with the intent not to sell them as advertised.

    e.    In violation of § 1770(a)(14) of the CLRA, GM represented that the transaction was supplied in accordance with a previous representation when it was not.

162. By reason of the acts and practices alleged herein, Defendant has engaged in unfair methods of competition and unfair or deceptive acts or practices in a transaction intended to results or which results in the sale of goods to any consumer, in violation of, *inter alia,* Civil Code §§ 1770(a)(2), (5), (7), (9), and (14).

163. Defendant engaged in these unfair and/or deceptive acts and practices with the intent that they result, and which did result, in the sale and/or lease of the Defective Vehicles to Plaintiffs and members of the Class.

164. In purchasing the vehicles from Defendant, Plaintiffs and the Class reasonably believed and/or depended on the material false and/or misleading information provided by Defendant with respect to the safety and quality of the GM vehicles. In other words, Defendant induced Plaintiffs and the Class to lease and/or purchase the vehicles through the acts and omissions alleged herein.

165.  In engaging in unfair or deceptive conduct in violation of the CLRA, Defendant actively concealed and failed to disclose material facts about the true characteristics and nature of the Defective Vehicles purchased by Plaintiffs and the Class.

166.  As a result of the unfair and deceptive acts and practices of Defendant herein described, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

167.  Pursuant to California Civil Code §§ 1780 and 1781, Plaintiffs and the Class hereby request certification of the Class, damages, injunctive relief, restitution, attorneys' fees, costs, and expenses pursuant to California Civil Code § 1780(d) and California Code of Civil Procedure § 1021.5.

168.  As a direct and proximate result of Defendant's violations of law, Plaintiffs and the Class have been injured.  Pursuant to the provisions of California Civil Code § 1782, Plaintiffs demand that within thirty (30) days from service of this Complaint, Defendant correct the deceptive practices described in this Complaint, pursuant to California Civil Code § 1770.  This includes providing notice and full compensation to consumers who have purchased the affected vehicles from GM.  If Defendant fails to do so, Plaintiffs will amend this Complaint to seek damages pursuant to Civil Code § 1782.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

### FOURTH CAUSE OF ACTION
### (Breach of Implied Warranty)

169.  Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

170.  Defendant impliedly warranted to persons purchasing its products that the products were what they were represented to be.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                                    49

171.  These implied warranties induced the community in general and Plaintiffs and other Class members in particular to purchase the products from Defendant.  These implied warranties were both directly and indirectly believed and relied upon by Plaintiffs and Class members and induced them to choose Defendant's product.  This reliance was justified by Defendant's skill, expertise, and judgment in the design, manufacturing, testing, labeling, distribution, or sale of such products.

172.  At the time of the sale, Defendant had knowledge of the purpose for which its products were purchased and impliedly warranted the same to be, in all respects, fit and proper for this purpose.

173.  Defendant breached its aforesaid warranties in that the products were not fit for the purpose for which they were intended and used; rather Defendant sold to Plaintiffs a product which was not fit for use.  The defect in the products existed prior to the delivery of the products to Plaintiffs and the Class.

174.  Plaintiffs and the Class have suffered injury in fact and have suffered an economic loss by, *inter alia*, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use.  Accordingly, the Court must issue an injunction restraining and enjoining Defendant from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of vehicles from Defendant.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

# FIFTH CAUSE OF ACTION

## (Breach of Express Warranty)

175.  Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

176.  Defendant expressly warranted to persons purchasing its products that they were what they were represented to be.

177.  These express warranties induced the community, in general, and Plaintiffs and members of the Class, in particular, to use and purchase Defendant's products.  These express warranties were both directly and indirectly believed and relied upon by Plaintiffs and the Class and induced Plaintiffs and the Class to choose Defendant's product.

178.  Defendant breached its aforesaid warranties in that its products were not fit for the use and purpose expressly warranted by Defendant.

179.  Plaintiffs and the Class have suffered injury in fact and have suffered an economic loss by, *inter alia*, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use.  Accordingly, the Court must issue an injunction restraining and enjoining Defendant from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of vehicles from Defendant.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

**CLASS ACTION COMPLAINT**

# SIXTH CAUSE OF ACTION

## (Unjust Enrichment)

180. Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

181. As a result of its continuous and systematic misrepresentations and failure to disclose that the vehicles it had manufactured contained serious defects that affected the ignition switch of its vehicles, Defendant was able to charge a higher price for its vehicles, which did not match the item's value. Based on these practices, Defendant was unjustly enriched.

182. Defendant knew, or should have known, of the benefit it was receiving due to its misrepresentations and failure to disclose, and enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for a product with a lower value. It would be inequitable and unjust for Defendant to retain these unlawfully obtained profits.

