# Exhibit NN

FILED

2014 APR -7 PM 2: 15

CENTRAL DIST. OF CAL.
LOS ANGELES

BY:_____

1    **STUEVE SIEGEL HANSON LLP**
2    Jason S. Hartley (CA Bar. No. 192514)
     Jason M. Lindner (CA Bar No. 211451)
3    hartley@stuevesiegel.com
     lindner@stuevesiegel.com
4    550 West C Street, Suite 1750
     San Diego, CA 92101
5    Phone:    (619) 400-5822
     Fax:      (619) 400-5832
6

7    **STUEVE SIEGEL HANSON LLP**
     Patrick J. Stueve (*pro hac vice* forthcoming)
8    stueve@stuevesiegel.com
     Todd E. Hilton (*pro hac vice* forthcoming)
9    hilton@stuevesiegel.com
     Bradley T. Wilders (*pro hac vice* forthcoming)
10   wilders@stuevesiegel.com
     460 Nichols Road, Suite 200
11   Kansas City, Missouri 64112
     Telephone:  (816) 714-7100
12   Facsimile:  (816) 714-7101
13

14   **GRAY, RITTER & GRAHAM, P.C.**
     Don M. Downing (*pro hac vice* forthcoming)
15   ddowning@grgpc.com
     701 Market Street, Suite 800
16   St. Louis, Missouri 63101
     Telephone:  (314) 241-5620
17   Facsimile:  (314)241-4140
18

19   *Attorneys for Plaintiff*

20              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA

21   RONALD COX, individually and        Case No. CV14-02608-BRO(CWx)
     on behalf of all others similarly
22   situated,
                                          **CLASS ACTION COMPLAINT**
23                  Plaintiff,
                                          **DEMAND FOR JURY TRIAL**
24   vs.

25

26   GENERAL MOTORS LLC;
     GENERAL MOTORS COMPANY;
27

28                  Defendants.

## INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiff Ronald Cox on behalf of himself and all others similarly situated, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff Ronald Cox, on behalf of himself and all others similarly situated, alleges the following against Defendants General Motors Company AND General Motors LLC (collectively "GM").

## THE PARTIES

2. Plaintiff Ronald Cox is a citizen of the state of California, residing in Long Beach, California. Plaintiff purchased a 2007 Saturn Ion within the jurisdiction of the United States District Court for the Central District of California.

3. Defendant General Motors LLC is a limited liability company formed under the laws of Delaware with its principal place of business at 3000 Renaissance Center, Detroit, Michigan. General Motors LLC is a wholly owned subsidiary of General Motors Company.

4. General Motors Company is a corporation formed under the laws of Delaware whose principal place of business also is 3000 Renaissance Center, Detroit, Michigan. General Motors Company exerts substantial control over and operates through General Motors LLC in California and other locations in the United States.

5. General Motors LLC maintains an agent for service of process in California. General Motors LLC and General Motors Company conduct substantial and continuous business in California, including through a dealership network.

6. At all relevant times, there has existed, and presently exists, a unity of interest in ownership and operation between General Motors Company and General Motors LLC. These defendants are the alter-egos of one another and General

COMPLAINT FOR DAMAGES

1  Motors Company exercised decision-making and control over General Motors LLC
2  with respect to the conduct giving rise to Plaintiffs' claims. Alternatively,
3  defendants constitute a single business enterprise. Defendants will be referred to
4  herein jointly as "GM" unless otherwise indicated.

5      7.    Defendants are engaged in the design, development, manufacture,
6  marketing, and sale of vehicles including those at issue in this case.

7  <u>**JURISDICTION AND VENUE**</u>

8      8.    This Court has jurisdiction over this action under 28 U.S.C. § 1332(d)
9  because the aggregate amount in controversy exceeds $5,000,000 and because more
10  than two-thirds of the members of the proposed Class and the Defendants are
11  citizens of different states.

12      9.    Venue is proper in the Central District of California under 28 U.S.C. §
13  1391(a) because a substantial part of the events and conduct giving rise to the
14  violations of law occurred in this District. Specifically Plaintiff purchased and
15  operated his vehicle in this District.

16      10.    Defendants are subject to personal jurisdiction here because they have
17  or previously did advertise, sell, and/or market for sale Defective Vehicles in the
18  state of California and to Plaintiff and other members of the proposed Class.

19  **FACTUAL BACKGROUND**

20  <u>**Old GM and New GM**</u>

21      11.    In or about May, 2009, Vehicle Acquisition Holdings LLC was formed
22  as a limited liability company under the laws of Delaware for the purpose of
23  purchasing substantially all of the assets of General Motors Corporation. NGMCO,
24  Inc., was incorporated in Delaware on or about May 29, 2009, became the
25  successor-in-interest to Vehicle Acquisition Holdings LLC. NGMCO, Inc. changed
26  its name to General Motors Company on or about July 9, 2009. On July 10, 2009
27  General Motors Company acquired substantially all of the assets (and assumed

28

    COMPLAINT FOR DAMAGES

certain liabilities) of General Motors Corporation (which subsequently changed its name to Motors Liquidation Company).

12. On or about August 11, 2009, General Motors Holding Company was incorporated under the laws of Delaware for the purpose of holding the operational assets of former General Motors Corporation. At some time on or after August 11, 2009 and prior to October 15, 2009, GM Merger Subsidiary Inc. was incorporated under the laws of Delaware as a wholly owned subsidiary of General Motors Holding Company. GM Merger Subsidiary, Inc. merged with General Motors Company on or about October 15, 2009, with General Motors Company being the survivor of the merger. On or about October 16, 2009, General Motors Company converted to a Delaware limited liability company under the name General Motors LLC. On or about December 9, 2010, General Motors Holding Company changed its name to General Motors Company. As a result of the corporate actions set forth in this paragraph, General Motors Company became the parent and sole owner of General Motors LLC, which remained the operational company of former General Motors Corporation assets. On or about November 17, 2010, General Motors Company sold shares in an initial public offering.

13. In public filings (including Form 10-K Annual Reports with the SEC), General Motors Company refers to General Motors Corporation for periods on and before July 9, 2009 as "Old GM," and refers to itself as "New GM." It also has stated that "[p]rior to July 10, 2009 Old GM operated the business of [New GM]." SEC Form 10-K Annual Report for year ended Dec. 31, 2009 at 1.

14. In fact, GM is a mere continuation of the Old GM in that, among other things:

(a) GM was formed solely for the purpose of acquiring and operating the assets of Old GM. GM admits in its corporate filings that it acquired "substantially all of the assets" of Old GM.

COMPLAINT FOR DAMAGES

(b)     GM is operated by the same managers as Old GM.  Of the twelve Executive Officers of GM appointed as of year-end 2009, five were Executive Officers of the Old GM.  Five more held other management positions at Old GM. Only two of the twelve Executive Officers came from outside GM.  Mary T. Barra, the current CEO, has been associated with Old GM in various management positions (including V.P., Global Manufacturing Engineering, and Executive Director, Vehicle Manufacturing Engineering) since 1980.

(c)     The business operations acquired by GM were nearly identical to the Old GM, in fact, new GM holds itself out as operating the same business as Old GM.

(d)     GM continued the operations of Old GM without interruption using the same assets, offices, plants, brand names, good will, dealerships, managers and employees.  GM operates from the same corporate headquarters as Old GM.

(e)     GM holds itself out to its customers and the public as a continuation of Old GM.

15.     Because GM is a mere continuation of Old GM, GM has successor liability for the conduct of Old GM as alleged herein.  In addition, from the moment of its creation, GM itself was aware of the safety defect in the vehicles at issue and itself committed one or more deceptive and unfair practices as alleged herein.

**Defective Ignition Switch**

16.     Since 2002, GM has been manufacturing and selling vehicles with a defective ignition switch that can inadvertently turn from the "on" position to the "accessory" or "off" position due to jostling by anything from a bumpy road to a heavy key chain, causing loss or reduction of power, and impairing normal steering operation and disabling airbags.

17.     On February 7, 2014, GM filed a Defect Notice with the National Highway Traffic Safety Administration ("NHTSA") stating that it had initiated a safety-related recall pertaining to a defect in 2005-2007 model year Chevrolet

COMPLAINT FOR DAMAGES

Cobalt and 2007 Pontiac G5 vehicles.  According to that Notice, "[t]he ignition switch torque performance may not meet General Motors' specification. If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the "run" position" resulting in "airbags not deploying and increasing the potential for occupant injury in certain kinds of crashes."

18.    On February 13, 2014, GM announced a recall of approximately 780,000 Chevrolet Cobalt (model years 2005-2007) and Pontiac G5 (model year 2007) vehicles due to faulty ignition switches.

19.    Eleven days later, on February 24, 2014, GM expanded the recall with four additional models – the Saturn Ion (model years 2003-2007), Chevrolet HHR (model years 2006-2007) Pontiac Solstice (model years 2006-2007) and Saturn Sky (model year 2007).

20.    All of these vehicles used the same or substantially the same defective ignition switch.  GM later expanded the recall to include the Chevrolet Cobalt (model years 2005-2010); Pontiac G5 (model year 2005-2010); Chevrolet HHR (model year 2008-2011); Pontiac Solstice (model year 2008-2010); Saturn Sky (model year 2008-2010). See CNBC, "General Motors recalling 824,000 more small cars" (March 28, 2014)

21.    According to GM, the ignition switches were supplied by Delphi Packard Electrical/Electronic Architecture ("Delphi").  *See* Letter from General Motors LLC to Nancy Lewis, Associate Administrator for Enforcement, NHTSF, dated February 7, 2014 at Attachment; Letter from General Motors LLC to Nancy Lewis, Associate Administrator for Enforcement, NHTSF, dated March 11, 2014, at Attachment A.

22.    GM has been closely associated with Delphi for decades.  Old GM created Delphi (originally formed as Automotive Components Group) in 1994, and

1    spun it off in 1999. *See* GM Heritage Center, "Delphi Automotive Systems."

2    Delphi went bankrupt in October 2005, "emerging four years later, after two

3    previous restructuring attempts had failed." Muller, "GM Divorce From Delphi Is

4    Final," *Forbes* (March 31, 2011). GM, "which spent at least $12.5 billion to prop

5    up Delphi during the bankruptcy, ended up taking back Delphi's steering business

6    and four Delphi plants as part of the final reorganization plan" and also obtained an

7    ownership interest in Delphi. *Id.* *See also* GM News, "New GM Subsidiaries will

8    include Delphi Components Operations and Global Steering Business" dated July

9    30, 2007 (GM announcing that Delphi components operations and steering business

10   became part of two new, wholly-owned GM; stating that "[t]he acquisition will

11   help GM to maintain continued uninterrupted supply to its . . . car and truck

12   operations."). GM retained that interest until March, 2011, when it sold the stock

13   back to Delphi for a reported $3.8 billion. *See* Bunkley, "G.M. Sells Delphi Stake

14   for $3.8 Billion," *New York Times* (March 31, 2011).

15        23.    Other models affected by the ignition switch defect are Pontiac Pursuit

16   (model years 2005-2006) sold in Canada and Opel GT (model year 2007) sold in

17   Europe. In all, approximately 2.6 million vehicles are affected globally across 8

18   model lines, approximately 2.2 million in the United States.

19        24.    In the United States, the vehicles recalled due to the ignition switch

20   defect are Chevrolet Cobalt (model years 2005-2010) and Pontiac G5 (model years

21   2005-2010), Saturn Ion (model years 2003-2007), Chevrolet HHR (model years

22   2006-2011, Pontiac Solstice (model years 2006-2010) and Saturn Sky (model year

23   2007-2010) vehicles (singly or together, the "Defective Vehicles").

24        25.    GM has admitted that at least 12 deaths and multiple crashes are

25   associated with the recalled vehicles. Others, including the Center for Auto Safety,

26   say that at least 303 deaths have been caused by disabled airbags due to the ignition

27   switch defect.

28

          COMPLAINT FOR DAMAGES

26.     GM currently is advising that "[u]ntil the recall repairs have been performed, it is <u>very</u> important that you remove all items from your key ring, leaving only the vehicle key," and that even the key fob "should also be removed from your key ring."  GM Website http://www.gm.com/ignition-switch-recall.html (last visited March 26, 2014) (emphasis original).

27.     GM also has indicated, however, that replacing the ignition switch may not resolve the risk, and that even after repair,  "[w]e recommend that customers only utilize the key, key ring and key fob (if equipped) that came with the vehicle." *Id.*

**GM's Knowledge**

28.     Both Old GM and New GM have known of the ignition switch defects for years, but have consistently concealed the defect, and the danger, from Defective-Vehicle owners.

29.     Old GM had information indicating that the ignition switch was a problem as early as 2001 before it started selling the Saturn Ion. *See* Wallace, "GM ignition switch issue surfaced in 2001," *CNNMoney* (March 13, 2014) ("The company said in a federal filing Wednesday that it discovered an issue with the Saturn Ion ignition switch in 2001 during pre-production development."); *see also* Wayland, "Official: Documents paint 'unsettling picture' of GM, NHTSA ignition switch recall," MLive.com (March 31, 2014) ("[A] 2001 pre-production report for the 2003 Saturn Ion . . . 'identified issues with the ignition switch.'")

30.     The warning signs continued.  In 2003, an internal inquiry revealed that a service technician observed the Saturn stall after the ignition had switched off while driving. After seeing that a heavy key ring had worn out the switch, the technician replaced it and the inquiry was closed.  Ivory, "G.M. Reveals It Was Told of Ignition Defect in '01," *New York Times* (March 12, 2014).

31.     According to Old GM's own filings with the National Highway Traffic Safety Administration ("NHTSA"), Old GM was aware of at least three fatal

COMPLAINT FOR DAMAGES

1   crashes involving the Saturn Ion in 2003 and 2004. Two of these crashes (one in
2   December 2003 in Connecticut; the other in November, 2004 in Texas) involved
3   non-deploying airbags. A third involved the May 2004 crash of a 2003 Ion in
4   Pennsylvania. Lienert, "U.S. Safety Watchdog Says 303 Deaths Linked To
5   Recalled GM Cars," *Reuters* (March 13, 2014).

6       32. Notwithstanding red flags relating to the ignition switch in Saturn Ions,
7   Old GM used the same ignition switch in its production of the Chevrolet Cobalt.
8   And Old GM learned that the same problems occurred in the Cobalt prior to
9   launching that model. *See* Healey and Meier, "9 revelations from GM's recall
10   chronology," *USA TODAY (February 27, 2014)*.

11       33. "Around the time production [of the Cobalt] started, GM learned of 'at
12   least one incident' where Cobalt lost power when key moved out of 'run' position
13   because of inadvertent contact. Engineers replicate[d] [this] failure during test
14   drives. GM initiate[d] [an] internal problem resolution process. Solutions [were]
15   considered to improve torque efficiency of the ignition switch, but '[a]fter
16   consideration of the lead time required, cost and effectiveness of each of these
17   solutions, the (report) was closed with no action." Detroit Free Press, "Interactive
18   Timeline: General Motors ignition switch recall" (Mar. 19, 2014); *see also* Healey
19   and Meier, "Lawsuit: GM knew of Cobalt ignition problem," *USA TODAY*
20   (February 19, 2014) ("At least one GM engineer had the problem while testing the
21   [Cobalt] . . . say documents obtained by USA TODAY from the lawsuit over a
22   crash that . . .killed Brooke Melton.").

23       34. Nevertheless, Old GM made a "business decision not to fix this
24   problem" before the Cobalt was launched in 2004. Bennett and Hughes, "New
25   Details Emerge in GM Cobalt Recall, Engineers Knew of Ignition Problems and
26   Expected Drivers to Coast Out of Traffic, Documents Show," *The Wall Street
27   Journal* (March 24, 2014) (quoting Gary Altman, program engineering manager for
28   the 2005 Cobalt from June 2013 deposition in Melton case).

        COMPLAINT FOR DAMAGES

35.     In Notices to NHTSA, dated February 24, 2014 and March 11, 2014, GM provided a partial chronology of events concerning the ignition switch defects. *See* Letter from General Motors LLC to Nancy Lewis, Associate Administrator for Enforcement, NHTSA dated March 11, 2014, Attachment B ("March 11, 2014 Notice"); Letter from General Motors LLC to Nancy Lewis, Associate Administrator for Enforcement, NHTSA dated February 24, 2014, Attachment B ("February 24, 2014 Notice").

36.     GM admitted that in 2004, "[a]round the time of the launch of the 2005 Chevrolet Cobalt," that GM learned about the Cobalt losing engine power when the key moved out of the "run" position, and stated that "GM employees were able to replicate this phenomenon during test drives." February 24, 2014 Notice at 1.  GM stated that an "engineering inquiry, known within GM as a Problem Resolution Tracking System inquiry ["PRTS"] was opened to investigate the issue." *Id.*   At that time, GM "considered a number of potential solutions. After consideration of the lead time required, cost, and effectiveness of each of these solutions, the PRTS was closed with no action." *Id.*

37.     GM also admitted that in 2005, GM employees received field reports of Chevrolet Cobalt vehicles losing engine power, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column." *Id.* at 1; *see also* March 11, 2014 Notice at 1 (same).  GM opened additional PRTSs to assess the issue. February 24, 2013 Notice at 1. During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a 'slotted' to a 'hole' configuration. That proposal was initially approved but later cancelled." March 11, 2014 Notice at 1.  The same issue applied to the Saturn Ion, Chevrolet HHR, and Pontiac Solstice "all of which were equipped with the same ignition switch as the Cobalt." *Id.*

38.     In March, 2005, another crash involving the Saturn Ion, involving two fatalities, occurred in which the air bags failed to deploy.  *See* Letter from Center

COMPLAINT FOR DAMAGES

1  For Auto Safety to David J. Friedman Acting Administrator NHTSA, dated March

2  13, 2014 (citing data from NHTSAS Fatal Analysis Reporting System).

3     39. Pursuant to 49 USC § 30118 and accompanying regulations including

4  49 CFR § 573.6, manufacturers are required to notify not only the National

5  Highway Transportation System Administration ("NHTSA") but also vehicle

6  owners and purchasers if it learns that a vehicle or equipment contains a defect

7  related to motor vehicle safety. That notice must be provided within a reasonable

8  time after learning about a safety-related defect, describe the defect, the risk, and

9  the measures to obtain repair. 49 U.S.C. §30119.

10     40. Old GM should have but did not institute an ignition-switch recall and

11  notify consumers about the problem. Instead, it issued non-public technical service

12  bulletins to dealers.

13     41. Technical service bulletins in no way substitute for consumer notice

14  because, among other things, "[m]ost owners will never know about [a service

15  bulletin]." Plungis, **"GM Had 2006 Ignition-Switch Remedy Unknown to Most

16  Owners,"** *Bloomberg* (March 17, 2014) (quoting Allan Kam, former NHTSA senior

17  enforcement attorneys). To the contrary, technical service bulletins "rely on

18  customers coming into the dealer on their own, and often asking about a specific

19  problem." *Id.*

20     42. Not only did Old GM fail to disclose the defect to consumers, the

21  technical service bulletins it sent to dealers were misrepresentative.

22     43. Old GM sent a service bulletin dated February 28, 2005 indicating

23  that the potential for drivers to inadvertently turn off the ignition of their Cobalts

24  was limited to a "profile" in which the driver's knee "contacts the key chain while

25  the vehicle is turning." Old GM told its dealers to "question the customer

26  thoroughly." In fact, however, Old GM knew that the risk was not so limited but

27  rather, present under normal foreseeable driving circumstances. Old GM also knew

28  that the Saturn Ion suffered from the same risk.

    COMPLAINT FOR DAMAGES

44.     Old GM sent another service bulletin to dealers in December 2005, again representing falsely the risk as it had in February. This bulletin also described a new key cover, which changed the key head to a hole, that could be provided to vehicle owners if they complained. *See* Gutierrez, "GM Changed Ignition Part Without Telling Drivers, Regulators," *NBC News* (March 13 2014). The service bulletin did not tell dealers to put the new key cover on the keys of new Cobalts before they were sold. Healey and Meier, "Lawsuit: GM knew of Cobalt ignition problem," *USA TODAY* (February 19, 2014).

45.     Consistent with the ineffectiveness of technical service bulletins, GM records indicate that fewer than 500 drivers received new key covers. *See* Gutierrez, "GM Chose Not to Implement a Fix for Ignition Problem," *NBC News* (March 13 2014) ("[A]ccording to GM warranty records, fewer than 500 drivers" received the new key covers); March 11, 2014 Notice ("GM's warranty records indicate that GM dealers have provided key inserts to 474 customers who brought their vehicles into dealers for service.").

46.     Meanwhile, Old GM otherwise was downplaying the problem. As of 2005, Old GM spokesman, Alan Adler, was telling the public that only in "rare cases when a combination of factors is present" might a Cobalt lose power if the ignition switch were bumped to the accessory or off position, and that "[s]ervice advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings." Jensen, "General Motors Recalls 778,000 Small Cars for Ignition Switch Problem," *New York Times* (Feb. 13, 2014). In fact, removing material from key rings would not eliminate the possibility that the ignition switch would turn to accessory or off, causing loss of power and failure of airbags.

47.     Old GM continued selling Defective Vehicles without disclosing the risk to consumers.

COMPLAINT FOR DAMAGES

1    48.   In late July, 2005, Amber Rose was killed in a frontal collision

2    involving a 2005 Cobalt whose airbags did not deploy.

3    49.   "On April 26, 2006, the Old GM design engineer responsible for the

4    ignition switch installed in all of the vehicles . . . signed a document approving

5    changes to the ignition switch." March 11, 2014 Notice at 2. This design change

6    was proposed by the supplier, Delphi, in order "to increase the torque in the switch

7    with a new detent plunger and spring to prevent it from slipping." Colias, "Former

8    GM engineers say quiet '06 redesign of faulty ignition switch was a major violation

9    of protocol," *Automotive News* (March 24, 2014). Contrary to company protocol

10   and industry standards, however, no new part number was assigned to the

11   redesigned switch. *Id.*; *see also* March 11, 2014 Notice at 2 ("This change to the

12   ignition switch was not reflected in a corresponding change in the part number for

13   the ignition switch."). Neither did Old GM issue a recall for repair of older models

14   still housing the defective ignition switch.

15   50.   Delphi did not begin providing the re-designed ignition switch until

16   "some point during the 2007 model year." March 11, 2014 Notice at 2.

17   51.   "In May 2006, a field evaluation inquiry, known within GM as a Field

18   Performance Report ('FPR') was opened to address customer complaints that their

19   Saturn Ion vehicles would neither crank nor start." March 11, 2014 Notice at 2.

20   Attached thereto was a document from Delphi recommending design changes

21   including the detent plunger to increase torque force. *Id.* The FPR was closed

22   based apparently on the technical service bulletin. *Id.*

23   52.   Old GM opened another PRTS on August 1, 2006 after a customer

24   complained of stalling after the ignition switch had been replaced. This PRTS was

25   canceled in October, 2006 without any action. *See* February 24, 2014 Notice at 2.

26   53.   Two additional crashes, involving three fatalities, occurred on

27   September 9, 2006 in West Virginia and on October 24, 2006 in Wisconsin

28   involving the Saturn Ion and Chevrolet Cobalt, respectively, in which the air bags

- 13 -                               COMPLAINT FOR DAMAGES

1   failed to deploy.   *See* Letter from Center For Auto Safety to David J. Friedman

2   Acting Administrator NHTSA, dated March 13, 2014 (citing data from NHTSAS

3   Fatal Analysis Reporting System).

4        54.   Data from NHTSA's Early Warning Reporting system indicates that

5   "in model years 2005 and 2006 -- the first years Cobalts were manufactured -- GM

6   reported more claims of injury and death with airbags as a contributing factor than

7   any other car in its class.   In 2006, Cobalts had more than 50 times as many airbag

8   claims as Honda Civics, and five times the claims of the Toyota Corolla and Ford

9   Focus."   Glor, "GM's Cobalt had more airbag claims than other cars in class,"

10  **CBSNEWS** (March 25, 2014)   (http://www.cbsnews.com/news/gms-cobalt-had-

11  more-airbag-claims-than-other-cars-in-class-data-show/) (last visited March 26,

12  2014)

13       55.   On March 29, 2007, a group of Old GM employees were meeting with

14  NHTSA representatives about occupant restraint systems.   NHTSA representatives

15  advised that data retrieved from the sensing and diagnostic module ("black box") of

16  the Cobalt involved in the fatal crash of July 29, 2005 confirmed that the power

17  mode status was in the "accessory" position. February 24, 2014 Notice at 2.   A file

18  on this crash had been open in Old GM's legal department since 2005.   *Id.*

19       56.   As of March, 2007, Old GM assigned an "investigating engineer" to

20  track Cobalt crashes involving frontal impacts where the air bags failed to deploy.

21  February 24, 2014 Notice at 2; *see also* Healey and Meier, "9 revelations from

22  GM's recall chronology," *USA TODAY (February 27, 2014) (same);* "Interactive

23  time line: General Motors ignition switch recall," *Detroit Free Press* (Mar. 19,

24  2014) *(*March 29, "NHTSA rep tells GM employees about the July 29, 2005 Cobalt

25  crash killing Amber Rose and says onboard recorder indicates ignition switch was

26  in 'accessory' mode . . . Following the meeting, a GM investigating engineer is told

27  to track crashes in which Cobalts were involved in frontal impacts and the airbags

28  did not deploy.").

COMPLAINT FOR DAMAGES

57.     By year's end 2007, Old GM knew of at least 9 Cobalt crashes in which airbags did not deploy and that the key was in "accessory" position in at least 4 of them.  March 11, 2014 Notice at 3; compare February 24, 2014 Notice at 2 (stating that GM "had notice of ten such incidents" by the end of 2007).   Still, it did not issue an ignition switch recall or otherwise notify consumers of the defects.

58.     In February 2009, Old GM initiated yet another PRTS regarding accidental ignition shut-off experienced by customers with, e.g., additional keys hanging from the ignition switch.  The key fob was changed from a slot to hole design, to be implemented for 2010 model year Cobalts only.  February 24, 2014 Notice at 2.

59.     On  May  15,  2009,  several  Old  GM  engineers  meet  with representatives of GM's supplier of the Cobalt's black boxes.   Old GM by that time had recovered 14 modules, "and according to [its supplier], the ignition was in the accessory position on [7] of the 14 cases."  Stout, Vlasic, Ivory and Ruiz, "General Motors Misled Grieving Families on a Lethal Flaw," *New York Times* (March 24, 2014) http://www.nytimes.com/2014/03/25/business/carmaker-misled-grieving-families-on-a-lethal-flaw.html?hpw&rref=business&_r=0   (last   visited March 25, 2014); *see also* February 24, 2014 Notice at 2.

60.     On June 12, 2009, Christopher Hamberg, was killed driving his 2007 Cobalt home in Houston.  On December 13, 2009, another crash in Charlottesville Virginia occurred, this time involving the Pontiac G5, in which the air bags failed to deploy.  *Id*.

61.     GM continued to receive complaints and investigate crashes in which the air bags failed to deploy.  It admitted that between 2005 and February, 2014, GM was "aware of 23 frontal-impact crashes involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the recall condition may have caused or contributed to the airbag's non-deployment . . . GM employees became aware of many of these crashes within a month of the dates on which they occurred . . . With

COMPLAINT FOR DAMAGES

1   respect to 22 of the 23 frontal-impact crashes . . . data retrieved from the vehicles'

2   [black box] indicated that the ignition switches were in the . . . 'accessory' position

3   in twelve of the crashes, and in the 'off' position in one of the crashes." February

4   24, 2014 Notice at 5. In addition, and "[t]hroughout this period, GM was involved

5   in claims and lawsuits in which allegations were made regarding the ignition switch

6   issue." *Id.*

7       62.    More crashes and fatalities occurred, including the 2010 Cobalt

8   crashes that killed Amy Kosilla and Jennifer Brooke Melton when, among other

9   things, the air bags failed to deploy.

10      63.    In July, 2011, "a meeting was held at GM involving Legal Staff, Field

11  Performance Assessment ('FPA') and Product Investigations personnel who would

12  be involved in the Field Performance Evaluation ('FPA') process. Soon thereafter,

13  in August 2011, a Field Performance Assessment Engineer ('FPAE') was assigned

14  to move forward with an FPE investigation of a group of crashes in which airbags

15  in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not

16  deployed during frontal impacts, which also included a review of information

17  related to the Ion, HHR and Solstice vehicles." March 11, 2014 Notice at 3.

18      64.    Contrary even to its own admitted design change approval in April

19  2006 (to increase the torque in the ignition switch), GM's 2014 communications

20  with NHTSA states that GM somehow did not learn until late April 2013 that "the

21  torque performance of a GM service part ignition switch purchased after 2010

22  differed substantially from that of an ignition switch that was original equipment

23  installed on a 2005 Cobalt" and that ignition switches in the "early-model Ion and

24  Cobalt vehicles did not meet GM's torque specifications." March 11, 2014 Notice

25  at 4.

26      65.    Moreover, a congressional report summarizing an investigation by the

27  House Energy and Commerce Committee indicates that "[e]xecutives with Delphi .

28  . . told investigators that . . . GM signed off on what's known as a Production Part

COMPLAINT FOR DAMAGES

Approval Process, or PPAP, document in February 2002 for the switch "even though sample testing of the ignition switch was below the original specifications set by GM." Spangler, Detroit Free Press, "Delphi told GM ignition switch didn't meet specs," *USAToday (March 30, 2014); see also* Cowen, Beech and Lienert, "Delphi told panel GM approved ignition switches below specifications," Reuters (March 30, 2014) ("General Motors Co approved [the] ignition switches . . . even though the parts did not appear to meet the company's specifications, officials of Delphi Automotive told U.S. congressional investigators." ); Thompson and Lienert, "Key GM crisis questions: Who approved switch revision and why recall took so long," Reuters (March 30, 2014) ("Delphi told U.S. congressional investigators last week that GM approved the original part in 2002, despite the fact it did not meet GM specifications, according to congressional aides on Sunday.").

66. Not until February, 2014 did GM finally issue a recall of some of the Defective Vehicles. The recall was initially announced on February 13, 2014 and later broadened on February 24, 2014 to include additional vehicles. On March 28, 2014, the recall was expanded to include even more vehicles, which together with the prior recall encompasses the all of the Defective Vehicles.

67. GM's CEO Mary Barra acknowledged in a video presentation on March 14, 2014 that "[s]omething went wrong with [GM's] process in this instance, and terrible things happened."

68. Through at minimum, documents at Old GM retained by New GM and the knowledge of officers, employees and agents continuing to work at New GM after its asset purchase in July 2009, GM from the moment it was created had knowledge of the defective condition of the vehicles at issue.

69. Up to and including the recall announcement on February 24, 2014, GM failed to reveal and concealed the nature and extent of the problem from owners of the Defective Vehicles. At no time prior to that date did Old GM or New

1    GM send notification to owners or prospective owners that the Defective Vehicles
2    are dangerous.

3        70.   In addition, and throughout the time it knew about the dangerous
4    defects in the Defective Vehicles, GM was falsely promoting their safety.  For
5    example:

6        (a)   In 2003, GM represented:  "Saturn ION sets itself apart from
7            competitors with innovative features, unique personalization
8            opportunities and surprising levels of safety . . . The ION sedan and
9            quad coupe are designed to carry on the Saturn tradition of being at the
10           top of the class when it comes to safety and security." Saturn
11           Overview,"SATURN ION GENERATES NEW CHARGE IN
12           SMALL-CAR SEGMENT" (2003)[1]

13       (b)   In 2004, GM stated:  "Like all Saturns, the Ion was designed with a
14           major emphasis on safety and security. The world-class structural
15           design provides the foundation, as the steel spaceframe helps absorb
16           the energy of a crash while protecting the integrity of the passenger
17           compartment . . . Dual-stage frontal air bags are standard . . . ."  GM
18           Media Archive, 2005 SATURN Product Information (Release date
19           Aug. 1, 2004)[2]

20       (c)   In 2004, GM announced that it was introducing Cobalt that year As
21           well as a "5/60 powertrain warranty," by which it said, "we're letting
22           or customers know that they can feel secure in the value and quality of

23
24
25   _____
     [1] http://archives.media.gm.com/division/2003_prodinfo/03_saturn/
26   03Ion/index.html (last visited March 26, 2014)

27   [2] http://archives.media.gm.com/division/2005_prodinfo/saturn/ion/index.html
     (last visited March 26, 2014)
28

the product." GM Communications "Chevrolet Announces Warranty On New Cobalt" (Release date 2004-10-26)[3]

(d)   In 2005, GM represented that it was "committed to keeping you and your family safe — from the start of your journey to your destination" and "[t]hat's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind."[4]

(e)   In 2006, GM stated: "The rigid body structure [of the Pontiac G5] that lays the foundation of G5's dynamic driving experience also reinforces its safety. In addition to the solid unibody structure, dual-stage air bags are standard . . . ."   GM Media Archive, Pontiac Overview, 2007 PONTIAC G5 (Release date Aug. 1, 2006)[5]

(f)   In 2007, GM represented that the Saturn Sky "has a host of safety features, including a supplemental restraint system (SRS) with dual-stage frontal air bags." GM Media Archive, 2007 Press Release[6]

g.   In 2008, still selling Cobalts, GM stated that "[a]lthough the Chevrolet Cobalt is no longer in production, used Cobalt models are readily available" and that "[r]easons for Cobalt's popularity included . . . a comprehensive standard safety package that included front air bags."[7]

---

[3] http://archives.media.gm.com/archive/documents/domain_13/docId_8986_pr.html (last visited March 26, 2014)

[4] http://web.archive.org/web/20050305041006/http://www.chevrolet.com/safety/ (last visited March 26, 2014)

[5] http://archives.media.gm.com/us/pontiac/en/product_services/r_cars/rcg5/07index.html (last visited March 26, 2014)

[6] http://archives.media.gm.com/us/saturn/en/product_services/r_cars/rcsky/07index.html#pr

[7] http://www.chevrolet.com/discontinued-vehicle/cobalt.html (last visited March 26, 2014)

COMPLAINT FOR DAMAGES

71.     As GM knows, vehicle safety is highly important to reasonable purchasers when making purchase decisions and when deciding whether to keep a vehicle already purchased.

72.     The proper operation and integrity of vehicle systems, including power and airbags, also is highly important to safety of drivers, their passengers, and other persons on the roadways.

**Statutory and Regulatory Requirements**

73.     When a vehicle manufacturer learns of a safety-related defect that could lead to injury or death, it is required to adhere to the requirements of Motor Vehicle Safety Act.  The purpose of that Act is "to reduce traffic accidents and deaths and injuries resulting from traffic accidents."  49 USC § 30101.

74.     49 USC § 30118(c) requires that a manufacturer notify NHTSA as well as owners, purchasers and dealers if it learns that a vehicle or equipment contains a defect related to motor vehicle safety or does not comply with a motor vehicle safety standard.  Section 30119 requires that such notification be given within a reasonable time after learning about a safety related defect or noncompliance. 49 U.S.C. §30119(c)(1)(2).

75.     A "defect" is "any defect in performance, construction, a component, or material of a motor vehicle or motor vehicle equipment. 49 USC §30102(a)(2).

76.     "Motor vehicle safety"  means "performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident." 49 USC §30102(a)(8).

77.     The Defective Vehicles meet the definition of vehicles or equipment with a defect related to motor vehicle safety, presenting an unreasonable risk of accidents, death or injury.

78.     Manufacturers must furnish a Defect and Noncompliance Information

COMPLAINT FOR DAMAGES

report to NHTSA not more than 5 working days after a defect in a vehicle or item of equipment is determined to be safety related or noncompliance with a motor vehicle safety standard is determined to exist. This notice must contain information regarding the nature of the defect, the affected vehicles, and the manufacturer's plan for remedying the issue. 49 CFR § 573.6(a)-(c) The manufacturer must provide notification to vehicle owners of a safety recall within a reasonable time of determining a defect relates to motor vehicle safety or a noncompliance exists (currently, no later than 60 days from the date it files the Defect and Noncompliance Information Report under part 573). See 49 CFR § 577.5(a); 49 CFR § 577.7(a).

79. The manufacturer must also within a reasonable time provide notice to dealers and distributors of a safety-related defect or noncompliance with a federal motor vehicle safety standard, clearly stating that the notice is a safety recall notice, identifying affected vehicles, with an advisory stating that the dealer or distributor cannot sell the affected vehicle until remedied. 49 CFR §577.13(a)-(b). Effective August 5, 2005, where the defect or noncompliance presents an immediate and substantial threat to motor vehicle safety, this notice must be transmitted to dealers and distributors within 3 business days (and not later than 5 business days) of transmitting the Defect and Noncompliance Information Report under 49 CFR 573.6. 49 CFR §577.7(c)(1)

80. Old GM and New GM violated one or more of these provisions by failing to issue a recall or notify owners and purchasers of the Defective Vehicles of a safety recall or even the defects.

## ALLEGATIONS RELATED TO EXEMPLARY/PUNITIVE DAMAGES

81. Plaintiff incorporates the allegations in paragraphs 1 through 79 above as though fully set forth herein.

82. GM's unlawful and unfair practices including deception, false promises, false pretense, misrepresentation, and/or the concealment, suppression, or

omission of material facts were outrageous because of Defendants' evil motive and/or conscious disregard and/or reckless indifference to the rights and/or safety of Plaintiff, Class members, and others.

83.   As a result of GM's conduct alleged herein, the jury should be permitted to return a verdict of punitive damages that will serve to punish GM and deter it and others from like conduct.

### INDIVIDUAL PLAINTIFF'S EXPERIENCE

84.   In or about August 2006, Plaintiff purchased a 2007 Saturn Ion from a Saturn dealership, Saturn of Cerritos, in Cerritos, California.  GM did not inform Plaintiff that the ignition switch in his vehicle was defective nor of the nature of the risks of the defect at the time of purchase nor anytime thereafter prior to the February 2014 recall.

85.   Plaintiff's vehicle has manifested the defect by spontaneously shutting off and/or going into accessory mode.

86.   Prior to the nationwide recall notice, GM still did not inform Plaintiff of the defect.

### CLASS ALLEGATIONS

87.   Plaintiff incorporates by reference all allegations above as though fully set forth in this paragraph.

88.   Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and the following Nationwide Class (excluding the state of Missouri) of similarly-situated persons:

> All current or former owners and lessees, excluding those who reside in Missouri or otherwise purchased or leased their vehicles in the state of Missouri, who purchased or leased a Saturn Ion (model years 2003-2007); Chevrolet Cobalt (model years 2005-2010); Pontiac G5 (model year

COMPLAINT FOR DAMAGES

2005-2010); Chevrolet HHR (model year 2006-2011); Pontiac Solstice (model year 2006-2010); Saturn Sky (model year 2007-2010) (singly or together, "Defective Vehicles"). ("Nationwide Class")

89. Plaintiff alleges a subclass that includes all current or former owners and lessees of a Defective Vehicle in California ("California Sub-Class").

90. Excluded from the class are the officers, directors, agents or employees of GM or any parent, subsidiary, or affiliate of GM; the judicial officers assigned to this litigation, as well as members of their staffs and immediate families. Also excluded from the class is any individual who has asserted a claim for personal injury as a result of purchasing a Defective Vehicle as to such injury.

91. The proposed class meets all requirements for class certification. The proposed Class satisfies the numerosity standards because the Class is believed to number well in excess of 2 million consumers throughout the country. As a result, joinder of all Class members in a single action is impracticable.

92. There are questions of fact and law common to the Class that predominate over any questions affecting only individual members. The questions of law and fact common to the Class include, without limitation, the following:

   (a) whether the ignition switch in the Defective Vehicles was/is defective;

   (b) whether, in connection with advertising or selling the Defective Vehicles, Defendants failed to disclose, suppressed, omitted and/or concealed risks;

   (c) whether in connection with marketing or selling the Defective Vehicles, Defendant falsely or fraudulently misrepresented in its advertisements, promotional materials or elsewhere, the safety of the Defective Vehicles;

   (d) whether in connection with marketing or selling the Defective Vehicles, Defendants engaged any method, act, use, practice,

- 23 -                                                    COMPLAINT FOR DAMAGES

advertisement or solicitation having the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression in regard to the safety of the Defective Vehicles;

(e)    whether, in connection with marketing or selling of the Defective Vehicles, Defendants made any assertions not in accord with the facts in regard to the safety of the Defective Vehicles;

(f)    whether, in connection with marketing or selling of the Defective Vehicles, Defendants omitted any material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading;

(g)    whether in connection with marketing or selling the Defective Vehicles, Defendants failed to disclose material facts either known to them or that, upon reasonable inquiry would be known to them;

(h)    whether Defendants failed to warn adequately of the defect and risks in the Defective Vehicles;

(i)    whether Defendants knew or could have known of the defect and risks in the Defective Vehicles;

(j)    whether Defendants continued to manufacture, market, distribute, and sell the Defective Vehicles notwithstanding its actual or constructive knowledge of their dangerous nature;

(k)    whether in connection with marketing or selling the Defective Vehicles, Defendants engaged any method, act, use or practice that operated to hide or keep material facts from consumers;

(l)    whether in connection with marketing or selling the Defective Vehicles, Defendants engaged in any method, act, use or practice likely to curtail or reduce the ability of consumers to take notice of material facts which were stated;

    COMPLAINT FOR DAMAGES

(m)     whether Defendants' conduct violated the law and/or was unconscionable;

(n)     whether Defendants' conduct offends any public policy as established by statutes or common law of this state, or is unethical, oppressive or unscrupulous and presents a risk of, or causes, substantial injury to consumers;

(o)     whether Defendants engaged in any method, use or practice which violates state or federal law intended to protect the public and presents a risk of, or causes substantial injury to consumer;

(p)     whether GM has successor liability for the acts of Old GM;

(q)     whether GM violated the TREAD Act;

(r)     whether GM violated the CLRA, UCL, Michigan Consumer Protection Act;

(s)     whether GM was negligent in its design, sale, or in failing to recall sooner the Defective vehicles.

93.     The questions set forth above, collectively and individually, predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.

94.     A class action is the appropriate method for the fair and efficient adjudication of this controversy. The presentation of separate actions by individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of class members to protect their interests.

95.     Plaintiff is an adequate representative of the class because he is a member of the class and his interests do not conflict with the interests of the members of the class that he seeks to represent. The interests of the members of the

    COMPLAINT FOR DAMAGES

1  class will be fairly and adequately protected by Plaintiff and his undersigned

2  counsel, who have extensive experience prosecuting complex class action litigation.

3      96.    On behalf of himself and the class, Plaintiff seeks compensatory

4  damages in an amount to be proven at trial.

5      97.    Maintenance of this action as a class action is a fair and efficient

6  method for the adjudication of this controversy. It would be impracticable and

7  undesirable for each member of the class who suffered harm to bring a separate

8  action. In addition, the maintenance of separate actions would place a substantial

9  and unnecessary burden on the courts and could result in inconsistent adjudications,

10  while a single class action can determine, with judicial economy, the rights of all

11  class members.

12      98.    Notice can be provided to class members by using techniques and

13  forms of notice customarily used in drug-related cases and complex class actions,

14  including by published and broadcast notice.

15

16  **TOLLING**

17      99.    Any applicable statute of limitations that might otherwise bar any

18  Class member's claims has been tolled by GM's knowing and active concealment

19  of the facts alleged above. Plaintiff and the members of the Class were ignorant of

20  vital information essential to the pursuit of their claims. Plaintiff and members of

21  the Class could not reasonably have discovered that their GM vehicles were

22  defective because GM did not provide relevant information about the defects to the

23  NHTSA or to vehicle owners/lessors, denied that there was a defect and concealed

24  the truth from the public until shortly before this action was filed.

25

26

27

28

    COMPLAINT FOR DAMAGES

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Violations of the Michigan Consumer Protection Act, Mich. Comp. L. Ann. § 445.901 et seq.) (Nationwide Class – Excluding the State of Missouri)

100.   Plaintiff Cox, on behalf of himself and the Nationwide Class, realleges as if fully set forth, each and every allegation set forth herein.

101.   GM and Plaintiff are persons under Mich. Comp. L. Ann. § 445.902(d).

102.   GM's business of selling and leasing vehicles, providing notice of automotive defects, selling replacement parts and warranties, and developing repair procedures falls within the definition of "trade or commerce" in Mich. Comp. L. Ann. § 445.902(g).

103.   GM committed unfair and deceptive acts as defined in Mich. Comp. L. Ann. § 445.903.

104.   Between July 10, 2009, and February 2014, GM knew about the ignition switch defect in Class Vehicles, but did not reveal that the Class Vehicles had defective ignition switches or that no appropriate repair procedure existed. Plaintiff and the Class were misled and deceived by GM's omission. The existence of the defect could not reasonably have been discovered by consumers until GM announced its recalls of the vehicles in February and March of 2014. GM thus violated Michigan's Consumer Protection Act by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. L. Ann. § 445.903 (s). .

105.   As a direct and proximate result of GM's unfair and deceptive acts, as alleged herein, Plaintiff Cox and Class members have suffered damages in that they spent more money on Class Vehicles and related purchases than they otherwise would have and are left with Class Vehicles that cannot be safely driven and which

COMPLAINT FOR DAMAGES

1   are of diminished value. Meanwhile, GM has generated more revenue connected

2   with Class Vehicles, including through the sale of warranties and replacement parts,

3   than it otherwise could have and charged inflated prices for warranties and parts,

4   unjustly enriching itself thereby.

5       106.   Plaintiff and Class members are entitled to actual damages or statutory

6   damages, to be further proven at trial, of $250 per person (whichever is higher),

7   equitable relief, attorney's fees and costs, declaratory relief, and a permanent

8   injunction enjoining GM from its unfair and deceptive practices.

## SECOND CAUSE OF ACTION

### (For Unlawful, Unfair, and Fraudulent Business Practices under Business and Professions Code § 17200 *et seq.*) (California Sub-Class)

13       107.   Plaintiff Cox, on behalf of himself and the California Subclass,

14   realleges as if fully set forth, each and every allegation set forth herein.

15       108.   GM's acts and practices, as alleged in this complaint, constitute

16   unlawful, unfair and/or fraudulent business practices, in violation of the Unfair

17   Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

18       109.   Between July 10, 2009, and February 2014, GM violated the Unfair

19   Competition Law by failing to disclose that the ignition switch on the Class

20   Vehicles is defective and poses a safety hazard, by continuing to profit from the

21   sale of warranties and replacement parts, and by failing to develop an appropriate

22   repair procedure.

23       110.   GM engaged in unlawful business practices by violating the TREAD

24   Act, 49 U.S.C. §§ 30101, *et. seq.*, and its implementing regulations. GM failed to

25   timely notify vehicle owners, purchasers, and dealers about the ignition switch

26   defect, in violation of 49 U.S.C. §§30118(c). GM also failed to notify the National

27   Highway Traffic Safety Administration (NHTSA) within 5 working days of

28   discovering the ignition switch defect, in violation of 49 CFR § 573.6.

COMPLAINT FOR DAMAGES

111. GM also engaged in unfair business practices by, among other things:

a) Engaging in conduct where the utility of that conduct is outweighed by the gravity of the consequences to Plaintiff and other members of the Class;

b) Engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and other members of the Class; and

c) Engaging in conduct that undermines or violates the stated policies underlying the TREAD Act, which seeks to reduce traffic accidents and deaths and injuries resulting from traffic accidents.

112. GM engaged in fraudulent business practices by engaging in conduct that was and is likely to deceive a reasonable consumer.

113. As a direct and proximate result of GM's unlawful, unfair, and fraudulent business practices as alleged herein, Plaintiff Cox and Class members have suffered injury in fact and lost money or property, in that they purchased Class Vehicles, warranties, and replacement parts they otherwise would not have, and are left with Class Vehicles that cannot be safely driven and which are of diminished value. Meanwhile, GM has generated more revenue connected with Class Vehicles, including through the sale of warranties and replacement parts, than it otherwise could have and charged inflated prices for warranties and parts, unjustly enriching itself thereby.

114. Plaintiff and Class members are entitled to equitable relief, including restitutionary disgorgement of all profits accruing to GM because of its unlawful, unfair, and fraudulent, and deceptive practices, attorney's fees and costs, declaratory relief, and a permanent injunction enjoining GM from its unlawful, unfair, fraudulent, and deceitful activity.

COMPLAINT FOR DAMAGES

**THIRD CAUSE OF ACTION**

**(For violation of Consumers Legal Remedies Act, Cal. Civ. Code**

**Sections 1750 et seq.) (California Sub-Class)**

115.   On behalf of himself and California Sub-Class members, Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

116.   Class Vehicles are "goods" under California Civil Code § 1761(a).

117.   GM  is a "person" under California Civil Code § 1761(c).

118.   Plaintiff  and  the  other  Class  members  are  "consumers"  under California Civil Code section 1761(d).

119.   The purchases and leases of Class Vehicles by Plaintiff and the other Class members are "transactions" under California Civil Code § 1761(e).

120.   In advertising and representing that the Defective Vehicles were safe and in good, operable conditions when in fact they are not; in failing to disclose at the time of sale, at the time of repair, or at any other time, that the ignition system is defective when in fact it is; and in concealing and failing to disclose that the ignition system has a defect that raises serious safety concerns and could potentially result in death and in failing to provide Defective Vehicles free from defect; GM is:

(a)   representing that goods and services have characteristics, uses, or benefits which they do not have;

(b)   advertising goods and services with intent not to sell them as advertised;

(c)   representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not; and

(d)   representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve.

121.   GM has made these representations or failed to disclose said material facts in connection with transactions intended to result or that have resulted in the sale and lease of Class Vehicles and ignition system parts to Plaintiff and the other

COMPLAINT FOR DAMAGES

1   Class members.   The proper functioning of the ignition are and were matters

2   material to the purchase or lease decisions of reasonable people, including Plaintiff

3   and Class members, because without limitation a loss of power due to the defect

4   while driving poses serious and potentially catastrophic consequences.

5   122.   Therefore, Plaintiff, on behalf of himself and all Class members seek

6   equitable relief, declaratory relief, attorneys' fees, costs of suit, and other relief as

7   appropriate.

8   ### THIRD CAUSE OF ACTION

9   ### (For Breach of Express Warranty)

10  ### (California Sub-Class)

11  123.   On behalf of himself and Sub-Class members, Plaintiff incorporates by

12  reference and realleges all paragraphs previously alleged herein.

13  124.   GM provided all purchasers of Class Vehicles with Express Warranties

14  described herein, which became part of the basis of the bargain.   The written

15  warranty for Plaintiff's vehicle stated that GM would "cover[] repairs to correct any

16  vehicle defect related to materials or workmanship occurring during the warranty

17  period." The express warranties for the Class are the same or substantially similar.

18  The defective ignition switch and such related component parts factory installed in

19  Class Vehicles are components originally manufactured or installed by GM.

20  Accordingly, GM's Express Warranties are express warranties under California

21  law.   The defective ignition switch in Class Vehicles is defective and fails under

22  normal use rendering the vehicle inoperable.

23  125.   The defective ignition switch in Class Vehicles is, and always has

24  been, defective and fails under normal use rendering the vehicle inoperable.   The

25  defect is related to the materials or workmanship of the Defendants or its agents.

26  The defect was present at the time of manufacture, sale, and thereafter.

27  126.   GM breached its Express Warranties when it concealed the true nature

28  of the defective ignition switch, charged for the repair of the defective ignition

- 31 -                          COMPLAINT FOR DAMAGES

1  switch, and refused to repair or replace, free of charge, the defective ignition switch

2  and any parts that failed because of such defect.  Plaintiff and Class members

3  notified GM of the breach within a reasonable time.

4      127.  Plaintiff and the Class members have been and continue to be damaged

5  by GM's breach of its Express Warranties.  Plaintiff and Class members were and

6  are damaged by GM's failure to comply with its express obligations under its

7  Express Warranties because Plaintiff and Class members have paid for repairs that

8  should have been covered by GM and GM has, to date, repaired Class Vehicles

9  with equally defective parts.  Furthermore, as a result of GM's breach of the

10  Express Warranties, Plaintiff and Class members have suffered damages in an

11  amount to be determined at trial.

12      128.  Therefore, Plaintiff and the other Class members are entitled to legal

13  and equitable relief against Hyundai, including damages, specific performance,

14  rescission, attorneys' fees, costs of suit, and other relief as appropriate.

15  **FOURTH CAUSE OF ACTION**

16  **(For violation of Song-Beverly Consumer Warranty Act California Civil**

17  **Code Sections 1790 et seq.) (California Sub-Class)**

18      129.  On behalf of himself and Sub-Class members, Plaintiff incorporates by

19  reference and realleges all paragraphs previously alleged herein.

20      130.  Class Vehicles are "consumer goods" under Civil Code § 1791(a).

21      131.  Plaintiff and the other Class members are "buyers" under Civil Code

22  § 1791(b).

23      132.  GM is a "manufacturer" of defective vehicles under Civil Code

24  § 1791(j).

25      133.  As described above, GM's Express Warranties are "express

26  warranties" under Civil Code § 1791.2.  The warranty for Plaintiff's vehicle stated

27  that GM would "cover[] repairs to correct any vehicle defect related to materials or

28  workmanship occurring during the warranty period." The express warranties for the

COMPLAINT FOR DAMAGES

1   Class are the same or substantially similar.

2       134.  The defective ignition switch in Class Vehicles is, and always has

3   been, defective and fails under normal use rendering the vehicle inoperable. The

4   defect is related to the materials or workmanship of the Defendants or its agents.

5   The defect was present at the time of manufacture, sale, and thereafter.

6       135.  GM breached its Express Warranties when it concealed the true nature

7   of the defective ignition switch, charged for the repair of the defective ignition

8   switch, and refused to repair or replace free of charge the defective ignition switch

9   and any parts that failed because of the defective ignition switch. Plaintiff and

10  Class members notified GM of the breach within a reasonable time.

11      136.  Plaintiff and the Class members have been and continue to be damaged

12  by GM's breach of its Express Warranties. Plaintiff and Class members were and

13  are damaged by GM's failure to comply with its express obligations under its

14  Express Warranties because Plaintiff and Class members have paid for repairs that

15  should have been covered by GM and GM has repaired Class Vehicles with equally

16  defective parts. Furthermore, as a result of GM's breach of the Express Warranties,

17  Plaintiff and Class members have suffered damages in an amount to be determined

18  at trial.

19      137.  Therefore, Plaintiff and the other Class members are entitled to legal

20  and equitable relief against GM, including damages, specific performance,

21  rescission, attorneys' fees, costs of suit, and other relief as appropriate.

22  **FIFTH CAUSE OF ACTION**

23  **(For violation of Song-Beverly Consumer Warranty Act California Civil**

24  **Code Sections 1790 et seq.) (California Sub-Class)**

25      138.  On behalf of himself and Sub-Class members, Plaintiff incorporates by

26  reference and realleges all paragraphs previously alleged herein.

27      139. Class Vehicles are "consumer goods" under Civil Code § 1791(a).

28      140.  Plaintiff and the other Class members are "buyers" under Civil Code

COMPLAINT FOR DAMAGES

1 § 1791(b).

2 141. GM is a "manufacturer" of defective vehicles under Civil Code
3 § 1791(j).

4 142. GM impliedly warranted to Plaintiffs and the other Class members that
5 the Defective Vehicles were "merchantable" within the meaning of Cal. Civ. Code
6 §§ 1791 §§ 1791.1(a) & 1791.2, however, the Defective Vehicles do not have the
7 quality that a buyer would reasonably expect.

8 143. Cal. Civ. Code § 1791.1(a) states: "Implied warranty of
9 merchantability" or "implied warranty that goods are merchantable" means that the
10 consumer goods meet each of the following:

11 (a) Pass without objection in the trade under the contract description.

12 (b) Are fit for the ordinary purposes for which such goods are used.

13 (c) Are adequately contained, packaged, and labeled.

14 (d) Conform to the promises or affirmation of fact made on the container
15 or label.

16 144. The Defective Vehicles would not pass without objection in the
17 automotive trade because they share a common design defect in that they are
18 equipped with defective ignition systems that can suddenly fail during normal
19 operation, leaving occupants of the Defective Vehicle vulnerable to crashes, serious
20 injury, and death. GM has admitted that the Defective Vehicles are defective in
21 issuing its recall.

22 145. Because of their defective ignition systems, the Defective Vehicles are
23 not safe to drive and thus not fit for ordinary purposes.

24 146. The Defective Vehicles are not adequately labeled because the labeling
25 fails to disclose the defects.

26 147. GM breached the implied warranty of merchantability by
27 manufacturing and selling Defective Vehicles that are defective. Furthermore, this
28 defect has caused Plaintiffs and the other Class members to not receive the benefit

COMPLAINT FOR DAMAGES

1  of the bargain.

2      148.  GM was provided notice of these issues through numerous complaints

3  filed against it, as well as internal knowledge derived from testing and internal

4  expert analysis.

5      149.  Plaintiff and the Class members have been and continue to be damaged

6  by GM's breach of its Express Warranties.  Plaintiff and Class members were and

7  are damaged by GM's failure to comply with its implied obligations because

8  Plaintiff and Class members have paid for repairs that should have been covered by

9  GM and GM has repaired Class Vehicles with equally defective parts.

10 Furthermore, as a result of GM's breach of the Express Warranties, Plaintiff and

11 Class members have suffered damages in an amount to be determined at trial.

12     150.  And as a direct and proximate result of GM's breach of the implied

13 warranty of merchantability, Plaintiffs and the other Class members received goods

14 whose dangerous condition substantially impairs their value to Plaintiffs and the

15 other Class Members.

16     151.  Plaintiffs and the other Class members have been damaged as a result

17 of the diminished value of Gm's products.

18     152.  Therefore, Plaintiff and the other Class members are entitled to legal

19 and equitable relief against GM, including damages, specific performance,

20 rescission, attorneys' fees, costs of suit, and other relief as appropriate.

21                          **PRAYER FOR RELIEF**

22     WHEREFORE, Plaintiff requests that this Court enter judgment against

23 Defendants and in favor of Plaintiff and award the following relief:

24     (a)    Certification of the proposed class(es);

25     (b)    Damages suffered by Plaintiff and the class including but not limited

26 to consequential, statutory, and all other damages permitted by law;

27     (c)    Attorneys' fees and those costs, including expert witness fees,

28 available under the law;

COMPLAINT FOR DAMAGES

1     (d)    Punitive and or exemplary/punitive damages in an amount sufficient to

2  punish Defendants and deter Defendants and others from like conduct in the future;

3     (e)    An injunction enjoining GM from continuing to engage in unlawful

4  business practices as alleged herein;

5     (f)    Pre-judgment and post-judgment interest;

6     (h)    For an order awarding such other and further relief as this Court may

7  deem just and proper.

## DEMAND FOR JURY TRIAL

9     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, on behalf of

10  himself and on behalf of the Class(es), demands a trial by jury on all issues so

11  triable.

12  Dated: April 7, 2014          STUEVE SIEGEL HANSON LLP

By: _____
Jason S. Hartley
Jason M. Lindner
**STUEVE SIEGEL HANSON LLP**
550 West C Street, Suite 1750
San Diego, CA 92101
Telephone: (619) 400-5822
Facsimile: (619) 400-5832

Patrick J. Stueve
Todd E. Hilton
Bradley T. Wilders
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101

Don M. Downing
**GRAY, RITTER & GRAHAM, P.C.**
701 Market Street, Suite 800
St. Louis, MO 63101
Telephone: (314) 241-5620
Facsimile: (314) 241-4140

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Beverly Reid O'Connell _____ and to

Magistrate Judge _____ Carla Woehrle _____ .

The case number on all documents filed with the Court should read as follows:

### 2:14-cv-02608-BRO(CWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the assigned Magistrate Judge has been designated to hear discovery-related motions. All discovery-related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____ April 7, 2014 _____          By  APEDRO _____
Date                                          Deputy Clerk

---

## ATTENTION

*A copy of this Notice must be served on all parties served with the Summons and Complaint (or, in cases removed from state court, on all parties served with the Notice of Removal) by the party who filed the Complaint (or Notice of Removal).*

---

CV-18 (04/14)                    NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | | |
|---|---|---|
| RONALD COX, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| *Plaintiff(s)* | ) ) | Civil Action No. |
| v. | ) ) | |
| GENERAL MOTORS, LLC; GENERAL MOTORS COMPANY, | ) ) ) ) | |
| *Defendant(s)* | ) ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Jason S. Hartley
> Stueve Siegel Hanson LLP
> 550 West C Street, Suite 1750
> San Diego, CA 92101

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: 4/7/2014

Signature of Clerk or Deputy Clerk

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

RONALD COX, individually and on behalf of all others similarly situated

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

GENERAL MOTORS, LLC; GENERAL MOTORS COMPANY

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)
Jason S. Hartley (CA Bar No. 192514)
Stueve Siegel Hanson LLP
550 West C Street, Suite 1750
San Diego, CA 92101 619-400-5822; hartley@stuevesiegel.com

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

---

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No ☐ **MONEY DEMANDED IN COMPLAINT:** $ 0.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violation of Michigan Consumer Protection Act, Mich. Comp. L. Ann. § 445.901 et seq; Unlawful, Unfair, and Fraudulent Business Practices under Business and Professions Code § 17200 et seq.) ; Breach of Express Warranty; violation of Song-Beverly Consumer Warranty Act

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☒ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

---

**FOR OFFICE USE ONLY:** Case Number: CV14-02608

CV-71 (09/13) | CIVIL COVER SHEET | Page 1 of 3

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes   ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| ☐ Yes   ☒ No | A PLAINTIFF? Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT? Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C:  Location of plaintiffs, defendants, and claims? | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

| **C.1.** Is either of the following true? If so, check the one that applies: | **C.2.** Is either of the following true? If so, check the one that applies: |
|---|---|
| ☐ 2 or more answers in Column C | ☐ 2 or more answers in Column D |
| ☐ only 1 answer in Column C and no answers in Column D | ☐ only 1 answer in Column D and no answers in Column C |
| Your case will initially be assigned to the **SOUTHERN DIVISION.** Enter "Southern" in response to Question D, below. | Your case will initially be assigned to the **EASTERN DIVISION.** Enter "Eastern" in response to Question D, below. |
| If none applies, answer question C2 to the right. ➡ | If none applies, go to the box below. ⬇ |

Your case will initially be assigned to the **WESTERN DIVISION.** Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____  DATE: April 6, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |