# Exhibit OO

Laurence D. King (SBN 206423)
Linda M. Fong (SBN 124232)
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
lking@kaplanfox.com
lfong@kaplanfox.com

Justin B. Farar (SBN 211556)
KAPLAN FOX & KILSHEIMER LLP
11111 Santa Monica Blvd., Suite 620
Los Angeles, CA 90025
Telephone: (310) 575-8604
Facsimile: (310) 575-8697
jfarar@kaplanfox.com

Jonathan A. Michaels (SBN 180455)
Kathryn J. Harvey (SBN 241029)
Kianna C. Parviz (SBN 293568)
MICHAELS LAW GROUP, APLC
2801 W. Coast Highway, Suite 370
Newport Beach, CA 92663
Telephone: (949) 581-6900
Facsimile: (949) 581-6908
jmichaels@michaelslawgroup.com
kharvey@michaelslawgroup.com
kparviz@michaelslawgroup.com

*Counsel for Plaintiff Kimi L. Hurst and the
Proposed Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| KIMI L. HURST, on behalf of herself and all others similarly situated, | CASE NO. 14-2619 |
| | CLASS ACTION |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| GENERAL MOTORS COMPANY, | |
| Defendant. | |

Plaintiff Kimi L. Hurst, on behalf of herself and all others similarly situated, brings this class action against Defendant General Motors Company ("Defendant" or "GM") and alleges, based upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, as follows:

## I.  **INTRODUCTION**

1.    Plaintiff brings this class action on behalf of all persons in the United States who currently own or lease one or more of the following GM vehicles: 2005-2010 Chevrolet Cobalt, 2007-2010 Pontiac G5, 2006-2010 Pontiac Solstice, 2006-2011 Chevrolet HHR, 2003-2007 Saturn Ion and 2007-2010 Saturn Sky (hereinafter "Defective Vehicles")[1] recently recalled because they contain a safety defect that can cause serious injury and even death.

2.    For a decade, GM has reassured consumers of the safety and reliability of its vehicles, while concealing a defect that caused its vehicles to have a sudden engine power loss, and disabled airbags.  GM has only recently acknowledged the products' defects in several recalls involving more than 2.19 million affected GM cars sold throughout the U.S.

3.    GM and government safety regulators reportedly failed to address this defect, which has been implicated in the deaths of over 300 people in crashes where the front air bags did not deploy.  Although GM linked the defect to 12 deaths and 31 crashes in some of the recalled models, a new review of federal crash data shows

---

[1]  On February 10, 2014, GM issued its first recall of the Defective Vehicles.  Since then, it has increased the scope of the recall twice to include other model years. According to the *New York Times*, the latest expansion on March 28, 2014, "added about 971,000 of the compact cars from later model years, including about 824,000 in the United States.  The wider recall was needed, G.M. said, to find about 90,000 defective ignition switches installed as replacement parts on the newer vehicles." http://www.nytimes.com/2014/03/30/business/total-of-gm-vehicle-recalls-in-2014-hits-4-8-million.html?hpw&rref=automobiles

CLASS ACTION COMPLAINT
CASE NO. 14-2619

1   that 303 people died after the air bags failed to deploy on two of the models that

2   were recalled.[2]

3       4.      The House Energy and Commerce Committee held a hearing on

4   April 1, 2014 to investigate GM's recall of the Defective Vehicles, probing GM and

5   others if "this tragedy could have been prevented and what can be done to ensure

6   the loss of life" doesn't happen again.  The House committee is investigating why

7   the recall happened just this year when indications of a problem – and hundreds of

8   consumer complaints – stretched back to 2001.[3]

9       5.      GM's CEO, Mary Barra has admitted that: "Something went wrong

10  with our process in this instance, and terrible things happened."

11      6.      This case arises from GM's breach of its obligations and duties,

12  including its failure to disclose that, as a result of a defective ignition switch design,

13  the recalled GM vehicles posed a risk of shutting down during normal driving

14  conditions and created an unreasonable uncertainty of accident, serious bodily

15  harm, and death.

16      7.      GM's predecessor, General Motors Corporation ("Old GM") also

17  violated these rules by designing and marketing vehicles with defective ignition

18  switches, and then by failing to disclose that defect even after it became aware that

19  the ignition switch defect was causing fatal accidents.  In addition to the liability

20  arising out of the statutory obligations assumed by GM, GM also has successor

21  liability for the deceptive and unfair acts and omissions of Old GM because GM

22  has continued the business enterprise of Old GM with full knowledge of the

23  ignition switch defects.

24

25

26   [2]  http://www.nytimes.com/2014/03/14/business/gm-air-bag-failures-linked-to-303-deaths.html?_r=0

27   [3]  http://www.usatoday.com/story/money/cars/2014/03/20/gm-barra-to-testify/6677913/

28

CLASS ACTION COMPLAINT
CASE NO. 14-2619

8. The defective ignition switches were manufactured by Delphi Automotive PLC ("Delphi"). Once a subsidiary of Old GM, Delphi spun-off from Old GM in 1999, and became an independent publicly held corporation.

9. Plaintiff alleges based on information and belief, that Delphi knew its ignition switches were defective, but nevertheless continued to manufacture and sell the defective ignition switch systems, which it knew would be used in the vehicles of Plaintiff and the Class.

10. Plaintiff believes that there are other GM vehicles which suffer from the same or substantially similar ignition switch defects as the Defective Vehicles. Accordingly, Plaintiff will supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switches, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment.

## II.    **JURISDICTION AND VENUE**

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) and the Class Action Fairness Act, in that (a) there is complete diversity. Plaintiff is a citizen of California and Defendant is domiciled in Michigan and otherwise maintains its principal place of business in Michigan); (b) the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs; and (c) there are 100 or more members of the proposed Plaintiff class.

12. This court has personal jurisdiction over Defendant because it conducts substantial business in California, including the sale and distribution of its products, and has sufficient contacts with California or otherwise intentionally avails itself of the laws and markets of California, so as to sustain this Court's jurisdiction over Defendant.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims

CLASS ACTION COMPLAINT
CASE NO. 14-2619

occurred in this judicial district.  In addition, Defendant does business and/or transacts business in this judicial district, and therefore, is subject to personal jurisdiction in this judicial district and resides here for venue purposes.

## III.    PARTIES

14.    Plaintiff Kimi L. Hurst is a resident and citizen of Santa Barbara, California.  Ms. Hurst owns a 2005 Chevy Cobalt, which she purchased used in 2007 at a dealership.  Ms. Hurst's Chevy Cobalt was manufactured, sold, distributed, advertised, marketed, and warranted by GM.  Ms. Hurst purchased her GM vehicle primarily for her personal, family, and household use.  Ms. Hurst has experienced several incidents consistent with the ignition defects at issue.

15.    Defendant General Motors Company ("GM"), a Delaware corporation, is headquartered in Detroit, Michigan.  Previously known as NGMCO, Inc., this company on July 10, 2009 acquired substantially all of the assets and assumed certain liabilities of Old GM through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code, and changed its name to General Motors Company.  At all relevant times, GM has been in the business of developing, producing and marketing cars and trucks worldwide. GM has a network of authorized retailers that sell GM vehicles and parts throughout California, including in this district.

## IV.    FACTUAL ALLEGATIONS

### A.    The Faulty Ignition Switch In The Defective Vehicles

16.    Despite the importance of a vehicle and its electrical operating systems remaining operational during ordinary driving conditions, GM failed to ensure that the vehicles it sold to consumers remained operational.

17.    In the Defective Vehicles, the ignition switch defects can cause the car's engine and electrical system to shut off, disabling the power steering and power brakes and causing the non-deployment of the vehicle's airbags in the event of a crash.

CLASS ACTION COMPLAINT
CASE NO. 14-2619

18.     The Defective Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

**B.     Although GM Knew Of The Ignition Switch Defects For Years, It Concealed The Defects From Plaintiff And The Class**

19.     Disturbingly, Old GM and GM both were aware of the ignition switch defects and their dangerous and deadly consequences for many years, but concealed their knowledge from Defective Vehicle owners.

20.     GM has admitted that it received reports as early as 2001 – three years earlier than previously disclosed – of a safety defect in its cars that the company has now linked to 12 deaths and at least 31 accidents over the past decade.  On March 12, 2014 the *New York Times* reported:

> In an expanded chronology of events filed with federal safety regulators about the recall of 1.6 million cars, the automaker said that during the development of the Saturn Ion in 2001 it had found that the ignition switch could turn off easily, but that a design change "had resolved the problem."
>
> Then, in 2003, an internal inquiry said that a service technician observed the car stall after the ignition had switched off while driving. After seeing that a heavy key ring had worn out the switch, the technician replaced it, the chronology said, and the inquiry was then closed.
>
> In its first version of the chronology, filed with the National Highway Traffic Safety Administration ["NHTSA"] on Feb. 24, G.M. said it had

learned in 2004 that if a driver bumped the ignition switch in a 2005 Chevrolet Cobalt, it could turn off, shutting the engine.

The new chronology also shows that G.M. in 2012 identified two nonfatal crashes involving Saturn Ions that may have been related to the ignition problem. These details were not disclosed in the previous filing. Instead G.M. cited a series of studies from that year that it said had failed to find a problem with the ignition switch.[4]

21.     The *New York Times* further reported: "In disclosing new details, the timeline also raises new questions. For example, G.M. says that in 2014 it performed additional analyses for the Saturn Ion, Chevrolet HHR, Pontiac Solstice and Plymouth Sky vehicles, which all shared the same ignition as the Saturn Ion and Chevrolet Cobalt. But it is unclear why it had not done such an analysis before."

22.     In 2004, Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue of the ignition key moving out of the "run" position when the driver made contact with the key or steering column. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

23.     According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

24.     By 2005, Old GM received new filed reports of Cobalts losing engine power, including repeated instances in which the key moved out of "run" position

---

[4]  http://www.nytimes.com/2014/03/13/business/gm-reveals-it-was-told-of-ignition-defect-in-01.html

when the driver contacted the key or steering columns. At a meeting on May 15, 2009, the company learned that data in the black boxes of Chevrolet Cobalts confirmed the existence of a potentially fatal defect in hundreds of thousands of cars. But in the months and years that followed, as a trove of internal documents and studies mounted, GM told the families of accident victims and other customers that it did not have enough evidence of any defect in their cars.[5]

25.     Old GM opened additional PRTS inquiries. During the course of a PRTS opened in May 2005, an Old GM engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration. Old GM initially approved the redesign but later withdrew its approval for the fix.[6]

26.     Instead, in December 2005, Old GM simply issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the loss of the car's electrical system.

27.     Rather than disclosing the true nature of the defects and correcting them, under the TSB, Old GM gave customers who complained about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key ring from moving up and down in the slot. The previous key ring was replaced with a smaller one that supposedly was able to keep the keys from hanging as low as they had in the past.[7] According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[8]

---

[5] http://www.nytimes.com/2014/03/25/business/carmaker-misled-grieving-families-on-a-lethal-flaw.html?_r=1 ["In one case, G.M. threatened to come after the family of an accident victim for reimbursement of legal fees if the family did not withdraw its lawsuit. In another instance, it dismissed a family with a terse, formulaic letter, saying there was no basis for claims."]

[6] Attachment B-573.6(c)(6) - Chronology submitted to the NHTSA with letter dated February 24, 2014, to Nancy Lewis from M. Carmen Benavides, Director, Product Investigations and Safety Regulations, GM Motors LLC.

[7] *Id.*

[8] *Id.*

CLASS ACTION COMPLAINT
CASE NO. 14-2619

28.     A year later, in 2006, Old GM added additional vehicle and model years to its original TSB.  Despite the approval by an Old GM engineer of a design change for the Cobalt's ignition switch a few months before then, the redesigned ignition switch was not produced until the 2007 model year.[9]  The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch."

29.     In 2007, during a meeting with NHTSA representatives to discuss another matter, investigators informed Old GM of a fatal crash in July 2005 involving airbags that failed to deploy.  The data retrieved from the car indicated that the car's power mode status was "accessory."  Old GM investigated and tracked similar incidents.  By the end of 2007, Old GM had notice of 10 frontal collisions in which the airbag did not deploy.[10]

30.     For the next six years, GM continued to get complaints and continued to investigate frontal crashes in which the airbags did not deploy.  However, according to GM, it was not until 2011 and 2012 that GM's examinations of switches from vehicles that had experienced crashes revealed significant design differences in the torque performance of ignition switches from the 2005 Cobalts and those from the 2010 model year, the last year of the Cobalt's production.  According to GM, it did not learn of the changes to the detent plunger approved by an Old GM engineer in 2006 until its "dialogue with the supplier" in late 2013.[11]

### C.     The Recalls Now Affect More than 2.19 Million Vehicles

31.     After numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, on January 31, 2014, GM finally announced a recall for some of the Defective Vehicles.

---

[9] *Id.*
[10] *Id.*
[11] *Id.* at 3-4.

CLASS ACTION COMPLAINT
CASE NO. 14-2619

32. Initially, GM ordered a recall of only the Chevrolet Cobalt and Pontiac GS for model years 2005-2007, covering 619,122 vehicles.

33. After further analysis, on February 24, 2014, GM expanded the recall to an additional 748,024 cars to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

34. GM provided dealers with notice of the recall on February 26, 2014 and March 4, 2014 and mailed letters to current owners on March 10 and March 11, 2014.

35. On March 28, 2014, GM again expanded the recall to include an additional 823,788 vehicles, bringing the current number of recalled Defective Vehicles to more than 2.19 million vehicles.

**D.** **GM Admits It Took "Too Long" To Recall The Defective Vehicles And Cost Was A Major Factor In Refusing To Implement A Fix A Decade Ago**

36. GM now faces an investigation by NHTSA, hearings in both the U. S. House and Senate, and a probe by the Department of Justice.

37. On April 1, 2014, GM's new CEO Mary Barra appeared before a House subcommittee. Documents submitted in advance of her appearance show that cost was a major consideration when GM declined a decade ago to implement fixes to an ignition switch used in small cars.[12]

38. Barra acknowledged that the company took too long to recall cars equipped with the switch. At a press conference after the House hearing, she said it "angers me that we had a situation that took more than a decade to correct."[13]

---

[12] http://abcnews.go.com/US/wireStory/congress-seeks-answers-delay-gm-recall-23146540
[13] *Id.*

**E.**     **Old GM Marketed And Sold The Defective Vehicles As Safe And Reliable**

39.     On information and belief, in marketing and advertising materials, Old GM consistently promoted the Defective Vehicles as safe and reliable.

40.     For example, in its 2004 corporate responsibility pledge, reported in the "Our Products, Vehicle Safety" section, Old GM stated:  "Helping drivers avoid crashes and making vehicles safer is a priority for GM."

41.     The following year, in or about 2005, Old GM continued its proclamation of dedication to consumers for the safety of its vehicles, acknowledging that its customers "expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash":

| Challenges | Objectives | Performance |
|---|---|---|
| Motor vehicle safety is a function of the design of the vehicle, the manner in which it is operated, and the environment in which it is driven. We know the fundamental cause of most collisions is a failure in driver behavior, and the most significant opportunities for reducing injuries call for improvements in driver behavior. | Our aim is to improve motor vehicle safety for customers, passengers and other motorists. **Our customers expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash.** We strive to exceed these expectations and to protect customers and their families while they are on the road. | GM is committed to continuously improving the crashworthiness and crash avoidance of its vehicles, and we support many programs aimed at encouraging safer motor vehicle use, specifically child passenger safety programs, distracted driving education efforts, and anti-drunk driving measures. |

Emphasis added.

42.     Similarly, in 2006 Old GM reminded consumers of its long history of paving "the way with vehicle safety innovations."

Your family's safety matters.  Whether it's a short errand around town, car-pooling, or a cross-country road trip, Chevrolet is committed to keeping you and your family safe – from the start of your journey to your destination.  That commitment begins long before you take your

family on the road, with Chevrolet and General Motors continuously
striving to improve the crashworthiness and crash avoidance of its
vehicles.

Since the early 1900s, GM has paved the way with vehicle safety
innovations.  And, in 1924, it unveiled the industry's first automotive
proving ground that remains the site of ongoing vehicle safety
development, enhancements and testing.  From conducting the first
vehicle rollover test to developing the first electric headlamp and using
shatterproof laminated glass throughout the vehicle to introducing the
first active front-seat head restraint system, GM has remained on the
cutting edge.  In addition, it has a long history of supporting child
passenger safety – from developing some of the first child-size
dummies used in crash testing to creating technology to help kids from
accidentally getting trapped in the trunk of a car.

That's why many Chevy vehicles built today come with a
comprehensive list of safety and security features to help keep you and
your family safe before, during and, thanks to OnStar, following a
collision.  See below to learn more.

F.    **Old GM Failed To Timely Notify NHTSA Of The Ignition Switch Defect**

43.    Pursuant to the Transportation Recall Enhancement, Accountability,
and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101–30170, and its
accompanying regulations, when an automobile manufacturer learns that a vehicle
has a safety defect, it must promptly disclose the defect.  If it is determined that the
vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and

1   dealers of the defect and must remedy the defect.  49 U.S.C. §§ 30118(b)(2)(A) &

2   (B).

3        44.    In addition, under 49 CFR § 573.6, GM had a duty to notify NHTSA

4   within 5 working days of discovering the ignition switch defect.

5        45.    Despite its knowledge of the safety defect years ago, GM chose to

6   conceal that information from consumers.  GM had a duty to timely notify vehicle

7   owners, purchasers and dealers about the ignition switch defect under 49 U.S.C.

8   § 30118(c) but it failed to do so.  GM also failed to notify NHTSA within 5 days of

9   discovering the safety condition.

10   **G.    GM Had A Duty To Disclose The Truth About The Defective
      Vehicles**

11

12        46.    As a result of Old GM's deceptive and misleading messages and

13   omissions about the Defective Vehicles, conveyed directly through its marketing

14   and advertising campaigns, Defendant has been able to boost vehicle sales and

15   maximize profits while knowing and concealing from consumers that the ignition

16   switches in the Defective Vehicles were defective.

17        47.    Old GM and GM were and remain under a duty to Plaintiff and the

18   putative class to disclose the truth about the ignition switches in the Defective

19   Vehicles.  Old GM, and GM were both in a superior position to know the truth

20   about their vehicles, and the true facts are not something that Plaintiff and the

21   putative class members, in the exercise of reasonable diligence, could have

22   discovered independently prior to purchasing or leasing one of the Defective

23   Vehicles.

24        48.    The TREAD Act protects consumers through NHTSA.  GM had a duty

25   to disclose to consumers its non-compliance under the TREAD Act and its failure

26   to promptly notify NHTSA, because it had exclusive knowledge about whether it

27   had complied with the statute; it actively concealed its non-compliance from the

28

CLASS ACTION COMPLAINT
CASE NO. 14-2619

public and from NHTSA; and it made representations about product safety while failing to disclose that it was violating the TREAD Act.

49.     The facts concealed and/or not disclosed to Plaintiff and the putative class are material facts that a reasonable person would have considered important in deciding whether or not to purchase or lease one of the Defective Vehicles.  Those facts include without limitation that the Defective Vehicles:  pose a "risk" under certain conditions; that the ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine; this "risk" increases if the driver's key ring is carrying added weight (such as more keys or the key fob) or the vehicle experiences rough road conditions or other jarring or impact related events; and if the ignition switch is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality.

50.     Defendant intentionally concealed and/or failed to disclose the motor vehicle safety defect for the purpose of inducing Plaintiff and putative class members to act thereon.

**H.     The Ignition Switch Defects Have Harmed Plaintiff And The Class**

51.     Plaintiff and the putative class members justifiably acted upon, or relied upon to their detriment, the concealed and/or non-disclosed material facts as evidenced by their purchase or lease of one or more of the Defective Vehicles. Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed, or they would not have purchased or leased the vehicle at all had they known the truth.

52.     As a direct and proximate cause of Defendant's misconduct, Plaintiff and the putative class members have suffered actual damages.  Defendant's conduct

has been and is malicious, wanton and/or reckless and/or shows a reckless indifference to the interests and rights of others.

53.     The ignition switch defects have caused damage to Plaintiff and the Class.

54.     A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect.

55.     A vehicle purchased, leased or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

56.     Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed.  Plaintiff and the Class overpaid for their Defective Vehicles, or they would not have purchased or leased the vehicle at all had they known the truth.

57.     Because of the concealed ignition switch defects, Plaintiff did not receive the benefit of the bargain.

58.     Plaintiff and the Class own unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition switch defects.

59.     GM admits to at least 12 deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles.  However, upon information and belief, the actual number may be much higher, and there may have been hundreds of deaths and injuries attributable to the ignitions switch defects.

60.     If Old GM or GM had timely disclosed the ignition switch defects as required by applicable law, all class members' vehicles would now be worth more.

CLASS ACTION COMPLAINT
CASE NO. 14-2619

## V.     SUCCESSOR LIABILITY

61.     GM expressly assumed certain obligations and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

62.     GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, including without limitation that it has admitted its knowledge of the ignition system defects from the date of its formation; it has continued in the business of designing, and marketing vehicles, including at least some of the same as Old GM; it retained the bulk of the employees of Old GM; it acquired, owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property; it acquired the contracts, books, and records of Old GM; and it acquired all goodwill and other intangible personal property of Old GM.

## VI.    TOLLING OF THE STATUTES OF LIMITATION

63.     All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein.  Plaintiff and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old GM and GM did not report information within their knowledge to federal authorities (NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this class action was filed.

64.     Indeed, Old GM instructed its service shops to provide Defective Vehicle owners with a new key ring if they complained about unintended shut down, rather than admit what Old GM knew – that the ignition switches were

dangerously defective and warranted replacement with a properly designed and built ignition system.

65.     Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiff, and the class the true character, quality, and nature of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

66.     Because of the active concealment by Old GM and GM, any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled.

## VII.   CLASS ALLEGATIONS

67.     Pursuant to Rules 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and all members of the following class (the "Class"):

> All persons in the United States who currently own or lease one or more of the following GM vehicles: 2005-2010 Chevrolet Cobalt, 2007-2010 Pontiac G5, 2006-2010 Pontiac Solstice, 2006-2011 Chevrolet HHR, 2003-2007 Saturn Ion and 2007-2010 Saturn Sky.

68.     This list will be supplemented to include other GM vehicles that have the defective ignition switches, which inadvertently turn off the engine and vehicle electrical systems during ordinary driving conditions.

69.     Included within the Class is a subclass of California residents who own or lease Defective Vehicles (the "California Subclass").

70.     Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff

assigned to this case, and all persons within the third degree of relationship to any such persons. Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Defective Vehicles.

71. Plaintiff is informed and believes that Old GM manufactured and sold to consumers at least 2.19 million of the Defective Vehicles nationwide and hundreds of thousands of Defective Vehicles in the State of California. Individual joinder of all Class or Subclass members is impracticable.

72. The Class expressly disclaims any recovery for physical injury resulting from the ignition switch defects. But the increased risk of injury from the ignition switch defects serves as an independent justification for the relief sought by Plaintiff and the Class.

73. The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

74. Questions of law and fact are common to the Class and the Subclass and predominate over questions affecting only individual members, including the following:

      a. Whether the Defective Vehicles are defective;

      b. When Old GM and GM discovered the defect;

      c. Whether Old GM and GM concealed the defect;

      d. Whether Old GM and GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches;

      e. Whether Old GM's and GM's unlawful, unfair and/or deceptive practices harmed Plaintiff and the members of the Class;

CLASS ACTION COMPLAINT
CASE NO. 14-2619

   f.  Whether GM violated California law, including the CLRA, Cal. Civ. Code §§ 1750, *et seq.*; and the UCL, Cal. Bus & Prof. Code §§ 17200, *et seq.,* and if so, what remedies are available for the California Subclass;

   g.  Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM; and

   h.  Whether Plaintiff and the members of the Class are entitled to damages, restitution, equitable and/or injunctive relief, and other relief deemed appropriate and the amount and nature of such relief.

  75. Plaintiff's claims are typical of the claims of the other Class members, and arise from the same course of conduct by GM and Old GM. The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

  76. Plaintiff will fairly and adequately represent and protect the interests of all absent Class members. Plaintiff has retained able counsel with extensive experience in class action litigation. The interests of Plaintiff are coincident with, and not antagonistic to, the interests of the other Class and California Subclass members.

  77. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

  78. Plaintiff and other members of the Class have suffered damages as a result of Defendant's unlawful and wrongful conduct. Absent a class action, Defendant will retain substantial funds received as a result of its wrongdoing, and such unlawful and improper conduct shall, in large measure, go unremedied. Absent a class action, the members of the Class will not be able to effectively litigate these claims and will suffer further losses, as Defendant will be allowed to continue such conduct with impunity and retain the proceeds of its ill-gotten gains.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because joinder of all Class members is impracticable.  Moreover, because the damages suffered by individual members of the Class are relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  The Class is readily definable, and the prosecution of this action as a class action will eliminate the possibility of repetitious litigation.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### CONSUMER LEGAL REMEDIES ACT
### (Violations of Cal. Civil Code §§ 1750, *et seq.*)

80.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

81.     The Consumers Legal Remedies Act, Civil Code §§ 1750 *et seq.* (hereinafter "CLRA") was designed and enacted to protect consumers from unfair and deceptive business practices.  To this end, the CLRA sets forth a list of unfair and deceptive acts and practices in Civil Code § 1770.

82.     The CLRA applies to Defendant's actions and conduct described herein because it extends to the sale of goods or services for personal, family or household use.

83.     At all relevant times, Plaintiff and members of the Class were "consumers" as that term is defined in Civil Code § 1761(d).

84.     The transactions from which this action arises include transactions involving the sale or lease of goods or services for personal, family or household purposes within the meaning of Civil Code § 1761.

85.     Defendant's practices in connection with the marketing and sale of the Defective Vehicles violate the CLRA in at least the following respects:

a.     In violation of § 1770(a)(5), Defendant knowingly misrepresented the characteristics and benefits of the Defective Vehicles;

b.     In violation of § 1770(a)(7) representing that the Defective Vehicles are of a particular standard, quality or grade, which they are not; and

c.     In violation of § 1770(a)(9), Defendant has knowingly advertised the Defective Vehicles with the intent not to sell the products as advertised.

86.     Defendant represents that the Defective Vehicles are safe and reliable. These representations are false and misleading in that the Defective Vehicles contain a defective ignition switch which poses a risk of the vehicle shutting down during normal driving conditions and creates an unreasonable uncertainty of accident, serious bodily harm, and death.  In addition, Defendant failed to disclose to consumers that if the switch was bumped or weighed down it could shut off the engine's power and disable air bags, increasing the risk of injury, serious bodily injury or even death.

87.     Defendant's acts and practices, undertaken in transactions intended to result and which did result in the purchase or lease of the Defective Vehicles by consumers, violate Civil Code § 1770 and caused harm to Plaintiff and Class and California Subclass members who would not have purchased and/or paid as much to purchase or lease the Defective Vehicles had they known the truth.  The acts and practices engaged in by Defendant that violate the CLRA include inducing Plaintiff and the Class and California Subclass to purchase (or pay more for) the Defective Vehicles than they would otherwise have paid had they known the truth.

88.     Plaintiff was injured by purchasing (or overpaying) for her Defective Vehicle.

89.     In accordance with Civil Code § 1780(a), Plaintiff and members of the Class and California Subclass seek injunctive and equitable relief for violations of

the CLRA. In addition, after mailing appropriate notice and demand in accordance with Civil Code §§ 1782(a) & (d), Plaintiff will subsequently amend this Class Action Complaint to also include a request for damages. Plaintiff and members of the Class and California Subclass request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief, including attorneys' fees and costs, as provided in Civil Code § 1780 and the Prayer for Relief.

**COUNT II**

**UNFAIR COMPETITION LAW**
**(Violations of Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

90. Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.

91. Defendant has engaged in unfair competition within the meaning of California Business & Professions Code §§ 17200, *et seq.* because Defendant's conduct is unlawful, misleading and unfair as herein alleged.

92. Defendant's business practices are unlawful because it violated the CLRA and the provisions of the TREAD Act as alleged herein. Old GM and Defendant's nondisclosure about safety considerations of the Defective Vehicles while selling and advertising the products were material.

93. The practices are misleading because they were likely to deceive consumers into believing that they were obtaining and/or leasing a vehicle that was safe and reliable.

94. Defendant failed to inform consumers that the vehicles contain a common design defect in that they are equipped with defective ignitions that can suddenly fail during normal operation, leaving passengers of the vehicles vulnerable to crashes, serious injuries and even death.

95.     Defendant's business practices, and each of them, are unfair because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers, which harm greatly outweighs any benefit associated with the business practice, in that consumers are led to believe that the product they were paying for had qualities that it did not. GM's CEO admits that her company took too long to recall the Defective Vehicles, and according to GM's internal documents, cost was a major consideration when GM declined a decade ago to implement fixes to the ignition switch used in the recalled cars.

96.     Plaintiff has standing to pursue this claim because she has been injured by virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged herein.  Plaintiff would not have purchased or paid as much for one of the Defective Vehicles had she known the truth.

97.     Plaintiff and the Class are entitled to relief, including full restitution and/or restitutionary disgorgement, to the greatest extent permitted by law, which may have been obtained by Defendant as a result of such business acts or practices, and enjoining Defendant to cease and desist from engaging in the practices described herein.

## COUNT III

### Violation of Magnuson-Moss Act
### (15 U.S.C. §§ 2301, *et seq.*)

98.     Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.

99.     Plaintiff and the Class are consumers as defined in 15 U.S.C. § 2301(3).

100.   Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301(4)(5).

101. The Defective Vehicles are consumer products as defined in 15 U.S.C. § 2301(6).

102. Pursuant to 15 U.S.C. § 2310(d)(1), a consumer who is damaged by the failure of a warrantor to comply with any obligation under a written warranty or implied warranty may bring suit for damages and other legal and equitable relief.

103. GM made express, implied and written warranties stating the Defective Vehicles would operate safely and reliably, and were free from material defects.

104. GM breached those warranties as alleged herein. The Defective Vehicles contain a common design defect – they are equipped with defective ignition switches that can suddenly fail during normal operation, leaving occupants at risk of crashes, serious injury and even death.

105. By reason of Defendant's breach of its implied warranties and express written warranties stating that the Defective Vehicles would operate safely and were free from material defects, Defendant has violated the statutory rights due the Plaintiff and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiff and the Class.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and in favor of Plaintiff and the Class, and grant the following relief:

A. For an Order certifying this case as a class action against Defendant and appointing Plaintiff as Representative of the Class;

B. For an Order of compensatory damages, statutory damages, restitution, and all other forms of monetary and non-monetary relief recoverable under the applicable law;

C. For costs of suit incurred herein;

- 23 -

1      D.      For prejudgment interest to the extent allowed by law;

2      E.      For penalties as allowed by law;

3      F.      For permanent injunctive relief to enjoin further violations of the law;

4   and

5      G.      For such other and further relief as this Court may deem just and

6   proper.

7                          **<u>JURY TRIAL DEMAND</u>**

8         Plaintiff requests a trial by jury on the legal claims, as set forth

9   herein.

10   DATED:  April 7, 2014              KAPLAN FOX & KILSHEIMER LLP

11                                       By:   _s/ *Laurence D. King*_
                                                Laurence D. King
12
                                          Laurence D. King
13                                        Linda M. Fong
                                          350 Sansome Street, Suite 400
14                                        San Francisco, CA  94104
                                          Telephone:  (415) 772-4700
15                                        Facsimile:   (415) 772-4707
                                          lking@kaplanfox.com
16                                        lfong@kaplanfox.com

17                                        Justin B. Farar
                                          KAPLAN FOX & KILSHEIMER LLP
18                                        11111 Santa Monica Blvd., Suite 620
                                          Los Angeles, CA 90025
19                                        Telephone:   (310) 575-8604
                                          Facsimile:    (310) 575-8697
20                                        jfarar@kaplanfox.com

21                                        Jonathan A. Michaels
                                          Kathryn J. Harvey
22                                        Kianna C. Parviz
                                          MICHAELS LAW GROUP, APLC
23                                        2801 W. Coast Highway, Suite 370
                                          Newport Beach, CA 92663
24                                        Telephone: (949) 581-6900
                                          Facsimile:  (949) 581-6908
25                                        jmichaels@michaelslawgroup.com
                                          kharvey@michaelslawgroup.com
26                                        kparviz@michaelslawgroup.com

27                                        *Counsel for Plaintiff Kimi L. Hurst and the*
                                          *Proposed Class*
28

CLASS ACTION COMPLAINT
                                                              CASE NO. 14-2619