# Exhibit PP

1   JOSEPH W. COTCHETT (SBN 36324)
2   jcotchett@cpmlegal.com
    FRANK M. PITRE (SBN 100077)
3   fpitre@cpmlegal.com
    PHILIP L. GREGORY (SBN 95217)
4   pgregory@cpmlegal.com
    ROBERT B. HUTCHINSON (SBN 45367)
5   rhutchinson@cpmlegal.com
6   ALEXANDRA A. HAMILTON (SBN 280834)
    ahamilton@cpmlegal.com
7
8   **COTCHETT, PITRE & McCARTHY, LLP**
    840 Malcolm Road
9   Burlingame, CA 94010
10  Tel: (650) 697-6000 / Fax: (650) 697-0577

11  *Attorneys for Plaintiffs*

12              **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14  **JAVIER F. MALAGA, an individual; and ESTELLA** | CASE NO. _____ SACV14-00533 JVS (RNBx) |
| 15  **ESTENCION, an individual; and on behalf of all others similarly situated,** | **CLASS ACTION COMPLAINT FOR:** |
| 16 | 1)  **BUS. & PROF. CODE § 17200** *et seq.* |
| 17              **Plaintiffs,** | 2)  **BUS. & PROF. CODE § 17500** *et seq.* |
| 18 | |
| 19       v. | 3)  **CIVIL CODE § 1750** *et seq.* |
| 20  **GENERAL MOTORS LLC, a corporation,** | 4)  **BREACH OF IMPLIED WARRANTY** |
| 21 | |
| 22              **Defendant.** | 5)  **BREACH OF EXPRESS WARRANTY** |
| 23 | 6)  **UNJUST ENRICHMENT** |
| 24 | |
| 25 | 7)  **FRAUDULENT CONCEALMENT** |
| 26 | |
| 27 | 8)  **NEGLIGENCE** |
| 28 | **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................ 1

II.   JURISDICTION AND VENUE ....................................... 4

III.  PARTIES.......................................................................... 5

    A.    PLAINTIFFS ........................................................... 5

    B.    DEFENDANT ........................................................... 7

IV.   CLASS ACTION ALLEGATIONS................................... 7

    A.    NUMEROSITY OF THE CLASS ............................ 8

    B.    EXISTENCE AND PREDOMINANCE OF COMMON
        QUESTIONS OF LAW AND FACT ....................... 8

    C.    TYPICALITY ........................................................... 9

    D.    ADEQUACY OF REPRESENTATION..................... 9

    E.    PROPER MAINTENANCE OF CLASS .................. 10

    F.    SUPERIORITY ....................................................... 10

V.    FACTUAL BASIS FOR THE CLAIMS ASSERTED........ 10

    A.    MODELS RECALLED ........................................... 10

    B.    GM'S IGNITION SWITCH DEFECT TIMELINE ..... 11

    C.    GM's LEGAL STAFF OPENS A FILE ON THE CRASH........ 13

    D.    GM's "COMMITMENT TO SAFETY" ..................... 20

    E.    OVERSIGHT AND INVESTIGATIONS SUBCOMMITTEE
        HEARING ON APRIL 1, 2014 ................................. 21

    F.    GM'S POSITION ON THE DEFECTIVE VEHICLES
        CHANGES OVER TIME........................................ 23

    G.    GM IN 2002 APPROVED AN IGNITION SWITCH KNOWING
        IT DID NOT MEET COMPANY SPECIFICATIONS ............... 32

1    H.    THE MODIFIED SWITCHES USED IN 2007-2011 VEHICLES

2          WERE ALSO APPROVED BY GM DESPITE NOT MEETING

3          COPANY SPECIFICATIONS ............................................................ 33

4    I.    GM VIOLATED THE TREAD ACT BY FAILING TO NOTIFY

5          THE NATIONAL HIGHWAY TRAFFIC SAFETY

6          ADMINISTRATION OF THE KNOWN DEFECTS ................... 35

7    VI.    SUCCESSOR LIABILITY ........................................................... 37

8    VII.    TOLLING OF THE STATUTE OF LIMITATIONS ................ 38

9    VIII.    CAUSES OF ACTION ................................................................. 39

10   FIRST CAUSE OF ACTION
11        (Unfair Competition Law: Bus. & Prof. Code § 17200 et seq.) .............. 39

12   SECOND CAUSE OF ACTION
13        (False Advertising Act: Bus. & Prof. Code § 17500 *et seq.*) ................... 42

14   THIRD CAUSE OF ACTION
15        (Consumer Legal Remedy Act: Civil Code § 1750, et seq.) ................... 45

16   FOURTH CAUSE OF ACTION
17        (Breach of Implied Warranty) ........................................................ 48

18   FIFTH CAUSE OF ACTION
19        (Breach of Express Warranty) ........................................................ 49

20   SIXTH CAUSE OF ACTION
21        (Unjust Enrichment) ...................................................................... 50

22   SEVENTH CAUSE OF ACTION
23        (Fraudulent Concealment) ............................................................. 51

24   EIGHTH CAUSE OF ACTION
25        (Negligence) .................................................................................. 52

26   IX.    PRAYER FOR RELIEF ............................................................... 52

27   X.    JURY DEMAND ........................................................................... 54

28

1       Plaintiffs Javier F. Malaga and Estella Estencion ("Plaintiffs"), individually

2   and on behalf of the Class described below, bring this action for damages and

3   injunctive relief pursuant to California's Unfair Business Practices Act, Cal. Bus.

4   & Prof. Code §§ 17200, *et seq.*; the False Advertising Law, Cal. Bus. & Prof. Code

5   §§ 17500, *et seq.*; California's Legal Remedy Act, Cal. Civil Code §§ 1750, *et*

6   *seq.*; and for violations of California common law against Defendant General

7   Motors LLC ("GM").  Plaintiffs complain and allege upon information and belief

8   based, *inter alia*, upon investigation conducted by Plaintiffs and Plaintiffs' counsel,

9   except as to those allegations pertaining to Plaintiffs personally, which are alleged

10  upon knowledge:

11  **I.**  **INTRODUCTION**

12      1.    In the last fifteen years, GM has designed, manufactured, promoted,

13  marketed, and sold defective vehicles that pose known and significant dangers to

14  unsuspecting drivers, passengers, motorists, and pedestrians.  GM allowed these

15  dangers to persist without taking adequate measures to eliminate the dangers or to

16  notify the government or public of the design defects.  By doing so, GM

17  jeopardized public safety and fostered a corporate culture of complete disregard to

18  the safety concerns of its customers.

19      2.    As far back as <u>2001</u>, GM learned that vehicles designed,

20  manufactured, promoted, and sold by GM contained defective ignition switches

21  (the "Defective Vehicles").  However, GM took no action to remedy, mitigate,

22  and/or minimize the danger inherent in this faulty system to motorists, passengers,

23  or pedestrians.  Instead of making an effort to repair these known defects, GM hid

24  this information.  These issues have been known to GM since <u>2001</u> and have

25  caused at least thirteen (13) deaths and thirty-one (31) crashes.  By ignoring safety

26  concerns, GM suppressed the dangers of defective ignition switches from the

27  public and the government and continued to design, manufacture, promote, and sell

28  vehicles with defective ignition switches.

**CLASS ACTION COMPLAINT**      1

3.     The ignition switch in the Defective Vehicles has several common switch points, including "RUN" or "ON," "OFF," and "ACC" or "accessory." When the ignition switch is in the "RUN" position, the vehicle's motor engine is running and the electrical systems have been activated.  When the ignition switch is in the "ACC" position, the motor is turned off but electrical power is activated, generally only supplying electricity to the vehicle's entertainment system.  When the ignition is in the "OFF" position, both the engine and electrical systems are turned off.  In most vehicles, a driver must intentionally turn the key in the ignition switch to move to each position.

4.     Because of the defects in the design, manufacture, and/or assembly, the ignition switches installed in the Defective Vehicles are loose and improperly positioned, making the switches susceptible to failure during normal and expected conditions.  Due to its defective design and improper position, the ignition switch can unexpectedly and suddenly move from the "ON" or "RUN" position to the "OFF" or "ACC" position (the "Ignition Switch Defect").  When this ignition switch failure occurs, the motor engine and certain electrical components, such as power-assisted steering, anti-lock brakes, and airbags, are abruptly turned off.

5.     The Ignition Switch Defect can occur at any time during normal and proper operation of the Defective Vehicles, making driving a game of Russian roulette.  The ignition can suddenly switch to "OFF" while the Defective Vehicle is moving at high speeds, such as 65 mph on the freeway, leaving the driver unable to control the vehicle, compromising the safety airbag system, and endangering the vehicle occupants, other motorists, and pedestrians.

6.     Although it knew of the Ignition Switch Defect, GM designed, manufactured, promoted, and sold over **2.6 million** Defective Vehicles, including the following models:

- 2005-2011 Chevrolet Cobalt;
- 2006-2011 Chevrolet HHR;

- 2006-2011 Pontiac Solstice;

- 2003-2007 Saturn Ion;

- 2007-2011 Saturn Sky; and

- 2005-2011 Pontiac G5.

7.    More egregious than the technical failures, however, was the fact that GM senior management kept those failures secret for years.  In 2013, a GM Senior Manager identified eighty (80) customer complaints that Chevrolet Cobalts had unexpectedly stopped or stalled since 2005.  Despite numerous customer complaints, GM disregarded, ignored, hid, and disparaged the safety risks that the Defective Vehicles presented to the unsuspecting public.  As a result of GM's actions, millions of lives were put at risk.

8.    On April 1, 2014, GM Chief Executive Officer Mary Barra testified before the House Oversight and Investigations Subcommittee and called GM's slow response to at least 13 deaths linked to faulty ignition switches "unacceptable." However, Ms. Barra was unable to give U.S. lawmakers any answers as to why GM continued to sell Defective Vehicles.

9.    During the April 2014 testimony, GM admitted that the cost to rectify the Ignition Switch Defect and to eliminate the significant risk created by the defect was a mere **$0.57 per Defective Vehicle**.  When questioned why GM did not spend the money to fix the Ignition Switch Defect, Ms. Barra stated that GM "had more of a cost culture" rather than a customer safety culture.

10.    In order to save 57 cents per Defective Vehicle, GM turned a blind eye to the defects.  GM waited nearly a decade to recall 2.6 million of the Defective Vehicles over the Ignition Switch Defect, knowing full well that a jarring of or too much weight on the ignition key could cause the switch to move from the "ON" to the "ACC" position, thereby cutting power to air bags, steering, and brakes.

11.    GM's disclosures and depositions leading to the recall suggest a cultural landscape during the prior decade where employees worked in silos, isolated from other departments and critical information. GM's Chief Executive Officer Mary Barra told Congress that people in one part of GM "didn't recognize information that would be valuable in another part of the company."

12.    GM's misconduct has endangered drivers, passengers, motorists, and pedestrians.  GM claims that "[s]afety will always be a priority at GM.  We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers."  GM violated this principle by jeopardizing the lives and safety of millions of Americans when it sold defective automobiles to consumers for many years.  The extent of the defects is still being discovered.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (d)(2) (the "Class Action Fairness Act") because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the proposed Class are citizens of a state different than that of Defendant.

14.    This Court has personal jurisdiction over Defendant and venue is proper because a substantial portion of the wrongdoing alleged in this Complaint took place in this State and Defendant is authorized to do business here and conducts business here.  Defendant has sufficient minimum contacts with this State, because Defendant intentionally availed itself of markets in this State by promoting, marketing, and selling of its products and services in this State, including the Defective Vehicles, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

**CLASS ACTION COMPLAINT**                                    4

15.     In particular, Defendant marketed, advertised, and sold automotive vehicles in this State.  The advertisements and other wrongful business practices at issue in this litigation were, at least in part, directed at this State, rendering the exercise of jurisdiction by this Court permissible.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because the injury was suffered in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

17.     This case should be assigned to the Central District of California since there are more GM dealerships, more Defective Vehicles, more GM owners and lessors, more consumers harmed, and more recall letters in California than any other state.  In addition, GM's headquarters for its Western Region is in Thousand Oaks, Ventura County, within the Central District of California.  The vast majority of the sales and inventory of GM in the United States go through the Southern California regional headquarters, which directs wholesale sales, service, and parts teams working with dealers in Washington, Oregon, California, Arizona, New Mexico, Nevada, Utah, Colorado, Wyoming, Montana, Idaho, Alaska, and Hawaii.  Venue in the Central District of California is therefore the most appropriate venue for this case.  This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

III.   **PARTIES**

A.     **PLAINTIFFS**

18.     Plaintiff **JAVIER F. MALAGA** (hereinafter "Plaintiff") is a citizen and resident of the State of California residing in Playa Del Rey, California.  In 2005, Plaintiff purchased a 2006 Chevrolet Cobalt, one of the cars identified by GM as a Defective Vehicle.  As a result of the wrongful and deceptive actions and business practices of GM, Plaintiff bought a dangerous vehicle that was not of the

1   quality that was advertised. As a result, Plaintiff not only overspent on a lower

2   quality product, but also acquired a vehicle that posed an undisclosed risk to the

3   health and safety of Plaintiff. One of GM's main selling points has been the

4   efficiency, cost effectiveness, and safety of its vehicles. Plaintiffs' purchase was

5   based, in significant part, on these representations and assertions by GM. GM

6   failed to disclose that most of its models over the last few years have contained

7   defective ignition switches that pose a serious risk of injury and death to the driver

8   and occupants, as well as other motorists and pedestrians on the road. If GM had

9   disclosed the nature and extent of its problems, Plaintiff would not have purchased

10   a vehicle from GM, or would not have purchased that the vehicle for the price paid.

11       19.    Plaintiff **ESTELLA ESTENCION** resides in Castroville, CA.

12       20.    Ms. Estencion was the victim of an auto accident while driving the

13   2006 Chevrolet Cobalt. The family friend was proceeding along N. Davis Road in

14   Salinas, CA, when he lost control of the 2006 Chevrolet Cobalt resulting in a

15   collision. During the course of the collision, the steering column of the 2006

16   Chevrolet Cobalt locked and the air bags did not deploy upon colliding with a rock

17   formation alongside the road. The 2006 Chevrolet Cobalt was seriously damaged

18   and had to be transported by tow truck to a tow yard.

19       21.    Plaintiff Estencion not only overspent on a lower quality product, but

20   also acquired a vehicle that posed an undisclosed risk to the health and safety of

21   Plaintiff. One of GM's main selling points has been the efficiency, cost

22   effectiveness, and safety of its vehicles. Plaintiff's purchase was based, in

23   significant part, on these representations and assertions by GM. GM failed to

24   disclose that most of its models over the last few years have contained defective

25   ignition switches that pose a serious risk of injury and death to the driver and

26   occupants, as well as other motorists and pedestrians on the road. If GM had

27   disclosed the nature and extent of its problems, Plaintiff would not have purchased

28   a vehicle from GM, or would not have purchased the vehicle for the price paid.

**CLASS ACTION COMPLAINT**          6

### B. **DEFENDANT**

22.   Defendant **GENERAL MOTORS LLC** ("GM") is a limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009.  In July 10, 2009, GM acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("GM Corporation") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

23.   Because GM acquired and operated GM Corporation and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of GM Corporation, as alleged in this Complaint.

### IV.   **CLASS ACTION ALLEGATIONS**

24.   This action is brought by Plaintiffs, individually and on behalf of all others similarly situated, pursuant to California's Unfair Competition Law and False Advertising Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.,* and 17500, *et seq.,* and for violations of California common law.  Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, on behalf of Plaintiffs and others similarly situated.  The Class is defined as followed:

> **All persons in the United States who currently own or lease one or more of the following GM vehicles: (a) 2005-2011 Chevrolet Cobalt; (b) 2006-2011 Chevrolet HHR; (c) 2006-2011 Pontiac Solstice; (d) 2003-2010 Saturn Ion; (e) 2007-2011 Saturn Sky; or (f) 2005-2011 Pontiac G5.  To the extent warranted, this list will be supplemented to include other GM vehicles that have the defective ignition switches.  Excluded from the Class are Defendant herein and its legal representatives, parents, affiliates,**

heirs, successors, assigns, and any other person who engaged in the improper conduct described herein (the "Excluded Persons").

25.   Plaintiffs seek to recover damages for Plaintiffs and the Class under the Unfair Business Practices Act, Business & Professions Code §§ 17200, *et seq.;* False Advertising Law, Business & Professions Code §§ 17500, *et seq.*, Civil Code §§ 1750, *et seq.* and for violations of California common law. Plaintiffs also seek an injunction prohibiting Defendant from continuing to engage in the practices described herein.

## A.   NUMEROSITY OF THE CLASS

26.   The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time, Plaintiffs are informed and believe that the number of individuals who have purchased Defective Vehicles in the last ten years in the United States alone is over two million (2,000,000) people.

## B.   EXISTENCE AND PREDOMINANCE OF COMMON QUESTIONS OF LAW AND FACT

27.   Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common questions include:

a.   Whether GM engaged in a deceptive and unlawful advertising and marketing campaign by concealing serious defects in its vehicles;

b.   Whether and to the extent GM breached its express warranties relating to the safety and quality of its vehicles;

c.   Whether and to the extent GM breached any implied warranties relating to the safety and quality of its vehicles;

d.   Whether and to the extent GM engaged in unfair, false, misleading, or deceptive acts or practices regarding its marketing and sale of its vehicles;

e.  Whether the conduct complained of herein constitutes deceptive and misleading advertising in violation of Business & Professions Code section 17200, *et seq.*;

f.  Whether the conduct complained of herein constitutes an unfair, illegal, and/or fraudulent business practice, in violation of Business & Professions Code section 17500, *et seq.*;

g.  Whether GM has been unjustly enriched as a result of the conduct complained of herein;

h.  Whether GM's conduct complained of herein is intentional and knowing; and

i.  Whether Plaintiffs and members of the Class are entitled to damages, restitution, disgorgement of profits, declaratory relief, punitive damages, and/or injunctive relief, as a result of GM's conduct complained of herein.

**C.  TYPICALITY**

28.  Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs and other Class members received the same standardized misrepresentations, warranties, and nondisclosures about the safety and quality of GM's vehicles.  GM's misrepresentations were made pursuant to a standardized policy and procedure implemented by GM.  Plaintiffs are members of the Class that Plaintiffs seek to represent and have suffered harm due to the unfair, deceptive, unreasonable, and unlawful practices of GM.

**D.  ADEQUACY OF REPRESENTATION**

29.  Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class that Plaintiffs seek to represent.  Plaintiffs are represented by experienced and able attorneys, who intend to prosecute this action vigorously for the benefit

1  of Plaintiffs and all Class members.  Plaintiffs and Plaintiffs' counsel will fairly

2  and adequately protect the interests of the Class members.

3  **E.   PROPER MAINTENANCE OF CLASS**

4       30.   Defendant has acted or refused to act, with respect to some or all

5  issues presented in this Complaint, on grounds generally applicable to the Class,

6  thereby making it appropriate to provide relief with respect to the Class as a

7  whole.

8  **F.   SUPERIORITY**

9       31.   A class action is the best available method for the efficient

10  adjudication of this litigation because individual litigation of Class members'

11  claims would be impracticable and unduly burdensome to the courts, and have the

12  potential to result in inconsistent or contradictory judgments.  There are no

13  unusual difficulties likely to be encountered in the management of this litigation

14  as a class action.  A class action presents fewer management problems and

15  provides the benefits of single adjudication, economies of scale, and

16  comprehensive supervision by a single court.

17  **V.   FACTUAL BASIS FOR THE CLAIMS ASSERTED**

18       32.   Ignoring known defects, GM suppressed the dangers of defective

19  ignition switches from the public and the government and continued to design,

20  manufacture, promote, and sell the Defective Vehicles, risking public safety to

21  increase corporate profits.

22  **A.   MODELS RECALLED**

23       33.   The ignition-switch recall covers more than 2.5 million cars.  At this

24  time, GM has issued recalls for the following models:

25  **February 13, 2014 and February 25, 2014:**

26       • 2005 – 2007 Chevrolet Cobalt;

27       • 2005 – 2007 Pontiac G5;

28       • 2003 – 2007 Saturn Ion;

- 2006 – 2007 Chevrolet HHR;
- 2006 – 2007 Pontiac Soltice; and
- 2007 Saturn Sky.

**March 28, 2014:**

- 2008 - 2011 Pontiac Solstice;
- 2008 - 2011 Pontiac G5;
- 2008 - 2011 Saturn Sky;
- 2008 - 2011 Chevrolet Cobalt; and
- 2008 - 2011 Chevrolet HHR.

**B.    GM'S IGNITION SWITCH DEFECT TIMELINE**

34.    Since 2001, GM has known that the vehicles it designed, manufactured, promoted, marketed, and sold contained the Ignition Switch Defect.  For over thirteen years, GM dismissed, ignored, concealed, and disparaged these defects, selling over 2.6 million Defective Vehicles containing the Ignition Switch Defect.

35.    **2001**: GM determined a defect exists on the key system during pre-production testing of the Saturn Ion.  A pre-production report for the 2003 Saturn Ion identified "two causes of failure" with the ignition switch: "[l]ow contact force and low detent plunger force."

36.    **2002**:  In February 2002, Delphi Automotive Systems, GM's supplier, informed GM in a Production Part Approval Process document that the ignition switch did not meet GM's specifications despite the warning.  GM still approved the ignition switch design.

37.    **2003**:  A service technician reported to GM that a Saturn Ion stalled while driving, and that the weight of the owner's keys had worn down the ignition switch.

38.    **2004:**  During the time of the release of the 2005 Chevrolet Cobalt, GM learned of an incident in which a 2005 Chevrolet Cobalt lost engine power

because the key moved out of the "RUN" position when the driver inadvertently contacted the key or steering column.

39.    GM employees were able to replicate the issue during test drives.  An engineering inquiry, known within GM as a Problem Resolution Tracking System (PRTS), was opened to investigate the complaint that the "vehicle can be keyed off with knee while driving."  Engineers believed that the low key cylinder torque effort was an issue and considered a number of potential solutions.  After GM considered the time required, cost, and effectiveness of each of these solutions, the PRTS was closed with **no action**.

40.    **2005:**  GM engineers met to consider making changes to the ignition switch after receiving new field reports of Chevrolet Cobalts losing engine power.  The proposal was initially approved but was later cancelled.  In dismissing the proposed changes, a GM ignition switch engineer stated that the switch is "very fragile and doing any further changes will lead to mechanical and/or electrical problems."  The approved proposal was canceled because "lead-time for all solutions is too long," "tooling cost and piece price are too high," and "[n]one of the solutions seems to fully countermeasure the possibility of the key being turned (ignition turned off) during driving."

41.    After another complaint of the vehicle turning off while driving, a GM engineer advised the Company to redesign its key head, but the proposal was ultimately rejected.  GM posted a $1.1 billion first quarter loss, blaming it on union overhead and high gas prices harming SUV sales.

42.    In July 29, 2005, Amber Marie Rose, 16, died in a frontal crash in her 2005 Chevrolet Cobalt in Maryland.  Contractors hired by the National Highway Traffic Safety Administration ("NHTSA") found that the Chevrolet Cobalt's ignition had moved out of the "RUN" position and into the "ACC" position, which cut off power to power steering the air bags.

## C.  **GM's LEGAL STAFF OPENS A FILE ON THE CRASH**

43.    In <u>December 2005,</u> GM issued an Information Service Bulletin entitled "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs," which applied to 2005-06 Chevrolet Cobalts, 2006 Chevrolet HHR, 2005-06 Pontiac Pursuits (Canada only), 2006 Pontiac Solstice, and 2003-06 Saturn Ions which all had the same ignition switch.  The Service Bulletin informed dealers that "there is a potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort"; and "the customer should be advised of this potential and should take steps to prevent it, such as removing unessential items from their key chain."

44.    **2006:**  On <u>April 26, 2006,</u> the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi.  <u>The approved changes included, among</u>  <u>other things the use of a new detent plunger and spring that increased torque force in the ignition switch.  The new design was implemented into cars from the 2007 model and later.</u>



Exemplar Chevrolet Cobalt Switch Detent Plungers

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

45.    On October 24, 2006, seventeen-year-old Wisconsin resident Megan Phillips was driving her 2005 Chevrolet Cobalt with two passengers, eighteen-year-old Natasha Weigel and fifteen-year-old Amy Rademaker.  According to a police report, the Cobalt left the road and struck a telephone junction box and two trees while traveling 48 miles per hour.  The police report stated that shortly after the vehicle left the roadway and before the collision, the ignition switch was turned from the "RUN" position to the "ACC" position.  Ms. Phillips and her two passengers were not wearing seat belts. A subsequent investigation by the Wisconsin State Police found the air bags did not deploy.  As a result of the collision, the two passengers were tragically killed while Ms. Phillips, now twenty-four years old, was critically injured and suffered permanent and severe brain damage.

46.    In October 2006, GM updated its December 2005 Service Bulletin to include additional models and years, including the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, and 2007 Pontiac Solstice.  GM also provided key inserts to approximately 475 customers who brought their vehicle in to the dealer for service.

47.    **2007**:  On March 29, 2007, GM employees met with NHTSA representatives in Washington, D.C. to discuss occupant restraint systems.  During the meeting, NHTSA informed GM employees of the 2005 fatal crash of Amber Marie Rose.  GM investigative engineers began tracking frontal impact crashes that involved Chevrolet Cobalts and airbags that did not deploy to identify similar characteristics in the crashes.  By the end of 2007, GM found ten (10) such incidents, sensing and diagnostic module (SDM) data was available for nine (9) of the ten (10) crashes, and that data showed that the ignition was in the "RUN" position in five (5) of the crashes and in the "ACC" position in four (4) of the crashes.

48.    A 2007 report by Indiana University of the October 2005 crash revealed that contact with the ignition switch could result in "engine shut down and loss of power"

49.    **2009:**  In February 2009, another PRTS was opened and resulted in the top of the key being changed from a "slot" design to "hole" design to reduce downward force.  The new key design was implemented in 2010 Chevrolet Cobalt models – the last year the Cobalt was sold.



GM's original key could accommodate multiple rings.



GM's redesigned key could hold just one ring.

50.    In April 2009, a 2005 Chevrolet Cobalt crashed in Pennsylvania, killing the Cobalt driver and front-seat passenger where the airbags failed to deploy.  The report from the investigation stated that the ignition was in the "accessory" position.

51.    On June 12, 2009, 18-year-old Christopher Hamberg was killed — not quite a month after the critical May 15 meeting of GM engineers about the

1   ignition data.  Driving his 2007 Chevrolet Cobalt home before dawn in Houston,

2   he lost control at 45 miles per hour and hit a curb, then a tree, according to the

3   police report.

4       52.    On <u>Dec. 13, 2009</u>, twenty-year-old Benjamin Hair crashed into a tree

5   in Charlottesville, Va., while driving home in a Pontiac G5.  As of that date, GM

6   records indicate GM had conducted five (5) internal studies about the ignition

7   problem.  Though Mr. Hair used his seatbelt, he died after the vehicle's air bags

8   failed to deploy.  "The police couldn't tell us what caused the accident," said

9   Brenda Hair, his mother.  The Hairs contacted GM, providing accident reports but

10  no vehicle data, because the car's black box had been destroyed.  "They came

11  back and said they'd presented it to their board of engineers, and they couldn't say

12  it was related" to a defect, Ms. Hair said.

13      53.    **2010**:  In <u>January 2010</u>, twenty-one-year-old Kelly Erin Ruddy burned

14  to death in a car crash.  Her mother, Mary Ruddy, said Kelly knew something was

15  wrong with her 2005 Chevy Cobalt.  Three months after the crash, the car was

16  recalled for a power steering problem. Mrs. Ruddy said GM "dismissed us."

17      54.    In <u>February 2010</u>, NHTSA again recommended a probe into problems

18  with air bags in Chevrolet Cobalts, and the Office of Defects Investigation again

19  decided that there is no correlation and dropped the matter.

20      55.    In <u>March 2010</u>, Jennifer Brooke Melton of Georgia took her

21  Chevrolet Cobalt in for service because the engine shut off while she was driving.

22  Four days later, she died in a collision.

23      56.    During depositions in their suit last year, the Meltons learned from

24  GM engineers that the Company had been aware of potential problems with its

25  ignition systems before Brooke purchased her car in <u>2005</u>.  The Meltons' lawyers

26  also found evidence that GM had altered the design of ignition switches after

27  Brooke purchased her Cobalt, but had done so <u>without</u> either notifying federal

28  regulators or car owners or changing the part number.  The change, which

1   apparently occurred in <u>2006</u>, increased the size of the detent plunger and spring, a
2   pair of parts that hold the ignition key in position – a change that an engineer hired
3   by the lawyers said seemed intended to increase the "torque force" holding the
4   key in place.

5       57.   When deposed by Melton's attorneys, GM engineer Ray DeGiorgio
6   testified that he was lead engineer for the ignition switch.  When asked if he had
7   signed off on the change in the part, which was supplied by Delphi Mechatronics,
8   Mr. DeGiorgio said he did <u>not</u> recall authorizing such a change.  Yet according to
9   a document obtained by NBC News, Mr. DeGiorgio signed off on a change to the
10   ignition switches supplied by Delphi Mechatronics on <u>April 26, 2006</u>.  The reason
11   given for the change on the document was "to increase torque force in the switch."

12       58.   In <u>March 2010</u>, Amy Kosilla died in an accident after the air bags in
13   her Chevrolet Cobalt failed to deploy.  "We sent the paperwork for the car to them
14   and they said there's nothing to this," said Neil Kosilla. "They said we had
15   nothing."

16       59.   **2011:**  GM launched a new investigation into 2005 – 2007 Chevrolet
17   Cobalts and the 2007 Pontiac G5 to determine why the air bags did not deploy in
18   crashes.  According to GM, the results of the investigation were inconclusive.

19       60.   In one of those cases, the company settled a lawsuit brought by the
20   family of twenty-five-year-old Hasaya Chansuthus, who crashed her 2006
21   Chevrolet Cobalt in Murfreesboro, Tennessee.  After first resisting, the Company
22   negotiated a deal even though Ms. Chansuthus's blood-alcohol level was more
23   than twice the legal limit.  Data from the black box — which records vehicle
24   systems information — showed that the key was in the accessory or off position,
25   according to court documents, and the air bags did <u>not</u> deploy.

26       61.   **2012:**  GM began to widen its investigation.  However, once again
27   GM closed the investigation without reaching a conclusion.

28

62.   Also in <u>2012</u>, GM identified four (4) crashes and four (4) corresponding fatalities (all involving 2004 Saturn Ions) along with six (6) other injuries from four (4) other crashes attributable to the Ignition Switch Defect.

63.   **<u>2013</u>:**  Mary Barra is named as the new CEO of General Motors.

64.   In <u>June 2013</u>, a deposition by a Chevrolet Cobalt program engineer says the Company made a "business decision not to fix this problem," raising questions of whether GM consciously decided to launch the Cobalt despite knowing of the Ignition Switch Defect.

65.   In the fall of <u>2013</u>, months after an eighth internal study on the Ignition Switch Defect had been issued, GM moved to cut off the flow of damaging depositions related to one accident by settling the Melton wrongful-death suit.

66.   When Lance Cooper, a lawyer for the Melton family, deposed Victor Hakim, a senior manager at GM, Mr. Cooper read more than 80 customer complaints into the official record that were filed with GM beginning in <u>2005</u> about Chevrolet Cobalts that had unexpectedly stopped and stalled.  On <u>September 13, 2013</u>, GM settled the case.  Under the terms of the settlement, the details are confidential.

67.   That same month, lawyers representing GM wrote to the lawyer in another wrongful-death case demanding that the lawsuit be withdrawn. The family of Allen Ray Floyd had sued GM after Mr. Floyd lost control of a 2006 Chevrolet Cobalt in daylight near Loris, South Carolina. Two weeks earlier, his sister had lost control of the same vehicle on the same road; she had it towed.  The Company contended the suit was "frivolous" because the accident occurred in <u>July 3, 2009</u>, a week before the Company's bankruptcy agreement took effect, which meant GM was not liable for damages.

68.   **<u>2014</u>**:  In <u>January 2014</u>, a GM committee approved a recall of some of the Defective Vehicles.

69.     On <u>January 31, 2014</u>, Ms. Barra learned of the Ignition Switch Defect, according to GM.

70.     On <u>February 6, 2014</u>, GM issued its 10-K to the Securities and Exchange Commission, which stated in part: "The costs and effect on our reputation of product recalls could materially adversely affect our business.  From time to time we recall our products to address performance, compliance or safety-related issues.  The costs we incur in connection with these recalls typically include the cost of the part being replaced and labor to remove and replace the defective part.  In addition product recalls can harm our reputation and cause us to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products.  Any costs incurred or lost sales caused by future product recalls could materially adversely affect our business. Conversely not issuing a recall or not issuing a recall on a timely basis can harm our reputation and cause us to lose customers for the same reasons as expressed above."

71.     The <u>February 6, 2014</u> 10-K for GM also included the following statements:

     a.    "In the U.S. if a vehicle or vehicle equipment does not comply with a safety standard or if a vehicle defect creates an unreasonable safety risk the manufacturer is required to notify owners and provide a remedy."

     b.    "We are committed to leadership in vehicle design, quality, reliability, telematics and infotainment and safety…."

72.     On <u>February 7, 2014</u>, GM notified NHTSA "that it determined that a defect, which relates to motor vehicle safety, exists in 619,122 cars."

73.     On <u>February 13, 2014</u>, GM recalled 780,000 compact cars, including Chevrolet Cobalts, Pontiac G5s, and Pontiac Pursuits (Canada only) from 2005-2007 models.

74.     On <u>February 25, 2014</u>, GM expanded its recall to include Saturn Ions and three other vehicles, totaling 1.6 million vehicles worldwide.

75. On <u>March 5, 2014</u>, NHTSA demanded that GM turn over documents that related to ignition switch problems.

76. On <u>March 10, 2014</u>, a House subcommittee announced it will hold a hearing, eventually set for <u>April 1, 2014</u>. The Justice Department also announced it was conducting a criminal probe. Also, GM hired two law firms to investigate into the recall, with Anton "Tony" Valukas, who investigated Lehman Brothers after the firm's <u>2008</u> Collapse, leading the internal probe.

77. On <u>March 18, 2014</u>, Ms. Barra issued an apology on behalf of GM and appointed a new global safety chief.

78. On <u>March 28, 2014</u>, GM expanded the small car recall to include 971,000 vehicles from the 2008-2011 model years, which may have had the defective switches installed as replacement parts. To date, GM has recalled <u>2.6 million vehicles</u>.

79. On <u>April 1-2, 2014</u>, Ms. Barra and NHTSA acting chief David Friedman testified before the House Energy and Commerce Committee's Subcommittee on Oversight and Investigations.

80. On <u>April 7, 2014</u>, GM expects replacement switches to be available at dealerships. The Company said the repairs could take until <u>October</u>.

**D.** **<u>GM's "COMMITMENT TO SAFETY"</u>**

81. GM claims that "[s]afety will always be a priority at GM. We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers." GM violated this principle by jeopardizing the lives and safety of millions of Americans when it sold defective automobiles to American consumers for many years.

82. Despite choosing corporate profits over safety, GM repeatedly touted safety as a huge priority to the Company as stated on their website below:

**E.**   **OVERSIGHT   AND   INVESTIGATIONS   SUBCOMMITTEE HEARING ON APRIL 1, 2014**

83.   General Motors Chief Executive Officer Mary Barra went before the Oversight and Investigations Subcommittee on April 1, 2014 and called GM's slow response to at least 13 deaths linked to faulty ignition switches "unacceptable," but was unable to give U.S. lawmakers any answers as to what went wrong based on GM's internal investigation.  **GM management was slammed at the hearing when members of Congress claimed that people died because GM failed to fix what amounted to a 57-cent problem.**  Rep. Diana DeGette, D-Colo, said, "We know GM made a series of terrible decisions, and we know that this tragedy has exposed significant gaps in federal law that allowed them to do so."

84.   GM first learned of the problem with its ignition switches on Chevrolet Cobalts, Saturn Ions, and other models in 2001, according to documents, but no action was taken until February 2014.  Lawmakers inquired how GM could have missed or ignored so many red flags that faulty ignition

1 switches could unexpectedly turn off engines during operation and leave airbags,

2 power steering, and power brakes inoperable. Ms. Barra could not give a clear

3 and concise answer and could only say that GM was now doing a better job of

4 overseeing the quality of its products.

5     85. David Friedman on behalf of The National Highway Traffic Safety

6 Administration ("NHTSA") also went before the House Committee on Energy and

7 Commerce Subcommittee on Oversight and Investigations. Mr. Friedman said

8 that NHTSA is pursuing an investigation of whether GM met its timeliness

9 responsibilities to report and address the defect under Federal law – an

10 investigation that will end with holding GM accountable if it failed in those

11 responsibilities. According to Mr. Friedman's statement, "NHTSA is working to

12 ensure that GM has accounted for the full scope of vehicles that may be covered

13 by the recall, is ensuring that consumers receive the needed remedy as soon as

14 possible, and is providing consumers information and resources essential to keep

15 them safe until the vehicles can be fixed."

16     86. GM first provided NHTSA with a chronology of events on February

17 24, 2014. The information in GM's chronology raised serious questions as to the

18 timeliness of GM's recall. As a result, NHTSA opened its current investigation

19 into GM's timeliness on February 26, 2014. On March 4, 2014, NHTSA issued a

20 special order seeking documents and answers, submitted under oath, to questions

21 relevant about how quickly GM acted on information about the defect.

22     87. GM and NHTSA opted multiple times not to open a formal

23 investigation or declare a recall to address the faulty ignition switch. Mr.

24 Friedman was asked why NHTSA officials in 2007 overruled an agency employee

25 who said a formal defect investigation of the switches should be started. Mr.

26 Friedman responded that air-bag failures discovered after several fatal accidents

27 involving Chevrolet Cobalts did not necessarily indicate a defect because the

28 devices were designed not to deploy in certain situations. Mr. Friedman said, "We

1   need a better understanding between the vehicle's power and air bags going off…
2   This connection is clearly something that has raised a lot of questions for us."

3        88.    Playing the blame game, Mr. Friedman said that NHTSA would have
4   acted decisively if GM had provided them with some of the facts that are now just
5   coming out.  "If GM did not follow the law in getting information to us quickly,
6   we're going to hold them accountable," said Mr. Friedman.

7        89.    GM had plenty of information to justify notifying the NHTSA earlier.
8   House investigators said in a memo that consumers complained to GM dealers
9   133 times about cars unexpectedly stalling or turning off when they went over
10  bumps or nudged the ignition key.  GM technicians linked many of those
11  customer complaints to faulty ignition switches, at a time the Company was
12  denying a defect existed, according to the memo, which was based on an analysis
13  of GM's warranty-claims database.  GM still has not reported most of those cases
14  to regulators.

15       90.    GM's Board of Directors failed its essential purpose.  The Board has a
16  Public Policy Committee.  The principal purpose of GM's Public Policy
17  Committee is to provide oversight and guidance to management on, among other
18  things, "business responsibilities of the Company."  The Public Policy
19  Committee's "primary responsibility is to review and provide counsel on issues
20  that significantly affect the Company's corporate reputation," including "vehicle
21  safety, manufacturing safety, and corporate social responsibility."  By failing to
22  insist on safety as a priority, GM allowed <u>a culture of cost savings over safety</u> to
23  control the operations of the Company.

24     **F.**    <u>**GM'S POSITION ON THE DEFECTIVE VEHICLES**</u>
25            <u>**CHANGES OVER TIME**</u>

26       91.    Immediately prior to the <u>April 1, 2014</u> hearing, House investigators
27  released an internal GM document (dated <u>April 26, 2006</u>) that showed a GM

28

**CLASS ACTION COMPLAINT**        23

engineer approved a critical change to a faulty ignition switch that had been linked to thirteen (13) deaths.

92. In <u>April 2013</u>, Ray DeGiorgio, the chief engineer on the Chevrolet Cobalt, was deposed in a case involving a Georgia woman who was killed in a Chevrolet Cobalt in <u>2009</u>. Mr. DeGiorgio was asked about the differences between the original switch and the replacement switch. Mr. DeGiorgio testified that he saw the differences but could not explain why the part had been changed. Mr. DeGiogio also testified he had not approved the part change. But, according to the <u>April 26, 2006</u> internal GM document, Mr. DeGiorgio did indeed sign off on the change. The reason given for the change on the document was "to increase torque force in the switch."

> Attorney: *"So if such a change was made, it was made without your knowledge and authorization?"*
>
> DeGiorgio: *"That is correct"*

Later in the deposition, DeGiorgio said, *"I can certainly tell you, I was not aware of this change."*

93. According to House investigators, documents show GM altered the design of the ignition switches, but the alteration was done without either notifying federal regulators or car owners or changing the part number. The change apparently occurred in <u>2006</u> and increased the size of the detent plunger and spring, a pair of parts that hold the ignition key in position.



94.     House committee members said the redesigned switch still did not meet GM's minimum specifications, citing testing done at the time by the supplier, Delphi Automotive.  This means the switches installed in 2008-2011 model year vehicles were still defective which contradicted GM's statements that only switches produced before the 2006 redesign were faulty and potentially linking the defect to deaths.

95.     On March 28, 2014, GM recalled the 2008-2011 vehicles, but said the recall was done only to ensure that defective ignition switches were not installed as replacement parts during their repair work.  GM said that about 5,000 defective switches had been used for repairs in those vehicles.

96.     However, on March 27, 2014, members of Congress on the House Energy and Commerce Committee met with Delphi officials and said there was more to the story than what GM was disclosing.  A March 31, 2014 letter sent to GM signed by Reps. Henry Waxman, Diana DeGette, and Jan Schakowsky stated: "Delphi confirmed that these testing results mean that the ignition switches

currently in use in 2008-2011 vehicles do not meet GM performance specifications."

97.    In <u>February 2014</u>, GM disclosed to federal regulators that it knew of problems with its ignition switches as early as <u>2001</u>.  GM told NHTSA that a design engineer responsible for the Cobalt's ignition switch "signed a document approving changes to the ignition switches proposed by the supplier, Delphi Mechatronics."

98.    A prepared chronology by GM wrote: "The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch… This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch.  GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year."

99.    Hours before the <u>April 1, 2014</u> hearing, Congressman Henry Waxman, D. California, said his staff had counted 133 cases between <u>June 2003</u> and <u>June 2012</u> when consumers told dealers that their cars were shutting off when they went over bumps or brushed against the ignition.  These 133 cases are:

| **MODEL** | **MODEL YEAR** | **VEHICLE MILES** | **COMPLAINT DATE** |
|---|---|---|---|
| **ION** | 2003 | 3,474 | 6/6/2003 |
| **ION** | 2003 | 9,300 | 7/1/2003 |
| **ION** | 2003 | 10,027 | 7/14/2003 |
| **ION** | 2003 | 10,639 | 7/21/2003 |
| **ION** | 2003 | 10,639 | 7/21/2003 |
| **ION** | 2003 | 7,807 | 3/15/2004 |
| **ION** | 2003 | 18,568 | 3/15/2004 |
| **ION** | 2003 | 16,108 | 4/8/2004 |

| **MODEL** | **MODEL YEAR** | **VEHICLE MILES** | **COMPLAINT DATE** |
|-----------|----------------|-------------------|--------------------|
| **ION** | 2003 | 16,192 | 4/12/2004 |
| **ION** | 2003 | 9,554 | 4/22/2004 |
| **ION** | 2003 | 15,031 | 5/1/2004 |
| **ION** | 2003 | 17,222 | 6/21/2004 |
| **ION** | 2004 | 18,209 | 6/24/2004 |
| **ION** | 2004 | 138 | 9/21/2004 |
| **ION** | 2004 | 6,583 | 3/1/2005 |
| **ION** | 2004 | 12,883 | 3/17/2005 |
| **ION** | 2004 | 8,182 | 4/20/2005 |
| **ION** | 2004 | 10,387 | 5/7/2005 |
| **ION** | 2004 | 7,945 | 6/29/2005 |
| **ION** | 2005 | 16,767 | 7/18/2005 |
| **ION** | 2004 | 19,963 | 7/22/2005 |
| **ION** | 2004 | 13,743 | 8/18/2005 |
| **ION** | 2004 | 31,456 | 8/25/2005 |
| **ION** | 2006 | 2,470 | 9/19/2005 |
| **HHR** | 2006 | 445 | 10/24/2005 |
| **ION** | 2004 | 17,185 | 12/5/2005 |
| **ION** | 2004 | 13,716 | 12/13/2005 |
| **ION** | 2005 | 12,420 | 1/9/2006 |
| **ION** | 2004 | 32,688 | 1/10/2006 |
| **ION** | 2006 | 10,221 | 1/27/2006 |
| **ION** | 2006 | 3,468 | 2/23/2006 |
| **ION** | 2005 | 7,042 | 6/14/2006 |
| **ION** | 2005 | 17,375 | 7/11/2006 |

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|---|---|---|---|
| **ION** | 2005 | 17,375 | 7/11/2006 |
| **ION** | 2006 | 9,057 | 7/25/2006 |
| **ION** | 2003 | 53,753 | 7/26/2006 |
| **ION** | 2005 | 13,929 | 7/29/2006 |
| **HHR** | 2006 | 13,464 | 8/3/2006 |
| **ION** | 2006 | 9,112 | 8/7/2006 |
| **ION** | 2004 | 36,911 | 10/16/2006 |
| **ION** | 2005 | 25,505 | 11/2/2006 |
| **ION** | 2004 | 12,850 | 11/29/2006 |
| **ION** | 2004 | 12,850 | 11/29/2006 |
| **ION** | 2006 | 30,439 | 1/16/2007 |
| **Cobalt** | 2005 | 15,123 | 3/5/2007 |
| **ION** | 2004 | 34,084 | 4/9/2007 |
| **HHR** | 2007 | 2,143 | 4/30/2007 |
| **Cobalt** | 2005 | 32,096 | 5/2/2007 |
| **Cobalt** | 2006 | 17,214 | 5/7/2007 |
| **ION** | 2006 | 26,819 | 5/19/2007 |
| **ION** | 2006 | 22,937 | 5/21/2007 |
| **ION** | 2006 | 15,791 | 5/30/2007 |
| **ION** | 2006 | 17,025 | 6/7/2007 |
| **Solstice** | 2006 | 9,749 | 6/20/2007 |
| **ION** | 2006 | 31,500 | 7/2/2007 |
| **HHR** | 2006 | 25,940 | 7/19/2007 |
| **ION** | 2005 | 17,303 | 8/2/2007 |
| **ION** | 2006 | 24,741 | 8/2/2007 |

| **MODEL** | **MODEL YEAR** | **VEHICLE MILES** | **COMPLAINT DATE** |
|---|---|---|---|
| **ION** | 2006 | 24,741 | 8/2/2007 |
| **Cobalt** | 2005 | 29,551 | 8/6/2007 |
| **ION** | 2006 | 11,161 | 8/6/2007 |
| **HHR** | 2006 | 35,804 | 8/7/2007 |
| **ION** | 2006 | 25,486 | 8/10/2007 |
| **ION** | 2005 | 28,000 | 8/11/2007 |
| **ION** | 2004 | 21,814 | 8/16/2007 |
| **ION** | 2004 | 21,814 | 8/16/2007 |
| **ION** | 2006 | 8,638 | 8/21/2007 |
| **HHR** | 2007 | 13,982 | 8/28/2007 |
| **ION** | 2006 | 30,221 | 8/29/2007 |
| **ION** | 2007 | 12,257 | 9/10/2007 |
| **Cobalt** | 2006 | 18,460 | 9/12/2007 |
| **ION** | 2006 | 12,421 | 9/20/2007 |
| **HHR** | 2006 | 23,241 | 10/9/2007 |
| **ION** | 2007 | 7,884 | 10/12/2007 |
| **ION** | 2006 | 33,477 | 10/15/2007 |
| **HHR** | 2006 | 29,383 | 10/23/2007 |
| **HHR** | 2006 | 40,859 | 10/24/2007 |
| **HHR** | 2006 | 49,914 | 10/30/2007 |
| **ION** | 2004 | 57,642 | 10/30/2007 |
| **ION** | 2005 | 31,006 | 11/7/2007 |
| **HHR** | 2006 | 29,358 | 12/12/2007 |
| **Cobalt** | 2006 | 23,058 | 1/3/2008 |
| **ION** | 2006 | 23,883 | 1/17/2008 |

| Model | Model Year | Vehicle Miles | Complaint Date |
|-------|-----------|--------------|----------------|
| **HHR** | 2006 | 30,808 | 1/31/2008 |
| **ION** | 2006 | 29,725 | 2/8/2008 |
| **ION** | 2007 | 15,247 | 2/13/2008 |
| **ION** | 2007 | 15,247 | 2/13/2008 |
| **ION** | 2006 | 20,513 | 2/25/2008 |
| **HHR** | 2006 | 24,811 | 2/28/2008 |
| **ION** | 2007 | 26,043 | 3/6/2008 |
| **ION** | 2007 | 7,538 | 3/10/2008 |
| **HHR** | 2006 | 24,955 | 3/14/2008 |
| **ION** | 2006 | 28,568 | 3/14/2008 |
| **ION** | 2007 | 11,594 | 3/17/2008 |
| **ION** | 2005 | 21,919 | 3/24/2008 |
| **ION** | 2006 | 21,942 | 5/21/2008 |
| **ION** | 2006 | 21,942 | 5/21/2008 |
| **ION** | 2006 | 21,942 | 5/21/2008 |
| **HHR** | 2006 | 27,363 | 6/19/2008 |
| **ION** | 2006 | 29,177 | 6/25/2008 |
| **Cobalt** | 2006 | 32,014 | 6/28/2008 |
| **ION** | 2006 | 23,889 | 7/9/2008 |
| **Cobalt** | 2005 | 62,512 | 7/22/2008 |
| **Cobalt** | 2006 | 49,509 | 8/22/2008 |
| **Cobalt** | 2006 | 49,509 | 8/26/2008 |
| **Cobalt** | 2007 | 24,357 | 9/2/2008 |
| **ION** | 2006 | 32,805 | 11/29/2008 |
| **ION** | 2007 | 13,696 | 12/2/2008 |

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|-------|-----------|--------------|----------------|
| **ION** | 2007 | 28,760 | 12/5/2008 |
| **ION** | 2007 | 35,611 | 12/5/2008 |
| **Cobalt** | 2006 | 21,310 | 12/18/2008 |
| **ION** | 2007 | 19,342 | 12/29/2008 |
| **G5** | 2007 | 27,270 | 1/5/2009 |
| **Cobalt** | 2006 | 35,514 | 6/1/2009 |
| **ION** | 2006 | 49,934 | 7/21/2009 |
| **HHR** | 2007 | 23,203 | 8/24/2009 |
| **ION** | 2003 | 36,770 | 8/24/2009 |
| **Cobalt** | 2006 | 26,040 | 8/28/2009 |
| **Cobalt** | 2007 | 31,328 | 12/18/2009 |
| **HHR** | 2007 | 32,629 | 2/15/2010 |
| **G5** | 2007 | 36,226 | 7/28/2010 |
| **Cobalt** | 2006 | 49,186 | 8/5/2010 |
| **HHR** | 2006 | 54,499 | 8/6/2010 |
| **HHR** | 2006 | 35,939 | 9/2/2010 |
| **Cobalt** | 2006 | 47,432 | 9/8/2010 |
| **Cobalt** | 2007 | 24,443 | 9/29/2010 |
| **ION** | 2006 | 40,820 | 11/4/2010 |
| **Cobalt** | 2005 | 70,380 | 6/15/2011 |
| **HHR** | 2006 | 51,404 | 9/12/2011 |
| **Cobalt** | 2007 | 58,321 | 9/13/2011 |
| **HHR** | 2006 | 39,692 | 9/28/2011 |
| **Cobalt** | 2006 | 48,568 | 6/25/2012 |

100.  This data was obtained from the General Motors' warranty database which is not reported to NHTSA.  As pointed out by the House Committee staff during the <u>April 1, 2014</u> hearing, the warranty database "can provide an early warning of vehicle defects."  The staff went through 150,000 records to find the claims relating to the ignition switch.  The staff quoted from the report's comments that read: "When bumping ignition switch area vehicle will shut off"; and "vehicle stalls out when hitting bump/pothole in road, noticed at 50 MPH."

## G.  **GM IN 2002 APPROVED AN IGNITION SWITCH KNOWING IT DID NOT MEET COMPANY SPECIFICATIONS**

101.  On <u>March 27, 2014</u>, the House Committee staff had a two-and-a-half-hour briefing on issues related to the faulty ignition switch from Delphi Automotive key staff members.  Delphi officials informed the Committee of important new information regarding the process by which production of the switch was approved and accepted by GM.  Delphi explained the general process, known as the Production Part Approval Process (PPAP), used when the supplier works with large customers like GM.  GM would provide a design and set of specifications and Delphi would then build the product and test it against specifications and present the results of the testing to GM for final production approval.

102.  Delphi representatives told the Committee that the ignition switch was designed, built, and then approved in <u>February 2002</u> by GM via the PPAP process.  Delphi was unable to provide full documentation associated with the PPAP process but did have documentation regarding the torque performance testing results conducted as part of the PPAP.  Delphi officials stated that it was "well documented" in <u>2002</u> that the ignition switch did not meet the required minimum torque specifications.  The testing results were far below GM's specifications.  There were 12 torque performance tests conducted on the ignition switch at the time, and most tests showed a torque of between 4 and 10 N-cm, and

that only two of the 12 tests showed the ignition switch surpassing 10 N-cm.
GM's specifications called for torque levels between 15 and 25 N-cm,
significantly above the results of the performance tests.  Delphi said that despite
these results, GM officials still approved the ignitions switch for production and
that this ignition switch was used in the recalled vehicles in model years 2003-
2007.

## H. THE MODIFIED SWITCHES USED IN 2007-2011 VEHICLES WERE ALSO APPROVED BY GM DESPITE NOT MEETING COPANY SPECIFICATIONS

103.  Delphi representatives also told Committee members about the
redesign of the ignition switch that was produced beginning in April 2006.
According to Delphi officials, GM began discussions with Delphi about needing
to modify and re-test the ignition switch in mid-2005.  Delphi agreed to modify
the design of the ignition switch and when presented to GM, got approval on a
design with a longer spring, and had Delphi produce prototypes and conduct
testing as part of a new PPAP that was approved by GM on April 26, 2006.  This
document was signed by lead design engineer for GM, Ray DeGiorgio.  Delphi
again could not provide complete documentation for the 2006 PPAP process but
did having testing results available.  According to Delphi, most torque test results
for the 2006 ignition switches were in the 10 to 15 N-cm range, higher than the
older models, but still not meeting GM's documented specifications.  These
results meant that the ignition switches used in 2008-2011 vehicles do not meet
GM's performance specifications.

104.  In response to this revelation, GM countered that it was "unaware of
any reports of fatalities with this group of vehicles where a frontal impact
occurred, the front air bags did not deploy, and the ignition is in the 'accessory' or
'off' position."  An analysis of NHTSA's Early Warning Report data shows that
there were fourteen (14) fatal crashes in the recalled 2008-2011 vehicles involving

1   a potential problem with an airbag, steering, electrical, or unknown component.

2   The Center for Auto Safety also identified a similar set of crashes in earlier GM

3   vehicles as those that "could indicated the ignition airbag defect."

4      105.  GM and GM engineers have reportedly stressed the importance of

5   meeting the torque specifications on 15-25 N-cm.  In a deposition for a Georgia

6   case involving a defective ignition switch in a 2005 Chevrolet Cobalt, Gary

7   Altman, the GM program engineer for the Chevrolet Cobalt, was asked:

8      Q:   *"And the vehicle never should have been sold if it didn't meet GM's*

9      *minimum torque performance requirements, should it? ..."*

10     Altman:   *"That's correct."*

11     Q;   *"And the reason is because that could be dangerous under certain*

12     *situations because the key can move from run to accessory? ..."*

13     Altman:   *"Yes."*

14   In the same case, GM engineer Ray DeGiorgio was asked,

15     Q:   *"Why do you have a minimum torque requirement from run to*

16      *accessory?"*

17     DeGiorgio: *"It's a design feature that is required.  You don't want anything*

18     *flopping around."*

19     Q:   *"...the intent was also to make sure that when people were using the*

20     *vehicle under ordinary driving conditions, that if the key was in the run*

21     *position, it wouldn't just move to the accessory position?"*

22     DeGiorgio: *"That is correct."*

23      106.  Brian Stouffer, another GM engineer also indicated in a deposition

24   that the torque values of the ignition switches on the later model vehicles were not

25   significantly different from the torque values on the older models.  Stouffer

26   testified*: "The values are not substantially higher on the '08s and '09s... there's a*

27   *slight trend upwards, but '08s and '09s are not drastically different.  The highest*

28   *was only – we were never higher than 20 newton centimeters.  We never had one*

1   *exceed that… there is a slight trend upward [in torque values] from '07, but*

2   *there's definitely not separation. They overlap. The ranges [of ignition torque in*

3   *pre-2007 and post 2007 vehicles] overlap."* If what Mr. Stouffer said is true,

4   there could be significant risk from the ignition switches in the 2008-2011

5   vehicles.

6   107.  Documents provided to the Congressional Committee confirm that top

7   GM officials knew of the out-of-spec ignition switches for 2008-2011 vehicles for

8   at least several months before announcing the recall.  A presentation for GM's

9   December 17, 2013 high-level Executive Field Action Decision Committee

10  meeting showed that torque performance measurements for five of twelve 2008-

11  2010 model year vehicles ignition switches were below the minimum GM

12  required specifications.  GM again acknowledged the importance of this

13  specification in the March 28, 2014 recall notice, which read:

14          *"If the torque performance is not to specification, and the*

15          *key ring is carrying added weight of the vehicle goes off*

16          *road or experiences some other jarring event, the ignition*

17          *switch may inadvertently be moved out of the 'run'*

18          *position."*

19  **I.      GM VIOLATED THE TREAD ACT BY FAILING TO NOTIFY**

20          **THE NATIONAL HIGHWAY TRAFFIC SAFETY**

21          **ADMINISTRATION OF THE KNOWN DEFECTS**

22  108.  Under the Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. §§

23  30101, *et seq*., and the Transportation Recall Enhancement, Accountability, and

24  Documentation Act (the "Tread Act"), 49 U.S.C. § 30170, GM is required to

25  recall and repair motor vehicle defects related to safety.

26  109.  If a manufacturer learns that a vehicle contains a defect and that defect

27  is related to motor vehicle safety, the manufacturer must inform the Secretary of

28  Transportation. 49 U.S.C. § 30118(c)(1) & (2).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**CLASS ACTION COMPLAINT**                                          35

110.  The Safety Act requires that manufacturers inform NHTSA within five (5) working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  The report to NHTSA must immediately include the following information:

   a.  The manufacturer's name;

   b.  The identification of the vehicles or equipment containing the defect, including:

- The make, line, model year, and years of manufacturing;
- A description of the basis for the determination of the recall population;
- How those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and
- A description of the defect.

111.  The manufacturer must also inform NHTSA, as soon as possible, regarding:

   a.  The total number of vehicles or equipment potentially containing the defect;

   b.  The percentage of vehicles estimated to contain the defect;

   c.  A chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with their dates of receipt; and

   d.  A description of the plan to remedy the defect.

112.  If the Secretary of Transportation determines that the vehicle is defective, it will require the manufacturer to notify the owners, purchasers, and dealers of the defect and require it to remedy the defect or noncompliance. 49 U.S.C. § 30118(b)(2)(A) & (B).

113.  Under the Tread Act, any manufacturer who violates 29 U.S.C. § 30166 must pay a civil penalty to the U.S. Government at $7,000 per violation per day with a maximum penalty "for a related series of daily violations [of] $17,350,000."  49 C.F.R. § 578.6(c).

114.  As described in detail above, since at least <u>2001</u>, GM has known about the defective ignition switches in its vehicles. Despite being aware of the ignition switch defects, GM waited until <u>February 7, 2014</u> before finally notifying NHTSA that it manufactured and sold vehicles with ignition switch defects that could disengage the vehicle's power and airbags.

115.  Notwithstanding its duty to do so, Defendant has known for many years, but has not disclosed to NHTSA or the public, how to fix the defects.  GM failed to inform NHTSA about known defects in the Defective Vehicles.  As a result, the public, including Plaintiffs and the Class, received no notice of the ignition switch defects until <u>February 2014</u>.

## VI.  SUCCESSOR LIABILITY

116.  From the date of its formation, GM expressly assumed certain obligations, including those obligations under the Tread Act, and is liable for its nondisclosure and concealment of the Ignition Switch Defect from the date of its formation to the present.

117.  GM also has successor liability for GM Corporation's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of GM Corporation.

118.  A significant number of GM Corporation employees remained employed at GM, including managers, directors, and/or members of the Board, demonstrating a continuity of knowledge.  For example, GM's current CEO, Mary Barra, was employed by GM Corporation in <u>1980</u>.  In <u>February 2008</u>, Ms. Barra was appointed Vice President of Global Manufacturing Engineering – a position in which she knew or should have known of the Ignition Switch Defect.  Victor

Hakim, GM's Rule 30(b)(6) deponent concerning the Ignition Switch Defect,
began at GM Corporation in <u>1971</u>.  Mr. Hakim is now a Senior
Manager/Consultant in GM's Field Performance Assessment Department.

119.  GM has continued to design, manufacture, promote, market, and sell
the same products as GM Corporation, including the Defective Vehicles.

120.  GM acquired real property, contracts, books, records, goodwill, and
other intangible personal property of GM Corporation.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

121.  GM is estopped from relying on any statutes of limitation because of
its fraudulent concealment and misrepresentations of the true facts concerning the
Ignition Switch Defect in the Defective Vehicles. GM was, at all relevant times,
aware of the nature and existence of the defects in the subject vehicles, but at all
times continued to design, manufacture, certify, market, advertise, distribute, and
sell the Defective Vehicles without revealing the true facts concerning the defects,
in order to sell cars, to avoid bad publicity, and to avoid the expense of recalls.
The true facts about the Defective Vehicles continue to be concealed from the
public, including Plaintiffs.

122.  All applicable statutes of limitation have been tolled by GM's
knowing and active fraudulent concealment and denial of the facts alleged herein.
Plaintiffs had no knowledge of, nor any reason to suspect, GM's concealment of
the Ignition Switch Defect in the Defective Vehicles.  Plaintiffs had no knowledge
of facts sufficient to place Plaintiffs on inquiry notice of the claims set forth in this
Complaint, until shortly before this Complaint was filed.

123.  Nor could Plaintiffs and the members of the Class have discovered the
violations through the exercise of reasonable diligence earlier than that time
because Defendant concealed the nature of its unlawful conduct and acts and
fraudulently concealed its activities through various other means and methods
designed to avoid detection.

124. Under the Tread Act, GM is required to inform NHTSA within five (5) working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." In addition, GM is required to recall and repair motor vehicle defects related to safety.

125. As described in detail above, since at least <u>2001</u>, GM has known about the defective ignition switches in its vehicles. Despite being aware of the Ignition Switch Defect, GM waited until <u>February 7, 2014</u> before finally notifying NHTSA that it manufactured and sold vehicles with ignition switch defects that could disengage the vehicle's power and airbags.

126. Due to its violations of the Tread Act and consumer protection laws and its active concealment of pertinent information related to the Ignition Switch Defect, any and all limitations periods otherwise applicable to Plaintiffs' claims have been tolled.

## VIII. <u>CAUSES OF ACTION</u>

### <u>FIRST CAUSE OF ACTION</u>

### <u>(Unfair Competition Law: Bus. & Prof. Code § 17200 et seq.)</u>

127. Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

128. The Unfair Competition Law, California Business and Professions Code § 17200, provides that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" the False Advertising Act, California Business and Professions Code § 17500. The Unfair Competition Law provides that a Court may order injunctive relief and restitution as remedies for any violation of the False Advertising Act.

129. Plaintiffs may pursue a representative claim on behalf of others in that Plaintiffs meet the standing requirements of California Business and Professions

1     Code Section 17204 and complies with Section 382 of the California Code of

2     Civil Procedure.

3        130. At all times herein, Defendant has engaged in unfair and unlawful

4     business practices. Defendant's business practices include, without limitation:

5       a.      Selling to Plaintiffs and the Class vehicles which contain defects or

6               design flaws which make them inherently more dangerous than other

7               similar vehicles;

8       b.      Failing to disclose to Plaintiffs and the Class that the vehicles sold to

9               such consumers contain a defect or design flaw which makes them

10              inherently more dangerous than other similar vehicles;

11       c.      Failing to remedy the defects or design flaws which made Defendant's

12              vehicles inherently more dangerous than other similar vehicles;

13       d.      Failing to design, manufacture, distribute, and sell a product which

14              would perform in a safe manner when used in a reasonably

15              foreseeable manner by a reasonable customer;

16       e.      Failing to timely inform NHTSA and vehicle owners, purchasers, and

17              dealers of the ignition switch defects and to timely recall the

18              Defective Vehicles; and

19       f.      Violating the other statutes and common law causes of action as

20              alleged in this Complaint.

21        131. The business acts and practices of Defendant, as hereinabove

22     described, constitute an unlawful business practice in violation of the Unfair

23     Competition Law for the reasons set forth below, without limitation:

24       a.      The acts and practices violate California Civil Code §§ 1709 and 1710

25              and are therefore unlawful;

26       b.      The acts and practices violate California Civil Code § 1750, *et seq.*,

27              and are therefore unlawful; and

28

    c.     The acts and practices violate the Tread Act, 49 U.S.C. § 30101, *et seq.*, and are therefore unlawful.

132.  The business acts and practices of Defendant as herein described also constitute an unfair business practice in violation of the Unfair Competition Law in that such acts and practices are substantially injurious to consumers and offensive to established California public policy.

133.  The business acts and practices of Defendant as herein described constitute a fraudulent business practice in violation of the Unfair Competition Law in that such acts and practices are likely to deceive California consumers as to their legal rights and obligations.

134.  Defendant's conduct has further injured Plaintiffs and the Class by impairing competition within the automotive vehicle markets, failing to disclose the defect to the NHTSA, and preventing Plaintiffs and the Class from discovering that their vehicles were unsafe and unreliable and making fully informed decisions about whether or not to lease, purchase, and/or retain the Defective Vehicles and/or the price to be paid to lease and/or purchase the Defective Vehicles.

135.  Plaintiffs and the Class have suffered harm as a proximate result of the wrongful conduct of Defendant alleged herein, and therefore bring this claim for restitution and disgorgement.  Plaintiffs and the Class have suffered injury in fact and have suffered an economic loss by, *inter alia*, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use.  Plaintiffs suffered injury in fact and have lost money as a result of such unfair competition.

136.  In leasing and/or purchasing the vehicles from Defendant, Plaintiffs and the Class reasonably believed and/or depended on the material false and/or misleading information provided by Defendant with respect to the safety and quality of the vehicles manufactured and sold by Defendant.  In other words, Defendant induced Plaintiffs and the Class to purchase the Defective Vehicles through the acts and omissions alleged herein.

137.  Unless restrained and enjoined, Defendant will continue in the acts and practices alleged above.  Accordingly, the Court must issue an injunction restraining and enjoining Defendant from advertising, selling, or otherwise disseminating false and misleading information about its products or failing to disclose relevant information.  Plaintiffs and the Class further request an order restoring any money or property, real or personal, which may have been lost by means of Defendant's unfair and deceptive business practices.

138.  In addition, pursuant to California Code of Civil Procedure Section 1021.5, Plaintiffs are entitled to recover Plaintiffs' reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

## SECOND CAUSE OF ACTION

### (False Advertising Act: Bus. & Prof. Code § 17500 *et seq.*)

139.  Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

140.  California Business and Professions Code § 17500, *et seq.*, the False Advertising Act, prohibits any person, firm, corporation, or association, or any employee thereof, with the intent to dispose of real or personal property, from performing services or inducing the public to enter into any obligation relating to property or services, disseminating an untrue or misleading statement concerning such property or services which the defendant knew, or in the exercise of

reasonable care should have known, was untrue or misleading. A court may order
injunctive relief and restitution to affected members as remedies for any violations
of California Business and Professions Code Section 17500 as part of the Unfair
Competition Law.

141. At all times herein, Defendant has engaged in disseminating false and
misleading communications which misrepresent the characteristics, nature,
quality, and safety of the Defective Vehicles and have failed to disclose the true
quality and defects of these products. Defendant's business practices include,
without limitation:

a.  Selling to Plaintiffs and the Class vehicles which contain defects or
    design flaws which make them inherently more dangerous than other
    similar vehicles;

b.  Failing to disclose to Plaintiffs and the Class that the vehicles sold to
    such consumers contain a defect or design flaw which makes them
    inherently more dangerous than other similar vehicles;

c.  Failing to remedy the defects or design flaws which made Defendant's
    vehicles inherently more dangerous than other similar vehicles;

d.  Failing to design, manufacture, distribute, and sell a product which
    would perform in a safe manner when used in a reasonably
    foreseeable manner by a reasonable customer;

e.  Failing to timely inform NHTSA and vehicle owners, purchasers, and
    dealers of the ignition switch defects and to timely recall the
    Defective Vehicles; and

f.  Violating the other statutes and common law causes of action as
    alleged in this complaint.

142. Defendant engaged in the advertising and the failure to disclose the
defects and design flaws in its products herein alleged with the intent to induce
Plaintiffs and the Class to purchase Defendant's products.

**CLASS ACTION COMPLAINT**

143. Defendant caused to be made or disseminated throughout California and the United States, through advertising, marketing, and other publications, statements that are untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue or misleading to consumers and Plaintiffs. Defendant's advertising was untrue or misleading and likely to deceive the public in that the true characteristics and nature of the vehicles sold by GM were not as advertised.

144. In purchasing the vehicles from Defendant, Plaintiffs and the Class reasonably believed and/or depended on the material false and/or misleading information provided by Defendant with respect to the quality and safety of the vehicles being sold. In other words, Defendant induced Plaintiffs and the Class to purchase GM automotive products through the acts and omissions alleged herein.

145. In making and disseminating the statements herein alleged, Defendant knew, or by the exercise of reasonable care should have known, that the statements were and are untrue or misleading and so acted in violation of California Business and Professions Code Section 17500. Moreover, Plaintiffs and the Class were exposed to Defendant's advertising and its false and misleading statements and were affected by the advertising in that Plaintiffs and the Class believed it to be true and/or relied on it when making purchasing decisions.

146. The business acts and practices of Defendant herein described also constitute an unfair business practice in violation of the Unfair Competition Law in that such acts and practices are substantially injurious to consumers and offensive to established California public policy.

147. In addition, the business acts and practices of Defendant as herein described constitute a fraudulent business practice in violation of the Unfair Competition Law in that such acts and practices are likely to deceive consumers

1  as to their legal rights and obligations with respect to the purchase of vehicles

2  from GM.

3  148.  Plaintiffs and the Class have suffered injury in fact and have suffered

4  an economic loss by, *inter alia*, (a) leasing and/or purchasing an inferior product

5  whose nature and characteristics render it of a lesser value than represented, (b)

6  incurring costs for diminished resale value of the products purchased, (c) leasing

7  and/or purchasing a product that poses a danger to the health and safety of not

8  only the purchaser but also other motorists, passengers, and pedestrians, (d)

9  incurring increased costs to repair the products purchased, and (e) incurring costs

10  for loss of use.  Accordingly, the Court must issue an injunction restraining and

11  enjoining Defendant from sending or transmitting false and misleading advertising

12  to individuals or entities concerning the purported safety and quality of vehicles

13  from Defendant.  Plaintiffs and the Class further request an order restoring any

14  money or property, real or personal, which may have been lost by means of

15  Defendant's false advertising.

16  149.  In addition, pursuant to California Code of Civil Procedure Section

17  1021.5, Plaintiffs are entitled to recover Plaintiffs' reasonable attorneys' fees,

18  costs and expenses incurred in bringing this action.

19  WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth

20  below.

21  **THIRD CAUSE OF ACTION**

22  **(Consumer Legal Remedy Act: Civil Code § 1750, et seq.)**

23  150.  Plaintiffs hereby incorporate by reference the above paragraphs, as

24  though those allegations were fully set out herein.

25  151.  The Consumer Legal Remedies Act, California Civil Code § 1750, *et*

26  *seq.* (hereinafter "CLRA"), was designed to protect consumers from unfair and

27  deceptive business practices.  To this end, the CLRA sets forth a list of unfair and

28

deceptive acts and practices that are specifically prohibited in any transaction intended to result in the sale or lease of goods or services to a consumer.

152.  Defendant is a "person" within the meaning of Civil Code §§ 1761(c) and 1770, and sells "goods" within the meaning of Civil Code §§ 1761(b) and 1770.

153.  Plaintiffs are consumers within the meaning of Civil Code § 1761(d).

154.  The subject vehicles constitute "goods" under California Civil Code § 1761(a).

155.  The lease and/or purchase of vehicles by Plaintiffs and the Class from Defendant constitutes a transaction within the meaning of Civil Code §§ 1761(e) and 1770.

156.  California Civil Code § 1770(a) provides that "[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful," including:

a.  In violation of § 1770(a)(2) of the CLRA, GM "misrepresent[ed] the source, sponsorship, approval, or certification of goods."

b.  In violation of § 1770(a)(5) of the CLRA, GM "represent[ed] that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

c.  In violation of § 1770(a)(7) of the CLRA, GM represented that goods are of a particular standard, quality, or grade when they are of another.

d.  In violation of § 1770(a)(9) of the CLRA, GM advertised goods with the intent not to sell them as advertised.

e.  In violation of § 1770(a)(14) of the CLRA, GM represented that the transaction was supplied in accordance with a previous representation when it was not.

1    157.  By reason of the acts and practices alleged herein, Defendant has

2    engaged in unfair methods of competition and unfair or deceptive acts or practices

3    in a transaction intended to results or which results in the sale of goods to any

4    consumer, in violation of, *inter alia,* Civil Code §§ 1770(a)(2), (5), (7), (9), and

5    (14).

6    158.  Defendant engaged in these unfair and/or deceptive acts and practices

7    with the intent that they result, and which did result, in the sale and/or lease of the

8    Defective Vehicles to Plaintiffs and members of the Class.

9    159.  In purchasing the vehicles from Defendant, Plaintiffs and the Class

10   reasonably believed and/or depended on the material false and/or misleading

11   information provided by Defendant with respect to the safety and quality of the

12   GM vehicles.  In other words, Defendant induced Plaintiffs and the Class to lease

13   and/or purchase the vehicles through the acts and omissions alleged herein.

14   160.  In engaging in unfair or deceptive conduct in violation of the CLRA,

15   Defendant actively concealed and failed to disclose material facts about the true

16   characteristics and nature of the Defective Vehicles purchased by Plaintiffs and

17   the Class.

18   161.  As a result of the unfair and deceptive acts and practices of Defendant

19   herein described, Plaintiffs and the Class have suffered damages in an amount to

20   be proven at trial.

21   162.  Pursuant to California Civil Code §§ 1780 and 1781, Plaintiffs and the

22   Class hereby request certification of the Class, damages, injunctive relief,

23   restitution, attorneys' fees, costs, and expenses pursuant to California Civil Code §

24   1780(d) and California Code of Civil Procedure § 1021.5.

25   163.  As a direct and proximate result of Defendant's violations of law,

26   Plaintiffs and the Class have been injured.  Pursuant to the provisions of

27   California Civil Code § 1782, Plaintiffs demand that within thirty (30) days from

28   service of this Complaint, Defendant correct the deceptive practices described in

**CLASS ACTION COMPLAINT**                                                    47

1    this Complaint, pursuant to California Civil Code § 1770.  This includes providing

2    notice and full compensation to consumers who have purchased the affected

3    vehicles from GM.  If Defendant fails to do so, Plaintiffs will amend this

4    Complaint to seek damages pursuant to Civil Code § 1782.

5         WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth

6    below.

7                    **FOURTH CAUSE OF ACTION**

8                    **(Breach of Implied Warranty)**

9         164.  Plaintiffs hereby incorporate by reference the above paragraphs, as

10   though those allegations were fully set out herein.

11        165.  Defendant impliedly warranted to persons purchasing its products that

12   the products were what they were represented to be.

13        166.  These implied warranties induced the community in general and

14   Plaintiffs and other Class members in particular to purchase the products from

15   Defendant.  These implied warranties were both directly and indirectly believed

16   and relied upon by Plaintiffs and Class members and induced them to choose

17   Defendant's product.  This reliance was justified by Defendant's skill, expertise,

18   and judgment in the design, manufacturing, testing, labeling, distribution, or sale

19   of such products.

20        167.  At the time of the sale, Defendant had knowledge of the purpose for

21   which its products were purchased and impliedly warranted the same to be, in all

22   respects, fit and proper for this purpose.

23        168.  Defendant breached its aforesaid warranties in that the products were

24   not fit for the purpose for which they were intended and used; rather Defendant

25   sold to Plaintiffs a product which was not fit for use.  The defect in the products

26   existed prior to the delivery of the products to Plaintiffs and the Class.

27        169.  Plaintiffs and the Class have suffered injury in fact and have suffered

28   an economic loss by, *inter alia*, (a) leasing and/or purchasing an inferior product

whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use.  Accordingly, the Court must issue an injunction restraining and enjoining Defendant from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of vehicles from Defendant.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

## FIFTH CAUSE OF ACTION
### (Breach of Express Warranty)

170.  Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

171.  Defendant expressly warranted to persons purchasing its products that they were what they were represented to be.

172.  These express warranties induced the community, in general, and Plaintiffs and members of the Class, in particular, to use and purchase Defendant's products.  These express warranties were both directly and indirectly believed and relied upon by Plaintiffs and the Class and induced Plaintiffs and the Class to choose Defendant's product.

173.  Defendant breached its aforesaid warranties in that its products were not fit for the use and purpose expressly warranted by Defendant.

174.  Plaintiffs and the Class have suffered injury in fact and have suffered an economic loss by, *inter alia*, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing

1  and/or purchasing a product that poses a danger to the health and safety of not

2  only the purchaser but also other motorists, passengers, and pedestrians, (d)

3  incurring increased costs to repair the products purchased, and (e) incurring costs

4  from loss of use.  Accordingly, the Court must issue an injunction restraining and

5  enjoining Defendant from sending or transmitting false and misleading advertising

6  to individuals or entities concerning the purported safety and quality of vehicles

7  from Defendant.

8      WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth

9  below.

10              **<u>SIXTH CAUSE OF ACTION</u>**

11                  **<u>(Unjust Enrichment)</u>**

12      175.  Plaintiffs hereby incorporate by reference the above paragraphs, as

13  though those allegations were fully set out herein.

14      176.  As a result of its continuous and systematic misrepresentations and

15  failure to disclose that the vehicles it had manufactured contained serious defects

16  that affected the ignition switch of its vehicles, Defendant was able to charge a

17  higher price for its vehicles, which did not match the item's value.  Based on these

18  practices, Defendant was unjustly enriched.

19      177.  Defendant knew, or should have known, of the benefit it was

20  receiving due to its misrepresentations and failure to disclose, and enjoyed the

21  benefit of increased financial gains, to the detriment of Plaintiffs and other Class

22  members, who paid a higher price for a product with a lower value.  It would be

23  inequitable and unjust for Defendant to retain these unlawfully obtained profits.

24      178.  Plaintiffs seek an order establishing Defendant as constructive trustee

25  of the profits unjustly obtained, plus interest.

26      WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth

27  below.

28

**CLASS ACTION COMPLAINT**                                    50

# SEVENTH CAUSE OF ACTION

## (Fraudulent Concealment)

179.  Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

180.  Throughout the relevant time period, Defendant knew that the Defective Vehicles contained defective ignition switches, presenting an unreasonably dangerous propensity to suddenly switch off and thereby injure drivers, passengers, motorists, and pedestrians.

181.  Defendant fraudulently concealed from and/or failed to disclose to Plaintiffs and the Class the true defective nature of the subject vehicle.

182.  Defendant was under a duty to Plaintiffs and the Class to disclose and warn of the defective nature of the subject vehicle because: (a) Defendant was in a superior position to know the true state of the facts about the hidden defects in the subject vehicles, and those defects were latent; (b) Defendant made partial disclosures about the safety and quality of the subject vehicles while not revealing their true defective nature; and (c) Defendant fraudulently and affirmatively concealed the defective nature of the subject vehicles from Plaintiffs.

183.  The facts concealed and/or not disclosed by Defendant to Plaintiffs and the Class were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or operate the subject vehicles.

184.  Defendant intentionally concealed and/or failed to disclose the true nature of the problems with the Defective Vehicles for the purpose of inducing Plaintiffs and the Class to act thereon, and Plaintiffs and the Class justifiably acted or relied upon, to the detriment of Plaintiffs and the Class, the concealed and/or non-disclosed facts, as evidenced by the purchase and operation of the Defective Vehicles by Plaintiffs and the Class.

185. As a direct and proximate cause of Defendant's misconduct, Plaintiffs and the Class have suffered actual damages, as hereinabove alleged.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

## EIGHTH CAUSE OF ACTION

### (Negligence)

186. Plaintiffs hereby incorporate by reference the above paragraphs, as though those allegations were fully set out herein.

187. As the manufacturer and seller of automotive vehicles, Defendant had a duty to Plaintiffs and the Class to not sell products that were defective and could result in serious injuries to either Plaintiffs, the Class, or even innocent third parties. Defendant breached that duty by designing, manufacturing, and selling products to Plaintiffs and the Class that had a serious ignition switch defect without disclosing these facts to Plaintiffs and the Class. That breach caused the economic harm, injury, and/or damage to Plaintiffs and the Class that are hereinabove set forth.

188. As a direct and legal result of this wrongful conduct, Plaintiffs and the Class have been damaged as hereinabove alleged, in an amount to be ascertained at the time of trial.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth below.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

1. That this Court certify this case as a class action;

2. That this Court find and declare Defendant's acts and practices as described herein to be unlawful, unfair, and fraudulent;

3. That Plaintiffs be awarded compensatory and general damages according to proof;

4. That Plaintiffs be awarded past and future medical and incidental expenses according to proof;

5. That Plaintiffs be awarded past and future loss of earnings and earning capacity according to proof;

6. That Plaintiffs be awarded loss of personal property and personal effects according to proof;

7. That Plaintiffs be awarded punitive damages according to proof;

8. That Defendant be preliminarily and permanently enjoined from engaging in the unlawful, unfair, and fraudulent acts and practices alleged herein;

9. That Defendant be ordered to make restitution to Plaintiffs;

10. That Plaintiffs be awarded attorneys' fees and expenses pursuant to California Code of Civil Procedure § 1021.5, California Civil Code § 1780, and any other statute which provides for award of such fees and expenses;

11. That Plaintiffs be awarded prejudgment interest on all sums collected;

12. For costs of suit herein incurred; and

13. Any other and further relief the Court may deem proper.

Dated: April 7, 2014                    **COTCHETT, PITRE & McCARTHY, LLP**

By: _____
                                    FRANK PITRE
                                    *Attorneys for Plaintiffs*

**CLASS ACTION COMPLAINT**                                    53

1    **X.**     **JURY DEMAND**

2       Plaintiffs demand trial by jury on all issues so triable.

3

4       Dated: April 7, 2014            **COTCHETT, PITRE & McCARTHY, LLP**

5

6                     By: _____

7                             FRANK PITRE
                               *Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**                            54

## DECLARATION

I, JAVIER MALAGA hereby declare and state as follows:

1.    I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

2.    I am a Plaintiff in the above-entitled action.

3.    Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

4.    This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because Defendants do business in this District (the Central District of California) and throughout the State of California.

5.    The Complaint field in this matter contains a cause of action for violations of the Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited liability company doing business nationwide, including California.

6.    I own a 2006 Chevrolet Cobalt.

I declare under penalty of perjury under the laws of the State of California that the foregoing Declaration is true and correct, and was executed by me in the city of PLAYA DELREY, California, on April 4th, 2014.

By
JAVIER MALAGA

1

## DECLARATION

2     I, _Estella Estencim_ hereby declare and state as follows:

3     1.      I have personal knowledge of the facts stated herein and, if necessary, could

4  competently testify thereto.

5     2.      I am a Plaintiff in the above-entitled action.

6     3.      Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the

7  Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

8     4.      This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a

9  county that is a proper place for trial of this action because Defendants do business in this

10 District (the Central District of California) and throughout the State of California.

11     5.      The Complaint field in this matter contains a cause of action for violations of the

12 Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited

13 liability company doing business nationwide, including California.

14     6.      I own a _2006 Chevy Cobalt_ which I purchased _Used_ in

15 _Salinas_, California. _at Chevy auto mall_

16

17     I declare under penalty of perjury under the laws of the State of California that the

18 foregoing Declaration is true and correct, and was executed by me in the city of _Salinas_

19 California, on April _3ed_, 2014.

20

21

22     By _____

23             [NAME]

24

25

26

27

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

56

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

JAVIER F. MALAGA, an individual; and ESTELLA ESTENCION, an individual; and on behalf of all others similarly situated

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

GENERAL MOTORS LLC, a corporation

**(b) County of Residence of First Listed Plaintiff** Los Angeles
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

Joseph W. Cotchett; Frank M. Pitre; Robert Hutchinson; Alexandra A. Hamilton
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Burlingame, CA 94010; Tel: (650) 697-6000; Fax: (650) 697-0577

Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☐ 2. U.S. Government Defendant
☐ 3. Federal Question (U.S. Government Not a Party)
☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No     ☒ **MONEY DEMANDED IN COMPLAINT:** $ OVER $5,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332 (d)(2), action for damages and injunctive relief pursuant to California's Unfair Business Practices Act, Cal. Bus. & Prof. Code §§ 17200, et seq.; the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq.; Civil Code § 1750, et seq.; and for violations of California common law

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☒ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | **SACV14-00533 JVS (RNBx)** |
|---|---|---|

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

CIVIL COVER SHEET

**VIII. VENUE**: Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes [x] No | [ ] Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| [ ] Yes [x] No | A PLAINTIFF? | A DEFENDANT? | |
| | Then check the box below for the county in which the majority of DEFENDANTS reside. | Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Los Angeles | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [x] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of defendants reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [x] |
| Indicate the location in which a majority of claims arose: | [ ] | [ ] | [x] | [ ] | [ ] | [ ] |

**C.1.** Is either of the following true? If so, check the one that applies:

[ ] 2 or more answers in Column C

[x] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2.** Is either of the following true? If so, check the one that applies:

[ ] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | SOUTHERN DIVISION |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?  ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?  ☐ NO   ☒ YES

If yes, list case number(s):   SEE ATTACHMENT A _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):**   FRANK M. PITRE    DATE: April 7, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

Case 3:14-cv-00532-VS-WN-4   Document 1   Filed 04/07/14   Page 63 of 64   PageID #63

# ATTACHMENT A

| <u>No.</u> | <u>Case Name</u> | <u>Case Number</u> | <u>Court</u> | <u>District Judge</u> |
|---|---|---|---|---|
| 1. | *Chris Shollenberger v. General Motors, LLC* | 2:14-cv-00582 | M.D. Pennsylvania | Hon. Yvette Kane |
| 2. | *Sylvia Benton v. General Motors, LLC* | 5:14-cv-00590 | C.D. California | Hon. James V. Selna |
| 3. | *Devora Kelley v. General Motors Company* | 8:14-cv-00465 | C.D. California | Hon. James V. Selna |
| 4. | *Galdina Maciel, Daniel Cortez, Cindy Wase, Zachary Dewitt, Roberta Cheraso, Demetrius Smith, Jenee Byrd, Ashuhan Leyva, Jim Gresik, Barbara Ellis Steele, Maria Raygoza, Barbara Gray, and Michelle Bennett v. General Motors, LLC* | 3:14-cv-01339 | N.D. California | Hon. Jeffrey S. White |
| 5. | *Peggy Sue Jones v. General Motors, LLC* | 4:14-cv-11197 | E.D. Michigan | Hon. Gerswin A. Drain |
| 6. | *Charles Silvas and Grace Silvas v. General Motors, LLC* | 2:14-cv-00089 | S.D. Texas | Hon. Nelva Gonzales Ramos |
| 7. | *Adman Jawad v. General Motors, LLC* | 4:14-cv-11151 | E.D. Michigan | Hon. Mark A. Goldsmith |
| 8. | *Katie Michelle McConnell v. General Motors, LLC* | 8:14-cv-00424 | C.D. California | Hon. James V. Selna |
| 9. | *Rudy Woodward v. General Motors, LLC, Don McCue Chevrolet, Inc.* | 1:14-cv-01877 | N.D. Illinois | Hon. Ronald A. Guzman |
| 10. | *Daryl Brandt and Maria Brandt v. General Motors, LLC* | 2:14-cv-00079 | S.D. Texas | Hon. Nelva Gonzales Ramos |
| 11. | *Teleso Satele and Carlota Onofre v. General Motors, LLC* | 8:14-cv-00485 | C.D. California | Hon. Consuelo B. Marshall |

| No. | Case Name | Case Number | Court | District Judge |
|---|---|---|---|---|
| 12. | *Martin Ponce v. General Motors, LLC* | 2:14-cv-02161 | C.D. California | Hon. John F. Walter |
| 13. | *Nicole Heuler v. General Motors, LLC* | 8:14-cv-00492 | C.D. California | Hon. Andrew J. Guilford |
| 14. | *Esperanza Ramirez, Penny Brooks, Stephanie Renee Carden, Melissa Cave, Diana Cnossen, Kim Genovese, Dianne Huff, Garrett S. Manicieri, Judy Murray, Judy Pickens, Linda Wright and Robert Wyman v. General Motors LLC, General Motors Holding, LLC, Delphi Automotive PLC, DPH-DAS LLC fka Delphi Automotive Systems, LLC* | 2:14-cv-02344 | C.D. California | Hon. Aubrey B. Collins |
| 15. | *Daniel Ratzlaff v. General Motors, LLC* | 2:14-cv-02424 | C.D. California | Hon. Aubrey B. Collins |
| 16. | *Dianne Ashworth, Karen Moore, David Dean, Sandra De Atley, Paul Glantz, Cathy Roads, Moraima Serpa and Steven Anderson v. General Motors, LLC* | 2:14-cv-00607 | N.D. Alabama | Hon. John H England, III |
| 17. | *Tammie Balls and Jeffery A. Balls v. General Motors LLC* | 2:14-cv-02475 | C.D. California | Hon. Philip S. Gutierrez |
| 18. | *Janice Ross, George Chambers and Robert Bellin v. General Motors LLC, General Motors Holding, LLC, Delphi Automotive PLC and DPH-DAS LLC* | 1:14-CV-02148 | E.D. New York | Unassigned |

| No. | Case Name | Case Number | Court | District Judge |
|-----|-----------|-------------|-------|----------------|
| 19. | *Elizabeth Y. Grumet, ABC Flooring, Inc., Marcus Sullivan, Katelyn Saxson, Amy C. Clinton and Allison C. Clinton v. General Motors LLC* | 3:14-cv-00713 | S.D. California | Hon. Jeffrey T. Miller |
| 20. | *Andre Hamid v. General Motors, LLC* | 1:14-cv-00953 | D. Colorado | Hon. Robert E. Blackburn |
| 21. | *Kyle Phillip, Evelyn Torres and Kelly Kirkpatrick v. General Motors, LLC* | 3:14-cv-08053 | D. Arizona | Hon. David G Campbell |
| 22. | *Sara Robinson, John Helcl, Richard Lewis and Denise Peterson v. General Motors LLC and Delphi Automotive PLC* | 2:14-cv-02510 | C.D. California | Hon. Otis D. Wright, II |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ James V. Selna _____ and to
Magistrate Judge _____ Robert N. Block _____ .

The case number on all documents filed with the Court should read as follows:

## SACV14-00533 JVS (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of
California, the assigned Magistrate Judge has been designated to hear discovery-related
motions. All discovery-related motions should be noticed on the calendar of the Magistrate
Judge.

Clerk, U. S. District Court

April 7, 2014                                    By  A. Gonzalez
_____                                   _____
Date                                                 Deputy Clerk

## ATTENTION

*A copy of this Notice must be served on all parties served with the Summons and Complaint (or, in cases
removed from state court, on all parties served with the Notice of Removal) by the party who filed the
Complaint (or Notice of Removal).*