# Exhibit RR

Joseph G. Price, Esquire
Sean P. McDonough, Esquire
Paul T. Oven, Esquire (Atty. I.D. 77106)
**DOUGHERTY LEVENTHAL & PRICE, LLP**
75 Glenmaura National Blvd.
Moosic, PA 18507
Telephone: 570-347-1011
Email: JPrice@dlplaw.com
        SMcDonough@dlplaw.com
        Ptoven@dlplaw.com
*(Local Counsel)*

Simon Bahne Paris, Esquire
Patrick Howard, Esquire (PA ID #88657 )
Charles J. Kocher, Esquire (PA ID #93141)
**SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Place
Philadelphia, PA19103
Telephone:  (215) 575-3986
Facsimile:  (215) 496-0999
Email:  sparis@smbb.com
        phoward@smbb.com
        ckocher@smbb.com

*(Additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA – SCRANTON

| | | |
|---|---|---|
| AUSTIN DEPALMA,  BOB & DOROTHY McCANN and PAUL J. POLLASTRO individually and on behalf of all others similarly situated, | : : : : : | Case No.: |
| Plaintiffs, | : : | |
| v. | : : | **CLASS ACTION COMPLAINT** |
| GENERAL MOTORS LLC AND DELPHI AUTOMOTIVE PLC | : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

Plaintiffs Austin DePalma, Bob & Dorothy McCann, and Paul J. Pollastro, individually and as class representatives on behalf of all similarly situated persons and the general public, bring this action against Defendants General Motors LLC ("GM") and Delphi Automotive PLC ("Delphi")( collectively referred to as "Defendants") and alleges as follows:

## I.  INTRODUCTION

1.  As the American public became aware on February 13, 2014, GM orchestrated a massive cover-up to conceal from both its customers and regulators that – *at least* - the following GM Vehicles contain an ignition switch defect that could cause the power to fail while the car is in operation: 2003-07 Saturn Ion; 2005-07 Chevrolet Cobalt; 2007 Pontiac G5; 2006-07 Chevrolet HHR; 2006-07 Pontiac Solstice; and 2007 Saturn Sky (the "Defective Vehicles").

2.  Unfortunately, GM's conduct to conceal a serious defect in the ignition systems of at least the Defective Vehicles is admittedly the cause in at least 13 deaths, blamed in at least 300 other fatal accidents, and is strikingly similar to the conduct of Toyota Motor Corp. that led to the largest criminal penalty ever imposed on an automaker in the United States. *See U.S. v. Toyota Motor Corp.*, 14-cv-00186, S.D.N.Y. (Court commenting that"[t]his unfortunately is a case that demonstrates that corporate fraud can kill.")

3.  Since 2002, GM has sold millions of vehicles throughout the United States and worldwide that have a safety defect that can cause the vehicle's ignition switch to unintentionally move from the "run" position to the "accessory" or "off" position, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags.

4.  Although knowing that the ignition switch fell below its own specifications, GM began installing these ignition switch systems in models from 2002 through at least 2007 and possibly later.  GM promised that these new systems would operate safely and reliably, and

provided an express warranty that GM would "correct any vehicle defect related to materials or workmanship occurring during the warranty period."[1]

5.      This promise turned out to be false in several material respects. In reality, GM knew of the defects with the Cobalt; intentionally ignored them in breach of the express warranty; and concealed this serious quality and safety problem plaguing its vehicles.

6.      From 2004 to the present, GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its ignition switch system. Yet, despite the dangerous nature of this defect and its effects on safety critical systems, GM concealed its existence and failed to repair the problem. And despite notice of the defect in its vehicles, GM did not disclose to consumers that its vehicles – which GM for years had advertised as "safe" and "reliable" – were in fact not as safe or reliable.

7.      GM's CEO, Mary Barra has admitted in a video message that: "Something went wrong with our process in this instance, and terrible things happened."

8.      This case arises from GM's breach of its express warranties, as well as its obligations and duties, including GM's failure to disclose that, as a result of defective ignition switch design, at least 2.6 million GM vehicles had the propensity to shut down during normal driving conditions and created an extreme and unreasonable risk of accident, serious bodily harm, and death.

9.      GM's predecessor, General Motors Corporation ("Old GM") also violated these rules by designing and marketing vehicles with defective ignition switches, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents. In addition to the liability arising out of the statutory obligations assumed by GM,

---

[1] 2007 GM Cobalt Warranty and Owner Assistance Information Manual, pg. 5.

GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.

10.     The defective ignition switches were manufactured by Delphi.  Once a subsidiary of Old GM, Delphi spun-off from Old GM in 1999, and was an independent publicly held corporation.

11.     Plaintiffs allege based on information and belief that Delphi knew its ignition switches were defective, but nevertheless continued to manufacture and sell the defective ignition switch systems, which it knew would be used in the vehicles of Plaintiffs and the Class.

12.     Plaintiffs believe that there are additional GM vehicles which suffer from the same or substantially similar ignition switch defects as the Defective Vehicles identified above. Accordingly, Plaintiffs will supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switches, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment

13.     The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

    a.     The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

    b.     When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident;

    c.     When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

14.     The ignition switch defects make the Defective Vehicles unreasonably dangerous. Because of the defects, the Defective Vehicles are likely to be involved in accidents, and, if

accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants.

15.     For many years, GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and maximize sales, GM concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

16.     Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[2] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects.[3]  If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[4]

17.     In addition to the TREAD Act and other laws, GM violated the Michigan Consumer Protection Act (the "MCPA") and fraudulently concealed the deadly ignition switch defects from consumers, owners, and lessees of the Defective Vehicles. GM also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed the Defective Vehicles to remain on the road. GM's conduct alleged herein also violates the Pennsylvania Unfair Trade Practices and Consumer Protection Law[5]; the Magnuson-Moss Warranty Act[6]; and breaches of GM's express and implied warranties.

---

[2] 49 U.S.C. §§ 30101-30170.

[3] 49 U.S.C. § 30118(c)(1) & (2).

[4] 49 U.S.C. § 30118(b)(2)(A) & (B).

[5] 73 P.S. § 201-1 *et seq.*

[6] 15 U.S.C. § 2301 *et seq.*

18.     Plaintiffs and the Class have been damaged by GM's misrepresentations, concealment and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding highly dangerous vehicles whose value has greatly diminished because of GM's failure to timely disclose the serious defect.

19.     Plaintiffs and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

20.     Plaintiffs and the Class paid more for the Defective Vehicles than they would have had they known of the ignition defects or they would not have purchased the Defective Vehicles at all.

## II.     JURISDICTION AND VENUE

21.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

22.     This Court has personal jurisdiction because one of the Plaintiffs resides in this district. This Court has personal jurisdiction over GM because GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

23.     Venue is proper in this District under 28 U.S.C. § 1391 because GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, GM transacts business within the District, and some of the events establishing the claims arose in this District.

## III.     PARTIES

24.     Plaintiff and Named Class Representative Austin DePalma is a resident of Scranton, Pennsylvania and a citizen of the United States. Plaintiff, presently 22 years-old, owns a 2007 Chevrolet Cobalt, VIN No. 1G1AL58F477242818, which was purchased for him in September 2011 by his grandparents and later transferred into his name for use to commute to work. Although GM knew of the problems associated with the Cobalt in 2011, due to its active concealment, Plaintiff was unaware of any defects with the Cobalt's ignition switch at the time of purchase.

25.     Since acquiring the Cobalt, Plaintiff DePalma has been in three separate incidents where the vehicle stalled while driving resulting in front-impact accidents. Although the vehicle needed to be towed from the scene of all three accidents due to the damage, the Cobalt's air bags never deployed. As a result of these incidents, Plaintiff DePalma was dropped from his insurance company. After receiving the recall notice in March 2014, GM informed Plaintiff DePalma that they "wanted the vehicle off the road immediately," instructed Plaintiff to remove all personal items from the vehicle, and take it to a GM dealership as quickly as possible. GM is now paying for Plaintiff DePalma's rental car, while the Cobalt sits at Tom Hesser Chevrolet in Scranton, PA. While in its possession, GM has conducted extensive inspection of the vehicle, but is yet to provide any of the information to Plaintiff DePalma.

26.     Plaintiffs and Named Class Representatives Bob and Dorothy McCann are residents of Philadelphia, PA and citizens of the United States. Plaintiffs purchased a new 2006 Chevrolet Cobalt, VIN No. 1G1AK55F267871726, from Bryner Chevrolet, in Jenkintown, PA on November 11, 2006. At the time of purchase, the Cobalt was covered by GM's 3-year / 36,000 mile warranty which affirmatively claimed that GM would "correct any vehicle defect

related to materials or workmanship during the warranty period." The McCanns also purchased the extended warranty to cover the Cobalt through November 11, 2011.

27.     Within 12 days and 159 miles of purchase, the McCanns returned to the dealership three (3) separate times because the Cobalt would not start. Each time, and with full knowledge of the ignition defect, GM told the McCanns that the vehicle's keys were "faulty," but never provided the McCanns with new or different keys. Mr. McCann questioned the dealership on November 24, 2006, about the Cobalt's ignition, and made contemporaneous notes on the service report, "what about ignition bad + not keys." GM never disclosed the existence of the ignition defect to the McCanns nor did they repair the defect in breach of the express warranty. Rather, GM actively concealed the defect from the McCanns.

28.     After receiving the recall notice in March 2014, the McCanns again returned to Bryner Chevrolet with the Cobalt. This time, GM wanted the vehicle off the road. Since March 15, 2014, GM has paid for the McCanns rental car, while their Cobalt remains housed at Bryner Chevrolet. Upon information and belief, GM has inspected the McCanns vehicle, but has not provided any information to the McCanns.

29.     Plaintiff and Named Class Representative Paul J. Pollastro is a resident of Coraopolis, Pennsylvania and a citizen of the United States. Plaintiff owns a 2007 Chevrolet Cobalt, VIN No. 1G1AL55F877163284, which he purchased in November 2010 for his then high-school aged daughter. Although GM knew of the problems associated with the Cobalt in 2010, due to its active concealment, Plaintiff was unaware of any defects with the Cobalt's ignition switch at the time of purchase.

30.     Plaintiff Pollastro purchased the Cobalt from a GM dealership, as a GM certified pre-owned vehicle that included a bumper-to-bumper limited warranty of 12-months / 12,000

miles that GM advertised as "above and beyond any remaining factory warranty." As a GM
certified pre-owned vehicle, GM allegedly conducted a 172-point inspection of the Cobalt prior
to making it available for sale to Plaintiff. This inspection, conducted by GM-trained
technicians, claimed to check the vehicle form "top to bottom, bumper-to-bumper, inside and
out." GM claimed that the inspection was to ensure "that the original, factory-installed items on
the vehicle have been inspected and reconditioned, [so] it [can] be sold as a GM Certified Used
Vehicle." This pre-sale inspection by GM's technicians specifically included the Cobalt's keys
and ignition system. And GM affirmatively represented that it "believe[s] in [its] vehicles and
[isn't] afraid to stand behind them. When we say 'No worries,' we mean it." GM made these
representations and warranties knowing that the Cobalt contained a latent defect, which could
cause an accident leading to serious bodily harm.

31. On November 23, 2010, during the warranty period, the key became stuck in the "on"
position in the ignition of Plaintiff Pollastro's Cobalt. Plaintiff Pollastro returned to the
dealership who claimed the problem was with the floor shifter. Although with full knowledge at
the time, GM never disclosed the existence of the ignition defect to Plaintiff Pollastro nor did
they repair the defect in breach of the express warranty. Rather, GM actively concealed the
defect from Plaintiff Pollastro.

32.    Defendant General Motors LLC ("GM") is a foreign limited liability company
formed under the laws of Delaware with its principal place of business located at 300
Renaissance Center, Detroit, Michigan. GM was incorporated in 2009 and on July 10, 2009
acquired substantially all assets and assumed certain liabilities of General Motors Corporation
("Old GM.") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

33.     Among the liabilities and obligations expressly retained by GM after the

bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the
> certification, reporting and recall requirements of the National
> Traffic and Motor Vehicle Act, the Transportation Recall
> Enhancement, Accountability and Documentation Act, the Clean
> Air Act, the California Health and Safety Code, and similar laws,
> in each case, to the extent applicable in respect of vehicles and
> vehicle parts manufactured or distributed by [Old GM].

34.     GM also expressly assumed:

> all Liabilities arising under express written warranties of [Old GM]
> that are specifically identified as warranties and delivered in
> connection with the sale of new, certified used or pre-owned
> vehicles or new or remanufactured motor vehicle parts and
> equipment (including service parts, accessories, engines and
> transmissions) manufactured or sold by [Old GM] or Purchaser
> prior to or after the Closing and (B) all obligations under Lemon
> Laws.

35.     Because GM acquired and operated Old GM and ran it as a continuing business

enterprise, and because GM was aware from its inception of the ignition switch defects in the

Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and

omissions of Old GM, as alleged in this Complaint.

## IV.     **FACTUAL ALLEGATIONS**

### A.     **The Ignition Switch Defects in the Defective Vehicles**

36.     Given the importance that a vehicle and its electrical operating systems remain

operational during ordinary driving conditions, it is imperative that a vehicle manufacturer

ensure that its vehicles remain operational from the time the driver starts the vehicle until the

driver intentionally shuts down the vehicle.  With respect to the Defective Vehicles, GM has

failed to do so.

37.     In the Defective Vehicles, the ignition switch defects can cause the car's engine and electrical system to shut off, disabling the power steering and power brakes and causing the non-deployment of the vehicle's airbags in the event of a crash.

38.     The Defective Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

39.     The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

a.     The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

b.     When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident;

c.     When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

**B.     GM Knew of the Ignition Switch Defects for Years, but Concealed the Defects from Plaintiffs and the Class**

40.     Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences since as early as 2004, but concealed their knowledge from Defective Vehicle owners.

41.     Among the many incidents reported nationally, there is at least one fatality in this district that pre-dates GM's recall of the Cobalt and which may be related to the ignition switch defect.

42.     Kelly Erin Ruddy, age 21, was driving a 2005 Chevrolet Cobalt north on Interstate 81 in Plains Township on January 10, 2010, when she lost control of the car causing

the vehicle to roll several times, catch fire, and eject Ms. Ruddy onto the road resulting in her death. After the accident, GM representatives removed the black box from Ms. Ruddy's vehicle at a Duryea scrapyard in the summer of 2010. Despite repeated attempts over the past several years to contact GM and retrieve the black box, the family has been unable to speak with anyone at GM. After the recall was announced, United States Senator Patrick Toomey (PA) wrote to GM demanding they return the vehicle's black box to the family. In response, on March 24, 2014, more than four years after the accident, GM has now agreed to arrange for the return of the black box so it can be determined whether the ignition system failed causing Ms. Ruddy's death.

43.      Long before Ms. Ruddy's incident, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy. Ms. Rose's death was the first of the hundreds deaths and injuries attributable to the ignition switch defects. Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM and GM to address the ignition switch problem.

44.      Another incident involved sixteen year-old Megan Phillips. Ms. Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees. NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact. According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they began communicating. As she stated, "I don't understand why [GM] would wait 10 years to say something. And I want to understand it but I never will."[7]

---

[7] *"Owners of Recalled GM Cars Feel Angry, Vindicated,"* Reuters (Mar. 17, 2014).

45.     Rather than publicly admitting the dangerous safety defects in its vehicles, GM attempted to attribute these and other incidents to "driver error."  Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering and/or airbag failures, including:

- 2005:  26 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved.

- 2006:  69 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved and 4 deaths citing Unknown component.

- 2007:  87 Cobalt Death and Injury Incidents, including 3 deaths citing Airbag as component involved.

- 2008:  106 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved and 2 deaths citing Unknown component.

- 2009:  133 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved, 1 death citing Service Brake as component involved, 1 death citing Steering as component involved, and 2 deaths citing Unknown component.

- 2010:  400 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 12 deaths citing steering as component involved, and 1 death citing Unknown component.

- 2011:  187 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 2 deaths citing Steering as component involved, and 1 Unknown component.

- 2012:  157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

46.     GM now admits that Old GM learned of the ignition switch defects as early as 2001.  During the pre-production development of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position.  Old GM claimed that a switch design change "had resolved the problem."[8]

---

[8] *"G.M. Reveals It Was Told of Ignition Defect in '01,"* D. Ivory, NEW YORK TIMES (Mar. 12, 2014).

47.    In 2003, an internal report documented an instance in which the service technician observed a stall while driving. The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. It was replaced and the matter was closed.[9]

48.    According to GM's latest chronology submitted to NHTSA pursuant to 49 CFR § 573.6, Old GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

49.    Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

50.    According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

51.    As soon the 2005 Cobalt hit the market, Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[10] Old GM opened additional PRTS inquires.

52.    In another PRTS opened in May 2005, Old GM engineers again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration. After initially approving the proposed fix, Old GM reversed course and canceled the fix.[11]

---

[9] Id.

[10] March 11, 2014 Chronology Re: Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles, at 1.

[11] Id.

According to emails obtained by multiple news outlets, the cost to complete the fix in 2005 would have cost approximately .57 cents per unit.

53.     Instead of instituting this inexpensive fix, in October 2005, Old GM simply issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the loss of the car's electrical system.

54.     Rather than disclosing the true nature of the defects and correcting them, under the TSB, Old GM gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key ring from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging as low as they had in the past.[12] According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[13]

55.     Yet there was no recall.  And, not surprisingly, Old GM continued to get complaints.

56.     In 2006, Old GM approved a design change for the Cobalt's ignition switch supplied by Delphi.  The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch."  But the new design was not produced until the 2007 model year.[14]

57.     In 2007, NHTSA investigators met with Old GM to discuss its airbags, and informed Old GM of the July 2005 frontal and fatal crash involving Amber Marie Rose.

_____

[12] *Id.* at 1-2.

[13] *Id.* at 3.

[14] *Id.* at 2.

58.     As described above, the airbags in Ms. Rose's 2005 Cobalt did not deploy. Data retrieved from her vehicle's diagnostic system indicated that the ignition was in the "accessory" position. Old GM investigated and tracked similar incidents.

59.     By the end of 2007, by GM's own admission, Old GM knew of 10 frontal collisions in which the airbag did not deploy.[15] Plaintiffs believe that Old GM actually knew of many other similar incidents involving the ignition switch defects.

60.     For the next six years, GM continued to get complaints and continued to investigate frontal crashes in which the airbags did not deploy.

61.     However, according to GM, it was not until 2011 and 2012 that GM's examinations of switches from vehicles that had experienced crashes revealed significant design differences in the torque performance of ignition switches from the 2005 Cobalts and those from the 2010 model year, the last year of the Cobalt's production.

62.     GM responded by blaming the supplier for the switch design.[16]

63.     In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the Cobalt and G5 vehicles.[17] The modification to the design switch, which should have occurred years before, is picture below:

---

[15] Feb. 24, 2014 Attachment B-573.6(c)(6) at 2.
[16] *Id.* at 3-4.

[17] *Id.* at 4-5.



2005 Model Year

5.9 mm

9.24 N-cm RUN-to-ACC Torque Value

10.6 mm

New Service Replacement Part

12.2 mm

17.57 N-cm RUN-to-ACC Torque Value

7.0 mm

1 mm

4/26/2013

**C.**     **GM Waited until 2014 to Finally Order a Recall of the Defective Vehicles**

64.     After analysis by GM's Field Performance Review Committee and the Executive Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of some of the Defective Vehicles on January 31, 2014.

65.     Initially, GM's EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

66.     After additional analysis, the EFADC expanded the recall on February 24, 2014 to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

67.     GM provided dealers with notice of the recall on February 26, 2014 and March 4, 2014 and mailed letters to current owners on March 10 and March 11, 2014.

68.      According to GM, "the dealers are to replace the ignition switch,"[18] presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

69.      In a video message addressed to GM employees on March 17, 2014, C.E.O. Mary Barra admitted that the Company had made mistakes and needed to change its processes.

70.      According to Ms. Barra, "Something went terribly wrong in our processes in this instance, and terrible things happened."  Barra continued to promise, "We will be better because of this tragic situation if we seize this opportunity."[19]

71.      GM now faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

72.      While GM has now appointed a new Vehicle Safety Chief, on information and belief at least 2.6 million Defective Vehicles remain on the road to this day; and, on information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defects.

**D.      Old GM Promoted the Defective Vehicles as Safe and Reliable**

73.      On information and belief, in marketing and advertising materials, Old GM consistently promoted the Defective Vehicles as safe and reliable.

74.      For example, one Cobalt ad promised that "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

75.      An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

---

[18] *Id.* at 6.
[19] *"Something Went "Very Wrong" at G.M., Chief Says."* N.Y. TIMES (Mar. 18, 2014).

18

76.     A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically engineered for whatever is next." Another 2003 spot closed with the tagline "Saturn. People first."

77.     A 2001 print ad touting the launch of the Saturn focused on safety:

> Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars. And it wasn't until we were satisfied that we added things....

78.     Old GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicles were defective posing a serious risk of an accident and injury to the Defective Vehicles' occupants and others.

79.     Throughout the relevant period, Old GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

80.     Old GM never informed consumers about the ignition switch defects.

**E.      The Ignition Switch Defects have Harmed Plaintiffs and the Class**

81.     The ignition switch defects have caused damage to Plaintiffs and the Class.

82.     A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect.

83.     A vehicle purchased, leased or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

84.     Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects

been disclosed. Plaintiffs and the Class overpaid for their Defective Vehicles. Because of the concealed ignition switch defects. Plaintiffs did not receive the benefit of the bargain.

85.     Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, due to the express warranty included with both the new and certified pre-owned vehicles. Plaintiffs did not receive the benefit of the bargain.

86.     Plaintiffs and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition switch defects.

87.     GM admits to at least twelve deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles. However, Plaintiffs believe that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignitions switch defects.

88.     If Old GM or GM had timely disclosed the ignition switch defects, all Class members' vehicles would now be worth more.

## V.     SUCCESSOR LIABILITY

89.     As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

90.     GM also expressly assumed liability for Lemon Law and warranty claims in the Master Sale and Purchase Agreement of June 26, 2009, and this assumption of liability includes the Class' claims for violations of the MMWA and express and implied warranty violations.

91.     GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

- GM retained the bulk of the employees of Old GM;

- GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of Old GM; and

- GM acquired all goodwill and other intangible personal property of Old GM.

## VI.  **TOLLING OF THE STATUTES OF LIMITATION**

92.    All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein.  Plaintiffs and the Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old GM and GM did not report information within their knowledge to federal authorities (NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this class action was

filed.

93.    Indeed, Old GM instructed its service shops to provide Defective Vehicle owners with a new key ring if they complained about unintended shut down, rather than admit what Old GM knew – that the ignition switches were dangerously defective and warranted replacement with a properly designed and built ignition system.

94.    Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiffs, and the Class the true character, quality, and nature of the Defective

Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or

substandard materials; and that it will require repair, poses a severe safety concern, and

diminishes the value of the Defective Vehicles.

95.     Because of the active concealment by Old GM and GM, any and all limitations

periods otherwise applicable to Plaintiffs' claims have been tolled.

### VII.     CLASS ALLEGATIONS

96.     Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

Plaintiffs bring this action on behalf of themselves and a Class initially defined as follows:

> All persons in the United States who currently own or lease one or
> more of the following GM vehicles: 2003-07 Saturn Ion; 2005-07
> Chevrolet Cobalt; 2007 Pontiac G5; 2006-07 Chevrolet HHR;
> 2006-07 Pontiac Solstice; and 2007 Saturn Sky (the "Defective
> Vehicles"). This list will be supplemented to include other GM
> vehicles that have the defective ignition switches, which
> inadvertently turn off the engine and vehicle electrical systems
> during ordinary driving conditions.

97.     Included within the Class is a subclass of Pennsylvania residents who own or

lease Defective Vehicles (the "Pennsylvania Subclass").

98.     Excluded from the Class are GM, its employees, co-conspirators, officers,

directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or

affiliated companies; class counsel and their employees; and the judicial officers and their

immediate family members and associated court staff assigned to this case, and all persons

within the third degree of relationship to any such persons. Also excluded are any individuals

claiming damages from personal injuries allegedly arising from the Defective Vehicles.

99.     The Defective Vehicles include at least the following models: Chevrolet Cobalts

(2005-07 model years); Pontiac G5 (2006-07 model years); Saturn Ions (2003-07 model years);

Chevrolet Hurst (2006-07 model years); Pontiac Solstice (2006-07 model years); and Saturn Sky
(2007 model year).

100.    Plaintiffs are informed and believes that Old GM manufactured and sold to
consumers at least 2.6 million of the Defective Vehicles nationwide and hundreds-of-thousands
of Defective Vehicles in the State of California.  Individual joinder of all Class or Subclass
members is impracticable.

101.    The Class expressly disclaims any recovery for physical injury resulting from the
ignition switch defects.  But the increased risk of injury from the ignition switch defects serves
as an independent justification for the relief sought by Plaintiffs and the Class.

102.    The Class can be readily identified using registration records, sales records,
production records, and other information kept by GM or third parties in the usual course of
business and within their control.

103.    Questions of law and fact are common to the Class and the Subclass and
predominate over questions affecting only individual members, including the following:

(a)    Whether the Defective Vehicles suffer from ignition switch defects;

(b)    Whether Old GM and GM concealed the defects;

(c)    Whether Old GM and GM misrepresented that the Defective Vehicles
were safe;

(d)    Whether Old GM and GM engaged in fraudulent concealment;

(e)    Whether Old GM and GM engaged in unfair, deceptive, unlawful and/or
fraudulent acts or practices in trade or commerce by failing to disclose that
the Defective Vehicles were designed, manufactured, and sold with
defective ignition switches;

(f)    Whether the alleged conduct by GM violated laws as Plaintiffs alleges;

(g)    Whether Old GM's and GM's unlawful, unfair and/or deceptive practices
harmed Plaintiffs and the members of the Class

    (h)    Whether GM violated the Michigan Consumer Protection Act ("MCPA"), and, if so, what remedies are available for the Class under Mich. Comp. L. Ann. § 445.911;

    (i)    Whether GM violated Pennsylvania law, including the Unfair Trade Practice and Consumer Protection Act; and breached the express and implied warranties provided by GM, and if so, what remedies are available for the Pennsylvania Subclass;

    (j)    Whether Plaintiffs and the members of the Class are entitled to declaratory, equitable and/or injunctive relief; and

    (k)    Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM.

104.    Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by GM and Old GM. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

105.    Plaintiffs will fairly and adequately represent and protect the interests of all absent Class members. Plaintiffs are represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

106.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable. Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

107.    The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM. The conduct of this action as a class action

presents far fewer management difficulties, conserves judicial resources and the parties'
resources, and protects the rights of each Class member.

108.     Plaintiffs are not aware of any obstacles likely to be encountered in the
management of this action that would preclude its maintenance as a class action.  Plaintiffs
anticipate providing appropriate notice to be approved by the Court after discovery into the size
and nature of the Class.

## VIII.   CAUSES OF ACTION

## COUNT I
### Fraudulent Concealment

109.     Plaintiffs and the Class incorporate by reference each preceding and following
paragraph as though fully set forth at length herein.

110.     This claim is brought on behalf of the nationwide Class.

111.     GM concealed and suppressed material facts concerning the ignition switch
defects, and GM also has successor liability for the acts of concealment and oppression of Old
GM as set forth above.

112.     The Companies had a duty to disclose the ignition switch defects because they
were known and/or accessible only to the Companies who had superior knowledge and access to
the facts, and the Companies knew they were not known to or reasonably discoverable by
Plaintiffs and the Class. These omitted and concealed facts were material because they directly
impact the safety of the Defective Vehicles. Whether an ignition switch was designed and
manufactured with appropriate safeguards is a material safety concern.

113.     The Companies actively concealed and/or suppressed these material facts, in
whole or in part, to protect their profits and avoid a costly recall, and they did so at the expense
of Plaintiffs and the Class.

114. On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Class and conceal material information regarding the defects that exist in the Defective Vehicles and other GM vehicles.

115. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class's actions were justified. The Companies were in exclusive control of the material facts and such facts were not known to the public, Plaintiffs or the Class.

116. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they purchased and retained vehicles that are now diminished in value from what they would have been had the Companies timely disclosed the ignition switch defects.

117. The Companies' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich the Companies. The Companies' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II

### Declaratory Judgment Act, 28 U.S.C. §2201, et seq.
### On behalf of a Rule 23(b)(2) Declaratory Relief Class

118. Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

119. Declaratory relief is intended to minimizes "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2751 (3d ed. 1998).

120.    The Defective Vehicles are delivered by GM with a New Vehicle Limited Warranty.  This Warranty warrants that the Defective Vehicles were free from defects at the time of delivery, stating: "Any defects still present at the time the vehicle is delivered to you are covered by the warranty."  The ignition switch defects are latent defects in the Defective Vehicles that existed at the time of delivery to the owner or lessee, and any subsequent sale.

121.    There is an actual controversy between GM and Plaintiffs concerning: (1) whether the ignition systems of the Defective Vehicles contain a defect; (2) whether the defect is covered by the Warranty; (3) whether the time limitations of the Warranty are nullified by GM's concealment of the ignition switch defects in the Defective Vehicles at the time of delivery to the original, or any subsequent, owner or lessee; (4) whether the recall announced by GM provides the relief available to the Class under the terms of the Warranty; and (5) whether GM is obligated to buy back the Defective Vehicles given its knowledge of the ignition switch defects as early as 2001, prior to delivery of those Defective Vehicles to the original owners, and active ongoing concealment of that knowledge from the original and subsequent owners and lessees of the Defective Vehicles for over a decade.

122.    Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

123.    Plaintiffs seek a declaration that the Defective Vehicles included a defective ignition switch assembly, which was known to GM prior to the delivery of those Defective Vehicles to the members of the Class.  Concealment of the known ignition switch defects at the time of sale denied the Class an opportunity to refuse delivery of the Defective Vehicle.  As a

result, the Class has a legal right to reject this vehicle today rather than accept the relief afforded by the limited recall announced by GM.

124.    The declaratory relief requested herein will generate common answers that will settle the controversy relating to the Defective Vehicles and the alleged ignition switch defects. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

## COUNT III

### (Violation of Magnuson-Moss Consumer Products Warranties Act, 15 U.S.C. § 2301, et seq. ("MMWA") (On behalf of all Classes)

125.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

126.    The MMWA provides a private right of action by purchasers of consumer products against manufacturers or retailers who, inter alia, fail to comply with the terms of the written, express and/or implied warranties. 15 U.S.C. § 2310(d)(1). As alleged above, Defendant has failed to comply with the terms of its written, express and/or implied warranties.

127.    The Defective Vehicles are consumer products, as that term is defined in 15 U.S.C. § 2301(a).

128.    GM is a warrantor, as that term is defined in 15 U.S.C. § 2301(5).

129.    The Plaintiffs and each member of the Classes are consumers, as that term is defined in 15 U.S.C. § 2301(3).

130.    As a warrantor, GM is obligated to afford the Class, as consumers, all rights and remedies available under the MMWA, regardless of privity.

131.    The MMWA provides a cause of action for breach of warranty or other violations of the Act. 15 U.S.C. § 2310(d)(1). GM has breached its express warranties as alleged herein.

It also has breached its implied warranty of merchantability, which it cannot disclaim under the

MMWA, 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods. Plaintiffs have

suffered damages as a result of GM's breaches of express and implied warranties as set forth

herein; thus, this action lies. 15 U.S.C. § 2310(d)(1)-(2).

132.    GM was on notice of the ignition switch defects as early as 2001, yet did not

undertake any opportunity to cure until 2014, nearly thirteen years later, when GM's knowledge

of the ignition switch defects was first made public. Also, once Plaintiffs' representative

capacity is determined, notice and opportunity to cure on behalf of the Class – through Plaintiffs

– can be provided under 15 U.S.C. § 2310(e).

133.    Plaintiffs and the Class members have suffered, and are entitled to recover,

damages as a result of GM's breaches of warranty and violations of the MMWA.

134.    Additionally, or in the alternative, the MMWA provides for "other legal and

equitable" relief where there has been a breach of warranty or failure to abide by other

obligations imposed by the MMWA. 15 U.S.C. § 2310(d)(1). Rescission and Revocation of

Acceptance are equitable remedies available to Class members under the MMWA.

135.    Plaintiffs also seek and an award of costs and expenses, including attorneys' fees,

under the MMWA to prevailing consumers in connection with the commencement and

prosecution of this action. 15 U.S.C. § 2310(d)(2). Plaintiffs and the prospective class intend to

seek such an award, including expert witness costs and other recoverable costs, as prevailing

consumers at the conclusion of this lawsuit.

## COUNT IV
### (Breach of Implied Warranty of Merchantability)

136.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint.

137.    GM is a merchant who sold the Defective Vehicles to Plaintiffs and members of the Class.

138.    GM impliedly warranted to Plaintiffs and members of the Class that the Defective Vehicles were free of defects, and were merchantable and fit for the ordinary purpose for which such goods were sold and used.

139.    As alleged herein, GM's sales of the Defective Vehicles breached this implied warranty of merchantability because the Defective Vehicles were sold with latent defects described herein as the ignition switch defects. As such, the Defective Vehicles are defective, un-merchantable, and unfit for the ordinary, intended purpose at the time of sale. These ignition switch defects create serious safety risks in the operation of the Defective Vehicles.

140.    GM, however, marketed, promoted and sold the Defective Vehicles as safe and free from defects.

141.    GM had knowledge of, yet concealed, this defect for over a decade. Plaintiffs provided reasonable and adequate notice to GM through its dealer network when seeking repairs on the vehicle following an accident. GM failed to cure the ignition switch defects that existed, and were known to GM yet concealed from Plaintiffs, at the time the Plaintiffs purchased their Defective Vehicle.

142.    Defendant's purported disclaimer or exclusion of the implied warranty of merchantability its written warranty is invalid, void, and unenforceable per Magnuson-Moss, 15 U.S.C. § 2308(a)(1).

143.    GM's warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable because they disclaimed a defect known but not disclosed to consumers at or before the time of purchase.

144.    Any contractual language contained in GM's written warranty that attempts to limit remedies is unconscionable, fails to conform to the requirements for limiting remedies under applicable law, causes the warranty to fail of its essential purpose, and is, thus, unconscionable, unenforceable and/or void.

145.    The Breach of Implied Warranty of Merchantability laws in the following states do not differ, or differ in an immaterial way, from the laws of Pennsylvania: Massachusetts, and New Jersey: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming.  Thus, this claim is likewise asserted on behalf of residents of these states.

146.    As a direct and proximate result of the breach of said warranty, Plaintiffs and the Class Members suffered and will continue to suffer losses as alleged herein in an amount to be determined at trial.

147.    Additionally, or in the alternative, Plaintiffs and the Class seek declaratory relief relating to the ignition switch defects alleged herein, and the opportunity to rescind the purchase agreement for the Defective Vehicle.

## COUNT V

### (Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law)
### (On behalf of a Pennsylvania State Sub-Class Only)

148.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

149.    Plaintiffs and the Pennsylvania State Sub-Class members are "person[s]" as that term is defined by 73 P.S. § 201-2(2).

150.    Defendants' conduct and omissions alleged herein occurred throughout the United States, including within the Commonwealth of Pennsylvania, and constitutes deceptive conduct that creates a likelihood of confusion or misunderstanding in connection with the sale of the Defective Vehicles.

151.    Defendants' conduct and omissions alleged herein violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4)(v), (vii), (xiv), and/or (xxi).

152.    Under the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1) & (2).

153.    In acquiring Old GM, GM expressly assumed the obligations to make all required disclosures under the TREAD Act.

154.    GM also has successor liability for the deceptive and unfair acts and omissions of Old GM.

155.    Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect. 49 U.S.C. § 30118(b)(2)(A) & (B).

156.    Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b).  At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from

similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

157.    The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect. 49 C.F.R. § 276.6(b) & (c).

158.    The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government.  The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000."  49 C.F.R. § 578.6(c).

159.    From at least 2001, Old GM had knowledge of the ignition switch defect, but hid the problem for the remainder of its existence until 2009.

160.    From its creation on July 10, 2009, GM knew of the ignition switch problem because of the knowledge of Old GM and continuous reports up until the present.

161.    GM admits the defect in the ignition switch has been linked to at least twelve accident-related fatalities.  But other sources have reported that hundreds of deaths and serious injuries are linked to the faulty ignition switches.

162.    Despite being aware of the ignition switch defects ever since its creation on July 10, 2009, GM waited until February 7, 2014, before finally sending a letter to NHTSA confessing its knowledge of the ignition switch defects which could cause the vehicles to lose power, and in turn cause the airbags not to deploy.  GM initially identified two vehicle models,

along with the corresponding model years, affected by the defect -- the 2005-2007 Chevrolet Cobalt and the 2007 Pontiac G5. On February 25, GM amended its letter to include four additional vehicles, the 2006¬2007 Chevrolet HHR, 2006-2007 Pontiac Solstice, 2003-2007 Saturn Ion, and the 2007 Saturn Sky.

163.  By failing to disclose and by actively concealing the ignition switch defect, and by selling vehicles while violating the TREAD Act and other conduct as alleged herein, Old GM and GM both engaged in unfair methods of competition and unfair or deceptive acts or practices prohibited by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*.

164.  Both Old GM and GM failed for many years to inform NHTSA about known defects in the Defective Vehicles' ignition system. Consequently, the public, including Plaintiffs and the Pennsylvania Subclass, received no notice of the ignition switch defects, that the defect could disable multiple electrical functions including power steering and power brakes, or that the defect could cause the airbags not to deploy in an accident.

165.  GM knew that the ignition switch had a defect that could cause a vehicle's engine to lose power without warning, and that when the engine lost power there was a risk that electrical functions would fail and that the airbags would not deploy. Yet GM failed to inform NHTSA or warn Plaintiffs or the public about these inherent dangers despite having a duty to do so.

166.  Old GM and GM owed Plaintiffs and the Pennsylvania Subclass a duty to comply with the TREAD Act and disclose the defective nature of Defective Vehicles, including the ignition switch defect and accompanying loss of power and failure of the airbags to deploy, because Old GM and GM:

      a.     Possessed exclusive knowledge of the ignition switch defects rendering the Defective Vehicles inherently more dangerous and unreliable than otherwise similar vehicles; and

      b.     Intentionally concealed the hazardous situation with Defective Vehicles by failing to comply with the TREAD Act and disclosing the ignition switch defects.

167.    Defective Vehicles equipped with the faulty ignition switch pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, and pedestrians, because they are susceptible to sudden loss of power resulting in the loss of power steering and power brakes and failure of the airbags to deploy.

168.    Old GM's and GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Defective Vehicles.

169.    Because of their violations detailed above, Old GM and GM caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs and the Pennsylvania Subclass.  Plaintiffs and the Pennsylvania Subclass members currently own or lease Defective Vehicles that are defective and inherently unsafe.  These violations caused the diminution in value of Plaintiffs' vehicles which are now worth less than they would have been without the ignition switch defects.  Had Old GM timely disclosed the defect, Plaintiffs would either not have purchased the Defective Vehicle at all, or would have paid less for the Defective Vehicle. Plaintiffs and the Class did not receive the benefit of their bargain which was for a safe vehicle free of serious safety defects.

170.    Had GM timely disclosed the ignition switch defects, the issue would have been resolved years ago and the value of Plaintiffs' Defective Vehicles would not now be diminished.

171.    Plaintiffs and the Class face the risk of irreparable injury as a result of GM's acts
and omissions in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection
Law, and these violations present a continuing risk to Plaintiffs and to the general public.

172.    Plaintiffs and other members of the Pennsylvania State Sub-Class pursuant to the
Pennsylvania Unfair Trade Practices and Consumer Protection Law, § 201-9.2 seek to recover
either their actual damages or one hundred dollars ($100.00), whichever is greater, together with
trebling of actual damages, counsel fees, expenses and costs, as well as any and all such other
items of damage and equitable relief available.

## COUNT VI

### (Breach of Express Warranty)
### (On behalf of All Class Members)

173.    Plaintiffs hereby incorporate by reference the allegations contained in the
preceding paragraphs of this Complaint.

174.    As part of the basis of the bargain when Plaintiffs McCann purchased the Cobalt
in November 2006, GM provided a 3-year/36,000 mile limited warranty promising "bumper to
bumper" repair or replacement of any part, component or system that was defective in materials
or workmanship.

175.    In addition, the McCanns purchased the extended warranty to cover the Cobalt
through November 2011.

176.    As specified in paragraph 26 above, on three (3) separate occasions during the
warranty period the McCanns presented the Cobalt to a GM authorized dealer for repairs to the
ignition system.

177.   Despite these repeated presentments, and despite GM's now admitted knowledge of the ignition switch defect, GM failed to cure the defect and failed to comply with the promises of its express warranty.

178.   In fact, Defendant knowingly concealed from the McCanns its knowledge of the defect in the ignition switch and the fact that Defendant had affirmatively failed to comply with its promise to repair or replace defective parts, systems or components.

179.   On information and belief, GM implemented a policy and practice of denying covered warranty repairs to all members of the Class with respect to ignition switch problems and complaints associated with ignition switch failures.

180.   Indeed, GM affirmatively decided not to manufacture, distribute and install a redesigned and non-defective ignition switch because such an expense would cost the company too much money.  As a result, GM breached the duty of good faith and fair dealing by failing to inform Plaintiffs McCann and all other Class members that the ignition switch system was in fact defective and that GM would not, in fact, be meeting its contractual promises under the original and extended warranties to repair or replace such defective parts.

181.   On information and belief, there are no material differences among any of the 50 states or United States territories concerning express warranties under the Uniform Commercial Code, particularly since Section 1-301 of the UCC provides for application of the law that is most protective of consumers and since UCC Sections 2-313 and 2-714 do not vary in any material respect among any of the jurisdictions of the United States.

182.   Before and during the warranty period, GM knew that the ignition switch system on the Cobalt was defective.

183.    By failing to repair or replace the defective ignition switch system, and by
fraudulently concealing the existence of this known defect, GM breached the express warranties
and its duties of good faith and fair dealing thereunder.

184.    As a result of these breaches of contract, Plaintiffs and all Class Members have
been damaged because they were deprived of the benefit of the bargain, which can be measured
by the amount they overpaid for an express warranty that the seller consciously but secretly
refused to fulfill, thus rendering the warranty worthless; by the reasonable repair and
replacement costs necessary to put each car in a non-defective condition upon delivery to each
consumer and thereafter, or by the difference in value between the price paid for the car and the
price that would have been paid had consumers known about the defect and the fact that the
warranty would not correct that defect at the time the car was sold to consumers.

185.    In view of these evident breaches of warranty, Plaintiffs and all Class members
are entitled, at a minimum, to nominal damages.

## COUNT VII

### (Breach of Express Warranty)
### (On behalf of Sub-Class of Purchasers of Certified Pre-owned Cars)

186.    Plaintiffs hereby incorporate by reference the allegations contained in the
preceding paragraphs of this Complaint.

187.    As part of the basis of the bargain when Plaintiff Pollastro purchased the
"Certified Pre-owned" Cobalt in November 2010, GM provided a 12 month/12,000 mile limited
warranty promising "bumper to bumper" repair or replacement of any part, component or system
that was defective in materials or workmanship.

188.    On information and belief, there are no material differences among any of the 50
states or United States territories concerning express warranties under the Uniform Commercial

Code, particularly since Section 1-301 of the UCC provides for application of the law that is most protective of consumers and since UCC Sections 2-313 and 2-714 do not vary in any material respect among any of the jurisdictions of the United States.

189.    Before and during the warranty period, GM knew that the ignition switch system on the Cobalt was defective.

190.    In addition, on May 9, 2011, Plaintiff presented the Cobalt to a GM authorized dealer, Northstar Chevrolet in Moon Township, PA, for repairs because the key was stuck in the ignition system and could not be removed.

191.    Plaintiff also presented the Cobalt to another GM authorized dealer, Colussy Chevrolet in Bridgeville, PA, for warranty repairs.

192.    Despite GM's prior knowledge of the ignition switch defect, and despite Plaintiff's two presentations for warranty service under the "Certified Pre-owned" warranty, GM failed to comply with the terms of its written, express warranty by replacing the defective ignition switch system.

193.    As a result, GM has breached the express warranty.

194.    On information and belief, GM has also breached the express warranties provided to all other purchasers of "Certified Pre-owned" cars having the defective ignition switch systems despite being on notice since at least 2005 that all the ignition switch components, parts or systems were, in fact, defective in materials and workmanship.

195.    As a result of GM's breach, Plaintiff and all other persons who purchased "Certified Pre-owned" cars having the defective ignition switch components have suffered damages.

196.     As a result of GM's breach, Plaintiff and all other sub-class members are also entitled, at a minimum, to nominal damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and in favor of Plaintiffs and the Class, and grant the following relief:

A.     Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class and Subclass Representative and Plaintiffs' chosen counsel as Class Counsel;

B.     Declare, adjudge and decree the conduct of GM as alleged herein to be unlawful, unfair and/or deceptive, and enjoin any such future conduct;

C.     Award Plaintiffs and Class members actual, compensatory damages, nominal damages and/or statutory damages, as proven at trial;

D.     Alternatively, if elected by Plaintiffs and the Subclass, permit rescission of the purchase agreement for the Defective Vehicles requiring GM's buy-back of the Defective Vehicles;

E.     Alternatively, if elected by Plaintiffs and the Subclass, require GM to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

F.     Award Plaintiffs and the Pennsylvania Subclass all monies paid to Old GM because of GM's violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

G.      Award Plaintiffs and the Class members exemplary damages in such amount as

proven;

H.      Award Plaintiffs and the Class members their reasonable attorneys' fees, costs,

and pre-judgment and post-judgment interest; and

I.      Award Plaintiffs and the Class members such other further and different relief as

the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on the legal claims, as set forth herein.

Date:  April 8, 2014                      By: _____

                                               Joseph G. Price, Esquire
                                               Sean P. McDonough, Esquire
                                               Paul T. Oven, Esquire
                                               **DOUGHERTY LEVENTHAL & PRICE, LLP**
                                               75 Glenmaura National Blvd.
                                               Moosic, PA 18507
                                               Telephone: 570-347-1011
                                               Email: JPrice@dlplaw.com
                                                         SMcDonough@dlplaw.com
                                                         Ptoven@dlplaw.com

Simon B. Paris                                    Michael D. Donovan
Patrick Howard                                    **DONOVAN AXLER, LLC**
Charles J. Kocher                                 1845 Walnut Street, Suite 1100
**SALTZ, MONGELUZZI, BARRETT &**                  Philadelphia, PA 19103
**BENDESKY, PC**                                  215-732-6067
One Liberty Place, 52nd Floor                     215-732-8060(fax)
1650 Market Street                                mdonovan@donovanaxler.com
Philadelphia, PA  19103
Tel.: (215) 575-3986
Fax: (215) 496-0999
Email:  sparis@smbb.com
         phoward@smbb.com
         ckocher@smbb.com

*Attorneys for Plaintiffs and the Class*

**AUSTIN DEPALMA, et al.**
**VS**
**GENERAL MOTORS LLC and DELPHI AUTOMOTIVE PLC**


**PLAINTIFFS' COUNSEL LIST**


JOSEPH G. PRICE, Esquire – Atty ID #32309 – jprice@dlplaw.com
SEAN McDONOUGH, Esquire – Atty. ID #47428 – smcdonough@dlplaw.com
PAUL T. OVEN, Esquire – Atty. ID #77106 – ptoven@dlp.law.com
**DOUGHERTY, LEVENTHAL & PRICE, L.L.P.**
75 Glenmaura National Boulevard
Moosic, PA  18507
570-347-1011 (Telephone)
570-347-7028 (Facsimile)

SIMON B. PARIS, Esquire – *pro hac motion to be filed* – sparis@smbb.com
PATRICK HOWARD, Esquire – Atty. ID #88657 – phoward@smbb.com
CHARLES J. KOCHER, Esquire – Atty. ID #93141 – ckocher@smbb.com
**SALTZ, MONGELUZZI, BARRETT & BENDESKY, P.C.**
One Liberty Place – 52nd Floor
1650 Market Street
Philadelphia, PA  19103
215-575-3986 (Telephone)
215-496-0999 (Facsimile)

MICHAEL D. DONOVAN, Esquire – mdonovan@donovanaxler.com
**DONOVAN AXLER, L.L.C.**
1845 Walnut Street – Suite 1100
Philadelphia, PA  19103
215-732-6067 (Telephone)
215- 732-8060 (Facsimile)