# Exhibit UU

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SHENYESA HENRY and PAM GLADSON, individually and on behalf of all similarly situated persons, | |
| Plaintiffs, | Case No. _____ |
| v. | JURY DEMANDED |
| GENERAL MOTORS LLC, | CLASS ACTION |
| Defendant. | |

_____

## PLAINTIFFS' CLASS ACTION COMPLAINT
_____

Plaintiffs Shenyesa Henry and Pam Gladson, individually and as class representatives on behalf of all similarly situated persons and the general public, brings this action against Defendant General Motors LLC ("Defendant" or "GM") and alleges as follows:

## I.    INTRODUCTION

1.    This case involves an egregious, unconscionable and unprecedented failure to disclose and to affirmatively conceal a known defect in GM vehicles.

2.    An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public. GM's

Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet, GM failed to live up to this commitment.

3.      The first priority of a car manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision. In addition, a car manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely, and its safety critical systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.  Moreover, a manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or its airbags not to deploy, must promptly disclose and remedy such defects.

4.      Since 2002, GM has sold millions of vehicles throughout the United States and worldwide that have a safety defect in which the vehicle's ignition switch can unintentionally move from the "run" position to the "accessory" or "off" position, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

5.      GM began installing these ignition switch systems in models from 2002 through at least 2007 and possibly later. GM promised that these new systems would operate safely and reliably. This promise turned out to be false in several material respects. In reality, GM concealed and did not fix a serious quality and safety problem plaguing its vehicles.

6.      Worse yet, the defects in GM's vehicle could have been easily avoided.

7.      From 2004 to the present, GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its ignition switch system.

8.      Yet, despite the dangerous nature of this defect and its effects on safety critical systems, GM concealed its existence and failed to repair the problem.

9.      Despite notice of the defect in its vehicles, GM did not disclose to consumers that its vehicles – which GM for years had advertised as "safe" and "reliable" – were in fact not as safe or reliable.

10.     GM's CEO, Mary Barra has admitted in a video message that: "Something went wrong with our process in this instance, and terrible things happened."

11.     This case arises from GM's breach of its obligations and duties, including GM's failure to disclose that, as a result of defective ignition switch design, at least 2.4 million GM vehicles had the propensity to shut down during normal driving conditions and created an extreme and unreasonable risk of accident, serious bodily harm, and death.

12.     GM's predecessor, General Motors Corporation ("Old GM") also violated these rules by designing and marketing vehicles with defective ignition switches, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents. In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.

13.     The defective ignition switches were manufactured by Delphi Automotive PLC ("Delphi"). Once a subsidiary of Old GM, Delphi spun-off from Old GM in 1999, and was an independent publicly held corporation.

14.     Plaintiffs allege based on information and belief, that Delphi knew its ignition switches were defective, but nevertheless continued to manufacture and sell the defective ignition switch systems, which it knew would be used in the vehicles of Plaintiffs and the Class.

15.     Plaintiffs bring this action for a Class of all persons in the United States who currently own or lease one or more of the following GM vehicles: 2003-07 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2005-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky (hereinafter "Defective Vehicles").Plaintiffs believe that there are other GM vehicles which suffer from the same or substantially similar ignition switch defects as the Defective Vehicles identified above. Accordingly, Plaintiffs will supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switches, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment.

16.     Plaintiffs also sue for a subclass of Texas residents who own or lease one or more Defective Vehicles.

17.     The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

        a. The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

        b. When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident;

        c. When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

18.    The ignition switch defects make the Defective Vehicles unreasonably dangerous. Because of the defects, the Defective Vehicles are likely to be involved in accidents, and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants.

19.    GM admits to at least twelve deaths as a result of the ignition switch defects, but the actual number is believed to be much higher.

20.    The ignition switch defects present a significant and unreasonable safety risk exposing Defective Vehicle owners and their passengers to a risk of serious injury or death.

21.    For many years, GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and maximize sales, GM concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

22.    Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects.[2]  If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[3]

23.    In addition to the TREAD Act and other laws, GM violated the Michigan Consumer Protection Act (the "MCPA") and fraudulently concealed the deadly ignition switch defects from consumers, owners, and lessees of the Defective Vehicles. GM also violated the

---

[1] 49 U.S.C. §§ 30101-30170.
[2] 49 U.S.C. § 30118(c)(1) & (2).
[3] 49 U.S.C. § 30118(b)(2)(A) & (B).

TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects.

24.    Plaintiffs and the Class have been damaged by GM's misrepresentations, concealment and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding highly dangerous vehicles whose value has greatly diminished because of GM's failure to timely disclose the serious defect.

25.    Plaintiffs and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

26.    Plaintiffs and the Class paid more for the Defective Vehicles than they would have had they known of the ignition defects or they would not have purchased the Defective Vehicles at all.

## II.    JURISDICTION AND VENUE

27.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

28.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over GM because GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

29.    Venue is proper in this District under 28 U.S.C. § 1391 because GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal

jurisdiction. Additionally, GM transacts business within the District, and some of the events establishing the claims arose in this District.

### III.    PARTIES

30.    Plaintiff and Named Class Representative Shenyesa Henry is a resident and citizen of Denton County, Texas.  Plaintiff owns a 2004 Saturn Ion.  Plaintiff chose the Ion in part because she wanted a safely designed and manufactured vehicle. Plaintiff saw advertisements for Old GM vehicles before she purchased the Ion, and, although she does not recall the specifics of the advertisements, she does recall that safety and quality were consistent themes across the advertisements she saw. These representations about safety and quality influenced Plaintiff's decision to purchase the Ion. Plaintiff did not learn of the ignition switch defects until about March 2014. Had Old GM disclosed the ignition switch defects, Plaintiff would not have purchased her Ion, or would have paid less than she did, and would not have retained the vehicle.

31.    Plaintiff and Named Class Representative Pam Gladson is a resident and citizen of Tarrant County, Texas.  Plaintiff owns a 2005 Chevrolet Cobalt.  Plaintiff chose the Cobalt in part because she wanted a safely designed and manufactured vehicle. Plaintiff saw advertisements for Old GM vehicles before she purchased the Cobalt, and, although she does not recall the specifics of the advertisements, she does recall that safety and quality were consistent themes across the advertisements she saw. These representations about safety and quality influenced Plaintiff's decision to purchase the Cobalt. Plaintiff did not learn of the ignition switch defects until about March 2014. Had Old GM disclosed the ignition switch defects, Plaintiff would not have purchased her Cobalt, or would have paid less than she did, and would not have retained the vehicle.

32.     Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. GM was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM.") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

33.     Among the liabilities and obligations expressly retained by GM after the bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

> GM also expressly assumed:

> all Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

34.     Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

## IV.    FACTUAL ALLEGATIONS

**A.    The Ignition Switch Defects in the Defective Vehicles**

35.    Given the importance that a vehicle and its electrical operating systems remain operational during ordinary driving conditions, it is imperative that a vehicle manufacturer ensure that its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle. With respect to the Defective Vehicles, GM has failed to do so.

36.    In the Defective Vehicles, the ignition switch defects can cause the car's engine and electrical system to shut off, disabling the power steering and power brakes and causing the non-deployment of the vehicle's airbags in the event of a crash.

37.    The Defective Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

**B.    GM Knew of the Ignition Switch Defects for Years, but Concealed the Defects from Plaintiffs and the Class**

38.    Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences for many years, but concealed their knowledge from Defective Vehicle owners.

39.    For example, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy. Ms. Rose's death was the first of the hundreds deaths and injuries attributable to the ignition switch defects. Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM and GM to address the ignition switch problem.

40.     Another incident involved sixteen year-old Megan Phillips. Ms. Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees. NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact. According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they began communicating. As she stated, "I don't understand why [GM] would wait 10 years to say something. And I want to understand it but I never will."[4]

41.     Rather than publicly admitting the dangerous safety defects in its vehicles, GM attempted to attribute these and other incidents to "driver error." Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering and/or airbag failures, including:

- 2005: 26 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved.

- 2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved and 4 deaths citing Unknown component.

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing Airbag as component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved and 2 deaths citing Unknown component.

- 2009: 133 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved, 1 death citing Service Brake as component involved, 1 death citing Steering as component involved, and 2 deaths citing Unknown component.

- 2010: 400 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 12 deaths citing steering as component involved, and 1 death citing Unknown component.

---

[4] "Owners of Recalled GM Cars Feel Angry, Vindicated," Reuters (Mar. 17, 2014).

- 2011: 187 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 2 deaths citing Steering as component involved, and 1 Unknown component.

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

42.     GM now admits that Old GM learned of the ignition switch defects as early as 2001. During the pre-production development of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position. Old GM claimed that a switch design change "had resolved the problem."[5]

43.     In 2003, an internal report documented an instance in which the service technician observed a stall while driving. The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. It was replaced and the matter was closed.[6]

44.     According to GM's latest chronology submitted to NHTSA pursuant to 49 CFR § 573.6, Old GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

45.     Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

46.     According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

---

[5] "G.M. Reveals It Was Told of Ignition Defect in '01," D. Ivory, NEW YORK TIMES (Mar. 12, 2014).
[6] *Id.*

47.     As soon the 2005 Cobalt hit the market, Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[7] Old GM opened additional PRTS inquires.

48.     In another PRTS opened in May 2005, Old GM engineers again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration. After initially approving the proposed fix, Old GM reversed course and again declined to implement a fix.[8]

49.     Instead, in October 2005, Old GM simply issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the loss of the car's electrical system.

50.     Rather than disclosing the true nature of the defects and correcting them, under the TSB, Old GM gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key ring from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging as low as they had in the past.[9]  According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[10]

51.     Yet there was no recall. And, not surprisingly, Old GM continued to get complaints.

---

[7]   March 11, 2014 Chronology Re: Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles, at 1.
[8]   *Id.*
[9]   *Id.* at 1-2.
[10]  *Id.* at 3.

52.    In 2006, Old GM approved a design change for the Cobalt's ignition switch supplied by Delphi. The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch." But the new design was not produced until the 2007 model year.[11]

53.    In 2007, NHTSA investigators met with Old GM to discuss its airbags, and informed Old GM of the July 2005 frontal and fatal crash involving Amber Marie Rose.

54.    As alleged above, the airbags in Ms. Rose's 2005 Cobalt did not deploy.  Data retrieved from her vehicle's diagnostic system indicated that the ignition was in the "accessory" position. Old GM investigated and tracked similar incidents.

55.    By the end of 2007, by GM's own admission, Old GM knew of 10 frontal collisions in which the airbag did not deploy.[12]  Plaintiffs believe that Old GM actually knew of many other similar incidents involving the ignition switch defects.

56.    For the next six years, GM continued to get complaints and continued to investigate frontal crashes in which the airbags did not deploy.

57.    However, according to GM, it was not until 2011 and 2012 that GM's examinations of switches from vehicles that had experienced crashes revealed significant design differences in the torque performance of ignition switches from the 2005 Cobalts and those from the 2010 model year, the last year of the Cobalt's production.

58.    GM responded by blaming the supplier for the switch design.[13]

59.    In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the Cobalt and G5 vehicles.[14]

---

[11] *Id.* at 2.
[12] Feb. 24, 2014 Attachment B-573.6(c)(6) at 2.
[13] *Id.* at 3-4.

**C.    GM Waited Until 2014 to Finally Order a Recall of the Defective Vehicles**

60.    After analysis by GM's Field Performance Review Committee and the Executive Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of *some* of the Defective Vehicles on January 31, 2014.

61.    Initially, GM's EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

62.    After additional analysis, the EFADC expanded the recall on February 24, 2014 to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

63.    On March 28, 2014, the recall was expanded to include the following vehicles - 2008 – 2010 Pontiac Solstice and G5; 2008-2010 Saturn Sky; 2008-2010 Chevrolet Cobalt; 2008-2011 Chevrolet HHR.

64.    GM provided dealers with notice of the recall on February 26, 2014 and March 4, 2014 and mailed letters to current owners on March 10 and March 11, 2014.

65.    According to GM, "the dealers are to replace the ignition switch,"[15] presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

66.    In a video message addressed to GM employees on March 17, 2014, C.E.O. Mary Barra admitted that the Company had made mistakes and needed to change its processes.

67.    According to Ms. Barra, "Something went terribly wrong in our processes in this instance, and terrible things happened." Barra continued to promise, "We will be better because of this tragic situation if we seize this opportunity."[16]

---

[14]  *Id.* at 4-5.
[15]  *Id.* at 6.

68.     GM now faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

69.     While GM has now appointed a new Vehicle Safety Chief, on information and belief at least 2.4 million Defective Vehicles remain on the road to this day; and, on information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defects.

**D.      Old GM Promoted the Defective Vehicles as Safe and Reliable**

70.     On information and belief, in marketing and advertising materials, Old GM consistently promoted the Defective Vehicles as safe and reliable.

71.     For example, one Cobalt ad promised that "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

72.     An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

73.     A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically engineered for whatever is next." Another 2003 spot closed with the tagline "Saturn. People first."

74.     A 2001 print ad touting the launch of the Saturn focused on safety:

Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars. And it wasn't until we were satisfied that we added things….

75.     Old GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicles were defective.

---

[16] *"Something Went "Very Wrong" at G.M., Chief Says."* N.Y. TIMES (Mar. 18, 2014).

76.    Throughout the relevant period, Old GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

77.    Old GM never informed consumers about the ignition switch defects.

**E.    The Ignition Switch Defects Have Harmed Plaintiffs and the Class**

78.    The ignition switch defects have caused damage to Plaintiffs and the Class.

A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect.

79.    A vehicle purchased, leased or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

80.    Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed. Plaintiffs and the Class overpaid for their Defective Vehicles. Because of the concealed ignition switch defects. Plaintiffs did not receive the benefit of the bargain.

81.    Plaintiffs and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition switch defects.

82.    GM admits to at least twelve deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles. However, Plaintiffs believe that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignitions switch defects.

83.     If Old GM or GM had timely disclosed the ignition switch defects as required by the law, all Class members' vehicles would now be worth more.

## V.     SUCCESSOR LIABILITY

84.     As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

85.     GM also expressly assumed liability for Lemon Law claims in the Master Sale and Purchase Agreement of June 26, 2009, and this assumption of liability includes the Class' claims under the Song-Beverly Act, which is California's Lemon Law statute.

86.     GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

- GM retained the bulk of the employees of Old GM;

- GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of Old GM; and

- GM acquired all goodwill and other intangible personal property of Old GM.

## VI.     TOLLING OF THE STATUTES OF LIMITATION

87.     All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein. Plaintiffs and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect,

that Old GM and GM did not report information within their knowledge to federal authorities (NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this class action was filed.

88.     Indeed, Old GM instructed its service shops to provide Defective Vehicle owners with a new key ring if they complained about unintended shut down, rather than admit what Old GM knew – that the ignition switches were dangerously defective and warranted replacement with a properly designed and built ignition system.

89.     Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiffs, and the Class the true character, quality, and nature of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

90.     Because of the active concealment by Old GM and GM, any and all limitations periods otherwise applicable to Plaintiffs' claims have been tolled.

## VII.     CLASS ALLEGATIONS

91.     Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class initially defined as follows:

> All persons in the United States who currently own or lease one or more of the following GM vehicles: 2003-07 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2005-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky (hereinafter "Defective Vehicles"). This list will be supplemented to include other GM vehicles that have the defective ignition switches, which inadvertently turn off the engine and vehicle electrical systems during ordinary driving conditions.

Included within the Class is a subclass of Texas residents who own or lease Defective-Vehicles (the "Texas Subclass").

92.     Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons. Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Defective Vehicles.

93.     The Defective Vehicles include at least the following models: 2003-07 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2005-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky.

94.     Plaintiffs are informed and believe that Old GM manufactured and sold to consumers at least 2.4 million of the Defective Vehicles nationwide and hundreds of thousands of Defective Vehicles in the State of Texas. Individual joinder of all Class or Subclass members is impracticable.

95.     The Class expressly disclaims any recovery for physical injury resulting from the ignition switch defects. But the increased risk of injury from the ignition switch defects serves as an independent justification for the relief sought by Plaintiffs and the Class.

96.     The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

97.     Questions of law and fact are common to the Class and the Subclass and predominate over questions affecting only individual members, including the following:

(a) Whether the Defective Vehicles suffer from ignition switch defects;

(b) Whether Old GM and GM concealed the defects;

(c) Whether Old GM and GM misrepresented that the Defective Vehicles were safe;

(d) Whether Old GM and GM engaged in fraudulent concealment;

(e) Whether Old GM and GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches;

(f) Whether the alleged conduct by GM violated laws as Plaintiffs allege;

(g) Whether Old GM's and GM's unlawful, unfair and/or deceptive practices harmed Plaintiffs and the members of the Class;

(h) Whether GM violated the Michigan Consumer Protection Act ("MCPA"), MICH. COMP. L. ANN. § 445.901, *et seq*. and, if so, what remedies are available for the Class under Mich. Comp. L. Ann. § 445.911;

(i) Whether GM's practices in connection with the promotion, marketing, advertising, packaging, labeling and sale of the Defective Vehicles unjustly enriched GM at the expense of, and to the detriment of, Plaintiffs and the other members of the Class;

(j) Whether GM breached implied warranties in its sale and lease of the Defective Vehicles, thereby causing harm to Plaintiffs and the other members of the Class;

(k) Whether the Defective Vehicles are unsafe and defective;

(l) Whether Plaintiffs and the members of the Class are entitled to equitable and/or injunctive relief; and

(m) Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM.

98.     Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by GM and Old GM. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

99.     Plaintiffs will fairly and adequately represent and protect the interests of all absent Class members. Plaintiffs are represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

100.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable. Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

101.    The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

102.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Plaintiffs anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

## VIII.   CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. §§ 2301 *et seq.*)

103.   Plaintiffs and the Class incorporate by reference each preceding and following paragraph as though fully set forth at length herein.

104.   This claim is brought on behalf of the nationwide Class.

105.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

106.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

107.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

108.   The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

109.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

110.   GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).   The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

111.   MG breached these warranties as described in more detail above.   Without limitation, the Defective Vehicles share a common design defect in that they are equipped with defective ignition switches that can suddenly fail during normal operation, leaving occupants of

the Defective Vehicles vulnerable to crashes, serious injury, or death. GM has admitted that the Defective Vehicles are defective in issuing its recall of the Defective Vehicles.

112.     Plaintiffs and each of the other Class members have had sufficient direct dealings with either GM or its agents (dealerships) to establish privity of contract between GM, on the one hand, and Plaintiffs and each of the other Class members, on the other hand. Nonetheless, privity is not required in this case because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumer of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the consumer only. Finally, privity is also not required because the Defective Vehicles are dangerous instrumentalities due to the above-referenced defects.

113.     Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile in this case. At the time of sale or lease of each Defective Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation or disclose the defect in design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

114.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Defective Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately

any payments made, Plaintiffs and the other Class members have not re-accepted their Defective
Vehicles by retaining them.

115.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the
sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of
interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs,
individually and on behalf of the other Class members, seek all damages permitted by law,
including diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT II

## VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT

(The MCPA MICH. COMP. L. ANN. § 44901, *et seq*.)

116.    Plaintiffs and the Class incorporate by reference each preceding and following
paragraph as though fully set forth at length herein.

117.    This claim is brought on behalf of the nationwide Class.

118.    Old GM, GM, and Plaintiffs are each "persons" under MICH. COMP. L. ANN. §
445.902(d).

119.    The sale of the Defective Vehicles to Plaintiffs and the Class occurred within
"trade and commerce" within the meaning of MICH. COMP. L. ANN. § 445.902(d), and both GM
and Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as
defined in that statutory section.

120.    The MCPA makes unlawful any "unfair, unconscionable, or deceptive methods,
acts or practices in the conduct of trade or commerce," as more specifically defined in the
MCPA. MICH. COMP. L. ANN. § 445.903 (1). GM has engaged in unfair, unconscionable, and
deceptive methods, acts and practices violation of the MCPA, and also has successor liability for

the unfair, unconscionable, and deceptive methods, acts and practices of Old GM as set forth above.

121.     Both Old GM and GM violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." MICH. COMP. L. ANN. § 445.903(s).

122.     As alleged above, both Companies knew of the safety ignition defect, while Plaintiffs and the Class were deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

123.     Old GM also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is." MICH. COMP. L. ANN. § 405.903(bb). For example, Old GM represented that the Defective Vehicles were safe such that reasonable people believed the represented or suggested state of affairs to be true; namely, that the Defective vehicles were safe.

124.     Old GM also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. L. ANN. § 405.903(cc). Old GM represented that the Defective Vehicles were safe, which made it even more incumbent on Old GM to reveal the material fact of the ignition switch defects.

125.     Old GM's and GM's acts and practices were unfair and unconscionable, because their acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and the Companies' failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and because the harm the

Companies caused consumers greatly outweighs any benefits associated with those practices. The Companies' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the Class from making fully informed decisions about whether to lease, purchase, and/or retain Defective Vehicles.

126.     While Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Defective Vehicles until 2007.

127.     All the while, Old GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

128.     Plaintiffs and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.  Old GM and GM failed to inform NHTSA, and therefore failed to inform consumers, that its vehicles had a defective ignition switch that could lead to injury and death.  Had Plaintiffs and the Class known this, they would either not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles. Plaintiffs and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of herein.

129.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Companies' business.

130.     Plaintiffs request that this Court: enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; provide to Plaintiffs and each Class either their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under MICH. COMP. L. ANN. § 445.911.

131.    Plaintiffs acknowledge that, on its face, the MCPA purports to (i) deprive non-residents of bringing class (but not individual) actions under the MCPA; and (ii) allows individuals (but not class members) the ability to recover a penalty of $250 per person if that amount is greater than their actual damages. After the United States Supreme Court's decision in *Shady Grove Orthopedic Ass., P.A. v. Allstate Ins. Co.*, 589 U.S. 393 (2010), however, any such prohibitions imposed in class actions (but not in individual actions) are trumped and superseded by Fed. R. Civ. P. 23, which imposes no such restrictions.

## COUNT III

## FRAUDULENT CONCEALMENT

132.    Plaintiffs and the Class incorporate by reference each preceding and following paragraph as though fully set forth at length herein.

133.    This claim is brought on behalf of the nationwide Class.

134.    GM concealed and suppressed material facts concerning the ignition switch defects, and GM also has successor liability for the acts of concealment and oppression of Old GM as set forth above.

135.    The Companies had a duty to disclose the ignition switch defects because they were known and/or accessible only to the Companies who had superior knowledge and access to the facts, and the Companies knew they were not known to or reasonably discoverable by Plaintiffs and the Class. These omitted and concealed facts were material because they directly impact the safety of the Defective Vehicles.  Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

136.    The Companies actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and avoid a costly recall, and they did so at the expense of Plaintiffs and the Class.

137.    On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Class and conceal material information regarding the defects that exist in the Defective Vehicles and other GM vehicles.

138.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class's actions were justified. The Companies were in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Class.

139.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they purchased and retained vehicles that are now diminished in value from what they would have been had the Companies timely disclosed the ignition switch defects.

140.    The Companies' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich the Companies. The Companies' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## BREACH OF IMPLIED WARRANTY

141.    Plaintiffs re-allege and incorporate by reference all preceding Paragraphs of this Complaint as if set forth fully herein.

142.    This claim is brought on behalf of the Texas Subclass.

143.    Plaintiffs and the other members of the proposed Class purchased or leased the
Defective Vehicles, which were promoted, marketed, and advertised as being safe to operate and
drive.  Pursuant to these sales and leases, GM impliedly warranted that the Defective Vehicles
were merchantable.  The defect in the Defective Vehicles will inevitably manifest itself during
ordinary use of the Defective Vehicles and as such, the defect renders the Defective Vehicles
unfit for the ordinary purpose for which the Defective Vehicles are used.

144.    GM breached the implied warranty of merchantability because Plaintiffs and the
other members of the proposed Class did not receive vehicles which were safe to operate and
thus, were not merchantable.

145.    As a result of the breach, Plaintiffs and the other members of the proposed Class
have been damaged in an amount to be determined at trial.

**COUNT V**

**UNJUST ENRICHMENT**

146.    Plaintiffs re-allege and incorporate by reference all preceding Paragraphs of this
Complaint as if set forth fully herein.

147.    This claim is brought on behalf of the Texas Subclass.

148.    As a result of GM's wrongful conduct as described herein, GM was enriched, at
the expense of Plaintiffs and the Class, through the receipt of money from the purchase or lease
of the Defective Vehicles.

149.    Under these circumstances, it would be against equity and good conscience to
permit GM to retain the ill-gotten monies that it received from Plaintiffs and the other members
of the proposed Class.  Because the Defective Vehicles were not safe and reliable as represented

by GM, it would be unjust and inequitable of GM to retain the benefit without restitution to Plaintiffs and the other members of the proposed Class for the monies received by GM for the sale or lease of the Defective Vehicles.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and in favor of Plaintiffs and the Class, and grant the following relief:

A. Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class and Subclass Representative and Plaintiffs' chosen counsel as Class Counsel;

B. Declare, adjudge and decree the conduct of GM as alleged herein to be unlawful, unfair and/or deceptive, and enjoin any such future conduct;

C. Award Plaintiffs and Class members actual, compensatory damages, or, in the alternative, statutory damages, as proven at trial;

D. Alternatively, if elected by Plaintiffs Class, require GM to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

E. Award Plaintiffs and the Class members exemplary damages in such amount as proven;

F. Award Plaintiffs and the Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

G. Award Plaintiffs and the Class members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on the legal claims, as set forth herein.

Dated: April 10, 2014                    Respectfully submitted,


**PAYNE MITCHELL LAW GROUP, LLP**

By: */s/ Dean Gresham*
Dean Gresham (Lead Counsel)
Texas Bar No. 24027215
Max Antony (not admitted)
Texas Bar No. 24079899
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Telephone: (214) 252-1888
Facsimile: (214) 252-1889
dean@paynemitchell.com
max@paynemitchell.com


**COUNSEL FOR PLAINTIFFS**