# Exhibit WW

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| NICOLE SALERNO, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>          v.<br><br>GENERAL MOTORS LLC; GENERAL MOTORS HOLDINGS, LLC; DELPHI AUTOMOTIVE PLC; and DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC,<br><br>          Defendants. | CASE NO. _____<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

## NATURE OF CLAIM

1.  Plaintiff Nicole Salerno brings this action for herself and on behalf of all persons similarly situated who purchased or leased certain vehicles manufactured, distributed, and/or sold by GENERAL MOTORS LLC, GENERAL MOTORS HOLDINGS, LLC, GENERAL MOTORS CORPORATION, GENERAL MOTORS COMPANY, and/or its related subsidiaries, successors, or affiliates ("GM") with defective ignition switches manufactured by DELPHI AUTOMOTIVE PLC, DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC, and/or its related subsidiaries, successors, or affiliates ("Delphi"), as described below.

2.  As used in this complaint, the "Defective Vehicles" or "Class Vehicles" refers to the GM vehicles sold in the United States equipped at the time of sale with ignition switches (the "Ignition Switches") sharing a common, uniform, and defective design, including the following makes and model years:

- 2005-2010 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

- 2006-2010 Pontiac Solstice

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2005-2010 Pontiac G5

3.  An estimated 2.6 million vehicles were sold in the United States equipped with the Ignition Switches. Upon information and belief, there are other vehicles sold in the United States equipped with the Ignition Switches that have not yet been disclosed by GM.

4.  The Ignition Switches in the Class Vehicles turn on the vehicle's motor engine and main electrical systems when the key is turned to the "run" or "on" position. The Ignition

2

Switches have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC" ("accessory"). At the "run" position, the vehicle's motor engine is running and the electrical systems have been activated; at the "accessories" position the motor is turned off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles a driver must intentionally turn the key in the ignition to move to these various positions.

5.    GM began installing the Delphi-manufactured Ignition Switches beginning in 2002 vehicle models. Upon information and belief, Delphi knew the Ignition Switches were defectively designed, but nonetheless continued to manufacture and sell the defective Ignition Switches with the knowledge that they would be used in GM vehicles, including the Class Vehicles.

6.    Because of defects in their design, the Ignition Switches installed in the Class Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position. Due to faulty design and improper positioning, the Ignition Switches can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "acc" position (the "Ignition Switch Defect"). When this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the safety airbag system.

3

7.     The Ignition Switch Defect can occur at any time during normal and proper operation of the Class Vehicles, meaning the ignition can suddenly switch off while it is moving at 65mph on the freeway, leaving the driver unable to control the vehicle.

8.     GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths.  GM has refused, however, to disclose the identities of those it counts among these thirteen deaths.  Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Class Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Class Vehicle models is expected to be much higher.

9.     All persons in the United States who have purchased or leased a Class Vehicle equipped with the Ignition Switches are herein referred to as Class Members ("Class Members").

10.    All Class Members were placed at risk by the Ignition Switch Defect from the moment they first drove their vehicles.  The Ignition Switch Defect precludes all Class Members from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Class Members and other vehicle occupants.  However, no Class Members knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure.

11.    Upon information and belief, prior to the sale of the Class Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data; yet despite this knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect from Class

Members and the public, and continued to market and advertise the Class Vehicles as reliable
and safe vehicles, which they are not.

12.     As a result of GM's alleged misconduct, Plaintiff and Class Members were
harmed and suffered actual damages, in that the Class Vehicles are unsafe, unfit for their
ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the
Ignition Switch Defect by way of a sudden and dangerous failure that puts them and others at
serious risk of injury or death.  Plaintiff and the Class did not receive the benefit of their bargain
as purchasers and lessees, received vehicles that were of a lesser standard, grade, and quality
than represented, and did not receive vehicles that met ordinary and reasonable consumer
expectations.  Class Members did not receive vehicles that would reliably operate with
reasonable safety, and that would not place drivers and occupants in danger of encountering an
ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not
disclose, through the use of non-defective ignition parts.  A car purchased or leased under the
reasonable assumption that it is "safe" as advertised is worth more than a car—such as the Class
Vehicles—that is known to contain a safety defect such as the Ignition Switch Defect.

13.     As a result, all purchasers of the Class Vehicles overpaid for their cars at the time
of purchase.  Furthermore, GM's public disclosure of the Ignition Switch Defect has further
caused the value of the Class Vehicles to materially diminish.  Purchasers or lessees of the Class
Vehicles paid more, either through a higher purchase price or higher lease payments, than they
would have had the Ignition Switch Defect been disclosed.

14.     Further, and in spite of GM's belated recall of the Class Vehicles, litigation is
necessary in order to ensure that Class Members receive full and fair compensation, under the
auspices of court order, for their injuries.

5

# PARTIES

**Plaintiff**

15.     Plaintiff Nicole Salerno is a resident of Pennsylvania.  Ms. Salerno owns a 2006
Saturn Ion.  Ms. Salerno's Saturn was manufactured, sold, distributed, advertised, marketed, and
warranted by GM.  Ms. Salerno purchased her vehicle primarily for her personal, family, and
household use.  She has had mechanical problems with her Saturn, including the fact that the
vehicle suddenly shuts off while driving.  Ms. Salerno is concerned about the risks of driving her
vehicle with the Ignition Switch Defect, and she is upset that GM has allowed and continues to
allow these recalled vehicles to remain on the road.

**Defendants**

16.     General Motors Corporation was a Delaware corporation with its headquarters in
Detroit, Michigan.  The Corporation through its various entities designed, manufactured,
marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in
Pennsylvania and multiple other locations in the United States and worldwide.

17.     In 2009, General Motors Corporation filed for bankruptcy, and substantially all of
its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to
General Motors LLC.

18.     Under the Agreement, General Motors LLC also expressly assumed certain
liabilities of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the
>
> certification, reporting and recall requirements of the National
>
> Traffic and Motor Vehicle Safety Act, the Transportation Recall
>
> Enhancement, Accountability and Documentation Act, the Clean
>
> Air Act, the California Health and Safety Code and similar Laws,

6

in each case, to the extent applicable in respect of vehicles and

vehicle parts manufactured or distributed by Seller.

In addition, General Motors LLC expressly set forth that it:

shall be responsible for the administration, management and

payment of all Liabilities arising under (i) express written

warranties of Sellers [General Motors Corporation] that are

specifically identified as warranties and delivered in connection

with the sale of new, certified used or pre-owned vehicles or new

or remanufactured motor vehicle parts and equipment (including

service parts, accessories, engines and transmissions)

manufactured or sold by Sellers or Purchaser prior to or after the

Closing and (ii) Lemon Laws.

19.     General Motors LLC is a Delaware corporation with its headquarters in Detroit,

Michigan.  General Motors LLC is registered with the Pennsylvania Department of State to

conduct business in Pennsylvania.  Its parent company is General Motors Holdings, LLC.

20.     At all times relevant herein, General Motors Corporation and its successor in

interest General Motors LLC were engaged in the business of designing, manufacturing,

constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing

automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle

components throughout the United States.

21.     Defendant Delphi Automotive PLC ("Delphi") is headquartered in Gillingham,

Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is

headquartered in Troy, Michigan.

22.     Delphi began as a wholly-owned subsidiary of General Motors Corporation, until
it was launched as an independent publicly-held corporation in 1999.

23.     In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy
in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi
plants to assist with its post-bankruptcy restructuring. In 2011, GM finally ended its ownership
interest in Delphi by selling back the assets.

24.     At all times relevant herein, Delphi, through its various entities, designed,
manufactured, and supplied GM with motor vehicle components, including the subject ignition
switches.

25.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

26.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act,
28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states
different from Defendants' home states, and the aggregate amount in controversy exceeds
$5,000,000, exclusive of interest and costs.  This Court has personal jurisdiction over the parties
because Defendants conduct extensive business here.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because GM
conducts substantial business in this District, has caused harm to Class Members residing in this
District, and Plaintiff resides in this District.

## FACTUAL BACKGROUND

*The Defective Vehicles*

28.     The Saturn Ion was a compact car first introduced in 2002 for the 2003 model
year, and was discontinued in 2007.

8

29.     The Chevrolet Cobalt was a compact car first introduced in 2004 for the 2005 model year, and was discontinued in 2010.

30.     The Pontiac G5 was first introduced in 2004 for the 2005 model year, and was discontinued in 2009.  The coupe and four-door sedan version of the G5 was marketed in Canada from 2005 to 2010, but is not a vehicle at issue in this action.

31.     The Chevrolet HHR was a compact car first introduced in 2005 for the 2006 model year, and was discontinued in 2011.

32.     The Pontiac Solstice was a sports car first introduced in 2005 for the 2006 model year, and was discontinued in 2009.

33.     The Saturn Sky was first introduced in 2006 for the 2007 model year, and was discontinued in 2009.

34.     The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

35.     The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

36.     Upon information and belief, GM promoted these Class Vehicles as safe and reliable in numerous marketing and advertising materials.

37.     No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time or purchase or lease.

### *GM Field Reports and Internal Testing Reveal a Problem*

38.     In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position.  In an internal report generated at the time, GM identified the cause of the

9

problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

39.     In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter.

40.     GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

41.     After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents of sudden loss of engine power. GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

10

42. Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition. Although GM initially approved the design, the company once again declined to act.

43. In testimony April 1, 2014, before the House Committee on Energy and Commerce, GM CEO Mary Barra explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

44. In April 2006, GM finally approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number. GM estimates that Delphi began producing the redesigned ignition switch for all Subject Vehicles during the 2007 model year.

45. Delphi assigned its newly designed switch the same part number assigned to the faulty ignition switch. Upon information and belief, Delphi's action was intended to make it difficult to trace the defective switch back to its original design in 2001.

46. After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

11

47.     According to Delphi, the component required to fix the Ignition Switch Defect costs approximately $2 to $5.  GM management estimated that replacement components would cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

48.     GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

**GM Issues Information Service Bulletins**

49.     In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch.  The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

50.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning."  GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain."  The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

51.    On July 19, 2005, the <u>New York Times</u> reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present." Adler advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

52.    The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead." She was able to safely coast to the side of the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of the service bulletin. The reporter stated that the key chain being used at the time of the stalling incident was provided by GM, and included only the key fob and a tag.

53.    GM, in a statement at the time through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition…."

54.    In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007A) to include additional vehicles and model years. Specifically, GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the

2007 Saturn Ion, and the 2007 Saturn Sky.  The updated bulletin included the same service advisories to GM dealers as the earlier version.

55.    According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

**Reports of Unintended Engine Shut Down**

56.    A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles."  Despite these reports, the Saturn Ion remained in production until 2007.

57.    On May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania, reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

**Crash Reports and Data**

58.    The Defendants knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

59.    National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

60.    In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

14

61.     In 2006, there were at least two fatalities associated with a Chevy Cobalt crash.
Information from the car's data recorder indicated that the ignition switch was in "accessory"
instead of run, and the front airbags failed to deploy.

62.     In 2007, GM reviewed available sensor data from nine front-impact Cobalt
crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition
was in the "accessory position." Crash information for the other Subject Vehicles was not
reviewed.

63.     In 2007, NHTSA's early warning division reviewed available data provided by
GM on airbag non-deployments in Chevrolet Cobalt vehicles.  This review identified 43
incidents in which airbags may not have deployed in a crash.  The early warning division
referred the case to NHTSA's data analysis division for further screening.  A defects panel was
convened, but after reviewing the data and consulting with GM, the panel ultimately concluded
that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect
trend that would warrant the agency opening a formal investigation."  In prepared remarks
delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting
Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the
information that GM has since provided—for instance, new evidence linking airbag non-
deployment to faulty ignition switches."

64.     GM has identified 23 frontal-impact crashes in the United States involving 2005
to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch Defect may have
caused or contributed to the failure of the safety airbags to deploy.

65.     GM has identified 8 frontal-impact crashes in the United States involving 2003 to
2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or contributed to

the failure of the safety airbags to deploy. These crashes resulted in four fatalities and six injuries to occupants.

66.     GM has identified 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in three injuries to occupants.

### GM's Belated Repair Recall of Some Vehicles

67.     On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The notice identified that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight.

68.     The notice also did not identify all the vehicles affected by the Ignition Switch Defect.

69.     The notice failed to indicate the full extent to which GM has been aware of the Defect. The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

70.     In a February 24, 2014 letter to the NHTSA, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the

Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

71.     On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect.  Specifically, GM identified the 2003 to 2007 model years of the MY Saturn Ion, 2006 and 2007 model years of the MY Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007 model year of MY Saturn Sky vehicles.

72.     According to the NHTSA Acting Administrator David Friedman, the chronology information provided by GM on February 24, 2014 "raise[d] serious questions as to the timeliness of GM's recall."  Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

73.     On March 4, 2014, the NTHSA issued GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

74.     On March 11, 2014, GM filed a new Part 573 report superseding its February 25 filing.  The new chronology provided with the report indicated that GM was aware of the Ignition Switch Defect in 2001—significantly earlier than its previous 2004 disclosure.  GM now indicated that it had a report from 2001 that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

75.     On March 28, 2014, GM filed a new Part 573 report, which expanded the recall set forth in its February 25, 2014 filing.  GM's March 28 report indicated that several additional model year vehicles may be affected by the Ignition Switch Defect.  GM identified those

17

vehicles as the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac

Solstice, 2008-2010 Pontiac G5, and 2008-2010 Saturn Sky. The March 28 report added over

one million vehicles to the total affected by the Ignition Switch Defect.

76.     GM notified dealers of the Defective Vehicles of the recall in February and March

2014. GM also notified owners of the Defective Vehicles by letter of the recall. The letter

minimized the risk of the defect, indicating that the Ignition Switch Defect would occur only

"under certain conditions" and emphasized that the risk increased if the "key ring is carrying

added weight . . . or your vehicle experiences rough road conditions."

77.     GM has advised the public that the replacement ignition switches "ARE NOT

CURRENTLY AVAILABLE."

78.     On information and belief, the replacement ignition switches are currently not

available at dealerships throughout the country.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment Tolling

79.     Upon information and belief, GM has known of the Ignition Switch Defect in the

vehicles since at least 2001, and certainly well before Plaintiff and Class Members purchased the

Class Vehicles, and has concealed from or failed to notify Plaintiff, Class Members, and the

public of the full and complete nature of the Ignitions Switch Defect, even when directly asked

about it by Class Members during communications with GM and GM dealers.

80.     Although GM has now acknowledged that "[t]here is a risk, under certain

conditions, that your ignition switch may move out of the "run" position, resulting in a partial

loss of electrical power and turning off the engine," GM did not fully disclose the Ignition

Switch Defect and in fact downplayed the widespread prevalence of the problem, and minimized

the risk of the Defect occurring during normal operation of the Class Vehicles.

81.     In 2005, GM issued a Technical Service Bulletin to dealers and service

technicians directing that customers be advised to "remove unessential items from their key

chains" to avoid inadvertent ignition switching, but did not identify or disclose the Defect.

82.     GM also stated, in 2005, that it was "rare" for the Ignition Switches in Class

Vehicles to unintentionally move from the "on" position to the "accessory" or "off" position.

GM knew that this statement was untrue, but issued the statement to exclude suspicion and

preclude inquiry.

83.     In 2007 and 2010, GM withheld information from the NHTSA when it knew that

the NHTSA was investigating airbag non-deployment in certain GM vehicles.  Indeed, NHTSA's

understood that airbag systems "were designed to continue to function in the event of a power

loss during a crash."  This understanding was confirmed by available GM service literature

reviewed during NHTSA's due diligence effort.  GM, however, had evidence that power loss

caused by the Ignition Switch Defect could also prevent the deployment of airbags.  Despite its

knowledge and familiarity with NHTSA's investigation, GM withheld this information, which

delayed its recall by several years.

84.     In February 2014, GM instituted only a limited recall, only identifying two of the

several models with the Ignition Switch Defect. Likewise, the later recall expanded to include

five additional model years and makes does not fully disclose all the vehicles affected by the

Ignition Switch Defect.  On March 28, GM expanded the recall yet again to include all model

years of each vehicle affected by the ignition switch recall.  GM has revealed the scope of the

recall in a hazardous, piecemeal fashion, under duress from Congress and intense consumer backlash.

85.    Upon information and belief, there are other Class Vehicles that have the Ignition Switch Defect that have not yet been disclosed by GM.

86.    As GM CEO Mary Barra explained during testimony before the House Committee on Energy and Commerce on April 1, 2014, GM's active concealment of the Ignition Switch Defect was the result of a "cost culture" versus one that placed an emphasis on safety.

87.    Pursuant to 49 U.S.C. § 30118(c), GM was obligated and had a duty to disclose the Ignition Switch Defect to the NHTSA when it learned of the Defect and/or decided in good faith that the Class Vehicles did not comply with an applicable motor vehicle safety standard.

88.    Any applicable statute of limitation has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## Estoppel

89.    GM was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the vehicles.  GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.  Plaintiff and Class Members reasonably relied upon GM's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## Discovery Rule

90.    The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their vehicles had the Ignition Switch Defect.

20

91.     However, Plaintiff and Class Members had no realistic ability to discern that the
vehicles were defective until—at the earliest—after the Ignition Switch Defect caused a sudden
unintended ignition shut off. Even then, Plaintiff and Class Members had no reason to know the
sudden loss of power was caused by a defect in the ignition switch because of GM's active
concealment of the Ignition Switch Defect.

92.     Not only did GM fail to notify Plaintiff or Class Members about Ignition Switch
Defect, GM in fact denied any knowledge of or responsibility for the Ignition Switch Defect
when directly asked about it. Thus, Plaintiff and Class Members were not reasonably able to
discover the Ignition Switch Defect until after they had purchased the vehicles, despite their
exercise of due diligence, and their causes of action did not accrue until they discovered that the
Ignition Switch Defect caused their vehicles to suddenly lose power.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this lawsuit as a class action on her own behalf and on behalf of
all other persons similarly situated as members of the proposed Class pursuant to Federal Rules
of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or c(4). This action satisfies the numerosity,
commonality, typicality, adequacy, predominance, and superiority requirements of those
provisions.

94.     The proposed nationwide class is defined as:

### Nationwide Class

All persons in the United States who purchased or leased a GM Class Vehicle

(2005-2010 Chevrolet Cobalt; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac

Solstice; 2003-2007 Saturn Ion; 2007-2010 Saturn Sky; and 2005-2010 Pontiac

G5), and any other GM vehicle model containing the same ignition switch as

21

those Class Vehicle models (Class Members).

95.     Plaintiff also brings this action on behalf of a statewide class of all persons who purchased or leased a Class Vehicle in the Commonwealth of Pennsylvania (the "Pennsylvania Class").

96.     Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into additional subclasses, or modified in any other way.

**Numerosity and Ascertainability**

97.     Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  Class Members are readily identifiable from information and records in GM's possession, custody, or control.

**Typicality**

98.     The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class Members, purchased or leased a GM Class Vehicle designed, manufactured, and distributed by Defendants.  The representative Plaintiff, like all Class Members, has been damaged by Defendants' misconduct relating to the Ignition Switch

Defect. Furthermore, the factual bases of Defendants' misconduct are common to all Class

Members and represent a common thread of misconduct resulting in injury to all Class Members.

### **Adequate Representation**

99.     Plaintiff will fairly and adequately represent and protect the interests of the Class.

Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions,

including actions involving defective products.

100.     Plaintiff and her counsel are committed to vigorously prosecuting this action on

behalf of the Class, and have the financial resources to do so.  Neither Plaintiff nor her counsel

have interests adverse to those of the Class.

### **Predominance of Common Issues**

101.     There are numerous questions of law and fact common to Plaintiff and Class

Members that predominate over any question affecting only individual Class Members, the

answers to which will advance resolution of the litigation as to all Class Members.  These

common legal and factual issues include:

        a.     whether the Class Vehicles suffer from the Ignition Switch Defect;

        b.     whether Defendants knew or should have known about the Ignition Switch

Defect, and, if so, how long Defendants have known of the Defect;

        c.     whether the defective nature of the Class Vehicles constitutes a material

fact reasonable consumers would have considered in deciding whether to purchase a GM

Vehicle;

        d.     whether GM had a duty to disclose the defective nature of the Vehicles to

Plaintiff and Class Members;

   e.  whether GM omitted and failed to disclose material facts about the

Vehicles;

   f.  whether GM's concealment of the true defective nature of the Class

Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing the

Vehicles; whether GM violated state consumer protection statutes, including, *inter alia*, the

Michigan Consumer Protection Act ("MCPA"), Mich. Comp. L. Ann. § 445.903 *et seq.*, and the

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1, *et. seq.*

   g.  whether the Class Vehicles were fit for their ordinary and intended use, in

violation of the implied warranty of merchantability;

   h.  whether Plaintiff and Class Members are entitled to a declaratory

judgment stating that the ignition switches in the Class Vehicles are defective and/or not

merchantable;

   i.  whether Plaintiff and Class Members are entitled to equitable relief,

including, but not limited to, a preliminary and/or permanent injunction;

   j.  whether GM should be declared responsible for notifying all Class

Members of the Defect and ensuring that all GM vehicles with the Ignition Switch Defect are

recalled and repaired; and

   k.  what aggregate amounts of statutory penalties, as available under the laws

of Michigan and Pennsylvania, are sufficient to punish and deter Defendants and to vindicate

statutory and public policy, and how such penalties should most equitably be distributed among

Class members.

**Superiority**

102.    Plaintiff and Class Members have all suffered and will continue to suffer harm
and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is
superior to other available methods for the fair and efficient adjudication of this controversy.

103.    Absent a class action, most Class Members would likely find the cost of litigating
their claims prohibitively high and would therefore have no effective remedy at law.  Because of
the relatively small size of the individual Class Members' claims, it is likely that only a few
Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class
action, Class Members will continue to incur damages, and Defendants' misconduct will
continue without remedy.

104.    Class treatment of common questions of law and fact would also be a superior
method to multiple individual actions or piecemeal litigation in that class treatment will conserve
the resources of the courts and the litigants, and will promote consistency and efficiency of
adjudication.

105.    Defendants have acted in a uniform manner with respect to the Plaintiff and Class
Members.

106.    Classwide declaratory, equitable, and injunctive relief is appropriate under Rule
23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the
class, and inconsistent adjudications with respect to the Defendants' liability would establish
incompatible standards and substantially impair or impede the ability of Class Members to
protect their interests. Classwide relief assures fair, consistent, and equitable treatment and
protection of all Class Members, and uniformity and consistency in Defendants' discharge of
their duties to perform corrective action regarding the Ignition Switch Defect.

## CAUSES OF ACTION

### COUNT I
**Asserted on Behalf of the Nationwide Class**
**(Violation of Michigan Consumer Protection Act ("MCPA),**
**Michigan Comp. Laws Ann. § 445.903 *et seq.*, and the Consumer Protection Acts of**
**Substantially Similar States)**

107.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

108.    This Claim is brought on behalf of the Nationwide Class.

109.    At all times relevant hereto, there was in full force and effect Mich. Comp. Laws Ann. § 445.903 *et seq.* (the "MCPA").

110.    Plaintiff and the Nationwide Class Members were "person[s]" within the meaning of the MCPA, M.C.L.A § 445.902(1)(d).

111.    At all relevant times hereto, Defendants were "persons" engaged in "trade or commerce" within the meaning of the MCPA, M.C.L.A. § 445.902(1)(d) and (g).

112.    The MCPA holds unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L.A.  § 445.902(1).

113.    The practices of Defendants violate the MCPA for, *inter alia*, one or more of the following reasons:

a.    Defendants represented that the Class Vehicles had approval, characteristics, uses, and benefits that they do not have;

b.    Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Class Vehicles;

c.    Defendants represented that the Class Vehicles were of a particular standard, quality, or grade, when they were of another;

26

d.      Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Class Vehicles, which did and tended to, mislead Plaintiff and the Class about facts that could not reasonably be known by the consumer until the February and March 2014 recalls;

e.      Defendants failed to reveal facts concerning the Ignition Switch Defect that were material to the transaction in light of representations of fact made in a positive manner;

f.      Defendants failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiff and the Class;

g.      Defendants made material representations and statements of fact to Plaintiff and the Class that resulted in Plaintiff and the Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

h.      Defendants intended that Plaintiff and Class Members rely on their misrepresentations and omissions, so that Plaintiff and other Class Members would purchase or lease the Class Vehicles.

114.    In the event that Michigan law is not applied, Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes.

115.    Plaintiff seeks injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts or; seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Class Member, reasonable attorneys' fees; and any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

27

116.    Plaintiff also seeks punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of Class Vehicles, deceived Plaintiff and Class Members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles it repeatedly promised Plaintiff and Class Members were safe. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

### COUNT II
### Asserted on Behalf of the Nationwide Class
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA"))

117.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

118.    This Claim is brought against GM on behalf of the Nationwide Class.

119.    At all times relevant hereto, there was in full force and effect the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA").

120.    Plaintiff and the Nationwide Class are consumers as defined in 15 U.S.C. § 2301(3).  They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranty.

121.    GM is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

122.    Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

123.    In connection with its sales of the Class Vehicles, GM gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability.  As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, marketed, and were adequately contained, packaged, and labeled. Mich. Comp. Laws Ann. § 440.2314(2)(a), (c), and (e), and U.C.C. § 2-314(b)(1), (3), and (5).

124.    GM is liable to Plaintiff and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability.

125.    GM breached its implied warranty of merchantability to Plaintiff and the Nationwide Class because the Class Vehicles were not fit for the ordinary purposes for which they are used—namely, as a safe passenger motor vehicle.  The Ignition Switch Defect, which affects Ignition Switches in the Class Vehicles, may, among other things, result in the vehicle's airbags not deploying in a crash event, increasing the potential for occupant injury or death.  This safety defect makes the Class Vehicles unfit for their ordinary purpose of providing safe transportation.

126.    GM further breached its implied warranty of merchantability to Plaintiff and the Nationwide Class because the Class Vehicles would not pass without objection in the trade, as they contained a defect that relates to motor vehicle safety due to the Ignition Switch Defect in each of the Class Vehicles.

127.    GM further breached its implied warranty of merchantability to Plaintiff and the Nationwide Class because the Class Vehicles were not adequately contained, packaged, and labeled.  The directions and warnings that accompanied the Class Vehicles did not adequately

instruct Plaintiff on the proper use of the Class Vehicles in light of the Ignition Switch Defect, or adequately warn Plaintiff of the dangers of improper use of the Class Vehicles.

128.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiff to not place extra weight on her vehicle's key chains, including a fob or extra keys. According to GM, placing extra weight on the vehicles' key chain increases the chances that the Ignition Switch will unintentionally move from the "on" position to the "accessory" or "off" position.

129.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiff to avoid rough, bumpy, and uneven terrain while driving her vehicle. Traveling across such terrain increases the chances that the Ignition Switch in the Class Vehicles will unintentionally move from the "on" position and into the "accessory" or "off" position, especially when the key chains were weighted down with a fob, additional keys or other items.

130.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiff to carefully avoid brushing or bumping up against her vehicle's key chains with a body part. According to GM, brushing or bumping up against the Class Vehicles' key chains increases the chances that the Ignition Switch in the Class Vehicles will unintentionally move from the "on" position and into the "accessory" or "off" position.

131.    At the time of the delivery of the Class Vehicles, GM did not adequately warn Plaintiff of the dangers of not taking the necessary steps outlined above to prevent the Ignition Switches in her vehicle from unintentionally moving from the "on" position and into the "accessory" or "off" position while in motion, including the loss of power and shut off of the engine resulting in an increased difficulty in maneuvering the vehicles, the lack of airbag deployment in the event of a crash and injury or death.

132.     Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and the Nationwide Class are entitled to recover the damages caused to them by GM's breach of the implied warranty of merchantability, which damages constitute the difference in value between the Class Vehicles as warranted (their sales prices) and the Class Vehicles as actually delivered (perhaps worth $0.00) (*i.e*, a total or partial refund of the full purchase prices of the Class Vehicles), plus loss of use and other consequential damages arising after the date of delivery of the Class Vehicles.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the Nationwide Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiff and the Nationwide Class in connection with the commencement and prosecution of this action.

## COUNT III
### Asserted on Behalf of the Nationwide Class and the Pennsylvania Class
### (Breach of Implied Warranties)

133.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

134.     This Claim is brought on behalf of the Nationwide Class under Michigan law.

135.     Further, this Claim is brought on behalf of the Pennsylvania Class under Pennsylvania law.

136.     At all times relevant hereto, there was in full force and effect the Michigan Comp. Laws Ann. § 440.2314 and the Pennsylvania Uniform Commercial Code ("PA.U.C.C."), 13 Pa. C.S.A. §1101, *et seq.*

137.     GM is a "merchant" as to the Class Vehicles within the meaning of Mich. Comp. Laws Ann. § 44.2104 and PA. U.C.C., 13 Pa C.S.A. §2104.  GM manufactured and sold the

Class Vehicles, which are "goods" within the meaning of these statutory provisions.

Consequently, pursuant to Mich. Comp. Laws Ann. § 440.2314 and PA. U.C.C., 13 Pa. C.S.A.

§2314, GM impliedly warranted that the Class Vehicles were merchantable, including that they

were fit for their ordinary purposes as safe passenger vehicles, that they could pass without

objection in the trade, and that they were adequately contained, packaged, and labeled.

138.    GM breached its implied warranty of merchantability to Plaintiff and the

Nationwide and Pennsylvania Class because the Class Vehicles were not fit for the ordinary

purposes for which they are used—a safe passenger vehicle. Mich. Comp. Laws Ann. §

440.2314(2)(c); PA.U.C.C. 13 Pa. C.S.A. §2314(b)(3). Specifically, and according to GM's

representatives, the Class Vehicles contain the Ignition Switch Defect, which makes the Class

Vehicles unfit for their ordinary purpose of providing safe transportation.

139.    GM further breached its implied warranty of merchantability to Plaintiff and the

Nationwide and Pennsylvania Class because the Class Vehicles would not pass without objection

in the trade, as they contained the Ignition Switch Defect. Mich. Comp. Laws Ann. §

440.2314(2)(a); PA. U.C.C., 13 Pa. C.S.A. §2314(b)(1).

140.    GM further breached its implied warranty of merchantability to Plaintiff and the

Nationwide and Pennsylvania Class because the Class Vehicles were not adequately contained,

packaged, and labeled in that the directions and warnings that accompanied the Class Vehicles

did not adequately instruct Plaintiff on the proper use of the Class Vehicles in light of the

Ignition Switch Defect. Mich. Comp. Laws Ann. § 440.2314(2)(e); PA. U.C.C., 13 Pa. C.S.A.

§2314(b)(5).

141.    At the time of delivery of the Class Vehicles, GM did not provide instructions and

warnings to Plaintiff to not place extra weight on their vehicles' key chains, including a fob or

extra keys.  In and around March of 2014, GM publicly stated that placing extra weight on the

key chain of the Class Vehicles increases the chances that the Ignition Switch in the Class

Vehicle will move from the "on" position and into the "accessory" or "off" position.

142.    At the time of the delivery of the Class Vehicles, GM did not provide instructions

and/or warnings to Plaintiff to avoid rough, bumpy, and uneven terrain while driving.  In and

around March of 2014, GM publicly stated that traveling across such terrain increases the

chances that the Ignition Switch in the Class Vehicle will move from the "on" position to the

"accessory" or "off" position.

143.    Additionally, at the time of delivery of the Class Vehicles, GM did not adequately

warn Plaintiff of the dangers of not taking the necessary steps outlined above to prevent the

Ignition Switch in the Class Vehicle from moving from the "on" position to the "accessory" or

"off" position while the Vehicle is in motion.

144.    As a proximate result of GM's breach of the implied warranty of merchantability,

Plaintiff and the Nationwide and Pennsylvania Classes were damaged in the amount of, and

entitled to recover, the difference in value between the Class Vehicles as warranted (their sales

price) and the Class Vehicles as actually delivered (perhaps worth $0.00) (*i.e.*, a total refund of

the full or partial purchase and/or lease price of the Class Vehicles), plus loss of use and other

consequential damages arising after the date of delivery of the Class Vehicles.

145.    It was not necessary for Plaintiff and each Nationwide and Pennsylvania Class

Member to give GM notice of GM's breach of the implied warranty of merchantability because

GM had actual notice of the Ignition Switch Defect.  Prior to the filing of this action, GM issued

a safety recall for the Class Vehicles acknowledging the Ignition Switch Defect.  GM admitted it

had notice of the Ignition Switch Defect as early as 2004, and possibly as early as 2001.  At the

time of the safety recall, GM also acknowledged that numerous accidents and fatalities were
caused by the Ignition Switch Defect. In addition to the above, the filing of this action is
sufficient to provide GM notice of its breaches of the implied warranty of merchantability with
respect to the Class Vehicles.

### COUNT IV
### Asserted on Behalf of the Nationwide Class and the Pennsylvania Class
### (Fraud by Concealment)

146.    Plaintiff hereby incorporates by reference the allegations contained in the
preceding paragraphs of this Complaint.

147.    This Claim is brought on behalf of the Nationwide Class and the Pennsylvania
Class.

148.    As set forth above, Defendants concealed and/or suppressed material facts
concerning the safety of their vehicles.

149.    Defendants had a duty to disclose these safety issues because they consistently
marketed their vehicles as reliable and safe and proclaimed that Defendants maintain the highest
safety standards. Once Defendants made representations to the public about safety, Defendants
were under a duty to disclose these omitted facts, because where one does speak one must speak
the whole truth and not conceal any facts which materially qualify those facts stated. One who
volunteers information must be truthful, and the telling of a half-truth calculated to deceive is
fraud.

150.    In addition, Defendants had a duty to disclose these omitted material facts
because they were known and/or accessible only to Defendants who have superior knowledge
and access to the facts, and Defendants knew they were not known to or reasonably discoverable
by Plaintiff and Class Members. These omitted facts were material because they directly impact

34

the safety of the Class Vehicles. Whether or not a vehicle ignition switch will unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power steering, anti-lock brakes and air bag deployment while the car is in motion, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles.

151.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

152.    Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and Class Members' actions were justified. Defendants were in exclusive control of the material facts concerning the Ignition Switch Defect and such facts were not known to the public or the Class Members.

153.    As a result of the concealment and/or suppression of facts, Plaintiff and Class Members have sustained and will continue to sustain damages arising from the difference between the actual value of that which Plaintiff and the Classes paid and the actual value of that which they received.

154.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

35

## COUNT V
### Asserted on Behalf of the Pennsylvania Class
### (Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law, ("Pa.UPT"), 73 P.S. §201-1, *et seq.*)

155.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

156.    This Count is brought on behalf of Plaintiff and the Pennsylvania Class.

157.    Plaintiff is a "person" within the meaning of Pa.UTP, 73 P.S. §201-2(2).

158.    Defendants are "persons" "within the meaning of Pa.UTP, 73 P.S. §201-2(2).

159.    The Pa.UTP prohibits engaging in any "unfair methods of competition" or "unfair or deceptive acts or practices" either at, prior to, or subsequent to a consumer transaction.  73 P.S. §201-2(4) and §201-3.  The prohibited acts include, inter alia: representing that goods have characteristics, uses, or benefits that they do not have, §201-4(v); representing that goods are of a particular standard, quality, or grade if they are of another, §201-2(4)(vii); advertising goods with intent not to sell them as advertised, §201-2(4)(ix); failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to, or after a contract for the purchase of goods is made, §201-2(4)(xiv); and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding, §201-2(4)(xxi).  Defendants' conduct, as described above, constitutes "unfair or deceptive acts or practices" within the meaning of this statute.

160.    Defendants violated the Pa.UTP when they represented, through advertising, warranties, and other express representations, that the Class Vehicles had characteristics and benefits that they did not actually have.

36

161.    Defendants violated the Pa.UTP when they falsely represented, through advertising, warranties, and other express representations, that the Class Vehicles were of certain quality or standard when they were not.

162.    Defendants violated the Pa.UTP by fraudulently concealing from and/or failing to disclose to Plaintiff and the Pennsylvania Class the defects associated with the Class Vehicles.

163.    Defendants violated the Pa UTP by actively misrepresenting in, and/or concealing and omitting from, their advertising, marketing, and other communications, material information regarding the Class Vehicles.  The material information included:

        a.    that there was a substantial risk of ignition switch failure that far exceeded the risk of such defect normally associated with similar consumer products;

        b.    that the Ignition Switch Defect might not become apparent until after the warranty had expired; and

        c.    that Defendants were not committed to repairing the Ignition Switch Defect if it was discovered after the warranty expired.

164.    The above-described unlawful, unfair and deceptive business practices by Defendants continue to present a threat to members of the consuming public, Plaintiff and the Pennsylvania Class.

165.    As a direct and proximate cause of Defendants' violations of the Pa.UTP Plaintiff and members of the Pennsylvania Class have suffered and continue to suffer ascertainable losses and damages, in that they purchased a Class Vehicle that contains inherent design defects about which Defendants knew prior to the sale of the Class Vehicles.

166.     Plaintiff also seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, treble damages, punitive damages, attorneys' fees, filing fees, reasonable costs of suit and any other just and proper relief available under the Pa. UTP.

## COUNT VI
### Asserted on Behalf of the Nationwide Class and the Pennsylvania Class
### (Claim for Actual Damages/Expense Reimbursement Fund)

167.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

168.     This Count is brought on behalf of Plaintiff and members of the Nationwide and Pennsylvania Classes.

169.     Plaintiff and Class Members have incurred out-of-pocket expenses and damages in attempting to rectify the Ignition Switch Defect in their Vehicles, and such expenses and losses will continue as they must take time off from work, pay for rental cars or other transportation arrangements, child care and the myriad expenses involved in going through the recall process to correct the Defect.

170.     Plaintiff and Class Members seek payment of such damages and reimbursement of such expenses under the consumer statutes and applicable law invoked in this Complaint. While such damages and expenses are individualized in detail and amount, the right of the Class Members to recover them presents common questions of law. Equity and fairness to all Class Members requires the establishment by court decree and administration under Court supervision of a Defendant-funded program, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defect.

## PRAYER FOR RELIEF

Plaintiff, on behalf of herself and all others similarly situated, requests the Court to enter judgment against the Defendants, as follows:

A.      an order certifying the proposed Classes, designating Plaintiff as the named representative of the Classes, and designating the undersigned as Class Counsel;

B.      a declaration that the Ignition Switches in Class Vehicles are defective;

C.      a declaration that the Defendants are financially responsible for notifying all Nationwide and Pennsylvania Class Members about the defective nature of the Class Vehicles;

D.      an order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles to eliminate the Ignition Switch Defect;

E.      an award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

F.      a declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

G.      an award of attorneys' fees and costs, as allowed by law;

H.      an award of pre-judgment and post-judgment interest, as provided by law;

I.      leave to amend this Complaint to conform to the evidence produced at trial; and

J.      such other relief as may be appropriate under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: April 11, 2014            BERGER & MONTAGUE, P.C.

                                By: _____
                                    Sherrie R Savett (PA Bar No. 17646)
                                    *ssavett@bm.net*
                                    Shanon J. Carson (PA Bar No.85957)
                                    *scarson@bm.net*
                                    Michael T. Fantini (PA Bar No. 57192)
                                    *mfantini@bm.net*
                                    Eric Lechtzin (PA Bar No. 62096)
                                    *elechtzin@bm.net*
                                    1622 Locust Street
                                    Philadelphia, PA  19103
                                    Tel: (215) 875-3000
                                    Fax: (215) 875-4636


                                John Broaddus
                                *jbroaddus@weitzlux.com*
                                WEITZ & LUXENBERG P.C
                                200 Lake Drive East, Ste. 205
                                Cherry Hill, NJ 08002
                                Telephone:  (856) 755-1115
                                Facsimile:   (856) 775-1995


                                Robin L. Greenwald
                                *rgreenwald@weitzlux.com*
                                James Bilsborrow
                                *jbilsborrow@weitzlux.com*
                                WEITZ & LUXENBERG P.C.
                                700 Broadway
                                New York, NY 10003
                                Telephone: (212)-558-5500
                                Facsimile: (212) 344-5466


                                Jonathan D. Selbin
                                *jselbin@lchb.com*
                                LIEF CABRASER HEIMANN & BERNSTEIN, LLP
                                250 Hudson Street, 8th Floor
                                New York, NY 10013
                                Tel: (212) 355-9500
                                Facsimile: (212) 355-9592

Elizabeth J. Cabraser
*ecabraser@lchb.com*
Todd A. Walberg
*twalburg@lchb.com*
LIEF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008


Benjamin L. Bailey
bbailey@baileyglasser.com
Eric B. Snyder
*esnyder@baileyglasser.com*
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
Facsimile:  (304) 342-1110


Don Barrett
*dbarrett@barrettlawgroup.com*
BARRETT LAW GROUP, P.A.
404 Court Square
Lexington, MS 39095-0927
Telephone: (662) 834-2488
Facsimile: (662) 834-2628


W. Daniel "Dee" Miles
*dee.miles@beasleyallen.com*
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Telephone: (800) 898 2034
Facsimile: (334) 954-7555


Roger L. Mandel
*rlm@lhlaw.net*
LACKEY HERSHMAN, L.L.P.
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219
Telephone: (214) 560-2238
Facsimile: (214) 560-2203

W. Mark Lanier
*wml@lanierlawfirm.com*
Eugene R. Egdorf
*ere@lanierlawfirm.com*
THE LANIER LAW FIRM P.C.
6810 FM 1960 West
Houston, TX 77069
Telephone: (713) 659-5200
Facsimile: (713) 659-2204

Robert K. Shelquist
*rkshelquist@locklaw.com*
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Ave., S., Suite 2200
Minneapolis, MN 55401-2179
Telephone: (612) 339-6900
Facsimile (612) 339-0981


Stewart A. Eisenberg
*stewart@erlegal.com*
Alexander Mercado
*alex2@erlegal.com*
EISENBERG, ROTHWEILER, WINKLER,
EISENBERG, & JECK P.C.
1634 Spruce Street
Philadelphia, Pa. 19103
Telephone: (215) 546-6636
Facsimile: (215) 546-3941


*Counsel for Plaintiff*


Kal6638691