# Exhibit XX

Francis "Casey" J. Flynn, *Pro Hac Vice Application Forthcoming*
Email:  francisflynn@gmail.com
Tiffany M. Yiatras, *Pro Hac Vice Application Forthcoming*
Email:  tyiatras@careydanis.com
CAREY DANIS & LOWE, L.L.C.
8235 Forsyth Boulevard, Suite 1100
Saint Louis, Missouri  63105
Telephone:  1-800-721-2519
Facsimile:  (314) 721-0905

Michael F. Ram, CSB #104805
Email:  mram@rocklawcal.com
RAM, OLSON, CEREGHINO & KOPCZYNSKI
555 Montgomery Street, Suite 820
San Francisco, California  94111
Telephone:  (415) 433-4949
Facsimile:  (415) 433-7311

[Additional Counsel Appear on Signature Page]

*Attorneys for Richard Stafford*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD STAFFORD, on behalf of himself and all others similarly situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>GENERAL MOTORS, LLC, a Delaware limited liability company,<br><br>                    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>1.  Violation of Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*<br>2.  Violation of California False Advertising Law, California Business & Professions Code § 17200, *et seq.*<br>3.  Negligence<br>4.  Fraudulent Concealment<br>5.  Product Liability – Design Defect<br>6.  Violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*<br>7.  Violation of Song-Beverly Consumer Warranty Act, California Civil Code § 1790, *et seq.*<br>8.  Violation of the Michigan Consumer Protection Act, Mich. Comp. L. Ann. § 445.901, *et seq.*<br>9.  Violation of Other State Statutes Prohibiting Unfair and Deceptive Acts and Practices |

CLASS ACTION COMPLAINT

1    Plaintiff Richard Stafford ("Plaintiff"), by and through his counsel, bring this Class Action

2   Complaint against Defendant General Motors, LLC ("Defendant" or "GM"), on behalf of himself and

3   all others similarly situated, and allege, upon personal knowledge as to their own actions and their

4   counsel's investigations, and upon information and belief as to all other matters, as follows:

5                                   **NATURE OF THE CASE**

6    1.    This case involves Defendant's conscious decision to overlook, and in fact conceal, a

7   deadly design defect in vehicle ignition switches in millions of GM vehicles placed on the road since

8   2003.

9    2.    In making the decision to cover up the ignition switch defect for at least a decade,

10  Defendant consciously put millions of Americans' lives at risk.  Defendant knowingly placed on

11  public streets more than one million defective vehicles with the propensity to shut down during

12  normal driving conditions, creating a certainty of accidents, bodily harm, and death.

13   3.    An auto manufacturer should never make profits more important than safety and

14  should never conceal defects that exist in its vehicles from consumers or the public.  Defendant's

15  Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our

16  customers in the vehicles they drive."  Yet Defendant failed to live up to this commitment.

17   4.    The first priority of an auto manufacturer should be to ensure that its vehicles are safe,

18  and particularly that its vehicles have operable ignition systems, airbags, power-steering, power

19  brakes, and other safety features that can prevent or minimize the threat of death or serious bodily

20  harm in a collision.  In addition, an auto manufacturer must take all reasonable steps to ensure that,

21  once a vehicle is running, it operates safely, and its critical safety systems (such as engine control,

22  braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.

23  Moreover, an auto manufacturer that is aware of dangerous design defects that cause its vehicles to

24  shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and

25  remedy such defects.

26   5.    Since at least 2003, Defendant has sold millions of vehicles throughout the United

27  States and worldwide that have a safety defect causing the vehicle's ignition switch to inadvertently

28  move from the "run" position to the "accessory" or "off" position during ordinary driving conditions,

resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

6.      There are at least two main reasons why the GM ignition switch systems are defective.  The first is that the ignition switch is simply weak and therefore does not hold the key in place in the "run position."  On information and belief, the ignition switch weakness is due to a defective part known as a "detent plunger."

7.      The second reason that the ignition switch systems are defective is due to the low position of the switches in the defective vehicles.  That causes the keys, and the fobs that hang off the keys, to hang so low in the defective vehicles that the drivers' knees can easily bump them and inadvertently shut down the vehicle.

8.      Defendant installed these faulty ignition switch systems in models from at least 2003 through at least 2011.  Defendant promised that these vehicles would operate safely and reliably. This promise turned out to be false in several material respects.  In reality, Defendant concealed and did not fix a serious quality and safety problem plaguing its vehicles.

9.      Worse yet, the ignition switch defects in Defendant's vehicles could have been easily avoided.

10.     From at least 2005 to the present, Defendant received reports of crashes and injuries that put Defendant on notice of the serious safety issues presented by its ignition switch system.

11.     Yet, despite the dangerous nature of this defect and its effects on critical safety systems, Defendant concealed its existence and failed to remedy the problem.

12.     Despite notice of the defect in its vehicles, Defendant did not disclose to consumers that its vehicles – which Defendant had advertised as "safe" and "reliable" for years – were in fact neither safe nor reliable.

13.     Defendant's CEO, Mary Barra, has admitted in a video message that "[s]omething went wrong with our process in this instance, and terrible things happened."

14.     This case arises from Defendant's breach of its obligations and duties, including Defendant's failure to disclose that, as a result of defective ignition switches, at least 2.59 million GM vehicles (and almost certainly more) may have the propensity to shut down during normal

1   driving conditions and create an extreme and unreasonable risk of accident, serious bodily harm, and

2   death.

3        15.     GM's predecessor, General Motors Corporation ("Old GM") (sometimes, together

4   with GM, "the Companies") also violated these obligations and duties by designing and marketing

5   vehicles with defective ignition switch systems, and then by failing to disclose that defect even after

6   it became aware that the ignition switch defect was causing fatal accidents.  In addition to the

7   liability arising out of the statutory obligations assumed by GM, GM also has successor liability for

8   the deceptive and unfair acts and omissions of Old GM because GM has continued the business

9   enterprise of Old GM with full knowledge of the ignition switch defects.

10        16.     The defective ignition switches were manufactured by Delphi Automotive PLC

11   ("Delphi").  Once a subsidiary of Old GM, Delphi spun off from Old GM in 1999, and became an

12   independent publicly held corporation.

13        17.     Plaintiff alleges, based on information and belief, that Delphi knew its ignition

14   switches were defective.  Nevertheless, Delphi continued to manufacture and sell the defective

15   ignition switch systems, which it knew would be used in the vehicle of Plaintiff and the Class.

16        18.     Plaintiff's  investigation, including a review of NHTSA's complaint database,

17   suggests that Defendant's recall does not capture all of the defective vehicles which suffer from the

18   same or substantially similar ignition switch defects as the recalled vehicles.  Plaintiff thereupon

19   believes and alleges that the following non-recalled GM vehicles also have defective ignition switch

20   systems: the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte

21   Carlo.

22        19.     Plaintiff brings this action for a Class of all persons in the United States who formerly

23   or currently own or lease one or more of the following GM vehicles: (a) (The recalled vehicles):

24   2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet

25   HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky; and (b) (Non-recalled vehicles): the

26   2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo

27   (collectively, "Defective Vehicles").

28

20.    To the extent warranted by the developing facts, Plaintiff will further supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switch systems, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment.

21.    The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

        a.    Due to their weaknesses and their low placement, the ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

        b.    When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident; and

        c.    When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

22.    The ignition switch defects make the Defective Vehicles unreasonably dangerous. Because of the defects, the Defective Vehicles are likely to be involved in accidents and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants and others in the vicinity.

23.    Defendant admits to at least 13 deaths as a result of the ignition switch defects, but the actual number is believed to be much higher.

24.    The ignition switch defects present a significant and unreasonable safety risk exposing Defective Vehicle owners, their passengers and others in the vicinity to a risk of serious injury or death.

25.    For many years, Defendant has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States.  However, to protect its profits and maximize sales, Defendant concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

26.    Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose

the defect.   49 U.S.C. §§ 30118(c)(1) & (2).  If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.  49 U.S.C. §§ 30118(b)(2)(A) & (B).  Defendant also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects.  These same acts and omissions also violated various state consumer protection laws as detailed below.

27.     Plaintiff and the Class have been damaged by Defendant's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding highly dangerous vehicles whose value has greatly diminished because of Defendant's failure to timely disclose the serious defect.

28.     Plaintiff and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

29.     Plaintiff and the Class either paid more for the Defective Vehicles than they would have had they known of the ignition switch defects, or they would not have purchased the Defective Vehicles at all had they known of the defects.

30.     Plaintiff brings claims against Defendant individually and on behalf of a class of all other similarly situated purchasers of the Products for violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"), negligence, fraudulent concealment, product liability (design defect), violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA"), violations of the Song-Beverly Consumer Warranty Act, California Civil Code § 1790, *et seq.* ("Song-Beverly Act"), violations of the Michigan Consumer Protection Act (the "MCPA"), Mich. Comp. L. Ann. § 445.901, *et seq.*, and violations of other state statutes prohibiting unfair and deceptive acts and practices.

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.
§ 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one
member of diverse citizenship from Defendant, and the amount in controversy exceeds $5 million.

32.     The Court has personal jurisdiction over Defendant because Defendant is authorized to,
and conducts substantial business in California, generally, and this District, specifically.  Defendant
has marketed, promoted, distributed, and sold the Defective Vehicles in California.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a
substantial part of the events and omissions giving rise to this action occurred in this District as the
Defect in Plaintiff's vehicle manifested itself within this District.

34.     To the extent there is any contractual or other impediment to pursuit of these claims on
a class action basis, Plaintiff specifically alleges, and will prove, if necessary, that any bar to class
action proceedings is unconscionable, unfair and against public policy.

35.     Richard Stafford ("Plaintiff" or "Stafford") is a citizen of the state of California.
Plaintiff purchased a 2004 Saturn Ion.  Plaintiff chose the 2004 Saturn Ion, in part, because he wanted
a safely designed and manufactured vehicle.  Plaintiff saw advertisements for Old GM vehicles before
he purchased the Ion.  Plaintiff does recall that safety and quality were consistent themes in the
advertisements he saw.  These representations about safety and quality influenced Plaintiff's decision
to purchase the Ion.  Plaintiff experienced the ignition switch defect described by the GM recall.  On
numerous occasions, Plaintiff experienced a complete loss of power in his vehicle.  On two such
occasions, he had to have the car towed.  On other one occasion approximately two years ago, while
Plaintiff was driving near AT&T Park in San Francisco, California, Plaintiff stepped on the brakes to
avoid another vehicle that had run a red light.  His vehicle immediately lost all power and he was
unable to avoid crashing into the other car.  After the accident, he had the title reissued as salvage and
then paid $150 to a Chevrolet dealer in Vacaville, California to have the computer reset.  The car
continued to experience intermittent losses of power, causing Plaintiff to take the ignition out of the
car.  Plaintiff did not learn of the ignition switch defects until about March 2014. Had Old GM and/or

Defendant disclosed the ignition switch defects, Plaintiff would not have purchased the Ion, or would have paid less than he did.

Plaintiff

## **PARTIES**

36.     Defendant General Motors is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, 48265.  Defendant was incorporated in 2009 and on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the US Bankruptcy Code.  Defendant manufactures and distributes the Defective Vehicles from its Michigan manufacturing plants to consumers in California and throughout the United States.

37.     Among the liabilities and obligations expressly retained by Defendant after the bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

38.     Defendant also expressly assumed:

> all Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

39.     Because Defendant acquired and operated Old GM and ran it as a continuing business enterprise, and because Defendant was aware from its inception of the ignition switch defects in the Defective Vehicles, Defendant is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

### THE IGNITION SWITCH DEFECTS IN THE DEFECTIVE VEHICLES

40.    Given the importance that a vehicle and its electrical operating systems remain operational during ordinary driving conditions, it is imperative that an auto manufacturer ensures its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle.  With respect to the Defective Vehicles, GM has failed to do so.

41.    In the Defective Vehicles, the ignition switch defects can cause the vehicle's engine and electrical system to shut off, disabling the power steering and power brakes and causing non-deployment of the vehicle's airbags in the event of an accident.

42.    The ignition switch systems in the Defective Vehicles are defective in at least two major respects.  The first is that the switches are simply weak because of a faulty "detent plunger"; the switch can inadvertently move from the "run" to the "accessory" or "off" position.  The second defect is that, due to the low position of the ignition switch, the driver's knee can easily bump the key (or the hanging fob below the key), and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.

43.    The Defective Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

### DEFENDANT KNEW OF THE IGNITION SWITCH DEFECTS FOR YEARS, BUT CONCEALED THE DEFECTS FROM PLAINTIFF AND THE CLASS

44.    Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences for many years, but concealed their knowledge from Defective Vehicle owners.

45.    For example, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy.  Ms. Rose's death is the first known of the hundreds of deaths and injuries attributable to the ignition switch defects.  Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM and GM to address the ignition switch problem.

46.    Another incident involved 16-year old Megan Phillips.  Ms. Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car

left the road and hit a clump of trees.  NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact.  According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they begin communicating.  As he stated, "I don't understand why [GM] would wait 10 years to say something.  And I want to understand it but I never will."[1]

47.    Rather than publicly admitting the dangerous safety defects in the Defective Vehicles, the Companies attempted to attribute these and other incidents to "driver error."  Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering and/or airbag failures, including:

- 2005:  26 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved.

- 2006:  69 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved and 4 deaths citing Unknown component.

- 2007:  87 Cobalt Death and Injury Incidents, including 3 deaths citing Airbag as component involved.

- 2008:  106 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved and 2 deaths citing Unknown component.

- 2009:  133 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved, 1 death citing Service Brake as component involved, 1 death citing Steering as component involved, and 2 deaths citing Unknown component.

- 2010:  400 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 12 deaths citing Steering as component involved, and 1 death citing Unknown component.

- 2011:  187 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 2 deaths citing Steering as component involved, and 1 citing Unknown component.

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

---

[1] "Owners of Recalled GM Cars Feel Angry, Vindicated," REUTERS (Mar. 17, 2014).

CLASS ACTION COMPLAINT - 9

48.     GM now admits that Old GM learned of the ignition switch defects as early as 2001. During the pre-production development of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position. Old GM claimed that a switch design change "had resolved the problem."[2]

49.     In 2003, an internal report documented an instance in which the service technician observed a stall while driving. The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. The switch was replaced and the matter was closed.[3]

50.     According to GM's latest chronology submitted to NHTSA pursuant to 49 C.F.R. § 573.6, Old GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

51.     Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

52.     According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

53.     Gary Altman, program engineering manager for the 2005 Cobalt, admitted that Old GM's engineering managers knew about ignition-switch problems in the vehicle that could disable power steering, power brakes and airbags, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable, though he did not attempt to explain why the vehicle would not require an operable airbag. Needless to say, hapless Cobalt purchasers were not informed of Old GM's decision to release the vehicle notwithstanding its knowledge of the ignition switch defect.

---

[2] "G.M. Reveals It Was Told of Ignition Defect in '01," D. Ivory, NEW YORK TIMES (Mar. 12, 2014).
[3] *Id.*

54.    As soon as the 2005 Cobalt hit the market, Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[4]  Old GM opened additional PRTS inquires.

55.    In another PRTS opened in May 2005, Old GM engineers again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration, in order to make the key and key fob hang higher in the vehicle and therefore make it less likely that a driver's knee would inadvertently shut down the vehicle.  After initially approving the proposed partial fix, Old GM reversed course and again declined to even attempt to implement a fix.[5]

56.    Instead, in October 2005, Old GM simply issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the loss of power in the vehicles' electrical system.

57.    Rather than disclosing the true nature of the defects and correcting them, under the TSB, Old GM gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key and fob from moving up and down in the slot.  "[T]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging as low as they had in the past.[6]  According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[7]

58.    Yet there was no recall.  And, not surprisingly, Old GM continued to get complaints.

59.    In 2006, Old GM approved a design change for the Cobalt's ignition switch supplied by Delphi.  The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch."  But the new design was not produced until the 2007 model year.[8]

---

[4] March 11, 2014, Chronology Re: Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles, at 1.
[5] Id.
[6] Id. at 1-2.
[7] Id. at 3.
[8] Id. at 2.

CLASS ACTION COMPLAINT - 11

60.     In what a high-level engineer at Old GM now calls a "cardinal sin" and "an extraordinary violation of internal processes," Old GM changed the part **design but kept the old part number**. That makes it impossible to determine from the part number alone which GM vehicles produced after 2007 contain the defective ignition switches.

61.     In 2007, NHTSA investigators met with Old GM to discuss its airbags, and informed Old GM of the July 2005 frontal and fatal crash involving Amber Marie Rose.

62.     As alleged above, the airbags in Ms. Rose's 2005 Cobalt did not deploy. Data retrieved from her vehicle's diagnostic system indicated that the ignition was in the "accessory" position. Old GM investigated and tracked similar incidents.

63.     By the end of 2007, by GM's own admission, Old GM knew of 10 frontal collisions in which the airbag did not deploy. Plaintiff believes that Old GM actually knew of many other similar incidents involving the ignition switch defects.

64.     At a May 15, 2009 meeting, GM engineers learned that data in the black boxes of Chevrolet Cobalt vehicles showed that the dangerous ignition switch defects existed in hundreds of thousands of Defective Vehicles. But still GM did not reveal the defect to NHTSA, Plaintiff or the Class.

65.     After the May 15, 2009 meeting, GM continued to get complaints of unintended shut down and continued to investigate frontal crashes in which the airbags did not deploy.

66.     After the May 15, 2009 meeting, GM told the families of accident victims and Defective Vehicle owners that it did not have sufficient evidence to conclude that there was any defect in the Defective Vehicles. In one case involving the ignition switch defects, GM threatened to sue the family of an accident victim for reimbursement of its legal fees if the family did not dismiss its lawsuit. In another, GM sent the victim's family a terse letter, saying there was no basis for any claims against GM. These statements were part of GM's continuation of the campaign of deception begun by Old GM.

67.     According to GM, it was not until 2011 and 2012 that GM's examinations of switches from vehicles that had experienced crashes revealed significant design differences in the torque

1  performance of ignition switches from the 2005 Cobalt vehicles and those from the 2010 model year,

2  the last year of the Cobalt's production.

3     68.     GM responded by blaming the supplier for the switch design.

4     69.     In 2014, after numerous assessments and facing increasing scrutiny of its conduct and

5  the defects in its vehicles, GM finally announced a recall for the 2003-2007 Chevrolet Cobalt and

6  2005-2007 Pontiac G5 vehicles.

7  **DEFENDANT WAITED UNTIL 2014 TO FINALLY ORDER A RECALL OF THE
   DEFECTIVE VEHICLES**

8

9     70.     After analysis by GM's Field Performance Review Committee and the Executive Field

10  Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of some of the Defective

11  Vehicles on January 31, 2014.

12     71.     Initially, GM's EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5

13  for model years 2005-2007.

14     72.     After additional analysis, the EFADC expanded the recall on February 24, 2014, to

15  include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for

16  model years 2003-2007, and the Saturn Sky for model year 2007.

17     73.     Most recently, on March 28, 2014, GM expanded the recall a third time, to include

18  Chevrolet Cobalts, Pontiac G5s and Solstices, Saturn Ions and Skys from the 2008 through 2010

19  model years, and Chevrolet HHRs from the 2008 through 2011 model years.

20     74.     GM provided dealers with notice of the recalls on February 26, 2014, March 4, 2014,

21  and March 28, 2014, and mailed letters to some of the current owners of the Defective Vehicles on

22  March 10 and March 11, 2014.

23     75.     To date, GM has ***not*** pledged to remedy the fact that the key and fob in the Defective

24  Vehicles hang dangerously low, leading to an unreasonable risk that the driver's knee will

25  inadvertently shut down the Defective Vehicles during ordinary driving conditions.

26     76.     In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra

27  admitted that the Company had made mistakes and needed to change its processes.

28

77.     According to Ms. Barra, "Something went terribly wrong in our processes in this instance, and terrible things happened."  Barra went on to promise, "[w]e will be better because of this tragic situation if we seize this opportunity."[9]

78.     GM now faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

79.     While GM has now appointed a new Vehicle Safety Chief, on information and belief, at least 2.59 million potentially Defective Vehicles remain on the road to this day; and, on information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defects.

## DEFENDANT HAS NOT RECALLED ALL THE DEFECTIVE VEHICLES

80.     Plaintiff's research, including a review of NHTSA's complaint database, suggests that GM's recall does not capture all of the Defective Vehicles.  Plaintiff thereupon believes and alleges that the following additional non-recalled GM vehicles also have defective ignition switches: the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

81.     Plaintiff owns a 2004 Saturn Ion.  As discussed above, Plaintiff has suffered from incidents of unintended shut down, including one such incident that led to a collision with another vehicle, and he believes those incidents are the result of the ignition switch defects.  In addition, this make and model was included in GM's ignition switch recall.  Plaintiff therefore believes and alleges that his 2004 Saturn Ion is a Defective Vehicle.

82.     On information and belief, in marketing and advertising materials, Old GM and GM consistently promoted all their vehicles, including the Defective Vehicles, as safe and reliable.

83.     For example, under a section captured "safety," Old GM's website for its Chevrolet brand stated in 2005:

> OUR COMMITMENT
> Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe – from the start of your journey to your destination.
>
> That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind….

---

[9]  "Something Went 'Very Wrong' at G.M., Chief Says."  N.Y. TIMES (Mar. 18, 2014).

84.    One Cobalt ad promised, "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

85.    An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

86.    A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically engineered for whatever is next." Another 2003 spot closed with the tagline "Saturn. People first."

87.    A 2001 print ad touting the launch of the Saturn focused on safety: "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars. And it wasn't until we were satisfied that we added things…."

88.    Once GM came into existence, it continued to stress the safety and reliability of all its vehicles, including the Defective Vehicles.

89.    For example, GM's Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "As long as there are babies, there'll be Chevys to bring them home."

90.    Another 2010 television ad informed consumers, "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

91.    Old GM and GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicles were defective.

92.    Throughout the relevant period, Old GM and GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

93.    Old GM and GM never informed consumers about the ignition switch defects.

**THE IGNITION SWITCH DEFECTS HAVE HARMED PLAINTIFF AND THE CLASS**

94.    The ignition switch defects have caused damage to Plaintiff and the Class.

95.    A vehicle purchased, leased, or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

96.     A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

97.     Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed. Plaintiff and the Class overpaid for their Defective Vehicles. Because of the concealed ignition switch defects, Plaintiff did not receive the benefit of the bargain.

98.     Class members who purchased new or used Defective Vehicles after the date Defendant came into existence – July 10, 2009 – overpaid for their Defective Vehicles as a direct result of Defendant's ongoing violations of the TREAD Act and state consumer protection laws by failing to disclose the existence of the ignition switch defects.

99.     Plaintiff and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for the Companies' failure to disclose and remedy the ignition switch defects.

100.    Defendant admits to at least 13 deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles. However, Plaintiff believes that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignition switch defects.

101.    If Old GM or GM had timely disclosed the ignition switch defects as required by the MCPA, the TREAD Act, and the State consumer protection laws set forth below, all Class members' vehicles would now be worth more.

## SUCCESSOR LIABILITY

102.    As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure and concealment of the ignition switch defects from the date of its formation on July 10, 2009.

103.    GM also expressly assumed liability for Lemon Law claims in the Master Sale and Purchase Agreement of June 26, 2009, and this assumption of liability includes the Class's claims under the Song-Beverly Act, which is California's Lemon Law statute.

104.     GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM's current CEO, Mary Barra, began working at Old GM in 1980, and in February 2008 she became Vice President of Global Manufacturing Engineering, in which position she knew or should have known of the ignition switch defects;

- GM's Rule 30(b)(6) deponent concerning complaints Old GM and GM received about ignition switch defects in the Cobalt, Victor Hakim, worked at Old GM from 1971 until the end of Old GM, and now is a "Senior Manager/Consultant" in the "field performance assessment" department, further demonstrating GM's longstanding knowledge of the ignition switch defects.

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

- GM retained the bulk of the employees of Old GM;GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of Old GM; and

- GM acquired all goodwill and other intangible personal property of Old GM.

**<u>TOLLING OF THE STATUTES OF LIMITATION</u>**

105.     All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein.  Plaintiff and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old GM and GM did not report information within their knowledge to federal authorities (NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this class action was filed.

106.     Indeed, Old GM instructed its service shops to provide Defective Vehicle owners with a new key ring if they complained about unintended shut down, rather than admit what Old GM knew:

1    that the ignition switches were dangerously defective and warranted replacement with a properly

2    designed and built ignition system.

3          107.    In April 2006, some eight years before the first recall of some Defective Vehicles, Old

4    GM internally authorized a redesign of the defective ignition switch. Yet, as part of Old GM's

5    concealment of the defect, GM redesigned the part but kept the old part number. According to one of

6    the high-level Old GM engineers at the time, "Changing the fit, form or function of a part without

7    making a part number change is a cardinal sin. It would have been an extraordinary violation of

8    internal processes."[10]

9          108.    Old GM and GM were, and GM remains, under a continuing duty to disclose to

10    NHTSA, Plaintiffs, and the Class the true character, quality, and nature of the Defective Vehicles; that

11    this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and

12    that it will require repair, poses a severe safety concern, and diminishes the value of the Defective

13    Vehicles.

14          109.    Because of the active concealment by Old GM and GM, any and all limitations periods

15    otherwise applicable to Plaintiff's claims have been tolled and GM is estopped from relying on any

16    statutes of limitation in their defense of this action.

17                              **CLASS ACTION ALLEGATIONS**

18          110.    Plaintiff seeks relief in his individual capacity and seek to represent a class consisting

19    of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3),

20    Plaintiff seeks certification of a class initially defined as follows:

> All persons in the United States who formerly or currently own or lease
> one or more of the following GM vehicles: (a) 2003-2010 Saturn Ion;
> 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011
> Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010; Saturn Sky;
> and (b) (Non-recalled vehicles): the 2005 Chevrolet Equinox, the 2006;
> Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

21

22

23

24

25

26

27

28    _____
[10] "'Cardinal sin': Former GM engineers say quiet '06 redesign of faulty ignition switch was a major
violation of protocol." Automotive News (Mar. 26, 2014).

CLASS ACTION COMPLAINT - 18

111. Excluded from the Class are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased the Product for the purpose of resale.

112. Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division into subclasses after they have had an opportunity to conduct discovery.

113. <u>Numerosity</u>. Fed. R. Civ. P. 23(a)(1). The Class is so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that many millions of consumers have purchased or leased the Defective Vehicles.

114. <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

        a.    Whether the Defective Vehicles suffer from ignition switch defects;

        b.    Whether Defendant violated the CLRA, California Civil Code § 1750, *et seq.*;

        c.    Whether Defendant violated the UCL, California Business and Professions Code § 17200, *et seq.*;

        d.    Whether Defendant was negligent;

        e.    Whether Defendant fraudulently concealed the ignition switch defects;

        f.    Whether Defendant is liable for a design defect;

        g.    Whether Defendant violated the MMWA, 15 U.S.,C. § 2301, *et seq.*;

        h.    Whether Defendant violated the Song-Berly Act, California Civil Code § 1790, *et seq.*;

        i.    Whether Defendant the MCPA, Mich. Comp. L. Ann. § 445.901, *et seq.*;

        j.    Whether Defendant violated the other state statutes prohibiting unfair and deceptive acts and practices; and

        k.    The nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

Case 3:14-cv-01702    Document 1    Filed 04/15/14    Page 22 of 37

115.    <u>Typicality</u>.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class.  Plaintiff and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

116.    <u>Adequacy of Representation</u>.  Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff's Counsel are competent and experienced in litigating class actions.

117.    <u>Superiority of Class Action</u>.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

118.    <u>Injunctive and Declaratory Relief</u>.  Fed. R. Civ. P. 23(b)(2).  Defendant's misrepresentations are uniform as to all members of the Class.  Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## **FIRST CAUSE OF ACTION**

### **(Violation of Consumers Legal Remedies Act – Civil Code § 1750, *et seq.*)**

119.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

120.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of California residents who formerly or currently own or lease one or more of the Defective Vehicles.

121.    This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

122.    Plaintiff and each member of the Class are consumers as defined by California Civil Code §1761(d).  Defendant intended to sell the Products.

123.    The Defective Vehicles are goods within the meaning of Civil Code §1761(a).

124. Defendant violated the CLRA in at least the following respects:

a.    In violation of §1770(a)(5), Defendant represented that the Defective Vehicles have approval, characteristics, and uses or benefits which they do not have (because they are defective);

b.    In violation of §1770(a)(7), Defendant represented that the Defective Vehicles are of a particular standard, quality or grade, when they are of another (having a design defect); and

c.    In violation of §1770(a)(16), Defendant represented that the Products have been supplied in accordance with previous representations (being free of design defects), when they were not.

125. Defendant violated the Act by representing the Defective Vehicles were safe and free of defects when they were not. Defendant knew, or should have known, that the representations and advertisements were false and misleading.

126. Defendant's acts and omissions constitute unfair, deceptive, and misleading business practices in violation of Civil Code §1770(a).

127. On April 11, 2014, Plaintiff notified Defendant in writing, by certified mail, of the violations alleged herein and demanded that Defendant remedy those violations.

128. If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of receipt of Plaintiff's written notice pursuant to §1782 of the California Act, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA. Plaintiff and the Class also will seek a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution, disgorgement, statutory damages, and any other relief that the Court deems proper.

129. Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to the public.

## SECOND CAUSE OF ACTION

**(California Unfair Competition Law – Cal. Bus. & Prof. Code § 17200, *et seq.*)**

130. Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

Case 3:14-cv-01702    Document 1    Filed 04/15/14    Page 23 of 37

131.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of California residents who formerly or currently own or lease one or more of the Defective Vehicles.

132.    Defendant engaged in unlawful, unfair, and/or fraudulent conduct under California Business & Professional Code § 17200, *et seq.*

133.    Defendant's conduct is unlawful in that it violates the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (as set forth in the first cause of action), and the Transportation Recall Enhancement, Accountability and Documentation Act (the "TREAD Act"), 49 U.S.C. § 30101, *et seq.* (by failing to timely inform the NHTSA of the ignition switch defects and allowing the Defective Vehicles to be sold with the ignition switch defects).

134.    Defendant's acts and practices violated the UCL because they violated the California Secret Warranty Law, California Civil Code section 1795.90 *et seq.*, by:

    a.    Failing to timely notify all affected vehicle owners that the ignition switches were part of an adjustment program and that they could have had their ignition switches repaired or replaced free of charge;

    b.    Failing to reimburse vehicle owners who paid to have their ignition switches repaired or replaced;

    c.    Replacing or repairing defective ignition switches for some customers but failing to notify all other customers of that benefit; and/or

    d.    Failing to comply with the applicable notification provisions in the Secret Warranty Law.

135.    Defendant's conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiff and Class members.  The harm to Plaintiff and Class members arising from Defendant's conduct outweighs any legitimate benefit Defendant derived from the conduct.  Defendant's conduct undermines and violates the stated spirit and policies underlying the Consumers Legal Remedies Act and the TREAD ACT as alleged herein.

136.    Defendant's actions and practices constitute "fraudulent" business practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers. Plaintiff relied on Defendant's representations and omissions.

137.    As a direct and proximate result of Defendant's violations, Plaintiff suffered injury in fact and lost money because they purchased the Defective Vehicle and paid the price they paid believing it to be free of defects when it was not.

138.    Plaintiff, on behalf of themselves and Class members, seek equitable relief in the form of an order requiring Defendant to refund Plaintiff and all Class members all monies they paid for repairing and/or replacing the Defective Vehicles, and injunctive relief in the form of an order prohibiting Defendant from engaging in the alleged misconduct and performing a corrective recall campaign.

## THIRD CAUSE OF ACTION

### (Negligence)

139.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

140.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of California residents who formerly or currently own or lease one or more of the Defective Vehicles.

141.    Defendant had a duty to its customers as a manufacturer of motor vehicles to design, manufacture, market, and provide vehicles that, in their ordinary operation, are reasonably safe for their intended uses. Defendant had a duty to adequately test its vehicles' safety before selling millions to consumers worldwide.

142.    Defendant had a duty to test vehicles for ignition switch problems once Defendant was on notice that its vehicles had a propensity to have ignition switch issues leading to engine failure, which can cause bodily injury, death, and property damage. Moreover, Defendant had a duty to provide true and accurate information to the public to prevent undue risks arising from the foreseeable use of its products.

143.    At all times relevant, Defendant sold, marketed, advertised, distributed, and otherwise placed Defective Vehicles into the stream of commerce in an unlawful, unfair, fraudulent, and/or deceptive manner that was likely to deceive the public.

144.    Defendant was negligent, and breached the above duties owed to Plaintiff and Class members.

145.    As direct and proximate causes of Defendant's breaches, Plaintiff and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

## FOURTH CAUSE OF ACTION

### (Fraudulent Concealment)

146.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

147.    Plaintiff bring this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of California residents who formerly or currently own or lease one or more of the Defective Vehicles.

148.    Defendant concealed material facts concerning the ignition switch defects before, during, and after the sale of the Defective Vehicles to Plaintiff and Class members.

149.    Defendant had a duty to disclose the ignition switch defects because it was known only to Defendant, who had superior knowledge and access to the facts, and Defendant knew it was not known to or reasonably discoverable by Plaintiff and Class members.  These concealed facts were material because they directly impact the safety of the Defective Vehicles.  Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

150.    Defendant actively concealed these material facts, in whole or in part, to protect its profits and avoid a costly recall, and it did so at the expense of Plaintiff and the Class.

151.    Plaintiff and the Class were unaware of these concealed material facts and would not have acted as they did if they had known of the concealed facts.  Plaintiff's and Class members' actions were justified.  Defendant was in exclusive control of the material facts and the public, Plaintiffs, and the Class did not know of these facts prior to purchasing the Defective Vehicles.

152.    Because of the concealment of the facts, Plaintiff and the Class sustained damage because they purchased and retained Defective Vehicles that are now diminished in value from what they would have been had Defendant timely disclosed the ignition switch defects.

153.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiff's and Class members' rights and well being, and to enrich Defendant.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FIFTH CAUSE OF ACTION

### (Product Liability – Design Defect)

154.    Plaintiff incorporates by reference and re-allege the preceding paragraphs.

155.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of California residents who formerly or currently own or lease one or more of the Defective Vehicles.

156.    Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the Defective Vehicles and their component parts and constituents, which was intended by Defendant to be used as passenger vehicles and for other related activities.

157.    Defendant knew that the Defective Vehicles were to be purchased and used without inspection for defects by Plaintiff and Class members.

158.    The Defective Vehicles were unsafe for their intended uses by reason of defects in their manufacture, design, testing, components, and constituents, so that they would not safely serve their purpose, but would instead expose the users of the vehicles to possible serious injuries.

159.    Defendant designed the Defective Vehicles defectively, causing them to fail to perform as safely as an ordinary customer would expect when used in an intended or reasonably foreseeable manner.

160.    The risks inherent in the design of the Defective Vehicles significantly outweigh any benefits of the design.

161.     Plaintiff and Class members were not aware of the Defect at any time prior to the recent revelations regarding problems with the Defective Vehicles.

162.     As direct and proximate causes of the ignition switch defects, Plaintiff and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

## SIXTH CAUSE OF ACTION

### (Violation of Magnuson-Moss Warranty Act, 15 U.SC. § 2301, *et seq.*)

163.     Plaintiff incorporates by reference and re-allege the preceding paragraphs.

164.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of California residents who formerly or currently own or lease one or more of the Defective Vehicles.

165.     Plaintiff and Class members are "consumers" within the meaning of the MMWA, 15 U.SC. § 2301(3).

166.     Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

167.     The Defective Vehicles are "consumer products" within the meaning of the MMWA, 15 U.SC. § 2301(1).

168.     Defendant affirmed the fact, promise, and/or described in writing that the ignition switch would meet a specified level of performance over a specified period of time, namely, that it would not require maintenance and last for the life of the Defective Vehicles.  Defendant's written affirmations of fact, promises, or descriptions related to the nature of the ignition switch in the Defective Vehicles and became part of the basis of the bargain between Plaintiff and Defendant.  Defendant refuses to recognize or honor the written ignition switch warranties and, indeed, denies the existence of these warranties.  Defendant breached its written warranties when the Defective Vehicles did not perform as represented by Defendant and thereafter when Defendant refused to recognize or honor the warranties. Defendant's conduct thereby caused damages to Plaintiff and Class members.

169.     The amount in controversy of each Plaintiff's individual claim meets or exceeds the sum

or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

170.     Resorting to any informal dispute resolution procedure and/or affording Defendant a reasonable opportunity to cure its breach of written warranties to Plaintiff is unnecessary and/or futile. At the time of sale to Plaintiffs, Defendant knew, should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the ignition switch defects, but nevertheless failed to rectify the situation and/or disclose it to Plaintiffs.  Moreover, the remedies available through any informal dispute resolution procedure would be wholly inadequate under the circumstances. Accordingly, any requirement under the MMWA or otherwise that Plaintiff resorts to any informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of written warranties is excused and, thereby, deemed satisfied.

171.     As a direct and proximate result of Defendant's breach of written warranties, Plaintiff and Class members sustained damages and other losses.  Defendant's conduct caused Plaintiff's and Class members' damages and, accordingly, Plaintiff and Class members are entitled to recover damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other equitable relief as appropriate.

## SEVENTH CAUSE OF ACTION

**(Violation of Song-Berverly Consumer Warranty Act, California Civil Code § 1790, *et seq.*)**

172.     Plaintiff incorporates by reference and re-allege the preceding paragraphs.

173.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of California residents who formerly or currently own or lease one or more of the Defective Vehicles.

174.     Plaintiff and Class members who purchased the Defective Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

175.     The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a)

176.     Defendant is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code § 1791(j).

177.    Defendant impliedly warranted to Plaintiff and the Class that its Defective Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Defective Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

178.    Cal. Civ. Code § 1791.1(a) states that "implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

179.    The Defective Vehicles would not pass without objection in the automotive trade because of the ignition switch defects that cause the Defective Vehicles to experience engine failure lead to an unreasonable likelihood of accident and an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

180.    Because of the ignition switch defects, the Defective Vehicles are not safe to drive and thus not fit for ordinary purposes.

181.    The Defective Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and its dangerous safety implications.

182.    Defendant breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles containing the ignition switch defects.

183.    The ignition switch defects have deprived Plaintiff and the Class of the benefit of their bargain and have caused the Defective Vehicles to depreciate in value.

184.    As a direct and proximate result of Defendant's breach of its duties, Class members received goods whose dangerous condition substantially impairs their value to Class members. Defendant's conduct has damaged Plaintiff and the Class through the diminished value, the malfunctioning, and the nonuse of their Defective Vehicles.

185.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective

Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

186.     Under Cal. Civ. Code § 1794, Class members are entitled to costs and attorneys' fees.

## EIGHTH CAUSE OF ACTION

**(Violations of Michigan Consumer Protection Act, Mich. Comp. L. Ann. § 445.901, *et seq.*)**

187.     Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

188.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Michigan residents who formerly or currently own or lease one or more of the Defective Vehicles.

189.     Old GM, GM, and Plaintiff are each "persons" under Mich. Comp. L. Ann. § 445.902(d).

190.     The sale of the Defective Vehicles to Plaintiff and the Class occurred within "trade and commerce" within the meaning of Mich. Comp. L. Ann. § 445.902(d), and both GM and Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

191.     The MCPA deems unlawful any "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce," as more specifically defined in the MCPA.  Mich. Comp. L. Ann. § 445.903(1).  GM has engaged in unfair, unconscionable, and deceptive methods, acts and practices in violation of the MCPA, and also has successor liability for the unfair, unconscionable, and deceptive methods, acts, and practices of Old GM as described herein.

192.     Both Old GM and GM violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."  Mich. Comp. L. Ann. § 445.903(s).

193.     As alleged above, both Companies knew of the ignition switch defect, while Plaintiff and the Class were deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

194.     Old GM also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state

of affairs to be other than it actually is."  Mich. Comp. L. Ann. § 405.903(bb).  Indeed, Old GM represented that the Defective Vehicles were safe such that reasonable people believed such representations to be true.

195.    Old GM also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. L. Ann. § 405.903(cc).  Old GM represented that the Defective Vehicles were safe, yet failed to disclose the material fact that the ignition switch was defective.

196.    Old GM's and GM's acts and practices were unfair and unconscionable because their acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and the Companies' failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and because the harm the Companies caused consumers greatly outweighs any benefits associated with those practices.  While Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Defective Vehicles until 2007.

197.    All the while, Old GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

198.    Plaintiff and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.

199.    Old GM and GM failed to inform NHTSA, and therefore failed to inform consumers, that the Defective Vehicles had a defective ignition switch that could lead to injury and death. Had Plaintiff and the Class known this, they would either not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles. Plaintiff and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of herein.

200.    Plaintiff requests that this Court: enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; provide to Plaintiff and each Class member either their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is

1  higher; award reasonable attorneys' fees; and provide other appropriate relief under Mich. Comp. L.

2  Ann. § 445.911.

3      201.    Plaintiff acknowledges that, on its face, the MCPA purports to (i) deprive non-residents

4  of bringing class (but not individual) actions under the MCPA; and (ii) allows individuals (but not class

5  members) the ability to recover a penalty of $250 per person if that amount is greater than their actual

6  damages.  After the United States Supreme Court's decision in *Shady Grove Orthopedic Ass'n, P.A. v.*

7  *Allstate Ins. Co.*, 589 U.S. 393 (2010), however, any such prohibitions imposed in class actions (but not

8  in individual actions) are trumped and superseded by Fed. R. Civ. P. 23, which imposes no such

9  restrictions.

10                                      **NINTH CAUSE OF ACTION**

11    **(Violations of the Other State Statutes Prohibiting Unfair and Deceptive Acts and Practices)**

12      202.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

13      203.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or,

14  alternatively in the event the Court declines to certify a nationwide Class, on behalf of subclasses of the

15  other states' residents who formerly or currently own or lease one or more of the Defective Vehicles.

16      204.    The state deceptive trade practices acts were enacted by the various states following the

17  passage of the Federal Trade Commission Act ("FTC Act"), which prohibits deceptive acts and

18  practices in the sale of products to consumers. The state laws in this area are modeled on the FTC Act

19  and are therefore highly similar in content.

20      205.    Defendant's actions violate the Deceptive Trade Practices Acts of the various states, as

21  set out more fully above, by failing to disclose and by actively concealing the defective ignition switch

22  in GM vehicles.

23      206.    The conduct described in the statement of facts constitutes unfair or deceptive trade

24  practices predominantly and substantially affecting the conduct of trade or commerce throughout the

25  United States in violation of the state deceptive trade practices acts and other similar state statutes

26  prohibiting unfair and deceptive acts and practices.  The deceptive trade practices acts violated by

27  Defendants are set forth in the next paragraph.

28

207.    The violations of the various state consumer protection acts (Alabama: the Alabama
Deceptive Trade Practices Act (Ala. Code § 8-19-*1 et seq*.); Alaska: Alaska Unfair Trade Practices and
Consumer Protection Act (Alaska Stat. § 45.50.471 *et seq*.); Arizona: the Arizona Consumer Fraud
Statute (Ariz. Rev. Stat. Ann. § 44-1521 *et seq*.); Arkansas: the Arkansas Deceptive Trade Practices Act
(Ark. Code Ann. § 4-88-101 *et seq*.); Colorado: the Colorado Consumer Protection Act (Colo. Rev.
Stat. §6-1-101 *et seq*.); Connecticut: the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat.
§ 42-110a *et seq*.);  Washington, D.C. the Consumer Protection Procedures Act (D.C. Code Ann. § 28-
3901 *et seq*.); Florida: the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. § 501.201
*et seq*. (West)) and the Florida False Advertising Statutes (Fla. Stat. Ann. § 817.40 *et seq*. (West));
Georgia: Uniform Deceptive Trade Practices Act (Ga. Code Ann. § 10-1-370 *et seq*.); the Fair Business
Practices Act (Ga. Code Ann. § 10-1-390 *et seq*.); and the False Advertising Statute (Ga. Code Ann. §
10-1-420 *et seq*.); Hawaii: The Hawaii Federal Trade Commission Act (Hawaii Rev. Stat. §480 et seq.)
and the Uniform Deceptive Trade Practice Act (Hawaii Rev. Stat. § 481A *et seq*.); Idaho: the Idaho
Consumer Protection Act (Idaho Code § 48-601 *et seq*.); Illinois: the Illinois Consumer Fraud and
Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. § 05/1 *et seq*. (Smith Hurd)) and the
Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. Ann. 510/1 *et seq*. (Smith Hurd)); Indiana:
the Deceptive Consumer Sales Act (Ind. Code Ann. § 24-5-0.5-1 *et seq*. (Burns)); Iowa: the Iowa
Consumer Fraud Act (Iowa Code Ann. § 714.16 (West)); Kansas:  the Kansas Consumer Protection Act
(Kan. Stat. Ann. § 50-623 et seq.); Kentucky: the Consumer Protection Act (Ky. Rev. Stat. § 367.110 *et
seq*.); Louisiana: the Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. Ann. §
51:1401 (West)); Maine: the Maine Unfair Trade Practices Act (Me. Rev. Stat. Ann. Tit. 5 § 206 *et
seq*.) and the Uniform Deceptive Trade Practices Act (Me. Rev. Stat. Ann. Tit. 10 § 1211 *et seq*.);
Maryland: the Maryland Consumer Protection Act (Md. Com. Law Code Ann. §§ 13-101 *et seq*., 14-
101 *et seq*.); Massachusetts: the Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A);
Minnesota: the Consumer Fraud Act (Minn. Stat. Ann. § 325 F. 69); the False Statement in
Advertisement Statute (Minn. Stat. Ann. § 325 F. 67); the Uniform Deceptive Trade Practices Act
(Minn. Stat. Ann. § 325D.44); and the Unlawful Trade Practices Act (Minn. Stat. Ann. § 325D.13);
Mississippi: the Consumer Protection Act (Miss. Code Ann. §75-24-1 *et seq*.) and the False Advertising

Statutes (Miss. Code Ann. § 97-23-3); Missouri: the Missouri Merchandising Practices Act (Mo. Rev.

Stat. § 407.010 *et seq.*);  Montana: the Montana Unfair Trade Practices and Consumer Protection Act

(Mont. Code Ann. §30-14-101 *et seq.*); and the Statutory Deceit Statute (Mont. Code Ann. § 27-1-712);

Nebraska: the Nebraska Consumer Protection Act (Neb. Rev. Stat. § 59-1601 *et seq.*) and the Nebraska

Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. § 87-301 *et seq.*); Nevada: the Deceptive

Trade Statutes (Nev. Rev. Stat. §§ 598.0903 *et seq.*, 41.600 *et seq.*);  New Hampshire: the Regulation of

Business Practices for Consumer Protection Act (N.H. Rev. Stat. Ann. § 358-A:1 *et seq.*); New Jersey:

the New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1 *et seq.* (West)); New Mexico: New

Mexico Unfair Practices Act (N.M. Stat. Ann. § 57-12-1 *et seq.*); New York: New York Consumer

Protection Act (N.Y. Gen. Bus. Law §§ 349, 350 (Consol.)); North Carolina: North Carolina Unfair and

Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1 *et seq.*); North Dakota: Deceptive Act or

Practice Statutes (N.D. Gen. Stat. § 51-15-01 *et. seq.*); Ohio:  Ohio Consumer Sales Practices Act (Ohio

Rev. Code Ann. § 1345.01 *et seq.* (Baldwin)); Oklahoma: Oklahoma Consumer Protection Act (Okla.

Stat. Ann. Tit. 15, § 751 *et seq.* (West)) and the Oklahoma Deceptive Trade Practices Act (Okla. Stat.

Ann. Tit. 78, § 51 *et seq.* (West)); Oregon: the Unlawful Trade Practices Act (Or. Rev. Stat. § 646.605

*et seq.*) and the Oregon Food and Other Commodities Act (Or. Rev. Stat. § 616.005 *et seq.*);

Pennsylvania: Unfair Trade Practices Act and Consumer Protection Law (Pa. Stat. Ann. Tit. 73 § 201-1

*et seq.* (Purdon); Rhode Island: Consumer Protection Act (R.I. Gen. Law § 6-13.1-1 *et seq.*); South

Carolina: South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq.*); South Dakota:

South Dakota Deceptive Trade Practices and Consumer Protection Law (S.D. Codified Laws Ann.

§ 37-24-1 *et seq.*); Tennessee: Tennessee Consumer Protection Act (Tenn. Code Ann. § 47-18-101 *et*

*seq.*); Texas: Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code Ann. § 17.41 *et seq.*

(Vernon)); Utah:  Utah Consumer Sales Practices Act (Utah Code Ann. § 13-11-1 *et seq.*) and the Utah

Truth in Advertising Act (Utah Code Ann. § 13-11a-1 *et seq.*); Vermont: Vermont Consumer Fraud

Statute (Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*); Virginia: Virginia Consumer Protection Act (Va. Code

59.1-196 *et seq.*); Washington: Washington Consumer Protection Act (Wash. Rev. Code Ann. § 19.86

*et seq.*); West Virginia: West Virginia Consumer Credit and Protection Act (W. Va. Code § 46A-6-101

*et seq.*); Wisconsin: Wisconsin Fraudulent Representations Act (Wis. Stat. Ann. § 100.18 *et seq.*

(West)); Wyoming: Consumer Protection Act (Wyo. Stat. § 40-12-101 *et seq.*)) have directly, foreseeably, and proximately caused damages to Plaintiff and proposed class in amounts yet to be determined.

208.    As a result of Defendant's violations of the Deceptive Trade Practices Acts of the various states prohibiting unfair and deceptive acts and practices, Plaintiff and Class members have suffered actual damages for which Defendant is liable.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representatives and appointing the undersigned counsel as Class Counsel;

B.    Ordering Defendant to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiff and the other members of the Class;

C.    Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

D.    Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and the other members of the Class;

E.    Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective recall campaign;

F.    Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

G.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

H.    Ordering such other and further relief as may be just and proper.

1

## **JURY DEMAND**

2

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

3

Dated:  April 11, 2014                                  Respectfully submitted,

4

5
                                           Francis "Casey" J. Flynn, *Pro Hac Vice*
                                              *Application Forthcoming*
6
                                           Email:  francisflynn@gmail.com
                                           Tiffany M. Yiatras, *Pro Hac Vice Application*
7
                                              *Forthcoming*
                                           Email:  tyiatras@careydanis.com
8
                                           CAREY DANIS & LOWE, L.L.C.
                                           8235 Forsyth Boulevard, Suite 1100
9
                                           Saint Louis, Missouri  63105
                                           Telephone:  1-800-721-2519
10
                                           Facsimile:  (314) 721-0905

11

12
                                  By:   /s/ Michael F. Ram, CSB #104805
                                           Michael F. Ram, CSB #104805
13
                                           Email:  mram@rocklawcal.com
                                           RAM, OLSON, CEREGHINO & KOPCZYNSKI
14
                                           555 Montgomery Street, Suite 820
                                           San Francisco, California  94111
15
                                           Telephone:  (415) 433-4949
                                           Facsimile:  (415) 433-7311

16

17
                                  By:   /s/ Beth E. Terrell, CSB #178181
                                           Beth E. Terrell, CSB #178181
18
                                           Email:  bterrell@tmdwlaw.com
                                           TERRELL MARSHALL DAUDT & WILLIE PLLC
19
                                           936 North 34th Street, Suite 300
                                           Seattle, Washington  98103-8869
20
                                           Telephone:  (206) 816-6603
                                           Facsimile:  (206) 350-3528
21

22
                                  *Attorneys for Richard Stafford*

23

24

25

26

27

28

CLASS ACTION COMPLAINT - 35

## **AFFIDAVIT OF BETH E. TERRELL**

I, Beth E. Terrell, declare as follows:

1.     I am an attorney with the law firm of Terrell Marshall Daudt & Willie, PLLC, counsel for Plaintiff Richard Stafford in this action.  I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California.  This declaration is made pursuant to California Civil Code section 1780(d).  I make this declaration based on my research of public records and upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2.     Based on my research and personal knowledge, Defendant General Motors, LLC does business within the County of San Francisco and Plaintiff's automotive defect manifested itself within the County of San Francisco, as alleged in this Class Action Complaint.

I declare under penalty of perjury under the laws of the United States and the State of California this 11th day of April 2014 in Seattle, Washington, that the foregoing is true and correct.


   /s/ Beth E. Terrell, CSB #178181
  Beth E. Terrell, CSB #178181