# Exhibit BBB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

14 APR 14 PM 2: 51

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

TRACY LEWIS, on behalf of herself and all
others similarly situated,

        Plaintiff,

    v.

GENERAL MOTORS LLC; GENERAL
MOTORS HOLDING, LLC; DELPHI
AUTOMOTIVE PLC; and DPH-DAS LLC
f/k/a DELPHI AUTOMOTIVE SYSTEMS,
LLC

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 1:14-cv-**14 -cv- 0 5 7 3 WTL -DKL**

CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

## NATURE OF CLAIM

1.     Plaintiff Tracy Lewis brings this action for herself and on behalf of all persons

similarly situated who purchased or leased certain vehicles manufactured, distributed, and/or

sold by GENERAL MOTORS LLC, GENERAL MOTORS HOLDINGS, LLC, GENERAL

MOTORS CORPORATION, GENERAL MOTORS COMPANY, and/or its related subsidiaries,

successors, or affiliates ("GM") with defective ignition switches manufactured by DELPHI

AUTOMOTIVE PLC, DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC, and/or

its related subsidiaries, successors or affiliates ("Delphi"), as described below.

2.     As used in this complaint, the "Defective Vehicles" or "Class Vehicles" refers to

GM vehicles sold in the United States that have defective ignition switches, including the

following makes and model years:

- 2005-2007 Chevrolet Cobalt

- 2006-2007 Chevrolet HHR

- 2006-2007 Pontiac Solstice

- 2003-2007 Saturn Sky

- 2005-2007 Pontiac G5

3.      An estimated 1.5 million vehicles are affected by the Ignition Switch Defect. Upon information and belief, there are other Class Vehicles that have the Ignition Switch Defect that have not yet been disclosed by GM.

4.      The Class Vehicles contain an ignition switch that turns on the vehicle's motor engine and main electrical systems when the key is turned to the "run" or "on" position. The GM ignition switches at issue have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC" ("accessory"). At the "run" position, the vehicle's motor engine is running and the electrical systems have been activated; at the "accessories" position the motor is turned off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical system are turned off. In most vehicles a driver must intentionally turn the key in the ignition to move to these various positions.

5.      GM began installing the defective Delphi manufactured ignition switches beginning in 2002 vehicle models. Upon information and belief, Delphi knew its ignition switches were defectively designed and/or manufactured, but nonetheless, continued to manufacture and sell the defective ignition switches with the knowledge that they would be used in GM vehicles, including the Class Vehicles.

6.      Because of defects in their design, manufacture, and/or assembly, the ignition switch installed in the Class Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position. Because of its faulty design and improper positioning, the ignition switch

2

can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "acc" position (the "Ignition Switch Defect"). When this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the safety airbag system.

7.      The Ignition Switch Defect can occur at any time during normal and proper operation of the Class Vehicles, meaning the ignition can suddenly switch off while it is moving at 65mph on the freeway, leaving the driver unable to control the vehicle.

8.      GM has acknowledged that the Ignition Switch Defect has caused at least twelve deaths. Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Class Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Class Vehicle models is expected to be much higher.

9.      All persons in the United States who have purchased or leased a Class Vehicle with the subject ignition switches are herein referred to as Class Members ("Class Members").

10.      The Ignition Switch Defect inhibits Class Members' proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Class Members and other vehicle occupants.

11.      Prior to the manufacture and sale of the vehicles at issue, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data, yet despite this

3

knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect from Class Members and the public, and continued to market and advertise the Class Vehicles as reliable and safe vehicles, which they are not.

12.     As a result of GM's alleged misconduct, Plaintiff and Class Members were harmed and suffered actual damages, in that the Class Vehicles have manifested, and continue to manifest, the Ignition Switch Defect. Plaintiff and the Class did not receive the benefit of their bargain as purchasers and lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Class Members did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car-such as the Class Vehicles-that is known to be subject to the risk of an Ignition Switch Defect. All purchasers of the Defective Vehicles overpaid for their cars. Furthermore, GM's public disclosure of the Ignition Switch Defect has caused the value of the Class Vehicles to materially diminish. Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the defects and non-conformities been disclosed.

**PARTIES**

13.     Plaintiff Tracy Lewis is a citizen of the state of Indiana and resides in the city of Greenwood. Ms. Lewis owns a 2007 Chevrolet HHR, which she purchased in 2011 in Indiana. Ms. Lewis's HHR was manufactured, sold, distributed, advertised, marketed, and warranted by

4

GM, and bears the Vehicle Identification No. 3GNDA23D97S551384. Ms. Lewis purchased her

vehicle primarily for her personal, family, and household use.

14.     General Motors Corporation was a Delaware corporation with its headquarters in

Detroit, Michigan. The Corporation through its various entities designed, manufactured,

marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in Indiana

and multiple other locations in the United States and worldwide.

15.     In 2009, General Motors Corporation filed for bankruptcy, and substantially all of

its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to

General Motors LLC.

16.     Under the Agreement, General Motors LLC also expressly assumed certain

liability of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the certification,
> reporting and recall requirements of the National Traffic and Motor Vehicle
> Safety Act, the Transportation Recall Enhancement, Accountability and
> Documentation Act, the Clean Air Act, the California Health and Safety Code and
> similar Laws, in each case, to the extent applicable in respect of vehicles and
> vehicle parts manufactured or distributed by Seller.

In addition, General Motors LLC expressly set forth that it:

> Shall be responsible for the administration, management and payment of all
> Liability arising under (i) express written warranties of Seller [General Motors
> Corporation] that are specifically identified as warranties and delivered in
> connection with the sale of new, certified, used or pre-owned vehicles or new or
> remanufactured motor vehicle parts and equipment (including service parts,

5

accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

17.     General Motors LLC is a Delaware corporation with its headquarters in Detroit, Michigan. General Motors LLC is registered with the Indiana Department of Corporations to conduct business in Indiana. Post-bankruptcy, General Motors LLC discontinued certain vehicle brands, including Pontiac and Saturn.

18.     At all relevant times herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States.

19.     Defendant Delphi Automotive PLC ("Delphi") is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan.

20.     Delphi began as a wholly-owned subsidiary of General Motors Corporation, until it was launched as an independent publicly-held corporation in 1999.

21.     In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi plants to assist with its post-bankruptcy restructuring. In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

22.     At all times relevant herein, Delphi through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

23.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

24.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

25.     Venue is proper in this Court pursuant to U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this district, and GM has caused harm to class members residing in this District.

## FACTUAL BACKGROUND

26.     The Saturn Ion was a compact car first introduced in 2002 for the 2003 model year, and was discontinued in 2007.

27.     The Chevrolet Cobalt was a compact car first introduced in 2004 for the 2005 model year, and was discontinued in 2010.

28.     The Pontiac G5 was first introduced in 2004 for the 2005 model year, and was discontinued in 2009. The coupe and four-door sedan version of the G5 was marketed in Canada from 2005 to 2010, but is not a vehicle at issue in this action.

29.     The Chevrolet HHR was a compact car first introduced in 2005 for the 2006 model year, and was discontinued in 2009.

30.     The Pontiac Solstice was a sports car first introduced in 2005 for the 2006 model year, and was discontinued in 2009.

31.     The Saturn Sky was first introduced in 2006 for the 2007 model year, and was discontinued in 2009.

7

32. The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

33. The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

34. Upon information and belief, GM promoted these Class Vehicles as safe and reliable in numerous marketing and advertising materials.

**GM Field Reports and Internal Testing Reveal a Problem**

35. In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position. In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

36. In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter.

37. GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate

a number of solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

38.    After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents of sudden loss of engine power. GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch…[and a] low position of the lock module [on] the [steering] column."

39.    Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition. Although GM initially approved the design, the company once again declined to act.

40.    In April 2006, GM finally approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number. GM estimates that Delphi began producing the redesigned ignition switch for all Subject Vehicles during the 2007 model year.

41.    After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design- as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off"

9

and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

42.     GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

**GM Issues Information Service Bulletins**

43.     In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch. The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn ION, which all had the same ignition switch.

44.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning." GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain." The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer-it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[] as low as in the past."

45.     In July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem

10

manifested in only "rare cases when a combination of factors is present." Adler advised that

consumers "can virtually eliminate this possibility by taking several steps, including removing

nonessential material from their key rings."

46.     The Times reporter noted that his wife had already encountered the problem with

the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column

with her knee, and found the engine "just went dead." She was able to safely coast to the side of

the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing

was found wrong and they were advised of the service bulletin. The reporter stated that the key

chain being used at the time of the stalling incident was provided by GM, and included only the

key fob and a tag.

47.     GM, in a statement at the time through Adler, insisted that this problem was not a

safety issue because "[w]hen his happens, the Cobalt is still controllable" and the "engine can be

restarted after shifting to neutral." Adler also claimed that his ignition issue was widespread

because "practically any vehicle can have power to a running engine cut off by inadvertently

bumping the ignition...."

48.     GM affirms its prior actions, stating that the field service campaign was the

correct response "given that the car's steering and braking systems remained operational after a

loss of engine power," and because the engine could be restarted by shifting into neutral or park.

49.     In October 2006, GM updated the Information Service bulletin, "Information on

Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-

007A) to include additional vehicles and model years. Specifically, GM included the 2007

Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the

11

2007 Saturn Ion, and the 2007 Saturn Sky. The updated bulletin included the same service advisories to GM dealers as the earlier version.

50.     According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM reports that GM dealers provided 474 key inserts to GM vehicles owners who brought their vehicles in for servicing.

**Reports of Unintended Engine Shut Down**

51.     A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles." Despite these reports, the Saturn Ion remained in production until 2007.

52.     In May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

**Crash Reports and Data**

53.     The Defendants knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

54.     National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

55.     In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

12

56. In 2006, there were at least two fatalities associated with a Chevy Cobalt crash. Information from the car's data recorder indicated that the ignitions switch was in "accessory" instead of run, and the front airbags failed to deploy.

57. In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

58. GM has identified 23 frontal-impact crashes in the United States involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.

59. GM has identified 8 frontal-impact crashes in the United States involving 2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in four fatalities and six injuries to occupants.

60. GM has identified 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in three injuries to occupants.

61. On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSH to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The notice identified that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the

"run" position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight.

62.     The notice also did not identify all the vehicles affected by the Ignition Switch Defect.

63.     The notice failed to indicate the full extent to which GM has been aware of the Defect. The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

64.     In a February 24, 2014 letter to the NHTSH, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

65.     On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect. Specifically, GM identified the 2003 to 2007 model years of the Saturn Ion, 2006 and 2007 model years of the Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007 model year of Saturn Sky vehicles.

66.     On March 4, 2014, the NTHSA issued GM a Special Order demanding that it provide additional information on 107 specific requests by April 3, 2014 including information to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

67.     On March 11, 2014, GM filed a new Part 573 report superseding its February 25 filing. The new chronology provided with the report indicated that GM was aware of the Ignition

14

Switch Defect in 2001-significantly earlier than its previous 2004 disclosure. GM now indicated

that it had a report from 2001 that revealed a problem with the ignition switch during pre-

production of the Saturn Ion.

68.     GM notified dealers of the Defective Vehicles of the recall in February and March

2014. GM also notified owners of the Defective Vehicles by letter of the recall. The letter

minimized the risk of the defect, indicating that the Ignition Switch Defect would occur only

"under certain conditions" and emphasized that the risk increased if the "key ring is carrying

added weight…or your vehicle experiences rough road conditions."

69.     GM has advised the public that the replacement ignition switches "ARE NOT

CURRENTLY AVAILABLE."

70.     Upon information and belief, GM has known of the Ignition Switch Defect in the

vehicles since at least 2001, and certainly well before Plaintiff and Class Members purchased the

Defective vehicles, and has concealed from or failed to notify Plaintiff, Class Members, and the

public of the full and complete nature of the Ignitions Switch Defect, even when directly asked

about it by Class Members during communications with GM and GM dealers.

71.     Although GM has now acknowledged that "[t]here is a risk, under certain

conditions, that your ignition switch may move out of the "run" position, resulting in a partial

loss of electrical power and turning off the engine," GM did not fully disclose the Ignition

Switch Defect and in fact downplayed the widespread prevalence of the problem, and minimized

the risk of the defect occurring during normal operation of the Class Vehicles.

72.     In 2005, GM issued a Technical Service Bulletin to dealers and service

technicians directing that customers be advised to "remove unessential items from their key

chains" to avoid inadvertent ignition switching, but did not identify or disclose the defect. In

February 2014, GM instituted only a limited recall, only identifying two of the several models with the Ignition Switch Defect. Likewise, the later recall expanded to include five additional model years and makes does not fully disclose all the vehicles affected by the Ignition Switch Defect.

73.     Upon information and belief, there are other Class Vehicles that have the Ignition Switch Defect that have not yet been disclosed by GM.

74.     Any applicable statute of limitation has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### Fraudulent Concealment/Estoppel

75.     GM was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the vehicles. GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiff and Class Members reasonably relied upon GM's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

### Discovery Rule

76.     The cause of action alleged herein did not accrue until Plaintiff and Class Members discovered that their vehicles had the Ignition Switch Defect.

77.     However, Plaintiff and Class Members had no realistic ability to discern that the vehicles were defective until-at the earliest-after the Ignition Switch Defect caused a sudden unintended ignition shut off. Even then, Plaintiff and Class Members had no reason to know the

sudden loss of power was caused by a defect in the ignition switch because of GM's active concealment of the Ignition Switch Defect.

78.     Not only did GM fail to notify Plaintiff or Class Members about the Ignition Switch Defect, GM in fact denied any knowledge of or responsibility for the Ignition Switch Defect when directly asked about it. Thus Plaintiff and Class Members were not reasonably able to discover the Ignition Switch Defect until after they had purchased the vehicles, despite their exercise of due diligence, and their cause of action did not accrue until they discovered that the Ignition Switch Defect caused their vehicles to suddenly lose power.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this lawsuit as a class action on her own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or c(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

80.     The proposed Nationwide Class is defined as:

### Nationwide Class

All persons in the United States who purchased or leased a GM Class Vehicle (2005-2007 Chevrolet Cobalt; 2006-2007 MY Chevrolet HHR; 2006-2007 Pontiac Solstice; 2003-2007 MY Saturn Ion; 2007 MY Saturn Sky; and 2005-2007 Pontiac G5), and any other GM vehicle model containing the same ignition switch as those Class Vehicle models (Class Members).

81.     Plaintiff also brings this action on behalf of the following Indiana Class:

All persons in the state of Indiana who purchased or leased a GM Class Vehicle (2005-2007 Chevrolet Cobalt; 2006-2007 MY Chevrolet HHR; 2006-2007 Pontiac Solstice; 2003-2007 MY Saturn Ion; 2007 Saturn Sky; and 2005-2007 Pontiac G5), and any other GM vehicle model containing the same ignition

switch as those Class Vehicle models (Class Members).

82.     Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into additional subclasses, or modified in any other way.

**Numerosity and Ascertainability**

83.     Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of theses Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in GM's possession, custody, or control.

**Typicality**

84.     The claim of the representative Plaintiff is typical of the claims of the Class in that the representative Plaintiff, like all Class Members, purchased or leased a GM Class Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiff, like all Class Members, has been damaged by Defendants' misconduct in that she has incurred costs relating to the Ignition Switch Defect. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in damage to all Class Members.

**Adequate Representation**

18

85.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

86.     Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel has interests adverse to those of the Class.

**Predominance of Common Issues**

87.     There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a.      whether the Class Vehicles suffer from the Ignition Switch Defect;

b.      whether Defendants knew or should have known about the Ignition Switch Defect, and, if yes, how long Defendants have known of the Defect;

c.      whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM Vehicle;

d.      whether GM had a duty to disclose the defective nature of the Vehicles to Plaintiff and Class Members;

e.      whether GM omitted and failed to disclose material facts about the Class Vehicles;

19

f.      whether GM's concealment of the true defective nature of the Class

Vehicles induced Plaintiff and Class Members to act to their detriment by

purchasing the Vehicles;

g.      whether GM violated the Michigan Consumer Protection Act ("MCPA"),

Mich. Comp. L. Ann. § 445.903 *et seq.,* and if so, what remedies are available

under § 445.911;

h.      whether GM violated Indiana state consumer protection statutes;

i.      whether the Class Vehicles were unfit for the ordinary purposes for which

they were used, in violation of the implied warranty of merchantability;

j.      whether Plaintiff and Class Members are entitled to a declaratory

judgment stating that the ignition switches in the Class Vehicles are defective

and/or not merchantable;

k.      whether Plaintiff and Class Members are entitled to equitable relief,

including, but not limited to a preliminary and/or permanent injunction;

l.      whether GM should be declared responsible for notifying all Class

Members of the Defect and ensuring that all GM vehicles with the Ignition Switch

Defect recalled and repaired; and

m.      what aggregate amounts of statutory penalties, as available under the laws

of Michigan and other States are sufficient to punish and deter Defendants and to

vindicate statutory and public policy, and how such penalties should most

equitably be distributed among Class members.

**<u>Superiority</u>**

88.     Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

89.     Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

90.     Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

91.     Defendants have acted in a uniform manner with respect to the Plaintiff and Class Members, as demonstrated in the following form "Dear GM Customer" letter:

> July 2013
>
> Dear General Motors Customer:
>
> This notice is sent to you in accordance with the requirements
> of the National Traffic and Motor Vehicle Safety Act.
> General Motors, based on data and information from supplier
> IMPCO Automotive, has decided that a defect, which related to
> motor vehicle safety, exists in certain compressed natural gas
> (CNG) fuel systems installed by IMPCO Automotive on 2011-

21

2013 model year CNG equipped Chevrolet Express and GMC

Savana vehicles. As a result, General Motors and IMPCO

Automotive are conducting a safety recall. We apologize for this

inconvenience. However, we are concerned about your safety and

continued satisfaction with our products.

---

### I M P O R T A N T

- Your 2011-2013 model year Chevrolet Express or GMC

  Savana CNG equipped vehicle is involved in safety recall

  13139.

- Owners who have not been contacted by General Motors

  concerning this recall should schedule an appointment

  with their Chevrolet or GMC dealer to arrange for the

  repairs to be completed.

- This service will be performed for you at **no charge.**

---

**Why is your vehicle being**

**recalled?**

The underbody shut-off

solenoid connector to a

CNG fuel tank may corrode

and could form a high-

resistance short in the

connector, potentially

causing overheating or a

self-extinguishing flame. If

22

there is a fuel leak or other combustible material in the vicinity, there is a risk of fire.

**What will we do?**
To correct this condition, improved solenoids and securing nuts will be installed for all exterior tanks and the regulator, and the 30 amp gas fuel pump fuse will be replaced with either a 7.5 amp fuse (for the four tank configuration) or a 5.0 amp fuse (for the three tank configuration). In addition, the wiring routing will be adjusted, if necessary, to eliminate any undue tension on the connector, and anti-corrosion sealing plugs will be installed into the valve body (2013 model year

23

vehicles have these plugs already installed). This service will be performed at no charge. The approximate time for the actual repair can be as much as four hours per vehicle, but the wait time for your vehicle may be longer depending on how busy the dealership is.

**What should you do?**   General Motors will contact certain fleets directly to arrange for the performance of the required repair. If you have not already been contacted by General Motors, please schedule an appointment with your Chevrolet or GMC dealer for this repair.

**Do you have questions?**   If you have questions or concerns that your dealer is unable to resolve, please

24

contact the GM Fleet Action

Center at 1-800-353-3867.

If after contacting your dealer and the Fleet Action Center, you are

still not satisfied GM has done their best to remedy this condition

without charge and within a reasonable time, you may wish to write

the Administrator, National Highway Traffic Safety Administration,

1200 New Jersey Avenue, SE., Washington, DC 20590, or call the

toll-free Vehicle Safety Hotline at 1.888.327.4236 (TTY

1.800.424.9153), or go to http://www.safercar.gov. The National

Highway Traffic Safety Administration Campaign ID Number of

this recall is 13V225.

Federal regulation requires that any vehicle lessor receiving this

recall notice must forward a copy of this notice to the lessee within

ten days.

Jim Moloney

General Director,

Customer and Relationship Services

GM Recall #13139

92.    Classwide declaratory, equitable, and injunctive relief is appropriate under Rule

23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the

class, and inconsistent adjudication with respect to the Defendants' liability would establish

incompatible standards and substantially impair or impede the ability of Class Members to

protect their interests. Classwide relief assures fair, consistent, and equitable treatment and

protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Ignition Switch Defect.

**FIRST CLAIM FOR RELIEF**

**Asserted on Behalf of the Nationwide Class**

**(Violation of Michigan Consumer Protection Act ("MCPA"),
Michigan Comp. Laws Ann.§ 445.903 *et seq.*)**

93.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

94.     This Claim is brought on behalf of the Nationwide Class.

95.     At all times relevant hereto, there was in full force and effect Mich. Comp. Laws Ann. § 445.903 *et seq.* (the "MCPA").

96.     Plaintiff and the Nationwide Class Members were "person[s]" within the meaning of the MCPA, M.C.L.A § 445.902(1)(d).

97.     At all relevant times hereto, Defendants were "persons" engaged in "trade or commerce" within the meaning of the MCPA, M.C.L.A. § 445.902(1)(d) and (g).

98.     The MCPA holds unlawful "[u]nfair, unconscionable or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L.A. §45.902(1).

99.     The practices of Defendants violate the MCPA for, *inter alia,* one or more of the following reasons.

a.     Defendants represented that the Class Vehicles had approval, characteristics, uses, and benefits that they do not have;

b.     Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information

26

to consumers regarding the safety, performance, reliability, quality, and nature of the Class Vehicles;

c.     Defendants represented that the Class Vehicles were of a particular standard, quality, or grade, when they were of another;

d.     Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Class Vehicles, which did and tended to, mislead Plaintiff and the Class about facts that could not reasonably be known by the consumer until the February and March 2014 recalls;

e.     Defendants failed to reveal facts concerning the Ignition Switch Defect that were material to the transaction in light of representations of fact made in a positive manner.

f.     Defendants failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiff and the Class;

g.     Defendants made material representations and statements of fact to Plaintiff and the Class that resulted in Plaintiff and the Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were;

h.     Defendants intended that Plaintiff and Class Members rely on their misrepresentations and omissions, so that Plaintiff and other Class Members would purchase or lease the Class Vehicles.

100.     Plaintiff seeks injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts or; seeks monetary relief against Defendants measured as the greater of (a)

27

actual damages in an amount to be determined at trial; or (b) statutory damages in the amount of

$250 for Plaintiff and each Class Member, reasonable attorneys' fees; and any other just and

proper relief available under the Mich. Comp. L. Ann. § 445.911.

101.　Plaintiff also seeks punitive damages against Defendants because they carried out

despicable conduct with wilful and conscious disregard of the rights and safety of others.

Defendants intentionally and willfully misrepresented the safety and reliability of Class Vehicles,

deceived Plaintiff and Class members on life-or-death matters, and concealed material facts that

only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw

in the Class Vehicles it repeatedly promised Plaintiff and Class Members were safe. Defendants'

unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## SECOND CLAIM FOR RELIEF

### Asserted on Behalf of the Nationwide Class
### (Fraud by Concealment)

102.　Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

103.　This Claim is brought on behalf of the Nationwide Class.

104.　As set forth above, Defendants concealed and/or suppressed material facts

concerning the safety of their vehicles.

105.　Defendants had a duty to disclose these safety issues because they consistently

marketed their vehicles as reliable and safe and proclaimed that Defendants maintain the highest

safety standards. Once Defendants made representations to the public about safety, Defendants

were under a duty to disclose these omitted facts, because where one does speak one must speak

the whole truth and not conceal any facts which materially qualify those facts stated. One who

volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

106.     In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and Class Members These omitted facts were material because they directly impact the safety of the Class Vehicles. Whether or not a vehicle ignition switch will unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power steering, anti-lock brakes and air bag deployment while the car is in motion, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles.

107.     Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

108.     Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and Class Members' actions were justified. Defendants were in exclusive control of the material facts concerning the Ignition Switch Defect and such facts were not known to the public or the Class Members.

109.     As a result of the concealment and/or suppression of facts, Plaintiff and Class members have sustained and will continue to sustain damages arising from the difference between the actual value of that which Plaintiff and the Classes paid and the actual value of that which they received.

29

110.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to
defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being to
enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an
amount sufficient to deter such conduct in the future, which amount is to be determined
according to proof.

## THIRD CLAIM FOR RELIEF

### Asserted on Behalf of the Indiana Class
### (Violation of Indiana's Deceptive Consumer Sales Act
### ("Indiana DCSA"), Ind. Code § 24-5-0.5-0.1 *et seq.* )

111.     Plaintiff hereby incorporates by reference the allegations contained in the
preceding paragraphs of this Complaint.

112.     This Count is brought on behalf of Plaintiff and the Indiana Class.

113.     Plaintiff and Class members are "persons" within the meaning of Indiana DCSA §
24-5-0.5-2(a)(2).

114.     Defendants are "suppliers" within the meaning of Indiana DCSA § 24-5-0.5-
2(a)(3).

115.     The conduct of Defendants as set forth herein constitutes incurable deceptive acts
because it has been done as part of a scheme, artifice, or device with intent to defraud or mislead,
and Defendants' incurable deceptive acts include, but are not limited to, those defined in Indiana
Code §§ 24-5-0.5-3(a)(1)–(2). Defendants' incurable deceptive acts have been willfully done and
Plaintiff and Class members have relied upon these deceptive acts.

116.     Plaintiff and the Indiana Class were injured as a result of the Defendants' conduct.
Plaintiff and the Indiana Class overpaid for the Class Vehicles and did not receive the benefit of
their bargain.

30

117.    Plaintiff seeks an order enjoining Defendants' unfair or deceptive acts or

practices, damages, and attorneys' fees, and any other just and proper relief available under the

Indiana DCSA, § 24-5-0.5-4.

**FOURTH CLAIM FOR RELIEF**
**(Claim for Actual Damages/Expense Reimbursement Fund)**

118.    Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

119.    This Count is brought on behalf of Plaintiff and Members of all Classes.

120.    Plaintiff and Class Members have incurred out-of-pocket expenses and damages

in attempting to rectify the Ignition Switch Defect in their Vehicles, and such expenses and

losses will continue as they must take time off from work, pay for rental cars or other

transportation arrangements, child care and the myriad expenses involved in going through the

recall process to correct the Defect.

121.    Plaintiff and Class Members seek payment of such damages and reimbursement

of such expenses under the consumer statutes and applicable law invoked in this Complaint.

While such damages and expenses are individualized in detail and amount, the right of the Class

Members to recover them presents common questions of law.  Equity and fairness to all Class

Members requires the establishment by court decree and administration under Court supervision

of a Defendant-funded program, using transparent, consistent, and reasonable protocols, under

which such claims can be made and paid, such that Defendants, not the Class Members, absorb

the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defect.

**PRAYER FOR RELIEF**

Plaintiff, on behalf of herself and all others similarly situated, requests the Court to enter

judgment against the Defendants, as follows:

31

A.     an order certifying the proposed Classes designating Plaintiff as the named representative of the Classes, and designating the undersigned as Class Counsel;

B.     a declaration that the Ignition Switches in Class Vehicles are defective;

C.     a declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D.     an order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles to eliminate the Ignition Switch Defect;

E.     an award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

F.     a declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

G.     an award of attorneys' fees and costs, as allowed by law;

H.     an award of pre-judgment and post-judgment interest, as provided by law;

I.     leave to amend this Complaint to conform to the evidence produced at trial; and

J.     such other relief as may be appropriate under the circumstances.

## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: April 14, 2014

Respectfully submitted,

Irwin B. Levin
Richard E. Shevitz
Vess A. Miller
Lynn A. Toops
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-100

*Attorneys for Plaintiff*