# Exhibit EEE

Jayne Conroy, Esq.
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES LLP
112 Madison Avenue, 7th Floor
New York, NY 10016-7416
Telephone:  (212) 784-6400
Facsimile:  (212) 784-6420
E-mail:  jconroy@hanlyconroy.com

Jodi Westbrook Flowers, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450
E-mail:  jflowers@motleyrice.com

Mark R. Koberna, Esq.
SONKIN & KOBERNA, LLC
3401 Enterprise Parkway, Suite 400
Cleveland, OH 44122
Tel:  (216) 514-8300
Fax:  (216) 514-4467
E-mail:  mkoberna@sonkinkoberna.com

Philip J. Goodman (P-14168)
Of Counsel
MICHAEL B. SERLING, PC
280 N. Old Woodward Avenue, Suite 406
Birmingham, MI 48009
Telephone:  (248) 647-6966
Facsimile:  (248) 647-8481
E-mail:  pjgoodman1@aol.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| BEDFORD AUTO WHOLESALE, INC., individually and on behalf of all others similarly situated, )<br>)<br>) | Case No.: |
| ) | **CLASS ACTION** |
| Plaintiffs, )<br>) | |
| ) | **CLASS ACTION COMPLAINT** |
| v. ) | |
| ) | **JURY TRIAL DEMANDED** |
| GENERAL MOTORS LLC, )<br>) | |
| Defendant. )<br>) | |

Plaintiff, BEDFORD AUTO WHOLESALE, INC., individually and as class representative on behalf of all similarly situated persons, brings this action against Defendant General Motors LLC ("Defendant" or "GM") and alleges, on personal information as to itself and on information and belief as to all other matters, as follows:

## I.    INTRODUCTION

1.    This case involves an unprecedented failure to disclose, indeed, affirmatively to conceal, known dangerous defects in GM vehicles.

2.    An auto manufacturer is entrusted with the safety of the driving public.  It should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public.  GM's Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our customers in the vehicles they drive."  The facts will show that GM repeatedly failed to live up to this commitment.

3.    The first priority of a car manufacturer should be to ensure that its vehicles are safe, and in particular that its vehicles have operative ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision.  In addition, a car manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely and its safety critical systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.  Moreover, a manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or its airbags not to deploy, must promptly disclose and remedy such defects.

4.    Since 2002, GM has sold millions of vehicles throughout the United States and worldwide that have a safety defect in which the vehicle's ignition switch can unintentionally

move from the "run" position to the "accessory" or "off" position, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

5. GM began installing these ignition switch systems in models from 2002 through at least 2007 and possibly later. GM promised that these new systems would operate safely and reliably. This promise turned out to be false in several material respects. In reality, GM concealed and did not fix a serious quality and safety problem plaguing its vehicles.

6. Worse yet, the defects in GM's vehicle could easily have been avoided.

7. From 2004 to the present, GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its ignition switch system.

8. Despite the dangerous nature of this defect and its effects on critical safety systems, GM concealed the existence of the defect and failed to repair the problem.

9. Despite being on notice of the defect in its vehicles, GM did not disclose to consumers that its vehicles – which GM for years had widely advertised as "safe" and "reliable" – were in fact not safe or reliable as claimed.

10. GM's CEO, Mary Barra has admitted in a video message: "Something went wrong with our process in this instance, and terrible things happened."

11. This case arises from GM's breach of its obligations and duties, including GM's failure to disclose that, as a result of defective ignition switch design, at least 2.6 million GM vehicles had the propensity to shut down during normal driving conditions and this created an extreme and unreasonable risk of accident, serious bodily harm, and death.

12. GM's predecessor, General Motors Corporation ("Old GM"), also violated these rules by designing and marketing vehicles with defective ignition switches, and then failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal

accidents.  In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.

13.    The defective ignition switches were manufactured by Delphi Automotive PLC ("Delphi").  Once a subsidiary of Old GM, Delphi spun-off from Old GM in 1999, and was an independent publicly-held corporation.

14.    Delphi knew its ignition switches were defective, but nevertheless continued to manufacture and sell the defective ignition switch systems, which it knew would be used in the vehicles of Plaintiff and the Class.

15.    Plaintiff brings this action for a Class of all persons or entities in the United States who currently own or lease one or more of the following GM vehicles:  Chevrolet Cobalt (2005-2010 model years); Chevrolet HHR (2006-2011 model years); Pontiac G5 (2006-2007 model years); Pontiac Solstice (2006-2010 model years); Saturn Ions (2003-2007 model years); and Saturn Sky (2007-2010 model years), (hereinafter "Defective Vehicles").

16.    Plaintiff believes that there are other GM vehicles which suffer from the same or substantially similar ignition switch defects as the Defective Vehicles identified above. Accordingly, Plaintiff will supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switches, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment.

17.    The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

  a. The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

b.  When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident;

c.  When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

18.    The ignition switch defects make the Defective Vehicles unreasonably dangerous. Because of the defects, the Defective Vehicles are likely to be involved in accidents, and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicles' occupants.

19.    GM admits to at least twelve deaths as a result of the ignition switch defects, but the actual number is estimated to be much higher.

20.    The ignition switch defects present a significant and unreasonable safety risk, exposing Defective Vehicle owners and their passengers to a risk of serious injury or death.

21.    For many years, GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States.  But, to protect its profits and maximize sales, GM concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

22.    Under    the    Transportation    Recall    Enhancement,    Accountability    and Documentation Act ("TREAD Act"),[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects.[2]  If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[3]

---

[1] 49 U.S.C. §§ 30101-30170.

[2] 49 U.S.C. § 30118(c)(1) & (2).

[3] 49 U.S.C. § 30118(b)(2)(A) & (B).

23.    In addition to the TREAD Act and other laws, GM violated the Michigan Consumer Protection Act (the "MCPA")[4] by engaging in unfair trade practices and by fraudulently concealing the deadly ignition switch defects from consumers, owners, dealers and wholesalers, and lessees of the Defective Vehicles.  GM also violated the TREAD Act by failing to timely inform the National Highway Traffic Safety Administration (the "NHTSA") of the ignition switch defects and by allowing cars to remain on the road with these defects.  GM's violations of the TREAD Act also constitute violations of the MCPA.

24.    Plaintiff and the Class have been damaged by GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding highly dangerous vehicles whose value has greatly diminished because of GM's failure to timely disclose the serious and potentially deadly defects.  Also, dealers cannot sell these vehicles and are paying interest on loans taken out to acquire and/or hold the vehicles in inventory.

25.    Plaintiff and the Class also were damaged by the acts and omissions of Old GM, for which GM is liable through successor liability, because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

26.    Plaintiff and the Class either paid more for the Defective Vehicles than they would have had they known of the ignition defects or they would not have purchased the Defective Vehicles at all.  As a result of the defects in these vehicles, the Plaintiff and the Class are unable to seal or otherwise realize their investments in the Defective Vehicles.

---

[4] Mich. Comp. L. Ann. § 445.901 .et seq.

## II.    JURISDICTION AND VENUE

27.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other Class members are citizens of a different state than Defendant GM.

28.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction.  This Court has personal jurisdiction over GM because the actions giving rise to the complaint took place in this District, and because GM has its headquarters and principle place of business in Detroit, Michigan.

29.    Venue is proper in this District under 28 U.S.C. § 1391 because GM is based in Michigan.  Also, as a corporation, GM is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, GM transacts business nationally.

## III.    PARTIES

30.    Plaintiff and Named Class Representative Bedford Auto Wholesale, Inc. is a company with its principal place of business in Bedford, Ohio.  Bedford Auto Wholesale, Inc. is in the business of purchasing and reselling automobiles, including the recalled defective vehicles at issue herein.  Plaintiff presently owns 36 of the recalled vehicles:  27 Chevrolet Cobalts, 7 Saturn Ions, and 2 Chevrolet HHRs.  All of these models have been recalled for safety defects related to the faulty ignition switch.  Plaintiff relied on GM to produce a safely designed and manufactured vehicle.  Plaintiff did not learn of the ignition switch defects until after the cars were in its possession, on or about March of 2014.  Had Old GM disclosed the ignition switch defects, Plaintiff would not have purchased these vehicles.  As a result of the vehicle defect and recalls, Plaintiff has been unable to re-sell the Defective Vehicles and is incurring considerable expense, financial loss, and economic damage as a result.

31.    Defendant General Motors LLC ("GM") is a limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.   GM was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

32.    Among the liabilities and obligations expressly retained by GM after the bankruptcy of Old GM are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

33.    GM also expressly assumed:

> All Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

34.    Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

## IV.    FACTUAL ALLEGATIONS

**A.        The Ignition Switch Defects in the Defective Vehicles**

35.    Given how important of a vehicle and its electrical operating systems remaining fully functional and operational during driving conditions, it is imperative that a vehicle manufacturer ensure that its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle.  With respect to the Defective Vehicles, GM has failed to do so.

36.    In the Defective Vehicles, the ignition switch defects can cause the car's engine and electrical system to shut off, disabling the power steering and power brakes and the airbag system, so that in the event of a crash (itself made more likely by the engine shut-off and the failure of the power steering and power brakes), the airbags will not deploy.

37.    The Defective Vehicles are, therefore, unreasonably prone to  accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

**B.        GM Knew of the Ignition Switch Defects for Years, but Concealed the Defects from Plaintiff and the Class**

38.    Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences for many years, but concealed their knowledge from Defective Vehicle owners.

39.    For example, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy.  Ms. Rose's death was the first of the hundreds of deaths and injuries attributable to the ignition switch defects.  Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM and GM to address the ignition switch defect and problem.

40.     Another incident involved 16 year-old Megan Phillips.  Ms. Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees.  NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact.  According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they begin communicating.  As she stated, "I don't understand why [GM] would wait 10 years to say something.  And I want to understand it but I never will."[5]

41.     Rather than publicly admitting the dangerous safety defects in its vehicles, GM attempted to attribute these and other incidents to "driver error."  Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering and/or airbag failures, including:

- 2005: 26 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved.

- 2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved and 4 deaths listing the component involved as "unknown."

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing "airbag" as the component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved and 2 deaths listing the component involved as "unknown."

- 2009: 133 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved, 1 death citing "service brake" as the component involved, 1 death citing "steering" as component involved, and 2 deaths listing the component involved as "unknown."

---

[5] "Reuters, *Owners of Recalled GM Cars Feel Angry, Vindicated*" (Mar. 17, 2014).

- 2010: 400 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 12 deaths citing "steering" as the component involved, and 1 death listing the component involved as "unknown."

- 2011: 187 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 2 deaths citing "steering" as the component involved, and 1 death listing the component involved as "unknown."

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing "airbag" as component involved, and 4 deaths citing "steering" as component involved.

42.     GM now admits that Old GM learned of the ignition switch defects as early as 2001.  During the pre-production development of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position.  Old GM claimed that a switch design change "had resolved the problem."[6]

43.     In 2003, an internal report documented an instance in which the service technician observed a stall while driving.  The service technician noted that the weight of several keys on the key ring had worn out the ignition switch.  The ignition switch was replaced and the matter closed.[7]

44.     According to GM's latest chronology, submitted to NHTSA pursuant to 49 CFR § 573.6, Old GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

45.     Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue.  According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

---

[6] "D. Ivory, *G.M. Reveals It Was Told of Ignition Defect in '01* N.Y. Times (Mar. 12, 2014).

[7] *Id.*

11

46.     According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions."  But after considering cost the cost and amount of time it would take to develop a fix, Old GM did nothing.

47.     As soon as the 2005 Cobalt hit the market, Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[8]  Old GM opened additional PRTS inquiries.

48.     In another PRTS opened in May 2005, Old GM engineers once again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration. After initially approving the proposed fix, Old GM reversed course and again declined to implement a fix.[9]

49.     Instead, in October 2005, Old GM simply issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the failure of the car's electrical system.

50.     Rather than disclose the true nature of the defects and correct them, pursuant to the TSB Old GM instead gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key rings from moving up and down in the slot.  "[T]he previous key ring" was "replaced with a smaller" one; this change would supposedly keep the keys from hanging as low as they

---

[8] March 11, 2014 Chronology Re:  Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Sky Vehicles, at 1.

[9] *Id.*

had in the past.[10]  According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[11]

51.    Yet there was no recall.  And, not surprisingly, Old GM continued to receive complaints.

52.    In 2006, Old GM approved a design change for the Cobalt's ignition switch that was supplied by Delphi.  The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch."  But the new design was not produced until the 2007 model year.[12]

53.    In 2007, NHTSA investigators met with Old GM to discuss its airbags and informed Old GM of the July 2005 frontal and fatal crashing involving Amber Marie Rose.

54.    As alleged above, the airbags in Ms. Rose's 2005 Cobalt did not deploy.  Data retrieved from the vehicle's diagnostic system indicated that the ignition was in the "accessory" position.  Old GM investigated and tracked similar incidents.

55.    By the end of 2007, by GM's own admission, Old GM knew of 10 frontal collisions in which the airbag did not deploy.[13]  Plaintiff believes that Old GM actually knew of many other similar incidents involving the ignition switch defects.

56.    For the next six years, GM continued to receive complaints and continued to investigate frontal crashes in which the airbags did not deploy.

57.    However, according to GM it was not until 2011 and 2012 that GM's examinations of switches from vehicles that had experienced crashes revealed significant design

---

[10] *Id.* at 1-2.

[11] *Id.* at 3.

[12] *Id.* at 2.

[13] Letter from M. Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, GM, to Nancy Lewis, Assoc. Adm'r for Enforcements, NHTSA, Attach. B-573.6(c)(6) at 2 (Feb. 24, 2014), *available at* http://www-odi.nhtsa.dot.gove/acms/cs/jaxrs/download/doc/UCM450663/RCDNN-14V047-3409.pdf.

13

differences in the torque performance of ignition switches from the 2005 Cobalt and those from the 2010 model year, the last year of the Cobalt's production.

58.     GM responded by blaming the supplier for the switch design.[14]

59.     In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the Cobalt and G5 vehicles.[15]

**C.          GM Waited until 2014 to Finally Order a Recall of the Defective Vehicles**

60.     After an analysis GM's Field Performance Review Committee and the Executive Action Decision Committee ("EFADC") finally ordered a recall of *some* of the Defective Vehicles on January 31, 2014.

61.     Initially, GM's EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

62.     After additional analysis, the EFADC expanded the recall on February 24, 2014 to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

63.     GM provided dealers with notice of the recall on February 26, 2014 and March 4, 2014, and mailed letters to current owners on March 10 and March 11, 2014.

64.     According to GM, "the dealers are to replace the ignition switch,"[16] presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

65.     In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes.

---

[14] *Id.* at 3-4.

[15] *Id.* at 4-5.

[16] *Id.* at 6.

66.    According to Ms. Barra, "Something went wrong in our processes in this instance, and terrible things happened."  Barra continued to promise, "We will be better because of this tragic situation if we seize this opportunity."[17]

67.    GM now faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.  GM has been ordered to turn over its internal documents, and CEO Mary Barra testified before the Senate and House in early April 2014.

68.    While GM has now appointed a new Vehicle Safety Chief and laid off two engineers, millions of Defective Vehicles remain on the road to this day; and, upon information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defect.

**D.        Old GM Promoted the Defective Vehicles as Safe and Reliable**

69.    On information and belief, Old GM consistently promoted the Defective Vehicles as safe and reliable in marketing and advertising materials.

70.    For example, a Cobalt ad promised that "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

71.    An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

72.    A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically engineered for whatever is next."  Another 2003 spot closed with the tagline "Saturn.  People first."

73.    A 2001 print ad touting the launch of the Saturn focused on safety:

---

[17] *Something Went "Very Wrong" at G.M., Chief Says,*  N.Y TIMES (Mar. 18, 2014).

> Need is where you begin. In cars, it's about things like reliability,
> durability and, of course, safety. That's where we started when
> developing our new line of cars. And it wasn't until we were
> satisfied that we added things . . . .

74.     Old GM made these representations to boost vehicle sales and maximize profits
while knowing that the ignition switches in the Defective Vehicles were defective.

75.     Throughout the relevant period, Old GM possessed knowledge and information
vastly superior to that of consumers – if not exclusive information – about the design and
function of the ignition switches in the Defective Vehicles and the existence of the defects in
those vehicles.

76.     Old GM never informed consumers, the public, the Plaintiff or Class members
about the ignition switch defects.

**E.          The Ignition Switch Defects have Harmed Plaintiff and the Class**

77.     The ignition switch defects have caused damage to Plaintiff and the Class.

78.     A vehicle purchased, leased, or retained with a serious safety defect is worth less
than the equivalent vehicle leased, purchased, or retained without the defect.

79.     A vehicle purchased, leased, or retained under the reasonable assumption that it is
safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic
accident because of the ignition switch defects.

80.     Purchasers and lessees paid more for the Defective Vehicles, through a higher
purchase price than they would have had the ignition switch defects been disclosed. Plaintiff and
the Class overpaid for their Defective Vehicles and are unable to resell them for what they paid
and are incurring costs and expenses to maintain the Defective Vehicles in inventory, including
without limitation, interest owed and other expenses. This loss is due to the concealed ignition

16

switch defects.  Plaintiff did not and now cannot realize any profit on the purchase of these vehicles and is unable to sell them.

81.     Plaintiff and the Class are stuck with unsafe, tainted vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition switch defects.

82.     GM admits to a least twelve deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles.  However, Plaintiff believes that the actual number is much higher, and that there may be hundreds of deaths and injuries attributable to the ignition switch defects.

83.     If Old GM or GM had timely disclosed and repaired the ignition switch defects as required by the MCPA, TREAD Act, the Common Law, and Lemon Law, all Class members' vehicles would now be worth more.

### V.      SUCCESSOR LIABILITY

84.     As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

85.     GM also expressly assumed liability for Lemon Law claims in the Master Sale and Purchase Agreement of June 26, 2009.

86.     GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM and for the following reasons:

      a.   GM admits that it knew of the ignition system defects from the very date of its formation;

      b.   GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

      c.   GM retained the bulk of the employees of Old GM;

    d.   GM acquired, owned, and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

    e.   GM acquired the contracts, books, and records of Old GM; and

    f.   GM acquired all goodwill and other intangible personal property of Old GM.

## VI.    TOLLING OF THE STATUTES OF LIMITATION

87.    All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein.  Plaintiff and Class members did not discover, and did not know of material facts that would have caused a reasonable person to suspect, that Old GM and GM did not report information within their knowledge to federal authorities (NHTSA) purchasers or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and that they opted to conceal that information until shortly before this Class action was filed.

88.    Indeed, Old GM instructed its service shops to provide Defective Vehicle owners with a new key ring if they complained about unintended shut down, rather than admit what Old GM already knew – that the ignition switches were dangerously defective and warranted replacement with a properly designed and built ignition system.

89.    Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiff, and the Class" the true character, quality, and nature of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that the defect will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

90.    Because of the active concealment by Old GM and GM, any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled.

## VII.    CLASS ALLEGATIONS

91.    Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action individually and on behalf of a Class initially defined as follows:

> All persons or entities in the United States who currently own or lease one or more of the following GM vehicles:  2003-2007 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky (the "Defective Vehicles").  This list will be supplemented to include other GM vehicles that have the defective ignition switches, which inadvertently turn off the engine and vehicle electrical systems during ordinary driving conditions.

92.    Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.  Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Defective Vehicles.

93.    The Defective Vehicles include at least the following models:  Chevrolet Cobalt (2005-10 model years); Chevrolet HHR (2006-2011 model years); Pontiac G5 (2006-2010 model years); Pontiac Solstice (2006-2010 model years); Saturn Ions (2003-2007 model years); and Saturn Sky (2007-2010 model years).

94.    Plaintiff is informed and believes that Old GM manufactured and sold to consumers millions of the Defective Vehicles nationwide.  Individual joinder of all Class members is impracticable.

95.     The Class expressly disclaims any recovery for physical injury resulting from the ignition switch defects.  But the increased risk of injury and death from the ignition switch defects serves as an independent justification for the relief sought by Plaintiff and the Class.

96.     The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

97.     Questions of law and fact are common to the Class members and predominate over questions affecting only individual members, including the following:

    a.   Whether the Defective Vehicles suffer from ignition switch defects;

    b.   Whether Old GM and GM concealed the defects;

    c.   Whether Old GM and GM misrepresented that the Defective Vehicles were safe;

    d.   Whether Old GM and GM engaged in fraudulent concealment;

    e.   Whether Old GM and GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches;

    f.   Whether the alleged conduct by GM violated laws as Plaintiff alleges;

    g.   Whether Old GM's and GM's unlawful, unfair and/or deceptive practices harmed Plaintiff and the members of the Class;

    h.   Whether GM violated the Michigan Consumer Protection Act, MICH. COMP. L. ANN. § 445.901, *et seq*. and, if so, what remedies are available for the Class under MICH. COMP. L. ANN. § 445.911.

    i.   Whether Plaintiff and the members of the Class are entitled to equitable and/or injunctive relief; and

    j.   Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM.

98.     Plaintiff's claims are typical of the claims of the Class members and arise from the same course of conduct by GM and Old GM.  The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

99.     Plaintiff will fairly and adequately represent and protect the interests of all absent Class members.  Plaintiff is represented by counsel competent and experienced in product liability, vehicle defect, consumer protection, and class action litigation.

100.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the individual Class members is impracticable.  Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

101.    The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

102.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Plaintiff anticipates providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

## VIII.   CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT

(The MCPA, MICH. COMP. L. ANN. § 44901, *et seq.*)

103.   Plaintiff and the Class re-allege and incorporate by reference all previous allegations as though fully set forth at length herein.

104.   This claim is brought on behalf of the nationwide Class.

105.   Old GM, GM, and Plaintiff are each "persons" under MICH. COMP. L. ANN. § 445.902(d).

106.   The sale of the Defective Vehicles to Plaintiff and the Class occurred within "trade and commerce" within the meaning of MICH. COMP. L. ANN. § 445.902(d), and both GM and Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

107.   The MCPA makes unlawful any "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce," as more specifically defined in the MCPA.  MICH. COMP. L. ANN. § 445.903 (1).  GM has engaged in unfair, unconscionable, and deceptive methods, acts and practices violation of the MCPA, and also has successor liability for the unfair, unconscionable, and deceptive methods, acts, and practices of Old GM as set forth above.

108.   Both Old GM and GM violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."  MICH. COMP. L. ANN. § 445.903(s).

109.   As alleged above, both Companies knew of the safety ignition defect, while Plaintiff and the Class were deceived by the Companies' omission and led to believe that the

22

Defective Vehicles were safe, and the information could not reasonably have been known by the consumer until the February and March 2014 recalls.

110.    Old GM also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is."  MICH. COMP. L. ANN. § 405.903(bb).  For example, Old GM represented that the Defective Vehicles were safe such that reasonable people believed the represented or suggested state of affairs to be true; namely, that the Defective Vehicles were safe.

111.    Old GM also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  MICH. COMP. L. ANN. § 405.903(cc).  Old GM represented that the Defective Vehicles were safe, which made it even more incumbent upon Old GM to reveal the material fact of the ignition switch defects.

112.    Old GM's and GM's acts and practices were unfair and unconscionable because their acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and the Companies' failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and because the harm the Companies caused consumers greatly outweighs any benefits associated with those practices. The Companies' conduct also has impaired competition within the automotive vehicles market and has prevented Plaintiff and the Class from making fully informed decisions about whether to lease, purchase, and/or retain Defective Vehicles.

113.    Even though Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Defective Vehicles until 2011.

114.    All the while, Old GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

115.    Plaintiff and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.  Old GM and GM failed to inform NHTSA, and therefore failed to inform consumers, that its vehicles had a defective ignition switch that could lead to injury or death.  Had Plaintiff and the Class known this, they either would not have purchased their vehicles at all or they would have paid less for them, and they would not have retained their Defective Vehicles.  Plaintiff and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of herein.

116.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Companies' business.

117.    Plaintiff requests that this Court: enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; provide to Plaintiff and each Class member either their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under MICH. COMP. L. ANN. § 445.911.

118.    Plaintiff acknowledges that, on its face, the MCPA purports to (i) deprive non-residents of bringing class (but not individual) actions under the MCPA; and (ii) allows individuals (but not class members) the ability to recover a penalty of $250 per person if that amount is greater than their actual damages.  After the United States Supreme Court's decision in *Shady Grove Orthopedic Ass'n., P.A. v. Allstate Insurance Co.,* 589 U.S. 393) (2010), however,

any such prohibitions imposed in class actions but not in individual actions) are trumped and superseded by Fed. R. Civ. P. 23, which imposes no such restrictions.

### COUNT II

### BREACH OF IMPLIED WARRANTY

119. Plaintiff and Class re-allege and incorporate by reference all previous allegations as though set forth at length herein.

120. The Defective Vehicles were defective at the time they left GM's control and were not reasonably safe for the reasonably foreseeable uses to which they would be used.

121. GM is in the business of manufacturing, designing, distributing, marketing, selling and/or supplying into the stream of commerce the Defective Vehicles.

122. At the time GM designed, manufactured, marketed, sold, and/or distributed the Defective Vehicles, GM intended and impliedly warranted the product to be of merchantable quality and safe for such use.

123. Plaintiff reasonably relied upon the skill and judgment of GM as to whether Defective Vehicles were of merchantable quality and safe for their intended use and upon GM's implied warranty as to such matters.

124. GM breached its implied warranty in the design of Defective Vehicles such that the damages suffered by Plaintiff were foreseeable by GM; the likelihood of the occurrence of the damage suffered by Plaintiff was foreseeable by GM at the time it distributed Defective Vehicles; there was a reasonable alternative design available, and such alternative design was practicable and would have reduced the foreseeable risk of harm posed by GM's product; and the omission of the available and practicable reasonable alternative design rendered GM's product not reasonably safe for use by a consumer.

125.    GM breached its implied warranty in the manufacturing of Defective Vehicles such that the Defective Vehicles product was unreasonably dangerous, not fit for the ordinary purpose for which it was intended, and not manufactured in such a way as to eliminate unreasonable risks of foreseeable injury.    Furthermore, GM failed to make reasonable inspections or conduct adequate testing of Defective Vehicles.  Despite knowing of the problems associated with the Defective Vehicles, GM took no action for over ten years to cure or disclose the defects.

126.    GM breached its implied warranty in the labeling of Defective Vehicles such that GM knew or should have known that the products were unreasonably dangerous and created significant risks of serious harm and/or death, yet it failed to provide adequate warnings to consumers of such significant risks of serious harm and/or death.

127.    The Defective Vehicles manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by GM were defective in their manufacture, construction, design, and labeling as described above at the time they left GM's control.

128.    As a direct and proximate result of Plaintiff's purchase, use and ownership of Defective Vehicles as manufactured, designed, sold, supplied, and introduced into the stream of commerce by GM, Plaintiff has suffered harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

129.    The defects at issue herein were a legal and/or proximate cause of Plaintiff's harm, damages, and economic loss.

130.    Plaintiff did not know that the Defective Vehicles were defective and dangerous until after purchase.

131.    As a direct and proximate result of GM's conduct, Plaintiff and the Class members suffered the injuries and compensable damages in an amount to be determined at trial.

## COUNT III

### BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

132.    Plaintiff and Class re-allege and incorporate by reference all previous allegations as though fully set forth at length herein.

133.    GM knew at the time it sold vehicles to the Plaintiff that such vehicles would be used for the specific purpose of, among other things, providing safe transportation.

134.    GM knew at the time it manufactured and sold vehicles to the public, the Plaintiff, and the Class members that those individuals chose to buy their vehicles from GM at least in part because of the reputation of GM cars and trucks as safe vehicles with high resale value, as compared to cars and trucks manufactured by GM's competitors.

135.    GM knew that Plaintiff and the Class members were relying on GM's skill and judgment in manufacturing vehicles that were purportedly suitable for providing safe transportation and that enjoyed high resale value, as compared to cars and trucks manufactured by GM's competitors.

136.    Defendant GM breached the implied warranty of fitness for a particular purpose because the Defective Vehicles contained an unreasonably dangerous condition and were not suitable for providing safe transportation. Likewise, the unreasonably dangerous condition of the vehicles has resulted in a substantial diminishment in the resale value of those vehicles.

137.    As a direct and proximate result of GM's conduct, Plaintiff and the Class members suffered injuries and compensable damages in an amount to be set forth at trial.

27

## COUNT IV

### RESTITUTION/UNJUST ENRICHMENT

138.    Plaintiff and the Class re-allege and incorporate by reference all previous allegations as though fully set forth at length herein.

139.    This claim is brought on behalf of the National Class.

140.    As a result of GM's wrongful conduct as described herein, GM was enriched, at the expense of Plaintiffs and the Class, through the receipt of money from the purchase, sale and/or lease of the defective vehicles as described herein.

141.    Under these circumstances, it would be against equity and good conscience to permit GM to retain the ill-gotten monies that it received from Plaintiffs and the other members of the proposed Classes.    Because the Defective Vehicles were not safe and reliable as represented by GM, it would be unjust and inequitable for GM to retain the benefit of enrichment through the sale of a known defective vehicle.    Plaintiff and the other members of the proposed Class seek restitution for the monies received by GM for the sale or lease of the defective vehicles.

## COUNT V

### FRAUDULENT CONCEALMENT

142.    Plaintiff and the Class re-allege and incorporate by reference all previous allegations as though fully set forth at length herein.

143.    This claim is brought on behalf of the nationwide Class of Plaintiffs.

144.    GM concealed and suppressed material facts concerning the ignition switch defects, and GM also has successor liability for the acts of concealment and suppression of material facts by oppression of Old GM as set forth above.

28

145.    The Defendant had a duty to disclose the ignition switch defects because they were known and/or accessible only to the Defendant who had superior knowledge and access to the facts, and the Defendant knew they were not known to or reasonably discoverable by Plaintiff and the Class.  These omitted and concealed facts were material because they directly impact the safety of the defective vehicles.  Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

146.    The Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and avoid a costly recall, and they did so at the expense of Plaintiff and the Class.

147.    On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiff and the Class and conceal material information regarding the defects that exist in the defective vehicles and other GM vehicles.

148.    Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiff's and the Class's actions were justified.  The Defendants were in exclusive control of the material facts and such facts were not known to the public, regulators, Plaintiff, or the Class.

149.    Because of the concealment and/or suppression of material facts, Plaintiff and the Class sustained damage because they purchased and retained vehicles that are now diminished in value from what they would have been had the Companies timely disclosed the ignition switch defects.

150.    The Companies' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich the Companies.  The Companies' conduct warrants an assessment of punitive damages in

an amount sufficient to deter such conduct in the future, in an amount to be determined according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter a judgment against GM and in favor of Plaintiff and the Class, and grant the following relief:

A.    Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class Representative and Plaintiff's chosen counsel as Class Counsel;

B.    Declare, adjudge, and decree the conduct of GM as alleged herein to be unlawful, unfair and/or deceptive, and enjoin any such future conduct;

C.    Award Plaintiff and the Class members actual, compensatory damages, or, in the alternative, statutory damages, as proven at trial;

D.    Alternatively, if elected by Plaintiff and the Class, require GM to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

E.    Award Plaintiff and Class members restitution of all monies paid to Old GM because of GM's violation of the MCPA, the lemon laws, equity and the common law;

F.    Award Plaintiff and the Class members exemplary damages in such amount as proven;

G.    Award Plaintiff and the Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

H.     Award Plaintiff and the Class members such other further and different legal or equitable relief as the case and the proof may require or as is determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on the legal claims, as set forth herein.

DATED:  April 16, 2014

By:___s/*Philip J. Goodman*_____
   Philip J. Goodman (P-14168)
   Of Counsel
MICHAEL B. SERLING, PC
280 N. Old Woodward Avenue, Suite 406
Birmingham, MI 48009
Telephone:  (248) 647-6966
Facsimile:  (248) 647-8481
E-mail:  pjgoodman1@aol.com

By:_____s/*Jayne Conroy*_____
   Jayne Conroy, NY Bar No. _____
HANLY CONROY BIERSTEIN SHERIDAN
 FISHER & HAYES LLP
112 Madison Avenue, 7th Floor
New York, NY 10016-7416
Telephone:  (212) 784-6400
Facsimile:  (212) 784-6420
E-mail:  jconroy@hanlyconroy.com

By:_____s/*Jodi Westbrook Flowers*_____
   Jodi Westbrook Flowers, SC Bar No. 066300
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450
E-mail:  jflowers@motleyrice.com

By:_____s/*Mark R. Koberna*_____
    Mark R. Koberna, OH Bar No. _____
SONKIN & KOBERNA, LLC
3401 Enterprise Parkway, Suite 400
Cleveland, OH 44122
Telephone:  (216) 514-8300
Facsimile:  (216) 514-4467
E-mail:  mkoberna@sonkinkoberna.com