# Exhibit GGG

1  Adam J. Levitt (to be admitted *pro hac vice*)       Roland Tellis (SBN 186269)
   alevitt@gelaw.com                                     rtellis@baronbudd.com
2  John E. Tangren (to be admitted *pro hac vice*)       Mark Pifko (SBN 228412)
   jtangren@gelaw.com                                    mpifko@baronbudd.com
3  **GRANT & EISENHOFER P.A.**                           Isaac Miller (SBN 266459)
4  30 North LaSalle Street, Suite 1200                   imiller@baronbudd.com
   Chicago, Illinois 60602                               **BARON & BUDD, P.C.**
5  Telephone:  (312) 214-0000                            15910 Ventura Boulevard, Suite 1600
   Facsimile:   (312) 214-0001                           Encino, California 91436
6                                                        Telephone: (818) 839-2333
7  Lance Cooper (SBN 151800)                             Facsimile:  (818) 986-9698
   lance@thecooperfirm.com
8  **THE COOPER FIRM**
   531 Roselane Street, Suite 200
9  Marietta, Georgia 30060
   Telephone: (770) 427-5588
10 Facsimile:  (770) 427-0010
11
   *Additional Counsel Identified Below*
12 Attorneys for Plaintiffs

13                **UNITED STATES DISTRICT COURT**
                  **CENTRAL DISTRICT OF CALIFORNIA**
14                     **SOUTHERN DIVISION**

15 KEN SACLO, MEL COHEN, TIFFANY          | Case No.:
16 MALONE, DAWN ORONA, LISA
   TEICHER, SUE NAGLE, ROBERT             **CLASS ACTION COMPLAINT**
17 YOUNG, ROBBIE LUTHANDER,
   HEATHER HOLLEMAN, JEREMY               **JURY TRIAL DEMANDED**
18 CLINTON, TOMMY TYSON, DAWN
   TALBOT, TARA HEATH, SARAH
19 SLOAN, BONNIE CONDON, DEREK
   WILSON, SHERRY KIELMAN,
20 SANDRA LEVINE, JENNIFER
   GLASGOW, MICHAEL OWENS,
21 SHAWN DOUCETTE, GERALDINE
   MILLER, CHRISTA WESSEL, PAMELA
22 MAAS, and ELIZABETH STEWART
   individually and on behalf of all others
23 similarly situated,
24                        Plaintiffs,
25            vs.

26 GENERAL MOTORS, LLC and
   CONTINENTAL AUTOMOTIVE
27 SYSTEMS US, INC.,
28                        Defendants.

COMPLAINT

1        Plaintiffs Ken Saclo, Mel Cohen, Tiffany Malone, Dawn Orona, Lisa Teicher, Sue

2   Nagle, Robert Young, Robbie Luthander, Heather Holleman, Jeremy Clinton, Tommy

3   Tyson, Dawn Talbot, Tara Heath, Sarah Sloan, Bonnie Condon, Derek Wilson, Sherry

4   Kielman, Sandra Levine, Jennifer Glasgow, Michael Owens, Shawn Doucette, Geraldine

5   Miller, Christa Wessel, Pamela Maas, Elizabeth Stewart (collectively, "Plaintiffs"),

6   individually and on behalf of the other members of the below-defined nationwide class

7   and statewide classes they respectively seek to represent (collectively, the "Class,"

8   unless otherwise identified herein), for their Class Action Complaint (the "Complaint")

9   allege against General Motors, LLC ("GM"" and Continental Automotive Systems U.S.,

10   Inc. ("Continental"), upon personal knowledge as to themselves and their own acts, and

11   as to all other matters upon information and belief, based upon the investigation made by

12   the undersigned attorneys, as follows:

13                           **NATURE OF THE CASE**

14      1.    Every day, hundreds of millions of people travel on our nation's highways

15   and streets. When people operate a motor vehicle, ride in one as a passenger, or walk

16   along roadways as pedestrians, they trust and rely on companies to make those vehicles

17   safe. Indeed, with a 2,500 pound machine traveling at highway speeds, this is no room

18   for error. And, when mistakes happen, the consequences are significant and can be life-

19   altering, or life-threatening. By failing to disclose critical information about the safety

20   of millions of vehicles, GM and Continental have violated the public's trust and shown a

21   blatant disregard for its safety.

22      2.    Plaintiffs bring this class action seeking redress and remedy from GM and

23   Continental on behalf of themselves and the other Class members, each of whom

24   purchased or leased one or more of the following vehicles: 2005–2010 Chevrolet

25   Cobalt, 2006–2011 Chevrolet HHR, 2006–2010 Pontiac Solstice, 2005–2010 Pontiac

26   G5, 2003–2007 Saturn Ion, and 2007-2010 Saturn Sky vehicles (collectively, the

27   "Defective Vehicles").

28

3.    Each of the Defective Vehicles contains a uniformly designed ignition switch, which is substantially similar for all of the Defective Vehicles, with the key position of the lock module on the steering column, and an ignition key with a slot for a key ring at the top (hereinafter collectively referred to as the "Key System"). The Key System on these vehicles is prone to fail during ordinary and foreseeable driving situations.[1] Each of the Defective Vehicles also contains the uniformly designed Airbag System that shuts off when the Key System on these vehicles fails during ordinary and foreseeable driving situations.

4.    Specifically, GM and Continental have actual knowledge that, because of the way in which the Key System and Airbag System were designed and integrated into the Defective Vehicles, the ignition switch can suddenly fail during normal operation, cutting off engine power and certain electrical systems in the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.[2]

5.    The Key System and Airbag System defects in the Defective Vehicles have been linked to at least thirty-one crashes and thirteen deaths,[3] and GM has recognized that the Key System poses an "increase[ed] risk of injury or fatality" to occupants because the ignition switch may move out of the "run" position during operation.[4]

---

[1] That all of the Defective Vehicles indeed have a common safety defect, and are of a substantially similar design to one another in regard to their Key System, is evidenced by the fact that GM has identified these specific models for recall for the same safety design defects.  *See* Exhibit A, GM Recall Letter (March 2014).

[2] *See* Exhibit A, GM Recall Letter.

[3] These numbers of crashes and deaths are taken from the GM Recall letter, but news reports have suggested the numbers of crashes and deaths associated with the Key System defects in the Defective Vehicles likely is much higher. *See, e.g.*, March 13, 2014 letter from the Center for Auto Safety to David J. Friedman, Acting Administrator, NHTSA, available at: http://www.cbsnews.com/htdocs/pdf/Friedman_Letter_March_13_2014_Full.pdf (last visited March 21, 2014).

[4] *See id.*

1      6.     Although GM and Continental have and had, actual knowledge of safety

2 defects in the Key System and Airbag System in the Defective Vehicles for years, they

3 fraudulently concealed and continue to fraudulently conceal material facts regarding the

4 extent and nature of safety defects in the Defective Vehicles and what must be done to

5 remedy the defects in the Key System and Airbag System.

6      7.     In fact, GM has not only fraudulently concealed material facts relating to

7 the safety defects in the Key System in the Defective Vehicles for years, but it has also

8 made affirmative fraudulent and misleading statements, and it is continuing to make

9 fraudulent and misleading statements to the public regarding the nature and extent of the

10 safety defects in the Key System in the Defective Vehicles.

11     8.     While GM has initiated a recall of identified vehicles in which it

12 acknowledges a defect with the ignition switch itself, it knows – ***and its own***

13 ***engineering documents reflect*** – that the defects transcend just the ignition switch and

14 also include the placement of the ignition switch, a lack of adequate protection of the

15 ignition switch from forces of inadvertent driver contact, and the use of a different type

16 of key, as well as the need to redesign the Airbag System so that it would not

17 immediately shut off when the Key System fails in ordinary and foreseeable driving

18 situations . To fully remedy the problem and render the Defective Vehicles safe and of

19 economic value to their owners again, additional design elements beyond a new ignition

20 switch are needed.

21     9.     The fact that GM has, to date, issued a partial recall despite knowing the

22 insufficiency thereof underscores GM's ongoing fraudulent concealment and fraudulent

23 misrepresentation of the nature and extent of the defects, and makes this action even

24 more important to obtaining a proper remedy for Plaintiffs and the other Class members.

25    10.    The defective Key System and Airbag System design, combined with GM's

26 and Continental's past and ongoing failure to adequately warn of, or remedy, that design,

27 and its past and ongoing fraudulent concealment and/or fraudulent misrepresentations of

28

COMPLAINT

1   the full nature and extent of the defects in that design in the Defective Vehicles, has

2   proximately caused and continues to cause Plaintiffs and the other Class members to

3   suffer economic damages because they purchased or leased vehicles that: (a) have

4   diminished value as they presently exist because the Key System cannot be operated

5   safely without fear of a catastrophic event; and (b) require modification of the Key

6   System and Airbag System, beyond that included in the recent GM recall of the

7   Defective Vehicles, to be operated safely or sold to other buyers, as demonstrated by

8   GM's own internal documents that have not been disclosed to the general public (but

9   that are discussed below).

10       11.   Through this action, Plaintiffs, individually and on behalf of the other Class

11   members, seek injunctive relief in the form of a repair to fully remedy the defects in the

12   Key System and Airbag System such that the Defective Vehicles have their economic

13   value restored and can be operated safely and/or damages to compensate them for the

14   diminished value of their Defective Vehicles as a result of the defects and GM's and

15   Continental's wrongful conduct related to same.

16                   **JURISDICTION AND VENUE**

17       12.   This court has subject-matter jurisdiction over this action under the Class

18   Action Fairness Act of 2005, 28 U.S.C. § 1332(d). Plaintiffs allege and believe that the

19   aggregate claims of the Class exceed $5,000,000 exclusive of interest and costs. There

20   are more than 100 Class members, and more than two-thirds of the Class is diverse from

21   GM.

22       13.   This Court has personal jurisdiction over GM and Continental because

23   GM's and Continental's contacts with the State of California are systematic, continuous,

24   and sufficient to subject it to personal jurisdiction in this Court.

25

26

27

28                             4

1       14.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial

2   part of the events or omissions giving rise to the claims occurred within this District, and

3   because Plaintiff Saclo is a resident of Orange County, California, which is in this

4   District.

5   **PARTIES**

6   **Plaintiffs**

7       15.    Plaintiff Mel Cohen ("Plaintiff Cohen") is a citizen of California, and a

8   resident of California City, which is in Kern County, California.

9       16.    Plaintiff Cohen owns a 2006 Chevrolet Cobalt.

10      17.    Induced by GM's fraudulent concealment and misrepresentations about the

11  existence of a defect of the severity and extent of defects, which left him without

12  knowledge of the conditions or the lack of value in a vehicle containing such

13  unremedied defects, Plaintiff purchased his Cobalt new from Rally GM in Palmdale,

14  California. He purchased the vehicle, not knowing that, as sold, it was defective.

15      18.    GM should have disclosed the Key System defects when Plaintiff Cohen

16  purchased the vehicle. Plaintiff Cohen would not have purchased the vehicle had he

17  known of the defects.

18      19.    Plaintiff Tiffany Malone ("Plaintiff Malone") is a citizen of Alabama, and a

19  resident of Mobile, which is in Mobile County, Alabama.

20      20.    Plaintiff Malone owns a 2007 Chevy Cobalt.

21      21.    Induced by GM's fraudulent concealment and misrepresentations about the

22  existence of a defect of the severity and extent of defects, which left her without

23  knowledge of the conditions or the lack of value in a vehicle containing such

24  unremedied defects, Plaintiff purchased her Cobalt new from U-J Chevrolet in Mobile,

25  Alabama. She paid $19,472.80 for the vehicle, not knowing that, as sold, it was

26  defective.

27

28

5
COMPLAINT

22.     GM should have disclosed the Key System defects when Plaintiff Malone purchased the vehicle. Plaintiff Malone would not have purchased the vehicle had he known of the defects.

23.     Plaintiff Dawn Orona ("Plaintiff Orona") is a citizen of Colorado, and a resident of Limon, which is in Lincoln County, Colorado.

24.     Plaintiff Orona owned a 2006 Chevy Cobalt.

25.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Chevy Cobalt in 2006. She purchased the vehicle, not knowing that, as sold, it was defective.

26.     Approximately 6 months after purchasing the 2006 Chevy Cobalt, Plaintiff and her husband experienced a power loss while attempting to complete a turn on a curve. Although Plaintiff's husband applied both feet on the brakes, the car jumped the curb and plowed into a brick wall. The impact of the crash was severe enough to break the front axle, totaling the vehicle, but the air bags never deployed.

27.     GM should have disclosed the Key System defects when Plaintiff Orona purchased the vehicle. Plaintiff Orona would not have purchased the vehicle had she known of the defects.

28.     Plaintiff Lisa Teicher ("Plaintiff Teicher") is a citizen of Connecticut, and a resident of Manchester, which is in Hartford County, Connecticut.

29.     Plaintiff Teicher owns a 2005 Chevrolet Cobalt.

30.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Cobalt used from Gengras Chevrolet in East

1 Hartford, Connecticut. She purchased the vehicle, not knowing that, as sold, it was
2 defective.

3     31. GM should have disclosed the Key System defects when Plaintiff Teicher
4 purchased the vehicle. Plaintiff Teicher would not have purchased the vehicle had she
5 known of the defects.

6     32. Plaintiff Sue Nagle ("Plaintiff Nagle") is a citizen of Maryland, and a
7 resident of Charlestown, which is in Cecil County, Maryland.

8     33. Plaintiff Nagle owns a 2006 Saturn Ion.

9     34. Induced by GM's fraudulent concealment and misrepresentations about the
10 existence of a defect of the severity and extent of defects, which left her without
11 knowledge of the conditions or the lack of value in a vehicle containing such
12 unremedied defects, Plaintiff purchased her Ion used from Porter Chevrolet in Newark,
13 Delaware. She purchased the vehicle, not knowing that, as sold, it was defective.

14     35. GM should have disclosed the Key System defects when Plaintiff Nagle
15 purchased the vehicle. Plaintiff Nagle would not have purchased the vehicle had she
16 known of the defects.

17     36. Plaintiff Robert Young ("Plaintiff Young") is a citizen of Florida, and a
18 resident of Miami Beach, which is in Miami-Dade County, Florida.

19     37. Plaintiff Young owns a 2007 Saturn Sky.

20     38. Induced by GM's fraudulent concealment and misrepresentations about the
21 existence of a defect of the severity and extent of defects, which left him without
22 knowledge of the conditions or the lack of value in a vehicle containing such
23 unremedied defects, Plaintiff purchased his 2007 Saturn Sky from Saturn of West Dade
24 in Miami, Florida. He purchased the vehicle, not knowing that, as sold, it was defective.

25     39. GM should have disclosed the Key System defects when Plaintiff Young
26 purchased the vehicle. Plaintiff Young would not have purchased the vehicle had he
27 known of the defects.

28

7
COMPLAINT

1    40.    Plaintiff Robbie Luthander ("Plaintiff Luthander") is a citizen of Texas, and

2  a resident of San Antonio, which is in Bexar County, Texas.

3    41.    Plaintiff Luthander owns a 2010 Chevrolet Cobalt.

4    42.    Induced by GM's fraudulent concealment and misrepresentations about the

5  existence of a defect of the severity and extent of defects, which left him without

6  knowledge of the conditions or the lack of value in a vehicle containing such

7  unremedied defects, Plaintiff purchased his Cobalt on May 15, 2012 from Cutter Buick

8  GMC located in Waipahu, Hawaii. He paid $17,000 for the vehicle, not knowing that,

9  as sold, it was defective.

10    43.    GM should have disclosed the Key System defects when Plaintiff

11  Luthander purchased the vehicle. Plaintiff Luthander would not have purchased the

12  vehicle had he known of the defects.

13    44.    Plaintiff Heather Holleman ("Plaintiff Holleman") is a citizen of Indiana,

14  and a resident of South Bend, which is in St. Joseph County, Indiana.

15    45.    Plaintiff Holleman owns a 2007 Pontiac G5.

16    46.    Induced by GM's fraudulent concealment and misrepresentations about the

17  existence of a defect of the severity and extent of defects, which left her without

18  knowledge of the conditions or the lack of value in a vehicle containing such

19  unremedied defects, Plaintiff purchased her Pontiac G5 new in May 2007 from Don

20  Meadows in South Bend, Indiana. She paid $17,500 for the vehicle, not knowing that,

21  as sold, it was defective.

22    47.    Plaintiff Holleman has experienced numerous issues with the ignition of her

23  Pontiac G5. The GM dealership where Plaintiff Holleman purchased her vehicle has

24  told her that the parts to fix the vehicle are unavailable, and they simply tell her to "be

25  careful."

26

27

28

1  48. GM should have disclosed the Key System defects when Plaintiff Holleman

2 purchased the vehicle. Plaintiff Holleman would not have purchased the vehicle had she

3 known of the defects.

4  49. Plaintiff Jeremy Clinton ("Plaintiff Clinton") is a citizen of Kansas, and a

5 resident of Shawnee, which is in Johnson County, Kansas.

6  50. Plaintiff Clinton leases a 2006 Chevrolet Cobalt.

7  51. Induced by GM's fraudulent concealment and misrepresentations about the

8 existence of a defect of the severity and extent of defects, which left him without

9 knowledge of the conditions or the lack of value in a vehicle containing such

10 unremedied defects, Plaintiff leased his Cobalt used from Shawnee Mission Kia in

11 Shawnee, Kia. He leased the vehicle, not knowing that, as sold, it was defective.

12  52. GM should have disclosed the Key System defects when Plaintiff Clinton

13 leased the vehicle. Plaintiff Clinton would not have leased the vehicle had he known of

14 the defects.

15  53. Plaintiff Tommy Tyson ("Plaintiff Tyson") is a citizen of Missouri, and a

16 resident of Gray Valley, which is in Jackson County, Missouri.

17  54. Plaintiff Tyson owns a 2011 Chevrolet HHR.

18  55. Induced by GM's fraudulent concealment and misrepresentations about the

19 existence of a defect of the severity and extent of defects, which left him without

20 knowledge of the conditions or the lack of value in a vehicle containing such

21 unremedied defects, Plaintiff Tyson purchased his 2011 Chevrolet HHR new on March

22 1, 2011 from Superior Chevrolet in Merriam, Kansas. He paid approximately $13,000

23 for the vehicle, not knowing that, as sold, it was defective.

24  56. In March 2013, GM replaced the original ignition switch on Plaintiff

25 Tyson's 2011 Chevrolet HHR with another defective ignition switch.

26

27

28

COMPLAINT

57.    GM should have disclosed the Key System defects when Plaintiff Tyson purchased the vehicle.  Plaintiff Tyson would not have purchased the vehicle had he known of the defects.

58.    Plaintiff Dawn Talbot ("Plaintiff Talbot") is a citizen of Kentucky, and a resident of Glasgow, which is in Barren County, Kentucky.

59.    Plaintiff Talbot owns a 2006 Chevy Cobalt.

60.    Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Chevy Cobalt used in 2009 from Goodman Automotive in Glasgow, Kentucky.  She purchased the vehicle, not knowing that, as sold, it was defective.

61.    Plaintiff Talbot has faced issues with power losses during driving.

62.    GM should have disclosed the Key System defects when Plaintiff Talbot purchased the vehicle.  Plaintiff Talbot would not have purchased the vehicle had she known of the defects.

63.    Plaintiff Tara Heath ("Plaintiff Heath") is a citizen of Michigan, and a resident of Flint, Michigan, which is in Genesee County, Michigan.

64.    Plaintiff Heath owns a 2010 Chevrolet HHR.

65.    Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Chevrolet HHR used in June 2013 from a dealership in Grand Blanc, Michigan.  She paid $8,000 for the vehicle, not knowing that, as sold, it was defective.

66.    Plaintiff Heath has experienced issues with the ignition of her Chevrolet HHR.

1    67.   GM should have disclosed the Key System defects when Plaintiff Heath

2  purchased the vehicle. Plaintiff Heath would not have purchased the vehicle had she

3  known of the defects.

4    68.   Plaintiff Sarah Sloan ("Plaintiff Sloan") is a citizen of Washington D.C.,

5  and a resident of Washington D.C.

6    69.   Plaintiff Sloan owns a 2007 Chevrolet Cobalt.

7    70.   Induced by GM's fraudulent concealment and misrepresentations about the

8  existence of a defect of the severity and extent of defects, which left her without

9  knowledge of the conditions or the lack of value in a vehicle containing such

10  unremedied defects, Plaintiff purchased her Cobalt new from Joe Panian Chevrolet in

11  Southfield, Michigan. She paid $16,988.18 for the vehicle, not knowing that, as sold, it

12  was defective.

13    71.   GM should have disclosed the Key System defects when Plaintiff Sloan

14  purchased the vehicle. Plaintiff Sloan would not have purchased the vehicle had she

15  known of the defects.

16    72.   Plaintiff Bonnie Condon ("Plaintiff Condon") is a citizen of Minnesota, and

17  a resident of Waseca, which is in Waseca County, Minnesota.

18    73.   Plaintiff Condon owns a 2005 Chevrolet Cobalt.

19    74.   Induced by GM's fraudulent concealment and misrepresentations about the

20  existence of a defect of the severity and extent of defects, which left her without

21  knowledge of the conditions or the lack of value in a vehicle containing such

22  unremedied defects, Plaintiff purchased her Cobalt used from Hirsh's Cambridge Motors

23  in Cambridge, Minnesota. She purchased for the vehicle, not knowing that, as sold, it

24  was defective.

25    75.   GM should have disclosed the Key System defects when Plaintiff Condon

26  purchased the vehicle. Plaintiff Condon would not have purchased the vehicle had she

27  known of the defects.

28

1      76.    Plaintiff Derek Wilson ("Plaintiff Wilson") is a citizen of Mississippi, and a

2  resident of Olive Branch, which is in DeSoto County, Mississippi.

3      77.    Plaintiff Wilson owns a 2005 Saturn Ion.

4      78.    Induced by GM's fraudulent concealment and misrepresentations about the

5  existence of a defect of the severity and extent of defects, which left him without

6  knowledge of the conditions or the lack of value in a vehicle containing such

7  unremedied defects, Plaintiff purchased his 2005 Saturn Ion used in September 2008

8  from Homer Skelton Hyundai in Olive Branch, Mississippi. He paid $12,761.45 for the

9  vehicle, not knowing that, as sold, it was defective.

10     79.    GM should have disclosed the Key System defects when Plaintiff Wilson

11  purchased the vehicle. Plaintiff Wilson would not have purchased the vehicle had he

12  known of the defects.

13     80.    Plaintiff Sherry Kielman ("Plaintiff Kielman") is a citizen of Kansas, and a

14  resident of Pleasanton, which is in Linn County, Kansas.

15     81.    Plaintiff Kielman owns a 2007 Chevrolet Cobalt.

16     82.    Induced by GM's fraudulent concealment and misrepresentations about the

17  existence of a defect of the severity and extent of defects, which left her without

18  knowledge of the conditions or the lack of value in a vehicle containing such

19  unremedied defects, Plaintiff purchased her Cobalt used on February 19, 2008 from Max

20  Motors in Butler, Missouri. She paid $10,595 for the vehicle, not knowing that, as sold,

21  it was defective.

22     83.    GM should have disclosed the Key System defects when Plaintiff Kielman

23  purchased the vehicle. Plaintiff Kielman would not have purchased the vehicle had she

24  known of the defects.

25     84.    Plaintiff Ken Saclo ("Plaintiff Saclo") is a citizen of California, and a

26  resident of Irvine, which is in Orange County, California.

27     85.    Plaintiff Saclo owns a 2006 Chevrolet Cobalt.

28

86.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left him without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased his Cobalt used on January 25, 2007 from Henderson Chevrolet in Henderson, Nevada. He paid $14,323.38 for the vehicle, not knowing that, as sold, it was defective.

87.     GM should have disclosed the Key System defects when Plaintiff Saelo purchased the vehicle. Plaintiff Saelo would not have purchased the vehicle had he known of the defects.

88.     Plaintiff Saelo's vehicle was involved in a recent collision due to the defects. Plaintiff Saelo's vehicle shut off in the middle of traffic and struck another vehicle from behind. During the accident, the airbags in Plaintiff Saelo's vehicle did not deploy.

89.     Plaintiff Sandra Levine ("Plaintiff Levine") is a citizen of New York, and a resident of Babylon, which is in Suffolk County, New York.

90.     Plaintiff Levine owns a 2005 Chevrolet Cobalt.

91.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Cobalt used on May 27, 2006 from Babylon Honda in Babylon, New York. She paid $16,627.96 for the vehicle, not knowing that, as sold, it was defective.

92.     GM should have disclosed the Key System defects when Plaintiff Levine purchased the vehicle. Plaintiff Levine would not have purchased the vehicle had she known of the defects.

93.     Plaintiff Jennifer Glasgow ("Plaintiff Glasgow") is a citizen of Ohio, and a resident of Westerville, which is in Franklin County, Ohio.

13

COMPLAINT

1   94.   Plaintiff Glasgow co-owns a 2006 Saturn Ion with her husband, Aaron
2   Glasgow.

3   95.   Induced by GM's fraudulent concealment and misrepresentations about the
4   existence of a defect of the severity and extent of defects, which left her without
5   knowledge of the conditions or the lack of value in a vehicle containing such
6   unremedied defects. Plaintiff purchased her Ion new on December 21, 2005, from
7   Saturn North in Worthington, Ohio. She paid $15,794.00 for the vehicle, not knowing
8   that, as sold, it was defective.

9   96.   Plaintiff Glasgow has faced issues with the ignition while starting the
10  vehicle, as well as power losses during driving.

11  97.   GM should have disclosed the Key System defects when Plaintiff Glasgow
12  purchased the vehicle. Plaintiff Glasgow would not have purchased the vehicle had she
13  known of the defects.

14  98.   Plaintiff Michael Owens ("Plaintiff Owens") is a citizen of Ohio, and a
15  resident of Shelby, which is in Richland County, Ohio.

16  99.   Plaintiff Owens owns a 2007 Saturn Ion.

17  100.   Induced by GM's fraudulent concealment and misrepresentations about the
18  existence of a defect of the severity and extent of defects, which left him without
19  knowledge of the conditions or the lack of value in a vehicle containing such
20  unremedied defects, Plaintiff purchased his Ion used from Graham Automall in
21  Mansfield, Ohio. He paid $17,607 for the vehicle, not knowing that, as sold, it was
22  defective.

23  101.   GM should have disclosed the Key System defects when Plaintiff Owens
24  purchased the vehicle. Plaintiff Owens would not have purchased the vehicle had he
25  known of the defects.

26  102.   Plaintiff Shawn Doucette ("Plaintiff Doucette") is a citizen of Pennsylvania,
27  and a resident of Hamburg, which is in Berks County, Pennsylvania.

28

14

COMPLAINT

1        103.  Plaintiff Doucette owns a 2005 Chevy Cobalt SS.

2        104.  Induced by GM's fraudulent concealment and misrepresentations about the

3  existence of a defect of the severity and extent of defects, which left him without

4  knowledge of the conditions or the lack of value in a vehicle containing such

5  unremedied defects, Plaintiff purchased his Chevy Cobalt new in September 2005 from

6  Outten Chevrolet of Hamburg in Hamburg, Pennsylvania. He purchased the vehicle, not

7  knowing that, as sold, it was defective.

8        105.  Plaintiff Doucette has experienced numerous power losses during driving.

9        106.  GM should have disclosed the Key System defects when Plaintiff Doucette

10  purchased the vehicle. Plaintiff Doucette would not have purchased the vehicle had he

11  known of the defects.

12        107.  Plaintiff Geraldine Miller ("Plaintiff Miller") is a citizen of South Dakota,

13  and a resident of Belle Fourche, which is in Butte County, South Dakota.

14        108.  Plaintiff Miller owns a 2006 Chevrolet HHR.

15        109.  Induced by GM's fraudulent concealment and misrepresentations about the

16  existence of a defect of the severity and extent of defects, which left her without

17  knowledge of the conditions or the lack of value in a vehicle containing such

18  unremedied defects, Plaintiff purchased her Chevrolet HHR used from White's Queen

19  City Motors in Spearfish, South Dakota. She paid $9,800 for the vehicle, not knowing

20  that, as sold, it was defective.

21        110.  Plaintiff Miller has experienced power loss while driving.

22        111.  GM should have disclosed the Key System defects when Plaintiff Miller

23  purchased the vehicle. Plaintiff Miller would not have purchased the vehicle had she

24  known of the defects.

25        112.  Plaintiff Christa Wessel ("Plaintiff Wessel") is a citizen of Pennsylvania,

26  and a resident of Pittsburgh, which is in Allegheny County, Pennsylvania.

27

28
COMPLAINT

1      113.  Plaintiff Wessel owned two 2007 Chevrolet Cobalts and a 2010 Chevrolet

2  Cobalt.

3      114.  Induced by GM's fraudulent concealment and misrepresentations about the

4  existence of a defect of the severity and extent of defects, which left her without

5  knowledge of the conditions or the lack of value in a vehicle containing such

6  unremedied defects, Plaintiff purchased her Cobalt new from Markwood Chevrolet in

7  Keyser, West Virginia.  She purchased the vehicle, not knowing that, as sold, it was

8  defective.

9      115.  GM should have disclosed the Key System defects when Plaintiff Wessel

10  purchased the vehicle.  Plaintiff Wessel would not have purchased the vehicle had she

11  known of the defects.

12      116.  Plaintiff Pamela Maas ("Plaintiff Maas") is a citizen of Wisconsin, and a

13  resident of Oconomowoc, which is in Waukesha County, Wisconsin.

14      117.  Plaintiff Maas owns a 2006 Saturn Ion.

15      118.  Induced by GM's fraudulent concealment and misrepresentations about the

16  existence of a defect of the severity and extent of defects, which left her without

17  knowledge of the conditions or the lack of value in a vehicle containing such

18  unremedied defects, Plaintiff purchased her Ion used in September 2012 from J.D.

19  Byrider in Waukesha, Wisconsin.  She paid $14,000 for the vehicle, not knowing that, as

20  sold, it was defective.

21      119.  Approximately 13 days after purchasing the vehicle, the ignition on

22  Plaintiff Maas's Ion failed, and she could no longer start the car.

23      120.  GM should have disclosed the Key System defects when Plaintiff Haas

24  purchased the vehicle.  Plaintiff Haas would not have purchased the vehicle had she

25  known of the defects.

26      121.  Plaintiff Elizabeth Stewart ("Plaintiff Stewart") is a citizen of Kentucky,

27  and a resident of Raceland, which is in Greenup County, Kentucky.

28

16
COMPLAINT

122. Plaintiff Stewart owns a 2010 Chevrolet Cobalt.

123. Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased her Cobalt used in February 2012 from a dealer in Paintsville, Kentucky. She paid $14,000 for the vehicle, not knowing that, as sold, it was defective.

124. Plaintiff Stewart's Cobalt has experienced issues as a result of the Key System defects. GM should have disclosed the Key System defects when Plaintiff Stewart purchased the vehicle. Plaintiff Stewart would not have purchased the vehicle had she known of the defects.

## Defendants

125. GM is a Delaware limited liability company doing business in all fifty states (including the District of Columbia) with its principal place of business in Detroit, Michigan.

126. Continental Automotive Systems US, Inc. is a corporation organized and existing under the laws of the State of Delaware. Continental is the supplier of the airbag Sensing Diagnostic Module ("SDM") for the Defective Vehicles.

127. In July 2009, the United States Bankruptcy Court approved the sale of General Motors Corporation to NGMCO, Inc., which was converted into Defendant General Motors, LLC (sometimes referred to herein as "Defendant GM" or as "new GM").

128. The sale of old GM to Defendant GM was reduced to an Amended and Restated Master Sale and Purchase Agreement ("the Agreement"), which includes definitions of Defendant GM's "Purchased Assets" and "Liabilities."

129. According to the terms of the Agreement, Defendant GM's "Purchased Assets," include:

17

(xiv) *all* books, records, ledgers, *files*, *documents*, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (*in whatever form or medium*), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

Amended and Restated Master Sale and Purchase Agreement at Section 2.2 "Purchased and Excluded Assets" (Emphasis added).

130. The contents of old GM's "files" and "documents" are properly attributable or imputable to Defendant GM. To that end, Defendant GM acquired notice of the Key Defects contained in old GM's documents, including numerous engineering reports, investigative reports, failure analyses, technical service bulletins, and other documentation concerning the defective Key System as described below.

131. Along with the Purchased Assets, Defendant GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

132. Among many others, the Liabilities assumed by Defendant GM under the Agreement include:

(vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured

18

motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

(ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . .[5]

(xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .[6]

133. Under the Agreement, Defendant GM also assumed responsibility for compliance with a wide range of laws and other regulations, including:

(a) From and after the Closing, Purchaser [new GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [old GM].

(b) From and after the Closing, Purchaser [new GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [old GM] … and (ii) Lemon Laws.[7]

134. Moreover, the opinion of the Bankruptcy Court approving the Agreement also made clear that Defendant GM assumed "the warranty and recall obligations of both

---

[5] Pursuant to the Agreement Approval Opinion, dated July 5, 2009; Docket No. 2967 at 17, this particular category of assumed liabilities is "regardless of when the product was purchased." (emphasis in the original).

[6] *See* Amended and Restated Master Sale and Purchase Agreement at Section 2.3 ("Assumed and Retained Liabilities").

[7] *See* Amended and Restated Master Sale and Purchase Agreement at Section 6.15 "Product Certification, Recall and Warranty Claims."

19

1 | Old GM and New GM." In re General Motors Corp., Case No. 09-50026 (REG); Sale
2 | Agreement Approval Opinion, dated July 5, 2009; Docket No. 2967 at 17.

3 |     135. Pursuant to the Agreement and other orders of the Bankruptcy Court,
4 | Defendant GM emerged out of the chapter 11 case and continued the business of old
5 | GM with the bulk of old GM's employees and, on information and belief, with many of
6 | the same senior-level management, officers, and directors.

7 |     136. Defendant GM continued this business with full knowledge of old GM's
8 | awareness of the defects with the Key System and old GM's failure to disclose those
9 | defects to the public – or, for that matter, to the Bankruptcy Court.

10 |     137. Additionally, regardless of old GM's bankruptcy, Defendant GM is liable
11 | for its own conduct. Indeed, there is no provision of the Agreement that releases
12 | Defendant GM from liability for its own fraudulent concealment of Key System defect
13 | and its failure to warn the public and take other action to remedy the defects and prevent
14 | ongoing economic harm to the owners/lessees of the Defective Vehicles.

15 |     138. From its inception in 2009, Defendant GM has had its own independent
16 | knowledge of defects in the Defective Vehicles and the need for multiple design steps to
17 | be undertaken to fully resolve those defects so as to prevent injury and economic harm
18 | to owners of GM vehicles. Yet, it continued to conceal the Key System defect, and it
19 | continued to fail to warn the public or to take any other action to remedy the defects and
20 | prevent ongoing economic harm to the owners/lessees of the Defective Vehicles.

21 |     139. As discussed above, Defendant GM assumed responsibility for compliance
22 | with a wide range of laws and other regulations, including the TREAD Act, in
23 | connection with the Defective Vehicles and is liable for its non-disclosure of the Key
24 | Defect from its inception in 2009.

25 |     140. Under the TREAD Act, if a vehicle is determined to be defective, a
26 | manufacturer like Defendant GM must promptly notify vehicle owners, purchasers and
27 | dealers of the defect and it must remedy the defect. 49 U.S.C. § 30118(b)(2)(A) & (B).

28 |

20
COMPLAINT

1  Defendant GM was also required to file a report with NHTSA, within five days, if "a
2  defect in a vehicle or item of equipment has been determined to be safety related, or
3  noncompliance with a motor safety standard has been determined to exist." Id. at §
4  573.6(a)-(b). Despite being aware of the Key System defect from its inception in 2009,
5  Defendant GM waited five years -- until February 2014 -- to send a letter to NHTSA
6  addressing its knowledge of the Key System defect.

7      141.  By actively concealing the Key System defect in the Defective Vehicles,
8  and by continuing to sell some of the Defective Vehicles after its inception, all the while
9  violating the TREAD Act, Defendant GM engaged in unlawful and fraudulent practices
10  in violation of law.

11      142.  For all of these reasons, and others to be confirmed or which may emerge
12  during the course of discovery, Defendant GM is the proper party against whom to assert
13  the claims herein, and Plaintiff will use the term "GM" from this point forward in the
14  Complaint to refer collectively to both GM entities.

## FACTUAL BACKGROUND
**The Defective Vehicles Have Common Defects in their Key Systems and Airbag
Systems, and GM and Continental Knew of these Defects for at Least a Decade and
Concealed them**

18      143.  In the late 1990's/early 2000's, GM and a supplier, Eaton Mechatronics
19  ("Eaton"), completed the specifications for the ignition switch for the Saturn Ion. Eaton
20  sold its vehicle switch/electronic division to Delphi Automotive Systems ("Delphi") on
21  March 31, 2001.

22      144.  A pre-production report for the 2003 Saturn Ion identified issues with the
23  ignition switch. In a section entitled "Root Cause Summary" the report states that the
24  "two causes of failure" were "[l]ow contact force and low detent plunger force."
25  Although the report states that a design change resolved the problem, any purported
26  design change did not resolve the problem.

27      145.  In 2001, during developmental testing of the 2003 Saturn Ion, GM learned

28

that the engines in those cars were stalling due to defects in the Key System therein.
GM chose not to fix these defects. Instead, in 2002, GM began manufacturing and
selling 2003 Saturn Ions with the defective Key System.

146. GM contracted with Continental to manufacture and supply the Airbag
System, including the sensing system, in the Defective Vehicles, including the 2003
Saturn Ion.

147. The Airbag System in the Defective Vehicles was defectively designed so
that it would shut off and the airbags would not deploy immediately upon the key
turning from the run to accessory/off position during foreseeable driving maneuvers.
The combination of defects in the Key System and Airbag System is particularly
dangerous since the key turning off immediately disables the airbags.

148. In February 2002, Delphi submitted a Production Part Procedure Process
("PPAP") document for the ignition switch in the 2003 Ion. According to Delphi
officials, GM approved the PPAP even though testing of the ignition switch torque was
below GM's performance specifications.

149. In 2004, GM engineers reported that the ignition switch on the Saturn Ion
was so weak and so low on the steering column that the driver's knee could easily bump
the key and turn off the car.

150. This defect was sufficiently serious for a GM engineer, in January 2004, as
part of GM's vehicle evaluation program, to affirmatively conclude, in writing, that
"[t]his is a basic design flaw and should be corrected if we want repeat sales."

151. In 2004, GM began manufacturing and selling the 2005 Chevrolet Cobalt.
The Cobalt was a sister vehicle (essentially the same car with a different badge or name)
to the Saturn Ion. GM installed the same Key System on the 2005 Cobalt as it did on the
Saturn Ion.

152. On October 29, 2004, around the time of GM's market launch of the 2005
Cobalt, Gary Altman – GM's program-engineering manager for the Cobalt – test drove

22

COMPLAINT

1  the Cobalt with the standard key and key fob. During the test drive, when Altman's
2  knee bumped the key, the engine turned off, causing the engine to stall. Altman reported
3  this incident to GM.

4      153.   In response to Altman's report, GM launched an engineering inquiry to
5  investigate the potential for the key to move from the "run" to the "accessory/off"
6  position during ordinary driving conditions. This inquiry is known within GM as a
7  Problem Resolution Tracking System Inquiry ("PRTS").

8      154.   On February 1, 2005, as part of the PRTS, GM engineers concluded:

9          There are two main reasons that [sic] we believe can cause a
           lower effort in turning the key: 1. A low torque detent in the
10         ignition switch. 2. A low position of the lock module in the
11         column. (PRTS   Complete Report N172404)

12     155.   As part of the PRTS, GM engineers also began looking into ways to solve
13  the problem of the key moving from the "run" to the "accessory/off" position during
14  ordinary driving.

15     156.   On February 18, 2005, GM engineers presented several possible solutions
16  to the Cockpit Program Integration Team ("CPIT"). GM engineers determined the only
17  "sure solution" to fixing the problem of the key inadvertently moving from the "run" to
18  the "accessory/off" position required changing from a low mount to a high mount lock
19  module, which would considerably reduce the possibility of the key/key fob being
20  impacted by a driver.

21     157.   According to GM engineers, this change in the key position on the lock
22  module, *combined with* increasing the detent in the ignition switch, would be a "sure
23  solution."

24     158.   GM, however, through Altman, rejected this "sure solution," in part,
25  because the cost to implement the solution would be too high.

26     159.   During this PRTS, GM also considered changing the key from a slot to a
27  hole as a way to attempt to contain this problem, but not as a solution to the problem.

28

                                      23
                                   COMPLAINT

160. Changing the key from a slot to a hole would reduce the lever arm of the key and the key chain. With the slot design, the key chain would hang lower on the key which would increase the torque force on the ignition switch when the chain was contacted or moved in any way. GM engineers determined this key change would significantly reduce the chance of the key inadvertently moving from the "run" to the "accessory/off" position during ordinary driving maneuvers.

161. A GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle.

162. GM, however, rejected this proposed key change and, on March 9, 2005, GM closed the PRTS without taking any steps to fix the defective Key System. The PRTS detailed the reasons why GM took no action.

> Per GMX001 PEM's [Gary Altman] directive we are closing this PRTS with no action. The main reasons are as following: All possible solutions were presented to CPIT and VAPIR: a. The lead-time for all the solutions is too long. b. The tooling cost and piece price are too high. c. None of the solutions seem to fully countermeasure the possibility of the key being turned (ignition turn off) during driving. *Thus none of the solutions represents an acceptable business case*.

(emphasis added)

163. On February 28, 2005, GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

164. The February 28, 2005 bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.

165. In the February 28, 2005 bulletin, GM provided the following recommendations/instructions to its dealers · *but not to the public in general*:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.

24
COMPLAINT

1
2
3

> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.

4
5
6

> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.

7
8
9

> Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

10
11
12

166. At that time, however, GM knew that the inadvertent turning off of the ignition in the Defective Vehicles was due to design defects in the Key System in those vehicles, and *was not* limited to short drivers using large heavy key chains.

13
14
15
16
17

167. GM failed to disclose and, in fact, concealed, the February 28, 2005 bulletin – and/or the information contained therein – to Cobalt and Pursuit owners/lessees, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a "sure solution" to the problem, and GM's knowledge of it.

18
19
20
21
22
23

168. Indeed, rather than disclosing this serious safety problem that uniformly affected all of the Defective Vehicles, GM, instead, concealed and obscured the problems, electing to wait until customers brought their cars to a dealership after an engine-stalling incident, and offered even its own dealers only an incomplete, incorrect, and insufficient description of the defects and the manner in which to actually remedy them.

24
25

169. As of February 2005, GM engineers knew that the Saturn Ion and Chevrolet Cobalt vehicles had the safety-related defects discussed in this Complaint.

26
27

170. Pursuant to 49 C.F.R. § 573.6 – which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect…related to motor vehicle safety," GM

28

25

1 | had a duty, no later than February 2005 to disclose the safety-related defects in the
2 | Saturn Ion and Chevrolet Cobalt vehicles.

3 |     171. Instead of complying with its legal obligations, however, GM fraudulently
4 | concealed the Key System defect from the public, and continued to manufacture and sell
5 | Ions and Cobalts with these known safety defects, causing the People of the State of
6 | California to purchase and own, and continue to own, vehicles that contained a defective
7 | and dangerous system.

8 |     172. Although it had actual knowledge of safety defects that it was concealing,
9 | GM continued to sell hundreds of thousands of Defective Vehicles, reaping profits from
10 | those sales from purchasers who were never informed the vehicles they were purchasing
11 | had a defective Key System and, therefore, were unable to consider that information in
12 | deciding whether to purchase or lease the Defective Vehicles.

13 |     173. In March 2005, following its receipt of a customer complaint that his/her
14 | Cobalt vehicle ignition turned off while driving, GM opened another PRTS – Complete
15 | Report (0793/2005-US). Steve Oakley, the brand quality manager for the Cobalt,
16 | originated the PRTS. As part of the PRTS, Mr. Oakley reviewed an email dated March
17 | 9, 2005 from Jack Weber, a GM engineer. The subject of the email was "Cobalt SS
18 | Ignition Turn Off." In the email Mr. Weber stated:

19 |     I've had a chance to drive a Cobalt SS and attempt to turn off
the ignition during heel/toe down shifting. Much to my
20 | surprise, the first time I turned off the ignition switch was
during a normal traffic brake application on I-96. After that I
21 | was able to do a static reproduction of the condition in a
parking lot. I've attached photos of the condition with
22 | comments. My Anthropometric Measurements are attached
23 | below:

24 |     Static view of keys, fob and registration hitting knee.

25 |     Position of RKE fob during normal driving. Dynamic
evaluation.

26 |     View of steering column cover and Pass Key 3+"lump" under
27 | the key slot.

28 |

1

      Key in run position, knee contacting the fob and the split ring is pulling on the key to move it to the "off" position. Static evaluation.

2

3

      Fob has levered around the steering column cover and turned the ignition off.

4

      Unobstructed view of the fob and column cover.

5

      Attached below is documentation of a RAMSIS study performed to attempt to duplicate the real world condition.

6

      Please call at (586) 986-0622 with questions.

7

      Jack Weber

8

174.  Mr. Weber clearly identified the defects in the Key System while he was

9

driving the Cobalt.

10

175.  Despite the clear evidence of the safety-related defect with the Key System,

11

during the March 2005 PRTS, GM engineers decided not to reconsider any of the

12

proposed solutions discussed during the February 2005 PRTS. Instead, the GM

13

engineers leading the PRTS recommended that sole corrective action GM should

14

recommend would be to advise customers to remove excess material from their key

15

rings, even though GM knew that the inadvertent turning off of the ignition in these

16

vehicles was due to design defects in the Key System in those vehicles, and was not

17

limited to drivers having excess key ring materials. During the March 2005 PRTS, GM

18

engineers decided not to reconsider any of the proposed solutions discussed during the

19

February 2005 PRTS. Instead, the GM engineers leading the PRTS recommended that

20

sole corrective action GM should recommend would be to advise customers to remove

21

excess material from their key rings, *even though GM knew that the inadvertent*

22

*turning off of the ignition in the Defective Vehicles was due to design defects in the*

23

*Key System in those vehicles, and was not limited to drivers having excess key ring*

24

*materials.*

25

176.  In May 2005, GM, following its receipt of another customer complaint that

26

his/her Cobalt vehicle ignition turned off while driving, it opened another PRTS.

27

28

177.  During the May 2005 PRTS, GM decided to redesign the key in order to reduce the possibility that a driver may inadvertently turn the key from the "run" to the "accessory/off" position during ordinary driving.

178.  Despite this initial safety/redesign commitment, however, GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public to the Defective Vehicles' serious safety risks.

179.  At or about this same time, GM, through Alan Adler, GM's Manager, Product Safety Communications, issued the following statement on with respect to the Chevrolet Cobalt's inadvertent shut-off problems, affirmatively representing that:[8]

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.
>
> When this happens, the Cobalt is still controllable. The engine can be restarted after shifting to neutral.
>
> GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off.
>
> Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.
>
> Ignition systems are designed to have "on" and "off" positions, and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to accessory or off position.

GM's Statement on Chevrolet Cobalt Inadvertent Shut-offs.  GM's statement, however, was demonstrably false and misleading.

---

[8] *See* http://www.nytimes.com/2005/06/19/automobiles/19KEYS.html?pagewanted=print (last visited March 21, 2014).

180.    Contrary to GM's above-referenced statement, GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob. GM knew that these incidents were not caused by heavy key chains or a driver's size and seating position. GM knew that removing the non-essential material from key rings would not "virtually eliminate" the possibility of inadvertent bumping of the ignition key from the "run" to the "accessory/off" position while the car is running.

181.    GM's above-referenced statement was further demonstrably false and misleading because GM knew that these incidents were ultimately caused by the safety-related defects in the Key System identified in the February 2005 PRTS.

182.    But GM's affirmative concealment of the problems with the Defective Vehicles did not end there.

183.    In a September 28, 2005 email, John Hendler, another GM engineer, wrote:

> I wanted to close the loop on the Electrical SMT's attempt to bring a new ignition switch design to the Delta/Kappa vehicles for MY 08. As the VSE for the Cobalt launch I am very aware of an issue with "inadvertent ignition offs" due to the low mounted ignition in the steering column and the low efforts required to rotate the ignition.

> A new, more robust, increased effort design is currently being implemented on the GMT 191 program for MY 07. My intention was to bring this part number common design to the Delta/Kappa vehicles for MY08. I attended an X Vapir with the Delta team to review the pros/cons of this change. The con of the change is that the piece cost of the ignition switch went up around $0.90 and would require $400K in tooling to add the almost 500K in volume.

> At the X Vapir my team was challenged to offset the piece cost with warranty savings and/or reduced PC/Inv. I worked through Purchasing with Stoneridge Poliak to gain the reductions. Stoneridge Poliak was unwilling to budge on their PC/Inv. The warranty offset for the new switch is in the $0.10-0.15 range.

> It was felt by the Delta team that the revision of the slot in the ignition key to a hole would significantly reduce the inadvertent offs and make any additional changes.

1

2

3

> Consequently, the ignition switch for the Deltas and Kappas
> will remain the carryover single detent switch until the piece
> cost hit can be eliminated or significantly reduced. My plan is
> to resource this switch design for MY 09 and make it available
> for the Deltas, Kappas, and the 19X families."

4   184.   Ray DeGiorgio, the lead design engineer for the Cobalt and Ion ignition

5   switch, was among the GM employees copied on this email.

6   185.   Mr. Hendler's email shows that, as of September 28, 2005, GM engineers

7   continued to recognize that the "inadvertent ignition offs" were due to both the low

8   mounted ignition switch in the steering column and the low effort required to rotate the

9   ignition. It also shows that, even as GM was implementing an improved ignition switch

10  on another vehicle line, it rejected implementing this ignition switch in the Defective

11  Vehicles on Ions and Cobalts solely for cost reasons even though the piece cost of the

12  ignition switch was less than a dollar.

13  186.   On July 29, 2005, Amber Marie Rose, a 16 year old Clinton, Maryland

14  resident, was driving a 2005 Cobalt when she drove off the road and struck a tree head-

15  on. Amber's driver's side frontal airbag did not deploy and she died as a result of the

16  injuries she sustained in the crash.

17  187.   GM received notice of Amber's incident in September 2005 and opened an

18  internal investigation file pertaining to this incident shortly thereafter.

19  188.   During its investigation of the incident, GM learned that the key in Amber's

20  Cobalt was in the "accessory/off" position at the time of the crash.

21  189.   During its investigation of the incident in which Amber was killed in her

22  Cobalt vehicle, GM also knew that the driver's side frontal airbag should have deployed

23  given the circumstances of the crash. Upon information and belief, GM subsequently

24  entered into a confidential settlement agreement with Amber's mother.

25  190.   In December 2005, shortly after it commenced its internal investigation into

26  the incident leading to Amber's death, GM issued a Technical Service Bulletin (05-02-

27  35-007) (the "TSB").

28

1    191.   The TSB, which GM affirmatively represented applied to 2005–2006

2  Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005–2006 Pontiac Pursuit, 2006 Pontiac

3  Solstices, and 2003–2006 Saturn Ions, provided, "Information on Inadvertent Turning of

4  Key Cylinder, Loss of Electrical System and no DTCs," provided the following service

5  information:

6           There is potential for the driver to inadvertently turn off
         the ignition due to low ignition key cylinder torque/effort.

7
            The concern is more likely to occur if the driver is short
8         and has a large and/or heavy key chain.  In these cases, this
         condition was documents and the driver's knee would contact
9         the key chain while the vehicle was turning and the steering
         column was adjusted all the way down.  This is more likely to
10        happen to a person who is short, as they have the seat
         positioned closer to the steering column.
11
            In cases that fit this profile, question the customer
12        thoroughly to determine if this may the cause.  The customer
         should be advised of this potential and should take steps to
13        prevent it - such as removing unessential items from their key
         chain.
14
            Engineering has come up with an insert for the key ring
15        so that it goes from a "slot" design to a hole design.  As a
         result, the key ring cannot move up and down in the slot any
16        longer - it can only rotate on the hole.  In addition, the previous
         key ring has been replaced with a smaller, 13 mm (0.5 in)
17        design. This will result in the keys not hanging as low as in the
         past.
18

19

20

21

22

23

24

25

26

27

28
                               31
                           COMPLAINT

192.   An image of the insert changing the "slot" design to a "hole" design appears as follows:



193.   As with its prior statement regarding the Defective Vehicles (see above), the information GM provided in this TSB was also false and misleading.

194.   In the two PRTSs GM issued before it issued the TSB, GM engineers never represented that short drivers or heavy key chains were the reasons why these incidents were happening.

195.   Indeed, at the time it issued the TSB, GM knew that these incidents were happening to drivers of all sizes using keys with the standard key fobs.

196.   In other words, GM knew these incidents were not caused by short drivers with heavy key chains, but because of the safety-related defects in the Key System of its Defective Vehicles.

197.   In 2005, GM began buying back Cobalts from certain customers who were experiencing engine stalling incidents. GM never told the public that it was buying back Cobalts under these circumstances. GM refused to buy back Cobalts from other customers who had also experienced engine stalling incidents. In fact, for many of the customers who complained about experiencing engine-stalling incidents, GM never informed these customers of the TSB and/or the availability of the key insert.

32

COMPLAINT

198. On November 17, 2005 – shortly after Amber's death and immediately before GM's issuance of the TSB – there was *another* incident involving a 2005 Cobalt in Baldwin, Louisiana. In that incident, the Cobalt went off the road and hit a tree. The frontal airbags did not deploy in this accident. GM received notice of this accident, opened a file, and referred to it as the "Colbert" incident.

199. On February 10, 2006, in Lanexa, Virginia – shortly after GM issued the TSB – a 2005 Cobalt flew off of the road and hit a light pole. As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.

200. On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident.

201. On August 1, 2006, following its receipt of a customer complaint about a Cobalt stalling while driving, GM opened yet another PRTS relating to this issue. GM closed this PRTS on October 2, 2006 however, without taking any action.

202. In October 2006, GM updated the TSB (05-02-35-007) to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt and 2007 Pontiac Solstice and G5. These vehicles had the same safety-related defects in the Key System as the vehicles in the original TSB.

203. On December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree. The frontal airbags failed to deploy in this incident. GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.

33

COMPLAINT

204. On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "White" incident.

205. In August 2007, GM met with Continental to review the Sensing and Diagnostic Module ("SDM") data from a crash of a 2005 Chevrolet Cobalt where the airbags failed to deploy resulting in a fatal injury. By this time, Continental had knowledge of the safety-related defects discussed in this Complaint. Continental had a duty to disclose the safety-related defects in the Defective Vehicles which had been manufactured and sold up until that time. Continental, however, fraudulently concealed the safety-related defects from NHTSA and the public.

206. On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck. The frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident.

207. In September 2007, the Chief of the Defect Assessment Division within the Office of Defects Investigation ("ODI") of the National Highway Traffic Safety Administration ("NHTSA") emailed other ODI officials and proposed an investigation of "frontal airbag non-deployment [sic] in the 2003-2006 Chevrolet Cobalt/Saturn Ion." This email went on to state that the:

> . . . issue was promoted by a pattern of reported non-deployments in VOQ [Vehicle Owners' Questionnaire] complaints that was first observed in early 2005. Since that time, [the Defects Assessment Division] has followed up on the complaints, enlisted the support of NCSA's Special Crash Investigations (SCI) team, discussed the matter with GM, and received a related EWD Referral. Notwithstanding GM's indications that they see no specific problem pattern, DAD perceives a pattern of non-deployments in these vehicles that does not exist in their peers . .

1       208.   This email from the Chief of the Defect Assessment Division at NHTSA

2   shows that, as of September 2007, GM was deliberately misleading NHTSA and

3   concealing the defects in the Key Systems in the Defective Vehicles from NHTSA in

4   violation of federal law.

5       209.   On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost

6   control and struck a guardrail. Despite there being a frontal impact in this incident, the

7   frontal airbags failed to deploy. GM received notice of this incident, opened a file, and

8   referred to it as the "Gathe" incident.

9       210.   On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road

10  and hit a tree. The frontal airbags failed to deploy. GM received notice of this incident,

11  opened a file, and referred to it as the "Breen" incident.

12      211.   On April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off

13  the road and struck a tree. Despite there being a frontal impact in this incident, the

14  frontal airbags failed to deploy. The download of the SDM showed the key was in the

15  "accessory/off" position. GM received notice of this incident, opened a file, and referred

16  to it as the "Freeman" incident.

17      212.   On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road

18  and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags

19  failed to deploy. The download of the SDM showed the key was in the "accessory/off"

20  position. GM received notice of this incident, opened a file, and referred to it as the

21  "Wild" incident.

22      213.   On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and

23  struck a tree. Despite there being a frontal impact in this incident, the frontal airbags

24  failed to deploy. GM received notice of this incident, opened a file, and referred to it as

25  the "McDonald" incident.

26      214.   On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt

27  traveled off the road and struck a tree. Despite there being a frontal impact in this

28
                                        35
                                    COMPLAINT

1    incident, the frontal airbags failed to deploy. GM received notice of this incident,

2    opened a file, and referred to it as the "Harding" incident.

3         215.   On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt

4    traveled off the road and hit a tree. Despite there being a frontal impact in this incident,

5    the frontal airbags failed to deploy. GM received notice of this incident, opened a file,

6    and referred to it as the "Dunn" incident.

7         216.   On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off

8    the road and hit a utility pole. Despite there being a frontal impact in this incident, the

9    frontal airbags failed to deploy. The download of the SDM showed the key was in the

10   "accessory/off" position. GM received notice of this incident, opened a file, and referred

11   to it as the "Grondona" incident.

12        217.   In February 2009, GM opened yet another PRTS with respect to the

13   Defective Vehicles – this time to investigate why the slot in the key in Cobalts allowed

14   the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of

15   the vehicles.

16        218.   Through this PRTS, GM determined that changing the key from a slot to a

17   hole would significantly reduce the likelihood of inadvertent turning off the ignition

18   switch.

19        219.   In March 2009, GM approved of the design change in the key from the slot

20   to a hole. According to GM, this redesigned change was implemented in model year

21   2010 Cobalts. GM, however, chose not to provide these redesigned keys the owners or

22   lessees of any of the vehicles implicated in the TSB (see Paragraph 190, above),

23   including the 2005–2007 Cobalts.

24

25

26

27

28

                                              36

220.   This timeline gives a short overview of some key points between 2004 and the present, as discussed above:

**2001-2004**
GM learns
Key Systems
are defective.

**2005-2009**
GM learns of
hundreds of field
reports of Key
System failures
and multiple
fatalities.

**2010-2014**
GM learns of more
field reports of
Key System
failures and
additional fatalities.

**2005**
GM engineers'
proposed fix
rejected; Amber
Rose dies after
airbag in Cobalt
fails to deploy.

**2009**
GM declares and
emerges from
bankruptcy.

**2014**
GM     issues
inadequate     recall
over 10 years
after learning its
Key Systems are
defective.

221.   Throughout this entire time period, GM was selling the Defective Vehicles to consumers for full price, and consumers were purchasing them believing that the vehicles were non-defective, but all the while GM concealing the extent and nature of the defects in the Defective Vehicles.

### Old GM's Marketing Represented to the Public that the Defective Vehicles Were Safe

222.   In a section called "safety," Old GM's Chevrolet website stated:[9]

**OUR COMMITMENT**

Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe — from the start of your journey to your destination.

That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

223.   Similarly, old GM promoted its Saturn vehicle line on television with statements like "Putting people first," and "Saturn. People First."[10]

---

[9] *See* http://web.archive.org/web/20050507180553/http://www.chevrolet.com/safety (last visited March 21, 2014).

37
COMPLAINT

1    224.    Saturn's print ad campaign featured advertisements like the following,

2    which stated, among other things, "Need is where you begin. In cars, it's about things

3    like reliability, durability and, of course, safety. That's where we started when

4    developing our new line of cars":



13    225.    In sum, in order to increase sales, old GM touted the safety of its vehicles.

14    226.    But, when the time came for the company to stay true to its words, neither

15    old GM, nor GM disclosed its knowledge about the dangerous Key System defects to its

16    customers.

### Meet the New GM, Same as the Old GM

17    227.    In 2009, GM declared bankruptcy, and, weeks later, it emerged from

18    bankruptcy. Both before and after GM's bankruptcy, the ignition switches in the

19    Defective Vehicles continued to fail and GM, in all iterations, continued to conceal the

20    truth.

21    228.    On May 15, 2009, GM again met with Continental and requested that

22    Continental download SDM data from a 2006 Chevrolet Cobalt accident where the

23    airbags failed to deploy. In a report dated May 11, 2009, Continental analyzed the SDM

24    data, and concluded that the SDM ignition state changed from "Run" to "Off" during the

---

[10] *See* http://www.youtube.com/watch?v=PcddX1UkLhE (last visited March 21, 2014).

1    accident, which, in turn, caused the front and side airbags not to deploy. Continental had

2    a duty to disclose the safety-related defects in the Defective Vehicles which had been

3    manufactured and sold up until that time. Continental, however, fraudulently concealed

4    the safety-related defects from NHTSA and the public.

5        229. On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-

6    lane highway in Paulding County, Georgia. While she was driving, her key turned from

7    the "run" to the "accessory/off" position causing her engine to shut off. After her engine

8    shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane,

9    where it collided with an oncoming car. Brooke was killed in the crash.

10       230. On March 22, 2011, Ryan Jahr, a GM engineer, downloaded the SDM from

11    Brooke's Cobalt. The information from the SDM download showed that the key in

12    Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds

13    before the crash. On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton,

14    filed a lawsuit against GM.

15       231. On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt

16    traveled off the road and struck a tree. Despite there being a frontal impact in this

17    incident, the frontal airbags failed to deploy. The download of the SDM showed the key

18    was in the "accessory/off" position. GM received notice of this incident, opened a file,

19    and referred to it as the "Chansuthus" incident.

20       232. On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the

21    road and struck a curb. Despite there being a frontal impact in this incident, the frontal

22    airbags failed to deploy. GM received notice of this incident, opened a file, and referred

23    to it as the "Najera" incident.

24       233. On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt

25    traveled off the road and struck a tree. Despite there being a frontal impact in this

26    incident, the frontal airbags failed to deploy. The download of the SDM showed the key

27    was in the "accessory/off" position. GM received notice of this incident, opened a file,

28

1    and referred to it as the "Sullivan" incident.

2       234.   These incidents are not limited to vehicles of model year 2007 and before.
3    According to GM's own investigation, there have been over 250 crashes involving 2008-
4    2010 Chevrolet Cobalts in which the airbags failed to deploy.

5       **GM Investigates Further, but Continues to Conceal the Defect**

6       235.   In 2010, GM began a formal investigation of the frontal airbag non-
7    deployment incidents in Chevrolet Cobalts and Pontiac G5s. GM subsequently elevated
8    the investigation to a Field Performance Evaluation ("FPE").

9       236.   In August 2011, GM assigned Engineering Group Manager, Brian Stouffer
10   as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE
11   investigation.

12      237.   In Spring 2012, Stouffer asked Jim Federico, a high level executive and
13   chief engineer at GM, to oversee the FPE investigation. Federico was the "executive
14   champion" for the investigation to help coordinate resources for the FPE investigation.

15      238.   In May 2012, GM engineers tested the torque on the ignition switches for
16   2005-2009 Cobalt, 2007, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion
17   vehicles in a junkyard. The results of these tests showed that the torque required to turn
18   the ignition switches in most of these vehicles from the "run" to the "accessory/off"
19   position did not meet GM's minimum torque specification requirements, including the
20   2008-2009 vehicles. These results were reported to Stouffer and other members of the
21   FPE.

22      239.   In September 2012, Stouffer requested assistance from a "Red X Team" as
23   part of the FPE investigation. The Red X Team was a group of engineers within GM
24   assigned to find the root cause of the airbag non-deployments in frontal accidents
25   involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that
26   the root cause of the airbag non-deployments in a majority of the frontal accidents was
27   the defective Key System. The Red X Team became involved in the investigation

28

1 | shortly after Mr. Stouffer's request.

2 | 240. During the field-performance-evaluation process, GM determined that,
3 | although increasing the detent in the ignition switch would reduce the chance that the
4 | key would inadvertently move from the "run" to the "accessory/off" position, it would
5 | not be a total solution to the problem.

6 | 241. Indeed, the GM engineers identified several additional ways to actually fix
7 | the problem. These ideas included adding a shroud to prevent a driver's knee from
8 | contacting the key, modifying the key and lock cylinder to orient the key in an upward
9 | facing orientation when in the run position, and adding a push button to the lock cylinder
10 | to prevent it from slipping out of run. GM rejected each of these ideas.

11 | 242. The photographs below are of a GM engineer in the driver's seat of a
12 | Cobalt during the investigation of Cobalt engine stalling incidents:



21 | 243. These photographs show the dangerous condition of the position of the key
22 | in the lock module on the steering column, as well as the key with the slot, which allow
23 | the key fob to hang too low off of the steering column. GM engineers understood that
24 | the key fob may be impacted and pinched between the driver's knee and the steering
25 | column which causes the key to be inadvertently turned from the run to accessory/off
26 | position. The photographs show why the GM engineers understood that increasing the
27 | detent in the ignition switch would not be a total solution to the problem. It also shows

28 |

41
COMPLAINT

1   why GM engineers believe that the additional changes to the Key System (such as the

2   shroud) were necessary to fix the defects with the Key System.

3      244. The GM engineers clearly understood that increasing the detent in the

4   ignition switch alone was not a solution to the problem but GM concealed · and

5   continued to conceal – from the public, the nature and extent of the defects.

6      245. By 2012, Federico, Stouffer, and the remaining members of the Red X

7   Team knew that the Key System in the Ion, the Cobalt, and the G5 vehicles had safety-

8   related defects that would cause the key to move from the "run" to the "accessory/off"

9   position while driving these vehicles. They also knew that when this happened the

10   airbags would no longer work in frontal crashes.

11      246. On October 4, 2012, there was a meeting of the Red X Team during which

12   Federico gave an update of the Cobalt airbag non-deploy investigation. According to an

13   email from Stouffer on the same date, the "primary discussion was on what it would take

14   to keep the SDM active if the ignition key was turned to the accessory mode." Despite

15   this recognition by GM engineers that the SDM should remain active if the key is turned

16   to the accessory/off mode, GM and Continental have done nothing to remedy this safety-

17   related defect and have fraudulently concealed, and continue to fraudulently conceal it,

18   from the public.

19      247. During the October 4, 2012 meeting, Stouffer, and the other members of the

20   Red X Team also discussed "revising the ignition switch to increase the effort to turn the

21   key from Run to Accessory."

22      248. On October 4, 2012, at 9:07 p.m., Stouffer emailed DiGeorgio and asked

23   him to "develop a high level proposal on what it would take to create a new switch for

24   service with higher efforts."

25    On October 5, 2012, at 7:39 a.m., DeGiorgio responded:

26   Brian,

27      In order to provide you with a HIGH level proposal, I need to
     understand what my requirements are. what is the TORQUE value

28

1    that you desire?
     Without this information I cannot develop a proposal.

2    249.    At 9:05 a.m. on that same day, Stouffer in responding to DeGiorgio's email,

3    stated:

4    Ray,

5        As I said in my original statement, I currently don't know what the
         torque value needs to be. Significant work is required to determine the
6        torque. What is requested is a high level understanding of what it
         would take to create a new switch.
7

8    250.    DiGiorgio responded back to Stouffer at 9:33 a.m. that same morning:

9    Brian,

10       Not knowing what my requirements are I will take a SWAG at the
         Torque required for a new switch. Here is my high level proposal:
11   **Assumption is 100 N cm Torque.**

12           •    New switch design = Engineering Cost Estimate
                  approx.. $300,000
13           •    Lead Time = 18 – 24 months from issuance of GM
                  Purchase Order and supplier selection.
14

15   Let me know if you have any additional questions.

16   251.    Stouffer admitted during his deposition that DeGiorgio's reference to

17   SWAG was an acronym for Silly Wild-Ass Guess.

18   252.    DeGiorgio's cavalier attitude exemplifies GM's decade-long approach to

19   the safety-related defects that existed in the Key System and Airbag System in the

20   Defective Vehicles. Rather than seriously addressing the safety-related defects in the

21   Key System, DeGiorgio's emails show he understood the ignition switches were

22   contributing to the crashes and fatalities and he could not care less.

23   253.    It is also obvious from this email exchange that Stouffer, who was a leader

24   of the Red X Team, had no problem with DeGiorgio's cavalier and condescending

25   response to the request that he evaluate the redesign of the ignition switches.

26   254.    Federico, Stouffer, and the other members of the Red X Team also

27   understood that these safety-related defects had caused or contributed to numerous

28
                                          43

accidents and multiple fatalities. Despite this knowledge, GM chose to conceal this information from the public, including the People of the State of California.

255. Under 49 C.F.R. ¶ 573.6, GM had a duty in 2012 to disclose the safety-related defects in the Ion, Cobalt, and G5. Rather than comply with their legal obligations, GM continued to fraudulently conceal these defects from the public and the U.S. government.

256. In December 2012, in Pensacola, Florida, Ebram Handy, a GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch. At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt.

257. At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below GM's minimum torque performance specifications. Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

258. In January 2013, Handy, in preparation for his Rule 30(b)(6) deposition in the *Melton* case, spoke with several GM engineers, including DeGiorgio and Stouffer. At that time, Handy knew that, based on the testing he had observed, the original ignition switch in the 2005 Cobalt failed to meet GM's minimum torque performance specifications and that GM had redesigned the ignition switches that were being sold as replacement switches. GM knew that an ignition switch that did not meet its minimum torque performance requirements was a safety-related defect.

259. GM engineers integrally involved with this situation have admitted that GM never should have sold the Defective Vehicles with ignition switches that did not meet its minimum torque performance requirements.

260. On April 29, 2013, Ray DeGiorgio, the chief design engineer for the

44
COMPLAINT

1    ignition switches in the Defective Vehicles was deposed in Detroit, Michigan. At his

2    deposition, Mr. DeGiorgio was shown photographs of the differences between the

3    ignition switch in Brooke's Cobalt and the ignition switch in the 2008 Cobalt or

4    replacement ignition switch. After looking at the photographs of the different ignition

5    switches, Mr. DeGiorgio testified as follows:

6        Q. The one on the right, Exhibit 13 is an '05 or an '06, and the one on the left,

7        Exhibit 14, is either an '08 or replacement. Do you see the difference?

8        A. Yes.

9        Q. Have you noticed that before today, Mr. DeGiorgio?

10       A. No sir.

11       Q. Were you aware of this before today, Mr. DeGiorgio?

12           MR. HOLLADAY: Object to the form. You can answer.

13       THE WITNESS: No sir.

14       Q. It appears to be pretty clear that the plunger and the cap is taller on Exhibit 14

15       compared to Exhibit 13, isn't it?

16       A. That's correct.

17       Q. How is a taller cap going to affect the rotational resistance?

18       A. It's hard to determine from these pictures exactly if it is a taller cap or is it

19       recessed inside the housing or not. It's hard for me to assess, really, what I'm

20       looking at.

21       Q. You've taken apart a number of switches and you're telling the jury you've

22       never noticed the difference in the plunger between the '05 and '06 versus the new

23       resistor or switch?

24           MR. HOLLADAY: Object to the form.

25       THE WITNESS: I did not notice, no.

26   (DeGiorgio Deposition, pp. 149-150)

27       261.   Mr. DeGiorgio was then further questioned about his knowledge of any

28

45

COMPLAINT

1 | differences in the ignition switches:

2
3   Q. And I'll ask the same question. You were not aware before today
    that GM had changed the spring – the spring on the ignition switch
4   had been changed from '05 to the replacement switch?

5       MR. HOLLADAY: Object to the form. Lack of predicate and
    foundation. You can answer.
6

7   THE WITNESS: I was not aware of a detent plunger switch change.
    We certainly did not approve a detent plunger design change.
8

9   Q. Well, suppliers aren't supposed to make changes such as this
    without GM's approval, correct?
10

11      A. That is correct.

12
    Q. And you are saying that no one at GM, as far as you know, was
13  aware of this before today?

14      MR. HOLLADAY: Object. Lack of predicate and foundation.
15  You can answer.

16      THE WITNESS: I am not aware about this change.
17

18 | (DeGiorgio Deposition, pp. 151-152)

19      262. Mr. DeGiorgio's testimony left no doubt that he had absolutely no

20 | knowledge of any change in the ignition switch in 2005-2010 Cobalts.

21      263. Mr. DeGiorgio also provided the following testimony about the ignition

22 | switch supplier, Delphi:

23      Q. And there weren't any changes made – or were there changes made to the

24  switch between '05 and 2010 that would have affected the torque values to move

25  the key from the various positions in the cylinder?

26      A. There was one change made to the resistor in '08, but that should not have

27  affected the torque or the displacement of the switch.

28
                        46

1    I can restate this way: There was an electrical change made in '08, but not a

2    mechanical change – at least there were no official changes, mechanical changes,

3    made to the switch that I know of.

4    Q. When you say no official, could there be unofficial changes made?

5    A. I'm not saying that there was, I'm just saying if there was something changed

6    at the supplier side, we were not aware of it and we did not approve it, okay?

7    (DeGiorgio Deposition, pp. 57-58)

8    Q. Did you ask Mary Fitz or anyone from Delphi whether there, in fact, had been

9    any changes made to the ignition switch?

10   A. Yes, yes I did. And they came back, said there's been no changes made to the

11   switch since the introduction to production.

12   Q. Who told you that?

13   A. Mary Fitz.

14   Q. Where is she located?

15   A. She's located in, I want to say, Delphi headquarters here in Michigan.

16   (DeGiorgio Deposition, pp. 117-118)

17       264.   Mr. DeGiorgio's testimony left no doubt that he had spoken with Delphi

18   employees and that they confirmed there were no changes made to the ignition switch in

19   2005-2010 Cobalts.

20       265.   Mr. DeGiorgio signed his errata sheet on May 23, 2013. In the signed

21   errata sheet, Mr. DeGiorgio did not change any testimony referenced in this Complaint.

22       266.   On June 12, 2013, Mr. Altman, the Cobalt program engineering manager,

23   testified as follows during his deposition in *Melton v. GM*:

24       Q.   And the vehicle never should have been sold if it didn't
         meet GM's minimum torque specifi – performance
25       requirements, should it?

26       MR. FRANKLIN: Object to form.

27       THE WITNESS: That's correct.

28
                              47
                          COMPLAINT

Q. And the reason is is because that could be dangerous under certain situations, because the key can move from run to accessory?

MR. FRANKLIN: Object to form.

THE WITNESS: Yes.

(Gary Altman Depo., pp. 23-24)

267. All of these incidents – as well as all of the GM documents that were included as the "Purchased Assets" for new GM – gave Defendant GM actual knowledge of the defects in the Key System in the Defective Vehicles. Notwithstanding those facts, coupled with its successor liability based on the above-described fraudulent concealment of the problems with the Defective Vehicles, Defendant GM continued to fraudulently conceal the nature and extent of the defects from the public, inducing customers to reasonably continue to own or purchase Defective Vehicles with no knowledge of the existence of these serious and uniform defects.

### GM Issues a Recall – Ten Years Too Late

268. On February 7, 2014, GM, in a letter from Carmen Benavides, Director – Product Investigations and Safety Regulations for GM, informed NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.

269. In its February 7, 2014 letter to NHTSA, GM represented that as replacement ignition switches became available, GM would replace the ignition switches on the Defective Vehicles.

270. On February 19, 2014, a request for timeliness query of General Motors' Safety Recall 13454 was sent to NHTSA ("timeliness query"). The timeliness query pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.

271. The February 19, 2014 timeliness query also asked NHTSA to investigate GM's failure to fulfill its legal obligation to report the safety defects in the Defective Vehicles to NHTSA within five days of discovering the defect.

1    272.   On February 24, 2014, GM sent a letter to Ms. Benavides and informed

2    NHTSA it was expanding the recall to include 2006-2007 model year (MY) Chevrolet

3    HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky

4    vehicles.

5    273.   GM included an Attachment to the February 24, 2014 letter.   In the

6    Attachment GM, **for the first time**, admitted that GM authorized a change in the

7    ignition switch in 2006.  Specifically, GM stated:

8    On April 26, 2006, the GM design engineer responsible for the
     Cobalt's ignition switch signed a document approving changes
9    to the ignition switch proposed   by the supplier, Delphi
     Mechatronics.  The approved changes included, among other
10   things, the use of a new detent plunger and spring that
     increased torque force in the ignition switch.  This change to
11   the ignition switch was not reflected in a corresponding change
     in the part number for the ignition switch.  GM believes that
12   the supplier began providing the re-designed ignition switch to
13   GM at some point during the 2007 model year.

14   274.   GM then produced more than 200,000 pages of documents in response to

15   Congressional requests leading up to the hearings April 1 and 2, 2014.

16   275.   Among these internal GM documents, there is a 2011 email correspondence

17   from Terry Woychowski, a senior GM engineer, to Mary T. Barra, General Motors'

18   current chief executive (who, at the time, served as the vice president for global product

19   development), and cc'ing William Kemp, a top GM safety attorney.  The email alerted

20   Ms. Barra to widening problems with power steering in the Cobalt, Pontiac G5, and

21   Saturn Ion.  While the email did not focus on the defects in the Key System and Airbag

22   System at issue in this case, it does suggest that Ms. Barra was made aware of safety

23   problems in the Defective Vehicles earlier than she has stated in testimony before

24   Congress.

25   276.   In another email correspondence from Frank S. Boris II, director of the

26   NHTSA's Office of Defects Investigation ("ODI"), to a GM employee in charge of

27   product investigations, Mr. Boris complained about the difficulties of working with GM,

28

1    stating that "[t]he general perception is that G.M. is slow to communicate, slow to act

2    and, at times, requires additional effort of [ODI] that we do not feel is necessary with

3    some of your peers."

4        277.    The documents produced by GM also included a document titled,

5    "GENERAL MOTORS COMMODITY VALIDATION SIGN-OFF," dated April 26,

6    2006. According to this document, Delphi had met all of the sign-off requirements in

7    order to provide a new ignition switch for certain GM vehicles. GM has acknowledged

8    that the ignition switch in the Cobalt was included in this design change.

9        278.    The design change included a new detent plunger "to increase torque force

10   in the switch." Mr. DeGiorgio's signature is on this page as the GM authorized engineer

11   who signed off on this change to the ignition switch.

12       279.    This GM Commodity Validation Sign-Off shows that Mr. DeGiorgio

13   repeatedly perjured himself during his deposition on April 29, 2013. Mr. DeGiorgio

14   perjured himself in order to fraudulently conceal evidence from the Meltons that GM

15   had signed off on the change in the ignition switch so that the Meltons, and ultimately a

16   jury, would never know that GM was changing the switches in 2007 and later model

17   year Cobalts and concealing these changes from Brooke.

18       280.    Mr. DeGiorgio perjured himself when he signed the errata sheet confirming

19   that all the testimony was true and accurate.

20       281.    On March 17, 2014, Mary T. Barra, General Motors' chief executive issued

21   an internal video, which was broadcast to employees.[11]  In the video, Ms. Barra admits:

22           . . . Scrutiny of the recall has expanded beyond the review by
             the federal regulators at NHTSA, the National Highway
23           Traffic Safety Administration. As of now, two congressional
             committees have announced that they will examine the issue.
24           And it's been reported that the Department of Justice is
             looking into this matter. . . . *These are serious developments*
25

26   _____
     [11] *See*
27   http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/
28   mar/0317-video.html (last visited March 21, 2014) (emphasis added).

COMPLAINT

*that shouldn't surprise anyone.* After all, *something went wrong with our process in this instance and terrible things happened.* . . . The bottom line is, *we will be better because of this tragic situation,* if we seize the opportunity. . . . I ask everyone to stay focused on making today's GM the best it can be.

282. On March 28, 2014, GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice and the Saturn Ion and Sky in the United States. According to reports, this second expansion of the ignition switch recall covers an additional 824,000 vehicles in the U.S., bringing the number of recalled vehicles to 2,191,146.

283. Not only is GM's recall ten years too late, it is completely insufficient to correct the safety-related defects in the Defective Vehicles.

284. Since at least 2005, GM has known that simply replacing the ignition switches on the Defective Vehicles is not a solution to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in these vehicles.

285. Additionally, GM's recall fails to address the design defect that causes the key fob/chain to hang too low on the steering column.

286. Thus, even when the ignition switches are replaced, this defective condition would still exist in the Defective Vehicles and there continues to be the potential for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

287. The recall is further insufficient because, through this recall, GM is not replacing all of the keys in the Defective Vehicles with the redesigned key with a hole instead of a slot. GM provided these keys to owners/lessees of the 2010 Cobalt with the understanding that the redesigned key would reduce the chance that the key could be inadvertently turned from the "run" to the "accessory/off" position.

288. The recall also fails to address the design defects in the Defective Vehicles which disables the airbag immediately upon the engine shutting off.

51
COMPLAINT

289. Although GM contends that it changed the ignition switch in some 2007 Cobalts and most of the 2008-2010 Cobalts, there continue to be non-deployment events in the later model Cobalts. Undermining GM's position is GM's own investigation into the non-deployment events in Cobalts identifies over 250 non-deploy crashes involving 2008-2010 Cobalts.

290. GM's engineers understood that increasing the detent in the ignition switch alone was not a solution to the problem, but GM concealed – and continues to conceal from the public, including the People of the State of California, the nature and extent of the defects, which the current recall will not cure.

### GM Expands Recall – Suspends Two Engineers

291. On Wednesday, April 9, 2014, GM issued an expanded recall of all 2003-2007 Saturn Ion, 2005 - 2010 Chevrolet Cobalt, 2006 - 2010 Pontiac Solstice, 2007 - 2010 Pontiac G5, 2007 - 2010 Saturn Sky, and 2006 - 2011 Chevrolet HHR vehicles.

292. GM's stated purpose for the expanded recall is to replace "lock cylinder" into which the key is inserted, because the current lock cylinders allow the key to be pulled out while the car is still running.

293. According to GM, the defective lock cylinder could lead to "a possible roll-away, crash and occupant or pedestrian injuries."

294. The next day, April 10, 2014 GM announced that it was suspending Ray DeGiorgio, the lead design engineer for the Cobalt and Ion ignition switch, and Gary Altman, GM's program-engineering manager for the Cobalt, for their respective roles in GM's safety failure.

295. This announcement came after Ms. Barra, GM's chief executive, was briefed on the results of former United States Attorney Anton R. Valukas internal investigation of the company, which was conducted in response to growing concerns regarding the safety of the Defective Vehicles.

296.  Additionally, GM also announced a new program entitled "Speak Up for Safety," which is intended to encourage GM employees to report potential customer safety issues. According to Ms. Barra, this program is being adopted because "GM must embrace a culture where safety and quality come first." Unfortunately, these actions are too little, too late.

## CLASS ACTION ALLEGATIONS

297.  Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and all others similarly situated. Plaintiffs seek to represent a class (the "Nationwide Class") initially defined as:

> All current and former owners and lessees of a Defective Vehicle (as defined herein) in the United States.

298.  Additionally, Plaintiffs seek to represent the following statewide classes (the "Statewide Classes") defined as follows:

a.  All current and former owners and lessees of a Defective Vehicle (as defined herein) in California (the "California State Class");

b.  All current and former owners and lessees of a Defective Vehicle (as defined herein) in Alabama (the "Alabama State Class");

c.  All current and former owners and lessees of a Defective Vehicle (as defined herein) in Colorado (the "Colorado State Class");

d.  All current and former owners and lessees of a Defective Vehicle (as defined herein) in Connecticut (the "Connecticut State Class");

e.  All current and former owners and lessees of a Defective Vehicle (as defined herein) in Delaware (the "Delaware State

53

COMPLAINT

Class");

f.    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Florida (the "Florida State Class");

g.    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Hawaii (the "Hawaii State Class")

h.    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Indiana (the "Indiana State Class");

i.    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Kansas (the "Kansas State Class");

j.    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Kentucky (the "Kentucky State Class");

k.    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Michigan (the "Michigan State Class");

l.    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Minnesota (the "Minnesota State Class");

m.    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Mississippi (the "Mississippi State Class");

n.    All current and former owners and lessees of a Defective Vehicle (as defined herein) in Missouri (the "Missouri State

54

1       Class");

2       o.      All current and former owners and lessees of a Defective

3               Vehicle (as defined herein) in Nevada (the "Nevada State

4               Class")

5       p.      All current and former owners and lessees of a Defective

6               Vehicle (as defined herein) in New York (the "New York State

7               Class");

8       q.      All current and former owners and lessees of a Defective

9               Vehicle (as defined herein) in Ohio (the "Ohio State Class");

10      r.      All current and former owners and lessees of a Defective

11              Vehicle (as defined herein) in Pennsylvania (the "Pennsylvania

12              State Class");

13      s.      All current and former owners and lessees of a Defective

14              Vehicle (as defined herein) in South Dakota (the "South Dakota

15              State Class");

16      t.      All current and former owners and lessees of a Defective

17              Vehicle (as defined herein) in West Virginia (the "West

18              Virginia State Class"); and

19      u.      All current and former owners and lessees of a Defective

20              Vehicle (as defined herein) in Wisconsin (the "Wisconsin State

21              Class").

22      299.    Excluded from each of the Nationwide and Statewide Classes are GM, as

23 well as GM's employees, affiliates, officers, and directors, including franchised dealers,

24 any individuals who experienced physical injuries as a result of the defects at issue in

25 this litigation, and the judge and court staff to whom this case is assigned. Plaintiff

26 reserves the right to amend the definition of the class if discovery or further investigation

27 reveals that the class should be expanded or otherwise modified.

28

300. **Numerosity and impracticality of joinder.** The members of the Nationwide and Statewide Classes are so numerous that joinder of all members is impractical. Millions of Nationwide and Statewide Class members purchased or leased class vehicles. The members of the Nationwide and Statewide Classes are easily and readily identifiable from information and records in GM's possession, custody, or control.

301. **Commonality and predominance.** There are common questions of law and fact that predominate over any questions affecting the individual members of the Nationwide and Statewide Classes. Common legal and factual questions include, but are not limited to:

    a.    whether GM breached the duty of reasonable care it owed to the Nationwide and Statewide Classes;

    b.    whether GM's breach of its duties directly and proximately caused the Nationwide and Statewide Classes' damages;

    c.    whether GM omitted, misrepresented, concealed, or manipulated material facts from Plaintiffs and the Nationwide and Statewide Classes regarding the defects, the actions taken to address the defects, and the result of those actions;

    d.    whether GM had a duty to disclose the defects to Plaintiffs and the other Nationwide and Statewide Class members;

    e.    whether GM engaged in fraud, fraudulent concealment, and made fraudulent representations to the public;

    f.    whether Plaintiffs and the other Nationwide and Statewide Class members are entitled to damages; and

    g.    whether Plaintiffs and the other Nationwide and Statewide Class members are entitled to equitable relief or other relief, and the nature of such relief.

COMPLAINT

302. **Typicality.** Plaintiffs' claims are typical of the claims of the other Nationwide and Statewide Class members because Plaintiffs and the other Nationwide and Statewide Class members purchased vehicles that contain defective parts. Neither Plaintiffs nor the other Nationwide and Statewide Class members would have purchased the Defective Vehicles had they known of the defects in the vehicles. Those defects also pose an unreasonable risk of harm to Plaintiffs and the other Nationwide and Statewide Class members. Plaintiffs and the other Nationwide and Statewide Class members suffered damages as a direct proximate result of the same wrongful practices that GM engaged in. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Nationwide and Statewide Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Nationwide and Statewide Class members.

303. **Adequacy.** Plaintiffs will fully and adequately protect the interests of the other members of the Nationwide and Statewide Classes and have retained class counsel who are experienced and qualified in prosecuting class actions, including consumer class actions and other forms of complex litigation. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Nationwide and Statewide Class members.

304. **Declaratory and Injunctive Relief.** GM has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Nationwide and Statewide Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and Statewide Class members as a whole.

305. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things: it is economically impracticable for members of the Nationwide and Statewide Classes to prosecute individual actions; prosecution as a class action will eliminate the possibility

of repetitious and redundant litigation; and, a class action will enable claims to be handled in an orderly, and expeditious manner.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of the Magnuson-Moss Warranty Act (Federal "Lemon Law")**
**15 U.S.C. §§ 2301 *et seq.***
**(Brought on behalf of the Nationwide Class against GM)**

306. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein

307. Plaintiffs bring this Count on behalf of the Nationwide Class ("Class," for the purposes of this Count).

308. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

309. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

310. GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

311. The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

312. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

313. GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

314. GM breached these warranties as described in more detail above. Without limitation, the Defective Vehicles share a common design defect in that they are equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes,

58
COMPLAINT

1  serious injury, and death. GM has admitted that the Defective Vehicles are defective in
2  issuing its recall.

3      315.  Plaintiffs and each of the other Class members have had sufficient direct
4  dealings with either GM or its agents (dealerships) to establish privity of contract
5  between GM, on the one hand, and Plaintiffs and each of the other Class members, on
6  the other hand. Nonetheless, privity is not required here because Plaintiffs and each of
7  the other Class members are intended third-party beneficiaries of contracts between GM
8  and its dealers, and specifically, of GM's implied warranties. The dealers were not
9  intended to be the ultimate consumers of the Defective Vehicles and have no rights
10 under the warranty agreements provided with the Defective Vehicles; the warranty
11 agreements were designed for and intended to benefit the consumers only. Finally,
12 privity is also not required because the Defective Vehicles are dangerous
13 instrumentalities due to the aforementioned defects and nonconformities.

14     316.  Affording GM a reasonable opportunity to cure its breach of written
15 warranties would be unnecessary and futile here. At the time of sale or lease of each
16 Defective Vehicle, GM knew, should have known, or was reckless in not knowing of its
17 misrepresentations concerning the Defective Vehicles' inability to perform as warranted,
18 but nonetheless failed to rectify the situation and/or disclose the defective design. Under
19 the circumstances, the remedies available under any informal settlement procedure
20 would be inadequate and any requirement that Plaintiffs resort to an informal dispute
21 resolution procedure and/or afford GM a reasonable opportunity to cure its breach of
22 warranties is excused and thereby deemed satisfied.

23     317.  Plaintiffs and the other Class members would suffer economic hardship if
24 they returned their Defective Vehicles but did not receive the return of all payments
25 made by them. Because GM is refusing to acknowledge any revocation of acceptance
26 and return immediately any payments made, Plaintiffs and the other Class members have
27 not re-accepted their Defective Vehicles by retaining them.

28

318.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
**Fraudulent Concealment**
**(Brought on behalf of the Nationwide Class against GM and Continental)**

319.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein

320.   Plaintiffs bring this Count on behalf of the Nationwide Class ("Class," for purposes of this Count).

321.   GM and Continental intentionally concealed material facts from Plaintiffs, the other Class members, the public, and NHTSA. GM and Continental have actual knowledge that, because of the way in which the Key System and Airbag System were designed and integrated into the Defective Vehicles, the ignition switch can suddenly fail during normal operation, cutting off engine power and certain electrical systems in the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death

322.   GM and Continental knew that the Defective vehicles were designed and manufactured with Key System and Airbag System defects, but they concealed those material facts. Although the Defective Vehicles contain material safety defects that GM and Continental knew of, or should have known of, at the time of distribution, GM recklessly manufactured and distributed those vehicles to consumers in the United States. Those consumers had no knowledge of the defects.

60
COMPLAINT

323. GM and Continental had a duty to disclose the facts to Plaintiffs, the other Class members, the public, and NHTSA, but failed to do so.

324. GM and Continental knew that Plaintiffs and the other Class members had no knowledge of those facts and that neither Plaintiffs nor the other Class members had an equal opportunity to discover the facts. GM and Continental were in a position of superiority over Plaintiffs and the other Class members. Indeed, Plaintiffs and the other Class members trusted GM not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

325. By failing to disclose these material facts, GM intended to induce Plaintiffs and the other Class members to purchase or lease the Defective Vehicles.

326. Plaintiffs and the other Class members reasonably relied on GM's nondisclosure.

327. Plaintiffs and the other Class members would not have purchased or leased the class vehicles had they known of the ignition-switch defect, or certainly would not have paid as much as they did.

328. GM reaped the benefit of the sales and leases of Defective Vehicles as a result of its nondisclosure.

329. As a direct and proximate result of GM and Continental's wrongful conduct, Plaintiffs and the other Class members have suffered or will suffer damages, including the cost of repairing the Key Systems and Airbag Systems in their vehicles to fully remedy the defects such that the Defective Vehicles can be operated safely, and the diminished value of their Defective Vehicles as a result of the defects and GM and Continental's wrongful conduct related to same.

330. Upon information and belief, Plaintiffs assert that the Airbag System in the Defective Vehicles can be designed to remain active and engaged for a set period of time after the vehicle is turned off. Based on Continental's conduct set forth herein, Plaintiffs request that Continental be required to redesign, and pay the costs of installing, new

61

COMPLAINT

1 | airbag systems for the Defective Vehicles to further enhance the vehicles' safety and
2 | reliability in light of the defects in the Key System.

3 |     331. GM and Continental's conduct was knowing, intentional, with malice,
4 | demonstrated a complete lack of care, and was in reckless disregard for the rights of
5 | Plaintiffs and the other Class members, such that punitive damages are appropriate.

6 |
7 | **THIRD CAUSE OF ACTION**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
8 | **(Brought on behalf of the California State Class against GM and Continental)**

9 |     332. Plaintiffs hereby incorporate by reference the allegations contained in the
10 | preceding paragraphs of this Complaint, as if fully set forth herein.

11 |     333. Plaintiff Cohen brings this Count on behalf of the California State Class.

12 |     334. California Business and Professions Code § 17200 prohibits any "unlawful,
13 | unfair, or fraudulent business act or practices."

14 |     335. GM and Continental have violated the unlawful and unfair prongs of
15 | § 17200 because the Defective Vehicles share a common design defect in that they are
16 | equipped with defective Key Systems and Airbag Systems that can suddenly fail during
17 | normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes,
18 | serious injury, and death. GM has admitted that the Defective Vehicles are defective in
19 | issuing its recall.

20 |     336. GM and Continental failed to adequately disclose and remedy this issue.

21 |     337. GM and Continental's conduct offends established public policy, as the
22 | harm GM and Continental caused to consumers greatly outweighs any benefits
23 | associated with those practices.

24 |     338. Plaintiff Cohen and the other California State Class members have suffered
25 | an injury in fact, including the loss of money or property, as a result of GM and
26 | Continental's unfair, unlawful, and/or deceptive practices.

27 |     339. GM has violated the fraudulent prong of § 17200 because GM

28 |

1  misrepresented the quality, safety, and reliability of the Defective Vehicles.

2  340.  Plaintiff Cohen and the other California State Class members relied on the

3  misrepresentations and/or omissions of GM with respect to the quality, safety, and

4  reliability of the Defective Vehicles. Plaintiff Cohen and the other California State Class

5  members would not have purchased or leased their Defective Vehicles and/or paid as

6  much for them but for GM's misrepresentations and/or omissions.

7  341.  All of the wrongful conduct alleged herein occurred, and continues to

8  occur, in the conduct of GM and Continental's business. GM and Continental's

9  wrongful conduct is part of a pattern or generalized course of conduct that is still

10  perpetuated and repeated in the State of California.

11  342.  Plaintiff Cohen, individually and on behalf of the other California State

12  Class members, requests that this Court enjoin GM and Continental from continuing

13  their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other

14  Class members any money acquired by unfair competition, including restitution and/or

15  restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal.

16  Civ. Code § 334.

17  **FOURTH CAUSE OF ACTION**
18  **Violation of the California False Advertising Law**
   **Cal. Civil Code §§ 17500 *et seq.***
19  **(Brought on behalf of the California State Class against GM)**

20  343.  Plaintiffs hereby incorporate by reference the allegations contained in the

21  preceding paragraphs of this Complaint, as if fully set forth herein.

22  344.  Plaintiff Cohen brings this Count on behalf of the California State Class.

23  345.  California Business and Professions Code § 17500 states:

24  It is unlawful for any . . . corporation . . . with intent directly or
   indirectly to dispose of real or personal property . . . to induce
25  the public to enter into any obligation relating thereto, to make
   or disseminate or cause to be made or disseminated . . . from
26  this state before the public in any state, in any newspaper or
   other publication, or any advertising device, . . . or in any other
27  manner or means whatever, including over the Internet, any
   statement . . . which is untrue or misleading, and which is
28

63

COMPLAINT

known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

346. Through advertising, marketing, and other publications, GM caused statements to be disseminated that were untrue or misleading, and that were known, or that by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers, including Plaintiff Cohen and the other California State Class members.

347. GM has violated § 17500 because its misrepresentations and omissions regarding the safety and reliability of its Defective Vehicles were material and likely to deceive a reasonable consumer.

348. Plaintiff Cohen and the other California State Class members have suffered an injury in fact, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Defective Vehicles, Plaintiff Cohen and each of the other California State Class members relied on the misrepresentations and/or omissions of GM with respect to the safety and reliability of the Defective Vehicles.

349. GM's representations turned out to be false because the Defective Vehicles share a common design defect in that they are equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. Had Plaintiff Cohen and the other California State Class members known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

350. Accordingly, Plaintiff Cohen and the other California State Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain.

351. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California.

352.   Plaintiff Cohen, individually and on behalf of the other California State Class members, request that this Court enjoin GM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff Cohen and the other California State Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief as is appropriate.

### FIFTH CAUSE OF ACTION
#### Violation of the Song-Beverly Consumer Warranty Act
#### (California's "Lemon Law") for Breach of Express Warranty
#### Cal. Civ. Code ¶§ 1790 *et seq.*
#### (Brought on behalf of the California State Class against GM)

353.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

354.   Plaintiff Cohen brings this Count on behalf of the California State Class.

355.   Plaintiff Cohen and the other California State Class members who purchased their Defective Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

356.   The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

357.   GM is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code § 1791(j).

358.   Plaintiff Cohen and the other California State Class members bought/leased new motor vehicles manufactured by GM.

359.   GM made express warranties to Plaintiff Cohen and the other California State Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, in its warranty, manual, and advertising, as described above.

360.   The Defective Vehicles share a common design defect in that they are equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes,

65
COMPLAINT

1    serious injury, and death. GM has admitted that the Defective Vehicles are defective in

2    issuing its recall.

3        361.   The Defective Vehicles are covered by GM's express warranties. The

4    defects described herein substantially impair the use, value, and safety of the Defective

5    Vehicles to reasonable consumers, including Plaintiff Cohen and the other California

6    State Class members.

7        362.   GM was on notice of these issues and defects through numerous other

8    complaints filed against it, as well as internal knowledge derived from testing and

9    internal expert analysis. Plaintiff Cohen will also provide notice of the issues and

10   defects to GM via letter.

11       363.   GM has had the opportunity to cure the defect in the Defective Vehicles but

12   it has chosen not to do so. GM has had ample warning of the defect through various

13   complaints, filed both in court with the NHTSA and directly with GM, and it has failed

14   to remedy the defect. Giving GM a chance to cure the defect simply is not practicable in

15   this case and would serve only to delay this litigation, and thus is not necessary.

16       364.   As a result of GM's breach of its express warranties, Plaintiff Cohen and

17   the other California State Class members received goods whose dangerous condition

18   substantially impairs their value to Plaintiff Cohen and the other California State Class

19   members. Plaintiff Cohen and the other California State Class members have been

20   damaged as a result of the diminished value of GM's products, the products'

21   malfunctioning, and the nonuse of their Defective Vehicles.

22       365.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff Cohen and the other

23   California State Class members are entitled to damages and other legal and equitable

24   relief including, at their election, the purchase price of their vehicles, or the overpayment

25   or diminution in value of their Defective Vehicles.

26       366.   Pursuant to Cal. Civ. Code § 1794, Plaintiff Cohen and the other California

27   State Class members are entitled to costs and attorneys' fees.

28

## SIXTH CAUSE OF ACTION
**Violation of the Song-Beverly Consumer Warranty Act
(California's "Lemon Law") for Breach of Implied Warranty
Cal. Civ. Code §§ 1790 *et seq.*
(Brought on behalf of the California State Class against GM)**

367.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

368.   Plaintiff Cohen brings this Count on behalf of the California State Class.

369.   Plaintiff Cohen and the other California State Class members who purchased Defective Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

370.   The Defective Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

371.   GM is a "manufacturer" of the Defective Vehicles within the meaning of Cal. Civ. Code § 1791(j).

372.   GM impliedly warranted to Plaintiff Cohen and the other California State Class members that the Defective Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, the Defective Vehicles do not have the quality that a buyer would reasonably expect.

373.   Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

    (1)   Pass without objection in the trade under the contract description.

    (2)   Are fit for the ordinary purposes for which such goods are used.

    (3)   Are adequately contained, packaged, and labeled.

    (4)   Conform to the promises or affirmations of fact made on the container or label.

374.   The Defective Vehicles would not pass without objection in the automotive trade because they share a common design defect in that they are equipped with

defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. GM has admitted that the Defective Vehicles are defective in issuing its recall.

375. Because of their defective Key Systems and Airbag Systems, the Defective Vehicles are not safe to drive and thus not fit for ordinary purposes.

376. The Defective Vehicles are not adequately labeled because the labeling fails to disclose the defects described herein.

377. GM breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles that are defective. Furthermore, this defect has caused Plaintiff Saclo and the other California State Class members to not receive the benefit of their bargain and have caused the Defective Vehicles to depreciate in value.

378. GM was on notice of these issues and defects through numerous other complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis. Plaintiff Cohen will also provide notice of the issues and defects to GM via letter.

379. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiff Cohen and the other California State Class members received goods whose dangerous condition substantially impairs their value to Plaintiff Saclo and the other California State Class members.

380. Plaintiff Cohen and the other California State Class members have been damaged as a result of the diminished value of GM's products.

381. Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff Cohen and the other California State Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

382. Pursuant to Cal. Civ. Code § 1794, Plaintiff Cohen and the other California

68

COMPLAINT

1  State Class members are entitled to costs and attorneys' fees.

2  **SEVENTH CAUSE OF ACTION**

3  **Violation of the California Consumer Legal Remedies Act -- Injunctive Relief Only**
**Cal. Civ. Code §§ 1750 *et seq.***

4  **(Brought on behalf of the California State Class against GM)**

5  383. Plaintiffs hereby incorporate by reference the allegations contained in the

6  preceding paragraphs of this Complaint, as if fully set forth herein.

7  384. Plaintiff Cohen brings this Count on behalf of the California State Class.

8  385. Plaintiff Cohen and the other California State Class members were deceived

9  by GM's failure to disclose that the Defective Vehicles share a common design defect in

10  that they are equipped with defective Key Systems and Airbag Systems that can

11  suddenly fail during normal operation, leaving occupants of the Defective Vehicles

12  vulnerable to crashes, serious injury, and death. GM has admitted that the Defective

13  Vehicles are defective in issuing its recall.

14  386. GM engaged in unfair or deceptive acts or practices when, in the course of

15  its business it, among other acts and practices:

16  a. Knowingly made false representations as to the characteristics,

17  uses and benefits of the Defective Vehicles;

18  b. Represented that the Defective Vehicles were of a particular

19  standard, quality, or grade, or that they were of a particular

20  style or model, when it knew or should have known that they

21  were of another; and

22  c. Advertised the Defective Vehicles with intent not to sell them

23  as advertised.

24  387. Failed to disclose material information concerning the Defective Vehicles,

25  which information was known to it at the time of advertising and selling the Defective

26  Vehicles, all of which was intended to induce consumers to purchase the Defective

27  Vehicles.

28

388. GM intended for Plaintiff Cohen and the other California State Class members to rely on it to provide safe, adequately designed, and adequately manufactured automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

389. GM intentionally failed or refused to disclose the defect to consumers and, instead, allowed consumers to believe the representations it had made about the Defective Vehicles.

390. GM's conduct and deceptive omissions were intended to induce Plaintiff Cohen and the other California State Class members to believe that the Defective Vehicles were safe, adequately designed, and adequately manufactured automobiles.

391. GM's conduct constitutes unfair acts or practices as defined by the California Consumer Legal Remedies Act (the "CLRA").

392. Plaintiff Cohen and the other California State Class members have suffered injury in fact and actual damages resulting from GM's material omissions and misrepresentations because they paid an inflated purchase price for the Defective Vehicles. However, Plaintiff Cohen and the other California State Class members reserve any claim for damages under the CLRA and by this Complaint bring only an action for injunctive relief under the CLRA pursuant to § 1782(d) of the Act.

393. Plaintiff Cohen and the other California State Class members' injuries were proximately caused by GM's fraudulent and deceptive business practices.

394. GM's conduct described herein is fraudulent, wanton, and malicious.

395. At this time, Plaintiff Cohen seeks only injunctive relief under this cause of action. Under California Civil Code § 1782(b), Plaintiff Cohen will notify GM in writing of the particular violations of California Civil Code § 1770 and demand that GM rectify the problems associated with the behavior detailed above, which acts and practices are in violation of California Civil Code § 1770.

396. Pursuant to California Civil Code § 1782(d), Plaintiff Cohen, individually

1  and on behalf of the other California State Class members, seeks a Court order enjoining

2  the above-described wrongful acts and practices of GM. Plaintiffs and the other

3  California State Class members reserve any claim for restitution, disgorgement, or

4  damages pursuant to California Civil Code § 1782(d).

5  397. If GM fails to rectify or agree to rectify the problems associated with the

6  actions detailed above and give notice to all affected consumers within 30 days of the

7  date of written notice pursuant to California Civil Code § 1782, Plaintiff Cohen will

8  amend this complaint to add claims for actual, punitive and statutory damages,

9  restitution, and disgorgement under California Civil Code § 1780, pursuant to California

10  Civil Code § 1782(d) ("Not less than 30 days after the commencement of an action for

11  injunctive relief, and after compliance with subdivision (a), the consumer may amend his

12  or her complaint without leave of court to include a request for damages.").

13  398. Under § 1780(c) of the Act, attached hereto as Exhibit B is the affidavit of

14  Ken Saelo showing that this action has been commenced in the proper forum.

**EIGHTH CAUSE OF ACTION**
**Violation of the Alabama Deceptive Trade Practices Act**
**Ala. Code § 8-19-1, *et seq.***
**(Brought on behalf of the Alabama State Class against GM)**

18  399. Plaintiffs hereby incorporate by reference the allegations contained in the

19  preceding paragraphs of this Complaint, as if fully set forth herein.

20  400. Plaintiff Malone brings this Count on behalf of the Alabama State Class.

21  401. GM's conduct constitutes deceptive acts or practices, including, but not

22  limited to: (a) GM's manufacture and sale of the Defective Vehicles equipped with

23  defective Key Systems and Airbag Systems that can suddenly fail during normal

24  operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious

25  injury, and death; (b) GM's failure to adequately disclose and remedy this issue; and (c)

26  GM's misrepresentations and omissions with respect to the quality, safety, and reliability

27  of the Defective Vehicles.

28

71

COMPLAINT

402.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

403.   GM's actions impact the public interest because Plaintiff Malone was injured in exactly the same way as numerous other members of the Alabama State Class who purchased or leased the Defective Vehicles as a result of GM's unfair and/or deceptive acts.

404.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of Alabama.

405.   Plaintiff Malone and the other Alabama State Class members were injured as a result of GM's conduct in that they overpaid for their Defective Vehicles and did not receive the benefit of the bargain, and their Defective Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations and omissions.

406.   GM's conduct proximately caused the injuries to Plaintiff Malone and the other Alabama State Class members as set forth above.

407.   Pursuant to Alabama Code § 8-19-8, Plaintiff Malone will serve the Alabama Attorney General with a copy of this complaint, as Plaintiff Malone seeks injunctive relief.

### NINTH CAUSE OF ACTION
**Violation of the Colorado Consumer Protection Act**
**Col. Rev. Stat. § 6-1-101, *et seq.***
**(Brought on behalf of the Colorado State Class against GM)**

408.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

409.   Plaintiff Orona brings this Count on behalf of the Colorado State Class.

410.   GM is a "person" as defined under the Colorado Consumer Protection Act

72

COMPLAINT

1 ("CCPA"). Colo. Rev. Stat. § 6-1-102(6).

2     411. Plaintiff Orona is a "consumer" under the CCPA.

3     412. The Defective Vehicles that are the subject of this action are "goods" under

4 the CCPA.

5     413. GM engaged in deceptive and misleading trade practices when, in the

6 course of its business it, among other acts and practices:

7       d.  Knowingly made false representations as to the characteristics,

8           uses and benefits of the Defective Vehicles;

9       e.  Represented that the Defective Vehicles were of a particular

10           standard, quality, or grade, or that they were of a particular

11           style or model, when it knew or should have known that they

12           were of another;

13       f.  Advertised the Defective Vehicles with intent not to sell them

14           as advertised;

15       g.  Advertised or otherwise represented that the Defective Vehicles

16           were warranted when, under normal conditions, the warranties

17           could not be practically fulfilled or which were for such a

18           period of time or were otherwise of such a nature as to have had

19           the capacity and the tendency to mislead purchasers or

20           prospective purchasers into believing that the Defective

21           Vehicles had a greater degree of quality, safety, and reliability

22           than was true in fact; and

23       h.  Failed to disclose material information concerning the

24           Defective Vehicles, which information was known to it at the

25           time of advertising and selling the Defective Vehicles, all of

26           which was intended to induce consumers to purchase the

27           Defective Vehicles.

28

1      414. GM's conduct significantly impacts the public as actual or potential

2 consumers of the Defective Vehicles because, upon information and belief, and as will

3 be borne out through discovery, GM sold thousands of the Defective Vehicles in the

4 State of Colorado, the consumers who purchased the vehicles were unsophisticated, the

5 consumers who purchased the vehicles had no bargaining power, and the defects in the

6 Defective Vehicles have impacted consumers and have significant potential to do so in

7 the future.

8      415. Additionally, this is a matter of public concern and the state has a strong

9 interest in protecting purchasers from the conduct in which GM engaged.

10      416. Plaintiff Orona and the other Colorado State Class members suffered injury

11 in fact to their legally protected interest under the CCPA in not being subjected to

12 deceptive trade practices when purchasing goods.

13      417. Plaintiff Orona and the other Colorado State Class members' injuries were

14 proximately caused by GM's deceptive trade practices set forth above.

15 **TENTH CAUSE OF ACTION**
**Violation of the Connecticut Unfair Trade Practices Act**

16 **Conn. Gen. Stat. § 42-110A, *et seq.***

17 **(Brought on behalf of the Connecticut State Class against GM)**

18      418. Plaintiffs hereby incorporate by reference the allegations contained in the

19 preceding paragraphs of this Complaint, as if fully set forth herein.

20      419. Plaintiff Teicher brings this Count on behalf of the Connecticut State Class.

21      420. The Connecticut Unfair Trade Practices Act provides that "[n]o person shall

22 engage in unfair methods of competition and unfair or deceptive acts or practices in the

23 conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

24      421. GM is a "person" within the meaning of the Connecticut Unfair Trade

25 Practices Act. Conn. Gen. Stat. § 42-110a(3).

26      422. In the course of GM's business, it knowingly and willfully failed to disclose

27 and actively concealed the fact that the Defective Vehicles share a common design

28

defect in that they are equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. Accordingly, GM engaged in unfair or deceptive trade practices, including: representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; and advertising the Defective Vehicles with the intent not to sell them as advertised.

423. GM's conduct was unfair because it caused substantial injury to consumers.

424. GM had a duty to disclose the aforementioned safety issues because it consistently marketed their Defective Vehicles as safe and proclaimed that safety is one of GM's highest corporate priorities. Once GM made representations to the public about safety, GM was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

425. In addition, GM had a duty to disclose these omitted material facts because they were known and/or accessible only to GM who has superior knowledge and access to the facts, and GM knew they were not known to or reasonably discoverable by Plaintiff Teicher and the other Connecticut State Class members. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not the Defective Vehicles equipped with defective Key Systems and Airbag Systems pose an unreasonable risk of death or serious bodily injury to Plaintiff Teicher and other Connecticut State Class members, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering and airbags are all rendered inoperable, are material safety concerns. GM possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

426.   Plaintiff Teicher and other Connecticut State Class members suffered ascertainable loss caused by GM's unfair and deceptive practices.  Plaintiff Teicher and the other Connecticut State Class members were injured as a result of GM's conduct in that they overpaid for their Defective Vehicles and did not receive the benefit of the bargain, and their Defective Vehicles have suffered a diminution in value.

427.   GM engaged in conduct amounting to a particularly aggravated, deliberate disregard of the safety and rights of others.

428.   Pursuant to Conn. Gen. Stat. § 42-110g, Plaintiff Teicher and the other Connecticut State Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees.

429.   Pursuant to Conn. Gen. Stat. § 42-110g(c), Plaintiff Teicher will mail a copy of the complaint to the Connecticut Attorney General.

### ELEVENTH CAUSE OF ACTION
**Violation of the Delaware Consumer Fraud Act**
**6 Del. Code § 2513, _et seq._**
**(Brought on behalf of the Delaware State Class against GM)**

430.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

431.   Plaintiff Nagle brings this Count on behalf of the Delaware State Class.

432.   The Delaware Consumer Fraud Act ("CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 DEL. CODE § 2513(a).

433.   GM is a "person" within the meaning of 6 Del. Code § 2511(7).

434.   As described herein, GM made misrepresentations and omissions with respect to the quality, safety, and reliability of the Defective Vehicles.  GM failed to

COMPLAINT

1   adequately disclose that the Defective Vehicles share a common design defect in that

2   they are equipped with defective Key Systems and Airbag Systems that can suddenly

3   fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to

4   crashes, serious injury, and death. GM intended that others rely on its

5   misrepresentations and omissions in connection with the sale and lease of the Defective

6   Vehicles.

7        435.   GM's actions set forth above occurred in the conduct of trade or commerce.

8        436.   GM's conduct proximately caused the injuries to Plaintiff Nagle and the

9   other Delaware State Class members as set forth above.

10       437.   Plaintiff Nagle and the other Delaware State Class members were injured as

11   a result of GM's conduct in that they overpaid for their Defective Vehicles and did not

12   receive the benefit of the bargain, and their Defective Vehicles have suffered a

13   diminution in value. These injuries are the direct and natural consequence of GM's

14   misrepresentations and omissions.

15       438.   Plaintiff Nagle and the other Delaware State Class members are entitled to

16   recover damages, as well as punitive damages for GM's gross and aggravated

17   misconduct.

18                **TWELFTH CAUSE OF ACTION**
**Violation of the Delaware Deceptive Trade Practices Act**

19                **6 Del. Code § 2532,** *et seq.*
**(Brought on behalf of the Delaware State Class against GM)**

20       439.   Plaintiffs hereby incorporate by reference the allegations contained in the

21   preceding paragraphs of this Complaint, as if fully set forth herein.

22       440.   Plaintiff Nagle brings this Count on behalf of the Delaware State Class.

23       441.   Delaware's Deceptive Trade Practices Act ("DTPA") prohibits a person

24   from engaging in a "deceptive trade practice," which includes: "(5) Represent[ing] that

25   goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits,

26   or quantities that they do not have, or that a person has a sponsorship, approval, status,

27   affiliation, or connection that the person does not have"; "(7) Represent[ing] that goods

28

1  or services are of a particular standard, quality, or grade, or that goods are of a particular

2  style or model, if they are of another"; "(9) Advertis[ing] goods or services with intent

3  not to sell them as advertised"; or "(12) Engag[ing] in any other conduct which similarly

4  creates a likelihood of confusion or of misunderstanding." 6 DEL. CODE § 2532.

5      442.  GM is a "person" with the meaning of 6 DEL. CODE § 2531(5).

6      443.  In the course of GM's business, it willfully failed to disclose and actively

7  concealed the fact that the Defective Vehicles share a common design defect in that they

8  are equipped with defective Key Systems and Airbag Systems that can suddenly fail

9  during normal operation, leaving occupants of the Defective Vehicles vulnerable to

10  crashes, serious injury, and death. Accordingly, GM engaged in unlawful trade

11  practices, including representing that the Defective Vehicles have characteristics, uses,

12  benefits, and qualities which they do not have; representing that Defective Vehicles are

13  of a particular standard and quality when they are not; advertising the Defective

14  Vehicles with the intent not to sell them as advertised; and otherwise engaging in

15  conduct likely to deceive.

16      444.  GM's actions set forth above occurred in the conduct of trade or commerce.

17      445.  GM's conduct proximately caused the injuries to Plaintiff Nagle and the

18  other Delaware State Class members as set forth above.

19      446.  Plaintiff Nagle and the other Delaware State Class members were injured as

20  a result of GM's conduct in that they overpaid for their Defective Vehicles and did not

21  receive the benefit of the bargain, and their Defective Vehicles have suffered a

22  diminution in value. These injuries are the direct and natural consequence of GM's

23  misrepresentations and omissions.

24      447.  Plaintiff Nagle, individually and on behalf of the other Delaware State

25  Class members, seeks injunctive relief and, if awarded damages under the Delaware

26  Consumer Fraud Act, treble damages pursuant to 6 Del. Code § 2533(c).

27

28

**THIRTEENTH CAUSE OF ACTION**
**Violation of Florida's Unfair and Deceptive Trade Practices Act**
**Fla. Stat. § 501.201, *et seq.***
**(Brought on behalf of the Florida State Class against GM)**

448. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

449. Plaintiff Young bring this Count on behalf of the Florida State Class.

450. At all relevant times, Plaintiff Young and the other Florida State Class members were consumers.

451. At all relevant times, Plaintiff Young and the other Florida State Class members purchased their Defective Vehicles by way of consumer transactions.

452. GM's conduct constitutes unfair and/or deceptive acts or practices, including, but not limited to: (a) GM's manufacture and sale of the Defective Vehicles equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death; (b) GM's failure to adequately disclose and remedy this issue; and (c) GM's misrepresentations and omissions with respect to the quality, safety, and reliability of the Defective Vehicles.

453. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

454. GM's actions impact the public interest because Plaintiff Young was injured in exactly the same way as numerous other members of the Florida State Class who purchased or leased the Defective Vehicles as a result of GM's unfair and/or deceptive acts.

455. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of Florida.

456.  Plaintiff Young and the other Florida State Class members were injured as a result of GM's conduct in that they overpaid for their Defective Vehicles and did not receive the benefit of the bargain, and their Defective Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of GM's misrepresentations and omissions.

457.  GM's conduct proximately caused the injuries to Plaintiff Young and the other Florida State Class members as set forth above, so they are entitled to compensatory damages and injunctive/equitable relief under Fla. Stat. § 501.201, *et seq.*

458.  GM is liable to Plaintiff Young and the other Florida State Class members under Fla. Stat. § 501.201, *et seq.* for damages for failure to pay the cost of repairing the Defective Vehicles.

459.  GM is liable to Plaintiff Young and the other Florida State Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages under Fla. Stat. § 501.201, *et seq.*

## FOURTEENTH CAUSE OF ACTION
### Violation of Hawaii's Unfair Competition and Practices Act
### Haw. Rev. Stat. § 480, *et seq.*
### (Brought on behalf of the Hawaii State Class against GM)

460.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

461.  Plaintiff Luthander brings this Count on behalf of the Hawaii State Class.

462.  GM is a "person" within the meaning of Haw. Rev. Stat. § 480-1.

463.  Plaintiff Luthander and other Hawaii State Class members are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1, who purchased or leased one or more of the Defective Vehicles.

464.  Hawaii's Unfair Competition and Practices Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Haw. Rev. Stat. § 480-2(a).

1    465.   GM's actions set forth above occurred in the conduct of trade or commerce.

2    466.   In the course of GM's business, it willfully failed to disclose and actively

3  concealed the fact that the Defective Vehicles share a common design defect in that they

4  are equipped with defective Key Systems and Airbag Systems that can suddenly fail

5  during normal operation, leaving occupants of the Defective Vehicles vulnerable to

6  crashes, serious injury, and death.

7    467.   GM had a duty to disclose the aforementioned safety issues because it

8  consistently marketed their Defective Vehicles as safe and proclaimed that safety is one

9  of GM's highest corporate priorities. Once GM made representations to the public about

10  safety, GM was under a duty to disclose these omitted facts, because where one does

11  speak one must speak the whole truth and not conceal any facts which materially qualify

12  those facts stated. One who volunteers information must be truthful, and the telling of a

13  half-truth calculated to deceive is fraud.

14    468.   In addition, GM had a duty to disclose these omitted material facts because

15  they were known and/or accessible only to GM who has superior knowledge and access

16  to the facts, and GM knew they were not known to or reasonably discoverable by P

17  Plaintiff Luthander and other Hawaii State Class members. These omitted facts were

18  material because they directly impact the safety of the Defective Vehicles. Whether or

19  not the Defective Vehicles equipped with defective Key Systems and Airbag Systems

20  pose an unreasonable risk of death or serious bodily injury to Plaintiff Luthander and

21  other Hawaii State Class members, passengers, other motorists, pedestrians, and the

22  public at large, because they are susceptible to incidents in which brakes, power steering

23  and airbags are all rendered inoperable, are material safety concerns.  GM possessed

24  exclusive knowledge of the defects rendering Defective Vehicles inherently more

25  dangerous and unreliable than similar vehicles.

26    469.   GM's misrepresentations and omissions described herein have the capacity

27  or tendency to deceive.  Because of these unlawful trade practices, including the failure

28

to disclose material information, Plaintiff Luthander and other Hawaii State Class members suffered injury, including the loss of money or property.

470. The propensity of the Defective Vehicles to suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death were material to Plaintiff Luthander and other Hawaii State Class members. Had Plaintiff Luthander and other Hawaii State Class members known of these serious quality, safety, and reliability issues, they would not have purchased or leased their Defective Vehicles.

471. GM's actions impact the public interest because Plaintiff Luthander was injured in exactly the same way as numerous other members the Hawaii State Class who purchased or leased the Defective Vehicles as a result of GM's unfair and/or deceptive acts.

472. GM's acts or practices, including the manufacture and sale of the Defective Vehicles with defective Key Systems and Airbag Systems, and its failure to adequately disclose the defects to NHTSA and Plaintiff Luthander and other Hawaii State Class members, were unconscionable, because they offend established public policy and the harm GM caused to consumers greatly outweighs any benefits associated with those practices. GM's conduct has also impaired competition within the automobile market, and has prevented Plaintiff Luthander and other Hawaii State Class members from making fully informed decisions about whether to lease, purchase, and/or retain the Defective Vehicles.

473. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of Hawaii.

474. GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff Luthander

82

COMPLAINT

1 | and other Hawaii State Class members, such that punitive damages are appropriate.

2 | 475. Because GM's conscious wrongdoing caused injury to Plaintiff Luthander

3 | and other Hawaii State Class members, they are entitled to recover treble damages or

4 | $1,000, whichever is greater, punitive damages, reasonable attorneys' fees, and any

5 | other relief the Court deems proper, under Haw. Rev. Stat. § 480-13.

### FIFTEENTH CAUSE OF ACTION
**Violation of Indiana's Deceptive Consumer Sales Act**
**Ind. Code § 24-5-0.5-3, *et seq.***
**(Brought on behalf of the Indiana State Class against GM)**

9 | 476. Plaintiffs hereby incorporate by reference the allegations contained in the

10 | preceding paragraphs of this Complaint, as if fully set forth herein.

11 | 477. Plaintiff Holleman brings this Count on behalf of the Indiana State Class.

12 | 478. Indiana's Deceptive Consumer Sales Act prohibits a person from engaging

13 | in a "deceptive trade practice," which includes representing: "(1) That such subject of a

14 | consumer transaction has sponsorship, approval, performance, characteristics,

15 | accessories, uses, or benefits that they do not have, or that a person has a sponsorship,

16 | approval, status, affiliation, or connection it does not have; (2) That such subject of a

17 | consumer transaction is of a particular standard, quality, grade, style or model, if it is not

18 | and if the supplier knows or should reasonably know that it is not; ... (7) That the

19 | supplier has a sponsorship, approval or affiliation in such consumer transaction that the

20 | supplier does not have, and which the supplier knows or should reasonably know that

21 | the supplier does not have; ... (b) Any representations on or within a product or its

22 | packaging or in advertising or promotional materials which would constitute a deceptive

23 | act shall be the deceptive act both of the supplier who places such a representation

24 | thereon or therein, or who authored such materials, and such suppliers who shall state

25 | orally or in writing that such representation is true if such other supplier shall know or

26 | have reason to know that such representation was false." Ind. Code § 24-5-0.5-3.

27 | 479. GM is a "person" within the meaning of Ind. Code § 24-5-0.5-2(2).

28 |

1    480.   In the course of GM's business, it willfully failed to disclose and actively

2  concealed the fact that the Defective Vehicles share a common design defect in that they

3  are equipped with defective Key Systems and Airbag Systems that can suddenly fail

4  during normal operation, leaving occupants of the Defective Vehicles vulnerable to

5  crashes, serious injury, and death.  Accordingly, GM engaged in unlawful trade

6  practices, including representing that the Defective Vehicles have characteristics, uses,

7  benefits, and qualities which they do not have; representing that Defective Vehicles are

8  of a particular standard and quality when they are not; advertising the Defective

9  Vehicles with the intent not to sell them as advertised; and otherwise engaging in

10  conduct likely to deceive.

11    481.   GM's actions set forth above occurred in the conduct of trade or commerce.

12    482.   GM's conduct proximately caused the injuries to Plaintiff Holleman and the

13  other Indiana State Class members as set forth above.

14    483.   Plaintiff Holleman and the other Indiana State Class members were injured

15  as a result of GM's conduct in that they overpaid for their Defective Vehicles and did

16  not receive the benefit of the bargain, and their Defective Vehicles have suffered a

17  diminution in value.  These injuries are the direct and natural consequence of GM's

18  misrepresentations and omissions.

19    484.   Plaintiff Holleman, individually and on behalf the other Indiana State Class

20  members, will provide GM with notice of its violations of the Indiana Deceptive

21  Consumer Sales Act, pursuant to Indiana Code § 24.5-0.5-5.

22  **SIXTEENTH CAUSE OF ACTION**
**Violation of the Kansas Consumer Protection Act**
23  **Kan. Stat. Ann. § 50-623, *et seq.***
**(Brought on behalf of the Kansas State Class against GM)**
24

25    485.   Plaintiffs hereby incorporate by reference the allegations contained in the

26  preceding paragraphs of this Complaint, as if fully set forth herein.

27

28
84
COMPLAINT

1     486.   Plaintiffs Clinton and Tyson bring this Count on behalf of the Kansas State
2   Class.

3     487.   GM is a "supplier" under the Kansas Consumer Protection Act ("Kansas
4   CPA"), Kan. Stat. Ann. § 50-624(l).

5     488.   Plaintiffs Clinton and Tyson and other Kansas State Class members are
6   "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or
7   leased one or more of the Defective Vehicles.

8     489.   The sale or lease of the Defective Vehicles to Plaintiffs Clinton and Tyson
9   and other Kansas State Class members was a "consumer transaction" within the meaning
10   of Kan. Stat. Ann. § 50-624(c).

11     490.   The Kansas CPA states "[n]o supplier shall engage in any deceptive act or
12   practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a).

13     491.   GM willfully failed to disclose and actively concealed the fact that the
14   Defective Vehicles share a common design defect in that they are equipped with
15   defective Key Systems and Airbag Systems that can suddenly fail during normal
16   operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious
17   injury, and death. Accordingly, GM engaged in deceptive acts or practices prohibited by
18   the Kansas CPA, including: representing that the Defective Vehicles have
19   characteristics, uses, and benefits which they do not have; and representing that
20   Defective Vehicles are of a particular standard and quality when they are not. Kan. Stat.
21   Ann. § 50-626(b)(1).

22     492.   GM knew that the Defective Vehicles were defectively designed and
23   manufactured with defective Key Systems and Airbag Systems that can suddenly fail
24   during normal operation, leaving occupants of the Defective Vehicles vulnerable to
25   crashes, serious injury, and death. Nevertheless, GM failed to adequately disclose and
26   remedy this issue.

27

28
                                        85

1    493.  GM owed Plaintiffs Clinton and Tyson and other Kansas State Class

2    members a duty to disclose the defective nature of the Defective Vehicles, including the

3    dangerous risk that the Key System and Airbag System can suddenly fail during normal

4    operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious

5    injury, and death, because GM: possessed exclusive knowledge of the defects rendering

6    the Defective Vehicles inherently more dangerous and unreliable than similar vehicles;

7    intentionally concealed the defects in the Defective Vehicles from Plaintiffs Clinton and

8    Tyson and other Kansas State Class members; and/or made incomplete representations

9    about the quality, safety, and reliability of the Defective Vehicles, while purposefully

10   withholding material facts from Plaintiffs Clinton and Tyson and other Kansas State

11   Class members that contradicted those representations.

12   494.  GM's unfair or deceptive acts or practices were likely to and did in fact

13   deceive reasonable consumers, including Plaintiffs Clinton and Tyson, about the true

14   quality, safety, and reliability of the Defective Vehicles.

15   495.  GM's deceptive practices significantly impact the public since the

16   Defective Vehicles equipped with defective Key Systems and Airbag Systems pose an

17   unreasonable risk of death or serious bodily injury to Plaintiff Clinton and other Kansas

18   State Class members, passengers, other motorists, pedestrians, and the public at large,

19   because they are susceptible to incidents in which brakes, power steering and airbags are

20   all rendered inoperable. The public interest is also affected because Plaintiffs Clinton

21   and Tyson were injured in exactly the same way as numerous other members of the

22   Kansas State Class who purchased or leased the Defective Vehicles as a result of GM's

23   deceptive acts.

24   496.  All of the wrongful conduct alleged herein occurred, and continues to

25   occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or

26   generalized course of conduct that is still perpetuated and repeated in the State of

27   Kansas.

28

1  497. A reasonable consumer would consider the unreasonable risk of death or

2 serious bodily injury posed by the defect in the Key Systems and Airbag Systems in the

3 Defective Vehicles important in selecting a vehicle to purchase or lease.

4  498. When Plaintiffs Clinton and Tyson and other Kansas State Class members

5 purchased their Defective Vehicles, they reasonably expected that the Defective

6 Vehicles were not susceptible to incidents in which brakes, power steering and airbags

7 are all rendered inoperable as a result of a defect in the Key System and Airbag System.

8  499. Plaintiffs Clinton and Tyson and other Kansas State Class members were

9 injured as a result of GM's deceptive trade practices in that they overpaid for their

10 Defective Vehicles and did not receive the benefit of the bargain, and their Defective

11 Vehicles have suffered a diminution in value.

12  500. Plaintiffs Clinton and Tyson and other Kansas State Class members seek

13 punitive damages against GM, because GM willfully, wantonly, fraudulently, and

14 maliciously failed to disclose and actively concealed the fact that the Defective Vehicles

15 share a common design defect.

16  501. Plaintiffs Clinton and Tyson and other Kansas State Class members

17 suffered actual harm as a result of GM's willful violations. Therefore, Plaintiff Clinton

18 and other Kansas State Class members seeks actual damages or maximum statutory

19 damages up to \$10,000 per violation, whichever is greater, punitive damages, and

20 reasonable attorneys' fees, pursuant to Kan. Stat. Ann. §§ 50-634 and 50-636.

21  502. Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs Clinton and Tyson will

22 serve the Kansas Attorney General with a copy of this complaint.

23

24

25

**SEVENTEENTH CAUSE OF ACTION**
**Violation of the Kentucky Consumer Protection Act**
**Ky. Rev. Stat. § 367.100, *et seq.***
**(Brought on behalf of the Kentucky State Class against GM)**

26  503. Plaintiffs hereby incorporate by reference the allegations contained in the

27 preceding paragraphs of this Complaint, as if fully set forth herein.

28

1     504. Plaintiffs Talbot and Stewart bring this Count on behalf of the Kentucky

2  State Class.

3     505. GM made misrepresentations and omissions regarding the quality, safety,

4  and reliability of the Defective Vehicles after learning about the defect in the Key

5  Systems and Airbag Systems of the Defective Vehicles with intent that Plaintiffs Talbot

6  and Stewart and the Kentucky State Class members rely on such representations in their

7  decision to purchase or lease the Defective Vehicles.

8     506. Plaintiffs Talbot and Stewart and the Kentucky State Class members relied

9  on GM's misrepresentations and/or omissions with respect to the quality, safety, and

10  reliability of the Defective Vehicles in connection with their decision to purchase or

11  lease the Defective Vehicles.

12     507. Through these misleading and deceptive statements and omissions, GM

13  violated the Kentucky Consumer Protection Act ("Kentucky CPA").

14     508. The Kentucky CPA applies to GM's transactions with Plaintiffs Talbot and

15  Stewart and the Kentucky State Class members, because GM's deceptive scheme was

16  carried out in Kentucky and affected Plaintiff Talbot and the Kentucky State Class

17  members.

18     509. As a direct and proximate result of GM's deceptive conduct, Plaintiffs

19  Talbot and Stewart and the Kentucky State Class members have sustained and will

20  continue to sustain economic losses and other damages for which they are entitled to

21  compensatory and equitable damages and declaratory relief in an amount to be proven at

22  trial.

23

24

25

26

27

28

## EIGHTEENTH CAUSE OF ACTION
### Violation of the Michigan Consumer Protection Act
### Mich. Comp. Laws § 445.901, *et seq.*
### (Brought on behalf of the Michigan State Class against GM)

510. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

511. Plaintiff Heath and Plaintiff Sloan brings this Count on behalf of the Michigan State Class.

512. At all times relevant to this suit, GM was conducting trade or commerce, as defined under Mich. Comp. Law § 445.902(1)(g), which is also known as the Michigan Consumer Protection Act ("Michigan CPA").

513. A party to a transaction covered under the Michigan CPA must provide the other party the promised benefits of the transaction.

514. Michigan courts, and federal courts applying Michigan law, have held that implied warranties contain a "promised benefit" that the product is fit for its intended and foreseeable use.

515. The defective nature of the Defective Vehicles failed to provide Plaintiff Heath, Plaintiff Sloan, and the Michigan State Class members the promised benefits of the implied warranties.

516. GM has committed unfair and deceptive acts by knowingly placing into the stream of commerce the Defective Vehicles which share a common design defect in that they are equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death.

517. GM committed these and other unfair and deceptive acts with regard to the marketing and sale of the Defective Vehicles. For instance, GM has made representations about the quality, safety, and reliability of the Defective Vehicles, which are unfair and deceptive in violation of the Michigan CPA.

1    518.   GM knew that the Defective Vehicles are defective in that they are
2  equipped with defective Key Systems and Airbag Systems that can suddenly fail during
3  normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes,
4  serious injury, and death.

5    519.   GM concealed and/or failed to warn Plaintiff Heath, Plaintiff Sloan, and the
6  Michigan State Class members that the Defective Vehicles are defective.

7    520.   Such concealment and/or failure to warn constitutes an unfair,
8  unconscionable, or deceptive act or practice as defined in the Michigan CPA.

9    521.   Based upon these allegations, GM violated Mich. Comp. Law § 445.903(d),
10  (p), and (s), as well as other section of Mich. Comp. Law § 445.903 to be developed
11  during the course of discovery.

12    522.   The unfair, unconscionable, and deceptive acts committed by GM caused
13  damages to Plaintiff Heath, Plaintiff Sloan, and the Michigan State Class members.

14    523.   GM is liable to Plaintiff Heath, Plaintiff Sloan, and the Michigan State
15  Class members under the Michigan CPA for damages for breaching its implied
16  warranties and for the aforementioned unfair, unconscionable, and deceptive acts.

17    524.   Plaintiff Heath, Plaintiff Sloan, and the Michigan State Class members are
18  entitled to compensatory damages, injunctive/equitable relief, and attorneys' fees under
19  the Michigan CPA.

20    525.   The allegations made by Plaintiff Heath and Plaintiff Sloan, individually
21  and on behalf of the other Michigan State Class members, meet the requirements of
22  Mich. Comp. Law § 445.911(11)(3), because the acts and/or practices of GM violate
23  Mich. Comp. Law § 445.903, have been declared unlawful by an appellate court of the
24  state which is either officially reported or made available for public dissemination in
25  accordance with the Michigan CPA, and/or have been declared by a circuit court and/or
26  the United States Supreme Court to constitute unfair or deceptive acts under the
27  specified standards set forth by the Federal Trade Commission.

28

## NINETEENTH CAUSE OF ACTION
**Violation of the Minnesota Uniform Deceptive Trade Practices Act
Minn. Stat. § 325D.43-48, *et seq.*
(Brought on behalf of the Minnesota State Class against GM)**

526. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

527. Plaintiff Condon brings this Count on behalf of the Minnesota State Class.

528. GM engaged in -- and continues to engage in -- conduct that violates the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44, *et seq.* The violations include the following:

a. GM violated Minn. Stat. § 325D.44(5) by representing that the Defective Vehicles have characteristics, uses, and benefits of safe and mechanically sound vehicles while knowing that the statements were false and the Defective Vehicles contained defects;

b. GM violated Minn. Stat. § 325D.44(7) by representing the Defective Vehicles as a non-defective product of a particular standard, quality, or grade while knowing the statements were false and the Defective Vehicles contained defects;

c. GM violated Minn. Stat. § 325D.44(9) by advertising, marketing, and selling the Defective Vehicles as reliable and without a known defect while knowing those claims were false; and

d. GM violated Minn. Stat. § 325D.44(13) by creating a likelihood of confusion and/or misrepresenting the safety of the Defective Vehicles.

529. GM's deceptive scheme was carried out in Minnesota and affected Plaintiff Condon and other Minnesota State Class members.

530. GM also failed to advise the NHTSA and the public about what it knew about the defects in the Key System and Airbag System.

91

1     531.   As a direct and proximate result of GM's deceptive conduct and violation

2   of Minn. Stat. § 325D.44, *et seq.*, Plaintiff Condon and other Minnesota State Class

3   members have sustained and will continue to sustain economic losses and other damages

4   for which they are entitled to compensatory and equitable damages and declaratory relief

5   in an amount to be proven at trial.

6                            **TWENTIETH CAUSE OF ACTION**
                  **Violation of the Minnesota Prevention of Consumer Fraud Act**
7                              **Minn. Stat. § 3255.68, *et seq.***
                  **(Brought on behalf of the Minnesota State Class against GM)**
8

9     532.   Plaintiffs hereby incorporate by reference the allegations contained in the

10   preceding paragraphs of this Complaint, as if fully set forth herein.

11     533.   Plaintiff Condon brings this Count on behalf of the Minnesota State Class.

12     534.   After learning of the defects in the Defective Vehicles, GM misrepresented

13   the quality, safety, and reliability of the Defective Vehicles with the intent that Plaintiff

14   Condon and the other Minnesota State Class members rely on such representations in

15   their decision regarding the purchase or lease of the Defective Vehicles.

16     535.   Plaintiff Condon and other Minnesota State Class members did, in fact, rely

17   on such representations in their decision to purchase or lease the Defective Vehicles.

18     536.   Through these misleading and deceptive statements and false promises, GM

19   violated Minn. Stat. §325F.69.

20     537.   The Minnesota Prevention of Consumer Fraud Act applies to GM's

21   transactions with Plaintiff Condon and other Minnesota State Class members because

22   GM's deceptive scheme was carried out in Minnesota and affected them.

23     538.   GM also failed to advise the NHTSA and the public about what it knew

24   about the defects in the Key System and Airbag System.

25     539.   As a direct and proximate result of GM's deceptive conduct and violation

26   of Minn. Stat. § 325F.69, *et seq.*, Plaintiff Condon and other Minnesota State Class

27   members have sustained and will continue to sustain economic losses and other damages

28
                                           92
                                       COMPLAINT

1  for which they are entitled to compensatory and equitable damages and declaratory relief

2  in an amount to be proven at trial.

### TWENTY-FIRST CAUSE OF ACTION
#### Violation of the Mississippi Products Liability Act
#### Miss. Code Ann. § 11-1-63, *et seq.*
#### (Brought on behalf of the Mississippi State Class against GM)

6  540.  Plaintiffs hereby incorporate by reference the allegations contained in the

7  preceding paragraphs of this Complaint, as if fully set forth herein.

8  541.  Plaintiff Wilson brings this Count on behalf of the Mississippi State

9  Class.GM has defectively designed, manufactured, sold, or otherwise placed in the

10 stream of commerce the Defective Vehicles.

11 542.  GM is strictly liable in tort for Plaintiff Wilson and the other Mississippi

12 State Class members' injuries and damages, and Plaintiff Wilson individually and on

13 behalf of the other Mississippi State Class members, respectfully relies upon the doctrine

14 as set forth in RESTATEMENT, SECOND, TORTS § 402(a).

15 543.  Because of the negligence of the design and manufacture of the Defective

16 Vehicles, by which Plaintiff Wilson and the other Mississippi State Class members were

17 injured, and the failure of GM to warn Plaintiff Wilson and the other Mississippi State

18 Class members of the certain dangers concerning the operation of the Defective Vehicles

19 which were known to GM but were unknown to Plaintiff Wilson and the other

20 Mississippi State Class members, GM has committed a tort.

21 544.  The Defective Vehicles which caused Plaintiff Wilson and the other

22 Mississippi State Class members' injuries were manufactured by GM.

23 545.  At all times herein material, GM negligently and carelessly did certain acts

24 and failed to do other things, including, but not limited to, inventing, developing,

25 designing, researching, guarding, manufacturing, building, inspecting, investigating,

26 testing, labeling, instructing, and negligently and carelessly failing to provide adequate

27 and fair warning of the characteristics, angers and hazards associated with the operation

28

1    of the Defective Vehicles in question to users of the Defective Vehicles, including, but

2    not limited to, Plaintiff Wilson and the other Mississippi State Class members, and

3    willfully failing to recall or otherwise cure one or more of the defects in the product

4    involved thereby directly and proximately causing the hereinafter described injury.

5     546. The Defective Vehicles were unsafe for their use by reason of the fact that

6    they were defective. For example, the Defective Vehicles were defective in their design,

7    guarding, development, manufacture, and lack of permanent, accurate, adequate and fair

8    warning of the characteristics, danger and hazard to the user, prospective user and

9    members of the general public, including, but not limited to, Plaintiff Wilson and the

10   other Mississippi State Class members, and because GM failed to recall or otherwise

11   cure one or more defects in the Class Vehicles involved thereby directly and proximately

12   causing the described injuries.

13    547. GM knew or reasonably should have known that the above mentioned

14   product would be purchased, leased, and used without all necessary testing or inspection

15   for defects by Plaintiff Wilson and the other Mississippi State Class members.

16    548. Plaintiff Wilson and the other Mississippi State Class members were not

17   aware of those defects at any time before the incident and occurrence mentioned in this

18   complaint, or else Plaintiff Wilson and the other Mississippi State Class members were

19   unable, as a practical matter, to cure the defective condition.

20    549. Plaintiff Wilson and the other Mississippi State Class members used the

21   Defective Vehicles in a foreseeable manner.

22    550. As a proximate result of GM's negligence, Plaintiff Wilson and the other

23   Mississippi State Class members suffered injuries and damages.

24

25

26

27

28

COMPLAINT

**TWENTY-SECOND CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability**
**Miss. Code Ann. § 75-2-314, *et seq.***
**(Brought on behalf of the Mississippi State Class against GM)**

551. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

552. Plaintiff Wilson bring this Count on behalf of the Mississippi State Class.

553. GM has defectively designed, manufactured, sold, or otherwise placed in the stream of commerce Defective Vehicles as set forth above.

554. GM impliedly warranted that the Defective Vehicles were merchantable for the ordinary purpose for which they were designed, manufactured, and sold.

555. The Defective Vehicles were not in merchantable condition or fit for their ordinary use due to the defects described above and as a result of the breach of warranty of merchantability by GM, Plaintiff Wilson and the Mississippi State Class members sustained injuries and damages.

**TWENTY-THIRD CAUSE OF ACTION**
**Negligence**
**Mississippi Common Law**
**(Brought on behalf of the Mississippi State Class against GM)**

556. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

557. Plaintiff Wilson brings this Count on behalf of the Mississippi State Class.

558. GM has defectively designed, manufactured, sold, or otherwise placed in the stream of commerce Defective Vehicles as set forth above.

559. GM had a duty to manufacture a product which would be safe for its intended and foreseeable uses and users, including the use to which it was put by Plaintiff Wilson and the Mississippi State Class members. GM breached its duty to Plaintiff Wilson and the Mississippi State Class members because it was negligent in the design, development, manufacture, and testing of the Defective Vehicles.

560. GM negligent in the design, development, manufacture, and testing of the Defective Vehicles because it knew, or in the exercise of reasonable care should have known, that the Defective Vehicles equipped with defective Key Systems and Airbag Systems pose an unreasonable risk of death or serious bodily injury to Plaintiff Wilson and other Mississippi State Class members, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering and airbags are all rendered inoperable.

561. GM negligently failed to adequately warn and instruct Plaintiff Wilson and other Mississippi State Class members of the defective nature of the Defective Vehicles, of the high degree of risk attendant to using them, given that the users of the Defective Vehicles would be ignorant of the defect.

562. Whereupon Plaintiff Wilson, individually and on behalf of other Mississippi State Class members, respectfully relies upon the Restatement, Second, Torts § 395.

563. GM further breached its duties to Plaintiff Wilson and other Mississippi State Class members by supplying directly and/or through a third person Defective Vehicles to be used by such foreseeable persons as Plaintiff Wilson and other Mississippi State Class members when:

    a. GM knew or had reason to know that the Defective Vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

    b. GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the Defective Vehicles are likely to be dangerous.

564. As a result of GM's negligence, Plaintiff Wilson and other Mississippi State Class members suffered damages.

### TWENTY-FOURTH CAUSE OF ACTION
#### Negligent Misrepresentation/Fraud
#### Mississippi Common Law
#### (Brought on behalf of the Mississippi State Class against GM)

565. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

566. Plaintiff Wilson brings this Count on behalf of the Mississippi State Class.

567. As set forth above, GM concealed and/or suppressed material facts concerning the quality, safety, and reliability of the Defective Vehicles.

568. GM had a duty to disclose these safety issues because it consistently marketed their Defective Vehicles as safe and proclaimed that safety is one of GM's highest corporate priorities. Once GM made representations to the public about safety, GM was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

569. In addition, GM had a duty to disclose these omitted material facts because they were known and/or accessible only to GM who has superior knowledge and access to the facts, and GM knew they were not known to or reasonably discoverable by Plaintiff Wilson and the other Mississippi State Class members. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not the Defective Vehicles equipped with defective Key Systems and Airbag Systems pose an unreasonable risk of death or serious bodily injury to Plaintiff Wilson and other Mississippi State Class members, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering and airbags are all rendered inoperable, are material safety concerns. GM possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

97
COMPLAINT

570. GM actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff Wilson and other Mississippi State Class members to purchase or lease Defective Vehicles at a higher price for the Defective Vehicles, which did not match the Defective Vehicles' true value.

571. Plaintiff Wilson and other Mississippi State Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff Wilson and other Mississippi State Class members' actions were justified. GM was in exclusive control of the material facts and such facts were not known to the public or the other class members.

572. As a result of the misrepresentation concealment and/or suppression of the facts, Plaintiff Wilson and other Mississippi State Class members sustained damage. For those class members who elect to affirm the sale, these damages, under Mississippi law, include the difference between the actual value of that the class members paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For those class members who want to rescind the purchase or lease are entitled to restitution and consequential damages under Mississippi law.

573. GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Wilson and other Mississippi State Class members' rights and wellbeing to enrich GM. Such conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### TWENTY-FIFTH CAUSE OF ACTION
**Violation of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. § 407.010 *et seq.***
**(Brought on behalf of the Missouri State Class against GM)**

574.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

575.    Plaintiff Kielman brings this Count on behalf of the Missouri State Class.

576.    GM's conduct constitutes unfair and/or deceptive acts or practices, including, but not limited to: (a) GM's manufacture and sale of the Defective Vehicles equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death; (b) GM's failure to adequately disclose and remedy this issue; and (c) GM's misrepresentations and omissions with respect to the quality, safety, and reliability of the Defective Vehicles.

577.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

578.    GM's actions impact the public interest because Plaintiff Kielman was injured in exactly the same way as numerous other members of the Missouri State Class who purchased or leased the Defective Vehicles as a result of GM's unfair and/or deceptive acts.

579.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of Missouri.

580.    Plaintiff Kielman and the other Missouri State Class members were injured as a result of GM's conduct in that they overpaid for their Defective Vehicles and did not receive the benefit of the bargain, and their Defective Vehicles have suffered a diminution in value.

COMPLAINT

581. GM's conduct proximately caused the injuries to Plaintiff Kielman and the other Missouri State Class members as set forth above.

582. GM is liable to Plaintiff Kielman and the other Missouri State Class members for damages in an amount to be proven at trial, including attorneys' fees, costs, and treble damages.

583. Pursuant to Mo. Rev. Stat. § 407.010, Plaintiff Kielman will serve the Missouri Attorney General with a copy of this complaint, as Plaintiff Kielman seeks injunctive relief.

### TWENTY-SIXTH CAUSE OF ACTION
**Violation of the Nevada Deceptive Trade Practices Act**
**Nev. Rev. Stat. § 598.0903 *et seq.***
**(Brought on behalf of the Nevada State Class against GM)**

584. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

585. Plaintiff Saclo brings this Count on behalf of the Nevada State Class.

586. GM is a "person" within the meaning of the Nevada Deceptive Trade Practices Act.

587. In the course of GM's business, it knowingly and willfully failed to disclose and actively concealed the fact that the Defective Vehicles share a common design defect in that they are equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. Accordingly, GM engaged in deceptive trade practices, including: representing that the Defective Vehicles have characteristics, uses, or benefits, which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; and knowingly making false representations in transactions involving the Defective Vehicles. Nev. Rev. Stat. § 598.0915(5), (7), (9).

588. Plaintiff Saclo and other Nevada State Class members suffered ascertainable loss caused by GM's unfair and deceptive practices. Plaintiff Saclo and

1    the other Nevada State Class members were injured as a result of GM's conduct in that
2    they overpaid for their Defective Vehicles and did not receive the benefit of the bargain,
3    and their Defective Vehicles have suffered a diminution in value.

4        589.    Plaintiff Saelo and other Nevada State Class members seek their actual
5    damages and all other available relief under the Nevada Deceptive Trade Practices Act.

6                        **TWENTY-SEVENTH CAUSE OF ACTION**
7                                **Deceptive Acts or Practices**
                                  **N.Y. Gen. Bus. Law §§ 349**
8              **(Brought on behalf of the New York State Class against GM)**

9        590.    Plaintiffs hereby incorporate by reference the allegations contained in the
10    preceding paragraphs of this Complaint, as if fully set forth herein.

11       591.    Plaintiff Levine brings this Count on behalf of the New York State Class.

12       592.    N.Y. Gen. Bus. Law § 349 makes unlawful "[d]eceptive acts or practices in
13    the conduct of any business, trade or commerce."

14       593.    In the course of GM's business, it willfully failed to disclose and actively
15    concealed the fact that the Defective Vehicles share a common design defect in that they
16    are equipped with defective Key Systems and Airbag Systems that can suddenly fail
17    during normal operation, leaving occupants of the Defective Vehicles vulnerable to
18    crashes, serious injury, and death.  Accordingly, GM made untrue, deceptive, or
19    misleading representations of material facts and omitted or concealed material facts.

20       594.    GM engaged in deceptive acts or practices when it failed to disclose
21    material information concerning the Defective Vehicles which was known to GM at the
22    time of the sale.  GM deliberately withheld information about the Defective Vehicles
23    propensity to suddenly fail during normal operation, leaving occupants of the Defective
24    Vehicles vulnerable to crashes, serious injury, and death due to a design defect in the
25    Key System and Airbag System.  GM withheld this information in order to ensure
26    consumers would purchase or lease the Defective Vehicles and to induce consumers to
27    enter into transactions.

28

1    595.   The propensity of the Defective Vehicles to suddenly fail during normal
2    operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious
3    injury, and death were material to Plaintiff Levine and other New York State Class
4    members. Had Plaintiff Levine and other New York State Class members known of
5    these serious quality, safety, and reliability issues, they would not have purchased or
6    leased their Defective Vehicles.

7    596.   Because GM's deception takes place in the context of automobile safety, its
8    deception affects the public interest.

9    597.   GM's unlawful conduct constitute unfair acts or practices that have the
10   capacity to deceive consumers, that in fact do deceive consumers, and that have a broad
11   impact on consumers at large.

12   598.   Plaintiff Levine and other New York State Class members suffered injury
13   caused by GM's failure to disclose material information. Plaintiff Levine and other New
14   York State Class members overpaid for their Defective Vehicles and did not receive the
15   benefit of their bargain. The value of their Defective Vehicles have diminished now that
16   the safety issues have come to light, and Plaintiff Levine and other New York State
17   Class members own Defective Vehicles that are not safe.

18   599.   Pursuant to N.Y. Gen. Bus. Law § 349, Plaintiff Levine and other New
19   York State Class members are entitled to recover the greater of actual damages or $50.
20   Because GM acted willfully or knowingly, Plaintiff Levine and other New York State
21   Class members are entitled to recover three times actual damages, up to $1,000.

22                        **TWENTY-EIGHTH CAUSE OF ACTION**
23                              **False Advertising**
                          **N.Y. Gen. Bus. Law §§ 350**
24            **(Brought on behalf of the New York State Class against GM)**

25   600.   Plaintiffs hereby incorporate by reference the allegations contained in the
26   preceding paragraphs of this Complaint, as if fully set forth herein.

27   601.   Plaintiff Levine brings this Count on behalf of the New York State Class.

28                                      102
                                     COMPLAINT

1      602.  N.Y. GEN. BUS. LAW § 350 makes unlawful "[f]alse advertising in the

2  conduct of any business, trade or commerce...." False advertising includes "advertising,

3  including labeling, of a commodity ... if such advertising is misleading in a material

4  respect," taking into account "the extent to which the advertising fails to reveal facts

5  material in the light of ... representations [made] with respect to the commodity...."

6  N.Y. GEN. BUS. LAW § 350-a.

7      603.  GM caused to be made or disseminated through New York, through

8  advertising, marketing, and other publications, statements that were untrue or

9  misleading, and which were known, or which by the exercise of reasonable care should

10  have been known to GM, to be untrue and misleading to consumers, including Plaintiff

11  Levine and other New York State Class members.

12      604.  GM has violated § 350 because the misrepresentations and omissions

13  regarding the safety, quality and reliability of its Defective Vehicles as set forth in this

14  complaint were material and likely to deceive a reasonable consumer.

15      605.  Plaintiff Levine and other New York State Class members have suffered an

16  injury, including the loss of money or property, as a result of GM's false advertising. In

17  purchasing or leasing their Defective Vehicles, Plaintiff Levine and other New York

18  State Class members relied on the misrepresentations and/or omissions of GM with

19  respect to the safety, quality, and reliability of the Defective Vehicles. GM's

20  representations turned out not to be true because the Defective Vehicles have a

21  propensity to suddenly fail during normal operation, leaving occupants of the Defective

22  Vehicles vulnerable to crashes, serious injury.

23      606.  Plaintiff Levine and other New York State Class members overpaid for

24  their Defective Vehicles and did not receive the benefit of their bargain. The value of

25  their Defective Vehicles have diminished now that the safety issues have come to light,

26  and Plaintiff Levine and other New York State Class members own Defective Vehicles

27  that are not safe.

28

607. Plaintiff Levine, individually and on behalf of other New York State Class members, requests that this Court enter such orders or judgments as may be necessary to enjoin GM from continuing its unfair, unlawful, and/or deceptive practices. Plaintiff Levine and other New York State Class members are also entitled to recover their actual damages or $500, whichever is greater. Because GM acted willfully and knowingly, Plaintiff Levine and other New York State Class members are entitled to recover three times actual damages, up to $10,000.

## TWENTY-NINTH CAUSE OF ACTION
### Violation of the Ohio Consumer Sales Practices Act
### Ohio Rev. Code Ann. § 1345.01, *et seq.*
### (Brought on behalf of the Ohio State Class against GM)

608. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

609. Plaintiff Glasgow and Plaintiff Owens bring this Count on behalf of the Ohio State Class.

610. At all times relevant to this suit, GM was a "supplier[s]," as defined in the Ohio Consumer Sales Practice Act, Ohio Rev. Code § 1345.01.

611. At all times relevant to this suit, Plaintiff Glasgow, Plaintiff Owens, and the other Ohio State Class members were "consumers," as defined in the Ohio Consumer Sales Practice Act, Ohio Rev. Code § 1345.01.

612. At all times relevant to this suit, Plaintiff Glasgow, Plaintiff Owens, and the other Ohio State Class members purchased or leased their Defective Vehicles as part of a "consumer transaction," as defined by Ohio Rev. Code § 1345.01(A).

613. As a result of placing defective products in the stream of commerce, GM breached its implied warranty in tort. A vehicle manufacturer's breach of an implied warranty has previously been declared by Ohio courts to be an unfair and deceptive act, as defined by Ohio Rev. Code § 1345.09(B). *Mason v. Mercedes Benz USA, LLC*, No. 85031, 2005 Ohio App. Lexis 3911 (8th Dist. Aug. 18, 2005).

104
COMPLAINT

1      614.   GM committed unfair and deceptive acts in violation of Ohio's Consumer

2   Sales Practice Act by knowingly placing into the stream of commerce the Defective

3   Vehicles equipped with defective Key Systems and Airbag Systems which have a

4   propensity to suddenly fail during normal operation, leaving occupants of the Defective

5   Vehicles vulnerable to crashes, serious injury. Moreover, GM committed an unfair,

6   deceptive, and unconscionable act by knowingly concealing the defects in the Defective

7   Vehicles and failing to warn Defective Vehicle owners and/or lessees of this defect.

8      615.   Further, as set forth above, GM made representations or public statements

9   about the quality, safety, and reliability of the Defective Vehicles, which are unfair and

10   deceptive in violation of Ohio law.

11      616.   GM committed these and other unfair and deceptive acts with regard to the

12   marketing and sale of the Defective Vehicles.  GM is liable Plaintiff Glasgow, Plaintiff

13   Owens, and the other Ohio State Class members under Ohio Rev. Code § 1345.09 for

14   damages for economic loss suffered by Plaintiff Glasgow, Plaintiff Owens, and the other

15   Ohio State Class members as a result of the defect.

16      617.   Plaintiff Glasgow, Plaintiff Owens, and the other Ohio State Class members

17   are entitled to compensatory damages, injunctive/equitable relief, and attorneys' fees

18   pursuant to Ohio Rev. Code § 1345.09.

19                          **THIRTIETH CAUSE OF ACTION**
20      **Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection**
                                              **Law**
21                                **73 P.S. § 201-1,** *et seq.*
                     **(Brought on behalf of the Pennsylvania State Class against GM)**
22
       618.   Plaintiffs hereby incorporate by reference the allegations contained in the
23
     preceding paragraphs of this Complaint, as if fully set forth herein.
24
       619.   Plaintiff Doucette bring this Count on behalf of the Pennsylvania State
25
     Class.
26

27

28
                                          105
                                    COMPLAINT

1    620.  The Pennsylvania Unfair Trade Practices and Consumer Protection Law,

2    Title 73, Chapter 4 of the Pennsylvania Statutes, prohibits unfair or deceptive acts or

3    practices in the conduct of any trade or commerce.

4    621.  As described herein, the Defective Vehicles equipped with defective Key

5    Systems and Airbag Systems which have a propensity to suddenly fail during normal

6    operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious

7    injury.

8    622.  GM failed to disclose this known defect, and sold the Defective Vehicles

9    with knowledge of the defect.

10    623.  GM's acts and practices described herein constitute unfair and deceptive

11    acts and practices within the meaning of the Pennsylvania Unfair Trade Practices and

12    Consumer Protection Law as GM's acts and practices herein described offend

13    established public policy, because the harm they cause to consumers outweighs any

14    benefits associated with those practices, and because GM fraudulently concealed the

15    defect from consumers.

16    624.  Plaintiff Doucette is informed and believe, and thereon alleges, that GM

17    concealed the existence of the defect with the intention of inducing Pennsylvania State

18    Class members to purchase the Defective Vehicles. This concealment was likely to

19    deceive a reasonable consumer.

20    625.  Whether or not the Defective Vehicles equipped with defective Key

21    Systems and Airbag Systems pose an unreasonable risk of death or serious bodily injury

22    to Plaintiff Doucette and other Pennsylvania State Class members, passengers, other

23    motorists, pedestrians, and the public at large, because they are susceptible to incidents

24    in which brakes, power steering and airbags are all rendered inoperable, are material

25    safety concerns to Plaintiff Doucette and other Pennsylvania State Class members. If

26    Plaintiff Doucette and other Pennsylvania State Class members  had known of the

27    defect, they would not have purchased the Defective Vehicles.

28

106

COMPLAINT

626.   As a result of GM's unfair and deceptive business practices, Plaintiff Doucette and other Pennsylvania State Class members were deceived and purchased the Defective Vehicles.

627.   As a result of GM's unfair and deceptive business practices, Plaintiff Doucette and other Pennsylvania State Class members have been damaged in an amount to be proven at trial. Plaintiff Doucette and other Pennsylvania State Class members are further entitled to injunctive relief, restitution, and disgorgement of profits obtained by GM as a result of its fraudulent and unfair business acts and practices.

### THIRTY-FIRST CAUSE OF ACTION
#### Violation of the South Dakota Deceptive Trade Practices Act
#### S.D. Codified Laws § 37-24-6, *et seq.*
#### (Brought on behalf of the South Dakota State Class against GM)

628.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

629.   Plaintiff Miller brings this Count on behalf of the South Dakota State Class.

630.   The conduct of GM as set forth herein constitutes deceptive acts or practices, fraud, misrepresentation, and omissions, including: (a) GM's manufacture and sale of the Defective Vehicles equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death; (b) GM's failure to adequately disclose and remedy this issue; and (c) GM's misrepresentations and omissions with respect to the quality, safety, and reliability of the Defective Vehicles.

631.   Plaintiff Miller and other members of the South Dakota State Class were injured as a result of GM's deceptive acts or practices, fraud, and material misrepresentations and omissions. Plaintiff Miller and other members of the South Dakota State Class overpaid for their Defective Vehicles and did not receive the benefit of their bargain. Additionally, the Defective Vehicles have suffered a diminution in value.

COMPLAINT

632. Plaintiff Miller and other members of the South Dakota State Class suffered damages as a direct proximate result of the same wrongful practices that GM engaged in.

633. Pursuant to S.D. Codified Laws § 37-24-1, Plaintiff Miller and the other South Dakota State Class members are entitled to their actual damages suffered as a result of GM's deceptive acts and practices.

### THIRTY-SECOND CAUSE OF ACTION
**Violation of the West Virginia Consumer Credit and Protection Act**
**W. Va. Code § 46A-1-101, *et seq.***
**(Brought on behalf of the West Virginia State Class against GM)**

634. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

635. Plaintiff Wessel brings this Count on behalf of the West Virginia State Class.

636. GM is a "person" under W. Va. Code § 46A-1-102(31).

637. Plaintiff Wessel and other members of the West Virginia State Class are "consumers," as defined by W. Va. Code §§ 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more of the Defective Vehicles.

638. By willfully failing to disclose and actively concealing the fact that the Defective Vehicles share a common design defect in that they are equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death, GM engaged in deceptive business practices prohibited by W. Va. Code § 46A-1-101, *et seq.*, including: representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising the Defective Vehicles with the intent not to sell them as advertised; and representing that the subject of a transaction involving the Defective Vehicles has been supplied in accordance with a previous representation when it has not.

639. GM made numerous material statements about the safety and reliability of the Defective Vehicles that were false or misleading.

640. Each of these statements contributed to the deceptive context of GM's unlawful advertising and representations as a whole.

641. GM knew that the Defective Vehicles were defectively designed and manufactured with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. Nevertheless, GM failed to adequately disclose and remedy this issue.

642. GM owed Plaintiff Wessel and other West Virginia State Class members a duty to disclose the defective nature of the Defective Vehicles, including the dangerous risk that the Key System and Airbag System can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death, because GM: possessed exclusive knowledge of the defects rendering the Defective Vehicles inherently more dangerous and unreliable than similar vehicles; intentionally concealed the defects in the Defective Vehicles from Plaintiff Wessel and other West Virginia State Class members; and/or made incomplete representations about the quality, safety, and reliability of the Defective Vehicles, while purposefully withholding material facts from Plaintiff Wessel and other West Virginia State Class members that contradicted those representations.

643. Defective Vehicles equipped with defective Key Systems and Airbag Systems pose an unreasonable risk of death or serious bodily injury to Plaintiff Wessel and other West Virginia State Class members, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which brakes, power steering and airbags are all rendered inoperable.

644. A reasonable consumer would consider the unreasonable risk of death or serious bodily injury posed by the defect in the Key Systems and Airbag Systems in the Defective Vehicles important in selecting a vehicle to purchase or lease.

645. When Plaintiff Wessel and other West Virginia State Class members purchased their Defective Vehicles, they reasonably expected that the Defective Vehicles were not susceptible to incidents in which brakes, power steering and airbags are all rendered inoperable as a result of a defect in the Key System and Airbag System.

646. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Wessel, about the true quality, safety, and reliability of the Defective Vehicles.

647. As a result of GM's unfair or deceptive acts or practices, Plaintiff Wessel and other West Virginia State Class members have suffered ascertainable loss. If GM's conduct is not stopped, Plaintiff Wessel and other West Virginia State Class members will continue to be injured. Plaintiff Wessel and other West Virginia State Class members currently own or lease Defective Vehicles that are defective and inherently unsafe.

648. Plaintiff Wessel and other West Virginia State Class members were injured as a result of GM's deceptive trade practices in that they overpaid for their Defective Vehicles and did not receive the benefit of the bargain, and their Defective Vehicles have suffered a diminution in value.

649. Plaintiff Wessel and other West Virginia State Class members risk irreparable injury as a result of GM's acts and material omissions, and these violations of W. Va. Code § 46A-1-101, *et seq.* present a continuing risk to Plaintiff Wessel as well as to the general public.

650. Pursuant to W. Va. Code § 46A-1-106, Plaintiff Wessel seeks monetary relief against GM measured as the greater of (1) actual damages in an amount to be determined at trial or (2) statutory damages in the amount of $200 per violation for

1 | Plaintiff Wessel and each member of the West Virginia State Class.

2 | 651. Plaintiff Wessel and other West Virginia State Class members seek punitive

3 | damages against GM, because GM willfully, wantonly, fraudulently, and maliciously

4 | failed to disclose and actively concealed the fact that the Defective Vehicles share a

5 | common design defect, thereby subjecting Plaintiff Wessel to cruel and unjust hardship

6 | as a result. GM's unlawful conduct constitutes, malice, oppression, and fraud

7 | warranting punitive damages.

8 | 652. Plaintiff Wessel further seeks an order enjoining GM's unfair or deceptive

9 | acts or practices, restitution, punitive damages, costs, and attorneys' fees under W. Va.

10 | Code § 46A-5-101, *et seq.* and any other just and proper relief available under the West

11 | Virginia Consumer Credit and Protection Act.

### THIRTY-THIRD CAUSE OF ACTION
**Violation of the Wisconsin Deceptive Trade Practices Act**
**Wisc. Stat. § 101.18, *et seq.***
**(Brought on behalf of the Wisconsin State Class against GM)**

653. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

654. Plaintiff Maas brings this Count on behalf of the Wisconsin State Class.

655. By willfully failing to disclose and actively concealing the fact that the Defective Vehicles share a common design defect in that they are equipped with defective Key Systems and Airbag Systems that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death, GM engaged in deceptive business practices prohibited by Wisc. Stat. § 101.18, *et seq.*, including: representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising the Defective Vehicles with the intent not to sell them as advertised; and representing that the subject of a transaction involving the Defective Vehicles has been supplied in accordance with a previous representation when it has not.

111

1      656.  GM made numerous material statements about the safety and reliability of

2  the Defective Vehicles that were false or misleading.

3      657.  Each of these statements contributed to the deceptive context of GM's

4  unlawful advertising and representations as a whole.

5      658.  GM's unfair or deceptive acts or practices were likely to and did in fact

6  deceive reasonable consumers, including Plaintiff Maas, about the true quality, safety,

7  and reliability of the Defective Vehicles.

8      659.  Plaintiff Maas and the other Wisconsin State Class members were injured

9  as a result of GM's deceptive trade practices in that they overpaid for their Defective

10  Vehicles and did not receive the benefit of the bargain, and their Defective Vehicles

11  have suffered a diminution in value.

12      660.  Plaintiff Maas and the other Wisconsin State Class members sustained

13  damages as a result of GM's deceptive trade practices, and are therefore entitled to

14  damages and other relief provided for under Wisc. Stat. § 110.18(11)(b)(2).  Because

15  GM willfully failed to disclose and actively concealed the fact that the Defective

16  Vehicles share a common design defect, Plaintiff Maas and the other Wisconsin State

17  Class members are entitled to treble damages.

18      661.  Plaintiff Maas and the other Wisconsin State Class members also seek costs

19  and attorneys' fees under Wisc. Stat. § 110.18(11)(b)(2).

20  / / /

21  / / /

22  / / /

23

24

25

26

27

28

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

(a)    That the Court certify this action as a class action, appointing Plaintiffs as class representative and appointing Plaintiffs' counsel as lead class counsel;

(b)    That the Court enjoin GM from continuing the unfair business practices alleged in this Complaint and requiring GM to repair the Defective Vehicles;

(c)    That the Court award Plaintiffs and the other Class members compensatory damages in an amount to be proven at trial;

(d)    That the Court award Plaintiffs and the other Class members punitive damages in an amount to be proven at trial;

(e)    That the Court award Plaintiffs and the other Class members attorneys' fees, costs, and expenses; and

(f)    That the Court award Plaintiffs and the other Class members all other relief as the Court deems appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs request trial by jury on all issues so triable.

Respectfully submitted,

Dated: April 16, 2014           By:   /s/ Mark Pifko
                                      Mark Pifko

                                Roland Tellis (SBN 186269)
                                rtellis@baronbudd.com
                                Mark Pifko (SBN 228412)
                                mpifko@baronbudd.com
                                Isaac Miller (SBN 266459)
                                jmiller@baronbudd.com
                                **BARON & BUDD, P.C.**
                                15910 Ventura Boulevard, Suite 1600
                                Encino, California 91436
                                Telephone: (818) 839-2333
                                Facsimile: (818) 986-9698

113
COMPLAINT

1    Adam J. Levitt (to be admitted *pro hac vice*)
     alevitt@gelaw.com
2    John E. Tangren (to be admitted *pro hac vice*)
     jtangren@gelaw.com
3    **GRANT & EISENHOFER P.A.**
     30 North LaSalle Street, Suite 1200
4    Chicago, Illinois 60602
     Telephone: (312) 214-0000
5    Facsimile: (312) 214-0001

6
     Lance Cooper (SBN 151800)
7    lance@thecooperfirm.com
     **THE COOPER FIRM**
8    701 Whitlock Avenue, S.W.
9    Marietta, Georgia 30064
     Telephone: (770) 427-5588
10   Facsimile: (770) 427-0010

11
     Scott B. Cooper (SBN 174520)
12   scott@cooper-firm.com
     **THE COOPER LAW FIRM, P.C.**
13   2030 Main Street, Suite 1300
     Irvine, California 92614
14   Telephone: (949) 724-9200
     Facsimile: (949) 724-9255
15

16   Cale H. Conley (to be admitted *pro hac vice*)
     cale@conleygriggs.com
17   Ranse M. Partin (to be admitted *pro hac vice*)
     ranse@conleygriggs.com
18   Andre T. Tennille III (to be admitted *pro hac vice*)
19   dre@conleygriggs.com
     **CONLEY GRIGGS PARTIN LLP**
20   The Hardin Building
     1380 West Paces Ferry Road, N.W., Suite 2100
21   Atlanta, Georgia 30327
     Telephone: (404) 467-1155
22   Facsimile: (404) 467-1166

23

24

25

26

27

28
                              114

James R. Bartimus (to be admitted *pro hac vice*)
jb@bflawfirm.com
Edward D. Robertson, Jr. (to be admitted *pro hac vice*)
crobertson@bflawfirm.com
**BARTIMUS, FRICKLETON, ROBERTSON
& GOZA, P.C.**
11150 Overbrook Road, Suite 200
Leawood, Kansas 66211
Telephone: (913) 266-2300
Facsimile: (913) 266-2366

Mark DiCello (to be admitted *pro hac vice*)
madicello@dicellolaw.com
Robert F. DiCello (to be admitted *pro hac vice*)
rfdicello@dicellolaw.com
**THE DICELLO LAW FIRM**
Western Reserve Law Building
7556 Mentor Avenue
Mentor, Ohio 44060
Telephone: (440) 953-8888
Facsimile: (440) 953-9138

Joseph J. Siprut (to be admitted *pro hac vice*)
jsiprut@siprut.com
**SIPRUT P.C.**
17 North State Street, Suite 1600
Chicago, Illinois 60602
Telephone: (312) 236-0000
Facsimile: (312) 948-9212

Niall A Paul (to be admitted *pro hac vice*)
npaul@spilmanlaw.com
**SPILMAN THOMAS & BATTLE, PLLC**
300 Kanawha Boulevard, East (25301)
Post Office Box 273
Charleston, West Virginia 25321
Telephone: (304) 340-3800
Facsimile: (304) 340-3801

Sharon L. Potter (to be admitted *pro hac vice*)
spotter@spilmanlaw.com
**SPILMAN THOMAS & BATTLE, PLLC**
Century Centre Building
1233 Main Street, Suite 4000
Wheeling, West Virginia 26003
Telephone: (304) 230-6950
Facsimile: (304) 230-6951

115

COMPLAINT

Nathan B. Atkinson (to be admitted *pro hac vice*)
natkinson@spilmanlaw.com
**SPILMAN THOMAS & BATTLE, PLLC**
110 Oakwood Drive, Suite 500
Winston-Salem, North Carolina 27103
Telephone: (336) 725-4710
Facsimile: (336) 725-4476

Guy R. Bucci (to be admitted *pro hac vice*)
Gbucci@BBJLC.com
Timothy C. Bailey (to be admitted *pro hac vice*)
Timbailey@BBJLC.com
Lee Javins (to be admitted *pro hac vice*)
Ljavins@BBJLC.com
**BUCCI BAILEY & JAVINS L.C.**
213 Hale Street
Charleston, West Virginia 25301
Telephone: (304) 932-4639
Facsimile: (304) 345-0375

Gregory M. Travalio (to be admitted *pro hac vice*)
gtravalio@isaacwiles.com
Mark H. Troutman (to be admitted *pro hac vice*)
mtroutman@isaacwiles.com
**ISAAC, WILES, BURKHOLDER & TEETOR, LLC**
Two Miranova Place, Suite 700
Columbus, Ohio 43215
Telephone: (614) 221-2121
Facsimile: (304) 345-0375

Jonathan Shub (SBN 237708)
jshub@seegerweiss.com
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, Pennsylvania 19102
Telephone: (215) 553-7980
Facsimile: (215) 851-8029

Matthew L. Dameron
matt@williamsdirks.com
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone: (816) 876-2600
Facsimile: (816) 221-8763

116

1       Andrés W. López
andres@awllaw.com
**THE LAW OFFICES OF ANDRÉS W. LOPÉZ, P.S.C.**
902 Fernández Juncos Ave.
Miramar
San Juan, Puerto Rico 00907
P.O. Box 13909
San Juan, PR 00908
Telephone: (787) 294-9508
Facsimile: (787) 294-9519

Attorneys for Plaintiffs
KEN SACLO, MEL COHEN, TIFFANY
MALONE, DAWN ORONA, LISA
TEICHER, SUE NAGLE, ROBERT
YOUNG, ROBBIE LUTHANDER,
HEATHER HOLLEMAN, JEREMY
CLINTON, TOMMY TYSON, DAWN
TALBOT, TARA HEATH, SARAH
SLOAN, BONNIE CONDON, DEREK
WILSON, SHERRY KIELMAN, SANDRA
LEVINE, JENNIFER GLASGOW,
MICHAEL OWENS, SHAWN
DOUCETTE, GERALDINE MILLER,
CHRISTA WESSEL, PAMELA MAAS,
and ELIZABETH STEWART individually
and on behalf of all others similarly situated

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

117

COMPLAINT