# Exhibit HHH

14 CV 2714

| | |
|---|---|
| 1 | James Bilsborrow<br>*jbilsborrow@weitzlux.com* |
| 2 | Robin Greenwald (PHV Pending)<br>*rgreenwald@weitzlux.com* |
| 3 | WEITZ & LUXENBERG P.C.<br>700 Broadway |
| 4 | New York, NY 10003<br>Telephone: (212) 558-5500 |
| 5 | Facsimile: (212) 344-5461 |

Jonathan Selbin
*jselbin@lchb.com*
Sudarsana Srinivasan
*dsrinivasan@lchb.com*
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Elizabeth J. Cabraser (PHV Pending)
*ecabraser@lchb.com*
Todd A. Walburg (PHV Pending)
*twalburg@lchb.com*
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

RECEIVED
APR 16 2014
U.S.D.C. S.D.N.Y.
CASHIERS

*Attorneys for the Plaintiffs*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

MARIE MAZZOCCHI, individually and on behalf
of all others similarly situated,

           Plaintiffs,

v.

GENERAL MOTORS LLC; GENERAL MOTORS
HOLDING, LLC; DELPHI AUTOMOTIVE PLC;
and DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE
SYSTEMS, LLC,

           Defendants.

Case No.

**CLASS ACTION COMPLAINT**

**FOR INJUNCTIVE RELIEF,
EQUITABLE RELIEF, AND
DAMAGES**

**JURY TRIAL DEMANDED**

## NATURE OF CLAIM

1.    Plaintiff MARIE MAZZOCCHI brings this action for herself and on behalf of all

persons similarly situated who purchased or leased certain vehicles manufactured, distributed,

and/or sold by GENERAL MOTORS LLC, GENERAL MOTORS HOLDING, LLC,

GENERAL MOTORS CORPORATION, GENERAL MOTORS COMPANY, and/or its related

subsidiaries, successors, or affiliates ("GM") with defective ignition switches manufactured by

DELPHI AUTOMOTIVE PLC, DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS,

LLC, and/or its related subsidiaries, successors, or affiliates ("Delphi"), as described below.

       2.      As used in this complaint, the "Defective Vehicles" or "Class Vehicles" refers to

the GM vehicles sold in the United States equipped at the time of sale with ignition switches (the

"Ignition Switches") sharing a common, uniform, and defective design, including the following

makes and model years:

-     2005-2010 Chevrolet Cobalt

-     2006-2011 Chevrolet HHR

-     2006-2010 Pontiac Solstice

-     2003-2007 Saturn Ion

-     2007-2010 Saturn Sky

-     2005-2010 Pontiac G5

       3.      An estimated 2.6 million vehicles were sold in the United States equipped with

the Ignition Switches. Upon information and belief, there are other vehicles sold in the United

States equipped with the Ignition Switches that have not yet been disclosed by GM.

       4.      The Ignition Switches in the Class Vehicles turn on the vehicle's motor engine

and main electrical systems when the key is turned to the "run" or "on" position. The Ignition

Switches have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC"

("accessory"). At the "run" position, the vehicle's motor engine is running and the electrical

systems have been activated; at the "accessories" position the motor is turned off, and electrical

power is generally only supplied to the vehicle's entertainment system; and at the "off" position,

both the vehicle's engine and electrical systems are turned off. In most vehicles a driver must

intentionally turn the key in the ignition to move to these various positions.

CLASS ACTION COMPLAINT

5.      The ignition switch is not an automotive component that vehicle manufacturers or reasonable consumers expect will deteriorate or break down after normal wear and tear, thereby triggering the need for replacement.

6.      Delphi, at all times material to this action, manufactured the defective ignition switch system for GM.  GM began installing the Delphi-manufactured Ignition Switches beginning in 2002 vehicle models. Upon information and belief, Delphi knew the Ignition Switches were defectively designed and did not meet GM's own design specifications, but nonetheless continued to manufacture and sell the defective Ignition Switches with the knowledge that they would be used in GM vehicles, including the Class Vehicles.  Delphi also manufactured the ignition switch system after the 2007 change implemented by GM without reflecting a corresponding change in the part number.

7.      Because of defects in their design, the Ignition Switches installed in the Class Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions.  The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position. Due to faulty design and improper positioning, the Ignition Switches can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "acc" position (the "Ignition Switch Defect").  When this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the safety airbag system.

8.      The Ignition Switch Defect can occur at any time during normal and proper operation of the Class Vehicles, meaning the ignition can suddenly switch off while it is moving at 65mph (or faster) on the freeway, leaving the driver unable to control the vehicle.

CLASS ACTION COMPLAINT

9.    GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths. GM has refused, however, to disclose the identities of those it counts among these thirteen deaths. Independent safety watchdog groups have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Class Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Class Vehicle models is expected to be much higher.

10.    All persons in the United States who have purchased or leased a Class Vehicle equipped with the Ignition Switches are herein referred to as Class Members ("Class Members").

11.    All Class Members were placed at risk by the Ignition Switch Defect from the moment they first drove their vehicles. The Ignition Switch Defect precludes all Class Members from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Class Members and other vehicle occupants. However, no Class Members knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure.

12.    Upon information and belief, prior to the sale of the Class Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data, yet despite this knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect from Class Members and the public, and continued to market and advertise the Class Vehicles as reliable and safe vehicles, which they are not. A reasonable manufacturer would not have sold a vehicle if it contained the Ignition Switch Defect.

CLASS ACTION COMPLAINT

13.    Moreover, reasonable consumers who knew about the Ignition Switch Defect would not have purchased the Class Vehicles due to the unexpected risk of a sudden and dangerous ignition switch failure that places the vehicle's occupants at serious risk of injury or death.

14.    As a result of GM's alleged misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, in that the Class Vehicles are unsafe, unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition Switch Defect by way of a sudden and dangerous failure that puts them and others at serious risk of injury or death.  Plaintiffs and the Class did not receive the benefit of their bargain as purchasers and lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations.  Class Members did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts.  A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car—such as the Class Vehicles—that is known to contain a safety defect such as the Ignition Switch Defect.

15.    As a result, all purchasers of the Class Vehicles overpaid for their cars at the time of purchase.  Furthermore, GM's public disclosure of the Ignition Switch Defect has further caused the value of the Class Vehicles to materially diminish.  Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Ignition Switch Defect been disclosed.

CLASS ACTION COMPLAINT

16.     Further, and in spite of GM's belated recall of the Class Vehicles, litigation is necessary in order to ensure that Class Members receive full and fair compensation, under the auspices of court order, for their injuries.

## PARTIES

### Plaintiffs

#### *Marie Mazzocchi*

17.     Plaintiff Marie Mazzocchi is a citizen of the state of New York, and she resides in the city of Fishkill. Ms. Mazzocchi owns a 2003 Saturn Ion, which she purchased new in 2010 in Poughkeepsie, New York. Ms. Mazzocchi's Saturn Ion was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Ms. Mazzocchi purchased her vehicle primarily for her personal, family, and household use. Ms. Mazzocchi no longer feels safe driving her vehicle and will not allow her daughter to drive it out of fear for her safety. Ms. Mazzocchi also doubts whether she can even believe GM when it purports that it will fix the Ignition Switch Defect in her car and the millions like it around the country.

### Defendants

18.     General Motors Corporation was a Delaware corporation with its headquarters in Detroit, Michigan. The Corporation, through its various entities, designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in New York and numerous other locations in the United States and worldwide.

19.     In 2009, General Motors Corporation filed for bankruptcy, and substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to General Motors LLC.

20.     Under the Agreement, General Motors LLC also expressly assumed certain liabilities of General Motors Corporation, including certain statutory requirements:

CLASS ACTION COMPLAINT

From and after the Closing, Purchaser [GM] shall comply with the

certification, reporting and recall requirements of the National

Traffic and Motor Vehicle Safety Act, the Transportation Recall

Enhancement, Accountability and Documentation Act, the Clean

Air Act, the California Health and Safety Code and similar Laws,

in each case, to the extent applicable in respect of vehicles and

vehicle parts manufactured or distributed by Seller.

In addition, General Motors LLC expressly set forth that it:

shall be responsible for the administration, management and

payment of all Liabilities arising under (i) express written

warranties of Sellers [General Motors Corporation] that are

specifically identified as warranties and delivered in connection

with the sale of new, certified used or pre-owned vehicles or new

or remanufactured motor vehicle parts and equipment (including

service parts, accessories, engines and transmissions)

manufactured or sold by Sellers or Purchaser prior to or after the

Closing and (ii) Lemon Laws.

21.     General Motors LLC is a Delaware corporation with its headquarters in Detroit,

Michigan.  General Motors LLC is registered with the New York Department of State to conduct

business in New York.

22.     At all times relevant herein, General Motors Corporation and its successor in

interest General Motors LLC were engaged in the business of designing, manufacturing,

constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing

CLASS ACTION COMPLAINT

1  automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle

2  components throughout the United States.

3       23.     Defendant Delphi Automotive PLC ("Delphi") is headquartered in Gillingham,

4  Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is

5

6  headquartered in Troy, Michigan.

7       24.     Delphi began as a wholly-owned subsidiary of General Motors Corporation, until

8  it was launched as an independent publicly-held corporation in 1999.

9       25.     In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy

10  in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi

11

12  plants to assist with its post-bankruptcy restructuring. In 2011, GM finally ended its ownership

13  interest in Delphi by selling back the assets.

14       26.     At all times relevant herein, Delphi, through its various entities, designed,

15  manufactured, and supplied GM with motor vehicle components, including the subject Ignition

16  Switches.

17       27.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

18

19                              **JURISDICTION AND VENUE**

20       28.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act,

21  28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states

22  different from Defendants' home states, and the aggregate amount in controversy exceeds

23  $5,000,000, exclusive of interest and costs.

24       29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because GM conducts

25

26  substantial business in this District, has caused harm to Class Members residing in this District,

27  and Plaintiff Marie Mazzocchi resides in this District.

28

CLASS ACTION COMPLAINT

## **FACTUAL BACKGROUND**

*The Defective Vehicles*

30.     The Saturn Ion was a compact car first introduced in 2002 for the 2003 model year, and was discontinued in 2007.

31.     The Chevrolet Cobalt was a compact car first introduced in 2004 for the 2005 model year, and was discontinued in 2010.

32.     The Pontiac G5 was first introduced in 2004 for the 2005 model year, and was discontinued in 2009.  The coupe and four-door sedan version of the G5 was marketed in Canada from 2005 to 2010, but is not a vehicle at issue in this action.

33.     The Chevrolet HHR was a compact car first introduced in 2005 for the 2006 model year, and was discontinued in 2011.

34.     The Pontiac Solstice was a sports car first introduced in 2005 for the 2006 model year, and was discontinued in 2009.

35.     The Saturn Sky was first introduced in 2006 for the 2007 model year, and was discontinued in 2009.

36.     The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

37.     The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

38.     Upon information and belief, GM promoted these Class Vehicles as safe and reliable in numerous uniform, standardized, and widely and continuously disseminated marketing and advertising materials.

39.     No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time or purchase or lease.

CLASS ACTION COMPLAINT

*GM Field Reports and Internal Testing Reveal a Problem*

40.    In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position. In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

41.    In early 2002, Delphi informed GM that the ignition switch did not meet GM's design standards. According to Delphi, GM's original torque specifications called for a range of 15 to 20 Newton-centimeters. Testing of the original switch in 2002, however, showed only a range of 4 to 10 Newton-centimeters in most cases. According to Delphi, the torque requirements were intended to ensure that there was sufficient rotational force to keep the switch in the "run" position.

42.    At that time, a replacement switch would have cost less than $1 to produce.

43.    In order to replace the switch to ensure that it met specifications, GM would have been forced to delay its release of the Saturn Ion. GM was unwilling to delay the Ion and proceeded to manufacture the vehicles with switches that it knew did not meet its specifications.

44.    In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter.

45.    GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly

CLASS ACTION COMPLAINT

switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

46.     After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents of sudden loss of engine power. GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

47.     Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition. Although GM initially approved the design, the company once again declined to act.

48.     In testimony April 1, 2014, before the House Committee on Energy and Commerce, GM CEO Mary Barra explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

CLASS ACTION COMPLAINT

49.     In a recent interview with the Detroit News, John Henke, who has tracked

relations between suppliers and automakers since 1992, echoed this sentiment, stating that in the

years 2002 to 2007, GM was "so cost-oriented; price took precedence over quality."

50.     In April 2006, GM finally approved a design change for the Chevrolet Cobalt's

ignition switch, as proposed by the supplier Delphi. According to GM, the changes included a

new detent plunger and spring, but there was no corresponding change in the ignition switch part

number.  GM estimates that Delphi began producing the redesigned ignition switch for all

Subject Vehicles during the 2007 model year.

51.     Delphi assigned its newly designed switch the same part number assigned to the

faulty ignition switch.  Upon information and belief, Delphi's action was intended to make it

difficult to trace the defective switch back to its original design in 2001.

52.     After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing

the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM

instituted the change after finding that consumers "with substantially weighted key

chains/additional keys hanging from ignition key have experienced accidental ignition shut-off"

and the design change was intended to "significantly reduce downward force and the likelihood

of this occurrence."  The new key design was produced for 2010 model year.

53.     According to Delphi, the component required to fix the Ignition Switch Defect

costs approximately $1.  GM management estimated that replacement components would cost an

additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

54.     GM also now acknowledges that Field Product Reports and PRTS reports related

to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may

be related to the Ignition Switch Defect.

***GM Issues Information Service Bulletins***

CLASS ACTION COMPLAINT

55.    In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch.  The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

56.    The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning."  GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain."  The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

57.    On July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present." Adler advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

58.    The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead." She was able to safely coast to the side of

CLASS ACTION COMPLAINT

the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of the service bulletin. The reporter stated that the key chain being used at the time of the stalling incident was provided by GM, and included only the key fob and a tag.

59.    GM, in a statement at the time through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition...."

60.    In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007A) to include additional vehicles and model years.  Specifically, GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky.  The updated bulletin included the same service advisories to GM dealers as the earlier version.

61.    According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

***Reports of Unintended Engine Shut Down***

62.    A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles."  Despite these reports, the Saturn Ion remained in production until 2007.

63.     On May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

***Crash Reports and Data***

64.     The Defendants knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

65.     National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

66.     In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

67.     In 2006, there were at least two fatalities associated with a Chevy Cobalt crash. Information from the car's data recorder indicated that the ignition switch was in "accessory" instead of run, and the front airbags failed to deploy.

68.     In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

69.     In 2007, NHTSA's early warning division reviewed available data provided by GM on airbag non-deployments in Chevrolet Cobalt vehicles. This review identified 43 incidents in which airbags may not have deployed in a crash. The early warning division referred the case to NHTSA's data analysis division for further screening. A defects panel was convened, but after reviewing the data and consulting with GM, the panel ultimately concluded

CLASS ACTION COMPLAINT

that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect

trend that would warrant the agency opening a formal investigation." In prepared remarks

delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting

Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the

information that GM has since provided—for instance, new evidence linking airbag non-

deployment to faulty ignition switches."

70.     GM has identified at least 23 frontal-impact crashes in the United States involving

2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch Defect may

have caused or contributed to the failure of the safety airbags to deploy.

71.     GM has identified at least 8 frontal-impact crashes in the United States involving

2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or

contributed to the failure of the safety airbags to deploy. These crashes resulted in four fatalities

and six injuries to occupants.

72.     GM has identified at least 3 frontal-impact crashes in the United States involving

2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may

have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in

three injuries to occupants.

73.     On information and belief, many more crashes, resulting in injuries and deaths,

have occurred because of the Ignition Switch Defect, and have gone unreported because

Defendants have concealed the problem for over ten years' time. These crashes continue to

occur, even as GM responds to Congressional investigations and has announced a recall.

Further, accidents will continue to occur unless and until the Ignition Switch Defect is

completely and effectively corrected.

***GM's Belated Repair Recall of Some Vehicles***

- 15 -

74.     On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  The notice identified that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight.

75.     The notice also did not identify all the vehicles affected by the Ignition Switch Defect.

76.     The notice failed to indicate the full extent to which GM has been aware of the Defect.  The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

77.     In a February 24, 2014 letter to the NHTSA, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

78.     On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect.  Specifically, GM identified the 2003 to 2007 model years of the MY Saturn Ion, 2006 and 2007 model years of the MY Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007 model year of MY Saturn Sky vehicles.

79.     According to the NHTSA Acting Administrator David Friedman, the chronology information provided by GM on February 24, 2014 "raise[d] serious questions as to the timeliness of GM's recall." Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

80.     On March 4, 2014, the NTHSA issued GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

81.     On March 11, 2014, GM filed a new Part 573 report superseding its February 25 filing. The new chronology provided with the report indicated that GM was aware of the Ignition Switch Defect in 2001—significantly earlier than its previous 2004 disclosure. GM now indicated that it had a report from 2001 that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

82.     On March 28, 2014, GM filed a new Part 573 report, which expanded the recall set forth in its February 25, 2014 filing. GM's March 28 report indicated that several additional model year vehicles may be affected by the Ignition Switch Defect. GM identified those vehicles as the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac Solstice, 2008-2010 Pontiac G5, and 2008-2010 Saturn Sky. The March 28 report added over one million vehicles to the total affected by the Ignition Switch Defect.

83.     On April 8, 2014, NHTSA fined GM $28,000—the maximum amount permitted by law—for its failure to comply with the Special Order issued on March 4, 2014. Although NHTSA demanded that GM answer 107 questions about the timing of its knowledge of the Ignition Switch Defect, GM failed to provide a single answer by April 8, 2014. According to

CLASS ACTION COMPLAINT

NHTSA, GM refused to answer even simple questions, such as whether the Ignition Switch was

redesigned at any time other than in 2006.

84.    On April 10, 2014, GM placed two engineers on paid leave as part of an internal

investigation of the Ignition Switch Defect recall.  One of these engineers, Ray DeGiorgio, was

the lead designer for the Ignition Switches.

85.    GM notified dealers of the Defective Vehicles of the recall in February and March

2014.  GM also notified owners of the Defective Vehicles by letter of the recall.  The letter

minimized the risk of the defect, indicating that the Ignition Switch Defect would occur only

"under certain conditions" and emphasized that the risk increased if the "key ring is carrying

added weight . . . or your vehicle experiences rough road conditions."

86.    On April 9, 2014, GM filed a new Part 573 report, which further expanded the

recall to include a defect identified with ignition lock cylinders.  GM's report indicates that the

defective cylinders can allow for the removal of the ignition key while the engine is still running,

allowing for the possibility of a rollaway, "vehicle crash and occupant or pedestrian injuries."

GM cautioned owners of the Defective Vehicles that "it is very important before exiting the

vehicle for customers to make sure the vehicle is in Park . . . ."

87.    GM has advised the public that the replacement ignition switches "ARE NOT

CURRENTLY AVAILABLE."  In testimony before Congress, however, GM CEO Mary Barra

stated that replacement ignition switches would be delivered to dealerships beginning on April 7,

2014.  On information and belief, GM did not begin delivering replacement parts on that date,

and has not delivered replacement parts sufficient to repair the recalled vehicles as of the date of

this filing.

CLASS ACTION COMPLAINT

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment Tolling

88.     Upon information and belief, GM has known of the Ignition Switch Defect in the vehicles since at least 2001, and certainly well before Plaintiffs and Class Members purchased the Class Vehicles, and has concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Ignitions Switch Defect, even when directly asked about it by Class Members during communications with GM and GM dealers.

89.     Although GM has now acknowledged that "[t]here is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine," GM did not fully disclose the Ignition Switch Defect and in fact downplayed the widespread prevalence of the problem, and minimized the risk of the Defect occurring during normal operation of the Class Vehicles.

90.     In 2005, GM issued a Technical Service Bulletin to dealers and service technicians directing that customers be advised to "remove unessential items from their key chains" to avoid inadvertent ignition switching, but did not identify or disclose the Defect.

91.     GM also stated, in 2005, that it was "rare" for the Ignition Switches in Class Vehicles to unintentionally move from the "on" position to the "accessory" or "off" position. GM knew that this statement was untrue, but issued the statement to exclude suspicion and preclude inquiry.

92.     In 2007 and 2010, GM withheld information from the NHTSA when it knew that the NHTSA was investigating airbag non-deployment in certain GM vehicles. Indeed, NHTSA's understood that airbag systems "were designed to continue to function in the event of a power loss during a crash." This understanding was confirmed by available GM service literature reviewed during NHTSA's due diligence effort. GM, however, had evidence that power loss

CLASS ACTION COMPLAINT

caused by the Ignition Switch Defect could also prevent the deployment of airbags. Despite its knowledge and familiarity with NHTSA's investigation, GM withheld this information, which delayed its recall by several years.

93.     In February 2014, GM instituted only a limited recall, only identifying two of the several models with the Ignition Switch Defect. Likewise, the later recall expanded to include five additional model years and makes does not fully disclose all the vehicles affected by the Ignition Switch Defect. On March 28, GM expanded the recall yet again to include all model years of each vehicle affected by the ignition switch recall. GM has revealed the scope of the recall in a hazardous, piecemeal fashion, under duress from Congress and intense consumer backlash.

94.     Upon information and belief, there are other Class Vehicles that have the Ignition Switch Defect that have not yet been disclosed by GM.

95.     As GM CEO Mary Barra explained during testimony before the House Committee on Energy and Commerce on April 1, 2014, GM's active concealment of the Ignition Switch Defect was the result of a "cost culture" versus one that placed an emphasis on safety.

96.     Pursuant to 49 U.S.C. § 30118(c), GM was obligated and had a duty to disclose the Ignition Switch Defect to the NHTSA when it learned of the Defect and/or decided in good faith that the Class Vehicles did not comply with an applicable motor vehicle safety standard.

97.     Any applicable statute of limitation has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**Estoppel**

98.     GM was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the vehicles. GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the

- 20 -

quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class

Members reasonably relied upon GM's knowing and affirmative misrepresentations and/or

active concealment of these facts. Based on the foregoing, GM is estopped from relying on any

statutes of limitation in defense of this action.

### Discovery Rule

99.     The causes of action alleged herein did not accrue until Plaintiffs and Class

Members discovered that their vehicles had the Ignition Switch Defect.

100.     However, Plaintiffs and Class Members had no realistic ability to discern that the

vehicles were defective until—at the earliest—after the Ignition Switch Defect caused a sudden

unintended ignition shut off. Even then, Plaintiffs and Class Members had no reason to know the

sudden loss of power was caused by a defect in the ignition switch because of GM's active

concealment of the Ignition Switch Defect.

101.     Not only did GM fail to notify Plaintiffs or Class Members about Ignition Switch

Defect, GM in fact denied any knowledge of or responsibility for the Ignition Switch Defect

when directly asked about it. Thus Plaintiff and Class Members were not reasonably able to

discover the Ignition Switch Defect until after they had purchased the vehicles, despite their

exercise of due diligence, and their causes of action did not accrue until they discovered that the

Ignition Switch Defect caused their vehicles to suddenly lose power.

### CLASS ACTION ALLEGATIONS

102.     Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of

all other persons similarly situated as members of the proposed Class pursuant to Federal Rules

of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or c(4). This action satisfies the numerosity,

commonality, typicality, adequacy, predominance, and superiority requirements of those

provisions.

103.    The proposed nationwide class is defined as:

**Nationwide Class**

All persons in the United States who purchased or leased a GM

Class Vehicle (2005-2010 Chevrolet Cobalt; 2006-2011 Chevrolet

HHR; 2006-2010 Pontiac Solstice; 2003-2007 Saturn Ion; 2007-

2010 Saturn Sky; and 2005-2010 Pontiac G5), and any other GM

vehicle model containing the same ignition switch as those Class

Vehicle models (Class Members).

104.    Plaintiffs also bring this action on behalf of a statewide class of all persons who

purchased or leased a Class Vehicle in the State of New York.

105.    Excluded from the Class are: (1) Defendants, any entity or division in which

Defendants have a controlling interest, and their legal representatives, officers, directors, assigns,

and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3)

governmental entities; and (4) those persons who have suffered personal injuries as a result of

the facts alleged herein.  Plaintiffs reserve the right to amend the Class definition if discovery

and further investigation reveal that the Class should be expanded, divided into additional

subclasses, or modified in any other way.

**Numerosity and Ascertainability**

106.    Although the exact number of Class Members is uncertain and can only be

ascertained through appropriate discovery, the number is great enough such that joinder is

impracticable.  The disposition of the claims of these Class Members in a single action will

CLASS ACTION COMPLAINT

provide substantial benefits to all parties and to the Court. Class Members are readily

identifiable from information and records in GM's possession, custody, or control.

### Typicality

107.    The claims of the representative Plaintiffs are typical of the claims of the Class in

that the representative Plaintiffs, like all Class Members, purchased or leased a GM Class

Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiffs,

like all Class Members, has been damaged by Defendants' misconduct in that he has incurred

costs relating to the Ignition Switch Defect. Furthermore, the factual bases of Defendants'

misconduct are common to all Class Members and represent a common thread of misconduct

resulting in injury to all Class Members.

### Adequate Representation

108.    Plaintiffs will fairly and adequately represent and protect the interests of the

Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class

actions, including actions involving defective products.

109.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on

behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel

have interests adverse to those of the Class.

### Predominance of Common Issues

110.    There are numerous questions of law and fact common to Plaintiffs and Class

Members that predominate over any question affecting only individual Class Members, the

answers to which will advance resolution of the litigation as to all Class Members. These

common legal and factual issues include:

    a.    whether the Class Vehicles suffer from the Ignition Switch Defect;

CLASS ACTION COMPLAINT

b.      whether Defendants knew or should have known about the Ignition Switch Defect, and, if yes, how long Defendants have known of the Defect;

c.      whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM Vehicle;

d.      whether GM had a duty to disclose the defective nature of the Vehicles to Plaintiffs and Class Members;

e.      whether GM omitted and failed to disclose material facts about the Vehicles;

f.      whether GM concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing the Vehicles;

g.      whether GM engaged in an unlawful enterprise that included a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

h.      whether GM violated state consumer protection statutes, including, *inter alia*, the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. L. Ann. § 445.903 *et seq.*, and §§ 349-350 of the New York General Business Law;

i.      whether the Class Vehicles were fit for their ordinary and intended use, in violation of the implied warranty of merchantability;

j.      whether Plaintiffs and Class Members are entitled to a declaratory judgment stating that the ignition switches in the Class Vehicles are defective and/or not merchantable;

- 24 -

CLASS ACTION COMPLAINT

k.      whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

l.      whether GM should be declared responsible for notifying all Class Members of the Defect and ensuring that all GM vehicles with the Ignition Switch Defect are recalled and repaired.

m.      what aggregate amounts of statutory penalties, as available under the laws of Michigan and New York are sufficient to punish and deter Defendants and to vindicate statutory and public policy, and how such penalties should most equitably be distributed among Class members.

## **Superiority**

111.    Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

112.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

113.    Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

CLASS ACTION COMPLAINT

114.    Defendants have acted in a uniform manner with respect to the Plaintiffs and

Class Members, as demonstrated in the following form "Dear GM Customer" letter:

                                                            July 2013

        Dear General Motors Customer:

        This notice is sent to you in accordance with the requirements of

        the National Traffic and Motor Vehicle Safety Act.

        General Motors, based on data and information from supplier

        IMPCO Automotive, has decided that a defect, which relates to

        motor vehicle safety, exists in certain compressed natural gas

        (CNG) fuel systems installed by IMPCO Automotive on 2011-

        2013 model year CNG equipped Chevrolet Express and GMC

        Savana vehicles.  As a result, General Motors and IMPCO

        Automotive are conducting a safety recall. We apologize for this

        inconvenience.  However, we are concerned about your safety and

        continued satisfaction with our products.

CLASS ACTION COMPLAINT

```
IMPORTANT

• Your 2011-2013 model year Chevrolet Express or GMC
  Savana CNG equipped vehicle is involved in safety
  recall 13139.

• Owners who have not been contacted by General
  Motors concerning this recall should schedule an
  appointment with their Chevrolet or GMC dealer to
  arrange for the repairs to be completed.

• This service will be performed for you at no charge.
```

**Why is your vehicle being recalled?**   The underbody shut-off solenoid connector to a CNG fuel tank may corrode and could form a high-resistance short in the connector, potentially causing overheating or a self-extinguishing flame. If there is a fuel leak or other combustible material in the vicinity, there is a risk of fire.

**What will we do?**   To correct this condition, improved solenoids and securing nuts will be installed for all

- 27 -

CLASS ACTION COMPLAINT

1      exterior tanks and the regulator,

2      and the 30 amp gas fuel pump

3      fuse will be replaced with either

4      a 7.5 amp fuse (for the four tank

5      configuration) or a 5.0 amp fuse

6      (for the three tank

7      configuration). In addition, the

8      wiring routing will be adjusted,

9      if necessary, to eliminate any

10     undue tension on the connector,

11     and anti-corrosion sealing plugs

12     will be installed into the valve

13     body (2013 model year vehicles

14     have these plugs already

15     installed). This service will be

16     performed at no charge. The

17     approximate time for the actual

18     repair can be as much as four

19     hours per vehicle, but the wait

20     time for your vehicle may be

21     longer depending on how busy

22     the dealership is.

23 **What should you do?**     General Motors will contact

24     certain fleets directly to arrange

CLASS ACTION COMPLAINT

| | |
|---|---|
| | for the performance of the |
| | required repair. If you have not |
| | already been contacted by |
| | General Motors, please schedule |
| | an appointment with your |
| | Chevrolet or GMC dealer for |
| | this repair. |
| **Do you have questions?** | If you have questions or |
| | concerns that your dealer is |
| | unable to resolve, please contact |
| | the GM Fleet Action Center at 1- |
| | 800-353-3867. |

If after contacting your dealer and the Fleet Action Center, you are

still not satisfied GM has done their best to remedy this condition

without charge and within a reasonable time, you may wish to

write the Administrator, National Highway Traffic Safety

Administration, 1200 New Jersey Avenue, SE., Washington, DC

20590, or call the toll-free Vehicle Safety Hotline at

1.888.327.4236 (TTY 1.800.424.9153), or go to

http://www.safercar.gov. The National Highway Traffic Safety

Administration Campaign ID Number for this recall is 13V225.

Federal regulation requires that any vehicle lessor receiving this

recall notice must forward a copy of this notice to the lessee within

ten days.

CLASS ACTION COMPLAINT

Jim Moloney

General Director,

Customer and Relationship Services

GM Recall #13139

115.    Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Classwide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Ignition Switch Defect.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Asserted on Behalf of the Nationwide Class
### (Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*)

116.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

117.    This Claim is brought on behalf of the Nationwide Class.

118.    Defendants, Plaintiffs, and the Nationwide Class are "persons" within the meaning of RICO, § 1961(3).

*The RICO Enterprise*

119.    From on or about 2001, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire

CLASS ACTION COMPLAINT

communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

120.    Defendants' existence was separate and distinct from the RICO Enterprise.

121.    The RICO Enterprise is separate and distinct from the pattern of racketeering

activity in which Defendants engaged and are engaging.

122.    The RICO enterprise that engaged in, and whose activities affected interstate and

foreign commerce, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) and

consists of "persons" associated together for the common purpose of employing the multiple

deceptive, abusive, and fraudulent acts described herein.

123.    The RICO enterprise, which engaged in, and whose activities affected interstate

and foreign commerce, was comprised of as association in fact of entities and indivduals that

included:

            a.      Defendant GM;

            b.      GM's Officers, Executives, and Engineers, who have collaborated and

colluded with each other and with other associates-in-fact in the Enterprise to deceive Plaintiff

and other Class members into purchasing dangerous and defective vehicles, and actively

concealing the danger and defect from Plaintiff and the other Class members, including, but not

limited to Alan Adler, GM's Manager for Safety Communications who, in June of 2005, issued

the deceptive public statement regarding the ignition problem; Ray DeGiorgio, GM's design

engineer who signed off on the ignition switch change that was never disclosed; and Mary T.

Barra, GM's current CEO;

            c.      Defendant Delphi;

            d.      GM's Dealers, who GM instructed to present false and misleading

information to Plaintiff and other members of the Class, through, *inter alia*, multiple Service

Bulletins, and who did in fact present such false and misleading information.

124.    The RICO Enterprise is an ongoing organization with an ascertainable structure,

and a framework for making and carrying out decisions, that functions as a continuing unit with

CLASS ACTION COMPLAINT

established duties, and that is separate and distinct from the pattern of racketeering activity in which GM has engaged and is engaging.  The RICO Enterprise was and is used as a tool to effectuate the pattern of racketeering activity.

125.    The members of the RICO Enterprise all had a common purpose: to increase and maximize Defendants' revenues by deceiving Plaintiff and other Class Members into purchasing dangerous and defective vehicles, and actively concealing the Ignition Switch Defect from Plaintiff and other Class Members.  The members of the RICO Enterprise shared the bounty of their enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud.  Each member of the RICO Enterprise benefited from the common purpose of the scheme to defraud: GM sold or leased more vehicles with the Ignition Switch Defect; Delphi sold more of the defective Ignition Switches; and GM's dealers sold and serviced more vehicles with the Ignition Switch Defect.

**The Pattern of Racketeering Activity**

126.    As set forth below, Defendants conducted and participated in the affairs of this RICO Enterprise through a pattern of racketeering activity that lasted more than a decade, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

a.    GM, with the assistance and collaboration of the other persons associated in fact with the enterprise, devised and employed a scheme or artifice to defraud by use of the telephone and internet and transmitted, or caused to be transmitted, by means of wire communication traveling in interstate or foreign commerce, writing(s) and/or signal(s), including GM's website, Service Bulletins to dealers, and communications with other members of the Enterprise, for the purpose of executing such scheme or artifice to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

CLASS ACTION COMPLAINT

b.      As part of the scheme to defraud, the RICO Enterprise utilized the
interstate and international mail and wires for the purpose of obtaining money or property by
means of the false pretenses and artifice to defraud, as described herein.

c.      The concealment of the dangerous and defective condition of the defective
GM vehicles is the core purpose of the underlying racketeering offense. The Enterprise had an
ascertainable structure by which GM operated and managed the association-in-fact by using its
Dealers and Delphi to concoct, obfuscate, carry out, and attempt to justify the fraudulent scheme
described herein.

127.    In furtherance of its scheme to defraud, GM issued the February 28, 2005 Service
Bulletin. It instructed GM's dealers to disseminate false and misleading information about the
dangerous and defective condition of the Defective Vehicles to customers, including Plaintiff
and other members of the Class. The February 28, 2005 Service Bulletin was sent via the mail
and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

128.    In June of 2005, GM issued a public statement through the mail and wires in
furtherance of its scheme to defraud. The statement provided the public, including Plaintiff and
the other Class Members, with false and misleading information about the dangerous and
defective condition of the Defective Vehicles, and sought to conceal that condition by
minimizing the issue and offering an ineffective fix. As such, the statement constitutes a
violation of 18 U.S.C. §§ 1341 and 1343.

129.    GM's December 2005 Service Bulletin was issued in furtherance of its scheme to
defraud. It instructed GM's dealers to disseminate false and misleading information about the
dangerous and defective condition of the defective vehicles to customers, including Plaintiff and
other members of the Class—namely, that the issue could be resolved by removing items from
key chains. The December 2005 Service Bulletin was sent via the mail and/or wires and
constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

130.    In October of 2006, GM issued an update to its December 2005 Service Bulletin
in furtherance of its scheme to defraud. The update repeated the instruction to GM's dealers to

CLASS ACTION COMPLAINT

disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class. The update to the December 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

131.  In furtherance of its scheme to defraud, GM communicated with Delphi via the mail and/or wires regarding the manufacture of the defective ignition switch system. Through those communications, GM instructed Delphi to continue manufacturing the defective part even though it did not meet GM's own specifications. Through those communications, GM also instructed Delphi to make a change to the defective ignition switch system in 2006, and to fraudulently conceal the change by not assigning a new part number. GM's communications with Delphi constitute repeated violations of 18 U.S.C. §§ 1341 and 1343.

132.  The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the enterprise and with the common purpose of defrauding Plaintiffs and other Class Members and obtaining significant funds while providing defective vehicles worth significantly less than the purchase price paid by customers. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

133.  The predicate acts all had the purpose of generating significant revenue and profits for the Defendants at the expense of Plaintiffs and the Class Members, who were never informed of the Ignition Switch Defect in their vehicles. The predicate acts were committed or caused to be committed by GM, through its participation in the RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and all other Class Members' funds.

134.  Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and Class Members were harmed in that they relied to their detriment on Defendants' conduct and, as a result, purchased dangerous and defective vehicles for significantly more money than they would have paid absent Defendants' scheme to defraud. Defendants unfairly reaped millions of

dollars in excessive sales revenue as a result of this scheme and its conduct in furtherance of this scheme.

***Plaintiffs' Injuries and Damages***

135.   By reason and as a result of Defendants' RICO-violative scheme, plaintiffs and the Class Members have been injured and suffered damages in their business and property: their cars have lost value, and they have and will continue to incur expense and loss in connection with their efforts to implement the Ignition Switch Defect correction and/or eliminate or reduce the risks and costs to which the Defective Vehicles and parts expose them.

136.   By reason of the foregoing the defendants, through their managerial officials, have unlawfully, knowingly and willfully conducted and participated directly or indirectly in the following enterprises through a pattern of racketeering activity in violation or attempted violation of 18 U.S.C. § 1962(c).

137.   These violations of 18 U.S.C. § 1962(c) by the Defendants have directly and proximately caused Plaintiffs' and Class Members' injuries and damage set forth above. Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as punitive damages and its costs and reasonable attorneys' fees at trial and on appeal pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF

**Asserted on Behalf of the Nationwide Class**
**(Violation of Michigan Consumer Protection Act ("MCPA),**
**Michigan Comp. Laws Ann. § 445.903 *et seq.*, and the Consumer Protection Acts of**
**Substantially Similar States)**

138.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

139.   This Claim is brought on behalf of the Nationwide Class.

140.   At all times relevant hereto, there was in full force and effect Mich. Comp. Laws Ann. § 445.903 *et seq.* (the "MCPA").

CLASS ACTION COMPLAINT

141.    Plaintiffs and the Nationwide Class Members were "person[s]" within the meaning of the MCPA, Mich. Comp. Laws Ann. § 445.902(1)(d).

142.    At all relevant times hereto, Defendants were "persons" engaged in "trade or commerce" within the meaning of the MCPA, Mich. Comp. Laws Ann. § 445.902(1)(d) and (g).

143.    The MCPA holds unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws Ann. § 445.902(1).

144.    The practices of Defendants violate the MCPA for, *inter alia*, one or more of the following reasons:

        a.      represented that the Class Vehicles had approval, characteristics, uses, and benefits that they do not have;

        b.      Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Class Vehicles;

        c.      Defendants represented that the Class Vehicles were of a particular standard, quality, or grade, when they were of another;

        d.      Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Class Vehicles, which did and tended to, mislead Plaintiffs and the Class about facts that could not reasonably be known by the consumer until the February and March 2014 recalls;

        e.      Defendants failed to reveal facts concerning the Ignition Switch Defect that were material to the transaction in light of representations of fact made in a positive manner;

        f.      Defendants failed to reveal material facts concerning the Ignition Switch Defect to Plaintiffs and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiffs and the Class;

CLASS ACTION COMPLAINT

g.      Defendants made material representations and statements of fact to Plaintiffs and the Class that resulted in Plaintiffs and the Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

h.      Defendants intended that Plaintiffs and Class Members rely on their misrepresentations and omissions, so that Plaintiffs and other Class Members would purchase or lease the Class Vehicles; and

145.    In the event that Michigan law is not applied, Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the consumer protection statutes of the fifty states.

146.    Plaintiffs seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts or; seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Class Member, reasonable attorneys' fees; and any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

147.    Plaintiffs also seek punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of Class Vehicles, deceived Plaintiffs and Class Members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles it repeatedly promised Plaintiffs and Class Members were safe. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

CLASS ACTION COMPLAINT

1

## THIRD CLAIM FOR RELIEF

2

**Asserted on Behalf of the Nationwide Class and the New York Class**

3

**(Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA"))**

4       148.    Plaintiffs hereby incorporate by reference the allegations contained in the

5 preceding paragraphs of this Complaint.

6       149.    This Claim is brought against GM on behalf of the Nationwide Class under

7 Michigan law.

8       150.    At all times relevant hereto, there was in full force and effect the Magnuson-Moss

9

10 Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA").

11      151.    Plaintiffs and the Nationwide Class are consumers as defined in 15 U.S.C. §

12 2301(3). They are consumers because they are persons entitled under applicable state law to

13 enforce against the warrantor the obligations of its implied warranty.

14      152.    GM is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

15      153.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action

16 and are not required to give GM notice and an opportunity to cure until such time as the Court

17

18 determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of

19 Civil Procedure.

20      154.    In connection with its sales of the Class Vehicles, GM gave an implied warranty

21 as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As a part of

22 the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their

23

24 ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as

25 designed, manufactured, marketed, and were adequately contained, packaged, and labeled.

26 Mich. Comp. Laws Ann. § 440.2314(2)(a), (c), and (e), and U.C.C. § 2-314(b)(1), (3), and (5).

27      155.    GM is liable to Plaintiffs and the Nationwide Class pursuant to 15 U.S.C. §

28 2310(d)(1), because it breached the implied warranty of merchantability.

CLASS ACTION COMPLAINT

156. GM breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class because the Class Vehicles were not fit for the ordinary purposes for which they are used—namely, as a safe passenger motor vehicle. The Ignition Switch Defect, which affects Ignition Switches in the Class Vehicles, may, among other things, result in the vehicle's airbags not deploying in a crash event, increasing the potential for occupant injury or death. This safety defect makes the Class Vehicles unfit for their ordinary purpose of providing safe transportation.

157. GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class because the Class Vehicles would not pass without objection in the trade, as they contained a defect that relates to motor vehicle safety due to the Ignition Switch Defect in each of the Class Vehicles.

158. GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class because the Class Vehicles were not adequately contained, packaged, and labeled. The directions and warnings that accompanied the Class Vehicles did not adequately instruct Plaintiffs on the proper use of the Class Vehicles in light of the Ignition Switch Defect, or adequately warn Plaintiffs of the dangers of improper use of the Class Vehicles.

159. At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiffs to not place extra weight on their vehicles' key chains, including a fob or extra keys. According to GM, placing extra weight on the vehicles' key chain increases the chances that the Ignition Switch will unintentionally move from the "on" position to the "accessory" or "off" position.

160. At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiffs to avoid rough, bumpy, and uneven terrain while driving their vehicles. Traveling across such terrain increases the chances that the Ignition Switch in the Class

- 39 -

Vehicles will unintentionally move from the "on" position and into the "accessory" or "off"

position, especially when the key chains were weighted down with a fob, additional keys or other

items.

       161.    At the time of the delivery of the Class Vehicles, GM did not provide instructions

and warnings to Plaintiffs to carefully avoid brushing or bumping up against their vehicles' key

chains with a body part. According to GM, brushing or bumping up against the Class Vehicles'

key chains increases the chances that the Ignition Switch in the Class Vehicles will

unintentionally move from the "on" position and into the "accessory" or "off" position.

       162.    At the time of the delivery of the Class Vehicles, GM did not adequately warn

Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent the Ignition

Switches in their vehicles from unintentionally moving from the "on" position and into the

"accessory" or "off" position while in motion, including the loss of power and shut off of the

engine resulting in an increased difficulty in maneuvering the vehicles, the lack of airbag

deployment in the event of a crash and injury or death.

       163.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and the Nationwide Class are

entitled to recover the damages caused to them by GM's breach of the implied warranty of

merchantability, which damages constitute the difference in value between the Class Vehicles as

warranted (their sales prices) and the Class Vehicles as actually delivered (perhaps worth $0.00)

(*i.e*, a total or partial refund of the full purchase prices of the Class Vehicles), plus loss of use

and other consequential damages arising after the date of delivery of the Class Vehicles. In

addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the Nationwide Class are entitled to

recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees

based on actual time expended) determined by the Court to have been reasonably incurred by

CLASS ACTION COMPLAINT

1   Plaintiffs and the Nationwide Class in connection with the commencement and prosecution of

2   this action.

3

4                           **FOURTH CLAIM FOR RELIEF**

5               **Asserted on Behalf of the Nationwide Class and the New York Class**
                        **(Breach of Implied Warranties)**

6

7           164.    Plaintiffs hereby incorporate by reference the allegations contained in the

8   preceding paragraphs of this Complaint.

9           165.    This Claim is brought on behalf of the Nationwide Class under Michigan law.

10          166.    Further, this Claim is brought on behalf of the New York Class.

11          167.    At all times relevant hereto, there was in full force and effect the Michigan Comp.

12  Laws Ann. § 440.2314 and N.Y. U.C.C. Law § 2-314.

13          168.    GM is a "merchant" as to the Class Vehicles within the meaning of Mich. Comp.

14  Laws Ann. § 44.2104 and N.Y. U.C.C. Law §2-104. GM manufactured and sold the Class

15  Vehicles, which are "goods" within the meaning of these statutory provisions. Consequently,

16  pursuant to Mich. Comp. Laws Ann. § 440.2314 and N.Y. U.C.C. § 2-314, GM impliedly

17

18  warranted that the Class Vehicles were merchantable, including that they were fit for their

19  ordinary purposes as safe passenger vehicles, that they could pass without objection in the trade,

20  and that they were adequately contained, packaged, and labeled.

21          169.    GM breached its implied warranty of merchantability to Plaintiffs and the

22  Nationwide and New York Class because the Class Vehicles were not fit for the ordinary

23  purposes for which they are used—a safe passenger vehicle. Mich. Comp. Laws Ann. §

24

25  440.2314(2)(c); N.Y. U.C.C. Law § 2-314(2)(c). Specifically, and according to GM's

26  representatives, the Class Vehicles contain the Ignition Switch Defect, which makes the Class

27  Vehicles unfit for their ordinary purpose of providing safe transportation.

28

CLASS ACTION COMPLAINT

170.    GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide and New York Class because the Class Vehicles would not pass without objection in the trade, as they contained the Ignition Switch Defect. Mich. Comp. Laws Ann. § 440.2314(2)(a); N.Y. U.C.C. Law § 2-314(2)(a).

171.    GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide and New York Class because the Class Vehicles were not adequately contained, packaged, and labeled in that the directions and warnings that accompanied the Class Vehicles did not adequately instruct Plaintiffs on the proper use of the Class Vehicles in light of the Ignition Switch Defect. Mich. Comp. Laws Ann. § 440.2314(2)(e); N.Y. U.C.C. Law § 2-314(2)(e).

172.    At the time of delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiffs to not place extra weight on their vehicles' key chains, including a fob or extra keys. In and around March of 2014, GM publicly stated that placing extra weight on the key chain of the Class Vehicles increases the chances that the Ignition Switch in the Class Vehicle will move from the "on" position and into the "accessory" or "off" position.

173.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and/or warnings to Plaintiffs to avoid rough, bumpy, and uneven terrain while driving. In and around March of 2014, GM publicly stated that traveling across such terrain increases the chances that the Ignition Switch in the Class Vehicle will move from the "on" position to the "accessory" or "off" position.

174.    Additionally, at the time of delivery of the Class Vehicles, GM did not adequately warn Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent the Ignition Switch in the Class Vehicle from moving from the "on" position to the "accessory" or "off" position while the Vehicle is in motion.

CLASS ACTION COMPLAINT

175.    As a proximate result of GM's breach of the implied warranty of merchantability,

Plaintiffs and the Nationwide and New York Class were damaged in the amount of, and entitled

to recover, the difference in value between the Class Vehicles as warranted (their sales price) and

the Class Vehicles as actually delivered (perhaps worth $0.00) (*i.e.*, a total refund of the full or

partial purchase and/or lease price of the Class Vehicles), plus loss of use and other

consequential damages arising after the date of delivery of the Class Vehicles.

176.    It was not necessary for Plaintiffs and each Nationwide and New York Class

Member to give GM notice of GM's breach of the implied warranty of merchantability because

GM had actual notice of the Ignition Switch Defect.  Prior to the filing of this action, GM issued

a safety recall for the Class Vehicles acknowledging the Ignition Switch Defect.  GM admitted it

had notice of the Ignition Switch Defect as early as 2004, and possibly as early as 2001.  At the

time of the safety recall, GM also acknowledged that numerous accidents and fatalities were

caused by the Ignition Switch Defect.  In addition to the above, the filing of this action is

sufficient to provide GM notice of its breaches of the implied warranty of merchantability with

respect to the Class Vehicles.

## FIFTH CLAIM FOR RELIEF

### Asserted on Behalf of the Nationwide Class
### (Fraud by Concealment)

177.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint.

178.    This Claim is brought on behalf of the Nationwide Class.

179.    As set forth above, Defendants concealed and/or suppressed material facts

concerning the safety of their vehicles.

180.    Defendants had a duty to disclose these safety issues because they consistently

marketed their vehicles as reliable and safe and proclaimed that Defendants maintain the highest

safety standards. Once Defendants made representations to the public about safety, Defendants

were under a duty to disclose these omitted facts, because where one does speak one must speak

the whole truth and not conceal any facts which materially qualify those facts stated. One who

volunteers information must be truthful, and the telling of a half-truth calculated to deceive is

fraud.

181.    In addition, Defendants had a duty to disclose these omitted material facts

because they were known and/or accessible only to Defendants who have superior knowledge

and access to the facts, and Defendants knew they were not known to or reasonably discoverable

by Plaintiffs and Class Members. These omitted facts were material because they directly

impact the safety of the Class Vehicles. Whether or not a vehicle ignition switch will

unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power

steering, anti-lock brakes and air bag deployment while the car is in motion, are material safety

concerns. Defendants possessed exclusive knowledge of the defects rendering Class Vehicles

inherently more dangerous and unreliable than similar vehicles.

182.    Defendants actively concealed and/or suppressed these material facts, in whole or

in part, with the intent to induce Plaintiffs and Class Members to purchase Class Vehicles at a

higher price for the vehicles, which did not match the vehicles' true value.

183.    Plaintiffs and Class Members were unaware of these omitted material facts and

would not have acted as they did if they had known of the concealed and/or suppressed facts.

Plaintiffs' and Class Members' actions were justified. Defendants were in exclusive control of

the material facts concerning the Ignition Switch Defect and such facts were not known to the

public or the Class Members.

184.    As a result of the concealment and/or suppression of facts, Plaintiffs and Class

Members have sustained and will continue to sustain damages arising from the difference

CLASS ACTION COMPLAINT

between the actual value of that which Plaintiffs and the Classes paid and the actual value of that which they received.

185.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SIXTH CLAIM FOR RELIEF

### Asserted on Behalf of the New York Class
### (Violation of New York's Deceptive Trade Practices Act ("NYTPA"), N.Y. Gen. Bus. Law § 349.)

186.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

187.     This Count is brought on behalf of Plaintiff Marie Mazzocchi and the New York Class.

188.     Plaintiffs are a "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

189.     Defendants are "persons," "firms," "corporations" or "associations" within the meaning of N.Y. Gen. Bus. Law § 349.

190.     The NYDTPA prohibits "deceptive acts and practices in the conduct of any business, trade or commerce, or in the furnishing of any service in the state."  N.Y. Gen. Bus. Law § 349(a).  Defendants' conduct, as described above, constitutes "deceptive acts and practices" within the meaning of this statute.  Further, Defendants' deceptive acts and practices, which were intended to mislead consumers who were in the process of purchasing and/or leasing the Class Vehicles, was consumer-oriented conduct.

CLASS ACTION COMPLAINT

191.   Defendants violated the NYDTPA when they represented, through advertising, warranties, and other express representations, that the Class Vehicles had characteristics and benefits that they did not actually have.

192.   Defendants violated the NYDTPA when they falsely represented, through advertising, warranties, and other express representations, that the Class Vehicles were of certain quality or standard when they were not.

193.   Defendants violated the NYDTPA by fraudulently concealing from and/or failing to disclose to Plaintiffs and the New York Class the defects associated with the Class Vehicles

194.   Defendants violated the NYDTPA by actively misrepresenting in, and/or concealing and omitting from, their advertising, marketing, and other communications, material information regarding the Class Vehicles.  The material information included:

   a.   that there was a substantial risk of ignition switch failure that far exceeded the risk of such defect normally associated with similar consumer products;

   b.   that the Ignition Switch Defect might not become apparent until after the warranty had expired; and

   c.   that Defendants were not committed to repairing the Ignition Switch Defect if it was discovered after the warranty expired.

195.   As a direct and proximate cause of Defendants' violations of the NYDTPA, Plaintiffs and members of the New York Class have suffered injury in fact and/or actual damage, in that they purchased a Class Vehicle that contains inherent design defects.

196.   Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs, on behalf of themselves and all others similarly situated, seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $50 for each Plaintiff and each New York Class Member.  Because Defendants' conduct was

CLASS ACTION COMPLAINT

1   committed willfully and knowingly, Plaintiffs are entitled to recover three times actual damages,

2   up to $1,000, for each Plaintiff and each New York Class Member.

3          197.    Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or

4   practices, punitive damages, and attorneys' fees, and any other just and proper relief available

5   under General Business Law § 349.

6

7                              **SEVENTH CLAIM FOR RELIEF**

8                        **Asserted on Behalf of the New York Class**
9                      **(Violation of New York's False Advertising Act,**
10                              **N.Y. Gen. Bus. Law § 350)**

11         198.    Plaintiffs hereby incorporate by reference the allegations contained in the

12  preceding paragraphs of this Complaint.

13         199.    This Count is brought on behalf of Plaintiff Marie Mazzocchi and the New York

14  Class.

15         200.    Defendants were and are engaged in the "conduct of business, trade or commerce"

16  within the meaning of N.Y. Gen. Bus. Law § 350.
17

18         201.    New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the

19  conduct of any business, trade or commerce." False advertising includes "advertising, including

20  labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into

21  account "the extent to which the advertising fails to reveal facts material in light of . . .

22  representations [made] with respect to the commodity . . . ." N.Y. Gen. Bus. Law § 350-a.

23         202.    Defendants caused to be made or disseminated through New York, through

24  advertising, marketing and other publications, statements that were untrue or misleading, and

25  that were known, or which by the exercise of reasonable care should have been known to

26  Defendants, to be untrue and misleading to consumers and Plaintiffs.

27

28

CLASS ACTION COMPLAINT

203.     Defendants have violated § 350 because the misrepresentations and omissions regarding the Ignition Switch Defect, as set forth above, were material and likely to deceive a reasonable consumer.

204.     Plaintiffs and the New York Class have suffered an injury, including the loss of money or property, as a result of GM's false advertising.  In purchasing or leasing their vehicles, Plaintiffs and the New York Class relied on the misrepresentation and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles.  Defendants' representations were false and/or misleading because the Ignition Switch Defect may cause the engine to shut down, disabling power steering, power brakes, and disabling deployment of safety airbags.  Had Plaintiffs and the New York Class known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

205.     Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiffs, on behalf of themselves and all others similarly situated, seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and New York Class Member.  Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover three times actual damages, up to $10,000, for each Plaintiff and each New York Class Member.

206.     Plaintiff also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under General Business Law §§ 349-350.

## EIGHTH CLAIM FOR RELIEF

### (Claim for Actual Damages/Expense Reimbursement Fund)

207.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

CLASS ACTION COMPLAINT

208.    This Count is brought on behalf of all Plaintiffs and Members of the New York Class.

209.    Plaintiffs and the New York Class Members have incurred out-of-pocket expenses and damages in attempting to rectify the Ignition Switch Defect in their Vehicles, and such expenses and losses will continue as they must take time off from work, pay for rental cars or other transportation arrangements, child care and the myriad expenses involved in going through the recall process to correct the Defect.

210.    Plaintiffs and Class Members seek payment of such damages and reimbursement of such expenses under the consumer statutes and applicable law invoked in this Complaint. While such damages and expenses are individualized in detail and amount, the right of the Class Members to recover them presents common questions of law. Equity and fairness to all Class Members requires the establishment by court decree and administration under Court supervision of a Defendant-funded program, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defect.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.    an order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, and designating the undersigned as Class Counsel;

B.    a declaration that the Ignition Switches in Class Vehicles are defective;

C.    a declaration that the Defendants are financially responsible for notifying all Nationwide and New York Class Members about the defective nature of the Class Vehicles;

D.    an order enjoining Defendants to desist from further deceptive distribution, sales,

and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles to eliminate the Ignition Switch Defect;

      E.      an award to Plaintiffs and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

      F.      a declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

      G.      an award of attorneys' fees and costs, as allowed by law;

      H.      an award of pre-judgment and post-judgment interest, as provided by law;

      I.      leave to amend this Complaint to conform to the evidence produced at trial; and

      J.      such other relief as may be appropriate under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

CLASS ACTION COMPLAINT

1

Dated: April 16, 2014                    WEITZ & LUXENBERG P.C.

2

3                                        By: _____/s/ James J. Bilsborrow_____
                                                 James Bilsborrow

4

5        Robin L. Greenwald
         rgreenwald@weitzlux.com
         James Bilsborrow

6        jbilsborrow@weitzlux.com
         WEITZ & LUXENBERG P.C.

7        700 Broadway
         New York, NY 10003

8        Telephone:    (212)-558-5500
         Facsimile:    (212) 344-5466

9
         Jonathan Selbin

10       jselbin@lchb.com
         Sudarsana Srinivasan

11       dsrinivasan@lchb.com
         LIEFF CABRASER HEIMANN &

12       BERNSTEIN, LLP
         250 Hudson Street, 8th Floor

13       New York, NY 10013
         Telephone: (212) 355-9500

14       Facsimile: (212) 355-9592

15       Elizabeth J. Cabraser
         ecabraser@lchb.com

16       Todd A. Walberg
         twalburg@lchb.com

17       275 Battery Street, 29th Floor
         San Francisco, CA 94111-3339

18       Telephone:  (415) 956-1000
         Facsimile:  (415) 956-1008

19
         *Attorneys for the Plaintiffs*

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT