# Exhibit LLL

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DENEISE BURTON, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>GENERAL MOTORS LLC; GENERAL MOTORS HOLDING, LLC; DELPHI AUTOMOTIVE PLC; and DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC,<br><br>　　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**FOR INJUNCTIVE RELIEF, EQUITABLE RELIEF, AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF CLAIM

1.　　Plaintiff Deneise Burton brings this action for herself and on behalf of all persons similarly situated who purchased or leased certain vehicles manufactured, distributed, and/or sold by GENERAL MOTORS LLC, GENERAL MOTORS HOLDING, LLC, GENERAL MOTORS CORPORATION, GENERAL MOTORS COMPANY, and/or its related subsidiaries, successors, or affiliates ("GM") with defective ignition switches manufactured by DELPHI AUTOMOTIVE PLC, DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC, and/or its related subsidiaries, successors, or affiliates ("Delphi"), as described below.

2.　　As used in this complaint, the "Defective Vehicles" or "Class Vehicles" refers to the GM vehicles sold in the United States equipped at the time of sale with ignition switches (the "Ignition Switches") sharing a common, uniform, and defective design, including, but not necessarily limited to, the following makes and model years:

- 2005-2010 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

- 2006-2010 Pontiac Solstice

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2005-2010 Pontiac G5

3.      An estimated 2.6 million vehicles were sold in the United States equipped with the Ignition Switches.  Upon information and belief, there are other vehicles sold in the United States equipped with the Ignition Switches that have not yet been disclosed by GM.

4.      The Ignition Switches in the Class Vehicles turn on the vehicle's motor engine and main electrical systems when the key is turned to the "run" or "on" position.  The Ignition Switches have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC" ("accessory").  At the "run" position, the vehicle's motor engine is running and the electrical systems have been activated; at the "accessories" position the motor is turned off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off.  In most vehicles a driver must intentionally turn the key in the ignition to move to these various positions.

5.      The ignition switch is not an automotive component that vehicle manufacturers or reasonable consumers expect will deteriorate or break down after normal wear and tear, thereby triggering the need for replacement.

6.      Delphi, at all times material to this action, manufactured the defective ignition switch system for GM.  GM began installing the Delphi-manufactured Ignition Switches beginning in 2002 vehicle models. Upon information and belief, Delphi knew the Ignition Switches were defectively designed and did not meet GM's own design specifications, but nonetheless continued to manufacture and sell the defective Ignition Switches with the knowledge that they would be used in GM vehicles, including the Class Vehicles. Delphi also manufactured the ignition switch system after a 2007 change implemented by GM without reflecting a corresponding change in part number

7.      Because of defects in their design, the Ignition Switches installed in the Class Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions.  The ignition module is located in a position in the vehicle that allows a driver to contact the key ring and inadvertently switch the ignition

CLASS ACTION COMPLAINT

position.  Due to faulty design and improper positioning, the Ignition Switches can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "acc" position (the "Ignition Switch Defect").  When this ignition switch failure occurs, the motor and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the safety airbag system.

8.     The Ignition Switch Defect can occur at any time during normal and proper operation of the Class Vehicles, meaning the ignition can suddenly switch off while it is moving at 70 mph on the freeway, leaving the driver unable to control the vehicle.

9.     GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths.  GM has refused, however, to disclose the identities of those it counts among these thirteen deaths.  Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Class Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Class Vehicle models is expected to be much higher.

10.    All persons in the United States who have purchased or leased a Class Vehicle equipped with the Ignition Switches are herein referred to as Class Members ("Class Members").

11.    All Class Members were placed at risk by the Ignition Switch Defect from the moment they first drove their vehicles.  The Ignition Switch Defect precludes all Class Members from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Class Members and other vehicle occupants.  However, no Class Members knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure.

12.    Upon information and belief, prior to the sale of the Class Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM,

CLASS ACTION COMPLAINT

collected by the National Highway Transportation Safety Administration's Office of Defect
Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field
testing done in response to those complaints; aggregate data from GM dealers; and accident
data; yet despite this knowledge, GM failed to disclose and actively concealed the Ignition
Switch Defect from Class Members and the public, and continued to market and advertise the
Class Vehicles as reliable and safe vehicles, which they are not. A reasonable manufacturer
would not have sold a vehicle if it contained the Ignition Switch Defect.

13.     Moreover, reasonable consumers who knew about the Ignition Switch Defect,
would not have purchased the Class Vehicles due to the unexpected risk of a sudden and
dangerous ignition switch failure that puts them and others at serious risk of injury or death.

14.     As a result of GM's alleged misconduct, Plaintiff and Class Members were
harmed and suffered actual damages, in that the Class Vehicles are unsafe, unfit for their
ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting,
the Ignition Switch Defect by way of a sudden and dangerous failure that puts them and
others at serious risk of injury or death. Plaintiff and the Class did not receive the benefit of
their bargain as purchasers and lessees, received vehicles that were of a lesser standard,
grade, and quality than represented, and did not receive vehicles that met ordinary and
reasonable consumer expectations. Class Members did not receive vehicles that would
reliably operate with reasonable safety, and that would not place drivers and occupants in
danger of encountering an ongoing and undisclosed risk of harm, which could have been
avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. A
car purchased or leased under the reasonable assumption that it is "safe" as advertised is
worth more than a car—such as the Class Vehicles—that is known to contain a safety defect
such as the Ignition Switch Defect.

15.     As a result, all purchasers of the Class Vehicles overpaid for their cars at the
time of purchase. Furthermore, GM's public disclosure of the Ignition Switch Defect has
further caused the value of the Class Vehicles to materially diminish. Purchasers or lessees

CLASS ACTION COMPLAINT

of the Class Vehicles paid more, either through a higher purchase price or higher lease
payments, than they would have had the Ignition Switch Defect been disclosed.

16.     Further, and in spite of GM's belated recall of the Class Vehicles, litigation is
necessary in order to ensure that Class Members receive full and fair compensation, under the
auspices of court order, for their injuries.

## PARTIES

### Plaintiff

#### *Deneise Burton*

17.     Plaintiff Deneise Burton is a citizen of the state of Oklahoma, and she resides in
Oklahoma City.  Ms. Burton owns a 2007 Saturn ION, which she purchased used on September
8, 2012 in Oklahoma City, Oklahoma.  Ms. Burton's Saturn ION was manufactured, sold,
distributed, advertised, marketed, and warranted by GM.  Ms. Burton purchased her vehicle
primarily for her personal, family, and household use.  After receiving the recall notice for her
Saturn ION, Ms. Burton delivered the vehicle to an authorized GM dealer for the recall repairs to
be made.

### Defendants

18.     General Motors Corporation was a Delaware corporation with its headquarters in
Detroit, Michigan.  The Corporation through its various entities designed, manufactured,
marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in
Oklahoma and multiple other locations in the United States and worldwide.

19.     In 2009, General Motors Corporation filed for bankruptcy, and substantially all of
its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to
General Motors LLC.

20.     Under the Agreement, General Motors LLC also expressly assumed certain
liabilities of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the
> certification, reporting and recall requirements of the National
> Traffic and Motor Vehicle Safety Act, the Transportation Recall
> Enhancement, Accountability and Documentation Act, the Clean

- 5 -                                    CLASS ACTION COMPLAINT

Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

In addition, General Motors LLC expressly set forth that it:

shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [General Motors Corporation] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

21.     General Motors LLC is a Delaware corporation with its headquarters in Detroit, Michigan.  General Motors LLC is registered with the Oklahoma Secretary of State to conduct business in Oklahoma.  Post-Bankruptcy, General Motors LLC discontinued certain vehicle brands, including Pontiac and Saturn.

22.     At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States.

23.     Defendant Delphi Automotive PLC ("Delphi") is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan.

24.     Delphi began as a wholly-owned subsidiary of General Motors Corporation, until it was launched as an independent publicly-held corporation in 1999.

25.     In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi plants to assist with its post-bankruptcy restructuring.  In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

CLASS ACTION COMPLAINT

26.     At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

27.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

28.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because GM conducts substantial business in this District, has caused harm to Class Members residing in this District, and Plaintiff Deneise Burton resides in this District.

## FACTUAL BACKGROUND

*The Class Vehicles*

30.     The Saturn Ion was a compact car first introduced in 2002 for the 2003 model year, and was discontinued in 2007.

31.     The Chevrolet Cobalt was a compact car first introduced in 2004 for the 2005 model year, and was discontinued in 2010.

32.     The Pontiac G5 was first introduced in 2004 for the 2005 model year, and was discontinued in 2009.  The coupe and four-door sedan version of the G5 was marketed in Canada from 2005 to 2010, but is not a vehicle at issue in this action.

33.     The Chevrolet HHR was a compact car first introduced in 2005 for the 2006 model year, and was discontinued in 2011.

34.     The Pontiac Solstice was a sports car first introduced in 2005 for the 2006 model year, and was discontinued in 2009.

35.     The Saturn Sky was first introduced in 2006 for the 2007 model year, and was discontinued in 2009.

CLASS ACTION COMPLAINT

36.    The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

37.    The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

38.    Upon information and belief, GM promoted these Class Vehicles as safe and reliable in numerous uniform, standardized, widely and continuously disseminated marketing and advertising materials.

39.    No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time or purchase or lease. No reasonable consumer would have purchased or leased a vehicle equipped with the Ignition Switch Defect at the purchase or lease price paid.

*GM Field Reports and Internal Testing Reveal a Problem*

40.    In 2001, GM engineers designed two different ignition switch models in 2001 for the Saturn Ion and Chevrolet.  GM ultimately selected the cheaper, smaller model for production.

41.    That same year, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position.  In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force."  The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

42.    In early 2002, Delphi informed GM that the ignition switch did not meet GM's design standards.  According to Delphi, GM's original torque specifications called for a range of 15 to 20 Newton-centimeters.  Testing of the original switch in 2002, however, showed only a range of 4 to 10 Newton-centimeters in most cases.  According to Delphi, the

CLASS ACTION COMPLAINT

torque requirements were intended to ensure that there was sufficient rotational force to keep the switch in the "run" position.

43. At that time, a replacement switch would have cost less than $1 to produce.

44. In order to replace the switch to ensure that it met specifications, GM would have been forced to delay its release of the Saturn Ion. GM was unwilling to delay the Ion and proceeded to manufacture the vehicles with switches that it knew did not meet its specifications.

45. In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter.

46. GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

47. After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents of sudden loss of engine power. GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

CLASS ACTION COMPLAINT

48. Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition. Although GM initially approved the design, the company once again declined to act.

49. In testimony April 1, 2014, before the House Committee on Energy and Commerce, GM CEO Mary Barra explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

50. In a recent interview with the Detroit News, John Henke, who has tracked relations between suppliers and automakers since 1992, echoed this sentiment, stating that in the years 2002 to 2007, GM was "so cost-oriented; price took precedence over quality."

51. In April 2006, GM finally approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number. GM estimates that Delphi began producing the redesigned ignition switch for all Subject Vehicles during the 2007 model year.

52. Delphi assigned its newly designed switch the same part number assigned to the faulty ignition switch. Upon information and belief, Delphi's action was intended to make it difficult to trace the defective switch back to its original design in 2001.

53. After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

CLASS ACTION COMPLAINT

54.     According to Delphi, the component required to fix the Ignition Switch Defect costs approximately $1.  GM management estimated that replacement components would cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

55.     GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

*GM Issues Information Service Bulletins*

56.     In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch.  The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

57.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning."  GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain."  The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

58.     On July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present." Adler

- 11 -                                    CLASS ACTION COMPLAINT

advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

59. The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead." She was able to safely coast to the side of the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of the service bulletin. The reporter stated that the key chain being used at the time of the stalling incident was provided by GM, and included only the key fob and a tag.

60. GM, in a statement at the time through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition…."

61. In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007A) to include additional vehicles and model years. Specifically, GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky. The updated bulletin included the same service advisories to GM dealers as the earlier version.

62. According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

CLASS ACTION COMPLAINT

*Reports of Unintended Engine Shut Down*

63. A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles." Despite these reports, the Saturn Ion remained in production until 2007.

64. On May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

*Crash Reports and Data*

65. The Defendants knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

66. National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

67. In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

68. In 2006, there were at least two fatalities associated with a Chevy Cobalt crash. Information from the car's data recorder indicated that the ignition switch was in "accessory," instead of run, and the front airbags failed to deploy.

69. In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

70. In 2007, NHTSA's early warning division reviewed available data provided by GM on airbag non-deployments in Chevrolet Cobalt vehicles. This review identified 43 incidents in which airbags may not have deployed in a crash. The early warning division

CLASS ACTION COMPLAINT

referred the case to NHTSA's data analysis division for further screening. A defects panel was convened, but after reviewing the data and consulting with GM, the panel ultimately concluded that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect trend that would warrant the agency opening a formal investigation." In prepared remarks delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the information that GM has since provided—for instance, new evidence linking airbag non-deployment to faulty ignition switches."

71.    GM has identified 23 frontal-impact crashes in the United States involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.

72.    GM has identified 8 frontal-impact crashes in the United States involving 2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in four fatalities and six injuries to occupants.

73.    GM has identified 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in three injuries to occupants.

74.    On information and belief, many more crashes, resulting in injuries and deaths, have involved the Ignition Switch Defect and gone unreported because Defendants have concealed the problem. These crashes continue to occur, even as GM responds to Congressional investigation and has announced a recall, and they will continue to occur unless and until the Ignition Switch defect is completely and effectively corrected.

***GM's Belated Repair Recall of Some Vehicles***

75.    On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The notice

identified that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight.

76.      The notice also did not identify all the vehicles affected by the Ignition Switch Defect.

77.      The notice failed to indicate the full extent to which GM has been aware of the Defect.  The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

78.      In a February 24, 2014 letter to the NHTSA, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

79.      On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect.  Specifically, GM identified the 2003 to 2007 model years of the MY Saturn Ion, 2006 and 2007 model years of the MY Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007 model year of MY Saturn Sky vehicles.

80.      According to the NHTSA Acting Administrator David Friedman, the chronology information provided by GM on February 24, 2014 "raise[d] serious questions as to the timeliness of GM's recall."  Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

CLASS ACTION COMPLAINT

81.     On March 4, 2014, the NHTSA issued GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

82.     On March 11, 2014, GM filed a new Part 573 report superseding its February 25 filing. The new chronology provided with the report indicated that GM was aware of the Ignition Switch Defect in 2001—significantly earlier than its previous 2004 disclosure. GM now indicated that it had a report from 2001 that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

83.     On March 28, 2014, GM filed a new Part 573 report, which expanded the recall set forth in its February 25, 2014 filing. GM's March 28 report indicated that several additional model year vehicles may be affected by the Ignition Switch Defect. GM identified those vehicles as the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac Solstice, 2008-2010 Pontiac G5, and 2008-2010 Saturn Sky. The March 28 report added over one million vehicles to the total affected by the Ignition Switch Defect.

84.     On April 8, 2014, NHTSA fined GM $28,000—the maximum amount permitted by law—for its failure to comply with the Special Order issued on March 4, 2014. Although NHTSA demanded that GM answer 107 questions about the timing of its knowledge of the Ignition Switch Defect, GM failed to provide a single answer by April 8, 2014. According to the NHTSA, GM refused to answer even simple questions, such as whether the Ignition Switch was redesigned at any time other than in 2006.

85.     On April 10, 2014, GM placed two engineers on paid leave as part of an internal investigation of the Ignition Switch Defect recall. One of these engineers, Ray DeGiorgio, was the lead designer for the Ignition Switches.

86.     GM notified dealers of the Class Vehicles of the recall in February and March 2014. GM also notified owners of the Class Vehicles by letter of the recall. The letter minimized the risk of the defect, indicating that the Ignition Switch Defect would occur only

CLASS ACTION COMPLAINT

"under certain conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

87.     On April 9, 2014, GM filed a new Part 573 report, which further expanded the recall to include a defect identified with ignition lock cylinders. GM's report indicates that the defective cylinders can allow for the removal of the ignition key while the engine is still running, allowing for the possibility of a rollaway, "vehicle crash and occupant or pedestrian injuries." GM cautioned owners of the Class Vehicles that "it is very important before exiting the vehicle for customers to make sure the vehicle is in "Park" . . . ."

88.     GM has advised the public that the replacement ignition switches "ARE NOT CURRENTLY AVAILABLE." During her testimony before Congress, GM CEO Mary Barra testified that replacement switches would be available beginning April 7, 2014.  On April 7, 2014, multiple news outlets reported that replacement switches were not available.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment Tolling

89.     Upon information and belief, GM has known of the Ignition Switch Defect in the vehicles since at least 2001, and certainly well before Plaintiff and Class Members purchased the Class Vehicles, and has concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the Ignitions Switch Defect, even when directly asked about it by Class Members during communications with GM and GM dealers.

90.     Although GM has now acknowledged that "[t]here is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine," GM did not fully disclose the Ignition Switch Defect and in fact downplayed the widespread prevalence of the problem, and minimized the risk of the Defect occurring during normal operation of the Class Vehicles.

91.     In 2005, GM issued a Technical Service Bulletin to dealers and service technicians directing that customers be advised to "remove unessential items from their key

CLASS ACTION COMPLAINT

chains" to avoid inadvertent ignition switching, but did not identify or disclose the Defect. In February 2014, GM instituted only a limited recall, only identifying two of the several models with the Ignition Switch Defect. Likewise, the later recall expanded to include five additional model years and makes does not fully disclose all the vehicles affected by the Ignition Switch Defect.

92.    Upon information and belief, there are other Class Vehicles that have the Ignition Switch Defect that have not yet been disclosed by GM.

93.    Any applicable statute of limitation has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### Estoppel

94.    GM was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the vehicles. GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiff and Class Members reasonably relied upon GM's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

### Discovery Rule

95.    The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their vehicles had the Ignition Switch Defect.

96.    However, Plaintiff and Class Members had no realistic ability to discern that the vehicles were defective until—at the earliest—after the Ignition Switch Defect caused a sudden unintended ignition shut off. Even then, Plaintiff and Class Members had no reason to know the sudden loss of power was caused by a defect in the ignition switch because of GM's active concealment of the Ignition Switch Defect.

CLASS ACTION COMPLAINT

97.     Not only did GM fail to notify Plaintiff or Class Members about Ignition Switch

Defect, GM in fact denied any knowledge of or responsibility for the Ignition Switch Defect

when directly asked about it. Thus Plaintiff and Class Members were not reasonably able to

discover the Ignition Switch Defect until after they had purchased the vehicles, despite their

exercise of due diligence, and their causes of action did not accrue until they discovered that the

Ignition Switch Defect caused their vehicles to suddenly lose power.

## CLASS ACTION ALLEGATIONS

98.     Plaintiff brings this lawsuit as a class action on her own behalf and on behalf of

all other persons similarly situated as members of the proposed Class pursuant to Federal Rules

of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or c(4). This action satisfies the numerosity,

commonality, typicality, adequacy, predominance, and superiority requirements of

those provisions.

99.     The proposed nationwide class is defined as:

### Nationwide Class

> All persons in the United States who purchased or leased a GM
> Class Vehicle (2005-2010 Chevrolet Cobalt; 2006-2011 Chevrolet
> HHR; 2006-2010 Pontiac Solstice; 2003-2007 Saturn Ion; 2007-
> 2010 Saturn Sky; and 2005-2010 Pontiac G5), and any other GM
> vehicle model containing the same ignition switch as those Class
> Vehicle models (Class Members).

100.     Alternatively, Plaintiff brings this action against GM for violations of the

Magnuson-Moss Warranty Act and breaches of the implied warranty of merchantability on

behalf of residents of states that do not require vertical privity to assert an implied warranty

claim, including: Alaska, Arkansas, Delaware, District of Columbia, Hawaii, Indiana, Kansas,

Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri,

Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma,

Pennsylvania, Rhode Island, South Carolina, Texas, Utah, West Virginia, and Wyoming ("Multi-

State Class")

CLASS ACTION COMPLAINT

101.    Further, alternatively, Plaintiff brings this action against GM for violations of the
Magnuson-Moss Warranty Act and breaches of the implied warranty of merchantability and
against all Defendants for violations of the Oklahoma Consumer Protection Act on behalf of a
statewide class of all persons who purchased or leased a Class Vehicle in the State of Oklahoma
("Oklahoma Class").

102.    Excluded from the Class are: (1) Defendants, any entity or division in which
Defendants have a controlling interest, and their legal representatives, officers, directors, assigns,
and successors; (2) the Judge to whom this case is assigned and the Judge's staff;
(3) governmental entities; and (4) those persons who have suffered personal injuries as a result of
the facts alleged herein. Plaintiff reserves the right to amend the Class definition if discovery
and further investigation reveal that the Class should be expanded, divided into additional
subclasses, or modified in any other way.

## Numerosity and Ascertainability

102.    The Nationwide and Oklahoma Class are each too numerous for individual
joinder of all their members to be practicable; GM's recall now includes over 2.6 million
vehicles. Although the exact number of Class Members is uncertain and can only be ascertained
through appropriate discovery, the number is great enough such that joinder is impracticable.
The disposition of the claims of these Class Members in a single action will provide substantial
benefits to all parties and to the Court. Class Members are readily identifiable from information
and records in GM's possession, custody, or control.

## Typicality

103.    The claims of the representative Plaintiff is typical of the claims of the Class
in that the representative Plaintiff, like all Class Members, purchased or leased a GM Class
Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiff,
like all Class Members, has been damaged by Defendants' misconduct in that she has
incurred a loss in value relating to the Ignition Switch Defect. Furthermore, the factual bases

CLASS ACTION COMPLAINT

of Defendants' misconduct are common to all Class Members and represent a common
thread of misconduct resulting in injury to all Class Members.

## Adequate Representation

104.    Plaintiff will fairly and adequately represent and protect the interests of the
Class.  Plaintiff has retained counsel with substantial experience in prosecuting class actions.

105.    Plaintiff and her counsel are committed to vigorously prosecuting this action
on behalf of the Class, and counsel has the financial resources to do so.  Neither Plaintiff nor
her counsel has interests adverse to those of the Class.

## Predominance of Common Questions

106.    There are numerous questions of law and fact common to Plaintiff and Class
Members that predominate over any question affecting only individual Class Members, the
answers to which will advance resolution of the litigation as to all Class Members.  These
common legal and factual issues include:

      a.    whether the Class Vehicles suffer from the Ignition Switch Defect;

      b.    whether Defendants knew or should have known about the Ignition Switch
Defect, and, if yes, how long Defendants have known or should have known of the Defect;

      c.    whether the defective nature of the Class Vehicles constitutes a material
fact reasonable consumers would have considered in deciding whether to purchase a
GM Vehicle;

      d.    whether GM had a duty to disclose the defective nature of the Vehicles to
Plaintiff and Class Members;

      e.    whether GM omitted and failed to disclose material facts about
the Vehicles;

      f.    whether GM's concealment of the true defective nature of the Class
Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing
the Vehicles;

CLASS ACTION COMPLAINT

g.     whether GM engaged in an unlawful enterprise that included a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

h.     whether GM violated the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. L. Ann. § 445.903 *et seq.*, and if so, what remedies are available under § 445.911;

i.     whether GM violated the Oklahoma Consumer Protection Act ("OCPA"), Okla. Stat., tit. § 15-752 *et seq*, and if so, what remedies are available under § 15-761.1;

j.     whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

k.     whether Plaintiff and Class Members are entitled to a declaratory judgment stating that the ignition switches in the Class Vehicles are defective and/or not merchantable;

l.     whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

m.     whether GM should be declared responsible for notifying all Class Members of the Defect and ensuring that all GM vehicles with the Ignition Switch Defect are recalled and repaired.

n.     what aggregate amounts of statutory penalties, as available under the laws of Michigan and Oklahoma are sufficient to punish and deter Defendants and to vindicate statutory and public policy, and how such penalties should most equitably be distributed among Class members.

107.    Defendants have acted in a uniform manner with respect to the Plaintiff and Class Members, as demonstrated in the following form "Dear GM Customer" letter:

July 2013

Dear General Motors Customer:

This notice is sent to you in accordance with the requirements of

CLASS ACTION COMPLAINT

the National Traffic and Motor Vehicle Safety Act.

General Motors, based on data and information from supplier IMPCO Automotive, has decided that a defect, which relates to motor vehicle safety, exists in certain compressed natural gas (CNG) fuel systems installed by IMPCO Automotive on 2011-2013 model year CNG equipped Chevrolet Express and GMC Savana vehicles.  As a result, General Motors and IMPCO Automotive are conducting a safety recall. We apologize for this inconvenience.  However, we are concerned about your safety and continued satisfaction with our products.

I M P O R T A N T

- Your 2011-2013 model year Chevrolet Express or GMC Savana CNG equipped vehicle is involved in safety recall 13139.
- Owners who have not been contacted by General Motors concerning this recall should schedule an appointment with their Chevrolet or GMC dealer to arrange for the repairs to be completed.
- This service will be performed for you at **no charge.**

**Why is your vehicle being recalled?**   The underbody shut-off solenoid connector to a CNG fuel tank may corrode and could form a high-resistance short in the connector, potentially causing overheating or a self-extinguishing flame. If there is a

CLASS ACTION COMPLAINT

fuel leak or other combustible material in the vicinity, there is a risk of fire.

**What will we do?**
To correct this condition, improved solenoids and securing nuts will be installed for all exterior tanks and the regulator, and the 30 amp gas fuel pump fuse will be replaced with either a 7.5 amp fuse (for the four tank configuration) or a 5.0 amp fuse (for the three tank configuration). In addition, the wiring routing will be adjusted, if necessary, to eliminate any undue tension on the connector, and anti-corrosion sealing plugs will be installed into the valve body (2013 model year vehicles have these plugs already installed). This service will be performed at no charge. The approximate time for the actual repair can be as much as four hours per vehicle, but the wait time for your vehicle may be longer depending on how busy

CLASS ACTION COMPLAINT

the dealership is.

**What should you do?**    General Motors will contact certain fleets directly to arrange for the performance of the required repair. If you have not already been contacted by General Motors, please schedule an appointment with your Chevrolet or GMC dealer for this repair.

**Do you have questions?**    If you have questions or concerns that your dealer is unable to resolve, please contact the GM Fleet Action Center at 1-800-353-3867.

If after contacting your dealer and the Fleet Action Center, you are still not satisfied GM has done their best to remedy this condition without charge and within a reasonable time, you may wish to write the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE., Washington, DC 20590, or call the toll-free Vehicle Safety Hotline at 1.888.327.4236 (TTY 1.800.424.9153), or go to http://www.safercar.gov. The National Highway Traffic Safety Administration Campaign ID Number for this recall is 13V225.

Federal regulation requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

- 25 -                                    CLASS ACTION COMPLAINT

Jim                                                       Moloney

General                                          Director,

Customer and Relationship Services

GM Recall #13139

## **Superiority**

108.     Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

109.     Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

110.     Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

111.     Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Classwide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Ignition Switch Defect.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Asserted on Behalf of the Nationwide Class
### (Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*)

112.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

113.    This Claim is brought on behalf of the Nationwide Class.

114.    Defendants, Plaintiff, and the Nationwide Class are "persons" within the meaning of RICO, § 1961(3).

***The RICO Enterprise***

115.    From on or about 2001, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

116.    Defendants' existence was separate and distinct from the RICO Enterprise.

117.    The RICO enterprise is separate and distinct from the pattern of racketeering activity in which Defendants engaged, and are engaging in.

118.    The RICO enterprise which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein.

119.    The RICO enterprise, which engaged in, and whose activities affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included:

***Defendant GM:*** GM's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates-in-fact in the Enterprise to deceive Plaintiff and other Class members into purchasing dangerous and defective vehicles, and actively

concealing the danger and defect from Plaintiff and the other Class members, including, but not limited to, Alan Adler, GM's Manager for Safety Communications who, in June of 2005, issued the deceptive public statement regarding the ignition problem; Ray DeGiorgio, GM's design engineer who signed off on the ignition switch change that was never disclosed; and Mary T. Barra, GM's current CEO;

**Defendant Delphi:** Delphi's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates-in-fact in the Enterprise to deceive Plaintiff and other Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and defect from Plaintiff and the other Class members.

**GM's Dealers:** GM dealers who GM instructed to present false and misleading information to Plaintiff and other members of the Class, through, *inter alia*, multiple Service Bulletins, and who did in fact present such false and misleading information.

120.  The RICO Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which GM has engaged and is engaging. The RICO Enterprise was and is used as a tool to effectuate the pattern of racketeering activity.

121.  The members of the RICO Enterprise all had a common purpose: to increase and maximize Defendants' revenues by deceiving Plaintiff and other Class Members into purchasing dangerous and defective vehicles, and actively concealing the Ignition Switch Defect from Plaintiff and the other Class Members. The members of the RICO Enterprise shared the bounty of their enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the RICO Enterprise benefited from the common purpose of the scheme to defraud: GM sold or leased more vehicles with the Ignition Switch Defect, Delphi sold more of the defective ignition switches, and GM's dealers sold and serviced more vehicles with the Ignition Switch Defect.

CLASS ACTION COMPLAINT

*The Pattern of Racketeering Activity*

122.    As set forth below, Defendants conducted and participated in the affairs of

this RICO enterprise through a pattern of racketeering activity that lasted more than a decade,

and that consisted of numerous and repeated violations of the federal mail and wire fraud

statutes, which prohibit the use of any interstate or foreign mail or wire facility for the

purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

a.      GM, with the assistance and collaboration of the other persons associated

in fact with the enterprise devised and employed a scheme or artifice to defraud

by use of the telephone and internet and transmitted, or caused to be transmitted,

by means of wire communication travelling in interstate or foreign commerce,

writing(s) and/or signal(s), including GM's website, Service Bulletins to dealers,

and communications with other members of the Enterprise, for the purpose of

executing such scheme or artifice to defraud, in violation of 18 U.S.C. § 1341

and §1343.

b.      As part of the scheme to defraud, the RICO Enterprise utilized the

interstate and international mail and wires for the purpose of obtaining money or

property by means of the false pretenses and artifice to defraud, as

described herein.

c.      The concealment of the dangerous and defective condition of the defective

GM vehicles is the core purpose of the underlying racketeering offense. The

Enterprise had an ascertainable structure by which GM operated and managed the

association-in-fact by using its Dealers and Delphi to concoct, obfuscate, carry

out, and attempt to justify the fraudulent scheme described herein.

123.    In furtherance of its scheme to defraud, GM's February 28, 2005 Service

Bulletin was issued in furtherance of its scheme to defraud. It instructed GM's dealers to

disseminate false and misleading information about the dangerous and defective condition of

the defective vehicles to customers, including Plaintiff and other members of the Class. The

CLASS ACTION COMPLAINT

February 28, 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

124.     In June of 2005, GM issued a public statement through the mail and wires in furtherance of its scheme to defraud. The statement provided the public, including Plaintiff and the other Class members, with false and misleading information about the dangerous and defective condition of the defective vehicles, and sought to conceal that condition by minimizing the issue and offering an ineffective fix. As such, the statement constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

125.     GM's December 2005 Service Bulletin was issued in furtherance of its scheme to defraud. It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class – namely, that the issue could be resolved by removing items from key chains. The December 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

126.     In October of 2006, GM issued an update to its December 2005 Service Bulletin in furtherance of its scheme to defraud. The update repeated the instruction to GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class. The update to the December 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

127.     In furtherance of its scheme to defraud, GM communicated with Delphi via the mail and/or wires regarding the manufacture of the defective ignition switch system. Through those communications, GM instructed Delphi to continue manufacturing the defective part even though it did not meet GM's own specifications. Through those communications, GM also instructed Delphi to make a change to the defective ignition switch system in 2006, and to fraudulently conceal the change by not assigning a new part

CLASS ACTION COMPLAINT

number. GM's communications with Delphi constitute repeated violations of 18 U.S.C. §§
1341 and 1343.

128.    The predicate acts constituted a variety of unlawful activities, each conducted
in furtherance of the enterprise and with the common purpose of defrauding Plaintiff and
other Class Members and obtaining significant funds while providing defective vehicles
worth significantly less than the purchase price paid by customers. The predicate acts also
had the same or similar results, participants, victims, and methods of commission. The
predicate acts were related and not isolated events.

129.    The predicate acts all had the purpose of generating significant revenue and
profits for the Defendants at the expense of Plaintiff and the Class Members, who were never
informed of the Ignition Switch Defect in their defective vehicles. The predicate acts were
committed or caused to be committed by GM, through its participation in the RICO
enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they
involved obtaining Plaintiff's and all other Class Members' funds.

130.    Defendants' conduct in furtherance of this scheme was intentional. Plaintiff
and Class Members were harmed in that they relied to their detriment on Defendants'
conduct and, as a result, purchased dangerous and defective vehicles for significantly more
money than they would have paid absent Defendants' scheme to defraud. Defendants
unfairly reaped millions of dollars in excessive sales revenue as a result of this scheme and
its conduct in furtherance of this scheme.

*Plaintiff's Injuries and Damages*

131.    By reason and as a result of Defendants' RICO-violative scheme, Plaintiff and
the Class Members have been injured and damages in their business and property: their cars
have lost value, and they have and will continue to incur expense and loss in connection with
their efforts to implement the Ignition Switch Defect correction and/or eliminate or reduce
the risks and costs to which the Defective Vehicles and parts expose them.

CLASS ACTION COMPLAINT

132.    By reason of the foregoing the defendants, through their managerial officials, have unlawfully, knowingly and willfully conducted and participated directly or indirectly in the following enterprises through a pattern of racketeering activity in violation or attempted violation of 18 U.S.C. § 1962(c).

133.    These violations of 18 U.S.C. § 1962(c) by the Defendants have directly and proximately caused Plaintiff's and Class Members' injuries and damage set forth above. Plaintiff and Class Members are entitled to bring this action for three times their actual damages, as well as punitive damages and its costs and reasonable attorneys' fees at trial and on appeal pursuant to 18 U.S.C. § 1964(c).

## CAUSES OF ACTION

## SECOND CLAIM FOR RELIEF

### Asserted on Behalf of the Nationwide Class
### (Violation of Michigan Consumer Protection Act ("MCPA), Michigan Comp. Laws Ann. § 445.903 *et seq.*

134.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

135.    This Claim is brought on behalf of the Nationwide Class.

136.    At all times relevant hereto, there was in full force and effect Mich. Comp. Laws Ann. § 445.903 *et seq.* (the "MCPA").

137.    Plaintiff and the Nationwide Class Members were "person[s]" within the meaning of the MCPA, M.C.L.A § 445.902(1)(d).

138.    At all relevant times hereto, Defendants were "persons" engaged in "trade or commerce" within the meaning of the MCPA, M.C.L.A. § 445.902(1)(d) and (g).

139.    The MCPA holds unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L.A.  § 445.902(1).

140.    The practices of Defendants violate the MCPA for, *inter alia*, one or more of the following reasons:

      a.      represented that the Class Vehicles had approval, characteristics, uses, and benefits that they do not have;

      b.      Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Class Vehicles;

      c.      Defendants represented that the Class Vehicles were of a particular standard, quality, or grade, when they were of another;

      d.      Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Class Vehicles, which did and tended to, mislead Plaintiff and the Class about facts that could not reasonably be known by the consumer until the February and March 2014 recalls;

      e.      Defendants failed to reveal facts concerning the Ignition Switch Defect that were material to the transaction in light of representations of fact made in a positive manner;

      f.      Defendants failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiff and the Class;

      g.      Defendants made material representations and statements of fact to Plaintiff and the Class that resulted in Plaintiff and the Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

      h.      Defendants intended that Plaintiff and Class Members rely on their misrepresentations and omissions, so that Plaintiff and other Class Members would purchase or lease the Class Vehicles; and

141.      In the event that Michigan law is not applied, Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes.

142.      Plaintiff seeks injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts or; seek monetary relief against Defendants measured as the greater of

(a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Class Member, reasonable attorneys' fees; and any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

143.    Plaintiff also seeks punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of Class Vehicles, deceived Plaintiff and Class Members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles it repeatedly promised Plaintiff and Class Members were safe. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## THIRD CLAIM FOR RELIEF

### Asserted on Behalf of the Nationwide Class
### (Fraud by Concealment)

144.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

145.    This Claim is brought on behalf of the Nationwide Class.

146.    As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

147.    Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as reliable and safe and proclaimed that Defendants maintain the highest safety standards. Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

148.    In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge

CLASS ACTION COMPLAINT

and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and Class Members. These omitted facts were material because they directly impact the safety of the Class Vehicles. Whether or not a vehicle ignition switch will unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power steering, anti-lock brakes and air bag deployment while the car is in motion, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles.

149.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

150.    Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and Class Members' actions were justified. Defendants were in exclusive control of the material facts concerning the Ignition Switch Defect and such facts were not known to the public or the Class Members.

151.    As a result of the concealment and/or suppression of facts, Plaintiff and Class Members have sustained and will continue to sustain damages arising from the difference between the actual value of that which Plaintiff and the Classes paid and the actual value of that which they received.

152.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FOURTH CLAIM FOR RELIEF

### Asserted on Behalf of the Nationwide Class the Multi-State Class and the Oklahoma Class Against GM
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et. seq.* ("MMWA"))

153. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraph of this Complaint.

154. This Claim is brought against GM on behalf of the Nationwide Class under Michigan law.

155. Alternatively, in the unlikely event that the Court determines that multiple states' laws apply to this Claim, it is brought against GM on behalf of residents of states that do not require vertical privity to assert an implied warranty claim, including: Alaska, Arkansas, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, West Virginia, and Wyoming ("Multi-State Class").

156. Further, alternatively, this Claim is brought against GM on behalf of the Oklahoma Class under Oklahoma law.

157. At all times relevant hereto, there was in full force and effect the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (the MMWA").

158. The Class Vehicles are consumer products as defined in 15 U.S.C. § 2301(1).

159. Plaintiff, the Nationwide Class, the Multi-State Class, and the Oklahoma Class are consumers as defined in 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranty.

160. GM is a supplier and a warrantor as defined in 15 U.S.C. § 2301(4) and (5).

CLASS ACTION COMPLAINT

161.     Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and are not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

162.     In connection with its sale of the Class Vehicles, GM gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability.  As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured and marketed, and were adequately contained, packaged and labeled. MICH. COMP. LAWS ANN.  § 440.2314(2)(a), (c) and (e), U.C.C. §  2-314(b)(1), (3) and (5),  and Okla. Stat., tit. 12A, § 2-314(2)(a), (c) and (e).

163.     GM is liable to Plaintiff and the Nationwide, Multi-State and Oklahoma Class pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability.

164.     GM breached its implied warranty of merchantability to Plaintiff and the Nationwide, Multi-State and Oklahoma Class because the Class Vehicles were not fit for the ordinary purposes for which they are used - a safe passenger motor vehicle.  The Ignition Switch Defect, which affects Ignition Switches in the Class Vehicles, may, among other things, result in the vehicle's airbags not deploying in a crash event, increasing the potential for occupant injury or death.  This safety defect makes the Class Vehicles unfit for their ordinary purpose of providing safe transportation.

165.     GM further breached its implied warranty of merchantability to Plaintiff and the Nationwide, Multi-State and Oklahoma Class because the Class Vehicles would not pass without objection in the trade, as they contained a defect that relates to motor vehicle safety due to the Ignition Switch Defect in each of the Class Vehicles.

CLASS ACTION COMPLAINT

165.    GM further breached its implied warranty of merchantability to Plaintiff and
the Nationwide, Multi-State and Oklahoma Class because the Class Vehicles were not
adequately contained, packaged, and labeled.  The directions and warnings that accompanied
the Class Vehicles did not adequately instruct Plaintiff on the proper use of the Class
Vehicles in light of the defective ignition switches in the vehicles and the propensity of the
switches to unintentionally move from the "on" position to the "accessory" or "off" position
causing a loss of power and the engine to shut off, or adequately warn of the dangers of
improper use of the Class Vehicles.

166.    At the time of the delivery of the Class Vehicles, GM did not provide
instructions and warnings to not place extra weight on the their vehicles' key chains,
including a fob or extra keys, because the extra weight increased the chances that the
defective ignition switches in their vehicles would unintentionally move from the "on"
position and into the "accessory" or "off" position.

167.    At the time of the delivery of the Class Vehicles, GM did not provide
instructions and warnings to avoid rough, bumpy and uneven terrain while driving their
vehicles because such conditions increased the chances that the defective ignition switches in
their vehicles would unintentionally move from the "on" position and into the "accessory" or
"off" position, especially when the key chains were weighted down with a fob, additional
keys or other items.

168.    At the time of the delivery of the Class Vehicles, GM did not provide
instructions and warnings to carefully avoid brushing or bumping up against their vehicles'
key chains with a body part because doing so increased the chances that the defective
ignition switches in their vehicles would unintentionally move from the "on" position and
into the "accessory" or "off" position.

CLASS ACTION COMPLAINT

169.    At the time of the delivery of the Class Vehicles, GM did not adequately warn of the dangers of not taking the necessary steps outlined above to prevent the defective ignition switches in their vehicles from unintentionally moving from the "on" position and into the "accessory" or "off" position while in motion, including the loss of power and shut off of the engine resulting in an increased difficulty in maneuvering the vehicles, the lack of airbag deployment in the event of a crash and injury or death.

170.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and the Nationwide, Multi-State and Oklahoma Class are entitled to recover the damages caused to them by GM's breach of the implied warranty of merchantability, which damages constitute the difference in value between the Class Vehicles as warranted (their sales prices) and the Class Vehicles as actually delivered (perhaps worth $0.00) (i.e, a total or partial refund of the full purchase prices of the Class Vehicles), plus loss of use and other consequential damages arising after the dates of deliveries of the Class Vehicles.   In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the Nationwide, Multi-State and Oklahoma Classes are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiff and the Nationwide, Multi-State and Oklahoma Classes in connection with the commencement and prosecution of this action.

## FIFTH CLAIM FOR RELIEF

**Asserted on Behalf of the Nationwide Class, the Multi-State Class and the Oklahoma Class Against GM**
**(Breach of Implied Warranty of Merchantability – Michigan Comp. Laws Ann. § 440.2314, Other States' Versions of U.C.C. § 2-314 and Okla. Stat. tit. 12A, § 2-314 )**

171.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

172.    This Claim is brought on behalf of the Nationwide Class under Michigan law.

CLASS ACTION COMPLAINT

173.    Alternatively, in the unlikely event that the Court determines that multiple states' laws apply to this Claim, it is brought against GM on behalf of the Multi-State Class.

174.    Further, alternatively, this Claim is brought against GM on behalf of the Oklahoma Class under Oklahoma law.

175.    At all times relevant hereto, there was in full force and effect the Michigan Comp. Laws Ann. § 440.2314, other States' versions of U.C.C. § 2-314, and Okla. Stat. tit. 12A, § 2-314.

175.    GM is a "merchant" as to the Class Vehicles within the meaning of MICH. COMP. LAWS ANN. § 440.2104, U.C.C. § 2-104, and Okla. Stat. tit. 12A, § 2-104.

176.    GM manufactured and sold the Class Vehicles, which are "goods" within the meaning of MICH. COMP. LAWS ANN. § 440.2105, U.C.C. § 2-105, and Okla. Stat. tit. 12A, § 2-105.

177.    Consequently, pursuant to MICH. COMP. LAWS ANN. § 440.2314, U.C.C. § 2-314, and Okla. Stat. tit. 12A, § 2-314 , GM impliedly warranted that the Class Vehicles were merchantable, including that they were fit for their ordinary purposes as safe passenger vehicles, they could pass without objection in the trade, and they were adequately contained, packaged, and labeled.

178.    GM breached its implied warranty of merchantability to Plaintiff and the Nationwide, Multi-State and Oklahoma Classes because the Class Vehicles were not fit for the ordinary purposes for which they are used, a safe passenger motor vehicle. MICH. COMP. LAWS ANN. § 440.2314(2)(c), U.C.C. § 2-314(b)(3), and Okla. Stat. tit. 12A, § 2-314(2)(c). Specifically, and according to GM's representatives, a defect which relates to motor vehicle safety exists in the Class Vehicles in that the ignition switch may unintentionally move from the "run" position to the "accessory" or "off" position with a corresponding loss of power and the shutting off of the engine, which, among other things, may result in the vehicle's airbags not deploying in a crash event, increasing the potential for occupant injury or death.

CLASS ACTION COMPLAINT

This safety defect makes the Class Vehicles unfit for their ordinary purpose of providing safe transportation.

179.    GM further breached its implied warranty of merchantability to Plaintiff and the Nationwide, Multi-State and Oklahoma Classes because the Class Vehicles would not pass without objection in the trade, as they contained a defect which relates to motor vehicle safety due to the defective ignition switch in each of the Class Vehicles. MICH. COMP. LAWS ANN. § 440.2314(2)(a), U.C.C. § 2-314(b)(1), and Okla. Stat. tit. 12A, § 2-314(2)(a) .

180.    GM further breached its implied warranty of merchantability to Plaintiff and the Nationwide, Multi-State and Oklahoma Classes because the Class Vehicles were not adequately contained, packaged and labeled in that the directions and warnings that accompanied the Class Vehicles did not adequately instruct on the proper use of the Class Vehicles in light of the defective ignition switches and the propensity of the switches to unintentionally move from the "on" position to the "accessory" or "off" position causing a loss of power and the engine to shut off, or adequately warn Plaintiff of the dangers of improper use of the Class Vehicles. MICH. COMP. LAWS ANN. § 440.2314(2)(e), U.C.C. § 2-314(b)(5), and Okla. Stat. tit. 12A, § 2-314(2)(e).

181.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to not place extra weight on the their vehicles' key chains, including a fob or extra keys, because the extra weight increased the chances that the defective ignition switches in their vehicles would unintentionally move from the "on" position and into the "accessory" or "off" position.

182.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to avoid rough, bumpy and uneven terrain while driving their vehicles because such conditions increased the chances that the defective ignition switches in their vehicles would unintentionally move from the "on" position and into the "accessory" or "off" position, especially when weighted down with a fob, additional keys or other items.

CLASS ACTION COMPLAINT

183.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to carefully avoid brushing or bumping up against their vehicles' key chains with a body part because doing so increased the chances that the defective ignition switches in their vehicles would unintentionally move from the "on" position and into the "accessory" or "off" position.

184.    Additionally, at the time of the delivery of the Class Vehicles, GM did not adequately warn of the dangers of not taking the necessary steps outlined above to prevent the defect ignition switches in their vehicles from unintentionally moving from the "on" position and into the "accessory" or "off" position while in motion, including the loss of power and shut off of the engine resulting in an increased difficulty in maneuvering the vehicles, the lack of airbag deployment in the event of a crash and injury or death.

185.    As a proximate result of the GM's breach of the implied warranty of merchantability, Plaintiff and the National, Multi-State and Oklahoma Classes were damaged in the amount of, and entitled to recover, the difference in value between the Class Vehicles as warranted (their sales prices) and the Class Vehicles as actually delivered (perhaps worth $0.00) (i.e., a total or partial refund of the full purchase prices of the Class Vehicles), plus loss of use and other consequential damages arising after the date of delivery of the Class Vehicles.  MICH. COMP. LAWS ANN.  §§ 440.2714(3) and 440.2715, U.C.C. §§ 2-714(b) and 2-715, and Okla. Stat. tit. 12A, § 2-714(2) and 2-715.

186.    It was not necessary for Plaintiff and each Class member to give GM notice of its breaches of the implied warranty of merchantability because GM had actual notice of the fact that the Class Vehicles contained a defect relating to motor vehicle safety.  Prior to the filing of this action, GM issued a safety recall for the Class Vehicles acknowledging a safety defect and that GM had notice of the defects back to 2009 when it was formed and Old GM had notice back to 2002.  At the time of the safety recall of the Class Vehicles, GM also acknowledged that numerous accidents and fatalities were caused by the defective ignition switches in the Class

CLASS ACTION COMPLAINT

Vehicles.  Additionally, the filing of this action is sufficient to give GM notice of its breaches of

the implied warranty of merchantability with respect to the Class Vehicles.

## SIXTH CLAIM FOR RELIEF

### Asserted on Behalf of the Oklahoma Class
### (Violation of Oklahoma's Consumer Protection Act ("OCPA"), Okla. Stat. tit. 15 §§ 15-752-765, *et seq.*)

187.     Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

188.     This Count is brought on behalf of Plaintiff Deneise Burton and the

Oklahoma Class.

189.     Plaintiff is a "persons" within the meaning of Okla. Stat. tit. 15 § 15-751(1).

190.     Defendants are "persons,"  "corporations" or "associations" within the meaning of

Okla. Stat. tit. 15 § 15-751(1).

191.     A person "engages in a practice which is declared to be unlawful under the

Oklahoma Consumer Protection Act when, in the course of the person's business, the person …

[c]omits an unfair or deceptive trade practices as defined in Section 752 of the [OCPA]."  Okla.

Stat. tit. 15 § 15-753.  Defendants' conduct, as described above, constitutes "unfair and deceptive

trade practices" within the meaning of this statute.  Further, Defendants' unfair and trade

deceptive  practices, which were intended to mislead consumers who were in the process of

purchasing and/or leasing the Class Vehicles, was consumer-oriented conduct.

192.     Defendants violated the OCPA when they represented, through advertising,

warranties, and other express representations, that the Class Vehicles had characteristics and

benefits that they did not actually have.

193.     Defendants violated the OCPA when they falsely represented, through advertising,

warranties, and other express representations, that the Class Vehicles were of certain quality or

standard when they were not.

194.     Defendants violated the OCPA by fraudulently concealing from and/or failing to

disclose to Plaintiff and the Oklahoma Class the defects associated with the Class Vehicles

195.     Defendants violated the OCPA by actively misrepresenting in, and/or concealing and omitting from, their advertising, marketing, and other communications, material information regarding the Class Vehicles.  The material information included:

a.     that there was a substantial risk of ignition switch failure that far exceeded the risk of such defect normally associated with similar consumer products;

b.     that the Ignition Switch Defect might not become apparent until after the warranty had expired; and

c.     that Defendants were not committed to repairing the Ignition Switch Defect if it was discovered after the warranty expired.

196.     The above-described unlawful, unfair and deceptive business practices by Defendants continue to present a threat to members of the consuming public, Plaintiff and the Oklahoma Class.

197.     As a direct and proximate cause of Defendants' violations of the OCPA, Plaintiff and members of the Oklahoma Class have suffered injury in fact and/or actual damage, in that they purchased a Class Vehicle that contains inherent design defects.

198.     These unfair and deceptive acts and/or practices therefore injured Plaintiff and the Oklahoma Class in the state of Oklahoma.

199.     Pursuant to Okla. Stat. tit. 15 § 15-761.1(A), Plaintiff, on behalf of herself and all others similarly situated, seek monetary relief against Defendants for (a) the actual damages sustained by Plaintiff and each Oklahoma Class Member in an amount to be determined at trial, and (b) costs of litigation, including but not limited to, costs and attorney's fees.

200.     Plaintiff also seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, and any other just and proper relief available under the OCPA.

## SEVENTH CLAIM FOR RELIEF

### (Claim for Actual Damages/Expense Reimbursement Fund)

201.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

CLASS ACTION COMPLAINT

202.    This Count is brought on behalf of Plaintiff and Members of all Classes.

203.    Plaintiff and  Class Members have incurred out-of-pocket expenses and damages in attempting to rectify the Ignition Switch Defect in their Vehicles, and such expenses and losses will continue as they must take time off from work, pay for rental cars or other transportation arrangements, child care and the myriad expenses involved in going through the recall process to correct the Defect.

204.    Plaintiff and Class Members seek payment of such damages and reimbursement of such expenses under the consumer statutes and applicable law invoked in this Complaint. While such damages and expenses are individualized in detail and amount, the right of the Class Members to recover them presents common questions of law. Equity and fairness to all Class Members requires the establishment by court decree and administration under Court supervision of a Defendant-funded program, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defect.

## PRAYER FOR RELIEF

Plaintiff, on behalf of herself and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.    an order certifying the proposed Classes, designating Plaintiff as the named representatives of the Classes, and designating the undersigned as Class Counsel;

B.    a declaration that the Ignition Switches in Class Vehicles are defective;

C.    a declaration that the Defendants are financially responsible for notifying all Nationwide and Oklahoma Class Members about the defective nature of the Class Vehicles;

D.    an order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles to eliminate the Ignition Switch Defect;

E.    an award to Plaintiff and Class Members of compensatory, and statutory

CLASS ACTION COMPLAINT

penalties, damages, including interest, in an amount to be proven at trial;

     F.      a declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

     G.      an award of attorneys' fees and costs, as allowed by law;

     H.      an award of pre-judgment and post-judgment interest, as provided by law;

     I.      leave to amend this Complaint to conform to the evidence produced at trial; and

     J.      such other relief as may be appropriate under the circumstances.

## JURY DEMAND

     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: April 18, 2014          EDWARD L. WHITE, P.C.

                    By:    */s/ Edward L. White*
                            Edward L. White

                    Edward L. White
                    *ed@edwhitelaw.com*
                    EDWARD L. WHITE, P.C.
                    853 E. 33rd Street
                    Edmond, OK 73013
                    Telephone: (405) 810-8188
                    Facsimile: (405) 608-0971

                    *Attorney for the Plaintiff*