BROWN RUDNICK LLP
Edward S. Weisfelner
David J. Molton
Howard S. Steel
7 Times Square
New York, New York 10036
Telephone: 212-209-4800

- and –

Ronald Rus (*pro hac vice* pending)
Joel S. Miliband (*pro hac vice* pending)
2211 Michelson Drive, 7th Floor
Irvine, California 92612
Telephone: 949-752-7100

ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.
Mark P. Robinson, Jr. (*pro hac vice* pending)
19 Corporate Plaza
Newport Beach, California 92660
Telephone: 949-720-1288

- and -

HAGENS BERMAN SOBOL
SHAPIRO LLP
Steve W. Berman (*pro hac vice* pending)
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: 206-623-7292

*Co-Counsel for Daniel Ratzlaff, Patricia
Barker, Sylvia Benton, Nicole Heuler, Katie
Michelle McConnell, Carlota Onofre, and
Teleso Satele, individually and as putative
class representatives*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                                            :
In re:                                                      :        Chapter 11
                                                            :
MOTORS LIQUIDATION COMPANY, *et al.*,                       :        Case No. 09-50026 (REG)
        f/k/a General Motors Corp., *et al.*                :
                                                            :        (Jointly Administered)
                            Debtors.                        :
                                                            :
-------------------------------------------------------------X

**OBJECTION TO MOTION OF
GENERAL MOTORS LLC PURSUANT TO 11 U.S.C. §§ 105 AND
<u>363 TO ENFORCE THE COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

I.     Plaintiffs And The Class Action Complaints. .......................................................3

II.    The Ignition Switch Defect. ...............................................................................5

      A.     General Background On The Ignition Defect. ...........................................5

      B.     What Did GM Internally Know And Conceal?..........................................6

      i.        GM Knew That There Were Problems With The Ignition Switch
Design In 2001 ..........................................................................................6

      ii.       GM Approved Production Of Ignition Switches In 2002 Despite
Knowing That They Did Not Meet GM's Own Design Specifications.7

      iii.      GM Engineers Understood The Need To Correct The Ignition Switch
Defect In 2004 ..........................................................................................7

      iv.      GM Engineers Proposed Design Changes In 2005 Which Were
Rejected By GM Management At Least Partly To Save Money ..........8

      v.        Complaints And Serious Accidents Accumulated In 2005 Which
NHTSA Began To Investigate. .........................................................10

      vi.      Rather Than Implementing A Recall And Fixing The Defect, Old GM
Sent A Service Bulletin To GM Dealers In Late 2005, TellingThem To
Tell Customers To Take Heavy Items Off Their Key Rings. .............11

      vii.     Old GM Knew About And Authorized A Design Change In April
2006, But Masked The Existence And Significance Of The Change By
Keeping The Part Number The Same .................................................12

      viii.    Fatality Crashes Continued To Occur, Including A Crash In October
2006 Where Two People Were Killed ...............................................12

      ix.      Old GM Responded By Updating The Service Bulletin About The
Heavy Key Chains. ..........................................................................13

      x.       GM Knew Of And Tracked Multiple Incidents Involving The Ignition
Switch Defect By 2007 And Avoided Scrutiny By Misleading NHTSA
And The Public..................................................................................14

      xi.      By 2009, As The Reports, Injuries And Deaths Continued To Mount,
Old GM Opened Another Internal Investigation................................16

      xii.     GM Internally Acknowledge The Ignition Switch Defect Problem
Throughout The Bankruptcy Proceedings .........................................16

      xiii.    New GM Testing In 2012 Again Confirmed The Widespread Scope Of
The Ignition Switch Defect. ..............................................................18

i

xiv.    New GM Internally Admitted In 2013 That It Knew That The Earlier Ignition Switch Design Was Defective..................................................19

xv.    New GM Waited Until February 2014 To Publicly Admit That The Ignition Switch Defect Existed In Its Vehicles, But Even Then Initially Misrepresented The Scope Of The Defect And The Vehicles Affected ..................................................................................................................21

C.    Recently Produced GM Documents And Congressional Testimony ........22

III.    Old GM's Chapter 11 Cases...............................................................................26

A.    General Case Background..........................................................................26

B.    Sale Of Old GM To New GM....................................................................26

C.    The Establishment Of Bar Dates...............................................................28

D.    Solicitation And Confirmation Of The Plan. ...........................................29

E.    New GM's Motion To Enforce The Sale Order........................................30

IV.    New GM's Successor Liability...........................................................................30

OBJECTION..........................................................................................................................33

I.    New GM Must Treat Similarly Situated Creditors Equally. ....................33

II.    Old GM Deprived The Plaintiffs And Ignition Switch Claimants Of Constitutional Due Process........................................................................35

CONCLUSION......................................................................................................................39

## TABLE OF AUTHORITIES

Page(s)

CASES

Aoude v. Mobil Oil,
892 F.2d 1115 (1st Cir. 1989) ........................................................................................38

Armstrong v. Manzo,
380 U.S. 545 (1965) .......................................................................................................36

Begier v. IRS,
496 U.S. 53 (1990) .........................................................................................................34

Chemetron Corp. v. Jones,
72 F.3d 341 (3d Cir. 1995), ...........................................................................................36

City of New York v. New York, New Haven & Hartford R.R. Co.,
344 U.S. 293 (1953) ..................................................................................................35, 36

DPWN Holdings (USA), Incorporated v. United Air Lines, Inc.,
2014 WL 1244184 (2d Cir. Mar. 27, 2014)....................................................................36

Evergreen Solar, Inc. v. Barclays PLC, et al. (In re Lehman Bros. Holdings, Inc.),
No. 08-01633, 2011 WL 722582 (Bankr. S.D.N.Y. Feb. 22, 2011) (Peck, J.)................35

In re Ames Dep't Stores, Inc.,
306 B.R. 43 (Bankr. S.D.N.Y. 2004) .............................................................................34

In re Arch Wireless,
534 F.3d 76 (1st Cir. 2008) ............................................................................................36

In re BGI, Inc.,
476 B.R. 812 (Bankr. S.D.N.Y. 2012) ...........................................................................36

In re Drexel Burnham Lambert Group, Inc.,
151 B.R. 674 (Bankr. S.D.N.Y. 1993) ...........................................................................36

In re Emons Indus., Inc.,
220 B.R. 182 (Bankr. S.D.N.Y. 1998) ...........................................................................35

In re General Motors Corp.,
407 B.R. 463 (Bankr. S.D.N.Y. 2009) ...........................................................................27

In re Johns-Manville Corp.,
600 F.3d 135 (2d Cir. 2010) ..........................................................................................36

In re Trans World Airlines, Inc.,
96 F.3d 687 (3d Cir. 1996) ............................................................................................36

In re XO Commc'ns, Inc.,
    301 B.R. 782 (Bankr. S.D.N.Y. 2003) ................................................................36

Jones v. Chemetron Corp., 517 U.S. 1137 (1997) .......................................................36

Leber-Krebs, Inc. v. Capitol Records,
    779 F.2d 895 (2d Cir. 1985) ...............................................................................38

Liona Corporation, Inc. v. PCH Associates, et al. (In re PCH Associates),
    949 F.2d 585 (2d Cir. 1991) ...............................................................................34

Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Industries, Inc.),
    467 B.R. 694 (S.D.N.Y. 2012) ......................................................................35, 36

Mullane v. Cent. Hanover Bank & Trust Co.,
    339 U.S. 306 (1953) ............................................................................................36

Reliable Electro Co., Inc., v. Olson Construction Company,
    726 F.2d 620 (10th Cir. 1984) ...........................................................................35

STATUTES

11 U.S.C. § 101(5) ..................................................................................................26, 37

11 U.S.C. § 363 .............................................................................................................26

11 U.S.C. § 365 .............................................................................................................26

11 U.S.C. § 502(b)(9) ...................................................................................................28

OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ......................................................................................................38

Fed. R. Civ. P. 30(b)(6) ...................................................................................31, 32, 33

Fed. R. Civ. P. 60(d) ....................................................................................................38

Fed. R. Bankr. P. 3003(c)(3) .......................................................................................28

Fed R. Bankr. P. 3017 ..................................................................................................29

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

Daniel Ratzlaff, Patricia Barker, Sylvia Benton, Nicole Heuler, Katie Michelle McConnell, Carlota Onofre, and Teleso Satele (collectively, the "Plaintiffs"), individually and as putative class representatives on behalf of all similarly situated persons and the general public, by and through their undersigned counsel, respectfully submit this objection (the "Objection") to the motion (the "Motion"), dated April 21, 2014 [Docket No. 12620], of General Motors LLC ("New GM") to permanently enjoin the Plaintiffs from asserting certain claims against New GM pursuant to the Court's July 5, 2009 Sale Order (the "Sale Order") approving the sale of substantially all of the assets of Motors Liquidation Company, f/k/a/ General Motors Corp. ("Old GM") to New GM. In support of the Objection, Plaintiffs respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Motion is a calculated response to the recent public disclosure of a massive cover-up by Old GM and New GM. Rather than respond to the fundamental denial of due process that permeated the Chapter 11 process and the fraud perpetrated on this Court, New GM proffers an unprecedented and unsupportable position that would have this Court distinguish between creditors with wrongful death and personal injury claims and those injured parties who have cognizable, substantial economic damages.

2.      As set forth in this Objection, it is indisputable that Old GM, despite having more than ample information and means to provide creditors with claims relating to the GM ignition switch defect (the "Ignition Switch Claimants") with actual notice, failed to provide these "known" creditors with adequate and required notice of, *inter alia*:  (i) the sale to New GM, (ii) the confirmation of Old GM's Plan, and (iii) the related releases, exculpations and injunctions contained in the orders pertaining thereto. That failure of notice violated fundamental

1

Constitutional due process. Accordingly, as a matter of black letter constitutional law, the applicable Bankruptcy Court orders on which New GM now bases its Motion are inapplicable to and unenforceable against the Ignition Switch Claimants.

3.      It is clear that Old GM and New GM consciously and actively expanded their long-running cover-up of the ignition switch defect to commit fraud on the Bankruptcy Court by failing to disclose these matters to the Court and actively misleading the Court.

4.      This Objection also provides ample basis upon which to hold New GM responsible for the failure to disclose the fraud perpetrated on the Court and the thousands of affected creditors.

5.      By the Motion, New GM now seeks to "double-down" on this conduct and attempts to eviscerate another fundamental bankruptcy precept – equal treatment of similarly situated creditors. The Motion – no doubt deliberatively designed for a public relations objective - expressly exempts creditors asserting claims involving an accident or incident causing personal injury, loss of life or property damage from the requested relief but seeks to require that all other creditors asserting all other claims against New GM related to the ignition switch defect be compelled to stand down and cease and desist their pending lawsuits.

6.      New GM's distinction between claims of equal priority is disingenuous and contrary to the fundamental bankruptcy maxim of equal treatment of similarly situated creditors. Simply put, New GM cannot arbitrarily pick and choose which claims move along to round two and which claims may be enjoined under the Sale Order. There is no basis under the Bankruptcy Code for New GM to artificially distinguish among similarly situated creditors.

7.      Unfortunately for New GM, its cover-up has been exposed and the Plaintiffs, by this Objection, seek to ensure that New GM is held accountable for its egregious wrong-doing.

2

Accordingly, the Court should find that the: (i) the Plaintiffs and Ignition Switch Claimants are not bound by the Sale Order and the Confirmation Order, together with the releases, exculpation and injunctions contained therein, because Old GM failed to provide the Ignition Switch Claimants with the notice required by law; (ii) Old GM and New GM committed fraud on the Bankruptcy Court so as to require revocation of the Sale Order and Confirmation Order insofar as necessary to afford Plaintiffs and Ignition Switch Claimants to pursue remedies against New GM in a court of competent jurisdiction; and (iii) the disparate treatment of equal creditors under the Motion is not supported as a matter of law and should not be tolerated by this Court.

## BACKGROUND

### I.    Plaintiffs And The Class Action Complaints.

8.    The Plaintiffs and the class action complaints that they have filed with respect to the ignition switch defect are as follows:

9.    Plaintiff and proposed Nationwide and California State Class Representative Daniel Ratzlaff ("Ratzlaff") is a resident and citizen of Quartz Hill, California.

10.    Plaintiff and proposed Nationwide and California State Class Representative Patricia Barker ("Barker") is a resident and citizen of Wilmington, California.

11.    On March 31, 2014, Ratzlaff and Barker filed a class action complaint against New GM in the United States District Court for the Central District of California, which is pending under Case No. 2:14-cv-02424 (the "Ratzlaff Action").

12.    Plaintiff and proposed Nationwide and California State Class Representative Katie Michelle McConnell ("McConnell") is a resident and citizen of Irvine, California. On March 19, 2014, McConnell filed a class action complaint against New GM in the United States

District Court for the Central District of California, which is pending under Case No. 8:14-cv-00424 (the "McConnell Action").

13.    Plaintiff and proposed Nationwide and California State Class Representative Carlota Onofre ("Onofre") is a resident and citizen of Irvine, California.

14.    Plaintiff and proposed Nationwide and California State Class Representative Teleso Satele ("Satele") is a resident and citizen of Torrance, California.

15.    On March 31, 2014, Onofre and Satele filed a class action complaint against New GM in the United States District Court for the Central District of California, which is pending under Case No. 8:14-cv-00485 (the "Satele Action").

16.    Plaintiff and proposed Nationwide and California State Class Representative Sylvia Benton ("Benton") is a resident and citizen of Barstow, California.  On March 26, 2014, Benton filed a class action complaint against New GM in the United States District Court for the Central District of California, which is pending under Case No. 5:14-cv-00590 (the "Benton Action").

17.    Plaintiff and proposed Nationwide and California State Class Representative Nicole Heuler ("Heuler," together with Ratzlaff, Barker, McConnell, Onofre, Satale, and Benton, the "Class Representatives") is a resident and citizen of Anaheim, California.  On April 1, 2014, Heuler filed a class action complaint against New GM in the United States District Court for the Central District of California, which is pending under Case No. 8:14-cv-00492 (the "Heuler Action," and together with the Ratzlaff Action, the McConnell Action, the Benton Action, and the Satele Action, the "Class Action").

18.    In the Class Action, the Plaintitffs, individually and on behalf of all similarly situated persons, each of whom own, owned, lease or leased one or more of the following New

4

GM vehicles: 2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; 2007-2010 Saturn Sky; 2005 Chevrolet Equinox; 2006 Chevrolet Trailblazer; and 2006 Chevrolet Monte Carlo (collectively, the "Defective Vehicles"), filed complaints (collectively, the "Class Action Complaints") seeking to hold New GM liable for damages that the class members have suffered as a result of the defective ignition switches.  True and correct copies of the Class Action Complaints are attached as Exhibits 1 through 5.[1]

## II.    The Ignition Switch Defect.

### A.    General Background On The Ignition Defect.

19.    Before, during, and after Old GM's Chapter 11 Cases, Old GM and then New GM manufactured and sold vehicles with a defective ignition switch.

20.    At no point during the Chapter 11 Cases did GM reveal to the Court, owners of Defective Vehicles, or the general public the existence of the ignition switch defect.

21.    The ignition switch defect can cause a Defective Vehicle's engine and electrical system to shut off, disabling the power steering and power brakes and causing non-deployment of the vehicle's airbags in the event of a crash.

22.    The ignition switch systems are defective in at least two major respects.  First, the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" or "off" position.  Second, because of the low position of the ignition switch, the driver's knee can easily bump the key (or the hanging fob below the key), and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.

---

[1]    Exhibits to this Objection are contained in the Compendium of Exhibits, to be filed with the Court. References to Exhibits in the Objection shall be designated as "Ex."

09-50026-mg    Doc 12629    Filed 04/22/14    Entered 04/22/14 21:35:34    Main Document
Pg 11 of 45

23.     The Defective Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators.

**B.      What Did GM Internally Know And Conceal?**

*i.      GM Knew That There Were
Problems With The Ignition Switch Design In 2001.*

24.     GM knew that the ignition switches to be used in millions of vehicles were defective before the vehicles were even sold to the public.  In the late 1990s and early 2000s, GM and one of its suppliers, Eaton Mechatronics, finalized the specifications for the ignition switch for the Saturn Ion.  Ex. 6 (Delphi Briefing to House Committee Staff (Mar. 27, 2014)) (hereinafter "Delphi Briefing").  Eaton Corporation later sold its Vehicle Switch/Electronic Division to Delphi Automotive Systems ("Delphi") on March 31, 2001.  See id.

25.     In 2001, years *before* the vehicles were ever sold and available to consumers, GM privately acknowledged in a pre-production report for the model/year ("MY") Saturn Ion that there were problems with the ignition switch.  Ex. 7 (GM Report/Complaint re "Electrical Concern" opened July 31, 2001, GMHEC000001980-90).

26.     GM's own engineers had personally experienced problems with the ignition switch.  See id.  In a section of the internal report titled "Root Cause Summary," GM engineers identified "two causes of failure," namely: "[l]ow contact force and low detent plunger force." Id. (GMHEC000001986).  The report also stated that the GM manager responsible for the issue was Ray DeGiorgio.  Id. (GMHEC000001981, 1986).

6

ii.    *GM Approved Production Of Ignition Switches In 2002 Despite Knowing That They Did Not Meet GM's Own Design Specifications.*

27.    GM approved production of the ignition switches despite knowing that they did not meet GM's own design specifications.

28.    In February of 2002, Delphi, GM's ignition switch supplier for the recalled vehicles, asked GM to approve production for the ignition switch and submitted a Production Part Approval Process ("PPAP") request.  Ex. 6 (Delphi Briefing).  Even though testing of the ignition switch revealed problems and that it did not meet the original specifications set by GM, GM approved the PPAP.  Id.

29.    Not surprisingly, in 2003, almost immediately after the first GM vehicles with the defective ignition switches were sold to the public, GM started receiving complaints regarding the loss of power while driving with no Diagnostic Trouble Codes ("DTCs") being recorded in 2003 Saturn Ions involving the ignition switch/steering column.  See, e.g., Ex. 8 (GMHEC000000238-249).

iii.    *GM Engineers Understood The Need To Correct The Ignition Switch Defect In 2004.*

30.    In 2004, GM knew that the ignition switch posed a safety concern that needed to be fixed.  For example, in October of 2004, GM internally documented incidents in which GM engineers verified that the ignition switch was turned to the off position as a result of being grazed by the driver's knee.  Ex. 9 (2004 PRTS, originated Nov. 19, 2004, GMHEC000001727-41).  The preliminary root cause of the problem was found to be "low key cylinder torque/effort."  Id.; see also Ex. 10 (GMHEC0002249-56)

31.    In November of 2004, GM initiated an engineering investigation, which it referred to as Problem Resolution Tracking System N172404 (the "2004 PRTS").  One of the

aims of the 2004 PRTS was to analyze complaints that GM vehicles, particularly the 2005 Chevrolet Cobalt, "can be keyed off with knee while driving." Ex. 9.

**iv.  GM Engineers Proposed Design Changes In 2005 Which Were Rejected By GM Management At Least Partly To Save Money.**

32.    As time went by, Old GM's knowledge of the safety problem continued and its concern increased.  In February of 2005, as part of the same 2004 PRTS, Old GM engineers met to analyze how to address the ignition switch defect. Ex. 9 (GMHEC000001733).  Old GM engineers proposed changing the ignition switch "torque effort," but were told by the ignition switch engineer (Ray DeGiorgio) that it was "close to impossible to modify the present ignition switch" because it was "very fragile and doing any further changes will lead to mechanical and/or electrical problems." Id.

33.    Still, Old GM engineers recognized that there was a need to do something in order to address to the apparent ignition switch problem.  For example, Old GM engineers were directed to investigate a possible key slot change as "containment" of the defect, including development cost and time estimates. Id. (GMHEC000001734).

34.    However, despite the clear problem that needed to be fixed, Old GM took no action to correct the defect.  By March of 2005, the GM Cobalt Program Engineering Manager's ("PEM") issued a "directive" to close the 2004 PRTS "with no action."    Id. (GMHEC000001735).  According to the internal GM document, the design change was refused because of three reasons:  (1) *time*, *i.e.*, because the "lead-time for all solutions is too long," (2) *money*, i.e., because the "tooling cost and piece price are too high," and (3) effectiveness, i.e., because "[n]one of the solutions seems to fully countermeasure the possibility of the key being turned (ignition turned off) during driving." Id.

8

35.    In deciding to do nothing to correct the serious safety defect that existed in its vehicles, Old GM simply shrugged off the issue entirely, concluding that "none of the solutions represents an acceptable business case." Id. Old GM did not explain what, if any, criteria exist for an "acceptable business case" or otherwise justify its decision to do nothing. See id. Other GM documents make clear that Old GM avoided taking action in order to cut costs.

36.    Ignoring the defect did not make the problem or reported incidents go away. In May of 2005, another Problem Resolution Tracking System (PRTS N182276) (the "2005 PRTS") was opened by GM to analyze the ignition switch in the 2005 Chevrolet Cobalt following customer complaints that the "vehicle ignition will turn off while driving." Ex. 11 (2005 PRTS, originated May 17, 2005, GMHEC000001742-54).

37.    GM acknowledged in the 2005 PRTS that it had previously addressed the same issue in the 2004 PRTS and "[d]ue to the level of buyback activity that is developing in the field, Brand Quality requests that the issue be reopened." Id. at (GMHEC000001743).

38.    To correct the defect in the ignition switch, Old GM engineers proposed changing the key ring slot to a hole and using a smaller key ring. Id. (GMHEC000001750).

39.    Old GM approved this proposal, but later cancelled it and did not proceed with the design change. Ex. 12 (GM Feb. 24, 2014 ltr. to NHTSA chronology).

40.    Likewise, Old GM did nothing to notify its consumers or the public of the ignition switch defect that existed in millions of GM vehicles.

41.    In June of 2005, a Senior Delphi Project Engineer stated in an confidential email that the "Cobalt is blowing up in [GM's] face in regards to the car turning off with the driver's knee." Ex. 13 (SC-000084).

9

42.     Internal GM documents show that the company has received at least 248 reports of air bag non-deployment in 2005 model/year vehicles.  See Ex. 13.

> ### v.      Complaints And Serious Accidents
> ### Accumulated In 2005 Which NHTSA Began To Investigate.

43.     In July of 2005, a 2005 Chevrolet Cobalt crashed in Maryland, killing the driver. Ex. 14 (Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

44.     On August 15, 2005, the NHTSA Special Crash Investigations Program conducted a Special Crash Investigation ("SCI") and found that the front airbags did not deploy because, according to the event data recorder ("EDR" or "SDM"), the "vehicle power mode status" of the ignition switch had shifted from "on" to "accessory."  Id.

45.     NHTSA continued the SCI of the July 2005 crash which was not reported by GM to NHTSA until the third quarter of 2005.  See Ex. 15 (Ltr. from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation to Gay P. Kent, Director, General Motors Corp. (Mar. 1, 2006) and Ltr. to Christina Morgan from Gay P. Kent, Director, Product Investigations (Apr. 6, 2006), GMHEC00198137-198210); see also Ex. 16 (GMHEC00197893).

46.     In September of 2005, Old GM engineer, John R. Hendler, sent an email with the subject: "No new Delta/Kappa ign switch for MY 08," to high ranking Old GM personnel, making clear that costs was the only reason why Old GM refused to fix the defect.  See Ex. 17 (GMHEC000219123) (emphasis added).

47.     GM engineer, Ray DeGiorgio responded to Old GM's Steven Kirkman privately, stating: "It's not over yet. . . . . read below [referring to the email sent by Mr. Hendler above]." Id.

48.    Around the same time, in September of 2005, regarding the ignition switch problem, Old GM's Craig St. Pierre stated in an internal company document:

> "Detent efforts on ignition switch are too low allowing key to be cycled to off position inadvertently.  Changes to the key can be made to reduce the moment which can be applied to key by key ring/keys.  This will assist in limiting the issue but will not completely eliminate it.  Changes to the switch will not be forthcoming from electrical group until MY07."

Ex. 11 (GMHEC0000001748).

49.    Old GM knew that a defect existed in its vehicles, but did nothing to warn consumers or correct the defect in vehicles that it had already sold and others that it planned to manufacture and sell for several more years.

###### vi.    *Rather Than Implementing A Recall And Fixing The Defect, Old GM Sent A Service Bulletin To GM Dealers In Late 2005, Telling Them To Tell Customers To Take Heavy Items Off Their Key Rings.*

50.    In December of 2005, rather than issuing a recall to fix the ignition switch defect, Old GM sent a Service Bulletin ("SB") 05-02-35-007 to GM dealers, titled "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs" for the Chevy Cobalt and HHR, Saturn Ion, and Pontaic Solstice vehicles.  See Ex. 18. (SB 05-02-35-007), "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," (Oct. 2006), at GMHEC000000001).  New GM has stated that it was the 2005 PRTS that led to the service bulletin.  See Ex. 19 (GM Mar. 11, 2014 ltr. to NHTSA, attached chronology).

51.    The service bulletin did not accurately identify the danger posed by the ignition switch defect.  See Ex. 19.  For example, there was no mention in the service bulletin of the possibility of airbag non-deployment.  See id.  Moreover, the service bulletin simply recommended that GM dealers tell persons who brought their vehicles in to remove heavy items from their key rings.  Id.

     ***vii.***        ***Old GM Knew About And Authorized A Design***
                    ***Change In April 2006, But Masked The Existence And***
                    <u>***Significance Of The Change By Keeping The Part Number The Same.***</u>

52.     Old GM authorized and knew about a design change for the ignition switch in 2006. In January of 2006, Delphi engineers told GM engineers, including Ray DeGiorgio, that the new ignition switches that it provided as samples for testing had a "new PCB [Printed Circuit Board] design and also the stronger Catera detent spring-plunger." Ex. 20 (SC-00001-02).

53.     In April of 2006, the GM design engineer who was responsible for the ignition switch in the recalled vehicles, Ray DeGiorgio, authorized Delphi to implement changes to fix the ignition switch defect. Ex. 21 (General Motors Commodity Validation Sign-Off (Apr. 26, 2006), GMHEC000003201; <u>see also</u> Ex. 19. New GM stated that the design change "was implemented to increase torque performance in the switch." <u>Id.</u> However, testing showed that, even with the proposed change, the performance of the ignition switch was *still* below GM's original specifications. Ex. 6 (Delphi Briefing).[2]

54.     The modified ignition switches were first installed in 2007 model/year vehicles for all of the vehicles affected by the recall. Ex. 19 (GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2). However, to conceal the problem and significance of the part change, Old GM kept the part number the same. <u>Id.</u>

     ***viii.***       ***Fatality Crashes Continued To Occur,***
                    <u>***Including A Crash In October 2006 Where Two People Were Killed.***</u>

55.     Customer complaints and reports of injury and fatality incidents continued. For example, in October of 2006, a 2005 Chevy Cobalt was involved in a crash in Wisconsin which resulted in the deaths of the front right and rear right passengers. NHTSA's SCI Program assigned Indiana University Transportation Research Center to investigate the crash. The

---

[2]     The GM ignition switches were made by Delphi in Mexico. <u>See id.</u>

vehicle was inspected on November 6, 2006. Ex. 22 (Indiana Univ. Transp. Research Ctr., On-site Air Bag Non-deployment Investigation Case No. IN06-033, Vehicle: 2005 Chevrolet Cobalt (Oct. 2006) (hereinafter the "2006 SCI Report"). Old GM reported the crash later in 2006 in its EWR filing. Ex. 23 (Ltr. from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation, to Gay P. Kent, Director, General Motors Corp. (May 7, 2007)); Ex. 24 (Ltr. to Christina Morgan from Gay P. Kent, Director, Product Investigations (June 7, 2007) (GMHEC00198410-198414). NHTSA requested additional information from GM in May of 2007, and GM responded a month later. Ex. 25 (GMHEC00197898).

### ix.    Old GM Responded By Updating The Service Bulletin About The Heavy Key Chains.

56.    Shortly thereafter, in October 2006, Old GM updated the prior December 2005 Service Bulletin to include additional models and model/year vehicles, namely: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, and 2007 Pontiac Solstice and G5. Ex. 26 (Service Bulletin 05-02-35-007, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," (Oct. 2006 revised), at GMHEC000000002). As it had previously done, in its statement to dealers, GM avoided acknowledging the ignition switch defect and blamed the problem on height and weight, *i.e.*, short people and heavy key rings, stating:

> "There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they will have the seat positioned closer to the steering column. In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and should take steps to prevent it – such as removing unessential items from their key chain."

Ex. 27.

57.     As a result of the service bulletins, out of the millions of Defective Vehicles on the road in the United States, Old GM provided key inserts to 474 customers who brought their vehicles to a GM dealer for service.  Ex. 28.

58.     Internal GM documents show that the company received at least 134 reports of air bag non-deployment in 2006 model/year vehicles.  Ex. 29.

### x.     GM Knew Of And Tracked Multiple Incidents Involving The Ignition Switch Defect By 2007 And Avoided Scrutiny By Misleading NHTSA And The Public.

59.     Old GM knew that people were being killed and seriously injured because of the ignition switch defect in its vehicles and the resulting loss of power and airbag non-deployment. For example, in March of 2007, Old GM met with NHTSA in which the July 29, 2005 fatality crash was discussed.  Ex. 12 (GM Feb. 24, 2014, Ltr. to NHTSA, attached chronology).

60.     According to New GM, after the meeting, GM began to track front impact crashes involving Cobalt vehicles where the air bags did not deploy in order to track similarities in the incidents.  However, GM was tracking ignition switch related incidents before this time.  In any event, by the end of 2007, Old GM identified ten (10) other incidents, including four (4) where the ignition switch had moved into the "accessory" position.  Id.

61.     In April of 2007, the NHTSA 2006 SCI Report stated that the "crash is of special interest because the vehicle was equipped with . . . dual state air bags that did not deploy." Ex. 14 (2006 SCI Report).  The SCI Report concluded that the air bags did not deploy "as a result of the impact with the clump of trees, possibly due to the yielding nature of the tree impact or power loss due to the movement of the ignition switch just prior to impact." Id. (at ii).  The EDR for the vehicle indicated that the ignition switch was in "accessory" mode at the time of impact.  Id. (at

7). The SCI Report also found that the investigation demonstrated that contact with the ignition switch could result in "engine shut down and loss of power." Id.

62.    A couple months later, in August of 2007, Old GM met with its SDM supplier, Continental, to review SDM data from a 2005 Chevrolet Cobalt crash where the airbags failed to deploy.   Ex. 30 (Continental Automotive Sys. US, Inc., Field Event Analysis Report, GMHEC00003143-3153).   See also Ex. 19 (GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2).

63.    The next month, in September of 2007, the Chief of the Defects Assessment Division ("DAD") within NHTSA's Office of Defects Investigation ("ODI") proposed an investigation of "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion" vehicles. Ex. 31 (email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007 at 4:54:16 p.m.), NHTSA-HEC-004491).   The Chief of DAD within ODI noted that the "issue was prompted by a pattern of reported non-deployments in VOQ [Vehicle Owner Questionnaire] complaints that was first observed in early 2005." Id.   The email stated that NHTSA had "discussed the matter with GM," but that Old GM had assured them that "they see no specific problem pattern." Id.  NHTSA's Greg Magno stated:

> "Notwithstanding GM's indications that they see no specific problem, DAD perceives a pattern of non-deployment in these vehicles that does not exist in their peers and that their circumstances are such that, in our engineering judgment, merited a deployment, and that such a deployment would have reduced injury levels or saved lives."

Id.

64.    Old GM tried to avoid the investigation by claiming that it was unaware of any problem in its vehicles.   In November of 2007, NHTSA's ODI considered a proposal to investigate the non-deployment of airbags in 2003-2006 model/year Chevy Cobalt and Saturn Ion vehicles.  Ex. 32 (DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483).   The

15

review was prompted by twenty-nine (29) complaints, four (4) fatal crashes, and fourteen (14) field reports that NHTSA knew about.  Id.

***xi.***      ***By 2009, As The Reports, Injuries And Deaths Continued***
***To Mount, Old GM Opened Another Internal Investigation.***

65.     In February of 2009, Old GM initiated another investigation of the ignition switch defect which resulted in a redesign of the ignition key for the 2010 model/year Cobalt.  Ex. 12 (GM Feb. 24, 2014 Ltr. to NHSTA, attached chronology at 2).  However, Old GM took no action in response to the investigation.  Consequently, deaths, injuries and incidents continued to occur related to the ignition switch defect.

66.     For example, in April of 2009, a 2005 Chevy Cobalt was involved in a crash in Pennsylvania which resulted in the deaths of the driver and front passenger.  Ex. 33 (Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.: CA09022, Vehicle: 2005 Chevrolet Cobalt (Apr. 2009) (hereinafter the "2009 SCI Report").  The crash was investigated by NHTSA.  Id.  The 2009 SCI Report noted that data from the Cobalt's SDM indicated that the ignition switch was in "accessory" mode at the time of the crash.  Id. (SDM Data Report, attached to 2009 SCI Report).

67.     In May of 2009, Old GM again met with its SDM supplier, Continental, and asked for data in connection with a crash involving a 2006 Chevy Cobalt where the air bags failed to deploy.  Ex. 31 (Continental Automotive Sys. US, Inc., Field Event Analysis Report, GMHEC00003129-3142).

68.     Yet again, GM did nothing to correct the ignition switch defect or warn consumers.  The next month, in June of 2009, Old GM filed a Chapter 11 petition.

***xii.***      ***GM Internally Acknowledge The Ignition***
***Switch Defect Problem Throughout The Bankruptcy Proceedings.***

16

69.     New GM picked up right where Old GM left off.  For example, after continuing to track report incidents and claims, on July of 2011, GM legal staff and engineers met regarding an investigation of crashes in which the air bags did not deploy. Ex. 19 (GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2).  The next month, in August of 2011, GM initiated a Field Performance Evaluation ("FPE") to analyze multiple frontal impact crashes involving the 2005-2007 Chevrolet Cobalt vehicles and the 2007 Pontiac G5, as well as a review of information related to the Ion, HHR, and Solstice vehicles, and airbag non-deployment.  Id.  Despite ongoing internal investigations and full knowledge of the ignition switch defect, New GM actively concealed the defect from the Court and the Ignition Switch Claimants.

70.     On October 3, 2011, GM's CEO, Mary T. Barra, was sent an email by GM's Terry Woychowski (then Vice President, Global Quality & Vehicle Launches, Vice President, Global Vehicle Program Management who has since left GM),[3] copying William J. Kemp (a GM lawyer).  Ex. 35 (GMHEC000221311).  The email forwarded an article in the New York Times on October 3, 2011 which stated:

> "The National Highway Traffic Safety Administration is a step closer to concluding that General Motors should have recalled 384,000 Saturn Ions in 2010 as part of a larger recall that covered one million Chevrolets and Pontiacs for a steering problem.  The agency posted a document on its Web site over the weekend saying that it upgraded its investigation into Saturn Ions from the 2004-7 model years as a result of heightened concern that a sudden loss of electrical power steering could cause crashes.  The document shows the agency has 846 complaints from Saturn owners and G.M. has almost 3,500.  There were two reports of driver injuries from crashes.  The document also said that the agency tested an Ion and was able to duplicate the type of steering failure that caused the 2010 recall of one million 2005-10 Chevrolet Cobalts and 2007-10 Pontiac G5s. General Motors had resisted the Cobalt and G5 recall, saying that even if the power assist suddenly failed, the driver would be able to control the car, although it would take more effort to turn the wheel.  The safety agency did not agree, concluding that such failures would increase the risk of a crash. . . ."

Id.

---

[3]     Terry Woychowski was an executive at GM and a "champion" of the ignition switch investigation at GM whose support was "needed" from GM's Product Investigations group.  Ex. 34 (GMHEC00224274)

71.    The email makes clear that New GM's CEO was aware of the ignition switch defects during the bankruptcy, but failed to disclose this vital information.  See id.

### xiii.    New GM Testing In 2012 Again Confirmed The Widespread Scope Of The Ignition Switch Defect.

72.    Just as old GM had done, New GM privately knew – but publicly denied – that the ignition switch in 2003-2007 model/year vehicles was defective.  For example, in May of 2012, New GM engineers tested the torque of forty-five (44) model/year GM vehicles.  Ex. 36 (GMHEC000221427); see also Ex. 19 (GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology). The results from the New GM testing showed that the majority of the vehicles tested from the 2003 to 2007 model/years had torque performance at or below 10 Newton centimeters ("Ncm"), which was below the original design specifications required by GM.  Id. GM's own testing also showed that the torque performance beginning in 2007 model/year vehicles was different (15 Ncm to 20 Ncm).  Id.  Around the same time, high-ranking New GM personnel continued to internally review the history of the ignition switch and power steering column issues.  Ex. 37 (GMHEC000221438).

73.    In September of 2012, New GM had a GM Red X Team Engineer (a special engineer assigned to find the root cause of an engineering design defect) examine the changes between the 2007 and 2008 Chevrolet Cobalt models following reported crashes where the airbags failed to deploy and the ignition switch was found in the "off" or "accessory" position. Ex. 38 (email from GM Field Performance Assessment Engineer to GM Red X Team Engineer (Sept. 6, 2012, 1:29:14 p.m., GMHEC000136204).

74.    The next month, in October of 2012, GM engineer Ray DeGiorgio (the Switch Lead Engineer) sent an email to Brian Stouffer of GM regarding the "2005-7 Cobalt and Ignition Switch Effort," stating:

"If we replaced switches on ALL the model years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch. This cost is based on volume of 1.5 units total."

Ex. 39 (GMHEC000221539).

75.    The October 2012 email makes clear that GM considered implementing a recall to fix the defective ignition switches in the Chevy Cobalt vehicles, but declined to do so in order to save money. See id.

### xiv.    New GM Internally Admitted In 2013 That It Knew That The Earlier Ignition Switch Design Was Defective.

76.    In April of 2013, New GM again *internally* acknowledged that it understood that there was a difference in the torque performance between the ignition switch parts in later model Chevrolet Cobalt vehicles compared with the 2003-2007 model/year vehicles. Ex. 19 (attached chronology at 4).

77.    New GM hired an outside engineering firm to investigate the ignition switch defect who confirmed that the ignition switches in the early model Cobalt and Ion vehicles did not meet GM's own design specifications and that the change to the switch in 2006 was the likely explanation for the difference in torque performance. Id. The report also found that vehicles with the modified ignition switch performed consistent with GM's design specifications. Id.

78.    Notwithstanding New GM's abundant knowledge of the ignition switch defect, see Ex. 36 (GMHEC000221427), New GM's public statements and litigation posture was radically different. For example, in May of 2013, GM's Brian Stouffer testified in a deposition in a personal injury action (Melton v. General Motors) that the Ncm performance was not substantially different as between the early (e.g., 2005) and later model year (e.g., 2008)

19

Chevrolet Cobalt vehicles.  Ex. 40 (GMHEC000146933).[4]    Likewise, a month before Mr.

Stouffer's testimony, in April of 2013, GM engineer Ray DeGiorgio denied the existence of any

type of ignition switch defect.  See Ex. 42 (GMHEC000138906) (emphasis added).[5]

79.    In October of 2013, New GM received documentation from Delphi confirming

that a change to the ignition switch in the Cobalt and other vehicles was made in April of 2006.

Id. (attached chronology at 5); Ex. 19.

80.    GM's Brian Stouffer, in an email to Delphi regarding the ignition switch in the

Chevy Cobalt, acknowledged that the ignition switch in early Cobalt vehicles – although bearing

the same part number – was different than the ignition switch in later Cobalt vehicles.  Ex. 44

(GMHEC000003197).   Mr. Stouffer claimed that "[t]he discovery of the plunger and spring

change was made aware to GM during a [sic] course of a lawsuit (Melton v. GM)."  Id.[6]  Delphi

personnel responded that GM had authorized the change back in 2006 but the part number had

remained the same.  See id. (GMHEC000003192-93).

81.    Ultimately, New GM could no longer conceal the ignition switch defect.   In

December of 2013, a GM engineer presented the results of their analysis to GM's Field

Performance Assessment Evaluation Recommendation Committee ("FPERC") and GM's

Executive Field Action Decision Committee ("EFADC").   Id. The EFADC met to review the

findings. Id.

---

[4]    That said, "[t]he modified switches used in 2007-2011 vehicles were also approved by GM despite not meeting company specifications." Ex. 41 (Mar. 31, 2014 Ltr. to Mary Barra from H. Waxman, D. DeGette, and J. Schankowsky).

[5]    GM prepared a PowerPoint regarding the Melton case in which the company internally admitted the ignition switches in the 2003-2007 MY vehicles did not meet GM's own design specifications and posed a safety risk and were substantially different in their torque performance.  Ex. 43 (GMHEC000003156-3180).

[6]    See also Ex. 43 (GMHEC000003156-3180).

82.     There was another EFADC meeting in January of 2014 which resulted in New GM's decision to finally conduct a safety recall of the model/year 2005-2007 Chevrolet Cobalt and Pontiac G5 vehicles.  Id.  At the time, New GM only asked the EFADC to consider a recall of those vehicles.  Id. However, at the same time, New GM knew that the same data existed for other GM vehicles, including the Saturn Ion, Chevrolet HHR, and Pontiac Solstice and Sky vehicles.  See id.

> **xv.     New GM Waited Until February 2014 To
> Publicly Admit That The Ignition Switch
> Defect Existed In Its Vehicles, But Even Then Initially
> Misrepresented The Scope Of The Defect And The Vehicles Affected.**

83.     On February 7, 2014, New GM told NHTSA that it determined that a defect existed in the 2005-2007 model/year Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  Ex. 45 (Ltr. from M. Carmen Benavides, Director, Product Investigations and Safety Regulations, General Motors, LLC, to Nancy Lewis, Associate Administrator for Enforcement, NHTSA (Feb. 7, 2014).  On February 13, 2014, New GM announced a recall of 2005-2007 model/year Chevrolet Cobalt and Pontiac G5 vehicles to address the ignition switch defect.  Ex. 46.

84.     On February 24, 2014, New GM had another EFADC meeting regarding the ignition switch defect in the Saturn Ion and Sky, Chevrolet HHR, and Pontiac Solstice vehicles, which resulted in the EFADC ordering a safety recall for certain model/years of these vehicles.  Ex. 19 (attached chronology at 6).

85.     On February 25, 2014, the recall was expanded to include additional 2003-2007 model/year vehicles, including the 2003-2007 Saturn Ion, 2006-2007 Chevrolet HHR and Pontiac Solstice, and 2007 Saturn Sky.  Ex. 47.  The total number of GM vehicles subject to the recall rose to approximately 1.6 million vehicles worldwide, including more than 1.3 million vehicles in the United States.  See id.

21

86.    On March 28, 2014, New GM again expanded the ignition switch defect recall to cover all model/years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States.  Ex. 48.  The recall covered an additional 824,000 GM vehicles in the United States, bringing the total number of recalled GM vehicles to nearly 2.2 million.  Id.  GM's CEO, Mary Barra, stated: "We are going to provide our customers with the peace of mind they deserve and expect by getting new switches into all the vehicles."

## C.    Recently Produced GM Documents And Congressional Testimony Have Shed Further Light On The Scope Of The Defect And GM's Concealment.

87.    New GM's CEO, Mary Barra, testified under oath before Congress on April 2, 2014. Ex. 49 (CQ Congressional Transcripts (Apr. 2, 2014)).  Barra has been with GM for thirty-three years.  Id. (at 26).  She has been a fixture and key executive within both Old and New GM. Before becoming CEO, she held numerous high-ranking engineering positions, including Executive Director of Manufacturing Engineering in 2005, Executive Director of Vehicle Manufacturing Engineering from 2005 to 2008, Vice President of Global Manufacturing from 2008 to 2009, and Executive Vice President of Global Product Development up until her appointment as CEO in January of 2014.  Id. (at 6).

88.    Even though her position warranted responsibility for the ignition switch defect, id. (at 5 ("[I]t came to light on my watch, so it's my responsibility to resolve it."), Barra testified that she only first "became aware of the defect and the recall on January 31st," 2014.  Id. (at 9). She testified under oath that "[she] became aware of the recall on January 31st," and that "[she] was aware in late December that there was analysis going on a Cobalt, but [she] didn't know what the part was."  Id. (at 19).  Barra further testified:

> "First of all, I agree, it took way too long for this to come to the attention and to do the recall, and we've admitted that. We've also apologized.  It is tragic that there has been lives lost and lives impacted with this event.

22

From the part number perspective, I find it completely unacceptable that a part would be changed without a part number, the actual identifier being changed. That is not a process of good engineering. That is not an acceptable process. It wasn't then, and it clearly isn't now. And as we do our investigation, we will deal with that situation, because that is not acceptable for good engineering principles.

But, as I look at the culture of the company during the time frame, this part was designed in the late '90s. It went into vehicles that went into production in '03, the latest of which went out of production in the late '11 timeframe.

The – the culture of the company at that time had more of a cost-culture focus. . ."

Id. (at 10).

89.    Regarding the use of the same part number for the different ignition switch, Barra further testified that "it is not an appropriate practice to do; it is not acceptable," and that "[i]t is crucial, it's engineering principle 101 to change the part number when you make a change." Id. (at 25). Barra admitted that GM documents indicate that the company "valued cost over quality." Id. (at 11). She further agreed that "[i]t's wrong," and was not just a mistake; rather it was calculated and done in an affirmative and deliberate manner. Id. (at 32).

90.    Barra further testified that the GM documents which showed that GM did a cost/benefit analysis and made the business decision not to fix the ignition switch defect was "completely unacceptable." Id. (at 14). According to Barra, "if it's a safety issue, there should not be a business case calculated." Id. (at 16). Barra further testified:

"I'm trying to understand it as well, because it took way too long. I understand if it had been handled more quickly, there – if – once there's a safety issue, it should never have a business case that goes against it in making any part of decision-making. And we go forward now, there isn't any. So, I am as disturbed as you . . . ."

Id. (at 45).

23

91.     Regarding the testimony of the Old and New GM engineer, Mr. DeGiorgio, who was responsible for the ignition switch in the Melton case, Barra testified that "[t]he data that's been put in front of [her] indicates that" he lied under oath.  Id. (at 36-37).

92.     On April 2, 2014, in his testimony before Congress, in response to Senator Blumenthal's question regarding whether he believed that GM "concealed material significant information from NHTSA," David Friedman, NHTSA's Acting Administrator, testified that "[NHTSA is] very concerned that they didn't provide [] sufficient information." Ex. 50 (CQ Congressional Transcript, Testimony of David Friedman, Acting Administrator of the NHTSA (Apr. 2, 2014), at 9).  He further testified that the issue regarding whether GM concealed information from NHTSA "is exactly the subject of an open investigation that [NHTSA] ha[s] into General Motors, and if [they] find that they did violate their responsibilities [to] report information and to act quickly, [NHTSA] will hold them accountable." Id. (at 10).

93.     Mr. Friedman was asked: "In your view, was the faulty ignition switch a defect?" and responded: "With what we know now, very clearly it was a defect" and "it was a defect that represents an unreasonable risk to safety." Id.  Mr. Friedman further testified that NHTSA is not convinced that the non-deployment of the airbags in the recalled vehicles is solely attributable to a mechanical defect involving the ignition switch, explaining:

> "And it may be even more complicated than that, actually.  And that's one of the questions that we actually have in our timeliness query to General Motors.  It is possible that it's not simply that the – the power was off, but a much more complicated situation where the very specific action of moving from on to the accessory mode is what didn't turn off the power, but may have disabled the algorithm.
>
> That, to me, frankly, doesn't make sense. From my perspective, if a vehicle – certainly if a vehicle is moving, the airbag's algorithm should require those airbags to deploy.  Even if the – even if the vehicle is stopped and you turn from 'on' to 'accessory,' I believe that the airbags should be able to deploy.

So this is exactly why we're asking General Motors this question, to understand is it truly a power issue or is there something embedded in their [software] algorithm that is causing this, something that should have been there in their algorithm."

Id. (at 19).

94.     On April 11, 2014, following the hearing before Congress and the testimony of

GM's CEO, five United States Senators sent a letter to the United States Department of Justice

("DOJ"). Ex. 51 (Ltr. from Sen. Richard Blumenthal, Sen. Barbara Boxer, Sen. Robert P. Casey,

Jr., Sen. Mazie K. Hirono, and Sen. Edward J. Markey to United States Attorney General, Eric J.

Holder, Jr., dated Apr. 11, 2014).  The letter stated in part:

> "Given the crucial role the United States government played in the creation of the current General Motors Corporation, we believe the federal government has a moral, if not legal, obligation to take all necessary steps to protect innocent consumers. . . . As a consequence of this fraudulent and reprehensible concealment, the United States Bankruptcy Court unknowingly authorized a purchase of GM's assets by the 'new GM,' which seemingly shielded this new GM from legal responsibility for these product defects or other illegality occurring prior to 2009.  This shield from legal responsibility was granted – with the federal government's support – despite vehement opposition from consumer advocates, as well as from state attorneys general who warned that this blanket shield from all liability would prove unfair and unwise."

Id.

95.     GM has publicly stated that the ignition switch defect has been linked to thirty-

one (31) frontal crashes and thirteen (13) fatalities.  Ex. 52 (Apr. 1, 2014 Supp. Memo).  Others,

however, have reported that the actual number of people that have been killed or seriously

injured as a result of the ignition switch defect is in the hundreds.  See id. (identifying at least

133 cases in which the ignition switch was the likely cause of the problem).  Numerous internal

GM documents which have only recently been made public show that GM delayed recalling

these vehicles earlier – and originally tried to limit the recall to a narrow subgroup of vehicles

despite a common defect – putting thousands of people at risk – in order to minimize costs and

maximize profits.  See, e.g., Ex. 38.  GM's CEO, Mary Barra has publicly admitted that "terrible things happened."  She is right.  However, neither she nor anyone else at GM has publicly admitted that these terrible things happened because GM was more concerned about saving money in costs – literally pennies per vehicle – than it was about saving the lives and protecting the people who trusted them the most.

## III.    Old GM's Chapter 11 Cases.

### A.    General Case Background.

96.    On June 1, 2009 (the "Petition Date"), Old GM and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the Southern District of New York, jointly administered under case number 09-50026 (REG) (the "Chapter 11 Cases").

97.    On September 15, 2009, Old GM filed its schedules of assets and liabilities.  See Docket Nos. 4061-4073, 4075, and 4077.  On October 4, 2009, Old GM filed an amendment to its schedule of assets and liabilities.  See Docket No. 4161 (collectively with each of the foregoing schedules, the "Schedules of Assets and Liabilities").

98.    Old GM did not list the Plaintiffs or the Ignition Switch Claimants as creditors on any of its Schedules of Assets and Liabilities, despite the Plaintiffs and Ignition Switch Claimants being known creditors of GM.

### B.    Sale Of Old GM To New GM.

99.    On the Petition Date, Old GM filed a motion (the "Sale Procedures Motion") seeking to approve procedures for the sale of substantially all of its assets to New GM, pursuant to Bankruptcy Code Sections 105(a), 363 and 365 (the "Sale").  See Docket No. 92.

100.    Old GM did not provide notice of the Sale Procedures Motion to the Plaintiffs or any Ignition Switch Claimants, despite the Plaintiffs and Ignition Switch Claimants being known creditors of GM.  See Docket No. 134.

101.    On June 2, 2009, the Bankruptcy Court entered an order approving certain bidding procedures requested in the Sale Procedures Motion (the "Sale Procedures Order").  See Docket No. 274.

102.    Pursuant to the Sale Procedures Order, the Bankruptcy Court approved the form of notice of the sale hearing (the "Sale Hearing Notice") and ordered that Old GM serve the Sale Hearing Notice on "all other known creditors."  See Sale Procedures Order, ¶ 9(c).

103.    The Sale was governed by that certain Amended and Restated Master Sale and Purchase Agreement, dated June 26, 2009 (the "MSPA").

104.    Old GM did not serve the Sale Hearing Notice or MSPA on the Plaintiffs or any Ignition Switch Claimants, despite the Plaintiffs and Ignition Switch Claimants being known creditors of GM.  See Docket No. 973.

105.    Because of Old GM's failure to provide the Plaintiffs and Ignition Switch Claimants with the Sale Hearing Notice, the Plaintiffs and Ignition Switch Claimants were deprived of notice and an opportunity to be heard at the Sale Hearing.

106.    On July 5, 2009, the Bankruptcy Court entered its Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition holdings LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement available at In re General Motors Corp., 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (the "Sale Decision") [Docket No. 2967], and the Sale Order [Docket No. 2968], approving the Sale and the MSPA.  The Sale closed on July 10, 2009.

27

C.      **The Establishment Of Bar Dates.**

107.    On September 2, 2009, Old GM filed a motion (the "Bar Date Motion") with the Bankruptcy Court seeking entry of an order pursuant to Bankruptcy Code Section 502(b)(9) and Federal Rules of Bankruptcy Rule 3003(c)(3) establishing November 9, 2009 as the deadline for each person or entity to file a proof of claim against Old GM.  See Docket No. 3940.

108.    Old GM did not provide notice of the Bar Date Motion to the Plaintiffs or any of the Ignition Switch Claimants, despite the Plaintiffs and Ignition Switch Claimants being known creditors of GM.  See Docket No. 4020.

109.    On September 16, 2009, the Bankruptcy Court entered an order (the "Bar Date Order") establishing November 30, 2009 as the deadline for each person or entity to file a proof of claim against Old GM (the "Bar Date"), and approving the form and manner of notice of the Bar Date (the "Bar Date Notice").  See Docket No. 4079.

110.    Pursuant to the Bar Date Order, the Bankruptcy Court ordered that Old GM serve the Bar Date Notice on "all parties known to the Debtors as having potential Claims against any of the Debtors' estates."  See Bar Date Order at 6.

111.    In violation of the Bar Date Order, Old GM did not serve the Bar Date Notice on the Plaintiffs or any Ignition Switch Claimants, despite the Plaintiffs and Ignition Switch Claimants being "parties known to the Debtors as having potential Claims against [the] Debtors' estates."  See Docket No. 4238.

28

### D.    Solicitation And Confirmation Of The Plan.

112.    On December 7, 2010, Old GM filed *The Debtors' Amended Joint Chapter 11 Plan* (the "Amended Plan").  See Docket No. 8015.

113.    On December 8, 2010, Old GM filed its Disclosure Statement for the Amended Plan (the "Disclosure Statement").  See Docket No. 8023.

114.    On December 8, 2010, the Court entered its order (the "Solicitation Order"), which, among other things, (i) approved the form and manner of notice of the hearing to consider the Disclosure Statement (the "Disclosure Statement Notice"); (ii) approved the Disclosure Statement under Bankruptcy Code Section 1125 and Bankruptcy Rule 3017, (iii) established March 3, 2011 as the date for the commencement of the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), (iv) approved the form and method of notice of the Confirmation Hearing (the "Confirmation Hearing Notice"), and (v) established certain procedures for soliciting and tabulating votes for the Amended Plan.  See Docket No. 8043.

115.    Old GM did not serve the Disclosure Statement Notice on the Plaintiffs or any Ignition Switch Defendants, despite the Plaintiffs and the Ignition Switch Defendants being known creditors of GM.  See Docket No. 7123.

116.    Pursuant to the Solicitation Order, the Bankruptcy Court ordered that Old GM serve the Confirmation Hearing Notice to, among other parties in interest, "any other known holders of Claims against or Equity Interests in the Debtors."  See Solicitation Order, ¶ 32(c).

117.    In violation of the Solicitation Procedures Order, Old GM did not serve the Confirmation Hearing Notice on the Plaintiffs or any Ignition Switch Claims, despite the Plaintiffs and Ignition Switch Defendants being "known holders of Claims" against the Debtors. See Docket Nos. 8607, 8449 and 9327.

118.    The Plaintiffs and Ignition Switch Claimants were deprived of notice and an opportunity to be heard at the Confirmation Hearing

119.    On March 18, 2011, Old GM filed *The Debtors' Second Amended Joint Chapter 11 Plan* (the "Plan"). See Docket No. 9836. On March 29, 2011, the Bankruptcy Court entered its Confirmation Order. See Docket No. 9941. On March 31, 2011, the Plan became effective (the "Effective Date"). See Docket No. 10151.

### E.    New GM's Motion To Enforce The Sale Order.

120.    On April 21, 2014, New GM filed the Motion. By the Motion, New GM requests that the Court enforce the terms of the Sale Order by ordering Plaintiffs to promptly dismiss all of their claims that violate provisions of that Order, to cease and desist from all efforts to assert such claims against New GM that are void because of the Sale Order, and to show cause whether they have any claims that are not already barred by the Sale Order. See Motion at 25-26. New GM asserts that the Motion "involves *only* litigation in which the plaintiffs seek economic loss against New GM relating to an Old GM vehicle or part, including, for example, for the claimed diminution in the vehicle's value, and for loss of use, alternative transportation, child care or lost wages for time spent in seeking prior repairs." See Motion at 7. According to New GM, those types of claims were never assumed by New GM and are barred by the Sale Order. See Id.

## IV.    New GM's Successor Liability.

121.    When GM's cover-up scheme finally unraveled and Plaintiffs' Ignition Switch Claims came to light, Plaintiffs promptly filed class action complaints, individually and as class representatives on behalf of all Ignition Switch Claimants, for among other claims, loss of property value and harm relating to holding highly dangerous vehicles. Because New GM acquired and operated Old GM and ran it as a continuing business enterprise and because New

GM was aware from its inception of the ignition switch defects, New GM is liable through successor liability for the deception and unfair acts and omissions of Old GM. Specifically, Plaintiffs seek to hold New GM liable for the Ignition Switch Claims as: (i) the sale of Old GM to New GM amounted to a de facto merger; and (ii) New GM was a mere continuation of Old GM; and (iii) the sale of Old GM to New GM was entered into fraudulently to avoid liability for the Ignition Switch Claims.

122.    The idea that "New GM" is culturally different from "Old GM" is a myth. There is a continuation and community of interest between Old GM and New GM. The conduct of a company is carried out by people. The bankruptcy did not expunge the knowledge of GM's employees or erase their memories (or the company's documents). The key people – engineers, managers, officers and directors at Old GM – who were involved in the ignition switch defect continued on with their Old GM ways well into the formation and existence of New GM.

123.    For example, in June of 2013, two years *after* the bankruptcy, "New" GM's Senior Manager/Consultant, Victor Hakim, employed by GM since 1971, was designated as "New" GM's Fed. R. Civ. P. 30(b)(6) witness to testify on behalf of "New GM" regarding defect incidents in the *Melton* case. See Ex. 53 (V. Hakim, *Melton* GM Fed. R. Civ. P. 30(b)(6) Jun. 11, 2013 Dep., at 6:19-7:3, 7:20-10). In the deposition, "New GM's" Rule 30(b)(6) witness testified about GM's Company Vehicle Evaluation Program ("CVEP") and hundreds of incidents and claims involving a loss of power in Cobalt and other GM vehicles involving the ignition switch defect. Having been designated to testify on behalf of the company and with the collective knowledge of the company, the witness was asked and testified:

> Q: And from the claims we saw today – I'll tell you that Brooke Melton bought her vehicle from Bill Heard Chevrolet on August 31st 2005. **And from the claims we saw today, there were over 2,000 incidents,** just with these claims, before GM or Bill Heard sold Brooke her vehicle. **Are you aware that before**

31

**August 31st of 2005, even though GM was aware of all these claims, it chose not to fix the problem with the ignition switch in the vehicle?**

. . .

THE WITNESS: I haven't researched any of that. So I guess **I don't know** the answer to that question.

Q: **Are you aware of whether GM ever chose to warn Brooke about the problem** with the Cobalt stalling before Bill Heard sold her the Cobalt on August 31st of 2005?

A. No, **I have no knowledge** one way or the other on that question.

Q: **Do you think they should have?** . . . If they know about a problem with the vehicle stalling, shouldn't they tell her about it?

. . .

THE WITNESS: Now, against, I can't – in general, **I can't answer a question like that**, so I –

Q: Are you aware, **as of today, GM has still chosen not to fix the problem with the ignition switch?**

. . .

THE WITNESS: I guess **I'm not sure how to answer that question**. I know there is a service bulletin and there is – you know, there is a change made to the key. But beyond that, **I don't know.**

Q: Yeah, my question was more specific to the ignition switch. Are you aware that, **as of today, GM has still chosen not to fix the problem with the ignition switch?**

. . .

A: Yeah, **I'm not real familiar with it.**

Q: **And are you aware that before Brooke's accident which resulted in her death, GM chose to never warn her about the problem of the vehicle stalling due to a defective ignition switch?**

. . .

THE WITNESS: No, again, **I can't answer that question one way or the other. I don't know.**

See id.. (V. Hakim, *Melton* GM Fed. R. Civ. P. 30(b)(6) Jun. 11, 2013 Dep., at 199:2-201:4) (emphasis added).

124. The testimony of GM's Rule 30(b)(6) witness, as well as testimony of Mr.

DeDiorgio, demonstrates that New GM continued to act with the same type of evasiveness,

indifference, lack of accountability and public denial of what was privately known to be a serious safety problem at Old GM.

125.    New GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM and for the following reasons:

- New GM admits that it knew of the ignition system defects from the very date of its formation;

- New GM's current CEO, Mary Barra, began working at Old GM in 1980, and in February 2008 she became Vice President of Global Manufacturing Engineering, in which position she knew or should have known of the ignition switch defects;

- New GM's Rule 30(b)(6) deponent concerning complaints Old GM and New GM received about ignition switch defects in the Cobalt, Victor Hakim, worked at Old GM from 1971 until the end of Old GM, and now is a "Senior Manager/Consultant" in the "field performance assessment" department, further demonstrating New GM's longstanding knowledge of the ignition switch defects.

- New GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

- New GM retained the bulk of the employees of Old GM;

- New GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- New GM acquired the contracts, books, and records of Old GM; and

- New GM acquired all goodwill and other intangible assets of Old GM.

## OBJECTION

## I.    New GM Must Treat Similarly Situated Creditors Equally.

33

126.    On February 13, 2014, New GM began a recall of millions of its Chevrolet Cobalt cars and other small cars for an ignition switch defect that has been linked to at least 13 deaths, a significant number of accidents and injuries and exorbitant loss of property value.    Several government investigations are pending and New GM's CEO, Mary Barra has admitted: "Something went wrong with our process in this instance, and terrible things happened."

127.    GM had evidence of the defective ignition switch as early as 2001 and mounting evidence in successive years that an immediate recall was necessary.    Without justification, GM chose to leave grave risk on the roads, despite a cost of only $0.57 per switch to fix the problem. As a result, millions of people have been harmed.

128.    In a ploy (no doubt motivated by public relations objectives) to avoid confronting the depths of their fraud on the Court, the U.S. government, and the public, New GM has selectively directed its Motion solely against plaintiffs asserting claims for economic loss, while excluding "litigation involving an accident or incident causing personal injury, loss of life or property damage."    See Motion at 1.

129.    By artificially distinguishing between similarly situated creditors, New GM violates a fundamental principle of the Bankruptcy Code - that similarly situated creditors be treated equally.[7]    In fact, the Second Circuit has noted that "equal treatment of similarly situated creditors" is "the predominant policy objective of a bankruptcy proceeding."[8]    The principle of

---

[7]    See Begier v. IRS, 496 U.S. 53, 58 (1990) (noting that "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code" that justifies trustee's power to avoid preferential payments); In re Ames Dep't Stores, Inc., 306 B.R. 43, 54 (Bankr. S.D.N.Y. 2004) (recognizing that administrative expense priorities are narrowly construed to promote equal treatment among similar creditors).

[8]    See Liona Corporation, Inc. v. PCH Associates, et al. (In re PCH Associates), 949 F.2d 585, 598 (2d Cir. 1991).

equal treatment has been applied post-confirmation to ensure that creditors were being treated fairly pursuant to the terms of a sale.[9]

130.    By the Motion, New GM is seeking to cherry-pick claim litigation and marginalize holders of bona fide claims against New GM solely because they are based on economic loss.  New GM has no sound basis as a matter of law to discriminate against the Ignition Switch Claimants while exempting similarly situated creditors from the Motion entirely. Such disparate treatment cannot be approved as a matter of law.

## II.    Old GM Deprived The Plaintiffs And Ignition Switch Claimants Of Constitutional Due Process.

131.    "As courts have long recognized, the requirement of notice is the cornerstone underpinning Bankruptcy Code procedure."[10]    "The notice requirements of bankruptcy are 'founded in the fundamental notions of procedural due process.'"[11]    "The statutory command for notice embodies a basic principal of justice – that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights."[12]    Failure to give proper notice violates "the

---

[9]     See, e.g., In re Emons Indus., Inc., 220 B.R. 182, 194 (Bankr. S.D.N.Y. 1998) (approving distributions to subsequent claimants to achieve "the uniform treatment of creditors of the Debtor who assert identical claims").

[10]    See Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Industries, Inc.), 467 B.R. 694, 706 (S.D.N.Y. 2012) (internal quotations and citation omitted).

[11]    See id. (quoting Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Industries, Inc.), 43 F.3d 714, 721 (1st Cir. 1994); Evergreen Solar, Inc. v. Barclays PLC, et al. (In re Lehman Bros. Holdings, Inc.), No. 08-01633, 2011 WL 722582, *5 (Bankr. S.D.N.Y. Feb. 22, 2011) (Peck, J.).

[12]    See City of New York v. New York, New Haven & Hartford R.R. Co., 344 U.S. 293, 297 (1953) (holding that where creditor was not listed as a known creditor and did not receive notice of the debtors' bankruptcy filing or bar order, the creditor's liens on the debtors' real estate were not discharged); Reliable Electro Co., Inc., v. Olson Construction Company, 726 F.2d 620, 623 (10th Cir. 1984) ("A fundamental right guaranteed by the constitution is the opportunity to be heard when a property interest is at stake. Specifically, the reorganization process depends upon all creditors and interested parties being properly notified of all vital steps in the proceeding so they may have the opportunity to protect their interests ….").

most rudimentary demands of due process of law."[13]  Consequently, "a party that did not receive

adequate notice of bankruptcy proceedings [cannot] be bound by orders issued during those

proceedings."[14]

132.    It is long-held that creditors must be afforded notice "reasonably calculated, under

all the circumstances to apprise" them of the pendency of any proceeding that may affect their

rights.[15]    Whether a creditor was provided with notice sufficient to satisfy due process

requirements "often turns on what the debtor or the claimant knew about the claim or, with

reasonable diligence, should have known."[16]

133.    For known creditors, due process requires actual notice.[17]  A "known" creditor is

a creditor whose identity is actually known or "reasonably ascertainable" to the debtor.[18]

---

[13]    See Armstrong v. Manzo, 380 U.S. 545, 550 (1965) "A fundamental requirement of due process is 'the opportunity to be heard.'  It is an opportunity which must be granted at a meaningful time and in a meaningful manner.") (quoting Grannis v. Ordean, 234 U.S. 385, 394 (1914)).

[14]    See In re Johns-Manville Corp., 600 F.3d 135, 158 (2d Cir. 2010) ("We hold that [the creditor] was not adequately represented in the proceedings that led to the bankruptcy court's approval of [the settlement agreement and plan], and that it did not receive adequate notice of the [orders approving the same]…. [The creditor] is therefore not bound by the terms of the [orders]."); In re Arch Wireless, 534 F.3d 76 (1st Cir. 2008) (holding that known creditor who did not receive notice of plan was not bound by plan injunction precluding creditors from asserting pre-confirmation claims against the debtor); In re Trans World Airlines, Inc., 96 F.3d 687 (3d Cir. 1996) (holding that requirements of due process dictate that if a potential claimant lacks sufficient notice of a bankruptcy proceeding, his or her claim cannot be discharged by an order confirming a plan of reorganization); Grumman, 467 B.R. at 706 ("Enforcing the sale order against the [plaintiffs] to take away their right to seek redress under a state law theory of successor liability when they did not have notice or an opportunity to participate in the proceedings that resulted in that order would deprive them of due process."); see also 8 COLLIER ON BANKRUPTCY ¶1141.02[4][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2011) ("If the debtor knows the identity of the creditor, the confirmation order and any third party release will be binding on the creditor only if the creditor was given proper notice of the case.").

[15]    See Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1953).

[16]    See DPWN Holdings (USA), Incorporated v. United Air Lines, Inc., 2014 WL 1244184, *5 (2d Cir. Mar. 27, 2014).

[17]    See City of New York, 344 U.S., at 296; In re BGI, Inc., 476 B.R. 812, 820 (Bankr. S.D.N.Y. 2012) ("Adequate notice entails actual written notice of the bankruptcy filing and the bar date."); In re Drexel Burnham Lambert Group, Inc., 151 B.R. 674, 681 (Bankr. S.D.N.Y. 1993); see also DPWN Holdings, 2014 WL at *6 (remanding notice issue to district court with the following instructions:  "If [the claimant] lacked such knowledge [sufficient to put claimant on notice of its claim], the inquiry will then shift to whether [the debtor] knew or should have known of its potential … liability such that due process required it to notify [the claimant] of the potential claim.").

134.    As detailed above, Old GM had ample knowledge to "reasonably ascertain," that the Plaintiffs and Ignition Switch Claimants are known creditors with claims arising from the ignition switch defect.  GM's clear ability to provide notice to such persons is perhaps best exemplified by the fact that GM sent recall notices to such persons directly by mail as part of the recall process.  Moreover, Old GM engineers first identified the ignition defect as far back as 2001.  In 2002, Old GM's parts supplier, Delphi, notified Old GM that the ignition switches did not meet specifications.  In 2004 and 2005, Old GM conducted several PRTSs with respect to the defective switches.  In 2005, engineers and executives at Old GM exchanged emails discussing the cost of fixing the defective switches.

135.    By its nature, a cover-up scheme like GM's concealment of the ignition switch defect places interested parties in the dark.  Having known of the defective ignition switches since 2001 and having obtained evidence of the dangerous consequences of the defective ignition switches many years in advance of its chapter 11 filing, it was reasonably ascertainable to Old GM that persons exposed to the ignition switch defect have been harmed and would naturally have claims under Bankruptcy Code Section 101(5).  Said another way, the Plaintiffs and Ignition Switch Claimants were *known* creditors of Old GM.  Yet Old GM failed to provide the Ignition Switch Claimants with actual notice of critical bankruptcy events.  Notably, Old GM did not provide these known creditors with notice of:  the bankruptcy; the claims bar date; the proposed sale procedures, the sale, or the chapter 11 plan.  Accordingly,  the Plaintiffs and Ignition Switch Claimants are not bound by the Sale Order and the Confirmation Order, together with the releases, exculpation and injunctions contained therein, because Old GM failed to

---

[18]    See Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995), *cert. denied* Jones v. Chemetron Corp., 517 U.S. 1137 (1997); In re XO Comme'ns, Inc., 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) (known creditors include "both a claimant whose identity is actually known to the debtor or a claimant whose identity is 'reasonably ascertainable' by the debtor.").

provide the Ignition Switch Claimants with the notice required by law, and, therefore, the Motion should be denied as it relates to the Plaintiffs and Ignition Switch Claimants.

## III.    Old GM Committed Fraud On The Court.

136.    It is well settled that the bankruptcy court has power under Fed. R. Civ. P. 60(d), to set aside a final order for "fraud on the court." Fed. R. Civ. P. 60(d). Fraud on the court requires a party to satisfy the pleading standard under Fed. R. Civ. P. 9(b), which requires a party to state with particularity the circumstances constituting fraud or mistake. Although Fed. R. Civ. P. 9(b) allows intent to be alleged generally, the facts must "give rise to a strong inference of fraudulent intent." A strong inference of fraudulent intent can be established by: (i) showing that the defendants had both motive and an opportunity to commit fraud; or (ii) alleging facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. Fed. R. Civ. P. 9(b).

137.    To succeed on a fraud on the court claim, a plaintiff must allege "specific acts of the debtor evidencing actual fraudulent intent."[19] The Court has great flexibility in fashioning the relief it deems appropriate to correct the fraud perpetrated against the court.[20]

138.    Unlike the circumstances in Morgenstein, Old GM and New GM had significant motivation to commit fraud on the Court and conceal the ignition switch defect throughout the chapter 11 proceeding as set forth in this Objection.    Disclosure of a long-running cover-up

---

[19]    See Morgenstein v. Motors Liquidation Corp., Adv. Pro. No. 11-9409 (REG), *Decision and Order on Motion to Dismiss*, dated January 18, 2012; see also Aoude v. Mobil Oil, 892 F.2d 1115, 1118 (1st Cir. 1989) (A "'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense").

[20]    See Leber-Krebs, Inc. v. Capitol Records, 779 F.2d 895, 900 (2d Cir. 1985) ("In tracing the development of a court's equity power to combat fraud in the enforcement of judgments, the Supreme Court [in Hazel-Atlas] recognized that the relief devised may '[take] several forms: [including] setting aside a judgment to permit a new trial, altering the terms of a judgment, or restraining the beneficiaries of a judgment from taking any benefit whatever from it.'").

38

jeopardizing the safety of millions of its customers may not have provided New GM with a "fresh start." But such disclosure was that was what the law and due process required.

139.    By concealing the ignition switch from the Court, Old GM deprived the Ignition Switch Claimants of due process and committed fraud on the Court.  If the ignition switch defect was disclosed and Ignition Switch Claimants provided constitutional due process, the Sale may have been fashioned and the Chapter 11 Plan adjusted to provide a permissible treatment of Ignition Switch Claims.  Because Old GM committed fraud on the Court and failed to disclose the ignition switch defect, it is now hind-sight speculation and pure conjecture whether Old GM, Treasury and New GM would have put forth the same Sale and Plan if the ignition defect had been properly disclosed.

140.    Given New GM's participation in Old GM's fraud on the court and the distributions of value that have already been made to creditors from the Old GM estate to date (the Court cannot have those distributions returned to the estate so as to afford Old and New GM a do-over based on their own misconduct), the Ignition Switch Claimants should be afforded the proper remedy required by the deliberate wrongful conduct and intentional nondisclosures of Old GM and New GM, *i.e.*, relief from the relevant releases and injunctions and an opportunity to assert their claims of successor liability or the functional equivalent against New GM in a court of competent jurisdiction.

## CONCLUSION

141.    The Plaintiffs herein believe that, regardless of the outcome of the pending Motion, this Court must address the concerns raised by the fundamental deprivation of procedural due process occasioned by the failure to give actual notice to the Plaintiffs. Furthermore, this court must determine what relief should be afforded in light of the apparent fraud on the Court occasioned by the actions of Old GM and New GM.  The Plantiffs will file such other and further pleadings, including an adversary proceeding if appropriate, following the May 2, 2014 status conference.

Dated: April 22, 2014
New York, New York

**BROWN RUDNICK LLP**

By: */s/ Edward S. Weisfelner*
Edward S. Weisfelner
David J. Molton
Howard S. Steel
7 Times Square
New York, New York 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801

- and –

Ronald Rus (pro hac vice pending)
Joel S. Miliband (pro hac vice pending)
2211 Michelson Drive, 7th Floor
Irvine, California 92612
Telephone:  949-752-7100

- and –

ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.
Mark P. Robinson (pro hac vice pending)
19 Corporate Plaza
Newport Beach, California 92660
Telephone:  949-720-1288

- and –

HAGENS BERMAN SOBOL SHAPIRO
LLP
Steve W. Berman (pro hac vice pending)
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone:  206-623-7292

*Co-Counsel for Plaintiffs*