# EXHIBIT 49

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
April 2, 2014 - Final

# Senate Commerce, Science and Transportation Subcommittee on Consumer Protection, Product Safety and Insurance Holds Hearing on the General Motors Ignition Switch Recall, Panel 1

**LIST OF PANEL MEMBERS AND WITNESSES**

MCCASKILL:

This subcommittee will come to order.

It was a rainy night. On March 10th, 2010, Brooke Melton, who was 29 years old and a pediatric nurse, was driving her 2005 Chevy Cobalt to meet her boyfriend for her birthday dinner outside of Atlanta. As she was driving on the highway, her car suddenly lost power. Unable to control the vehicle, it hydroplaned, crossed the center line, and slammed in to another vehicle at 58 miles per hour. Her car ended up in a creek. The airbags never deployed.

Ken and Beth Melton, her parents, rushed to the hospital, but she was dead when they arrived. In their nightmare of grief, they hired a lawyer, a trial lawyer. They asked him to help them understand what had happened, and if possible hold whoever was responsible accountable. And he went to work, spending his own resources to get to the bottom of what happened to Brooke on that rainy night in Georgia when she was on her way to celebrate her birthday.

He hired an engineer to help him. Together, Mr. Cooper, the lawyer, and Mr. Hood, an engineer, began to identify a defect that someone at General Motors had discovered years before. There was a problem with the ignition switch in Chevy Cobalts. It could easily be bumped or brushed or pulled from "on" to "accessory" or "off," powering down the car, disabling the power steering, disabling the power brakes and preventing the airbag from deploying.

After two years of fighting General Motors for documents and a timeline of events, at a deposition in April of last year, Mr. Cooper finally confronted General Motors with the facts. Someone at General Motors had switched out the unsafe ignition switches in several car models and covered it up by using the same part number for the same switch -- for the new switch -- had covered it up by using the same part number for the new switch.

The simple work of the engineer hired by the trial lawyer representing the Meltons had discovered the defective part and its replacement with the same number. And when Mr. Cooper confronted General Motors, Mr. Ray DeGiorgio, their lead switch engineer, with the evidence of the part switch, he lied. He said he didn't know anything about it.

Documents -- General Motors commodity validation signoff, signed in April of 2006, bear the signature of in fact Ray DeGiorgio, spelling out in the document also a new detent plunger was implemented to increase torque force in the switch, with the box checked "resubmission, doing engineering changes."

Further, it is now clear that G.M. new of the faulty switch in 2004, knew the airbags were not deploying in 2005, and in late 2005, knew someone had died. We don't know how many people crashed because of

this coverup. We do know that many died, including Ms. Melton and at least one of my constituents, a Missouri woman who died in a crash in 2009 in the suburbs surrounding St. Louis.

So there is great work done by a trial lawyer and an engineer he hired in exposing a serious safety issue with a product, work that should have first been done by G.M., and secondly by federal regulators. And then there's the federal regulator's failure to spot a trend, even though the TREAD Act was passed specifically to give this regulatory agency the information it needed to catch exactly this type of problem, and a culture of coverup that allowed an engineer at General Motors to lie under oath -- repeatedly lie under oath.

It might have been the old G.M. that started sweeping this defect under the rug 10 years ago, but even under the new G.M., the company waited nine months to take action after being confronted with specific evidence of this egregious violation of public trust.

Thousands of my constituents in St. Louis and Kansas City areas go to work at General Motors every day, building some of the finest cars on the road. I am proud of them and I am proud of their work. This is not their failure. They and the American public were failed by a corporate culture that chose to conceal rather than disclose, and by a safety regulator that failed to act.

With this hearing, I intend to identify potential problems in our auto safety system and work with Chairman Rockefeller, Ranking Members Thune and Heller, and the other members of this committee to rectify these problems so that this tragedy hopefully is never repeated again. It's time that we finally get this right so that it doesn't take an enterprising trial lawyer and an engineer to bring -- that he hired to bring to light what NHTSA should have known long ago, and what General Motors should have fixed long before Ken and Beth Melton lost their daughter Brooke.

Our job today is to learn as much as possible about the failures of General Motors and the regulators to keep unsuspecting daughters, fathers, wives and sons safe.

Senator Heller?

HELLER:

Thank you, Chairman McCaskill. Thanks for holding this hearing.

HELLER:

And thank you, Ms. Barra, for appearing in front of us today.

HELLER:

I want to begin by offering my deepest sympathies to the families and friends of those who have been affected by these tragedies.

I also want you to know that we'll get to the bottom of why it took so long to get these vehicles off the road.

As many of you know, General Motors has issued a recall of over 2.2 million vehicles, due to problems with the ignition switch that G.M. has admitted to knowing about in some form as early as 2001.

These faulty ignition switches have linked to 13 deaths.

G.M. has now recalled certain years of Chevy Cobalts, Pontiac G5s, Saturn Ions, the Chevrolet HHR, and the Pontiac Solstice, and the Saturn Sky.

Last Friday, it was reported that sometime in 2006 or as late as 2007, General Motors changed the ignition switch part. A whole new part was manufactured and sold, but G.M. kept the same part number for that new part.

Now, my home town of Carson City, we have an engineering company that builds pistons and rods for NASCAR teams. I've talked with him, talked with owners, talked with other -- other builders in Nevada. And I can tell you this, if a company sold a part that was changed in any way and did not change the model number or the serial number on that part, it would cause significant problems for these businesses, these individuals, and, of course, the racing teams themselves.

Ms. Barra, you know that I have raced cars for years. I've used G.M. testing facilities on some of the cars that I have raced. I have blown engines, broke transmissions, broke rear ends, lost my brakes, throttle stuck, and my ignition quit on me.

And I tell you this, because we break those engines down, those transmissions, those rear ends, to find out exactly what the integrity of those parts are and how they broke, why they broke. And the difference, of course, being, is winning or losing.

Now, I can tell you, based on my experience, it is incredibly unusual for a car company to change a car part and not change the part number.

Government investigators have now requested the G.M. provide any documents chronicling the switch change and who within the company provided it.

I'm also requesting today that G.M. provide this committee with that same information.

But that's only part of this issue. We also need to recognize that when G.M. emerged from bankruptcy in 2009, the federal government owned 60 percent of the company because taxpayers -- taxpayers bailed the company out.

So G.M. knew of this issue in some capacity over 10 years ago. They changed the part, but didn't tell anyone. They asked for a taxpayer bailout, and the current administration had to step in and restructure the company.

Through all of this, G.M. was unable to determine that they should pull 2.2 million vehicles off the road.

This is why, from where I'm sitting, G.M. has a lot of explaining to do, both to this committee and to the taxpayers.

Here's the issue for G.M., it looks like there are multiple moments when the company faced conflicts of interest. And you said it yourself yesterday, Ms. Barra, G.M. has a culture based on cost, not safety.

So many people are wondering if G.M. did not initiate a recall because G.M. could not survive one in 2006 or they did not initiate a recall because the government owned 60 percent of the company.

It is possible that G.M. has an explanation for why it took so long to pull these cars off the road. However, after yesterday's hearing, I'm afraid we're not gonna get too many answers today.

I hope G.M. is in a position to speak to what happened more specifically. That is why we called you here, and I think G.M. should take the opportunity today to explain their actions and help this committee get to the bottom of what happened.

There is also another side of this story, and this is whether the National Highway Traffic and Safety Administration (sic) received all the information from early warning reports that it needed to determine if further investigations were warranted.

NHTSA received 260 complaints over 11 years, and these vehicles were turning off while being driven. Yet NHTSA did not move forward with a recall investigation in 2007 or 2010.

I wrote to NHTSA asking very simple questions regarding their process in recalling vehicles, and what they saw in 2007 or 2010 that compelled them to pass on any investigation.

I'm very disappointed in NHTSA's ability to respond to my letter in time for this hearing.

When we're looking at incidents which -- in which individuals died, I expect more from NHTSA than what they showed today, and I think NHTSA knows that they can do better. And they'd better do better.

That being said, my understanding that the secretary of transportation has requested an internal investigation to conduct an audit of NHTSA's handling of the G.M. recall. Secretary Foxx also stated that he has directed NHTSA and the department's general counsel to jointly conduct a due diligence review.

And I am pleased by both of these development. Look forward to the reports.

We need to ensure that consumers are safe on the road. We need to understand the facts of this recall. There are many questions that need answering, and I hope that today's hearing begins to provide some answers to the U.S. taxpayers and to what they deserve.

So, thank you, Chairman McCaskill.

MCCASKILL:

Thank you, Senator Heller.

Ms. Barra, welcome. We respect and appreciate your presence here today, and we welcome your testimony.

BARRA:

Is it on now?

OK. Sorry about that.

Thank you very much.

My name is Mary Barra, and I'm the chief executive officer of General Motors. I appreciate the opportunity to be here today.

More than a decade ago, G.M. embarked on a small car program. And sitting here today, I cannot tell you

why it took years for a safety defect to be announced in that program. But I can tell you we will find out.

This is an extraordinary situation. It involves vehicles we no longer make. But it came to light on my watch, so it's my responsibility to resolve it.

When we have answers, we will be fully transparent with you, with our regulators and with our customers.

While I can't turn back the clock, as soon as I learned about the problem, we acted, without hesitation. We told the world we had a problem that needed to be fixed. We did so because whatever mistakes were made in the past, we will not shirk from our responsibilities now and in the future.

Today's G.M. will do the right thing.

This begins with my sincere apologies to everyone who's been affected by this recall, especially to the families and friends of those who lost lives or were injured.

I am deeply sorry, and the men and women of General Motors are deeply sorry.

I've asked former U.S. attorney Anton Valukas to conduct a thorough and unimpeded investigation of the actions of General Motors, and I've received updates from him, and he tells me his work is well along.

He has the free rein to go where the facts take him, regardless of outcome. The facts will be the facts.

Once they are in, my leadership team and I will do what's necessary to assure this doesn't happen again. We will hold ourselves accountable.

However, I want to stress, we are not waiting for his results to make changes. I've named a new vice president of global vehicle safety, which is a first for General Motors.

Jeff Boyer's top priority is to quickly identify and resolve any and all product safety issues. He is not taking on this task alone. I stand with him; my senior management team stands with him. And we welcome input from outside G.M., from you, from NHTSA, from our customers, our dealers, and our current and former employees.

I have asked everyone on our team to keep stressing the system at G.M. and work with one thing in mind, our customers and their safety are at the center of everything we do.

Our customers who have been affected by this recall are getting our full and undivided attention. We've empowered our dealers to take extraordinary measures to treat each case specifically.

If people do not want to drive a recalled vehicle before it is repaired, dealers can provide a loaner or a rental free of charge. To date, we've provided nearly 13,000 loaner vehicles.

A supplier is manufacturing new replacement parts for the vehicles that are no longer in production. We've commissioned two lines and asked for a third. And those parts will start being delivered to dealers next week.

These measures are only the first in making things right and rebuilding the trust with our customers.

I would like this committee to know that all of our G.M. employees and I are determined to set a new

standard. And I'm encouraged to say that everyone at G.M., up to and including our board of directors, supports this.

As a second generation General Motors employee, I'm here as the CEO, but I'm also here representing the men and women who are part of today's G.M. And I can tell you that they are dedicated to putting the highest quality and safest vehicles on the road.

In addition, I announced yesterday that we have retained Kenneth Feinberg as a consultant to help us evaluate the situation and recommend the best path forward.

I'm sure this committee knows Mr. Feinberg is highly qualified and is very experienced in the handling of matters such as this. Having led the compensation efforts involved in 9/11, the B.P. oil spill, and the Boston Marathon bombing, Mr. Feinberg brings expertise and objectivity to this effort.

As I have said, I consider this to be an extraordinary event, and we are responding to it in an extraordinary way. As I see it, G.M. has both civic responsibilities and legal responsibilities. And we are thinking through exactly what those responsibilities are and how to balance them appropriately. Bringing Mr. Feinberg on is the first step.

I would now be happy to answer your questions. Thank you.

MCCASKILL:

Thank you, Ms. Barra.

I want to briefly go through your resume. Beginning in 2004, when this defect was discovered by someone at G.M., you were executive director of manufacturing engineering, from 2004, 2005. And 2005 to 2008, you were executive director of vehicle manufacturing engineering.

From February 1st, 2008 to July 2009, you were vice president of global manufacturing and engineering. From July 30th, 2009 to February 1st of 2011, you were vice president of global human resources. From February 1st 2011 to August 2013, you were senior vice president of global product development. And from August to 2013 to January 15th of 2014, you were executive vice president of global product development.

MCCASKILL:

Is that a correct rendition of your resume over the last decade?

In April and May of last year, G.M.'s employees were deposed in the lawsuit trying to get some kind of justice for Brooke Melton. They were confronted in the deposition with the fact that there were two different parts with the same part number and the different torque on both of those parts leading to the malfunction of the ignition switch.

At that deposition, General Motors had a lawyer, and it was very clear at that deposition that there were two parts with the same number and that they had been switched out and that one of them was defective. When that lawyer for General Motors left that hearing, who did he report to?

BARRA:

I don't know which lawyer was at that trial, so I can't answer that question.

MCCASKILL:

Well, hold on, and I'll get it for you.

have some lawyers here with you today, don't you? Don't you have your general counsel with you?

BARRA:

Yes I do.

MCCASKILL:

You're free to confer with him if he would like to tell you who that lawyer would report to after that deposition.

BARRA:

Again, we are doing a full investigation with Mr. Valukas and all of the individuals that are associated with this incident will be a part of that, and the findings will be conclusive.

MCCASKILL:

It was Mr. Philip Holladay appearing on behalf of General Motors from the King & Spalding law firm in Atlanta, Georgia.

BARRA:

OK. So he didn't report to General Motors, then, he was part of King & Spalding.

MCCASKILL:

Well, but he would have reported to his client. He was there representing you. He was your agent at that deposition.

BARRA:

Yes.

MCCASKILL:

So he would've -- I guarantee you, if I'm a lawyer and I'm at a deposition where this bombshell has been dropped on my client, that there are two identical -- two different parts with the same number, one of which is defective, I guarantee you I don't go back and tell the folks at the law firm. I'm on my cellphone in the lobby saying to General Motors, "We've got a problem."

I need to know who would typically be -- would it be the general counsel's office that the lawyers that you hire would report to you on litigation?

BARRA:

It would've been part of the senior legal team.

MCCASKILL:

OK.

It would be very important for us to identify who that lawyer reported to after that deposition.

BARRA:

I will -- that will be part of Mr. Valukas's investigation.

MCCASKILL:

Now, I'm assuming that when that happens, there's an investigation internally.

BARRA:

One of the findings that we've had from Mr. Valukas already as he's done his study is that within General Motors, there were silos. And as information was known in one part of the business, for instance, the legal team, it didn't necessarily get communicated as effectively as it should've been to other parts: for instance, the engineering team. That's something that I've already corrected today.

MCCASKILL:

Ms. Borrow (sic), I'm not asking whether or not the lawyers called the engineers. I'm asking whether or not lawyers, in a multimillion dollar lawsuit, where there has been evidence of a defective switch and a replacement that had never been identified to the public being presented to the lawyers for your company, not reporting that up to the executive level of your company. Those lawyers work for the executive level. They don't work for the engineers. They're hired by your senior council. That's who hires those lawyers. His office, correct?

BARRA:

Yes.

MCCASKILL:

OK.

So, what I want to know is what investigation began after that deposition?

BARRA:

That is part of the investigation.

MCCASKILL:

So, you don't know whether or not anything happened after that investigation?

BARRA:

I don't have the complete facts to share with you today.

MCCASKILL:

OK.

Well, that is incredibly frustrating to me that you wouldn't have a simple timeline of what happened once you got that knowledge.

So, it went on for nine months. You have no idea, even though you were in the executive level of leadership at the company at the time. It was never discussed anywhere in your presence for nine months, even though this had occurred?

BARRA:

I became aware of the defect and the recall on January 31st.

MCCASKILL:

OK. So let me do quickly, that.

On February 7th, you issued the first recall. 12 days later, Mr. Cooper, the trial lawyer, wrote to NHTSA pointing out that in addition to the recall you'd done, it was not complete. He pointed out there were four other models that had the defective ignition. Six days later, you in fact recalled those vehicles.

On Monday of last week, Mr. Cooper filed a court pleading in California, alleging there were additional cars that should've been recalled and had not been recalled, because they had defective switches placed in them during repairs. Last Friday, four days later after that pleading, G.M. finally issued the third round of recalls.

Is this the new G.M., Ms. Barra? Is this the new G.M. that takes a lawyer having to writing NHTSA, and a court pleading in court for you to finally recall all the cars that had been impacted by this defective switch?

BARRA:

As we looked at the first population of vehicles, we immediately go and then read across to the other vehicles that may have the same part. Often, when you have the same part in another vehicle, it can be a different configuration, a different geometry. As we looked into that population, we then recalled that population, and then, we immediately started to look up where were the spare parts.

From a General Motors perspective, for G.M. dealers, we could go to dealer records and understand where if a dealer put a spare part into a vehicle, we knew then. But then, as we worked with our supplier, we learned that they had sold these spare parts to other third party repairs, where there were no records kept. When we learned that, we immediately went out and recalled the entire population of all of these vehicles, because we couldn't be certain if there was a vehicle that had a part put in that we couldn't track.

MCCASKILL:

And I think it's great you've done that all. It just is worrisome to me that it took three shots after nine

months.

Senator Heller.

HELLER:

Thank you.

Ms. Barra, the public is very skeptical of General Motors, and let me explain to you what they're seeing.

At some point, last decade, G.M. knew that there was a problem with a faulty ignition switch which led to the death of 13 people.

In late 2006, early 2007, G.M. replaced the ignition parts but kept the same part number and did not tell anyone. Shortly thereafter, G.M. needed U.S. taxpayers' loan to bail them out. The company was provided so much assistance, that when they emerged from bankruptcy, the federal government in 2009 owned 60 percent of the company.

So, from where I sit, it looks like G.M. is not forthcoming with the American people, who bailed them out.

It looks like there were multiple moments where the company had conflicts of interest, either with initiating a recall at a time when G.M. was not financially sound, or when the government owned 60 percent of the company.

So, what I'm going to do is allow you to explain yourself to the American people, and I think we need to know whether you believe the company acted in the best interests of the consumers who bought your car and the U.S. taxpayers who bailed you out.

BARRA:

First of all, I agree, it took way too long for this to come to the attention and to do the recall, and we've admitted that. We've also apologized. It is tragic that there has been lives lost and lives impacted with this event.

From the part number perspective, I find it completely unacceptable that a part would be changed without a part number, the actual identifier being changed. That is not a process of good engineering. That is not an acceptable process. It wasn't then, and it clearly isn't now. And as we do our investigation, we will deal with that situation, because that is not acceptable for good engineering principles.

But, as I look at the culture of the company during the time frame, this part was designed in the late '90s. It went into vehicles that went into production in '03, the latest of which went out of production in the '11 timeframe.

The -- the culture of the company at that time had more of a cost-culture focus, and I can tell you we have done several things since the bankruptcy to create a new culture at General Motors, to be focused on the customer, starting with rewriting our values: the first value is the customer is our compass, the second is relationships, matters, and individual excellence.

We have also taken quite a bit of bureaucracy out of the vehicle development process and the structure itself. We've dramatically improved our quality organization and our customer experience organization, so there's been dramatic improvements made in General Motors since that time.

HELLER:

Ms. Barra, I've heard -- I read the transcripts from yesterday's hearing, and you've said most of this, when you were on the other side of the Capitol, and you said that safety comes first at G.M., that you don't look at cost. G.M. looks at the speed at which it can fix it. And you said that there was a change, that G.M. has gone from a cost culture to a safety culture.

I want you to explain that. And in explaining that, does that mean that in 2006, General Motors was more concerned with the bottom line as opposed to recalling their vehicles?

BARRA:

When we look at -- when the complete investigation is done, there was documents that were produced yesterday that if those are incomplete context, that they've valued cost over quality, once we knew there was a safety defect that is unacceptable. In today's culture, we don't condone that, and it starts with leadership: myself, our leadership, and product development across the company.

If there is a safety defect, there is not a calculation done on business case or cost. It's how quickly can we get the repair and put the right part or fix or inspection, whatever needs to be done to make sure the vehicles are safe that our customers are driving.

HELLER:

So, let me ask you again. If safety was not the highest priority in the past, is it fair to assume that G.M. only acts in the best interests of G.M. at all times? Was that true in 2006?

BARRA:

Again, that's a very broad statement. I would say that there's been times in the past where there's been a safety focus. General Motors is a hundred year old company. But I can tell you now, from a post-bankruptcy, there is a focus on the customer and on safety and on quality.

HELLER:

I have more questions but I'll wait.

MCCASKILL:

We will have another round of questions for Ms. Barra.

Senator Boxer.

BOXER:

Thank you, Ms. Barra.

I have here a timeline of when you knew, when the company knew there were problems. It starts in '01. In '03, a service technician of G.M. noted that there was a stall while driving. And it goes on, and there's a constant theme here of the thing that's getting worse and worse through the years.

Now, you're new at your job, but you've been at G.M. for how many years?

BARRA:

33.

BOXER:

33 years. So, when this was first discovered, you were executive director of competitive operations engineering, where you developed and executed strategies to improve the effectiveness of vehicle manufacturing and engineering, but you didn't know of this?

BARRA:

Correct.

BOXER:

Nobody told you about this?

BARRA:

Correct.

BOXER:

OK. And then, you were plant manager of Detroit Hamtramck Assembly in '03 to '04 where you were responsible for day to day plant activities related to safety, people, and quality, and still, you knew nothing about this.

BARRA:

We didn't build any of these models at the Detroit Hamtramck plant.

BOXER:

In that position, you knew nothing about this, correct?

BARRA:

Correct.

BOXER:

OK.

And then, in '04 to '05, you were executive director, manufacturing engineering, responsible for developing and implementing global bills of process and equipment to optimize capital deployment and manufacturing operating costs, and you developed and continuously improved lean cost initiatives.

You knew nothing about this when you were executive director of manufacturing and engineering?

BARRA:

Correct.

BOXER:

You knew nothing.

How about when you were vice president of global manufacturing engineering, '08 to '09? You knew nothing?

BARRA:

Correct.

BOXER:

And you still knew nothing when you were vice president of global human resources?

BARRA:

Correct.

BOXER:

You're a really important person to this company. Something is very strange that such a top employee would know nothing. Now, have you seen photos of your cars that have had that ignition problem, and that problem led to deaths? Have you seen photos of those cars, what they look like?

BARRA:

Yes.

BOXER:

I have another one for you to look at.

The people are here, Mary Theresa Ruddy (sic) of Scranton, Pennsylvania, died at the age of 21. She was a senior at Marywood University. Her parents are here, her family.

I guess it's -- it's somewhat shocking after the Pinto -- and that goes back to when I was first an elected official -- I was shocked that there was such a cold and calculating way that Ford decided not to fix a fatal flaw in their fuel tank. And we learned through lawyers as -- as our chairman has pointed out, they made a very -- through discovery they found out it was a very careful cost- benefit analysis, and Ford decided it was cheaper for them to pay off the families of the dead than to fix the problem that would have cost them $11 a car.

Did you make that kind of calculation over at G.M. in this situation?

BARRA:

I did not.

BOXER:

Do you know of anybody who did make it?

BARRA:

That is the purpose of the investigation...

BOXER:

But you don't know now? You haven't asked and you don't know?

BARRA:

I asked for an investigation...

BOXER:

Do you know if G.M. ever used this kind of cost-benefit analysis in its history?

BARRA:

There were documents shared with me yesterday that if they're true, as we go through the complete timeline, will demonstrate that it's completely unacceptable...

BOXER:

Well, I didn't ask you that.

I said, do you know if G.M. ever used this kind of cost-benefit analysis in its history? Do you know?

BARRA:

If it was used for -- not for a safety item, ti would be unacceptable.

BOXER:

It's OK to do it for a safety item? Is that what you're saying?

BARRA:

I said the opposite of that.

BOXER:

Well, you didn't.

So, what about in 1973 when G.M. engineer Edward Ivey concluded it was not cost effective for G.M. to spend more than $2.20 per vehicle to prevent a fire death?

Do you know about that?

BOXER:

I'd heard about it.

BOXER:

You've heard of it? You haven't looked at it -- looked into it?

BARRA:

General Motors today finds any time there's an incident...

BOXER:

Well, you know, today and today. Yesterday, I did some things that I'm accountable for. It's not about -- you have been involved in this since you became CEO, have you not looked into this?

Look, Mr. Ivey's study placed the value of a human life lost at $200,000 and estimated the company could cost effectively spend only $2 for rear impact protection to prevent fuel-fed fires, and that a burn death would cost the company $2.40 a vehicle. Through this analysis, G.M. determined it would not be cost effective to pay more than $2.20 per car for each burned death.

So you talk about today's G.M., but evidence shows that as recently as 2005, G.M. used a cost benefit analysis to determine that fixing the problem was, quote, "Not an acceptable business case."

Are you aware of this situation in 2005? Has that been called to your attention?

BARRA:

I was aware in general of the Ivey letter. I've never seen it.

BOXER:

What about the 2005? Is that the new G.M. or the old G.M., 2005?

BARRA:

General Motors Company was formed in 2009.

BOXER:

OK, so the old G.M. in 2005 -- you're not aware that hey used a cost benefit analysis to determine that fixing the problem was not, quote, "An acceptable business case"?

BARRA:

Again, if it's a safety issue, there should not a business case calculated.

BOXER:

But you don't know anything about this?

BARRA:

That's why we've hired an investigation. We're going back over a period of a decade to understand exactly what happened...

BOXER:

OK, I'll hold (inaudible) thank you.

MCCASKILL:

As -- as people know, the Commerce Committee does order of arrival. Just so -- to remind everyone. Every committee does it different, but Senator Rockefeller does order of arrival. I'll -- I'll respect him in that regard.

I respect him anyway.

I respect in all regards.

(LAUGHTER)

But I also will respect him in that regard. So next would be Senator Klobuchar.

KLOBUCHAR:

Thank you very much, Senator McCaskill. Thank you for holding this hearing.

Ms. Barra, the -- one of the families involved in this is a young woman who was killed named Natasha Weigel from Albert-Lea, Minnesota. I met with her dad, Doug yesterday. I talked to her mom -- to her mom's husband yesterday. And this young girl was in Wisconsin. She was in a Cobalt with some friends, and suddenly the ignition went off and the car was barrelled 71 miles per hour into trees. And two of the girls were killed including Natasha.

And she was a hockey player, young girl, and one of the letters that her dad gave me that she wrote to him just a few months before she died. She talks about -- this is her words, "I wouldn't be the good goalie I am now if it wasn't for you dad, standing behind the net, behind the glass. Just knowing you were there made me trust myself better, and I definitely felt secure to know you had my back."

And I think you understand that these families need someone to have their back. They want to have the backs of their kids -- at least the memories of their kids, and I think this is -- a lot of what this is about, including a major change in process that we clearly need in G.M. and probably in the transportation field in terms of how we look at these things.

And as you look at this internal evidence, I think the things that we need to know including why did G.M.

open numerous internal reviews, but not elevate the issue to a formal investigation until 2011? Why was G.M.'s management not aware of critical decisions being made related to the defect? Did G.M. disclose the issue during the company's bankruptcy proceedings?

These are the things that are on the minds of the American people. and then, on the government side, with NHTSA, did NHTSA have sufficient resources to do a prompt, thorough investigation? Did NHTSA have the technical expertise and technology to evaluate this growing evidence?

I know in our case, and the Weigel family claim -- a complaint was made with NHTSA way back when Natasha was killed. What could NHTSA have done differently as it was receiving complaints over this very long period of time?

So my first question of you is really about your -- this internal process, and I'd like to know what factors -- as we've just seen these recalls with more and more of them rolling out over the last few weeks -- what factors did G.M. consider when it's examining whether or not to elevate a potential safety defect to a higher level of review?

BARRA:

In today's General Motors, we look at -- I mean as a -- as an incident is -- is learned about, and it can come from any source, it can come from our dealers, it can come from testing, ti can come from a claim being made and it gets assigned to a team of knowledgeable engineers. They investigate, try to understand what's happening, try to understand -- you know, if there's an incident what it could cause that then gets reviewed by a team -- cross-functional team and then goes to a final group to make a decision. That's the process that's used.

KLOBUCHAR:

And what's the single most important factor the company considers when look at whether to do a recall?

BARRA:

The most important thing is that there's a safety issue, and we will -- we've actually, over the last few years, made great strides to quickly get information, look, and get into the field as quickly as possible.

If you look at the data right now, of General Motors, we actually do more recalls than anyone with smaller population, because we're trying to get -- if we find something we're trying to get in and fix it as quick as we can.

KLOBUCHAR:

And you think there will be further recalls to come here, different models?

BARRA:

I believe as we find problems, large or small, we will do the right thing. And, if it requires a recall, we will do a recall.

KLOBUCHAR:

OK, now we have the issue of the claims with many of the families that have been involved, do you think that families have equal opportunity to compensation regardless of whether or when G.M. went through

bankruptcy?

And, if you could also describe -- you just announced this appointment (ph), Mr. Feinberg, how this would work so that these families would get their compensation?

BARRA:

And we -- we hired Mr. Feinberg late last week. We have our first meeting with Mr. Feinberg on Friday. And we want to -- it's open right now. We've -- he has guided us on the different things that we need to consider. Again, as I've said we have civic and we have legal responsibilities. We are gonna work through those.

I anticipate, based on the time line he's given us, it will take about 60 days -- that's the time line he's told us to plan for. As we explore and look at all the different options, we have not made any decisions yet, all options are still open. But, I don't have a decision today.

KLOBUCHAR:

So do you think that these families should be able to be compensated regardless of the bankruptcy issue?

BARRA:

That's why we hired Mr. Feinberg to work through this issue.

KLOBUCHAR:

OK, last question -- my time's running out -- what does G.M. have to do to regain the American public's trust?

BARRA:

We have to work every day -- and I am 150 percent committed to it, as is my team, to make sure we are putting the safest and the highest quality vehicles on the road across the globe. And that's what we'll work tirelessly to do. That's what the men and women of General Motors want to do.

KLOBUCHAR:

Thank you.

MCCASKILL:

Senator Coats.

COATS:

Ms. Barra, yesterday -- correct me if I'm wrong here, but -- I believe you said that G.M. -- you did say you had hired Mr. Feinberg to investigate the matter, but you also did not commit to sharing the results of that investigation with the public and with the Congress, instead saying, and I think I'm quoting you correctly, you'll, "Share what's appropriate."

After a night's sleep on that question, is that still your position or do you think it would be appropriate to

share everything Mr. Feinberg discovered with us and with the public?

BARRA:

Well, first of all, I would like to add to that. What I -- what the specific question I was asked was, the findings from Mr. Valukas' study, who is doing the complete investigation -- the external investigation of what happened over this more than a decade period.

And when I said we would share what appropriate -- we will share everything and anything that's related to safety of our vehicles, that's related to the safety of this incident -- we'll share that with the customers, we'll share that with -- with you, with our regulators. If we learn things that are broader from a safety perspective, we will share that.

The only thing -- and the reason why I used, "what is appropriated," is if there is an issue of competitiveness, because we have opened up everything to Mr. Valukas, that would be something that we would, again, if there was a safety issue we would override on the safety side, but other competitive issues and then also as an employer, we have responsibilities on privacy to some of our employees as part of the employment agreement I have to respect that as well.

But, clearly -- I appreciate the opportunity to clarify this -- anything remotely related to safety of vehicles, or anything that could improve the process -- we could have done better with NHTSA -- will readily be shared in a very transparent process.

COATS:

Well, I'm glad you clarified that, because I think it raised concerns of all of us that -- relative to that.

So just -- just to make the record clear, anything related to a safety issue will be shared with the public and with the Congress.

BARRA:

Absolutely.

COATS:

Were you aware of this problem when you were offered the chairmanship -- the CEO position at G.M.?

BARRA:

I became aware of the recall on January 31st. I was aware in late December that there was analysis going on on a Cobalt, but I didn't even know what the part was.

COATS:

Well, whether you like it or not, you've become the face of the problem, but hopefully also the face of the solution. But it is important that, I think, we understand what your role was during your 33 years, and more important than that, that the investigation point out just who knew what and when did they know it.

I would suggest to the chair that perhaps a followup subcommittee hearing potentially involve those who held the leadership and the key positions in G.M. during the timeframe that we're looking at here. And that

would include some government officials also, since they own the company -- 60 percent of the company for a considerable period of time.

So, I say that because I think we need to hear from people who had the key positions in G.M. that perhaps had knowledge of this and made a decision, either on a cost basis or for whatever reason, to come before the committee and explain their role in this, rather than dumping the whole -- the whole issue on its new CEO.

But again, as I said, you -- you've taken on this duty and like many before you, including presidents of the United States, what is anticipated that your role will be turns out to be something very, very different.

But we're going to need your complete cooperation as we work through this difficult issue, but I think also I would suggest to the chair and the vice chair that we seriously consider bringing before us those who were in positions of responsibility when these decisions were made.

MCCASKILL:

Thank you, Senator Coats.

We will in all likelihood do some kind of followup hearing on this, and I think it would be helpful to hear from some of the people in key places. I'd certainly love to talk to, under oath -- I shouldn't say "under oath" -- in a committee setting, I'd like to talk to the legal team about how they handled the lawsuits around this defect.

Senator Nelson?

NELSON:

Thank you, Madam Chairman.

Ms. Barra, I have been a General Motors customer virtually all my life, and have been very satisfied. I'm concerned by virtue of what we've learned, is there a corporate culture -- and since you're the new sheriff in town, you're going to have to get into that culture.

As Senator Boxer had mentioned, back in 1973, that accident of the fuel fires, and so an engineer for G.M. wrote the value analysis of auto fuel-fed fire-related fatalities. And Senator Boxer had already talked about that.

Madam Chairman, I would ask that that be entered into the record -- that engineer's report.

MCCASKILL:

Without objection.

NELSON:

Now, given this potential culture problem in G.M., since I'm a G.M. customer, if I were to have a recalled Chevrolet Cobalt, would you recommend that I drive home in it tonight?

BARRA:

If you take the -- all the keys off the ring except the ignition key or just use the ignition key, our engineering team has done extensive analysis to say that it's safe to drive.

NELSON:

What -- what if I were going on a long trip?

BARRA:

Again, if you don't have anything else on your key ring and I recommend just the ignition key, you are safe to drive the vehicle. The analysis has been done over weeks.

NELSON:

I suspect that Cobalt drivers would not take comfort in that advice, knowing what has come up. And you all may want to revise that advice. You mention here that G.M. has hired Ken Feinberg. You know, he's accustomed to large claims. He handled the B.P. oil spill in the Gulf. You all have confirmed 13 deaths. Does this suggest with Feinberg coming on board that the number of deaths and the injuries is going to be potentially much higher?

BARRA:

We are starting our work with Mr. Feinberg on Friday. We think he's an expert in this area and we want to do what's right. So we thought he was the person with the most expertise to go forward. And I would also, to the previous question, if a person is not comfortable driving their Cobalt or one of these models, we are providing loaners free of charge.

NELSON:

With Feinberg on board, does that suggest that G.M. is going to compensate owners who feel the need that they have to park their car, other than the loaner that you're speaking about?

BARRA:

Again, working with Mr. Feinberg, there's many aspects that we need to work through with him, and so that will -- that is why he, on his timeline, is saying it will be about 60 days.

NELSON:

The Center of Auto Safety has suggested that they think this defect may have caused over 300 deaths. That's a big difference from the 13 that you've acknowledged. Why do you think those numbers are so far apart?

BARRA:

My understanding is there's data sources from the car's database where it captures a proportion of incidents that occurred in those vehicles in a broader population. In some cases, the way airbags are designed, they're not intended to go off, depending on the crash. And if you'd like me to have -- we have a team that's very knowledgeable. They've spent virtually their entire career working on airbags and understanding that. We could share that.

NELSON:

Tomorrow, you're going to have to formally respond to NHTSA about what the company did and did not know. Companies are legally required to report safety defects within five business days of discovering them. And so this information is going to be critical to determine whether G.M. broke the law.

While we're waiting on this determination, can you tell us whether you think that G.M. informed the government and the consumers pursuant to the law in order to prevent those accidents?

BARRA:

I want to know that answer just as much as you did -- you do. And that's why I've got Mr. Valukas who is doing this report. And we are working on all the information that NHTSA has -- has requested to provide that in a timely fashion.

NELSON:

Thank you.

(CROSSTALK)

MCCASKILL:

Senator Blumenthal?

BLUMENTHAL:

Thank you, Madam Chairman. And thank you, Senator McCaskill, for holding this hearing.

Thank you, Ms. Barra, for being here today. You and I have met before, haven't we?

BARRA:

Yes, we have.

BLUMENTHAL:

And I'm going to tell you now what I said then, which is I have enormous admiration and respect for your career, what you've accomplished, and the leadership that you've provided to G.M. And I also have enormous respect for your company. It's an iconic, enormously important manufacturing company and it produces terrific products (inaudible).

And I know that you're accompanied here by a regiment of lawyers and a battalion of public relations consultants, and that your breaking with the culture is a very difficult step. But let me, with all due respect, suggest three steps -- at least three steps that you can take if you really want to break with the culture and show the leadership that I think is worthy of G.M. and worthy of your leadership.

Number one, commit to a compensation fund that will do justice for the victims of the defect that killed people in your cars. Number two, warn drivers who are currently behind the wheel of those cars that they should not drive them until they're repaired, because they're unsafe. And number three, support the measure that Senator Markey and I have proposed that would improve the system of safety accountability going forward, require more disclosure to the public, and better transparency in reporting by the car manufacturers in case of defect, to the federal agencies.

And the federal agencies have a substantial share of the blame in this instance. I think it's pretty much incontrovertible that G.M. knew about this lethal safety defect, failed to correct it, and failed to tell its customers about it, and then concealed it from the courts and the United States.

So I think these steps are appropriate, and I hope that you will adopt them despite whatever the complexities that you see and whatever the advice is that you're getting.

And I want to know, first of all, what is it that Ken Feinberg has to work through to convince you that there should be compensation to these victims?

BARRA:

Ken Feinberg has just indicated (inaudible) as he goes in, he interviews a lot of people, tries to get a complete understanding of the process...

(CROSSTALK)

BLUMENTHAL:

But he is not -- and excuse me for interrupting you, but we all have five minutes here, so I'm trying to make the best use of it as possible -- he's not a bankruptcy expert. And right now, G.M. is still in courts across the country invoking a blanket shield from liability that's the result of its deception and concealment to the federal government.

BLUMENTHAL:

I opposed it at the time, as attorney general for the state of Connecticut, not foreseeing that the material adverse fact being concealed was as gigantic as this one. But why not just come clean and say we're gonna do justice here; we're gonna do the right thing; we're gonna compensate victims, knowing that money can't erase the pain or maybe even ease it, but it's the right thing to do?

BARRA:

Our first step in evaluating this is to hire Mr. Feinberg, and we plan to work through with him, and understand his expertise. As I said, there's civic as well as legal responsibilities, and we want to be balanced and make sure we are thoughtful in what we do.

BLUMENTHAL:

Let me go on to the next step. Let me show you the recall notice. And I'm sure you've seen it.

It says "the risk increases if your key ring is carrying added weight such as more keys or the key fob, or" -- and I stress -- "or your vehicle experiences rough road conditions or other jarring or impact-related events."

Even with all the weight off the key chain, doesn't that recall notice tell you that cars should not be driven where there are rough road conditions or other kinds of potential jarring events?

BARRA:

The testing that has been done has been on our proving ground, that has extensive capability where the

vehicle would be jarred, and with just the key or the key and the ring, it has -- it has performed.

BLUMENTHAL:

Is it your testimony here today that those cars are as safe as any other car on the road today?

BARRA:

Again, as you look across all the safety technology that is on vehicles from the past to present, there's variation on safety based on the technology that's on cars today. So there's variation with -- across the whole population.

BLUMENTHAL:

Is -- that Cobalt car as driven now, safe for your daughters to drive? Would you allow them behind the wheel?

BARRA:

I would allow my son and daughter -- well, my son, because he's the only one eligible to drive -- if he only had the ignition key.

BLUMENTHAL:

So the added risk if you have only the ignition key of driving that car on the road is zero? There's no additional risk of driving the unrecalled Cobalt on the road?

BARRA:

The testing that we've done as it relates to this indicates that the weight is not -- would not cause that issue.

(CROSSTALK)

BLUMENTHAL:

My time...

BARRA:

And if someone -- can I just say, if someone is uncomfortable, though, we are providing loaners. If someone asks for a loaner, a loaner is provided.

BLUMENTHAL:

Well, again, I would respectfully suggest that you advise your customers to get loaners rather than driving these cars.

Thank you, Madam Chairman.

MCCASKILL:

Senator Ayotte?

AYOTTE:

Thank you, Madam Chairman.

Ms. Barra, you described the situation with the duplicate parts, the duplicate ignition switches, one had the defect, one didn't; however, the same part number was kept.

And, as I understand that, that happened the part was actually approved by the chief engineer in 2006, and that it was, the redesigned ignition switch, was put at some point into the model during the 2007 year.

And you've described that as an unacceptable practice.

You know, I have to say, when I look at this situation, particularly the fact that there is indications that G.M. may have known as soon as 2001 about the problems with the ignition switch -- ignition switch, the fact that there would be two identical parts, and in other words, one's defective and one isn't, and that you didn't change the part number, strikes me as deception.

And I think it goes beyond unacceptable. I believe this is criminal.

And I guess my question to you is have there been any other instances where G.M. actually is changing a part and fixing a defect, and keeps the part number the same? Because this -- this, to me, is not a matter of acceptability, this is criminal deception.

BARRA:

I am not aware of any, and I -- it is not an appropriate practice to do; it is not acceptable. It is crucial, it's engineering principle 101 to change the part number when you make a change.

AYOTTE:

Yeah, I think it just, obviously, was someone made the decision, and it was approved with -- by G.M. to do this. And I would like to know whether it's ever been done in any other instance, because I think that we should get to the bottom of that in terms of deception, in terms of the potential safety issues that can flow from that, of not triggering, for people, that there's actually a part that is being fixed, but not with a different number.

So it's really a matter, I think, of being honest and truthful with the public here. So I would like to get a follow-up answer to that, as this investigation goes forward, because I don't see this as anything but criminal, when I see the change in this part number.

I also wanted to ask about, the chair asked you about the deposition in April of -- May of last year, where, clearly in the deposition the trial counsel had raised this issue of the two parts with the same number, one defective, one not. And does the general counsel report directly to the CEO?

Yes. And I find it shocking that something like that, and I share the chair's concern, wouldn't have gone directly up through the leadership of G.M.

And so, I think this is a very important issue that we need to understand, even a year ago, what was told and who knew what, when. Because it seems to me -- I'm a lawyer by background as well. This would

have been shocking for me to hear in a deposition representing a client, and I would have gone to the top of something, if I heard something like that, to make sure that my client understood what was happening and the risks that they faced.

I also wanted to ask you about, with regard to the taxpayer bailout of G.M. in 2009 of at that point, had there already been lawsuits filed related to the ignition switch?

BARRA:

I can't answer that question. I don't know.

AYOTTE:

I would like to know whether G.M. actually notified the administration's auto industry task force, which helped administer the taxpayer bailout about the ignition switch.

But I would assume that if there were any lawsuits that had been filed that were pending with regard to the safety of the products of G.M., that this would have been something that would have been brought to the attention of the administration. And I would like to know what information was provided to that task force or to other officials in the administration, as we provided taxpayer dollars to G.M. to address the bailout and the bankruptcy.

So I think this is an important issue as well. And, obviously, an important issue I think for NHTSA as well. So if you could get back to us on that, I would appreciate it.

Thank you.

MCCASKILL:

Senator Rubio?

RUBIO:

Thank you, Madam Chair.

Ms. Barra, you've been at G.M. for how many years?

BARRA:

Thirty-three.

RUBIO:

Thirty-three years.

You've discussed a lot today about the culture at General Motors and the change in the culture.

Can I ask you about the culture at G.M. in your years there? Was there a culture at G.M. at any time that you worked there about avoiding -- a culture of discouraging bad news about the company?

BARRA:

I think the culture wasn't always as welcoming of bad news. You know, again, it was not across the whole company, but in pockets, it wasn't always as welcomed as it should have been.

RUBIO:

And certainly at senior management positions, in light of, for example, the bankruptcy and the subsequent need for the federal government to intervene and bail out the company for it to survive, did you notice that that was exacerbated during that time, that at that point in time there was a particular amount of resistance towards any sort of bad news about the company, like, for example, faulty ignition switches?

BARRA:

I wouldn't draw that conclusion.

RUBIO:

So you were never involved in and you never saw any conversations with regards to the need to diminish the amount of bad news about the company or anything that would be disruptive...

BARRA:

No.

RUBIO:

... even if it involved safety issues?

BARRA:

No. No.

RUBIO:

OK. So, let me ask you this question now, leading to the next point. And I think -- I just want to ask it, and I know your answer is going to be that there's an ongoing investigation. But I think it's important to ask it.

From what you know now, from the documents you've been able to review and the conversations that you've had, I would imagine that this issue has captured the attention and perhaps consumed much of your time and the time of senior management at G.M. Is that right? This is probably the central issue confronting the company right now.

So, just based on what you know over the last few weeks, having dealt with this issue, can you tell us whether General Motors intentionally misled its customers and federal regulators when someone decided to delay disclosing or fixing the faulty ignition switch?

BARRA:

I don't know. That's why we're doing the investigation.

RUBIO:

But you won't rule that out?

BARRA:

I -- Mr. Valukas has the reins to go wherever the facts take him. And the facts are the facts, and we'll deal with those.

RUBIO:

So, if, in fact, -- if, in fact, it turns out that there are individuals who made decisions -- I mean, is the purpose of this investigation to deduce two things, first, the process that led to the decisions to be made, how was it that this decision was made, so that you'll never do that again? That's the first part of the investigation.

The second part, and the one that I think is important, because this is not just about General Motors, there are other companies out there making all sorts of products. And what we never want to do is live in a country where companies can decide that, as a business model, we will decide not to make fixes to things despite the fact that they're dangerous, because it costs too much money to fix it.

That's a dangerous precedent. I heard the Ford Pintos mentioned earlier.

Because we would never tolerate that. You know, if I owned a restaurant and poison was part of my ingredients, and I decided not to change the recipe, because it cost too much money, and someone died, I wouldn't -- they wouldn't just close down my restaurant. I would go to jail.

So my second question is, as part of this investigation to decide who made these decisions, who, in fact, decided or what group of people decided not to disclose these -- these -- these flaws and to do something about them in a timely manner, is part of the investigation to identify those individuals who made those decisions?

BARRA:

If there were decisions made by individuals that were inappropriate, and some of the things that I've seen, I'm very troubled by, as Mr. Valukas completes his findings, the G.M., my team, my leadership team, we will take steps.

And if that means that there's disciplinary actions, up to and including termination, we will do that. We demonstrated that already when we dealt with the India Travera (ph) issue last year.

RUBIO:

So, certainly, if someone was negligent, if someone said, "We have this information; we don't think it's a big deal. We shouldn't do anything about it," that is negligence, and certainly someone like that should not continue to work for the company.

But will you also look for -- for evidence in that investigation that, in fact, people knew that this was a problem, but decided that the costs weren't worth it?

Are we -- are you also in search of that, to see if, in fact, there were individuals, or a culture in the

company created by a group of individuals that encouraged employees to make these sorts of cost benefit analysis based on economics and not on customer safety?

BARRA:

As I've said, that type of an analysis on a safety issue or a safety defect is not acceptable, it's not the way we're going to do business, and that is not he culture. We will make sure that that is not the culture we have going forward.

RUBIO:

But again, my question is, if in fact you discover, or will you look to see, if in fact there was a decision made by a group of individuals not to move forward on this because of its cost?

BARRA:

Yes.

RUBIO:

You want to know the answer to that question?

And that would be -- we will know the names of these people, and we will know the process by which they made that decision as well?

BARRA:

We will work on the process. In raising the names, I have to make sure that I stay consistent with employer laws that I have, but trust me, we acted swiftly when we had issues with individuals who are no longer with the company in the past.

RUBIO:

Yeah, and I would follow up by talking to your council and ours as well, but I'm not sure there are any laws that allow companies to shield an individual who made, at that point, what appears to be a criminal decision not to move forward on a safety item, and because of some sort of internal economic consideration.

BARRA:

I guess we need to complete the investigation and have the facts in front of us, and we will act not only from a company perspective, but if there is issues beyond that that have to be dealt with, we will deal with those.

RUBIO:

I have one last question and my time is up.

Will you fully cooperate with the Justice Department if they want to conduct a concurrent investigation alongside the internal one?

BARRA:

We will fully cooperate with the Justice Department.

RUBIO:

Thank you.

MCCASKILL:

Senator Johnson?

JOHNSON:

Thank you, Madam Chair.

Ms. Barra, like Senator Klobuchar, I met with the -- the stepfather and mother of Natasha Weigel, and that accident occurred in Wisconsin, so this hits pretty close to home.

Your background is electrical engineer, correct?

BARRA:

Correct.

JOHNSON:

And so, you've been with G.M. for 33 years. In that capacity, I would imagine General Motors has been a leader in terms of total quality management in their manufacturing back, in their manufacturing process.

BARRA:

We've improved over our quality dramatically over the last several years.

JOHNSON:

OK. I've got a manufacturing background myself. I ran a plant for 31 years.

In your engineering capacity, I would imagine you dealt with the quality management system in a pretty robust fashion, correct?

BARRA:

Correct. In the manufacturing arena, yes.

JOHNSON:

OK. I want to drill down a little bit in terms of where Chairman McCaskill and Senator Ayotte went on the change of that -- that part number. I've gone through a lot of quality audits, and of course the reason you have different numbers for different parts is for traceability, correct?

BARRA:

Correct. A number of reasons, but that being a key one.

JOHNSON:

A real key one. So, if there's a problem, there's a defect in the manufacturing process, you can trace back exactly where that happened.

So, that's not -- you call that not good engineer principle. That's really just a total violation of a total quality management system, correct?

BARRA:

Correct.

JOHNSON:

And again, total quality management has been a part of G.M. for how many decades?

BARRA:

I would say at least my career, and it's been improving along the way

JOHNSON:

And the engineering departments in particular are totally focused on -- on those TQM principles, correct?

BARRA:

Correct.

JOHNSON:

When you change a part, OK, there's going to be an awful lot of engineering that goes into changing that part, correct?

There are going to be subparts that go within a part...

BARRA:

It depends on the change in the part.

JOHNSON:

Let's say an ignition switch. How many, just -- you know, there are multiple parts to an ignition switch, correct?

BARRA:

Correct.

JOHNSON:

So when you redesign that, there are going to be different parts combined with that part.

BARRA:

And then the part number that General Motors uses as the subassembly comes to us would have a unique and individual part number.

JOHNSON:

So it'd be very difficult within a total quality management system to have multiple changes in part numbers combined in an assembled part and then not have that part number changed in a completely different part, correct?

BARRA:

I agree.

JOHNSON:

Almost impossible.

BARRA:

It's wrong.

JOHNSON:

Which means it wasn't just a mistake. Somebody had to proactively make sure that that part number did not change, correct?

BARRA:

That's why we're investigating to learn exactly why that happened.

JOHNSON:

But again, within a total quality management system, with everything that goes into changing a part, an assembled part, so there are going to be different part numbers combining into that part, there is almost -- there is really no conceivable way within a total quality managed system, with computers as they are today with types of controls you put in a total quality management system, that within that system, a new assembled part would not have a different part number.

BARRA:

I agree with you, and that's why I find it so disturbing.

JOHNSON:

So, basically the conclusion would be is that process, that procedure, that computer system was purposefully overridden.

BARRA:

That is why we are doing the investigation.

JOHNSON:

Well, again, that's the assumption we have to make, right?

Now, also within that traceability, part of a total quality management system, we should be able to quickly identify who or what departments were involved in that, correct?

BARRA:

And we are doing that.

JOHNSON:

OK. Now, again, I'm no attorney. I can't really speak to criminality. But, it's going to be pretty important to find out who was responsible for overriding the quality system to change that part.

BARRA:

I want to understand why those actions were taken.

JOHNSON:

And the only reason anybody would make sure in a total quality management system that a part number didn't change would be to hide the fact that part changed for some reason, correct?

BARRA:

And I would like the complete investigation to be completed before I start making assumptions.

JOHNSON:

OK. I have no further questions. Thank you.

MCCASKILL:

Senator Markey.

MARKEY:

Thank you, Madam Chair.

This is a Chevy Cobalt 2006 ignition switch. This is the same design that failed, shutting off vehicle airbags and killing innocent victims.

We now know that the difference between this switch and one that would have worked was the difference between life and death, and do you know the other difference? The other thing that we now know? That it would only cost two dollars to repair. Two dollars. And that's how little this ignition switch would have cost. And it was apparently two dollars too much for General Motors to act, despite a decade of warnings, accident reports, and deaths.

And while a number of investigations are ongoing to determine exactly how many times this evidence was covered up by G.M. or ignored by NHTSA, there is one clear conclusion that we can make, and that it is much more difficult to cover up evidence that is publicly available.

Ms. Barra, if I have a car accident and decide to report the details to NHTSA, NHTSA puts that information into a public consumer complaint database. But if I made the very same complaint to General Motors instead of to NHTSA, G.M. can deem all the details of my complaint to be confidential business information, and it does that every single time.

You told Senator Coats that you would have all of the information, that you would share anything and everything related to G.M.'s Cobalt situation.

My question to you is this: will you commit publicly to disclosing all documents, including accident reports, notices that a fatal accident could have been caused by a safety defect, and all details of consumer complaints G.M. receives about all of its vehicles, going forward: Cobalt or any other vehicle?

BARRA:

I understand there's different things being looked at to see what we should be reporting to NHTSA, and we will actively support looking at what we think would be useful to help, you know, speed the process of understanding a defect or understanding why something happened. We will work cooperatively, and I understand there's legislation underway, and we'd be happy to review and put -- provide input.

MARKEY:

All right. So, let's reach the legislation, because it's clear that if you're not going to commit to doing it voluntarily, that we need legislation that mandates it. The families are here. The victims are here. They want to be vindicated, themselves, but they don't want other families to ever suffer what they have suffered.

So, Senator Blumenthal and I have introduced legislation, an early warning reporting system.

Let me ask you this. Our bill would require automakers to submit the documents that first alerts them to fatal accidents involving their vehicles to the Searchable Early Warning Reporting System. Would you support that legislation?

BARRA:

That legislation is being reviewed by our team. We're providing input. We need to review the entire legislation.

MARKEY:

Number two, it would require the Transportation Department to publish materials it receives about safety incidents that it currently keeps secret. Could you support that for families across America?

BARRA:

Senator, as this bill is put forward, we'd like to review it in its entirety and provide input, and then we will comply with whatever legislation is passed, and we will work proactively with NHTSA to try and make sure the most helpful information is brought forward.

MARKEY:

Number three, it would require the Transportation Department to upgrade its databases to give consumers the tools they need to protect the members of their family. Can you support that?

BARRA:

The answer, again, we will look at -- I'd like to look at the legislation in its entirety and provide -- provide input, and work with NHTSA to make sure the appropriate information that will be most helpful is what's made available.

MARKEY:

Fourth, it would require the Transportation Department to use the information it has to better identify fatal defects before they claim more innocent lives. Can you support that legislation for every auto company in America?

BARRA:

Again, I would like to look at the legislation in its entirety, look at what makes the most sense working with NHTSA, to make sure the most valuable information is put forward.

MARKEY:

I am very troubled that you are not willing to commit to ending this culture of secrecy at General Motors.

BARRA:

I didn't say that.

MARKEY:

Yes you have, OK. And I know this, OK. Because I have tried, year after year, for more than 10 years to have legislation passed that would require the disclosure of all of this information, and it was the automobile industry that killed my legislation year after year.

And this is the moment now, for you to say more than that you're sorry, but that you're going to commit that families get the information to make sure that it never affects any other family in America again.

And you should be in position right now, Ms. Barra, I am telling you this, to say: "We will disclose this information; we will make it available." You've had more than two months now to make this decision. You've had more than two months to think about what went wrong. You've had more than two months to think about why you worked to kill legislation as a corporation for years that provided a consumer database for that individual families knew that their families could be harmed.

And yet you will do not have an answer. You still do not understand what the American public wants. They need the information to protect their families. And it is important for everyone to know that General Motors is still not giving us the "yes" the American people want to that question.

MCCASKILL:

Ms. Barra, how many lawsuits relating to the defect both pending and closed, as well as settlements, has G.M. been a defendant or a codefendant?

BARRA:

I don't have that information. I can provide it to the committee.

MCCASKILL:

I'm assuming you've had some briefings from your counsel about your exposure on this defect?

BARRA:

We have not talked about exposure. We're -- we have -- it's very important once we realized the situation, we immediately hired Anton Valukas. We don't want to have multiple investigations. We thought it was most important to have...

(CROSSTALK)

MCCASKILL:

I'm not asking about investigations. I'm saying as the CEO of General Motors, you have not had a briefing by your general counsels about the litigation that is ongoing against your company concerning this defect. You've not had that conversation?

BARRA:

I've been focused on getting the parts for customers.

MCCASKILL:

We would like to know how many cases have been filed. We would like to know how many cases have been completed. We would like to know how many are settled. And most importantly, how many of those required confidentiality? How much whack-a-mole has been going on in terms of trying to deal with these lawsuits on a one-off basis, and leveraging what a lawyer wants to do for their client with the requirement of secrecy?

Has Mr. DeGiorgio been fired?

BARRA:

The investigation has only been going on for a couple of weeks. We have already made process steps. As I return to the office, we will start to look at the people implications.

MCCASKILL:

So he has not been fired?

BARRA:

No, he has not.

MCCASKILL:

OK. Is he still working there every day?

BARRA:

Yes.

MCCASKILL:

OK. And you know that he lied under oath.

BARRA:

The data that's been put in front of me indicates that, but I'm waiting for the full investigation. I want to be fair.

MCCASKILL:

OK. Well, let me help you here. He said several times he had no idea these changes had been made. Here is a document that he signed under his name, Mr. Ray DeGiorgio, he signed it on April 26th, 2006 approving of the change.

Now, it is hard for me to imagine you would want him anywhere near engineering anything at General Motors under these circumstances. And I -- I for the life of me, can't understand why he still has his job. And I think it is -- I know you want to be methodical. I know you want to be thorough. I know you want to get this right. But I think it sends exactly the wrong message that somebody who perjures repeatedly under oath -- he wasn't just asked the question once. He was asked the question over and over again.

Now, here's a really important question. This document, which is completely relevant to any lawsuit that is filed against G.M. around these crashes, would have been included in any document request from any lawyer representing a family. This document was not given to Mr. Cooper. This document was withheld from the lawyer representing the family of Brooke Melton. He didn't even find out about this document until after his case had been settled.

How do you justify withholding a key piece of documentary evidence in a litigation concerning a part that was changed without a part number change, as it is spelled out in this document for anyone to read? How does that happen?

BARRA:

I cannot -- I don't condone not providing information when requested in a legal proceeding. And if that was done, we will deal with the individuals accountable for that.

MCCASKILL:

Well, I think it's very important that we find out how many cases this document was provided to counsel in when it was requested. It's clearly within the scope. I guarantee you, there is not a request for documents being made of G.M. around these cases that the scope of the request did not include this document.

And I want to know how many cases they buried this document. Because this is what happens in America. Corporations think they can get away with hiding documents from litigants and that there will be no consequences. And I want to make sure there's consequences for hiding documents because this is hiding the truth from families that need to know. And it's outrageous and it needs to stop.

Last week -- last month, the Department of Justice announced a $1.2 billion settlement in a criminal case against Toyota. It resulted in a massive recall -- unintended acceleration. We talked about it in these hearings. What is particularly relevant to you, and I want to put this on the record, is the facts around the redesign of a part in that criminal case.

And I'm going to quote from the facts of that settlement. Toyota redesigned a part using, quote, "a designation that entailed no part number change," end of quote. Department of Justice said that Toyota engineers did this explicitly to, quote, "prevent their detection from NHTSA."

And I know this has gone over with you time and time again, but I wanted to make sure we got that in the record, that we have had it occur with another car manufacturer.

Finally, I want to talk just for a minute about the nature of the defect. I'm confused about this. When I was going through all the documents preparing for this hearing, in his testimony Acting Administrator Friedman says that G.M.'s own technical specifications for the Cobalt call for the airbags to contain an independent power source that is armed and ready to fire for up to 60 seconds after the vehicle's power is cut off. That's in G.M.'s specifications to NHTSA.

Is that an accurate description of the technical specifications?

BARRA:

I don't know. I -- we'd have to go back and review that and I can provide that information.

MCCASKILL:

Because there seems to be a problem here, because if the specifications say that airbag deploys when power is off, and we know these airbags are not deploying when power is off, then we've got a much bigger problem. That means we could have airbags across the entire automobile industry that do not have the appropriate sensors in there that allow for the deployment even when the power has gone off during some kind of collision or, in this case, because of a defective part.

That would be information we would also like you to follow up on.

Finally, two things for the record. Will you commit to coming back in front of this committee when you can answer the questions?

BARRA:

Yes.

MCCASKILL:

And secondly, all the information you're providing to NHTSA on Friday, would you be so kind as to provide a copy of all of that information to this committee?

BARRA:

Yes.

MCCASKILL:

Thank you.

Senator Heller?

HELLER:

Thank you, Chairman.

You've answered most of the questions with the response that there's an ongoing investigation and you want to see the results of that. Do you have a target date for when that review will be complete?

BARRA:

I hope to have that done within 45 to 60 days.

HELLER:

Forty-five to 60 days. I think that's important (inaudible).

BARRA:

And I've asked Mr. Valukas to go as quickly as he possibly can, but not sacrifice accuracy for speed.

HELLER:

What opportunities will we have to review that?

BARRA:

As I said before, any information related to safety, anything related to this incident, anything we think would help, you know, from a NHTSA broader, we will provide it; anything related. The only thing we won't is issues of competitiveness or if there's privacy issues we have to comply.

HELLER:

How broad will this review be?

BARRA:

I have asked Mr. Valukas to -- there is no boundaries and there are no sacred cows. I want to make sure we have a complete understanding, because only with a complete understanding can we make all the

changes we need to make from both a people and a process perspective.

HELLER:

Is Delphi a vendor or a subsidiary?

BARRA:

Delphi is a supplier, not a subsidiary.

HELLER:

OK. OK. Will this overview include looking at Delphi and their participation in this?

BARRA:

To the extent that Mr. Valukas goes in that -- that direction and we get information from them, yes.

HELLER:

I think it would make some sense to talk to people at Delphi and find out, in their words, and perhaps bring them to this committee to find out what their understanding, make -- to determine, you know, their involvement in this particular case.

Can you -- can you tell us whether or not this is a one-time occurrence?

BARRA:

This is -- as I look at it, I see it as a very extraordinary situation. There have been many, many cases where we've been quick to act from a safety recall process. And as I mentioned before, often we are known to do more recalls of smaller population because we want to get to issues as quickly as we can.

HELLER:

So you have no recall of whether or not a similar situation has occurred in the past where a part -- two different parts had the same part number?

BARRA:

I'm not aware of that. That is bad engineering.

HELLER:

Do you think it was an oversight on Delphi?

BARRA:

I -- I don't know. And that's what I hope to learn with the investigation. I want to understand all the parties involved and if they -- what they did, what was wrong, what was no following process, et cetera.

HELLER:

What would you consider this -- the financial stability of G.M. in 2005, 2006, and 2007, just before the taxpayers bailed them out?

BARRA:

Poor.

HELLER:

What would you have been -- what do you think would have been the damage done to the public image if the company initiated recall of these cars in 2005?

BARRA:

I can't -- I can't, you know, guess what that would have been. Obviously, it would have been less than it is now and it would have been much better to have this issue resolved because it clearly took too long.

HELLER:

Do you think G.M. would have survived if they had recalled cars in 2005?

BARRA:

I can't guess.

HELLER:

Do you think the company took that into consideration?

BARRA:

I did not take that into consideration and know of no one who did.

HELLER:

That perhaps G.M. would have gone under had they initiated a recall in 2005?

BARRA:

I -- I don't know.

HELLER:

All right.

Thank you, Chairman.

MCCASKILL:

Senator Boxer?

BOXER:

Ms. Barra, I really hate to say this, but if this is the new G.M. leadership, it's pretty lacking and maybe this round you can change my mind. I'll give you another chance to.

But leadership means stepping out with a fresh start, and I don't see it. For example, you had Mr. Blumenthal, Senator Blumenthal show you the recall notice and you still won't say that everybody who has these cars should get rid of it. Even though the recall notice says if you're key chain is heavy or you go over rough roads -- have you seen this winter? In Vermont, they had 94 occasions of snow. You know what that does to the infrastructure? Look, you should have said, "You're right."

Then Mr. Markey, Senator Markey, a great leader on this, says, "Will you support just making transparent the reports to the company that there's a problem with the car or put it out there?" Oh no. You can't -- you can't answer that either.

So, then, my question, in March '05, your G.M. people said it cost too much to fix these cars. The code words, quote, "none of the solutions represents an acceptable business case." Now, that was a public document. It's -- you -- G.M. gave that document over. Oh, you can't even talk to that. You don't know anything about anything.

And Madam Chairman, who's not here, I'm going to ask unanimous consent to place in the record more pictures of Mary Theresa Ruddy's (sic) car. And -- and -- and what kind of a death follows that kind of a crash. You could see from there. So, without objection, I'll put that in.

Now, it's my understanding, you are recalling many of your cars now. Not all of them. You're giving some -- but if people want to, they can say, please pay for a loaner, is that correct?

BARRA:

That is correct.

BOXER:

Well, that is the right thing to do. But, are you -- do you support a law that would say recall cars like yours can no longer be rented or loaned? Do you support a law like that?

BARRA:

If there is a safety issue on the vehicle, and we made sure on these vehicles, that all that their...

BOXER:

No, no. Do you support a proposed law by Senator McCaskill and myself that would say recall cars like yours can no longer be rented or loaned? We have a law. Do you support that law, that proposal, that bill?

BARRA:

I'd like to read the whole bill before I said if I'd support it or not.

BOXER:

You'd like to read it? You haven't read it?

BARRA:

No, I have not.

BOXER:

Well, it's been out a long time. Are you aware that recall cars can be rented or loaned? Are you aware of that?

BARRA:

I know.

BOXER:

So you can send your owner of one of these cars to a rental place or get a loaner and they could lease and they could get a defective car. Are you aware of that, that there is no law that says?

BARRA:

I know, because I've checked for the vehicles here, that they are grounded.

BOXER:

Say that again?

BARRA:

For this specific issue, one of the first things we did is made sure that...

BOXER:

I'm not asking about that. I'm asking you, do you support a law that Senator McCaskill and I and Schumer and others have proposed that would say, if a car is recalled, it cannot be leased or loaned?

BARRA:

My understand is the rental community is voluntary complying with that.

BOXER:

Do you support a law, yes or no?

BARRA:

Conceptually it makes sense. I would like to understand it entirely.

BOXER:

Well, conceptually is not the question.

Do you support the bill?

BARRA:

I haven't read it.

BOXER:

Well, you should since you were the CEO of G.M. when we got an e-mail from your organization that you're a part of, the -- the auto -- the Manufacturer's Alliance opposing the bill.

So, you already were CEO. This is the new G.M.. And you oppose the law.

Now, you should know that my constituent, Callie Houck lost her two daughters, Rachel, 24, and Jackie, 20, in a tragic accident caused by an unrepaired safety defect in a rental car they were driving.

So, Senator Schumer, and McCaskill, we wrote the Rachel and Jacqueline Houck Safe Rental Car Act, and you know what? The rental car people support it, but you don't. The automobile manufacturers don't.

So, you are essentially bragging today, if I may use a word, that you're telling your people, "Oh go get another car," but at the same time, your lobbying organization is opposing a bill that would make sure that no one, no one would die the way they died.

So, I would say, Madam Chairman, I am so grateful to you and Senator Heller for this hearing. These issues run deep, and we have work to do. And I am very disappointed, really, as a woman to woman, I am very disappointed, because the culture that you are representing here today is a culture of the status quo.

Thank you.

MCCASKILL:

Senator Klobuchar.

KLOBUCHAR:

Thank you, Madam Chairman.

I just have a few specific follow up questions, Ms. Barra.

In your testimony, you mentioned the steps G.M. has taken in terms of this recall, and because the recall focuses on model year vehicles built way back from 2003 to 2007, I wonder how many of these vehicles are now on their second or third owners, and if this is creating challenges to reach these owners, and if there's anything more that can be done.

BARRA:

One of the things we would very much support is some type of database, I don't know the right agency to manage it, where we would have the latest donors attached to the VINs. What we do when we have this issue, because we want to get second, third, however many owners there are, is we go to Polk, where registration data is kept, and that's how we get the latest information. But if there was something that allowed that, you know, there was a master database as such that you always knew what VIN and who was the registered owner, that would be incredibly helpful.

KLOBUCHAR:

OK. And this would be something from the Department of Transportation?

BARRA:

Or NHTSA. I'm not sure which agency would do that, but that would be something I think would be very beneficial.

KLOBUCHAR:

OK. Well, we should approach them about that with the next questions.

Ms. Barra, G.M. received, I think some of my colleagues have gone over this, but consumer complaints related to the faulty switch for years, evidence back to 2011. Internally, what we've learned is the company conducted reviews, issued service bulletins to dealers, on how to advise customers on the problem, and even approved redesign to the ignition switches. But none of this was ever made public, and as we know, we didn't get this formal investigation by 2011.

Was it that G.M. management felt that they could handle this internally and make these changes? I'm just trying to understand the reasoning. And I know you're doing this investigation, but...

BARRA:

I'm trying to understand it as well, because it took way too long. I understand if it had been handled more quickly, there -- if -- once there's a safety issue, it should never have a business case that goes against it in making any part of decision-making. And we go forward now, there isn't any.

So, I am as disturbed as you, I want to understand, and I commit to you I will make change, both people and process.

KLOBUCHAR:

OK.

Delphi Automotive, the company that produced the ignition switches that are linked to this defect, has informed congressional investigator that G.M. approved the original part in 2002 even though it didn't meet G.M.'s specification for torque performance. Do you think it met those specifications?

BARRA:

I understand there's documentation that exists that says it doesn't, and that's what I have to understand: why that happened.

KLOBUCHAR:

OK.

And then last, in your testimony, you mentioned you have named a new vice president for global vehicle safety. I think that sounds like a pretty good idea right now, but I was surprised there wasn't already a person high up in the company dedicated solely to safety.

Will the person in the position be involved with key decisions related to safety that are made by upper management?

BARRA:

This person will have free reign and have input, have a team, and access to all information across. We're going to be investing in more resources for this individual so they can use the right data analytic tools to sometimes put the pieces together more quickly.

He will sit on our head of vehicle development for the entire globe, his staff, and he will meet with me on a monthly basis, and meet with our board on a quarterly basis.

KLOBUCHAR:

And how are you going to measure if it's working or not, what success is in that position?

BARRA:

Again, I'll look to make sure how quickly, when we learn of an issue, how quickly we understand it and implement change, and do the -- you know, work with NHTSA and take the necessary steps all the way up to and including a safety recall.

KLOBUCHAR:

And do other automobile companies have a person in place like this, a position like this?

BARRA:

I haven't -- I haven't done a read across of other OEMs to look at that.

KLOBUCHAR:

OK.

Well, I'm going to put the letter on the record from our constituent who perished in the car crash, named Natasha Weigel, and I think just as many of these other Senators, my thoughts and prayers are with her family as they pursue justice, and all the families behind you, and obviously there's a lot more work to do.

So, thank you for appearing today.

MCCASKILL:

Senator Blumenthal.

BLUMENTHAL:

Thank you, Madam Chairman, and thank you for committing to continue these hearings.

Ms. Barra, we were talking about the recall notice, and I was pointing out that you've said there's no risk as long as people don't add keys to the ignition key, is that correct?

BARRA:

I said that there's been extensive engineering analysis and testing done that demonstrates that the weight of the key or the key and just the ring...

BLUMENTHAL:

Who has done the analysis?

BARRA:

General Motors engineers.

BLUMENTHAL:

Would you commit to making them available to us?

BARRA:

Yes.

BLUMENTHAL:

Would you commit to providing documents that support that analysis? Any documents in connection with that analysis?

BARRA:

Yes.

BLUMENTHAL:

Thank you.

Now, are you saying the recall notice is wrong? Because the recall notice says risk increases with rough roads or jarring events.

BARRA:

I think it was trying to capture the (inaudible)...

BLUMENTHAL:

Well, do you agree or disagree? I apologize again for interrupting.

BARRA:

It's OK.

BLUMENTHAL:

Are you saying that the recall notice is wrong?

BARRA:

No.

BLUMENTHAL:

So, that people should not drive on rough roads or with jarring events using one of the recalled, unrepaired automobiles?

BARRA:

I think the notice was trying to be descriptive of -- of the situation where it's most likely to occur, but again, the testing is related to the key.

BLUMENTHAL:

What would it take to change your view that people should not be driving these unrepaired, recalled cars? If I came to you with 100 events of people finding that they lose power and control of their cars, would that persuade you?

BARRA:

It wouldn't take 100 events.

BLUMENTHAL:

It would take 10?

BARRA:

It would take -- I mean, my understanding is with the key or the key in the ring, the incident -- this phenomenon which caused these issues will not occur. If it was anything more than that...

BLUMENTHAL:

If I came to you with those events, and there are those events, would that persuade you?

BARRA:

I'm not aware of any events where there's just the key or the key ring where that occurred.

BLUMENTHAL:

If I came to you...

BARRA:

Yes it would.

BLUMENTHAL:

If I came to you with the death of a young woman who went to school not far from here who was driving one of these cars unrepaired and was killed, when her airbag was disabled, because of this defect, would it change your view?

BARRA:

Senator Blumenthal, my response is in to -- if there's just the key or the key and the ring, that's the analysis we've done to indicate that these vehicles are safe to drive.

BLUMENTHAL:

I know that you've done that analysis, but would it change your view on whether you would recommend to your customers that this car is fine to drive, no risk, as long as you don't add keys to the ignition?

BARRA:

I guess I'm not clear on what you're asking me.

BLUMENTHAL:

I'm asking whether that additional information -- you're an engineer. You make decisions based on...

BARRA:

What additional information are you providing?

BLUMENTHAL:

About deaths? Or loss of power and control over cars, those kinds of events in cars that have this defect and encounter rough roads or jarring events?

BARRA:

Senator, if I had any data, any incidence where with just the key or the key in the ring there was any risk I would not have -- I would ground these vehicles across the country.

BLUMENTHAL:

Have you ever been in a car that's lost control over power, steering, brakes?

BARRA:

I've been in a vehicle that's lost power steering and power brakes.

BLUMENTHAL:

Driving privately, not in a test vehicle?

BARRA:

I was driving on public roads. So it wasn't a test vehicle. It was a motor -- a safe vehicle to be on the road.

BLUMENTHAL:

Pretty frightening.

BARRA:

It's -- it can be startling.

BLUMENTHAL:

And have you spoken to the families?

BARRA:

I did speak to the families on Monday night.

BLUMENTHAL:

And you've mentioned G.M. civic responsibility. Don't you believe it has a moral responsibility here to advise more strongly about these potential risks?

BARRA:

We are going on a multi-dimension communications, letters to people, we're monitoring social media, we have a dedicated website. We are working multiple channels to make sure we communicate with the individuals that would own these vehicles or drive these vehicles.

BLUMENTHAL:

Well, let me just say, because my time has expired, again first, my thanks for facing these questions. This G.M. is not the old G.M., it's not even the pre-2014 G.M.

What you're doing now is incurring both legal and moral responsibility for the actions that you're taking or failing to take. And I will tell you that the more I hear and see in these documents, the more I learn about what happened before the reorganization, and in connection with the reorganization, the more convinced I am that G.M. has a real exposure to criminal liability.

In fact, I think it's likely inappropriate (ph) that G.M. will face prosecution based on this evidence. And I think the more that you can do as a leader of G.M. to come forward and to do the right thing now the better it will be for the future of the company.

So I hope to continue to work with you, and hope that you will review the legislation that's been offered, because going forward it can make a real difference.

Thank you, Madam Chair.

MCCASKILL:

Senator Ayotte?

AYOTTE:

Thank you, Madam Chair.

As I understand it, at this point, nobody within G.M. has been fired as a result of the issue that comes before us today on the ignition switch, and obviously this long pattern of having information and not providing disclosure and recall to the public.

Is that true, nobody yet has been fired?

BARRA:

I think it's important to do a complete investigation, but we will take the appropriate action. But, yes, that's true.

AYOTTE:

So, one thing you've hired Mr. Valukas to conduct this internal investigation and I assume G.M. is paying Mr. Valukas, correct?

BARRA:

Correct.

AYOTTE:

Now, I'm aware of his qualification and certainly that the's a very qualified individual, however, it seems to me -- how will you guarantee that basically all of the individuals who -- or maybe not all of them, maybe some of them are no longer with the company -- but I think we can guess that many of the individuals who were involved in the decision that lead us to where we are today are still at G.M. or potentially could be at G.M. And we already have the situation that the chair mentioned, with regard to the failure to disclose in the litigation documentation that was directly relevant to the litigation that showed the -- the change in terms of the part and the failure to create a new number for the change in the defective ignition switch.

And I guess -- I guess I'm -- I'm very concerned, how are you as CEO going to guarantee that no documents are withheld from not only Mr. Valukas, but also investigations that are being conducted by the government and how are you going to ensure that given that the people that Mr. Valukas is going to be focused on, I think, many of them are going to be being worried about their own future and liability,

whether it's civil or criminal liability, that you actually can get to the bottom of this with this internal investigation.

BARRA:

Again, Mr. Valukas, I think, is very experienced in doing this. He has several decades worth of experience and has the highest integrity. I certainly know he is not gonna compromise his reputation for General Motors.

And I have confidence based on the fact he's done investigations in the past and we've acted -- gotten to the truth by, you know, going to multiple -- multiple sources to get to the truth. And we will act on it. And we've demonstrated that we would up to and including discharging people.

AYOTTE:

And I have no doubt, as I've said, about Mr. Valukas' qualification.

will you -- have you already segregated all the documents and put them aside that are related to this issue, because -- and evidence that you're aware of now so that Mr. Valukas at least has that set aside, because, at the moment, you know, given the potential liability that we're facing it seems to me -- and you're potentially facing -- that this is a very important issue to ensure that no one can interfere with that at this point.

BARRA:

I agree with you. It's a very important investigation, and that's one of the reasons we only have one independent person doing that investigation. And there are I believe over 200 people who already have, you know, document litigation hold.

So we are doing everything that we can to make sure he has access to everything and anyone he wants.

AYOTTE:

So you have actually already set aside to ensure that -- that these documents are preserved and anyone that he needs access to he's able to have access to?

BARRA:

I would say we -- anyone he wants to have access to, he will have access to. When you use the term, set aside, again everybody has been placed that is remotely in connection on litigation hold so they cannot -- you know, the documents exist and -- and they're on notice that they cannot do anything with their documents.

AYOTTE:

Well, it seems to me that they may not be on notice that they can't do anything with their documents, but I would hope that you as CEO would be making sure it's not just you're telling that to people but you actually are ensuring that these documents can't be interfered with beforehand or (inaudible) this investigation.

And my -- my question to you would be, when this investigation is conducted -- I appreciate that you said you're willing to come back to the committee, and we thank you for that -- will you make Mr. Valukas available to this committee?

BARRA:

I think that would be Mr. Valukas' option, not my decision to make for him.

AYOTTE:

Well, you've hired him, and as far as I know, when you hire someone to conduct an investigation -- because I've done it before, as attorney general of our state -- one of the terms that I would want to work out up front is, will you be willing to present the results of your investigation and to whom would you be willing to present them to?

So you've not come to that agreement with him?

BARRA:

I would share the results of the investigation as I've already said I would share it with this committee, with Congress, with NHTSA and with our employees and customers.

AYOTTE:

Well, I guess, I think that if you're gonna have confidence -- and you've said multiple times in this hearing that -- that you're confident with Mr. Valukas. I don't question his credentials. He's got exemplary credentials. And it seems to me that we would want to hear -- obviously appreciate your testimony as the CEO and certainly want to hear what steps you're taking to address this issue -- but I -- I would think it would be important for this committee actually to hear directly from Mr. Valukas on the investigation itself and what the scope of his investigation was.

So thank you.

MCCASKILL:

Thank you, Ms. Barra.

I -- I know that as I go back and review this hearing, I will say to myself, you got too excited and you went too hard. But, the passion is real on this side of the table. So to the extent that this has been a rough day for you, it is coming from the right place. It is coming form a deep commitment that may of us have to these families and to automobile safety in this great country of ours.

You -- you had a great company. You've got an enormous responsibility to get this right. We appreciate you being here, and I can't promise that the next time you're here I will not get as aggressive as I have today, but I do think it's important that we point out the may problems that these facts presents to you and your company, and to the legacy of General Motors going forward.

This is an incredibly important moment in your corporate history, and you are -- you're in change, and you've gotta make some very tough decisions going forward. And we will be monitoring all those decisions, and we'll look forward to having you back here to testify when you can go into the details of the investigation.

And, I would ask, that you make sure that your investigator look at a pattern of legal council in your corporation. How are they cooperating with litigation, why are they requiring confidential settlements -- I think that is something that we need to understand, because it is in fact, because of those confidential settlements that many of these problems do not get the light of air like -- that they should, and I'm just glad

that in this instance, Mr. Cooper and his engineer, Mr. Hood did what they did, because they performed the valuable service to this country that should have been preformed by your company and by the federal regulators.

Thank you very much for being here.

CQ Transcriptions, April 2, 2014

---

## List of Panel Members and Witnesses
PANEL MEMBERS:

SEN. CLAIRE MCCASKILL, D-MO. CHAIRMAN

SEN. MARK PRYOR, D-ARK.

SEN. BARBARA BOXER, D-CALIF.

SEN. AMY KLOBUCHAR, D-MINN.

SEN. RICHARD BLUMENTHAL, D-CONN.

SEN. BRIAN SCHATZ, D-HAWAII

SEN. CORY BOOKER, D-N.J.

SEN. JAY ROCKEFELLER, D-W.VA. EX OFFICIO

SEN. DEAN HELLER, R-NEV. RANKING MEMBER

SEN. ROY BLUNT, R-MO.

SEN. KELLY AYOTTE, R-N.H.

SEN. DAN COATS, R-IND.

SEN. TED CRUZ, R-TEXAS

SEN. DEB FISCHER, R-NEB.

SEN. JOHN THUNE, R-S.D. EX OFFICIO

SEN. BILL NELSON, D-FLA.

SEN. EDWARD J. MARKEY, D-MASS.

SEN. RON JOHNSON, R-WIS.

WITNESSES:

MARY BARRA, CEO, GENERAL MOTORS COMPANY

Source: CQ Transcriptions

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

© 2014 CQ Roll Call All Rights Reserved.