# <u>EXHIBIT 50</u>

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
April 2, 2014 - Final

# Senate Commerce, Science and Transportation Subcommittee on Consumer Protection, Product Safety and Insurance Holds Hearing on the General Motors Ignition Switch Recall, Panel 2

**LIST OF PANEL MEMBERS AND WITNESSES**

MCCASKILL:

I want to thank Mr. Friedman, who is the acting administrator of the National Highway Traffic Safety Administration, and Mr. Calvin Scovel, inspector general of U.S. Department of Transportation. I want to thank you both for being here today. We look forward to your testimony.

And we'll begin with you, Mr. Friedman.

FRIEDMAN:

Thank you, Chairman.

Chairman McCaskill, Ranking Member Heller, members of the committee, thank you for the opportunity to appear before you today.

To begin, I would like to say that on behalf of everyone at NHTSA, we are deeply saddened by the lives lost in crashes involving the General Motors' ignition switch defect.

The victims' families and friends, several of whom I know were at the hearing yesterday, and some who may be here today, have suffered greatly. And I am deeply sorry for their loss.

Safety is NHTSA's top priority, and our employees go to work every day trying to prevent tragedies like these. Our work, reducing dangerous behaviors behind the wheel, improving the safety of vehicles and addressing safety defects, has helped reduce highway fatalities to historic lows not seen since 1950.

In the case of the recently recalled General Motors vehicles, we are first focused on safety and ensuring that General Motors identifies all vehicles with a defective ignition switch, fixes these vehicles quickly, and is doing all it can to inform consumers about how to keep themselves safe.

We are also investigating whether General Motors met its responsibilities to report and address this defect as required under federal law.

If it failed to do so, we will hold General Motors accountable, as we have in other cases over the last five years, which have led to record fines on auto makers.

Internally at NHTSA and the department, we have already begun a review of our actions and assumptions in this case, to further our ability to address potential defects.

Today, I will share what I've learned so far.

In this case, NHTSA used consumer complaints and early warning data, three special crash investigations on the Cobalt, industry Web sites and agency expertise on air bag technology.

Some of that information did raise concerns about air bag nondeployments in these vehicles. So in 2007, we convened an expert panel to review that information.

Our consumer complaint data on injury crashes with air bag nondeployments showed that neither the Cobalt nor the Ion stood out when compared to similar vehicles.

The two SCI (ph) crash reports we reviewed at the time were inconclusive on the cause of nondeployment.

The reports noted that the air bags did not deploy, and the power mode was in accessory mode, but these crashes involved unbelted occupants and off-road conditions that began with relatively small collisions where, by design, air bags are less likely to deploy, in order to avoid doing more harm than good.

Further, power loss is not uncommon in crashes where air bags deploy, and did not stand out as a reason for nondeployment.

In light of these factors, NHTSA did not open an investigation.

We continued monitoring the data, however, and in 2010 found that the related consumer complaint rate for the Cobalt had decreased by nearly half since the 2007 review.

Based on our engineering expertise and our processes, the data available to NHTSA at the time was not sufficient to warrant opening a formal investigation.

So the question we're all asking is, what does this all mean?

From my perspective, it means that NHTSA was concerned and engaged on this issue. This was a difficult case, where we used tools and expertise that over the last decade have successfully resulted in 1,299 recalls, including 35 recalls on air bag nondeployments alone.

Those tools and expertise have served us well. And we will continue to rely on them, but also to improve them.

For example, we have already invested in advanced computer tools to improve our ability to spot defects and trends, and are planning to expand that effort.

But what we know -- what we now know also clearly means that we need to challenge our assumptions and look at how we handle difficult cases like this going forward.

So we are looking to better understand how manufacturers deal with vehicle power loss and air bags, especially when the ignition switch is turned.

We are also considering ways to improve the use of crash investigations in identifying defects. We are reviewing ways to address what appear to be remote defect possibilities and evaluating our approach to engaging manufacturers in all stages of our defects process.

Between these efforts and those of the department's inspector general, I know that we will continue to improve our ability to identify vehicle defects and ensure they are fixed.

But now, I want to close on one important note: Our ability to find defects also requires auto makers to act in good faith and provide information on time.

General Motors has now provided new information definitively linking air bag nondeployment to faulty ignition switches, identifying a part change, and indicating potentially critical supplier conversations on air bags.

Had this information been available earlier, it would have likely changed NHTSA's approach to this issue.

The reality, however, is both NHTSA and the auto industry as a whole must look to improve.

Madam Chairman, Ranking Member, members of the committee, I greatly appreciate the opportunity to testify before you today. Thank you.

MCCASKILL:

Thank you, Mr. Friedman.

Mr. Scovel?

SCOVEL:

Chairman McCaskill, Ranking Member Heller, members of the subcommittee, thank you for inviting me to testify at this important hearing on vehicle safety.

Since 2002, our office has identified opportunities for NHTSA to improve its efforts to address safety defects. Today, I will focus on NHTSA's action to address major weaknesses we reported in 2011. I will also discuss how our work can help lead to strong actions against auto makers that choose to withhold critical safety data from NHTSA.

In 2011, we reported the NHTSA's Office of Defects Investigation needed improvement in four key areas. The first area concerns one of ODI's most critical functions, to determine when to investigate allegations of safety defects.

ODI did not adequately track its disposition of consumer complaints or document decisions about whether to investigate, leaving its decisions open to interpretation and subject to questions after the fact.

NHTSA completed actions to complete the three recommendations we made to improve ODI's process for recommending investigations, including modifying its central database for safety defect information to track its reviews of consumer complaints.

We identified similar process weaknesses in ODI's documentation of open investigations. Some investigation files did not include sufficient information on meetings with manufacturers, consumer complaint identification numbers, or a determination of testing needs.

In one investigation ODI did not sufficiently document the basis for its decision to close the case.

Consistent with our recommendation to strengthen controls, NHTSA developed a standard checklist for documenting the evidence investigators collect.

ODI also lacked a systematic process for determining when to use third-party assistance to test for potential mechanical or electronic defects and to validate information manufacturers provide.

In response to our recommendation, NHTSA established a framework for determining when third-party assistance should be used.

Finally, NHTSA lacked processes for ensuring an adequate and well-trained investigative workforce.

In response to our recommendations, NHTSA developed a formal training program to help ensure its investigators stayed current on technology advancements in the automotive industry and plans to complete, by the end of May, a workforce assessment to determine the number and most effective mix of staff needed to achieve ODI's objectives.

We believe NHTSA's enhanced processes will put the agency in a better position to identify and investigate vehicle safety defects.

However, the success of these process improvements will depend on how effectively ODI uses and applies them, when conducting its analyses and investigations.

At the secretary's request, we will initiate an audit, building on our previous reviews of NHTSA's efforts to identify and investigate vehicle safety defects.

Despite the department's best efforts to improve its safety defect analyses and investigations, vehicle safety will remain a concern, if auto makers conceal vital information.

The Toyota case perfectly demonstrates the risk involved when auto makers withhold critical safety data and fail to report defects to NHTSA. Our investigators participated in the multi-agency criminal probe of Toyota, reviewing approximately 400,000 documents and interviewing more than 100 individuals.

Last month, Toyota forfeited $1.2 billion for intentionally concealing information on vehicle defects from NHTSA. This penalty, the largest of its kind, sends a clear message to auto manufacturers: Safety is and will remain DOT's and OIG's highest priority.

To this end, we expect the industry to be vigilant and forthcoming to keep the public safe. We will continue to assess NHTSA's efforts to identify and investigation vehicle safety defects, and stand ready to investigation allegations of wrongdoing by auto manufacturers.

Finally, Chairman McCaskill, with your permission, I would like to offer these words to the families and friends of those who have been lost in crashes involving G.M.'s defective ignition switches: I offer you my deepest sympathy. My staff and the Office of Inspector General, and I, are resolved to determine what NHTSA knew of this safety defect, when it knew it, and what actions NHTSA took to address it.

We will also examine NHTSA's current safety defect investigation processes and make recommendations for improvement. The secretary has asked us for this, the Congress expects this of us, and you, the family and friends and victims, deserve this of us.

I give you my word we will do our duty.

This concludes my prepared statement. I will be happy to answer any questions you or other members of the subcommittee may have.

MCCASKILL:

Thank you very much, Mr. Scovel.

I know that there was a $1.2 billion settlement in conjunction with the criminal investigation. Actually, technically, it was a wire fraud charge that the forfeiture occurred around.

But, the failure to give information to NHTSA or to lying to NHTSA, that is capped at $35 million. So, if you don't have a situation that the facts lend themselves to a criminal prosecution, but rather, it's a withholding of information which, by the way, could be a negligent withholding of information, it wouldn't have to be an intentional withholding of information. Is $35 million enough? I mean, is that really a deterrent to -- to companies like General Motors or Toyota or Chrysler or any of the companies that are -- are supposed to be getting this data?

FRIEDMAN:

Senator, when we find evidence that automakers have not acted in a timely manner, we will fine them to the maximum extent allowed by law. In the last Congress, we did support increasing that fine to $300 million.

MCCASKILL:

And do you believe that's necessary too, Mr. Scovel?

SCOVEL:

Senator McCaskill, I believe that's a policy consideration for the -- for the administration and for the Congress. In considering the purposes behind such -- such penalties, whether it be those that can be similarly related to the basis for sentencing and criminal proceedings, retribution, prevention, deterrence, rehabilitation, certainly deterrence is one factor that -- that the Congress and the department ought to consider in deciding whether to raise the penalty from $35 million to any figure above that.

Whether it's a question of is $35 million regarded by some automakers as simply a cost of doing business, that can certainly be a conclusion that some may draw from it.

There may well be information that an inspector general or the Government Accountability Office may be able to derive through an audit process to help the Congress and the department make that determination.

MCCASKILL:

I know you mentioned the workforce assessment that's ongoing. I think I was struck when I was going through the materials for this hearing, because I asked the question about your budget, Mr. Friedman: especially for defect investigations.

Your budget has been at $10 million for defect investigations for a decade. Now, this is a decade that has seen major changes in automobile manufacturing. It has seen a much more complicated engineering scenario, where we have interdependence of computers. You know, it is -- it is -- the complexity has gone up exponentially over the last decade.

Do you believe that $10 million is an adequate to spend in this country for defects investigation for the entire automobile industry?

FRIEDMAN:

Senator, the president has requested an increase in our budget across NHTSA in order to better increase our abilities to address the wide variety of challenges we face.

In 2012 alone, 33,561 lives were lost on our highways due to a variety of factors, whether it was impaired driving, not wearing seatbelts, safety technology that hadn't yet been brought into the fleet, as well as a smaller portion of that associated with defects.

We have been asking to increase our budget, because each one of those lives lost is a tragedy...

MCCASKILL:

But it was in your budget, Mr. Friedman. You're not asking for an increase in the defects investigation. I mean, it -- it it the budget that's been submitted doesn't show an increase.

FRIEDMAN:

I believe...

MCCASKILL:

The money is going other places in your agency.

FRIEDMAN:

I believe we have asked for some -- some increases in resources. Certainly, some increases in staff. And part of what we have been doing is investing, using our resources to invest in technology to make our efforts significantly more efficient.

One of the things that we have done is invest in a new computer tool that's derived from IBM's Watson technology to -- in order to enhance our ability to find patterns, to quickly get to those patterns, to connect information, and we do have plans to continue expanding that effort.

We need to put more tools in place to be able to sift through the data that we have so that we can find these patterns or examples of defects and get them fixed.

MCCASKILL:

In 2007, you considered opening an investigation into airbag non-deployment, as you mentioned in your testimony. You chose not to.

Was that -- was the basis of that decision recorded anywhere?

FRIEDMAN:

I don't believe we have complete records of that. This goes back to one of the findings in the inspector

general's report.

MCCASKILL:

Right.

FRIEDMAN:

Frankly, it is something that is -- is currently hamstringing our ability to fully pull together all of what happened, however, I do have staff actively working on making sure we understand what happened.

But that is something that has changed, and it is something that we will have going forward. Already have, and will continue to have going forward. That hopefully, a case like this will not happen again, but if it does, we will have better resources to be able to understand exactly what happened.

MCCASKILL:

Well, I think we need to have the resources and the expertise at NHTSA to find these defects and then obviously, we've got to have the transparency of the process that is available to the public, and available to anyone who wants to see it. And part of the complaints I hear about NHTSA is that it's very difficult sometimes to get information out of NHTSA by safety advocates that are trying to do their work in the public arena in terms of safety.

And, I think we'll continue to follow up on that.

Senator Heller?

HELLER:

Thank you Madam Chairwoman.

Thanks for this hearing and thanks for those that are testifying for being here today.

Mr. Friedman, I have to admit that I'm a little frustrated with your administration. We -- I had sent a letter and in anticipation of getting the results to questions prior to this hearing, and I think I was assured that it would come before today, last night in particular, and of course, that didn't happen.

So, with the chairman's permission, I will submit the questions and the letter to the record. If there's no objections.

And I believe I have no other alternative but to ask you the questions here and now, if I can't get it in writing.

So, first question I have, did G.M. report all consumer complaints related to the stalling incidents and airbag failures that it considered in the recall to NHTSA?

FRIEDMAN:

Senator, first, if I may apologize, I'm sorry, we're not able to get you the answers to your questions. I know the same is the case with several other members. Our focus on making sure that you're addressing the

safety issues and responding to the committee has taken up a significant amount of our time, but I will get you a letter -- a response to your letter this week.

But in -- in terms of your question, General Motors reports to us the counts of complaints, but they do not provide to us the -- the detailed complaints themselves.

HELLER:

So, what actions do you take based on that information?

FRIEDMAN:

Well, we use that information, the number of their complaints, along with a wide variety of other pieces of information, both that they provide, and that we gather ourselves, through our complaint database, through our special crash investigations, through industry websites and other resources. We look at that data.

We have an early warning division that is focused exclusively on looking at the early warning data, which would include complaint numbers and other data, and we have a defects assessment division that focuses on consumer complaints and compiling the information. We gather that data, and in this case, we did.

There were clear warning signs and concerns, and therefore, an expert panel was convened based on those concerns to determine, after looking more deeply into the issue, whether or not there's sufficient information to open up.

HELLER:

Any conclusions for that expert panel?

FRIEDMAN:

In that expert panel, the decision was made not to open the investigation based on a couple of key factors. The first is that the Cobalt and Ion did not stand out when it came to airbag non- deployment complaints compared to their peers, they were a little bit above average, but they did not stand out.

Second, in looking at the detailed crash investigations, the two that were available at the time, they were inconclusive as to the cause of airbag non-deployment. Airbags are -- understandably, many people expect airbags to deploy in any frontal crash, for example, but they're actually designed to only deploy when they will help the occupant and not cause more harm than good.

HELLER:

When were those conclusions made?

FRIEDMAN:

In 2007. That was the first time we looked.

HELLER:

So, share with me what the threshold, what threshold does NHTSA use to determine whether a complaint like this warrants further investigation?

FRIEDMAN:

Senator, we don't have a specific threshold. Each case is different. In cases where a defect is clear, all it takes is one and we will act on that one case, if there's clear evidence of a defect.

If there's not, we look for further evidence, we look for trends, but we consciously do not have a specific threshold because each case is different.

If there is a vehicle where only 5,000 are sold per year, and we see one incident, that may be sufficient to open an investigation. If there's a vehicle where there is 500,000 sold in a year, if there's one incident that's a clear defect, we will open, but if there's a larger number and it's not a clear defect trend, we may not open. It does depend on the facts of the case.

HELLER:

So, you're saying in this particular case that you couldn't tell me how many additional incidents or reports would be necessary in order for NHTSA to take further action?

FRIEDMAN:

We rely on a combination of our engineering expertise data indicating whether or not there's a significant trend. So, if the number of -- of complaints had gone up significantly, that would have caused us to act.

In fact, what happened when we looked at this again in 2010, the complaint rate overall went down.

HELLER:

OK.

I'll hold off for additional questions.

Senator Blumenthal.

BLUMENTHAL:

Thank you.

Thank you both for being here, Mr. Friedman and General Scovel. I, first of all, want to thank you for your service to our nation and now for your service at NHTSA as inspector general, and thank you Mr. Friedman for your service at NHTSA.

Let me ask you, Mr. Friedman, I take it from what you've said yesterday and what you say here -- what you've said here today that G.M. concealed material significant information from NHTSA. Is that correct?

FRIEDMAN:

We are very concerned that they didn't provide us with sufficient information. The -- the...

BLUMENTHAL:

Well, I know you're concerned. We're all concerned.

Did they conceal information so far as you know?

FRIEDMAN:

That is -- that is exactly the subject of an open investigation that we have into General Motors, and if we find that they did violate their responsibilities report information and to act quickly, we will hold them accountable. But, because that's an open investigation, I don't want to prejudge that.

But I am very concerned that they did not provide us with part number changes. I'm concerned that they had conversations with suppliers about the algorithms and that we weren't aware of it.

BLUMENTHAL:

In your view, was the faulty ignition switch a defect?

FRIEDMAN:

With what we know now, very clearly it was a defect.

BLUMENTHAL:

Was it a -- a design defect?

FRIEDMAN:

I'm not sure. It was clearly a defect -- it was a defect that represents an unreasonable risk to safety.

The key itself -- and -- and it's -- from my understanding of the situation, it's a combination of factors. The key itself with low torque could turn, and there's clearly something about their algorithm that would -- appears to disable the airbags in that case.

That, to be honest, doesn't make sense to me, because if the vehicle's moving...

(CROSSTALK)

BLUMENTHAL:

Well, it shut off the car, which in turn disabled the airbag. Is that correct?

FRIEDMAN:

I don't know if that's -- we're actually asking them very specific questions to understand that. Power -- power loss in a vehicle in a crash is not uncommon. There are capacitors built in to these airbag systems to ensure that they have power in the case of losing battery.

(CROSSTALK)

BLUMENTHAL:

Well, I -- I have -- I have limited time, so let me just ask you very directly. It is your testimony today that it was a defect.

FRIEDMAN:

Based on what we know now, absolutely.

BLUMENTHAL:

And defects are supposed to be reported, correct?

FRIEDMAN:

Absolutely.

BLUMENTHAL:

Let me ask you, General -- I know that you've made various recommendations about changes and reforms at NHTSA.

And looking at your testimony, I understand that many of those recommendations have been made -- correct?

SCOVEL:

Yes, Senator. The recommendations have been made. NHTSA has taken steps to address nearly all of those.

The most significant one still outstanding has to do with the workforce assessment.

BLUMENTHAL:

Right. But I noted that in one of the paragraphs of your testimony, page six, you say "We believe the enhanced processes -- processes NHTSA put in place to address our 2011 recommendations will put the agency in a better position to identify and investigate vehicle safety defects to the extent that ODI uses and applies these process enhancements when conducting its analysis and investigation."

The way I interpret that sentence is you know they've said they adopted the recommendation but you don't know, in fact, whether they're doing them.

SCOVEL:

Precisely. We don't know how effective these new process enhancements will be.

We believe, based on our assessment of NHTSA's processes as of the 2010, 2011 timeframe using the -- the Toyota case as -- as a case study, if you will -- assessing NHTSA's processes and what we recommended to improve those that the steps that NHTSA took should help.

Now, are they the silver bullet? Would they have avoided what -- or -- or prevented any other problems that we might see with -- with GM? That we don't know.

But what we do want to -- to answer now is the mail from the secretary where he asks us specifically whether NHTSA acted in an expedition -- expeditious and timely manner to identify and pursue safety defects covered by the GM recalls and whether NHTSA had and currently has sufficient resources, processes and data available to it to fulfill its safety function with respect to the recall.

So, we want to see how it's being applied.

BLUMENTHAL:

Are you involved, as you were in Toyota, in a criminal investigation of GM?

SCOVEL:

Senator, I can't confirm or deny that a criminal investigation is underway.

BLUMENTHAL:

But you...

SCOVEL:

Based on our Toyota experience...

BLUMENTHAL:

You were involved in the Toyota criminal investigation?

SCOVEL:

Absolutely. We were critical to the -- to the criminal investigation of Toyota. Our agents were identified by name a couple of weeks ago by the attorney general as his press conference where he announced the forfeiture.

And -- and we are -- we have gained a tremendous amount of expertise in this area.

BLUMENTHAL:

And let me ask you, finally -- I'd ask both of you to support the legislation that Senator Markey and I have introduced. Are you willing to do so?

FRIEDMAN:

Senator, I'm very open to working with yourself and Senator Markey on how to make sure that we can best move forward and how we can improve; and very open to further discussions on your legislation.

SCOVEL:

Sir, if I may -- and my response is a little more complicated and I will apologize in advance.

I'm -- I'm sure you'll appreciate that as an inspector general, my presumption is that more transparency is

almost always better than less by -- by virtue of the fact that I serve as DOT inspector general; by statute and by executive order, I serve on the Recovery Accountability and Transparency Board, the Government Accountability and Transparency Board -- so, transparency is literally our middle name.

However, I am fully cognizant of the policy factors -- the considerations on the other side regarding confidential business information and so forth.

BLUMENTHAL:

Thank you. Thank you very much.

MCCASKILL:

Senator Klobuchar?

KLOBUCHAR:

Thank you very much, Madam Chair.

Mr. Friedman, maybe you heard earlier about the case of -- of the three young women in the car in Wisconsin. Two were killed, one of them was one of my constituents, Natasha Weigel.

And following the crash, NHTSA opened up an investigation and found incidents of similar ignition switch problems, but was unable to determine what was causing the problem.

The report found that -- this is a quote -- "such a determination would most likely require an analysis of the airbag system to determine if, in fact, the airbag is capable of deploying when the ignition is switched from the on position to the accessory position. Such an undertaking is beyond the scope of this investigation."

Mr. Friedman, do you think that this report should've raised enough red flags to trigger further investigations into this question?

FRIEDMAN:

This report was one of the pieces of information that did raise concerns and that -- and that the panel did consider.

At that time, our understanding of airbags indicated that, first of all, power loss in a crash was not uncommon and that airbag systems were designed to be able to function in those circumstances.

Based on that expertise and based on the information we had available, it was determined that it wasn't sufficient information to open up at the time.

This is, frankly, one of the clear lessons that we are learning from this -- a lesson that clearly comes too late -- that we needed to question that assumption.

And going forward, one of the things that I have talked to my staff about and that we are looking at is how can we better consider remote defect possibilities?

How can we better integrate these special crash investigations even further? They're already part of the

process. But how do we better integrate them into this process?

This was a tragedy. That -- the -- the...

KLOBUCHAR:

And this report, I think, was -- the crash was one of the first where they barreled 71 miles per hour into a grove of trees. It was one of the first to be linked to the faulty ignition switch.

So, do you think if you had something better in place, it was potential for trying to prevent these tragedies in the future?

FRIEDMAN:

Well, that is, without a doubt, my goal. One -- one of the challenges in this specific instance was that, as you noted, the vehicle hit trees.

The first set of trees that they hit was kind of a softer strike with an unbelted occupant, which is the exact kind of condition where airbags are often -- are designed to often not deploy because if the driver or passenger is moving forward as the airbag is expanding, sadly, it could do more harm than good. More than 200 lives had been lost previously because of that challenge.

And so, our understanding of the system indicated that under those conditions, that the conditions of the crash were the more likely reason for non-deployment.

But clearly, as I said, we need to relook at our assumptions and relook at our understanding of these systems, and we are actively doing that.

We are -- we are talking to automakers to understand -- to better understand their algorithms and if there is a problem out there.

KLOBUCHAR:

Investigators, as you know, are still gathering the recall data and records to understand what actually happened here with GM.

But based on the records we have so far, one thing we know is that NHTSA's very dependent on the automobile companies for the data and the context that's needed to tell whether something is, in fact, an isolated event or a dangerous trend or a defect.

Is it your view that NHTSA has to rely too heavily on auto manufacturers to get this information?

FRIEDMAN:

Senator, we -- we rely on auto manufacturers for some information. But we also have significant resources with information that have nothing to do with the automakers.

One of the most important pieces of our database are consumer complaints. Right now, we get about 45,000 of those a year, which we look through each and every one.

I would like to see that number grow. We have plans and efforts underway to try to get more and more consumers when they see problems to report them to us.

There -- there is added data that we get from automakers and we do use that as part of the process.

I -- I don't think we're too dependent on them because we try to make sure -- and in this case, we did rely on our expertise and our data as part of the process.

KLOBUCHAR:

That was -- you got about 260 complaints about the faulty ignition? Is that about right?

FRIEDMAN:

I believe that's one of the numbers that -- that was reported on the ignition switch. At the time, what we were trying to understand and what we were looking at was airbag non-deployments.

At the time, we did not have the information directly linking...

(CROSSTALK)

KLOBUCHAR:

But you didn't know it (ph) was (ph) about (ph) --but -- well, I know we're going to find all this out -- I hope very soon. But you didn't know that it was about ignition switches? You just thought it was some -- you were looking at the airbags instead of the...

FRIEDMAN:

At the time, our focus was trying to understand why airbags may not have been deployed. There was -- there were these added complaints about ignition switches are stalling.

I believe the 260 number may have been all stalling complaints. I would have to check on that to be sure.

It's not clear that all of those were related to the ignition switch. There are many causes of stalls...

KLOBUCHAR:

Did the airbags not deploy because it wasn't a traditional crash right away? It just shut down, so then the airbags don't deploy?

FRIEDMAN:

The dynamics of -- of these crashes to -- to the investigators -- to our crash investigators indicated that that was the more likely reason.

But it's very possible now that we know what we know that the ignition switch being in the accessory position was the problem. We now have that definitive link from General Motors -- a link that if we had had earlier, we would have been able to act.

KLOBUCHAR:

Mr. Scovel, you look like you wanted to talk (ph).

SCOVEL:

Yes, thank you, Senator. I have something that may help the committee understand this point, too.

And -- and I have in front of me a copy of the Special Crash Investigation Report that -- that I know you're referring to, Senator, because you -- you read from the last sentence here, too, of the main paragraph on page seven.

It's encouraging to hear the administrator talk about reexamining processes and specifically use the term "integrating" special crash investigation reports because we clearly need to -- we, my office -- need to understand how the -- the agency intends to do that, because we've identified that on the basis of certainly this one piece of evidence that you've cited as a key concern.

The administrator has spoken to at least the preliminary finding or assessment that the airbags didn't deploy because of the nature of the impact against softly yielding trees.

In fact, the expert engineers conducting the special crash investigation about a year later submitted an amended -- amendment to the report that removed that as their initial assessment and said that they couldn't tell whether it might be that or it might be that or it might be the loss of power through the ignition system, but then such an undertaking was beyond the scope of the investigation and they pointed out that it would require further analysis.

(CROSSTALK)

KLOBUCHAR:

So they (inaudible) and it may have been the ignition switch.

SCOVEL:

Right.

KLOBUCHAR:

But that's not what they were asked to investigate. Is that what it is? It seems so strange when you want to...

SCOVEL:

It does, but it's properly beyond the scope of what -- how NHTSA has laid out what it wants to get from the special crash investigation.

KLOBUCHAR:

OK. Is there a way you could change that where you'd say, "We don't know what happened here; this is very odd that these girls were just driving down the road and suddenly (inaudible) 71 miles per hour surge into some trees." I mean...

FRIEDMAN (?):

Well, part of -- so the purpose of special crash investigations is to better understand the circumstances of crashes of interest. We were very concerned about airbag nondeployment, which is exactly why we were having special crash investigators go out and gather data and information on these crashes. I do believe that that is a good process. That is the right process.

We also make sure that the special crash investigators and ODI talk to each other. It is the job of the investigators to try to understand whether or not there's a defect. So SCI is a great tool for gathering the data, but we then also need our experts to engage in the process to translate and understand that data.

KLOBUCHAR:

OK. I have one last on the recall process -- one last question (inaudible).

Manufacturers can voluntarily initiate recalls without waiting for NHTSA to order it, or NHTSA can order manufacturers -- right? -- to initiate a recall. However, if they're going to do that, if they're actually going to order one, they need this lengthy process that includes holding a public hearing, completing the investigation, giving the manufacturer time to file a detailed response, and perhaps even defending a recall in federal court.

Mr. Friedman, by taking so long to order a recall here, the recall of these cars, which seemed to be rolling out a different one every day, are we shortchanging Americans and jeopardizing safety? In other words, when lives are at stake and when manufacturers may be reluctant, as appears to be in this case, to initiate a recall, if you back through time, on their own, is the length of time it takes for a NHTSA to order a recall a problem?

FRIEDMAN:

Senator, the good news here is that we very, very rarely ever have to go to that length. We're actually potentially involved in such a situation with a car seat manufacturer who has resisted moving forward with some infant seats. But the vast majority of the time, almost every single time, the industry does act. But sometimes it does take extra pressure.

What I would like to see, frankly, is when we provide evidence to an automaker that there's a defect, that they act right away. I would like to see quicker action from automakers. But to be clear, the vast majority of the time, we do not have to go through that whole process. We can get the recalls much earlier in the process and we very often do.

KLOBUCHAR:

Thank you.

MCCASKILL:

First, do you monitor the legal claims against manufacturers?

FRIEDMAN:

The legal claims are one of the pieces of information that does come into NHTSA through the early warning system, through our early warning data system. However, depending on the -- where those claims are in the process in terms of litigation, whether or not that litigation or the findings are sealed, we may not

have all the access to that information.

MCCASKILL:

So, but you're monitoring -- because it's very easy to find -- I mean, I could go on my iPad right now and Google "lawsuits against General Motors," and pull up hundreds of them, I'm sure, in fairly quick order. Do you all do that, so you know if a complaint's been filed on a defect on the automobile?

Because what I'm trying to do is harness the great work that clearly is going on, since it was a lawyer who figured this out, harness that work for your agency. And I don't get the sense that you all are paying that close of attention to these cases.

FRIEDMAN:

We're paying very close attention to these cases. We get death and injury reports, which include claims -- unsubstantiated claims in some cases -- associated with these vehicles. So we -- we get those reports. And when we see something that raises concerns, we do reach out and ask for additional details.

In this case, with the Cobalts and other vehicles, if my numbers are correct, I believe we reached out 98 times to follow up on various claims, death and injury claims associated with these vehicles. We looked at that data and that information as part of that process. I had...

(CROSSTALK)

MCCASKILL:

So, I'd be interested to know the specifics of that. How many -- those 98 claims, when you looked at them, how many of them have been settled, how many of them were tried, how many went to a jury verdict, what were the verdicts. If you actually did that, I'd like to see that documentation.

My next question is: If you look and you find one of those cases that's been settled and it's confidential, do you have the legal authority to ask that manufacturer to give you the details of that lawsuit?

FRIEDMAN:

I don't know the exact details of our legal authority. I do know that, for example, if it hasn't been sealed, depending on the case, we can ask for additional information.

MCCASKILL:

Well, let's assume it's been sealed. Let's assume that General Motors or Toyota or Chrysler or any of them insist that they will not settle with the client, with the victim, unless there is an agreement of confidentiality. Do you have the ability, independent of the confidentiality between victim and the defendant, do you have the ability to go directly to the defendant and get that information?

FRIEDMAN:

I'll have to verify with my team, but I do no believe we have the ability to request sealed documents. I also...

MCCASKILL:

How about subpoenas? You can subpoena, right?

FRIEDMAN:

Yes.

MCCASKILL:

OK. That worries me you didn't know.

FRIEDMAN:

It worries me as well.

(LAUGHTER)

MCCASKILL:

So, how often have you utilized the subpoena power of NHTSA to get more information from automobile manufacturers?

FRIEDMAN:

That's something I will definitely get back to you on the record.

MCCASKILL:

OK. I would be very interested in that.

And then finally, I'm a little worried about this whole deployment of airbags, power-on, power-off. As you have said, testimony said that you believe the specifications were that if the power was off, the airbag would still deploy. We are now learning that the reason the airbag didn't deploy is because the power was off. This is a problem.

FRIEDMAN:

And it may even be more complicated than that, actually. And that's one of the questions that we actually have in our timeliness query to General Motors. It is possible that it's not simply that the -- the power was off, but a much more complicated situation where the very specific action of moving from on to the accessory mode is what didn't turn off the power, but may have disabled the algorithm.

That, to me, frankly, doesn't make sense. From my perspective, if a vehicle -- certainly if a vehicle is moving, the airbag's algorithm should require those airbags to deploy. Even if the -- even if the vehicle is stooped and you turn from "on" to "accessory," I believe that the airbags should be able to deploy.

So this is exactly why we're asking General Motors this question, to understand is it truly a power issue or is there something embedded in their algorithm that is causing this, something that should not have been there in their algorithm.

MCCASKILL:

Yeah. Well, it's pretty important we figure that out. And then what you need to do is you need to look across the entire manufacturing spectrum on this issue.

FRIEDMAN:

We've already begun that.

MCCASKILL:

Because either an airbag is dependent on power or it isn't. And if it is dependent on power, we've got an issue.

FRIEDMAN:

Yes, Senator. In fact, I've already directed my staff several days -- well, at least days, if not more than a week ago when we were -- as we were digging into this, to reach out to automakers and to suppliers, because I have the same concern you have, and I want to make sure that we fully understand this issue so that Americans driving on our roads are safe. Safety must always be our top priority.

(CROSSTALK)

HELLER (?):

Thank you.

Mr. Friedman, how long have you been the acting director?

FRIEDMAN:

I've been the acting administrator just over two months.

HELLER (?):

What was your prior experience with NHTSA?

FRIEDMAN:

Prior to that, I was the deputy administrator for about eight months.

HELLER (?):

Anything prior to that with NHTSA?

FRIEDMAN:

Prior to that, I worked for a nonprofit organization and we engaged on fuel economy and fuel economy and safety-related issues where they overlapped. I worked there for about 12 years.

HELLER (?):

I'm just trying to get your history at NHTSA. Probably one of the biggest complaints I get when I go home, talking to businesses and companies, is, you know, government interference and the strong hand of government themselves, and some of the regulations.

Could you describe to me what the relationship between NHTSA and G.M. has been in the past?

FRIEDMAN:

Our relationship has been a relationship you'd expect between a regulator and a regulated entity. Our goal as part of that relationship is to ensure that we are catching the defects involved; that we are discussing with them possible safety technologies; and that we're ensuring that they are providing information to us and we are raising concerns to them when appropriate.

HELLER (?):

Are you comfortable with the relationship?

FRIEDMAN:

I would like to see from all automakers increased efforts to be responsive when NHTSA reaches out on defects issues. I would like to have the confidence that they are all sharing all the information that they have.

HELLER (?):

Do you have that confidence today?

FRIEDMAN:

I think clearly the Toyota case indicates that no, I should not fully have that confidence because that is a clear case where, in fact, there was a part number change, a part change that was not revealed. It's also one of the reasons why I'm concerned in this case, and one of the reasons why we have opened an investigation into the automakers.

In fact, over the last five years, we've issued record fines against automakers, not just Toyota, but Ford as well, and at least one other manufacturer because we were concerned that they did not act properly under the law. And we found that they did not act properly under the law.

HELLER (?):

Is the secretary of transportation consulted with decisions regarding NHTSA investigations?

FRIEDMAN:

That's a very broad question. In terms of there are some investigations that the secretary of transportation is made aware of, but certainly in the defects assessment panels or the defects panels, the secretary of transportation is not involved in that decision-making process.

HELLER (?):

Was -- was he involved in this one?

FRIEDMAN:

No.

HELLER (?):

He was not.

FRIEDMAN:

And just to be clear, there were -- there was a panel that happened in 2007. That's the panel that we're discussing, and absolutely not.

HELLER (?):

Was anyone in the secretary's office consulted?

FRIEDMAN:

No.

HELLER (?):

Let me ask you another question. Did any -- did any government official outside the Department of Transportation consult or provide input on the decision not to move forward in 2007 or 2010?

FRIEDMAN:

Not that I'm aware of, no. That would not be our standard process.

HELLER (?):

Mr. Scovel, let me ask you the same question. In your investigation, did you check to see or was that part of your broad scope of things to find out what influence may or may not have occurred in 2007 or 2010?

SCOVEL:

Senator, it was not part of the audit that we conducted in the 2010-2011 timeframe, which was prompted most immediately by the Toyota problems. Going forward, I can tell you that in the current audit, which the secretary has requested us to do, we will be looking at everything that NHTSA knew, what it didn't know, when it knew it, and what actions it took in response to that. Should we come across any documentation, and our auditors are trained and will be instructed to be on the lookout for such matters, we will take them...

(CROSSTALK)

SCOVEL:

... take them under cognizance and will refer them to the proper authorities.

HELLER (?):

Including other government influence on the decision-making process.

SCOVEL:

Yes, sir.

HELLER (?):

Very good.

Thank you, Chairman.

MCCASKILL:

I want to thank both of you for being here today. I think we've had a productive day and have learned a lot.

And there will be follow-up hearings, and we'll be calling on you, particularly, Mr. Friedman, to give us more information as your investigation continues.

Thank you both.

FRIEDMAN:

Thank you.

CQ Transcriptions, April 2, 2014

---

## List of Panel Members and Witnesses
PANEL MEMBERS:

SEN. CLAIRE MCCASKILL, D-MO. CHAIRMAN

SEN. MARK PRYOR, D-ARK.

SEN. BARBARA BOXER, D-CALIF.

SEN. AMY KLOBUCHAR, D-MINN.

SEN. RICHARD BLUMENTHAL, D-CONN.

SEN. BRIAN SCHATZ, D-HAWAII

SEN. CORY BOOKER, D-N.J.

SEN. JAY ROCKEFELLER, D-W.VA. EX OFFICIO

SEN. DEAN HELLER, R-NEV. RANKING MEMBER

http://www.cq.com/doc/congressionaltranscripts-4451542?print=true

SEN. ROY BLUNT, R-MO.

SEN. KELLY AYOTTE, R-N.H.

SEN. DAN COATS, R-IND.

SEN. TED CRUZ, R-TEXAS

SEN. DEB FISCHER, R-NEB.

SEN. JOHN THUNE, R-S.D. EX OFFICIO

WITNESSES:

DAVID J. FRIEDMAN, ACTING ADMINISTRATOR, NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION

CALVIN L. SCOVEL III, INSPECTOR GENERAL, U.S. DEPARTMENT OF TRANSPORTATION

Source: CQ Transcriptions

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

© 2014 CQ Roll Call All Rights Reserved.