# <u>EXHIBIT 53</u>

**VICTOR HAKIM**

June 11, 2013

**MELTON  vs. GENERAL MOTORS**

---

**1**

IN THE STATE COURT OF COBB COUNTY
STATE OF GEORGIA

KENNETH DAVID MELTON AND MARY ELIZABETH
MELTON, Individually, and as Administrators
of the Estate of JENNIFER BROOKE MELTON,
deceased,

             Plaintiffs,

                              Civil Action 2011-A-2652

    vs

GENERAL MOTORS LLC, THORNTON CHEVROLET,
INC., BILL HEARD CHEVROLET AT TOWN CENTER,
LLC, and DEI HOLDINGS, INC.,
             Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

             VIDEOTAPED 30(b)(6) DEPOSITION
DEPONENT:   VICTOR HAKIM
DATE:       Tuesday, June 11, 2013
TIME:       10:11 a.m.
LOCATION:   Westin Detroit Metropolitan Airport
            2501 Worldgateway Place
            Detroit, Michigan 48242
REPORTER:   Angela E. Broccardo, CSR 4679

---

**3**

1   APPEARANCES CONTINUED:

2

3      KENNETH SISCO (Telephonically)

4      Law Offices of Ian R. Rappaport

5      5565 Glenridge Connector, Suite 500

6      Atlanta, Georgia 30342

7      (678) 473-3387

8          Appearing on behalf of Defendant DEI

9      Holdings, Inc.

10

11   ALSO PRESENT:

12      Patrick Murphy, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**2**

1   APPEARANCES:

2

3      LANCE A. COOPER

4      The Cooper Firm

5      701 Whitlock Avenue, S.W.

6      Building J, Suite 43

7      Marietta, Georgia 30064

8      (770) 427-5588

9          Appearing on behalf of the Plaintiffs.

10

11      HAROLD E. FRANKLIN, JR.

12      King & Spalding, LLP

13      1180 Peachtree Street, N.E.

14      Atlanta, Georgia 30309

15      (414) 572-3539

16          Appearing on behalf of the Defendant General

17      Motors, LLC

18

19      SHAWN N. KALFUS

20      Freeman, Mathis & Gary, LLP

21      100 Galleria Parkway, Suite 1600

22      Atlanta, Georgia 30339

23      (770) 818-4250

24          Appearing on behalf of Defendant Thornton

25      Chevrolet, Inc.

---

**4**

1            TABLE OF CONTENTS

2

3   WITNESS                         PAGE

4      VICTOR HAKIM

5      EXAMINATION BY MR. COOPER          6

6      EXAMINATION BY MR. KALFUS        169

7      EXAMINATION BY MR. FRANKLIN      176

8      RE-EXAMINATION BY MR. COOPER     198

9

10   EXHIBIT        DESCRIPTION           PAGE

11   (Exhibits attached to transcript.)

12   Exhibit No. 1   Amended Notice         5

13   Exhibit No. 2   Cobalt Claims Volume 1     8

14   Exhibit No. 3   Cobalt Claims Volume II   92

15   Exhibit No. 4   Claims Notebook         146

16   Exhibit A    Defendant's Objections to Notice  175

17   Exhibit No. 5   Bates Pages 37595 through 37610   201

18

19

20

21

22

23

24

25

---

VICTOR HAKIM                                                      June 11, 2013
MELTON  vs. GENERAL MOTORS

**5**

1            Detroit, Michigan
2            Tuesday, June 11, 2013
3            10:11 a.m.
4            * * *
5            (Exhibit No. 1 marked.)
6            MR. COOPER:  This will be the deposition of
7    Victor Hakim taken on behalf of the plaintiffs
8    pursuant to an amended notice which will be attached
9    as Exhibit 1 to the deposition taken for all purposes
10   allowed under the Georgia Civil Practice Act.  All
11   objections except as to form and responsiveness shall
12   be reserved.
13           What does Mr. Hakim want to do about
14   signature?
15           MR. FRANKLIN:  Read and sign.
16           MR. COOPER:  All right.  We can go on the
17   video.
18           VIDEOGRAPHER:  We are on the record.  This
19   is disc one of the 30(b)(6) video deposition of Victor
20   Hakim being taken at 2501 Worldgateway Place in
21   Romulus, Michigan.  Today is Tuesday, June 11, 2012.
22   The time is 10:13 a.m.  This is in the matter of
23   Melton versus General Motors, et al., Case Number
24   2011-A-2652, pending in Cobb County State Court in the
25   State of Georgia.

**6**

1            My name is Patrick Murphy, legal
2    videographer, our court reporter today is Angela
3    Broccardo, and we both represent Esquire Deposition
4    Solutions.  The attorneys will now introduce
5    themselves for the record.
6            MR. COOPER:  Lance Cooper here on behalf of
7    the Melton family.
8            MR. FRANKLIN:  Harold Franklin on behalf of
9    General Motors, LLC.
10           MR. KALFUS:  Shawn Kalfus on behalf of
11   Thornton Chevrolet, Inc.
12           MR. SISCO:  Ken Sisco on behalf of DEI
13   Holdings.
14           VICTOR HAKIM
15   having first been duly sworn, was examined and
16   testified as follows:
17           EXAMINATION
18   BY MR. COOPER:
19   Q.   Please state your full name, sir.
20   A.   The name is Victor Hakim.
21   Q.   Mr. Hakim, are you presently employed?
22   A.   Yes.
23   Q.   Who is your employer?
24   A.   General Motors.
25   Q.   How long have you been employed by General Motors?

**7**

1    A.   Since 1971.
2    Q.   What is your current position at General Motors?
3    A.   I'm a senior manager slash consultant.
4    Q.   What are your day-to-day responsibilities as senior
5         manager slash consultant?
6    A.   Day-to-day re -- I work in a department called field
7         performance assessment, and in that department we look
8         at how the vehicles perform in the field and provide
9         technical assessments on the vehicle performance and
10        then feedback to the product groups.
11   Q.   Let me show you what I've marked as Exhibit 1.  Have
12        you seen that document before today, sir?
13           MR. FRANKLIN:  Is that the notice?
14           MR. COOPER:  Yes.
15           MR. FRANKLIN:  Okay.
16           THE WITNESS:  I have.
17   BY MR. COOPER:
18   Q.   Are you here to testify about the subject matter set
19        forth in the notice?
20           MR. FRANKLIN:  Let me state for the record,
21        Lance, that Mr. Hakim has been -- is being designated
22        by GM as its corporate representative regarding the
23        topics included within the notice as reflected by GM's
24        amended objections to plaintiffs' amended notice.  His
25        testimony will be subject to those objections and

**8**

1    areas of testimony that we are presenting him here to
2    talk about.
3            Specifically he will be presented to talk
4    about and he is familiar with the information in the
5    documents produced relating to those incidents and
6    complaints in which it is alleged that a vehicle
7    stalled or lost power, including those documents
8    reflecting that a customer alleged that the stalling
9    or loss of power resulted in a loss of vehicle
10   control.
11           Thank you.
12   BY MR. COOPER:
13   Q.   Are you prepared to testify about the subject matter
14        set forth in the deposition notice?
15   A.   I am prepared to testify on what is set forth, I
16        believe, in what Mr. Franklin just talked about.
17   Q.   And you've brought with you here today some documents?
18   A.   Yes.
19   Q.   And what are these documents?
20   A.   Those are claims consistent with what Mr. Franklin
21        just described.
22           (Exhibit No. 2 marked.)
23   BY MR. COOPER:
24   Q.   Let me show you what we have marked as Exhibit 2.
25           MR. COOPER:  Which, Shawn, I don't have a

VICTOR HAKIM                                                June 11, 2013
MELTON  vs. GENERAL MOTORS

**9**

1  copy for you. I apologize.
2      MR. KALFUS: That's okay.
3      MR. FRANKLIN: Thank you.
4  BY MR. COOPER:
5  Q.  It's a document entitled "Cobalt Claims," and I want
6  to walk through the claims -- some of the claims that
7  General Motors has produced to us, walk through those
8  with you here today.
9      If you could turn to tab 1 of Exhibit 2,
10  please. The first claim is -- the owner is Rebecca
11  Bowden from Pennsylvania; is that correct?
12  A.  Okay. Give me a moment here to take a look at it.
13  Yes.
14  Q.  And she has a claim involving a 2005 Cobalt, and
15  General Motors opened that claim on March 8th of 2005?
16  A.  Yes.
17  Q.  The vehicle had 1,500 miles on it, and the agent notes
18  that the claim involves stalls.
19      Do you see that?
20  A.  It says "agent notes" and then yeah, there is a
21  notation that says "stalls." Correct.
22  Q.  And the first paragraph of the claim says:
23      "Customer states just leaving dealer with
24  her 2005 Cobalt. Bought it new February 14, had it
25  less than a month, and now has about 1,500 miles on

**10**

1  vehicle. Customer received bulletin from dealer
2  stating Cobalts may experience engine stalls, loss of
3  electrical systems, and no DTC. Customer engine has
4  already stalled once in a snowstorm making her
5  steering column lock up and vehicle spun out of
6  control. No one hurt, but customer terrified of
7  vehicle. Doesn't want it anymore. Customer ready to
8  trade it in for a Honda or something if can't get a
9  new, safe Chevrolet. Customer states bulletin claims
10  engine may stall if driver is short and has a large
11  key chain. Customer 5' 4", has a five-year-old, and
12  is five months pregnant. Doesn't feel safe driving
13  the vehicle, and dealer states that they can't do
14  anything about it. No codes. Customer states is also
15  having concern with radio. Every three days sets
16  itself to new."
17      That's what the complaint said or the claim
18  says; correct?
19  A.  That's what the first part of it says. There's more
20  pages to it.
21  Q.  Sure.
22  A.  There's, yeah, a number of pages to it, actually.
23  Q.  And did you produce -- provide this claim in the
24  documents that you are prepared to testify about
25  today?

**11**

1  A.  I believe so. If you don't mind, let me take a look.
2  Q.  Sure.
3      MR. FRANKLIN: Lance, each one of these is
4  a separate tab?
5      MR. COOPER: Right.
6  BY MR. COOPER:
7  Q.  You did?
8  A.  Yes.
9  Q.  All right. Thank you.
10      Go to tab 2, please, sir. This is an
11  incident reported by Alfred Prisco from Colorado
12  involving an '05 Cobalt, and it's March 11th of 2005;
13  correct?
14  A.  Which date is March 11th? I --
15  Q.  Opened, the claim was opened or General Motors
16  received notice --
17  A.  Yes.
18  Q.  -- as of March 11, 2005. The vehicle had 3,700 miles
19  on it, and again the agent notes, it says stalls;
20  correct?
21  A.  Sorry, I just need to locate "agent notes." I don't
22  see that. You'll have to point it out to me. Oh,
23  there it is. Sorry. Got it. Yes, "Agent notes:
24  Stalls." Correct.
25  Q.  And then the initial paragraph, it says:

**12**

1      "Customer states purchased a new 2005 Chevy
2  Cobalt for their 19-year-old son with around
3  3,700 miles on it. The first week son had the
4  vehicle, the vehicle started stalling every day. Took
5  it to the dealer. Dealer states the computer inside
6  the car died. Dealer gave customer a new Cobalt. The
7  new vehicle started doing the same thing. Informed
8  dealer. Customer's son was driving home from work one
9  evening. He was driving around 70 miles per hour on
10  E470 Highway. He was getting off the off ramp where
11  the vehicle stalled. The vehicle stalled. It locked
12  up where the driver had no control over the vehicle
13  and vehicle went into ditch. Police came. Vehicle
14  had to be towed to dealer. No one was badly injured.
15  Only her son bumped his head and has a knot on it, but
16  did not get medical attention."
17      Is that what the document says?
18  A.  That's what that one paragraph says. Of course there
19  are, again, multiple pages to the document. So
20  there's a lot more information in it.
21  Q.  And go to tab 3, please, sir. Jessica Justice from
22  Northfield, Ohio.
23      Do you see this incident?
24  A.  Yes.
25  Q.  March 4 -- excuse me, April 4 -- April 7th, 2005 is

VICTOR HAKIM                                                      June 11, 2013
MELTON vs. GENERAL MOTORS

---

**13**

1    the open date for the claim, and the odometer is
2    2,800 miles.
3        Do you see that?
4    A.  I do.
5    Q.  This vehicle was actually repurchased by General
6    Motors, wasn't it?
7    A.  That's what it says, yes.
8    Q.  In the initial paragraph, as far as the complaint, it
9    states:
10        "Vehicle will stall while driving. Has
11   happened once while vehicle was in drive driving down
12   the street. States on other occasion the vehicle has
13   stalled out. Brought car home from service today.
14   States vehicle has been at the dealer twice in one
15   week regarding same concern, and when bring vehicle
16   home, the concern is still present. States received
17   bulletin from dealer stating that vehicle concern
18   cannot be fixed at this time, stating that the vehicle
19   can stall if the driver hits the key, stating it can
20   happen to a driver who is of short stature, if a
21   driver has too much weight pulling on the ignition.
22   Customer states vehicle is only two months and two
23   weeks old."
24        Did I read that correctly?
25   A.  Yes.

---

**14**

1    Q.  Go to the next page, please, sir. Not the next tab,
2    just the next page.
3    A.  Not the next tab. Okay.
4    Q.  Top of this document says "Spoke to service manager
5    Mike Toth." We'll read the initial paragraph at the
6    top here:
7        "States did diagnosis of vehicle. States
8    there is a loss of communication in ignition switch
9    when it is hit. States it is an ongoing problem
10   within the Chevy Cobalt. States the ignition cylinder
11   is very sensitive. It doesn't have to be hit hard to
12   make the vehicle stall. States, based on a PI
13   technical assistance bulletin, there is no current
14   repair that can fix the problem. Service manager
15   states the customer keys didn't appear to be too heavy
16   for the ignition."
17        That's what that paragraph says; correct?
18   A.  Correct.
19   Q.  Next paragraph:
20        "Customer states to resolve the issue
21   should take keys off the ring while in ignition. If
22   she touches the ignition, the vehicle dies. Cannot be
23   fixed. TSB bulletin."
24        Did I read that correctly?
25   A.  Okay. So I kind of lost you there. The next

---

**15**

1    paragraph --
2    Q.  Yes, sir.
3    A.  -- below; right?
4    Q.  Yes, sir.
5    A.  Okay. Yes.
6    Q.  And then the next -- two paragraphs down from that, it
7    says:
8        "Customer states that it is a safety
9    concern. Customer states she does not like the
10   thought of having to be concerned with driving."
11        Did I read that correctly?
12   A.  Sure.
13   Q.  If you can go two pages back, sir, to Bates number 62,
14   top of the page. There is a conversation with a third
15   party and GM.
16        "Third party seeks to know why GM keeps
17   selling this vehicle if more and more people are
18   complaining."
19        "CRM." What is a CRM?
20   A.  That's a customer relations manager.
21   Q.  GM employee?
22   A.  Yes.
23   Q.  "CRM advised the third party that she could not advise
24   on this issue until further research was done. CRM
25   seeks to have the customer call the CRM tomorrow."

---

**16**

1        Did I read that correctly?
2    A.  Yes.
3    Q.  And then as we identified, GM ultimately repurchased
4    this vehicle from the customer?
5    A.  Yes.
6    Q.  If you go to Bates number 17 --
7        MR. FRANKLIN: Which number?
8        MR. COOPER: 17969.
9    BY MR. COOPER:
10   Q.  This is a "Privileged and Confidential Information."
11   It says "Case Assessment by: Nicole Johnson."
12        Do you see the top of that?
13   A.  Yes.
14   Q.  Nicole Johnson is a GM employee?
15   A.  I'll assume so. I don't know that for a fact.
16   Q.  Well, have you reviewed this complaint before today,
17   sir?
18   A.  Yes.
19   Q.  And it says "Vehicle Repair History," and it says on
20   date, March 30th, '05, "car stalled while driving."
21   And then April 6, '05, "car stalled," and it talks
22   about the bulletin; correct?
23   A.  Yes.
24   Q.  And if you go down to the bottom of the page, it says
25   "CRM Recommendation & Rationale," and this is a GM

---

VICTOR HAKIM                                                June 11, 2013
MELTON  vs. GENERAL MOTORS

## 17

1    employee recommendation and rationale; correct?
2    A.  It's the CRM's recommendation, yes.  Right.
3    Q.  The CRM, the GM employee, "recommends that the concern
4        is a safety issue.  The GM employee recommends
5        offering the customer a repurchase."
6            Did I read that correctly?
7    A.  Yes.
8    Q.  Go to tab 4, please, sir.  This is an incident
9        involving Mary Civardi from New Jersey.  She is
10       driving a 2005 Cobalt, and the claim was opened on
11       April 12th of 2005, and the vehicle had approximately
12       600 miles on it; correct?
13   A.  Correct.
14           MR. KALFUS:  What was the date?  I'm sorry.
15           MR. COOPER:  April 12, 2005.
16   BY MR. COOPER:
17   Q.  And GM decided to repurchase this '05 Cobalt, too;
18       correct?
19   A.  Correct.
20   Q.  And if you look at the customer statement at the
21       bottom of the page, it says:
22           "Approximately 600 mile" -- excuse me --
23       "Approximate mileage, 600.  Right after the vehicle
24       was purchased, the vehicle died.  I took it back to
25       the dealership again, and they completely checked the

## 18

1        vehicle.  I am very afraid of this vehicle.  Vehicle
2        died on highway four times.  The dealership gave us a
3        loaner.  March 23rd of this year is when vehicle was
4        bought.  Dealership states that they called the
5        engineers."
6            Did I read that correctly?
7    A.  You did.
8    Q.  And at the top of the next page:
9            "Tom Purdy (service manager) Concern - She
10       says she has a stalling issue that seems to do on the
11       right-hand turns.  We are about to get into the
12       vehicle to find a repair.  Haven't had an opportunity
13       to do though yet."
14           And then it says, two paragraphs down:
15           "Rich states:  This woman is scared to
16       death of this vehicle.  She takes care of her
17       grandchildren, and she is afraid one day she is going
18       to be riding around with them and kill them.  She has
19       the fear of God in her about this car.  Now, this
20       woman is very nice and has done a lot of business
21       here, and we would like to do anything we can to help
22       her, but the title has already gone through and we
23       need GM approval."
24           Did I read that correctly?
25   A.  Yes.

## 19

1    Q.  If you go to the next tab -- excuse me.
2    Q.  Any problem with me reading sort of the next page
3        there before we go to the next tab?
4    Q.  I thought you are prepared -- are you prepared to
5        testify about these cases?
6    A.  Well, certainly, but I can't memorize all the
7        documents.  So I -- if you can get me back to where we
8        were, I would like to read the document until we get
9        to that page, if you don't mind.
10   Q.  You are at the page.
11   A.  Thank you.  All right.  Thanks.
12           MR. FRANKLIN:  17973, is that where we are?
13           THE WITNESS:  Yes.  Right.  Yeah.  Right.
14           So the gist of that document is that
15       General Motors could not duplicate the issue, the
16       dealer couldn't duplicate the stalling.  They put a
17       recorder in the car and couldn't duplicate it.  That's
18       what I read through that section that was not
19       highlighted.
20   BY MR. COOPER:
21   Q.  Is that it?
22   A.  That's it.
23   Q.  I looked through the documents you brought with you
24       today.  This Civardi claim is not in the documents.
25           Would it be correct to say this is the

## 20

1        first time you've seen this claim?
2            MR. FRANKLIN:  Object to form.
3            THE WITNESS:  I may have looked at this
4        one.
5    BY MR. COOPER:
6    Q.  Why didn't you bring it with you, if you looked at it,
7        sir?
8    A.  It may not have fit the criteria.  In essence, we
9        don't have a stalling/loss of control with this one.
10       So it doesn't fit the amended deposition notice.
11   Q.  Who made the decision as to what claims you would
12       bring with you today, sir?
13   A.  Well, those claims were sorted based on -- based on
14       the deposition notice.
15   Q.  The question is who made that decision.
16           MR. FRANKLIN:  Object to the extent it
17       calls for -- calling for privileged information.
18   BY MR. COOPER:
19   Q.  Did you look at claims other than what you brought
20       with you here today?
21   A.  Yes.
22   Q.  And you chose not to bring a number of claims?
23   A.  Yes.  They didn't fit the criteria.
24   Q.  What criteria.
25   A.  The criteria in the amended deposition notice.

VICTOR HAKIM
MELTON  vs. GENERAL MOTORS

June 11, 2013

## 21

1  Q.  Read the criteria that the Civardi claim does not --
2      in Exhibit 1 that the Civardi claim does not meet.
3  A.  Yeah, this is not the amended -- is this our amended
4      notice? I guess I'm going to get confused here on
5      different --
6  Q.  No, that's our notice, sir.
7  A.  -- exhibits and --
8  Q.  That's our notice. Read the notice, and please
9      explain how the Civardi claim does not come within the
10     notice and the subject matter set forth in the notice.
11         MR. FRANKLIN: Let me state something on
12     the record, as I did at the outset.
13         We are presenting Mr. Hakim to testify --
14     there have been over 32,000 pages of claims, lawsuits,
15     et cetera, produced in this case. We are presenting,
16     as we stated in our objection to the notice, Mr. Hakim
17     to testify about the documents which reflect an
18     incident involving an allegation that a vehicle
19     stalled or lost power, including those in which the
20     customer claimed that the stalling or loss of power
21     resulted in a loss of vehicle control, among those
22     documents, those 32,000 pages that were produced.
23     Those are the documents that Mr. Hakim brought here
24     with him today.
25  BY MR. COOPER:

## 22

1  Q.  Did you -- you testified that you reviewed additional
2      documents, Mr. Hakim?
3  A.  Sure.
4  Q.  Including additional claims?
5  A.  Of course.
6  Q.  And you chose not to bring a number of claims,
7      including the Civardi claim; is that correct?
8  A.  Yes.
9  Q.  And it's your position, as the General Motors employee
10     who is prepared to testify today about the subject
11     matters, that the Civardi claim does not fall within
12     our notice?
13  A.  No, I didn't say that. It doesn't fall within the
14     amended objections based on what Mr. Franklin stated.
15  Q.  Look at page 17986, sir. It's the next tab.
16  A.  Sorry, help me out.
17  Q.  Just go to the next tab.
18  A.  You have tabs and numbers; right?
19         MR. FRANKLIN: What is this, tab 5?
20         MR. COOPER: Tab 4.
21  BY MR. COOPER:
22  Q.  Ms. Civardi actually wrote a letter?
23  A.  So this is the same claim that we were discussing;
24     right?
25  Q.  Yes, sir.

## 23

1         MR. FRANKLIN: And I'm sorry, Lance, I'm
2      not following. What page are we on? Because I
3      thought you said next tab. What page?
4         MR. COOPER: 17986. It's the tab, the red
5      tab.
6  BY MR. COOPER:
7  Q.  This is a letter to Kathleen Coelho. Do you know
8      Ms. Coelho at General Motors?
9  A.  I do not.
10  Q.  It's a letter from Ms. Civardi dated April 12, 2005,
11     and on that date Ms. Civardi wrote a letter to Ms.
12     Coelho where she says:
13         "Thank you so very much for your
14     courteousness, patience and attention to this matter.
15     As we discussed, this letter will confirm our
16     telephone conversation today in which I notified you
17     of a persistent and very serious stalling problem with
18     my new '05 Chevy/Cobalt (purchase date March 23,
19     2005)" -- purchased at a New Jersey dealership.
20     General Manager Richard Yearwood was the manager of
21     the dealership.
22         Next sentence says:
23         "I informed you the car has inexplicably
24     stalled several times within the last week while
25     traveling at various speeds, including highway speeds.

## 24

1      Upon noticing the aggravated nature of the problem
2      this past weekend, I immediately brought the car to
3      the dealer yesterday; Monday, April 11. After
4      conducting a morning long observation and inspection
5      of the car, including contacting GM engineering for
6      diagnostic instruction, the dealer was unable to
7      determine the cause of the problem and told me that
8      the car was performing appropriately. This morning
9      while I was driving on a local highway with lots of
10     traffic, the car died again and I came very close to
11     being rear-ended by the vehicles traveling behind me.
12     Fortunately, the car restarted immediately, but as you
13     might expect, I have now lost trust and confidence in
14     the vehicle. I immediately returned the car to the
15     dealership after this incident. The service
16     department has informed me that they are going to
17     perform a week long diagnostic to see if their
18     technicians can determine the cause of this very
19     hazardous condition. However, the GM, Mr. Yearwood,
20     also advised that the dealership is not in a position
21     to take a return of the vehicle and that I should
22     contact GM directly. I am a grandmother who
23     frequently travels with my young grandchildren in the
24     car. I have been a long-time GM vehicle owner and
25     shareholder. My family and I have very high respect

df795fa4-a19b-4bb3-8775-98895e393e47

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

## 25

1    for GM and its subsidiaries and would like to continue
2    to support the company. Indeed, prior to this matter,
3    I have never had a complaint with any of my GM
4    vehicles, and I continue to have respect for the
5    service personnel at my dealership. But, now, as you
6    might imagine, I am saddened and disappointed that Mr
7    Yearwood seemed indifferent to my plight and I am
8    afraid to drive this car.
9            "Please consider this letter notice of a
10   serious potential hazard and defect that should be
11   investigated, especially in view of the fact that the
12   Cobalt is a new model."
13           Did I read that correctly?
14   A.  Yes.
15   Q.  Do you know why the dealership and GM didn't tell
16   Ms. Civardi about the technical service bulletin?
17   A.  No, I don't know, and I don't know if the bulletin was
18   out at that time or not. I don't recall.
19   Q.  Well, we saw earlier in the first claim that the
20   bulletin was out because they talk about the bulletin
21   in the March claim, don't they?
22           MR. FRANKLIN: Object to form.
23           THE WITNESS: I don't remember. Can you
24   point me back to that?
25   BY MR. COOPER:

## 26

1    Q.  Well, the jury heard it.
2            Do you recall that?
3            MR. FRANKLIN: Object to form.
4            THE WITNESS: Can you point me back to the
5    page? Do you mind?
6    BY MR. COOPER:
7    Q.  Sure. If you look back at tab 1.
8    A.  Tab 1.
9    .Q.  Open date, March 8th, 2005.
10           Do you see that?
11   A.  Yes.
12   Q.  A claim -- the Rebecca Bowden claim, and if you look
13   at the first paragraph, which we read, in the middle
14   of the paragraph says:
15           "Customer states bulletin claims engines
16   may stall if driver is short and has a large key
17   chain."
18           This is March 28th of two thousand --
19   excuse me, March 8th of 2005. The claim was closed on
20   March 28th of 2005.
21           So as of March 28th, 2005, at least
22   according to this claim, the bulletin had to have been
23   issued; correct?
24   A.  It sounds that way, yes.
25   Q.  Do you know then, sir, why Ms. Coelho or anyone at GM

## 27

1    didn't make Ms. Civardi aware of the bulletin and the
2    potential fix to the stalling problem?
3            MR. FRANKLIN: Object to form.
4            THE WITNESS: Yeah, I do not.
5    BY MR. COOPER:
6    Q.  If you can go to tab 5, please, sir. Right there, tab
7    5.
8    A.  That last claim, there was a repurchase, it looks
9    like, right, of that vehicle?
10   Q.  Correct, they chose to repurchase --
11   A.  So they did repurchase the vehicle from the customer.
12   Q.  Tab 5. It's Markeese Hampton from Maryland made a
13   claim involving a 2005 Chevy Cobalt. The claim was
14   opened on May 2nd of 2005, and the vehicle had
15   3,000 miles on it; correct?
16   A.  Correct.
17   Q.  And again, the agent note is stalls?
18   A.  Correct.
19   Q.  And customer states here down on the page:
20           "Vehicle stalls out while driving. Twice
21   while on the freeway. Took to dealer. Dealer said
22   couldn't duplicate and customer should come back when
23   it happens again. Customer states they are losing
24   confidence in vehicle and believes it is a safety
25   concern."

## 28

1            Did I read that correctly?
2    A.  Yes.
3    Q.  If you go to the next page, sir, ending in 49, the
4    highlight there toward the bottom of the page. The
5    CRM is assisting the customer, and the customer
6    states:
7            "Cobalt one month after purchase vehicle
8    cuts off with a tractor-trailer behind him and it
9    almost killed them. His wife was also in a similar
10   situation where vehicle stalled while she was
11   driving."
12           Did I read that correctly?
13   A.  Yes.
14   Q.  Turn to tab 6, please, sir.
15   A.  Okay.
16           MR. FRANKLIN: Lance, one moment. The
17   copies that I've gotten don't have -- like yours and
18   the witnesses, don't have the highlighted sections.
19   I'm trying to follow, but you are going to have to
20   bear with me so that I can make sure I am following
21   what you're reading and asking the witness to read.
22           What you've just read I take it is the
23   bottom paragraph on page 18049; is that right?
24           MR. COOPER: Correct.
25           MR. FRANKLIN: The full paragraph there?

VICTOR HAKIM
MELTON vs. GENERAL MOTORS

June 11, 2013

## 29

1      MR. COOPER: Correct.
2      MR. FRANKLIN: Okay.
3  BY MR. COOPER:
4  Q.   If you go to tab 6, please, sir, Michael Smith from
5      Tampa, Florida owned a 2005 Cobalt. Made a claim that
6      GM opened on May 3rd of 2005. The vehicle had
7      2,500 miles on it. And again, the agent note is
8      stalls; correct?
9  A.   Correct.
10 Q.   In the second paragraph of this claim:
11      "Customer states that his brand new car
12      keeps having continuous stalling problems while
13      vehicle is moving and while in a stopped position.
14      Customer is very concerned on a safety aspect that the
15      vehicle will stall at a bad time. Customer states he
16      has only made one payment on vehicle, yet vehicle has
17      been in the service department four to five times in
18      the first 2,500 miles on it."
19      Did I read that correctly?
20 A.   Yes.
21 Q.   Go to the next page, sir, ending in 52, fourth
22      paragraph:
23      "Customer states that he is very concerned
24      with the safety of his vehicle. Customer states that
25      problem usually happens at a stoplight with foot on

## 30

1      brake. Customer states when he steps on gas to
2      accelerate, vehicle will sometimes stall as it begins
3      to move. Customer states that the problem is that the
4      vehicle has a hard time turning over and other
5      vehicles are having to hit their brakes and sometimes
6      almost hit him. Customer states he is not trying to
7      be a pain, but is very frustrated that his brand new
8      car is acting this way, and that the dealer response
9      is always the same where they cannot find the problem
10      and tell customer to drive vehicle around for a while
11      to see what happens next. Customer states that he
12      wants dealer to repurchase vehicle."
13      Did I read that correctly?
14 A.   Yes.
15 Q.   Do you know why GM never told Mr. Smith about the
16      technical service bulletin involving this vehicle?
17      MR. FRANKLIN: Object to form.
18      THE WITNESS: Well, I don't. I don't see
19      any mention in here about the key or key being an
20      issue.
21 BY MR. COOPER:
22 Q.   So the answer is you don't know why they didn't?
23 A.   Correct.
24      MR. FRANKLIN: Object to form.
25 BY MR. COOPER:

## 31

1  Q.   If you would go to tab 7, sir, please.
2  A.   Do you mind if I look at the rest of that document?
3  Q.   Sure.
4  A.   All right. So the gist of that is they replaced a
5      diode, but it kind of ended there. All right.
6  Q.   They never told Mr. Smith about the technical service
7      bulletin, did they?
8      MR. FRANKLIN: Object to form.
9      THE WITNESS: I didn't see that mentioned
10      in the document, but they did an electrical repair on
11      it.
12 BY MR. COOPER:
13 Q.   And did you bring this document, Mr. Smith's claim,
14      with you here today?
15 A.   Which tab was that again? 6? Was that tab 6?
16 Q.   Yes, sir.
17 A.   I don't believe I did.
18 Q.   Is this the first time you've seen this claim?
19 A.   I remember seeing it, so I don't believe it is the
20      first time that I've seen it.
21 Q.   Who pulled the documents for you to review in
22      preparation for this deposition?
23      MR. FRANKLIN: Object to form -- or object
24      to the question to the extent it calls for privileged
25      information.

## 32

1  BY MR. COOPER:
2  Q.   You can answer.
3  A.   So what was the question?
4  Q.   The question is, in preparation for this deposition, I
5      understand that you reviewed a number of claims, some
6      of which you have here today, some of which you chose
7      not to provide here today.
8      Who pulled all of the initial claims to
9      start with for you to review?
10      MR. FRANKLIN: Let me object, again, and
11      restate what I stated at the beginning, that Mr. Hakim
12      has been presented to talk about the subjects as set
13      forth in the objections to the amended notice and has
14      brought with him the claims that fit that description.
15 BY MR. COOPER:
16 Q.   You can answer the question.
17 A.   The discovery coordinator at legal staff.
18 Q.   Who is that?
19 A.   Jamie Morrison.
20 Q.   So you had nothing to do with actually pulling the
21      claims?
22      MR. FRANKLIN: Object to form.
23      THE WITNESS: Well, I don't know what you
24      mean by "pulling the claims."
25 BY MR. COOPER:

VICTOR HAKIM                                                    June 11, 2013
MELTON vs. GENERAL MOTORS

**33**

1  Q.  Well, you are being presented --
2  A.  So you have to kind of explain what you mean by
3      "pulling the claims."
4  Q.  Sure.  At some point in time in the recent past, I
5      assume you were given notice that GM was going to put
6      you up as the corporate representative for this
7      deposition; correct?
8  A.  Correct.
9  Q.  Did you know anything about the case before that?
10 A.  Yes.
11 Q.  How did you know about the case?
12     MR. FRANKLIN:  Let me object to this line
13     of questioning.
14 BY MR. COOPER:
15 Q.  You can answer.
16 A.  I know generally about the case because I work in the
17     department where the case is worked.
18 Q.  And when you were told you were going to be the
19     corporate representative deposition, what did you
20     independently do to gather documents that may -- you
21     may need to review in order to prepare yourself for
22     the deposition?
23 A.  I didn't do anything independently.  Documents and
24     claims are pulled through legal staff, through search
25     criteria.  I was satisfied -- I did check the search

**34**

1      criteria, and I was satisfied it was a very thorough
2      search, and those claims were provided to me to review
3      through legal staff.
4  Q.  And what search criteria did you review?
5  A.  The criteria that they used, which was very broad
6      search terms to search for claims.
7  Q.  And what was the criteria?
8  A.  In general, they used the scope that was outlined in
9      the -- for this case.  So vehicle scope, the term
10     "stall, electrical, ignition, engine."  So very broad
11     terms to generate as much as they could.
12 Q.  And then someone from GM legal counsel then provided
13     you with the documents relating to these claims?
14     MR. FRANKLIN:  Let me object and instruct
15     the witness not to answer.  I think this is calling
16     for privileged communications between the witness and
17     his attorneys.
18 BY MR. COOPER:
19 Q.  I'm allowed to know what documents you reviewed in
20     preparation for this deposition.
21     MR. FRANKLIN:  Let me object.  Lance, the
22     witness has already testified that he has generally
23     reviewed all the documents, and that he has brought
24     those that meet the criteria set forth in the
25     objection.

**35**

1  BY MR. COOPER:
2  Q.  What other documents did you review, other than what
3      you've brought with you here today?
4  A.  I reviewed, in general, the claims that were produced.
5  Q.  And when you say "in general, the claims that were
6      produced," did you -- for what vehicles?
7  A.  For the scope vehicles, the vehicles that were in the
8      scope for this deposition.
9  Q.  And those were provided to you?
10 A.  Yes.
11 Q.  Where are those documents now?
12 A.  Well, they are electronic.
13 Q.  So you were provided them in electronic form and then
14     printed out what you have with you here today?
15 A.  Yes.
16 Q.  Let's go to tab 7, please.  Maryellen Biddle from
17     Pennsylvania owned a 2005 Cobalt.  She made a claim
18     that was opened on May 19th, 2005.  There were
19     945 miles on the vehicle, and GM decided to repurchase
20     the Cobalt; correct?
21 A.  Correct.
22 Q.  And the agent notes again is stalling, stalls.
23     Do you see that?
24 A.  I do.
25 Q.  And then on the initial description it says:

**36**

1      "Customer calls.  Customer states she just
2      bought a new Cobalt for her daughter April 30th, 2005.
3      The vehicle has stalled out three times now.  This is
4      a safety issue."
5      Did I read that correctly?
6  A.  Yes.
7  Q.  Go to tab 8, please.
8      MR. FRANKLIN:  Let me state for the record,
9      Lance, I know you are presenting the witness with
10     these documents, and it's obviously fine to ask
11     questions.  I just want the witness to be able to be
12     familiar with it before we move on to the next
13     document, because he's not reading, necessarily,
14     everything.  You are picking out certain aspects of
15     these claims.  So I appreciate you letting the witness
16     become familiar with the document before you move on
17     to the next one.
18 BY MR. COOPER:
19 Q.  Tab 8, please, sir.  Do you have tab 8 in front of
20     you?
21 A.  Yeah.  I was just finishing reading the document, and
22     basically this is a repurchase.  They couldn't figure
23     out why she was having the concerns, and they
24     repurchased the vehicle.
25 Q.  Page 8, Eric Miller from the state of Washington owned

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**37**

1    a 2005 Cobalt.  The GM claim open date is May 24th,
2    2005, the vehicle had 7,500 miles on it, and this
3    vehicle was also repurchased; correct?
4  A.  Correct.
5  Q.  And it says here on the bottom of the first page:
6         "Customer states that he's had multiple
7    attempts on a repair with the vehicle stalling out,
8    but the dealership has had no success to date in
9    fixing the concern.  Have replaced the fuel pump and a
10   module.  Currently the vehicle is at the dealer and
11   has been for a few days, and he's in a loaner vehicle.
12   Seeks repurchase of the vehicle, if possible."
13        Did I read that correctly?
14 A.  Yes.
15 Q.  And then if you look at -- there is a red tab, or
16   there should be, toward the back of this.  Well, let
17   me see.
18        This claim, GM actually attached the TSB
19   involving the --
20 A.  If you don't mind, can I just look at these other --
21   just glance at these other pages until we get there?
22 Q.  Sure.
23 A.  Thank you.
24        Okay.  I'm to your tab now.
25 Q.  And the tab is the technical service bulletin for the

---

**38**

1    engine stalling as a result of the key moving in the
2    ignition?
3        MR. FRANKLIN:  Is this page 18198?
4        MR. COOPER:  Correct.
5        MR. FRANKLIN:  Thanks.
6  BY MR. COOPER:
7  Q.  Do you see that?
8  A.  Yes.
9  Q.  And it's dated February 28th, 2005?
10 A.  Yes.
11 Q.  Did you bring Mr. Miller's claim with you here today,
12   sir?
13 A.  I don't believe so.
14 Q.  So you are not prepared to testify about this claim,
15   other than what you've read here today?
16        MR. FRANKLIN:  Object to form.
17        THE WITNESS:  No, I don't agree with your
18   statement.
19 BY MR. COOPER:
20 Q.  You are prepared to testify?
21 A.  Of course.
22 Q.  What did you do with Mr. Miller's claim to review it
23   before today?
24 A.  Well, you know, I can't recall if I reviewed it or
25   not.  I believe I may have, but ask me any questions

---

**39**

1    you want about it.
2  Q.  Okay.  Tab 9, sir.  Raymond Arjona from New York owned
3    a 2005 Chevy Cobalt.  The GM claim was opened on
4    June 6th of 2005.  The odometer had 4,000 miles on it.
5        Do you see that?
6  A.  Yes.
7  Q.  If you go down in the body of the document:
8         "Customer states has had the vehicle stall
9    in the middle of use four times.  Customer states that
10   she has had the vehicle taken to the vehicle dealer
11   twice.  Customer states after the first visit the
12   customer was advised the concern had been corrected
13   and to pick the vehicle up.  Customer advised the same
14   day of receiving the vehicle the problem occurred
15   again.  Customer states she took the vehicle back to
16   the dealer and is now being told there is no fix for
17   the concern.  However, dealer advised of a bulletin
18   advising that if there are an excessive amount of keys
19   or if the driver knee hits the ignition, the vehicle
20   can stall.  Customer seeks a better type of resolution
21   than to adjust her daughter's driving habits who is
22   the driver of the vehicle.  Customer states she will
23   not pick the vehicle up until a better resolution is
24   reached."
25        Did I read that correctly?

---

**40**

1  A.  Yes.
2  Q.  Did you bring Mr. Arjona's claim documents with you
3    here today?
4  A.  I don't think so.  Let me just check.  No.
5  Q.  Tab 10, sir.  Audrey Naguina from Davenport, Iowa
6    owned a 2005 Chevy Cobalt.  The GM claim open date is
7    June 9th of 2005.  In the agent note is stalls;
8    correct?
9  A.  Correct.
10 Q.  And the body of the document:
11        "Numerous concerns.  Customer states has
12   taken in numerous times.  Died again yesterday.
13   Dealer states concern cannot be duplicated.  States
14   almost had an accident while trying to start vehicle
15   again.  States brand new car should not have so many
16   concerns.  Is getting frustrated with vehicle."
17        Did I read that correctly?
18 A.  Yes.
19 Q.  Tab 11, please.
20        MR. FRANKLIN:  Same objection I had before.
21   I'd like the witness to be able to review it before
22   moving on to the next document.
23        THE WITNESS:  Okay.
24 BY MR. COOPER:
25 Q.  According to this document, Ms. Naguina was never made

---

VICTOR HAKIM

MELTON  vs. GENERAL MOTORS

June 11, 2013

**41**

1    aware of the technical service bulletin, was she?

2         MR. FRANKLIN:  Object to form.

3         THE WITNESS:  It does not -- I can't say

4    that for a fact, but it doesn't state that in the

5    document.

6    BY MR. COOPER:

7    Q.    Tab 11, please.  Nathaniel Long from Cleveland, Ohio

8    owned a 2005 Chevy Cobalt.  The GM claim open date is

9    June 10th of 2005, the odometer was 4,943 miles, and

10   the agent notes is stalls; correct?

11   A.    Correct.

12   Q.    And the body of the document:

13        "Customer states just purchased a vehicle

14   less than 90 days.  '05 Chevy Cobalt.  Now has

15   concern, happened two times, and hit a bump in the

16   street, and the whole car cut off.  Car shut off

17   yesterday when coming down a hill and engine shut off

18   and could not turn.  Car is being serviced this

19   morning.  Not happy with vehicle now.  Vehicle is at

20   Lakeshore Chevrolet.  Customer states she is not getting back in

21   concern.  Customer states she is not getting back in

22   that car."

23        Did I read that correctly?

24   A.    Yes.

25   Q.    And according to this document, Nathaniel Long was

**42**

1    never made aware of the technical service bulletin; is

2    that right?

3         MR. FRANKLIN:  Object to form.

4         THE WITNESS:  It sounds like maybe they

5    were on page 18267 at the top.  The bulletin is

6    mentioned there.

7    BY MR. COOPER:

8    Q.    Okay.  So they actually were made aware of the

9    bulletin.  "Nothing out for bulletin except heavy key

10   chain and customer states does not have one."

11        Is that what it says?

12   A.    Yes.

13   Q.    Okay.  Let's go to tab 12.

14   A.    If you don't mind, I just want to finish --

15   Q.    Sure.

16   A.    -- taking a look at this one.  Okay.

17   Q.    Tab 12, please.  Elsie Garrison from Guntersville,

18   Alabama owned a 2005 Chevy Cobalt.  The GM claim open

19   date is 6-27-2005, the vehicle had 2,500 miles on it,

20   and again the agent note was stalls; is that right?

21   A.    Correct.

22   Q.    And if you look in the body of the document, the

23   highlighted section:

24        "CRM states" -- that's the GM employee

25   states -- "the customer claims that her vehicle stalls

**43**

1    for no reason at no specific time."

2         And the last paragraph:

3         "Customer states at various intervals the

4    vehicle dies for no reason.  When the engine stops

5    running, no lights will come on.  The steering locks

6    and it's hard to brake.  She took vehicle to the

7    dealer in May, and the vehicle has done this twice

8    since then.  There is no specific time or place the

9    vehicle does this.  The purpose for trading her old

10   car was to have a dependable vehicle to take her

11   mother to the doctor."

12        Did I read that correctly?

13   A.    Yes.

14   Q.    If you would go to tab 13, please.

15        MR. FRANKLIN:  Have you had a chance to

16   finish reviewing it?

17        THE WITNESS:  I'm getting there.  Okay.

18   I'm good.

19   BY MR. COOPER:

20   Q.    Tab 13, sir.  Christopher Whitt from McCarr, Kentucky

21   owned a 2005 Chevy Cobalt.  The GM claim open date is

22   June 27, 2005, the odometer 8,481 miles, and the

23   vehicle -- the agent note is stalls.

24        Do you see that?

25   A.    Yes.

**44**

1    Q.    And if you go to the next page ending in 75, the

2    highlighted section:

3         "Customer states approximately 3,000 miles

4    on vehicle.  Calling to see if there is anything out

5    on issue she is having with vehicle, 2005 Cobalt,

6    any reports of vehicle stalling.  Can be driving down

7    the street and the vehicle just dies.  No consistence

8    in speed.  Has called the dealer and they have asked

9    the customer to bring in the vehicle on Saturday to

10   diagnose."

11        And you go down further:

12        "Customer states that her Chevy Cobalt went

13   into the shop on July 9th, '05 for the vehicle just

14   turning off on her.  Customer states at the time the

15   dealer told her they let the vehicle run for one hour

16   and then drove it for 13 miles, and the car did not

17   duplicate the concern.  Customer states that she feels

18   it is a safety issue."

19        Did I read that correctly?

20   A.    Yes.

21   Q.    Then if you go to the next page, there is a discussion

22   about the diagnosis, ending in 76.

23   A.    Which page are we on?  This one?

24   Q.    Ending in 76, yes, right here.  It says:

25        "Get diagnosis from dealer.  Dealer did not

VICTOR HAKIM                                          June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**45**

1    duplicate the problems.  There is a TSB for these
2    symptoms.  Have ordered the parts and will be in at
3    the end of the week."
4          Did I read that correctly?
5  A.  Yes.
6  Q.  Then you go to the next page, sir, top of page 78, it
7    says:
8          "Having issue again.  Customer states the
9    day before yesterday the car died again.  Key ring
10   didn't resolve the issue.  Was almost in car accident.
11   Car behind her almost hit her."
12         Did I read that correctly?
13 A.  Yes.
14 Q.  Go to tab 14, please, sir.
15         MR. FRANKLIN:  Again, I would ask the
16   witness be allowed to read the portions of the
17   document that were not inquired about.
18 BY MR. COOPER:
19 Q.  And I won't ask this every time, sir, but we are going
20   to mark all the documents you brought with you today
21   as an exhibit, and obviously we can assume that,
22   although you may have reviewed the claims, that you --
23   before today, you came here prepared to testify only
24   about the claims that are set forth in the documents
25   you brought with you today; correct?

---

**46**

1          MR. FRANKLIN:  Object to form.
2          THE WITNESS:  Well, the claims that were
3    brought here meet the criteria that was described by
4    Mr. Franklin where we had an allegation of stalling
5    and loss of control, and I think almost all the claims
6    that we've reviewed -- I'm not sure all of them --
7    that you have in your book did not result in loss of
8    control.
9  BY MR. COOPER:
10 Q.  And you did not come prepared to testify about those,
11   although obviously, as we sit here today and talk
12   about them, you can talk about what is in the
13   documents that are before you today; correct?
14         MR. FRANKLIN:  Object to form.
15         THE WITNESS:  Again, I'm not sure what you
16   mean by "prepared to."  I mean what we said was that
17   we would testify on the documents that are in that
18   amended notice, and that is what I brought.  Right?
19   So "prepared" is kind of an ambiguous word.
20 BY MR. COOPER:
21 Q.  Well, no, "prepared" is not -- "prepared" means, if I
22   ask you, for example, about a claim and document in
23   here which you didn't bring with you today, you would
24   not be prepared to testify about it, unless I
25   presented you with my own document today and you jus

---

**47**

1    basically reviewed it and either confirmed or didn't
2    confirm what I said about it.
3          MR. FRANKLIN:  Object to form.  The
4    witness, Lance, is not required to bring documents.
5    It's just that we did bring those that met the
6    criteria.  But you can ask the witness about any of
7    the documents that you've brought.
8          THE WITNESS:  Yeah.
9  BY MR. COOPER:
10 Q.  You can answer the question.
11 A.  So, in essence, I brought documents that were part of
12   this notice.  Right?  I did not bring all these other
13   documents, but they have been produced, and you have
14   them, and you can certainly ask me questions about
15   them.
16         These documents -- again, I think almost
17   all of the documents that we've talked about here did
18   not involve any loss of control.
19 Q.  Okay.  Do you want to finish with your review?
20 A.  Sure.  Thank you.
21         Okay.  I'm good with that one.
22 Q.  So go to tab 14, please.  A Glen Wilt claim.  He's
23   from Garrettsville, Ohio.  He owns a 2005 Chevy
24   Cobalt.  The claim open date, June 27, 2005.  Vehicle
25   has 12,000 miles on it.  Again, the agent notes is

---

**48**

1    stalls; is that correct?
2  A.  Correct.
3  Q.  And if you go to the top of the next page, it says:
4          "Friday customer's wife was in the vehicle
5    on the way home when the vehicle stalled in the middle
6    of the intersection.  Customer feels that she was
7    nearly hit in the intersection."
8          Did I read that correctly?
9  A.  Yes.
10 Q.  Go to tab 15, please.
11 A.  Okay.  So if you don't mind me just kind of glance
12   through the rest of this.
13         So this one, again, did not involve loss of
14   control.  Okay.
15 Q.  What do you know about the Helen Nute case, Helen Nute
16   claim?
17 A.  So you'll have to help me with the number.
18 Q.  Well, see if it's in your documents there, sir.
19 A.  Are you going to give me a Bates number, or do you
20   want me to look through names?
21 Q.  Sure, look through names.
22 A.  So spell the name for me, please.
23 Q.  Helen N-u-t-e.  Actually, the Bates number, I've got
24   it.  18335.
25 A.  I don't think I have that one in here.  18335?

---

VICTOR HAKIM
MELTON vs. GENERAL MOTORS

June 11, 2013

## 49

1  Q.  Yes.

2      MR. FRANKLIN: While he looks at that,

3  Lance, I want to confirm, 14 was the Glen Wilt case,

4  Bates number 18285; is that right?

5      MR. COOPER: Correct.

6      MR. FRANKLIN: Okay. And we've not gone to

7  15 yet?

8      MR. COOPER: Correct.

9      MR. FRANKLIN: Okay. Thanks.

10      THE WITNESS: All right. So unless I've

11  misordered these, I don't have that one in here.

12  BY MR. COOPER:

13  Q.  So do you know anything about it? Are you prepared to

14  testify about it?

15  A.  Well, I can't remember about it. If I can look at it,

16  I may be able to answer your questions.

17  Q.  The question is, are you prepared today to testify

18  about that claim?

19  A.  If you show me the claim, I can answer your question.

20  I can't answer a question that way. I'm prepared to

21  testify about claims. I brought claims that involved

22  loss of control as defined in our objection, and if

23  you let me look at the claim, we can see if I can

24  answer questions about it for you.

25  Q.  What do you know about the Nathan Hill claim?

## 50

1      MR. FRANKLIN: Let me object to this line

2  of questioning. We have produced almost 32,000 pages

3  of claims, lawsuits, et cetera, from numerous

4  databases from the searches that Mr. Hakim has already

5  described. I think it is fundamentally unfair to just

6  throw out the name of a claimant that might fall among

7  those 32,000 pages and expect the witness to have

8  instant recall of that particular claim.

9      If counsel has a question about a

10  particular claim, he should present the witness with

11  that document that GM produced, and the witness can

12  certainly answer questions and advise as to whether or

13  not he recalls reviewing that claim. But giving out a

14  name among 32,000 pages, I think, is completely

15  unreasonable.

16  BY MR. COOPER:

17  Q.  You can answer the question.

18  A.  I need the Bates number to answer the question.

19  Q.  Sure. 18338.

20  A.  So I have 18 -- I don't have that one. So if it's in

21  one of your tabs, I can answer questions about it.

22  Q.  What do you know about the Raymond Gilbert claim,

23  18454?

24      MR. FRANKLIN: I'm going to object again.

25  It appears that these are in the notebook that you

## 51

1  brought, Lance. I would ask that you provide -- you

2  just tell the witness which tab to turn to, and you

3  can ask questions, as opposed to a memory contest.

4  BY MR. COOPER:

5  Q.  It's not a memory contest. I'm asking what you have

6  done to prepare yourself to testify about that claim.

7  A.  Well, again, I don't have those claims in front of me.

8  I need to look at the document. And if I can't answer

9  your questions, so be it. But I believe I can answer

10  your questions, so show me the document.

11  Q.  How many claims have there been involving -- engine

12  stalling involving 2005 and 2006 Cobalts?

13      MR. FRANKLIN: Object to form.

14      THE WITNESS: I don't know the answer to

15  that.

16  BY MR. COOPER:

17  Q.  How many warranty claims have there been involving

18  engine stalling in 2005 and 2006 Cobalts?

19  A.  I don't know the answer to that.

20  Q.  Are you prepared to testify about the warranty claims

21  at all?

22  A.  Well, again, in our amended notice, we were prepared

23  to talk about these claims that involve stalling, but

24  the warranty data was produced. If you show me the

25  warranty data, I may be able to answer your questions,

## 52

1  of course.

2  Q.  What warranty data have you reviewed, sir?

3  A.  Actually, I don't believe I reviewed the warranty

4  data.

5  Q.  So if you haven't reviewed the warranty data, you are

6  not prepared to testify about the warranty data? Fair

7  to say?

8      MR. FRANKLIN: Object to form.

9      THE WITNESS: No. If you show me the

10  warranty data, I may be able to answer your questions,

11  but I don't know that that fits the dep notice in

12  terms of claims, in terms of these types of claims.

13  BY MR. COOPER:

14  Q.  You don't know whether our amended notice incorporated

15  the warranty claims?

16  A.  I -- we have this notice, and we have our objections,

17  and the objections and what we were going to testify

18  to did not include the warranty data.

19  Q.  How many claims have there been where there has been

20  an accident and an airbag has not deployed in a

21  Cobalt?

22      MR. FRANKLIN: Object to form.

23      THE WITNESS: I don't know the answer to

24  that question.

25  BY MR. COOPER:

VICTOR HAKIM                                      June 11, 2013
MELTON  vs. GENERAL MOTORS

---

### 53

1  Q.  Have you done anything to prepare yourself to testify
2      about those incidents or claims?
3          MR. FRANKLIN: Let me object to the form of
4      this line of questioning for the same reasons that
5      I've stated before. The witness is here. The witness
6      has reviewed the numerous claims, lawsuits, et cetera,
7      from the numerous databases that have been provided in
8      this case, and is here to talk about those. Again, I
9      would object to this line of questioning.
10         If counsel has a question for the witness,
11     I would ask that the documents that counsel has
12     brought, that he present the witness with them and
13     allow the witness to testify.
14         MR. COOPER: Can you reread my question,
15     please?
16         (Record read back as requested.)
17  BY MR. COOPER:
18  Q.  Involving airbag non-deployments in '05 and '06
19      Cobalts.
20  A.  No, I looked at claims that involve stalling.
21  Q.  Let's go to tab 15. Lisa Funk from Levittown,
22      Pennsylvania owned an '05 Cobalt. The GM claim date
23      is opened July 7th of 2005, the vehicle had
24      2,320 miles on it, and the agent note again is stalls;
25      correct?

---

### 54

1  A.  Correct.
2  Q.  And the body of the document:
3          "Customer states speaking with customer's
4      mother, Rhonda. Daughter purchased a 2005 Chevy
5      Cobalt. Replaced a whole new gas tank. Customer
6      states her daughter has had it stall three times.
7      States her daughter does not feel safe."
8          Did I read that correctly?
9  A.  Yes.
10 Q.  And then if you go to the next red tab there.
11         MR. FRANKLIN: What is the Bates number on
12     that page?
13         MR. COOPER: 18330.
14         MR. FRANKLIN: Thank you.
15  BY MR. COOPER:
16 Q.  There is a "Dissatisfied Closed Business Reason"
17     section. It says:
18         "Customer seeks repurchase due to
19     intermittent stall issue. Dealer unable to diagnose
20     or duplicate. AVM advised no repurchase."
21         Do you know why GM would have repurchased
22     some of the other vehicles because they were stalling
23     and not this vehicle?
24 A.  I do not. I mean each case would be independent,
25     right, have its own individual facts about it. So I

---

### 55

1      can't tell you that.
2  Q.  Tab 16.
3  A.  I would like to read the pages in between. Okay.
4  Q.  Tab 16. Helen Nute from Plainfield, Vermont owned an
5      '05 Cobalt. The GM claim open date is July 18th,
6      2005. Odometer is 3,853 miles.
7          Do you see that?
8  A.  Yes.
9  Q.  And the middle of the body of the paragraph as far as
10     the customer issues, it says:
11         "Purchase new Cobalt from Cody Chevrolet on
12     July" -- excuse me -- "June 17th, '05, and all repairs
13     have been completed. Vehicle has experienced several
14     failures, to include unduplicated engineering" --
15     "engine stalling concerns."
16         Did I read that correctly?
17 A.  Yes.
18 Q.  Go to tab 17, please.
19 A.  Okay. So, again, no loss of control there. Tab 17?
20 Q.  Sure. Nathan Hill from Corpus Christi, Texas owned a
21     2005 Cobalt. The GM claim open date, July 21, 2005.
22     Odometer, 3,200 miles.
23         Did I read that correctly?
24 A.  Yes.
25 Q.  And the body of the paragraph or document says:

---

### 56

1          "Complaint vehicle." It says "Allen Hill,
2      customer states vehicle has about 2,100 miles.
3      Customer states is calling in for his son Nathan.
4      Customer states that he was told by dealer to contact
5      CAC to start file."
6          What is CAC?
7  A.  Customer assistance center.
8  Q.  "Customer states that his son purchased a new Cobalt
9      and vehicle has been in the shop five times. Customer
10     states that vehicle has been with the dealer this time
11     for one and a half weeks. Customer states that the
12     vehicle just dies. Customer states that all lights
13     come on in dash, shakes at times, and can't drive over
14     30 miles per hour."
15         Did I read that correctly?
16 A.  Yes.
17 Q.  Go to tab 18.
18 A.  Yeah, if you don't mind, I just want to take a look at
19     a few of the pages here.
20         So it looks like they did a repurchase on
21     this one. Okay. Next tab?
22 Q.  18. Do you have that?
23 A.  Yes.
24 Q.  Raymond Gilbert from Detroit, Michigan owned a 2005
25     Cobalt. The GM open claim date, August 10th of 2005,

---

VICTOR HAKIM
MELTON  vs. GENERAL MOTORS

June 11, 2013

**57**

1    the odometer had 14,900 miles, and the agent note, it
2    says stalls; correct?
3    A.    Correct.
4    Q.    And the body of the document:
5              "Customer complains about vehicle.
6    Customer states bought vehicle new.  Several times now
7    the engine has cut off on the highway.  The last time
8    it happened, the customer hit a bump in the road, and
9    the entire vehicle turned off.  Customer wasn't able
10    to turn the vehicle on while in neutral.  Had to pull
11    off the road and restart the vehicle.  This doesn't
12    happen all the time.  Dealer states that they weren't
13    able to duplicate the problem.  Dealer advised mixing
14    gasoline because maybe it was the gasoline.  Dealer
15    road test for 19 miles and found nothing."
16              Did I read that correctly?
17    A.    Yes.
18    Q.    If you go to the next page.
19              MR. FRANKLIN:  Next tab or next page?
20    BY MR. COOPER:
21    Q.    Next page, 18445, third paragraph from the bottom.
22              "Customer concerned about safety of family
23    with current vehicle.  Customer states feels unsafe in
24    vehicle because the vehicle has cut out at least five
25    times before and dealer wasn't able to duplicate the

**58**

1    problem.  Customer states dealership is a good dealer,
2    and they have done everything to help customer out,
3    but no diagnostic has been given."
4              Did I read that correctly?
5    A.    Yes.
6    Q.    And if you go to the next page ending in 456, the
7    first full paragraph:
8              "Customer states that this issue is big
9    safety concern and does not want wife driving vehicle
10    anymore.  Engine died again this morning when he was
11    driving on freeway through construction zone at about
12    60 miles per hour after hitting bump in the road.
13    Previous CRM advised that customer could go to another
14    dealer for second opinion, but if no concern was
15    found, customer would be charged diagnosis fee."
16              Did I read that correctly?
17    A.    Yes.
18    Q.    If you go to the next page, sir.  To the right there,
19    the bottom right-hand side ending in 458:
20              "Customer called.  Customer states that
21    wife doesn't feel safe in vehicle because vehicle
22    stopped inside the service bay at dealership with the
23    weight of the keys.  Customer states feels scared in
24    scared in that the vehicle would turn off when the
25    vehicle is on the freeway and be caught in an

**59**

1    accident.  Customer states they have tried the new
2    Colorado with the weight of the keys, and it didn't
3    turn off.  Customer seeks repurchase of their vehicle.
4    CRM advised that the weight of the keys will make the
5    vehicle turn off."
6              And that's the GM employee; correct?
7    A.    Yes.
8    Q.    CRM?
9    A.    Yes.
10    Q.    The GM employee "advised will give this info to Kevin
11    Andrews, as he is still researching the issue, and
12    will contact them on August 30th."
13              Did I read that correctly?
14    A.    Yes.
15    Q.    Go to tab 19, please, sir.
16    A.    I'm just cleaning up the rest of this document, if you
17    don't mind.
18    Q.    Sure.
19    A.    I think there is some description on Bates
20    number 18459 where there is some aftermarket alarm
21    interfacing with the ignition and some thoughts of
22    that being the issue on the vehicle.
23              Where do you want me to go now?
24    Q.    19, please.  The owner is Evelyn Ledoux, Plainfield,
25    Connecticut, a 2005 Cobalt.  A GM open claim date,

**60**

1    August 11, 2005.  The odometer, a little over
2    12,000 miles, and the agent notes is stalls; correct?
3    A.    Correct.
4    Q.    And the body of the document:
5              "Vehicle customer states refusing to
6    replace the ignition switch and president of the
7    company told them to do it.  I have been in near
8    accident because of the car shutting off while I was
9    driving down the streets -- street."  Excuse me.  "So
10    many problems with this vehicle, I just don't feel
11    safe in it."
12              And then there is another note at the
13    bottom.  "Concern," question mark, "unsafe vehicle,
14    engine shuts off while driving."
15              Did I read that correctly?
16    A.    Yes.
17    Q.    Go to tab 20.
18    A.    Okay.  So just let me clear the rest of the pages.
19              So this is -- it looks like there was an
20    accident, and the allegation had to do with brakes.
21              Okay.  Next tab you said?
22    Q.    20.  Do you have that?
23    A.    Yes.
24    Q.    Marcos Cruz from Three Rivers, Texas owned a 2005
25    Cobalt.  The GM open claim date is August 15th, '05.

VICTOR HAKIM
MELTON vs. GENERAL MOTORS

June 11, 2013

---

**61**

1  The vehicle had a little over 23,000 miles on it, and
2  again the agent note is stalls; correct?
3  A.  Correct.
4  Q.  And the body of the document:
5      "Jennifer Cruz, customer states that
6  vehicle shut off on the interstate.  Concern for
7  safety for children.  Customer seeks for vehicle to be
8  replaced.  Acknowledges that she was provided with
9  extended service contract, plus one month car payment.
10  Customer seeks for vehicle to be replaced.  Does not
11  feel safe in vehicle."
12      Did I read that correctly?
13  A.  Yes.
14  Q.  Tab 21, please.
15  A.  Okay.  I'm there.
16  Q.  Howard Gelman from Monroeville, Pennsylvania owned a
17  2005 Cobalt.  The GM claim date opened August 22,
18  2005.  The vehicle had 23,000 miles on it; correct?
19  A.  Yes.
20  Q.  And the body of the paragraph:
21      "Customer seeks repurchase.  Electrical
22  concern.  Customer states dealer cannot find anything
23  wrong with it.  Has been in at least three times for
24  vehicle cutting off.  Customer states wants to start
25  the lemon law process.  Does not feel safe in vehicle.

---

**62**

1  Customer states there are no warning, no light,
2  vehicle just shuts off.  Customer just picked up
3  vehicle from dealer today for same concern.  Today
4  they gave him a paper about stalling and a problem
5  with the electrical system, ID number 1683813, but
6  customer does not see how it pertains to him.
7  Customer seeks to make sure that it is documented
8  that, when he initially called to request it, the
9  mileage was 11,703 miles."
10      Did I read that correctly?
11  A.  Yes.
12  Q.  Go to tab 22, please.
13  A.  Okay.  Where am I going?  22?
14  Q.  22.  Margaret Hamm from Lowell, Indiana owned a 2005
15  Chevy Cobalt.  The GM claim open date, August 25, '05.
16  Vehicle had 6,000 miles on it, and the agent again
17  noted stalls; correct?
18  A.  Yes.
19  Q.  And then the body of the document:
20      "Customer states that she was driving down
21  the highway and her knee hit under the steering wheel
22  and the engine dies."
23      And then if you go a few lines down, "CRM
24  advised" -- that's the GM employee again, the CRM --
25  "advised since this is a safety issue to customer, she

---

**63**

1  should get the vehicle in as soon as possible."
2      Did I read that correctly?
3  A.  Yes.
4  Q.  Go to tab 23, please.
5  A.  Okay.
6  Q.  Grant Smith from Cincinnati, Ohio owned an '05 Cobalt.
7  The GM open date is September 2, 2005.  The vehicle
8  had 9,600 miles on it, and this vehicle was actually
9  repurchased by GM?
10  A.  Correct.
11  Q.  And in the description, in the "Work History," there
12  is a note:
13      "Still losing engine power, feels unsafe,
14  and doesn't want to travel in it.  Customer doesn't
15  want the car and have loan revoked."
16      And then it says at the bottom there, "What
17  conditions does concern occur?"  The answer is, "While
18  driving and leaving stoplight, lost engine power."
19      Did I read that correctly?
20  A.  Yes.
21  Q.  Go to tab 24, please.
22  A.  On Bates -- on that one, 18639, there is some
23  discussion about a bad battery and a bad battery cell
24  which may have caused the car to stall.
25      Where did you want me to go next?

---

**64**

1  Q.  Tab 24, please.  Arthur Ledoux from Plainfield,
2  Connecticut owned an '05 Cobalt.  The GM open claim
3  date or claim open date, September 10, 2005.  The
4  vehicle had 13,502 miles on it, and GM repurchased
5  this vehicle; is that right?
6  A.  Yes.
7  Q.  And the body of the document:
8      "Customer states that he was going up on
9  ramp and the key light (brake light) was bright red.
10  Customer states he has taken the vehicle to the dealer
11  for the issue in the past and that he is not taking
12  the vehicle to a GM dealer again unless he is dropping
13  off the vehicle."
14      Is that right?
15  A.  Yes.
16  Q.  And again, the agent notes there is stalls?
17  A.  Yes.
18  Q.  And if you go to the blue tab, right here is one of
19  these GM documents, "Case Assessment by Rodney Cross."
20  Do you know Mr. Cross?
21      MR. FRANKLIN:  What is the Bates number?
22      MR. COOPER:  18741.
23      MR. FRANKLIN:  Thanks.
24  BY MR. COOPER:
25  Q.  Do you know Mr. Cross?

---

VICTOR HAKIM                                          June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**65**

1   A.   I do not.
2   Q.   It says "Vehicle Repair History." August 5th, '05,
3        mileage 6,577, "Could not duplicate stall concern."
4        And then August 12th, '05, the vehicle has 6,665 miles
5        on it, "Replaced ignition switch housing." And then
6        on September 15th, '05, it says "Customer states
7        vehicle shuts off when driving. And then October 18,
8        '05, "Could not duplicate engine stalling concern.
9        And then January 31st, '06 "Installed key support
10       cover."
11            Did I read that correctly?
12   A.   Yes.
13   Q.   What is a key support cover?
14   A.   I believe that's the cover that changes the key from a
15       slot to a hole. It's an insert.
16   Q.   And then tab 25, please, sir. Are you there?
17   A.   Yes.
18   Q.   Antoinett Vamos from North Versailles, Pennsylvania.
19       She owned an '05 Cobalt. Open claim date,
20       September 12th, '05. The vehicle had a little over
21       6,500 miles on it, and the agent note again is stalls.
22   A.   Okay. I'm sorry, I just need to re-adjust a little
23       bit. All right. That was tab 25, you said?
24   Q.   Yes. Do you have that in front of you now?
25   A.   Yes.

---

**66**

1   Q.   I'll read it again. Antoinett Vamos from North
2        Versailles, Pennsylvania, an '05 Chevy Cobalt. GM
3        claim open date, 9-12-2005. The vehicle had over
4        5,600 miles on it, and the agent notes is stalls; is
5        that right?
6   A.   Yes.
7   Q.   And it says here in the body of the document:
8             "Customer states vehicle has shut off on
9        her three times. Customer states when her knee hits
10       something under the steering column, vehicle will shut
11       off. Vehicle doesn't do it all the time. Customer
12       states she is going to bring it in to dealer for this
13       concern. Also her head lamps will fog up."
14            Did I read that correctly?
15   A.   Yes.
16   Q.   If you go to -- two pages back to Bates 773 --
17       actually, go to 772 on the left there. Do you see
18       that?
19   A.   Yes.
20   Q.   "CRM" -- this is the GM employee -- "advised customer
21       states vehicle is turning off when she hits the
22       steering column or dash with her knee. She has been
23       told there is an issue but there is no fix. CRM seeks
24       to know if there should be a fix or if the AVM
25       should."

---

**67**

1        What is AVM?
2   A.   Area vehicle manager.
3   Q.   If you go to the next page, 773:
4             "Customer states the dealership told her
5        she shouldn't sit too close to the steering wheel to
6        avoid accidentally turning off the vehicle. Customer
7        believes she was sold something that is defective.
8        Customer would like vehicle fixed or a new vehicle
9        without the concern and replace it."
10            At the bottom of the page it says:
11            "Dealer states when the car was checked no
12       problem could be found or duplicated. The ignition
13       cylinder is a low-effort cylinder. The part can't be
14       replaced or repaired. It is a design problem that
15       can't be resolved with the current parts."
16            Did I read that correctly?
17   A.   Yes.
18   Q.   What does "low-effort cylinder" mean?
19   A.   Well, I'm assuming what they mean is that the torque
20       to turn the cylinder requires -- doesn't require high
21       effort.
22   Q.   The next page, 1774, this paragraph says:
23            "Customer states the vehicle turns off
24       intermittently if the customer accidentally bumps the
25       steering column or the keys."

---

**68**

1        Do you see that?
2   A.   I'm sorry, you said 1774?
3   Q.   Right there.
4   A.   Okay.
5   Q.   And I'll reread that first sentence.
6             "Customer states the vehicle turns off
7        intermittently if the customer accidently bumps the
8        steering column or the keys. Service manager states
9        when the car was checked no problem could be found or
10       duplicated. Diagnosis - concern unable to duplicate.
11       Per TSB, key may be turning when hit with knee."
12            And that's -- TSB is technical service
13       bulletin; is that right?
14   A.   Yes.
15   Q.   "The ignition cylinder is a low-effort cylinder. The
16       part can't be replaced or repaired. It is a design
17       problem that can't be resolved with the current parts.
18       Customer feels unsafe in the vehicle knowing it could
19       turn off the vehicle while driving, like when pulling
20       out into traffic. Customer would like to have the
21       concern resolved or be put in a different vehicle
22       without any concern. Please let me know what we can
23       do for the customer's vehicle to operate like any
24       other vehicle or if repurchase is an option."
25            And then if you go to the top of the next

---

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs.  GENERAL MOTORS

---

### 69

1    page, 775, it says "PAAVM states." What is a PAAVM?
2    Pennsylvania?
3    A.  Must be.
4    Q.  AVM. And what is AVM again?
5    A.  Area vehicle manager.
6    Q.  Is that a GM employee?
7    A.  Yes.
8    Q.  The GM employee states:
9        "This is a known vehicle concern at this
10    time. Has no suggested fix. The vehicle has a
11    low-effort key cylinder as a normal function of the
12    vehicle. All he can suggest at this time is to be
13    patient in waiting for a possible solution, while
14    being careful not to bump the ignition cylinder. GM
15    is working on the solution, but no buyback or
16    repurchase will be considered."
17        Did I read that correctly?
18    A.  Yes.
19    Q.  And then if you go down the page, it says "CRM
20    advises," or the GM employee advises:
21        "I got a response from back from the AVM.
22    The AVM states this is a known vehicle concern that at
23    this time has no suggested fix. The vehicle has a
24    low-effort key cylinder as a normal function of the
25    vehicle. All he can suggest at this time is to be

### 70

1    patient in waiting for a possible solution, while
2    being careful not to bump the ignition cylinder. GM
3    is working on the solution, but no buyback/repurchase
4    will be considered."
5        And it says "Customer states she will have
6    to pursue an answer via other means then, such as an
7    attorney."
8        Did I read that correctly?
9    A.  Yes.
10    Q.  Tab -- well, let me ask you this: The Vamos claim
11    here, did you bring that with you today as part of the
12    documents?
13    A.  No, this claim didn't involve a loss of control.
14    Q.  Tab 26 then, please. Bonnie Robustelli, Millington,
15    New Jersey owned an '05 Cobalt. Open claim date,
16    August 12, 2005, the vehicle had 8,500 miles on it,
17    and the agent notes is stalls; correct?
18    A.  Correct.
19    Q.  And then the body of the paragraph, it says:
20        "Repurchase. Bonnie Robustelli. Customer
21    states that she has had her vehicle in the shop on
22    several occasions for the same stalling concern, and
23    it had to be towed there this time."
24        Is that correct?
25    A.  Correct.

### 71

1    Q.  Go to tab 27, please.
2    A.  Okay. So just give me a moment.
3        Okay. I'm good. Tab 27, you said?
4    Q.  Yes, sir. Andres Filippidies, College Point, New York
5    owned an '05 Cobalt. Open claim date, September 15th,
6    '05, the vehicle had 2,000 miles on it, and the agent
7    notes is stalls; correct?
8    A.  Correct.
9    Q.  And the body of the document:
10        "Purchased new -- or "Customer states
11    purchased new. It wouldn't start for me twice. Had
12    it towed to Bay Chevrolet by roadside both times, and
13    they said they had fixed it both times and they
14    didn't. Yesterday the vehicle died going 60 miles an
15    hour on the highway. Put in into neutral, rolled it
16    to the side of the road, and it started up. Went to
17    the sales department at the selling dealership, and
18    they said they can't do anything about it. Almost
19    killed their family. Does not want the car. It's
20    defective.
21        Did I read that correctly?
22    A.  Yes.
23    Q.  Go to tab 28, please.
24        Okay. Next tab you said?
25    Q.  28.

### 72

1    A.  28.
2    Q.  John Papa, Levittown, New York owned an '05 Cobalt.
3    The GM open claim date, September 23, '05. The
4    vehicle had 700 miles on it, and GM actually
5    repurchased this vehicle; is that correct?
6    A.  Correct.
7    Q.  And the body of the document:
8        "Vehicle customer states Cobalt has been in
9    three times. Shuts off. They have it right now. A
10    week after purchase she was driving home about
11    35 miles per hour. Once it sits and she waits five
12    minutes, it starts up again. The SVM has driven the
13    vehicle home and was unable to duplicate the concern.
14    Almost was rear-ended."
15        Did I read that correctly?
16    A.  Yes.
17    Q.  Go to tab 29 -- actually, page 802. This is an
18    electronic preliminary repurchase authorization. Is
19    this part of the repurchase process?
20    A.  Yes.
21    Q.  And it says here "Reason For Repurchase" on this
22    document:
23        "Vehicle stalls at highway speed while
24    driving. Multiple calls to engineering. Unable to
25    locate cause for stalling condition."

---

VICTOR HAKIM                                        June 11, 2013
MELTON  vs. GENERAL MOTORS

---

73

1          Is that what it says?
2    A.    Yes.
3    Q.    And then go to Bates -- excuse me, tab number 29,
4          please.
5    A.    Okay.  What tab number?
6              MR. FRANKLIN:  You can look at the rest of
7          the document.  Have you done that?
8              THE WITNESS:  Yes.
9    BY MR. COOPER:
10   Q.    29.
11   A.    29.
12   Q.    Amy Fiorilli from Limerick, Pennsylvania owned an '05
13         Cobalt.  A claim open date, September 24th, 2005, the
14         vehicle had 1,700 miles on it, and the agent notes
15         stalls; correct?
16   A.    Correct.
17   Q.    And the body of the document:
18              "Customer states vehicle has been stalling
19         two to three times a week.  Took vehicle in to the
20         dealer and was advised that if steering column is
21         bumped, engine will cut off.  Yesterday evening engine
22         cut off again.  Customer called the dealer and advised
23         concern, and dealer advised that if she wants out of
24         the vehicle, she could call GMAC."
25              And again the concern is down there at

---

74

1          the -- the body of the document, the concern is the
2          engine stalls; correct?
3    A.    Correct.
4    Q.    And if you go to the next page, Bates number 1842 --
5          18842.  Yeah, we have it there.  It says at the middle
6          of that -- or top third of that page, "Escalation to
7          TM."  What does TM mean?
8    A.    Don't know.
9    Q.    "Customer states vehicle stalling when son's knee hits
10         ignition.  The vehicle stalls.  Mike at dealership
11         told her he talked to husband and told him they are
12         aware of the issue.  Mike provided customer with copy
13         of service bulletin.  Customer is fearful for her
14         son's life.  Dealer states it is a known issue and
15         tells customer to have son not bump the ignition.
16         Does not even want to take vehicle off dealer's lot
17         for fear of something horrible happening.  Just wants
18         GM to take the vehicle back.  How many people need to
19         die for this issue to be a recall?"
20              Did I read that correctly?
21   A.    Yes.
22   Q.    And then the body of the paragraph, Tricia Freshner
23         with CAC, it says:
24              "Customer has advised purchased" -- excuse
25         me -- "Customer has advised purchased this vehicle for

---

75

1          her son who has driven vehicle about eight times.
2          During four of these times the vehicle has stalled.
3          The dealer has seen the vehicle and has performed a
4          computer update and has also found a TSB that they
5          feel may be related to this concern.  The customer has
6          -- the dealer has advised customer of this TSB and has
7          advised her that her son should not bump the steering
8          column, as this may cause stalling.  Customer feels
9          this concern is placing her son's life in danger and
10         is afraid to have him drive the vehicle.  Customer is
11         seeking repurchase.  I have spoken with the service
12         manager who advised the TSB as well and has indicated
13         they have been researching the concerns.  I am seeking
14         a decision on repurchase.  Also, if repurchase is not
15         an option, what will we be doing for this customer to
16         repair this vehicle?"
17              Did I read that correctly?
18   A.    Yes.
19   Q.    Go to tab 30, please, sir.
20   A.    Which tab number?
21   Q.    30, please.  This is Preston Delph from Hebron,
22         Kentucky who is the owner of a 2006 Chevy Cobalt.  The
23         GM open claim date, September 27, 2005, the vehicle
24         has a little over 3,900 miles on it, and this vehicle
25         was actually repurchased, and the agent note again is

---

76

1          stalls; correct?
2    A.    Correct.
3    Q.    If you go to the next page, sir, there is a
4          description of the situation, top paragraph:
5              "Customer states the first time engine shut
6          down, daughter was driving it.  Age 18, drives to
7          work.  She was driving down the road around 35 miles
8          per hour.  When it stopped the first time, the
9          steering column locked up, speedometer went down to
10         zero, and brakes locked up.  Got over to the side of
11         the road and tried to start again and it did.
12         Customer states this is the third time with mother.
13         Customer states daughter was driving down a hill when
14         stalled out.  AC died.  All lights on dash went dead
15         and shut off.  Customer states daughter got it under
16         control.  No control of brakes or anything.  Got it
17         stopped, turned off, and it started right up again.
18         Customer states last time daughter was pulling out of
19         the parking onto the road with green light, and
20         vehicle died in the middle of the road.  Almost went
21         up on the curb and daughter put in park, then
22         restarted it.  Customer states she has not been in it
23         when it has happened.  September 15th was the third
24         time, and they made -- and they made fell on its
25         face" -- whatever that means -- "but did in six weeks

---

df795fa4-a19b-4bb3-8775-98895e393e47

VICTOR HAKIM                                           June 11, 2013
MELTON vs. GENERAL MOTORS

---

**77**

1    time. Had the vehicle maybe two to three weeks.
2    Customer states vehicle is not safe to drive. Will
3    not let her daughter drive. CRM apologized."
4            Did I read that correctly?
5    A.   Yes.
6    Q.   Tab 31, please, sir.
7    A.   Okay. 31?
8    Q.   Rosalie Schenker from Gettysburg, Pennsylvania owned a
9    2005 Cobalt. The GM claim open date is October 3,
10   2005. The odometer, 2,780 miles.
11           Did I read that correctly?
12   A.   Yes.
13   Q.   And the body of the document, it says:
14           "Customer states owner of '05 Chevrolet
15   Cobalt with approximately 2,780 miles. Customer
16   states they want to register a complaint on the
17   vehicle. Customer states when her husband was driving
18   the vehicle and was adjusting himself, he hit the
19   keys. The ignition cut off. Customer states it
20   happened the day he purchased the vehicle, but he
21   didn't think anything of it. Customer states that she
22   feels that this is dangerous. Customer states that
23   she is afraid to drive the vehicle. Customer states
24   that she went to the dealer and they have not come up
25   with a good solution. Dealer put a rubber tiny insert

---

**78**

1    in keyhole. Customer states that the ignition key
2    turns off very easily. Customer states that dealer
3    told him that GM engineering told him that the rubber
4    insert is the fix. Customer states that since he has
5    had the insert, it happened again, but has not advised
6    the dealer."
7            Did I read that correctly?
8    A.   Yes.
9    Q.   If you go two pages back to page 901, it says:
10           "Customer states that when she spoke to
11   dealer, customer states she spoke to Wayne who advised
12   customer to come in and look at two other Cobalts.
13   Customer states that dealer said that two employees at
14   the dealer own Cobalts and it does the same thing that
15   customer's vehicle does. Customer states that dealer
16   told her that she needs to adapt. Customer states
17   that she feels that it is a safety issue and that it
18   is defective. "CRM" -- the GM employee -- "advises
19   customer that concern has been escalated and
20   repurchase has been denied due to the fact that it is
21   not a mechanical issue but an issue with the
22   customer's driving habits."
23           Did I read that correctly?
24   A.   Yes.
25   Q.   And then at the bottom of the page there, the

---

**79**

1    highlighted section:
2            "File was escalated to AVM and denied
3    repurchase. AVM" -- area manager -- "stated that he
4    has worked on file closely. AVM stated that there is
5    nothing mechanically wrong with the vehicle. It is
6    the customer's driving habits. They hit the ignition
7    key slot and CRM" -- excuse me -- "and CRM can close
8    file out dissatisfied. No further recommendations for
9    dealer at this time."
10           Did I read that correctly?
11   A.   Yes.
12   Q.   Go to tab 32, please.
13   A.   Sorry, I'm just clearing the rest of the pages here.
14           I think on Bates 18904 there is a statement
15   that says "CRM asked if this happened again, and
16   customer stated that it has not happened," after the
17   fix.
18           So where do you want me to go now?
19   Q.   Tab 32, please. It says Andrea Ortiz from Chicago,
20   Illinois owned an '05 Cobalt. Open claim date,
21   October 18th, '05, the vehicle had approximately
22   28,000 miles on it, and it says agent notes two
23   stalls; is that correct?
24   A.   Yes.
25   Q.   And it looks like, if you look at the next page, that

---

**80**

1    GM actually settled this case, and the reference
2    for -- is engine stalling or engine stalls?
3            MR. FRANKLIN: Object to form.
4            THE WITNESS: Yes. I mean it looks like
5    there is some kind of settlement agreement there.
6    BY MR. COOPER:
7    Q.   Do you know where the rest of the documents for this
8    claim are? I mean if this is a settlement of the
9    claim, we have one page of the GM computer database
10   printout.
11           MR. FRANKLIN: Objection.
12   BY MR. COOPER:
13   Q.   Do you know where the other documents would be?
14           MR. FRANKLIN: Object to the extent it
15   calls for privileged information.
16           THE WITNESS: Yeah, and the answer would be
17   no, I don't.
18   BY MR. COOPER:
19   Q.   All right. Tab 33, please.
20   A.   I don't know if there are any other documents. Which?
21   Q.   Tab 33. Christy Grace from Fresno, California owned
22   an '05 Cobalt. The claim open date is November 3rd,
23   2005, the vehicle had a little over 8,000 miles on it,
24   and the agent note is stalls.
25           Do you see that?

---

VICTOR HAKIM
MELTON  vs. GENERAL MOTORS

June 11, 2013

---

**81**

1    A.   Yes.

2    Q.   And then it says here in the body of the document:

3         "Hedrick's Chevrolet in Fresno, California

4    told me" -- I guess that's the customer -- "that the

5    reason my car stalled was due to a glitch in the

6    software and that they applied the program update.  I

7    was told by the dealership that I needed to contact

8    customer service to receive a case number to fix the

9    body damage caused when the car stalled and my husband

10   lost control.  I have a copy of the tow receipt.  The

11   CHP officer detailed the damage.  Employee at

12   Hedrick's Chevrolet documented the damage before I

13   took my car.  Need the car inspected for safety" --

14   something "miled this message November 1, 2005."

15        Is that what it says?

16   A.   Yes.

17   Q.   And then if you go to page 1306 where that little

18   green tab is there, bottom of the paragraph, it says:

19        "Owner description:  Customer states

20   husband was driving vehicle.  Let foot off gas to get

21   off ramp.  There was no steering so he hit the brake

22   and it did not work and slid down the ramp and landed

23   in some bushes.  Vehicle was dead so he turned vehicle

24   off and it started up.  Customer states husband walked

25   three miles home after incident because he was shaken

---

**82**

1    up.  Customer states we were told by dealer there was

2    a software switch, so they did update, but that was

3    the cause of the stalling."

4         Did I read that correctly?

5    A.   Yes.

6    Q.   Is this one of the claims that you included in your --

7    starting with Bates number 19302?

8    A.   Yes.

9    Q.   What was the software glitch that there was with

10   the -- this particular vehicle?

11   A.   I don't know specifically.

12   Q.   Was there, in fact, a software glitch?

13   A.   When you read this document, it looks like they

14   updated the software in the powertrain control module,

15   the PCM.

16   Q.   Was that vehicle-wide, was that for all Cobalts, or

17   just for this particular vehicle?

18   A.   I -- from what I can tell, they updated it for this

19   vehicle.  There may have been an update in the

20   software in general.

21   Q.   Then if you look at Bates number 19310, which is --

22   A.   This one?

23   Q.   Yes.  It's a fax from Ms. Grace to GM's customer

24   service department regarding the '05 sedan and the

25   incident on September 24th, 2005.

---

**83**

1         Do you see that?

2    A.   Yes.

3    Q.   "There had been no problems with the car until

4    September 24th, '05.  The car stalled once in the

5    morning and then completely shut down without warning.

6    No warning lights came on.  My husband was not able to

7    steer the car, the brakes locked up, the brake pedal

8    went mushy, and the engine system shut down.  Thank

9    goodness there were no cars around him.  The car was

10   towed to Hedrick's Chevrolet.  Hedrick's told me the

11   reason my car stalled was due to a glitch in the

12   software and they applied the program update."

13        Did I read that correctly?

14   A.   Yes.

15   Q.   And then the last -- next paragraph:

16        "I was told by the dealership that I needed

17   to contact customer service to receive a case number

18   before they can fix the body damage caused when the

19   car stalled and my husband lost control."

20        Is that what it says?

21   A.   Yes.

22   Q.   If we go to the next tab, 34.

23        MR. FRANKLIN:  Let me state also, Lance, we

24   will stipulate these documents say what they say, to

25   the extent that helps speed things up.

---

**84**

1    BY MR. COOPER:

2    Q.   Tab 34.

3    A.   Yes.

4    Q.   Anatoleu Bekrev from Spring Hill, Tennessee, he owned

5    an '05 Cobalt.  The GM claim open date, November 3rd,

6    2005, the vehicle had 27,000 miles on it, and the

7    agent note is stalls; correct?

8    A.   Correct.

9    Q.   And in the body of the paragraph:

10        "Customer states bought the vehicle brand

11   new.  Vehicle has had problems since day one.  Major

12   concern now is that the vehicle engine stalls.  Engine

13   cuts off sporadically.  Driving or sitting at stop

14   lights or stop signs.  Vehicle has stalled at 80 miles

15   per hour.  Customer lost control of vehicle and almost

16   hit tree."

17        Did I read that correctly?

18   A.   Yes.

19   Q.   Is that one of the claims that you brought with you

20   today?

21   A.   Yes.

22   Q.   Can I see that?  Is that Bekrev?  Thank you.

23        Tab 35, please.

24        MR. FRANKLIN:  Have you had a chance to

25   review that?

---

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**85**

1       THE WITNESS: Yeah, there is some
2   discussion on Bates 19314 about running the vehicle
3   with low fuel and possibly could be the reason for the
4   stall.
5   BY MR. COOPER:
6   Q.   Tab 35. Mary Mines from Detroit, Michigan owned an
7   '05 Cobalt. The GM claim open date, November 15th,
8   2005, the vehicle had 1,900 miles on it, and the agent
9   note is stalls; correct?
10  A.   Correct.
11  Q.   And the body of the document:
12       "Caller is son, Bobby Mines. Mr. Mines
13  states that his mother purchased the vehicle in July
14  of '05 and has been in the shop two times for stalling
15  issues. It happened two times yesterday, and they
16  will have to take the vehicle back again for a third
17  time."
18       Did I read that correctly?
19  A.   Yes.
20  Q.   Tap 36, please.
21  A.   36, you said?
22  Q.   Yes. Mandi Beach from Millbury, Ohio owned an '05
23  Cobalt. The GM claim open date, November 16th, '05.
24  The vehicle had approximately 10,000 miles on it;
25  correct?

---

**86**

1   A.   Yes.
2   Q.   Body of the document:
3       "Vehicle customer states four-months-old
4   Cobalt currently in there now. Driving total power,
5   shutting car off. Dealer states keys too heavy.
6   Knees hitting keys. Last time busy brake shut off and
7   restart. Carsales was in the car with the customer
8   and it shut off."
9       Did I read that correctly?
10  A.   Yes.
11       MR. COOPER: We can take a break.
12       VIDEOGRAPHER: This completes disc one. We
13  are off the record at 12:10 p.m.
14       (A brief recess was taken.)
15       VIDEOGRAPHER: Back on the record at 12:21.
16  This is disc two of GM corporate rep Victor Hakim.
17  Please proceed.
18  BY MR. COOPER:
19  Q.   Tab 37, please. This involves Becki Williams from
20  Woodsville, Ohio. She is an '05 Cobalt owner. The GM
21  open claim date, November 16th, 2005. The vehicle has
22  4,470 miles on it; correct?
23  A.   Yes.
24  Q.   And the body of the document:
25       "Third party states vehicle stalled in the

---

**87**

1   middle of highway. Third party states that daughter
2   could have been killed if there -- they wasn't on the
3   side of the road. Third party states took vehicle to
4   dealer and dealer replaced the throttle body. Third
5   party states now daughter is afraid to drive because
6   vehicle stalled."
7       Did I read that correctly?
8   A.   Yes.
9   Q.   Tab 38, please.
10  A.   So they replaced the throttle body on that one. Is
11  that -- I think that's what we said there; right?
12       Yeah. Okay.
13       Tab 38?
14  Q.   Yes. Krystal Davis from Willoughby, Ohio owned an '05
15  Cobalt. The claim open date, November 28th, 2005,
16  vehicle has 16,000 miles on it, and the agent note is
17  stalls; is that right?
18  A.   Yes.
19  Q.   And in the body of the paragraph:
20       "Customer states vehicle continuing to
21  stall. Was driving vehicle in snow and stalled again
22  and spun out into a field. Did not hit anything. No
23  one was hurt."
24       Did I read that correctly?
25  A.   Yes.

---

**88**

1   Q.   If you go two pages over to page 639, the bottom
2   right-hand corner, the highlighted section there:
3       "Customer issue, has recurrent concerns
4   with vehicle stalling. Last time it happened customer
5   lost control of vehicle and spun out into ditch.
6   Customer and family are very afraid of vehicle and
7   will not drive it again."
8       Did I read that correctly?
9   A.   Yes.
10  Q.   Tab 39, please.
11  A.   I don't see anything -- can I just take a look at the
12  rest of the pages before we move on?
13  Q.   Sure.
14  A.   So it looks like this was a -- maybe it was a
15  repurchase, and there was no reason given for the
16  stall. Okay. Which tab?
17  Q.   39. Christopher Whitt from McCarr, Kentucky, an '05
18  Cobalt. December 13th, '05 open claim date. The
19  vehicle has 12,992 miles on it, and the agent notes is
20  stalls; correct?
21  A.   Correct.
22  Q.   And then in the body of the paragraph, it says:
23       "Customer. I'm worried about when my
24  vehicle stalls. I have an 11-month-old baby that
25  rides in this car. When the vehicle quits, I have no

---

VICTOR HAKIM                                      June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**89**

1    steering, brakes, and was about involved in an
2    accident. When take the car to the shop, it is always
3    can't find anything wrong. Something needs to be done
4    before we get hurt."
5        Did I read that correctly?
6    A.   Yes.
7    Q.   If you look at the next page ending in 680, the
8    highlighted section where it says:
9        "Description: Vehicle quits while driving
10   regardless of speed. Once happened when slowing and
11   rest time while driving two times highway speed and
12   other three times it was in town. Has not happened
13   since last repair. Put key ring on key. Last time
14   happened was about 45 days ago. They have never made
15   repairs for that."
16       Did I read that correctly?
17   A.   Yes.
18   Q.   Tab 40, please.
19   A.   Okay. So just let me clear the rest of the pages.
20       So it looks like, on Bates 19682, they
21   offered a General Motors protection plan and resolved
22   the issue with the customer.
23   Q.   Tab 40, please. Emmy Anderson from Independence,
24   Missouri owned an '06 Cobalt. The claim open date,
25   December 27, 2005, the vehicle had 8,000 miles on it,

---

**90**

1    and the agent notes is stalls?
2    A.   Correct.
3    Q.   And the body of the document:
4        "Customer states was driving vehicle last
5    night when car shut down and customer lost control,
6    causing her to drive into a ditch. Customer states
7    contacted dealer. Dealer told customer to contact CAC
8    for further assistance."
9        What is CAC?
10   A.   Customer assistance center.
11   Q.   And then if you look at the next page ending in 723, I
12   don't think we highlighted it, but it says:
13       "Description of this incident: Customer
14   states she was driving about 20 miles per hour in a
15   construction zone. Customer states she had just taken
16   off from a red light, switching to second gear, when
17   the vehicle stalled. Customer could not steer.
18   Customer then pumped the clutch to start the vehicle,
19   but it did not. Customer states the road curves to
20   the left a little so it caused customer to go off to
21   the side of the road and into a grassy median.
22   Customer states the left rear bumper has a hole in it.
23   Customer states the vehicle would die five to ten
24   times a day and only takes a few minutes after
25   starting the vehicle will it shuts off. Customer

---

**91**

1    states she takes her kids to school, which is only
2    15-to-20-minute drive, and the vehicle is die.
3    Customer states the vehicle would die on her and other
4    mechanics but never for the dealership. CRM" -- the
5    GM employee -- "advised the customer that CRM will
6    contact the dealer and call customer back."
7        Did I read that correctly?
8    A.   Yes.
9    Q.   Turn to tab 41, please.
10   A.   Okay. So I'm just clearing the rest of the documents.
11       Tab 41?
12   Q.   Yes, sir. Judith Russell from Auxvasse, Missouri
13   owned a 2005 Cobalt. The claim open date, December
14   29th, '05. The vehicle had 15,000 miles on it, and
15   the agent notes is stalls; correct?
16   A.   Correct.
17   Q.   And the body of the document:
18       "Complaint, vehicle engine stall. Husband
19   Robert customer states when going through a curve and
20   step on brakes, engine would die. Dealer could not
21   duplicate. Customer feels safety issue. Dealer tried
22   driving home and back to dealership to try to
23   duplicate and could not duplicate. Customer only
24   taken into dealership one time for concern. Concern
25   occurred two times to Robert and one times to

---

**92**

1    father -- one time to father" -- excuse me. "Customer
2    states does not want vehicle. Lost confidence in
3    vehicle."
4        Did I read that correctly?
5    A.   Yes.
6        (Exhibit No. 3 marked.)
7    BY MR. COOPER:
8    Q.   I'm going to show you what we've marked as Exhibit 3,
9    which are additional claims.
10       MR. FRANKLIN: So we are done with the set
11   that we just --
12       MR. COOPER: Well, I think I just kept all
13   yours --
14       MR. FRANKLIN: Okay.
15   BY MR. COOPER:
16   Q.   We have tab 42. Francis Strickland from Lakeland,
17   Georgia owned an '05 Cobalt. The claim open date,
18   January 3rd, 2006, the vehicle had 9,250 miles on it,
19   and the agent note is stalls; correct?
20   A.   Correct.
21   Q.   It says here in the body of the document:
22       "Owns two vehicles. 2004 Silverado and
23   2005 Cobalt. This concern is regarding the Cobalt.
24   New vehicle with multiple concerns. No longer feels
25   safe in the vehicle. '05 Cobalt has been in the shop

---

09-50026-mg    Doc 12640-53    Filed 04/23/14    Entered 04/23/14 18:52:12    Exhibit 53
Pg 25 of 53

VICTOR HAKIM                                                      June 11, 2013
MELTON  vs. GENERAL MOTORS

## 93

1    numerous times.  Does not feel safe in vehicle.
2    Vehicle stalls intermittently.  Check engine light
3    comes on and sometimes fails to accelerate when
4    pressing the gas pedal.  Also makes thumping noise
5    coming from rear of vehicle on right-hand side.
6    States they would like GM to exchange the vehicle."
7         Is that correct?
8    A.  Correct.
9    Q.  Turn to tab 43, please.
10   A.  Okay.  So just let me read the rest of these.
11        Okay.  Which tab?
12   Q.  43, please.  Lisa Sanford from Fayetteville, North
13       Carolina owned an '06 Cobalt.  Claim date opened
14       January 16, 2006, the vehicle had 1,200 miles on it,
15       and the agent note is stalls; correct?
16   A.  Yes.
17   Q.  And the body of the paragraph:
18        "To whom it may concern.  Please be aware
19       that the 2006 Chevrolet Cobalt has a serious defect
20       that is not being addressed by General Motors.  The
21       car stalls and the steering wheel locks up while it is
22       being driven.  This is a random occurrence and not
23       associated with any particular driving situation.  Why
24       is it so dangerous?  My Cobalt stopped completely in
25       traffic with my child in the back seat.  When the car

## 94

1    dies, the steering wheel locks up and the vehicle
2    cannot be controlled.  Had the driver behind me not
3    been more alert, I would have been rear-ended at the
4    time.  I had to stop, put on my flashers, and restart
5    the vehicle in order to proceed.  It had stopped on
6    other occasions prior to this, and I should have
7    immediately brought it in, but I thought perhaps there
8    was air in the line or some other innocuous problem.
9    Until the instance above I had not realized how
10   dangerous it was.  The Cobalt has done this about ten
11   times since we purchased it about a month ago."
12        Did I read that correctly?
13   A.  Yes.
14   Q.  Then if you go to the next tab.  That's it.
15        MR. FRANKLIN:  What is the page number?
16        MR. COOPER:  Bates 978.
17   BY MR. COOPER:
18   Q.  First full paragraph, which says:
19        "Although the mechanical department at the
20       dealership has a bulletin alerting them of this
21       problem, the Cobalt is still being sold to
22       unsuspecting consumers.  They are not being told of
23       this potentially dangerous defect.  Reed-Lallier
24       Chevrolet of Fayetteville, North Carolina has three
25       vehicles which have been returned for repair because

## 95

1    of this flaw, yet they are still selling the Cobalt."
2         Did I read that correctly?
3    A.  Yes.  That's words from the customer, I believe.
4    Q.  It looks like it, yes.
5    A.  Yes.
6    Q.  We can go to tab 44.
7    A.  44?
8    Q.  Yes.  Ronald Heaster from Crawley, West Virginia owned
9        an '05 Cobalt.  A claim open date, January 18th, 2006,
10       the vehicle had 18,379 miles on it, and this vehicle
11       was actually repurchased, and the agent note is
12       stalls; correct?
13   A.  Correct.
14   Q.  And the body of the paragraph:
15        "Ignition switch, customer states.
16       Customer was concerned with the ignition switch on his
17       daughter's '05 Cobalt.  The vehicle was just serviced
18       in the shop about one week from today concerning the
19       key coming out of the ignition and the vehicle still
20       running.  The vehicle is also having problems with
21       completely shutting off in mid driving for no reason.
22       Customer is concerned about their daughter's safety.
23       They were told by someone in the dealership that this
24       was a normal occurrence on Cobalts.  CRM will
25       investigate."

## 96

1         Is that what that says?
2    A.  Yes.
3    Q.  If you look at the top of the next page.
4    A.  Yeah.  On that current page, on 19985, "CRM called the
5        dealership and was told that this was not a normal
6        feature."
7         Where did you want me to go?
8    Q.  Top of the next page, 987.  Actually, it's the page
9        after that to the right, and it says:
10        "Customer states they are concerned with
11       safety.  Customer states vehicle stalled three times
12       before Christmas."
13        Is that what it says?
14   A.  Yes.
15   Q.  Turn to 45, please, sir.
16   A.  Tab?
17   Q.  45.
18   A.  45.
19   Q.  Salomon Maldonado from Arleta, California owned an '05
20       Cobalt.  Claim open date, February 3rd, 2006, vehicle
21       had 16,152 miles, and the agent note is stalls;
22       correct?
23   A.  Yes.
24   Q.  The body of the document:
25        "Vehicle customer states I just wanted to

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**97**

1    let someone know that the vehicle is acting like this.
2    The vehicle stops just in the middle of the road, and
3    this last time I almost got hit in the rear because
4    the vehicle behind me was not expecting me to just
5    stop in the middle of the road.  The vehicle stopped
6    in the middle of the road on me three times:  One, I
7    was going over a bump; two, I was going up a hill; and
8    3 is when I was making a turn to another street."
9         Did I read that correctly?
10   A.   Yes.
11   Q.   Page 46, please.  Or tab 46.  Excuse me.  Brandy
12   Atkins, Kernersville, North Carolina, owner of an '05
13   Cobalt.  The claim open date, February 6, 2006, the
14   vehicle has 20,000 miles on it; correct?
15   A.   Correct.
16   Q.   Body of the document:
17        "Nature of concern.  Vehicle concern.
18   Message.  I haven't had my Cobalt long enough to be
19   having trouble with it.  But twice now while in drive
20   on the highway my car has turned off for no reason.
21   The first time it happened I took it to the dealership
22   and they didn't know what was wrong and blamed it on
23   my heavy key chain.  Well, my key chain isn't heavy
24   anymore, and my car turned off again."
25        Did I read that correctly?

---

**98**

1    A.   Yes.
2    Q.   Tab 47, please.
3    A.   Okay.
4    Q.   Tab 47, please.  Nicholas Skias from Wernersville,
5    Pennsylvania owned an '06 Cobalt.  Claim date, open
6    claim date, February 10th, 2006.  Agent note is
7    stalls; correct?
8    A.   Yes.
9    Q.   The message -- the vehicle concern, the message is:
10        "I have two problems concerning my Cobalt
11   SS.  First, as I am driving down the road, my engine
12   just shuts off out of nowhere.  This incident has
13   happened twice, once traveling at about 55 miles per
14   hour, and another at around 40.  After this happened,
15   the car would not fire back up until approximately
16   five minutes later.  I did not spend $22,000 for a car
17   to have these problems.  Also, I just got into an
18   automobile accident, and the problem with that is my
19   airbags did not deploy.  The impact was definitely
20   fast and hard enough to where they should have.  I
21   want something done about these items.  If no actions
22   are taken about the problems, I'm going to be forced
23   to file a lawsuit because these are some big safety
24   issues."
25        Did I read that correctly?

---

**99**

1    A.   Yes.
2    Q.   Tab 48, please.
3    A.   Okay.
4    Q.   48?
5    A.   Yes.
6    Q.   Teresa Lafehr from Windsor Colorado, owner of a 2005
7    Cobalt.  Open claim date, February 20th, 2006.  The
8    vehicle mileage 13,740.  The agent notes is stalls;
9    correct?
10   A.   Yes.
11   Q.   And the vehicle, body:
12        "The customer states she has been into the
13   dealer several times.  Dealer gave customer AVDOC" --
14   whatever that means -- "that says low key ignition
15   cylinder has the potential for customers to
16   inadvertently turn off switch while driving.  Doc says
17   this tends to happen with short customers, and
18   customer states she is not short.  The ignition switch
19   was changed out in about October, but the concern has
20   happened again.  The engine stalls while the customer
21   is driving."
22        Did I read that correctly?
23   A.   Yes.
24   Q.   Go to tab 49, please.  This is Teresa Lafehr again, so
25   go to tab 50.

---

**100**

1    A.   You are saying this is a repeat of that last one?
2    Q.   Yes.  Yes.
3    A.   Okay.
4    Q.   Tab 50, Brian Williams from Danbury, Connecticut, '05
5    Cobalt owner.  Open date, claim open date, March 14,
6    2006, the vehicle had 5,000 miles on it, and GM
7    repurchased this vehicle, and the agent note is
8    stalls; correct?
9    A.   Yes.
10        MR. FRANKLIN:  Is this number 49?
11        MR. COOPER:  50.  49 was a duplicate.
12   BY MR. COOPER:
13   Q.   It says -- and in the body of the document, it says:
14        "Work history number 95.  Car shutting down
15   while driving.  Customer states vehicle has four times
16   shut down while driving.  Loses power steering.
17   Dangerous.  Afraid to drive car, and it has sat mostly
18   for two months.  Wife had car today, and again, it
19   just shut right down.  Had bad words with dealership."
20        Did I read that correctly?
21   A.   You know, I kind of lost where you were.  I'm sorry.
22   Oh, yeah, right here, you are saying.  Okay.  Yes.
23   Q.   All right?
24   A.   Yes.
25   Q.   And then the next -- top of the next page, 2401 -- or

---

VICTOR HAKIM                                          June 11, 2013
MELTON  vs. GENERAL MOTORS

---

101

1    excuse me, 0401, it says:
2         "Customer states vehicle is not safe and
3    wants GM to fix it before him, his wife, or someone
4    else gets killed.  Doesn't want to hear it can't be
5    duplicated.  It's done it four times in 5,000 miles."
6         Did I read that correctly?
7   A.  Yes.
8   Q.  And then go two more pages or three more pages back to
9    the document at the bottom, 404, where the green tab
10   is there.
11        Do you see that?
12  A.  Yes.
13  Q.  And it says:
14        "Customer states his wife will no longer
15   drive the vehicle after the last incident on Friday
16   evening when she just missed running into the back of
17   a vehicle.  Customer then he talked with Rob at the
18   dealership who he told they would not drive the car
19   anymore or make payments.  They like the car, but it's
20   unsafe and it's going to kill someone."
21        Did I read that correctly?
22  A.  Yes.
23  Q.  Turn to tab 51, please.
24  A.  Okay.  So where am I going now?
25  Q.  51.

---

102

1   A.  51.
2   Q.  Kathryn Shaffer from Malvern, Ohio, owner of an '05
3    Chevy Cobalt.  Claim open date, May 5th, 2006, vehicle
4    had 11,000 miles on it, and the agent note is stalls;
5    correct?
6   A.  Correct.
7   Q.  And if you look at the body of the document, there are
8    a number of complaints.  I have highlighted the ones
9    related to stalling, where it says:
10        "Customer states now the car shut off on
11   daughter at 55 miles per hour yesterday.  Customer
12   states now scared to put her daughter in the car.
13   Customer states again now we are getting into danger."
14        Is that what she said?
15  A.  Yes.
16        MR. FRANKLIN:  Object to form.
17        THE WITNESS:  Well, that's what the
18   document says, right.
19  BY MR. COOPER:
20  Q.  Sure.  And if you can go to tab 52.
21  A.  52.
22  Q.  Cindy Wind from Siloam Springs, Arkansas, an '05
23   Cobalt owner.  A claim open date, May 22nd, 2006, the
24   vehicle has a little over 20,000 miles on it, and the
25   agent note is stalls; correct?

---

103

1   A.  Correct.
2   Q.  And the comments here in the body of the document:
3         "My husband and I purchased an '05 Chevy
4    Cobalt last Saturday, May 13th, '06, and on several
5    occasions the car has just quit while it was being
6    driven.  We took the car to the Chevrolet shop in
7    Siloam Springs and they can't pinpoint the problem.
8    This is a huge problem and very dangerous.  Could
9    someone please help?  Thank you."
10        Did I read that correctly?
11  A.  Yes.
12  Q.  Tab 53, please.
13  A.  Tab 53?
14  Q.  Yes.  Michael Saternitzky from Neillsville, Wisconsin,
15   owner of a 2006 Chevy Cobalt.  The claim open date,
16   May 23, 2006.  Vehicle mileage, 2,000 miles.
17        Is that correct?
18  A.  Yes.
19  Q.  The body of the document:
20        "Vehicle complaint.  Customer states
21   ignition has gone out twice on the vehicle and
22   customer does not feel safe and secure while driving
23   it.  Is hoping GM will take the vehicle back.
24   Customer has owned multiple GM vehicles in the past
25   and just traded an '04 in for this one.  Customer has

---

104

1    vehicle for about two weeks before the steering locked
2    up and the ignition quit working.  The dealer fixed
3    it.  Now, about two weeks later, customer's wife was
4    driving it and it happened again."
5         Did I read that correctly?
6   A.  Yes.
7   Q.  Tab 54, please.
8   A.  Okay.
9   Q.  Shelley Hill from Cleveland, Ohio, owner of an '05
10   Cobalt.  The claim open date, January 5th, 2006.  The
11   vehicle mileage, 22,000 miles; correct?
12  A.  Yes.
13  Q.  And the agent note is stalls; correct?
14  A.  Correct.
15  Q.  And then the "customer seeks" here:
16        "Customer seeks repurchase.  Customer
17   states her vehicle has cut off since she purchased
18   vehicle.  Customer states the dealer has attempted to
19   repair several times.  Customer seeks to file with the
20   Better Business Bureau.  Customer states previous
21   rep" -- excuse me -- "customer seeks if the dealer is
22   lying by advising that she has not brought vehicle in
23   for service.  Customer states previous rep advised
24   only one repair.  Customer states she has a ton of
25   invoices that document that she has been to the dealer

---

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

**105**

1   more than once. Customer states she shouldn't have to
2   go to dealer six times now with new vehicle. Customer
3   states this is a safety concern. Customer states the
4   vehicle has shut off while coasting through an
5   intersection. Customer states the dealer has tried
6   telling her different stories. Customer states dealer
7   advised too many keys on the ring, different type of
8   gas, ignition switch, et cetera. Customer states she
9   is taking vehicle to dealer on Monday. Customer
10  states she has had numerous other concerns that she
11  does not care about because they were not safety
12  related. Customer states she is about to file with
13  the Better Business Bureau. Customer states she is
14  not the only person with a cutting-off concern."
15       .    Did I read that correctly?
16  A.   Yes.
17  Q.   Tab 55, please.
18  A.   Okay. 55?
19  Q.   Yes, sir. Stacey Mallett from Cartersville, Georgia,
20       owner of an '05 Cobalt. Claim open date, May 31, '06,
21       the vehicle had 4,900 miles on, and the agent note
22       says stalls; correct?
23  A.   Correct.
24  Q.   And if you look at the next page, there is a
25       description of the customer statements. It's 1226.

**106**

1   It's the tab there you see, and it states:
2        "Customer states the vehicle has stopped
3   two times in the middle of the road. Customer states
4   when the vehicle starts to act up, if you turn the
5   vehicle off and turn it back on, the vehicle goes back
6   to normal. Customer states the vehicle is very
7   dangerous to drive. Customer states she is seeking a
8   repurchase of the vehicle."
9        Did I read that correctly?
10  A.   Yes.
11  Q.   Tab 56, please.
12  A.   So it looks like on Bates 21228 that the body computer
13       was changed, the BCM.
14  Q.   Tab 56. Eric Olsen from Hauppauge, New York, owner of
15       an '06 Cobalt. The claim open date, June 21, 2006,
16       the vehicle had 1,800 miles on it, and the agent note
17       is stalls; correct?
18  A.   Correct.
19  Q.   And the body of the document here:
20        "Second time repairs have been done for the
21   same problem. The car shut off. It was repaired,
22   running perfect. 27 days later car shut off in middle
23   of intersection. Customer asked dealer to fix simple
24   problems as well as the interior. Dealer never fixed
25   those. Today Larry, service manager, thinks the car

**107**

1   is fixed and is taking car for test drive. Customer
2   begging for a new car. She is too afraid for car will
3   do it again while her daughter drives it."
4        Did I read that correctly?
5   A.   Yes.
6   Q.   Tab 57, please.
7   A.   I'm there.
8   Q.   Jamie Bella from Erlanger, Kentucky, owner of an '06
9        Cobalt. Claim open date, June 28, 2006. Vehicle has
10       10,400 miles on it; correct?
11  A.   Yes.
12  Q.   And the body of the customer complaint says here:
13        "Customer owned the vehicle for eight
14   months. In those eight months, the vehicle has been
15   in the dealership eight times for service problems.
16   Customer purchased the vehicle on a Friday. Monday
17   morning the car was in the service department. The
18   car completely shut down on a busy highway. She has
19   been working with the dealership for a long time to
20   try and correct the problems she is having with this
21   vehicle. The car will completely die in the middle of
22   the highway. She doesn't feel safe in this vehicle
23   anymore. She has been in a rental vehicle for the
24   past two weeks."
25        Did I read that correctly?

**108**

1   A.   Yes.
2   Q.   Tab 58, please.
3   A.   Okay. Next?
4   Q.   58.
5   A.   58.
6   Q.   Patricia Manoy, East Windsor, New Jersey, owner of a
7        2006 Cobalt. Claim open date, August 22nd, 2006. The
8        vehicle had 16,980 miles on it; correct?
9   A.   Yes.
10  Q.   And the alleged product allegation:
11        "Vehicle involved in a collision. Customer
12   states: Customer called in once to file product
13   allegation report. States this shouldn't happen on a
14   brand-new vehicle. Son was driving the car and picked
15   up his friend on their street when the vehicle
16   suddenly stalled. He decided to pull over but he
17   was -- but he slammed into a curb. Dealer states the
18   engine blew and it's a $3,300 repair for the parts
19   damaged."
20        Is that what it says?
21  A.   Yes.
22  Q.   Tab 59, please.
23  A.   So this one sounds like he had a major problem with
24   the engine or blew the engine, is what I read there on
25   24434. Okay.

df795fa4-a19b-4bb3-8775-98895e393e47

VICTOR HAKIM                                                           June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**109**

1    Q.    Tab 59. Tosha Moss from Allentown, Pennsylvania owned
2          an '05 Cobalt. Claim open date, September 13, 2006,
3          the vehicle had 29,172 miles on it, and the agent
4          notes is stalls; correct?
5    A.    Correct.
6    Q.    And if you look at the next page, at the bottom of
7          3531. Do you have 3531?
8    A.    Yes.
9    Q.    It says here:
10              "Customer doesn't feel safe in vehicle that
11         has turned off on her three times. Customer states
12         the first week of August customer was driving in
13         vehicle and vehicle lost power steering. Customer
14         took vehicle to dealer for a diagnosis, but dealer was
15         unable to find any problem with the vehicle. Customer
16         again was driving on the streets and the vehicle again
17         lost power steering. Customer then again took the
18         vehicle to the dealer and again the dealer couldn't
19         find anything wrong."
20              Did I read that correctly?
21   A.    Yes.
22   Q.    Tab 60, please.
23   A.    Okay. Tab 60.
24   Q.    Harmony Wade, Alexandria, Virginia, owner of a 2006
25         Cobalt. The claim open date, November 7, 2006. The

---

**110**

1          vehicle had 4,500 miles on it; correct?
2    A.    Correct.
3    Q.    And if you look at the next page ending in 861, bottom
4          left, it says "Vehicle shut off while driving."
5              Do you see that?
6    A.    Yes.
7    Q.    And if you look at the next page, 862, the center of
8          the page, it says:
9              "The customer states alleged product
10         allegation collision. Customer states the vehicle
11         shut down causing no control over the vehicle. The
12         vehicle was unresponsive, causing a collision.
13         Customer seeks reimbursement for rental vehicle and
14         wants money back. The car is a lemon, I don't want
15         that car ever again in my life -- or in life." Excuse
16         me. "I keep saying I'm going to go and get it and I
17         just haven't. CRM advised customer that their
18         information will be forwarded to the product
19         allegation department within the BRC."
20              Did I read that correctly?
21   A.    Yes.
22   Q.    Next page ending in 863, there is a "Vehicle Concern"
23         paragraph, and it says:
24              "First, I actually have a 2006 Cobalt, but
25         that option wasn't available on the pull-down menu

---

**111**

1          above. Second, the problem I have with my car is a
2          scary one. My car is currently at Heritage Auto
3          Plaza. It is there because I was in a car accident
4          when the power in my car completely shut off while I
5          was driving it. The steering wheel did not work, the
6          brakes were unresponsive, and everything in the
7          cockpit went to zero. Only the headlights and the
8          radio continued to work. This is the second time this
9          has happened. The first time I was able to move the
10         car off the road."
11              Did I read that correctly?
12   A.    Yes.
13   Q.    Then it says:
14              "I took my car to Rosenthal Chevrolet.
15         They told me nothing was wrong, it was a fluke and
16         would never happen again. I'm now completely afraid
17         of my car. Again they have said there is no problem.
18         I have since learned some things about how the Cobalt
19         is made. It is very disturbing. I do not want the
20         car. Can someone please contact me so we can discuss
21         how to resolve this?"
22              Did I read that correctly?
23   A.    Yes.
24   Q.    Tab 61, please.
25              MR. FRANKLIN: I need to take a quick

---

**112**

1          break.
2              VIDEOGRAPHER: We're off the record at
3          1:05 p.m.
4              (A brief recess was taken.)
5              VIDEOGRAPHER: Back on the record at 1:12.
6          Go ahead.
7    BY MR. COOPER:
8    Q.    Tab 61, please. Nancy Engle from Orlando, Florida,
9          owner of an '05 Cobalt. The claim open date,
10         November 30, 2006, vehicle has 11,775 miles on it, and
11         the agent notes is stalling; correct?
12   A.    Correct.
13   Q.    And it says:
14              "Recurring engine problem. Customer states
15         engine keeps shutting off. Happened six times. Wheel
16         would lock. Brought it to a GM dealership, but dealer
17         could not duplicate concern."
18              Did I read that correctly?
19   A.    Yes.
20   Q.    If you look at the next page ending in 848, bottom
21         left-hand paragraph, it says:
22              "Her daughter bought a 2005 Cobalt. She is
23         the second owner and she is still in warranty. She
24         purchased the vehicle approximately a month and a half
25         ago, beginning of October, and since then, when she is

---

VICTOR HAKIM                                                            June 11, 2013
MELTON  vs. GENERAL MOTORS

## 113

1   driving on the road, the engine would stop working and
2   the steering locks.  They have bought it into the
3   dealership, and they have been unable to duplicate the
4   problem, as it happened approximately six times and
5   they cannot seem to find out what is wrong with it.
6   Ms. Engle is extremely worried that the engine will go
7   out at the wrong time and there will be a serious
8   accident."
9           Did I read that correctly?
10  A.  Yes.
11  Q.  Tab 62, please.  Gabriel Karam from Burson,
12  California, an owner of an '05 Cobalt.  Claim open
13  date, December 4th, 2006.  Vehicle miles, 17,000.
14  Agent notes, stalls; correct?
15  A.  Correct.
16  Q.  And then the customer complaint:
17          "Customer calling on behalf of daughter,
18  Jennifer Karam.  Customer states happened the first
19  time two or three months after purchase.  Jennifer
20  Karam.  He feels as though the vehicle is not safe for
21  his daughter because it happened all of a sudden.
22  Customer seeks for the problem to be fixed."
23          Did I read that correctly?
24  A.  Yes.
25  Q.  Tab 63, please.  Virginia Aranda from Fort Worth,

## 114

1           Texas owned a 2006 Cobalt.  The GM claim open date,
2   December 20, 2006.  Vehicle mileage, 1,200 miles;
3   correct?
4   A.  Yes.
5   Q.  And the customer statement or work history:
6           "The car keeps dying on her.  Customer
7   states owns Chevy Cobalt 2006.  It keeps dying on her.
8   It happened five times this last week.  Customer is
9   afraid something might happen to her since she is
10  elderly.  Customer took the vehicle to the dealership
11  and they said they can't find anything."
12          Did I read that correctly?
13  A.  Yes.
14  Q.  Look at the bottom of the page, "Transfer from
15  Manila," it says:
16          "Customer states stalled on her on I35 and
17  20 south.  Great people at the dealership.  Third or
18  fourth time it has been in there.  Visited her in her
19  home twice.  Could have got killed twice because it
20  stalled on her twice.  Luckily the Lord blessed her
21  and it just floated to the side of the road.  Started
22  after that.  Five times it stalled on her last week.
23  Terrified to go anywhere because she is scared it will
24  stall on her.  She has never had to drive in the slow
25  lanes."

## 115

1           Did I read that correctly?
2   A.  Yes.
3   Q.  Tab 64, please.  Dale Johnston from McKeesport,
4   Pennsylvania, owner of an '05 Cobalt.  GM claim open
5   date, January 18th, 2007, vehicle mileage 27,500, and
6   the agent notes stalls; correct?
7   A.  Correct.
8   Q.  And the customer statement at the bottom of the page:
9           "Customer states has had numerous problems
10  with this car.  Many warning lights keep coming on,
11  engine stalls, power steering locks up, and this
12  almost causes daughter to have an accident.
13  Transmission."
14          Did I read that correctly?
15  A.  Yes.
16  Q.  Tab 65, please.
17  Q.  So Bates 22366 says -- it says:
18          "Advised, called in" -- and this is sort of
19  in the middle lower portion of that -- "the dealership
20  replaced the computer ignition system in the car, and
21  it's okay now.  Will call again if it acts up, but he
22  doesn't think that will happen now, and thanked me for
23  all my help."
24          So it looks like they changed the computer
25  ignition system in that one.

## 116

1   Q.  Tab 65, please.  Tom Edwards, owner of a -- or owned a
2   2006 Chevy Cobalt.  Claim open date, January 22nd,
3   2007, and this was actually a repurchase?  The vehicle
4   was repurchased?
5   A.  Yes.
6   Q.  It says here on the bottom:
7           "Customer states been in and out of
8   dealership for five times.  Dealer cannot duplicate
9   the problem on the vehicle.  Customer states that
10  sometimes when he is driving, the vehicle dies out,
11  and there is something wrong with the transmission.
12  He does not enjoy to drive it anymore.  He is a GM
13  employee.  Wants to speak to us so that he won't file
14  a lemon case."
15          Did I read that correctly?
16  A.  Yes.
17  Q.  Tab 66, please.
18  A.  Tab 66.
19  Q.  Danielle Fee from Tupperlake, New York owned a 2005
20  Cobalt.  The claim open date, February 22nd, 2007,
21  vehicle mileage, 20,730, and the agent note is stalls.
22          Do you see that?
23  A.  Yes.
24  Q.  And the body of the document:
25          "Car shutting off while driving.  Lauri

VICTOR HAKIM
MELTON  vs. GENERAL MOTORS

June 11, 2013

## 117

1  Dukette, mother, calling in for daughter. Customer
2  states daughter is traveling distance of one hour and
3  15 every day to school. Second time this has
4  happened. Car shut off going 55 miles an hour and the
5  car shut off, everything went black, steering locked,
6  which she then had no control. She went into a spin
7  and then came to a stop on the side of the road. Came
8  to a stop in a snowbank. Called dealership once again
9  this morning. She was not hurt, no damage done, but
10  mother very afraid something terrible will happen.
11  Vehicle has been in before, and they could not find
12  anything."
13      Did I read that correctly?
14  A.  Yes.
15  Q.  Tab 67, please.
16  A.  Okay. 67?
17  Q.  Yes, sir. Richard Cline from Saint Albans, West
18  Virginia owned a 2005 Cobalt. The claim open date,
19  March 15th, 2007. Vehicle mileage, 20,940; correct?
20  A.  Yes.
21  Q.  And the vehicle concern, the message is:
22      "I purchased a Cobalt for my wife nearly
23  two years ago. We have had it in the shop several
24  times and we have had nothing but problems with it.
25  Each month it is something new and she barely drives

## 118

1  it. I'm beyond furious because each time we take it
2  to the shop, they mysteriously find nothing wrong with
3  it. The engine stalls, the steering wheel ignition
4  locks up, it leaks, it rattles. The AC surges and
5  locks up. This is ridiculous. I want something done
6  for the safety of my wife and children before the car
7  breaks down on the side of the road. Can someone
8  contact me and get this resolved? Apparently no one
9  locally is competent enough to handle the situation.
10  I would either like to have the car completely
11  repaired, or I feel that her car should be replaced
12  immediately. Please contact me."
13      Did I read that correctly?
14  A.  Yes.
15  Q.  Tab 68, please.
16  A.  Okay. Tab 68?
17  Q.  Yes, sir. Bradley Zinn from Hanover, Pennsylvania
18  owned a 2006 Cobalt. GM claim open date, March 19th,
19  2007. Vehicle mileage, 11,000. Agent notes, stalls;
20  correct?
21  A.  Yes.
22  Q.  The body of the document:
23      "Vehicle customer states they just got the
24  vehicle back, but they have taken the vehicle to the
25  dealer about four times and he feels unsafe having his

## 119

1  sons in the vehicle because the vehicle has been
2  shutting off."
3      Is that what it says?
4  A.  Yes.
5  Q.  It says:
6      "And there have been problems with
7  antifreeze leaking and the sunroof fell and the
8  vehicle has had a misfire. Dealer states that there
9  was water in the gas. We don't use the cheap stuff
10  because he owns the car, but his sons drive it. He is
11  a big man. Jason Naim at the dealer says that he was
12  going to personally drive it, but he is not sure if he
13  really did that. But it is not safe to be driving.
14  Dealer says that they would call GM. I guess they did
15  call GM, but he is afraid that it will stall on their
16  boys and put an engine switch on the vehicle. But
17  when you are pulling over, you don't have time to be
18  pushing the button. He takes it for maintenance.
19  Naim Jason, head of the service department, names the
20  guys that worked on it, Chris Helferd, Christine, but
21  he was told that Jason was not in until noon.
22  Dealership is closed."
23      Did I read that correctly?
24  A.  Yes.
25  Q.  Tab 69, please.

## 120

1  A.  Okay. 69.
2  Q.  Paul Graveline from Virginia Beach, Virginia owned a
3  2005 Cobalt. The open date, claim open date, was
4  April 6, 2007, and the agent notes was stalls;
5  correct?
6  A.  Correct.
7  Q.  Tab 70, please. Christine Rafool from Canton,
8  Georgia, owner of a 2005 Cobalt. Claim open date,
9  April 13, 2007, the mileage was 15,000, and the agent
10  notes was stalls; correct?
11  A.  Correct.
12  Q.  And it says here in the body of the document:
13      "Customer states" -- it says "Engine
14  stalling. Customer states was purchased for the
15  daughter and it stalled. Today turning onto the side
16  street and it stalled on the daughter while she was
17  driving it. Customer states that she has filed a
18  lemon law. We do not have a lawyer yet, but we have
19  filed the papers. Someone at the place where I filed
20  the lemon law papers told me to contact the customer
21  assistance center. Having the lights come on is not
22  major, but having a car stall while driving is pretty
23  major. This car shutting down as my daughter is
24  driving and I want this documented so that GM knows
25  that this is a concern with the Cobalt. This is a

VICTOR HAKIM                                                        June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**121**

1    safety issue, and I don't want someone to get killed
2    or seriously hurt. Customer seeks let GM know what
3    the vehicle is doing -- what this vehicle is doing."
4            The CRS, or the GM employee, states:
5        "I certainly will document everything down.
6    And being you have filed a lemon law, I'm no longer
7    able to assist you with this. I do apologize for all
8    the trouble you've been having, and this is all
9    documented down."
10           Did I read that correctly?
11   A.   Yes.
12   Q.   Tab 71, please. Tyrice Goodwin, Baltimore, Maryland
13       owned a 2005 Cobalt. The claim open date, April 21,
14       2007, vehicle mileage, 13,936, and the agent note is
15       stalls; correct?
16   A.   Correct.
17   Q.   And the body of the document:
18           "Customer states customer frustrated.
19       Two-year-old vehicle. Dealer could not find anything
20       wrong. Every time she hits a bump, the vehicle cuts
21       off. Almost caused five accidents. Brought the
22       vehicle to the dealership. Dealer would test drive it
23       and still could not duplicate it. Last time customer
24       took the vehicle to dealer is April 6, 2007. Service
25       advisor was Jonathan Luther. Customer is on the road

---

**122**

1    right now when the concern happened again."
2            Did I read that correctly?
3    A.   Yes.
4    Q.   Tab 72, please. Aaron Loring from Beaumont, Texas
5        owned a 2005 Cobalt. The claim open date, 8-22-2007.
6        Vehicle mileage, 26,000; correct?
7    A.   Yes.
8    Q.   Body of the document:
9            "Customer calling about stalling problem.
10       Customer states the vehicle will lose power when
11       driving and sometimes it will turn off. Have taken
12       the vehicle into the dealer three times. Was advised
13       that vehicle is fine and they cannot duplicate the
14       problem. Customer is afraid to drive it."
15           Did I read that correctly?
16   A.   Yes.
17   Q.   Tab 73, please.
18   A.   On Bates 25479, there is a discussion, about in the
19       middle of the page, that says:
20           "Dealer states last time we saw it, it was
21       on the 17th of this month. It says performed a
22       diagnostic test at 29500 found a U code, U2103.
23       Checked the bulletins. Called TAC. Advised check
24       connections. Recommended customer remove non-factory
25       alarm system. It was a communication code. If she

---

**123**

1    would remove this alarm, we could further diagnose it.
2    If it's damage from the alarm installation, I cannot
3    cover it under warranty."
4            So there is a discussion there, I suppose,
5    as a possible cause with an aftermarket alarm system.
6    Q.   All right. Tab 73, please. Trixsy Rivera from
7        Palmyra, Pennsylvania owned a 2006 Cobalt. Claim open
8        date, May 23, 2007. Vehicle mileage, 13,125. The
9        agent notes is stalls; correct?
10   A.   Correct.
11   Q.   And then:
12           "Customer states the vehicle already died
13       down on me twice. One was on the highway and the
14       other one was in the road. I almost had an accident
15       because of this, and I want to file a lemon law.
16       Customer is currently at the dealership right now."
17           Did I read that correctly?
18   A.   Yes.
19   Q.   Tab 74, please.
20           MR. FRANKLIN: If you need to take a break
21       at any point, let us know.
22           THE WITNESS: It's -- what is it, 1:30? So
23       I guess I have a question, if I'm allowed to ask it.
24       Am I allowed to ask a question?
25           MR. COOPER: We'll go off the record.

---

**124**

1            VIDEOGRAPHER: We're off the record. 1:34.
2        (Lunch recess.)
3            VIDEOGRAPHER: We are back on the record at
4        2:18. This is disc three of the video deposition of
5        30(b)(6) GM corporate representative Victor Hakim.
6        Please proceed.
7    BY MR. COOPER:
8    Q.   Turn to tab 74, please. Are you there?
9    A.   Yes.
10   Q.   This is A. Stone from Dallas, Georgia, owned an '06
11       Cobalt. GM claim date, open date, July 5th, 2007,
12       vehicle mileage, 26,000 miles, and again, agent notes
13       is stalls; is that correct?
14   A.   Yes.
15   Q.   And if you go down to the body of the complaint, which
16       we've highlighted, it says:
17           "My daughter was driving the vehicle
18       Tuesday evening and it started running rough. She
19       glanced down and a light came on. She couldn't tell
20       if it was a red or amber light. After a couple of
21       minutes it started to flash, and then white smoke came
22       out from under the hood. She was making a turn into
23       her friend's driveway when the engine shut down and
24       cut off all power to the vehicle. She had to run the
25       vehicle up on an embankment because it was the only

---

VICTOR HAKIM                                      June 11, 2013
MELTON vs. GENERAL MOTORS

---

125

1    way to get it to stop."
2         Did I read that correctly?
3    A.   Yes.
4    Q.   Turn to 75, please.
5    A.   So this one looks like it's got an investigative
6    report with it, a PAR report, where they investigated
7    the vehicle, starting on Bates 13892, and they were
8    trying to determine whether the smoke and the
9    condition, whether the crash occurred first or that
10   was first. Okay.
11   Q.   So tab 75, Diana De Jesus from Poughquag, New York,
12   2006 Chevrolet Cobalt owner. GM claim open file date,
13   July 26th, 2007, vehicle mileage, 31,000 miles, and
14   agent notes is stalls; correct?
15   A.   Yes.
16   Q.   And if you go to the next page, at the top right where
17   it is highlighted, it says:
18        "We had an experience where the vehicle
19   died on us and we put it in neutral and got start.
20   Dealer advised that they took car back in May, dealing
21   with Mark, business manager, he vent, and tells us all
22   the issues that are going on and the dealer and not
23   giving us the proper treatment. The service manager
24   spoke to this past Wednesday and scheduled appointment
25   for Saturday, and they going to keep me in car and see

---

126

1    what they can do. Problems are just increasing with
2    the car. Vehicle is financed. I feel for my safety
3    of myself and my family."
4         Is that what it says?
5    A.   Yes.
6    Q.   Tab 76, please.
7    A.   Okay.
8    Q.   Tab 76. Are you there?
9    A.   Yes.
10   Q.   The owner is Jimmy Newton of Pinckneyville, Illinois.
11   An '05 Cobalt. The claim's open date, August 16th,
12   2007, vehicle mileage, 15,000, and the agent notes is
13   stalls; correct?
14   A.   Correct.
15   Q.   And it says:
16        "Customer states I have a 2005 Cobalt.
17   I've had it in the shop several times. They can't
18   seem to find the problem. The car dies for no reason.
19   I am so unhappy with car. I have talked to dealer and
20   try to work something out. I don't feel safe in the
21   vehicle. The car is at the dealer. I am so unhappy.
22   It just stalls. It started about a month after I
23   bought it."
24        Is that what it says?
25   A.   Yes.

---

127

1    Q.   And then it says:
2         "I brought the car in for window whistling.
3    I told them about it then. It doesn't happen every
4    single day. It's intermittent. I took it over for a
5    recall and told them about it again. They told me to
6    take some key rings off of the key chain, cut her a
7    new key and put in new ignition switch. The vehicle
8    has 15,000 miles. I've had it for two years. I feel
9    they sold us a lemon. It's to the point I don't want
10   the car anymore."
11        Did I read that correctly?
12   A.   Yes.
13   Q.   Turn to tab 77, please.
14   A.   Okay. 77?
15   Q.   Yes, sir. John Ptashnik is the owner, New Baltimore,
16   Michigan. '05 Chevy Cobalt. GM claim open date of
17   6-5-2007, vehicle mileage, 29,959, and again the agent
18   notes vehicle stalls; correct?
19   A.   Correct.
20   Q.   And then in the body of the document:
21        "Car keeps stalling. Customer states that
22   he is very frustrated with this whole situation. My
23   vehicle has been causing a lot of trouble, keeps
24   stalling out when you go over bumps. And now, when I
25   go to visit my daughter, we have to cross railroad

---

128

1    tracks, and it keeps stalling when we go across. I
2    feel that it is a safety hazard. Dealer just recently
3    replaced the ignition switch, steering shaft, patch up
4    electrical tape with silver tape, battery leak out
5    erosion materials, hose cracked in vent system."
6         Did I read that correctly?
7    A.   Yes.
8    Q.   Turn to tab 78, please.
9    A.   So to Bates 25599, it looks like the service reps
10   drove the vehicle over heavy railroad tracks and could
11   not duplicate it and dirt roads and could not
12   duplicate the condition.
13   Q.   Tab 78. Nicole Bradley is the owner from Chicago,
14   Illinois. It's a 2005 Cobalt. The claim open date,
15   9-5-2007. The vehicle mileage, 11,179 miles; correct?
16   A.   Correct.
17   Q.   Middle of the paragraph -- excuse me, middle of the
18   document here, it says:
19        "Customer called in having a problem with
20   the vehicle. Customer said that the vehicle has been
21   having the same problem for the last two years.
22   Customer says -- said that the vehicle always loses
23   power. Customer said that, while she is driving, the
24   vehicle suddenly jerks and stops. Customer said that
25   she already took it to the dealership and all they do

---

VICTOR HAKIM                                      June 11, 2013
MELTON  vs. GENERAL MOTORS

---

### 129

1  is reprogram the sensors, but it is still not fixing
2  the problem."
3      Did I read that correctly?
4  A.  Yes.
5  Q.  And at the bottom there, it says:
6      "Customer states I purchased my vehicle in
7  July of 2005. Come November or December, I started
8  experiencing issues. The vehicle would shut off in
9  the middle of the street while I'm driving. I have
10  been back and forth to the dealership for
11  approximately -- ten times approximately. Every time
12  I go back to the dealership, they reprogram the
13  sensors. Before the vehicle would stop, no warning
14  lights will come on, except the vehicle will start
15  making funny noises. The dealership have test driven
16  it but have found nothing, this is because it only
17  happens sporadically. I feel unsafe in the vehicle
18  and do not want to be in it anymore."
19      Did I read that correctly?
20  A.  Yes.
21  Q.  Turn to tab 79, please.
22  A.  Okay. 79.
23  Q.  The owner is Tracy Ashman from Pottsville,
24  Pennsylvania, an '06 Cobalt. The claim open date,
25  9-10-2007. 14,000 vehicle miles. The agent notes is

---

### 130

1  stalls; correct?
2  A.  Correct.
3  Q.  And then the customer statement:
4      "We don't want this vehicle anymore. We
5  have had this issue since we bought it. The dealer
6  hasn't been able to fix it, and now my daughter is
7  hurt and she could have been killed. Was driving on
8  Highway 80 in Pennsylvania near Lockhaven, driving
9  around 80 miles per hour, when the vehicle completely
10  shut off in the middle of the highway. No emergency
11  lights, no power, no engine, just dead. Thank God she
12  wasn't hit by anything, but she could have. They sent
13  an ambulance and police, so I don't know what is
14  happening yet, but this is unsafe. How do I enact the
15  lemon law?"
16      Is that what it says?
17  A.  Yes.
18  Q.  And if you look at the next page, the bottom of the
19  page:
20      "Customer states just" -- I guess "wanted
21  to advise you of a vehicle being brought to your
22  dealership. Possible PAR" -- or yeah, "CRS states."
23  Excuse me. What is CRS?
24      MR. FRANKLIN: What is the Bates number on
25  that page? I'm sorry.

---

### 131

1      MR. COOPER: 952.
2      THE WITNESS: I know it as CRM, customer
3  relations manager.
4  BY MR. COOPER:
5  Q.  Maybe that's what it is.
6  A.  I'm not sure what the CRS means.
7  Q.  Maybe it's just a typo. Anyway:
8      "Just wanted to advise you of a vehicle
9  being brought into your dealership. Possible PAR
10  case. Ongoing issue. Vehicle shuts down completely
11  at random, all systems, including electrical.
12  Happened today on highway traveling nearly 80 miles
13  per hour."
14      Is that what it says?
15  A.  Yes.
16  Q.  And then at the bottom of the next page, 953:
17      "Customer states what now? I don't want
18  this vehicle. It almost killed her. It's a total
19  lemon. The dealer should never have given it back
20  with such a problem if they didn't know how to fix it.
21  The semi driver nearly plowed her over."
22      Is that what it says?
23  A.  Yes.
24  Q.  Turn to tab -- just a moment. 959, the next -- there
25  should be a tab there.

---

### 132

1  A.  Sorry.
2  Q.  It's all right. Right there. Same claim. Owner
3  description says:
4      "Vehicle lost all power, completely shut
5  down, all systems, including electrical, while driving
6  nearly 80 miles per hour. Driver injured."
7      And it says:
8      "More information. Customer has brought to
9  dealer many times regarding random shutdown of
10  vehicle. Says unable to duplicate. No repair
11  completed." Then "University clinic sent customer to
12  get checked out at the hospital. Doesn't have further
13  information regarding treatment."
14      Is that what it says?
15  A.  That's what it says, yes.
16  Q.  Tab 80, please.
17  A.  There is some information on 13955 that -- kind of in
18  the middle of the page -- says:
19      "Customer states she went to university and
20  they said couldn't treat her because not university
21  related. Referred her to a hospital, but she didn't
22  go because she didn't have a car."
23      And then "CRS states has she received any
24  treatment or diagnosis?"
25      "No."

---

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

---

## 133

1    On the next page, on 13956, it says, about
2 in the middle there, "CRS states thank you.  You
3 mentioned your daughter being injured, but she hasn't
4 been treated yet; is that right?"
5    "Yes, I think so."
6    "In order to proceed further, we'll need
7 more specific information.  What is the nature of her
8 injury?"
9    "Don't know exact, but she was hurt because
10 she is a small woman and hit the steering wheel when
11 the vehicle suddenly stopped because of this problem
12 you can't fix."
13    So it doesn't look like there is any
14 treatment there.  Okay.
15 Q.  Tab 80?
16 A.  80.
17 Q.  Grace Worth, owner from Cape Coral, Florida, 2005
18 Cobalt.  Open claim date, 9-10-2005, mileage, 36,990
19 and the agent notes is stalls; correct?
20 A.  Correct.
21 Q.  And the customer states:
22    "Is original owner of a 2005 Cobalt
23 currently with 36,990 miles.  Has been to two
24 dealerships.  Vehicle shuts off while driving.  It
25 shut off yesterday in Boone, North Carolina.  Has

---

## 134

1 stalled about eight times, but has been to dealership
2 about three or four times.  Is concerned because they
3 are in the mountains, and if the vehicle stalls, they
4 could have an accident."
5    Did I read that correctly?
6 A.  Yes.
7 Q.  And then tab 81, please.
8 A.  Okay.
9 Q.  Tab 81.  Jennifer Barr is the owner from Whitehall,
10 Ohio.  It's an '06 Cobalt.  Claim open date,
11 10-29-2007.  Vehicle mileage, 30,000.  Agent notes,
12 stalls; correct?
13 A.  Correct.
14 Q.  It says:
15    "Vehicle stalls for no reason, customer
16 states.  Third time to dealer.  It just keeps
17 stalling.  Of the record someone told me it is a
18 manufacturer's defect.  I'm not putting my child in
19 the car anymore."
20    Is that what it says?
21 A.  Yes.
22 Q.  And then the "concern" down there, question mark, is
23 the "engine shuts off."  Is that what it says?
24 A.  Yes.
25 Q.  Tab 82, please.

---

## 135

1 A.  Okay.
2 Q.  Tab 82.  Jessica Baker is the owner from Cleveland,
3 Ohio.  2006 Chevy Cobalt.  Claim open date, 11-8-2007
4 mileage, 30,013 miles, and again agent notes is
5 stalls.
6    Do you see that?
7 A.  Oh, sorry.  Yes.
8 Q.  And then if you look at the center of the page, it
9 says:
10    "Vehicle shuts off completely when driving.
11 Customer states it shuts off when I'm driving, and I
12 have a 14-month-old.  It is not safe because another
13 car almost ran into me because it just off in the
14 middle of the road."
15    Is that what it says?
16 A.  Yes.
17 Q.  Tab 83, please.
18 A.  83?
19 Q.  Yes.  Angel Hoyt is the owner from Graysville, Ohio, a
20 2005 Cobalt.  Claim open date of 1-30-2008, vehicle
21 mileage, 33,000, and the agent notes is stalls;
22 correct?
23 A.  Correct.
24 Q.  And it says here:
25    "Alleged product allegation.

---

## 136

1 Injury/collision.  Customer states the ignition and
2 the shifter and the wheel locks up and car shuts off.
3 One week ago I wrecked the vehicle and it is going to
4 cost $5,000, that is how much damage, but I do not
5 have a deductible for my insurance.  The dealership
6 didn't want to touch it until you said we are going to
7 do it, and even when I wrecked the car, the airbags
8 didn't deploy.  Dealer said that it was in cruise
9 control and there was a bad sensor which caused
10 everything to lock up.  My two wrists are bruised and
11 I hit my head, but I have been back and forth to the
12 hospital, and I have insurance for all of that."
13    Did I read that correctly?
14 A.  Yes.
15 Q.  If you go to the next page, top left:
16    "Customer states I've had it for five
17 months and I've had it in the shop three times now re:
18 the same problem.  Shifter in the ignition keeps
19 going -- keeps going bad, steering wheel would lock
20 up, and vehicle would shut off."
21    Is that what it says?
22 A.  Yes.
23 Q.  It says "It happened again a week ago"; right?
24 A.  In the next line, yes.
25 Q.  And if you go three more pages to the 965, the owner

---

VICTOR HAKIM
MELTON vs. GENERAL MOTORS

June 11, 2013

## 137

1  description, it says they are:
2      "Driving down the road, the car shut off
3  and the wheel locked up and I was making a right turn
4  and the vehicle threw me into the ditch on the right
5  side of the road."
6      Is that what it says?
7  A.  Yes.
8  Q.  Tab 84, please.
9  A.  Tab 84?
10 Q.  Yes, sir. Stephanie McCalabe, an owner from
11 Cleveland, Ohio. It's a 2007 Cobalt, and the agent
12 notes is stalls; correct?
13 A.  Yes.
14 Q.  And the open date for the claim is August -- excuse
15 me, March 25th, 2008, and the mileage is 13,563;
16 correct?
17 A.  Yes.
18 Q.  And it says here:
19     "Customer states early Saturday morning she
20 was driving up a hill off the freeway to a stoplight
21 when her vehicle stalled on her. Fell backwards,
22 turned on her towards the left, and was spinning on
23 icy, snowy roads. She could not turn her steering
24 wheel at all. She ended up hitting a pothole or a
25 curb and bent her tire."

## 138

1      Is that what it says?
2  A.  Yes.
3  Q.  Tab 85, please. Marilee Dedmon from Winter Park,
4  Florida, an owner of an '05 Cobalt. Claim open date,
5  April 24th, 2008. Vehicle mileage, 26,660. Agent
6  notes, stalls; correct?
7  A.  Correct.
8  Q.  And the first paragraph there:
9      "Customer states my Cobalt keeps stopping
10 in the middle of traffic. About ten days ago it
11 stopped on the 408 and the other day on Highway 50."
12     Is that what it says?
13 A.  Yes.
14 Q.  And if you go two pages back to page number 968, at
15 the bottom there. Do you see that? It says:
16     "Last Monday, April 21st, her husband
17 driving on Highway 50, engine again stopped
18 completely. Customer had no choice but to drive away
19 from the main lane on the highway and went to the side
20 of highway, hitting some orange barricades. Customer
21 states some scratches were made on the side of the
22 vehicle and on the tire. Customer's husband was able
23 to start the engine on vehicle barely and drive back
24 home. Customer called dealership, Roger Holler, and
25 explained situation. Service manager over the phone

## 139

1  told customer due to scratch on vehicle made at
2  highway, the case should be handled by GM, and until
3  this happens, dealership won't able to fix vehicle nor
4  promise any type of rental coverage."
5      Is that what it says?
6  A.  Yes.
7  Q.  Tab 86, please. James Gonzales from River --
8  A.  Yeah, I'm sorry. I just wanted to clear a few pages.
9  Sorry.
10     On Bates 13976, at the bottom, there's some
11 comments from Mike Laing, the service manager:
12     "Dealer states that the customer first
13 complained about the problem in April 2008. States
14 that on 4-10-2008, they reprogrammed the PCM and the
15 fuel injector flush and cleared all codes. On April
16 21st is when the customer had the accident."
17     Then they said, CRS -- on the next page, on
18 Bates 13977:
19     "Go ahead and repair the vehicle and make
20 sure that it does not have any more problems with the
21 engine. Repair all the body damage on the vehicle.
22 Advised to also put customer in a rental vehicle."
23     All right.
24 Q.  Tab 86. James Gonzales, the owner from Riverview,
25 Florida, 2006 Cobalt. Claim open date of May 9th,

## 140

1  2008, mileage, 34,553, and the agent notes stalls?
2  A.  Correct.
3  Q.  And the note from the customer here is:
4      "I would like Chevy to buy back my Cobalt
5  due to continuing excessive -- continuing excessive
6  defective major parts. I fear for my family and
7  myself safety because the Cobalt has died many times
8  while we were driving on a major road interstate. I
9  fear the next time will cause a major accident. Every
10 month is a new problem."
11     Did I read that correctly?
12 A.  Yes.
13 Q.  Turn to tab 87, please.
14 A.  There are just a few additional comments on Bates
15 29831, about in the middle. It says:
16     "CRS asked if customer has any aftermarket
17 items on the vehicle. Customer states aftermarket
18 items, GM performance parts Stage 2 performance kit
19 installed by Bill Heard. Vehicle not in any accident.
20 CRS went over concerns. Problems with the motor.
21 Intake manifold. Fan motor has been repaired three
22 times. Alternator has been replaced. Not a current
23 concern. Clutch has been replaced."
24     And then let me get to this other page. On
25 Bates 29839, Ann Gonzales -- I believe this is

VICTOR HAKIM                                          June 11, 2013
MELTON  vs. GENERAL MOTORS



**141**

1  attributed to her:
2      "I did receive the message and thank you
3  very much. I really appreciate you guys handling
4  everything so quickly and being able to take care of
5  everything for us, and I guess we have pretty much
6  have gotten everything in the mail. If you need
7  anything else, I was going to go ahead and fax it over
8  for awhile. The interest statement."
9      So it sounds like maybe they are working on
10  a repurchase or something like that, so. Okay.
11  Q.  Tab 87. Andrea Woods, owner from St. Louis, Missouri
12  of an '05 Cobalt. Claim open date of 7-18-2008.
13  Vehicle mileage, 44,000.
14      Do you see that?
15  A.  Yes.
16  Q.  And at the body of the paragraph:
17      "Customer states that he is calling on
18  behalf of his daughter. She has a car with major
19  concerns that are life threatening at this point. The
20  vehicle just stops in the middle of highway. The
21  vehicle is having power steering concerns, fuel
22  injector concerns, CD players, and the key won't fit
23  the ignition correctly. His daughter is very upset.
24  She has been working with someone before and the
25  dealer has not -- and not getting anywhere regarding

**142**

1  the concerns."
2      Is that what it says?
3  A.  Yes.
4  Q.  Tab 88, please.
5  A.  Well, the agent notes on that one states "sticks."
6  That's on that same Bates number, 31103.
7  Q.  All right. Tab 88?
8  A.  Okay. Tab 88?
9  Q.  Timothy Forck, an owner from Jefferson City, Missouri.
10  An '05 Cobalt. Claim open date of August 25th, 2008,
11  mileage 60,000 miles, agent notes is three stalls?
12  A.  Yes. I'm not sure what the three means, but that's
13  what it says.
14  Q.  I understand. And the next page, if you go to the
15  next page where it says "Nature of Concern and
16  Message" it says:
17      "My '05 Cobalt has had issues since I
18  bought it from the dealer four months ago. At times
19  when I drive, the traction control light comes on, as
20  does the power steering light. The ABS and brake
21  light blink on and off. The power steering assist
22  shuts down. The car shifts at the wrong times and
23  stalls when the brakes are applied. I have researched
24  this online and have found that a faulty body control
25  module might be the issue, but when I mentioned it to

**143**

1  the dealer, they blew me off. If you could, I would
2  like to know if my research is likely to be correct or
3  if my symptoms are from another issue. This issue is
4  dangerous, and I would like to have it fixed. I
5  didn't expect this when buying a fairly new car from a
6  GM certified location."
7      Did I read that correctly?
8  A.  Yes.
9  Q.  Tab 89, please.
10  A.  Okay. Tab 89.
11  Q.  Thomas Spirling is the owner from Bakersfield,
12  California. It's a 2007 Cobalt. Claim open date of
13  March 12, 2009.
14      Do you see that?
15  A.  Yes.
16  Q.  Vehicle mileage, 13,009. And in the history, it says:
17      "Alleged product failure. Collision.
18  Customer states Jane Spirling calling, who is his
19  mother. Son got into an accident this morning and
20  found a TSB about this. What happened was that the
21  vehicle stalled and customer tried to start the
22  vehicle and it did, but it lunged and hit another
23  vehicle."
24      Did I read that correctly?
25  A.  Yes.

**144**

1  Q.  Turn to tab 90, please.
2  A.  There is a further description on Bates 14021.
3      "Customer states that on 3-12-09 her son
4  was driving the vehicle. He was about to take off
5  from a red light. She states that the vehicle then
6  stalled. Customer was putting vehicle in park to turn
7  it on again. While doing so, the vehicle launched
8  forward and he hit another vehicle. It was a 4x4. No
9  injuries involved. There was minor damage to both
10  vehicles." Okay.
11  Q.  Then tab 90. Floyd Yenna, owner of a 2006 Cobalt.
12  Claim open date of 4-14-2009, vehicle mileage,
13  37,000 miles, agent notes here, it just says "quit";
14  right?
15  A.  Yes.
16  Q.  And then it says in the history here:
17      "Customer can't control vehicle. No steer.
18  No brake. Customer states we have a 2006 Cobalt. The
19  vehicle encountered an accident. The dealer said
20  there was nothing wrong with the car. From there, it
21  started quitting. When it was involved with a second
22  accident early this year. Car was seriously damaged.
23  Vehicle quits and my daughter was driving the car, hit
24  another vehicle. No one got injured. We brought it
25  to the same dealer, and dealer can't find anything.

VICTOR HAKIM                                         June 11, 2013
MELTON vs. GENERAL MOTORS

---

## 145

1    It was at the dealer four or five times, twice for the
2    accident. I want the vehicle fixed. The dealer keeps
3    telling me that they fixed it, but it quits. There
4    was a police report in both accidents."
5         Did I read that correctly?
6    A.   Yes.
7    Q.   And then if you look at the next page, the bottom,
8    where it says "Customer states"? Do you see that?
9    A.   Yes.
10   Q.   025?
11   A.   Yes.
12   Q.   "Customer states daughter was at work beginning of
13   January and the car quit on her. We took the car to
14   Bowman Chevrolet for repair. The vehicle was in there
15   for three weeks and she got the car back. When she
16   got it back, she noticed when driving two days after
17   getting it back that it stalled on her. She called
18   the dealer and they said there was something wrong
19   with the power, so they went and got the car. They
20   called her after a couple of days to pick up the
21   vehicle. When a lady called her, she said there was a
22   code on the computer, but she didn't know what it was.
23   The service tech said he just had to reset it, and she
24   got it back, and the car quit on her three more times,
25   and each time she called the dealer and they would

## 146

1    tell her that there was nothing wrong with the car.
2    The last time she was driving down the road when it
3    was snowy and the car died on her while she was
4    driving. She couldn't control the vehicle, and she
5    ended up hitting another vehicle. The dealership has
6    been looking at it and they still haven't been able to
7    find anything wrong with the car. All I want is the
8    vehicle to be repaired."
9         Did I read that correctly?
10   A.   Yes.
11             (Exhibit No. 4 marked.)
12   BY MR. COOPER:
13   Q.   Let me show you what I'll mark as Exhibit 4, which is
14   a claims notebook that we've prepared.
15             MR. COOPER: Harold, you'll have to look on
16   your --
17             MR. FRANKLIN: You said this is the claims
18   notebook?
19             MR. COOPER: Yeah. It's just a notebook so
20   we can simply go through these documents and see what
21   if anything, he knows about them, and I'll give you
22   the Bates number.
23   BY MR. COOPER:
24   Q.   I think when we -- at the beginning of the
25   deposition -- am I correct in understanding you have

## 147

1    not reviewed any of the claims -- any claims documents
2    relating to the power steering or recall?
3    A.   I did not.
4             MR. FRANKLIN: Let me state for the record,
5    as set forth in our notice also, that we objected to
6    producing a witness on those power steering documents,
7    and we set forth the specific Bates ranges because
8    that is not a current allegation in this case. There
9    are no allegations regarding the loss of power
10   steering in the second amended complaint.
11             So those ranges we objected to producing a
12   witness on, and Mr. Hakim is not here to talk about
13   those documents.
14   BY MR. COOPER:
15   Q.   Were you involved at all in the power steering recall?
16   A.   Was I involved in it?
17   Q.   Yes.
18   A.   You mean when it was initially developed?
19   Q.   Yes.
20   A.   A bit, yes.
21   Q.   Okay. And the reason there was a recall is because
22   General Motors determined there was a safety-related
23   defect related to the power steering in the '05
24   Cobalt?
25             MR. FRANKLIN: Again, Mr. Hakim is not here

## 148

1    individually today. He's here as a corporate
2    representative to talk about the topics set forth in
3    the notice, and we said that in our objection, and I
4    want to make that clear.
5    BY MR. COOPER:
6    Q.   You can answer.
7    A.   General Motors issued a safety recall. Right. Yes.
8    Q.   Did they determine there was a safety-related defect
9    in the power steering of the '05 Cobalt?
10             MR. FRANKLIN: Object to form.
11             THE WITNESS: If you read the recall
12   notice, the wording is standard wording from NHTSA
13   saying that there is a defect in the vehicle.
14   BY MR. COOPER:
15   Q.   And what would happen is, for whatever reason, the
16   defective condition, people would lose their power
17   steering --
18             MR. FRANKLIN: Object to form.
19   BY MR. COOPER:
20   Q.   -- under certain circumstances?
21             MR. FRANKLIN: Object to form.
22             THE WITNESS: That's correct, that could
23   happen, right.
24   BY MR. COOPER:
25   Q.   They would still have the manual steering, but they

VICTOR HAKIM                                                    June 11, 2013
MELTON vs. GENERAL MOTORS

---

**149**

1    would lose the power steering?
2  A.   That's correct.
3  Q.   And General Motors decided that, if you lose your
4       power steering under certain circumstances, that
5       that's a safety hazard; correct?
6           MR. FRANKLIN: Object to form.
7           THE WITNESS: Well, that recall uses
8       standard language from NHTSA, right, and it was issued
9       as a safety recall.  But you still have steering and
10      control of the vehicle.
11 BY MR. COOPER:
12 Q.   And when the engine stalls like in the cases -- the
13      dozens of cases we've been -- here today, for whatever
14      reason it stalls, when the engine stalls in an '05
15      Cobalt, the driver is going to lose their power
16      steering, aren't they?
17 A.   Generally correct, yes.
18 Q.   And you still may be able to answer some questions, so
19      if you could turn to tab 1, please.
20          MR. FRANKLIN: I need --
21          MR. COOPER: It's Bates numbers 1708
22      through 1727.
23          MR. FRANKLIN: What is that document?
24          MR. COOPER: I don't know.  It's a document
25      that you all produced.  I believe it's power steering

---

**150**

1       complaints.
2           MR. FRANKLIN: Is it within the range of
3       documents in plaintiffs' notice --
4           MR. COOPER: Yes.
5           MR. FRANKLIN: -- for this witness?
6           MR. COOPER: Yes.
7           MR. FRANKLIN: So I'm sorry, tell me one
8       more time --
9           MR. COOPER: 1708 through 1727.
10          MR. FRANKLIN: 1708 through 1727.
11 BY MR. COOPER:
12 Q.   Have you seen a document --
13          MR. FRANKLIN: Hold on a second.
14 BY MR. COOPER:
15 Q.   Have you seen a document like this before?
16          MR. FRANKLIN: Lance, I'm sorry.  That
17      number, you said 1708.  Are you sure, is that it?
18          MR. COOPER: Right.
19          MR. FRANKLIN: Because that's not in the
20      notice that I'm looking at in plaintiffs' notice, that
21      range.  Did you mean 17908?
22          MR. COOPER: What's that?  No, there's --
23      tab 5 -- I mean, excuse me, subject matter number 5
24      states "All incidents where there was allegedly a loss
25      of power steering when someone was driving," and then

---

**151**

1       it had the vehicles which are within the scope of the
2       discovery.
3  BY MR. COOPER:
4  Q.   And what I'm trying to figure out is, what is tab 1?
5       Have you seen the documents in tab 1 before today?
6  A.   It does not look familiar to me.
7           MR. FRANKLIN: Let me state for the record
8       that that range is not among the ranges set forth in
9       plaintiffs' notice.
10          MR. COOPER: Well, it's specifically set
11      forth in subject matter number 5.
12 BY MR. COOPER:
13 Q.   In reviewing GM's responses, it's our understanding
14      these are power-steering-related claims.  But if I
15      understand what you are saying, sir, you haven't
16      reviewed this document before today or these documents
17      before today, and you are not prepared to testify
18      about them; is that correct?
19 A.   That's correct.
20          MR. FRANKLIN: As I've stated before also,
21      we have not produced the witness to talk about power
22      steering because that is not a present allegation in
23      this case.
24 BY MR. COOPER:
25 Q.   And looking at tab 2, from what we've been able to

---

**152**

1       discern, this is a list of claims, and it has Kenneth
2       David Melton at the top of it.  It's Bates
3       number 14832 through 14833.
4           Have you seen this document before today?
5  A.   Well I'm going to say I'm not sure.  It's possible,
6       but I didn't review it in detail.
7  Q.   And do you know anything about the claims that are set
8       forth in this document?  I assume you know something
9       about the Melton claim --
10          MR. FRANKLIN: Let me look on --
11 BY MR. COOPER:
12 Q.   -- because you've talked about that.
13          So I'll ask again.  I assume you know
14      something about the Melton claim, which is the top
15      claim.  Do you know anything about the other claims
16      which were listed in this GM-produced document?
17 A.   I'm going to say it's not familiar, the names are not
18      familiar.
19 Q.   And then go to tab 5, please.  And I think you
20      confirmed this earlier, but this is the warranty
21      information that GM has produced relating to the
22      technical service bulletin work that was done.
23          MR. FRANKLIN: Object to form.
24 BY MR. COOPER:
25 Q.   And it's my understanding you haven't reviewed this

---

VICTOR HAKIM                                           June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**153**

1    data and you are not prepared to testify about these
2    warranty claims; is that correct?
3         MR. FRANKLIN: Object to form, and let me
4    also state that the warranty data was not among the
5    ranges set forth in plaintiffs' notice that plaintiff
6    wanted a witness to talk about.
7    BY MR. COOPER:
8    Q.   You can answer the question.
9    A.   I think my answer is yes to the question, I'm not
10        prepared to -- I haven't reviewed this.
11   Q.   Okay. And then I saw -- if you go to tab 6, these are
12        some technical assistance center documents. What is
13        the difference between these documents and the
14        documents we spent the last couple of hours going
15        over, the individual claims documents?
16   A.   These documents are the dealership technician or
17        someone from the dealership calling the General Motors
18        service group looking for information on how to handle
19        a repair or problem or issue.
20   Q.   Okay. And these documents are all, I guess, GM
21        documents prepared in the ordinary course of GM's
22        business?
23   A.   Yes.
24   Q.   As well as the documents we've been going over in
25        Exhibits 2 and 3?

---

**154**

1    A.   Yes.
2         MR. FRANKLIN: And for the record, the
3    witness did bring some of those tech documents.
4         MR. COOPER: Yeah. We'll attach those to
5    the deposition.
6    BY MR. COOPER:
7    Q.   And then going to tab 7, it's another list, it looks
8        like, of claims where Kenneth David Melton versus
9        General Motors is the top of the list. It's Bates
10       numbers 133745 through 133751.
11            Have you seen this before today?
12   A.   I'm not real -- I'm not familiar with this one.
13   Q.   Okay. Do you know anything about the claims that are
14       listed in here?
15            MR. FRANKLIN: Let me state for the record,
16       Lance, that that range, based on that number that you
17       just read out, that is among the power steering
18       documents that we objected to in our notice to
19       producing the witness to talk about.
20   BY MR. COOPER:
21   Q.   Do you know anything about any of these claims?
22   A.   I'm going to say -- I mean I'll just look through here
23       to see if anything is familiar, but.
24   Q.   Okay.
25   A.   I'm going to say no, based on what I see.

---

**155**

1    Q.   And then page -- excuse me, tab 12. We were trying to
2        figure out what these are, and I think I saw something
3        that you all produced --
4             MR. FRANKLIN: What is the Bates number for
5        that?
6             MR. COOPER: 37595 through 37610.
7    BY MR. COOPER:
8    Q.   And what are these?
9    A.   These are -- this is a summary -- it looks like it's
10       done in an Excel spreadsheet format -- from General
11       Motors' CVEP program, which is company vehicle
12       evaluation program.
13   Q.   Tell me about the CVEP program.
14   A.   So these would be comments from company vehicle
15       drivers.
16   Q.   I think you brought something like that with you
17       today.
18   A.   The same thing.
19   Q.   Okay. Why did you bring this with you today?
20   A.   I thought it was in the Bates range.
21   Q.   So tell me -- for example, it looks like there's --
22       just this first page, two -- or the plant is Spring
23       Hill, Tennessee. The platform is A. These are for
24       Ions, I believe?
25   A.   Yes.

---

**156**

1    Q.   And then what is the problem that's being reported on
2        these? I guess you've got to go back to --
3    A.   You have to sort of --
4    Q.   Go back to T.
5    A.   Sort of line them up, you know.
6    Q.   Okay. So, for example, Bates number 37599, it looks
7        like, at least from what you pulled, there were three
8        incidents involving Ions where GM employees
9        experienced this problem of their knee or something
10       hitting the key and the ignition turning from run to
11       accessory or run to off?
12            MR. FRANKLIN: Object to form.
13            THE WITNESS: Right, two of those
14       experienced that problem.
15   BY MR. COOPER:
16   Q.   Actually, I want to make sure -- I think it's all --
17       maybe I'm misunderstanding it. Let's kind of walk
18       through this. Gerald Young, if you look. He's on
19       37597 under M. Right? Gerald Young.
20   A.   Okay.
21   Q.   He's vehicle number 2, and his comment is:
22            "Ignition switch is too low. The other
23       keys and the key fob hit on the driver's right knee.
24       The switch should be raised at least one inch toward
25       the wiper stock. This is a basic design flaw and

---

VICTOR HAKIM                                      June 11, 2013
MELTON  vs. GENERAL MOTORS



**157**

1    should be corrected if we want repeat sales."
2        Is that correct?
3    A.  Yes.
4    Q.  And he is telling GM this as of January 9th of 2004,
5        it says "date received"?
6    A.  I would say yes.  What page is that on?
7    Q.  That's the page just before --
8    A.  Just before.
9    Q.  -- the verbatim page.
10           MR. FRANKLIN:  What is the Bates number?
11           MR. COOPER:  37598.
12           THE WITNESS:  So yes.
13   BY MR. COOPER:
14   Q.  Okay.  And then the next GM employee, Onassis
15       Matthews, is driving an Ion, and his comment is:
16           "The location of the ignition key was in
17       the general location where my knee would rest.  (I am
18       6'3" tall, not many places to put my knee.)  On
19       several occasions I inadvertently turned the ignition
20       key off with my knee while driving down the road.  For
21       a tall person, the location of the ignition key should
22       be moved to a place that will not inadvertently be
23       switched to the off position."
24           Did I read that correctly?
25   A.  Yes.

**158**

1    Q.  And his -- GM received his comments or -- yeah, his
2        comments on February 19th of 2004; correct?
3    A.  Correct.
4    Q.  And then the third person who is driving an Ion or
5        third GM employee is Raymond Smith.  He says:
6            "I may have experienced this problem one
7        time.  I thought that my knee had inadvertently turned
8        the key to the off position.  The car started . .
9        immediately and the condition has not happened again."
10           And he reported that on April 15th of 2004;
11       correct?
12   A.  Correct.
13   Q.  And you understand that the ignition switch in the Ion
14       and the Cobalt is the same ignition switch?
15           MR. FRANKLIN:  Object to form.
16           THE WITNESS:  I believe it is, yes.
17   BY MR. COOPER:
18   Q.  Are you aware that GM did anything in response --
19       anything to the Cobalt to redesign the vehicle in
20       response to these complaints about the problem with
21       the ignition switch in the Ion?
22   A.  I'm not aware, no.
23   Q.  Are there any other CVEP documents relating to the Ion
24       or the Cobalt?
25           MR. FRANKLIN:  Object to form.

**159**

1            THE WITNESS:  I don't believe so.  I
2        believe these would be those.
3    BY MR. COOPER:
4    Q.  Where would those documents be kept?  What department
5        would have control over the CVEP documents?
6    A.  Well, I think CVEP would.  But that was searched to
7        produce these documents.
8    Q.  What is CVEP -- what department is CVEP within?
9    A.  Oh, that I don't know.  That I don't know.
10   Q.  Tab 13, if we can go there.
11           MR. COOPER:  What's the --
12           MR. COOPER:  This is Bates number 71720
13       through 71729, to start with.
14   BY MR. COOPER:
15   Q.  Do you know what this is?
16           MR. FRANKLIN:  Let me see that a quick
17       second.
18           MR. COOPER:  Sure.
19           MR. FRANKLIN:  Let me object to questions
20       about the document presented, as it is not among those
21       listed in plaintiffs' deposition notice, and to the
22       extent -- or any documents relating to the FPE
23       investigation, GM has already produced witnesses and a
24       witness who led that investigation.  And as stated in
25       this deposition notice, we object to producing, you

**160**

1        know, an additional witness to talk about that
2        investigation, to the extent that the documents being
3        presented are from that investigation.
4    BY MR. COOPER:
5    Q.  Have you seen this before today?
6    A.  I have not.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

df795fa4-a19b-4bb3-8775-98895e393e47

09-50026-mg    Doc 12640-53    Filed 04/23/14    Entered 04/23/14 18:52:12    Exhibit 53
Pg 42 of 53

VICTOR HAKIM                                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

161

1   ████████████
2
3   Q.   All right.  So it appears as though there actually are
4        more CVEP complaints than what we talked about in
5        tab 7?
6        MR. FRANKLIN:  Object to form.
7        THE WITNESS:  Well, I don't know.  This is
8        for Cobalt.  I think what we looked at here was the
9        Ion.
10  BY MR. COOPER:
11  Q.   Well, I think I was specific, but let me be more
12       specific.
13       Have the CVEP complaints for all of the
14       vehicles within the scope of discovery been searched
15       in order to identify the claims that should be
16       produced in this case?
17       MR. FRANKLIN:  Object form.
18       THE WITNESS:  Well, let me just look here.
19       Yeah, I don't see any in this CVEP for Cobalt, in
20       these documents.
21  BY MR. COOPER:
22  Q.   And as far as the documents we've just been talking
23       about, and that is Bates number 71720 through 71729,
24       you've never seen these documents before today?
25  A.   I'm not familiar with that, no.

162

1   Q.   And you are not familiar with any of the claims that
2        are -- or incidents that are discussed or addressed in
3        this document; is that correct?
4   A.   Oh, that I don't know.  I mean it's possible some of
5        the claims that we went over are in here.  So I'm not
6        sure how to answer that question.  I mean this looks
7        like a spreadsheet of some sort.
8   Q.   Well, I thought you said CVEP was GM employees making
9        a complaint; right?
10  A.   Yes.
11  Q.   Okay.  So the CVEP claims, at least the two here, or
12       reports of incidents, those would not be -- have
13       gone -- you would not have gone over those today in
14       Exhibits 2 and 3; correct?
15       MR. FRANKLIN:  Object to form.
16       THE WITNESS:  Correct.  Sorry, I didn't
17       understand your question properly.
18  BY MR. COOPER:
19  Q.   Okay.  And you don't know -- other than what's written
20       on Bates number 71721, you don't know anything about
21       these two CVEP incidents?
22  A.   No, I do not.
23  Q.   And then underneath that, there is TV2K.  What is
24       that?
25  A.   I'm not familiar with that.

163

1   Q.   And again, you don't know what the bold SR numbers
2        mean?
3   A.   I do not.
4   Q.   Then going past 71729 -- it's in the same tab.
5   A.   71 --
6   Q.   Right here, in the same tab.  We --
7        MR. FRANKLIN:  One second.  Let me look on.
8   BY MR. COOPER:
9   Q.   There has been a GM confidential document produced
10       pursuant to protective order, which I can't figure out
11       what it is, so -- but it appears to be incidents
12       relating to the Cobalt.
13       MR. FRANKLIN:  Let me --
14  BY MR. COOPER:
15  Q.   Do you know -- because it says -- it identifies the
16       '05 or the '06 Cobalt in number -- tab number 6 there.
17       MR. FRANKLIN:  Let me state for the record
18       that to the extent these documents are from or were
19       created during the FPE investigation, I object on the
20       same grounds that have been asserted previously
21       regarding privileged communications in an ongoing
22       investigation, and would instruct the witness not to
23       answer if those documents are indeed from that
24       investigation.  I -- they were not within the range of
25       the notice, and at the moment I don't know where

164

1   those documents -- or who generated those documents.
2   So I'm making those objections out of
3   caution in the event that they are or that they were.
4   BY MR. COOPER:
5   Q.   Have you seen this document before today?
6   A.   No, I'm not familiar with it.
7   Q.   Do you know -- can you decipher what it is?
8   A.   Other than it looks like a spreadsheet that someone
9        created, no.
10


VICTOR HAKIM                                    June 11, 2013
MELTON vs. GENERAL MOTORS



165

9  Q.  And then "GM CARS," would that be -- what does that
10     mean when it says "GM CARS" there?
11         MR. FRANKLIN:  Object to foundation.
12         THE WITNESS:  Yeah, I believe that's like
13     a -- that's the same as CAC, or customer assistance
14     center.
15  BY MR. COOPER:
16  Q.  Okay.
17  A.  I think the name has changed to CARS, customer
18     assistance relations center or something like that, or
19     relation services.
20  Q.  So you don't know who would have put this data
21     together, who would have put this analysis together?
22  A.  I do not.

166

21  Q.  We won't go -- suffice it to say, whatever is in here,
22     you don't know anything about it?
23  A.  Correct.
24  Q.  All right.
25         MR. FRANKLIN:  That was tab 14 of that

167

1     exhibit; right?
2          MR. COOPER:  Tab 14.
3   BY MR. COOPER:
4   Q.  Tab 15 is the same.  It has some different TREAD data
5      information in here, but it's the same -- I guess your
6      answer would be the same, you don't know anything
7      about this?
8   A.  Yes.
9          MR. FRANKLIN:  Object to form.
10  BY MR. COOPER:
11  Q.  And then tab 16, do you know what this document
12     is?  It's basically Bates number 132699 through
13     132706.
14  A.  No, I'm not familiar with this one.
15  Q.  Okay.  And then 17, are you familiar with this
16     one?
17         MR. FRANKLIN:  What is the Bates number?
18         MR. COOPER:  73222 through 73221.
19  BY MR. COOPER:
20  Q.  Or any of the incidents described in here?
21         MR. FRANKLIN:  The objections I interposed
22     before apply to all of the documents in this notebook,
23     to the extent they are from the investigation.
24         THE WITNESS:  I'm not familiar with this
25     document either.

168

1   BY MR. COOPER:
2   Q.  Okay.  And then tabs 18, 37915, these are, from what
3      we understand, at least some of the incidents where GM
4      Cobalts have been in frontal impacts and the airbags
5      have not deployed.
6          Are you familiar with those incidents?  Or
7      let me ask you this:  Have you reviewed any of those
8      incidents in preparing for your deposition here today?
9          MR. FRANKLIN:  And I'm sorry, because I
10     don't have that notebook, I'm going to ask you to read
11     me that Bates number again for tab 18.
12         MR. COOPER:  Yeah.  You all make them so
13     small here.  5 -- or 37818 through 37921.
14         THE WITNESS:  Yeah, these documents are not
15     Bates numbered here.
16  BY MR. COOPER:
17  Q.  No, you have to go to the one before that.
18  A.  Oh, do you?
19  Q.  Yeah.
20  A.  But I'm not familiar with these, this document.
21  Q.  Tab 19.
22  A.  Oh, tab 19.  Sorry.
23  Q.  That's all right.  So you are not familiar with --
24  A.  I don't see a 19.  Yeah.  I have 18.
25  Q.  Okay.  Let me see that.  We got shortchanged here one

VICTOR HAKIM                                              June 11, 2013
MELTON  vs. GENERAL MOTORS

### 169

1    Yeah, it should have been right here, so -- but as
2    part of tab 17 in the exhibit, there are, if you look
3    here, incidents where GM Cobalts have been involved in
4    frontal impact collisions and the airbags have not
5    deployed.
6         And the question I have for you is:  Have
7    you -- are you prepared to testify about those
8    incidents today?
9    A.  I am not.
10   Q.  Do you know anything about those incidents?
11   A.  I do not.
12   Q.  Okay.
13        MR. COOPER:  That's all the questions I
14   have.  Thank you.
15        MR. FRANKLIN:  Take a break.
16        MR. COOPER:  Sure.
17        VIDEOGRAPHER:  We're off the record. 3:33.
18        (A brief recess was taken.)
19        VIDEOGRAPHER:  Back on the record at 3:56.
20   Go ahead.
21        EXAMINATION
22   BY MR. KALFUS:
23   Q.  Mr. Hakim, my name is Shawn Kalfus, as you know, and I
24   believe you understand that I represent Thornton
25   Chevrolet in this case.  Is that right?

### 170

1    A.  Yes.
2    Q.  Okay.  Thanks for taking the time to talk to us today.
3    It's nice to meet you.
4         With respect to the claims that you and
5    Mr. Cooper have discussed today -- I believe there
6    were approximately 90 of them -- there seemed to be
7    some inconsistency with the way the dealerships chose
8    to deal with each claim.  Is that fair?
9         MR. FRANKLIN:  Object to form.
10        THE WITNESS:  I mean if you are asking me
11   if they all were the same, I would say no, they
12   weren't all the same.
13   BY MR. KALFUS:
14   Q.  All right.  How do you explain the differences, if you
15   can?
16   A.  Well, I guess I don't -- I really can't.  I don't know
17   that I can go back and explain, without looking at
18   each individual claim and then the details again and
19   trying to make some assessment on why a particular
20   dealer did one thing versus another one.
21   Q.  What goes into the decision to repurchase a vehicle
22   based on customer complaints?
23   A.  What goes into the decision?  There's a whole process
24   that's run through what's called the BRC, which is
25   business resource center, and there is a whole

### 171

1    process, and I'm going to tell you I don't know that
2    whole detailed process.  But I'm sure they'll look at
3    the -- you know, they would look at the vehicle
4    condition, how many times it's been in for a
5    particular repair or repairs, and whether there is a
6    repair available or how -- you know, is the car clean,
7    how many miles on it, those kind of things.  But I
8    will tell you I don't know the whole process.
9    Q.  When you look at a body of claims like we've seen
10   today, is it common for you to see different
11   approaches taken by different dealerships for similar
12   issues?
13   A.  Boy, again, that's kind of an open-ended question to
14   say is it -- do I see differences at times?  Sure.  I
15   mean yeah, because each claim will be its own unique
16   kind of event.
17   Q.  Are there ever circumstances where you see these
18   differences and those differences concern you?
19        MR. FRANKLIN:  Object to form.
20        THE WITNESS:  I guess I never thought about
21   it that way, so I'm going to say no.  I --
22   BY MR. KALFUS:
23   Q.  Have there been times when you've seen dealership A
24   perform a certain task and dealership B perform a
25   different task and thought that they should have done

### 172

1    the same thing?
2    A.  Well, again, I can't think of anything directly that I
3    could answer that affirmatively with.
4    Q.  When you looked through these 90 cases today with
5    respect to the low-torque admission switch issue, did
6    you see any circumstances where dealerships varied in
7    their approaches and that concerned you?
8         MR. FRANKLIN:  Object to form.
9         THE WITNESS:  And that it concerned me?  I
10   don't think so.  I mean there were differences, but
11   I --
12   BY MR. KALFUS:
13   Q.  Were there times when you thought that a dealership
14   should have done something differently?
15   A.  There is no way I could make that assessment, just
16   reviewing those documents.
17   Q.  Who -- is that something that you would do if you had
18   more information, or is there somebody else that would
19   make that assessment?
20   A.  Well, I would think somebody that would have been at
21   the dealership at the time would have been better to
22   make an assessment like that.
23   Q.  I guess what I'm asking, is there anybody at the GM
24   level that looks -- that overlooks the dealerships and
25   determines whether they are doing proper -- or taking

VICTOR HAKIM                                              June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**173**

1    the proper course of action with issues like this?
2    A.    Well, I think that the representatives, like the area
3          vehicle manager or the CRM, would have interaction --
4          probably more the AVM -- have interaction with the
5          dealer, looking at what they are doing.
6    Q.    And those are GM employees; right?
7    A.    Yes.
8    Q.    And who at GM corporate would be above those folks?
9    A.    Well, again, that's a global question.  But that would
10         be part of the -- sort of the dealership network or
11         what's called -- I think it's VSSM or vehicle sales
12         and services.  I'm not sure what the -- I forget what
13         the M stands for, but that group.  Marketing, I think,
14         is what the M stands for.
15   Q.    All right.  And that's based here Detroit in the
16         headquarters?
17   A.    I can't tell you -- I'm sure there are some folks here
18         in the Detroit area, but there are probably folks all
19         over the world.
20   Q.    Does GM do anything to ensure or to encourage
21         dealerships to handle similar circumstances similarly?
22         MR. FRANKLIN:  Object to form.
23         THE WITNESS:  Well, so I -- the only way I
24         could answer that is, when we produce a service
25         bulletin, for instance, that provides some direction

**174**

1          on handling a particular issue or concern.  And then
2          we have TAC, of course, which is the technical
3          assistance center, so that a dealership can call for
4          assistance.
5    BY MR. KALFUS:
6    Q.    So the TSBs and the phone numbers are there to
7          encourage dealerships to handle situations
8          consistently; would that be true?
9    A.    Well, I think that's one of the results.  I think they
10         are there to help, in essence.  You know, if there is
11         a particular problem, a TSB is issued to help a dealer
12         diagnose a problem, right, so that they know where to
13         look and they can resolve the issue quicker.
14   Q.    Are there any other methods that GM corporate would
15         use to communicate with their dealerships to make sure
16         that they are all on the same page?
17   A.    I'm not familiar.  There could be, certainly, with
18         that group, but I can't tell you any other, beyond
19         what I know, yeah.
20   Q.    Do you have any criticisms about the way Thornton
21         Chevrolet handled Brooke Melton's service and repair?
22   A.    I'll tell you, I'm not familiar with how they handled
23         it, so I don't have any criticisms.
24   Q.    All right.  You don't -- are you familiar with
25         anything that Thornton Chevrolet did in this case?

**175**

1    A.    No, I didn't review that.
2    Q.    Do you intend to look into that and offer any opinions
3          down the road?
4    A.    I'm going to say that I don't at the moment.
5          MR. KALFUS:  Those are all the questions I
6          have for you.  Thank you, sir.
7          MR. FRANKLIN:  Exhibits --
8          MR. SISCO:  While you are doing that, this
9          is Ken Sisco.  I've been sitting by the phone all day.
10         MR. FRANKLIN:  Yes.  Ken, do you have any
11         questions?
12         MR. SISCO:  No, I don't have any questions.
13         That's why I took myself off mute and just put that on
14         the record for you before you redirect your client.
15         MR. FRANKLIN:  Okay.  Thank you.
16         (Discussion held off the record.)
17         (Exhibit A marked.)
18         MR. FRANKLIN:  Mr. Hakim, I know that it's
19         been a long day.  I've got a couple of areas that I
20         would like to go over with you, and before I get
21         started, I do want to make -- enter as part of the
22         record the objections, General Motors' amended
23         objections to plaintiffs' amended notice of taking
24         30(b)(6) deposition.  I previously talked about this
25         objection.  I just want to make it a part of the

**176**

1          record, so I'll enter that.
2                    EXAMINATION
3    BY MR. FRANKLIN:
4    Q.    Mr. Hakim, you have been asked today during the course
5          of this deposition questions about numerous claims of
6          incidents that have occurred in the field where there
7          have been reports written by folks at GM, both CAC
8          data and also TAC files and other files.
9          Did you have an opportunity to review much
10         of the production from this case?  Are you aware that
11         GM has produced, obviously, all of the documents that
12         you have been presented with today, in addition to
13         many others?
14   A.    Yes.
15   Q.    Okay.  And in terms of your area of testimony today,
16         have you seen this amended -- these amended objections
17         to plaintiffs' deposition notice before today?
18   A.    Yes.
19   Q.    Okay.  And in terms of the area -- the areas of
20         testimony, does this accurately reflect the areas that
21         you have testified about today and that you were
22         prepared to testify about today?
23   A.    Yes.
24   Q.    So is it fair to say that the claims that you brought
25         with you today come from -- they are taken from the

VICTOR HAKIM                                          June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**177**

1    set of Bates ranges that were identified in this
2    deposition notice?
3  A.  Yes.
4  Q.  Okay. And I won't ask you to do the math, but I'll
5    represent to you, just by looking at the Bates
6    numbers, that if you were to even do, you know, very
7    basic calculations, that they -- it's over 32,000
8    pages that comprise the production of other claims,
9    incidents, et cetera.
10        Is that consisted with your understanding,
11    based on what you've seen and kind of what you have
12    reviewed as well?
13  A.  Makes sense.
14  Q.  In just about all, if not all of the claims that you
15    were asked about today, they involve incidents of
16    vehicles stalling; correct?
17  A.  Correct.
18  Q.  Okay. Tell us in terms of how -- in terms of a
19    vehicle stalling, what are the reasons that a vehicle
20    can stall? Are there many reasons?
21  A.  Oh, you mean, in general, how could a vehicle stall?
22  Q.  That's right.
23  A.  It could run out of gas, cause stalling. There could
24    be just some grounding problem or electrical problem
25    that could cause the vehicle to stall. You could have

---

**178**

1    a problem with the throttle, throttle body, could
2    cause a vehicle to stall. Problem with the generator
3    or alternator could cause a vehicle to stall. Battery
4    problem, in conjunction with a generator problem,
5    could cause a vehicle to stall. Just a stick shift
6    vehicle, just driver error operating the vehicle, you
7    know, putting the clutch out too quickly, could cause
8    a vehicle to stall. I mean those are a few things
9    that come to mind.
10  Q.  Okay. Are you aware that in this case the allegation
11    is that the vehicle's key rotated from the run
12    position to the accessory position? Is that your
13    understanding about the allegations in this case?
14  A.  Yes.
15  Q.  Okay. Is that something that could cause a vehicle to
16    stall?
17  A.  Yes.
18  Q.  But again, it is one of the many potential causes of
19    the vehicle stalling; correct?
20  A.  Yes.
21  Q.  And in the claims that you were presented today, that
22    you were able to review today during your deposition,
23    was there an indication in any of them that the
24    vehicle stalled because the key rotated from the run
25    to accessory position?

---

**179**

1  A.  Is there any indication?
2  Q.  Right. Is there anything in any of those documents
3    that states that the key went from the run to
4    accessory position? In the documents that you have
5    brought with you today and the ones that you were
6    presented with, do you -- were there any that you saw
7    that specifically said that, that the key went from
8    the run to accessory position?
9  A.  Well, there were some where the customer said that
10    they -- you know, that they -- that the vehicle
11    stalled.
12  Q.  Right.
13  A.  And then in some cases, when the evaluations were
14    done, in essence, there were -- most of them were
15    "could not duplicate the problem," but some referenced
16    the key as a possible method or a possible way.
17  Q.  So in some of those, as I recall, and you'll recall
18    from earlier, there were some in which it was stated
19    that someone's knee interacted with the key, the
20    ignition area where the key is inserted; correct?
21  A.  Yes.
22  Q.  Okay. But in many others -- in fact, in most of
23    them -- there was no indication that that is what had
24    happened; correct?
25  A.  Well, that's correct, yes.

---

**180**

1  Q.  Okay. Some of them -- one of them talked about smoke
2    coming from under the hood; correct?
3  A.  Yes.
4  Q.  And others talked about the vehicle shaking or the key
5    being stuck in the ignition. Do you recall --
6  A.  I do.
7  Q.  -- seeing all types of scenarios?
8  A.  Yes.
9  Q.  Okay. So you would agree that there is not, within
10    those documents, evidence as to one particular cause
11    for the stalling event; that there are many different
12    scenarios that could have caused any of those events?
13  A.  True.
14  Q.  The stalling events. Is vehicle stalling anything
15    that is unique to a particular make and model vehicle?
16  A.  Geez, I guess that's kind of a global question. I
17    suppose it's possible for any vehicle to stall.
18  Q.  In terms of the frequency of a stalling event for one
19    particular vehicle -- type of vehicle versus another,
20    or for one manufacturer versus another, do you have
21    any knowledge as to whether or not the Chevy Cobalt
22    stalled more or less than a vehicle manufactured by
23    another company or another vehicle within GM's
24    inventory? Do you have any sense as to whether there
25    was more stalling with the Cobalt than other vehicles,

---

VICTOR HAKIM                                          June 11, 2013
MELTON  vs. GENERAL MOTORS

## 181

1    by other manufacturers or by GM?
2  A.  I don't.
3  Q.  Are you generally familiar with the Melton accident in
4    terms -- have you seen the police report from the
5    Melton accident before?
6  A.  Yes.
7  Q.  Okay. Are you generally familiar with this crash in
8    terms of, you know, whether the vehicle was on a
9    roadway and whether it interacted with another
10    vehicle, speeds and that kind of thing? Are you
11    generally familiar with that?
12  A.  Yes.
13  Q.  What is your general understanding about this crash?
14  A.  That a crash occurred, I believe, in the Atlanta area
15    on a highway. I think it was a two -- I guess I don't
16    remember if it was a two-lane highway. But I remember
17    that it was raining. I remember the police report
18    said raining or wet conditions and that -- that the
19    Melton vehicle crossed over the -- from their lane of
20    travel -- and I don't recall north or south, but
21    crossed over from their lane of travel. And I believe
22    the police report thought the vehicle was traveling
23    too fast for the conditions, were the general comments
24    in the police report; may have hit -- hydroplaned or
25    hit some water, crossed over, and then was struck by

## 182

1    the other vehicle on the passenger side.
2      MR. COOPER: Object to the responsiveness.
3  BY MR. FRANKLIN:
4  Q.  With the claims and incidents that you have reviewed
5    and that you've been asked about today, do you -- did
6    you see any of them that involved an allegation that
7    the key rotated from run to accessory that caused the
8    loss of control of a vehicle resulting in a crash?
9  A.  No.
10  Q.  I'm going to ask you to look at -- we're going to go
11    through some of the claims from Exhibit 2 and
12    Exhibit 3, those two notebooks.
13  A.  Does this go back somewhere?
14  Q.  Yeah, you can just leave it right there. Thank you.
15      Do you recall in these claims that you saw
16    that talked about customers going to dealerships and
17    bringing forward their concerns that the dealerships
18    tried repeatedly to duplicate the concerns or the
19    conditions that the customers were complaining about?
20  A.  Yes, I believe in a lot of the -- actually, probably
21    the majority, but I can't say that, there were a lot
22    of attempts by the dealers to duplicate the concern.
23  Q.  You were asked earlier about -- and I want to have you
24    just kind of walk us through generally about your
25    understanding about GM's efforts to -- in terms of how

## 183

1    these 32,000 -- approximately 32,000 pages of
2    documents -- or pages, rather, were produced in this
3    case.
4      You mentioned that you are generally
5    familiar with the searches that were done, and I
6    believe you stated you believed that those searches
7    were reasonable.
8  A.  Yes.
9  Q.  Were they broad?
10  A.  Yes.
11  Q.  How?
12  A.  How? Well, I thought I -- well, earlier I think the
13    question was asked, but there were broad search terms
14    used. So the scope or the scope of the matter that
15    was already predetermined was used as the scope, and
16    then very broad search terms were used, which included
17    stall, engine, I think electrical, ignition, all those
18    terms that would try and bring up as many documents as
19    possible.
20  Q.  And those searches were done in -- I take it were they
21    done in databases where GM would ordinarily keep
22    documents relating to customer complaints or
23    complaints or inquiries coming in from dealerships?
24  A.  Yes.
25  Q.  Okay.

## 184

1  A.  You said in from dealerships. You know, from
2    dealerships, but also from customers, right, so.
3  Q.  Correct. Okay. Let me ask you -- I'm going to ask
4    you to turn to tab 9 in Exhibit 2. This is the Ray
5    Arjona case.
6      MR. KALFUS: Bates number, please?
7      MR. FRANKLIN: Bates number 18254.
8  BY MR. FRANKLIN:
9  Q.  You were asked earlier about, you know, the fact
10    that -- in terms of your review of these claims and
11    incidents, and the fact that you brought some
12    documents with you today, you were asked specifically
13    about this one at that Bates number that I just read,
14    and I believe you testified that this one, I believe,
15    did not involve the loss of control. Is that correct?
16    Is that your understanding? Take your time and look
17    at it.
18  A.  Right, I don't see anything in here about loss of
19    control.
20  Q.  Okay. Let me ask you to go to tab number 12. This
21    involved a 2005 Chevy Cobalt. It's the Elsie Garrison
22    claim, tab number 12 from Exhibit 2. And you were
23    asked -- or you were read portions of this document,
24    and I want to ask you to look at page 18294.
25  A.  Okay.

VICTOR HAKIM                                          June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**185**

1  Q.  And this appears to be the last entry from this claim,
2      so we have a history here of when the complaint or
3      when the incident was first brought to the attention
4      of someone at GM, and it walks you through the
5      communications, and I'd like -- you were asked about
6      some of the earlier communications about the vehicle
7      stalling.
8          I'd like you to read from page 18294, the
9      last entry that's in all caps there, and it appears to
10     be dated August 11, 2005.  It says:
11         "Not available.  Attempted to contact the
12     customer, but was advised by the mother that she is
13     not available."
14         Do you see where it says there that the CRM
15     advised of the reason for the call, and the mother
16     responded that "Things are going very well with the
17     vehicle and there are no concerns at this time"?
18  A.  Yes, I see that.
19  Q.  Okay.  Based on that, is it your view that the
20     person's complaints or concerns were resolved?
21  A.  It sounds that way, yes.
22  Q.  Please go to tab number 17.  This is Bates
23     number 18338, and this is the Nathan Hill incident.
24     Let me know when you are there.
25  A.  Yes, I'm there.

---

**186**

1  Q.  Okay.  You were asked questions and read portions of
2      this report as well.  I'd like to ask you -- at least
3      it appears that this -- the vehicle -- that there were
4      a lot of issues regarding -- or a lot of complaints
5      about this vehicle from the customer, and you were
6      asked about the stalling.
7          But I want to ask you whether or not,
8      looking at that work history number right in the
9      middle of page 18338, do you see where it says:
10         "The lights came on in the dash.  The
11     vehicle shakes at times.  Can't drive over 30 miles
12     per hour.  The air conditioning blows warm.  A new
13     computer chip was installed."
14         Do you see that?
15  A.  Yes.
16  Q.  The next page, 18339, the first full paragraph,
17     "Dealer states gets hot outside, vehicle will not
18     start."
19         Do you see that?
20  A.  Yes.
21  Q.  And further down, there is a paragraph that says
22     "Dealer states that he really doesn't have any more
23     info to provide."
24         There's another sentence there, "Dealer
25     states that he can only work on the vehicle when it is

---

**187**

1      very hot because that is the only time when the
2      vehicle will die out."
3          Do you see that?
4  A.  Yes.
5  Q.  Does that appear to be consistent with the other --
6      the complaints or incidents about a vehicle stalling
7      while someone is driving?
8  A.  Are you saying could that cause a vehicle to stall, in
9      essence, a problem --
10  Q.  Yes --
11  A.  -- with temperature and maybe --
12  Q.  -- excessive heat, right.
13  A.  Could be, yes.
14  Q.  Is that an issue that would be consistent with
15     anything about the ignition switch and, you know,
16     rotation of the ignition switch in terms of heat, or
17     is that a separate --
18  A.  That's a separate issue, of course.  Yeah, this would
19     probably be more related to fuel or fuel lines.
20  Q.  Do you see here on page 18340, towards the middle of
21     the page, "Dealer states that the EBTCM" -- it goes
22     on, but let's look at the second sentence.
23         "Dealer states that the cruise control is
24     also not working, and this may be connected to the
25     EBTCM and a no start."

---

**188**

1          Do you know what the EBTCM is?
2  A.  I'm sorry, you'll have to get me to your spot there.
3  Q.  I'm sorry.  Page 18340.
4  A.  I have that.
5  Q.  And if you go down to the paragraph beginning with D-
6      r-s-t-s.
7  A.  Oh, okay.
8  Q.  Do you see that?
9  A.  Yes.
10  Q.  The second sentence, "Dealer states that the cruise
11     control is also not working, and this may be connected
12     to the EBTCM and no start."
13         Do you see that?
14  A.  Yes.
15  Q.  Okay.  What does that mean, if you know?
16  A.  Well, I think that that -- there's a typo in there.
17     It's probably EBCM.
18  Q.  Okay.
19  A.  It probably doesn't need the T, and that would be the
20     electronic brake control module.
21  Q.  Okay.  Let me ask you to go to tab 18, Bates number
22     18454.
23  A.  Okay.
24  Q.  This is for an '05 Cobalt.  Let me ask you to go to
25     page 18456.  You were read certain portions of this

---

VICTOR HAKIM                                               June 11, 2013
MELTON  vs. GENERAL MOTORS

---

### 189

1    incident, and I'm going to ask you to go to the --
2    near the bottom of page 18456 where it says "Dealer
3    states believes customer" --
4        Do you see that?
5    A.  Yes, I see that.
6    Q.  "Dealer states believes customer is being coached on
7        how to get vehicle repurchased because he instructed
8        the customer to call the dealer and have vehicle towed
9        if concern came up again, but customer did not call or
10       have vehicle towed, and there was another time that
11       the customer called when the concern came up and the
12       dealer told customer to have the vehicle towed in
13       right away, but the customer did not have the vehicle
14       towed and just drove it to the dealer."
15       Do you see that?
16   A.  I do.
17   Q.  Okay.  Is it your opinion, based on tab number 18,
18       that the dealer was attempting to do all they could to
19       assist the customer to find out what was wrong?
20   A.  Well, it appears that way, that they were trying to
21       get the vehicle in, and I think the last sentence
22       there says "Customer does not need appointment, just
23       bring vehicle in," and they were trying to duplicate
24       the issue.
25   Q.  And were they able to?

### 190

1    A.  Well, I don't know.  I'll have to read the rest of
2        this.
3    Q.  Okay.  And you know what, the document says what it
4        does, so don't worry about that.
5        Let me direct your attention to page 18459,
6        and it's above the top third of the page, "Dlr advised
7        vehicle has aftermarket remote start and alarm."
8        Do you see that?
9    A.  I see that.
10   Q.  "The module for the remote start and alarm did not
11       adapt to the new cylinder, so the vehicle is now at
12       the alarm company now for service.  Diagnosis is that
13       the aftermarket module caused the issue.  Is going to
14       wait for the vehicle to get back from the alarm
15       company.  Then dealer is going to inspect to make sure
16       it's working properly."
17       Based on this, is it your understanding
18       that the dealer found that the alarm -- this
19       aftermarket alarm could have had an effect or could
20       have been causing the problem here?
21       MR. COOPER:  Object to the form.
22       THE WITNESS:  Well, it sounds that way, or
23       it sounds like they think it affects the ignition in
24       some way.
25   BY MR. FRANKLIN:

### 191

1    Q.  Please turn to tab 23.  Let me know when you are
2        there.
3    A.  I'm there.
4    Q.  Okay.  You were asked about this incident, and you
5        were read certain portions of this report.  I want to
6        direct your attention to 18639.
7    A.  Okay.
8    Q.  Looking kind of halfway, the halfway mark on the page,
9        you'll see a notation about:
10       "The car broke down.  Customer states
11       idling was rough and around 2 to 3 and a bit over.
12       Went down to 1,000.  Just broke down in his driveway
13       and had reduced engine light come on.  When he turned
14       the key and it would not start and the car started to
15       click."
16       Do you see that?
17   A.  Yes.
18   Q.  In looking further down, do you see that the dealer
19       states "Bad cell in the battery and was replaced and
20       everything was fine and took for test drive and car
21       running fine"?
22       Do you see that?
23   A.  Yes.
24   Q.  Okay.  Is it your understanding from this, now that
25       I've read other portions of this report, that the

### 192

1    vehicle problems were a result of a bad cell in the
2    battery?
3        MR. COOPER:  Object to the form.
4        THE WITNESS:  That's what it looks like,
5    yes.
6    BY MR. FRANKLIN:
7    Q.  Looking at tab 24.  So let me direct your attention to
8        page 18741, and I'm sorry, this involves an '05
9        Cobalt.  This is the Arthur Ledoux incident.  And I
10       want to direct your attention to page 18741, looking
11       at "Customer Primary Symptoms or Concerns."
12       Do you see there on August 5th, 2005,
13       "Could not duplicate stall concern, road tested,
14       working as designed"?
15       Do you see that?
16   A.  Yes.
17   Q.  And then following that, do you see that "Replaced
18       ignition switch housing"?  Do you see that entry on
19       August 12th, 2005?
20   A.  Yes.
21   Q.  And then after that on September 15th:
22       "Customer states vehicle shuts off when
23       driving.  No codes.  All systems operating as normal.
24       All operating according to GM specs."
25       Do you see that?

---

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

---

**193**

1    A.   Yes.
2    Q.   And on January 31st, 2006, "Installed key support
3         cover."
4              Is it your understanding -- what is your
5         understanding about what that means, the key support
6         cover?
7    A.   I believe that that's a plastic insert that changes
8         the key from a slot to a hole.
9    Q.   Do you see, following that key insert work being done
10        on January 31st, 2006, that there were no more -- on
11        this case assessment form, there are no more
12        references to -- there are other issues with the
13        vehicle in terms of the heating and air and a
14        headlight issue, but there are no more complaints or
15        incidents of stalling?
16   A.   Okay.  So you are saying after -- after the 1-31 date?
17   Q.   Yes.
18   A.   1-31-06?
19   Q.   Yes, looking along the history in terms of concerns.
20   A.   Well, I agree there's no other stalling or that kind
21        of issue, if that's what your question is, after that.
22   Q.   Okay.  Tab number 34 is the Anatoleu Bekrev incident
23        involving a 2005 Cobalt.
24             Do you see that?
25   A.   Well, I'll get there in a second.

---

**194**

1    Q.   Okay.  Take your time.
2    A.   Okay.
3    Q.   This one involves -- at least the allegation is that
4         the vehicle would cut off sporadically while sitting
5         at a stoplight or stop signs or while driving.
6              Do you see that?
7    A.   Yes.
8    Q.   So if a vehicle is -- in terms of your understanding
9         about the allegations in this lawsuit that, you know,
10        the key went from run to accessory while someone was
11        driving, if someone is sitting at a traffic light,
12        would you expect the key to be able to rotate from run
13        to accessory and cause a vehicle to stall while
14        sitting in a parked -- or at a traffic light or a stop
15        sign?
16   A.   I guess I don't know.  I hadn't thought about it.  I
17        suppose you -- there would have to be some movement.
18        It seems inconsistent.
19   Q.   Please go to page 19314, and you were read portions of
20        this report, and I want to direct your attention to --
21        there is an entry there towards the bottom of the
22        page.  It's the full paragraph right before the bottom
23        of the page.  In other words, right here.  It says
24        "Dante Groomes," and this looks like it's -- I guess
25        that's November 8, 2005?

---

**195**

1    A.   Okay.  Yes.
2    Q.   There is a discussion about a buyback, and it says:
3              "It has been determined that the vehicle
4         has been ran at low fuel levels.  This could be a
5         cause for concern for the engine stalling.  Sufficient
6         gas pressure is necessary to push gas into the engine.
7         Low gas levels will not cause ample pressure to push
8         gas down the lines."
9              And then later it talks about, after this,
10        the dealer was not able to duplicate the concerns.
11             Is it your understanding, from looking at
12        this, that that is what was suspected in terms of this
13        vehicle's stalling, that it was due to insufficient
14        fuel or low gas pressure?
15             MR. COOPER:  Object to the form.
16             THE WITNESS:  Well, I think all I can tell
17        you is that, you know, that was raised as an issue,
18        right, so that they suspected that that could be a
19        cause.
20   BY MR. FRANKLIN:
21   Q.   Okay.
22             VIDEOGRAPHER:  One minute.
23             MR. FRANKLIN:  Okay.  Do you want to switch
24        the tape?
25             VIDEOGRAPHER:  This complete disc three.

---

**196**

1         We are off the record at 4:39.
2             (Discussion held off the record.)
3             VIDEOGRAPHER:  Back on the record at 4:41.
4         This is disc four of the deposition of GM corporate
5         rep Victor Hakim.  Please proceed.
6    BY MR. FRANKLIN:
7    Q.   Please skip to tab number 88, and that may be in the
8         next notebook.  I'm not sure.
9             MR. COOPER:  It is.
10   BY MR. FRANKLIN:
11   Q.   I'm sorry, 89.  Please go to 89.
12   A.   At least you didn't get me back the other way.
13   Q.   Yeah.  It's Bates number 14019.
14   A.   Okay.
15   Q.   You were asked about this one earlier.  This is the
16        Thomas Spirling incident.  And there was a lot of --
17        there were references to the vehicle lurching forward
18        or launching forward.
19             In terms of your understanding about what
20        happens when a vehicle stalls, is that something that
21        you would expect, for a vehicle to lurch or to move
22        forward when it is stalling, or is that a different
23        condition?
24   A.   No, I -- when I saw this, it looked a little
25        inconsistent or something else was going on when it --

---

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

## 197

1    when the statement here is that it -- "He tried
2    starting the vehicle, and then it lunged forward."
3        So it seemed a little inconsistent.  It
4    doesn't seem to quite make sense with stalling.
5    Q.   Okay.  And again, in none of -- you've kind of talked
6    about the many different potential causes of a vehicle
7    stalling, and that in -- of all these that have been
8    presented to you today and that you've reviewed, the
9    actual cause of the stalling incident, including, you
10   know, a grounding issue in terms of the electrical
11   current or the throttle body or the generator or
12   alternator or the battery, or run to accessory or what
13   have you, any of those are potential causes of the
14   stalling in any of these claims that you've seen;
15   correct?
16       MR. COOPER:  Object to the form.
17       THE WITNESS:  Could be, sure.
18   BY MR. FRANKLIN:
19   Q.   In fact, in these incidents that you've looked at, it
20   is not known in most instances what caused the
21   stalling incident; correct?
22   A.   I believe that's true.
23       MR. FRANKLIN:  I appreciate your time.  I
24   have no further questions for you.
25       MR. COOPER:  Just a couple of follow-ups.

## 198

1                RE-EXAMINATION
2    BY MR. COOPER:
3    Q.   As we saw from the claims today, vehicle stalling can
4    be a dangerous condition, can't it?
5        MR. FRANKLIN:  Object to form.
6        THE WITNESS:  All right.  So as a general
7    kind of question, I don't know that I can make that
8    assessment.  You said from the claims that we saw
9    today.  So I don't know that I can make that
10   assessment, you know, in that way.
11   BY MR. COOPER:
12   Q.   Well, can vehicle stalling be a dangerous situation?
13   A.   In the way you ask the question, you say can it be.
14   In general, stalling -- in general, you can control
15   the vehicle.  You still have braking and steering.  So
16   it's -- I suppose there could be instances, but I
17   can't say in general that that's, you know, always the
18   case.
19   Q.   So I just want to make sure I understand your
20   testimony.  Is it your testimony that vehicle stalling
21   is never a dangerous situation?
22       MR. FRANKLIN:  Object to form.
23       THE WITNESS:  No, certainly I wouldn't say
24   that.  I would say, you know, it has to be assessed,
25   right, and each case would be different.

## 199

1    BY MR. COOPER:
2    Q.   And from the claims we saw today -- I'll tell you that
3    Brooke Melton bought her vehicle from Bill Heard
4    Chevrolet on August 31st of 2005.  And from the claims
5    we saw today, there were over 2,000 incidents, just
6    with these claims, before GM or Bill Heard sold Brooke
7    her vehicle.
8        Are you aware that before August 31st of
9    2005, even though GM was aware of all these claims, it
10   chose not to fix the problem with the ignition switch
11   in the vehicle?
12       MR. FRANKLIN:  Object to form.
13       THE WITNESS:  I haven't researched any of
14   that.  So I guess I don't know the answer to that
15   question.
16   BY MR. COOPER:
17   Q.   Are you aware of whether GM ever chose to warn Brooke
18   about the problem with Cobalt stalling before Bill
19   Heard sold her the Cobalt on August 31st of 2005?
20   A.   No, I have no knowledge one way or the other on that
21   question.
22   Q.   Do you think they should have?
23       MR. FRANKLIN:  Object to form.
24   BY MR. COOPER:
25   Q.   If they know about a problem with the vehicle

## 200

1    stalling, shouldn't they tell her about it?
2        MR. FRANKLIN:  Object to form.
3        THE WITNESS:  Now, again, I can't -- in
4    general, I can't answer a question like that, so I --
5    BY MR. COOPER:
6    Q.   Are you aware, as of today, GM has still chosen not to
7    fix the problem with the ignition switch?
8        MR. FRANKLIN:  Object to form.
9        THE WITNESS:  I guess I'm not sure how to
10   answer that question.  I know there is a service
11   bulletin and there is -- you know, there is a change
12   made to the key.  But beyond that, I don't know.
13   BY MR. COOPER:
14   Q.   Yeah, my question was more specific to the ignition
15   switch.
16       Are you aware that, as of today, GM has
17   still chosen not to fix the problem with the ignition
18   switch?
19       MR. FRANKLIN:  Object to form.
20       THE WITNESS:  Yeah, I'm not real familiar
21   with it.
22   BY MR. COOPER:
23   Q.   And are you aware that before Brooke's accident which
24   resulted in her death, GM chose to never warn her
25   about the problem of the vehicle stalling due to a

VICTOR HAKIM                                                June 11, 2013
MELTON vs. GENERAL MOTORS

## 201

```
1    defective ignition switch?
2         MR. FRANKLIN:  Object to form.
3         THE WITNESS:  No, again, I can't answer
4    that question one way or the other.  I don't know.
5         MR. COOPER:  No further questions.  Thanks.
6         VIDEOGRAPHER:  This will complete today's
7    deposition of corporate representative Victor Hakim.
8    We are off the record at 4:50.
9         (Exhibit No. 5 marked.)
10        (The deposition was concluded at 4:50 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## 202

```
1    State of Michigan  )
2    County of Wayne    )
3
4         I certify that this transcript is a
5    complete, true, and correct record of the testimony of
6    the witness held in this case.
7         I also certify that, prior to taking this
8    deposition, the witness was duly sworn or affirmed to
9    tell the truth.
10        I further certify that I am not a relative
11   or an employee of an attorney for a party, or a
12   relative or an employee of a party; and that I am not
13   financially interested, directly or indirectly, in the
14   matter.
15
16        June 19, 2013
17
18
19
20
21
22        _____
23        Angela E. Broccardo, CSR-4679
24        Notary Public, Wayne County, Michigan
25
```

## 203

```
1              DEPOSITION ERRATA SHEET
2
3
4    Our Assignment No. 442432/378398
5    Case Caption:  Melton vs. General Motors, et al.
6
7
8        DECLARATION UNDER PENALTY OF PERJURY
9         I declare under penalty of perjury that I
10   have read the entire transcript of my Deposition taken
11   in the captioned matter or the same has been read to
12   me, and the same is true and accurate, save and except
13   for changes and/or corrections, if any, as indicated
14   by me on the DEPOSITION ERRATA SHEET hereof, with the
15   understanding that I offer these changes as if still
16   under oath.
17
18   Signed on the _____ day of _____, 20___.
19
20        _____
         VICTOR HAKIM
21
22
23
24
25
```

## 204

```
1              DEPOSITION ERRATA SHEET
2    Page No.____Line No.____Change to:_____
3
4    Reason for change:_____
5    Page No.____Line No.____Change to:_____
6
7    Reason for change:_____
8    Page No.____Line No.____Change to:_____
9
10   Reason for change:_____
11   Page No.____Line No.____Change to:_____
12
13   Reason for change:_____
14   Page No.____Line No.____Change to:_____
15
16   Reason for change:_____
17   Page No.____Line No.____Change to:_____
18
19   Reason for change:_____
20   Page No.____Line No.____Change to:_____
21
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25        VICTOR HAKIM
```

VICTOR HAKIM                                                    June 11, 2013
MELTON  vs. GENERAL MOTORS

205

```
 1        DEPOSITION ERRATA SHEET
 2        Page No._____Line No._____Change to:_____
 3        _____
 4        Reason for change:_____
 5        Page No._____Line No._____Change to:_____
 6        _____
 7        Reason for change:_____
 8        Page No._____Line No._____Change to:_____
 9        _____
10        Reason for change:_____
11        Page No._____Line No._____Change to:_____
12        _____
13        Reason for change:_____
14        Page No._____Line No._____Change to:_____
15        _____
16        Reason for change:_____
17        Page No._____Line No._____Change to:_____
18        _____
19        Reason for change:_____
20        Page No._____Line No._____Change to:_____
21        _____
22        Reason for change:_____
23
24        SIGNATURE:_____DATE:_____
25             VICTOR HAKIM
```