# Exhibit C

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.

REYNALDO A. ESPINEIRA, individually
and on behalf of all others similarly
situated,

   Plaintiff,

vs.

GENERAL MOTORS, LLC, and
DELPHI AUTOMOTIVE, PLC,

   Defendants.

   **CLASS ACTION**
   **JURY TRIAL DEMANDED**

_____/

## CLASS ACTION COMPLAINT

Plaintiff Reynaldo A. Espineira, individually and on behalf of all similarly situated persons, brings this action against Defendant General Motors, LLC ("GM") and Defendant Delphi Automotive, PLC ("Delphi") (collectively "Defendants") for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), ("RICO"), asserts additional statutory and common law claims, and alleges as follows:

### NATURE OF THE CASE

1. This case arises from GM's recent string of recalls (collectively "the Recall"), the culmination of GM and Delphi's scheme to defraud GM consumers through their unconscionable failure to disclose and active concealment of a defect in certain GM vehicles that renders them unsafe to drive and has killed at least 12 innocent victims and possibly hundreds more.

2. The defect involves the vehicles' ignition switch system, which is dangerously susceptible to failure during normal and foreseeable driving conditions (the "Ignition Switch Defect").  When the system fails, the switch turns from the "Run" (or "On") position to either

09-50026-mg    Doc 12672-4    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
Case 1:14-cv-01427-FM    Document 1    Filed on ESD Docket 04/24/2014    Page 2 of 37
to Schedule 1  Exh. C    Pg 3 of 40

the "Off" or the "accessory" position, which then results in a loss of power, speed control, and braking, as well as a disabling of the vehicle's airbags.

3.      Delphi manufactured the defective ignition switches.

4.      On information and belief, Delphi knew its ignition switches were defective yet it continued to manufacture and sell the defective ignition switch systems knowing they would be used in the vehicles of Plaintiff and the Class.

5.      The vehicles that have this defect ("Defective Vehicles") are:

- 2003-2007 Saturn Ion
- 2007 Saturn Sky
- 2005-2007 Pontiac G5
- 2006-2007 Pontiac Solstice
- 2005-2007 Chevrolet Cobalt
- 2006-2007 Chevrolet HHR

6.      So far, there are approximately 2.6 million Defective Vehicles.

7.      GM, acknowledging that "[s]omething went wrong with our process in this instance and terrible things happened," has recalled the Defective Vehicles to replace their ignition switch systems.  But merely replacing the ignition switch systems will not completely solve the problem, make the Defective Vehicles safe, or restore the Defective Vehicles' value because the design defect pervades the entire structure of the ignition switch and has destroyed the reputation of the Defective Vehicles. Specifically, the design defect also includes the location of the ignition switch, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the type of key that is used.

8.      Plaintiff brings this action on behalf of a Class of all persons in the United States who currently own or lease one or more Defective Vehicles.

9. Plaintiff also brings this action for a subclass of Florida residents who own or lease one or more Defective Vehicles.

10. In light of the recent Recall, Defendants' scheme to defraud and gross misconduct have harmed Plaintiff and Class Members and caused them actual damages. Plaintiff and Class Members did not receive the benefit of their bargains as purchasers and lessees as they received vehicles that were less safe, less useful, of lower quality, and, most significantly, are now less valuable in light of the Recall. Plaintiff and Class Members contracted to purchase or lease vehicles that do not unexpectedly turn off and become uncontrollable without airbag protection, but because of the Ignition Switch Defect, received defective vehicles that unexpectedly turn off and become uncontrollable without airbag protection. As a result of publicity regarding the Ignition Switch Defect and GM's misconduct, punctuated by the Recall, the value of the Defective Vehicles has diminished, and GM's offer to replace the ignition switch system does not adequately address the diminished value of Plaintiff's and Class Members' vehicles.

## JURISCTION AND VENUE

11. This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 class members, and more than two-thirds of the Class is diverse from Defendants. This Court also has original federal question jurisdiction because Plaintiff's first claim arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO") and Plaintiff's second claim arises under the Magnuson-Moss Consumer Products Warranties Act, 15 U.S.C. § 2301, *et seq.* ("Magnuson-Moss"). The Court has supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367.

09-50026-mg    Doc 12672-4    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
Case 1:14-cv-21417-FAM    Document 1    Entered on FLSD Docket 04/21/2014    Page 4 of 37
to Schedule 1  Exh. C    Pg 5 of 40

12.     This Court has personal jurisdiction over Defendants because Defendants conduct

substantial business in this District, and some of the actions giving rise to the complaint took

place in this District.

13.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part

of the events or omissions giving rise to the claims occurred in this District, and because

Defendants have caused harm to Class Members residing in this District, including, but not

limited to, Plaintiff.

## PARTIES

14.     Plaintiff Reynaldo Espineira is a resident of Miami, Miami-Dade County, Florida.

Plaintiff owns a 2004 Saturn Ion, which he bought new in September 2003 with a standard

warranty. Plaintiff chose the Saturn in part because he wanted a safely designed and manufactured

vehicle and he understood that Saturns had a reputation for being high-quality, durable, and safe

vehicles. But since the purchase, Plaintiff has had repeated trouble with the defective ignition

switch, including trouble getting the key out of the ignition and difficulty even starting the

vehicle. Plaintiff tried to have the vehicle repaired on at least three separate occasions, yet the

defect remains. Like millions of others, Plaintiff did not learn of the Ignition Switch Defect until

around March 2014, the time of the Recall. Had GM disclosed the Ignition Switch Defect,

Plaintiff would not have purchased his Saturn Ion, or would have paid less than he did, and

would not have retained the vehicle only to suffer the diminished value brought on by the Recall.

Moreover, since the Recall, Plaintiff has attempted to sell the vehicle and has been unable to do

so.

15.     Defendant GM is a limited liability company formed under the laws of Delaware

with its principal place of business in Michigan. GM was incorporated in 2009, and on July 10,

09-50026-mg   Doc 12672-4   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
to Schedule 1  Exh. C   Pg 6 of 40
Case 1:14-cv-01427-AW   Document 1   Entered on FLSD Docket 04/24/2014   Page 5 of 37

2009, acquired substantially all the assets and assumed certain liabilities of General Motors

Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy

Code, pursuant to a Master Sales and Purchase Agreement ("Agreement").

16.     Under the Agreement, GM expressly assumed the following obligation:

> From and after the Closing, Purchaser [GM] shall comply with
> the certification, reporting and recall requirements of the
> National Traffic and Motor Vehicle Act, the Transportation
> Recall Enhancement, Accountability and Documentation Act,
> the Clean Air Act, the California Health and Safety Code, and
> similar laws, in each case, to the extent applicable in respect of
> vehicles and vehicles parts manufactured or distributed by [Old
> GM].

17.     GM also expressly assumed:

> All Liabilities arising under express written warranties of [Old
> GM] that are specifically identified as warranties and delivered
> in connection with the sale of new, certified used or pre-owned
> vehicles or new or remanufactured motor vehicle parts and
> equipment (including service parts, accessories, engines and
> transmissions) manufactured or sold by [Old GM] or Purchaser
> prior to or after the Closing and (B) all obligations under
> Lemon Laws.

18.     Based on the express language of the Agreement, GM assumed liability for the

claims at issue in this lawsuit.

19.     GM is also liable through successor liability for the deceptive and unfair acts and

omissions of Old GM, as alleged in this Complaint, because GM acquired and operated Old GM

and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos,

plants, offices, leadership, personnel, engineers, and employees, GM was aware from its inception

of the Ignition Switch Defect in the Defective Vehicles, and GM and Old GM concealed the

Ignition Switch Defect from the public, regulators, and the bankruptcy court. Because GM is

liable for the wrongful conduct of Old GM, there is no need to distinguish between the conduct of

Old GM and GM, and the complaint will hereinafter simply refer to GM as the corporate actor when describing the relevant facts.

20.      Defendant Delphi is a foreign corporation based in the United Kingdom. Delphi can be served through the Hague Convention at Courteney Road, Hoath Way, Gillingham, Kent ME8 0RU, United Kingdom. Once a subsidiary of Old GM, Delphi spun-off in 1999 and became an independent publicly held corporation. Delphi, through its various entities, has designed, manufactured, and supplied GM with motor vehicle components, including the defective ignition switches at issue here.

21.      Notwithstanding Delphi's 2009 bankruptcy, Defendant Delphi is also liable through successor liability for the deceptive and unfair acts and omissions of Old Delphi, as alleged in this Complaint, because Delphi acquired and operated Old Delphi and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos, plants, offices, leadership, personnel, engineers, and employees, Delphi was aware from its inception of the Ignition Switch Defect in the Defective Vehicles, and Delphi and Old Delphi concealed the Ignition Switch Defect from the public, regulators, and the bankruptcy court. Because Delphi is liable for the wrongful conduct of Old Delphi, there is no need to distinguish between the conduct of Old Delphi and Delphi, and the complaint will hereinafter simply refer to Delphi as the corporate actor when describing the relevant facts.

**FACTUAL ALLEGATIONS**

A.      **Defendants' Decade of Concealment**

22.      In documents filed with the federal government, GM has admitted that it learned of the Ignition Switch Defect in 2001, during the pre-preproduction development of the Saturn Ion.  At that time, an internal report indicated that the car was stalling due to problems with the

Case 1:14-cv-01427-FAW   Document 1   Entered on FLSD Docket 04/24/2014   Page 7 of 37
09-50026-mg   Doc 12672-4   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
to Schedule 1  Exh. C    Pg 8 of 40

ignition switch, which included "low detent plunger force" in the ignition switch.  The report

stated that "an ignition switch design change" solved the problem, but it obviously did not.

23.    GM nonetheless began manufacturing and selling the Ion in 2002 (for the 2003

model year) with the defective ignition switch systems, which were manufactured by Delphi.

24.    In 2003, an internal GM inquiry documented that a service technician observed

the Saturn Ion stall after the ignition had switched off while driving.  The technician noticed that

"[t]he owner had several keys on the key ring," and the report stated that "[t]he additional weight

of the keys had worn out the ignition switch."  The technician replaced the ignition switch, and

the inquiry was closed without further action.

25.    In 2004, three GM employees driving production Ions reported that their cars had

stalled from a loose ignition switch. "The switch should be raised at least one inch toward the

wiper stalk . . . . This is a basic design flaw and should be corrected if we want repeat sales," one

engineer reported.

26.    Despite these reports, after considering "lead time required, cost, and

effectiveness," GM decided to do nothing.

27.    Even worse, when GM began manufacturing and selling the Chevrolet Cobalt in

2004 (for the 2005 model year), which was essentially the same car as the Saturn Ion, it installed

the same ignition switch system as it installed in the Ion.

28.    Soon after the Cobalt entered the market, GM began receiving complaints about

incidents of vehicles losing engine power, including instances in which the key moved out of the

"run" position when a driver inadvertently contacted the key or steering column.  Engineering

inquiries, known within GM as Problem Resolution Tracking System ("PRTS") reports, were

opened to assess the issue.

09-50026-mg   Doc 12672-4   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
to Schedule 1   Exh. C   Pg 9 of 40
Case 1:14-cv-01427-AW   Document 1   Entered on FLSD Docket 04/21/2014   Page 8 of 37

29.     In February 2005, GM engineers concluded that the problem had two causes: "a lower torque detent in the ignition switch . . . [and the] low position of the lock module on the [steering] column."   Again, however, GM decided not to take action.

30.     On February 28, 2005, GM issued a Service Bulletin to its dealers addressing "the potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effect" in 2005 Cobalts and 2005 Pontiac Pursuits, which GM stated was "more likely to occur if the driver is short and has a large heavy key chain."   Notably, GM did not disseminate this information to Plaintiff and the Class members.

31.     The February 28, 2005 Service Bulletin directed the dealers to advise customers that "removing unessential items from their key chains" would prevent the ignition from being turned off inadvertently.

32.     But GM knew at that time that the problem was a result of design defects in the key and ignition system, and not short drivers using heavy key chains.   Moreover, GM knew that the "fix" it directed dealers to offer customers was insufficient to prevent the problem with the ignition.

33.     GM transmitted the February 28, 2005 Service Bulletin to its dealers through the mail or wires.

34.     During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration.   The slot design allowed the key chain to hang lower on the key, which placed more torque on the ignition switch when the chain was contacted or moved.   The proposal was initially approved, but later cancelled.

35.     In June 2005, the *New York Times* reported that Chevrolet dealers were telling customers to lighten their key rings to prevent intermittent stalling and the loss of electrical

09-50026-mg   Doc 12672-4   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
to Schedule 1   Exh. C   Pg 10 of 40
Case 1:14-cv-01427-AKH   Document 1   Filed on FLSD Docket 04/24/2014   Page 9 of 37

power in their cars.  The article included a statement from Alan Adler, GM's Manager for Safety

Communications, in which he reassured the public that the problem only occurred in "rare cases

when a combination of factors is present," that customers "can virtually eliminate this possibility

by taking several steps, including removing nonessential material from their key rings," and that

"when [the stalling] happens, the Cobalt is still controllable" and the "engine can be restarted

after shifting to neutral."   GM intended Adler's statement to be disseminated to the public

through the mail or wires.

36.    These statements were false because GM's internal documents showed that these

incidents occurred when drivers were using keys with the standard key fob, and that removing

non-essential items from the key ring would not "virtually eliminate" the risk of an incident.

37.    In July 2005, Amber Marie Rose, who was 16-years old, was killed when she

drove her 2005 Cobalt off the road and struck a tree.  Her driver's side airbag did not deploy,

even though it should have given the circumstances of the head-on crash, and the car's ignition

switch was in the "accessory/off" position at the time of the crash.  GM learned of these facts in

2005 and documented them in an internal investigation file.

38.    Instead of fixing the defect, in December 2005, GM issued a service bulletin to its

dealers that reiterated much of the same deceptive message Adler delivered earlier in the year.  It

indicated that the possibility of the driver inadvertently turning off the ignition was more likely

to occur if the driver is short and has a large or heavy key chain, and recommended that drivers

remove unessential items from key chains.  In addition, it informed dealers that it had developed

an insert for the key ring to prevent it from moving up and down in the slot, and that the key ring

had been replaced with a smaller design that would not hang as low as in the past.  The service

bulletin applied to 2003-06 Saturn Ions, 2005-06 Chevrolet Cobalts, the 2006 Chevrolet HHR,

and the 2006 Pontiac Solstice, all of which were equipped with the same defective ignition switch system. GM issued the December 2005 Service Bulletin to its dealers through the mail or wires.

39.     In October 2006, GM updated its December 2005 Service bulletin to include the 2007 Saturn Ion, the 2007 Saturn Sky, the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, and the 2007 Pontiac Solstice.  GM issued this update to its dealers through the mail or wires.

40.     In 2006, at least two fatal accidents involving Cobalts occurred in which the cars' data recorders indicated that the ignition switches were in the "accessory" position and the front airbags failed to deploy.  GM learned of this information in 2006.

41.     In 2007 and 2008, GM became aware of at least four more such fatal accidents.

42.     NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbag failed to deploy in non-rear impact crashes.

43.     GM finally made some changes to the design of the ignition switch system in 2006 to include a new detent plunger and spring.  The new switch, however, did not receive a new part number, which is considered a "cardinal sin" in the engineering community, and further concealed the defect in the switch that was installed in the Defective Vehicles.

44.     In 2012, GM engineers studied 44 vehicles across a range of make and model years, and results revealed that vehicles tested from model years 2003 through 2007 exhibited torque performance below the original specifications established by GM.  Rather than immediately notify NHTSA of the results of this study or conduct a recall, GM continued to conceal the nature of the Ignition Switch Defect.

Case 1:14-cv-04137-AKH   Document 1   Filed on TXSD Docket 04/25/2014   Page 11 of 37
09-50026-mg   Doc 12678-4   Filed 04/30/14   Entered 04/30/14 16:54:21   Supplement
to Schedule 1   Exh. C   Pg 12 of 40

45.     In April 2013, GM hired an outside engineering consulting firm to investigate the ignition switch system.  The external report concluded that ignition switches installed in early model Cobalt and Ion vehicles did not meet GM's torque specification.  Rather than immediately notify NHTSA of the results of this report, GM continued to conceal the nature of the Ignition Switch Defect.

46.     Despite its utter disregard for public safety, GM vehicles have been marketed based on safety from 2002 through the present.  For example, in 2005, Chevrolet emphasized on its website that "[y]our family's safety is important to us . . . . That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind."  Likewise, in advertisements for Saturns, GM utilized the slogan, "Saturn. People First," and stated that, "[i]n cars, it's about things like reliability, durability, and of course, safety. That's where we started when developing our new line of cars."

**B.     GM Finally Discloses the Ignition Switch Defect**

47.     It was not until February of 2014 — almost thirteen years after first recognizing the defect — that GM finally admitted publicly that the ignition switch system is defective and agreed to recall the Defective Vehicles to replace the old ignition switch with the re-designed version.

48.     In a February 14, 2014 letter to the NHTSA regarding the Recall, GM finally acknowledged — in contrast to its prior representations to the agency — that changes were made to the ignition switches during the 2007 model year.  Specifically, GM stated that on "April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch  proposed by the supplier, Delphi Mechatronics."  The GM design engineer referenced was Ray DeGiorgio.

11

Case 1:14-cv-02147-AKH   Document 1   Filed 04/30/14   Entered 04/25/2014   Page 12 of 37
09-50026-mg   Doc 12678-4   Filed 04/30/14   Entered 04/30/14 16:54:21   Supplement
to Schedule 1   Exh. C   Pg 13 of 40

49.    GM's Recall is insufficient because it does not address the location of the ignition switch system or how low the key fob hangs on the steering column, all of which create a risk of inadvertent driver contact and an inadvertent turning of the switch. The Recall also fails to account for the permanent loss of value of (and reputation to) the Defective Vehicles.

50.    Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects. If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.  GM repeatedly violated the TREAD Act by actively concealing information about the Ignition Switch Defect for more than a decade.

51.    On March 17, 2014, GM's CEO Mary T. Barra issued an internal video to employees, wherein she admits that "[t]hese are serious developments that shouldn't surprise anyone.  After all, something went wrong with our process in this instance and terrible things happened."[1]

52.    Throughout the relevant period, GM possessed vastly superior knowledge and information to that of consumers — if not exclusive information — about the design and function on the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

53.    The Ignition Switch Defect has caused actual damages to Plaintiff and the Class.

---

[1] The Ignition Switch Defect is not the only example of GM's misconduct when it comes to concealing defects. Recent reports indicate that GM "waited years to recall nearly 335,000 Saturn Ions for power steering failures despite getting thousands of consumer complaints and more than 30,000 warranty repair claims." This *other* defect — the power steering defect — can cause the affected vehicle to lose power steering, making turning the vehicle much more difficult. Complaints filed with the NHTSA reveal incidents in which 2004 Saturn Ion steering wheels locked, causing the affected vehicles to crash into a tree or get pulled into oncoming traffic. GM has admitted that it didn't do enough to take care of the power steering problem.

54. A vehicle purchased, leased, or retained with a known serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the known defect.

55. A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

56. As a result of publicity regarding the Ignition Switch Defect and GM's misconduct, punctuated by the Recall, the value of the Defective Vehicles has diminished, and GM's offer to replace the ignition switch system does not adequately address the diminished value of Plaintiff's and Class Members' vehicles. Plaintiff and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's wrongful conduct.

## STATUTES OF LIMITATION

57. There are no applicable statutes of limitations because the claims of Plaintiff and the Class did not accrue until the Recall, the instant the value of the Defective Vehicles diminished.

58. Alternatively, any applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the Ignition Switch Defect. On information and belief, Defendants have been aware of the Ignition Switch Defect since at least 2001, and have concealed from Plaintiff, the Class, the public, and the government the complete nature of the Ignition Switch Defect.

59. Even now, after the Defective Vehicles have been recalled, Defendants continue to engage in their scheme to defraud by downplaying the significance, danger, and nature of the Ignition Switch Defect.

60. Plaintiff and the Class did not discover and could not have discovered with reasonable diligence the facts that would have caused a reasonable person to suspect that the

Ignition Switch Defect existed or that Defendants did not report information within their knowledge regarding the existence of a dangerous defect to federal authorities or consumers until shortly before this class action was filed.

61. Defendants actively concealed the true character, quality, and nature of the Defective Vehicles. Plaintiff and the Class relied on Defendants' active concealment of these facts. Moreover, GM was and remains under a continuing duty to disclose to NHTSA, Plaintiff, and the Class the true character, quality, and nature of the Defective Vehicles. Defendants are therefore estopped from relying on any statutes of limitation in this action.

## CLASS ALLEGATIONS

62. Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and a Class initially defined as follows:

> All persons in the United States who currently own or lease one or more of the following GM vehicles: 2003-07 Saturn Ion; 2005-07 Chevrolet Cobalt; 2005-07 Pontiac G5; 2006-07 Chevrolet HHR; 2006-07 Pontiac Solstice; and 2007 Saturn Sky (the "Defective Vehicles").

63. Included within the Class is a subclass of Florida residents who own or lease Defective Vehicles (the "Florida Subclass").

64. Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case. Also excluded from the Class are Delphi, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees.

Case 1:14-cv-01147-PAM   Document 1-4   Entered on FLSD Docket 04/25/2014   Page 15 of 37
09-50026-reg   Doc 12678-4   Filed 04/30/14   Entered 04/30/14 16:54:21   Supplement
to Schedule 1   Exh. C   Pg 16 of 40

Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Defective Vehicles.

65.    The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

66.    As there are approximately 2.6 million Defective Vehicles, the number of Class Members is great enough that joinder is impracticable.

67.    The claims of Plaintiff are typical of the claims of the Class, as Plaintiff and Class Members alike purchased or leased Defective Vehicles and were harmed in the same way by Defendants' uniform misconduct.

68.    Plaintiff will fairly and adequately protect the interests of the other members of the Class and Subclasses.  Plaintiff's counsel has substantial experience in prosecuting class actions.  Plaintiff and his counsel are committed to vigorously prosecuting this action, have the financial resources to do so, and do not have any interests adverse to the Class.

69.    There are numerous questions of law and fact that are common to the Class and the Subclasses and predominate over questions affecting only individual members, including the following:

(a)    Whether Defendants, as part of a racketeering scheme to defraud, concealed information about the dangerous and defective condition of the relevant vehicles from Plaintiff and the Class;

(b)    Whether Defendants, through their RICO Enterprise, as described below, used the mail or wires in furtherance of their scheme to defraud;

(c)    Whether the Defective Vehicles suffer from Ignition Switch Defects;

(d)    Whether Defendants concealed the defects;

(e)      Whether Defendants misrepresented that the Defective Vehicles were safe;

(f)      Whether Defendants owed Plaintiff and the Class a duty to disclose the Ignition Switch Defect;

(g)      Whether Defendants engaged in fraudulent concealment;

(h)      Whether Defendants engaged in unfair, deceptive, unlawful or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches; and

(i)      Whether Defendants' unlawful, unfair or deceptive practices harmed Plaintiff and the Class.

70.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable.  Likewise, because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

71.      The prosecution of separate actions by the individual Class members would also create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for Defendants. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

## COUNT I

**VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT**
**(18 U.S.C. § 1962(c))**
**(Against Defendants on behalf of all Classes)**

72.      Plaintiff incorporates by reference each preceding paragraph as though fully set forth at length herein.

Case 1:14-cv-01417-PAM    Document 1    Entered on FLSD Docket 04/25/2014    Page 1 of 37
09-50026-mg    Doc 12672-4    Filed 04/30/14    Entered 04/30/14 16:54:21    Supplement
to Schedule 1    Exh. C    Pg 18 of 40

73.     This claim is brought on behalf of all Classes.

74.     Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the "RICO Enterprise" through a "pattern of racketeering activity."

75.     At all times relevant, GM, Delphi, their associates-in-fact, Plaintiff, and the Class members were and are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

76.     At all times relevant, Plaintiff and each Class member were and are a "person injured in his or her business or property by reason of a violation of RICO within the meaning of 18 U.S.C. § 1964(c).

77.     At all times relevant, Defendants were and are a "person" who participated in or conducted the affairs of the RICO Enterprise through the pattern of racketeering activity described below.  While Defendants participated in the RICO Enterprise, they have an existence separate and distinct from the Enterprise.  Further, the RICO Enterprise is separate and distinct from the pattern of racketeering activity in which Defendants have engaged and are engaging.

78.     At all times relevant, Defendants were associated with, operated, or controlled the RICO Enterprise, and participated in the operation and management of the affairs of the RICO Enterprise, through a variety of actions described herein.  Defendants' participation in the RICO Enterprise was necessary for the successful operation of their scheme to defraud.

### The RICO Enterprise

79.     Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

80. The following persons, and others presently unknown, have been members of and constitute the "enterprise" within the meaning of RICO, which are referred to herein collectively as the RICO Enterprise:

      a.     <u>Defendant General Motors, LLC</u>;

      b.     <u>GM's Officers, Executives, and Engineers</u>, who have collaborated and colluded with each other and with other associates-in-fact in the Enterprise to deceive Plaintiff and other Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and defect from Plaintiff and the other Class members, including, but not limited to Alan Adler, GM's Manager for Safety Communications who, in June of 2005, issued the deceptive public statement regarding the ignition problem; Ray DeGiorgio, GM's design engineer who signed off on the ignition switch change that was never disclosed; and Mary T. Barra, GM's current CEO;

      c.     <u>Defendant Delphi Automotive PLC</u>, who, at all times material, manufactured the defective ignition switch system for GM, even though it knew that the system did not meet GM's own design specifications. Delphi also manufactured the ignition switch system after the 2007 change implemented by GM without reflecting a corresponding change in part number;

      d.     <u>GM's Dealers</u>, who GM instructed to present false and misleading information to Plaintiff and other members of the Class, through, *inter alia*, multiple Service Bulletins, and who did in fact present such false and misleading information.

81. The RICO Enterprise of GM, GM's officers, executives, and engineers, Delphi, and GM's dealers, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) and consists of

"persons" associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein. The RICO Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which Defendants have engaged and are engaging. The RICO Enterprise was and is used as a tool to effectuate the pattern of racketeering activity.

82.    The members of the RICO Enterprise all had a common purpose: to increase and maximize Defendants' revenues by deceiving Plaintiff and other Class members into purchasing dangerous and defective vehicles, and actively concealing the Ignition Switch Defect from Plaintiff and the other Class members. The members of the RICO Enterprise shared the bounty of their enterprise, *e.g.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the RICO Enterprise benefited from the common purpose of the scheme to defraud: GM sold or leased more vehicles with the Ignition Switch Defect, Delphi sold more of the defective ignition switches, and GM's dealers sold and serviced more vehicles with the Ignition Switch Defect.

83.    Defendants conducted and participated in the affairs of this RICO Enterprise through a pattern of racketeering activity that lasted more than a decade, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

84.    As part and in furtherance of the scheme to defraud, Defendants' deceptive scheme to increase revenue depended on actionable deceptive conduct. Defendants actively

concealed the dangerous and defective condition of GM's vehicles from its customers through deceptive misrepresentations and omitting material information.

### Predicate Acts: Mail and Wire Fraud

85.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act that is in indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

86.    As set forth below, to carry out, or attempt to carry out its scheme to defraud, Defendants have engaged in, and continue to engage in, the affairs of the RICO Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.    GM, with the assistance and collaboration of the other persons associated in fact with the enterprise devised and employed a scheme or artifice to defraud by use of the telephone and internet and transmitted, or caused to be transmitted, by means of wire communication travelling in interstate or foreign commerce, writing(s) or signal(s), including GM's website, Service Bulletins to dealers, and communications with other members of the Enterprise, for the purpose of executing such scheme or artifice to defraud, in violation of 18 U.S.C. § 1341 and § 1343.

b.    As part of the scheme to defraud, the RICO Enterprise utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the false pretenses and artifice to defraud, as described herein.

c.    The concealment of the dangerous and defective condition of the defective GM vehicles is the core purpose of the underlying racketeering offense.  The Enterprise had an ascertainable structure by which GM operated and managed the association-in-fact by using its

Case 1:14-cv-04131-PAW    Document 1    Entered on FLSD Docket 04/25/2014    Page 21 of 37
09-50026-mg    Doc 12678-4    Filed 04/30/14    Entered 04/30/14 16:54:21    Supplement
to Schedule 1  Exh. C    Pg 22 of 40

Dealers and Delphi to concoct, obfuscate, carry out, and attempt to justify the fraudulent scheme described herein.

87.    GM's February 28, 2005 Service Bulletin was issued in furtherance of its scheme to defraud. It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class. The February 28, 2005 Service Bulletin was sent via the mail or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

88.    In 2005, in furtherance of its scheme to defraud, GM emphasized on its Chevrolet website that "[y]our family's safety is important to us . . . . That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind." This false statement, maintained on the internet through the wires, constitutes a violation of 18 U.S.C. § 1343.

89.    In June of 2005, GM issued a public statement through the mail and wires in furtherance of its scheme to defraud. The statement provided the public, including Plaintiff and the other Class members, with false and misleading information about the dangerous and defective condition of the defective vehicles, and sought to conceal that condition by minimizing the issue and offering an ineffective fix. As such, the statement constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

90.    GM's December 2005 Service Bulletin was issued in furtherance of its scheme to defraud. It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class — namely, that the issue could be resolved by removing items from

21

key chains.  The December 2005 Service Bulletin was sent via the mail or wires and constitutes a

violation of 18 U.S.C. §§ 1341 and 1343.

91.     In October of 2006, GM issued an update to its December 2005 Service Bulletin

in furtherance of its scheme to defraud.  The update repeated the instruction to GM's dealers to

disseminate false and misleading information about the dangerous and defective condition of the

defective vehicles to customers, including Plaintiff and other members of the Class.  The update

to the December 2005 Service Bulletin was sent via the mail or wires and constitutes a violation

of 18 U.S.C. §§ 1341 and 1343.

92.     In furtherance of the scheme to defraud, GM communicated with Delphi via the

mail or wires regarding the manufacture of the defective ignition switch system.  Through those

communications, GM instructed Delphi to continue manufacturing the defective part even

though it did not meet GM's own specifications. Delphi followed these instructions and

continued to manufacture the defective parts. Through those communications, GM also

instructed Delphi to make a change to the defective ignition switch system in 2006, and to

fraudulently conceal the change by not assigning a new part number.  Delphi also followed these

instructions, making a change to the defective ignition switch system in 2006 and fraudulently

concealing the change by not assigning a new part number. GM's communications with Delphi,

and Delphi's responses, constitute repeated violations of 18 U.S.C. §§ 1341 and 1343.

93.     Defendants' conduct in furtherance of this scheme was intentional.  Plaintiff and

the other Class members were harmed in that they relied to their detriment on Defendants'

conduct and, as a result, purchased dangerous and defective vehicles that saw their value

plummet the moment GM issued the Recall.  Defendants unfairly reaped millions of dollars in

excessive sales revenue as a result of this scheme and its conduct in furtherance of this scheme.

Case 1:14-cv-01417-PAW   Document 1   Entered on FLSD Docket 04/25/2014   Page 23 of 37
09-50026-mg   Doc 12672-4   Filed 04/30/14   Entered 04/30/14 16:54:21   Supplement
to Schedule 1   Exh. C   Pg 24 of 40

94.     As described throughout this Complaint, Defendants engaged in a pattern of related and continuous predicate acts for over a decade:  the scheme began sometime in or around 2000 and continued until approximately March 2014.

95.     The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the Enterprise and with the common purpose of defrauding Plaintiff and other Class members and obtaining significant funds while providing defective vehicles that are now worth significantly less in light of the Recall.  The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

96.     The predicate acts all had the purpose of generating significant revenue and profits for Defendants at the expense of Plaintiff and the other Class members, who were never informed of the Ignition Switch Defect in their defective vehicles and who have now been damaged by the diminution in value cause by the Recall.  The predicate acts were committed or caused to be committed by Defendants, through their participation in the RICO Enterprise and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and all other Class members' funds.

97.     Count I seeks relief pursuant to 18 U.S.C. § 1964(c) from Defendants for violation of 18 U.S.C. § 1962(c).

## COUNT II
## VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### (Michigan Comp. Laws Ann. § 445, *et seq.*)
### (Against Defendants on behalf of all Classes)

98.     Plaintiff and the Class incorporate by reference paragraphs 1 through 71 as though fully set forth at length herein.

99.     This claim is brought on behalf of all Classes.

100.    Plaintiff and Class Members are all "persons" under the Michigan Consumer Protection Act ("MCPA"), M.C.L.A. § 445.902(1)(d).

101.    Defendants were each a "person" engaged in "trade or commerce" under the MCPA, M.C.L.A. § 445.902(1)(d) and (g).

102.    The MCPA prohibits any "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."  M.C.L.A. § 445.903(1).

103.    Defendants' conduct, as alleged in the preceding paragraphs, constitutes unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.  In particular, Defendants violated the MCPA by

a.    "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer," M.C.L.A. § 445.903(s);

b.    "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is," M.C.L.A. § 405.903(bb); and

c.    "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner," M.C.L.A. § 405.903(cc).

104.    GM's practices that violated the MCPA include, without limitation, the following:

a.    GM represented that the Defective Vehicles had safety characteristics that they do not have;

b.    GM represented that the Defective Vehicles were of a particular standard, quality, or grade, when they are not;

Case 1:14-cv-02147-AW Document 1 Entered on FLSD Docket 04/25/2014 Page 25 of 37
09-50026-mg   Doc 12672-4   Filed 04/30/14   Entered 04/30/14 16:54:21   Supplement
to Schedule 1   Exh. C   Pg 26 of 40

        c.       GM knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature, even though GM knew that such information was material to the transaction in light of GM's prior representations;

        d.       GM failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, Class Members, the public, and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to Plaintiff, Class Members, the public, and the government;

        e.       GM intended for Plaintiff, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiff and Class Members would purchase or lease the Defective Vehicles; and

        f.       GM repeatedly violated the TREAD Act.

105.    Delphi's practices that violated the MCPA include, without limitation, the following:

        a.       Delphi represented that the defective ignition switches had safety characteristics that they do not have;

        b.       Delphi represented that the Defective Vehicles were of a particular standard, quality, or grade, when they are not;

        c.       Delphi knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature;

        d.       Delphi failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, Class Members, the public, and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to Plaintiff, Class Members, the public, and the government; and

e.    Delphi intended for Plaintiff, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiff and the Class would purchase or lease the Defective Vehicles;

106.   Defendants' acts and practices were unfair and unconscionable, because their acts and practices offend established public policy, and because the harm Defendants caused consumers greatly outweighs any benefits associated with its acts and practices.  Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiff and the Class from making fully informed decisions about whether to lease, purchase, or retain Defective Vehicles.

107.   Plaintiff and the Class have suffered an injury, including the loss of money or property, as a result of Defendants' unfair, unlawful, or deceptive practices.  Had Plaintiff and the Class known about the full extent of the Ignition Switch Defect, they would not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles only to suffer the diminution in value caused by the Recall. Plaintiff and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of here.

108.   All of the wrongful conduct alleged here occurred, and continues to occur, in the conduct of Defendants' business.

109.   Plaintiff requests that this Court enjoin Defendants from continuing their unfair, unlawful, or deceptive practices; require Defendants to repair Plaintiff's and Class Members' vehicles to completely eliminate the Ignition Switch Defect; provide to Plaintiff and each Class Member either their actual damages as the result of Defendants' unfair, unlawful, and deceptive

Case 1:14-cv-02147-AKH    Document 1    Entered on FLSD Docket 04/25/2014    Page 27 of 37
09-50026-mg    Doc 12672-4    Filed 04/30/14    Entered 04/30/14 16:54:21    Supplement
to Schedule 1  Exh. C    Pg 28 of 40

trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under the MCPA.

110.    Plaintiff also seeks punitive damages against Defendants because they carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally, willfully, and repeatedly misrepresented the reliability and safety of the Defective Vehicles, and continued to conceal material facts that only they knew, even while numerous innocent victims were being killed as a result of its conduct.  Defendants' unlawful conduct constitutes malice, oppression, and fraud justifying punitive damages.

### COUNT III
### FRAUD BY CONCEALMENT
### (Against Defendants on behalf of all Classes)

111.    Plaintiff and the Class incorporate by reference paragraphs 1 through 71 as though fully set forth at length herein.

112.    This claim is brought on behalf of all Classes.

113.    Defendants concealed and suppressed material facts concerning the Ignition Switch Defect.

114.    Defendants had a duty to disclose the Ignition Switch Defect because GM consistently represented that its vehicles were reliable and safe and proclaimed that it maintained the highest safety standards, and the defect was known or accessible only to Defendants, who had superior knowledge and access to the facts, and Defendants knew that the facts were not known to or reasonably discoverable by Plaintiff and the Class. These omitted and concealed facts were material because they directly impact the safety of the Defective Vehicles, and GM's prior representations regarding the safety of its vehicles became materially misleading when Defendants concealed facts regarding the Ignition Switch Defect.

115.    Defendants actively concealed or suppressed these material facts, in whole or in part, to induce Plaintiff and Class Members to purchase or lease the Defective Vehicles at high prices, and to protect Defendants' profits and avoid a costly recall, and Defendants did so at the expense of Plaintiff and the Class.

116.    Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts. Plaintiff's and the Class's actions were justified.

117.    Because of the concealment or suppression of the facts, Plaintiff and the Class sustained damages because the value of the Defective Vehicles has been diminished by the Recall, the direct result of Defendants' wrongful conduct.

118.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT IV**
**VIOLATIONS OF THE FLORIDA UNFAIR & DECEPTIVE TRADE PRACTICES ACT**
**(FDUTPA, Fla. Stat. § 501.201, *et seq.*)**
**(Against Defendants on behalf of the Florida Subclass)**

119.    Plaintiff and the Class incorporate by reference paragraphs 1 through 71 as though fully set forth at length herein.

120.    This Count is brought on behalf of the Florida Subclass.

121.    Plaintiff is a "consumer" under FDUTPA, § 501.203(7), Fla. Stat.

122.    Defendants engaged in "trade or commerce" within the meaning of FDUTPA, § 501.203(8), Fla. Stat.

Case 1:14-cv-21417-AMC Document 1 Entered on FLSD Docket 04/25/2014 Page 29 of 37
09-50026-mg Doc 12672-4 Filed 04/30/14 Entered 04/30/14 16:54:21 Supplement
to Schedule 1 Exh. C Pg 30 of 40

123. Under the TREAD Act, 49 U.S.C. § 30101, *et seq.*, and its corresponding regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect, and must promptly notify vehicle owners, purchasers, and dealers of the defect and remedy the defect. The TREAD Act also requires manufacturers to file various reports and notify NHTSA within days of learning of a defect.

124. From at least as early as 2001, Defendants were aware of the Ignition Switch Defect. But GM waited until February 7, 2014, to finally send a letter to NHTSA confessing that it knew of the Ignition Switch Defect and that the defect could cause vehicles to lose power and control and cause the airbags not to deploy.

125. GM's failure to disclose and active concealment of the Ignition Switch Defect violated the TREAD Act, and thereby violated FDUTPA.

126. Defendants violated FDUTPA by engaging in the following practices:

a. Defendants represented that the Defective Vehicles had safety characteristics that they do not have;

b. Defendants represented that the Defective Vehicles were of a particular standard, quality, or grade, when they are not;

c. Defendants knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature. GM knew that such information was material to the transaction in light of its prior representations;

d. Defendants failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, the Florida Subclass, the public, and the government, the omission of which

29

would tend to mislead or deceive consumers, and which could not be reasonably known to Plaintiff, Class Members, the public, and the government; and

e.  Defendants intended for Plaintiff, the Florida Subclass, the public, and the government to rely on their misrepresentations and omissions, so that Plaintiff and the Florida Subclass would purchase or lease the Defective Vehicles.

127.  Plaintiff and the Florida Subclass were injured as a result of Defendants' misconduct because Plaintiff and the Florida Subclass now own or lease Defective Vehicles that have seen their value plummet in light of the Recall.

128.  Plaintiff seeks damages and an order enjoining Defendants' unfair or deceptive acts or practices and an order requiring Defendants to completely remedy the defect in Plaintiff's and the Florida Subclass Members' vehicles, and attorneys' fees, and any other just and proper relief available under FDUTPA.

**COUNT V**
**VIOLATIONS OF MAGNUSON-MOSS CONSUMER PRODUCTS**
**WARRANTIES ACT ("Magnuson-Moss")**
**(15 U.S.C. § 2301, *et seq.*)**
**(Against GM on behalf of all Classes)**

129.  Plaintiff and the Class incorporate by reference paragraphs 1 through 71 as though fully set forth at length herein.

130.  Magnuson-Moss provides a private right of action by purchasers of consumer products against manufacturers or retailers who, among other things, fail to comply with the terms of the written, express, or implied warranties. *See* 15 U.S.C. § 2310(d)(1). As alleged above, GM has failed to comply with the terms of its written, express, or implied warranties.

131.  The Defective Vehicles are "consumer products," as that term is defined in 15 U.S.C. § 2301(1).

132.    GM is a "warrantor," as that term is defined in 15 U.S.C. § 2301(5).

133.    Plaintiff and each member of the Classes are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

134.    As a warrantor, GM is obligated to afford the Classes, as consumers, all rights and remedies available under Magnuson-Moss, regardless of privity.

135.    Magnuson-Moss provides a cause of action for, among other things, breach of warranty. *See* 15 U.S.C. § 2310(d)(1). GM breached its express warranties as alleged above. GM has also breached its implied warranties of merchantability, which it cannot disclaim under Magnuson-Moss, *see* 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods. Plaintiff and the Classes have suffered damages as a result of GM's breaches of express and implied warranties as set forth above. *See* 15 U.S.C. § 2310(d)(1)-(2).

136.    GM was on notice of the ignition switch defects as early as 2001, yet did not undertake any opportunity to cure until 2014, nearly thirteen years later, when GM's knowledge of the ignition switch defects was first made public. Also, once Plaintiff's representative capacity is determined, notice and opportunity to cure on behalf of the Classes — through Plaintiff — can be provided under 15 U.S.C. § 2310(e).

137.    Plaintiff and the Class members have suffered, and are entitled to recover, damages as a result of GM's breaches of warranty and violations of Magnuson-Moss.

138.    Additionally, or in the alternative, Magnuson-Moss provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by Magnuson-Moss. *See* 15 U.S.C. § 2310(d)(1). Rescission and Revocation of Acceptance are equitable remedies available to Plaintiff and the Class members under Magnuson-Moss.

Case 1:14-cv-01417-PKC Document 1 Filed 03/05/14 Page 32 of 37
09-50026-mg    Doc 12672-4    Filed 04/30/14    Entered 04/30/14 16:54:21    Supplement
to Schedule 1  Exh. C    Pg 33 of 40

139.    Plaintiff also seeks an award of costs and expenses, including attorney's fees, under Magnuson Moss to prevailing consumers in connection with the commencement and prosecution of this action. *See* 15 U.S.C. § 2310(d)(2). Plaintiff and the Class intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against GM on behalf of the Florida Subclass)

140.    Plaintiff and the Class incorporate by reference paragraphs 1 through 71 as though fully set forth at length herein.

141.    This Count is brought on behalf of the Florida Subclass.

142.    GM is a merchant that sold or leased the Defective Vehicles to Plaintiff and members of the Florida Subclass.

143.    GM impliedly warranted to Plaintiff and members of the Florida Subclass that the Defective Vehicles were free of defects, and were merchantable and fit for the ordinary purpose for which such goods were sold and used.

144.    As alleged above, GM's sales of the Defective Vehicles breached this implied warranty of merchantability because the Defective Vehicles were sold with latent defects described above as the ignition switch defects. Accordingly, the Defective Vehicles are unfit for the ordinary intended purpose at the time of sale. These ignition switch defects create serious safety risks in the operation of the Defective Vehicles.

145.    Yet GM marketed, promoted, and sold the Defective Vehicles as safe and free from defects.

146.    GM had knowledge of and concealed this defect for over a decade.

Case 1:14-cv-21417-FAM   Document 1   Entered on FLSD Docket 04/25/2014   Page 33 of 37
09-50026-mg   Doc 12678-4   Filed 04/30/14   Entered 04/30/14 16:54:21   Supplement
to Schedule 1  Exh. C   Pg 34 of 40

147.     GM failed to cure the ignition switch defects that existed and were known to GM when Plaintiff and members of the Florida Subclass purchased the Defective Vehicles.

148.     Any purported disclaimer or exclusion of the implied warranty of merchantability in GM's written warranty is invalid, void, and unenforceable under Magnuson-Moss, 15 U.S.C. § 2308(a)(1).

149.     GM's warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable because they disclaimed a defect known but not disclosed to consumers at or before the time of purchase.

150.     Any contractual language contained in GM's written warranty that attempts to limit remedies is unconscionable, fails to conform to the requirements for limiting remedies under applicable law, causes the warranty to fail of its essential purpose, and thus is unconscionable, unenforceable, or void.

151.     As a direct and proximate result of the breach of said warranty, Plaintiff and the Florida Subclass suffered and will continue to suffer losses as alleged above in an amount to be determined at trial.

152.     Additionally, or in the alternative, Plaintiff and the Florida Subclass seek declaratory relief relating to the ignition switch defect described above, and the opportunity to rescind the purchase agreement for the Defective Vehicle.

### COUNT VII
### BREACH OF EXPRESS WARRANTY
### (Against GM on behalf of the Florida Subclass)

153.     Plaintiff and the Class incorporate by reference paragraphs 1 through 71 as though fully set forth at length herein.

154.     This Count is brought on behalf of the Florida Subclass.

155.    As part of the basis of the bargain when all members of the Florida Subclass purchased their vehicles, GM provided a warranty promising "bumper to bumper" repair or replacement of any part, component, or system that was defective in materials or workmanship.

156.    Plaintiff brought his vehicle to authorized dealers for repairs on at least three separate occasions.

157.    Despite these opportunities, and despite GM's knowledge of the ignition switch defect, GM failed to cure the defect and failed to comply with the promises of its express warranty.

158.    GM knowingly concealed from Plaintiff its knowledge of the defect in the ignition switch and failed to comply with its promise to repair or replace defective parts, systems, or components.

159.    Before and during the warranty period, GM knew that the ignition switch system was defective.

160.    By failing to repair or replace the defective ignition switch system, and by fraudulently concealing the existence of this known defect, GM breached the express warranties and its duties of good faith and fair dealing under those warranties.

161.    As a result of these breaches of contract, Plaintiff and all members of the Florida Subclass have been damaged because they were deprived of the benefit of the bargain, which can be measured by the amount they overpaid for an express warranty that the seller consciously but secretly refused to fulfill, thus rendering the warranty worthless; by the reasonable repair and replacement costs necessary to put each car in a non-defective condition upon delivery to each consumer and thereafter; or by the diminution in the Defective Vehicles' value caused by the Recall.

Case 1:14-cv-21417-AM  Document 1-4  Entered on FLSD Docket 04/25/2014  Page 35 of 37
09-50026-mg    Doc 12672-4    Filed 04/30/14    Entered 04/30/14 16:54:21    Supplement
to Schedule 1  Exh. C    Pg 36 of 40

162.    In light of these breaches of warranty, Plaintiff and all members of the Florida Subclass are entitled to, at a minimum, nominal damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against Defendants, and grant the following relief:

A.    Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3) and or 23(b)(2), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class and Subclass Representative and Plaintiff's chosen counsel as Class Counsel;

B.    Declare, adjudge, and decree that Defendants violated 18 U.S.C. § 1962(c) by conducting the affairs of the RICO Enterprise through a pattern of racketeering activity;

C.    Declare, adjudge, and decree the conduct of Defendants as alleged herein to be unlawful, unfair or deceptive, and enjoin any such future conduct;

D.    Declare, adjudge, and decree that the ignition switches in the Defective Vehicles are defective;

E.    Declare, adjudge, and decree that Defendants must disgorge, for the benefit of Plaintiff, Class Members, and Subclass Members all or part of the ill-gotten gains it received from the sale or lease of the Defective Vehicles;

F.    Award Plaintiff, Class Members, and Subclass Members actual, compensatory damages, or, in the alternative, statutory damages, as proven at trial;

G.    Award Plaintiff and the nation-wide Class Members treble damages pursuant to 18 U.S.C. § 1964(c).

H.      Alternatively, if elected by Plaintiff, Class Members, and Subclass Members, require Defendants to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

I.      Award Plaintiff, Class Members, and Subclass Members punitive damages in such amount as proven at trial;

J.      Award Plaintiff, Class Members, and Subclass Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

K.      Award Plaintiff, Class Members, and Subclass Members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all the legal claims alleged in this Complaint.

Respectfully submitted,

KOZYAK, TROPIN, & THROCKMORTON P.A.
*Counsel for Plaintiff*
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

By: /s/ Adam M. Moskowitz
Adam M. Moskowitz
amm@kttlaw.com
Harley S. Tropin
hst@kttlaw.com
Thomas A. Tucker Ronzetti
tr@kttlaw.com
Tal J. Lifshitz
tjl@kttlaw.com
Robert Neary
rn@kttlaw.com

Harke Clasby & Bushman LLP
9699 NE Second Avenue

Case 1:14-cv-01417-PAC    Document 1    Entered on FLSD Docket 04/25/2014    Page 37 of 37
09-50026-mg    Doc 12678-4    Filed 04/30/14    Entered 04/30/14 16:54:21    Supplement
to Schedule 1  Exh. C    Pg 38 of 40

Miami Shores, Florida 33138
Telephone: 305-536-8220
Lance A. Harke
lharke@harkeclasby.com
Howard Bushman
hbushman@harkeclasby.com

Freidin Dobrinsky
2 S. Biscayne Blvd., Suite 3100
Miami, Florida 33131
Telephone: 305-371-3666 (ext. 201)
Manuel L. Dobrinsky
mdobrinsky@fdlaw.net

PODHURST ORSECK, P.A.
City National Bank Building
25 West Flagler Street, Suite 800
Miami, Florida 33130
Telephone: 305-358-2800
Aaron S. Podhurst, Esq.
apodhurst@podhurst.com
Peter Prieto, Esq.
pprieto@podhurst.com
John Gravante, III
jgravante@podhurst.com
Matthew Weinshall
mweinshall@podhurst.com

353403.1

# JS 44 CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS / DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff _____ *(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____ *(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**TORTS**

*PERSONAL INJURY*
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

*PERSONAL INJURY*
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**
*Habeas Corpus:*
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
*Other:*
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee – Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (See VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

*(See instructions):* a) Re-filed Case ☐ YES ☐ NO b) Related Cases ☐ YES ☐ NO

JUDGE _____ DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE _____

SIGNATURE OF ATTORNEY OF RECORD

/s/ Tal J. Lifshitz

**FOR OFFICE USE ONLY**

RECEIPT # aaaaaaaaaaa AMOUNT ʻaaaaaaaaaa IFP aaaaaaaaaaaa JUDGE aaaaaaaaaaaaaaaaaaaaaaaaaaa""""""MAG JUDGE"aaaaaaaaaaaaaaaaaa

Case 2:14-cv-00147-FMO   Document 1-1   Entered on FLSD Docket 04/21/2014   Page 2 of 2
09-50026-mg   Doc 12672-4   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
to Schedule 1  Exh. C    Pg 40 of 40

JS 44 Reverse  (Rev. 12/12)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.　　**(a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

　　　　(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

　　　　(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.　　**Jurisdiction**.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

III.　　**Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.　　**Nature of Suit**.  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

V.　　**Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

VI.　　**Related/Refiled Cases**. This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

VII.　　**Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.　　　　Example: U.S. Civil Statute: 47 USC 553

　　　　　　　　　　Brief Description: Unauthorized reception of cable service

VIII.　　**Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.