# Exhibit D

09-50026-mg   Doc 12672-5   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
Case 3:14-cv-00627-JFW-DF M    Document 1   Filed 04/21/14   Page 5 of 50   Page ID #:1
to Schedule 1  Exh. D    Pg 2 of 51

MARY E. ALEXANDER, ESQ. (SBN: 104173)
JENNIFER L. FIORE, ESQ. (SBN: 203618)
Mary Alexander & Associates, P.C.
44 Montgomery Street, Suite 1303
San Francisco, CA  94104
Telephone: (415) 433-4440
Fax: (415) 433-5440
Email:  malexander@maryalexanderlaw.com
         jiore@maryalexanderlaw.com

Attorneys for Plaintiff
MESAFINT GEBREMARIAM

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MESAFINT GEBREMARIAM, individually and on behalf of all others similarly situated, )<br><br>Plaintiffs, )<br>vs. )<br>GENERAL MOTORS, LLC, )<br>Defendant. )<br>)<br>)<br>)<br>) | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**FOR DAMAGES, INJUNCTIVE RELIEF AND EQUITABLE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

  A.  Chevrolet Cruze – Front Axle Right Half Shaft Fracture Defect .............................1

  B.  Ignition Switch and Related Defects ........................................................................4

II.  JURISDITION AND VENUE ...............................................................................9

III.  PARTIES ..............................................................................................................9

  A.  Plaintiffs ...................................................................................................................9

  B.  Defendant ................................................................................................................10

IV. CLASS ACTION ALLEGATIONS .......................................................................12

  Numerosity ...................................................................................................................13

  Existence and Predominance of Common Questions of Law & Fact .........................13

  Typicality .....................................................................................................................14

  Adequacy of Representation .........................................................................................14

  Superiority ....................................................................................................................14

  Proper Maintenance of the Class .................................................................................14

V. FACTUAL ALLEGATIONS ..................................................................................15

  A.  Front Axle Right Half Shaft Fracture Defect .........................................................15

  B.  Ignition Switch and Related Defects ......................................................................17

    1.  The $.57 Per Vehicle Fix that GM Failed to Implement ....................................17

    2.  GM Promoted the Defective Vehicles as "Safe" and "Reliable" .......................19

    3.  GM Knew of the Defects for Years, But Concealed the Defects from Plaintiff and the Class .........................................................................................................20

    4.  No Recall Was Issued Until 2014 .......................................................................24

    5.  The Redesigned Switch Did Not Meet GM Specifications .................................25

    6.  The Cruze Has Been Plagued with Same Problems as the Recalled Cars ..........26

  C.  GM Violated the Tread Act by Failing to Notify the NHTSA of the Known Defects ..........26

  D.  The Defects Have Harmed Plaintiff and the Class .................................................28

VI.  FACTUAL ALLEGATIONS ...............................................................................28

i

VII. TOLLING OF THE STATUTES OF LIMITATIONS .............................................................29

VIII. CAUSES OF ACTION ............................................................................................................30

FIRST CAUSE OF ACTION – VIOLATIONS OF THE CONSUMER LEGAL REMEDIES
ACT (Cal. Civ. Code § 1750, et seq.)..........................................................................................30

SECOND CAUSE OF ACTION – VIOLATION OF THE CALIFORNIA UNFAIR
COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, et seq.)...............................................35

THIRD CAUSE OF ACTION – FALSE ADVERTISING (Cal. Bus. & Prof. Code § 17500 et
seq.)..............................................................................................................................................37

FOURTH CAUSE OF ACTION – BREACH OF IMPLIED WARRANTY ..............................40

FIFTH CAUSE OF ACTION - VIOLATION OF SONG-BEVERLY CONSUMER
WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(CALIFORNIA "LEMON LAW") (Cal. Civ. Code §§ 1791.1 & 1792) ....................................41

SIXTH CAUSE OF ACTION – BREACH OF EXPRESS WARRANTY.................................42

SEVENTH CAUSE OF ACTION - NEGLIGENCE .................................................................43

EIGHTH CAUSE OF ACTION - FRAUDULENT CONCEALMENT .....................................44

NINTH CAUSE OF ACTION – UNJUST ENRICHMENT .....................................................45

TENTH CAUSE OF ACTION – CLAIM FOR ACTUAL DAMAGES AND EXPENSE
REIMBURSEMENT FUND ......................................................................................................45

IX.  PRAYER FOR RELIEF............................................................................................................46

X.  JURY DEMAND ........................................................................................................................47

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

Plaintiff, Mesafint Gebremariam, individually and on behalf of other members of the nationwide and statewide classes he seeks to represent, as described below, for his Class Action Complaint alleges against Defendant General Motors, LLC ("GM"), upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by Plaintiff and Plaintiff's attorneys, as follows:

## I.   INTRODUCTION

1.     Plaintiff brings this class action on behalf of all persons in the United States who own or lease one or more of the following GM vehicles:  2009-2014 Chevrolet Cruze, 2005-2011 Chevrolet Cobalt, 2006-2011 Chevrolet HHR, 2006-2011 Pontiac G5, 2006-2011 Pontiac Solstice, 2003-2007 Saturn Ion, 2007-2011 Saturn Sky, 2003-2007 Cadillac CTS, 2004-2009 Cadillac SRX, 2005-2009 Saab 9-7x, 2004-2012 Chevrolet Malibu and 2007-2010 Saturn Aura, as set forth herein, (collectively the "Defective Vehicles").

### A.     Chevrolet Cruze – Front Axle Right Half Shaft Fracture Defect

2.     Since at least model year 2013, GM has designed, manufactured, promoted, marketed and sold defective Chevrolet Cruzes throughout the United States, including the State of California, that pose known and significant dangers to unsuspecting drivers, passengers, pedestrians, and the other motorists and cars on the road.  The Chevy Cruze is the successor vehicle to the Cobalt in North America, with model year 2011 going on sale in late 2010.

3.     GM allowed these dangers to persist without taking adequate measures to eliminate the dangers and without taking adequate measures to notify the public and the government of the design defects.  GM has completely disregarded the safety of its customers and the public and continues to jeopardize public safety.

4.     GM has recalled 174,046 Chevy Cruze vehicles, model years 2013 and 2014, with 1.4-liter turbocharged four-cylinder gasoline engines, because there is a serious safety defect in the power train, axle assembly.  The interconnecting tubular bar on the front right axle half shaft may fracture and separate, resulting in power loss to the vehicle.  GM reported that it had warranty reports of several dozen shaft fractures.  The March 2014 Product Safety Recall Bulletin No. 14079 informs service providers to inspect the right (passenger side) half shaft near the front

Case 9:14-cv-00627-JFW-DFM   Document 1   Filed 04/21/14   Page 5 of 50   Page ID #:5
09-50026-mg   Doc 12672-5   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
to Schedule 1  Exh. D   Pg 6 of 51

wheel.  If the green stripe is not present on the half shaft, it is to be replaced.  See Diagram Nos. 3 (with green) and No. 4 (without green):



5.      On September 13, 2013, GM first recalled only "certain model year 2013 and 2014 Chevrolet Cruze vehicles equipped with manual transmissions (MF3/MR5) and manufactured January 24, 2013, through August 1, 2013.  On the affected vehicles, **the right front half shaft may fracture and separate.**"  (September 13, 2013 Recall Notice from U.S. Department of Transportation, National Highway Traffic Safety Administration ("NHTSA") website, www.safercar.gov) (emphasis added).

6.      The "Consequence" is:  If the half shaft fractures and separates while driving, **the vehicle would lose power** and coast to a stop.  If a vehicle with a fractured half shaft is parked without the parking brake applied, the vehicle could move unexpectedly.  **Either condition increases the risk of a crash.**"  (*Id.*)  (emphasis added).



_____
CLASS ACTION COMPLAINT

09-50026-mg    Doc 12672-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 7 of 51
Case 09-14-cv-00027-JFW-DFM    Document11    Filed 04/21/14    Page 5 of 50    Page ID #:6

7.      On March 28, 2014, GM recalled all Chevy Cruze vehicles "equipped with a 1.4L turbo engine, and manufactured between November 28, 2012, and March 7, 2014.  On the affected vehicles, **the right front half shaft may fracture and separate**."  (March 28, 2014 Recall Notice) (emphasis added).



8.      The *same* "Consequence" is:  "If the half shaft fractures and separates while driving, **the vehicle would lose power** and coast to a stop. If a vehicle with a fractured half shaft is parked without the parking brake applied, the vehicle could move unexpectedly. **Either condition increases the risk of a crash.**"  (*Id.*) (emphasis added).  The March 2014 recall covers about 2,500 replacement shafts used to fix the manual transmission Cruzes after the September 2013 recall.  This means that the replacements were defective as well.

9.      GM knew there was the serious risk of harm with all Chevy Cruzes before it initiated the first recall for manual transmissions, yet failed to recall all 1.4L automatic transmissions.  This failure and GM's hiding of this defect resulted in defective manual transmission Cruzes being sold to the unsuspecting public, including the Class Representative,

CLASS ACTION COMPLAINT

Case 09-50026-mg    Doc 12672-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 8 of 51
Case 3:14-cv-00027-HWM-DF M  Document 1    Filed 04/21/14    Page 7 of 50    PageID #: 7

Mesafint Gebremariam.  He purchased his automatic transmission Cruze on November 13, 2013, two months *after* the first recall.  He would not have purchased it had he known about this defect.

### B.  Ignition Switch and Related Defects

10.     For over ten years, GM has designed, manufactured, promoted, marketed and sold Defective Vehicles that pose known and significant dangers to unsuspecting drivers, passengers, pedestrians, and the other motorists and cars on the road.  GM allowed these dangers to persist without taking adequate measures to eliminate the dangers and without taking adequate measures to notify the public and the government of design defects.  GM has jeopardized and continues to jeopardize public safety, and has had a corporate culture of complete disregard for the safety concerns of its customers and the safety of the public at large.

11.     The ignition switch defects can cause the vehicle's engine and electrical system to shut off, disabling the power steering and power brakes and causing the non-deployment of the vehicle's air bags in the event of a crash.  The Defective Vehicles are, thus, unreasonably prone to be involved in accidents, which will likely result in serious bodily harm or death to the drivers, passengers as well as other motorists and pedestrians.

12.     Going back to at least 2001, GM learned that vehicles it designed, manufactured, promoted and sold contained defective ignition switches.  GM took no action to remedy or mitigate the danger inherent in this faulty system to drivers, passengers, pedestrians and the other motorists and cars on the road.  These defective vehicles have caused at least **thirteen (13) deaths** and **thirty-two (32) crashes**, likely including the Class Representative, Mesafint Gebremariam on April 11, 2014.

13.     There have been three recalls related to the defective ignition switches; the latest being issued on April 10, 2014.  GM has issued recalls for the following models:

February 13 and 25, 2014:

2005 – 2007 Chevrolet Cobalt
2005 – 2007 Pontiac G5
2003 – 2007 Saturn Ion
2006 – 2007 Chevrolet HHR
2006 – 2007 Pontiac Solstice
2007 Saturn Sky

4

09-50026-mg   Doc 12672-5   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
to Schedule 1  Exh. D    Pg 9 of 51
Case 3:14-cv-00027-JRW-DF-M   Document 1   Filed 04/21/14   Page 8 of 50   Page ID #:8

**March 28, 2014:**

2008 – 2011 Pontiac Solstice
2008 – 2011 Pontiac G5
2008 – 2011 Saturn Sky
2008 – 2011 Chevrolet Cobalt
2008 – 2011 Chevrolet HHR

**April 10, 2014:**

2005 – 2010 Chevrolet Cobalt
2006 – 2011 Chevrolet HHR
2007 – 2010 Pontiac G5
2006 – 2010 Pontiac Solstice
2003 – 2007 Saturn Ion
2007 – 2010 Saturn Sky

14.     With respect to the February 13, February 25 and March 28, 2014 recalls, the

defective ignition switches have switch points, including "RUN" or "ON," "OFF," and "ACC" or

"accessory."  When the ignition switch is in the "RUN" position, the vehicle's motor engine is

running and the electrical system is activated.  When the ignition switch is in the "ACC" position,

the motor is turned off but electrical power is activated, supplying electricity to the vehicle's

entertainment system.  When the ignition is in the "OFF" position, both the engine and electrical

systems are turned off.

15.     The February 7, 2014 GM letter to NHTSA first informing the NHTSA of the

problem explained the problem as follows:

The ignition switch torque performance may not meet General Motor's specification.  If
the torque performance is not to specification, and the key ring is carrying added weight or
the vehicle goes off road or experiences some other jarring event, the ignition switch may
inadvertently be moved out of the "run" position.  The time of the key movement out of the
"run position, relative to the activation of the sensing algorithm of the crash event,
may result in the airbags not deploying, increasing the potential for occupant injury in
certain kinds of crashes.  Until this correction is performed, customers should remove non-
essential items from their key ring.  Dealers are to replace the ignition switches.

16.     The ignition switches are loose and improperly positioned, making the switches

prone to failure during usual and expected conditions.  The ignition switch can suddenly and

without warning move from the "ON" or "RUN" position to the "OFF" or "ACC" position. When

CLASS ACTION COMPLAINT

1    this, the "Ignition Switch Defect" happens, the motor engine and certain important electrical

2    components, including the power-assisted steering, anti-lock brakes, seatbelt pretensioners and

3    airbags, are abruptly turned off. The ignition can suddenly switch to "OFF" while the Defective

4    Vehicle is moving at expected speeds, for example, 65-70 mph on the highway. When this

5    happens, the driver is left without the necessary means to control the vehicle, the safety airbag

6    system is compromised and the vehicle's driver, passengers, other motorists, pedestrians and cars

7    are at serious risk of injury or death.

8            17.     With respect to the most recent recall on April 10, 2014, involving the same

9    vehicles, GM issued an additional recall because "the key can be removed from the ignition when

10   the ignition is not in the "Off" position." (April 10, 2014 Recall Notice.) The "Consequence" is:

11   "If the key can be removed from the ignition when the ignition is not in the 'off' position, **the**

12   **vehicle could roll away**: (a) for an automatic transmission, if the transmission is not in the "Park"

13   position; or (b) for a manual transmission, if the parking brake is not engaged and the

14   transmission is not in the 'Reverse' position. **This potential for rollaway increases the risk for**

15   **a crash and occupant or pedestrian injuries**." (*Id.*) (emphasis added). GM Safety recall 14113

16   is for key replacements while GM Safety recall 14133 is for replacement of the ignition lock

17   cylinder and key replacement.

18           18.     Below is an illustration of the defective ignition switch, which includes the

19   components contained in latest recall:



**PARTS INVOLVED IN GM IGNITION RECALLS**
This diagram displays the three parts that are affected by the recalls for the Chevrolet Cobalt,
Pontiac G5, Saturn ION, Chevrolet HHR, Pontiac Pursuit, Pontiac Solstice, and Saturn Sky.

Ignition Switch

Ignition Lock Cylinder

Key

Complete Steering Column Assembly
*(for reference only)*

6

_____
CLASS ACTION COMPLAINT

09-50026-mg   Doc 12673-5   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
to Schedule 1  Exh. D    Pg 11 of 51
Case 2:14-cv-00082-JFW-BFM   Document 14   Filed 04/21/14   Page 15 of 50   Page ID #:40

19.     GM began installing defective ignition switch systems in 2003 models.  All the while knowing of the Ignition Switch Defect, GM designed, manufactured, promoted, marketed and sold over 2.6 million Defective Vehicles per its own admission, including the following models:

• 2005-2011 Chevrolet Cobalt

• 2006-2011 Chevrolet HHR

• 2006-2011 Pontiac Solstice

• 2003-2007 Saturn Ion

• 2007-2011 Saturn Sky

• 2005-2011 Pontiac G5

20.     The defective ignition switches were manufactured by Delphi Automotive PLC ("Delphi"), a former subsidiary of Old GM, which became an independent publicly held corporation in 1999.  Delphi knew that its ignition switches were defective and did not meet GM torque specifications, yet continued to manufacture and sell the defective ignition switch systems, knowing they would be used in the Defective Vehicles.

21.     The number of defective vehicles likely exceeds **3,000,000 (3 Million)** as Delphi reported in an April 11, 2014 letter to the NHTSA that it supplied ignition switches to either GM directly, a tier supplier of GM or a Delphi division that supplied the ignition switch to GM as part of a larger sub-assembly for the above-listed vehicles as well as the following makes and models:

• 2003-2007 Cadillac CTS

• 2004-2009 Cadillac SRX

• 2005-2009 Saab 9-7x

• 2004-2012 Chevrolet Malibu

• 2007-2010 Saturn Aura

(April 11, 2014 Delphi Letter with Listing of Vehicle Manufacturers and Third Parties Who Were Supplied Ignition Switches, NHTSA-IGN-000001.)  See Table "Listing of Vehicle Manufacturers and Third Parties Who Were Supplied Ignition Switches":

CLASS ACTION COMPLAINT

**LISTING OF VEHICLE MANUFACTURERS AND THIRD PARTIES WHO WERE SUPPLIED
IGNITION SWITCHES FROM 1999 TO PRESENT**

| OEM/Third Party Invoice | Notes | Vehicle Make | Vehicle Model | Model Years |
|---|---|---|---|---|
| Koyo Steering Systems USA[1] | Production | Saturn | Ion | 2003-2004 |
| GM | Service | | | |
| Koyo Steering Systems USA[1] | Production | Chevrolet | Cobalt | 2005-2007 |
| | | | HHR | 2006-2007 |
| JTEKT North America[1] | | Pontiac | G5 | 2007 |
| | | | Solstice | 2006-2007 |
| GM | Service | Saturn | Sky | 2007 |
| | | | Ion | 2005-2007 |
| JTEKT North America[1] | Production | Chevrolet | Cobalt | 2008-2010 |
| | | | HHR | 2008-2011 |
| | | Pontiac | G5 | 2008-2009 |
| GM | Service | | Solstice | 2008-2009 |
| | | Saturn | Sky | 2008-2009 |
| Delphi Saginaw[2] | Production | Cadillac | CTS | 2003-2007 |
| GM | Service | | SRX | 2004-2006 |
| Delphi Saginaw[2]/Nexteer[1] | Production | Cadillac | SRX | 2007-2009 |
| GM | Service | | | |
| IAC[1]/Lear Huron[1] | Production | Saab | 9-7x | 2005-2009 |
| GM | Service | | | |
| Delphi Safety & Interior[2] | Production | Chevrolet | Malibu | 2004 |
| GM | Service | | | |
| Delphi Safety & Interior[2] | Production | Pontiac | G6 | 2005-2006 |
| GM | Service | Chevrolet | Malibu | 2005-2006 |
| Delphi Safety & Interior[2] | Production | Pontiac | G6 | 2007-2010 |
| Delphi Thermal[2] | | Chevrolet | Malibu | 2007-2010 |
| Inteva[1] | | Saturn | Aura | 2007-2010 |
| GM | Service | | | |
| Inteva[1] | Production | Chevrolet | Malibu | 2011-2012 |
| GM | Service | | | |

[1]Tier supplier to GM that supplied sub-assemblies that included the ignition switch.
[2]Delphi division that supplied sub-assemblies that included the ignition switch.

22.     There are likely other GM vehicles which suffer from the same or substantially similar safety defects as the Defective Vehicles identified above. Plaintiff intends to supplement the list of Defective Vehicles to include the additional GM vehicles that have defective ignition switches.

23.     GM senior management hid the failures for years and put profits over the safety of millions of lives. This class action arises due to GM's egregious concealment of known safety defects and the unprecedented failure to disclose the defects in millions of GM vehicles.

8

CLASS ACTION COMPLAINT

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
Case 2:14-cv-00062-JFW-FFM    Document 1    Filed 02/11/14    Page 12 of 50    Page ID #:12
to Schedule 1  Exh. D    Pg 13 of 51

24.      In addition to liability for the statutory obligations assumed by GM, GM has successor liability of Old GM for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the defects.  See discussion *infra*, Successor Liability, Section VI.

## II.      JURISDITION AND VENUE

25.      This court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C.  § 1332 (a) & (d).  The amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs.  There are more than 100 Class members and members of the class are diverse from GM.

26.      This Court has personal jurisdiction over GM because GM's contacts with the State of California are systematic, continuous, and sufficient to subject it to personal jurisdiction in this Court.

27.      Venue is proper in this District under 28 U.S.C. § 1391 because GM, a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction, and GM transacts business within the District, with its headquarters for the Western Region in Thousand Oaks, County of Ventura, within this District.  Venue is also proper in this District as some of the events establishing the claims arose in this District.

## III.  PARTIES

### A.      Plaintiffs

28.      Plaintiff and Class Representative, Mesafint Gebremariam, is a resident of the City and County of San Francisco, California.  Plaintiff Gebremariam owns a 2014 Chevy Cruze vehicle.  Plaintiff has standing to assert the claims alleged herein and has been harmed as a result of Defendant's conduct.

29.      Induced by GM's misrepresentations and fraudulent concealment about the existence of defects, and the severity and extent of defects, which left him without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased his Cruze new on November 13, 2013 from Stewart Chevrolet in Colma, California. He paid $31,240 for the vehicle, including taxes, service protections and fees, not knowing that,

CLASS ACTION COMPLAINT

as sold, it was defective.

30.    On or about April 11, 2014, while Plaintiff was driving his Cruze on Oak Street in San Francisco, the Cruze suddenly, and without warning, shut off.  The vehicle lost power as he was going down hill.  The vehicle continued downhill without power to the motor, steering or brakes.  The vehicle finally came to rest after hitting parked cars, and crashing into another vehicle being driven in front of him.  The airbags did not deploy.

31.    GM shou1d have disclosed the defects when Plaintiff purchased the vehicle. Plaintiff wou1d not have purchased the vehicle had he known of the defects.

**B.    Defendant**

32.    Defendant GM is a Delaware corporation with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009, and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

33.    GM contractually assumed liability for the claims in this lawsuit arising before the Defective Vehicles were originally designed, manufactured, marketed and distributed into the stream of commerce by Old GM.

34.    The fact that GM has initiated and is conducting a recall (although not complete) of Defective Vehicles, it is legally responsible for those vehicles still on the road and recognizes that it is responsible for those vehicles despite old GM's bankruptcy.

35.    The Purchased Assets of GM in the Amended and Restated Master Sale and Purchase Agreement include in Section 2.2, "Purchased and Excluded Assets":

(viii) all inventories of vehicles, raw materials, work-in-process, finished goods, supplies, stock, parts, packaging materials and other accessories related thereto (collectively, "Inventory"), wherever located, including any of the foregoing in the possession of manufacturers, suppliers, customers, dealers or others and any of the foregoing in transit or that is classified as returned goods;…

(xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials, reports and other materials (in  whatever form or medium), including Tax books and records and Tax

CLASS ACTION COMPLAINT

Returns used or held for use in connection with the ownership or operation of the Purchased Assets or   Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment   and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; ....

36.     GM is, therefore, the owner of all "vehicles" and "finished goods" (such as vehicles) of old GM, "wherever [they are] located," and including any such vehicles or finished goods in the "possession of" "customers." The Defective Vehicles in the possess ion of GM customers were and are a "Purchased Asset" of GM under the Agreement.

37.     Under the Agreement, GM is also the owner of all of old GM's documents and has knowledge thereof.  The contents of those documents are imputed to GM.  Notice of defects contained in documents of "Old GM" is part of GM's composite knowledge as a corporation.

38.     Under the Agreement, GM not only "Purcha.sed Assets," but "Assumed Liabilities," which included "all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing." "Liabilities" was a defined term meaning "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

39.     Among the liabilities expressly retained by GM after the bankruptcy are the following:

From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].
GM also expressly assumed:

[A]ll Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or

11

_____

CLASS ACTION COMPLAINT

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
Case 0:12-cv-00062-JFM-TBM    Document 1    Filed 08/21/14    Page 15 of 50    Page ID #: 15
to Schedule 1  Exh. D    Pg 16 of 51

pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old  GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

40.     Since GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability for the acts and omissions of Old GM, as alleged in this Complaint.

## IV.    CLASS ACTION ALLEGATIONS

41.     Under FRCP Rules 23(a), (b)(2), b(3) and/or c(4), Plaintiff brings this action on behalf of himself, individually, and on behalf of all others similarly situated.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.  The Class is initially defined as follows:

### Nationwide Class

All persons in the United States who purchased or leased one or more of the following GM vehicles:  2009-2014 Chevrolet Cruze, 2005-2011 Chevrolet Cobalt, 2006-2011 Chevrolet HHR, 2006-2011 Pontiac G5, 2006-2011 Pontiac Solstice, 2003-2007 Saturn Ion, 2007-2011 Saturn Sky, 2003-2007 Cadillac CTS, 2004-2009 Cadillac SRX, 2005-2009 Saab 9-7x, 2004-2012 Chevrolet Malibu, 2007-2010 Saturn Aura and any other GM vehicles model containing the same ignition switch and/or front axle right half shaft ("Class Members").

42.     Plaintiff also brings this action on behalf of the following **California State Class**: All Class Members who purchased or leased a Class Vehicle in the State of California.  Together, the Nationwide and California State Class are referred to as the "Class."

43.     Excluded from the Class are any individuals claiming damages from personal injuries allegedly arising from the Defective Vehicles.  But the increased risk of injury from the defects serves as an independent justification for the relief sought by Plaintiff and the Class.

44.     Excluded from the Class are GM and its legal representatives, parents, affiliates,

12

heirs, successors, assigns, and any other person who engaged in the improper conduct described herein (the "Excluded Persons").  Also excluded are any individuals claiming personal injuries allegedly arising from the Defective Vehicles.

45**.    Numerosity:**  Plaintiff is informed and believe that the number of individuals who have purchased Defective Vehicles in the last ten years in the United States alone is over 3 million (3,000,000) people.  The Class is so numerous that joinder of all Class members is impracticable.  The Class can be readily identified through registration records, sales records, production records and other information kept by GM or third parties in the usual and normal course of business and within their control.

46.    **Existence and Predominance of Common Questions of Law & Fact:**  Common questions of law and fact exist as to the Class and predominate over questions affecting only individual members, including the following:

    a.  Whether the Defective Vehicles suffer from the defects;

    b.  Whether GM engaged in a deceptive and unlawful advertising and marketing campaign by concealing serious defects in its vehicles;

    c.  Whether GM misrepresented that the Defective Vehicles were safe;

    d.  Whether and to the extent GM breached its express warranties relating to the safety and quality of its vehicles;

    e.  Whether and to the extent GM breached any implied warranties relating to the safety and quality of its vehicles;

    f.  Whether GM engaged in fraudulent concealment;

    g.  Whether and to the extent GM engaged in unfair, false, misleading, or deceptive acts or practices regarding its marketing and sale of its vehicles;

    h.  Whether the alleged conduct by GM violated laws as Plaintiff alleges,

    i.  Whether GM has been unjustly enriched as a result of the conduct complained of herein;

    j.  Whether GM's conduct complained of herein is intentional and knowing;

    k.  Whether Plaintiff and members are entitled to damages, restitution,

13

Case 2:14-cv-00082-JFW-FFM    Document 1    Filed 04/11/14    Page 17 of 50    Page ID #:17

disgorgement of profits, declaratory relief, punitive damages, and/or injunctive relief, and were harmed as a result of GM's conduct complained of herein; and

l. Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM.

47. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and other Class members received the same standardized misrepresentations, warranties, and nondisclosures about the safety and quality of GM's vehicles. GM's misrepresentations were made pursuant to a standardized policy and procedure implemented by GM. Plaintiff is a member of the Class that Plaintiff seeks to represent and has suffered harm due to the unfair, deceptive, unreasonable, and unlawful practices of GM.

48. **Adequacy of Representation:** Plaintiff will fairly and adequately represent the interests of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the Class that Plaintiff seeks to represent.  Plaintiff is represented by attorneys experienced in product liability, consumer protection and class action litigation, who intend to prosecute this action vigorously for the benefit of Plaintiff and all Class members. Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the Class members.

49. **Superiority:**  A class action is superior to and is the best available method for the fair and efficient adjudication of this controversy since joinder or all individual Class members is impracticable.  As the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each individually.  Individual litigation of Class members' claims would be unduly burdensome to the courts and have the likely potential to result in inconsistent or contradictory judgments. There are no unusual difficulties likely to be encountered in the management of this litigation as a class action. A class action presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

50. **Proper Maintenance of the Class:**  Defendant GM has acted or refused to act, with respect to some or all issues presented in this Complaint, on grounds generally applicable to

CLASS ACTION COMPLAINT

Case 2:14-cv-00062-JAW-2FM   Document 1   Filed 02/17/14   Page 18 of 50   Page ID #:18

the Class, thereby making it appropriate to provide relief with respect to the Class as a whole. Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Plaintiff anticipates providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

## V.    FACTUAL ALLEGATIONS

### A.    Front Axle Right Half Shaft Fracture Defect

51.    In addition to facts contained in the preceding Sections, Plaintiff further alleges as follows.  GM knew of the defects since before the first recall in September 2013.  On September 23, 2013, GM submitted a notification letter to the NHTSA pursuant to 49 C.F.R. § 573.6, stating that it had decided to conduct a safety recall for certain model year 2013-2014 Chevrolet Cruzes built between January 24, 2013 and August 1, 2013, equipped with a manual transmission only. Although all Cruze vehicles, whether equipped with manual or automatic transmissions, use half shafts containing tubular bars manufactured by GM's Korea Delphi Automotive Systems Corporation ("KDAC"), GM only recalled the manual transmission Cruzes at that time.  GM reported that its engineers believed that the bars in the manual Cruze vehicles might be more likely to fracture because they experienced higher torque loads under various operating conditions than the bars in the automatic transmission Cruzes.  See discussion of recall, Section I, *supra*.

52.    On or around November 22, 2013, GM reported that it allegedly received its first report of a fractured tubular bar in an automatic transmission Cruze.  After this report, GM reported that it continued to monitor claims of fractured tubular bars in half shafts in automatic Cruzes. By December 17, 2013, GM received another report of a fractured tubular bar in another automatic transmission Cruze.

53.    In 2014, GM continued to receive additional reports of fractured half shafts on automatic transmission Cruzes.  For example:

- On January 29, 2014, Nexteer submitted a report documenting four (4) instances of tubular bar fractures in automatic transmission Cruzes.  Those vehicles were built between February 10 and May 28, 2013.

- On February 5, 2014, Avis Car Rental, which has a large fleet of Cruzes, reported that the

CLASS ACTION COMPLAINT

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
Case 09-12b-cv-00062-JPW-BFM    Document 1    Filed 04/21/14    Page 15 of 50    Page ID #19
to Schedule 1  Exh. D    Pg 20 of 51

axle in a model year 2013 Cruze, with an automatic transmission, had broken.  GM
learned upon inspection that the problem was a fractured tubular bar on the half shaft.

- On February 13, 2014, a GM employee conducted a warranty database search for claims
  related to fractured half shafts in automatic transmission Cruzes. That search identified
  **thirty (30) claims of fractured half shafts** in model year 2013 Cruzes built between
  January 24 and May 28, 2013.

- By February 19, 2014, GM had learned of at least **forty-seven (47) claims of fractured
  half shafts** in model year 2013-14 automatic transmission Cruze vehicles.

54.    After the 2013 recall, GM continued to receive reports of fractured half shafts on
manual transmission Cruze vehicles.  For example:

- GM had three warranty claims for fractured half shafts made on February 10, 13 and 20,
  2014, involving manual transmission Cruze vehicles, whose half shafts had been replaced
  in October 2013 as part of Safety Recall 13276 (13V-452).

- GM had warranty claims for fractured half shafts in three manual transmission Cruze
  vehicles built in August and September 2013. The existence of fractured half shaft bars in
  Cruze vehicles built after August 1, 2013, and in vehicles that had been serviced under
  Safety Recall 13276, show that the procedures that had been implemented (eddy-current
  testing of all tubular bars on half shafts used in automatic transmission Cruze vehicles)
  had not screened all defective bars from the supply stream.

55.    On March 6, 2014, a GM engineer documented the vehicle build dates for manual
and automatic transmission Cruze vehicles with fractured tubular bars.  The earliest build date for
such a vehicle was January 24, 2013, and the latest build date was September 25, 2013.  On
March 17, 2014, GM's Field Performance Evaluation Review Committee learned of the issue and
recommended a recall of model year 2013-2014 manual transmission Cruze vehicles built
between January 24, 2013 and March 7, 2014, and model year 2013-2014 automatic transmission
Cruze vehicles built between January 23, 2013 and January 8, 2014.

56.    On March 19, 2014, the issue was presented to the Executive Field Action
Decision Committee ("EFADC"). The presentation to the EFADC identified 2013-2014 manual

_____
CLASS ACTION COMPLAINT

transmission Cruzes built between January 24, 2013 and March 7, 2014, and 2013-2014

automatic transmission Cruzes built between January 23, 2013 and January 8, 2014, as potentially

containing defective tubular half shaft bars.  The EFADC requested additional consideration of

the vehicle build dates included in the proposed recall.

57.    At a second EFADC presentation on March 26, 2014, the recall window was

revised to include manual Cruzes vehicles built between November 28, 2012 and March 7, 2014,

and automatic Cruzes built between November 28, 2012 and January 8, 2014.  The EFADC

directed a safety recall accordingly.

58.    The end date of the recall window for automatic transmission vehicles was set

earlier than the end date of the recall window for manual transmissions because the automatic

transmission vehicles were built in higher volumes, and GM has allegedly exhausted the supply of

now-suspect tubular bars more quickly and began using bars produced with the revised

normalization process sooner.

59.    The safety recall includes some manual transmission Cruze vehicles serviced

under Safety Recall 13276 (first recall in September 2013) that may have received half shafts

containing bars normalized before the implementation of improved normalization procedures in

October and November 2013.  On March 27, 2014, GM notified its dealers to stop delivering

these Cruze vehicles.

60.    On March 28, 2014, GM informed the NHTSA that it intended to conduct the

safety recall for those model year 2013-2014 Cruze vehicles, with both automatic and manual

transmissions.

61.    GM knew that there was the serious risk of harm with all Chevy Cruzes before it

initiated the first recall for manual transmissions, yet failed to recall all 1.4L automatic

transmissions.  This failure and GM's hiding of this defect resulted in defective manual

transmission Cruzes being sold to the unsuspecting public.

**B.**    **Ignition Switch and Related Defects**

**1.**    **The $.57 Per Vehicle Fix that GM Failed to Implement**

62.    In addition to facts contained in the preceding Sections, Plaintiff further alleges as

17

follows.  GM waited nearly a decade to recall over 2.6 million Defective Vehicles, knowing that moving of or too much weight on the ignition key could cause the switch to move from the "ON" to the "ACC" position, thereby cutting power to steering, brakes, seatbelt pretensioners and airbags.

63.    On April 1, 2014, GM Chief Executive Officer Mary Barra testified before the United State's House Oversight and Investigations Subcommittee.  She called GM's slow response to at least 13 deaths linked to faulty ignition switches "unacceptable."  Ms. Barra, however, was unable to provide Congress with answers as to why GM continued to sell Defective Vehicles.

64.    During the April 2014 testimony, GM admitted that the cost to fix the Ignition Switch Defect was only **57 cents ($0.57)**.  When questioned why GM did not spend the money to fix the Ignition Switch Defect, Ms. Barra testified that GM "had more of a cost culture" rather than a customer safety culture.

65.    Ms. Barra has admitted in a video message to employees on March 17, 2014: "Something went wrong with our process in this instance, and terrible things happened."  Ms. Barra testified to Congress that people in one part of GM "didn't recognize information that would be valuable in another part of the company."  GM had a cultural landscape where employees worked isolated from other departments and critical information.

66.    GM's Vehicle Safety Chief, Jeff Boyer has stated:  "Nothing is more important than the safety of our customers in the vehicles they drive."  GM failed to live up to this commitment.  GM claims that safety will always be a priority at GM:  "We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets.  Our safety philosophy is at the heart of the development of each vehicle.  In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers."  GM violated this "safety" principle by putting the lives and safety of millions of Americans at risk.

67.    It is crucial for the safety of the public that automobile safety features that can prevent or minimize death or serious bodily harm in a collision operate safely, and that vehicles' safety critical systems, e.g., power to the engine, braking, seatbelt and airbag systems, work

CLASS ACTION COMPLAINT

properly and safely.  A manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation and its airbags not to deploy must promptly disclose and remedy such defects.  GM, however, concealed and did not fix serious quality and safety defects in its mass of vehicles.

68.    Old GM and GM knew of the deadly ignition switch defects and the resulting dangerous consequences, but concealed their knowledge from potential customers who ultimately became Defective Vehicle owners.

## 2.    GM Promoted the Defective Vehicles as "Safe" and "Reliable"

69.    The defects could have been easily avoided.  GM was on notice of the serious safety issues presented by its ignition switch system and knew about the problems before the subject vehicles were even sold.  After being sold, GM received numerous reports of crashes and injuries that further put GM on notice.  GM, however, for over a decade, did not disclose to consumers that its vehicles, which were advertised year after year as "safe" and "reliable" were anything but safe and reliable.

70.    Old GM consistently promoted the Defective Vehicles as safe and reliable.  For instance, ads and promotional materials made the following claims regarding safety and reliability:

- A Cobalt ad promised:  "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."
- A 2001 print ad touting the launch of the Saturn focused on safety: "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars. And it wasn't until we were satisfied that we added things…"
- 2003 Saturn Ion:  "The Ion sedan and quad coupe are designed to carry on the tradition of being at the top of the class when it comes to safety and security."
- 2006 and 2007 Saturn Ion:  "Like all Saturns, the Ion was designed with an emphasis on safety and security."
- An ad for the 2006 Pontiac Solstice promises that the vehicle:  "Brings power and defines performance."
- 2006 Pontiac G5:  "The 2006 Pontiac G5 Pursuit offers a host of features for safety-minded consumers."
- 2006 Chevrolet HHR:  "HHR is designed to protect occupants in the event of a crash."

19

_____
CLASS ACTION COMPLAINT

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 24 of 51
Case 2:14-cv-00062-JFW-FFM    Document 1    Filed 04/21/14    Page 23 of 50    Page ID #:23

- 2007 Saturn Sky: "Shy has a host of safety features. . . including dual stage frontal air bags. . . that use the latest sensing technology to turn the front passenger air bag on or off."

Old GM made these representations to increase vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicles were defective.

71.    At all times relevant herein, Old GM and GM possessed superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles. Yet, GM never informed consumers about the ignition switch defects before the first recall on February 13, 2014 recall.

### 3.    <u>GM Knew of the Defects for Years, But Concealed the Defects from Plaintiff and the Class</u>

72.    Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering and/or airbag failures.  Reports for those years included:

- **2005:** 26 death and injury accidents, including sixteen year-old Megan Phillips, who was driving a 2005 Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends.  NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the airbags.

- **2006:** 69 death and injury accidents, including 2 deaths listing airbags as component involved.

- **2007:** 87 death and injury accidents, including 3 deaths listing airbags as component involved.

- **2008:** 106 death and injury accidents, including 1 death listing airbag as component involved.

- **2009:** 133 death and injury accidents, including 1 death listing airbag as component involved, 1 death listing service brake as component involved and 1 death listing steering as component involved.  One incident involved a 2005 Cobalt in Pennsylvania where the driver and front-seat passenger airbags failed to deploy, and the ignition was in the

20

"accessory" position.  Another involved the death of an 18-year-old driving a 2007 Cobalt in Houston.

- **2010:** 400 death and injury accidents, including 2 deaths listing airbag as component involved and 12 deaths listing steering as component involved.  One involved the death of Kelly Erin Rudy who burned to death in her 2005 Cobalt; another involved Jennifer Brooke Melton of Georgia who died in a crash four days after taking her car in for service because the engine had shut off while she was driving; and another involving Amy Kosilla who died after the airbags failed to deploy.

- **2011:** 187 death and injury accidents, including 2 deaths listing airbag as component involved and 2 deaths listing steering as component involved.

- **2012:** 157 death and injury accidents, including 5 deaths listing airbag as component involved and 4 deaths listing steering as component involved.

Instead of admitting the dangerous safety defects in its vehicles, GM attempted to classify the vast majority of incidents as "driver error."

73.    In 2013, a GM Senior Manager identified eighty (80) customer complaints that Cobalts had unexpectedly stopped or stalled since 2005.

74.    GM now admits that Old GM learned of the ignition switch defects as early as 2001.  During pre-production development of the Saturn Ion, engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position.  Old GM claimed that a switch design change "had resolved the problem."  ("G.M. Reveals It Was Told of Ignition Defect in '01," D. Ivory, New York Times (Mar. 12, 2014)).   In 2002, Delphi informed GM in a Production Part Approval Process report that the ignition switch did not meet GM's specifications.  In 2003, an internal report documented an instance in which the service technician observed a stall while driving.  The service technician noted that the weight of several keys on the key ring had worn out the ignition switch.  It was replaced and the matter was closed.

75.    According to GM's chronology submitted to NHTSA pursuant to 49 CFR § 573.6, engineers encountered the problem again in 2004 during test drives of the Cobalt before it went to market.  (March 11, 2014 Chronology Re: Recall of 2006-2007 Chevron HHR and Pontiac

CLASS ACTION COMPLAINT

Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles, p. 1, filed with March 11, 2014 letter to NHTSA.)  Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue.  Engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."  (*Id*.)  Per GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions."  (*Id*.)  But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

76.     Soon after sales of the 2005 Cobalt started, Old GM received complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."  (*Id*.)  Old GM opened additional PRTS's.  The PRTS opened in May 2005, Old GM engineers suggested that GM re-design the key head from a "slotted" to a "hole" configuration.  After initially approving the proposed fix, Old GM reversed course and again declined to implement a fix, because the "lead-time for all solutions is too long," and "tooling cost and piece price are too high."  A GM engineer stated that the switch is "very fragile and doing any further changes will lead to mechanical and/or electrical problems."

77.     Old GM opted instead to issue a Technical Service Bulletin ("TSB") in October 2005, advising service technicians and dealers that the inadvertent turning of the key cylinder was causing the loss of the car's electrical system.  Instead of disclosing the true nature of the defects and fixing them, Old GM gave customers, who complained, "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key ring from moving up and down in the slot.  The "previous key ring" was "replaced with a smaller" one.  This change was allegedly able to keep the keys from hanging lower (and more susceptible to jarring).  (*Id*. at 1-2.)

78.     Old GM issued a December 2005 Service Bulletin, titled "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs," which covered 2005-2006 Cobalts, 2006 Chevrolet HHR, 2006 Pontiac Solstice and 2003-2006 Saturn Ions because they all had the same ignition switch.

79.     GM dealers reportedly provided key inserts to 474 customers who brought their

22

Case 1:14-cv-00062-JFM Document 1-4 Filed 04/21/14 Page 28 of 50 Page ID #:26
09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 27 of 51

vehicles in for service.  (*Id*. at 3.)

80.    In October 2006, GM updated the December 2005 Service Bulletin to include: 2007 Chevrolet HHR, 2007 Pontiac Solstice, 2007 Saturn Sky and Ion.

81.    In 2006, the GM design engineer responsible for the ignition switch approved a design change, which included "the use of a new detent plunger and spring that increased torque force in the ignition switch."  The new design was first produced in the 2007 model year.  (*Id*. at 2.)

82.    In 2007, Old GM met with NHTSA investigators regarding airbags.  NHTSA told Old GM of the July 2005 frontal and fatal crash involving Amber Marie Rose.  The airbags in Ms. Rose's 2005 Cobalt did not deploy.  Data retrieved from her vehicle's diagnostic system indicated that the ignition was in the "accessory" position.  Old GM investigated and found similar incidents.  By its own admission, by the end of 2007, Old GM knew of 10 frontal collisions in which the airbag did not deploy.  (February 24, 2014 Attachment B-573.6(c)(6) at p. 2, submitted to NHTSA with February 24, 2014 GM letter.)

83.    GM continued to receive complaints and continued to investigate frontal crashes in which the airbags did not deploy in Cobalts and other makes and models.  For example, in 2009, twenty-year-old Benjamin Hair died after crashing into a tree in Virginia when the airbags failed to deploy.

84.    According to GM, it was not until 2011 and 2012 that GM's examinations of switches from vehicles that had experienced crashes revealed significant design differences in the torque performance of ignition switches from the 2005 Cobalts and those from the 2010 model year, the last year of the Cobalt's production.

85.    However, discovery and investigation in the Melton case in 2013 reveal otherwise. The Meltons' lawyers and experts found evidence that GM had altered the design of ignition switches, but had done so without notifying federal regulators or car owners or even changing the part number as required by law. The change, which apparently occurred in **2006** according to a document obtained by NBC News, increased the size of the detent plunger and spring, a pair of parts that hold the ignition key in position intended to increase the "torque force" in the switch to

CLASS ACTION COMPLAINT

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 28 of 51
Case 2:14-cv-00062-JFW-FFM    Document 1    Filed 02/11/14    Page 27 of 50    Page ID #:27

hold the key in place.

86.     In 2011, GM had launched a new investigation into why the airbags did not deploy in crashes involving 2005-2007 Cobalts and 2007 Pontiac G5s.  In one fatality in Tennessee, the data from the black box showed that the key was in the "accessory" or "OFF" position.  Per GM, the results of the investigation were inconclusive.

87.     In 2012, GM identified four (4) fatal collisions and six (6) injury-producing incidents involving 2004 Saturn Ions.

88.     Before the April 2014 Congressional Hearings, Congressman Henry Waxman reported that his staff had counted 133 cases between June 2003 *and* June 2012 of consumers telling dealers that their GM vehicles were shutting off when they went over bumps or brushed against the ignition.  The reports include over 80 Saturn Ions, over 20 Chevrolet Cobalts and HHRs, and some Pontiac G5s and Solstice.  This data was obtained from the GM's warranty database, which is not reported to NHTSA. As pointed out by the House Committee staff during the April 1, 2014 hearing, the warranty database "can provide an early warning of vehicle defects."

### 4.     No Recall Was Issued Until 2014

89.     In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the Chevrolet Cobalt and Pontiac G5 vehicles. (February 24, 2014 Attachment B-573.6(c)(6) at p. 5-6, to NHTSA.)

90.     After analysis by GM's Field Performance Review Committee and the Executive Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of *some* of the Defective Vehicles on January 31, 2014.

91.     The first recall initiated on February 13, 2014 was for 780,000 compact cars: 2005-2007 Chevrolet Cobalts and Pontiac G5s (included Canadian Pontiac Pursuits as well).

92.     After additional analysis, the EFADC expanded the recall, which was issued on February 25, 2014 to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

93.     On March 28, 2014, GM belatedly expanded the recall to include an additional

_____
CLASS ACTION COMPLAINT

971,000 vehicles from the 2008-2011 model years.

94.    According to GM, "the dealers are to replace the ignition switch," presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, seatbelts and airbags.  (Feb. 24, 2014 Attachment B-573.6(c)(6) at p. 6.)

95.    On April 10, 2014, GM expanded the recall to include:  2005 – 2010 Chevrolet Cobalt; 2006 – 2011 Chevrolet HHR; 2007 – 2010 Pontiac G5; 2006 – 2010 Pontiac Solstice; 2003 – 2017 Saturn Ion; and 2007 – 2010 Saturn Sky.  GM issued an additional recall because the key can be removed from the ignition when the ignition is not in the "Off" position, and the vehicle could roll away.

96.    As set forth in Delphi's April 11, 2014 letter to the NHTSA, the number of vehicles likely exceeds 3,000,000 (3 Million) and includes the following makes and models:

• 2003-2007 Cadillac CTS
• 2004-2009 Cadillac SRX
• 2005-2009 Saab 9-7x
• 2004-2012 Chevrolet Malibu
• 2007-2010 Saturn Aura

97.    While GM has now appointed a new Vehicle Safety Chief, on information and belief over 3 million Defective Vehicles remain on the road to this day; and, on information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defects.

98.    GM faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

### 5.    The Redesigned Switch Did Not Meet GM Specifications

99.    The ignition switches installed in 2008-2011 model year vehicles were still defective because they did not meet GM's minimum torque specifications based on testing done by Delphi. GM reportedly recalled the 2008-2011 vehicles, but said the recall was done only to ensure that defective ignition switches were not installed as replacement parts during approximately 5,000 repairs.  GM did not tell the full story.

100.    Delphi representatives informed Congressional Committee members about the redesign of the ignition switch that was produced beginning in April 2006.  According to Delphi

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1    Exh. D    Pg 30 of 51
Case 2:14-cv-00062-JRW-BFM    Document 1    Filed 04/21/14    Page 29 of 50    Page ID #:29

officials, GM began discussions with Delphi about modifying and retesting the ignition switch in mid-2005. Delphi agreed to modify the design of the ignition switch and presented to GM a design with a longer spring.  GM approved the new design in April 26, 2006, which was signed by GM's engineer, Ray DeGiorgio (the same engineer who testified in the Melton case). According to Delphi, most torque test results for the 2006 ignition switches were in the 10 to 15 N-cm range, higher than the older models, but still not meeting GM's documented specifications of 15-25 N-cm.  This means that the ignition switches used in 2008-2011 vehicles do not meet GM's performance specifications.

101.    NHTSA's data shows that there were at least fourteen (14) fatal crashes in the recalled 2008-2011 vehicles involving a potential problem with an airbag, steering, electrical or unknown component.  Documents provided to the Congressional Committee show that top GM officials knew that ignition switches for the 2008-2011 vehicles did not meet torque specifications before announcing the recall. GM again acknowledged the importance of this specification in the March 28, 2014 Recall Notice:  "If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position."

### 6.    The Cruze Has Been Plagued with Same Problems as the Recalled Cars

102.    NHTSA's data shows that there were over sixty (60) incidents involving Chevrolet Cruze vehicles, model years 2011- 2014, with potential problems with airbags, steering and electrical components.  There were at least ten (10) reports of vehicles being involved in crashes and airbags not deploying; about twenty (20) reports of the vehicles suddenly stalling or shutting off; and over thirty (30) reports of problems with the power steering while driving.

103.    The full nature and extent of GM warranty claims regarding the Chevrolet Cruze is not yet known as GM has not disclosed that information to the NHTSA or the public.

### C.    GM Violated the Tread Act by Failing to Notify the NHTSA of the Known Defects

104.    Under the Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. §§ 30101, *et*

*seq.*, and the Transportation Recall Enhancement, Accountability & Documentation Act (the "Tread Act"), 49 U.S.C. § 30170, GM is required to recall and repair motor vehicle defects related to safety.

105.    If a manufacturer learns that a vehicle contains a defect that is related to safety, the manufacturer must inform the Secretary of Transportation pursuant to 49 U.S.C. § 30118(c)(1) & (2).  Manufacturers must inform NHTSA within five (5) working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  The report to NHTSA shall immediately include the following information:  manufacturer's name; identification of the vehicles or equipment containing the defect, including:  make, line, model year and years of manufacturing; a description of the basis for the determination of the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect.  The manufacturer shall also inform NHTSA, as soon as possible, regarding:  the total number of vehicles potentially containing the defect; and the percentage of vehicles estimated to contain the defect; a chronology of all principal events forming the basis of the determination that the defect related to safety, including a summary of all warranty claims, field or service reports and all other information, with their dates of receipt; and a description of the plan to remedy the defect.

106.    Pursuant to 49 U.S.C. § 30118(b)(2)(A) & (B), if the Secretary of Transportation determines that the vehicle is defective, it will require the manufacturer to notify the owners, purchasers and dealers of the defect and require it to remedy the defect or noncompliance.  Under the Tread Act, any manufacturer who violates 29 U.S.C. § 30166 must pay a civil penalty to the U.S. Government at $7,000 per violation per day with a maximum penalty "for a related series of daily violations [of] $17,350,000." 49 C.F.R. § 578.6(c).  For example, GM has been ordered to pay $7,000 per day since April 3, 2014 for failure to provide answers to all of NHTSA questions.  ("GM Fined for Stalling on Ignition-Switch Recall Info," *TIME* (April 8, 2014)).

107.    As described in more detail above, going back to at least 2001, GM has known about the defective ignition switches. Yet, GM waited until February 2014 before finally

27

---

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 32 of 51
Case 2:14-cv-00062-JVW-FFM    Document 1    Filed 04/17/14    Page 32 of 50    Page ID #:31

notifying NHTSA that it manufactured and sold vehicles with ignition switch defects that could cause disabling of the power steering and power brakes and cause the non-deployment of the vehicle's air bags in the event of a crash.  GM did not give the public, including Plaintiff and the Class, notice of the ignition switch defects at any time before February 2014.

108.    With respect to the front axle right half shaft defect, GM knew that there was the serious risk of harm with all Chevy Cruzes before it initiated the first recall for manual transmissions, yet failed to recall all 1.4L automatic transmissions.  This failure and GM's hiding of this defect resulted in defective automatic transmission Cruzes being sold to the unsuspecting public.

**D.**    **The Defects Have Harmed Plaintiff and the Class**

109.    The defects have caused damage to Plaintiff and the Class.  A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect.  A vehicle purchased, leased or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic injury or death because of the defects.

110.    Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the defects been disclosed. Plaintiff and the Class overpaid for their Defective Vehicles.  Because of the concealed defects, Plaintiff and the Class did not receive the benefit of the bargain.

111.    Plaintiff and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the defects.

112.    If Old GM or GM had timely disclosed the defects as required by the MCPA, TREAD Act, California's Unfair Competition Law ("UCL"), California Consumer Legal Remedies Act ("CLRA") and Song-Beverly Act, all Class members' vehicles would now be worth more.

**VI.    SUCCESSOR LIABILITY**

113.    As discussed above in Paragraphs 32-40, GM expressly assumed certain duties and obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure of the ignition

CLASS ACTION COMPLAINT

switch defects from the date of its formation on July 10, 2009 to the present.

114.    GM expressly assumed liability for Lemon Law claims in the Master Sale and Purchase Agreement of June 26, 2009, and this assumption of liability includes the Class' claims under the Song-Berverly Act, which is California's Lemon Law statute.

115.    GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

- GM admits that it was knew of the ignition system defects from the very date of its formation;

- GM has continued in the business of designing, manufacturing and marketing vehicles, including at least some of the same vehicles as Old GM, including the Defective Vehicles;

- GM retained the bulk of the employees of Old GM, including managers, directors and/or members of the Board, demonstrating a continuity of knowledge, including GM's current CEO, Mary Barra, who was employed by GM in 1980 and appointed Vice President of Global Manufacturing Engineering in 2008, a position in which she knew or should have known of the Ignition Switch Defect;

- GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books and records of Old GM; and

- GM acquired all goodwill and other intangible personal property of Old GM.

## VII.    TOLLING OF THE STATUTES OF LIMITATIONS

116.    GM is estopped from relying on any statutes of limitations.  All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein.  Plaintiff and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old GM and GM did not report information within their knowledge to federal authorities (e.g., NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that

CLASS ACTION COMPLAINT

information until shortly before this class action was filed.

117.    To the contrary, Old GM instructed its service shops to provide Defective Vehicle owners with a new key ring if they complained about unintended shut down, rather than admit what Old GM knew (that the ignition switches were dangerously defective and warranted replacement with a properly designed and built ignition system).

118.    Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiff and the Class the true character, quality and nature of the Defective Vehicles, that this defect is based on dangerous, inadequate and defective design and/or substandard materials, and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

119.    Because of the active concealment by Old GM and GM, any and all limitations periods otherwise applicable to the claims alleged herein have been tolled.

## VIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION – VIOLATIONS OF THE

### CONSUMER LEGAL REMEDIES ACT

**(Cal. Civ. Code § 1750, *et seq.*)**

120.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as though fully set forth herein.  This Cause of Action is brought on behalf of the California State Class.

121.    Plaintiff and members of the Class are "consumers," who purchased or leased one or more Defective Vehicles pursuant to Cal. Civil Code § 1761(d).

122.    GM is a "person" under Cal. Civ. Code § 1761(c).  GM engaged in unfair or deceptive acts or practices that violated the Consumer Legal Remedies Act ("CLRA"), Cal. Civil Code § 1750, *et seq.,* as described herein.

123.    California Civ. Code § 1770(a) provides that the "following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."  GM violated several parts of Section 1770(a), including:

CLASS ACTION COMPLAINT

- Section 1770(a)(2) by GM "misrepresent[ing] the source, sponsorship, approval, or certification of goods."

- Section 1770(a)(5) by GM "represent[ing] that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

- Section 1770(a)(7) by GM representing that goods are of a particular standard, quality, or grade when they are of another.

- Section 1770(a)(9) by GM advertising goods with the intent not to sell them as advertised.

- Section 1770(a)(14) by GM representing that the transaction was supplied in accordance with a previous representation when it was not.

124.    Further, under the TREAD Act, 49 U.S.C. § 30118(c)(1) & (2), and its accompanying regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.

125.    In acquiring Old GM, GM expressly assumed the obligations to make all required disclosures under the TREAD Act.  GM also has successor liability for the deceptive and unfair acts and omissions of Old GM.

126.    If a manufacturer learns that a vehicle contains a defect that is related to safety, the manufacturer must inform the Secretary of Transportation pursuant to 49 U.S.C. § 30118(c)(1) & (2).  Manufacturers must inform NHTSA within five (5) working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  The report to NHTSA shall immediately include the following information:  manufacturer's name; identification of the vehicles or equipment containing the defect, including:  make, line, model year and years of manufacturing; a description of the basis for the determination of the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect.

127.    The manufacturer shall also inform NHTSA, as soon as possible, regarding:  the total number of vehicles potentially containing the defect; and the percentage of vehicles estimated to contain the defect; a chronology of all principal events forming the basis of the

CLASS ACTION COMPLAINT

1   determination that the defect related to safety, including a summary of all warranty claims, field

2   or service reports and all other information, with their dates of receipt; and a description of the

3   plan to remedy the defect.

4       128.    Under the Tread Act, any manufacturer who violates 29 U.S.C. § 30166 must pay

5   a civil penalty to the U.S. Government at $7,000 per violation per day with a maximum penalty

6   "for a related series of daily violations [of] $17,350,000." 49 C.F.R. § 578.6(c).

7       129.    With respect to the front axle right half shaft defect, GM knew that there was the

8   serious risk of harm with all Chevy Cruzes before it initiated the first recall for manual

9   transmissions, yet failed to recall all 1.4L automatic transmissions.  This failure and GM's hiding

10  of this defect resulted in defective Cruzes being sold to the unsuspecting public, including the

11  Class Representative, Mesafint Gebremariam.

12      130.    By failing to disclose and by actively concealing the front axle right half shaft

13  defect, and by selling vehicles while violating the TREAD Act and other conduct as alleged

14  herein, Old GM and GM both engaged in deceptive business  practices prohibited by the CLRA.

15      131.    With respect to the ignition switch defect, from at least 2001, Old GM had

16  knowledge of the ignition switch defect, but hid the problem for the remainder of its existence

17  until 2009.  From its creation on July 10, 2009, GM knew of the ignition switch problem because

18  of the knowledge of Old GM and continuous reports up until the present.  GM admits the defect

19  in the ignition switch has been linked to at least thirteen (13) fatalities.  Other sources have

20  reported that hundreds of deaths and serious injuries are linked the faulty ignition switches.

21      132.    Despite being aware of the ignition switch defects ever since its creation on July

22  10, 2009, GM waited until February 7, 2014, before finally sending a letter to NHTSA admitting

23  its knowledge of the ignition switch defects causing the vehicles to lose power and the airbags not

24  to deploy.  GM initially only identified two vehicle models, along with the corresponding model

25  years, to be recalled:  2005-2007 Chevrolet Cobalt and 2007 Pontiac G5.  On February 25, 2014,

26  GM amended its letter to include four additional vehicles, the 2006-2006 Chevrolet HHR, 2006-

27  2007 Pontiac Solstice, 2003-2007 Saturn Ion, and the 2007 Saturn Sky.

28      133.    By failing to disclose and by actively concealing the ignition switch defect, and by

CLASS ACTION COMPLAINT

selling vehicles while violating the TREAD Act and other conduct as alleged herein, Old GM and GM both engaged in deceptive business practices prohibited by the CLRA.

134. Both Old GM and GM failed for years to inform the NHTSA about the known defects in the Defective Vehicles' ignition system. Consequently, the public, including Plaintiff and the Class, received no notice of the ignition switch defects, that the defect could disable multiple electrical functions including power steering and power brakes, or that the defect could cause the airbags not to deploy and the seatbelt pretensioners not to function. GM knew that the ignition switch had a defect that could cause a vehicle's engine to lose power without warning, and that when the engine lost power there was a risk that electrical functions would fail and that the airbags would not deploy. GM, however, failed to inform NHTSA or warn Plaintiff or the public about these inherent dangers despite having a duty to do so.

135. Old GM and GM owed Plaintiff and the Class a duty to comply with the TREAD Act and disclose the defective nature of Defective Vehicles, including the front axle right half shaft and ignition switch defects because Old GM and GM:

    a.    Possessed exclusive knowledge of the defects rendering the Defective Vehicles inherently more dangerous and unreliable than otherwise similar vehicles;

    b.    Intentionally concealed the hazardous situation with Defective Vehicles by failing to comply with the TREAD Act and disclosing the front axle right half shaft defect with manual transmissions; and

    c.    Intentionally concealed the hazardous situation with Defective Vehicles by failing to comply with the TREAD Act and disclosing the ignition switch defects.

136. The Defective Vehicles pose an unreasonable risk of death or serious bodily injury to Plaintiff, passengers, and other motorists and pedestrians, because they are susceptible to sudden loss of power resulting in the loss of power steering and power brakes and failure of the airbags to deploy.

137. Old GM's and GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the Class, about the true safety and reliability of the Defective Vehicles.

CLASS ACTION COMPLAINT

09-50026-mg   Doc 12673-5   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
to Schedule 1  Exh. D   Pg 38 of 51
Case 09-50026-reg   Doc 11-5   Document 1   Filed 04/21/14   Page 637 of 50   Page ID #:37

138.    As a result of their violations of the CLRA detailed above, Old GM and GM caused actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff and the Class.  Plaintiff and the Class members currently own or lease Defective Vehicles that are defective and inherently unsafe.  These violations caused the diminution in value of their vehicles, which are now worth less than they would have been without the defects.  Had Old GM and GM timely disclosed the defects, Plaintiff and the Class would either not have purchased the Defective Vehicles at all, or would have paid less for the Defective Vehicles.  Plaintiff and the Class did not receive the benefit of their bargain, which was for a safe vehicle free of serious safety defects.

139.    Had GM timely disclosed the defects, the value of Plaintiff and the Class' Defective Vehicles would not now be diminished.

140.    Plaintiff and the Class face the risk of irreparable injury as a result of GM's acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiff and to the general public.

141.    Under Cal. Civ. Code § 1780(a), Plaintiff and the Class seek monetary relief against GM measured as the diminution of the value of their vehicles caused by Old GM's and GM's violations of the CLRA as alleged herein.

142.    Under Cal. Civ. Code § 1780(b), Plaintiff and the Class seek an additional award against GM of up to $5,000 for each class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Old GM and GM knew or should have known that their conduct was directed to one or more Class members, who are senior citizens or disabled persons.  Their conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more Class members who are senior citizens or disabled persons are substantially more vulnerable to Old GM and GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility or disability.  Each of them has suffered substantial physical, emotional and/or economic damage resulting from Old GM's and GM's conduct.

143.    Plaintiff and the Class seek punitive damages against GM because it carried out

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 39 of 51
Case 2:12-cv-00062-JW-FFM    Document 1    Filed 02/21/14    Page 39 of 50    Page ID #:38

despicable conduct with willful and conscious disregard of the rights and safety of others, including Plaintiff and the Class to potential to cruel and unjust hardship in knowing disregard of their rights.  First Old GM, then GM intentionally and willfully concealed and failed to inform the NHTSA of the defects related to the ignition switch; and GM intentionally and willfully concealed the defects with the automatic transmission Cruze vehicles.  GM deceived Plaintiff and the Class on the safety of GM vehicles, concealing material facts that only GM knew.  GM's conduct constitutes malice, oppression and fraud warranting punitive damages under Cal. Civ. Code § 3294.

144.    Plaintiff seeks an order enjoining GM's unfair or deceptive acts and practices, restitution, punitive damages, costs, attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

145.    Class members who purchased a Defective Vehicle after July 10, 2009 ("Repurchasers") also have a CLRA claim against GM for failing to disclose the known ignition-switch defect.  But for GM's deceptive and unfair failure to disclose the ignition switch defects, the Repurchasers would either not have purchased the Defective Vehicles or would have paid less for them, entitling them to monetary relief under Cal. Civ. Code § 1780(a) and punitive damages, for the reasons set forth herein.

146.    To the extent required by Cal. Civ. Code § 1780(d), Plaintiff is filing a declaration showing that venue in this District is proper.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

## SECOND CAUSE OF ACTION – VIOLATION OF THE
## CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200, et seq.)

147.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as though fully set forth herein.  This Cause of Action is brought on behalf of the California State Class.

148.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  GM has engaged in unlawful, fraudulent and unfair business acts and

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
Case 2:14-cv-00062-JFW-FFM    Document 1    Filed 04/11/14    Page 35 of 50    Page ID #:39
to Schedule 1  Exh. D    Pg 40 of 51

practices in violation of the UCL.  GM has successor liability for the unlawful, fraudulent and unfair business acts and practices of Old GM.

149.    Both Old GM and GM violated the unlawful prong of Section 17200 by:  (1) their violations of the Consumer Legal Remedies Act, Cal. Civil Code § 1750, *et seq.*, as set forth in the First Cause of Action by the acts and practices set forth herein; and (2) because they engaged in business acts or practices that are unlawful because they violated the TREAD Act, discussed *infra*, and its regulations.  They violated the TREAD Act when they failed to timely inform NHTSA of the ignition switch defects and the front axle right half shaft defect and allowed cars to be sold with these defects.

150.    Old GM and GM violated the unfair and fraudulent prong of section 17200 by failing to inform NHTSA about defects impacting the safety and reliability of its vehicles.  They engaged in conduct that was likely to deceive reasonable owners into believing that the vehicles were safe and reliable.  The information that should have been disclosed to NHTSA about the faulty ignition switch and front axle right half shaft would be material to a reasonable consumer.

151.    Old GM and GM also violated the unfair prong of section 17200 because their acts and practices, as set forth herein and include the manufacture and sale of vehicles with an ignition switch defect and/or front axle right half shaft defects, and their failure to adequately disclose the defects to NHTSA and implement a remedy, offend established public policy.  The harm they have caused consumers greatly outweighs any benefits associated with those acts and practices.  Their conduct has also impaired competition within the automotive vehicle market and has prevented Plaintiff and the Class from making fully informed decisions about whether to lease, purchase and/or retain the Defective Vehicles.  For example, GM knew of the ignition switch defects by 2001, yet it continued to design, manufacture and market the Defect Vehicles for years, knowing that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

152.    Plaintiff and the Class have suffered an injury, including the loss of money or property, because of GM's unfair, unlawful and/or deceptive practices.  GM failed to inform NHTSA and consumers, that its vehicles had a defective ignition switch and/or front axle right

half shaft defect that could lead to injury or death.  Had Plaintiff and the Class known this they would either not have purchased their vehicles at all, would have paid less for them and/or would not have retained their Defective Vehicles.

153.    All of the acts and practices alleged herein occurred, and continue to occur, in the conduct of GM's business.  GM's wrongful conduct is part of a pattern and/or generalized course of conduct that is still perpetuated and repeated, in California and nationwide.

154.    Plaintiff and the Class respectfully request that the Court enter such orders and judgments as necessary, including a declaratory judgment that GM has violated the UCL; an order enjoining GM from continuing its unfair, unlawful and/or deceptive practices; an order and judgment restoring any money lost as the result of GM's unfair, unlawful and deceptive trade practices to the Class members, including restitution and disgorgement of any profits GM received as a result of its unfair, unlawful and/or deceptive practices as provided in Cal. Bus. & Prof. Code § 17203, Cal. Civ. Code § 3345, Cal Civ. Proc. § 384, and all other relief set forth herein or available under the law.

155.    Class members who purchased a Defective Vehicle after July 10, 2009 ("Repurchasers") have a UCL claim against GM for failing to disclose the known defects.  But for GM's deceptive and unfair failure to disclose the defects, the Repurchasers would either not have purchased the Defective Vehicles or would have paid less for them, entitling them to orders or judgments to enjoin GM from continuing its unfair, unlawful and/or deceptive practices; and/or restore to the Repurchasers any money lost as the result of GM's unfair, unlawful and deceptive trade practices pursuant to Cal. Bus. & Prof. Code § 17203, Cal. Civ. Code § 3345, Cal Civ. Proc. § 384.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

### THIRD CAUSE OF ACTION – FALSE ADVERTISING

### (Cal. Bus. & Prof. Code § 17500 *et seq.*)

156.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as though fully set forth herein.  This Cause of Action is brought on behalf of the California State Class.

CLASS ACTION COMPLAINT

157.    California Bus. & Prof. Code § 17500, *et seq.,* the False Advertising Act, prohibits any person, firm, corporation, or association, or any employee thereof, with the intent to dispose of real or personal property, from performing services or inducing the public to enter into any obligation relating to property or services, disseminating an untrue or misleading statement concerning such property or services which the defendant knew, or in the exercise of reasonable care should have known, was untrue or misleading.  A court may order injunctive relief and restitution to affected members as remedies for any violations of Section 17500.

158.    At all times relevant herein, GM engaged in disseminating false and misleading communications which misrepresent the characteristics, nature, quality and safety of the Defective Vehicles and have failed to disclose the true quality and defects of these products.  GM engaged in the advertising and the failure to disclose the defects and design flaws in its products with the intent to induce Plaintiff and the Class to purchase Defendant's vehicles.  Defendant's business practices include, without limitation:

a.  Failing to remedy the defects or design flaws which made Defendant's vehicles inherently more dangerous than other similar vehicles;

b.  Failing to design, manufacture, distribute and sell a product which would perform in a safe manner when used in a reasonably foreseeable manner by a reasonable customer.

c.  Selling to Plaintiff and the Class vehicles containing defects or design flaws, which make them inherently more dangerous than other similar vehicles;

d.  Failing to disclose to Plaintiff and the Class that the vehicles sold to such consumers contain a defect or design flaw which makes them inherently more dangerous than other similar vehicles;

e.  Failing to timely inform NHTSA and vehicle owners, purchasers and dealers of the defects and to timely recall the Defective Vehicles; and

f.  Violating the other statutes and common law causes of action as alleged in this complaint.

159.    GM caused to be made or disseminated throughout California and the United States, through advertising, marketing and other publications, including the internet, statements

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 43 of 51
Case 2:14-cv-00622-JFW-JFM    Document 1-4    Filed 01/23/14    Page 42 of 50    Page ID #:42

that are untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to GM, to be untrue or misleading to consumers and Plaintiff, acting in violation of Cal. Bus. & Prof. Code § 17500.  GM's advertising was untrue or misleading and likely to deceive the public in that the true characteristics and nature of the vehicles sold by GM were not as advertised.

160.    In purchasing GM vehicles, Plaintiff and the Class reasonably believed and/or depended on the material false and/or misleading information provided by GM with respect to the quality and safety of the vehicles being sold.  GM induced Plaintiff and the Class to purchase GM automotive products through the acts and omissions alleged herein.  Plaintiff and the Class believed the false and/or misleading information to be true and/or relied on it when making purchasing decisions.

161.    GM's business acts and practices described herein constitute an unfair business practice in violation of the Unfair Competition Law in that such acts and practices are substantially injurious to consumers and offensive to established California public policy.  GM's acts and omissions constitute a fraudulent business practice in violation of the Unfair Competition Law in that such acts and practices are likely to deceive consumers as to their legal rights and obligations with respect to the purchase of vehicles from GM.

162.    As a result of GM's business acts and practices, Plaintiff and the Class have suffered injury in fact and have suffered an economic loss by, among other things:  (1) leasing and/or purchasing an inferior vehicle whose nature and characteristics render it of a lesser value than represented; (2) incurring costs for diminished resale value of the vehicles purchased; (3) leasing and/or purchasing a vehicle that poses a danger to the health and safety of not only the consumer, but passengers and other and pedestrians; (4) incurring increased costs to repair the products purchased; and (5) incurring costs for loss of use.

163.    Plaintiff, on behalf of the Class, respectfully requests that the Court issue an injunction restraining and enjoining GM from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of GM vehicles.  Plaintiff and the Class further request an order restoring any money or property, real or personal,

1   which may have been lost by means of Defendant's false advertising.

2        164.    Pursuant to Cal. Code Civ. Proc. § 1021.5, Plaintiff seeks reasonable attorneys'

3   fees, costs and expenses incurred in bringing this action.

4        WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

5        **FOURTH CAUSE OF ACTION – BREACH OF IMPLIED WARRANTY**

6        165.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as

7   though fully set forth herein.  This Cause of Action is brought on behalf of the Nationwide Class.

8        166.    GM impliedly warranted to consumers that the vehicles were what they were

9   represented to be.  These implied warranties induced the public in general, Plaintiff and other

10  Class members in particular to choose and purchase GM vehicles.  These implied warranties were

11  both directly and indirectly believed and relied upon by Plaintiff and Class members.  This

12  reliance was justified by GM's skill, expertise and judgment in the design, manufacturing, testing,

13  labeling, distribution and/or sale of automobiles.

14       167.    At the time of the sales, GM had knowledge of the purpose for which its products

15  were purchased and impliedly warranted the same to be, in all respects, fit and proper for this

16  purpose.  GM breached its warranties in that the products were not fit for the purpose for which

17  they were intended and used.  GM sold to Plaintiff and other Class members a product, which was

18  not fit for use.  The defect in the products existed prior to the delivery of the products to Plaintiff

19  and the Class.

20       168.    Plaintiff and the Class have suffered injury in fact and have suffered an economic

21  loss by, among other things:  (1) leasing and/or purchasing an inferior vehicle whose nature and

22  characteristics render it of a lesser value than represented; (2) incurring costs for diminished

23  resale value of the vehicles purchased; (3) leasing and/or purchasing a vehicle that poses a danger

24  to the health and safety of not only the consumer, but passengers and other and pedestrians; (4)

25  incurring increased costs to repair the products purchased; and (5) incurring costs for loss of use.

26       169.    Plaintiff, on behalf of the Class, respectfully requests that the Court issue an

27  injunction restraining and enjoining GM from sending or transmitting false and misleading

28  advertising to individuals or entities concerning the purported safety and quality of GM vehicles.

CLASS ACTION COMPLAINT

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

### FIFTH CAUSE OF ACTION - VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CALIFORNIA "LEMON LAW")

**(Cal. Civ. Code §§ 1791.1 & 1792)**

170.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as though fully set forth herein.  This Cause of Action is brought on behalf of the California State Class.

171.    Plaintiff and Class members who purchased or leased the Defective Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).  The Defective Vehicles are "consumer goods" within the meaning of Section 1791(a).

172.    GM was a "manufacturer" of the Defective Vehicles within the meaning of Section 1791(j); and, in purchasing Old GM, expressly assumed liability and responsibility for "payment of all [Old GM's] Liabilities arising under….Lemon Laws," which includes California's Lemon Law, the Song-Beverly Act.

173.    GM impliedly warranted to Plaintiff and the Class that its Defective Vehicles were "merchantable" within the meaning of Sections 1791.1(a) & 1792.  The Defective Vehicles, however, do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.  Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
> (1)    Pass without objection in the trade under the contract description.
> (2)    Are fit for the ordinary purposes for which such goods are used.
> (3)    Are adequately contained, packaged, and labeled.
> (4)    Conform to the promises or affirmations of fact made on the container or label.

174.    The Defective Vehicles breach the implied warranty of merchantability because of the defects that cause the Defective Vehicles to inadvertently shut down during ordinary driving conditions and disabling the power steering and power brakes and causing the non-deployment of the vehicle's air bags in the event of a crash, leading to an unreasonable likelihood of accident and

CLASS ACTION COMPLAINT

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 46 of 51
Case 09-12p-cv-00062-JFM-DFM    Document 1-4    Filed 08/11/14    Page 45 of 50    Page ID #:45

an unreasonable likelihood that such accidents would cause serious bodily injury or death to vehicle occupants or other motorists and pedestrians.  Because of the defects, the Defective Vehicles are not safe to drive, and thus not fit for ordinary purposes.  These defects have deprived Plaintiff and the Class of the benefit of their bargain and have caused the Defective Vehicles to depreciate in value.

175.    The Defective Vehicles are not adequately labeled because the labeling fails to disclose the defects and does not advise Plaintiff and Class members to avoid attaching anything to their vehicle key rings.  GM failed to warn about the dangerous safety defects in the Defective Vehicles.

176.    As a direct and proximate result of GM's breach of its duties under California's Lemon Law, Class members received goods whose dangerous condition substantially impairs their value.  Plaintiff and the Class have been damaged by the diminished value of GM's products, the products' malfunctioning and the nonuse of their Defective Vehicles.

177.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and Class members are entitled to damages and other legal and equitable relief  including, at their election, the purchase price of their Defective Vehicles or the overpayment or diminution in value of their Defective Vehicles.  Further, under Cal. Civ. Code § 1794, Class members are entitled to costs and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

**SIXTH CAUSE OF ACTION – BREACH OF EXPRESS WARRANTY**

178.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as though fully set forth herein.  This Cause of Action is brought on behalf of the Nationwide Class.

179.    GM expressly warranted to persons purchasing its vehicles that they were what they were represented to be.  These express warranties induced the public in general, Plaintiff and members of the Class, in particular, to use and purchase Defendant's products. These express warranties were both directly and indirectly believed and relied upon by Plaintiff and the Class, and induced Plaintiff and the Class to choose Defendant's vehicles.

180.    Defendant breached its aforesaid warranties in that its products were not fit for the

_____
CLASS ACTION COMPLAINT

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
Case 09-12P-cv-00062-JPW-GFM    Document 1    Filed 04/11/14    Page 45 of 50    Page ID #:46
to Schedule 1  Exh. D    Pg 47 of 51

use and purpose expressly warranted by Defendant.

181.    Plaintiff and the Class have suffered injury in fact and have suffered an economic loss by, among other things:  (1) leasing and/or purchasing an inferior vehicle whose nature and characteristics render it of a lesser value than represented; (2) incurring costs for diminished resale value of the vehicles purchased; (3) leasing and/or purchasing a vehicle that poses a danger to the health and safety of not only the consumer, but passengers and other and pedestrians; (4) incurring increased costs to repair the products purchased; and (5) incurring costs for loss of use.

182.    Plaintiff, on behalf of the Class, respectfully requests that the Court issue an injunction restraining and enjoining GM from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of GM vehicles.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

### SEVENTH CAUSE OF ACTION - NEGLIGENCE

183.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as though fully set forth herein.  This Cause of Action is brought on behalf of the Nationwide Class.

184.    As the of designer, manufacturer, promoter, marketer and seller of automotive vehicles, GM had a duty to Plaintiff and the Class to not sell products that were defective and could result in serious injuries to either Plaintiff, the Class or innocent bystanders and third parties. GM breached that duty by designing, manufacturing, promoting, marketing and selling products to Plaintiff and the Class that had a serious ignition switch defect and/or front axle right half shaft defect without disclosing these facts to Plaintiff and the Class. That breach caused the economic harm, injury, and/or damage to Plaintiff and the Class that are set forth herein.

185.    In its February 6, 2014 10-K filing with the United States Security Exchange Commission, GM included the following statements that recognize its duty to act with reasonable care:  "In the U.S. if a vehicle or vehicle equipment does not comply with a safety standard or if a vehicle defect creates an unreasonable safety risk the manufacturer is required to notify owners and provide a remedy."  (February 6, 2014 10-K, p. 13.)

186.    As a direct and proximate result of GM's negligence, Plaintiff and the Class have been damaged as alleged herein in an amount to be ascertained at the time of trial.

CLASS ACTION COMPLAINT

09-50026-mg    Doc 12673-5    Filed 04/30/14    Entered 04/30/14 16:54:11    Supplement
to Schedule 1  Exh. D    Pg 48 of 51
Case 2:12-cv-00062-JFW-JEM   Document 1   Filed 01/11/14   Page 47 of 50   Page ID #:47

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

## **EIGHTH CAUSE OF ACTION - FRAUDULENT CONCEALMENT**

187.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as though fully set forth herein.  This Cause of Action is brought on behalf of the Nationwide Class.

188.    At all times relevant herein, GM knew that the Defective Vehicles contained defective ignition switches and/or front axle right half shaft defects, presenting an unreasonably dangerous propensity for the car to suddenly turn off, disabling the power steering and power brakes and causing the non-deployment of the vehicle's air bags in the event of a crash and cause harm to drivers, passengers and other motorists and pedestrians.

189.    GM fraudulently concealed from and/or failed to disclose to Plaintiff and the Class the true defective nature of the Defective vehicles.  GM was under a duty to Plaintiff and the Class to disclose and warn of the defective nature of the Defective Vehicles because: (a) GM was in a superior position to know the true state of the facts about the hidden defects in the vehicles, and those defects were latent; (b) GM made partial disclosures about the safety and quality of the subject vehicles while not revealing their true defective nature; and (c) GM fraudulently and purposefully concealed the defective nature of the Defective vehicles from Plaintiff and the Class.

190.    The facts concealed and/or not disclosed by GM to Plaintiff and the Class were material facts that a reasonable person would have considered to be important in deciding whether to purchase and/or operate the Defective Vehicles.

191.    GM intentionally concealed and/or failed to disclose the true nature of the problems with the Defective Vehicles for the purpose of inducing Plaintiff and the Class to act thereon.  Plaintiff and the Class justifiably acted or relied upon, to the detriment of Plaintiff and the Class, the concealed and/or non-disclosed facts, as evidenced by their purchase and operation of the Defective Vehicles.

192.    As a direct and proximate cause of result of GM's misconduct, Plaintiff and the Class have suffered actual damages as alleged herein.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

///

_____
CLASS ACTION COMPLAINT

## NINTH CAUSE OF ACTION – UNJUST ENRICHMENT

193.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as though fully set forth herein.  This Cause of Action is brought on behalf of the Nationwide Class.

194.    As a result of GM's continuous and systematic misrepresentations and failure to disclose that the vehicles it had designed, manufactured, promoted, marketed and sold contained serious defects that affected the safety of its vehicles, Defendant was able to charge a higher price for its vehicles, which did not match the vehicle's value.  Based on these practices, GM was unjustly enriched.

195.    GM knew and should have known of the benefit it was receiving due to its misrepresentations and failure to disclose, and enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and Class members, who paid a higher price for a product with a lower value.  It would be inequitable and unjust for GM to retain these unlawfully obtained profits.

196.    Plaintiff, therefore, seeks and order establishing Defendant as constructive trustee of the profits unjustly obtained, plus interest.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

## TENTH CAUSE OF ACTION – CLAIM FOR ACTUAL DAMAGES
## AND EXPENSE REIMBURSEMENT FUND

197.    Plaintiff incorporates by reference all the proceeding and succeeding paragraphs as though fully set forth herein.  This Cause of Action is brought on behalf of the Nationwide Class.

198.    Plaintiff and the Class have incurred out-of-pocket expenses, losses and damages (collectively "damages") in attempting to rectifying the defects in their Defective Vehicles.  Such damages will continue as they pay for rental cars and alternative transportation, miss time from work, pay for other incidental expenses, including childcare and anything else involved in dealing with the recall process and resolving the issues with their Defective Vehicles.

199.    Plaintiff and the Class seek payment of any and all such damages under the consumer statutes and applicable law set forth herein.  Although the damages are individualized in terms of amounts and details, the right of each member of the Class to recover such damages presents common questions of law.

CLASS ACTION COMPLAINT

09-50026-mg   Doc 12673-5   Filed 04/30/14   Entered 04/30/14 16:54:11   Supplement
Case 1:14-cv-00622-JFM   Document 1-4   Filed 02/21/14   Page 45 of 50   Page ID #:49
to Schedule 1  Exh. D    Pg 50 of 51

200.   Fairness and equity to the Class require that:  (1) GM, not the Class, absorb any and all damages reasonably connected to the recall of the Defective Vehicles and correction of the defects; and (2) a GM-funded expense reimbursement fund be established by Court order and administered under Court supervision, using open, uniform and reasonable protocols under which such damages can be paid.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth herein.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and in favor of Plaintiff and the Class, and grant the following relief:

1.   an order certifying the proposed Classes designating Plaintiff as the name representative of the Classes, or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class and Class Representatives and Plaintiff's chosen counsel as Class Counsel;

2.   a declaration that the ignition switches and front axle right half shaft are defective;

3.   a declaration that GM is financially responsible for notifying all Class Members about the defective nature of the Defective Vehicles;

4.   a declaration that the conduct of GM as alleged herein to be unlawful, unfair and/or deceptive, and an order enjoining any such future conduct and directing GM to permanently, expeditiously and completely repair the Defective Vehicles;

5.   an award to Plaintiff and Class members actual, compensatory damages, or, in the alternative, statutory damages, including interest, in amounts to be proven at trial;

6.   alternatively, if elected by Plaintiff and the Class or Class members, an award requiring GM to repair the defective vehicles or provide a comparable vehicle that does not have the same or any serious defects;

7.   an award to Plaintiff and the Class of restitution of all monies paid to GM because of GM's violation of the UCL, the CLRA and the Song-Beverly Act;

8.   a declaration that GM must disgorge, for the benefit of Plaintiff and the Class, all

CLASS ACTION COMPLAINT

1    or part of the ill-gotten profits received from the sale or lease of the Defective Vehicles, or make

2    full restitution to Plaintiff and Class members;

3          9.     a declaration establishing a GM-funded expense reimbursement fund to be

4    administered under Court supervision;

5          10.    an award to Plaintiff and the Class of their reasonable attorneys' fees, costs and

6    pre-judgment and post-judgment interest, and all other damages allowed under the law, including,

7    but not limited to Cal. Code Civ. Proc. § 1021.5;

8          11.    an award to Plaintiff and the Class of punitive damages in an amount to be proven

9    at trial;

10          12.    leave to amend this Complaint to conform to the evidence produced at trial; and

11          13.    any such other relief as the Court deems appropriate or just under the

12    circumstances.

13    **X.    JURY DEMAND**

14         Plaintiff demands a trial by jury on any and all issues in this action so triable of right.

15

16    DATED:  April 21, 2014          MARY ALEXANDER & ASSOCIATES, P.C.

17

18                    By:     /s/ Mary E. Alexander

19                         Mary E. Alexander, Esq.

20                         Jennifer L. Fiore, Esq.
                     *Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT