# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LARRY BENDER,<br><br>Plaintiff<br><br>v.<br><br>GENERAL MOTORS, LLC,<br>Defendant. | Court File No. 1:14-cv-134 |

**CIVIL COMPLAINT – CLASS ACTION COMPLAINT**

Plaintiff Larry Bender, by and through Plaintiff's attorneys JONES WARD PLC, upon

information and belief and at all times hereinafter mentioned, on behalf of himself and all others

similarly situated, alleges as follows:

**INTRODUCTION AND SUMMARY OF ACTION**

1.    This case involves Defendant's conscious decision to overlook, and in fact

conceal, a deadly design defect in vehicle ignition switches in millions of GM vehicles placed

on the road since 2003.

2.    In making the decision to cover up the ignition switch defect for at least a

decade, Defendant consciously put millions of Americans' lives at risk.  Defendant knowingly

placed on public streets more than one million defective vehicles with the propensity to shut

down during normal driving conditions, creating a certainty of accidents, bodily harm, and

death.

3.    An auto manufacturer should never make profits more important than safety and

should never conceal defects that exist in its vehicles from consumers or the public.

Defendant's Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than

the safety of our customers in the vehicles they drive."  Yet Defendant failed to live up to this

commitment.

4.      The first priority of an auto manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision.  In addition, an auto manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely, and its critical safety systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.  Moreover, an auto manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

5.      Since at least 2003, Defendant has sold millions of vehicles throughout the United States and worldwide that have a safety defect causing the vehicle's ignition switch to inadvertently move from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

6.      There are at least two main reasons why the GM ignition switch systems are defective.  The first is that the ignition switch is simply weak and therefore does not hold the key in place in the "run position."  On information and belief, the ignition switch weakness is due to a defective part known as a "detent plunger."

7.      The second reason that the ignition switch systems are defective is due to the low position of the switches in the defective vehicles.  That causes the keys, and the fobs that hang off the keys, to hang so low in the defective vehicles that the drivers' knees can easily bump them and inadvertently shut down the vehicle.

8.      Defendant installed these faulty ignition switch systems in models from at least 2003 through at least 2011.  Defendant promised that these vehicles would operate safely and reliably.  This promise turned out to be false in several material respects.  In reality, Defendant concealed and did not fix a serious quality and safety problem plaguing its vehicles.

9.      Worse yet, the ignition switch defects in Defendant's vehicles could have been

easily avoided.

10.     From at least 2005 to the present, Defendant received reports of crashes and injuries that put Defendant on notice of the serious safety issues presented by its ignition switch system.

11.     Yet, despite the dangerous nature of this defect and its effects on critical safety systems, Defendant concealed its existence and failed to remedy the problem.

12.     Despite notice of the defect in its vehicles, Defendant did not disclose to consumers that its vehicles – which Defendant had advertised as "safe" and "reliable" for years – were in fact neither safe nor reliable.

13.     Defendant's CEO, Mary Barra, has admitted in a video message that "[s]omething went wrong with our process in this instance, and terrible things happened."

14.     This case arises from Defendant's breach of its obligations and duties, including Defendant's failure to disclose that, as a result of defective ignition switches, at least 2.59 million GM vehicles (and almost certainly more) may have the propensity to shut down during normal driving conditions and create an extreme and unreasonable risk of accident, serious bodily harm, and death.

15.     GM's predecessor, General Motors Corporation ("Old GM") (sometimes, together with GM, "the Companies") also violated these obligations and duties by designing and marketing vehicles with defective ignition switch systems, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents.  In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.

16.     The defective ignition switches were manufactured by Delphi Automotive PLC ("Delphi").  Once a subsidiary of Old GM, Delphi spun off from Old GM in 1999, and became an independent publicly held corporation.

17.     Plaintiff alleges, based on information and belief, that Delphi knew its ignition switches were defective.  Nevertheless, Delphi continued to manufacture and sell the defective ignition switch systems, which it knew would be used in the vehicles of Plaintiff and the Class.

18.     Plaintiff's investigation, including a review of NHTSA's complaint database, suggests that Defendant's recall does not capture all of the defective vehicles which suffer from the same or substantially similar ignition switch defects as the recalled vehicles.  Plaintiff thereupon believes and alleges that the following non-recalled GM vehicles also have defective ignition switch systems: the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

19.     Plaintiff brings this action for a Class of all persons in Indiana and/or the United States who formerly or currently own or lease one or more of the following GM vehicles: (a) (The recalled vehicles): 2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky; and (b) (Non-recalled vehicles): the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo (collectively, "Defective Vehicles").

20.     To the extent warranted by the developing facts, Plaintiff will further supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switch systems, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment.

21.     The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

    a.     Due to their weaknesses and their low placement, the ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

    b.     When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident; and

    c.     When the electrical system shuts down, the vehicle's airbags are

disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

22. The ignition switch defects make the Defective Vehicles unreasonably dangerous. Because of the defects, the Defective Vehicles are likely to be involved in accidents and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants and others in the vicinity.

23. Defendant admits to at least 13 deaths as a result of the ignition switch defects, but the actual number is believed to be much higher.

24. The ignition switch defects present a significant and unreasonable safety risk exposing Defective Vehicle owners, their passengers and others in the vicinity to a risk of serious injury or death.

25. For many years, Defendant has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. However, to protect its profits and maximize sales, Defendant concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

26. Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect. 49 U.S.C. §§ 30118(c)(1) & (2). If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect. 49 U.S.C. §§ 30118(b)(2)(A) & (B). Defendant also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects. These same acts and omissions also violated various state consumer protection laws as detailed below.

27. Plaintiff and the Class have been damaged by Defendant's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding highly dangerous vehicles whose value has greatly diminished because of

Defendant's failure to timely disclose the serious defect.

28.     Plaintiff and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

29.     Plaintiff and the Class either paid more for the Defective Vehicles than they would have had they known of the ignition switch defects, or they would not have purchased the Defective Vehicles at all had they known of the defects.

30.     Plaintiff brings claims against Defendant individually and on behalf of a class of all other similarly situated purchasers of the Products for violations of Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3 *et seq.*, breach of express warranty, breach of implied warranty of merchantability, breach of contract and common law warranty, or, in the alternative, unjust enrichment, product liability (design defect), violations of the Magnuson-Moss Warranty Act, 15 U.SC. § 2301, *et seq.* ("MMWA"), fraudulent concealment, violations of the Michigan Consumer Protection Act (the "MCPA"), Mich. Comp. L. Ann. § 445.901, *et seq.*, and violations of other state statutes prohibiting unfair and deceptive acts and practices.

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendant, and the amount in controversy exceeds $5 million.

32.     The Court has personal jurisdiction over Defendant because Defendant is authorized to, and conducts substantial business in Indiana, generally, and this District, specifically.  Defendant has marketed, promoted, distributed, and sold the Defective Vehicles in Indiana.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to this action occurred in this District as the Defect in Plaintiff's vehicle manifested itself within this District.

34.    To the extent there is any contractual or other impediment to pursuit of these claims on a class action basis, Plaintiff specifically alleges, and will prove, if necessary, that any bar to class action proceedings is unconscionable, unfair and against public policy.

## PARTIES

35.    Plaintiff Larry Bender ("Bender") is a citizen of the state of Indiana, residing in the city of Fort Wayne.  Plaintiff purchased a 2007 Chevrolet Cobalt ("the Cobalt").  Plaintiff chose the 2007 Cobalt, in part, because he wanted a safely designed and manufactured vehicle. Plaintiff saw advertisements for Old GM vehicles before he purchased the Cobalt.  Plaintiff recalls that safety and quality were consistent themes in the advertisements he saw.  These representations about safety and quality influenced Plaintiff's decision to purchase the Cobalt. Plaintiff experienced the ignition switch defect described by the GM recall. Plaintiff did not learn of the ignition switch defects until around March 2014.  Had Old GM and/or Defendant disclosed the ignition switch defects, Plaintiff would not have purchased the Cobalt and would not have retained the vehicle once the defect was announced.

36.    Defendant General Motors is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, 48265. Defendant was incorporated in 2009 and on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the US Bankruptcy Code.  Defendant manufactures and distributes the Defective Vehicles from its Michigan manufacturing plants to consumers in Indiana and throughout the United States.

37.    Among the liabilities and obligations expressly retained by Defendant after the bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

7

38.     Defendant also expressly assumed:

all Liabilities arising under express written warranties of [Old GM]
that are specifically identified as warranties and delivered in
connection with the sale of new, certified used or pre-owned
vehicles or new or remanufactured motor vehicle parts and
equipment (including service parts, accessories, engines and
transmissions) manufactured or sold by [Old GM] or Purchaser prior
to or after the Closing and (B) all obligations under Lemon Laws.

39.     Because Defendant acquired and operated Old GM and ran it as a continuing
business enterprise, and because Defendant was aware from its inception of the ignition switch
defects in the Defective Vehicles, Defendant is liable through successor liability for the
deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

## THE IGNITION SWITCH DEFECTS IN THE DEFECTIVE VEHICLES

40.     Given the importance that a vehicle and its electrical operating systems remain
operational during ordinary driving conditions, it is imperative that an auto manufacturer ensures
its vehicles remain operational from the time the driver starts the vehicle until the driver
intentionally shuts down the vehicle.  With respect to the Defective Vehicles, GM has failed to
do so.

41.     In the Defective Vehicles, the ignition switch defects can cause the vehicle's
engine and electrical system to shut off, disabling the power steering and power brakes and
causing non-deployment of the vehicle's airbags in the event of an accident.

42.     The ignition switch systems in the Defective Vehicles are defective in at least two
major respects.  The first is that the switches are simply weak because of a faulty "detent
plunger"; the switch can inadvertently move from the "run" to the "accessory" or "off" position.
The second defect is that, due to the low position of the ignition switch, the driver's knee can
easily bump the key (or the hanging fob below the key), and cause the switch to inadvertently
move from the "run" to the "accessory" or "off" position.

43.     The Defective Vehicles are, therefore, unreasonably prone to be involved in
accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to

the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

## DEFENDANT KNEW OF THE IGNITION SWITCH DEFECTS FOR YEARS, BUT CONCEALED THE DEFECTS FROM PLAINTIFF AND THE CLASS

44.     Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences for many years, but concealed their knowledge from Defective Vehicle owners.

45.     For example, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy.  Ms. Rose's death is the first known of the hundreds of deaths and injuries attributable to the ignition switch defects.  Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM and GM to address the ignition switch problem.

46.     Another incident involved 16-year old Megan Phillips.  Ms. Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees.  NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact.  According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they begin communicating.  As he stated, "I don't understand why [GM] would wait 10 years to say something.  And I want to understand it but I never will."[1]

47.     Rather than publicly admitting the dangerous safety defects in the Defective Vehicles, the Companies attempted to attribute these and other incidents to "driver error."  Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering and/or airbag failures, including:

---

[1] "Owners of Recalled GM Cars Feel Angry, Vindicated," REUTERS (Mar. 17, 2014).

- 2005:  26 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved.

- 2006:  69 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved and 4 deaths citing Unknown component.

- 2007:  87 Cobalt Death and Injury Incidents, including 3 deaths citing Airbag as component involved.

- 2008:  106 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved and 2 deaths citing Unknown component.

- 2009:  133 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved, 1 death citing Service Brake as component involved, 1 death citing Steering as component involved, and 2 deaths citing Unknown component.

- 2010:  400 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 12 deaths citing Steering as component involved, and 1 death citing Unknown component.

- 2011:  187 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 2 deaths citing Steering as component involved, and 1 citing Unknown component.

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

48.      GM now admits that Old GM learned of the ignition switch defects as early as 200l.  During the pre-production development of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position.  Old GM claimed that a switch design change "had resolved the problem."[2]

49.      In 2003, an internal report documented an instance in which the service technician observed a stall while driving.  The service technician noted that the weight of several keys on

---

[2] "G.M. Reveals It Was Told of Ignition Defect in '01," D. Ivory, NEW YORK TIMES (Mar. 12, 2014).

the key ring had worn out the ignition switch.  The switch was replaced and the matter was closed.[3]

50.    According to GM's latest chronology submitted to NHTSA pursuant to 49 C.F.R. § 573.6, Old GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

51.    Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue.  According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

52.    According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions."  But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

53.    Gary Altman, program engineering manager for the 2005 Cobalt, admitted that Old GM's engineering managers knew about ignition-switch problems in the vehicle that could disable power steering, power brakes and airbags, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable, though he did not attempt to explain why the vehicle would not require an operable airbag.  Needless to say, hapless Cobalt purchasers were not informed of Old GM's decision to release the vehicle notwithstanding its knowledge of the ignition switch defect.

54.    As soon as the 2005 Cobalt hit the market, Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[4]  Old GM opened additional PRTS inquires.

---

[3] *Id.*
[4] March 11, 2014, Chronology Re: Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles, at 1.

55.     In another PRTS opened in May 2005, Old GM engineers again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration, in order to make the key and key fob hang higher in the vehicle and therefore make it less likely that a driver's knee would inadvertently shut down the vehicle. After initially approving the proposed partial fix, Old GM reversed course and again declined to even attempt to implement a fix.[5]

56.     Instead, in October 2005, Old GM simply issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the loss of power in the vehicles' electrical system.

57.     Rather than disclosing the true nature of the defects and correcting them, under the TSB, Old GM gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key and fob from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging as low as they had in the past.[6] According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[7]

58.     Yet there was no recall. And, not surprisingly, Old GM continued to get complaints.

59.     In 2006, Old GM approved a design change for the Cobalt's ignition switch supplied by Delphi. The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch." But the new design was not produced until the 2007 model year.[8]

60.     In what a high-level engineer at Old GM now calls a "cardinal sin" and "an extraordinary violation of internal processes," Old GM changed the part **design but kept the old**

---

[5] *Id.*
[6] *Id.* at 1-2.
[7] *Id.* at 3.
[8] *Id.* at 2.

*part number*. That makes it impossible to determine from the part number alone which GM vehicles produced after 2007 contain the defective ignition switches.

61.     In 2007, NHTSA investigators met with Old GM to discuss its airbags, and informed Old GM of the July 2005 frontal and fatal crash involving Amber Marie Rose.

62.     As alleged above, the airbags in Ms. Rose's 2005 Cobalt did not deploy. Data retrieved from her vehicle's diagnostic system indicated that the ignition was in the "accessory" position. Old GM investigated and tracked similar incidents.

63.     By the end of 2007, by GM's own admission, Old GM knew of 10 frontal collisions in which the airbag did not deploy. Plaintiff believes that Old GM actually knew of many other similar incidents involving the ignition switch defects.

64.     At a May 15, 2009 meeting, GM engineers learned that data in the black boxes of Chevrolet Cobalt vehicles showed that the dangerous ignition switch defects existed in hundreds of thousands of Defective Vehicles. But still GM did not reveal the defect to NHTSA, Plaintiff or the Class.

65.     After the May 15, 2009 meeting, GM continued to get complaints of unintended shut down and continued to investigate frontal crashes in which the airbags did not deploy.

66.     After the May 15, 2009 meeting, GM told the families of accident victims and Defective Vehicle owners that it did not have sufficient evidence to conclude that there was any defect in the Defective Vehicles. In one case involving the ignition switch defects, GM threatened to sue the family of an accident victim for reimbursement of its legal fees if the family did not dismiss its lawsuit. In another, GM sent the victim's family a terse letter, saying there was no basis for any claims against GM. These statements were part of GM's continuation of the campaign of deception begun by Old GM.

67.     According to GM, it was not until 2011 and 2012 that GM's examinations of switches from vehicles that had experienced crashes revealed significant design differences in the torque performance of ignition switches from the 2005 Cobalt vehicles and those from the 2010 model year, the last year of the Cobalt's production.

13

68.     GM responded by blaming the supplier for the switch design.

69.     In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the 2003-2007 Chevrolet Cobalt and 2005-2007 Pontiac G5 vehicles.

## DEFENDANT WAITED UNTIL 2014 TO
## FINALLY ORDER A RECALL OF THE DEFECTIVE VEHICLES

70.     After analysis by GM's Field Performance Review Committee and the Executive Field Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of some of the Defective Vehicles on January 31, 2014.

71.     Initially, GM's EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

72.     After additional analysis, the EFADC expanded the recall on February 24, 2014, to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

73.     Most recently, on March 28, 2014, GM expanded the recall a third time, to include Chevrolet Cobalts, Pontiac G5s and Solstices, Saturn Ions and Skys from the 2008 through 2010 model years, and Chevrolet HHRs from the 2008 through 2011 model years.

74.     GM provided dealers with notice of the recalls on February 26, 2014, March 4, 2014, and March 28, 2014, and mailed letters to some of the current owners of the Defective Vehicles on March 10 and March 11, 2014.

75.     To date, GM has *not* pledged to remedy the fact that the key and fob in the Defective Vehicles hang dangerously low, leading to an unreasonable risk that the driver's knee will inadvertently shut down the Defective Vehicles during ordinary driving conditions.

76.     In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes.

77.     According to Ms. Barra, "Something went terribly wrong in our processes in this instance, and terrible things happened." Barra went on to promise, "[w]e will be better because of this tragic situation if we seize this opportunity."[9]

78.     GM now faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

79.     While GM has now appointed a new Vehicle Safety Chief, on information and belief, at least 2.59 million potentially Defective Vehicles remain on the road to this day; and, on information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defects.

## DEFENDANT HAS NOT RECALLED ALL THE DEFECTIVE VEHICLES

80.     Plaintiff's research, including a review of NHTSA's complaint database, suggests that GM's recall does not capture all of the Defective Vehicles. Plaintiff thereupon believes and alleges that the following additional non-recalled GM vehicles also have defective ignition switches: the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

81.     Plaintiff owned a 2007 Chevrolet Cobalt. This make and model was included in GM's ignition switch recall.

82.     On information and belief, in marketing and advertising materials, Old GM and GM consistently promoted all their vehicles, including the Defective Vehicles, as safe and reliable.

83.     For example, under a section captured "safety," Old GM's website for its Chevrolet brand stated in 2005:

> OUR COMMITMENT
> Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe – from the start of your journey to your destination.

---

[9] "Something Went 'Very Wrong' at G.M., Chief Says." N.Y. TIMES (Mar. 18, 2014).

> That's why every Chevrolet is designed with a comprehensive list of
> safety and security features to help give you peace of mind….

84.     One Cobalt ad promised, "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

85.     An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

86.     A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically engineered for whatever is next."  Another 2003 spot closed with the tagline "Saturn.  People first."

87.     A 2001 print ad touting the launch of the Saturn focused on safety: "Need is where you begin.  In cars, it's about things like reliability, durability and, of course, safety.  That's where we started when developing our new line of cars.  And it wasn't until we were satisfied that we added things…."

88.     Once GM came into existence, it continued to stress the safety and reliability of all its vehicles, including the Defective Vehicles.

89.     For example, GM's Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "As long as there are babies, there'll be Chevys to bring them home."

90.     Another 2010 television ad informed consumers, "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

91.     Old GM and GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicles were defective.

92.     Throughout the relevant period, Old GM and GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

93.     Old GM and GM never informed consumers about the ignition switch defects.

## THE IGNITION SWITCH DEFECTS HAVE HARMED PLAINTIFF AND THE CLASS

94.     The ignition switch defects have caused damage to Plaintiff and the Class.

95.     A vehicle purchased, leased, or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

96.     A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

97.     Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed.  Plaintiff and the Class overpaid for their Defective Vehicles.  Because of the concealed ignition switch defects, Plaintiff did not receive the benefit of the bargain.

98.     Class members who purchased new or used Defective Vehicles after the date Defendant came into existence – July 10, 2009 – overpaid for their Defective Vehicles as a direct result of Defendant's ongoing violations of the TREAD Act and state consumer protection laws by failing to disclose the existence of the ignition switch defects.

99.     Plaintiff and the Class became stuck with unsafe vehicles that are now worth less than they would have been but for the Companies' failure to disclose and remedy the ignition switch defects.  Because of the recall and the delay in parts available to fix it, Plaintiff no longer felt safe driving the Cobalt and traded it in for a lesser amount than he would have been able to get for the Cobalt had there not been a recall, and was forced to incur additional, unplanned expenses in obtaining a replacement car.

100.    Defendant admits to at least 13 deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles.  However, Plaintiff believes that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignition switch defects.

17

101.    If Old GM or GM had timely disclosed the ignition switch defects as required by the MCPA, the TREAD Act, and the State consumer protection laws set forth below, all Class members' vehicles would now be worth more.

## SUCCESSOR LIABILITY

102.    As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure and concealment of the ignition switch defects from the date of its formation on July 10, 2009.

103.    GM also expressly assumed liability for Lemon Law claims in the Master Sale and Purchase Agreement of June 26, 2009.

104.    GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM's current CEO, Mary Barra, began working at Old GM in 1980, and in February 2008 she became Vice President of Global Manufacturing Engineering, in which position she knew or should have known of the ignition switch defects;

- GM's Rule 30(b)(6) deponent concerning complaints Old GM and GM received about ignition switch defects in the Cobalt, Victor Hakim, worked at Old GM from 1971 until the end of Old GM, and now is a "Senior Manager/Consultant" in the "field performance assessment" department, further demonstrating GM's longstanding knowledge of the ignition switch defects.

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

- GM retained the bulk of the employees of Old GM; GM acquired owned and
  leased real property of Old GM, including all machinery, equipment, tools,
  information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of Old GM; and

- GM acquired all goodwill and other intangible personal property of Old GM.

## TOLLING OF THE STATUTES OF LIMITATION

105.    All applicable statutes of limitation have been tolled by GM's knowing and active
fraudulent concealment and denial of the facts alleged herein.  Plaintiff and Class members did
not discover, and did not know of facts that would have caused a reasonable person to suspect,
that Old GM and GM did not report information within their knowledge to federal authorities
(NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that
Old GM and GM had information in their possession about the existence and dangerousness of
the defect and opted to conceal that information until shortly before this class action was filed.

106.    Indeed, Old GM instructed its service shops to provide Defective Vehicle owners
with a new key ring if they complained about unintended shut down, rather than admit what Old
GM knew: that the ignition switches were dangerously defective and warranted replacement with
a properly designed and built ignition system.

107.    In April 2006, some eight years before the first recall of some Defective Vehicles,
Old GM internally authorized a redesign of the defective ignition switch. Yet, as part of Old
GM's concealment of the defect, GM redesigned the part but kept the old part number.
According to one of the high-level Old GM engineers at the time, "Changing the fit, form or
function of a part without making a part number change is a cardinal sin.  It would have been an
extraordinary violation of internal processes."[10]

108.    Old GM and GM were, and GM remains, under a continuing duty to disclose to
NHTSA, Plaintiff, and the Class the true character, quality, and nature of the Defective Vehicles;

---

[10] "'Cardinal sin': Former GM engineers say quiet '06 redesign of faulty ignition switch was a
major violation of protocol."  Automotive News (Mar. 26, 2014).

that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

109. Because of the active concealment by Old GM and GM, any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled and GM is estopped from relying on any statutes of limitation in their defense of this action.

## CLASS ACTION ALLEGATIONS

110. Plaintiff seeks relief in his individual capacity and seeks to represent a class consisting of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a class initially defined as follows:

> All persons in Indiana and the United States who formerly or
> currently own or lease one or more of the following GM vehicles: (a)
> 2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010
> Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice;
> and 2007-2010; Saturn Sky; and (b) (Non-recalled vehicles): the
> 2005 Chevrolet Equinox, the 2006; Chevrolet Trailblazer, and the
> 2006 Chevrolet Monte Carlo.

111. Excluded from the Class are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased the Product for the purpose of resale.

112. Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division into subclasses after they have had an opportunity to conduct discovery.

113. Numerosity. Fed. R. Civ. P. 23(a)(1). The Class is so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that many millions of consumers have purchased or leased the Defective Vehicles.

114.    <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

a.    Whether the Defective Vehicles suffer from ignition switch defects;

b.    Whether Defendant violated the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3;

c.    Whether Defendant violated Indiana Code § 26-1-2-313

d.    Whether Defendant was negligent;

e.    Whether Defendant fraudulently concealed the ignition switch defects;

f.    Whether Defendant is liable for a design defect;

g.    Whether Defendant violated the MMWA, 15 U.S.,C. § 2301, *et seq.*;

h.    Whether Defendant violated Ind. Code § 26-1-2-314;

i.    Whether Defendant the MCPA, Mich. Comp. L. Ann. § 445.901, *et seq.*;

j.    Whether Defendant violated the other state statutes prohibiting unfair and deceptive acts and practices; and

k.    The nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

115.    <u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class.  Plaintiff and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

116.    <u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff's Counsel are competent and experienced in litigating class actions.

117.    <u>Superiority of Class Action</u>.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially

conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

118.    <u>Injunctive and Declaratory Relief</u>.  Fed. R. Civ. P. 23(b)(2).  Defendant's misrepresentations are uniform as to all members of the Class.  Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

**(Violation of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3)**

119.    Plaintiff incorporates by reference and re-allege the preceding paragraphs.

120.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

121.    This cause of action is brought pursuant to the Indiana Deceptive Consumer Sales Act, Indiana Code § 24-5-0.5-3, *et seq.* because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

122.    Indiana's Deceptive Consumer Sales Act prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation

thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

123.    Defendant is a person with the meaning of IND. CODE § 24-5-0.5-2(2).

124.    In the course of Defendant's business, it willfully failed to disclose and actively concealed the ignition switch defect and the lack of adequate fail-safe mechanisms in the Defective Vehicles. Accordingly, Defendant engaged in unlawful trade practices, including representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles are of a particular standard and quality when they are not; advertising Defective Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

125.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

126.    Defendant's conduct proximately caused injuries to Plaintiff and the Class.

127.    Plaintiff and the Class were injured as a result of Defendant's conduct in that Plaintiff overpaid for their Defective Vehicles and did not receive the benefit of the bargain, and their vehicles have suffered a diminution in value. These injuries are the direct and natural consequences of Defendant's misrepresentations and omissions.

128.    Plaintiff seeks injunctive relief and, if awarded damages under Indiana Deceptive Consumer Protection Act, treble damages pursuant to IND. CODE § 24-5-0.5-4(a)(1).

129.    Defendant's conduct is outrageous, reckless, malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to the public, and therefore Plaintiff and the Class seek punitive damages.

### SECOND CAUSE OF ACTION

### (Breach of Express Warranty – Ind. Code § 26-1-2-313)

130.    Plaintiff incorporates by reference and re-allege the preceding paragraphs.

131.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

132.     Defendant is and was at all relevant times a merchant with respect to motor vehicles.

133.     In the course of selling its vehicles, Defendant expressly warranted in writing that the Vehicles were covered by a Basic Warranty.

134.     Defendant breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part it supplied. Defendant has not repaired or adjusted, or was not able to timely repair or adjust, the Vehicles' materials and workmanship defects.

135.     In addition to this Basic Warranty, Defendant expressly warranted several attributes, characteristics and qualities.

136.     These warranties are only a sampling of the numerous warranties that Defendant made relating to safety, reliability and operation of the Defective Vehicles. Generally these express warranties promise heightened, superior, and state-of-the-art safety, reliability, performance standards, and promoted the benefits Defendant's cars. These warranties were made, inter alia, in advertisements, on websites, and in uniform statements provided by Defendant to be made by salespeople. These affirmations and promises were part of the basis of the bargain between the parties.

137.     These additional warranties were also breached because the Defective Vehicles were not fully operational, safe, or reliable (and remained so even after the problems were acknowledged and a recall "fix" was announced), nor did they comply with the warranties expressly made to purchasers or lessees. Defendant did not provide at the time of sale, and has not provided since then, vehicles conforming to these express warranties.

138.     Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the

Case 1:14-cv-01348-TCS-RBD    Document 1    Filed 05/09/14    Page 26 of 40

Plaintiff and the Class whole and because the Defendant have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

139.    Accordingly, recovery by the Plaintiff is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff seek all remedies as allowed by law.

140.    Also, as alleged in more detail herein, at the time that Defendant warranted and sold the vehicles they knew that the vehicles did not conform to the warranties and were inherently defective, and Defendant wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles.

141.    Plaintiff and the Class were therefore induced to purchase the vehicles under false and/or fraudulent pretenses.

142.    Moreover, many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Defendant's fraudulent conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the Class' remedies would be insufficient to make Plaintiff and the Class whole.

143.    Finally, due to the Defendant's breach of warranties as set forth herein, Plaintiff and the Class assert as an additional and/or alternative remedy, as set forth in IND. CODE § 26-1-2-608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the Class of the purchase price of all vehicles currently owned.

144.    Defendant was provided notice of these issues by numerous complaints filed against it, and by numerous individual letters and communications sent by Plaintiff and the Class before or within a reasonable amount of time after Defendant issued the recall and the allegations of vehicle defects became public.

145.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and the Class have been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (Negligence)

146.     Plaintiff incorporates by reference and re-allege the preceding paragraphs.

147.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

148.     Defendant had a duty to its customers as a manufacturer of motor vehicles to design, manufacture, market, and provide vehicles that, in their ordinary operation, are reasonably safe for their intended uses.  Defendant had a duty to adequately test its vehicles' safety before selling millions to consumers worldwide.

149.     Defendant had a duty to test vehicles for ignition switch problems once Defendant was on notice that its vehicles had a propensity to have ignition switch issues leading to engine failure, which can cause bodily injury, death, and property damage.  Moreover, Defendant had a duty to provide true and accurate information to the public to prevent undue risks arising from the foreseeable use of its products.

150.     At all times relevant, Defendant sold, marketed, advertised, distributed, and otherwise placed Defective Vehicles into the stream of commerce in an unlawful, unfair, fraudulent, and/or deceptive manner that was likely to deceive the public.

151.     Defendant was negligent, and breached the above duties owed to Plaintiff and Class members.

152.     As direct and proximate causes of Defendant's breaches, Plaintiff and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

### FOURTH CAUSE OF ACTION

### (Fraudulent Concealment)

153.     Plaintiff incorporates by reference and re-allege the preceding paragraphs.

154.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

155.     Defendant concealed material facts concerning the ignition switch defects before, during, and after the sale of the Defective Vehicles to Plaintiff and Class members.

156.     Defendant had a duty to disclose the ignition switch defects because it was known only to Defendant, who had superior knowledge and access to the facts, and Defendant knew it was not known to or reasonably discoverable by Plaintiff and Class members.  These concealed facts were material because they directly impact the safety of the Defective Vehicles.  Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

157.     Defendant actively concealed these material facts, in whole or in part, to protect its profits and avoid a costly recall, and it did so at the expense of Plaintiff and the Class.

158.     Plaintiff and the Class were unaware of these concealed material facts and would not have acted as they did if they had known of the concealed facts.  Plaintiff' and Class members' actions were justified.  Defendant was in exclusive control of the material facts and the public, Plaintiff, and the Class did not know of these facts prior to purchasing the Defective Vehicles.

159.     Because of the concealment of the facts, Plaintiff and the Class sustained damage because they purchased and retained Defective Vehicles that are now diminished in value from what they would have been had Defendant timely disclosed the ignition switch defects.

160.     Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiff's and Class members' rights and well being, and to enrich Defendant.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION**

**(Product Liability – Design Defect – Ind. Code § 34-20-1-1 et seq.)**

161.     Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

162.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

163.     Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the Defective Vehicles and their component parts and constituents, which was intended by Defendant to be used as passenger vehicles and for other related activities.

164.     Defendant knew that the Defective Vehicles were to be purchased and used without inspection for defects by Plaintiff and Class members and without substantial alteration in the condition in which the product was sold by Defendant to retailers and dealerships.

165.     The Defective Vehicles were unsafe for their intended uses by reason of defects in their manufacture, design, testing, components, and constituents, so that they would not safely serve their purpose, but would instead expose the users of the vehicles to possible serious injuries.

166.     Defendant designed the Defective Vehicles defectively, causing them to fail to perform as safely as an ordinary customer would expect when used in an intended or reasonably foreseeable manner.

167.     The risks inherent in the design of the Defective Vehicles significantly outweigh any benefits of the design.

168.     Plaintiff and Class members were not aware of the Defect at any time prior to the recent revelations regarding problems with the Defective Vehicles.

169.     As direct and proximate causes of the ignition switch defects, Plaintiff and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and

being subjected to potential risk of injury. Defendant is strictly liable for these damages under the Indiana Products Liability Act.

<u>**SIXTH CAUSE OF ACTION**</u>

**(Violation of Magnuson-Moss Warranty Act, 15 U.SC. § 2301, *et seq.*)**

170.    Plaintiff incorporates by reference and re-allege the preceding paragraphs.

171.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

172.    Plaintiff and Class members are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

173.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

174.    The Defective Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

175.    Defendant affirmed the fact, promise, and/or described in writing that the ignition switch would meet a specified level of performance over a specified period of time, namely, that it would not require maintenance and last for the life of the Defective Vehicles. Defendant's written affirmations of fact, promises, or descriptions related to the nature of the ignition switch in the Defective Vehicles and became part of the basis of the bargain between Plaintiff and Defendant. Defendant refuses to recognize or honor the written ignition switch warranties and, indeed, denies the existence of these warranties. Defendant breached its written warranties when the Defective Vehicles did not perform as represented by Defendant and thereafter when Defendant refused to recognize or honor the warranties. Defendant's conduct thereby caused damages to Plaintiff and Class members.

176.    The amount in controversy of Plaintiff's individual claim meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in

this suit.

177.     Resorting to any informal dispute resolution procedure and/or affording Defendant a reasonable opportunity to cure its breach of written warranties to Plaintiff is unnecessary and/or futile. At the time of sale to Plaintiff, Defendant knew, should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the ignition switch defects, but nevertheless failed to rectify the situation and/or disclose it to Plaintiff. Moreover, the remedies available through any informal dispute resolution procedure would be wholly inadequate under the circumstances. Accordingly, any requirement under the MMWA or otherwise that Plaintiff resort to any informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of written warranties is excused and, thereby, deemed satisfied.

178.     As a direct and proximate result of Defendant's breach of written warranties, Plaintiff and Class members sustained damages and other losses. Defendant's conduct caused Plaintiff' and Class members' damages and, accordingly, Plaintiff and Class members are entitled to recover damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other equitable relief as appropriate.

## SEVENTH CAUSE OF ACTION

### (Breach of the Implied Warranty of Merchantability, Ind. Code § 26-1-2-314)

179.     Plaintiff incorporates by reference and re-allege the preceding paragraphs.

180.     Defendant is and was at all relevant times a merchant with respect to motor vehicles.

181.     A warranty that the Defective Vehicles were in merchantable condition is implied by law in the instant transactions.

182.     These vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that the ignition switch will switch from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to

deploy.

183.     Defendant was provided notice of these issues by numerous complaints filed against it, including the instant complaint, and by numerous individual letters and communications sent by Plaintiff and the Class before or within a reasonable amount of time after Defendant issued the recall and the allegations of vehicle defects became public.

184.     As a direct and proximate result of Defendant's breach of the warranties of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

185.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

## EIGHTH CAUSE OF ACTION
### (Violations of Michigan Consumer Protection Act, Mich. Comp. L. Ann. § 445.901, *et seq.*)

186.     Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

187.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

188.     Old GM, GM, and Plaintiff are each "persons" under Mich. Comp. L. Ann. § 445.902(d).

189.     The sale of the Defective Vehicles to Plaintiff and the Class occurred within "trade and commerce" within the meaning of Mich. Comp. L. Ann. § 445.902(d), and both GM and Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

190.     The MCPA deems unlawful any "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce," as more specifically defined in the MCPA. Mich. Comp. L. Ann. § 445.903(1).  GM has engaged in unfair, unconscionable, and deceptive methods, acts and practices in violation of the MCPA, and also has successor liability for the

unfair, unconscionable, and deceptive methods, acts, and practices of Old GM as described herein.

191.    Both Old GM and GM violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. L. Ann. § 445.903(s).

192.    As alleged above, both Companies knew of the ignition switch defect, while Plaintiff and the Class were deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

193.    Old GM also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is." Mich. Comp. L. Ann. § 405.903(bb). Indeed, Old GM represented that the Defective Vehicles were safe such that reasonable people believed such representations to be true.

194.    Old GM also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. L. Ann. § 405.903(cc). Old GM represented that the Defective Vehicles were safe, yet failed to disclose the material fact that the ignition switch was defective.

195.    Old GM's and GM's acts and practices were unfair and unconscionable because their acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and the Companies' failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and because the harm the Companies caused consumers greatly outweighs any benefits associated with those practices. While Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Defective Vehicles until 2007.

196.    All the while, Old GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily

injury or death.

197.    Plaintiff and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.

198.    Old GM and GM failed to inform NHTSA, and therefore failed to inform consumers, that the Defective Vehicles had a defective ignition switch that could lead to injury and death. Had Plaintiff and the Class known this, they would either not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles. Plaintiff and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of herein.

199.    Plaintiff requests that this Court: enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; provide to Plaintiff and each Class member either their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under Mich. Comp. L. Ann. § 445.911.

200.    Plaintiff acknowledges that, on its face, the MCPA purports to (i) deprive non-residents of bringing class (but not individual) actions under the MCPA; and (ii) allows individuals (but not class members) the ability to recover a penalty of $250 per person if that amount is greater than their actual damages.  After the United States Supreme Court's decision in *Shady Grove Orthopedic Ass'n, P.A. v. Allstate Ins. Co.*, 589 U.S. 393 (2010), however, any such prohibitions imposed in class actions (but not in individual actions) are trumped and superseded by Fed. R. Civ. P. 23, which imposes no such restrictions.

## NINTH CAUSE OF ACTION

### (Violations of the Other State Statutes Prohibiting Unfair and Deceptive Acts and Practices)

201.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

202.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of subclasses

of the other states' residents who formerly or currently own or lease one or more of the Defective Vehicles.

203.     The state deceptive trade practices acts were enacted by the various states following the passage of the Federal Trade Commission Act ("FTC Act"), which prohibits deceptive acts and practices in the sale of products to consumers. The state laws in this area are modeled on the FTC Act and are therefore highly similar in content.

204.     Defendant's actions violate the Deceptive Trade Practices Acts of the various states, as set out more fully above, by failing to disclose and by actively concealing the defective ignition switch in GM vehicles.

205.     The conduct described in the statement of facts constitutes unfair or deceptive trade practices predominantly and substantially affecting the conduct of trade or commerce throughout the United States in violation of the state deceptive trade practices acts and other similar state statutes prohibiting unfair and deceptive acts and practices.  The deceptive trade practices acts violated by Defendant are set forth in the next paragraph.

206.     The violations of the various state consumer protection acts (Alabama: the Alabama Deceptive Trade Practices Act (Ala. Code §8-19-1 et seq.); Alaska: Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. §45.50.471 et seq.); Arizona: the Arizona Consumer Fraud Statute (Ariz. Rev. Stat. Ann. §44-1521 et seq.); Arkansas: the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. §4-88-101 et seq.); California: the California False Advertising Law, California Business & Professions Code § 17200, et. seq.); Colorado: the Colorado Consumer Protection Act (Colo. Rev. Stat. §6-1-101 et seq.); Connecticut: the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §42-110a et seq.);  Washington, D.C. the Consumer Protection Procedures Act (D.C. Code Ann. §28-3901 et seq.); Florida: the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. §501.201 et seq. (West)) and the Florida False Advertising Statutes (Fla. Stat. Ann. §817.40 et seq. (West)); Georgia: Uniform Deceptive Trade Practices Act (Ga. Code Ann. §10-1-370 et seq.); the Fair Business Practices Act (Ga. Code Ann. §10-1-390 et seq.); and the False Advertising Statute (Ga. Code Ann. §10-1-420

et seq.); Hawaii: The Hawaii Federal Trade Commission Act (Hawaii Rev. Stat. §480 et seq.) and the Uniform Deceptive Trade Practice Act (Hawaii Rev. Stat. §481A et seq.); Idaho: the Idaho Consumer Protection Act (Idaho Code §48-601 et seq.); Illinois: the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. §505/1 et seq. (Smith Hurd)) and the Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. Ann. 510/1 et seq. (Smith Hurd)); Iowa: the Iowa Consumer Fraud Act (Iowa Code Ann. §714.16 (West)); Kansas: the Kansas Consumer Protection Act (Kan. Stat. Ann. §50-623 et seq.); Kentucky: the Consumer Protection Act (Ky. Rev. Stat. §367.110 et seq.); Louisiana: the Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. Ann. §51:1401 (West)); Maine: the Maine Unfair Trade Practices Act (Me. Rev. Stat. Ann. Tit. 5 §206 et seq.) and the Uniform Deceptive Trade Practices Act (Me. Rev. Stat. Ann. Tit. 10 §1211 et seq.); Maryland: the Maryland Consumer Protection Act (Md. Com. Law Code Ann. §§13-101 et seq., 14-101 et seq.); Massachusetts: the Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A); Minnesota: the Consumer Fraud Act (Minn. Stat. Ann. §325 F. 69); the False Statement in Advertisement Statute (Minn. Stat. Ann. §325 F. 67); the Uniform Deceptive Trade Practices Act (Minn. Stat. Ann. §325D.44); and the Unlawful Trade Practices Act (Minn. Stat. Ann. §325D.13); Mississippi: the Consumer Protection Act (Miss. Code Ann. §75-24-1 et seq.) and the False Advertising Statutes (Miss. Code Ann. §97-23-3); Missouri: the Missouri Merchandising Practices Act (Mo. Rev. Stat. §407.010 et seq.); Montana: the Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. §30-14-101 et seq.); and the Statutory Deceit Statute (Mont. Code Ann. §27-1-712); Nebraska: the Nebraska Consumer Protection Act (Neb. Rev. Stat. §59-1601 et seq.) and the Nebraska Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. §87-301 et seq.); Nevada: the Deceptive Trade Statutes (Nev. Rev. Stat. §§598.0903 et seq., 41.600 et seq.); New Hampshire: the Regulation of Business Practices for Consumer Protection Act (N.H. Rev. Stat. Ann. §358-A:1 et seq.); New Jersey: the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §56:8-1 et seq. (West)); New Mexico: New Mexico Unfair Practices Act (N.M. Stat. Ann. §57-12-1 et seq.); New York: New York Consumer Protection Act (N.Y. Gen. Bus. Law §§349, 350 (Consol.)); North Carolina: North Carolina

Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §75-1.1 et seq.); North Dakota: Deceptive Act or Practice Statutes (N.D. Gen. Stat. §51-15-01 et. seq.); Ohio: Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. §1345.01 et seq. (Baldwin)); Oklahoma: Oklahoma Consumer Protection Act (Okla. Stat. Ann. Tit. 15, §751 et seq. (West)) and the Oklahoma Deceptive Trade Practices Act (Okla. Stat. Ann. Tit. 78, §51 et seq. (West)); Oregon: the Unlawful Trade Practices Act (Or. Rev. Stat. §646.605 et seq.) and the Oregon Food and Other Commodities Act (Or. Rev. Stat. §616.005 et seq.); Pennsylvania: Unfair Trade Practices Act and Consumer Protection Law (Pa. Stat. Ann. Tit. 73 §201-1 et seq. (Purdon); Rhode Island: Consumer Protection Act (R.I. Gen. Law §6-13.1-1 et seq.); South Carolina: South Carolina Unfair Trade Practices Act (S.C. Code Ann. §39-5-10 et seq.); South Dakota: South Dakota Deceptive Trade Practices and Consumer Protection Law (S.D. Codified Laws Ann. §37-24-1 et seq.); Tennessee: Tennessee Consumer Protection Act (Tenn. Code Ann. §47-18-101 et seq.); Texas: Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code Ann. §17.41 et seq. (Vernon)); Utah: Utah Consumer Sales Practices Act (Utah Code Ann. §13-11-1 et seq.) and the Utah Truth in Advertising Act (Utah Code Ann. §13-11a-1 et seq.); Vermont: Vermont Consumer Fraud Statute (Vt. Stat. Ann. Tit. 9, §2451 et seq.); Virginia: Virginia Consumer Protection Act (Va. Code 59.1-196 et seq.); Washington: Washington Consumer Protection Act (Wash. Rev. Code Ann. §19.86 et seq.); West Virginia: West Virginia Consumer Credit and Protection Act (W. Va. Code §46A-6-101 et seq.); Wisconsin: Wisconsin Fraudulent Representations Act (Wis. Stat. Ann. §100.18 et seq. (West)); Wyoming: Consumer Protection Act (Wyo. Stat. §40-12-101 et seq.)) have directly, foreseeably, and proximately caused damages to Plaintiff and proposed class in amounts yet to be determined.

207. As a result of Defendant's violations of the Deceptive Trade Practices Acts of the various states prohibiting unfair and deceptive acts and practices, Plaintiff and Class members have suffered actual damages for which Defendant is liable.

## **TENTH CAUSE OF ACTION**

### **(Breach of Contract/Common Law Warranty/Unjust Enrichment)**

208.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

209.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

210.    To the extent Defendant's repair or adjust commitment is deemed not to be a warranty under Indiana's Commercial Code, Plaintiff pleads in the alternative under common law warranty and contract law. Defendant limited the remedies available to Plaintiff and the Class to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Defendant, and/or warranted the quality or nature of those services to Plaintiff.

211.    Defendant breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing an ignition switch problem, including those that were recalled, or to replace them.

212.    As a direct and proximate result of Defendant's breach of contract or common law warranty, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

213.    In the alternative, Defendant had knowledge of the safety defects in its vehicles, which it failed to, disclose to Plaintiff and the Class.

214.    As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendant charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Plaintiff.

215.    Defendant appreciated, accepted and retained the benefits conferred by Plaintiff and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant to retain these wrongfully obtained profits. There is no justification for Plaintiff's and the Class' impoverishment and Defendant's related enrichment.

216.     Plaintiff, therefore, are entitled to restitution and seek an order establishing

Defendant as constructive trustees of the profits unjustly obtained, plus interest.

## ELEVENTH CAUSE OF ACTION

### Fraudulent Concealment

217.     Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

218.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or,

alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of

Indiana residents who formerly or currently own or lease one or more of the Defective Vehicles.

219.     Defendant intentionally concealed the above-described material safety

information, or acted with reckless disregard for the truth, and denied Plaintiff and the Class

information that is highly relevant to their purchasing decision.

220.     Defendant further affirmatively misrepresented to Plaintiff in advertising and other

forms of communication, including standard and uniform material provided with each car that the

vehicles they were selling were new, had no significant defects and would perform and operate

properly when driven in normal usage.

221.     Defendant knew these representations were false when made.

222.     The vehicles purchased or leased by Plaintiff and the Class were, in fact, defective,

unsafe, and unreliable, because the vehicles were subject to an ignition switch defect as described

above.

223.     Defendant had a duty to disclose that these vehicles were defective, unsafe and

unreliable in that the vehicles were subject to sudden, extreme acceleration without adequate fail-

safe mechanisms because Plaintiff relied on Defendant's material representations that the vehicles

they were purchasing were safe and free from defects.

224.     The aforementioned concealment was material because if it had been disclosed

Plaintiff and the Class would not have bought or leased the vehicles.

225.     The aforementioned representations were material because they were facts that

would typically be relied on by a person purchasing or leasing a new motor vehicle. Defendant

knew or recklessly disregarded that its representations were false because it knew that people had

died as a result of its vehicles' ignition defect between 2002 and 2009. Defendant intentionally

made the false statements in order to sell vehicles.

226.    Plaintiff and the Class relied on Defendant's reputation – along with Defendant's

failure to disclose the acceleration problems and Defendant's affirmative assurance that its

vehicles were safe and reliable and other similar false statements – in purchasing or leasing

Defendant's vehicles.

227.    As a result of their reliance, Plaintiff and the Class have been injured in an amount

to be proven at trial, including, but not limited to, their lost benefit of the bargain and

overpayment at the time of purchase and/or the diminished value of their vehicles.

228.    Defendant's conduct was knowing, intentional, with malice, demonstrated a

complete lack of care, and was in reckless disregard for the rights of Plaintiff and the Class.

Plaintiff and the Class are therefore entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class

proposed in this Complaint, respectfully requests that the Court enter judgment in his favor and

against Defendant, as follows:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B.    Ordering Defendant to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiff and the other members of the Class;

C.    Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

D.    Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and the other members of the Class;

E.    Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective recall campaign;

F.    Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

G.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

H.      Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.


Respectfully submitted,
JONES WARD PLC


s/ Jasper D. Ward IV_____
Jasper D. Ward IV
Marion E. Taylor Building
312 South Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Phone: (502) 882-6000
Facsimile: (502) 587-2007
*Attorneys for Plaintiff*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| <br><br>_____<br>*Plaintiff(s)*<br>v.<br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

JS 44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)**   County of Residence of First Listed Plaintiff _____<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)**   Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1   U.S. Government
          Plaintiff

❏ 3   Federal Question
          *(U.S. Government Not a Party)*

❏ 2   U.S. Government
          Defendant

❏ 4   Diversity
          *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place<br>of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a<br>Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance<br>❏ 120 Marine<br>❏ 130 Miller Act<br>❏ 140 Negotiable Instrument<br>❏ 150 Recovery of Overpayment<br>   & Enforcement of Judgment<br>❏ 151 Medicare Act<br>❏ 152 Recovery of Defaulted<br>   Student Loans<br>   (Excludes Veterans)<br>❏ 153 Recovery of Overpayment<br>   of Veteran's Benefits<br>❏ 160 Stockholders' Suits<br>❏ 190 Other Contract<br>❏ 195 Contract Product Liability<br>❏ 196 Franchise | **PERSONAL INJURY**<br>❏ 310 Airplane<br>❏ 315 Airplane Product<br>   Liability<br>❏ 320 Assault, Libel &<br>   Slander<br>❏ 330 Federal Employers'<br>   Liability<br>❏ 340 Marine<br>❏ 345 Marine Product<br>   Liability<br>❏ 350 Motor Vehicle<br>❏ 355 Motor Vehicle<br>   Product Liability<br>❏ 360 Other Personal<br>   Injury<br>❏ 362 Personal Injury -<br>   Medical Malpractice | **PERSONAL INJURY**<br>❏ 365 Personal Injury -<br>   Product Liability<br>❏ 367 Health Care/<br>   Pharmaceutical<br>   Personal Injury<br>   Product Liability<br>❏ 368 Asbestos Personal<br>   Injury Product<br>   Liability<br>**PERSONAL PROPERTY**<br>❏ 370 Other Fraud<br>❏ 371 Truth in Lending<br>❏ 380 Other Personal<br>   Property Damage<br>❏ 385 Property Damage<br>   Product Liability | ❏ 625 Drug Related Seizure<br>   of Property 21 USC 881<br>❏ 690 Other | ❏ 422 Appeal 28 USC 158<br>❏ 423 Withdrawal<br>   28 USC 157<br><br>**PROPERTY RIGHTS**<br>❏ 820 Copyrights<br>❏ 830 Patent<br>❏ 840 Trademark | ❏ 375 False Claims Act<br>❏ 400 State Reapportionment<br>❏ 410 Antitrust<br>❏ 430 Banks and Banking<br>❏ 450 Commerce<br>❏ 460 Deportation<br>❏ 470 Racketeer Influenced and<br>   Corrupt Organizations<br>❏ 480 Consumer Credit<br>❏ 490 Cable/Sat TV<br>❏ 850 Securities/Commodities/<br>   Exchange<br>❏ 890 Other Statutory Actions<br>❏ 891 Agricultural Acts<br>❏ 893 Environmental Matters<br>❏ 895 Freedom of Information<br>   Act<br>❏ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | |
| ❏ 210 Land Condemnation<br>❏ 220 Foreclosure<br>❏ 230 Rent Lease & Ejectment<br>❏ 240 Torts to Land<br>❏ 245 Tort Product Liability<br>❏ 290 All Other Real Property | ❏ 440 Other Civil Rights<br>❏ 441 Voting<br>❏ 442 Employment<br>❏ 443 Housing/<br>   Accommodations<br>❏ 445 Amer. w/Disabilities -<br>   Employment<br>❏ 446 Amer. w/Disabilities -<br>   Other<br>❏ 448 Education | **Habeas Corpus:**<br>❏ 463 Alien Detainee<br>❏ 510 Motions to Vacate<br>   Sentence<br>❏ 530 General<br>❏ 535 Death Penalty<br>**Other:**<br>❏ 540 Mandamus & Other<br>❏ 550 Civil Rights<br>❏ 555 Prison Condition<br>❏ 560 Civil Detainee -<br>   Conditions of<br>   Confinement | **LABOR**<br>❏ 710 Fair Labor Standards<br>   Act<br>❏ 720 Labor/Management<br>   Relations<br>❏ 740 Railway Labor Act<br>❏ 751 Family and Medical<br>   Leave Act<br>❏ 790 Other Labor Litigation<br>❏ 791 Employee Retirement<br>   Income Security Act<br><br>**IMMIGRATION**<br>❏ 462 Naturalization Application<br>❏ 465 Other Immigration<br>   Actions | **SOCIAL SECURITY**<br>❏ 861 HIA (1395ff)<br>❏ 862 Black Lung (923)<br>❏ 863 DIWC/DIWW (405(g))<br>❏ 864 SSID Title XVI<br>❏ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>❏ 870 Taxes (U.S. Plaintiff<br>   or Defendant)<br>❏ 871 IRS—Third Party<br>   26 USC 7609 | ❏ 899 Administrative Procedure<br>   Act/Review or Appeal of<br>   Agency Decision<br>❏ 950 Constitutionality of<br>   State Statutes |

## V.  ORIGIN *(Place an "X" in One Box Only)*

❏ 1   Original
          Proceeding

❏ 2   Removed from
          State Court

❏ 3   Remanded from
          Appellate Court

❏ 4   Reinstated or
          Reopened

❏ 5   Transferred from
          Another District
          *(specify)*

❏ 6   Multidistrict
          Litigation

| VI.  CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:<br>_____<br>Brief description of cause:<br>_____ |
|---|---|

| VII.  REQUESTED IN<br>          COMPLAINT: | ❏  CHECK IF THIS IS A **CLASS ACTION**<br>   UNDER RULE 23, F.R.Cv.P. | **DEMAND $** | CHECK YES only if demanded in complaint:<br>**JURY DEMAND:**    ❏ Yes   ❏ No |
|---|---|---|---|

| VIII.  RELATED CASE(S)<br>           IF ANY | *(See instructions):* | JUDGE _____ | DOCKET NUMBER _____ |
|---|---|---|---|

DATE _____          SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____       AMOUNT _____       APPLYING IFP _____       JUDGE _____       MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.**  Place an "X" in one of the six boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.