# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLIN ELLIOTT, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff(s),<br><br>v.<br><br>GENERAL MOTORS LLC; GENERAL MOTORS HOLDING, LLC; DELPHI AUTOMOTIVE PLC; and DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC,<br><br>　　　　　Defendants. | Case No.  14-cv-11982<br><br>**CLASS ACTION COMPLAINT**<br><br>**FOR INJUNCTIVE RELIEF, EQUITABLE RELIEF, AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF CLAIM

1.      Plaintiff COLIN ELLIOTT brings this action individually and on behalf of all persons similarly situated who purchased or leased certain vehicles manufactured, distributed, and/or sold by GENERAL MOTORS LLC, GENERAL MOTORS HOLDING, LLC, GENERAL MOTORS CORPORATION, GENERAL MOTORS COMPANY, and/or its related subsidiaries, successors, or affiliates ("GM") with defective ignition switches manufactured by DELPHI AUTOMOTIVE PLC, DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC, and/or its related subsidiaries, successors, or affiliates ("Delphi"), as described below.

2.      As used in this complaint, the "Defective Vehicles" or "Class Vehicles" refers to the GM vehicles sold in the United States equipped at the time of sale with

1

ignition switches (the "Ignition Switches") sharing a common, uniform, and defective design, including, but may not be limited to, the following makes and model years:

- 2005-2010 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

- 2006-2010 Pontiac Solstice

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2005-2010 Pontiac G5

3.      An estimated 2.6 million vehicles were sold in the United States equipped with the Ignition Switches.  Upon information and belief, there are other vehicles sold in the United States equipped with the Ignition Switches that have not yet been disclosed by GM.

4.      The Ignition Switches in the Class Vehicles turn on the vehicle's motor engine and main electrical systems when the key is turned to the "run" or "on" position.  The Ignition Switches have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC" ("accessory").  At the "run" position, the vehicle's motor engine is running and the electrical systems have been activated; at the "accessories" position the motor is turned off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off.  In most vehicles a driver must intentionally turn the key in the ignition to move to these various positions.

5.      The ignition switch is not an automotive component that vehicle manufacturers or reasonable consumers expect will deteriorate or break down after normal wear and tear, thereby triggering the need for replacement.

6.      Delphi, at all times material to this action, manufactured the defective ignition switch system for GM.  GM began installing the Delphi-manufactured Ignition Switches beginning in 2002 vehicle models. Upon information and belief, Delphi knew the Ignition Switches were defectively designed and did not meet GM's own design specifications, but nonetheless continued to manufacture and sell the defective Ignition Switches with the knowledge that they would be used in GM vehicles, including the Class Vehicles. Delphi also manufactured the ignition switch system after the 2007 change implemented by GM without reflecting a corresponding change in part number.

7.      Because of defects in their design, the Ignition Switches installed in the Class Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions.  The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position.  Due to faulty design and improper positioning, the Ignition Switches can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "acc" position (the "Ignition Switch Defect").  When this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the safety airbag system.

3

8.     The Ignition Switch Defect can occur at any time during normal and proper operation of the Class Vehicles, meaning the ignition can suddenly switch off while it is moving at 65mph on the freeway, leaving the driver unable to control the vehicle.

9.     GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths.  GM has refused, however, to disclose the identities of those it counts among these thirteen deaths.  Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Class Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Class Vehicle models is expected to be much higher.

10.     All persons in the United States who have purchased or leased a Class Vehicle equipped with the Ignition Switches are herein referred to as Class Members ("Class Members").

11.     All Class Members were placed at risk by the Ignition Switch Defect from the moment they first drove their vehicles.  The Ignition Switch Defect precludes all Class Members from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Class Members and other vehicle occupants.  However, no Class Members knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure.

12.     Upon information and belief, prior to the sale of the Class Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design,

4

manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data, yet despite this knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect from Class Members and the public, and continued to market and advertise the Class Vehicles as reliable and safe vehicles, which they are not. A reasonable manufacturer would not have sold a vehicle if it contained the Ignition Switch Defect.

13.    Moreover, reasonable consumers who knew about the Ignition Switch Defect, would not have purchased the Class Vehicles due to the unexpected risk of a sudden and dangerous ignition switch failure that puts them and others at serious risk of injury or death.

14.    As a result of GM's alleged misconduct, Plaintiff and Class Members were harmed and suffered actual damages, in that the Class Vehicles are unsafe, unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition Switch Defect by way of a sudden and dangerous failure that puts them and others at serious risk of injury or death. Plaintiff and the Class did not receive the benefit of their bargain as purchasers and lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Class Members did not receive vehicles that would reliably operate with reasonable safety, and that would

not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car—such as the Class Vehicles—that is known to contain a safety defect such as the Ignition Switch Defect.

15.     As a result, all purchasers of the Class Vehicles overpaid for their cars at the time of purchase. Furthermore, GM's public disclosure of the Ignition Switch Defect has further caused the value of the Class Vehicles to materially diminish. Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Ignition Switch Defect been disclosed.

16.     Further, and in spite of GM's belated recall of the Class Vehicles, litigation is necessary in order to ensure that Class Members receive full and fair compensation, under the auspices of court order, for their injuries.

## PARTIES

### Plaintiff

### *Colin Elliott – Massachusetts*

17.     Plaintiff Colin Elliott is a citizen of the Commonwealth of Massachusetts and resides in the town of Bourne. Mr. Elliott is the registered owner of a forest green 2008 Saturn Sky Roadster. Mr. Elliott purchased the car new in 2007 from a dealership in Hyannis, MA. Mr. Elliott's Saturn Sky Roadster was manufactured, sold, distributed,

advertised, marketed, and warranted by GM, and bears the Vehicle Identification No.

1G8MB35B58Y109987.  Mr. Elliott purchased his vehicle primarily for his personal,

family and household use. Mr. Elliott stopped using his Saturn Sky Roadster

approximately three weeks ago when he learned that GM's recall had been expanded to

include his model and year.  Since that time, Mr. Elliott has been forced to carpool to

work with his wife.  Mr. Elliott has been severely inconvenienced since learning of the

recall. Mr. Elliott will not drive his Saturn Sky unless it is absolutely necessary. He does

not believe his Saturn is safe and is constantly concerned when behind the wheel.

**Defendants**

18.     General Motors Corporation was a Delaware corporation with its

headquarters in Detroit, Michigan.  The Corporation through its various entities

designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and

other brand automobiles in Alabama, Arkansas, California, Colorado, Delaware,

Florida, Georgia, Hawaii, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maryland,

Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska,

Nevada, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, South

Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia,

Wisconsin and multiple other locations in the United States and worldwide.

19.     In 2009, General Motors Corporation filed for bankruptcy, and

substantially all of its assets were sold pursuant to a Master Sales and Purchase

Agreement ("Agreement") to General Motors LLC.

7

20.     Under the Agreement, General Motors LLC also expressly assumed

certain liabilities of General Motors Corporation, including certain statutory

requirements:

> From and after the Closing, Purchaser [GM] shall comply
>
> with the certification, reporting and recall requirements of
>
> the National Traffic and Motor Vehicle Safety Act, the
>
> Transportation Recall Enhancement, Accountability and
>
> Documentation Act, the Clean Air Act, the California Health
>
> and Safety Code and similar Laws, in each case, to the extent
>
> applicable in respect of vehicles and vehicle parts
>
> manufactured or distributed by Seller.

In addition, General Motors LLC expressly set forth that it:

> shall be responsible for the administration, management and
>
> payment of all Liabilities arising under (i) express written
>
> warranties of Sellers [General Motors Corporation] that are
>
> specifically identified as warranties and delivered in
>
> connection with the sale of new, certified used or pre-owned
>
> vehicles or new or remanufactured motor vehicle parts and
>
> equipment (including service parts, accessories, engines and
>
> transmissions) manufactured or sold by Sellers or Purchaser
>
> prior to or after the Closing and (ii) Lemon Laws.

8

21.     General Motors LLC is a Delaware corporation with its headquarters in Detroit, Michigan. General Motors LLC is registered with the California Department of Corporations to conduct business in California. Post-bankruptcy, General Motors LLC discontinued certain vehicle brands, including Pontiac and Saturn.

22.     At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States.

23.     Defendant Delphi Automotive PLC ("Delphi") is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan.

24.     Delphi began as a wholly-owned subsidiary of General Motors Corporation, until it was launched as an independent publicly-held corporation in 1999.

25.     In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi plants to assist with its post-bankruptcy restructuring. In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

26.     At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

9

27.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

28.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this district, and GM has caused harm to class members residing in this District.

## FACTUAL BACKGROUND

*The Defective Vehicles*

30.     The Saturn Ion was a compact car first introduced in 2002 for the 2003 model year, and was discontinued in 2007.

31.     The Chevrolet Cobalt was a compact car first introduced in 2004 for the 2005 model year, and was discontinued in 2010.

32.     The Pontiac G5 was first introduced in 2004 for the 2005 model year, and was discontinued in 2009.  The coupe and four-door sedan version of the G5 was marketed in Canada from 2005 to 2010, but is not a vehicle at issue in this action.

33.     The Chevrolet HHR was a compact car first introduced in 2005 for the 2006 model year, and was discontinued in 2011.

34.     The Pontiac Solstice was a sports car first introduced in 2005 for the 2006 model year, and was discontinued in 2009.

35.     The Saturn Sky was first introduced in 2006 for the 2007 model year, and was discontinued in 2009.

36.     The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

37.     The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

38.     Upon information and belief, GM promoted these Class Vehicles as safe and reliable in numerous uniform, standardized, widely and continuously disseminated marketing and advertising materials.

39.     No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time or purchase or lease. No reasonable consumer would purchase or lease a vehicle equipped with the Ignition Switch Defect.

*GM Field Reports and Internal Testing Reveal a Problem*

40.     In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position.  In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force."  The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one

11

setting to another unless the driver turns the key. The report stated that than an

"ignition switch design change" was believed to have resolved the problem.

41.    In 2003, a second report documented an incident with a Saturn Ion where

"a service technician observed a stall while driving."  There the technician noted that

the owner had several keys on the key ring and surmised that the "weight of the keys

had worn out the ignition switch" and replaced the switch and closed the matter.

42.    GM engineers encountered the problem again in 2004 just prior to the

launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt

vehicle suddenly switched out of the "run" position and lost engine power.  GM

engineers were able to replicate this problem during test drives of the Cobalt.

According to GM, an engineering inquiry known as a Problem Resolution Tracking

System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions;

however, after considering "lead time required, cost, and effectiveness," GM decided to

do nothing.

43.    After the Chevrolet Cobalt entered the market in 2004, GM began

receiving complaints about incidents of sudden loss of engine power.  GM engineers

determined that the low torque in the ignition switch could cause the key to move from

the "run" to the "accessory" or "off" position under ordinary driving conditions with

normal key chains because "detent efforts on ignition switch are too low, allowing key

to be cycled to off position inadvertently."  Specifically, in February 2005, GM engineers

concluded that "there are two main reasons that we believe can cause a lower effort in

turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

44.    Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition.  Although GM initially approved the design, the company once again declined to act.

45.    In testimony April 1, 2014, before the House Committee on Energy and Commerce, GM CEO Mary Barra explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much.  Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

46.    In April 2006, GM finally approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number.  GM estimates that Delphi began producing the redesigned ignition switch for all Subject Vehicles during the 2007 model year.

47.    Delphi assigned its newly designed switch the same part number assigned to the faulty ignition switch.  Upon information and belief, Delphi's action was intended to make it difficult to trace the defective switch back to its original design in 2001.

48.     After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

49.     According to Delphi, the component required to fix the Ignition Switch Defect costs approximately $2 to $5. GM management estimated that replacement components would cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

50.     GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

*GM Issues Information Service Bulletins*

51.     In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch. The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

14

52.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning."  GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain."  The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

53.     On July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present." Adler advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

54.     The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead." She was able to safely coast to the side of the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of

15

the service bulletin. The reporter stated that the key chain being used at the time of the

stalling incident was provided by GM, and included only the key fob and a tag.

55.    GM, in a statement at the time through Adler, insisted that this problem

was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and

the "engine can be restarted after shifting to neutral." Adler also claimed that this

ignition issue was widespread because "practically any vehicle can have power to a

running engine cut off by inadvertently bumping the ignition…."

56.    In October 2006, GM updated the Information Service Bulletin,

"Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No

DTCs" (#05-02-35-007A) to include additional vehicles and model years.  Specifically,

GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5,

the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky.  The updated

bulletin included the same service advisories to GM dealers as the earlier version.

57.    According to GM, the service bulletin was the appropriate response

"given that the car's steering and braking systems remained operational even after a

loss of engine power." GM reports that GM dealers provided 474 key inserts to GM

vehicle owners who brought their vehicles in for servicing.

***Reports of Unintended Engine Shut Down***

58.    A number of reports from warranty and technical assistance data

beginning in 2003, "addressed complaints of stalling Ion vehicles."  Despite these

reports, the Saturn Ion remained in production until 2007.

16

Case 1:14-cv-11082-WGY    Document 1    Filed 05/01/14    Page 17 of 47

59.     On May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

***Crash Reports and Data***

60.     The Defendants knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

61.     National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

62.     In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

63.     In 2006, there were at least two fatalities associated with a Chevy Cobalt crash.  Information from the car's data recorder indicated that the ignition switch was in "accessory" instead of run, and the front airbags failed to deploy.

64.     In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

65.     In 2007, NHTSA's early warning division reviewed available data

provided by GM on airbag non-deployments in Chevrolet Cobalt vehicles.  This review

identified 43 incidents in which airbags may not have deployed in a crash.  The early

warning division referred the case to NHTSA's data analysis division for further

screening.  A defects panel was convened, but after reviewing the data and consulting

with GM, the panel ultimately concluded that "[t]he data available at the time of this

evaluation did not indicate a safety defect or defect trend that would warrant the

agency opening a formal investigation."  In prepared remarks delivered April 1, 2014,

to the Committee on Energy and Commerce, NHTSA Acting Administrator David

Friedman stated, "At the time of these reviews, NHTSA did not have the information

that GM has since provided — for instance, new evidence linking airbag non-

deployment to faulty ignition switches."

66.     GM has identified 23 frontal-impact crashes in the United States involving

2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch

Defect may have caused or contributed to the failure of the safety airbags to deploy.

67.     GM has identified 8 frontal-impact crashes in the United States involving

2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or

contributed to the failure of the safety airbags to deploy. These crashes resulted in four

fatalities and six injuries to occupants.

68.     GM has identified 3 frontal-impact crashes in the United States involving

2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect

may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in three injuries to occupants.

69.     On information and belief, many more crashes, resulting in injuries and deaths, have involved the Ignition Switch Defect and gone unreported because Defendants have concealed the problem. These crashes continue to occur, even as GM responds to Congressional investigation and has announced a recall, and will continue to occur unless and until the Ignition Switch defect is completely and effectively corrected.

### GM's Belated Repair Recall of Some Vehicles

70.     On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  The notice identified that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight.

71.     The notice also did not identify all the vehicles affected by the Ignition Switch Defect.

72.     The notice failed to indicate the full extent to which GM has been aware of the Defect.  The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and

on January 31, 2014, the Executive Field Action Decision Committee decided to conduct
a safety recall."

73.     In a February 24, 2014 letter to the NHTSA, GM amended the Part 573
Report to include a more detailed chronology. The chronology indicated that GM first
learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt
from field tests by its engineers.

74.     On February 25, 2014, GM amended its Part 573 Report to cover additional
models and model years due to the same Ignition Switch Defect.  Specifically, GM
identified the 2003 to 2007 model years of the MY Saturn Ion, 2006 and 2007 model
years of the MY Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007
model year of MY Saturn Sky vehicles.

75.     According to the NHTSA Acting Administrator David Friedman, the
chronology information provided by GM on February 24, 2014 "raise[d] serious
questions as to the timeliness of GM's recall."  Therefore, the NHTSA opened a
"timeliness query" on February 26, 2014.

76.     On March 4, 2014, the NTHSA issued GM a Special Order demanding that
it provide additional information by April 3, 2014, on 107 specific requests, including
information to "evaluate the timing of GM's defect decision making and reporting of
the safety defect to NHTSA."

77.     On March 11, 2014, GM filed a new Part 573 report superseding its
February 25 filing.  The new chronology provided with the report indicated that GM

was aware of the Ignition Switch Defect in 2001 — significantly earlier than its previous 2004 disclosure. GM now indicated that it had a report from 2001 that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

78. On March 28, 2014, GM filed a new Part 573 report, which expanded the recall set forth in its February 25, 2014 filing. GM's March 28 report indicated that several additional model year vehicles may be affected by the Ignition Switch Defect. GM identified those vehicles as the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac Solstice, 2008-2010 Pontiac G5, and 2008-2010 Saturn Sky. The March 28 report added over one million vehicles to the total affected by the Ignition Switch Defect.

79. GM notified dealers of the Defective Vehicles of the recall in February and March 2014. GM also notified owners of the Defective Vehicles by letter of the recall. The letter minimized the risk of the defect, indicating that the Ignition Switch Defect would occur only "under certain conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

80. On April 9, 2014, GM filed a new Part 573 report, which further expanded the recall to include a defect identified with ignition lock cylinders. GM's report indicates that the defective cylinders can allow for the removal of the ignition key while the engine is still running, allowing for the possibility of a rollaway, "vehicle crash and occupant or pedestrian injuries." GM cautioned owners of the Defective Vehicles that

21

"it is very important before exiting the vehicle for customers to make sure the vehicle is in "Park" . . . ."

81.    GM has advised the public that the replacement ignition switches "ARE NOT CURRENTLY AVAILABLE."

### TOLLING OF THE STATUTE OF LIMITATIONS

#### Fraudulent Concealment Tolling

82.    Upon information and belief, GM has known of the Ignition Switch Defect in the vehicles since at least 2001, and certainly well before Plaintiff and Class Members purchased the Defective vehicles, and has concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the Ignitions Switch Defect, even when directly asked about it by Class Members during communications with GM and GM dealers.

83.    Although GM has now acknowledged that "[t]here is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine," GM did not fully disclose the Ignition Switch Defect and in fact downplayed the widespread prevalence of the problem, and minimized the risk of the Defect occurring during normal operation of the Class Vehicles.

84.    In 2005, GM issued a Technical Service Bulletin to dealers and service technicians directing that customers be advised to "remove unessential items from their key chains" to avoid inadvertent ignition switching, but did not identify or disclose the

Defect.  In February 2014, GM instituted only a limited recall, only identifying two of the several models with the Ignition Switch Defect. Likewise, the later recall expanded to include five additional model years and makes does not fully disclose all the vehicles affected by the Ignition Switch Defect.

85.     Upon information and belief, there are other Class Vehicles that have the Ignition Switch Defect that have not yet been disclosed by GM.

86.     Any applicable statute of limitation has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**Estoppel**

87.     GM was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the vehicles.  GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.  Plaintiff and Class Members reasonably relied upon GM's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

**Discovery Rule**

88.     The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their vehicles had the Ignition Switch Defect.

89.     However, Plaintiff and Class Members had no realistic ability to discern that the vehicles were defective until—at the earliest—after the Ignition Switch Defect caused a sudden unintended ignition shut off.  Even then, Plaintiff and Class Members had no reason to know the sudden loss of power was caused by a defect in the ignition switch because of GM's active concealment of the Ignition Switch Defect.

90.     Not only did GM fail to notify Plaintiff or Class Members about the Ignition Switch Defect, GM in fact denied any knowledge of or responsibility for the Ignition Switch Defect when directly asked about it. Thus Plaintiff and Class Members were not reasonably able to discover the Ignition Switch Defect until after they had purchased the vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Ignition Switch Defect caused their vehicles to suddenly lose power.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this lawsuit as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or c(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

92.     The proposed nationwide class is defined as:

### Nationwide Class

All persons in the United States who purchased or leased a

24

GM Class Vehicle (2005-2010 Chevrolet Cobalt; 2006-2011

MY Chevrolet HHR; 2006-2010 Pontiac Solstice; 2003-2007

MY Saturn Ion; 2007-2010 MY Saturn Sky; and 2005-2010

Pontiac G5), and any other GM vehicle model containing the

same ignition switch as those Class Vehicle models (Class

Members).

93.    Excluded from the Class are: (1) Defendants, any entity or division in

which Defendants have a controlling interest, and their legal representatives, officers,

directors, assigns, and successors; (2) the Judge to whom this case is assigned and the

Judge's staff; (3) governmental entities; and (4) those persons who have suffered

personal injuries as a result of the facts alleged herein.  Plaintiff reserves the right to

amend the Class definition if discovery and further investigation reveal that the Class

should be expanded, divided into additional subclasses, or modified in any other way.

## Numerosity and Ascertainability

94.    The nationwide and statewide classes are each too numerous for

individual joinder of all their members to be practicable; GM's recall now includes over

2.6 million vehicles.  Although the exact number of Class Members is uncertain and can

only be ascertained through appropriate discovery, the number is great enough such

that joinder is impracticable.  The disposition of the claims of these Class Members in a

single action will provide substantial benefits to all parties and to the Court.  Class

Members are readily identifiable from information and records in GM's possession, custody, or control.

## Typicality

95. The claims of the Plaintiff are typical of the claims of the Class in that the Plaintiff, like all Class Members, purchased or leased a GM Class Vehicle designed, manufactured, and distributed by Defendants. The Plaintiff, like all Class Members, have been damaged by Defendants' misconduct in that he has incurred costs relating to the Ignition Switch Defect. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

## Adequate Representation

96. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective automotive products.

97. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class.

## Predominance of Common Questions

98. There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class

Members, the answers to which will advance resolution of the litigation as to all Class

Members.  These common legal and factual issues include:

      a.       whether the Class Vehicles suffer from the Ignition Switch Defect;

      b.       whether Defendants knew or should have known about the

Ignition Switch Defect, and, if yes, how long Defendants have known of the Defect;

      c.       whether the defective nature of the Class Vehicles constitutes a

material fact reasonable consumers would have considered in deciding whether to

purchase a GM Vehicle;

      d.       whether GM had a duty to disclose the defective nature of the

Vehicles to Plaintiff and Class Members;

      e.       whether GM omitted and failed to disclose material facts about the

Vehicles;

      f.       whether GM concealment of the true defective nature of the Class

Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing

the Vehicles;

      g.       whether GM engaged in an unlawful enterprise that included a

pattern of racketeering activity consisting of numerous and repeated uses of the

interstate mails and wire communications to execute a scheme to defraud, in violation

of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1962(c).

     h.     whether GM violated the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. L. Ann. § 445.903 *et seq.*, and if so, what remedies are available under § 445.911;

     i.     whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

     j.     whether Plaintiff and Class Members are entitled to a declaratory judgment stating that the ignition switches in the Class Vehicles are defective and/or not merchantable;

     k.     whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

     l.     whether GM should be declared responsible for notifying all Class Members of the Defect and ensuring that all GM vehicles with the Ignition Switch Defect are recalled and repaired.

     m.     what aggregate amounts of statutory penalties, as available under the laws of Michigan, Massachusetts and other States are sufficient to punish and deter Defendants and to vindicate statutory and public policy, and how such penalties should most equitably be distributed among Class members.

## **Superiority**

99.     Plaintiff, like other GM purchasers, is afraid to drive his GM vehicle due to the serious nature of the defect. Like many other GM purchasers, Plaintiff relies on his car to get to work every day and has been, and will continue to be, significantly

inconvenienced as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

100.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

101.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

102.   Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Classwide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Ignition Switch Defect.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF
### Asserted on Behalf of the Nationwide Class
### (Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*)

103.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

104.    This Claim is brought on behalf of the Nationwide Class.

105.    Defendants, Plaintiff, and the Nationwide Class are "persons" within the meaning of RICO, § 1961(3).

*The RICO Enterprise*

106.    From on or about 2001, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

107.    Defendants' existence was separate and distinct from the RICO Enterprise.

108.    The RICO enterprise is separate and distinct from the pattern of racketeering activity in which Defendants engaged and are engaging.

109.    The RICO enterprise which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact within the meaning of 18

30

U.S.C. § 1961(4) and consists of "persons" associated together for the common purpose
of employing the multiple deceptive, abusive and fraudulent acts described herein.

110.   The RICO enterprise, which engaged in, and whose activities affected
interstate and foreign commerce, was comprised of an association in fact of entities and
individuals that included:

      a.     Defendant GM;

      b.     GM's Officers, Executives, and Engineers, who have collaborated
and colluded with each other and with other associates-in-fact in the
Enterprise to deceive Plaintiff and other Class members into purchasing
dangerous and defective vehicles, and actively concealing the danger and
defect from Plaintiff and the other Class members, including, but not
limited to Alan Adler, GM's Manager for Safety Communications who, in
June of 2005, issued the deceptive public statement regarding the ignition
problem; Ray DeGiorgio, GM's design engineer who signed off on the
ignition switch change that was never disclosed; and Mary T. Barra, GM's
current CEO;

      c.     Defendant Delphi;

111.   GM's Dealers, who GM instructed to present false and misleading
information to Plaintiff and other members of the Class, through, *inter alia*, multiple
Service Bulletins, and who did in fact present such false and misleading information.

112.    The RICO Enterprise is an ongoing organization with an ascertainable

structure, and a framework for making and carrying out decisions, that functions as a

continuing unit with established duties, and that is separate and distinct from the

pattern of racketeering activity in which GM has engaged and is engaging. The RICO

Enterprise was and is used as a tool to effectuate the pattern of racketeering activity.

113.    The members of the RICO Enterprise all had a common purpose: to

increase and maximize Defendants' revenues by deceiving Plaintiff and other Class

Members into purchasing dangerous and defective vehicles, and actively concealing the

Ignition Switch Defect from Plaintiff and the other Class Members. The members of the

RICO Enterprise shared the bounty of their enterprise, *i.e.*, by sharing the benefit

derived from increased sales revenue generated by the scheme to defraud. Each

member of the RICO Enterprise benefited from the common purpose of the scheme to

defraud: GM sold or leased more vehicles with the Ignition Switch Defect, Delphi sold

more of the defective ignition switches, and GM's dealers sold and serviced more

vehicles with the Ignition Switch Defect.

*The Pattern of Racketeering Activity*

114.    As set forth below, Defendants conducted and participated in the affairs

of this RICO enterprise through a pattern of racketeering activity that lasted more than

a decade, and that consisted of numerous and repeated violations of the federal mail

and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire

facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§

1341 and 1343.

32

a.      GM, with the assistance and collaboration of the other persons

associated in fact with the enterprise devised and employed a scheme or

artifice to defraud by use of the telephone and internet and transmitted, or

caused to be transmitted, by means of wire communication travelling in

interstate or foreign commerce, writing(s) and/or signal(s), including

GM's website, Service Bulletins to dealers, and communications with

other members of the Enterprise, for the purpose of executing such

scheme or artifice to defraud, in violation of 18 U.S.C. § 1341 and §1343.

b.      As part of the scheme to defraud, the RICO Enterprise utilized the

interstate and international mail and wires for the purpose of obtaining

money or property by means of the false pretenses and artifice to defraud,

as described herein.

c.      The concealment of the dangerous and defective condition of the

defective GM vehicles is the core purpose of the underlying racketeering

offense. The Enterprise had an ascertainable structure by which GM

operated and managed the association-in-fact by using its Dealers and

Delphi to concoct, obfuscate, carry out, and attempt to justify the

fraudulent scheme described herein.

115.    In furtherance of its scheme to defraud, GM's February 28, 2005 Service

Bulletin was issued in furtherance of its scheme to defraud. It instructed GM's dealers

to disseminate false and misleading information about the dangerous and defective

condition of the defective vehicles to customers, including Plaintiff and other members
of the Class. The February 28, 2005 Service Bulletin was sent via the mail and/or wires
and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

116.    In June of 2005, GM issued a public statement through the mail and wires
in furtherance of its scheme to defraud. The statement provided the public, including
Plaintiff and the other Class members, with false and misleading information about the
dangerous and defective condition of the defective vehicles, and sought to conceal that
condition by minimizing the issue and offering an ineffective fix. As such, the statement
constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

117.    GM's December 2005 Service Bulletin was issued in furtherance of its
scheme to defraud. It instructed GM's dealers to disseminate false and misleading
information about the dangerous and defective condition of the defective vehicles to
customers, including Plaintiff and other members of the Class – namely, that the issue
could be resolved by removing items from key chains. The December 2005 Service
Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§
1341 and 1343.

118.    In October of 2006, GM issued an update to its December 2005 Service
Bulletin in furtherance of its scheme to defraud. The update repeated the instruction to
GM's dealers to disseminate false and misleading information about the dangerous and
defective condition of the defective vehicles to customers, including Plaintiff and other
members of the Class. The update to the December 2005 Service Bulletin was sent via
the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

119.     In furtherance of its scheme to defraud, GM communicated with Delphi
via the mail and/or wires regarding the manufacture of the defective ignition switch
system. Through those communications, GM instructed Delphi to continue
manufacturing the defective part even though it did not meet GM's own specifications.
Through those communications, GM also instructed Delphi to make a change to the
defective ignition switch system in 2006, and to fraudulently conceal the change by not
assigning a new part number. GM's communications with Delphi constitute repeated
violations of 18 U.S.C. §§ 1341 and 1343.

120.     The predicate acts constituted a variety of unlawful activities, each
conducted in furtherance of the enterprise and with the common purpose of defrauding
Plaintiff and other Class Members and obtaining significant funds while providing
defective vehicles worth significantly less than the purchase price paid by customers.
The predicate acts also had the same or similar results, participants, victims, and
methods of commission. The predicate acts were related and not isolated events.

121.     The predicate acts all had the purpose of generating significant revenue
and profits for the Defendants at the expense of Plaintiff and the Class Members, who
were never informed of the Ignition Switch Defect in their defective vehicles. The
predicate acts were committed or caused to be committed by GM, through its
participation in the RICO enterprise and in furtherance of its fraudulent scheme, and
were interrelated in that they involved obtaining Plaintiff's and all other Class
Members' funds.

122.    Defendants' conduct in furtherance of this scheme was intentional. Plaintiff and Class Members were harmed in that they relied to their detriment on Defendants' conduct and, as a result, purchased dangerous and defective vehicles for significantly more money than they would have paid absent Defendants' scheme to defraud. Defendants unfairly reaped millions of dollars in excessive sales revenue as a result of this scheme and its conduct in furtherance of this scheme.

*Plaintiff's Injuries and Damages*

123.    By reason and as a result of Defendants' RICO-violative scheme, Plaintiff and the Class Members have been injured and damages in their business and property: their cars have lost value, and they have and will continue to incur expense and loss in connection with their efforts to implement the Ignition Switch Defect correction and/or eliminate or reduce the risks and costs to which the Defective Vehicles and parts expose them.

124.    By reason of the foregoing the defendants, through their managerial officials, have unlawfully, knowingly and willfully conducted and participated directly or indirectly in the following enterprises through a pattern of racketeering activity in violation or attempted violation of 18 U.S.C. § 1962(c).

125.    These violations of 18 U.S.C. § 1962(c) by the Defendants have directly and proximately caused Plaintiff's and Class Members' injuries and damage set forth above. Plaintiff and Class Members are entitled to bring this action for three times their actual

36

damages, as well as punitive damages and its costs and reasonable attorneys' fees at

trial and on appeal pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF

### Asserted on Behalf of the Nationwide Class
### (Violation of Michigan Consumer Protection Act ("MCPA),
### Michigan Comp. Laws Ann. § 445.903 *et seq.*)

126.    Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

127.    This Claim is brought on behalf of the Nationwide Class.

128.    At all times relevant hereto, there was in full force and effect Mich. Comp.

Laws Ann. § 445.903 *et seq.* (the "MCPA").

129.    Plaintiff and the Nationwide Class Members were "person[s]" within the

meaning of the MCPA, M.C.L.A § 445.902(1)(d).

130.    At all relevant times hereto, Defendants were "persons" engaged in "trade

or commerce" within the meaning of the MCPA, M.C.L.A. § 445.902(1)(d) and (g).

131.    The MCPA holds unlawful "[u]nfair, unconscionable, or deceptive

methods, acts, or practices in the conduct of trade or commerce." M.C.L.A.  § 445.902(1).

132.    The practices of Defendants violate the MCPA for, *inter alia*, one or more

of the following reasons:

a.    represented that the Class Vehicles had approval, characteristics,

uses, and benefits that they do not have;

b.      Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Class Vehicles;

c.      Defendants represented that the Class Vehicles were of a particular standard, quality, or grade, when they were of another;

d.      Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Class Vehicles, which did and tended to, mislead Plaintiff and the Class about facts that could not reasonably be known by the consumer until the February and March 2014 recalls;

e.      Defendants failed to reveal facts concerning the Ignition Switch Defect that were material to the transaction in light of representations of fact made in a positive manner;

f.      Defendants failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiff and the Class;

g.      Defendants made material representations and statements of fact to Plaintiff and the Class that resulted in Plaintiff and the Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were;

38

      h.    Defendants intended that Plaintiff and Class Members rely on their misrepresentations and omissions, so that Plaintiff and other Class Members would purchase or lease the Class Vehicles; and

133.   Plaintiff seeks injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts or; seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Class Member, reasonable attorneys' fees; and any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

Plaintiff also seeks punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of Class Vehicles, deceived Plaintiff and Class Members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles it repeatedly promised Plaintiff and Class Members were safe. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## THIRD CLAIM FOR RELIEF
### Asserted on Behalf of the Nationwide Class
### (Fraud by Concealment)

134.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

135.   This Claim is brought on behalf of the Nationwide Class.

136.   As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

137.   Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as reliable and safe and proclaimed that Defendants maintain the highest safety standards. Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

138.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and Class Members.  These omitted facts were material because they directly impact the safety of the Class Vehicles.  Whether or not a vehicle ignition switch will unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power steering, anti-lock brakes and air bag deployment while the car is in motion, are material safety concerns.  Defendants possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles.

139.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

140.   Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiff's and Class Members' actions were justified.  Defendants were in exclusive control of the material facts concerning the Ignition Switch Defect and such facts were not known to the public or the Class Members.

141.   As a result of the concealment and/or suppression of facts, Plaintiff and Class Members have sustained and will continue to sustain damages arising from the difference between the actual value of that which Plaintiff and the Classes paid and the actual value of that which they received.

142.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CLAIM FOR RELIEF**
**Breach of Implied Warranties Under Massachusetts Law**

143.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

41

144.    This Claim is brought on behalf of Plaintiff under Massachusetts law.

145.    At all times relevant hereto, there was in full force and effect M.G.L. Ch. 106 § 2-314.

146.    GM is a "merchant" as to the Class Vehicles within the meaning of M.G.L. Ch. 106 § 2-314. GM manufactured and sold the Class Vehicles, which are "goods" within the meaning of these statutory provisions. Consequently, pursuant to M.G.L. Ch. 106 § 2-314, GM impliedly warranted that the Class Vehicles were merchantable, including that they were fit for their ordinary purposes as safe passenger vehicles, that they could pass without objection in the trade, and that they were adequately contained, packaged, and labeled.

147.    GM breached its implied warranty of merchantability to Plaintiff because the Class Vehicles were not fit for the ordinary purposes for which they are used—as a safe passenger vehicle. M.G.L. Ch. 106 § 2-314(c). Specifically, and according to GM's representatives, the Class Vehicles contain the Ignition Switch Defect, which makes the Class Vehicles unfit for their ordinary purpose of providing safe transportation.

148.    GM further breached its implied warranty of merchantability to Plaintiff and Class Members because the Class Vehicles would not pass without objection in the trade, as they contained the Ignition Switch Defect. M.G.L Ch. 106 § 2-314(a).

149.    GM further breached its implied warranty of merchantability to Plaintiff and Class Members because the Class Vehicles were not adequately contained, packaged, and labeled in that the directions and warnings that accompanied the Class

Vehicles did not adequately instruct Plaintiff or Class Members on the proper use of the

Class Vehicles in light of the Ignition Switch Defect.  M.G.L. Ch. 106 § 2-314(e).

150.   At the time of delivery of the Class Vehicles, GM did not provide

instructions and warnings to Plaintiff or Class Members to not place extra weight on

their vehicles' key chains, including a fob or extra keys.  In and around March of 2014,

GM publicly stated that placing extra weight on the key chain of the Class Vehicles

increases the chances that the Ignition Switch in the Class Vehicle will move from the

"on" position and into the "accessory" or "off" position.

151.   At the time of the delivery of the Class Vehicles, GM did not provide

instructions and/or warnings to Plaintiff or Class Members to avoid rough, bumpy, and

uneven terrain while driving.  In and around March of 2014, GM publicly stated that

traveling across such terrain increases the chances that the Ignition Switch in the Class

Vehicle will move from the "on" position to the "accessory" or "off" position.

152.   Additionally, at the time of delivery of the Class Vehicles, GM did not

adequately warn Plaintiff or Class Members of the dangers of not taking the necessary

steps outlined above to prevent the Ignition Switch in the Class Vehicle from moving

from the "on" position to the "accessory" or "off" position while the Vehicle is in

motion.

153.   As a proximate result of GM's breach of the implied warranty of

merchantability, Plaintiff and Class Members were damaged in the amount of, and

entitled to recover, the difference in value between the Class Vehicles as warranted

(their sales price) and the Class Vehicles as actually delivered (perhaps worth $0.00)

(*i.e.*, a total refund of the full or partial purchase and/or lease price of the Class Vehicles), plus loss of use and other consequential damages arising after the date of delivery of the Class Vehicles.

154.    It was not necessary for Plaintiff and each Class Member to give GM notice of GM's breach of the implied warranty of merchantability because GM had actual notice of the Ignition Switch Defect.  Prior to the filing of this action, GM issued a safety recall for the Class Vehicles acknowledging the Ignition Switch Defect.  GM admitted it had notice of the Ignition Switch Defect as early as 2004, and possibly as early as 2001.  At the time of the safety recall, GM also acknowledged that numerous accidents and fatalities were caused by the Ignition Switch Defect.  In addition to the above, the filing of this action is sufficient to provide GM notice of its breaches of the implied warranty of merchantability with respect to the Class Vehicles.

**FIFTH CLAIM FOR RELIEF**

**(Claim for Actual Damages/Expense Reimbursement Fund)**

155.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

156.    This Count is brought on behalf of Plaintiff and all Class Members.

157.    Plaintiff and Class Members have incurred out-of-pocket expenses and damages in attempting to rectify the Ignition Switch Defect in their Vehicles, and such expenses and losses will continue as they must take time off from work, pay for rental

cars or other transportation arrangements, child care and the myriad expenses involved in going through the recall process to correct the Defect.

158.   Plaintiff and Class Members seek payment of such damages and reimbursement of such expenses under the consumer statutes and applicable law invoked in this Complaint. While such damages and expenses are individualized in detail and amount, the right of the Class members to recover them presents common questions of law. Equity and fairness to all Class members requires the establishment by court decree and administration under Court supervision of a Defendant-funded program, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid, such that Defendants, not the Class members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defect.

## **PRAYER FOR RELIEF**

Plaintiff, on his own behalf and on behalf of all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.     an order certifying the proposed Classes designating Plaintiff as the named representatives of the Classes, and designating the undersigned as Class Counsel;

B.     a declaration that the Ignition Switches in Class Vehicles are defective;

C.     a declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D.      an order enjoining Defendants to desist from further deceptive distribution,

sales, and lease practices with respect to the Class Vehicles, and directing Defendants to

permanently, expeditiously, and completely repair the Class Vehicles to eliminate the

Ignition Switch Defect;

E.      an award to Plaintiff and Class Members of compensatory, exemplary, and

statutory penalties, damages, including interest, in an amount to be proven at trial;

F.      a declaration that the Defendants must disgorge, for the benefit of Plaintiff and

Class Members, all or part of the ill-gotten profits it received from the sale or lease of

the Class Vehicles, or make full restitution to Plaintiff and Class Members;

G.      an award of attorneys' fees and costs, as allowed by law;

H.      an award of pre-judgment and post-judgment interest, as provided by law;

I.      leave to amend this Complaint to conform to the evidence produced at trial; and

J.      such other relief as may be appropriate under the circumstances.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of

any and all issues in this action so triable of right.

Dated: May 1, 2014

*/s/ Thomas M. Greene*
Thomas M. Greene, Esq. BBO# 210020
*tgreene@greenellp.com*
Michael Tabb, Esq. BBO# 491310
*matabb@greenellp.com*
GREENELLP
One Liberty Square, Suite 1200
Boston, MA 02109
(617) 261-0040

Robin L. Greenwald (pro hac vice to be filed)
*rgreenwald@weitzlux.com*
James Bilsborrow (pro hac vice to be filed)
*jbilsborrow@weitzlux.com*
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, NY 10003
Telephone:    (212)-558-5500
Facsimile:    (212) 344-5466

*Attorneys for the Plaintiff*

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Colin Elliott, individually and on behalf of all others similarly situated | General Motors LLC; General Motors Holding, LLC; Delphi Automotive PLC; DPH-DAS LLC f/k/a Delphi Automotive Systems, LLC |

**(b)** County of Residence of First Listed Plaintiff   Barnstable County, MA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Wayne County, MI
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Thomas M. Greene, Esq. and Michael Tabb, Esq., Greene LLP, One Liberty Square, Suite 1200, Boston, MA 02109, (617) 261-0040

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product      Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument |     Liability    ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &      Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
|    & Enforcement of Judgment |     Slander      Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'      Product Liability | | ☐ 830 Patent | ☒ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted |     Liability    ☐ 368 Asbestos Personal | | ☐ 840 Trademark |     Corrupt Organizations |
|    Student Loans | ☐ 340 Marine      Injury Product | | | ☐ 480 Consumer Credit |
|    (Excludes Veterans) | ☐ 345 Marine Product      Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment |     Liability    **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle    ☐ 370 Other Fraud |     Act | ☐ 862 Black Lung (923) |     Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract |     Product Liability    ☐ 380 Other Personal |     Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal      Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise |     Injury    ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury -      Product Liability |     Leave Act | |     Act |
| |     Medical Malpractice | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** |     Income Security Act |     or Defendant) |     Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party |     Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | |     26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/      Sentence | | |     State Statutes |
| ☐ 245 Tort Product Liability |     Accommodations    ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty | **IMMIGRATION** | | |
| |     Employment    **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |     Other    ☐ 550 Civil Rights |     Actions | | |
| | ☐ 448 Education    ☐ 555 Prison Condition | | | |
| |     ☐ 560 Civil Detainee - | | | |
| |      Conditions of | | | |
| |      Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1961 et seq.
Brief description of cause:
Use of mails and wires to execute a scheme to defraud

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**   >5,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____ DOCKET NUMBER _____

DATE   05/01/2014

SIGNATURE OF ATTORNEY OF RECORD   *Thomas M. Greene*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. **Title of case (name of first party on each side only)** Colin Elliott, individually and on behalf of all others similarly situated v.
General Motors LLC, et al.

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local**
**rule 40.1(a)(1)).**

[✓] **I.** **410, 441, 470, 535, 830*, 891, 893, 895, R.23, REGARDLESS OF NATURE OF SUIT.**

[ ] **II.** **110, 130, 140, 160, 190, 196, 230, 240, 290,320,362, 370, 371, 380, 430, 440, 442, 443, 445, 446, 448, 710, 720,**
**740, 790, 820*, 840*,  850, 870,  871.**

[ ] **III.** **120, 150, 151, 152, 153, 195, 210, 220, 245, 310, 315,  330, 340, 345, 350, 355, 360, 365, 367, 368, 375, 385, 400,**
**422, 423, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555,  625, 690, 751, 791, 861-865,  890, 896, 899,**
**950.**

**\*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.**

3. **Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this**
**district please indicate the title and number of the first filed case in this court.**

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**

    YES [ ]    NO [✓]

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?    (See 28 USC**
**§2403)**

    YES [ ]    NO [✓]

    **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**

    YES [ ]    NO [ ]

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**

    YES [ ]    NO [✓]

7. **Do all of the parties  in this action, excluding governmental agencies of the united states and the Commonwealth of**
**Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).**

    YES [✓]    NO [ ]

    **A.** **If yes, in which division do all of the non-governmental parties reside?**

    Eastern Division [✓]          Central Division [ ]          Western Division [ ]

    **B.** **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,**
**residing in Massachusetts reside?**

    Eastern Division [ ]          Central Division [ ]          Western Division [ ]

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes,**
**submit a separate sheet identifying the motions)**

    YES [ ]    NO [ ]

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME** Thomas M. Greene
**ADDRESS** One Liberty Square, Suite 1200, Boston, MA 02109
**TELEPHONE NO.** (617) 261-0040

**(CategoryForm12-2011.wpd  - 12/2011)**