# Exhibit E

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMBERLYNN I. VILLA,<br>JACK COHEN, HELEN BELL,<br>CAITLYN ARMSTRONG, and<br>FRANK KEENAN, individually and<br>on behalf of others similarly situated,<br><br>                      Plaintiffs,<br><br>    v.<br><br>GENERAL MOTORS, LLC,<br>GENERAL MOTORS CORPORATION,<br>DELPHI AUTOMOTIVE PLC, and<br>DPH-DAS LLC (f/k/a DELPHI<br>AUTOMOTIVE SYSTEMS, LLC),<br><br>                    Defendants. | CIVIL ACTION NO.<br><br>**COMPLAINT – CLASS ACTION<br>FOR INJUNCTIVE RELIEF,<br>EQUITABLE RELIEF, AND<br>DAMAGES**<br><br>JURY TRIAL DEMANDED |

Plaintiffs AMBERLYNN I. VILLA, JACK COHEN, HELEN BELL, CAITLYN ARMSTRONG, and FRANK KEENAN bring this action for themselves and on behalf of all persons similarly situated who purchased or leased certain vehicles manufactured, distributed, and/or sold by GENERAL MOTORS, LLC; GENERAL MOTORS CORPORATION; or their related subsidiaries, successors, or affiliates (collectively "GM") with defective ignition switches manufactured by DELPHI AUTOMOTIVE PLC; DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC; or their related subsidiaries, successors, or affiliates (collectively "Delphi"), and defective lock cylinders, as described below.

## NATURE OF CLAIM

1.     This case arises from the manufacture and sale of millions of defective vehicles that are unsafe to drive because:

a.     the vehicles' ignition switches can spontaneously switch, or be inadvertently switched, into the "off" or "accessory" position during normal and expected vehicle operation, thereby immediately turning off the engine, and

b.     the vehicles' ignition lock cylinders can fail to secure the ignition key while the ignition switch is in the "on" position, resulting in key removal while the engine is running.

2.     The "Defective Vehicles" at issue in this Complaint are GM vehicles sold in the United States that were equipped at the time of sale with ignition switches (the "Ignition Switches") sharing a common, uniform, and defective design, and ignition lock cylinders (the "Lock Cylinders") sharing a common, uniform, and defective design, including the following makes and model years:

a.     2005-2010 Chevrolet Cobalt

b.     2006-2011 Chevrolet HHR

c.     2007-2010 Pontiac G5

d.     2006-2010 Pontiac Solstice

e.     2003-2007 Saturn Ion

f.     2007-2010 Saturn Sky.

This is not an exhaustive list as it is possible the Ignition Switches and/or Lock Cylinders were installed in other makes and models of GM vehicles sold in the United States, but not yet identified by GM or disclosed to the public.

3.      The Ignition Switches in the Defective Vehicles turn on the vehicles' motor engine and main electrical systems when the key is turned to the "run" or "on" position. The Ignition Switches have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC" ("accessory"). At the "run" position, the vehicle's motor engine is running and the electrical systems have been activated; at the "accessories" position the motor is turned off, and electrical power is generally supplied only to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles, a driver must intentionally turn the key in the ignition to move to these various positions.

4.      Because of defects in their design, the Ignition Switches installed in the Defective Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position. Due to faulty design and improper positioning, the Ignition Switches can spontaneously move or be inadvertently moved from the "on" or "run" position while the vehicle is in operation to the "off" or "acc" position (the "Ignition Switch Defect"). When this ignition switch failure occurs, the motor engine and certain electrical components such as power-assisted steering and anti-lock brakes are turned off, thereby endangering the vehicle occupants and compromising the safety airbag system.

5.      The Ignition Switch Defect can occur at any time during normal and proper operation of the Defective Vehicles, meaning the ignition can suddenly switch off while it is moving at 65mph on the freeway, leaving the driver unable to control the vehicle.

6.      The Ignition Switches are designed and manufactured by Delphi, and GM began installing them in its vehicles in 2002. Upon information and belief, Delphi knew the Ignition

3

Switches were defectively designed, but nonetheless continued to manufacture and sell the Ignition Switches with the knowledge that they would be used in GM vehicles, including the Defective Vehicles.

7.     Publicly, GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths. GM has refused, however, to disclose the identities of those it counts among these thirteen deaths. Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Defective Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Defective Vehicle models is expected to be much higher.

8.     The Lock Cylinders in the Defective Vehicles are separate components from the Ignition Switches. In the Defective Vehicles, a driver must insert the vehicle's key into the Lock Cylinder and turn the key to the "on" position in order to start the vehicle's engine. In most vehicles, a driver must intentionally turn the key to the "off" position to remove the key from the vehicle's lock cylinder.

9.     Because of defects in their design, the Lock Cylinders installed in the Defective Vehicles are, by their nature, loose and are susceptible to failure during normal and expected conditions. Due to faulty design, a driver can remove the ignition key from the Lock Cylinder while the Defective Vehicle's engine is still running (the "Lock Cylinder Defect"). Removing the ignition key while the engine of a vehicle is running creates a safety hazard for the vehicle's occupants as well as for persons and property in the surrounding area as the driver could exit the vehicle believing it is off, resulting in vehicle "rollaway."

10.     The Lock Cylinder Defect can occur at any time during normal and proper operation of the Defective Vehicles.

11.     Publicly, GM has acknowledged that it has had several hundred complaints about the Lock Cylinder Defect and that at least one accident with injuries has been caused by the Lock Cylinder Defect.

12.     All persons in the United States who have purchased or leased a Defective Vehicle equipped with a defective Ignition Switch and/or defective Lock Cylinder are herein referred to as Class Members ("Class Members").

13.     All Class Members were placed at risk by the Ignition Switch Defect and Lock Cylinder Defect from the moment they first drove their vehicles. These Defects preclude all Class Members from proper and safe use of their vehicles, reduce vehicle occupant protection, and endanger Class Members and other vehicle occupants. However, no Class Members knew, or could reasonably have discovered, the Defects, prior to manifestation of the Defects during operation of the Defective Vehicles.

14.     Upon information and belief, prior to the sale of the Defective Vehicles, GM knew of the Ignition Switch Defect and Lock Cylinder Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI"), or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data, yet despite this knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect and Lock Cylinder Defect from Class Members and the public, and continued to market and advertise the Defective Vehicles as reliable and safe vehicles, which they are not.

5

Case 2:14-cv-02848-JCJ   Document 1   Filed 05/01/14   Page 6 of 45

15.     As a result of GM's alleged misconduct, Plaintiffs and Class Members were harmed and suffered actual damages in that the Defective Vehicles are unsafe, unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition Switch Defect and/or Lock Cylinder Defect by way of a sudden and dangerous failure that puts them and others at serious risk of injury or death. Plaintiffs and the Class Members did not receive the benefit of their bargain as purchasers and lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Class Members did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car—such as the Defective Vehicles—that is known to contain a safety defect such as the Ignition Switch Defect or Lock Cylinder Defect.

16.     As a result, all who purchased or leased a Defective Vehicle overpaid for their cars at the time of purchase or lease. Furthermore, GM's public disclosure of the Ignition Switch Defect and Lock Cylinder Defect has further caused the value of the Defective Vehicles to materially diminish. Purchasers or lessees of the Defective Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Ignition Switch Defect and Lock Cylinder Defect been disclosed prior to the purchase or lease of such vehicles.

17.     Further, and in spite of GM's belated recall of the Defective Vehicles, litigation is necessary in order to ensure that Class Members receive full and fair compensation, under the auspices of court order, for their injuries.

**PARTIES**

18.    Plaintiff AmberLynn I. Villa is a citizen of the state of Pennsylvania and she resides in the city of Philadelphia.  Ms. Villa owns a 2006 Chevrolet Cobalt SS, which she purchased used in August 2013 from Active Auto Sales in Philadelphia. Ms. Villa's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Ms. Villa purchased her vehicle primarily for her personal, family, and household use. Approximately a month after she purchased the vehicle, the car's power failed as Ms. Villa drove it over an uneven portion of pavement on an entrance ramp to 1-95 South in Philadelphia. Ms. Villa is now frightened to drive her vehicle.

19.    Plaintiff Jack Cohen is a citizen of the state of Pennsylvania and he resides in the city of Philadelphia. Mr. Cohen owns a 2009 Chevrolet HHR/LT, which he purchased new in May 2009 from Reedman Toll Chevrolet in Langhorne, Pennsylvania.  Mr. Cohen's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Mr. Cohen purchased his vehicle primarily for his personal, family, and household use.  Mr. Cohen, who has not received a recall notice from GM, is concerned that it would be unsafe to drive his vehicle.

20.    Plaintiff Helen Bell is a citizen of the state of Pennsylvania and she resides in the city of Berwyn. Ms. Bell owns a 2005 Chevrolet Cobalt, which she purchased new from Roberts Automall/Chevrolet while it was located in Downingtown, Pennsylvania.  Ms. Bell's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Ms. Bell purchased her vehicle primarily for her personal, family, and household use.  Although she received a recall notice from GM, Ms. Bell has been unable to have her car repaired because the dealer has not received the necessary parts from GM.  Ms. Bell is now terrified to drive her vehicle.

7

21.     Plaintiff Caitlyn Armstrong is a citizen of the state of Pennsylvania and she resides in the city of Bensalem.  Ms. Armstrong owned a 2006 Chevrolet HHR, which she purchased used in February 2013 from CHR Import Motors in Fairless Hills, Pennsylvania.  Ms. Armstrong's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Ms. Armstrong purchased her vehicle primarily for her personal, family, and household use. Her vehicle was totaled in an accident in March 2014 during which her air bags failed to deploy.

22.     Plaintiff Frank Keenan is a citizen of the state of Pennsylvania and he resides in the city of Drexel Hill.  Mr. Keenan owns a 2006 Chevrolet Cobalt, which he purchased used in 2010 from Springfield Ford in Springfield, Pennsylvania. Mr. Keenan's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Mr. Keenan purchased his vehicle primarily for his personal, family, and household use.

23.     Defendant General Motors Corporation was a Delaware corporation with its headquarters in Detroit, Michigan. The Corporation through its various entities designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in Pennsylvania and multiple other locations in the United States and worldwide.

24.     In 2009, General Motors Corporation filed for bankruptcy, and substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to General Motors, LLC.

25.     Under the Agreement, General Motors, LLC, also expressly assumed certain liabilities of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

In addition, General Motors, LLC, expressly set forth that it:

> shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [General Motors Corporation] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

26.    Defendant General Motors, LLC, is a Delaware limited liability company with its headquarters in Detroit, Michigan. General Motors, LLC, is registered with the Pennsylvania Department of State to conduct business in Pennsylvania.

27.    At all times relevant herein, General Motors Corporation and its successor in interest General Motors, LLC, were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Defective Vehicles, and other motor vehicles and motor vehicle components throughout the United States.

28.    Because General Motors, LLC, acquired and operated General Motors Corporation and ran it as a continuing business enterprise, and because General Motors, LLC, was aware from its inception of the Ignition Switch Defect and Lock Cylinder Defect in the Defective Vehicles, General Motors, LLC, is liable through successor liability for the acts and omissions of General Motors Corporation.

29.    Defendant Delphi Automotive, PLC, is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Defendant DPH-DAS, LLC, a Delaware limited liability company formerly known as Delphi Automotive Systems, LLC.  DPH-DAS, LLC, is headquartered in Troy, Michigan, and is registered with the Pennsylvania Department of State to

Case 2:14-cv-02548-JCJ   Document 1   Filed 05/05/14   Page 12 of 45

conduct business in Pennsylvania.  Defendants Delphi Automotive, PLC, and DPH-DAS, LLC, are collectively referred to herein as "Delphi."

30.     Delphi began as a wholly-owned subsidiary of General Motors Corporation until it was launched as an independent publicly-held corporation in 1999.

31.     In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi plants to assist with its post-bankruptcy restructuring. In 2011, GM ended its ownership interest in Delphi by selling back the assets.

32.     At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject Ignition Switches.

33.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

**JURISDICTION AND VENUE**

34.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs, as well as members of the Class, are citizens of a different state than Defendants.

35.     Venue is proper in this Court under 28 U.S.C. § 1391 because GM conducts substantial business in this district, Defendants have caused harm to Class Members residing in this district, and Plaintiffs Villa, Cohen, Bell, Armstrong, and Keenan reside in this district.

**FACTUAL ALLEGATIONS**

36.     The Saturn Ion is a compact car first introduced in 2002 for the 2003 model year and discontinued in 2007.

37.     The Chevrolet Cobalt is a compact car first introduced in 2004 for the 2005 model year and discontinued in 2010.

38.     The Pontiac G5 was first introduced in 2004 for the 2005 model year, and was discontinued in 2010. The coupe and four-door sedan versions of the G5 were marketed in Canada from 2005 to 2010, but are not at issue in this action.

39.     The Chevrolet HHR is a compact car first introduced in 2005 for the 2006 model year and discontinued in 2011.

40.     The Pontiac Solstice is a sports car first introduced in 2005 for the 2006 model year and discontinued in 2010.

41.     The Saturn Sky was first introduced in 2006 for the 2007 model year, and was discontinued in 2010.

42.     The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

43.     The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

44.     Upon information and belief, GM promoted these Defective Vehicles as safe and reliable in numerous marketing and advertising materials.

45.     No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time of purchase or lease.

### GM's Knowledge of Vehicle Defects and Failure to Disclose or Timely Act

46.     In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position. In an internal report generated at the time, GM identified the cause of the problem

as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that an "ignition switch design change" was believed to have resolved the problem.

47.     In early 2002, Delphi informed GM that the ignition switch did not meet GM's design standards. According to Delphi, GM's original torque specifications called for a range of 15 to 25 Newton-centimeters. Testing of the original switch in 2002, however, showed only a range of 4 to 10 Newton-centimeters in most cases. According to Delphi, the torque requirements were intended to ensure that there was sufficient rotational force to keep the switch in the "run" position.

48.     A replacement switch would have cost less than $1 to produce.

49.     In order to replace the switch to ensure that it met specifications, GM would have been forced to delay its release of the Saturn Ion. GM was unwilling to delay the Ion and proceeded to manufacture the vehicles with switches that it knew did not meet its specifications.

50.     In 2003, a report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter. There were also a number of reports from warranty and technical assistance data to GM beginning in 2003 that raised complaints about stalling Saturn Ions.

51.     GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM, an engineering inquiry known as

Case 2:14-cv-02948-JCJ   Document 1   Filed 05/05/14   Page 13 of 45

a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

52.     After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents of sudden loss of engine power. GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

53.     Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition. Although GM initially approved the design, the company once again declined to act.

54.     In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch. The bulletin applied to the 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

55.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the

driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning." GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain." The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past." GM did not consider the Ignition Switch Defect to be a safety problem because it believed vehicles were still controllable after losing power and could be restarted after shifting to neutral.

56.     Also in 2005, GM began receiving complaints from consumers about keys coming out of the ignition lock cylinders in certain Defective Vehicles.

57.     In testimony April 1, 2014, before the House Committee on Energy and Commerce, GM CEO Mary Barra explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

58.     In April 2006, GM finally approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number. GM estimates that Delphi began producing the redesigned ignition switch for all Subject Vehicles during the 2007 model year.

59.     Delphi assigned its newly designed switch the same part number assigned to the faulty ignition switch. Upon information and belief, Delphi's action was intended to make it difficult to trace the defective switch back to its original design in 2001.

14

Case 2:14-cv-02948-JC5   Document 1   Filed 05/05/14   Page 15 of 45

60.     In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007A) to include additional vehicles and model years. Specifically, GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky. The updated bulletin included the same service advisories to GM dealers as the earlier version.

61.     According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

62.     After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

63.     According to Delphi, the component required to fix the Ignition Switch Defect costs approximately $1. GM management estimated that replacement components would cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

64.     GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

65.     The National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

66.     In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

67.     In 2006, there were at least two fatalities associated with a Chevy Cobalt crash. Information from the car's data recorder indicated that the ignition switch was in "accessory" instead of run, and the front airbags failed to deploy.

68.     In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position."

69.     In 2007, NHTSA's early warning division reviewed available data provided by GM on airbag non-deployments in Chevrolet Cobalt vehicles. This review identified 43 incidents in which airbags may not have deployed in a crash. The early warning division referred the case to NHTSA's data analysis division for further screening. A defects panel was convened, but after reviewing the data and consulting with GM, the panel ultimately concluded that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect trend that would warrant the agency opening a formal investigation." In prepared remarks delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the information that GM has since provided—for instance, new evidence linking airbag nondeployment to faulty ignition switches."

70.     GM has identified at least 23 frontal-impact crashes in the United States involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.

71.     GM has identified at least 8 frontal-impact crashes in the United States involving 2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in four fatalities and six injuries to occupants.

72.     GM has identified at least 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in three injuries to occupants.

### 2014 Recalls

73.     GM failed to initiate recalls of all vehicles purportedly affected by the Ignition Switch Defect and Lock Cylinder Defect until 2014.

74.     GM's failure to timely initiate the recalls is a violation of the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), which requires manufacturers to promptly notify the United States Secretary of Transportation, vehicle owners, vehicle purchasers, and vehicle dealers of any vehicle defect related to motor vehicle safety. 49 U.S.C. § 30118(c).

75.     GM also failed to follow regulations implementing the TREAD Act that require manufacturers to submit a detailed report to NHTSA within 5 days of learning about a safety-related defect.  49 C.F.R. § 573.6(a)-(c).

Case 2:14-cv-02948-JCB Document 1 Filed 05/05/14 Page 18 of 45

76.     First, on February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The notice identified that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight, or identify all the vehicles affected by the Ignition Switch Defect.

77.     The notice also failed to indicate the full extent to which GM had been aware of the Ignition Switch Defect by suggesting that GM's knowledge of the defect was recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

78.     In a February 24, 2014 letter to the NHTSA, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

79.     On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect. Specifically, GM identified the 2003 to 2007 model years of the Saturn Ion, 2006 and 2007 model years of the Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007 model year of Saturn Sky vehicles.

80.     According to NHTSA Acting Administrator David Friedman, the chronology information provided by GM on February 24, 2014 "raise[d] serious questions as to the

Case 2:14-cv-32948-JCb   Document-1   Filed 05/05/14   Page 19 of 45

timeliness of GM's recall." Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

81.     On March 4, 2014, NHTSA issued GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

82.     On March 11, 2014, GM filed a new Part 573 report superseding its February 25 filing. The new chronology provided with the report indicated that GM was aware of the Ignition Switch Defect in 2001—significantly earlier than its previous 2004 disclosure. GM now indicated that it had a report from 2001 that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

83.     On March 28, 2014, GM filed a new Part 573 report, which expanded the recall set forth in its February 25, 2014 filing. GM's March 28 report indicated that several additional model year vehicles may be affected by the Ignition Switch Defect. GM identified those vehicles as the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac Solstice, 2008-2010 Pontiac G5, and 2008-2010 Saturn Sky. The March 28 report added over one million vehicles to the total affected by the Ignition Switch Defect.

84.     On April 8, 2014, NHTSA fined GM $28,000—the maximum amount permitted by law—for its failure to comply with the Special Order issued on March 4, 2014. Although NHTSA demanded that GM answer 107 questions about the timing of its knowledge of the Ignition Switch Defect, GM failed to provide a single answer by April 8, 2014. According to the NHTSA, GM refused to answer even simple questions, such as whether the Ignition Switch was redesigned at any time other than 2006.

85.     On April 10, 2014, GM placed two engineers on paid leave as part of an internal investigation of the Ignition Switch Defect recall. One of these engineers, Ray DeGiorgio, was the lead designer for the Ignition Switches.

86.     GM notified dealers of the Defective Vehicles of the recall in February and March 2014. GM also sent written notification to owners of the Defective Vehicles. The letter minimized the risk of the defect, indicating that the Ignition Switch Defect would occur only "under certain conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . .or your vehicle experiences rough road conditions." Despite the fact that some owners of the Defective Vehicles were notified of the product recall, many current or former owners report that they have not received a recall notice. Many owners report that they only became aware of the recall through the news media.

87.     GM's recall letter advised the public that the replacement ignition switches "ARE NOT CURRENTLY AVAILABLE." During her testimony before the House Committee on Energy and Commerce, however, GM CEO Mary Barra testified that replacement ignition switches would be available beginning April 7, 2014. On April 7, 2014, multiple news outlets nonetheless reported that replacement ignition switches were not available.

88.     On April 10, 2014, GM file a Part 573 Defect Notice with NHTSA recalling for the Lock Cylinder Defect the same vehicles that it had already recalled for the Ignition Switch Defect.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

89.     Upon information and belief, GM has known of the Ignition Switch Defect in the vehicles since at least 2001, and certainly well before Plaintiffs and Class Members purchased

the Defective Vehicles. GM has concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Ignition Switch Defect, even when directly asked about it by Class Members during communications with GM and GM dealers.

90.    Although GM has now acknowledged that "[t]here is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine," GM did not fully disclose the Ignition Switch Defect and in fact downplayed the widespread prevalence of the problem, and minimized the risk of the Defect occurring during normal operation of the Defective Vehicles.

91.    In 2005, GM issued a Technical Service Bulletin to dealers and service technicians directing that customers be advised to "remove unessential items from their key chains" to avoid inadvertent ignition switching, but did not identify or disclose the Ignition Switch Defect.

92.    GM also stated, in 2005, that it was "rare" for the Ignition Switches in Defective Vehicles to unintentionally move from the "on" position to the "accessory" or "off" position. GM knew that this statement was untrue, but issued the statement to exclude suspicion and preclude inquiry.

93.    Upon information and belief, GM has known of the Lock Cylinder Defect since at least 2005, and certainly well before Plaintiffs and most Class Members purchased the Defective Vehicles. GM has concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Lock Cylinder Defect, even when directly asked about it by Class Members during communications with GM and GM dealers.

94.    In 2007 and 2010, GM withheld information from NHTSA when it knew that NHTSA was investigating airbag non-deployment in certain GM vehicles. Indeed, NHTSA

Case 2:14-cv-02948-JCJ   Document 1   Filed 05/05/14   Page 22 of 45

understood that airbag systems "were designed to continue to function in the event of a power loss during a crash." This understanding was confirmed by available GM service literature reviewed during NHTSA's due diligence effort. GM, however, had evidence that power loss caused by the Ignition Switch Defect could also prevent the deployment of airbags. Despite its knowledge and familiarity with NHTSA's investigation, GM withheld this information, which delayed its recall by several years.

95.     In February 2014, GM instituted a limited recall, only identifying two of the several models with the Ignition Switch Defect. The recall later expanded to include five additional model years and makes. On March 28, GM expanded the recall yet again to include all model years of each vehicle make affected by the Ignition Switch recall. GM has revealed the scope of the recall in a hazardous, piecemeal fashion, under duress from Congress and intense consumer backlash. Indeed, GM continues to inhibit government inquiries, as evidenced by the $28,000 fine imposed by the NHTSA on April 8, 2014.

96.     GM waited until April 2014 to institute a recall for the Lock Cylinder Defect.

97.     Upon information and belief, there are other Defective Vehicles that have the Ignition Switch Defect and Lock Cylinder Defect that have not yet been disclosed by GM.

98.     As GM CEO Mary Barra explained during testimony before the House Committee on Energy and Commerce on April 1, 2014, GM's active concealment of the Ignition Switch Defect was the result of a "cost culture" that placed an emphasis on profits over safety. There is no doubt this "cost culture" was also the basis of GM's failure to disclose the Lock Cylinder Defect.

99.     Pursuant to 49 U.S.C. § 30118(c), GM was obligated and had a duty to disclose the Ignition Switch Defect and Lock Cylinder Defect to the NHTSA when it learned of the

Defects and/or decided in good faith that the Defective Vehicles did not comply with an applicable motor vehicle safety standard.

100.    Any applicable statute of limitation has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## Estoppel

101.    GM was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the vehicles. GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class Members reasonably relied upon GM's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## CLASS ACTION ALLEGATIONS

102.    Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4) on behalf of themselves and a the following proposed nationwide Class:

All persons in the United States who purchased or leased one of the Defective Vehicles, which consist of 2005-2010 Chevrolet Cobalts; 2006-2011 Chevrolet HHRs; 2007-2010 Pontiac G5s; 2006-2010 Pontiac Solstices; 2003-2007 Saturn Ions; 2007-2010 Saturn Skys; and any other GM vehicle model containing the same Ignition Switch and/or Lock Cylinder as the Defective Vehicles.

103.    Included within the Class is a statewide subclass of all persons who purchased or leased a Defective Vehicle in the state of Pennsylvania.

104.     Excluded from the Class are: 1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; 2) the Judge to whom this case is assigned and the Judge's staff and immediate family; 3) governmental entities; 4) those persons who have suffered personal injuries allegedly arising from a Defective Vehicle.

105.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

106.     **Numerosity and Ascertainability.** Through its recalls, GM has identified over two million Defective Vehicles that suffer from the Ignition Switch Defect and Lock Cylinder Defect. Individual joinder of all Class members would, therefore, be impracticable, and the disposition of the claims of Class members in a single action will provide substantial benefits to all parties and to the Court. Additionally, through the recall notices, and other information and records in GM's possession, custody, or control (such as sales records), the Class members are readily identifiable.

107.     **Typicality.** The claims of Plaintiffs are typical of the claims of the putative Class members in that Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants. Plaintiffs, like all members of the Class, purchased or leased a Defective Vehicle designed, manufactured, and distributed by Defendants, and have been damaged accordingly.

108.     **Adequate Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products. Plaintiffs and

Case 2:14-cv-02548-JCC Document 1 Filed 05/05/14 Page 25 of 45

their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

109.    **Predominance of Common Issues.** There are numerous questions of law and fact common to Plaintiffs and the Class Members that predominate over any questions that affect only individual Class Members, including:

a.      Whether the Defective Vehicles suffer from the Ignition Switch Defect;

b.      Whether the Defective Vehicles suffer from the Lock Cylinder Defect;

c.      Whether Defendants knew or should have known about the Ignition Switch Defect and, if so, how long have they known;

d.      Whether GM knew or should have known about the Lock Cylinder Defect, and, if so, how long has it known;

e.      Whether the defective nature of the Defective Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM vehicle;

f.      Whether Defendants had a duty to disclose the defective nature of the Defective Vehicles to Plaintiffs and Class Members;

g.      Whether Defendants omitted and failed to disclose material facts about the Defective Vehicles;

h.      Whether Defendants' concealment of the true defective nature of the Defective Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing the Vehicles; whether Defendants violated state consumer protection statutes, including, *inter alia*, the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. L. Ann. § 445.903 *et seq*.,

Case 2:14-cv-02048-JCJ Document 1 Filed 05/05/14 Page 26 of 45

and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, § 73 Pa. Stat. Ann. § 201-1 *et seq*.;

       i.      Whether the Defective Vehicles were unfit for their ordinary and intended use, in violation of the implied warranty of merchantability;

       j.      Whether Plaintiffs and Class Members are entitled to a declaratory judgment stating that the Ignition Switches in the Defective Vehicles are defective and/or not merchantable;

       k.      Whether Plaintiffs and Class Members are entitled to a declaratory judgment stating that the Lock Cylinders in the Defective Vehicles are defective and/or not merchantable;

       l.      Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

       m.      Whether Defendants should be declared responsible for notifying all Class Members of the Ignition Switch Defect and ensuring that all Defective Vehicles are recalled and repaired;

       n.      Whether GM should be declared responsible for notifying all Class Members of the Lock Cylinder Defect and ensuring that all Defective Vehicles are recalled and repaired; and

       o.      What aggregate amounts of statutory penalties, as available under the laws of Michigan and Pennsylvania, are sufficient to punish and deter Defendants and to vindicate statutory and public policy, and how such penalties should most equitably be distributed among Class members.

Case 2:14-cv-02948-JCJ    Document 1    Filed 05/05/14    Page 27 of 45

110.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all individuals who purchased or leased a Defective Vehicle is impracticable, and, as the damages suffered by each individual may be relatively small while the costs of litigating each individual's claim is likely to be high, individuals may be effectively prohibited from seeking legal relief but for their participation in a class action. Thus, absent a class action, Class Members will continue to incur damages, and Defendants' conduct will continue without remedy. Furthermore, the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM.

111.    Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Class-wide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Ignition Switch Defect and Lock Cylinder Defect.

## CAUSES OF ACTION

### COUNT I—Fraudulent Concealment
(On behalf of Nationwide Class against GM and Delphi)

112.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-111 of this Complaint.

113.    This Claim is brought against GM and Delphi on behalf of the Nationwide Class.

27

Case 2:14-cv-02948-JCB    Document 1    Filed 05/05/14    Page 28 of 45

114.    As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of the Defective Vehicles.

115.    GM had a duty to disclose these safety issues with regard to the Ignition Switch Defect and Lock Cylinder Defect because it consistently marketed its vehicles as reliable and safe and proclaimed that GM maintains the highest safety standards. Once GM made representations to the public about safety, GM was under a duty to disclose these omitted facts, because where one does speak, one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

116.    Delphi had a duty to disclose these safety issues with regard to the Ignition Switch Defect because it marketed its component parts as reliable and safe, and knew they were being used in vehicles that were marketed by GM to maintain the highest safety standards.

117.    The GM and Delphi Defendants had a duty to disclose these omitted material facts regarding the Ignition Switch Defect because the facts were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs and Class Members. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle ignition switch will unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power steering, anti-lock brakes and air bag deployment while the car is in motion, are material safety concerns. Defendants possessed exclusive knowledge of the Ignition Switch Defect, which rendered the Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

Case 2:14-cv-02948-JCJ   Document 1   Filed 05/05/14   Page 29 of 45

118.    GM had a duty to disclose these omitted material facts regarding the Lock Cylinder Defect because the facts were known and/or accessible only to GM who had superior knowledge and access to the facts, and GM knew these facts were not known to or reasonably discoverable by Plaintiffs and Class Members. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle ignition key can come out of the ignition lock cylinder while the car is in running and in motion is a material safety concern. GM possessed exclusive knowledge of the Lock Cylinder Defect, which rendered the Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

119.    Defendants actively concealed and/or suppressed the material facts as set forth in paragraphs 115 and 116 above, in whole or in part, with the intent to induce Plaintiffs and Class Members to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value, and in order to protect their profits by avoiding a costly recall.

120.    Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and Class Members' actions were justified. Defendants were in exclusive control of the material facts concerning the Ignition Switch Defect and the Lock Cylinder Defect and such facts were not known to the public or the Class Members.

121.    As a result of the concealment and/or suppression of facts, Plaintiffs and Class Members have sustained and will continue to sustain damages arising from the difference between the actual value of that which Plaintiffs and the Class Members paid and the actual value of that which they received.

122.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being in

Case 2:14-cv-02948-JCG    Document 1    Filed 05/05/14    Page 32 of 45

order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT II—Violation of Magnuson-Moss Warranty Act, 15 U.S.C. §2103, *et seq.*
(On behalf of Nationwide Class against GM)

123.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-111 of this Complaint.

124.    This Claim is brought against GM on behalf of the Nationwide Class under Michigan law.

125.    At all times relevant hereto, there was in full force and effect the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA"). The MMWA provides a private right of action by purchasers of consumer products against manufacturers or retailers who, *inter alia*, fail to comply with the terms of the written, express and/or implied warranties. 15 U.S.C. § 2310(d)(1).

126.    Plaintiffs and the Nationwide Class are consumers as defined in 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranty.

127.    GM is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

128.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

129.    In connection with its sales of the Defective Vehicles, GM gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability.

Case 2:14-cv-02948-JC5   Document 1   Filed 05/05/14   Page 32 of 45

As a part of the implied warranty of merchantability, GM warranted that the Defective Vehicles would pass without objection in the trade as designed, manufactured, and marketed; were fit for their ordinary purpose as safe passenger motor vehicles; and were adequately contained, packaged, and labeled.  Mich. Comp. Laws Ann. § 440.2314(2)(a), (c), and (e), and U.C.C. § 2-314(2)(a), (c), and (e).

130.    GM is liable to Plaintiffs and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability.

131.    GM breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class because the Defective Vehicles were not fit for the ordinary purposes for which they are used—namely, as safe passenger motor vehicles. The Ignition Switch Defect may, among other things, unexpectedly stop the Defective Vehicles from running, and result in the vehicles' airbags not deploying in a crash event, increasing the potential for occupant injury or death. The Lock Cylinder defect may, among other things, allow the ignition keys of the Defective Vehicles to be removed while the vehicles are running, increasing the potential for occupant injury or death in a rollaway accident. These safety defects make the Defective Vehicles unfit for their ordinary purpose of providing safe transportation.

132.    GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class because the Defective Vehicles would not pass without objection in the trade, as they contained defects that relate to motor vehicle safety due to the Ignition Switch Defect and Lock Cylinder Defect in each of the Defective Vehicles.

133.    GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class because the Defective Vehicles were not adequately contained, packaged, and labeled. The directions and warnings that accompanied the Defective Vehicles did not

adequately instruct Plaintiffs on the proper use of the Defective Vehicles in light of the Ignition Switch Defect and Lock Cylinder Defect, or adequately warn Plaintiffs of the dangers of improper use of the Defective Vehicles.

134. At the time of the delivery of the Defective Vehicles, GM did not provide instructions and warnings to Plaintiffs to not place extra weight on their vehicles' key chains, including a fob or extra keys. According to GM, placing extra weight on the vehicles' key chain increases the chances that the Ignition Switch will unintentionally move from the "on" position to the "accessory" or "off" position.

135. At the time of the delivery of the Defective Vehicles, GM did not provide instructions and warnings to Plaintiffs to avoid rough, bumpy, and uneven terrain while driving their vehicles. Traveling across such terrain increases the chances that the Ignition Switch in the Defective Vehicles will unintentionally move from the "on" position and into the "accessory" or "off" position, especially when the key chains were weighted down with a fob, additional keys or other items.

136. At the time of the delivery of the Defective Vehicles, GM did not provide instructions and warnings to Plaintiffs to carefully avoid brushing or bumping up against their vehicles' key chains with a body part. According to GM, brushing or bumping up against the Defective Vehicles' key chains increases the chances that the Ignition Switch in the Defective Vehicles will unintentionally move from the "on" position and into the "accessory" or "off" position.

137. At the time of the delivery of the Defective Vehicles, GM did not adequately warn Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent the Ignition Switches in their vehicles from unintentionally moving from the "on" position and into

Case 2:14-cv-32948-JCb Document 1 Filed 05/05/14 Page 33 of 45

the "accessory" or "off" position while in motion, including the loss of power and shutting off of the engine resulting in an increased difficulty in maneuvering the vehicles, and the lack of airbag deployment in the event of a crash and injury or death.

138.    At the time of the delivery of the Defective Vehicles, GM did not provide instructions and warnings to Plaintiffs to put the Defective Vehicles with manual transmissions into reverse gear and set the parking brake before exiting the vehicle, which GM claims will prevent rollaway accidents from occurring due to the Lock Cylinder Defect.

139.    At the time of the delivery of the Defective Vehicles, GM did not adequately warn Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent rollaway of the Defective Vehicles in the event the vehicle's ignition key is removed from the Lock Cylinder while the vehicle is still running.

140.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and the Nationwide Class are entitled to recover the damages caused to them by GM's breach of the implied warranty of merchantability, which damages constitute the difference in value between the Defective Vehicles as warranted (their sales prices) and the Defective Vehicles as actually delivered (perhaps worth $0.00) (i.e, a total or partial refund of the full purchase prices of the Defective Vehicles), plus loss of use and other consequential damages arising after the date of delivery of the Defective Vehicles. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the Nationwide Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiffs and the Nationwide Class in connection with the commencement and prosecution of this action.

**COUNT III- Violation of Michigan Consumer Protection Act, Michigan**
**Comp. Laws Ann., § 445.903 *et seq.*, or the Substantially Similar**
**Consumer Protection Acts of the Other States**
(On behalf of Nationwide Class against GM and Delphi)

141.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-111 of this Complaint.

142.    This Claim is brought against Defendants GM and Delphi on behalf of the Nationwide Class under Michigan law and the laws of substantially similar states.

143.    At all times relevant hereto, there was in full force and effect Mich. Comp. Laws Ann. § 445.903 *et seq.* (the "MCPA").

144.    Plaintiffs and the Nationwide Class Members were "person[s]" within the meaning of the MCPA, Mich. Comp. L. Ann. § 445.902(1)(d).

145.    At all relevant times hereto, Defendants were "persons" engaged in "trade or commerce" within the meaning of the MCPA, Mich. Comp. L. Ann. § 445.902(1)(d) and (g).

146.    The MCPA holds unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. L. Ann. § 445.902(1).

147.    The practices of Defendants violate the MCPA for, *inter alia*, one or more of the following reasons:

a.    Defendants represented that the Defective Vehicles had characteristics, uses, and benefits that they do not have;

b.    Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Defective Vehicles;

c.    Defendants represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were of another;

34

     d.     Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Defective Vehicles, which did and tended to, mislead Plaintiffs and the Class about facts that could not reasonably be known by the consumer until the February, March, and April 2014 recalls;

     e.     Defendants failed to reveal facts concerning the Ignition Switch Defect and Defendant GM failed to reveal facts concerning the Lock Cylinder Defect that were material to the transaction in light of representations of fact made in a positive manner;

     f.     Defendants failed to reveal material facts concerning the Ignition Switch Defect  and Defendant GM failed to reveal material facts concerning the Lock Cylinder Defect to Plaintiffs and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiffs and the Class;

     g.     Defendants made material representations and statements of fact to Plaintiffs and the Class that resulted in Plaintiffs and the Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

     h.     Defendants intended that Plaintiffs and Class Members rely on their misrepresentations and omissions, so that Plaintiffs and other Class Members would purchase or lease the Defective Vehicles.

148.     In the event that Michigan law is not applied, Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the consumer protection statutes of the fifty states.

149.     Plaintiffs seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts or; seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of

$250 for Plaintiffs and each Class Member, reasonable attorneys' fees; and any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

150.    Plaintiffs also seek punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of Defective Vehicles, deceived Plaintiffs and Class Members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting unsafe defects in the Defective Vehicles it repeatedly promised Plaintiffs and Class Members were safe.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

### Count IV-- Breach of Implied Warranties
(On behalf of Nationwide Class against GM)

151.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-111 of this Complaint.

152.    This Claim is brought against GM on behalf of the Nationwide Class under Michigan law.

153.    In the alternative, this Claim is brought on behalf of the Pennsylvania Subclass under Pennsylvania law.

154.    At all times relevant hereto, there was in full force and effect the Michigan Comp. Laws Ann. § 440.2314 and the Pennsylvania Uniform Commercial Code ("P.U.C.C."), Uniform, 13 Pa. Cons. Stat. Ann. § 1101, *et seq.*

155.    GM is a "merchant" as to the Defective Vehicles within the meaning of Mich. Comp. Laws Ann. § 44.2104 and P.U.C.C., 13 Pa. Cons. Stat. Ann. § 2104. GM manufactured and sold the Defective Vehicles, which are "goods" within the meaning of these statutory

Case 2:14-cv-32948-JC5   Document 1   Filed 05/15/14   Page 37 of 45

provisions. Consequently, pursuant to Mich. Comp. Laws Ann. § 440.2314 and P.U.C.C., 13 Pa. Cons. Stat. Ann. § 2314, GM impliedly warranted that the Defective Vehicles were merchantable, including that they were fit for their ordinary purposes as safe passenger vehicles, that they could pass without objection in the trade, and that they were adequately contained, packaged, and labeled.

156.   GM breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class and Pennsylvania Subclass because the Defective Vehicles were not fit for the ordinary purposes for which they are used—a safe passenger vehicle. Mich. Comp. Laws Ann. § 440.2314(2)(c); P.U.C.C., 13 Pa. Cons. Stat. Ann. § 2314(b)(3). Specifically, and according to GM's representatives, the Defective Vehicles contain the Ignition Switch Defect and Lock Cylinder Defect, which make the Defective Vehicles unfit for their ordinary purpose of providing safe transportation.

157.   GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class and Pennsylvania Subclass because the Defective Vehicles would not pass without objection in the trade, as they contained the Ignition Switch Defect and Lock Cylinder. Mich. Comp. Laws Ann. §440.2314(2)(a); P.U.C.C., 13 Pa. Cons. Stat. Ann. § 2314(b)(1).

158.   GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class and Pennsylvania Subclass because the Defective Vehicles were not adequately contained, packaged, and labeled in that the directions and warnings that accompanied the Defective Vehicles did not adequately instruct Plaintiffs on the proper use of the Defective Vehicles in light of the Ignition Switch Defect and Lock Cylinder Defect. Mich. Comp. Laws Ann. § 440.2314(2)(e); P.U.C.C., 13 Pa. Cons. Stat. Ann. § 2314(b)(5).

159.    At the time of delivery of the Defective Vehicles, GM did not provide instructions and warnings to Plaintiffs to not place extra weight on their vehicles' key chains, including a fob or extra keys. In and around March of 2014, GM publicly stated that placing extra weight on the key chain of the Defective Vehicles increases the chances that the Ignition Switch in the Defective Vehicles will move from the "on" position and into the "accessory" or "off" position.

160.    At the time of the delivery of the Defective Vehicles, GM did not provide instructions and/or warnings to Plaintiffs to avoid rough, bumpy, and uneven terrain while driving. In and around March of 2014, GM publicly stated that traveling across such terrain increases the chances that the Ignition Switch in the Defective Vehicles will move from the "on" position to the "accessory" or "off" position.

161.    Additionally, at the time of delivery of the Defective Vehicles, GM did not adequately warn Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent the Ignition Switch in the Defective Vehicles from moving from the "on" position to the "accessory" or "off" position while the Vehicle is in motion.

162.    At the time of the delivery of the Defective Vehicles, GM did not provide instructions and warnings to Plaintiffs to put the Defective Vehicles with manual transmissions into reverse gear and set the parking brake before exiting the vehicle, which GM claims will prevent rollaway accidents from occurring due to the Lock Cylinder Defect.

163.    At the time of the delivery of the Defective Vehicles, GM did not adequately warn Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent rollaway of the Defective Vehicles in the event the vehicle's ignition key is removed from the Lock Cylinder while the vehicle is still running.

164.    As a proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the Nationwide Class and Pennsylvania Subclass were damaged in the amount of, and entitled to recover, the difference in value between the Defective Vehicles as warranted (their sales price) and the Defective Vehicles as actually delivered (perhaps worth $0.00) (i.e., a total refund of the full or partial purchase and/or lease price of the Defective Vehicles), plus loss of use and other consequential damages arising after the date of delivery of the Defective Vehicles.

165.    It was not necessary for Plaintiffs and each Nationwide Class and Pennsylvania Subclass member to give GM notice of GM's breach of the implied warranty of merchantability because GM had actual notice of the Ignition Switch Defect and Lock Cylinder Defect. Prior to the filing of this action, GM issued safety recalls for the Defective Vehicles acknowledging the Ignition Switch Defect and Lock Cylinder Defect. GM admitted it had notice of the Ignition Switch Defect as early as 2004, and possibly as early as 2001, and that it had notice of the Lock Cylinder Defect as early as 2005. At the time of the safety recalls, GM also acknowledged that numerous accidents and fatalities were caused by the Ignition Switch Defect, and that it received several hundred complaints about the Lock Cylinder defect. In addition to the above, the filing of this action is sufficient to provide GM notice of its breaches of the implied warranty of merchantability with respect to the Defective Vehicles.

### COUNT V—Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law, § 73 Pa. Stat. Ann. § 201-1 *et seq.*
(on behalf of Pennsylvania Subclass against GM and Delphi)

166.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-111 of this Complaint.

167.    This Claim is brought against GM on behalf of the Pennsylvania Subclass under Pennsylvania law.

168.    Each Plaintiff and Class Member is a "person" within the meaning of Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PCPL"), § 73 Pa. Stat. Ann. § 201-2(2).

169.    Each Defendant is a "person" within the meaning of PCPL, § 73 Pa. Stat. Ann. § 201-2(2).

170.    The PCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," 73 Pa. Stat. Ann. § 201-3, including:

      a.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . .," § 201-2(4)(v);

      b.    "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another," § 201-2(4)(vii);

      c.    "Advertising goods or services with intent not to sell them as advertised," § 201-2(4)(ix);

      d.    "Engaging in any . . . fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." § 201-2(4)(xxi).

Case 2:14-cv-02948-JC5   Document 1   Filed 05/05/14   Page 42 of 45

171.    Defendants' conduct, as described above, constitutes "fraudulent or deceptive conduct" within the meaning of this statute.

172.    Defendants violated the PCPL when they represented, through advertising, warranties, and other express representations, that the Defective Vehicles had characteristics and benefits that they did not actually have.

173.    Defendants violated the PCPL when they falsely represented, through advertising, warranties, and other express representations, that the Defective Vehicles were of certain quality or standard when they were not.

174.    Defendants violated the PCPL by fraudulently concealing from and/or failing to disclose to Plaintiffs and the Pennsylvania Subclass the defects associated with the Defective Vehicles.

175.    Defendants violated the PCPL by actively misrepresenting in, and/or concealing and omitting from, their advertising, marketing, and other communications, material information regarding the Defective Vehicles. The material information included:

a.    that there was a substantial risk of ignition switch failure that far exceeded the risk of such defect normally associated with similar consumer products;

b.    that the Ignition Switch Defect might not become apparent until after the warranty had expired; and

c.    that Defendants were not committed to repairing the Ignition Switch Defect if it was discovered after the warranty expired;

d.    that there was a substantial risk the ignition key could be removed from a running vehicle that far exceeded the risk of such defect normally associated with similar consumer products;

41

e.      that the Lock Cylinder Defect might not become apparent until after the warranty had expired; and

f.      that Defendants were not committed to repairing the Lock Cylinder Defect if it was discovered after the warranty expired.

176.    The above-described unlawful, unfair and deceptive business practices by Defendants continue to present a threat to members of the consuming public, Plaintiffs and the Pennsylvania Subclass.

177.    As a direct and proximate cause of Defendants' violations of the PCPL, Plaintiffs and members of the Pennsylvania Subclass have suffered and continue to suffer ascertainable losses and damages, in that they purchased a Defective Vehicle that contains inherent design defects about which Defendants knew prior to the sale of the Defective Vehicles.

178.    Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, treble damages, punitive damages, attorneys' fees, filing fees, reasonable costs of suit and any other just and proper relief available under the PCPL.

### COUNT VI—Claim for Actual Damages/Expense Reimbursement Fund
(on behalf of Nationwide Class against GM)

179.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-111 of this Complaint.

180.    This Claim is brought against GM on behalf of the Nationwide Class.

181.    Plaintiffs and the Class Members have incurred out-of-pocket expenses and damages in attempting to rectify the Ignition Switch Defect and Lock Cylinder Defect in their Vehicles, and such expenses and losses will continue as they must take time off from work, pay for rental cars or other transportation arrangements, child care and the myriad expenses involved in going through the recall process to correct the Defects.

182.     Plaintiffs and Class Members seek payment of such damages and reimbursement of such expenses under the consumer statutes and applicable law invoked in this Complaint.

183.     While such damages and expenses are individualized in detail and amount, the right of the Class Members to recover them presents common questions of law. Equity and fairness to all Class Members requires the establishment by court decree and administration under Court supervision of a Defendant-funded program, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the Defective Vehicles and correction of the Defects.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

a.     an order certifying the proposed Nationwide Class and Pennsylvania Subclass, designating Plaintiffs as the named representatives of the Class and Subclass, and designating the undersigned as Class Counsel;

b.     a declaration that the Ignition Switches in Defective Vehicles are defective;

c.     a declaration that the Lock Cylinders in Defective Vehicles are defective;

d.     a declaration that the Defendants are financially responsible for notifying all Nationwide Class Members and Pennsylvania Subclass Members about the defective nature of the Defective Vehicles;

e.     an order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Defective Vehicles, and directing

Defendants to permanently, expeditiously, and completely repair the Defective Vehicles to eliminate the Ignition Switch Defect and Lock Cylinder Defect;

> f.    an award to Plaintiffs and Class and Subclass Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

> g.    a declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Defective Vehicles, or make full restitution to Plaintiffs and Class and Subclass Members;

> h.    an award of attorneys' fees and costs, as allowed by law;

> i.    an award of pre-judgment and post-judgment interest, as provided by law;

> j.    leave to amend this Complaint to conform to the evidence produced at trial; and

> k.    such other relief as may be appropriate under the circumstances.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

DATED: May 1, 2014.

*Jeanne A. Markey*

JEANNE A. MARKEY
Email: jmarkey@cohenmilstein.com
GARY L. AZORSKY
Email: gazorsky@cohenmilstein.com
Cohen Milstein Sellers & Toll, PLLC
1717 Arch Street
Suite 3610
Philadelphia, PA 19103
Telephone: (267) 479-5700

ANDREW N. FRIEDMAN
Email: afriedman@cohenmilstein.com
KIT A. PIERSON
Email: kpierson@cohenmilstein.com
Cohen Milstein Sellers & Toll, PLLC
1100 New York Ave. NW
Washington, DC 20005
Telephone: (202) 408-4600

THEODORE J. LEOPOLD
Email: tleopold@cohenmilstein.com
DIANA L. MARTIN
Email:  dmartin@cohenmilstein.com
Cohen Milstein Sellers & Toll, PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone:  (561) 515-1400

*Attorneys for Plaintiffs*