# Exhibit F

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**
CASE NO. _____

JOLENE FUGATE

      PLAINTIFF

v.

GENERAL MOTORS, LLC

      DEFENDANT

**CLASS ACTION COMPLAINT**

Plaintiff Jolene Fugate, on behalf of herself and the Class described below, brings the following claims against Defendant General Motors, LLC.

**NATURE OF THE ACTION**

1.      This case involves Defendant's conscious decision to overlook, and in fact conceal, a deadly design defect in vehicle ignition switches in millions of GM vehicles placed on the road since 2003.

2.      In making the decision to cover up the ignition switch defect for at least a decade, Defendant consciously put millions of Americans' lives at risk.  Defendant knowingly placed on public streets more than one million defective vehicles with the propensity to shut down during normal driving conditions, creating a certainty of accidents, bodily harm, and death.

3.      An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public. Defendant's Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our customers in the vehicles they drive."  Yet Defendant failed to live up to this commitment.

4.      The first priority of an auto manufacturer should be to ensure that its vehicles

1

are safe, and particularly that its vehicles have operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision.  In addition, an auto manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely, and its critical safety systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.  Moreover, an auto manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

5.      Since at least 2003, Defendant has sold millions of vehicles throughout the United States and worldwide that have a safety defect causing the vehicle's ignition switch to inadvertently move from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

6.      There are at least two main reasons why the GM ignition switch systems are defective.  The first is that the ignition switch is simply weak and therefore does not hold the key in place in the "run position."  On information and belief, the ignition switch weakness is due to a defective part known as a "detent plunger."

7.      The second reason that the ignition switch systems are defective is due to the low position of the switches in the defective vehicles.  That causes the keys, and the fobs that hang off the keys, to hang so low in the defective vehicles that the drivers' knees can easily bump them and inadvertently shut down the vehicle.

8.      Defendant installed these faulty ignition switch systems in models from at least 2003 through at least 2011.  Defendant promised that these vehicles would operate safely and reliably.  This promise turned out to be false in several material respects.  In reality, Defendant concealed and did not fix a serious quality and safety problem plaguing its vehicles.

9.      Worse yet, the ignition switch defects in Defendant's vehicles could have been easily avoided.

10.     From at least 2005 to the present, Defendant received reports of crashes and injuries that put Defendant on notice of the serious safety issues presented by its ignition switch system.

11.     Yet, despite the dangerous nature of this defect and its effects on critical safety systems, Defendant concealed its existence and failed to remedy the problem.

12.     Despite notice of the defect in its vehicles, Defendant did not disclose to consumers that its vehicles – which Defendant had advertised as "safe" and "reliable" for years – were in fact neither safe nor reliable.

13.     Defendant's CEO, Mary Barra, has admitted in a video message that "[s]omething went wrong with our process in this instance, and terrible things happened."

14.     This case arises from Defendant's breach of its obligations and duties, including Defendant's failure to disclose that, as a result of defective ignition switches, at least 2.59 million GM vehicles (and almost certainly more) may have the propensity to shut down during normal driving conditions and create an extreme and unreasonable risk of accident, serious bodily harm, and death.

15.     GM's predecessor, General Motors Corporation ("Old GM") (sometimes, together with GM, "the Companies") also violated these obligations and duties by designing and marketing vehicles with defective ignition switch systems, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents.  In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.

16.     The defective ignition switches were manufactured by Delphi Automotive PLC ("Delphi").  Once a subsidiary of Old GM, Delphi spun off from Old GM in 1999, and became an independent publicly held corporation.

17.     Plaintiff alleges, based on information and belief, that Delphi knew its ignition

switches were defective. Nevertheless, Delphi continued to manufacture and sell the defective ignition switch systems, which it knew would be used in the vehicles of Plaintiff and the Class.

18.     Plaintiff's investigation, including a review of NHTSA's complaint database, suggests that Defendant's recall does not capture all of the defective vehicles which suffer from the same or substantially similar ignition switch defects as the recalled vehicles. Plaintiff thereupon believes and alleges that the following non-recalled GM vehicles also have defective ignition switch systems: the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

19.     Plaintiff brings this action for a Class of all persons in Kentucky and/or the United States who formerly or currently own or lease one or more of the following GM vehicles: (a) (The recalled vehicles): 2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky; and (b) (Non-recalled vehicles): the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo (collectively, "Defective Vehicles").

20.     To the extent warranted by the developing facts, Plaintiff will further supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switch systems, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment.

21.     The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

a.      Due to their weaknesses and their low placement, the ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

b.      When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident; and

c.      When the electrical system shuts down, the vehicle's airbags are

disabled, creating a serious risk of serious bodily harm or death if an accident

occurs.

22.    The ignition switch defects make the Defective Vehicles unreasonably

dangerous.  Because of the defects, the Defective Vehicles are likely to be involved in

accidents and, if accidents occur, there is an unreasonable and extreme risk of serious bodily

harm or death to the vehicle's occupants and others in the vicinity.

23.    Defendant admits to at least 13 deaths as a result of the ignition switch defects,

but the actual number is believed to be much higher.

24.    The ignition switch defects present a significant and unreasonable safety risk

exposing Defective Vehicle owners, their passengers and others in the vicinity to a risk of

serious injury or death.

25.    For many years, Defendant has known of the ignition switch defects that exist in

millions of Defective Vehicles sold in the United States.  However, to protect its profits and

maximize sales, Defendant concealed the defects and their tragic consequences and allowed

unsuspecting vehicle owners to continue driving highly dangerous vehicles.

26.    Under the Transportation Recall Enhancement, Accountability and

Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying

regulations, when a manufacturer learns that a vehicle contains a safety defect, the

manufacturer must promptly disclose the defect.  49 U.S.C. §§ 30118(c)(1) & (2).  If it is

determined that the vehicle is defective, the manufacturer must notify vehicle owners,

purchasers, and dealers of the defect and must remedy the defect.  49 U.S.C. §§ 30118(b)(2)(A)

& (B).  Defendant also violated the TREAD Act by failing to timely inform NHTSA of the

ignition switch defects and allowed cars to remain on the road with these defects.  These same

acts and omissions also violated various state consumer protection laws as detailed below.

27.    Plaintiff and the Class have been damaged by Defendant's misrepresentations,

concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as

they are now holding highly dangerous vehicles whose value has greatly diminished because of

Defendant's failure to timely disclose the serious defect.

28.    Plaintiff and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

29.    Plaintiff and the Class either paid more for the Defective Vehicles than they would have had they known of the ignition switch defects, or they would not have purchased the Defective Vehicles at all had they known of the defects.

30.    Plaintiff brings claims against Defendant individually and on behalf of a class of all other similarly situated purchasers of the Products for violations of Kentucky Consumer Protection Act, § 367.110 *et seq.*, breach of express warranty, breach of implied warranty of merchantability, breach of contract and common law warranty, or, in the alternative, unjust enrichment, product liability and negligent design defect, violations of the Magnuson-Moss Warranty Act, 15 USC. § 2301, *et seq.* ("MMWA"), fraudulent concealment, violations of the Michigan Consumer Protection Act (the "MCPA"), Mich. Comp. L. Ann. § 445.901, *et seq.*, and violations of other state statutes prohibiting unfair and deceptive acts and practices.

## JURISDICTION AND VENUE

31.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendant, and the amount in controversy exceeds $5 million.

32.    The Court has personal jurisdiction over Defendant because Defendant is authorized to, and conducts substantial business in Kentucky, generally, and this District, specifically.  Defendant has marketed, promoted, distributed, and sold the Defective Vehicles in Kentucky.

33.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to this action occurred in this District as the Defect in Plaintiff's vehicle manifested itself within this District.

34.     To the extent there is any contractual or other impediment to pursuit of these claims on a class action basis, Plaintiff specifically alleges, and will prove, if necessary, that any bar to class action proceedings is unconscionable, unfair and against public policy.

## PARTIES

35.     Plaintiff Jolene Fugate ("Fugate") is a citizen of the Commonwealth of Kentucky, residing in the city of Isom.  Plaintiff purchased a 2006 Saturn Ion ("the Ion").  Plaintiff chose the 2006 Ion, in large part, because she wanted a safely designed and manufactured vehicle and chose the Ion because of its reputation for safety.  Plaintiff saw advertisements for Old GM vehicles before she purchased the Ion.  Plaintiff recalls that safety and quality were consistent themes in the advertisements she saw.  These representations about safety and quality influenced Plaintiff's decision to purchase the Ion.  Plaintiff experienced the ignition switch defect described by the GM recall.  Plaintiff did not learn of the ignition switch defects recall until around March 2014.  Had Old GM and/or Defendant disclosed the ignition switch defects, Plaintiff would not have purchased the Ion and would not have retained the vehicle once the defect was announced.

36.     Defendant General Motors is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, 48265. Defendant was incorporated in 2009 and on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the US Bankruptcy Code.  Defendant manufactures and distributes the Defective Vehicles from its Michigan manufacturing plants to consumers in Kentucky and throughout the United States.

37.     Among the liabilities and obligations expressly retained by Defendant after the bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each

case, to the extent applicable in respect of vehicles and vehicle parts
manufactured or distributed by [Old GM].

38.    Defendant also expressly assumed:

> all Liabilities arising under express written warranties of [Old GM]
> that are specifically identified as warranties and delivered in
> connection with the sale of new, certified used or pre-owned
> vehicles or new or remanufactured motor vehicle parts and
> equipment (including service parts, accessories, engines and
> transmissions) manufactured or sold by [Old GM] or Purchaser prior
> to or after the Closing and (B) all obligations under Lemon Laws.

39.    Because Defendant acquired and operated Old GM and ran it as a continuing

business enterprise, and because Defendant was aware from its inception of the ignition switch

defects in the Defective Vehicles, Defendant is liable through successor liability for the

deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

## THE IGNITION SWITCH DEFECTS IN THE DEFECTIVE VEHICLES

40.    Given the importance that a vehicle and its electrical operating systems remain

operational during ordinary driving conditions, it is imperative that an auto manufacturer ensures

its vehicles remain operational from the time the driver starts the vehicle until the driver

intentionally shuts down the vehicle.  With respect to the Defective Vehicles, GM has failed to

do so.

41.    In the Defective Vehicles, the ignition switch defects can cause the vehicle's

engine and electrical system to shut off, disabling the power steering and power brakes and

causing non-deployment of the vehicle's airbags in the event of an accident.

42.    The ignition switch systems in the Defective Vehicles are defective in at least two

major respects.  The first is that the switches are simply weak because of a faulty "detent

plunger"; the switch can inadvertently move from the "run" to the "accessory" or "off" position.

The second defect is that, due to the low position of the ignition switch, the driver's knee can

easily bump the key (or the hanging fob below the key), and cause the switch to inadvertently

move from the "run" to the "accessory" or "off" position.

43.    The Defective Vehicles are, therefore, unreasonably prone to be involved in

accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to

the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

## DEFENDANT KNEW OF THE IGNITION SWITCH DEFECTS FOR YEARS, BUT CONCEALED THE DEFECTS FROM PLAINTIFF AND THE CLASS

44.    Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences for many years, but concealed their knowledge from Defective Vehicle owners.

45.    For example, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy.  Ms. Rose's death is the first known of the hundreds of deaths and injuries attributable to the ignition switch defects.  Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM and GM to address the ignition switch problem.

46.    Another incident involved 16-year old Megan Phillips.  Ms. Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees.  NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact.  According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they begin communicating.  As he stated, "I don't understand why [GM] would wait 10 years to say something.  And I want to understand it but I never will."[1]

47.    Rather than publicly admitting the dangerous safety defects in the Defective Vehicles, the Companies attempted to attribute these and other incidents to "driver error."  Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering and/or airbag failures, including:

---

[1] "Owners of Recalled GM Cars Feel Angry, Vindicated," REUTERS (Mar. 17, 2014).

- 2005:  26 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved.

- 2006:  69 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved and 4 deaths citing Unknown component.

- 2007:  87 Cobalt Death and Injury Incidents, including 3 deaths citing Airbag as component involved.

- 2008:  106 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved and 2 deaths citing Unknown component.

- 2009:  133 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved, 1 death citing Service Brake as component involved, 1 death citing Steering as component involved, and 2 deaths citing Unknown component.

- 2010:  400 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 12 deaths citing Steering as component involved, and 1 death citing Unknown component.

- 2011:  187 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 2 deaths citing Steering as component involved, and 1 citing Unknown component.

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

48.     GM now admits that Old GM learned of the ignition switch defects as early as 2001.  During the pre-production development of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position.  Old GM claimed that a switch design change "had resolved the problem."[2]

49.     In 2003, an internal report documented an instance in which the service technician observed a stall while driving.  The service technician noted that the weight of several keys on

---

[2] "G.M. Reveals It Was Told of Ignition Defect in '01," D. Ivory, NEW YORK TIMES (Mar. 12, 2014).

the key ring had worn out the ignition switch.  The switch was replaced and the matter was closed.[3]

50.     According to GM's latest chronology submitted to NHTSA pursuant to 49 C.F.R. § 573.6, Old GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

51.     Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue.  According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

52.     According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions."  But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

53.     Gary Altman, program engineering manager for the 2005 Cobalt, admitted that Old GM's engineering managers knew about ignition-switch problems in the vehicle that could disable power steering, power brakes and airbags, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable, though he did not attempt to explain why the vehicle would not require an operable airbag.  Needless to say, hapless Cobalt purchasers were not informed of Old GM's decision to release the vehicle notwithstanding its knowledge of the ignition switch defect.

54.     As soon as the 2005 Cobalt hit the market, Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[4]  Old GM opened additional PRTS inquires.

---

[3] *Id.*
[4] March 11, 2014, Chronology Re: Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles, at 1.

55.     In another PRTS opened in May 2005, Old GM engineers again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration, in order to make the key and key fob hang higher in the vehicle and therefore make it less likely that a driver's knee would inadvertently shut down the vehicle.  After initially approving the proposed partial fix, Old GM reversed course and again declined to even attempt to implement a fix.[5]

56.     Instead, in October 2005, Old GM simply issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the loss of power in the vehicles' electrical system.

57.     Rather than disclosing the true nature of the defects and correcting them, under the TSB, Old GM gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key and fob from moving up and down in the slot.  "[T]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging as low as they had in the past.[6]  According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[7]

58.     Yet there was no recall.  And, not surprisingly, Old GM continued to get complaints.

59.     In 2006, Old GM approved a design change for the Cobalt's ignition switch supplied by Delphi.  The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch."  But the new design was not produced until the 2007 model year.[8]

60.     In what a high-level engineer at Old GM now calls a "cardinal sin" and "an extraordinary violation of internal processes," Old GM changed the part ***design but kept the old***

---

[5] *Id.*
[6] *Id.* at 1-2.
[7] *Id.* at 3.
[8] *Id.* at 2.

*part number*.  That makes it impossible to determine from the part number alone which GM

vehicles produced after 2007 contain the defective ignition switches.

61.     In 2007, NHTSA investigators met with Old GM to discuss its airbags, and

informed Old GM of the July 2005 frontal and fatal crash involving Amber Marie Rose.

62.     As alleged above, the airbags in Ms. Rose's 2005 Cobalt did not deploy.  Data

retrieved from her vehicle's diagnostic system indicated that the ignition was in the "accessory"

position.  Old GM investigated and tracked similar incidents.

63.     By the end of 2007, by GM's own admission, Old GM knew of 10 frontal

collisions in which the airbag did not deploy.  Plaintiff believes that Old GM actually knew of

many other similar incidents involving the ignition switch defects.

64.     At a May 15, 2009 meeting, GM engineers learned that data in the black boxes of

Chevrolet Cobalt vehicles showed that the dangerous ignition switch defects existed in hundreds

of thousands of Defective Vehicles.  But still GM did not reveal the defect to NHTSA, Plaintiff

or the Class.

65.     After the May 15, 2009 meeting, GM continued to get complaints of unintended

shut down and continued to investigate frontal crashes in which the airbags did not deploy.

66.     After the May 15, 2009 meeting, GM told the families of accident victims and

Defective Vehicle owners that it did not have sufficient evidence to conclude that there was any

defect in the Defective Vehicles.  In one case involving the ignition switch defects, GM

threatened to sue the family of an accident victim for reimbursement of its legal fees if the family

did not dismiss its lawsuit.  In another, GM sent the victim's family a terse letter, saying there

was no basis for any claims against GM.  These statements were part of GM's continuation of

the campaign of deception begun by Old GM.

67.     According to GM, it was not until 2011 and 2012 that GM's examinations of

switches from vehicles that had experienced crashes revealed significant design differences in

the torque performance of ignition switches from the 2005 Cobalt vehicles and those from the

2010 model year, the last year of the Cobalt's production.

68.     GM responded by blaming the supplier for the switch design.

69.     In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the 2003-2007 Chevrolet Cobalt and 2005-2007 Pontiac G5 vehicles.

## DEFENDANT WAITED UNTIL 2014 TO
## FINALLY ORDER A RECALL OF THE DEFECTIVE VEHICLES

70.     After analysis by GM's Field Performance Review Committee and the Executive Field Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of some of the Defective Vehicles on January 31, 2014.

71.     Initially, GM's EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

72.     After additional analysis, the EFADC expanded the recall on February 24, 2014, to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

73.     Most recently, on March 28, 2014, GM expanded the recall a third time, to include Chevrolet Cobalts, Pontiac G5s and Solstices, Saturn Ions and Skys from the 2008 through 2010 model years, and Chevrolet HHRs from the 2008 through 2011 model years.

74.     GM provided dealers with notice of the recalls on February 26, 2014, March 4, 2014, and March 28, 2014, and mailed letters to some of the current owners of the Defective Vehicles on March 10 and March 11, 2014.

75.     To date, GM has *not* pledged to remedy the fact that the key and fob in the Defective Vehicles hang dangerously low, leading to an unreasonable risk that the driver's knee will inadvertently shut down the Defective Vehicles during ordinary driving conditions.

76.     In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes.

14

77.    According to Ms. Barra, "Something went terribly wrong in our processes in this instance, and terrible things happened."  Barra went on to promise, "[w]e will be better because of this tragic situation if we seize this opportunity."[9]

78.    GM now faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

79.    While GM has now appointed a new Vehicle Safety Chief, on information and belief, at least 2.59 million potentially Defective Vehicles remain on the road to this day; and, on information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defects.

## DEFENDANT HAS NOT RECALLED ALL THE DEFECTIVE VEHICLES

80.    Plaintiff's research, including a review of NHTSA's complaint database, suggests that GM's recall does not capture all of the Defective Vehicles.  Plaintiff thereupon believes and alleges that the following additional non-recalled GM vehicles also have defective ignition switches: the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

81.    Plaintiff owned a 2006 Saturn Ion.  This make and model was included in GM's ignition switch recall.

82.    On information and belief, in marketing and advertising materials, Old GM and GM consistently promoted all their vehicles, including the Defective Vehicles, as safe and reliable.

83.    For example, under a section captured "safety," Old GM's website for its Chevrolet brand stated in 2005:

> OUR COMMITMENT
> Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe – from the start of your journey to your destination.

---

[9] "Something Went 'Very Wrong' at G.M., Chief Says."  N.Y. TIMES (Mar. 18, 2014).

That's why every Chevrolet is designed with a comprehensive list of
safety and security features to help give you peace of mind….

84.    One Cobalt ad promised, "Side curtain airbags coupled with OnStar makes every

journey the safest possible to assure that you and your occupants will stay safe at all times."

85.    An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines

performance."

86.    A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically

engineered for whatever is next."  Another 2003 spot closed with the tagline "Saturn.  People

first."

87.    A 2001 print ad touting the launch of the Saturn focused on safety: "Need is

where you begin.  In cars, it's about things like reliability, durability and, of course, safety.

That's where we started when developing our new line of cars.  And it wasn't until we were

satisfied that we added things…."

88.    Once GM came into existence, it continued to stress the safety and reliability of

all its vehicles, including the Defective Vehicles.

89.    For example, GM's Chevrolet brand ran television ads in 2010 showing parents

bringing their newborn babies home from the hospital, with the tagline "As long as there are

babies, there'll be Chevys to bring them home."

90.    Another 2010 television ad informed consumers, "Chevrolet's ingenuity and

integrity remain strong, exploring new areas of design and power, while continuing to make

some of the safest vehicles on earth."

91.    Old GM and GM made these representations to boost vehicle sales and maximize

profits while knowing that the ignition switches in the Defective Vehicles were defective.

92.    Throughout the relevant period, Old GM and GM possessed vastly superior

knowledge and information to that of consumers – if not exclusive information – about the

design and function of the ignition switches in the Defective Vehicles and the existence of the

defects in those vehicles.

93.    Old GM and GM never informed consumers about the ignition switch defects.

**THE IGNITION SWITCH DEFECTS HAVE HARMED PLAINTIFF AND THE CLASS**

94.    The ignition switch defects have caused damage to Plaintiff and the Class.

95.    A vehicle purchased, leased, or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

96.    A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

97.    Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed.  Plaintiff and the Class overpaid for their Defective Vehicles.  Because of the concealed ignition switch defects, Plaintiff did not receive the benefit of the bargain.

98.    Class members who purchased new or used Defective Vehicles after the date Defendant came into existence – July 10, 2009 – overpaid for their Defective Vehicles as a direct result of Defendant's ongoing violations of the TREAD Act and state consumer protection laws by failing to disclose the existence of the ignition switch defects.

99.    Plaintiff and the Class became stuck with unsafe vehicles that are now worth less than they would have been but for the Companies' failure to disclose and remedy the ignition switch defects.  Because of the defect and the wreck, Plaintiff has lost the use and enjoyment of this vehicle, and even if the car is repaired, the value of the car is lower because of the recall and defect.  Plaintiff has been forced to incur additional, unplanned expenses because of the loss of the car.

100.    Defendant admits to at least 13 deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles.  However, Plaintiff believes that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignition switch defects.

101.    If Old GM or GM had timely disclosed the ignition switch defects as required by the MCPA, the TREAD Act, and the State consumer protection laws set forth below, all Class members' vehicles would now be worth more.

## SUCCESSOR LIABILITY

102.    As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure and concealment of the ignition switch defects from the date of its formation on July 10, 2009.

103.    GM also expressly assumed liability for Lemon Law claims in the Master Sale and Purchase Agreement of June 26, 2009.

104.    GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM's current CEO, Mary Barra, began working at Old GM in 1980, and in February 2008 she became Vice President of Global Manufacturing Engineering, in which position she knew or should have known of the ignition switch defects;

- GM's Rule 30(b)(6) deponent concerning complaints Old GM and GM received about ignition switch defects in the Cobalt, Victor Hakim, worked at Old GM from 1971 until the end of Old GM, and now is a "Senior Manager/Consultant" in the "field performance assessment" department, further demonstrating GM's longstanding knowledge of the ignition switch defects.

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

- GM retained the bulk of the employees of Old GM; GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of Old GM; and

- GM acquired all goodwill and other intangible personal property of Old GM.

## **TOLLING OF THE STATUTES OF LIMITATION**

105.    All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein.  Plaintiff and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old GM and GM did not report information within their knowledge to federal authorities (NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this class action was filed.

106.    Indeed, Old GM instructed its service shops to provide Defective Vehicle owners with a new key ring if they complained about unintended shut down, rather than admit what Old GM knew: that the ignition switches were dangerously defective and warranted replacement with a properly designed and built ignition system.

107.    In April 2006, some eight years before the first recall of some Defective Vehicles, Old GM internally authorized a redesign of the defective ignition switch. Yet, as part of Old GM's concealment of the defect, GM redesigned the part but kept the old part number. According to one of the high-level Old GM engineers at the time, "Changing the fit, form or function of a part without making a part number change is a cardinal sin.  It would have been an extraordinary violation of internal processes."[10]

108.    Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiff, and the Class the true character, quality, and nature of the Defective Vehicles;

---

[10] "'Cardinal sin': Former GM engineers say quiet '06 redesign of faulty ignition switch was a major violation of protocol."  Automotive News (Mar. 26, 2014).

that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

109.    Because of the active concealment by Old GM and GM, any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled and GM is estopped from relying on any statutes of limitation in their defense of this action.

## CLASS ACTION ALLEGATIONS

110.    Plaintiff seeks relief in her individual capacity and seeks to represent a class consisting of all others who are similarly situated.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a class initially defined as follows:

> All persons in Kentucky and the United States who formerly or currently own or lease one or more of the following GM vehicles: (a) 2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010; Saturn Sky; and (b) (Non-recalled vehicles): the 2005 Chevrolet Equinox, the 2006; Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

111.    Excluded from the Class are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased the Product for the purpose of resale.

112.    Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division into subclasses after they have had an opportunity to conduct discovery.

113.    <u>Numerosity</u>.  Fed. R. Civ. P. 23(a)(1).  The Class is so numerous that joinder of all members is unfeasible and not practicable.  While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that many millions of consumers have purchased or leased the Defective Vehicles.

114. <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

      a.      Whether the Defective Vehicles suffer from ignition switch defects;

      b.      Whether Defendant violated the Kentucky Consumer Protection Act KRS § 367.110, *et seq.*;

      c.      Whether Defendant was negligent;

      d.      Whether Defendant fraudulently concealed the ignition switch defects;

      e.      Whether Defendant is liable for a design defect;

      f.      Whether Defendant violated the MMWA, 15 U.S.,C. § 2301, *et seq.*;

      g.      Whether Defendant violated KRS § 355.2-313

      h.      Whether Defendant the MCPA, Mich. Comp. L. Ann. § 445.901, *et seq.*;

      i.      Whether Defendant violated the other state statutes prohibiting unfair and deceptive acts and practices; and

      j.      The nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

115. <u>Typicality</u>. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

116. <u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

117. <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially

conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

118.    <u>Injunctive and Declaratory Relief</u>.  Fed. R. Civ. P. 23(b)(2).  Defendant's misrepresentations are uniform as to all members of the Class.  Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### (Violation of Kentucky Consumer Protection Act, KRS § 367.110, et seq.)

119.    Plaintiff incorporates by reference and re-allege the preceding paragraphs.

120.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Kentucky residents who formerly or currently own or lease one or more of the Defective Vehicles.

121.    Defendant misrepresented the safety of the Defective Vehicles after learning of their defects with the intent that Plaintiff and the Class rely on such representations in her decision regarding the purchase, lease and/or use of the Defective Vehicles.

122.    Plaintiff and the Class did, in fact, rely on such representations in their decision regarding the purchase, lease and/or use of the Defective Vehicles.

123.    Through those misleading and deceptive statements and false promises, Defendant violated the Kentucky Consumer Protection Act ("KCPA").

124.    The KCPA applies to Defendant's transactions with Plaintiff and the Class because Defendant's deceptive scheme was carried out in Kentucky and affected Plaintiff and the Class.

125.    Defendant also failed to advise NHSTA and the public about what they knew about the ignition defects in the Defective Vehicles.

126.    Plaintiff and the Class relied on Defendant's silence as to known defects in connection with their decision regarding the purchase, lease and/or use of the Defective

Vehicles.

127.    As a direct and proximate result of Defendant's deceptive conduct and violation of the KCPA, Plaintiff and the Class have sustained and will continue to sustain economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

128.    Defendant's conduct was knowing and/or intentional and/or with malice and/or demonstrated a complete lack of care and/or reckless and/or was in conscious disregard for the rights of Plaintiff, and thus Plaintiff is entitled to punitive damages.

## SECOND CAUSE OF ACTION

### (Breach of Express Warranty, KRS § 355.2-313)

129.    Plaintiff incorporates by reference and re-allege the preceding paragraphs.

130.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Kentucky residents who formerly or currently own or lease one or more of the Defective Vehicles.

131.     Defendant expressly warranted – through statements and advertisements described above – that the vehicles were of high quality, and at a minimum, would actually work properly and safely.

132.    Defendant breached this warranty by knowingly selling to Plaintiff and the Class vehicles with dangerous defects, and which were not of high quality.

133.    Plaintiff and the Class have been damaged as a direct and proximate result of the breaches by Defendant in that the Defective Vehicles purchased by Plaintiff and the Class were and are worth far less than what the Plaintiff and the Class paid to purchase, which was reasonably foreseeable to Defendant.

134.    As a result of the foregoing wrongful conduct of Defendant, Plaintiff has been damaged in an amount to be proven at trial, including, but not limited to, actual and punitive damages, equitable relief and reasonable attorneys' fees.

Case 7:14-cv-00071-ART Doc #: 1-1 Filed: 05/02/14 Page: 24 of 36 - Page ID#: 24

## THIRD CAUSE OF ACTION

### (Negligence)

135.     Plaintiff incorporates by reference and re-allege the preceding paragraphs.

136.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Kentucky residents who formerly or currently own or lease one or more of the Defective Vehicles.

137.     Defendant had a duty to its customers as a manufacturer of motor vehicles to design, manufacture, market, and provide vehicles that, in their ordinary operation, are reasonably safe for their intended uses.  Defendant had a duty to adequately test its vehicles' safety before selling millions to consumers worldwide.

138.     Defendant had a duty to test vehicles for ignition switch problems once Defendant was on notice that its vehicles had a propensity to have ignition switch issues leading to engine failure, which can cause bodily injury, death, and property damage.  Moreover, Defendant had a duty to provide true and accurate information to the public to prevent undue risks arising from the foreseeable use of its products.

139.     At all times relevant, Defendant sold, marketed, advertised, distributed, and otherwise placed Defective Vehicles into the stream of commerce in an unlawful, unfair, fraudulent, and/or deceptive manner that was likely to deceive the public.

140.     Defendant was negligent, and breached the above duties owed to Plaintiff and Class members.

141.     As direct and proximate causes of Defendant's breaches, Plaintiff and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

## FOURTH CAUSE OF ACTION

### (Fraudulent Concealment)

142.    Plaintiff incorporates by reference and re-allege the preceding paragraphs.

143.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Kentucky residents who formerly or currently own or lease one or more of the Defective Vehicles.

144.    Defendant concealed material facts concerning the ignition switch defects before, during, and after the sale of the Defective Vehicles to Plaintiff and Class members, intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiff and the Class information that is highly relevant to their purchasing decision..

145.    Defendant had a duty to disclose the ignition switch defects because it was known only to Defendant, who had superior knowledge and access to the facts, and Defendant knew it was not known to or reasonably discoverable by Plaintiff and Class members.  These concealed facts were material because they directly impact the safety of the Defective Vehicles.  Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

146.    Defendant actively concealed these material facts, in whole or in part, to protect its profits and avoid a costly recall, and it did so at the expense of Plaintiff and the Class.

147.    Plaintiff and the Class were unaware of these concealed material facts and would not have acted as they did if they had known of the concealed facts.  Plaintiff' and Class members' actions were justified.  Defendant was in exclusive control of the material facts and the public, Plaintiff, and the Class did not know of these facts prior to purchasing the Defective Vehicles.

148.    Because of the concealment of the facts, Plaintiff and the Class sustained damage because they purchased and retained Defective Vehicles that are now diminished in value from what they would have been had Defendant timely disclosed the ignition switch defects.

149.    Defendant further affirmatively misrepresented to Plaintiff in advertising and

other forms of communication, including standard and uniform material provided with each car, that the vehicles they were selling were new, had no significant defects and would perform and operate properly when driven in normal usage.

150.    The above misrepresentations and concealments were material because they were facts that would typically be relied upon by a person purchasing or leasing a new motor vehicle, and if it had been disclosed Plaintiff and the Class would not have bought or leased the Defective Vehicles.

151.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiff's and Class members' rights and well-being, and to enrich Defendant.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION**

**(Violation of Magnuson-Moss Warranty Act, 15 U.SC. § 2301,** *et seq.***)**

152.    Plaintiff incorporates by reference and re-allege the preceding paragraphs.

153.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Kentucky residents who formerly or currently own or lease one or more of the Defective Vehicles.

154.    Plaintiff and Class members are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

155.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

156.    The Defective Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

157.    Defendant affirmed the fact, promise, and/or described in writing that the ignition switch would meet a specified level of performance over a specified period of time, namely, that

it would not require maintenance and last for the life of the Defective Vehicles. Defendant's written affirmations of fact, promises, or descriptions related to the nature of the ignition switch in the Defective Vehicles and became part of the basis of the bargain between Plaintiff and Defendant. Defendant refuses to recognize or honor the written ignition switch warranties and, indeed, denies the existence of these warranties. Defendant breached its written warranties when the Defective Vehicles did not perform as represented by Defendant and thereafter when Defendant refused to recognize or honor the warranties. Defendant's conduct thereby caused damages to Plaintiff and Class members.

158.    The amount in controversy of Plaintiff's individual claim meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

159.    Resorting to any informal dispute resolution procedure and/or affording Defendant a reasonable opportunity to cure its breach of written warranties to Plaintiff is unnecessary and/or futile. At the time of sale to Plaintiff, Defendant knew, should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the ignition switch defects, but nevertheless failed to rectify the situation and/or disclose it to Plaintiff. Moreover, the remedies available through any informal dispute resolution procedure would be wholly inadequate under the circumstances. Accordingly, any requirement under the MMWA or otherwise that Plaintiff resort to any informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of written warranties is excused and, thereby, deemed satisfied.

160.    As a direct and proximate result of Defendant's breach of written warranties, Plaintiff and Class members sustained damages and other losses. Defendant's conduct caused Plaintiff' and Class members' damages and, accordingly, Plaintiff and Class members are entitled to recover damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other equitable relief as appropriate.

Case 2:14-cv-00071-WOB    Doc #: 1 Filed: 05/02/14    Page: 28 of 88 - Page ID#: 28

## SIXTH CAUSE OF ACTION

### (Violations of Michigan Consumer Protection Act, Mich. Comp. L. Ann. § 445.901, *et seq.*)

161.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

162.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of Kentucky residents who formerly or currently own or lease one or more of the Defective Vehicles.

163.    Old GM, GM, and Plaintiff are each "persons" under Mich. Comp. L. Ann. § 445.902(d).

164.    The sale of the Defective Vehicles to Plaintiff and the Class occurred within "trade and commerce" within the meaning of Mich. Comp. L. Ann. § 445.902(d), and both GM and Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

165.    The MCPA deems unlawful any "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce," as more specifically defined in the MCPA. Mich. Comp. L. Ann. § 445.903(1).  GM has engaged in unfair, unconscionable, and deceptive methods, acts and practices in violation of the MCPA, and also has successor liability for the unfair, unconscionable, and deceptive methods, acts, and practices of Old GM as described herein.

166.    Both Old GM and GM violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."  Mich. Comp. L. Ann. § 445.903(s).

167.    As alleged above, both Companies knew of the ignition switch defect, while Plaintiff and the Class were deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer

until the February and March 2014 recalls.

168.     Old GM also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is."  Mich. Comp. L. Ann. § 405.903(bb). Indeed, Old GM represented that the Defective Vehicles were safe such that reasonable people believed such representations to be true.

169.     Old GM also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. L. Ann. § 405.903(cc).  Old GM represented that the Defective Vehicles were safe, yet failed to disclose the material fact that the ignition switch was defective.

170.     Old GM's and GM's acts and practices were unfair and unconscionable because their acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and the Companies' failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and because the harm the Companies caused consumers greatly outweighs any benefits associated with those practices. While Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Defective Vehicles until 2007.

171.     All the while, Old GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

172.     Plaintiff and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.

173.     Old GM and GM failed to inform NHTSA, and therefore failed to inform consumers, that the Defective Vehicles had a defective ignition switch that could lead to injury and death. Had Plaintiff and the Class known this, they would either not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles. Plaintiff and the Class have therefore suffered a "loss" because of the violations of the

MCPA complained of herein.

174.    Plaintiff requests that this Court: enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; provide to Plaintiff and each Class member either their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under Mich. Comp. L. Ann. § 445.911.

175.    Plaintiff acknowledges that, on its face, the MCPA purports to (i) deprive non-residents of bringing class (but not individual) actions under the MCPA; and (ii) allows individuals (but not class members) the ability to recover a penalty of $250 per person if that amount is greater than their actual damages.  After the United States Supreme Court's decision in *Shady Grove Orthopedic Ass'n, P.A. v. Allstate Ins. Co.*, 589 U.S. 393 (2010), however, any such prohibitions imposed in class actions (but not in individual actions) are trumped and superseded by Fed. R. Civ. P. 23, which imposes no such restrictions.

**SEVENTH CAUSE OF ACTION**
**(Violations of the Other State Statutes Prohibiting**
**Unfair and Deceptive Acts and Practices)**

176.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

177.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of subclasses of the other states' residents who formerly or currently own or lease one or more of the Defective Vehicles.

178.    The state deceptive trade practices acts were enacted by the various states following the passage of the Federal Trade Commission Act ("FTC Act"), which prohibits deceptive acts and practices in the sale of products to consumers. The state laws in this area are modeled on the FTC Act and are therefore highly similar in content.

179.    Defendant's actions violate the Deceptive Trade Practices Acts of the various states, as set out more fully above, by failing to disclose and by actively concealing the defective

ignition switch in GM vehicles.

180.     The conduct described in the statement of facts constitutes unfair or deceptive trade practices predominantly and substantially affecting the conduct of trade or commerce throughout the United States in violation of the state deceptive trade practices acts and other similar state statutes prohibiting unfair and deceptive acts and practices.  The deceptive trade practices acts violated by Defendant are set forth in the next paragraph.

181.     The violations of the various state consumer protection acts (Alabama: the Alabama Deceptive Trade Practices Act (Ala. Code §8-19-1 et seq.); Alaska: Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. §45.50.471 et seq.); Arizona: the Arizona Consumer Fraud Statute (Ariz. Rev. Stat. Ann. §44-1521 et seq.); Arkansas: the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. §4-88-101 et seq.); California: the California False Advertising Law, California Business & Professions Code § 17200, et. seq.); Colorado: the Colorado Consumer Protection Act (Colo. Rev. Stat. §6-1-101 et seq.); Connecticut: the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §42-110a et seq.);  Washington, D.C. the Consumer Protection Procedures Act (D.C. Code Ann. §28-3901 et seq.); Florida: the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. §501.201 et seq. (West)) and the Florida False Advertising Statutes (Fla. Stat. Ann. §817.40 et seq. (West)); Georgia: Uniform Deceptive Trade Practices Act (Ga. Code Ann. §10-1-370 et seq.); the Fair Business Practices Act (Ga. Code Ann. §10-1-390 et seq.); and the False Advertising Statute (Ga. Code Ann. §10-1-420 et seq.); Hawaii: The Hawaii Federal Trade Commission Act (Hawaii Rev. Stat. §480 et seq.) and the Uniform Deceptive Trade Practice Act (Hawaii Rev. Stat. §481A et seq.); Idaho: the Idaho Consumer Protection Act (Idaho Code §48-601 et seq.); Illinois: the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. §505/1 et seq. (Smith Hurd)) and the Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. Ann. 510/1 et seq. (Smith Hurd)); Indiana: the Deceptive Consumer Sales Act (Ind. Code Ann. §24-5-0.5-1 et seq. (Burns)); Iowa: the Iowa Consumer Fraud Act (Iowa Code Ann. §714.16 (West)); Kansas:  the Kansas Consumer Protection Act (Kan. Stat. Ann. §50-623 et seq.); Louisiana: the Unfair Trade Practices and

Consumer Protection Law (La. Rev. Stat. Ann. §51:1401 (West)); Maine: the Maine Unfair Trade Practices Act (Me. Rev. Stat. Ann. Tit. 5 §206 et seq.) and the Uniform Deceptive Trade Practices Act (Me. Rev. Stat. Ann. Tit. 10 §1211 et seq.); Maryland: the Maryland Consumer Protection Act (Md. Com. Law Code Ann. §§13-101 et seq., 14-101 et seq.); Massachusetts: the Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A); Minnesota: the Consumer Fraud Act (Minn. Stat. Ann. §325 F. 69); the False Statement in Advertisement Statute (Minn. Stat. Ann. §325 F. 67); the Uniform Deceptive Trade Practices Act (Minn. Stat. Ann. §325D.44); and the Unlawful Trade Practices Act (Minn. Stat. Ann. §325D.13); Mississippi: the Consumer Protection Act (Miss. Code Ann. §75-24-1 et seq.) and the False Advertising Statutes (Miss. Code Ann. §97-23-3); Missouri: the Missouri Merchandising Practices Act (Mo. Rev. Stat. §407.010 et seq.); Montana: the Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. §30-14-101 et seq.); and the Statutory Deceit Statute (Mont. Code Ann. §27-1-712); Nebraska: the Nebraska Consumer Protection Act (Neb. Rev. Stat. §59-1601 et seq.) and the Nebraska Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. §87-301 et seq.); Nevada: the Deceptive Trade Statutes (Nev. Rev. Stat. §§598.0903 et seq., 41.600 et seq.);  New Hampshire: the Regulation of Business Practices for Consumer Protection Act (N.H. Rev. Stat. Ann. §358-A:1 et seq.); New Jersey: the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §56:8-1 et seq. (West)); New Mexico: New Mexico Unfair Practices Act (N.M. Stat. Ann. §57-12-1 et seq.); New York: New York Consumer Protection Act (N.Y. Gen. Bus. Law §§349, 350 (Consol.)); North Carolina: North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §75-1.1 et seq.); North Dakota: Deceptive Act or Practice Statutes (N.D. Gen. Stat. §51-15-01 et. seq.); Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. §1345.01 et seq. (Baldwin)); Oklahoma: Oklahoma Consumer Protection Act (Okla. Stat. Ann. Tit. 15, §751 et seq. (West)) and the Oklahoma Deceptive Trade Practices Act (Okla. Stat. Ann. Tit. 78, §51 et seq. (West)); Oregon: the Unlawful Trade Practices Act (Or. Rev. Stat. §646.605 et seq.) and the Oregon Food and Other Commodities Act (Or. Rev. Stat. §616.005 et seq.); Pennsylvania: Unfair Trade Practices Act and Consumer Protection Law (Pa. Stat. Ann. Tit. 73 §201-1 et seq. (Purdon); Rhode Island:

Consumer Protection Act (R.I. Gen. Law §6-13.1-1 et seq.); South Carolina: South Carolina
Unfair Trade Practices Act (S.C. Code Ann. §39-5-10 et seq.); South Dakota: South Dakota
Deceptive Trade Practices and Consumer Protection Law (S.D. Codified Laws Ann. §37-24-1 et
seq.); Tennessee: Tennessee Consumer Protection Act (Tenn. Code Ann. §47-18-101 et seq.);
Texas: Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code Ann. §17.41 et seq.
(Vernon)); Utah:  Utah Consumer Sales Practices Act (Utah Code Ann. §13-11-1 et seq.) and the
Utah Truth in Advertising Act (Utah Code Ann. §13-11a-1 et seq.); Vermont: Vermont Consumer
Fraud Statute (Vt. Stat. Ann. Tit. 9, §2451 et seq.); Virginia: Virginia Consumer Protection Act
(Va. Code 59.1-196 et seq.); Washington: Washington Consumer Protection Act (Wash. Rev.
Code Ann. §19.86 et seq.); West Virginia: West Virginia Consumer Credit and Protection Act
(W. Va. Code §46A-6-101 et seq.); Wisconsin: Wisconsin Fraudulent Representations Act (Wis.
Stat. Ann. §100.18 et seq. (West)); Wyoming: Consumer Protection Act (Wyo. Stat. §40-12-101
et seq.)) have directly, foreseeably, and proximately caused damages to Plaintiff and proposed
class in amounts yet to be determined.

182.    As a result of Defendant's violations of the Deceptive Trade Practices Acts of the
various states prohibiting unfair and deceptive acts and practices, Plaintiff and Class members
have suffered actual damages for which Defendant is liable.

## EIGHTH CAUSE OF ACTION

### (Breach of Contract/Common Law Warranty/Unjust Enrichment)

183.    Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

184.    Plaintiff brings this claim individually and on behalf of the nationwide Class, or,
alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of
Kentucky residents who formerly or currently own or lease one or more of the Defective
Vehicles.

185.    To the extent Defendant's repair or adjust commitment is deemed not to be a
warranty under Kentucky's Commercial Code, Plaintiff pleads in the alternative under common
law warranty and contract law. Defendant limited the remedies available to Plaintiff and the Class

to just repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Defendant, and/or warranted the quality or nature of those services to Plaintiff.

186.     Defendant breached this warranty or contract obligation by failing to repair the Defective Vehicles evidencing an ignition switch problem, including those that were recalled, or to replace them.

187.     As a direct and proximate result of Defendant's breach of contract or common law warranty, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

188.     In the alternative, Defendant had knowledge of the safety defects in its vehicles, which it failed to, disclose to Plaintiff and the Class.

189.     As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Defendant charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Plaintiff.

190.     Defendant appreciated, accepted and retained the benefits conferred by Plaintiff and the Class, who without knowledge of the safety defects paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant to retain these wrongfully obtained profits. There is no justification for Plaintiff's and the Class' impoverishment and Defendant's related enrichment.

191.     Plaintiff, therefore, are entitled to restitution and seek an order establishing Defendant as constructive trustees of the profits unjustly obtained, plus interest.

## NINTH CAUSE OF ACTION

### (Breach of Implied Warranty of Merchantability, KRS § 335.2-314)

192.     Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

193.     Plaintiff brings this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of a Class of

Kentucky residents who formerly or currently own or lease one or more of the Defective Vehicles.

194.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

195.     Defendants impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

196.     As described above, there were dangerous defects in the vehicles manufactured, distributed, and/or sold by Defendants, which Plaintiffs purchased, including, but not limited to, defects that caused the vehicles to suddenly and unintentionally accelerate, and the lack of safety slow and stop the vehicle when such acceleration occurred.

197.     These dangerous defects existed at the time the vehicles left Defendants' manufacturing facilities and at the time they were sold to Plaintiffs. Furthermore, because of these dangerous defects, Plaintiffs did not receive the benefit of their bargain and the vehicles have suffered a diminution in value.

198.     These dangerous defects were the direct and proximate cause of damages to the Plaintiffs and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in her favor and against Defendant, as follows:

A.     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B.     Ordering Defendant to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiff and the other members of the Class;

C.     Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the other members of the Class;

D.   Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and the other members of the Class;

E.   Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective recall campaign;

F.   Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

G.   Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

H.   Ordering such other and further relief as may be just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class demand a trial by jury.

Respectfully submitted,

s/Jasper D. Ward

JONES WARD PLC
Jasper D. Ward IV
Marion E. Taylor Building
312 South Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Phone: (502) 882-6000
Facsimile: (502) 587-2007
*Attorneys for Plaintiff*
*To be admitted Pro Hac Vice*