# Exhibit J

JS 44C/SDNY
REV. 4/2014

**CIVIL COVER SHEET**

14 CV 3298

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS
LISA PHANEUF, ADAM SMITH, MIKE GARCIA, JAVIER DELACRUZ,
STEVE SILEO, STEVEN BUCCI, DAVID PADILLA, CATHERINE CABRAL
and JOSEPH CABRAL

DEFENDANTS
GENERAL MOTORS LLC

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
1311 Mamaroneck Avenue, White Plains, New York 10605
(914) 298-3281 x 2801

ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

MAY - 7 2014

Consumer Protection Claims Under The Laws Of Various States; Diversity Pursuant to 1332(d) CAFA

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [✓] Yes [ ] Judge Previously Assigned

If yes, was this case  Vol. [ ]  Invol. [ ]  Dismissed.  No [ ]  Yes [ ]  If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE?          No [ ]          Yes [ ]

(PLACE AN [x] IN ONE BOX ONLY)                    NATURE OF SUIT

| TORTS | | | | ACTIONS UNDER STATUTES |
|---|---|---|---|---|
| **CONTRACT** | **PERSONAL INJURY** | **PERSONAL INJURY** | **FORFEITURE/PENALTY** | **BANKRUPTCY** |

**CONTRACT**
[ ] 110  INSURANCE
[ ] 120  MARINE
[ ] 130  MILLER ACT
[ ] 140  NEGOTIABLE INSTRUMENT
[ ] 150  RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151  MEDICARE ACT
[ ] 152  RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153  RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160  STOCKHOLDERS SUITS
[x] 190  OTHER CONTRACT
[ ] 195  CONTRACT PRODUCT LIABILITY
[ ] 196  FRANCHISE

**PERSONAL INJURY**
[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY
[ ] 362 PERSONAL INJURY - MED MALPRACTICE

**PERSONAL INJURY**
[ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**
[ ] 463 ALIEN DETAINEE
[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
[ ] 440  OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ ACCOMMODATIONS
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 448 EDUCATION

**PRISONER CIVIL RIGHTS**
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION
[ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT

**FORFEITURE/PENALTY**
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690 OTHER

**LABOR**
[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 740 RAILWAY LABOR ACT
[ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**IMMIGRATION**
[ ] 462 NATURALIZATION APPLICATION
[ ] 465 OTHER IMMIGRATION ACTIONS

**BANKRUPTCY**
[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**
[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**
[ ] 375 FALSE CLAIMS
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 896 ARBITRATION
[ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**REAL PROPERTY**
[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

Check if demanded in complaint:

[✓] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ TBD _____   OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE Jesse M. Furman                DOCKET NUMBER 14-2458

Check YES only if demanded in complaint
JURY DEMAND: [X] YES [ ] NO

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*    **ORIGIN**

[x] 1 Original Proceeding    [ ] 2 Removed from State Court    [ ] 3 Remanded from Appellate Court    [ ] 4 Reinstated or Reopened    [ ] 5 Transferred from (Specify District)    [ ] 6 Multidistrict Litigation    [ ] 7 Appeal to District Judge from Magistrate Judge Judgment

[ ] a. all parties represented

[ ] b. At least one party is pro se.

*(PLACE AN x IN ONE BOX ONLY)*    **BASIS OF JURISDICTION**    *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [x] 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [x] 5 |
| CITIZEN OF ANOTHER STATE | [x] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)
**PLEASE SEE SCHEDULE ATTACHED HERETO**

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)
**General Motors LLC**
**C/O CORPORATION SERVICE COMPANY**
**80 STATE STREET**
**ALBANY, NEW YORK, 12207-2543**

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] MANHATTAN
(DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE 5/7/2014    SIGNATURE OF ATTORNEY OF RECORD    ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[x] YES (DATE ADMITTED Mo. July Yr. 2011 )
RECEIPT #    Attorney Bar Code # GB1723

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

## Plaintiffs Addresses

Lisa Phaneuf
203 Austin St.
New Bedford, Massachusetts 02740

Adam Smith
49 Town Farm Road
Ipswich, Massachusetts 01938

Mike Garcia
9841 Mieras Road
Yakima, Washington 98901

Javier Delacruz
10916 Claremount Ave
Albuquerque, New Mexico 87112

Steve Sileo
65 Durham Road
Skillman, New Jersey 08558

Steven Bucci
1335 East State Street, Apt. 8
Sharon, Pennsylvania 16146

David Padilla
1487 Lloyd Thayer Circle
Stockton, California 95206

Catherine Cabral
Joseph Cabral
6 Tower Hill Rd
Somerset, Massachusetts 02726

IH-32                                                                Rev: 2014-1

# United States District Court
### for the
# Southern District of New York
## Related Case Statement

### Full Caption of Later Filed Case:

LISA PHANEUF, ADAM SMITH, MIKE
GARCIA, JAVIER DELACRUZ, STEVE SILEO,
STEVEN BUCCI, DAVID PADILLA,
CATHERINE CABRAL and JOSEPH CABRAL,

| Plaintiff | Case Number |
|---|---|
| vs. | |
| GENERAL MOTORS LLC, | |

Defendant

### Full Caption of Earlier Filed Case:

(including in bankruptcy appeals the relevant adversary proceeding)

STEVE GROMAN, Individually, and on
Behalf of All Others Similarly Situated,

| Plaintiff | Case Number |
|---|---|
| vs. | 1:14-cv-02458-JMF |
| GENERAL MOTORS LLC, | |

Defendant

Page 1

IH-32                                                                    Rev: 2014-1

Status of Earlier Filed Case:

| | Closed | (If so, set forth the procedure which resulted in closure, e.g., voluntary dismissal, settlement, court decision.  Also, state whether there is an appeal pending.) |

| ✓ | Open | (If so, set forth procedural status and summarize any court rulings.) |

The complaint in the earlier filed action has been filed and served on Defendant.  An initial pretrial conference is scheduled for July 2, 2014.

Explain in detail the reasons for your position that the newly filed case is related to the earlier filed case.

The two cases concern substantially similar facts and claims against the same Defendant. Plaintiffs in both cases allege pecuniary injury arising from a defect in Defendant's vehicles' ignition switches, and both complaints allege substantially similar violations of state consumer protection statutes, as well as fraud by concealment, due to Defendant's failure to disclose the defect.

Signature: _____   Date: **May 7, 2014**

         FINKELSTEIN, BLANKINSHIP,
Firm:    FREI-PEARSON & GARBER, LLP
         _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LISA PHANEUF, ADAM SMITH,
MIKE GARCIA, JAVIER
DELACRUZ, STEVE SILEO,
STEVEN BUCCI, DAVID
PADILLA, CATHERINE CABRAL
and JOSEPH CABRAL,

                Plaintiffs,

    v.

GENERAL MOTORS LLC,

                Defendant.

**14** Case No. **CV** _____ **3998**

Jury Trial Demanded

Class Action

      Plaintiffs Lisa Phaneuf, Adam Smith, Mike Garcia, Javier Delacruz, Steve Sileo,

Steven Bucci, David Padilla, Catherine and Joseph Cabral ("Plaintiffs"), individually, and

on behalf of all others similarly situated (the "Class" defined below) allege the following

against Defendant General Motors LLC ("New GM") successor-in-interest to General

Motors Corporation ("Old GM")[1] (collectively, the "Company," or "GM")[2] upon

personal knowledge as to themselves and their own acts and as to all other matters upon

information and belief, based upon, among other things, their attorneys' investigation.

**I.   INTRODUCTION**

    1.   Plaintiffs bring this class action on behalf of themselves and a class (the "Class")

comprised of: all persons in the United States who purchased or leased a Chevrolet

---

[1] General Motors Corporation was renamed Motors Liquidation Company following its
July 2009 bankruptcy.
[2] Any reference to "GM" relating to a date before July 10, 2009 means Old GM. Any
reference to "GM" relating to a date after July 10, 2009 means New GM. Any reference
to "GM" that does not relate to a specific date means Old GM and New GM, collectively.

Cobalt, Chevrolet HHR, Pontiac Solstice, Pontiac G5, Saturn Ion, or Saturn Sky
(collectively, the "Affected Vehicles") at any time between July 10, 2009 and February
13, 2014 (the "Class Period").

2.  As GM has acknowledged in multiple letters to the National Highway Traffic
Safety Administration ("NHTSA"), there is "a defect which relates to motor vehicle
safety" in the Affected Vehicles. To wit, "the ignition switch [in the Affected Vehicles]
may unintentionally move from the 'run' position to the 'accessory' or 'off' position with
a corresponding reduction or loss of power," which, in turn, "may result in the airbags not
deploying, increasing the potential for occupant injury in certain kinds of crashes." Upon
information and belief, this issue (the "Ignition Defect") may also affect a vehicle's
power braking or power steering.

3.  GM admits that it knew about the Ignition Defect for years before it issued a
recall notice. The Company learned of testing results in 2002 that showed that the
ignition switch in the Affected Vehicles did not meet GM's own specifications. In 2004,
GM opened an engineering inquiry after a complaint that the "vehicle can be keyed off
with knee while driving." As an employee of GM's ignition switch supplier wrote, in
2005, "*Cobalt [was] blowing up in [GM's] face in regards to turning the car off with
the driver's knee.*" But after considering a variety of solutions, GM decided to take "no
action" because "tooling cost and piece price are too high" and "none of the solutions
represents an acceptable business case."

4.  Between 2003 and 2013, NHTSA received—and forwarded to GM—more than
240 complaints about the Affected Vehicles suddenly turning off while being driven.
Over a slightly shorter time span (June 2003 to June 2012), GM received 133 complaints

from consumers about vehicles unexpectedly stalling or turning off when going over bumps or when the key was bumped. In many of these complaints, the comments from consumers and GM technicians indicated that they had identified the ignition switch as the likely cause of the problem.

5.  The Ignition Defect posed (and continues to pose) a significant safety risk. As GM itself admits, the Ignition Defect has been linked to at least twelve fatal crashes. And this figure is likely to be understated. On March 13, 2014, the New York Times reported on a study by the Friedman Research Corporation which identified 303 deaths involving GM vehicles in which the airbags failed to deploy to protect people in the front seats.

6.  Both New GM and Old GM had an ongoing duty to disclose the existence of safety defects, such as the Ignition Defect, in the Affected Vehicles. Yet GM concealed the Ignition Defect from consumers until February 2014. As GM's current CEO Mary Barra acknowledged in written testimony submitted to Congress, it "took years for a safety defect to be announced." In a March 17, 2014 video message to employees, Barra admitted that "[s]omething went very wrong in our processes in this instance, and terrible things happened[.]"

7.  As a consequence of GM's uniform misleading omissions, Plaintiffs and members of the Class overpaid for the vehicles that they purchased. Had Plaintiffs and Class members known of the Ignition Defect, they would have paid less for the Affected Vehicles or not purchased/leased the Affected Vehicles at all. By this action, Plaintiffs, on behalf of the Class, seek restitution, actual damages, statutory damages, punitive damages, attorneys' fees and costs for their economic losses.

## II.    PARTIES

8.  Plaintiff Lisa Phaneuf ("Phaneuf") is and at all relevant times has been a citizen of the Commonwealth of Massachusetts. In September 2010, Phaneuf purchased a 2006 Chevrolet HHR (VIN: 3GNDA23P865S505974) from O'Hara Mazda in Fairhaven, MA for $11,779. Phaneuf's Chevrolet HHR was manufactured, sold, distributed, advertised, marketed, and warranted by GM and was purchased by Phaneuf primarily for personal, household and family use. If GM had disclosed the existence of the Ignition Defect, Phaneuf would not have purchased the Affected Vehicle or would have paid significantly less than she did.

9.  Plaintiff Adam Smith ("Smith") is and at all relevant times has been a citizen of the Commonwealth of Massachusetts. In November 2009, Smith purchased a 2007 Pontiac Solstice from Herb Chambers Auto Group in Danvers, Massachusetts. Smith's Pontiac Solstice was purchased by Smith primarily for personal, household and family use. If GM had disclosed the existence of the Ignition Defect, Smith would not have purchased the Affected Vehicle or would have paid significantly less than he did.

10. Plaintiff Mike Garcia ("Garcia") is and at all relevant times has been a citizen of the State of Washington. In April 2011, Garcia purchased a 2010 Chevrolet Cobalt (VIN: 1GCGK29U21Z27310) from Blade Chevrolet & RV's in Yakima, Washington. Garcia's Chevrolet Cobalt was purchased by Garcia primarily for personal, household and family use. If GM had disclosed the existence of the Ignition Defect, Garcia would not have purchased the Affected Vehicle or would have paid significantly less than he did.

11. Plaintiff Javier Delacruz ("Delacruz") is and at all relevant times has been a citizen of the State of New Mexico. In September 2009, Delacruz purchased a 2009

Chevrolet Cobalt in New Mexico. Delacruz's Chevrolet Cobalt was purchased by Delacruz primarily for personal, household and family use. If GM had disclosed the existence of the Ignition Defect, Delacruz would not have purchased the Affected Vehicle or would have paid significantly less than he did.

12. Steve Sileo ("Sileo") is and at all relevant times has been a citizen of the State of New Jersey. In August 2010, Sileo purchased a 2010 Chevrolet Cobalt in New Jersey. Sileo's Chevrolet Cobalt was purchased by Sileo primarily for personal, household, and family use. If GM had disclosed the existence of the Ignition Defect, Sileo would not have purchased the Affected Vehicle or would have paid significantly less than he did.

13. Steven Bucci ("Bucci") is and at all relevant times has been a citizen of the State of Pennsylvania. In November 2009, Bucci purchased a 2009 Chevrolet Cobalt in Pennsylvania. Bucci's Chevrolet Cobalt was purchased by Bucci primarily for personal, household, and family use. If GM had disclosed the existence of the Ignition Defect, Bucci would not have purchased the Affected Vehicle or would have paid significantly less than he did.

14. David Padilla ("Padilla") is and at all relevant times was a citizen of the State of California. In April 2010, Padilla purchased a 2010 Chevrolet Cobalt in California. Padilla's Chevrolet Cobalt was purchased by Padilla primarily for personal, household, and family use. If GM had disclosed the existence of the Ignition Defect, Padilla would not have purchased the Affected Vehicle or would have paid significantly less than he did.

15. Plaintiffs Catherine and Joseph Cabral (the "Cabrals") are citizens of the Commonwealth of Massachusetts. In June 2010, the Cabrals—who were at the time,

residents and citizens of Florida—purchased a 2007 Chevrolet Cobalt (VIN: 1G1AL58F177169102) from Kaiser Pontiac-Buick-GMC Truck, Inc., a GM dealership in Deland, Florida for $13,182. The Cabrals' Chevrolet Cobalt was manufactured, sold, distributed, advertised, marketed, and warranted by GM and was purchased by the Cabrals primarily for personal, household and family use. If GM had disclosed the existence of the Ignition Defect, the Cabrals would not have purchased the Affected Vehicle or would have paid significantly less than they did.

16. Defendant General Motors LLC ("New GM") is a Delaware corporation with a principal place of business in Detroit, Michigan. New GM is a successor-in-interest to General Motors Corporation ("Old GM"). As set forth below, New GM purchased substantially all of Old GM's assets during Old GM's bankruptcy proceedings in 2009. Following Old GM's bankruptcy, New GM has continued to design, manufacture, market, distribute, and sell the Affected Vehicles throughout the United States and in countries across the world.

## III.    JURISDICTION AND VENUE

17. Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from GM's home state, and the aggregate amount in controversy exceeds $5,000,000.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this district, and GM has caused harm to class members residing in this District. Moreover, GM has sought protection from the Bankruptcy Court located in this District.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   GM Admits That The Affected Vehicles Have An Ignition Defect That Significantly Increases The Risk of Death or Injury

19. On February 13, 2014, GM announced that it was recalling all 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5s. Less than two weeks later, GM expanded the recall to include all 2006-2007 model year Chevrolet HHRs, 2006-2007 model year Pontiac Solstices, 2007 Pontiac G5s, 2003-2007 model year Saturn Ions, and 2007 model year Saturn Skys. On March 28, 2014, GM expanded the recall further to include all model years of the already-recalled vehicles, including: 2008-10 Chevrolet Cobalts, 2008-11 Chevrolet HHRs, 2008-10 Pontiac Solstices, 2008-10 Pontiac G5s and 2008-10 Saturn Skys.

20. GM sent letters to NHTSA on February 24, 2014 (the "February 24 Admissions"), and March 11, 2014 letter (the "March 11 Admissions"). In those letters, GM admitted that "a defect which relates to motor vehicle safety exists" in the Affected Vehicles. As GM admitted, "the ignition switch [in the Affected Vehicles] may unintentionally move from the 'run' position to the 'accessory' or 'off' position with a corresponding reduction or loss of power," which, in turn, "may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes." Upon information and belief, this issue may also affect a vehicle's power braking or power steering.

21. GM has admitted that the Ignition Defect has been linked to at least twelve deaths. In the February 24 Admissions, GM stated that it was aware of eight deaths, in which the Ignition Defect in Chevrolet Cobalts and Pontiac G5s may have been a cause or contributing factor. In the March 11 Admissions, GM stated that it was aware of

another four deaths, in which the Ignition Defect in Saturn Ions may have been a cause or contributing factor.

22. On March 13, 2014, the New York Times reported on a study by the Friedman Research Corporation which identified 303 deaths involving GM vehicles in which the airbags failed to deploy to protect people in the front seats.

### B. Safety Sells: GM Promised Consumers That Its Vehicles Were Safe

23. Consumers care about safety when they are buying a car. As GM acknowledged in its most recent Form 10-K: "The principal factors that determine consumer vehicle preferences in the markets in which we operate include price, quality, available options, style, safety, reliability, fuel economy and functionality." According to GM's own customer research, published by dealerships in 2013, "54 percent of customers rank[ed] safety as a 'very important' consideration" in their purchase decision.

24. Yet until February 13, 2014, GM had never revealed the existence of the Ignition Defect to consumers. To the contrary, during the Relevant Period, GM repeatedly told consumers that its cars were safe and secure, including in the event of a collision.

25. As early as the 1960s, GM's marketing claimed that "Safety comes first at GM."



26. This strategy continued through the period in which GM manufactured and sold the Affected Vehicles. In 2005, for example, GM launched the "Only GM" advertising campaign. As a February 6, 2005 story in the Pittsburgh Post-Gazette put it: "General Motors Corp. [was] trying to follow another emerging trend: safety sells. ... That marketing strategy is seen as the company's attempt to distinguish itself from other manufacturers[.]" "Safety and security" were the first two features highlighted in the Company's February 17, 2005 press release describing the campaign. According to the press release, the "campaign's initial pool of television spots feature[d] children raising questions about safety." A GM spokesperson commenting on a companion campaign, targeting Hispanics stated that "Hispanics feel strongly about their family's safety in all areas, especially when it comes to the vehicle they drive."

27. Similarly, an April 5, 2005 press release about the "Hot Button marketing program" stated that the "Value of GM's Brands [Was] Bolstered By GM's Focus On

Continuous Safety" and explained that the Hot Button program was "intended to showcase the range of GM cars, trucks and SUVs that offer drivers continuous safety - protection before, during and after a vehicle collision."

28. On June 14, 2005, GM issued a press release stating that "Safety [Was The] No. 1 Concern For Women At The Wheel" and highlighting "[f]eatures that help protect drivers before, during and after a crash includ[ing] … [f]ront and side-impact air bags [to] restrain the driver and front passenger in moderate to severe impacts."

29. GM marketed the Affected Vehicles, specifically, as safe and reliable. In a statement aired on Good Morning America on March 7, 2005, a GM spokesperson stated that "the [Chevrolet] Cobalt exceeds all Federal safety standards that provide - significant real-world safety before, during, and after a crash." In November 2005, GM ran radio advertisements stating that "One of the best things to keep you [and your] family safe is to buy a Chevy equipped with OnStar … from Cobalt to Corvette there's a Chevy to fit your budget."

30. After the 2009 bankruptcy, New GM continued to sell safety. GM adopted and heavily promoted its new "Five Principles."[3] The first Principle is "Safety and Quality First." GM promises customers that "[s]afety will always be a priority at GM.  We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle."

31. Sales of the Affected Vehicles benefited from GM's emphasis on safety. The website for GM's Chevrolet brand, for example, discusses the now-discontinued Cobalt

---

[3] *See, e.g.*, http://www.gm.com/company/aboutGM/our_company.html

and states that "[r]easons for Cobalt's popularity included ... a comprehensive standard safety package that included front air bags, four-wheel antilock brakes and safety-cage construction."[4]

## C. At the Turn of the Twenty-First Century, GM Was A Desperate Company Obsessed With Reducing Costs

32. GM found itself in a desperate economic situation when it began designing and ultimately producing the Affected Vehicles. After years of mismanagement, GM was faced with collapsing credit ratings and skyrocketing legacy costs for generous healthcare and pension agreements. Between 1999 and 2001, the Company's net income fell from $6 billion to just $601 million. According to a 2004 estimate by Morgan Stanley, pension and retiree health care costs added $1,824 to the cost of each GM vehicle sold, compared to $186 per vehicle sold by Toyota. As a consequence, GM had the lowest profit margins in the automobile industry.

33. As GM's CEO Rick Wagoner admitted in the Company's annual report for the year ending December 31, 2004, the "road ahead" for the company was sure to include "numerous and jarring" "bumps," including "global overcapacity... falling prices... rapidly escalating health-care costs... unstable fuel prices... increasing competition every year." He conceded that 2004 was "a year in which [GM] did not take the step forward [that it] was aiming for." That year was the last profitable year for Old GM. In 2005, GM recorded a $10.4 billion net loss. The company lost another $1.9 billion in 2006 and lost more than $38.7 billion in 2007. In 2008, GM lost more than $30.8 billion. On June 1, 2009, Old GM filed for bankruptcy.

---

[4] *See* http://www.chevrolet.com/discontinued-vehicle/cobalt.html

34. In a March 22, 2014 investigative report, Bloomberg detailed the aggressive cost-cutting culture at GM during the time that the Affected Vehicles were first designed and produced. According to a former employee of a then-GM supplier: "Suppliers and people in the industry would joke that GM makes design decisions based on three things: One was cost, two was cost and three was cost." In testimony before Congress on April 1, 2014, GM's current CEO acknowledged that "in the past," GM had "a cost culture."

35. In 2001, GM was producing small cars to meet federal fuel-economy regulations but was losing money on every small car that it sold. An April 17, 2014 story by GM quoted automobile industry Jesse Toprak as stating that "The Cobalt wasn't designed to be the best compact car. It was done to make sure that GM met fuel economy standards and utilized manufacturing capacity that was already there[.]"

36. GM decided to develop its next generation of small cars, the "Ion, Cobalt and Opel Astra cars from the same mechanical platform, code-named Delta" as part of a joint venture with Fiat (which was, at the time, partially owned by GM). This plan failed when GM's relationship with Fiat deteriorated between 2000 and 2005.

37. When the original plan for a "world compact" failed, Bloomberg reports that "GM patched Cobalts and Ions together with some new parts [and some] parts … scavenged from other models," including "the aging Cavalier." GM also "began pressing its supplier and former parts division, [Delphi] to shave pennies off the price of every part to match what several of the people familiar with GM called the 'China Cost' — a rock-bottom price pegged to cheap Chinese labor. If suppliers couldn't match it, these people said, GM would threaten to outsource production overseas."

38. GM had the worst supplier relations of any of the major automobile manufacturers from 2002 to 2005, according to an annual survey conducted by Planning Perspectives Inc. In 2005, 85 percent of GM suppliers characterized their relationship with the automaker as "poor," and 53 percent would "prefer not to do business" with the company or were "ambivalent" about it, according to the survey.

39. Unsurprisingly, GM's focus on cost, cost, and cost led to shortcuts. As a result of GM's cost-cutting obsession, its small vehicles were notably defective. As the New York Times reported on March 31, 2014: "Long before the Chevrolet Cobalt became known for having a deadly ignition defect, it was already seen as a lemon. Owners complained about power steering failures, locks inexplicably opening and closing, doors jamming shut in the rain — even windows falling out." According to the newspaper's analysis "[i]n more than 120 instances, General Motors was forced under state lemon laws to buy back faulty Cobalts, pay settlements to owners or let them trade in the cars[.]"

### D. GM Knew About The Ignition Defect For More Than A Decade But Concealed The Defect From Customers And Did Not Issue A Recall

40. Some of these shortcuts—including, in particular, the Ignition Defect—led to dangerous problems with the Affected Vehicles. But as the body count grew, GM repeatedly ignored the Ignition Defect, finding that a repair or recall did not present "an acceptable business case."

#### 1) GM Received Multiple Reports About The Ignition Defect Between 2001 and 2005

41. As set forth below, the Ignition Defect is caused, at least in part, by a detent spring and plunger that is too short. In April 2006, GM attempted to fix the Ignition Defect by replacing the original detent spring and plunger with a longer detent spring and plunger. But it appears that the first detent spring and plunger that GM considered for the

Affected Vehicles was the longer (and safer) version. A cache of documents that GM submitted to Congressional investigators in 2014 included two engineering drawings created during the development stages in 2001. In September 2001, GM created Drawing Number 741-79378, which was a drawing of the longer/safer detent spring and plunger. In October 2001, GM created Drawing Number 741-75259, which referenced the earlier drawing and was a drawing of the shorter/less safe detent spring and plunger. The only plausible explanation for the change is that the shorter detent spring and plunger was cheaper.

42. In the February 24 Admissions, GM claimed that it first learned of the Ignition Defect in 2005. Not true. In fact, as GM acknowledged in the March 11 Admissions, the Company first learned of the Ignition Defect in 2001, when it received a report of an "issue relating to the ignition switch" caused by "low detent plunger force' in the ignition switch" of the Saturn Ion, which was, at the time, in the development stages.

43. According to a March 30, 2014 memorandum issued by the Majority Staff of the House Committee on Energy and Commerce (the "Majority Staff Memo"), GM's ignition switch supplier for the Affected Vehicles, Delphi submitted a Production Part Approval Process ("PPAP") document for the switch in 2002. According to the Majority Staff Memo, "Delphi officials told Committee staff that GM approved the PPAP *even though sample testing of the ignition switch torque was below the original specifications set by GM.*"[5] According to a March 31, 2014 letter sent to Barra by three Members of Congress investigating the Ignition Defect:

> Delphi officials stated that it was 'well documented' in 2002 that the switch did not meet the required minimum torque specifications. The

---

[5] All emphasis, unless otherwise noted, is added.

testing results were in fact far below GM's specifications. Delphi told the committee that there were 12 torque performance tests conducted on the switch at thte time ... and that *only two of the 12 tests showed the switch surpassing [torque of] 10 N-cm. GM's specifications called for torque levels between 15 and 25 N-[c]m, significantly above the results of the performance tests.*

44. In a June 12, 2013 deposition, Gary Altman, GM's program engineer for the Cobalt, admitted that the "vehicle never should have been sold if it didn't meet GM's minimum torque performance requirements" because it could be "dangerous under certain situations because the key can move from run to accessory."

45. GM admits that in 2003, a GM service technician observed the Ignition Defect while he was driving. An Affected Vehicle stalled while the technician was driving and the technician observed that the "weight of the keys had worn out the ignition switch."

46. According to the February 24 Admissions, around the time of the Cobalt's launch, "GM learned of at least one incident in which a Cobalt lost engine power because the key moved out of the 'run' position when the driver inadvertently contacted the key or steering column." GM employees "were able to replicate this phenomenon during test drives." GM received "new field reports of Cobalts losing engine power ... [when] the key moved out of the 'run' position" after the Cobalt launched. In November 2004, GM opened engineering inquiry PRTS N172404 (the "2004 Inquiry") to examine a customer complaint that the "vehicle can be keyed off with knee while driving."

### 2)  GM Studied The Problem and Ultimately Issued A Service Bulletin About The Ignition Defect In 2005

47. According to the Majority Staff Memo, GM engineers met in February 2005 to consider possible solutions to the problem identified in the 2004 Inquiry. Among other solutions, the engineers considered increasing or changing the ignition switch "torque

effort." In March 2005, however, the Cobalt Project Engineering Manager directed that

the 2004 Inquiry be closed "with no action" because "tooling cost and piece price are too

high" and *none of the solutions represents an acceptable business case*."

48. According to a March 11, 2014 report by JPMorgan Chase & Co., Delphi stated

that the ignition switch responsible for the Ignition Defect cost between $2 and $5 to

produce.

49. In May 2005, GM opened a new engineering inquiry PRTS N182276 (the "2005

Inquiry") to investigate a 2005 Chevrolet Cobalt customer's complaint that the "vehicle

ignition will turn off while driving." The 2005 Inquiry document noted the 2004 Inquiry

had been closed but stated that "due to the level of buyback activity that is developing in

the field, Brand Quality requests that the issue be reopened." As part of the 2005 Inquiry,

GM approved and then cancelled a proposed solution to change the key ring slot to a hole

and use a smaller key ring.

50. On June 14, 2005, in an internal email discussion, John Coniff (a Senior Project

Engineer) at Delphi asked for an analysis of "force displacement" on "all the Ignition

switches," stating that "*Cobalt is blowing up in [GM's] face in regards to turning the

car off with the driver's knee*."

51. On July 29, 2005, a 2005 Chevrolet Cobalt crashed and the driver was killed.

Sensory Data Module data ("Sensory Data") available to GM showed that the front

airbag system did not deploy and that the vehicle power mode status was in "Accessory."

52. In a September 28, 2005 email to a group of GM employees— including Lori

Queen, an executive on GM's small car program and Raymond DeGiorgio, the GM

engineer responsible for the ignition switch installed in the Affected Vehicles—a GM

Engineering Group Manager, John Hendler, stated that he was "*very aware*" of an issue with "'inadvertent ignition offs' due to the low mounted ignition switch" but that a "*more robust" ignition switch would not be installed in model-year 2008 vehicles because the "piece cost could not be offset with warranty savings.*" According to that email, the increased piece cost was estimated to be $0.90 and the warranty offset was estimated to be between $0.10 and $0.15. In testimony before Congress on April 1, 2014, GM CEO Mary Barra stated that this analysis was "inappropriate."

53. In December 2005, GM issued Information Service Bulletin 05-02-35-007, which applied to the Chevrolet Cobalt and HHR, the Saturn Ion, and the Pontiac Solstice. According to the February 24 Admissions, the Service Bulletin "informed dealers that: 'there is potential for the driver sent to inadvertently turn off the ignition due to low ignition key cylinder torque/effort." Service Bulletins are sent only to dealerships and are not released to the public. In a March 18, 2014 story, Bloomberg quoted Joan Claybrook, the former head of NHTSA, as saying that "service bulletins have been recall-avoidance devices—there's no question about that."

### 3) GM Redesigned The Ignition Switch In 2006 and Updated Its Service Bulletin

54. On April 26, 2006, DeGiorgio signed a document that approved changes to the ignition switch. The changes included "a new detent plunger and spring that increased torque force in the ignition switch." The change to the ignition switch was not reflected in a corresponding change in the part number, however, and NHTSA was not notified of the change. According to a May 27, 2006 document produced by Delphi to Congressional investigators: "Ray DeGiorgio … agree[d] to implement [the change] without changing

17

GM p/n." In testimony before Congress on April 1, 2014, GM CEO Mary Barra stated that it was "inconceivable" and "not acceptable," that a new part number was not issued.

55. On October 25, 2006, GM sent its dealerships an updated Technical Service Bulletin 05-02-35-007A, which was expanded to include the 2007 Saturn Ion and Sky, the 2007 Chevrolet HHR, and the 2007 Pontiac Solstice and G5. The Bulletin stated that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort" and recommended that if customers complained, dealerships could install "an insert for the key ring so that it goes from a slot design to a hole design."

4) GM Admits Reviewing Crash Data In 2007 That Higlighted The Ignition Defect

56. According to the February 24 Admissions, GM met with representatives of NHTSA on March 29, 2007. During that meeting, NHTSA informed GM of a fatal crash on July 29, 2005, in which "a 2005 Cobalt was involved in a frontal collision, the airbags did not deploy, and data retrieved from the car's sensing and diagnostic module … indicated that the car's power mode status was 'accessory.'" GM Legal Staff had opened a file relating to this crash in September 2005.

57. Following the meeting with NHTSA, a GM engineer was assigned to investigate non-rear-impact crashes involving Cobalts, in which airbags did not deploy. In August 2007, GM met with its Sensory Data supplier, Continental Corporation ("Continental"), to review data from a crash involving a 2005 Chevrolet Cobalt in which the airbags failed to deploy. In total, as part of its investigation, GM reviewed sensing and diagnostic data from nine crashes. In four of the nine crashes, the ignition was in the "accessory" position. GM knew or should have known that the airbags' failure to deploy in these crashes was caused by the Ignition Defect.

5) GM Changed The Design of The Ignition Key In 2009 and
Reviewed Additional Data Highlighting The Ignition Defect In
2009 and 2011

58. According to the February 24 Admissions, GM opened yet another engineering

inquiry into the Ignition Defect in February 2009, which ultimately resulted in a redesign

of the ignition key for model year 2010 Chevrolet Cobalts. In May 2009, GM again met

with Continental and asked to review Sensory Data from a 2006 accident involving a

Chevrolet Cobalt in which the airbags failed to deploy. GM reviewed Sensory Data from

fourteen crashes. In seven of those collisions, the Sensory Data showed that the ignition

was in the accessory position. Continental also informed GM that in certain crashes, its

Sensory Data sensing algorithm may have been disabled.

59. According to the March 11 Admissions, GM initiated a Field Performance

Evaluation in August 2011 (the "2011 Inquiry") to examine a group of frontal impact

crashes involving 2005-2007 Chevrolet Cobalts and 2007 Pontiac G5s in which airbags

did not deploy.

6) In 2012 and 2013, GM Studied Ignition Switches In Affected
Vehicles

60. According to the February 24 Admissions, in May 2012, the Field Performance

Assessment Engineer in charge of the 2011 Inquiry studied a "cross-section of steering

columns and ignition switches from Chevrolet Cobalts, Chevrolet HHRs, Pontiac G5s,

and Saturn Ions, in model years ranging from 2003 through 2010…. Certain of these

ignition switches exhibited torque performance below that specified by GM for the

ignition switch."

61. Between April and October of 2013, GM "retained outside engineering resources

to conduct a comprehensive ignition switch survey and assessment … The data gathered

by GM's outside technical expert showed … the ignition switches … tested that had been installed in early-model Cobalts did not meet GM's torque specification." In a July 2013 email regarding other defect investigations, the Director of NHTSA's Office of Defects Investigation wrote to GM that the agency perceived GM as "slow to communicate, slow to act, and, at times, require[ing] additional effort … [not] necessary with some of [its] peers."

62. GM continued to study the Ignition Defect between October 2013 and January 31, 2014, on which date the Executive Field Action Decision Committee finally ordered the initial recall of some of the Affected Vehicles.

### 7) Between 2003 and 2014, GM Received Hundreds of Complaints About the Ignition Defect

63. An April 1, 2014 analysis of GM's warranty database by the Democratic Staff of the House Committee on Energy and Commerce, "identified 133 cases – dating from June 2003 through June 2012 – of consumers raising concerns directly to GM dealers about vehicles that were unexpectedly stalling or turning off when going over bumps or when the key was bumped. In many of these warranty claims, the comments from consumers and GM technicians indicate that they had identified the ignition switch as the likely cause of the problem."

64. NHTSA allows consumers to submit complaints about potential safety defects with their vehicles. Those complaints are filed on Vehicle Owner Questionnaires ("VOQs"). In addition to conducting its own analysis on complaint data, NHTSA regularly sends manufacturers all VOQs that the agency has received (upon information and belief, these updates are sent monthly).

65. According to a New York Times analysis published on March 8, 2014, NHTSA "received more than 260 complaints over the last 11 years about [the Affected Vehicles] suddenly turn[ing] off while being driven ... an average of two complaints a month" since February 2003. The year-by-year cumulative complaints were as follows:

| Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative Complaints | 7 | 15 | 38 | 60 | 91 | 109 | 132 | 174 | 204 | 228 | 248 |

### E. GM Had An Ongoing Duty To Disclose The Ignition Defect

66. Federal law imposes a duty on all automobile manufacturers to "notify ... the owners, purchasers, and dealers of the vehicle ... if the manufacturer (1) learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety; or (2) decides in good faith that the vehicle or equipment does not comply with an applicable motor vehicle safety standard prescribed under this chapter." 49 U.S.C. § 30118(c).

67. GM failed to provide any such notification of the Ignition Defect to owners or purchasers of the Affected Vehicles until January 2014—more than a decade after it first learned of the problem.

68. GM has admitted wrongdoing. In a February 25, 2014 press release, GM said that it was "deeply sorry" and admitted that "[t]he chronology shows that the process employed to examine this phenomenon was not as robust as it should have been." In a March 17, 2014 video message to employees, GM's CEO Mary Barra admitted that "[s]omething went very wrong in our processes in this instance, and terrible things happened[.]" In a March 18, 2014 interview, Barra admitted that "[c]learly, this took too long." In written testimony submitted to the House Committee on Energy and the

21

Commerce Subcommittee on Oversight and Investigations on March 31, 2014, Barra

acknowledged that it "took years for a safety defect to be announced" and that "mistakes

were made in the past."

### F. The Class Members Claims Were Not Extinguished By GM's 2009 Bankruptcy

69. As noted above, Old GM (*i.e.*, the corporation that was formerly General Motors

Corporation and is now Motors Liquidation Company) filed for bankruptcy on June 1,

2009. On July 5, 2009, the Bankruptcy Court for the Southern District of New York

issued an order (the "363 Order") approving a sale of substantially all of Old GM's assets

to New GM (*i.e.*, the company that was then Vehicle Acquisition LLC and is now

General Motors LLC). This sale, which was made pursuant to section 363 of the of the

Bankruptcy Code is the "363 Sale." GM emerged from bankruptcy on July 10, 2009.

70. Plaintiffs and Class members had not yet purchased their vehicles at the time that

the 363 Sale occurred. Plaintiffs and members of the Class thus had no relationship with

New GM or Old GM and did not have notice of any claims (or the extinguishment of any

claims) against either entity at the time of the 363 Order or plan confirmation. Moreover,

at the time it filed for bankruptcy, GM was well aware of the Ignition Defect. Yet the

Company concealed the Ignition Defect from—and thereby defrauded—the Bankruptcy

Court, just as it did consumers.

71. New GM was subject to a continuing duty to notify the owners, purchasers, and

dealers of defects related to motor vehicle safety. Under the terms of the 363 Sale Master

Sales and Purchase Agreement, New GM agreed to "comply with the certification,

reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act,

the Transportation Recall Enhancement, Accountability and Documentation Act, the

Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to
the extent applicable in respect of vehicles and vehicle parts manufactured or distributed
by" Old GM. Thus, as noted above, New GM was required to "notify ... the owners,
purchasers, and dealers of the vehicle" of any defect "related to motor vehicle safety[.]"

### G. Plaintiffs And The Class Overpaid For Their Vehicles Because of GM's Misleading Omissions

72. Plaintiffs and members of the Class overpaid for their vehicles. If GM had
disclosed the existence of the Ignition Defect, Plaintiffs and Class members would not
have purchased or leased the Affected Vehicles or would have paid significantly less than
they did.

73. GM reaped an improper benefit from the inflated sale price of both new and used
Affected Vehicles. A robust resale market is highly significant for automakers. As Chuck
Stevens, the now-CFO of GM, told analysts at a Bank of America Corp. forum on March
27, 2013, GM's lower resale values relative to rivals mean the Company spends an
additional $150 million to $200 million annually to make its lease payments competitive.
That same week, Alan Batey, a high ranking GM executive stated that "[r]esidual values,
at the end of the day, are the ultimate acid test of whether the vehicle has been
successful[.]" According to Batey, "[i]f you've got really strong residual values and
you're not having to discount heavily to hit certain lease rates, it's great business."

### H. The Recall Does Not Make Plaintiffs Whole

74. Plaintiffs suffered an injury at the moment they purchased their vehicles at an
inflated price. And GM's promised repairs will not make Plaintiffs or Class members
whole.

75. There is no guarantee that GM will be able to eliminate the risk posed by the Ignition Defect. As set forth above, GM repeatedly attempted solutions to the Ignition Defect that repeatedly failed. Class members cannot trust that this time will be any different. Indeed, GM's own website recommends that even *after* the repair is completed, customers should not use a heavy key ring and should "only utilize the key, key ring and key fob (if equipped) that came with the vehicle."

76. Moreover, the Affected Vehicles have lost resale value. As a GM employee admitted in a July 15, 2011 press release, "[r]esale value is one of the most important considerations among … knowledgeable car buyers as it can literally save consumers thousands of dollars over the life of the vehicle[.]" And as GM admitted in its most recent Form 10-K "product recalls can harm [the Company's] reputation and cause [it] to lose customers, particularly if those recalls cause consumers to question the safety or reliability of our products." Consumers, of course, have particularly strong reason to "question the safety or reliability" of the Affected Vehicles, meaning that the demand for those vehicles has undoubtedly decreased and the resale price has declined accordingly.

## V.    CLASS ALLEGATIONS

77. Plaintiffs bring this action on behalf of themselves and the following Class, pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure:

> All persons in the United States who purchased or leased an Affected Vehicle (Chevrolet Cobalt, Chevrolet HHR, Pontiac Solstice, Pontiac G5, Saturn Ion, or Saturn Sky) at any time between July 10, 2009 and February 13, 2014 (the "Class Period").

78. The Class contains the following State Subclasses:

> **California Subclass**: All Class Members who purchased or leased an Affected Vehicle in California.

**Florida Subclass**: All Class Members who purchased or leased an Affected Vehicle in Florida.

**Massachusetts Subclass**: All Class Members who purchased or leased an Affected Vehicle in Massachusetts.[6]

**New Jersey Subclass**: All Class Members who purchased or leased an Affected Vehicle in New Jersey.

**New Mexico Subclass**: All Class Members who purchased or leased an Affected Vehicle in New Mexico.

**Pennsylvania Subclass**: All Class Members who purchased or leased an Affected Vehicle in Pennsylvania.

**Washington Subclass**: All Class Members who purchased or leased an Affected Vehicle in Washington.

79. The Class excludes GM's officers and directors, current or former employees, as well as their immediate family members. Plaintiffs and the Class do not assert claims for personal injuries caused by the Ignition Defect.

80. Plaintiffs reserve the right to amend the definition of this proposed Class, including by adding additional subclasses.

81. The Class is so numerous that joinder of all members is impracticable. GM has recalled approximately 2.6 million Affected Vehicles because of the Ignition Defect. At minimum, hundreds of thousands of those vehicles were purchased or leased within the Class Period. The precise number and identity of class members can be ascertained from the records of GM and/or state governments' motor vehicle registration records.

82. There are question of fact or law common to the Class. These questions include, but are not limited to:

---

[6] Concurrently with the filing of this Complaint, Phaneuf and Smith, on behalf of themselves and the Massachusetts Subclass, are sending a demand letter to GM pursuant to the requirements of the Massachusetts Consumer Protection Act, M.G.L. ch. 93A. If GM does not make a written tender of settlement within thirty days, Plaintiffs will amend to add a count for violation of M.G.L. ch. 93A.

a.   Whether the Affected Vehicles had a safety defect when Class
members purchased their vehicles;

b.   Whether GM had a duty to disclose the existence of the Ignition
Defect to Class members;

c.   Whether GM concealed the existence of the Ignition Defect from
Class members;

d.   Whether Class members are entitled to damages;

e.   Whether Class members are entitled to injunctive and/or
declaratory relief.

83. Plaintiffs' claims are typical of the Class and Plaintiff is not subject to any unique

defenses.

84. Plaintiff will fairly and adequately protect the interest of the Class. Plaintiffs'

interests do not conflict with the interests of the Class. Plaintiffs have retained competent

counsel experienced in class action litigation of this type. Plaintiffs' counsel will fairly

and adequately protect the interests of the Class.

85. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(3)

because questions of law or fact common to the Class predominate over any questions

affecting only individual members. Certification is also appropriate under Federal Rule of

Civil Procedure 23(b)(2) because GM has acted or refused to act on grounds generally

applicable to the Class and, as such, final injunctive relief or corresponding declaratory

relief with regard to the Class members as a whole is appropriate.

86. A class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Individual lawsuits are economically infeasible and

procedurally impracticable. Plaintiffs know of no difficulty to be encountered in the

management of this case that would preclude its maintenance as a class action.

VI.    **CLAIMS ALLEGED AND RELIEF SOUGHT**

### A. Claims Asserted By The Class

### COUNT 1
### Violation of Michigan Consumer Protection Act

87. Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

88. Plaintiffs bring this claim individually and on behalf of the other Class Members against GM.

89. Plaintiffs, members of the Class, and GM are "persons" within the meaning of M.C.L. § 445.911(3). GM was and is engaged in "trade and commerce" within the meaning of M.C.L.A. § 445.903(1).

90. Plaintiffs and other members of the Class were injured by GM's willful and knowing employment in trade and/or commerce of unfair, unconscionable and/or deceptive acts or practices in violation of M.C.L. § 445.903 including, among other things affirmatively misrepresenting that the Affected Vehicles were safe and reliable; and uniformly failing to disclose the existence of the Ignition Defect in the Affected Vehicles.

91. As a direct and proximate result of GM's unfair and deceptive acts and practices, Plaintiffs and members of the Class overpaid for the Affected Vehicles and have been damaged thereby.

92. Plaintiffs seek injunctive relief to enjoin GM from continuing its unfair and deceptive acts; monetary relief in the amount of the greater of (i) actual damages or (ii) statutory damages in the amount of $250 per M.C.L.A. § 445.911(2); punitive damages for GM's willful and conscious fraud that endangered the lives of Plaintiffs and

members of the Class; attorneys' fees; and any other just and proper relief that the Court may award.

**COUNT 2**
**Fraud By Concealment**

93. Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

94. Plaintiffs bring this claim individually and on behalf of the other Class Members against GM.

95. GM concealed from/failed to disclose to Plaintiffs and Class members that the Affected Vehicles had the Ignition Defect.

96. GM had a duty to disclose the Ignition Defect because (i) GM made affirmative representations about the safety and reliability of the Affected Vehicles; (ii) federal law required GM to disclose safety defects such as the Ignition Defect; (iii) GM had superior knowledge of and access to the facts regarding the Ignition Defect which it knew or should have known were both material and not known to or reasonably discoverable by Plaintiffs and members of the Class.

97. GM actively concealed the Ignition Defect with the intent to induce Plaintiffs and Class members to purchase or lease the Affected Vehicles for a higher price than the actual value of the Affected Vehicles.

98. Because of GM's fraudulent concealment, Plaintiffs and members of the Class were, in fact, unaware of the Ignition Defect when they purchased or leased the Affected Vehicles.

99. As a direct and proximate result of GM's fraudulent concealment, Plaintiffs and members of the Class overpaid for the Affected Vehicles and have been damaged thereby.

100.      Plaintiffs seek injunctive relief to enjoin GM from continuing its unfair and deceptive acts; monetary relief in the amount of the greater of actual damages; punitive damages for GM's willful and conscious fraud that endangered the lives of Plaintiffs and members of the Class; and any other just and proper relief that the Court may award.

### COUNT 3
**Unjust Enrichment**

101.      Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

102.      Plaintiffs bring this claim individually and on behalf of the other Class Members against GM.

103.      GM had knowledge of the Ignition Defect, which it concealed from/failed to disclose to Plaintiffs and Members of the Class.

104.      As a result of its wrongful acts and omissions, as set forth above, GM was able to sell or lease the Affected Vehicles for more than they were worth and when Affected Vehicles were sold used, the vehicles were sold at a higher resale price than they were worth, all of which allowed GM to wrongfully receive a benefit from Plaintiffs and members of the Class. It would be inequitable and unjust for GM to retain these wrongfully obtained profits.

105.      Plaintiffs and members of the Class are therefore entitled to restitution in an amount to be determined at trial.

## B. Claims Asserted By the Florida Subclass

## COUNT 5
**Violation of Florida Deceptive and Unfair Trade Practices Act, F.S. §501.201, et seq.**

106.    Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

107.    The Cabrals bring this claim individually and on behalf of the other Florida Subclass Members (collectively, the "Florida Plaintiffs") against GM.

108.    The Florida Plaintiffs, and GM are "persons" within the meaning of F.S. §501.2075.

109.    The Florida Plaintiffs were injured by GM's employment in trade and commerce of unfair or deceptive acts or practices, including, among other things affirmatively misrepresenting that the Affected Vehicles were safe and reliable; and uniformly failing to disclose the existence of the Ignition Defect in the Affected Vehicles.

110.    As a direct and proximate result of GM's unfair and deceptive acts and practices, the Florida Plaintiffs overpaid for the Affected Vehicles and have been damaged thereby.

111.    The Florida Plaintiffs seek injunctive relief to enjoin GM from continuing its unfair and deceptive acts; monetary relief in the amount of their actual damages; punitive damages for GM's willful and conscious fraud that endangered the lives of Plaintiffs and members of the Class; attorneys' fees; and any other just and proper relief that the Court may award.

## C. Claims Asserted By the Washington Subclass

### COUNT 6
### Violation of Washington Consumer Protection Act, R.C.W. 19.86, et seq.

112.     Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

113.     Garcia brings this claim individually and on behalf of the other Washington Subclass Members (collectively, the "Washington Plaintiffs") against GM.

114.     The Washington Plaintiffs, and GM are "persons" within the meaning of RCW 19.86, et seq.

115.     The Washington Plaintiffs were injured by GM's employment in trade and commerce of unfair or deceptive acts or practices, including, among other things affirmatively misrepresenting that the Affected Vehicles were safe and reliable; and uniformly failing to disclose the existence of the Ignition Defect in the Affected Vehicles.

116.     As a direct and proximate result of GM's unfair and deceptive acts and practices, the Washington Plaintiffs overpaid for the Affected Vehicles and have been damaged thereby.

117.     The Washington Plaintiffs seek injunctive relief to enjoin GM from continuing its unfair and deceptive acts; monetary relief in the amount of their actual damages; statutory damages; punitive damages for GM's willful and conscious fraud that endangered the lives of Plaintiffs and members of the Class; attorneys' fees; and any other just and proper relief that the Court may award.

### D.  Claims Asserted By the New Mexico Subclass

<u>COUNT 7</u>
Violation of New Mexico Unfair Trade Practices Act, N.M.S.A. § 57-12-2, *et seq.*

118.     Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

119.     Delacruz brings this claim individually and on behalf of the other New Mexico Subclass Members (collectively, the "New Mexico Plaintiffs") against GM.

120.     The New Mexico Plaintiffs, and GM are "persons" within the meaning of N.M.S.A. 57-12-2.

121.     The New Mexico Plaintiffs were injured by GM's employment in trade and commerce of unfair or deceptive acts or practices, including, among other things affirmatively misrepresenting that the Affected Vehicles were safe and reliable; and uniformly failing to disclose the existence of the Ignition Defect in the Affected Vehicles.

122.     As a direct and proximate result of GM's unfair and deceptive acts and practices, the New Mexico Plaintiffs overpaid for the Affected Vehicles and have been damaged thereby.

123.     The New Mexico Plaintiffs seek injunctive relief to enjoin GM from continuing its unfair and deceptive acts; monetary relief in the amount of their actual damages; statutory damages; punitive damages for GM's willful and conscious fraud that endangered the lives of Plaintiffs and members of the Class; attorneys' fees; and any other just and proper relief that the Court may award.

### E. Claims Asserted By the New Jersey Subclass

### COUNT 8
### Violation of New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, et seq.

124.    Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

125.    Sileo brings this claim individually and on behalf of the other New Jersey Subclass Members (collectively, the "New Jersey Plaintiffs") against GM.

126.    The New Jersey Plaintiffs, and GM are "persons" within the meaning of N.J. Stat. Ann. § 56-8-1(d).

127.    The New Jersey Plaintiffs were injured by GM's employment in trade and commerce of unconscionable, unfair or deceptive acts or practices, including, among other things affirmatively misrepresenting that the Affected Vehicles were safe and reliable; and uniformly failing to disclose the existence of the Ignition Defect in the Affected Vehicles.

128.    As a direct and proximate result of GM's unconscionable, unfair and deceptive acts and practices, the New Jersey Plaintiffs overpaid for the Affected Vehicles and have been damaged thereby.

129.    The New Jersey Plaintiffs seek injunctive relief to enjoin GM from continuing its unfair and deceptive acts; monetary relief in the amount of their actual damages; statutory damages; punitive damages for GM's willful and conscious fraud that endangered the lives of Plaintiffs and members of the Class; attorneys' fees; and any other just and proper relief that the Court may award.

### F.  Claims Asserted By the Pennsylvania Subclass

### COUNT 9
### Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*

130.    Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

131.    Bucci brings this claim individually and on behalf of the other Pennsylvania Subclass Members (collectively, the "Pennsylvania Plaintiffs") against GM.

132.    The Pennsylvania Plaintiffs, and GM are "persons" within the meaning of 73 P.S. § 201-2(2), et seq.

133.    The Pennsylvania Plaintiffs were injured by GM's employment in trade and commerce of unfair or deceptive acts or practices, including, among other things affirmatively misrepresenting that the Affected Vehicles were safe and reliable; and uniformly failing to disclose the existence of the Ignition Defect in the Affected Vehicles.

134.    As a direct and proximate result of GM's unfair and deceptive acts and practices, the Pennsylvania Plaintiffs overpaid for the Affected Vehicles and have been damaged thereby.

135.    The Pennsylvania Plaintiffs seek injunctive relief to enjoin GM from continuing its unfair and deceptive acts; monetary relief in the amount of their actual damages; statutory damages; punitive damages for GM's willful and conscious fraud that endangered the lives of Plaintiffs and members of the Class; attorneys' fees; and any other just and proper relief that the Court may award.

### G. Claims Asserted By the California Subclass

**COUNT 10**
**Violation of California Unfair Competition Law,**
**Cal. Bus. Prof. Code § 17200, et seq.**

136.    Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

137.    Padilla brings this claim individually and on behalf of the other California Subclass Members (collectively, the "California Plaintiffs") against GM.

138.    The California Plaintiffs, and GM are "persons" within the meaning of Cal. Bus. Prof. Code § 17201.

139.    The California Plaintiffs were injured by GM's employment in trade and commerce of unfair, unlawful, or fraudulent acts or practices, including, among other things affirmatively misrepresenting that the Affected Vehicles were safe and reliable; and uniformly failing to disclose the existence of the Ignition Defect in the Affected Vehicles.

140.    As a direct and proximate result of GM's unfair, unlawful and fraudulent acts and practices, the California Plaintiffs overpaid for the Affected Vehicles and have been damaged thereby.

141.    The California Plaintiffs seek injunctive relief to enjoin GM from continuing its unfair and deceptive acts; restitution; punitive damages for GM's willful and conscious fraud that endangered the lives of Plaintiffs and members of the Class; attorneys' fees; and any other just and proper relief that the Court may award.

## VII.    JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  May 7, 2014                              Respectfully submitted,

                                                 **FINKELSTEIN, BLANKINSHIP,**
                                                 **FREI-PEARSON & GARBER, LLP**


                                                 By:
                                                 D. Greg Blankinship
                                                 Todd S. Garber
                                                 1311 Mamaroneck Avenue
                                                 White Plains, New York 10605
                                                 Tel: (914) 298-3281
                                                 Fax: (914) 824-1561
                                                 gblankinship@fbfglaw.com
                                                 tgarber@fbfglaw.com

                                                 **BLOCK & LEVITON LLP**
                                                 Jeffrey C. Block
                                                 Jason M. Leviton
                                                 Joel A. Fleming
                                                 155 Federal Street, Suite 1303
                                                 Boston, Massachusetts  02110
                                                 Tel:  (617) 398-5600
                                                 Fax:  (617) 507-6020
                                                 Jeff@blockesq.com
                                                 Jason@blockesq.com
                                                 Joel@blockesq.com