# Exhibit K

JS 44C/SDNY
REV. 4/2014

CIVIL COVER SHEET

14 CV 3326 2014

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS**
Meaghan Skillman, individually and on behalf of all others similarly situated

**DEFENDANTS**
General Motors, LLC and Delphi Automotive, PLC

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER**
Taus, Cebulash & Landau, LLP
80 Maiden Lane, Suite 1204, New York, NY 10038
Tel.: (212) 931-0704

**ATTORNEYS (IF KNOWN)**

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. § 1332(d): alleging that the sale of cars with defective ignition switches constituted fraudulent concealment, among other claims

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No ☑ Yes ☐ Judge Previously Assigned

If yes, was this case  Vol. ☐  Invol. ☐  Dismissed.  No ☐  Yes ☐   If yes, give date _____ & Case No. _____

**IS THIS AN INTERNATIONAL ARBITRATION CASE?**   No ☒   Yes ☐

*(PLACE AN [x] IN ONE BOX ONLY)*

# NATURE OF SUIT

## TORTS

## ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY/ | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ | | | [ ] 375 FALSE CLAIMS |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT | PHARMACEUTICAL PERSONAL | [ ] 625 DRUG RELATED | [ ] 422 APPEAL | [ ] 400 STATE |
| [ ] 130 MILLER ACT | LIABILITY | INJURY/PRODUCT LIABILITY | SEIZURE OF PROPERTY | 28 USC 158 | REAPPORTIONMENT |
| [ ] 140 NEGOTIABLE | [ ] 320 ASSAULT, LIBEL & | [ ] 365 PERSONAL INJURY | 21 USC 881 | [ ] 423 WITHDRAWAL | [ ] 410 ANTITRUST |
| INSTRUMENT | SLANDER | PRODUCT LIABILITY | [ ] 690 OTHER | 28 USC 157 | [ ] 430 BANKS & BANKING |
| [ ] 150 RECOVERY OF | [ ] 330 FEDERAL | [ ] 368 ASBESTOS PERSONAL | | | [ ] 450 COMMERCE |
| OVERPAYMENT & | EMPLOYERS' | INJURY PRODUCT | | | [ ] 460 DEPORTATION |
| ENFORCEMENT | LIABILITY | LIABILITY | | PROPERTY RIGHTS | [ ] 470 RACKETEER INFLU- |
| OF JUDGMENT | [ ] 340 MARINE | | | | ENCED & CORRUPT |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT | PERSONAL PROPERTY | | [ ] 820 COPYRIGHTS | ORGANIZATION ACT |
| [ ] 152 RECOVERY OF | LIABILITY | | | [ ] 830 PATENT | (RICO) |
| DEFAULTED | [ ] 350 MOTOR VEHICLE | [x] 370 OTHER FRAUD | | [ ] 840 TRADEMARK | [ ] 480 CONSUMER CREDIT |
| STUDENT LOANS | [ ] 355 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | | | [ ] 490 CABLE/SATELLITE TV |
| (EXCL VETERANS) | PRODUCT LIABILITY | | | | |
| [ ] 153 RECOVERY OF | [ ] 360 OTHER PERSONAL | | | SOCIAL SECURITY | [ ] 850 SECURITIES/ |
| OVERPAYMENT | INJURY | [ ] 380 OTHER PERSONAL | LABOR | | COMMODITIES/ |
| OF VETERAN'S | [ ] 362 PERSONAL INJURY - | PROPERTY DAMAGE | | [ ] 861 HIA (1395ff) | EXCHANGE |
| BENEFITS | MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE | [ ] 710 FAIR LABOR | [ ] 862 BLACK LUNG (923) | |
| [ ] 160 STOCKHOLDERS | | PRODUCT LIABILITY | STANDARDS ACT | [ ] 863 DIWC/DIWW (405(g)) | |
| SUITS | | | [ ] 720 LABOR/MGMT | [ ] 864 SSID TITLE XVI | |
| [ ] 190 OTHER | | PRISONER PETITIONS | RELATIONS | [ ] 865 RSI (405(g)) | [ ] 890 OTHER STATUTORY |
| CONTRACT | | [ ] 463 ALIEN DETAINEE | [ ] 740 RAILWAY LABOR ACT | | ACTIONS |
| [ ] 195 CONTRACT | | [ ] 510 MOTIONS TO | [ ] 751 FAMILY MEDICAL | | [ ] 891 AGRICULTURAL ACTS |
| PRODUCT | ACTIONS UNDER STATUTES | VACATE SENTENCE | LEAVE ACT (FMLA) | FEDERAL TAX SUITS | |
| LIABILITY | | 28 USC 2255 | | | [ ] 893 ENVIRONMENTAL |
| [ ] 196 FRANCHISE | CIVIL RIGHTS | [ ] 530 HABEAS CORPUS | [ ] 790 OTHER LABOR | [ ] 870 TAXES (U.S. Plaintiff or | MATTERS |
| | | [ ] 535 DEATH PENALTY | LITIGATION | Defendant) | [ ] 895 FREEDOM OF |
| | [ ] 440 OTHER CIVIL RIGHTS | [ ] 540 MANDAMUS & OTHER | [ ] 791 EMPL RET INC | [ ] 871 IRS-THIRD PARTY | INFORMATION ACT |
| REAL PROPERTY | (Non-Prisoner) | | SECURITY ACT | 26 USC 7609 | [ ] 896 ARBITRATION |
| | [ ] 441 VOTING | | | | [ ] 899 ADMINISTRATIVE |
| [ ] 210 LAND | [ ] 442 EMPLOYMENT | PRISONER CIVIL RIGHTS | IMMIGRATION | | PROCEDURE ACT/REVIEW OR |
| CONDEMNATION | [ ] 443 HOUSING/ | | | | APPEAL OF AGENCY DECISION |
| [ ] 220 FORECLOSURE | ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS | [ ] 462 NATURALIZATION | | [ ] 950 CONSTITUTIONALITY OF |
| [ ] 230 RENT LEASE & | [ ] 445 AMERICANS WITH | [ ] 555 PRISON CONDITION | APPLICATION | | STATE STATUTES |
| EJECTMENT | DISABILITIES - | [ ] 560 CIVIL DETAINEE | [ ] 465 OTHER IMMIGRATION | | |
| [ ] 240 TORTS TO LAND | EMPLOYMENT | CONDITIONS OF CONFINEMENT | ACTIONS | | |
| [ ] 245 TORT PRODUCT | [ ] 446 AMERICANS WITH | | | | |
| LIABILITY | DISABILITIES -OTHER | | | | |
| [ ] 290 ALL OTHER | [ ] 448 EDUCATION | | | | |
| REAL PROPERTY | | | | | |

*Check if demanded in complaint:*

☑ **CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23**

DEMAND $_____  OTHER _____

*Check YES only if demanded in complaint*
**JURY DEMAND:** ☒ YES  ☐ NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE Jesse M. Furman      DOCKET NUMBER 14-2458

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*                                         **ORIGIN**

[X] 1 Original     [ ] 2 Removed from     [ ] 3 Remanded     [ ] 4 Reinstated or     [ ] 5 Transferred from     [ ] 6 Multidistrict     [ ] 7 Appeal to District
Proceeding         State Court            from                 Reopened              (Specify District)      Litigation               Judge from
                   [ ] a. all parties represented   Appellate                                                                          Magistrate Judge
                                          Court                                                                                        Judgment
                   [ ] b. At least one
                         party is pro se.

*(PLACE AN x IN ONE BOX ONLY)*                     **BASIS OF JURISDICTION**                        *IF DIVERSITY, INDICATE*
[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION    [X] 4 DIVERSITY          *CITIZENSHIP BELOW.*
                                                      (U.S. NOT A PARTY)

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF DEF |  | PTF DEF |  | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1  [ ]1 | CITIZEN OR SUBJECT OF A<br>FOREIGN COUNTRY | [ ]3 [ ]3 | INCORPORATED and PRINCIPAL PLACE<br>OF BUSINESS IN ANOTHER STATE | [ ]5  [X]5 |
| CITIZEN OF ANOTHER STATE | [X]2  [ ]2 | INCORPORATED or PRINCIPAL PLACE<br>OF BUSINESS IN THIS STATE | [ ]4 [ ]4 | FOREIGN NATION | [ ]6  [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)
Meaghan Skillman
24654 Katherine Court, Apt. 118
Harrison Township, MI 48045
Macomb County

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

General Motors, LLC            Delphi Automotive, PLC
300 Renaissance Center         Courteney Road
Detroit, MI 48265              Hoath Way
Wayne County                   Gillingham, Kent ME8 0RU
                               United Kingdom

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] **WHITE PLAINS**    [X] **MANHATTAN**
              (DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS
              COMPLAINT.)
DATE 5/7/2014    SIGNATURE OF ATTORNEY OF RECORD              ADMITTED TO PRACTICE IN THIS DISTRICT
                                                             [ ] NO
                                                             [X] YES (DATE ADMITTED Mo. Aug.    Yr. 2013    )
RECEIPT #                                                    Attorney Bar Code # MG-1285

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**14 CV 3326**

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MEAGHAN SKILLMAN, | ) | |
| Individually and on Behalf of All Others | ) | Docket No. |
| Similarly Situated, | ) | ECF Case |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| GENERAL MOTORS LLC and | ) | **JURY TRIAL DEMANDED** |
| DELPHI AUTOMOTIVE PLC | ) | |
| Defendants. | ) | |

Plaintiff, Meaghan Skillman, individually and on behalf of all similarly situated person and the general public brings this action against Defendants General Motors, LLC ("GM") and Delphi Automotive, PLC ("Delphi") (collectively termed "Defendants") and alleges as follows:

### NATURE OF THE CASE

1.       Over a decade ago, GM discovered ignition-switch defects in millions of its vehicles that rendered them unfit for their intended use – to provide safe, reliable transportation. These defects can cause the vehicle's engine and electrical system to shut off mid-ride, resulting in a complete and sudden loss of power, and preventing airbags from being deployed in the case of a collision.

2.       GM marketed and advertised that these vehicles, although equipped with defective ignition switches, were safe and reliable. In fact, the opposite was true. Since as early as 2001, GM knew that the defective design of the ignition switches presented serious safety issues. Rather than replacing the defective ignition switch, or notifying the National Highway Traffic Safety Administration ("NHTSA") or the public of this danger, GM made a business decision to conceal the defects. When GM eventually began manufacturing vehicles with a corrected part, it used the same part number to avoid notice of or questions regarding the change.

3.      GM fraudulently concealed these ignition defects during its 2009 chapter 11

bankruptcy, as it took billions of dollars in taxpayer money from the U.S. Government and

obtained the U.S. Government's sponsorship of a plan of reorganization that salvaged the

company's very existence. During the bankruptcy case, GM did not disclose the existence of the

known ignition-switch defects to the Bankruptcy Court, the U.S. Government, to persons who

owned or leased GM vehicles containing the defective ignition switch at that time, or to any

other interested parties.

4.      No longer able to conceal the existence of the ignition-switch defects, GM has

now grudgingly admitted that it knew millions of its vehicles were equipped with defective

ignition switches dating back to 2001 – three years earlier than it initially reported, and has

instituted a recall of more than 2.6 million vehicles. GM was forced to disclose that, by its own

count, these defects have caused at least 31 accidents and 13 deaths. According to the Center for

Automotive Safety, NHTSA's Fatal Analysis Reporting System indicates that these defects have

caused 303 deaths thus far.

5.      GM's investigation of the defective ignition-switch design was, as the president of

GM North America stated, "not as robust as it should have been."[1] Moreover, Delphi, the maker

of the defective ignition switch, stated that it will only cost $2 to $5 to produce a replacement

ignition switch which can be 'swapped out' in just a few minutes.[2]

6.      As detailed herein, GM has violated federal law, various state statutes, and

---

[1] *See* Christopher Jensen, *A Call for General Motors to Fill Gaps in Safety Inquiry*, N.Y. TIMES, Mar. 5, 2014, http://www.nytimes.com/2014/03/06/automobiles/a-call-for-general-motors-to-fill-gaps-in-safety-inquiry.html?_r=0.

[2] Jeff Bennett, GM Now Says It Detected Ignition Switch Problem Back in 2001, WALL ST. J., Mar. 12, 2014 (10:35 p.m.), http://online.wsj.com/news/articles/SB10001424052702304914904579435171004763740. However, other estimates of the repair price are as low as $0.57 per switch. *See, The GM Ignition Switch Recall: Why Did It Take So Long?: Hearing Before the H. Energy and Commerce Comm.*, 133th Cong. (2014) (statement of Rep. Diana DeGette citing 2005 GM documents).

common-law duties between 2002 and the present (the "Class Period"). Plaintiff brings this class

action seeking redress and remedy from GM and Delphi on behalf of herself and other Class

Members, each of whom purchased or leased one or more of the following vehicles: 2005-2010

Chevrolet Cobalt, 2006-2011 Chevrolet HHR, 2006-2010 Pontiac Solstice, 2007-2010 Pontiac

G5, 2003-2007 Saturn Ion, and 2007-2010 Saturn Sky (collectively, the "Defective Vehicles").

7.      Plaintiff believes that there are additional GM vehicles that have the same or

similar defects in their ignition-switch systems as the Defective Vehicles. Plaintiff will

supplement the definition of Defective Vehicles to include these additional defective vehicles as

they are identified.

8.      The fact that GM has, to date, issued a partial recall despite knowing the

insufficiency thereof underscores GM's ongoing fraudulent concealment and fraudulent

misrepresentation of the nature and extent of the defects, and makes this class action even more

important to obtaining a proper remedy for Plaintiff and the other Class Members.

9.      GM's defective design, combined with GM's past and ongoing failure to

adequately warn of, or remedy, that design, and its past and ongoing fraudulent concealment

and/or fraudulent misrepresentations of the full nature and extent of the defects in that design in

the Defective Vehicles, has proximately caused and continues to cause Plaintiff and the Class to

suffer economic damages because they purchased or leased vehicles that contain a defective and

dangerous ignition switch.

10.     Plaintiff and the Class have been damaged by GM's misrepresentations,

concealment, and non-disclosure.

11.     Through this action, Plaintiff, individually and on behalf of the Class, seeks

injunctive relief in the form of a repair to fully remedy the defects in the ignition-switch system

3

such that the Defective Vehicles have their economic value restored and can be operated safely, and/or damages to compensate them for the diminished value of their Defective Vehicles as a result of the defects and GM's wrongful conduct.

## JURISDICTION AND VENUE

12.    This court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

13.    Venue is proper in this District under 28 U.S.C. § 1391 because GM conducts substantial business in this District, has caused harm to Class Members residing in this District, and because, as a corporation, GM is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## PARTIES

14.    Plaintiff and Named Class Representative Meaghan Skillman is a resident of Macomb County, Michigan and a citizen of the United States. Plaintiff owns a 2005 Chevrolet Cobalt, VIN 1G1AK12F457587400, which she purchased in 2009 for her personal transportation. Although GM knew of the problems associated with the Cobalt in 2009, due to its active concealment, Plaintiff was unaware of any defects with the Cobalt's ignition switch at the time of purchase.

15.    Since acquiring the Cobalt, Plaintiff has experienced the vehicle stalling while driving. While driving on the highway, Ms. Skillman bumped the key with her knee, instantly turning the key into the "off position." Without warning, the engine and electrical system

4

immediately shut down. GM was aware of this precise danger in 2005, if not earlier.[3] Ms. Skillman was able to coast her vehicle off to the side of the highway, and later restart the car safely. Fortunately, in this instance, no one was injured, although Ms. Skillman is left with a Defective Vehicle with a greatly diminished resale value.

16.     Defendant General Motors LLC is a Delaware corporation with its headquarters in Detroit, Michigan. GM is registered with the New York Department of State to conduct business in New York.

17.     GM was incorporated in 2009 and on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

18.     Among the liabilities and obligations expressly retained by GM after the bankruptcy are:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

19.     GM also expressly assumed:

> all Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

---

[3] *The GM Ignition Switch Recall: Why Did It Take So Long?: Hearing Before the H. Energy and Commerce Comm.*, 133th Cong. (2014), Exhibit 25 Delphi Email Chain, Subject: Force Displacement Curves SC-000084 (stating "Cobalt is blowing up in their face in regards to turning the car off with the driver's knee").

20.     Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition-switch defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

21.     Defendant Delphi is New Jersey Corporation with its principal place of business located in Gillingham, UK.

22.     Upon Information and belief, Delphi manufactured the defective ignition switches. Delphi was a former subsidiary of Old GM until it spun off in 1999 and became an independent company. Upon information and belief, Delphi knew the ignition switches were defective at all relevant times and was in a position to manufacture a corrective device or otherwise fix the device for a minimal amount of money, likely from $0.57 to $4 per vehicle.

## FACTUAL ALLEGATIONS

**A.     The ignition-switch defects in the Defective Vehicles**

23.     Given the importance that a vehicle and its electrical operating systems remain operational during ordinary driving conditions, it is imperative that a vehicle manufacturer ensure that its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle. With respect to the Defective Vehicles, GM has failed to do so.

24.     In the Defective Vehicles, the ignition-switch defects can cause the car's engine and electrical system to shut off, disabling the power steering and power brakes and causing non-deployment of the vehicle's airbags in the event of a crash.

25.     The Defective Vehicles are, therefore, unreasonably prone to being involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to

the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

26.     The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition-switch defects"):

(a) The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

(b) When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident and injury to the vehicle's occupants, occupants of other vehicles, and pedestrians;

(c) When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

27.     It has now been disclosed that the defects stem from a small, inexpensive part called the "detent plunger" reproduced below:



28.     Upon information and belief, in the recalled vehicles, the spring on the detent plunger was both too short and too relaxed. The too-short, relaxed coil did not create enough tension to hold the key in the "run" position; thus, very little force was required to turn the ignition key. Therefore, if a key ring carried too much weight (i.e. a key fob, other keys, or a key chain) or if the key was bumped or jarred, the key could move out of the "run" position, shutting down the car's engine and electrical system. This in turn would prevent the airbags from deploying in the event of a crash.

**B.      GM knew of the ignition-switch defects for years, but concealed the defects from Plaintiff and the Class**

29.     GM and Old GM were, at all times, under an affirmative duty to warn customers

7

about known defects. Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[4] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects.[5] If it is determined that the vehicle is defective, the manufacturer must notify owners, purchasers, and dealers of the Defective Vehicles and must remedy the defects.[6] This duty existed throughout the Class Period.

30.     Both Old GM and GM knew of the deadly ignition-switch defects and their dangerous consequences since as early as 2001, but concealed their knowledge from Defective Vehicle owners.

31.     A number of incidents reported nationally predate GM's recall of the Cobalt, and are most likely related to the ignition-switch defects.

32.     Kelly Erin Ruddy, age twenty-one, was driving a 2005 Chevrolet Cobalt north on Interstate 81 in Plains Township, Pennsylvania on January 10, 2010, when she lost control of her car causing it to roll several times, catch fire, and eject Ms. Ruddy onto the road, killing her in the process. After the accident, GM representatives removed the black box from Ms. Ruddy's vehicle at a Duryea scrapyard in the summer of 2010. Despite repeated attempts over the past several years to contact GM and retrieve the black box, the family has been unable to speak with anyone at GM. After the recall was announced, United States Senator Patrick Toomey (PA) wrote to GM demanding they return the vehicle's black box to the family. On March 24, 2014, more than four years after the accident, GM finally agreed to arrange for the return of the black box so it could be determined whether the ignition system failed, causing Ms. Ruddy's death.

---

[4] 49 U. S. C. §30101-30170.
[5] 49 U. S. C. §301188 (c)(1) & 2.
[6] 49 U. S. C. §30118(b)(2)(A) & B.

33.    Long before Ms. Ruddy's incident, on July 29, 2005, Amber Marie Rose, age

sixteen, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy. Ms. Rose's

death was the first of the hundreds deaths and injuries attributable to the ignition-switch defects.

Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM

and GM to address the ignition-switch problem.

34.    Another incident involved sixteen-year-old Megan Phillips. Ms. Phillips was

driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage

friends when the car left the road and hit a clump of trees. NHTSA investigators found that the

key had moved from the "run" to the "accessory" position, turning off the engine and disabling

the vehicle's airbags before impact.

35.    Rather than publicly admitting the dangerous safety defects in its vehicles, GM

attempted to attribute these and other incidents to "driver error." Every year from 2005 to 2012,

first Old GM and then GM received reports of deaths involving Cobalt steering and/or airbag

failures, including:

- 2005: 26 Cobalt Death and Injury Incidents, including one death citing Airbag as component involved.

- 2006: 69 Cobalt Death and Injury Incidents, including two deaths citing Airbag as component involved and 4 deaths citing Unknown component.

- 2007: 87 Cobalt Death and Injury Incidents, including three deaths citing Airbag as component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including one death citing Airbag as component involved and two deaths citing Unknown component.

- 2009: 133 Cobalt Death and Injury Incidents, including one death citing Airbag as component involved, one death citing Service Brake as component involved, one death citing Steering as component involved, and two deaths citing Unknown component.

- 2010: 400 Cobalt Death and Injury Incidents, including two deaths citing Airbag as component involved, 12 deaths citing steering as component involved, and one

death citing Unknown component.

- 2011: 187 Cobalt Death and Injury Incidents, including two deaths citing Airbag as component involved, two deaths citing Steering as component involved, and 1 Unknown component.

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

36.    GM now admits that Old GM learned of the ignition-switch defects as early as 2001. During the pre-production development of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "run" position to the "accessory" or "off" position. Old GM claimed that a switch design change "had resolved the problem."[7]

37.    In 2003, an internal report documented an instance in which the service technician observed a stall while driving. The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. It was replaced and the matter was closed.[8]

38.    According to GM's latest chronology submitted to NHTSA pursuant to 49 C.F.R. §573.6, Old GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

39.    Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

40.    According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

---

[7] Danielle Ivory, *G.M. Reveals It Was Told of Ignition Defect in '01*, N.Y. TIMES (Mar. 12,2014), http://www.nytimes.com/2014/03/13/business/gm-reveals-it-was-told-of-ignition-defect-in-01.html?_r=0.
[8] *Id.*

41.    As soon as the 2005 Cobalt hit the market, Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[9] Old GM opened additional PRTS inquires.

42.    In another PRTS opened in May 2005, Old GM engineers again assessed the problem and proposed that GM redesign the key head from a "slotted" to a "hole" configuration.

43.    After initially approving the proposed fix, Old GM reversed course and canceled the fix.[10] According to Defendants' emails obtained by multiple news outlets, the cost to complete the fix in 2005 would have cost approximately 57 cents per unit.

44.    Instead of instituting this inexpensive fix, in October 2005, Old GM simply issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the loss of the car's electrical system.

45.    Rather than disclosing the true nature of the defects and correcting them, under the TSB, Old GM gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key ring from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging as low as they had in the past.[11] According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[12]

46.    Yet there was no recall. Unsurprisingly, Old GM continued to receive complaints.

---

[9] March 11, 2014 Chronology Re: Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles, at 1.
[10] Id.
[11] Id. at 1-2
[12] Id. at 3.

11

47.     In 2006, Old GM approved a design change for the Cobalt's ignition switch supplied by Delphi. The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch." [13] While new design was finally produced for model years after 2007, GM did not change the part number, and believes that some newer-model cars could have been repaired with defective older-model switches.

48.     In 2007, NHTSA investigators met with Old GM to discuss its airbags, and informed Old GM of the July 2005 fatal crash involving Amber Marie Rose.

49.     As described above, the airbags in Ms. Rose's 2005 Cobalt did not deploy. Data retrieved from her vehicle's diagnostic system indicated that the ignition was in the "accessory" position. Old GM investigated and tracked similar incidents.

50.     By the end of 2007, by GM's own admission, Old GM knew of ten frontal collisions in which the airbag did not deploy. Plaintiff believes that Old GM actually knew of many other similar incidents involving the ignition-switch defects.

51.     For the next six years, GM continued to receive complaints and investigate frontal crashes in which the airbags did not deploy. However, rather than admit any possible wrong doing, Old GM and GM both vehemently and publicly denied any culpability for accidents involving GM vehicles.

52.     GM employed a harsh litigation strategy when dealing with claims brought by those harmed by its defective ignition switches. For example, "in one case, GM threatened to come after the family of an accident victim for reimbursement of legal fees if the family did not withdraw its lawsuit. In another instance, it dismissed a family [whose 23 year-old daughter died when the air bags in her Cobalt failed to deploy] with a terse, formulaic letter, saying there was

---

[13] *Id.* at 2.

no basis for [their] claims."[14] In another case, Allen Ray Floyd's family sued GM after Allen lost control of his 2006 Cobalt and died. Just two weeks before the accident, Allen's sister had lost control of the same vehicle and had to have it towed. GM sent a letter to a family contending the suit was "frivolous," and, according to the family's attorney, "telling us to drop our case or else they'd come after us."[15]

53.    In other instances, GM simply ignored grieving families killed by its defective vehicles. "We did call GM," said the mother of an eighteen-year-old killed when he suddenly lost control of his 2007 Cobalt, just less than a month after GM engineers met to review ignition-switch data. GM never returned their calls.[16]

54.    According to GM, it was not until 2011 and 2012 that its examinations of switches from crashed vehicles revealed significant design differences in the torque performance of ignition switches from the 2005 Cobalts and those from the 2010 model year, the last year of the Cobalt's production. GM again attempted to deflect any responsibility by blaming Delphi, its supplier, for the switch design.

55.    In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the Cobalt vehicles.

**C.    GM waited until 2014 to finally order a recall of the Defective Vehicles**

56.    After analysis by GM's Field Performance Review Committee and the Executive Action Decision Committee ("EFADC"), the EFADC finally decided to order a recall of some of the Defective Vehicles on January 31, 2014.

---

[14] Hilary Stout, Bill Vlasic, Danielle Ivory, and Rebecca R. Ruiz, *General Motors Misled Grieving Families on a Lethal Flaw*, N.Y. Times, Mar. 25, 2014, http://www.nytimes.com/2014/03/25/business/carmaker-misled-grieving-families-on-a-lethal-flaw.html.
[15] *Id.*
[16] *Id.*

57.    On February 13, 2014, GM recalled the 2005-2007 Chevrolet Cobalts and Pontiac G5s. Then, on February 25, 2014, GM doubled the size of the recall to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007. GM again expanded its global recall on March 28, 2014, bringing the number of recalled Defective Vehicles to 2.6 million, and including all model years of the Chevrolet Cobalt and HHR, all model years of the Saturn Io and Sky, all model years of the Pontiac G5, and model years 2006-2010 of the Pontiac Solstice.

58.    According to GM, dealers should replace the ignition switch, presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

59.    In a video message addressed to GM employees on March 17, 2014, C.E.O. Mary Barra admitted that the Company had made mistakes and needed to change its processes. According to Ms. Barra, "Something went terribly wrong in our processes in this instance, and terrible things happened." Barra continued to promise, "We will be better because of this tragic situation if we seize this opportunity."[17]

60.    GM now faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

61.    Upon information and belief, at least 2.6 million Defective Vehicles remain on the road to this day; and, on information and belief, other vehicles not-yet acknowledged by GM may also have the deadly ignition-switch defects.

**D.    Old GM promoted the Defective Vehicles as safe and reliable**

62.    On information and belief, in marketing and advertising materials, Old GM

---

[17] Bill Vlasic and Christopher Jensen, *Something Went 'Very Wrong' at G.M., Chief Says*, N.Y. TIMES, Mar. 17, 2014, http://www.nytimes.com/2014/03/18/business/gm-chief-barra-releases-video-on-recalls.html.

consistently promoted the Defective Vehicles as safe and reliable.

63.    For example, one Cobalt ad promised that "[s]ide curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

64.    An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

65.    A 2003 television spot for the Saturn Ion closed with the tagline: "Specifically designed and engineered for whatever's next." Another 2003 spot closed with the tagline: "Saturn. People first."

66.    A 2001 print ad touting the launch of the Saturn focused on safety: "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars. And it wasn't until we were satisfied that we added things. . . ."

67.    Old GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicles were defective, posing a serious risk of an accident and injury to the Defective Vehicles' occupants and others.

68.    Throughout the relevant period, Old GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

69.    Old GM never informed consumers about the ignition-switch defects.

**E.    The ignition-switch defects have harmed Plaintiff and the Class**

70.    The ignition-switch defects have caused damage to Plaintiff and the Class.

15

71.     A vehicle purchased, leased, or retained with serious safety defects is worth less than the equivalent vehicle leased, purchased, or retained without the defects.

72.     A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition-switch defects.

73.     Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition-switch defects been disclosed. Plaintiff and the Class overpaid for their Defective Vehicles because of the concealed ignition-switch defects. Plaintiff did not receive the benefit of the bargain.

74.     Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, due to the express warranty included with both the new and certified pre-owned vehicles. Plaintiff did not receive the benefit of the bargain.

75.     Plaintiff and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition-switch defects.

76.     GM admits to at least twelve deaths resulting from accidents linked to the ignition-switch defects in the Defective Vehicles. However, Plaintiff believes that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignition-switch defects.

77.     If Old GM or GM had timely disclosed the ignition-switch defects, all Class Members' vehicles would now be worth more.

## SUCCESSOR LIABILITY

78.     On July 10, 2009, GM acquired substantially all assets and assumed certain liability of Old GM through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

Bankruptcy does not immunize GM from liability here. Specifically, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its nondisclosure of the ignition-switch defects from the date of its formation on July 10, 2009, and appears to have committed bankruptcy fraud in connection with the Section 363 sale. GM also expressly assumed liability for warranty claims in the Master Sale and Purchase Agreement of June 26, 2009, and this assumption of liability includes the claims of the Class.

79.    GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, including, but not limited to, the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

- GM retained the bulk of the employees of Old GM;

- GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of Old GM; and

- GM acquired all goodwill and other intangible personal property of Old GM.

80.    GM has known since 2001 that at least one of its vehicles had serious safety problems involving the defective ignition switch, while at all times advertising and promoting its GM vehicles as highly reliable and safe.

81.    On numerous occasions, GM considered implementing a fix to its vehicles' ignition-switch problems and deliberately chose to ignore the problems, putting millions of American in mortal danger every time one of the GM vehicles was on the roadways.

82.    Nowhere in the Sale Motion or any of Old GM's bankruptcy filings did it disclose

17

the defective ignition switch. Old GM also never disclosed the defective ignition switch during the extensive, multi-day hearing on the Sale Motion.

83.    GM and Old GM did not report information within their knowledge to the Bankruptcy Court, federal authorities (NHTSA or the Auto Task Force of the United States Department of Treasury), or consumers, nor would a reasonable and diligent investigation have disclosed that GM and Old GM had information in their possession about the existence and dangerousness of the ignition-switch defects and opted to conceal that information until shortly before this action was filed.

84.    GM and Old GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiff, and the Class the true character, quality, and nature of the Defective Vehicles; that these defects are based on dangerous, inadequate, and defective design and/or substandard materials; and that they will require repair, pose severe safety concerns, and diminish the value of the Defective Vehicles.

## **TOLLING OF THE STATUTES OF LIMITATION**

85.    All applicable statutes of limitation have been tolled by GM's and Delphi's knowing and active fraudulent concealments and denials of the facts alleged herein. Plaintiff and the Class did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old GM, GM, Delphi did not report information within their knowledge to federal authorities or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defects and opted to conceal that information until shortly before this class action was filed.

86.    Indeed, Old GM instructed its service shops to provide Defective Vehicle owners

18

with a new key ring if they complained about unintended shut down, rather than admit what Old GM knew – that the ignition switches were dangerously defective and warranted replacement with a properly-designed-and-built ignition system.

87.    Old GM, GM, and Delphi were, and GM and Delphi remain, under a continuing duty to disclose to NHTSA, Plaintiff, and the Class the true character, quality, and nature of the Defective Vehicles; that these defects are based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

88.    Because of the active concealment by Old GM and GM, any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled.

## CLASS ALLEGATIONS

89.    Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and a Class initially defined as follows: All persons in the United States who currently own or lease one or more of the following GM vehicles: 2005-10 Chevrolet Cobalt, 2006-11 Chevrolet HHR, 2007-10 Pontiac G5, 2006-10 Pontiac Solstice, 2003-07 Saturn Ion, and 2007-10 Saturn Sky. This list will be supplemented to include other GM vehicles that have the defective ignition switches, which inadvertently turn off the engine and vehicle electrical systems during ordinary driving conditions.

90.    Included within the Class is a subclass of New York residents who own or lease Defective Vehicles (the "New York Subclass").

91.    Excluded from the Class are GM, its employees, coconspirators, officers, directors, legal representatives, heirs, successors, and wholly- or partly-owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their

19

immediate family members and associated court staff assigned to this case, and all persons

within the third degree of relationship to any such persons. Also excluded are any individuals

claiming damages from personal injuries allegedly arising from the Defective Vehicles.

92.     The Defective Vehicles include at least the following models: Chevrolet Cobalt

(all model years), Chevrolet HHR (all model years), Pontiac G5 (all model years), Pontiac

Solstice (2006-10 model years), Saturn Ion (all model years), and Saturn Sky (all model years).

93.     Plaintiff is informed and believes that Old GM manufactured and sold to

consumers at least 2.6 million Defective Vehicles nationwide and hundreds-of-thousands of

Defective Vehicles in the State of New York. Individual joinder of all Class or Subclass

members is impracticable.

94.     The Class expressly disclaims any recovery for physical injury resulting from the

ignition-switch defects. But the increased risk of injury from the ignition-switch defects serves as

an independent justification for the relief sought by Plaintiff and the Class.

95.     The Class can be readily identified using registration records, sales records,

production records, and other information kept by GM or third parties in the usual course of

business and within their control.

96.     Questions of law and fact are common to the Class and the Subclass and

predominate over questions affecting only individual members, including the following:

  (a)  Whether the Defective Vehicles suffer from ignition-switch defects;

  (b)  Whether Old GM, GM, and Delphi concealed the defects;

  (c)  Whether Old GM and GM misrepresented that the Defective Vehicles were
       safe;

  (d)  Whether Old GM, GM, and Delphi engaged in fraudulent concealment;

  (e)  Whether Old GM, GM, and Delphi engaged in unfair, deceptive, unlawful

and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches;

(f)   Whether the alleged conduct by GM and Delphi violated laws as Plaintiff alleges;

(g)   Whether Old GM's, GM's, and Delphi's unlawful, unfair and/or deceptive practices harmed Plaintiff and the members of the Class;

(h)   Whether Plaintiff and the members of the Class are entitled to declaratory, equitable, and/or injunctive relief; and

(i)   Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM.

97.     Plaintiff's claims are typical of the claims of the Class members, and arise from the same course of conduct by GM, Old GM, and Delphi. The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

98.     Plaintiff will fairly and adequately represent and protect the interests of all absent Class members. Plaintiff is represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

99.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class Members is impracticable. Because the damages suffered by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class Members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

100.    The prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications for individual Class Members, which would establish incompatible standards of conduct for GM. The conduct of this action as a class action

presents far fewer management difficulties, conserves judicial resources and the parties'

resources, and protects the rights of each Class Member.

101.    Plaintiff is not aware of any obstacles likely to be encountered in the management

of this action that would preclude its maintenance as a class action. Plaintiff anticipates

providing appropriate notice to be approved by the Court after discovery into the size and nature

of the Class.

## CAUSES OF ACTION

### COUNT I – FRAUDULENT CONCEALMENT
### (On Behalf of the Nationwide Class)

102.    Plaintiff and the Class incorporate by reference each preceding and following

paragraph as though fully set forth at length herein.

103.    This claim is brought on behalf of the Nationwide Class.

104.    GM and Delphi concealed and suppressed material facts concerning the ignition-

switch defects, and GM has successor liability for the acts of concealment and oppression of Old

GM as set forth above.

105.    Defendants had a duty to disclose these safety issues because they consistently

marketed their vehicles as reliable and safe and proclaimed that Defendants maintain the highest

safety standards. Once Defendants made representations to the public about safety, Defendants

were under a duty to disclose these omitted facts, because where one does speak one must speak

the whole truth and not conceal any facts which materially qualify those facts stated. One who

volunteers information must be truthful, and the telling of a half-truth calculated to deceive is

fraud.

106.    Defendants had a duty to disclose the ignition-switch defects because they were

known and/or accessible only to Defendants who had superior knowledge and access to the facts,

22

and Defendants knew they were not known to nor reasonably discoverable by Plaintiff and the Class. These omitted and concealed facts were material because they directly impact the safety of the Defective Vehicles. Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

107.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and avoid a costly recall, and they did so at the expense of Plaintiff and the Class.

108.    On information and belief; GM and Delphi have still not made full and adequate disclosure and continue to defraud Plaintiff and the Class and conceal material information regarding the defects that exist in the Defective Vehicles and other GM vehicles.

109.    Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and the Class's actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or the Class.

110.    Because of the concealment and/or suppression of the facts, Plaintiff and the Class sustained damage because they purchased and retained vehicles that are now diminished in value from what they would have been had Defendants timely disclosed the ignition-switch defects.

111.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II – DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201, *et seq.*, ON BEHALF OF A RULE 23(b)(2) DECLARATORY RELIEF CLASS

112.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

113.    Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

114.    The Defective Vehicles are delivered by GM with a New Vehicle Limited Warranty. This Warranty warrants that the Defective Vehicles were free from defects at the time of delivery, stating: "Any defects still present at the time the vehicle is delivered to you are covered by the warranty." The ignition-switch defects are latent defects in the Defective Vehicles that existed at the time of delivery to the owner or lessee, and any subsequent sale.

115.    There is an actual controversy between GM and Plaintiff concerning: (1) whether the ignition systems of the Defective Vehicles contain a defect; (2) whether the defects are covered by the Warranty; (3) whether the time limitations of the Warranty are nullified by GM's concealment of the ignition-switch defects in the Defective Vehicles at the time of delivery to the original, or any subsequent, owner or lessee; (4) whether the recall announced by GM provides the relief available to the Class under the terms of the Warranty; and (5) whether GM is obligated to buy back the Defective Vehicles given its knowledge of the ignition-switch defects as early as 2001, prior to delivery of those Defective Vehicles to the original owners, and active ongoing concealment of that knowledge from the original and subsequent owners and lessees of the Defective Vehicles for over a decade.

116.    Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal

24

relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

117.    Plaintiff seeks a declaration that the Defective Vehicles included a defective ignition-switch assembly, which was known to GM prior to the delivery of those Defective Vehicles to the members of the Class. Concealment of the known ignition-switch defects at the time of sale denied the Class an opportunity to refuse delivery of the Defective Vehicle. As a result, the Class has a legal right to reject this vehicle today rather than accept the relief afforded by the limited recall announced by GM.

118.    The declaratory relief requested herein will generate common answers that will settle the controversy relating to the Defective Vehicles and the alleged ignition-switch defects. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

## COUNT III – VIOLATION OF MAGNUSON-MOSS CONSUMER WARRANTIES ACT, 15 U.S.C. § 2301, *et seq.* ("MMWA")
### (On behalf of all Classes)

119.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

120.    The MMWA provides a private right of action by purchasers of consumer products against manufacturers or retailers who, *inter alia*, fail to comply with the terms of written, express, and/or implied warranties. 15 U.S.C. § 2310(d)(l). As alleged above, Defendants have failed to comply with the terms of its written, express, and/or implied warranties.

121.    The Defective Vehicles are consumer products, as that term is defined in 15 U.S.C. § 2301(a).

122.    GM is a supplier and warrantor, as that term is defined in 15 U.S.C. § 2301(4) and

25

(5).

123.    Plaintiff and each member of the Classes are consumers, as that term is defined in 15 U.S.C. § 2301(3).

124.    As a warrantor, GM is obligated to afford the Class, as consumers, all rights and remedies available under the MMWA, regardless of privity.

125.    The MMWA provides a cause of action for breach of warranty or other violations of the Act. 15 U.S.C. § 2310(d)(1 ). GM has breached its express warranties as alleged herein.

126.    It has also breached its implied warranty of merchantability, which it cannot disclaim under the MMWA, 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods. Plaintiff has suffered damages as a result of GM's breaches of express and implied warranties as set forth herein; thus, this action lies. 15 U.S.C. § 2310(d)(1)-(2).

127.    GM was on notice of the ignition-switch defects as early as 2001, yet did not undertake any opportunity to cure until 2014, nearly thirteen years later, when GM's knowledge of the ignition-switch defects was first made public. Also, once Plaintiff's representative capacity is determined, notice and opportunity to cure on behalf of the Class – through Plaintiff – can be provided under 15 U.S.C. § 2310(e).

128.    GM breached its implied warranty of merchantability to Plaintiff and Class Members because the Defective Vehicles would not pass without objection in the trade, as they contained defects related to motor vehicle safety due to the ignition-switch defects.

129.    GM further breached its implied warranty of merchantability to Plaintiff and Class Members because the Defective Vehicles were not adequately contained, packaged, and labeled. The directions and warnings that accompanied the Defective Vehicles did not adequately instruct Plaintiff on the proper use of the Defective Vehicles in light of the ignition-

switch defects or adequately warn Plaintiff of the dangers of improper use of the Defective
Vehicles.

130.    Plaintiff and the Class Members have suffered, and are entitled to recover,
damages as a result of GM's breaches of warranty and violations of the MMWA.

131.    Additionally, or in the alternative, the MMWA provides for "other legal and
equitable" relief where there has been a breach of warranty or failure to abide by other
obligations imposed by the MMWA. 15 U.S.C. § 2310(d)(1). Rescission and Revocation of
Acceptance are equitable remedies available to Class Members under the MMWA.

132.    Plaintiff also seeks an award of costs and expenses, including attorneys' fees,
under the MMWA to prevailing consumers in connection with the commencement and
prosecution of this action. 15 U.S.C. § 2310(d)(2). Plaintiff and the Class intend to seek such an
award, including expert witness costs and other recoverable costs, as prevailing consumers at the
conclusion of this lawsuit.

133.    It was not necessary for Plaintiff and each Class Member to give GM notice of
GM's breach of the implied warranty of merchantability because GM had actual notice of the
ignition-switch defects. Prior to the filing of this action, GM issued a safety recall for the
Defective Vehicles acknowledging the ignition-switch defects. GM admitted it had notice of the
ignition-switch defects as early as 2001. At the time of the safety recall, GM also acknowledged
that numerous accidents and fatalities were caused by the ignition-switch defects. In addition to
the above, the filing of this action is sufficient to provide GM notice of its breaches of the
implied warranty of merchantability with respect to the Defective Vehicles.

## COUNT IV – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of All Classes)

134.    Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint.

135.    GM is a merchant who sold the Defective Vehicles to Plaintiff and Class
Members.

136.    GM impliedly warranted to Plaintiff and members of the Class that the Defective
Vehicles were free of defects, and were merchantable and fit for the ordinary purpose for which
such goods were sold and used.

137.    As alleged herein, GM's sales of the Defective Vehicles breached this implied
warranty of merchantability because the Defective Vehicles were sold with latent defects
described herein as the ignition-switch defects. As such, the Defective Vehicles are defective,
un-merchantable, and unfit for the ordinary, intended purpose at the time of sale. These ignition-
switch defects create serious safety risks in the operation of the Defective Vehicles.

138.    GM, however, marketed, promoted, and sold the Defective Vehicles as safe and
free from defects.

139.    GM breached its implied warranty of merchantability to Plaintiff and the Class
because the Defective Vehicles would not pass without objection in the trade, as they contained
the ignition-switch defects.

140.    GM further breached its implied warranty of merchantability to Plaintiff and
Class Members because the Defective Vehicles were not adequately contained, packaged, and
labeled. The directions and warnings that accompanied the Defective Vehicles did not
adequately instruct Plaintiff on the proper use of the Defective Vehicles in light of the ignition-
switch defects or adequately warn Plaintiff of the dangers of improper use of the Defective
Vehicles.

141.    GM had knowledge of, yet concealed, these defects for over a decade. Plaintiff

28

provided reasonable and adequate notice to GM through its dealer network when seeking repairs on the vehicle following an accident. GM failed to cure the ignition-switch defects that existed and were known to GM, yet concealed from Plaintiff, at the time Plaintiff purchased her Defective Vehicle.

142.    Defendants' purported disclaimer or exclusion of the implied warranty of merchantability in its written warranty is invalid, void, and unenforceable per Magnuson-Moss, 15 U.S.C. § 2308(a)(l). GM's warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable because they disclaimed defects known but not disclosed to consumers at or before the time of purchase.

143.    Any contractual language contained in GM's written warranty that attempts to limit remedies is unconscionable, fails to conform to the requirements for limiting remedies under applicable law, causes the warranty to fail of its essential purpose, and is, thus, unconscionable, unenforceable, and/or void.

144.    As a direct and proximate result of the breach of said warranty, Plaintiff and the Class suffered and will continue to suffer losses as alleged herein in an amount to be determined at trial.

145.    Additionally, or in the alternative, Plaintiff and the Class seek declaratory relief relating to the ignition-switch defects alleged herein, and the opportunity to rescind the purchase agreement for the Defective Vehicle.

146.    It was not necessary for Plaintiff and each Class Member to give GM notice of GM's breach of the implied warranty of merchantability because GM had actual notice of the ignition-switch defects. Prior to the filing of this action, GM issued a safety recall for the Defective Vehicles acknowledging the ignition-switch defects. GM admitted it had notice of the

ignition-switch defects as early as 2001. At the time of the safety recall, GM also acknowledged that numerous accidents and fatalities were caused by the ignition-switch defects. In addition to the above, the filing of this action is sufficient to provide GM notice of its breaches of the implied warranty of merchantability with respect to the Defective Vehicles.

## COUNT V – VIOLATION OF CONSUMER PROTECTION STATUTES
### (On behalf of Consumer Protection Statute Class)

147.   145. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

148.   146. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices with respect to the sale of the Defective Vehicles in violation of the following state consumer protection and unfair competition statutes.

149.   Defendants have violated Alaska Stat. 45-50-471 *et seq.*

150.   Defendants have violated Ariz. Rev. Stat. § 44-1521 *et seq.*

151.   Defendants have violated Arkansas Code § 4-88-101 *et seq.*

152.   Defendants have violated Cal. Civ. Code § 1770 *et seq.*, Cal. Bus. & Prof. Code § 17200 *et seq.*, and Cal. Bus. & Prof. Code § 17070.

153.   Defendants have violated Colo. Rev. Stat. § 6-1-101 *et seq.*

154.   Defendants have violated Conn. Gen. Stat. § 42-110A *et seq.*

155.   Defendants have violated 6 Del. Code § 2513 *et seq.* and 6 Del. Code § 2532 *et seq.*

156.   Defendants have violated D.C. Code Ann. § 28-3901 *et seq.*

157.   Defendants have violated Florida Stat. § 501.201 *et seq.*

158.   Defendants have violated Ga. Code Ann. § 10-1-370 *et seq.*

159.   Defendants have violated Haw. Rev. Stat. Ann. § 481A-3.

160.   Defendant has violated Idaho Code § 48-601 *et seq.*

161.    Defendants have violated 815 Ill. Comp. Stat. 505/1 *et seq.* and 815 Ill. Comp. Stat. 510/1 *et seq.*

162.    Defendants have violated Ind. Code § 24-5-0.5-3.

163.    Defendants have violated Iowa Code § 714H.1 *et seq.*

164.    Defendants have violated Kan. Stat. Ann. § 50-623 *et seq.*

165.    Defendants have violated Ky. Rev. Stat. § 367.110 *et seq.*

166.    Defendants have violated Me. Rev. Stat. Ann. Tit. 5 § 205-A *et seq.*

167.    Defendants have violated Md. Code Com. Law § 13-101 *et seq.*

168.    Defendants have violated Mass. Gen. Laws chapter 93A § 1 *et seq.*

169.    Defendants have violated Mich. Comp. Laws § 445.901.

170.    Defendants have violated Minn. Stat. § 325F.69 *et seq.* and Minn. Stat. § 325D.43 *et seq.*

171.    Defendants have violated Mo. Ann. Stat. 407.020.

172.    Defendants have violated Neb. Rev. Stat. § 87-302 and Neb. Rev. Stat. § 59-1601 *et seq.*

173.    Defendants have violated Nev. Rev. Stat. § 598.0903 *et seq.*

174.    Defendants have violated New Hampshire Rev. Stat. § 358-A:1 *et seq.*

175.    Defendants have violated N.J. Stat. Ann. § 56:8-1 *et seq.*

176.    Defendants have violated New Mexico Stat. Ann. § 57-12-1 *et seq.*

177.    Defendants have violated N.Y. Gen. Bus. Law § 349 *et seq.*

178.    Defendants have violated North Carolina Gen. Stat. § 75-1.1 *et seq.*

179.    Defendants have violated N.D. Cent. Code § 51-15-02.

180.    Defendants have violated Ohio Rev. Code Ann. § 1345.01 *et seq.* and Ohio Rev.

Code Ann. § 4165.01 *et seq.*

181.    Defendants have violated Okla. Stat. Tit. 15 § 751 *et seq.* and 78 Okla. Stat. Ann. § 51 *et seq.*

182.    Defendants have violated Or. Rev. Stat. § 646.605 *et seq.*

183.    Defendants have violated 73 P.S. § 201-1 *et seq.*

184.    Defendants have violated Rhode Island Gen. Laws § 6-13.1-1 *et seq.*

185.    Defendants have violated S.D. Codified Laws § 37-24-6 *et seq.*

186.    Defendants have violated Tex. Bus. & Com. Code § 17.41 *et seq.*

187.    Defendants have violated Utah Code Ann. 13-11-1 *et seq.*

188.    Defendants have violated Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*

189.    Defendants have violated Va. Code Ann. 59.1-200 *et seq.*

190.    Defendants have violated Rev. Code Wash. Ann. § 19.86.010 *et seq.*

191.    Defendants have violated W. Va. Code § 46A-1-101 *et seq.*

192.    Defendants have violated Wisc. Stat. § 100.18 *et seq.*

193.    Defendants have violated Wyo. Stat. § 45-12-105 *et seq.*

194.    Defendants' misrepresentations and omissions regarding the safety and reliability of its vehicles as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

195.    Defendants' intentional and purposeful acts, described above, were intended to and did cause Plaintiff and the Class to pay artificially inflated prices for the Defective Vehicles purchased in the states listed above.

196.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members have been injured in their business and property in that they paid more for their

vehicles than they otherwise would have paid in the absence of Defendants' unlawful conduct.

197.    All of the wrongful conduct alleged herein occurred in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that was perpetrated nationwide.

198.    Plaintiff and Class Members are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including, but not limited to, actual damages, injunctive relief, attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of its unlawful conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and Delphi in favor of Plaintiff and the Class, and grant the following relief:

A.    Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class and Subclass Representative and Plaintiff's chosen counsel as Class Counsel;

B.    Declare, adjudge, and decree the conduct of GM and Delphi as alleged herein to be unlawful, unfair, and/or deceptive, and enjoin any such future conduct;

C.    Award Plaintiff and Class Members actual, compensatory damages, nominal damages, and/or statutory damages, as proven at trial;

D.    Alternatively, if elected by Plaintiff and the Class, permit rescission of the purchase agreement for the Defective Vehicles requiring GM's buy-back of the Defective

33

Vehicles;

     E.     Alternatively, if elected by Plaintiff and the Class, require GM to repair the

defective ignition switches or provide a comparable vehicle that does not have ignition-switch

defects;

     F.     Award Plaintiff and the Class all monies paid to Old GM because of GM's

violation of the State Unfair Trade Practices and Consumer Protection Laws as set forth herein;

     G.     Award Plaintiff and Class Members exemplary damages in such amount as

proven;

     H.     Award Plaintiff and  Class Members their reasonable attorneys' fees, costs, and

pre-judgment and post-judgment  interest; and

     I.     Award Plaintiff and the Class such other further and different relief as the case

may require or as determined to be just, equitable, and proper by this Court.

## JURY  TRIAL DEMAND

Plaintiff requests a trial by jury on the legal claims, as set forth herein.

Respectfully Submitted,

May 7, 2014

/s/ _____

Miles Greaves (MG-1285)
Brett Cebulash (BC-0044)
Kevin Landau (KL-2467)
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
mgreaves@tcllaw.com
bcebulash@tcllaw.com
klandau@tcllaw.com

Daniel E. Gustafson
Jason S. Kilene
Sara J. Payne

34

**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street
Suite 2600
Minneapolis, MN 55402
dgustafson@gustafsongluek.com
jkilene@gustafsongluek.com
spayne@gustafsongluek.com

*Attorneys for Plaintiff*