# Exhibit L

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

JOHN W. TAYLOR, individually and on
behalf of all others similarly situated,

     Plaintiff,

vs.

GENERAL MOTORS, LLC,

     Defendant.

## CLASS ACTION COMPLAINT

Plaintiff JOHN W. TAYLOR, individually and on behalf of all other similarly situated persons, brings this action against Defendant General Motors, LLC ("GM").

### INTRODUCTION

1.     This case arises from GM's scheme to defraud GM consumers through its failure to disclose and active concealment of a defect in certain GM cars that renders them unsafe to drive. The defect is in the cars' ignition switch system, which is susceptible to failure during normal driving conditions. When the ignition switch system fails, the switch turns from the "run" or "on" position to either the "off" or "accessory" position, which results in a loss of power, speed control, and braking, as well as a disabling of the car's airbags (the "Ignition Switch Defect").

2.     There are at least approximately 2.6 million GM cars that have this defect. The cars that have this defect (the "Defective Cars") are:

- 2005-2010 Chevrolet Cobalt
- 2006-2011 Chevrolet HHR
- 2007-2010 Pontiac G5
- 2006-2010 Pontiac Solstice
- 2003-2007 Saturn Ion
- 2007-2010 Saturn Sky

3.      GM's scheme has harmed Plaintiff and the Class Members and caused them actual damages. Plaintiff and the Class Members did not receive the benefit of their bargains as purchasers and lessees of the Defective Cars. Instead, they received cars that were less safe, less useful, of lower quality and less valuable than represented. Plaintiff and the Class Members contracted to purchase cars that do not unexpectedly turn off and become uncontrollable without airbag protection. However, because of the Ignition Switch Defect, they received Defective Cars that unexpectedly turn off and become uncontrollable without airbag protection. Plaintiff and the Class Members thus overpaid for their cars or made lease payments that were too high. Plaintiff and the Class Members would not have paid as much for their cars nor made as high lease payments had the Ignition Switch Defect been disclosed. As a result of the widespread publicity regarding the Ignition Switch Defect and GM's misconduct, the value of the Defective Cars has diminished. GM's offer to replace the ignition switch system does not adequately address the diminished value of the Plaintiff and the Class Members' cars.

4.      Plaintiff brings this action on behalf of a Class of all persons in the United States who currently own or lease a Defective Car. Plaintiff also brings this action for a Subclass of Florida residents who own or lease a Defective Car.

## JURISDICTION AND VENUE

5.    This Court has diversity jurisdiction over this action under 28 U.S.C. §
1332(d) (the Class Action Fairness Act), because the amount in controversy for the
Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100
class members, and members of the Class are citizens of a state different from GM.

6.    This Court has personal jurisdiction over GM because GM is registered
to do business in the State of Florida, maintains a registered agent in the State of
Florida, and conducts substantial and ongoing business both in the State of Florida
and in this District.

7.    Venue is proper in this District under 28 U.S.C. § 1391 because a
substantial part of the events or omissions giving rise to the claims occurred in this
District, and because GM has caused harm to Class Members residing in this
District, including Plaintiff.

## PARTIES

8.    Plaintiff John W. Taylor is a citizen of Florida who resides in Juno
Beach, Florida. Taylor owns a 2006 Chevy Cobalt, which he bought new. Taylor did
not learn of the Ignition Switch Defect until in or around February 2014 at the
earliest. Had GM disclosed the Ignition Switch Defect, Taylor would not have
purchased his 2006 Chevy Cobalt, or would have paid less than he did, and would
not have retained the car.

9.    Defendant GM is a limited liability company formed under the laws of
Delaware with its principal place of business in Detroit, Michigan. GM was

incorporated in 2009, and on July 10, 2009, acquired substantially all of the assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a sale under Chapter 11 of the U.S. Bankruptcy Code, pursuant to a Master Sales and Purchase Agreement (the "Agreement").

10.     Under the Agreement, GM expressly assumed the following obligation:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Car Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of cars and cars parts manufactured or distributed by [Old GM].

11.     GM also expressly assumed the following liabilities:

> All Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned cars or new or remanufactured motor car parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

12.     GM is also liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint, because GM acquired and operated Old GM and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos, plants, offices, leadership, personnel, engineers and employees. GM was aware from its inception of the Ignition Switch Defect in the Defective Cars. GM and Old GM concealed the Ignition Switch Defect from the public, regulators and the bankruptcy court.

Because GM is liable for the wrongful conduct of Old GM, there is no need to distinguish between the conduct of Old GM and GM, and this Complaint will simply refer to GM as the corporate actor when describing the relevant facts.

<u>FACTUAL ALLEGATIONS</u>

**A.    GM's Decade of Concealment.**

13.    In documents filed with the federal government, GM has admitted that it learned of the Ignition Switch Defect in 2001, during the pre-production development of the Saturn Ion. At that time, an internal report indicated that the car was stalling due to problems with the ignition switch, which included "low detent plunger force" in the ignition switch. The report stated that "an ignition switch design change" purportedly solved the problem, but it obviously did not.

14.    GM nonetheless began manufacturing and selling the Ion in 2002 (for the 2003 model year) with the defective ignition switch systems, which were manufactured by Delphi Automotive, PLC.

15.    In 2003, an internal GM inquiry documented that a service technician observed the Saturn Ion stall after the ignition had switched off while driving. The technician noticed that "[t]he owner had several keys on the key ring," and the report stated that "[t]he additional weight of the keys had worn out the ignition switch." The technician replaced the ignition switch, and the inquiry was closed without further action.

16.    In 2004, three GM employees driving production Ions reported that their cars had stalled from a loose ignition switch. "The switch should be raised at

least one inch toward the wiper stalk . . . . This is a basic design flaw and should be corrected if we want repeat sales," one engineer reported.

17. Despite these reports, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

18. Even worse, when GM began manufacturing and selling the Chevrolet Cobalt in 2004 (for the 2005 model year), which was essentially the same car as the Saturn Ion, it installed the <u>same</u> ignition switch system as it installed in the Ion.

19. Soon after the Cobalt entered the market, GM began receiving complaints about incidents of cars losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. Engineering inquiries, known within GM as Problem Resolution Tracking System ("PRTS") reports, were opened to assess the issue.

20. In February 2005, GM engineers concluded that the problem had two causes: "a lower torque detent in the ignition switch . . . [and the] low position of the lock module on the [steering] column." Again, however, GM decided to do nothing.

21. On February 28, 2005, GM issued a Service Bulletin to its dealers addressing "the potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effect" in 2005 Cobalts and 2005 Pontiac Pursuits, which GM stated was "more likely to occur if the driver is short and has a large heavy key chain." The February 28, 2005 Service Bulletin directed the dealers to advise customers that "removing unessential items from their key chains" would prevent the ignition from being turned off inadvertently. Notably, GM did not

disseminate this information to its customers.

22.    GM knew at that time it released the Service Bulletin that the problem
was a result of design defects in the key and ignition system, and not short drivers
using heavy key chains. Moreover, GM knew that the "fix" it directed dealers to
offer customers was insufficient to prevent the problem with the ignition.

23.    During the course of a PRTS opened in May 2005, an engineer
proposed that GM redesign the key head from a "slotted" to a "hole" configuration.
The slot design allowed the key chain to hang lower on the key, which placed more
torque on the ignition switch when the chain was contacted or moved. The proposal
was initially approved, but later cancelled by GM.

24.    In June 2005, the <u>New York Times</u> reported that Chevrolet dealers
were telling customers to lighten their key rings to prevent intermittent stalling
and the loss of electrical power in their cars. The article included a statement from
Alan Adler, GM's Manager for Safety Communications, in which he reassured the
public that the problem only occurred in "rare cases when a combination of factors
is present," that customers "can virtually eliminate this possibility by taking several
steps, including removing nonessential material from their key rings," and that
"when [the stalling] happens, the Cobalt is still controllable" and the "engine can be
restarted after shifting to neutral."

25.    These statements were false because GM's internal documents showed
that these incidents occurred when drivers were using keys with the standard key
fob, and that removing non-essential items from the key ring would not "virtually

eliminate" the risk of an incident.

26.     In July 2005, Amber Marie Rose, who was 16 years old, was killed when she drove her 2005 Cobalt off the road and struck a tree. Her driver's side airbag did not deploy, even though it should have given the circumstances of the head-on crash, and the car's ignition switch was in the "accessory/off" position at the time of the crash. GM learned of these facts in 2005 and documented them in an internal investigation file.

27.     Instead of fixing the defect, in December 2005, GM issued another Service Bulletin to its dealers that reiterated much of the same deceptive message Adler delivered earlier in the year. It indicated that the possibility of the driver inadvertently turning off the ignition was more likely to occur if the driver is short and has a large or heavy key chain and recommended that drivers remove unessential items from key chains. In addition, it informed dealers that it had developed an insert for the key ring to prevent it from moving up and down in the slot, and that the key ring had been replaced with a smaller design that would not hang as low as in the past. The Service Bulletin applied to 2003-06 Saturn Ions, 2005-06 Chevrolet Cobalts, the 2006 Chevrolet HHR, and the 2006 Pontiac Solstice, all of which were equipped with the same defective ignition switch system.

28.     In October 2006, GM updated its December 2005 Service Bulletin to include the 2007 Saturn Ion, the 2007 Saturn Sky, the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5 and the 2007 Pontiac Solstice.

29.     In 2006, at least two fatal accidents involving Cobalts occurred in

which the cars' data recorders indicated that the ignition switches were in the "accessory" position and the front airbags failed to deploy. GM learned of this information in 2006.

30.    In 2007 and 2008, GM became aware of at least four more such fatal accidents.

31.    NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbag failed to deploy in non-rear impact crashes.

32.    GM finally made some changes to the design of the ignition switch system in 2006 to include a new detent plunger and spring. The new switch, however, did not receive a new part number, which is considered a "cardinal sin" in the engineering community, and further concealed the defect in the switch that was installed in the Defective Cars.

33.    In 2012, GM engineers studied 44 cars across a range of make and model years, and results revealed that cars tested from model years 2003 through 2007 exhibited torque performance below the original specifications established by GM. Rather than immediately notify NHTSA of the results of this study or conduct a recall, GM continued to conceal the nature of the Ignition Switch Defect.

34.    In April 2013, GM hired an outside engineering consulting firm to investigate the ignition switch system. The external report concluded that ignition switches installed in early model Cobalt and Ion cars did not meet GM's torque specification. Rather than immediately notify NHTSA of the results of this report,

GM continued to conceal the nature of the Ignition Switch Defect.

35.    Despite its utter disregard for public safety, GM cars have been marketed based on safety from 2002 through the present. For example, in 2005, Chevrolet emphasized on its website that "[y]our family's safety is important to us . . . . That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind." Likewise, in advertisements for Saturns, GM utilized the slogan, "Saturn. People First," and stated that, "[i]n cars, it's about things like reliability, durability, and of course, safety. That's where we started when developing our new line of cars."

### B.    GM Finally Discloses the Ignition Switch Defect.

36.    It was not until February of 2014 – almost thirteen years after first recognizing the defect – that GM finally admitted publicly that the ignition switch system is defective and agreed to recall the Defective Cars to replace the old ignition switch with the re-designed version.

37.    In a February 14, 2014 letter to NHTSA regarding the recall, GM finally acknowledged – in contrast to its prior representations to the agency – that changes were made to the ignition switches during the 2007 model year. Specifically, GM stated that on "April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics."

38.    GM's recall is too little too late.  Among other problems, it does not address the location of the ignition switch system or how low the key fob hangs on

the steering column, all of which create a risk of inadvertent driver contact and an inadvertent turning of the switch.

39.    Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations, when a manufacturer learns that a car contains a safety defect, the manufacturer must promptly disclose the defects. If it is determined that the car is defective, the manufacturer must notify car owners, purchasers and dealers of the defect and must remedy the defect. GM repeatedly violated the TREAD Act by actively concealing information about the Ignition Switch Defect for more than a decade.

40.    On March 17, 2014, GM's CEO Mary T. Barra issued an internal video to employees, wherein she admits that "[t]hese are serious developments that shouldn't surprise anyone. After all, something went wrong with our process in this instance and terrible things happened."

41.    Throughout the relevant period, GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function on the ignition switches in the Defective Cars and the existence of the defects in those cars.

**C.    Damages to Plaintiff and the Class Members.**

42.    The Ignition Switch Defect has caused actual damages to Plaintiff and the Class Members.

43.    A car purchased, leased or retained with a serious safety defect is

worth less than the equivalent car purchased, leased or retained without the defect.

44.     A car purchased, leased or retained under the reasonable assumption that it is safe is worth more than a car known to be subject to the unreasonable risk of catastrophic accident because of the Ignition Switch Defects.

45.     Purchasers and lessees paid more for the Defective Cars, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed. Plaintiff and the Class Members overpaid for their Defective Cars. Because of the concealed Ignition Switch Defect, Plaintiff and the Class Members did not receive the benefit of their bargains.

46.     Additionally, as a result of publicity regarding the Ignition Switch Defect and GM's misconduct, the value of the Defective Cars has diminished. GM's offer to replace the ignition switch system does not adequately address the diminished value of the Plaintiff and Class Members' cars. Plaintiff and the Class Members are stuck with unsafe cars that are now worth less than they would have been but for GM's wrongful conduct.

## TOLLING OF THE STATUTES OF LIMITATION

47.     All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the Ignition Switch Defect. GM has been aware of the Ignition Switch Defect since at least 2001, and has concealed from Plaintiff, the Class Members, the public and the government the complete nature of the Ignition Switch Defect.

48.     Plaintiff and the Class Members did not discover and could not have

discovered with reasonable diligence the facts that would have caused a reasonable person to suspect that the Ignition Switch Defect existed or that GM did not report information within its knowledge regarding the existence of a dangerous defect to federal authorities or consumers until in or around February 2014 at the earliest.

49.     GM was and remains under a continuing duty to disclose to NHTSA, Plaintiff and the Class Members the true character, quality and nature of the Defective Cars. GM actively concealed the true character, quality and nature of the Defective Cars. GM is therefore estopped from relying on any statutes of limitation in this action.

<u>CLASS ALLEGATIONS</u>

50.     Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff bring this action on behalf of themselves and a Class initially defined as follows:

> **All persons in the United States who currently own or lease one the following GM cars:**
>
> **2005-2010 Chevrolet Cobalt**
> **2006-2011 Chevrolet HHR**
> **2007-2010 Pontiac G5**
> **2006-2010 Pontiac Solstice**
> **2003-2007 Saturn Ion**
> **2007-2010 Saturn Sky**

51.     Included within the Class is a subclass of Florida residents who own or lease any of the above Defective Cars (the "Florida Subclass").

52.     Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly

owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case. Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Defective Cars.

53.     The Class can be readily identified using registration records, sales records, production records and other information kept by GM or third parties.

54.     There are at least approximately 2.6 million Defective Cars. The number of Class Members is therefore great enough that joinder is impracticable.

55.     The claims of Plaintiff are typical of the claims of the Class Members. Plaintiff and the Class Members alike purchased or leased Defective Cars and were harmed in the same way by GM's uniform misconduct.

56.     Plaintiff will fairly and adequately protect the interests of the other Class Members. Plaintiff counsel has substantial experience in prosecuting class actions, including in particular class actions involving defective cars. Plaintiff and their counsel are committed to vigorously prosecuting this action, have the financial resources to do so, and do not have any interests adverse to the Class.

57.     There are numerous questions of law and fact that are common to the Class and predominate over questions affecting only individual members, including the following:

(a)     Whether the Defective Cars suffer from Ignition Switch Defects;

(b)     Whether GM concealed the defects;

(c)     Whether GM misrepresented that the Defective Cars were safe;

(d)     Whether GM owed Plaintiff and Class Members a duty to disclose the Ignition Switch Defect;

(e)     Whether GM engaged in fraudulent concealment;

(f)     Whether GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Cars were designed, manufactured and sold with defective ignition switches; and

(g)     Whether GM's unlawful, unfair and/or deceptive practices harmed Plaintiff and the members of the Class.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the joinder of all individual members of the Class is impracticable. Likewise, the damages suffered by each individual member of the Class may be small in relation to the expense and burden of individual litigation. Accordingly, it would be very difficult or impossible for individual members of the Class to redress the wrongs done to each of them individually.  In addition, the burden imposed on the judicial system by individual lawsuits would be enormous.

59.     The prosecution of separate actions by the individual members of the Class would also create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for GM. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

### CAUSES OF ACTION

### COUNT I

### MICHIGAN CONSUMER PROTECTION ACT
**(Michigan Comp. Laws § 445, *et seq.*)**

60.     Plaintiff and the Class incorporate by reference paragraphs 1-59.

61.     This claim is brought on behalf of the nationwide Class.

62.     Plaintiff and the Class Members are "persons" under the Michigan

Consumer Protection Act (the "MCPA"), M.C.L.A. § 445.902(1)(d).

63.     GM is a "person" engaged in "trade or commerce" under the MCPA,

M.C.L.A. § 445.902(1)(d) & (g).

64.     The MCPA prohibits any "unfair, unconscionable, or deceptive

methods, acts, or practices in the conduct of trade or commerce." M.C.L.A. §

445.903(1).

65.     GM's conduct constitutes unfair, unconscionable or deceptive methods,

acts or practices in the conduct of trade or commerce. In particular, GM violated the

MCPA by

        a.      "[f]ailing to reveal a material fact, the omission of which tends to

        mislead or deceive the consumer, and which fact could not reasonably be

        known by the consumer," M.C.L.A. § 445.903(s);

        b.      "[m]aking a representation of fact or statement of fact material

        to the transaction such that a person reasonably believes the represented or

        suggested state of affairs to be other than it actually is," M.C.L.A. §

        405.903(bb); and

c.    "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner," M.C.L.A. § 405.903(cc).

66.    GM's practices that violated the MCPA include the following:

a.    GM represented that the Defective Cars had safety characteristics that they do not have;

b.    GM represented that the Defective Cars were of a particular standard, quality or grade, when they are not;

c.    GM knew of the Ignition Switch Defect but failed to disclose its existence or its complete nature, even though GM knew that such information was material to the transaction in light of GM's prior representations;

d.    GM failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, the Class Members, the public and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to Plaintiff, the Class Members, the public and the government;

e.    GM intended for Plaintiff, the Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiff and the Class Members would purchase or lease the Defective Cars; and

f.    GM repeatedly violated the TREAD Act.

67.     GM's acts and practices were unfair and unconscionable, because its acts and practices offend established public policy, and because the harm GM caused consumers greatly outweighs any benefits associated with its acts and practices. GM's conduct has also impaired competition within the automotive cars market and has prevented Plaintiff and the Class from making fully informed decisions about whether to lease, purchase or retain Defective Cars.

68.     While GM knew of the Ignition Switch Defect by 2001 and knew that the defect caused the Defective Cars to have an unreasonable propensity to shut down and become uncontrollable, it continued to design, manufacture and market the Defective Cars until as late as 2011.

69.     Plaintiff and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices. Had Plaintiff and the Class known about the full extent of the Ignition Switch Defect, they would either not have purchased their cars at all or would have paid less for them, and would not have retained their Defective Cars. Plaintiff and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of here.

70.     All of the wrongful conduct alleged here occurred, and continues to occur, in the conduct of GM's business.

71.     Plaintiff request that this Court: (a) enjoin GM from continuing its unfair, unlawful and/or deceptive practices; (b) require GM to repair Plaintiff' and Class Members' cars to completely eliminate the Ignition Switch Defect; (c) provide

to Plaintiff and each Class Member either their actual damages as the result of
GM's unfair, unlawful and deceptive trade practices, or $250 per Class member,
whichever is higher; (d) award reasonable attorneys' fees; and (e) provide other
appropriate relief under the MCPA.

72.    Plaintiff also seeks punitive damages against GM because it carried
out reprehensible conduct with willful and conscious disregard of the rights and
safety of others. GM intentionally, willfully and repeatedly misrepresented the
reliability and safety of the Defective Cars and continued to conceal material facts
that only it knew, even while innocent victims were being killed as a result of its
conduct. GM's unlawful conduct constitutes malice, oppression and fraud justifying
punitive damages.

## COUNT II

## FRAUD BY CONCEALMENT

73.    Plaintiff and the Class incorporate by reference paragraphs 1-59.

74.    This claim is brought on behalf of the nationwide Class.

75.    GM concealed and suppressed material facts concerning the Ignition
Switch Defect.

76.    GM had a duty to disclose the Ignition Switch Defect because it
consistently represented that its cars were reliable and safe and proclaimed that it
maintained the highest safety standards, and the defect was known and/or
accessible only to GM, which had superior knowledge and access to the facts, and
GM knew that the facts were not known to or reasonably discoverable by Plaintiff

and the Class. These omitted and concealed facts were material because they directly impact the safety of the Defective Cars, and GM's prior representations regarding the safety of its cars became materially misleading when GM concealed facts regarding the Ignition Switch Defect.

77. GM actively concealed and/or suppressed these material facts, in whole or in part, to induce Plaintiff and Class Members to purchase or lease the Defective Cars at high prices, and to protect its profits and avoid a costly recall, and it did so at the expense of Plaintiff and the Class.

78. Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff and the Class's actions were justified.

79. Because of the concealment and/or suppression of the facts, Plaintiff and the Class sustained damages, including the difference between the actual value of that which Plaintiff and Class Members paid and what they received. The value of the Defective Cars has also been diminished by GM's wrongful conduct.

80. GM's acts were done maliciously, oppressively, deliberately, with intent to defraud and in reckless disregard of Plaintiff and the Class's rights and well-being to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT III

### FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT
### (FDUTPA, Fla. Stat. § 501.201, *et seq.*)

81.    Plaintiff and the Class incorporate by reference paragraphs 1-59.

82.    This Count is brought on behalf of the Florida Subclass.

83.    Plaintiff are "consumers" under FDUTPA, Fla. Stat. § 501.203(7).

84.    GM engaged in "trade or commerce" within the meaning of FDUTPA,

Fla. Stat. § 501.203(8).

85.    Under the TREAD Act, 49 U.S.C. § 30101, *et seq.*, and its

corresponding regulations, if a manufacturer learns that a car contains a defect and

that defect is related to motor car safety, the manufacturer must disclose the defect,

and must promptly notify car owners, purchasers, and dealers of the defect and

remedy the defect. The TREAD Act also requires manufacturers to file various

reports and notify NHTSA within days of learning of a defect.

86.    GM's failure to disclose and active concealment of the Ignition Switch

Defect violated the TREAD Act, and thereby violated FDUTPA.

87.    GM also violated FDUTPA by engaging in the following practices:

a.    GM represented that the Defective Cars had safety

characteristics that they do not have;

b.    GM represented that the Defective Cars were of a

particular standard, quality or grade, when they are not;

c.    GM knew of the Ignition Switch Defect, but failed to disclose its

existence or its complete nature, even though GM knew that such

information was material to the transaction in light of GM's prior representations;

d.    GM failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, the Florida Subclass, the public, and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to Plaintiff, Class Members, the public and the government; and

e.    GM intended for Plaintiff, the Florida Subclass, the public and the government to rely on its misrepresentations and omissions, so that Plaintiff and the Florida Subclass would purchase or lease the Defective Cars.

88.    Plaintiff and the Florida Subclass were injured as a result of GM's misconduct. Plaintiff and the Florida Subclass overpaid for the Defective Cars and did not receive the benefit of their bargain.

89.    Plaintiff seek damages and an order enjoining GM's unfair or deceptive acts or practices and an order requiring GM to completely remedy the defect in Plaintiff' and the Florida Subclass Members' cars, and attorneys' fees, and any other just and proper relief available under FDUTPA.

## P<small>RAYER</small> F<small>OR</small> R<small>ELIEF</small>

Plaintiff, individually and on behalf of the Class Members, respectfully request that this Court enter a judgment against GM and grant the following relief:

A.    Determine that this action may be maintained as a class action    and certify it as such under Rules 23(b)(3) and or 23(b)(2), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class and Subclass Representatives and Plaintiff' chosen counsel as Class Counsel;

B.    Declare the conduct of GM as alleged in this Complaint to be unlawful, unfair and/or deceptive, and enjoin any such future conduct;

C.    Declare that the ignition switches in the Defective Cars are defective;

D.    Declare that GM must disgorge, for the benefit of Plaintiff and the Class Members, all or part of the ill-gotten gains it received from the sale or lease of the Defective Cars;

E.    Award Plaintiff and the Class Members actual and compensatory damages or, in the alternative, statutory damages in amounts to be proven at trial;

F.    Alternatively, if elected by Plaintiff and the Class Members, require GM to repair the defective ignition switches;

G.    Award Plaintiff and the Class Members punitive damages in an amount to be proven at trial;

H.    Award Plaintiff and the Class Members their reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest; and

I.    Award Plaintiff and the Class Members such other relief as the Court may determine to be just, equitable or proper.

### JURY TRIAL DEMAND

Plaintiff request a trial by jury on all of the legal claims alleged in this Complaint.

Respectfully Submitted,

COLSON HICKS EIDSON, P.A.
Mike Eidson, Esq.
Curtis B. Miner, Esq.
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Tel: 305-476-7400
Fax: 305-476-7444


By:  s/ Curtis B. Miner
        Curtis B. Miner, Esq.
        Florida Bar No. 885681
        curt@colson.com