# Exhibit N

1  Elaine T. Byszewski (SBN 222304)
   HAGENS BERMAN SOBOL SHAPIRO LLP
2  301 North Lake Avenue, Suite 203
   Pasadena, CA  91101
3  Telephone:  (213) 330-7150
   Facsimile:  (213) 330-7152
4  E-mail: elaine@hbsslaw.com

5  Steve W. Berman (*pro hac vice pending*)
   Andrew M. Volk (*pro hac vice pending*)
6  HAGENS BERMAN SOBOL SHAPIRO LLP
   1918 Eighth Avenue, Suite 3300
7  Seattle, WA  98101
   Telephone:  (206) 623-7292
8  Facsimile:  (206) 623-0594
   E-mail:  steve@hbsslaw.com
9  E-mail:  andrew@hbsslaw.com

10 Mark P. Robinson, Jr. (SBN 054426)
   Kevin F. Calcagnie (SBN 108994)
11 Scot D. Wilson (SBN 223367)
   ROBINSON CALCAGNIE ROBINSON
12 SHAPIRO DAVIS, INC.
   19 Corporate Plaza
13 Newport Beach, CA  92660
   Telephone:  (949) 720-1288
14 Facsimile:  (949) 720-1292
   mrobinson@rcrsd.com
15
   *Attorneys for Plaintiffs*
16

17            UNITED STATES DISTRICT COURT

18           CENTRAL DISTRICT OF CALIFORNIA

19 | DEANNA DINCO, DAVID BUTLER, | Case No.: 2:14-cv-02424 |
   | CURTIS BLINSMON, AARON | |
20 | HENDERSON, GRACE BELFORD, | **CLASS ACTION** |
   | NATHAN TERRY, MICHAEL PESCE, | |
21 | RHONDA HASKINS, JENNIFER | |
   | GEARIN, ARLENE REVAK, GEORGE | **CLASS ACTION COMPLAINT** |
22 | MATHIS, MARY DIAS, SHEREE | |
   | ANDERSON, MICHAEL AMEZQUITA, | **JURY TRIAL DEMANDED** |
23 | LORRAINE DE VARGAS, DAWN | |
   | TEFFT, BONNIE TAYLOR, JERRILE | |
24 | GORDON, KEISHA HUNTER and LES | |
   | ROUSE, individually and on behalf of all | |
25 | others similarly situated, | |
   | | |
26 |            Plaintiffs, | |
   | | |
27 |    v. | |
   | | |
28 | GENERAL MOTORS LLC, | |
   | | |
   |            Defendant. | |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................. 1

II.   JURISDICTION AND VENUE ............................................................ 7

III.   PARTIES ............................................................................................. 7

IV.   FACTUAL ALLEGATIONS ............................................................... 14

    A.   The Ignition Switch Defects in the Defective Vehicles ........................... 14

    B.   GM Knew of the Ignition Switch Defects for Years, but Concealed the Defects from Plaintiffs and the Class ..................................................... 16

    C.   GM Waited until 2014 to Finally Order a Recall of Some of the Defective Vehicles ............................................................................... 24

    D.   GM Promoted the Defective Vehicles as Safe and Reliable .................. 25

    E.   The Ignition Switch Defects have Harmed Plaintiffs and the Class ........ 26

    F.   Other Recently Revealed Information Demonsrates a Widespread Pattern of Concealing Dangerous Defects at GM and Casts Further Doubt on Whether GM is Now Adequately Addressing the Igntion Switch Defects ....................................................................................... 28

        1.   The EPS problem .......................................................................... 28

        2.   Airbag problems caused by defective wiring harnesses ............... 30

V.   TOLLING OF THE STATUTES OF LIMITATION ............................. 33

VI.   FROM THE DATE OF ITS INCEPTION, GM OWED A DUTY TO DISCLOSE AND NOT TO CONCEAL THE IGNTION SWITCH DEFECTS IN THE DEFECTIVE VEHICLES ........................................................................................... 34

VII.   CLASS ALLEGATIONS ..................................................................... 37

    A.   The Nationwide Class and Subclass ..................................................... 37

    B.   State Classes ........................................................................................ 37

VIII.   CAUSES OF ACTION ...................................................................... 41

    A.   Nationwide Class Claims ...................................................................... 41

COUNT I   FRAUDULENT CONCEALMENT ...................................................... 41

010440-11  689939 V1

COUNT II  TORTIOUS INTERFERENCE WITH CONTRACT ............................ 43

    B.    State Class Claims.................................................................. 45

CALIFORNIA  COUNT I  VIOLATIONS OF THE CONSUMER
    LEGAL REMEDIES ACT  (CAL. CIV. CODE § 1750, *et seq.*) ........................ 45

COUNT II  VIOLATION OF THE CALIFORNIA UNFAIR
    COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200, *et
    seq.*)................................................................................................ 51

COUNT III  VIOLATION OF SONG-BEVERLY CONSUMER
    WARRANTY ACT FOR BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY (CALIFORNIA
    "LEMON LAW")  (CAL. CIV. CODE §§ 1791.1 & 1792) ................................ 53

ALABAMA  VIOLATION OF ALABAMA DECEPTIVE TRADE
    PRACTICES ACT  (ALA. CODE § 8-19-1, *et seq.*)............................................ 55

ARIZONA  VIOLATIONS OF THE ARIZONA CONSUMER
    FRAUD ACT  (ARIZONA REV. STAT. § 44-1521, *et seq.*) ................................ 57

COLORADO  VIOLATIONS OF THE COLORADO CONSUMER
    PROTECTION ACT  (COLORADO CPA, COLO. REV. STAT.
    § 6-1-101, *et seq.*)........................................................................ 58

CONNECTICUT  VIOLATION OF CONNECTICUT UNLAWFUL
    TRADE PRACTICES ACT  (CONN. GEN. STAT. § 42-110A, *et
    seq.*)................................................................................................ 61

FLORIDA  VIOLATION OF FLORIDA'S UNFAIR &  DECEPTIVE
    TRADE PRACTICES ACT  (FLA. STAT. § 501.201, *et seq.*) ........................ 63

GEORGIA  COUNT I  VIOLATION OF GEORGIA'S UNIFORM
    DECEPTIVE  TRADE PRACTICES ACT  (GA. CODE ANN.
    § 10-1-370, *et seq.*)........................................................................ 64

COUNT II  VIOLATION OF GEORGIA'S FAIR BUSINESS
    PRACTICES ACT  (GA. CODE ANN. § 10-1-390, *et seq.*) ........................ 66

ILLINOIS  COUNT I  VIOLATION OF ILLINOIS CONSUMER
    FRAUD AND  DECEPTIVE BUSINESS PRACTICES ACT
    (815 ILL. COMP. STAT. 505/1, *et seq.*  and 720 ILL. COMP. STAT.
    295/1A)................................................................................ 67

COUNT II  VIOLATION OF THE ILLINOIS UNIFORM
    DECEPTIVE TRADE PRACTICES ACT  (815 ILL. COMP.
    STAT. 510/1, *et. seq.* and  720 ILL. COMP. STAT. 295/1A) ................................ 68

MARYLAND  VIOLATIONS OF THE MARYLAND CONSUMER
    PROTECTION ACT  (MD. CODE COM. LAW § 13-101, *et seq.*)...................... 69

010440-11 689939 V1

MASSACHUSETTS  VIOLATION OF THE MASSACHUSETTS
  CONSUMER PROTECTION ACT  (MASS. GEN. LAWS ANN.
  ch. 93A) ...................................................................................................... 71

MICHIGAN  VIOLATIONS OF THE MICHIGAN CONSUMER
  PROTECTION ACT  (MICH. COMP. LAWS. ANN. § 445.901, *et
  seq.*)............................................................................................................... 72

NEW JERSEY  VIOLATION OF NEW JERSEY CONSUMER
  FRAUD ACT  (N.J. STAT. ANN. § 56:8-1, *et seq.*) ............................... 75

NEW MEXICO  VIOLATIONS OF THE NEW MEXICO UNFAIR
  TRADE PRACTICES ACT  (N.M. STAT. ANN. §§ 57-12-1, *et
  seq.*)............................................................................................................... 77

NEW YORK  DECEPTIVE ACTS OR PRACTICES  (N.Y. GEN.
  BUS. LAW § 349 AND 350) ................................................................. 80

OHIO  COUNT I  VIOLATION OF OHIO CONSUMER SALES
  PRACTICES ACT  (OHIO REV. CODE ANN. § 1345.01, *et seq.*) ...................... 83

COUNT II  VIOLATION OF OHIO DECEPTIVE TRADE
  PRACTICES ACT  (OHIO REV. CODE ANN. § 4165.01, *et seq.*) ...................... 84

OKLAHOMA  VIOLATION OF OKLAHOMA CONSUMER
  PROTECTION ACT  (OCPA, OKLA. STAT. TIT. 15 § 751, *et
  seq.*)............................................................................................................... 86

TEXAS  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
  PRACTICES ACT  (TEX. BUS. & COM. CODE § 17.41, *et seq.*) ...................... 88

WISCONSIN  VIOLATIONS OF THE WISCONSIN  DECEPTIVE
  TRADE PRACTICES ACT  (WIS. STAT. § 110.18) ........................................ 90

PRAYER FOR RELIEF ................................................................................... 92

JURY TRIAL DEMAND ................................................................................. 93

- iii -

1    Plaintiffs Deanna Dinco, David Butler, Curtis Blinsmon, Aaron Henderson,

2    Grace Belford, Nathan Terry, Michael Pesce, Rhonda Haskins, Jennifer Gearin,

3    Arlene Revak, George Mathis, Mary Dias, Sheree Anderson, Michael Amezquita,

4    Lorraine De Vargas, Dawn Tefft, Bonnie Taylor, Jerrile Gordon, Keisha Hunter and

5    Les Rouse, individually and as class representatives on behalf of all similarly situated

6    persons and the general public, bring this action against Defendant General Motors

7    LLC ("Defendant" or "GM") and allege as follows:

8    ## I.    INTRODUCTION

9        1.    This case involves an egregious failure to disclose, and the affirmative

10   concealment of, a known safety defect in vehicles sold by GM, and by its

11   predecessor, "Old GM."

12       2.    This action seeks to hold GM liable only for its **own** acts and omissions

13   *after* the July 5, 2009 Sale Order and Purchase Agreement through which GM

14   acquired virtually all of the assets and certain liabilities of Old GM, and for the

15   "lemon law" liability GM expressly assumed under the Sale Order and Purchase

16   Agreement, and **not otherwise** for the conduct of Old GM.[1]

17       3.    An auto manufacturer should never make profits more important than

18   safety and should never conceal defects that exist in its vehicles from the vehicles'

19   drivers or the public.  GM Vehicle Safety Chief Jeff Boyer has stated that:  "Nothing

20   is more important than the safety of our customers in the vehicles they drive."  Yet

21   GM failed to live up to this commitment.

22       4.    The first priority of a car manufacturer should be to ensure that its

23   vehicles are safe, and particularly that its vehicles have operable ignition systems,

24   airbags, power-steering, power brakes, seatbelt pretensioners and other safety features

25   
26   _____
     [1] The applicability of the bar on successor liability claims against GM for the acts
     and omissions of Old GM *prior to* the Sale Order is an issue that is currently pending
27   in Bankruptcy Court in the Southern District of New York.  To the extent permitted
     by the Bankruptcy Court, Plaintiffs herein will seek leave of this Court to amend their
     Complaint to add successor liability claims against GM for the acts and omissions of
28   Old GM.

Case 2:14-cv-03689    Document 1    Filed 05/12/14    Page 8 of 93    Page ID #:8

1  that can prevent or minimize the threat of death or serious bodily harm to the

2  vedhicle's occupants.  Moreover, a manufacturer that is aware of dangerous design

3  defects that cause its vehicles to shut down during operation, or render the vehicles'

4  airbags and other safety systems inoperable, must promptly disclose and remedy such

5  defects.

6          5.        Under the Transportation Recall Enhancement, Accountability and

7  Documentation Act ("TREAD Act")[2] and its accompanying regulations, when a

8  manufacturer learns that a vehicle contains a safety defect, the manufacturer must

9  promptly disclose the defect.[3]  If it is determined that the vehicle is defective, the

10  manufacturer may be required to notify vehicle owners, purchasers, and dealers of the

11  defect, and may be required to remedy the defect.[4]

12          6.        Hundreds of thousands of vehicles sold by GM from the date of its

13  inception in 2009 until at least 2011 are prone to a safety defect such that the

14  vehicle's ignition switch can inadvertently move from the "run" position to the

15  "accessory" or "off" position during ordinary driving conditions, resulting in a loss of

16  power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags

17  to deploy.  Hereinafter, these vehicles are sometimes referred to as "Defective

18  Vehicles."

19          7.        GM's predecessor, Old GM, sold more than 1.5 million Defective

20  Vehicles throughout the United States – and in the asset purchase agreement through

21  which it acquired Old GM's assets ("Purchase Agreement"), GM *explicitly assumed*

22  both the responsibilities to report safety defects with respect to the vehicles sold by Old

23  GM as required by the TREAD ACT and the "lemon law" obligations of Old GM.  In

24  addition, throughout its existence, GM has profited from servicing and selling parts for

25

26  _____

27      [2] 49 U.S.C. §§ 30101-30170.
        [3] 49 U.S.C. § 30118(c)(1) & (2).

28      [4] 49 U.S.C. § 30118(b)(2)(A) & (B).

1   Defective Vehicles sold by GM.  GM thereby had a duty to disclose its knowledge of

2   the ignition switch defects, and not to conceal the defects.

3        8.     The ignition switch systems at issue are defective for several reasons.

4   The first is that the ignition switch is too weak and therefore does not hold the key in

5   place in the "run" position.   According to documents recently released by GM, the

6   ignition switch weakness is due to a defective "detent plunger" that does not provide

7   sufficient "torque" to hold the key in place during ordinary driving conditions.

8        9.     The second reason that the ignition switch systems are defective is due to

9   the low position of the switches in the Defective Vehicles.  That causes the keys, and

10   the fobs that hang off the keys, to hang so low in the Defective Vehicles that the

11   drivers' knees can easily bump them and inadvertently shut down the vehicle.  The

12   problem is exacerbated by the use of a "slotted" key – which allows the key ring and

13   the fob to hang lower than would a key with a hole instead of a slot.

14        10.    The third reason the ignition switch systems are defective is that they

15   immediately cause the airbags to become inoperable when the ignition switch is in the

16   "accessory" or "off" position.  As NHTSA's Acting Administrator testified in recent

17   Congressional hearings, he believes the airbags should deploy whenever the car is

18   moving – even if the ignition switch moves out of the "run" position.

19        11.    From its inception in 2009 until February of 2014, GM concealed and

20   did not fix the serious quality and safety problem plaguing the Defective Vehicles.

21        12.    Worse yet, the ignition switch defects could and should have been

22   remedied *years ago*.

23        13.    From at least 2005 to the present, both Old GM and GM received reports

24   of crashes and injuries that put GM on notice of the serious safety issues presented by

25   its ignition switch system.  Given the continuity of engineers, general counsel, and

26   other key personnel from Old GM to GM, GM was aware of the ignition switch

27   defects *from the very date of its inception pursuant to the July 5, 2009 Sale Order.*

28

14.    Yet, despite the dangerous nature of the ignition switch defects and the effects on critical safety systems, GM concealed the existence of the defects and failed to remedy the problem.

15.    GM's CEO, Mary Barra, has admitted in a video message that: "Something went wrong with our process in this instance, and terrible things happened."  But that admission, and GM's attempt to foist the blame on its parts supplier and two engineers who it has now suspended, are cold comfort for Plaintiffs and the Class.

16.    This case arises from GM's breach of its obligations and duties, including (i) its concealment of, and failure to disclose that, as a result of defective ignition switches, at least 2.19 million Defective Vehicles have the propensity to shut down during normal driving conditions and create an extreme and unreasonable risk of accident, serious bodily harm, and death; (ii) its failure to disclose the defects despite the TREAD Act obligations it assumed under the Purchase Agreement and (iii) its continued sales of Defective Vehicles after the date of the 2009 Sale Order.

17.    Plaintiffs bring this action for a Class of all persons in the United States who either (i) own or lease one or more of the following GM vehicles:  2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky (hereinafter "Defective Vehicles"), or (ii) sold a Defective Vehicle at a diminished price on or after March 1, 2014.

18.    To the extent warranted by the developing facts, Plaintiffs will further supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switch systems which can cause a loss of vehicle speed control, loss of braking control, airbag non-deployment, and the failure of seatbelt pretensioners.

19.    In the addition to their nationwide class claims against GM for fraudulent concealment and tortious interference with GM dealerships' service and repair contracts with Defective Vehicle owners, Plaintiffs also bring claims against

- 4 -

010440-11  689939 V1

GM under the laws of the States of California, Alabama, Arizona, Colorado, Connecticut, Florida, Georgia, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New Mexico, New York, Ohio, Oklahoma, Texas, and Wisconsin, on behalf of the respective residents of each of those States who either (i) own or lease one or more of the Defective Vehicles, or (ii) sold a Defective Vehicle on or after March 1, 2014.

20.    The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

a.    Due to their weaknesses and their low placement, the ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

b.    When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident; and

c.    When the electrical system shuts down, the vehicle's airbags and seatbelt pretensioners are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

21.    The ignition switch defects make the Defective Vehicles unreasonably dangerous.  Because of the defects, the Defective Vehicles are likely to be involved in accidents and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death.

22.    GM admits to at least 13 deaths as a result of the ignition switch defects, but Plaintiffs believe the actual number to be much higher.

23.    The ignition switch defects present a significant and unreasonable safety risk exposing Defective Vehicle owners, their passengers and others in the vicinity to a risk of serious injury or death.

24.    From its inception in 2009, GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States.  But, to protect its profits and to avoid remediation costs and a public relations nightmare, GM

010440-11  689939 V1

concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

25.     GM violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed the Defective Vehicles to remain on the road, and to continue to be sold.  In addition to violating the TREAD Act, GM fraudulently concealed the deadly ignition switch defects from owners, and from post-July 5, 2009, new and used vehicle purchasers and lessees of the Defective Vehicles.  These same acts and omissions also violated various State laws as detailed below.

26.     From the date of its inception on July 5, 2009, GM has profited from the service and repair of Defective Vehicles.  Though GM knew that that the service and repair departments at GM dealerships had contractual obligations to Defective Vehicle owners to repair their vehicles and ensure they were free of safety defects, GM intentionally concealed its knowledge of the ignition switch defects from its dealerships in order to avoid the expense and negative publicity of a recall.  In so doing, GM caused its dealerships to breach their contracts with Defective Vehicles, and caused harm to Defective Vehicle owners.

27.     Plaintiffs and the Class have been damaged by GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding highly dangerous vehicles whose value has greatly diminished because of GM's failure to timely disclose and remedy the serious defects. GM's egregious and widely-publicized conduct and the never-ending and piecemeal nature of GM's recalls has so tarnished the Defective Vehicles that no reasonable consumer would purchase them – let alone pay what would otherwise be fair market value for the vehicles.

28.     In addition, Plaintiffs and Class members who purchased new or used Defective Vehicles after GM's inception on July 5, 2009, would either not have

010440-11 689939 V1

purchased their Defective Vehicles if they had known of the ignition switch defects, or they would have paid substantially less for those vehicles.

## II.    JURISDICTION AND VENUE

29.    This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

30.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.  This Court has personal jurisdiction over GM because GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

31.    Venue is proper in this District under 28 U.S.C. § 1391 because GM, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, GM transacts business within the District, and some of the events establishing the claims arose in this District.

## III.    PARTIES

32.    Plaintiff and proposed Nationwide and California State Class Representative Deanna Dinco is a resident and citizen of Arroyo Grande, California. Ms. Dinco purchased a used 2006 Saturn Ion on July 3, 2006, in Santa Maria, California.  On multiple occasions, her Ion has started and then shut down immediately, sometimes several times in a row.  She has taken her vehicle to multiple mechanics, but none could successfully repair her vehicle.  Because of the issues with her vehicle, she has been late to work multiple times and threatened with termination, which caused extreme anxiety, depression, and panic attacks.  She fears driving her vehicle due to the ignition switch recall and the risk the ignition switch defects pose.  She also believes the value of her vehicle has been diminished as a result of the defects.  Ms. Dinco did not learn of the ignition switch defects until March 2014.

33.     Plaintiff and proposed Nationwide and California State Class Representative David Butler is a resident and citizen of Poway, California.  Mr. Butler purchased a new 2006 Chevy Cobalt on April 18, 2006, in Poway, California.  Mr. Butler's Cobalt has not yet shut down while Mr. Butler is driving it.  Nonetheless, he continues to frequently drive the vehicle and is concerned about the safety issues posed by the ignition switch defects.  Mr. Butler believes his vehicle's value is diminished as a result of the defects.  Mr. Butler did not learn of the ignition switch defects until March 2014.

34.     Plaintiff and proposed Nationwide and California State Class Representative Curtis Blinsmon is a resident and citizen of Fresno, California.  Mr. Blinsmon purchased a new 2007 Saturn Sky in May, 2007, in Fresno, California.  Although Mr. Blinsmon has not experienced the ignition shut down while driving, he is concerned about the safety issues posed by driving the vehicle as a result of the ignition switch defects.  He believes his vehicle's value is diminished as a result of the defects.  Mr. Blinsmon did not learn of the ignition switch defects until March 2014.

35.     Plaintiff and proposed Nationwide and Alabama State Class Representative Aaron Henderson is a resident and citizen of Tuscaloosa, Alabama.  Mr. Henderson purchased a new 2007 Saturn Ion 3 in September, 2006, in Madison, Wisconsin.  Mr. Henderson's vehicle has been in two accidents since December, 2012 and the airbags failed to deploy in both instances.  Mr. Henderson believes the ignition switch failure may have been the cause of these accidents and airbag failure.  On December 7, 2012, he was involved in the first accident and suffered minor injuries.  On February 23, 2014, he was involved in the second accident and suffered minor injuries again.  Mr. Henderson did not learn of the ignition switch defects until March 2014.

36.     Plaintiff and proposed Nationwide and Arizona State Class Representative Grace Belford is a resident and citizen of Phoenix, Arizona.  Ms. Belford purchased a new 2005 Chevy Cobalt in October, 2005, in Phoenix,

Case 2:14-cv-09668    Document 1    Filed 05/15/14    Page 13 of 95    Page ID #:13

1    Arizona.  On two separate occasions, Ms. Belford's ignition has unexpectedly shut off

2    as the result of driving over a bump in the road.  Despite her concerns and fears about

3    driving the vehicle, it is her only form of transportation and she continued to drive it

4    to work every day until she was able to secure a loaner vehicle.  Ms. Belford was

5    planning on using her vehicle as a down payment on a new vehicle, but the resale

6    value of her Cobalt has been diminished because of the ignition switch defect.

7    Ms. Belford did not learn of the ignition switch defects until March 2014.

8           37.    Plaintiff and proposed Nationwide and Colorado State Class

9    Representative Nathan Terry is a resident and citizen of Loveland, Colorado.

10   Mr. Terry purchased a used 2007 Pontiac G5 GT in January, 2011, in Westminster,

11   Colorado.  Mr. Terry owns a 2007 Pontiac G5 that is being recalled by GM.

12   Although Mr. Terry has not experienced his vehicle's ignition shutting off while

13   driving, he is concerned about his safety and believes the value of his vehicle is now

14   greatly diminished as a result of the ignition switch defects.  Mr. Terry did not learn

15   of the ignition switch defects until March 2014.

16          38.    Plaintiff and proposed Nationwide and Connecticut State Class

17   Representative Michael Pesce is a resident and citizen of Waterbury, Connecticut.

18   Mr. Pesce purchased a used 2006 Chevy Cobalt on May 29, 2008, in Waterbury,

19   Connecticut.  In August, 2011, Mr. Pesce's 18 year-old son was driving the vehicle

20   on a major highway in Connecticut when the vehicle lost all power.  His son was able

21   to pull over and restart the car, but after another few minutes it died again.  Mr. Pesce

22   paid to have the vehicle looked over and repaired, but he now believes the problem

23   was related to the ignition switch defects.  He is concerned about the ongoing safety

24   of the vehicle and believes its value has greatly diminished.  Mr. Pesce did not learn

25   about the ignition switch defects until March 2014.

26          39.    Plaintiff and proposed Nationwide and Florida State Class Representative

27   Rhonda Haskins is a resident and citizen of Ocala, Florida.  Ms. Haskins purchased a

28   used 2007 Chevy Cobalt on November 15, 2013, in Ocala, Florida.  Ms. Haskins is

concerned about her ongoing safety in driving the vehicle and believes its value is now greatly diminished as a result of the ignition switch defects.  Ms. Haskins did not learn about the ignition switch defects until March 2014.

40.     Plaintiff and proposed Nationwide and Georgia State Class Representative Jennifer Gearin is a resident and citizen of Clermont, Georgia. Ms. Gearin purchased a new 2006 Chevy Cobalt in 2006 in Gainesville, Georgia. Although Ms. Gearin has not experienced her vehicle shutting down while driving, she is very afraid for her safety as a result of the ignition switch defects and she must drive a very long distance to work on a daily basis.  Ms. Gearin did not learn about the ignition switch defects until March 2014.

41.     Plaintiff and proposed Nationwide and Illinois State Class Representative Arlene Revak is a resident and citizen of Joliet, Illinois.  Ms. Revak purchased a used 2008 Chevy HHR in September, 2013, in Cresthill, Illinois. Ms. Revak purchased the HHR in part because of her desire for a safe vehicle. Ms. Revak is now concerned both for her safety while driving the vehicle and that the vehicle's value has diminished as a result of the ignition switch defect.  Ms. Revak did not learn about the ignition switch defects until March 2014.  Had she been aware of the ignition switch defects, Ms. Revak would either have paid less for the vehicle or not purchased it at all.

42.     Plaintiff and proposed Nationwide and Maryland State Class Representative George Mathis is a resident and citizen of Parkville, Maryland. Mr. Mathis purchased a new 2007 Chevy Cobalt in May, 2007, in York, Pennsylvania.  Mr. Mathis has experienced his ignition shutting down on him while driving on three separate occasions, with one instance resulting in a minor accident and the other two nearly resulting in an accident.  Mr. Mathis did not learn about the ignition switch defects until March 2014.

43.     Plaintiff and proposed Nationwide and Massachusetts State Class Representative Mary Dias is a resident and citizen of Taunton, Massachusetts.

010440-11  689939 V1

Ms. Dias purchased a used 2007 Chevy HHR on February 28, 2008, in Woonsocket, Rhode Island. Because of the ignition switch defects, Ms. Dias is very concerned for her safety every time she drives her vehicle. She also believes the value of her vehicle is now diminished as a result of the ignition switch defects. Ms. Dias did not learn of the ignition switch defects until March 2014.

44. Plaintiff and proposed Nationwide and Michigan State Class Representative Sheree Anderson is a resident and citizen of Detroit, Michigan. Ms. Anderson purchased a used 2008 Chevy HHR on November 15, 2011, in Michigan. Ms. Anderson chose the HHR in part because she desired a safe vehicle. Although Ms. Anderson has not experienced her vehicle shutting down while driving, she is concerned for her safety as a result of the ignition switch defects. She must continue to drive her vehicle, however, because it is her main form of transportation and she must drive it to work every day. She also believes the value of her vehicle is now greatly diminished as a result of the ignition switch defects. She would not have purchased the vehicle had she known it would present such a myriad of problems and defects. Ms. Anderson did not learn about the ignition switch defects until March 2014. Had she known about the ignition switch defects, she would either not have purchased the HHR or would have paid less for it.

45. Plaintiff and proposed Nationwide and New Jersey State Class Representative Michael Amezquita is a resident and citizen of Hamilton, New Jersey. Mr. Amezquita purchased a new 2006 Chevy Cobalt on June 30, 2006, in East Windsor, New Jersey. Mr. Amezquita is concerned about the safety risks driving his vehicle poses and also believes the value of his vehicle is diminished as a result of the ignition switch defects. Mr. Amezquita did not learn of the ignition switch defects until March 2014.

46. Plaintiff and proposed Nationwide and New Mexico State Class Representative Lorraine De Vargas is a resident and citizen of Santa Fe, New Mexico. Ms. De Vargas purchased a used 2005 Saturn Ion in 2008, in Santa Fe, New Mexico.

010440-11 689939 V1

Ms. De Vargas experienced her ignition shutting off while driving in December 2012, resulting in an accident. She slid into a fence and her airbags failed to deploy. The vehicle damage has been repaired, and Ms. De Vargas continues to drive her Ion to work every day. She is concerned about the safety of her vehicle, the impact the defects have had on the value of her vehicle, and the costs she has incurred in fixing the vehicle previously. Ms. De Vargas did not learn of the ignition switch defects until March 2014.

47. Plaintiff and proposed Nationwide and New York State Class Representative Dawn Tefft is a resident and citizen of Mt. Upton, New York. Ms. Tefft purchased a used 2010 Chevy Cobalt on June 21, 2011, in Sidney, New York. Ms. Tefft bought her Cobalt in part because of her desire for a safe vehicle. Ms. Tefft was involved in a serious accident on October 24, 2013, while driving to work. While Ms. Tefft was driving her Cobalt, the vehicle shut down unexpectedly and caused her to collide head-on with a bridge at forty to forty-five miles per hour. The airbags failed to deploy, and the vehicle was totaled as a result of the accident. While thankful to have survived the accident, she still suffers from reoccurring neck and back pains, and severe headaches. Ms. Tefft did not learn about the ignition switch defects until March, 2014. Had she been aware of the ignition switch defects, Ms. Tefft would either not have purchased her Cobalt or would have paid less for it.

48. Plaintiff and proposed Nationwide and Ohio State Class Representative Bonnie Taylor is a resident and citizen of Laura, Ohio. Ms. Taylor purchased a new 2007 Chevy Cobalt on December 23, 2006, in Troy, Ohio. Although Ms. Taylor has not experienced the ignition shut down while driving her Cobalt, she believes the Cobalt has too many serious safety defects for her to ever feel safe driving it again. She also feels that the value of her vehicle is severely diminished as a result of the recall. Ms. Taylor did not learn of the ignition switch defects until March 2014.

49. Plaintiff and proposed Nationwide and Oklahoma State Class Representative Jerrile Gordon is a resident and citizen of Del City, Oklahoma.

Case 2:14-cv-09668    Document 1    Filed 05/15/14    Page 17 of 93    Page ID #:17

1  Ms. Gordon purchased a used 2006 Chevy Cobalt in 2011, in Oklahoma City,

2  Oklahoma.  Ms. Gordon chose the Cobalt in part because she wanted a safely

3  designed and manufactured car.  Ms. Gordon's vehicle has shut down twice while she

4  was driving on the highway.  Ms. Gordon did not learn of the ignition switch defects

5  until March 2014.  Had she been aware of the of the ignition switch defects,

6  Ms. Gordon would either not have purchased her Cobalt or would have paid less for it

7  than she did.

8      50.    Plaintiff and proposed Nationwide and Texas State Class Representative

9  Keisha Hunter is a resident and citizen of Fort Worth, Texas.  Ms. Hunter purchased a

10  used 2006 Chevy Cobalt on March 22, 2013, in Arlington, Texas.  Ms. Hunter chose

11  the Cobalt in part because she wanted a safe vehicle.  While Ms. Hunter has not yet

12  had her Cobalt shut down while driving, she is concerned for her safety and the

13  diminished value of her vehicle as a result of the ignition switch defects.  Ms. Hunter

14  did not learn of the ignition switch defects until March 2014.  Had she been aware of

15  the of the ignition switch defects, Ms. Hunter would either not have purchased her

16  Cobalt or would have paid less for it than she did.

17      51.    Plaintiff and proposed Nationwide and Wisconsin Class Representative

18  Les Rouse is a resident and citizen of LaCrosse, Wisconsin.  Mr. Rouse purchased a

19  new 2004 Saturn Ion 2 in October, 2004, in LaCrosse, Wisconsin.  Mr. Rouse has

20  experienced loss of electrical power in his vehicle while driving and he is concerned

21  about driving it due to the safety risks it poses.  He also believes the value of his car

22  has diminished as a result of the ignition switch defects.  Mr. Rouse did not learn of

23  the ignition switch defects until March 2014.

24      52.    Defendant General Motors LLC ("GM") is a foreign limited liability

25  company formed under the laws of Delaware with its principal place of business

26  located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009

27  and on July 5, 2009, acquired substantially all assets and assumed certain liabilities of

28

1    General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S.

2    Bankruptcy Code.

3        53.    Among the liabilities and obligations expressly assumed by GM are the

4    following:

5           From and after the Closing, Purchaser [GM] shall comply
            with the certification, reporting and recall requirements of
6           the National Traffic and Motor Vehicle Act, the
            Transportation Recall Enhancement, Accountability and
7           Documentation Act, the Clean Air Act, the California
            Health and Safety Code, and similar laws, in each case, to
8           the extent applicable in respect of vehicles and vehicle parts
            manufactured or distributed by [Old GM].

9        54.    GM also expressly assumed:

10          [A]ll Liabilities arising under express written warranties of
11          [Old GM] that are specifically identified as warranties and
            delivered in connection with the sale of new, certified used
12          or pre-owned vehicles or new or remanufactured motor
            vehicle parts and equipment (including service parts,
13          accessories, engines and transmissions) manufactured or
            sold by [Old GM] or Purchaser prior to or after the Closing
14          and (B) all obligations under Lemon Laws

15       55.    Finally, GM also expressly assumed "all Liabilities arising out of,

16   relating to, in respect of, or in connection with the use, ownership or sale of the

17   Purchased Assets after the closing."  Those assets included all contracts of Old GM,

18   including its contracts with dealers and service centers.

19                    **IV.    FACTUAL ALLEGATIONS**

20   **A.    The Ignition Switch Defects in the Defective Vehicles**

21       56.    Given the imperative that a vehicle and its electrical operating systems

22   remain operational during ordinary driving conditions, a vehicle manufacturer must

23   ensure that its vehicles remain operational from the time the driver starts the vehicle

24   until the driver intentionally shuts down the vehicle.  If a manufacturer is aware of

25   defects in this regard, it must promptly notify vehicle owners and the public so that

26   prompt remediation will occur.  With respect to the Defective Vehicles, GM failed to

27   do so.

28

010440-11  689939 V1                          - 14 -

57.     The ignition switch defects can cause the Defective Vehicles' engines and electrical systems to shut off, disabling the power steering and power brakes and causing non-deployment of the vehicles' airbags and the failure of the vehicles' seatbelt pretensioners in the event of a crash.

58.     The ignition switch systems at issue are defective in at least three major respects.  The first is that the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" or "off" position.

59.     The second defect is that, due to the low position of the ignition switch, the driver's knee can easily bump the key (or the hanging fob below the key), and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position.

60.     The third defect is that the airbags immediately become inoperable whenever the ignition switch moves from the "run" to the "accessory" position.  As NHTSA's Acting Administrator, David Friedman, recently testified before Congress, NHTSA is not convinced that the non-deployment of the airbags in the recalled vehicles is solely attributable to a mechanical defect involving the ignition switch:

> And it may be even more complicated than that, actually. And that's one of the questions that we actually have in our timeliness query to General Motors.  It is possible that it's not simply that the – the power was off, but a much more complicated situation where the very specific action of moving from on to the accessory mode is what didn't turn off the power, but may have disabled the algorithm.
>
> That, to me, frankly, doesn't make sense.  From my perspective, if a vehicle – certainly if a vehicle is moving, the airbag's algorithm should require those airbags to deploy.  Even if the – even if the vehicle is stopped and you turn from 'on' to 'accessory,' I believe that the airbags should be able to deploy.
>
> So this is exactly why we're asking General Motors this question, to understand is it truly a power issue or is there something embedded in their [software] algorithm that is

010440-11  689939 V1

causing this, something that should have been there in their algorithm.[5]

61.    The Defective Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

## B.    GM Knew of the Ignition Switch Defects for Years, but Concealed the Defects from Plaintiffs and the Class

62.    Alarmingly, GM knew of the deadly ignition switch defects and their dangerous consequences form the date of its inception on July 5, 2009, but concealed its knowledge from Defective Vehicle owners and later purchasers of new and used Defective Vehicles.

63.    In part, GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects remained in their same positions once GM took over from Old GM.

64.    For example, the Old GM Lead Switch Engineer who was responsible for the rollout of the defective ignition switch in 2003 was Ray DeGiorgio. Mr. DeGiorgio continued to serve as an engineer at GM until April 2014 when he was suspended as a result of his involvement in the defective ignition switch problem.

65.    In 2001, two years *before* the Defective Vehicles were ever available to consumers, Old GM privately acknowledged in an internal pre-production report for the model/year ("MY") 2003 Saturn Ion that there were problems with the ignition switch.[6]  Old GM's own engineers had personally experienced problems with the ignition switch.  In a section of the internal report titled "Root Cause Summary," Old GM engineers identified "two causes of failure," namely:  "[l]ow contact force and

---

[5] Congressional Transcript, Testimony of David Friedman, Acting Administrator of NHTSA (Apr. 2, 2014), at 19.

[6] GM Report/Complaint re "Electrical Concern" opened July 31, 2001, GMHEC000001980-90.

low detent plunger force."[7]  The report also stated that GM person responsible for the issue was Ray DeGiorgio.[8]

66.     As detailed below, Mr. DeGiorgio actively concealed the defect, both while working for Old GM **and** while working for GM.

67.     Similarly, Gary Altman was Old GM's program-engineering manager for the Cobalt, which is one of the Defective Vehicle models which hit the market in MY 2005.  He remained as an engineer at GM until he was suspended on April 10, 2014, by GM for his role in the ignition switch problem.

68.     On October 29, 2004, Mr. Altman test-drove a Cobalt.  While he was driving, his knee bumped the key, and the vehicle shut down.

69.     In response to the Altman incident, Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue.  According to the chronology provided to NHTSA by GM in March 2014, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

70.     The PRTS concluded in 2005 that:

> There are two main reasons that we believe can cause a lower effort in turning the key:
>
> 1.     A low torque detent in the ignition switch and
>
> 2.     A low position of the lock module in the column.[9]

71.     The 2005 PRTS further demonstrates the knowledge of Ray DeGiorgio (who, like Mr. Altman, worked for Old GM and continued until very recently working for GM), as the PRTS' author states that "[a]fter talking to Ray DeGiorgio, I found out that it is close to impossible to modify the present ignition switch.  The

---

[7] *Id*. at GMHEC000001986.

[8] *Id*. at GMHEC000001981, 1986.

[9] Feb. 1, 2005 PRTS at GMHEC000001733.

1   switch itself is very fragile and doing any further changes will lead to mechanical

2   and/or electrical problems."[10]

3       72.   Gary Altman, program engineering manager for the 2005 Cobalt,

4   recently admitted that Old GM engineering managers (including himself and

5   Mr. DeGiorgio) knew about ignition-switch problems in the vehicle that could disable

6   power steering, power brakes and airbags, but launched the vehicle anyway because

7   they believed that the vehicles could be safely coasted off the road after a stall.

8   Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the

9   power steering and power brakes inoperable, though he did not attempt to explain

10   why the vehicle would not require an operable airbag.

11       73.   Rather than publicly admitting the dangerous safety defects in the

12   Defective Vehicles, first Old GM and then GM attempted to attribute these and other

13   incidents to "driver error."  Every year from 2005 to 2012, first Old GM and then GM

14   received reports of deaths in Cobalts involving steering and/or airbag failures,

15   including:

16       • 2005:  26 Cobalt Death and Injury Incidents, including 1 death
           citing Airbag as component involved.

17

18       • 2006:  69 Cobalt Death and Injury Incidents, including 2 deaths
           citing Airbag as component involved and 4 deaths citing
           Unknown component.

19

20       • 2007:  87 Cobalt Death and Injury Incidents, including 3 deaths
           citing Airbag as component involved.

21

22       • 2008:  106 Cobalt Death and Injury Incidents, including 1
           death citing Airbag as component involved and 2 deaths citing
           Unknown component.

23

24       • 2009:  133 Cobalt Death and Injury Incidents, including 1
           death citing Airbag as component involved, 1 death citing
           Service Brake as component involved, 1 death citing Steering
           as component involved, and 2 deaths citing Unknown
           component.

25

26

27

28   _____
     [10] Id.

- 2010:  400 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 12 deaths citing Steering as component involved, and 1 death citing Unknown component.

- 2011:  187 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 2 deaths citing Steering as component involved, and 1 citing Unknown component.

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

74.    In April 2006, the GM design engineer who was responsible for the ignition switch in the recalled vehicles, Lead Switch Engineer Ray DeGiorgio, authorized part supplier Delphi to implement changes to fix the ignition switch defect.[11]  GM stated that the design change "was implemented to increase torque performance in the switch."[12]  However, testing showed that, even with the proposed change, the performance of the ignition switch was **still** below original specifications.[13]

75.    The modified ignition switches started to be installed in 2007 model/year vehicles.[14]  In what a high-level engineer at Old GM now calls a "cardinal sin" and "an extraordinary violation of internal processes," Old GM changed the part design **but kept the old part number**.[15]  That makes it impossible to determine from the part number alone which GM vehicles produced after 2007 contain the defective ignition switches.

---

[11] General Motors Commodity Validation Sign-Off (Apr. 26, 2006), GMHEC000003201.  *See also* GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

[12] *Id.*

[13] Delphi Briefing, Mar. 27, 2014.

[14] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

[15] "'*Cardinal sin*':  *Former GM engineers say quiet '06 redesign of faulty ignition switch was a major violation of protocol.*"  *Automotive News* (Mar. 26, 2014).

76.     At a May 15, 2009 meeting, Old GM engineers (soon to be GM engineers) learned that data in the black boxes of Chevrolet Cobalts showed that the dangerous ignition switch defects existed in hundreds of thousands of Defective Vehicles. But still GM did not reveal the defect to NHTSA, Plaintiffs or the Class.

77.     After the May 15, 2009 meeting, GM continued to get complaints of unintended shut down and continued to investigate frontal crashes in which the airbags did not deploy.

78.     After the May 15, 2009 meeting, GM told the families of accident victims and Defective Vehicle owners that it did not have sufficient evidence to conclude that there was any defect in the Defective Vehicles. In one case involving the ignition switch defects, GM threatened to sue the family of an accident victim for reimbursement of its legal fees if the family did not dismiss its lawsuit. In another, GM sent the victim's family a terse letter, saying there was no basis for any claims against GM. These statements were part of GM's campaign of deception.

79.     In July 2011, GM legal staff and engineers met regarding an investigation of crashes in which the air bags did not deploy. The next month, in August 2011, GM initiated a Field Performance Evaluation ("FPE") to analyze multiple frontal impact crashes involving MY 2005-2007 Chevrolet Cobalt vehicles and 2007 Pontiac G5 vehicles, as well as a review of information related to the Ion, HHR, and Solstice vehicles, and airbag non-deployment.[16]

80.     GM continued to conceal and deny what it privately knew – that the ignition switches in the Defective Vehicles were defective. For example, in May 2012, GM engineers tested the torque of the ignition switches in numerous Old GM vehicles.[17] The results from the GM testing showed that the majority of the vehicles tested from the 2003 to 2007 model/years had torque performance at or below 10

---

[16] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

[17] GMHEC000221427; *see also* Mar. 11, 2014 Ltr. to NHTSA, attached chronology).

Newton centimeters ("Ncm"), which was below the original design specifications required by GM.[18]  Around the same time, high ranking GM personnel continued to internally review the history of the ignition switch issue.[19]

81.    In September 2012, GM had a GM Red X Team Engineer (a special engineer assigned to find the root cause of an engineering design defect) examine the changes between the 2007 and 2008 Chevrolet Cobalt models following reported crashes where the airbags failed to deploy and the ignition switch was found in the "off" or "accessory" position.[20]

82.    The next month, in October of 2012, GM engineer Ray DeGiorgio (the lead engineer on the defective ignition switch) sent an email to Brian Stouffer of GM regarding the "2005-7 Cobalt and Ignition Switch Effort," stating:  "If we replaced switches on ALL the model years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch."[21]

83.    The October 2012 email makes clear that GM considered implementing a recall to fix the defective ignition switches in the Chevy Cobalt vehicles, but declined to do so in order to save money.

84.    In April 2013, GM again *internally* acknowledged that it understood that there was a difference in the torque performance between the ignition switch parts in later model Chevrolet Cobalt vehicles compared with the 2003-2007 model/year vehicles.[22]

---

[18] *Id.*

[19] GMHEC000221438.

[20] Email from GM Field Performance Assessment Engineer to GM Red X Team Engineer (Sept. 6, 2012, 1:29:14 p.m., GMHEC000136204).

[21] GMHEC000221539.

[22] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 4.

85.   GM hired an outside engineering firm to investigate the ignition switch defect who confirmed that the ignition switches in the early model Cobalt and Ion vehicles did not meet GM's own design specifications.[23]

86.   Notwithstanding what GM actually knew from the testing that it had done almost exactly a year earlier in May of 2012 and privately acknowledged,[24] its public statements and position in litigation was radically different.  For example, in May 2013, Brian Stouffer testified in deposition in a personal injury action (*Melton v. General Motors*) that the Ncm performance (a measurement of the strength of the ignition switch) was ***not*** substantially different as between the early (*e.g.*, 2005) and later model year (*e.g.*, 2008) Chevrolet Cobalt vehicles.[25]

87.   Similarly, a month before Mr. Stouffer's testimony, in April 2013, GM engineer Ray DeGiorgio denied the existence of any type of ignition switch defect:

> Q:  Did you look at, as a potential failure mode for this switch, the ease of which the key could be moved from run to accessory?
>
> . . .
>
> THE WITNESS:  No, because in our minds, moving the key from, I want to say, ***run to accessory is not a failure mode, it is an expected condition***.  It is important for the customer to be able to rotate the key fore and aft, so as long as we meet those requirements, ***it's not deemed as a risk.***
>
> Q:  Well, it's not expected to move from run to accessory when you're driving down the road at 55 miles an hour, is it?
>
> . . .
>
> THE WITNESS:  ***It is expected for the key to be easily and smoothly transitioned from one state to the other*** without binding and without harsh actuations.

---

[23] *Id*.  GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 4).  *See also* GMHEC000003156-3180.

[24] *See* GMHEC000221427.

[25] GMHEC000146933.  That said, "[t]he modified switches used in 2007-2011 vehicles were also approved by GM despite not meeting company specifications."  Mar. 31, 2014 Ltr. to Mary Barra from H. Waxman, D. DeGette, and J. Schankowsky.

Q: And why do you have a minimum torque requirement from run to accessory?

. . .

THE WITNESS:  It's a design feature that is required.  You don't want anything flopping around.  You want to be able to control the dimensions and basically provide – one of the requirements in this document talks about having a smooth transition from detent to detent.  One of the criticisms – I shouldn't say criticisms.  One of the customer complaints we have had in the – and previous to this was he had cheap feeling switches, they were cheap feeling, they were higher effort, and the intent of this design was to provide a smooth actuation, provide a high feeling of a robust design.  That was the intent.

Q:  I assume the intent was also to make sure that when people were using the vehicle under ordinary driving conditions, that if the key was in the run position, it wouldn't just move to the accessory position, correct?

. . .

A:  That is correct, but also – it was not intended – ***the intent was to make the transition to go from run to off with relative ease.***[26]

88.     Brian Stouffer, in an email to Delphi regarding the ignition switch in the Chevy Cobalt, acknowledged that the ignition switch in early Cobalt vehicles – although bearing the same part number – was different than the ignition switch in later Cobalt vehicles.[27]  Mr. Stouffer claimed that "[t]he discovery of the plunger and spring change was made aware to GM during a [sic] course of a lawsuit (*Melton v. GM*)."[28]  Delphi personnel responded that GM had authorized the change back in 2006 but the part number had remained the same.[29]

89.     Eventually, the defect could no longer be ignored or swept under the rug.

---

[26] GMHEC000138906 (emphasis added).

[27] GMHEC000003197.

[28] *Id. See also* GMHEC000003156-3180.

[29] *See* GMHEC000003192-93.

**C.    GM Waited until 2014 to Finally Order a Recall of Some of the Defective Vehicles**

90.    After analysis by GM's Field Performance Review Committee and the Executive Field Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of *some* of the Defective Vehicles on January 31, 2014.

91.    Initially, the EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

92.    After additional analysis, the EFADC expanded the recall on February 24, 2014, to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

93.    Most recently, on March 28, 2014, GM expanded the recall a third time, to include Chevrolet Cobalts, Pontiac G5s and Solstices, Saturn Ions and Skys from the 2008 through 2010 model years, and Chevrolet HHRs from the 2008 through 2011 model years.

94.    GM provided dealers with notice of the recalls on February 26, 2014, March 4, 2014, and March 28, 2014, and mailed letters to some of the current owners of the Defective Vehicles on March 10 and March 11, 2014.

95.    According to GM, the dealers are to replace the ignition switch, presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

96.    To date, GM has *not* pledged to remedy the fact that the key and fob in the Defective Vehicles hang dangerously low, leading to an unreasonable risk that the driver's knee will inadvertently shut down the Defective Vehicles during ordinary driving conditions.

97.    GM has also *not* pledged to remedy the fact that airbags will not deploy as soon as the ignition switch moves from the "run" to the "accessory" or "off" position.

98.    In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes.

99.    According to Ms. Barra, "[s]omething went terribly wrong in our processes in this instance, and terrible things happened."  Barra went on to promise, "[w]e will be better because of this tragic situation if we seize this opportunity."[30]

100.    GM now faces investigations by NHTSA, the S.E.C., and at least one State Attorney General, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

101.    While GM has now appointed a new Vehicle Safety Chief, on information and belief, at least 2.19 million potentially Defective Vehicles remain on the road to this day.

**D.    GM Promoted the Defective Vehicles as Safe and Reliable**

102.    On information and belief, in marketing and advertising materials, GM consistently promoted all its vehicles, including the Defective Vehicles sold after July 5, 2009, as safe and reliable.

103.    For example, a radio ad that ran from GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

104.    An online ad for "GM certified" used vehicles that ran from July 6, 2009 until April 5, 2010 stated that "GM certified means no worries."

105.    Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "[a]s long as there are babies, there'll be Chevys to bring them home."

---

[30] "*Something Went 'Very Wrong' at G.M., Chief Says.*"  N.Y. TIMES (Mar. 18, 2014).

010440-11  689939 V1

106.   Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

107.   An online national ad campaign for GM in April of 2012 stressed "Safety. Utility. Performance."

108.   A national print ad campaing in April of 2013 states that "[w]hen lives are on the line, you need a dependable vehicle you can rely on.  Chevrolet and GM…for power, performance and safety."

109.   A December 2013 GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

110.   GM made these and similar representations to boost new and used vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicles were defective.

111.   Throughout the relevant period, GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

112.   Until recently, GM never informed consumers about the ignition switch defects.

**E.     The Ignition Switch Defects have Harmed Plaintiffs and the Class**

113.   The ignition switch defects have caused damage to Plaintiffs and the Class.

114.   A vehicle purchased, leased, or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

115.   A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

116.   Purchasers and lessees of Defective Vehicles after the July 5, 2009, inception of GM paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had GM disclosed the ignition switch defects.  Plaintiffs and those Class members who purchased new or used Defective Vehicles *after* July 5, 2009, overpaid for their Defective Vehicles as the result of GM's conduct.  Because GM concealed the ignition switch defects, these Plaintiffs did not receive the benefit of the bargain.  In addition, the value of all Defective Vehicles has diminished as the result of GM's deceptive conduct.

117.   Plaintiffs and *all* Class members are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose and remedy the ignition switch defects.

118.   In addition, Plaintiffs and *all* Class members are subject to a recall that *does not* fully cure the safety defects.  Even if they receive a replacement switch with a stronger detent plunger, their vehicles will *not* be safe from the unreasonable risk of sudden unintended shutdown, with the attendant loss of power steering and other critical safety systems, including an operable airbag.  That is because GM has *not* pledged to address either the placement of the ignition switch in the Defective Vehicles *or* the fact that the airbags in the Defective Vehicles become inoperable as soon as the ignition switch turns to the "accessory" or "off" position.

119.   GM admits to at least 13 deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles.  However, Plaintiffs believe that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignition switch defects.

120.   If GM had timely disclosed the ignition switch defects as required by the TREAD Act, the law of fraudulent concealment, tortious interference with contract and the State consumer protection laws set forth below, all Class members' vehicles would now be safe to drive, and would be considerably more valuable than they are now.  Because of GM's now highly-publicized campaign of deception, and its

belated, piecemeal and ever-expanding recall, so much stigma has attached to the Defective Vehicles that no rational consumer would now purchase a Defective Vehicle – let alone pay what otherwise would have been fair market value for the vehicle.

**F.**     **Other Recently Revealed Information Demonsrates a Widespread Pattern of Concealing Dangerous Defects at GM and Casts Further Doubt on Whether GM is Now Adequately Addressing the Ignition Switch Defects**

121.   Disturbingly, as set forth below, other recently-revealed information suggests that GM's egregious mishandling of the ignition switch defects is part of a pattern of concealing dangerous known defects in GM vehicles.

122.   That pattern of conduct, together with the ever-expanding and piecemeal nature of the recall, calls into further question whether GM is to be trusted when it claims that simply replacing the ignition switch will fully resolve the myriad of issues faced by Defective Vehicle owners as a result of the ignition switch defects.

**1.     The EPS problem**

123.   Between 2003 and 2010, first Old GM and then sold in the United States over 1.3 million vehicles with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

124.    In 2009, GM assumed Old GM's obligation to report any known, dangerous defects in GM vehicles, including the defective vehicles, which are affected by the faulty EPS.  And, as with the ignition switch defects, GM was aware of the EPS problem

125.   When the EPS fails, a message appears on the vehicle's dashboard,  and a chime sounds to inform the driver.  Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

126.    In 2010, GM first recalled Chevy Cobalt and Pontiac G5 models for these EPS issues, yet it did ***not*** recall the many other vehicles that had the very same faulty EPS.

127.    Documents released by the National Highway Traffic Safety Administration ("NHTSA") show that GM waited years to recall nearly 335,000 Saturn Ions for EPS failure – despite receiving nearly 4,800 consumer complaints and more than 30,000 claims for warranty repairs.  That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent.  By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[31]  Here, the rate translates to 1430 complaints per 100,000 vehicles.

128.    In response to the consumer complaints, in September 2011 NHTSA opened an investigation into the EPS defect in Saturn Ions.

129.    NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

130.    NHTSA linked approximately 12 crashes and two injuries to the EPS defect in the Ions.

131.    In 2011, GM missed yet another opportunity to recall the additional vehicles with faulty EPS when CEO Mary Barra – then head of product development – was advised by engineer Terry Woychowski that there was a serious power steering issue in Saturn Ions.  Ms. Barra was also informed of the ongoing NHTSA investigation.  At the time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in GM's 2005 steering recall of Cobalt and G5 vehicles.

---

[31] *See* http://www-odi.nhtsa.dot.gov/cars/problems/defect/-results.cfm?action_number=EA06002&SearchType=QuickSearch&summary=true.

132.   Yet GM took no action for four years.  It wasn't until March 31, 2014, that GM finally recalled the approximately 1.3 million vehicles in the United States affected by the EPS defect.

133.   After announcing the March 31, 2014 recall, Jeff Boyer, GM's Vice President of Global Vehicle Safety, acknowledged that GM recalled some of these same vehicle models previously for the *same issue*, but that GM "did not do enough."

## 2.   Airbag problems caused by defective wiring harnesses

134.   From 2007 until at least 2013, first Old GM and then GM sold nearly1.2 million vehicles throughout the United States that have defective wiring harnesses. Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash.  The vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and death to the drivers and front-seat passengers.

135.   In 2009, GM assumed Old GM's obligation to report any known, dangerous defects in GM vehicles, including those affected by the faulty airbag components.  Once again, GM knew of the dangerous airbag defect from the date of its inception on July 5, 2009.

136.   As the wiring harness connectors in the SIABs corrode or loosen over time, resistance will increase.  The airbag sensing system will interpret this increase in resistance as a fault, which then triggers illumination of the "SERVICE AIR BAG" message on the vehicle's dashboard.  This message may be intermittent at first and the airbags and pretensioners will still deploy.  But over time, the resistance can build to the point where the SIABs, pretensioners, and front center airbags will not deploy in the event of a collision.[32]

---

[32] *See* GM Notice to NHTSA dated March 17, 2014, at 1.

137.   The problem apparently arose when GM made the switch from using gold-plated terminals to connect its wire harnesses to cheaper tin terminals in 2007.[33]

138.   In June 2008, Old GM noticed increased warranty claims for airbag service on certain of its vehicles and determined it was due to increased resistance in airbag wiring.  After analysis of the tin connectors in September 2008, Old GM determined that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring.  It released a technical service bulletin on November 25, 2008, for 2008-2009 Buick Enclaves, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line.  Old GM also began the transition back to gold-plated terminals in certain vehicles.  At that point, Old GM suspended all investigation into the defective airbag wiring and took no further action.[34]

139.   In November 2009, GM learned of similar reports of increased airbag service messages in 2010 Chevy Malibu and 2010 Pontiac G6 vehicles.  After investigation, GM concluded that corrosion and wear in the same tin connector was the root of the airbag problems in the Malibu and G6 models.[35]

140.   In January 2010, after review of the Malibu and G6 airbag connector issues, GM concluded that ignoring the service airbag message could increase the resistance such that an SIAB might not deploy in a side impact collision.  On May 11, 2010, GM issued a Customer Satisfaction Bulletin for the Malibu and G6 models and instructed dealers to secure both front seat-mounted, side-impact airbag wire harnesses and, if necessary, reroute the wire harness.[36]

---

[34] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.
[35] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 2.
[36] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 2.

141.    From February to May 2010, GM revisited the data on vehicles with faulty harness wiring issues, and noted another spike in the volume of the airbag service warranty claims. This led GM to conclude that the November 2008 bulletin was "not entirely effective in correcting the [wiring defect present in the vehicles]." On November 23, 2010, GM issued another Customer Satisfaction Bulletin for certain 2008 Buick Enclave, 2008 Saturn Outlook, 2008 GMC Acadia, models built from October 2007 to March 2008, instructing dealers to secure SIAB harnesses and re-route or replace the SIAB connectors.[37]

142.    GM issued a revised Customer Service Bulletin on February 3, 2011, requiring replacement of the front seat-mounted side impact airbag connectors in the same faulty vehilces in the November 2010 bulletin. In July 2011, GM again replaced its connector, this time with a Tyco-manufactured connector featuring a silver sealed terminal.[38]

143.    But in 2012 GM noticed another spike in the volume of warranty claims relating to SIAB connectors in vehicles built in the second half of 2011. After further analysis of the Tyco connectors, it discovered that inadequate crimping of the connector terminal was causing increased system resistance. In response, GM issued an internal bulletin for 2011-12 Buick Enclave, Chevy Traverse, and GMC Acadia models, recommending dealers repair affected vehicles by replacing the original connector with a new sealed connector.[39]

144.    The defect was still uncured, however, because in 2013 GM again marked an increase in service repairs and buyback activity due to illuminated airbag service lights. On October 4, 2013, GM opened an investigation into airbag connector issues in 2011-2013 Buick Enclave, Chevy Traverse, and GMC Acadia

---

[37] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 3.
[38] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 3.
[39] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 4.

010440-11  689939 V1

- 32 -

models.  The investigation revealed an increase in warranty claims for vehicles built in late 2011 and early 2012.[40]

145.   On February 10, 2014, GM concluded that corrosion and crimping issues were again the root cause of the airbag problems.[41]

146.   GM initially planned to issue a less-urgent Customer Satisfaction Program to address the airbag flaw in the 2010-2013 Defective Vehicles.  But it wasn't until a call with NHTSA on March 14, 2014, that GM finally issued a full-blown safety recall on the vehicles with the faulty harness wiring – years after it first learned of the defective airbag connectors, after four investigations into the defect, and after issuing at least six service bulletins on the topic.  The recall as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover approximately 1.2 million vehicles.[42]

147.   On March 17, 2014, GM issued a recall for 1,176,407 vehicles potentially afflicted by the defective airbag system.  The recall instructs dealers to remove driver and passenger SIAB connectors and splice and solder the wires together.[43]

## V.    TOLLING OF THE STATUTES OF LIMITATION

148.   All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein.  Plaintiffs and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that GM did not report information within its knowledge to federal authorities (including NHTSA), its dealerships or consumers, nor would a reasonable and diligent investigation have disclosed that GM had

---

[40] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 4.

[41] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 5.

[42] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 5.

[43] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 5.

010440-11  689939 V1

1    information in its possession about the existence and dangerousness of the defect and

2    opted to conceal that information until shortly before this action was filed.

3        149.   Ever since its inception on July 5, 2009, GM has been under a continuing

4    duty to disclose to NHTSA, its dealerships, Plaintiffs, and the Class the true character,

5    quality, and nature of the Defective Vehicles; that this defect is based on dangerous,

6    inadequate, and defective design and/or substandard materials; and that it will require

7    repair, poses a severe safety concern, and diminishes the value of the Defective

8    Vehicles.

9        150.   Because of the active concealment by GM, any and all limitations

10   periods otherwise applicable to Plaintiffs' claims have been tolled.

11   **VI.   FROM THE DATE OF ITS INCEPTION, GM OWED A DUTY TO
     DISCLOSE AND NOT TO CONCEAL THE IGNTION SWITCH DEFECTS IN
12   THE DEFECTIVE VEHICLES**

13       151.   Regardless of whether GM or Old GM manufactured or sold a particular

14   Defective Vechicle to a particular Class member, GM is responsible for *its own*

15   actions with respect to *all* the Defective Vehicles, and the resulting harm to Class

16   members that occurred as the result of GM's acts and omissions.  Simply put, GM

17   was aware of serious safety defects, and it also knew that Defective Vehicle owners

18   were unaware of the defect.  Under these circumstances, GM had the clear duty to

19   disclose and not conceal the ignition switch defects to Plaintiffs and the Class –

20   regardless of when they acquired their Defective Vehicles.

21       152.   GM's obligations stem from several different sources, including, but not

22   limited to: (i) the obligations it explicitly assumed under the TREAD Act to promptly

23   report any safety defect to Defective Vehicle owners and to NHTSA so that

24   appropriate remedial action could occur; (ii) the duty it had under the law of

25   fraudulent concealment and tortious interference with contract, as pleaded below; (iii)

26   the duty  it had under the State consumer protection laws, as pleaded below; and (iv)

27   the general legal principle embodied in § 324A of the Restatement (Second) of Torts,

28   ("Liability To Third Person For Negligent Performance Of Undertaking").

153.   In acquiring Old GM, GM expressly assumed the obligations to make all required disclosures under the TREAD Act with respect to all the Defective Vehicles. Under the TREAD Act, if it is determined that vehicle has a safety defect, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect, and may be ordered to remedy the defect.  49 U.S.C. § 30118(b)(2)(A) & (B).

154.   Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  49 C.F.R. § 573.6(a) & (b).  At a minimum, the report to NHTSA must include:  the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect.  49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

155.   The manufacturer must also promptly inform NHTSA regarding:  the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.  49 C.F.R. § 276.6(b) & (c).

156.   It cannot be disputed that GM assumed a duty to all Defective Vehicle owners under the TREAD Act, and that it violated this duty.

157.   Under § 324A of the *Restatement*, an entity that undertakes to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability for harm to the third person resulting from the failure to exercise reasonable care to protect the undertaking if (a) the failure

to establish reasonable care increases the risk of such harm…" While the doctrine grew up in the context of physical harm, it also applies to economic loss, such as that suffered by Plaintiffs and the Class.

158.  *Restatement* § 324A applies to an undertaking which is purely gratuitous, and it applies with even greater force here, where GM is receiving substantial remuneration for its undertaking in relation to its dealerships' service centers.  GM provides parts for the Defective Vehicles as they are serviced at its dealerships, and receives substantial revenue from dealerships relating to the servicing of Defective Vehicles.  It also receives an additional benefit in that many of the people who own these vehicles will eventually sell or trade in their old vehicles for new ones. Consumers using GM service centers and buying GM replacement parts necessarily rely upon GM to advise its dealerships of defects, notify its dealerships of safety related issues, provide its dealerships with accurate and up to date information and enable them to remedy defects. GM's failure to carry out these obligations has increased the risk of harm to owners of Defective Vehicles, who regularly have their vehicles inspected and serviced at GM dealerships and rely upon representations that the vehicles are safe and free of defects.

159.  GM's dealerships pass along GM replacement parts, and they also rely on GM's expertise regarding how the vehicles should be maintained, and what conditions are necessary for the dealer to conclude that the vehicles are in proper working order at the time they are inspected, serviced and released back to the owner. The dealerships rely on GM's assurances of safety, that GM will tell them about safety related problems that come to GM's attention, and that GM will pass along knowledge of defects and how to address them.  Dealers servicing the Defective Vehicles rely on GM's representations that the vehicles and their component parts and safety features will function correctly if certain conditions are met when the vehicles are inspected and serviced, as do the consumers who go to a GM dealership for repairs.  GM's breach of its obligations to its dealerships has resulted in harm to

Plaintiffs and the Class.

## VII.   CLASS ALLEGATIONS

**A.     The Nationwide Class and Subclass**

160.   Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class initially defined as follows (the "Nationwide Class"):

> During the fullest period allowed by law, all persons in the United States who own or lease, or who sold after March 1, 2014, one or more of the following GM vehicles:  2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; and 2007-2010 Saturn Sky ("Defective Vehicles"). To the extent warranted, the list of Defective Vehicles list will be supplemented to include other GM vehicles that have the defective ignition switches, which inadvertently turn off the engine and vehicle electrical systems during ordinary driving conditions.

161.   Plaintiffs also bring a claim on behalf of themselves and a Class initially defined as follows (the "Tortious Interference Subclass"):

> During the fullest period allowed by law, all persons in the United States who own or lease, or who sold after March 1, 2014, one or more Defective Vehicles that they had serviced or repaired by one or more GM dealerships on or after July 5, 2009.

**B.     State Classes**

162.   Plaintiffs also allege statewide class action claims ("State Classes"). These Classes are defined as follows:

> During the fullest period allowed by law all persons or entities in the **State of California** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

> During the fullest period allowed by law, all persons or entities in the **State of Alabama** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

> During the fullest period allowed by law, all persons or entities in the **State of Colorado** who either (i) own or lease

one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of Connecticut** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of Florida** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of Georgia** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of Illinois** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of Maryland** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **Commonwealth of Massachusetts** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of Michigan** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of New Jersey** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of New Mexico** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of New York** who either (i) own or lease one or more Defective Vehicle(s) or (ii) sold a Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or entities in the **State of Ohio** who either (i) own or lease one

010440-11  689939 V1

or more Defective Vehicle(s) or (ii) sold a Defective
Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or
entities in the **State of Oklahoma** who either (i) own or
lease one or more Defective Vehicle(s) or (ii) sold a
Defective Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or
entities in the **State of Texas** who either (i) own or lease
one or more Defective Vehicle(s) or (ii) sold a Defective
Vehicle on or after March 1, 2014.

During the fullest period allowed by law, all persons or
entities in the **State of Wisconsin** who either (i) own or
lease one or more Defective Vehicle(s) or (ii) sold a
Defective Vehicle on or after March 1, 2014.

163.  Excluded from each Class are Old GM and GM, their employees, co-
conspirators, officers, directors, legal representatives, heirs, successors and wholly or
partly owned subsidiaries or affiliates of GM; class counsel and their employees; and
the judicial officers and their immediate family members and associated court staff
assigned to this case, and all persons within the third degree of relationship to any
such persons.

164.  Plaintiffs are informed and believe that there are at least 2.1 million
Defective Vehicles nationwide and thousands of Defective Vehicles in each State
where a State Class claim is pled.  Individual joinder of all Class members is
impracticable.

165.  The Class expressly disclaims any recovery in this action for physical
injury resulting from the ignition switch defects.  But the increased risk of injury from
the ignition switch defects serves as an independent justification for the relief sought
by Plaintiffs and the Class.

166.  The Class can be readily identified using registration records, sales
records, production records, and other information kept by GM or third parties in the
usual course of business and within their control.

167.  Questions of law and fact are common to the Class and predominate over
questions affecting only individual members, including the following:

010440-11  689939 V1

1          a.      Whether the Defective Vehicles suffer from ignition switch

2   defects;

3          b.      Whether GM concealed the defects;

4          c.      Whether GM misrepresented that the Defective Vehicles were

5   safe;

6          d.      Whether GM engaged in fraudulent concealment;

7          e.      Whether GM tortiously interefered with the contracts between its

8   dealerships and Defective Vehicle Owners;

9          f.      Whether GM engaged in unfair, deceptive, unlawful and/or

10  fraudulent acts or practices in trade or commerce by failing to disclose that the

11  Defective Vehicles were designed, manufactured, and sold with defective ignition

12  switches;

13         g.      Whether the alleged conduct by GM violated laws as Plaintiffs

14  allege;

15         h.      Whether GM's unlawful, unfair, and/or deceptive practices

16  harmed Plaintiffs and the members of the Class;

17         i.      Whether Plaintiffs and the members of the Class are entitled to

18  equitable and/or injunctive relief; and

19         j.      Whether any or all applicable limitations periods are tolled by acts

20  of fraudulent concealment.

21       168.   Plaintiffs' claims are typical of the claims of the Class members, and

22  arise from the same course of conduct by GM.  The relief Plaintiffs seek is typical of

23  the relief sought for the absent Class members.

24       169.   Plaintiffs will fairly and adequately represent and protect the interests of

25  all absent Class members.  Plaintiffs are represented by counsel competent and

26  experienced in product liability, consumer protection, and class action litigation.

27       170.   A class action is superior to other available methods for the fair and

28  efficient adjudication of this controversy, since joinder of all the individual Class

010440-11  689939 V1                                      - 40 -

members is impracticable.  Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

171.   The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

172.   Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Plaintiffs anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

## VIII.  CAUSES OF ACTION

A.    **Nationwide Class Claims**

### COUNT I
### FRAUDULENT CONCEALMENT

173.   Plaintiffs and the Class incorporate by reference each preceding and following paragraph as though fully set forth at length herein.

174.   This claim is brought on behalf of the Nationwide Class.

175.   GM concealed and suppressed material facts concerning the ignition switch defects.

176.   GM had a duty to disclose the ignition switch defects because they were known and/or accessible only to GM who had superior knowledge and access to the facts, and GM knew they were not known to or reasonably discoverable by Plaintiffs and the Class.  These omitted and concealed facts were material because they directly

impact the safety of the Defective Vehicles.  Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

177.   GM actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and avoid a costly recall, and they did so at the expense of Plaintiffs and the Class.

178.   On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Class and conceal material information regarding the defects that exist in the Defective Vehicles and other GM vehicles.

179.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the Class's actions were justified.  GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Class.

180.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of GM's concealment of, and failure to timely disclose, the ignition switch defects.

181.   Those Class members who purchased new or used Defective Vehicles after July 5, 2009, either would have paid less for the vehicles or would not have purchased them at all.  They did not receive the benefit of their bargain as a result of the fraudulent concealment of GM.

182.   The value of all Class members' vehicles has diminished as a result of GM's fraudulent concealment of the ignition switch defect which has greatly tarnished the Defective Vehicles and made any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

183.   GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich GM.  GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II

## TORTIOUS INTERFERENCE WITH CONTRACT

184.   Plaintiffs bring this claim solely on behalf of Nationwide Class members who had their Defective Vehicles serviced or repaired by GM dealerships on or after July 5, 2009 (the "Tortious Interference Subclass," in this Count referred to as the "Class").

185.   Plaintiffs incorporate by reference and reallege each preceding and following paragraph as though set forth fully herein.

186.   The Defective Vehicles of Plaintiffs and the Class were each either serviced or repaired under contracts with GM dealerships.  Under those contracts, the GM dealerships were required to service, repair and inspect the Defective Vehicles and ensure that any safety defects were repaired, or that at a minimum Defective Vehicle owners were apprised of safety defects and advised of the means and cost of repairing any such defects.

187.   GM was aware that its dealerships were servicing and repairing Defective Vehicles, and that those dealerships relied on GM to advise them of any known safety defects in the vehicles so that the dealerships were able to perform their obligations under their contracts with the vehicle owners.  GM educated and advised dealerships on the proper course to take in evaluating and servicing vehicles.   On information and belief, in repairing and servicing GM vehicles, GM dealerships follow protocols set by GM and those did not contain the proper information and procedures to identify and repair the problems resulting from the ignition switch defects.

188. GM was aware of the ignition switch defects from the date of its inception on July 5, 2009, but chose not to inform its dealerships of nature and extent of the defects in order to avoid the substantial cost and negative publicity of a recall. GM knew that, by so concealing its knowledge of the ignition switch defects, it would cause its dealerships to return serviced and repaired Defective Vehicles to their owners without having repaired the defects.

189. GM's intentional concealment of the ignition switch defects from its dealerships caused its dealerships to breach their service and repair agreements with Defective Vehicle owners.

190. As intended, GM profited from its dealerships' servicing and provision of parts to Defective Vehicle owners.

191. As a result of GM's intentional concealment of the ignition switch defects from its dealerships, Plaintiffs and the Class suffered damages. Their vehicles remained defective, and have now suffered significant diminishment in value because the dealers did not effectively service and/or repair Defective Vehicles as they were required to do under their contracts with Defective Vehicle owners.

192. Plaintiffs and the Class accordingly seek the difference in value between their vehicles in their defective state and what the value would have been had GM's dealerships remedied the ignition switch defect as they were obligated to do under their contracts with Class members.

193. GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich GM. GM's conduct was particularly egregious as it continued to reap profits from Defective Vehicle owners while concealing its knowledge of the costly and dangerous ignition switch defects that placed Defective Vehicle owners, their passengers, other drivers and their passengers at significant risk and thereby evidenced a blatant disregard fot the rights of Defective Vehicle owners. Accordingly, Plaintiffs seek punitive damages in an amount to be determined at trial.

194.    Plaintiffs also seek whatever other remedies deemed appropriate by the Court.

**B.      State Class Claims**

**CALIFORNIA**

**COUNT I**

**VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT**
**(CAL. CIV. CODE § 1750, *et seq.*)**

195.    Plaintiffs Deanna Dinco, David Butler, and Curtis Blinsmon, (in this Count referred to as "Plaintiffs.") bring this claim solely on behalf of Class members who are residents of California (the "California State Class," in this Count referred to as the "Class").

196.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

197.    GM is a "person" under CAL. CIV. CODE § 1761(c).

198.    Plaintiffs are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased or leased one or more Defective Vehicles.

199.    GM engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq.*, as described above and below.

200.    Under the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1) & (2).

201.    In acquiring Old GM, GM expressly assumed the obligations to make all required disclosures under the TREAD Act with respect to all the Defective Vehicles.

202.    Under the TREAD Act, if it is determined that a vehicle has a safety defect, the manufacturer must promptly notify vehicle owners, purchasers and dealers

1   of the defect, and may be ordered to remedy the defect.  49 U.S.C. § 30118(b)(2)(A)

2   & (B).

3       203.   Under the TREAD Act, manufacturers must also file a report with

4   NHTSA within five working days of discovering "a defect in a vehicle or item of

5   equipment has been determined to be safety related, or a noncompliance with a motor

6   vehicle safety standard has been determined to exist."  49 C.F.R. § 573.6(a) & (b).  At

7   a minimum, the report to NHTSA must include:  the manufacturer's name; the

8   identification of the vehicles or equipment containing the defect, including the make,

9   line, model year and years of manufacturing; a description of the basis for

10  determining the recall population; how those vehicles differ from similar vehicles that

11  the manufacturer excluded from the recall; and a description of the defect.  49 C.F.R.

12  § 276.6(b), (c)(1), (c)(2), & (c)(5).

13      204.   The manufacturer must also promptly inform NHTSA regarding:  the

14  total number of vehicles or equipment potentially containing the defect; the

15  percentage of vehicles estimated to contain the defect; a chronology of all principal

16  events that were the basis for the determination that the defect related to motor

17  vehicle safety, including a summary of all warranty claims, field or service reports,

18  and other information, with its dates of receipt; and a description of the plan to

19  remedy the defect.  49 C.F.R. § 276.6(b) & (c).

20      205.   The TREAD Act provides that any manufacturer who violates 49 U.S.C.

21  § 30166 must pay a civil penalty to the U.S. Government.  The current penalty "is

22  $7,000 per violation per day," and the maximum penalty "for a related series of daily

23  violations is $17,350,000."  49 C.F.R. § 578.6(c).

24      206.   From the date of its inception on July 5, 2009, GM knew of the ignition

25  switch problem both because of the knowledge of Old GM personnel who remained

26  at GM and continuous reports and internal investigation right up until the present.

27

28

010440-11  689939 V1

- 46 -

207.   GM admits the defect in the ignition switch has been linked to at least 13 accident-related fatalities.  But other sources have reported that hundreds of deaths and serious injuries are linked to the faulty ignition switches.

208.   Despite being aware of the ignition switch defects ever since its creation on July 5, 2009, GM waited until February 7, 2014, before finally sending a letter to NHTSA confessing its knowledge of the ignition switch defects which could cause the vehicles to lose power, and in turn cause the airbags not to deploy.  GM initially identified two vehicle models, along with the corresponding model years, affected by the defect – the 2005-2007 Chevrolet Cobalt and the 2007 Pontiac G5.  On February 25, 2014, GM amended its letter to include four additional vehicles, the 2006-2007 Chevrolet HHR, 2006-2007 Pontiac Solstice, 2003-2007 Saturn Ion, and the 2007 Saturn Sky.  In late March 2014, GM added later model-year Ions and Cobalts (through 2010), HHRs through 2011, and Skys through 2010.

209.   By failing to disclose and by actively concealing the ignition switch defect, and by selling vehicles while violating the TREAD Act and through its other conduct as alleged herein, GM engaged in deceptive business practices prohibited by the CLRA, CAL. CIV. CODE § 1750, *et seq*.

210.   GM failed for many years to inform NHTSA about known defects in the Defective Vehicles' ignition system.  Consequently, the public, including Plaintiffs and the Class, received no notice of the ignition switch defects, that the defect could disable multiple electrical functions including power steering and power brakes, or that the defect could cause the airbags not to deploy and seatbelt pretensioners not to trigger in an accident.

211.   GM knew that the ignition switch had a defect that could cause a vehicle's engine to lose power without warning, and that when the engine lost power there was a risk that electrical functions would fail and that the airbags would not deploy and the seatbelt pretensioners would not trigger.  Yet GM failed to inform

NHTSA or warn Plaintiffs or the public about these inherent dangers despite having a duty to do so.

212.   GM owed Plaintiffs and the Class a duty to comply with the TREAD Act and disclose the defective nature of the Defective Vehicles, including the ignition switch defect and accompanying loss of power and failure of the airbags to deploy, because GM:

a.      Possessed exclusive knowledge of the ignition switch defects rendering the Defective Vehicles inherently more dangerous and unreliable than otherwise similar vehicles; and

b.      Intentionally concealed the hazardous situation with the Defective Vehicles by failing to comply with the TREAD Act, which required the disclosure of the ignition switch defects.

213.   Defective Vehicles equipped with the faulty ignition switch pose an unreasonable risk of death or serious bodily injury to Plaintiffs, passengers, other motorists, and pedestrians, because they are susceptible to sudden loss of power resulting in the loss of power steering and power brakes and failure of the airbags to deploy.

214.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of the Defective Vehicles.

215.   Because of its violations of the CLRA detailed above, GM caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs and the Class.  Plaintiffs and the Class members currently own or lease Defective Vehicles that are defective and inherently unsafe.  These violations caused the diminution in value of Plaintiffs' vehicles which are now worth less than they would have been had GM timely disclosed the defects.  Because GM fraudulently concealed the defects, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Vehicles has greatly diminished.  No rational consumer

1    would purchase the Defective Vehicles in light of the stigma attached to those

2    vehicles by GM's conduct.

3        216.   Had GM timely disclosed the ignition switch defects, the issue would

4    have been resolved years ago and the value of Plaintiffs' Defective Vehicles would

5    not now be diminished.

6        217.   Further, Class members who purchased or leased new or used Defective

7    Vehicles after on or July 5, 2009, did not receive the benefit of their bargain as a

8    result of GM's unfair and deceptive conduct in violation of the TREAD Act and the

9    CLRA.  Had these Class members been aware of the ignition switch defects they

10   would have either paid less for their vehicles or would not have purchased the

11   vehicles.

12       218.   Moreover, notwithstanding its obligations under the TREAD Act and the

13   CLRA, GM has not yet disclosed that the low placement of the ignition column and

14   the fact that the airbags shut off as soon as the key hits the "accessory" or "off"

15   position are also defects.  This failure to disclose continues to pose a grave risk to the

16   Class.

17       219.   Plaintiffs and the Class face the risk of irreparable injury as a result of

18   GM's acts and omissions in violation of the CLRA, and these violations present a

19   continuing risk to Plaintiffs and to the general public.

20       220.   Plaintiffs in this Complaint seek injunctive relief.  Plaintiffs sent a

21   CLRA Notice Letter to GM on May 1, 2014.  After thirty days, Plaintiffs will, Under

22   CAL. CIV. CODE § 1780(a), seek monetary relief against GM measured as the

23   diminution of the value of their vehicles caused by GM's violations of the CLRA as

24   alleged herein.

25       221.   Under CAL. CIV. CODE § 1780(b), Plaintiffs will seek an additional

26   award against GM of up to $5,000 for each Class member who qualifies as a "senior

27   citizen" or "disabled person" under the CLRA.  GM knew or should have known that

28   its conduct was directed to one or more Class members who are senior citizens or

disabled persons.  GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more Class members who are senior citizens or disabled persons are substantially more vulnerable to GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from GM's conduct.

222.    Plaintiffs will also seek punitive damages against GM because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the Class to potential cruel and unjust hardship as a result.  GM intentionally and willfully concealed and failed to inform NHTSA of the unsafe and unreliable Defective Vehicles, GM deceived Plaintiffs on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations problem of correcting a deadly flaw in the Defective Vehicles.  GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under CAL. CIV. CODE § 3294.

223.    Plaintiffs further seek an order enjoining  unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

224.    Plaintiffs include affidavits with this Complaint that show that venue in this District is proper, to the extent such affidavits are required by CAL. CIV. CODE § 1780(d).

## COUNT II

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

225.   Plaintiffs Dinco, Butler, and Blinsmon (in this Count referred to as "Plaintiffs") bring this claim solely on behalf of Class members who are residents of California (the "California State Class," in this Count referred to as the "Class").

226.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

227.   California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  GM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

228.   GM violated the unlawful prong of section 17200 by its violations of the CLRA, CAL. CIV. CODE § 1750, *et seq.*, as set forth in Count I and by the acts and practices set forth in this Complaint.

229.   GM also violated the unlawful prong because it engaged in business acts or practices that are unlawful because they violate the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its regulations.

230.   GM violated the TREAD Act when it failed to timely inform NHTSA of the ignition switch defects and allowed cars to be sold and remain on the road with these defects.

231.   GM violated the unfair and fraudulent prong of section 17200 because, in failing or refusing to inform NHTSA about a defect affecting the safety and reliability of the Defective Vehicles, GM precluded reasonable owners from discovering their vehicles were unsafe and unreliable.  The information that GM was required to disclose to NHTSA about the faulty ignition switch was material to a reasonable consumer.

232.   GM also violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including the manufacture and sale of vehicles

010440-11  689939 V1

1   with an ignition switch defect after July 5, 2009, and GM's failure to adequately

2   disclose the defect to NHTSA so that a remedy could be implemented, offend

3   established public policy, and also because the harm GM caused consumers greatly

4   outweighs any benefits associated with those practices.  GM's conduct has also

5   impaired competition within the automotive vehicles market and has prevented

6   Plaintiffs and the Class from making fully informed decisions about whether to lease,

7   purchase and/or retain the Defective Vehicles.

8        233.   While GM knew of the ignition switch defects from the date of its

9   inception on July 5, 2009, it continued to design, manufacture and market the

10  Defective Vehicles until 2011.  All the while, GM knew that the vehicles had an

11  unreasonable propensity to shut down during ordinary driving conditions, leading to

12  an unreasonable risk of serious bodily injury or death.

13       234.   Plaintiffs and the Class have suffered an injury, including the loss of

14  money or property, because of GM's unfair, unlawful and/or deceptive practices.  GM

15  failed to inform NHTSA, and therefore failed to inform consumers, that its vehicles

16  had a defective ignition switch that could lead to injury and death, all in violation of

17  Section 17200 of the UCL.  These violations caused the diminution in value of

18  Plaintiffs' vehicles which are now worth less than they would have been had GM

19  timely disclosed the defects.  Because GM fraudulently concealed the defects,

20  resulting in a raft of negative publicity once the defects finally began to be disclosed,

21  the value of the Defective Vehicles has greatly diminished.  No rational consumer

22  would purchase the Defective Vehicles in light of GM's conduct and the stigma now

23  thereby attached to the Defective Vehicles.

24       235.   Had GM timely disclosed the ignition switch defects, the issue would

25  have been resolved years ago and the value of Plaintiffs' Defective Vehicles would

26  not now be diminished.

27       236.   Further, Class members who purchased or leased new or used Defective

28  Vehicles after July 5, 2009, did not receive the benefit of their bargain and overpaid

for their vehicles as a result of GM's unfair and deceptive conduct in violation of the
TREAD Act, the CLRA, and Section 17200 of the UCL.  Had these Class members
been aware of the ignition switch defects they would have either paid less for their
vehicles or would not have purchased the vehicles.

237.  All of the wrongful conduct alleged herein occurred, and continues to
occur, in the conduct of GM's business.  GM's wrongful conduct is part of a pattern
or generalized course of conduct that is still perpetuated and repeated, both in
California and nationwide.

238.  Plaintiffs and the Class have suffered an injury, including the loss of
money or property, due to GM's unfair, unlawful and/or deceptive practices.

239.  Plaintiffs request that this Court enter such orders or judgments as may
be necessary, including a declaratory judgment that GM has violated the UCL; an
order enjoining GM from continuing its unfair, unlawful, and/or deceptive practices;
an order and judgment restoring to the Class members any money lost as a result of
unfair, unlawful and deceptive trade practices, including restitution and disgorgement
of any profits GM received as a result of its unfair, unlawful and/or deceptive
practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. § 384 and
CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

## COUNT III

**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT
FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(CALIFORNIA "LEMON LAW")**

**(CAL. CIV. CODE §§ 1791.1 & 1792)**

240.  Plaintiffs Dinco, Butler and Blinsmon (in this Count referred to as
"Plaintiffs") bring this claim solely on behalf of Class members who are residents of
California (the "California State Class," in this Count referred to as the "Class").

241.  Plaintiffs reallege and incorporate by reference all paragraphs as though
fully set forth herein.

242.   Plaintiffs and Class members who purchased or leased the Defective Vehicles in California are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

243.   The Defective Vehicles are "consumer goods" within the meaning of CIV. CODE § 1791(a).

244.   Old GM was a "manufacturer" of the Defective Vehicles within the meaning of CAL. CIV. CODE § 1791(j), and, in purchasing Old GM, GM expressly assumed liability and responsibility for "payment of all [Old ] Liabilities arising under … Lemon Laws," including California's Lemon Law, the Song-Beverly Act.

245.   Old GM impliedly warranted to Plaintiffs and the Class that its Defective Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Defective Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

246.   CAL. CIV. CODE § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)   Pass without objection in the trade under the contract description.
>
> (2)   Are fit for the ordinary purposes for which such goods are used.
>
> (3)   Are adequately contained, packaged, and labeled.
>
> (4)   Conform to the promises or affirmations of fact made on the container or label.

247.   The Defective Vehicles would not pass without objection in the automotive trade because of the ignition switch defects that cause the Defective Vehicles to inadvertently shut down during ordinary driving conditions, leading to an unreasonable likelihood of accident and an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

248.   Because of the ignition switch defects, the Defective Vehicles are not safe to drive and thus not fit for ordinary purposes.

010440-11 689939 V1

249.   The Defective Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and does not advise Class members to avoid attaching anything to their vehicle key rings.  GM failed to warn about the dangerous safety defects in the Defective Vehicles.

250.   Old GM breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles containing defects leading to the sudden and unintended shut down of the vehicles during ordinary driving conditions. These defects have deprived Plaintiffs and the Class of the benefit of their bargain and have caused the Defective Vehicles to depreciate in value.

251.   As a direct and proximate result of Old GM's breach of its duties under California's Lemon Law (for which GM expressly assumed liability), Class members received goods whose dangerous condition substantially impairs their value to Class members.  Plaintiffs and the Class have been damaged by the diminished value of Old GM's products, the products' malfunctioning, and the nonuse of their Defective Vehicles.

252.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

253.   Under CAL. CIV. CODE § 1794, Class members are entitled to costs and attorneys' fees.

## ALABAMA

## VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT

### (ALA. CODE § 8-19-1, *et seq.*)

254.   This claim is brought only on behalf of Plaintiff Aaron Henderson (referred to in this Count as "Plaintiff" and all Class members residing in Alabama (the "Alabama State Class," referred to in this Count as the "Class").

255.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

256.    The conduct of GM, as set forth herein, constitutes unfair or deceptive acts or practices, including, but not limited to, GM's manufacture and sale of vehicles with ignition switch defects which GM failed to adequately investigate, disclose and remedy, and GM's misrepresentations and omissions regarding the safety and reliability of its vehicles.

257.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

258.    GM's actions impact the public interest because Plaintiff was injured in the same way as millions of others purchasing, leasing and/or retaining Defective Vehicles of diminished value as a result of GM's generalized course of deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business.

259.    Plaintiff and the Class were injured as a result of GM's conduct. Plaintiff's Defective Vehicle has suffered a diminution in value as a result of GM's now-publicized campaign of concealment and never-ending piecemeal recalls that have attached great stigma to the Defective Vehicles.

260.    In addition, Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, did not receive the benefit of their bargain as a result of GM's deceptive and unfair practices as alleged herein.  Had they been aware of the ignition switch defects, these Class members would either not have purchased their Defective Vehicles at all or would have paid substantially less for them.

261.    GM's conduct proximately caused the injuries to Plaintiff and the Class.

262.    GM is liable to Plaintiff and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

010440-11 689939 V1

263.    Pursuant to ALA. CODE § 8-19-8, Plaintiff will serve the Alabama Attorney General with a copy of this complaint as Plaintiff seeks injunctive relief.

## ARIZONA

## VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT

### (ARIZONA REV. STAT. § 44-1521, *et seq.*)

264.    Plaintiff Grace Belford (referred to in this Count as "Plaintiff") brings this claim solely on behalf of Class members residing in Arizona (the "Arizona Class," referred to in this Count as the "Class.")

265.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

266.    GM, Plaintiff and the Class are "persons" under ARIZ. REV. STAT. § 44-1521(6).

267.    GM made false, deceptive and misleading statements, and omitted material facts, concerning the Defective Vehicles, and led consumer and Defective Vehicle Owners to believe that the Defective Vehicles were safe for ordinary use.

268.    In fact, as known to GM from the date of its inception on July 5, 2009, the Defective Vehicles were anything but safe.  In fact, they employed defective ignition switches that make the vehicles prone to sudden shut down during ordinary driving conditions, and the resultant shut down of power steering, power breaks, seatbelt pretensioners, and the vehicles' airbags.

269.    Plaintiff and the Class were injured as a result of GM's conduct. Plaintiff's Defective Vehicle has suffered a diminution in value as a result of GM's now-publicized campaign of concealment and never-ending piecemeal recalls that have attached great stigma to the Defective Vehicles.

270.    In addition, Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, did not receive the benefit of their bargain as a result of GM's deceptive and unfair practices as alleged herein.  Had they been aware of the ignition switch defects, these Class members would either not have

010440-11  689939 V1

1   purchased their Defective Vehicles at all or would have paid substantially less for

2   them.  And the value of their vehicles has greatly diminished as the result of GM's

3   deceptive and unfair practices.

4       271.   GM's conduct proximately caused the injuries to Plaintiff and the Class.

5       272.   GM is liable to Plaintiff and the Class for damages in amounts to be

6   proven at trial.

7   **COLORADO**

8   **VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**

9   **(COLORADO CPA, COLO. REV. STAT. § 6-1-101, *et seq.*)**

10       273.   Plaintiff Nathan Terry (referred to in this Count as "Plaintiff") brings this

11   claim solely on behalf of Class members residing in Colorado (the "Colorado State

12   Class," referred to in this Count as the "Class").

13       274.   Plaintiff realleges and incorporates by reference all paragraphs as though

14   fully set forth herein.

15       275.   GM is a "person" under § 6-1-102(6) of the Colorado Consumer

16   Protection Act ("Colorado CPA"), COLO. REV. STAT. § 6-1-101, *et seq.*

17       276.   Class members are "consumers" for purposes of § 6-1-113(1)(a) of the

18   Colorado CPA.

19       277.   GM engaged in deceptive trade practices prohibited by the Colorado

20   CPA, including:  (1) knowingly making a false representation as to the characteristics,

21   uses, and benefits of the Defective Vehicles that had the capacity or tendency to

22   deceive Class members; (2) representing that the Defective Vehicles are of a

23   particular standard, quality, and grade even though it knew or should have known

24   they are not; (3) advertising the Defective Vehicles with the intent not to sell them as

25   advertised; and (4) failing to disclose material information concerning the Defective

26   Vehicles that was known to GM at the time of advertisement or sale with the intent to

27   induce Class members to purchase, lease or retain the Defective Vehicles.  In the

28

1    course of its business, GM participated in deceptive trade practices that violated the

2    Colorado CPA as described herein.

3        278.   As alleged above, GM made material statements about the safety and

4    reliability of the Defective Vehicles sold on or after July 5, 2009, that were either

5    false or misleading.  Each of these statements contributed to the deceptive context of

6    GM's unlawful advertising and representations as a whole.

7        279.   GM also failed to disclose and actively concealed the dangerous ignition

8    switch defect in the Defective Vehicles.  GM knew of the ignition switch defect,

9    while the Class was deceived by GM's omission into believing the Defective

10   Vehicles were safe, and the information could not have reasonably been known by the

11   consumer until the February and March 2014 recalls.

12       280.   While GM knew of the ignition switch defects from the date of its

13   inception on July 5, 2009, it continued to design, manufacture, and market the

14   Defective Vehicles until 2011.

15       281.   All the while, GM knew that the Defective Vehicles had an unreasonable

16   propensity to shut down during ordinary driving conditions, leading to an

17   unreasonable risk of serious bodily injury or death.

18       282.   GM nevertheless failed to warn Class members about these inherent

19   dangers despite having a duty to do so.  GM's deceptive practices were likely to and

20   did in fact deceive reasonable consumers, including Class members, about the true

21   safety and reliability of the Defective Vehicles.

22       283.    GM's deceptive and unfair acts and practices significantly impact the

23   public as actual consumers and users of the Defective Vehicles, which pose an

24   unreasonable risk of death or serious bodily injury to Class members, passengers,

25   other motorists, pedestrians, and the public at large, because they are susceptible to

26   ignition switch malfunction causing the car's engine and electrical system to shut off,

27   disabling the power steering and power brakes and causing the non-deployment of the

28   vehicle's airbags in the event of a crash.  Public interest is also affected because Class

members were injured in exactly the same way as millions of others purchasing
and/or leasing Defective Vehicles as a result of both GM's generalized course of
deception.  All of the wrongful conduct alleged herein occurred, and continues to
occur, in the conduct of GM's business.

284.   GM's acts and practices, including the manufacture and sale of vehicles
with an ignition switch defect, and its failure to adequately disclose the defect to
NHTSA and the Class and timely implement a remedy, were unconscionable because
they offend established public policy, and because the harm GM caused consumers
greatly outweighs any benefits associated with those practices.  GM's conduct has
also impaired competition within the automotive vehicles market and has prevented
Plaintiff and the Class from making fully informed decisions about whether to lease,
purchase and/or retain Defective Vehicles.

285.   Whether or not a vehicle's (a) ignition switch will malfunction,
(b) causing the car's engine and electrical system to shut off, (c) disabling the power
steering and power brakes, and (d) causing the non-deployment of the vehicle's
airbags and seatbelt pretensioners in a crash are facts that a reasonable consumer
would consider important in selecting a vehicle to purchase or lease, and in retaining
that vehicle.  When Class members bought and/or retained a Defective Vehicle for
personal, family, or household purposes, they reasonably expected the vehicle would
feature a non-defective, safe ignition switch.

286.   Class members suffered injury-in-fact to their legally protected property
interests as a result of GM's violations of the Colorado CPA detailed above.  Class
members owned or leased Defective Vehicles that are defective and inherently
unsafe.  The ignition switch defects and the resulting risk of accident, injury, or death
have caused the value of the Defective Vehicles to plummet, and that diminishment
was greatly exacerbated by the publicization of GM's campaign of deception and its
never-ending, piecemeal recalls.  So much stigma has attached to the Defective
Vehicles as the result of GM's misconduct that no reasonable consumer would

purchase the vehicles – let alone pay what otherwise would have been fair market value for the vehicles.

287.   Those Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, did not receive the benefit of the bargain as a result of GM's deceptive and unfair conduct as alleged herein.  Had they been aware of the ignition switch defects, these Class members would either not have purchased their Defective Vehicles at all, or would have paid substantially less than they did.

288.   Class members also seek punitive damages against GM because it engaged in bad faith conduct.  GM misrepresented the safety and reliability of the Defective Vehicles, deceived Class members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles they repeatedly promised Class members were safe.  GM's bad-faith conduct warrants punitive damages.

289.   Because the Class members suffered injury-in-fact, they seek actual damages or $500, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees under COLO. REV. STAT. § 6-1-113.

## CONNECTICUT

## VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT

### (CONN. GEN. STAT. § 42-110A, *et seq.*)

290.   Plaintiff Michael Pesce (referred to in this Count as "Plaintiff") brings this claim solely on behalf of Class members who are Connecticut residents (the "Connecticut State Class," referred to in this Count as the "Class").

291.   Plaintiff realleges and incorporates by reference all paragraphs as though set forth herein.

292.   The Connecticut Unfair Trade Practices Act ("CUTPA") provides:  "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  CONN. GEN. STAT. § 42-110b(a).

- 61 -

293.   GM is, a "person" within the meaning of CUTPA.  CONN. GEN. STAT. § 42-110a(3).

294.   In the course of its business, GM willfully failed to disclose and actively concealed the dangerous risks of the ignition switch defects in the Defective Vehicles as described above.  This was a deceptive act in that GM represented that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; represented that the Defective Vehicles are of a particular standard and quality when they are not; and advertised the Defective Vehicles with the intent not to sell them as advertised.  GM knew or should have known that its conduct violated the CUTPA.

295.   GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Defective Vehicles which was known to GM.  GM deliberately withheld the information about the vehicles' propensity to suddenly shut down in order to avoid the public relations nightmare and expense of a recall, and to ensure that consumers would purchase its vehicles and to induce consumers to enter into a transaction.

296.   The conduct of GM was unfair because it causes substantial injury to consumers and Defective Vehicle owners and lessees.

297.   The propensity of the Defective Vehicles for sudden, inadvertent shutdown during ordinary driving conditions was material to Plaintiff and the Class.  Had those Class members who purchased Defective Vehicles on or after July 5, 2009, known that their Defective Vehicles had these serious safety defects, they would either not have purchased the vehicles or else would have paid substantially less for them.  These Class members plainly suffered ascertainable loss caused by the deceptive and unfair practices of GM.

298.   Plaintiff and those Class members who purchased their Defective Vehicles prior to July 5, 2009, also suffered ascertainable loss caused by the deceptive and unfair practices of GM.  Because of the ignition switch defects, GM's

1   now-publicized campaign of concealment and the never-ending and piecemeal nature

2   of the recalls, the value of their vehicles has substantially diminished.

3       299.   GM engaged in conduct amounting to a particularly aggravated,

4   deliberate disregard of the rights and safety of others.

5       300.   Plaintiff and the Class are entitled to recover their actual damages,

6   punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

7       301.   Pursuant to CONN. GEN. STAT. § 42-110g(c), Plaintiff will mail a copy of

8   the complaint to Connecticut's Attorney General.

9                                **FLORIDA**

10           **VIOLATION OF FLORIDA'S UNFAIR &
             DECEPTIVE TRADE PRACTICES ACT**

11                     (**FLA. STAT. § 501.201,** *et seq.*)

12      302.   Plaintiff Rhonda Haskins (referred to in this Count as "Plaintiff") brings

13   this claim solely on behalf of Class members who are Florida residents (the "Florida

14   State Class," referred to in this Count as the "Class").

15      303.   Plaintiff realleges and incorporates by reference all paragraphs as though

16   fully set forth herein.

17      304.   The conduct of GM as set forth herein constitutes unfair or deceptive

18   acts or practices, including, but not limited to, GM's manufacture and sale of vehicles

19   with the ignition switch defects which GM failed to adequately investigate, disclose

20   and remedy, and GM's misrepresentations and omissions regarding the safety and

21   reliability of the Defective Vehicles.

22      305.   The actions of GM as set forth above occurred in the conduct of trade or

23   commerce.

24      306.   GM's actions impact the public interest because Plaintiff and the Class

25   were injured in exactly the same way as millions of others purchasing and/or leasing

26   and retaining Defective Vehicles as a result of GM's generalized course of deception.

27

28

All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business.

307.   Plaintiff and the Class were injured as a result of GM's conduct. GM's now-publicized campaign of deception and the never-ending and piecemeal nature of the recalls have attached a significant stigma to the Defective Vehicles and greatly diminished their value.

308.   Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, overpaid for their Defective Vehicles and did not receive the benefit of their bargain as the result of GM's misconduct. But for GM's deceptive and unfair conduct, these Class members either would not have purchased their Defective Vehicles or would have paid substantially less for them, and the value of their vehicles has greatly diminished as the result of GM's misconduct as alleged herein.

309.   GM's misconduct proximately caused the injuries to Plaintiff and the Class.

310.   GM is liable to Plaintiff and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

311.   Pursuant to FLA. STAT. § 501.201, Plaintiff will serve the Florida Attorney General with a copy of this complaint as Plaintiff seeks injunctive relief.

### GEORGIA

### COUNT I

### VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT

### (GA. CODE ANN. § 10-1-370, *et seq.*)

312.   Plaintiff Jennifer Gearin (referred to in this Count as "Plaintiff") asserts this claim solely on behalf of Class members who are Georgia residents (the "Georgia State Class," referred to in this Count as the "Class").

313.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

314.    The conduct of GM as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, GM's manufacture and sale of vehicles with the ignition switch defect which GM failed to adequately investigate, disclose and remedy, and GM's misrepresentations and omissions regarding the safety and reliability of the Defective Vehicles.

315.    GM's actions as set forth above occurred in the conduct of trade or commerce.

316.    GM's actions impact the public interest because Plaintiff and the Class were injured in exactly the same way as millions of others purchasing, leasing and retaining the Defective Vehicles as a result of GM's generalized course of deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business.

317.    Plaintiff and the Class were injured as a result of GM's conduct.  All the Defective Vehicles are greatly diminished in value by the now-known ignition switch defects, by the now-publicized campaign of deception by GM and by GM's never-ending and piecemeal recall, all of which have combined to impose a significant stigma on the Defective Vehicles that greatly diminishes their value.

318.    Those Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, overpaid for their Defective Vehicles and did not receive the benefit of their bargain as the result of GM's deceptive and unfair conduct, and their vehicles have suffered a diminution in value that was exacerbated by GM's continued course of deceptive acts and omissions.

319.    GM's conduct proximately caused the injuries to Plaintiff and the Class.

320.    GM is liable to Plaintiff and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

321.    Pursuant to GA. CODE ANN. § 10-1-370, Plaintiff will serve the Georgia Attorney General with a copy of this complaint as Plaintiff seeks injunctive relief.

## COUNT II

## VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT

### (GA. CODE ANN. § 10-1-390, *et seq.*)

322. Plaintiff Jennifer Gearin (referred to in this Count as "Plaintiff") asserts this claim solely on behalf of Class members who are Georgia residents (the "Georgia State Class," referred to in this Count as the "Class").

323. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

324. The conduct of GM as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, GM's manufacture and sale of vehicles with a dangerous ignition switch defect which GM failed to adequately investigate, disclose and remedy, and GM's misrepresentations and omissions regarding the safety and reliability of the Defective Vehicles.

325. GM's actions as set forth above occurred in the conduct of trade or commerce.

326. GM's actions impact the public interest because Plaintiff and the Class were injured in exactly the same way as millions of others purchasing and/or leasing and owning Defective Vehicles as a result of GM's generalized course of deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business.

327. Plaintiff and the Class were injured as a result of GM's conduct. The value of the Defective Vehicles has greatly diminished as the result of (i) the fact that the ignition switch defects have become known; (ii) the publicization of GM's campaign of deception; and (iii) the never-ending and piecemeal nature of the recalls, all of which have combined to impose a significant stigma on the Defective Vehicles that has greatly diminished the value of the vehicles.

328. Class members who purchased new or used Defective Vehicles on or after July 5, 2009, overpaid for their Defective Vehicles and did not receive the

benefit of their bargain as the result of the deceptive and unfair conduct of GM, and their vehicles have suffered a diminution in value due to the ignition switch defects that was exacerbated by the deceptive acts and omissions of GM.  Furthermore, had these Class members known of the ignition switch defects, they either would not have purchased their Defective Vehicles or would have paid substantially less for them.

329.   GM's conduct proximately caused injuries to Plaintiff and the Class.

330.   GM is liable to Plaintiff and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

331.   Pursuant to GA. CODE ANN. § 10-1-390, Plaintiff will serve the Georgia Attorney General with a copy of this complaint as Plaintiff seeks injunctive relief.

## ILLINOIS

## COUNT I

### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

#### (815 ILL. COMP. STAT. 505/1, *et seq.* and 720 ILL. COMP. STAT. 295/1A)

332.   Plaintiff Arlene Revak (referred to in this Count as "Plaintiff") brings this claim solely on behalf of Class members who are Illinois residents (the "Illinois State Class," referred to in this Count as the "Class").

333.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

334.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/2 prohibits unfair or deceptive acts or practices in connection with any trade or commerce.  Specifically, the Act prohibits suppliers from representing that their goods are of a particular quality or grade when they are not.

335.   GM is a "person" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILL. COMP. STAT. 505/1(c).

336.   Plaintiff and the Class are "consumers" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILL. COMP. STAT. 505/1(e).

337.   The unfair and deceptive conduct of GM caused damages to Plaintiff and the Class as alleged.  The value of all Class members' cars has diminished as a result of GM's deceptive and unfair practices in connection with the ignition switch defects, its now-publicized campaign of deception and its never-ending and piecemeal recall as detailed herein.

338.   Plaintiff and Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, did not receive the benefit of their bargain as the result of GM's deceptive and unfair practices.  Had they been aware of the ignition switch defects, these Class members would either not have purchased their Defective Vehicles at all or would have paid substantially less for them.

339.   As a result of the foregoing wrongful conduct of GM, Plaintiff and the Class have been damaged in an amount to be proven at trial, including, but not limited to, actual damages, court costs, and reasonable attorneys' fees under 815 ILL. COMP. STAT. 505/1, *et seq.*

### COUNT II

### VIOLATION OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT

### (815 ILL. COMP. STAT. 510/1, *et. seq.* and 720 ILL. COMP. STAT. 295/1A)

340.   Plaintiff Arlene Revak (referred to in this Count as "Plaintiff") brings this claim solely on behalf of Class members who are Illinois residents (the "Illinois State Class," referred to in this Count as the "Class").

341.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

342.   815 ILL. COMP. STAT. 510/2 provides that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person:  "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (5) represents that goods or services have sponsorship, approval, characteristics

1    ingredients, uses, benefits, or quantities that they do not have or that a person has a

2    sponsorship, approval, status, affiliation, or connection that he or she does not have; …

3    (7) represents that goods or services are of a particular standard, quality, or grade or

4    that goods are a particular style or model, if they are of another; … (9) advertises

5    goods or services with intent not to sell them as advertised; … [or] (12) engages in any

6    other conduct which similarly creates a likelihood of confusion or misunderstanding."

7         343.   GM is a "person" within the meaning of 815 ILL. COMP. STAT. 510/1(5).

8         344.   The vehicles sold to Plaintiff and Class members who purchased or

9    leased new or used Defective Vehicles on or after July 5, 2009, were not of the

10   particular sponsorship, approval, characteristics, ingredients, uses, benefits, or

11   qualities represented by GM.  These same vehicles were not of the particular

12   standard, quality, and/or grade represented by GM.

13        345.   The conduct of GM was knowing and/or intentional and/or with malice

14   and/or demonstrated a complete lack of care and/or reckless and/or was in conscious

15   disregard for the rights of Plaintiff and the Class.

16        346.   As a result of the foregoing wrongful conduct of GM, Plaintiff and the

17   Class have been damaged in an amount to be proven at trial, and seek actual and

18   punitive damages, equitable relief, reasonable attorneys' fees, and other available and

19   appropriate relief.

20   **MARYLAND**

21   **VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**

22   **(MD. CODE COM. LAW § 13-101, *et seq.*)**

23        347.   Plaintiff George Mathis (referred to in this Count as "Plaintiff") brings

24   this claim solely on behalf of Class members who are Maryland residents (the

25   "Maryland State Class," referred to in this Count as the "Class").

26        348.   Plaintiff realleges and incorporates by reference all paragraphs as though

27   fully set forth herein.

28

349.   Plaintiff and GM are "persons" within the meaning of the Maryland Consumer Protection Act (the "Act") for all purposes therein.

350.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of the Defective Vehicles.

351.   As a direct and proximate result of their unfair and deceptive business practices, and violations of the Act detailed above, GM caused actual damages, injuries, and losses to Plaintiff and the Class and, if not stopped, will continue to harm Plaintiff and the Class.  Plaintiff and the Class currently own or lease Defective Vehicles that are defective and inherently unsafe.  The ignition switch defects have caused the value of the Defective Vehicles to plummet, and the diminishment was exacerbated by the publicization of GM's campaign of concealment and the never-ending and piecemeal nature of the recalls, which have combined to attach a significant stigma to the Defective Vehicles.

352.   Those Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, did not receive the benefit of their bargain as the result of GM's deceptive and unfair acts and practices.  Had those Class members been aware of the ignition switch defects, they would have either not purchased their Defective Vehicles at all or would have paid substantially less for them, and their value is now greatly diminished as the result of GM's misconduct.

353.   Plaintiff and the Class are entitled to all damages permitted by MD. CODE COM. LAW § 13-101, *et seq.*, including actual damages sustained, civil penalties, attorneys' fees, and costs of this action.  Also, the State of Maryland is entitled to statutory penalties from GM for each violation of the Act.

010440-11  689939 V1

# MASSACHUSETTS

## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT

### (MASS. GEN. LAWS ANN. ch. 93A)

354.   Plaintiff Mary Dias (referred to in this Count as "Plaintiff") will bring this claim solely on behalf of Class members who are Massachusetts residents (the "Massachusetts State Class," referred to in this Count as the "Class").  As of now this Count is notice only that a claim will be asserted in an Amended Complaint.

355.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

356.   The conduct of GM as set forth herein constitutes unfair and deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, MASS. GEN. LAWS. ANN. ch. 93A, including, but not limited to, GM's manufacture and sale of vehicles with the ignition switch defects, which GM failed to adequately investigate, disclose and remedy, and GM's misrepresentations and omissions regarding the safety and reliability of the Defective Vehicles, which misrepresentations and omissions possessed the tendency to deceive.

357.   GM engages in the conduct of trade or commerce and the misconduct alleged herein occurred in trade or commerce.

358.   In satisfaction of MASS. GEN. LAWS ANN. ch. 93A, § 9(3), Plaintiff has made a demand on GM and will wait more than 30 days prior to the filing of an Amended Complaint by letter sent by Plaintiff and the Class.  The letter asserts that rights of consumers as claimants have been violated, describes the unfair and deceptive acts committed by GM, and specifies the injuries that Plaintiff and the Class have suffered and the relief they seek.

359.   As a result of GM's unfair and deceptive acts or practices in violation of the Massachusetts Consumer Protection Act, MASS. GEN. LAWS. ANN. ch. 93A, Plaintiff and the Class suffered injury as described herein.  The value of Class

010440-11  689939 V1

members' vehicles has greatly diminished as the result of the publicization of GM's concealment of the ignition switch defect and the never-ending and piecemeal nature of the recalls which have combined to impose a great stigma on the Defective Vehicles that has greatly diminished their value.

360.   The Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, overpaid for their Defective Vehicles and did not receive the benefit of their bargain as the result of the misconduct of GM, and their vehicles have suffered a diminution in value that was exacerbated by perpetuation of the campaign of deception and the botched handling of the recalls as described above.

361.   Plaintiff and the Class are therefore entitled to actual damages, or $25 per Class member, whichever is greater.

## MICHIGAN

## VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### (MICH. COMP. LAWS. ANN. § 445.901, *et seq.*)

362.   This claim is brought by Plaintiff Sheree Anderson (referred to in this Count as "Plaintiff") on behalf of a Class of Michigan residents who leased or owned one or more of the Defective Vehicles on or after July 5, 2009.

363.   Plaintiff and the Class reallege and incorporate by reference each paragraph as though fully set forth at length herein.

364.   GM and Plaintiff are each "persons" under MICH. COMP. LAWS. ANN. § 445.902(d).

365.   GM committed unfair, unconscionable or deceptive methods, acts, or practices in the conduct of "trade and commerce" within the meaning of MICH. COMP. LAWS. ANN. § 445.902(g),

366.   The Michigan Consumer Protection Act ("MCPA") makes unlawful any "unfair, unconscionable, or deceptive methods, acts or practices," as more specifically defined in the MCPA.  MICH. COMP. LAWS. ANN. § 445.903(1).  GM has engaged in

010440-11  689939 V1

unfair, unconscionable, and deceptive methods, acts and practices in violation of the MCPA.

367.   GM violated the MCPA, with respect to *all* Class members, by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."  MICH. COMP. LAWS. ANN. § 445.903(s).

368.   As alleged above, GM knew of the ignition switch defect, while Plaintiff and the Class were deceived by the omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

369.   With respect to all Class members who purchased or leased new or used Defective Vehicles from July 5, 2009, to the present, GM also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is."  MICH. COMP. LAWS. ANN. § 405.903(bb).  For example, GM represented that the Defective Vehicles were safe such that reasonable people believed the represented or suggested state of affairs to be true; namely, that the Defective Vehicles were safe.

370.   With respect to all Class members who purchased or leased new or used Defective Vehicles from July 5, 2009, to the present, GM also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  MICH. COMP. LAWS. ANN. § 405.903(cc).  GM represented that the Defective Vehicles were safe, which made it even more incumbent on GM to reveal the material fact of the ignition switch defects.

371.   GM's acts and practices were unfair and unconscionable, because its acts and practices, including the manufacture and sale of vehicles with an ignition switch defect after July 5, 2009, and its failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and

because the harm GM caused Defective Vehicle owners greatly outweighs any
benefits associated with those practices.

372.   While GM knew of the ignition switch defects from the very date of its
inception, July 5, 2009, it continued to design, manufacture, and market the Defective
Vehicles until at least 2011.

373.   All the while, GM knew that the vehicles had an unreasonable
propensity to shut down during ordinary driving conditions, leading to an
unreasonable risk of serious bodily injury or death.

374.   Plaintiff and the Class have suffered an injury, including the loss of
money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.
GM failed to inform NHTSA, and therefore failed to inform consumers, that the
Defective Vehicles had a defective ignition switch that could lead to injury and death.
Had Plaintiff and those members of the Class who purchased Defective Vehicles after
July 5, 2009, known this, they would either not have purchased their vehicles at all or
would have paid less for them.  The value of their Defective Vehicles has diminished
as a result of GM's concealment of and failure to disclose and remedy the ignition
switch defects.  Plaintiff and the Class have therefore suffered a "loss" because of the
violations of the MCPA complained of herein.

375.   Those Class members who purchased Defective Vehicles from Old GM,
or acquired them used prior to the existence of GM, also suffered injury, including the
loss of money or property, as a result of  unfair, unlawful, unconscionable and/or
deceptive practices.  GM failed to inform NHTSA, and therefore failed to inform
consumers, that the Defective Vehicles had a defective ignition switch that could lead
to injury and death.  The value of their Defective Vehicles has diminished as a result
of GM's concealment of and failure to disclose and remedy the ignition switch
defects, and Plaintiff and the Class hold vehicles whose value has diminished as a
result of  violations of the MCPA.  GM's long period of fraudulent concealment of the
defect in violation of the MCPA has so tarnished the Defective Vehicles as to cause

massive diminishment in their market value.  Plaintiff and the Class have therefore
suffered a "loss" because of the violations of the MCPA complained of herein

376.   Plaintiff requests that this Court:  enjoin GM from continuing its unfair,
unlawful, and/or deceptive practices; provide to Plaintiff and each Class member
either their actual damages as the result of unfair, unlawful, and deceptive trade
practices, or $250 per Class member, whichever is higher; award reasonable
attorneys' fees; and provide other appropriate relief under MICH. COMP. LAWS. ANN.
§ 445.911, including an injunction requiring GM to *fully* remedy the ignition switch
defects.

377.   Plaintiff acknowledges that, on its face, the MCPA purports to allow
individuals (but not Class members) the ability to recover a penalty of $250 per
person if that amount is greater than their actual damages.  After the United States
Supreme Court's decision in *Shady Grove Orthopedic Ass'n, P.A. v. Allstate Ins. Co.*,
589 U.S. 393 (2010), however, any such prohibitions imposed in class actions (but
not in individual actions) are trumped and superseded by Fed. R. Civ. P. 23, which
imposes no such restrictions.

## NEW JERSEY

## VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT

### (N.J. STAT. ANN. § 56:8-1, *et seq.*)

378.   Plaintiff Michael Amezquita (referred to in this Count as "Plaintiff")
brings this claim solely on behalf of Class members who reside in New Jersey (the
"New Jersey State Class," referred to in this Count as the "Class").

379.   Plaintiff realleges and incorporates by reference all paragraphs as though
fully set forth herein.

380.   The New Jersey Consumer Fraud Act ("CFA") makes unlawful "[t]he
act, use or employment by any person of any unconscionable commercial practice,
deception, fraud, false pretense, false promise, misrepresentation, or the knowing
concealment, suppression or omission of any material fact with the intent that others

010440-11  689939 V1

1   rely upon such concealment, suppression or omission, in connection with the sale or

2   advertisement of any merchandise or real estate, or with the subsequent performance

3   of such person as aforesaid, whether or not any person has in fact been misled,

4   deceived or damaged thereby…."  N.J. STAT. ANN. § 56:8-2.

5       381.   GM is, a person within the meaning of the CFA.  N.J. STAT. ANN.

6   § 56:8-1(d).

7       382.   In the course of GM's business, it knowingly failed to disclose and

8   actively concealed the dangerous risks of the ignition switch defect in the Defective

9   Vehicles as described above.  This was an unlawful practice in that GM represented

10  that the Defective Vehicles have characteristics, uses, benefits, and qualities which

11  they do not have; represented that the Defective Vehicles are of a particular standard

12  and quality when they are not; and advertised the Defective Vehicles with the intent

13  not to sell them as advertised.  GM knew or should have known that its conduct

14  violated the CFA.

15      383.   With respect to those Class members who purchased or leased new or

16  used GM vehicles on or after July 5, 2009, GM engaged in an unlawful practice under

17  the CFA when it failed to disclose material information concerning the Defective

18  Vehicles which it knew at the time of the sale.  GM deliberately withheld the

19  information about the vehicles' propensity to shut down during ordinary driving

20  conditions so that consumers would purchase its vehicles and to induce the consumer

21  to enter into a transaction.

22      384.   GM's unlawful practices caused substantial injury to Class members.  As

23  a result of the publicization of GM's campaign of deception and the never-ending and

24  piecemeal nature of the recalls, Class members' vehicles are plagued with a stigma

25  that has radically diminished their value.

26      385.   Had Class members who purchased or leased new or used GM vehicles

27  on or after July 5, 2009, known that their Defective Vehicles had these serious safety

28  defects, they would either not have purchased their Defective Vehicles or would have

1    paid substantially less for them.  And the value of their vehicles has been greatly

2    diminished as the result of GM's deceptive, unfair and unlawful conduct.

3         386.    Plaintiff and the Class have therefore suffered ascertainable loss of

4    money or property caused by GM's unlawful practices.

5         387.    Plaintiff and the Class are entitled to recover legal and/or equitable relief,

6    treble damages, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19.

7         388.    Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiff will mail a copy of the

8    complaint to New Jersey's Attorney General within ten (10) days of filing it with the

9    Court.

10                                    **NEW MEXICO**

11    **VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT**

12                     **(N.M. STAT. ANN. §§ 57-12-1, *et seq.*)**

13        389.    Plaintiff Lorraine De Vargas (referred to in this Count as "Plaintiff")

14    brings this claim solely on behalf of Class members residing in New Mexico (the

15    "New Mexico State Class," referred to in this Count as the "Class").

16        390.    Plaintiff realleges and incorporates by reference all paragraphs as though

17    fully set forth herein.

18        391.    GM, Plaintiff and Class members are "person[s]" under the New Mexico

19    Unfair Trade Practices Act ("New Mexico UT PA"), N.M. STAT. ANN. § 57-12-2.

20        392.    GM's actions as set forth herein occurred in the conduct of trade or

21    commerce as defined under N.M. STAT. ANN. § 57-12-2.

22        393.    GM's acts and omissions described herein constitute unfair or deceptive

23    acts or practices under N.M. STAT. ANN. § 57-12-2.  Specifically, by failing to

24    disclose and actively concealing the dangerous ignition switch defect in Defective

25    Vehicles, Old GM and GM engaged in deceptive business practices prohibited by the

26    New Mexico UT PA, including:  (1) representing that the Defective Vehicles have

27    characteristics and benefits, which they do not have; (2) representing that the

28    Defective Vehicles are of a particular standard, quality, and grade when they are not;

(3) using exaggeration as to a material fact and by doing so deceiving or tending to deceive; (4) failing to state a material fact and by doing so deceiving or tending to deceive; and (5) representing that a transaction involving the Defective Vehicles confers or involves rights, remedies, and obligations which it does not.  *See* N.M. STAT. ANN. § 57-12-2.

394.    As alleged herein, GM made material statements about the safety and reliability of the Defective Vehicles that were either false or misleading.  Each of these statements contributed to the deceptive context of GM's unlawful advertising and representations as a whole.

395.    As described herein, both GM knew of the safety ignition switch defect, while the Class was deceived by GM's omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

396.    While GM knew of the ignition switch defects from the date of its inception in 2009, it continued to manufacture, and market the Defective Vehicles until at least 2011.

397.    All the while, GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

398.    GM's deceptive practices were likely to and did in fact deceive reasonable consumers, including Class members, about the true safety and reliability of the Defective Vehicles.  Both GM nevertheless failed to warn Class members about these inherent dangers despite having a duty to do so.

399.    GM took advantage of the lack of knowledge, ability, experience, and capacity of the Class members to a grossly unfair degree.  With respect to Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, GM's actions resulted in a gross disparity between the value received and the

price paid by those Class members.  GM's actions were unconscionable within the meaning of § 57-12-2(E) of the New Mexico UT PA.

400.    GM's acts and practices were unfair and unconscionable, because its acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and its failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and because the harm GM caused consumers greatly outweighs any benefits associated with those practices. GM's conduct has also impaired competition within the automotive vehicles market and has prevented the Class from making fully informed decisions about whether to lease, purchase, and/or retain the Defective Vehicles.

401.    Class members were actually harmed as a result of GM's violation of the New Mexico UT PA.  The Defective Vehicles of Plaintiff and all Class members suffer from diminished value caused by the publicization of GM's campaign of deception, and the never-ending and piecemeal nature of the recalls, which has combined to impose a significant stigma on the Defective Vehicles and greatly diminished their value.

402.    Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value as the result of GM's deceptive, unfair and unconscionable conduct as set forth above.

403.    Class members also seek punitive damages against GM because its conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith.  GM fraudulently and willfully misrepresented the safety and reliability of the Defective Vehicles, deceived Class members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Class members were safe.  Because GM's conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith, it warrants punitive damages.

010440-11 689939 V1

404.   Because GM's unconscionable, willful conduct caused actual harm to Class members, the Class seeks recovery of actual damages or $100 per Class member, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, under N.M. STAT. ANN. § 57-12-10.

## NEW YORK

## DECEPTIVE ACTS OR PRACTICES

### (N.Y. GEN. BUS. LAW § 349 AND 350)

405.   Plaintiff Dawn Tefft (referred to in this Count as "Plaintiff") brings this claim solely on behalf of Class members residing in New York (the "New York State Class," referred to in this Count as the "Class").

406.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

407.   New York General Business Law ("G.B.L."), N.Y. GEN. BUS. LAW § 349, makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

408.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous ignition switch defect in the Defective Vehicles as described above.  Accordingly, GM made untrue, deceptive, or misleading representations of material facts and omitted and/or concealed material facts.

409.   As alleged herein, GM made numerous material statements about the safety and reliability of the Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of both GM's unlawful advertising and representations as a whole.

410.   As described herein, GM knew of the safety ignition switch defect, while Plaintiff and the Class were deceived by GM's omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

411.   While GM knew of the ignition switch defects from the date of its inception in 2009, it continued to design, manufacture, and market the Defective Vehicles until at least 2011.

412.   All the while, GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

413.   Whether or not a vehicle's ignition switch will malfunction, (a) causing the car's engine and electrical system to shut off, (b) disabling the power steering and power brakes, and (c) causing the non-deployment of the vehicle's airbags in a crash, are facts that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.  When Class members bought or leased a new or used Defective Vehicle for personal, family, or household purposes on or after July 5, 2009, they reasonably expected the vehicle would feature a non-defective, safe ignition switch.

414.   GM's deceptive practices were likely to and did in fact deceive reasonable consumers, including Class members, about the true safety and reliability of the Defective Vehicles.  GM nevertheless failed to warn Class members about these inherent dangers despite having a duty to do so.

415.   GM's acts and practices were unfair and unconscionable, because its acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and its failure to disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and because the harm GM caused consumers greatly outweighs any benefits associated with those practices. GM's conduct has also impaired competition within the automotive vehicles market and has prevented the Class from making fully informed decisions about whether to lease, purchase, and/or retain the Defective Vehicles.

416.   GM's deceptive and unfair acts and practices significantly impact the public as actual consumers of the Defective Vehicles, which pose an unreasonable risk of death or serious bodily injury to Class members, passengers, other motorists,

pedestrians, and the public at large, because they are susceptible to ignition switch malfunction causing the car's engine and electrical system to shut off, disabling the power steering and power brakes and causing the non-deployment of the vehicle's airbags in the event of a crash.  Public interest is also affected because Class members were injured in the same way as millions of others purchasing and/or leasing Defective Vehicles as a result of both GM's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business.

417.   Plaintiff and Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, suffered injury caused by GM's  violation of the G.B.L.  Class members overpaid for their Defective Vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.  Plaintiff suffered additional damages, as her Defective Vehicle was totaled as a result of the ignition switch defects on October 24, 2013.

418.   All Class members who currently own (or recently sold) their Defective Vehicles also suffered injury caused by GM's violations of the G.B.L.  Now that GM's campaign of deception has been exposed, and given the never-ending and piecemeal nature of the recalls, great stigma has attached to the Defective Vehicles and their value is therefore greatly diminished as the result of GM's misconduct.

419.   Class members also seek punitive damages against GM because of its egregious conduct.  GM egregiously misrepresented the safety and reliability of the Defective Vehicles, deceived Class members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Class members were safe.  GM's egregious conduct warrants punitive damages.

420.   Because GM's willful and knowing conduct caused injury to Class members, the Class seeks recovery of actual damages or $50, whichever is greater,

discretionary treble damages up to $1,000, punitive damages, and reasonable

attorneys' fees, under N.Y. GEN. BUS. LAW § 349.

## OHIO

## COUNT I

## VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT

### (OHIO REV. CODE ANN. § 1345.01, *et seq.*)

421.    Plaintiff Bonnie Taylor (referred to in this Count as "Plaintiff") brings

this claim solely on behalf of Class members who reside in Ohio (the "Ohio State

Class," referred to in this Count as the "Class").

422.    Plaintiff realleges and incorporates by reference all paragraphs as though

fully set forth herein.

423.    The Ohio Consumer Protection Act, OHIO REV. CODE § 1345.02,

prohibits unfair or deceptive acts or practices.  Specifically, the Act prohibits

suppliers from representing that goods have characteristics or uses or benefits which

they do not have.  The Act also prohibits suppliers from representing that their goods

are of a particular quality or grade they are not.

424.    GM is a "supplier" as that term is defined in the Ohio Consumer

Protection Act, OHIO REV. CODE § 1345.01(C).

425.    Plaintiff and the Class are "consumers" as that term is defined in the

Ohio Consumer Protection Act, OHIO REV. CODE § 1345.01(D).

426.    The conduct of GM alleged above constitutes unfair and/or deceptive

practices in violation of OHIO REV. CODE § 1345.02 because GM represented through

advertising and other marketing communications that the Defective Vehicles it sold

on or after July 5, 2009, were new and free from defects and could be driven safely in

normal operation.  Instead, the vehicles were not of the standard, quality, or grade of

new vehicles.

427.    GM's conduct caused damages to Plaintiff and the Class as alleged.

010440-11 689939 V1

428.   The value of all Class members' cars has been diminished as the result of GM's now-publicized campaign of deception, and the never-ending and piecemeal nature of the recalls, which have combined to impose a value-reducing stigma on the Defective Vehicles.

429.   Those Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, overpaid for their vehicles and did not receive the benefit of their bargain as the result of GM's misconduct.  But for that misconduct, these Class members would either not have purchased their Defective Vehicles at all, or would have paid substantially less for them.

430.   Plaintiff and the Class specifically do not allege herein a claim for violation of OHIO REV. CODE § 1345.72.

431.   As a result of the foregoing wrongful conduct of GM, Plaintiff and the Class have been damaged in an amount to be proven at trial, including, but not limited to, actual and statutory damages, treble damages, court costs, and reasonable attorneys' fees, pursuant to OHIO REV. CODE § 1345.09, *et seq.*

## COUNT II

## VIOLATION OF OHIO DECEPTIVE TRADE PRACTICES ACT
### (OHIO REV. CODE ANN. § 4165.01, *et seq.*)

432.   Plaintiff Bonnie Taylor (referred to in this Count as "Plaintiff") brings this claim solely on behalf of Class members who reside in Ohio (the "Ohio State Class," referred to in this Count as the "Class").

433.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

434.   OHIO REV. CODE § 4165.02(A) provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person does any of the following:  "(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (7) Represents that goods or services have sponsorship,

approval, characteristics, ingredients, uses, benefits, or quantities that they do not

have or that a person has a sponsorship, approval, status, affiliation, or connection

that the person does not have; … (9) Represents that goods or services are of a

particular standard, quality, or grade, or that goods are of a particular style or model,

if they are of another; … [or] (11) Advertises goods or services with intent not to sell

them as advertised."

435.   GM is a "person" within the meaning of OHIO REV. CODE § 4165.01(D).

436.   The vehicles sold to those Class members who purchased or leased new

or used Defective Vehicles on or after July 5, 2009, were not of the particular

sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities

represented by GM.  Those same vehicles were not of the particular standard, quality,

and/or grade represented by GM.

437.   GM also made false or misleading statements of fact concerning the

Defective Vehicles – i.e., that such vehicles were suitable for ordinary use – when

GM, in fact, knew that they were defective and not suitable for ordinary use.

438.   GM's deceptive trade practices caused damages to Plaintiff and the

Class, as alleged above.

439.   GM's conduct was knowing and/or intentional and/or with malice and/or

demonstrated a complete lack of care and/or reckless and/or was in conscious

disregard for the rights of Plaintiff and the Class.

440.   As a result of the foregoing wrongful conduct of GM, Plaintiff and the

Class have been damaged in an amount to be proven at trial, including, but not limited

to, actual and punitive damages, equitable relief and reasonable attorneys' fees.

010440-11  689939 V1

# OKLAHOMA

## VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT

### (OCPA, OKLA. STAT. TIT. 15 § 751, *et seq.*)

441. Plaintiff Jerrile Gordon (referred to in this Count as "Plaintiff") brings this claim solely on behalf of Class members residing in Oklahoma (the "Oklahoma State Class," referred to in this Count as the "Class").

442. Plaintiff realleges and incorporates by reference each paragraph as if set forth fully herein.

443. Class members are "persons" under the Oklahoma Consumer Protection Act ("OCPA"), OKLA. STAT. TIT. 15 § 752.

444. The sale of the Defective Vehicles to Class members was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15 § 752, and GM's actions as set forth herein occurred in the conduct of trade or commerce.

445. GM engaged in deceptive and unfair trade practices prohibited by the OCPA, including, but not limited to, making a false or misleading representations to Class members, knowingly or with reason to know, as to the approval or certification of the Defective Vehicles; making a false representation to Class members, knowingly or with reason to know, as to the characteristics or benefits of the Defective Vehicles; falsely representing to Class members, knowingly or with reason to know, that the Defective Vehicles were of a particular standard when they were of another; and advertising to Class members, knowingly or with reason to know, the Defective Vehicles with intent not to sell them as advertised. *See* OKLA. STAT. TIT. 15, § 753. GM is directly liable for engaging in deceptive and unfair trade practices prohibited by the OCPA.

446. As alleged herein, GM made material statements about the safety and reliability of the Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of both GM's unlawful advertising and representations as a whole.

447.   GM also failed to disclose and actively concealed the dangerous ignition switch defect in the Defective Vehicles.  GM knew of the ignition switch defect, while the Class was deceived by GM's omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

448.   While GM knew of the ignition switch defects from the date of its inception in 2009, it continued to design, manufacture, and market the Defective Vehicles at least until 2011.

449.   All the while, GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

450.   GM nevertheless failed to warn Class members about these inherent dangers despite having a duty to do so.  Old GM's deceptive practices were likely to and did in fact deceive reasonable consumers, including Class members, about the true safety and reliability of the Defective Vehicles.

451.   GM's deceptive and unfair acts and practices significantly impact the public since the Defective Vehicles pose an unreasonable risk of death or serious bodily injury to Class members, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to ignition switch malfunction causing the car's engine and electrical system to shut off, disabling the power steering and power brakes and causing the non-deployment of the vehicle's airbags in the event of a crash.  Public interest is also affected because Class members were injured in exactly the same way as millions of others purchasing and/or leasing Defective Vehicles as a result of both GM's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business.

452.   The Class suffered injury-in-fact caused by GM's violation of the OCPA.  As a result of the publicization of GM's campaign of deceit and the never-

1   ending and piecemeal nature of the recall, great stigma has attached to the Defective

2   Vehicles, greatly diminishing their value.

3       453.   Class members who purchased or leased new or used Defective Vehicles

4   on or after July 5, 2009, overpaid for their Defective Vehicles and did not receive the

5   benefit of their bargain, and their vehicles have suffered a diminution in value as set

6   forth above.

7       454.   GM's acts and practices were unfair and unconscionable, because its acts

8   and practices, including the manufacture and sale of vehicles with an ignition switch

9   defect, and GM's failure to adequately disclose the defect to NHTSA and the Class

10  and timely implement a remedy, offend established public policy, and because the

11  harm GM caused consumers greatly outweighs any benefits associated with those

12  practices.  GM's conduct has also impaired competition within the automotive

13  vehicles market and has prevented Plaintiff and the Class from making fully informed

14  decisions about whether to lease, purchase, and/or retain Defective Vehicles.

15      455.   Because GM's unconscionable conduct caused injury to Class members,

16  the Class seeks recovery of actual damages, discretionary damages up to $2,000 per

17  violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15 § 761.1.

18                              **TEXAS**

19  **VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**

20              **(TEX. BUS. & COM. CODE § 17.41, *et seq.*)**

21      456.   Plaintiff Keisha Hunter (referred to in this Count as "Plaintiff") brings

22  this claim solely on behalf of Class members who reside in Texas (the "Texas State

23  Class," referred to in this Count as the "Class").

24      457.   Plaintiff realleges and incorporates by reference all paragraphs as though

25  fully set forth herein.

26      458.   The conduct of GM described above constitutes false, misleading, or

27  deceptive acts or practices under the Texas Deceptive Trade Practices – Consumer

28  Protection Act, TEX. BUS. & COM. CODE § 17.41, *et seq.* ("Texas DTPA").

459.   By failing to disclose and actively concealing the dangerous ignition switch defects in the Defective Vehicles, GM engaged in deceptive business practices prohibited by the Texas DTPA, including:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; (4) representing that a transaction involving the Defective Vehicles confers or involves rights, remedies, and obligations which it does not; and (5) failing to disclose information concerning the Defective Vehicles with the intent to induce consumers to purchase or lease the Defective Vehicles.

460.   As alleged above, GM made numerous material statements about the safety and reliability of the Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of GM's unlawful advertising and representations as a whole.

461.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of the Defective Vehicles.

462.   In purchasing, leasing, and/or continuing to use their vehicles, Plaintiff and the Class relied on the misrepresentations and/or omissions of GM with respect to the safety and reliability of the vehicles.  GM's representations turned out not to be true because the vehicles can unexpectedly and dangerously shut down during ordinary driving conditions.  Had Plaintiff and the Class known this they would not have purchased or leased their Defective Vehicles and/or paid as much for them, and they would not have retained and continued to use them.

463.   GM is therefore liable to Plaintiff and the Class for damages under §§ 17.50(a)(2) and 17.50(b) of the Texas DTPA.  These same actions also constitute an unconscionable action or course of action under § 17.50(a)(3) of the Texas DTPA.

464.    Plaintiff and the Class sustained damages as a result of GM's unlawful acts as discussed above and are, therefore, entitled to damages and other relief provided for under § 17.50(b) of the Texas DTPA.  Because this conduct was committed knowingly and/or intentionally, Plaintiff and the Class are entitled to treble damages.

465.    For those Class members who purchased new Defective Vehicles on or after July 5, 2009, who wish to rescind their purchases, they are entitled under § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

466.    Plaintiff and the Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

## WISCONSIN

### VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT

### (WIS. STAT. § 110.18)

467.    Plaintiff Les Rouse (referred to in this Count as "Plaintiff") brings this claim solely on behalf of Class members who reside in Wisconsin (the "Wisconsin State Class," referred to in this Count as the "Class").

468.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

469.    GM's above-described acts and omissions constitute false, misleading, or deceptive acts or practices under the Wisconsin Deceptive Trade Practices Act § 110.18 ("Wisconsin DTPA").

470.    By failing to disclose and misrepresenting the risks posed by defective ignition switches in the Defective Vehicles, GM engaged in deceptive business practices prohibited by the Wisconsin DTPA, including:  (1) representing that the Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles are of a particular standard, quality,

and grade when they are not; (3) advertising the Defective Vehicles with the intent not to sell them as advertised; (4) representing that a transaction involving the Defective Vehicles confers or involves rights, remedies, and obligations which it does not; and (5) representing that the subject of a transaction involving the Defective Vehicles has been supplied in accordance with a previous representation when it has not.

471.   As alleged above, GM made numerous material statements about the safety and reliability of the Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of GM's unlawful advertising and representations as a whole.

472.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of the Defective Vehicles.

473.   In purchasing or leasing their vehicles, and in retaining and continuing to operate them, Plaintiff and the Class relied on the misrepresentations and/or omissions of GM with respect to the safety and reliability of the vehicles.  GM's representations turned out not to be true because the vehicles can unexpectedly and dangerously shut down during ordinary driving conditions.  Had Plaintiff and the Class known this they would not have purchased or leased their Defective Vehicles and/or paid as much for them, and/or they would not have retained and continued to operate them.

474.   All Class members suffered harm as the result of GM's deceptive and unfair practices.  As a result of the publicization of GM's campaign of deception and the never-ending and piecemeal nature of the recalls, great stigma now attaches to the Defective Vehicles and their value is greatly diminished.

475.   Class members who purchased or leased new or used Defective Vehicles on or after July 5, 2009, overpaid for their vehicles and did not receive the benefit of their bargain as a result of GM's unfair and deceptive practices as alleged above.  The value of their vehicles is greatly diminished as a result of GM's misconduct.

476.   Plaintiff and the Class sustained damages as a result of GM's unlawful acts and are, therefore, entitled to damages and other relief provided for under § 110.18(11)(b)(2) of the Wisconsin DTPA.  Because GM's conduct was committed knowingly and/or intentionally, Plaintiff and the Class are entitled to treble damages.

477.   Plaintiff and the Class also seek court costs and attorneys' fees under § 110.18(11)(b)(2) of the Wisconsin DTPA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf all others similarly situated, respectfully request that this Court enter a judgment against GM and in favor of Plaintiffs and the Class, and grant the following relief:

A.     Determine that this action may be maintained as a class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class Representatives and Plaintiffs' chosen counsel as Class Counsel;

B.     Declare, adjudge, and decree the conduct of GM as alleged herein to be unlawful, unfair, and/or deceptive, and enjoin any such future conduct;

C.     Award Plaintiffs and Class members actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

D.     Award Plaintiffs and the Class members exemplary damages in such amount as proven;

E.     Award damages and other remedies as allowed by the laws of the States as alleged in the State Class counts;

F.     Award Plaintiffs and the Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

G.     Grant an injunction ordering GM to implement an effective remedy for all vehicles with defective ignition switches, including those not yet subject to recall; and

H.     Award Plaintiffs and the Class members such other further and different
relief as the case may require or as determined to be just, equitable, and proper by this
Court.

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on the legal claims, as set forth herein.

DATED:  May 12, 2014                    HAGENS BERMAN SOBOL SHAPIRO LLP

By:_____*/s/ Elaine T. Byszewski*_____
     Elaine T. Byszewski, Cal. Bar No. 222304
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150
Facsimile:  (213) 330-7152
E-mail:  elaine@hbsslaw.com

Steve W. Berman (*pro hac vice pending*)
Andrew M. Volk (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-mail:  steve@hbsslaw.com
E-mail:  andrew@hbsslaw.com

Robert B. Carey (*pro hac vice pending*)
Rachel E. Freeman (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-mail:  rob@hbsslaw.com
E-mail:  michellak@hbsslaw.com

010440-11  689939 V1

1                     Mark P. Robinson, Jr. (SBN 054426)

2                     Kevin F. Calcagnie (SBN 108994)
Scot D. Wilson (SBN 223367)

3                     ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.

4                     19 Corporate Plaza
Newport Beach, CA  92660

5                     Telephone:  (949) 720-1288
Facsimile:  (949) 720-1292

6                     E-mail:  mrobinson@rcrsd.com

7

8                     Jon C. Cuneo (*pro hac vice pending*)
CUNEO GILBERT & LADUCA LLP

9                     507 C Street NE
Washington, DC  20002

10                    Telephone:  (202) 587-5065
Facsimile:  (202) 789-1813

11                    E-mail:  JonC@cuneolaw.com

12                    *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Elaine T. Byszewski (SBN 222304)
    HAGENS BERMAN SOBOL SHAPIRO LLP
2   301 North Lake Avenue, Suite 203
    Pasadena, CA  91101
3   Telephone:  (213) 330-7150
    Facsimile:  (213) 330-7152
4   E-mail: elaine@hbsslaw.com

5   Steve W. Berman (*pro hac vice pending*)
    Andrew M. Volk (*pro hac vice pending*)
6   HAGENS BERMAN SOBOL SHAPIRO LLP
    1918 Eighth Avenue, Suite 3300
7   Seattle, WA  98101
    Telephone:  (206) 623-7292
8   Facsimile:  (206) 623-0594
    E-mail:  steve@hbsslaw.com
9   E-mail:  andrew@hbsslaw.com

10  Mark P. Robinson, Jr. (SBN 054426)
    Kevin F. Calcagnie (SBN 108994)
11  Scot D. Wilson (SBN 223367)
    ROBINSON CALCAGNIE ROBINSON
12  SHAPIRO DAVIS, INC.
    19 Corporate Plaza
13  Newport Beach, CA  92660
    Telephone:  (949) 720-1288
14  Facsimile:  (949) 720-1292
    mrobinson@rcrsd.com

15  *Attorneys for Plaintiffs*

16              UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18  DEANNA DINCO, DAVID BUTLER,          Case No.: 2:14-cv-02424
    CURTIS BLINSMON, AARON
19  HENDERSON, GRACE BELFORD,            **CLASS ACTION**
    NATHAN TERRY, MICHAEL PESCE,
20  RHONDA HASKINS, JENNIFER
    GEARIN, ARLENE REVAK, GEORGE         **DECLARATION OF DEANNA**
21  MATHIS, MARY DIAS, SHEREE            **DINCO**
    ANDERSON, MICHAEL AMEZQUITA,
22  LORRAINE DE VARGAS, DAWN
    TEFFT, BONNIE TAYLOR, JERRILE
23  GORDON, KEISHA HUNTER and LES
    ROUSE, individually and on behalf of all
24  others similarly situated,

25                      Plaintiffs,

26          v.

27  GENERAL MOTORS LLC,

28                      Defendant.

---

DECLARATION OF DEANNA DINCO

I, Deanna Dinco, hereby declare and state as follows:

1.    I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

2.    I am a Plaintiff in the above-entitled action.

3.    Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

4.    This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a county that is a proper place for trial of this action because Defendant does business in this District (the Central District of California) and throughout the State of California.

5.    The Complaint filed in this matter contains causes of action for violations of the Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited liability company doing business nationwide, including California.

6.    I own a 2006 Saturn Ion which I purchased used in Santa Maria, California on July 3, 2006.

I declare under penalty of perjury under the laws of the State of California that the foregoing Declaration is true and correct, and was executed by me in the city of _Arroyo Grande_, California, on April _28_, 2014.

By _____
Deanna Dinco

Elaine T. Byszewski (SBN 222304)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150
Facsimile:  (213) 330-7152
E-mail: elaine@hbsslaw.com

Steve W. Berman (*pro hac vice pending*)
Andrew M. Volk (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-mail:  steve@hbsslaw.com
E-mail:  andrew@hbsslaw.com

Mark P. Robinson, Jr. (SBN 054426)
Kevin F. Calcagnie (SBN 108994)
Scot D. Wilson (SBN 223367)
ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.
19 Corporate Plaza
Newport Beach, CA  92660
Telephone:  (949) 720-1288
Facsimile:  (949) 720-1292
mrobinson@rcrsd.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEANNA DINCO, DAVID BUTLER, CURTIS BLINSMON, AARON HENDERSON, GRACE BELFORD, NATHAN TERRY, MICHAEL PESCE, RHONDA HASKINS, JENNIFER GEARIN, ARLENE REVAK, GEORGE MATHIS, MARY DIAS, SHEREE ANDERSON, MICHAEL AMEZQUITA, LORRAINE DE VARGAS, DAWN TEFFT, BONNIE TAYLOR, JERRILE GORDON, KEISHA HUNTER and LES ROUSE, individually and on behalf of all others similarly situated, | Case No.: 2:14-cv-02424 **CLASS ACTION** **DECLARATION OF DAVID BUTLER** |
| Plaintiffs, | |
| v. | |
| GENERAL MOTORS LLC, | |
| Defendant. | |

DECLARATION OF DAVID BUTLER

1    I, David Butler, hereby declare and state as follows:

2       1.    I have personal knowledge of the facts stated herein and, if necessary,

3    could competently testify thereto.

4       2.    I am a Plaintiff in the above-entitled action.

5       3.    Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support

6    of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code

7    § 1780(a).

8       4.    This action for relief under Cal. Civ. Code § 1780(a) has been

9    commenced in a county that is a proper place for trial of this action because

10   Defendant does business in this District (the Central District of California) and

11   throughout the State of California.

12      5.    The Complaint filed in this matter contains causes of action for

13   violations of the Consumers Legal Remedies Act against General Motors, LLC

14   ("GM"), a Delaware limited liability company doing business nationwide, including

15   California.

16      6.    I own a 2006 Chevy Cobalt which I purchased new in Poway,

17   California on April 18, 2006.

18      I declare under penalty of perjury under the laws of the State of California that

19   the foregoing Declaration is true and correct, and was executed by me in the city of

20   _Poway_, California, on April _27_, 2014.

21                                    By _David Butler_

22                                       David Butler

23

24

25

26

27

28

                                    1

BUTLER DECLARATION RE CLRA VENUE

Elaine T. Byszewski (SBN 222304)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
E-mail: elaine@hbsslaw.com

Steve W. Berman (*pro hac vice pending*)
Andrew M. Volk (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail: steve@hbsslaw.com
E-mail: andrew@hbsslaw.com

Mark P. Robinson, Jr. (SBN 054426)
Kevin F. Calcagnie (SBN 108994)
Scot D. Wilson (SBN 223367)
ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.
19 Corporate Plaza
Newport Beach, CA 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292
mrobinson@rcrsd.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEANNA DINCO, DAVID BUTLER, CURTIS BLINSMON, AARON HENDERSON, GRACE BELFORD, NATHAN TERRY, MICHAEL PESCE, RHONDA HASKINS, JENNIFER GEARIN, ARLENE REVAK, GEORGE MATHIS, MARY DIAS, SHEREE ANDERSON, MICHAEL AMEZQUITA, LORRAINE DE VARGAS, DAWN TEFFT, BONNIE TAYLOR, JERRILE GORDON, KEISHA HUNTER and LES ROUSE, individually and on behalf of all others similarly situated, | Case No.: 2:14-cv-02424 <br><br> **CLASS ACTION** <br><br> **DECLARATION OF CURTIS BLINSMON** |
| Plaintiffs, | |
| v. | |
| GENERAL MOTORS LLC, | |
| Defendant. | |

DECLARATION OF CURTIS BLINSMON

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

I, Curtis Blinsmon, hereby declare and state as follows:

1.    I have personal knowledge of the facts stated herein and, if necessary, could competently testify thereto.

2.    I am a Plaintiff in the above-entitled action.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3.     Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support
of the Class Action Complaint and the claim therein for relief under Cal. Civ. Code
§ 1780(a).

4.     This action for relief under Cal. Civ. Code § 1780(a) has been
commenced in a county that is a proper place for trial of this action because

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Defendant does business in this District (the Central District of California) and
throughout the State of California.

     5.    The Complaint filed in this matter contains causes of action for
violations of the Consumers Legal Remedies Act against General Motors, LLC
("GM"), a Delaware limited liability company doing business nationwide, including
California.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

     6.     I own a 2007 Saturn Sky which I purchased new in Fresno, California in May, 2007.

     I declare under penalty of perjury under the laws of the State of California that the foregoing Declaration is true and correct, and was executed by me in the city of FRESNO, California, on April 28TH, 2014.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

By

Curtis Blinsmon