# Exhibit P

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.

MICHAEL LEVINE,

        Plaintiff,

vs.

GENERAL MOTORS, LLC,

        Defendant,

_____/

## CLASS ACTION COMPLAINT

This case arises from General Motors LLC's ("GM") unconscionable failure to disclose and active concealment of a defect in certain GM vehicles that renders them unsafe to drive and that has killed at least 13 innocent victims and likely hundreds more. The defect involves a vehicles' ignition switch system over many makes and model years, which is dangerously susceptible to failure during normal and foreseeable driving conditions (the "Ignition Switch Defect"). When the system fails, the switch turns from the "Run" (or "ON") position to either the "Off" or the "accessory" position, which then results in a loss of power, speed control, and braking, as well as disabling the vehicle's airbags. The result, of which GM has known for years and has actively concealed, has caused many deaths and significant injury to thousands of people. Accordingly, the Plaintiff, Michael Levine, individually and on behalf of all similarly situated individuals, brings this action against Defendant GM, and alleges as follows:

1

## PARTIES

1.    Plaintiff Michael Levine is a resident and citizen of Miami-Dade County, Florida.  Mr. Levine owns a 2008 Chevrolet Cobalt, which he purchased new.  Plaintiff chose the Cobalt, in part, because he wanted a safely designed and manufactured vehicle and he understood that a Chevrolet Cobalt has a reputation for being high-quality, durable, safe vehicles. Plaintiff did not learn of the Ignition Switch Defect until about March 2014.  Plaintiff, the father of two young children, recently took his vehicle into a Chevrolet dealership and learned his ignition switch was defective and that it would take months before the ignition switch could be repaired by GM.  Had GM disclosed the Ignition Switch Defect, Plaintiff would not have purchased the Cobalt, or would have paid less than he did, and would not have retained the vehicle.

2.    Defendant GM is a limited liability company formed under the laws of Delaware with its principal place of business in Michigan.  GM incorporated in 2009 and on July 10, 2009, acquired substantially all of the assets and certain liabilities of General Motors Corporation ("Old GM") pursuant to a Section 363 sale under Chapter 11 of the US. Bankruptcy Code and a Master Sales and Purchase Agreement ("Agreement").

3.    Under the Agreement, GM expressly assumed the following obligation:

From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles parts manufactured or distributed by [Old GM].

4.    GM also expressly assumed:

All Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor

2

vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

5.     GM is also liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint, because GM acquired and operated Old GM and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos plants, offices, leadership, personnel, engineers, and employees. GM was aware from its inception of the Ignition Switch Defect in the defective vehicles, and GM and Old GM concealed the Ignition Switch Defect from the public, regulators, and the bankruptcy court.  Because GM is liable for the wrongful conduct of Old GM, there is no need to distinguish between the conduct of Old GM and GM, and the Complaint will simply refer to GM as the corporate actor when describing the relevant facts.

## JURISDICTION AND VENUE

6.     This Court has diversity jurisdiction over this action under 28 U.S.C. §1332(d) because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 Class members, and more than two-thirds of the Class is diverse from the Defendant.

7.     This Court has personal jurisdiction over the Defendant because the Defendant conducts substantial business in this District, and some of the actions giving rise to the Complaint took place in this District.

8.     Venue is proper in this District under 28 U.S.C. §1391(d) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendant has caused harm to Class members residing in this District.

## FACTUAL ALLEGATIONS

9.      For years, GM manufactured and actively concealed a defect in certain of its vehicles.  The ignition switch of certain makes and model vehicles are dangerously susceptible to failure during normal and foreseeable driving conditions (the "Ignition Switch Defect").  When the system fails, the switch turns from the "Run" (or "ON") position to either the "Off" or the "accessory" position, which results in a loss of power, speed control, and braking, and disables the vehicle's airbags.

10.     The vehicles that have this defect ("Defective Vehicles") include:

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2007-2010 Pontiac G5

- 2006-2010 Pontiac Solstice

- 2005-2010 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

11.     So far, there are approximately 2.6 million Defective Vehicles.  However, there may be many more, and these numbers may grow because of GM's active concealment of the defect.

12.     GM, acknowledging that "[s]omething went wrong with our process in this instance and terrible things happened," has recalled the Defective Vehicles to replace their ignition switch systems.  Merely replacing the ignition switch systems, however, will not completely solve the problem or make the Defective Vehicles safe, because the defect also includes the location of the switch, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the type of key that is used.

4

13.     In documents filed with the federal government, GM has admitted that it learned of the Ignition Switch Defect in 2001, during the pre-production development of the Saturn Ion. At that time, an internal report indicated that the car was stalling due to the problems with the ignition switch, which included "low detent plunger force" in the ignition switch.  The report stated that "an ignition switch design change" solved the problem, but it obviously did not.

14.     GM nonetheless began manufacturing and selling the Saturn Ion in 2002 (for the 2003 model year) with the defective ignition switch systems, which were manufactured by Delphi Automotive.

15.     In 2003, an internal GM inquiry documented that a service technician observed an Ion stall after the ignition had switched off while driving.  The technician noticed that "[t]he owner has several keys on the key ring," and the report stated that "[t]he additional weight of the keys had worn out the ignition switch."  The technician replaced the ignition switch, and the inquiry was closed without further action.

16.     In 2004, three GM employees driving production Ions reported that their cars had stalled from a loose ignition switch.  "The switch should be raised at least one inch toward the wiper stalk . . . This is a basic design flaw and should be corrected if we want repeat sales," one engineer reported.

17.     Despite the reports, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

18.     Even worse, when GM began manufacturing and selling the Chevrolet Cobalt in 2004 (for the 2005 model year), which was essentially the same car as the Ion, it installed the same ignition switch system as it had installed in the Ion.

19.     Soon after the Cobalt entered the market, GM began receiving complaints about

5

incidents of vehicles losing engine power, including instances in which the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. Engineering inquiries, known within GM as Problem Resolution Tracking System ("PRTS") reports, were opened to assess the issue.

20.    In February 2005, GM engineers concluded that the problem had two causes: "a lower torque detent in the ignition switch . . . [and the] low position of the lock module on the [steering] column." Again, however, GM decided not to take action.

21.    During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration. The slot design allowed the key chain to hang lower on the key, which placed more torque on the ignition switch when the chain was contacted or moved. The proposal was initially approved, but later cancelled.

22.    In June 2005, the *New York Times* reported that Chevrolet dealers were telling customers to lighten their key rings to prevent intermittent stalling and the loss of electrical power in their cars. The article included a statement from Alan Adler, GM's Manager for Safety Communications, in which he reassured the public that the problem only occurred in "rare cases when a combination of factors is present," that customers "can virtually eliminate the possibility by taking several steps, including removing nonessential material from their key rings" and that "when [the stalling] happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral."

23.    These statements were false because GM's internal documents demonstrate that these incidents occurred when drivers were using keys with the standard key fob, and that removing non-essential items from the key ring would not "virtually eliminate" the risk of incident.

6

24.     In July 2005, Amber Marie Rose, who was 16 years old, was killed when she drove her Cobalt off the road and struck a tree. Her driver's side airbag did not deploy, even though it should have given the circumstances of the head-on crash, and the car's ignition switch was in the "accessory/off" position at the time of the crash. GM learned of these facts in 2005 and documented them in an internal investigation file.

25.     Instead of fixing the defect, in December 2005, GM issued a service bulletin to its dealers that reiterated much of the same message Mr. Adler delivered earlier that year. It indicated that the possibility of the driver inadvertently turning off the ignition was more likely to occur if the driver is short and has a large or heavy key chain, and recommended that drivers remove non-essential items from key chains. In addition, it informed dealers that it had developed an insert for the key ring to prevent it from moving up and down in the slot, and that the key ring had been replaced by a smaller design that would not hang as low as in the past. The service bulletin applied to 2003-06 Saturn Ions, 2005-06 Chevrolet Cobalts, the 2006 Chevrolet HHR, and the 2006 Pontiac Solstice, all of which were equipped with the same defective ignition switch system.

26.     In October 2006, GM updated its prior service bulletin to include the 2007 Saturn Ion, the 2007 Saturn Sky, the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, and the 2007 Pontiac Solstice.

27.     In 2006, at least two fatal accidents involving the Cobalt occurred where the cars' data recorders indicated that the ignition switches were in the "accessory" position and the front airbags failed to deploy. GM learned of this information in 2006, yet again took no corrective action.

28.     In 2007 and 2008, GM became aware of at least four more such fatal accidents.

7

29.    The NHTSA's Fatal Analysis Reporting System ("FARS") reveals 303 deaths in front seat occupants in 2005-07 Cobalt vehicles and 2003-07 Ions where the airbag failed to deploy in non-rear impact crashes.

30.    GM finally made some changes to the design of the ignition switch system in 2006 to include a new detent plunger and spring. The new switch did not receive a new part number, which is considered a "cardinal sin" in the engineering community, and further concealed the defect in the switch that was installed in the Defective Vehicles.

31.    In 2012, GM engineers studied 44 vehicles from across a range of make and model years, and the study revealed that vehicles tested from model years 2003 through 2007 exhibited torque performance below the original specifications established by GM.  Rather than immediately notify the NHTSA of the results of this study or conduct a recall, GM continued to conceal the nature of the Ignition Switch Defect.

32.    In April 2013, GM hired an outside engineering consulting firm to investigate the ignition switch system. The external report concluded that ignition switches installed in early model Cobalt and Ion vehicles did not meet GM's torque specification.  Rather than immediately notify the NHTSA of the results of this report, GM continued to conceal the nature of the Ignition Switch Defect.

33.    Despite its utter disregard for the public safety, GM vehicles have been marketed based on its safety from 2002 through the present.  For example, in 2005, Chevrolet emphasized on its website that "[y]our family's safety is important to us . . . That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind."  Likewise, in advertisements for Saturn, GM utilized the slogan, "Saturn, People First,"

and stated that, "[i]n cars, it's about things like reliability, durability, and of course, safety. That's where we started when developing our new line of cars."

34. In February 2014, almost thirteen years after first recognizing the defect, GM finally admitted publicly that the ignition switch system was defective and agreed to recall the Defective Vehicles to replace the old ignition switch with the re-designed version.

35. This recall was insufficient because it did not address the location of the ignition switch system or how low the key fob hangs on the steering column, all of which creates a risk of inadvertent driver contact and an inadvertent turning of the switch.

36. Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect. If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect. GM repeatedly violated the TREAD Act by actively concealing information about the Ignition Switch Defect for more than a decade.

37. Throughout the relevant period, GM possessed vastly superior knowledge and information than its consumers – if not exclusive information – about the design and function of the ignition switch in the Defective Vehicles and the existence of the defects in those vehicles.

38. The Ignition Switch Defect has caused actual damages to Plaintiff and the Class.

39. A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect.

40. A vehicle purchased, leased, or retained under the reasonable assumption that it is

safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

41.     Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed.  Plaintiff and the Class overpaid for their Defective Vehicles.  Because of the concealed Ignition Switch Defect, Plaintiff and the Class members did not receive the benefit of their bargains.

42.     Additionally, as a result of publicity regarding the Ignition Switch Defect and GM's misconduct, the value of the Defective Vehicles has diminished significantly, and GM's offer to replace the ignition switch system does not adequately address the diminished value of Plaintiff's and Class members' vehicles.  Plaintiff and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's wrongful conduct.

## TOLLING OF THE STATUES OF LIMITATION

43.     All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the Ignition Switch Defect.  GM has been aware of the Ignition Switch Defect since at least 2001, and has concealed from the Plaintiff, the Class members, the public, and the government the complete nature of the Ignition Switch Defect.

44.     Even now, after the Defective Vehicles have been recalled, GM continues to attempt to minimize the significance, danger, and nature of the Ignition Switch Defect.

45.     Plaintiff and the Class members did not discover and could not have discovered with reasonable diligence the facts that would have caused a reasonable person to suspect that the Ignition Switch Defect existed or that GM did not report information within its knowledge

regarding the existence of a dangerous defect to federal authorities or consumers until shortly before this class action was filed.

46. GM was and remains under a continuing duty to disclose to the NHTSA, the Plaintiff and the Class members the true character, quality, and nature of the Defective Vehicles. GM actively concealed the true character, quality, and nature of the Defective Vehicles. Plaintiff and the Class members relied on GM's active concealment of these facts. GM is therefore estopped from relying on any statutes of limitation in this action.

47. Plaintiff brings this action on behalf of a Class of all persons in the United States who currently own one or more Defective Vehicles.

48. Plaintiff also brings this action for a subclass of Florida residents who own or lease one or more Defective Vehicles.

49. GM's gross misconduct has harmed Plaintiff and the Class members and caused them actual damages. Plaintiff and the Class members did not receive the benefit of their bargains as purchasers and lessees, as they received vehicles that were less safe, less useful, and of lower quality than represented. Plaintiff and the Class members contracted to purchase vehicles that do not unexpectedly turn off and become uncontrollable without airbag protection, but because of the Ignition Switch Defect, received defective vehicles that do unexpectedly turn off and become uncontrollable without airbag protection. Plaintiff and the Class members overpaid for their vehicles or made lease payments that were much too high. Plaintiff and the Class members would not have paid as much for their vehicles or made high lease payments had the Ignition Switch Defect been disclosed. As a result of publicity regarding the Ignition Switch Defect and GM's misconduct, the value of the Defective Vehicles has diminished significantly,

and GM's offer to replace the ignition system does not adequately address the diminished value of Plaintiff's and the Class members' vehicles.

## CLASS ALLEGATIONS

50.     Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and a Class initially defined as follows:

> All persons in the United States who currently own or lease one or more of the following GM vehicles: 2003-07 Saturn ION; 2005-10 Chevrolet Cobalt; 2007-10 Pontiac G5; 2006-11 Chevrolet HHR; 2006-10 Pontiac Solstice; and 2007-10 Saturn Sky (the "Defective Vehicles").

51.     Included within the Class is a subclass of Florida residents who own or lease the Defective Vehicles (the "Florida Subclass").

52.     Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case. Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Defective Vehicles.

53.     The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

54.     As there are approximately 2.6 million Defective Vehicles, the number of Class members is so great that joinder in impracticable.

55.     The claims of the Plaintiff are typical of the claims of the Class, as Plaintiff and the Class members alike purchased or leased Defective Vehicles and were harmed in the same way by GM's uniform misconduct.

56.    Plaintiff will fairly and adequately protect the interests of the other members of the Class and Subclass.  Plaintiff's counsel has substantial experience in prosecuting class actions.  Plaintiff and his counsel are committed to vigorously prosecuting this action, have the financial resources to do so, and do not have any interests adverse to the Class.

57.    There are numerous questions of law and fact that are common to the Class and the Subclass and predominate over questions affecting only individual members, including the following:

(a)   Whether the Defective Vehicles suffer from Ignition Switch Defects;

(b)   Whether GM concealed the defects;

(c)   Whether GM misrepresented that the Defective Vehicles were safe;

(d)   Whether GM owed Plaintiff and the Class members a duty to disclose the Ignition Switch Defect;

(e)   Whether GM engaged in fraudulent concealment;

(f)   Whether GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches; and

(g)   Whether GM's unlawful, unfair and/or deceptive practices harmed Plaintiff and the members of the Class.

58.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable.  Likewise, because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult

13

or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

59.    The prosecution of separate actions by the individual Class members would also create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

## COUNT I
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT

60.    Plaintiff incorporates paragraphs 1-59 as if fully set forth herein.

61.    This claim is brought on behalf of the nationwide Class.

62.    Plaintiff and the Class members are all "persons" under the Michigan Consumer Protection Act ("MCPA"), M.C.L.A. § 445.902(1)(d).

63.    GM was a "person" engaged in "trade or commerce" under MCPA, M.C.L.A. § 445.902(1)(d) and (g).

64.    The MCPA prohibits any "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L.A. § 445.903(1).

65.    GM's conduct, as alleged in the preceding paragraphs, constitutes unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce. In particular, GM violated the MCPA by

a.    "[F]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer," M.C.L.A . § 445.903(s)

14

b.      "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, "M.C.L.A, § 405.903(bb); and

c.      "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." M.C.L.A. § 405.903(cc).

66.      GM's practices that violated the MCPA include, without limitation, the following:

a.      GM represented that the Defective Vehicles had safety characteristics that they do not have;

b.      GM represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were not;

c.      GM knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature, even though GM knew that such information was material to the transaction in light of GM's prior representations;

d.      GM failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, the Class members, the public, and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to the Plaintiff, the Class members, the public, and the government;

e.      GM intended for the Plaintiff, the Class members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiff and the Class members would purchase or lease the Defective Vehicles; and

f.      GM repeatedly violated the TREAD Act.

67.      GM's acts and practices were unfair and unconscionable, because its acts and practices offend established public policy, and because the harm GM caused consumers greatly

15

outweighs any benefits associated with its acts and practices. GM's conduct has also impaired competition within the automotive vehicles market and has prevented the Plaintiff and the Class from making fully informed decisions about whether to lease, purchase, and/or retain Defective Vehicles.

68.     While GM knew of the Ignition Switch Defect as early as 2001, and knew that the defect caused the Defective Vehicles to have an unreasonable propensity to shut down and become uncontrollable, it continued to design, manufacture, and market the Defective Vehicles until at least 2011.

69.     Plaintiff and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices. Had Plaintiff and the Class known about the full extent of the Ignition Switch Defect, they would either not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles. Plaintiff and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of here.

70.     All of the wrongful conduct alleged here occurred, and continues to occur, in the conduct of GM's business.

71.     Plaintiff requests that this court: enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; require GM to repair Plaintiff's and the Class members vehicles to completely eliminate the Ignition Switch Defect; provide to Plaintiff and each Class either their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorney's fees; and provide other appropriate relied under the MCPA.

72.     Plaintiff also seeks punitive damages against GM because it carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others. GM intentionally, willfully, and repeatedly misrepresented the reliability and the safety of the Defective Vehicles, and continued to conceal material facts that only it knew, even while numerous innocent victims were killed as a result of its conduct.  GM's unlawful conduct constitutes malice, oppression, and fraud justifying punitive damages.

**COUNT II**
**FRAUD BY CONCEALMENT**

73.     Plaintiff incorporates paragraphs 1-59 as if fully set forth herein.

74.     This claim is brought on behalf of the nationwide Class.

75.     GM concealed and suppressed material facts concerning the Ignition Switch Defect.

76.     GM had a duty to disclose the Ignition Switch Defect because it constantly represented that its vehicles were reliable and safe and advertised that it maintained the highest safety standards, and the defect was known and/or accessible to GM, which had superior knowledge and access to the facts, and GM knew that the facts were not known to or reasonably discoverable by Plaintiff and the Class.  These omitted and concealed facts were material because they directly impacted the safety of the Defective Vehicles, and GM's prior representations regarding the safety of its vehicles became materially misleading when GM concealed facts regarding the Ignition Switch Defect.

77.     GM actively concealed and/or suppressed these material facts, in whole or in part, to induce Plaintiff and the Class members to purchase or lease the Defective Vehicles at high prices, and to protect its profits and avoid a costly recall, and it did so at the expense of Plaintiff and the Class.

78.     Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiff's and the Class' actions were justified.

79.     Because of the concealment and/or suppression of the facts, Plaintiff and the Class sustained damages, including the difference between the actual value of that which Plaintiff and Class members paid and what they received.  The value of the Defective Vehicles has been diminished by GM's wrongful conduct.

80.     GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class' rights and well-being to enrich GM.  GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT III
## VIOLATIONS OF THE FLORIDA UNFAIR & DECEPTIVE TRADE PRACTICES ACT

81.     Plaintiff and the Class incorporate by reference paragraphs 1-59 as if fully set forth herein.

82.     This Count is brought on behalf of the Florida Subclass.

83.     Plaintiff is a "consumer" under FDUTPA, § 501.203(7), Fl. Stat.

84.     GM engaged in "trade or commerce" within the meaning of FDUTPA, § 501.203(8), Fla. Stat.

85.     Under the TREAD Act, 49 U.S.C. § 30101, *et. seq.*, and its corresponding regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect, and must promptly notify vehicle owners, purchasers, and dealers of the defect and remedy the defect.  The TREAD Act

also requires manufacturers to file various reports and notify the NHTSA within days of learning of a defect.

86.     From as early as 2001, GM was aware of the Ignition Switch Defect.  But it waited until February 7, 2014, to finally send a letter to the NHTSA confessing that it knew of the Ignition Switch Defect and that the defect could cause vehicles to lose power and control and cause the airbags not to deploy.

87.     GM's failure to disclose and active concealment of the Ignition Switch Defect violated the TREAD Act, and thereby violated FDUTPA.

88.     GM also violated FDUTPA by engaging in the following practices:

a.     GM represented that the Defective Vehicles had safety characteristics that they do not have;

b.     GM represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were not;

c.     GM knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature, even though GM knew that such information was material to the transaction in light of GM's prior representations;

d.     GM failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, the Florida Subclass, the public, and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to the Plaintiff, the Class members, the public, and the government; and

e.     GM intended for Plaintiff, the Florida Subclass, the public, and the government to rely on its misrepresentations and omissions, so that the Plaintiff and the Florida Subclass would purchase or lease the Defective Vehicles.

89.     Plaintiff and the Florida Subclass were injured as a result of GM's misconduct. Plaintiff and the Florida Subclass overpaid for the Defective Vehicles and did not receive the benefit of their bargain.

90.     Plaintiff seeks damages and an order enjoining GM's unfair or deceptive acts or practices and an order requiring GM to completely remedy the defect in Plaintiff's and the Florida Subclass members' vehicles, and attorney's fees, and any other just and proper relief available under FDUTPA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM, and grant the following relief:

A.   Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3) and or 23(b)(2), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class and Subclass Representative and Plaintiff's chosen counsel as Class Counsel;

B. Declare, adjudge, and decree the conduct of GM as alleged herein to be unlawful, unfair and/or deceptive, and enjoin any such future conduct;

C. Declare, adjudge, and decree that the ignition switches in the Defective Vehicles are defective;

D. Declare, adjudge, and decree that GM must disgorge, for the benefit of the Plaintiff, the Class members, and the Subclass members all or part of the ill-gotten gains it received from the sale or lease of the Defective Vehicles;

E.   Award Plaintiff, the Class members, and the Subclass members actual, compensatory damages, or, in the alternative, statutory damages, as proven at trial;

F.  Alternatively, if elected by the Plaintiff, the Class members, and the Subclass members, require GM to repair the defective ignition switches or provide a comparable vehicle that does not have the ignition switch defect;

G.  Award the Plaintiff, the Class members, and the Subclass members punitive damages in such amount as proven at trial;

H.  Award the Plaintiff, the Class members, and the Subclass members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

I.  Award the Plaintiff, the Class members, and the Subclass members such other further and different relief as the case may require or as determined to be equitable and proper by this Court.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all the legal claims alleged in this Complaint.

Dated this 13th day of May, 2014.

Respectfully submitted,

GROSSMAN ROTH, P.A.
2525 Ponce de Leon Blvd., Suite 1150
Coral Gables, FL 33134
Telephone No.: (305) 442-8666
Facsimile: (305) 285-1668

By: _____
David M. Buckner
Fla. Bar No.: 60550
dbu@grossmanroth.com
Seth E. Miles
Fla. Bar No.: 385530
sem@grossmanroth.com
Brett E. von Borke
Fla. Bar No.: 0044802
bvb@grossmanroth.com
Attorneys for Plaintiff

21