# Exhibit T

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

RUTH DUARTE, individually
and on behalf of all others similarly
situated,

       Plaintiff,

vs.

GENERAL MOTORS LLC,
DELPHI AUTOMOTIVE PLC, and
DELPHI AUTOMOTIVE SYSTEMS, LLC,

       Defendants.

_____/

### **CLASS ACTION**
### **JURY TRIAL DEMANDED**

### **CLASS ACTION COMPLAINT**

Plaintiff Ruth Duarte, individually and on behalf of all similarly situated persons, brings this action against Defendant General Motors, LLC ("GM"), Defendant Delphi Automotive PLC, and Defendant Delphi Automotive Systems, LLC (both Delphi Defendants collectively "Delphi") ("GM" and "Delphi" Defendants collectively "Defendants") for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), ("RICO"), asserts additional statutory and common law claims, and alleges as follows:

### **NATURE OF THE CASE**

1.    This case arises from New GM's recent string of recalls (collectively "the Recall"), the culmination of GM and Delphi's scheme to defraud GM consumers through their unconscionable failure to disclose and active concealment of a defect in certain GM vehicles that renders them unsafe to drive and has killed at least 13 innocent victims and possibly hundreds

more.[1] The Department of Transportation announced on May 16, 2014 that GM will pay a $35 million penalty for delays in reporting the defect — "the single highest civil penalty amount ever paid as a result of a [National Highway Traffic Safety Administration] investigation of violations stemming from a recall." U.S. Secretary of Transportation Anthony Foxx stated that "GM did not act and did not alert us in a timely manner. What GM did was break the law. They failed to make their public safety obligations . . . ." The NHTSA has stated that their review of GM found "systemic" issues regarding how information was shared and the Recall unfolded, and that it was "hard to point to one single fault." Apart from the penalty, GM will be now be subject to "unprecedented oversight" as a result of the NHTSA's investigation of the Recall.

2.      The defect involves the vehicles' ignition switch system, which is dangerously susceptible to failure during normal and foreseeable driving conditions (the "Ignition Switch Defect").   When the system fails, the switch turns from the "Run" (or "On") position to either the "Off" or the "accessory" position, which then results in a loss of power, speed control, and braking, as well as a disabling of the vehicle's airbags.

3.      Delphi manufactured and supplied the defective ignition switches.

4.      Delphi knew its ignition switches were defective yet it continued to manufacture and sell the defective ignition switch systems knowing they would be used in the vehicles of Plaintiff and the Class. Congress has initiated an investigation into Delphi's role in the enterprise with both Old and New GM.

5.      The vehicles that have this defect ("Defective Vehicles") are:

- 2003-2007 Saturn Ion
- 2007-2010 Saturn Sky

---

[1] Both GM and Delphi were involved in bankruptcy proceedings that are set forth in more detail below. For purposes of clarity, Plaintiff will refer to the pre-bankruptcy Defendant entities as "Old GM" and "Old Delphi" when the distinction is appropriate. Similarly, Plaintiff will refer to the post-bankruptcy Defendant entities as "New GM" and "New Delphi."

- 2005-2010 Pontiac G5
- 2006-2010 Pontiac Solstice
- 2005-2010 Chevrolet Cobalt
- 2006-2011 Chevrolet HHR

6.       So far, there are approximately 2.6 million Defective Vehicles.

7.       New GM, acknowledging that "[s]omething went wrong with our process in this instance and terrible things happened," has recalled the Defective Vehicles to replace their ignition switch systems.  But merely replacing the ignition switch systems will not completely solve the problem, make the Defective Vehicles safe, or restore the Defective Vehicles' value because the design defect pervades the entire structure of the ignition switch and has destroyed the reputation of the Defective Vehicles. Specifically, the design defect also includes the location of the ignition switch, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the type of key that is used.

8.       Plaintiff brings this action on behalf of a Class of all persons in the United States who currently own or lease one or more Defective Vehicles.

9.       In light of the recent Recall, Defendants' scheme to defraud and gross misconduct have harmed Plaintiff and Class Members and caused them actual damages. Plaintiff and Class Members did not receive the benefit of their bargains as purchasers and lessees as they received vehicles that were less safe, less useful, of lower quality, and, most significantly, are now less valuable in light of the Recall.  Plaintiff and Class Members contracted to purchase or lease vehicles that do not unexpectedly turn off and become uncontrollable without airbag protection, but because of the Ignition Switch Defect, received defective vehicles that unexpectedly turn off and become uncontrollable without airbag protection.  As a result of publicity regarding the Ignition Switch Defect and both Old and New GM's misconduct, punctuated by the Recall, the

value of the Defective Vehicles has diminished and Plaintiff and Class Members have lost the opportunity to sell or even simply to enjoy their vehicles unhampered by Defendants' fraudulent conduct. New GM's offer to replace the ignition switch system does not adequately address the diminished value of Plaintiff's and Class Members' vehicles or the loss of Plaintiff's and Class Members' opportunity to sell or even simply to enjoy their vehicles unhampered by Defendants' fraudulent conduct.

## JURISCTION AND VENUE

10.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 class members, and more than two-thirds of the Class is diverse from Defendants.  This Court also has original federal question jurisdiction because Plaintiff's first claim arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO") and Plaintiff's fourth claim arises under the Magnuson-Moss Consumer Products Warranties Act, 15 U.S.C. § 2301, *et seq.* ("Magnuson-Moss"). The Court has supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants have caused harm to Class Members residing in this District, including, but not limited to, Plaintiff.

# PARTIES

13.     Plaintiff Ruth Duarte is a citizen of Calexico, California.  Plaintiff owns a 2007 Pontiac G5, which she bought used in May of 2008 from Pontiac Womack in National City, California. Plaintiff's vehicle has shut off or stalled many times on freeways and other streets. She has had various problems with the ignition switch, including having to shake the keyhole so that the key can turn. Plaintiff has also had her power steering fail, and on occasion the vehicle continues to move while in "Park." Plaintiff has taken the Pontiac to get repaired on three separate occasions. The vehicle was diagnosed with gear, transmission, and steering column problems, and she was told that all had to be replaced. She had the replacements made at her own expense, yet the problems with the vehicle remain. Plaintiff's purchase of the vehicle was induced by Defendants' fraudulent concealment and misrepresentations about the existence of the ignition switch defect, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects. Plaintiff would not have purchased her Pontiac, or would have paid less than she did, and would not have retained the vehicle only to suffer the diminished value brought on by the Recall and the deprivation of her right to sell or enjoy her vehicle unhampered by Defendants' scheme.

14.     Defendant GM is a limited liability company formed under the laws of Delaware with its principal place of business in Michigan. New GM was incorporated in 2009, and on July 10, 2009, acquired substantially all the assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code, pursuant to a Master Sales and Purchase Agreement ("Agreement").

15.     Under the Agreement, New GM expressly assumed the following obligation:

> From and after the Closing, Purchaser [New GM] shall comply
> with the certification, reporting and recall requirements of the

5

National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicles parts manufactured or distributed by [Old GM].

16.     New GM also expressly assumed:

All Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

17.     Based on the express language of the Agreement, New GM assumed liability for the claims at issue in this lawsuit.

18.     New GM is also liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint, because New GM acquired and operated Old GM and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos, plants, offices, leadership, personnel, engineers, and employees, New GM was aware from its inception of the Ignition Switch Defect in the Defective Vehicles, and New GM and Old GM concealed the Ignition Switch Defect from the public, regulators, and the bankruptcy court.

19.     Defendant Delphi Automotive PLC is a foreign corporation based in the United Kingdom.

20.     Defendant Delphi Automotive Systems, LLC is a foreign corporation organized and formed under the laws of the State of Delaware with its principal place of business in Michigan.

21. Once a subsidiary of Old GM, Old Delphi spun-off in 1999 and became an independent publicly held corporation. Both Old and New Delphi, through their various entities, have designed, manufactured, and supplied GM with motor vehicle components, including the defective ignition switches at issue here.

22. Notwithstanding Old Delphi's 2005 bankruptcy, New Delphi is also liable through successor liability for the deceptive and unfair acts and omissions of Old Delphi, as alleged in this Complaint, because New Delphi acquired and operated Old Delphi and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos, plants, offices, leadership, personnel, engineers, and employees, New Delphi was aware from its inception of the Ignition Switch Defect in the Defective Vehicles, and New Delphi and Old Delphi concealed the Ignition Switch Defect from the public, regulators, and the bankruptcy court.

## FACTUAL ALLEGATIONS

### A. Defendants' Decade of Concealment

23. In documents filed with the federal government, New GM has admitted that Old GM learned of the Ignition Switch Defect in 2001, during the pre-preproduction development of the Saturn Ion. At that time, an internal report indicated that the car was stalling due to problems with the ignition switch, which included "low detent plunger force" in the ignition switch. The report stated that "an ignition switch design change" solved the problem, but it obviously did not.

24. Old GM nonetheless began manufacturing and selling the Ion in 2002 (for the 2003 model year) with the defective ignition switch systems, which were manufactured by Delphi.

25. In 2003, an internal Old GM inquiry documented that a service technician observed the Saturn Ion stall after the ignition had switched off while driving. The technician

noticed that "[t]he owner had several keys on the key ring," and the report stated that "[t]he additional weight of the keys had worn out the ignition switch." The technician replaced the ignition switch, and the inquiry was closed without further action.

26.    In 2004, three Old GM employees driving production Ions reported that their cars had stalled from a loose ignition switch. "The switch should be raised at least one inch toward the wiper stalk . . . . This is a basic design flaw and should be corrected if we want repeat sales," one engineer reported.

27.    Despite these reports, after considering "lead time required, cost, and effectiveness," Old GM decided to do nothing.

28.    Even worse, when Old GM began manufacturing and selling the Chevrolet Cobalt in 2004 (for the 2005 model year), which was essentially the same car as the Saturn Ion, it installed the same ignition switch system as it installed in the Ion.

29.    Soon after the Cobalt entered the market, Old GM began receiving complaints about incidents of vehicles losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. Engineering inquiries, known within Old GM as Problem Resolution Tracking System ("PRTS") reports, were opened to assess the issue.

30.    In February 2005, Old GM engineers concluded that the problem had two causes: "a lower torque detent in the ignition switch . . . [and the] low position of the lock module on the [steering] column." Again, however, Old GM decided not to take action.

31.    On February 28, 2005, Old GM issued a Service Bulletin to its dealers addressing "the potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effect" in 2005 Cobalts and 2005 Pontiac Pursuits, which Old GM stated was "more

likely to occur if the driver is short and has a large heavy key chain." Notably, Old GM did not disseminate this information to Plaintiff and the Class members.

32.    The February 28, 2005 Service Bulletin directed the dealers to advise customers that "removing unessential items from their key chains" would prevent the ignition from being turned off inadvertently.

33.    But Old GM knew at that time that the problem was a result of design defects in the key and ignition system, and not short drivers using heavy key chains. Moreover, Old GM knew that the "fix" it directed dealers to offer customers was insufficient to prevent the problem with the ignition.

34.    Old GM transmitted the February 28, 2005 Service Bulletin to its dealers through the mail or wires.

35.    During the course of a PRTS opened in May 2005, an engineer proposed that Old GM redesign the key head from a "slotted" to a "hole" configuration. The slot design allowed the key chain to hang lower on the key, which placed more torque on the ignition switch when the chain was contacted or moved. The proposal was initially approved, but later cancelled.

36.    In June 2005, the *New York Times* reported that Chevrolet dealers were telling customers to lighten their key rings to prevent intermittent stalling and the loss of electrical power in their cars. The article included a statement from Alan Adler, Old GM's Manager for Safety Communications, in which he reassured the public that the problem only occurred in "rare cases when a combination of factors is present," that customers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings," and that "when [the stalling] happens, the Cobalt is still controllable" and the "engine can

be restarted after shifting to neutral." Old GM intended Adler's statement to be disseminated to the public through the mail or wires.

37. These statements were false because Old GM's internal documents showed that these incidents occurred when drivers were using keys with the standard key fob, and that removing non-essential items from the key ring would not "virtually eliminate" the risk of an incident.

38. In July 2005, Amber Marie Rose, who was 16-years old, was killed when she drove her 2005 Cobalt off the road and struck a tree. Her driver's side airbag did not deploy, even though it should have given the circumstances of the head-on crash, and the car's ignition switch was in the "accessory/off" position at the time of the crash. Old GM learned of these facts in 2005 and documented them in an internal investigation file.

39. Instead of fixing the defect, in December 2005, Old GM issued a service bulletin to its dealers that reiterated much of the same deceptive message Adler delivered earlier in the year. It indicated that the possibility of the driver inadvertently turning off the ignition was more likely to occur if the driver is short and has a large or heavy key chain, and recommended that drivers remove unessential items from key chains. In addition, it informed dealers that it had developed an insert for the key ring to prevent it from moving up and down in the slot, and that the key ring had been replaced with a smaller design that would not hang as low as in the past. The service bulletin applied to 2003-06 Saturn Ions, 2005-06 Chevrolet Cobalts, the 2006 Chevrolet HHR, and the 2006 Pontiac Solstice, all of which were equipped with the same defective ignition switch system. Old GM issued the December 2005 Service Bulletin to its dealers through the mail or wires.

40.    In October 2006, Old GM updated its December 2005 Service bulletin to include the 2007 Saturn Ion, the 2007 Saturn Sky, the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, and the 2007 Pontiac Solstice.  Old GM issued this update to its dealers through the mail or wires.

41.    In 2006, at least two fatal accidents involving Cobalts occurred in which the cars' data recorders indicated that the ignition switches were in the "accessory" position and the front airbags failed to deploy.  Old GM learned of this information in 2006.

42.    In 2007 and 2008, Old GM became aware of at least four more such fatal accidents.

43.    NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbag failed to deploy in non-rear impact crashes.

44.    Old GM finally made some changes to the design of the ignition switch system in 2006 to include a new detent plunger and spring.  The new switch, however, did not receive a new part number, which is considered a "cardinal sin" in the engineering community, and further concealed the defect in the switch that was installed in the Defective Vehicles.

45.    In May 2012, New GM engineers studied 44 vehicles across a range of make and model years, and results revealed that vehicles tested from model years 2003 through 2007 exhibited torque performance below the original specifications established by GM.  Rather than immediately notify NHTSA of the results of this study or conduct a recall, New GM continued to conceal the nature of the Ignition Switch Defect.

46.    In September 2012, New GM assigned a special engineer to examine the changes between the 2007 and 2008 Chevrolet Cobalt models following reported crashes where the airbags failed to deploy and the ignition switch was found in the "off" or "accessory" position.

47.    In October 2012, GM Engineer Ray DeGiorgio sent an email to Brian Stouffer of GM regarding the "2005-7 Cobalt and Ignition Switch Effort," stating, "If we replaced switches on ALL the model years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch. This cost is based on volume of 1.5 units total." This email makes clear that New GM considered implementing a recall to fix the Defective Ignition Switches, but decided against it to save money.

48.    In April 2013, New GM hired an outside engineering consulting firm to investigate the ignition switch system.  The external report concluded that ignition switches installed in early model Cobalt and Ion vehicles did not meet GM's torque specification.  Rather than immediately notify NHTSA of the results of this report, New GM continued to conceal the nature of the Ignition Switch Defect.  In fact, in April and May of 2013, two New GM employees — Brian Stouffer and Ray DeGiorgio — have downplayed or outright denied the existence of any Ignition Switch Defect in depositions in the personal injury action of *Melton v. General Motors.*

49.    In October 2013, Delphi delivered documentation to New GM confirming that a change to the ignition switch in the Cobalt and other vehicles was made in April 2006.

50.    Brian Stouffer, in an email to Delphi regarding the ignition switch in the Chevy Cobalt, acknowledged that the ignition switch in early Cobalt vehicles was different than the switch in later Cobalt vehicles notwithstanding the fact that both switches had the same part

number. Delphi responded that Old GM authorized the change in 2006 but the part number remained the same.

**B.      GM Finally Discloses the Ignition Switch Defect**

51.      It was not until February of 2014 — almost thirteen years after first recognizing the defect — that New GM finally admitted publicly that the ignition switch system is defective and agreed to recall the Defective Vehicles to replace the old ignition switch with the re-designed version.

52.      In a February 14, 2014 letter to the NHTSA regarding the Recall, New GM finally acknowledged — in contrast to its prior representations to the agency — that changes were made to the ignition switches during the 2007 model year.  Specifically, New GM stated that on "April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch  proposed by the supplier, Delphi Mechatronics."  The GM design engineer referenced was Ray DeGiorgio.

53.      On March 17, 2014, New GM's CEO Mary T. Barra issued an internal video to employees, wherein she admits that "[t]hese are serious developments that shouldn't surprise anyone.  After all, something went wrong with our process in this instance and terrible things happened."[2]

54.      On April 2, 2014, Barra testified under oath before Congress. She has been with GM for thirty-three years as a key executive with both Old and New GM. Before becoming CEO, she held numerous high-ranking engineering positions, including Executive Director of

---

[2] The Ignition Switch Defect is not the only example of GM's misconduct when it comes to concealing defects. Recent reports indicate that GM "waited years to recall nearly 335,000 Saturn Ions for power steering failures despite getting thousands of consumer complaints and more than 30,000 warranty repair claims." This *other* defect — the power steering defect — can cause the affected vehicle to lose power steering, making turning the vehicle much more difficult. Complaints filed with the NHTSA reveal incidents in which 2004 Saturn Ion steering wheels locked, causing the affected vehicles to crash into a tree or get pulled into oncoming traffic. New GM has admitted that it didn't do enough to take care of the power steering problem.

Manufacturing Engineering in 2005, Executive Director of Vehicle Manufacturing Engineering

from 2005 to 2008, Vice President of Global Manufacturing from 2008 to 2009, and Executive

Vice President of Global Product Development up until her appointment as CEO in January

2014.

55.    Despite the utter disregard for public safety, both Old and New GM vehicles have

been marketed based on safety from 2002 through the present.  For example, in 2005, Chevrolet

emphasized on its website that "[y]our family's safety is important to us . . . . That's why every

Chevrolet is designed with a comprehensive list of safety and security features to help give you

peace of mind."  Likewise, in advertisements for Saturns, GM utilized the slogan, "Saturn.

People First," and stated that, "[i]n cars, it's about things like reliability, durability, and of

course, safety.  That's where we started when developing our new line of cars."

56.    While New GM has publicly stated that the Ignition Switch Defect has been

linked to thirty-one frontal crashes and thirteen deaths, others have reported that the actual

number of deaths or serious injuries is in the hundreds.

57.    Despite having knowledge of the Ignition Switch Defect, both Old and New GM

delayed the Recall to maximize profits, placing millions of people in danger.

58.    New GM's Recall is insufficient because it does not address the location of the

ignition switch system or how low the key fob hangs on the steering column, all of which create

a risk of inadvertent driver contact and an inadvertent turning of the switch. The Recall also fails

to account for the permanent loss of value of (and reputation to) the Defective Vehicles.

59.    Under    the    Transportation    Recall    Enhancement,    Accountability    and

Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying

regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer

must promptly disclose the defect. If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect. Both Old and New GM repeatedly violated the TREAD Act by actively concealing information about the Ignition Switch Defect for more than a decade.

60.     Throughout the relevant period, both Old and New GM possessed vastly superior knowledge and information to that of consumers — if not exclusive information — about the design and function on the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

61.     The Ignition Switch Defect has caused actual damages to Plaintiff and the Class.

62.     A vehicle purchased, leased, or retained with a known serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the known defect.

63.     A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

64.     As a result of publicity regarding the Ignition Switch Defect and GM's misconduct, punctuated by the Recall, the value of the Defective Vehicles has diminished, and New GM's offer to replace the ignition switch system does not adequately address the diminished value of Plaintiff's and Class Members' vehicles. Plaintiff and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for Old and New GM's wrongful conduct.

65.     Moreover, Defendants' scheme has deprived Plaintiff and the Class Members of the right and entitlement to sell or enjoy their property unhampered by fraudulent conduct.

## STATUTES OF LIMITATION

66.     There are no applicable statutes of limitations because the claims of Plaintiff and the Class did not accrue until the Recall, the instant the value of the Defective Vehicles diminished.

67.     Alternatively, any applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the Ignition Switch Defect.  On information and belief, Defendants have been aware of the Ignition Switch Defect since at least 2001, and have concealed from Plaintiff, the Class, the public, and the government the complete nature of the Ignition Switch Defect.

68.     Even now, after the Defective Vehicles have been recalled, Defendants continue to engage in their scheme to defraud by downplaying the significance, danger, and nature of the Ignition Switch Defect.

69.     Plaintiff and the Class did not discover and could not have discovered with reasonable diligence the facts that would have caused a reasonable person to suspect that the Ignition Switch Defect existed or that Defendants did not report information within their knowledge regarding the existence of a dangerous defect to federal authorities or consumers until shortly before this class action was filed.

70.     Defendants actively concealed the true character, quality, and nature of the Defective Vehicles.  Plaintiff and the Class relied on Defendants' active concealment of these facts.  Moreover, GM was and remains under a continuing duty to disclose to NHTSA, Plaintiff, and the Class the true character, quality, and nature of the Defective Vehicles. Defendants are therefore estopped from relying on any statutes of limitation in this action.

## CLASS ALLEGATIONS

71.     Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

Plaintiff brings this action on behalf of herself and a Class initially defined as follows:

> All persons in the United States who currently own or lease one or
> more of the following GM vehicles: 2003-07 Saturn Ion; 2005-10
> Chevrolet Cobalt; 2005-10 Pontiac G5; 2006-11 Chevrolet HHR;
> 2006-10 Pontiac Solstice; and 2007-10 Saturn Sky (the "Defective
> Vehicles").

72.     Excluded from the Class are GM, its employees, co-conspirators, officers, directors,

legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated

companies; class counsel and their employees; and the judicial officers and their immediate

family members and associated court staff assigned to this case. Also excluded from the Class are

Delphi, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors

and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees.

Also excluded are any individuals claiming damages from personal injuries allegedly arising

from the Defective Vehicles.

73.     The Class can be readily identified using registration records, sales records,

production records, and other information kept by GM or third parties in the usual course of

business and within their control.

74.     As there are approximately 2.6 million Defective Vehicles, the number of Class

Members is great enough that joinder is impracticable.

75.     The claims of Plaintiff are typical of the claims of the Class, as Plaintiff and Class

Members alike purchased or leased Defective Vehicles and were harmed in the same way by

Defendants' uniform misconduct.

17

76.     Plaintiff will fairly and adequately protect the interests of the other members of the Class. Plaintiff's counsel has substantial experience in prosecuting class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action, have the financial resources to do so, and do not have any interests adverse to the Class.

77.     There are numerous questions of law and fact that are common to the Class and predominate over questions affecting only individual members, including the following:

(a)     Whether Defendants, as part of a racketeering scheme to defraud, concealed information about the dangerous and defective condition of the relevant vehicles from Plaintiff and the Class;

(b)     Whether Defendants, through their RICO Enterprise, as described below, used the mail or wires in furtherance of their scheme to defraud;

(c)     Whether the Defective Vehicles suffer from Ignition Switch Defects;

(d)     Whether Defendants concealed the defects;

(e)     Whether Defendants misrepresented that the Defective Vehicles were safe;

(f)     Whether Defendants owed Plaintiff and the Class a duty to disclose the Ignition Switch Defect;

(g)     Whether Defendants engaged in fraudulent concealment;

(h)     Whether Defendants engaged in unfair, deceptive, unlawful or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches; and

(i)     Whether Defendants' unlawful, unfair or deceptive practices harmed Plaintiff and the Class.

78.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable. Likewise, because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult

or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

79.     The prosecution of separate actions by the individual Class members would also create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for Defendants. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

## COUNT I
## VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. § 1962(c))
### (Against Defendants)

80.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth at length herein.

81.     This claim is brought on behalf of the Class.

82.     Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the "RICO Enterprise" through a "pattern of racketeering activity."

83.     At all times relevant, Old GM, New GM, Old Delphi, New Delphi, their associates-in-fact, Plaintiff, and the Class members were and are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

84.     At all times relevant, Plaintiff and each Class member were and are a "person injured in his or her business or property by reason of a violation of RICO within the meaning of 18 U.S.C. § 1964(c).

85.     At all times relevant, Defendants were and are a "person" who participated in or conducted the affairs of the RICO Enterprise through the pattern of racketeering activity described below.  While Defendants participated in the RICO Enterprise, they have an existence

separate and distinct from the Enterprise. Further, the RICO Enterprise is separate and distinct from the pattern of racketeering activity in which Defendants have engaged and are engaging.

86.     At all times relevant, Defendants were associated with, operated, or controlled the RICO Enterprise, and participated in the operation and management of the affairs of the RICO Enterprise, through a variety of actions described herein. Defendants' participation in the RICO Enterprise was necessary for the successful operation of their scheme to defraud.

### The RICO Enterprise

87.     Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

88.     The following persons, and others presently unknown, have been members of and constitute the "enterprise" within the meaning of RICO, which are referred to herein collectively as the RICO Enterprise:

    a.     Defendant General Motors, LLC;

    b.     Both Old and New GM's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates-in-fact in the Enterprise to deceive Plaintiff and other Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and defect from Plaintiff and the other Class members, including, but not limited to Alan Adler, GM's Manager for Safety Communications who, in June of 2005, issued the deceptive public statement regarding the ignition problem; Ray DeGiorgio, GM's design engineer who signed off on the ignition switch change that was never disclosed; and Mary T. Barra, GM's current CEO;

      c.    <u>Defendants Delphi Automotive PLC and Delphi Automotive Systems,</u> <u>LLC</u>, who, at all times material, manufactured and supplied the defective ignition switch system for GM, even though they knew that the system did not meet GM's own design specifications. Delphi also manufactured and supplied the ignition switch system after the 2007 change implemented by GM without reflecting a corresponding change in part number;

      d.    <u>GM's Dealers</u>, who GM instructed to present false and misleading information to Plaintiff and other members of the Class, through, *inter alia*, multiple Service Bulletins, and who did in fact present such false and misleading information.

89.    The RICO Enterprise of Old GM, New GM, GM's officers, executives, and engineers, Old Delphi, New Delphi, and GM's dealers, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein. The RICO Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which Defendants have engaged and are engaging. The RICO Enterprise was and is used as a tool to effectuate the pattern of racketeering activity.

90.    The members of the RICO Enterprise all had a common purpose: to increase and maximize Defendants' revenues by deceiving Plaintiff and other Class members into purchasing dangerous and defective vehicles, and actively concealing the Ignition Switch Defect from Plaintiff and the other Class members. The members of the RICO Enterprise shared the bounty of their enterprise, *e.g.*, by sharing the benefit derived from increased sales revenue generated by

the scheme to defraud.  Each member of the RICO Enterprise benefited from the common purpose of the scheme to defraud:  both Old and New GM sold or leased more vehicles with the Ignition Switch Defect, both Old and New Delphi sold more of the defective ignition switches, and GM's dealers sold and serviced more vehicles with the Ignition Switch Defect.

91.     Defendants conducted and participated in the affairs of this RICO Enterprise through a pattern of racketeering activity that lasted more than a decade, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

92.     As part and in furtherance of the scheme to defraud, Defendants' deceptive scheme to increase revenue depended on actionable deceptive conduct.  Defendants actively concealed the dangerous and defective condition of GM's vehicles from its customers through deceptive misrepresentations and omitting material information.

### Predicate Acts: Mail and Wire Fraud

93.     Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act that is indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

94.     As set forth below, to carry out, or attempt to carry out its scheme to defraud, Defendants have engaged in, and continue to engage in, the affairs of the RICO Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.     Both Old and New GM, with the assistance and collaboration of the other persons associated in fact with the enterprise devised and employed a scheme or artifice to

defraud by use of the telephone and internet and transmitted, or caused to be transmitted, by means of wire communication travelling in interstate or foreign commerce, writing(s) or signal(s), including GM's website, Service Bulletins to dealers, and communications with other members of the Enterprise, for the purpose of executing such scheme or artifice to defraud, in violation of 18 U.S.C. § 1341 and § 1343.

b.      As part of the scheme to defraud, the RICO Enterprise utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the false pretenses and artifice to defraud, as described herein.

c.      The concealment of the dangerous and defective condition of the defective GM vehicles is the core purpose of the underlying racketeering offense. The Enterprise had an ascertainable structure by which GM operated and managed the association-in-fact by using its Dealers and Delphi to concoct, obfuscate, carry out, and attempt to justify the fraudulent scheme described herein.

95.    Old GM's February 28, 2005 Service Bulletin was issued in furtherance of its scheme to defraud. It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class. The February 28, 2005 Service Bulletin was sent via the mail or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

96.    In 2005, in furtherance of its scheme to defraud, Old GM emphasized on its Chevrolet website that "[y]our family's safety is important to us . . . . That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind." This false statement, maintained on the internet through the wires, constitutes a violation of 18 U.S.C. § 1343.

97.     In June of 2005, Old GM issued a public statement through the mail or wires in furtherance of its scheme to defraud.  The statement provided the public, including Plaintiff and the other Class members, with false and misleading information about the dangerous and defective condition of the defective vehicles, and sought to conceal that condition by minimizing the issue and offering an ineffective fix.  As such, the statement constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

98.     Old GM's December 2005 Service Bulletin was issued in furtherance of its scheme to defraud.  It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class — namely, that the issue could be resolved by removing items from key chains.  The December 2005 Service Bulletin was sent via the mail or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

99.     In October of 2006, Old GM issued an update to its December 2005 Service Bulletin in furtherance of its scheme to defraud.  The update repeated the instruction to GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class.  The update to the December 2005 Service Bulletin was sent via the mail or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

100.     In furtherance of the scheme to defraud, GM communicated with Delphi via the mail or wires regarding the manufacture of the defective ignition switch system.  Through those communications, GM instructed Delphi to continue manufacturing the defective part even though it did not meet GM's own specifications. Delphi followed these instructions and continued to manufacture the defective parts. Through those communications, GM also

instructed Delphi to make a change to the defective ignition switch system in 2006, and to fraudulently conceal the change by not assigning a new part number. Delphi also followed these instructions, making a change to the defective ignition switch system in 2006 and fraudulently concealing the change by not assigning a new part number. GM's communications with Delphi, and Delphi's responses, constitute repeated violations of 18 U.S.C. §§ 1341 and 1343.

101.    Defendants' conduct in furtherance of this scheme was intentional. Plaintiff and the other Class members were harmed in that they relied to their detriment on Defendants' conduct and, as a result, purchased dangerous and defective vehicles that saw their value plummet the moment New GM issued the Recall. Defendants unfairly reaped millions of dollars in excessive sales revenue as a result of this scheme and its conduct in furtherance of this scheme.

102.    As described throughout this Complaint, Defendants engaged in a pattern of related and continuous predicate acts for over a decade: the scheme began sometime in or around 2000 and is ongoing.

103.    The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the Enterprise and with the common purpose of defrauding Plaintiff and other Class members and obtaining significant funds while providing defective vehicles that are now worth significantly less in light of the Recall. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

104.    The predicate acts all had the purpose of generating significant revenue and profits for Defendants at the expense of Plaintiff and the other Class members, who were never informed of the Ignition Switch Defect in their defective vehicles and who have now been

damaged by the diminution in in value caused by the Recall. The predicate acts were committed or caused to be committed by Defendants, through their participation in the RICO Enterprise and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and all other Class members' funds.

105.    Plaintiff and Class Members have a protected property interest in current or prospective contractual relations, such as selling or enjoying their cars without being hampered by Defendants' RICO Enterprise. This deprivation of Plaintiff's and Class Members' property interest is distinct from the injury suffered as a result of the diminished value of the vehicles.

106.    Defendants' RICO Enterprise deprived Plaintiff and Class Members of their protected property interest in, and entitlement to, current or prospective business or contractual relations, such as selling or enjoying their cars without being hampered by Defendants' RICO Enterprise

107.    Count I seeks relief pursuant to 18 U.S.C. § 1964(c) from Defendants for violation of 18 U.S.C. § 1962(c).

## COUNT II
### VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
**(Michigan Comp. Laws Ann. § 445,** *et seq.***)**
<u>**(Against Defendants)**</u>

108.    Plaintiff and the Class incorporate by reference paragraphs 1 through 79 as though fully set forth at length herein.

109.    This claim is brought on behalf of all Class.

110.    Plaintiff and Class Members are all "persons" under the Michigan Consumer Protection Act ("MCPA"), M.C.L.A. § 445.902(1)(d).

111.    Defendants were each a "person" engaged in "trade or commerce" under the MCPA, M.C.L.A. § 445.902(1)(d) and (g).

112.    The MCPA prohibits any "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."  M.C.L.A. § 445.903(1).

113.    Defendants' conduct, as alleged in the preceding paragraphs, constitutes unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.  In particular, Defendants violated the MCPA by

a.      "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer," M.C.L.A. § 445.903(s);

b.       "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is," M.C.L.A. § 405.903(bb); and

c.      "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner," M.C.L.A. § 405.903(cc).

114.    GM's practices that violated the MCPA include, without limitation, the following:

a.      GM represented that the Defective Vehicles had safety characteristics that they do not have;

b.      GM represented that the Defective Vehicles were of a particular standard, quality, or grade, when they are not;

c.      GM knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature, even though GM knew that such information was material to the transaction in light of GM's prior representations;

d.      GM failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, Class Members, the public, and the government, the omission of which would tend

to mislead or deceive consumers, and which could not be reasonably known to Plaintiff, Class Members, the public, and the government;

       e.     GM intended for Plaintiff, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiff and Class Members would purchase or lease the Defective Vehicles; and

       f.     GM repeatedly violated the TREAD Act.

115.   Delphi's practices that violated the MCPA include, without limitation, the following:

       a.     Delphi represented that the defective ignition switches had safety characteristics that they do not have;

       b.     Delphi represented that the Defective Vehicles were of a particular standard, quality, or grade, when they are not;

       c.     Delphi knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature;

       d.     Delphi failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff, Class Members, the public, and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to Plaintiff, Class Members, the public, and the government; and

       e.     Delphi intended for Plaintiff, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiff and the Class would purchase or lease the Defective Vehicles;

116.   Defendants' acts and practices were unfair and unconscionable, because their acts and practices offend established public policy, and because the harm Defendants caused

consumers greatly outweighs any benefits associated with its acts and practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiff and the Class from making fully informed decisions about whether to lease, purchase, or retain Defective Vehicles.

117.    Plaintiff and the Class have suffered an injury, including the loss of money or property, as a result of Defendants' unfair, unlawful, or deceptive practices. Had Plaintiff and the Class known about the full extent of the Ignition Switch Defect, they would not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles only to suffer the diminution in value caused by the Recall. Plaintiff and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of here.

118.    All of the wrongful conduct alleged here occurred, and continues to occur, in the conduct of Defendants' business.

119.    Plaintiff requests that this Court enjoin Defendants from continuing their unfair, unlawful, or deceptive practices; require Defendants to repair Plaintiff's and Class Members' vehicles to completely eliminate the Ignition Switch Defect; provide to Plaintiff and each Class Member either their actual damages as the result of Defendants' unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under the MCPA.

120.    Plaintiff also seeks punitive damages against Defendants because they carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally, willfully, and repeatedly misrepresented the reliability and safety of the Defective Vehicles, and continued to conceal material facts that only they knew, even while

numerous innocent victims were being killed as a result of its conduct.  Defendants' unlawful

conduct constitutes malice, oppression, and fraud justifying punitive damages.

**COUNT III**

**FRAUD BY CONCEALMENT**
**(Against Defendants)**

121.    Plaintiff and the Class incorporate by reference paragraphs 1 through 79 as though

fully set forth at length herein.

122.    This claim is brought on behalf of all Class.

123.    Defendants concealed and suppressed material facts concerning the Ignition

Switch Defect.

124.    Defendants had a duty to disclose the Ignition Switch Defect because GM

consistently represented that its vehicles were reliable and safe and proclaimed that it maintained

the highest safety standards, and the defect was known or accessible only to Defendants, who

had superior knowledge and access to the facts, and Defendants knew that the facts were not

known to or reasonably discoverable by Plaintiff and the Class. These omitted and concealed

facts were material because they directly impact the safety of the Defective Vehicles, and GM's

prior representations regarding the safety of its vehicles became materially misleading when

Defendants concealed facts regarding the Ignition Switch Defect.

125.    Defendants actively concealed or suppressed these material facts, in whole or in

part, to induce Plaintiff and Class Members to purchase or lease the Defective Vehicles at high

prices, and to protect Defendants' profits and avoid a costly recall, and Defendants did so at the

expense of Plaintiff and the Class.

126.     Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts. Plaintiff's and the Class's actions were justified.

127.     Because of the concealment or suppression of the facts, Plaintiff and the Class sustained damages because the value of the Defective Vehicles has been diminished by the Recall, the direct result of Defendants' wrongful conduct.

128.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT IV

### VIOLATIONS OF MAGNUSON-MOSS CONSUMER PRODUCTS WARRANTIES ACT ("Magnuson-Moss") (15 U.S.C. § 2301, *et seq.*) (Against GM)

129.     Plaintiff and the Class incorporate by reference paragraphs 1 through 79 as though fully set forth at length herein.

130.     Magnuson-Moss provides a private right of action by purchasers of consumer products against manufacturers or retailers who, among other things, fail to comply with the terms of the written, express, or implied warranties. *See* 15 U.S.C. § 2310(d)(1). As alleged above, GM has failed to comply with the terms of its implied warranties.

131.     The Defective Vehicles are "consumer products," as that term is defined in 15 U.S.C. § 2301(1).

132.     GM is a "warrantor," as that term is defined in 15 U.S.C. § 2301(5).

133. Plaintiff and each member of the Class are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

134. As a warrantor, GM is obligated to afford the Class, as consumers, all rights and remedies available under Magnuson-Moss, regardless of privity.

135. Magnuson-Moss provides a cause of action for, among other things, breach of warranty. *See* 15 U.S.C. § 2310(d)(1). GM has breached its implied warranties of merchantability, which it cannot disclaim under Magnuson-Moss, *see* 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods. Plaintiff and the Class have suffered damages as a result of GM's breaches of implied warranties as set forth above. *See* 15 U.S.C. § 2310(d)(1)-(2).

136. GM was on notice of the ignition switch defects as early as 2001, yet did not undertake any opportunity to cure until 2014, nearly thirteen years later, when GM's knowledge of the ignition switch defects was first made public. Also, once Plaintiff's representative capacity is determined, notice and opportunity to cure on behalf of the Class — through Plaintiff — can be provided under 15 U.S.C. § 2310(e).

137. Plaintiff and the Class members have suffered, and are entitled to recover, damages as a result of GM's breaches of warranty and violations of Magnuson-Moss.

138. Additionally, or in the alternative, Magnuson-Moss provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by Magnuson-Moss. *See* 15 U.S.C. § 2310(d)(1). Rescission and Revocation of Acceptance are equitable remedies available to Plaintiff and the Class members under Magnuson-Moss.

139. Plaintiff also seeks an award of costs and expenses, including attorney's fees, under Magnuson Moss to prevailing consumers in connection with the commencement and

prosecution of this action. *See* 15 U.S.C. § 2310(d)(2). Plaintiff and the Class intend to seek such

an award, including expert witness costs and other recoverable costs, as prevailing consumers at

the conclusion of this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf all others similarly situated,

respectfully requests that this Court enter a judgment against Defendants, and grant the following

relief:

A.      Determine that this action may be maintained as a Class action and

certify it as such under Rule 23(b)(3) and or 23(b)(2), or alternatively certify all issues and claims

that are appropriately certified; and designate and appoint Plaintiff as Class  Representative and

Plaintiff's chosen counsel as Class Counsel;

B.      Declare, adjudge, and decree that Defendants violated 18 U.S.C. § 1962(c) by

conducting the affairs of the RICO Enterprise through a pattern of racketeering activity;

C.      Declare, adjudge, and decree the conduct of Defendants as alleged herein to be

unlawful, unfair or deceptive, and enjoin any such future conduct;

D.      Declare, adjudge, and decree that the ignition switches in the Defective Vehicles

are defective;

E.      Declare, adjudge, and decree that Defendants must disgorge, for the benefit of

Plaintiff and Class Members all or part of the ill-gotten gains it received from the sale or lease of

the Defective Vehicles;

F.      Award Plaintiff and Class Members actual, compensatory damages, or, in the

alternative, statutory damages, as proven at trial;

G.    Award Plaintiff and Class Members treble damages pursuant to 18 U.S.C. § 1964(c).

H.    Alternatively, if elected by Plaintiff and Class Members, require Defendants to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

I.    Award Plaintiff and Class Members punitive damages in such amount as proven at trial;

J.    Award Plaintiff and Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

K.    Award Plaintiff and Class Members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all the legal claims alleged in this Complaint.

Respectfully submitted,

KOZYAK TROPIN & THROCKMORTON, P.A.
*Counsel for Plaintiff*
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

By: /s/ Adam M. Moskowitz
Adam M. Moskowitz
amm@kttlaw.com
Harley S. Tropin
hst@kttlaw.com
Thomas A. Tucker Ronzetti
tr@kttlaw.com
Tal J. Lifshitz
tjl@kttlaw.com
Robert Neary
rn@kttlaw.com

WHATLEY KALLAS LLP
1180 Avenue of the Americas
20th Floor
New York, New York 10036
Telephone: (212) 447-7011
Joe R. Whatley, Jr.
jwhatley@whatleykallas.com

HIDEN, ROTT & OERTLE, LLP
2635 Camino Del Rio South, Suite 306
San Diego, California 92108
Telephone: (619) 296-5884
Michael Rott
mrott@hrollp.com
Eric M. Overholt
eoverholt@hrollp.com

353403.8