Jonathan L. Flaxer, Esq.
S. Preston Ricardo, Esq.
Dallas L. Albaugh, Esq.
Michael S. Weinstein, Esq.
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
Telephone:  (212) 907-7300
Facsimile:  (212) 754-0330

Alexander H. Schmidt, Esq.
Stacey Kelly Breen, Esq.
Malcolm T. Brown, Esq.
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone:  (212) 545-4600
Facsimile:  (212) 545-4653

*Counsel for Plaintiffs*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, | : | Case No. 09-50026 (REG) |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------X

| | | |
|---|---|---|
| STEVEN GROMAN, ROBIN DELUCO ELIZABETH Y. GRUMET, ABC FLOORING, INC., MARCUS SULLIVAN, KATELYN SAXSON, AMY C. CLINTON, AND ALLISON C. CLINTON, on behalf of themselves, and all others similarly situated, | : : : : : : | Adv. Pro. No. 14-01929 (REG) |
| | : | |
| Plaintiffs, | : | **FIRST AMENDED** |
| | : | **CLASS ACTION COMPLAINT** |
| -v- | : : | |
| GENERAL MOTORS LLC, | : : | |
| Defendant. | : | |

---------------------------------------------------------------X

Dr. Steven Groman, Robin DeLuco, Elizabeth Y. Grumet, ABC Flooring, Inc., Marcus

Sullivan, Katelyn Saxson, Amy C. Clinton, and Allison C. Clinton, each individually and as a

class representative on behalf of all similarly situated persons (collectively, "**Plaintiffs**"),

through their counsel, Golenbock Eiseman Assor Bell & Peskoe LLP and Wolf Haldenstein

Adler Freeman & Herz LLP, on knowledge as to their own status and actions and otherwise upon

information and belief, respectfully allege for their first amended complaint ( "**Amended**

**Complaint**") against General Motors LLC ("**GM**") as follows:

### Nature of Adversary Proceeding

1.      Over a decade ago, GM discovered a potentially fatal ignition switch defect (the

"**Ignition Switch Defect**") in millions of its vehicles that rendered them unfit for their intended

purpose – to provide safe, reliable transportation – because the defect could cause the vehicles'

engines to shut off mid-ride, resulting in a sudden and unexpected loss of power.  Since initially

discovering that defect in 2001, GM had multiple opportunities to disclose the defect to the

federal government and GM's customers and to correct the defect by issuing a recall, which was

legally mandated because the defect presented a serious public safety issue.  But on each

occasion, instead of issuing a recall to replace the defective ignition switch and notifying the

National Highway Traffic Safety Administration ("**NHTSA**"), vehicle owners and the public of

the danger of operating the vehicles as required under the law, GM made a business decision to

conceal the defect's existence, and risk damage, injury and death to millions of customers, to

save money.

2.      When GM finally corrected the defective ignition switch in its vehicles beginning

in 2006 for the 2007 model year, GM covered up its malfeasance by illegally using the same part

number to identify both the defective part and the replacement part in order to avoid detection of

the defect by the government and the public, and to deflect any questions about why the change

was made.  As a consequence of GM's cover-up, the defective parts remained in the inventories

of GM dealerships, which then sometimes installed the defective parts in 2006 GM models, as

well as in older models, when their owners brought them in for repairs.

3.       Once GM could no longer conceal the existence of the Ignition Switch Defect in

late 2013, it issued recalls (the "**GM Recall**") for the following vehicles: 2005-10 Chevrolet

Cobalt; 2005-10 Pontiac G5; 2003-07 Saturn Ion; 2006-11 Chevrolet HHR; 2005-06 Pontiac

Pursuit (Canada); 2006-10 Pontiac Solstice; and 2007-10 Saturn Sky ("**GM Vehicles**").  GM has

since disclosed that, by its own count, the defect is linked to at least 31 accidents and 13 deaths.

According to the Center for Automotive Safety, data recorded on NHTSA's Fatal Analysis

Reporting System indicates that 303 fatalities have resulted from the defective ignition switches.

4.       GM now faces numerous investigations by U.S. Governmental departments and

agencies, including the U.S. Congress, Department of Justice, NHTSA and the Securities and

Exchange Commission.  As reported by the New York Times, the Department of Justice is

investigating, among other things, whether GM committed bankruptcy fraud by not disclosing

the Ignition Switch Defect, even though it knew that the defect would expose drivers and

passengers of GM Vehicles to unreasonable risks of accidents and injury or death, and result in

significant post-bankruptcy liability claims by GM's customers.

5.       Adding to GM's depravity, during its 2009 chapter 11 case, GM fraudulently

concealed the Ignition Switch Defect even as it accepted a $50 billion taxpayer bailout and

obtained the U.S. Government's sponsorship of a plan of reorganization that salvaged the

company's very existence.  During its bankruptcy case, GM crafted and obtained court approval

of a sale order that permitted a newly-formed GM entity to buy substantially all of the old GM's

3

assets "free and clear" of any claims despite knowing that it had not disclosed potentially billions

of dollars in product liability and consumer fraud claims relating to the Ignition Switch Defect.

GM deliberately concealed those claims from the Bankruptcy Court, the people and entities who

owned or leased GM Vehicles, the U.S. Government, GM's other creditors, and every other

party in interest.  As a result, GM's customers did not have an opportunity to assert, or have any

reason to believe that they should try to assert, any objections to the sale or claims in the

bankruptcy for damages caused by the Ignition Switch Defect.

6.    Now that the Ignition Switch Defect has finally been disclosed, Plaintiffs and

millions of other GM customers have discovered for the first time that they have substantial

claims for economic losses stemming from GM's longstanding and repeated failures to disclose

the defect.  These claims include consumer fraud under numerous state statutes that are designed

to punish and deter GM for having falsely advertised its vehicles as safe when GM knew they

contained potentially fatal defects.  The state consumer fraud statutes at issue are exercises of

each State's police power to protect the health and welfare of its citizens and serve a critical

public purpose that should be enforced, especially now that GM, thanks to the taxpayer bailout,

is a healthy company no longer in bankruptcy.  Plaintiffs' claims also include damages under the

Magnuson-Moss Warranty Act relating to the unmerchantability of GM Vehicles and the

diminished value the GM Vehicles now have and will continue to have even after they are

repaired pursuant to the GM Recall.

7.    GM has taken the position that the unmerchantability of GM Vehicles and GM's

consumer fraud both before and after the filing of the bankruptcy petition, are barred by this

Court's  sale order under section 363 of the Bankruptcy Code entered on July 5, 2009 (the "**Sale**

**Order**").  Among other dubious propositions, GM's argument suggests that the U.S.

2021312.3

Government would have agreed to extend almost $50 billion of taxpayer money for GM's restructuring and supported shielding it from liability through the Sale Order even if it had known of GM's intentional misconduct.

8.      Plaintiffs, who have commenced class actions against GM to recover for the consumer fraud penalties and economic injuries stemming from the Ignition Switch Defect, bring this class action to obtain an order declaring that the Sale Order cannot be used by GM to absolve it of any liability from Plaintiffs' Ignition Switch Defect claims.

9.      Plaintiffs assert that given the underlying facts demonstrating GM's fraudulent concealment and cover-up of the Ignition Switch Defect, GM's knowledge of the defect within the organization and GM's consequent statutory governmental reporting obligations, it is inconceivable that individuals within GM's upper management and General Counsel's office did not know about the Ignition Switch Defect in GM Vehicles, or the attendant contingent liabilities, when GM entered bankruptcy in June 2009.

10.     Indeed, on May 16, 2014, the United States Secretary of Transportation and NHTSA's Acting Director announced at a press conference that GM executives "all the way up" GM's reporting structure knew of the Ignition Switch Defect at various points in time.  Despite that knowledge, GM failed to disclose those liabilities to this Court, the Government or other GM creditors, and failed to give notice to Plaintiffs and millions of other potential claimants, even though GM had a plain duty to do so.

## Jurisdiction and Venue

11.     This Court has subject matter jurisdiction over the Complaint pursuant to 28 U.S.C. §§ 1334(b) and 2201.

12.    The Complaint is brought pursuant to Fed. R. Bankr. P. 7001(2), (7), and (9), and is a core proceeding under 28 U.S.C. 157(b)(2), including subsections (A), (K), (N), and (O) thereof.

13.    Venue of the Complaint in the Southern District of New York is proper pursuant to 28 U.S.C. § 1409(a).

### The Parties and the Class Action Complaints

14.    Plaintiff and proposed New York State Class Representative Dr. Steven Groman is a resident and citizen of the State of New York.   On April 8, 2014, Groman filed a class action complaint against GM in the United States District Court for the Southern District of New York, which is pending under Case No. 14-cv-02458 (JMF).

15.    Plaintiff and proposed New York State Class Representative Robin DeLuco is a resident and citizen of the State of New York.   On April 16, 2014, DeLuco filed a class action complaint against GM in the United States District Court for the Southern District of New York, which is pending under Case No. 14-cv-02713.

16.    Plaintiff and proposed California State Class Representative Elizabeth Y. Grumet is a resident and citizen of the State of California.

17.    Plaintiff and proposed Florida State Class Representative ABC Flooring, Inc. is a Florida corporation.

18.    Plaintiff and proposed Illinois State Class Representatives Marcus Sullivan, Amy C. Clinton, and Allison C. Clinton, are residents and citizens of the State of Illinois.

19.    Plaintiff and proposed Michigan State Class Representative Katelyn Saxson is a resident and citizen of the State of Michigan.

20.     On March 27, 2014, Plaintiffs Grumet, ABC, Sullivan, Amy Clinton, Allison Clinton, and Katelyn Saxson (together with Plaintiffs Groman and DeLuco, the "**Class Representatives**") filed a class action complaint against GM in the United States District Court for the Southern District of California, which is pending under Case No. 14-cv-0713.

21.     The Class Representatives, on behalf of all similarly situated persons, each of whom own, owned, lease or leased one or more GM Vehicles, filed complaints (collectively, the "**Class Actions**") seeking to hold GM liable for damages that the class members have suffered as a result of an ignition switch (the "**Ignition Switch**") installed in the GM Vehicles (the "**Defective Vehicle Claims**").  True and correct copies of the complaints in the Class Actions are attached hereto as **Exhibits 1 through 3**.

22.     Defendant General Motors LLC is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009 and, on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

23.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and/or (b)(3), as incorporated by Fed. R. Bankr. P. 7023 (the "**Bankruptcy Rules**").  Plaintiffs seek to represent a class initially defined as: All persons and entities that purchased or leased GM Vehicles in the United States (the "**Nationwide Class**") between 2002 and the present (the "**Class Period**").  Plaintiffs additionally seek to represent the following state classes (the "**State Classes**"):

      a.     All persons and entities that purchased or leased GM Vehicles in the State of New York.

7

b.    All persons and entities that purchased or leased GM Vehicles in the State of California.

c.    All persons and entities that purchased or leased GM Vehicles in the State of Florida

d.    All persons and entities that purchased or leased GM Vehicles in the State of Illinois.

e.    All persons and entities that purchased or leased GM Vehicles in the State of Michigan.

24.    Together, the Nationwide and State Classes shall be collectively referred to hereinafter as the "**Class**."  The Class excludes GM and any entity in which GM has a controlling interest, and its officers, directors, legal representatives, successors and assigns.  The Class also excludes any entity in which GM has or had a controlling interest, and its officers, directors, legal representatives, successors and assigns.

25.    The Class is so numerous that joinder of all members is impracticable.

26.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

27.    The Class Representatives' claims are typical of the claims of the Class.  As alleged herein, the Class Representatives and members of the Class ("**Class Members**") all sustained damages arising out of GM's same course of unlawful conduct.

28.    There are questions of law and fact common to the Class, including but not limited to:

- Whether and when GM and Old GM had knowledge of the defect prior to the issuance of the GM Recall;

- Whether GM and Old GM concealed the defect affecting the GM Vehicles;

- Whether GM bears liability for GM Vehicles purchased or leased by Plaintiffs and Class Members;

- Whether the Sale Order was approved in violation of Plaintiffs' due process rights, and as a result cannot bind Plaintiffs and Class Members;

- Whether GM is precluded and estopped from invoking, any claimed protections provided by the Sale Order from Defective Vehicle Claims given that the same employees of Old GM who concealed the Ignition Switch Defect (as defined below) from the Bankruptcy Court thereafter continued to do so as employees of GM, and, like Old GM, thereby prevented Plaintiffs and Class Members from asserting their rights concerning the Defective Vehicle Claims in the Bankruptcy Case;

- Whether Plaintiffs and Class Members were denied the opportunity to protect their rights in connection with the 363 Sale (as defined below) as a result of Old GM's concealment and misconduct and, consequently, are entitled to obtain equitable relief from the Sale Order in order to assert Defective Vehicle Claims against GM;

- Whether Plaintiffs and Class Members are entitled to a declaration that the Sale Order is void and unenforceable to the extent it purports to preclude them from seeking legal recourse against GM for the Defective Vehicle Claims;

- Whether Plaintiffs and Class Members are entitled to a declaration that the Sale Order is void and unenforceable as a fraud on the Bankruptcy Court to the extent it purports to preclude them from seeking legal recourse against GM for the Defective Vehicle Claims.

29.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical and not practical.  The Class Members have a high degree of similarity and are cohesive.  The Class Representatives anticipate no difficulty in the management of this matter as a class action.

30.     Class action status is also warranted under Fed. R. Civ. P. 23(b)(2) and Fed. R. Bankr. P. 7023 because GM has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

31.     Class action status is also warranted under Fed. R. Civ. P. 23(b)(3) and Fed. R.

Bankr. P. 7023 because questions of law or fact common to the members of the Class

predominate over any questions affecting only individual members, and a class action is superior

to other available methods for the fair and efficient adjudication of this controversy.

## Factual Background

### A.     *Summary of the Events Leading to the GM Recall*

32.     Old GM and GM have sold millions of GM Vehicles throughout the world with a

life-threatening Ignition Switch Defect that GM knew could cause the engines in those vehicles

to shut down during normal operation without warning.  GM Vehicles' Ignition Switch could

unintentionally move from the "Run" position to the "Accessory" or "Off" position and cause the

engine and electrical system in the cars to shut down and stall the car while in operation.

33.     At all relevant times, Old GM and GM both knew that the Ignition Switch was

defectively designed because the component detent spring and plunger did not provide sufficient

torque to the keep the Ignition Switch from inadvertently moving to the "Accessory" or "Off"

position during normal operation of GM Vehicles.

34.     At all relevant times, Old GM and GM both knew that all GM Vehicles presented

an unreasonable risk of accidents since they were or may have been equipped with the Ignition

Switch and, thus, vulnerable to the Ignition Switch Defect.

35.     At all relevant times, Old GM and GM both knew that the Ignition Switch, as

approved for use in GM Vehicles, did not meet the company's own torque performance

specifications.

36.     At all relevant times, Old GM and GM also both knew:  (i) that when an Ignition

Switch Defect occurs and the engine and electrical system shut down, the power steering and

power brakes in GM Vehicles are disabled and the airbags often will not deploy; (ii) that the

defect creates a substantial risk that GM Vehicles will be involved in an accident due to engine stall and the unexpected loss of power steering and power brakes; and (iii) that the accident is likely to result in serious bodily injury or even death to vehicle operators and occupants, especially when, among other things, the airbags do not deploy in a collision.

37.      Old GM and GM received hundreds of complaints from consumers about unexpected engine shut-offs and stalls in GM Vehicles and the dangers that such incidents pose. Despite such complaints, Old GM and GM both chose to conceal from the public their knowledge about the Ignition Switch Defect and that it resulted in collisions – causing serious injuries and deaths to occupants – where the airbags did not deploy and the Ignition Switch was recorded in the "Accessory" position.  Nevertheless, at all relevant times, Old GM and GM both marketed and advertised GM Vehicles as highly safe and reliable.

38.      Even after a link between the Ignition Switch Defect and airbag non-deployment in GM Vehicles was confirmed by GM's sensing and diagnostic module supplier in mid-May 2009 – two weeks before Old GM filed for bankruptcy – Old GM and GM chose to continue to conceal the existence of the problem.

39.      At all relevant times, Old GM and GM both knew that the Ignition Switch Defect was related to motor vehicle safety and, as such, both had a legal duty under the Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et seq.* (the "**Safety Act**"), to promptly disclose that defect to NHTSA and to the owners, purchasers and dealers of GM Vehicles.  *See* 49 U.S.C. § 30118(c).

40.      Under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "**TREAD Act**") and its implementing regulations, Old GM and GM both had a legal duty to notify NHTSA of the Ignition Switch Defect not more than 5 working days after it was determined to be related to motor vehicle safety.  *See* 49 CFR § 573.6(a) & (b).

11

41.    Both Old GM and GM implemented internal controls and compliance procedures designed to ensure compliance with the reporting and other legal requirements of the Safety Act and TREAD Act.  Given the financial exposure and other legal and reputational damage the companies would suffer for failure to meet their requirements under those statutes, both Old GM's and GM's compliance procedures were headed by senior executives who made the final decisions on whether notices to NHTSA and recalls were required.  Presumably, Old GM and GM internally followed their Safety Act and TREAD Act compliance protocols and, ultimately, senior executives responsible for compliance made one, if not several, decisions over the years not to notify NHTSA of the Ignition Switch Defect and not to recall the GM Vehicles, and to thereby violate Old GM and GM's duties under the Safety and TREAD Acts.

42.    Despite knowing of the defect since 2001, GM *first* notified NHTSA of the Ignition Switch Defect in a letter dated February 7, 2014 when it determined to conduct a recall for 2005-07 Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  *See* Feb. 7, 2014 Recall Letter at 1, *available at* http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM450012/RCDNN-14V047-1347P.pdf.  The Feb. 7, 2014 Recall Letter sets forth, in relevant part, as follows:

> [GM] has decided that a defect, which relates to motor vehicle safety, exists in 2005-2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  The ignition switch torque performance may not meet [GM's] specification.  If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the "run" position.  The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes.

*Id.*

43.    By letter dated February 24, 2014, GM amended its Feb. 7, 2014 Recall Letter to NHTSA to attach a "chronology of principal events that were the basis for the determination that

the [Ignition Switch D]efect related to motor vehicle safety." Feb. 24, 2014 Recall Letter at 1,
*available at* http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM450663/RCDNN-14V047-3409.pdf.

44.    GM subsequently notified NHTSA in a letter dated February 25, 2014 that it was
expanding the class of GM Vehicles with the Ignition Switch Defect to include 2006-07
Chevrolet HHR and Pontiac Solstice, 2003-07 Saturn Ion and 2007 Saturn Sky vehicles in the
GM Recall. *See* Feb. 25, 2014 Recall Letter at 1, *available at* http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM450732/RCDNN-14V047-7510.pdf.

45.    On March 4, 2014, GM submitted a document to NHTSA, titled *Frequently Asked
Questions for Ignition Switch Recall 13454 & 14063*, advising that 2005-07 Pontiac G5 vehicles
were also being included in the GM Recall. *See* Mar. 4, 2014 FAQ at 1, *available at*
http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM451403/RCORRD-14V047-4567.pdf.

46.    By letter dated March 11, 2014, GM amended its Feb. 25, 2014 Recall Letter to
attach a revised "chronology of principal events that were the basis for the determination that the
[Ignition Switch D]efect related to motor vehicle safety." Mar. 11, 2014 Recall Letter at 1,
*available at* http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM451430/RCDNN-14V047-9346P.pdf. According to the chronology, the GM Recall was expanded to include
2006-07 Chevrolet HHR and Pontiac Solstice, 2003-07 Saturn Ion and 2007 Saturn Sky vehicles
because they were equipped with the same Ignition Switch that was installed in 2005-07
Chevrolet Cobalt and 2007 Pontiac G5 vehicles. *Id.*, Attach. B at 2.

47.    GM notified NHTSA in a letter dated March 28, 2014 that it was expanding the
class of GM Vehicles with the Ignition Switch Defect to include 2008-10 Chevrolet Cobalt,

2008-11 Chevrolet HHR, 2008-10 Pontiac Solstice, 2008-10 Pontiac G5, 2003-07 Saturn Ion and

2008-10 Saturn Sky vehicles in the GM Recall.  *See* Mar. 28, 2014 Recall Letter at 1, *available*

*at* http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM451430/RCDNN-14V047-

9346P.pdf.  The GM Recall was expanded because GM records indicated that certain Ignition

Switch parts may have been installed during repair of some later model year vehicles.  *Id.*  GM

did not explain or disclose that its campaign to conceal the design change of the Ignition Switch

from public knowledge – by insisting upon using the old part number for the "new" part – was

the reason why certain defective Ignition Switches remained in the supply chain.

48.     By letter dated April 11, 2014, GM amended its Mar. 28, 2014 Recall Letter that

attached a revised "chronology of principal events which were the basis for the determination

that the [Ignition Switch D]efect related to motor vehicle safety."  April 11, 2014 Recall Letter at

2, *available at* http://www-di.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM453829/RCDNN-

14V047-2110.pdf.

**B.      *GM Consciously Concealed the Ignition Switch Defect Since 2001***

**(1)      *Old GM Manufactured and Sold GM Vehicles Despite a Known Potentially Fatal Safety Related Defect***

49.     GM documents produced in response to an investigation initiated by the U.S.

House Committee on Energy and Commerce show that Old GM was aware of the Ignition

Switch Defect as early as 2001.

50.     According to a 2001 Problem Resolution Tracking System Report, Old GM

engineers discovered during pre-production testing of the 2003 Saturn Ion that the Ignition

Switch was defective insofar as it could unintentionally move from the "Run" position to the

"Accessory" or "Off" position and cause the car to stall.  *See* 2001 PRTS Report, Issue No. A-

83ZA-81205, (GMHEC000001980-90).

51.     Old GM engineers isolated "two causes of failure" in the Ignition Switch: "Low contact force and low detent plunger force." *Id.* (GMHEC000001986).

52.     On November 14, 2001, after a purported "design change without new requirement/specification" was implemented to address both causes of failure, Old GM falsely declared that "the problem does not exist anymore." *Id.* (GMHEC000001987-88).  Ray DeGiorgio, Chief Ignition Design Engineer for the small car program at Old GM, approved the evaluation and resolution of the pre-production Ignition Switch issues earlier in 2001.

53.     However, earlier engineering drawings prepared by Eaton Corporation ("**Eaton**")[1] for Old GM during its pre-production testing for the 2003 Saturn Ion reveal that there were two competing designs for the detent spring and plunger to be used in the Ignition Switch while pre-production testing was ongoing.

54.     One design was a long detent spring and plunger.  *See* Eaton Detent Spring and Plunger, Drawing No. 741-79378, drafted on Sept. 25, 2001 (GMHEC000003204).  The other was a short detent spring and plunger.  *See* Eaton Detent Spring and Plunger, Drawing No. 741-75259, drafted on Oct. 25, 2001 (GMHEC000003202) (the "**Short Detent Design Drawing**").  The fundamental difference between the two was that the long detent spring and plunger created greater torque when a key was inserted into the ignition, thus addressing the known problem – unintended or inadvertent Ignition Switch movement during vehicle operation leading to an engine stall.

55.     Nevertheless, Old GM approved the defective Short Detent Design Drawing for the 2003 Saturn Ion.  According to a GM Analysis/Development/Validation Plan & Report, Delphi began submitting the Ignition Switch with the short detent spring and plunger for

---

[1] Eaton sold its Vehicle Switch/Electronic Division to Delphi Automotive Systems ("**Delphi**") in 2001.

development to Old GM in December 2001.  *See* Validation Plan, May 21, 2002 (SC-000019-80).

56.    In February 2002, Delphi submitted a Production Part Approval Process form to Old GM to obtain approval for production of the defective Ignition Switch.  *See* House Comm. on Energy & Commerce Memorandum at 5, Mar. 30, 2014, *available at* http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD010.pdf.  Old GM approved production despite the fact that the Ignition Switch did not meet its original torque performance specifications.  *Id; see* PPAP, Approval Date: May 3, 2002 (SC-000415).

57.    Old GM began to sell the 2003 Saturn Ion in August 2002.  Shortly thereafter, customers began to complain about intermittent engine stalls and loss of power while driving.

58.    In 2003, Old GM began to monitor Saturn customer complaints about engine stall. According to a 2003 GM Field Performance Report, a Saturn Ion customer – with 15 miles on his vehicle – complained of "intermittent stall while driving … with no trouble codes associated with the stall."  FRP No. 3101/2003/US (GMHEC000000238).  The report further noted that "[t]echnicians are *rarely* able to duplicate the concern," revealing that it *was* duplicated at times. *Id.*

59.    The Ignition Switch Defect was again brought to the attention of Old GM engineers in 2004.  During pre-production testing of the 2005 Chevrolet Cobalt, Gary Altman, Old GM's Program Engineering Manager for the Cobalt, reported in a Problem Resolution Tracking System Report that "while driving … the drivers [sic] knee bumped the key in such a manner as to turn off the ignition."  *See* 2004 PRTS Report, Issue No. N172404

(GMHEC000001727).  The preliminary root cause identified for this issue was stated in the 2004

PRTS Report as: "low key cylinder torque/effort."  *Id.* (GMHEC000001727-28).

### (2)    *Proposals by Old GM Engineers to Fix the Defect Were Rejected by Management*

60.    On February 1, 2005, Old GM engineers settled on two causes for why the

Ignition Switch in the 2005 Chevrolet Cobalt could move from the "Run" position to the

"Accessory" or "Off" position during normal driving conditions: (a) "[a] low torque detent in the

ignition switch"; and (b) "[a] low position of the lock module in the [steering] column."  *Id.*

(GMHEC000001733).  In addressing the first cause, the engineers determined that

"changing/increasing the ignition switch torque effort would be a good solution."  *Id.*  The

engineers were later advised by Ray DeGiorgio that "it is close to impossible to modify the

present ignition switch … [that it] is very fragile and doing any further changes will lead to

mechanical and/or electrical problems."  *Id.*

61.    While Old GM engineers continued to work toward finding an acceptable fix, on

March 9, 2005, the Cobalt Program Engineering Manager (Gary Altman) issued a directive to

discontinue that effort and take "no action."  *Id.* (GMHEC000001735).  According to the 2004

Problem Resolution Tracking System Report, the engineers were told: (a) "[t]he lead time for all

the solutions is too long"; (b) "[t]he tooling cost and piece price are too high"; (c) "[n]one of the

solutions seems to fully countermeasure the possibility of the key being turned (ignition turn off

during driving"; and (d) "none of the solutions represents an acceptable business case."  *Id.*

Thus, once again, despite its knowledge of the life-threatening defect, Old GM affirmatively

decided that the cost of disclosing and fixing the Ignition Switch Defect outweighed the safety

benefits of taking an alternative course of corrective action.

62.     Less than three months later, in May 2005, Old GM initiated a new Problem

Resolution Tracking System inquiry to revisit the same Ignition Switch issue that was closed

without resolution after the 2004 inquiry.  *See* 2005 PRTS Report, Issue No. N182276

(GMHEC000001742-54).  The internal evaluation of the 2005 Chevrolet Cobalt was reopened

because of a customer complaint "that the vehicle ignition will turn off while driving."  *Id*.

(GMHEC000001742-43).  Additionally, Old GM's "Brand Quality" unit requested that the

issue be reopened "due to the level of buyback activity that is developing in the field …."  *Id*.

(GMHEC000001743).

63.     In June 2005, Old GM asked Delphi to review the Ignition Switch issue in the

Cobalt.  *See* Delphi Letter at 2, April, 11, 2014, *available at* http://www-

odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM453825/RCMR-14V047-8855.pdf.  Delphi

engineers working on the problem remarked in an internal June 2005 email exchange that:

"Cobalt is blowing up in [Old GM's] face in regards to turning the car off with the driver's

knee."  Delphi Confidential email dated June 14, 2005 (SC-000084).

64.     In August 2005, Old GM engineers proposed to resolve the issue by

implementing a "smaller key ring"; however, this proposal was rejected as an "unacceptable

business case."  2005 PRTS Report (GMHEC000001748).

65.     In September 2005, Old GM engineers realized that the use of a smaller key still

would not address the fundamental problem because "[d]etent efforts on ignition switch are too

low allowing key to be cycled to off position inadvertently."  *Id.*  They additionally noted that

"[c]hanges to key can be made to reduce the moment which can be applied to key by key

ring/keys.  This will assist in limiting the issue but will not completely eliminate it.  Changes to

the switch will not be forthcoming from electrical group until MY07."  *Id.*

### (3)    Old GM Implemented a Design Change to the Ignition Switch in 2007 Model GM Vehicles, but Covered Up the Defect and Did Nothing to Remedy the Defect in the Vehicles Already on the Road

66.    On or about January 15, 2006, Old GM requested that Delphi modify the Ignition Switch design to increase "torque to specification."  Delphi Answers to NHTSA at 2-3; *see* Delphi Mechatronics Change Request Form (NHTSA-IGN-00002-04) (attached to Delphi Answers to NHTSA).

67.    On April 26, 2006, Ray DeGiorgio signed a GM Commodity Validation Sign-Off authorizing Delphi to implement a design change to the Ignition Switch.  *See* Ignition Switch Sign-Off (GMHEC000003201).  He noted that the "[n]ew detent plunger (Catera spring/plunger) was implemented to increase torque force in the switch." *Id.*

68.    The design change was also documented in an April 30, 2006 engineering drawing prepared by Delphi.  *See* Delphi Ignition Switch Assembly, Drawing No. 741-76307-T (GMHEC000003206).  Among other things, the Ignition Switch Drawing shows that Old GM replaced the short detent spring and plunger in the Ignition Switch with the long detent spring and plunger previously rejected in 2001.  *Id*.

69.    Old GM directed Delphi to implement the design change in the Ignition Switch – by replacing the short detent spring and plunger to the long detent spring and plunger – *without changing the GM part number for the new part*.  *See* Delphi Engineering Change Support Information Cover Page, May 27, 2006 (GMHEC000003199); Feb. 24, 2014 Recall Letter, attach. B at 2.

70.    In violation of the Safety Act, Old GM did not disclose the redesign of the Ignition Switch to NHTSA, or the reasons therefor.

2021312.3

71.     Old GM began to install the new ignition switch with the long detent spring and plunger in GM Vehicles manufactured for the 2007 model year.  *See* House Memorandum at 7.

72.     Old GM, however, did not issue a recall for GM Vehicles that remained vulnerable to unexpected engine shut off and stalls, despite having a legal duty under the Safety Act to do so.

73.     Through its actions, Old GM consciously concealed the Ignition Switch Defect from NHTSA, owners, purchasers and dealers of GM Vehicles, and the public at large.

74.     By failing to disclose the Ignition Switch Defect in GM Vehicles after the redesign with the long detent spring and plunger, Old GM intentionally exposed operators and occupants of these vehicles to unreasonable risks of accidents, injuries and death.

> **(4)     *Despite Knowing that its Customers were Being Killed, Old GM Circulated Service Bulletins to GM Dealers Rather Than Publicly Disclose the Ignition Switch Defect and Issue a Legally Required Recall***

75.     On July 29, 2005, a 2005 Chevrolet Cobalt crashed in Maryland, killing the 16-year old driver of the vehicle.  Because the vehicle's airbags did not deploy in the crash, notification of the accident was forwarded to NHTSA's Office of Defects Investigations, which initiated a Special Crash Investigation ("**Crash Investigation**").

76.     On August 15, 2005, Calspan Corporation was assigned to conduct the Crash Investigation due to the reported non-deployment of the driver side airbags.  The Crash Investigation found that the driver side airbags did not deploy, and the sensing and diagnostic module data in the 2005 Cobalt indicated that the "vehicle power mode status" was in "Accessory."  *See* Calspan On-Site Air Bag Non-Deployment Investigation, Case No. CA05-049 *available at* http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD019.pdf.

77.    Despite receiving the results of Calspan's Crash Investigation, and despite knowing that the Ignition Switch Defect caused GM Vehicles to slip into the Accessory or Off positions while they were being driven, Old GM did not issue a recall to repair the now-proven deadly defect.  Instead, on December 2005, Old GM issued Service Bulletin No. 05-02-35-007 with the subject reference "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," for 2005-06 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005-06 Pontiac Pursuit, 2006 Pontiac Solstice and 2003-06 Saturn Ion vehicles.  *See* Service Bulletin No. 05-02-35-007, *available at*

http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD021.pdf.  The Service Bulletin acknowledged that "[t]here is a potential for the driver [in these vehicles] *to inadvertently turn off the ignition due to low ignition cylinder torque/effort*."

*Id.*  The Service Bulletin continued:

> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain.  In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down.  This is more likely to happen to a person who is short, as they will have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may [sic] the cause.  The customer should be advised of this potential and should take steps to prevent it – such as removing unessential items from their key chain.
>
> Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design.  As a result, the key cannot move up and down in the slot any longer – it can only rotate on the hole.  In addition, the previous key ring has been replaced with a smaller, 13 mm design. This will result in the keys not hanging as low in the past.

*Id.*

21

78.    In October 2006, a 2005 Chevrolet Cobalt crashed in Wisconsin, killing the front right and back right passengers.  The vehicle's airbags also failed to deploy in this crash. NHTSA assigned the Crash Investigation to the Indiana University Transportation Research Center.  *See Indiana Univ. Transp. Research Ctr. Onsite Air Bag Non-Deployment Investigation, Case No. IN-06-033, available at* http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD023.pdf.  Like the 2005 Crash Investigation, this investigation found that the SDM data in the 2005 Cobalt indicated that the "vehicle power mode status" was in "Accessory."  *Id.*

79.    Despite knowing the results of Indiana University's Crash Investigation, and despite knowing that the Ignition Switch Defect caused GM Vehicles to slip into the Accessory or Off positions while they were being driven, Old GM still did not issue a recall to repair the now twice-proven deadly defect.  Instead, on October 2006, Old GM revised Service Bulletin No. 05-02-35-007 to include 2007 Chevrolet Cobalt, 2007 Chevrolet HHR, 2007 Pontiac G5, 2007 Pontiac Solstice, 2007 Saturn Ion and 2007 Saturn Sky vehicles.  *See* Service Bulletin No. 05-02-35-007A, *available at* http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD025.pdf.

80.    Old GM's Service Bulletins to dealers resulted in a total of 474 key inserts being handed out to customers who brought their GM Vehicles in for service.  Old GM did nothing to warn the hundreds of thousands of owners of GM Vehicles that their cars, which Old GM continued to advertise were safe and reliable, had a potentially fatal defect.

81.    Given GM's reporting obligations under the Safety and TREAD Acts, Old GM's decisions to issue service bulletins rather than recalls had to have been made by, or with the knowledge and approval of, senior executives at the company.

2021312.3

### (5) Old GM Continued to Track Airbag Non-Deployment Incidents But Not Issue a Recall for GM Vehicles

82.     On March 29, 2007, a group of Old GM employees met with representatives from NHTSA in Washington, D.C. to discuss occupant restraint systems.  During the meeting, a NHTSA representative discussed the fatal crash on July 29, 2005 that involved the 2005 Chevrolet Cobalt in a frontal collision where the airbags did not deploy and the vehicle's power mode status was in "Accessory."  *See* April 11, 2014 Recall Letter, Attach. B at 3.

83.     While the Old GM employees at the 2007 meeting claimed not to be aware of the incident, Old GM's Legal Department had opened an accident file in September 2005.  *Id.*

84.     After the meeting, Old GM tasked an investigating engineer to identify Cobalt crashes involving front-end impacts where the airbags did not deploy.  *Id.*  Sensing and diagnostic module data was available for nine crashes – in four of the crashes, the data showed that the ignition was in the "Accessory" position.  *Id.*

85.     In August 2007, Old GM engineers met with Continental Automotive Systems US, Inc. ("**Continental**"), the company's sensing and diagnostic module supplier for the Chevrolet Cobalt, to review sensing and diagnostic module data obtained from a 2005 Cobalt involved in a front-end crash where the airbags did not deploy.

86.     On September 5, 2007, the Chief of NHTSA's Defects Assessment Division ("**DAD**"), emailed other NHTSA officials to propose an investigation of frontal airbag non-deployment in certain GM Vehicles.  *See* G. Magno email Sept. 5, 2007, *available at* http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD027.pdf.  The DAD email provides, in relevant part:

> DAD hereby presents IE07-080 which proposes investigation of frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion.  The non-deployments of are frontal airbags that

do not deploy in severe frontal crashes under circumstances where they would be expected to function and reduce injury levels.

The issue was prompted by a pattern of reported non-deployments in VOQ [Vehicle Owner Questionnaire] complaints that was first observed in early 2005.  Since that time DAD has followed up on complaints, enlisted the support of NCSA's [Crash Investigation] team, discussed the matter with [Old] GM, and received a related EWD referral.

Notwithstanding [Old] GM's indications that they see no specific problem pattern, DAD perceives a pattern of non-deployments in these vehicles that does not exist in their peers and that their circumstances are such that, in our engineering judgment, merited a deployment, and that such a deployment would have reduced injury levels or saved lives.

*Id.*

87.    On November 15, 2007, a NHTSA Office of Defects Investigations Issue Evaluation panel reviewed the proposal.  DAD prepared a PowerPoint presentation limited to 2003-05 Saturn Ion and 2005-06 Chevrolet Cobalt vehicles.  *See* DAD Presentation, Nov. 15, 2007 (NHTSA-HECC-004462-81), *available at*

http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD028.pdf.

88.    According to the DAD Presentation, "[t]he frontal airbags in the … Saturn Ion and … Chevy Cobalt may not deploy in certain crash events where supporting evidence shows that the airbags should have deployed.  Failure of an airbag to deploy can result in reduced protection for vehicle occupants, and may result in injury or death."  *Id.* (NHTSA-HECC-004474).

89.    The Issue Evaluation was prompted by "29 complaints, 4 fatal crashes & 14 Field Reports."  *Id.*  Injuries were reported in twenty-five of the twenty-nine crashes, and NHTSA had

received reports of two additional fatalities involving these GM Vehicles through news reports. *Id.* (NHTSA-HECC-004479).

90.    According to documents later prepared by GM, the company received 248 reports of airbag non-deployment incidents in 2005 model year GM Vehicles. *See* GM Charts, *available at* http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD042.pdf.

91.    Those GM documents show that the company also received 134 reports of airbag non-deployment incidents in 2006 model year GM Vehicles. *See* GM Charts.

92.    Despite all the evidence of fatal and injurious crashes of GM Vehicles where air bags did not deploy, and despite knowing that the Ignition Switch Defect caused GM Vehicles to slip into the Accessory or Off positions while they were being driven, Old GM chose not to issue a recall to repair the now repeatedly-proven deadly defect.

93.    In April 2009 – less than two months before Old GM filed for bankruptcy – a 2005 Chevrolet Cobalt crashed in Pennsylvania, killing the driver and front seat passenger. Calspan was assigned to conduct a Crash Investigation due to the reported non-deployment of airbags. The Crash Investigation found that the driver and front right passenger position airbags did not deploy, and the sensing and diagnostic module data in the 2005 Cobalt indicated that the "vehicle power mode status" was in "Accessory." *See* Calspan On-Site Air Bag Non-Deployment Investigation, SCI Case No. CA09022, *available at* http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD029.pdf.

94.    Despite knowing the results of Calspan's Crash Investigation, and despite knowing that the Ignition Switch Defect caused GM Vehicles to slip into the Accessory or Off

positions while they were being driven, Old GM did not even issue a service bulletin, much less

a recall.  Fearing the potential repercussions for its bankruptcy, Old GM elected not to disclose

the fatal defect in the GM Vehicles and to continue to expose millions of Americans to death or

serious bodily injury each time one of the GM Vehicles was on the road.

95.    Given GM's reporting obligations under the Safety and TREAD Acts, Old GM's

decisions not to issue recalls despite these demonstrated fatal Ignition Switch Defect incidents

again had to have been made by, or with the knowledge and approval of, senior GM executives.

**C.    Shortly Before Old GM Filed for Bankruptcy, Senior Executives of Old
GM Knew of the Link between the Ignition Switch Defect and Airbag
Non-Deployment in GM Vehicles**

96.    On May 15, 2009 – a little over two weeks before Old GM filed for bankruptcy –

several Old GM engineers met again with Continental.  *See* April 11, 2014 Recall Letter, Attach.

B at 4.

97.    At this meeting, the sensing and diagnostic module data from fourteen front end

crashes in which the airbags did not deploy, was available for analysis.  Continental verified that

in *50%* of the crashes the ignition was recorded in the "Accessory" position.  *Id.*

98.    This information confirmed a link between the Ignition Switch Defect and airbag

non-deployment in GM Vehicles.   It also reconfirmed – two weeks before its bankruptcy filing –

that Old GM had enormous exposure for wrongful death, personal injury, property damage and

consumer fraud and other economic loss claims related to the Ignition Switch Defect.

99.    Despite confirming the link between the Ignition Switch Defect and airbag non-

deployment in GM Vehicles, Old GM continued to conceal the problem.

100.    Before filing for bankruptcy, Old GM had in place compliance procedures for

ensuring that Old GM complied with the Safety Act and TREAD Act, including the requirements

to report safety-related defects to NHTSA.  The senior compliance officers in whom rested final

26

authority over whether to report safety issues to NHTSA were senior executives within various

departments of Old GM, including its General Counsel's office.

101.    While some of the persons who occupied the senior executive levels of Old GM's

Safety and TREAD Act regulatory compliance process may have changed over time, the senior

executives occupying those positions were likely made aware of NHTSA's Crash Investigations

described above, and they, among other senior executives, made the decisions to issue service

bulletins rather than recalls in response to the Crash Investigations.  The same senior executives

also made the decisions to not report the Ignition Switch Defect to NHTSA despite Old GM

having many opportunities, and a legal obligation to do so.

102.    The same senior executives in all likelihood were also aware of the results of the

May 15, 2009 Continental meeting re-confirming the link between the Ignition Switch Defect

and the non-deployment of air bags in the GM Vehicles.  Despite their knowledge, some or all of

those senior executives decided not to take steps or measures that would have caused Old GM to

disclose the Ignition Switch Defect and its large attendant liabilities to the Court or to Old GM's

creditors before or during Old GM's bankruptcy.

103.    Some or all of those senior executives retained their jobs and positions with GM

after new GM was formed in July 2009, and they maintained their roles and responsibilities in

connection with GM's Safety Act and TREAD Act compliance program.  Even after moving

over to new GM, those senior executives failed to disclose the Ignition Switch Defect and its

large attendant liabilities to the Court or to Old GM's creditors before or during Old GM's

bankruptcy.

104.    GM recently agreed to enter into a consent order admitting that it violated the

Safety Act by repeatedly failing to notify the government about the Ignition Switch Defect and

paid a record-setting maximum $35 million fine to end NHTSA's investigation. United States

Secretary of Transportation Anthony Foxx reported during a May 16, 2014 press conference

announcing the consent order, that what "was very clear is that employees of General Motors,

from engineers, investigators, *all the way up through executives*, at varying points in time were

aware of information and were briefed on information associated with this recall. That's exactly

why we are – entered into this consent agreement, to hold them accountable for *failing to act at a*

*variety of levels within the company* on the safety defect information they had and they should

have brought forward."

105.    At the same press conference, David Friedman, Acting Administrator of NHTSA,

stated that GM knew about "this exact issue, what happens when a key inadvertently ends up in

the accessory position," certainly no later than 2009, when it received information tying the non-

deployment of airbags to Ignition Switch Defect related stalls in GM Vehicles.

**D.      *The Bankruptcy Proceeding***

**(1)      *GM Reorganizes with the Backing and Extensive***
**         *Financial Support of the U.S. Government***

106.    In late 2008, while in the midst of a severe liquidity crisis, Old GM was

compelled to seek financial assistance from the U.S. Government in order to continue operations

and reorganize. Between December 2008 and May 2009, the U.S. Government provided Old

GM with billions of dollars of taxpayer money in the form of short-term, emergency funding and

working capital loans as Old GM finalized a restructuring plan.

107.    On December 31, 2008, Old GM received $13.4 billion in short-term financing

through the Troubled Asset Relief Program. *See* U.S. Treasury Dept. Office of Public Affairs

GM Timeline, *available at* http://www.treasury.gov/press-center/press-

releases/Documents/GM%20Timeline.pdf.

108.    On April 22, 2009, the U.S. Government provided a $2 billion working capital loan to Old GM.  *Id.*

109.    On May 20, 2009, the U.S. Government provided an additional $4 billion working capital loan to Old GM.  *Id*.

110.    On June 1, 2009 (the "**Petition Date**"), Old GM filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "**Bankruptcy Case**") in this Court (the "**Bankruptcy Court**").  At the time of its filing, Old GM's largest secured creditor was the United States Treasury.

111.    On the Petition Date, Old GM filed its motion for approval (the "**Sale Motion**") to sell substantially all of its assets to a U.S. Treasury-sponsored purchaser via a Master Sale and Purchase Agreement dated as of the Petition Date under section 363 of the Bankruptcy Code(the "**363 Sale**").

112.    On June 3, 2009, the U.S. Government provided Old GM with $30.1 billion in debtor-in-possession financing.

113.    As Old GM stated in its filings with the Bankruptcy Court, restoring consumer confidence in GM was critical to its restructuring plan and a fundamental premise of the U.S. Treasury program:

- In the Sale Motion, Old GM stated that the "363 Transaction will restore confidence on the part of consumers that they can purchase a GM vehicle without concerns regarding residual value, replacement parts, warranty obligations, and maintenance."

- In its Disclosure Statement, Old GM stated that: ". . . a fundamental premise of the U.S. Treasury program was to revive consumer confidence in [Old] GM products and services for the benefit of [Old] GM's employees, its extended supplier and dealer network, and the families and communities that depend on [Old] GM operations.  Knowing that [Old] GM's business would exist and be supported in the form of GM, consumers would have the confidence that if they purchased a GM

vehicle, there would be a dealer network and U.S. Government support to assure parts, warranty service, and a market for future used GM vehicle trade-ins."

114.    On July 5, 2009, only a month after the Petition Date, the Bankruptcy Court entered the Sale Order approving the sale of substantially all of Old GM's assets to GM, which for all practical purposes is the same as Old GM, under the Amended and Restated Master Sale and Purchase Agreement ("**MPA**"), dated as of June 26, 2009, by and among Old GM and its debtor subsidiaries, as sellers, and GM, the purchaser sponsored by the U.S. Treasury.

115.    The Sale Order purported to transfer substantially all of Old GM's valuable operating assets to GM (the "**Assets**") "free and clear" of claims, including claims for successor liability.  Specifically, Paragraphs 7-10 of the Sale Order provide:

> Except for the Assumed Liabilities,[2] pursuant to sections 105(a) and 363(1) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon Closing, shall be free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, and all such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, shall attach to the net proceeds of the 363 Transaction in the order of their priority, with the same validity, force and effect that they now have as against the Purchased Assets, subject to any claims and defenses a Seller or any other party in interest may possess with respect thereto.
>
> Except as expressly permitted or otherwise specifically provided by the MPA or [the Sale] Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, and other creditors, holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or

---

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Sale Order.

2021312.3

unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined (with respect to future claims or demands based on exposure to asbestos, to the fullest extent constitutionally permissible) from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor liability.

[The Sale] Order (a) shall be effective as a determination that, as of the Closing, (i) no claims other than Assumed Liabilities, will be assertable against the Purchaser, its affiliates, their present or contemplated members or shareholders, successors, or assigns, or any of their respective assets (including the Purchased Assets); (ii) the Purchased Assets shall have been transferred to the Purchaser free and clear of all claims (other than Permitted Encumbrances); and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities….

The transfer of the Purchased Assets to the Purchaser pursuant to the MPA constitutes a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title and interest of the Sellers in and to the Purchased Assets free and clear of any all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than Permitted Encumbrances), including rights or claims based on any successor or transferee liability, other than the Assumed Liabilities.

116.    On March 29, 2011 (the "**Confirmation Date**"), the Court entered an order confirming Old GM's Second Amended Joint Chapter 11 Plan (the "**Plan**").  The Plan became effective on March 31, 2011.

117.    The Plan established post-confirmation trusts to administer creditor claims and make plan distributions to creditors.  The Motors Liquidation Company GUC Trust (the "**GUC Trust**") was formed for the benefit of general unsecured creditors, and the MLC Asbestos PI Trust (the "**Asbestos Trust**") was formed for the benefit of asbestos personal injury claimants.

All claimants against Old GM as of the Confirmation Date received a beneficial interest in the

GUC Trust or the Asbestos Trust.

118.   In or about April of 2011, Old GM announced that 97% of creditor claims had

been resolved, and distributed more than 75% of the Stock and Warrants that Old GM owned in

GM to unsecured creditors.

### (2)   Old GM and GM Fraudulently Concealed the Existence of Claims Related to the Ignition Switch Defect from the Bankruptcy Court, the U.S. Government, Old GM's and GM's Other Creditors, the Plaintiffs and the Public

119.   Upon filing for bankruptcy on June 1, 2009, Old GM became a debtor-in-

possession and thus became duty bound to carry out numerous statutory duties, including to

investigate the acts, conduct and liabilities of Old GM.   In addition, upon becoming a debtor-in-

possession, Old GM became a fiduciary to the Bankruptcy Court and the Old GM bankruptcy

estate (the "**Estate**"), along with its creditors, including the U.S. Government.  This duty

includes a fiduciary duty of care.   Consistent with the foregoing, Old GM was required, with the

utmost care, to:  (i) conduct a reasonably diligent search to identify all of Old GM's creditors;

(ii) disclose to the Court and to Old GM's creditors each and every claim and liability that

existed or could be asserted against the Estate: and (iii) notify all creditors and parties-in-interest,

including Plaintiffs and the Class Members, of the hearing on the Sale Motion and of their

opportunity to object.

120.   Old GM knew or should have known that not only was it acting in a fiduciary

role, but also that the Bankruptcy Court and all parties in interest were entitled to, and would in

fact rely on, Old GM to carry out these duties.  In this respect, Old GM was represented by

extremely sophisticated and knowledgeable counsel, who surely advised Old GM of its fiduciary

and statutory duties with great care and in great detail.

2021312.3

121.    Old GM's fiduciary and other duties were heightened due to the unusual nature of the 363 Sale, including that:  (i) the sale was not arms-length in that there was no non-insider third party buyer who would insist on careful, extensive diligence as to all actual and potential liabilities; and (ii) the notice period regarding the sale was relatively brief.  Thus, certain circumstances that ordinarily ensure the integrity of the sale process were not present.

122.    GM was fully aware of every fact and circumstance known to Old GM, as well as of every duty imposed upon Old GM given that GM was merely a continuation of Old GM, sharing virtually all of its employees and officers.

123.    Despite these duties, and despite the fact that Old GM and GM and their senior executives were fully aware of the Ignition Switch Defect, the results of the various NHSTA Crash Investigations, Old GM's issuance of service bulletins to GM dealers addressing the Ignition Switch Defect related problems, and the information provided by Continental in May 2009 reconfirming the link between the Ignition Switch Defect and air bag non-deployment problems in GM Vehicles, neither Old GM nor GM disclosed the Ignition Switch Defect or its massive attendant liabilities to the Bankruptcy Court, the U.S. Government and other creditors, or to the Plaintiffs and other Class Members.

124.    Nowhere in the Sale Motion or in any of Old GM's filings with this Court did it disclose the existence of any potential claims or liability it faced as a result of the Ignition Switch Defect; nor was any potential claim or liability ever disclosed during the multi-day hearing on the Sale Motion.

125.    Pursuant to an Order of this Court dated June 2, 2009, Old GM was required to give notice to all known creditors of the 363 Sale.  Old GM could have readily ascertained Plaintiffs and the Class Members through reasonably diligent efforts.  Despite all of the

foregoing facts and circumstances, Old GM, however, did not notify Plaintiffs or the Class

Members of the Sale Motion despite its obligation to do so.

126.    GM, given its full knowledge of all of the facts and circumstances known to Old

GM, could have insisted as a condition to the 363 Sale that Old GM add all owners of vehicles

subject to service bulletins, such as the Plaintiffs and the Class Members, to the list of parties to

be served with notice of the 363 Sale if it wished to avoid assuming potential latent liabilities to

them.  GM, however, did not do so.

127.    On September 2, 2009, Old GM filed a motion (the "**Bar Date Motion**"),

pursuant to Section 502(b)(9) of the Bankruptcy Code and Fed. R. Bankr. P. 3003(c)(3), to

establish November 9, 2009 as the deadline for filing proof of claims.

128.    Neither Old GM nor GM provided notice of the Bar Date Motion to Plaintiffs or

the Class Members, despite the fact that, as buyers and lessees of GM Vehicles that may have the

Ignition Switch Defect, they were known creditors of Old GM.

129.    On September 16, 2009, the Court entered an order (the "**Bar Date Order**")

setting November 9, 2009 (the "**Bar Date**") as the deadline to file a proof of claim against Old

GM and approving the form and notice of the Bar Date (the "**Bar Date Notice**").

130.    Pursuant to the Bar Date Order, the Court directed Old GM to serve the Bar Date

Notice upon "all parties known to the Debtors as having potential Claims against any of the

Debtors' estates."

131.    Old GM did not serve Plaintiffs or the Class Members with the Bar Date Notice

and, thus, violated the Bar Date Order.

132.    Old GM and GM knowingly and fraudulently concealed the Ignition Switch

Defect from the Bankruptcy Court and parties in interest.  Old GM and GM's fraudulent intent is

demonstrated by the above facts reflecting Old GM and GM's long-held knowledge and

concealment of the Ignition Switch Defect and the following facts surrounding the bankruptcy.

133.    In March 2009, the U.S. Government rejected Old GM's initial restructuring plan

and gave it an additional sixty days to submit a viable plan or, otherwise, Old GM would be

forced to liquidate.  *See* Remarks by the President on the American Automotive Industry, Mar.

30, 2009, *available at* http://www.whitehouse.gov/the-press-office/remarks-president-american-

automotive-industry-33009.  As set forth in a March 30, 2009 speech by President Obama:

> One of the challenges we've confronted from the beginning of this administration is what to do with the state of the struggling auto industry.  In recent months, my Auto Task Force has been reviewing requests by [GM] and Chrysler for additional government assistance, as well as plans developed by each of these companies to restructure, to modernize, and to make themselves more competitive.  Our evaluation is now complete. …
>
> …
>
> [T]he federal government provided [GM] and Chrysler with emergency loans to prevent their sudden collapse at the end of last year – only on the condition that they would develop plans to restructure.  In keeping with that agreement, each company has submitted a plan to restructure.  But after careful analysis, we've determined that neither goes far enough to warrant the substantial new investments that these companies are requesting.
>
> And so today I'm announcing that my administration will offer GM and Chrysler a limited additional period of time to work with creditors, unions, and other stakeholders to fundamentally restructure in a way that would justify an investment of additional taxpayer dollars.  During this period they must produce plans that would give the American people confidence in their long-term prospects for success.
>
> …
>
> GM has made a good faith effort to restructure over the past several months – but the plan that they've put forward is, in its current form, not strong enough. …

> In this context, my administration will offer General Motors adequate working capital over the next 60 days.

*Id.*

134.    If Old GM did not submit a viable plan – one that would "justify an investment of additional taxpayer dollars" and instill "confidence in [its] long-term prospects for success" – the company would have been forced to cease operations and proceed to an orderly liquidation. Hence, Old GM and GM and their co-extensive senior executives had ample motive to conceal any actual or potential large liabilities that may have interfered with their ability to meet the Government's requirement to present a viable reorganization plan within 60 days.

135.    Indeed, this Court has previously conducted hearings concerning a large liability that Old GM and GM concealed because it would have interfered with their reorganization had it been properly and timely disclosed.  In 2012, the GUC Trust brought an adversary proceeding against numerous hedge funds and other holders of certain GM Canada bonds, asserting that Old GM defrauded the Bankruptcy Court by backdating a lock-up agreement to make it appear to be a pre-petition transaction and to use property of Old GM's Estate without Court approval.

136.    Old GM entered the lock-up agreement to keep GM Canada out of insolvency proceedings in Canada.  If GM Canada had been forced into such proceedings by the hedge funds and other holders of certain GM Canada bonds, that proceeding would have foreclosed any opportunity for GM to reorganize through an expedited bankruptcy process in the U.S.

137.    Additionally, the failure to obtain Court approval of the post-petition lock-up agreement provided grounds to vitiate it and potentially reopen the bankruptcy.  As the Court explained at a July 26, 2012 hearing, the impact of Old GM's conduct was significant:

> Certain of the GUC Trust allegations, if proven, could indeed cause me to grant 60(b) relief.

> …

Though the evidence may well not show that disclosure of the lock-up agreement was intentionally concealed from the Court, the evidence will almost certainly show … that at the time of the sale hearing … no disclosure was made to me whatever of Old GM's intention by that motion to include provisions under which it would cooperate in efforts to put beyond judicial review a payment of $376 million to certain selected creditors, and acquiescence an additional $2.67 billion in claims and give up of the estate's rights as to important avoidance actions.

It may be simply that Old GM's lawyers had more important things on their mind than to mention these things to me when I approved the [MPA] and entered the sale order, but the bottom line is … that this matter is huge, and if these things had been disclosed to me then I would have been concerned about them then as I am now.

There was a lack of disclosure to the Court on the matter with the potential to injure Old GM creditors to the extent of hundreds of millions, if not billions of dollars.

…

It never once occurred to me, and nobody bothered to disclose, that amongst all of the assigned contracts was this lock-up agreement, if indeed it was assigned at all.  When I heard about that it wasn't just a surprise, it was a shock.

*In re Gen. Motors Corp.,* No. 09-50026, Adv. Case. No. 12-9802, July, 19, 2012

Hearing Tr. (Dkt. No. 146) at 90:20-21, 90:25 – 91:1-21, 94:10-14.

138.    The disclosure of the Ignition Switch Defect would have similarly interfered with Old GM's ability to present a viable restructuring plan in the timeframe required by the U.S. Government.  As with respect to the undisclosed lock-up agreement, Old GM and GM's senior executives knew that Old GM's potential liabilities resulting from the undisclosed Ignition Switch Defect amounted to hundreds of millions, if not billions, of dollars.

139.    In fact, Old GM initially proposed a sale that would have completely absolved GM of all claims relating to GM Vehicles.  Thirty-seven State Attorneys General opposed the proposal to completely extinguish all warranty or liability claims for GM Vehicles manufactured

37

and sold prior to the 363 Sale.  Only through the efforts of the State Attorneys General did GM

agree to assume:  (i) "all Liabilities arising under express warranties of [Old GM] … in

connection with the sale of any new, certified used or pre-owned vehicles or new or

remanufactured motor vehicle parts and equipment … manufactured or sold … prior to or after

the Closing and … all obligations under Lemon Laws"; and (ii) "all Liabilities to third parties for

death, personal injury or other injury to Persons or damage to personal property caused by motor

vehicles designed for operation on public roadways or by the component parts of such motor

vehicles and, in each case, manufactured, sold or delivered by [Old GM] … which arise directly

out of accidents, incidents or other distinct and discreet occurrences that happen on or after the

Closing Date and arise from such motor vehicles' operation or performance."    Sale Order at 29.

140.    Undoubtedly, the Attorneys General would have sought to preserve Plaintiffs' and

Class Members' right to assert consumer fraud and related state police power claims against GM

had they known in June or early July 2009 that the Ignition Switch Defect had not been disclosed

or corrected by Old GM for almost an entire decade or properly and timely disclosed to them or

the Court.  The United States Government, moreover, would not have consented to the Sale

Order or agreed to extend $50 billion of taxpayer money to bail out GM had it known that Old

GM and GM continued to sell and allow its customers to drive more than one million potentially

fatal GM Vehicles that should have been recalled and repaired in accordance with the

requirements of the Safety and TREAD Acts but never were.

141.    By illegally concealing the Ignition Switch Defect, Old GM and GM avoided the

significant costs and negative reputational damage of a recall at a time when it was desperate to

establish GM's future viability.  The recall of GM Vehicles in existence at that time would have

significantly diminished the company's prospects for further financial assistance or backing from

the U.S. Government.  Further, the investigation of the Ignition Switch Defect would show that

Old GM was well aware of a serious safety defect in GM Vehicles and that its response to the

problem was to send out service bulletins rather than complying with its obligations under

federal law by timely notifying NHTSA of the Ignition Switch Defect and issuing a recall.

142.    Old GM directors and executives, moreover, had an independent motive to

conceal matters that were potentially harmful to GM's successful reorganization, including the

Ignition Switch Defect in GM Vehicles, because they would have lost hundreds of thousands to

millions of dollars of value in Old GM stock had the company been forced to liquidate in a

Chapter 7 proceeding.  While technically their Old GM stock was cancelled as part of the Plan,

GM has since replaced (and in some cases even enhanced) the value of those officers and

directors' holdings by issuing them new GM stock and stock options.

**E.      *GM Used the Bar Order as a Sword to Discourage Claims Related to the Ignition Switch Defect and Continued to Conceal the Existence of the Defect Despite the Existence of Substantial Evidence to the Contrary***

143.    Even though GM and its senior executives were aware before the 363 Sale and the

Bar Date of the link between the Ignition Switch Defect and airbag non-deployments in

collisions involving GM Vehicles, and that those accidents often resulted in horrific injuries and

fatalities, both Old GM and GM vehemently denied any culpability for such accidents during and

after the bankruptcy.

144.    Old GM and GM also employed a harsh litigation strategy when dealing with the

claims brought by those who were harmed and the families of the deceased.  For example, "in

one case, GM threatened to come after the family of an accident victim for reimbursement of

legal fees if the family did not withdraw its lawsuit.  In another instance, it dismissed a family

with a terse, formulaic letter, saying there was no basis for claims."  H. Stout, B. Vlasic, D. Ivory

& R. Ruiz, *Carmaker Misled Grieving Families on a Lethal Flaw*, N.Y. Times, Mar. 25, 2014,

*available at* http://www.nytimes.com/2014/03/25/business/carmaker-mislead-grieving-families-on-a-lethal-flaw.html.  GM also threatened injured parties with retaliatory lawsuits and asserted

that the earlier bankruptcy barred these people from pursing claims.  *Id.*

145.    GM's litigation strategy also consisted of concealing facts showing the link

between the Ignition Switch Defect and the fatal accidents it caused.

146.    On May 10, 2010, a 2005 Chevrolet Cobalt crashed in Georgia, killing the 29-

year old driver of the vehicle.  The accident occurred after the Ignition Switch on the Cobalt

unintentionally moved from the On position to the Accessory position, shutting off power

steering and power brakes and causing the driver to lose control of her vehicle before being

struck by another car in oncoming traffic.

147.    In July 2011, GM Legal staff and Field Performance Assessment and Product

Investigations personnel met regarding a Field Performance Evaluation of frontal airbag non-

deployment incidents in the 2005-07 Chevrolet Cobalt and 2007 Pontiac G5.  *See* April 11, 2014

Recall Letter, Attach. B at 4.

148.    In August 2011, Brian Stouffer, a GM Field Performance Assessment Engineer,

was assigned to the FPE investigation.  *Id.*  In addition to an analysis of a group of crashes

involving 2005-07 Chevrolet Cobalt and 2007 Pontiac G5 vehicles where the airbags did not

deploy, the FPE investigation also included a review of information related to Saturn Ion,

Chevrolet HHR and Pontiac Solstice vehicles.  *Id.*

149.    On October 3, 2011, Mary Barra, Executive Vice President of Global Product

Development at GM, received an email from Terry Woychowski with the reference "NYT on

ION Upgrade."  Oct. 3, 2011 email string (GMHECC000221311), available at

http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-

SD036.pdf.

150.    The email to Barra forwarded an earlier email from William Kemp, a GM safety

lawyer, to Woychowski, which included in its body a New York Times article titled *Government*

*Deepens Investigation of Saturn Ion for Steering Problem*, and the comment, "[f]irst story I've

seen." *Id.* The article, embodied within the email Barra received, sets forth the following:

> The National Highway Traffic Safety Administration is a step
> closer to concluding that General Motors should have recalled
> 384,000 Saturn Ions in 2010 as part of a larger recall that covered
> one million Chevrolets and Pontiacs for a steering problem. The
> agency posted a document on its Web site over the weekend saying
> that it upgraded its investigation into Saturn Ions from the 2004-7
> model years as a result of heightened concern that a sudden loss of
> electric power steering could cause crashes. The document shows
> the agency has 846 complaints from Saturn owners and G.M. has
> almost 3,500. There were two reports of driver injuries from
> crashes. The document also said that the agency tested an Ion and
> was able to duplicate the type of steering failure that caused the
> 2010 recall of one million 2005-10 Chevrolet Cobalts and 2007-10
> Pontiac G5s. General Motors had resisted the Cobalt and G5
> recall, saying that even if the power assist suddenly failed, the
> driver would be able to control the car, although it would take
> more effort to turn the wheel. The safety agency did not agree,
> concluding that such failures would increase the risk of a crash.
> Shortly after the recall, the agency received a letter from G.M.
> answering several questions posed earlier by the agency. One
> answer noted that the Saturn Ion was equipped with the same
> power steering system as the Cobalt and G5. G.M. argued that the
> Saturns did not need to be recalled. Alan Adler, a spokesman for
> G.M., said that the Saturn failure rate was far lower and the
> automaker was providing those owners with a 10-year or 100,000-
> mile warranty. Eric Bolton, a spokesman for the agency, said that
> N.H.T.S.A. did not insist on a Saturn recall because it did not have
> enough proof of a defect. Even so, the agency began collecting
> information, including complaints, and last December it opened a
> recall query, an investigation into whether a recall was adequate.
> The recall query has now been upgraded to an engineering
> analysis, a step closer to a recall. Mr. Adler said that the
> automaker was cooperating with the agency. Mr. Adler did not

41

respond to a question about the company's earlier assertion that the
vehicles did not need to be recalled.

*Id.*

151.    In May 2012, GM engineers tested the torque performance of the Ignition Switch

in forty-four GM Vehicles. *See* House Memorandum at 10. The test results revealed that the

majority of GM Vehicles, from model years 2003-07, exhibited torque performance below

original GM specifications. *Id.* The tests also exhibited an upward shift in Ignition Switch

torque performance for 2007 model year vehicles manufactured beginning in late 2006. *Id.*

152.    GM, however, always knew that the Ignition Switch did not meet GM

specifications. In February 2002, Old GM approved the Delphi Product Part Approval Process

despite the fact that sample testing showed that Ignition Switch torque was below original

specification. *See* ¶ 56, *supra.* In January 2006, Old GM requested that Delphi change the

Ignition Switch design to increase Ignition Switch torque to specification. That design change –

which involved replacing the short detent spring and plunger in the Ignition Switch with the long

detent spring and plunger – was approved by Old GM in April 2006. *See* ¶¶ 66-67, *supra.*

Sometime thereafter, Old GM began to install the modified ignition switch in 2007 model year

vehicles for all models affected by the GM Recall. *See* ¶ 71, *supra.*

153.    In September 2012, Brian Stouffer by email requested assistance from the GM

Red X team (GM engineers assigned to find the root cause of engineering or technical problems)

"to examine changes on the Cobalt between the 2007 and 2008 models." Sept. 6, 2012 Email

(GMHEC000136204). His email states in relevant part:

> I am trying to understand why 2008 customers no longer report
> vehicle stalling root caused to knee contact with the key/key fob
> that turned the ignition. There are many reports of that condition
> for 2005-7 vehicles. There was speculation that the condition
> stops because the key went from having a slot for the key ring to a
> hole. With the slot, there is a moment arm that may allow the key

to turn if the fob is contacted.  However, from our discussion with the engineer responsible for keys, the change for slot to a hole did not occur until the 2010 model.

My investigation into the issue began due to reports of crashes with non-deploying airbags in 2005-2007 Cobalt vehicles.  One thing the crashes all have in common is that before the most significant impact, they all had an off road event.  Analysis of the vehicles found that in many cases, the ignition was in accessory or off when the impact occurred.  It is believed that during the off road event, the driver's knee may contact the key or key fob and turn the ignition off.  With the ignition in that position, the airbags will not deploy, but the SDM does not record the crash information.

For 2008 Cobalt vehicles, we are not aware of any reports of frontal crashes with non-deploying frontal airbags.  The same is true for complaints (TAC/CAC) related to knee contact with the ignition that shut the car off.

*Id.*

154.    In April 2013, GM reconfirmed through Stouffer that "the torque performance of a GM service part ignition switch purchased after 2010 differed substantially from … an [I]gnition [S]witch that was the original equipment installed on a 2005 Cobalt."  April 11, 2014 Recall Letter, Attach. B at 6.  Among other things, Stouffer "learned that others had observed and documented that the detent plunger and spring used on the service part switch differed from those used on the original equipment switch installed on the 2005 Cobalt."  *Id.*

155.    GM, however, remained unwilling to disclose this information to the public.  For example, GM's chief switch engineer, Ray DeGiorgio was deposed on April 29, 2013 ("**DeGiorgio Deposition**") in a wrongful death action of the young woman who died in the May 10, 2010 crash of her 2005 Chevrolet Cobalt in Georgia (the "**Melton Action**").  During the deposition, DeGiorgio not only disputed the existence of the Ignition Switch Defect in the 2005 Cobalt, *see* DeGiorgio Deposition  at 58:12 – 59:25 (GMHEC000138909), *available at*

http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-

SD056.pdf, he denied being aware of any design changes made to the Ignition Switch in GM

Vehicles during model years 2005 and 2010 that would have affected torque performance. *Id.* at

57:1 – 58:3; 129:2-5 (GMHEC000138927).

156.    As indicated above, on April 26, 2006, DeGiorgio approved the Ignition Switch

Sign-Off which authorized Delphi to implement a design change to the Ignition Switch. *See* ¶

67, *supra*.

157.    Brian Stouffer was also deposed in the Melton Action on May 1, 2013 ("**Stouffer**

**Deposition**") and testified – directly contrary to his findings the month before – that the torque

performance numbers on switches used in production after the 2007 model year were not

"substantially higher" than those used in production before the 2007 model year. *See* Stouffer

Deposition at 29:22 – 30:20 (GMHEC000146933), *available at*

http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-

SD055.pdf.

158.    GM's Legal Department, including its notoriously "hands on" General Counsel

Michael Millikin, who became an Associate General Counsel at Old GM in 2005 and General

Counsel of GM in July 2009, was also aware of the body of evidence being marshaled internally

regarding the Ignition Switch Defect in GM Vehicles, as well as the efforts to conceal that

information from public knowledge.  Discovery produced by GM in the Melton Action followed

a structured protocol managed by GM Legal.  As set forth in the corporate guidelines for

employee conduct:

> Litigation is a fact of life.  Requests for documents in various form
> … related to litigation and other legal proceedings normally flow
> through channels set up for that purpose, but there are many times
> when other employees receive them.  Consult immediately with the
> Legal Staff if, as a representative of GM, you receive any
> summons, subpoena, inquiry, or other communication from a

> court, marshal, sheriff, government agent, or from any lawyer.
> Before submitting to an interview, answering any questions,
> producing any documents, or even responding to any questions
> about litigation or an investigation, consult with the Legal Staff.
> This applies to matters in which GM is involved directly, like an
> investigation or a lawsuit involving a GM product or a GM facility.
> It also applies to matters in which GM is involved indirectly,
> including investigations of suppliers, dealers, or competitors.

GM Winning with Integrity (Aug. 2, 2011) at 12, *available at*

http://www.gm.com/content/dam/gmcom/COMPANY/Investors/Corporate_Governance/PDFs/

Winning_With_Integrity.pdf.  GM's Legal Department was complicit in the fraud resulting in

the false testimony elicited by DeGiorgio and Stouffer which was inconsistent with

contemporaneous facts within the possession, custody and control of the company.

159.    On June 17, 2013, GM adopted DeGiorgio's testimony in the Melton Action

regarding changes to the Ignition Switch.  In response to plaintiffs' request for documents

relating to "GM's investigation into the change in the cap [(detent)] and spring in the 2005

Cobalt ignition switch to the cap and spring in the 2008 Cobalt ignition switch, as well as the

replacement ignition switches for the Cobalt, GM stated falsely as follows:

> As design release engineer Ray DeGiorgio testified, GM … did not
> request and was not asked to authorize or approve a change in the
> cap and spring in the ignition switch used in the 2008 Chevrolet
> Cobalt or in replacement ignition switches that would affect the
> torque required to move the key from the run to accessory position.

Compl., Melton v. General Motors, Civ. No. 14A1197-4 (Ga. Ct., Cobb Co.), May 12, 2014.

160.    In October 2013, Delphi re-confirmed to GM that a design change was made to

the Ignition Switch.  In an October 14, 2013 email from Brian Stouffer to Gary Greib at Delphi,

Stouffer states that the Ignition Switch for the 2005 Cobalt is not the same as the one available

for service, although both have the same part number.  *Id.*  Further, both the detent spring and

plunger in the service part are longer (than in the 2005 Cobalt), which increases the torque effort

when the key is turned.  *See* Oct. 29, 2013 Email String (GMHEC000003197), *available at*

http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-

SD022.pdf.  Stouffer claimed that GM was made aware of the change in the detent spring and

plunger during the course of the Melton Action and that he had reviewed the documents

provided to GM Legal Staff by Delphi related to the change, however, did not receive any design

drawing information.  *Id.*

161.    On October 29, 2013, Greib provided Stouffer with the additional records

requested.  *Id.* (GMHEC000003192-93, (GMHEC000003199-206).

162.    Further testing by GM on the issue "determined that whether a key moves from

the 'run' to 'accessory' position and how that key movement affects airbag deployment depends

on a number of factors, including: vehicle steering inputs and path of travel immediately before

key movement; the weight and load on the key ring immediately before key movement; whether

the installed ignition switch meets the torques specifications that GM provided to its supplier;

and the timing of the movement of the key out of the 'run' position relative to the activation of

the airbag's sensing algorithm of the crash event."  April 11, 2014 Recall Letter, Attach. B at 6.

163.    Based on the forgoing, GM decided it could no longer conceal the Ignition Switch

Defect in GM Vehicles.

**F.**     ***GM Finally Admits Publicly in 2014 that a Defect Related to Motor***
         ***Vehicle Safety Exists in GM Vehicles***

164.    Despite years of complaints and substantial evidence that the GM Vehicles were

prone to a sudden and inadvertent engine and electrical shut offs and engine stalls that threatened

the lives of operators and occupants of GM Vehicles (as well as passengers in other vehicles with

which GM Vehicles may collide), Old GM and GM nevertheless advertised that GM Vehicles

were safe and reliable.

2021312.3

165.    On January 31, 2014, GM's Executive Field Action Decision Committee directed

that a safety recall be issued for 2005-07 Chevrolet Cobalt and Pontiac G5 vehicles. *Id.*  The

committee was tasked to consider recalling only these vehicles even though it was also presented

with identical information related to Saturn Ion, Chevrolet HHR, Pontiac Solstice and Saturn Sky

vehicles. *Id.* at 6-7.

166.    After years of denying the existence of any problem, GM announced in a

February 7, 2014 Recall Letter (posted on NHTSA's website on February 14, 2014) the recall of

more than 619,000 GM Vehicles because of the Ignition Switch Defect.  In a separate news

release, GM said it knew of at least six deaths in five crashes related to the defect in which the

front air bags did not deploy.

167.    GM announced in a February 25, 2014 Recall Letter the recall of 748,024 more

GM Vehicles.  GM further conceded that it was aware of the deaths of at least 12 front-seat

occupants in crashes where the front air bags did not deploy.

168.    The GM Recall now covers over 2.5 million GM Vehicles.

G.    **The U.S. Government Launches Criminal and Civil Investigations**

169.    NHTSA has already concluded an investigation into whether GM violated the

Safety Act by failing to timely notify it of the Ignition Switch Defect once GM knew that the

defect exposed operators and occupants of GM Vehicles to unreasonable risks of accidents.

170.    On April 1-2, 2014, Mary Barra, GM's CEO, testified before the House of

Representatives concerning GM's concealment of the Ignition Switch Defect.  At that hearing,

Congress asked questions concerning Old GM's and GM's concealment of, and failure to

correct, the Ignition Switch Defect.

171.    On April 11, 2014, five United States Senators sent a letter to the United States

Attorney General, Eric J. Holder, Jr., requesting the intervention and assistance of the

Department of Justice on behalf of victims of damage from the Ignition Switch Defect. *See*

April 11, 2014 Letter, *available at* http://www.markey.senate.gov/news/press-releases/markey-

blumenthal-colleagues-call-on-doj-to-intervene-in-gm-recall. In relevant part, the letter states:

> Like many Americans, we were appalled and astonished by GM's
> recent admission that it knew of these disabling defects and their
> disastrous effects well before the 2009 reorganization. Their
> deliberate concealment caused continuing death and damage, and it
> constituted a fraud on the bankruptcy court that approved its
> reorganization. It also criminally deceived the United States
> government and the public.
>
> As a consequence of this fraudulent and reprehensible
> concealment, the United States Bankruptcy Court unknowingly
> authorized a purchase of GM's assets by the "new GM," which
> seemingly shielded this new GM from legal responsibility for these
> product defects or other illegality occurring prior to 2009. This
> shield from legal responsibility was granted – with the federal
> government's support – despite vehement opposition from
> consumer advocates, as well as from state attorneys general who
> warned that this blanket shield from all liability would prove unfair
> and unwise.

*Id*.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment and Rule 60(b)(4) of the Federal Rules of Civil Procedure – Violation of Due Process)

172.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 171, as

though fully set forth herein.

173.    A subclass of Plaintiffs owned GM Vehicles with an Ignition Switch Defect

during a time that includes, but is not limited to, commencement of the Bankruptcy Case through

approval of the Sale Order (the "**Presale Plaintiffs**").

174.    In connection with the Sale Motion, Old GM was duty bound to make certain that

all creditors, including Presale Plaintiffs, received due and timely notice of the Sale Motion and

provide an opportunity for the Presale Plaintiffs to object thereto.

175.     Before approval of the Sale Order, Old GM and GM knew or could have reasonably ascertained through reasonably diligent efforts that Presale Plaintiffs owned GM Vehicles with an Ignition Switch Defect.

176.     Prior to and as of the Sale Motion, the Presale Plaintiffs were known creditors of Old GM.

177.     The Sale Order purports to permit the conveyance of Old GM's Assets to GM free and clear of the Defective Vehicle Claims.

178.     At no time before approval of the Sale Order or immediately thereafter did Old GM Provide, or did Presale Plaintiffs receive, notice from Old GM of the proposed 363 Sale or that their GM Vehicles had an Ignition Switch Defect.  To the contrary, Old GM and GM fraudulently concealed the existence of the Ignition Switch Defect from Presale Plaintiffs, other creditors, the Bankruptcy Court, the United States government, and the public.

179.     Because Presale Plaintiffs were not given such notice, they were deprived of due process, and thus the ability to present their objections to the 363 Sale, to pursue their Defective Vehicle Claims against the bankruptcy estate of Old GM, and to otherwise obtain adequate protection or any other appropriate relief.

180.     By reason of the foregoing, the Sale Order was approved in violation of Presale Plaintiffs' due process rights, and as a result cannot bind the Presale Plaintiffs.

181.     There is a justiciable, actual, real, and substantial controversy between Presale Plaintiffs and GM concerning whether the Sale Order is valid and enforceable against Presale Plaintiffs so as to preclude them from seeking legal recourse against GM for the Defective Vehicle Claims, and a declaration by this Court will have the immediate effect of determining

whether the Sale Order bars the Defective Vehicle Claims against GM, solely to the extent such

claims are based upon conduct occurring before the Sale Order.

182.    Based on the foregoing, Presale Plaintiffs are entitled to a declaration that the Sale

Order is void and unenforceable to the extent it purports to preclude Presale Plaintiffs from

seeking legal recourse against GM for the Defective Vehicle Claims.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment and Rule 60(d)(3) of the Federal Rules of Civil Procedure – Fraud on the Court)

183.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 182, as

though fully set forth herein.

184.    Presale Plaintiffs seek relief from those parts of the Sale Order that might be

construed as precluding them from obtaining legal recourse against GM for the Defective

Vehicle Claims on the grounds that Old GM deliberately concealed the Ignition Switch Defect

during its Bankruptcy Case, thereby perpetrating a fraud on the Bankruptcy Court.

185.    When Old GM sought approval of the proposed 363 Sale to GM, one of the

paramount issues that the Bankruptcy Court had to decide as part of the approval process was

which liabilities of Old GM would be retained by Estate and which would be assumed by GM.

These liabilities included, without limitation, litigation liabilities for acts and omissions by Old

GM that occurred before the 363 Sale.

186.    Before the Bankruptcy Court approved the 363 Sale, and, indeed, as early as

2001, Old GM knew that millions of the vehicles it had manufactured and sold to consumers,

including Presale Plaintiffs, contained the Ignition Switch Defect.

187.    In seeking approval of the 363 Sale, Old GM intentionally concealed the

existence of the Ignition Switch Defect from the Bankruptcy Court by, *inter alia*, (i) hiding the

2021312.3

fact that in late 2006 it implemented a new design to correct the Ignition Switch Defect in parts

to be used in later vehicle models while not changing the part number, (ii) surreptitiously

deciding not to recall the millions of earlier models that Old GM knew were defective and

instead willfully putting millions of people at continuing risk of death and damage through use

of the defective GM Vehicles, and (iii) not notifying Plaintiffs and the Class Members of the

363 Sale and their opportunity to object thereto.

188.    Old GM knew the foregoing facts and had a duty, as a debtor-in-possession and

officer of the court, to ensure that the Bankruptcy Court was informed about these and related

facts that were pertinent to approval of the 363 Sale.  In fact, one of the primary duties of a

debtor-in-possession is to make full, fair, and complete disclosure to the Bankruptcy Court and

all parties in interest.

189.    The U.S. Government, which facilitated GM's acquisition of Old GM's assets

through billions of dollars in taxpayer-funded financing, was, like the Bankruptcy Court, left

equally in the dark by Old GM – and by GM after its formation – about the Ignition Switch

Defect until this year.

190.    Since the Ignition Switch Defect has been exposed and subjected to public

scrutiny, the U.S. Government has launched a criminal inquiry into GM's conduct, while

Congress and regulatory agencies embark upon and continue their own investigations of GM's

knowledge about the Ignition Switch Defect and its response thereto.  Members of Congress

have expressed their outrage at Old GM's conduct in connection with the 363 Sale and GM's

invocation of the fraudulently-induced "free and clear" provisions of the Sale Order as a shield

from the Defective Vehicle Claims.

191.    Upon information and belief, had the U.S. Government known the foregoing facts, it would have insisted that GM agree to, and that the Bankruptcy Court enter a sale order ensuring, the assumption of liabilities by GM for Defective Vehicle Claims or some other meaningful alternative relief for Plaintiffs.

192.    Old GM's misconduct deliberately deprived the Bankruptcy Court of information necessary to rule upon the Sale Motion.  Had the Bankruptcy Court known the foregoing facts, it would not have approved the 363 Sale through entry of a sale order that might be construed as not providing relief for Defective Vehicle Claims, or it would have provided some other meaningful alternative relief for Plaintiffs as part of the proposed 363 Sale.

193.    The employees of Old GM who had knowledge of and concealed the Ignition Switch Defect from the Bankruptcy Court had a motive to conceal the Ignition Switch Defect, including to preserve their employment by GM in substantially similar roles after the 363 Sale. Those persons also continued to conceal the Ignition Switch Defect while employed by GM.

194.    GM cannot invoke, and is precluded and estopped from invoking, any claimed protections provided by the Sale Order from Defective Vehicle Claims given that the same employees of Old GM who concealed the Ignition Switch Defect from the Bankruptcy Court thereafter continued to do so as employees of GM, and, like Old GM, thereby prevented Plaintiffs from asserting their rights concerning the Defective Vehicle Claims in the Bankruptcy Case.

195.    There is a justiciable, actual, real, and substantial controversy between Plaintiffs and GM concerning whether the Sale Order is valid and enforceable against Plaintiffs so as to preclude them from seeking legal recourse against GM for the Defective Vehicle Claims, and a declaration by this Court will have the immediate effect of determining whether the Sale Order

2021312.3

bars the Defective Vehicle Claims against GM, solely to the extent such claims are based upon conduct occurring before the Sale Order.

196.    Based on the foregoing, Plaintiffs are entitled to a declaration that the Sale Order is void and unenforceable as a fraud on the Bankruptcy Court to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims.

### THIRD CLAIM FOR RELIEF
**(Declaratory Judgment and Rule 60(d)(1) of the Federal Rules of Civil Procedure – Independent Action for Relief)**

197.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 196, as though fully set forth herein.

198.    If Presale Plaintiffs are not entitled to relief pursuant to Federal Rules of Civil Procedure 60(b)(4) and 60(d)(3) from those parts of the Sale Order that might be construed as precluding them from seeking legal recourse against GM for the Defective Vehicle Claims, then they have no other available or adequate remedy for redress other than this independent claim for equitable relief pursuant to Federal Rule of Civil Procedure 60(d)(1).

199.    The Plan provides that March 29, 2011, the confirmation date for the Plan, was the record date for claims against the bankruptcy estate of Old GM.  On the Effective Date, all such claims received beneficial interests in the GUC Trust or Asbestos Trust in satisfaction of their claims against the Estate of Old GM.

200.    For the reasons set forth above, Presale Plaintiffs did not know about the Ignition Switch Defect and were denied an opportunity to protect their rights in connection with the 363 Sale.  As a result of Old GM's concealment and misconduct, Presale Plaintiffs are no longer able to assert any claims against the bankruptcy estate of Old GM and have no other available remedy

2021312.3

for claims relating to the Ignition Switch Defect other than to obtain the relief from the Sale Order sought herein.

201.    As set forth above, no fault, neglect, or carelessness by Plaintiffs created the circumstances from which they now require equitable relief.  Rather, Old GM created, and GM perpetuated, Presale Plaintiffs' need for the equitable relief sought herein by fraudulently concealing the Ignition Switch Defect and failing to provide Presale Plaintiffs with notice and an opportunity to be heard in connection with the 363 Sale.

202.    Old GM's concealment fraudulently induced the Government to agree to and endorse the MPA and Sale Order without forcing GM to assume the concealed liabilities or otherwise provide a remedy to Plaintiffs and Class Members affected by the Ignition Switch Defect.  As a matter of equity, the Sale Order should not be interpreted to include the claims arising from the Ignition Switch Defects as retained liabilities in Old GM because the parties did not intend to leave those liabilities behind.  If Old GM fraudulently induced the Government to enter into the MPA, the Sale Order should not be interpreted to reward and give effect to GM's fraud.

203.    There is a justiciable, actual, real, and substantial controversy between Plaintiffs and GM concerning whether the Sale Order is valid and enforceable against Plaintiffs so as to preclude them from seeking legal recourse against GM for the Defective Vehicle Claims, and a declaration by this Court will have the immediate effect of determining whether the Sale Order bars the Defective Vehicle Claims against GM, solely to the extent such claims are based upon conduct occurring before the Sale Order.

2021312.3

204.     Based on the foregoing, Plaintiffs are entitled to a declaration that the Sale Order is void and unenforceable to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims.

WHEREFORE, Plaintiffs respectfully requests that the Bankruptcy Court enter judgment against GM and award the following relief:

A.     On the First Claim for Relief, a judgment declaring that the Sale Order was approved in violation of Presale Plaintiffs' due process rights and is therefore void and unenforceable to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims;

B.     On the Second Claim for Relief, a judgment declaring that the Sale Order is void and unenforceable as a fraud on the Bankruptcy Court to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims;

C.     On the Third Claim for Relief, if Plaintiffs are not entitled to relief from those parts of the Sale Order that might be construed as precluding them from seeking legal recourse against GM for the Defective Vehicle Claims on the grounds that the Sale Order was approved in violation of due process and/or as a result of a fraud on the Bankruptcy Court, then a judgment should be entered declaring that Presale Plaintiffs have no other available or adequate remedy for redress other than an independent claim for equitable relief pursuant to Federal Rule of Civil Procedure 60(d)(1) and that the Sale Order is void and unenforceable to the extent it purports to preclude Presale Plaintiffs from seeking legal recourse against GM for the Defective Vehicle Claims;

D.     On all claims, allowing reasonable attorneys' fees as allowed by law; and

2021312.3

E.     On all claims, awarding such other relief as is just and proper.

Dated:  New York, New York
         May 21, 2014


**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**


 /s/ Alexander H. Schmidt
Alexander H. Schmidt, Esq.
Stacey Kelly Breen, Esq.
Malcolm T. Brown, Esq.
270 Madison Avenue
New York, NY 10016
Telephone:  (212) 545-4600
Facsimile:  (212) 545-4653

*Counsel for Plaintiffs*

**GOLENBOCK EISEMAN ASSOR**
  **BELL & PESKOE LLP**


 /s/ Jonathan L. Flaxer
Jonathan L. Flaxer, Esq.
S. Preston Ricardo, Esq.
Dallas L. Albaugh, Esq.
Michael S. Weinstein, Esq.
437 Madison Avenue
New York, New York 10022
Telephone: (212) 907-7327
Facsimile: (212) 754-0777

*Counsel for Plaintiffs*

2021312.3