# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBIN DELUCO, Individually, and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>GENERAL MOTORS LLC,<br><br>        Defendant. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |



Plaintiff Robin DeLuco ("Plaintiff"), individually and as a class representative on behalf of all similarly situated persons, brings this action against Defendant General Motors LLC ("G.M.") and alleges as follows:

## I.   INTRODUCTION

1.   Faced with the real possibility that its conduct rises to criminality,[1] Alan Batey, president of G.M. North America, stated that G.M.'s near decade-long investigation of a defective ignition switch design "was not as robust as it should have been." This comment is wholly inexcusable in light of G.M.'s nationwide recall of approximately 2.6 million vehicles due to a defect in the ignition switch system that is linked to a least 13 crash related deaths.

2.   G.M. marketed and advertised that these vehicles, though equipped with defective ignition switches, were safe and reliable. The vehicles were, however, anything but safe and reliable. In fact, as early as 2001, G.M. knew that the defective design of the ignition switches in these vehicles presented serious safety issues. Instead of disclosing the defect and its disabling impact upon other safety systems in these vehicles – including that the defect could shut down

---

[1] *See* Emily Flitter, *Federal Prosecutors Open Criminal Probe of GM Recall: Source*, REUTERS, March 11, 2014, *available at* http://www.reuters.com/article/2014/03/11/us-autos-gm-recall-probe-idUSBREA2A1RZ20140311.

the engine and electrical system without warning, and prevent airbags from being deployed in the case of a collision – G.M. consciously chose to conceal it and not address the problem.

3.      The efforts by G.M. to conceal the existence of the defectively designed ignition switches in its vehicles, even after it was aware that the defect was linked to several accident related fatalities, displays a wanton degree of corporate malfeasance. Indeed, it appears G.M. may have gone so far as to commit bankruptcy fraud in order to avoid disclosure of the problems with the ignition switch, while, at the same time, taking taxpayer money to salvage a failing business model.

4.      G.M. now has grudgingly admitted that it knew millions of its vehicles were equipped with defective ignition switches dating back to as early as 2001 – three years earlier than it initially reported – and has yet to determine the full scope of the problem. Moreover, based on statements by the maker of the ignition component in G.M. cars subject to the 2.6 million-vehicle recall, it would have only cost "a few dollars to produce and minutes to install" a fix.[2]

5.      Plaintiff brings this action on behalf of herself and other Class Members, each of whom own, owned, lease or leased one or more of the following vehicles: 2005-10 Chevrolet Cobalt; 2005-10 Pontiac G5; 2003-2007 Saturn Ion; 2006-11 Chevrolet HHR; 2005-2006 Pontiac Pursuit (Canada); 2006-10 Pontiac Solstice; and 2007-10 Saturn Sky (the "Defective Vehicles").

6.      Plaintiff believes that there are additional G.M. vehicles that have the same or similar defect in their ignition switch systems as the Defective Vehicles. Plaintiffs will

---

[2] Jeff Bennett, *GM Now Says It Detected Ignition Switch Problem Back in 2001*, Wall St. J., (Mar. 12, 2014, 10:35 p.m.), http://online.wsj.com/news/articles/SB1000142405270230491490 4579435171004763740 ?KEYWORDS=gm &mg=reno64-wsj.

supplement the definition of Defective Vehicles to include these additional vehicles with defective ignition switch systems as they are identified.

## II.    JURISDICTION AND VENUE

7.    Jurisdiction is proper before this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332 (d), because Plaintiff and members of the proposed Class are citizens of different states than G.M., and the aggregate amount in controversy exceeds $5,000,000.

8.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338 with respect to claims seeking declaratory and other relief arising under the Magnuson-Moss Federal Warranty Act, 15 U.S.C. §§ 2301 *et seq.*, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the entire case or controversy.

9.    This Court has personal jurisdiction over G.M. because G.M. conducts substantial business in this District, has maintained continuous and systematic business contacts through the advertisement and sale of G.M. vehicles within the State and some of the actions giving rise to the complaint took place in this District.

10.    Venue is proper in this District under 28 U.S.C. § 1391 because G.M., as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, a substantial part of the events and/or actions giving rise to the claims alleged herein occurred in this District.

## III.    PARTIES

11.    Plaintiff and proposed New York State Class Representative Robin DeLuco ("DeLuco") is a resident and citizen of the State of New York. DeLuco owns a 2006 Saturn Ion, which she purchased new in 2006 from an authorized G.M. dealer in New Jersey. DeLuco chose the Saturn Ion in part because she wanted a safely designed and manufactured vehicle.

12.      DeLuco saw advertisements for G.M. vehicles before she purchased the car and, although she does not recall the specifics of the advertisements, she recalls that safety and quality were consistent themes across the advertisements she saw before making the purchase of her 2006 Saturn Ion. She also recalls seeing promotional materials about the Saturn at the dealership where she purchased her 2006 Saturn Ion and spoke with Saturn salespeople who told her that the Saturn Ion was one of the safest vehicles in its class. The representations about safety and quality influenced DeLuco's decision to purchase the 2006 Saturn Ion. She did not learn of the ignition switch defects until about March 2014. Had G.M. disclosed the ignition switch defects, she would not have purchased the vehicle and would not have paid as much for it.

13.      DeLuco has experienced multiple shut down incidents in her 2006 Saturn Ion, including the sudden and unexpected loss of power steering and brakes. DeLuco experienced these shut down incidents both before and after July 10, 2009. Since becoming aware of the G.M. recall notice, DeLuco has stopped driving her 2006 Saturn out of concern for her safety. She is unable to participate in the G.M. loaner program because the G.M. dealer in New Jersey to which she was directed in order to participate in the program requires the vehicle to be dropped off by DeLuco at the dealership, which refused to bring the loaner vehicle to her.

14.      Defendant General Motors LLC is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. G.M. was incorporated in 2009 and, on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old G.M.") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

15.      Among the liabilities and obligations expressly retained by G.M. after the bankruptcy are the following:

From and after the Closing, Purchaser [G.M.] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old G.M.].

16.    G.M. also expressly assumed:

all Liabilities arising under express written warranties of [Old G.M.] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old G.M.] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

17.    Because G.M. acquired and operated Old G.M. and ran it as a continuing business enterprise, and because G.M. was aware from its inception of the ignition switch defects in the Defective Vehicles G.M. is liable through successor liability for the deceptive and unfair acts and omissions of Old G.M., as alleged in this Complaint.

## IV.    TOLLING OF STATUTES OF LIMITATION

### A.    Discovery Rule Tolling

18.    Any applicable statute(s) of limitations has been tolled by G.M.'s knowing and active concealment and denial of the facts alleged herein.

19.    Plaintiff and the other members of the Class could not have discovered through the exercise of reasonable diligence that their Defective Vehicles were defective within the time period for the applicable statutes of limitation. Indeed, Plaintiff and members of the Class could not have reasonably discovered the true nature of the defect in the ignition switches in their Defective vehicles until shortly before this class action litigation was commenced.

### B.    Fraudulent Concealment Tolling

20.    At all relevant times to this action G.M. affirmatively concealed from Plaintiff and other members of the Class the defects in the Defective Vehicles.  G.M. withheld from Plaintiff and other members of the Class information essential to the pursuit of their claims and, as a direct consequence, Plaintiff and other members of the Class could not have discovered the defects upon the exercise of reasonable diligence.

21.    As set forth below, G.M. was aware of the design defect in the ignition switches as early as 2001 and despite such knowledge continued to manufacture, market, advertise, sell, lease and warrant such vehicles without disclosing the defects to Plaintiff and other members of the Class.

22.    G.M. has repeatedly denied the existence of defects in the Defective Vehicles to Plaintiff and other members of the Class.  Such denials concealed G.M.'s knowledge of the defects, as well as the attendant risks, from Plaintiff and other members of the Class.

23.    The running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiff and other members of the Class have in connection with the defects in their Defective Vehicles, pursuant to the fraudulent concealment doctrine.

### C.    Estoppel

24.    G.M. had a continuous duty to disclose to Plaintiff and members of the Class true character, quality and nature of the Defective Vehicles, that this defect is based on a poor design and/or substandard materials, and that it will require repairs, poses a safety concern, and diminishes the resale value of the Defective Vehicles.

25.    G.M. knowingly, affirmatively and consciously concealed the true nature, quality and character of the Defective Vehicles from its customers.

26.    As a result, G.M. is estopped from relying on any and all statutes of limitation in defense of this action.

## V.    SUBSTANTIVE ALLEGATIONS

27.    Since 2002, G.M. has sold millions of Defective Vehicles throughout the world including within the United States knowing that they were prone to a very dangerous safety defect namely that the ignition switch could unintentionally move from the run position to "off" or "accessory" resulting in a loss of power, loss of braking, and a failure to deploy airbags in the event of a collision.

28.    Upon information and belief, G.M. installed these defective ignition switches in its cars from 2001 to 2011. During this period, G.M. received hundreds of complaints that the Defective Vehicles were prone to sudden shut-off even though it concomitantly touted the Defective Vehicles as highly reliable and safe.

29.    The issues surrounding the Defective Vehicles include the period when Old G.M. designed and manufactured the vehicles with defective ignition switches, and failed to disclose the existence of the defect even after Old G.M. became aware that it had caused fatalities. G.M. is liable for Old G.M.'s unfair and deceptive acts and/or omissions by virtue of the statutory obligations it assumed. G.M. also has successor liability for the conduct of Old G.M. because G.M. has continued to operate the franchise of Old G.M knowing full well that the ignition switches were defectively designed.

30.    Upon information and belief, Delphi Automotive PLC "("Delphi") manufactured the defective ignition switches. Delphi was a former subsidiary of Old G.M until it was spun off in 1999 and became an independent company. Upon information and belief, Delphi knew the switches were defective at all relevant times and was in a position to manufacture a corrective device or other fix for a minimal amount of money, possibly from $2 to $5 per vehicle.

31.     The Defective Vehicles are inherently dangerous because the defective ignition switches renders them vulnerable to inadvertent engine shut off during normal operation. The ignition switches can, during normal driving conditions, shut off the engine and electrical system in Defective Vehicles without warning.  Once the engine and electrical system is shut down, power steering and power brakes fail raising a substantial risk that the vehicle will be involved in an accident.  Moreover, with the electrical system down, the vehicle's airbags are disengaged, thus, leaving passengers vulnerable to serious bodily injury or even death in the event of an accident.

32.     It has now been disclosed that the defect stems from a small, inexpensive part called the "detent plunger" reproduced below:



33.     After years of denying the existence of any problem with the Defective Vehicles, on February 14, 2014, G.M. finally disclosed in a report posted on the National Highway Traffic Safety Administration's ("NHTSA") website, dated February 7, 2014, that it would recall

619,000 cars in the United States because either a heavy key ring or a "jarring event" such as running off the road could cause the ignition to shut off and possibly prevent the air bags from deploying in a crash. The vehicles affected by the initial recall were the 2007 Pontiac G5 and 2005-07 Chevrolet Cobalt. In addition to the vehicles being recalled in the United States, another 153,000 in Canada and 6,100 in Mexico were to be recalled. In a separate news release, G.M. said it knew of at least six deaths in five crashes in which the front air bags did not deploy. Commenting on the events, a G.M. spokesman said "all of these crashes occurred off-road and at high speeds, where the probability of serious or fatal injuries was high regardless of air bag deployment."[3]

34.    The February 7, 2014 G.M. letter to the NHTSA, further detailed the problem as follows:

> The ignition switch torque performance may not meet General Motors' specification. If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the "run" position. The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes. Until this correction is performed, customers should remove non-essential items from their key ring.
>
> Dealers are to replace the ignition switch.[4]

35.    At the center of the recall was the above-mentioned Chevrolet Cobalt. Engineered more than a decade ago, executives at G.M. touted it as the beginning of a new era and the replacement for the poorly received Chevrolet Cavalier. As reported in *The New York*

---

[3] Christopher Jenson, *General Motors Recalls 778,000 Small Cars for Ignition Switch Problems*, N.Y. Times, (Feb. 13, 2014), http://www.nytimes.com/2014/02/14/automobiles/general-motors-recalls-778000-small-cars-for-ignition-switch-problem.html.

[4] Letter from General Motors LLC to Nancy Lewis, Assoc. Admin. for Enforcement, Nat'l Hwy. Traffic Safety Admin., Recall Management Division (NVS-215), (Feb. 7, 2014), http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM450012/RCDNN-14V047-1347P.pdf.

*Times* on March 17, 2014, the Cobalt "would not only replace the aging and undistinguished Chevrolet Cavalier, but it would also prove that G.M.'s engineering and manufacturing skills had matured to the point that – like the Japanese automakers – it could build a world-class small car."[5] The Cobalt's "mechanical underpinnings" were first developed in the 2003 Saturn Ion and included the flawed ignition switch.[6] G.M. knew this flaw existed from the moment the car hit dealers' floors even though it touted the car as "safe and sound" in an advertisement for a 2007 Saturn Ion.

36.    The advertisement states, "The Ion's designers accounted for almost everything but compromise. It's nimble, yet strong. Modern, but inviting. Sporty, yet safe and sound. Featuring the U.S. Government's highest possible front crash-test rating-five stars."

37.    G.M. promotional materials include the following claims of safety and reliability:

> 2003 Saturn Ion: "The ION sedan and quad coupe are designed to carry on the tradition of being at the top of the class when it comes to safety and security."
>
> 2006 and 2007 Saturn Ion: "Like all Saturns, the Ion was designed with an emphasis on safety and security."
>
> 2006 Pontiac G5: "The 2006 Pontiac G5 Pursuit offers a host of features for safety-minded consumers."
>
> 2006 Chevrolet HHR: "HHR is designed to protect occupants in the event of a crash."
>
> 2007 Saturn Sky: "Sky has a host of safety features ... including dual stage frontal air bags ... that use the latest sensing technology to turn the front passenger air bag on or off."
>
> 2005 - 2007 Chevrolet Cobalt: "Safety was a priority in the development of the Cobalt." Cobalt's "rigid body structure ... reinforces occupant safety." "The rigid body structure ... reinforces its safety [and] load carrying capability for crash protection."

---

[5] Christopher Jensen, *G.M. Saw Cobalt as Its Entry Into a Better Small-Car Market,* N.Y. Times, (Mar. 17, 2014), http://www.nytimes.com/2014/03/18/business/gm-saw-cobalt-as-its-entry-into-the-upscale-small-car-market.html?ref=generalmotorscorporation.html.

[6] *Id.*

38.     Accordingly, purchasers of the Defective Vehicles were lead to believe that the cars were safe and reliable. This proved to be untrue.

39.     On February 25, 2014, G.M. announced it would double the size of the recall stemming from an ignition switch defect in the Defective Vehicles. G.M. said in the release that it was now aware of the deaths of at least 12 front-seat occupants in crashes where the front air bags did not deploy. While G.M. had previously recalled 619,000 vehicles in the United States, including Chevrolet Cobalts from the 2005-07 model years and 2007 Pontiac G5 models, G.M. added 2003-07 Saturn Ions, 2006-07 Chevrolet HHRs and 2006-07 Pontiac Solstice and Saturn Sky models.[7]

40.     On February 26, 2014, *The Associated Press* reported that NHTSA was investigating whether G.M. acted quickly enough to recall 1.6 million older-model small cars in a case linked to 12 deaths. According to the *AP*, the agency has the authority to fine G.M. as much as $35 million under legislation that went into effect late last year. Automakers must report evidence of safety defects within five days. G.M. filed documents with the safety agency recently however that showed it knew of the problem as early as 2004.[8]

41.     The recall follows years of warnings and mounting evidence that the Defective Vehicles were prone to potentially dangerous operational shutdown that rendered the airbags inoperative. It has been reported by *The New York Times* on March 2, 2014, that shortly after the

---

[7] Christopher Jenson, *G.M. to Expand Small Car Recall to 1.4 Million Vehicles*, N.Y. Times (Feb. 25, 2014), http://www.nytimes.com/2014/02/26/automobiles/gm-to-expand-small-car-recall-to-1-4-million-vehicles.html.

[8] Tom Krisher, *U.S. Safety Agency Likely is investigating G.M. for Slow Response to Small Car Recall*, A.P. (Feb. 26, 2014), http://www.usnews.com/news/business/articles/2014/02/26/us-safety-agency-likely-probing-gm-recall-response.html.

Cobalts left their Lordstown, Ohio assembly plant, G.M. learned that there was a problem with the ignition system.[9]

42.    For example, engineers determined as early as 2004 that a defect in the ignition switch meant a key could be unintentionally jostled out of the "Run" position to the "Accessory" or "Off" position by a heavy key ring or by a nudge from a driver's leg. With the ignition switch in the "Accessory" or "Off" position, it would cause the car to stall and shut down power. The powering down of the engine and electrical system would also disable the airbags so that any accident ensuing from the sudden and unexpected stall would not deploy the airbag safety devices and leave the vehicle's occupants exposed.

43.    In 2004, engineers, having identified the problem, proposed a fix.  G.M. executives, however, decided, based among other things, that cost was prohibitive and declined to take remedial action.  It has been reported that the 2004 proposed fix was actually less than $12.

44.    Reports detailing sudden ignition turn off continued through 2005 and yet another fix was considered but not implemented.[10]  G.M. instead, sought to place the burden on customers and, in 2005, G.M. sent dealers a technical service bulletin about the 2005-06 Cobalt warning about a stalling problem related to heavy key rings. At that time, a G.M. executive explained, "in rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running. Service advisers are telling customers they can virtually

---

[9] Christopher Jensen, *In G.M. Recalls Inaction and Trails of Fatal Crashes*, N.Y. Times, (Mar. 12, 2014), http://www.nytimes.com/2014/03/03/business/in-general-motors-recalls-inaction-and-trail-of-fatal-crashes.html.

[10] *See id.*

eliminate this possibility by taking several steps, including removing nonessential material from their key rings."[11]

45.    G.M.'s apathy for its customers and public safety became even more apparent when it was revealed on March 12, 2014, by *The New York Times* that G.M. knew since 2001 there were serious safety problems in the Defective Vehicles.    According to an expanded chronology submitted to regulators, G.M. admitted that during the development of the Saturn Ion in 2001, it learned that the ignition switch could turn off.    While G.M. insisted that the issue was resolved then, a 2003 internal inquiry indicated otherwise.[12]

46.    Further, at a May 15, 2009 meeting, G.M. confirmed from the data retrieved from the "black box" of a Cobalt during a post accident examination that the ignition switch in the Defective Vehicle was the cause of the accident.[13]

47.    According to the *N.Y. Times*, there is even more additional evidence of knowledge:

> Since the engineers' meeting in May 2009, at least 23 fatal crashes have involved the recalled models, resulting in 26 deaths. G.M. reported the accidents to the government under a system called Early Warning Reporting, which requires automakers to disclose claims they receive blaming vehicle defects for serious injuries or deaths.
>
> A New York Times review of 19 of those accidents – where victims were identified through interviews with survivors, family members, lawyers and law enforcement officials – found that G.M. pushed back against families in at least two of the accidents, and reached settlements that required the victims to keep the discussions confidential.
>
> In one of those cases, the company settled a lawsuit brought by the family of Hasaya Chansuthus, 25, who crashed her 2006 Cobalt in

---

[11] *Id.*

[12] Hilary Stout, Bill Vlasic, Danielle Ivory, and Rebecca R. Ruiz, *Carmaker Misled Grieving Families on a Lethal Flaw*, N.Y. Times (Mar. 25, 2014), http://www.nytimes.com/2014/03/25/business/carmaker-mislead-grieving-families-on-a-lethal-flaw.html.

[13] *Id.*

Murfreesboro, Tenn. After resisting, the company negotiated a deal
even though Ms. Chansuthus's blood-alcohol level was more than
twice the legal limit. Data from the black box – which records
vehicle systems information – showed that the key was in the
accessory or off position, according to court documents, and the air
bags did not deploy. (The accessory position turns off the car,
disabling the air bags, but allows certain electronics, like the radio,
to run.) The terms of the settlement are confidential.

In other instances, G.M. ignored repeated calls, families said. "We
did call G.M.," said Leslie Dueno, whose 18-year-old son,
Christopher Hamberg, was killed on June 12, 2009 – not quite a
month after the critical May 15 meeting of G.M. engineers about
the ignition data – driving his 2007 Cobalt home before dawn in
Houston. He lost control at 45 miles per hour and hit a curb, then a
tree, the police report said. "Nobody ever called me. They never
followed up. Ever."[14]

48.     As explained above, the evidence that G.M. knew there was a link between the

defective ignition switches and accidents came in the form of electronically captured data

retrieved from sensing modules removed from wrecked cars.  Premised upon a review of this

information, the *New York Times* stated that by the end of 2007, G.M. recognized for certain the

"link between a faulty switch and deactivated air bags":

Consumer complaints and claims came to the company in a variety
of ways – through lawsuits, calls, letters and emails, warranty
claims, or insurance claims. G.M.'s legal staff was the recipient of
lawsuits, insurance information, accident reports and any other
litigation-related paperwork. But warranty claims and customer
calls were routed through the sales and service division – a vast
bureaucracy that occupies most of one tower at G.M.'s
headquarters in Detroit. Because the legal staff reports to the chief
executive, and the sales department to the head of G.M. North
America, it is unclear whether they share information related to a
specific car, like the Cobalt.

And an even bigger communication gap on the Cobalt appeared to
exist between the engineers in Warren, Mich., and the company
lawyers in downtown Detroit. The most glaring example was that
G.M. officials meeting with federal regulators in March 2007 did
not know about a fatal Cobalt wreck in 2005 – even though G.M.'s
legal department had had an open file on the case for almost two
years.

Within the product development system was an isolated, subgroup
of engineers assigned to Cobalt safety tests. According to the

---

[14] *Id.*

chronology G.M. has submitted to federal safety regulators, an
unknown number of engineers were involved in opening – and
closing – four separate inquiries on the Cobalt between 2004 and
2009. Engineers also performed four other analyses.

By the end of 2007, G.M. had examined data from nine "sensing
and diagnostic modules" of crashed vehicles. In four cases, the
ignition was in the accessory position. But it was not until May 15,
2009, that G.M. engineers verified the data. That day, they met
with officials from its supplier Continental, which manufactured
the Cobalt's diagnostic modules, or black boxes. By then G.M. had
recovered 14 modules, and according to Continental, the ignition
was in the accessory position on seven of the 14 cases. This
appears to be the first proven link between a faulty switch and
deactivated air bags.[15]

49.    Despite knowing full well that the Defective Vehicles' defective ignition switch

was linked to horrific accidents including fatalities, G.M. vehemently denied its culpability until

just hours before the first recall. Indeed, it employed a harsh litigation strategy when dealing with

the claims brought by the many who were harmed and the families of the deceased. According

to *The New York Times*, "in one case, G.M. threatened to come after the family of an accident

victim for reimbursement of legal fees if the family did not withdraw its lawsuit. In another

instance, it dismissed a family with a terse, formulaic letter, saying there was no basis for

claims."[16]

50.    G.M. also threatened injured parties with retaliatory lawsuits and asserted that the

earlier bankruptcy barred these people from pursing claims. As reported in the *Times*:

That same month, lawyers representing G.M. wrote to the lawyer
in another wrongful-death case demanding that the lawsuit be
withdrawn. The family of Allen Ray Floyd had sued G.M. after
Mr. Floyd lost control of a 2006 Cobalt in daylight near Loris, S.C.
Two weeks earlier, his sister had lost control of the same vehicle
on the same road; she had it towed. The company contended the
suit was "frivolous" because the accident occurred on July 3, 2009,
a week before the company's bankruptcy agreement took effect,
which meant G.M. was not liable for damages.

---

[15] *Id.*

[16] *Id.*

"They sent us a letter in September telling us to drop our case or
else they'd come after us," said William Jordan, the family's
lawyer. "They were going to come after me for sanctions, to pay
their attorneys' fees."

Mr. Jordan added: "We looked at the prospect of going into
bankruptcy court and duking it out with them and looking at the
language of the bankruptcy legislation, and it just seemed to be
such a big undertaking. We decided to capitulate."

51.    Finally, G.M.'s conduct and effort to avoid liability by hiding behind Old G.M.'s

bankruptcy, has federal authorities investigating whether the automaker committed fraud by not

disclosing defects that could lead to expensive future liabilities.  The issue is whether Old G.M.

knew about the ignition defect at the time it filed for bankruptcy in 2009, and failed to fully

disclose the problem.  The record is quite clear, however, that Old G.M. and G.M. knew the

defect existed in the Defective Vehicles as early as 2001, and clearly by 2002.

52.    G.M. and its predecessor were at all times under an affirmative duty to advise

customers about known defects. Specifically, under the Transportation Recall Enhancement,

Accountability and Documentation Act ("TREAD Act") and its accompanying regulations,

when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must

promptly disclose the defects.    If it is determined that the vehicle is defective, the

manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must

remedy the defect. This duty existed throughout the Class Period.

53.    On March 28, 2014, G.M. announced it was expanding the recall to cover ignition

switches in all model years of its Chevrolet Cobalt, HHR, Pontiac G5, Solstice and Saturn Ion

and Sky in the United States since defective ignition switches may have been used in those

vehicles.

## VI.   SUCCESSOR LIABILITY

54.   G.M. was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of G.M. Corp through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code. Bankruptcy does not immunize G.M. from liability here. Specifically, G.M. expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009, and appears to have committed bankruptcy fraud in connection with the Section 363 sale.

55.   G.M. also expressly assumed liability for warranty claims in the Master Sale and Purchase Agreement of June 26, 2009, and this assumption of liability includes the claims of the Class.

56.   Moreover, G.M. has successor liability for Old G.M.'s acts and omissions in the marketing and sale of the Defective Vehicles during the Class Period because G.M. has continued the business enterprise of Old G.M., for the following reasons:

- G.M. admits that it knew of the ignition system defects from the very date of its formation;
- G.M. has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old G.M.;
- G.M. retained the bulk of the employees of Old G.M.;
- G.M. acquired owned and leased real property of Old G.M., including all machinery, equipment, tools, information technology, product inventory, and intellectual property;
- GM acquired the contracts, books, and records of Old G.M. Corp; and
- G.M. acquired all goodwill and other intangible personal property of Old G.M.

57.     G.M. and Old G.M. did not report information within their knowledge to the Bankruptcy Court, federal authorities (NHTSA or the Auto Task Force of the United States Department of the Treasury) or consumers, nor would a reasonable and diligent investigation have disclosed that G.M. and Old G.M. had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this action was filed.

58.     G.M. and Old G.M. were, and G.M. remains, under a continuing duty to disclose to NHTSA, Plaintiffs and the Class the true character, quality, and nature of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

59.     Because of the active concealment by G.M. and Old G.M., any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled.

## VII.    CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Classes:

> a.     All persons and entities that purchased or leased Defective Vehicles in the United States between 2002 and the present (the "Class Period") (the "Nationwide Class").

> b.     All persons and entities that purchased or leased Defective Vehicles during the Class Period in the State of New York (the "New York State Class").

61.     Together, the Nationwide and New York State Classes shall be collectively referred to hereinafter as the "Class." The Class excludes G.M. and any entity in which G.M. has a controlling interest, and its officers, directors, legal representatives, successors and assigns.

The Class also excludes any entity in which G.M. has or had a controlling interest, and its officers, directors, legal representatives, successors and assigns.

62.     The Class is so numerous that joinder of all members is impracticable.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

64.     Plaintiff's claims are typical of the claims of the Class.    As alleged herein, Plaintiff and members of the Class all sustained damages arising out of the G.M.'s same course of unlawful conduct.

65.     There are questions of law and fact common to the Class, including but not limited to:

- Whether G.M. and its predecessor had knowledge of the defect prior to its issuance of the current safety recall;

- Whether G.M. and its predecessor concealed defects affecting the Defective Vehicles;

- Whether G.M. and its predecessor misrepresented the safety of the Defective Vehicles;

- Whether G.M. and its predecessor's misrepresentations and omissions regarding the safety and quality of its vehicles were likely to deceive a reasonable person;

- Whether a reasonable customer would pay less for a car that had the ignition defect;

- Whether a reasonable customer would pay less for a vehicle that did not conform to G.M. and its predecessor's assurances of quality;

- Whether G.M. and its predecessor breached its applicable warranties;

- Whether G.M. bears successor liability for Defective Vehicles that Class Members purchased or leased before July 10, 2009, the date G.M. acquired substantially all of the assets of its predecessor;

- Whether G.M. bears liability for Defective Vehicles that Class Members purchased or leased after July 10, 2009;

- Whether G.M. committed bankruptcy fraud in connection with the Section 363 sale or otherwise;

- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

- Whether injunctive relief enjoining the reoccurrence of G.M.'s conduct and/or declaratory relief that such conduct is unlawful, is warranted.

66.    The interest of Class Members in individually controlling the prosecution of separate actions is theoretical and not practical. The members of the Class have a high degree of similarity and are cohesive.  Plaintiff anticipates no difficulty in the management of this matter as a class action.

67.    Class action status is also warranted under Federal Rules of Civil Procedure 23(b)(2) because G.M. has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

68.    Class action status is also warranted under Federal Rules of Civil Procedure 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.   CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT**
**15 U.S.C. § 2301, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

69.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

70.    This claim is brought on behalf of Plaintiff and the Nationwide Class (the "Class" for purposes of this Count).

71.    This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* (the "Act"), by virtue of 28 U.S.C. §§ 1332 (a)-(d).

72.    The Defective Vehicles constitute "consumer products," as defined in 15 U.S.C. § 2301.

73.    Plaintiff and the other members of the Class are "consumers," as defined in 15 U.S.C. § 2301.

74.    Old G.M. and G.M. are "suppliers" and a "warrantors" of the Defective Vehicles as defined in 15 U.S.C. § 2301.

75.    The Defective Vehicles are "consumer products" within the meaning of the Act, pursuant to 15 U.S.C. § 2301(1).

76.    Old G.M. supplied a "written warranty" regarding the Defective Vehicles, as defined in 15 U.S.C. § 2301(6).

77.    The Defective Vehicles were designed with defective ignition switches that can cause the Defective Vehicles' engine and electrical system to shut down without warning, exposing vehicle occupants to serious risks of accidents, injuries and potentially death.  G.M.

issued a recall with respect to the Defective Vehicles, thus, admitting that the ignition switches are defective.

78.    As more fully described above, G.M. breached its express and implied warranties to Plaintiff and the members of the Class by, among other things: selling and/or leasing the Defective Vehicles in an unmerchantable condition; selling and/or leasing the Defective Vehicles when they were not fit for the ordinary purposes for which vehicles are used, and which were not fully operational, safe or reliable; and not repairing or curing defects and nonconformities in the Defective Vehicles as they were identified.

79.    Plaintiff and each member of the Class had sufficient direct dealings with old G.M., G.M. or their agents (dealerships) to establish privity of contract between G.M. and each member of the Class.  Privity, however, is not required here because Plaintiff and each member of the Class are intended third-party beneficiaries of contracts between G.M. and its dealers, and specifically, they are intended beneficiaries of G.M.'s express and implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Additionally, privity is not required because the Defective Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

80.    G.M. has successor liability for the acts of Old G.M. as described above.

81.    Requiring an informal dispute settlement procedure or affording G.M. a reasonable opportunity to cure its breach of warranties would be unnecessary and futile.  At the time of sale or lease of each the Defective Vehicles, G.M. knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Vehicles' inability to

perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.    Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – under the Act or otherwise – that Plaintiff resort to an informal dispute resolution procedure and/or afford G.M. a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

82.    Based on the facts alleged herein, any durational limitation to the warranties that would otherwise bar the claims under the Act, whether premised upon express or implied warranty, is procedurally and substantively unconscionable under federal law and the applicable state common law.

83.    Based on the facts alleged herein, any durational limitation to the warranties that would otherwise bar the claims in this Count is tolled under equitable doctrines. Plaintiff and the other Class members sustained injuries and damages as a proximate result of G.M.'s violation of their written and/or implied warranties and are entitled to legal and equitable relief against G.M., including economic damages, rescission or other relief as appropriate.

84.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

85.    Plaintiff, individually and on behalf of each member of the Class, seeks all damages permitted by law, including diminution in value of their Defective Vehicles, in an amount to be proven at trial.

## COUNT II

### FRAUDULENT CONCEALMENT
### (On behalf of Plaintiff and the Nationwide Class)

86.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

87.     This claim is brought on behalf of Plaintiff and the Nationwide Class (the "Class" for purposes of this Count).

88.     Old G.M. and G.M. concealed material facts about the defect in the ignition switches of the Defective Vehicles and the safety of such vehicles.

89.     G.M. has successor liability for the acts of concealment of Old G.M. as described above.

90.     G.M. had a duty to disclose these safety, quality, dependability, and reliability issues because G.M. consistently marketed the Defective Vehicles as safe.

91.     Once G.M. made representations to the public about the safety, quality, dependability and reliability of the Defective Vehicles, G.M. was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated. A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

92.     In addition, G.M. had a duty to disclose omitted facts with respect to the defects in the ignition switches of the Defective Vehicles because they were known and/or accessible only to G.M., which has superior knowledge and exclusive access to the facts, and G.M. knew they were not known to or discoverable by Plaintiff and the other Class members.

93.     These omitted facts were material because they concern the safety and reliability of the Defective Vehicles.  That a defect existed in the ignition switches of the Defective

Vehicles which could cause the vehicles' engine and electrical system to shut down without warning, and disable the vehicles' safety systems, are material facts to consumers.

94.    G.M. actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the other members of the Class to purchase Defective Vehicles at a higher price for the Defective Vehicles, which did not match Defective Vehicles' true value.

95.    G.M. still has not made full and adequate disclosure and continues to defraud Plaintiff and the other members of the Class by concealing material information regarding the defects in the Defective Vehicles and other G.M. vehicles.

96.    Plaintiff and the other members of the Class reasonably relied on G.M.'s statements in its marketing and advertising that the Defective Vehicles were safe, and would not have purchased or leased the Defective Vehicles had they known of the defects in the ignition switches, or would not have paid as much as they did.

97.    As a result of the concealment and/or suppression of the facts, Plaintiff and the other members of the Class sustained damages. For those Class members who elect to affirm the sale, damages include the difference between the actual value of that for which Class members paid and the actual value of what they received, together with additional damages arising from the sales transaction. Those Class members who want to rescind their purchase are entitled to restitution and consequential damages.

98.    G.M.'s acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Class members' rights and well-being, and to enrich itself.    G.M.'s conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT III

**VIOLATIONS OF NEW YORK CONSUMER PROTECTION FROM DECEPTIVE ACTS
AND PRACTICES, N.Y. Gen. Bus. L. § 349
(On Behalf of Plaintiff and the New York State Class)**

99.     Plaintiff and the New York State Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

100.     This claim is brought on behalf of Plaintiff and the New York State Class (the "Class" for purposes of this Count) pursuant to section 349 of the New York General Business Law.

101.     Section 349 makes unlawful deceptive acts or practices in the conduct of any business, trade or commerce.

102.     Under the TREAD Act, a manufacturer of a vehicle has a legal duty to notify NHTSA, as well as the owners, purchasers and dealers of the vehicle, if the manufacturer learns that the vehicle contains a defect related to motor vehicle safety or the vehicle does not comply with an applicable motor vehicle safety standard. 49 U.S.C. § 30118(c).

103.     Plaintiff and the members of the Class were deceived by G.M.'s failure to disclose the defect in the ignition switches of the Defective Vehicles.

104.     Old G.M. had knowledge of the ignition switch defects since 2001, however, never disclosed the existence of such defects.  GM admitted the existence of the ignition switch defects in the Defective Vehicles in connection with the issuing of the recall in February 2014.

105.     G.M. admits that the defect in the ignition switches of the Defective Vehicles has been linked to at least 12 accident related fatalities.

106.     In acquiring Old G.M., G.M. assumed the obligations to make all required disclosures under the TREAD Act.

107.   G.M. also has successor liability for the unfair or deceptive acts or practices of Old G.M.

108.   By failing to disclose and consciously concealing the ignition switch defects in the Defective Vehicles, in violation of the TREAD Act, Old G.M. and G.M. engaged in deceptive acts or practices prohibited under section 349 of the New York General Business Law.

109.   Indeed, for more than a decade, Old G.M. and G.M. failed to disclose to NHTSA the known defects in the ignition switches in the Defective Vehicles. As a result, consumers, including Plaintiff and the member of the Class received no notice of the defect that could shut down engine power without warning, disable power steering and brakes, and cause airbags not to deploy in an accident.

110.   Old G.M. and G.M. knew that the defects in the ignition switches in the Defective Vehicles rendered such vehicle unreasonably dangerous to consumers, however, failed to disclose the danger to NHTSA, Plaintiff, other members of the Class or the public – despite having a duty to do so.

111.   Instead, Old G.M. and G.M. allowed consumers to continue to believe the representations made about the Defective Vehicles in its marketing and advertising that such vehicles were safe.  Old G.M. and G.M. engaged in deceptive acts or practices when it failed to disclose material information concerning the Defective Vehicles that was known to G.M. at the time of sale or lease.

112.   Old G.M.'s and G.M.'s deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the safety and reliability of the Defective Vehicles.

113.   Plaintiff and the other members of the Class have suffered injuries resulting from G.M.'s material omission regarding the Defective Vehicles because they paid an inflated purchase price for such vehicles.  If Old G.M. and G.M. had timely disclosed the defect, Plaintiff and the members of the Class would not have purchased the Defective Vehicles at all, or would have paid less.

114.    Because Old G.M.'s and G.M.'s unlawful conduct takes place in the context of automobile safety, their deceptive acts or practices affect a public interest. Old G.M.'s and G.M.'s unlawful conduct constitutes acts or practices that have the capacity to deceive consumers, do deceive consumers and have a broad impact on the public at large.

115.    Plaintiff and the members of the Class suffered injuries caused by Old G.M.'s and G.M.'s failure to disclose material information. Plaintiff and the other members of the Class overpaid to purchase or lease the Defective Vehicles and did not receive the benefit of their bargain. The value of the Defective Vehicles has diminished now that the G.M. admitted knowledge of the safety issue.

116.    Pursuant to section 349 of the New York General Business Law, Plaintiff and the other members of the Class are entitled to recover the greater of their actual damages or $50.00. Because Old G.M. and G.M. acted willfully and knowingly, Plaintiff and the other members of the Class are entitled to recover three times actual damages, up to $1000.00.

## COUNT IV

### VIOLATIONS OF NEW YORK CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES, N.Y. Gen. Bus. L. § 350
### (On Behalf of Plaintiff and the New York State Class)

117.    Plaintiff and the New York State Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

118.    This claim is brought on behalf of Plaintiff and the New York State Class (the "Class" for purposes of this Count) pursuant to section 350 of the New York General Business Law.

119.    Section 350 makes unlawful false advertising in the conduct of any business, trade or commerce. False advertising means "advertising, including labeling, of a commodity …

- 28 -

if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity ...." N.Y. Gen. Bus. L. § 350-a.

120. Old G.M. and G.M. caused to be made or disseminated in New York, through advertising, marketing and other publications, statements regarding the quality, safety and reliability of the Defective Vehicles that were untrue or misleading.

121. By persistently and repeatedly engaging in the acts described above, including the misrepresentations and/or omission of material facts regarding the quality, safety and reliability of the Defective Vehicles, Old G.M. and G.M. engaged in false advertising in violation of section 350 of the New York General Business Law.

122. Old G.M. and G.M. violated section 350 of the N.Y. General Business Law by engaging in conduct that was likely to deceive reasonable consumer, owners and purchaser into believing that the Defective Vehicles were safe and reliable.

123. Old G.M. and G.M. willfully and knowingly engaged in the conduct described above.

124. G.M. has successor liability for the unlawful, unfair and fraudulent acts or practices of Old G.M.

125. Plaintiff and the other members of the Class reasonably relied on Old G.M.'s and G.M.'s statements in its marketing and advertising that the Defective Vehicles were safe and reliable, and would not have purchased or leased the Defective Vehicles had they known of the defects in the ignition switches, or would not have paid as much as they did.

126.   Plaintiff and the members of the Class have suffered injuries, including the loss of money or property, because of Old G.M.'s and G.M.'s false advertising.   In purchasing or leasing their Defective Vehicles, Plaintiff and the other members of the Class relied on the misrepresentations and/or omission of Old G.M. and G.M. with respect to the quality, safety and reliability of the Defective Vehicles.

127.   Plaintiff and the other members of the Class overpaid for the purchase or lease of the Defective Vehicles and did not receive the benefit of their bargain.   The value of the Defective Vehicles has diminished now that the G.M. admitted knowledge of the safety issue.

128.   Plaintiff, individually and on behalf of the other members of the Class, requests that this Court enter such orders and judgments as may be necessary to enjoin G.M from continuing such false advertisements.   Pursuant to section 350 of the New York General Business Law, Plaintiff and the other members of the Class are entitled to recover the greater of their actual damages or $500.00 as well as treble damages up to $10,000.

## COUNT V

## BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY, N.Y. U.C.C. § 2-213
### (On Behalf of Plaintiff and the New York State Class)

129.   Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

130.   This claim is brought on behalf of Plaintiff and the New York State Class (the "Class" for purposes of this Count).

131.   Old G.M. and G.M. were, at all relevant times, merchants with respect to motor vehicles under N.Y. U.C.C. § 2-213.

132.   In the course of selling the Defective Vehicles, Old G.M. and G.M. expressly warranted to repair and adjust to correct defects in materials and workmanship of any part

supplied by Old G.M. and G.M.  G.M. has not repaired or adjusted, and has been unable to repair or adjust the Defective Vehicles' materials and workmanship defects described herein.

133.    These warranties were made, *inter alia*, in advertisements and in uniform statements made by G.M. to the public and consumers of the Defective Vehicles.  These affirmations and promises were part of the basis of the bargain between Old G.M. and G.M., on the one hand, and Plaintiff and the other Class members, on the other.

134.    Old G.M. and G.M. did not provide at the time of sale, and G.M. has not provided since then, G.M. Vehicles conforming to these express warranties.

135.    G.M. expressly assumed all liabilities arising under the written warranties of Old G.M.

136.    Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class Members whole.

137.    Recovery by Plaintiff and the other Class Members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

138.    Moreover, at the time that Old G.M. and G.M. warranted, sold and leased the Defective Vehicles, it knew that the Defective Vehicles did not conform to the warranties and were inherently defective, and wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Defective Vehicles.

139.    Plaintiff and the other Class Members were induced to purchase the Defective Vehicles under false and/or fraudulent pretenses and without the benefit of full disclosure of the problems described herein.

140.    Many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Old G.M.'s and G.M.'s conduct as alleged herein, and due to G.M.'s failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class Members' remedies would be insufficient to make Plaintiff and the other Class Members whole.

141.    As a direct and proximate result of the breach of express warranties, Plaintiff and the other members of the Class have been damaged in an amount to be determined at trial.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually, and on behalf of the other members of the Nationwide and New York State Classes he seeks to represent, respectfully request that the Court enter judgment in their favor and against G.M. as follows:

A.    Declaring that this action is a proper class action and certifying the Nationwide and New York State Classes requested herein, designating Plaintiff as a Nationwide and New York State Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

B.    Enjoining G.M. from continuing the unfair or deceptive acts or practices alleged in this Complaint and requiring G.M. to repair the Defective Vehicles;

C.    Ordering G.M. to pay actual, compensatory and statutory damages to Plaintiff and the other members of the Nationwide and New York State Classes;

D.    Alternatively, if elected, ordering G.M. to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

E.    Ordering G.M. to pay punitive damages to Plaintiff and the other members of the Nationwide and New York State Classes;

F.    Ordering G.M. to pay pre- and post-judgment interest on any amounts awarded;

     G.      Ordering G.M. to pay the costs of suit, including Plaintiff's and the other Class

Members' reasonable attorneys' fees; and

     H.      Granting such other and further equitable relief as this Court may deem just and

proper.

## X.    JURY TRIAL DEMAND

     Plaintiff hereby demands a trial by jury as to all claims in this action.

DATED: April 16, 2014

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ, LLP**

_____
Alexander H. Schmidt
Malcolm T. Brown
270 Madison Avenue
New York, NY 10016
Telephone:  (212) 545-4400
Facsimile:  (212) 545-4653

*Attorneys for Plaintiff*

**GOLENBOCK EISEMAN ASSOR**
**BELL & PESKOE LLP**

_____
Jonathan L. Flaxer
S. Preston Ricardo
Dallas Albaugh
Michael S. Weinstein
437 Madison Avenue
New York, New York 10022
Telephone: (212) 907-7327
Facsimile: (212) 754-0777

*Attorneys for Plaintiff*

744960