# EXHIBIT  1

1416-CV08092

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

### IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
### AT INDEPENDENCE

| | |
|---|---|
| PATRICE  WITHERSPOON, on  behalf  of  herself and all others similarly situated,  )  )  )  )  )  )  )  )  )  )  )  ) | |
| | Civil Case No. |
| Plaintiff, | |
| v. | Division: |
| GENERAL MOTORS LLC;  GENERAL MOTORS COMPANY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

### INDIVIDUAL AND CLASS ACTION PETITION

Plaintiff Patrice Witherspoon on behalf of herself and all others similarly situated, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge, to obtain damages, costs of suit, and attorneys' fees from General Motors LLC and General Motors Co. (collectively "GM" or "Defendants"):

### NATURE OF THE ACTION

1.     Pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 *et seq.*, ("MMPA"), Plaintiff brings this action against Defendant on her own behalf and as representative of the class for damages arising from their purchases or leases of the following vehicles: Saturn Ion (model years 2003-2007); Chevrolet Cobalt (model years 2005-2010); Pontiac G5 (model years 2005-2010); Chevrolet HHR (model years 2006-2011); Pontiac Solstice (model years 2006-2010); Saturn Sky (model years 2007-2010) (singly or together, "Defective Vehicles")

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

2.     For many years, GM sold consumers the above-referenced GM vehicles with defective ignition systems.  When the defective parts failed, GM replaced defective ignition systems with the same or similar parts containing the same defect.

3.     GM designed, manufactured, distributed, advertised, marketed, promoted, warranted and sold these vehicles with defective ignition systems installed thereon without disclosing to any single consumer or any of its authorized dealerships: 1) that the ignition systems were defective and could fail under normal operating conditions causing the vehicle to shut off or go into "accessory" mode where it would lose power, disabling many vehicle systems including power steering, the braking system and the airbag deployment system; 2) that the replacement parts being sold or otherwise provided by GM to fix the original ignition systems were, themselves, similarly defective; and 3) that GM would, as a matter of practice or policy, refuse to cover such failures under their warranty in almost every circumstance.

## **THE PARTIES**

4.     Plaintiff Patrice Witherspoon is a citizen of the state of Missouri, residing in Lee's Summit, Missouri.  Plaintiff purchased a 2006 Saturn Ion containing the defective ignition system within the jurisdiction of this Court.

5.     Defendant General Motors LLC is a limited liability company formed under the laws of Delaware with its principal place of business at 300 Renaissance Center, Detroit, Michigan. General Motors LLC is a wholly owned subsidiary of General Motors Company.

6.     General Motors Company is a corporation formed under the laws of Delaware whose principal place of business also is 300 Renaissance Center, Detroit,

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

Michigan.  General Motors Company exerts substantial control over and operates through General Motors LLC in Missouri and other locations in the United States.

7.      General Motors LLC maintains an agent for service of process in Missouri. General Motors LLC and General Motors Company have offices and at least one manufacturing plant in Missouri, and conduct substantial and continuous business in Missouri, including through a dealership network.

8.      At all relevant times, there has existed, and presently exists, a unity of interest in ownership and operation between General Motors Company and General Motors LLC.   These defendants are the alter-egos of one another and General Motors Company exercised decision-making and control over General Motors LLC with respect to the conduct giving rise to Plaintiff's claims.  Alternatively, Defendants constitute a single business enterprise.  Defendants will be referred to herein jointly as "GM" unless otherwise indicated.

9.      Defendants are engaged in the design, development, manufacture, marketing, and sale of vehicles including those at issue in this case.

## JURISDICTION AND VENUE

10.      Venue is properly in this Court because Plaintiff's causes of action accrued in Jackson County, Missouri and all or part of Defendants' conduct alleged herein occurred in Jackson County, Missouri, where Defendants carries on regular business.

11.      As a result of the manufacture, distribution, delivery and sales of the subject parts and vehicles to purchasers within Jackson County and throughout the State of Missouri, Defendant, directly or through subsidiaries, affiliates or agents, obtained the benefits of the laws of the State of Missouri and the Missouri market for vehicles, and other

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

related markets.  GM, directly and through its authorized dealerships did and does engage in substantial and continuous business in Missouri where it sells, advertises, markets, promotes and warrants both its vehicles and its ignition system replacement parts to consumers throughout the State of Missouri.  Personal jurisdiction is thus proper in this Court.

## TOLLING OR NON-ACCRUAL OF APPLICABLE STATUTES OF LIMITATION

12.     Any applicable statutes of limitations have been tolled or have not run because Defendants knowingly and actively concealed and denied the facts as alleged herein.  Defendants had actual or constructive knowledge of the wrongful courses of action alleged here.  Plaintiff and Class members have been kept in ignorance of information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

13.     Plaintiff, Class members, and the general public, did not discover the facts constituting Defendants' illegal business practices until a date within the limitations period governing this action, and promptly exercised due diligence by filing this Petition.  Plaintiff, Class members, and the general public were not at fault for failing to discover Defendants' misconduct sooner, and had no actual or presumptive knowledge of the facts of Defendants' misconduct to put them on inquiry notice.  Plaintiff, Class members and the general public could not reasonably have discovered Defendants' misrepresentations and/or material omissions and, therefore, their claims have not yet accrued, and/or any statute of limitations was tolled.

14.     Defendants are and were under a continuing duty to disclose the true nature of the defective ignition system in GM vehicles to Plaintiff, Class members and the general public.  In addition and/or in the alternative, because of Defendants' concealment of the

4

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

defective nature of the ignition system in GM vehicles, Defendants are estopped from relying on any statute of limitations defense.

## SUBSTANTIVE ALLEGATIONS

### Old GM and New GM

15.    In or about May, 2009, Vehicle Acquisition Holdings LLC was formed as a limited liability company under the laws of Delaware for the purpose of purchasing substantially all of the assets of General Motors Corporation.    NGMCO, Inc., was incorporated in Delaware on or about May 29, 2009, became the successor-in-interest to Vehicle Acquisition Holdings LLC.    NGMCO, Inc. changed its name to General Motors Company on or about July 9, 2009. On July 10, 2009 General Motors Company acquired substantially all of the assets (and assumed certain liabilities) of General Motors Corporation (which subsequently changed its name to Motors Liquidation Company).

On or about August 11, 2009, General Motors Holding Company was incorporated under the laws of Delaware for the purpose of holding the operational assets of former General Motors Corporation.    At some time on or after August 11, 2009 and prior to October 15, 2009, GM Merger Subsidiary Inc. was incorporated under the laws of Delaware as a wholly owned subsidiary of General Motors Holding Company.    GM Merger Subsidiary, Inc. merged with General Motors Company on or about October 15, 2009, with General Motors Company being the survivor of the merger.    On or about October 16, 2009, General Motors Company converted to a Delaware limited liability company under the name General Motors LLC.    On or about December 9, 2010, General Motors Holding Company changed its name to General Motors Company.    As a result of the corporate actions set forth in this paragraph, General Motors Company became the parent and sole owner of General

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

Motors LLC, which remained the operational company of former General Motors Corporation assets.  On or about November 17, 2010, General Motors Company sold shares in an initial public offering.

16.    In public filings (including Form 10-K Annual Reports with the SEC), General Motors Company refers to General Motors Corporation for periods on and before July 9, 2009 as "Old GM," and refers to itself as "New GM."  It also has stated that "[p]rior to July 10, 2009 Old GM operated the business of [New GM]."  SEC Form 10-K Annual Report for year ended Dec. 31, 2009 at 1.

17.    In fact, GM is a mere continuation of the Old GM in that, among other things:

(a)  GM was formed solely for the purpose of acquiring and operating the assets of Old GM.  GM admits in its corporate filings that it acquired "substantially all of the assets" of Old GM.

(b)  GM is operated by the same managers as Old GM.  Of the twelve Executive Officers of GM appointed as of year-end 2009, five were Executive Officers of the Old GM.  Five more held other management positions at Old GM.   Only two of the twelve Executive Officers came from outside GM.  Mary T. Barra, the current CEO, has been associated with Old GM in various management positions (including V.P., Global Manufacturing Engineering, and Executive Director, Vehicle Manufacturing Engineering) since 1980.

(c)  The business operations acquired by GM were nearly identical to the Old GM; in fact, new GM holds itself out as operating the same business as Old GM.

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

(d)  GM continued the operations of Old GM without interruption using the same assets, offices, plants, brand names, good will, dealerships, managers and employees.  GM operates from the same corporate headquarters as Old GM.

(e)  GM holds itself out to its customers and the public as a continuation of Old GM.

18.    Because GM is a mere continuation of Old GM, GM has successor liability for the conduct of Old GM as alleged herein.  In addition, from the moment of its creation, GM itself was aware of the safety defect in the vehicles at issue and itself committed one or more deceptive and unfair practices as alleged herein.

**Defective Ignition Switch**

19.    Since 2002, GM has been manufacturing and selling vehicles with a defective ignition switch that can inadvertently turn from the "on" position to the "accessory" or "off" position due to jostling by anything from a bumpy road to a heavy key chain, causing loss or reduction of power, and impairing normal steering operation and disabling airbags.

20.    On February 7, 2014, GM filed a Defect Notice with the National Highway Traffic Safety Administration ("NHTSA") stating that it had initiated a safety-related recall pertaining to a defect in 2005-2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  According to that Notice, "[t]he ignition switch torque performance may not meet General Motors' specification. If the torque performance is not to specification, and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the "run" position" resulting in "airbags not deploying and increasing the potential for occupant injury in certain kinds of crashes."

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

21.     On February 13, 2014, GM announced a recall of approximately 780,000 Chevrolet Cobalt (model years 2005-2007) and Pontiac G5 (model year 2007) vehicles due to faulty ignition switches.  Eleven days later, on February 24, 2014, GM expanded the recall with four additional models – the Saturn Ion (model years 2003-2007), Chevrolet HHR (model years 2006-2007) Pontiac Solstice (model years 2006-2007) and Saturn Sky (model year 2007).

22.     All of these vehicles used the same or substantially the same defective ignition switch.  GM later expanded the recall to include the Chevrolet Cobalt (model years 2005-2010); Pontiac G5 (model years 2005-2010); Chevrolet HHR (model years 2008-2011); Pontiac Solstice (model years 2008-2010); Saturn Sky (model years 2008-2010). *See* CNBC, "General Motors recalling 824,000 more small cars" (March 28, 2014).

23.     According to GM, the ignition switches were supplied by Delphi Packard Electrical/Electronic Architechure ("Delphi").  *See* Letter from General Motors LLC to Nancy Lewis, Associate Administrator for Enforcement, NHTSF, dated February 7, 2014; Letter from General Motors LLC to Nancy Lewis, Associate Administrator for Enforcement, NHTSF, dated March 11, 2014.

24.     GM has been closely associated with Delphi for decades.  Old GM created Delphi (originally formed as Automotive Components Group) in 1994, and spun it off in 1999.  *See* GM Heritage Center, "Delphi Automotive Systems."  Delphi went bankrupt in October 2005, "emerging four years later, after two previous restructuring attempts had failed."  Muller, "GM Divorce From Delphi Is Final," *Forbes* (March 31, 2011).  GM, "which spent at least $12.5 billion to prop up Delphi during the bankruptcy, ended up taking back Delphi's steering business and four Delphi plants as part of the final reorganization plan"

8

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

and also obtained an ownership interest in Delphi. *Id.  See also* GM News, "New GM Subsidiaries will include Delphi Components Operations and Global Steering Business" dated July 30, 2007 (GM announcing that Delphi components operations and steering business became part of two new, wholly-owned GM; stating that "[t]he acquisition will help GM to maintain continued uninterrupted supply to its . . . car and truck operations."). GM retained that interest until March, 2011, when it sold the stock back to Delphi for a reported $3.8 billion. *See* Bunkley, "G.M. Sells Delphi Stake for $3.8 Billion," *New York Times* (March 31, 2011).

25.     Other models affected by the ignition switch defect are Pontiac Pursuit (model years 2005-2006) sold in Canada and Opel GT (model year 2007) sold in Europe. In all, approximately 2.6 million vehicles are affected globally across 8 model lines, approximately 2.2 million in the United States.

26.     In the United States, the vehicles recalled due to the ignition switch defect are Chevrolet Cobalt (model years 2005-2010) and Pontiac G5 (model years 2005-2010), Saturn Ion (model years 2003-2007), Chevrolet HHR (model years 2006-2011), Pontiac Solstice (model years 2006-2010) and Saturn Sky (model years 2007-2010) vehicles (singly or together, the "Defective Vehicles").

27.     GM has admitted that at least 12 deaths and multiple crashes are associated with the recalled vehicles.   Others, including the Center for Auto Safety, say that at least 303 deaths have been caused by disabled airbags due to the ignition switch defect.

28.     GM currently is advising that "[u]ntil the recall repairs have been performed, it is <u>very</u> important that you remove all items from your key ring, leaving only the vehicle key," and that even the key fob "should also be removed from your key ring."  GM Website

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

http://www.gm.com/ignition-switch-recall.html (last visited March 26, 2016) (emphasis original).

29.     GM also has indicated, however, that replacing the ignition switch may not resolve the risk, and that even after repair,  "[w]e recommend that customers only utilize the key, key ring and key fob (if equipped) that came with the vehicle." *Id.*

**GM's Knowledge**

30.     Both Old GM and New GM have known of the ignition switch defects for years, but have consistently concealed the defect, and the danger, from Defective-Vehicle owners.

31.     Old GM had information indicating that the ignition switch was a problem as early as 2001 before it started selling the Saturn Ion.  *See* Wallace, "GM ignition switch issue surfaced in 2001," *CNNMoney* (March 13, 2014) ("The company said in a federal filing Wednesday that it discovered an issue with the Saturn Ion ignition switch in 2001 during pre-production development."); *see also* Wayland, "Official: Documents paint 'unsettling picture' of GM, NHTSA ignition switch recall,"  MLive.com (March 31, 2014) ("[A] 2001 pre-production report for the 2003 Saturn Ion . . . 'identified issues with the ignition switch.'")

32.     The warning signs continued.  In 2003, an internal inquiry revealed that a service technician observed the Saturn stall after the ignition had switched off while driving. After seeing that a heavy key ring had worn out the switch, the technician replaced it and the inquiry was closed.  Ivory, "G.M. Reveals It Was Told of Ignition Defect in '01," *New York Times* (March 12, 2014).

33.     According to Old GM's own filings with the National Highway Traffic Safety Administration ("NHTSA"), Old GM was aware of at least three fatal crashes involving the

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

Saturn Ion in 2003 and 2004.  Two of these crashes (one in December 2003 in Connecticut;

the other in November, 2004 in Texas) involved non-deploying airbags.  A third involved

the May 2004 crash of a 2003 Ion in Pennsylvania.  Lienert, "U.S. Safety Watchdog Says 303

Deaths Linked To Recalled GM Cars," *Reuters* (March 13, 2014).

34.    Notwithstanding red flags relating to the ignition switch in Saturn Ions, Old

GM used the same ignition switch in its production of the Chevrolet Cobalt.  And Old GM

learned that the same problems occurred in the Cobalt prior to launching that model.  *See*

Healey and Meier, "9 revelations from GM's recall chronology," *USA TODAY* (February 27,

2014).

35.    "Around the time production [of the Cobalt] started, GM learned of 'at least

one incident' where Cobalt lost power when key moved out of 'run' position because of

inadvertent contact. Engineers replicate[d] [this] failure during test drives.  GM initiate[d]

[an] internal problem resolution process. Solutions [were] considered to improve torque

efficiency of the ignition switch, but '[a]fter consideration of the lead time required, cost

and effectiveness of each of these solutions, the (report) was closed with no action."

Detroit Free Press, "Interactive Timeline: General Motors ignition switch recall" (Mar. 19,

2014); *see also* Healey and Meier, "Lawsuit: GM knew of Cobalt ignition problem," *USA*

*TODAY*  (February 19, 2014) ("At least one GM engineer had the problem while testing the

[Cobalt] . . . say documents obtained by USA TODAY from the lawsuit over a crash that . .

.killed Brooke Melton.").

36.    Nevertheless, Old GM made a "business decision not to fix this problem"

before the Cobalt was launched in 2004.  Bennett and Hughes, "New Details Emerge in GM

Cobalt Recall, Engineers Knew of Ignition Problems and Expected Drivers to Coast Out of

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

Traffic, Documents Show," *The Wall Street Journal* (March 24, 2014) (quoting Gary Altman, program engineering manager for the 2005 Cobalt from June 2013 deposition in Melton case).

37.    In Notices to NHTSA, dated February 24, 2014 and March 11, 2014, GM provided a partial chronology of events concerning the ignition switch defects. *See* Letter from General Motors LLC to Nancy Lewis, Associate Administrator for Enforcement, NHTSA dated March 11, 2014 ("March 11, 2014 Notice"); Letter from General Motors LLC to Nancy Lewis, Associate Administrator for Enforcement, NHTSA dated February 24, 2014 ("February 24, 2014 Notice").

38.    GM admitted that in 2004, "[a]round the time of the launch of the 2005 Chevrolet Cobalt," that GM learned about the Cobalt losing engine power when the key moved out of the "run" position, and stated that "GM employees were able to replicate this phenomenon during test drives." February 24, 2014 Notice at 1. GM stated that an "engineering inquiry, known within GM as a Problem Resolution Tracking System inquiry ["PRTS"] was opened to investigate the issue." *Id.* At that time, GM "considered a number of potential solutions. After consideration of the lead time required, cost, and effectiveness of each of these solutions, the PRTS was closed with no action." *Id.*

39.    GM also admitted that in 2005, GM employees received field reports of Chevrolet Cobalt vehicles losing engine power, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column." *Id.* at 1; *see also* March 11, 2014 Notice at 1 (same). GM opened additional PRTSs to assess the issue. February 24, 2013 Notice at 1. During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a 'slotted' to a 'hole'

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

configuration.  That proposal was initially approved but later cancelled."  March 11, 2014

Notice at 1.  The same issue applied to the Saturn Ion, Chevrolet HHR, and Pontiac Solstice

"all of which were equipped with the same ignition switch as the Cobalt."  *Id*.

40.    In March, 2005, another crash involving the Saturn Ion, involving two

fatalities, occurred in which the air bags failed to deploy.  *See* Letter from Center For Auto

Safety to David J. Friedman Acting Administrator NHTSA, dated March 13, 2014 (citing data

from NHTSAS Fatal Analysis Reporting System).

41.    Pursuant to 49 USC § 30118 and accompanying regulations including 49 CFR

§ 573.6, manufacturers are required to notify not only the National Highway

Transportation System Administration ("NHTSA") but also vehicle owners and purchasers

if it learns that a vehicle or equipment contains a defect related to motor vehicle safety.

That notice must be provided within a reasonable time after learning about a safety-related

defect, describe the defect, the risk, and the measures to obtain repair.  49 U.S.C. §30119.

42.    Old GM should have but did not institute an ignition-switch recall and notify

consumers about the problem.  Instead, it issued non-public technical service bulletins to

dealers.

43.    Technical service bulletins in no way substitute for consumer notice because,

among other things, "[m]ost owners will never know about [a service bulletin]."  Plungis**,**

**"**GM Had 2006 Ignition-Switch Remedy Unknown to Most Owners," *Bloomberg* (March 17,

2014) (quoting Allan Kam, former NHTSA senior enforcement attorneys).  To the contrary,

technical service bulletins "rely on customers coming into the dealer on their own, and

often asking about a specific problem."  *Id.*

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

44.    Not only did Old GM fail to disclose the defect to consumers, the technical service bulletins it sent to dealers were misrepresentative.

45.    Old GM sent a service bulletin dated February 28, 2005 indicating that the potential for drivers to inadvertently turn off the ignition of their Cobalts was limited to a "profile" in which the driver's knee "contacts the key chain while the vehicle is turning." Old GM told its dealers to "question the customer thoroughly."   In fact, however, Old GM knew that the risk was not so limited but rather, present under normal foreseeable driving circumstances.  Old GM also knew that the Saturn Ion suffered from the same risk.

46.    Old GM sent another service bulletin to dealers in December 2005, again representing falsely the risk as it had in February.  This bulletin also described a new key cover, which changed the key head to a hole, that could be provided to vehicle owners if they complained.  *See* Gutierrez, "GM Changed Ignition Part Without Telling Drivers, Regulators," *NBC News*  (March 13 2014).   The service bulletin did not tell dealers to put the new key cover on the keys of new Cobalts before they were sold.  Healey and Meier, "Lawsuit: GM knew of Cobalt ignition problem," *USA TODAY*  (February 19, 2014).

47.    Consistent with the ineffectiveness of technical service bulletins, GM records indicate that fewer than 500 drivers received new key covers.  *See* Gutierrez, "GM Chose Not to Implement a Fix for Ignition Problem," *NBC News* (March 13 2014) ("[A]ccording to GM warranty records, fewer than 500 drivers" received the new key covers); March 11, 2014 Notice ("GM's warranty records indicate that GM dealers have provided key inserts to 474 customers who brought their vehicles into dealers for service.").

48.    Meanwhile, Old GM otherwise was downplaying the problem.  As of 2005, Old GM spokesman, Alan Adler, was telling the public that only in "rare cases when a

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

combination of factors is present" might a Cobalt lose power if the ignition switch were bumped to the accessory or off position, and that "[s]ervice advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings." Jensen, "General Motors Recalls 778,000 Small Cars for Ignition Switch Problem," *New York Times* (Feb. 13, 2014). In fact, removing material from key rings would not eliminate the possibility that the ignition switch would turn to accessory or off, causing loss of power and failure of airbags.

49.    Old GM continued selling Defective Vehicles without disclosing the risk to consumers.

50.    In late July, 2005, Amber Rose was killed in a frontal collision involving a 2005 Cobalt whose airbags did not deploy.

51.    "On April 26, 2006, the Old GM design engineer responsible for the ignition switch installed in all of the vehicles . . . signed a document approving changes to the ignition switch." March 11, 2014 Notice at 2. This design change was proposed by the supplier, Delphi, in order "to increase the torque in the switch with a new detent plunger and spring to prevent it from slipping." Colias, "Former GM engineers say quiet '06 redesign of faulty ignition switch was a major violation of protocol," *Automotive News* (March 24, 2014). Contrary to company protocol and industry standards, however, no new part number was assigned to the redesigned switch. *Id*.; *see also* March 11, 2014 Notice at 2 ("This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch."). Neither did Old GM issue a recall for repair of older models still housing the defective ignition switch.

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

52.     Delphi did not begin providing the re-designed ignition switch until "some point during the 2007 model year." March 11, 2014 Notice at 2.

53.     "In May 2006, a field evaluation inquiry, known within GM as a Field Performance Report ('FPR') was opened to address customer complaints that their Saturn Ion vehicles would neither crank nor start." March 11, 2014 Notice at 2.  Attached thereto was a document from Delphi recommending design changes including the detent plunger to increase torque force.  *Id.*  The FPR was closed based apparently on the technical service bulletin. *Id.*

54.     Old GM opened another PRTS on August 1, 2006 after a customer complained of stalling after the ignition switch had been replaced.  This PRTS was canceled in October, 2006 without any action.  *See* February 24, 2014 Notice at 2.

55.     Two additional crashes, involving three fatalities, occurred on September 9, 2006 in West Virginia and on October 24, 2006 in Wisconsin involving the Saturn Ion and Chevrolet Cobalt, respectively, in which the air bags failed to deploy.  *See* Letter from Center For Auto Safety to David J. Friedman Acting Administrator NHTSA, dated March 13, 2014 (citing data from NHTSAS Fatal Analysis Reporting System).

56.     Data from NHTSA's Early Warning Reporting system indicates that "in model years 2005 and 2006 -- the first years Cobalts were manufactured -- GM reported more claims of injury and death with airbags as a contributing factor than any other car in its class.   In 2006, Cobalts had more than 50 times as many airbag claims as Honda Civics, and five times the claims of the Toyota Corolla and Ford Focus." Glor, "GM's Cobalt had more airbag    claims    than    other    cars    in    class,"    *CBSNEWS*    (March    25,    2014)

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

(http://www.cbsnews.com/news/gms-cobalt-had-more-airbag-claims-than-other-cars-in-class-data-show/) (last visited March 26, 2014)

57.    On March 29, 2007, a group of Old GM employees were meeting with NHTSA representatives about occupant restraint systems.   NHTSA representatives advised that data retrieved from the sensing and diagnostic module ("black box") of the Cobalt involved in the fatal crash of July 29, 2005 confirmed that the power mode status was in the "accessory" position.  February 24, 2014 Notice at 2.   A file on this crash had been open in Old GM's legal department since 2005.  *Id.*

58.    As of March, 2007, Old GM assigned an "investigating engineer" to track Cobalt crashes involving frontal impacts where the air bags failed to deploy.  February 24, 2014 Notice at 2; *see also* Healey and Meier, "9 revelations from GM's recall chronology," *USA TODAY* (February 27, 2014) (same); "Interactive time line: General Motors ignition switch recall," *Detroit Free Press* (Mar. 19, 2014) (March 29, "NHTSA rep tells GM employees about the July 29, 2005 Cobalt crash killing Amber Rose and says onboard recorder indicates ignition switch was in 'accessory' mode . . . Following the meeting, a GM investigating engineer is told to track crashes in which Cobalts were involved in frontal impacts and the airbags did not deploy.").

59.    By year's end 2007, Old GM knew of at least 9 Cobalt crashes in which airbags did not deploy and that the key was in "accessory" position in at least 4 of them. March 11, 2014 Notice at 3; compare February 24, 2014 Notice at 2 (stating that GM "had notice of ten such incidents" by the end of 2007).   Still, it did not issue an ignition switch recall or otherwise notify consumers of the defects.

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

60.    In February 2009, Old GM initiated yet another PRTS regarding accidental ignition shut-off experienced by customers with, e.g., additional keys hanging from the ignition switch.  The key fob was changed from a slot to hole design, to be implemented for 2010 model year Cobalts only.  February 24, 2014 Notice at 2.

61.    On May 15, 2009, several Old GM engineers meet with representatives of GM's supplier of the Cobalt's black boxes.   Old GM by that time had recovered 14 modules, "and according to [its supplier], the ignition was in the accessory position on [7] of the 14 cases."  Stout, Vlasic, Ivory and Ruiz, "General Motors Misled Grieving Families on a Lethal Flaw," *New York Times* (March 24, 2014) http://www.nytimes.com/2014/03/25/business/carmaker-misled-grieving-families-on-a-lethal-flaw.html?hpw&rref=business&_r=0 (last visited March 25, 2014); *see also* February 24, 2014 Notice at 2.

62.    On June 12, 2009, Christopher Hamberg, was killed driving his 2007 Cobalt home in Houston.    On December 13, 2009, another crash in Charlottesville Virginia occurred, this time involving the Pontiac G5, in which the air bags failed to deploy.  *Id.*

63.    GM continued to receive complaints and investigate crashes in which the air bags failed to deploy.   It admitted that between 2005 and February, 2014, GM was "aware of 23 frontal-impact crashes involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the recall condition may have caused or contributed to the airbag's non-deployment . . . GM employees became aware of many of these crashes within a month of the dates on which they occurred . . . With respect to 22 of the 23 frontal-impact crashes . . . data retrieved from the vehicles' [black box] indicated that the ignition switches  were in the . . . 'accessory' position in twelve of the crashes, and in the 'off' position in one of the

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

crashes."  February 24, 2014 Notice at 5.  In addition, and "[t]hroughout this period, GM was involved in claims and lawsuits in which allegations were made regarding the ignition switch issue." *Id.*

64.     More crashes and fatalities occurred, including the 2010 Cobalt crashes that killed Amy Kosilla and Jennifer Brooke Melton when, among other things, the air bags failed to deploy.

65.     In July, 2011, "a meeting was held at GM involving Legal Staff, Field Performance Assessment ('FPA') and Product Investigations personnel who would be involved in the Field Performance Evaluation ('FPA') process.  Soon thereafter, in August 2011, a Field Performance Assessment Engineer ('FPAE') was assigned to move forward with an FPE investigation of a group of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not deployed during frontal impacts, which also included a review of information related to the Ion, HHR and Solstice vehicles."  March 11, 2014 Notice at 3.

66.     Contrary even to its own admitted design change approval in April 2006 (to increase the torque in the ignition switch), GM's 2014 communications with NHTSA states that GM somehow did not learn until late April 2013  that "the torque performance of a GM service part ignition switch purchased after 2010 differed substantially from that of an ignition switch that was original equipment installed on a 2005 Cobalt" and that ignition switches in the "early-model Ion and Cobalt vehicles did not meet GM's torque specifications."  March 11, 2014 Notice at 4.

67.     Moreover, a congressional report summarizing an investigation by the House Energy and Commerce  Committee indicates that "[e]xecutives with Delphi . . . told

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

investigators that . . . GM signed off on what's known as a Production Part Approval

Process, or PPAP, document in February 2002 for the switch "even though sample testing

of the ignition switch was below the original specifications set by GM."  Spangler, Detroit

Free Press, "Delphi told GM ignition switch didn't meet specs," *USAToday (March 30,*

*2014); see also* Cowen, Beech and Lienert, "Delphi told panel GM approved ignition switches

below specifications," Reuters (March 30, 2014) ("General Motors Co approved [the]

ignition switches . . . even though the parts did not appear to meet the company's

specifications, officials of Delphi Automotive told U.S. congressional investigators." );

Thompson and Lienert, "Key GM crisis questions: Who approved switch revision and why

recall took so long," Reuters (March 30, 2014) ("Delphi told U.S. congressional

investigators last week that GM approved the original part in 2002, despite the fact it did

not meet GM specifications, according to congressional aides on Sunday.").

68.    Not until February, 2014 did GM finally issue a recall of some of the Defective

Vehicles.  The recall was initially announced on February 13, 2014 and later broadened on

February 24, 2014 to include additional vehicles.  On March 28, 2014, the recall was

expanded to include even more vehicles, which together with the prior recall encompasses

all of the Defective Vehicles known to date.

69.    GM's CEO Mary Barra acknowledged in a video presentation on March 14,

2014 that "[s]omething went wrong with [GM's] process in this instance, and terrible

things happened."

70.    Through at minimum, documents at Old GM retained by New GM and the

knowledge of officers, employees and agents continuing to work at New GM after its asset

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

purchase in July 2009, GM from the moment it was created had knowledge of the defective

condition of the vehicles at issue.

71.    Up to and including the latest recall announcement on March 11, 2014, GM

failed to reveal and concealed the nature and extent of the problem from owners of the

Defective Vehicles.  At no time prior to that date did Old GM or New GM send notification to

owners or prospective owners that the Defective Vehicles are dangerous.

72.    In addition, and throughout the time it knew about the dangerous defects in

the Defective Vehicles, GM was falsely promoting their safety.  For example:

> a.    In 2003, GM represented:  "Saturn ION sets itself apart from
> competitors with innovative features, unique personalization opportunities
> and surprising levels of safety . . . The ION sedan and quad coupe are
> designed to carry on the Saturn tradition of being at the top of the class when
> it comes to safety and security." Saturn Overview,"SATURN ION GENERATES
> NEW CHARGE IN SMALL-CAR SEGMENT" (2003)[1]
>
> b.    In 2004, GM stated:  "Like all Saturns, the Ion was designed with a
> major emphasis on safety and security. The world-class structural design
> provides the foundation, as the steel spaceframe helps absorb the energy of a
> crash while protecting the integrity of the passenger compartment . . . Dual-
> stage frontal air bags are standard . . . ."   GM Media Archive, 2005 SATURN
> Product Information (Release date Aug. 1, 2004)[2]
>
> c.    In 2004, GM announced that it was introducing Cobalt that year as
> well as a "5/60 powertrain warranty," by which it said, "we're letting or
> customers know that they can feel secure in the value and quality of the
> product."  GM Communications  "Chevrolet Announces Warranty On New
> Cobalt" (Release date 2004-10-26)[3]

---

[1]    http://archives.media.gm.com/division/2003_prodinfo/03_saturn/03_Ion/index.html    (last
visited March 26, 2014)

[2]    http://archives.media.gm.com/division/2005_prodinfo/saturn/ion/index.html    (last   visited
March 26, 2014)

[3] http://archives.media.gm.com/archive/documents/domain_13/docId_8986_pr.html (last  visited
March 26, 2014)

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

d.    In 2005, GM represented that it was "committed to keeping you and your family safe — from the start of your journey to your destination" and "[t]hat's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind."[4]

e.    In 2006, GM stated: "The rigid body structure [of the Pontiac G5] that lays thefoundation of G5's dynamic driving experience also reinforces its safety. In addition to the solid unibody structure, dual-stage air bags are standard . . . ."  GM Media Archive, Pontiac Overview, 2007 PONTIAC G5 (Release date Aug. 1, 2006)[5]

f.    In 2007, GM represented that the Saturn Sky "has a host of safety features, including a supplemental restraint system (SRS) with dual-stage frontal air bags."  GM Media Archive, 2007 Press Release[6]

g.    In 2008, still selling Cobalts, GM stated that "[a]lthough the Chevrolet Cobalt is no longer in production, used Cobalt models are readily available" and that "[r]easons for Cobalt's popularity included . . . a comprehensive standard safety package that included front air bags."[7]

73.    As GM knows, vehicle safety is highly important to reasonable purchasers when making purchase decisions and when deciding whether to keep a vehicle already purchased.

74.    The proper operation and integrity of vehicle systems, including power and airbags, also is highly important to safety of drivers, their passengers, and other persons on the roadways.

---

[4] http://web.archive.org/web/20050305041006/http://www.chevrolet.com/safety/ (last visited March 26, 2014)

[5] http://archives.media.gm.com/us/pontiac/en/product_services/r_cars/r_c_g5/07index.html (last visited March 26, 2014)

[6] http://archives.media.gm.com/us/saturn/en/product_services/r_cars/r_c_sky/07index.html#pr

[7] http://www.chevrolet.com/discontinued-vehicle/cobalt.html (last visited March 26, 2014)

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

**<u>Statutory and Regulatory Requirements</u>**

75.     When a vehicle manufacturer learns of a safety-related defect that could lead to injury or death, it is required to adhere to the requirements of Motor Vehicle Safety Act. The purpose of that Act is "to reduce traffic accidents and deaths and injuries resulting from traffic accidents."  49 USC § 30101.

76.     49 USC § 30118(c) requires that a manufacturer notify NHTSA as well as owners, purchasers and dealers if it learns that a vehicle or equipment contains a defect related to motor vehicle safety or does not comply with a motor vehicle safety standard. Section 30119 requires that such notification be given within a reasonable time after learning about a safety related defect or noncompliance.  49 U.S.C. §30119(c)(1)(2).

77.     A "defect" is "any defect in performance, construction, a component, or material of a motor vehicle or motor vehicle equipment.  49 USC §30102(a)(2).

78.     "Motor vehicle safety"  means **"**performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident." 49 USC §30102(a)(8).

79.     The Defective Vehicles meet the definition of vehicles or equipment with a defect related to motor vehicle safety, presenting an unreasonable risk of accidents, death or injury.

80.     Manufacturers must furnish a Defect and Noncompliance Information report to NHTSA not more than 5 working days after a defect in a vehicle or item of equipment is determined to be safety related or noncompliance with a motor vehicle safety standard is determined to exist.   This notice must contain information regarding the nature of the

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

defect, the affected vehicles, and the manufacturer's plan for remedying the issue.  49 CFR §
573.6(a)-(c)  The manufacturer must provide notification to vehicle owners of a safety
recall within a reasonable time of determining a defect relates to motor vehicle safety or a
noncompliance exists (currently, no later than 60 days from the date it files the Defect and
Noncompliance Information Report under part 573).  *See* 49 CFR § 577.5(a); 49 CFR §
577.7(a).

81.    The manufacturer must also within a reasonable time provide notice to
dealers and distributors of a safety-related defect or noncompliance with a federal motor
vehicle safety standard, clearly stating that the notice is a safety recall notice, identifying
affected vehicles, with an advisory stating that the dealer or distributor cannot sell the
affected vehicle until remedied.  49 CFR §577.13(a)-(b).   Effective August 5, 2005, where
the defect or noncompliance presents an immediate and substantial threat to motor vehicle
safety, this notice must be transmitted to dealers and distributors within 3 business days
(and not later than 5 business days) of transmitting the Defect and Noncompliance
Information Report under 49 CFR 573.6.  49 CFR §577.7(c)(1).

82.    Old GM and New GM violated one or more of these provisions by failing to
issue a recall or notify owners and purchasers of the Defective Vehicles of a safety recall or
even the defects.

**ALLEGATIONS RELATED TO PUNITIVE DAMAGES**

83.    Plaintiff incorporates the allegations set forth above as though fully set forth
herein.

84.    GM's unlawful and unfair practices including deception, false promises, false
pretense, misrepresentation, and/or the concealment, suppression, or omission of material

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

facts in connection with the sale, distribution, or advertisement of GM vehicles and its ignition system were outrageous because of Defendants' evil motive and/or conscious disregard and/or reckless indifference to the rights and/or safety of Plaintiff, Class members, and others.

85.    As a result of GM's conduct alleged herein, the jury should be permitted to return a verdict of punitive damages that will serve to punish GM and deter it and others from like conduct. The MMPA expressly provides for punitive damages. *See* Mo. Rev. Stat. § 407.025.

**INDIVIDUAL PLAINTIFF'S EXPERIENCE**

86.    In or about December 2005, Plaintiff purchased a 2006 Saturn Ion from a Saturn dealership in Blue Springs, Missouri.  GM did not inform Plaintiff that the ignition switch in her vehicle was defective nor of the nature of the risks of the defect at the time of purchase nor anytime thereafter prior to the February 2014 recall.

87.    Prior to the nationwide recall notice, GM still did not inform Plaintiff of the defect.

**CLASS ALLEGATIONS**

88.    Plaintiff incorporates by reference all allegations above as though fully set forth in this paragraph.

89.    Plaintiff brings this class action pursuant to Missouri Rules of Civil Procedure Rule 52.08 and the Missouri Merchandising Practices Act on behalf of herself and the following class of similarly-situated persons (the "Class"):

> All persons or entities who purchased or leased within the State of Missouri, or Missouri residents who purchased or leased, one or more of the Defective Vehicles (as defined in

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

paragraph 1) for personal or family use (and their estates, administrators, legal representatives, heirs or beneficiaries).

Excluded from the class are the officers, directors, agents or employees of GM or any parent, subsidiary, or affiliate of GM; the judicial officers assigned to this litigation, as well as members of their staffs and immediate families. Also excluded from the class is any individual who has asserted a claim for personal injury as a result of purchasing a Defective Vehicle as to such injury.

90.    The proposed class meets all requirements for class certification. The proposed Class satisfies the numerosity standards because the Class is believed to number in the thousands of persons in the state of Missouri. As a result, joinder of all Class members in a single action is impracticable.

91.    There are questions of fact and law common to the Class that predominate over any questions affecting only individual members. The questions of law and fact common to the Class include, without limitation, the following:

(a)    whether the ignition switch in the Defective Vehicles was/is defective;

(b)    whether, in connection with advertising or selling the Defective Vehicles, Defendants failed to disclose, suppressed, omitted and/or concealed risks;

(c)    whether in connection with marketing or selling the Defective Vehicles, Defendants falsely or fraudulently misrepresented in its advertisements, promotional materials or elsewhere, the safety of the Defective Vehicles;

(d)    whether in connection with marketing or selling the Defective Vehicles, Defendants engaged any method, act, use, practice, advertisement or solicitation having the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression in regard to the  safety of the Defective Vehicles;

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

(e)    whether, in connection with marketing or selling of the Defective Vehicles, Defendants made any assertions not in accord with the facts in regard to the safety of the Defective Vehicles;

(f)    whether, in connection with marketing or selling of the Defective Vehicles, Defendants omitted any material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading;

(g)    whether in connection with marketing or selling the Defective Vehicles, Defendants failed to disclose material facts either known to them or that, upon reasonable inquiry would be known to them;

(g)    whether Defendants failed to warn adequately of the defect and risks in the Defective Vehicles;

(h)    whether Defendants knew or could have known of the defect and risks in the Defective Vehicles;

(i)    whether Defendants continued to manufacture, market, distribute, and sell the Defective Vehicles notwithstanding its actual or constructive knowledge of their dangerous nature;

(j)    whether in connection with marketing or selling the Defective Vehicles, Defendants engaged any method, act, use or practice that operated to hide or keep material facts from consumers;

(k)    whether in connection with marketing or selling the Defective Vehicles, Defendants engaged in any method, act, use or practice likely to curtail or reduce the ability of consumers to take notice of material facts which were stated;

(l)    whether Defendants' conduct violated Missouri's Merchandising Practices Act;

(m)    whether Defendants' conduct offends any public policy as established by statutes or common law of this state, or is unethical, oppressive or unscrupulous and presents a risk of, or causes, substantial injury to consumers;

(n)    whether Defendants engaged in any method, use or practice which violates state or federal law intended to protect the public and presents a risk of, or causes substantial injury to consumer;

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

(o)    whether the actual value of the Defective Vehicles was less than the value of those vehicles as they were represented by Defendants;

(p)    whether GM has successor liability for the acts of Old GM.

92.    The questions set forth above, collectively and individually, predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.

93.    A class action is the appropriate method for the fair and efficient adjudication of this controversy. The presentation of separate actions by individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of class members to protect their interests.

94.    Plaintiff is an adequate representative of the class because she is a member of the class and her interests do not conflict with the interests of the members of the class that she seeks to represent. The interests of the members of the class will be fairly and adequately protected by Plaintiff and her undersigned counsel, who have extensive experience prosecuting complex class action litigation.

95.    On behalf of herself and the class, Plaintiff seeks damages equal to the difference between the actual value of the Defective Vehicle she purchased and the value of that vehicle had it been as represented by Defendant and/or free from the alleged defect.

96.    Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy. It would be impracticable and undesirable for each member of the class who suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

97.     The Defendant has acted or refused to act on grounds generally applicable to all members of the classes, thereby making appropriate final judgment with respect to the classes as a whole.

98.     Notice can be provided to class members by using techniques and forms of notice customarily used in complex class actions, including by published and broadcast notice.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT I**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**(UNLAWFUL PRACTICES)**

99.     Plaintiff incorporates by reference the allegations set out above as though fully set forth herein.

100.     Plaintiff did not learn of the dangerous design defect in her vehicle until she received the recall notice.  Reasonably prudent persons were not on notice of that defect or an actionable injury due to Defendants' concealment.  Moreover, Defendants committed multiple wrongs as described herein, up to and including at least March 11, 2014 when a recall was issued for all the Defective Vehicles if not later.

101.     Defects in ignition switches and their dangerous propensities are facts that a reasonable consumer, including Plaintiff, would consider important in making a purchasing decision, or would be likely to induce a reasonable consumer to act, respond or change his/her behavior in a substantial manner in retaining or driving a vehicle and thus were material.  *See* 15 CSR 60-9.010 (1)(C).

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

102.    Under the Missouri Merchandising Practices Act ("MMPA"), the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice."    Mo. Rev. Stat. 407.020.1.

103.    "Any act, use or employment declared unlawful by [Section 407.020] violates [the Act] whether committed before, during or after the sale, advertisement or solicitation. Mo. Rev. Stat. 407.020.1.

104.    Under the MMPA, deception is any method, act, use, practice, advertisement or solicitation that has the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression.  15 CSR 60-9.020 (1).

105.    Fraud includes any acts, omissions or artifices which involve falsehood, deception, trickery, breach of legal or equitable duty, trust, or confidence, and are injurious to another or by which an undue or unconscientious advantage over another is obtained. 15 CSR 60-9.040 (1)    Fraud, as used in Section 407.020.1. is not limited to common law fraud or deceit and is not limited to finite rules, but extends to the infinite variations of human invention.  15 CSR 60-9.040 (2)

106.    False pretense is any use of trick or deception, forgery, or false and fraudulent representation, statement, pretense, instrument or device with the intent to defraud.  15 CSR 60-9.050 (1) Reliance and injury are not elements of false pretense as used in section 407.020.1. 15 CSR 60-9.050 (2)

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

107.    A misrepresentation is an assertion that is not in accord with the facts.  15
CSR 60-9.070 (1) Reliance, knowledge that the assertion is false or misleading, intent to
defraud, intent that the consumer rely upon the assertion, or any other capable mental
state such as recklessness or negligence, are not elements of misrepresentation as used in
Section 407.020.1. 15 CSR 60-9.070 (2)

108.    It is a misrepresentation for any person in connection with the
advertisement or sale of merchandise to make an untrue statement of material fact.  15 CSR
60-9.080 (1).

109.    It is a misrepresentation for any person in connection with the
advertisement or sale of merchandise to omit to state a material fact necessary in order to
make statements made, in light of the circumstances under which they are made, not
misleading. 15 CSR 60-9.090 (1)

110.    Concealment of a material fact is any method, act, use or practice which
operates to hide or keep material facts from consumers. 15 CSR 60-9.110 (1).

111.    Suppression of a material fact is any method, act, use or practice which is
likely to curtail or reduce the ability of consumers to take notice of material facts which are
stated. 15 CSR 60-9.110 (2).

112.    Omission of a material fact is any failure by a person to disclose material
facts known to him/her, or upon reasonable inquiry would be known to him/her. 15 CSR
60-9.110 (3).

113.    In connection with the advertising, marketing, sale, and distribution of the
Defective Vehicles, Defendants engaged in acts and practices including deception, false
promises, misrepresentation, and/or concealment, suppression, or omission of material

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

facts, each of which constitutes an unlawful and/or unfair practices in violation of the MMPA.

114.    In addition to affirmative misrepresentations made in regard to the safety of the Defective Vehicles, Defendants omitted, suppressed and concealed material facts in by failing to notify consumers of material facts known to them or upon reasonably inquiry would be known to them concerning the defects and attendant risks that are the subject of this action.

115.    The acts and practices engaged in by Defendants and described herein constitute unlawful and/or fraudulent practices in violation of the MMPA.

116.    Plaintiff purchased her vehicle on or about December 2005 primarily for personal or family use.

117.    As a direct and proximate result of the unlawful merchandising practices of Defendants, Plaintiff purchased their vehicles from GM, and as a result suffered economic damages in that they paid more for their vehicles than they would have had Defendants' not concealed and/or omitted material facts surrounding the defective nature of the ignition parts on their vehicles.

## COUNT II
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
## (UNFAIR PRACTICES)

118.    Plaintiff incorporates by reference the allegations set forth above as though fully set forth herein.

119.    Under the Missouri Merchandising Practices Act, an unfair practice is any practice which: (A) either 1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

its interpretive decisions; or 2. Is unethical, oppressive or unscrupulous; and (B) Presents a risk of, or causes, substantial injury to consumers.    15 CSR § 60-8.020(1).    Deception, fraud, or misrepresentation is not required to prove an   unfair practice.  15 CSR § 60-8.020(2).

120.    By selling and continuing to sell the Defective Vehicles, failing to notify consumers of the safety risks, and failing to recall the Defective Vehicles, Defendants engaged in unfair practices that (1) offend public policy; (2) are unethical, oppressive or unscrupulous; (3) or present a risk of or cause substantial injury to consumers.

121.    Under the MMPA, it also is an unfair practice for any person in connection with the advertisement or sale of merchandise to engage in any method, use or practice which (A) violates state or federal law intended to protect the public; and (B) Presents a risk of, or causes substantial injury to consumers.  15 CSR 60-8.090(1)(A)-(B).

122.    Old GM had an obligation to, but failed to notify Defective Vehicle owners as well as dealers of the safety-related defect and to repair the same within a reasonable time after learning of the safety-related defect in violation of federal statutes and regulations including those set out in the paragraphs above.

123.    Among the obligations retained by GM after Old GM's bankruptcy was the obligation to "comply with the . . . reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act . . . and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM]."  July 2, 2009 8-K at § 6.15(a)

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

124.    By selling and continuing to sell the Defective Vehicles, failing to notify consumers of the safety risks, and failing to recall the Defective Vehicles, Defendants engaged in unfair practices that violated federal statutes and regulations intended to protect the public, including those set out in the paragraphs above, and presented a risk or, or caused substantial injury to consumers, including but not limited to the risk that their air bags or brakes would fail and/or that their vehicle would lose power while being driven.

## PUNITIVE DAMAGES

125.    Plaintiff incorporates by reference the allegations set forth above as though fully set forth herein.

126.    Punitive damages are warranted in this case based on Defendants' evil motive and/or conscious disregard and/or reckless indifference to the rights and/or safety of Plaintiff, class members, and others.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants and in favor of Plaintiff and award the following relief:

(a)    Certification of the proposed class;

(b)    Damages suffered by Plaintiff and the class including but not limited to consequential, statutory, and all other damages permitted by law;

(c)    Attorneys' fees and those costs, including expert witness fees, available under the law;

(d)    Punitive and or exemplary damages in an amount sufficient to punish Defendants and deter Defendants and others from like conduct in the future;

Electronically Filed - Jackson - Independence - April 07, 2014 - 04:32 PM

(e)     An injunction enjoining GM from continuing to engage in unlawful business practices as alleged herein;

(f)     Pre-judgment and post-judgment interest;

(h)      For an order awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**Date: April 7, 2014**                    **STUEVE SIEGEL HANSON LLP**


By:_____
Patrick J. Stueve, Mo. Bar #37682
Todd E. Hilton, Mo. Bar #51388
Bradley T. Wilders, Mo. Bar #60444
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:    (816) 714-7100
Facsimile:     (816) 714-7101

**GRAY, RITTER & GRAHAM, P.C.**
Don M. Downing, Mo. Bar #41786
701 Market Street, Suite 800
St. Louis, Missouri 63101
Telephone:    (314) 241-5620
Facsimile:     (314)241-4140

Attorneys for Plaintiffs