# Exhibit B

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.

ALICIA HARRIS and
KRISTIN TOTH, individually
and on behalf of all others similarly
situated,

       Plaintiffs,

vs.

GENERAL MOTORS LLC,
DELPHI AUTOMOTIVE PLC, and
DELPHI AUTOMOTIVE SYSTEMS, LLC,

       Defendants.

_____/

### **CLASS ACTION**
### **JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Alicia Harris and Kristin Toth ("Plaintiffs"), individually and on behalf of all similarly situated persons, bring this action against Defendant General Motors, LLC ("GM"), Defendant Delphi Automotive PLC, and Defendant Delphi Automotive Systems, LLC (both Delphi Defendants collectively "Delphi") ("GM" and "Delphi" Defendants collectively "Defendants") for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), ("RICO"), assert additional statutory and common law claims, and allege as follows:

## NATURE OF THE CASE

1.    This case arises from New GM's recent string of recalls (collectively "the Recall"), the culmination of GM and Delphi's scheme to defraud GM consumers through their unconscionable failure to disclose and active concealment of a defect in certain GM vehicles that renders them unsafe to drive and has killed at least 13 innocent victims and possibly hundreds

more.[1] The Department of Transportation announced on May 16, 2014 that GM will pay a $35 million penalty for delays in reporting the defect — "the single highest civil penalty amount ever paid as a result of a [National Highway Traffic Safety Administration] investigation of violations stemming from a recall." U.S. Secretary of Transportation Anthony Foxx stated that "GM did not act and did not alert us in a timely manner. What GM did was break the law. They failed to make their public safety obligations . . . ." The NHTSA has stated that their review of GM found "systemic" issues regarding how information was shared and the Recall unfolded, and that it was "hard to point to one single fault." Apart from the penalty, GM will be now be subject to "unprecedented oversight" as a result of the NHTSA's investigation of the Recall.

2.      The defect involves the vehicles' ignition switch system, which is dangerously susceptible to failure during normal and foreseeable driving conditions (the "Ignition Switch Defect").   When the system fails, the switch turns from the "Run" (or "On") position to either the "Off" or the "accessory" position, which then results in a loss of power, speed control, and braking, as well as a disabling of the vehicle's airbags.

3.      Delphi manufactured and supplied the defective ignition switches.

4.      Delphi knew its ignition switches were defective yet it continued to manufacture and sell the defective ignition switch systems knowing they would be used in the vehicles of Plaintiffs and the Class. Congress has initiated an investigation into Delphi's role in the enterprise with both Old and New GM.

5.      The vehicles that have this defect ("Defective Vehicles") are:

- 2003-2007 Saturn Ion
- 2007-2010 Saturn Sky

---

[1] Both GM and Delphi were involved in bankruptcy proceedings that are set forth in more detail below. For purposes of clarity, Plaintiffs will refer to the pre-bankruptcy Defendant entities as "Old GM" and "Old Delphi" when the distinction is appropriate. Similarly, Plaintiffs will refer to the post-bankruptcy Defendant entities as "New GM" and "New Delphi."

- 2005-2010 Pontiac G5
- 2006-2010 Pontiac Solstice
- 2005-2010 Chevrolet Cobalt
- 2006-2011 Chevrolet HHR

6.      So far, there are approximately 2.6 million Defective Vehicles.

7.      New GM, acknowledging that "[s]omething went wrong with our process in this instance and terrible things happened," has recalled the Defective Vehicles to replace their ignition switch systems.  But merely replacing the ignition switch systems will not completely solve the problem, make the Defective Vehicles safe, or restore the Defective Vehicles' value because the design defect pervades the entire structure of the ignition switch and has destroyed the reputation of the Defective Vehicles. Specifically, the design defect also includes the location of the ignition switch, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the type of key that is used.

8.      Plaintiffs bring this action on behalf of a Class of all persons in the United States who currently own or lease one or more Defective Vehicles.

9.      In light of the recent Recall, Defendants' scheme to defraud and gross misconduct have harmed Plaintiffs and Class Members and caused them actual damages. Plaintiffs and Class Members did not receive the benefit of their bargains as purchasers and lessees as they received vehicles that were less safe, less useful, of lower quality, and, most significantly, are now less valuable in light of the Recall.  Plaintiffs and Class Members contracted to purchase or lease vehicles that do not unexpectedly turn off and become uncontrollable without airbag protection, but because of the Ignition Switch Defect, received defective vehicles that unexpectedly turn off and become uncontrollable without airbag protection.  As a result of publicity regarding the Ignition Switch Defect and both Old and New GM's misconduct, punctuated by the Recall, the

3

value of the Defective Vehicles has diminished and Plaintiffs and Class Members have lost the opportunity to sell or even simply to enjoy their vehicles unhampered by Defendants' fraudulent conduct. New GM's offer to replace the ignition switch system does not adequately address the diminished value of Plaintiffs' and Class Members' vehicles or the loss of Plaintiffs' and Class Members' opportunity to sell or even simply to enjoy their vehicles unhampered by Defendants' fraudulent conduct.

## JURISCTION AND VENUE

10.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 class members, and more than two-thirds of the Class is diverse from Defendants.  This Court also has original federal question jurisdiction because Plaintiffs' first claim arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO") and Plaintiffs' fourth claim arises under the Magnuson-Moss Consumer Products Warranties Act, 15 U.S.C. § 2301, *et seq.* ("Magnuson-Moss"). The Court has supplemental jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants have caused harm to Class Members residing in this District, including, but not limited to, Plaintiffs.

## PARTIES

13.      Plaintiff Alicia Harris is a citizen of Montevallo, Alabama.  Plaintiff Harris owns a 2004 Saturn Ion, which she bought new. Plaintiff Harris's Saturn has trouble cranking, especially in extremely cold or hot weather. Plaintiff's purchase was induced by Defendants' fraudulent concealment and misrepresentations about the existence of the ignition switch defect, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects. Plaintiff would not have purchased her Saturn, or would have paid less than she did, and would not have retained the vehicle only to suffer the diminished value brought on by the Recall and the deprivation of her right to sell or enjoy her vehicle unhampered by Defendants' scheme.

14.      Plaintiff Kristin Toth is a citizen of Toledo, Ohio.  Plaintiff Toth owned a 2009 Chevrolet Cobalt, which she bought used on June 16, 2011 for $10,700.00. On Tuesday, February 6, 2014, while driving on I-75, Plaintiff Toth was hit by a semi-truck. Plaintiff's vehicle would not start back after being hit, stranding her in the middle of the interstate. Plaintiff was then hit by another semi-truck on the driver's side. Plaintiff's vehicle was totaled and Plaintiff suffered injuries. Plaintiff's purchase of the Chevrolet was induced by Defendants' fraudulent concealment and misrepresentations about the existence of the ignition switch defect, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects. Plaintiff would not have purchased her Chevrolet, or would have paid less than she did, and would not have retained the vehicle only to suffer the diminished value brought on by the Recall and the deprivation of her right to sell or enjoy her vehicle unhampered by Defendants' scheme.

15.     Defendant GM is a limited liability company formed under the laws of Delaware with its principal place of business in Michigan. New GM was incorporated in 2009, and on July 10, 2009, acquired substantially all the assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code, pursuant to a Master Sales and Purchase Agreement ("Agreement").

16.     Under the Agreement, New GM expressly assumed the following obligation:

> From and after the Closing, Purchaser [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicles parts manufactured or distributed by [Old GM].

17.     New GM also expressly assumed:

> All Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

18.     Based on the express language of the Agreement, New GM assumed liability for the claims at issue in this lawsuit.

19.     New GM is also liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint, because New GM acquired and operated Old GM and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos, plants, offices, leadership, personnel, engineers, and employees, New GM was aware from its inception of the Ignition Switch Defect in the Defective Vehicles, and New GM

6

and Old GM concealed the Ignition Switch Defect from the public, regulators, and the bankruptcy court.

20.     Defendant Delphi Automotive PLC is a foreign corporation based in the United Kingdom.

21.     Defendant Delphi Automotive Systems, LLC is a foreign corporation organized and formed under the laws of the State of Delaware with its principal place of business in Michigan.

22.     Once a subsidiary of Old GM, Old Delphi spun-off in 1999 and became an independent publicly held corporation. Both Old and New Delphi, through their various entities, have designed, manufactured, and supplied GM with motor vehicle components, including the defective ignition switches at issue here.

23.     Notwithstanding Old Delphi's 2005 bankruptcy, New Delphi is also liable through successor liability for the deceptive and unfair acts and omissions of Old Delphi, as alleged in this Complaint, because New Delphi acquired and operated Old Delphi and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos, plants, offices, leadership, personnel, engineers, and employees, New Delphi was aware from its inception of the Ignition Switch Defect in the Defective Vehicles, and New Delphi and Old Delphi concealed the Ignition Switch Defect from the public, regulators, and the bankruptcy court.

## FACTUAL ALLEGATIONS

### A.     Defendants' Decade of Concealment

24.     In documents filed with the federal government, New GM has admitted that Old GM learned of the Ignition Switch Defect in 2001, during the pre-preproduction development of the Saturn Ion.  At that time, an internal report indicated that the car was stalling due to problems

with the ignition switch, which included "low detent plunger force" in the ignition switch.  The report stated that "an ignition switch design change" solved the problem, but it obviously did not.

25.     Old GM nonetheless began manufacturing and selling the Ion in 2002 (for the 2003 model year) with the defective ignition switch systems, which were manufactured by Delphi.

26.     In 2003, an internal Old GM inquiry documented that a service technician observed the Saturn Ion stall after the ignition had switched off while driving.  The technician noticed that "[t]he owner had several keys on the key ring," and the report stated that "[t]he additional weight of the keys had worn out the ignition switch."  The technician replaced the ignition switch, and the inquiry was closed without further action.

27.     In 2004, three Old GM employees driving production Ions reported that their cars had stalled from a loose ignition switch. "The switch should be raised at least one inch toward the wiper stalk . . . . This is a basic design flaw and should be corrected if we want repeat sales," one engineer reported.

28.     Despite these reports, after considering "lead time required, cost, and effectiveness," Old GM decided to do nothing.

29.     Even worse, when Old GM began manufacturing and selling the Chevrolet Cobalt in 2004 (for the 2005 model year), which was essentially the same car as the Saturn Ion, it installed the same ignition switch system as it installed in the Ion.

30.     Soon after the Cobalt entered the market, Old GM began receiving complaints about incidents of vehicles losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column.

Engineering inquiries, known within Old GM as Problem Resolution Tracking System ("PRTS") reports, were opened to assess the issue.

31.     In February 2005, Old GM engineers concluded that the problem had two causes: "a lower torque detent in the ignition switch . . . [and the] low position of the lock module on the [steering] column."  Again, however, Old GM decided not to take action.

32.     On February 28, 2005, Old GM issued a Service Bulletin to its dealers addressing "the potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effect" in 2005 Cobalts and 2005 Pontiac Pursuits, which Old GM stated was "more likely to occur if the driver is short and has a large heavy key chain."  Notably, Old GM did not disseminate this information to Plaintiffs and the Class members.

33.     The February 28, 2005 Service Bulletin directed the dealers to advise customers that "removing unessential items from their key chains" would prevent the ignition from being turned off inadvertently.

34.     But Old GM knew at that time that the problem was a result of design defects in the key and ignition system, and not short drivers using heavy key chains.  Moreover, Old GM knew that the "fix" it directed dealers to offer customers was insufficient to prevent the problem with the ignition.

35.     Old GM transmitted the February 28, 2005 Service Bulletin to its dealers through the mail or wires.

36.     During the course of a PRTS opened in May 2005, an engineer proposed that Old GM redesign the key head from a "slotted" to a "hole" configuration.  The slot design allowed the key chain to hang lower on the key, which placed more torque on the ignition switch when the chain was contacted or moved.  The proposal was initially approved, but later cancelled.

37.     In June 2005, the *New York Times* reported that Chevrolet dealers were telling customers to lighten their key rings to prevent intermittent stalling and the loss of electrical power in their cars.  The article included a statement from Alan Adler, Old GM's Manager for Safety Communications, in which he reassured the public that the problem only occurred in "rare cases when a combination of factors is present," that customers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings," and that "when [the stalling] happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral."  Old GM intended Adler's statement to be disseminated to the public through the mail or wires.

38.     These statements were false because Old GM's internal documents showed that these incidents occurred when drivers were using keys with the standard key fob, and that removing non-essential items from the key ring would not "virtually eliminate" the risk of an incident.

39.     In July 2005, Amber Marie Rose, who was 16-years old, was killed when she drove her 2005 Cobalt off the road and struck a tree.  Her driver's side airbag did not deploy, even though it should have given the circumstances of the head-on crash, and the car's ignition switch was in the "accessory/off" position at the time of the crash.  Old GM learned of these facts in 2005 and documented them in an internal investigation file.

40.     Instead of fixing the defect, in December 2005, Old GM issued a service bulletin to its dealers that reiterated much of the same deceptive message Adler delivered earlier in the year.  It indicated that the possibility of the driver inadvertently turning off the ignition was more likely to occur if the driver is short and has a large or heavy key chain, and recommended that drivers remove unessential items from key chains.  In addition, it informed dealers that it had

10

developed an insert for the key ring to prevent it from moving up and down in the slot, and that the key ring had been replaced with a smaller design that would not hang as low as in the past. The service bulletin applied to 2003-06 Saturn Ions, 2005-06 Chevrolet Cobalts, the 2006 Chevrolet HHR, and the 2006 Pontiac Solstice, all of which were equipped with the same defective ignition switch system. Old GM issued the December 2005 Service Bulletin to its dealers through the mail or wires.

41.    In October 2006, Old GM updated its December 2005 Service bulletin to include the 2007 Saturn Ion, the 2007 Saturn Sky, the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, and the 2007 Pontiac Solstice.  Old GM issued this update to its dealers through the mail or wires.

42.    In 2006, at least two fatal accidents involving Cobalts occurred in which the cars' data recorders indicated that the ignition switches were in the "accessory" position and the front airbags failed to deploy.  Old GM learned of this information in 2006.

43.    In 2007 and 2008, Old GM became aware of at least four more such fatal accidents.

44.    NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbag failed to deploy in non-rear impact crashes.

45.    Old GM finally made some changes to the design of the ignition switch system in 2006 to include a new detent plunger and spring.  The new switch, however, did not receive a new part number, which is considered a "cardinal sin" in the engineering community, and further concealed the defect in the switch that was installed in the Defective Vehicles.

46.     In May 2012, New GM engineers studied 44 vehicles across a range of make and model years, and results revealed that vehicles tested from model years 2003 through 2007 exhibited torque performance below the original specifications established by GM.  Rather than immediately notify NHTSA of the results of this study or conduct a recall, New GM continued to conceal the nature of the Ignition Switch Defect.

47.     In September 2012, New GM assigned a special engineer to examine the changes between the 2007 and 2008 Chevrolet Cobalt models following reported crashes where the airbags failed to deploy and the ignition switch was found in the "off" or "accessory" position.

48.     In October 2012, GM Engineer Ray DeGiorgio sent an email to Brian Stouffer of GM regarding the "2005-7 Cobalt and Ignition Switch Effort," stating, "If we replaced switches on ALL the model years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch. This cost is based on volume of 1.5 units total." This email makes clear that New GM considered implementing a recall to fix the Defective Ignition Switches, but decided against it to save money.

49.     In April 2013, New GM hired an outside engineering consulting firm to investigate the ignition switch system.  The external report concluded that ignition switches installed in early model Cobalt and Ion vehicles did not meet GM's torque specification.  Rather than immediately notify NHTSA of the results of this report, New GM continued to conceal the nature of the Ignition Switch Defect.  In fact, in April and May of 2013, two New GM employees — Brian Stouffer and Ray DeGiorgio — have downplayed or outright denied the existence of any Ignition Switch Defect in depositions in the personal injury action of *Melton v. General Motors.*

50.     In October 2013, Delphi delivered documentation to New GM confirming that a change to the ignition switch in the Cobalt and other vehicles was made in April 2006.

51.     Brian Stouffer, in an email to Delphi regarding the ignition switch in the Chevy Cobalt, acknowledged that the ignition switch in early Cobalt vehicles was different than the switch in later Cobalt vehicles notwithstanding the fact that both switches had the same part number. Delphi responded that Old GM authorized the change in 2006 but the part number remained the same.

**B.     GM Finally Discloses the Ignition Switch Defect**

52.     It was not until February of 2014 — almost thirteen years after first recognizing the defect — that New GM finally admitted publicly that the ignition switch system is defective and agreed to recall the Defective Vehicles to replace the old ignition switch with the re-designed version.

53.     In a February 14, 2014 letter to the NHTSA regarding the Recall, New GM finally acknowledged — in contrast to its prior representations to the agency — that changes were made to the ignition switches during the 2007 model year. Specifically, New GM stated that on "April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics." The GM design engineer referenced was Ray DeGiorgio.

54.     On March 17, 2014, New GM's CEO Mary T. Barra issued an internal video to employees, wherein she admits that "[t]hese are serious developments that shouldn't surprise anyone. After all, something went wrong with our process in this instance and terrible things happened."[2]

---

[2] The Ignition Switch Defect is not the only example of GM's misconduct when it comes to concealing defects. Recent reports indicate that GM "waited years to recall nearly 335,000 Saturn Ions for power steering failures

55.    On April 2, 2014, Barra testified under oath before Congress. She has been with GM for thirty-three years as a key executive with both Old and New GM. Before becoming CEO, she held numerous high-ranking engineering positions, including Executive Director of Manufacturing Engineering in 2005, Executive Director of Vehicle Manufacturing Engineering from 2005 to 2008, Vice President of Global Manufacturing from 2008 to 2009, and Executive Vice President of Global Product Development up until her appointment as CEO in January 2014.

56.    Despite the utter disregard for public safety, both Old and New GM vehicles have been marketed based on safety from 2002 through the present.  For example, in 2005, Chevrolet emphasized on its website that "[y]our family's safety is important to us . . . . That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind."  Likewise, in advertisements for Saturns, GM utilized the slogan, "Saturn. People First," and stated that, "[i]n cars, it's about things like reliability, durability, and of course, safety.  That's where we started when developing our new line of cars."

57.    While New GM has publicly stated that the Ignition Switch Defect has been linked to thirty-one frontal crashes and thirteen deaths, others have reported that the actual number of deaths or serious injuries is in the hundreds.

58.    Despite having knowledge of the Ignition Switch Defect, both Old and New GM delayed the Recall to maximize profits, placing millions of people in danger.

59.    New GM's Recall is insufficient because it does not address the location of the ignition switch system or how low the key fob hangs on the steering column, all of which create

---

despite getting thousands of consumer complaints and more than 30,000 warranty repair claims." This *other* defect — the power steering defect — can cause the affected vehicle to lose power steering, making turning the vehicle much more difficult. Complaints filed with the NHTSA reveal incidents in which 2004 Saturn Ion steering wheels locked, causing the affected vehicles to crash into a tree or get pulled into oncoming traffic. New GM has admitted that it didn't do enough to take care of the power steering problem.

a risk of inadvertent driver contact and an inadvertent turning of the switch. The Recall also fails to account for the permanent loss of value of (and reputation to) the Defective Vehicles.

60.     Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect. If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.  Both Old and New GM repeatedly violated the TREAD Act by actively concealing information about the Ignition Switch Defect for more than a decade.

61.     Throughout the relevant period, both Old and New GM possessed vastly superior knowledge and information to that of consumers — if not exclusive information — about the design and function on the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

62.     The Ignition Switch Defect has caused actual damages to Plaintiffs and the Class.

63.     A vehicle purchased, leased, or retained with a known serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the known defect.

64.     A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

65.     As a result of publicity regarding the Ignition Switch Defect and GM's misconduct, punctuated by the Recall, the value of the Defective Vehicles has diminished, and New GM's offer to replace the ignition switch system does not adequately address the diminished value of Plaintiffs' and Class Members' vehicles.  Plaintiffs and the Class are stuck

15

with unsafe vehicles that are now worth less than they would have been but for Old and New GM's wrongful conduct.

66.    Moreover, Defendants' scheme has deprived Plaintiffs and the Class Members of the right and entitlement to sell or enjoy their property unhampered by fraudulent conduct.

## STATUTES OF LIMITATION

67.    There are no applicable statutes of limitations because the claims of Plaintiffs and the Class did not accrue until the Recall, the instant the value of the Defective Vehicles diminished.

68.    Alternatively, any applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the Ignition Switch Defect.  On information and belief, Defendants have been aware of the Ignition Switch Defect since at least 2001, and have concealed from Plaintiffs, the Class, the public, and the government the complete nature of the Ignition Switch Defect.

69.    Even now, after the Defective Vehicles have been recalled, Defendants continue to engage in their scheme to defraud by downplaying the significance, danger, and nature of the Ignition Switch Defect.

70.    Plaintiffs and the Class did not discover and could not have discovered with reasonable diligence the facts that would have caused a reasonable person to suspect that the Ignition Switch Defect existed or that Defendants did not report information within their knowledge regarding the existence of a dangerous defect to federal authorities or consumers until shortly before this class action was filed.

71.    Defendants actively concealed the true character, quality, and nature of the Defective Vehicles.  Plaintiffs and the Class relied on Defendants' active concealment of these facts.  Moreover, GM was and remains under a continuing duty to disclose to NHTSA, Plaintiffs,

and the Class the true character, quality, and nature of the Defective Vehicles. Defendants are therefore estopped from relying on any statutes of limitation in this action.

## CLASS ALLEGATIONS

72.     Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs brings this action on behalf of herself and a Class initially defined as follows:

> All persons in the United States who currently own or lease one or more of the following GM vehicles: 2003-07 Saturn Ion; 2005-10 Chevrolet Cobalt; 2005-10 Pontiac G5; 2006-11 Chevrolet HHR; 2006-10 Pontiac Solstice; and 2007-10 Saturn Sky (the "Defective Vehicles").

73.     Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case. Also excluded from the Class are Delphi, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees. Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Defective Vehicles.

74.     The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

75.     As there are approximately 2.6 million Defective Vehicles, the number of Class Members is great enough that joinder is impracticable.

76.    The claims of Plaintiffs are typical of the claims of the Class, as Plaintiffs and Class Members alike purchased or leased Defective Vehicles and were harmed in the same way by Defendants' uniform misconduct.

77.    Plaintiffs will fairly and adequately protect the interests of the other members of the Class.  Plaintiffs' counsel has substantial experience in prosecuting class actions.  Plaintiffs and his counsel are committed to vigorously prosecuting this action, have the financial resources to do so, and do not have any interests adverse to the Class.

78.    There are numerous questions of law and fact that are common to the Class and predominate over questions affecting only individual members, including the following:

(a)    Whether Defendants, as part of a racketeering scheme to defraud, concealed information about the dangerous and defective condition of the relevant vehicles from Plaintiffs and the Class;

(b)    Whether Defendants, through their RICO Enterprise, as described below, used the mail or wires in furtherance of their scheme to defraud;

(c)    Whether the Defective Vehicles suffer from Ignition Switch Defects;

(d)    Whether Defendants concealed the defects;

(e)    Whether Defendants misrepresented that the Defective Vehicles were safe;

(f)    Whether Defendants owed Plaintiffs and the Class a duty to disclose the Ignition Switch Defect;

(g)    Whether Defendants engaged in fraudulent concealment;

(h)    Whether Defendants engaged in unfair, deceptive, unlawful or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches; and

(i)    Whether Defendants' unlawful, unfair or deceptive practices harmed Plaintiffs and the Class.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is impracticable.  Likewise, because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

80.     The prosecution of separate actions by the individual Class members would also create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for Defendants. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

## COUNT I
## VIOLATION OF RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. § 1962(c))
### (Against Defendants)

81.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth at length herein.

82.     This claim is brought on behalf of all Classes.

83.     Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the "RICO Enterprise" through a "pattern of racketeering activity."

84.     At all times relevant, Old GM, New GM, Old Delphi, New Delphi, their associates-in-fact, Plaintiffs, and the Class members were and are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

19

85. At all times relevant, Plaintiffs and each Class member were and are a "person injured in his or her business or property by reason of a violation of RICO within the meaning of 18 U.S.C. § 1964(c).

86. At all times relevant, Defendants were and are a "person" who participated in or conducted the affairs of the RICO Enterprise through the pattern of racketeering activity described below. While Defendants participated in the RICO Enterprise, they have an existence separate and distinct from the Enterprise. Further, the RICO Enterprise is separate and distinct from the pattern of racketeering activity in which Defendants have engaged and are engaging.

87. At all times relevant, Defendants were associated with, operated, or controlled the RICO Enterprise, and participated in the operation and management of the affairs of the RICO Enterprise, through a variety of actions described herein. Defendants' participation in the RICO Enterprise was necessary for the successful operation of their scheme to defraud.

## The RICO Enterprise

88. Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

89. The following persons, and others presently unknown, have been members of and constitute the "enterprise" within the meaning of RICO, which are referred to herein collectively as the RICO Enterprise:

    a.    <u>Defendant General Motors, LLC</u>;

    b.    <u>Both Old and New GM's Officers, Executives, and Engineers</u>, who have collaborated and colluded with each other and with other associates-in-fact in the Enterprise to deceive Plaintiffs and other Class members into purchasing dangerous and defective vehicles,

and actively concealing the danger and defect from Plaintiffs and the other Class members, including, but not limited to Alan Adler, GM's Manager for Safety Communications who, in June of 2005, issued the deceptive public statement regarding the ignition problem; Ray DeGiorgio, GM's design engineer who signed off on the ignition switch change that was never disclosed; and Mary T. Barra, GM's current CEO;

   c. <u>Defendants Delphi Automotive PLC and Delphi Automotive Systems, LLC</u>, who, at all times material, manufactured and supplied the defective ignition switch system for GM, even though they knew that the system did not meet GM's own design specifications. Delphi also manufactured and supplied the ignition switch system after the 2007 change implemented by GM without reflecting a corresponding change in part number;

   d. <u>GM's Dealers</u>, who GM instructed to present false and misleading information to Plaintiffs and other members of the Class, through, *inter alia*, multiple Service Bulletins, and who did in fact present such false and misleading information.

  90. The RICO Enterprise of Old GM, New GM, GM's officers, executives, and engineers, Old Delphi, New Delphi, and GM's dealers, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein. The RICO Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which Defendants have engaged and are engaging. The RICO Enterprise was and is used as a tool to effectuate the pattern of racketeering activity.

91.     The members of the RICO Enterprise all had a common purpose: to increase and maximize Defendants' revenues by deceiving Plaintiffs and other Class members into purchasing dangerous and defective vehicles, and actively concealing the Ignition Switch Defect from Plaintiffs and the other Class members.  The members of the RICO Enterprise shared the bounty of their enterprise, *e.g.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud.  Each member of the RICO Enterprise benefited from the common purpose of the scheme to defraud:  both Old and New GM sold or leased more vehicles with the Ignition Switch Defect, both Old and New Delphi sold more of the defective ignition switches, and GM's dealers sold and serviced more vehicles with the Ignition Switch Defect.

92.     Defendants conducted and participated in the affairs of this RICO Enterprise through a pattern of racketeering activity that lasted more than a decade, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

93.     As part and in furtherance of the scheme to defraud, Defendants' deceptive scheme to increase revenue depended on actionable deceptive conduct.  Defendants actively concealed the dangerous and defective condition of GM's vehicles from its customers through deceptive misrepresentations and omitting material information.

### **Predicate Acts: Mail and Wire Fraud**

94.     Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act that is indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

95.     As set forth below, to carry out, or attempt to carry out its scheme to defraud, Defendants have engaged in, and continue to engage in, the affairs of the RICO Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.      Both Old and New GM, with the assistance and collaboration of the other persons associated in fact with the enterprise devised and employed a scheme or artifice to defraud by use of the telephone and internet and transmitted, or caused to be transmitted, by means of wire communication travelling in interstate or foreign commerce, writing(s) or signal(s), including GM's website, Service Bulletins to dealers, and communications with other members of the Enterprise, for the purpose of executing such scheme or artifice to defraud, in violation of 18 U.S.C. § 1341 and § 1343.

b.      As part of the scheme to defraud, the RICO Enterprise utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the false pretenses and artifice to defraud, as described herein.

c.      The concealment of the dangerous and defective condition of the defective GM vehicles is the core purpose of the underlying racketeering offense.  The Enterprise had an ascertainable structure by which GM operated and managed the association-in-fact by using its Dealers and Delphi to concoct, obfuscate, carry out, and attempt to justify the fraudulent scheme described herein.

96.     Old GM's February 28, 2005 Service Bulletin was issued in furtherance of its scheme to defraud.  It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including

Case 1:14-cv-20119-PAL   Document 12   Entered on FLSD Docket 05/22/2015   Page 24 of 35

Plaintiffs and other members of the Class. The February 28, 2005 Service Bulletin was sent via the mail or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

97.     In 2005, in furtherance of its scheme to defraud, Old GM emphasized on its Chevrolet website that "[y]our family's safety is important to us . . . . That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind." This false statement, maintained on the internet through the wires, constitutes a violation of 18 U.S.C. § 1343.

98.     In June of 2005, Old GM issued a public statement through the mail or wires in furtherance of its scheme to defraud. The statement provided the public, including Plaintiffs and the other Class members, with false and misleading information about the dangerous and defective condition of the defective vehicles, and sought to conceal that condition by minimizing the issue and offering an ineffective fix. As such, the statement constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

99.     Old GM's December 2005 Service Bulletin was issued in furtherance of its scheme to defraud. It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiffs and other members of the Class — namely, that the issue could be resolved by removing items from key chains. The December 2005 Service Bulletin was sent via the mail or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

100.     In October of 2006, Old GM issued an update to its December 2005 Service Bulletin in furtherance of its scheme to defraud. The update repeated the instruction to GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiffs and other members of the

Class.  The update to the December 2005 Service Bulletin was sent via the mail or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

101.    In furtherance of the scheme to defraud, GM communicated with Delphi via the mail or wires regarding the manufacture of the defective ignition switch system.  Through those communications, GM instructed Delphi to continue manufacturing the defective part even though it did not meet GM's own specifications. Delphi followed these instructions and continued to manufacture the defective parts. Through those communications, GM also instructed Delphi to make a change to the defective ignition switch system in 2006, and to fraudulently conceal the change by not assigning a new part number.  Delphi also followed these instructions, making a change to the defective ignition switch system in 2006 and fraudulently concealing the change by not assigning a new part number. GM's communications with Delphi, and Delphi's responses, constitute repeated violations of 18 U.S.C. §§ 1341 and 1343.

102.    Defendants' conduct in furtherance of this scheme was intentional.  Plaintiffs and the other Class members were harmed in that they relied to their detriment on Defendants' conduct and, as a result, purchased dangerous and defective vehicles that saw their value plummet the moment New GM issued the Recall.  Defendants unfairly reaped millions of dollars in excessive sales revenue as a result of this scheme and its conduct in furtherance of this scheme.

103.    As described throughout this Complaint, Defendants engaged in a pattern of related and continuous predicate acts for over a decade: the scheme began sometime in or around 2000 and is ongoing.

104.    The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the Enterprise and with the common purpose of defrauding Plaintiffs and other

Class members and obtaining significant funds while providing defective vehicles that are now worth significantly less in light of the Recall. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

105. The predicate acts all had the purpose of generating significant revenue and profits for Defendants at the expense of Plaintiffs and the other Class members, who were never informed of the Ignition Switch Defect in their defective vehicles and who have now been damaged by the diminution in in value caused by the Recall. The predicate acts were committed or caused to be committed by Defendants, through their participation in the RICO Enterprise and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and all other Class members' funds.

106. Plaintiffs and Class Members have a protected property interest in current or prospective contractual relations, such as selling or enjoying their cars without being hampered by Defendants' RICO Enterprise. This deprivation of Plaintiffs' and Class Members' property interest is distinct from the injury suffered as a result of the diminished value of the vehicles.

107. Defendants' RICO Enterprise deprived Plaintiffs and Class Members of their protected property interest in, and entitlement to, current or prospective business or contractual relations, such as selling or enjoying their cars without being hampered by Defendants' RICO Enterprise

108. Count I seeks relief pursuant to 18 U.S.C. § 1964(c) from Defendants for violation of 18 U.S.C. § 1962(c).

## COUNT II

## VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### (Michigan Comp. Laws Ann. § 445, *et seq.*)
### (Against Defendants)

109. Plaintiffs and the Class incorporate by reference paragraphs 1 through 80 as though fully set forth at length herein.

110. This claim is brought on behalf of all Classes.

111. Plaintiffs and Class Members are all "persons" under the Michigan Consumer Protection Act ("MCPA"), M.C.L.A. § 445.902(1)(d).

112. Defendants were each a "person" engaged in "trade or commerce" under the MCPA, M.C.L.A. § 445.902(1)(d) and (g).

113. The MCPA prohibits any "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L.A. § 445.903(1).

114. Defendants' conduct, as alleged in the preceding paragraphs, constitutes unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce. In particular, Defendants violated the MCPA by

a. "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer," M.C.L.A. § 445.903(s);

b. "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is," M.C.L.A. § 405.903(bb); and

c. "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner," M.C.L.A. § 405.903(cc).

115. GM's practices that violated the MCPA include, without limitation, the following:

a.      GM represented that the Defective Vehicles had safety characteristics that they do not have;

b.      GM represented that the Defective Vehicles were of a particular standard, quality, or grade, when they are not;

c.      GM knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature, even though GM knew that such information was material to the transaction in light of GM's prior representations;

d.      GM failed to reveal material facts concerning the Ignition Switch Defect to Plaintiffs, Class Members, the public, and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to Plaintiffs, Class Members, the public, and the government;

e.      GM intended for Plaintiffs, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiffs and Class Members would purchase or lease the Defective Vehicles; and

f.      GM repeatedly violated the TREAD Act.

116.    Delphi's practices that violated the MCPA include, without limitation, the following:

a.      Delphi represented that the defective ignition switches had safety characteristics that they do not have;

b.      Delphi represented that the Defective Vehicles were of a particular standard, quality, or grade, when they are not;

c.      Delphi knew of the Ignition Switch Defect, but failed to disclose its existence or its complete nature;

d.     Delphi failed to reveal material facts concerning the Ignition Switch Defect to Plaintiffs, Class Members, the public, and the government, the omission of which would tend to mislead or deceive consumers, and which could not be reasonably known to Plaintiffs, Class Members, the public, and the government; and

e.     Delphi intended for Plaintiffs, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiffs and the Class would purchase or lease the Defective Vehicles;

117.    Defendants' acts and practices were unfair and unconscionable, because their acts and practices offend established public policy, and because the harm Defendants caused consumers greatly outweighs any benefits associated with its acts and practices.  Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the Class from making fully informed decisions about whether to lease, purchase, or retain Defective Vehicles.

118.    Plaintiffs and the Class have suffered an injury, including the loss of money or property, as a result of Defendants' unfair, unlawful, or deceptive practices.  Had Plaintiffs and the Class known about the full extent of the Ignition Switch Defect, they would not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles only to suffer the diminution in value caused by the Recall. Plaintiffs and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of here.

119.    All of the wrongful conduct alleged here occurred, and continues to occur, in the conduct of Defendants' business.

120.    Plaintiffs requests that this Court enjoin Defendants from continuing their unfair, unlawful, or deceptive practices; require Defendants to repair Plaintiffs' and Class Members' vehicles to completely eliminate the Ignition Switch Defect; provide to Plaintiffs and each Class Member either their actual damages as the result of Defendants' unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under the MCPA.

121.    Plaintiffs also seek punitive damages against Defendants because they carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally, willfully, and repeatedly misrepresented the reliability and safety of the Defective Vehicles, and continued to conceal material facts that only they knew, even while numerous innocent victims were being killed as a result of its conduct. Defendants' unlawful conduct constitutes malice, oppression, and fraud justifying punitive damages.

## COUNT III

## FRAUD BY CONCEALMENT
### (Against Defendants)

122.    Plaintiffs and the Class incorporate by reference paragraphs 1 through 80 as though fully set forth at length herein.

123.    This claim is brought on behalf of all Classes.

124.    Defendants concealed and suppressed material facts concerning the Ignition Switch Defect.

125.    Defendants had a duty to disclose the Ignition Switch Defect because GM consistently represented that its vehicles were reliable and safe and proclaimed that it maintained the highest safety standards, and the defect was known or accessible only to Defendants, who had superior knowledge and access to the facts, and Defendants knew that the facts were not

known to or reasonably discoverable by Plaintiffs and the Class. These omitted and concealed facts were material because they directly impact the safety of the Defective Vehicles, and GM's prior representations regarding the safety of its vehicles became materially misleading when Defendants concealed facts regarding the Ignition Switch Defect.

126.    Defendants actively concealed or suppressed these material facts, in whole or in part, to induce Plaintiffs and Class Members to purchase or lease the Defective Vehicles at high prices, and to protect Defendants' profits and avoid a costly recall, and Defendants did so at the expense of Plaintiffs and the Class.

127.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts. Plaintiffs' and the Class's actions were justified.

128.    Because of the concealment or suppression of the facts, Plaintiffs and the Class sustained damages because the value of the Defective Vehicles has been diminished by the Recall, the direct result of Defendants' wrongful conduct.

129.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT IV**

**VIOLATIONS OF MAGNUSON-MOSS CONSUMER PRODUCTS WARRANTIES ACT ("Magnuson-Moss")**
**(15 U.S.C. § 2301, *et seq.*)**
**(Against GM)**

130.    Plaintiffs and the Class incorporate by reference paragraphs 1 through 80 as though fully set forth at length herein.

31

131.    Magnuson-Moss provides a private right of action by purchasers of consumer products against manufacturers or retailers who, among other things, fail to comply with the terms of the written, express, or implied warranties. *See* 15 U.S.C. § 2310(d)(1). As alleged above, GM has failed to comply with the terms of its implied warranties.

132.    The Defective Vehicles are "consumer products," as that term is defined in 15 U.S.C. § 2301(1).

133.    GM is a "warrantor," as that term is defined in 15 U.S.C. § 2301(5).

134.    Plaintiffs and each member of the Classes are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

135.    As a warrantor, GM is obligated to afford the Classes, as consumers, all rights and remedies available under Magnuson-Moss, regardless of privity.

136.    Magnuson-Moss provides a cause of action for, among other things, breach of warranty. *See* 15 U.S.C. § 2310(d)(1). GM has breached its implied warranties of merchantability, which it cannot disclaim under Magnuson-Moss, *see* 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods. Plaintiffs and the Classes have suffered damages as a result of GM's breaches of implied warranties as set forth above. *See* 15 U.S.C. § 2310(d)(1)-(2).

137.    GM was on notice of the ignition switch defects as early as 2001, yet did not undertake any opportunity to cure until 2014, nearly thirteen years later, when GM's knowledge of the ignition switch defects was first made public. Also, once Plaintiffs' representative capacity is determined, notice and opportunity to cure on behalf of the Classes — through Plaintiffs — can be provided under 15 U.S.C. § 2310(e).

138.    Plaintiffs and the Class members have suffered, and are entitled to recover, damages as a result of GM's breaches of warranty and violations of Magnuson-Moss.

139.    Additionally, or in the alternative, Magnuson-Moss provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by Magnuson-Moss. *See* 15 U.S.C. § 2310(d)(1). Rescission and Revocation of Acceptance are equitable remedies available to Plaintiffs and the Class members under Magnuson-Moss.

140.    Plaintiffs also seek an award of costs and expenses, including attorney's fees, under Magnuson Moss to prevailing consumers in connection with the commencement and prosecution of this action. *See* 15 U.S.C. § 2310(d)(2). Plaintiffs and the Class intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against Defendants, and grant the following relief:

A.    Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3) and or 23(b)(2), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class  Representative and Plaintiffs' chosen counsel as Class Counsel;

B.    Declare, adjudge, and decree that Defendants violated 18 U.S.C. § 1962(c) by conducting the affairs of the RICO Enterprise through a pattern of racketeering activity;

C.    Declare, adjudge, and decree the conduct of Defendants as alleged herein to be unlawful, unfair or deceptive, and enjoin any such future conduct;

D.      Declare, adjudge, and decree that the ignition switches in the Defective Vehicles are defective;

E.      Declare, adjudge, and decree that Defendants must disgorge, for the benefit of Plaintiffs and Class Members all or part of the ill-gotten gains it received from the sale or lease of the Defective Vehicles;

F.      Award Plaintiffs and Class Members actual, compensatory damages, or, in the alternative, statutory damages, as proven at trial;

G.      Award Plaintiffs and Class Members treble damages pursuant to 18 U.S.C. § 1964(c).

H.      Alternatively, if elected by Plaintiffs and Class Members, require Defendants to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

I.      Award Plaintiffs and Class Members punitive damages in such amount as proven at trial;

J.      Award Plaintiffs and Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

K.      Award Plaintiffs and Class Members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiffs requests a trial by jury on all the legal claims alleged in this Complaint.

Respectfully submitted,

KOZYAK TROPIN, & THROCKMORTON P.A.
*Counsel for Plaintiffs*
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134

Telephone: (305) 372-1800

By: /s/ Adam M. Moskowitz
Adam M. Moskowitz
amm@kttlaw.com
Harley S. Tropin
hst@kttlaw.com
Thomas A. Tucker Ronzetti
tr@kttlaw.com
Tal J. Lifshitz
tjl@kttlaw.com
Robert Neary
rn@kttlaw.com


Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone: 205-314-0500
Gregory O. Wiggins (*pro hac vice* to be filed)
gwiggins@wcqp.com
Kevin W. Jent (*pro hac vice* to be filed)
kjent@wcqp.com


GRAY & WHITE
713 E. Market Street, 2nd Floor
Louisville, Kentucky 40202
Telephone: (502) 805-1800
Mark K. Gray (*pro hac vice* to be filed)
MGray@grayandwhitelaw.com
Matthew L. White (*pro hac vice* to be filed)
MWhite@grayandwhitelaw.com


353403.6

JS 44 (Rev. 12/12)

Case 9:50026-mtg Doc 12717-2 Filed 06/03/14 Entered 06/03/14 15:06:46 Exhibit B
Case 1:09-cv-23187-PAS Document 115 Entered on FLSD Docket 01/19/2011 Page 15 of 22
Pg 37 of 38

CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS / DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

PERSONAL INJURY
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**PRISONER PETITIONS**
Habeas Corpus:
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
Other:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee – Conditions of Confinement

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (See VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)
*(See instructions):*
a) Re-filed Case ☐YES ☐ NO    b) Related Cases ☐YES ☐ NO

JUDGE ___ DOCKET NUMBER ___

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:

LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
DEMAND $ ___
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**
DATE ___ SIGNATURE OF ATTORNEY OF RECORD

Adam M. Moskowitz

**FOR OFFICE USE ONLY**
RECEIPT # aaaaaaaaaaaa    AMOUNT ˡaaaaaaaaaaa    IFP aaaaaaaaaaaaa    JUDGE aaaaaaaaaaaaaaaaaaaaaaaaaaaa˥˥˥˥˥˥MAG JUDGE˥aaaaaaaaaaaaaaaaa

Case 1:14-cv-02193-AKX  Document 1-15  Filed on 05/28/14 in TXSD  Page 22 of 22

JS 44 Reverse  (Rev. 12/12)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.	**(a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.	**Jurisdiction**.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

III.	**Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.	**Nature of Suit**.  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

V.	**Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

VI.	**Related/Refiled Cases**. This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

VII.	**Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.
	Example: U.S. Civil Statute: 47 USC 553
	Brief Description: Unauthorized reception of cable service

VIII.	**Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.