# Exhibit F

ROBERT A. BUCCOLA, ESQ. / SBN: 112880
STEVEN M. CAMPORA, ESQ. / SBN: 110909
JASON J. SIGEL, ESQ. / SBN: 235761
**DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**
20 Bicentennial Circle
Sacramento, CA 95826
Telephone:  (916) 379-3500
Facsimile:  (916) 379-3599

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RANDI SPANGLER, an individual; and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>GENERAL MOTORS LLC, a corporation,<br>        Defendants. | Case No.: <br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1)    BUS. & PROF. CODE § 17200 et seq.**<br><br>**2)    BUS. & PROF. CODE § 17500 et seq.**<br><br>**3)    CIVIL CODE § 1750 et seq.**<br><br>**4)    BREACH OF IMPLIED WARRANTY**<br><br>**5)    BREACH OF EXPRESS WARRANTY**<br><br>**6)    UNJUST ENRICHMENT**<br><br>**7)    FRAUDULENT CONCEALMENT**<br><br>**8)    NEGLIGENCE**<br><br>**JURY TRIAL DEMANDED** |

-I-

**Class Action Complaint**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   JURISDICTION AND VENUE.............................................................4

III.  PARTIES ..............................................................................................5

   A.  PLAINTIFF .........................................................................................5

   B.  DEFENDANT ......................................................................................5

IV.   CLASS ACTION ALLEGATIONS ......................................................6

   A.  NUMEROSITY OF THE CLASS........................................................6

   B.  EXISTENCE AND PREDOMINANCE OF COMMON QUESTIONS OF LAW AND FACT .6

   C.  TYPICALITY ......................................................................................7

   D.  ADEQUACY OF REPRESENTATION .................................................8

   E.  PROPER MAINTENANCE OF CLASS ................................................8

   F.  SUPERIORITY ....................................................................................8

V.    FACTUAL BASIS FOR THE CLAIMS ASSERTED .........................8

   A.  MODELS RECALLED ........................................................................8

   B.  GM'S IGNITION SWITCH DEFECT TIMELINE ..............................9

   C.  GM'S LEGAL STAFF OPENS A FILE ON THE CRASH ..................10

   D.  GM'S "COMMITMENT TO SAFETY" ...............................................17

   E.  OVERSIGHT AND INVESTIGATIONS SUBCOMMITTEE HEARING ON APRIL 1, 2014 ................................18

   F.  GM'S POSITION ON THE DEFECTIVE VEHICLES CHANGES OVER TIME .............20

   H.  THE MODIFIED SWITCHES USED IN 2007-2011 VEHICLES WERE ALSO APPROVED BY GM DESPITE NOT MEETING COMPANY SPECIFICATIONS...........29

   I.  GM VIOLATED THE TREAD ACT BY FAILING TO NOTIFY THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION OF THE KNOWN DEFECTS ........31

VI.   SUCCESSOR LIABILITY ...................................................................33

VII.  TOLLING OF THE STATUTE OF LIMITATIONS ...........................34

-i-

Class Action Complaint

VIII.    CAUSES OF ACTION ................................................................... 35

FIRST CAUSE OF ACTION
    (Unfair Competition Law: Bus. & Prof. Code § 17200 et seq.) ......................... 35

SECOND CAUSE OF ACTION
    (False Advertising Act: Bus. & Prof. Code § 17500 et seq.) .............................. 37

THIRD CAUSE OF ACTION
    (Consumer Legal Remedy Act: Civil Code § 1750, et seq.)............................... 40

FOURTH CAUSE OF ACTION
    (Breach of Implied Warranty) ....................................................... 42

FIFTH CAUSE OF ACTION
    (Breach of Express Warranty) ....................................................... 43

SIXTH CAUSE OF ACTION
    (Unjust Enrichment).............................................................. 44

SEVENTH CAUSE OF ACTION
    (Fraudulent Concealment) .......................................................... 45

EIGHTH CAUSE OF ACTION
    (Negligence) .................................................................... 46

IX.    PRAYER FOR RELIEF............................................................. 46

X.    JURY DEMAND .................................................................. 47

-ii-

**Class Action Complaint**

Plaintiff Randi Spangler, individually and on behalf of the Class described below, brings this action for damages and injunctive relief pursuant to California's Unfair Business Practices Act, Cal. Bus. & Prof. Code §§ 17200, et seq.; the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq.; California's Legal Remedy Act, Cal. Civil Code §§ 1750, et seq.; and for violations of California common law against Defendant General Motors LLC ("GM"). Plaintiff complains and alleges upon information and belief based, inter alia, upon investigation conducted by Plaintiff and Plaintiff's counsel, except as to those allegations pertaining to Plaintiff personally, which are alleged upon personal knowledge:

## I.   **INTRODUCTION**

1.      In the last fifteen years, GM has designed, manufactured, promoted, marketed, and sold defective vehicles that pose known and significant dangers to unsuspecting drivers, passengers, motorists, and pedestrians. GM allowed these dangers to persist without taking adequate measures to eliminate the dangers or to notify the government or public of the design defects. By doing so, GM jeopardized public safety and fostered a corporate culture of complete disregard to the safety concerns of its customers.

2.      As far back as 2001, GM learned that vehicles designed, manufactured, promoted, and sold by GM contained defective ignition switches (the "Defective Vehicles"). However, GM took no action to remedy, mitigate, and/or minimize the danger inherent in this faulty system to motorists, passengers, or pedestrians. Instead of making an effort to repair these known defects, GM hid this information. These issues have been known to GM since 2001 and have caused at least thirteen (13) deaths and thirty-one (31) crashes. By ignoring safety concerns, GM suppressed the dangers of defective ignition switches from the public and the government and continued to design, manufacture, promote, and sell vehicles with defective ignition switches.

3.      The ignition switch in the Defective Vehicles has several common switch points, including "RUN" or "ON," "OFF," and "ACC" or "accessory." When the ignition switch is in the "RUN" position, the vehicle's motor engine is running and the electrical systems have been activated. When the ignition switch is in the "ACC" position, the motor is turned off but

-1-

**Class Action Complaint**

electrical power is activated, generally only supplying electricity to the vehicle's entertainment system.  When the ignition is in the "OFF" position, both the engine and electrical systems are turned off.  In most vehicles, a driver must intentionally turn the key in the ignition switch to move to each position.

4.      Because of the defects in the design, manufacture, and/or assembly, the ignition switches installed in the Defective Vehicles are loose and improperly positioned, making the switches susceptible to failure during normal and expected conditions.  Due to its defective design and improper position, the ignition switch can unexpectedly and suddenly move from the "ON" or "RUN" position to the "OFF" or "ACC" position (the "Ignition Switch Defect").  When this ignition switch failure occurs, the motor engine and certain electrical components, such as power-assisted steering, anti-lock brakes, and airbags, are abruptly turned off.

5.      The Ignition Switch Defect can occur at any time during normal and proper operation of the Defective Vehicles, making driving a game of Russian roulette.  The ignition can suddenly switch to "OFF" while the Defective Vehicle is moving at high speeds, such as 65 mph on the freeway, leaving the driver unable to control the vehicle, compromising the safety airbag system, and endangering the vehicle occupants, other motorists, and pedestrians.

6.      Although it knew of the Ignition Switch Defect, GM designed, manufactured, promoted, and sold over 2.6 million Defective Vehicles, including the following models:

- 2005-2011 Chevrolet Cobalt;

- 2006-2011 Chevrolet HHR;

- 2006-2011 Pontiac Solstice;

- 2003-2007 Saturn Ion;

- 2007-2011 Saturn Sky; and

- 2005-2011 Pontiac G5.

7.      More egregious than the technical failures, however, was the fact that GM senior management kept those failures secret for years.  In 2013, a GM Senior Manager identified eighty (80) customer complaints that Chevrolet Cobalts had unexpectedly stopped or stalled since 2005.  Despite numerous customer complaints, GM disregarded, ignored, hid, and

**Class Action Complaint**

disparaged the safety risks that the Defective Vehicles presented to the unsuspecting public. As a result of GM's actions, millions of lives were put at risk.

8.      On April 1, 2014, GM Chief Executive Officer Mary Barra testified before the House Oversight and Investigations Subcommittee and called GM's slow response to at least 13 deaths linked to faulty ignition switches "unacceptable." However, Ms. Barra was unable to give U.S. lawmakers any answers as to why GM continued to sell Defective Vehicles.

9.      During the April 2014 testimony, GM admitted that the cost to rectify the Ignition Switch Defect and to eliminate the significant risk created by the defect was a mere $0.57 per Defective Vehicle.  When questioned why GM did not spend the money to fix the Ignition Switch Defect, Ms. Barra stated that GM "had more of a cost culture" rather than a customer safety culture.

10.      In order to save 57 cents per Defective Vehicle, GM turned a blind eye to the defects.  GM waited nearly a decade to recall 2.6 million of the Defective Vehicles over the Ignition Switch Defect, knowing full well that a jarring of or too much weight on the ignition key could cause the switch to move from the "ON" to the "ACC" position, thereby cutting power to air bags, steering, and brakes.

11.      GM's disclosures and depositions leading to the recall suggest a cultural landscape during the prior decade where employees worked in silos, isolated from other departments and critical information. GM's Chief Executive Officer Mary Barra told Congress that people in one part of GM "didn't recognize information that would be valuable in another part of the company."

12.      GM's misconduct has endangered drivers, passengers, motorists, and pedestrians.  GM claims that "[s]afety will always be a priority at GM.  We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers."  GM violated this principle by jeopardizing the lives and safety of millions of Americans when it sold defective automobiles to consumers for many years.  The extent of the

-3-

**Class Action Complaint**

defects is still being discovered.

## II. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (d)(2) (the "Class Action Fairness Act") because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the proposed Class are citizens of a state different than that of Defendant.

14. This Court has personal jurisdiction over Defendant and venue is proper because a substantial portion of the wrongdoing alleged in this Complaint took place in this State and Defendant is authorized to do business here and conducts business here. Defendant has sufficient minimum contacts with this State, because Defendant intentionally availed itself of markets in this State by promoting, marketing, and selling of its products and services in this State, including the Defective Vehicles, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. In particular, Defendant marketed, advertised, and sold automotive vehicles in this State. The advertisements and other wrongful business practices at issue in this litigation were, at least in part, directed at this State, rendering the exercise of jurisdiction by this Court permissible.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because the injury was suffered in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

17. This case should be assigned to the Central District of California since there are more GM dealerships, more Defective Vehicles, more GM owners and lessors, more consumers harmed, and more recall letters in California than any other state. In addition, GM's headquarters for its Western Region is in Thousand Oaks, Ventura County, within the Central District of California. The vast majority of the sales and inventory of GM in the United States go through the Southern California regional headquarters, which directs wholesale sales, service, and parts teams working with dealers in Washington, Oregon, California, Arizona, New Mexico, Nevada, Utah, Colorado, Wyoming, Montana, Idaho, Alaska, and Hawaii. Venue in the

-4-

**Class Action Complaint**

1  Central District of California is therefore the most appropriate venue for this case.  This Court

2  has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the

3  amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other Class

4  members are citizens of a different state than Defendant.

5  **III.   PARTIES**

6        **A.    PLAINTIFF**

7        18.     Plaintiff RANDI SPANGLER resides in Citrus Heights, California.

8        19.     On or about October 2, 2007, Ms. Spangler purchased a 2007 Chevrolet HHR,

9  which she still owns.  Plaintiff's 2007 Chevrolet HHR is one of the cars recently identified by GM

10  as a Defective Vehicle.  Plaintiff not only overspent on a lower quality product, but also

11  acquired a vehicle that posed an undisclosed risk to the health and safety of Plaintiff.  One of

12  GM's main selling points has been the efficiency, cost effectiveness, and safety of its vehicles.

13  Plaintiff's purchase was based, in significant part, on these representations and assertions by

14  GM.  GM failed to disclose that most of its models over the last few years have contained

15  defective ignition switches that pose a serious risk of injury and death to the driver and

16  occupants, as well as other motorists and pedestrians on the road.  If GM had disclosed the

17  nature and extent of its problems, Plaintiff would not have purchased a GM vehicle, or would

18  not have purchased the vehicle for the price paid.

19        **B.    DEFENDANT**

20        20.     Defendant GENERAL MOTORS LLC ("GM") is a limited liability company formed

21  under the laws of Delaware with its principal place of business located at 300 Renaissance

22  Center, Detroit, Michigan.  GM was incorporated in 2009.  On July 10, 2009, GM acquired

23  substantially all assets and assumed certain liabilities of General Motors Corporation ("GM

24  Corporation") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

25        21.     Because GM acquired and operated GM Corporation and ran it as a continuing

26  business enterprise, and because GM was aware from its inception of the ignition switch

27  defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and

28  unfair acts and omissions of GM Corporation, as alleged in this Complaint.

**Class Action Complaint**

## IV.    CLASS ACTION ALLEGATIONS

22.    This action is brought by Plaintiff, individually and on behalf of all others similarly situated, pursuant to California's Unfair Competition Law and False Advertising Law, Cal. Bus. & Prof. Code §§ 17200, et seq., and 17500, et seq., and for violations of California common law.   Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, on behalf of Plaintiff and others similarly situated.   The Class is defined as followed:

> **All persons in the United States who currently own or lease one or more of the following GM vehicles: (a) 2005-2011 Chevrolet Cobalt; (b) 2006-2011 Chevrolet HHR; (c) 2006-2011 Pontiac Solstice; (d) 2003-2010 Saturn Ion; (e) 2007-2011 Saturn Sky; or (f) 2005-2011 Pontiac G5.  To the extent warranted, this list will be supplemented to include other GM vehicles that have the defective ignition switches.  Excluded from the Class are Defendant herein and its legal representatives, parents, affiliates, heirs, successors, assigns, and any other person who engaged in the improper conduct described herein (the "Excluded Persons").**

23.    Plaintiff seeks to recover damages for Plaintiff and the Class under the Unfair Business Practices Act, Business & Professions Code §§ 17200, et seq.; False Advertising Law, Business & Professions Code §§ 17500, et seq., Civil Code §§ 1750, et seq. and for violations of California common law.   Plaintiff also seeks an injunction prohibiting Defendant from continuing to engage in the practices described herein.

### A.    NUMEROSITY OF THE CLASS

24.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown at this time, Plaintiff is informed and believes that the number of individuals who have purchased Defective Vehicles in the last ten years in the United States alone is over two million (2,000,000) people.

### B.    EXISTENCE AND PREDOMINANCE OF COMMON QUESTIONS OF LAW AND FACT

25.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.    These common questions include:

/ / /

-6-

**Class Action Complaint**

a.  Whether GM engaged in a deceptive and unlawful advertising and marketing campaign by concealing serious defects in its vehicles;

b.  Whether and to the extent GM breached its express warranties relating to the safety and quality of its vehicles;

c.  Whether and to the extent GM breached any implied warranties relating to the safety and quality of its vehicles;

d.  Whether and to the extent GM engaged in unfair, false, misleading, or deceptive acts or practices regarding its marketing and sale of its vehicles;

e.  Whether the conduct complained of herein constitutes deceptive and misleading advertising in violation of Business & Professions Code section 17200, et seq.;

f.  Whether the conduct complained of herein constitutes an unfair, illegal, and/or fraudulent business practice, in violation of Business & Professions Code section 17500, et seq.;

g.  Whether GM has been unjustly enriched as a result of the conduct complained of herein;

h.  Whether GM's conduct complained of herein is intentional and knowing; and

i.  Whether Plaintiff and members of the Class are entitled to damages, restitution, disgorgement of profits, declaratory relief, punitive damages, and/or injunctive relief, as a result of GM's conduct complained of herein.

**C.    TYPICALITY**

26.    Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and other Class members received the same standardized misrepresentations, warranties, and nondisclosures about the safety and quality of GM's vehicles.   GM's misrepresentations were made pursuant to a standardized policy and procedure implemented by GM.  Plaintiff is a member of the Class that Plaintiff seeks to represent and has suffered harm due to the unfair, deceptive, unreasonable, and unlawful practices of GM.

/ / /

-7-

**Class Action Complaint**

D. **ADEQUACY OF REPRESENTATION**

27.    Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class that Plaintiff seeks to represent.  Plaintiff is represented by experienced and able attorneys, who intend to prosecute this action vigorously for the benefit of Plaintiff and all Class members.  Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the Class members.

E. **PROPER MAINTENANCE OF CLASS**

28.    Defendant has acted or refused to act, with respect to some or all issues presented in this Complaint, on grounds generally applicable to the Class, thereby making it appropriate to provide relief with respect to the Class as a whole.

F. **SUPERIORITY**

29.    A class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable and unduly burdensome to the courts, and have the potential to result in inconsistent or contradictory judgments.  There are no unusual difficulties likely to be encountered in the management of this litigation as a class action.  A class action presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

V. **FACTUAL BASIS FOR THE CLAIMS ASSERTED**

30.    Ignoring known defects, GM suppressed the dangers of defective ignition switches from the public and the government and continued to design, manufacture, promote, and sell the Defective Vehicles, risking public safety to increase corporate profits.

A. **MODELS RECALLED**

31.    The ignition-switch recall covers more than 2.5 million cars.  At this time, GM has issued recalls for the following models:

**February 13, 2014 and February 25, 2014:**

•    2005 – 2007 Chevrolet Cobalt;

•    2005 – 2007 Pontiac G5;

**Class Action Complaint**

-8-

- 2003 – 2007 Saturn Ion;

- 2006 – 2007 Chevrolet HHR;

- 2006 – 2007 Pontiac Soltice; and

- 2007 Saturn Sky.

**March 28, 2014:**

- 2008 - 2011 Pontiac Solstice;

- 2008 - 2011 Pontiac G5;

- 2008 - 2011 Saturn Sky;

- 2008 - 2011 Chevrolet Cobalt; and

- 2008 - 2011 Chevrolet HHR.

**B.      GM'S IGNITION SWITCH DEFECT TIMELINE**

32.      Since 2001, GM has known that the vehicles it designed, manufactured, promoted, marketed, and sold contained the Ignition Switch Defect.  For over thirteen years, GM dismissed, ignored, concealed, and disparaged these defects, selling over 2.6 million Defective Vehicles containing the Ignition Switch Defect.

33.      **2001**: GM determined a defect exists on the key system during pre-production testing of the Saturn Ion.  A pre-production report for the 2003 Saturn Ion identified "two causes of failure" with the ignition switch: "[l]ow contact force and low detent plunger force."

34.      **2002**:  In February 2002, Delphi Automotive Systems, GM's supplier, informed GM in a Production Part Approval Process document that the ignition switch did not meet GM's specifications.  Despite the warning, GM still approved the ignition switch design.

35.      **2003**:  A service technician reported to GM that a Saturn Ion stalled while driving, and that the weight of the owner's keys had worn down the ignition switch.

36.      **2004**: During the time of the release of the 2005 Chevrolet Cobalt, GM learned of an incident in which a 2005 Chevrolet Cobalt lost engine power because the key moved out of the "RUN" position when the driver inadvertently contacted the key or steering column.

/ / /

/ / /

-9-

**Class Action Complaint**

37.    GM employees were able to replicate the issue during test drives.    An engineering inquiry, known within GM as a Problem Resolution Tracking System (PRTS), was opened to investigate the complaint that the "vehicle can be keyed off with knee while driving."    Engineers believed that the low key cylinder torque effort was an issue and considered a number of potential solutions.    After GM considered the time required, cost, and effectiveness of each of these solutions, the PRTS was closed with **no action**.

38.    **2005**: GM engineers met to consider making changes to the ignition switch after receiving new field reports of Chevrolet Cobalts losing engine power.    The proposal was initially approved but was later cancelled.    In dismissing the proposed changes, a GM ignition switch engineer stated that the switch is "very fragile and doing any further changes will lead to mechanical and/or electrical problems."    The approved proposal was canceled because "lead-time for all solutions is too long," "tooling cost and piece price are too high," and "[n]one of the solutions seems to fully countermeasure the possibility of the key being turned (ignition turned off) during driving."

39.    After another complaint of the vehicle turning off while driving, a GM engineer advised the Company to redesign its key head, but the proposal was ultimately rejected.    GM posted a $1.1 billion first quarter loss, blaming it on union overhead and high gas prices harming SUV sales.

40.    In July 29, 2005, Amber Marie Rose, 16, died in a frontal crash in her 2005 Chevrolet Cobalt in Maryland.    Contractors hired by the National Highway Traffic Safety Administration ("NHTSA") found that the Chevrolet Cobalt's ignition had moved out of the "RUN" position and into the "ACC" position, which cut off power to power steering the air bags.

C.    **GM'S LEGAL STAFF OPENS A FILE ON THE CRASH**

41.    In December 2005, GM issued an Information Service Bulletin entitled "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs," which applied to 2005-06 Chevrolet Cobalts, 2006 Chevrolet HHR, 2005-06 Pontiac Pursuits (Canada only), 2006 Pontiac Solstice, and 2003-06 Saturn Ions which all had the same ignition switch.    The Service Bulletin informed dealers that "there is a potential for the driver to

-10-

**Class Action Complaint**

1  inadvertently turn off the ignition due to low ignition key cylinder torque/effort"; and "the

2  customer should be advised of this potential and should take steps to prevent it, such as

3  removing unessential items from their key chain."

4       42.   **2006**:  On April 26, 2006, the GM design engineer responsible for the Cobalt's

5  ignition switch signed a document approving changes to the ignition switch proposed by the

6  supplier, Delphi.  <u>The approved changes included, among other things the use of a new detent</u>

7  <u>plunger and spring that increased torque force in the ignition switch.  The new design was</u>

8  <u>implemented into cars from the 2007 model and later.</u>



Exemplar Chevrolet Cobalt Switch Detent Plungers

21       43.   On October 24, 2006, seventeen-year-old Wisconsin resident Megan Phillips was

22  driving her 2005 Chevrolet Cobalt with two passengers, eighteen-year-old Natasha Weigel and

23  fifteen-year-old Amy Rademaker.  According to a police report, the Cobalt left the road and

24  struck a telephone junction box and two trees while traveling 48 miles per hour.  The police

25  report stated that shortly after the vehicle left the roadway and before the collision, the

26  ignition switch was turned from the "RUN" position to the "ACC" position.  Ms. Phillips and her

27  two passengers were not wearing seat belts. A subsequent investigation by the Wisconsin

28  State Police found the air bags did not deploy.  As a result of the collision, the two passengers

-11-

**Class Action Complaint**

were tragically killed while Ms. Phillips, now twenty-four years old, was critically injured and suffered permanent and severe brain damage.

44.    In October 2006, GM updated its December 2005 Service Bulletin to include additional models and years, including the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, and 2007 Pontiac Solstice.  GM also provided key inserts to approximately 475 customers who brought their vehicle in to the dealer for service.

45.    2007:  On March 29, 2007, GM employees met with NHTSA representatives in Washington, D.C. to discuss occupant restraint systems.  During the meeting, NHTSA informed GM employees of the 2005 fatal crash of Amber Marie Rose.  GM investigative engineers began tracking frontal impact crashes that involved Chevrolet Cobalts and airbags that did not deploy to identify similar characteristics in the crashes.  By the end of 2007, GM found ten (10) such incidents, sensing and diagnostic module (SDM) data was available for nine (9) of the ten (10) crashes, and that data showed that the ignition was in the "RUN" position in five (5) of the crashes and in the "ACC" position in four (4) of the crashes.

46.    A 2007 report by Indiana University of the October 2005 crash revealed that contact with the ignition switch could result in "engine shut down and loss of power"

47.    2009:  In February 2009, another PRTS was opened and resulted in the top of the key being changed from a "slot" design to "hole" design to reduce downward force.  The new key design was implemented in 2010 Chevrolet Cobalt models – the last year the Cobalt was sold.



GM's original key could accommodate multiple rings.

**Class Action Complaint**



GM's redesigned key could hold just one ring.

48.    In April 2009, a 2005 Chevrolet Cobalt crashed in Pennsylvania, killing the Cobalt driver and front-seat passenger where the airbags failed to deploy.  The report from the investigation stated that the ignition was in the "accessory" position.

49.    On June 12, 2009, 18-year-old Christopher Hamberg was killed — not quite a month after the critical May 15 meeting of GM engineers about the ignition data.  Driving his 2007 Chevrolet Cobalt home before dawn in Houston, he lost control at 45 miles per hour and hit a curb, then a tree, according to the police report.

50.    On Dec. 13, 2009, twenty-year-old Benjamin Hair crashed into a tree in Charlottesville, Va., while driving home in a Pontiac G5.  As of that date, GM records indicate GM had conducted five (5) internal studies about the ignition problem.  Though Mr. Hair used his seatbelt, he died after the vehicle's air bags failed to deploy.  "The police couldn't tell us what caused the accident," said Brenda Hair, his mother.  The Hairs contacted GM, providing accident reports but no vehicle data, because the car's black box had been destroyed.  "They came back and said they'd presented it to their board of engineers, and they couldn't say it was related" to a defect, Ms. Hair said.

51.    2010:  In January 2010, twenty-one-year-old Kelly Erin Ruddy burned to death in a car crash.  Her mother, Mary Ruddy, said Kelly knew something was wrong with her 2005 Chevy Cobalt.   Three months after the crash, the car was recalled for a power steering problem. Mrs. Ruddy said GM "dismissed us."

/ / /

-13-

**Class Action Complaint**

52.     In February 2010, NHTSA again recommended a probe into problems with air bags in Chevrolet Cobalts, and the Office of Defects Investigation again decided that there is no correlation and dropped the matter.

53.     In March 2010, Jennifer Brooke Melton of Georgia took her Chevrolet Cobalt in for service because the engine shut off while she was driving.  Four days later, she died in a collision.

54.     During depositions in their suit last year, the Meltons learned from GM engineers that the Company had been aware of potential problems with its ignition systems before Brooke purchased her car in 2005.  The Meltons' lawyers also found evidence that GM had altered the design of ignition switches after Brooke purchased her Cobalt, but had done so without either notifying federal regulators or car owners or changing the part number.  The change, which apparently occurred in 2006, increased the size of the detent plunger and spring, a pair of parts that hold the ignition key in position – a change that an engineer hired by the lawyers said seemed intended to increase the "torque force" holding the key in place.

55.     When deposed by Melton's attorneys, GM engineer Ray DeGiorgio testified that he was lead engineer for the ignition switch.  When asked if he had signed off on the change in the part, which was supplied by Delphi Mechatronics, Mr. DeGiorgio said he did not recall authorizing such a change.  Yet according to a document obtained by NBC News, Mr. DeGiorgio signed off on a change to the ignition switches supplied by Delphi Mechatronics on April 26, 2006.  The reason given for the change on the document was "to increase torque force in the switch."

56.     In March 2010, Amy Kosilla died in an accident after the air bags in her Chevrolet Cobalt failed to deploy.  "We sent the paperwork for the car to them and they said there's nothing to this," said Neil Kosilla. "They said we had nothing."

57.     2011:  GM launched a new investigation into 2005 – 2007 Chevrolet Cobalts and the 2007 Pontiac G5 to determine why the air bags did not deploy in crashes.  According to GM, the results of the investigation were inconclusive.

/ / /

-14-

**Class Action Complaint**

58.    In one of those cases, the company settled a lawsuit brought by the family of twenty-five-year-old Hasaya Chansuthus, who crashed her 2006 Chevrolet Cobalt in Murfreesboro, Tennessee.  After first resisting, the Company negotiated a deal even though Ms. Chansuthus's blood-alcohol level was more than twice the legal limit.  Data from the black box — which records vehicle systems information — showed that the key was in the accessory or off position, according to court documents, and the air bags did not deploy.

59.    2012:  GM began to widen its investigation.  However, once again GM closed the investigation without reaching a conclusion.

60.    Also in 2012, GM identified four (4) crashes and four (4) corresponding fatalities (all involving 2004 Saturn Ions) along with six (6) other injuries from four (4) other crashes attributable to the Ignition Switch Defect.

61.    2013:  Mary Barra is named as the new CEO of General Motors.

62.    In June 2013, a deposition by a Chevrolet Cobalt program engineer says the Company made a "business decision not to fix this problem," raising questions of whether GM consciously decided to launch the Cobalt despite knowing of the Ignition Switch Defect.

63.    In the fall of 2013, months after an eighth internal study on the Ignition Switch Defect had been issued, GM moved to cut off the flow of damaging depositions related to one accident by settling the Melton wrongful-death suit.

64.    When Lance Cooper, a lawyer for the Melton family, deposed Victor Hakim, a senior manager at GM, Mr. Cooper read more than 80 customer complaints into the official record that were filed with GM beginning in 2005 about Chevrolet Cobalts that had unexpectedly stopped and stalled.  On September 13, 2013, GM settled the case.  Under the terms of the settlement, the details are confidential.

65.    That same month, lawyers representing GM wrote to the lawyer in another wrongful-death case demanding that the lawsuit be withdrawn. The family of Allen Ray Floyd had sued GM after Mr. Floyd lost control of a 2006 Chevrolet Cobalt in daylight near Loris, South Carolina. Two weeks earlier, his sister had lost control of the same vehicle on the same road; she had it towed.  The Company contended the suit was "frivolous" because the accident

-15-

**Class Action Complaint**

1    occurred in July 3, 2009, a week before the Company's bankruptcy agreement took effect,

2    which meant GM was not liable for damages.

3        66.    2014:   In January 2014, a GM committee approved a recall of some of the

4    Defective Vehicles.

5        67.    On January 31, 2014, Ms. Barra learned of the Ignition Switch Defect, according

6    to GM.

7        68.    On February 6, 2014, GM issued its 10-K to the Securities and Exchange

8    Commission, which stated in part: "The costs and effect on our reputation of product recalls

9    could materially adversely affect our business.  From time to time we recall our products to

10   address performance, compliance or safety-related issues.  The costs we incur in connection

11   with these recalls typically include the cost of the part being replaced and labor to remove and

12   replace the defective part.  In addition product recalls can harm our reputation and cause us to

13   lose customers, particularly if those recalls cause consumers to question the safety or

14   reliability of our products.  Any costs incurred or lost sales caused by future product recalls

15   could materially adversely affect our business. Conversely not issuing a recall or not issuing a

16   recall on a timely basis can harm our reputation and cause us to lose customers for the same

17   reasons as expressed above."

18       69.    The February 6, 2014 10-K for GM also included the following statements:

19       a.    "In the U.S. if a vehicle or vehicle equipment does not comply with a safety

20           standard or if a vehicle defect creates an unreasonable safety risk the manufacturer is

21           required to notify owners and provide a remedy."

22       b.    "We are committed to leadership in vehicle design, quality, reliability, telematics

23           and infotainment and safety…."

24       70.    On February 7, 2014, GM notified NHTSA "that it determined that a defect,

25   which relates to motor vehicle safety, exists in 619,122 cars."

26       71.    On February 13, 2014, GM recalled 780,000 compact cars, including Chevrolet

27   Cobalts, Pontiac G5s, and Pontiac Pursuits (Canada only) from 2005-2007 models.

28   / / /

-16-

**Class Action Complaint**

72.     On February 25, 2014, GM expanded its recall to include Saturn Ions and three other vehicles, totaling 1.6 million vehicles worldwide.

73.     On March 5, 2014, NHTSA demanded that GM turn over documents that related to ignition switch problems.

74.     On March 10, 2014, a House subcommittee announced it will hold a hearing, eventually set for April 1, 2014.  The Justice Department also announced it was conducting a criminal probe. Also, GM hired two law firms to investigate into the recall, with Anton "Tony" Valukas, who investigated Lehman Brothers after the firm's 2008 Collapse, leading the internal probe.

75.     On March 18, 2014, Ms. Barra issued an apology on behalf of GM and appointed a new global safety chief.

76.     On March 28, 2014, GM expanded the small car recall to include 971,000 vehicles from the 2008-2011 model years, which may have had the defective switches installed as replacement parts.  To date, GM has recalled 2.6 million vehicles.

77.     On April 1-2, 2014, Ms. Barra and NHTSA acting chief David Friedman testified before the House Energy and Commerce Committee's Subcommittee on Oversight and Investigations.

78.     On April 7, 2014, GM expects replacement switches to be available at dealerships.  The Company said the repairs could take until October.

**D.    GM'S "COMMITMENT TO SAFETY"**

79.     GM claims that "[s]afety will always be a priority at GM.  We continue to emphasize our safety-first culture in our facilities, and as we grow our business in new markets. Our safety philosophy is at the heart of the development of each vehicle. In addition to safety, delivering the highest quality vehicles is a major cornerstone of our promise to our customers."  GM violated this principle by jeopardizing the lives and safety of millions of Americans when it sold defective automobiles to American consumers for many years.

/ / /

/ / /

**Class Action Complaint**

80.    Despite choosing corporate profits over safety, GM repeatedly touted safety as a huge priority to the Company as stated on their website below:



E.    **OVERSIGHT AND INVESTIGATIONS SUBCOMMITTEE HEARING ON**
       **APRIL 1, 2014**

81.    General Motors Chief Executive Officer Mary Barra went before the Oversight and Investigations Subcommittee on April 1, 2014 and called GM's slow response to at least 13 deaths linked to faulty ignition switches "unacceptable," but was unable to give U.S. lawmakers any answers as to what went wrong based on GM's internal investigation.    GM management was slammed at the hearing when members of Congress claimed that people died because GM failed to fix what amounted to a 57-cent problem.    Rep. Diana DeGette, D-Colo, said, "We know GM made a series of terrible decisions, and we know that this tragedy has exposed significant gaps in federal law that allowed them to do so."

82.    GM first learned of the problem with its ignition switches on Chevrolet Cobalts, Saturn Ions, and other models in 2001, according to documents, but no action was taken until February 2014.    Lawmakers inquired how GM could have missed or ignored so many red flags that faulty ignition switches could unexpectedly turn off engines during operation and leave airbags, power steering, and power brakes inoperable.    Ms. Barra could not give a clear and

-18-

**Class Action Complaint**

concise answer and could only say that GM was now doing a better job of overseeing the quality of its products.

83. David Friedman on behalf of The National Highway Traffic Safety Administration ("NHTSA") also went before the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations. Mr. Friedman said that NHTSA is pursuing an investigation of whether GM met its timeliness responsibilities to report and address the defect under Federal law – an investigation that will end with holding GM accountable if it failed in those responsibilities. According to Mr. Friedman's statement, "NHTSA is working to ensure that GM has accounted for the full scope of vehicles that may be covered by the recall, is ensuring that consumers receive the needed remedy as soon as possible, and is providing consumers information and resources essential to keep them safe until the vehicles can be fixed."

84. GM first provided NHTSA with a chronology of events on February 24, 2014. The information in GM's chronology raised serious questions as to the timeliness of GM's recall. As a result, NHTSA opened its current investigation into GM's timeliness on February 26, 2014. On March 4, 2014, NHTSA issued a special order seeking documents and answers, submitted under oath, to questions relevant about how quickly GM acted on information about the defect.

85. GM and NHTSA opted multiple times not to open a formal investigation or declare a recall to address the faulty ignition switch. Mr. Friedman was asked why NHTSA officials in 2007 overruled an agency employee who said a formal defect investigation of the switches should be started. Mr. Friedman responded that air-bag failures discovered after several fatal accidents involving Chevrolet Cobalts did not necessarily indicate a defect because the devices were designed not to deploy in certain situations. Mr. Friedman said, "We need a better understanding between the vehicle's power and air bags going off... This connection is clearly something that has raised a lot of questions for us."

86. Playing the blame game, Mr. Friedman said that NHTSA would have acted decisively if GM had provided them with some of the facts that are now just coming out. "If GM did not follow the law in getting information to us quickly, we're going to hold them accountable," said Mr. Friedman.

-19-

**Class Action Complaint**

87.    GM had plenty of information to justify notifying the NHTSA earlier.    House investigators said in a memo that consumers complained to GM dealers 133 times about cars unexpectedly stalling or turning off when they went over bumps or nudged the ignition key. GM technicians linked many of those customer complaints to faulty ignition switches, at a time the Company was denying a defect existed, according to the memo, which was based on an analysis of GM's warranty-claims database.  GM still has not reported most of those cases to regulators.

88.    GM's Board of Directors failed its essential purpose.  The Board has a Public Policy Committee. The principal purpose of GM's Public Policy Committee is to provide oversight and guidance to management on, among other things, "business responsibilities of the Company."  The Public Policy Committee's "primary responsibility is to review and provide counsel on issues that significantly affect the Company's corporate reputation," including "vehicle safety, manufacturing safety, and corporate social responsibility."  By failing to insist on safety as a priority, GM allowed a culture of cost savings over safety to control the operations of the Company.

**F.    GM'S POSITION ON THE DEFECTIVE VEHICLES CHANGES OVER TIME**

89.    Immediately prior to the April 1, 2014 hearing, House investigators released an internal GM document (dated April 26, 2006) that showed a GM engineer approved a critical change to a faulty ignition switch that had been linked to thirteen (13) deaths.

90.    In April 2013, Ray DeGiorgio, the chief engineer on the Chevrolet Cobalt, was deposed in a case involving a Georgia woman who was killed in a Chevrolet Cobalt in 2009. Mr. DeGiorgio was asked about the differences between the original switch and the replacement switch. Mr. DeGiorgio testified that he saw the differences but could not explain why the part had been changed. Mr. DeGiogio also testified he had not approved the part change.   But, according to the April 26, 2006 internal GM document, Mr. DeGiorgio did indeed sign off on the change.  The reason given for the change on the document was "to increase torque force in the switch."

/ / /

**Class Action Complaint**

Attorney: *"So if such a change was made, it was made without your knowledge and authorization?"*

DeGiorgio: *"That is correct"*

Later in the deposition, DeGiorgio said, "I can certainly tell you, I was not aware of this change."

91.    According to House investigators, documents show GM altered the design of the ignition switches, but the alteration was done without either notifying federal regulators or car owners or changing the part number.  The change apparently occurred in 2006 and increased the size of the detent plunger and spring, a pair of parts that hold the ignition key in position.



92.    House committee members said the redesigned switch still did not meet GM's minimum specifications, citing testing done at the time by the supplier, Delphi Automotive. This means the switches installed in 2008-2011 model year vehicles were still defective which contradicted GM's statements that only switches produced before the 2006 redesign were faulty and potentially linking the defect to deaths.

-21-

**Class Action Complaint**

93.     On March 28, 2014, GM recalled the 2008-2011 vehicles, but said the recall was done only to ensure that defective ignition switches were not installed as replacement parts during their repair work.  GM said that about 5,000 defective switches had been used for repairs in those vehicles.

94.     However, on March 27, 2014, members of Congress on the House Energy and Commerce Committee met with Delphi officials and said there was more to the story than what GM was disclosing.  A March 31, 2014 letter sent to GM signed by Reps. Henry Waxman, Diana DeGette, and Jan Schakowsky stated: "Delphi confirmed that these testing results mean that the ignition switches currently in use in 2008-2011 vehicles do not meet GM performance specifications."

95.     In February 2014, GM disclosed to federal regulators that it knew of problems with its ignition switches as early as 2001. GM told NHTSA that a design engineer responsible for the Cobalt's ignition switch "signed a document approving changes to the ignition switches proposed by the supplier, Delphi Mechatronics."

96.     A prepared chronology by GM wrote: "The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch… This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch.  GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year."

97.     Hours before the April 1, 2014 hearing, Congressman Henry Waxman, D. California, said his staff had counted 133 cases between June 2003 and June 2012 when consumers told dealers that their cars were shutting off when they went over bumps or brushed against the ignition.  These 133 cases are:

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|-------|-----------|---------------|----------------|
| **ION** | 2003 | 3,474 | 6/6/2003 |
| **ION** | 2003 | 9,300 | 7/1/2003 |

-22-

**Class Action Complaint**

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|-------|-----------|---------------|----------------|
| **ION** | 2003 | 10,027 | 7/14/2003 |
| **ION** | 2003 | 10,639 | 7/21/2003 |
| **ION** | 2003 | 10,639 | 7/21/2003 |
| **ION** | 2003 | 7,807 | 3/15/2004 |
| **ION** | 2003 | 18,568 | 3/15/2004 |
| **ION** | 2003 | 16,108 | 4/8/2004 |
| **ION** | 2003 | 16,192 | 4/12/2004 |
| **ION** | 2003 | 9,554 | 4/22/2004 |
| **ION** | 2003 | 15,031 | 5/1/2004 |
| **ION** | 2003 | 17,222 | 6/21/2004 |
| **ION** | 2004 | 18,209 | 6/24/2004 |
| **ION** | 2004 | 138 | 9/21/2004 |
| **ION** | 2004 | 6,583 | 3/1/2005 |
| **ION** | 2004 | 12,883 | 3/17/2005 |
| **ION** | 2004 | 8,182 | 4/20/2005 |
| **ION** | 2004 | 10,387 | 5/7/2005 |
| **ION** | 2004 | 7,945 | 6/29/2005 |
| **ION** | 2005 | 16,767 | 7/18/2005 |
| **ION** | 2004 | 19,963 | 7/22/2005 |
| **ION** | 2004 | 13,743 | 8/18/2005 |
| **ION** | 2004 | 31,456 | 8/25/2005 |
| **ION** | 2006 | 2,470 | 9/19/2005 |
| **HHR** | 2006 | 445 | 10/24/2005 |

-23-

**Class Action Complaint**

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|-------|------------|---------------|----------------|
| ION | 2004 | 17,185 | 12/5/2005 |
| ION | 2004 | 13,716 | 12/13/2005 |
| ION | 2005 | 12,420 | 1/9/2006 |
| ION | 2004 | 32,688 | 1/10/2006 |
| ION | 2006 | 10,221 | 1/27/2006 |
| ION | 2006 | 3,468 | 2/23/2006 |
| ION | 2005 | 7,042 | 6/14/2006 |
| ION | 2005 | 17,375 | 7/11/2006 |
| ION | 2005 | 17,375 | 7/11/2006 |
| ION | 2006 | 9,057 | 7/25/2006 |
| ION | 2003 | 53,753 | 7/26/2006 |
| ION | 2005 | 13,929 | 7/29/2006 |
| HHR | 2006 | 13,464 | 8/3/2006 |
| ION | 2006 | 9,112 | 8/7/2006 |
| ION | 2004 | 36,911 | 10/16/2006 |
| ION | 2005 | 25,505 | 11/2/2006 |
| ION | 2004 | 12,850 | 11/29/2006 |
| ION | 2004 | 12,850 | 11/29/2006 |
| ION | 2006 | 30,439 | 1/16/2007 |
| Cobalt | 2005 | 15,123 | 3/5/2007 |
| ION | 2004 | 34,084 | 4/9/2007 |
| HHR | 2007 | 2,143 | 4/30/2007 |
| Cobalt | 2005 | 32,096 | 5/2/2007 |

-24-

**Class Action Complaint**

| Model | Model Year | Vehicle Miles | Complaint Date |
|-------|-----------|---------------|----------------|
| Cobalt | 2006 | 17,214 | 5/7/2007 |
| ION | 2006 | 26,819 | 5/19/2007 |
| ION | 2006 | 22,937 | 5/21/2007 |
| ION | 2006 | 15,791 | 5/30/2007 |
| ION | 2006 | 17,025 | 6/7/2007 |
| Solstice | 2006 | 9,749 | 6/20/2007 |
| ION | 2006 | 31,500 | 7/2/2007 |
| HHR | 2006 | 25,940 | 7/19/2007 |
| ION | 2005 | 17,303 | 8/2/2007 |
| ION | 2006 | 24,741 | 8/2/2007 |
| ION | 2006 | 24,741 | 8/2/2007 |
| Cobalt | 2005 | 29,551 | 8/6/2007 |
| ION | 2006 | 11,161 | 8/6/2007 |
| HHR | 2006 | 35,804 | 8/7/2007 |
| ION | 2006 | 25,486 | 8/10/2007 |
| ION | 2005 | 28,000 | 8/11/2007 |
| ION | 2004 | 21,814 | 8/16/2007 |
| ION | 2004 | 21,814 | 8/16/2007 |
| ION | 2006 | 8,638 | 8/21/2007 |
| HHR | 2007 | 13,982 | 8/28/2007 |
| ION | 2006 | 30,221 | 8/29/2007 |
| ION | 2007 | 12,257 | 9/10/2007 |
| Cobalt | 2006 | 18,460 | 9/12/2007 |

-25-

Class Action Complaint

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|-------|-----------|---------------|----------------|
| **ION** | 2006 | 12,421 | 9/20/2007 |
| **HHR** | 2006 | 23,241 | 10/9/2007 |
| **ION** | 2007 | 7,884 | 10/12/2007 |
| **ION** | 2006 | 33,477 | 10/15/2007 |
| **HHR** | 2006 | 29,383 | 10/23/2007 |
| **HHR** | 2006 | 40,859 | 10/24/2007 |
| **HHR** | 2006 | 49,914 | 10/30/2007 |
| **ION** | 2004 | 57,642 | 10/30/2007 |
| **ION** | 2005 | 31,006 | 11/7/2007 |
| **HHR** | 2006 | 29,358 | 12/12/2007 |
| **Cobalt** | 2006 | 23,058 | 1/3/2008 |
| **ION** | 2006 | 23,883 | 1/17/2008 |
| **HHR** | 2006 | 30,808 | 1/31/2008 |
| **ION** | 2006 | 29,725 | 2/8/2008 |
| **ION** | 2007 | 15,247 | 2/13/2008 |
| **ION** | 2007 | 15,247 | 2/13/2008 |
| **ION** | 2006 | 20,513 | 2/25/2008 |
| **HHR** | 2006 | 24,811 | 2/28/2008 |
| **ION** | 2007 | 26,043 | 3/6/2008 |
| **ION** | 2007 | 7,538 | 3/10/2008 |
| **HHR** | 2006 | 24,955 | 3/14/2008 |
| **ION** | 2006 | 28,568 | 3/14/2008 |
| **ION** | 2007 | 11,594 | 3/17/2008 |

-26-

**Class Action Complaint**

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|-------|-----------|---------------|----------------|
| ION | 2005 | 21,919 | 3/24/2008 |
| ION | 2006 | 21,942 | 5/21/2008 |
| ION | 2006 | 21,942 | 5/21/2008 |
| ION | 2006 | 21,942 | 5/21/2008 |
| HHR | 2006 | 27,363 | 6/19/2008 |
| ION | 2006 | 29,177 | 6/25/2008 |
| Cobalt | 2006 | 32,014 | 6/28/2008 |
| ION | 2006 | 23,889 | 7/9/2008 |
| Cobalt | 2005 | 62,512 | 7/22/2008 |
| Cobalt | 2006 | 49,509 | 8/22/2008 |
| Cobalt | 2006 | 49,509 | 8/26/2008 |
| Cobalt | 2007 | 24,357 | 9/2/2008 |
| ION | 2006 | 32,805 | 11/29/2008 |
| ION | 2007 | 13,696 | 12/2/2008 |
| ION | 2007 | 28,760 | 12/5/2008 |
| ION | 2007 | 35,611 | 12/5/2008 |
| Cobalt | 2006 | 21,310 | 12/18/2008 |
| ION | 2007 | 19,342 | 12/29/2008 |
| G5 | 2007 | 27,270 | 1/5/2009 |
| Cobalt | 2006 | 35,514 | 6/1/2009 |
| ION | 2006 | 49,934 | 7/21/2009 |
| HHR | 2007 | 23,203 | 8/24/2009 |
| ION | 2003 | 36,770 | 8/24/2009 |

**Class Action Complaint**

| MODEL | MODEL YEAR | VEHICLE MILES | COMPLAINT DATE |
|-------|-----------|---------------|----------------|
| Cobalt | 2006 | 26,040 | 8/28/2009 |
| Cobalt | 2007 | 31,328 | 12/18/2009 |
| HHR | 2007 | 32,629 | 2/15/2010 |
| G5 | 2007 | 36,226 | 7/28/2010 |
| Cobalt | 2006 | 49,186 | 8/5/2010 |
| HHR | 2006 | 54,499 | 8/6/2010 |
| HHR | 2006 | 35,939 | 9/2/2010 |
| Cobalt | 2006 | 47,432 | 9/8/2010 |
| Cobalt | 2007 | 24,443 | 9/29/2010 |
| ION | 2006 | 40,820 | 11/4/2010 |
| Cobalt | 2005 | 70,380 | 6/15/2011 |
| HHR | 2006 | 51,404 | 9/12/2011 |
| Cobalt | 2007 | 58,321 | 9/13/2011 |
| HHR | 2006 | 39,692 | 9/28/2011 |
| Cobalt | 2006 | 48,568 | 6/25/2012 |

98.     This data was obtained from the General Motors' warranty database which is not reported to NHTSA.  As pointed out by the House Committee staff during the April 1, 2014 hearing, the warranty database "can provide an early warning of vehicle defects."  The staff went through 150,000 records to find the claims relating to the ignition switch.  The staff quoted from the report's comments that read: "When bumping ignition switch area vehicle will shut off"; and "vehicle stalls out when hitting bump/pothole in road, noticed at 50 MPH."

**G.    GM IN 2002 APPROVED AN IGNITION SWITCH KNOWING IT DID NOT MEET COMPANY SPECIFICATIONS**

99.     On March 27, 2014, the House Committee staff had a two-and-a-half-hour briefing on issues related to the faulty ignition switch from Delphi Automotive key staff

-28-

**Class Action Complaint**

members.  Delphi officials informed the Committee of important new information regarding the process by which production of the switch was approved and accepted by GM.  Delphi explained the general process, known as the Production Part Approval Process (PPAP), used when the supplier works with large customers like GM.  GM would provide a design and set of specifications and Delphi would then build the product and test it against specifications and present the results of the testing to GM for final production approval.

100.    Delphi representatives told the Committee that the ignition switch was designed, built, and then approved in February 2002 by GM via the PPAP process.  Delphi was unable to provide full documentation associated with the PPAP process but did have documentation regarding the torque performance testing results conducted as part of the PPAP.  Delphi officials stated that it was "well documented" in 2002 that the ignition switch did not meet the required minimum torque specifications.  The testing results were far below GM's specifications.  There were 12 torque performance tests conducted on the ignition switch at the time, and most tests showed a torque of between 4 and 10 N-cm, and that only two of the 12 tests showed the ignition switch surpassing 10 N-cm.  GM's specifications called for torque levels between 15 and 25 N-cm, significantly above the results of the performance tests.  Delphi said that despite these results, GM officials still approved the ignitions switch for production and that this ignition switch was used in the recalled vehicles in model years 2003-2007.

**H.    THE MODIFIED SWITCHES USED IN 2007-2011 VEHICLES WERE ALSO APPROVED BY GM DESPITE NOT MEETING COMPANY SPECIFICATIONS**

101.    Delphi representatives also told Committee members about the redesign of the ignition switch that was produced beginning in April 2006.  According to Delphi officials, GM began discussions with Delphi about needing to modify and re-test the ignition switch in mid-2005.  Delphi agreed to modify the design of the ignition switch and when presented to GM, got approval on a design with a longer spring, and had Delphi produce prototypes and conduct testing as part of a new PPAP that was approved by GM on April 26, 2006.  This document was signed by lead design engineer for GM, Ray DeGiorgio.  Delphi again could not provide

-29-

**Class Action Complaint**

complete documentation for the 2006 PPAP process but did having testing results available. According to Delphi, most torque test results for the 2006 ignition switches were in the 10 to 15 N-cm range, higher than the older models, but still not meeting GM's documented specifications. These results meant that the ignition switches used in 2008-2011 vehicles do not meet GM's performance specifications.

102.    In response to this revelation, GM countered that it was "unaware of any reports of fatalities with this group of vehicles where a frontal impact occurred, the front air bags did not deploy, and the ignition is in the 'accessory' or 'off' position." An analysis of NHTSA's Early Warning Report data shows that there were fourteen (14) fatal crashes in the recalled 2008-2011 vehicles involving a potential problem with an airbag, steering, electrical, or unknown component. The Center for Auto Safety also identified a similar set of crashes in earlier GM vehicles as those that "could indicated the ignition airbag defect."

103.    GM and GM engineers have reportedly stressed the importance of meeting the torque specifications on 15-25 N-cm. In a deposition for a Georgia case involving a defective ignition switch in a 2005 Chevrolet Cobalt, Gary Altman, the GM program engineer for the Chevrolet Cobalt, was asked:

Q:      *"And the vehicle never should have been sold if it didn't meet GM's minimum torque performance requirements, should it? …"*

Altman:      *"That's correct."*

Q;      *"And the reason is because that could be dangerous under certain situations because the key can move from run to accessory? …"*

Altman:      *"Yes."*

In the same case, GM engineer Ray DeGiorgio was asked,

Q:      *"Why do you have a minimum torque requirement from run to accessory?"*

DeGiorgio:      *"It's a design feature that is required.  You don't want anything flopping around."*

Q:      *"…the intent was also to make sure that when people were using the vehicle under ordinary driving conditions, that if the key was in the run position, it*

-30-

**Class Action Complaint**

*wouldn't just move to the accessory position?"*

DeGiorgio:    *"That is correct."*

104.    Brian Stouffer, another GM engineer also indicated in a deposition that the torque values of the ignition switches on the later model vehicles were not significantly different from the torque values on the older models.  Stouffer testified: "The values are not substantially higher on the '08s and '09s… there's a slight trend upwards, but '08s and '09s are not drastically different.   The highest was only – we were never higher than 20 newton centimeters.  We never had one exceed that… there is a slight trend upward [in torque values] from '07, but there's definitely not separation.  They overlap.  The ranges [of ignition torque in pre-2007 and post 2007 vehicles] overlap."  If what Mr. Stouffer said is true, there could be significant risk from the ignition switches in the 2008-2011 vehicles.

105.    Documents provided to the Congressional Committee confirm that top GM officials knew of the out-of-spec ignition switches for 2008-2011 vehicles for at least several months before announcing the recall.  A presentation for GM's December 17, 2013 high-level Executive Field Action Decision Committee meeting showed that torque performance measurements for five of twelve 2008-2010 model year vehicles ignition switches were below the minimum GM required specifications.   GM again acknowledged the importance of this specification in the March 28, 2014 recall notice, which read:

*"If the torque performance is not to specification, and the key ring is carrying added weight of the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position."*

**I.    GM VIOLATED THE TREAD ACT BY FAILING TO NOTIFY THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION OF THE KNOWN DEFECTS**

106.    Under the Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. §§ 30101, et seq., and the Transportation Recall Enhancement, Accountability, and Documentation Act (the "Tread Act"), 49 U.S.C. § 30170, GM is required to recall and repair motor vehicle defects related to safety.

-31-

**Class Action Complaint**

107.    If a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must inform the Secretary of Transportation. 49 U.S.C. § 30118(c)(1) & (2).

108.    The Safety Act requires that manufacturers inform NHTSA within five (5) working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." The report to NHTSA must immediately include the following information:

a.    The manufacturer's name;

b.    The identification of the vehicles or equipment containing the defect, including:

•    The make, line, model year, and years of manufacturing;

•    A description of the basis for the determination of the recall population;

•    How those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and

•    A description of the defect.

109.    The manufacturer must also inform NHTSA, as soon as possible, regarding:

a.    The total number of vehicles or equipment potentially containing the defect;

b.    The percentage of vehicles estimated to contain the defect;

c.    A chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with their dates of receipt; and

d.    A description of the plan to remedy the defect.

110.    If the Secretary of Transportation determines that the vehicle is defective, it will require the manufacturer to notify the owners, purchasers, and dealers of the defect and require it to remedy the defect or noncompliance. 49 U.S.C. § 30118(b)(2)(A) & (B).

111.    Under the Tread Act, any manufacturer who violates 29 U.S.C. § 30166 must pay a civil penalty to the U.S. Government at $7,000 per violation per day with a maximum penalty "for a related series of daily violations [of] $17,350,000." 49 C.F.R. § 578.6(c).

/ / /

-32-

**Class Action Complaint**

112.    As described in detail above, since at least 2001, GM has known about the defective ignition switches in its vehicles. Despite being aware of the ignition switch defects, GM waited until February 7, 2014 before finally notifying NHTSA that it manufactured and sold vehicles with ignition switch defects that could disengage the vehicle's power and airbags.

113.    Notwithstanding its duty to do so, Defendant has known for many years, but has not disclosed to NHTSA or the public, how to fix the defects.  GM failed to inform NHTSA about known defects in the Defective Vehicles.  As a result, the public, including Plaintiff and the Class, received no notice of the ignition switch defects until February 2014.

## VI.    SUCCESSOR LIABILITY

114.    From the date of its formation, GM expressly assumed certain obligations, including those obligations under the Tread Act, and is liable for its nondisclosure and concealment of the Ignition Switch Defect from the date of its formation to the present.

115.    GM also has successor liability for GM Corporation's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of GM Corporation.

116.    A significant number of GM Corporation employees remained employed at GM, including managers, directors, and/or members of the Board, demonstrating a continuity of knowledge.  For example, GM's current CEO, Mary Barra, was employed by GM Corporation in 1980.  In February 2008, Ms. Barra was appointed Vice President of Global Manufacturing Engineering – a position in which she knew or should have known of the Ignition Switch Defect.  Victor Hakim, GM's Rule 30(b)(6) deponent concerning the Ignition Switch Defect, began at GM Corporation in 1971.  Mr. Hakim is now a Senior Manager/Consultant in GM's Field Performance Assessment Department.

117.    GM has continued to design, manufacture, promote, market, and sell the same products as GM Corporation, including the Defective Vehicles.

118.    GM acquired real property, contracts, books, records, goodwill, and other intangible personal property of GM Corporation.

/ / /

-33-

**Class Action Complaint**

**VII.    TOLLING OF THE STATUTE OF LIMITATIONS**

119.    GM is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentations of the true facts concerning the Ignition Switch Defect in the Defective Vehicles. GM was, at all relevant times, aware of the nature and existence of the defects in the subject vehicles, but at all times continued to design, manufacture, certify, market, advertise, distribute, and sell the Defective Vehicles without revealing the true facts concerning the defects, in order to sell cars, to avoid bad publicity, and to avoid the expense of recalls. The true facts about the Defective Vehicles continue to be concealed from the public, including Plaintiff.

120.    All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein.  Plaintiff had no knowledge of, nor any reason to suspect, GM's concealment of the Ignition Switch Defect in the Defective Vehicles.  Plaintiff had no knowledge of facts sufficient to place Plaintiff on inquiry notice of the claims set forth in this Complaint, until shortly before this Complaint was filed.

121.    Nor could Plaintiff and the members of the Class have discovered the violations through the exercise of reasonable diligence earlier than that time because Defendant concealed the nature of its unlawful conduct and acts and fraudulently concealed its activities through various other means and methods designed to avoid detection.

122.    Under the Tread Act, GM is required to inform NHTSA within five (5) working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." In addition, GM is required to recall and repair motor vehicle defects related to safety.

123.    As described in detail above, since at least 2001, GM has known about the defective ignition switches in its vehicles. Despite being aware of the Ignition Switch Defect, GM waited until February 7, 2014 before finally notifying NHTSA that it manufactured and sold vehicles with ignition switch defects that could disengage the vehicle's power and airbags.

/ / /

-34-

**Class Action Complaint**

124.    Due to its violations of the Tread Act and consumer protection laws and its active concealment of pertinent information related to the Ignition Switch Defect, any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled.

## VIII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Unfair Competition Law: Bus. & Prof. Code § 17200 et seq.)

125.    Plaintiff hereby incorporates by reference the above paragraphs, as though those allegations were fully set out herein.

126.    The Unfair Competition Law, California Business and Professions Code § 17200, provides that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" the False Advertising Act, California Business and Professions Code § 17500. The Unfair Competition Law provides that a Court may order injunctive relief and restitution as remedies for any violation of the False Advertising Act.

127.    Plaintiff may pursue a representative claim on behalf of others in that Plaintiff meets the standing requirements of California Business and Professions Code Section 17204 and complies with Section 382 of the California Code of Civil Procedure.

128.    At all times herein, Defendant has engaged in unfair and unlawful business practices.  Defendant's business practices include, without limitation:

a.    Selling to Plaintiff and the Class vehicles which contain defects or design flaws which make them inherently more dangerous than other similar vehicles;

b.    Failing to disclose to Plaintiff and the Class that the vehicles sold to such consumers contain a defect or design flaw which makes them inherently more dangerous than other similar vehicles;

c.    Failing to remedy the defects or design flaws which made Defendant's vehicles inherently more dangerous than other similar vehicles;

d.    Failing to design, manufacture, distribute, and sell a product which would perform in a safe manner when used in a reasonably foreseeable manner by a reasonable

-35-

**Class Action Complaint**

customer;

     e.     Failing to timely inform NHTSA and vehicle owners, purchasers, and dealers of the ignition switch defects and to timely recall the Defective Vehicles; and

     f.     Violating the other statutes and common law causes of action as alleged in this Complaint.

    129.    The business acts and practices of Defendant, as hereinabove described, constitute an unlawful business practice in violation of the Unfair Competition Law for the reasons set forth below, without limitation:

     a.     The acts and practices violate California Civil Code §§ 1709 and 1710 and are therefore unlawful;

     b.     The acts and practices violate California Civil Code § 1750, et seq., and are therefore unlawful; and

     c.     The acts and practices violate the Tread Act, 49 U.S.C. § 30101, et seq., and are therefore unlawful.

    130.    The business acts and practices of Defendant as herein described also constitute an unfair business practice in violation of the Unfair Competition Law in that such acts and practices are substantially injurious to consumers and offensive to established California public policy.

    131.    The business acts and practices of Defendant as herein described constitute a fraudulent business practice in violation of the Unfair Competition Law in that such acts and practices are likely to deceive California consumers as to their legal rights and obligations.

    132.    Defendant's conduct has further injured Plaintiff and the Class by impairing competition within the automotive vehicle markets, failing to disclose the defect to the NHTSA, and preventing Plaintiff and the Class from discovering that their vehicles were unsafe and unreliable and making fully informed decisions about whether or not to lease, purchase, and/or retain the Defective Vehicles and/or the price to be paid to lease and/or purchase the Defective Vehicles.

/ / /

-36-

**Class Action Complaint**

133.     Plaintiff and the Class have suffered harm as a proximate result of the wrongful conduct of Defendant alleged herein, and therefore bring this claim for restitution and disgorgement.   Plaintiff and the Class have suffered injury in fact and have suffered an economic loss by, inter alia, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use.   Plaintiff has suffered injuries in fact and has lost money as a result of such unfair competition.

134.     In leasing and/or purchasing the vehicles from Defendant, Plaintiff and the Class reasonably believed and/or depended on the material false and/or misleading information provided by Defendant with respect to the safety and quality of the vehicles manufactured and sold by Defendant.   In other words, Defendant induced Plaintiff and the Class to purchase the Defective Vehicles through the acts and omissions alleged herein.

135.     Unless restrained and enjoined, Defendant will continue in the acts and practices alleged above.   Accordingly, the Court must issue an injunction restraining and enjoining Defendant from advertising, selling, or otherwise disseminating false and misleading information about its products or failing to disclose relevant information.   Plaintiff and the Class further request an order restoring any money or property, real or personal, which may have been lost by means of Defendant's unfair and deceptive business practices.

136.     In addition, pursuant to California Code of Civil Procedure Section 1021.5, Plaintiff is entitled to recover Plaintiff's reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

## SECOND CAUSE OF ACTION

### (False Advertising Act: Bus. & Prof. Code § 17500 et seq.)

137.     Plaintiff hereby incorporates by reference the above paragraphs, as though those

-37-

**Class Action Complaint**

allegations were fully set out herein.

138.   California Business and Professions Code § 17500, et seq., the False Advertising Act, prohibits any person, firm, corporation, or association, or any employee thereof, with the intent to dispose of real or personal property, from performing services or inducing the public to enter into any obligation relating to property or services, disseminating an untrue or misleading statement concerning such property or services which the defendant knew, or in the exercise of reasonable care should have known, was untrue or misleading.  A court may order injunctive relief and restitution to affected members as remedies for any violations of California Business and Professions Code Section 17500 as part of the Unfair Competition Law.

139.   At all times herein, Defendant has engaged in disseminating false and misleading communications which misrepresent the characteristics, nature, quality, and safety of the Defective Vehicles and have failed to disclose the true quality and defects of these products.  Defendant's business practices include, without limitation:

a.   Selling to Plaintiff and the Class vehicles which contain defects or design flaws which make them inherently more dangerous than other similar vehicles;

b.   Failing to disclose to Plaintiff and the Class that the vehicles sold to such consumers contain a defect or design flaw which makes them inherently more dangerous than other similar vehicles;

c.   Failing to remedy the defects or design flaws which made Defendant's vehicles inherently more dangerous than other similar vehicles;

d.   Failing to design, manufacture, distribute, and sell a product which would perform in a safe manner when used in a reasonably foreseeable manner by a reasonable customer;

e.   Failing to timely inform NHTSA and vehicle owners, purchasers, and dealers of the ignition switch defects and to timely recall the Defective Vehicles; and

f.   Violating the other statutes and common law causes of action as alleged in this complaint.

/ / /

-38-

**Class Action Complaint**

140.    Defendant engaged in the advertising and the failure to disclose the defects and design flaws in its products herein alleged with the intent to induce Plaintiff and the Class to purchase Defendant's products.

141.    Defendant caused to be made or disseminated throughout California and the United States, through advertising, marketing, and other publications, statements that are untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue or misleading to consumers and Plaintiff. Defendant's advertising was untrue or misleading and likely to deceive the public in that the true characteristics and nature of the vehicles sold by GM were not as advertised.

142.    In purchasing the vehicles from Defendant, Plaintiff and the Class reasonably believed and/or depended on the material false and/or misleading information provided by Defendant with respect to the quality and safety of the vehicles being sold.  In other words, Defendant induced Plaintiff and the Class to purchase GM automotive products through the acts and omissions alleged herein.

143.    In making and disseminating the statements herein alleged, Defendant knew, or by the exercise of reasonable care should have known, that the statements were and are untrue or misleading and so acted in violation of California Business and Professions Code Section 17500.  Moreover, Plaintiff and the Class were exposed to Defendant's advertising and its false and misleading statements and were affected by the advertising in that Plaintiff and the Class believed it to be true and/or relied on it when making purchasing decisions.

144.    The business acts and practices of Defendant herein described also constitute an unfair business practice in violation of the Unfair Competition Law in that such acts and practices are substantially injurious to consumers and offensive to established California public policy.

145.    In addition, the business acts and practices of Defendant as herein described constitute a fraudulent business practice in violation of the Unfair Competition Law in that such acts and practices are likely to deceive consumers as to their legal rights and obligations with respect to the purchase of vehicles from GM.

-39-

**Class Action Complaint**

146. Plaintiff and the Class have suffered injury in fact and have suffered an economic loss by, inter alia, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use. Accordingly, the Court must issue an injunction restraining and enjoining Defendant from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of vehicles from Defendant. Plaintiff and the Class further request an order restoring any money or property, real or personal, which may have been lost by means of Defendant's false advertising.

147. In addition, pursuant to California Code of Civil Procedure Section 1021.5, Plaintiff is entitled to recover Plaintiff's reasonable attorneys' fees, costs and expenses incurred in bringing this action.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

### THIRD CAUSE OF ACTION

### (Consumer Legal Remedy Act: Civil Code § 1750, et seq.)

148. Plaintiff hereby incorporates by reference the above paragraphs, as though those allegations were fully set out herein.

149. The Consumer Legal Remedies Act, California Civil Code § 1750, et seq. (hereinafter "CLRA"), was designed to protect consumers from unfair and deceptive business practices. To this end, the CLRA sets forth a list of unfair and deceptive acts and practices that are specifically prohibited in any transaction intended to result in the sale or lease of goods or services to a consumer.

150. Defendant is a "person" within the meaning of Civil Code §§ 1761(c) and 1770, and sells "goods" within the meaning of Civil Code §§ 1761(b) and 1770.

151. Plaintiff is a consumer within the meaning of Civil Code § 1761(d).

152. The subject vehicles constitute "goods" under California Civil Code § 1761(a).

-40-

**Class Action Complaint**

153.    The lease and/or purchase of vehicles by Plaintiff and the Class from Defendant constitutes a transaction within the meaning of Civil Code §§ 1761(e) and 1770.

154.    California Civil Code § 1770(a) provides that "[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful," including:

a.      In violation of § 1770(a)(2) of the CLRA, GM "misrepresent[ed] the source, sponsorship, approval, or certification of goods."

b.      In violation of § 1770(a)(5) of the CLRA, GM "represent[ed] that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

c.      In violation of § 1770(a)(7) of the CLRA, GM represented that goods are of a particular standard, quality, or grade when they are of another.

d.      In violation of § 1770(a)(9) of the CLRA, GM advertised goods with the intent not to sell them as advertised.

e.      In violation of § 1770(a)(14) of the CLRA, GM represented that the transaction was supplied in accordance with a previous representation when it was not.

155.    By reason of the acts and practices alleged herein, Defendant has engaged in unfair methods of competition and unfair or deceptive acts or practices in a transaction intended to results or which results in the sale of goods to any consumer, in violation of, inter alia, Civil Code §§ 1770(a)(2), (5), (7), (9), and (14).

156.    Defendant engaged in these unfair and/or deceptive acts and practices with the intent that they result, and which did result, in the sale and/or lease of the Defective Vehicles to Plaintiff and members of the Class.

157.    In purchasing the vehicles from Defendant, Plaintiff and the Class reasonably believed and/or depended on the material false and/or misleading information provided by Defendant with respect to the safety and quality of the GM vehicles.   In other words, Defendant induced Plaintiff and the Class to lease and/or purchase the vehicles through the

-41-

**Class Action Complaint**

acts and omissions alleged herein.

158.    In engaging in unfair or deceptive conduct in violation of the CLRA, Defendant actively concealed and failed to disclose material facts about the true characteristics and nature of the Defective Vehicles purchased by Plaintiff and the Class.

159.    As a result of the unfair and deceptive acts and practices of Defendant herein described, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

160.    Pursuant to California Civil Code §§ 1780 and 1781, Plaintiff and the Class hereby request certification of the Class, damages, injunctive relief, restitution, attorneys' fees, costs, and expenses pursuant to California Civil Code § 1780(d) and California Code of Civil Procedure § 1021.5.

161.    As a direct and proximate result of Defendant's violations of law, Plaintiff and the Class have been injured.  Pursuant to the provisions of California Civil Code § 1782, Plaintiff demands that within thirty (30) days from service of this Complaint, Defendant correct the deceptive practices described in this Complaint, pursuant to California Civil Code § 1770.  This includes providing notice and full compensation to consumers who have purchased the affected vehicles from GM.  If Defendant fails to do so, Plaintiff will amend this Complaint to seek damages pursuant to Civil Code § 1782.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

## FOURTH CAUSE OF ACTION

### (Breach of Implied Warranty)

162.    Plaintiff hereby incorporates by reference the above paragraphs, as though those allegations were fully set out herein.

163.    Defendant impliedly warranted to persons purchasing its products that the products were what they were represented to be.

164.    These implied warranties induced the community in general and Plaintiff and other Class members in particular to purchase the products from Defendant.  These implied warranties were both directly and indirectly believed and relied upon by Plaintiff and Class members and induced them to choose Defendant's product.  This reliance was justified by

-42-

**Class Action Complaint**

Defendant's skill, expertise, and judgment in the design, manufacturing, testing, labeling, distribution, or sale of such products.

165.    At the time of the sale, Defendant had knowledge of the purpose for which its products were purchased and impliedly warranted the same to be, in all respects, fit and proper for this purpose.

166.    Defendant breached its aforesaid warranties in that the products were not fit for the purpose for which they were intended and used; rather Defendant sold to Plaintiff a product which was not fit for use.  The defect in the products existed prior to the delivery of the products to Plaintiff and the Class.

167.    Plaintiff and the Class have suffered injury in fact and have suffered an economic loss by, inter alia, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use.  Accordingly, the Court must issue an injunction restraining and enjoining Defendant from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of vehicles from Defendant.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

### FIFTH CAUSE OF ACTION

### (Breach of Express Warranty)

168.    Plaintiff hereby incorporates by reference the above paragraphs, as though those allegations were fully set out herein.

169.    Defendant expressly warranted to persons purchasing its products that they were what they were represented to be.

170.    These express warranties induced the community, in general, and Plaintiff and members of the Class, in particular, to use and purchase Defendant's products.  These express warranties were both directly and indirectly believed and relied upon by Plaintiff and the Class

-43-

**Class Action Complaint**

and induced Plaintiff and the Class to choose Defendant's product.

171.  Defendant breached its aforesaid warranties in that its products were not fit for the use and purpose expressly warranted by Defendant.

172.  Plaintiff and the Class have suffered injury in fact and have suffered an economic loss by, inter alia, (a) leasing and/or purchasing an inferior product whose nature and characteristics render it of a lesser value than represented, (b) incurring costs for diminished resale value of the products purchased, (c) leasing and/or purchasing a product that poses a danger to the health and safety of not only the purchaser but also other motorists, passengers, and pedestrians, (d) incurring increased costs to repair the products purchased, and (e) incurring costs for loss of use.  Accordingly, the Court must issue an injunction restraining and enjoining Defendant from sending or transmitting false and misleading advertising to individuals or entities concerning the purported safety and quality of vehicles from Defendant.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

173.  Plaintiff hereby incorporates by reference the above paragraphs, as though those allegations were fully set out herein.

174.  As a result of its continuous and systematic misrepresentations and failure to disclose that the vehicles it had manufactured contained serious defects that affected the ignition switch of its vehicles, Defendant was able to charge a higher price for its vehicles, which did not match the item's value.  Based on these practices, Defendant was unjustly enriched.

175.  Defendant knew, or should have known, of the benefit it was receiving due to its misrepresentations and failure to disclose, and enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and other Class members, who paid a higher price for a product with a lower value.  It would be inequitable and unjust for Defendant to retain these unlawfully obtained profits.

/ / /

-44-

**Class Action Complaint**

176.   Plaintiff seeks an order establishing Defendant as constructive trustee of the profits unjustly obtained, plus interest.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

### SEVENTH CAUSE OF ACTION

### (Fraudulent Concealment)

177.   Plaintiff hereby incorporates by reference the above paragraphs, as though those allegations were fully set out herein.

178.   Throughout the relevant time period, Defendant knew that the Defective Vehicles contained defective ignition switches, presenting an unreasonably dangerous propensity to suddenly switch off and thereby injure drivers, passengers, motorists, and pedestrians.

179.   Defendant fraudulently concealed from and/or failed to disclose to Plaintiff and the Class the true defective nature of the subject vehicle.

180.   Defendant was under a duty to Plaintiff and the Class to disclose and warn of the defective nature of the subject vehicle because: (a) Defendant was in a superior position to know the true state of the facts about the hidden defects in the subject vehicles, and those defects were latent; (b) Defendant made partial disclosures about the safety and quality of the subject vehicles while not revealing their true defective nature; and (c) Defendant fraudulently and affirmatively concealed the defective nature of the subject vehicles from Plaintiff.

181.   The facts concealed and/or not disclosed by Defendant to Plaintiff and the Class were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or operate the subject vehicles.

182.   Defendant intentionally concealed and/or failed to disclose the true nature of the problems with the Defective Vehicles for the purpose of inducing Plaintiff and the Class to act thereon, and Plaintiff and the Class justifiably acted or relied upon, to the detriment of Plaintiff and the Class, the concealed and/or non-disclosed facts, as evidenced by the purchase and operation of the Defective Vehicles by Plaintiff and the Class.

/ / /

-45-

**Class Action Complaint**

183.    As a direct and proximate cause of Defendant's misconduct, Plaintiff and the Class have suffered actual damages as hereinabove alleged.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

## EIGHTH CAUSE OF ACTION

## (Negligence)

184.    Plaintiff hereby incorporates by reference the above paragraphs, as though those allegations were fully set out herein.

185.    As the manufacturer and seller of automotive vehicles, Defendant had a duty to Plaintiff and the Class to not sell products that were defective and could result in serious injuries to either Plaintiff, the Class, or even innocent third parties.  Defendant breached that duty by designing, manufacturing, and selling products to Plaintiff and the Class that had a serious ignition switch defect without disclosing these facts to Plaintiff and the Class.  That breach caused the economic harm, injury, and/or damage to Plaintiff and the Class that are hereinabove set forth.

186.    As a direct and legal result of this wrongful conduct, Plaintiff and the Class have been damaged as hereinabove alleged, in an amount to be ascertained at the time of trial.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.    That this Court certify this case as a class action;

2.    That this Court find and declare Defendant's acts and practices as described herein to be unlawful, unfair, and fraudulent;

3.    That Plaintiff be awarded compensatory and general damages according to proof;

4.    That Plaintiff be awarded past and future medical and incidental expenses according to proof;

5.    That Plaintiff be awarded past and future loss of earnings and earning capacity according to proof;

-46-

**Class Action Complaint**

6.      That Plaintiff be awarded loss of personal property and personal effects according to proof;

7.      That Plaintiff be awarded punitive damages according to proof;

8.      That Defendant be preliminarily and permanently enjoined from engaging in the unlawful, unfair, and fraudulent acts and practices alleged herein;

9.      That Defendant be ordered to make restitution to Plaintiff;

10.     That Plaintiff be awarded attorneys' fees and expenses pursuant to California Code of Civil Procedure § 1021.5, California Civil Code § 1780, and any other statute which provides for award of such fees and expenses;

11.     That Plaintiff be awarded prejudgment interest on all sums collected;

12.     For costs of suit herein incurred; and

13.     Any other and further relief the Court may deem proper.

DATED: May 27, 2014            **DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**


By:____/s/ Steven M. Campora_____
        STEVEN M. CAMPORA


**X.      JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.


DATED: May 27, 2014            **DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**


By:____/s/ Steven M. Campora_____
        STEVEN M. CAMPORA

-47-

**Class Action Complaint**

1  ROBERT A. BUCCOLA, ESQ. / SBN: 112880
   STEVEN M. CAMPORA, ESQ. / SBN: 110909
2  JASON J. SIGEL, ESQ. / SBN: 235761
   **DREYER BABICH BUCCOLA WOOD CAMPORA, LLP**
3  20 Bicentennial Circle
   Sacramento, CA 95826
4  Telephone:  (916) 379-3500
   Facsimile:  (916) 379-3599
5
6  Attorneys for Plaintiff
7
8                    **UNITED STATES DISTRICT COURT**
9                    **CENTRAL DISTRICT OF CALIFORNIA**
10
11 RANDI SPANGLER,                          Case No.:
12        Plaintiff,                        **DECLARATION**
13        v.
14 GENERAL MOTORS LLC, a corporation,,
15        Defendants.
   _____
16
17        I, RANDI SPANGLER hereby declare and state as follows:
18        1.    I have personal knowledge of the facts stated herein and, if necessary, could
19 competently testify thereto.
20        2.    I am a Plaintiff in the above-entitled action.
21        3.    Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the
22 Class Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).
23        4.    This action for relief under Cal. Civ. Code § 1780(a) has been commenced in a
24 county that is a proper place for trial of this action because Defendants do business in this
25 District (the Central District of California) and throughout the State of California.
26        5.    The Complaint field in this matter contains a cause of action for violations of the
27 Consumers Legal Remedies Act against General Motors, LLC ("GM"), a Delaware limited liability
28 company doing business nationwide, including California.

                                              i
**Declaration of Randi Spangler**

1      6.     I own a 2007 Chevrolet HHR.

2       I declare under penalty of perjury under the laws of the State of California that the

3  foregoing Declaration is true and correct, and was executed by me in the city of Sacramento,

4  California, on April 30, 2014.

6                                      RANDI SPANGLER

---

ii

**Declaration of Randi Spangler**