# Exhibit A

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS

MAY 20 2014

JAMES W. McCORMACK, CLERK

By:_____
DEP CLERK

**DREW HIGGINBOTHAM, on behalf of
himself and all others similarly situated,**

        **Plaintiff,**

**v.**

**GENERAL MOTORS LLC and
GENERAL MOTORS
CORPORATION,**

        **Defendants.**

CASE NO. 4:14 cv 306 Jmm

**JURY TRIAL DEMANDED**

This case assigned to District Judge Moody
and to Magistrate Judge Kearney

## CLASS ACTION COMPLAINT

    Plaintiff, Drew Higginbotham ("Plaintiff" or "Mr. Higginbotham"), individually and as

class representative on behalf of all similarly situated persons, brings this action against

Defendants General Motors Corporation and its successor, General Motors LLC ("Defendants,"

"GM," or the "Company") and states as follows:

## INTRODUCTION

    1.     This case arises from GM's active concealment, for over a decade, of knowledge

of a dangerously defective ignition switch installed on millions of GM vehicles. Specifically, as

a result of having the defective ignition switch, the vehicles at issue are at risk of shutting down

during normal driving conditions – losing power to the engine and to major electrical systems

responsible for critical safety features like airbags, power steering, and antilock brakes – thus

creating an extreme and unreasonable risk of accident, serious bodily harm, and death.

    2.     At present, there have been reports of hundreds of accidents attributable to the

defective ignition switches, including scores of fatalities.

3.      The vehicles at issue ("Defective Vehicles") include the following make and model years:

- Chevrolet Cobalt (2005-2010 model years);

- Chevrolet HHR (2006-2011 model years);

- Pontiac G5 (2006-2007 model years);

- Pontiac Solstice (2006-2010 model years);

- Saturn Ion (2003-2007 model years); and

- Saturn Sky (2007-2010 model years).

4.      Since as early as 2001, GM received reports of ignition switch malfunctions in the Defective Vehicles.  On multiple occasions since that time, the Company has opened internal investigations that identified both the cause of the problem and the attendant safety risks. However, choosing to place profit over consumer safety, GM repeatedly elected to do nothing about the problem, even when faced with reports of drivers suffering serious bodily injury and even death as a result of accidents caused by the faulty ignition switches.

5.      Further, GM actively concealed knowledge of the ignition switch problems in the Defective Vehicles from the public and from regulators.  Internal documents reveal that GM fostered a culture in which profits were placed above consumer safety, and that employees were warned not to be "cute or clever" when investigating potentially dangerous defects in their products.  Indeed, employees were admonished not only for using words and phrases like "dangerous," "death trap," "potentially disfiguring," or "Corvair-like" in the course of their work, but even for such benign terms as "safety" and "safety-related."

6.      Only in early 2014, thirteen years after first having knowledge of the problems inherent to the Defective Vehicles, did GM issue a recall.  Moreover, while the Company has

2

issued a recall of the Defective Vehicles, at present there are not sufficient replacement ignition switches to repair the Defective Vehicles. By one estimate, Plaintiff and Class members will have to wait until October of 2014 for GM to repair the Defective Vehicles.

7.       As GM's knowledge of the ignition switch problems in the Defective Vehicles has come to light, regulators have continually admonished the Company. The National Highway Transportation Safety Administration ("NHTSA") recently fined GM $35 million – the maximum amount that the NHTSA has federal authority to exact – for the Company's abuses. GM is also undergoing multiple investigations by Congress, the Justice Department, and state Attorney Generals.

8.       Plaintiff brings this action for a Class of all persons in the United States who currently own or lease one or more of the following GM vehicles: Chevrolet Cobalt (2005-2010 model years); Chevrolet HHR (2006-2011 model years); Pontiac G5 (2006-2007 model years); Pontiac Solstice (2006-2010 model years); Saturn Ion (2003-2007 model years); and Saturn Sky (2007-2010 model years).

9.       Plaintiff believes that there are other GM vehicles which suffer from the same or substantially similar ignition switch defects as the Defective Vehicles identified above. Accordingly, Plaintiff will supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switches, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment as such information becomes available.

10.      Plaintiff and the Class have been damaged by GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding highly dangerous vehicles whose value has greatly diminished because of GM's failure to timely disclose the serious and potentially deadly defects. Plaintiff and the Class either

3

paid more for the Defective Vehicles than they would have had they known of the ignition

defects or they would not have purchased the Defective Vehicles at all. As a result of the defects

in these vehicles, the Plaintiff and the Class are unable to sell or otherwise realize their full

investments in the Defective Vehicles.

11.    Defendants' acts and omissions complained of herein amount to violations of the

Michigan Consumer Protection Act, MCLS § 445.901, *et seq.*; violations of the Arkansas

Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.*; breach of implied warranty;

breach of implied warranty of fitness for a particular purpose; an instance of unjust enrichment;

and acts of fraudulent concealment.

## PARTIES

12.    Plaintiff and Named Class Representative Drew Higginbotham is a citizen of the

State of Arkansas and resides in the city of Little Rock. Plaintiff owns a 2003 Saturn Ion, which

was manufactured, sold, distributed, advertised, marketed, and warranted by Defendants.

13.    Defendant General Motors Corporation ("Old GM") was a Delaware corporation

headquartered in Detroit, Michigan. Through its various subsidiaries and affiliates, Old GM

manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand

automobiles throughout the United States. In 2009, Old GM filed for bankruptcy, and

substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement to

Defendant General Motors LLC.

14.    Defendant General Motors LLC ("New GM") is a limited liability company

formed under the laws of Delaware with its principal place of business located at 300

Renaissance Center, Detroit, Michigan. New GM was incorporated in 2009, and on July 10,

4

2009, acquired substantially all assets and assumed certain liabilities of Old GM through a

Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

15.    Among the liabilities and obligations expressly retained by New GM after the

bankruptcy of Old GM are the following:

> From and after the Closing, Purchaser [New GM] shall comply
> with the certification, reporting and recall requirements of the
> National Traffic and Motor Vehicle Act, the Transportation Recall
> Enhancement, Accountability and Documentation Act, the Clean
> Air Act, the California Health and Safety Code, and similar laws,
> in each case, to the extent applicable in respect of vehicles and
> vehicle parts manufactured or distributed by [Old GM].

16.    New GM also expressly assumed:

> [a]ll Liabilities arising under express written warranties of [Old
> GM] that are specifically identified as warranties and delivered in
> connection with the sale of new, certified used or pre-owned
> vehicles or new or remanufactured motor vehicle parts and
> equipment (including service parts, accessories, engines and
> transmissions) manufactured or sold by [Old GM] or Purchaser
> prior to or after the Closing and (B) all obligations under Lemon
> Laws.

17.    Because New GM acquired and operated Old GM and ran it as a continuing

business enterprise, and because New GM was aware from its inception of the ignition switch

defects in the Defective Vehicles, New GM is liable through successor liability for the deceptive

and unfair acts and omissions of Old GM, as alleged in this Complaint.

## JURISDICTION AND VENUE

18.    The Court has subject matter jurisdiction over this class action pursuant to 28

U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in

controversy exceeds $5,000,000.00, exclusive of interest and costs, and is a class action in which

some Members of the Class are citizens of states different than Defendant. *See* 28 U.S.C. §

1332(d)(2)(A).

5

19.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a).  A substantial part of the events or omissions giving rise to these claims occurred in this district.

## GENERAL ALLEGATIONS

### A.     THE FAULTY IGNITION SWITCH AND THE DEFECTIVE VEHICLES.

20.     During the relevant time period, a faulty ignition switch was installed by GM in the Defective Vehicles.

21.     The chief purpose of an ignition switch is to turn on the engine and electrical systems of the car in which it is installed.  The ignition switch in the Defective Vehicles has several positions:  "Run," "Accessory," and "Off."  When in the "Run" position, the vehicle's engine and electrical systems are engaged.  When in the "Accessory" position, the vehicle's motor is turned off, but power is still supplied to certain portions of the vehicle's electrical systems, such as the radio.  When in the "Off" position, the vehicle has been turned off completely, and power is not flowing to either the engine or the electrical systems.

22.     With Defendant's faulty ignition switches, installed in the Defective Vehicles during the class period, whenever the switch is in the "Run" position and the vehicle's engine and electrical systems are running – *i.e.*, if the car is being driven – if the driver were to inadvertently bump the key ring with his or her leg, or if the key ring were heavy (containing more than just the vehicle's key), there is a material risk that the ignition switch will revert to either the "Accessory" or "Off" position.  When this failure occurrs, the engine in the Defective Vehicle will shut off as a matter of course, and often other critical safety features in the Defective Vehicle will also be disabled, such as power brakes, power steering, and airbags.

23.     The Defective Vehicles are, therefore, unreasonably prone to accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

24.     To date, Defendants have identified the following Defective Vehicles as having had faulty ignition switches installed:  Chevrolet Cobalt (2005-2010 model years); Chevrolet HHR (2006-2011 model years); Pontiac G5 (2007-2010 model years); Pontiac Solstice (2006-2010 model years); Saturn Ion (2003-2007 model years); and Saturn Sky (2007-2010 model years).

**B.     STARTING IN 2001, GM RECEIVES REPORTS DETAILING THE FAULTY IGNITION SWITCH AND ATTENDANT SAFETY RISKS, BUT REMAINS SILENT FOR THIRTEEN YEARS.**

25.     Defendants knew or had reason to know of the faulty ignition switches in the Defective Vehicles for over a decade, but affirmatively concealed this information from Defective Vehicle owners.

26.     Defendants admit that they learned of the ignition switch defects as early as 2001. During the pre-production development of the Saturn Ion – one of the Defective Vehicles – GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position.  Defendants generated an internal report examining the issue, but concluded that a switch design change "had resolved the problem."[1]

27.     In 2002, GM approved the existing ignition switch design, despite warnings from its supplier that the switch did not meet GM's specifications.[2]

28.     In 2003, a new internal document noted a report from a service technician, who had observed a stall in a Saturn Ion while driving.  The service technician noted that the weight

---

[1] D. Ivory, "G.M. Reveals It Was Told of Ignition Defect in '01," *New York Times* (Mar. 12, 2014).
[2] "Key Events in GM's Ignition Switch Recall," *Associated Press* (May 16, 2014) (available at http://abcnews.go.com/Business/wireStory/key-events-gms-ignition-switch-recall-23755301).

of several keys on the key ring had "worn out" the ignition switch. The ignition switch was replaced and the matter closed.[3]

29. In 2004, Defendants' engineers encountered the problem again, during before-market test drives of the Chevrolet Cobalt.

30. GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the ignition switch defect and were able to replicate this phenomenon during test drives. According to GM, the PRTS engineers believed that "low key cylinder torque effort" was an issue and considered a number of potential solutions. However, after evaluatinging the cost and amount of time it would take to implement a fix to the problem, GM elected to do nothing. Indeed, the engineering manager of the Cobalt closed the investigation into ignition switch problems, saying that proposed fixes would take too long and cost too much, and that "*none of the solutions represents an acceptable business case.*"[4]

31. As soon as the 2005 Cobalt hit the market, GM began receiving complaints about sudden loss of power, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[5] GM opened additional PRTS inquiries. In one report, engineers claimed to have distilled the problem to two factors: "a lower torque detent[6] in the ignition switch…[and a] low position of the lock module [on] the [steering] column."

---

[3] Danielle Ivory, "G.M. Reveals It Was Told of Ignition Defect in '01," *New York Times* (Mar. 12, 2014) (available at http://www.nytimes.com/2014/03/13/business/gm-reveals-it-was-told-of-ignition-defect-in-01.html).
[4] "Key Events in GM's Ignition Switch Recall," *supra*, n. 2.
[5] Letter from M. Carmen Benavides to Nancy Lewis, NHTSA, "Chronology Re: Recall of 2006 Chevrolet HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Sky Vehicles," at 1 (Mar. 11, 2014) (available at http://www.documentcloud.org/documents/1084789-gm-updated-3-12-14.html).
[6] The "detent" is the part of an ignition switch's inner workings that keeps the switch from rotating from one setting – "Run," "Accessory," and "Off" – to another unless the driver turns the key.

8

32.     In a PRTS opened in May 2005, GM engineers once again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration. After initially approving the proposed fix, GM reversed course and again declined to implement a fix.[7]

33.     Instead, in October 2005, GM issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the failure of the car's electrical system. Rather than disclose the true nature of the defects and correct them, GM instead instructed technicians to give customers "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key rings from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change would supposedly keep the keys from hanging as low as they had in the past.[8] According to GM's records, GM dealers provided key inserts to only 474 customers who brought their vehicles into dealers for service.[9]

34.     In 2006, GM approved a design change for the Cobalt's ignition switch that was supplied by Delphi. The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch." But the new design was not produced until the 2007 model year.[10]

35.     During approximately this same time period – from 2003 to 2006 – Defendants' Field Product Reports and PRTS reports found similar engine failures in the Saturn Ion, which were likely attributable to the ignition switch defect.

36.     In 2007, NHTSA investigators met with GM to discuss its airbags and informed GM of the July 2005 frontal and fatal crashing involving Amber Marie Rose. Ms. Rose, age 16,

---

[7] "Chronology Re: Recall of 2006 Chevrolet HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Sky Vehicles," *supra*, n. 5.
[8] *Id.* at 1-2.
[9] *Id.* at 3.
[10] *Id.* at 2.

died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy. Her death was the first of the hundreds of deaths and injuries attributable to the ignition switch defects. Data retrieved from the vehicle's diagnostic system indicated that the ignition was in the "accessory" position. GM investigated and tracked similar incidents.

37.     By the end of 2007, by GM's own admission, GM knew of 10 collisions involving Defective Vehicles in which the airbag did not deploy.[11] GM continued to receive complaints and continued to investigate crashes in which the airbags did not deploy. Rather than publicly admitting the dangerous safety defects in its vehicles, GM attempted to attribute these and other incidents to "driver error." Every year from 2005 to 2012, first Old GM and then New GM received reports of deaths in Cobalts involving steering and/or airbag failures, including:

- **2005:** 26 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved.

- **2006:** 69 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved and 4 deaths listing the component involved as "unknown."

- **2007:** 87 Cobalt Death and Injury Incidents, including 3 deaths citing "airbag" as the component involved.

- **2008:** 106 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved and 2 deaths listing the component involved as "unknown."

- **2009:** 133 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved, 1 death citing "service brake" as the component involved, 1 death citing "steering" as component involved, and 2 deaths listing the component involved as "unknown."

- **2010:** 400 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 12 deaths citing "steering" as the component involved, and 1 death listing the component involved as "unknown."

---

[11] *Id.*

10

- **2011:** 187 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 2 deaths citing "steering" as the component involved, and 1 death listing the component involved as "unknown."

- **2012:** 157 Cobalt Death and Injury Incidents, including 5 deaths citing "airbag" as component involved, and 4 deaths citing "steering" as component involved.

38.     Internal documents have recently surfaced demonstrating that during this time period, GM adopted a policy of willfully concealing these dangers from its customers.  For example, the New York Times recently reported on "deeply disturbing" GM presentations used to "train employees to obscure some problems."  In a PowerPoint slide titled "What every company vehicle driver <u>must</u> know," the New York Times article notes that

> [w]orkers writing reports were encouraged to avoid using certain words and phrases with negative overtones, including "apocalyptic," "dangerous," "death trap," "potentially disfiguring," "rolling sarcophagus," and "Corvair-like," as well as more benign phrases like "safety" and "safety related."[12]

39.     Per the New York Times, the cynical presentation further instructed employees

> not to be "cute or clever."  It gave examples of "comments that do not help identify or solve problems," including, "This is a lawsuit waiting to happen," and, "Kids and wife panicking over the situation."[13]

## C.     GM WAITED UNTIL 2014 TO FINALLY ORDER A RECALL OF THE DEFECTIVE VEHICLES.

40.     After thirteen years of knowing of the faulty ignition switch in its Defective Vehicles – and engaging in an internal campaign to obfuscate the dangers arising therefrom – GM's Field Performance Review Committee and the Executive Action Decision Committee

---

[12] Matthew L. Wald & Danielle Ivory, "GM Is Fined Over Safety and Called a Lawbreaker," *The New York Times* (May 16, 2014) (available at http://www.nytimes.com/2014/05/17/business/us-fines-general-motors-35-million-for-lapses-on-ignition-switch-defect.html).
[13] "Chronology Re: Recall of 2006 Chevrolet HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Sky Vehicles," *supra*, n. 5.

("EFADC") finally ordered a recall of *some* of the Defective Vehicles on January 31, 2014.

Initially, the EFADC only ordered a recall of the Chevrolet Cobalt and Pontiac G5 for model

years 2005-2007. Almost one month later, on February 24, 2014, the recall was expanded to

include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion

for model years 2003-2007, and the Saturn Sky for model year 2007.

41.     Since that time, GM has expanded its recall to include more model years. At

present, GM has recalled the following makes and model years: Chevrolet Cobalt (2005-2010

model years); Chevrolet HHR (2006-2011 model years); Pontiac G5 (2007-2010 model years);

Pontiac Solstice (2006-2010 model years); Saturn Ion (2003-2007 model years); and Saturn Sky

(2007-2010 model years).

42.     GM provided dealers with notice of the recall on February 26, 2014 and March 4,

2014, and mailed letters to current owners on March 10 and March 11, 2014.

43.     According to GM, "the dealers are to replace the ignition switch,"[14] presumably

with one with sufficient torque to prevent the inadvertent shut down of the ignition, power

steering, power brakes, and airbags. However, at present few, if any, replacement parts are

available. Instead, it is currently estimated that it will be October, 2014 before all of the

Defective Vehicles have been fixed.[15]

44.     In a video message addressed to GM employees on March 17, 2014, CEO Mary

Barra admitted that the Company had made mistakes and needed to change its processes.

According to Ms. Barra, "Something went wrong in our processes in this instance, and terrible

---

[14] *Id.* at 6.
[15] "Key Events in GM's Ignition Switch Recall," *Associated Press* (May 16, 2014) (available at
http://abcnews.go.com/Business/wireStory/key-events-gms-ignition-switch-recall-23755301).

things happened." Barra continued to promise, "We will be better because of this tragic situation if we seize this opportunity."[16]

45.     Since GM's actions first came to light, the outcry has been staggering, not only from the public, but also from law enforcement and legislators. GM has faced scrutiny of the NHTSA – receiving a $35 million dollar fine, the largest that the federal agency may assess – as well as hearings in both the U.S. House and Senate and a probe by the Department of Justice. GM has been ordered to turn over its internal documents, and CEO Mary Barra testified before the Senate and House in early April 2014.

46.     While GM has now appointed a new Vehicle Safety Chief and laid off two engineers, millions of Defective Vehicles remain on the road to this day; and, upon information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defect.

## DEFENDANT'S CONDUCT HAS HARMED
## PLAINTIFF AND CLASS MEMBERS

47.     The ignition switch defects detailed herein have caused damage to Plaintiff and the Class.

48.     A vehicle purchased, leased, or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect. Similarly, a vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the risk of accident endemic to the Defective Vehicles.

49.     Purchasers and lessees paid a higher purchase price for the Defective Vehicles than they would have had the ignition switch defects been disclosed. Plaintiff and the Class

---

[16] Bill Vlasic & Christopher Jensen, "Something Went 'Very Wrong' at G.M., Chief Says," *New York Times* (Mar. 18, 2014) (available at http://www.nytimes.com/2014/03/18/business/gm-chief-barra-releases-video-on-recalls.html).

13

overpaid for their Defective Vehicles and are unable to resell them for what they paid and are incurring costs and expenses to maintain the Defective Vehicles in inventory, including without limitation, interest owed and other expenses. This loss is due to the concealed ignition switch defects. Plaintiff did not and now cannot realize any profit on the purchase of these vehicles and is unable to sell them.

50.     Plaintiff and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition switch defects.

51.     GM admits to a least twelve deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles. However, Plaintiff believes that the actual number is much higher, and that there may be hundreds or even thousands of deaths and injuries attributable to the faulty ignition switch in the Defective Vehicles.

**A.     SUCCESSOR LIABILITY.**

52.     As discussed in paragraphs 13-17, *supra*, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for Old GM's nondisclosure of the problems associated with the ignition switch in the Defective Vehicles, as well as its own nondisclosures beginning on the date of its formation on July 10, 2009 and continuing to present day.

53.     New GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM. Additionally, New GM has admitted that it knew of the ignition system defects from the very date of its formation; New GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM; New GM retained the bulk of the employees of Old GM; New GM acquired, owned, and leased

real property of Old GM, including all machinery, equipment, tools, information technology,

product inventory, and intellectual property; New GM acquired the contracts, books, and records

of Old GM; and New GM acquired all goodwill and other intangible personal property of Old

GM.

## B.   TOLLING OF THE STATUTES OF LIMITATION.

54.   All applicable statutes of limitation have been tolled by Defendants' knowing and

active fraudulent concealment and denial of the facts alleged herein.  Plaintiff and Class

members did not discover – and were not aware of material facts that would have caused a

reasonable person to suspect – that Old GM and New GM had information in their possession

about the existence and dangerousness of the ignition switches in the Defective Vehicles and that

they affirmatively concealed that information until shortly before this Class action was filed.

55.   Because of the active concealment by Defendants, any and all limitations periods

otherwise applicable to the claims of Plaintiff and members of the Class have been tolled.

## CLASS ALLEGATIONS

56.   Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure, individually and on behalf of all Members of the following classes (collectively

referred to as "the Class" or "Class"):

> **National Class:**  All persons in the United States who currently
> own or lease one or more of the following GM vehicles:  Chevrolet
> Cobalt (2005-2010 model years); Chevrolet HHR (2006-2011
> model years); Pontiac G5 (2006-2007 model years); Pontiac
> Solstice (2006-2010 model years); Saturn Ion (2003-2007 model
> years); and Saturn Sky (2007-2010 model years).

> **Arkansas Sub-Class:**  All persons in the State of Arkansas who
> currently own or lease one or more of the following GM vehicles:
> Chevrolet Cobalt (2005-2010 model years); Chevrolet HHR (2006-
> 2011 model years); Pontiac G5 (2006-2007 model years); Pontiac
> Solstice (2006-2010 model years); Saturn Ions (2003-2007 model
> years); and Saturn Sky (2007-2010 model years).

15

57.     Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.  Also excluded are any individuals claiming damages from personal injuries allegedly arising from the Defective Vehicles.

58.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

59.     The Class can be readily identified using registration records, sales records, production records, and other information kept by Defendants in the usual course of business and within their control.

60.     The Class is so numerous that joinder of all Members is impracticable.  Upon information and belief, Defendants manufactured and sold millions of the Defective Vehicles nationwide.

61.     There are questions of law or fact common to the Class.  These questions include, but are not limited to, the following:

> a.     whether the Defective Vehicles suffer from ignition switch defects detailed in this Complaint;
>
> b.     whether Defendants knew or should have known about the ignition switch defects detailed in this Complaint;
>
> c.     if Defendants knew of the ignition switch defects detailed in this Complaint, how long Defendants knew of such defects;

d.      whether Defendants attempted to coneal the ignition switch defects

detailed in this Complaint from Plaintiff and Class members;

e.      whether Defendants misrepresented to Plaintiff and Class members that

the Defective Vehicles were safe;

f.      whether Defendants engaged in fraudulent concealment;

g.      whether Defendants engaged in unfair, deceptive, unlawful and/or

fraudulent acts or practices in trade or commerce by failing to disclose that

the Defective Vehicles were designed, manufactured, and sold with

defective ignition switches;

h.      whether the nature of the faulty ignition switches in the Defective

Vehicles constitutes a material fact reasonable consumers would have

considered in deciding whether to purchase a Defective Vehicle;

i.      whether Defendants had a duty to disclose the defective nature of the

Defective Vehicles to Plaintiff and Class Members;

j.      whether Defendants omitted and failed to disclose material facts about the

Defective Vehicles;

k.      whether Defendants' concealment of facts related to the Defective

Vehicles induced Plaintiff and Class members to act to their detriment by

purchasing the Defective Vehicles;

l.      whether Old GM's and GM's unlawful, unfair and/or deceptive practices

harmed Plaintiff and the members of the Class;

> m.    whether Defendants violated the Michigan Consumer Protection Act
> ("MCPA"), Mich. Comp. L. Ann. § 445.901, *et seq*. and, if so, what
> remedies are available under the MCPA;
>
> n.    whether Defendants violated the Arkansas Deceptive Trade Practices Act
> ("ADTPA"), Ark. Code Ann. § 4-88-101, *et seq*., and, if so, what remedies
> are available under the ADTPA;
>
> o.    whether, and to what extent, GM has successor liability for the acts and
> omissions of Old GM; and
>
> p.    whether Plaintiff and Class Members are entitled to damages, civil
> penalties, punitive damages, and/or injunctive relief.

62.    Plaintiff's claims are typical of the claims of the Class members and arise from the same course of conduct by Defendants.  The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

63.    Plaintiff will fairly and adequately represent and protect the interests of all absent Class members.  Plaintiff's interests do not conflict with the interests of the Class Members. Plaintiff is represented by counsel competent and experienced in product liability, vehicle defect, consumer protection, and class action litigation.

64.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Plaintiff anticipates providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

65.     Plaintiff asserts that pursuant to Fed. R. Civ. P. 23(b)(3), questions of law or fact

common to the Class members predominate over any questions affecting only individual

members.

66.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy since joinder of all the individual Class members is

impracticable.  Because the damages suffered by each individual Class member may be

relatively small, the expense and burden of individual litigation would make it very difficult or

impossible for individual Class members to redress the wrongs done to each of them

individually, and the burden imposed on the judicial system would be enormous.  The

prosecution of separate actions by the individual Class members would create a risk of

inconsistent or varying adjudications for individual Class members, which would establish

incompatible standards of conduct for GM.  The conduct of this action as a class action presents

far fewer management difficulties, conserves judicial resources and the parties' resources, and

protects the rights of each Class member.

## CAUSES OF ACTION

### COUNT ONE
**(Violations of the Michigan Consumer Protection Act,
MCLS § 445.901, *et seq*. (the "MCPA"))
(Brought on Behalf of the Class)**

67.     Plaintiff adopts and incorporates each and every allegation of this complaint as if

stated fully herein.

68.     Defendants and Plaintiff are each "persons" under MCLS § 445.902(d).

69.     The sale of the Defective Vehicles to Plaintiff and the Class was, at all times

relevant to this litigation, an act of "trade and commerce" within the meaning of MCLS §

445.902(g).

19

70.     As detailed throughout this Complaint, Defendants committed deceptive and unfair acts in the conduct of trade and commerce as defined in MCLS § 445.903(1). Specifically, Defendants violated MCLS § 445.903(1) where

a.     Defendants represented that the Defective Vehicles had approval, characteristics, uses, and benefits that they do not have;

b.     Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Defective Vehicles;

c.     Defendants represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were of another;

d.     Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Defective Vehicles, which did and tended to, mislead Plaintiffs and the Class about facts that could not reasonably be known by the consumer until the 2014 recalls;

e.     Defendants failed to reveal facts concerning the faulty ignition switch in the Defective Vehicles that were material to the transaction in light of representations of fact made in a positive manner;

f.     Defendants failed to reveal material facts concerning the faulty ignition switch in the Defective Vehicles to Plaintiffs and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiffs and the Class;

g.     Defendants made material representations and statements of fact to

Plaintiffs and the Class that resulted in Plaintiffs and the Class Members

reasonably believing the represented or suggested state of affairs to be

other than what they actually were; and

h.     Defendants intended that Plaintiffs and Class Members rely on their

misrepresentations and omissions, so that Plaintiffs and other Class

Members would purchase or lease the Defective Vehicles.

71.     Plaintiff and the Class have suffered an injury, including the loss of money and

property, as a result of Defendants' unfair, unlawful, and deceptive practices.  Defendants failed

to inform Plaintiff and Class members that its Defective Vehicles had a defective ignition switch

that could lead to injury or death.  Had Plaintiff and the Class known this, they either would not

have purchased their vehicles at all, or they would have paid less for them, and they would not

have retained their Defective Vehicles.  Plaintiff and the Class have therefore suffered a "loss"

because of the violations of the MCPA complained of herein.

72.     All of the wrongful conduct alleged herein occurred, and continues to occur, in

the conduct of the Defendants' business.

73.     Plaintiff requests that this Court enjoin GM from continuing its unfair, unlawful,

and deceptive practices; provide to Plaintiff and each Class member either their actual damages

as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member,

whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief

pursuant to MCLS § 445.911.

21

## COUNT TWO
### (Violations of the Arkansas Deceptive Trade Practices Act,
### Ark. Code Ann. § 4-88-101, *et seq.* (the "ADTPA"))
### (Brought on Behalf of the Arkansas Sub-Class)

74.     Plaintiff adopts and incorporates each and every allegation of this complaint as if stated fully herein.

75.     Defendants and Plaintiff are each "persons" under Ark. Code Ann. § 4-88-102(5).

76.     As detailed throughout this Complaint, Defendants committed deceptive and unfair acts in the conduct of trade and commerce as prohibited by Ark. Code Ann. § 4-88-107(a). Specifically, Defendants violated Ark. Code Ann. § 4-88-107(a) where

a.     Defendants represented that the Defective Vehicles had approval, characteristics, uses, and benefits that they do not have;

b.     Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Defective Vehicles;

c.     Defendants represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were of another;

d.     Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Defective Vehicles, which did and tended to, mislead Plaintiffs and the Class about facts that could not reasonably be known by the consumer until the 2014 recalls;

e.     Defendants failed to reveal facts concerning the faulty ignition switch in the Defective Vehicles that were material to the transaction in light of representations of fact made in a positive manner;

22

    f.       Defendants failed to reveal material facts concerning the faulty ignition switch in the Defective Vehicles to Plaintiffs and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiffs and the Class;

    g.      Defendants made material representations and statements of fact to Plaintiffs and the Class that resulted in Plaintiffs and the Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

    h.      Defendants intended that Plaintiffs and Class Members rely on their misrepresentations and omissions, so that Plaintiffs and other Class Members would purchase or lease the Defective Vehicles.

77.    Defendants' fraudulent conealment of material facts, as complained of herein, is also a violation of Ark. Code Ann. § 4-88-108.

78.    Plaintiff and the Class have suffered an injury, including the loss of money and property, as a result of Defendants' unfair, unlawful, and deceptive practices. Defendants failed to inform Plaintiff and Class members that its Defective Vehicles had a defective ignition switch that could lead to injury or death. Had Plaintiff and the Class known this, they either would not have purchased their vehicles at all or they would have paid less for them, and they would not have retained their Defective Vehicles. Plaintiff and the Class have therefore suffered a "loss" because of the violations of the ADTPA complained of herein.

79.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Defendants' business.

23

80.     Plaintiff requests that this Court enjoin GM from continuing its unfair, unlawful,
and deceptive practices, and award to Plaintiff and each Class member their actual damages as
the result of GM's unfair, unlawful, and deceptive trade practices, reasonable attorneys' fees, and
and other appropriate relief pursuant to Ark. Code Ann. § 4-88-113.

## COUNT THREE
### (Breach of Implied Warranty)
### (Brought on behalf of the Class)

81.     Plaintiff adopts and incorporates each and every allegation of this complaint as if
stated fully herein.

82.     The Defective Vehicles were defective at the time they left Defendants' control
and were not reasonably safe for the reasonably foreseeable uses to which they would be put.

83.     Defendants are in the business of manufacturing, designing, distributing,
marketing, selling and/or supplying into the stream of commerce the Defective Vehicles.

84.     At the time Defendants designed, manufactured, marketed, sold, and/or
distributed the Defective Vehicles, Defendants intended and impliedly warranted the Defective
Vehicles to be of merchantable quality and safe for such use.

85.     Plaintiff and Class members reasonably relied upon the skill and judgment of
Defendants as to whether Defective Vehicles were of merchantable quality and safe for their
intended use and upon Defendants' implied warranty as to such matters.

86.     Defendants breached their implied warranty in the design of Defective Vehicles
such that the damages suffered by Plaintiff and Class members were foreseeable by Defendants;
the likelihood of the occurrence of the damage suffered by Plaintiff and Class members was
foreseeable by Defendants at the time they distributed Defective Vehicles; there was a
reasonable alternative design available, and such alternative design was practicable and would
have reduced the foreseeable risk of harm posed by Defendants' Defective Vehicles; and

24

Defendants' failure to adopt the available and practicable reasonable alternative design rendered Defendants' Defective Vehicles not reasonably safe for use by a consumer.

87.    Defendants breached their implied warranty in the manufacturing of Defective Vehicles such that the Defective Vehicles were unreasonably dangerous, not fit for the ordinary purpose for which they were intended, and not manufactured in such a way as to eliminate unreasonable risks of foreseeable injury. Furthermore, Defendants failed to make reasonable inspections or conduct adequate testing of Defective Vehicles. Despite knowing of the problems associated with the Defective Vehicles, Defendants took no action for approximately thirteen years to cure or disclose the defects.

88.    Defendants breached their implied warranty in the labeling of Defective Vehicles such that Defendants knew or should have known that the products were unreasonably dangerous and created significant risks of serious harm and/or death, yet they failed to provide adequate warnings to consumers of such significant risks of serious harm and/or death.

89.    The Defective Vehicles manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants were defective in their manufacture, construction, design, and labeling as described above at the time they left Defendants' control.

90.    As a direct and proximate result of Plaintiff's and Class members' purchase, use and ownership of Defective Vehicles as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendants, Plaintiff and Class members have suffered harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

91.    The defects at issue herein were a legal and/or proximate cause of Plaintiff's and Class members' harm, damages, and economic loss.

92.     Neither Plaintiff nor Class member knew that the Defective Vehicles were
defective and dangerous until after purchase.

93.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class
members suffered the injuries and compensable damages in an amount to be determined at trial.

## COUNT FOUR
### (Breach of Implied Warranty of Fitness for a Particular Purpose)
### (Brought on behalf of the Class)

94.     Plaintiff adopts and incorporates each and every allegation of this complaint as if
stated fully herein.

95.     Defendants knew at the time they sold vehicles to Plaintiff and Class members
that such vehicles would be used for the specific purpose of, among other things, providing safe
transportation.

96.     Defendants knew at the time they manufactured and sold vehicles to Plaintiff and
Class members that those individuals chose to buy their vehicles from Defendants at least in part
because of the reputation of Defendants' cars and trucks as safe vehicles with high resale value.

97.     Defendants knew that Plaintiff and Class members were relying on Defendants'
skill and judgment in manufacturing vehicles that were purportedly suitable for providing safe
transportation and that enjoyed high resale value.

98.     Defendants breached the implied warranty of fitness for a particular purpose
because the Defective Vehicles contained an unreasonably dangerous condition and were not
suitable for providing safe transportation. Likewise, the unreasonably dangerous condition of the
Defective Vehicles has resulted in a substantial diminishment in their resale value.

99.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class
members suffered injuries and compensable damages in an amount to be determined at trial.

**COUNT FIVE**
**(Unjust Enrichment)**
**(Brought on behalf of the Class)**

100.    Plaintiff adopts and incorporates each and every allegation of this complaint as if stated fully herein.

101.    As a result of Defendants' wrongful conduct as described herein, Defendants were enriched at the expense of Plaintiffs and the Class, through the receipt of money from the purchase, sale and/or lease of the Defective Vehicles as described herein.

102.    Under these circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten monies that it received from Plaintiff and the Class. Because the Defective Vehicles were not safe and reliable as represented by Defendants, it would be unjust and inequitable for GM to retain the benefit of enrichment through the sale of a known Defective Vehicle. Plaintiff and the Class seek restitution for the monies received by Defendants for the sale or lease of the Defective Vehicles.

**COUNT SIX**
**(Fraudulent Concealment)**
**(Brought on behalf of the Class)**

103.    Plaintiff adopts and incorporates each and every allegation of this complaint as if stated fully herein.

104.    Defendants concealed and suppressed material facts concerning the ignition switch in the Defective Vehicles.

105.    GM has successor liability for the acts of concealment and suppression of material facts of Old GM as set forth in paragraphs 13-17, *supra*.

27

106.    Defendants had a duty to disclose the ignition switch defects in the Defective Vehicles.  Defendant knew that such knowledge was not known or reasonably discoverable by Plaintiff and the Class.

107.    Defendants' omissions were material because they directly implicate the safety of the Defective Vehicles.  Whether a vehicle has an increased risk of losing power to the motor and/or major electrical systems in the course of driving is a material safety concern.

108.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and avoid a costly recall, and they did so at the expense of Plaintiff and the Class.

109.    On information and belief, Defendants have still not made full and adequate disclosure with regard to the full extent of affected Defective Vehicles.

110.    Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiff's and the Class's actions were justified.

111.    Because of the concealment and/or suppression of material facts, Plaintiff and the Class sustained damage because, *inter alia*, they purchased and retained vehicles that are now diminished in value from what they would have been had Defendants timely disclosed the ignition switch defects.

112.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiff's and the Class's rights and well-being, and for the sole purpose of enriching Defendants.  Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, in an amount to be determined according to proof at trial.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of the Class he seeks to represent, demands a jury on any issue so triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, requests judgment be entered against Defendant and that the Court grant the following:

1. An order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff is a proper class representative, that Plaintiff's attorneys be appointed Class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and that Class notice be promptly issued;

2. Judgment against Defendant for Plaintiff's and Class Members' asserted causes of action;

3. Appropriate declaratory relief against Defendant;

4. Preliminary and permanent injunctive relief against Defendant;

5. Equitable relief in the form of restitution and disgorgement of revenues wrongfully obtained as a result of Defendant's wrongful conduct;

6. An award of actual damages and compensatory damages in an amount to be determined;

7. An award of punitive damages;

8. An award of reasonable attorney's fees and other litigation costs reasonably incurred; and

9. Any and all relief to which Plaintiff and the Class may be entitled.

DATED:  May 20, 2014                   Respectfully submitted,


                                       BY: _____
                                           David F. Slade, ABN 2013143
                                           Randall K. Pulliam, ABN 98105
                                           Allen Carney, ABN 94122
                                           Hank Bates, ABN 98063
                                           CARNEY BATES & PULLIAM, PLLC
                                           11311 Arcade Drive, Suite 200
                                           Little Rock, AR 72212
                                           Telephone:  501.312.8500
                                           Facsimile:  501.312.8505
                                           dslade@cbplaw.com
                                           rpulliam@cbplaw.com
                                           acarney@cbplaw.com
                                           hbates@cbplaw.com


                                       *Attorney for Plaintiff Drew Higginbotham*