# Exhibit A

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI**

VICKIE SMITH, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

GENERAL MOTORS, LLC, GENERAL MOTORS HOLDING, LLC, GENERAL MOTORS CORPORATION, DELPHI AUTOMOTIVE PLC, and DPH-DAS, LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC,

Defendants.

CIVIL ACTION NO. 3:14cv120-SA-SAA

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

SECTION: Oxford Division
DISTRICT JUDGE: Aycock
MAGISTRATE: Alexander

**CLASS ACTION COMPLAINT**

Plaintiff Vickie Smith brings this action behalf of herself and all other persons similarly situated who purchased or leased vehicles manufactured, distributed, and/or sold by GENERAL MOTORS LLC, GENERAL MOTORS HOLDING, LLC, GENERAL MOTORS CORPORATION, GENERAL MOTORS COMPANY, and/or its related subsidiaries, successors, or affiliates ("GM") with defective ignition switches manufactured by DELPHI AUTOMOTIVE PLC, DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC, and/or its related subsidiaries, successors, or affiliates ("Delphi"), as described below.

**INTRODUCTION**

1. This case involves an egregious and unprecedented failure to disclose and to affirmatively conceal a known defect in GM vehicles.

2. An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public. GM's

Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our customers in the vehicles they drive." Yet GM failed to live up to this commitment.

3.      The first priority of a car manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision. In addition, a car manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely, and its critical safety systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.

4.       Moreover, a manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

5.      Since at least 2003, GM has sold millions of vehicles throughout the United States and worldwide that have a safety defect in which the vehicle's ignition switch can inadvertently move from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

6.      There are at least two main reasons why the GM ignition switch systems are defective.  The first is that the ignition switch is simply weak and therefore does not hold the key in place in the "run" position.  On information and belief, the ignition switch weakness is due to a defective part known as a "detent plunger."

7.      The second reason that the ignition switch systems are defective is due to the low position of the switches in the GM vehicles referenced below. That causes the keys, and the fobs

that hang off the keys, to hang so low in the GM vehicles that the drivers' knees can easily bump them and inadvertently shut down the vehicle.

8.      As used in this complaint, the "Defective Vehicles" refers to the GM vehicles sold in the United States that have defective ignition switches, including the following makes and model years:

- 2005 - 2010 Chevrolet Cobalt
- 2006 - 2011 Chevrolet HHR
- 2006 - 2010 Pontiac Solstice
- 2003 - 2007 Saturn Ion
- 2007 - 2010 Saturn Sky
- 2005 - 2010 Pontiac G5

9.      Because of defects in their design, manufacture, and/or assembly, the ignition switch installed in the Defective Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position.

10.      Because of its faulty design and improper positioning, the ignition switch can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "accessory" position (the "Ignition Switch Defect"), which can occur at any time during normal and proper operation of the Defective Vehicles, meaning the ignition can suddenly switch off while it is moving at 65mph on the freeway, leaving the driver unable to control the vehicle.

11. GM installed these defective ignition switch systems in models from at least 2003 through at least 2011. GM promised that these vehicles would operate safely and reliably. This promise turned out to be false in several material respects. In reality, GM concealed and did not fix a serious quality and safety problem plaguing its vehicles.

12. To the extent warranted by the developing facts, Plaintiff will further supplement the list of Defective Vehicles to include additional GM vehicles that have the Ignition Switch Defect, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment.

13. More importantly, the Ignition Switch Defect in GM's vehicles could have been easily avoided. From at least 2005 to the present, GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its ignition switch system.

14. GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths. GM has refused, however, to disclose the identities of those it counts among these thirteen deaths. ( I'm not sure what the previous sentence is saying.) Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Defective Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Defective Vehicle models is expected to be much higher.

15. Despite the dangerous nature of this defect and its effects on critical safety systems, GM concealed its existence and did not disclose to consumers that its vehicles – which GM for years had advertised as "safe" and "reliable" – were in fact neither safe nor reliable.

16. This case arises from GM's breach of its obligations and duties, including GM's failure to disclose that, as a result of the Ignition Switch Defect, at least 2.6 million GM vehicles (and almost certainly more) may have the propensity to shut down during normal driving

conditions and create an extreme and unreasonable risk of accident, serious bodily harm, and death.

17.     Many of the Defective Vehicles were originally designed, manufactured, marketed, and placed into the stream of commerce by GM's predecessor. GM's predecessor, General Motors Corporation (referred to as "Old GM"), also violated these obligations and duties by designing and marketing vehicles with defective ignition switch systems, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents. In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the Ignition Switch Defects.

18.     Old GM filed for bankruptcy in 2009.  In July 2009, the bankruptcy court approved the sale of GM's predecessor to GM.  Notwithstanding the prior bankruptcy or contractual obligations under the sale agreement, GM is liable for its own conduct.  From its inception in 2009 and while extolling the safety and reliability of its vehicles, GM had its own independent knowledge of the defects in its vehicles, yet chose to conceal them.

19.     Specifically, GM has actual knowledge that, because of the way in which the ignition was designed and integrated into the Defective Vehicles, the ignition switch can suddenly fail during normal operation, cutting off engine power and certain electrical systems in the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

20.     The defective ignition switches were manufactured by Delphi Automotive PLC is this supposed to be LLC rather than PLC?? ("Delphi").  Once a subsidiary of General Motors

Corporation, Delphi spun off from General Motors Corporation in 1999, and became an independent publicly held corporation.

21. Upon information and belief, Delphi knew the ignition switches were defectively designed, but nonetheless continued to manufacture and sell the defective ignition switches with the knowledge that they would be used in GM vehicles, including the Defective Vehicles.

22. Although GM and Delphi had, and have had, actual knowledge of safety defects in the Defective Vehicles for years, they fraudulently concealed and continue to fraudulently conceal material facts regarding the extent and nature of safety defects in the Defective Vehicles and what must be done to remedy the defects.

23. GM has not only fraudulently concealed material facts relating to the safety defects in the Defective Vehicles for years, but it has also made affirmative fraudulent and misleading statements, and it is continuing to make fraudulent and misleading statements to the public and to Plaintiff regarding the nature and extent of the safety defects in the Defective Vehicles.

24. Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect.[2] If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[3]

25. GM also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects. These same acts and omissions also violated various State consumer protection laws as detailed below.

---

1 49 U.S.C.§§ 30101-30170

2 49 U.S.C. § 30118(c)(l) & (2).

3 49 U.S.C. § 30118(b)(2)(A) & (B)

26.     Plaintiff brings this action on behalf of herself and all persons in the United States who currently own or lease one or more of the Defective Vehicles, with the subject ignition switches (herein referred to as "Class Members").

27.     In the alternative to their nationwide class claims, Plaintiff also brings claims under the laws of the States that have consumer protection statutes on behalf of the respective residents of each of those States who currently own or lease one or more of the Defective Vehicles.

28.     All Class Members were placed at risk by the Ignition Switch Defect from the moment they first drove their vehicles. The Ignition Switch Defect precludes all Class Members from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Class Members and other vehicle occupants. However, no Class Members knew, or could reasonably have discovered, the Ignition Switch Defect, prior to it manifesting in a sudden and dangerous failure.

29.     Upon information and belief, prior to the sale of the Defective Vehicles, GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from GM dealers; and accident data. Yet, despite this knowledge, GM failed to disclose and actively concealed the Ignition Switch Defect from Class Members and the public, and continued to market and advertise the Defective Vehicles as reliable and safe vehicles, which they are not.

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 8 of 49 PageID #: 8

30. As a result of GM's alleged misconduct, Plaintiff and Class Members were harmed and suffered actual damages, in that the Defective Vehicles are unsafe, unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition Switch Defect by way of a sudden and dangerous failure that puts them and others at serious risk of injury or death. Plaintiff and the Class did not receive the benefit of their bargain as purchasers and lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Plaintiff and Class Members did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car—such as the Defective Vehicles—that is known to contain a safety defect such as the Ignition Switch Defect.

31. As a result, all purchasers of the Defective Vehicles overpaid for their cars at the time of purchase. Furthermore, GM's public disclosure of the Ignition Switch Defect has further caused the value of the Defective Vehicles to materially diminish. Purchasers or lessees of the Defective Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Ignition Switch Defect been disclosed.

32. Plaintiff and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Defective Vehicles they purchased or leased are worth less than they would have been without the ignition switch defects.

33.     Further, and in spite of GM's belated recall of the Defective Vehicles, litigation is necessary in order to ensure that Class Members receive full and fair compensation, under the auspices of court order, for their injuries.

**PARTIES**

34.     Plaintiff Vickie Smith is a citizen of the state of Mississippi and resides in Senatobia, MS.  Ms. Smith owns a 2005 Chevrolet Cobalt, which she purchased new at Heafner Motors, in Batesville, Mississippi.  Ms. Smith's Cobalt was manufactured, sold, distributed, advertised, marketed, and warranted by GM, and bears the Vehicle Identification No. 1G1AK52F557607127.  Ms. Smith purchased her GM vehicle primarily for her personal, family, and household use.  Ms. Smith has experienced several incidents consistent with the ignition defects at issue as well as other problems such as electrical power outages and loss of power steering.  Plaintiff Smith did not learn of the ignition switch defects until about March 2014.  Had GM disclosed the ignition switch defects, Plaintiff Smith would not have purchased her Chevrolet Cobalt, or would have paid less than she did, and would not have retained the vehicle.

35.     General Motors Corporation was a Delaware corporation with its headquarters in Detroit, Michigan.  The Corporation through its various entities designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles in Mississippi and multiple other locations in the United States and worldwide.  General Motors Corporation is registered in the State of Mississippi and with it registered agent of process being CT Corporation System, 645 Lakeland Dr., Ste 101, Flowood, MS 39232.

36.     In 2009, General Motors Corporation ("Old GM") filed for bankruptcy, and substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to General Motors LLC ("GM")

37.     Under the Agreement, General Motors LLC also expressly assumed certain liabilities of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

In addition, General Motors LLC expressly set forth that it:

> shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [General Motors Corporation] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

38.     Because GM acquired and operated General Motors Corporation and ran it as a continuing business enterprise, and because GM was aware from its inception of the Ignition Switch Defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

39.     General Motors LLC is a Delaware corporation with its headquarters in Detroit, Michigan.  General Motors LLC is registered with the Secretary of State and conducts business in all fifty states (including the District of Columbia).   GM was incorporated in 2009 and on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

40.     At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing

automobiles, including the Defective Vehicles, and other motor vehicles and motor vehicle components throughout the United States.

41. Delphi Automotive PLC is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Defendant, DPH-DAS LLC ("Delphi") f/k/a Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan.

42. Delphi began as a wholly-owned subsidiary of General Motors Corporation, until it was launched as an independent publicly-held corporation in 1999.

43. In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi plants to assist with its post-bankruptcy restructuring. In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

44. At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

45. GM and Delphi are collectively referred to in this Complaint as "Defendants".

**<u>JURISDICTION AND VENUE</u>**

46. This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other Class members are citizens of a different state than Defendants.

47. This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

48. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants, as corporations, are deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, Defendants transact business within the District, and some of the events establishing the claims arose in this District.

## FACTUAL ALLEGATIONS

***The Defective Vehicles***

49. The Saturn Ion was a compact car first introduced in 2002 for the 2003 model year, and was discontinued in 2007.

50. The Chevrolet Cobalt was a compact car first introduced in 2004 for the 2005 model year, and was discontinued in 2010.

51. The Pontiac G5 was first introduced in 2004 for the 2005 model year, and was discontinued in 2009. The coupe and four-door sedan version of the G5 was marketed in Canada from 2005 to 2010, but is not a vehicle at issue in this action.

52. The Chevrolet HHR was a compact car first introduced in 2005 for the 2006 model year, and was discontinued in 2011.

53. The Pontiac Solstice was a sports car first introduced in 2005 for the 2006 model year, and was discontinued in 2009.

54. The Saturn Sky was first introduced in 2006 for the 2007 model year, and was discontinued in 2009.

55. The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

56. The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

57. Upon information and belief, GM promoted these Defective Vehicles as safe and reliable in numerous marketing and advertising materials.

58. No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time or purchase or lease.

***GM Field Reports and Internal Testing Reveal a Problem***

59. In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position. In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

60. In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving." There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch" and replaced the switch and closed the matter.

61. GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate

a number of solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

62. After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents of sudden loss of engine power. GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

63. Additional PRTSs were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition. Although GM initially approved the design, the company once again declined to act.

64. In testimony April 1, 2014, before the House Committee on Energy and Commerce, GM CEO Mary Barra explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision-making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

65. In April 2006, GM finally approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number. GM estimates that Delphi began producing the redesigned ignition switch for all

Subject Vehicles during the 2007 model year. On information and belief, this redesigned
ignition switch did not cure the defect in the original switch and also did not meet design
specifications.

66.    Delphi assigned its newly designed switch the same part number assigned to the
faulty ignition switch. Upon information and belief, Delphi's action was intended to make it
difficult to trace the defective switch back to its original design in 2001.

67.    After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing
the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM
instituted the change after finding that consumers "with substantially weighted key
chains/additional keys hanging from ignition key have experienced accidental ignition shut-off"
and the design change was intended to "significantly reduce downward force and the likelihood
of this occurrence." The new key design was produced for the 2010 model year. On information
and belief, this redesigned ignition switch did not cure the defect in the original switch and also
did not meet design specifications.

68.    According to Delphi, the component required to fix the Ignition Switch Defect
costs approximately $2 to $5. GM management estimated that replacement components would
cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

69.    GM also now acknowledges that Field Product Reports and PRTS reports related
to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may
be related to the Ignition Switch Defect.

***GM Issues Information Service Bulletins***

70.    In 2005, as a result of internal investigation, GM issued an Information Service
Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical

System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch. The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

71. The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning." GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain." The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

72. On July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present." Adler advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

73. The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead." She was able to safely coast to the side of the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing

was found wrong and they were advised of the service bulletin. The reporter stated that the key chain being used at the time of the stalling incident was provided by GM, and included only the key fob and a tag.

74. GM, in a statement at the time through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition...."

75. In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007A) to include additional vehicles and model years. Specifically, GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky. The updated bulletin included the same service advisories to GM dealers as the earlier version.

76. According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

***Reports of Unintended Engine Shut Down***

77. A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles." Despite these reports, the Saturn Ion remained in production until 2007.

78. On May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

***Crash Reports and Data***

79. The Defendants knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

80. National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

81. In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

82. In 2006, there were at least two fatalities associated with a Chevrolet Cobalt crash. Information from the car's data recorder indicated that the ignition switch was in "accessory" instead of run, and the front airbags failed to deploy.

83. In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

84. In 2007, NHTSA's early warning division reviewed available data provided by GM on airbag non-deployments in Chevrolet Cobalt vehicles. This review identified 43 incidents in which airbags may not have deployed in a crash. The early warning division referred the case to NHTSA's data analysis division for further screening. A defects panel was convened, but after

reviewing the data and consulting with GM, the panel ultimately concluded that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect trend that would warrant the agency opening a formal investigation." In prepared remarks delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the information that GM has since provided—for instance, new evidence linking airbag non- deployment to faulty ignition switches."

85. GM has identified 23 frontal-impact crashes in the United States involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy.

86. GM has identified 8 frontal-impact crashes in the United States involving 2003 to 2007 Saturn Ion vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in four fatalities and six injuries to occupants.

87. GM has identified 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Ignition Switch Defect may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in three injuries to occupants.

***GM's Belated Repair Recall of Some Vehicles***

88. On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The notice identified that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or

experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight.

89. The notice also did not identify all the vehicles affected by the Ignition Switch Defect.

90. The notice failed to indicate the full extent to which GM has been aware of the Defect. The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

91. In a February 24, 2014 letter to the NHTSA, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

92. On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect. Specifically, GM identified the 2003 to 2007 model years of the Saturn Ion, 2006 and 2007 model years of the Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007 model year of Saturn Sky vehicles.

93. According to the NHTSA Acting Administrator David Friedman, the chronology information provided by GM on February 24, 2014 "raise[d] serious questions as to the timeliness of GM's recall." Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 21 of 49 PageID #: 21

94. On March 4, 2014, the NTHSA issued GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

95. On March 11, 2014, GM filed a new Part 573 report superseding its February 25, 2014 filing. The new chronology provided with the report indicated that GM was aware of the Ignition Switch Defect in 2001—significantly earlier than its previous 2004 disclosure. GM now indicated that it had a report from 2001 that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

96. On March 28, 2014, GM filed a new Part 573 report, which expanded the recall set forth in its February 25, 2014 filing. GM's March 28, 2014 report indicated that several additional model year vehicles may be affected by the Ignition Switch Defect. GM identified those vehicles as the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac Solstice, 2008-2010 Pontiac G5, and 2008-2010 Saturn Sky. The March 28, 2014 report added over one million vehicles to the total affected by the Ignition Switch Defect, including the vehicle owned by Plaintiff.

97. GM notified dealers of the Defective Vehicles of the recall in February and March 2014. GM also notified owners of the Defective Vehicles by letter of the recall. The letter minimized the risk of the defect, indicating that the Ignition Switch Defect would occur only "under certain conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 22 of 49 PageID #: 22

98. GM has advised the public that it "plans to produce enough repair parts by October to have the ability to repair the majority of the vehicles impacted by the ignition switch recalls."

***GM Pays Record Civil Fine in Response to Congressional Investigation***

99. In response to the Special Order request from NTHSA, GM provided over 200,000 pages of information. The government's review of these internal company documents showed that GM had known since at least November 2009 that defective ignition switches were prone to turn off, preventing the air bags from working. David Friedman, head of the NTHSA said the investigation found "deeply disturbing" evidence over how GM treated safety concerns.

100. Mr. Friedman cited an internal presentation from 2008 that was used to train employees to obscure some safety problems. GM workers writing reports were encouraged to avoid using certain words and phrases with negative overtones, including "apocalyptic," "dangerous," "death trap, "potentially disfiguring," "rolling sarcophagus," and "Corvair-like," as well as more benign phrases like "safety" and "safety related" to describe design defects and safety problems.

101. On May 16, 2014, the Department of Transportation announced that GM would pay a $35 million penalty for delays in reporting the defect — "the single highest civil penalty amount ever paid as a result of a [National Highway Traffic Safety Administration] investigation of violations stemming from a recall." U.S. Secretary of Transportation Anthony Foxx Anthony stated that "GM did not act and did not alert us in a timely manner. What GM did was break the law. They failed to make their public safety obligations . . . ." The NHTSA has stated that their review of GM found "systemic" issues regarding how information was shared and the Recall unfolded, and that it was "hard to point to one single fault." Apart from the penalty, GM will be

now be subject to "unprecedented oversight" as a result of the NHTSA's investigation of the Recall.

102. As part of GM's settlement and Consent Decree Order, GM admitted that it failed to comply with federal law that requires automakers to alert NHTSA within five business days of learning about a safety-related defect.

103. Mr. Friedman also stated, "No excuse, process, or organizational structure will be allowed to stand in the way of any company meeting their obligation to quickly find and fix safety issues in a vehicle. It's critical to the safety of the driving public that manufacturers promptly report and remedy safety-related defects that have the potential to lead to deaths or injuries on our nation's highways."

**SUCCESSOR LIABILITY**

104. As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure and concealment of the ignition switch defects from the date of its formation on July 10, 2009.

105. GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

a) GM admits that it knew of the ignition system defects from the very date of its formation;

b) GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as its predecessor, Old GM;

c) GM retained the bulk of the employees of its predecessor, Old GM;

    d)      GM acquired owned and leased real property of its predecessor, Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

    e)      GM acquired the contracts, books, and records of its predecessor, Old GM; and

    f)      GM acquired all goodwill and other intangible personal property of its predecessor, Old GM.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment Tolling

106.    Upon information and belief, GM has known of the Ignition Switch Defect in the vehicles since at least 2001, and certainly well before Plaintiff and Class Members purchased the Defective Vehicles, and has concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the Ignitions Switch Defect, even when directly asked about it by Class Members during communications with GM and GM dealers.

107.    Although GM has now acknowledged that "[t]here is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine," GM did not fully disclose the Ignition Switch Defect and in fact downplayed the widespread prevalence of the problem, and minimized the risk of the Defect occurring during normal operation of the Defective Vehicles.

108.    In 2005, GM issued a Technical Service Bulletin to dealers and service technicians directing that customers be advised to "remove unessential items from their key chains" to avoid inadvertent ignition switching, but did not identify or disclose the Defect.

109.    GM also stated, in 2005, that it was "rare" for the Ignition Switches in the Defective Vehicles to unintentionally move from the "on" position to the "accessory" or "off" position. GM knew that this statement was untrue, but issued the statement to exclude suspicion and preclude inquiry.

110.    In 2007 and 2010, GM withheld information from the NHTSA when it knew that the NHTSA was investigating airbag non-deployment in certain GM vehicles. Indeed, NHTSA's understood that airbag systems "were designed to continue to function in the event of a power loss during a crash." This understanding was confirmed by available GM service literature reviewed during NHTSA's due diligence effort. GM, however, had evidence that power loss caused by the Ignition Switch Defect could also prevent the deployment of airbags. Despite its knowledge and familiarity with NHTSA's investigation, GM withheld this information, which delayed its recall by several years.

111.    In February 2014, GM instituted only a limited recall, only identifying two of the several models with the Ignition Switch Defect. Likewise, the later recall expanded to include five additional model years and makes does not fully disclose all the vehicles affected by the Ignition Switch Defect. On March 28, 2014, GM expanded the recall yet again to include all model years of each vehicle affected by the ignition switch recall. GM has revealed the scope of the recall in a hazardous, piecemeal fashion, under duress from Congress and intense consumer backlash.

112.    Upon information and belief, there are other GM vehicles that have the Ignition Switch Defect that have not yet been disclosed by GM.

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 26 of 49 PageID #: 26

113. As GM CEO Mary Barra explained during testimony before the House Committee on Energy and Commerce on April 1, 2014, GM's active concealment of the Ignition Switch Defect was the result of a "cost culture" versus one that placed an emphasis on safety.

114. Pursuant to 49 U.S.C. § 30118(c), GM was obligated and had a duty to disclose the Ignition Switch Defect to the NHTSA when it learned of the defect and/or decided in good faith that the Defective Vehicles did not comply with an applicable motor vehicle safety standard.

115. Any applicable statute of limitation has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**Estoppel**

116. GM was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the vehicles. GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiff and Class Members reasonably relied upon GM's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

**Discovery Rule**

117. The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their vehicles had the Ignition Switch Defect.

118. However, Plaintiff and Class Members had no realistic ability to discern that the vehicles were defective until—at the earliest—after the Ignition Switch Defect caused a sudden unintended ignition shut off. Even then, Plaintiff and Class Members had no reason to know the

sudden loss of power was caused by a defect in the ignition switch because of GM's active concealment of the Ignition Switch Defect.

119. Not only did GM fail to notify Plaintiff or Class Members about the Ignition Switch Defect, GM in fact denied any knowledge of or responsibility for the Ignition Switch Defect when directly asked about it. Thus, Plaintiff and Class Members were not reasonably able to discover the Ignition Switch Defect until after they had purchased the vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Ignition Switch Defect caused their vehicles to suddenly lose power.

## CLASS ALLEGATIONS

120. Plaintiff brings this lawsuit as a class action on behalf of herself and all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or c(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

121. The proposed nationwide class is defined as:

### Nationwide Class

> All persons in the United States who purchased or leased a GM Defective Vehicle: (2005-2010 Chevrolet Cobalt; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; 2003-2007 Saturn Ion; 2007-2010 Saturn Sky; and 2005-2010 Pontiac G5) and any other GM vehicle model containing the same ignition switch as those Defective Vehicle models (Class Members).
>
> This list will be supplemented to include additional GM vehicles that have the defective ignition switches which inadvertently turn off the engine and vehicle electrical systems during ordinary driving conditions.

122. In addition to, and in the alternative Plaintiff brings this action on behalf of the following State Classes:

**Mississippi:**   All Class Members who purchased or leased a Defective Vehicle in the
State of Mississippi ("Mississippi Class").

123.   Excluded from this Class are: (1) Defendants, any entity or division in which
Defendants have a controlling interest, and their legal representatives, officers, directors, assigns,
and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3)
governmental entities; and (4) those persons who have suffered personal injuries as a result of
the facts alleged herein.  Plaintiff reserves the right to amend the Class definition if discovery
and further investigation reveal that the Class should be expanded, divided into additional
subclasses, or modified in any other way.

124.   **Numerosity.** Although the exact number of Class Members is uncertain and can
only be ascertained through appropriate discovery, the number is great enough such that joinder
is impracticable. The disposition of the claims of these Class Members in a single action will
provide substantial benefits to all parties and to the Court.  Class Members are readily
identifiable from information and records in GM's possession, custody, or control.

125.   **Typicality.** The claims of the representative Plaintiff are typical of the claims of
the Class in that the representative Plaintiff, like all Class Members, purchased or leased a GM
Defective Vehicle designed, manufactured, and distributed by Defendants. The representative
Plaintiff, like all Class Members, have been damaged by Defendants' misconduct in that they
have incurred costs relating to the Ignition Switch Defect. Neither Plaintiff nor the Class
members would have purchased the Defective Vehicles had they known of the defects in the
vehicles.  Furthermore, the factual bases of Defendants' misconduct are common to all Class
Members and represent a common thread of misconduct resulting in injury to all Class Members.

126.   **Commonality.** Common questions of law and fact exist as to Plaintiff and Class
Members that predominate over any question affecting only individual Class Members, the

answers to which will advance resolution of the litigation as to all Class Members. Such common legal and factual issues include, but are not limited to:

a. whether the GM Vehicles suffer from the Ignition Switch Defect;

b. whether Defendants knew or should have known about the Ignition Switch Defect, and, if yes, how long Defendants have known of the Defect;

c. whether GM and its predecessor had knowledge of the Ignition Switch Defect prior to its issuance of the current safety recall;

d. whether GM and its predecessor concealed defects affecting the Defective Vehicles;

e. whether GM and its predecessor's misrepresentations and omissions regarding the safety and quality of its vehicles were likely to deceive a reasonable person;

f. whether GM and its predecessor breached its applicable warranties;

g. whether the defective nature of the GM Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase or lease a GM Vehicle;

h. whether GM had a duty to disclose the defective nature of the Subject Vehicles to Plaintiff and Class Members;

i. whether GM omitted and failed to disclose material facts about the Defective Vehicles;

j. whether GM concealment of the true defective nature of the Defective Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing or leasing the Vehicles;

    k.   whether GM violated state consumer protection statutes, including, *inter alia*, the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. L. Ann. § 445.903 *et seq.,* and if so, what remedies are available under § 445.911;

    l.   whether GM violated various state consumer protection statutes;

    m.   whether the Defective Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

    n.   whether Plaintiff and Class Members are entitled to a declaratory judgment stating that the ignition switches in the Defective Vehicles are defective and/or not merchantable;

    o.   whether GM should be declared responsible for notifying all Class Members of the defect and ensuring that all GM vehicles with the Ignition Switch Defect are recalled and repaired;

    p.   whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

    q.   whether injunctive relief enjoining the reoccurrence of Defendant's conduct and/or declaratory relief that such conduct is unlawful, is warranted.

127.   **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel has interests adverse to those of the Class.

128.   **Declaratory and Injunctive Relief.** GM has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Nationwide and Statewide Classes,

thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members as a whole.

129. **Superiority.** Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

130. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

131. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

132. Defendants have acted in a uniform manner with respect to the Plaintiff and Class Members as all Class Members have received for all intents and purposes the identical Important Safety Recall letter from GM in accordance with the National Traffic and Motor Vehicle Safety Act.

133. Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 32 of 49 PageID #: 32

incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Classwide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Ignition Switch Defect.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

***Asserted on Behalf of the Nationwide Class***

**Violation of the Magnuson-Moss Warranty Act,**
**15 U.S.C. §§ 2301 *et seq.* ("MMWA")**

134. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

135. This Claim is brought against GM on behalf of the Nationwide Class.

136. At all times relevant hereto, there was in full force and effect the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. (MMWA").

137. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

138. Plaintiff and Class Members are consumers as defined in 15 U.S.C. § 2301(3). They are consumers because they are person entitled under applicable state law to enforce against the warrantor the obligations of its implied warranty.

139. The Defective Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

140. GM is a supplier and warrantor as defined in 15 U.S.C. § 2301(4)-(5).

141.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by failure of a warrantor to comply with a written or implied warranty. GM breached these warranties as described in more detail herein.

142.   Pursuant to 15 U.S.C. § 2310(e), Plaintiff and Class Members are entitled to bring this class action and are not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

143.   In connection with its sales of the Defective Vehicles, GM gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As a part of the implied warranty of merchantability, GM warranted that the Defective Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, marketed, and were adequately contained, packaged, and labeled.

144.   GM is liable to Plaintiff and the Class Members pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability.

145.   GM breached its implied warranty of merchantability to Plaintiff and the Class Members because the Defective Vehicles were not fit for the ordinary purposes for which they are used—namely, as safe passenger motor vehicles. The Ignition Switch Defect, which affects ignition switch systems in the Defective Vehicles, may, among other things, result in the vehicle's airbags not deploying in a crash event, increasing the potential for occupant injury or death. This safety defect makes the Defective Vehicles unfit for their ordinary purpose of providing safe transportation.

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 34 of 49 PageID #: 34

146. GM further breached its implied warranty of merchantability to Plaintiff and the Class Members because the Defective Vehicles would not pass without objection in the trade, as they contained a defect that relates to motor vehicle safety due to the Ignition Switch Defect in each of the Defective Vehicles.

147. GM further breached its implied warranty of merchantability to Plaintiff and the Class Members because the Defective Vehicles were not adequately contained, packaged, and labeled. The directions and warnings that accompanied the Defective Vehicles did not adequately instruct Plaintiff and Class Members on the proper use of the Defective Vehicles in light of the Ignition Switch Defect, or adequately warn Plaintiff and Class Members of the dangers of improper use of the Defective Vehicles.

148. At the time of the delivery of the Defective Vehicles, GM did not provide instructions and warnings to Plaintiff and Class Members to not place extra weight on their vehicles' key chains, including a fob or extra keys. According to GM, placing extra weight on the vehicles' key chain increases the chances that the ignition switch will unintentionally move from the "on" position to the "accessory" or "off" position.

149. At the time of the delivery of the Defective Vehicles, GM did not provide instructions and warnings to Plaintiff and Class Members to avoid rough, bumpy, and uneven terrain while driving their vehicles. Traveling across such terrain increases the chances that the ignition switch in the Defective Vehicles will unintentionally move from the "on" position and into the "accessory" or "off" position, especially when the key chains were weighted down with a fob, additional keys or other items.

150. At the time of the delivery of the Defective Vehicles, GM did not provide instructions and warnings to Plaintiff and Class Members to carefully avoid brushing or bumping

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 35 of 49 PageID #: 35

up against their vehicles' key chains with a body part. According to GM, brushing or bumping up against the Defective Vehicles' key chains increases the chances that the ignition switch in the Defective Vehicles will unintentionally move from the "on" position and into the "accessory" or "off" position.

151. At the time of the delivery of the Defective Vehicles, GM did not adequately warn Plaintiff and Class Members of the dangers of not taking the necessary steps outlined above to prevent the ignition switches in their vehicles from unintentionally moving from the "on" position and into the "accessory" or "off" position while in motion, including the loss of power and shut off of the engine resulting in an increased difficulty in maneuvering the vehicles, the lack of airbag deployment in the event of a crash and injury or death.

152. Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and the Class Members are entitled to recover the damages caused to them by GM's breach of the implied warranty of merchantability, which damages constitute the difference in value between the Defective Vehicles as warranted (their sales prices) and the Defective Vehicles as actually delivered (perhaps worth $0.00) (*i.e.*, a total or partial refund of the full purchase prices of the Defective Vehicles), plus loss of use and other consequential damages arising after the date of delivery of the Defective Vehicles.

153. Pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiff and Class Members in connection with the commencement and prosecution of this action.

**SECOND CLAIM FOR RELIEF**

***Asserted on Behalf of the Nationwide Class***

**Violation of Michigan Consumer Protection Act ("MCPA), Michigan Comp. Laws Ann. § 445.903 *et seq.*, and the Consumer Protection Acts of Substantially Similar States**

154. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

155. This Claim is brought on behalf of the Nationwide Class.

156. At all times relevant hereto, there was in full force and effect Mich. Comp. Laws Ann. § 445.903 *et seq.* (the "MCPA").

157. Plaintiff and the Class Members were "person[s]" within the meaning of the MCPA, M.C.L.A § 445.902(1)(d).

158. At all relevant times hereto, Defendants were "persons" engaged in "trade or commerce" within the meaning of the MCPA, M.C.L.A. § 445.902(1)(d) and (g).

159. The MCPA holds unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L.A. § 445.902(1).

160. The practices of Defendants violate the MCPA for, *inter alia*, one or more of the following reasons:

a. Represented that the Defective Vehicles had approval, characteristics, uses, and benefits that they do not have;

b. Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Defective Vehicles;

      c.     Defendants represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were of another;

      d.     Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Defective Vehicles, which did and tended to, mislead Plaintiff and the Class about facts that could not reasonably be known by the consumer until the February and March 2014 recalls;

      e.     Defendants failed to reveal facts concerning the Ignition Switch Defect that were material to the transaction in light of representations of fact made in a positive manner;

      f.     Defendants failed to reveal material facts concerning the Ignition Switch Defect to Plaintiff and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiff and the Class;

      g.     Defendants made material representations and statements of fact to Plaintiff and the Class that resulted in Plaintiff and the Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

      h.     Defendants intended that Plaintiff and Class Members rely on their misrepresentations and omissions, so that Plaintiff and other Class Members would purchase or lease the Defective Vehicles.

161.    Plaintiff seeks injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts or; seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of

$250 for Plaintiff and each Class Member, reasonable attorneys' fees; and any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

162. Plaintiff also seeks punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of Defective Vehicles, deceived Plaintiff and Class Members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Defective Vehicles it repeatedly promised Plaintiff and Class Members were safe. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**THIRD CLAIM FOR RELIEF**

***Asserted on Behalf of the Nationwide Class***

**Fraudulent Concealment**

163. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

164. This Claim is brought on behalf of the Nationwide Class.

165. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles from Plaintiff, Class Members, the public and NHTSA. GM knew that the Defective Vehicles were designed and manufactured with defective ignition switches, but GM concealed those material facts.

166. Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as reliable and safe and proclaimed that Defendants maintain the highest safety standards. Once Defendants made representations to the public about safety, Defendants

were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

167.    In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and Class Members.  These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not a vehicle ignition switch will unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power steering, anti-lock brakes and air bag deployment while the car is in motion, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

168.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Defective Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

169.    Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and Class Members' actions were justified. Defendants were in exclusive control of the material facts concerning the Ignition Switch Defect and such facts were not known to the public or the Class Members.

170.    As a result of the concealment and/or suppression of facts, Plaintiff and Class Members have sustained and will continue to sustain damages arising from the difference

between the actual value of that which Plaintiff and the Class paid and the actual value of that which they received.

171. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FOURTH CLAIM FOR RELIEF

***Asserted on Behalf of the Mississippi Class***

**Violations of the Mississippi Products Liability Act ("MPLA"),**
**Miss. Code Ann. §§ 11-1-63, *et seq.***

172. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

173. This Claim is brought on behalf of Plaintiff Vickie Smith and the Mississippi Class.

174. Defendants have defectively designed, manufactured, sold or otherwise placed in the stream of commerce Defective Vehicles.

175. Defendants are strictly liable in tort for Plaintiff and other Mississippi Class Members' injuries and damages, and the Plaintiff, individually and on behalf of the Mississippi Class Members, respectfully rely upon the doctrine as set forth in RESTATEMENT, SECOND, TORTS § 402(a).

176. Because of the negligence of the design and manufacture of the Defective Vehicle, by which Plaintiff was injured and the failure of Defendants to warn Plaintiff of the

certain dangers concerning the operation of the Defective Vehicles which were known to Defendants but were unknown to Plaintiff, the Defendants have committed a tort.

177.    The Defective Vehicles which caused Plaintiff and the Mississippi Class Members' injuries were manufactured by Defendants.

178.    At all times herein material, Defendants negligently and carelessly did certain acts and failed to do other things, including, but not limited to, inventing, developing, designing, researching, guarding, manufacturing, building, inspecting, investigating, testing, labeling, instructing, and negligently and carelessly failing to provide adequate and fair warning of the characteristics, dangers and hazards associated with the operation of the vehicles in question to users of the Defective Vehicles, including, but not limited to, Plaintiff and other Mississippi Class Members, and willfully failing to recall or otherwise cure one or more of the defects in the product involved thereby directly and proximately causing the described injuries.

179.    The Defective Vehicles were unsafe for their use by reason of the fact that they were defective. For example, the Defective Vehicles were defective in their design, guarding, development, manufacture, and lack of permanent, accurate, adequate and fair warning of the characteristics, danger and hazards to the user, prospective user and members of the general public, including, but not limited to, Plaintiff and other Mississippi Class Members, and because Defendants failed to recall or otherwise cure one or more defects in the Defective Vehicles involved thereby directly and proximately causing the described injuries.

180.    Defendants knew or reasonably should have known that the above mentioned product would be purchased, leased, and used without all necessary testing or inspection for defects by Plaintiff and other Mississippi Class Members.

181. Plaintiff and other Mississippi Class Members were not aware of those defects at any time before the incident and occurrence mentioned in this complaint, and Plaintiff and other Mississippi Class Members were unable, as a practical matter, to cure the defective condition.

182. Plaintiff and Mississippi Class Members used the Defective Vehicles in a foreseeable manner.

183. As a proximate result of Defendants' negligence, Plaintiff and other Mississippi Class Members suffered injuries and damages.

## FOURTH CLAIM FOR RELIEF

***Asserted on Behalf of the Mississippi Class***

**Breach of Implied Warranty of Merchantability,**
**Miss. Code Ann. § 75-2-314, *et seq.***

184. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

185. This Claim is brought on behalf of Plaintiff Vickie Smith and the Mississippi Class.

186. Defendants have defectively designed, manufactured, sold, or otherwise placed in the stream of commerce Defective Vehicles as set forth above.

187. Defendants impliedly warranted that the Defective Vehicles were merchantable for the ordinary purpose for which they were designed, manufactured, and sold.

188. The Defective Vehicles were not in merchantable condition or fit for their ordinary use due to the Ignition Switch Defect and as a result of the breach of warranty of merchantability by Defendants, Plaintiff and the Mississippi Class Members sustained injuries and damages.

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 43 of 49 PageID #: 43

## FIFTH CLAIM FOR RELIEF

***Asserted on Behalf of the Mississippi Class***

**Mississippi Common Law**
**Negligence**

189. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

190. This Claim is brought on behalf of Plaintiff Vickie Smith and the Mississippi Class.

191. Defendants have defectively designed, manufactured, sold, or otherwise placed in the stream of commerce Defective Vehicles as set forth above.

192. Defendants had a duty to manufacture a product which would be safe for its intended and foreseeable uses and users, including the use to which it was put by Plaintiff and the Mississippi Class Members. Defendants breached its duty to Plaintiff and the Mississippi Class Members because it was negligent in the design, development, manufacture, and testing of the Defective Vehicles.

193. Defendants were negligent in the design, development, manufacture, and testing of the Defective Vehicles because they knew, or in the exercise of reasonable care should have known, that the Defective Vehicles equipped with the Ignition Switch Defect pose an unreasonable risk of death or serious bodily injury to Plaintiff and other Mississippi Class Members, passengers, other motorists, pedestrians, and the general public, because they are susceptible to incidents in which brakes, power steering and airbags are all rendered inoperable.

194. Defendants negligently failed to adequately warn and instruct Plaintiff and other Mississippi Class Members of the defective nature of the Defective Vehicles, of the high degree

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 44 of 49 PageID #: 44

of rick attendant to using them given that the users of the Defective Vehicles would be ignorant of the defect.

195. Whereupon Plaintiff, individually and on behalf of the Mississippi Class Members, respectfully rely upon the doctrine as set forth in RESTATEMENT, SECOND, TORTS § 395.

196. Defendants further breached their duties to Plaintiff and other Mississippi Class Members by supplying directly and/or through a third person Defective Vehicles to be used by such foreseeable persons as Plaintiff and other Mississippi Class Members when:

a. Defendants knew or had reason to know that the Defective Vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

b. Defendants failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the Defective Vehicles are likely to be dangerous.

197. As a result of Defendants' negligence, Plaintiff and other Mississippi Class Members suffered damages.

**SIXTH CLAIM FOR RELIEF**

***Asserted on Behalf of the Mississippi Class***

**Mississippi Common Law**
**(Negligent Misrepresentation/Fraud)**

198. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

199. This Claim is brought on behalf of Plaintiff Vickie Smith and the Mississippi Class.

200.   As set forth above, Defendants concealed and/or suppressed material facts concerning the quality, safety and reliability of the Defective Vehicles.

201.   Defendants had a duty to disclose these safety issues because they consistently marketed their Defective Vehicles as safe and proclaimed that safety is one of their highest corporate priorities. Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

202.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and the Mississippi Class Members. These omitted facts were material because they directly impact the safety of the Defective Vehicles. Whether or not the Defective Vehicles equipped with the Ignition Switch Defect pose an unreasonable risk of death or serious bodily injury to Plaintiff and the Mississippi Class Members, passengers, other motorists, pedestrians, and the general public, because they are susceptible to incidents in which brakes, power steering and airbags are all rendered inoperable, are material safety concerns. Defendants possessed exclusive knowledge of the defects rendering Defective Vehicles inherently more dangerous and unreliable than similar vehicles.

203.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and other Mississippi Class Members to purchase or

lease the Subject Vehicles at a higher price for the Defective Vehicles which did not match the
Defective Vehicles' true value.

204.    Plaintiff and other Mississippi Class Members were unaware of these omitted
material facts and would not have acted as they did if they had known of the concealed and/or
suppressed facts. Plaintiff and the Mississippi Class Members' actions were justified. Defendants
were in exclusive control of the material facts and such facts were not known to the public or the
other class members.

205.    As a result of the misrepresentation, concealment and/or suppression of the facts,
Plaintiff and the Mississippi Class Members sustained damages. For those class members who
elect to affirm the sale, these damages, under Mississippi law, include the difference between the
actual value of that the class members paid and the actual value of that which they received,
together with additional damages arising from the sales transaction, amounts expended in
reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost
profits. For those class members who want to rescind the purchase or lease are entitled to
restitution and consequential damages under Mississippi law.

206.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to
defraud, and in reckless disregard to Plaintiff and other Mississippi Class Members' rights and
well-being to enrich Defendants. Such conduct warrants an assessment of punitive damages in an
amount sufficient to deter such conduct in the future, which is to be determined according to
proof.

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 47 of 49 PageID #: 47

**SEVENTH CLAIM FOR RELIEF**

**Claim for Actual Damages/Expense Reimbursement Fund**

207. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

208. This Claim is brought on behalf of the Plaintiff and Members of all Classes.

209. Plaintiff and Class Members have incurred out-of-pocket expenses and damages in attempting to rectify the Ignition Switch Defect in their GM Vehicles, and such expenses and losses will continue as they must take time off from work, pay for rental cars or other transportation arrangements, child care and the myriad expenses involved in going through the recall process to correct the defect.

210. Plaintiff and Class Members seek payment of such damages and reimbursement of such expenses under the consumer statutes and applicable law invoked in this Complaint. While such damages and expenses are individualized in detail and amount, the right of the Class Members to recover them presents common questions of law. Equity and fairness to all Class Members requires the establishment by court decree and administration under Court supervision of a Defendant-funded program, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid, such that Defendants, not the Class members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the defect.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of herself and all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. an order certifying the proposed Class, designating Plaintiff as the named representative of the Class, and designating the undersigned as Class Counsel;

B. a declaration that the ignition switches in Defective Vehicles are defective;

C. a declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Defective Vehicles;

D. an order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Defective Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Defective Vehicles to eliminate the Ignition Switch Defect;

E. an award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

F. a declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Defective Vehicles, or make full restitution to Plaintiff and Class Members;

G. an award of attorneys' fees and costs, as allowed by law;

H. an award of pre-judgment and post-judgment interest, as provided by law;

Case: 3:14-cv-00120-SA-SAA Doc #: 1 Filed: 06/04/14 49 of 49 PageID #: 49

I. leave to amend this Complaint to conform to the evidence produced at trial; and

J. such other relief as may be appropriate under the circumstances.

Dated: June 4, 2014

RESPECTFULLY SUBMITTED,

*/s/ Don Barrett*

Don Barrett
BARRETT LAW GROUP, PA
404 Court Square N.
Lexington, MS 39096
Telephone: (662) 834-2488
Facsimile: (662) 834-2628

James R. Dugan, II (LSBA# 24785)
David B. Franco
Chad J. Primeaux
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181

Mitchell A. Toups (TX Bar # 20151600)
WELLER, GREEN, TOUPS & TERRELL, LLP
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 832-8577

And

James W. Flood, III (D.C. Bar # 996067)
FLOOD LAW GROUP, LLP
1101 Pennsylvania Ave. NW, Suite 600
Washington, DC 20004
Telephone: (202) 756-1970
Facsimile: (202) 756-7323

***Attorneys for Plaintiff and the Proposed Classes***