# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAWRENCE M. ELLIOTT | ) | |
| and | ) | |
| CELESTINE V. ELLIOTT., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:14-cv-00691-KBJ |
| v. | ) | |
| | ) | |
| GENERAL MOTORS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' MOTION FOR LEAVE TO FILE THE
## PROPOSED FIRST AMENDED COMPLAINT AND TO JOIN PARTIES

On June 20, 2014, plaintiffs, Lawrence and Celestine Elliott, filed a motion in this Court requesting that consideration of General Motors LLC's ("GM's") Motion to Dismiss be deferred until June 27, 2014, while plaintiffs drafted and filed a motion for leave to file an amended complaint.

Plaintiffs now file this motion, pursuant to Fed. R. Civ. P. 15(a)(2), for leave to file the attached First Amended Complaint against GM.

Plaintiffs additionally request leave to join Berenice Summerville as a Plaintiff and Delphi Automotive PLC and Delphi Automotive Systems LLC as defendants, pursuant to Fed. R. Civ. P. 21 and Fed. R. Civ. P. 20(a)(1)(b). Ms. Summerville's claims against GM raise the same or common questions of law and fact as those of Mr. and Mrs. Elliott. The proposed Defendants are independently and jointly and severally liable with GM for many of the injuries that Plaintiffs allege.

1

Pursuant to Local Rule 7(m), counsel for Plaintiffs contacted counsel for GM regarding the filing of this motion. Counsel for GM stated that GM would not consent to Plaintiffs' request to amend their pleadings.

Respectfully submitted,

/s/ Daniel Hornal (D.C. Bar No. 1005381)

DATE: June 28, 2014

_____

Daniel Hornal, Esq.
705 4th Street, NW
Suite 403
Washington, DC, 20001
(202) 709 9662
daniel@taloslaw.com
Attorney for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAWRENCE M. ELLIOTT     )
   and                 )
CELESTINE V. ELLIOTT.,     )
                       )
         Plaintiffs,   )     Case No. 1:14-cv-00691-KBJ
v.                       )
                       )
GENERAL MOTORS LLC,     )
                       )
         Defendant.   )

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE THE PROPOSED FIRST AMENDED COMPLAINT AND TO JOIN PARTIES

3

## I.  Plaintiffs' Motion for Leave to File First Amended Complaint

On April 1, 2014, Lawrence and Celestine Elliott, as *pro se* plaintiffs, filed a Complaint in letter form in the Superior Court of the District of Columbia, which was docketed as Civil Action No. 14-001980. General Motors LLC ("GM") was served with a Summons and the Complaint on April 4, 2014, and on April 23, 2014, GM removed the case to this Court.

On April 23, 2014, GM moved to dismiss Mr. and Mrs. Elliott's Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. No. 3). Plaintiffs' original Complaint was filed without the benefit of counsel and contains a variety of complaints stemming from their ownership of their 2006 Chevrolet Cobalt. *See* Complaint in Superior Court Documents, May 5, 2014 (Doc. No. 7).

As the Proposed First Amended Complaint alleges, Mr. and Mrs. Elliott are 78 and 73 years of age respectively.  After they retired from over twenty-five years as taxi and commercial drivers, they paid the full manufacturers' suggested retail price for a new 2006 Chevrolet Cobalt. They had used this vehicle to transport their family, including grand and great-grand children who reside with them or nearby.  This car has safety related defects that posed unreasonable and imminent danger of death or serious bodily injury. New GM and Delphi concealed these defects from them since the time of New GM's inception in October 2009.

On May 12, 2014, GM notified the United States Judicial Panel on Multidistrict Litigation that this action is related to the proceedings in *In re: General Motors LLC Ignition Switch Litigation. See* Notice of Related Action *(In re: General Motors LLC Ignition Switch Litigation* MDL No. 2543 Doc. No. 223). On June 11, 2014, that forum determined that Elliot et al. v. GM is not appropriate for inclusion in the Multidistrict Litigation proceedings. *See*

4

Notice to Counsel *(In re: General Motors Ignition Switch Litigation* MDL No. 2543 Doc. No. 269).

April 21, 2014, in *In re: Motors Liquidation,* GM filed a Motion to Enforce the Bankruptcy Court's July 5, 2009 Sale Order and Injunction. *See* Motion to Enforce (*Motors Liquidation Company,* (Bankr. S.D.N.Y), Doc. No. 12620).  GM again unilaterally designated Mr. and Mrs. Elliotts' action, on a spreadsheet schedule, along with dozens of others, and based solely on the *pro se* letter, as an "ignition switch action" in its attempt to bar claims against it based on the bankruptcy proceedings of its predecessor. *See id.*  GM is currently attempting to circumvent this Court's authority over its docket by appealing to the Bankruptcy Court in the Southern District of New York to bar Mr. and Mrs. Elliott even from presenting the instant motion to this Court.  *See id*. Plaintiffs, through their counsel, are in contact with the Bankruptcy Court to determine how to proceed to correct GM's erroneous inclusion of the Elliott's claims in those proceedings.

Plaintiffs now move for leave to amend their original complaint, pursuant to Fed. R. Civ. P. 15(a)(2), to join parties, and to clarify their factual allegations and the legal claims they assert. Such clarification is indispensible to the ability of this Court and sister Courts considering related matters to give fair consideration to Plaintiffs claims. If a party seeks leave of the court to amend the complaint, the court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This Court has previously found that amendments should only be denied where there is a clear justification for doing so, such as "futility, bad faith, undue delay, or dilatory motive." *See, e.g., Lopez v. JetSetDC, LLC,* ---F. Supp. 2d--- (D.D.C. 2014) (citing *Monroe v. Williams*, 704 F. Supp. 621, 623 (D.D.C. 1988)).  Due to the *pro se* nature of Plaintiffs' original Complaint, the intent of this Amended Complaint is the opposite of dilatory. The Amended Complaint clarifies the position of Plaintiffs such that their claims

5

can be more easily evaluated in light of GM's Motion to Dismiss under Fed. R. Civ. P.

12(b)(6) and other issues that are reasonably expected to arise in the litigation.

Plaintiffs seek to join Berenice Summerville as a Plaintiff. Ms. Summerville bought a dark

blue 2010 Chevrolet Cobalt in December of 2009 as a Christmas gift for her mother. Ms.

Summerville primarily used the car to drive her mother, who is now eighty years old, to doctor

appointments and run errands. Ms. Summerville resides in Maryland, just five miles outside

the District of Columbia; she frequently drives her Cobalt within the District. Just like Mr. and

Mrs. Elliott, Ms. Summerville has endured a litany of problems with her Cobalt; there has

periodically been an odor of gasoline around the car, and she has noted the vehicle's

particularly poor gas mileage – both indicators of a gas leak that would be consistent with the

2006 Cobalt's defective gas pump. Additionally, her 2010 Cobalt uses the same defective

ignition switch as the 2006 Cobalt that belongs to Mr. and Mrs. Elliott.

Plaintiffs seek to join related Delphi entities as Defendants. As the Proposed First

Amended Complaint alleges, Delphi manufactured the defective ignition switches in Plaintiffs

and Ms. Summerville's vehicles, and collaborated with GM in an extensive and elaborate

scheme to conceal the defect from Plaintiffs, class members, regulatory authorities, investors,

and others

Fed. Rule Civ. P. 21 states, "the court may at any time, on just terms, add or drop a party."

In this case, those just terms come from Fed. Rule Civ. P. 20. Rule 20 requires first that the

claims of the two parties arise out of the same transaction, occurrence or series thereof – that

the claims are logically related. Fed. Rule Civ. P 20(a)(1)-(2); *see, e.g., Disparte v. Corporate*

*Executive Bd.* 223 F.R.D. 7, 11 (D.D.C. 2004) (citing *Moore v. New York Cotton Exchange,*

270 U.S. 593, 610)). The claims that Mrs. Summerville brings, like Mr. and Mrs. Elliott's

6

claims, arise out of the same conspiracy between GM, Delphi, and their dealers to conceal the

extent of the danger posed by the latent defects in the vehicles plaintiffs purchased and drove.

Second, Rule 20(a)(1)-(2) requires that there be *some* question of law or fact as to all of the

plaintiffs' claims. Fed. Rule Civ. P 20(a)(1)-(2); *see, e.g, Disparte*, 223 F.R.D. at 11 (citing

*Mosley v. General Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir. 1974)). The claims that Ms.

Summerville brings share many questions of law and fact in common with the claims that Mr.

and Mrs. Elliott bring, including but not limited to the following:

    A.  Whether the ignition switches in Plaintiffs' and Class Members vehicles are

          defective;

    B.  Whether the fuel pumps in Plaintiffs' and Class Members' Chevrolet Cobalts are

          defective;

    C.  Whether Defendants violated 18 U.S.C. § 1962(c) by conducting the affairs of the

          RICO Enterprise through a pattern of racketeering activity; and

    D.  Whether Defendants had a duty to disclose the latent safety defects in plaintiffs'

          cars upon Defendants' discovery of those defects.

Finally, joinder may not prejudice any party or cause needless delay. *See Call of the Wild

Movie, LLC v. Does*, 770 F. Supp. 2d 332 (D.D.C. 2011). In this case, joinder does not

prejudice any party and is explicitly intended to reduce delay by increasing the efficiency with

which these common questions of law and fact can be resolved. Pursuant to judicial efficiency

and expeditious resolution of disputes, joinder of parties and claims has been "strongly

encouraged." *United Mine Workers of America v. Gibbs,* 383 U.S. 715 (1966); *see also M.K. v.

Tenet,* 216 F.R.D. 133 (D.D.C. 2002) (stating the interest of this Court in preventing "multiple

lawsuits, extra expense to the parties, and loss of time to the court [and]...litigants.).

Respectfully submitted,

/s/ Daniel Hornal (D.C. Bar No. 1005381)

DATE: June 28, 2014

_____

Daniel Hornal, Esq.
705 4th Street, NW
Suite 403
Washington, DC, 20001
(202) 709 9662
daniel@taloslaw.com
Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LAWRENCE M. ELLIOTT      )
    and                  )
CELESTINE V. ELLIOTT.,    )
                            )
         Plaintiffs,    )    Case No. 1:14-cv-00691-KBJ
v.                       )
                            )
GENERAL MOTORS LLC,    )
                            )
         Defendant.    )

## [PROPOSED] Order

Upon consideration of the Motion for Leave to File First Amendment Complaint filed by Plaintiffs, Mr. and Mrs. Elliott, IT IS HEREBY ORDERED that the Plaintiffs' motion is GRANTED. The clerk is directed to file the First Amended Complaint.

Upon consideration of Plaintiffs' Motion for Permissive Joinder of Berenice Summerville as a Plaintiff, IT IS HEREBY ORDERED that the Plaintiffs' motion is GRANTED and Berenice Summerville is joined as a Plaintiff in this matter.

Upon consideration of Plaintiffs' Motion for Permissive Joinder of Delphi Automotive PLC and Delphi Automotive Systems LLC ("the Delphi parties"), IT IS HEREBY ORDERED that the Plaintiffs' motion is GRANTED and the Delphi parties are joined as Defendants in this matter.

ORDERED, District of Columbia, this _____ day of _____, 2014

_____
UNITED STATES DISTRICT JUDGE

9

**DISTRIBUTION:**

Robert Sharpleigh Ryland
KIRKLAND & ELLIS LLP
655 15th Street, NW
Suite 1200
Washington, DC 20005
Tel: (202) 879-5086
Fax: (202) 879-5200
robert.ryland@kirkland.com
Attorney for General Motors LLC

Matthew Francis Hall
DUNWAY & CROSS
1100 Connecticut Avenue, NW
Suite 410
Washington, DC 20036
Tel: (202) 862-9700
Fax: (202) 862-9710
Attorney for General Motors LLC

10

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing Plaintiffs' Motion to Amend Complaint and Join Plaintiffs and Defendants, Memorandum in Support thereof, and Proposed Order on the following parties by electronically filing them with the Court's electronic case filing system this 28th day of June 2014:

Robert Sharpleigh Ryland
KIRKLAND & ELLIS LLP
655 15th Street, NW
Suite 1200
Washington, DC 20005
Tel: (202) 879-5086
Fax: (202) 879-5200
robert.ryland@kirkland.com
Attorney for General Motors LLC

Matthew Francis Hall
DUNWAY & CROSS
1100 Connecticut Avenue, NW
Suite 410
Washington, DC 20036
Tel: (202) 862-9700
Fax: (202) 862-9710
Attorney for General Motors LLC

/s/ Daniel Hornal (D.C. Bar No. 1005381)

DATE: June 28, 2014

Daniel Hornal, Esq.
705 4th Street, NW
Suite 403
Washington, DC, 20001
(202) 709 9662
daniel@taloslaw.com
Attorney for Plaintiffs

11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LAWRENCE M. ELLIOTT, | ) | |
| CELESTINE V. ELLIOTT, and | ) | |
| BERENICE SUMMERVILLE, | ) | |
| for themselves, on behalf | ) | Case No. 1:14-cv-00691 (KBJ) |
| of all others similarly situated, | ) | |
| and on behalf of the People of the | ) | CLASS ACTION FOR DECLARATORY, |
| District of Columbia, | ) | INJUNCTIVE, AND MONETARY RELIEF |
| | ) | |
| | ) | REPRESENTATIVE ACTION FOR |
| Plaintiffs, | ) | DECLARATORY, INJUNCTIVE, AND |
| | ) | MONETARY RELIEF |
| | ) | PURSUANT TO THE |
| v. | ) | D.C CONSUMER PROTECTION |
| | ) | PROCEDURES ACT, D.C. Code § 28-3901 |
| GENERAL MOTORS LLC, | ) | et seq. |
| DELPHI AUTOMOTIVE PLC, | ) | |
| and DPH-DAS LLC f/k/a DELPHI | ) | JURY TRIAL DEMANDED |
| AUTOMOTIVE SYSTEMS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

### INTRODUCTORY STATEMENT

Plaintiffs LAWRENCE ELLIOTT, CELESTINE ELLIOTT and BERENICE

SUMMERVILLE bring this action for themselves, and on behalf of all persons similarly

situated who own or have owned the substandard and dangerous vehicles identified below at

any time since October 19, 2009.  The Elliotts also bring this action of behalf of the public as

representatives of the People of the District of Columbia.

1.     Mr. and Mrs. Elliott are 78 and 73 years of age respectively as of the date of

filing this Complaint. They have been married for forty-nine years. They are retired

commercial drivers with over twenty-five years of on-the-road experience.  After they retired

from professional driving, they paid the full manufacturer's suggested retail price for a new

12

2006 Chevrolet Cobalt at a now-defunct GM dealership in Washington, D.C. The Elliotts'

Cobalt has substantial safety related defects that render it dangerous to drive. The Elliotts'

Cobalt has substantial safety related defects that render it dangerous to drive; these same

defects are  suspected of causing death or personal injury to hundreds of people across the

United States, according to the National Highway Traffic Safety Administration ("NHTSA).

    2.      The Elliotts' Cobalt has a defective ignition switch that could, unexpectedly and

without warning, shut down the car's engine and electrical systems while the car is in motion -

rendering the power steering, anti-lock brakes and airbags inoperable.

    3.      The Elliotts' Cobalt has a plastic fuel pump which is mounted on the top of the

gas tank. When the fuel pump leaks, gasoline flows down the side of the tank and can pool

under the car, dangerously close to the car's catalytic converter. The fuel pump is not designed

to withstand the reasonably foreseeable environmental and operating conditions to which a car

can be expected to be exposed. The fuel pump in the Elliotts' car has already failed to

withstand the heat to which it is exposed. After noticing a persistent fuel smell, the Elliotts

eventually discovered a two-foot in diameter pool of leaked gasoline under the car.

Subsequently, a GM dealer replaced the pump at New GM's direction, with, as far as Plaintiffs

can determine, a new plastic replica of the first pump - presenting the same defect and the same

unreasonable safety risk of personal injury and property damages to Plaintiffs and class

members due to the fire hazards associated with the pooling gas.

    4.      The Elliotts, whose entire family – including their children, grandchildren, and

great-grandchildren – depended upon the Cobalt for transportation, are now extremely hesitant

to drive the vehicle. They fear for their own safety and, in particular, for the safety of their

great grandchildren (aged 6 and 8) who reside with them and were frequently driven to school

in the car before the Elliotts discovered the extent and nature of the Cobalt's defects.

5.      In December 2009, Ms. Berenice Summerville bought a 2010 Chevrolet Cobalt as a Christmas gift for her mother, Louella Summerville, who is 80 years of age as of the date of the filing of this First Amended Complaint. Like the Elliotts' 2006 Cobalt, Ms. Summerville's vehicle contains a defective ignition switch and a defective fuel pump, both of which posed and continue to pose risks of imminent death, personal injury or property damage. Ms. Summerville first became aware of problems with the car when she noticed the smell of gasoline when starting or switching off the car. She also noticed that the car had particularly poor gas mileage, which she supposed was consistent with fuel leakage. When she took the car in for maintenance, she asked the mechanic at Ourisman Chevrolet of Marlow Heights ("Ourisman"), a GM dealership, to inspect for fuel leakage, but the dealer refused to do so without a fee. Because the odor and poor performance continued, she again requested that the fuel system be inspected for leaks at her car's most recent service. After searching the vehicle history, Ourisman representatives informed Ms. Summerville that although there had been a recall on the fuel system, it was now closed. Ourisman again refused to inspect the fuel system without a fee. Ms. Summerville also noticed that the airbag light was flickering on and off, inexplicably, on both the passenger and driver sides of the car. She no longer drives the Cobalt because of fear for her own and her mother's safety.

6.      GM admits that, since its incorporation on October 19, 2009, General Motors LLC ("GM" or "New GM") has known and failed to disclose that the Plaintiffs' Cobalts and class members' vehicles are substandard and pose significant and unreasonable risks of death, serious personal injury, and property damage. GM could hardly deny these facts in any event. New GM acquired all the books, records and accounts of General Motors Corporation ("Old GM"), including records that document the unlawful concealment of defects in vehicles sold by Old GM prior to New GM's existence. New GM also retained the engineering, legal and

14

management officials who were responsible for designing, engineering, and concealing safety-related defects at Old GM; those officials were immediately assigned to precisely the same tasks at New GM, and they implemented or continued identical policies and practices to conceal safety related defects in GM products.

7.      The National Highway Traffic Safety Administration (NHTSA) fined New GM $28,000,000, the maximum permissible under applicable law, for GM's failure to disclose defects related to the ignition switches in Plaintiffs' and class members' cars.

8.      For nearly five years after its inception, GM failed to disclose to, and actively concealed from, Plaintiffs, class members, investors, litigants, courts, law enforcement and other government officials including the NHTSA, the risks of death, personal injury, and property damage posed by its defective products.  Instead, conspiring with Delphi, Ourisman, GM's dealers nationwide, outside lawyers, and various others, GM engaged in, and may still be engaging in, an extensive, aggressive and complex campaign to conceal and minimize the safety-related defects that exist in Plaintiffs' and class members' vehicles. That campaign is designed to mislead Plaintiffs, class members, consumers, investors, courts, law enforcement officials, and other governmental officials, including the NHTSA, that the value of the company and the worth and safety of its products are greater than they are. With those same co-conspirators, GM directed an unlawful and continuing enterprise calculated to gain an unfair advantage over competitor automakers that conduct their business within the bounds of the law.

9.      Defendants first deployed their campaign of deception on the day that New GM began operating. The scheme continued at least until its exposure began in early 2014. Through their deception, Defendants recklessly endangered the safety of Plaintiffs, their families, and members of the public. Defendants' wrongful acts and omissions harmed Plaintiffs and class

members by exposing them to increased risk of death or serious bodily injury, by depriving

them of the full use and enjoyment of their vehicles, and by causing a substantial diminution in

the value of the vehicles to Plaintiffs and class members, and a substantial diminution in value

of their vehicles on the open automobile market.

10.     As of the date of the filing of this First Amended Complaint, the United States

Department of Justice has opened, and is pursuing, a criminal investigation into GM's

campaign of deceit.

11.     GM's Chief Executive Officer Mary Barra admitted on behalf of the company

that New GM employees knew about safety-related defects in millions of vehicles, including

the Elliotts' 2006 Cobalt and Ms. Summerville's 2010 Cobalt, and that GM did not disclose

those defects as it was required to do by law. Ms. Barra attributed New GM's "failure to

disclose critical pieces of information," in her words, to New GM's policies and practices that

mandated and rewarded the unreasonable elevation of cost concerns over safety risks. For

example, GM chose to use and then conceal defective ignition switches in Plaintiffs' and class

members' vehicles in order to save approximately $0.99 per vehicle.

12.     In executing their scheme to conceal the dangerous character of Plaintiffs'

vehicles, Defendants violated a multitude of laws:

        a)      In furtherance of their common design to prevent Plaintiffs, class

        members, other consumers, law enforcement and other governmental officials,

        litigants, courts, and investors from learning of the safety defects in GM cars,

        GM, Delphi, and GM's dealers conducted a racketeering enterprise and engaged

        in a pattern of racketeering activities, including repeated and continuous acts of

        mail and wire fraud, television and radio fraud, and tampering with witnesses

        and victims in violation of the Racketeer Influenced and Corrupt Organizations

16

Case 1:14-cv-00691-KBJ    Document 15    Filed 06/28/14    Page 17 of 53

Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, causing the harm to Plaintiffs and class members described above.

b)      By concealing the material fact of the dangerousness of the Plaintiffs' and class members' vehicles, by failing properly to repair the safety defects in the cars in a timely manner, and by engaging in other unconscionable and/or unlawful behavior, GM and Delphi violated the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.*, and the Maryland Consumer Protection Act,. Md. Code, Com. Law § 13-408 *et seq.*, causing the harm described above to Plaintiffs and class members.

c)      GM and Delphi also violated their duties to warn Plaintiffs and class members about the dangers that their vehicles posed, resulting in economic loss and increased risk of personal injury for which Defendants are liable to Plaintiffs and Class members under the common law of the District of Columbia and the States of Florida, Maryland, New Jersey and Ohio.

d)      Because they intentionally concealed a material fact from Plaintiffs and Class members, Defendants are liable to Plaintiffs for the harm Plaintiffs and class members have suffered and for punitive damages under the common law of fraud common to the several States.

e)      By civilly conspiring to conceal the safety-related defects of GM vehicles, both among themselves and among nonparties to this litigation, and because they acted jointly to harm Plaintiffs and class members, Defendants are jointly and severally liable for all harm they or any co-conspirator caused.

f)      Defendants aided and abetted the conduct of each other and of nonparties in concealing the safety-related defects of GM vehicles.

g)      With respect to the claims of Ms. Summerville and other purchasers of identified cars sold since New GM's inception, Defendants are also liable for breach of a sellers implied warranty of merchantability under the Uniform Commercial Code §2-314 of thirty-one States identified herein that have abolished vertical privity requirements for such suits. They are also liable under the common law of the several States to those purchasers for fraud in inducing the purchases through misrepresentations and material omissions upon which Plaintiffs and class members based their purchases.

## PARTIES

13.      Plaintiffs Lawrence and Celestine Elliott are citizens and residents of the District of Columbia. Mr. and Mrs. Elliott jointly own a 2006 Chevrolet Cobalt SS. Although Mr. and Mrs. Elliott have always been the primary drivers of their cars, they have children, grand children, and great-grandchildren who live with them, and frequently ride in the cars as passengers and, on rare occasions, also drive the cars.

14.      Plaintiff Berenice Summerville is a citizen and resident of the State of Maryland. She purchased a 2010 Chevrolet Cobalt in December 2010 from a GM dealer in the State of Maryland, and she has been the primary driver of the vehicle for virtually the entire period since she purchased the car. She often drives in the District of Columbia, which is less than 5 miles from her home.

15.      General Motors LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Detroit, Michigan. On October 19, 2009, it began conducting the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the vehicles of class members, and other motor vehicles and motor vehicle components throughout

18

Case 1:14-cv-90691-KBJ   Document 15   Filed 06/28/14   Page 19 of 53

the United States. Plaintiffs' claims and allegations against GM refer solely to this entity. In

this First Amended Complaint, Plaintiffs are not making any claim against Old GM (General

Motors Corporation) whatsoever, and Plaintiffs are not making any claim against New GM

based on its having purchased assets from Old GM or based on its having continued the

business or succeeded Old GM. Plaintiffs disavow any claim based on the design or sale of

vehicles by Old GM, or based on any retained liability of Old GM. Plaintiffs seek relief from

New GM solely for claims that have arisen after October 19, 2009, and solely based on actions

and omissions of New GM.

16.     Delphi Automotive PLC is headquartered in Gillingham, Kent, United

Kingdom, and is the parent company of Delphi Automotive Systems LLC, headquartered in

Troy, Michigan. At all times relevant herein, Delphi, through its various entities, designed,

manufactured, and supplied GM with motor vehicle components, including the defective

ignition switches contained in the Cobalts owned by Plaintiffs, and in at least 6.5 million other

vehicles.

17.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

**JURISDICTION AND VENUE**

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C § 1331, because the

claims under the Racketeer Influenced and Corrupt Organizations Act present a federal

question. Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28

U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states

different from Defendants' home states, and the aggregate amount in controversy exceeds

$5,000,000, exclusive of interest and costs.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a
substantial part of the events or omissions giving rise to these claims occurred in this District,
and Defendants have caused harm to plaintiffs and class members residing in this District.

## FACTUAL BACKGROUND

20.     GM has publicly admitted that the ignition switches in Plaintiffs' and class
members' cars are defective and pose a safety hazard. It has also admitted that, from its
inception in 2009, various New GM engineers, attorneys, and management officials knew of,
and took measures to conceal, the ignition switch defect and/or diminish its significance. GM
has been found guilty of failing to disclose the defect to Plaintiffs, class members, and
governmental officials as required by law, and the NHTSA has fined New GM the maximum
penalty that agency is authorized to impose.

21.     GM continues to conceal the defect in the design of the fuel pumps on
Plaintiffs' and Class members' vehicles from Plaintiffs, class members, investors, and
governmental officials. On October 29, 2009, GM notified the NHTSA that they were recalling
2006 Chevrolet Cobalt and Saturn Ion vehicles sold or registered in Arizona and Nevada, and
2007 Chevrolet Cobalt, Pontiac G5, and Saturn Ion vehicles sold or registered in Arizona,
California, Florida, Nevada and Texas. The reason for the recall was that "the plastic supply or
return port on the modular reservoir assembly may crack…[and] fuel will leak." (NHTSA
Report Campaign No. 09V419000). The consequence of this defect was listed in the report as
follows: "Fuel leakage, in the presence of an ignition source, could result in a fire." The recall
was limited, however, to vehicles in the five aforementioned states. Special coverage – that is,
GM would replace a noticeably leaking fuel pump if the issue was specifically brought to them
by a customer – was provided in a limited number of additional states: 2006 vehicles registered
in Alabama, Arkansas, California, Florida Georgia, Hawaii, Louisiana, Mississippi, North

Carolina, New Mexico, Oklahoma, South Carolina, Tennessee, and Texas, and 2007 vehicles

registered in Alabama, Arkansas, Georgia, Hawaii, Louisiana, Mississippi, North Carolina,

New Mexico, Oklahoma, South Carolina, and Tennessee. GM offered vehicle owners outside

the listed recall states no recourse, even if their plastic fuel pumps, which were susceptible to

exactly the same life-threatening defect, started noticeably leaking.  GM did not inform owners

of identical vehicles outside of Arizona, California, Florida, Nevada and Texas that they were

in danger of being seriously injured or killed by their defective and potentially leaking fuel

pump, despite the fact that the defective fuel pump can cause fuel to pool very close to the

catalytic converter, which can temperatures in excess of 1000 degrees Fahrenheit in some

circumstances. A fuel leak in close proximity to such high temperatures is extremely unsafe.

     22.     On September 19, 2012, GM notified the NHTSA that they were expanding the

recall described in paragraph 21 to cover 2007 Chevrolet Equinox and Pontiac Torrent

vehicles, 2007 Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles, 2008 Chevrolet Cobalt

and Pontiac G5 vehicles, and 2009 Chevrolet Cobalt and Pontiac G5 vehicles, but again

geographically limited the recall, providing no recourse or notification to vehicle owners

outside Arizona, Arkansas, California, Nevada, Oklahoma and Texas.

     23.     Since at least October 29, 2009, GM has been aware that the fuel pumps in

Plaintiffs' and class members' vehicles are defective because of their propensity to fail when

exposed to high temperatures, which can occur in any car regardless of what state it is

registered in. Failure of the fuel pump threatens the kind of fuel leakage that Plaintiffs and

class members have detected, and creates an unreasonable danger of fire, personal injury

and/or property damage. GM continues to conceal the safety defect and risk of death or severe

personal and property damage from vehicle owners outside the recall states. GM has failed to

notify Plaintiffs, class members, and governmental officials of the full scope of the defect, nor

has it rectified the defect, as required by law.

24.     Under the Transportation Recall Enhancement, Accountability and

Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying

regulations, when a manufacturer learns that a vehicle contains a safety defect, the

manufacturer must disclose the defect to appropriate government officials and registered

owners of the vehicle in question.

25.     Upon its inception, New GM instituted and continued policies and practices

intended to conceal safety related defects in GM products from Plaintiffs, class members,

investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental

officials. In furtherance of its illegal scheme, New GM trained and directed its employees and

dealers to take various measures to avoid exposure of safety related product defects:

a)     GM mandated that its personnel avoid exposing GM to the risk of having to

recall vehicles with safety-related defects by limiting the action that GM would take

with respect to such defects to the issuance of a Technical Service Bulletin or an

Information Service Bulletin.

b)     New GM directed its engineers and other employees to falsely characterize

safety-related defects – including the defects described in this complaint – in their

reports, business and technical records as "customer convenience" issues, to avoid

being forced to recall vehicles as the relevant law requires.

c)     New GM trained its engineers and other employees in the use of euphemisms to

avoid disclosure to the NHTSA and others of the safety risks posed by defects in GM

products.

Case 1:14-cv-00691-KBJ   Document 15   Filed 06/28/14   Page 25 of 53

d)      New GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall.

     i.      A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

e)      New GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving plaintiffs and the public.

f)      New GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

g)      New GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

h)      New GM instituted and/or continued managerial practices designed to ensure that its employees and officials would not investigate or respond to safety-related defects, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public. In a practice New GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product defects issues in meetings by nodding in response to suggestions about steps that they company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

23

i)     New GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related defects and GM's refusal to respond to and/or GM's continuing concealment of those defects. New GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy. New GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

j)     New GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was defective. New GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for New GM, Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials to identify. New GM knew from its inception that the part number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles.

26.    New GM followed a practice and policy of intentionally mischaracterizing safety issues as "customer convenience" issues to avoid recall costs, and it enlisted its dealership network in its campaign of concealment by minimizing the safety aspects of the "technical service bulletins" and "information service bulletins" it sent to dealers. New GM directed dealers to misrepresent the safety risks associated with the product defects of its vehicles. New GM followed this practice with respect to the defective ignition switches from its inception in October 2009 until its campaign of concealment of the ignition switch defect began to unravel in February 2014.

27.    New GM followed a practice or policy of minimizing and mischaracterizing safety related defects in its cars in its communications with Plaintiffs, class members, law

enforcement officials, the NHTSA, and other governmental officials. New GM followed these

practices and procedures when it wrongfully limited the geographic reach of its October 2009

recall of defective fuel pumps in Plaintiffs and class members cars to drivers in a small number

of states, even though GM knew that the fuel pump defect threatened the safety and posed

unreasonable risks of death, serious bodily injury, and property damage in all vehicles

containing the fuel pump regardless of the state in which the vehicle was registered. GM

concealed the fact that vehicle owners and drivers who are residents of Maryland and the

District of Columbia and other states face the same or similar unreasonable risks of fuel

leakage and subsequent fire as drivers in the recall states.

28.     Upon the inception of New GM in October 2009, New GM and Delphi agreed

to conceal safety related defects from Plaintiffs, class members, law enforcement officials,

other governmental officials, litigants, courts, and investors. Both New GM and Delphi knew

since October 2009 that the design of the faulty ignition switch in Plaintiffs and class

members' cars had been altered without a corresponding change in part number, in gross

violation of normal engineering practices and standards. Part labeling fraud is particularly

dangerous in vehicle parts potentially related to safety because it makes tracing and identifying

faulty parts very difficult, and will delay the detection of critical safety defects.

29.     Since New GM's inception in October 2009, both New GM and Delphi have

known that the faulty ignition switch in the Plaintiffs' Cobalts and class members' vehicles

posed a serious safety and public health hazard because the faulty ignition switch caused

moving stalls. Each Defendant had legal duties to disclose the safety related defects. Rather

than notifying the NHTSA, Defendants instead decided that Plaintiffs and class members, and

millions of drivers and pedestrians should face imminent risk of injury and death due to the

defective ignition switches in Plaintiffs' and class members' vehicles. Delphi and GM entered

into an agreement to conceal the alteration of the part without simultaneously changing the part

number, and concealed the risks associated with the defective ignition switches.

30.     In 2012, more GM employees learned that the ignition switches in vehicles from

model years 2003, 2004, 2005, 2006, and 2007 exhibited torque performance below the

specifications originally established by GM. Rather than notify Plaintiffs, class members, or

the NHTSA, GM continued to conceal the nature of the defect.

31.     In April 2013, GM hired an outside engineering-consulting firm to investigate

the defective ignition switch system. The resulting report concluded that the ignition switches

in early model Cobalt and Ion vehicles did not meet GM's torque specification. Rather than

notify Plaintiffs, class members, or the NHTSA, GM still continued to conceal the nature of the

Ignition Switch Defect until 2014.

32.     NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front

seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbags failed to deploy in non-

rear impact crashes.

33.     While GM has finally admitted that the ignition switch in millions of vehicles

poses an unreasonable safety risk to Plaintiffs, class members, and to the public, it continues to

deny and conceal that fact that the fuel pump design on Plaintiffs' and class members' vehicles

is also defective and poses its own imminent and unreasonable risk of death or serious bodily

injury.

34.     New GM explicitly directed its lawyers and any outside counsel it engaged to

act to avoid disclosure of safety related defects – including the ignition switch defect – in GM

products.  These actions included settling cases raising safety issues, demanding that GM's

victims agree to keep their settlements secret, threatening and intimidating potential litigants

into not bringing litigation against New GM by falsely claiming such suits are barred by Order

26

09-50026-reg  Doc 12749-1  Filed 07/01/14  Entered 07/01/14 16:14:43  Exhibit A
Case 1:14-cv-00691-KBJ  Document 15  Filed 06/28/14  Page 27 of 53
Pg 28 of 54

of the Bankruptcy Court, and settling cases for amounts of money that did not require GM managerial approval, so management officials could maintain their false veneer of ignorance concerning the safety related defects. In one case, GM threatened the family of an accident victim with liability for GM's legal fees if the family did not withdraw its lawsuit, misrepresenting to the family that their lawsuit was barred by Order of GM's Bankruptcy Court. In another case, GM communicated by means of mail and wire to the family of the victim of a fatal accident caused by the faulty ignition switch that their claim has no basis, even though GM knew that its communication was false and designed to further GM's campaign of concealment and deceit. In other cases, GM falsely claimed that accidents or injuries were due to the driver when it knew the accidents were likely caused by the dangerous product defects GM concealed.

## TOLLING OF THE STATUTE OF LIMITATIONS

37.    Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

38.    The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their vehicles had the safety related defects described herein.

39.    Plaintiffs and Class Members had no reason to know that their products were defective and dangerous because of Defendants' active concealment.

## CLASS ACTION ALLEGATIONS

40.    Plaintiffs bring this lawsuit as a class action on their own behalves and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority

Case 1:14-cv-00691-KBJ    Document 15    Filed 06/28/14    Page 28 of 53

requirements of those provisions. All proposed Class and Subclass periods run from the
inception of New GM in October 2009 and continue until judgment or settlement of this case.

41.    Plaintiffs bring this action on behalf of a proposed nationwide class defined as
follows: All persons in the United States who, since the inception of New GM in October
2009, hold or have held a legal or equitable interest in a GM vehicle with a defective ignition
switch manufactured by Delphi and/or a defective fuel pump. As of the time of the filing of
this First Amended Complaint, Plaintiffs are aware that the following GM models contain
dangerous ignition switches:

- 2005-2011 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

- 2006-2010 Pontiac Solstice

- 2007-2010 Pontiac G5

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2005-2009 Buick Lacrosse

- 2006-2011 Buick Lucerne

- 2004-2005 Buick Regal LS & GS

- 2006-2014 Chevrolet Impala

- 2006-2008 Chevrolet Monte Carlo

- 2000-2005 Cadillac Deville

- 2004-2011 Cadillac DTS

As of the time of the filing of this First Amended Complaint, Plaintiffs are aware that the
following GM models contain dangerously defective fuel pumps:

Case 1:14-cv-90691-KBJ   Document 15   Filed 06/28/14   Page 29 of 53

- 2006-2010 Chevrolet Cobalt

- 2006-2007 Saturn Ion

- 2007-2009 Pontiac G5

- 2007 Chevrolet Equinox


42.   Plaintiffs also bring this action on behalf of the following Subclasses:

a.   The Elliotts bring this action on behalf of all persons in the District of
Columbia who, since October 2009, hold or have held a legal or equitable
interest in a GM vehicle with a defective ignition switch or defective fuel
pump as described above. The GM models include those listed in the
preceding paragraph (the "District of Columbia" Subclass);

b.   Ms. Summerville brings this action on behalf of all persons in the State of
Maryland who, since October 2009, purchased or hold or have held a legal
or equitable interest in a GM vehicle with a defective ignition switch and/or
fuel pump (the "Maryland Subclass");

c.   Ms. Summerville brings this action on behalf of residents of the District of
Columbia, Alaska, Arkansas, Delaware, Hawaii, Indiana, Kansas, Louisiana,
Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,
Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, North
Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas,
Utah, West Virginia, and Wyoming, who, since New GM's inception in
October 2009, purchased a GM vehicle containing the defective ignition
switch manufactured by Delphi and/or the defective fuel pump (the "Multi-
State Warranty Subclass");

    d.   Plaintiffs also bring this action on behalf of residents of the District of

Columbia and the States of California, Florida, Maryland, New Jersey and

Ohio who, since October 2009, hold or have held a legal or equitable

interest in a GM vehicle with a defective ignition switch and/or fuel pump

(the "Multi-State Negligence Subclass").

43.    Excluded from the Class are: (1) Defendants, any entity or division in which

Defendants have a controlling interest, and their legal representatives, officers, directors,

assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3)

governmental entities; and (4) those persons who have suffered personal injuries as a result of

the facts alleged herein.

## NUMEROSITY AND ASCERTAINABILITY

44.    Although the exact number of Class Members is uncertain and can only be

ascertained through appropriate discovery, the number is great enough such that joinder for

each Class or Subclass is impracticable. The disposition of the claims of these Class Members

in a single action will provide substantial benefits to all parties and to the Court. Class

Members are readily identifiable from information and records in GM's possession, custody, or

control, and/or from public vehicular registration records.

## TYPICALITY

45.    The claims of the Plaintiffs are typical of the claims of each member of the

class and subclasses in that the representative Plaintiffs, like all class members, legally or

equitably own or owned a GM vehicle during the Class Period that contained a defective

ignition switch manufactured by Delphi and/or a defective fuel pump. Plaintiffs, like all class

and subclass members, have been damaged by Defendants' misconduct, namely, in being

wrongfully exposed to an increased risk of death or serious bodily injury, in suffering

diminished use and enjoyment of their vehicles, and in suffering the diminished market value

of their vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all

class and subclass members.

## ADEQUATE REPRESENTATION

46.     Plaintiffs will fairly and adequately represent and protect the interests of the

class and subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting

consumer class actions and in prosecuting complex federal litigation. Plaintiffs and their

counsel are committed to vigorously prosecuting this action on behalf of the class and

subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have

interests adverse to those of the class of subclasses.

## PREDOMINANCE OF COMMON ISSUES

47.     There are numerous questions of law and fact common to Plaintiffs and Class

Members that predominate over any question affecting only individual Class Members, the

answers to which will advance resolution of the litigation as to all Class Members. These

common legal and factual issues include:

a.      Whether the vehicles owned by class or subclass members during the class

periods suffer from the defective ignition switch and/or defective fuel pump described

herein?

b.       Whether the defective ignition switch and/or fuel pump posed an unreasonable

danger of death or serious bodily injury?

c.      Whether GM and/or Delphi imposed an increased risk of death or serious bodily

injury on Plaintiffs and class and subclass members during the Class period?

d.      Whether GM and/or Delphi caused Plaintiffs and class and subclass members to

suffer economic loss during the Class period?

31

e.      Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer the loss of the use and enjoyment of their vehicles during the class period?

f.      Whether GM and Delphi had a legal duty to disclose the ignition switch danger to class and subclass members?

g.      Whether GM and/or Delphi had a legal duty to disclose the ignition switch danger to the NHTSA?

h.      Whether either GM and/or Delphi breached duties to disclose the ignition switch defect?

i.      Whether class and subclass members suffered legally compensable harm?

j.      Whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM Vehicle during the class period?

k.      Whether Defendants violated the consumer protection statutes of the District of Columbia and Maryland by concealing the ignition switch defect and/or the fuel pump defect from Plaintiffs and governmental officials?

l.      Whether Defendants violated Maryland's consumer protection statute by concealing material facts about and making affirmative misrepresentations about GM cars in connection with sales made since the inception of the New GM?

m.      Whether the fact that the ignition switch was defective was a material fact?

n.      Whether Ms. Summervilles and the Multi-State Warranty Subclass members' vehicles were merchantable?

o.      Whether Plaintiffs and Class Members are entitled to a declaratory judgment stating that the ignition switches and/or fuel pumps in their vehicles are defective and/or not merchantable?

p.      Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction?

q.      Whether GM should be declared responsible for notifying all Class Members of the Defect and ensuring that all GM vehicles with the Ignition Switch Defect are recalled and repaired?

r.      Whether Defendants conducted a criminal enterprise in violation of RICO?

s.      Whether Defendants engaged in a pattern or practice of racketeering?

t.      Whether Defendants committed mail or wire fraud in connection with their concealment of the defective ignition switch.

u.      Whether class members were harmed by Defendants' violations of RICO?

v.      Whether class and subclass members are entitled to recover punitive damages from Defendants, and, if so, what amount would be sufficient to deter Defendants from engaging in such conduct in the future and to punish Defendants for their recklessness regarding the public health and safety and their campaign of concealment?

### SUPERIORITY

48.     Plaintiffs and class and subclass members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most class and subclass members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual class and subclass member's claims, it is likely that few could afford to seek legal redress for Defendants' misconduct. Absent a class action, class and subclass members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and

fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication. The class action is superior for defendants as well, who otherwise could be forced to litigate thousands of separate actions.

49. Defendants have acted in a uniform manner with respect to the Plaintiffs and class and subclass members. Class and subclass wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of class and subclass members to protect their interests. Class and subclass wide relief assures fair, consistent, and equitable treatment and protection of all class and subclass members.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF RACKETEER INFLUENCED**
**AND CORRUPT ORGANIZATIONS ACT**
**(18 U.S.C. § 1962(c) and (d))**

50. Plaintiff incorporates by reference each preceding paragraph as though fully set forth at length herein.

51. This claim is brought by all Plaintiffs on behalf of the nationwide Class.

52. Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the "RICO Enterprise" through a "pattern of racketeering activity." Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c).

53. At all times relevant, GM, Delphi, its associates-in-fact, Plaintiffs, and the Class and Subclass members are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

34

54.     At all times relevant, Plaintiff and each class and subclass member were and are

"a person injured in his or her business or property" by reason of a violation of RICO within

the meaning of 18 U.S.C. § 1964(c).

55.     At all times relevant, GM and Delphi are and were each a "person" who

participated in or conducted the affairs of the RICO Enterprise through the pattern of

racketeering activity described below. While GM and Delphi each participated in the RICO

Enterprise, they each exist separately and distinctly from the Enterprise. Further, the RICO

Enterprise is separate and distinct from the pattern of racketeering activity in which GM and

Delphi have engaged and are engaging.

56.     At all times relevant, GM and Delphi were associated with, operated or

controlled, the RICO Enterprise, and participated in the operation and management of the

affairs of the RICO Enterprise, through a variety of actions described herein. Defendants'

participation in the RICO Enterprise was necessary for the successful operation of its scheme

to defraud.

## The RICO Enterprise

57.     Defendants participated in the operation and management of an association-in-

fact enterprise whose aim was to conceal safety related defects in Delphi products installed in

GM vehicles from Plaintiffs, class members, the NHTSA, litigants, courts, law enforcement

officials, consumers, and investors. The Enterprise was motivated by the common design of

concealing the true value of the defendant companies and their products, and it constituted an

unlawful, continuing enterprise calculated to gain an unfair advantage over competitor

automakers who conduct their business within the bounds of the law. The Enterprise was partly

embodied in practices and procedures intended to mischaracterize safety related defects – such

as the ignition switch – as "customer convenience issues" to avoid incurring the costs of a

recall, and minimizing the significance of disclosures that were made by limiting the scope of their gas-pump recall to five and then seven states.

58.   The RICO Enterprise began with the inception of New GM, on October 19, 2009. The following persons, and others presently unknown, have been members of and constitute the association-in-fact enterprise with the following roles:

a)   New GM, which mandated its employees take the various measures, described above at paragraph 26, to conceal safety related defects, including the ignition switch and the fuel pump defects.

b)   GM's engineers (including but not limited to Ray DeGiorgio, Gary Altman, a program engineering manager, Michael Robinson, vice president for environmental sustainability and regulatory affairs, Gay Kent, general director of product investigations and safety regulations) who have carried out GM's directives since the inception of New GM in October 2009 by minimizing and misrepresenting the safety aspects of the ignition switch defect – enabling GM to avoid its legal obligations to recall vehicles with safety related defects. GM's engineers (including but not limited to Mr. DeGiorgio, Mr. Altman, Mr. Robinson and Ms. Kent) have also concealed the part-number-labeling fraud of which they have known since New GM's inception in October 2009.

c)   GM's in-house lawyers (including but not limited to Jaclyn Palmer, Ron Porter, William Kemp, Lawrence Buonomo, and Jennifer Sevigny), who knowingly assisted GM in evading its legal responsibilities by taking measures allowing GM management to claim ignorance about the increasing number of accidents and personal injuries that the ignition switches were causing throughout the Class period. GM's in-house lawyers,

as described in Paragraph 36, also took measures to ensure that lawsuits filed by victims of the ignition switch defect and their surviving families were settled confidentially – preventing them from revealing the defect to other Plaintiffs, class members, law enforcement officials, or other government authorities, including the NHTSA – for amounts below the threshold that would trigger closer scrutiny within GM.

d)      GM's outside lawyers, retained to defend the Company against lawsuits filed by victims with injuries allegedly caused by the ignition switch defect, who were directed to play, and played, the same roles as those of in-house counsel described above – taking analagous measures to help GM conceal the ignition switch defect.

e)      Delphi, who, since the inception of the new GM in October 2009, has participated in the Enterprise to conceal the defective ignition switch system and its knowledge that ignition switch part numbers on vehicles driven by class members during the class period were misleading or fraudulent and would hinder any attempt to investigate or learn about the ignition switch defect.

f)      GM's Dealers, including but not limited to Ourisman of Marlow Heights, whom New GM instructed, explicitly or implicitly, to present false and misleading information regarding the ignition switch and fuel pump defects to Plaintiffs and Class members, through, *inter alia*, Technical Service Bulletins and Information Service Bulletins, and who did, in fact, present such false and misleading information to Plaintiffs and Class members during the Class period.

58.     GM and Delphi conducted and participated in the affairs of this RICO Enterprise through a continuous pattern of racketeering activity that began with the inception

of the New GM in October 2009, and that consisted of numerous and repeated violations of the

federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and 18 U.S.C. § 1512

(tampering with witnesses and victims).

### Predicate Acts of Wire and Mail Fraud

59.     Since its inception in October 2009 and in furtherance of its scheme to defraud,

GM, its engineers and its lawyers communicated with Delphi on a regular basis via the mail

and/or wires regarding the defective ignition switch. Through those communications, GM

instructed Delphi to continue concealing the ignition switch defect and to continue to produce

ignition mislabeled or fraudulently labeled switches to help GM evade detection of New GM's

unlawful failure to recall vehicles with defective ignition switches by the NHTSA or other law

enforcement officials. GM's and Delphi's communications constitute repeated violations of 18

U.S.C. §§ 1341 and 1343.

60.     Since GM's inception in October 2009, in furtherance of its scheme to defraud,

GM's lawyers communicated with those claiming injuries caused by the ignition switch defects

on a regular basis via the mail and/or wires. Upon information and belief, GM's lawyers

utilized the mail and wires to insist that litigants agree to confidentiality agreements forbidding

disclosure that the ignition switch defects caused their injuries, and to communicate with

supervisors and each other about ensuring that the cases settled below the threshold that would

trigger scrutiny that might endanger Defendants' concealment of the ignition switch defects.

61.     Since its inception in October 2009, GM has routinely used the wires and mail

to disseminate false and fraudulent advertising about Plaintiffs' and Class members' vehicles,

misrepresenting the vehicles as safe and dependable and failing to disclose the ignition switch

or fuel pump defects in its advertising.

### Predicate Acts of Tampering With Witnesses and Victims

62.     New GM engaged in an ongoing scheme to tamper with witnesses and victims
as described in 18 U.S.C. § 1512(b) by using misleading conduct to influence, delay and
prevent the testimony of victims in official proceedings and by entering into a campaign of
intimidation and false statements to discourage victims from pursuing their claims against GM,
as described elsewhere in the complaint. New GM's in-house legal office played an integral
role in the RICO Enterprise by instituting and/or continuing policies and practices with respect
to potential and ongoing legal proceedings designed to intimidate victims from utilizing the
courts to seek legal protection and to prevent outsiders from becoming aware of the number of
victims of safety related defects in GM cars and the severity of injuries those defects were
causing.  GM instructed its counsel to deny to victims and their families the existence of the
ignition switch defect, and to place blame for any injuries on driver error or irresponsible
driving. GM instructed its counsel to prepare its corporate and fact witnesses by encouraging
them to deny that they remember anything about any topic on which they were questioned.
GM's lawyers actively discouraged GM personnel from taking any notes at safety related
meetings. In furtherance of its scheme to conceal its wrongful behavior, GM insisted as a
condition of providing any compensation to victims that they agree to confidentiality
agreements designed to prevent detection of the safety related defect at issue by Plaintiffs,
Class and Subclass members, the NHTSA, courts, litigants, and investors.  New GM also
corruptly encouraged its employees and engaged in misleading conduct to prevent said
employees from reporting safety defects and therefore delay or prevent their testimony about
said defects. GM accomplished this by, *inter alia*, punishing employees who raised red flags
about safety defects, thus intentionally intimidating and threatening employees who otherwise
could have raised red flags. Jaclyn Palmer, Ron Porter, William Kemp, Lawrence Buonomo,

and Jennifer Sevigny, five of GM's in-house lawyers responsible for carrying the tasks

described herein, were fired by GM in June 2014, after the Enterprise came to light.

63.     Defendants' conduct in furtherance of this scheme to conceal and/or minimize

the significance of the ignition switch defect and fuel pump defect was intentional. Plaintiff,

Class and Subclass members were harmed in that they were forced to endure increased risk of

death or serious bodily injury, they lost use and enjoyment of their vehicles, and their vehicles'

values have diminished because of Defendants' participation in conducting the RICO

Enterprise. The predicate acts committed in furtherance of the enterprise each had a significant

impact on interstate commerce.


## COUNT II
### Asserted on Behalf of Plaintiffs and the Nationwide Class
### (Common Law Fraud)

64.     Plaintiffs hereby incorporate by reference all allegations contained in the

preceding paragraphs of this Complaint.

65.     At the time of New GM's inception in 2009, Defendants knew that the ignition

switch used or which would be placed in the Plaintiffs' and class members' vehicles could

inadvertently move from "run" to "accessory" or "off," under regular driving conditions. This

fact was material to Plaintiffs and class members.

66.     In late October 2009, Defendants also knew that the fuel pump design in the

Chevrolet Cobalt was prone to cause fuel leakage and fires.

67.     Between October 2009 and February 2014, Defendants actively and

intentionally concealed and/or suppressed the existence and true nature of the ignition switch

and fuel pump defects, and minimized the extent of the danger they posed in direct and indirect

communications with Plaintiffs, class and subclass members, dealers, the NHTSA, and others.

68.     Plaintiffs and class members reasonably relied on GM's communications and material omissions to their detriment. As a result of the concealment and/or suppression of facts, Plaintiffs and Class Members have sustained and will continue to sustain injuries, consisting of the diminished value of their GM vehicles and the lost use and enjoyment of the vehicles that Defendants actions have caused, and exposure to increased risk of death or serious bodily injury.

69.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and with reckless disregard to Plaintiffs' and Class Members' rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
**Asserted on Behalf of Ms. Summerville and the Nationwide Subclass of Class Members Who Purchased their Vehicles after New GM's Incorporation on October 19, 2009 (Common Law Fraud)**

70.     Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

71.     This Claim is brought on behalf of Berenice Summerville and the subclass of consumers who purchased their vehicles after New GM's incorporation on October 19, 2009.

72.     Upon incorporation of New GM, Defendants knew that ignition switch used in the 2010 Chevrolet Cobalt and other Class Vehicles purchased after October 10, 2009 could inadvertently move from "run" to "accessory" or "off," under regular driving conditions, and that the fuel pump was dangerously defective and posed an unreasonable risk of death or serious bodily injury.

73.    Prior to November 2009, Defendants also knew that the fuel pump design in the
Chevrolet Cobalt was improperly placed and prone to leakage and even fire.

74.    Between October 2009 and February 2014, Defendants actively and
intentionally concealed and/or suppressed the existence and true nature of the ignition switch
and fuel pump defects, and minimized the extent of the danger they posed. Concealment of the
fuel pump defect continues to the present.

75.    Because Defendants were in exclusive control of the material facts concerning
the ignition switch and fuel pump defects, Plaintiffs' and Class Members' actions in
purchasing and driving the dangerous vehicles were justified because they had no way of
knowing that material facts had been concealed. Plaintiffs and Class Members would not have
acted as they did in purchasing and driving their cars if they had known of the concealed and/or
suppressed facts.

76.    In the alternative, even if a class member would still have made the vehicle
purchase had the defects been known, they would have paid less for their vehicles but for the
concealment of the defect. The concealment of the defects artificially increased the market
price of the vehicles.

77.    As a result of the concealment and/or suppression of facts, Plaintiffs and Class
Members have sustained, and continue to sustain, damages arising from the difference in value
between the prices they were induced to pay for their vehicles, and the true value of a vehicle
with a defective ignition switch or fuel pump.

78.    Defendants' acts were done maliciously, oppressively, deliberately, with intent
to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being,
in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive

42

damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV
**Asserted on Behalf of Plaintiffs and on Behalf of the Multi-State Negligence Subclass (Negligent Infliction of Economic Loss and Increased Risk under the Common Law of the District of Columbia and Florida, Maryland, New Jersey, and Ohio)**

79.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

80.     This claim is brought on behalf of Plaintiffs and the District of Columbia and Maryland Classes and, with respect to the fuel pump defect, the District of Columbia and Maryland subclasses of consumers whose vehicles also suffer from the fuel pump defect described in Paragraph 21.

81.     Because the defective ignition switches and fuel pumps created a foreseeable risk of severe personal and property injury to drivers, passengers, other motorists, and the public at large, Defendants had a duty to warn consumers about, and fix, the defect as soon as soon as they learned of the problem – upon the inception of New GM in October 2009.

82.     Rather than alerting vehicle owners to the danger, Defendants actively concealed and suppressed knowledge of the problems.

83.     Defendants created an unreasonable risk of death or serious bodily injury to Plaintiffs and Subclass members. Plaintiffs and Subclass members were particularly identifiable and foreseeable victims of Defendants' negligence, and their injuries in terms of the diminution in the value of their vehicles and the loss of use and enjoyment of the vehicles was particularly foreseeable.

84.     Defendants created an unreasonable risk of death or serious bodily injury through a pattern and practice of negligent hiring and training of its employees, and by creating

and allowing to continue a culture at GM which encouraged the minimizing and hiding of safety defects from the public. GM negligently increased this risk by firing or otherwise retaliating against employees who did attempt to convince GM to fix safety problems.

85.    As a result of Defendants' failure to warn them about the defects or repair their vehicles, Plaintiffs and Class Members sustained, and continue to sustain, damages arising from the increased risk of driving vehicles with safety related defects, from the loss of use and enjoyment of their vehicles, and from the diminished value of their vehicles attributable to Defendants' wrongful acts.

86.    Plaintiffs and class members seek compensatory damages in an amount to be proved at trial, including compensation for any pain and suffering they endured.

## COUNT V
**Asserted on Behalf of Mr. and Mrs. Elliott, for themselves, as representatives of the public, and on behalf of the District of Columbia Subclass**
**(Violation of the District of Columbia's Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.*)**

87.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

88.    This Count is brought on behalf of Mr. and Mrs. Elliott and the District of Columbia Subclass.

89.    Plaintiffs are "consumers" within the meaning of the CPPA, § 28-3901(a)(2).

90.    Defendants are "persons" within the meaning of the CPPA, § 28-3901(a)(1).

91.    Upon the inception of GM in 2009, Defendants knew the Elliotts' and Subclass members' vehicles, due to the ignition switch defect, are prone to engine and electrical failure during normal and expected driving conditions. The potential concurrent loss of control of the vehicle and shut down of safety mechanisms such as air bags and anti-lock brakes makes

Subclass Vehicles less reliable, less safe, and less suitable for normal driving activities
inhibiting their proper and safe use of their vehicles, reducing their protections from injury
during reasonably foreseeable driving conditions, and endangering Subclass members, other
vehicle occupants, and bystanders. GM knew that the defective fuel pumps in the vehicles
posed unreasonable risks of death, serious bodily injury, and property damage to the Elliotts,
Subclass members, and bystanders. Because of the life threatening nature of these defects, their
existence was a material fact that Defendants concealed from plaintiffs and class members.

92.     Subclass members had no reason to believe that their vehicles possessed
distinctive shortcomings; throughout the Class Period, they relied on Defendants to identify
latent features that distinguished Plaintiffs' and Subclass members' vehicles from similar
vehicles without the ignition switch and fuel pump defects, and the Defendants' failure to do so
tended to mislead consumers into believing the Class Vehicles were safe to drive.

93.     Defendants violated D.C. Code § 28-3904(f) by failing to state a material fact,
the omission of which tended to mislead consumers.

94.     Defendants violated the District of Columbia's consumer protection act
generally by violating the common law governing fraud and negligence of the District of
Columbia.

95.     Defendants violated the CPPA because any violation of any state or federal
regulation of any trade practice is also a violation of the CPPA, so each complaint of each
violation of federal law described above, including allegations of GM's violations of the Tread
Act, "), 49 U.S.C. §§ 30101-30170, is also a predicate violation of the CPPA.

96.     Plaintiffs seek treble damages, or $1,500 per violation, whichever is greater,
payable to the consumer, an order enjoining Defendants' unfair or deceptive acts or practices,
attorneys' fees, punitive damages, and any other just and proper relief available under D.C.

Code § 28-3905(k)(2), including preliminary and permanent injunctive relief aimed at

providing protection for the People of the District of Columbia from Defendants' reckless

endangerment of the public health and their wanton disregard for the law.

## COUNT VI
### Asserted on Behalf of Ms. Summerville and the Maryland Subclass
### (Violation of Maryland's Consumer Protection Act ("MDCPA"),
### Md. Code, Comm. Law § 13-101 *et seq.*)

97.     Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint.

98.     This Count is brought on behalf of Ms. Summerville, the Maryland Class

generally with respect to the alleged violations of MDCPA § 13-301(3) and the portion of the

Maryland Class who purchased vehicles after October 19, 2009, with respect to violations of

MDCPA §§ 13-301(2)(i), 13-301(2)(iv), and 13-301(3).

99.     Plaintiffs are "consumers" within the meaning of MDCPA, § 13-101(c)(1).

100.     Defendants are "merchants" within the meaning of MDCPA, § 13-

101(g)(1).

101.     Upon the inception of GM in 2009, Defendants knew the Elliotts' and Subclass

members' vehicles, due to the ignition switch defect, are prone to engine and electrical failure

during normal and expected driving conditions. The potential concurrent loss of control of the

vehicle and shut down of safety mechanisms such as air bags and anti-lock brakes makes

Subclass Vehicles less reliable, less safe, and less suitable for normal driving activities

inhibiting their proper and safe use of their vehicles, reducing their protections from injury

during reasonably foreseeable driving conditions, and endangering Subclass members, other

vehicle occupants, and bystanders.  GM knew that the defective fuel pumps in the vehicles

posed unreasonable risks of death, serious bodily injury, and property damage to the Elliotts,

Subclass members, and bystanders. Because of the life threatening nature of these defects, their existence was a material fact that Defendants concealed from plaintiffs and class members in violation of Md. Code, Comm. Laws § 13-301(3). Plaintiffs were injured thereby having to endure unreasonable risk of death, serious bodily imjury, and diminution of the value of each of their vehicles.

102.    At no time during the Class Period did Ms. Summerville and Subclass members have access to the pre-release design, manufacturing, and field-testing data, and they had no reason to believe that their vehicles possessed distinctive shortcomings. Throughout the Class Period, they relied on Defendants to identify any latent features that distinguished their vehicles from similar vehicles without the ignition switch and fuel pump defects, and the Defendants' failure to do so tended to mislead consumers into believing no distinctive defect was present in their vehicles.

103.    With respect to Maryland Subclass members like Ms. Summerville who purchased their defective vehicles since October 19, 2009, Defendants violated Md. Code, Comm. Laws § 13-301(2)(i) by falsely representing, through advertising, warranties, and other express representations, that the Class Vehicles had characteristics and benefits which they did not actually have, namely, reasonably safe design and component parts.

104.    With respect to Maryland Subclass members like Ms. Summerville who purchased their defective vehicles since October 19, 2009, Defendants violated Md. Code, Comm. Laws § 13-301(2)(iv) by falsely representing through advertising, warranties, and other express representations, that the Class Vehicles met a certain standard or quality which they did not.

105.    With respect to the Subclass generally without regard to whether they purchased their vehicle after October 129, 2009, Defendants violated Md. Code, Comm. Laws § 13-

47

301(3) throughout the Class Period by failing to state a material fact, the omission of which tended to mislead consumers, by concealing the ignition switch and fuel pump defects from Ms. Summerville and Subclass members.

106.    Plaintiffs seek an order enjoining Defendants' unfair or deceptive acts or practices, and attorney's fees, and any other just and proper relief available under Md. Code, Com. Laws § 13-408.

## COUNT VII
### Asserted on behalf of Ms. Summerville and the Multi-State Class
### (Breach of Implied Warranty of Merchantability Under § 2-314 of the UCC)

107.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

108.    This Count is brought on behalf of Ms. Summerville and the Multi-State Warranty Class.

109.    Plaintiffs are "buyers" within the meaning of the Uniform Commercial Code.

110.    Defendants GM and Delphi are "sellers" within the meaning of the Uniform Commercial Code because the Multi-State class members' jurisdictions do not require privity with the buyer for a breach of the implied warranty of merchantability claim.

111.    Subclass members who purchased Class Vehicles from Defendants since October 19, 2009, did so under an implied warranty that the vehicles would be merchantable. Because of the poor design of the fuel pump, which made leakage and fire more likely, and because of the ignition switch defect, their vehicles are not fit for ordinary purposes for which such vehicles are generally used and are therefore not merchantable.

112.    Defendants sold goods that were not merchantable, because those goods are not fit for the ordinary purposes for which such goods are used – the vehicles were marketed and intended to be driven, but become unsafe under ordinary driving conditions.

48

113.    Ms. Summerville and the Multi-State Class members were injured in that they did not receive the full benefits of their bargains with Defendants and seek to recover an amount to make them whole, or seek to exercise their contractual rights of rescission and return to the *status quo ante* by allowing them to return their vehicles to GM for a full refund, and to seek any other rights and remedies afforded them under the Uniform Commercial Code as buyers injured by the total breach of the seller in failing to tender a merchantable product as promised.

### COUNT VIII
**Asserted on Behalf of Plaintiffs and the Nationwide and all Subclasses**
**(Civil Conspiracy and Joint Action or Aiding and Abetting)**

114.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

115.    This Count is brought on behalf of the nationwide Class and all Subclasses.

116.    Defendants are jointly and severally liable for Plaintiffs' and Class and Subclass members' injuries because they acted in concert to cause those injuries.

117.    Defendants are also liable for Plaintiffs' and class and subclass members' injuries because they entered into specific agreement, explicit and implied, with each other and with others, including but not limited to the other defendants, dealers, engineers, accountants and lawyers (the co-conspirators) described in the preceding paragraphs of this First Amended Complaint, to inflict those injuries and to conceal their actions from Plaintiffs, Class and Subclass members and others.  By these agreements, Defendants conspired to violate each of the laws that form the basis for the claims in the preceding Counts of this Complaint.

118.    Defendants each committed overt acts in furtherance of the conspiracy.

119.    Defendants knew that the conduct of the co-conspirators constituted a breach of duties to the plaintiffs.

120.    Defendants gave substantial assistance and encouragement to the co-conspirators in their course of conduct in violation of the rights of the plaintiffs.

121.    Defendants were aware that their assistance and encouragement of the wrongful acts herein complained of substantially assisted the wrongful acts herein complained of.

122.    The wrongful acts herein complained of harmed plaintiffs.

123.    All defendants are therefore liable under civil conspiracy and civil aiding and abetting for all harm to plaintiffs and class members as described in this complaint.

## ALLEGATIONS IN SUPPORT OF
## PRELIMINARY RELIEF

124.    As of the date of the filing of this Complaint, GM concedes that some 6.5 million GM products have safety related defects that create an unreasonable danger of death or serious bodily harm to their drivers, vehicle occupants, nearby drivers, and bystanders.

125.    Despite purporting to come clean about its campaign of concealment and deceit in February 2014, GM has failed to take measures to ensure that these vehicles do not remain on the roads as a source of further death and injury.  Tens of thousands of GM vehicles with safety related defect threatening moving stalls and other dangerous conditions are driven within the District of Columbia by D.C. resident and commuters.

126.    GM has recklessly endangered the public health and safety of the People of the District of Columbia.

127.    One of the main purposes of the "representative action" authorized by the law of the District of Columbia is to allow private citizens such has Mr. and Mrs. Elliott to who are

entitled to relief in this representative action to assist public authorities in protecting the public interest.

<h1 style="text-align:center">PRAYER FOR RELIEF</h1>

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter a judgment against GM and Delphi, and grant the following relief:

E.     Determine that the Elliotts may act as representatives of the public on behalf of the People of the District of Columbia;

F.     Declare, adjudge and decree that Defendants have recklessly endangered the public safety of the People of the District of Columbia and order specific steps that Defendants must take to restore public safety, including but not limited to preliminary relief aimed at removing the unreasonably dangerous GM vehicles from the public streets and thoroughfares of the District forthwith; providing safe replacement vehicles for Plaintiffs and Class and Subclass members that do not contain safety related defects; and, in light of the nature of GM's wrongdoing, the substantial threat to the public health it has wrongfully caused, its apparent management recalcitrance or incompetence as evidenced by GM's failure to take significant remedial steps for the past six months since it has publicly admitted its years-long campaign of concealment and deceit, the appointment of a Special Master with expertise in the automobile industry and ethical risk management practices to assist in the judicial supervision of GM's management reforms designed to ensure that the Company does not continue to threaten the public safety in the future; and permanent injunctive relief aimed at ensuring that GM deploys reasonable and responsible management controls with respect to safety or cease its business of manufacturing for sale to the public complex products that can so easily be a threat of death of serious bodily injury if not manufactured properly.

G.      Determine that this action may be maintained as a Class action and certify it as

such under Fed. R. Civ. P. 23(a) and 23(b)(3) and/or Fed. R. Civ. P. 23(b)(2), and/or Fed. R.

Civ. 23(c)(2), or alternatively certify all issues and claims that are appropriately certified; and

designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen

counsel as Class Counsel;

H.      Declare, adjudge and decree that the ignition switches in Plaintiffs' and Class

and Subclass Members vehicles are defective;

I.      Declare, adjudge and decree that the fuel pumps in Plaintiffs' and Class and

Subclass Members' vehicles are defective;

J.      Declare, adjudge and decree that Defendants violated 18 U.S.C. §§ 1962(c) and

(d) by conducting the affairs of the RICO Enterprise through a pattern of racketeering activity

and conspiring to do so;

K.      Declare, adjudge and decree the conduct of Defendants as alleged herein to be

unlawful, unfair, and/or deceptive, enjoin any such future conduct, and direct Defendants to

permanently, expeditiously, and completely repair the Plaintiffs', Class and Subclass

Members' vehicles to eliminate the ignition switch and fuel pump defects or, in the case of

Class and Subclass Members who purchased their vehicles after October 9, 2009, declare GM

in total breach of contract for its failure to tender a merchantable vehicle, and order GM to

return the full purchase price paid upon surrender of the vehicle at the election of the Class and

Subclass member;

L.      Declare, adjudge and decree that Defendants are financially responsible for

notifying all Class Members about the defective nature of the Class Vehicles;

M.      Declare, adjudge and decree that Defendants must disgorge, for the benefit of

Plaintiffs, Class Members, and Subclass Members all or part of the ill-gotten gains it received

from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class

Members;

N.     Award Plaintiffs, Class Members, and Subclass Members the greater of actual,

compensatory damages or statutory damages, or treble damages under the CPPA, as proven at

trial;

O.     Award Plaintiff and the nation-wide Class Members treble damages pursuant to

18 U.S.C. § 1964(c);

P.     Award Plaintiff, Class Members, and Subclass Members punitive damages in

such amount as proven at trial;

Q.     Award Plaintiff, Class Members and Subclass Members their reasonable

attorneys' fees, costs, and prejudgment and postjudgment interest; and

R.     Award Plaintiff, Class Members, and Subclass Members such other further and

different relief as the case may require or as determined to be just, equitable, and proper by this

Court.

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on all the legal claims alleged in this Complaint.


Respectfully submitted,

_____/s/_____
Daniel Hornal
Talos Law
D.C Bar #1005381
705 4th St. NW #403
Washington, DC 20001
(202) 709-9662
daniel@taloslaw.com
Attorney for Plaintiffs

53