**Hearing Date: August 5, 2014 at 9:45 a.m. (Eastern Time)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------------x

**PLAINTIFFS LAWRENCE AND CELESTINE ELLIOTT'S NO STAY PLEADING
PURSUANT TO THE COURT'S SCHEDULING ORDERS AND MOTION FOR
ORDER OF DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION
PURSUANT TO BANKR. R. 7012(b) AND FOR RELATED RELIEF**

# Table of Contents

Table of Authorities ................................................................................................. 3

Introduction ............................................................................................................. 4

**Preliminary Statement Regarding the Court's Case Management Concerns** ........................ 5

**PROCEDURAL AND FACTUAL BACKGROUND** .............................................. 14

   1.   **The Sale Order and MSPA** ................................................................................ 14

   2.   **The Elliotts' Lawsuit** ........................................................................................ 15

   3.   **Claims asserted in the Elliotts' proposed FAC** ........................................... 18

**ARGUMENT** ......................................................................................................... 21

   1.   **The Elliotts' Claims Do Not Pertain to any of the Liabilities that were the Subject of the Sale Order and MSPA.** ...................................................................... 21

   2.   **GM's Shell Game in this Proceeding Regarding "Pre-Petition Vehicles and Parts"** ............ 23

   3.   **This Court Lacks Subject Matter Jurisdiction over the Elliotts' claims** ................................ 31

     a.  GM Bears the Burden of Establishing this Court's Subject Matter Jurisdiction. ...................... 31

     b.  The Elliotts Claims Do Not "Relate to" Any Proceeding Before the Court. ............................ 31

## Table of Authorities

### Cases

*In re Cuyahoga Equip. Corp.*, 980 F.2d 110 (2d Cir. 1992)........................................................ 32

*In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002)............................................................. 11

*In re Dreir*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010) .................................................................. 33

*In re Fairchild Aircraft Corp.*, 184 B.R. 910 (Bankr. W.D. Tex. 1995) ................................. 32

*In re Grumman*, 445 B.R. 243, 255 (Bankr. S.D.N.Y. 2011) ..................................................... 33

*In re Johns Manville Corp.*, 517 F.3d 52 (2d Cir. 2008) .......................................... 28, 32, 33, 34

*In re Kubly,* 818 F.2d 643 (7th Cir. 1987) ............................................................................... 33

*In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005)........................................ 11

*In re Old Carco LLC*, 492 B.R. 392 (Bankr. S.D.N.Y. 2013) .................................................... 32

*In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012) ................................................................ 32

*In re Specialty Equip. Cos.,* 3. F. 3d 1043 (7th Cir. 1993) ...................................................... 11

*In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995) ........................................................................ 33

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994)....................................................... 31

*Matter of Mooney Aircraft, Inc.*, 730 F.2d 367 (5th Cir. 1984)................................................ 32

*Teachers Ins. & Annuity Ass'n of Am. v. Bultur*, 803 F.2d 61 (2d Cir. 1986) ........................... 11

### Statutes

18 U.S.C. § 1962 ....................................................................................................................... 19

28 U.S.C. § 1334 ....................................................................................................................... 31

28 U.S.C. § 157 ......................................................................................................................... 31

D.C. Code § 28-3901 ............................................................................................................ 7, 20

D.C. Code § 28-3905 ................................................................................................................... 7

Fed. Bankr. R. 7012(b) ............................................................................................................... 4

Fed. R. Civ. P. 12(b)(6)............................................................................................................. 17

U.S. Const. art. III ..................................................................................................................... 31

### Introduction

Plaintiffs Lawrence and Celestine Elliott[1] submit this No Stay Pleading pursuant to this Court's May 16, 2014 Scheduling Order[2] as qualified by the Court's July 8, 2014, Order,[3] permitting them to file this request at this time.

Mr. and Mrs. Elliott also move pursuant to Fed. Bankr. R. 7012(b) for an Order of Dismissal from this proceeding of their action against New GM, *Elliott v. General Motors LLC*, Docket No. 1:14-cv-00691 (D.D.C. Apr. 23, 2014), ("the Elliott lawsuit") because this Court lacks subject matter jurisdiction over each of their claims.

The ground for the Elliotts' requested relief is that the Elliotts' lawsuit does not fall within the terms of the Court's Sale Order[4], or GM's Motion to Enforce that Order[5], or this Court's constitutionally limited subject matter jurisdiction, because Mr. and Mrs. Elliott assert no claims that arose when Old GM was conducting business or that can be traced in any way to liabilities that Old GM may have retained when New GM purchased assets from it. They assert no claims about Old GM's conduct at all. The Elliotts' third party claims against non-debtor New

---

[1] The Elliotts and their counsel are not specialists in Bankruptcy law and, although they are no longer acting *pro se*, they lack resources to retain specialized counsel for these proceedings. They respect that the Court and other lawyers involved in these proceedings have long experience and deep knowledge of the subject. They trust that this attempt to speak the local language will be appreciated even if pronunciation may be garbled and the accent imperfect.

[2] *See* Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929 (*In re Motors Liquidation,* 1:09-bk-50026, Doc. No. 12697 ¶5) (hereinafter "May 16 Scheduling Order").

[3] *See* Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929 (*In re Motors Liquidation,* 1:09-bk-50026, Doc. No. 12697 ¶5) (hereinafter "May 16 Scheduling Order").

[3] *See* Order Restraining Lawrence and Celestine Elliott and their Counsel (*Id.* Doc. No. 12763).

[4] *See* Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (II) Authorizing assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief (*In re Motors Liquidation*, 1:09-bk-50026, Doc. No. 2968, July 5, 2009).

[5] *See* Motion to Enforce the Court's July 2009 Sale Order and Injunctions, .*In re Motors Liquidation*, 1:09-bk-50026, Doc. No. 12620, April 21, 2014).

GM are *solely and exclusively* based on breaches of independent, non-derivative duties that New GM directly owed them – unrelated to any duties Old GM may *also* have owed them. They allege that New GM breached New GM's duties, causing the Elliotts to suffer legally cognizable harm. The Sale Order did not purport to encompass and, as explained below, could not constitutionally encompass, their claims. Because their claims are not "related to" any proceedings before this Court, this Court lacks jurisdiction to stay their lawsuit or to restrict the Elliotts in any way, so their action ought to be dismissed from these proceedings forthwith. Orders of this Court directed at Mr. and Mrs. Elliott, their counsel and others working with them, should be vacated.

### Preliminary Statement Regarding the Court's Case Management Concerns

At the July 2, 2014, hearing on this matter, the Court directed counsel for Plaintiffs to address the Court's concerns that granting relief from the Scheduling Order Stay to Plaintiffs in one lawsuit may disrupt the entire case management structure that the Court and other parties before it have worked so diligently, and apparently cooperatively, to achieve. The Court is, understandably, concerned that such relief will encourage a stream of additional Plaintiffs to exercise their reserved rights to apply for similar relief from their own stipulated stays,[6] undoing the effort it has taken to coordinate all of the cases before the Court.

---

[6] Since retaining counsel, the Elliotts have consistently maintained and sought an opportunity to present to the Court their contention that this Court lacks subject matter jurisdiction over their action. It appears counsel failed to engage the Court's singular case management concerns at the July 2, 2014, hearing. In counsel's non-Bankruptcy litigation experience, tribunals are accustomed to treating questions that go to the jurisdiction of the tribunal as conceptually and chronologically antecedent to the question of how to manage cases properly within its jurisdiction. *See* Declaration of Gary Peller (attached to this pleading as Exhibit 1) (hereinafter "Peller Declaration"), ¶ 4. To the extent that counsel did not appropriately engage the Court at the July 2, 2014, hearing, Plaintiffs endeavor to address those concerns here.

The Elliotts, as *pro se* litigants throughout April and May 2014, were never invited to participate in, or advised about what transpired at, the meetings during which lawyers representing Plaintiffs in other lawsuits agreed *they* should consent to the Scheduling Order and stay *their* lawsuits until the "threshold issues" are resolved.[7] Nevertheless, the Elliotts appreciate the need for orderly disposition of the issues that the Court faces and the difficulties of integrating *pro se* litigants into the Court's processes that take place so far from where many litigants reside, literally and figuratively. Plaintiffs embrace the principles that the Court enunciated: actions similarly situated with respect to the claims that they assert must be treated similarly, and, in a consolidated proceeding like this, no one group should be permitted unfairly to "jump ahead" of others.

The Elliotts' straightforward response to the Court's concern is that their lawsuit never should have been here in the first place. The Elliotts' lawsuit should not be part of the group of lawsuits that this Court must (or even has jurisdiction to) manage, because the Elliotts' lawsuit does not implicate the Sale Order in any way. The Elliotts are *not* similarly situated, with respect to the claims they assert, to the other actions that presumably are properly before the Court. Their action just doesn't belong in this consolidated line at all.[8] Dismissing their action from this

---

[7] Counsel for the Elliotts have limited experience with, but great respect for, the difficulties of consolidated proceedings. They have made contact with Designated Counsel and sought to coordinate with them, *see* Peller Declaration, at ¶ 39, as well as with Lead Counsel in the MDL, *see id.* at ¶ 38. Although the clerk of the United States Judicial Panel on Multidistrict Litigation initially rejected GM's attempts to consolidate the Elliotts' lawsuit with the other "ignition switch" cases, some of their claims may ultimately be consolidated in light of GM's pending motion seeking such relief, *see* Defendant General Motors LLC's Motion to Transfer Tag-Along Action for Consolidated Pretrial Proceedings (*In re General Motors LLC Ignition Switch Litigation*, 2543 (U.S.J.P.M.L. Mar. 24, 2014) - counsel thought it best to alert Lead Counsel that this and similar cases that this Court lacks jurisdiction over are likely headed, at least in part, to the MDL.

[8] Because the Elliotts have reasonable grounds to believe that any use of their own 2006 Cobalt or other GM vehicles in question on the pot-hole ridden streets, *see e.g.,* Mike DeBonis, "The Lousy State of D.C.'s Streets," The Washington Post (July 9, 2014) (attached as Exhibit 2), of the financially strapped District of Columbia poses an imminent and unreasonable risk of death, serious bodily injury, and property damage to the vehicles' drivers, passengers, and anyone else unlucky enough to be in the vicinity when the risks manifest, the Elliotts' lawsuit seeks *inter alia* preliminary relief on behalf of the People of the District of Columbia to remove the public safety menace

proceeding is constitutionally mandated; this makes sense, because there is simply no legitimate reason to subject a lawsuit with no conceivable link to the assets of a bankrupt to the extraordinary Stays of bankruptcy practice.[9] Unlike the 87 other lawsuits, the Elliotts do not assert claims based on successor, transferee, derivative liability, or claims based on fraudulent concealment by Old GM - the Elliotts explicitly disavow seeking relief on any such basis. The other 87 Plaintiffs apparently made a considered judgment that the potential warranty, fraud, and other claims arguably related to retained liabilities of Old GM that they assert are worth pursuing, despite the delay that litigating issues related to the Sale Order will entail. But the

---

forthwith, and to put in place interim measures to ensure proper judicial oversight and supervision of New GM's practices with respect to safety, risk management, and regulatory compliance. *See* Plaintiffs' First Amended Complaint, included in Plaintiffs' Motion for Leave to File the Proposed First Amended Complaint and to Join Parties (*Elliott v. General Motors LLC*, 1:14-cv-00691-KBJ, Doc. No. 15, June 28, 2014, ¶ 124-127) (hereinafter "First Amended Complaint"). Unique District law allows Mr. and Mrs. Elliott to act as Representatives of the People to seek injunctive relief as a kind of "private attorneys general," empowering private citizens such as the Elliotts to help the strapped local government vindicate the public interest. *See* D.C. Code § 28-3905(k)(2)(E); § 28-3901(b) and (c). Had the Elliotts participated in the meetings that led other Plaintiffs to agree to stay their lawsuits, they certainly would have expressed concern about agreeing to any Stay procedure that left Plaintiffs without the ability to seek preliminary relief to address these kinds of public safety emergencies.

   To describe the relief that the Elliotts seek as representatives of the People is to demonstrate why the Elliotts' lawsuit does not belong in Bankruptcy Court.

   The Elliotts have endeavored to keep up with these proceedings to the best of their abilities by reviewing the pleadings submitted and transcripts of the hearings held. They were understandably offended at the manner in which their motives for bringing suit in a representative and class capacity were maligned by GM's counsel at the July 2, 2014, hearing, *see* July 2, 2014, Hearing Transcript (attached as Exhibit 3) (hereinafter "July 2 Hearing Transcript"), at 105:24, and by the fact that such unprofessional behavior by GM's counsel – which Plaintiffs' counsel assumed was not worthy of response – appeared to be the very basis for the Court's moving from the its "tentative" Order to the ultimately punitive Order the Court ended up entering on July 8, 2014. Counsel are making arrangements for Mr. and Mrs. Elliott to attend the August 5, 2014, hearing in this matter because, in part, the Elliotts hope to meet Mr. Steinberg to let him know personally why they are suing GM. If the Court wishes, Mr. and Mrs. Elliott will be available to testify as to their reasons for wanting to sue GM on behalf of others, and in particular on behalf of the People of the District of Columbia.

   It can hardly pass without noting that New GM--having already publicly admitted to putting profit seeking over care for safety risks, and thereby causing the deaths of hundreds and counting, and many more personal injuries, all tragedies traceable to New GM's greed--is hardly in a good position to damn fee seeking torts lawyers seeking compensation for New GM's wrongdoing on behalf of the victims of its misconduct. *See id.*

[9] To put the point more casually, the Elliotts are fair-minded. They don't mind waiting in line with others to get what everyone in line is waiting for, but there is no point in the Elliotts waiting at *this* door. There is nothing for them here.

---

Elliotts, asserting no such claims, have no reason to wait with *this*[10] crowd of Plaintiffs, all of whom seek different relief based on different claims and apparently see some advantage in attaching claims implicating Old GM's retained liability to the rest of the legal arsenal available to them and already aimed at New GM.

Because the Elliotts' lawsuit has no conceivable relation to any retained liabilities of Old GM, this Court this lacks subject matter jurisdiction over the Elliotts' claims.[11] As a definitional matter, they are not "related to" these proceedings in any way. The Court's concern over managing the claims properly before it is, of course, absolutely appropriate, but the Elliott lawsuit is simply not properly before the Court.

In terms of case management, the Court must also be aware that more lawsuits are on the way. What looks today like the Elliotts alone unreasonably refusing to join the consensus arranged by Designated Counsel will soon be scores of other lawsuits, with pleadings, like those of the Elliotts, carefully crafted[12] – in the face of GM's threats regarding the Sale Order – to avoid making any claim based on the retained liabilities of Old GM. Those litigants, like the

---

[10] The Elliotts understand that at least some of their claims may be consolidated with, and transferred to, the pending MDL. After this Court properly dismisses their claims for lack of subject matter jurisdiction, there will be no Stay in place in their action (or in the others like it soon to reach the Court), and Judge Furman will face the case management issue of what to do with different groups of actions in the MDL, some stayed by this Court and others, not implicating the Sale Order, presenting no reason for delay and presumably proceeding—as they should—with the joint pretrial procedures typically undertaken in active, ongoing multidistrict litigation. But how to manage the issues arising in such circumstances is appropriately the province of the MDL transferee District Court, not a tribunal lacking a jurisdictional basis for acting.

[11] The technical legal argument makes common sense. This Court has no power to enjoin parties from pursuing their constitutional rights to seek redress in civil courts *unless* their claims relate in some way to some matter properly before the Bankruptcy Court. Otherwise, a non-debtor could willfully opt to misuse the Stay powers of the Bankruptcy Court to delay the judicial process by claiming, without basis and without obligation to present such basis, that its wrongdoing relates to an Order issued by a Bankruptcy Court, and it is, therefore, entitled to have litigation against it Stayed. Of course the law cannot permit such maneuvering, but that is precisely how the Elliott action got here.

[12] New GM cannot have it both ways; it cannot wave this Court's Sale Order at potential litigants to discourage lawsuits them from suing New GM because, as New GM threatened the Elliotts, *see* Peller Declaration, ¶ 20, the assertion of any claims relating to retained liabilities would be a violation of the Sale Order injunction, and then, when litigants like the Elliotts heed the warnings and make no such claims, insist their cases are stayed anyway.

Elliotts, will have no reason to enter a Stay Stipulation arrangement, because, like the Elliotts, they will assert no claims that rest on retained liabilities and will have no reason to wait in this Court – there will be nothing for them to wait for. Like the Elliotts, they will also, one-by-one, seek dismissal for lack of subject matter jurisdiction, and this Court will have no power to "manage" their claims because it will be obliged to grant dismissal. Additionally, of course, New GM should not be permitted to systematically delay the civil litigation filed against them by simply filing bulk schedules of actions they claim, without any plausible basis, relate to the Sale Order.[13]

American Bankruptcy law gives Bankruptcy Courts exceptional and extraordinary power to enjoin parties from prosecuting ongoing civil litigation, power that is wholly foreign to those accustomed to the norms prevailing outside the Bankruptcy context. It is understandable that the Court, constantly facing the startled outrage of litigants unfamiliar with the exceptional province of Bankruptcy law, may tire of hearing parties – whose cases have been enjoined pursuant to the legitimate, explicitly Constitutionally recognized power of this Court – express outrage about denials of their due process rights to seek redress in the courts, and so on. The extraordinary Stay power to stop proceedings in other courts flat in their tracks is shocking to lawyers accustomed to ordinary civil litigation, and, Plaintiffs surmise, an unremarkable matter of everyday practice here.

The exercise of those extraordinary powers to freeze litigation in its tracks, with no questions asked, and enforce such Stays with the contempt power of the court, is wholly legitimate when used to carry out the underlying ideals of the Bankruptcy Act. The unique

---

[13] Perhaps the Scheduling Order should be modified to ensure that, before the Stay apparatus is imposed, parties like the Elliotts have a meaningful opportunity to present their jurisdictional arguments before facing the risk of contempt for exercising the simple civil right of presenting legal papers to respond to GM's attempts to dismiss their case.

powers of the Bankruptcy Court reflect the unique commitment of American Bankruptcy law to the emphatic protection of an ailing insolvent, besieged by creditors, and seeking the protection of the Bankruptcy Court because it cannot protect itself. The automatic stay provisions of the Code, triggered by simply filing for the protection of the Court, are the most dramatic example of this ideal, embodying the commitment to protect the ailing debtor, or its dying carcass, from the metaphoric vultures who would tear it apart wastefully and without regard for the rights of others to their fair share.

Practicing under the automatic Stay, the Bankruptcy Court is required to protect debtors with its extraordinary power to immediately enjoin all lawsuits against the debtor, corral all creditors together, and manage the parties brought before it to insure all are treated equitably and no creditor "jumps ahead" of those similarly situated.

The kind of case management the Court seeks to impose upon the Elliotts in this proceeding—enjoining all pending litigation, getting all interested parties before the Court, and methodically organizing the interests into similarly situated classes of claims before the merits of any particular parties' claims are reached—is wholly appropriate when an ailing, insolvent debtor seeks the Court's protection of the Court from hungry creditors. It reflects deep-rooted public policy favoring giving debtors a chance to regroup, obtain start anew, to get some temporary respite from the demands that are destroying them, and start anew. Like traditional equity jurisprudence more generally, American Bankruptcy law embodies empathy and care for a person or entity unable to care for itself in the rough and tumble of the market.

**But new GM is not the debtor in this proceeding. Because non-debtors do not present the same claim for empathy and equitable care** as the ailing debtors at the heart of Bankruptcy concerns, and because the potential for abuse is so much greater when non-debtors

try to avail themselves of the extraordinary and exceptional equitable power of the Bankruptcy Court, *see e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005), the law is clear: ***non-debtors are not entitled to the same care and solicitude from the Bankruptcy Court that debtors receive as a matter of course***. On the contrary, the Second Circuit has repeatedly admonished lower courts to exercise caution, exercising the traditional powers of the Bankruptcy Court on behalf of non-debtors – like GM – only in exceptional circumstances (none of which are presented here). *See e.g In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005); *see also Teachers Ins. & Annuity Ass'n of Am. v. Bultur*, 803 F.2d 61, 65 (2d Cir. 1986); *see also In re Dow Corning Corp.*, 280 F. 3d 648, 658-61 (6th Cir. 2002); *In re Specialty Equip. Cos.,* 3. F. 3d 1043, 1044-49 (7th Cir. 1993).

Moreover, the protection that New GM seeks is a particularly dramatic example of how non-debtors seeking the equitable, exceptional, and extraordinary protection of the Bankruptcy laws could pose particular risks of abuse and therefore should *not* be accorded the same presumptive solicitude that Bankruptcy Courts rightly provide ailing debtors under siege from voracious creditors and in need of help to have a chance of survival.

New GM is a non-debtor – in robust financial health - whose 2014 first quarter adjusted earnings before interest and tax totaled $0.5 billion with profits exceeding $0.1 billion, *after* a $1.3 billion pre-tax charge for recall-related costs.[14] New GM seeks the extraordinary and exceptional equitable power of this Court to shield it, not from impatient creditors unwilling to give the debtor the requisite time to right itself before demanding what is owed, but rather from allegations that it is liable to Plaintiffs who were legally injured when New GM ran a criminal racketeering enterprise designed to conceal the imminently dangerous character of Plaintiffs'

---

[14] *See* Press Release, "GM Reports First Quarter Net Income of $0.1 Billion" (attached as Exhibit 4).

vehicles from Plaintiffs, the public, and from responsible governmental officials.[15] New GM is not here as a weak and bleeding debtor, in need of the Court's help to have any chance of survival. New GM is here because it developed a litigation stall strategy whose design is to maximize its profits.[16] Surely, that New GM's alleged crimes were "white-collar" should not obscure how inappropriate, and potentially abusive, the exercise of the exceptionally extraordinary power of the Bankruptcy Court's injunction power may be when used to shield a non-debtor such as New GM from the normal processes of American civil justice.[17]

The potential for perversion of the Bankruptcy Court's extraordinary power if non-debtors avail themselves of its protective embrace is apparent in the case at bar. New GM is using the Bankruptcy Court's unique protections not for their core purpose of protecting debtors, but as part of a strategic, profit-driven, plan: to pursue an aggressive litigation strategy to stall any and all litigation against it. Mr. and Mrs. Elliott, who are 78 and 73 years old respectively, have been together for 59 years, are of modest means and in ailing health – they are unable to walk for extended periods and depend having a car to transport Mrs. Elliott their daughter and granddaughter to work, and their great grandchildren to work. They are understandably unwilling to drive their 2006 Cobalt around the streets of the District, but cannot take advantage of New

---

[15] However easy it might be to make these allegations in many cases, in this instance the same or similar allegations are the subject of several ongoing criminal and regulatory investigations at various levels of government, as the Court is aware. *See* July 2 Hearing Transcript, at 39:1-7.

[16] This is not to suggest that it is necessarily wrongful for New GM to avail itself of the all the rights and remedies the law accords it. Plaintiffs are well aware that it owes duties to shareholders as well as to various others. It is only to highlight that the presumptive solicitude accorded a debtor is simply not justified in the non-debtor context.

[17] Plaintiffs allege that New GM's wrongdoing was committed largely at meetings in well-appointed corporate offices and conference rooms where engineers, risk managers, compliance personnel, and others followed a "no-notes" policy to help conceal any information related to safety issues, as recommended, regrettably for our profession, by GM's lawyers, all while they made conscious decisions that have had such deadly consequences. *See* First Amended Complaint, (*Elliott v. General Motors LLC*, 1:14-cv-00691-KBJ, Doc. No. 15, June 28, 2014, ¶ 25) The "white collar" quality of their wrongdoing should not obscure the fact that New GM recklessly endangered the public safety just as effectively as they would have by firing guns on the street without regard for the safety of others.

GM's "complimentary loaner policy",[18] because GM has been unable to arrange a rental car with handicap plates for them.[19] Acting *pro se*, and aware of news accounts of New GM's active concealment of safety defects in each of their GM vehicles, the Elliotts filed a 4-page letter with the District of Columbia Superior Court to initiate a lawsuit against GM. They were not contacted by GM until GM had successfully brought their case before this Court by simply listing it on a Schedule of Actions New GM asserted were related to the Sale Order.

Without any showing that their case was appropriately included in the bulk designation of "Ignition Switch Actions," GM has, with the apparent solicitude of the Court, managed the proceedings such that the Elliotts are already under the shadow of contempt proceedings. No judicial consideration of the possibility their lawsuit was inappropriately included, or that GM brought their case to this court for strategic reasons without any link to the retained liability of Old GM, has occurred. GM has already tried to intimidate the Elliotts, through counsel, into withdrawing their allegations against New GM;[20] the Elliotts and their counsel submit this pleading now under the shadow of impending contempt proceedings impliedly threatened by GM for alleged violations of Orders this Court was without jurisdiction to impose. At least with respect to the Elliotts, there could hardly be a more vivid demonstration of the different roles played when non-debtors seek refuge in the protective embrace of Bankruptcy. In its dispute

---

[18] "If people do not want to drive a recalled vehicle before it is repaired, dealers can provide them with a loaner or rental car – free of charge." *See* Written Testimony of General Motors Chief Executive Officer Mary Barra Before the Senate Committee on Commerce, Science and Transportation Subcommittee on Consumer Protection, Product Safety, and Insurance (April 2, 2014) (attached as Exhibit 5).

[19] *See* Peller Declaration, ¶ 38.

[19] *See* Peller Declaration, ¶ 38.

[20] Notably, GM's counsel repeatedly suggested that the current Stay dispute could be easily resolved by the Elliotts seeking voluntary dismissal and *then refilling their claims anew.* Peller Declaration ¶ 21. Such a suggestion, flying in the face of GM's contention that the assertion of any claims against it based on pre-petition vehicles would violate the Sale Order, should raise concerns that this Court's great powers are being used for forum shopping and not for the loftier purposes for which this Court has been granted its extraordinary power.

with the Elliotts, GM is healthy, strong, aggressive, robust, and able to mount the talents of lawyers from the leading law firms in the world as it presses its liability tampering strategy in this and other fora. New GM does not need, and does not deserve, the special solicitude of the Court, particularly not the extraordinary Stay powers accorded by this Court to protect ailing persons, to protect it from the onslaught posed by a 4-page pro se letter to the Superior Court on behalf of an elderly couple with modest means, whose primarily want reliable transportation and the safety of DC streets.

In terms of case management, the risk of abuse presented in applications by *non-debtors* to prevent third parties from suing them suggests a different case management plan should be adopted when non-debtors seek the Court's equitable protection; a case management plan that does not automatically adopt the presumption that protection is required simply by virtue of simple bulk designations, and one that provides a meaningful opportunity for third parties to challenge the invocation of the Court's protection at the earliest possible time (and certainly not *after* "threshold issues" are determined).

## PROCEDURAL AND FACTUAL BACKGROUND

1.    **The Sale Order and MSPA**

On July 5, 2009, the Court issued its Sale Order. Pursuant to the sale, New GM acquired substantially all of Old GM's assets. New GM did not, however, assume all of Old GM's liabilities. The MSPA and the Sale Order contain specific provisions defining the liabilities that New GM would assume and those Old GM would retain – New GM would have no responsibility or liability with respect to the "retained" liabilities. The Sale Order definitively states that New GM would assume no liability, and liability could not be imposed upon New GM with respect to any claims of the Debtors other than the expressly assumed liabilities. In particular, the Sale Order dictates that – unless explicitly assumed – New GM would have no

liability "based on any successor or transferee liability." *See* Sale Order ¶¶ 10, 46, 48. Likewise, New GM would have no liability for any claim arising "prior to the Closing Date," related to production "prior to the Closing Date," that could have been asserted against Old GM "prior to the Closing Date." *See* Sale Order ¶ 46. The Sale order additionally enjoins the pursuit of any claim asserting "successor or transferee liability" or against Old GM unless the claim is otherwise assumed. *See* Sale Order ¶ 8, 47.

## 2.    The Elliotts' Lawsuit

Starting in February 2014, and in piecemeal over the next several months, New GM has publicly admitted that New GM employees and lawyers knew about safety-related defects in millions of vehicles, including the Elliotts' vehicles, and that GM did not disclose those defects as it was required to do by law. GM'S CEO, Mary Barra attributed New GM's "failure to disclose critical pieces of information," in her words, to New GM's policies and practices that mandated and rewarded the unreasonable elevation of cost concerns over safety risks.[21]

The Elliotts are now, and have for some time been, extremely hesitant to drive their Cobalt. They fear for their own safety and, in particular, for the safety of their great grandchildren (aged 6 and 8) who reside with them and were frequently driven to school in the car before the Elliotts discovered the extent and nature of their car's defects.

On April 1, 2014, having become too frightened to use their defective GM vehicles to drive themselves, their grand and their great-grandchildren, they filed a four-page letter with the District of Columbia Superior Court that included diverse factual assertions stemming from their ownership of a 2006 Chevrolet Trailblazer (not one of the "ignition switch defect" vehicles) and

---

[21] *E.g.,* Bill Vlaxsic, "GM says inquiry found 'pattern of incompetence' The Boston Globe, (June 06, 2014) (attached as Exhibit 6).

a 2006 Chevrolet Cobalt. An ignition switch in the Cobalt was one of many flaws the Elliotts purported to describe in their *pro se* letter to the Superior Court. They also complained about a dangerous fuel pump that had already failed in their Cobalt, and a series of electrical and rust problems with their Trailblazer.

On April 23, 2014, GM removed Mr. and Mrs. Elliotts' case to the United States District Court for the District of Columbia and at the same time moved to dismiss the complaint under Fed. R. Civ. Pro. 12(b)(6) on the ground that the *pro se* papers failed to allege cognizable harm and failed therefore to state a claim for relief.

> "Given that plaintiffs' Complaint amounts to nothing more than accusations of wrongdoing by General Motors LLC with no discernible theory to support recovery of either compensatory or punitive damages, dismissal pursuant to Rule 12(b)(6) is appropriate. …In addition, given the lack of any cognizable loss or injury alleged in the Complaint, plaintiffs lack standing to file suit against General Motors LLC." [22]

Mr. and Mrs. Elliott filed a *pro se* response to GM's Motion on May 8, 2014. *See* Memorandum in opposition to Motion to Dismiss Plaintiffs' Complaint, (*Elliott*, Doc. 12, May 8, 2014). As of the date of this Motion, GM has not withdrawn its Motion to Dismiss in the *Elliott v. GM* action, and the motion remains pending before Judge Jackson.

On May 12, 2014, GM notified the United States Judicial Panel on Multidistrict Litigation that this action is related to the proceedings in *In re: General Motors LLC Ignition Switch Litigation. See* Notice of Related Action, *In re General Motors LLC Ignition Switch Litigation* MDL No. 2543 Doc. No. 223. On June 11, 2014, that forum determined that the action was not appropriate for inclusion in the Multidistrict Litigation proceedings concerning ignition switch claims. *See* Notice to Counsel, *In re: General Motors Ignition Switch Litigation* MDL No. 2543 Doc. No. 269.

---

[22] General Motors LLC's Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (*Elliott v. General Motors LLC*, 1:14-cv-00691-KBJ, Doc. 3, April 23, 2014, ¶ 4)

On June 20, 2014, the Elliotts moved the DC District Court to defer consideration of
GM's pending Motion to Dismiss until the Elliotts had a chance to present the Court with a
Motion to Amend their complaint. *See* Motion for Order Deferring Consideration of Defendant's
Pending Motion to Dismiss (*Elliot*, Doc. No. 14, June 20, 2014). On June 28, 2014, the Elliotts
moved the DC District Court for leave to amend their complaint and to join parties, proposing an
Amended Complaint that would address GM's contentions that alleged deficiencies in the *pro se*
papers warranted dismissal under Fed. R. Civ. Pro. 12(b)(6). *See* Motion for Leave to File First
Amended Complaint (*Id.*, Doc. No. 15, June 28, 2014). That Motion is also currently pending
before Judge Jackson.

**3.    GM's Motion to Enforce the Sale Order**

On April 21, 2014, GM moved this Court to enforce its July 5, 2009, Sale Order by
restraining the various parties from suing New GM for claims related to "ignition switch defects"
insofar as such claims were based on liability that Old GM retained under the Sale Order. Motion
to Enforce the Bankruptcy Court's July 5, 2009 Sale Order and Injunction.[23] *See* Motion to
Enforce (*In re Motors Liquidation Co.* 1:09-bk-50026, Doc. No. 12620, April 21, 2014 (hereafter
"*Motors*")) (hereafter "Motion to Enforce").

GM's Motion is *exclusively* concerned with establishing whether and which liabilities of
the Old GM it did or did not assume. Under the Sale Order, it argues, "New GM would be
insulated from lawsuits by Old GM's creditors based on Old GM liabilities [New GM] did not
assume. The MSPA and Sale Order and Injunction were expressly intended to provide such
protections."[24] New GM contends that it did not assume potential product liability, breach of

[24] Motion to Enforce, ¶ 3

Plaintiffs' No Stay Pleading and Motion to Dismiss, *Elliott v. GM*                17/36

warranty, negligence, successor liability, or other liabilities that the Old GM might have had with respect to vehicles sold before the asset sale to New GM.[25]

### 4.    Claims asserted in the Elliotts' proposed FAC

The proposed FAC alleges five causes of action on behalf of the Elliotts. Each of these causes of action alleges liability only for the acts of New GM and Delphi Automotive PLLC committed after New GM came into being on October 19, 2014.

In their pleading, the Elliotts explicitly disavow any claims based on New GM's potential liability under successor, transferee, or derivative theories of liability:

> General Motors LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Detroit, Michigan. On October 19, 2009, it began conducting the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the vehicles of class members, and other motor vehicles and motor vehicle components throughout the United States. Plaintiffs' claims and allegations against GM refer solely to this entity. In this First Amended Complaint, Plaintiffs are not making any claim against Old GM (General Motors Corporation) whatsoever, and Plaintiffs are not making any claim against New GM based on its having purchased assets from Old GM or based on its having continued the business or succeeded Old GM. Plaintiffs disavow any claim based on the design or sale of vehicles by Old GM, or based on any retained liability of Old GM. Plaintiffs seek relief from New GM solely for claims that have arisen after October 19, 2009, and solely based on actions and omissions of New GM.

First Amended Complaint *(Elliot*, Doc. 15, June 28, 2014, ¶15) (hereafter "FAC").

Separate from this paragraph, there are three other references to "Old GM" in the Elliotts' FAC. *See* FAC ¶ 6. These references occur in a single paragraph that describes how New GM came to know the critical information that it concealed from Plaintiffs and others. *See id*. None

---

[25] Id. at ¶11 (quoting Master Sale and Purchase Agreement (*Motors*, Doc. No. 2968, July 05, 2009)) (hereafter MSPA).

of the references include allegations of any act, omission or other liability creating conduct on the part of Old GM.

The Class Periods for each of the proposed Classes and Subclasses for which the Elliotts seek certification do not begin until October 19, 2009. *See* FAC ¶ 42(a)-(d).

*The RICO Claim*: Count I is for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq*. The basis for this claim is that New GM, Delphi, their inside and outside counsel, engineers and dealers engaged in a racketeering enterprise, and used the mails and wires fraudulently to deceive plaintiffs and the public by concealing serious safety defects that posed imminent risks of death, serious bodily injury, and property damage, and that the RICO actors conspired to keep the illegal racketeering from being exposed, and entered into a common scheme to defraud victims. FAC ¶¶ 52-61. The RICO enterprise also included tampering with witnesses and intimidating victims. FAC ¶¶ 62-63.

This count alleges wrongful behavior that has occurred only after New GM purchased Old GM's assets. *See* FAC ¶¶ 58, 60-61. It alleges no acts or omissions occurring before October 19, 2014, nor asserts any duties whose origin could possibly have been in the Retained liabilities of Old GM under the Sale Order. This Count does not allege and has no connection with any similar racketeering enterprise that the Old GM may have engaged in, and that *other* Plaintiffs in this proceeding might have alleged. The Elliotts make no allegations about any wrongful acts that may have occurred prior to October 19, 2009.

*The common law fraud claim*: The common-law fraud count asserted on behalf of the Elliotts alleges that when New GM learned about the safety defects in its vehicles on or after October 19, 2009, it came under a duty to disclose that information to Plaintiffs and others, and breached that duty, causing legally cognizable harm to Plaintiffs and others, by concealing the dangerousness

of the vehicles, information material to the determinations of Plaintiffs and others' whether their vehicles were safe to drive, and that this conduct caused both economic harm and exposure to increased risk of death or injury. Like the RICO count, the fraud allegations are explicitly limited to actions by the New GM and others after New GM's purchase of the assets in October 2009, to wit, the concealment of the defects. *See* FAC ¶¶ 65-67. This Count does not allege any similar fraudulent conduct that Old GM might have engaged in.

*The negligent infliction of economic loss and increased risk claim*: Count IV of the FAC alleges that, upon acquiring knowledge of the imminent personal injury risks that GM cars posed on or after October 19, 2009, and knowing that Plaintiffs and others had no reasonable way of learning the risks unless GM disclosed the risks to them, New GM came under a duty to disclose those risks to the Elliotts and to others, and New GM acted unreasonably and in breach of this duty when it actively concealed rather than disclosed the information, causing economic loss and increased risks of death and serious physical injury to the Elliotts and others.

*The DC CPPA claim*: Count V alleges that New GM violated the DC Consumer Protection Procedures Act (CPPA), D.C. Code § 28-3901 et seq., by failing to disclose critical safety defects to the public, by violating the common law of fraud and negligence and negligent misrepresentation in the District of Columbia, and by violating federal laws regulating trade practices, including the TREAD act, which requires, *inter alia*, prompt disclosure of safety defects. Just like the previous counts, the CPPA count complains only of the acts of New GM and Delphi, occurring after the inception of the New GM. FAC ¶ 91.

*Joint liability, aiding and abetting and civil conspiracy claims*: Count VIII asserts that Defendant Delphi and Defendant New GM, as well as the accountants, lawyers and engineers who participated in the illegal conduct, are jointly liable for each other's acts because they acted

jointly to cause Plaintiffs and others harm, or under a theory of civil conspiracy, or because they aided and abetted each other in wrongful conduct. Count VIII does not purport to hold New GM liable for conduct of the Old GM, nor does it allege any acts that may have occurred prior to October 19, 2009.

**ARGUMENT**

**1.      The Elliotts' Claims Do Not Pertain to any of the Liabilities that were the Subject of the Sale Order and MSPA.**

The Sale Order protected New GM against any claims that are based on "successor or transferee liability," claims that arose before the "closing date" and claims that existed against Old GM. *See* Sale Order ¶¶ 7, 10, 46, 48. The Sale Order does not *immunize* New GM for any wrongdoing it commits. The claims the Elliotts bring do not fall within the scope of the Sale Order because they neither allege, nor depend, upon successor or transferee liability, they did not arise before the "closing date," and they did not pertain to Old GM. The claims the Elliott's wish to bring only arose when New GM came into being and allegedly began concealing and suppressing material, and potentially fatal, safety defects with Delphi Automotive, PLLC,. The identity and origin of the particular vehicles in which those safety defects inhered is not dispositive of whether New GM and Delphi Automotive PLLC illegally concealed the defects from Plaintiffs, the public, and government officials and attempted to suppress lawsuits related thereto. The Elliotts' claims depend upon no wrongdoing by Old GM and could not have existed against Old GM because the alleged wrongdoing did not occur until after Old GM had ceased to exist – this is true despite the fact that, in this particular case, the Elliotts may have had *other* claims against Old GM. All liability addressed in the Sale Order was either assumed by New GM or retained by Old GM. New GM could not have assumed liability for the Elliotts' claims from Old GM, and Old GM could not have retained liability for the Elliotts' claims, because Old GM

never had the liability for the Elliotts' claims. For this reason, the Sale Order simply cannot reach the claims brought by the Elliotts against New GM. Elliotts' claims are, therefore, distinguishable from those of the *Phaneuf* plaintiffs, which the Court determined should be stayed,[26] because the Elliotts do not seek to hold New GM accountable as "successor in interest"[27] to Old GM's assets, but as an independent corporation breaching its own independent duty to Mr. and Mrs. Elliott.

The Elliotts' case is also distinguishable from prior rulings enforcing the July 2009 Sale Order and Injunction. The "Trusky Plaintiffs," for example, alleged that New GM "breached warranty obligations New GM *assumed* from Old GM in the 363 Sale." *In re Motors Liquidation Co.*, 09-50026 REG, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013). The Elliotts make no allegations dependent upon duties or obligations that New GM *could* have assumed from Old GM *at all*. The "Castillo Plaintiffs," meanwhile, sought a declaratory judgment that New GM "*assumed* a settlement agreement between Old GM and the Castillo Plaintiffs as part of New GM's purchase." *In re Motors Liquidation Co.*, 09-50026 REG, 2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17, 2012). New GM could *not* have assumed the liabilities at issue in the Elliotts' claims, because they never *existed* against Old GM. Finally, unlike the plaintiffs addressed in the Court's May 17, 2010 Order Pursuant to 11 U.S.C. § 105(a) Enforcing 363 Sale Order (*Motors*, Doc. No. 6237), who brought personal injury claims against New GM after accidents that occurred *before* the closing date, the Elliotts allege only the injury that occurred *after* New GM had come into existence.

---

[26] *See* July 2 Hearing Transcript, 91:12-21

[26] *See* July 2 Hearing Transcript, 86:13

[26] See Motion to Enforce the Court's July 2009 Sale Order and Injunction (*Motors*, Doc. No. 12620 If 15-16, and n. 11)

Additionally, of the forty-eight claims GM samples in Schedule II of their Motion to Enforce the Sale Order (*Motors*, Dkt. 12620-2) (which does not address the Elliotts' claims, even though they are included in the Motion to Enforce), Plaintiffs found six that did not allege "successor" liability. In contrast, the Elliotts' FAC uses the word "successor" only once – to exclude the successors of defendants New GM and Delphi PLLC from their alleged class. The incorporated cases assert claims based on an express or implied warranty at the sale of the plaintiffs' vehicles, successor liability claims, and "miscellaneous tort and statutory claims premised in whole or in part on the alleged acts or omissions of Old GM."[28] Again, and by New GM's own definition, the Elliots' claims simply do not fall within scope of GM's Motion to enforce. The Elliotts make no allegation that New GM is responsible for any warranty that stems from the purchase of their cars, they make no allegation of successor liability, and make no allegation that is premised on any alleged act or omission by Old GM.

## 2.    GM's Shell Game in this Proceeding Regarding "Pre-Petition Vehicles and Parts"

As noted above, GM's Motion to Enforce the Sale Order that prompted these proceedings takes great pains to carefully to distinguish the liabilities of Old GM that it assumed from the liabilities of Old GM that it did not assume and that were accordingly retained by Old GM. GM then concludes that, because particular claims were retained by Old GM, Plaintiffs asserting *any* claims that relate to the assets it purchased from Old GM must be enjoined.

To state GM's contention is to demonstrate its inadequacy. The Sale Order and MSPA speak to how the liabilities of Old GM associated with the assets it was selling to New GM would be divided between Old GM, the seller, and New GM, the purchaser. The Elliotts assert legal claims that GM contends relate to "pre-petition vehicles and parts" because they refer to

_____

New GM's concealment from the Elliotts and others of material information about the risks presented by driving the Elliotts' 2006 GM car. GM contends that the fact that the Elliotts assert claims that have anything to do with an asset it bought from Old GM means that they must be violating the Sale Order injunction simply by asserting the claims. The missing analytic step is to examine the claims that the Elliotts *do* assert, and determine if any of the claims rest on liabilities that Old GM retained. As the above description of the Elliotts' claims demonstrates, the Elliotts have taken care to honor[29] GM's contentions that the Sale Order bars lawsuits against it based on liabilities that Old GM retained, by carefully crafting their allegations so that they assert no such claims. Nor, of course, are the Elliotts asserting claims based on liabilities of the Old GM that New GM concedes it did assume. The Elliotts claims have nothing to do with the Sale Order, or with GM's purported with to enforce that Order, because each of the Elliotts' claims is based in breaches by New GM of duties it allegedly owed to Plaintiffs and others, none of which have anything to do with the division of *Old GM's* liabilities reflected in the Sale Order.

In its papers to date, GM nowhere demonstrates any connection between the Elliotts' factual allegations and the legal claims they assert, on the one hand, and the particular legal claims that New GM contends it has no liability for by virtue of the Sale Order. Instead, GM invites the Court simply to prejudge the issue because:

> [T]here is no need for the DC District Court to decide the Motion to Amend …for this Court to be able to consider the allegations in the Proposed Amended Complaint and decide whether their action is an Ignition Switch Action. Indeed, the argument itself is meritless, given that the Elliotts seek economic loss damages arising from a pre-petition vehicle…and the words "ignition switch" appear on almost every page of their 33-Page draft Proposed Amended Complaint."[30]

---

[29] That is, to observe the boundaries of GM's interpretation of the Sale Order in its Motion to Enforce. Plaintiffs in no way mean to indicate that they agree with GM's interpretation of its liabilities under that document and those proceedings. They do not.

[30] The Elliotts continue to believe that it would have been more reasonable to consider their arguments in a more measured way, without the extreme time restrictions that the Court has imposed, and particularly on the basis of

From the premise that New GM is protected from lawsuits that are based on Old GM's liabilities that it did not assume, GM leaps to the unwarranted conclusion (which it apparently hedges for ethical reasons) that any claims made against New GM by owners of vehicles sold by (or even containing parts sold by) Old GM must be "Retained Liabilities":

> To be sure, the causes of action asserted by Plaintiffs in the Ignition Switch Actions are varied, and in some instances, because of imprecise drafting, it is unclear whether there *might be a viable cause of action ...being asserted against New GM*. What is clear, however, is *that the crux of Plaintiffs' claims* is a problem in the ignition switch in vehicles and parts sold by the Old GM. Claims based on that factual predicate are Retained Liabilities.

GM then identifies the actions it claims violate the Sale Order, including the Elliotts' Lawsuit, in an *en masse* chart that provides no information about the lawsuits other than that they involve particular GM Models and presumably (inferring from the inclusion of the Elliott action) the factual allegations used the words "ignition switch."

*In order to connect that information to possible violations of the Sale Order* — a critical step given the extraordinary relief that New GM seeks from third party non debtor lawsuits, and the extraordinary relief it has already been accorded in connection with the Elliotts lawsuit, *GM would need to show not only that the lawsuits mentioning ignition switches involve pre-petition vehicles or parts, but also that <u>the claims</u> being asserted are the claims that it is protected against under the Sale Order*. The critical question is not what year vehicles or auto parts were made, but whether the duties that Plaintiffs allege that New GM violated involved retained

---

pleadings that have actually been filed as opposed to Proposed pleadings. This way of proceeding involves the Court in an unconstitutional prior restraint of Plaintiffs rights to initiate lawsuits, protected as an aspect of their free speech rights under the First Amendment to the US Constitution. Nevertheless, given the Court's rulings and Orders, the remainder of this Motion will demonstrate that the Sale Order does not bar any of the third party non-debtor claims that they assert against New GM in their Proposed First Amended Complaint based on New GM's indepented duties to them. In any event, the Sale Order could not reach these claims without exceeding the jurisdictional authority of this Court.

liabilities of Old GM or instead, as Plaintiffs contend, involve independent duties that New GM owed them.

Rather than provide this requisite analysis to connect factual allegations about ignition switches in pre-petition vehicles to the Court, GM purported to simply "sample" allegations it cherry-picked from pleadings. GM represents to the Court (in a footnote) that "[t]he allegations and claims asserted in the Ignition Switch Actions include Retained Liabilities such as implied warranty claims, successor liability claims, and miscellaneous tort and statutory claims premised in whole or in part on the alleged acts or omissions of Old GM." GM's only support for the conclusion is its reference to another chart purportedly containing *samples* of such allegations from select cases. Notably, *GM did not include any such summaries or excerpts* from the Elliott's *pro se* pleadings.

Whatever its possible merits in relation to other litigants, GM's argument is plain wrong with respect to the Elliotts. Respectfully, Mr. and Mrs. Elliott are entitled to individual rather than bulk consideration before their rights to litigate their claims are restricted or, as in the case of their rights to pursue a representative or class action, extinguished. They also should not to be presumed to be in violation of this Court's Orders based on GM's carefully crafted representations to the Court that, upon scrutiny, avoid explicitly saying anything directly about the Elliotts' claims at all.

To emphasize, GM is wrong to include the Elliott action within the ambit of its Motion to Enforce because the Elliotts are not complaining that Old GM sold them a vehicle with a bad ignition switch and that New GM is liable for that act. They complain that *New GM* violated *its* duties to disclose that their vehicles were dangerous to drive, in part because of the ignition switch defect that GM has now publicly conceded that *it* (or more precisely, its engineers,

lawyers, risk managers, and management) concealed from the Plaintiffs, the public, and governmental regulators. Whether the Elliotts will prevail on this theory is not for this Court to determine, but rather the issue to be determined is solely whether such allegations impinge in any way on retained liabilities of Old GM. They plainly do not.

GM and, regrettably, the Court have thus far treated Lawrence and Celestine Elliott (and their counsel) as transgressors presumptively guilty of violating the Sale Order simply because the independent duties that they allege New GM owed to them and then breached relate to "pre-petition" vehicles or parts.

But legal duties are owed by persons, they do not inhere in vehicles or auto parts or other objects in the material world. The fact that the Elliotts' legal claims for relief from New GM relate to "pre-petition" vehicles simply means that they may have had *potential* claims against Old GM, say for breach of implied warranty, common law misrepresentation, or state consumer protection violations, *in addition to* those claims they have chosen to assert. But it does not mean that the Elliotts are in fact *asserting* such claims. They are not.

Plaintiffs' claims do relate to "pre-petition" vehicles, but that single fact cannot act as a shorthand to justify neglecting the more extended consideration required to reach the ultimate conclusion that such claims are encompassed by the Sale Order injunction and therefore that Lawrence and Celestine Elliott and their counsel must necessarily be acting in violation of this Court's authority by asserting such claims. Before such a conclusion can reasonably (or constitutionally) be reached, an analysis is necessary *first* to determine if their third-party non-debtor claims assert derivative or successor liability on the part of New GM for retained liability of Old GM, in which case the claims may well be within the terms of the Sale Order, or if they are based instead on allegations that New GM violated *independent* duties that New GM owed to

the Elliotts, causing them legally cognizable harm, in which case the claims would not be, and

constitutionally could not have been, encompassed by the Sale Order and Injunction.[31] This

analysis, which GM's invocation of "pre-petition" vehicles and auto parts neglects, is also

required to determine the *constitutional* authority of this Court because, as discussed below,

Bankruptcy Courts have no subject matter jurisdiction over third party non-debtor claims that

allege breaches of duties independently owed by third party non debtors such as New GM.[32]

It is ironic that the Elliotts (and their counsel), who have expended great effort to *comply*

*with* this Court's Sale Order, and accordingly have made every effort to *avoid* making any claims

that could arguably be within the terms of this Court's injunction,[33] have nevertheless been

treated as presumptive violators of the Order solely and exclusively because they make claims

against New GM on behalf of owners of "pre-petition" vehicles (or, if Plaintiffs understand,

maybe even pre-petition auto parts in post-petition vehicles). Surely neither GM nor the Court

interpret the Sale Order to enjoin these third-party non-debtor claims because the such parties

---

[31] Presumably New GM will argue that it owed no such duties, and it may win that argument. But the relevant question before this Court is not whether the Elliotts claims will withstand legal challenge, that is, whether there is a legal basis for the duties they allege were owed and breached, but more narrowly whether the *allegations* are essentially of breaches of independent or derivative duties.

[32] The Court of Appeals has admonished the lower courts to conduct this analysis:

> In our view, the jurisdictional analysis by the lower courts falls short for several reasons…The courts below appeared to view the jurisdictional inquiry as a factual one: if the direct actions "arose out of" or are "related to" the Manville-Travelers relationship, then the court had jurisdiction. But the factual determination was only half of the equation. The nature and extent of Travelers' duty to the Direct Action plaintiffs is a function of state law. Neither court looked to the laws of the states where the claims arose to determine if indeed Travelers did have an independent legal duty in its dealing with plaintiffs, notwithstanding the factual background in which the duty arose. … it is evident that Plaintiffs' Direct Action claims constitute independent tort actions… [And even] the states' unwillingness to recognize these actions does not vest a federal court with jurisdiction to enjoin all such future claims.

*In re Johns Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008), vacated & remanded on other grounds, 557 U.S. 137 (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir. 2010) ("Manville III").

[33] GM can't have it both ways—the careful compliance with this Court's Sale Order is not "artful pleading around the Sale Order" but compliance with it.

---

*could have* asserted claims in alleged violation of the Sale Order *but chose not to*.[34] And surely

no reasonable interpretation of the Sale Order would read it to immunize New GM from all civil

liability for *its* alleged criminal and reckless endangerment of the public safety and the lives of

Mr. and Mrs. Elliott, their families, and millions of other drivers, passengers and bystanders who

may come into contact with GM vehicles posing imminent and unreasonable danger of inflicting

personal injury and property damage. New GM has already admitted that *New GM* decided to

conceal rather than to disclose the risks about which the Elliotts complain, as part of an episode

of gross corporate misconduct, plaintiffs allege, perpetuated through a criminal enterprise

engaged in various acts of racketeering activity systematically designed to conceal and minimize

the risks posed by GM vehicles. Plaintiffs claims center around that *concealment by New GM*.

Whether the Elliotts prevail may depend on whether the courts who ultimately hear their claims

agree that GM owed them a duty to disclose in these circumstances, and that the alleged

concealment breached that duty. But the ultimate legal *merits* of the Elliotts allegations have

nothing to do with the question here—do the Elliotts' claims rest on duties they allege the New

GM owed them, independent of any duties that it may or may not have assumed from the Old

GM? Because they implicate no successor, transferee, or derivative liability of Old GM, they

have nothing whatsoever to do with the Sale Order transaction.

The Elliotts have never asserted, and do not seek now in their pending Motion to Amend

their *pro se* pleading pending before the United States District Court for the District of Columbia

---

[34] The Elliotts and their counsel believed that a reasonable way to proceed to decide these important substantive
questions would be to do so on the basis of a set of pleadings drafted by counsel, rather than the *pro se* pleadings.
*See* letter of June 30 (Dkt. 12740). As we now understand it, the Court intends to conduct this inquiry on the basis of
the Elliotts' proposed pleading that have not yet been accepted for filing in the Elliott action. While insisting to this
Court that the Elliotts are violating the authority of this Court simply by seeking to amend their pro se pleadings in
the face of GM's pending motion to dismiss that action, GM opposes the Elliotts' motion to clarify their pleadings
yet insists that this Court conduct its analysis on the basis of such proposed pleadings. Plaintiffs oppose this way of
proceeding as an unconstitutional prior restraint on their free speech and due process rights.

to assert, any claims that derive from, succeed from, or arose at any time against Old GM. They make no claims whatsoever that relate to any liabilities that Old GM retained under the Sale Order, or to conduct engaged in by Old GM, or to New GM's liability for Old GM's conduct or inaction. Unlike other actions against New GM related to the ignition switch defect that this Court has considered, the Elliotts do not seek to charge New GM with liability for the wrongdoing of Old GM in any way whatsoever.

In light of their advanced years, the prospect of indefinite and unpredictable delay in resolving the issues pending in this forum relating to whether the Sale Order bars derivative or successor product liability, fraud, and/or consumer protection claims, and taking into account the Elliotts' judgment that New GM's independent, non-derivative liability for injuries caused to the Elliotts and others by New GM's *own* acts of criminal reckless endangerment in concealing safety defects threatening imminent and unreasonable risk of death or serious bodily injury is so clear, the Elliotts have made a considered judgment to forgo, for now, any claims that they might have asserted based on their purchase of and/or Old GM's sale of their vehicles. They make no claims whatsoever in connection with the purchase of their vehicles, whether based on breach of warranty, misrepresentation, fraud, false advertising, negligent design, consumer protection violations, or strict product liability for a defective design, and they assert no claims that might have arisen at the time of or in connection with their purchase of and Old GM's sale of their vehicles. Nor do they allege fraudulent concealment by the Old GM from this Court or from any other party of any information. The resolution of the "Threshold Issues" in this Court will have has absolutely no relevance to any legal or factual claim the Elliotts assert. The Elliott action is simply not "related," *see* 28 U.S.C. § 157(a) to anything this Court has before it.

Instead, the Elliotts allege breaches of *duties solely owed by New GM to the Elliotts and others*, wholly apart from any transaction that New GM may have had with Old GM, or that the Elliotts or those they seek to represent may have had with Old GM. Because the Elliotts' claims do not derive from Old GM's liability to them in any way, and because the terms of the Sale Order, and GM's motion itself, concern claims (perhaps alleged by other plaintiffs, but not by the Elliotts) purporting to hold New GM liable for retained liabilities of Old GM, the Elliotts' action should not be part of these proceedings, and dismissal should be granted as requested on the ground that the Elliott action is not an "ignition switch action" potentially encompassed by the Court's Sale Order injunction, and therefore Mr. and Mrs. Elliotts' lawsuit is not within the proper subject of GM's Motion to Enforce.

**3.     This Court Lacks Subject Matter Jurisdiction over the Elliotts' claims against the New GM.**

*a.   GM Bears the Burden of Establishing this Court's Subject Matter Jurisdiction.*

Federal courts are courts of limited jurisdiction. See U.S. Const. art. III, § 2, cl. 1; *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). The "burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.*

*b.   The Elliotts Claims Do Not "Relate to" Any Proceeding Before the Court.*

28 U.S.C. § 1334 provides for original jurisdiction in the district courts for "all cases under title 11" and "all civil proceedings arising under title 11, or arising in or related to cases under title 11." The technical jurisdiction issue presented is whether the Elliotts' claims against New GM "relate to" any proceeding properly before the Court, in that their claims themselves assuredly do not "arise in" the proceedings that Old GM initiated. While jurisdiction to Enforce the Sale Order may uncontroversially be exercised under §105, the broad powers of §105 create no independent jurisdiction. The ancillary jurisdiction courts possess to enforce their own orders

"is itself limited by the jurisdictional limits of the order sought to be enforced." *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 916 (Bankr. W.D. Tex. 1995) (*citing* Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 163 (7th Cir. 1994); *Matter of Mooney Aircraft, Inc.*, 730 F.2d 367, 374-75 (5th Cir. 1984)), vacated on other grounds, 220 B.R. 909 (Bankr. W.D. Tex. 1998). ; *see In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012).

The Second Circuit has repeatedly warned lower Court's to exercise particular care when healthy non-debtors sought the to avail themselves of the protective power of the Bankruptcy courts and that made clear that this Court's "related to" jurisdiction is limited to power over litigants in proceedings *only* when the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. *See Manville II*, 517 F.3d at 66; *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test for determining whether litigation has a significant connection with a pending bankruptcy [sufficient to confer bankruptcy jurisdiction] is whether its outcome might have any conceivable effect on the bankrupt estate." (internal quotation marks omitted)). *In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012) ("'related to' jurisdiction to enjoin a third party dispute exists where the subject of the third party dispute is property of the estate, or the dispute would have an effect on the estate.") (internal quotation marks omitted), *see also In re Old Carco LLC*, 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) ("Nevertheless, the *law may impose a separate duty to warn on New Chrysler*," and there would in such circumstances be no subject matter jurisdiction over third party claims against New Chrysler), *see also In re Dreir*, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010) ("While the Bar Order is limited to creditors and parties in interest in the LLP and Dreier cases, these parties may also have *direct* claims against GSO") *(emphasis added)*; *see also In re Grumman*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) ("§ 362(f) authorizes the Court to absolve the buyer of in personam

liability for pre-confirmation claims in a chapter 11 case. The rule does not extend to potential future tort claims of the type now asserted by the Fredericos, and the GM sale order did not grant the buyer this relief.")

In the particular context of third party claims against non-debtors, like those that the Elliotts assert against New GM, the at least one part of the rule for determining "related to" jurisdiction, and thus the constitutional bounds of this Court's power, is crystal clear and easy to apply: When the third-party's claims against a non-debtor rest on *independent duties* that the non-debtor allegedly owed the third party, rather than derivative, successor, or transferee duties of the debtor, there is no Bankruptcy Court subject matter jurisdiction over the dispute without an affirmative showing of some conceivable impact on the res of the bankrupt. *In re Johns-Manville Corp.*, 517 F.3d 52, 65 (2d Cir. 2008) ("Manville II"), *vacated & remanded on other grounds*, 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009), aff'g in part & rev'g in part, 600 F.3d 135, 2010 U.S. App. LEXIS 5877, 2010 WL 1007832 (2d Cir. Mar. 22, 2010) ("Manville III"); *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995); *In re Kubly*, 818 F.2d 643, 645 (7th Cir. 1987).

Nor can the good intentions of a bankruptcy court to protect the seller of a bankrupt's assets to help it achieve "global peace" replace the necessity for a prior determination that subject matter jurisdiction, some connection to the bankrupt, be shown when a non-debtor like GM seeks its extraordinary protection:

> The district court emphasized the bankruptcy court's declaration that its "repeated use of the term[s] 'arising out of' and 'related to' [was] not gratuitous or superfluous; they were meant to provide . . . global finality for Travelers. But global finality is only as "global" as the bankruptcy court's jurisdiction. A court's ability to provide finality to a third-party is defined by its jurisdiction, not its good intentions.

*In re Johns Manville Corp.*, 517 F.3d at 66 (2d Cir. 2008).

The power of Bankruptcy Courts to act equitably and do justice has roots in ancient powers of the equity court. But the constitutional jurisdiction of the Court runs out thankfully at least at the point where, as in the case in bar, the power is called upon, not to extend empathy and care to an ailing person or entity struggling to survive, but rather to put the shield of the Stay at the disposal of a robust multi-national corporation accused of historic acts of corporate misconduct so that it is able to shield itself from the claims that an elderly District couple of limited means filed on a pro se basis once they became convinced their GM cars were unsafe and New GM knew it and never told them. Respectfully, this Court has no jurisdiction over their claims and New GM may not utilize the extraordinary Stay power of this Court simply as a tool in its quest to tamp down its potential liability for its wrongdoing.

For similar reasons, were the Court to reach the issue, New GM is not entitled to the equitable remedy of a stay because it is unlikely to success in its Motion to Enforce against the Elliotts, for the reasons stated above, the balance of the equities starkly favor the Elliots who seek in their lawsuit the basic transportation to provide for their families and themselves, and who seek to protect the public safety, and the administrative convenience that GM cites is less irreparable that the Elliotts lost time with their families, and the lost and shattered lives that Elliotts allege will continue as the cost of GM's wrongdoing.

Respectfully submitted,

_____/s/_____
Daniel Hornal
Talos Law
D.C Bar #1005381
705 4th St. NW #403
Washington, DC 20001
(202) 709-9662
daniel@taloslaw.com
Attorney for Plaintiffs

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re                                           :        Chapter 11
                                                :
MOTORS LIQUIDATION COMPANY, *et al.*,           :        Case No.: 09-50026 (REG)
             f/k/a General Motors Corp., *et al.*  :
                                                :
                          Debtors.              :        (Jointly Administered)
-----------------------------------------------------------------x

## <u>Order</u>

Upon consideration of the Elliotts' motion to dismiss for lack of subject matter, it is

hereby ORDERED that the Elliotts are released from the jurisdiction of this court.


**So Ordered**


_____
Judge

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th of June, 2014, a copy of the foregoing motion and proposed

order was filed with the Clerk of the court and also served via CM/ECF upon all parties.


_____/s/_____
Daniel Hornal
Talos Law
D.C Bar #1005381
705 4th St. NW #403
Washington, DC 20001
(202) 709-9662
daniel@taloslaw.com
Attorney for Plaintiffs