# Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                 :
In re                             :          Chapter 11
                                   :
MOTORS LIQUIDATION COMPANY, *et al.*,    :          Case No.: 09-50026 (REG)
      f/k/a General Motors Corp., *et al.*        :
                                   :
                  Debtors.           :          (Jointly Administered)
                                   :
------------------------------------------------------------X

**DECLARATION OF GARY PELLER**

I, Gary Peller, do hereby solemnly affirm and declare on oath that:

1.       I have served as a Professor of Law since 1982: at the University of Virginia School of Law (1982-1986 as Assistant Professor 1986-1989 as Professor), at the Georgetown University Law Center (1989-present) and as a visiting professor at the University of Texas School of Law (1988-1989) and the University of Utah School of Law (1998).

2.       Prior to my work as a Professor of Law, I spent two years as Law Clerk to the Honorable Morris E. Lasker in the United States District Court for the Southern District of New York (1980-1982).

3.       I am a member of the Bars of the State of Maryland, the United States District Court for the District of Maryland, and the United States Court of Appeals for the Fourth Circuit, and Of Counsel at Katz, Marshall & Banks, in Washington, D.C.

4.       I served as Co-Lead Counsel: *Hill-Rodriguez v. BlueHippo Funding, LLC*, 06-0750 (D. Md.), 07-1542 (4th Cir. 2007), *Ray v. BlueHippo Funding LLC*, 06-1654 (N.D. Ca. 2006),

*Purdie v. ACE Cash Express, In, Inc.,* 3:01-cv-01754 (N.D. Tex.), *Brown v. ACE Case Express,*

*Inc.,* S-01-2674 (D.Md.); Counsel for Appellants: *Aiello v. Grasmick*, 1998 U&.S. App. LEXIS

12098, *Gadsby v. Grasmick,* 109 F.3d 940 (1997); Executive Committee and Class Co-Counsel:

*In re: American Family Publishers Business Practices Litigation,* 98 M.D.L 1235 (D.N.J. 1999)

5.      On June 14, 2014, I left the Washington, D.C. metro area for a long-planned three-week

vacation.

6.      On June 17, 2014, Mr. Lawrence Elliott and Mrs. Celestine Elliott retained me as counsel

in their, originally *pro se*, action against General Motors LLC, *Elliott v. General Motors LLC,*

1:14-cv-00691 (D.D.C. Apr 23, 2014) (hereinafter *Elliott*).

7.      On June 17, 2014, I contacted Mr. Robert Ryland to inform him that the Elliotts had

retained us as counsel. In our conversation, we discussed GM's proposed Joint Motion to stay

the Elliotts' action.

8.      On June 17, 2014, I e-mailed Mr. Ryland to confirm our retention and his request a copy

of the proposed motion so that we could mark it up – as per our earlier conversation.

9.      Upon retention, I, immediately examined the dockets that might be relevant to the case:

*Elliott*, *Motors*, *In re: General Motors LLC Ignition Switch Litigation*, 2543 (U.S.J.P.M.L. Mar

24, 2014), and *In re: General Motors LLC Ignition Switch Litigation,* 1:14-md-02543 (S.D.N.Y

Jun 12, 2014).

10.     The following eleven individuals worked with me and may be subject to the Court's

Contempt Power under the provisions of the Order Staying and Restraining Lawrence and

Celestine Elliott, and their Counsel, from Further Proceeding with their Ignition Switch Action,

Except as Expressly Set Forth Herein (hereinafter "Restraining Order"), *see* Order Staying and

Restraining Lawrence and Celestine Elliott, and their Counsel, from Proceeding with their

Ignition Switch Action, Except as Expressly Set Forth Herein (*In re Motors Liquidation*, 1:09-bk-50026 (Bankr. S.D.N.Y. Jun 01, 2009, Doc. No. 12763) (hereinafter *Motors*): Lawrence Elliott, Celestine Elliott, Daniel Hornal, four members of Mr. Hornal's staff, two members of my staff, and myself.

11.     After review of the *Elliott* docket, it became clear to us that the Elliotts were exposed to GM's pending Motion to Dismiss (*Elliott*, Doc. 3).

12.     We reasoned that our first priority should be amending the Elliotts' *pro se* complaint to clarify their claims and legal grounds therefore; we believed that the District of Columbia District Court, and, if necessary this Court, the United States Judicial Panel on Multidistrict Litigation, and the Southern District of New York District Court, would all prefer to make any determinations about the nature of the Elliotts' claims on the basis of clear allegations drafted by competent counsel rather than on the basis of *pro se* papers, and we believed we urgently needed to protect the Elliotts from dismissal on the basis of their *pro se* complaint.

13.     In review of the *Motors* docket, we found General Motors' Motion to Enforce the Court's July 5, 2009 Sale Order and Injunction (hereinafter "Motion to Enforce") (*Motors*, Doc. 12620).

14.     After familiarizing ourselves with the dockets as best we could in the limited time available to us, we engaged in extensive consultation with the Elliotts – taking significant time to explain the complication that their lawsuit had met, including the proceedings in this Court, as well as the potential that all or part of their claims may be consolidated with and transferred into the pending MDL in the SDNY.

15.     After such consultation with the Elliotts, who are in their mid-to-late seventies, it became clear that, given the Elliotts' advanced age, we could not afford to wait for the scope of the Sale Order and Injunction to be established before seeking relief for our clients. The Elliotts,

therefore, opted to, temporarily at least, forego any claims whose assertion could even arguably violate the Sale Order.

16.     On June 18, I contacted Mr. Robert Ryland by e-mail again to request GM's consent to amend the pro se Complaint the Elliotts' had originally filed.

17.     After a conversation with Mr. Leonid Feller on June 18th, I understood GM's position to be that no action could be taken in *Elliott* because of the Court's May 16 Scheduling Order that the action be stayed.

18.     Mr. Feller and I conferred throughout the following days, on the 19th, 20th, and 23rd of June, but were unable to agree on the applicability of the May 16 Scheduling Order to the Elliotts' claims. While plaintiffs were willing to enter into a joint motion that more narrowly stayed the claims appropriately within the purview of the Bankruptcy Court (*Motors*, 2968), Counsel for GM insisted that any joint motion must be signed as proposed by GM, without alterations.

19.     Mr. Feller insisted that I was confusing the MDL procedure with the Bankruptcy procedure when I insisted that the Elliotts' lawsuit was not an "ignition switch action" in the terms of GM's bankruptcy proceeding. Mr. Feller insisted that the MDL was limited to ignition switch actions, but the bankruptcy proceeding was not.

20.     Mr. Feller also insisted that the assertion of any claims relating to retained liabilities would be a violation of the Sale Order Injunction.

21.     During the meet and confer process, Mr. feller suggested to me and to co-counsel on different occasions that an appropriate solution would be to withdraw the Elliotts' lawsuit and re-file it as a new lawsuit. In counsel's judgment, the only purpose this would serve would be to allow GM to try its luck at the case getting assigned to a judge they prefer.

22.     On June 20, 2014 we filed our Motion for an Order Deferring Consideration of Defendant's Pending Motion to Dismiss (*Elliott*, Doc. No. 14) but had been unable to obtain the consent of counsel for GM before that point.

23.     On June 23, 2014 I still had not received a copy of the proposed joint motion that I might mark up in order to facilitate negotiation. That afternoon I received such a copy and began to review it in order to propose revisions.

24.     On June 24, I received an e-mail from Mr. Feller informing me that unless plaintiffs executed and returned the draft motion by 2pm that afternoon in substantially the same form, GM would be filing a Supplemental Response in the Bankruptcy Court (*Motors*, Doc. No. 12735) seeking to include the matter at the July 2 hearing.

25.     Finding the proposed joint statement too broad, plaintiffs were unable to comply, and GM filed the Supplemental Response by General Motors LLC in Connection with Stay Procedures Set Forth In the Courts May 16, 2014 Scheduling Order (*Motors*, Doc. No. 12735) on June 24, 2014. The inclusion of the matter at the July 2, 2014, hearing left counsel very little time to prepare to advocate on behalf of Mr. and Mrs. Elliott at the hearing, submit the requisite papers, and – as the proposed First Amended Complaint was not submitted until June 28, 2014 – continue researching and drafting Mr. and Mrs. Elliott's revised complaint.

26.     On July 27, 2014, Mr. Feller confirmed that our issue would be included in the July 2, 2014, hearing.

27.     With the benefit of the Motion to Enforce, counsel researched choice of law provisions and then the applicable consumer protection provisions and common law theories that were applicable to the conduct of New GM directly – independently of any of any claims against Old

GM, against New GM for liability retained thereby, or against New GM for liability as a successor in interest to Old GM.

28.      In our research, we learned that the District of Columbia's Consumer Protection Procedures Act (DCCPPA) entitled the Elliotts, and all others within the District's jurisdiction, to a uniquely broad range of relief. *See* D.C. Code § 28-3905(k)(2)(E). Additionally, the DCCPPA's "representative action" provisions accord the Elliotts the right to act as representatives to protect the public interest.

29.      Upon further consultation with the Elliotts, it was determined that, in the event their action were consolidated with others, they wished to ensure that DC residents, as unique beneficiaries of the favorable DCCPPA, were treated fairly in any pre-trial matters – particularly in any certification of a nationwide class that might impinge on the due process rights of DC residents by denying them the benefits that DC law affords them – and for this purpose, opted to file the Amended Complaint as a representative and class action.

30.      This required further, time-consuming, research into the filing of class allegations and representative actions.

31.      In reviewing the related dockets, and documents pertaining to New GM's concealment of the risks of which the Elliotts complain, counsel began to suspect that New GM and Delphi had been engaged in a criminal enterprise committing various acts of racketeering activity systematically designed to conceal and minimize those risks. This prompted further, extensive, research into Racketeer Influenced and Corrupt Organizations law.

32.      On June 28, 2014, after hours of painstaking drafting designed to comply with the July 5, 2009 Sale Order and Injunction, we filed a Motion for Leave to File a First Amended Complaint in the District of Columbia District Court. (*Elliott*, Doc. No. 15)

33.    Aware that my clients did not have access to safe vehicles – given the various recalls on, and safety risks inherent in, both of their GM vehicles – I spoke with counsel for General Motors, Mr. Leonid Feller, about my concerns for the safety of my clients and the residents of the District of Columbia in light of GM's failure to take measures to expeditiously get the dangerous vehicles it had failed to recall off the roads. I understood, from that conversation, that GM was providing rental cars free of charge, and that the Elliotts would be able to obtain one simply by contacting a dealer.

34.    Because I did not want our 78-year-old client to have to arrange this, I attempted to do so on his behalf. I spent almost five hours speaking to person after person in the service departments of four different GM dealers in the nearby area, none of whom were familiar with such a rental program. I was placed on hold several times, connected with voicemail boxes of apparently random people at the dealers – none of whom returned my calls – and directed through non-functioning phone trees leading to nowhere. When I finally reached someone familiar with GM's rental car promise, that person insisted Mr. Elliott drive his dangerous vehicle to the dealership. I was not comfortable asking my elderly client to do so

35.    On June 30th, following my fruitless efforts to obtain a rental car for the Elliotts, I contacted Mr. Ryland and Mr. Feller by e-mail requesting the GM arrange a free rental and make arrangements to have that rental car dropped off at the Elliotts' home and the Cobalt transported to a GM dealership by GM.

36.    On June 30th a member of my staff contacted three more area dealerships. One dealer insisted that the program to provide vehicles had been canceled, and two (not the Elliotts' closest dealerships) acknowledged the rental program but insisted that the Elliotts would be limited to working with their *closest* local dealerships.

37.     On July 1, GM moved to transfer *Elliott* into the "Ignition Switch" Multidistrict Litigation in the Southern District of New York.

38.     On July 2, 2014, a member of my staff made one final attempt, but we have, as yet, been unable to successfully obtain the rental vehicles that the Elliotts needed as the GM dealers were unable to obtain a rental car with the "handicap" plates our clients required.

39.     Only July 7, 2014, I contacted Designated Counsel Edward Weisfelner, Howard Steel, Sander Esserman, and Peter Lockwood by telephone. I also contacted Elizabeth Cabreser and Todd Walburg, lead counsel for plaintiffs in the proceedings in *In re General Motors LLC Ignition Switch Litigation*, 1:14-md-02542 (S.D.N.Y. Jun. 12, 2014), by e-mail seeking coordination and advice.

40.     On July 8, 2014, in the face of the Court's July 8, 2014 Restraining Order, *see* Order Restraining Lawrence and Celestine Elliott, and their Counsel, from Further Proceeding with Their Ignition Switch Action, Except as Expressly Set Forth Herein (*In re Motors Liquidation*, Doc. No. 12763, July 08, 2014)*,* I contacted more experienced colleagues in the academic and public interest communities regarding how best to advice my clients.

41.     Only July 10, 2014, I was able to speak to Howard Steel by telephone, and in e-mail correspondence began discussing coordination.

42.     During the period from June 28, 2014, when the Elliotts submitted their Motion to Amend to the District Court, until that time of this filing, I have devoted approximately over one hundred hours to drafting pleadings, conducting and supervising legal research, drafting letters to the Court, and conferring with co-counsel regarding the proceedings in this Court.

43.     Counsel did not understand the Court to have instructed counsel to provide the requisite legal notice of the Court's Order to any other party, and I have not done so.

/s/ Gary Peller

Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, D.C., 20001
peller@georgetown.edu

# Exhibit 2


Ad

The Washington Post

**SELECT CAREER FAIR**

**Tuesday, July 15:**
Engineering, Technology
& Security Clearance

**Wednesday, July 16:**
Nursing, Therapy
& Allied Health

**Wednesday, July 16:**
Professional & General

The Washington Post · 1150 15th Street NW, Washington, DC 20071

LEARN MORE

**District of DeBonis**

# The lousy state of D.C.'s streets explained in 14 slides and two charts

**By Mike DeBonis** July 9    Follow @mikedebonis

On Tuesday, D.C. Council member Mary M. Cheh (D-Ward 3) invited city transportation officials to fill her in on the state of the city's streets. After a long, cold winter, complaints about the pocked condition of city roadways have risen even higher than usual, Cheh said, and the officials needed to provide answers.

Here are a few, courtesy of a District Department of Transportation slide show.

The District has more than 4,000 lane-miles of roadway. (A lane-mile is a mile of pavement one lane wide; i.e., a mile-long stretch of four-lane street equals four lane-miles.) About half are eligible to be maintained with federal funds; the other half are not.

DDOT rates the condition of every lane-mile of pavement using this gizmo.

The pavement is rated according to a "Pavement Condition Index" from zero to 100, ranging from the truly awful ...

Advertisement



Take the **Buy Local Challenge**

Pledge to eat at least one thing from a local farm every day during Buy Local Week!

**July 19 - 27, 2014**
www.buy-local-challenge.com

Enter this year's photo contest, "Take the Challenge to the EXTREME" and win!

Contest details on the website.

... to the merely subpar ...

... to the downright fabulous.

According to the city's own statistics, about one-quarter of the pavement in the city is in "poor," "very poor" or "failed" condition. Roughly another quarter is in "fair" condition, with about half in "good" or "excellent" condition.

Pavement eligible for federal maintenance funds, not surprisingly, tends to be in better condition.

While local lane-miles account for 53 percent of the city total, they only get one-half to two-thirds the funding that federal lane-miles do.

So who decided which streets get fixed? DDOT says it strives for a "fact-based allocation of funds" based on the Pavement Condition Index, but also the amount of traffic involved, "community input" and "unforeseen emergencies." The upshot, the agency said, is that "non-critical" repairs can be put off "for months or potentially years."

Streets can undergo various types of repair, ranging from a full reconstruction, where the roadway is rebuilt from the ground up, to a less-intensive resurfacing ...

… to a still-less-intensive "slurry seal" …

… to a basic "crack seal."

The more intensive the repair, the more it costs.

Only a small fraction of the city's street and roads are repaved in a given year. In 2014, less than 50 lane-miles of pavement were paved or patched (not including filled potholes).

So what is to be done about the city's lousy streets?

Every year, DDOT touts its "Potholepalooza" pothole-filling blitz, but those efforts can't turn a fair-rated road into an excellent-rated one. Only more aggressive and more expensive paving projects can do that. But only a tiny percentage of the transportation department's budget is spent on paving projects on streets not eligible for federal highway funds. This fiscal year, for instance, only $6.7 million of the $148 million DDOT capital budget is set aside for local street paving; compare that to the $63 million earmarked for the streetcar program or even the $8.6 million budgeted for streetlight management.

Now, $73 million is earmarked in federal-aid funds for major street repair projects on federal roadways — but, again, not all of that is purely for paving, and that's only a fraction of the overall $253 million total federal-aid budget.

Both Acting DDOT Director Matthew Brown and Chief Engineer Muhammed Khalid acknowledged Tuesday that more money would help improve the condition of local roads, and Cheh actually boosted the local funding levels to $8.8 million — from $612,000 per ward to $1 million — for the next fiscal year, which starts Oct. 1. Again, some perspective: That's still only 4.4 percent of DDOT's $199 million capital budget. Meanwhile, the amount budgeted for major repairs on federal-eligible roadways is going down to $56 million — a nominal cut of 23 percent.

Advertisement

The upshot: With big-ticket projects like the streetcar system and the rebuilding of the Frederick Douglass Bridge sucking up dollars, basic street paving is pretty far down the list of priorities for DDOT's funding and attention. Particularly if you live on a local street, your best bets are to be a squeaky wheel or hope your pavement is in such bad shape the city can't ignore it any more.

Mike DeBonis covers local politics and government for The Washington Post. He also writes a blog and a political analysis column that runs on Fridays.

# Exhibit 3

Page 39

```
 1         So what we're struggling with is even with the
 2   benefit of the Valukas report and, as we all know, there are
 3   more items coming out seemingly every day in the press from
 4   various government investigations and other events, we --
 5   it's not so clear and I'm not sure the stipulation, you
 6   know, process is going to produce facts -- stipulated facts
 7   about senior level knowledge.
 8         And, again, I'm very open to continuing the
 9   process and we'll work at it and work at it hard, but it may
10   be a decision point when we're back here in August whether
11   or not on the plaintiffs' side and on the GUC trust and
12   Wilmington side we're comfortable that there's enough of a
13   record to give Your Honor what we think should be a full
14   enough record, and that some limited discovery may be
15   necessary to test out how senior the knowledge goes without
16   conceding whether or not we're required to show it.
17         With respect to the remedy and the due -- and the
18   fraud on the Court issue, again, from the perspective of the
19   Groman plaintiffs we see them as somewhat similar in terms
20   of the record that Your Honor, we think, ought to have to
21   decide those issues which is that we think it does expand
22   the inquiry in two ways, two basic ways.
23         One is that it implicates -- how shall I say --
24   well, to use Mr. Steinberg's term, mens rea.  You know, how
25   bad was this.  I'll just leave it at that.
```

1      but those are the threshold issues.

2             THE COURT:  And either you or your opponents or

3      both are going to address decisions like my Castillo

4      decision?

5             MR. STEINBERG:  Yes.

6             THE COURT:  Where I dealt with somewhat similar

7      issues?

8             MR. STEINBERG:  That's correct.  The other thing

9      that Your Honor was correct also in pointing out to our

10     brief where we reviewed the complaint, we reviewed the

11     allegations.  It's clear that what they're alleging is Old

12     GM's conduct as it relates to the potential liability for

13     what they -- for the vehicles they bought -- successor

14     liability, because that word is actually in their complaint

15     a couple of different occasions -- Old GM vehicles and Old

16     GM parts, and that, by definition, implicates the sale order

17     and injunction.

18             And, once the sale order and injunction is

19     implicated, they never should have brought their action, but

20     they now have brought their action.  It's up to Your Honor,

21     as the person who had exclusive jurisdiction, to determine

22     how these claims are to be resolved.

23             This morning's hearing was how these claims are

24     going to be resolved, by bifurcating and dealing with the

25     threshold issues.  They are not anywhere different than

Page 91

1      to put a gun to your head to give you a deadline to do it,

2      but I would appreciate an answer as soon as practical, and

3      you should advise my chambers with a copy of your

4      communication to Mr. Steinberg and all of the parties who I

5      heard from today as to whether you would like to take an

6      appeal.  If you do, I will write an opinion on it, but, in

7      the nature of the way that I have to triage my matters, I've

8      found that, very often, when I summarize a ruling orally,

9      that it's sufficient, except for an appellate record, and

10     then, I'll decide whether I need to write to assist an

11     appellate Court.

12             I am ruling more specifically that the sale order

13     now applies, though it's possible, without prejudging any

14     issues, that, after I hear from the other 87 litigants, I

15     might ultimately rule that it does not apply to some kinds

16     of claims and that, even if the sale order didn't apply,

17     that New GM would be entitled to a preliminary injunction

18     temporarily staying the Phaneuf plaintiffs' action from

19     going forward, pending a determination by me on the other 87

20     litigants' claims under the standards articulated by the

21     circuit in Jackson Dairy (sic) and its progeny (sic).

22             My findings of fact, conclusions of law, and bases

23     for the exercise of my discretion will be summarized now and

24     more fully set forth if you decide you want to take an

25     appeal.  All of the facts with respect to the Phaneuf

1    any other theory that has been asserted by any of the 87

2    plaintiffs.  It actually is the same 1(e) issue that we had

3    before, which is if they want to claim that the new GM is

4    responsible for something that happened relating to a 2006

5    vehicle, even if it doesn't involve an ignition switch, it's

6    -- if it's the compressor or something else like that, which

7    is also in their complaint.

8            So maybe the MDL takes it or maybe it doesn't.

9    But it implicates the MSPA.  It's implicates your sale order

10   injunction.  It's a pre-petition vehicle and old GM's view

11   and I say it, I say it with the same caveat I had before,

12   the MSPA listed three categories for which we assume

13   everything else we didn't assume.  This doesn't fall into

14   any of the three categories.

15           I won't argue anything more than that other than

16   that I'm happy for them to treat this as a no stay pleading.

17   I'm happy to make the same arguments that I did in the

18   Phaneuf action.  I actually think they should be withdrawing

19   their class action complaint.  If they actually want to re-

20   file an Elliott complaint that is specific only to the

21   Elliotts and not new parties and clarifies what a pro se

22   plaintiff would do, I probably would consent to do that as

23   well, too, so that there's a clear pleading onboard.

24           But I'm not consenting for them to go forward,

25   make this a class action, come ahead of everybody, and

1        First of all, the stay stipulation applies whether

2   it's filed with a Court or not.  So, the pro se client was

3   actually bound by it just as a technical matter.

4        The second thing is the stay stipulation requires

5   them to do those acts that are necessary to implement the

6   stay stipulation which meant that they were required to

7   consent to the motion.  We prepared the motion.  We gave

8   them the motion.  He refused to comment on the motion.

9   Instead filed the complaint before Justice Jackson and is

10  now soliciting clients to try to sue new GM with respect to

11  pre-petition vehicles.

12       That's what's happening here.  I agree with Your

13  Honor insofar that if the tentative said he wants to file a

14  no stay stipulation in view of the Phaneuf ruling.  Fine.

15  Let him do it.  Let him articulate what his theory is and

16  we'll respond.  But don't, in effect, take advantage of the

17  fact that you violated the sale order and injunction, give

18  something and then say, that's why I want to announce the

19  truce.  He should be required to withdraw that action and I

20  said before, if he wants to clarify an individual action on

21  behalf of the Elliotts, let him do that.  I think we would

22  consent if this was an individual action on behalf of the

23  Elliotts.  It will say ignition switch on almost every page.

24       That's what this complaint says as well, too.

25       THE COURT:  All right.

# Exhibit 4

 **News**

For Release: Thursday, April 24, 7:30 a.m. EDT

# GM Reports First Quarter Net Income of $0.1 Billion

*Net income reduced by recall charge and special items*

- EBIT-adjusted of $0.5 billion, reduced by $1.3 billion pre-tax recall charge and $0.3 billion in restructuring costs
- Company records strong core operating performance in first quarter
- Revenue and free cash flow improved year-over-year

**DETROIT** – General Motors Co. (NYSE: GM) today announced first quarter net income attributable to common stockholders of $0.1 billion, or $0.06 per diluted share. Strong core operating performance during the quarter was more than offset by a net loss from special items of $0.4 billion, or $(0.23) per diluted share, and a $1.3 billion pre-tax charge primarily for the cost of recall-related repairs, or $(0.48) per diluted share.

Special items in the quarter were primarily related to changing the exchange rate GM uses for re-measuring the net assets of its Venezuelan subsidiaries.

In the first quarter of 2013, GM's net income attributable to common stockholders was $0.9 billion, or $0.58 per diluted share, including a net loss from special items of $0.2 billion or $(0.09) per diluted share.

Earnings before interest and tax (EBIT) adjusted was $0.5 billion and included the impact of a $1.3 billion pre-tax charge for recall-related costs and $0.3 billion in restructuring costs. This compares to the first quarter of 2013, when the company recorded EBIT-adjusted of $1.8 billion, which included a pre-tax charge of $0.1 billion for recalls and $0.1 billion in restructuring costs.

Net revenue in the first quarter of 2014 was $37.4 billion, compared to $36.9 billion in the first quarter of 2013.

"The performance of our core operations was very strong this quarter, reflecting the positive response of customers to the new vehicles we are bringing to market," said GM CEO Mary Barra. "Our focus remains on creating the world's best vehicles with the highest levels of safety, quality and customer service, while aggressively addressing our business opportunities and challenges globally."

**GM Results Overview** (in billions except for per share amounts)

|  | Q1 2014 | Q1 2013 |
| --- | --- | --- |
| **Revenue** | $37.4 | $36.9 |
| **Net income attributable to common stockholders** | $0.1 | $0.9 |
| **Earnings per share (EPS) diluted** | $0.06 | $0.58 |
| **Impact of special items on EPS diluted** | $(0.23) | $(0.09) |

| | | |
|---|---|---|
| **EBIT-adjusted** | $0.5 | $1.8 |
| **Automotive net cash flow from operating activities** | $2.0 | $0.5 |
| **Adjusted automotive free cash flow** | $0.2 | $(1.3) |

## Segment Results

- GM North America reported EBIT-adjusted of $0.6 billion which included the impact of a $1.3 billion pre-tax charge for recall costs in the quarter. This compared with EBIT-adjusted of $1.4 billion in the first quarter of 2013.
- GM Europe reported EBIT-adjusted of $(0.3) billion, which includes $0.2 billion for restructuring costs. This compares with EBIT-adjusted of $(0.2) billion in the first quarter of 2013.
- GM International Operations reported EBIT-adjusted of $0.3 billion, compared with EBIT-adjusted of $0.5 billion in the first quarter of 2013.
- GM South America reported EBIT-adjusted of $(0.2) billion, compared with EBIT-adjusted of $0.0 billion in the first quarter of 2013.
- GM Financial earnings before tax was $0.2 billion for the quarter, compared with $0.2 billion in the first quarter of 2013.

## Cash Flow and Liquidity

First quarter automotive cash flow from operating activities of $2.0 billion and automotive free cash flow of $0.2 billion were both significantly improved compared with the first quarter of 2013. GM ended the quarter with very strong total automotive liquidity of $37.4 billion.  Automotive cash and marketable securities was $27.0 billion compared with $27.9 billion at year-end 2013.

"Our revenue and cash flow improved this quarter and our underlying business performance remains on plan," said Chuck Stevens, GM executive vice president and CFO. "Executing flawless launches and using our strength in the U.S. and China to restructure key global operations will continue to be our focus this year."

**General Motors Co.** (NYSE:GM, TSX: GMM) and its partners produce vehicles in 30 countries, and the company has leadership positions in the world's largest and fastest-growing automotive markets.  GM, its subsidiaries and joint venture entities sell vehicles under the Chevrolet, Cadillac, Baojun, Buick, GMC, Holden, Jiefang, Opel, Vauxhall and Wuling brands. More information on the company and its subsidiaries, including OnStar, a global leader in vehicle safety, security and information services, can be found at http://www.gm.com.

# # #

**CONTACTS:**

Tom Henderson                              Randy Arickx
313-410-2704                               313-268-7070
Global Financial Communications            GM Investor Relations
tom.e.henderson@gm.com                     randy.c.arickx@gm.com

## Forward-Looking Statements

In this press release and in related comments by our management, our use of the words "expect," "anticipate," "possible," "potential," "target," "believe," "commit," "intend," "continue," "may," "would," "could," "should," "project," "appears," "projected," "positioned" or similar expressions is intended to identify forward-looking statements that represent our current judgment about possible future events. We believe these judgments are reasonable, but these statements are not guarantees of any events or financial results, and our actual results may differ materially due to a variety of important factors. Among other items, such factors might include: our ability to realize production efficiencies and to achieve reductions in costs as a result of our restructuring initiatives and labor modifications; our ability to maintain quality control over our vehicles and avoid material vehicle recalls, and the cost and effect on our reputation of product recalls; our ability to maintain adequate financing sources, including as required to fund our planned significant investment in new technology; our ability to successfully integrate Ally Financial's international operations; the ability of our suppliers to timely deliver parts, components and systems; our ability to realize successful vehicle applications of new technology; overall strength and stability of our markets, particularly outside of North America and China; costs and risks associated with litigation and government investigations including those related to our recent recalls and our ability to continue to attract new customers, particularly for our new products. GM's most recent annual report on Form 10-K provides information about these and other factors, which we may revise or supplement in future reports to the SEC.

# Exhibit 5

You can now read 10 articles in a month for free on BostonGlobe.com. Read as much as you want anywhere and anytime for just 99¢.

## The Boston Globe

# Business



**OPINION**

## A Magna moment at the MFA



**METRO**

## Boston animal shelter found in crisis



**POLITICS**

## Health care everything el

# GM says inquiry found 'pattern of incompetence'

**By Bill Vlaxsic**   | NEW YORK TIMES   JUNE 06, 2014



FABRIZIO COSTANTINI/NEW YORK TIMES

"We made serious mistakes in the past and as a result we're making significant changes in our company," CEO Mary T. Barra said of long delays in recalling millions of unsafe autos.

WARREN, Mich. — An internal investigation by General Motors found "a pattern of incompetence and neglect" in its decadelong failure to recall millions of defective cars but concluded that there was no deliberate cover-up, the company's chief executive said Thursday.

CEO Mary T. Barra said 15 employees had been dismissed, most in senior and executive roles, and five others had been disciplined. But the report did not tie Barra and her top lieutenants to the recall delay that GM has linked to 13 deaths and 47 crashes.

CONTINUE READING BELOW ▼

"Repeatedly, individuals failed to disclose critical pieces of information that could have fundamentally changed the lives of those impacted by a faulty ignition switch," she said. "If this information had been disclosed, I believe in my heart the company would have dealt with this matter appropriately."

She did not identify the discharged employees or the departments they worked in. She said only that "more than 50 percent" were executives, and that two who had been suspended were dismissed. In April, two midlevel engineers, Raymond DeGiorgio and his supervisor, Gary Altman, were placed on paid leave. Both had been deposed last year in a lawsuit filed against GM by the family of a Georgia woman who died in a Cobalt crash in 2010.

The report was the result of an investigation overseen by Anton R. Valukas, a former US attorney. Saying that Valukas had "complete independence" to conduct his inquiry, Barra said that it included more than 350 interviews with more than 230 people and a review of millions of documents.

Outlining the findings, Barra painted a picture of a company where employees failed to act on knowledge they knew could address a danger.

"Numerous individuals did not accept any responsibility to drive our organization to understand what was truly happening," she said. "The report highlights a company that operated in silos, with a number of individuals seemingly looking for reasons not to act, instead of finding ways to protect our customers."

CONTINUE READING BELOW ▼

She said that the failure to act continued up to the decision on Jan. 31 to begin the recall, which would grow to nearly 2.6 million cars.

"Throughout the entire 11-year history, there was no demonstrated sense of urgency, right to the very end," she said.

But despite the failures, she said, the report found no institutional effort to cover up the problems, an allegation she faced in pointed questioning before congressional lawmakers.

"Mr. Valukas's report revealed no conspiracy by the corporation to cover up the facts," she said. "In addition, the investigators found no evidence that any employee made a trade-off between safety and cost."

She repeated that GM had undertaken initiatives to improve safety practices and quality control, including the appointment of a new vice president for safety, Jeff Boyer.

She also said GM would put in place a long-awaited compensation program for victims, to begin Aug. 1, administered by Kenneth Feinberg, a lawyer who specializes in compensation programs. The details, she said, are to be completed in the coming weeks.

"We are taking responsibility for what has happened by taking steps to treat these victims and their families with compassion, decency, and fairness," Barra said. "We made serious mistakes in the past and as a result we're making significant changes in our company to ensure they never happen again."

The release of the internal investigative report was expected to be a turning point in a safety crisis that has consumed General Motors since Feb. 14, when the automaker began a broad recall of millions of small cars equipped with defective ignition switches. The automaker has said the number of fatalities and crashes linked to the defect could increase as it gathers more information.

But the recall was just the beginning of an escalating series of safety actions at GM, including dozens of subsequent recalls of other vehicles.

General Motors has also come under intense scrutiny about how and why it failed to repair a defect that existed in its cars for more than a decade.

Barra has consistently said she and other senior executives first learned of the switch problems Jan. 31 — the day that an internal safety committee ordered the initial recall.

"We will hold ourselves accountable," Barra told employees in a March 4 e-mail, her first public comment on the issue. Six days later, GM hired Valukas, chairman of the law firm Jenner & Block, to investigate the long-delayed recall.

Before Thursday, four senior executives had already left since the recall.

Barra had refused to answer detailed questions about events leading up to the recall — including during her testimony at two contentious congressional hearings in April — until Valukas completed his report.

Jenner & Block has long had ties to GM. In addition to performing securities work for the company, one of Jenner & Block's lawyers, Robert S. Osborne, was GM's general counsel from 2006 to 2009, years that the ignition switch problem festered within GM. And before that, Osborne was a senior partner at Jenner & Block.

The other firm involved in the internal investigation, King & Spalding, defended GM in a wrongful-death lawsuit filed by the family of Brooke Melton, a case that brought the ignition switch defect to light last year.

© 2014 BOSTON GLOBE MEDIA PARTNERS, LLC