# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No.____.____-CV-___-___

| | |
|---|---|
| DIANA CORBETT; MICHAEL BARNES<br>and GERTRUDE BARNES,<br>Individually and on behalf of all others<br>similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS, LLC, a Delaware<br>limited liability company,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CLASS ACTION COMPLAINT

Plaintiffs, Diana Corbett, Michael Barnes and Gertrude Barnes, by and through their counsel, bring this Class Action Complaint against Defendant General Motors, LLC ("Defendant" or "GM"), on behalf of themselves and all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows:

## PARTIES

1.      Plaintiff Diana Corbett ("Corbett") is a citizen of the State of North Carolina who resides in New Hanover County.

2.      Plaintiffs Michael Barnes and Gertrude Barnes (collectively "Barnes") are citizens of the State of North Carolina who reside in New Hanover County.

3.      Plaintiffs bring this action for a Class of all persons in North Carolina who formerly or currently own or lease one or more of the following GM vehicles that have been recalled:  2003-2010 Saturn Ion, 2005-2010 Chevrolet Cobalt, 2007-2010 Pontiac G5, 2006-

2011 Chevrolet HHR, 2006-2010 Pontiac Solstice, 2007-2010 Saturn Sky, and 2010-2014

Camaro; and the following GM vehicles that have not been recalled: 2005 Chevrolet Equinox,

2006 Chevrolet Trailblazer, and 2006 Chevrolet Monte Carlo (collectively, "Defective

Vehicles").

4.    Defendant General Motors, LLC is a Delaware limited liability company with its

principal place of business located at 300 Renaissance Center, Detroit, Michigan, 48265.

Defendant was incorporated in 2009 and on July 10, 2009, acquired substantially all assets and

assumed certain liabilities of General Motors Corporation ("Old GM") through a Section 363

sale under Chapter 11 of the US Bankruptcy Code. Defendant manufactures and distributes the

Defective Vehicles from its Michigan manufacturing plants to consumers in North Carolina and

throughout the United States.

5.    Among the liabilities and obligations expressly retained by Defendant after the

bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the
> certification, reporting and recall requirements of the National
> Traffic and Motor Vehicle Act, the Transportation Recall
> Enhancement, Accountability and Documentation Act, the Clean Air
> Act, the California Health and Safety Code, and similar laws, in each
> case, to the extent applicable in respect of vehicles and vehicle parts
> manufactured or distributed by [Old GM].

6.    Defendant also expressly assumed:

> all Liabilities arising under express written warranties of [Old GM]
> that are specifically identified as warranties and delivered in
> connection with the sale of new, certified used or pre-owned vehicles
> or new or remanufactured motor vehicle parts and equipment
> (including service parts, accessories, engines and transmissions)
> manufactured or sold by [Old GM] or Purchaser prior to or after the
> Closing and (B) all obligations under Lemon Laws.

7.      Because Defendant acquired and operated Old GM and ran it as a continuing business enterprise, and because Defendant was aware from its inception of the ignition switch defects in the Defective Vehicles, Defendant is liable independently and through successor liability for the improper acts and omissions of Old GM, as alleged in this Complaint.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendant, and the amount in controversy exceeds $5 million.

9.      The Court has personal jurisdiction over Defendant because Defendant is authorized to, and conducts substantial business in North Carolina, generally, and this District, specifically.  Defendant has marketed, promoted, distributed, and sold the Defective Vehicles in North Carolina.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to this action occurred in this District.

11.     To the extent there is any contractual or other impediment to pursuit of these claims on a class action basis, Plaintiffs specifically alleges, and will prove, if necessary, that any bar to class action proceedings is unconscionable, unfair and against public policy.

## NATURE OF THE CASE

12.     This case involves Defendant's conscious decision to overlook and conceal, a deadly design defect in vehicle ignition switches in millions of GM vehicles placed on the road since 2003, including the vehicles owned by Plaintiffs and the Class.

13.      In making the decision to cover up the ignition switch defect for at least a decade, Defendant consciously put millions of Americans' lives at risk, including the Plaintiffs and the Class.  Defendant knowingly placed on public streets more than one million defective vehicles with the propensity to shut down during normal driving conditions, creating a certainty of accidents, bodily harm, and death.

14.      An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public.  Defendant's Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important than the safety of our customers in the vehicles they drive."  Yet, Defendant failed to live up to this commitment.

15.      The first priority of an auto manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision. In addition, an auto manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely, and its critical safety systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.  Moreover, an auto manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

16.      Since at least 2003, Defendant has sold millions of vehicles throughout the United States (including North Carolina) and worldwide that have a safety defect causing the vehicle's ignition switch to inadvertently move from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

17.    There are at least two main reasons why the GM ignition switch systems are defective.  The first is that the ignition switch is simply weak and therefore does not hold the key in place in the "run position."  On information and belief, the ignition switch weakness is due to a defective part known as a "detent plunger."  The second reason that the ignition switch systems are defective is due to the low position of the switches in the defective vehicles.  That causes the keys, and the fobs that hang off the keys, to hang so low in the defective vehicles that the drivers' knees can easily bump them and inadvertently shut down the vehicle.

18.    Defendant installed these faulty ignition switch systems in models from at least 2003 through at least 2011.  Defendant promised that these vehicles would operate safely and reliably.  This promise turned out to be false in several material respects.  In reality, Defendant concealed and did not fix a serious quality and safety problem plaguing its vehicles.

19.    Worse yet, the ignition switch defects in Defendant's vehicles could have been easily avoided.

20.    From at least 2005 to the present, Defendant received reports of crashes and injuries that put Defendant on notice of the serious safety issues presented by its ignition switch system.

21.    Yet, despite the dangerous nature of this defect and its effects on critical safety systems, Defendant concealed its existence and failed to remedy the problem.

22.    Despite notice of the defect in its vehicles, Defendant did not disclose to consumers that its vehicles – which Defendant had advertised as "safe" and "reliable" for years – were in fact neither safe nor reliable.

23.    Defendant's CEO, Mary Barra, has admitted in a video message that "[s]omething went wrong with our process in this instance, and terrible things happened."

24.     This case arises from Defendant's breach of its obligations and duties, including Defendant's failure to disclose that, as a result of defective ignition switches, at least 2.59 million GM vehicles (and, upon information and belief, many more) may have the propensity to shut down during normal driving conditions and create an extreme and unreasonable risk of accident, serious bodily harm, and death.

25.     GM's predecessor, General Motors Corporation ("Old GM") (sometimes, together with GM, "the Companies") violated its obligations and duties by designing and marketing vehicles with defective ignition switch systems, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents.  In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.

26.     The defective ignition switches were manufactured by Delphi Automotive PLC ("Delphi").  Once a subsidiary of Old GM, Delphi spun off from Old GM in 1999, and became an independent publicly held corporation.

27.     Plaintiffs allege, based on information and belief, that Delphi knew its ignition switches were defective.  Nevertheless, Delphi continued to manufacture and sell the defective ignition switch systems, which it knew would be used in the vehicle of Plaintiffs and the Class.

28.     Plaintiffs' investigation, including a review of NHTSA's complaint database, suggests that Defendant's recall does not capture all of the defective vehicles which suffer from the same or substantially similar ignition switch defects as the recalled vehicles.  In fact, on Friday, June 13, 2013, GM announced a recall of the Chevrolet Camaro citing ignition switch issues that are similar to those previously disclosed.  Plaintiffs thereupon believe and allege that

the following non-recalled GM vehicles also have defective ignition switch systems: the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

29.     As provided above, Plaintiffs bring this action for a Class of all persons in North Carolina who formerly or currently own or lease one or more of the Defective Vehicles which includes:

a.     Recalled vehicles: 2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; 2007-2010 Saturn Sky; and 2010-2014 Camaro; and

b.     Non-recalled vehicles: the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

30.     To the extent warranted by the developing facts, Plaintiffs will further supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switch systems, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment.

31.     Plaintiff Corbett purchased and owns a 2006 Pontiac Solstice and Plaintiffs Barnes purchased and own a 2009 Chevrolet Cobalt, both of which are, upon information and belief, Defective Vehicles.

32.     The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

a.     Due to their weaknesses and their low placement, the ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

b.     When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident; and

c.      When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

33.     The ignition switch defects make the Defective Vehicles unreasonably dangerous. The Defective Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

34.     Defendant admits to at least 13 deaths as a result of the ignition switch defects, but the actual number is believed to be much higher.

35.     The ignition switch defects present a significant and unreasonable safety risk exposing Defective Vehicle owners, their passengers and others in the vicinity to a risk of serious injury or death.

36.     For many years, Defendant has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States.  However, to protect its profits and maximize sales, Defendant concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

37.     Under  the  Transportation  Recall  Enhancement,  Accountability  and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect.   49 U.S.C. §§ 30118(c)(1) & (2).  If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.   49 U.S.C. §§ 30118(b)(2)(A) & (B).   Defendant also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and

allowed cars to remain on the road with these defects.  These same acts and omissions also violated various state consumer protection laws.

38.    Plaintiffs and the Class have been damaged by Defendant's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding highly dangerous vehicles whose value has greatly diminished because of Defendant's failure to timely disclose the serious defect.

39.    Plaintiffs and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

40.    Plaintiffs and the Class either paid more for the Defective Vehicles than they would have had they known of the ignition switch defects, or they would not have purchased the Defective Vehicles at all had they known of the defects.

41.    Plaintiffs bring claims against Defendant individually and on behalf of a class of all other similarly situated purchasers of the Defective Vehicles for:

    a.    Negligence;

    b.    Breach of the implied warranty of merchantability;

    c.    Breach of the implied warranty of fitness for a specific purpose;

    d.    Breach of express warranties;

    e.    Negligent Misrepresentations;

    f.    Fraudulent concealment;

    g.    Violations of the Magnuson-Moss Warranty Act, 15 U.SC. § 2301, *et seq.* ("MMWA");

h.      Violations of the Michigan Consumer Protection Act (the "MCPA"), Mich.

Comp. L. Ann. § 445.901, *et seq.*; and

i.      Violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.

Gen. Stat. § 75-1.1 *et. seq.*.

## PLAINTIFFS' PURCHASE OF DEFECTIVE VEHICLES
## AND SUBSEQUENT DAMAGES

42.      Plaintiff Corbett purchased a new 2006 Pontiac Solstice from Bob King Buick-

Pontiac-GMC, Inc. in Wilmington, North Carolina.  Plaintiff Corbett chose the 2006 Pontiac

Solstice, in part, because she wanted a safely designed and manufactured vehicle.  Plaintiff saw

advertisements for Old GM vehicles before she purchased the 2006 Pontiac Solstice.  Plaintiff

does recall that safety and quality were consistent themes in the advertisements she saw.  These

representations about safety and quality influenced Plaintiff Corbett's decision to purchase the

2006 Pontiac Solstice.  After receiving notice of the recall, Plaintiff Corbett returned the 2006

Pontiac Solstice to the Bob King dealership to be serviced in accordance with the notice.    To

date, Plaintiff Corbett is awaiting the dealership to receive the needed replacement parts.

43.      Plaintiffs Barnes purchased a "certified" pre-owned 2009 Cobalt from Jeff

Gordon Chevrolet in Wilmington, North Carolina in November 2009.  Like Corbett, Barnes

desired a safe reliable automobile that their daughter, Meghan, could drive.  The Barnes family

members saw advertisements and literature for the 2009 Cobalt and were persuaded to purchase

the 2009 Cobalt by Defendant's representations and those of its agents regarding safety and

quality.

44.      Plaintiffs Barnes' 2009 Cobalt has experienced the ignition switch defects

described by the GM recall.   Before the recall was announced, Plaintiffs' 2009 Cobalt

experienced several episodes during which the ignition switch defects caused the vehicle's power

steering to become disabled and affected the vehicle's speed control.  After receiving notice of the recall, Barnes caused the 2009 Cobalt to be returned to Jeff Gordon Chevrolet for service. This service has not fixed the problems that Plaintiffs Barnes are informed and believe are associated with the ignition switch defects, as the 2009 Cobalt continues to suffer from power steering and speed control issues along with other problems.

### THE IGNITION SWITCH DEFECTS IN THE DEFECTIVE VEHICLES

45.     Given the importance that a vehicle and its electrical operating systems remain operational during ordinary driving conditions, it is imperative that an auto manufacturer ensures its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle.  With respect to the Defective Vehicles, GM has failed to do so.

46.     In the Defective Vehicles, the ignition switch defects, as detailed above, can cause the vehicle's engine and electrical system to shut off, disabling the power steering and power brakes and causing non-deployment of the vehicle's airbags in the event of an accident.

47.     Due to the ignition switch defects, the Defective Vehicles are unreasonably prone to be involved in accidents, which in turn are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

### DEFENDANT KNEW OF THE IGNITION SWITCH DEFECTS FOR YEARS, BUT CONCEALED THE DEFECTS FROM PLAINTIFFS AND THE CLASS

48.     Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences for many years, but concealed their knowledge from Defective Vehicle owners.

49.    For example, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy.  Ms. Rose's death is the first known of the hundreds of deaths and injuries attributable to the ignition switch defects.  Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM and GM to address the ignition switch problem.

50.    Another incident involved 16-year old Megan Phillips, who was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees.  NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact.  According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they begin communicating.  As he stated, "I don't understand why [GM] would wait 10 years to say something.  And I want to understand it but I never will."[1]

51.    Rather than publicly admitting the dangerous safety defects in the Defective Vehicles, the Companies attempted to attribute these and other incidents to "driver error."  Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering and/or airbag failures, including:

- 2005:  26 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved.

- 2006:  69 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved and 4 deaths citing Unknown component.

---

[1] "Owners of Recalled GM Cars Feel Angry, Vindicated," REUTERS (Mar. 17, 2014).

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing Airbag as component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved and 2 deaths citing Unknown component.

- 2009: 133 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved, 1 death citing Service Brake as component involved, 1 death citing Steering as component involved, and 2 deaths citing Unknown component.

- 2010: 400 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 12 deaths citing Steering as component involved, and 1 death citing Unknown component.

- 2011: 187 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 2 deaths citing Steering as component involved, and 1 citing Unknown component.

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

52.    GM now admits that Old GM learned of the ignition switch defects as early as 200l. During the pre-production development of the Saturn Ion, Old GM engineers learned that

the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position. Old GM claimed that a switch design change "had resolved the problem."[2]

53.     In 2003, an internal report documented an instance in which a service technician observed a stall while driving. The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. The switch was replaced and the matter was closed.[3]

54.     According to GM's latest chronology submitted to NHTSA pursuant to 49 C.F.R. § 573.6, Old GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

55.     Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

56.     According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

57.     Gary Altman, program engineering manager for the 2005 Cobalt, admitted that Old GM's engineering managers knew about ignition-switch problems in the vehicle that could disable power steering, power brakes and airbags, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes

---

[2] "G.M. Reveals It Was Told of Ignition Defect in '01," D. Ivory, NEW YORK TIMES (Mar. 12, 2014).
[3] *Id.*

inoperable, though he did not attempt to explain why the vehicle would not require an operable airbag. Needless to say, hapless Cobalt purchasers were not informed of Old GM's decision to release the vehicle notwithstanding its knowledge of the ignition switch defect.

58.        As soon as the 2005 Cobalt hit the market, Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[4] Old GM opened additional PRTS inquires.

59.        In another PRTS opened in May 2005, Old GM engineers again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration, in order to make the key and key fob hang higher in the vehicle and therefore make it less likely that a driver's knee would inadvertently shut down the vehicle. After initially approving the proposed partial fix, Old GM reversed course and again declined to even attempt to implement a fix.[5]

60.        Instead, in October 2005, Old GM simply issued a Technical Service Bulletin ("TSB") advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the loss of power in the vehicles' electrical system.

61.        Rather than disclosing the true nature of the defects and correcting them, under the TSB, Old GM gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key and fob from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging as low as they had

---

[4] March 11, 2014, Chronology Re: Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles, at 1.
[5] *Id.*

in the past.[6]  According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[7]

62.    Yet there was no recall.  And, not surprisingly, Old GM continued to get complaints.

63.    In 2006, Old GM approved a design change for the Cobalt's ignition switch supplied by Delphi.  The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch."  But the new design was not produced until the 2007 model year.[8]

64.    In what a high-level engineer at Old GM now calls a "cardinal sin" and "an extraordinary violation of internal processes," Old GM changed the part *design but kept the old part number*.  That makes it impossible to determine from the part number alone which GM vehicles produced after 2007 contain the defective ignition switches.

65.    In 2007, NHTSA investigators met with Old GM to discuss its airbags, and informed Old GM of the July 2005 frontal and fatal crash involving Amber Marie Rose.

66.    As alleged above, the airbags in Ms. Rose's 2005 Cobalt did not deploy.  Data retrieved from her vehicle's diagnostic system indicated that the ignition was in the "accessory" position.  Old GM investigated and tracked similar incidents.

67.    By the end of 2007, by GM's own admission, Old GM knew of 10 frontal collisions in which the airbag did not deploy.[9]  Plaintiffs believe that Old GM actually knew of many other similar incidents involving the ignition switch defects.

---

[6] *Id.* at 1-2.
[7] *Id.* at 3.
[8] *Id.* at 2.
[9] Feb. 24, 2014, Attachment B-573.6(c)(6) at 2.

68.       At a May 15, 2009 meeting, GM engineers learned that data in the black boxes of Chevrolet Cobalt vehicles showed that the dangerous ignition switch defects existed in hundreds of thousands of Defective Vehicles.  But still GM did not reveal the defect to NHTSA, Plaintiffs or the Class.

69.       After the May 15, 2009 meeting, GM continued to get complaints of unintended shut down and continued to investigate frontal crashes in which the airbags did not deploy.

70.       After the May 15, 2009 meeting, GM told the families of accident victims and Defective Vehicle owners that it did not have sufficient evidence to conclude that there was any defect in the Defective Vehicles.  In one case involving the ignition switch defects, GM threatened to sue the family of an accident victim for reimbursement of its legal fees if the family did not dismiss its lawsuit.  In another, GM sent the victim's family a terse letter, saying there was no basis for any claims against GM.  These statements were part of GM's continuation of the campaign of deception begun by Old GM.

71.       According to GM, it was not until 2011 and 2012 that GM's examinations of switches from vehicles that had experienced crashes revealed significant design differences in the torque performance of ignition switches from the 2005 Cobalt vehicles and those from the 2010 model year, the last year of the Cobalt's production.

72.       GM responded by blaming the supplier for the switch design.[10]

73.       In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the 2003-2007 Chevrolet Cobalt and 2005-2007 Pontiac G5 vehicles.[11]

---

[10]    *Id.* at 3-4.
[11]    *Id.* at 4 – 5.

## DEFENDANT WAITED UNTIL 2014 TO FINALLY ORDER A
## RECALL OF THE DEFECTIVE VEHICLES

74.    After analysis by GM's Field Performance Review Committee and the Executive Field Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of some of the Defective Vehicles on January 31, 2014.

75.    Initially, GM's EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

76.    After additional analysis, the EFADC expanded the recall on February 24, 2014, to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

77.    On March 28, 2014, GM expanded the recall a third time, to include Chevrolet Cobalts, Pontiac G5s and Solstices, Saturn Ions and Skys from the 2008 through 2010 model years, and Chevrolet HHRs from the 2008 through 2011 model years.

78.    GM provided dealers with notice of the recalls on February 26, 2014, March 4, 2014, and March 28, 2014, and mailed letters to some of the current owners of the Defective Vehicles on March 10 and March 11, 2014.

79.    On June 13, 2014, GM announced a new recall affecting the Chevrolet Camaro, model years 2010-2014. GM says that the recall is due to an ignition switch issue that is "similar to" but not the same as for the Defective Vehicles. Specifically, GM is recalling the Camaro's key fob because the fob is so large, a driver's knee can hit the fob and knock the ignition out of the "run" position.  As part of the recall, GM is offering to change the Camaro key to a standard design from one in which the key is concealed inside the fob and is opened by pushing a button.

80.     Interestingly, to date, GM has **not** pledged to remedy the fact that the key and fob in the Defective Vehicles hang dangerously low, leading to an unreasonable risk that the driver's knee will inadvertently shut down the Defective Vehicles during ordinary driving conditions.

81.     In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes.

82.     According to Ms. Barra, "Something went terribly wrong in our processes in this instance, and terrible things happened."  Barra went on to promise, "[w]e will be better because of this tragic situation if we seize this opportunity."[12]

83.     GM now faces an investigation by NHTSA, multiple hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

84.     While GM has now appointed a new Vehicle Safety Chief, on information and belief, at least 2.59 million potentially Defective Vehicles remain on the road to this day; and, on information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defects.


## DEFENDANT HAS NOT RECALLED ALL THE DEFECTIVE VEHICLES

85.     Plaintiffs' research, including a review of NHTSA's complaint database, suggests that GM's recall does not capture all of the GM vehicles using the defective ignition switches. Plaintiffs thereupon believe and allege that the following additional non-recalled GM vehicles also have defective ignition switches: the 2005 Chevrolet Equinox, the 2006 Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.  For this reason, Plaintiffs have included these vehicles in the list of Defective Vehicles subject to Plaintiffs' claims.

---

[12]  "Something Went 'Very Wrong' at G.M., Chief Says."  N.Y. TIMES (Mar. 18, 2014).

## DEFENDANT REPRESENTED THE DEFECTIVE VEHICLES AS SAFE AND RELIABLE

86.    On information and belief, in marketing and advertising materials, Old GM and GM consistently promoted all their vehicles, including the Defective Vehicles, as safe and reliable.

87.    For example, under a section captured "safety," Old GM's website for its Chevrolet brand stated in 2005:

> OUR COMMITMENT
> Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe – from the start of your journey to your destination.
>
> That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind….

88.    One Cobalt ad promised, "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

89.    An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

90.    A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically engineered for whatever is next."  Another 2003 spot closed with the tagline "Saturn.  People first."

91.    A 2001 print ad touting the launch of the Saturn focused on safety: "Need is where you begin.  In cars, it's about things like reliability, durability and, of course, safety.  That's where we started when developing our new line of cars.  And it wasn't until we were satisfied that we added things…."

92.     Once GM came into existence, it continued to stress the safety and reliability of all its vehicles, including the Defective Vehicles.

93.     For example, GM's Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "As long as there are babies, there'll be Chevys to bring them home."

94.     Another 2010 television ad informed consumers, "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

95.     Old GM and GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicles were defective.

96.     Throughout the relevant period, Old GM and GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

97.     Old GM and GM never informed consumers about the ignition switch defects.


**THE IGNITION SWITCH DEFECTS HAVE HARMED PLAINTIFFS AND THE CLASS**

98.     The ignition switch defects have caused damage to Plaintiffs and the Class.

99.     A vehicle purchased, leased, or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

100.    A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

101.    Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed.  Plaintiffs and the Class overpaid for their Defective Vehicles.  Because of the concealed ignition switch defects, Plaintiffs did not receive the benefit of the bargain.

102.    Class members who purchased new or used Defective Vehicles after the date Defendant came into existence – July 10, 2009 – overpaid for their Defective Vehicles as a direct result of Defendant's ongoing violations of the TREAD Act and state consumer protection laws by failing to disclose the existence of the ignition switch defects.

103.    Plaintiffs and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for the Companies' failure to disclose and remedy the ignition switch defects.

104.    If Old GM or GM had timely disclosed the ignition switch defects as required by the MCPA, the TREAD Act, and the applicable State consumer protection laws, all Class members' vehicles would now be worth more.

## SUCCESSOR LIABILITY

105.    As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure and concealment of the ignition switch defects from the date of its formation on July 10, 2009.

106.    Because Defendant acquired and operated Old GM and ran it as a continuing business enterprise, and because Defendant was aware from its inception of the ignition switch defects in the Defective Vehicles, Defendant is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

107.    In addition to the liabilities of Old GM that Defendant expressly assumed and retained through the bankruptcy as detailed above, GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM's current CEO, Mary Barra, began working at Old GM in 1980, and in February 2008 became Vice President of Global Manufacturing Engineering, in which position she knew or should have known of the ignition switch defects;

- GM's Rule 30(b)(6) deponent concerning complaints Old GM and GM received about ignition switch defects in the Cobalt, Victor Hakim, worked at Old GM from 1971 until the end of Old GM, and now is a "Senior Manager/Consultant" in the "field performance assessment" department, further demonstrating GM's longstanding knowledge of the ignition switch defects.

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

- GM retained the bulk of the employees of Old GM; GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of Old GM; and

- GM acquired all goodwill and other intangible personal property of Old GM.

## TOLLING OF THE STATUTES OF LIMITATION

108.     All applicable statutes of limitation have been tolled by GM's knowing and active

fraudulent concealment and denial of the facts alleged herein.  Plaintiffs and Class members did

not discover, and did not know of facts that would have caused a reasonable person to suspect,

that Old GM and GM did not report information within their knowledge to federal authorities

(NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that

Old GM and GM had information in their possession about the existence and dangerousness of

the defect and opted to conceal that information until shortly before this class action was filed.

109.     Indeed, Old GM instructed its service shops to provide Defective Vehicle owners

with a new key ring if they complained about unintended shut down, rather than admit what Old

GM knew that the ignition switches were dangerously defective and warranted replacement with

a properly designed and built ignition system.

110.     In April 2006, some eight years before the first recall of some Defective Vehicles,

Old GM internally authorized a redesign of the defective ignition switch. Yet, as part of Old

GM's concealment of the defect, GM redesigned the part but kept the old part number.

According to one of the high-level Old GM engineers at the time, "Changing the fit, form or

function of a part without making a part number change is a cardinal sin.  It would have been an

extraordinary violation of internal processes."[13]

111.     Old GM and GM were, and GM remains, under a continuing duty to disclose to

NHTSA, Plaintiffs, and the Class the true character, quality, and nature of the Defective

Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or

---

[13] "'Cardinal sin': Former GM engineers say quiet '06 redesign of faulty ignition switch was a
major violation of protocol."  Automotive News (Mar. 26, 2014).

substandard materials; and that it will require repair, poses a severe safety concern, and

diminishes the value of the Defective Vehicles.

112.    Because of the active concealment by Old GM and GM, any and all limitations

periods otherwise applicable to Plaintiffs' claims have been tolled and GM is estopped from

relying on any statutes of limitation in their defense of this action.


## CLASS ACTION ALLEGATIONS

113.    Plaintiffs seek relief in their individual capacity and seek to represent a class

consisting of all others who are similarly situated.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2)

and/or (b)(3), Plaintiffs seeks certification of a class initially defined as follows:

> All persons in North Carolina who formerly or currently own or
> lease one or more of the following GM vehicles: (a) (Recalled
> vehicles) 2003-2010 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-
> 2010 Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac
> Solstice; and 2007-2010; Saturn Sky; and 2010-2014 Camaro (b)
> (Non-recalled vehicles): the 2005 Chevrolet Equinox, the 2006;
> Chevrolet Trailblazer, and the 2006 Chevrolet Monte Carlo.

114.    Excluded from the Class are Defendant and its subsidiaries and affiliates,

Defendant's executives, board members, legal counsel, the judges and all other court personnel

to whom this case is assigned, their immediate families, and those who purchased the Product for

the purpose of resale.

115.    Plaintiffs reserve the right to amend or modify the Class definition with greater

specificity or division into subclasses after they have had an opportunity to conduct discovery.

116.    Numerosity.  Fed. R. Civ. P. 23(a)(1).  The Class is so numerous that joinder of

all members is unfeasible and not practicable.  While the precise number of Class members has

not been determined at this time, Plaintiffs is informed and believes that many thousands of

consumers have purchased or leased the Defective Vehicles.

117.    <u>Commonality</u>.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

a.    Whether the Defective Vehicles suffer from ignition switch defects;

b.    Whether Defendant was negligent;

c.    Whether Defendant breached the implied warranty of merchantability;

d.    Whether Defendant breached the implied warranty of fitness for a particular purpose;

e.    Whether Defendant breached express warranties;

f.    Whether Defendant made negligent misrepresentations to induce the purchases of the Defective Vehicles;

g.    Whether Defendant fraudulently concealed the ignition switch defects;

h.    Whether Defendant is liable for a design defect;

i.    Whether Defendant violated the MMWA, 15 U.S.,C. § 2301, *et seq.*;

j.    Whether Defendant violated the MCPA, Mich. Comp. L. Ann. §445.901, *et seq.*;

k.    Whether Defendant violated the New Motor Vehicles Warranties Act, N.C. Gen. Stat. §20-351;

l.    Whether Defendant violated N.C. Gen. Stat. § 75-1.1 *et. seq.*; and

m.    The nature of the relief, including equitable relief, to which Plaintiffs and the Class members are entitled.

118.    <u>Typicality</u>.  Fed. R. Civ. P. 23(a)(3).  Plaintiffs'' claims are typical of the claims of the Class.  Plaintiffs and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

119.    <u>Adequacy of Representation</u>.  Fed. R. Civ. P. 23(a)(4).  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs' Counsel is competent and experienced in litigating class actions.

120.    <u>Superiority of Class Action</u>.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

121.    <u>Injunctive and Declaratory Relief</u>.  Fed. R. Civ. P. 23(b)(2).  Defendant's misrepresentations are uniform as to all members of the Class.  Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

122.    All conditions precedent, if any, have been satisfied.

## FIRST CLAIM FOR RELIEF
### (Negligence-Design Defect)

123.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

124.    Plaintiffs bring this claim individually and on behalf of the Class of North Carolina residents who formerly or currently own or lease one or more of the Defective Vehicles.

125.    Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the Defective Vehicles and their component parts and constituents, which was intended by Defendant to be used as passenger vehicles and for other related activities.

126.    Defendant had a duty to design, manufacture and sell, distribute or otherwise place into commerce vehicles that are not unreasonably dangerous or defective. Defendant had a duty to test vehicles for ignition switch problems once Defendant was on notice that its vehicles had a propensity to have ignition switch issues leading to engine failure, which can cause bodily injury, death, and property damage

127.    Defendant knew that the Defective Vehicles would be purchased and used without purchaser, including Plaintiffs and Class members, being able, through the exercise of reasonable care, to discover the defects.

128.    The Defective Vehicles were unsafe for their intended uses by reason of defects in their manufacture, design, testing, components, and constituents, so that they would not safely serve their purpose, but would instead expose the users of the vehicles to possible serious injuries.

129.    As designed by Defendant, the Defective Vehicles were defective and unreasonably dangerous, causing them to fail to perform as safely as an ordinary customer would expect when used in an intended or reasonably foreseeable manner.

130.    The risks inherent in the design of the Defective Vehicles significantly outweigh any benefits of the design.

131.    Plaintiffs and Class members were not aware of the Defect at any time prior to the recent revelations regarding problems with the Defective Vehicles.

132.    Defendant breached the aforementioned duties and were negligent and reckless in the following acts and or omissions:

a.    By failing to properly design, test and manufacture the Defective Vehicles in a reasonably safe manner;

b.      By manufacturing, promoting and servicing and selling the Defective Vehicles, which Defendant knew or in the exercise of reasonable care, should have known did not meet the standards or levels of scientific advancement or technology existing in the trade.

133.      As direct and proximate causes of Defendant's breaches, Plaintiffs and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

**SECOND CLAIM FOR RELIEF**
**(Negligence-Failure of the Continuing Duty to Warn)**

134.      Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

135.      Plaintiffs bring this claim individually and on behalf of the Class of North Carolina residents who formerly or currently own or lease one or more of the Defective Vehicles.

136.      Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofitted or failed to retrofit, failed to recall, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the Defective Vehicles and their component parts and constituents, which were intended by Defendant to be used as passenger vehicles and for other related activities.

137.      Defendant had a continuing duty to warn Plaintiffs and the Class, as foreseeable users and operators of the Defective Vehicles, of dangers Defendant knew or should have known existed through the exercise of reasonable care.  Plaintiffs and the Class were entitled to know that the Defective Vehicles, in their ordinary operation, were not reasonably safe for their intended and normal purposes and uses.

138.      For all dates in which they knew or should have known of the defects described herein, Defendant breached the aforementioned duties and were negligent and by its failure to

warn Plaintiffs and the Class of the unreasonably dangerous condition and defect, namely the

ignition switch defects that cause the Defective Vehicles to experience engine failure and lead to

an unreasonable likelihood of accident, which  could cause serious bodily harm or death to

vehicle occupants.

139.    As direct and proximate causes of Defendant's breaches, Plaintiffs and the Class

have been damaged including, but not limited to, the cost of repairs required due to ignition

switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being

subjected to potential risk of injury.

### THIRD CLAIM FOR RELIEF
**(Breach of Implied Warranties of Merchantability)**

140.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

141.    Plaintiffs bring this claim individually and on behalf of the Class of North

Carolina residents who formerly or currently own or lease one or more of the Defective Vehicles.

142.    Plaintiffs and Class members who purchased the Defective Vehicles in North

Carolina are "buyers" within the meaning of N.C. Gen. Stat. § 25-2-103 (1)(a) and N.C. Gen.

Stat. § 99B-2(b).

143.    The Defective Vehicles are "goods" within the meaning of N.C. Gen. Stat. § 25-2-

105.

144.    The Defective Vehicles are "products" within the meaning of N.C. Gen. Stat. §

99B-2(b).

145.    Defendant is a "manufacturer" of the Defective Vehicles within the meaning of

N.C. Gen. Stat. § 99B-1 and a "seller" within the meaning of N.C. Gen. Stat. § 25-2-103.

146.    Plaintiffs and the Class all purchased Defective Vehicles having the defective

ignition switches.

147.    Pursuant to N.C. Gen. Stat. §25-2-314 and other applicable law, including to N.C. Gen. Stat. § 99B-1 *et. seq.*, Defendant warranted that the Defective Vehicles were suited for their normal and intended use and purpose and was merchantable.

148.    Because of the ignition switch defects, the Defective Vehicles are not safe to drive and thus were not fit for ordinary purposes at the time the Defective Vehicles left Defendant's control.

149.    At the time the Defective Vehicles left the Defendant's control, the Defective Vehicles, without an adequate warning or instruction, created and unreasonably dangerous condition that Defendant knew, or in the exercise of ordinary care should have known, posed a substantial risk of harm to a reasonably foreseeable claimant, including Plaintiffs and the Class.

150.    At the time the Defective Vehicles left the Defendant's control, the Defendant became aware, or in the exercise of ordinary care should have known, that the Defective Vehicles posed a substantial risk of harm to a reasonably foreseeable user or consumer, including Plaintiffs and the Class, and failed to take reasonable steps to give adequate warning or instruction or take other reasonable action under the circumstances.

151.    The defects, as alleged herein, were not an open and obvious risk or a risk that was a matter of common knowledge at the time the Defective Vehicles were purchased.

152.    At the time the Defective Vehicles left the Defendant's control, the Defendant unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation of the Defective Vehicles, including the ignition switches, that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the Defective Vehicles.

153.     At the time the Defective Vehicles left the Defendant's control, the design or formulation of the Defective Vehicles, including the ignition switches, was so unreasonable that a person, aware of relevant facts, would not use a product of this design.

154.     The Defective Vehicles are not merchantable or fit for their normal and intended purposes and would not pass without objection in the automotive trade because of the ignition switch defects that cause the Defective Vehicles to experience engine failure lead to an unreasonable likelihood of accident and an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

155.     No materials provided with the Defective Vehicles disclose the ignition switch defects and the resulting dangerous safety implications.

156.     Defendant breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles containing the ignition switch defects.

157.     Defendant breached the implied warranty of merchantability by selling the Defective Vehicles without giving specific instructions or warning or other caution to Plaintiffs and the Class in order to notify them of the defects and danger.

158.     The ignition switch defects have deprived Plaintiffs and the Class of the benefit of their bargain and have caused the Defective Vehicles to depreciate in value.

159.     As direct and proximate causes of Defendant's breaches of the implied warranty of merchantability, Plaintiffs and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

## FOURTH CLAIM FOR RELIEF
### (Breach of Implied Warranties of Fitness for a Particular Purpose)

160.     Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

161.     Plaintiffs bring this claim individually and on behalf of the Class of North Carolina residents who formerly or currently own or lease one or more of the Defective Vehicles.

162.     Plaintiffs and the Class all purchased Defective Vehicles having the defective ignition switches.

163.     Pursuant to N.C. Gen. Stat. §25-2-315 and other applicable law, including to N.C. Gen. Stat. § 99B-1 *et. seq.*, Defendant warranted that the Defective Vehicles, including the ignition switches, were fit for the specific purpose of being a switch in the control system of an internal combustion engine motor vehicle that activates the main electrical systems for the vehicle. Besides providing power to the starter solenoid and the ignition system components (including the engine control unit and ignition coil), the ignition switch also controls power to many accessories including the steering, brakes, air bags and more.

164.     The Defective Vehicles, including the defective ignition switches, were not fit for this specific purpose for the reason that the ignition switch defects can cause the vehicle's engine and electrical system to shut off, disabling the power steering and power brakes and causing non-deployment of the vehicle's airbags in the event of an accident.

165.     As direct and proximate causes of Defendant's breaches of the implied warranty of fitness for a particular purpose, Plaintiffs and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

## FIFTH CLAIM FOR RELIEF
### (Breach of Express Warranties)

166.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

167.    As is alleged in paragraphs 97-105 above, and as will be more fully shown at the trial of this matter, the Defendant expressly warranted that the Defective Vehicles were safe and reliable for years.

168.    The above-referenced statements by Defendant, and others that will be shown at the trial of this matter, were express warranties within the meaning of N.C. Gen. Stat. § 25-2-313.

169.    As set forth above, the Defective Vehicles are, in fact, defective and have failed, in direct contradiction to the representations and warranties made by Defendant. Therefore, Defendant has breached its express warranties.

170.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

## SIXTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

171.    Plaintiffs repeat and reallege the preceding paragraphs and incorporate them herein by reference.

172.    Defendant, in the course of its business and in the course of inducing Plaintiffs and the Class to purchase the Defective Vehicles, supplied false and misleading information and concealed and failed to supply material information of which it was aware.

173.    Defendant owed a duty of care to Plaintiffs and the Class because they were within the class of persons to whom Defendant intended to supply information in order influence their decision to purchase Defective Vehicles.  At all times, Defendant was aware that the information that they supplied to Plaintiffs and the Class would be relied upon by Plaintiffs and the Class in making their decision to purchase the Defective Vehicles.

174.    Defendant failed to exercise reasonable care or competence in obtaining or communicating said information relied upon by the Plaintiffs and the Class in making their decision to purchase the Defective Vehicles.

175.    The reliance by Plaintiffs and the Class members upon the information supplied by Defendants was justifiable and reasonable under the circumstances.

176.    As direct and proximate causes of Defendant's negligent misrepresentations, Plaintiffs and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**(Fraudulent Concealment)**

177.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

178.    Plaintiffs bring this claim individually and on behalf of the Class of North Carolina residents who formerly or currently own or lease one or more of the Defective Vehicles.

179.    Defendant concealed material facts concerning the ignition switch defects before, during, and after the sale of the Defective Vehicles to Plaintiffs and Class members.

180.    Defendant had a duty to disclose information regarding the ignition switch defects because such information was known only to Defendant, who had superior knowledge and

access to the facts, and Defendant knew it was not known to or reasonably discoverable by Plaintiffs and Class members. These concealed facts were material because they directly impact the safety of the Defective Vehicles. Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

181.    Defendant actively concealed these material facts, in whole or in part, to protect its profits and avoid a costly recall, and it did so at the expense of Plaintiffs and the Class.

182.    Plaintiffs and the Class were unaware of these concealed material facts and would not have acted as they did if they had known of the concealed facts. Plaintiffs' and Class members' actions were justified and reasonable. Defendant was in exclusive control of the material facts and the public, Plaintiffs, and the Class did not know of these facts prior to purchasing the Defective Vehicles.

183.    Because of the concealment of the facts, Plaintiffs and the Class sustained damage because they purchased and retained Defective Vehicles that are now diminished in value from what they would have been had Defendant timely disclosed the ignition switch defects.

184.    As direct and proximate causes of Defendant's fraudulent concealment, Plaintiffs and the Class have been damaged including, but not limited to, the cost of repairs required due to ignition switch problems, the financial loss of owning the Defective Vehicles that are unsafe, and being subjected to potential risk of injury.

185.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiffs' and Class members' rights and well being, and to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## EIGHTH CLAIM FOR RELIEF
**(Violation of Magnuson-Moss Warranty Act, 15 U.SC. § 2301, *et seq.*)**

186.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

187.    Plaintiffs bring this claim individually and on behalf of the Class of North Carolina residents who formerly or currently own or lease one or more of the Defective Vehicles.

188.    Plaintiffs and Class members are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

189.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

190.    The Defective Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

191.    By reason of Defendant's statements, affirmations and omissionsPlaintiffs and the Class were justified in assuming that the Defective Vehicle's ignition switch would meet a specified level of performance over a specified period of time, namely, that it would not require unreasonable maintenance and would last for a reasonable  period of time.  Defendant's written affirmations of fact, promises, or descriptions related to the nature of the ignition switch in the Defective Vehicles and became part of the basis of the bargain between Plaintiffs and Defendant. Defendant refuses to recognize or honor the written ignition switch warranties and, indeed, denies the existence of these warranties.  Defendant breached its written warranties when the Defective Vehicles did not perform as represented by Defendant and thereafter when Defendant refused to recognize or honor the warranties.  Defendant's conduct thereby caused damages to Plaintiffs and Class members.

192.    The amount in controversy of each Plaintiffs' individual claim meets or exceeds

the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

193.    Resorting to any informal dispute resolution procedure and/or affording Defendant a reasonable opportunity to cure its breach of written warranties to Plaintiffs is unnecessary and/or futile. At the time of sale to Plaintiffs, Defendant knew, should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the ignition switch defects, but nevertheless failed to rectify the situation and/or disclose it to Plaintiffs. Moreover, the remedies available through any informal dispute resolution procedure would be wholly inadequate under the circumstances. Accordingly, any requirement under the MMWA or otherwise that Plaintiffs resort to any informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of written warranties is excused and, thereby, deemed satisfied.

194.    As a direct and proximate result of Defendant's breach of written warranties, Plaintiffs and Class members sustained damages and other losses. Defendant's conduct caused Plaintiffs' and Class members' damages and, accordingly, Plaintiffs and Class members are entitled to recover damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other equitable relief as appropriate.

## NINTH CLAIM FOR RELIEF
**(Violations of Michigan Consumer Protection Act, Mich. Comp. L. Ann. § 445.901, *et seq.*)**

195.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

196.    Plaintiffs bring this claim individually and on behalf of the Class of North Carolina residents who formerly or currently own or lease one or more of the Defective Vehicles.

197.    Old GM, GM, and Plaintiffs are each "persons" under Mich. Comp. L. Ann.

§ 445.902(d).

198.    The sale of the Defective Vehicles to Plaintiffs and the Class occurred within "trade and commerce" within the meaning of Mich. Comp. L. Ann. § 445.902(d), and both GM and Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

199.    The MCPA deems unlawful any "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce," as more specifically defined in the MCPA. Mich. Comp. L. Ann. § 445.903(1).  GM has engaged in unfair, unconscionable, and deceptive methods, acts and practices in violation of the MCPA, and also has successor liability for the unfair, unconscionable, and deceptive methods, acts, and practices of Old GM as described herein.

200.    Both Old GM and GM violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."  Mich. Comp. L. Ann. § 445.903(s).

201.    As alleged above, both Companies knew of the ignition switch defect, while Plaintiffs and the Class were deceived by the Companies' omission into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer until the February and March 2014 recalls.

202.    Old GM also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is."  Mich. Comp. L. Ann. § 405.903(bb). Indeed, Old GM represented that the Defective Vehicles were safe such that reasonable people believed such representations to be true.

203.    Old GM also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. L. Ann. § 405.903(cc).  Old GM represented that the Defective Vehicles were safe, yet failed to disclose the material fact that the ignition switch was defective.

204.    Old GM's and GM's acts and practices were unfair and unconscionable because their acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and the Companies' failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and because the harm the Companies caused consumers greatly outweighs any benefits associated with those practices. While Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Defective Vehicles until 2007.

205.    All the while, Old GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

206.    Plaintiffs and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.

207.    Old GM and GM failed to inform NHTSA, and therefore failed to inform consumers, that the Defective Vehicles had a defective ignition switch that could lead to injury and death. Had Plaintiffs and the Class known this, they would either not have purchased their vehicles at all or would have paid less for them, and would not have retained their Defective Vehicles. Plaintiffs and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of herein.

208.    Plaintiffs requests that this Court: enjoin GM from continuing its unfair, unlawful,

and/or deceptive practices; provide to Plaintiffs and each Class member either their actual

damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class

member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate

relief under Mich. Comp. L. Ann. § 445.911.

209.    Plaintiffs acknowledges that, on its face, the MCPA purports to (i) deprive non-

residents of bringing class (but not individual) actions under the MCPA; and (ii) allows

individuals (but not class members) the ability to recover a penalty of $250 per person if that

amount is greater than their actual damages.  After the United States Supreme Court's decision in

*Shady Grove Orthopedic Ass'n, P.A. v. Allstate Ins. Co.*, 589 U.S. 393 (2010), however, any such

prohibitions imposed in class actions (but not in individual actions) are trumped and superseded

by Fed. R. Civ. P. 23, which imposes no such restrictions.


## TENTH CLAIM FOR RELIEF
### (Violation of North Carolina's Unfair and Defective Trade Practices Act )

210.    Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

211.    Plaintiffs bring this claim individually and on behalf of the Class of North

Carolina residents who formerly or currently own or lease one or more of the Defective Vehicles.

212.     N.C. Gen. Stat. § 75-1.1 *et. seq.* makes unlawful, "Unfair methods of competition

in or

affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

213.    By selling Defective Vehicles throughout the State of North Carolina and by

undertaking the acts complained of herein, including the sale of the Defective Vehicles to

Plaintiffs and the Class and making misleading representations to Plaintiffs and the Class about

the Defective Vehicles, Defendant has affected commerce within the meaning of  N.C. Gen. Stat.

§§75-1.1 *et. seq.*

214.    Defendant engaged in unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1. 1 *et. seq.* by, among other things improperly:

a.    Selling for value unreasonably dangerous vehicles to the general public without giving notice of the dangerous and unsafe propensities inherent within the Defective Vehicles;

b.    Failing to give Plaintiffs and the Class adequate warnings and notices regarding the defects in the Defective Vehicles despite the fact that Defendant knew or should have known of these defects, with the intent that Plaintiffs and the members of the Classes would rely upon Defendant's failure to disclose the defects when purchasing the Defective Vehicles.

c.    Making such sales of the Defective Vehicles while using explicit statements indicating that the Defective Vehicles were roadworthy and safe in order to induce the Plaintiffs and class to purchase the Defective Vehicles;

d.    Failing to timely notify all affected vehicle owners that the ignition switches were part of an adjustment program and that they could have had their ignition switches repaired or replaced free of charge;

e.    Failing to reimburse vehicle owners who paid to have their ignition switches repaired or replaced;

f.    Replacing or repaired defective ignition switches for some customers but failing to notify all other customers of that benefit; and

g.    Failing to adequately disclose the defect to NHTSA, Plaintiffs and the Class and timely implement a remedy.

215.     Defendant's conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiffs and

Class members.  The harm to Plaintiffs and Class members arising from Defendant's conduct outweighs any legitimate benefit Defendant derived from the conduct.

216.    Defendant's actions and practices constitute "unfair and deceptive" business practices in violation of N.C. Gen. Stat. §75-1. 1 *et.seq.* because, among other things, they are likely to deceive reasonable consumers such as Plaintiffs and the Class.

217.    As a direct and proximate result of these unfair, deceptive and unconscionable commercial practices, Plaintiffs and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices and, pursuant to N.C. Gen. Stat.§ 75-16, are entitled to recover treble damages and, pursuant to N.C. Gen. Stat.§ 75-16.1 are entitled to an award attorneys' fees and costs.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

1.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives and appointing the undersigned counsel as Class Counsel;

2.    Ordering Defendant to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiffs and the other members of the Class;

3.    Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiffs and the other members of the Class;

4.    Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and the other members of the Class;

5.    Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective recall campaign;

6.    Ordering the Defendant to pay treble damages pursuant to the provisions of N.C. Gen. Stat. § 75-16 and costs of this action, including reasonable attorneys' fees in accordance with N.C. Gen. Stat. § 75-16.1 and as otherwise is allowed by law;

7.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

8.    For a trial by jury on all issues and Claims for Relief so triable; and

9.    Ordering such other and further relief as may be just and proper.

This the 1st day of July, 2014.

Respectfully submitted,

/s/ Joel R. Rhine
**RHINE MARTIN LAW FIRM, P.C.**
**Joel R. Rhine**
North Carolina State Bar No. 16028
Email: jrr@rhinelawfirm.com

/s/ Jean Sutton Martin
**Jean Sutton Martin**
North Carolina State Bar No. 25703
Email: jsm@rhinelawfirm.com
1612 Military Cutoff Road Suite 300
Wilmington, North Carolina 28403
Tel: (910) 772-9960
Fax: (910) 772-9062