# Exhibit C

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS**
Sandra K. Kluessendorf, individually and on behalf of all others similarly situated,

**DEFENDANTS**
General Motors LLC; General Motors Holding, LLC; Delphi Automotive PLC; and DPH-DAS LLC f/k/a Delphi Automotive Systems, LLC,

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
Friedman Law Group LLP
270 Lafayette Street, 14th Floor
New York, NY 10012       212-680-5150

ATTORNEYS (IF KNOWN)

**14 CV 5035**

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. § 1332(d): alleging that the sale of cars with defective ignition switches constituted fraudulent concealment, among other claims.

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [x] Yes [ ] Judge Previously Assigned

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ]  If yes, give date _____ & Case No. _____

Is THIS AN INTERNATIONAL ARBITRATION CASE?   No [x]   Yes [ ]

(PLACE AN [x] IN ONE BOX ONLY)                    NATURE OF SUIT

TORTS                                              ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | | [ ] 367 HEALTHCARE/ | | | [ ] 375 FALSE CLAIMS |
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | PHARMACEUTICAL PERSONAL | [ ] 625 DRUG RELATED | [ ] 422 APPEAL | [ ] 400 STATE |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT | INJURY/PRODUCT LIABILITY | SEIZURE OF PROPERTY | 28 USC 158 | REAPPORTIONMENT |
| [ ] 130 MILLER ACT | LIABILITY | [ ] 365 PERSONAL INJURY | 21 USC 881 | [ ] 423 WITHDRAWAL | [ ] 410 ANTITRUST |
| [ ] 140 NEGOTIABLE | [ ] 320 ASSAULT, LIBEL & | PRODUCT LIABILITY | [ ] 690 OTHER | 28 USC 157 | [ ] 430 BANKS & BANKING |
| INSTRUMENT | SLANDER | [ ] 368 ASBESTOS PERSONAL | | | [ ] 450 COMMERCE |
| [ ] 150 RECOVERY OF | [ ] 330 FEDERAL | INJURY PRODUCT | | | [ ] 460 DEPORTATION |
| OVERPAYMENT & | EMPLOYERS' | LIABILITY | | PROPERTY RIGHTS | [ ] 470 RACKETEER INFLU- |
| ENFORCEMENT | LIABILITY | | | | ENCED & CORRUPT |
| OF JUDGMENT | [ ] 340 MARINE | PERSONAL PROPERTY | | [ ] 820 COPYRIGHTS | ORGANIZATION ACT |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT | | | [ ] 830 PATENT | (RICO) |
| [ ] 152 RECOVERY OF | LIABILITY | [x] 370 OTHER FRAUD | | [ ] 840 TRADEMARK | [ ] 480 CONSUMER CREDIT |
| DEFAULTED | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | | | [ ] 490 CABLE/SATELLITE TV |
| STUDENT LOANS | [ ] 355 MOTOR VEHICLE | | | | |
| (EXCL VETERANS) | PRODUCT LIABILITY | | | SOCIAL SECURITY | [ ] 850 SECURITIES/ |
| [ ] 153 RECOVERY OF | [ ] 360 OTHER PERSONAL | [ ] 380 OTHER PERSONAL | | [ ] 861 HIA (1395ff) | COMMODITIES/ |
| OVERPAYMENT OF | INJURY | PROPERTY DAMAGE | LABOR | [ ] 862 BLACK LUNG (923) | EXCHANGE |
| VETERAN'S | [ ] 362 PERSONAL INJURY - | [ ] 385 PROPERTY DAMAGE | | [ ] 863 DIWC/DIWW (405(g)) | |
| BENEFITS | MED MALPRACTICE | PRODUCT LIABILITY | [ ] 710 FAIR LABOR | [ ] 864 SSID TITLE XVI | |
| [ ] 160 STOCKHOLDERS | | | STANDARDS ACT | [ ] 865 RSI (405(g)) | [ ] 890 OTHER STATUTORY |
| SUITS | | PRISONER PETITIONS | [ ] 720 LABOR/MGMT | | ACTIONS |
| [ ] 190 OTHER | | [ ] 463 ALIEN DETAINEE | RELATIONS | | [ ] 891 AGRICULTURAL ACTS |
| CONTRACT | | [ ] 510 MOTIONS TO | [ ] 740 RAILWAY LABOR ACT | | |
| [ ] 195 CONTRACT | | VACATE SENTENCE | [ ] 751 FAMILY MEDICAL | FEDERAL TAX SUITS | |
| PRODUCT | ACTIONS UNDER STATUTES | 28 USC 2255 | LEAVE ACT (FMLA) | | |
| LIABILITY | | [ ] 530 HABEAS CORPUS | | [ ] 870 TAXES (U.S. Plaintiff or | [ ] 893 ENVIRONMENTAL |
| [ ] 196 FRANCHISE | CIVIL RIGHTS | [ ] 535 DEATH PENALTY | [ ] 790 OTHER LABOR | Defendant) | MATTERS |
| | | [ ] 540 MANDAMUS & OTHER | LITIGATION | [ ] 871 IRS-THIRD PARTY | [ ] 895 FREEDOM OF |
| | [ ] 440 OTHER CIVIL RIGHTS | | [ ] 791 EMPL RET INC | 26 USC 7609 | INFORMATION ACT |
| REAL PROPERTY | (Non-Prisoner) | | SECURITY ACT | | [ ] 896 ARBITRATION |
| | [ ] 441 VOTING | | | | [ ] 899 ADMINISTRATIVE |
| [ ] 210 LAND | [ ] 442 EMPLOYMENT | PRISONER CIVIL RIGHTS | IMMIGRATION | | PROCEDURE ACT/REVIEW OF |
| CONDEMNATION | [ ] 443 HOUSING/ | | [ ] 462 NATURALIZATION | | APPEAL OF AGENCY DECISION |
| [ ] 220 FORECLOSURE | ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS | APPLICATION | | [ ] 950 CONSTITUTIONALITY O |
| [ ] 230 RENT LEASE & | [ ] 445 AMERICANS WITH | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION | | STATE STATUTES |
| EJECTMENT | DISABILITIES - | [ ] 560 CIVIL DETAINEE | ACTIONS | | |
| [ ] 240 TORTS TO LAND | EMPLOYMENT | CONDITIONS OF CONFINEMENT | | | |
| [ ] 245 TORT PRODUCT | [ ] 446 AMERICANS WITH | | | | |
| LIABILITY | DISABILITIES -OTHER | | | | |
| [ ] 290 ALL OTHER | [ ] 448 EDUCATION | | | | |
| REAL PROPERTY | | | | | |

Check if demanded in complaint:

[✓] CHECK IF THIS IS A CLASS ACTION
     UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

Check YES only if demanded in complaint
JURY DEMAND: [x] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE Jesse M. Furman       DOCKET NUMBER 14-cv-2458

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32

*(PLACE AN x IN ONE BOX ONLY)*                                        **ORIGIN**

[x] 1  Original          [ ] 2  Removed from      [ ] 3  Remanded    [ ] 4  Reinstated or    [ ] 5  Transferred from  [ ] 6  Multidistrict    [ ] 7  Appeal to District
       Proceeding              State Court               from                Reopened               (Specify District)        Litigation              Judge from
                         [ ] a.  all parties represented    Appellate                                                                                      Magistrate Judge
                                                            Court                                                                                          Judgment
                         [ ] b.  At least one
                                 party is pro se.

*(PLACE AN x IN ONE BOX ONLY)*                    **BASIS OF JURISDICTION**                        *IF DIVERSITY, INDICATE*
[ ] 1  U.S. PLAINTIFF   [ ] 2  U.S. DEFENDANT   [ ] 3  FEDERAL QUESTION   [x] 4  DIVERSITY        *CITIZENSHIP BELOW.*
                                                       (U.S. NOT A PARTY)

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 | [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 | [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 | [x]5 |
| CITIZEN OF ANOTHER STATE | [x]2 | [ ]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 | [ ]4 | FOREIGN NATION | [ ]6 | [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)
Sandra K. Kluessendorf
1049 Summit Ave.
St. Paul Park, MN  55071
Washington County, Minnesota


DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)
General Motors, LLC - 300 Renaissance Center - Detroit, MI  48265 - Wayne County

Delphi Automotive, PLC, Delphi Automotive Systems LLC - 5725 Delphi Drive - Troy, MI  48098-2815



DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:




Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] MANHATTAN
              (DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS
              COMPLAINT.)
DATE 7/3/14          SIGNATURE OF ATTORNEY OF RECORD          ADMITTED TO PRACTICE IN THIS DISTRICT
                                                             [ ] NO
RECEIPT #                                                    [x] YES (DATE ADMITTED  Mo.1_____  Yr. 2007____ )
                                                             Attorney Bar Code # SL 051 7

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**IN THE UNITED STATES DISTRICT COURTF**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**14 CV 5035**

| | |
|---|---|
| SANDRA K. KLUESSENDORF, individually and on behalf of all others similarly situated, | ) CIVIL ACTION NO: _____ ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| GENERAL MOTORS LLC; GENERAL MOTORS HOLDING, LLC; DELPHI AUTOMOTIVE PLC; and DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC, | ) **CLASS ACTION COMPLAINT** ) ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

1.      Plaintiff Sandra K. Kluessendorf ("Plaintiff"), individually and on behalf of all

similarly situated persons in the United States who purchased or leased certain vehicles

manufactured, distributed, and/or sold by General Motors LLC,[1] General Motors Holding, LLC,

General Motors Corporation, General Motors Companies, and/or its related subsidiaries,

successors, or affiliates (collectively "GM"), with defective ignition switches manufactured by

Delphi Automotive PLC, DHP-DAS LLC f/k/a Delphi Automotive Systems LLC, and/or its

related subsidiaries, successors or assigns ("Delphi") for violations of common law, state statutes

and federal law beginning in 2002 to the present (the "Class Period").

---

[1] General Motors Corporation filed for bankruptcy on June 1, 2009, and a new General Motors Company was created July 10, 2009. General Motors LLC is the wholly-owned subsidiary of General Motors Company, which conducts the automotive business operations of the company.

1

2.      As used in this Complaint, the terms "Defective Vehicles" or "Affected Vehicles" refer to the GM vehicles sold in the United States that have defective ignition switches, including:

- 2005-2010 Chevrolet Cobalt;

- 2006-2011 Chevrolet HHR;

- 2005-2010 Pontiac G5;

- 2006-2010 Pontiac Solstice;

- 2003-2007 Saturn Ion; and

- 2007-2010 Saturn Sky.[2]

3.      More than 2.6 million vehicles worldwide are affected by the defective ignition switches ("DIS") and have been recalled,[3] and there are other vehicles manufactured by GM that have the DIS but may not have been disclosed by GM at this time.

4.      As detailed herein, Plaintiffs and the Class were harmed and suffered actual damages, because the Affected Vehicles manifested, and continue to manifest, the DIS. Class Members, including Plaintiff, did not receive the benefit of their bargain as purchasers and lessees, received vehicles that were of lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Class Members and Plaintiff did not receive vehicles that would operate in a reliable manner and with reasonable safety, and that would not place the driver and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. A car purchased or leased under the

---

[2] *See* General Motors Ignition Recall Safety Information, at http://www.gmignitionupdate.com/ (last visited May 9, 2014).
[3] *See Government says no need to park recalled GM cars*, AP, available at http://www.foxnews.com/leisure/2014/05/09/government-says-no-need-to-park-recalled-gm-cars/ (last visited May 9, 2014).

2

reasonable assumption that it is "safe" as advertised is worth more than a car—such as the Defective Vehicles—that is known to be subject to the risk of a DIS.

5.    All purchasers and lessees of the Defective Vehicles overpaid for their cars. Furthermore, GM's public disclosure of the DIS has caused the value of the Affected Vehicles to diminish in a material way. Purchasers or lessees of these vehicles paid more, either through higher purchase price or higher lease payments, than they would have if they had known of the defects and if the existence of the DIS had been disclosed.

## I. INTRODUCTION

6.    Throughout the Class Period, GM and its predecessor touted the safety and reliability of its vehicles. However, in a recent statement Mary T. Barra, the chief executive of General Motors Company, admitted that "something went very wrong ... and terrible things happened."[4]

7.    The "something" that "went wrong" was that GM and its predecessor knew of the defective ignition switch—through, among other things, reports from pre-release design, manufacturing, and field testing data; warranty repair data; consumer complaints made directly to GM and to the National Highway Transportation Safety Administration ("NHTSA") and its Office of Defect Investigation ("ODI"); field testing; data from GM dealers; and accident data—and intentionally withheld, since possibly as early as 2001, this information showing that DIS's were cutting off engine power, thus disabling critical functions needed to safely operate vehicles, such as power steering, power braking and airbags, in a number of GM model cars, including the 2005-2010 Chevrolet Cobalt, 2005-2010 Pontiac G5, 2003-2007 Saturn Ion, 2006-2011 Chevrolet HHR, 2006-2010 Pontiac Solstice and 2007-2010 Saturn Sky (the "DIS Models"). In

---

[4] *See* Bill Vlasic, *Something Went 'Very Wrong' at G.M., Chief Says*, THE NEW YORK TIMES, March 18, 2014, at B1.

addition, GM also sold vehicles with defective airbag wiring, faulty brake pumps and non-compliant unbelted passenger restraints (the "Late Model Recalls").

8.      In regard to the DIS Models, GM has admitted that at least twelve deaths have been directly attributed to the DIS defect when airbags did not deploy in collisions after the ignition unexpectedly cut off.

9.      A great number of additional deaths may be attributable to the defect. According to data provided by the National Highway Traffic Safety Administration (the "NHTSA"), 303 people have died after the air bags failed to deploy in just two of the models that were recalled by GM. Many of these tragedies could have been avoided. GM's predecessor ("GM Corp." as defined herein) attempted to surreptitiously repair the defect in 2005 in at least some of the DIS Models by instructing dealers to make minor adjustments. However, customers were not informed about the potentially fatal defect until 2014.

10.     In a chronology of events submitted by GM to federal regulators on March 11, 2014 the Company admitted that it was alerted to the DIS flaws as early as 2001.

11.     GM and its predecessor were at all times under an affirmative duty to advise customers about known defects. Specifically, under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[5] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects.[6] If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[7] This duty existed throughout the Class Period.

---

[5] 49 U.S.C. §§ 30101-30170.
[6] 49 U.S.C. § 30118(c)(1) & (2).
[7] 49 U.S.C. § 30118(b)(2)(A) & (B).

4

12.    Notwithstanding this and other duties, and despite having specific information indicating that the ignition switches could fail and render the car inoperable, and initiating a stealth fix for DISs throughout the Class Period, GM and its predecessor continued to advertise its vehicles as "safe and sound" without disclosing that known flaws could without warning turn the DIS Models into potential deathtraps.

13.    Reports indicate that GM's complete disregard for the safety of its customers and their families has resulted in a criminal probe of its conduct[8] and a Congressional investigation.[9]

14.    In February of 2014—more than a decade after first knowing about the DIS defect—GM recalled 1.62 million vehicles. Significantly, based on GM's own admissions, GM actively concealed information in its possession relating to DIS defects from at least 2001 to 2014. Notwithstanding GM's belated recall and its attempts to control the fallout from its potentially criminal conduct, the economic damage to the owners of the DIS Models is done.

15.    Plaintiff, like over two million owners of the recalled GM models, is left with the uncertainty of whether her car is safe to drive but the certainty that its value has been diminished. Had Plaintiff known the truth about the problems with the Defective or GM's willingness to remain silent (while stealthily attempting to remedy some, but not all, DIS Models) she would not have purchased her GM vehicle or would have demanded a discount over the price she paid.

16.    Safety and reliability was a significant factor for Plaintiff when she was considering the purchase of her GM car. Knowing this was a central concern for its customers who are deciding to purchase a vehicle, GM and its predecessor advertised and promoted its vehicles to be safe and reliable since 2001, but failed to disclose to purchasers that they knew of

---

[8] See Emily Flitter, et al., *Federal Prosecutors Open Criminal Probe of GM Recall: Source*, REUTERS, March 11, 2014, available at http://mobile.reuters.com/article/idUSBREA2A1RZ20140311?irpc=932 (last visited May 9, 2014).
[9] See Sophia Yan, *Congress to Investigate GM Recall*, CNN, March 11, 2014, available at http://money.cnn.com/2014/03/11/autos/gm-recall-congress/ (last visited May 9, 2014).

a potential defect that could lead to serious injury and death. As a result, buyers did not get the benefit of their bargain and were misled by GM's deceptive conduct.

17.    As a result of GM's alleged misconduct, Plaintiff and Class Members were harmed and suffered actual damages, due to the fact that the Affected Vehicles have manifested, and continue to manifest, the DIS. Plaintiff and the Class did not receive the benefit of their bargain as purchasers and lessees, received vehicles that were of a lesser standard, grade, and quality than what was represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Class Members did not receive vehicles that would operate reliably and with reasonable safety, and that would not place drivers and their passengers in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. An automobile leased or purchased under the reasonable assumption that it is "safe" as advertised is worth more than a car—such as the Defective Vehicles—that is known to be subject to the risk of a DIS. All purchasers of the Defective Vehicles overpaid for their cars.

18.    Furthermore, the disclosure of the defect has caused the value of the Defective Vehicles to materially diminish. Purchasers or Lessees of the recalled DIS Models paid more, either through a higher purchase price or higher lease payments, than they would have had the defects and non-conformities been disclosed. In addition, many owners suffered from a loss of the use of the vehicle while they were waiting for the necessary repairs to be performed, and must wait for months due to a shortage of parts necessary to make the required repairs.

19.    GM's predecessor, General Motors Corporation ("GM Corp.") also violated disclosure requirements by designing and marketing vehicles with defective ignition switches, and then by failing to disclose that defect even after it became aware that the ignition switch

6

defect was causing fatal accidents. In addition to the liability arising out of the statutory

obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts

and omissions of GM Corp. because GM has continued the business enterprise of GM Corp. with

full knowledge of the ignition switch defects.

20.     Defendants' conduct proximately and foreseeably caused Plaintiff and members

of the Class, defined herein, to suffer economic injury by forcing Plaintiff and similarly situated

owners to pay artificially inflated prices for the DIS Models throughout the Class Period.

21.     Plaintiff and the Class were also damaged by the acts and omissions of GM Corp.

for which GM is liable through successor liability because the DIS Models they purchased are

worth less than they would have been without the ignition switch defects.

## II. JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 because Plaintiff asserts claims under federal law, namely the Magnuson-Moss

Warranty Act, 15 U.S.C. § 2301, *et seq.*, on her own behalf and on behalf of a nationwide class.

23.     This Court also has jurisdiction over the subject matter of this action pursuant to

the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action,

including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal

Rules of Civil Procedure; there are thousands and potentially millions of potential Class

members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000;

and Defendants are citizens of a State different from that of Plaintiff and, upon information and

belief, more than two-thirds of the members of the Classes reside.

24.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendant' GM

conducts substantial business in this District, has caused harm to class members residing in this

7

District and because, as a corporation, GM is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

### III. PARTIES

25.    Plaintiff Sandra K. Kluessendorf is a citizen of Minnesota. Plaintiff owns a 2009 Chevrolet Cobalt subject to the DIS-related recall. Plaintiff has experienced loss of vehicle power on several occasions while she was driving. Had she known of the DIS defect, she would not have bought the 2009 Chevrolet Cobalt or she would not have paid as much for it.

26.    Plaintiff did not learn of the DIS defects in her car until April 2014. Ever since her purchase of the vehicle, Plaintiff has had issues with the ignition sticking, which prevented the car from being started. In 2010 or 2011, Plaintiff received a recall notice for a separate issue and brought her car back to the dealership, at which time the service technicians experienced the problem with the ignition themselves and asked if that had been a problem for Plaintiff. She explained that she had problems with the sticking ignition ever since she purchased the vehicle. The technicians told Plaintiff the problems were being caused by having other keys on her key ring. Plaintiff removed the additional keys from her key ring, but she continues to experience the problem on a weekly basis. Plaintiff has still not yet received the official notice of the recall of her vehicle, but she did receive a letter explaining the recall and repair process, and was told she must wait to have her car repaired because the dealership did not have the required parts.

27.    Defendant General Motors LLC ("GM") is a Delaware company headquartered in Detroit, Michigan, conducts business in this District, and is responsible for the manufacture, distribution, and sale of all GM automobiles in the United States, as well as engineering design, development, research and development, and manufacturing activities in the U.S., Canada, and

Mexico. GM is a wholly-owned subsidiary of General Motors Company, a Delaware corporation

headquartered in Detroit, Michigan.

28.    GM was incorporated in 2009 and on July 10, 2009 acquired substantially all

assets and assumed certain liabilities of General Motors Corporation ("GM Corp.") through a

sale under Section 363, Chapter 11 of the U.S. Bankruptcy Code.

29.    Because GM acquired and operated GM Corp. and ran it as a continuing business

enterprise, and because GM was aware from its inception of the ignition switch defects in the

DIS Models, GM is liable through successor liability for the deceptive and unfair acts and

omissions of GM Corp., as alleged in this Complaint. Moreover, as explained below, *see* Section

IV(F), GM is fully liable for all losses alleged herein.

30.    Additionally, GM expressly retained certain liabilities and obligations after the

bankruptcy, including:

> [1] [A]ll Liabilities arising under express written warranties of [GM Corp.] that
> are specifically identified as warranties and delivered in connection with the sale
> of new, certified used or pre-owned vehicles or new or remanufactured motor
> vehicle parts and equipment (including service parts, accessories, engines and
> transmissions) manufactured or sold by [GM Corp.] or Purchaser prior to or after
> the Closing and . . . all obligations under Lemon Laws.

> [2] [C]ertification, reporting and recall requirements of the National Traffic and
> Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and
> Documentation Act, the Clean Air Act, the California Health and Safety Code,
> and similar laws, in each case, to the extent applicable in respect of vehicles and
> vehicle parts manufactured or distributed by [GM Corp.].

31.    Defendant Delphi Automotive PLC ("Delphi") is headquartered in Gillingham,

Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is

headquartered in Troy, Michigan.

32.    Delphi began as a wholly-owned subsidiary of General Motors Corporation, until

it was launched as an independent publicly-held corporation in 1999.

9

33.     In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi plants to assist with its post-bankruptcy restructuring. In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

34.     At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

35.     GM and Delphi are collectively referred to in this Complaint as "Defendants."

## IV. FACTUAL ALLEGATIONS

**A.     GM Markets and Sells DIS Models as "Safe" and "Reliable"**

36.     In advertisements, GM and GM Corp. stated its cars were safe.

37.     Some examples of GM Corp.. advertising include the following claims of safety and reliability:

**2003 Saturn Ion:** "The ION sedan and quad coupe are designed to carry on the tradition of being at the top of the class when it comes to safety and security."

**2006 and 2007 Saturn Ion:** "Like all Saturns, the Ion was designed with an emphasis on safety and security."

**2007 Saturn Ion:** "The ION's designers accounted for almost everything but compromise. . . . Sporty, yet safe and sound. Featuring the U.S. Government's highest possible front crashtest rating—five stars."

**2006 Pontiac G5:** "The 2006 Pontiac G5 Pursuit offers a host of features for safety-minded consumers."

**2006 Chevrolet HHR:** "HHR is designed to protect occupants in the event of a crash."

**2007 Saturn Sky:** "Sky has a host of safety features... including dual stage frontal air bags... that use the latest sensing technology to turn the front passenger air bag on or off."

2005 - 2007 Chevrolet Cobalt: "Safety was a priority in the development of the Cobalt."
Cobalt's "rigid body structure… reinforces occupant safety."

"The rigid body structure… reinforces its safety [and] load carrying capability for crash
protection."

38.     Purchasers of the Cobalt and other DIS Models thus were led to believe the

Cobalt and other DIS Models were safe, reliable vehicles.

###     B.     GM Field Reports and Internal Testing Reveal the Defect

39.     In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that

the ignition switch cold unintentionally move from the "run" position to the "off" or "accessory"

position.  In an internal report prepared at the time, GM identified the cause of the problem as

"low detent plunger force."  The "detent" is the part of the ignition switch that keeps the switch

from rotating from one setting to another unless the driver turns the key.  The report stated that

an "ignition switch design change" was believed to have resolved the problem.

40.     In 2003, a second report documented an incident with a Saturn Ion where a

"service technician observed a stall while driving."  In that case, the technician noted that the

owner had several keys on the key ring and concluded that the additional "weight of the keys had

worn out the ignition switch."  The technician replaced the switch and closed the matter.

41.     GM engineers encountered additional problems in 2004 before the release of the

2005 Chevrolet Cobalt.  GM was informed of an incident where a Cobalt suddenly switched out

of the "run" position and lost all engine power.  GM engineers were able to replicate this

problem during test drives of the Cobalt.  An engineering inquiry known as a Problem

Resolution Tracking System ("PRTS") was able to isolate and identify the problem and evaluate

a number of solutions.  After considering the "lead time required, cost, and effectiveness," GM

decided to take no further action.

11

42.     After the Chevrolet Cobalt was released in 2004, GM began receiving complaints about incidents involving a sudden loss of engine power. GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" position to the "off" or "accessory" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." In February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

43.     Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition. Although GM initially approved the design, the company once again declined to act.

44.     In April 2006, GM finally approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number. GM estimates that Delphi began producing the redesigned ignition switch for all Subject Vehicles during the 2007 model year.

45.     After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

12

46.     GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect

47.     In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch. The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

48.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning." GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain." The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

49.     In July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present." Adler advised that

consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

50.    The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt: she was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead." She was able to safely coast to the side of the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of the service bulletin. The reporter stated that the key chain being used at the time of the stalling incident was provided by GM, and included only the key fob and a tag.

51.    GM, in a statement at the time through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition...."

52.    GM affirms its prior actions, stating that the field service campaign was the correct response "given that the car's steering and braking systems remained operational after a loss of engine power," and because the engine could be restarted by shifting into neutral or park.

53.    In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007A) to include additional vehicles and model years. Specifically, GM included he 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky. The updated bulletin included the same service advisories to GM dealers as the earlier version.

14

54.     According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power." GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

55.     A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles." Despite these reports, the Saturn Ion remained in production until 2007.

56.     In May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

57.     The Defendants knew of the Ignition Switch Defect and its deadly consequences for consumers, but concealed that information from safety regulators and the public.

58.     National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

59.     Thus, rather than issue a recall which would have alerted the public to the DIS defect, GM Corp. simply sent notices like the 2005 Service Bulletin telling their dealers that certain models' ignition switches could unexpectedly shut off, powering down their cars' engines. Dealers, in turn, were instructed to tell drivers to remove unessential items from their key chains.

15

60.     GM's representations to purchasers about safety and reliability were demonstrably misleading. Both GM Corp. and GM knew of the DIS problems and their potentially fatal consequences, but concealed them from buyers.

**C.     GM Finally Acknowledges the Defects**

61.     Finally, on February 7, 2014, GM notified NHTSA of its decision to recall 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles on the basis of the severe safety problem relating to defects in the DIS.

62.     Following GM's announcement of the Cobalt and G5 recall on February 7, 2014, the decision was made to conduct "a more in-depth analysis" of additional vehicles.

63.     According to GM in its March 11, 2014 chronology, a PowerPoint demonstration was presented at the December 2013 and January 2014 meetings to the EFADC reflecting a proposed recall of only the Cobalt and G5 vehicles. For these two meetings, a "backup" slide deck was prepared that also included information relating to the investigator's examination of key insert claims data for the Ion, HHR and Solstice vehicles. The "backup" slide decks also included factual material relating to other vehicles, including a copy of the April 26, 2006 document approving changes to the ignition switch proposed by the supplier. GM claims it does not know whether the "backup" slides were reviewed during these two meetings.

64.     Although not explained by GM, according to the Company, it eventually became aware of the fact that additional models were affected by the DIS (a fact that would have been obvious had the "backup" powerpoint slides been seriously considered) and should be subject to the DIS recall.

65.     By letter dated February 24, 2014, GM notified NHTSA of its decision to recall all of the other DIS Models, specifically, the 2003-2007 model year Saturn Ion, 2006-2007

16

model year Chevrolet HHR, 2006-2007 Pontiac Solstice, and 2007 model year Saturn Sky vehicles, because these vehicles were equipped with the same defective DIS.

66.     In a somewhat unsettling conclusion for owners of the DIS Models and other GM vehicles, GM represented to NHTSA that its "review of data and information relating to the recalled vehicles continues."

67.     On March 28, 2014, GM expanded the DIS recall to include later-year models that were not manufactured with the DIS, but that may have been repaired with a defective switch.

### D.     GM Recalls Late Model Vehicles for Unrelated Defects

68.     In addition to the DIS Models that have been recalled, GM has recently recalled over 1.5 million additional vehicles due to safety defects (the "Late Model Recalls").

69.     On March 17, 2014, GM recalled 1.33 million sport utility vehicles because of a wiring problem that could cause air bags not to deploy in a crash.

70.     The vehicles include Buick Enclaves and GMC Acadias from the 2008 to 2013 model years, Chevrolet Traverses from the 2009 to 2013 model years, and Saturn Outlooks from the 2008 to 2010 model years.

71.     GM said a wiring problem could cause the illumination of a "service air bag" warning.  Ignoring the warning will eventually result in the nondeployment of seat-mounted side air bags.

72.     Also on March 17, 2014, GM said it would recall 66,000 Cadillac XTS sedans, model years 2013 and 2014, because problems in a brake pump could possibly cause engine fires. GM said it was aware of two fires related to the defect.

73.    The automaker will also recall 354,000 full-size vans that do not comply with requirements for head impacts for unbelted occupants. The vehicles are Chevrolet Express and GMC Savannah vans from the model years 2009 to 2014.

**E.    The Faulty Ignition Switches and Related Quality Concerns Have Caused or Will Cause Values of DIS Models to Be Substantially Diminished**

74.    A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car known to be subject to the risk of a possibly life-threatening failure of an ignition switch that renders the airbag inoperable. A car purchased under the assumption that it was produced in conformity to high safety standards is worth more than a car produced in a system that promotes expedience over quality and safety and hides known defects. Moreover, car owners (and lessees) have a reasonable expectation that car manufacturers will abide by federal state and common law obligations to affirmatively disclose known defects in a timely manner.

75.    This did not happen and, as a result, all purchasers of the DIS Models overpaid for their cars at the time of purchase. As news of the DIS defect and GM's quality control issues surfaced in February 2014, the value of GM vehicles has diminished and will continue to do so.

76.    National and regional media outlets around the country have reported extensively regarding the DIS in recent days and weeks, raising public awareness of the defect and its safety implications. Among the news negatively affecting the value of the DIS Models are the following reports that have been widely read.

77.    For example, on March 14, 2014 a news article reported that a 29-year-old woman died on her birthday after her vehicle—a Chevrolet Cobalt—spun out of control and

caused a collision with another vehicle.[10] Only four days prior to the incident, the woman's

vehicle reportedly turned off unexpectedly while she was driving, disengaging her power

steering and brakes. The woman took her car to a dealership for repairs following the earlier

incident, but an expert's examination of her vehicle's "black box" allegedly revealed that her key

had moved from the "on" position to the "accessory" position three seconds before the accident.

78.     In an April 1, 2014 article[11] about the recall and the teenage girl "whose 2005

death was the first linked to an ignition switch problem that's triggered a massive recall of

General Motors vehicles," the girl's mother stated that although GM only acknowledges 13

fatalities related to the defective ignition switch, she had found at least 29 fatalities through the

use of a Facebook page that was set up for the families of victims.

79.     Another article published on March 13, 2014 put the number of victims at over

300.[12] The article stated, "As lawmakers press General Motors and regulators over their decade-

long failure to correct a defective ignition switch, a new review of federal crash data shows that

303 people died after the air bags failed to deploy on two of the models that were recalled last

month."

80.     In yet another article published on March 18, 2014, the overall death toll of the

DIS defect was discussed.[13] That article reiterated that "303 deaths could have been caused by a

defect that recently prompted General Motors to recall 1.6 million cars[.]" The article continued,

---

[10] Gabe Gutierrez et al., *Parents 'Boiling With Anger' After Daughter's Death in GM Car*, NBC NEWS, March 14, 2014, available at http://www.nbcnews.com/storyline/gm-recall/parents-boiling-anger-afterdaughters-death-gm-car-n52316 (last visited May 9, 2014).
[11] Scott Neuman, *Mother Of Victim: More Killed By GM Ignition Switch Defect*, NPR, April 1, 2014, available at http://www.npr.org/blogs/thetwo-way/2014/04/01/297910918/mother-of-victim-more-killed-by-gm-ignition-switch-defect (last visited May 9, 2014).
[12] Danielle Ivory And Hilary Stout, *303 Deaths Seen in G.M. Cars With Failed Air Bags*, NEW YORK TIMES, March 13, 2014, available at http://www.nytimes.com/2014/03/14/business/gm-air-bag-failures-linked-to-303-deaths.html?_r=0 (last visited May 9, 2014).
[13] David Undercoffler, *As Many as 303 Deaths Linked to Faulty Ignition Switches in Recalled GM Cars*, LOS ANGELES TIMES, March 18, 2014, available at http://www.latimes.com/business/autos/la-fi-hy-autos-303-deaths-linked-to-recallgm-20140313,0,4720511.story#axzz2wXy972jF (last visited May 9, 2014).

19

"[t]he number of fatalities increased while GM and the NHTSA delayed seriously addressing the issue for years[.]"

81.    News outlets have also reported on GM Chief Executive Officer Mary Barra's "campaign" to reassure consumers about the safety of GM's vehicles. One article in The Wall Street Journal quoted Barra, who admitted "Clearly this took too long."[14] In somewhat of a contradiction, Barra further stated, as set forth in the article, "It's a complex situation and we have to wait on [our internal investigator's] report before drawing any conclusions." The article noted that Barra denied having prior knowledge of the DIS. A separate article cited Barra's "new GM apology" that "terrible things happened."[15]

82.    Other reports have focused on the United States Government's investigation of the DIS issue and in particular the interest taken by top-ranking officials. For instance, one recent report announced that United States Senator Richard Blumenthal asked NHTSA to turn over its records relating to automobile collisions linked to recalled GM vehicles.[16] Senator Blumenthal was quoted in the article, "Since 2003, too many unnecessary deaths have occurred due to known airbag and ignition deficiencies. These accidents were well-documented and logged in NHTSA's complaints database[.]" Senator Blumenthal was further quoted, "NHTSA, GM, and Congress have the duty to ensure a failure of this magnitude is prevented in the future and in order to do so, it is necessary to have a full understanding as to why a failure [to investigate sooner] occurred with this case."

---

[14] Jeff Bennett, *GM CEO Apologizes for Recall Delay, Vows Change*, THE WALL STREET JOURNAL, March 18, 2014, available at
http://online.wsj.com/news/articles/SB10001424052702304017604579447151127194412?mg=reno64-wsj (last visited May 9, 2014).
[15] Chris Isidore, Barra on Recall: *'Terrible things happened'*, CNNMONEY, March 18, 2014, available at http://money.cnn.com/2014/03/17/news/companies/gmrecall-barra/ (last visited May 9, 2014).
[16] David Shepardson, *Senator Wants NHTSA Records on GM Ignition Deaths*, THE DETROIT NEWS, March 20, 2014, available at http://www.detroitnews.com/article/20140320/AUTO0103/303200112/Senatorwants-NHTSA-records-GM-ignition-deaths (last visited May 9, 2014).

83.    Another report, published on March 20, 2014, revealed that sixteen year-old Megan Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees. NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact. According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they began communicating. As she stated, "I don't understand why [GM] would wait 10 years to say something. And I want to understand it but I never will."[17]

84.    These reports, along with dozens of others detailing the complete lack of regard for customers' safety demonstrated by GM for over a decade, have had a material, negative impact on the value of the DIS Models, including Plaintiff's vehicle.

### F. Successor Liability and Limitations Period Tolling

85.    GM was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of GM Corp. through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code. Bankruptcy does not immunize GM from liability here. Specifically, GM expressly assumed certain obligations under, inter alia, the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

86.    GM also expressly assumed liability for warranty claims in the Master Sale and Purchase Agreement of June 26, 2009, and this assumption of liability includes the Classes' claims pursuant to Minnesota and other state statutes.

---

[17] Eric Beech, *Owners of Recalled GM Cars Feel Angry, Vindicated*, REUTERS Mar. 17, 2014, available at http://www.reuters.com/article/2014/03/16/us-gm-recallvictims-idUSBREA2F0AT20140316, (last visited May 9, 2014).

87.     Moreover, GM has successor liability for GM Corp.'s acts and omissions in the marketing and sale of the DIS Models during the Class Period because GM has continued the business enterprise of GM Corp., for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as GM Corp.;

- GM retained the bulk of the employees of GM Corp.;

- GM acquired owned and leased real property of GM Corp., including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of GM Corp.; and

- GM acquired all goodwill and other intangible personal property of GM Corp..

88.     GM and GM Corp. did not report information within their knowledge to federal authorities (NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that GM Corp. and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this action was filed.

89.     GM Corp. instructed its service shops to provide DIS Model owners with a new key ring if they complained about unintended shut down rather than admit what it knew—that the ignition switches were dangerously defective and warranted replacement with a properly designed and built ignition system.

22

90.     GM Corp. and GM were, and GM remains, under a continuing duty to disclose to

NHTSA, Plaintiff and the Class the true character, quality, and nature of the DIS Models; that

this defect is based on dangerous, inadequate, and defective design and/or substandard materials;

and that it will require repair, poses a severe safety concern, and diminishes the value of the DIS

Models.

91.     Because of the active concealment by GM Corp. and GM, any and all limitations

periods otherwise applicable to Plaintiff's claims have been tolled.

## V. CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a),

(b)(2) and/or (b)(3) on behalf of the following Classes:

> All persons and entities who purchased or leased DIS Models in the United States
> up to and including the present (the "Nationwide Class").

> All persons or entities who purchased or leased DIS Models in the State of
> Minnesota up to and including the present (the "Minnesota Class").

> All persons or entities who purchased or leased DIS Models in the states of
> Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District
> of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas,
> Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri,
> Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North
> Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island,
> South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West
> Virginia, Wisconsin and Wyoming up to and including the present (the
> "Consumer Protection Statute Class").

93.     The Classes exclude Defendants and any entity in which Defendants have a

controlling interest, and their officers, directors, legal representatives, successors and assigns.

The Classes also exclude General Motors Company, GM Corp., Delphi Automotive PLC and

any entity in which these entities have or had a controlling interest, and their officers, directors,

legal representatives, successors and assigns.

94.    The Classes are so numerous that joinder of all members is impracticable.

95.    A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

96.    Plaintiff's claims are typical of the claims of the Classes. As alleged herein, Plaintiff and members of the Classes all sustained damages arising out of the Defendants' same course of unlawful conduct.

97.    There are questions of law and fact common to the Classes, including but not limited to:

- Whether the Class Vehicles suffer from the DIS, and if yes, how long Defendants have known of the defect;

- Whether Defendants concealed defects affecting the DIS Models;

- Whether Defendants misrepresented the safety of the DIS Models;

- Whether Defendants' misrepresentations and omissions regarding the safety and quality of its vehicles were likely to deceive a reasonable person;

- Whether a reasonable customer would pay less for a car that had an DIS;

- Whether a reasonable customer would pay less for a vehicle that did not conform to GM and its predecessor's assurances of quality;

- Whether Defendants breached their express or implied warranties;

- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

- Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

24

98.    The interest of Class members in individually controlling the prosecution of

separate actions is theoretical and not practical. The Classes have a high degree of similarity and

are cohesive. Prosecution of the action through multiple representatives would be objectionable

and Plaintiff anticipates no difficulty in the management of this matter as a class action.

99.    Class action status is also warranted under Rule 23(b)(2) because Defendants

have acted or refused to act on grounds generally applicable to the Classes, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes

as a whole.

100.    Class action status is also warranted under Rule 23(b)(3) because questions of law

or fact common to the members of the Classes predominate over any questions affecting only

individual members, and a class action is superior to other available methods for the fair and

efficient adjudication of this controversy.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of Magnuson-Moss Warranty Act,
15 U.S.C. § 2301, *et seq.*
On behalf of the Nationwide Class Against All Defendants**

101.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

102.    Plaintiff asserts this claim on behalf of herself and all persons or entities who

purchased or leased an DIS Model from GM, GM Corp.., or a GM or GM Corp.. dealership.

103.    Plaintiff and each member of the Class is a "consumer" within the meaning of the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

104. GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

105. The GM vehicles containing the Delphi ignition switches are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1)

106. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

107. GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The DIS Models' implied warranties are covered under 15 U.S.C. § 2301(7).

108. GM breached these warranties as described in more detail above, but generally by providing DIS Models in non-merchantable condition, which are not fit for the ordinary purpose for which vehicles are used, and which are not fully operational, safe, or reliable.

109. Plaintiff and the Class have had sufficient direct dealings with Defendant and its agents to establish privity of contract with Defendant. Nevertheless, privity is not required in this case because the DIS Models are dangerous instrumentalities due to the aforementioned defects and nonconformities.

110. Plaintiff and the Class seek, where applicable, to revoke their acceptance of the DIS Models, or in the alternative, all damages, including diminution of value of the DIS Models.

## SECOND CLAIM

### Breach of Express Warranty,
### Minn. Stat. Ann. § 325G.19
### On behalf of the Minnesota Class Against All Defendants

111. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

26

112.    Defendants are and were at all times "merchants" as defined by the Uniform Commercial Code ("UCC").

113.    Defendant GM expressly affirmed through its statements and advertisements that the DIS Models were of high quality, and, at a minimum, would work properly and safely. These affirmations became part of the basis of the bargains between the Class members and GM.

114.    Defendants breached this warranty by knowingly selling to Plaintiff and the Class vehicles with dangerous defects and which were not of high quality.

115.    Plaintiff and the Class have been damaged as a direct and proximate result of the breaches by Defendants in that the DIS Models purchased by Plaintiff and the Class were and are worth far less than what Plaintiff and the Class paid to purchase, which was reasonably foreseeable to Defendants.

116.    Plaintiff and the Class were unaware of these defects and could not have reasonably discovered them when they purchased their vehicles from GM.

117.    Plaintiff and the Class are entitled to damages, including the diminished value of their vehicles and the value of the non-use of the vehicles pending successful repair, in addition to any costs associate with purchasing safer vehicles, incidental and consequential damages, and all other damages allowable under the law, including such further relief as the Court deems just and proper.

## THIRD CLAIM

### Breach of Implied Warranty of Merchantability,
### Minn. Stat. Ann. § 336.2-314
### On behalf of the Minnesota Class Against All Defendants

118.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

27

119.    Defendant GM impliedly warranted that their vehicles were of good and merchantable quality and fit, and safe for their ordinary and intended use—namely, transporting the drive and passengers in reasonable safety during normal operation without unduly endangering them or members of the public.

120.    As described above, there were dangerous defects in the DIS Models manufactured, distributed, and sold by Defendant GM and that contained defective ignition switches that were manufactured and sold by Defendant Delphi, which Plaintiff and the Class purchased or leased, including ignition mechanism defects that caused the vehicles to suddenly turn off.

121.    These dangerous defects existed at the time the vehicles left each Defendant's manufacturing facilities and at the time they were sold to Plaintiff and the Class. Furthermore, because of these dangerous defects, Plaintiff and the Class did not receive the benefit of their bargain and the vehicles have suffered a diminution in value.

122.    These dangerous defects were the direct and proximate cause of damages to the Plaintiff and the Class.

## FOURTH CLAIM

### Common Law Breach of Contract and Breach of Warranty
### On behalf of the Nationwide Class and the Minnesota Class Against All Defendants

123.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124.    In the alternative to the statutory claims alleged above, Plaintiff pleads this claim under common law warranty and contract law.

125.    GM breached its warranty and contract obligations by tendering to Plaintiff and the Classes vehicles that were defective as to their ignition mechanism, causing the DIS Models to suddenly and unexpectedly turn off.

126.    Delphi breached its warranty obligations by providing a defective ignition switch to GM, for installation in the GM DIS Models.

127.    The ignition mechanism defect present in the DIS Models did not constitute merely a minor breach, as the potential for a sudden loss of engine power placed Plaintiff and the Classes at an unreasonable risk of suffering serious bodily injury. As such, Plaintiff and the Classes would not have purchased the DIS Models at the price that they did pay, had they known of the ignition mechanism defect.

128.    As a direct and proximate result of Defendants' breach of contract or warranty, Plaintiff and the Classes have suffered damages.

## FIFTH CLAIM

### Fraudulent Misrepresentation & Fraudulent Concealment
### On behalf of the Minnesota Class and the Nationwide Class Against All Defendants

129.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

130.    As described above, Defendants made material omissions and affirmative misrepresentations regarding the DIS Models and the ignition switches installed in the Affected Vehicles..

131.    Defendants knew these representations were false when made.

132.    The vehicles purchased or leased by Plaintiff and the Classes were defective, unsafe, and unreliable because the vehicles were subject to an ignition mechanism defect that would unexpectedly turn off a DIS Model's engine.

29

133.    Defendants had a duty to disclose that these vehicles were defective, unsafe, and unreliable in that the vehicles were subject to an ignition mechanism defect that would unexpectedly turn off a DIS Model's engine.

134.    The aforementioned concealment was material because if it had been disclosed Plaintiff and the Classes would not have bought or leased the vehicles at the same price, or would not have bought or leased the vehicles at all.

135.    The aforementioned representations were material because they were facts that would typically be relied upon by a person purchasing or leasing a new motor vehicle. Defendants knew or recklessly disregarded that its representations as to the DIS Models were false. Defendant intentionally made the false statements in order to sell vehicles.

136.    Plaintiff and the Classes relied upon GM's reputation and its failure to disclose the ignition mechanism problems with the Delphi ignition switches in purchasing or leasing the DIS Models.

137.    As a result of their reliance, Plaintiff and the Classes have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

138.    Defendant's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs. Plaintiff and the Classes are therefore entitled to an award of punitive damages.

### SIXTH CLAIM

**Unjust Enrichment,**
**On behalf of the Minnesota Class and the Nationwide Class Against All Defendants**

139.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

140.    Plaintiff and the Classes paid the value of vehicles that are not defective, would

not be compromised by the need for repairs, and could be safely operated, but were provided

with vehicles that are defective, needed repairs, and could not be safely operated.

141.    As such, Plaintiff and the Classes conferred a windfall upon GM and Delphi,

which knew of the windfall and has unjustly retained such benefits.

142.    As a direct and proximate result of GM's and Delphi's unjust enrichment,

Plaintiff and the Classes have suffered and continue to suffer various damages, including, but not

limited to, restitution of all amounts by which Defendants were enriched through their

misconduct.

<h2 style="text-align:center">SEVENTH CLAIM</h2>

**Violations of State Consumer Protection
and Unfair Competition Statutes
On behalf of the Consumer Protection Statute Class Against All Defendants**

143.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

144.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or

fraudulent acts or practices with respect to the sale of the DIS Models in violation of the

following state consumer protection and unfair competition statutes.

145.    Defendants have violated Alaska Stat. 45-50-471 *et seq.*

146.    Defendants have violated Ariz. Rev. Stat. § 44-1521 *et seq.*

147.    Defendants have violated Arkansas Code § 4-88-101 *et seq.*

148.    Defendants have violated Cal. Civ. Code § 1770 *et seq.*, Cal. Bus. & Prof. Code §

17200 *et seq.*, and Cal. Bus. & Prof. Code § 17070.

149.    Defendants have violated Colo. Rev. Stat. § 6-1-101 *et seq.*

150.    Defendants have violated Conn. Gen. Stat. § 42-110A, *et seq.*

151.    Defendants have violated 6 Del. Code § 2513 *et seq.* and 6 Del. Code § 2532 *et seq.*

152.    Defendants have violated D.C. Code Ann. § 28-3901 *et seq.*

153.    Defendants have violated Florida Stat. § 501.201 *et seq.*

154.    Defendants have violated Ga. Code Ann. § 10-1-370 *et seq.*

155.    Defendants have violated Haw. Rev. Stat. Ann. § 481A-3.

156.    Defendants have violated Idaho Code § 48-601 *et seq.*

157.    Defendants have violated 815 Ill. Comp. Stat. 505/1 *et seq.* and 815 Ill. Comp. Stat. 510/1 *et seq.*

158.    Defendants have violated Ind. Code § 24-5-0.5-3.

159.    Defendants have violated Iowa Code § 714H.1 *et seq.*

160.    Defendants have violated Kan. Stat. Ann. § 50-623 *et seq.*

161.    Defendants have violated Ky. Rev. Stat. § 367.110 *et seq.*

162.    Defendants have violated Me. Rev. Stat. Ann. Tit. 5 § 205-A *et seq.*

163.    Defendants have violated Md. Code Com. Law § 13-101 *et seq.*

164.    Defendants have violated Mass. Gen. Laws chapter 93A § 1 *et seq.*

165.    Defendants have violated Mich. Comp. Laws § 445.901.

166.    Defendants have violated Minn. Stat. § 325F.69 *et seq.* and Minn. Stat. § 325D.43 *et seq.*

167.    Defendants have violated Mo. Ann. Stat. 407.020.

168.    Defendants have violated Neb. Rev. Stat. § 87-302 and Neb. Rev. Stat. § 59-1601 *et seq.*

32

169.    Defendants have violated Nev. Rev. Stat. § 598.0903 *et seq.*

170.    Defendants have violated New Hampshire Rev. Stat. § 358-A:1 *et seq.*

171.    Defendants have violated N.J. Stat. Ann. § 56:8-1, *et seq.*

172.    Defendants have violated New Mexico Stat. Ann. § 57-12-1 *et seq.*

173.    Defendants have violated N.Y. Gen. Bus. Law § 349 *et seq.*

174.    Defendants have violated North Carolina Gen. Stat. § 75-1.1 *et seq.*

175.    Defendants have violated N.D. Cent. Code § 51-15-02.

176.    Defendants have violated Ohio Rev. Code Ann. § 1345.01 *et seq.* and Ohio Rev. Code Ann. § 4165.01 *et seq.*

177.    Defendants have violated Okla. Stat. Tit. 15 § 751 *et seq.* and 78 Okla. Stat. Ann. § 51 *et seq.*

178.    Defendants have violated Or. Rev. Stat. § 646.605 *et seq.*

179.    Defendants have violated 73 P.S. § 201-1 *et seq.*

180.    Defendants have violated Rhode Island Gen. Laws § 6-13.1-1 *et seq.*

181.    Defendants have violated S.D. Codified Laws § 37-24-6 *et seq.*

182.    Defendants have violated Tex. Bus. & Com. Code § 17.41 *et seq.*

183.    Defendants have violated Utah Code Ann. 13-11-1 *et seq.*

184.    Defendants have violated Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*

185.    Defendants have violated Va. Code Ann. 59.1-200 *et seq.*

186.    Defendants have violated Rev. Code Wash. Ann. § 19.86.010 *et seq.*

187.    Defendants have violated W. Va. Code § 46A-1-101 *et seq.*

188.    Defendants have violated Wisc. Stat. § 100.18 *et seq.*

189.    Defendants have violated Wyo. Stat. § 45-12-105 *et seq.*

190.    Defendant GM's misrepresentations and omissions regarding the safety and reliability of its vehicles as set forth in this Complaint, and which contained defective ignition switches manufactured by Defendant Delphi, were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

191.    Defendant GM's intentional and purposeful acts, described above, were intended to and did cause Plaintiff and the Class to pay artificially inflated prices for DIS Models purchased in the states listed above.

192.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and Class members have been injured in their business and property in that they paid more for DIS Models than they otherwise would have paid in the absence of Defendant's unlawful conduct.

193.    All of the wrongful conduct alleged herein occurred in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that was perpetrated nationwide.

194.    Plaintiff and Class members are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including but not limited to, actual damages, injunctive relief, attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Classes and award the following relief:

A.    That this action be certified as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure, declaring Plaintiff as the representative of the Classes and Plaintiff's

counsel as counsel for the Classes;

B.    That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.    Compensatory, consequential, and general damages in an amount to be

determined at trial;

D.    Costs and disbursements of the action;

E.    Restitution and/or disgorgement of Defendants' ill-gotten gains, and the

imposition of an equitable constructive trust over all such amounts for the benefit of the Classes;

F.    Pre- and post-judgment interest;

G.    Reasonable attorneys' fees;

H.    That Defendants be enjoined from the conduct challenged herein;

I.    Such monetary, injunctive other relief to each of the subclasses that is provided

for by the state statutes pursuant to each Count alleged; and

J.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated:  July 3, 2014          By: s/ _____
                                  Gary B. Friedman
                                  Tracey Kitzman
                                  Scott Levy
                                  Rebecca Quinn
                                  FRIEDMAN LAW GROUP LLP
                                  270 Lafayette Street, 14th Floor
                                  New York, NY  10012
                                  Tel.: (212) 680-5150
                                  Fax: (646) 277-1151
                                  rquinn@flgllp.com

35

Garrett D. Blanchfield, Jr. (209855)
Roberta A. Yard (322295)
REINHARDT WENDORF & BLANCHFIELD
E1250 First National Bank Building
332 Minnesota St.
St. Paul, MN 55101
Tel.: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com

*Attorneys for Plaintiff*

*4812-7675-2411, v. 1*