# Exhibit F

JS 44C/SDNY
REV. 4/2014

**CIVIL COVER SHEET**

**14 CV 5328**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS
Janet I. Turpyn and Richard J. Turpyn, individually and on behalf of all others similarly situated

DEFENDANTS
General Motors LLC
General Motors Corporation
Delphi Automotive PLC

JUL 16 2014

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
Alex R. Strauss, Esq.
MOTLEY RICE LLC
600 Third Avenue, Ste. 2101
New York, NY 10016

ATTORNEYS (IF KNOWN)
Richard C. Godfrey, Esq.
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 28 U.S.C. § 1332(d).

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No ☐ Yes ☒ Judge Previously Assigned Hon. Jesse M. Furman

If yes, was this case  Vol.☐  Invol. ☐  Dismissed. No ☒  Yes ☐  If yes, give date _____ & Case No. 14-md-2543

**IS THIS AN INTERNATIONAL ARBITRATION CASE?**    No ☒    Yes ☐

*(PLACE AN [x] IN ONE BOX ONLY)*    NATURE OF SUIT

| TORTS | | ACTIONS UNDER STATUTES |

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | [ ] 422 APPEAL 28 USC 158 | [ ] 375 FALSE CLAIMS [ ] 400 STATE REAPPORTIONMENT |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 690 OTHER | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 410 ANTITRUST |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | | | [ ] 430 BANKS & BANKING |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | | | PROPERTY RIGHTS | [ ] 450 COMMERCE |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | PERSONAL PROPERTY | | [ ] 820 COPYRIGHTS | [ ] 460 DEPORTATION [ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT LIABILITY | [x] 370 OTHER FRAUD | | [ ] 830 PATENT | |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 350 MOTOR VEHICLE [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 371 TRUTH IN LENDING | | [ ] 840 TRADEMARK | [ ] 480 CONSUMER CREDIT [ ] 490 CABLE/SATELLITE TV |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | LABOR | SOCIAL SECURITY | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 160 STOCKHOLDERS SUITS | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 861 HIA (1395ff) [ ] 862 BLACK LUNG (923) [ ] 863 DIWC/DIWW (405(g)) [ ] 864 SSID TITLE XVI [ ] 865 RSI (405(g)) | |
| [ ] 190 OTHER CONTRACT | | | [ ] 720 LABOR/MGMT RELATIONS | | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 195 CONTRACT PRODUCT LIABILITY | | PRISONER PETITIONS | [ ] 740 RAILWAY LABOR ACT | | [ ] 891 AGRICULTURAL ACTS |
| [ ] 196 FRANCHISE | ACTIONS UNDER STATUTES | [ ] 463 ALIEN DETAINEE [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA) | FEDERAL TAX SUITS | |
| | CIVIL RIGHTS | [ ] 530 HABEAS CORPUS | [ ] 790 OTHER LABOR LITIGATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 893 ENVIRONMENTAL MATTERS |
| | | [ ] 535 DEATH PENALTY | [ ] 791 EMPL RET INC SECURITY ACT | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 895 FREEDOM OF INFORMATION ACT |
| REAL PROPERTY | [ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner) | [ ] 540 MANDAMUS & OTHER | | | [ ] 896 ARBITRATION |
| | [ ] 441 VOTING | | IMMIGRATION | | [ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION |
| [ ] 210 LAND CONDEMNATION | [ ] 442 EMPLOYMENT [ ] 443 HOUSING/ ACCOMMODATIONS | PRISONER CIVIL RIGHTS | [ ] 462 NATURALIZATION APPLICATION | | |
| [ ] 220 FORECLOSURE | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 550 CIVIL RIGHTS [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION ACTIONS | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 230 RENT LEASE & EJECTMENT | | [ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT | | | |
| [ ] 240 TORTS TO LAND | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | | | | |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 448 EDUCATION | | | | |
| [ ] 290 ALL OTHER REAL PROPERTY | | | | | |

*Check if demanded in complaint:*

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

DEMAND $_____ OTHER _____    JUDGE Jesse M. Furman    DOCKET NUMBER 14-md-2543

*Check YES only if demanded in complaint*
JURY DEMAND: ☒ YES ☐ NO

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*

## ORIGIN

[X] 1 Original Proceeding   [ ] 2 Removed from State Court   [ ] 3 Remanded from Appellate Court   [ ] 4 Reinstated or Reopened   [ ] 5 Transferred from (Specify District)   [ ] 6 Multidistrict Litigation   [ ] 7 Appeal to District Judge from Magistrate Judge Judgment

a. **all parties represented**

[ ] b. **At least one party is pro se.**

*(PLACE AN x IN ONE BOX ONLY)*

## BASIS OF JURISDICTION

*IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF   [ ] 2 U.S. DEFENDANT   [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)   [X] 4 DIVERSITY

## CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [X] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [X] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)
Janet Turpyn and Richard Turpyn
72 Maul Road
Hilton, NY 14468
Monroe County

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

SEE ATTACHED ADDENDUM

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   [ ] WHITE PLAINS   [X] MANHATTAN
(DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE 7/16/14   SIGNATURE OF ATTORNEY OF RECORD

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[X] YES (DATE ADMITTED Mo. March   Yr. 2014   )
Attorney Bar Code # AS1690

RECEIPT #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: GENERAL MOTORS LLC
IGNITION SWITCH LITIGATION

*This Document Relates To*

JANET TURPYN AND RICHARD TURPYN,
Individually and on Behalf of All Others
Similarly Situated,

**ADDENDUM TO CIVIL COVER SHEET**

PLAINTIFFS

v.

GENERAL MOTORS LLC, GENERAL
MOTORS CORPORATION AND DELPHI
AUTOMOTIVE PLC,

DEFENDANTS.

## DEFENDANTS' ADDRESSES AND COUNTIES

**GENERAL MOTORS LLC**
300 RENAISSANCE CENTER
DETROIT, MI 48265
WAYNE COUNTY

**GENERAL MOTORS CORPORATION**
300 RENAISSANCE CENTER
DETROIT, MI 48265
WAYNE COUNTY

**DELPHI AUTOMOTIVE PLC**
5725 DELPHI DRIVE
TROY, MI 48098-2815
OAKLAND COUNTY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x

IN RE:

**14 CV**    **5328**

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

14-MD-2543 (JMF)

*This Document Relates To*

    JANET TURPYN AND RICHARD TURPYN,
    Individually and on Behalf of All Others Similarly Situated,

PLAINTIFFS

v.

GENERAL MOTORS LLC, GENERAL MOTORS
CORPORATION AND DELPHI AUTOMOTIVE PLC,

DEFENDANTS.

Case No.

Jury Trial Demanded

Class Action

Complaint

-------------------------------------------------------------------------------x

    Plaintiffs Janet Turpyn and Richard Turpyn, individually and as class representatives on behalf of all similarly situated persons, brings this action against Defendant General Motors LLC and its predecessor in interest General Motors Corporation ("GM" or "General Motors") and Defendant Delphi Automotive PLC ("Delphi") (collective referred to herein as "Defendants") and allege, on personal information as to themselves and on information and belief as to all other matters, as follows:

## I.    INTRODUCTION

    1.    This case involves an unprecedented failure to disclose and cover-up of a known dangerous and defective ignition switch in General Motors vehicles, a part so patently defective

and below specifications that the GM engineer who designed the ignition switch called it "the switch from hell."[1]

2.     According to GM's own internal investigation, General Motors "made a decision that would lead to catastrophic results – GM chose to use an ignition switch in certain cars that was so far below GM's own specifications that it failed to keep the car powered on in circumstances that drivers could encounter, resulting in moving stalls on the highway as well as loss of power on rough terrain a driver might confront moments before a crash.  Problems with the switch's ability to keep the car powers on were known within the GM ranks.  The failure of the switch meant that drivers were without airbag protection [or power steering or power brakes] at the time they needed it most."[2]

3.     "The below-specification switch approved in 2002 made its way into a variety of vehicles including the Chevrolet Cobalt.  Yet GM did not issue a recall for the Cobalt and other cars until 2014, and even then the initial recall was incomplete.  GM's inability to address the ignition switch problem for over 11 years is a history of failures."[3]

4.     GM has sold at least 15 million automobiles installed with defective ignition switches which slip into the "accessory" or "off" position and turn off the engine without warning while the car is in motion.  This ignition switch defect results in disabling of power steering, power brakes and preventing the deployment of air bags in the vehicles.

5.     The disabling of these basic and essential safety features renders drivers unable to control their vehicles and has caused an as-yet-to-be-determined number of fatal automobile accidents.

---

[1] *Report to the Board of Directors of General Motors Company Regarding the Ignition Switch Recalls*, authored by Anton R. Valukas of Jenner & Block (May 29, 2014) (or "Valukas Report") at 5.

[2] Valukas Report at 1, parenthetical added.

[3] Valukas Report at 1-2.

6.    According to GM, the company knew about the deadly ignition switch defects for more than a decade before informing the public or its customers.

7.    GM's Vehicle Safety Chief stated that: "Nothing is more important than the safety of our customers in the vehicles they drive." The facts will show that GM repeatedly failed to live up to this commitment.

8.    GM knowingly concealed information about these safety defects from the public and their customers, thereby allowing unsuspecting GM automobile owners to continue driving vehicles which posed a mortal danger to themselves, their passengers, other drivers and pedestrians.

9.    An automobile manufacturer that is aware of dangerous design defects has a duty to promptly disclose and remedy such defects.

10.    According to some reports, the cost of changing the deadly ignition switches to one that meets torque specifications would have been just $0.57 per car.

11.    Despite the small price of replacing the deadly defective ignition switch with an adequate part, documents provided to the United States Congress by GM confirm its employees knew about the ignition switch defects as early as 2001, but decided not to disclose the problems or redesign the switches because of the cost.

12.    GM's current CEO, Mary Barra has admitted in a video message: "Something went wrong with our process in this instance, and terrible things happened." Barra finally admitted in her most recent congressional testimony, "we consider a stall to be a safety issue."[4]

13.    The National Highway and Safety Administration has already fined GM $35 million based on the delays in addressing these safety problems for over a decade. Nonetheless, GM

---

[4] Testimony of Mary Barra, CEO of General Motors LLC, before the House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations; June 18, 2014, ("Barra Testimony") at 53.

3

continues to argue that bankruptcy protections should shield the company from financial liability associated with the injuries, death and related losses caused by the known dangers it consciously withheld from the public and its customers for over a decade.

14.    Plaintiff brings this action for a Class of all persons in the United States and all persons in the State of New York who currently own or lease one or more of the following GM vehicles: Chevrolet Cobalt (2005-2010 model years); Chevrolet HHR (2006-2011 model years); Pontiac G5 (2006-2007 model years); Pontiac Solstice (2006-2010 model years); Saturn Ions (2003-2007 model years); Saturn Sky (2007-2010 model years) (collectively "First Wave Defective Vehicles")[5]; Buick Allure (2005-2009 model years); Buick LaCrosse (2005-2009 model years); Buick Lucerne (2006-2011 model years); Buick Regal LS (2004-2005 model years); Buick Regal GS (2004-2005 model years); Cadillac Deville (2000-2005 model years); Cadillac DTS (2004-2011 model years); Cadillac CTS (2003-2014 model years); Cadillac SRX (2004-2006 model years); Chevrolet Camaro (2010-2014 model years); Chevrolet Impala (2000-2014 model years); Chevrolet Monte Carlo (2000-2008 model years); Chevrolet Malibu (1997-2005 model years); Oldsmobile Intrigue (1998-2002 model years); Oldsmobile Alero (1999-2004 model years); Pontiac Grand Am (1999-2005 model years); Pontiac Grand Prix (2004-2008 model years); Daewoo G2x (2007-2009 model years); Opal GT (2007-2010 model years); Pontiac Pursuit (2005-2007 model years); and Vauxhall GT (2007-2010 model years) (collectively "Second Wave Defective Vehicles")[6]; (cumulatively "Defective Vehicles").

15.    Upon information and belief there are additional GM vehicles which suffer from the same or substantially similar ignition switch defects as the Defective Vehicles identified above. Accordingly, Plaintiffs reserve their rights to supplement the list of Defective Vehicles to include

---

[5] Recalls for First Wave Defective Vehicles were issued on February 25, 2014; March 28, 2014 and April 9, 2014.

[6] Recalls for Second Wave Defective Vehicles were issued on June 13, 2014; June 16, 2014 and June 30, 2014.

4

additional GM vehicles that have defective ignition switches, which result in a loss of vehicle steering control, loss of braking control, and airbag non-deployment.

16.   Despite being squarely on notice of the defect and the damages that resulted, GM refused to warn or otherwise alert the public to known hazards associated with the deadly ignition switch defects linked to hundreds of preventable deaths, countless injuries and many hundreds of millions of dollars in financial damage.

17.   The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "ignition switch defects"):

a.   The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

b.   When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident; and

c.   When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

18.   The ignition switch defects make the Defective Vehicles unreasonably dangerous.

19.   As a direct and proximate result of the defects, the Defective Vehicles are likely to be involved in accidents, and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicles' occupants.

20.   The ignition switch defects present a significant and unreasonable public safety risk, exposing Defective Vehicle owners, their passengers, drivers and passengers of other vehicles, and pedestrians to a risk of serious injury or death.

21.   Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[7] and its accompanying regulations, when a manufacturer learns that a

---

[7] 49 U.S.C. §§ 30101-30170.

vehicle contains a safety defect, the manufacturer must promptly disclose the defects.[8]  If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[9]  GM owed a duty to the Plaintiffs and the Class that owned or leased the Defective Vehicles and it breached that duty.

22.    In addition to the TREAD Act, the Michigan Consumer Protection Act, and the common law laws, GM violated the New York Consumer Protection from Deceptive Acts and Practices Act by engaging in unfair trade practices and by fraudulently concealing the deadly ignition switch defects from consumers, owners, dealers and wholesalers, and lessees of the Defective Vehicles.  GM also violated the TREAD Act by failing to timely inform the National Highway Traffic Safety Administration ("NHTSA") of the ignition switch defects and by allowing cars to remain on the road with these safety defects.

23.    Plaintiff and the Class have been damaged by GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now in possession of highly dangerous and defective vehicles whose value has significantly diminished because of GM's failure to timely disclose the serious and potentially deadly defects.  In addition to the mortal danger of driving in these vehicles, vehicles owners and lessees cannot sell or otherwise divest themselves of these automobiles at a fair price given their diminished value.

24.    In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of General Motors Corporation ("Old GM") because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.

---

[8] 49 U.S.C. § 30118(c)(1) & (2).

[9] 49 U.S.C. § 30118(b)(2)(A) & (B).

25.   Plaintiff and the Class also were damaged by the acts and omissions of Old GM, for which GM is liable through successor liability, because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

26.   Plaintiff and the Class either paid more for the Defective Vehicles than they would have had they known of the ignition defects or they would not have purchased the Defective Vehicles at all.   As a result of the defects in these vehicles, the Plaintiff and the Class are unable to sell or otherwise realize their investments in the Defective Vehicles.

27.   An automobile manufacturer has a legal duty to design, inspect, test, manufacture and assemble automobiles which it places into the stream of commerce to provide a reasonable degree of occupant safety during the intended and foreseeable use of those automobiles.

28.   Defendants breached these duties which resulted in financial harm to Plaintiffs and the Class for which Defendants are liable.

## II.    JURISDICTION AND VENUE

29.   This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other Class members are citizens of a different state than Defendants.

30.   Venue is proper in this Court pursuant to 28 U.S. C. § 1332(d) because a substantial part of the events or omissions giving rise to these claims occurred in this district, and GM has caused harm to Plaintiffs and class members residing in this District.   Moreover, GM has sought protection from the Bankruptcy Court located in this District and has waived its right to challenge on venue purposes.

## III.    PARTIES

**Plaintiffs/Class Representatives**

31.    Plaintiffs and Named Class Representatives Janet Turpyn and Richard Turpyn are

U.S. citizens with their residence in Monroe County, New York.  Plaintiffs presently own one of

the Defective Vehicles, a 2006 Chevrolet HHR.  This model has been recalled for safety defects

related to the faulty ignition switch.  Plaintiffs relied on GM to produce a safely designed and

manufactured vehicle.  Plaintiffs did not learn of the ignition switch defects until after the car

was in their possession.  Had Old GM disclosed the ignition switch defects, Plaintiffs would not

have purchased this vehicle.  As a result of the vehicle defect and recalls, Plaintiffs have been

unable to re-sell the Defective Vehicle and is incurring considerable expense, financial loss, and

economic damage as a result.

32.    Richard Turpyn purchased the Defective Vehicle for his wife, Janet Turpyn, from a

dealer in 2007.  The Turpyn's Chevrolet HHR was manufactured, sold, distributed, advertised,

marketed, and warranted by GM.  Mr. and Mrs. Turpyn purchased the vehicle primarily for Mrs.

Turpyn's personal, family, and household use.  Mrs. Turpyn is now nervous about driving her

vehicle and believes it has lost resale value.  Mr. and Mrs. Turpyn have experienced power

failures in the vehicle on a number of occasions, including one time when she was approaching a

stop sign and the engine stalled.  Fortunately, the intersection was not busy and she was not hurt.

Mrs. Turpyn is outraged that GM put her life at risk for so many years without a warning.

**Defendants**

33.    Defendant General Motors LLC ("GM") is a limited liability company formed under

the laws of Delaware with its principal place of business located at 300 Renaissance Center,

Detroit, Michigan.  GM was incorporated in 2009 and on July 10, 2009 acquired substantially all

assets and assumed certain liabilities of its predecessor in interest General Motors Corporation

("GM") through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

34.   Among the liabilities and obligations expressly retained by GM after the 2009 bankruptcy are the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

35.   GM also expressly assumed:

> All Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

36.   Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

37.   Defendant Delphi Automotive PLC ("Delphi") is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan.

38.   Delphi began as a wholly-owned subsidiary of General Motors Corporation, until it was launched as an independent publicly-held corporation in 1999.

39.   In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi

plants to assist with its post-bankruptcy restructuring. In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

40.     At all times relevant herein, Delphi through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

## IV.    FACTUAL ALLEGATIONS

### A.    The Ignition Switch Defects in the Defective Vehicles

41.     Given the importance of a vehicle and its operating systems remaining fully functional and operational during driving conditions, it is imperative that a vehicle manufacturer ensure that its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle. With respect to the Defective Vehicles, GM has failed to do so.

42.     In the Defective Vehicles, the ignition switch defects can cause the car's engine and electrical system to shut off, disabling the power steering, the power brakes and the airbag system, so that in the event of a crash (itself made more likely by the engine shut-off and the failure of the power steering and power brakes), the airbags will not deploy.

43.     The Defective Vehicles are, therefore, unreasonably prone to accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

### B.    GM Knew of the Ignition Switch Defects for Years, but Concealed the Defects from Plaintiff and the Class

44.     Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences for many years, but concealed their knowledge from Defective Vehicle owners.

10

45.   GM's internal knowledge of the ignition switch defects span over 11 years.   See Valukas Report.

46.   Not only did GM fail to address the safety defects, it acted to cover-up and fraudulently conceal the facts from Regulator, the Class, and the driving public. One GM Quality Service Manager who drafted a Technical Service Bulletin ("TSB") in connection with the ignition switch defects, also stated "the term 'stall' is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about vehicle safety, which suggests GM should recall the vehicle, not issue a bulletin."[10]   GM personnel stated that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[11]

47.   It was brought to light in the Valukas Report, and multiple GM employees confirmed, that GM intentionally avoids using the word "stall" "because such language might draw the attention of NHTSA" and "may raise a concern about safety, which suggests GM should recall the vehicle…"

48.   Finally, GM CEO Mary Barra testified on June 18, 2014, before the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigation that "we consider a stall to be a safety issue."[12]

49.   In GM presentation material provided to NHTSA during a recent investigation, GM had advised its employees to avoid using a number of words, including: "bad," "catastrophic," "Corvair-like," "dangerous," "decapitating," "defect," "defective," "eviscerated," "Hindenburg,"

---

[10] Valukas Report at 92.

[11] *Id.* at 93.

[12] Barra Testimony at 53.

11

"inferno," "Kevorkianesque," "life-threatening," "mutilating," "powder keg," "rolling sarcophagus," "safety," "safety-related," "suicidal," "Titanic," and "widow-maker."[13]

50.    Instead, GM advised its employees to use the words:

- "Issue, Condition [or] Matter" instead of "Problem"
- "Has Potential Safety Implications" instead of "Safety"
- "Does not perform to design" instead of "Defect/Defective"[14]

51.    As NHTSA' Acting Administrator David Friedman stated the following at the May 16, 2014 press conference announcing the Consent Order concerning the ignition switch defect:

> GM must rethink the corporate philosophy reflected in the documents we reviewed, including training materials that explicitly discouraged employees from using words like 'defect,' 'dangerous,' 'safety related,' and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem.

52.    Old GM and GM were clearly on notice as they continued to receive reports of deaths and accidents related to the Defective Vehicles.

53.    In 2005, a GM employee informed GM engineers that her 2006 Chevrolet Impala shut off when she went over a bump in the road as she was driving.[15]   In an August 2005 email, she warned that the problem appeared to be related to the ignition switch and stated that a GM technician that looked at her car said other employees had similar complaints with the Pontiac Solstice.[16]   She stated, "I think this is a serious safety problem, especially if this switch is on multiple programs. I'm thinking big recall."[17]

---

[13] *See* United States Department of Transportation National Highway Traffic Safety Administration Consent Order in *In Re: TQ14-001, NHTSA Recall No. 14V-047*, May 16, 2014, at "Exhibit B."

[14] *Id.*

[15] GMHEC000442219-2221.

[16] *Id.*

[17] *Id.* at 1.

54.    Rather than publicly admitting the dangerous safety defects in its vehicles, GM attempted to attribute these and other incidents to driver error.  From 2002 until 2013, first Old GM and then GM were repeatedly put on notice and received reports of deaths in Cobalts involving steering and/or airbag failures, including but not limited to:

- 2005: 26 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved.

- 2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved and 4 deaths listing the component involved as "unknown."

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing "airbag" as the component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved and 2 deaths listing the component involved as "unknown."

- 2009: 133 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved, 1 death citing "service brake" as the component involved, 1 death citing "steering" as component involved, and 2 deaths listing the component involved as "unknown."

- 2010: 400 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 12 deaths citing "steering" as the component involved, and 1 death listing the component involved as "unknown."

- 2011: 187 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved, 2 deaths citing "steering" as the component involved, and 1 death listing the component involved as "unknown."

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing "airbag" as component involved, and 4 deaths citing "steering" as component involved.

55.    GM now admits that Old GM learned of the ignition switch defects as early as 2001. During the pre-production development of the 2003 Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off"

13

position. In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that an "ignition switch design change" was believed to have resolved the problem.[18]

56.   In 2003, an internal report documented an instance in which the service technician observed a stall while driving. The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. The ignition switch was replaced and the matter closed.[19]

57.   According to GM's latest chronology, submitted to NHTSA pursuant to 49 CFR § 573.6, GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

58.   Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the ignition switch defect issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

59.   According to GM, its engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering cost the cost and amount of time it would take to develop a fix, GM did nothing.

60.   As soon as the Cobalt hit the market, GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved

---

[18] D. Ivory, "G.M. Reveals It Was Told of Ignition Defect in '01 " *New York Times,* March 12, 2014.

[19] *Id.*

14

out of the 'run' position when a driver inadvertently contacted the key or steering column."[20]

GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently." Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column." GM opened additional PRTS inquiries.

61. From the outset, GM employees, customers, and members of the automotive press found repeatedly that they would hit the key fob or keychain with their knee, and the car would turn off. GM received some of these reports before the Cobalt's launch, and others afterwards. There were scathing reviews in the press. There were customer complaints describing the moving stalls and customers' safety concerns.

62. The problem of moving stalls and the ignition switch continued throughout 2005, and was described both within GM and in the media. In May and June 2005, reviewers from two newspapers, including the *New York Times*, wrote about how they or a family member had inadvertently turned a Cobalt off with their knees. One of GM's main safety lawyers e-mailed a colleague trying to marshal evidence for the press that the risk was "remote" and "inconsequential." He wrote that he did not want to be criticized for failing to "defend a brand new launch."[21]

---

[20] March 11, 2014 Chronology Re: Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Sky Vehicles (or "Chronology"), at 1.

[21] Valukas Report at 7.

63.    In a PRTS opened in May 2005, GM engineers once again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration. After initially approving the proposed fix, GM reversed course and again declined to implement a fix.[22]

64.    In testimony on April 1, 2014, before the House Committee on Energy and Commerce, GM CEO Mary Barra explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

65.    Throughout 2005, various committees within GM considered proposed fixes, but those were rejected as too costly. Instead of fixing the ignition switch, in December 2005, GM sent a notice to dealers (a TSB) warning that customers might complain of ignition cut-offs caused by low ignition torque, counseling that customers remove heavy items from their key rings, and offering an insert to the key that would reduce the likelihood that the ignition switch would rotate inadvertently. That bulletin did not refer to the problem as "stalling," however, precisely because GM believed customers might associate stalling with a safety problem.[23]

66.    Rather than disclose the true nature of the defects and correct them, pursuant to the TSB Old GM instead gave customers who brought in their vehicle complaining about stalling "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key rings from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change would supposedly keep the keys from hanging as low as they had in

---

[22] Chronology at 1.

[23] Valukas Report at 8-9.

the past.[24] According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[25]

67.    Still there was no recall and GM continued to receive complaints that put it squarely on notice of the defect.

68.    In April 2006, GM approved a design change for the Cobalt's ignition switch that was supplied by Delphi.[26] The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch." The defect was simple: the part at issue was too weak. However, testing showed that even with the proposed change, the performance of the ignition switch was still below original specifications.[27] Modified ignition switches - with greater torque - were not produced until the 2007 model year.[28]

69.    Those outside GM, including, in 2007, a trooper from the Wisconsin Safety Patrol and a research team from Indiana University, figured out the connection between the switch and the airbag non-deployment.[29] Still, GM failed to act to notify its customers or the driving public of the dangers posed by the Defective Vehicles.

70.    In 2007, NHTSA investigators met with GM to discuss its airbags and informed GM of the July 2005 frontal and fatal crashes involving the Defective Vehicles.

71.    GM was told by NHTSA, the airbags in the Cobalt did not deploy, causing the death of passengers. Data retrieved from the vehicle's diagnostic system indicated that the ignition was in the "accessory" position. GM investigated and tracked similar incidents.

---

[24] *Id.* at 1-2.

[25] *Id.* at 3.

[26] *Id.* at 2. *See also* General Motors Commodity Validation Sign-Off (April 26, 2006), GMHEC000003201.

[27] Delphi Briefing, March 27, 2014.

[28] Chronology at 2.

[29] Valukas Report at 3.

72.    By the end of 2007, by GM's own admission, GM knew of 10 frontal collisions in which the airbag did not deploy.[30]  Plaintiffs believe that GM actually knew of many other similar fatal incidents involving the ignition switch defects.

73.    For the next six years, GM continued to receive complaints and continued to investigate frontal crashes in which the airbags did not deploy.

74.    While GM heard over and over from various quarters – including customers, dealers, the press, and their own employees – that the car's ignition switch led to moving stalls; group after group and committee after committee within GM that reviewed the issue failed to take action or acted too slowly.  Although everyone had responsibility to fix the problem, nobody took responsibility.  It was an example of what one top executive described as the "GM nod," when everyone nods in agreement to a proposed plan of action, but then leaves the room and does nothing.[31]

75.    According to GM it was not until 2011 and 2012 that GM's examinations of switches from vehicles that had experienced crashes revealed significant design differences in the torque performance of ignition switches from the 2005 Cobalt and those from the 2010 model year, the last year of the Cobalt's production.

76.    GM responded by blaming the supplier for the switch design.[32]

77.    In 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the Cobalt and other Defective Vehicles.[33]

---

[30] Letter from M. Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, GM, to Nancy Lewis, Assoc. Adm'r for Enforcements, NHTSA, Attach. B-573.6(c)(6) at 2 (February 24, 2014), *available at* http://democrats.energycommerce.house.gov/sites/default/files/documents/Letter-Benavides-Lewis-2014-02-24.pdf (or "Benavides Letter").

[31] Valukas Report at 2.

[32] Benavides Letter at 3-4.

## C.    GM Waited until 2014 to Finally Order a Recall of the Defective Vehicles

78.    GM continued to conceal the ignition switch defect and a staggering number of other known safety defects due in large measure to GM's focus on cost-cutting over safety, its culture of burying safety issues, and its training of employees to avoid using terms such as "stall," "defect," or "safety issue" in order to avoid the attention of regulators.  As a result, GM has been forced to recall nearly 29 million vehicles in the first half of this year; over 15 million of which are related to the ignition defect.

79.    On January 31, 2014, GM ordered the first recall of *some* of the Defective Vehicles after an analysis by GM's Field Performance Review Committee and the Executive Action Decision Committee ("EFADC").

80.    Initially, GM's EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

81.    After additional analysis, the EFADC expanded the recall on February 24, 2014 to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

82.    GM provided dealers with notice of the recall on February 26, 2014 and March 4, 2014, and mailed letters to current owners on March 10 and March 11, 2014.

83.    On March 28, 2014, GM expanded the recall to include additional models and years of GM vehicles: 2008-2011 Chevrolet HHR, 2008-2010 Chevrolet Cobalt, 2008-2010 Pontiac G5, 2008-2010 Pontiac Soltice, 2008-2010 Saturn Sky, 2008-2010 Opel GT, and 2008-2009 Daewoo G2X.

---

[33] *Id.* at 4-5.

84.   The Saturn Ion was a compact car first introduced in 2002 for the 2003 model year, and was discontinued in 2007.

85.   The Chevrolet Cobalt was a compact car first introduced in 2004 for the 2005 model year, and was discontinued in 2010.

86.   The Pontiac G5 was first introduced in 2004 for the 2005 model year, and was discontinued in 2009.  The coupe and four-door sedan version of the G5 was marketed in Canada from 2005 to 2010, but is not a vehicle at issue in this action.

87.   The Chevrolet HHR was a compact car first introduced in 2005 for the 2006 model year, and was discontinued in 2011.

88.   The Pontiac Solstice was a sports car first introduced in 2005 for the 2006 model year, and was discontinued in 2009.

89.   The Saturn Sky was first introduced in 2006 for the 2007 model year, and was discontinued in 2009.

90.   The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

91.   The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

92.   On June 13, 2014, GM extended the recall again to include the Chevrolet Camaro model years 2010 - 2014.

93.   Three days later, GM added the following models to their list of recalled cars due to ignition switch issues:   2005-2009 Buick Allure, 2005-2009 Buick LaCrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2004-2011 Cadillac DTS, 2006-2011 Buick Lucerne, 2004-2005 Buick Regal LS & GS, 2006-2008 Chevrolet Monte Carlo.

20

94.    On June 30, 2014, GM extended the ignition switch recall yet again to include the

Chevrolet Malibu model years 1997-2005, the Oldsmobile Intrique model years 1998-2005, the

Oldsmobile Alero model years 1999-2004, the Pontiac Grand Am model years 1999-2005, the

Chevrolet Impala model years 2000-2005, the Chevrolet Monte Carlo model years 2000-2005,

the Pontiac Grand Prix model years 2004-2008, the Cadillac CTS model years 2003-2014, and

the Cadillac SRX model years 2004-2006.

95.    According to GM, "the dealers are to replace the ignition switch,"[34] presumably with

one with sufficient torque or weight to prevent the inadvertent shut down of the ignition, power

steering, power brakes, and airbags.

96.    In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra

admitted that the Company had made mistakes and needed to change its processes.

97.    According to Ms. Barra, "Something went wrong in our processes in this instance,

and terrible things happened."  Barra continued to promise, "We will be better because of this

tragic situation if we seize this opportunity."[35]

98.    While GM has now appointed a new Vehicle Safety Chief and laid off fifteen

employees, millions of Defective Vehicles remain on the road to this day; and, upon information

and belief, other vehicles not yet recalled by GM may also have the deadly ignition switch

defect.

99.    Despite long-standing notice of this defect, even when the recall was finally done,

GM had insufficient quantities of the bigger parts available to remedy the defect in a timely

manner causing delays and failing to mitigate the damages of the class.

---

[34] *Id.* at 6.

[35] Bill Vlasic and Christopher Jensen, "Something Went 'Very Wrong' at G.M., Chief Says," *New York Times,* March 17, 2014.

21

**D.    Old GM and GM Promoted the Defective Vehicles as Safe and Reliable**

100.    On information and belief, Old GM and GM consistently promoted the Defective

Vehicles as safe and reliable in marketing and advertising materials.

101.    GM represented that it was building vehicles with design excellence, quality and

performance:

> And across the globe, other GM vehicles are gaining similar acclaim for
> design excellence, quality and performance, including the Holden
> Commodore in Australia, the Chevrolet Agile in Brazil, the Buick
> LaCrosse in China and many others.
>
> The company's progress is early evidence of a new business model that
> begins and ends with great vehicles.  We are leveraging our global
> resources and scale to maintain stringent cost management while taking
> advantage of growth and revenue opportunities around the world, to
> ultimately deliver sustainable results for all of our shareholders.

102.    GM falsely indicated that it had changed its structure to create more "accountability":

> That work continues, and it has been complemented by changes to our
> design and engineering organization that have flattened the structure and
> created more accountability for produce execution, profitability and
> customer satisfaction.

103.    And GM fallaciously represented that product quality was a key focus:

> Product quality and long-term durability are two other areas that demand
> our unrelenting attention, even though we are doing well on key measures.

104.    In a 2013 Letter to Stockholders, GM noted that its brand had grown in value and that

it designed the "World's Best Vehicles":

> Dear Stockholder:
>
> Your company is on the move once again.  While there were highs and
> lows in 2011, our overall report card shows very solid marks, including
> record net income attributable to common stockholders of $7.6 billion and
> EBIT-adjusted income of $8.3 billion.
>
> • GM's overall momentum, including a 13 percent sales
>   increase in the United States, created new jobs and drove
>   investments.  We have announced investments in 29 U.S.

> facilities totaling more than \$7.1 billion since July 2009, with
> more than 17,500 jobs created or retained.

Design, Build and Sell the World's Best Vehicles

> This pillar is intended to keep the customer at the center of everything we
> do, and success is pretty easy to define. It means creating vehicles that
> people desire, value and are proud to own. When we get this right, it
> transforms our reputation and the company's bottom line.

Strengthen Brand Value

> Clarity of purpose and consistency of execution are the cornerstones of our
> product strategy, and two brands will drive our global growth. They are
> Chevrolet, which embodies the qualities of value, reliability, performance
> and expressive design; and Cadillac, which creates luxury vehicles that are
> provocative and powerful.

> Each day the cultural change underway at GM becomes more striking.
> The old internally focused, consensus-driven and overly complicated GM
> is being reinvented brick by brick, by truly accountable executives who
> know how to take calculated risks and lead global teams that are
> committed to building the best vehicles in the world as efficiently as we
> can.

> That's the crux of our plan. The plan is something we can control. We
> like the results we're starting to see and we're going to stick to it – always.

105. In advertisements and Company literature, GM boasted of the safety, reliability, and

quality of its vehicles.

106. Specifically, GM wanted the Cobalt to be an "aspirational vehicle" to attract drivers[36]

and directed marketing efforts at young drivers.[37] During the launch of the Cobalt brand, GM

held promotional events at several popular spring break locations.[38] For the Ion, GM hosted

---

[36] J&B Interview of Lori Queen, May 12, 2014.

[37] John Hendler, GM, Delta GMX001 Electrical Content Overview v. 1.4 (April 3, 2001), at 4 [DOC ID 000136777531; GMHEC000485652-5824]; 2009 CY Aveo, Cobalt & HHR Strategic Marketing Plans: Phase I (Nov. 5, 2008), at 22, 25.

[38] Revolver Marketing Group, *General Motors/Chevrolet National "Cobalt" Brand Launch, available at* http://www.revolvermarketinggroup.com/project/general-motorschevrolet-national-launch-of-the-cobalt-brand/.

marketing events at nightclubs.[39]    GM's marketing efforts bore fruit:   the Cobalt enjoyed substantial sales to younger drivers.  By the end of 2008, 40 percent of Cobalt Coupe sales were to drivers under 30.[40]

107. A radio ad that ran from GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

108. A 2010 television ad stated, "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

109. GM ran an online national ad campaign in April 2012 touting "Safety. Utility. Performance."

110. A national print ad campaign in April 2013 stated that "[w]hen lives are on the line, you need a dependable vehicle you can rely on.  Chevrolet and GM ... for power, performance and safety."

111. In earlier advertisements, Old GM consistently promoted the Defective Vehicles as safe and reliable.

112. For example, a Cobalt ad promised that "Side curtain airbags coupled with OnStar makes every journey the safest possible to assure that you and your occupants will stay safe at all times."

113. An ad for the 2006 Solstice promises that the vehicle "[b]rings power and defines performance."

---

[39] "Saturn Invites Young New Yorkers to Celebration for ION Launch," *The Auto Channel*, April 2, 2002; *available at* http://www.theautochannel.com/news/2002/04/02/038119.html.

[40] Cobalt Coupe & Sedan Compares, from Valukas Report at 20.

24

114. A 2003 television spot for the Saturn vehicle closed with the tagline "Specifically engineered for whatever is next." Another 2003 spot closed with the tagline "Saturn. People first."

115. A 2001 print ad touting the launch of the Saturn focused on safety:

> Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars. And it wasn't until we were satisfied that we added things . . . .

116. Old GM and GM made these representations to boost vehicle sales and maximize profits while knowing that the ignition switches in the Defective Vehicles were defective.

117. Throughout the relevant period, Old GM and GM possessed knowledge and information vastly superior to that of consumers – if not exclusive information – about the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

118. Old GM and GM never informed consumers, the public, the Plaintiff or Class members about the ignition switch defects.

**E.    GM's Culture Promoted Cost-Cutting Over Safety**

119. GM trained its personnel to not reveal known defects, pushed the belief that cost-cutting was more important than safety and intentionally deprived its employees of necessary resources for detecting and remedying defects. The disturbing picture of GM's culture of cost-cutting over safety was made apparent in the Valukas Report.

120. For example, one "directive" at GM was "cost is everything;" meaning all levels of employees at GM should focus on controlling costs.[41]

---

[41] Valukas Report at 249-250.

121. A GM engineer stated that emphasis on cost control at GM "permeates the fabric of the whole culture."[42]

122. In an email dated January 29, 2008, from a GM engineer to a programming engineer regarding the "inadvertent shut off issue we had with Cobalt/G5," the engineer states, "the program did not want to pay ~$2.00/car and ~$300,000 in tooling for a new ignition switch…We do have a plug that fits in the key slot that is available through service. This fixes the issue where the key rotated from run to acc. position."[43]  He goes further to state, "This also effects the HHR."[44]

123. In an internal email dated October 2012 regarding the "2005-7 Cobalt and Ignition Switch Effort," GM stated, "[i]f we replaced switches on ALL the model years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch."[45]  More recent estimates put the cost to GM to use the non-defective, to-specification part was just $0.57 per car.

124. A senior GM executive admitted that GM "emphasized timing over quality."[46]

125. "[T]here was resistane or reluctance to raise issues or concerns in the GM culture." The atmosphere at GM "discouraged individuals from raising safety concerns."[47]

126. GM CEO Mary Barra noted that GM engineers were "unwilling to identify issues out of concern that it would delay the launch" of a vehicle.[48]

127. GM often "pushed back" on describing matters as safety issues, resulting in "GM personnel fail[ing] to raise significant issues to key decision-makers."[49]

---

[42] *Id.*

[43] GMHEC000277710-7711

[44] *Id.*

[45] GMHEC000221539.

[46] Valukas Report at 249-250.

[47] *Id.* at 252.

[48] *Id.*

128. A GM employee, who was the drafter of a TSB on the ignition switch defects, stated that "he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of the job for doing just that."[50]

129. A former GM employee sued GM in 2003 under the Michigan whistle-blower law alleging "that General Motors is violating the law by not properly dealing with safety issues that are persistent and ongoing."[51]   While the Plaintiff there the lawsuit, his actions brought GM's lack of concern for safety to GM's attention and they failed to act.

130. According to the Valukas Report, the failure to properly identify correct the ignition switch defect was due to inter alia:

- GM's corporate culture of indifference to safety[52]
- GM's concealment of safety issues from and lack of communication with NHTSA[53]
- The improper conduct and handling of safety issues by GM's Legal Staff[54]

## F.   The Ignition Switch Defects have Harmed Plaintiff and the Class

131. The ignition switch defects have caused damage to Plaintiff and the Class.

132. No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time of purchase or lease.

133. A vehicle purchased, leased, or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

---

[49] *Id.* at 252-253.

[50] *Id.* at 93.

[51] "GM Recalls: How General Motors Silenced a Whistle-Blower," by Tim Higgins and Nick Summers, *Business Week*, June 18, 2014.

[52] Valukas Report at 260-261.

[53] *Id.* at 263.

[54] *Id.* at 264.

134. A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

135. Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price than they would have had the ignition switch defects been disclosed. Plaintiffs and the Class overpaid for their Defective Vehicles and are unable to resell them for what they paid and are incurring costs and expenses to maintain the Defective Vehicles, including without limitation, interest owed and other expenses. This loss is due to the concealed ignition switch defects. Plaintiffs did not and now cannot realize any profit on the purchase of these vehicles and are unable to sell them.

136. Plaintiffs and the Class are stuck with unsafe, tainted vehicles that are now worth less than they would have been as a result of GM's failure to disclose the ignition switch defects.

137. GM admits to a least thirteen deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles. The actual number is likely much higher, and there may be hundreds of deaths and injuries attributable to the ignition switch defects.

138. If Old GM or GM had timely disclosed and repaired the ignition switch defects as required by the law, all Class members' vehicles would now be worth more. The failure to do so was a foreseeable proximate cause of Plaintiffs damages.

## V.   SUCCESSOR LIABILITY

139. As discussed above, GM expressly assumed certain obligations of Old GM under, *inter alia,* the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

140. GM also expressly assumed liability for Lemon Law claims in the Master Sale and Purchase Agreement of June 26, 2009.

28

141. GM has successor liability for Old GM's acts and omissions in the marketing and sale

of the Defective Vehicles because it has continued the business enterprise of Old GM and for the

following reasons:

> d. GM admits that it knew of the ignition system defects from the very
>    date of its formation;
> e. GM has continued in the business of designing, manufacturing, and
>    marketing vehicles, including at least some of the same vehicles as Old
>    GM;
> f. GM retained the bulk of the employees of Old GM;
> g. GM acquired, owned, and leased real property of Old GM, including all
>    machinery, equipment, tools, information technology, product
>    inventory, and intellectual property;
> h. GM acquired the contracts, books, and records of Old GM; and
> i. GM acquired all goodwill and other intangible personal property of Old
>    GM.

## VI.    TOLLING OF THE STATUTES OF LIMITATION

142. All applicable statutes of limitation have been tolled by GM's knowing and active

fraudulent concealment and pattern and practice of continuous denial of the facts alleged herein.

Plaintiffs and Class members did not discover, and did not know of material facts that would

have caused a reasonable person to suspect, that Old GM and GM did not report vital safety

information within their knowledge to federal authorities (NHTSA) purchasers or consumers, nor

would a reasonable and diligent investigation have disclosed that Old GM and GM had

information in their possession about the existence and dangerousness of the defect and that they

opted to conceal that information until shortly before this Class action was filed.

143. Indeed, Old GM instructed its service shops to provide Defective Vehicle owners

with a new key ring if they complained about unintended shut down, rather than admit what Old

GM already knew – that the ignition switches were below specifications and dangerously

defective. GM warranted replacement with a properly designed and built ignition system.

29

144. Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiffs, and the Class "the true character, quality, and nature" of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that the defect will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

145. Because of the active concealment by GM, any and all limitations periods otherwise applicable to Plaintiffs' claims have been tolled.

## VII.    ESTOPPEL

146. GM was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the vehicles. GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.  Plaintiffs and Class Members reasonably relied upon GM's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## VIII.    DISCOVERY RULE

147. The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their vehicles had the ignition switch defect.

148. However, Plaintiffs and Class Members had no realistic ability to discern that the vehicles were defective until - at the earliest - after the ignition switch defect caused a sudden unintended ignition shut off. Even then, Plaintiffs and Class Members had no reason to know the sudden loss of power was caused by a defect in the ignition switch because of GM's active concealment of the ignition switch defect.

149. Not only did GM fail to notify Plaintiffs and Class Members about the ignition switch

defect, GM in fact denied any knowledge of or responsibility for the ignition switch defect when

directly asked about it. Thus Plaintiffs and Class Members were not reasonably able to discover

the ignition switch defect until after they had purchased the vehicles, despite their exercise of due

diligence, and their causes of action did not accrue until they discovered that the ignition switch

defect caused their vehicles to suddenly lose power.

## IX.    CLASS ALLEGATIONS

150. Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

Plaintiffs bring this action individually and on behalf of a Class initially defined as follows:

> All persons in the United States who purchased or leased one or
> more of the following GM vehicles (the "Nationwide Class") :
> 2003-2007 Saturn Ion; 2005-2010 Chevrolet Cobalt; 2007-2010
> Pontiac G5; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac
> Solstice; and 2007-2010 Saturn Sky[55]; Buick Allure (2005-2009
> model years); Buick LaCrosse (2005-2009 model years); Buick
> Lucerne (2006-2011 model years); Buick Regal LS (2004-2005
> model years); Buick Regal GS (2004-2005 model years); Cadillac
> Deville (2000-2005 model years); Cadillac DTS (2004-2011 model
> years); Chevrolet Camaro (2010-2014 model years); Chevrolet
> Impala (2006-2014 model years); Chevrolet Monte Carlo (2006-
> 2008 model years); Daewoo G2x (2007-2009 model years); Opal
> GT (2007-2010 model years); Pontiac Pursuit (2005-2007 model
> years); and Vauxhall GT (2007-2010 model years)[56], (the
> "Defective Vehicles").
>
> This list will be supplemented to include other GM vehicles that
> have the defective ignition switches, which inadvertently turn off
> the engine and vehicle electrical systems during ordinary driving
> conditions.

151. Excluded from the Class are GM, its employees, co-conspirators, officers, directors,

legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated

---

[55] First Wave Defective Vehicles

[56] Second Wave Defective Vehicles

31

companies; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons. Also excluded are any individuals claiming damages from personal injuries or wrongful death allegedly arising from the Defective Vehicles.

152. The Defective Vehicles include at least the following models: Chevrolet Cobalt (2005-10 model years); Chevrolet HHR (2006-2011 model years); Pontiac G5 (2006-2010 model years); Pontiac Solstice (2006-2010 model years); Saturn Ions (2003-2007 model years); and Saturn Sky (2007-2010 model years)[57]; Buick Allure (2005-2009 model years); Buick LaCrosse (2005-2009 model years); Buick Lucerne (2006-2011 model years); Buick Regal LS (2004-2005 model years); Buick Regal GS (2004-2005 model years); Cadillac Deville (2000-2005 model years); Cadillac DTS (2004-2011 model years); Chevrolet Camaro (2010-2014 model years); Chevrolet Impala (2006-2014 model years); Chevrolet Monte Carlo (2006-2008 model years); Daewoo G2x (2007-2009 model years); Opal GT (2007-2010 model years); Pontiac Pursuit (2005-2007 model years); and Vauxhall GT (2007-2010 model years).[58]

153. Plaintiffs are informed and believe that Old GM manufactured and sold to consumers millions of the Defective Vehicles nationwide. Individual joinder of all Class members is impracticable.

154. Plaintiffs also bring this action on behalf of a statewide class of all persons who purchased or leased one of the Defective Vehicles in the State of New York.

155. The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

---

[57] First Wave Defective Vehicles.

[58] Second Wave Defective Vehicles.

156. Questions of law and fact are common to the Class members and predominate over

questions affecting only individual members, including the following:

      j.   Whether the Defective Vehicles suffer from ignition switch defects;
      k.   Whether Old GM and GM concealed the defects;
      l.   Whether Old GM and GM misrepresented that the Defective Vehicles were safe;
      m.  Whether Old GM and GM engaged in fraudulent concealment;
      n.   Whether Old GM and GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches;
      o.   Whether the alleged conduct by GM violated laws as Plaintiffs allege;
      p.   Whether Old GM's and GM's unlawful, unfair and/or deceptive practices harmed Plaintiffs and the members of the Class;
      q.   Whether Plaintiffs and the members of the Class are entitled to equitable and/or injunctive relief; and
      r.   Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM.

157. Plaintiffs' claims are typical of the claims of the Class members and arise from the

same course of conduct by GM and Old GM. The relief Plaintiff seeks is typical of the relief

sought for the absent Class members.

158. Plaintiffs will fairly and adequately represent and protect the interests of all absent

Class members. Plaintiff is represented by counsel competent and experienced in product

liability, vehicle defect, consumer protection, and class action litigation.

159. A class action is superior to other available methods for the fair and efficient

adjudication of this controversy since joinder of all the individual Class members is

impracticable. Because the damages suffered by each individual Class member may be

relatively small, the expense and burden of individual litigation would make it very difficult or

impossible for individual Class members to redress the wrongs done to each of them

individually, and the burden imposed on the judicial system would be enormous.

160.  The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

161.  Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Plaintiffs anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

## X.    CAUSES OF ACTION

### COUNT I

## VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT

(Asserted on Behalf of the Nationwide Class)

(The MCPA, MICH. COMP. L. ANN. § 44901, *et seq*. and the Consumer Protection Acts of substantially similar states)

162.  Plaintiffs and the Class re-allege and incorporate by reference all previous allegations as though fully set forth at length herein.

163.  This claim is brought on behalf of the nationwide Class.

164.  Old GM, GM, and Plaintiffs are each "persons" under MICH. COMP. L. ANN. § 445.902(d).

165.  The sale of the Defective Vehicles to Plaintiffs and the Class occurred within "trade and commerce" within the meaning of MICH. COMP. L. ANN. § 445.902(d), and both GM and Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

34

166. The MCPA makes unlawful any "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce," as more specifically defined in the MCPA. MICH. COMP. L. ANN. § 445.903 (1). GM has engaged in unfair, unconscionable, and deceptive methods, acts and practices violation of the MCPA, and also has successor liability for the unfair, unconscionable, and deceptive methods, acts, and practices of Old GM as set forth above.

167. Both Old GM and GM violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." MICH. COMP. L. ANN. § 445.903(s).

168. As alleged above, both Companies knew of the safety ignition defect, while Plaintiffs and the Class were deceived by the Companies' omission and led to believe that the Defective Vehicles were safe, and the information could not reasonably have been known by the consumer until the February and March 2014 recalls.

169. Old GM also violated the MCPA by "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is." MICH. COMP. L. ANN. § 405.903(bb). For example, Old GM represented that the Defective Vehicles were safe such that reasonable people believed the represented or suggested state of affairs to be true; namely, that the Defective Vehicles were safe.

170. Old GM also violated the MCPA by "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. L. ANN. § 405.903(cc). Old GM represented that the Defective Vehicles were safe, which made it even more incumbent upon Old GM to reveal the material fact of the ignition switch defects.

171. Old GM's and GM's acts and practices were unfair and unconscionable because their acts and practices, including the manufacture and sale of vehicles with an ignition switch defect, and the Companies' failure to adequately disclose the defect to NHTSA and the Class and timely implement a remedy, offend established public policy, and because the harm the Companies caused consumers greatly outweighs any benefits associated with those practices.   The Companies' conduct also has impaired competition within the automotive vehicles market and has prevented Plaintiffs and the Class from making fully informed decisions about whether to lease, purchase, and/or retain Defective Vehicles.

172. Even though Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Defective Vehicles until 2011.

173. All the while, Old GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

174. Plaintiffs and the Class have suffered an injury, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.  Old GM and GM failed to inform NHTSA, and therefore failed to inform consumers, that its vehicles had a defective and unsafe ignition switch.  Had Plaintiffs and the Class known this, they either would not have purchased their vehicles at all or they would have paid less for them, and they would not have retained their Defective Vehicles.  Plaintiffs and the Class have therefore suffered a "loss" because of the violations of the MCPA complained of herein.

175. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Companies' business.

176. Plaintiffs request that this Court: enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; provide to Plaintiffs and each Class member either their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, or $250 per Class member, whichever is higher; award reasonable attorneys' fees; and provide other appropriate relief under MICH. COMP. L. ANN. § 445.911.

177. Plaintiffs acknowledge that, on its face, the MCPA purports to (i) deprive non-residents of bringing class (but not individual) actions under the MCPA; and (ii) allows individuals (but not class members) the ability to recover a penalty of $250 per person if that amount is greater than their actual damages. After the United States Supreme Court's decision in *Shady Grove Orthopedic Ass'n., P.A. v. Allstate Insurance Co.,* 589 U.S. 393) (2010), however, any such prohibitions imposed in class actions but not in individual actions) are trumped and superseded by Fed. R. Civ. P. 23, which imposes no such restrictions.

178. In the event Michigan law is not applied, Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable deceptive or fraudulent acts or practices in violation of various state consumer protection statutes.

179. Defendants' unlawful conduct constitutes willful and wanton malice and fraud warranting punitive damages.

## COUNT II

## VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT
## 15 U.S.C. § 2301, et seq.

(Asserted on Behalf of the Nationwide and New York Class)

180. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

181. This claim is brought on behalf of the Nationwide Class (the "Class" for purposes of this Count) under Michigan law.

182. This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act, 15 U.S.C. §S 2301, et seq. (the "Act"), by virtue of 28 U.S.C. §S 1332 (a)-(d).

183. The Defective Vehicles constitute "consumer products," as defined in 15 U.S.C. § 2301(1).

184. Plaintiffs and the other members of the Class are "consumers," as defined in 15 U.S.C. § 2301(3).

185. Old GM and GM are "suppliers" and a "warrantors" of the Defective Vehicles as defined in 15 U.S.C. § 2301(4) and (5).

186. The Defective Vehicles are "consumer products" within the meaning of the Act, pursuant to 15 U.S.C. § 2301(1).

187. Old GM supplied a "written warranty" regarding the Defective Vehicles, as defined in 15 U.S.C. § 2301(6).

188. The Defective Vehicles were designed with defective ignition switches that can cause the Defective Vehicles' engine and electrical system to shut down without warning, exposing vehicle occupants to serious risks of accidents, injuries and potentially death. GM issued recalls with respect to the Defective Vehicles, thus, admitting that the ignition switches are defective.

189. As more fully described above, GM breached its express and implied warranties to Plaintiffs and the members of the Class by, among other things: selling and/or leasing the Defective Vehicles in an unmerchantable condition; selling and/or leasing the Defective Vehicles when they were not fit for the ordinary purposes for which vehicles are used, and which were not

fully operational, safe or reliable; and not repairing or curing defects and nonconformities in the Defective Vehicles as they were identified.

190. Plaintiffs and each member of the Class had sufficient direct dealings with old GM, GM or their agents (dealerships) to establish privity of contract between GM and each member of the Class. Privity, however, is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, they are intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Additionally, privity is not required because the Defective Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities. GM has successor liability for the acts of Old GM as described above.

191. Requiring an informal dispute settlement procedure or affording GM a reasonable opportunity to cure its breach of warranties would be unnecessary and futile. At the time of sale or lease of each the Defective Vehicles, GM knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement — under the Act or otherwise — that Plaintiffs resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

192. Based on the facts alleged herein, any durational limitation to the warranties that would otherwise bar the claims under the Act, whether premised upon express or implied warranty, is procedurally and substantively unconscionable under federal law and the applicable state common law.

193. Based on the facts alleged herein, any durational limitation to the warranties that would otherwise bar the claims in this Count is tolled under equitable doctrines. Plaintiffs and the other Class members sustained injuries and damages as a proximate result of GM's violation of their written and/or implied warranties and are entitled to legal and equitable relief against GM, including economic damages, rescission or other relief as appropriate.

194. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of each member of the Class, seek all damages permitted by law, including diminution in value of their Defective Vehicles, in an amount to be proven at trial.

## COUNT III

### FRAUDULENT CONCEALMENT

(Asserted on behalf of the Nationwide Class)

195. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

196. This claim is brought on behalf of the Nationwide Class (the "Class" for purposes of this Count).

197. Old GM and GM concealed material facts about the defect in the ignition switches of the Defective Vehicles and the safety of such vehicles.

198. GM has successor liability for the acts of concealment of Old GM as described above.

40

199. GM had a duty to disclose these safety, quality, dependability, and reliability issues because GM consistently marketed the Defective Vehicles as safe.

200. Once GM made representations to the public about the safety, quality, dependability and reliability of the Defective Vehicles, GM was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated. A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

201. In addition, GM had a duty to disclose omitted facts with respect to the defects in the ignition switches of the Defective Vehicles because they were known and/or accessible only to GM, which has superior knowledge and exclusive access to the facts, and GM knew they were not known to or discoverable by Plaintiffs and the other Class members.

202. These omitted facts were material because they concern the safety and reliability of the Defective Vehicles. That a defect existed in the ignition switches of the Defective Vehicles which could cause the vehicles' engine and electrical system to shut down without warning, and disable the vehicles' safety systems, are material facts to consumers.

203. GM actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the other members of the Class to purchase Defective Vehicles at a higher price for the Defective Vehicles, which did not match Defective Vehicles' true value.

204. GM still has not made full and adequate disclosure and continues to defraud Plaintiffs and the other members of the Class by concealing material information regarding the defects in the Defective Vehicles and other GM vehicles.

205. Plaintiffs and the other members of the Class reasonably relied on GM's statements in its marketing and advertising that the Defective Vehicles were safe, and would not have purchased or leased the Defective Vehicles had they known of the defects in the ignition switches, or would not have paid as much as they did.

206. As a result of the concealment and/or suppression of the facts, Plaintiffs and the other members of the Class sustained damages. For those Class members who elect to affirm the sale, damages include the difference between the actual value of that for which Class members paid and the actual value of what they received, together with additional damages arising from the sales transaction. Those Class members who want to rescind their purchase are entitled to restitution and consequential damages.

207. GM's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Class members' rights and well-being, and to enrich itself. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT IV

## VIOLATIONS OF NEW YORK CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES

### N.Y. Gen. Bus. L. § 349

(Asserted on Behalf of the New York Class)

208. Plaintiffs and the New York Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

209. This claim is brought on behalf of Plaintiffs and the New York Class (the "Class" for purposes of this Count) pursuant to section 349 of the New York General Business Law.

42

210. The New York Consumer Protection from Deceptive Acts and Practices, Section 349, makes unlawful deceptive acts or practices in the conduct of any business, trade or commerce.

211. Under the TREAD Act, a manufacturer of a vehicle has a legal duty to notify NHTSA, as well as the owners, purchasers and dealers of the vehicle, if the manufacturer learns that the vehicle contains a defect related to motor vehicle safety or the vehicle does not comply with an applicable motor vehicle safety standard. 49 U.S.C. § 30118(c).

212. Plaintiffs and the members of the Class were deceived by GM's failure to disclose the defect in the ignition switches of the Defective Vehicles in the course of GM's business, trade and commerce.

213. Old GM had knowledge of the ignition switch defects since 2001, however, never disclosed the existence of such defects. GM admitted the existence of the ignition switch defects in the Defective Vehicles in connection with the issuing of the recall in February 2014.

214. GM admits that the defect in the ignition switches of the Defective Vehicles has been linked to at least 13 accident related fatalities.

215. In acquiring Old GM, GM assumed the obligations to make all required disclosures under the TREAD Act.

216. GM also has successor liability for the unfair or deceptive acts or practices of Old GM.

217. By failing to disclose and consciously concealing the ignition switch defects in the Defective Vehicles, in violation of the TREAD Act, Old GM and GM engaged in deceptive acts or practices prohibited under section 349 of the New York General Business Law.

218. Indeed, for more than a decade, Old GM and GM failed to disclose to NHTSA the known defects in the ignition switches in the Defective Vehicles. As a result, consumers,

43

including Plaintiffs and the member of the Class received no notice of the defect that could shut down engine power without warning, disable power steering and brakes, and cause airbags not to deploy in an accident.

219. Old GM and GM knew that the defects in the ignition switches in the Defective Vehicles rendered such vehicle unreasonably dangerous to consumers, however, failed to disclose the danger to NHTSA, Plaintiffs, other members of the Class or the public despite having a duty to do so.

220. Instead, Old GM and GM allowed consumers to continue to believe the representations made about the Defective Vehicles in its marketing and advertising that such vehicles were safe. Old GM and GM engaged in deceptive acts or practices when it failed to disclose material information concerning the Defective Vehicles that was known to GM at the time of sale or lease.

221. Old GM's and GM's deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the safety and reliability of the Defective Vehicles.

222. Plaintiffs and the other members of the Class have suffered losses resulting from GM's material omission regarding the Defective Vehicles because they paid an inflated purchase price for such vehicles. If Old GM and GM had timely disclosed the defect, Plaintiffs and the members of the Class would not have purchased the Defective Vehicles at all, or would have paid less.

223. Because Old GM's and GM's unlawful conduct takes place in the context of automobile safety, their deceptive acts or practices affect a public interest Old GM's and GM's

unlawful conduct constitutes acts or practices that have the capacity to deceive consumers, do deceive consumers and have a broad impact on the public and public safety.

224. Plaintiffs and the members of the Class suffered injuries caused by Old GM's and GM's failure to disclose material information. Plaintiffs and the other members of the Class overpaid to purchase or lease the Defective Vehicles and did not receive the benefit of their bargain. The value of the Defective Vehicles has diminished now that the GM admitted knowledge of the safety issue.

225. Pursuant to section 349 of the New York General Business Law, Plaintiffs and the other members of the Class are entitled to recover the greater of their actual damages or $50.00.

226. Because Old GM and GM acted willfully and knowingly, Plaintiffs and the other members of the Class are entitled to recover three times actual damages, up to $1000.00. Defendants' acts were done maliciously, deliberately with intent to defraud and in reckless disregard of Plaintiffs and Class Members safety. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter future unlawful conduct.

## COUNT V

### VIOLATIONS OF NEW YORK FALSE ADVERTISING ACT

### N.Y. Gen. Bus. L. § 350

(Asserted on Behalf of the New York Class)

227. Plaintiffs and the New York Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein. For purposes of this Count, pursuant to section 350 of the New York General Business Law.

228. Section 350 makes unlawful false advertising in the conduct of any business, trade or commerce. False advertising means "advertising, including labeling, of a commodity if such advertising is misleading in a material respect. In determining whether any advertising is

45

misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity…" N.Y. Gen. Bus. L. § 350-a.

229. The Plaintiffs and Class Representatives, Janet and Richard Turpyn, are residents of the state of New York.

230. Old GM and GM caused to be made or disseminated in New York, through advertising, marketing and other publications, statements regarding the quality, safety and reliability of the Defective Vehicles that were untrue or misleading.

231. By persistently and repeatedly engaging in the acts described above, including the misrepresentations and/or omission of material facts regarding the quality, safety and reliability of the Defective Vehicles, Old GM and GM engaged in false advertising in violation of section 350 of the New York General Business Law.

232. Old GM and GM violated section 350 of the N.Y. General Business Law by engaging in conduct that was likely to deceive reasonable consumer, owners and purchaser into believing that the Defective Vehicles were safe and reliable.

233. Old GM and GM willfully and knowingly engaged in the conduct described above.

234. GM has successor liability for the unlawful, unfair and fraudulent acts or practices of Old GM.

235. Plaintiffs and the other members of the Class reasonably relied on Old GM's and GM's statements in its marketing and advertising that the Defective Vehicles were safe and reliable, and would not have purchased or leased the Defective Vehicles had they known of the defects in the ignition switches, or would not have paid as much as they did.

46

236. Plaintiffs and the members of the Class have suffered injuries, including the loss of money or property, because of Old GM's and GM's false advertising. In purchasing or leasing their Defective Vehicles, Plaintiffs and the other members of the Class relied on the misrepresentations and/or omission of Old GM and GM with respect to the quality, safety and reliability of the Defective Vehicles.

237. Plaintiffs and the other members of the Class overpaid for the purchase or lease of the Defective Vehicles and did not receive the benefit of their bargain. The value of the Defective Vehicles has diminished now that the GM admitted knowledge of the safety issue.

238. Plaintiffs, individually and on behalf of the other members of the Class, requests that this Court enter such orders and judgments as may be necessary to enjoin G.M from continuing such false advertisements. Pursuant to section 350 of the New York General Business Law, Plaintiffs and the other members of the Class are entitled to recover the greater of their actual damages or $500.00. Because Old GM and GM acted willfully, wantonly, with malice and intent to defraud, Plaintiffs and the other members of the Class are entitled to recover three times actual damages, up to $10,000.00, and punitive damages.

## COUNT VI

## BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY

## N.Y. U.C.C. § 2-213

(Asserted on Behalf of the New York Class)

239. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

240. This claim is brought on behalf of the New York State Class (the "Class" for purposes of this Count).

47

241. Old GM and GM were, at all relevant times, merchants with respect to motor vehicles under N.Y. U.C.C. § 2-2 13.

242. In the course of selling the Defective Vehicles, Old GM and GM expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by Old GM and GM. GM has not repaired or adjusted, and has been unable to repair or adjust the Defective Vehicles' materials and workmanship defects described herein.

243. These warranties were made; inter alia, in advertisements and in uniform statements made by GM to the public and consumers of the Defective Vehicles. These affirmations and promises were part of the basis of the bargain between Old GM and GM, on the one hand, and Plaintiffs and the other Class members, on the other.

244. Old GM and GM did not provide at the time of sale, and GM has not provided since then, GM. Vehicles conforming to these express warranties.

245. GM expressly assumed all liabilities arising under the written warranties of Old GM.

246. Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the other Class members whole.

247. Recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs individually and on behalf of the other Class members, seeks all remedies as allowed by law.

248. Moreover, at the time that Old GM and GM warranted, sold and leased the Defective Vehicles, it knew that the Defective Vehicles did not conform to the warranties and were inherently defective, and wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Defective Vehicles.

48

249. Plaintiffs and the other Class members were induced to purchase the Defective Vehicles under false and/or fraudulent pretenses and without the benefit of full disclosure of the problems described herein.

250. Many of the damages flowing from the Defective Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Old GM's and GM's conduct as alleged herein, and due to GM 's failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

251. As a direct and proximate result of the breach of express warranties, Plaintiffs and the other members of the Class have been damaged in an amount to be determined at trial.

## COUNT VII

## BREACH OF IMPLIED WARRANTIES

(Asserted on Behalf of the Nationwide Class)

252. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

253. This Claim is brought on behalf of the Nationwide Class. Further, this Claim is brought on behalf of the New York Class.

254. At all times relevant hereto, there was in full force and effect N.Y. U.C.C. LAW § 2–314.

255. GM is a "merchant" as to the Class Vehicles within the meaning of N.Y. U.C.C. LAW § 2–104. GM manufactured and sold the Class Vehicles, which are "goods" within the meaning of these statutory provisions. Consequently, pursuant N.Y. U.C.C. LAW § 2–314, GM impliedly warranted that the Class Vehicles were merchantable, including that they were fit for

49

their ordinary purposes as safe passenger vehicles, that they could pass without objection in the trade, and that they were adequately contained, packaged, and labeled.

256. GM breached its implied warranty of merchantability to Plaintiffs and the Nationwide and New York Class because the Class Vehicles were not fit for the ordinary purposes for which they are used—namely as a safe passenger motor vehicle. N.Y. U.C.C. LAW § 2–314(2)(c). Specifically, and according to GM's representatives, the Class Vehicles contain the Key Defects, which makes the Class Vehicles unfit for their ordinary purpose of providing safe transportation.

257. GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide and New York Class because the Class Vehicles would not pass without objection in the trade, as they contained the Key Defects. N.Y. U.C.C. LAW § 2–314(2)(a).

258. GM further breached its implied warranty of merchantability to Plaintiffs and the Nationwide and New York Class because the Class Vehicles were not adequately contained, packaged, and labeled in that the directions and warnings that accompanied the Class Vehicles did not adequately instruct Plaintiffs on the proper use of the Class Vehicles in light of the Key Defects. N.Y. U.C.C. LAW § 2–314(2)(e).

259. At the time of delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiffs to not place extra weight on his vehicles' key chain, including a fob or extra keys. In and around March of 2014, GM publicly stated that placing extra weight on the key chain of the Class Vehicles increases the chances that the Ignition Switch in the Class Vehicle will move from the "on" position and into the "accessory" or "off" position.

260. At the time of the delivery of the Class Vehicles, GM did not provide instructions and/or warnings to Plaintiffs to avoid rough, bumpy, and uneven terrain while driving. In and around March of 2014, GM publicly stated that traveling across such terrain increases the

chances that the Ignition Switch in the Class Vehicle will move from the "on" position to the "accessory" or "off" position.

261. Additionally, at the time of delivery of the Class Vehicles, GM did not adequately warn Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent the Ignition Switch in the Class Vehicle from moving from the "on" position to the "accessory" or "off" position while the Vehicle is in motion.

262. As a proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the Nationwide and New York Class were damaged in the amount of, and entitled to recover, the difference in value between the Class Vehicles as warranted (their sales price) and the Class Vehicles as actually delivered (perhaps worth $0.00) (i.e., a total refund of the full or partial purchase and/or lease price of the Class Vehicles), plus loss of use and other consequential damages arising after the date of delivery of the Class Vehicles.

263. It was not necessary for Plaintiffs and each Nationwide and New York Class Members to give GM notice of GM's breach of the implied warranty of merchantability because GM had actual notice of the Key Defects. Prior to the filing of this action, GM issued a safety recall for the Class Vehicles acknowledging the Key Defects. GM admitted it had notice of the Key Defects as early as 2004, and possibly as early as 2001. At the time of the safety recall, GM also acknowledged that numerous accidents and fatalities were caused by the Key Defects. In addition to the above, the filing of this action is sufficient to provide GM notice of its breaches of the implied warranty of merchantability with respect to the Class Vehicles.

## COUNT VIII

### NEGLIGENCE

(Asserted on Behalf of the Nationwide Class)

264. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

265. This Count is brought on behalf of Plaintiffs and the Nationwide Subclass and New York Subclass.

266. Defendants negligently designed, manufactured, and sold the Class Vehicles with the Key Defects, presenting an unreasonable risk of harm to Plaintiffs and members of the Nationwide Subclass and New York Subclass.

267. Because of the Key Defects, the Class Vehicles were dangerous and unsafe for their intended use.

268. As a direct and proximate result of Defendants' negligence, Plaintiffs and members of the Nationwide Subclass and New York Subclass suffered property damage and/or personal injuries when their Class Vehicles were involved in collisions after the ignition was inadvertently switched into the accessory or off position.

## COUNT IX

## STRICT PRODUCTS LIABILITY

(Asserted on Behalf of the Nationwide and New York Class)

269. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

270. This Count is brought on behalf of Plaintiffs and the Nationwide Subclass and New York Subclass.

271. At all relevant times, the Class Vehicles and their ignition switches were defective in design, manufacture, and in having inadequate warnings, causing the Class Vehicles to be dangerously defective and unsafe for their intended use.

52

272. The Class Vehicles were not adequately contained, packaged, and labeled in that the directions and warnings that accompanied the Class Vehicles did not adequately instruct Plaintiffs on the proper use of the Class Vehicles in light of the Key Defects. N.Y. U.C.C. LAW § 2–314(2)(e).

273. At the time of delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiffs to not place extra weight on his vehicles' key chain, including a fob or extra keys. In and around March of 2014, GM publicly stated that placing extra weight on the key chain of the Class Vehicles increases the chances that the Ignition Switch in the Class Vehicle will move from the "on" position and into the "accessory" or "off" position.

274. At the time of the delivery of the Class Vehicles, GM did not provide instructions and/or warnings to Plaintiffs to avoid rough, bumpy, and uneven terrain while driving. In and around March of 2014, GM publicly stated that traveling across such terrain increases the chances that the Ignition Switch in the Class Vehicle will move from the "on" position to the "accessory" or "off" position.

275. Additionally, at the time of delivery of the Class Vehicles, GM did not adequately warn Plaintiffs of the dangers of not taking the necessary steps outlined above to prevent the Ignition Switch in the Class Vehicle from moving from the "on" position to the "accessory" or "off" position while the Vehicle is in motion.

276. Plaintiffs and the Nationwide Subclass and New York Subclass were purchasers, lessors, and/or users of the Class Vehicles manufactured and sold by GM containing defective ignition switches manufactured and sold by Delphi.

277. Defendants placed the defective ignition switches and Class Vehicles in the stream of commerce. The ignition switches and Class Vehicles were defective when they left Defendants' control.

278. Plaintiffs and the Nationwide Subclass and New York Subclass used the ignition switches and Class Vehicles in the manner intended by Defendants and in a manner that was reasonably foreseeable by Defendants as involving substantial danger not readily apparent. Defendants failed to adequately warn Plaintiffs and the members of the Nationwide Subclass and New York Subclass of the danger.

279. Defendants knew that the Class Vehicles and ignition switches were dangerously defective and could not be safely used for their intended purpose. Defendants further knew that these dangerous defects would not be apparent to the public and that Plaintiffs and Nationwide Subclass and New York Subclass would use the Class Vehicles without adequate warning of the Key Defects. Defendants nevertheless placed the ignition switches and the Class Vehicles into the stream of commerce in willful and conscious disregard of public safety, meriting punitive damages.

280. Plaintiffs seek punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of Class Vehicles, deceived Plaintiffs and Class Members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles it repeatedly promised Plaintiffs and Class Members were safe. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

54

281. As a direct and proximate result of the Key Defects, Plaintiffs and members of the Nationwide Subclass and New York Subclass suffered property damage and/or personal injuries when their Class Vehicles were involved in collisions after the ignition was inadvertently switched into the accessory or off position.

## COUNT X

### UNJUST ENRICHMENT

(Asserted on Behalf of the Nationwide Class)

282. Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

283. Plaintiffs bring this claim individually and on behalf of the other Class members against GM.

284. GM had knowledge of the Ignition Defect, which it concealed from/failed to disclose to Plaintiffs and Members of the Class.

285. As a result of its wrongful acts and omissions as set forth above, GM was able to sell or lease the Affected Vehicles for more than they were worth and when Affected Vehicles were sold used, the vehicles were sold at a higher resale price than they were worth, all of which allowed GM to wrongfully receive a benefit from Plaintiffs and members of the class. It would be inequitable and unjust for GM to retain these wrongfully obtained profits.

286. Plaintiffs and members of the Class are therefore entitled to restitution in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter a judgment against GM and Delphi and in favor of Plaintiffs and the Class, and grant the following relief:

55

A.    Determine that this action may be maintained as a Class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiffs as Class Representative and Plaintiffs' chosen counsel as Class Counsel;

B.    Declare, adjudge, and decree the conduct of Defendants as alleged herein to be unlawful, unfair, unconscionable and/or deceptive, and enjoin any such future conduct;

C.    Award Plaintiffs and the Class members actual, compensatory damages, or, in the alternative, statutory damages, as proven at trial;

D.    Alternatively, if elected by Plaintiffs and the Class, require GM to repair the defective ignition switches or provide a comparable vehicle that does not have ignition switch defects;

E.    Award Plaintiffs and Class members' restitution of all monies paid to Old GM because of GM's violation of the lemon laws, equity and the common law;

F.    Award Plaintiffs and the Class members exemplary or punitive damages in such amount as proven;

G.    Award Plaintiffs and the Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

H.    Award Plaintiffs and the Class members such other further and different legal or equitable relief as the case and the proof may require or as is determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

56

DATED: July 16, 2014                    MOTLEY RICE LLC

By: _____

    Joseph F. Rice, Esq. - *Pro Hac Vice pending*
      (SC Bar No. 4710; Fed I.D. No. 3445)
    Jodi Westbrook Flowers, Esq. - *Pro Hac Vice*
      *pending* (SC Bar No. 66300)
    Donald A. Migliori, Esq. - *Pro Hac Vice*
      *pending* (RI4936; MA567562; MN0245951)
    Alex R. Straus, Esq. (NY Bar No. AS1690)
    28 Bridgeside Boulevard
    Mount Pleasant, SC 29464
    Telephone:  (843) 216-9000
    Facsimile:  (843) 216-9450
    E-mail:  astraus@motleyrice.com

    and

    MOTLEY RICE LLC
    600 Third Avenue, Suite 2101
    New York, NY 10016
    Telephone:  (212) 577-0040
    Facsimile:  (212) 577-0054