UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Case No.: 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

----------------------------------------------------------------x

## DECISION WITH RESPECT TO NO STAY
## PLEADING (PHANEUF PLAINTIFFS)[1]


APPEARANCES:

KING & SPALDING LLP
*Attorneys for General Motors LLC*
1185 Avenue of the Americas
New York, New York 10036
By:    Arthur J. Steinberg, Esq. (argued)
       Scott I. Davidson, Esq.


KIRKLAND & ELLIS LLP
*Attorneys for General Motors LLC*
300 North LaSalle
Chicago, Illinois 60654
By:    Richard C. Godfrey, Esq.
       Andrew B. Bloomer, Esq.


BLOCK & LEVITON LLP
*Attorneys for Phaneuf Plaintiffs*
155 Federal Street, Suite 400
Boston, Massachusetts 02110
By:    Jeffrey C. Block, Esq. (argued)
       Joel A. Fleming, Esq.

---

[1]    This written decision memorializes and amplifies on the oral decision that I issued after the close of oral argument at the hearing on this matter on July 2, 2014 (the "**July 2 Hearing**").  Because it had its origins in the originally dictated decision, it has a more conversational tone.  As a general matter, it speaks as of the time I issued the original decision, though by footnote (*see* n.8), I've updated it to describe an event that took place after I dictated the original decision.

FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
*Attorneys for Phaneuf Plaintiffs*
1279 Route 300
Newburg, New York 12551
By:    Todd Garber, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In February 2014, General Motors LLC ("**New GM**") announced ignition switch

defects in Chevy Cobalts and Pontiac G5s going back to the 2005 model year—at least

seemingly in material part before the chapter 11 filing of Reorganized Debtor General

Motors Corporation, now called Motors Liquidation Corp. ("**Old GM**"), from whom

New GM purchased the bulk of Old GM assets in a section 363 "free and clear" sale[2] in

July 2009.[3]  The 2014 announcement came many years after ignition switch issues were

first discovered by at least some personnel at Old GM.  Very nearly immediately after

New GM's announcement, a large number of class actions (and to a lesser extent,

individual lawsuits) relating to those defects, referred to here as the "**Ignition Switch**

**Actions**," were commenced against New GM.

At the time of the 363 Sale, New GM assumed many, but much less than all, of

Old GM's liabilities.[4]  Focusing on that distinction, in April 2014, New GM filed a

---

[2]    I approved the sale—referred to here as the "**363 Sale**"—by order dated July 5, 2009 (the "**Sale Order**") (ECF No. 2968), and the sale closed a few days thereafter.

[3]    In a February 2014 letter to the National Traffic and Highway Administration, New GM made reference to 2005–2007 model year Chevy Cobalts, and 2007 model year Pontiac G5s.  Defective ignition switches, manufactured at a time yet to be determined (before the 363 Sale, after the 363 Sale, or both), may also have been installed in other vehicles, including those in other (and possibly later) model years, including some after the 363 Sale.  I make no findings as to any of these matters at this point in time; I merely identify them as matters that may eventually need to be stipulated to or otherwise resolved.

[4]    The Old GM  liabilities assumed by New GM, on the one hand, and not assumed, on the other, were described in the 363 Sale's underlying sale agreement, captioned "Amended and Restated Master Purchase and Sale Agreement," often referred to by the parties as the "**ARMSPA**," "**MPA**," or "**MSPA**."  As in the past—because, as I've repeatedly noted, all but the most common acronyms are singularly unhelpful to those who haven't been living with a case—I instead use the

motion before me (the "**Motion to Enforce**")[5] to enforce the free and clear provisions of

the Sale Order—contending (though these contentions are disputed) that most, if not all,

of the claims in the Ignition Switch Actions related to vehicles or parts manufactured and

sold by Old GM; that the Ignition Switch Actions assert liabilities not assumed by New

GM; and that the Sale Order's free and clear provisions proscribe such claims.  At very

nearly the same time, counsel for one group of plaintiffs—the "**Groman Plaintiffs**"—

commenced a class action adversary proceeding in this Court (the "**Groman

Adversary**")[6] seeking a declaration that their claims were not so proscribed.

    In this jointly administered proceeding in which I address issues in New GM's

Motion to Enforce and the Groman Adversary,[7] I must determine whether one out of

88 Ignition Switch Actions—brought by a group of plaintiffs (the "**Phaneuf Plaintiffs**"),

suing on their own behalf and on behalf of a purported class—should be allowed to

proceed when the plaintiffs in every other Ignition Switch Actions agreed to stay their

actions while the issues in the Motion to Enforce were being litigated.[8]

---

more descriptive term "**Sale Agreement**."  *See, e.g.*, *Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 2012 Bankr. LEXIS 1688, at *13 n.25, 2012 WL 1339496, at *5 n.25 (Bankr. S.D.N.Y. Apr. 17, 2012) (Gerber, J.), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013) (Furman, J.) ("The Sale Agreement was more formally entitled 'Amended and Restated Master Purchase and Sale Agreement,' and referred to more than occasionally as the 'ARMSPA.'  By reason of the Court's dislike of acronyms, which rarely are helpful to anyone lacking intimate familiarity with the subject, the Court simply says 'Sale Agreement'").

[5]    ECF No. 12620.

[6]    Adv. No. 14-01929.

[7]    I determined early on that the largely overlapping issues in the contested matter that resulted from New GM's Motion to Enforce and the Groman Adversary should be heard together in this Court.  For brevity I'll hereafter refer to the Motion to Enforce as a shorthand means to collectively refer to both.

[8]    At the time I orally ruled with respect to the Phaneuf Plaintiffs' issues at the July 2 Hearing, they were the only plaintiff group that had declined to stipulate to stay its Ignition Switch Action.  In proceedings later that day, I granted leave to two initially *pro se* individual plaintiffs (the "**Elliott Plaintiffs**"), who had so stipulated but later retained counsel, to be relieved of the stipulation they had agreed to while *pro se*.  Thus, after having delivered my oral decision on this matter, I now have one more group of plaintiffs seeking to proceed before all of the others.

Some of the issues that I'll later need to decide may turn out to be difficult, but those here are not. I rule that the Phaneuf Plaintiffs should be treated no differently than those in the 87 other Ignition Switch Actions who agreed to voluntary stays, with adherence to the orderly procedures in this Court that were jointly agreed to by counsel for those other plaintiffs and New GM. The Phaneuf Plaintiffs' complaint alleges matters that, on their face, involve matters preceding Old GM's chapter 11 filing and 363 sale, with respect to which the Sale Order's "free and clear" injunctive provisions, at least in the first instance, apply. And the Phaneuf Plaintiffs would not be prejudiced at all, much less materially, by litigating their needs and concerns along with the other New GM consumers raising substantially identical claims. Though injunctive provisions are already in place and thus a preliminary injunction is unnecessary, New GM has also shown an entitlement to a preliminary injunction staying the Phaneuf Plaintiffs from proceeding with their litigation elsewhere while the issues here are being determined.

My Findings of Fact, Conclusions of Law, and bases for the exercise of my discretion follow.

<u>Findings of Fact</u>

As previously noted, very nearly immediately after New GM's public announcement of the ignition switch defects, a very large number of Ignition Switch Actions were commenced against New GM. Although back in 2009, New GM had voluntarily undertaken to assume liability for death, personal injury, and property damage arising from accidents and incidents after the 363 Sale, these lawsuits were for something else—for "economic loss," which I understand to cover (possibly among things) claims for alleged diminishment in value of affected vehicles, out of pocket expenses, inconvenience, and, additionally, punitive damages, RICO damages, and attorneys fees.

-4-

### A. The Context of this Controversy

Very shortly after it filed its Motion to Enforce, New GM sought a conference with me to establish procedures to manage the litigation of its motion. With the Groman Adversary also having been filed, and with additional similar litigation foreseeable, I granted new GM's request for the conference. I solicited comments from interested parties with respect to the agenda for that conference, and held an on-the-record conference on May 2 (the "**May 2 Conference**"). By the time of the May 2 Conference, I understood there to be about 65 Ignition Switch Actions; I'm informed that their number has now reached 88.

To deal with the very large number of plaintiffs' attorneys who might be impacted by any rulings I might issue, I asked them to designate a smaller group of their number who'd speak on their behalf. The plaintiffs' lawyers community did so. They designated the law firms of Brown Rudnick, LLP; Caplin & Drysdale, Chartered; and Stutzman, Bromberg, Esserman & Plifka, PC (whose practices include the representation of tort and asbestos plaintiffs in bankruptcy courts) to speak on their behalf; those three firms came to be known as the "**Designated Counsel**." And at the May 2 Conference, it became apparent that this controversy had the potential to impact prepetition creditors of Old GM, who, under Old GM's reorganization plan, had become unit holders ("**Unit Holders**") in a General Unsecured Creditors Trust—referred to colloquially as the "**GUC Trust**"—which, among other things, would quarterback objections to claims on behalf of Old GM unsecured creditors, whose recoveries might be diluted by others' claims against Old GM. Thus I determined that I should give counsel for the GUC Trust and Unit Holders the opportunity to be heard as well. Though I provided means for other plaintiffs' counsel to be heard to the extent that the Designated Counsel didn't

satisfactorily present the others' views, I ruled that I should primarily hear from Designated Counsel to avoid duplication and to allow the issues to be decided in an orderly manner.

At the May 2 Conference, with knowledge of the injunctive provisions of the Sale Order, I determined that while the litigation process was underway in this Court, plaintiffs in Ignition Switch Actions would either

(i) agree to enter into a stipulation ("**Stay Stipulation**") with New GM staying the Ignition Switch Actions they'd brought elsewhere, or

(ii) file with the Bankruptcy Court a "**No Stay Pleading**"—as later defined in a heavily negotiated scheduling order (the "**May 16 Order**")[9] I signed after the May 2 Conference—setting forth why they believed their Ignition Switch Actions should not be stayed.

The May 16 Order further provided that after September 1, any party may request that I "modify the stay for cause shown, including based on any rulings in this case, or any perceived delay in the resolution of the Threshold Issues."[10]

---

[9]      ECF No. 12697.

[10]     The "Threshold Issues" are:

> a.  Whether Plaintiffs' procedural due process rights were violated in connection with the Sale Motion and the Sale Order and Injunction, or alternatively, whether Plaintiffs' procedural due process rights would be violated if the Sale Order and Injunction is enforced against them ("**Due Process Threshold Issue**");

> b.  If procedural due process was violated as described in (a) above, whether a remedy can or should be fashioned as a result of such violation and, if so, against whom ("**Remedies Threshold Issue**");

> c.  Whether any or all of the claims asserted in the Ignition Switch Actions are claims against the Old GM bankruptcy estate (and/or the GUC Trust) ("**Old GM Claim Threshold Issue**"); and

On June 9, the Ignition Switch Actions, which were brought in many judicial districts in the United States, were transferred, under 28 U.S.C. § 1407, upon a decision of the Judicial Panel on Multidistrict Litigation[11] to the United States District Court for the Southern District of New York.  They're now pending in this district for pretrial purposes before the Hon. Jesse Furman, United States District Judge.  Each of Judge Furman and I has granted comity to the other, and he has entered a scheduling order in his court that accomplishes his needs while respecting mine.[12]  By a subsequent MDL Panel order, the Phaneuf Plaintiffs' action is before Judge Furman too.

Plaintiffs in 87 out of 88 Ignition Switch Actions agreed to enter into stay stipulations.[13]  But the Phaneuf Plaintiffs declined to do so.  Instead, they filed a No Stay Pleading, contending that they are asserting only post-sale claims, and thus that their claims should be treated differently.  They argue that they should be allowed to proceed with their action even while the Motion to Enforce is pending.

---

d.  If any or all of the claims asserted in the Ignition Switch Actions are or could be claims against the Old GM bankruptcy estate (and/or the GUC Trust), should such claims or the actions asserting such claims nevertheless be disallowed/dismissed on grounds of equitable mootness (“**Equitable Mootness Threshold Issue**”).

[11]  *See In re General Motors LLC Ignition Switch Litigation*, --- F.Supp.2d ---, 2014 U.S. Dist. LEXIS 79713, 2014 WL 2616819 (J.P.M.L June 9, 2014) (“***JPML Decision***”).

[12]  Order No. 1, *In re General Motors LLC Ignition Switch Litigation*, No. 14-MC-2543 (S.D.N.Y. June 24, 2014), ECF No. 3 (the “**June 24 Order**”).

[13]  But see n.8 above, with respect to the Elliott Plaintiffs' request, which I granted, to withdraw from their earlier stipulation.

*B.  The Sale Agreement and Sale Injunctions*

As noted above, the Sale Agreement and Sale Order set out Old GM liabilities that New GM would assume and not assume.[14]  Under the Sale Agreement, New GM did not assume liability for most "**Product Liability Claims**" (as there defined).[15]  But New GM expressly assumed responsibility for claims for death, personal injury or damage to property caused by "accidents or incidents" first occurring after the 363 Sale,[16] even if such might otherwise be claims against Old GM.[17]

Under the Sale Agreement (and the Sale Order, which had corresponding provisions), New GM also took on, as additional Assumed Liabilities, some, but not all, claims other than for death, personal injury or property damage caused by accidents or incidents.  In addition, the Sale Order included several injunctive provisions.  Relevant provisions of the Sale Order follow.

*1.  Sale Order Provisions re Assumed Liabilities*

Under the Sale Order (and as described with greater precision there), New GM assumed Old GM's obligations under express warranties (colloquially referred to as the "glove box" warranty) that had been delivered in connection with the sale of vehicles and

---

[14]    Liabilities New GM agreed to assume were called "**Assumed Liabilities**," in each of the Sale Agreement and Sale Order.  Those New GM did not assume (and that Old GM retained) were called "**Retained Liabilities**."

[15]    *See* Sale Agreement § 2.3(a)(ix) (as amended on June 30, 2009 (see pages 111–12 of ECF No. 2968-2)).

[16]    *Id.*

[17]    *See generally In re Motors Liquidation Co.*, 447 B.R. 142, 149 (Bankr. S.D.N.Y. 2011) (Gerber, J.) ("**GM-Deutsch**") (construing the "incidents" portion of the "accidents or incidents" language (in the context of claims against New GM by the estate of a consumer who had been in an accident before the 363 Sale, but died thereafter) as covering more than just "accidents," but covering things that were similar, such as fires, explosions, or other definite events that caused injuries and resulted in the right to sue).

-8-

vehicle parts prior to the 363 Sale.[18]  But New GM did not assume  responsibility for

other alleged warranties, including implied warranties and statements in materials such as

individual customer communications, owner's manuals, advertisements, and other

promotional materials.[19]

The Sale Order also provided that except for the Assumed Liabilities expressly set

forth in the Sale Agreement, New GM would not "have any liability for any claim that

arose prior to the Closing Date, relates to the production of vehicles prior to the Closing

Date, or otherwise is assertable against the Debtors or is related to the Purchased Assets

prior to the Closing Date."[20]  And it went on to say that:

> The Purchaser [New GM] shall not be deemed, as a
> result of any action taken in connection with the
> MPA [Sale Agreement] or any of the transactions or
> documents ancillary thereto or contemplated
> thereby or in connection with the acquisition of the
> Purchased Assets, to:
>
> > (i) be a legal successor, or otherwise
> > be deemed a successor to the Debtors (other
> > than with respect to any obligations arising
> > under the Purchased Assets from and after
> > the Closing);
>
> > (ii) have, de facto or otherwise,
> > merged with or into the Debtors; or
>
> > (iii) be a mere continuation or
> > substantial continuation of the Debtors or
> > the enterprise of the Debtors.

---

[18]    *See* Sale Order ¶ 56.  New GM also assumed Old GM obligations under state "lemon law"
statutes—which generally require a manufacturer to provide a consumer remedy when the
manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute,
after a reasonable number of attempts as further defined in the statute—and other related
regulatory obligations under such statutes.  *Id.*

[19]    *Id.*

[20]    Sale Order ¶ 46.

> Without limiting the foregoing, the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character
>
> for any claims, including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity, environmental, labor and employment, and products or antitrust liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or unliquidated.[21]

The Sale Order also provided:

> Except for the Assumed Liabilities, or as expressly permitted or otherwise specifically provided for in the MPA or this Order,
>
> the Purchaser shall have no liability or responsibility for any liability or other obligation of the Sellers [Old GM and its Debtor subsidiaries] arising under or related to the Purchased Assets.
>
> Without limiting the generality of the foregoing, and except as otherwise specifically provided in this Order and the MPA,
>
> the Purchaser shall not be liable for any claims against the Sellers or any of their predecessors or Affiliates, and
>
> the Purchaser shall have no successor, transferee, or vicarious liabilities of any kind or character,
>
> including, but not limited to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger, or substantial continuity,
>
> whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to the Sellers or any obligations of the Sellers arising prior to the Closing.[22]

---

[21]    Sale Order ¶ 46 (reformatted for readability).

[22]    Sale Order ¶ 48 (reformatted for readability).

### 2. Sale Order Injunctive Provisions

Importantly for this matter, the Sale Order also included injunctive provisions.

The first of them provided, in relevant part:

> Except as expressly permitted or otherwise specifically provided by the MPA or this Order,
>
> all persons and entities, including, but not limited to . . . litigation claimants . . .
>
> holding . . . claims . . . of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against . . . a Seller . . .
>
> arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction,
>
> are forever barred, estopped, and permanently enjoined (with respect to future claims or demands based on exposure to asbestos, to the fullest extent constitutionally permissible)
>
> from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' . . . claims . . . , including rights or claims based on any successor or transferee liability.[23]

The second injunctive provision provided, in relevant part:

> Effective upon the Closing and except as may be otherwise provided by stipulation filed with or announced to the Court with respect to a specific matter or an order of the Court,
>
> all persons and entities are forever prohibited and enjoined

---

[23]    Sale Order ¶ 8 (reformatted for readability).

from commencing or continuing in any manner any action or other proceeding, whether in law or equity,

in any judicial, administrative, arbitral, or other proceeding against the Purchaser . . . or the Purchased Assets, with respect to any

> (i) claim against the Debtors other than Assumed Liabilities, or

> (ii) successor or transferee liability of the Purchaser for any of the Debtors, including, without limitation, the following actions:

>> (a) commencing or continuing any action or other proceeding pending or threatened against the Debtors as against the Purchaser, or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets;

>> . . . .

>> (e) commencing or continuing any action, in any manner or place, that does not comply, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof . . . .[24]

## C.. *The Phaneuf Plaintiffs' Claims*

The Phaneuf Plaintiffs' complaint alleges that after the 363 Sale (which it will be recalled took place in July 2009), at various times in the period from November 2009 to September 2010, Phaneuf Plaintiffs:

- Lisa Phaneuf purchased a 2006 Chevy HHR;

- Adam Smith purchased a 2007 Pontiac Solstice; and

---

[24]    Sale Order ¶ 47 (reformatted for readability).

- Catherine and Joseph Cabral purchased a 2007 Chevy Cobalt.[25]

Each was a vehicle manufactured by Old GM.[26]

But the Phaneuf Plaintiffs' Ignition Switch Action was brought against New GM.

New GM was sued as alleged "successor in interest" to Old GM,[27] and the Phaneuf

Plaintiffs repeatedly rely on alleged conduct of Old GM, in part by referring to the two

entities collectively,[28] and in part by specific reference to acts undertaken by Old GM

before New GM was created.  In seven places in their complaint, the Phaneuf Plaintiffs

speak of acts that took place in February 2005;[29] April 2005;[30] June 2005;[31] March

---

[25]    *See* Phaneuf Compl. ¶¶ 8, 9, 15, ECF No. 12698-10 ("**Compl.**").

[26]    The Phaneuf Plaintiffs' Complaint suggests that others in their group—Mike Garcia, who bought a 2010 Cobalt; Javier Delacruz, who bought a 2009 Cobalt (in September 2009, which conceivably could have been manufactured after the July 2009 363 Sale); Steve Sileo, who bought a 2010 Cobalt; Steven Bucci, who bought a 2009 Cobalt (in November 2009, which, like Delacruz's Cobalt, conceivably could have been manufactured after the July 2009 363 Sale); and David Padilla, who purchased a 2010 Cobalt (*see* Compl. ¶¶ 10–14)—might have purchased vehicles manufactured by New GM, rather than Old GM, and that they thus might have factual circumstances that distinguish them from Phaneuf, Smith, and the Cabrals.  But all of the Phaneuf Plaintiffs sue under a common complaint.  In the briefing to follow, Garcia, Delacruz, Sileo, Bucci and Padilla, like others, will be free to flesh out the facts with respect to the manufacture of their vehicles, and to point out any factual distinctions that might be warranted.

[27]    *See* Compl. at page 1, before the beginning of numbered paragraphs ("Plaintiffs . . . allege the following against Defendant General Motors LLC ('New GM') *successor-in-interest to General Motors Corporation ('Old GM')* (collectively, the 'Company,' or 'GM')") (emphasis added).

[28]    The Phaneuf Plaintiffs' effort to treat Old GM and New GM as a single entity is inappropriate, as a matter of bankruptcy law, if not as a matter of other law as well.  As if it cures the deficiency, the Phaneuf Plaintiffs continue, in a footnote:

> Any reference to "GM" relating to a date before July 10, 2009
> means Old GM.  Any reference to "GM" relating to a date
> after July 10, 2009 means New GM.  Any reference to "GM"
> that does not related to a specific date means Old GM and
> New GM, collectively.

Compl. n.2.  That tactic underscores the Phaneuf Plaintiffs' efforts to muddy the distinctions between the two entities, and to impose liability on New GM based on Old GM's conduct.

[29]    *See* Compl. ¶ 26 ("In 2005, for example, GM launched the 'Only GM' advertising campaign. . . . 'Safety and security' were the first two features highlighted in the Company's February 17, 2005 press release describing the campaign.").

[30]    *Id.* ¶ 27 ("Similarly, an April 5, 2005 press release about the 'Hot Button marketing program' stated that the 'Value of GM's Brands [Was] Bolstered By GM's Focus On Continuous Safety' and explained that the Hot Button program was 'intended to showcase the range of GM cars,

2005;[32] November 2005;[33] April 2006;[34] and as early as 2003.[35] Each of those acts took place before the formation of New GM, and would have been more candidly described in the Phaneuf Plaintiffs' complaint if, in each instance, the reference to "GM" were to "Old GM." The allegations do not describe actions taken by New GM.

I don't now make any finding as to any respects in which New GM might be liable for its own post-sale conduct, or whether the Sale Order (or any part of it) should be invalidated, by reason of due process concerns or any of the other matters that Designated Counsel will be briefing in the upcoming weeks.[36] But I do find the Phaneuf Plaintiffs' efforts to merge pre- and post-sale acts, and to place reliance on the alleged conduct of Old GM, especially collectively, are much more than sufficient for me to find that the Phaneuf Plaintiffs place material reliance on Old GM actions that took place before the Sale Order, and assert claims with respect to vehicles that were manufactured before the 363 Sale. Thus I find as a fact, or mixed question of fact and law, that the

---

trucks and SUVs that offer drivers continuous safety-protection before, during and after a vehicle collision.'") (hyphen in original).

[31]    *Id.* ¶ 28 ("On June 14, 2005, GM issued a press release stating that 'Safety [Was The] No. 1 Concern For Women At The Wheel' . . . .").

[32]    *Id.* ¶ 29 ("In a statement aired on Good Morning America on March 7, 2005, a GM spokesperson stated that 'the [Chevrolet] Cobalt exceeds all Federal safety standards that provide – significant real-world safety before, during, and after a crash.'" (alteration and hyphen in original).

[33]    *Id.* (" In November 2005, GM ran radio advertisements stating that 'One of the best things to keep you [and your] family safe is to buy a Chevy equipped with OnStar . . . from Cobalt to Corvette there's a Chevy to fit your budget.'") (alterations in original).

[34]    *Id.* ¶ 41 ("In April 2006, GM attempted to fix the Ignition Defect by replacing the original detent spring and plunger with a longer detent spring and plunger.").

[35]    *Id.* ¶ 45 ("[I]n 2003, a GM service technician observed the Ignition Defect while he was driving").

[36]    I likewise don't make a finding now as to the significance of the pre- or post-sale timing of the design or manufacture of *parts* that might have gone into vehicles that were built pre- or post-sale. I assume that issues of that character will be addressed by Designated Counsel, New GM, and others in the briefing in the upcoming weeks, and those parties deserve to be heard before I make any decisions in that regard.

threshold applicability of the Sale Order—and its injunctive provisions—has easily been established in the first instance, at least for the purposes of the Phaneuf Plaintiffs' claims.[37]

Discussion

In that factual context, I rule that the Phaneuf Plaintiffs' claims will be treated the same as those in the other 87 Ignition Switch Actions. The stay already imposed by the injunctive provisions of Paragraphs 8 and 47 of the Sale Order (and that I may also impose by preliminary injunction) will remain in place insofar as it affects the Phaneuf Plaintiffs' complaint—subject to the right, shared by all of the other plaintiffs in the Ignition Switch Actions, to ask that I revisit the issue after September 1.

*A. Applicability of the Sale Order*

Paragraph 8 of the Sale Order provides, among other things, that all persons and entities "are . . . enjoined . . . from asserting against the Purchaser [New GM] . . . such persons' or entities' . . . claims . . ., including rights or claims based on any successor or transferee liability."

Similarly, Paragraph 47 of the Sale Order provides, among other things, that all persons and entities "are . . . enjoined from commencing or continuing in any manner any action or other proceeding . . . against the Purchaser . . . with respect to any (i) claim against the Debtors other than Assumed Liabilities, or (ii) successor or transferee liability of the Purchaser for any of the Debtors . . . ."

---

[37]     That is not to say, of course, that what the Sale Order says will be the end of the inquiry, either in the Phaneuf Plaintiffs' case or in the case of the other 87 Ignition Switch Actions. By reason of the due process contentions that the other litigants will address, or otherwise, the Sale Order may turn out to have exceptions or self-destruct. But for now it's in place.

-15-

I've found as a fact—based on the Phaneuf Plaintiffs' complaint's express reference to New GM as the "successor in interest" to Old GM,[38] and the facts that at least three of them purchased cars manufactured before the 363 Sale;[39] that their complaint (apparently intentionally) merges pre- and post-sale conduct by Old GM and New GM;[40] and that their complaint places express reliance on at least seven actions by Old GM, before New GM was formed[41]—that at least much of the Phaneuf Plaintiffs' complaint seeks to impose liability on New GM based on Old GM's pre-sale acts. Efforts of that character are expressly forbidden by the two injunctive provisions just quoted. Though I can't rule out the possibility that a subset of matters the Phaneuf Plaintiffs might ultimately show would not similarly be forbidden, at this point the Sale Order injunctive provisions apply. And it need hardly be said that I have jurisdiction to interpret and enforce my own orders,[42] just as I've previously done, repeatedly, with respect to the very Sale Order here.[43]

---

[38]    *See* page 13 & n.27 above.

[39]    *See* pages 12–13 & n.25 above.

[40]    *See* page 13 & n.28 above.

[41]    *See* pages 13–14 & nn.29–35 above.

[42]    *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("***Travelers***") ("[A]s the Second Circuit recognized . . . the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); *see also In re Lyondell Chem. Co.*, 445 B.R. 277, 287 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (same).

[43]    *See Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 2012 Bankr. LEXIS 1688, at *17, 20, 31, 50, 2012 WL 1339496, at *6–7, 9, 14 (Bankr. S.D.N.Y. April 17, 2012) (Gerber, J.), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013) (Furman, J.) (interpreting the Sale Order, among other extrinsic evidence bearing on the intent of Old GM and New GM in entering into the Sale Agreement, to aid in determining whether New GM assumed Old GM's settlement with the Castillo Plaintiffs); *Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 2013 Bankr. LEXIS 620, at *4, 11–24, 2013 WL 620281, at *1, 4–8 (Bankr. S.D.N.Y. Feb. 19, 2013) (Gerber, J.) (construing the Sale Order, and then remanding the remainder of a controversy, involving issues unrelated to the Sale Order, to the Eastern District of Michigan); *GM-Deutsch*, discussed at n.17 above.

Other judges in the Southern District of New York, at both the District Court and Bankruptcy Court levels, have recognized this as well. *See, e.g., In re Grumman Olson Indus., Inc.*, 467 B.R.

Thus unless and until I rule, after hearing from counsel in the other 87 Ignition

Switch Actions, that I should not enforce the Sale Order, in whole or in part (or that with

respect to any particular matters, the Sale Order does not apply), the Phaneuf Plaintiffs

remain enjoined under it.  As the Supreme Court held in *Celotex*,[44] persons subject to an

injunctive order issued by a court with jurisdiction are expected to obey that decree until

it is modified or reversed, even if they have proper grounds to object to the order.

Then even assuming (though this is debatable) that I could deprive New GM of

the benefits of the Sale Order's injunctive provisions in the exercise of my discretion, I

am not prepared to do so now.  I have 88 Ignition Switch Actions before me—in most of

which parties are likely to make similar contentions.  Under section 105(d) authority[45]

---

694 (S.D.N.Y. 2012) (Oetken, J.), *aff'g*, 445 B.R. 243, 247–50 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.) ("**Grumman Olson**") (confirming that a bankruptcy judge can interpret the scope and effect of his or her court's prior sale order, post-confirmation, and as between non-debtors (citing *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 228–31 (2d Cir.2002) (holding that Bankruptcy Court could exercise continuing postconfirmation jurisdiction over non-debtor parties, in part because "the dispute . . . was based on rights established in the sale order" and noting that  a "bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders"))); *In re Old Carco LLC*, 505 B.R. 151, 159 & 163 n.17 (Bankr. S.D.N.Y. 2014) (Bernstein, C.J.) ("the Court retains bankruptcy jurisdiction under 28 U.S.C. § 1334 to interpret its prior sale order even when the dispute involves non-debtor third parties"); *see also Moelis Co. LLC v. Wilmington Trust FSB (In re Gen. Growth Props., Inc.)*, 460 B.R. 592, 595 (Bankr. S.D.N.Y. 2011) (Gropper, J.) ("[a] bankruptcy court always has jurisdiction to interpret its own orders.  It does not matter that the State Court Action is purportedly between two non-debtors or the Chapter 11 Cases have been confirmed.") (citation omitted).

44    *Celotex Corp. v. Edwards*, 514 U.S. 300, 306–07 (1995).

45    Bankruptcy Code section 105(d) provides:

The court, on its own motion or on the request of a party in interest—

(1) shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and

(2) unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically . . . .

given to me by Congress, I established an orderly process, with input from Designated

Counsel and counsel for New GM, the Groman Adversary Plaintiffs, the GUC Trust and

others by which I can fairly address these issues.  It would be grossly unfair to the

plaintiffs in the 87 Ignition Switch Actions who stipulated to stay their cases to give a

single litigant group leave to proceed on its own.  My efforts to manage 88 cases, with

largely overlapping issues, require that they proceed in a coordinated way.

There is no basis in law or equity, or logic, for the notion that I should except one

plaintiff group from the process to which the other 87 litigant groups are bound.  Making

an exception for the Phaneuf Plaintiffs would be monumentally bad case management.

During the July 2 Hearing, we had lengthy discussion as to what would make the most

sense in managing the issues in this case—which are in many respects difficult ones.

Except for the limited purpose of having concluded that the Phaneuf Plaintiffs' complaint

raises contentions forbidden, in the first instance, by the Sale Order, I need to minimize

piecemeal rulings now, by me or by any other judge—assuming that he or she would

disregard express provisions in the Sale Order giving me exclusive jurisdiction to decide

the matters before me now.[46]  Nor should I simply let the Phaneuf Plaintiffs' claims

proceed without the scrutiny that all of the other Ignition Switch Action claims will

undergo.

I've determined that the Sale Order applies in the first instance.  The procedures

established by my earlier orders are necessary to ensure the fair adjudication of the issues

before me.  The Phaneuf Plaintiffs have not come close to making a sufficient showing as

---

[46]    *See* Sale Order ¶ 71 ("This Court retains exclusive jurisdiction to enforce and implement the terms
and provisions of this Order, the MPA, . . . and each of the agreements executed in connection
therewith, . . . including, but not limited to, retaining jurisdiction to . . . (c) resolve any disputes
arising under or related to the MPA, except as otherwise provided therein . . . .").

to why I should make an exception for them—nor for allowing them to proceed ahead of the other 87 Ignition Switch Actions.

### B.  Preliminary Injunction

Additionally, I determine that even if the Sale Order lacked the injunctive provisions it has, it would be appropriate to enter a preliminary injunction protecting New GM from the need now to defend claims that, under the Sale Agreement and Sale Order, it did not assume, and preventing the piecemeal litigation of the Phaneuf Plaintiffs' claims ahead of all of the other lawsuits similarly situated.

The standards for entry of a preliminary injunction in the Second Circuit, as set out in its well-known decision in *Jackson Dairy*[47] and its progeny,[48] are well established. As stated in *Jackson Dairy*, "the standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."[49]  Those requirements are easily met here.

### 1.  Irreparable Harm

Here, irreparable injury, in terms of the case management concerns and prejudice to the litigants in the other 87 actions, has been established.  It's foreseeable, if not obvious, that at least many of the 87 other litigants will present issues that the Phaneuf Plaintiffs now present.

---

[47]  *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ("***Jackson Dairy***").

[48]  *See, e.g., Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F. 3d 206, 215 (2d Cir. 2012) (applying the *Jackson Dairy* standard, though not citing *Jackson Dairy* directly); *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (citing *Jackson Dairy*); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (same).

[49]  *Jackson Dairy*, 596 F.2d at 72.

And when actions raise overlapping issues, even if they're not wholly congruent, coordinated disposition is essential.[50]  The facts that the Phaneuf Plaintiffs present may not appear in every one of those 88 cases.  But the chances that similar facts will not be present in at least many of them are remote.  I well understand the desires of litigants to get their cases moving as quickly as possible.  But those desires are insufficient to trump the normal case management concerns that I and most other judges have.

Indeed, these concerns underlie why MDL proceedings, like the one before Judge Furman, come into being.  For reasons that would be obvious to most, the MDL Panel determined that Ignition Switch Actions should be handled by a single judge for coordinated or consolidated pretrial proceedings.  Irreparable injury in terms of case management concerns, for each of me and Judge Furman (not to mention prejudice to the litigants in the other 87 actions), would plainly occur if I were to allow the Phaneuf Plaintiffs to proceed before all of the others.

Judge Furman's case management concerns were apparent in his June 24 Order,[51] which, among other things, set up his cases for adjudication in an orderly way,[52] just as I

---

[50]  Exemplifying this is the Phaneuf Plaintiffs' reliance on the Bankruptcy Court and District Court decisions in *Grumman Olson*, see n.43 above, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.), and 467 B.R. 694 (S.D.N.Y. 2012) (Oetken, J.), respectively.  I have no doubt whatever that in the subsequent proceedings before me in connection with the other 87 Ignition Switch Actions, Designated Counsel will place reliance on one or both of those cases, and that New GM will argue, in contrast, that in respects relevant here, those cases are distinguishable or wrongly decided.  (The GUC Trust may also wish to be heard on the *Grumman Olson* cases, though its likely position is less obvious.)  That is exactly why the Phaneuf Plaintiffs' contentions should not be heard on their own, and why I should not be making early judgments on the merits of the issues now—especially before Designated Counsel, New GM, the GUC Trust and any others with differing views have had a chance to be heard.

[51]  *See* n.12 above.

[52]  *See, e.g.*, June 24 Order at Section XI, regulating motion practice (providing that "[a]ny and all pending motions in the transferor courts are denied without prejudice, and will be adjudicated under procedures set forth in this Order and subsequent orders issued by this Court"); *id.* at Section XII, regulating discovery (providing that "[p]ending the development of a fair and efficient schedule, all outstanding discovery proceedings are suspended until further order of this Court, and no further discovery shall be initiated," but further providing that the June 24 Order

did.  Each of us recognizes the need for coordinated proceedings in a matter of this size

and complexity.

>    2.  *Sufficiently Serious Questions Going to the Merits*

But I don't need to, and should not, make a finding of likelihood of success on the

merits.  That would require me to decide too much at this time, to the potential prejudice

of the plaintiffs in the other 87 Ignition Switch Actions, New GM, and the GUC Trust.  I

need not address likelihood of success because, as I've previously noted, serious

questions going to the merits provide an alternate basis for the entry of a preliminary

injunction, when coupled with the requisite tipping of hardships.

New GM has easily shown serious issues going to the merits with respect to relief

from this Court, though it is premature for me to go beyond such a narrow finding.  It

now appears, from the preceding discussion, that at least many of the Phaneuf Plaintiffs'

claims were not assumed by New GM.  It's possible that the Phaneuf Plaintiffs or others

could eventually establish that a subset of their claims would fall outside of the Sale

Order's scope, but New GM has already made at least a prima facie showing that it did

not assume a significant portion of the Phaneuf Plaintiffs' claims.  Similarly, while we

know that other Ignition Switch Action plaintiffs will want to be heard on whether due

process concerns place constraints on New GM's ability to rely on the Sale Order, the

starting point is the Sale Order itself.  New GM has shown serious issues going to the

merits with respect to the protection it was granted under the express language of that

order, which would remain unless and until due process (or other) concerns make some

or all of the Sale Order's protections drop out of the picture.

---

would not "preclude any discovery that is agreed or ordered to facilitate matters in the Bankruptcy
Court, *provided that* to the extent any discovery is undertaken in the Bankruptcy Court, it shall be
coordinated with this Court.") (italics in original).

*3. Balance of Hardships*

Finally, I turn to the balance of hardships.   That too weighs in New GM's favor.

The hardship to New GM if it were forced to litigate against the Phaneuf Plaintiffs on one track, and the other 87 actions, on another, would be significant.  New GM would have to defend largely similar claims in multiple forums, thus exposing it to both unnecessary expense and the possibility of inconsistent results.  And New GM, the non-bankruptcy court and I would all be prejudiced by confusion with respect to which issues could be decided in the non-bankruptcy court, and which would have to be decided here.  There also could be prejudice to the plaintiffs in the other 87 Ignition Switch Actions, who might be affected (presumably not by *res judicata* or collateral estoppel, but still by *stare decisis*) by adverse rulings in the non-bankruptcy court.  And there would be significant prejudice to my case management needs, as the extensively negotiated coordinated mechanism for dealing with 88 separate actions, with coordinated briefing of threshold issues, was cut away.

By contrast, by being treated the same as the plaintiffs in the other 87 actions, the Phaneuf Plaintiffs would not be harmed in any material respect.  Their effort to proceed going it alone rests on the notion that another federal judge—here, Judge Furman— would consider it productive to allow one plaintiff group to move forward in its action while 87 others are stayed, pending the determination in this Court of critical threshold issues that will determine what claims may, and what claims may not, be asserted in light of the Sale Order.  That premise is unrealistic.

Reasons cited by the Multidistrict Panel in sending the Ignition Switch Actions to New York included its recognition that I "already [have] been called upon by both General Motors and certain plaintiffs to determine whether the 2009 General Motors

bankruptcy Sale Order prohibits plaintiffs' ignition switch defect lawsuits."[53]  Proceeding

without regard to the agreed-on mechanisms for determining those issues in this Court

would frustrate the purpose for which the Ignition Switch Actions were sent here.  And

there is little or no basis for the Phaneuf Plaintiffs' assumption (or hope) that Judge

Furman would deprive me of the ability to do my job.

To the contrary, Judge Furman has been highly sensitive to the Bankruptcy

Court's needs and concerns.  His first order provided that while he might appoint lead

and liaison counsel before I ruled, he would be open to consideration as to whether such

appointment should be amended if "the Bankruptcy Court rules that some, but less than

all, of the claims now pending here may be asserted."[54]  He asked counsel appearing

before him to address, among other things, "the extent to which proceedings in this Court

should proceed before rulings by the Bankruptcy Court, on the one hand, or should be

deferred pending such rulings, on the other."[55]  He provided, as I have, for an initial

suspension of discovery, but provided further that his directive would not "preclude any

discovery that is agreed or ordered to facilitate matters in the Bankruptcy Court, *provided*

*that* to the extent any discovery is undertaken in the Bankruptcy Court, it shall be

coordinated with this Court."[56]  And he expressly provided that matters addressed in his

order could be reconsidered "to the extent necessary or desirable to address any rulings

---

[53]    *JPML Decision*, --- F.Supp.2d at ---, 2014 U.S. Dist. LEXIS 79713, at *4, 2014 WL 2616819, at
*2.

[54]    June 24 Order Section IX.

[55]    *Id.* Section X(B).

[56]    *Id.* Section XII (italics in original).

by the Bankruptcy Court or any higher court exercising appellate authority over the Bankruptcy Court's decision."[57]

Given the respect evidenced by each of the Multidistrict Panel and Judge Furman of the Bankruptcy Court's responsibility to determine matters pending here, there is no reasonable basis for a conclusion that Judge Furman would want—or allow—the Phaneuf Plaintiffs' action, which has been added to the lengthy list of cases before him, to proceed on its own.

Thus, even if I had not already found that the Sale Order's injunctive provisions already apply, New GM would be entitled to a preliminary injunction in its favor until I've ruled on the Threshold Issues.

Conclusion

For the above reasons, the Phaneuf Plaintiffs' Ignition Switch Action, like the others, will be stayed pending further rulings in the matters before me, or my further order.

This decision is without prejudice to the rights of the plaintiffs in all of the other 87 Ignition Switch Actions, and of any other parties (including, without limitation, New GM and the GUC Trust) who might hereafter want to be heard on issues before me.

New GM is to settle an order in accordance with this ruling.

Dated: New York, New York          _s/Robert E. Gerber_____
       July 30, 2014               United States Bankruptcy Judge

---

[57]        *Id.* Section XVI.