# Exhibit F



**CORPORATION SERVICE COMPANY**

null / ALL
**Transmittal Number: 12777281**
Date Processed: 07/28/2014

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Rosemarie Williams<br>General Motors LLC<br>Mail Code 48482-038-210<br>400 Renaissance Center<br>Detroit, MI 48265 |

| | |
|---|---|
| **Entity:** | General Motors LLC<br>Entity ID Number  3113523 |
| **Entity Served:** | General Motors LLC |
| **Title of Action:** | Vest, Jason, C. vs. General Motors LLC; Delphi Automotive PLC; DPH-DAS LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Wrongful Death |
| **Court/Agency:** | Mercer County Circuit Court, West Virginia |
| **Case/Reference No:** | 14-C-437 |
| **Jurisdiction Served:** | West Virginia |
| **Date Served on CSC:** | 07/28/2014 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | WV Secretary of State on 07/23/2014 |
| **How Served:** | Certified Mail |
| Sender Information: | DiTrapano, Barrett, DiPiero, McGinley & Simmons, PLLC (East Charleston, WV)<br>304-342-0133 |
| **Client Requested Information:** | Year: 2005<br>Make: Chevrolet<br>Model: Cobalt<br>VIN: |

| | |
|---|---|
| **Notes:** | DiTrapano, Barrett, DiPiero, McGinley & Simmons, PLLC 604 Virginia Street, East Charleston, WV 25301<br>CSC Location document was served: Corporation Service Company 209 West Washington Street Charleston,<br>WV 25302 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305



**USPS CERTIFIED MAIL™**



9214 8901 1251 3410 0000 3133 56

**Natalie E. Tennant**
Secretary Of State
State Of West Virginia
**Phone:** 304-558-6000
866-767-8683
**Visit us online:**
www.wvsos.com

GENERAL MOTORS LLC
Corporation Service Company
209 WASHINGTON ST W
CHARLESTON, WV 25302-2348

**Control Number:** 28542

**Defendant:** GENERAL MOTORS LLC
209 WASHINGTON ST W
CHARLESTON, WV 25302-2348 US

**Agent:** Corporation Service Company

**County:** Mercer

**Civil Action:** 14-C-437-OA

**Certified Number:** 92148901125134100000313356

**Service Date:** 7/23/2014

I am enclosing:

**1 summons and amended complaint**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in your name and on your behalf.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in your name and on your behalf as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper, **not to the Secretary of State's office.***

Sincerely,

*Natalie E. Tennant*

Natalie E. Tennant
Secretary of State

**SUMMONS**

## IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

**JASON C. VEST**, as Administrator of the
**ESTATE OF KEISHA D. VEST,**

      Plaintiff,

v.

                                         Civil Action No. 14-C- **437-0A**
                                         Judge: **Omar Aboulhosn**

**GENERAL MOTORS, LLC,**
**DELPHI AUTOMOTIVE PLC,**
**DPH-DAS, LLC** f/k/a
**DELPHI AUTOMOTIVE SYSTEMS, LLC,** and
**RAMEY CHRYSLER-PLYMOUTH-DODGE, INC.,**
a West Virginia corporation,

      Defendants.
**To the above-named Defendant:**

**GENERAL MOTORS, LLC**
**c/o CORPORATION SERVICE COMP.**
**209 W WASHINGTON STREET**
**CHARLESTON, WV 25302**

      IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby Summoned and required

to serve upon **Robert M. Bastress III** Plaintiff's attorney, whose address is **P.O. Box 1631, Charleston,**

**West Virginia 25326-1631,** an answer, including any related counterclaim you may have, to the **Complaint**

filed against you, in the above-styled civil action, a true copy of which is herewith delivered to you. You are

required to serve your answer to the Complaint within thirty (30) days after service of this summons upon

you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for

the relief demanded in the Complaint, and you will be thereafter barred from asserting in another action any

claim you may have which must be asserted by counterclaim in the above-styled civil action.

Dated **July 2, 2014**

                                    **JULIE BALL**

                                  Clerk of Court

                                By    *Stacy Anderson*

*2014 JUL 23 AM 11:28*
*SECRETARY OF STATE*
*STATE OF WEST VIRGINIA*
*ACCEPTED FOR*
*SERVICE OF PROCESS*

AMENDED CIVIL CASE INFORMATION STATEMENT
CIVIL CASES

IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

I.     CASE STYLE:

Plaintiff(s)

Case #: 14-C-437

Judge Aboulhosn

**JASON C. VEST,** as Administrator of the
**ESTATE OF KEISHA D. VEST,**

vs.

| Defendant(s) | Days to Answer | Type of Service |
|---|---|---|
| **GENERAL MOTORS, LLC**<br>**c/o CORPORATION SERVICE COMP.**<br>**209 W WASHINGTON STREET**<br>**CHARLESTON, WV 25302** | 30 days | Secretary of State |
| **DELPHI AUTOMOTIVE PLC**<br>**Courteney Road**<br>**Hoath Way**<br>**Gillingham, Kent ME8 0RU**<br>**United Kingdom** | | |
| **DPH-DAS, LLC f/k/a**<br>**DELPHI AUTOMOTIVE SYSTEMS, LLC**<br>**5725 Delphi Drive**<br>**Troy, MI 48098** | 30 days | Secretary of State |
| **RAMEY CHRYSLER-PLYMOUTH-DODGE, INC.**<br>**a West Virginia corporation,**<br>**c/o THOMAS LILLY**<br>**1605 N. WALKER ST.**<br>**PRINCETON, WV 24740** | 30 days | Secretary of State |

Defendants.

Original and 1 copy of Amended Complaint furnished herewith.

| PLAINTIFFS: **JASON C. VEST,** as Administrator of the **ESTATE OF KEISHA D. VEST** DEFENDANTS: **GENERAL MOTORS, LLC, ET AL.** | CASE NUMBER: 14-C-437 |
|---|---|
| | |

## II.    TYPE OF CASE:

| TORTS | OTHER   CIVIL | |
|---|---|---|
| ☐  Asbestos | ☐  Adoption | ☐  Appeal from Magistrate Court |
| ☐  Professional Malpractice | ☐  Contract | ☐  Petition for Modification of Magistrate Sentence |
| ☐  Personal Injury | ☐  Real Property | ☐  Miscellaneous Civil |
| ☐  Product Liability | ☐  Mental Health | ■    Other |
| ☐  Other Tort | ☐  Appeal of Administrative Agency | ☐  Fraud or Conversion |

III.    JURY DEMAND:    ■ Yes    ☐ No
CASE WILL BE READY FOR TRIAL BY *(MONTH/YEAR):* 06/15

IV.    DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL ACCOMMODATIONS DUE TO A DISABILITY OR AGE?    ☐ YES    ☐ NO
IF YES, PLEASE SPECIFY:
☐ Wheelchair accessible hearing room and other facilities
☐ Interpreter or other auxiliary aid for the hearing impaired
☐ Reader or other auxiliary aid for the visually impaired
☐ Spokesperson or other auxiliary aid for the speech impaired
■ Other: ____Unknown at this time_____

Rudolph L. DiTrapano        (W.Va. Bar No. 1024)
Robert M. Bastress III        (W.Va. Bar No. 9616)

*Representing:*

*Firm:*        DiTRAPANO, BARRETT, DiPIERO, McGINLEY & SIMMONS, PLLC    ■ *Plaintiffs*  ☐ *Defendant*

*Address:*    P.O. Box 1631_____    ☐ *Cross-Complainant*

        Charleston, WV 25326-1631_____    ☐ Cross-Defendant

Telephone:    (304) 342-0133_____    Dated: July 15, 2014

*Signature*

## I. TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY ....................................... 1

II.     PARTIES, JURISDICTION & VENUE ................................... 2

III.    FACTS .......................................................... 4

        A       Background of the Defective Nature of the Ignition Switch ............. 4

        B.      Defendants Learn of Defect in 2001 and Continue to
                Conceal It Before Ms. Vest's Tragic Death in 2006 .................... 5

                i.      GM knew of the ignition switch's defect in 2001 ................. 5

                ii.     GM approved production of the ignition switch in 2002
                        despite knowing it did not meet design specifications ............. 6

                iii.    GM certainly understood the urgent need to
                        immediately correct the ignition switch defect no later than 2004. .. 7

                iv.     GM engineers proposed design changes in 2005
                        which were rejected by GM management at least
                        partly to save money ....................................... 8

                v.      Meanwhile, complaints and serious accidents continued to
                        accumulate which triggers NHTSA to begin investigating ........ 10

                vi.     Rather than implementing a recall and fixing the
                        defect, GM sent a service bulletin to GM dealers in
                        December 2005 telling them only to advise complaining
                        customers to take heavy items off their key rings ................ 11

                vii.    GM authorized a design change in April 2006,
                        but masked the existence and significance of the
                        change by keeping the part number the same ................... 12

        C.      Mrs. Vest's Tragic Death ........................................ 13

        D.      Defendants Continue to Learn of More Deaths and Injuries
                and Proceeded with Hiding the Defect until 2014 ..................... 13

i

i.    GM knew of and tracked multiple incidents
involving the ignition switch defect by 2007 and
avoided scrutiny by misleading NHTSA and the public .... 13

ii.    In 2009, GM opened yet another internal
(and *third)* investigation and still continued its
refusal to disclose the issues with the ignition switches ..... 15

iii.    GM testing in 2012 again confirmed the
widespread scope of the ignition switch defect ............ 15

iv.    In 2013, GM internally admits the ignition
switch design was defective ........................... 16

E.    *GM Finally Issues Recall and Publicly Admits the Ignition
Switch Design Defect in February 2014* ............................ 17

F.    *The suspensions, terminations, fines and further investigations
in the aftermath of the recalls* .................................... 18

IV. CLAIMS ........................................................ 20

V. RELIEF ......................................................... 25

ii

## IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

**JASON C. VEST,** as Administrator of the
**ESTATE OF KEISHA D. VEST,**

     Plaintiff,

v.
                               Civil Action No. 14-C- 437
                               Honorable Omar Aboulhosn

**GENERAL MOTORS, LLC,**
**DELPHI AUTOMOTIVE PLC,**
**DPH-DAS, LLC f/k/a**
**DELPHI AUTOMOTIVE SYSTEMS, LLC,** and
**RAMEY CHRYSLER-PLYMOUTH-DODGE, INC.,**
a West Virginia corporation,

     Defendants.

### AMENDED COMPLAINT

Plaintiff Jason Vest, as Administrator of the Estate of Keisha D. Vest, by counsel, alleges the following against Defendant General Motors, LLC ("GM"), Defendant Delphi Automotive PLC, Defendant DPH-DAS, LLC f/k/a Delphi Automotive Systems, LLC (collectively "Delphi"), and Defendant Ramey Chrysler-Plymouth-Dodge, Inc. ("Ramey"), a West Virginia resident corporation.

## I. INTRODUCTION AND SUMMARY

1.   *The cover up.*  This action stems from the defective ignition switch (internally dubbed the "switch from hell") in Chevrolet Cobalts and the well-publicized 13-year long, massive cover-up of such ignition switch defects by GM, Delphi, and its agents. The ignition switch defects caused the electrical systems in certain vehicles, including 2005 Chevy Cobalts, to lose power and prevented airbags from deploying. In 2014, GM "came clean" after 13 years, several internal investigations (in 2004, 2005, 2009, 2012), and a concealed part change and admitted this defect caused, at the very least, 13 deaths and many more injuries. The numbers of deaths and serious personal injuries caused by the defective ignition switch has continued to climb, and some have speculated the actual number is in the several hundreds.

2.   *The admission.*  In May 2014, GM admitted to the National Highway Traffic Safety Administration ("NHTSA") and other federal regulators it did not report the ignition switch defect in a timely manner, broke federal law, and thus GM paid the maximum fine of $35 million to the U.S. Department of Transportation. At a press conference announcing the fine, Transportation Secretary Anthony Foxx stated: "What GM did was break the law. They failed to meet their public-safety obligations." He further characterized GM's action as "[l]iterally, silence can kill."

3.  *The consequences.* It did just that in the case of Keisha D. Vest. On May 2, 2006, Mrs. Vest, a MRI technician and 26 year-old happily-married mother of a three year-old son and pregnant with the couple's second child, was on her way to work. Her brakes failed, and Mrs. Vest went through a stop sign when the car was struck by a tractor trailer at 6:02 a.m. The airbag in the 2005 Chevy Cobalt her husband had purchased just two weeks earlier did not deploy. As a consequence, she was killed, leaving behind a devastated family.

4.  *The cause - cost over safety.* New GM's CEO Marry Barra recently conceded: "Something went wrong with our process in this instance, and terrible things happened." She is right about that. These terrible things happened because Defendants were more concerned about saving money in costs - literally cents per vehicle – than it was about saving lives and protecting the people who trusted them the most, like the Vests. In a remarkable moment of candor, GM's CEO recently revealed, "the culture of the company at that time [in early 2006] had more of a cost-culture focus."

## II. PARTIES, JURISDICTION & VENUE

3.  Plaintiff Jason C. Vest is the administrator of the estate of his deceased wife, Keisha D. Vest. **(Exhibit 1)**. Plaintiff is and was at all times herein a West Virginia resident.

6.  Defendant GM is a Delaware corporation with its headquarters in Michigan. Through its various entities, it designed, manufactured, marketed, distributed and sold Chevrolet Cobalts in West Virginia. GM is registered with the West Virginia Secretary of State to conduct business in this State and does business in Mercer

2

County, West Virginia. As explained more fully below, the various GM entities were engaged in an ongoing cover-up of the ignition switch defects, and Defendant General Motors, LLC thus has successor liability to Plaintiff.

7.  Defendant Delphi Automotive PLC is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan. In 2002, GM began installing the then Delphi Corp.-manufactured ignition switches. The above-captioned Delphi Defendants (Delphi Automotive PLC and DPH-DAS, LLC f/k/a Delphi Automotive Systems, LLC) knew the ignition switches were defectively designed and did not meet GM's own design specifications, but nonetheless Delphi continued to manufacture and sell the defective ignition switches with the knowledge that they would be used in GM vehicles. Delphi also manufactured the ignition switch system after a 2007 change implemented by GM without reflecting a corresponding change in part number. As explained more fully below, the various Delphi entities were engaged in an ongoing cover-up of the ignition switch defects, and Defendants Delphi Automotive PLC and DPH-DAS, LLC f/k/a Delphi Automotive Systems, LLC thus have successor liability to Plaintiff.

8.  Defendant Ramey is a West Virginia corporation doing business in Mercer County, West Virginia. Plaintiff Jason Vest purchased the 2005 Chevy Cobalt in question from Defendant Ramey on April 20, 2006, less than two weeks before Keisha Vest's tragic death.

3

## III. FACTS

### A.    Background of the Defective Nature of the Ignition Switch

9.    The ignition switches have several common switch points, including "RUN" (or
"ON"), "OFF," and "ACC" ("accessory"). At the "run" position, the vehicle's motor
engine is running and the electrical systems are active. At the "accessory" position,
the motor is turned off, and electrical power is generally only supplied to the
vehicle's entertainment system. At the "off" position, both the vehicle's engine and
electrical systems are turned off. In most vehicles a driver must intentionally turn the
key in the ignition to move to these various positions. In short, these defective
ignition switches allowed the key to rotate in the ignition slot, for example, when
bumped, jostled, or in contact with a heavy amount of keys, thereby turning off the
engines and electrical power systems and preventing life-saving airbags from
deploying in a crash.

10.    The ignition switches installed in the 2005 Chevy Cobalts were not properly
manufactured to meet specifications for "torque performance," the ability of the
switch to hold the ignition key firmly in place during vehicle operation.

11.    Actually, the ignition switch systems are defective in, at least, two major respects.
First, as alluded to previously, the switches are simply weak. Because of a faulty
"detent plunger,"[1] the switch can inadvertently move from the "run" to the
"accessory" or "off" position. Second, because of the low position of the ignition
switch, the driver's knee can easily bump the key (or the hanging fob below the key)

---

[1] The "detent" is part of the ignition switch's inner workings that keeps the switch from
rotating from one setting to another unless the driver turns the key.

and cause the switch to inadvertently move from the "run" to the "accessory" or "off"

position. Both of these ignition switch defects can easily cause a 2005 Chevrolet

Cobalt's engine and electrical system to shut off, disabling the power steering and

power brakes and causing non-deployment of the vehicle's airbags in the event of a

crash.

12. GM has admitted vehicles it manufactured prior to 2007, including the Chevrolet

Cobalt, were all equipped with the same defective ignition switch manufactured by

Delphi.

13. Since 2001, GM sold millions of vehicles with ignition switches that were, and are,

prone to slipping out of the "on" or "run" position during operation to the "off" or

"accessory" position, thereby suddenly cutting power to the airbags, the power

steering and the breaking systems.

14. Further, the ignition switch defect can occur at any time during the normal operation

of the 2005 Chevrolet Cobalt, meaning the ignition can suddenly switch off while in

motion, leaving the driver unable to control the car.

**B.** *Defendants Learn of Defect in 2001 and Continue to Conceal It Before Ms.*
*Vest's Tragic Death in 2006.*

15. GM knew the ignition switches used in millions of vehicles were defective and

dangerous before those vehicles were even sold to the public.

**i.    GM knew of the ignition switch's defect in 2001.**

16. In a chronology of events GM filed with NHTSA on March 11, 2014, GM admitted

it first became aware of an issue with the defective ignition switches in 2001.

Remarkably, GM did not disclose the fact that it had observed the ignition switch

problem in 2001, but rather waited until March 2014, 13 years later.

5

17.    As background, in the late 1990's and early 2000's, GM and one of its suppliers,

Eaton Mechatronics, finalized the specifications for the ignition switch for the Saturn

Ion. Eaton later sold its Vehicle Switch/Electronic Division to Delphi Automotive

Systems on March 31, 2001.

18.    Shortly thereafter, on July 31, 2001, a GM engineer in Michigan encountered a

problem with the ignition switch while driving a prototype of the 2003 Saturn Ion

and indicated as much in a pre-production report.

19.    Indeed, GM engineers' personal experience in having problems with the ignition

switch was well-documented. In a section of an internal report, titled "Root Cause

Summary," GM engineers identified "two causes of failure," namely "[l]ow contact

force and low detent plunger force[,]" which GM later acknowledged is another way

of saying the ignition switch was prone to shifting out of the "run" position into the

"accessory" or "off" positions.

20.    Indeed, there are two engineering drawings which show GM had considered designs

for both a longer and shorter detent plunger and spring part in 2001. These have been

called the "smoking gun" documents by Clarence Ditlow, the executive director of

the Center for Auto Safety, because they demonstrate Defendants' awareness of the

problem.

ii.    **GM approved production of the ignition switch in 2002 despite
knowing it did not meet design specifications.**

21.    In February 2002, Delphi asked GM to approve production for the ignition switch

and submitted a formal Production Part Approval Process ("PPAP") request.

22.    Even though testing revealed a defect, GM nevertheless approved the PPAP request.

6

### iii.    GM certainly understood the urgent need to immediately correct the ignition switch defect no later than 2004.

23.    In 2003, GM received complaints regarding the loss of power while driving 2003 Saturn Ions.

24.    In 2003, a GM service technician witnessed a car stall after the ignition turned off while driving.

25.    An internal inquiry was opened, and then closed, without any further action taken. At the time, GM did not publicly disclose the incident.

26.    In October 2004, around the time of the launch of its 2005 Chevrolet Cobalt (a sibling to the Ion), GM internally documented incidents in which GM engineers verified that the ignition switch was turned to the "off" position and the Cobalt thus lost engine power as a result of being grazed by the driver's knee.

27.    GM recognized this incident was not a "fluke" because its employees "were able to replicate this phenomenon during test drives." GM engineers opened an investigation into the causes and possible solutions for this problem. They quickly determined that the inadvertent shut down problem was likely caused by the "low key cylinder torque effect" – the same cause later described in the 2014 recall.

28.    In November 2004, GM initiated an engineering (and the *first* formal) investigation, which it referred to as Problem Resolution Tracking System N172404 ("2004 PRTS"). One of the aims of the 2004 PRTS was to analyze the complaints that GM vehicles, particularly the 2005 Chevrolet Cobalt, "can be keyed off with knee while driving."

### iv.    GM engineers proposed design changes in 2005 which were rejected by GM management at least partly to cut costs.

29.    In February 2005, as part of the same 2004 PRTS, GM engineers met to analyze how to address the ignition switch defect. GM managing engineer, Ray DeGiorgio, told other GM engineers it was "close to impossible to modify the present ignition switch[.]"

30.    Nevertheless, GM engineers investigated a possible key slot change as "containment" of the defect, including development cost and time estimates.

31.    Despite the clear problem, GM took no further action at the time. By March 2005, a GM Cobalt Program Engineering Manager issued a directive to close the 2004 investigative PRTS "with no action." GM ultimately declined to implement any of the potential remedies, citing cost considerations.

32.    In March 2005, GM engineer, Blendi Sullaj, noted: "None of the solutions represents an acceptable business case."

33    A GM internal document indicates the design change was refused because of (1) money, (2) time, and (3) questionable effectiveness of the replacement. In terms of the first reason, the GM internal document indicated the "tooling cost and piece price are too high."

34.    Simply put, GM avoided taking action on this critical safety issue in order to cut costs.

35.    In sum, the ignition switch problem was neither fixed nor disclosed to the public in 2004-2005, and the 2005 model Chevrolet Cobalt was launched with the same defective ignition switch that was not recalled until 2014.

36. On May 17, 2005, PRTS N182276 ("2005 PRTS") was opened to analyze the ignition switch in the 2005 Chevrolet Cobalt following customer complaints that the "vehicle ignition will turn off while driving."

37. In the 2005 PRTS, GM acknowledged this issue was the subject of the 2004 PRTS and that the issue was being "reopened" in a *second* investigation.

38. GM engineers proposed changing the key ring slot to a hole and smaller key ring.

39. GM originally approved this proposal, but later canceled it and did not proceed with the design change.

40. In June 2005 during the *second* GM investigation/PRTS, no change in the defective switch was ultimately implemented because the "business case [was] not supported" to re-design the part.

41. On June 14, 2005, Delphi's Senior Project Manager, John Coniff, stated in a confidential email, "Ray is requesting this information. . . . Cobalt is blowing up in [GM's] face in regards to the car turning off with the driver's knee."

42. Again, Defendants did nothing at the time to notify the public of the ignition switch defect that existed in millions of GM vehicles.

43. A group of GM engineers in September 2005 discussed (via email) postponement until Fall 2008 of a proposal to implement a new switch on the Cobalt, Ion and companion vehicles because the change would add $400,000 in retooling cost, plus an additional 90 cents per vehicle.

44. In September 2005, GM engineer, John R. Hendler, sent an email with the subject: "No new Delta/Kappa ign switch for MY 08," to high ranking GM personnel, suggesting cost was the reason why GM refused to fix the defect.

9

45.    Ray DeGiorgio responded privately to GM's Steven Kirkman, stating: "It's not over

yet . . . read below [referring to Hendler's email]."

46.    Around the same time, in September 2005, GM's engineer, Craig St. Pierre, stated

the following in an internal company document:

> "Detent efforts on ignition switch are too low
> allowing key to be cycled to off position
> inadvertently. Changes to the key can be made to
> reduce the moment which can be applied to key by
> key ring/keys. This will assist in limiting the issue but
> will not completely eliminate it. Changes to the
> switch will not be forthcoming from electrical group
> until MY07.

47.    Lori Queen, an executive overseeing GM's small car team, challenged the delay,

saying, "I'm not sure it's ok to wait."

### v.    Meanwhile, complaints and serious accidents continued to accumulate which triggers NHTSA to begin investigating.

48.    In 2005, GM continued to receive reports of Cobalt engines inadvertently shutting

off during vehicle operation.

49.    Internal GM documents show it received at least 248 reports of air bag non-

deployment in 2005 models alone.

50.    In July 2005, 16 year-old Maryland resident Amber Marie Rose was killed when her

2005 Chevrolet Cobalt crashed and the airbags failed to deploy. An investigator

hired by Ms. Rose's family determined that the airbags could not deploy because at

the time of the crash the ignition switch was off and had shut down the vehicle's

electrical system. After this July 2005 fatality involving a Chevrolet Cobalt,

NHTSA's Special Crash Investigations Program conducted a Special Crash

Investigation ("SCI") of the incident on August 15, 2005. The investigation found

the front airbags did not deploy because, according to the event data recorder, the "vehicle power mode status" of the ignition switch had shifted from "on" to "accessory."

51.    In September 2005, GM was informed that Ms. Rose's death was linked to the defective ignition switches. Previously, GM's legal department had opened a file, and the case was subsequently settled.

> **vi.    Rather than implementing a recall and fixing the defect, GM sent a service bulletin to GM dealers in December 2005 telling them only to advise complaining customers to take heavy items off their key rings.**

52.    In December 2005, GM sent its dealers a technical service bulletin (05-02-35-007) informing them about a potential ignition switch issue and told them to advise owners to remove "unessential items from their key chains."

53.    To be clear, the service bulletin did not accurately identify the danger posed by the ignition switch defect. For example, there was no mention in the service bulletin of the possibility of airbag non-deployment or engine failure. Moreover, the service bulletin simply recommended that GM dealers tell persons who brought their vehicles in to remove heavy items from their key rings.

54.    That is, GM told dealers if customers brought their vehicles in for service, after experiencing a sudden loss of power during operation, those customers should be provided with key ring "inserts" to change the shape of the ignition key hole. This was the "fix" GM had earlier declined to implement globally.

55.    GM did not disclose the same to the public at large or to regulators. Nor did it implement a system-wide fix.

11

vii.    **GM authorized a design change in April 2006, but masked the existence and significance of the change by keeping the part number the same.**

56.    After knowing about the defect for some time, Delphi, finally in January 2006, proposed a change to the design of the ignition switch which would increase its torque performance by installing a new detent plunger and spring to prevent the key from slipping.

57.    In April 2006, GM managing engineer Ray DeGiorgio authorized Delphi to implement changes to fix the ignition switch defect.

58.    Delphi thus began providing the re-designed ignition switch to GM at some point for use in 2007 model vehicles.

59.    Tellingly, the part number on the defective switches was not changed. This was done to conceal the problem and significance of the part change. Regarding the use of the same part number for the different ignition switch, CEO Marry Barra's later 2014 Congressional testimony was unequivocal: "it is not an appropriate practice to do so . . . [i]t's crucial, it's engineering principle 101 to change the part number when you make a change."

60.    Acknowledging the readily-apparent attempt by GM to hide dangerous defects because of the potential cost to the company, Barra stated before Congress in 2014: "I find it completely unacceptable that a part would be changed without a part number . . . the culture of the company at that time had more of a cost-culture focus."

### C.    Mrs. Vest's Tragic Death

61.    Meanwhile, on April 20, 2006, Jason Vest purchased a 2005 Chevy Cobalt from Defendant Ramie in Princeton, Mercer County, West Virginia.

62.    Jason Vest bought the car for his 26 year-old wife, Keisha Dawn Vest, to drive back-and-forth to work in Mt. Airy, North Carolina, where she worked as an MRI technician.

63.    On the morning of May 2, 2006, Keisha D. Vest was on her way to work when she lost control of the 2005 Chevrolet Cobalt and went through a stop sign. The car was struck by a tractor trailer driven by Freedom Logistics truck driver, Marvin A. Edwards.

64.    Mrs. Vest was killed in the accident.

65.    According to the death certificate, the immediate cause of death was a "closed head injury" and other causes listed were "chest injury" and "auto accident."

66.    Pictures from the accident clearly demonstrate the air bag did not deploy.

67.    Had the air bag deployed, Keisha Vest would have survived.

68.    Mrs. Vest was pregnant at the time of her death and left behind a then 3 year-old son.

69.    Because the Chevrolet Cobalt was totaled, Mr. Vest was sent a bill for the remaining balance on the car.

### D.    Defendants Continue to Learn of More Deaths and Injuries and Proceeded with Hiding the Defect until 2014.

####    i.    GM knew of and tracked multiple incidents involving the ignition switch defect by 2007 and avoided scrutiny by misleading NHTSA and the public.

70.    Defendants received news of yet another accident involving a 2005 Chevy Cobalt. This one occurred in Wisconsin in October 2006.

13

71.    Sometime in October 2006, GM updated its previous December 2005 product service bulletin, but again, it failed to acknowledge the ignition switch defect and continued to blame fatalities and serious injuries on individual drivers.

72.    In March 2007, NHTSA investigators met with GM and informed it of Amber Rose's fatal accident on July 29, 2005, where the airbag did not deploy in the collision and data retrieved from the car's sensing and diagnostic module ("SDM") indicated that, at the time of the crash, the car's ignition was in the "accessory" position, rather than the "on" position.

73.    In April 2007, the NHTSA report stated this "crash is of special interest because the vehicle was equipped with . . . dual state air bags that did not deploy" and the ignition switch was in "accessory" mode at the time of impact.

74.    In August 2007, GM met with its SDM supplier, Continental, to review data from crashes involving 2005 Chevrolet Cobalts where the airbags failed to deploy.

75.    In September 2007, NHTSA proposed an investigation into "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion" vehicles. The "issue was prompted by a pattern of reported non-deployments" in vehicle owner questionnaire "complaints that was first observed in early 2005." NHTSA had discussed this with GM, and GM assured it there was not a "specific problem pattern." An email from NHTSA chief investigator, Greg Magno, noted:

> Notwithstanding GM's indications that they see no specific problem, [Defects Assessment Division] DAD perceives a pattern of non-deployment in these vehicles that does not exist in their peers and that their circumstances are such that, in our engineering judgment, merited a deployment, and that such a deployment would have reduced injury levels or saved lives.

14

76.    GM tried to avoid the investigation by claiming it was unaware of any problems in

its vehicles.

    ii.    **In 2009, GM opened yet another internal (and *third*) investigation
and still continued its refusal to disclose the issues with the
ignition switches.**

77.    In February 2009, GM opened another crash investigation report, which found that

"customers with substantially weighted key chains/additional keys hanging from

ignition key have experienced accidental ignition shut-off."

78.    On May 15, 2009, GM engineers met again with representatives of its SDM supplier,

Continental.  During this meeting, GM was told that, in at least a substantial number

of instances, the crashes where airbags failed to deploy involved ignitions switched

that shifted to the "accessory" position from the "on" position.

79.    In June 2009, General Motors Corp. ("Old GM") finalized its Chapter 11 bankruptcy

petition without any mention of the well-known problems with the defective ignition

switches.

    iii.    **GM testing in 2012 again confirmed the widespread scope of the
ignition switch defect.**

80.    In May 2012, GM engineers' testing of 44 vehicles further confirmed the defective

nature of the ignition switches in 2003-2007 model/year vehicles.

81.    In September 2012, GM had a group of special engineers assigned to find the root

cause of an engineering defect, called a "Red X Team," examine Chevrolet Cobalts

following accidents where the ignition switch was found in the "accessory" or "off"

position.

82.    In an email from October 2012, with the subject, "2005-7 Cobalt and Ignition Switch

Effort," Ray DeGiorgio wrote the following to fellow GM colleague, Brian Stouffer:

15

"If we replaced switches on ALL the model years, i.e.,
2005, 2006, 2007 the piece price would be about
$10.00 per switch. This cost is based on volume of
1.5 units total."

iv.     **In 2013, GM internally admits the ignition switch design was
defective.**

83.    In April 2013, GM internally acknowledged there was a difference between the
ignition switch parts in later model year Chevy Cobalts as compared with the 2003-
2007 model/year vehicles.

84.    GM hired an outside engineering firm (the *fifth* investigation) which further
confirmed that the earlier ignition switches did not meet GM's own design
specifications. The newer vehicles with the modified ignition switches, however,
performed consistent with GM's specifications.

85.    Notwithstanding GM's abundant knowledge of the ignition switch defect, its public
statements and litigation posture was evasive and contrarian. For example, in May
2013, GM's Brian Stouffer testified (in the case of *Melton v. GM*, where a Georgia
woman was killed in a 2010 crash in which she was driving a 2005 Chevrolet Cobalt)
that the performance of the ignition switch in the 2005 Cobalt as compared to that of
the 2008 Cobalt was not substantially different.

86.    Likewise, at a deposition in 2013, Ray DeGiorgio testified that he "was not aware of
the detent plunger switch change" and "certainly did not approve [such] . . . a design
change." He further averred, "if any such change was made, it was made without
[his] knowledge and authorization." Later, during U.S. Senate questioning in 2014,
GM CEO Marry Barra acknowledged, "the data that's been put in front of me
indicates that [DeGiorgio lied under oath in that deposition], but I'm waiting for the

full investigation." After the report from investigation conducted by GM-retained lawyer Anton Valukas was issued in June 2014, DeGiorgio was fired.

87.    GM re-started its internal investigation – number *four* at least! – after the plaintiff's expert in *Melton*, Mark Hood, noticed that the detent plunger and spring had both gotten longer.[2] GM and Delphi were now caught in their lie.

88.    In October 2013, GM received documentation from Delphi confirming that a change to the ignition switch in the Cobalt and other vehicles was made in April 2006.

89.    GM's Brian Stouffer responded to Delphi acknowledging that the ignition switch in earlier Cobalts was different than the switch in later Cobalt vehicles.

90.    Delphi replied that GM had authorized it to make the change back in 2006 but the part number had remained the same.

91.    Ultimately, Defendants could no longer conceal the ignition switch defect.

   **E.    GM Finally Issues Cobalt Recall and Publicly Admits the Ignition Switch Design Defect in February 2014.**

92.    After meetings in December 2013 and January 2014, GM decided to conduct a recall of the model/year 2005-2007 Chevy Cobalts.

93.    On February 7, 2014, GM told NHTSA that it determined a defect existed in the 2005-2007 model/year Chevrolet Cobalts, among others.

94.    On February 13, 2014, GM finally announced a recall of 2005-2007 model/year Chevrolet Cobalts, among others, to address the ignition switch defect.

---

[2] As alluded to previously, these two internal ignition parts – the detent plunger and spring – make a key less likely to slip from the "on" to the "accessory" position while a vehicle is being driven.

95.    The uncovering of GM's misconduct finally in 2014 has thus far led to a total of more than 34 recalls of 13.9 million GM vehicles in the United States between February and June 2014.

96.    During her recent testimony before Congress, GM CEO Marry Barra admitted, "I agreed, it took way too long for this to come to the attention and to do the recall . . . . It is tragic that there has [*sic*] been lives lost and lives impacted with this event."

97.    Throughout all of the events described from 2001 to 2014, Defendants concealed the defective and dangerous nature of the ignition switch.

98.    It was only at the time GM made its understanding of defective nature of the ignition switch in 2014 that Jason Vest and other members of the family of Keisha D. Vest discovered that the ignition switch in the 2005 Chevrolet Cobalt driven by Mrs. Vest at the time of her death was defective.

F.    *The suspensions, terminations, fines and further investigations in the aftermath of the recalls.*

99.    In May 2014, GM paid the maximum fine of $35 million to the U.S. Department of Transportation for its failure to adequately address the defective ignition switches.

100.    Reports have already suggested that the number of crashes and fatalities associated with the defects is likely much higher than the 13 deaths and many more injuries GM confirmed originally as being directly attributable to the defective ignition switches.

101.    It has also recently surfaced that there was an internal culture at GM designed to downplay problems.  For example, a slide presentation demonstrated that GM workers were told to avoid words like "defect," "crippling," "serious," "explode," "always," "bad," "deathtrap," and "widowmaker."

18

102.    In early April 2014, Ray DeGiorgio and Gary Altman (the program engineering manger for the Cobalt and Ion) were originally put on paid leave by GM.

103.    On June 6, 2014, GM fired 15 employees, including DeGiorgio and Altman, for their involvement in fatally flawed ignition switches. According to media reports, the list also includes Michael Robinson, vice president for regulatory affairs; Gary Kent, general director of vehicle safety and crashworthiness; Carmen Benavides, former director of product investigations, safety regulations and certification, field performance; Bill Kemp, top recall lawyer; Lawrence Buonomo, head of product litigation in GM's legal department; Jennifer Sevigny, in-house lawyer who headed GM's field product assessment group; Ronald Porter, in-house lawyer; and Jaclyn Palmer, in-house lawyer.

104.    As evident from the preceding paragraph, GM's legal department has justifiably come under scrutiny. Sometime before the ignition switch defects became public, GM quietly paid $5 million to settle an ignition-related lawsuit, and this fact was well known to its legal department. According to the findings of an internal company inquiry released in June 2014, "secrecy ruled" in the GM legal department. GM's legal department has been characterized as taking "actions that obscured the deadly flaw, both inside and outside the company."

105.    In Spring/Summer 2014, CEO Mary Barra has acknowledged that the company has a "moral responsibility" to victims, but GM President Dan Ammann hinted that GM would fight lawsuits for crash victims who elect not to accept whatever settlements GM chooses to offer in its claims process.

19

106.  Members of Congress have called for criminal probes of Defendants' misconduct, and according to a *Wall Street Journal* article, federal prosecutors in New York have issued grand jury subpoenas. Defendant Delphi acknowledged it has received a subpoena and has turned over documents relating to the production and design of ignition switches. Defendant GM previously disclosed the Justice Department probe.

## IV. CLAIMS

### (COUNT I - PRODUCTS LIABILITY)

107.  Plaintiff re-alleges and incorporates by reference the previous allegations in this Complaint.

108.  Defendants either manufactured or sold Plaintiff the defective parts and defective vehicle. In testimony before Congress, NHTSA's acting administrator, David Friedman, explained the ignition switch was "very clearly" a defect and "was a defect that represents an unreasonable risk to safety." Defendants have essentially admitted as much.

109.  The 2005 Chevrolet Cobalt operated by Keisha D. Vest at the time of her fatal accident was defective in, *inter alia*, the following respects: (a) the ignition switch's detent plunger and spring were too short, (b) the placement of the ignition switch on the vehicle was inherently dangerous, (c) the ignition switch was inadequately protected from forces of foreseeable, inadvertent driver contact, and (d) the defect was not adequately disclosed to the public, including Keisha D. Vest, such that she could have taken adequate precautions to protect herself.

110.  The ignition switch is not an automotive component that Plaintiff would or should

20

expect will deteriorate or break down after normal wear and tear, thereby triggering the need for replacement. This is particularly true, where, as here, the Vests purchased the car only weeks before Mrs. Vest was killed.

111. The defects in the 2005 Chevrolet Cobalt proximately and directly caused Mrs. Vest's death. Defendants are jointly and severally liable to Plaintiff for those damages.

112. At the time of the transition to their current corporate form, the GM and Delphi Defendants were in the midst of manufacturing a product that is known to create serious health hazards, and these Defendant successor corporations continued to produce the same product in the same manner. According, Defendants GM and Delphi are liable for punitive damages for liabilities incurred by the predecessor company in its manufacture of such product. Syl. Pt. 4, *Davis v. Celotex Corp.*, 187 W. Va. 566, 420 S.E.2d 557 (1992).

### (COUNT II - NEGLIGENCE)

113. Plaintiff re-alleges and incorporates by reference the previous allegations in this Complaint.

114. Defendants owed a duty to Plaintiff to exercise reasonable care in the design, manufacture, and sale of the 2005 Chevrolet Cobalt so as to render it free from defects and to make it reasonably safe for its foreseeable usage and users and fit for its intended purpose.

115. Defendants breached this duty in, *inter alia*, the following ways: (a) putting the defective 2005 Chevrolet Cobalt in the stream of commerce and failing to correct the defects known to the vehicle, (b) failing to inspect the vehicle to eliminate the

21

dangerous and defective conditions, (c) failing to warn of the well-known dangers of this vehicle, and (d) failing to comply with the standard of reasonable safeness, *etc.*

116.    Defendants' breaches of its duties proximately and directly caused Plaintiff to suffer damages.

## (COUNT III - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

117.    Plaintiff re-alleges and incorporates by reference the previous allegations in this Complaint.

118.    The ignition switch was supplied by Delphi to GM for its 2005 Chevrolet Cobalt manufactured by GM. The 2005 Chevrolet Cobalt was then sold by Defendant Ramey to the Vests with an implied warranty of merchantability and fitness. Defendants impliedly warranted that the subject vehicle was fit for the ordinary purpose for which it was sold.

119.    Plaintiff relied on Defendants' implied warranty of merchantability and fitness.

120.    Defendants breached the implied warranty of merchantability and fitness in that this vehicle was not fit for the ordinary purpose for which it was sold.

121.    As a consequence of Defendants' breach, Plaintiff suffered damages.

## (COUNT IV - FRAUD, FRAUDULENT MISREPRESENTATION, & FRAUDULENT CONCEALMENT)

122.    Plaintiff re-alleges and incorporates by reference the previous allegations in this Complaint.

123.    Among other things, Defendants GM and Delphi made the following fraudulent misrepresentations and omissions : (a) assured regulators and customers that a recall was not necessary, (b) hid a change to the defective ignition switch by failing to

22

adopt a new part number, (c) sent out a service bulletin in October 2005 (prior to

Mrs. Vest's death) which masked the dangerous and defective nature of the ignition

switch by failing to refer to potential airbag non-deployment or engine failure, and

(d) gave false testimony at depositions about the serious danger and defective nature

of the ignition switch and the subsequent change in design, *etc.*

124.  As described in more detail in the paragraphs above, Defendants committed

fraudulent acts or induced others to commit fraudulent acts.

125.  Those fraudulent statements referred to in the paragraphs above were false.

126.  Had those fraudulent statements not been made to, or those omissions and pertinent

concealed facts not been hidden from Plaintiff, Mrs. Vest would certainly not have

operated the defective 2005 Chevrolet Cobalt, which ultimately caused her untimely

and tragic death.

127.  In that sense, Plaintiff relied on the statements referred to in these paragraphs above.

128.  With respect to the fraudulent concealment component, the above-described facts

were made by GM and Delphi, who had knowledge of these facts, a duty to disclose

them, and an intention to mislead.

129.  As a consequence of Defendants' fraudulent misrepresentations, omissions and

concealment, Plaintiff suffered damages.

## (COUNT V - VIOLATIONS OF WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT ("WVCCPA"))

130.  Plaintiff re-alleges and incorporates by reference the previous allegations in this

Complaint.

131.  Under the WVCCPA, *W.Va.Code* § 46A-6-104 prohibits the use of unfair or

23

deceptive act or practices in any trade or commerce.

132.    West Virginia Code § 46A-6-102(7) states,

"Unfair methods of competition and unfair or deceptive acts or
practices" means and includes, but is not limited to, any one or more
of the following:

**** 

(E) Representing that goods or services have
sponsorship, approval, characteristics, ingredients,
uses, benefits or quantities that they do not have or
that a person has a sponsorship, approval, status,
affiliation or connection that he does not have;

****

(G) Representing that goods or services are of a
particular standard, quality or grade, or that goods are
of a particular style or model if they are of another;

****

(L) Engaging in any other conduct which similarly creates a
likelihood of confusion or of misunderstanding;

(M) The act, use or employment by any person of any
deception, fraud, false pretense, false promise or
misrepresentation, or the concealment, suppression or
omission of any material fact with intent that others
rely upon such concealment, suppression or omission,
in connection with the sale or advertisement of any
goods or services, whether or not any person has in
fact been misled, deceived or damaged thereby[.]

133.    Defendants' committed unfair deceptive acts or practices in violation of W. Va. Code

§ 46A-6-104.

134.    These unfair or deceptive acts or practices caused Plaintiff to suffer damages,

including those statutory damages provided by the WVCCPA.

24

## V. RELIEF

Plaintiff Jason C. Vest, the Administrator and Personal Representative of the Estate of Keisha D. Vest (and their then unborn child),[3] decedent's son, decedent's parents, and such others as are within the purview of the Wrongful Death Act, have suffered damages and are entitled to recover from Defendants all damages permitted by law as a result of the wrongful death of Keisha D. Vest (and her unborn child), including, but not limited to:

(a)    Decedents' pain and suffering prior to death;

(b)    Decedents' loss of income;

(c)    Decedents' medical expenses;

(d)    Beneficiaries' sorrow, mental anguish, and solace, including loss of society, companionship, comfort, guidance, kindly offices, and advice of the decedent, Keisha D. Vest (and her unborn child);

(e)    Beneficiaries' loss of services, protection, care, and assistance provided by the decedent, Keisha D. Vest (and her unborn child);

(f).    Reasonable funeral expenses; and

In addition to these and other compensatory damages, Plaintiff seeks to recover the following from Defendants:

(g)    Attorney fees and costs;

(h)    ***Punitive Damages;***[4]

(i)    Statutory Damages (under the WVCCPA, for example); and

(j)    All other relief this Court deems just and proper.

---

[3]*See* Syl. Pt. 2, *Farley v. Sartin*, 195 W. Va. 671, 466 S.E.2d 522 (1995).

[4] *See supra* ¶ 112.

**PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY.**

JASON C. VEST, as Administrator of the
THE ESTATE OF KEISHA D. VEST,
—By Counsel—

Rudolph L. DiTrapano          (W.Va. Bar No. 1024)
Robert M. Bastress III          (W.Va. Bar No. 9616)
**DiTRAPANO, BARRETT, DiPIERO,**
**McGINLEY & SIMMONS, PLLC**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133 (phone)
(304) 342-4605 (fax)
rob.bastress@dbdlawfirm.com

26

# IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

**FILED**

**JUL 0 2 2014**

JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

**JASON C. VEST**, as Administrator of the
**ESTATE OF KEISHA D. VEST**,

        Plaintiff,

v.

Civil Action No. 14-C- 437-OA
Judge: Umar Abbulhosn

**GENERAL MOTORS, LLC**,
**DELPHI AUTOMOTIVE PLC**,
**DPH-DAS, LLC** f/k/a
**DELPHI AUTOMOTIVE SYSTEMS, LLC**, and
**RAMEY CHRYSLER-PLYMOUTH-DODGE, INC.**,
a West Virginia corporation,

        Defendants.

## COMPLAINT

# I. TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PARTIES, JURISDICTION & VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A    Background of the Defective Nature of the Ignition Switch . . . . . . . . . . . . . 4

      B.   Defendants Learn of Defect in 2001 and Continue to
           Conceal It Before Ms. Vest's Tragic Death in 2006 . . . . . . . . . . . . . . . . . . . 5

           i.    GM knew of the ignition switch's defect in 2001 . . . . . . . . . . . . . . . . 5

           ii.   GM approved production of the ignition switch in 2002
                 despite knowing it did not meet design specifications . . . . . . . . . . . . 6

           iii.  GM certainly understood the urgent need to
                 immediately correct the ignition switch defect no later than 2004. . . 7

           iv.   GM engineers proposed design changes in 2005
                 which were rejected by GM management at least
                 partly to save money . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

           v.    Meanwhile, complaints and serious accidents continued to
                 accumulate which triggers NHTSA to begin investigating . . . . . . . . 10

           vi.   Rather than implementing a recall and fixing the
                 defect, GM sent a service bulletin to GM dealers in
                 December 2005 telling them only to advise complaining
                 customers to take heavy items off their key rings . . . . . . . . . . . . . . . 11

           vii.  GM authorized a design change in April 2006,
                 but masked the existence and significance of the
                 change by keeping the part number the same . . . . . . . . . . . . . . . . . . . 12

      C.   Mrs. Vest's Tragic Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      D.   Defendants Continue to Learn of More Deaths and Injuries
           and Proceeded with Hiding the Defect until 2014 . . . . . . . . . . . . . . . . . . . . 13

i.   GM knew of and tracked multiple incidents
     involving the ignition switch defect by 2007 and
     avoided scrutiny by misleading NHTSA and the public  . . . . 13

ii.  In 2009, GM opened yet another internal
     (and *third)* investigation and still continued its
     refusal to disclose the issues with the ignition switches  . . . . . 15

iii. GM testing in 2012 again confirmed the
     widespread scope of the ignition switch defect  . . . . . . . . . . . 15

iv.  In 2013, GM internally admits the ignition
     switch design was defective  . . . . . . . . . . . . . . . . . . . . . . . . . . 16

E.   *GM Finally Issues Recall and Publicly Admits the Ignition
     Switch Design Defect in February 2014*  . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

F.   *The suspensions, terminations, fines and further investigations
     in the aftermath of the recalls*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV. CLAIMS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V. RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Plaintiff Jason Vest, as Administrator of the Estate of Keisha D. Vest, by counsel, alleges the

following against Defendant General Motors, LLC ("GM"), Defendant Delphi Automotive PLC,

Defendant DPH-DAS, LLC f/k/a Delphi Automotive Systems, LLC (collectively "Delphi"), and

Defendant Ramey Chrysler-Plymouth-Dodge, Inc. ("Ramey"), a West Virginia resident corporation.

## I. INTRODUCTION AND SUMMARY

1.    *The cover up.* This action stems from the defective ignition switch (internally

dubbed the "switch from hell") in Chevrolet Cobalts and the well-publicized 13-year

long, massive cover-up of such ignition switch defects by GM, Delphi, and its agents.

The ignition switch defects caused the electrical systems in certain vehicles,

including 2005 Chevy Cobalts, to lose power and prevented airbags from deploying.

In 2014, GM "came clean" after 13 years, several internal investigations (in 2004,

2005, 2009, 2012), and a concealed part change and admitted this defect caused, at

the very least, 13 deaths and many more injuries. The numbers of deaths and serious

personal injuries caused by the defective ignition switch has continued to climb, and

some have speculated the actual number is in the several hundreds.

2.    *The admission.* In May 2014, GM admitted to the National Highway Traffic Safety

Administration ("NHTSA") and other federal regulators it did not report the ignition

switch defect in a timely manner, broke federal law, and thus GM paid the maximum

fine of $35 million to the U.S. Department of Transportation. At a press conference

announcing the fine, Transportation Secretary Anthony Foxx stated: "What GM did

was break the law. They failed to meet their public-safety obligations." He further

characterized GM's action as "[l]iterally, silence can kill."

3.  *The consequences.* It did just that in the case of Keisha D. Vest. On May 2, 2006, Mrs. Vest, a MRI technician and 26 year-old happily-married mother of a three year-old son and pregnant with the couple's second child, was on her way to work. Her brakes failed, and Mrs. Vest went through a stop sign when the car was struck by a tractor trailer at 6:02 a.m. The airbag in the 2005 Chevy Cobalt her husband had purchased just two weeks earlier did not deploy. As a consequence, she was killed, leaving behind a devastated family.

4.  *The cause - cost over safety.* New GM's CEO Marry Barra recently conceded: "Something went wrong with our process in this instance, and terrible things happened." She is right about that. These terrible things happened because Defendants were more concerned about saving money in costs - literally cents per vehicle – than it was about saving lives and protecting the people who trusted them the most, like the Vests. In a remarkable moment of candor, GM's CEO recently revealed, "the culture of the company at that time [in early 2006] had more of a cost-culture focus."

## II. PARTIES, JURISDICTION & VENUE

5.  Plaintiff Jason C. Vest is the administrator of the estate of his deceased wife, Keisha D. Vest. **(Exhibit 1)**. Plaintiff is and was at all times herein a West Virginia resident.

6.  Defendant GM is a Delaware corporation with its headquarters in Michigan. Through its various entities, it designed, manufactured, marketed, distributed and sold Chevrolet Cobalts in West Virginia. GM is registered with the West Virginia Secretary of State to conduct business in this State and does business in Mercer

2

County, West Virginia. As explained more fully below, the various GM entities were engaged in an ongoing cover-up of the ignition switch defects, and Defendant General Motors, LLC thus has successor liability to Plaintiff.

7.  Defendant Delphi Automotive PLC is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan. In 2002, GM began installing the then Delphi Corp.-manufactured ignition switches. The above-captioned Delphi Defendants (Delphi Automotive PLC and DPH-DAS, LLC f/k/a Delphi Automotive Systems, LLC) knew the ignition switches were defectively designed and did not meet GM's own design specifications, but nonetheless Delphi continued to manufacture and sell the defective ignition switches with the knowledge that they would be used in GM vehicles. Delphi also manufactured the ignition switch system after a 2007 change implemented by GM without reflecting a corresponding change in part number. As explained more fully below, the various Delphi entities were engaged in an ongoing cover-up of the ignition switch defects, and Defendants Delphi Automotive PLC and DPH-DAS, LLC f/k/a Delphi Automotive Systems, LLC thus have successor liability to Plaintiff.

8.  Defendant Ramey is a West Virginia corporation doing business in Mercer County, West Virginia. Plaintiff Jason Vest purchased the 2005 Chevy Cobalt in question from Defendant Ramey on April 20, 2006, less than two weeks before Keisha Vest's tragic death.

3

### III. FACTS

#### A.   Background of the Defective Nature of the Ignition Switch

9.     The ignition switches have several common switch points, including "RUN" (or "ON"), "OFF," and "ACC" ("accessory"). At the "run" position, the vehicle's motor engine is running and the electrical systems are active. At the "accessory" position, the motor is turned off, and electrical power is generally only supplied to the vehicle's entertainment system. At the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles a driver must intentionally turn the key in the ignition to move to these various positions. In short, these defective ignition switches allowed the key to rotate in the ignition slot, for example, when bumped, jostled, or in contact with a heavy amount of keys, thereby turning off the engines and electrical power systems and preventing life-saving airbags from deploying in a crash.

10.     The ignition switches installed in the 2005 Chevy Cobalts were not properly manufactured to meet specifications for "torque performance," the ability of the switch to hold the ignition key firmly in place during vehicle operation.

11.     Actually, the ignition switch systems are defective in, at least, two major respects. First, as alluded to previously, the switches are simply weak. Because of a faulty "detent plunger,"[1] the switch can inadvertently move from the "run" to the "accessory" or "off" position. Second, because of the low position of the ignition switch, the driver's knee can easily bump the key (or the hanging fob below the key)

_____

[1] The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key.

4

and cause the switch to inadvertently move from the "run" to the "accessory" or "off"
position. Both of these ignition switch defects can easily cause a 2005 Chevrolet
Cobalt's engine and electrical system to shut off, disabling the power steering and
power brakes and causing non-deployment of the vehicle's airbags in the event of a
crash.

12.      GM has admitted vehicles it manufactured prior to 2007, including the Chevrolet
Cobalt, were all equipped with the same defective ignition switch manufactured by
Delphi.

13.      Since 2001, GM sold millions of vehicles with ignition switches that were, and are,
prone to slipping out of the "on" or "run" position during operation to the "off" or
"accessory" position, thereby suddenly cutting power to the airbags, the power
steering and the breaking systems.

14.      Further, the ignition switch defect can occur at any time during the normal operation
of the 2005 Chevrolet Cobalt, meaning the ignition can suddenly switch off while in
motion, leaving the driver unable to control the car.

**B.**      ***Defendants Learn of Defect in 2001 and Continue to Conceal It Before Ms.***
***Vest's Tragic Death in 2006.***

15.      GM knew the ignition switches used in millions of vehicles were defective and
dangerous before those vehicles were even sold to the public.

**i.      GM knew of the ignition switch's defect in 2001.**

16.      In a chronology of events GM filed with NHTSA on March 11, 2014, GM admitted
it first became aware of an issue with the defective ignition switches in 2001.
Remarkably, GM did not disclose the fact that it had observed the ignition switch
problem in 2001, but rather waited until March 2014, 13 years later.

17.    As background, in the late 1990's and early 2000's, GM and one of its suppliers,

Eaton Mechatronics, finalized the specifications for the ignition switch for the Saturn

Ion.  Eaton later sold its Vehicle Switch/Electronic Division to Delphi Automotive

Systems on March 31, 2001.

18.    Shortly thereafter, on July 31, 2001, a GM engineer in Michigan encountered a

problem with the ignition switch while driving a prototype of the 2003 Saturn Ion

and indicated as much in a pre-production report.

19.    Indeed, GM engineers' personal experience in having problems with the ignition

switch was well-documented.  In a section of an internal report, titled "Root Cause

Summary," GM engineers identified "two causes of failure," namely "[l]ow contact

force and low detent plunger force[,]" which GM later acknowledged is another way

of saying the ignition switch was prone to shifting out of the "run" position into the

"accessory" or "off" positions.

20.    Indeed, there are two engineering drawings which show GM had considered designs

for both a longer and shorter detent plunger and spring part in 2001.  These have been

called the "smoking gun" documents by Clarence Ditlow, the executive director of

the Center for Auto Safety, because they demonstrate Defendants' awareness of the

problem.

        ii.      **GM approved production of the ignition switch in 2002 despite
                 knowing it did not meet design specifications.**

21.    In February 2002, Delphi asked GM to approve production for the ignition switch

and submitted a formal Production Part Approval Process ("PPAP") request.

22.    Even though testing revealed a defect, GM nevertheless approved the PPAP request.

6

### iii. GM certainly understood the urgent need to immediately correct the ignition switch defect no later than 2004.

23. In 2003, GM received complaints regarding the loss of power while driving 2003 Saturn Ions.

24. In 2003, a GM service technician witnessed a car stall after the ignition turned off while driving.

25. An internal inquiry was opened, and then closed, without any further action taken. At the time, GM did not publicly disclose the incident.

26. In October 2004, around the time of the launch of its 2005 Chevrolet Cobalt (a sibling to the Ion), GM internally documented incidents in which GM engineers verified that the ignition switch was turned to the "off" position and the Cobalt thus lost engine power as a result of being grazed by the driver's knee.

27. GM recognized this incident was not a "fluke" because its employees "were able to replicate this phenomenon during test drives." GM engineers opened an investigation into the causes and possible solutions for this problem. They quickly determined that the inadvertent shut down problem was likely caused by the "low key cylinder torque effect" – the same cause later described in the 2014 recall.

28. In November 2004, GM initiated an engineering (and the *first* formal) investigation, which it referred to as Problem Resolution Tracking System N172404 ("2004 PRTS"). One of the aims of the 2004 PRTS was to analyze the complaints that GM vehicles, particularly the 2005 Chevrolet Cobalt, "can be keyed off with knee while driving."

### iv. **GM engineers proposed design changes in 2005 which were rejected by GM management at least partly to cut costs.**

29.     In February 2005, as part of the same 2004 PRTS, GM engineers met to analyze how to address the ignition switch defect. GM managing engineer, Ray DeGiorgio, told other GM engineers it was "close to impossible to modify the present ignition switch[.]"

30.     Nevertheless, GM engineers investigated a possible key slot change as "containment" of the defect, including development cost and time estimates.

31.     Despite the clear problem, GM took no further action at the time. By March 2005, a GM Cobalt Program Engineering Manager issued a directive to close the 2004 investigative PRTS "with no action." GM ultimately declined to implement any of the potential remedies, citing cost considerations.

32.     In March 2005, GM engineer, Blendi Sullaj, noted: "None of the solutions represents an acceptable business case."

33      A GM internal document indicates the design change was refused because of (1) money, (2) time, and (3) questionable effectiveness of the replacement. In terms of the first reason, the GM internal document indicated the "tooling cost and piece price are too high."

34.     Simply put, GM avoided taking action on this critical safety issue in order to cut costs.

35.     In sum, the ignition switch problem was neither fixed nor disclosed to the public in 2004-2005, and the 2005 model Chevrolet Cobalt was launched with the same defective ignition switch that was not recalled until 2014.

36.   On May 17, 2005, PRTS N182276 ("2005 PRTS") was opened to analyze the ignition switch in the 2005 Chevrolet Cobalt following customer complaints that the "vehicle ignition will turn off while driving."

37.   In the 2005 PRTS, GM acknowledged this issue was the subject of the 2004 PRTS and that the issue was being "reopened" in a *second* investigation.

38.   GM engineers proposed changing the key ring slot to a hole and smaller key ring.

39.   GM originally approved this proposal, but later canceled it and did not proceed with the design change.

40.   In June 2005 during the *second* GM investigation/PRTS, no change in the defective switch was ultimately implemented because the "business case [was] not supported" to re-design the part.

41.   On June 14, 2005, Delphi's Senior Project Manager, John Coniff, stated in a confidential email, "Ray is requesting this information. . . . Cobalt is blowing up in [GM's] face in regards to the car turning off with the driver's knee."

42.   Again, Defendants did nothing at the time to notify the public of the ignition switch defect that existed in millions of GM vehicles.

43.   A group of GM engineers in September 2005 discussed (via email) postponement until Fall 2008 of a proposal to implement a new switch on the Cobalt, Ion and companion vehicles because the change would add $400,000 in retooling cost, plus an additional 90 cents per vehicle.

44.   In September 2005, GM engineer, John R. Hendler, sent an email with the subject: "No new Delta/Kappa ign switch for MY 08," to high ranking GM personnel, suggesting cost was the reason why GM refused to fix the defect.

45.   Ray DeGiorgio responded privately to GM's Steven Kirkman, stating: "It's not over

yet . . . read below [referring to Hendler's email]."

46.   Around the same time, in September 2005, GM's engineer, Craig St. Pierre, stated

the following in an internal company document:

> "Detent efforts on ignition switch are too low
> allowing key to be cycled to off position
> inadvertently. Changes to the key can be made to
> reduce the moment which can be applied to key by
> key ring/keys. This will assist in limiting the issue but
> will not completely eliminate it. Changes to the
> switch will not be forthcoming from electrical group
> until MY07.

47.   Lori Queen, an executive overseeing GM's small car team, challenged the delay,

saying, "I'm not sure it's ok to wait."

> **v.    Meanwhile, complaints and serious accidents continued to
> accumulate which triggers NHTSA to begin investigating.**

48.   In 2005, GM continued to receive reports of Cobalt engines inadvertently shutting

off during vehicle operation.

49.   Internal GM documents show it received at least 248 reports of air bag non-

deployment in 2005 models alone.

50.   In July 2005, 16 year-old Maryland resident Amber Marie Rose was killed when her

2005 Chevrolet Cobalt crashed and the airbags failed to deploy. An investigator

hired by Ms. Rose's family determined that the airbags could not deploy because at

the time of the crash the ignition switch was off and had shut down the vehicle's

electrical system. After this July 2005 fatality involving a Chevrolet Cobalt,

NHTSA's Special Crash Investigations Program conducted a Special Crash

Investigation ("SCI") of the incident on August 15, 2005. The investigation found

the front airbags did not deploy because, according to the event data recorder, the "vehicle power mode status" of the ignition switch had shifted from "on" to "accessory."

51.    In September 2005, GM was informed that Ms. Rose's death was linked to the defective ignition switches. Previously, GM's legal department had opened a file, and the case was subsequently settled.

> **vi.    Rather than implementing a recall and fixing the defect, GM sent a service bulletin to GM dealers in December 2005 telling them only to advise complaining customers to take heavy items off their key rings.**

52.    In December 2005, GM sent its dealers a technical service bulletin (05-02-35-007) informing them about a potential ignition switch issue and told them to advise owners to remove "unessential items from their key chains."

53.    To be clear, the service bulletin did not accurately identify the danger posed by the ignition switch defect. For example, there was no mention in the service bulletin of the possibility of airbag non-deployment or engine failure. Moreover, the service bulletin simply recommended that GM dealers tell persons who brought their vehicles in to remove heavy items from their key rings.

54.    That is, GM told dealers if customers brought their vehicles in for service, after experiencing a sudden loss of power during operation, those customers should be provided with key ring "inserts" to change the shape of the ignition key hole. This was the "fix" GM had earlier declined to implement globally.

55.    GM did not disclose the same to the public at large or to regulators. Nor did it implement a system-wide fix.

        vii.     **GM authorized a design change in April 2006, but masked the existence and significance of the change by keeping the part number the same.**

56.     After knowing about the defect for some time, Delphi, finally in January 2006, proposed a change to the design of the ignition switch which would increase its torque performance by installing a new detent plunger and spring to prevent the key from slipping.

57.     In April 2006, GM managing engineer Ray DeGiorgio authorized Delphi to implement changes to fix the ignition switch defect.

58.     Delphi thus began providing the re-designed ignition switch to GM at some point for use in 2007 model vehicles.

59.     Tellingly, the part number on the defective switches was not changed. This was done to conceal the problem and significance of the part change. Regarding the use of the same part number for the different ignition switch, CEO Marry Barra's later 2014 Congressional testimony was unequivocal: "it is not an appropriate practice to do so . . . [i]t's crucial, it's engineering principle 101 to change the part number when you make a change."

60.     Acknowledging the readily-apparent attempt by GM to hide dangerous defects because of the potential cost to the company, Barra stated before Congress in 2014: "I find it completely unacceptable that a part would be changed without a part number . . . the culture of the company at that time had more of a cost-culture focus."

### C.    Mrs. Vest's Tragic Death

61.    Meanwhile, on April 20, 2006, Jason Vest purchased a 2005 Chevy Cobalt from
Defendant Ramie in Princeton, Mercer County, West Virginia.

62.    Jason Vest bought the car for his 26 year-old wife, Keisha Dawn Vest, to drive back-
and-forth to work in Mt. Airy, North Carolina, where she worked as an MRI
technician.

63.    On the morning of May 2, 2006, Keisha D. Vest was on her way to work when she
lost control of the 2005 Chevrolet Cobalt and went through a stop sign. The car was
struck by a tractor trailer driven by Freedom Logistics truck driver, Marvin A.
Edwards.

64.    Mrs. Vest was killed in the accident.

65.    According to the death certificate, the immediate cause of death was a "closed head
injury" and other causes listed were "chest injury" and "auto accident."

66.    Pictures from the accident clearly demonstrate the air bag did not deploy.

67.    Had the air bag deployed, Keisha Vest would have survived.

68.    Mrs. Vest was pregnant at the time of her death and left behind a then 3 year-old son.

69.    Because the Chevrolet Cobalt was totaled, Mr. Vest was sent a bill for the remaining
balance on the car.

### D.    Defendants Continue to Learn of More Deaths and Injuries and Proceeded with Hiding the Defect until 2014.

#### i.    GM knew of and tracked multiple incidents involving the ignition switch defect by 2007 and avoided scrutiny by misleading NHTSA and the public.

70.    Defendants received news of yet another accident involving a 2005 Chevy Cobalt.
This one occurred in Wisconsin in October 2006.

13

71.    Sometime in October 2006, GM updated its previous December 2005 product service bulletin, but again, it failed to acknowledge the ignition switch defect and continued to blame fatalities and serious injuries on individual drivers.

72.    In March 2007, NHTSA investigators met with GM and informed it of Amber Rose's fatal accident on July 29, 2005, where the airbag did not deploy in the collision and data retrieved from the car's sensing and diagnostic module ("SDM") indicated that, at the time of the crash, the car's ignition was in the "accessory" position, rather than the "on" position.

73.    In April 2007, the NHTSA report stated this "crash is of special interest because the vehicle was equipped with . . . dual state air bags that did not deploy" and the ignition switch was in "accessory" mode at the time of impact.

74.    In August 2007, GM met with its SDM supplier, Continental, to review data from crashes involving 2005 Chevrolet Cobalts where the airbags failed to deploy.

75.    In September 2007, NHTSA proposed an investigation into "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion" vehicles. The "issue was prompted by a pattern of reported non-deployments" in vehicle owner questionnaire "complaints that was first observed in early 2005." NHTSA had discussed this with GM, and GM assured it there was not a "specific problem pattern." An email from NHTSA chief investigator, Greg Magno, noted:

> Notwithstanding GM's indications that they see no specific problem, [Defects Assessment Division] DAD perceives a pattern of non-deployment in these vehicles that does not exist in their peers and that their circumstances are such that, in our engineering judgment, merited a deployment, and that such a deployment would have reduced injury levels or saved lives.

14

76.    GM tried to avoid the investigation by claiming it was unaware of any problems in

its vehicles.

      ii.    **In 2009, GM opened yet another internal (and *third*) investigation
and still continued its refusal to disclose the issues with the
ignition switches.**

77.    In February 2009, GM opened another crash investigation report, which found that

"customers with substantially weighted key chains/additional keys hanging from

ignition key have experienced accidental ignition shut-off."

78.    On May 15, 2009, GM engineers met again with representatives of its SDM supplier,

Continental. During this meeting, GM was told that, in at least a substantial number

of instances, the crashes where airbags failed to deploy involved ignitions switched

that shifted to the "accessory" position from the "on" position.

79.    In June 2009, General Motors Corp. ("Old GM") finalized its Chapter 11 bankruptcy

petition without any mention of the well-known problems with the defective ignition

switches.

      iii.    **GM testing in 2012 again confirmed the widespread scope of the
ignition switch defect.**

80.    In May 2012, GM engineers' testing of 44 vehicles further confirmed the defective

nature of the ignition switches in 2003-2007 model/year vehicles.

81.    In September 2012, GM had a group of special engineers assigned to find the root

cause of an engineering defect, called a "Red X Team," examine Chevrolet Cobalts

following accidents where the ignition switch was found in the "accessory" or "off"

position.

82.    In an email from October 2012, with the subject, "2005-7 Cobalt and Ignition Switch

Effort," Ray DeGiorgio wrote the following to fellow GM colleague, Brian Stouffer:

"If we replaced switches on ALL the model years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch. This cost is based on volume of 1.5 units total."

    iv.    **In 2013, GM internally admits the ignition switch design was defective.**

83.    In April 2013, GM internally acknowledged there was a difference between the ignition switch parts in later model year Chevy Cobalts as compared with the 2003-2007 model/year vehicles.

84.    GM hired an outside engineering firm (the *fifth* investigation) which further confirmed that the earlier ignition switches did not meet GM's own design specifications. The newer vehicles with the modified ignition switches, however, performed consistent with GM's specifications.

85.    Notwithstanding GM's abundant knowledge of the ignition switch defect, its public statements and litigation posture was evasive and contrarian. For example, in May 2013, GM's Brian Stouffer testified (in the case of *Melton v. GM*, where a Georgia woman was killed in a 2010 crash in which she was driving a 2005 Chevrolet Cobalt) that the performance of the ignition switch in the 2005 Cobalt as compared to that of the 2008 Cobalt was not substantially different.

86.    Likewise, at a deposition in 2013, Ray DeGiorgio testified that he "was not aware of the detent plunger switch change" and "certainly did not approve [such] . . . a design change." He further averred, "if any such change was made, it was made without [his] knowledge and authorization." Later, during U.S. Senate questioning in 2014, GM CEO Marry Barra acknowledged, "the data that's been put in front of me indicates that [DeGiorgio lied under oath in that deposition], but I'm waiting for the

16

full investigation." After the report from investigation conducted by GM-retained lawyer Anton Valukas was issued in June 2014, DeGiorgio was fired.

87.    GM re-started its internal investigation – number *four* at least! – after the plaintiff's expert in *Melton*, Mark Hood, noticed that the detent plunger and spring had both gotten longer.[2] GM and Delphi were now caught in their lie.

88.    In October 2013, GM received documentation from Delphi confirming that a change to the ignition switch in the Cobalt and other vehicles was made in April 2006.

89.    GM's Brian Stouffer responded to Delphi acknowledging that the ignition switch in earlier Cobalts was different than the switch in later Cobalt vehicles.

90.    Delphi replied that GM had authorized it to make the change back in 2006 but the part number had remained the same.

91.    Ultimately, Defendants could no longer conceal the ignition switch defect.

   E.    *GM Finally Issues Recall and Publicly Admits the Ignition Switch Design Defect in February 2014.*

92.    After meetings in December 2013 and January 2014, GM decided to conduct a recall of the model/year 2005-2007 Chevy Cobalts.

93.    On February 7, 2014, GM told NHTSA that it determined a defect existed in the 2005-2007 model/year Chevrolet Cobalts, among others.

94.    On February 13, 2014, GM finally announced a recall of 2005-2007 model/year Chevrolet Cobalts, among others, to address the ignition switch defect.

---

   [2] As alluded to previously, these two internal ignition parts – the detent plunger and spring – make a key less likely to slip from the "on" to the "accessory" position while a vehicle is being driven.

95.     The uncovering of GM's misconduct finally in 2014 has thus far led to a total of 34

        recalls of 13.9 million GM vehicles in the United States between February and June

        2014.

96.     During her recent testimony before Congress, GM CEO Marry Barra admitted, "I

        agreed, it took way too long for this to come to the attention and to do the recall . .

        . . It is tragic that there has [*sic*] been lives lost and lives impacted with this event."

97.     Throughout all of the events described from 2001 to 2014, Defendants concealed the

        defective and dangerous nature of the ignition switch.

98.     It was only at the time GM made its understanding of defective nature of the ignition

        switch in 2014 that Jason Vest and other members of the family of Keisha D. Vest

        discovered that the ignition switch in the 2005 Chevrolet Cobalt driven by Mrs. Vest

        at the time of her death was defective.

        **F.      *The suspensions, terminations, fines and further investigations in the
                aftermath of the recalls.***

99.     In May 2014, GM paid the maximum fine of $35 million to the U.S. Department of

        Transportation for its failure to adequately address the defective ignition switches.

100.    Reports have already suggested that the number of crashes and fatalities associated

        with the defects is likely much higher than the 13 deaths and many more injuries GM

        confirmed originally as being directly attributable to the defective ignition switches.

101.    It has also recently surfaced that there was an internal culture at GM designed to

        downplay problems.  For example, a slide presentation demonstrated that GM

        workers were told to avoid words like "defect," "crippling," "serious," "explode,"

        "always," "bad," "deathtrap," and "widowmaker."

18

102.   In early April 2014, Ray DeGiorgio and Gary Altman (the program engineering manger for the Cobalt and Ion) were originally put on paid leave by GM.

103.   On June 6, 2014, GM fired 15 employees, including DeGiorgio and Altman, for their involvement in fatally flawed ignition switches. According to media reports, the list also includes Michael Robinson, vice president for regulatory affairs; Gary Kent, general director of vehicle safety and crashworthiness; Carmen Benavides, former director of product investigations, safety regulations and certification, field performance; Bill Kemp, top recall lawyer; Lawrence Buonomo, head of product litigation in GM's legal department; Jennifer Sevigny, in-house lawyer who headed GM's field product assessment group; Ronald Porter, in-house lawyer; and Jaclyn Palmer, in-house lawyer.

104.   As evident from the preceding paragraph, GM's legal department has justifiably come under scrutiny. Sometime before the ignition switch defects became public, GM quietly paid $5 million to settle an ignition-related lawsuit, and this fact was well known to its legal department. According to the findings of an internal company inquiry released in June 2014, "secrecy ruled" in the GM legal department. GM's legal department has been characterized as taking "actions that obscured the deadly flaw, both inside and outside the company."

105.   In Spring/Summer 2014, CEO Mary Barra has acknowledged that the company has a "moral responsibility" to victims, but GM President Dan Ammann hinted that GM would fight lawsuits for crash victims who elect not to accept whatever settlements GM chooses to offer.

19

106.   Some members of Congress have called for criminal probes of Defendants' misconduct.

## IV. CLAIMS

## (COUNT I - PRODUCTS LIABILITY)

107.   Plaintiff re-alleges and incorporates by reference the previous allegations in this Complaint.

108.   Defendants either manufactured or sold Plaintiff the defective parts and defective vehicle.   In testimony before Congress, NHTSA's acting administrator, David Friedman, explained the ignition switch was "very clearly" a defect and "was a defect that represents an unreasonable risk to safety." Defendants have essentially admitted as much.

109.   The 2005 Chevrolet Cobalt operated by Keisha D. Vest at the time of her fatal accident was defective in, *inter alia*, the following respects: (a) the ignition switch's detent plunger and spring were too short, (b) the placement of the ignition switch on the vehicle was inherently dangerous, (c) the ignition switch was inadequately protected from forces of foreseeable, inadvertent driver contact, and (d) the defect was not adequately disclosed to the public, including Keisha D. Vest, such that she could have taken adequate precautions to protect herself.

110.   The ignition switch is not an automotive component that Plaintiff would or should expect will deteriorate or break down after normal wear and tear, thereby triggering the need for replacement.   This is particularly true, where, as here, the Vests purchased the car only weeks before Mrs. Vest was killed.

111.    The defects in the 2005 Chevrolet Cobalt proximately and directly caused Mrs.
Vest's death. Defendants are jointly and severally liable to Plaintiff for those
damages.

112.    At the time of the transition to their current corporate form, the GM and Delphi
Defendants were in the midst of manufacturing a product that is known to create
serious health hazards, and these Defendant successor corporations continued to
produce the same product in the same manner. According, Defendants GM and
Delphi are liable for punitive damages for liabilities incurred by the predecessor
company in its manufacture of such product. Syl. Pt. 4, *Davis v. Celotex Corp.*, 187
W. Va. 566, 420 S.E.2d 557 (1992).

## (COUNT II - NEGLIGENCE)

113.    Plaintiff re-alleges and incorporates by reference the previous allegations in this
Complaint.

114.    Defendants owed a duty to Plaintiff to exercise reasonable care in the design,
manufacture, and sale of the 2005 Chevrolet Cobalt so as to render it free from
defects and to make it reasonably safe for its foreseeable usage and users and fit for
its intended purpose.

115.    Defendants breached this duty in, *inter alia*, the following ways: (a) putting the
defective 2005 Chevrolet Cobalt in the stream of commerce and failing to correct the
defects known to the vehicle, (b) failing to inspect the vehicle to eliminate the
dangerous and defective conditions, (c) failing to warn of the well-known dangers of
this vehicle, and (d) failing to comply with the standard of reasonable safeness, *etc.*

116.    Defendants' breaches of its duties proximately and directly caused Plaintiff to suffer

damages.

## (COUNT III - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

117.    Plaintiff re-alleges and incorporates by reference the previous allegations in this

Complaint.

118.    The ignition switch was supplied by Delphi to GM for its 2005 Chevrolet Cobalt

manufactured by GM.  The 2005 Chevrolet Cobalt was then sold by Defendant

Ramey to the Vests with an implied warranty of merchantability and fitness.

Defendants impliedly warranted that the subject vehicle was fit for the ordinary

purpose for which it was sold.

119.    Plaintiff relied on Defendants' implied warranty of merchantability and fitness.

120.    Defendants breached the implied warranty of merchantability and fitness in that this

vehicle was not fit for the ordinary purpose for which it was sold.

121.    As a consequence of Defendants' breach, Plaintiff suffered damages.

## (COUNT IV - FRAUD, FRAUDULENT MISREPRESENTATION, & FRAUDULENT CONCEALMENT)

122.    Plaintiff re-alleges and incorporates by reference the previous allegations in this

Complaint.

123.    Among other things, Defendants GM and Delphi made the following fraudulent

misrepresentations and omissions : (a) assured regulators and customers that a recall

was not necessary,  (b) hid a change to the defective ignition switch by failing to

adopt a new part number, (c) sent out a service bulletin in October 2005 (prior to

Mrs. Vest's death) which masked the dangerous and defective nature of the ignition

22

switch by failing to refer to potential airbag non-deployment or engine failure, and (d) gave false testimony at depositions about the serious danger and defective nature of the ignition switch and the subsequent change in design, *etc.*

124.    As described in more detail in the paragraphs above, Defendants committed fraudulent acts or induced others to commit fraudulent acts.

125.    Those fraudulent statements referred to in the paragraphs above were false.

126.    Had those fraudulent statements not been made to, or those omissions and pertinent concealed facts not been hidden from Plaintiff, Mrs. Vest would certainly not have operated the defective 2005 Chevrolet Cobalt, which ultimately caused her untimely and tragic death.

127.    In that sense, Plaintiff relied on the statements referred to in these paragraphs above.

128.    With respect to the fraudulent concealment component, the above-described facts were made by GM and Delphi, who had knowledge of these facts, a duty to disclose them, and an intention to mislead.

129.    As a consequence of Defendants' fraudulent misrepresentations, omissions and concealment, Plaintiff suffered damages.

### (COUNT V - VIOLATIONS OF WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT ("WVCCPA"))

130.    Plaintiff re-alleges and incorporates by reference the previous allegations in this Complaint.

131.    Under the WVCCPA, *W.Va.Code* § 46A-6-104 prohibits the use of unfair or deceptive act or practices in any trade or commerce.

23

132.    West Virginia Code § 46A-6-102(7) states,

"Unfair methods of competition and unfair or deceptive acts or practices" means and includes, but is not limited to, any one or more of the following:

****

(E) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

****

(G) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another;

****

(L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby[.]

133.    Defendants' committed unfair deceptive acts or practices in violation of W. Va. Code

§ 46A-6-104.

134.    These unfair or deceptive acts or practices caused Plaintiff to suffer damages,

including those statutory damages provided by the WVCCPA.

24

## V. RELIEF

Plaintiff Jason C. Vest, the Administrator and Personal Representative of the Estate of Keisha D. Vest, her son, her parents, and such others as are within the purview of the Wrongful Death Act, have suffered damages and are entitled to recover from Defendants all damages permitted by law as a result of the wrongful death of Keisha D. Vest, including, but not limited to:

(a)    Decedent's pain and suffering prior to his death;

(b)    Decedent's loss of income;

(c)    Decedent's medical expenses;

(d)    Beneficiaries' sorrow, mental anguish, and solace, including loss of society, companionship, comfort, guidance, kindly offices, and advice of the decedent, Keisha D. Vest;

(e)    Beneficiaries' loss of services, protection, care, and assistance provided by the decedent, Keisha D. Vest;

(f).    Reasonable funeral expenses; and

In addition to these and other compensatory damages, Plaintiff seeks to recover the following from Defendants:

(g)    Attorney fees and costs;

(h)    *Punitive Damages*;[3]

(i)    Statutory Damages (under the WVCCPA, for example); and

(j)    All other relief this Court deems just and proper.

---

[3] *See supra* ¶ 112.

**PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY.**

**JASON C. VEST,** as Administrator of the
**THE ESTATE OF KEISHA D. VEST,**
*–By Counsel–*

Rudolph L. DiTrapano          (W.Va. Bar No. 1024)
Robert M. Bastress III        (W.Va. Bar No. 9616)
**DiTRAPANO, BARRETT, DiPIERO,**
**McGINLEY & SIMMONS, PLLC**
604 Virginia Street, East
Charleston, West Virginia 25301
(304) 342-0133 (phone)
(304) 342-4605 (fax)
rob.bastress@dbdlawfirm.com

United States of America

State of West Virginia  County of Mercer, ss:

# Letter of Administration

### Estate of KEISHA DAWN VEST

I, VERLIN T MOYE, Clerk of the Mercer County Commission, in the State of West Virginia, do hereby certify that JASON C VEST was on the 23rd day of May, 2014, appointed by the Mercer County Commission as administrator(s) of the Estate of KEISHA DAWN VEST, duly qualified as such by taking oath prescribed by law, and by giving approved bond in the sum of $5,000.00, as required by law.

NOW THEREFORE, be it known that said appointment is now in full force and effect and that full faith and credit are due and should be given to all the acts of the said JASON C VEST as such administrator(s) of the Estate of KEISHA DAWN VEST, as well in all jurisdictions, as elsewhere.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Mercer County Commission at my office in said County on the 23rd day of May, 2014.

VERLIN T MOYE
Clerk of the Mercer County Commission

By

Michelle A. Bragg, Fiduciary Clerk

LettersofAdministration.rpt



EXHIBIT
1




02 1R          $ (
0002009608   JU
MAILED FROM ZIP C

BUSINESS & LICENSING
1610 - 00