# Exhibit E

JS 44C/SDNY
REV. 4/2014

**14 CV 5137**    JUL 0 9 2014

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of
pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the
Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of
initiating the civil docket sheet.

PLAINTIFFS
Thomas Stevenson

DEFENDANTS
General Motors LLC

2014 JUL -3  P 4:33

U S DISTRICT COURT SDNY

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
Robert J. Axelrod
Axelrod & Dean LLP
830 3RD AVE. FL 5
New York, NY 10022 Tel: 646-448-5263 Email: riaxelrod@axelroddean.com

ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. s 1332(a) & (d). Plaintiff alleges claims against General Motors LLC for failing to disclose dangerous safety defects.

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No ☑ Yes ☐ Judge Previously Assigned

If yes, was this case Vol. ☐ Invol. ☐ Dismissed. No ☐ Yes ☐ If yes, give date _____ & Case No. _____

**IS THIS AN INTERNATIONAL ARBITRATION CASE?**    No ☒    Yes ☐

(PLACE AN [x] IN ONE BOX ONLY)                     NATURE OF SUIT

**TORTS**

**ACTIONS UNDER STATUTES**

**CONTRACT**
[ ] 110  INSURANCE
[ ] 120  MARINE
[ ] 130  MILLER ACT
[ ] 140  NEGOTIABLE INSTRUMENT
[ ] 150  RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151  MEDICARE ACT
[ ] 152  RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153  RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160  STOCKHOLDERS SUITS
[ ] 190  OTHER CONTRACT
[ ] 195  CONTRACT PRODUCT LIABILITY
[ ] 196  FRANCHISE

**REAL PROPERTY**
[ ] 210  LAND CONDEMNATION
[ ] 220  FORECLOSURE
[ ] 230  RENT LEASE & EJECTMENT
[ ] 240  TORTS TO LAND
[ ] 245  TORT PRODUCT LIABILITY
[ ] 290  ALL OTHER REAL PROPERTY

**PERSONAL INJURY**
[ ] 310  AIRPLANE
[ ] 315  AIRPLANE PRODUCT LIABILITY
[ ] 320  ASSAULT, LIBEL & SLANDER
[ ] 330  FEDERAL EMPLOYERS' LIABILITY
[ ] 340  MARINE
[ ] 345  MARINE PRODUCT LIABILITY
[X] 350  MOTOR VEHICLE
[ ] 355  MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360  OTHER PERSONAL INJURY
[ ] 362  PERSONAL INJURY - MED MALPRACTICE

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
[ ] 440  OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441  VOTING
[ ] 442  EMPLOYMENT
[ ] 443  HOUSING/ ACCOMMODATIONS
[ ] 445  AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446  AMERICANS WITH DISABILITIES -OTHER
[ ] 448  EDUCATION

**PERSONAL INJURY/**
**PERSONAL INJURY/HEALTHCARE/**
[ ] 367  HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 365  PERSONAL INJURY PRODUCT LIABILITY
[ ] 368  ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370  OTHER FRAUD
[ ] 371  TRUTH IN LENDING
[ ] 380  OTHER PERSONAL PROPERTY DAMAGE
[ ] 385  PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**
[ ] 463  ALIEN DETAINEE
[ ] 510  MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530  HABEAS CORPUS
[ ] 535  DEATH PENALTY
[ ] 540  MANDAMUS & OTHER

**PRISONER CIVIL RIGHTS**
[ ] 550  CIVIL RIGHTS
[ ] 555  PRISON CONDITION
[ ] 560  CIVIL DETAINEE CONDITIONS OF CONFINEMENT

**FORFEITURE/PENALTY**
[ ] 625  DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690  OTHER

**LABOR**
[ ] 710  FAIR LABOR STANDARDS ACT
[ ] 720  LABOR/MGMT RELATIONS
[ ] 740  RAILWAY LABOR ACT
[ ] 751  FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790  OTHER LABOR LITIGATION
[ ] 791  EMPL RET INC SECURITY ACT

**IMMIGRATION**
[ ] 462  NATURALIZATION APPLICATION
[ ] 465  OTHER IMMIGRATION ACTIONS

**BANKRUPTCY**
[ ] 422  APPEAL 28 USC 158
[ ] 423  WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**
[ ] 820  COPYRIGHTS
[ ] 830  PATENT
[ ] 840  TRADEMARK

**SOCIAL SECURITY**
[ ] 861  HIA (1395ff)
[ ] 862  BLACK LUNG (923)
[ ] 863  DIWC/DIWW (405(g))
[ ] 864  SSID TITLE XVI
[ ] 865  RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870  TAXES (U.S. Plaintiff or Defendant)
[ ] 871  IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**
[ ] 375  FALSE CLAIMS
[ ] 400  STATE REAPPORTIONMENT
[ ] 410  ANTITRUST
[ ] 430  BANKS & BANKING
[ ] 450  COMMERCE
[ ] 460  DEPORTATION
[ ] 470  RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480  CONSUMER CREDIT
[ ] 490  CABLE/SATELLITE TV
[ ] 850  SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 890  OTHER STATUTORY ACTIONS
[ ] 891  AGRICULTURAL ACTS
[ ] 893  ENVIRONMENTAL MATTERS
[ ] 895  FREEDOM OF INFORMATION ACT
[ ] 896  ARBITRATION
[ ] 899  ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION
[ ] 950  CONSTITUTIONALITY OF STATE STATUTES

*Check if demanded in complaint:*

✓ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $5,000,000    OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE Hon. Jesse M. Furman    DOCKET NUMBER 1:14-04265

*Check YES only if demanded in complaint*
JURY DEMAND: ☐ YES ☐ NO

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*                                          **ORIGIN**

☒ 1 Original       ☐ 2 Removed from      ☐ 3 Remanded     ☐ 4 Reinstated or    ☐ 5 Transferred from   ☐ 6 Multidistrict   ☐ 7 Appeal to District
   Proceeding         State Court              from                Reopened            (Specify District)       Litigation           Judge from
                                              Appellate                                                                              Magistrate Judge
                   ☐ a. all parties represented    Court                                                                            Judgment

                   ☐ b. At least one
                        party is pro se.

*(PLACE AN x IN ONE BOX ONLY)*                       **BASIS OF JURISDICTION**                    *IF DIVERSITY, INDICATE*
                                                                                                  *CITIZENSHIP BELOW.*
☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☐ 3 FEDERAL QUESTION    ☒ 4 DIVERSITY
                                             (U.S. NOT A PARTY)

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [x] 5 |
| CITIZEN OF ANOTHER STATE | [x] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)
Thomas Stevenson
960 St. Mary Avenue
Cayucos, California 93430


DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)
General Motors LLC
C/O CORPORATION SERVICE COMPANY
80 STATE STREET
ALBANY, NEW YORK, 12207-2543


DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:




Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   ☐ WHITE PLAINS    ☒ MANHATTAN
             (DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS
             COMPLAINT.)
DATE July 3, 2014  SIGNATURE OF ATTORNEY OF RECORD        ADMITTED TO PRACTICE IN THIS DISTRICT
                                                          [ ] NO
RECEIPT #                                                 [x] YES (DATE ADMITTED Mo. 09___  Yr. 1999___)
                                                          Attorney Bar Code #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

UNITED STATES DISTRICT COURT **14 CV 5137**
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THOMAS STEVENSON, | | Case No.: |
| | Plaintiff, | **CLASS ACTION** |
| v. | | |
| GENERAL MOTORS LLC, | | **CLASS ACTION COMPLAINT** |
| | Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Thomas Stevenson, individually and on behalf of all similarly situated persons and the general public, brings this action against Defendant General Motors LLC ("Defendant" or "GM") and alleges as follows:

## I.    INTRODUCTION

1.    This case arises out of General Motors ("GM") and its predecessor's[1] failure to disclose and lengthy concealment of a known defect affecting the Electronic Power Steering ("EPS") system of over 1.3 million vehicles and compromising the safety and integrity of those vehicles.

2.    To protect consumers and the public, automakers are obligated to timely report and address safety issues with the vehicles they manufacture. During a recent press conference about a settlement with GM, NHTSA Acting Administrator David Friedman, emphasized that: "Quickly addressing and reporting safety defects should always be a car maker's bottom line. There is no such thing as an automaker overreacting to a safety defect."[2]

---

[1] GM was incorporated in 2009. As discussed in section IV(A), on July 5, 2009, GM acquired substantially all assets and assumed certain liabilities of its predecessor, General Motors Corporation, through a Section 363 sale pursuant to Chapter 11 of the U.S. Bankruptcy Code. This Complaint refers to GM's predecessor as "Old GM."

[2] May 16, 2014 press conference regarding settlement between NHTSA and GM.

3.      When an automaker learns that a vehicle has a safety defect its legal obligations –
and GM's legal obligations – are clear: the Transportation Recall Enhancement, Accountability
and Documentation Act ("TREAD Act")[3] and its accompanying regulations, requires
automakers, including GM, to promptly disclose the defect.[4] If it is determined that the vehicle
is defective, the automaker may be required to notify vehicle owners, purchasers, and dealers of
the defect, and may be required to remedy the defect.[5]

4.      The safety defect at issue in this case involves the EPS system. Essentially, the
defect can cause the vehicle's EPS to suddenly fail during normal driving, requiring greater
effort by the driver to manually steer the vehicle and increases the risk of collisions and injuries.
It affects over 1.3 million vehicles sold by GM and its predecessor Old GM.  Those vehicles
include the following makes and models:

    A.      2004-2006 and 2008-2009 Chevrolet Malibu;

    B.      2004-2006 Chevrolet Malibu Maxx;

    C.      2009-2010 Chevrolet HHR (non-turbo);

    D.      2010 Chevrolet Cobalt;

    E.      2005-2006 and 2008-2009 Pontiac G6;

    F.      2004-2007 Saturn Ion; and

    G.      2008-2009 Saturn Aura.

5.      This Complaint refers to these vehicles as "Defective Vehicles."

6.      In addition to the issues with the EPS system, GM similarly recalled other makes
and models for problems arising from defects with the ignition switch system, which also
impacted the EPS system. Specifically, when a Defective Vehicle's engine and electrical system
shuts down, the power steering and power brakes also shut down, creating a serious risk of
accident.

---

[3] 49 U.S.C. §§ 30101-30170.
[4] 49 U.S.C. § 30118(c)(1) & (2).
[5] 49 U.S.C. § 30118(b)(2)(A) & (B).

7.     From 2004 until March of 2014, GM concealed and did not fix the serious quality and safety problems affecting the Defective Vehicles.

8.     The EPS system defects could and should have been reported and corrected years ago.

9.     From at least 2004 to the present, both Old GM and GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its EPS system.

10.    Instead of complying with its obligation to report and address the safety defects, GM concealed them. GM's non-disclosure and concealment put drivers of Defective Vehicles, as well as their passengers and the public at an unreasonable risk of injury or death. GM's conduct also allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles.

11.    The investigation into the EPS system defects revealed at least 12 crashes linked to loss of power steering assist, two of which resulted in injuries to the drivers. Plaintiff believes the actual numbers to be much higher.

12.    Following GM's eventual EPS recall in March 2014, GM's CEO, Mary Barra, admitted in a video message that: "Something went wrong with our process in this instance, and terrible things happened."

13.    GM recently agreed to a settlement with the NHTSA that includes a $35 million dollar fine - the maximum amount the NHTSA can fine GM for a single reporting violation. The fine equals less than 1% of GM's earnings over the last year. The Department of Transportation has asked Congress to raise the fine limit to $300 million.

## II.     JURISDICTION AND VENUE

14.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other Class members are citizens of a different state than Defendant.

- 3 -

15.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over GM because GM conducts substantial business in this District.

16.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because, as a corporation, GM is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, GM transacts substantial business within the District, so GM is subject to personal jurisdiction in this District.

## III.     PARTIES

17.     Plaintiff and proposed Nationwide and California State Class Representative Thomas Stevenson is a resident and citizen of Cayucos, California. Mr. Stevenson purchased a 2007 Saturn Ion on or around November 2007, in Bakersfield, California. In 2008, while Mr. Stevenson was driving his Saturn Ion, he was confronted with a warning chime and dashboard message that read: "PWR STR." Seconds later the EPS system was ineffective and Mr. Stevenson was without power steering. Although the car was still operable after the EPS system lost power, it took considerably more effort to control and steer the vehicle. Inexplicably, the EPS system was again operable after the Saturn Ion was turned off and then back on. Mr. Stevenson took the car to a GM dealership to have the issue addressed, but his claims were met with disbelief because the service technician could not recreate the failure. After the second and third instances, and return to the dealership, Mr. Stevenson was informed that GM authorized dealerships to replace the entire steering column.

18.     Because of the EPS system defects, Mr. Stevenson is very concerned for his safety when he drives his vehicle. He also believes the value of his vehicle is now diminished as a result of the EPS system defects. Mr. Stevenson did not learn of the EPS system defects until March 31, 2014, when the recall was announced.

19.     Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware maintaining its principal place of business at 300 Renaissance Center, Detroit, Michigan.

- 4 -

20.    GM was incorporated in 2009. As described in below, on July 5, 2009, GM

acquired substantially all assets and assumed certain liabilities of General Motors Corporation

("Old GM") through a sale pursuant to Section 363, Chapter 11 of the U.S. Bankruptcy Code.

## IV.    FACTUAL ALLEGATIONS

## A.    GM's Liability for Its Own Conduct and Liability GM Acquired from Old GM.

21.    GM was incorporated in 2009. On July 5, 2009, GM acquired substantially all

assets and assumed certain liabilities of Old GM through a Section 363 sale.

22.    When GM acquired Old GM's assets through the Sale Order and Purchase

Agreement ("Purchase Agreement"), it expressly assumed both the responsibilities to report

safety defects in the vehicles sold by Old GM as required by the TREAD ACT and Old GM's

"lemon law" obligations. [6]

23.    The liabilities and obligations expressly assumed by GM include the following:

> From and after the Closing, Purchaser [GM] shall comply with the
> certification, reporting and recall requirements of the National
> Traffic and Motor Vehicle Act, the Transportation Recall
> Enhancement, Accountability and Documentation Act, the Clean
> Air Act, the California Health and Safety Code, and similar laws, in
> each case, to the extent applicable in respect of vehicles and vehicle
> parts manufactured or distributed by [Old GM].

24.    GM expressly assumed:

> [A]ll Liabilities arising under express written warranties of [Old
> GM] that are specifically identified as warranties and delivered in
> connection with the sale of new, certified used or pre-owned
> vehicles or new or remanufactured motor vehicle parts and
> equipment (including service parts, accessories, engines and
> transmissions) manufactured or sold by [Old GM] or Purchaser prior
> to or after the Closing and (B) all obligations under Lemon Laws.

25.    GM also expressly assumed "all Liabilities arising out of, relating to, in respect

of, or in connection with the use, ownership or sale of the Purchased Assets after the closing."

---

[6] The applicability of the bar on successor liability claims against GM for the acts and omissions
of Old GM prior to the Sale Order is an issue that is currently pending in Bankruptcy Court in
the Southern District of New York. To the extent permitted by the Bankruptcy Court, Plaintiff
herein will seek leave of this Court to amend this Complaint to add successor liability claims
against GM for the acts and omissions of Old GM.

Those assets included all of old GM's contracts, including its contracts with dealers and service
centers.

26.    Additionally, since its inception, GM has profited from servicing and selling parts
for Defective Vehicles sold by GM and Old GM. Therefore, GM had a duty to disclose its
knowledge of the EPS system defects, and not to conceal the defects. GM is liable for its acts
and omissions after the July 5, 2009 Purchase Agreement and for Old GM's "lemon law"
liability it expressly assumed under the Purchase Agreement.

**B.    The EPS System Defects Cause the Defective Vehicles to Lose Power Steering Assist,
Requiring Greater Driver Effort and Increasing the Risk of Crash.**

27.    Electronic power steering systems, which supplement the torque a driver must
apply to the steering wheel of a vehicle, have replaced traditional hydraulic power steering in
many newer-model vehicles. The traditional hydraulic power steering accomplished the same
results by using pistons in the steering rack with pressurized fluid. The hydraulic pump, which
pressurized the fluid, was powered by the vehicle's engine; drawing energy from the engine
regardless of whether the driver was turning the wheel. Because the hydraulic pump was
constantly drawing energy away from the engine, it created inefficiencies and increased fuel
consumption.

28.    To reduce those inefficiencies and increase fuel economy, GM and other
automakers have done away with the traditional hydraulic power steering systems in favor of
electronic power steering systems. With these electronic power steering systems, like the one
introduced by GM that is the subject of this lawsuit, the hydraulic pump and pistons are replaced
by an electronic motor attached to the steering rack that applies torque when the vehicle senses
that the steering wheel has been turned. Because the electric motor is not powered by the
vehicle's engine, manufacturers have realized improved fuel economy and are able to fine tune
vehicle steering.

29.    Because the electronic power steering systems and the electronic motors –
including the EPS system – are not powered by the vehicle's engine, however, power steering

- 6 -

assist in vehicles equipped with the EPS system is dependent on the proper functioning of the electronic power steering system.

30.     In the Defective Vehicles, there may be a sudden loss of electric power steering assist *that could occur at any time while driving*. According to NHTSA, if power steering assist is lost a message is displayed on the Driver Information Center and a chime sounds to inform the driver.

31.     Sudden loss of power steering assist in the EPS system can occur in the Defective Vehicles if (1) the system loses electrical power; or (2) whenever the system detects a fault that requires it to enter fail-safe operation mode, removing power from the EPS motor.

32.     GM claims that a buildup of brush debris mixed with oily material could cause the EPS system's motor to stop working, resulting in the loss of power steering assist in the Defective Vehicles.

33.     When the Defective Vehicles lose power steering assist, the Defective Vehicles revert to manual steering, which requires significantly more torque and effort to be applied by the driver, increasing the risk of crash – especially if the vehicle is mid-turn.

## C.     GM Concealed the Electric Power Steering Defects for Years and Did Not Recall the Vast Majority of Defective Vehicles until March 2014.

34.     Over 1.3 million vehicles sold by Old GM and later GM between 2003 and 2010 had the EPS safety defect that caused the vehicle's EPS system to suddenly fail during normal driving.

35.     In 2009, when GM assumed Old GM's obligation to report any known, dangerous defects in GM vehicles, it knew about the EPS defect.

36.     In March 2010, GM recalled model years 2005-2010 of the Chevrolet Cobalt for and model years 2007-2010 of the Pontiac G6 for EPS defects. GM did not recall many other vehicles with the same EPS system that had the same problem.

37.     In April 2010, one month after GM agreed to the limited recall, GM sent a letter to NHTSA informing NHTSA that it had information indicating that the 2004-2007 model year

- 7 -

Saturn Ions were likewise affected by EPS defects leading sources to question whether the Saturn Ions should also have been included in the March 2010 recall.

38.     In September 2011, due to consumer complaints, NHTSA opened an investigation into the EPS defect in Saturn Ions.

39.     Importantly, NHTSA database records show complaints from Saturn Ion owners as early as June 2004, with the first injury reported in May 2007. In total, NHTSA linked approximately 12 crashes and two injuries to the EPS defect in the Saturn Ions. But GM did nothing.

40.     In 2011, GM CEO Mary Barra – then head of product development – was advised by engineer Terry Woychowski that there was a serious power steering issue in Saturn Ions.[7] Ms. Barra was also aware of the ongoing NHTSA investigation. At the time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in GM's 2010 steering recall of Cobalt and G6 vehicles. Despite having this knowledge, GM did not recall additional vehicles.

41.     Three years later, on March 31, 2014, GM finally announced a recall of the approximately 1.3 million Defective Vehicles in the United States affected by the EPS defect. The March 2014 recall finally included the Saturn Ion model years 2004-2007, along with the: 2004-2006 and 2008-2009 model year Chevrolet Malibu; 2004-2006 model year Chevrolet Malibu Maxx; 2009-2010 model year Chevrolet HHR; 2010 model year Chevrolet Cobalt; 2005-2006 and 2008-2009 model year Pontiac G6; and 2008-2009 model year Saturn Aura.

42.     GM provided dealers with notice of the later recall on March 31, 2014, and mailed letters to some of the current owners of the Defective Vehicles in June, 2014, announcing and explaining the recall. Under the recall, the dealers are to conduct the following repairs according to one of four bulletins:

---

[7] October 3, 2011 Email from Terry Woyochowski to Mary Barra regarding NYT on ION Upgrade, available at:
http://democrats.energycommerce.house.gov/sites/default/files/documents/E-mail-Woychowski-Barra.pdf

a. Bulletin 14115, which covers model year 2004-2007 Saturn Ion, 2009-
2010 Chevrolet HHR and 2010 Chevrolet Cobalts, instructs dealers to
replace the EPS system motor;

b. Bulletin 14116, which covers model year 2004-2006 Chevrolet Malibu
and Malibu Maxx, 2005-2006 Pontiac G6 and 2008-2009 Chevrolet
Malibu, Pontiac G6 and Saturn Aura built from March 1, 2008, through
June 27, 2008, instructs dealers to replace the torque sensor assembly of
those models;

c. Bulletin 14117, which covers model year 2008 Chevrolet Malibu, Pontiac
G6 and Saturn Aura built from February 1, 2008, through February 28,
2008, instructs dealers to replace the torque sensor assembly and EPS
motor controller unit; and

d. Bulletin 14118 covers model year 2008 Chevrolet Malibu, Pontiac G6 and
Saturn Aura built from October 1, 2007, through January 31, 2008,
instructs dealers to replace the EPS motor controller unit.

43.     After announcing the March 31, 2014 recall, Jeff Boyer, GM's Vice President of
Global Vehicle Safety, acknowledged that GM recalled some of these same vehicle models
previously for the same issue, but that GM "did not do enough."

44.     Similarly, in a video message addressed to GM employees on March 17, 2014,
CEO Mary Barra admitted that the Company had made mistakes and needed to change its
processes. According to Ms. Barra, "[s]omething went terribly wrong in our processes in this
instance, and terrible things happened." Ms. Barra went on to promise, "[w]e will be better
because of this tragic situation if we seize this opportunity."[8]

45.     Significantly, documents released by NHTSA show that GM received nearly
4,800 consumer complaints and more than 30,000 claims for warranty repairs related to the EPS

---

[8] *"Something Went 'Very Wrong' at G.M., Chief Says."* N.Y. TIMES (Mar. 18, 2014).

- 9 -

problem on the Saturn Ion. That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent. By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[9] Here, the rate translates to 1430 complaints per 100,000 vehicles.

**D.    GM Advertised the Defective Vehicles as Safe.**

46.    On information and belief, GM's marketing and advertising materials consistently promoted all its vehicles, including the Defective Vehicles sold after July 5, 2009, as safe and reliable.

47.    For example, a radio ad that ran from GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

48.    An online ad for "GM certified" used vehicles that ran from July 6, 2009 until April 5, 2010 stated that "GM certified means no worries."

49.    The Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "[a]s long as there are babies, there'll be Chevys to bring them home."

50.    Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

51.    A national online ad campaign for GM in April of 2012 stressed "Safety. Utility. Performance."

52.    A national print ad campaign in April of 2013 stated that "[w]hen lives are on the line, you need a dependable vehicle you can rely on. Chevrolet and GM…for power, performance and safety."

53.    A December 2013 GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

---

[9] *See* http://www-odi.nhtsa.dot.gov/cars/problems/defect/-
results.cfm?action_number=EA06002&SearchType=QuickSearch&summary=true.

54.     GM made these and similar representations to boost new and used vehicle sales and maximize profits at the same time it knew there were EPS system defects in the Defective Vehicles.

55.     Throughout the relevant period, GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the EPS system in the Defective Vehicles and the existence of the defects in those vehicles.

56.     Until recently, GM never informed consumers about the EPS system defect in the Defective Vehicles.

**E.     Plaintiff and Class Members Were Injured by the EPS Defects.**

57.     The EPS defects have injured Plaintiff and Class members.

58.     Plaintiff and Class members' vehicles are worth less than they would be without the defects. A vehicle purchased, leased, or retained with serious safety defects is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

59.     A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of accident because of the EPS defects.

60.     Plaintiff and those Class members who purchased new or used Defective Vehicles after July 5, 2009, overpaid for their Defective Vehicles as the result of GM's conduct. They paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had GM disclosed the EPS system defects. Because GM concealed the EPS system defects, the Plaintiff and Class members did not receive the benefit of the bargain.

61.     Plaintiff and Class members now have unsafe vehicles that are worth less than they would have been but for GM's failure to disclose and remedy the EPS defects. Any reasonable consumer would be reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

62.     There have been at least 12 accidents and multiple injuries linked to the EPS system defects in the Defective Vehicles. However, Plaintiff believes that the actual numbers

- 11 -

may be much higher, and that there may have been hundreds of deaths and injuries attributable to the EPS defects.

63.      If GM had timely disclosed the EPS defects as required by the TREAD Act, the law of fraudulent concealment, tortious interference with contract and the State consumer protection laws set forth below, Plaintiff and Class members' vehicles would now be safe to drive and would be considerably more valuable than they are now. Due to the publicity surrounding GM's conduct and its belated and expanding recall, a stigma has attached to the Defective Vehicles. A reasonable consumer would not purchase a Defective Vehicle now – let alone pay what otherwise would have been fair market value for the vehicle.

**F.     GM's Handling of the EPS Defects Is Part of a Pattern of Concealing Safety Defects.**

64.      Recently-revealed information suggests that GM's egregious mishandling of the EPS defects is part of a pattern of concealing known safety defects in GM vehicles.

65.      The federal government's investigation recently revealed that in 2008 training materials that explicitly discouraged employees from using words such as "safety," "safety related," "defect," "serious," and "failure" when communicating about issues with a vehicle. During a press conference, NHTSA Acting Administrator David Friedman said that such training prevented investigators and engineers from "clearly communicat[ing] up the chain when they suspect[ed] a problem." In the same materials, employees were also instructed to avoid words like "deathtrap," "widow maker," "rolling sarcophagus," "Hindenburg," "Titanic," "powder keg," "apocalyptic," "You're toast," and "Kervorkianesque" and phrases like "This is a lawsuit waiting to happen" and "Unbelievable engineering screw-up."

66.      Information about other defects – including the ignition switch systems and the electric power steering and airbag issues related to the wiring harness – shows GM's pattern and raises concerns as to whether GM is properly addressing the EPS defects.

**1.     *The Ignition Switch System Defects***

67.      It is critical that a vehicle remains on and all of its electrical systems operate under normal driving conditions. If an automaker knows about safety defects that affect the

- 12 -

vehicle's operation and electrical systems, it must promptly notify federal authorities and vehicle owners and correct the problems. GM failed to do so.

68.  The ignition switch systems in the Defective Vehicles have at least three defects:

   A.  First, the ignition switch is too weak to maintain the key in the "run" position. Therefore, Defective Vehicles and their electrical systems can shut down during ordinary driving. Documents released by GM state that the "detent plunger" is defective in that it does not provide enough torque to hold the key in place during operation.

   B.  Second, the ignition switch is too low, which causes the key and key fob to hang low enough that the driver's knee can easily bump them and inadvertently shut down the vehicle. The Defective Vehicles also use "slotted" keys, which compared to keys with a hole, allow the key ring and fob to hang lower.

   C.  Third, when the ignition switch is in the "accessory" or "off" position, the airbags are immediately disabled. NHTSA's Acting Administrator, David Friedman, recently testified before Congress, that NHTSA is not convinced that the non-deployment of the airbags in the recalled vehicles is solely attributable to a mechanical defect involving the ignition switch:

   And it may be even more complicated than that, actually. And that's one of the questions that we actually have in our timeliness query to General Motors. It is possible that it's not simply that the – the power was off, but a much more complicated situation where the very specific action of moving from on to the accessory mode is what didn't turn off the power, but may have disabled the algorithm.

   That, to me, frankly, doesn't make sense. From my perspective, if a vehicle – certainly if a vehicle is moving, the airbag's algorithm should require those airbags to deploy. Even if the – even if the vehicle is stopped and you turn from 'on' to 'accessory,' I believe that the airbags should be able to deploy.

- 13 -

> So this is exactly why we're asking General Motors this
> question, to understand is it truly a power issue or is there
> something embedded in their [software] algorithm that is
> causing this, something that should have been there in their
> algorithm.[10]

69.    When a Defective Vehicle's engine and electrical system shuts down, the power
steering and power brakes also shut down, creating a serious risk of accident. When the electrical
system shuts down, the vehicle's airbags and seatbelt pretensioners are disabled, creating a
serious risk of serious bodily harm or death if an accident occurs.

70.    The Defective Vehicles are, therefore, unreasonably disposed to accidents, and
those accidents are unreasonably likely to result in serious bodily harm or death to the drivers
and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

## 2.    *Airbag problems related to defective wiring harnesses*

71.    Over 1.2 million vehicles sold by Old GM and later GM between 2003 and 2010
had defective wiring harnesses. As the wiring harness connectors in the side-impact airbags
("SIABs") corrode or loosen over time, resistance increases. The airbag sensing system interprets
this increase in resistance as a problem, and the "SERVICE AIR BAG" light appears on the
dashboard. The light may appear occasionally at first, and the airbags and pretensioners will still
deploy. Over time, the resistance can increase to the point where the SIABs, pretensioners, and
front center airbags will not deploy in the event of a collision.[11]

72.    The problem apparently started when GM switched from using gold-plated
terminals to connect its wire harnesses to cheaper tin terminals in 2007.

73.    In June 2008, Old GM experienced a spike in warranty claims for airbag service
on certain vehicles.

74.    In September 2008, after testing the cheaper tin terminals, Old GM determined
that corrosion and wear to the connectors caused increased resistance in the airbag wiring. So

---

[10] Congressional Transcript, Testimony of David Friedman, Acting Administrator of NHTSA
(Apr. 2, 2014), at 19.
[11] *See* GM Notice to NHTSA dated March 17, 2014, at 1.

- 14 -

Old GM released a technical service bulletin on November 25, 2008, for 2008-2009 Buick Enclaves, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models that instructed dealerships to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line. Old GM also initiated the transition back to gold-plated terminals in certain vehicles. After these supposed remedies, Old GM suspended all investigation into the defective airbag wiring and took no further action.[12]

75.    GM knew about the airbag problems when it assumed Old GM's obligation to report any known, dangerous defects in GM vehicles.

76.    And, in November 2009, GM received similar reports of increased airbag service messages in the 2010 Chevy Malibu and 2010 Pontiac G6 vehicles. After investigating, GM concluded that corrosion and wear in the same tin component caused the airbag problems in the Malibu and G6 models.[13]

77.    In January 2010 and after reviewing the Malibu and G6 airbag problems, GM determined that, by ignoring the "SERVICE AIR BAG" light, the resistance could increase so much that a SIAB may not deploy in a side impact collision.

78.    On May 11, 2010, GM issued a Customer Satisfaction Bulletin for the Malibu and G6 models instructing dealerships to secure both front seat-mounted and side-impact airbag wire harnesses and, if necessary, to reroute the wire harness.[14]

79.    From February to May 2010, GM monitored the data on vehicles with faulty harness wiring issues and noted another spike in airbag service warranty claims leading to the conclusion that the November 2008 bulletin was "not entirely effective in correcting the [wiring defect present in the vehicles]."

80.    On November 23, 2010, GM issued another Customer Satisfaction Bulletin for affected vehicle models, including the 2008 Buick Enclave, 2008 Saturn Outlook, 2008 GMC

---

[12] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.
[13] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 2.
[14] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 2.

- 15 -

Acadia, models built from October 2007 to March 2008. The bulletin instructed dealerships to secure SIAB harnesses and re-route or replace the SIAB connectors.[15]

81.     Then, on February 3, 2011, GM issued a revised Customer Service Bulletin instructing dealerships to replace the front seat-mounted side impact airbag connectors in the same defective vehicles listed in the November 2010 bulletin. In July 2011, GM again replaced its connector. This time GM used a Tyco-manufactured connector featuring a silver sealed terminal.[16]

82.     But in 2012 GM noticed another increase in warranty claims relating to SIAB connectors in vehicles built in the second half of 2011. After some analysis, it discovered that inadequate crimping of the Tyco connector terminals caused increased system resistance.

83.     In response, GM issued an internal bulletin for 2011-12 Buick Enclaves, Chevy Traverses, and GMC Acadias, recommending dealers repair affected vehicles by replacing the original connector with a new sealed connector.[17]

84.     The defect was still uncured, however, because GM experienced another increase in service repairs and buyback activity due to "SERVICE AIR BAGS" lights in 2013.

85.     On October 4, 2013, GM began an investigation into airbag connector problems in 2011-2013 Buick Enclaves, Chevy Traverses, and GMC Acadias. The investigation revealed an increase in warranty claims for these models built in late 2011 and early 2012.[18]

86.     On February 10, 2014, GM concluded that corrosion and crimping issues were again the cause of the airbag problems.[19]

87.     GM initially planned to issue a less-urgent Customer Satisfaction Program to address the airbag problem in the 2010-2013 Defective Vehicles. After, a call with NHTSA on March 14, 2014, that GM finally issued a safety recall on the vehicles with the faulty harness

---

[15] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 3.

[16] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 3.

[17] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 4.

[18] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 4.

[19] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 5.

wiring. Consistent with GM's prior dilatory behavior, it took four investigations and at least six service bulletins on the problem before GM finally issued the recall. The recall as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover approximately 1.2 million vehicles.[20]

88.     On March 17, 2014, GM issued a recall for 1,176,407 vehicles potentially afflicted by airbag problem. The recall instructs dealerships to remove driver and passenger SIAB connectors and splice and solder the wires together.[21]

## V.    GM'S DUTY TO DISCLOSE THE EPS SYSTEM DEFECTS

89.     It does not matter whether GM or Old GM manufactured or sold a particular Defective Vehicle to a particular purchaser; GM is responsible for its *own* actions with respect to *all* the Defective Vehicles, and, because GM was aware of the serious safety defects and knew that owners of Defective Vehicles were unaware of those defects, the resulting harm to Class members that occurred as the result of GM's acts and omissions. Under these circumstances, GM had the clear duty to disclose (and not conceal) the EPS system defects, the ignition switch defects, and other safety defects to Plaintiff and Class members – regardless of when they acquired their Defective Vehicles.

90.     GM's legal obligations stem from several different sources, including, but not limited to: (i) the obligations it explicitly assumed under the TREAD Act to promptly report any safety defect to NHTSA and Defective Vehicle owners to allow for appropriate remedial action; (ii) the duty it had under the law of fraudulent concealment and tortious interference with contract, as pleaded below; (iii) the duty it had under the State consumer protection laws, as pleaded below; and (iv) the general legal principle embodied in § 324A of the Restatement (Second) of Torts, ("Liability To Third Person For Negligent Performance Of Undertaking").

---

[20] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 5.
[21] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 5.

91.     In acquiring Old GM, GM expressly assumed the obligations to make all required disclosures under the TREAD for all the Defective Vehicles, but failed to make those disclosures.

92.     Under TREAD, if it is determined that vehicle has a safety defect, the manufacturer *must* promptly notify vehicle owners, purchasers and dealers of the defect, and may be ordered to remedy the defect.[22]

93.     Under TREAD, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."[23] At a minimum, the report to NHTSA must include:  the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect.[24]

94.     The manufacturer must also promptly inform NHTSA regarding:  the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.[25]

95.     GM expressly assumed a duty to all Defective Vehicle owners under the TREAD Act and then violated this duty.

96.     Under § 324A of the *Restatement*, an entity that undertakes to render services that he should recognize as necessary for the protection of a third person or his things, is subject to

---

[22] 49 U.S.C. § 30118(b)(2)(A) & (B).

[23] 49 C.F.R. § 573.6(a) & (b).

[24] 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

[25] 49 C.F.R. § 276.6(b) & (c).

- 18 -

liability for harm caused to the third person by the entity's failure to exercise reasonable care to protect the undertaking if [] the failure to establish reasonable care increases the risk of such harm . . . ." While the doctrine was conceived in the context of physical harm, it has grown to include economic loss, such as that suffered by Plaintiff and Class members.

97.     *Restatement* § 324A applies to gratuitous undertakings, but applies with even greater force here, where GM is receiving substantial remuneration for its undertaking in relation to its dealerships' service centers. GM, which provides parts for the Defective Vehicles as they are serviced at its dealerships, reaps substantial revenues from dealerships for servicing the Defective Vehicles. It also incidentally benefits when many of the people eventually sell or trade in their Defective Vehicles for new ones.

98.     Consumers using GM service centers and buying GM replacement parts necessarily rely on GM to advise its dealerships of defects in a timely manner, notify its dealerships of safety-related issues, and provide its dealerships with accurate and up to date information to enable them to remedy defects. GM's failure to carry out these obligations has increased the risk of harm to owners of Defective Vehicles, who regularly have their vehicles inspected and serviced at GM dealerships and rely upon representations that the vehicles are safe and free of defects.

99.     GM's dealerships rely on GM's expertise regarding how the vehicles should be maintained and what conditions are necessary for the dealer to conclude that the vehicles are in proper working order at the time they are inspected, serviced and released back to the owner. The dealerships further rely on GM to assure the safety of its vehicles, inform them of safety related problems that come to GM's attention, and to pass along knowledge regarding defects and repairs for those defects. Dealers servicing the Defective Vehicles, as well as the consumers who go to a GM dealership for repairs, rely on GM's representations that the vehicles and their component parts and safety features will function correctly if certain conditions are met when the vehicles are inspected and serviced. GM's breach of its obligations to its dealerships has resulted in harm to Plaintiff and Class members.

- 19 -

## VI. CLASS ALLEGATIONS

100. Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

Plaintiff brings this action on behalf of himself and a Class initially defined as follows:

> During the fullest period allowed by law, all persons in the United
> States who own or lease, or who sold after March 1, 2014, one or
> more of the following GM vehicles: 2004-2006, 2008-2009 Chevy
> Malibu; 2004-2006 Chevy Malibu Maxx; 2009-2010 Chevy HHR
> (non-turbo); 2010 Chevy Cobalt; 2005-2006, 2008-2009 Pontiac
> G6; 2004-2007 Saturn Ion; 2008-2009 Saturn Aura ("Defective
> Vehicles").

101. To the extent warranted, the list of Defective Vehicles list will be supplemented to include other GM vehicles that have the defective EPS system, which suddenly and unexpectedly lose power steering during ordinary driving conditions.

102. Excluded from the Class are Old GM and GM, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of GM; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

103. On information and belief, there are at least 1.3 million Defective Vehicles nationwide. Individual joinder of all Class members is impracticable.

104. The Class expressly disclaims any recovery in this action for physical injury resulting from the EPS system defects. However, the increased risk of injury from the EPS defects serves as an independent justification for the relief sought by Plaintiff and the Class.

105. The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

106. Questions of law and fact are common to the Class and predominate over questions affecting only individual members. Those questions include but are not limited to the following:

A. Whether the Defective Vehicles suffer from EPS system defects;

B. Whether GM concealed the defects;

C. Whether GM misrepresented that the Defective Vehicles were safe;

D. Whether GM engaged in fraudulent concealment;

E. Whether GM tortuously interfered with the contracts between its dealerships and owners of Defective Vehicles;

F. Whether GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective EPS systems;

G. Whether the alleged conduct by GM violated laws as Plaintiff alleges;

H. Whether GM's unlawful, unfair, and/or deceptive practices harmed Plaintiff and Class members;

I. Whether Plaintiff and Class members are entitled to equitable and/or injunctive relief; and

J. Whether any or all applicable limitations periods are tolled by acts of fraudulent concealment.

107. Plaintiff's claims are typical of the claims of the Class members, and arise from the same course of conduct by GM. Plaintiff also seeks relief that is typical of the relief sought for the absent Class members.

108. Plaintiff will fairly and adequately represent and protect the interests of all absent Class members. Plaintiff is represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

109. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (1) joinder of all the individual Class members is impracticable; (2) the damages suffered by each individual Class member may be relatively small; (3) the expense and burden of individual litigation adverse GM would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them

- 21 -

individually; and (4) the burden imposed on the judicial system by individual actions by 1.3 million individuals would be enormous.

110.    The prosecution of separate actions by the individual Class members would also create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM. Conducting this action as a class action – as opposed to separate individual actions – presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

111.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Plaintiff anticipates providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

## VII.    TOLLING OF STATUTE OF LIMITATIONS

112.    GM's knowing and active fraudulent concealment of the facts stated herein tolls all applicable statute of limitations. Plaintiff and Class members did not discover and were not aware of facts that would have led a reasonable person to suspect that GM did not report information within its knowledge to federal authorities, including the NHTSA, its dealerships or customers. A reasonable and diligent investigation would not have revealed that GM had information in its possession about the existence of safety defects. GM concealed that information until recently.

113.    Since July 5, 2009, GM has been under a continuing duty to disclose to NHTSA, its dealerships, Plaintiff and Class members, the true character, quality, and nature of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

114.    Because of the active concealment by GM, any and all limitations periods otherwise applicable to Plaintiff's claims have been tolled.

- 22 -

## VIII.  CAUSES OF ACTION

### A.    Common Law Claims

## COUNT I
## FRADULENT CONCEALMENT

115.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

116.    GM concealed and suppressed material facts concerning the EPS defects.

117.    GM had a duty to disclose the EPS system defects because the defects were known and/or accessible only to GM, which had superior knowledge and access to facts that GM knew were not known to or reasonably discoverable by Plaintiff and Class members. The facts that GM suppressed and concealed were material to Plaintiff and the Class members because they directly impacted the safety of the Defective Vehicles.

118.    At the expense of Plaintiff and Class members, GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid a costly recall.

119.    On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiff and Class members and conceal material information regarding the defects that exist in the Defective Vehicles and other GM vehicles.

120.    Plaintiff and Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff and Class members' actions were justified because GM was in exclusive control of material facts that were unknown to the public, Plaintiff, or Class members.

121.    Plaintiff and Class members sustained damage because of the concealment and/or suppression of the facts; GM's fraudulent concealment of the EPS system defects has diminished the value of Plaintiff's and the Class members' vehicles and tarnished the reputation of the Defective Vehicles, making any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

- 23 -

122.     Class members who purchased new or used Defective Vehicles after July 5, 2009,
either would have paid less for the vehicles or would not have purchased them at all had they
been aware of the material facts that GM concealed and suppressed. Thus, as a result of GM"s
fraudulent concealment, Plaintiff and the Class members did not receive the benefit of their
bargain.

123.     GM's acts were done maliciously, oppressively, deliberately, with intent to
defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being to
enrich GM. GM's conduct warrants an award of punitive damages, in an amount to be
determined at trial, to deter such conduct in the future.

## COUNT II
## TORTIOUS INFERFERENCE WITH CONTRACT

124.     Plaintiff incorporates by reference the allegations in the above paragraphs as if
fully set forth herein.

125.     The Defective Vehicles sold to Plaintiff and Class members were either serviced
or repaired under contracts with GM dealerships. Under those contracts, the GM dealerships
were required to service, repair and inspect the Defective Vehicles and ensure that any safety
defects were repaired or, at a minimum, that owners of Defective Vehicle were apprised of safety
defects and advised of the means and cost of repairing any such defects.

126.     GM was aware that its dealerships were servicing and repairing Defective
Vehicles and that those dealerships relied on GM to advise them of any known safety defects in
the vehicles. GM educated and advised dealerships on the proper procedures for evaluating and
servicing vehicles. On information and belief, in repairing and servicing GM vehicles, GM
dealerships follow protocols set by GM and those protocols omitted information and procedures
necessary to identify and repair problems resulting from the EPS system defects.

127.     GM was aware of the EPS system defects on July 5, 2009, but chose not to inform
its dealerships of the nature and extent of the defects to avoid the substantial cost and negative
publicity of a recall. GM also knew that, by concealing its knowledge of the EPS system defects,

- 24 -

it would cause its dealerships to return serviced and repaired Defective Vehicles to their owners, including Plaintiff and the Class members, without having repaired the EPS system defects.

128.   GM's intentional concealment of the EPS system defects from its dealerships caused its dealerships to breach their service and repair agreements with owners of Defective Vehicles.

129.   As intended, GM profited from its dealerships' servicing and provision of parts to owners of Defective Vehicles.

130.   As a result of GM's intentional concealment of the EPS system defects from its dealerships, Plaintiff and Class members suffered damages. Their vehicles remained defective, and have significantly declined in value because the dealers did not effectively service and/or repair Defective Vehicles, as they were required to do under their contracts with owners of Defective Vehicles.

131.   Plaintiff and Class members seek the difference in value between their vehicles in their defective state and what the value would have been had GM's dealerships remedied the EPS system defect as they were obligated to do under their contracts with owners of Defective Vehicles.

132.   GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being to enrich GM. GM's conduct was particularly egregious as it continued to reap profits from owners of Defective Vehicles while concealing its knowledge of the costly and dangerous EPS system defects that placed Defective Vehicle owners, their passengers, other drivers and their passengers at significant risk. GM's conduct shows a blatant disregard for the rights of owners of Defective Vehicles. Accordingly, Plaintiff seeks punitive damages in an amount to be determined at trial.

133.   Plaintiff also seeks other remedies deemed appropriate by the Court.

///

///

- 25 -

## B.     State Statutory Claims

### COUNT III
### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *et seq.*)

134.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

135.     GM is a "person" under CAL. CIV. CODE § 1761(c).

136.     Plaintiff and Class members are "consumers," as defined by CAL. CIVIL CODE § 1761(d), who purchased or leased one or more Defective Vehicles.

137.     GM engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq.*, as described above and below.

138.     Under the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.[26]

139.     When GM acquired Old GM, it expressly assumed the obligations to make all required disclosures under the TREAD Act with respect to all the Defective Vehicles.

140.     Under the TREAD Act, if it is determined that a vehicle has a safety defect, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect, and may be ordered to remedy the defect.[27]

141.     The TREAD Act also requires manufacturers to file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."[28] At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for

---

[26] 49 U.S.C. § 30118(c)(1) & (2).
[27] 49 U.S.C. § 30118(b)(2)(A) & (B).
[28] 49 C.F.R. § 573.6(a) & (b).

determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect.[29]

142.    The manufacturer is also required to promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.[30]

143.    The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government. The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000."[31]

144.    GM knew of the EPS system problem on July 5, 2009, because of the knowledge of Old GM personnel who remained at GM and because of continuous reports and internal investigations that persisted until only recently.

145.    GM admits the defect in the EPS has been linked several accidents and injuries.

146.    Despite being aware of the EPS system defects since its inception on July 5, 2009, GM waited until March 2014, before finally sending a letter to NHTSA confessing its knowledge of the EPS system defects, which could cause the vehicles to lose power steering and become difficult to control.

147.    GM's knowledge is confirmed by the fact that it previously recalled the Chevrolet Cobalt and Pontiac G6 in March 2010, for similar EPS system defects. Those makes and models employed the same EPS system as other GM models, including Mr. Stevenson's 2007 Saturn Ion, that – inexplicably – were not recalled until March 31, 2014. By failing to disclose and by actively concealing the EPS system defect, and by selling vehicles while violating the TREAD

---

[29] 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).
[30] 49 C.F.R. § 276.6(b) & (c).
[31] 49 C.F.R. § 578.6(c).

- 27 -

Act and through its other conduct as alleged herein, GM engaged in deceptive business practices prohibited by the California Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq*.

148.    GM failed for many years to inform NHTSA about known defects in the Defective Vehicles' EPS system. Consequently, the public, including Plaintiff and Class members, received no notice of the EPS system defects or that they could unexpectedly lose power steering in their vehicles, making the vehicles significantly more difficult to control and increasing the probability of an accident.

149.    GM knew the Defective Vehicles could unexpectedly lose power steering, making the Defective Vehicles significantly more difficult to control and increasing the probability of an accident. Despite having a duty to do so, GM failed to inform NHTSA or warn Plaintiff, the Class members or the public about these inherent dangers.

150.    GM owed Plaintiff and Class members a duty to comply with the TREAD Act and disclose the defective nature of the Defective Vehicles, including the EPS system defect and accompanying loss of power steering because GM:

> A. Possessed exclusive knowledge of the EPS system defects rendering the Defective Vehicles inherently more dangerous and unreliable than otherwise similar vehicles; and
>
> B. Intentionally concealed the hazardous situation with the Defective Vehicles by failing to comply with the TREAD Act, which required the disclosure of the EPS system defects.

151.    Defective Vehicles equipped with the faulty EPS system pose an unreasonable risk of death or serious bodily injury to Plaintiff, Class members, passengers, other motorists, and pedestrians, because they are susceptible to sudden loss of power steering resulting in Defective Vehicles becoming increasingly difficult to steer and control, especially at lower speeds.

152.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of the Defective Vehicles.

153.    Because of its CLRA violations detailed above, GM caused actual damage to Plaintiff and, if unabated, will continue to harm Plaintiff and Class members. Plaintiff and Class members currently own or lease Defective Vehicles that are defective and inherently unsafe. These violations caused the diminution in value of Plaintiff's and Class member's vehicles which are now worth less than they would have been had GM timely disclosed the defects. Because GM fraudulently concealed the defects, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Vehicles has greatly diminished. No rational consumer would purchase the Defective Vehicles in light of the stigma attached to those vehicles by GM's conduct.

154.    Had GM timely disclosed the EPS system defects, the issue would have been resolved years ago and the value of Plaintiff's Defective Vehicles would not now be diminished.

155.    Further, Class members who purchased or leased new or used Defective Vehicles after on or July 5, 2009, did not receive the benefit of their bargain as a result of GM's unfair and deceptive conduct that violated the TREAD Act and the CLRA. Had these Class members been aware of the EPS system defects they would not have purchased the vehicles or would have paid less for their vehicles.

156.    Plaintiff and Class members face the risk of irreparable injury as a result of GM's CLRA violations, and these violations present a continuing risk to Plaintiff, Class members and to the general public.

157.    Plaintiff seeks an order enjoining unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

158.    Plaintiff sent a CLRA Notice Letter to GM on March 15, 2014 (**Exhibit A**). After thirty days, Plaintiff will, under CAL. CIV. CODE § 1780(a), seek monetary relief against GM

- 29 -

measured as the diminution of the value of his vehicle caused by GM's violations of the CLRA as alleged herein.

159.    Under CAL. CIV. CODE § 1780(b), Plaintiff will seek an additional award against GM of up to $5,000 for each Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA. GM knew or should have known that its conduct was directed to one or more Class members who are senior citizens or disabled persons. GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more Class members who are senior citizens or disabled persons are substantially more vulnerable to GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from GM's conduct.

160.    Plaintiff will also seek punitive damages against GM because it willfully and consciously disregarded the rights and safety of others, potentially subjecting Plaintiff and Class members to cruel and unjust hardship. GM also intentionally and willfully concealed and failed to inform NHTSA of the unsafe and unreliable Defective Vehicles. GM deceived Plaintiff and Class members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations problem of disclosing and correcting a deadly flaw in the Defective Vehicles. GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under CAL. CIV. CODE § 3294.

161.    Plaintiff includes an affidavit with this Complaint that show that venue in this District is proper, to the extent such affidavits are required by CAL. CIV. CODE § 1780(d) **(Exhibit B).**

///

///

- 30 -

## COUNT IV
## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

162.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

163.   California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." GM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

164.   GM violated the unlawful prong of section 17200 by its violations of the CLRA, CAL. CIV. CODE § 1750, *et seq.*, as set forth in Count III and by the acts and practices set forth in this Complaint.

165.   GM also violated the unlawful prong because it engaged in business acts or practices that are unlawful because they violate the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its regulations.

166.   GM violated the TREAD Act when it failed to timely inform NHTSA of the EPS system defects and allowed cars to be sold and remain on the road with these defects.

167.   GM violated the unfair and fraudulent prong of section 17200 because, in failing or refusing to inform NHTSA about a defect affecting the safety and reliability of the Defective Vehicles, GM prevented reasonable owners from discovering their vehicles were unsafe and unreliable. The information that GM was required to disclose to NHTSA about the faulty EPS system was material to a reasonable consumer.

168.   GM also violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint, including the manufacture and sale of vehicles with an EPS system defect after July 5, 2009, and GM's failure to adequately disclose the defect to NHTSA so that a remedy could be implemented, offend established public policy, and also because the harm GM caused consumers greatly outweighs any benefits associated with those practices. GM's conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiff

- 31 -

and Class members from making fully informed decisions about whether to lease, purchase and/or retain the Defective Vehicles.

169.    While GM knew of the EPS system defects from the date of its inception on July 5, 2009, it continued to design, manufacture and market the Defective Vehicles until 2011. All the while, GM knew that the vehicles had an unreasonable propensity to shut down during ordinary driving conditions, leading to an unreasonable risk of serious bodily injury or death.

170.    Plaintiff and the Class members have suffered an injury, including the loss of money or property, because of GM's unfair, unlawful and/or deceptive practices. GM failed to inform NHTSA, and therefore failed to inform consumers, that its vehicles had a defective EPS system that could lead to injury and death, all in violation of Section 17200 of the UCL. These violations caused the diminution in value of Plaintiff's and Class member's vehicles which are now worth less than they would have been had GM timely disclosed the defects. Because GM fraudulently concealed the defects, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Vehicles has greatly diminished. No rational consumer would purchase the Defective Vehicles in light of GM's conduct and the stigma now attached to the Defective Vehicles.

171.    Had GM timely disclosed the EPS defects, the issue would have been resolved years ago and the value of Plaintiff's and Class member's Defective Vehicles would not now be diminished.

172.    Further, Class members who purchased or leased new or used Defective Vehicles after July 5, 2009, did not receive the benefit of their bargain and overpaid for their vehicles as a result of GM's unfair and deceptive conduct in violation of the TREAD Act, the CLRA, and Section 17200 of the UCL. Had these Class members been aware of the EPS defects they would have either paid less for their vehicles or would not have purchased the vehicles.

173.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

- 32 -

174.    Plaintiff and Class members have suffered an injury, including the loss of money
or property, due to GM's unfair, unlawful and/or deceptive practices.

175.    Plaintiff requests that this Court enter such orders or judgments as may be
necessary, including a declaratory judgment that GM has violated the UCL; an order enjoining
GM from continuing its unfair, unlawful, and/or deceptive practices; an order and judgment
restoring to Class members any money lost as a result of unfair, unlawful and deceptive trade
practices, including restitution and disgorgement of any profits GM received as a result of its
unfair, unlawful and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203,
CAL CIV. PROC. § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and
proper.

### COUNT V
### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CALIFORNIA "LEMON LAW")
### (CAL. CIV. CODE §§ 1791.1 & 1792)

176.    Plaintiff incorporates by reference the allegations in the above paragraphs as if
fully set forth herein.

177.    Plaintiff and Class members who purchased or leased the Defective Vehicles in
California are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

178.    The Defective Vehicles are "consumer goods" within the meaning of CIV. CODE
§ 1791(a).

179.    Old GM was a "manufacturer" of the Defective Vehicles within the meaning of
CAL. CIV. CODE § 1791(j), and, in acquiring Old GM, GM expressly assumed liability and
responsibility for "payment of all [Old ] Liabilities arising under ... Lemon Laws," including
California's Lemon Law, the Song-Beverly Act.

180.    Old GM impliedly warranted to Plaintiff and Class members that its Defective
Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792;
however, the Defective Vehicles do not have the quality that a buyer would reasonably expect,
and were therefore not merchantable.

- 33 -

181.  CAL. CIV. CODE § 1791.1(a) states:
      "Implied warranty of merchantability" or "implied warranty that
      goods are merchantable" means that the consumer goods meet
      each of the following:

      (1)   Pass without objection in the trade under the contract
            description.

      (2)   Are fit for the ordinary purposes for which such goods are
            used.

      (3)   Are adequately contained, packaged, and labeled.

      (4)   Conform to the promises or affirmations of fact made on
            the container or label.

182.   The Defective Vehicles would not pass without objection in the automotive trade

because of the EPS system defects that cause the Defective Vehicles to inadvertently shut down

during ordinary driving conditions, leading to an unreasonable likelihood of accident and an

unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle

occupants.

183.   Because of the EPS system defects, the Defective Vehicles are not safe to drive

and thus not fit for ordinary purposes.

184.   The Defective Vehicles are not adequately labeled because the labeling fails to

disclose the EPS system defects. GM failed to warn about the dangerous safety defects in the

Defective Vehicles

185.   Old GM breached the implied warranty of merchantability by manufacturing and

selling Defective Vehicles containing defects leading to the potential safety issues during

ordinary driving conditions. These defects have deprived Plaintiff and the Class members of the

benefit of their bargain and have caused the Defective Vehicles to diminish in value.

186.   As a direct and proximate result of Old GM's breach of its duties under

California's Lemon Law (for which GM expressly assumed liability), Plaintiff and Class

members received goods whose dangerous condition substantially impairs their value to Plaintiff

- 34 -

and class members. Plaintiff and Class members have been damaged by the diminished value of Old GM's products, the products' malfunctioning, and the nonuse of their Defective Vehicles.

187.    Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiff and Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Defective Vehicles, or the overpayment or diminution in value of their Defective Vehicles.

188.    Under CAL. CIV. CODE § 1794, Plaintiff and Class members are entitled to costs and attorneys' fees.

### COUNT VI
### VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT ("MCPA), (Michigan Comp. Laws Ann. § 445.901 et seq.)

189.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

190.    This Claim is brought on behalf of nationwide Class of purchasers.

191.    At all times relevant hereto, Plaintiff and the nationwide Class members were "person[s]" within the meaning of MCPA. *See* M.C.L.A § 445.902(1)(d).

192.    At all relevant times hereto, GM was likewise a "person" engaged in "trade or commerce" within the meaning of the MCPA. *See* M.C.L.A. § 445.902(1)(d) and (g).

193.    The MCPA holds unlawful certain "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." M.C.L.A. § 445.902(1).

194.    GM's practices described above violate the MCPA for one or more of the following reasons:

   a. GM represented that the Defective Vehicles had approval, characteristics, uses, and benefits that they do not have;

   b. GM provided, disseminated, marketed, and otherwise distributed false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Defective Vehicles;

   c. GM represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were of another;

- 35 -

d. GM engaged in unconscionable commercial practices in failing to reveal material facts and information about the Defective Vehicles, which did and tended to, mislead Plaintiff and the Class members about facts that could not reasonably be known by the consumer until the March 2014 recall;

e. GM failed to reveal facts concerning the EPS system defects that were material to the transaction in light of representations of fact made in a positive manner;

f. GM failed to reveal material facts concerning the EPS system defects to Plaintiff and the Class members, the omission of which would tend to mislead or deceive consumers, including Plaintiff and the Class members;

g. GM made material representations and statements of fact to Plaintiff and the class members that resulted in Plaintiff and the Class members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

h. GM intended that Plaintiff and Class members rely on their misrepresentations and omissions, so that Plaintiff and other Class members would purchase or lease the Defective Vehicles.

195. Plaintiff seeks injunctive relief to enjoin GM from continuing their unfair and deceptive acts or; seeks monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Class member; reasonable attorneys' fees; and any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

196. GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being to enrich GM. GM's conduct was particularly egregious as it continued to reap profits from owners of Defective Vehicles while concealing its knowledge of the costly and dangerous EPS system defects that placed Defective Vehicle owners, their passengers, other drivers and their passengers at significant risk. GM's conduct shows a blatant disregard for the rights of owners of Defective Vehicles. Accordingly, Plaintiff also seeks punitive damages against GM because GMs' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

///

- 36 -

## COUNT VI
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

197.    Plaintiff incorporates by reference the allegations in the above paragraphs as if
fully set forth herein.

198.    Plaintiff and Class members are consumers who purchased or leased one or more
Defective Vehicles.

199.    GM had a statutory duty to refrain from unfair or deceptive acts or practices.

200.    GM violated this duty by failing to disclose and by actively concealing the EPS
defect, and by selling vehicles while violating the TREAD Act and through its other conduct as
alleged herein.

201.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive
reasonable consumers, including Plaintiff, about the true safety and reliability of the Defective
Vehicles.

202.    As a proximate result of GM's unfair, unlawful and/or deceptive practices,
Plaintiff and Class members suffered injury, including the loss of money or property. GM's
actions, as alleged herein, caused the diminution in value of Plaintiff's and Class members
vehicles which are now worth less than they would have been had GM timely disclosed the
defects. Because GM fraudulently concealed the defects, resulting in a raft of negative publicity
once the defects finally began to be disclosed, the value of the Defective Vehicles has greatly
diminished. No rational consumer would purchase the Defective Vehicles in light of GM's
conduct and the stigma now attached to the Defective Vehicles.

203.    Further, Class members who purchased or leased new or used Defective Vehicles
after July 5, 2009, did not receive the benefit of their bargain and overpaid for their vehicles as a
result of GM's unfair and deceptive conduct in violation of the TREAD Act, the CLRA, and
Section 17200 of the UCL. Had these Class members been aware of the EPS defects they would
have either paid less for their vehicles or would not have purchased the vehicles.

- 37 -

204.    GM's actions, as alleged herein, constitute unfair compensation or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below:

205.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, *et seq.*

206.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*

207.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*

208.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*

209.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq*.

210.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq*.

211.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq*.

212.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq*.

213.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Code Ann. § 10-1-370, *et seq*. and Ga. Code Ann. § 10-1-390, *et seq.*

214.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*

215.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq*.

216.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*

- 38 -

217.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*

218.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*

219.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. ch. 93A, *et seq.*

220.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445-901, *et seq.*

221.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*

222.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mo. Rev. Stat. § 407.010, *et seq.*

223.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

224.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*

225.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:l, *et seq.*

226.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*

227.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*

228.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

229.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

230.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-0, *et seq*.

231.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*

232.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. tit. 15 § 751, *et seq*.

233.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq*.

234.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq*.

235.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*

236.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq*.

237.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq*.

238.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq*.

239.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*

240.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq*.

241.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. Tit. 9. § 2451, *et seq*.

242.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq*.

- 40 -

243.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*

244.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq*.

245.    Plaintiff will provide notice to the Attorney General where required by state statute and has sent pre-suit demand letters where appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and in favor of Plaintiff and the Class, and grant the following relief:

A.    Determine that this action may be maintained as a class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class Representatives and Plaintiff's chosen counsel as Class Counsel;

B.    Declare, adjudge, and decree the conduct of GM as alleged herein to be unlawful, unfair, and/or deceptive, and enjoin any such future conduct;

C.    Award Plaintiff and Class members actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

D.    Award Plaintiff and Class members exemplary damages in such amount as proven;

E.    Award damages and other remedies as allowed by the laws of the States as alleged herein;

F.    Award Plaintiff and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

G.    Grant an injunction ordering GM to implement an effective remedy for all
      vehicles with defective EPS systems, including those not yet subject to recall; and

H.    Award Plaintiff and Class members such other further and different relief as the
      case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

246.  Plaintiff requests a trial by jury on the legal claims, as set forth herein.

DATED: July 3, 2014

**AXELROD & DEAN LLP**

By: _____

Robert J. Axelrod
830 Third Avenue, 5th Floor
New York, NY 10022
Tel: (646) 448-5263
rjaxelrod@axelroddean.com
*Local Counsel for Plaintiff*

## THE PAYNTER LAW FIRM PLLC

Stuart M. Paynter (226147)
Jennifer L. Murray (4184529[i])
1200 G Street N.W., Suite 800
Washington, DC 20005
Tel.: (202) 626-4486
Fax: (866) 734-0622
stuart@paynterlawfirm.com

## BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.

Andrew S. Friedman
Patricia N. Syverson
Kevin R. Hanger
2325 E. Camelback Rd. Ste. 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Fax: (602) 274-1199
afriedman@bffb.com
psyverson@bffb.com
khanger@bffb.com
*Attorneys for Plaintiff*

---

[i] Admitted in New York only.

- 42 -

# EXHIBIT A

T 206.623.7292    206.623.0594



Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 EIGHTH AVENUE, SUITE 3300
SEATTLE, WA 98101
www.hbsslaw.com
**Direct (206) 268-9320**
steve@hbsslaw.com

May 15, 2014

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

General Motors LLC
300 Renaissance Center
Detroit, MI 48243

> **Re:**   *Thomas Stevenson v. GM*
> **NOTICE PURSUANT TO:  California Civil Code § 1782**

Dear Sir/Madam:

Our law firm represents Thomas Stevenson ("Plaintiff") and all others similarly situated (the "Class") in an action against General Motors LLC ("GM") arising out of alleged misrepresentations, breaches of warranty, and violations of consumer protection statutes with regard to GM vehicle models that have defective electric power steering ("EPS").

GM made numerous material statements about the safety, quality, and repairs related to the affected vehicles that were either false or misleading and failed to disclose the dangerous EPS defect, even when it had a duty to do so.

GM knew of the EPS defect from the date of New GM's inception on July 5, 2009. Despite this knowledge, GM concealed this defect from consumers and owners of vehicles containing the defective EPS. Despite having a duty to warn Plaintiffs about the inherent dangers presented by this defect, GM failed to do so.

An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public. GM's Vehicle Safety Chief, Jeff Boyer said, "Nothing is more important than the safety of our customers in the vehicles they drive." Yet, GM failed to live up to this commitment.

The first priority of a car manufacturer should be to ensure its vehicles are safe, and that its vehicles have operable ignition systems, airbags, power-steering, power brakes and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision. A car manufacturer must try to ensure that, once a vehicle is running, it operates safely, and its safety critical systems (such as engine control, braking, and airbag systems) work properly until the driver shuts the vehicle down. A manufacturer that is aware of dangerous design defects that cause its vehicles to suddenly lose power steering must promptly disclose and remedy such defects.

SEATTLE   LOS ANGELES   BOSTON   CHICAGO   COLORADO SPRINGS   NEW YORK   PHOENIX   SAN FRANCISCO   WASHINGTON D.C.

010440-11 679484 V1

May 15, 2014
Page 2

Between 2003 and 2010, GM sold in the United States over 1.3 million vehicles with the EPS defect causing the vehicle's electric power steering to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk for collisions and injuries. The EPS defect can be attributed to one of three potentially faulty parts: the power steering motor, the steering column, or the power steering motor control unit. The defect may also be caused by the combination of a faulty steering column and power steering motor control unit.

In 2009, GM assumed Old GM's obligation to report any known, dangerous defects in GM vehicles, including the defective vehicles, which are affected by the faulty EPS. GM expressly assumed (i) responsibility to promptly notify NHTSA of any known safety defects in these "Old GM" vehicles and (ii) to make good on any "lemon law" warranty claims arising from defective vehicles sold by "Old GM."

On January 27, 2009, GM began its first investigation into the EPS defect. But over four months later, on June 9, 2009, GM moved the investigation to a monitor status because GM failed to identify a root cause and believed there was a low rate of warranty claims in relation to similar issues.

It wasn't until July 2009 that GM discovered the root cause of the EPS issue was a defective electric power-steering motor. But only after GM noticed a spike in the warranty claims did it transfer the investigation back to active status in October 2009. GM started production on a new motor to address the steering issues in December 2009.

Finally, on January 27, 2010, GM opened a Preliminary Evaluation to assess the frequency, scope, and safety consequences of the EPS defect. This investigation eventually resulted in the first safety recall, on March 1, 2010, of only the 2005-2010 Chevy Cobalt and 2007-2010 Pontiac G5 vehicles.

GM would not recall the other defective EPS Vehicles, including the 2010 Cobalt being recalled a second time for this same EPS issue, until March 31, 2014, over four years after the first EPS recall.

Documents released by the National Highway Traffic Safety Administration ("NHTSA") show that GM waited years to recall nearly 335,000 Saturn Ions for EPS failure—despite receiving nearly 4,800 consumer complaints and over 30,000 claims for warranty repairs. That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent. By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles. *See*http://www.odi.nhtsa.dot.gov/cars/problems/defect/results.cfm?action_number=EA06002&SearchType=QuickSearch&summary=true. Here, the rate translates to 1430 complaints per 100,000 vehicles.

In response to the consumer complaints, in September 2011 NHTSA opened an investigation into the EPS defect in Saturn Ions. NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007. NHTSA linked approximately twelve crashes and two injuries to the EPS defect in the Ions.

May 15, 2014
Page 3

In 2011, GM missed yet another opportunity to recall the additional vehicles with faulty EPS when CEO Mary Barra—then head of product development—was advised by engineer Terry Woychowski that there was a serious power steering issue in Saturn Ions. Ms. Barra was also informed of the ongoing NHTSA investigation. NHTSA was reportedly close to concluding the Saturn Ions should have been in GM's 2005 steering recall of Cobalt and G5 vehicles.

Yet GM took no action for four years. It wasn't until March 31, 2014, when GM finally recalled the approximately 1.3 million vehicles in the United States affected by the EPS defect.

After announcing the March 31, 2014 recall, Jeff Boyer, GM's Vice President of Global Vehicle Safety, acknowledged that GM recalled some of these same vehicle models previously for the *same issue*, but that GM "did not do enough."

This case arises from GM's breach of its obligations and duties, including GM's failure to disclose that, because of the defective EPS design, at least 1.3 million GM vehicles had the propensity to suddenly lose power steering during normal driving conditions, requiring greater effort by the driver to steer the vehicle and increasing the risk for collisions, serious bodily harm, and death.

The foregoing conduct affects:

> During the fullest period allowed by law, all persons in the United States who (i) currently own or lease one or more of the following GM vehicles: 2004-2006, 2008-2009 Chevrolet Malibu models; 2004-2006 Chevy Malibu Maxx models; 2009-2010 Chevrolet HHR (Non-Turbo) models; 2010 Chevrolet Cobalt models; 2008-2009 Saturn Aura models; 2004-2007 Saturn ION models; 2005-2006, 2008-2009 Pontiac G6 models; and some service parts installed into certain vehicles before May 31, 2010 under a previous safety recall ("Defective Vehicles"), or (ii) sold a Defective Vehicle on or after March 31, 2014. To the extent warranted, this list will be supplemented to include other GM vehicles that have defective EPS, which inadvertently lose power steering during ordinary driving conditions.

By concealing this information, making false statements, and failing to fully remedy this dangerous condition, GM violated, and continues to violate the Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1770, *et seq.* Representing goods, including automobiles, have characteristics, uses, or benefits which they do not have, representing that goods are of a particular standard, quality or grade if they are of another, and advertising goods with intent not to sell them as advertised constitute unfair or deceptive trade practices under CLRA, CAL. CIV. CODE §§ 1770(a)(5), (7), and (14).

These unfair or deceptive acts or practices by GM violate the CLRA. They also violate California Business and Professions Code §§ 17200, *et seq.* and 17500, *et seq.*; constitute breach of the implied warranty of merchantability (CAL COM. CODE § 2314); and constitute fraudulent concealment.

This Notice is being served for a Class of current and former owners and lessees of Defective Vehicles, which will seek damages under the CLRA unless GM takes the actions requested here.

May 15, 2014
Page 4

Under CAL. CIV. CODE § 1782, Plaintiffs demand that GM halt such unfair trade practices and make the following appropriate remedies on a Class-wide basis:

- compensate Plaintiffs and all members of the Class for their overpayment in purchasing or leasing Defective Vehicles, and for the diminished value caused by GM's deceptive and unfair conduct;

- permit Plaintiffs and members of the Class to revoke acceptance of their vehicles and fully refund their purchase price or payments under their leases; and

- reimburse Plaintiffs and members of the Class for incidental and consequential damages.

In summary, under CAL. CIV. CODE § 1782, this letter serves as notification of GM's alleged violations of CAL. CIV. CODE § 1770, and Plaintiffs demand the above-described rectification of these violations on a Class-wide basis. Otherwise, Plaintiffs and the Class will seek recovery of damages, costs, and fees through the courts under the Consumer Legal Remedies Act.

The putative class demands that GM correct or otherwise rectify the damage caused by such unfair trade practices and return all excess monies paid by putative class members, and compensate them for the diminished value to their vehicles caused by GM's deceptive and unfair acts or practices. Otherwise, the class will continue to seek recovery of damages, costs and fees through the courts under CAL. CIV. CODE § 1780.

Sincerely,

HAGENS BERMAN SOBOL SHAPIRO LLP

for

Steve W. Herman

Each sheet can be used for one Certified Mail piece, which can be sent without Physical Return Receipt Service (Option Ⓐ) or with Physical Return Receipt Service (Option Ⓑ).

09-50026-mg    Doc 12808-7    Filed 08/01/14    Entered 08/01/14 17:31:28    Exhibit E
Pg 53 of 59

## CERTIFIED MAIL

# VOID

**Ⓐ**
**Certified Mail**
**WITHOUT Physical Return Receipt Service**

*(No Return Receipt Card)*
**Instructions**
1. Apply this label to the TOP EDGE of the mailpiece.
2. Apply address label below to the CENTER of the mailpiece.

**stamps.com**

PS Form 3800 6/02

**U.S. Postal Service — Certified Mail Receipt**

| **ARTICLE NUMBER** 9407 1118 9956 1852 7035 52 | **FEES** | |
|---|---|---|
| | Postage per piece | $0.48 |
| **ARTICLE ADDRESS TO:** | Certified Fee | 3.30 |
| | Return Receipt Fee | 2.70 |
| General Motors LLC | **Total Postage & Fees:** | **$6.48** |
| TOWER 300 | | |
| 300 Renaissance Center | | |
| Detroit MI 48243-1402 | Postmark Here | |

**Delivery Address when used with Ⓐ or Return Address when used with Ⓑ**

**Ⓑ Top of the page**

← Fold and Tear →

**Ⓑ**
**Certified Mail**
**WITH Physical Return Receipt Service**

*(Uses Return Receipt Card)*
**Instructions**
1. Apply address label above to the back of this card.
2. Apply this card to the TOP EDGE of the mailpiece.

**Certified Mail Labels (SDC-3910)**
Covered by and/or for use with U.S. Patent 6,254,762, 6,868,406, 7,216,110, 7,236,956, 7,396,073, 7,430,065, 7,567,940, 7,613,639, 7,742,943, 7,882,094, 8,027,926, 8,027,927, 8,027,933, 8,051,044, and 10,946,021

CERTIFIED MAIL

CINDY JOHNSON
11 WEST JEFFERSON ST SUITE 1000
PHOENIX, AZ 85003

9407 1118 9956 1852 7035 52

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature: ( ☐ Addressee or ☒ Agent)

X _____

B. Received By: (Please Print Clearly)

C. Date of Delivery

5/19

D. Addressee's Address (If Different From Address Used by Sender.)

Secondary Address / Suite / Apt. / Floor   (Please Print Clearly)

Delivery Address

City _____ State ____ ZIP + 4 Code

RETURN RECEIPT REQUESTED

Article Addressed To:

General Motors LLC
TOWER 300
300 Renaissance Center
Detroit MI 48243-1402

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS STEVENSON,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS LLC,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION**<br><br>**DECLARATION OF ROBERT J. AXELROD PURSUANT TO CALIFORNIA CIVIL CODE §1780(d)** |

I, Robert J. Axelrod, declare as follows:

1.       I am an attorney duly licensed to practice in the State of New York, and in the Southern District of New York.  I am Senior Partner of Axelrod & Dean LLP, local counsel of record for plaintiff in the above-entitled action.

2.       Defendants General Motors LLC, has done and is doing business in the Southern District of New York.  Such business includes the marketing, franchising, distribution and sale of its vehicles and parts for its vehicles.

I declare under penalty of perjury under the laws of the New York that the foregoing is true and correct.

Executed this 3rd day of July 2014, at New York, New York.

Robert J. Axelrod

- 1 -

Stevenson v. General Motors LLC, Docket No. 1:14-cv-05137 (S.D.N.Y. Jul 09, 2014), Court Docket

# General Information

**Court**                  United States District Court for the Southern District of New
                           York

**Nature of Suit**         Personal Injury: Motor Vehicle

**Docket Number**          1:14-cv-05137

**Status**                 Open

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Stevenson v. General Motors LLC, Docket No. 1:14-cv-05137 (S.D.N.Y. Jul 09, 2014), Court Docket

# Notes

No Notepad Content Found

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service