# Exhibit F

JS 44C/SDNY
REV. 4/2014

**CIVIL COVER SHEET**

# 14 CV 5850

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS**

Daniela Jones

**DEFENDANTS**

General Motors LLC

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER**
Robert J. Axelrod
Jay Douglas Dean
Axelrod & Dean LLP, 830 3RD AVE, FL 5, New York, NY 10022 Tel:
646-448-5263 Email:riaxelrod@axelroddean.com; iddean@axelroddean.com

**ATTORNEYS (IF KNOWN)**
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654

JUL 2 9 2014

**CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. s 1332(a) & (d): Plaintiff alleges claims against General Motors LLC for failing to disclose dangerous safety defects.

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No[x]Yes[ ]Judge Previously Assigned

If yes, was this case Vol.[ ] Invol.[ ] Dismissed. No[ ] Yes[ ] If yes, give date _____ & Case No. _____

Is this an international arbitration case?    No [x]    Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*        **NATURE OF SUIT**

| | |
|---|---|
| **TORTS** | **ACTIONS UNDER STATUTES** |

| **CONTRACT** | **PERSONAL INJURY** | **PERSONAL INJURY** | **FORFEITURE/PENALTY** | **BANKRUPTCY** | **OTHER STATUTES** |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | [ ] 422 APPEAL 28 USC 158 | [ ] 375 FALSE CLAIMS |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | | | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 690 OTHER | | [ ] 410 ANTITRUST |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | | **PROPERTY RIGHTS** | [ ] 430 BANKS & BANKING |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | **PERSONAL PROPERTY** | | [ ] 820 COPYRIGHTS | [ ] 450 COMMERCE |
| | [ ] 345 MARINE PRODUCT LIABILITY | | | [ ] 830 PATENT | [ ] 460 DEPORTATION |
| [ ] 151 MEDICARE ACT | | [ ] 370 OTHER FRAUD | | [ ] 840 TRADEMARK | [ ] 470 RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [x] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | | | [ ] 480 CONSUMER CREDIT |
| | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | | | **SOCIAL SECURITY** | [ ] 490 CABLE/SATELLITE TV |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 862 BLACK LUNG (923) | |
| [ ] 160 STOCKHOLDERS SUITS | | | [ ] 720 LABOR/MGMT | [ ] 863 DIWC/DIWW (405(g)) | |
| [ ] 190 OTHER CONTRACT | | **PRISONER PETITIONS** | [ ] 740 RAILWAY LABOR ACT | [ ] 864 SSID TITLE XVI | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 195 CONTRACT PRODUCT LIABILITY | | [ ] 463 ALIEN DETAINEE | [ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA) | [ ] 865 RSI (405(g)) | [ ] 891 AGRICULTURAL ACTS |
| | **ACTIONS UNDER STATUTES** | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | | **FEDERAL TAX SUITS** | |
| [ ] 196 FRANCHISE | **CIVIL RIGHTS** | [ ] 530 HABEAS CORPUS | [ ] 790 OTHER LABOR LITIGATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 893 ENVIRONMENTAL MATTERS |
| | [ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner) | [ ] 535 DEATH PENALTY | [ ] 791 EMPL RET INC SECURITY ACT | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 895 FREEDOM OF INFORMATION ACT |
| **REAL PROPERTY** | [ ] 441 VOTING | [ ] 540 MANDAMUS & OTHER | | | [ ] 896 ARBITRATION |
| | [ ] 442 EMPLOYMENT | | **IMMIGRATION** | | [ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION |
| [ ] 210 LAND CONDEMNATION | [ ] 443 HOUSING/ ACCOMMODATIONS | **PRISONER CIVIL RIGHTS** | [ ] 462 NATURALIZATION APPLICATION | | |
| [ ] 220 FORECLOSURE | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 550 CIVIL RIGHTS | [ ] 465 OTHER IMMIGRATION ACTIONS | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 230 RENT LEASE & EJECTMENT | | [ ] 555 PRISON CONDITION | | | |
| [ ] 240 TORTS TO LAND | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT | | | |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 448 EDUCATION | | | | |
| [ ] 290 ALL OTHER REAL PROPERTY | | | | | |

*Check if demanded in complaint:*

[✓] **CHECK IF THIS IS A CLASS ACTION**
UNDER F.R.C.P. 23

**DEMAND $** 5,000,000    **OTHER** _____

*Check YES only if demanded in complaint*
**JURY DEMAND:** [ ] YES [ ] NO

**DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?**
IF SO, STATE:

**JUDGE** Hon. Jesse M. Furman    **DOCKET NUMBER** 1:14-md-02543

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

(PLACE AN x IN ONE BOX ONLY)                                    **ORIGIN**

[X] 1 Original Proceeding    [ ] 2 Removed from State Court    [ ] 3 Remanded from Appellate Court    [ ] 4 Reinstated or Reopened    [ ] 5 Transferred from (Specify District)    [ ] 6 Multidistrict Litigation    [ ] 7 Appeal to District Judge from Magistrate Judge Judgment

a. all parties represented

b. At least one party is pro se.

(PLACE AN x IN ONE BOX ONLY)                **BASIS OF JURISDICTION**                    **IF DIVERSITY, INDICATE CITIZENSHIP BELOW.**

[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [X] 4 DIVERSITY

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [x] 5 |
| CITIZEN OF ANOTHER STATE | [x] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)
Daniela Jones
3002 S 42nd Ave
Yakima, WA 98903

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)
General Motors LLC
C/O CORPORATION SERVICE COMPANY
80 STATE STREET
ALBANY, NEW YORK, 12207-2543

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [X] MANHATTAN
(DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE July 28, 2014 SIGNATURE OF ATTORNEY OF RECORD                ADMITTED TO PRACTICE IN THIS DISTRICT
                                                                 [ ] NO
                    Jay Douglas Dean                             [x] YES (DATE ADMITTED Mo. 07    Yr. 1989    )
RECEIPT #                                                        Attorney Bar Code #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14-CV    5850**

| | |
|---|---|
| DANIELA JONES,<br><br>                              Plaintiff,<br><br>    v.<br><br>GENERAL MOTORS LLC,<br><br>                              Defendant. | Case No.:<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Daniela Jones, individually and on behalf of all similarly situated persons and the general public, brings this action against Defendant General Motors LLC ("Defendant" or "GM") and alleges as follows:

## I.    INTRODUCTION

1.      This case arises out of General Motors ("GM") and its predecessor's[1] failure to disclose and lengthy concealment of a known defect affecting the Electronic Power Steering ("EPS") system of over 1.3 million vehicles and compromising the safety and integrity of those vehicles.   Some of these vehicles were also recalled for a separate and distinct ignition switch defect. Purchasers of these "overlap" vehicles are excluded from the class alleged here. *See infra* Part VI.

2.      To protect consumers and the public, automakers are obligated to timely report and address safety issues with the vehicles they manufacture. During a recent press conference about a settlement with GM, NHTSA Acting Administrator David Friedman, emphasized that:

---

[1] GM was incorporated in 2009. As discussed in section IV(A), on July 5, 2009, GM acquired substantially all assets and assumed certain liabilities of its predecessor, General Motors Corporation, through a Section 363 sale pursuant to Chapter 11 of the U.S. Bankruptcy Code. This Complaint refers to GM's predecessor as "Old GM."

"Quickly addressing and reporting safety defects should always be a car maker's bottom line. There is no such thing as an automaker overreacting to a safety defect."[2]

3.      When an automaker learns that a vehicle has a safety defect its legal obligations – and GM's legal obligations – are clear: the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act")[3] and its accompanying regulations, requires automakers, including GM, to promptly disclose the defect.[4] If it is determined that the vehicle is defective, the automaker may be required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to remedy the defect.[5]

4.      The safety defect at issue in this case involves the EPS system. Essentially, the defect can cause the vehicle's EPS to suddenly fail during normal driving, requiring greater effort by the driver to manually steer the vehicle and increases the risk of collisions and injuries. It affects over 1.3 million vehicles sold by GM and its predecessor Old GM. Those vehicles include the following makes and models:

      A.      2004-2006 and 2008-2009 Chevrolet Malibu;

      B.      2004-2006 Chevrolet Malibu Maxx;

      C.      2009-2010 Chevrolet HHR (non-turbo);

      D.      2010 Chevrolet Cobalt;

      E.      2005-2006 and 2008-2009 Pontiac G6;

      F.      2004-2007 Saturn Ion; and

      G.      2008-2009 Saturn Aura.

5.      This Complaint refers to these vehicles as "Defective Vehicles."

6.      In addition to the issues with the EPS system, GM similarly recalled other makes and models for problems arising from defects with the ignition switch system, which also impacted the EPS system. Specifically, when a Defective Vehicle's engine and electrical system

---

[2] May 16, 2014 press conference regarding settlement between NHTSA and GM.
[3] 49 U.S.C. §§ 30101-30170.
[4] 49 U.S.C. § 30118(c)(1) & (2).
[5] 49 U.S.C. § 30118(b)(2)(A) & (B).

shuts down, the power steering and power brakes also shut down, creating a serious risk of accident.

7.      From 2004 until March of 2014, GM concealed and did not fix the serious quality and safety problems affecting the Defective Vehicles.

8.      The EPS system defects could and should have been reported and corrected years ago.

9.      From at least 2004 to the present, both Old GM and GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its EPS system.

10.     Instead of complying with its obligation to report and address the safety defects, GM concealed them. GM's non-disclosure and concealment put drivers of Defective Vehicles, as well as their passengers and the public at an unreasonable risk of injury or death. GM's conduct also allowed unsuspecting new and used car purchasers to continue to buy the Defective Vehicles.

11.     The investigation into the EPS system defects revealed at least 12 crashes linked to loss of power steering assist, two of which resulted in injuries to the drivers. Plaintiff believes the actual numbers to be much higher.

12.     Following GM's eventual EPS recall in March 2014, GM's CEO, Mary Barra, admitted in a video message that: "Something went wrong with our process in this instance, and terrible things happened."

13.     GM recently agreed to a settlement with the NHTSA that includes a $35 million dollar fine - the maximum amount the NHTSA can fine GM for a single reporting violation. The fine equals less than 1% of GM's earnings over the last year. The Department of Transportation has asked Congress to raise the fine limit to $300 million.

## II.    JURISDICTION AND VENUE

14.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other Class members are citizens of a different state than Defendant.

15.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over GM because GM conducts substantial business in this District.

16.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because, as a corporation, GM is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, GM transacts substantial business within the District, so GM is subject to personal jurisdiction in this District.

## III.    PARTIES

17.    Plaintiff and proposed Nationwide Class Representative Daniela Jones is a resident and citizen of Yakima, Washington.  Ms. Jones owns a 2008 Chevrolet Malibu that she purchased in 2013. Mr. Jones received a recall notice related to the EPS; however, to date, no dealer has had the parts to repair the defect. Mr. Jones has attempted to trade in the vehicle, but the vehicle has diminished in value so much that it is now worth less than Ms. Jones owes. Because of the EPS system defects, Ms. Jones is very concerned for her safety when she drives his vehicle. The steering wheeling is hard to turn at times and often vibrates. Mr. Jones did not learn of the EPS system defects until March 31, 2014, when the recall was announced.

18.    Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware maintaining its principal place of business at 300 Renaissance Center, Detroit, Michigan.

19.    GM was incorporated in 2009. As described in below, on July 5, 2009, GM acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM") through a sale pursuant to Section 363, Chapter 11 of the U.S. Bankruptcy Code.

- 4 -

## IV.    FACTUAL ALLEGATIONS

**A.    GM's Liability for Its Own Conduct and Liability GM Acquired from Old GM.**

20.    GM was incorporated in 2009. On July 5, 2009, GM acquired substantially all assets and assumed certain liabilities of Old GM through a Section 363 sale.

21.    When GM acquired Old GM's assets through the Sale Order and Purchase Agreement ("Purchase Agreement"), it expressly assumed both the responsibilities to report safety defects in the vehicles sold by Old GM as required by the TREAD ACT and Old GM's "lemon law" obligations. [6]

22.    The liabilities and obligations expressly assumed by GM include the following:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

23.    GM expressly assumed:

> [A]ll Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

24.    GM also expressly assumed "all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the closing." Those assets included all of old GM's contracts, including its contracts with dealers and service centers.

---

[6] The applicability of the bar on successor liability claims against GM for the acts and omissions of Old GM prior to the Sale Order is an issue that is currently pending in Bankruptcy Court in the Southern District of New York. To the extent permitted by the Bankruptcy Court, Plaintiff herein will seek leave of this Court to amend this Complaint to add successor liability claims against GM for the acts and omissions of Old GM.

25.     Additionally, since its inception, GM has profited from servicing and selling parts
for Defective Vehicles sold by GM and Old GM. Therefore, GM had a duty to disclose its
knowledge of the EPS system defects, and not to conceal the defects. GM is liable for its acts
and omissions after the July 5, 2009 Purchase Agreement and for Old GM's "lemon law"
liability it expressly assumed under the Purchase Agreement.

**B.     The EPS System Defects Cause the Defective Vehicles to Lose Power Steering Assist, Requiring Greater Driver Effort and Increasing the Risk of Crash.**

26.     Electronic power steering systems, which supplement the torque a driver must
apply to the steering wheel of a vehicle, have replaced traditional hydraulic power steering in
many newer-model vehicles. The traditional hydraulic power steering accomplished the same
results by using pistons in the steering rack with pressurized fluid. The hydraulic pump, which
pressurized the fluid, was powered by the vehicle's engine; drawing energy from the engine
regardless of whether the driver was turning the wheel. Because the hydraulic pump was
constantly drawing energy away from the engine, it created inefficiencies and increased fuel
consumption.

27.     To reduce those inefficiencies and increase fuel economy, GM and other
automakers have done away with the traditional hydraulic power steering systems in favor of
electronic power steering systems. With these electronic power steering systems, like the one
introduced by GM that is the subject of this lawsuit, the hydraulic pump and pistons are replaced
by an electronic motor attached to the steering rack that applies torque when the vehicle senses
that the steering wheel has been turned. Because the electric motor is not powered by the
vehicle's engine, manufacturers have realized improved fuel economy and are able to fine tune
vehicle steering.

28.     Because the electronic power steering systems and the electronic motors –
including the EPS system – are not powered by the vehicle's engine, however, power steering
assist in vehicles equipped with the EPS system is dependent on the proper functioning of the
electronic power steering system.

- 6 -

29.     In the Defective Vehicles, there may be a sudden loss of electric power steering assist *that could occur at any time while driving*. According to NHTSA, if power steering assist is lost a message is displayed on the Driver Information Center and a chime sounds to inform the driver.

30.     Sudden loss of power steering assist in the EPS system can occur in the Defective Vehicles if (1) the system loses electrical power; or (2) whenever the system detects a fault that requires it to enter fail-safe operation mode, removing power from the EPS motor.

31.     GM claims that a buildup of brush debris mixed with oily material could cause the EPS system's motor to stop working, resulting in the loss of power steering assist in the Defective Vehicles.

32.     When the Defective Vehicles lose power steering assist, the Defective Vehicles revert to manual steering, which requires significantly more torque and effort to be applied by the driver, increasing the risk of crash – especially if the vehicle is mid-turn.

**C.     GM Concealed the Electric Power Steering Defects for Years and Did Not Recall the Vast Majority of Defective Vehicles until March 2014.**

33.     Over 1.3 million vehicles sold by Old GM and later GM between 2003 and 2010 had the EPS safety defect that caused the vehicle's EPS system to suddenly fail during normal driving.

34.     In 2009, when GM assumed Old GM's obligation to report any known, dangerous defects in GM vehicles, it knew about the EPS defect.

35.     In March 2010, GM recalled model years 2005-2010 of the Chevrolet Cobalt for and model years 2007-2010 of the Pontiac G6 for EPS defects. GM did not recall many other vehicles with the same EPS system that had the same problem.

36.     In April 2010, one month after GM agreed to the limited recall, GM sent a letter to NHTSA informing NHTSA that it had information indicating that the 2004-2007 model year Saturn Ions were likewise affected by EPS defects leading sources to question whether the Saturn Ions should also have been included in the March 2010 recall.

37.    In September 2011, due to consumer complaints, NHTSA opened an investigation into the EPS defect in Saturn Ions.

38.    Importantly, NHTSA database records show complaints from Saturn Ion owners as early as June 2004, with the first injury reported in May 2007. In total, NHTSA linked approximately 12 crashes and two injuries to the EPS defect in the Saturn Ions. But GM did nothing.

39.    In 2011, GM CEO Mary Barra – then head of product development – was advised by engineer Terry Woychowski that there was a serious power steering issue in Saturn Ions.[7] Ms. Barra was also aware of the ongoing NHTSA investigation. At the time, NHTSA reportedly came close to concluding that Saturn Ions should have been included in GM's 2010 steering recall of Cobalt and G6 vehicles. Despite having this knowledge, GM did not recall additional vehicles.

40.    Three years later, on March 31, 2014, GM finally announced a recall of the approximately 1.3 million Defective Vehicles in the United States affected by the EPS defect. The March 2014 recall finally included the Saturn Ion model years 2004-2007, along with the: 2004-2006 and 2008-2009 model year Chevrolet Malibu; 2004-2006 model year Chevrolet Malibu Maxx; 2009-2010 model year Chevrolet HHR; 2010 model year Chevrolet Cobalt; 2005-2006 and 2008-2009 model year Pontiac G6; and 2008-2009 model year Saturn Aura.

41.    GM provided dealers with notice of the later recall on March 31, 2014, and mailed letters to some of the current owners of the Defective Vehicles in June, 2014, announcing and explaining the recall. Under the recall, the dealers are to conduct the following repairs according to one of four bulletins:

---

[7] October 3, 2011 Email from Terry Woyochowski to Mary Barra regarding NYT on ION Upgrade, available at:
http://democrats.energycommerce.house.gov/sites/default/files/documents/E-mail-Woychowski-Barra.pdf

- 8 -

a. Bulletin 14115, which covers model year 2004-2007 Saturn Ion, 2009-2010 Chevrolet HHR and 2010 Chevrolet Cobalts, instructs dealers to replace the EPS system motor;

b. Bulletin 14116, which covers model year 2004-2006 Chevrolet Malibu and Malibu Maxx, 2005-2006 Pontiac G6 and 2008-2009 Chevrolet Malibu, Pontiac G6 and Saturn Aura built from March 1, 2008, through June 27, 2008, instructs dealers to replace the torque sensor assembly of those models;

c. Bulletin 14117, which covers model year 2008 Chevrolet Malibu, Pontiac G6 and Saturn Aura built from February 1, 2008, through February 28, 2008, instructs dealers to replace the torque sensor assembly and EPS motor controller unit; and

d. Bulletin 14118 covers model year 2008 Chevrolet Malibu, Pontiac G6 and Saturn Aura built from October 1, 2007, through January 31, 2008, instructs dealers to replace the EPS motor controller unit.

42.    After announcing the March 31, 2014 recall, Jeff Boyer, GM's Vice President of Global Vehicle Safety, acknowledged that GM recalled some of these same vehicle models previously for the same issue, but that GM "did not do enough."

43.    Similarly, in a video message addressed to GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes. According to Ms. Barra, "[s]omething went terribly wrong in our processes in this instance, and terrible things happened." Ms. Barra went on to promise, "[w]e will be better because of this tragic situation if we seize this opportunity."[8]

44.    Significantly, documents released by NHTSA show that GM received nearly 4,800 consumer complaints and more than 30,000 claims for warranty repairs related to the EPS

---

[8] *"Something Went 'Very Wrong' at G.M., Chief Says."* N.Y. TIMES (Mar. 18, 2014).

problem on the Saturn Ion. That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent. By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[9] Here, the rate translates to 1430 complaints per 100,000 vehicles.

**D.    GM Advertised the Defective Vehicles as Safe.**

45.    On information and belief, GM's marketing and advertising materials consistently promoted all its vehicles, including the Defective Vehicles sold after July 5, 2009, as safe and reliable.

46.    For example, a radio ad that ran from GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

47.    An online ad for "GM certified" used vehicles that ran from July 6, 2009 until April 5, 2010 stated that "GM certified means no worries."

48.    The Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "[a]s long as there are babies, there'll be Chevys to bring them home."

49.    Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

50.    A national online ad campaign for GM in April of 2012 stressed "Safety. Utility. Performance."

51.    A national print ad campaign in April of 2013 stated that "[w]hen lives are on the line, you need a dependable vehicle you can rely on. Chevrolet and GM...for power, performance and safety."

52.    A December 2013 GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

---

[9] *See* http://www-odi.nhtsa.dot.gov/cars/problems/defect/-
results.cfm?action_number=EA06002&SearchType=QuickSearch&summary=true.

53.    GM made these and similar representations to boost new and used vehicle sales and maximize profits at the same time it knew there were EPS system defects in the Defective Vehicles.

54.    Throughout the relevant period, GM possessed vastly superior knowledge and information to that of consumers – if not exclusive information – about the design and function of the EPS system in the Defective Vehicles and the existence of the defects in those vehicles.

55.    Until recently, GM never informed consumers about the EPS system defect in the Defective Vehicles.

**E.    Plaintiff and Class Members Were Injured by the EPS Defects.**

56.    The EPS defects have injured Plaintiff and Class members.

57.    Plaintiff and Class members' vehicles are worth less than they would be without the defects. A vehicle purchased, leased, or retained with serious safety defects is worth less than the equivalent vehicle leased, purchased, or retained without the defect.

58.    A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of accident because of the EPS defects.

59.    Plaintiff and those Class members who purchased new or used Defective Vehicles after July 5, 2009, overpaid for their Defective Vehicles as the result of GM's conduct. They paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had GM disclosed the EPS system defects. Because GM concealed the EPS system defects, the Plaintiff and Class members did not receive the benefit of the bargain.

60.    Plaintiff and Class members now have unsafe vehicles that are worth less than they would have been but for GM's failure to disclose and remedy the EPS defects. Any reasonable consumer would be reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

61.    There have been at least 12 accidents and multiple injuries linked to the EPS system defects in the Defective Vehicles. However, Plaintiff believes that the actual numbers

may be much higher, and that there may have been hundreds of deaths and injuries attributable to the EPS defects.

62.    If GM had timely disclosed the EPS defects as required by the TREAD Act, the law of fraudulent concealment, tortious interference with contract and the State consumer protection laws set forth below, Plaintiff and Class members' vehicles would now be safe to drive and would be considerably more valuable than they are now. Due to the publicity surrounding GM's conduct and its belated and expanding recall, a stigma has attached to the Defective Vehicles. A reasonable consumer would not purchase a Defective Vehicle now – let alone pay what otherwise would have been fair market value for the vehicle.

**F.    GM's Handling of the EPS Defects Is Part of a Pattern of Concealing Safety Defects.**

63.    Recently-revealed information suggests that GM's egregious mishandling of the EPS defects is part of a pattern of concealing known safety defects in GM vehicles.

64.    The federal government's investigation recently revealed that in 2008 training materials that explicitly discouraged employees from using words such as "safety," "safety related," "defect," "serious," and "failure" when communicating about issues with a vehicle. During a press conference, NHTSA Acting Administrator David Friedman said that such training prevented investigators and engineers from "clearly communicat[ing] up the chain when they suspect[ed] a problem." In the same materials, employees were also instructed to avoid words like "deathtrap," "widow maker," "rolling sarcophagus," "Hindenburg," "Titanic," "powder keg," "apocalyptic," "You're toast," and "Kervorkianesque" and phrases like "This is a lawsuit waiting to happen" and "Unbelievable engineering screw-up."

65.    Information about other defects – including the ignition switch systems and the electric power steering and airbag issues related to the wiring harness – shows GM's pattern and raises concerns as to whether GM is properly addressing the EPS defects.

**1.    *The Ignition Switch System Defects***

66.    It is critical that a vehicle remains on and all of its electrical systems operate under normal driving conditions. If an automaker knows about safety defects that affect the

- 12 -

vehicle's operation and electrical systems, it must promptly notify federal authorities and vehicle owners and correct the problems. GM failed to do so.

67. The ignition switch systems in the Defective Vehicles have at least three defects:

A. First, the ignition switch is too weak to maintain the key in the "run" position. Therefore, Defective Vehicles and their electrical systems can shut down during ordinary driving. Documents released by GM state that the "detent plunger" is defective in that it does not provide enough torque to hold the key in place during operation.

B. Second, the ignition switch is too low, which causes the key and key fob to hang low enough that the driver's knee can easily bump them and inadvertently shut down the vehicle. The Defective Vehicles also use "slotted" keys, which compared to keys with a hole, allow the key ring and fob to hang lower.

C. Third, when the ignition switch is in the "accessory" or "off" position, the airbags are immediately disabled. NHTSA's Acting Administrator, David Friedman, recently testified before Congress, that NHTSA is not convinced that the non-deployment of the airbags in the recalled vehicles is solely attributable to a mechanical defect involving the ignition switch:

> And it may be even more complicated than that, actually. And that's one of the questions that we actually have in our timeliness query to General Motors. It is possible that it's not simply that the – the power was off, but a much more complicated situation where the very specific action of moving from on to the accessory mode is what didn't turn off the power, but may have disabled the algorithm.
>
> That, to me, frankly, doesn't make sense. From my perspective, if a vehicle – certainly if a vehicle is moving, the airbag's algorithm should require those airbags to deploy. Even if the – even if the vehicle is stopped and you turn from 'on' to 'accessory,' I believe that the airbags should be able to deploy.

> So this is exactly why we're asking General Motors this
> question, to understand is it truly a power issue or is there
> something embedded in their [software] algorithm that is
> causing this, something that should have been there in their
> algorithm.[10]

68.     When a Defective Vehicle's engine and electrical system shuts down, the power
steering and power brakes also shut down, creating a serious risk of accident. When the electrical
system shuts down, the vehicle's airbags and seatbelt pretensioners are disabled, creating a
serious risk of serious bodily harm or death if an accident occurs.

69.     The Defective Vehicles are, therefore, unreasonably disposed to accidents, and
those accidents are unreasonably likely to result in serious bodily harm or death to the drivers
and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

## 2.     *Airbag problems related to defective wiring harnesses*

70.     Over 1.2 million vehicles sold by Old GM and later GM between 2003 and 2010
had defective wiring harnesses. As the wiring harness connectors in the side-impact airbags
("SIABs") corrode or loosen over time, resistance increases. The airbag sensing system interprets
this increase in resistance as a problem, and the "SERVICE AIR BAG" light appears on the
dashboard. The light may appear occasionally at first, and the airbags and pretensioners will still
deploy. Over time, the resistance can increase to the point where the SIABs, pretensioners, and
front center airbags will not deploy in the event of a collision.[11]

71.     The problem apparently started when GM switched from using gold-plated
terminals to connect its wire harnesses to cheaper tin terminals in 2007.

72.     In June 2008, Old GM experienced a spike in warranty claims for airbag service
on certain vehicles.

73.     In September 2008, after testing the cheaper tin terminals, Old GM determined
that corrosion and wear to the connectors caused increased resistance in the airbag wiring. So

---

[10] Congressional Transcript, Testimony of David Friedman, Acting Administrator of NHTSA
(Apr. 2, 2014), at 19.
[11] *See* GM Notice to NHTSA dated March 17, 2014, at 1.

- 14 -

Old GM released a technical service bulletin on November 25, 2008, for 2008-2009 Buick Enclaves, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models that instructed dealerships to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line. Old GM also initiated the transition back to gold-plated terminals in certain vehicles. After these supposed remedies, Old GM suspended all investigation into the defective airbag wiring and took no further action.[12]

74.    GM knew about the airbag problems when it assumed Old GM's obligation to report any known, dangerous defects in GM vehicles.

75.    And, in November 2009, GM received similar reports of increased airbag service messages in the 2010 Chevy Malibu and 2010 Pontiac G6 vehicles. After investigating, GM concluded that corrosion and wear in the same tin component caused the airbag problems in the Malibu and G6 models.[13]

76.    In January 2010 and after reviewing the Malibu and G6 airbag problems, GM determined that, by ignoring the "SERVICE AIR BAG" light, the resistance could increase so much that a SIAB may not deploy in a side impact collision.

77.    On May 11, 2010, GM issued a Customer Satisfaction Bulletin for the Malibu and G6 models instructing dealerships to secure both front seat-mounted and side-impact airbag wire harnesses and, if necessary, to reroute the wire harness.[14]

78.    From February to May 2010, GM monitored the data on vehicles with faulty harness wiring issues and noted another spike in airbag service warranty claims leading to the conclusion that the November 2008 bulletin was "not entirely effective in correcting the [wiring defect present in the vehicles]."

79.    On November 23, 2010, GM issued another Customer Satisfaction Bulletin for affected vehicle models, including the 2008 Buick Enclave, 2008 Saturn Outlook, 2008 GMC

---

[12] See GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

[13] See GM Notification Campaign No. 14V-118 dated March 31, 2014, at 2.

[14] See GM Notification Campaign No. 14V-118 dated March 31, 2014, at 2.

Acadia, models built from October 2007 to March 2008. The bulletin instructed dealerships to secure SIAB harnesses and re-route or replace the SIAB connectors.[15]

80.     Then, on February 3, 2011, GM issued a revised Customer Service Bulletin instructing dealerships to replace the front seat-mounted side impact airbag connectors in the same defective vehicles listed in the November 2010 bulletin. In July 2011, GM again replaced its connector. This time GM used a Tyco-manufactured connector featuring a silver sealed terminal.[16]

81.     But in 2012 GM noticed another increase in warranty claims relating to SIAB connectors in vehicles built in the second half of 2011. After some analysis, it discovered that inadequate crimping of the Tyco connector terminals caused increased system resistance.

82.     In response, GM issued an internal bulletin for 2011-12 Buick Enclaves, Chevy Traverses, and GMC Acadias, recommending dealers repair affected vehicles by replacing the original connector with a new sealed connector.[17]

83.     The defect was still uncured, however, because GM experienced another increase in service repairs and buyback activity due to "SERVICE AIR BAGS" lights in 2013.

84.     On October 4, 2013, GM began an investigation into airbag connector problems in 2011-2013 Buick Enclaves, Chevy Traverses, and GMC Acadias. The investigation revealed an increase in warranty claims for these models built in late 2011 and early 2012.[18]

85.     On February 10, 2014, GM concluded that corrosion and crimping issues were again the cause of the airbag problems.[19]

86.     GM initially planned to issue a less-urgent Customer Satisfaction Program to address the airbag problem in the 2010-2013 Defective Vehicles. After, a call with NHTSA on March 14, 2014, that GM finally issued a safety recall on the vehicles with the faulty harness

---

[15] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 3.
[16] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 3.
[17] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 4.
[18] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 4.
[19] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 5.

- 16 -

wiring. Consistent with GM's prior dilatory behavior, it took four investigations and at least six service bulletins on the problem before GM finally issued the recall. The recall as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover approximately 1.2 million vehicles.[20]

87.    On March 17, 2014, GM issued a recall for 1,176,407 vehicles potentially afflicted by airbag problem. The recall instructs dealerships to remove driver and passenger SIAB connectors and splice and solder the wires together.[21]

## V.    GM'S DUTY TO DISCLOSE THE EPS SYSTEM DEFECTS

88.    It does not matter whether GM or Old GM manufactured or sold a particular Defective Vehicle to a particular purchaser; GM is responsible for its *own* actions with respect to *all* the Defective Vehicles, and, because GM was aware of the serious safety defects and knew that owners of Defective Vehicles were unaware of those defects, the resulting harm to Class members that occurred as the result of GM's acts and omissions. Under these circumstances, GM had the clear duty to disclose (and not conceal) the EPS system defects, the ignition switch defects, and other safety defects to Plaintiff and Class members – regardless of when they acquired their Defective Vehicles.

89.    GM's legal obligations stem from several different sources, including, but not limited to: (i) the obligations it explicitly assumed under the TREAD Act to promptly report any safety defect to NHTSA and Defective Vehicle owners to allow for appropriate remedial action; (ii) the duty it had under the law of fraudulent concealment and tortious interference with contract, as pleaded below; (iii) the duty it had under the State consumer protection laws, as pleaded below; and (iv) the general legal principle embodied in § 324A of the Restatement (Second) of Torts, ("Liability To Third Person For Negligent Performance Of Undertaking").

---

[20] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 5.
[21] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 5.

90.     In acquiring Old GM, GM expressly assumed the obligations to make all required disclosures under the TREAD for all the Defective Vehicles, but failed to make those disclosures.

91.     Under TREAD, if it is determined that vehicle has a safety defect, the manufacturer *must* promptly notify vehicle owners, purchasers and dealers of the defect, and may be ordered to remedy the defect.[22]

92.     Under TREAD, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."[23] At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect.[24]

93.     The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.[25]

94.     GM expressly assumed a duty to all Defective Vehicle owners under the TREAD Act and then violated this duty.

95.     Under § 324A of the *Restatement*, an entity that undertakes to render services that he should recognize as necessary for the protection of a third person or his things, is subject to

---

[22] 49 U.S.C. § 30118(b)(2)(A) & (B).
[23] 49 C.F.R. § 573.6(a) & (b).
[24] 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).
[25] 49 C.F.R. § 276.6(b) & (c).

liability for harm caused to the third person by the entity's failure to exercise reasonable care to protect the undertaking if [] the failure to establish reasonable care increases the risk of such harm . . . ." While the doctrine was conceived in the context of physical harm, it has grown to include economic loss, such as that suffered by Plaintiff and Class members.

96.    *Restatement* § 324A applies to gratuitous undertakings, but applies with even greater force here, where GM is receiving substantial remuneration for its undertaking in relation to its dealerships' service centers. GM, which provides parts for the Defective Vehicles as they are serviced at its dealerships, reaps substantial revenues from dealerships for servicing the Defective Vehicles. It also incidentally benefits when many of the people eventually sell or trade in their Defective Vehicles for new ones.

97.    Consumers using GM service centers and buying GM replacement parts necessarily rely on GM to advise its dealerships of defects in a timely manner, notify its dealerships of safety-related issues, and provide its dealerships with accurate and up to date information to enable them to remedy defects. GM's failure to carry out these obligations has increased the risk of harm to owners of Defective Vehicles, who regularly have their vehicles inspected and serviced at GM dealerships and rely upon representations that the vehicles are safe and free of defects.

98.    GM's dealerships rely on GM's expertise regarding how the vehicles should be maintained and what conditions are necessary for the dealer to conclude that the vehicles are in proper working order at the time they are inspected, serviced and released back to the owner. The dealerships further rely on GM to assure the safety of its vehicles, inform them of safety related problems that come to GM's attention, and to pass along knowledge regarding defects and repairs for those defects. Dealers servicing the Defective Vehicles, as well as the consumers who go to a GM dealership for repairs, rely on GM's representations that the vehicles and their component parts and safety features will function correctly if certain conditions are met when the vehicles are inspected and serviced. GM's breach of its obligations to its dealerships has resulted in harm to Plaintiff and Class members.

- 19 -

## VI.    CLASS ALLEGATIONS

99.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

Plaintiff brings this action on behalf of himself and a Class initially defined as follows:

> During the fullest period allowed by law, all persons in the United
> States who own or lease, or who sold after March 1, 2014, one or
> more of the following GM vehicles: 2005-2006, 2007-2010
> Pontiac G6; 2004-2006, 2008-2009 Chevy Malibu; 2004-2006
> Chevy Malibu Max; 2009-2010 Chevy HHR; 2008-2009 Saturn
> Aura
>
> ("Defective Vehicles").

100.    The Class is limited to Defective Vehicles that have been recalled for the EPS

defect only. It does not include Defective Vehicles that have been recalled for both the ignition

switch and EPS defects.

101.    To the extent warranted, the list of Defective Vehicles list will be supplemented to

include other GM vehicles that have the defective EPS system, which suddenly and unexpectedly

lose power steering during ordinary driving conditions.

102.    Excluded from the Class are Old GM and GM, their employees, co-conspirators,

officers, directors, legal representatives, heirs, successors and wholly or partly owned

subsidiaries or affiliates of GM; Class Counsel and their employees; and the judicial officers and

their immediate family members and associated court staff assigned to this case, and all persons

within the third degree of relationship to any such persons.

103.    On information and belief, there are at least 1.3 million Defective Vehicles

nationwide. Individual joinder of all Class members is impracticable.

104.    The Class expressly disclaims any recovery in this action for physical injury

resulting from the EPS system defects. However, the increased risk of injury from the EPS

defects serves as an independent justification for the relief sought by Plaintiff and the Class.

105.    The Class can be readily identified using registration records, sales records,

production records, and other information kept by GM or third parties in the usual course of

business and within their control.

106.    Questions of law and fact are common to the Class and predominate over questions affecting only individual members. Those questions include but are not limited to the following:

A.  Whether the Defective Vehicles suffer from EPS system defects;

B.  Whether GM concealed the defects;

C.  Whether GM misrepresented that the Defective Vehicles were safe;

D.  Whether GM engaged in fraudulent concealment;

E.  Whether GM tortuously interfered with the contracts between its dealerships and owners of Defective Vehicles;

F.  Whether GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective EPS systems;

G.  Whether the alleged conduct by GM violated laws as Plaintiff alleges;

H.  Whether GM's unlawful, unfair, and/or deceptive practices harmed Plaintiff and Class members;

I.  Whether Plaintiff and Class members are entitled to equitable and/or injunctive relief; and

J.  Whether any or all applicable limitations periods are tolled by acts of fraudulent concealment.

107.    Plaintiff's claims are typical of the claims of the Class members, and arise from the same course of conduct by GM. Plaintiff also seeks relief that is typical of the relief sought for the absent Class members.

108.    Plaintiff will fairly and adequately represent and protect the interests of all absent Class members. Plaintiff is represented by counsel competent and experienced in product liability, consumer protection, and class action litigation.

109.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (1) joinder of all the individual Class members is

impracticable; (2) the damages suffered by each individual Class member may be relatively small; (3) the expense and burden of individual litigation adverse GM would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually; and (4) the burden imposed on the judicial system by individual actions by 1.3 million individuals would be enormous.

110. The prosecution of separate actions by the individual Class members would also create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for GM. Conducting this action as a class action – as opposed to separate individual actions – presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

111. Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Plaintiff anticipates providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class.

## VII.   TOLLING OF STATUTE OF LIMITATIONS

112. GM's knowing and active fraudulent concealment of the facts stated herein tolls all applicable statute of limitations. Plaintiff and Class members did not discover and were not aware of facts that would have led a reasonable person to suspect that GM did not report information within its knowledge to federal authorities, including the NHTSA, its dealerships or customers. A reasonable and diligent investigation would not have revealed that GM had information in its possession about the existence of safety defects. GM concealed that information until recently.

113. Since July 5, 2009, GM has been under a continuing duty to disclose to NHTSA, its dealerships, Plaintiff and Class members, the true character, quality, and nature of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

114.    Because of the active concealment by GM, any and all limitations periods
otherwise applicable to Plaintiff's claims have been tolled.

## VIII.    CAUSES OF ACTION

**A.    Common Law Claims**

### COUNT I
### FRADULENT CONCEALMENT

115.    Plaintiff incorporates by reference the allegations in the above paragraphs as if
fully set forth herein.

116.    GM concealed and suppressed material facts concerning the EPS defects.

117.    GM had a duty to disclose the EPS system defects because the defects were
known and/or accessible only to GM, which had superior knowledge and access to facts that GM
knew were not known to or reasonably discoverable by Plaintiff and Class members. The facts
that GM suppressed and concealed were material to Plaintiff and the Class members because
they directly impacted the safety of the Defective Vehicles.

118.    At the expense of Plaintiff and Class members, GM actively concealed and/or
suppressed these material facts, in whole or in part, to protect its profits and avoid a costly recall.

119.    On information and belief, GM has still not made full and adequate disclosure and
continues to defraud Plaintiff and Class members and conceal material information regarding the
defects that exist in the Defective Vehicles and other GM vehicles.

120.    Plaintiff and Class members were unaware of these omitted material facts and
would not have acted as they did if they had known of the concealed and/or suppressed facts.
Plaintiff and Class members' actions were justified because GM was in exclusive control of
material facts that were unknown to the public, Plaintiff, or Class members.

121.    Plaintiff and Class members sustained damage because of the concealment and/or
suppression of the facts; GM's fraudulent concealment of the EPS system defects has diminished
the value of Plaintiff's and the Class members' vehicles and tarnished the reputation of the

Defective Vehicles, making any reasonable consumer reluctant to purchase any of the Defective Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

122.   Class members who purchased new or used Defective Vehicles after July 5, 2009, either would have paid less for the vehicles or would not have purchased them at all had they been aware of the material facts that GM concealed and suppressed. Thus, as a result of GM"s fraudulent concealment, Plaintiff and the Class members did not receive the benefit of their bargain.

123.   GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being to enrich GM. GM's conduct warrants an award of punitive damages, in an amount to be determined at trial, to deter such conduct in the future.

## COUNT II
## TORTIOUS INFERFERENCE WITH CONTRACT

124.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

125.   The Defective Vehicles sold to Plaintiff and Class members were either serviced or repaired under contracts with GM dealerships. Under those contracts, the GM dealerships were required to service, repair and inspect the Defective Vehicles and ensure that any safety defects were repaired or, at a minimum, that owners of Defective Vehicle were apprised of safety defects and advised of the means and cost of repairing any such defects.

126.   GM was aware that its dealerships were servicing and repairing Defective Vehicles and that those dealerships relied on GM to advise them of any known safety defects in the vehicles. GM educated and advised dealerships on the proper procedures for evaluating and servicing vehicles. On information and belief, in repairing and servicing GM vehicles, GM dealerships follow protocols set by GM and those protocols omitted information and procedures necessary to identify and repair problems resulting from the EPS system defects.

127.    GM was aware of the EPS system defects on July 5, 2009, but chose not to inform its dealerships of the nature and extent of the defects to avoid the substantial cost and negative publicity of a recall. GM also knew that, by concealing its knowledge of the EPS system defects, it would cause its dealerships to return serviced and repaired Defective Vehicles to their owners, including Plaintiff and the Class members, without having repaired the EPS system defects.

128.    GM's intentional concealment of the EPS system defects from its dealerships caused its dealerships to breach their service and repair agreements with owners of Defective Vehicles.

129.    As intended, GM profited from its dealerships' servicing and provision of parts to owners of Defective Vehicles.

130.    As a result of GM's intentional concealment of the EPS system defects from its dealerships, Plaintiff and Class members suffered damages. Their vehicles remained defective, and have significantly declined in value because the dealers did not effectively service and/or repair Defective Vehicles, as they were required to do under their contracts with owners of Defective Vehicles.

131.    Plaintiff and Class members seek the difference in value between their vehicles in their defective state and what the value would have been had GM's dealerships remedied the EPS system defect as they were obligated to do under their contracts with owners of Defective Vehicles.

132.    GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being to enrich GM. GM's conduct was particularly egregious as it continued to reap profits from owners of Defective Vehicles while concealing its knowledge of the costly and dangerous EPS system defects that placed Defective Vehicle owners, their passengers, other drivers and their passengers at significant risk. GM's conduct shows a blatant disregard for the rights of owners of Defective Vehicles. Accordingly, Plaintiff seeks punitive damages in an amount to be determined at trial.

133.    Plaintiff also seeks other remedies deemed appropriate by the Court.

- 25 -

**B.    State Statutory Claims**

**COUNT III**
**VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT ("MCPA),**
**(Michigan Comp. Laws Ann. § 445.901 et seq.)**

134.    Plaintiff incorporates by reference the allegations in the above paragraphs as if

fully set forth herein.

135.    This Claim is brought on behalf of nationwide Class of purchasers.

136.    At all times relevant hereto, Plaintiff and the nationwide Class members were

"person[s]" within the meaning of MCPA. *See* M.C.L.A § 445.902(1)(d).

137.    At all relevant times hereto, GM was likewise a "person" engaged in "trade or

commerce" within the meaning of the MCPA. *See* M.C.L.A. § 445.902(1)(d) and (g).

138.    The MCPA holds unlawful certain "[u]nfair, unconscionable, or deceptive

methods, acts, or practices in the conduct of trade or commerce." M.C.L.A. § 445.902(1).

139.    GM's practices described above violate the MCPA for one or more of the

following reasons:

> a.  GM represented that the Defective Vehicles had approval, characteristics, uses, and benefits that they do not have;
>
> b.  GM provided, disseminated, marketed, and otherwise distributed false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Defective Vehicles;
>
> c.  GM represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were of another;
>
> d.  GM engaged in unconscionable commercial practices in failing to reveal material facts and information about the Defective Vehicles, which did and tended to, mislead Plaintiff and the Class members about facts that could not reasonably be known by the consumer until the March 2014 recall;
>
> e.  GM failed to reveal facts concerning the EPS system defects that were material to the transaction in light of representations of fact made in a positive manner;

    f.   GM failed to reveal material facts concerning the EPS system defects to Plaintiff and the Class members, the omission of which would tend to mislead or deceive consumers, including Plaintiff and the Class members;

    g.   GM made material representations and statements of fact to Plaintiff and the class members that resulted in Plaintiff and the Class members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

    h.   GM intended that Plaintiff and Class members rely on their misrepresentations and omissions, so that Plaintiff and other Class members would purchase or lease the Defective Vehicles.

140.    Plaintiff seeks injunctive relief to enjoin GM from continuing their unfair and deceptive acts or; seeks monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Class member; reasonable attorneys' fees; and any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

141.    GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and well-being to enrich GM. GM's conduct was particularly egregious as it continued to reap profits from owners of Defective Vehicles while concealing its knowledge of the costly and dangerous EPS system defects that placed Defective Vehicle owners, their passengers, other drivers and their passengers at significant risk. GM's conduct shows a blatant disregard for the rights of owners of Defective Vehicles. Accordingly, Plaintiff also seeks punitive damages against GM because GMs' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT IV
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

142.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

143.    Plaintiff and Class members are consumers who purchased or leased one or more Defective Vehicles.

144.    GM had a statutory duty to refrain from unfair or deceptive acts or practices.

145.    GM violated this duty by failing to disclose and by actively concealing the EPS defect, and by selling vehicles while violating the TREAD Act and through its other conduct as alleged herein.

146.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of the Defective Vehicles.

147.    As a proximate result of GM's unfair, unlawful and/or deceptive practices, Plaintiff and Class members suffered injury, including the loss of money or property. GM's actions, as alleged herein, caused the diminution in value of Plaintiff's and Class members vehicles which are now worth less than they would have been had GM timely disclosed the defects. Because GM fraudulently concealed the defects, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Vehicles has greatly diminished. No rational consumer would purchase the Defective Vehicles in light of GM's conduct and the stigma now attached to the Defective Vehicles.

148.    Further, Class members who purchased or leased new or used Defective Vehicles after July 5, 2009, did not receive the benefit of their bargain and overpaid for their vehicles as a result of GM's unfair and deceptive conduct in violation of the TREAD Act, the CLRA, and Section 17200 of the UCL. Had these Class members been aware of the EPS defects they would have either paid less for their vehicles or would not have purchased the vehicles.

149.    GM's actions, as alleged herein, constitute unfair compensation or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes listed below:

150.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, *et seq.*

151.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*

- 28 -

152.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*

153.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Civ. Code § 1750, *et. seq.*

154.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*

155.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*

156.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*

157.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*

158.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*

159.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Code Ann. § 10-1-370, *et seq.* and Ga. Code Ann. § 10-1-390, *et seq.*

160.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*

161.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*

162.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*

163.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*

164.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*

165.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. ch. 93A, *et seq.*

166.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445-901, *et seq.*

167.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*

168.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mo. Rev. Stat. § 407.010, *et seq.*

169.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

170.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*

171.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:l, *et seq.*

172.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*

173.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*

174.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

175.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*

176.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-0, *et seq.*

177.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*

178.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. tit. 15 § 751, *et seq.*

179.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*

180.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*

181.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*

182.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*

183.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*

184.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*

185.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*

186.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq.*

187.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. Tit. 9. § 2451, *et seq.*

188.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*

189.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*

190.    GM has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*

191.    Plaintiff will provide notice to the Attorney General where required by state statute and has sent pre-suit demand letters where appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and in favor of Plaintiff and the Class, and grant the following relief:

A.    Determine that this action may be maintained as a class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class Representatives and Plaintiff's chosen counsel as Class Counsel;

B.    Declare, adjudge, and decree the conduct of GM as alleged herein to be unlawful, unfair, and/or deceptive, and enjoin any such future conduct;

C.    Award Plaintiff and Class members actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

D.    Award Plaintiff and Class members exemplary damages in such amount as proven;

E.    Award damages and other remedies as allowed by the laws of the States as alleged herein;

F.    Award Plaintiff and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

G.    Grant an injunction ordering GM to implement an effective remedy for all vehicles with defective EPS systems, including those not yet subject to recall; and

H.    Award Plaintiff and Class members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

192.    Plaintiff requests a trial by jury on the legal claims, as set forth herein.

DATED: July 28, 2014

AXELROD & DEAN, LLP

By: _____
Robert J. Axelrod
Jay Douglas Dean
830 3RD AVE, FL 5
New York, NY 10022
Tel: (646) 448-5263
rjaxelrod@axelroddean.com
jddean@axelroddean.com
*Local Counsel for Plaintiff*

**THE PAYNTER LAW FIRM PLLC**

Stuart M. Paynter (226147)
Jennifer L. Murray (4184529[i])
1200 G Street N.W., Suite 800
Washington, DC  20005
Tel.: (202) 626-4486
Fax: (866) 734-0622
stuart@paynterlawfirm.com

**BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.**

Andrew S. Friedman
Patricia N. Syverson
Kevin R. Hanger
2325 E. Camelback Rd. Ste. 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Fax: (602) 274-1199
afriedman@bffb.com
psyverson@bffb.com
khanger@bffb.com
*Attorneys for Plaintiff*

_____

[i] Admitted in New York only.

Jones v. General Motors LLC, Docket No. 1:14-cv-05850 (S.D.N.Y. Jul 29, 2014), Court Docket

# General Information

| | |
|---|---|
| **Court** | United States District Court for the Southern District of New York; United States District Court for the Southern District of New York |
| **Nature of Suit** | Personal Injury - Motor Vehicle[350] |
| **Docket Number** | 1:14-cv-05850 |
| **Status** | Open |

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Jones v. General Motors LLC, Docket No. 1:14-cv-05850 (S.D.N.Y. Jul 29, 2014), Court Docket

# Notes

No Notepad Content Found

Bloomberg Law®

© 2014 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service