# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**WENDY KOSOVEC, individually
and on behalf of others
similarly situated,**

*Plaintiff*

**v.**                                                                          **Case NO.: _____**

**GENERAL MOTORS, LLC; GENERAL MOTORS
HOLDINGS, LLC;**

*Defendants*                                                            **CLASS ACTION
                                                                                    JURY TRIAL DEMANDED**

---

## CLASS ACTION COMPLAINT

Come now Plaintiff, Wendy Kosovec, and brings this action on her own behalf and on behalf of a class of persons defined below against the Defendant General Motors LLC and/or General Motors Holdings, LLC ("GM") and for her Class Action Complaint alleges upon information and belief and based on the investigation to date of counsel, as follows:

### I. Preliminary Statement

1.       While touting the safety and reliability of its vehicles in its advertising and marketing, General Motors, LLC ("GM") was concealing a defect that caused its vehicles to have a sudden engine and electrical system power loss. Unbeknownst to purchasers of the GM vehicles, millions of GM vehicles contained this life-threatening safety defect in the ignition switch. GM, however, was acutely aware of the defective design of the ignition switches, but intentionally concealed this information from the general public. Indeed, GM's defective ignition switch only recently came to light in a series of recalls, thereby diminishing the value of the

vehicles equipped with this faulty switch. Plaintiff and the class members seek recovery for the damages resulting from the diminution in value of their GM vehicles.

2.   As described below, by concealing the existence of the defective Ignition Switch plaguing many models and years of GM-branded vehicles while concurrently marketing the GM brand as "safe" and "reliable," and claiming that it built the "world's best vehicles," GM enticed Plaintiff and the Class Members to purchase or lease vehicles that have now diminished in value as the truth about the GM brand has come out, and a stigma has attached to all GM-branded vehicles.

3.   Plaintiff, Wendy Kosovec, brings this action for herself and on behalf of all persons similarly situated who purchased or leased certain vehicles manufactured, distributed, and/or sold by GENERAL MOTORS LLC, GENERAL MOTORS HOLDING, LLC, GENERAL MOTORS CORPORATION, GENERAL MOTORS COMPANY, and/or its related subsidiaries, successors, or affiliates ("GM") with defective ignition switches, as described below. Where relevant, "Old GM" refers to GM and/or its related subsidiaries, successors, or affiliates prior to bankruptcy and restructuring, and "New GM" refers to GM and/or its related subsidiaries, successors, or affiliates after the bankruptcy and reorganization in July 2009.

4.   Plaintiff brings this action on behalf of herself and other Class members, each of whom own, owned, lease or leased one or more of the following vehicles:

2005-2010 Chevrolet Cobalt

2007 Pontiac G5

2006-2011 Chevrolet HHR

2006-2010 Pontiac Solstice

2008-10 Pontiac G5

2003-2007 Saturn Ion

2007-2010 Saturn Sky

2010-14 Chevrolet Camaros

2005-2009 Buick Lacrosse

2006-2014 Chevrolet Impala

2000–2005 Cadillac Deville

2004–2011 Cadillac DTS

2006–2011 Buick Lucerne

2004–2005 Buick Regal LS & GS MY

2006–2008 Chevrolet Monte Carlo

1997-2005 Chevrolet Malibu

1998-2002 Oldsmobile Intrigue

1999-2004 Oldsmobile Alero

1999-2005 Pontiac Grand Am

2000-05 Chevrolet Impala and Monte Carlo

2004-08 Pontiac Grand Prix

2003-14 Cadillac CTS

2004-06 Cadillac SRX

2005-10 Pontiac GS;

2005-2006 Pontiac Pursuit (Canada); (the "Defective Vehicles").

    5.  Plaintiff believes that there are additional GM vehicles that have the same or similar

defect in their ignition switch systems as the Defective Vehicles that have not yet been disclosed

by GM. Plaintiff will supplement the definition of Defective Vehicles to include these additional vehicles with defective ignition switch systems as they are identified.

6. The defective ignition switches in the Defective Vehicles allow the vehicle, for no apparent reason, to turn from the "On" position, to the "Accessory" or "Off" position while driving, resulting in a loss of electrical power, power steering, power braking and engine shut off. Put simply, the Ignition Switch failed to stay in the "Run" position when it should have stayed in the "Run" position. GM was aware that the ignition switch failed to keep the car powered on in circumstances that drivers could encounter, resulting in moving stalls on the highway as well as loss of power on rough terrain or jarring that drivers could encounter seconds before a crash. In addition, when the switch failed the air bags would not deploy, which meant that drivers were without airbag protection at the time they needed it most. Further, the Defective Vehicles have a condition in which the ignition key may be removed when the ignition is not in the "Off" position, which can cause unintended vehicle motion and could result in a vehicle crash and occupant or pedestrian injuries.

7. Problems with the switch's ability to keep the car powered on were known within GM's engineering ranks at the earliest stages of its production

8. It was not until February 7, 2014 - 13 years after GM engineers first discovered the problem - that GM finally told NHTSA that it was aware of a major safety defect with its ignition switch.

9. As a result of GM's alleged misconduct, Plaintiff and Class Members were harmed and suffered actual damages, in that the Defective Vehicles are unsafe, unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, ignition switch failure that puts them and others at serious risk of injury or death. Plaintiff and the Class

4

Members did not receive the benefit of their bargain as purchasers and lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Class Members did not receive vehicles that would reliably operate with reasonable safety, and instead received vehicles that put drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. A car purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car-such as the Class Vehicles-that is known to contain a safety defect such as the Ignition Switch Defect.

10. As a result, all purchasers and lessees of the Defective Vehicles overpaid for their cars at the time of purchase. Furthermore, GM's public disclosure of the Ignition Switch Defect has further caused the value of the Defective Vehicles to materially diminish.

11. In addition, the negative perception associated with the defective ignition switch has reduced potential buyers' willingness to purchase the Defective Vehicles in the secondary market, further resulting in diminished value.

12. Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects[1]. If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[2] GM owed a duty to Plaintiff and the Class that owned or leased the Defective Vehicles and it breached that duty.

---

[1] 49 U.S.C. §§ 30101-30170.
[2] 49 U.S.C. § 30118(c)(l) & (2).

13.   In addition to the TREAD Act, the Michigan Consumer Protection Act, and the common law laws, GM violated the Florida Deceptive and Unfair Trade Practices Act by engaging in unfair trade practices and by fraudulently concealing the deadly ignition switch defects from consumers, owners, dealers and wholesalers, and lessees of the Defective Vehicles. GM also violated the TREAD Act by failing to timely inform the National Highway Traffic Safety Administration ("NHTSA") of the ignition switch defects and by allowing cars to remain on the road with these safety defects.

14.   Plaintiff and the Class Members have been damaged by GM's misrepresentations, concealment, and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now in possession of highly dangerous and defective vehicles whose value has significantly diminished because of GM's failure to timely disclose the serious and potentially deadly defects. In addition to the danger of driving in these vehicles, vehicles owners and lessees cannot sell or otherwise divest themselves of these automobiles at a fair price given their diminished value.

## II.  Jurisdiction and Venue

15. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d); 28 U.S.C § 331 because at least one class member is of diverse citizenship from at least one defendant; there are more than 1 million class members; with the aggregate amount in controversy exceeding $5 million.

16. This Court has personal jurisdiction over GM because GM conducts significant business in this District and has maintained continuous and systematic business contacts through the advertisement and sale of GM vehicles within the State of Florida and therefore the Court has general jurisdiction for all purposes.

17.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338 with respect to claims seeking declaratory and other relief arising under the Magnuson-Moss Federal Warranty Act, 15 U.S.C. §§ 2301 *et seq.,* and supplemental jurisdiction pursuant to 28 U.S .C. § 1367 over the entire case or controversy.

18.  Pursuant to 28 U.S.C. § 1391(a)(2), venue is proper in this District because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

### III. Parties

19. Plaintiff Wendy Kosovec is a resident of Escambia County, Florida. Plaintiff owns a 2008 Chevrolet Cobalt subject to the ignition switch recall. Plaintiff's Chevrolet Cobalt was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Plaintiff purchased the Defective Vehicle primarily for personal, family, and household use. Plaintiff no longer feels safe driving the Defective Vehicle and is doubtful about the reliability of GM statements that it will fix the defective ignition switch.

20. On June 1, 2009, General Motors Corporation filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York, Case No. 09-50026. Defendant General Motors LLC is a Delaware limited liability company with its headquarters in Detroit, Michigan formed for the purpose of serving as the successor-in-interest for General Motors Corporation following the bankruptcy. General Motors LLC is registered with the Florida Department of State to conduct business in Florida.

21.  As part of the bankruptcy reorganization process, the newly-created company, Defendant General Motors LLC, acquired substantially all of the assets of Old GM, and assumed old GM's business operations. The new company also assumed certain liabilities of Old GM under Bankruptcy Code 363, including the express warranty for Plaintiff's vehicle.

22.  On June 26, 2009, the New GM entered into an agreement titled, *Amended and Restated Master Sale and Purchase Agreement by and Among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers and NGMCO, Inc., a Purchaser,* wherein New GM expressly assumed certain liabilities of Old GM, as follows:

> Section 2.3 Assumed and Retained Liabilities
> * * *
>
> (vii) (A) all liabilities arising under express written warranties of Sellers [old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers [old GM] or Purchaser [new GM] prior to or after the Closing and (B) all obligations under Lemon Laws;

23.  At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Defective Vehicles, and other motor vehicles and motor vehicle components throughout the United States.

24.  Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

8

## IV.  CLASS ACTION ALLEGATIONS

25.  Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4) on behalf of herself and other similarly situated persons as members of the proposed Class.  The proposed class includes all persons who reside in Florida and own, owned, lease or leased one or more of the following vehicles:

2005-2010 Chevrolet Cobalt

2007 Pontiac G5

2006-2011 Chevrolet HHR

2006-2010 Pontiac Solstice

2008-10 Pontiac G5

2003-2007 Saturn Ion

2007-2010 Saturn Sky

2010-14 Chevrolet Camaros

2005-2009 Buick Lacrosse

2006-2014 Chevrolet Impala

2000–2005 Cadillac Deville

2004–2011 Cadillac DTS

2006–2011 Buick Lucerne

2004–2005 Buick Regal LS & GS MY

2006–2008 Chevrolet Monte Carlo

1997-2005 Chevrolet Malibu

1998-2002 Oldsmobile Intrigue

1999-2004 Oldsmobile Alero

1999-2005 Pontiac Grand Am

2000-05 Chevrolet Impala and Monte Carlo

2004-08 Pontiac Grand Prix

2003-14 Cadillac CTS

2004-06 Cadillac SRX

2005-10 Pontiac GS;

2005-2006 Pontiac Pursuit (Canada);

the ("Defective Vehicles").

26. Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons. Also excluded are any individuals claiming damages from personal injuries or wrongful death allegedly arising from the Defective Vehicles.

27. The class is sufficiently numerous that joinder of all members is impracticable insofar as, upon information and belief, the class is comprised of over 2.6 million recalled vehicles.

28. There are questions of law and fact common to the class. These questions include, among others, the diminution in value of the recalled vehicles for each class period and causation.

29. The claims of the representative parties are typical of the claims of the class Plaintiffs have suffered the same claims asserted herein on behalf of the class members, thereby supporting typicality.

30. Plaintiff will fairly and adequately protect the interests of the class. The interest of Plaintiff is representative and coincident with, not antagonistic to, those of the remainder of the class.

31. In addition, Plaintiff is represented by experienced and competent counsel. Counsel for Plaintiff has handled numerous class actions and product liability claims.

32. In addition, the prosecution of separate actions by individual members of the class would create a risk of: inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for defendants; and adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to obtain compensatory or equitable relief.

33. The questions of law and fact common to the members of the class predominate over any questions affecting individual members, and class treatment is a superior method for the fair and efficient adjudication of the issues in dispute because it permits a large number if injured parties, joinder of whom is impracticable, to prosecute their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.

34. There are no difficulties likely to be encountered in the maintenance of these claims as a class action, and no superior alternative exists whereby the relative rights of the Plaintiff, the Class Members and GM can be fairly managed.

35.  GM has acted on grounds generally applicable to the Class with respect to  the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FACTUAL BACKGROUND

*The Ignition Switch and SDM Module*

36.  The Ignition Switch was fraught with problems from the outset, with GM personnel ultimately authorizing production of a switch that could rotate as a result of torque less than that required by GM's specifications.

37.  Components within the Ignition Switch control the amount of effort required to turn the switch from one position to another. A plunger cap and coiled spring inside the Ignition Switch sit in a small groove called a "detent," which holds the switch in the position to which the driver turns the key: Off, Run, Accessory, or Crank. The driver rotates the key by applying a certain amount of pressure or torque to overcome the detent, thereby rotating the switch out of one position and into another. One method to increase the effort required to rotate the Ignition Switch from one position to another is to use a longer and more tightly coiled spring.

38.  As described above, the amount of effort required to rotate the defective Ignition Switch was too low, permitting it to move from the "Run" position to the "Accessory" or "Off" position, when it was not the driver's intention to do so.  If the Ignition Switch moved out of "Run" to "Accessory" or "Off" when it should have stayed in "Run", the airbags would not deploy in the event of a crash that would otherwise meet the criteria to trigger airbag deployment.

12

39.   The torque performance of the Ignition Switch was the result of the plunger and spring interacting with the detent profiles inside the switch itself. The Ignition Switch required less effort to rotate from one position to another, because the spring exerted insufficient force on the detent profiles.

40.   A fundamental component of the airbag system in the Defective Vehicles is the Sensing Diagnostic Module ("SDM"). The SDM is an onboard electronic module in airbag systems that tracks data about the vehicle's status, including the vehicle's acceleration and speed, and determines when and whether airbags should deploy, and if so, triggers deployment. By 2004, SDMs could also serve as a vehicle's "black box", allowing for forensic analysis of accidents or malfunctions of the car's components, including airbags.

41.   As early as 2001, during pre-production development of the Ion, internal GM reports addressed an issue relating to the ignition switch's "pass lock" system. The report stated that the causes of the problem included "low detent plunger force" in the ignition switch.  The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report also claimed that an "ignition switch design change" had resolved the problem.

42.  March 2001, GM finalized the specifications for the Ignition Switch, which required that the torque necessary to move the Ignition Switch from "Run" to "Accessory" was to fall between 15 N-cm and 25 N-cm.   The GM specification did not include particularized requirements, such as dimensions, for the Ignition Switch's detent plunger and spring. Rather, the internal components of the Ignition Switch were a "black box design," which meant that GM personnel provided the supplier (Delphi) information regarding the part's packaging and

13

Case 1:14-cv-00354-RS-EMT    Document 1    Filed 07/23/14    Page 24 of 33

requirements, including the specification, and let the supplier design the details of the switch as necessary to satisfy those requirements.

43.  In prototype testing, in 2001 GM discovered that the Run detent (or groove) in the Ignition Switch was not well-defined and allowed the key to settle somewhere between "Run" and "Accessory" when the car was started.

44.  An August 2001 internal GM report on prototype testing noted that when the ignition circuit lost power," the ABS [anti-lock brake system] and SDM would also drop," causing warning lights to come on for the anti-lock brakes, SDM, power steering, and airbags, among other systems.

45.  Validation testing conducted by Delphi in late 2001 and early 2002 revealed that the Ignition Switch consistently failed to meet the torque values in the Specification (20 N-cm +/- 5 N-cm).

46.  By at least 2004, GM was aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. An investigation was opened and after consideration of lead-time required, cost and effectiveness of potential solutions, the investigation was closed and no action taken.

47.  During the 2003 to 2005 time period GM personnel received complaints that the Ignition Switch inadvertently rotated out of the Run position, causing moving stalls.  Because the complaints of ignition shut-offs and moving stalls were classified as non-safety issues, GM did nothing to address the problem and instead continued to manufacture and sell cars with the defective Ignition Switch.

48.   On November 19, 2004, GM personnel opened a Problem Resolution Tracking System ("PRTS") report to address a complaint that the Cobalt could be "keyed off with knee while driving." This was the first of six reports opened between 2004 and 2009 in connection with moving stalls in the Cobalt.

49.   In February 2005, GM issued a Preliminary Information, a communication that GM sends to dealers (but not consumers) about a possible issue, even if there is not yet a resolution to the issue.  The Preliminary Information explained the potential for drivers to inadvertently turn off the ignition, explained the cause to be the low torque of the Ignition Switch, and specifically noted the potential for a "stall."  See, Preliminary Information, Engine Stalls, Loss of Electrical Systems, and No DTCs (Feb. 28, 2005).

50.   In March 2005, GM Product Investigations, the group of engineers with responsibility for safety issues, drafted a multi-factor framework for assessing the safety impact of the engine stall problem.

51.   During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration.  The estimated cost to make the key change was $70,000 for tooling for a new key head, $400,000 to modify production assembly equipment, and a piece price increase of $0.50 per vehicle.

52.   GM CEO Mary Barra, in testimony given on April 1, 2014, before the House Committee on Energy and Commerce, explained that the proposed "fix" for the Ignition Switch Defect was rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

15

53.   On June 14, 2005, similar complaints of "inadvertent ignition shut-offs" in the Solstice - which used the same defective Ignition Switch - surfaced.

54.   The PRTS process led to GM's issuing Information Service Bulletin 05-02-35-007 in December 2005. This Service Bulletin provided "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs," and applied to a number of vehicles, including vehicles subject to the Ion, HHR, Solstice and Sky recall-specifically, 2003-06 Saturn Ion, 2006 Chevrolet HHR, and 2006 Pontiac Solstice vehicles- all of which were equipped with the same ignition switch as the Cobalt.

55.   On April 26, 2006, the GM design engineer responsible for the ignition switch installed in all of the vehicles subject to the Cobalt and G5 recall and the Ion, ID-IR, Solstice and Sky recall signed a document approving changes to the ignition switch.  According to GM, the approved changes included, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch.

56.   Upon information and belief, GM's reuse of the part number for the defective ignition switch on the newly designed ignition switch was intended to make it difficult to trace the defective switch back to its original design in 2001.

57.   In 2007 GM investigated several frontal impact accidents involving Cobalts in which the airbags did not deploy.  Only nine of the vehicles' sensing and diagnostic modules ("SDM's") were available for review.  Review of the SDM's revealed that the ignition was in the "Run" position in five of the crashes and in the "Accessory" position in four of the crashes.

58.   After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design-as had been suggested in 2005. GM

instituted the change after finding that consumers with "substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off", and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

***Crash Reports and Data***

59.   GM was aware the deadly consequences of the defective Ignition Switch, but concealed that information from Plaintiff, the Class Members, safety regulators and the public.

60.   In November 2004, engineers in GM's High Performance Vehicle Operations ("HPVO") noted that an individual in their group had repeatedly experienced a moving stall during a track test of the Cobalt SS (the high-performance version of the Cobalt) when the driver's knee "slightly graze[d]" the key fob.[3]

61.   Also in November 2004, a crash occurred in which a 2004 Saturn Ion left the road, traveled through brush and struck a tree head on.[4]  Despite the severity of the impact the air bags in the Ion did not deploy.

62.   Further in November 2004, GM personnel opened the first of six PRTS reports to address the complaint that the Cobalt could be "keyed off with knee while driving." Between 2004 and 2009 five addition PRTS reports were filed in connection with moving stalls in the Cobalt.[5]

63.   NHTSA data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

---

[3] Valukas Report at 61.
[4] Valukas Report at 124.
[5] Valukas Report at 63.

64.  In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.[6]

65.  In October 2006, a crash occurred in which a 2005 Cobalt left the road and struck a telephone box and two trees, resulting in two fatalities.[7]  The air bags did not deploy.

66.  In March 2007, NHTSA presented GM employees with information on a crash involving a 2005 Cobalt in which the airbag did not deploy. NHTSA's Special Crash Investigations (SCI) report on this crash found that the ignition switch had been in the accessory position at the time of the crash. Similarly, a second SCI report on a crash from October 2006 with similar conditions found, "The case vehicle's driver and front right passenger air bags did not deploy as a result of the impact with the clump of trees, possibly due to ... power loss due to movement of the ignition switch just prior to the impact." The report cited six similar complaints in the NHTSA database.

67.  GM recently acknowledged at least 16 fatalities linked to the Defective Vehicles.

68. In addition, GM has admitted that it is aware of at least 61 impact accidents tied to defective Ignition Switches.

69.  News reports have indicated that analysis shows that frequently of fatal accidents involving the Defective Vehicles may be as high as six time that of comparable vehicles. (See, June 2, 2014 Reuters article Exclusive: At least 74 dead in crashes similar to those GM linked to faulty switches available at   http://www.reuters.com/article/2014/06/03/us-gm-recall-idUSKBN0EE01920140603).

---

[6] Valukas Report at 110.
[7] Valukas Report at 113.

***GM Finally Issues Recalls***

70. On February 7, 2014, GM notified the National Highway Transportation Safety Administration ("NHTSA") of its decision to recall 2005-2007 model year

Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles ("the Cobalt and G5 recall").

71. On February 25, 2014, GM notified NHTSA of its decision to recall the 2003-2007 model year Saturn Ion, 2006-2007 model year Chevrolet HHR and Pontiac Solstice, and 2007 model year Saturn Sky vehicles ("the Ion, HHR, Solstice and Sky recall").

72. On February 26, 2014, following the first of two recalls for the ignition switch defect,

NHTSA opened a timeliness query (TQ) to evaluate the timing of GM's defect decision-making and reporting of the safety defect to NHTSA.

73. On March 28, 2014, GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States. This second expansion of the ignition switch recall covered an additional 823, 788 vehicles in the US, bringing the number of recalled vehicles to 2,191,934.

74. NHTSA and GM signed a Consent Order on May 16, 2014.5 By the terms of the Consent Order, "GM admits it violated the Safety Act by failing to provide notice to NHTSA of the safety-related defect that is the subject of Recall No. 14V-047." GM agreed to pay $35 million - the maximum civil penalty for a related series of violations - to the U.S. Treasury in addition to the penalty owed for the company's failure to respond completely to NHTSA's February 2014 inquiry.

75. On June 13, 2014, GM announced a recall of just over 500,000 Chevrolet Camaros due to a problem with the ignition switches. According to GM's recall announcement, a

driver's knee can bump the key fob and cause the key to move out of the "Run" position, with a corresponding loss in power.

76.    On June 16, 2014, GM announced the recall of 3.16 million vehicles including, 2005-2009 Buick Allure; 2005-2009 Buick LaCrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2004-2011 Cadillac DTS, 2006-2011 Buick Lucerne, 2004-2005 Buick Regal LS & GS, 2006-2008 Chevrolet Monte Carlo. GM stated that "the ignition switch may inadvertently move out of the "Run" position if the key is carrying extra weight and experiences some jarring event."

77.    On June 30, 2014 GM recalled an additional 8.45 million vehicles including the 1997-2005 Chevrolet Malibu; 1998-2002 Oldsmobile Intrique; 1999-2004 Oldsmobile Alero; 1999-2005 Pontiac Grand Am; 2000-05 Chevrolet Impala and Monte Carlo; and 2004-08 Pontiac Grand Prix.

78.    On July 2, 2014 GM issued a recall involving 2005-2009 Buick Lacrosse, 2006-2011 Buick Lucerne, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2014 MY Chevrolet Impala and 2006-2007 MY Chevrolet Monte Carlo vehicles.

79.    On July 3, 2014, GM issued a recall involving 2000-2005 Chevrolet Impala and Monte Carlo, 1997-2005 Chevrolet Malibu, 1999-2004 Oldsmobile Alero, 1998-2002 Oldsmobile Intrigue, 1999-2005 Pontiac Grand Am and 2004-2008 Pontiac Grand Prix vehicles

80.    The defective Ignition Switch in GM vehicles has adversely affected the company's reputation as a manufacturer of safe, reliable vehicles with high resale value, as compared to vehicles made by their competitors. In the wake of the news reports about this serious problem,

GM customers and consumers generally are - as they should be - skeptical about the quality and safety of GM vehicles. Indeed, it is likely that the entire fleet of GM vehicles has been stigmatized by this defect, but most specifically the vehicles directly affected by this recall.

81.  If GM had timely disclosed the defective Ignition Switch as required by the TREAD Act, the law of fraudulent concealment, and Florida consumer laws set forth below, Class members' vehicles would be considerably more valuable than they are now. Because of GM's now highly publicized campaign of deception, and its belated, piecemeal and ever-expanding recalls, so much stigma has attached to the GM brand that no rational consumer would pay what otherwise would have been fair market value for the Defective Vehicles.

## TOLLING OF THE STATUTES OF LIMITATION

82.  Upon information and belief, GM has known of the defective Ignition Switch since at least 2001, and certainly well before Plaintiff and Class Members purchased the Defective Vehicles, and has actively concealed and/or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the defective Ignition Switch.

83.  All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and pattern and practice of continuous denial of the facts alleged herein. Plaintiff and the Class Members did not discover, and did not know of material facts that would have caused a reasonable person to suspect, that Old GM and GM did not report vital safety information within their knowledge to federal authorities (NHTSA) purchasers or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and that they opted to conceal that information until very recently.

84.  Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiff, and the Class Members "the true character, quality, and nature" of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that the defect will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

85.  Although GM has now acknowledged that "[t]here is a risk, under certain conditions, that your ignition switch may move out of the 'Run' position, resulting in a partial loss of electrical power and turning off the engine," GM did not fully disclose the defective Ignition Switch, but rather, downplayed the prevalence of the problem, and the risk power loss occurring during normal operation of the Defective Vehicles.

86.  For example, in 2005, GM issued a Technical Service Bulletin to dealers and service technicians (but not to the general public) directing that customers be advised to "remove unessential items from their key chains" to avoid inadvertent ignition switching, but did not identify or disclose the defective Ignition Switch to the general public.  That bulletin did not refer to the problem as "stalling," however, precisely because GM believed customers might associate stalling with a safety problem. Only a customer who had already experienced a stall and who went into a dealer to complain would get information about the proposed solutions. Other customers would remain unaware of the problem, as well as GM's proposed solutions.[8]

87.  GM also stated, in 2005, that it was "rare" for the Ignition Switches in the Defective Vehicles to unintentionally move from the "On" position to the "Accessory" or "Off" position. At the time of the statement GM knew, or in the exercise of reasonable care should have known, that this statement was false and misleading.

---

[8] Valukas Report at 8.

88.    The systematic concealment of known defects was deliberate. In fact, recently revealed documents show that GM valued cost-cutting over safety, trained its personnel to *never* use the word "defect," "stall," or other words suggesting that any GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

## ESTOPPEL

89.    GM was and is under a continuous duty to disclose to Plaintiff and the Class Members the true character, quality, and nature of the vehicles. GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by many of these defects. Given the continuity of engineers, corporate counsel, and other key personnel from Old GM to GM, GM was aware of the now infamous ignition switch defect (and many other serious defects in numerous models of GM-branded vehicles) *from the very date of its inception on July 10, 2009.* Plaintiff and the Class Members reasonably relied upon GM's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## DISCOVERY RULE

90.    The causes of action alleged herein did not accrue until Plaintiff and the Class Members actually discovered that their vehicles had the defective Ignition Switch.

91.    Plaintiff and the Class Members had no realistic ability to determine that the vehicles were defective until - at the earliest - after the defective Ignition Switch caused a sudden stall. Even then, Plaintiff and the Class Members had no reason to know the sudden loss of power was caused by the defective Ignition Switch.

## CAUSES OF ACTION

## COUNT I
## FRAUDULENT CONCEALMENT

92.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

93.  As described above, GM made material omissions and affirmative misrepresentations regarding the safety, reliability and quality of the Defective Vehicles and the GM brand.

94.  GM had a duty to disclose the defects in the Ignition Switch because the defect was known and/or accessible only to GM who had vastly superior knowledge and exclusive access to the facts, and such facts were not known to or reasonably discoverable by Plaintiff and the Class Members. Further, when GM marketed the Defective Vehicles as safe, reliable and quality vehicles, GM had actual knowledge of the defect in the Ignition Switch.  Thus, GM made omissions of material fact necessary in order to make the statements made by GM, in the light of the circumstances under which they are made, not misleading. In other words, GM was under a duty to disclose these omitted facts, because, where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated. These omissions and misrepresentations were material because any reasonable consumer would consider a defect that impacts a vehicle's safety and reliability to be an important fact and because the defect directly impacts the value of the Defective Vehicles purchased or leased by Plaintiff and the Class Members.

95.  Plaintiff and the Class Members were unaware of the defective Ignition Switch and would not have purchased or leased the Defective Vehicle or would have paid a reduced price for

said Defective Vehicle if they had been aware of the defective Ignition Switch and its safety and reliability implications.

96. GM engaged in the courses of fraud, manipulation and deception herein described in order to induce Plaintiff and the other Class Members to purchase Defective Vehicles at a higher price for the Defective Vehicles, which did not match Defective Vehicles' true value.

97. GM's material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing the facts set out herein as well as the true condition and value of the Defective Vehicles from Plaintiff and the Class Members and to support the artificially inflated price of the Defective Vehicles.

98. According to the Restatement of Torts (Second), sec 551(1): "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose .... "

99. GM knowingly, willfully and/or recklessly deceived Plaintiff and the Class Members through the secretive, misleading and omissive activity described herein.

100. Plaintiff and the Class Members reasonably relied on GM's statements in marketing and advertising material that the Defective Vehicles were safe, and would not have purchased or leased the Defective Vehicles had they known of the defects in the Ignition Switches, or would not have paid the artificially inflated price of the Defective Vehicles.

101. As a direct result of the concealment and/or suppression of the facts, Plaintiff and the Class Members sustained damages in that Plaintiff and the Class Members now own or lease vehicles that diminished in value as a result of GM's concealment of, and failure to timely disclose, the serious safety and quality defects in the Defective Vehicles.

**COUNT II**
**VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT**

102.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint**.**

103.  At all times relevant hereto, there was in full force and effect Mich. Comp. Laws Ann. § 445.903 *et seq.* (the "MCPA").

104.  Plaintiff and the Class Members are "person[s]" within the meaning of the MCPA, Mich. Comp. Laws Ann. § 445.902(1)(d).

105.  At all relevant times hereto, GM was a "person[s]" engaged in "trade or commerce" within the meaning of the MCPA, Mich. Comp. Laws Ann. § 445.902(l)(d) and (g).

106.  The sale of the Defective Vehicles to Plaintiff and the Class Members occurred within "trade and commerce" within the meaning of the MCPA, Mich. Comp. Laws Ann. § 445.902(d), and both GM and Old GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined therein.

107.  The MCPA makes unlawful any "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade or commerce," as more specifically defined in the MCPA.

Mich. Comp. Laws Ann. § 445.903 (1). GM has engaged in unfair, unconscionable, and deceptive methods, acts and practices in conduct of trade or commerce in violation of the MCPA, and also has successor liability for the unfair, unconscionable, and deceptive methods, acts, and practices of Old GM as set forth above.

26

108.  In addition, Old GM and GM violated the MCPA by "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. Laws Ann. § 445.903(s).

109.  Plaintiff seeks injunctive relief to enjoin GM from continuing these unfair, unconscionable and deceptive acts or; seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Class Member, reasonable attorneys' fees; and any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

110.  Plaintiff further seeks punitive damages against GM because GM carried out the above described acts with willful and conscious disregard of the rights and safety of others. GM intentionally and willfully misrepresented the safety and reliability of the Defective Vehicles, actively deceived Plaintiff and the Class Members with regard to matter of health and safety, and maliciously concealed material facts, in order to avoid the expense and public relations nightmare of correcting a deadly flaw.

## COUNT III
## VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT
## 15 U.S.C. § 2301, et seq.

111.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

112.  Magnuson-Moss provides a private right of action by purchasers of consumer products against manufacturers or retailers who, among other things, fail to comply with the terms of the written, express, or implied warranties. *See* 15 U.S.C. § 2310(d)(l). As alleged above, GM has failed to comply with the terms of its implied warranties.

113.  The Defective Vehicles are "consumer products" pursuant to 15 U.S.C. § 2301(1).

27

114.  GM is a "warrantor" pursuant to 15 U.S.C. § 2301(5).

115.  Plaintiff and the Class Members are "consumers" pursuant to 15 U.S.C. § 2301(3).

116.  Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

117.  As a warrantor, GM is obligated to afford the Class, as consumers, all rights and remedies available under Magnuson-Moss, regardless of privity. Plaintiff and the Class Members have had sufficient direct dealings with GM and/or its agents (dealerships) to establish privity of contract between GM, on the one hand, and Plaintiff and the Class Members, on the other hand. Regardless, privity is not required here because Plaintiff and the Class Members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements related to the Defective Vehicles; the warranty agreements were intended to benefit the consumers only. Finally, privity is not required because the Defective Vehicles are dangerous instrumentalities due to the defects and nonconformities alleged herein.

118.  In connection with its sale of the Defective Vehicles, GM gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As a part of the implied warranty of merchantability, GM warranted that the Defective Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured and marketed, and were adequately contained, packaged and labeled.

119.  GM is liable to Plaintiff and the Class Members pursuant to 15 U.S.C. § 23 10(d)(l), because it breached the implied warranty of merchantability in that the Defective Vehicles were not fit for the ordinary purposes for which they are used, a safe passenger motor vehicle.

120.  The defective Ignition Switch, which allows the Defective Vehicles to shut down during ordinary driving conditions, causing stalls, the loss of power-steering and power-brakes, and the non-deployment of airbags in the event of a collision is a defect which relates to motor vehicle safety, rendering the Defective Vehicles unfit for their ordinary purpose.

121.  In addition, GM breached its implied warranty of merchantability to Plaintiff and the Class Members because the Defective Vehicles, as a result of the defective Ignition Switch, would not pass without objection in the trade.

122.  Further, despite GM's knowledge of this dangerous condition, the packaging and labelling of the Defective Vehicles did not adequately warn Plaintiff and the Class Members of the dangers of the Defective Vehicles and/or did not adequately instruct Plaintiff and the Class Members on the proper use of the Defective Vehicles in light of the defective Ignition Switches.

123.  Plaintiff and the Class Members have suffered damages as a result of GM's breaches of implied warranties as set forth above. *See* 15 U.S.C. § 2310(d)(l)-(2).

124.  Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Defective Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff

resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

125.  Pursuant to 15 U.S.C. § 2310(d)(l), Plaintiff and the Class Members are entitled to recover the damages caused to them by GM's breach of the implied warranty of merchantability, which damages constitute the difference in value between the Defective Vehicles as warranted (their sales prices) and the Defective Vehicles as actually delivered.

126. Plaintiff also seeks an award of costs and expenses, including attorney's fees, under Magnuson Moss to prevailing consumers in connection with the commencement and prosecution of this action. *See* 15 U.S.C. § 2310(d)(2). Plaintiff and the Class Members intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

**COUNT IV**
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

127.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

128.  Plaintiff brings Count IV, individually, and on behalf of the Class, who purchased or leased the Defective Vehicles.

129.  This is an action for actual damages pursuant to Chapter 501, Part II, Fla. Stat., the "Florida Deceptive and Unfair Trade Practices Act" ("FDUTPA").

130.  At all times material hereto, Plaintiff and the Class Members were "consumers" within the meaning of FDUTPA, and GM has engaged in "trade or commerce" within the meaning of FDUTPA.

131. Section 501.204(1) of FDUTPA imposes a duty on GM to refrain from engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

132. Section 501.211 of FDUTPA provides consumers with a private right of action for FDUTP A violations.

133. Based on the foregoing course of conduct alleged throughout this Complaint, GM has engaged in representations, acts, practices or omissions which are material, and which are likely to mislead consumers acting reasonably under the circumstances. Thus, GM has engaged in deceptive acts or practices in violation of§ 501.204(1), *Fla. Stat.*

134. Moreover, based on the foregoing course of conduct alleged throughout this Complaint, GM has committed acts or practices in trade or commerce which offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers; or GM has committed acts or practices which have caused, or are likely to cause, consumer injury, which is substantial, not outweighed by any countervailing benefits to consumers or competition that the practice produces, and an injury that consumers themselves could not reasonably have avoided. Therefore, GM has engaged in unfair acts or practices in violation of § 501.204(1), *Fla. Stat.*

135. And as set forth above throughout the Complaint, consumers, including Plaintiff and the Class Members, have suffered losses and thus incurred actual damages as a result of GM's unfair or deceptive acts or practices in violation of FDUTPA, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and in favor of Plaintiff and the Class Members, and grant the following relief:

A. Determine that this action may be maintained as a class action and certify it as such under Rule 23(b)(3), or alternatively certify all issues and claims that are appropriately certified; and designate and appoint Plaintiff as Class Representative and Plaintiff's chosen counsel as Class Counsel;

B. Declare, adjudge, and decree the conduct of GM as alleged herein to be unlawful, unfair, and/or deceptive, and enjoin any such future conduct;

C. Award Plaintiff and the Class Members actual, compensatory damages or, in the alternative, statutory damages, as proven at trial;

D. Award Plaintiff and the Class Members exemplary damages in such amount as proven;

E. Award damages and other remedies as allowed by the laws of the State of Florida;

F. Award Plaintiff and the Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

G. Award Plaintiff and the Class Members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on the legal claims, as set forth herein.

_____/s/ Peter J. Mougey_____

Peter J. Mougey Esq. (FBN 0191825)
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7068
Facsimile: (850) 436-6068

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

WENDY KOSOVEC, individually and on behalf of other similarly situated

## DEFENDANTS

GENERAL MOTORS, LLC; GENERAL MOTORS HOLDINGS, LLC

**(b)** County of Residence of First Listed Plaintiff    Escambia County, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Wayne County, MI
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Levin, Papantonio, Thomas, Mitchell, Rafferty, & Proctor, PA
316 S. Baylen St, Suite 600 Pensacola, FL 32502
(850)435-7000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1   U.S. Government Plaintiff
- ❏ 3   Federal Question
  *(U.S. Government Not a Party)*
- ❏ 2   U.S. Government Defendant
- ☒ 4   Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Product Liability | | | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | Liability | ❏ 367 Health Care/ | | | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Product Liability | | ❏ 830 Patent | ❏ 470 Racketeer Influenced and |
| ❏ 152 Recovery of Defaulted | Liability | ❏ 368 Asbestos Personal | | ❏ 840 Trademark | Corrupt Organizations |
| Student Loans | ❏ 340 Marine | Injury Product | | | ❏ 480 Consumer Credit |
| (Excludes Veterans) | ❏ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| ❏ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ☒ 370 Other Fraud | Act | ❏ 862 Black Lung (923) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 190 Other Contract | Product Liability | ❏ 380 Other Personal | Relations | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| ❏ 196 Franchise | Injury | ❏ 385 Property Damage | ❏ 751 Family and Medical | | ❏ 895 Freedom of Information |
| | ❏ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ❏ 790 Other Labor Litigation | | ❏ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement | **FEDERAL TAX SUITS** | ❏ 899 Administrative Procedure |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ❏ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | ❏ 950 Constitutionality of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 530 General | | | |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other | ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ❏ 2   Removed from State Court
- ❏ 3   Remanded from Appellate Court
- ❏ 4   Reinstated or Reopened
- ❏ 5   Transferred from Another District *(specify)*
- ❏ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332; 15 U.S.C 2301
Brief description of cause:
Violation of Magnuson-Moss; Violationof MCLA 445; Fraud by Concealment; Violation of FDUTPA

## VII. REQUESTED IN COMPLAINT:

☒   CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE Furman (FDNY)     DOCKET NUMBER MDL 2543

DATE 7/28/14

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Florida

| | |
|---|---|
| WENDY KOSOVEC, individually and on behalf of others similarly situated<br><br>_____<br>*Plaintiff(s)*<br>v.<br>GENERAL MOTORS, LLC<br>GENERAL MOTORS HOLDINGS, LLC<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   General Motors, LLC
General Motors Holdings, LLC
By Serving Registered Agent
Corporation Service Company
1201 Hays St.
Tallahasee, FL 32301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Peter J. Mougey (pmougey@levinlaw.com)
Levin, Papantonio, Thomas, Mitchell, Raferty, & Proctor, PA
316 S. Baylen St., Suite 600
Pensacola, FL 32502

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
                                                                     *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: