# Exhibit C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------

WILLIAM L. RUKEYSER, individually
and on behalf of all others similarly
situated,

     Plaintiff,

     v.

GENERAL MOTORS LLC,

     Defendant.

-----------------------------------------------------

Case No. 14-cv-5715

**CLASS ACTION**

**JURY TRIAL DEMANDED**

### AMENDED COMPLAINT

Plaintiff, William L. Rukeyser ("Plaintiff" or "Rukeyser"), by and through undersigned counsel, on behalf of himself and all other persons and entities similarly situated, brings this complaint against Defendant General Motors LLC ("Defendant" or "General Motors"), and alleges, upon information and belief and based on the investigation to date of counsel, as follows:

### <u>INTRODUCTION</u>

1.     This class action concerns all persons and entities in the United States (the "Class") who currently own or lease a Chevrolet Cobalt; Chevrolet HHR; Pontiac Solstice; Saturn Ion; Saturn Sky; or Pontiac G5 (the "GM Vehicles") containing defective ignition switches ("ignition switches").

2.     Defendant has designed, manufactured, advertised, promoted, warranted and sold millions of GM Vehicles containing defective ignition switches for use in the United States and worldwide.

1

3.      Defendant marketed and warranted to consumers, including Plaintiff and the Class, that its GM Vehicles were of superior quality and engineered and built to be safe, long-lasting and reliable.

4.      However, Defendant failed to properly and adequately design, formulate and test its GM Vehicles before advertising and selling them as safe, durable and fit for use to Plaintiff and the Class.

5.      GM Vehicles are equipped with ignition systems that are defective.  The ignition switches, which are supposed to serve the basic function of turning the vehicle on or off, habitually slip out of a "run" position and into an "accessory" or "off" position without any notice or warning.  As a result of the slip, GM Vehicles lose their power, speed and overall brake control.  In addition, they do not deploy their airbags.  Such failures place Plaintiff and the Class in highly dangerous situations which have resulted in, and will continue to result in, collisions, bodily harm and possibly death.  In addition, the defects associated with Defendant's GM Vehicles diminish the value of the vehicles owned or leased by Plaintiff and the Class.

6.      Because of the defects associated with Defendant's ignition switches, GM Vehicles are unable to function as represented and promised by Defendant and are unfit for their ordinary and intended use(s).

7.      Defendant and its predecessor, General Motors Corporation ("Former General Motors"), have known about ignition switch defects and failures in GM Vehicles since at least 2001.

8.      For nearly a decade, Defendant has received a litany of complaints from consumers, dealers and service technicians concerning failures with its ignition switches.  It has also had access to reports and studies concerning crashes, injuries and deaths that have occurred

as a result of the faulty ignition switches.  *See* Ruiz, Ivory and Stout, *13 Deaths, Untold Heartache, From G.M. Defect*, May 24, 2014, NYT (failures with Defendant's ignition switches resulted in at least 13 deaths; "[t]he issue of a potential cover-up hangs heavily over G.M. The company has acknowledged that as early as 2001 it had evidence that the ignition switch could, if jostled, suddenly shut off the power in a moving car, disabling air bags and impeding braking and steering systems").  In addition, Defendant has been subjected to numerous investigations and inquiries organized by the National Highway Traffic Safety Administration ("NHTSA"), the United States Department of Justice, the Securities and Exchange Commission, the United States Congress and numerous state attorneys general.

9.      Instead of addressing the various warnings and indications that it has received over the years, Defendant ignored them.  Defendant even went as far as to ignore its statutory duty under the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§ 30101-30170 ("TREAD Act"), which requires a vehicle manufacturer to disclose known defects.   Under this important safety statute, if a defect is found to exist, the manufacturer must notify vehicle owners and dealers in an effort to promptly remedy the situation.  Because Defendant failed to notify NHTSA that its ignition switches were defective, it was forced to enter into a Consent Order (which required it to pay certain fines) with the Administration and publicly admit that it violated the Act.

10.     Defendant refused to inform Plaintiff and the Class about the defect(s) associated with its GM Vehicles because it sought profits over safety.

11.     Defendant continues to deceptively and falsely make representations regarding its GM Vehicles, including the product's fitness for use and reliability.  *See* Healey, J., *Senators: Fire GM legal chief, pay more recall victims*, USA Today, July 7, 2014,

http://www.usatoday.com/story/money/cars/2014/07/17/gm-senate-millikin-barra-delphi-recall/12768159/ (reporting that during a July 17, 2014 Senate Subcommittee on Consumer Protection, Product Safety and Insurance hearing, Senator Richard Blumenthal (D-Conn.) stated that GM's lawyers were possibly involved in "cover-up, concealment, deceit and even fraud" and should be accused of crimes by the Justice Department).

12. Ignition switches installed in the GM Vehicles have failed or will fail prematurely and will not perform as warranted by the Defendant. As a result, Plaintiff and the Class have incurred and will continue to incur actual damages and out of pocket costs and expenses because a vehicle purchased or leased with such a serious safety defect is worth less than a vehicle without such a defect.

13. Had Plaintiff and Class been provided with information regarding the defective nature of Defendant's GM Vehicles, which Defendant readily possessed, they would not have purchased or otherwise acquired the defective vehicles. Moreover, they would not have relied on the marketing and warranty representations made by the Defendant which suggested that the vehicles were safe and worry-free.

14. Defendant has finally admitted that its GM Vehicles are defective and organized a recall, during February, March, April, June and July of 2014, of approximately 13 million vehicles equipped with dangerous ignition switches.

15. Due to the size of the typical individual Class member's claim, and because most purchasers of the GM Vehicles have only modest resources, it is unlikely that individual Class members could afford to seek recovery against Defendant on their own. This is especially true in light of the size and resources of the Defendant and its refusal to completely recall or otherwise fully disclose the true nature of the product defects to the Plaintiff and the Class. A

class action is, therefore, the only reasonable means by which Class members can obtain relief
from this Defendant.

## JURISDICTION AND VENUE

16.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28
U.S.C. § 1332(d), because Plaintiff and members of the proposed Class are citizens of states
different from Defendant, and the aggregate amount in controversy exceeds $5,000,000.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a
substantial part of the events or omissions giving rise to these claims occurred in this District
and Defendant has caused harm and injury to class members residing in this District.  Defendant
is registered with the New York Department of State to conduct business in this District.  In
addition, the Defendant's Chapter 11 sale of its assets, implemented through section 363 of
Chapter 11, Title 11 of the United States Code, took place in the United States Bankruptcy
Court for the Southern District of New York.

## PARTIES

18.    Plaintiff, William L. Rukeyser, is a citizen and resident of California, residing in
Davis, California.  In 2008, after reviewing several bids from different vehicle dealers, Plaintiff
purchased a new four door LS Sedan Chevrolet Cobalt for approximately $12,000 from Sanborn
Chevy, located in Lodi, California.  Plaintiff Rukeyser's Chevrolet Cobalt was purchased
primarily for personal, household, and family use.

19.    Prior to purchasing his vehicle, Plaintiff reviewed Defendant's website and
analyzed representations suggesting that the Cobalt had favorable fuel economy.  In addition,
Plaintiff visited an additional website to research safety crash test data results (which he has
done in the past prior to purchasing a new vehicle).  Shortly before the time of his purchase,

Plaintiff test drove the Cobalt at Sanborn Chevy to see how it handled and drove.

20.     Plaintiff relied on Defendant's marketing and representations (in particular that the Cobalt was a quality built product). Unbeknownst to Plaintiff, the statements made by Defendant contained misrepresentations and omissions of material fact regarding the quality, safety, reliability, and durability of its GM Vehicles.

21.     In May 2014, Defendant, via a recall letter sent by General Motors Customer & Relationship Service General Director Jim Moloney (titled: "Important Safety Recall"), informed Plaintiff that an ignition switch defect existed with his 2008 Chevrolet Cobalt.

22.     In June 2014, and pursuant to Defendant's recall letter and directions, Plaintiff took his car to Hanlee Chevy in Davis, California so that it could be equipped with a new ignition switch. To date, over a month later, Plaintiff's Cobalt still remains at the dealership awaiting an ignition switch. (The dealership informed Plaintiff that it has been waiting for Defendant to send new ignition switches for use.)

23.     Plaintiff would not have purchased Defendant's vehicle, or paid such a large amount of money for it, had Defendant disclosed that its GM Vehicles contained defective and unsafe ignition switches that have caused and will continue to cause harm and possible death to unsuspecting owners. Defendant has left Plaintiff with an unsafe vehicle that has a greatly diminished value.

24.     Defendant, General Motors LLC, is a Delaware Corporation with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48243.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff and similarly situated individuals (the "Class") bring this class action pursuant to Federal Rule of Civil Procedure 23 as defined as follows:

Nationwide Class:

All persons and entities in the United States who currently own or lease a GM Vehicle (2005-2011 Chevrolet Cobalt; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; 2003-2010 Saturn Ion; 2007-2010 Saturn Sky; and 2007-2010 Pontiac G5) containing defective ignition switches.

Alternatively, Plaintiff and similarly situated individuals bring this class action pursuant to Federal Rule of Civil Procedure 23 as defined as follows:

California Class:

All persons and entities in the state of California who currently own or lease a GM Vehicle (2005-2010 Chevrolet Cobalt; 2006-2011 Chevrolet HHR; 2006-2010 Pontiac Solstice; 2003-2010 Saturn Ion; 2007-2010 Saturn Sky; and 2007-2010 Pontiac G5) containing defective ignition switches.

26.     Plaintiff reserves the right to amend his class definitions following further investigation and discovery.

27.     Excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Defendant and any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant and its legal representatives, assigns and successors of Defendant; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

28.     *Numerosity*: The Class is composed of thousands of persons geographically dispersed throughout the United States and the State of California, the joinder of whom in one action is impractical. Moreover, upon information and belief, the Class is ascertainable and identifiable from Defendant's records or identifying marks on the GM Vehicles and ignition switches.

29.     *Commonality*: The critical question of law and fact common to the Plaintiff's Class that will materially advance the litigation is whether GM Vehicles are inherently defective

7

and unsafe, contrary to the expectations imparted by Defendant through its representations and omissions.

30.     Other questions of law and fact common to the Class that exist as to all members of the Class and predominate over any questions affecting only individual members of the Class include the following:

    a.      Whether Defendant's ignition switches are defective, defectively designed, and/or defectively manufactured;

    b.      Whether Defendant knew or should have known about the defects in its GM Vehicles and ignition switches;

    c.      Whether Defendant concealed from Plaintiff and members of the Class defects in its GM Vehicles and ignition switches;

    d.      Whether Defendant breached warranties relating to its GM Vehicles and ignition switches;

    e.      Whether the terms of Defendant's warranties were unconscionable or failed essential purpose;

    f.      Whether Plaintiff and members of the Class are entitled to damages and what the damages consist of;

    g.      Whether Defendant engaged in unfair, false, misleading, or deceptive trade practices; and

    h.      Whether Defendant made false misrepresentations regarding its GM Vehicles and ignition switches.

31.     *Typicality*: Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Defendant's conduct in designing, manufacturing,

marketing, advertising, warranting and selling the defective GM Vehicles and Defendant's conduct in concealing the defect in the GM Vehicles to the Class.

32. *Adequate Representation*: Plaintiff will fairly and adequately protect the interests of the members of the Class and Subclass and has no interests antagonistic to those of the Class or the Subclass. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including but not limited to consumer class actions involving, *inter alia*, breach of warranties, product liability, consumer fraud and product design defects.

33. *Predominance and Superiority*: This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

34. Defendant is, and at all times relevant hereto was, engaged in the business of designing, developing, manufacturing, distributing, marketing, and selling GM Vehicles.

35. GM Vehicles are equipped with ignition systems that are defective.

36. Defendant's ignition switches, which are supposed to serve the basic function of

turning the vehicle on or off, habitually slip out of a "run" position and into an "accessory" or "off" position without any notice or warning.

37.    Ignition switches in Defendant's Cobalt vehicles are equipped with a spring loaded "detent plunger," located inside the ignition switch controller and attached to the end of the ignition key cylinder in the steering column, that does not operate properly when in use. Gates, G., *The Fault in the Cobalt Ignition Switch*, June 5, 2014, NYT.  As a result of this defect, GM Vehicles lose power, speed, and overall brake control. They also do not deploy their airbags.

38.    The following diagram illustrates an alteration (size enhancement from 5.9 mm to 7.0 mm) in the ignition switch (spring loaded "detent plunger) that Defendant made for its Chevrolet Cobalt (which is the vehicle Plaintiff purchased and which was subject to a recall):



(Diagram: International Business Times)

39.    The following photo illustrates the housing protecting a GM Vehicle's ignition switch:



(Photo: Michael Spooneybarger/Reuters/Landov)

40.     Ignition switch defects in GM Vehicles occur during normal and intended use and are not the result of incorrect installation.

41.     GM Vehicles are unfit for the ordinary purposes for which they are used because their ignition switch failure reduces the function (causes brake and power failures and do not deploy their air bags) of the GM Vehicles and/or completely eliminates their ability to function as marketed and represented by Defendant.

42.     Defective ignition switches in GM Vehicles caused Plaintiff and members of the Class to suffer damages, including but not limited to, fees and costs for maintenance and diminished vehicle value.

**Defendant's Bankruptcy Reorganization Cannot Shield It From Its Liabilities And Obligations**

43.     In 2009, Defendant, as a result of a sale under Chapter 11 of the U.S. Bankruptcy Code, acquired all assets and assumed various liabilities related to the former General Motors Corporation ("Former General Motors").

44.     Two pertinent liabilities and obligations retained by Defendant after the sale and bankruptcy are:

Purchaser shall comply with the certification reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed.

…

all Liabilities arising under express written warranties . . . that are specifically identified as warranties.

45.    Defendant has successor liability for Former General Motors' actions related to the design, manufacture, promotion and sales of GM Vehicles because Defendant has continued the general business of Former General Motors (i.e., has retained many of the same quality control, warranty, sales and research and development employees, implements many of the same practice and procedures, has knowledge about the ignition switches at issue here and acquired books, records and property).

**After 10 Years Of Concealment And Inaction, Defendant Offered A Recall To Certain Customers**

46.    In 2014, Defendant admitted that its vehicles were defective and dangerous. According to Defendant's Field Performance Review Committee and the Executive Field Action Decision Committee ("EFADC"), during February, March, April, June and July of 2014, Defendant recalled approximately 13 million vehicles (some of which were equipped with dangerous ignition switches).

47.    General Motors' Chief Executive Officer Mary Barra, testifying before the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations on April 1, 2014 stated: "More than a decade ago, GM embarked on a small car program. Sitting here today, I cannot tell you why it took years for a safety defect to be announced in that program, but I can tell you that we will find out." *See* "The GM Ignition Switch Recall: Why

Did It Take So Long?" April 1, 2014.

48.    In May 2014, Defendant (via a letter sent by General Motors Customer & Relationship Service General Director Jim Moloney), sent an ignition switch recall letter (titled: "Important Safety Recall") to Plaintiff concerning defects with his 2008 Chevrolet Cobalt.  The letter stated, in part, that:

> General Motors has decided that one or more defects as described below which relate to motor vehicle safety exists in certain 2008-2010 model year (MY) Chevrolet Cobalt, 2008-2011 MY Chevrolet HHR, 2008-2010 MY Pontiac Solstice, 2008-2010 MY Pontiac G5, and 2008-2010 MY Saturn Sky vehicles.  As a result, GM is conducting a recall.  We apologize for this inconvenience.  However, we are concerned about your safety and continued satisfaction with our products.

…

> **IMPORTANT**
> - This notice applies to your 2008 model year Chevrolet Cobalt, **VIN 1G1AK58F587257638**.
> - Parts needed for the recall repairs are becoming available for dealers to order.  Please contact your GM dealer to schedule an appointment to have the recall repairs performed on your vehicle.
> - **Until the recall repairs have been performed, it is <u>very</u> important that you remove all items from your key ring, leaving only the vehicle key.  The key fob (if applicable), should also be removed from the key ring.  Also, when exiting your vehicle, always make sure your vehicle is in "Park", or in the case of a manual transmission, put the transmission into reverse gear.  Always set the parking brake.**
> - The recall repairs will be performed for you at **no charge.**

…

49.    The letter described the ignition switch defect and the associated risks (which Defendant has known about for approximately 10 years):

| Why is your vehicle being recalled? | GM records indicate a defective Ignition & Start Switch or a kit containing a defective Ignition & Start Switch may have been installed in some 2008-2010 MY Chevrolet Cobalt, 2008-2011 MY Chevrolet HHR, 2008-2010 MY Pontiac Solstice, 2008-2010 MY Pontiac G5, and 2008-2010 MY Saturn Sky vehicles. |
|---|---|
| | If your vehicle has the defective Ignition & Start Switch, there is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine. This risk increases if your key ring is carrying added weight (such as more keys or the key fob) or your vehicle experiences rough road conditions or other jarring or impact related events. If the ignition switch is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality. |

...

Some of these vehicles may also have a condition in which the ignition key may be removed when the ignition is not in the "Off" position. If the ignition key is removed when the ignition is not in the "Off" position, unintended vehicle motion may occur: (a) for an automatic transmission, if the transmission is not in "Park"; or (b) for a manual transmission, if the parking brake is not engaged and the transmission is not in reverse gear. This could result in a vehicle crash and occupant or pedestrian injuries.

50.     Defendant's knowledge concerning defects with its ignition switches, and the need to develop a recall program to combat such failures, is evidenced by its own admissions. As stated in Defendant's May 2014 letter (above): "General Motors has decided that one or more defects as described" relates to "vehicle safety" in certain GM Vehicles.

51.     Rather than take immediate measures to inform Plaintiff and the Class about the defects that it knew existed with its ignition switches and the fact that it was contemplating a recall to combat apparent problems, Defendant failed to disseminate to customers, service people, dealers and distributors information and knowledge that it possessed.

**Defendant Was, Or Should Have Been, Aware Of Such Defects As Early As 2001 – Several Years Prior To Plaintiff's Purchase And Years Prior To The Failures Experienced By Plaintiff And The Class**

52.     There are many general and specific industry reports and studies documenting the defects associated with Defendant's GM Vehicles' switches that were available to

Case 1:14-cv-03715-JMF    Document 4    Filed 07/29/14    Page 18 of 36

Defendant (and Former General Motors) prior to their sale to Plaintiff and the Class. Despite the mounting evidence of which Defendant knew, or should have been aware, concerning the topic, it took no action to inform Plaintiff and the Class of the defects that its GM Vehicles suffer from.

53.     For instance, in 2001, during the pre-production development of the Saturn Ion, Defendant's engineers discovered that the ignition switch could inadvertently slip from "run" to "off."

54.     In 2003, according to a report cited by the New York Times, *see* Ivory, D., *G.M. Reveals It Was Told of Ignition Defect in '01*, Mar. 12, 2014, NYT, during an internal inquiry by Defendant, "a service technician observed the car stall after the ignition had switched off while driving. After seeing that a heavy key ring had worn out the switch, the technician replaced it, the chronology said, and the inquiry was then closed."

55.     In 2004, Defendant learned "that if a driver bumped the ignition switch in a 2005 Chevrolet Cobalt, it could turn off, shutting the engine." *Id*.

56.     In 2005, a 16-year-old motorist, Amber Marie Rose, died when her 2006 Chevrolet Cobalt crashed after an ignition switch failure.

57.     In 2005, Defendant received field reports of Chevrolet Cobalt vehicles losing engine power, including instances where the car slipped out of "run" and into a contrary position. *See* "Chronology" attached to Mar. 11, 2014 Letter from M. Carmen Benavides, Director Product Investigations and Safety Regulations on behalf of Defendant to Nancy Lewis, NHTSA (available at: http://docs.house.gov/meetings/IF/IF02/20140401/102033/HHRG-113-IF02-20140401-SD013.pdf) ("Chronology").

58.     Since 2005, Defendant received the following safety defect reports (some of

which are attributed to steering and/or airbag component failures) concerning injuries and deaths suffered by owners of Chevrolet Cobalts (the vehicle Plaintiff purchased in 2008):

- 2005:  26 death and injury reports.

- 2006:  69 death and injury reports.

- 2007:  87 death and injury reports.

- 2008:  106 death and injury reports.

- 2009:  133 death and injury reports.

- 2010:  400 death and injury reports.

- 2011:  187 death and injury reports.

- 2012:  157 death and injury reports.

59.    In 2005, Defendant issued a Technical Service Bulletin ("TSB") warning service technicians and dealers about inadvertent ignition switch slips and the result of such slips.

60.    In 2006, another 16-year-old motorist, Megan Phillips, died when her 2005 Chevrolet Cobalt crashed after an ignition switch failure (NHTSA investigators confirmed that her ignition switch slipped out of position).

61.    In 2006, Defendant engineers responsible for ignition switch installations in various vehicle makes reviewed and analyzed alterations to the ignition switch proposed by a supplier. *See* Chronology.

62.    In 2007, a Defendant "investigating engineer was tasked with tracking crashes in which Cobalts were involved in frontal impacts and the airbags did not deploy, in order to try to identify common characteristics of these crashes." *See* Chronology.

63.    In 2007, a NHTSA official emailed "the agency's Office of Defects Investigation recommending a probe looking into the failure of air bags to deploy in crashes involving

16

Chevrolet Cobalts and Saturn Ions, prompted by 29 complaints, four fatal crashes and 14 field reports." Basu, T., *Timeline: A History Of GM's Ignition Switch Defect*, Mar. 31, 2014, NPR, http://www.npr.org/2014/03/31/297158876/timeline-a-history-of-gms-ignition-switch-defect.

64.    In 2011, a Defendant "Field Performance Assessment Engineer ("FP AE") was assigned to move forward with an FPE investigation of a group of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 that had not deployed during frontal impacts." *See* Chronology.

65.    In 2012, Defendant "identified two nonfatal crashes involving Saturn Ions that may have been related to the ignition problem. These details were not disclosed in the previous filing." Ivory, D., *G.M. Reveals It Was Told of Ignition Defect in '01*, Mar. 12, 2014, NYT.

**Defendant's Suppression/Omissions Regarding Defects In Its GM Vehicles**

66.    Defendant advertised and promoted its GM Vehicles as safe, reliable and worry-free despite failing to test them, including for issues that may arise through normal and foreseeable usage. Defendant represents on its website and within its marketing materials the following:

> Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification.
> http://www.gm.com/vision/quality_safety/gms_commitment_tosafety.html
>
> …
>
> Our engineers thoroughly test our vehicles for durability, comfort and noise minimization before you think about them. The same quality process ensures our safety technology performs when you need it.
> http://www.gm.com/vision/quality_safety/gms_commitment_tosafety.html
>
> ...

This means that we are committed to delivering vehicles with compelling designs, flawless quality and reliability, and leading safety, fuel economy and infotainment features.
http://www.gm.com/company/aboutGM/our_company.html

…

Safety will always be a priority at GM.
http://www.gm.com/company/aboutGM/our_company.html

…

Our safety philosophy is at the heart of the development of each vehicle.
http://www.gm.com/company/aboutGM/our_company.html

…

That is why our vehicles go through extreme testing procedures in the lab, on the road and in our production facilities prior to being offered to customers.
http://www.gm.com/company/aboutGM/our_company.html

…

No matter what you're searching for, Chevrolet offers a unique line-up of cars that deliver fuel economy, style, technology, performance, safety and definitive attitude to meet your needs.
http://www.chevrolet.com/car.html

67.    Defendant and its authorized agents, dealers and distributors made each of the above-described assertions, statements, representations and warranties with the intent and purpose of inducing consumers to purchase its GM Vehicles.  However, Defendant knew that the representations were not true and that the GM Vehicles were defective and would not function as promised.  Defendant also made numerous material omissions in their product literature and uniformly withheld important information relating to the design, safety, reliability and performance of its GM Vehicles.

68.    Defendant has engaged in a scheme to cover up the true nature of the problems with its GM Vehicles.  Among other things, it failed to notify NHTSA, pursuant to the TREAD

Act, that its ignition switches were defective. As a result, it was subsequently forced to enter into a Consent Order (which required it to pay certain fines). Defendant has concealed and suppressed from Plaintiff and the Class that the real problem with its GM Vehicles, regardless of the manner of installation, is the unsafe and defective design and manufacture of its ignition switches.

69.     To this day, Defendant continues in this pattern of concealment and suppression by deliberately and knowingly misrepresenting to the Plaintiff and Class the true nature of the problems with Defendant's GM Vehicles.

70.     Plaintiff and the Class are particularly vulnerable to such deceptive practices because they are anxious to protect the vehicles as best as they can and because of the financial burden and dangers in not having a safe vehicle and mode of transportation.

71.     Had the Defendant not withheld and omitted important safety information about the design, reliability and performance of its GM Vehicles, Plaintiff and the members of the Class would not have purchased Defendant's products.

**Defendant's Admissions To The United States Congress Concerning GM Vehicle Failures**

72.     Starting in 2014, as a result of public outrage and the need for hearings to review Defendant's actions, the United States Congress conducted a number of hearings seeking testimony from Defendant's officers.

73.     The hearings concerning Defendant's actions took place before the following committees:

- Before the House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, April 1, 2014.

- Before the Senate Committee on Commerce, Science and Transportation, Subcommittee on Consumer Protection, Product Safety and Insurance, April 2, 2014.

- Before the House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, June 18, 2014.

- Before the Senate Committee on Commerce, Science and Transportation, Subcommittee on Consumer Protection, Product Safety and Insurance, July 17, 2014.

74.    A small number of Defendant's admissions from the hearings are as follows:

**Selected Testimony of General Motors Chief Executive Officer Mary Barra Before the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations, June 18, 2014:**

- "The Valukas report, as you now know, is extremely thorough, brutally tough and deeply troubling. It paints a picture of an organization that failed to handle a complex safety issue in a responsible way."

- "I told our team as bluntly as I knew how, that the series of questionable actions and inactions uncovered in the investigation were inexcusable."

- "I want this terrible experience permanently etched in our collective memories. This isn't just another business challenge. This is a tragic problem that never should have happened. And it must never happen again."

- "First, we have made a number of personnel decisions. Fifteen individuals identified in the report are no longer with the company...Under the new system, this should never happen again."

- "The basic issue is that the switch that he approved to go into production did not meet the performance requirements. That was the first mistake."

**Testimony of General Motors Chief Executive Officer Mary Barra Before Senate Committee on Commerce, Science and Transportation, Subcommittee on Consumer Protection, Product Safety and Insurance, July 17, 2014:**

- "In a town hall meeting before thousands of GM employees and several thousand more around the world via satellite we accepted responsibility for what went wrong."

**Testimony of General Motors Executive Vice President and General Counsel Michael P. Millikin Before Senate Committee on Commerce, Science and Transportation, Subcommittee on Consumer Protection, Product Safety and Insurance, July 17, 2014:**

- "We now have to correct our mistakes."

## ESTOPPEL FROM PLEADING AND TOLLING OF
## <u>APPLICABLE STATUTES OF LIMITATION</u>

75.     This action is filed within all applicable statutes of limitation.

76.     Moreover, because the defects in the GM Vehicles are latent and not detectable until manifestation, Plaintiff and the Class members were not reasonably able to discover that their GM Vehicles were defective until after installation, despite their exercise of due diligence.

77.     Defendant knew that the GM Vehicles were defective prior to the time of sale and concealed that material information from Plaintiff and all consumers.

78.     As such, any applicable statutes of limitation have been tolled by Defendant's concealment of material facts, and Defendant is estopped from relying on any such statutes of limitation.

### <u>CAUSES OF ACTION</u>

### COUNT ONE

**Violation of the California Unfair Competition Law ("UCL")
Cal. Bus. & Prof. Code § 17200, *et seq.* and Similar
Laws of Other States**

79.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

80.     Defendant's conduct in designing, manufacturing, engineering, fabricating, assembling, constructing, testing, examining, distributing, and/or marketing its GM Vehicles was an unfair, unlawful, or fraudulent business practice in violation of California's UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*  Further, Defendant's concealment, intentional and negligent misrepresentation, and breach of warranties constitute unfair, unlawful, and fraudulent business acts and practices in violation of § 17200.

21

81. California Business and Professions Code § 17200 applies to all claims of all the Plaintiff and Class members.

82. Defendant engaged in and continues to engage in acts or practices that constitute unfair competition as defined by Business and Professions Code § 17200. Those acts include, but are not limited to, the following:

a. Making or authorizing written and oral statements which were untrue or misleading and which were known or in the existence of reasonable care should have been known to be untrue or misleading, as more fully described above and incorporated herein by this reference as though set forth at length;

b. Making untrue or misleading statements about the quality, safety and/or abilities of its GM Vehicles.

83. Had Plaintiff and members of the Class known the true facts about the defects in the GM Vehicles they would not have purchased them for use.

84. The unlawful acts and practices of Defendant alleged herein constitute unlawful business acts or practices within the meaning of California Business and Professions Code § 17200. Defendant's unlawful business acts and/or practices as alleged herein have violated numerous state, statutory and/or common laws – and said predicate acts are therefore *per se* violations of § 17200.

85. Defendant's untrue and misleading statements as alleged in this action constitute tortious conduct that gave Defendant an unfair competitive advantage in the market place over competitors who did not engage in such practices. Said misconduct, as alleged herein, also violated established law and/or public policies which seek to promote disclosure of any defects in consumer products. Misleading and failing to properly disclose the nature and extent of such

defects to consumers, prior to those consumers purchasing the subject GM Vehicles, as alleged herein, was and is directly contrary to established legislative goals and policies promoting thorough disclosure of defects in consumer products. Therefore, Defendant's acts and/or practices alleged herein were and are unfair within the meaning of Business and Professions Code § 17200.

86.    The harm to Plaintiff and the Class outweighs the utility, if any, of Defendant's acts and/or practices as alleged herein. Thus Defendant's deceptive business acts and/or practices, as alleged herein, were unfair within the meaning of the Business and Professions Code § 17200.

87.    In addition, as alleged herein, Defendant intended that Plaintiff and the Class consumers would be misled and/or deceived into believing that they were purchasing GM Vehicles that did not contain defective ignition switches, and that did not require additional maintenance, recall and repair to function as promised and represented.

88.    At all relevant times, Defendant's misconduct and omissions alleged herein: (a) caused substantial danger and injury to the public; (b) had no countervailing benefit to consumers or to competition that could possibly outweigh this substantial injury; and (c) caused damage and bodily injury to ordinary consumers. Thus, Defendant's acts and/or practices as alleged herein were unfair within the meaning of Business and Professions Code § 17200.

89.    Defendant's acts and practices, as alleged herein, were likely to, and did, deceive the public.  Defendant's untrue and misleading statements, as alleged herein, therefore constitute fraudulent business acts and/or practices within the meaning of California Business and Professions Code §17200.

90.    California consumers have been, and continue to be, deceived by Defendant's

untrue and misleading statements as alleged herein. California consumers have suffered damage, been put in harms-way and lost money as a result of the deceptive conduct alleged herein. The unlawful, unfair, deceptive and/or fraudulent business acts and practices of Defendant, as fully described herein, present a continuing threat to the Plaintiff and the Class to be misled and/or deceived by Defendant as alleged herein, and/or to be substantially damaged by these untrue and misleading statements.

91.     Plaintiff and the Class have been injured and have suffered loss of money or property as a result of Defendant's unsafe, unfair, unlawful, and/or fraudulent business acts and practices.

92.     Plaintiff has standing to pursue claims under the UCL as he lost money or property as a result of Defendant's unsafe, unlawful, unfair, or fraudulent business practices.

93.     Additionally, the Class paid more for their defective GM Vehicles than they would have had they known the true defective nature of the units.

94.     Accordingly, the Plaintiff and Class have suffered a loss of money or property as a result of Defendant's conduct with regard to the GM Vehicles.

95.     Plaintiff has standing to pursue claims under the UCL as he relied on Defendant's affirmative representations regarding the quality, safety, durability, and reliability of the GM Vehicles; additionally, had Defendant disclosed the true, defective and dangerous nature of the GM Vehicles, he would not have purchased them.

96.     For instance, and as alleged herein, prior to purchasing his vehicle, Plaintiff reviewed Defendant's website and analyzed representations suggesting that the Cobalt was good on mileage.  Shortly before the time of his purchase, Plaintiff test drove his Cobalt at Sanborn Chevy.  Plaintiff relied upon the representations and statements made on Defendant's website

and in its marketing materials and literature.

97.     As a direct or proximate result of Defendant's unfair, unlawful or fraudulent business practices as set forth above, Defendant has been unjustly enriched by Plaintiff and Class members' payment of consideration in the purchase of the GM Vehicles. As such, Plaintiff and Class members are entitled to restitution of all consideration paid to Defendant under § 17200.

## COUNT TWO

### Violation of the California False Advertising Law ("FAL"):
### Cal. Bus. & Prof. Code § 17500, *et seq.* and Similar Laws
### of Other States

98.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

99.     Much of the conduct described above and throughout this Complaint took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

100.    California Business and Professions Code § 17500 applies to all claims of all the Class members because the conduct which constitutes violations of the code by Defendant occurred within the State of California.

101.    California Business and Professions Code § 17500 prohibits deceptive or misleading practices in connection with advertising or representations made for the purpose of inducing, or which are likely to induce, consumers to purchase products.

102.    Defendant, when it marketed, advertised and sold its GM Vehicles, represented to Plaintiff and Class members that the GM Vehicles were free of manufacturing defects and safe, despite the fact that the GM Vehicles were defective, dangerous and prone to failure.  For instance, Defendant on its website stated:

25

Safety will always be a priority at GM.
http://www.gm.com/company/aboutGM/our_company.html

…

Our safety philosophy is at the heart of the development of each vehicle.
http://www.gm.com/company/aboutGM/our_company.html

…

That is why our vehicles go through extreme testing procedures in the lab, on the road and in our production facilities prior to being offered to customers.
http://www.gm.com/company/aboutGM/our_company.html

103.    GM Vehicles were inherently defective and their ignition switches caused failures with the vehicles' brakes, power and air bags – all of which amount to danger.  At the time of its misrepresentations, and illustrated herein, Defendant was either aware that the GM Vehicles were defective or was aware that Defendant lacked the information and/or knowledge required to make such a representation truthfully.

104.    Defendant's descriptions of the GM Vehicles were false, misleading, and likely to deceive Plaintiff and other reasonable consumers. Defendant's conduct therefore constitutes deceptive or misleading advertising.

105.    Plaintiff has standing to pursue claims under the FAL as he reviewed and relied on Defendant's advertising regarding the GM Vehicles.  For instance, as alleged herein, Plaintiff researched GM Vehicles before purchase and reviewed and relied on the statements made and contained on Defendant's website and in its marketing materials and literature.

106.    In reliance on the statements made in Defendant's advertising, which were ultimately untrue, Plaintiff purchased Defendant's manufactured GM Vehicle.

107.    Had Defendant's advertising regarding the GM Vehicles disclosed the true defective nature of the units, Plaintiff and the Class would not have purchased them.

26

108.    Defendant's statements in its advertising regarding GM Vehicles, referenced herein, were part of a scheme or plan by Defendant not to sell its GM Vehicles as advertised and promised.

109.    As a direct and proximate result of Defendant's violations of the California Business and Professions Code, Plaintiff and the Class seek restitution of any monies wrongfully acquired or retained by Defendant and by means of its deceptive or misleading representations, including monies already obtained from Plaintiff and the Class under § 17500.

## COUNT THREE

### Violation of the California Consumers Legal Remedies Act:
### Cal. Civ. Code § 1750, *et seq*. and Similar Laws
### of Other States

110.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

111.    The conduct described above and throughout this Complaint took place within the State of California and constitutes unfair methods of competition or unfair or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code § 1750, *et seq*.

112.    The CLRA applies to all claims of all the Class members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

113.    Plaintiff and members of the Class are "consumers" as defined by Civ. Code § 1761(d).

114.    Defendant is a "person" as defined by Civ. Code § 1761(c).

115.    GM Vehicles qualify as "goods" as defined by Civ. Code § 1761(a).

116.    Plaintiff's and the Class members' purchases of the GM Vehicles, as alleged and described herein, are "transactions" as defined by Civ. Code § 1761(e).

27

117.   As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer as unlawful:

a.   "Representing that goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."  Civ. Code § 1770(a)(5).

b.   "Representing that goods . . . are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Civ. Code § 1770(a)(7).

118.   Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civ. Code §§ 1770(a)(5) and (a)(7) when it represented, through its advertising and other express representations, that GM Vehicles had benefits or characteristics that they did not actually have. As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA, and has made representations regarding the defective units that the GM Vehicles did not in fact have, and represented the units as of a quality that was not true. The products were not and are not safe or durable.

119.   As detailed above, Defendant further violated the CLRA when it falsely represented that the GM Vehicles were of a certain standard or quality.

120.   As detailed above, Defendant violated the CLRA when it advertised the GM Vehicles with the intent not to sell them as advertised.

121.   Defendant's deceptive practices were specifically designed to induce Plaintiff and Class members to purchase or otherwise acquire the GM Vehicles.

122.     Defendant engaged in uniform marketing efforts to reach Class members, their agents, and/or third parties upon whom they relied, to persuade them to purchase GM Vehicles manufactured by Defendant.  To this day, Defendant continues to engage in unlawful practices in violation of the CLRA.  Furthermore, Defendant continues to conceal the defective nature of the GM Vehicles.

123.     Plaintiff and the Class demand judgment against Defendant under the CLRA for injunctive relief in the form of restitution and/or proportional disgorgement of funds paid to Defendant to purchase Defendant's defective products or repair and and/or replace defective GM Vehicles.

124.     On July 24, 2014, Plaintiff submitted a CLRA notice letter to Defendant regarding the claims asserted herein. If Defendant fails to provide appropriate relief for its violations of CLRA §§ 1770(a)(5) and (a)(7), within 30 days of receipt of Plaintiff's notification, in accordance with California Civ. Code § 1782(b), Plaintiff is entitled under CLRA § 1780, to recover or obtain any of the following relief for Defendant's violations of the CLRA:

    a.     Actual damages under Civ. Code §1780 (a)(1);

    b.     Punitive damages under Civ. Code §1780(a)(4);

    c.     Attorney's fees and costs under Civ. Code §1780(d); and

    d.     Any other relief the Court deems proper under Civ. Code §1780(a)(5).

## COUNT FOUR

**Violation of Michigan Consumer Protection Act:
Mich. Comp. Laws Ann. § 445.901, *et seq*. and Similar Laws
of Other States**

125.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

126.     The conduct described in this Complaint constitutes a violation of the Michigan

Consumer Protection Act, M.C.L.A. § 445.901, *et seq*., as unfair, unconscionable or deceptive

methods, acts or practices in the conduct of trade or commerce are unlawful. *See* M.C.L.A. §

445.903.

127.     Defendant engaged in the unfair, unconscionable, and deceptive acts or practices,

as set forth in this Complaint, in the conduct of trade or commerce.

128.     Defendant engaged in unfair, unconscionable, and deceptive acts or practices in

violation of the Michigan Consumer Protection Act when it (1) represented that GM Vehicles

were safe, durable and free of defects when it knew the GM Vehicles would fail and were not

suitable for use; (2) failed to disclose to, or concealed from, consumers material facts about the

defective nature of the GM Vehicles; and (3) failed to disclose its own knowledge of the

defective nature of the GM Vehicles.

129.     Defendant either knew or should have known its GM Vehicles contained defects,

would fail prematurely and were not as warranted as represented by Defendant.

130.     Defendant's conduct and omissions described herein repeatedly occurred in

Defendant's trade or business and were capable of deceiving a substantial portion of the

consuming public.

131.     The facts concealed or not disclosed by Defendant are material facts in that

Plaintiff and any reasonable consumer would have considered those facts important in deciding

whether to purchase the GM Vehicles or purchase vehicles constructed with the Defendant's

ignition switches. Had Plaintiff and the Class known the GM Vehicles were unsafe and

defective, they would not have purchased the GM Vehicles or they would have either negotiated

a lower price to reflect the risk or simply avoided the risk all together by purchasing different

vehicles.

132.    Defendant intended that Plaintiff and the Class would rely on the deception by purchasing its GM Vehicles, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

133.    Defendant's unlawful conduct is continuing, with no indication that Defendant will cease.

134.    As a direct and proximate result of the deceptive, misleading, unfair and unconscionable practices of the Defendant set forth above, Plaintiff and Class Members are entitled to actual damages, compensatory damages, penalties, attorney's fees and costs as set forth under the Michigan Consumer Protection Act and Michigan law.

135.    The Defendant's deceptive, misleading, unfair and unconscionable practices set forth above were done willfully, wantonly and maliciously entitling Plaintiff and Class members to an award of punitive damages.

## COUNT FIVE
### Breach of the Implied Warranty of Merchantability

136.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

137.    An implied warranty of merchantability arises automatically when the product is a "good" and the seller is a merchant in the business of furnishing the product to the consumer. The GM Vehicles at issue here are goods and Defendant is a merchant in the business of selling such vehicles to consumers.  Accordingly, all of Defendant's GM Vehicles come within the implied warranty of merchantability.

138.    An implied warranty of merchantability provides that the product is of merchantable quality and fit for its ordinary and intended use.

139.    Defendant breached the aforementioned implied warranty of merchantability because the GM Vehicles were not of merchantable quality or fit for their ordinary and intended use and because they contained a defect at the time of their sale that resulted in, and continues to result in, dangerous failures of the product when used in a normal, foreseeable and customary way.

140.    The defects at issue are latent defects. Plaintiff and members of the Class could not have known about the GM Vehicles' propensity for failure.

141.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff and members of the Class have suffered damages in amounts to be determined at trial.

## COUNT SIX

### Fraudulent Concealment

142.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

143.    Defendant knowingly, fraudulently and actively misrepresented, omitted and concealed from consumers material facts relating to the safety and quality of its GM Vehicles.

144.    Defendant had a duty to disclose to Plaintiff and members of the Class the actual quality and dangers related to its GM Vehicles.

145.    The misrepresentations, omissions and concealments complained of herein were material and were made on a uniform and market-wide basis.  As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiff and members of the Class have been damaged, as alleged herein.

146.    Plaintiff and members of the Class reasonably and actually relied upon Defendant's representations, omissions and concealments. Plaintiff and the Class relied on

Defendant's representations suggesting that its products met NHTSA and other vehicle safety standards. Such reliance may also be imputed, based upon the materiality of Defendant's wrongful conduct.

147.    As alleged herein, Plaintiff reviewed and relied on the statements contained on Defendant's website and test drove his Cobalt before purchasing it.

148.    Based on such reliance, Plaintiff and Class members purchased the GM Vehicles and, as a result, suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.

149.    Had Plaintiff and members of the Class been aware of the true nature of Defendant's business practices, they would not have purchased the GM Vehicles.

150.    Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud and/or malice, entitling Plaintiff and members of the Class to an award of punitive damages to the extent allowed.

151.    Plaintiff and the members of the Class are entitled to damages and injunctive relief as claimed below.

## COUNT SEVEN

### Violation of the Magnuson-Moss Warranty Act

152.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

153.    The Magnuson-Moss Warranty Act, 15 U.S.C § 2301, *et seq*. ("MMWA" or the "Act") provides a private right of action to purchasers of consumer products against retailers who, *inter alia*, fail to comply with the terms of a written warranty, express warranty and/or implied warranty. As demonstrated above, Defendant has failed to comply with the terms of its warranties - written, express and implied - with regard to the GM Vehicles that it manufactured,

advertised, distributed, marketed and/or sold.

154.    GM Vehicles are a consumer product as defined in 15 U.S.C. § 2301(1).

155.    Plaintiff and the Class are consumers as defined in 15 U.S.C. § 2301(3).

156.    Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

157.    Defendant provided Plaintiff and the Class with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

158.    Defendant is obligated under the terms of the written warranty to repair and/or replace the defective and dangerous GM Vehicles sold to Plaintiff and the Class.

159.    Additionally, pursuant to 15 U.S.C. § 2304(d)(l), the "warrantor may not assess the consumer for any costs the warrantor or his representatives incur in connection with the required remedy of a warranted product . . . . [I]f any incidental expenses are incurred because the remedy is not made within a reasonable time or because the warrantor imposed an unreasonable duty upon the consumer as a condition of securing remedy, then the consumer shall be entitled to recover reasonable incidental expenses which are so incurred in any action against the warrantor."

160.    As a direct and proximate result of Defendant's breach of its warranties stating that the GM Vehicles would be free from defects and were safe, Defendant has violated the statutory rights due Plaintiff and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*., thereby damaging Plaintiff and the Class in an amount to be proven at trial.

161.    Defendant has received notice of its violations (as alleged herein, it has known about its ignition switch failures since at least 2001) and was afforded a reasonable opportunity to cure the violations and did not do so.

## COUNT EIGHT

### Declaratory and Injunctive Relief

162.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

163.    Defendant advertised and sold and continues to advertise and sell its GM Vehicles while concealing associated defects.  Such conduct is unconscionable.

164.    Plaintiff, on behalf of himself and the Class, seeks a Court declaration of the following:

a.    All Defendant's GM Vehicles have ignition switch defects;

b.    All Defendant's GM Vehicles have a defect in workmanship and material that cause failures;

c.    Defendant knew of the defects in its GM Vehicles;

d.    Defendant shall re-audit and reassess all prior reports and claims concerning its GM Vehicles; and

e.    Defendant shall establish an inspection program and protocol to be communicated to Class members, which will require Defendant to inspect, upon request, a Class member's vehicle to determine whether a failure is manifest.

### PRAYER FOR RELIEF

165.    WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays that this case be certified and maintained as a class action and for judgment to be entered upon Defendant as follows:

1.    For compensatory and other damages;

2.    For restitution and other relief;

3.    For actual damages sustained or treble damages;

4.     For punitive damages;

5.     For injunctive and declaratory relief;

6.     For reasonable attorneys' fees and reimbursement of all costs for the

prosecution of this action; and

7.     For such other and further relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

166.    Plaintiff hereby demands a trial by jury on all claims so triable.


Dated:  July 29, 2014                              By:/s/ Jonathan W. Cuneo

Jonathan W. Cuneo (S.D.N.Y. Bar #JC1112)
Pamela Gilbert
CUNEO GILBERT & LADUCA, LLP
507 C Street NE
Washington, DC 20002
Tel: 202-789-3960
Fax: 202-789-1813
jonc@cuneolaw.com
pamelag@cuneolaw.com