183. Plaintiffs seek an order establishing Defendant as constructive trustee of the profits unjustly obtained, plus interest.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

# SEVENTH CAUSE OF ACTION

## (Fraudulent Concealment)

184. Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

185. Throughout the relevant time period, Defendant knew that the Defective Vehicles contained defective ignition switches, presenting an unreasonably dangerous propensity to suddenly switch off and thereby injure drivers, passengers, motorists, and pedestrians.

186. Defendant fraudulently concealed from and/or failed to disclose to Plaintiffs and the Class the true defective nature of the subject vehicle.

187.  Defendant was under a duty to Plaintiffs and the Class to disclose and warn of the defective nature of the subject vehicle because: (a) Defendant was in a superior position to know the true state of the facts about the hidden defects in the subject vehicles, and those defects were latent; (b) Defendant made partial disclosures about the safety and quality of the subject vehicles while not revealing their true defective nature; and (c) Defendant fraudulently and affirmatively concealed the defective nature of the subject vehicles from Plaintiffs.

188.  The facts concealed and/or not disclosed by Defendant to Plaintiffs and the Class were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or operate the subject vehicles.

189.  Defendant intentionally concealed and/or failed to disclose the true nature of the problems with the Defective Vehicles for the purpose of inducing Plaintiffs and the Class to act thereon, and Plaintiffs and the Class justifiably acted or relied upon, to the detriment of Plaintiffs and the Class, the concealed and/or non-disclosed facts, as evidenced by the purchase and operation of the Defective Vehicles by Plaintiffs and the Class.

190.  As a direct and proximate cause of Defendant's misconduct, Plaintiffs and the Class have suffered actual damages as hereinabove alleged.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

## EIGHTH CAUSE OF ACTION

### (Negligence)

191.  Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

192.  As the manufacturer and seller of automotive vehicles, Defendant had a duty to Plaintiffs and the Class to not sell products that were defective and could result in serious injuries to either Plaintiffs, the Class, or even innocent third

parties. Defendant breached that duty by designing, manufacturing, and selling products to Plaintiffs and the Class that had a serious ignition switch defect without disclosing these facts to Plaintiffs and the Class. That breach caused the economic harm, injury, and/or damage to Plaintiffs and the Class that are hereinabove set forth.

193. As a direct and legal result of this wrongful conduct, Plaintiffs and the Class have been damaged as hereinabove alleged, in an amount to be ascertained at the time of trial.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

## IX.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

1. That this Court certify this case as a class action;

2. That this Court find and declare Defendant's acts and practices as described herein to be unlawful, unfair, and fraudulent;

3. That Plaintiffs be awarded compensatory and general damages according to proof;

4. That Plaintiffs be awarded past and future medical and incidental expenses according to proof;

5. That Plaintiffs be awarded past and future loss of earnings and earning capacity according to proof;

6. That Plaintiffs be awarded loss of personal property and personal effects according to proof;

7. That Plaintiffs be awarded punitive damages according to proof;

8. That Defendant be preliminarily and permanently enjoined from engaging in the unlawful, unfair, and fraudulent acts and practices alleged herein;

9. That Defendant be ordered to make restitution to Plaintiffs;

1      10.   That Plaintiffs be awarded attorneys' fees and expenses pursuant to

2             California Code of Civil Procedure § 1021.5, California Civil Code §

3             1780, and any other statute which provides for award of such fees and

4             expenses;

5      11.   That Plaintiffs be awarded prejudgment interest on all sums collected;

6      12.   For costs of suit herein incurred; and

7      13.   Any other and further relief the Court may deem proper.

Dated: April 7, 2014          **COTCHETT, PITRE & McCARTHY, LLP**

By: _____
              FRANK M. PITRE
             *Attorneys for Plaintiffs*

## X.   <u>JURY DEMAND</u>

Plaintiffs demand trial by jury on all issues so triable.

Dated: April 7, 2014          **COTCHETT, PITRE & McCARTHY, LLP**

By: _____
              FRANK M. PITRE
             *Attorneys for Plaintiffs*

**CLASS ACTION COMPLAINT**             55

## DECLARATION

I,   _Scott LANE_   hereby declare and state as follows:

1.    I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

2.    I am President of Camlan, Inc., a California Corporation. Camlan, Inc. is a Plaintiff in the above-entitled action.

3.    Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

4.    This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because Defendants do business in this District (the Central District of California) and throughout the State of California.

5.    The Complaint field in this matter contains a cause of action for violations of the Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited liability company doing business nationwide, including California.

6.    I own a _2005 CHEV HHR_ which I purchased _USED_ in _ANAHEIM_, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing Declaration is true and correct, and was executed by me in the city of _WALNUT CREEK_ California, on April _4th_, 2014.

By _____

SCOTT LANE

56

## DECLARATION

I, Salvador R Marqu hereby declare and state as follows:

1.     I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

2.     I am a Plaintiff in the above-entitled action.

3.     Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

4.     This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because Defendants do business in this District (the Central District of California) and throughout the State of California.

5.     The Complaint field in this matter contains a cause of action for violations of the Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited liability company doing business nationwide, including California.

6.     I own a 2006 chevy HHR which I purchased Used in Salinas , California. Private Party

I declare under penalty of perjury under the laws of the State of California that the foregoing Declaration is true and correct, and was executed by me in the city of Salinas California, on April 3rd , 2014.

By _____

[NAME]

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

57

## DECLARATION

I, _Randall B. Piña_ hereby declare and state as follows:

1.    I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

2.    I am a Plaintiff in the above-entitled action.

3.    Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

4.    This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because Defendants do business in this District (the Central District of California) and throughout the State of California.

5.    The Complaint field in this matter contains a cause of action for violations of the Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited liability company doing business nationwide, including California.

6.    I own a _2011 HHR_ which I purchased _new_ in _Fresno_, California. _at Michael's Chevrolet_

I declare under penalty of perjury under the laws of the State of California that the foregoing Declaration is true and correct, and was executed by me in the city of _Salinas_, California, on April _3d_, 2014.


By  _Randall B. Piña_

[NAME]

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**DECLARATION**

I, _Amalia M. Brooks_ hereby declare and state as follows:

1.     I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

2.     I am a Plaintiff in the above-entitled action.

3.     Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

4.     This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because Defendants do business in this District (the Central District of California) and throughout the State of California.

5.     The Complaint field in this matter contains a cause of action for violations of the Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited liability company doing business nationwide, including California.

6.     I own a _2006 Chevy HHR_ which I purchased _used_ in _Boise, Id._, ~~California.~~ _Lithia Ford Lincoln of Boise_

I declare under penalty of perjury under the laws of the State of California that the foregoing Declaration is true and correct, and was executed by me in the city of _Los Banos_ California, on April _3_, 2014.


By _____

[NAME]

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| CAMLAN, INC., a California corporation; SALVADOR R. MARQUEZ, an individual; RANDALL PINA, an individual; AMALIA M. BROOKS, an individual; and on behalf of all others similarly situated, | GENERAL MOTORS LLC, a corporation |

| (b) County of Residence of First Listed Plaintiff   Contra Costa | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|
| Joseph W. Cotchett; Frank M. Pitre; Robert Hutchinson; Alexandra A. Hamilton COTCHETT, PITRE & McCARTHY, LLP 840 Malcolm Road, Burlingame, CA 94010; Tel: (650) 697-6000; Fax: (650) 697-0577 | |

### II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. ORIGIN (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No    (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No    ☒ MONEY DEMANDED IN COMPLAINT: $ OVER $5,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.) 28 U.S.C. § 1332 (d)(2), action for damages and injunctive relief pursuant to California's Unfair Business Practices Act, Cal. Bus. & Prof. Code §§ 17200, et seq.; the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq.; Civil Code § 1750, et seq.; and for violations of California common law

### VII. NATURE OF SUIT (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☒ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 210 Land Condemnation | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | **SACV14-00535 JLS (ANx)** |
|---|---|---|

| CV-71 (11/13) | CIVIL COVER SHEET | Page 1 of 3 |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF? | A DEFENDANT? | |
| ☐ Yes ☒ No | Then check the box below for the county in which the majority of DEFENDANTS reside. | Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☒ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | SOUTHERN DIVISION |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?    ☒ NO    ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Have any cases been previously filed **in this court** that are related to the present case?    ☐ NO    ☒ YES

If yes, list case number(s):    SEE ATTACHMENT A

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)    ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

---

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   FRANK M. PITRE                    DATE:   April 7, 2014

---

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# ATTACHMENT A

| No. | Case Name | Case Number | Court | District Judge |
|---|---|---|---|---|
| 1. | *Chris Shollenberger v. General Motors, LLC* | 2:14-cv-00582 | M.D. Pennsylvania | Hon. Yvette Kane |
| 2. | *Sylvia Benton v. General Motors, LLC* | 5:14-cv-00590 | C.D. California | Hon. James V. Selna |
| 3. | *Devora Kelley v. General Motors Company* | 8:14-cv-00465 | C.D. California | Hon. James V. Selna |
| 4. | *Galdina Maciel, Daniel Cortez, Cindy Wase, Zachary Dewitt, Roberta Cheraso, Demetrius Smith, Jenee Byrd, Ashuhan Leyva, Jim Gresik, Barbara Ellis Steele, Maria Raygoza, Barbara Gray, and Michelle Bennett v. General Motors, LLC* | 3:14-cv-01339 | N.D. California | Hon. Jeffrey S. White |
| 5. | *Peggy Sue Jones v. General Motors, LLC* | 4:14-cv-11197 | E.D. Michigan | Hon. Gerswin A. Drain |
| 6. | *Charles Silvas and Grace Silvas v. General Motors, LLC* | 2:14-cv-00089 | S.D. Texas | Hon. Nelva Gonzales Ramos |
| 7. | *Adman Jawad v. General Motors, LLC* | 4:14-cv-11151 | E.D. Michigan | Hon. Mark A. Goldsmith |
| 8. | *Katie Michelle McConnell v. General Motors, LLC* | 8:14-cv-00424 | C.D. California | Hon. James V. Selna |
| 9. | *Rudy Woodward v. General Motors, LLC, Don McCue Chevrolet, Inc.* | 1:14-cv-01877 | N.D. Illinois | Hon. Ronald A. Guzman |
| 10. | *Daryl Brandt and Maria Brandt v. General Motors, LLC* | 2:14-cv-00079 | S.D. Texas | Hon. Nelva Gonzales Ramos |
| 11. | *Teleso Satele and Carlota Onofre v. General Motors, LLC* | 8:14-cv-00485 | C.D. California | Hon. Consuelo B. Marshall |

| No. | Case Name | Case Number | Court | District Judge |
|-----|-----------|-------------|-------|----------------|
| 12. | *Martin Ponce v. General Motors, LLC* | 2:14-cv-02161 | C.D. California | Hon. John F. Walter |
| 13. | *Nicole Heuler v. General Motors, LLC* | 8:14-cv-00492 | C.D. California | Hon. Andrew J. Guilford |
| 14. | *Esperanza Ramirez, Penny Brooks, Stephanie Renee Carden, Melissa Cave, Diana Cnossen, Kim Genovese, Dianne Huff, Garrett S. Manicieri, Judy Murray, Judy Pickens, Linda Wright and Robert Wyman v. General Motors LLC, General Motors Holding, LLC, Delphi Automotive PLC, DPH-DAS LLC fka Delphi Automotive Systems, LLC* | 2:14-cv-02344 | C.D. California | Hon. Aubrey B. Collins |
| 15. | *Daniel Ratzlaff v. General Motors, LLC* | 2:14-cv-02424 | C.D. California | Hon. Aubrey B. Collins |
| 16. | *Dianne Ashworth, Karen Moore, David Dean, Sandra De Atley, Paul Glantz, Cathy Roads, Moraima Serpa and Steven Anderson v. General Motors, LLC* | 2:14-cv-00607 | N.D. Alabama | Hon. John H England, III |
| 17. | *Tammie Balls and Jeffery A. Balls v. General Motors LLC* | 2:14-cv-02475 | C.D. California | Hon. Philip S. Gutierrez |
| 18. | *Janice Ross, George Chambers and Robert Bellin v. General Motors LLC, General Motors Holding, LLC, Delphi Automotive PLC and DPH-DAS LLC* | 1:14-CV-02148 | E.D. New York | Unassigned |

| No. | Case Name | Case Number | Court | District Judge |
|---|---|---|---|---|
| 19. | *Elizabeth Y. Grumet, ABC Flooring, Inc., Marcus Sullivan, Katelyn Saxson, Amy C. Clinton and Allison C. Clinton v. General Motors LLC* | 3:14-cv-00713 | S.D. California | Hon. Jeffrey T. Miller |
| 20. | *Andre Hamid v. General Motors, LLC* | 1:14-cv-00953 | D. Colorado | Hon. Robert E. Blackburn |
| 21. | *Kyle Phillip, Evelyn Torres and Kelly Kirkpatrick v. General Motors, LLC* | 3:14-cv-08053 | D. Arizona | Hon. David G Campbell |
| 22. | *Sara Robinson, John Helcl, Richard Lewis and Denise Peterson v. General Motors LLC and Delphi Automotive PLC* | 2:14-cv-02510 | C.D. California | Hon. Otis D. Wright, II |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Josephine L. Staton _____ and to
Magistrate Judge _____ Arthur Nakazato _____ .

The case number on all documents filed with the Court should read as follows:

#### SACV14-00535 JLS (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the assigned Magistrate Judge has been designated to hear discovery-related motions. All discovery-related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

April 7, 2014                          By  A. Gonzalez
_____ Date _____                         Deputy Clerk

### ATTENTION

*A copy of this Notice must be served on all parties served with the Summons and Complaint (or, in cases removed from state court, on all parties served with the Notice of Removal) by the party who filed the Complaint (or Notice of Removal).*

CV-18 (04/14)                 NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES