# Exhibit D

JS 44C/SDNY
REV. 4/2014

**CIVIL COVER SHEET**

**14 CV 6018**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**AUG 0 1 2014**

PLAINTIFFS
Ishmail Sesay; Joanne Yearwood

DEFENDANTS
General Motors LLC; Delphi Automotive PLC; DPH-DAS LLC f/k/a Delphi Automotive Systems, LLC

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Gary Peller
600 New Jersey Avenue, N.W. Washington, D.C. 20001

ATTORNEYS (IF KNOWN)
Kirkland & Ellis; King & Spalding

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

RICO (18 U.S.C. sec. 1962; racketeering enterrise conducted by defendants to conceal unreasonable safety risks in GM products.

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No ☑ Yes ☐ Judge Previously Assigned

If yes, was this case Vol. ☐ Invol. ☐ Dismissed. No ☐ Yes ☐ If yes, give date _____ & Case No. _____

Is THIS AN INTERNATIONAL ARBITRATION CASE?    No ☐    Yes ☐

(PLACE AN [x] IN ONE BOX ONLY)    NATURE OF SUIT

**TORTS**

**ACTIONS UNDER STATUTES**

**CONTRACT**

[ ] 110    INSURANCE
[ ] 120    MARINE
[ ] 130    MILLER ACT
[ ] 140    NEGOTIABLE INSTRUMENT
[ ] 150    RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151    MEDICARE ACT
[ ] 152    RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153    RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160    STOCKHOLDERS SUITS
[ ] 190    OTHER CONTRACT
[ ] 195    CONTRACT PRODUCT LIABILITY
[ ] 196    FRANCHISE

**PERSONAL INJURY**

[ ] 310    AIRPLANE
[ ] 315    AIRPLANE PRODUCT LIABILITY
[ ] 320    ASSAULT, LIBEL & SLANDER
[ ] 330    FEDERAL EMPLOYERS' LIABILITY
[ ] 340    MARINE
[ ] 345    MARINE PRODUCT LIABILITY
[ ] 350    MOTOR VEHICLE
[ ] 355    MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360    OTHER PERSONAL INJURY
[ ] 362    PERSONAL INJURY - MED MALPRACTICE

**PERSONAL INJURY**
[ ] 367    HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 365    PERSONAL INJURY PRODUCT LIABILITY
[ ] 368    ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370    OTHER FRAUD
[ ] 371    TRUTH IN LENDING

[ ] 380    OTHER PERSONAL PROPERTY DAMAGE
[ ] 385    PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**
[ ] 463    ALIEN DETAINEE
[ ] 510    MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530    HABEAS CORPUS
[ ] 535    DEATH PENALTY
[ ] 540    MANDAMUS & OTHER

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
[ ] 440    OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441    VOTING
[ ] 442    EMPLOYMENT
[ ] 443    HOUSING/ ACCOMMODATIONS
[ ] 445    AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446    AMERICANS WITH DISABILITIES -OTHER
[ ] 448    EDUCATION

**FORFEITURE/PENALTY**
[ ] 625    DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690    OTHER

**LABOR**
[ ] 710    FAIR LABOR STANDARDS ACT
[ ] 720    LABOR/MGMT RELATIONS
[ ] 740    RAILWAY LABOR ACT
[ ] 751    FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790    OTHER LABOR LITIGATION
[ ] 791    EMPL RET INC SECURITY ACT

**IMMIGRATION**
[ ] 462    NATURALIZATION APPLICATION
[ ] 465    OTHER IMMIGRATION ACTIONS

**BANKRUPTCY**
[ ] 422    APPEAL 28 USC 158
[ ] 423    WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**
[ ] 820    COPYRIGHTS
[ ] 830    PATENT
[ ] 840    TRADEMARK

**SOCIAL SECURITY**
[ ] 861    HIA (1395ff)
[ ] 862    BLACK LUNG (923)
[ ] 863    DIWC/DIWW (405(g))
[ ] 864    SSID TITLE XVI
[ ] 865    RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870    TAXES (U.S. Plaintiff or Defendant)
[ ] 871    IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**
[ ] 375    FALSE CLAIMS
[ ] 400    STATE REAPPORTIONMENT
[ ] 410    ANTITRUST
[ ] 430    BANKS & BANKING
[ ] 450    COMMERCE
[ ] 460    DEPORTATION
[☑] 470    RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT
[ ] 480    CONSUMER CREDIT
[ ] 490    CABLE/SATELLITE TV
[ ] 850    SECURITIES/ COMMODITIES/ EXCHANGE

[ ] 890    OTHER STATUTORY ACTIONS
[ ] 891    AGRICULTURAL ACTS

[ ] 893    ENVIRONMENTAL MATTERS
[ ] 895    FREEDOM OF INFORMATION ACT
[ ] 896    ARBITRATION
[ ] 899    ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION
[ ] 950    CONSTITUTIONALITY OF STATE STATUTES

**REAL PROPERTY**

[ ] 210    LAND CONDEMNATION
[ ] 220    FORECLOSURE
[ ] 230    RENT LEASE & EJECTMENT
[ ] 240    TORTS TO LAND
[ ] 245    TORT PRODUCT LIABILITY
[ ] 290    ALL OTHER REAL PROPERTY

**PRISONER CIVIL RIGHTS**
[ ] 550    CIVIL RIGHTS
[ ] 555    PRISON CONDITION
[ ] 560    CIVIL DETAINEE CONDITIONS OF CONFINEMENT

Check if demanded in complaint:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____ OTHER _____

Check YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

JUDGE Hon Jesse M. Furman    DOCKET NUMBER 14-MD-2543

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*                                    **ORIGIN**

[x] 1 Original
Proceeding
[ ] 2 Removed from
State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from (Specify District)
[ ] 6 Multidistrict Litigation
[ ] 7 Appeal to District Judge from Magistrate Judge Judgment

[ ] a. all parties represented

[ ] b. At least one party is pro se.

*(PLACE AN x IN ONE BOX ONLY)*            **BASIS OF JURISDICTION**            *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [x] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [ ] 4 DIVERSITY

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Ishmail Sesay
3312 Buchanan Street, Ap't 101
Mount Rainier, MD 20712
(Prince George's County, MD)

Joanne Yearwood
5440 Marinelli Road, #121
N. Bethesda/Rockville 20852
(Montgomery County, MD)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

General Motors, LLC
300 Renaissance Center L1
Detroit, MI 48243

Delphi Automotive PLC

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] MANHATTAN
(DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE 07-26-14    SIGNATURE OF ATTORNEY OF RECORD        ADMITTED TO PRACTICE IN THIS DISTRICT

RECEIPT #                                [x] NO
                                         [x] YES (DATE ADMITTED Mo. _____ Yr. _____)
                                         Attorney Bar Code #    *phv pend-*

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

Clear Form        Save        Print

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**    14 CV<sub>x</sub> 6018

---------------------------------------------------------------------X

**IN RE:**
**GENERAL MOTORS LLC IGNITION SWITCH LITIGATION**    **14-MD-2543 (JMF)**

---------------------------------------------------------------------X

---------------------------------------------------------------------X

**ISHMAIL SESAY, and JOANNE YEARWOOD,**
**for themselves, on behalf of all others similarly situated,**    **CLASS ACTION FOR**
**DECLARATORY,**
**INJUNCTIVE, AND**
**MONETARY RELIEF**

  **Plaintiffs,**

**v.**

**GENERAL MOTORS LLC,**    **JURY TRIAL DEMANDED**
**DELPHI AUTOMOTIVE PLC,**
**and DPH-DAS LLC f/k/a DELPHI**
**AUTOMOTIVE SYSTEMS, LLC,**

**Defendants.**

---------------------------------------------------------------------X

## COMPLAINT

### INTRODUCTORY STATEMENT

    Plaintiffs ISHMAIL SESAY and JOANNE YEARWOOD bring this action for

themselves, and on behalf of all persons similarly situated who own or have owned the

substandard and dangerous vehicles identified below at any time since October 19, 2009.

    1.    Ishmail Sesay lives with his wife in Maryland. The couple own a single car: a

2007 Chevrolet Impala, purchased from a friend on December 20, 2012. Mr. Sesay and his wife

depend on the car to get to and from work, to run daily errands, and, most importantly, to provide

a safe means of transportation for their one-year-old son. Unbeknownst to Mr. Sesay, until it was

recalled on June 23, 2014, however, the Impala never provided such safe transportation; its

1

dangerous ignition switch had already helped kill or seriously injure hundreds of people across the United States. Every time he used the car, Mr. Sesay relied on its safety. New GM's failure to disclose the dangerous condition was material to his decision to use the car.

2.      Mr. Sesay's Impala has a dangerous ignition switch that could, unexpectedly and without warning, shut down the car's engine and electrical systems while the car is in motion - rendering the power steering, anti-lock brakes and airbags inoperable.

3.      On April 13, 2013, Joanne Yearwood purchased a used 2010 Chevrolet Cobalt from a dealership in Maryland. She paid over $16,000 for the car. She regularly drives her 53 year old brother and herself in the car. In February 2014, she learned that New GM had failed to disclose, and in fact concealed from her and others, the fact that her car was unreasonably dangerous to drive because of its ignition switch. She relied on the car's safety every time she used it. GM's failure to disclose the car's dangerous condition was material to her decision to use the car.

4.      New GM admits that, since its incorporation on October 19, 2009, General Motors LLC ("GM" or "New GM") has known and failed to disclose that the Plaintiffs' and class members' vehicles are substandard and pose significant, unreasonable, risks of death, serious personal injury, and property damage. New GM could hardly deny these facts in any event - New GM acquired all the books, records and accounts of General Motors Corporation ("Old GM"), including records that document the unlawful concealment of risks in vehicles sold by Old GM prior to New GM's existence. New GM also retained the engineering, legal and management officials who were responsible for designing, engineering, and concealing safety-related risks at Old GM; those officials were immediately assigned to precisely the same tasks at New GM, and they implemented or continued identical policies and practices to conceal safety related risks in GM products.

2

5.    The National Highway Traffic Safety Administration (NHTSA) fined New GM $28,000,000, the maximum permissible under applicable law, for New GM's failure to disclose risks related to the ignition switches in Plaintiffs' and class members' cars.

6.    For nearly five years after its inception, New GM failed to disclose to, and actively concealed from, Plaintiffs, class members, investors, litigants, courts, law enforcement and other government officials including the NHTSA, the risks of death, personal injury, and property damage posed by its products. Instead, conspiring with Delphi, GM's dealers nationwide, outside lawyers, and various others, New GM engaged in, and may still be engaging in, an extensive, aggressive and complex campaign to conceal and minimalize the safety-related risks that exist in Plaintiffs' and class members' vehicles. That campaign is designed to mislead Plaintiffs, class members, consumers, investors, courts, law enforcement officials, and other governmental officials, including the NHTSA, that the value of the company and the worth and safety of its products are greater than they are. With those same co-conspirators, New GM directed an unlawful and continuing enterprise calculated to gain an unfair advantage over competitor automakers conducting their businesses within the bounds of the law.

7.    Defendants first deployed their campaign of deception on the day that New GM began operating. The scheme continued at least until its exposure began in early 2014. Through their deception, Defendants recklessly endangered the safety of Plaintiffs, their families, and members of the public. Defendants' wrongful acts and omissions harmed Plaintiffs and class members by exposing them to increased risk of death or serious bodily injury, by depriving them of the full use and enjoyment of their vehicles, and by causing a substantial diminution in the value of the vehicles to Plaintiffs and class members, and a substantial diminution in value of their vehicles on the open automobile market.

8.     As of the date of the filing of this Complaint, the United States Department of Justice has opened, and is pursuing, a criminal investigation into GM's campaign of deceit.

9.     GM's Chief Executive Officer Mary Barra admitted on behalf of the company that New GM employees knew about safety-related risks in millions of vehicles, including Mr. Sesay's 2007 Impala and Ms. Yearwood's 2010 Cobalt, and that GM did not disclose those risks as it was required to do by law. Ms. Barra attributed New GM's "failure to disclose critical pieces of information," in her words, to New GM's policies and practices that mandated and rewarded the unreasonable elevation of cost concerns over safety risks.

10.     In executing their scheme to conceal the dangerous character of Plaintiffs' vehicles, Defendants violated a multitude of laws:

a)     In furtherance of their common design to prevent Plaintiffs, class members, other consumers, law enforcement and other governmental officials, litigants, courts, and investors from learning of the safety risks in GM cars, GM, Delphi, and GM's dealers conducted a racketeering enterprise and engaged in a pattern of racketeering activities, including repeated and continuous acts of mail and wire fraud, television and radio fraud, and tampering with witnesses and victims in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*, causing the harm to Plaintiffs and class members described above.

b)     By concealing the material fact of the dangerousness of the Plaintiffs' and class members' vehicles, by failing properly to repair the safety risks in the cars in a timely manner, and by engaging in other unconscionable and/or unlawful behavior, GM and Delphi violated the Maryland Consumer Protection Act,. Md.

Code, Com. Law § 13-408 *et seq.*, causing the harm described above to Plaintiffs and class members.

c)      GM and Delphi also violated their duties to warn Plaintiffs and class members about the dangers that their vehicles posed, resulting in economic loss and increased risk of personal injury for which Defendants are liable to Plaintiffs and Class members under the law of negligence common to the District of Columbia and the States of Maryland, California, Florida, Ohio, and New Jersey.

d)      Because they intentionally concealed a material fact from Plaintiffs and Class members, Defendants are liable to Plaintiffs for the harm Plaintiffs and class members have suffered and for punitive damages under the law of fraud common to the several States.

e)      By civilly conspiring to conceal the safety-related risks of GM vehicles, both among themselves and among nonparties to this litigation, and because they acted jointly to harm Plaintiffs and class members, Defendants are jointly and severally liable for all harm they or any co-conspirator caused.

f)      Defendants aided and abetted the conduct of each other and of nonparties in concealing the safety-related risks of GM vehicles.

## PARTIES

11.      Plaintiffs Ishmail Sesay and Joanne Yearwood are both citizens and residents of Maryland.

12.      Mr. Sesay owns a 2007 Chevrolet Impala he purchased second-hand in December 2010. Although Mr. Sesay is the primary driver of the vehicle, his wife depends upon the car for transportation to and from work, and the couple rely on the car to transport their one-year-old son..

5

13.    Ms. Yearwood owns a 2010 Chevrolet Cobalt purchased on April 13, 2010

14.    General Motors LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Detroit, Michigan. On October 19, 2009, it began conducting the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the vehicles of class members, and other motor vehicles and motor vehicle components throughout the United States. Plaintiffs' claims and allegations against GM refer solely to this entity. In this First Amended Complaint, Plaintiffs are not making any claim against Old GM (General Motors Corporation) whatsoever, and Plaintiffs are not making any claim against New GM based on its having purchased assets from Old GM or based on its having continued the business or succeeded Old GM. Plaintiffs disavow any claim based on the design or sale of vehicles by Old GM, or based on any retained liability of Old GM. Plaintiffs seek relief from New GM solely for claims that have arisen after October 19, 2009, and solely based on actions and omissions of New GM.

15.    Delphi Automotive PLC is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, headquartered in Troy, Michigan. At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the dangerous ignition switches contained in the Cobalts owned by Plaintiffs, and millions of other vehicles.

16.    GM and Delphi are collectively referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C § 1331, because the claims under the Racketeer Influenced and Corrupt Organizations Act present a federal question. Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. §

6

1332(d), because members of the proposed Plaintiff Class are citizens of states different from

Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000,

exclusive of interest and costs.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1404, by the consent of both

parties.

## FACTUAL BACKGROUND

19.    GM has publicly admitted that the ignition switches in Plaintiffs' and class

members' cars are dangerous and pose a safety hazard. It has also admitted that, from its

inception in 2009, various New GM engineers, attorneys, and management officials knew of, and

took measures to conceal, the ignition switch risk and/or diminish its significance. GM has been

found guilty of failing to disclose the risk to Plaintiffs, class members, and governmental

officials as required by law, and the NHTSA has fined New GM the maximum penalty that

agency is authorized to impose.

20.    Under the Transportation Recall Enhancement, Accountability and

Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying

regulations, when a manufacturer learns that a vehicle contains a safety risk, the manufacturer

must disclose the risk to appropriate government officials and registered owners of the vehicle in

question.

21.    Upon its inception, New GM instituted and continued policies and practices

intended to conceal safety related risks in GM products from Plaintiffs, class members, investors,

litigants, courts, law enforcement officials, the NHTSA, and other governmental officials. In

furtherance of its illegal scheme, New GM trained and directed its employees and dealers to take

various measures to avoid exposure of safety related product risks:

7

a)      GM mandated that its personnel avoid exposing GM to the risk of having to recall vehicles with safety-related risks by limiting the action that GM would take with respect to such risks to the issuance of a Technical Service Bulletin or an Information Service Bulletin.

b)      New GM directed its engineers and other employees to falsely characterize safety-related risks – including the risks described in this complaint – in their reports, business and technical records as "customer convenience" issues, to avoid being forced to recall vehicles as the relevant law requires

c)      New GM trained its engineers and other employees in the use of euphemisms to avoid disclosure to the NHTSA and others of the safety risks posed by risks in GM products.

d)      New GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall.

    i.      A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

e)      New GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving plaintiffs and the public.

f)      New GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

8

g)      New GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

h)      New GM instituted and/or continued managerial practices designed to ensure that its employees and officials would not investigate or respond to safety-related risks, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public. In a practice New GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product risks issues in meetings by nodding in response to suggestions about steps that they company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

i)      New GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related risks and GM's refusal to respond to and/or GM's continuing concealment of those risks. New GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy.  New GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

j)      New GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was risk. New GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for New GM, Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials to identify. New GM knew from its inception that the part number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles.

22.    New GM followed a practice and policy of intentionally mischaracterizing safety issues as "customer convenience" issues to avoid recall costs, and it enlisted its dealership network in its campaign of concealment by minimizing the safety aspects of the "technical service bulletins" and "information service bulletins" it sent to dealers. New GM directed dealers to misrepresent the safety risks associated with the product risks of its vehicles. New GM followed this practice with respect to the dangerous ignition switches from its inception in October 2009 until its campaign of concealment of the ignition switch risk began to unravel in February 2014.

23.    New GM followed a practice or policy of minimizing and mischaracterizing safety related risks in its cars in its communications with Plaintiffs, class members, law enforcement officials, the NHTSA, and other governmental officials

24.    Upon the inception of New GM in October 2009, New GM and Delphi agreed to conceal safety related risks from Plaintiffs, class members, law enforcement officials, other governmental officials, litigants, courts, and investors. Both New GM and Delphi knew since October 2009 that the design of the faulty ignition switch in Plaintiffs and class members' cars had been altered without a corresponding change in part number, in gross violation of normal engineering practices and standards. Part labeling fraud is particularly dangerous in vehicle parts potentially related to safety because it makes tracing and identifying faulty parts very difficult, and will delay the detection of critical safety risks.

25.    Since New GM's inception in October 2009, both New GM and Delphi have known that the faulty ignition switch in the Plaintiffs' Impala and Cobalt and class members' vehicles posed a serious safety and public health hazard because the faulty ignition switch caused moving stalls. Each Defendant had legal duties to disclose the safety related risks. Rather than notifying the NHTSA, Defendants instead decided that Plaintiffs and class members, and

10

millions of drivers and pedestrians should face imminent risk of injury and death due to the

dangerous ignition switches in Plaintiffs' and class members' vehicles. Delphi and GM entered

into an agreement to conceal the alteration of the part without simultaneously changing the part

number, and concealed the risks associated with the dangerous ignition switches.

26.     In 2012, more GM employees learned that the ignition switches in vehicles from

model years 2003, 2004, 2005, 2006, and 2007 exhibited torque performance below the

specifications originally established by GM. Rather than notify Plaintiffs, class members, or the

NHTSA, GM continued to conceal the nature of the risk.

27.     In April 2013, GM hired an outside engineering-consulting firm to investigate the

ignition switch system. The resulting report concluded that the ignition switches in early model

Cobalt and Ion vehicles did not meet GM's torque specification. Rather than notify Plaintiffs,

class members, or the NHTSA, GM still continued to conceal the nature of the Ignition Switch

Risk until 2014.

28.     NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front

seat occupants in 2005-07 Cobalts and 2003-07 Ions where the airbags failed to deploy in non-

rear impact crashes.

29.     New GM explicitly directed its lawyers and any outside counsel it engaged to act

to avoid disclosure of safety related risks – including the ignition switch risk – in GM products.

These actions included settling cases raising safety issues, demanding that GM's victims agree to

keep their settlements secret, threatening and intimidating potential litigants into not bringing

litigation against New GM by falsely claiming such suits are barred by Order of the Bankruptcy

Court, and settling cases for amounts of money that did not require GM managerial approval, so

management officials could maintain their veneer of ignorance concerning the safety related

risks. In one case, GM threatened the family of an accident victim with liability for GM's legal

11

fees if the family did not withdraw its lawsuit, misrepresenting to the family that their lawsuit was barred by Order of GM's Bankruptcy Court. In another case, GM communicated by means of mail and wire to the family of the victim of a fatal accident caused by the faulty ignition switch that their claim has no basis, even though GM knew that its communication was false and designed to further GM's campaign of concealment and deceit. In other cases, GM falsely claimed that accidents or injuries were due to the driver when it knew the accidents were likely caused by the dangerous product risks GM concealed.

## TOLLING OF THE STATUTE OF LIMITATIONS

37.     Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

38.     The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their vehicles had the safety related risks described herein.

39.     Plaintiffs and Class Members had no reason to know that their products were dangerous because of Defendants' active concealment.

## CLASS ACTION ALLEGATIONS

40.     Plaintiffs bring this lawsuit as a class action on their own behalves and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. All proposed Class and Subclass periods run from the inception of New GM in October 2009 and continue until judgment or settlement of this case.

41.     Plaintiffs bring this action on behalf of a proposed nationwide class defined as follows: All persons in the United States who, since the inception of New GM in October 2009, hold or have held a legal or equitable interest in a GM vehicle with a dangerous ignition switch

12

manufactured by Delphi. As of the time of the filing of this First Amended Complaint, Plaintiffs

are aware that the following GM models contain dangerous ignition switches:

- 2005-2011 Chevrolet Cobalt

- 2006-2011 Chevrolet HHR

- 2006-2010 Pontiac Solstice

- 2007-2010 Pontiac G5

- 2003-2007 Saturn Ion

- 2007-2010 Saturn Sky

- 2005-2009 Buick Lacrosse

- 2006-2011 Buick Lucerne

- 2004-2005 Buick Regal LS & GS

- 2006-2014 Chevrolet Impala

- 2006-2008 Chevrolet Monte Carlo

- 2000-2005 Cadillac Deville

- 2004-2011 Cadillac DTS

42.    Plaintiffs also bring this action on behalf of the following Subclasses:

a.    Mr. Sesay and Ms. Yearwood bring this action on behalf of all persons in the

State of Maryland who, since October 2009, purchased or hold or have held a

legal or equitable interest in a GM vehicle with a dangerous ignition switch

(the "Maryland Subclass");

b.    Plaintiffs also bring this action on behalf of residents of the District of

Columbia and the States of California, Florida, Maryland, New Jersey and

Ohio who, since October 2009, hold or have held a legal or equitable interest

in a GM vehicle with a dangerous ignition switch (the "Multi-State Negligence Subclass").

43.    Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.

### NUMEROSITY AND ASCERTAINABILITY

44.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder for each Class or Subclass is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in GM's possession, custody, or control, and/or from public vehicular registration records.

### TYPICALITY

45.    The claims of the Plaintiffs are typical of the claims of each member of the class and subclasses in that the representative Plaintiffs, like all class members, legally or equitably own or owned a GM vehicle during the Class Period that contained a dangerous ignition switch manufactured by Delphi. Plaintiffs, like all class and subclass members, have been damaged by Defendants' misconduct, namely, in being wrongfully exposed to an increased risk of death or serious bodily injury, in suffering diminished use and enjoyment of their vehicles, and in suffering the diminished market value of their vehicles.  Furthermore, the factual bases of Defendants' misconduct are common to all class and subclass members.

### ADEQUATE REPRESENTATION

14

46.     Plaintiffs will fairly and adequately represent and protect the interests of the class and subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions and in prosecuting complex federal litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the class of subclasses.

## PREDOMINANCE OF COMMON ISSUES

47.     There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a.      Whether the vehicles owned by class or subclass members during the class periods suffer from the dangerous ignition switch described herein?

b.      Whether the dangerous ignition switch posed an unreasonable danger of death or serious bodily injury?

c.      Whether GM and/or Delphi imposed an increased risk of death or serious bodily injury on Plaintiffs and class and subclass members during the Class period?

d.      Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer economic loss during the Class period?

e.      Whether GM and/or Delphi caused Plaintiffs and class and subclass members to suffer the loss of the use and enjoyment of their vehicles during the class period?

f.      Whether GM and Delphi had a legal duty to disclose the ignition switch danger to class and subclass members?

15

g.      Whether GM and/or Delphi had a legal duty to disclose the ignition switch danger to the NHTSA?

h.      Whether either GM and/or Delphi breached duties to disclose the ignition switch risk?

i.      Whether class and subclass members suffered legally compensable harm?

j.      Whether Defendants violated Maryland's consumer protection statute by concealing the ignition switch risk from Plaintiffs and governmental officials?

k.      Whether the fact that the ignition switch was dangerous was a material fact?

l.      Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction?

m.      Whether GM should be declared responsible for notifying all Class Members of the risk and ensuring that all GM vehicles with the Ignition Switch risk are recalled and repaired?

n.      Whether Defendants conducted a criminal enterprise in violation of RICO?

o.      Whether Defendants engaged in a pattern or practice of racketeering?

p.      Whether Defendants committed mail or wire fraud in connection with their concealment of the dangerous ignition switch.

q.      Whether class members were harmed by Defendants' violations of RICO?

r.      Whether class and subclass members are entitled to recover punitive damages from Defendants, and, if so, what amount would be sufficient to deter Defendants from engaging in such conduct in the future and to punish Defendants for their recklessness regarding the public health and safety and their campaign of concealment?

**SUPERIORITY**

16

48.    Plaintiffs and class and subclass members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most class and subclass members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual class and subclass member's claims, it is likely that few could afford to seek legal redress for Defendants' misconduct. Absent a class action, class and subclass members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication. The class action is also superior for defendants, who could be forced to litigate thousands of separate actions.

49.    Defendants have acted in a uniform manner with respect to the Plaintiffs and class and subclass members. Class and subclass wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of class and subclass members to protect their interests. Class and subclass wide relief assures fair, consistent, and equitable treatment and protection of all class and subclass members.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF RACKETEER INFLUENCED
### AND CORRUPT ORGANIZATIONS ACT
### (18 U.S.C. § 1962(c) and (d))

17

50.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth at length herein.

51.    This claim is brought by all Plaintiffs on behalf of the nationwide Class.

52.    Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the "RICO Enterprise" through a "pattern of racketeering activity." Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c).

53.    At all times relevant, GM, Delphi, its associates-in-fact, Plaintiffs, and the Class and Subclass members are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

54.    At all times relevant, Plaintiff and each class and subclass member were and are "a person injured in his or her business or property" by reason of a violation of RICO within the meaning of 18 U.S.C. § 1964(c).

55.    At all times relevant, GM and Delphi are and were each a "person" who participated in or conducted the affairs of the RICO Enterprise through the pattern of racketeering activity described below. While GM and Delphi each participated in the RICO Enterprise, they each exist separately and distinctly from the Enterprise. Further, the RICO Enterprise is separate and distinct from the pattern of racketeering activity in which GM and Delphi have engaged and are engaging.

56.    At all times relevant, GM and Delphi were associated with, operated or controlled, the RICO Enterprise, and participated in the operation and management of the affairs of the RICO Enterprise, through a variety of actions described herein. Defendants' participation in the RICO Enterprise was necessary for the successful operation of its scheme to defraud.

**The RICO Enterprise**

57.    Defendants participated in the operation and management of an association-in-fact enterprise whose aim was to conceal safety related risks in Delphi products installed in GM

18

vehicles from Plaintiffs, class members, the NHTSA, litigants, courts, law enforcement officials, consumers, and investors. The Enterprise was motivated by the common design of concealing the true value of the defendant companies and their products, and it constituted an unlawful, continuing enterprise calculated to gain an unfair advantage over competitor automakers who conduct their business within the bounds of the law. The Enterprise was partly embodied in practices and procedures intended to mischaracterize safety related risks – such as the ignition switch – as "customer convenience issues" to avoid incurring the costs of a recall.

58.    The RICO Enterprise began with the inception of New GM, on October 19, 2009. The following persons, and others presently unknown, have been members of and constitute the association-in-fact enterprise with the following roles:

a)    New GM, which mandated its employees take the various measures, described above at paragraph 26, to conceal safety related risks, including the ignition switch risks.

b)    GM's engineers (including but not limited to Ray DeGiorgio, Gary Altman, a program engineering manager, Michael Robinson, vice president for environmental sustainability and regulatory affairs, Gay Kent, general director of product investigations and safety regulations) who have carried out GM's directives since the inception of New GM in October 2009 by minimizing and misrepresenting the safety aspects of the ignition switch risk – enabling GM to avoid its legal obligations to recall vehicles with safety related risks. GM's engineers (including but not limited to Mr. DeGiorgio, Mr. Altman, Mr. Robinson and Ms. Kent) have also concealed the part-number-labeling fraud of which they have known since New GM's inception in October 2009.

c)    GM's in-house lawyers (including but not limited to Jaclyn Palmer, Ron Porter, William Kemp, Lawrence Buonomo, and Jennifer Sevigny), who knowingly assisted GM

in evading its legal responsibilities by taking measures allowing GM management to claim ignorance about the increasing number of accidents and personal injuries that the ignition switches were causing throughout the Class period. GM's in-house lawyers, as described in Paragraph 36, also took measures to ensure that lawsuits filed by victims of the ignition switch risk and their surviving families were settled confidentially – preventing them from revealing the risk to other Plaintiffs, class members, law enforcement officials, or other government authorities, including the NHTSA – for amounts below the threshold that would trigger closer scrutiny within GM.

d)      GM's outside lawyers, retained to defend the Company against lawsuits filed by victims with injuries allegedly caused by the ignition switch risk, who were directed to play, and played, the same roles as those of in-house counsel described above – taking analagous measures to help GM conceal the ignition switch risk.

e)      Delphi, who, since the inception of the new GM in October 2009, has participated in the Enterprise to conceal the dangerous ignition switch system and its knowledge that ignition switch part numbers on vehicles driven by class members during the class period were misleading or fraudulent and would hinder any attempt to investigate or learn about the ignition switch risk.

f)      GM's Dealers, whom New GM instructed, explicitly or implicitly, to present false and misleading information regarding the ignition switch risks to Plaintiffs and Class members, through, *inter alia*, Technical Service Bulletins and Information Service Bulletins, and who did, in fact, present such false and misleading information to Plaintiffs and Class members during the Class period.

58.    GM and Delphi conducted and participated in the affairs of this RICO Enterprise through a continuous pattern of racketeering activity that began with the inception of the New GM in October 2009, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, and 18 U.S.C. § 1512 (tampering with witnesses and victims).

### Predicate Acts of Wire and Mail Fraud

59.    Since its inception in October 2009 and in furtherance of its scheme to defraud, GM, its engineers and its lawyers communicated with Delphi on a regular basis via the mail and/or wires regarding the dangerous ignition switch. Through those communications, GM instructed Delphi to continue concealing the ignition switch risk and to continue to produce ignition mislabeled or fraudulently labeled switches to help GM evade detection of New GM's unlawful failure to recall vehicles with dangerous ignition switches by the NHTSA or other law enforcement officials. GM's and Delphi's communications constitute repeated violations of 18 U.S.C. §§ 1341 and 1343.

60.    Since GM's inception in October 2009, in furtherance of its scheme to defraud, GM's lawyers communicated with those claiming injuries caused by the ignition switch risks on a regular basis via the mail and/or wires. Upon information and belief, GM's lawyers utilized the mail and wires to insist that litigants agree to confidentiality agreements forbidding disclosure that the ignition switch risks caused their injuries, and to communicate with supervisors and each other about ensuring that the cases settled below the threshold that would trigger scrutiny that might endanger Defendants' concealment of the ignition switch risks.

61.    Since its inception in October 2009, GM has routinely used the wires and mail to disseminate false and fraudulent advertising about Plaintiffs' and Class members' vehicles,

21

misrepresenting the vehicles as safe and dependable and failing to disclose the ignition switch risks in its advertising.

### Predicate Acts of Tampering With Witnesses and Victims

62.    New GM engaged in an ongoing scheme to tamper with witnesses and victims as described in 18 U.S.C. § 1512(b) by using misleading conduct to influence, delay and prevent the testimony of victims in official proceedings and by entering into a campaign of intimidation and false statements to discourage victims from pursuing their claims against GM, as described elsewhere in the complaint. New GM also corruptly encouraged its employees and engaged in misleading conduct to prevent said employees from reporting safety risks and therefore delay or prevent their testimony about said risks. GM accomplished this by, inter alia, punishing employees who raised red flags about safety risks, thus intentionally intimidating and threatening employees who otherwise could have raised red flags.

63.    Defendants' conduct in furtherance of this scheme to conceal and/or minimize the significance of the ignition switch risk was intentional. Plaintiff, Class and Subclass members were harmed in that they were forced to endure increased risk of death or serious bodily injury, they lost use and enjoyment of their vehicles, and their vehicles' values have diminished because of Defendants' participation in conducting the RICO Enterprise. The predicate acts committed in furtherance of the enterprise each had a significant impact on interstate commerce.

### COUNT II
### Asserted on Behalf of Plaintiffs and the Nationwide Class
### (Common Law Fraud)

64.    Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint.

65.    At the time of New GM's inception in 2009, Defendants knew that the ignition switch used or which would be placed in the Plaintiffs' and class members' vehicles could inadvertently move from "run" to "accessory" or "off," under regular driving conditions. This fact was material to Plaintiffs and class members.

66.    Between October 2009 and February 2014, Defendants actively and intentionally concealed and/or suppressed the existence and true nature of the ignition switch risks, and minimized the extent of the danger they posed in direct and indirect communications with Plaintiffs, class and subclass members, dealers, the NHTSA, and others.

67.    Plaintiffs and class members reasonably relied on GM's communications and material omissions to their detriment. As a result of the concealment and/or suppression of facts, Plaintiffs and Class Members have sustained and will continue to sustain injuries, consisting of the diminished value of their GM vehicles and the lost use and enjoyment of the vehicles that Defendants actions have caused, and exposure to increased risk of death or serious bodily injury.

68.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and with reckless disregard to Plaintiffs' and Class Members' rights and well-being, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
### Asserted on Behalf of Plaintiffs and on Behalf of the Multi-State Negligence Subclass
### (Negligent Infliction of Economic Loss and Increased Risk under the Common Law of the District of Columbia and California, Florida, Maryland, New Jersey, and Ohio)

69.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

70.    This claim is brought on behalf of Plaintiffs and the District of Columbia and Maryland Classes.

71.    Because the dangerous ignition switches created a foreseeable risk of severe personal and property injury to drivers, passengers, other motorists, and the public at large, Defendants had a duty to warn consumers about, and fix, the risk as soon as soon as they learned of the problem – upon the inception of New GM in October 2009.

72.    Rather than alerting vehicle owners to the danger, Defendants actively concealed and suppressed knowledge of the problem.

73.    Defendants created an unreasonable risk of death or serious bodily injury to Plaintiffs and Subclass members. Plaintiffs and Subclass members were particularly identifiable and foreseeable victims of Defendants' negligence, and their injuries in terms of the diminution in the value of their vehicles, increased risk to them, and the loss of use and enjoyment of the vehicles was particularly foreseeable.

74.    Defendants created an unreasonable risk of death or serious bodily injury through a pattern and practice of negligent hiring and training of its employees, and by creating and allowing to continue a culture at GM which encouraged the minimizing and hiding of safety risks from the public. GM negligently increased this risk by firing or otherwise retaliating against employees who did attempt to convince GM to fix safety problems.

75.    As a result of Defendants' failure to warn them about the risks or repair their vehicles, Plaintiffs and Class Members sustained, and continue to sustain, damages arising from the increased risk of driving vehicles with safety related risks, from the loss of use and enjoyment of their vehicles, and from the diminished value of their vehicles attributable to Defendants' wrongful acts.

76.     Plaintiffs and class members seek compensatory damages in an amount to be proved at trial, including compensation for any pain and suffering they endured.

## COUNT IV
### Asserted on Behalf of Mr. Sesay, Ms. Yearwood, and the Maryland Subclass
### (Violation of Maryland's Consumer Protection Act ("MDCPA"), Md. Code, Comm. Law § 13-101 *et seq.*)

77.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

78.     This Count is brought on behalf of Plaintiffs, the Maryland Class generally with respect to the alleged violations of MDCPA § 13-301(3) and the portion of the Maryland Class who purchased vehicles after October 19, 2009, with respect to violations of MDCPA §§ 13-301(2)(i), 13-301(2)(iv), and 13-301(3).

79.     Plaintiffs are "consumers" within the meaning of MDCPA, § 13-101(c)(1).

80.     Defendants are "merchants" within the meaning of MDCPA, § 13-101(g)(1).

81.     Upon the inception of GM in 2009, Defendants knew the Plaintiffs and Subclass members' vehicles, due to the ignition switch risk, are prone to engine and electrical failure during normal and expected driving conditions. The potential concurrent loss of control of the vehicle and shut down of safety mechanisms such as air bags and anti-lock brakes makes Subclass Vehicles less reliable, less safe, and less suitable for normal driving activities inhibiting their proper and safe use of their vehicles, reducing their protections from injury during reasonably foreseeable driving conditions, and endangering Subclass members, other vehicle occupants, and bystanders. Because of the life threatening nature of the risk, its existence was a material fact that Defendants concealed from plaintiffs and class members in violation of Md. Code, Comm. Laws § 13-301(3). Plaintiffs were injured thereby having to endure unreasonable risk of death, serious bodily injury, and diminution of the value of each of their vehicles.

82.    At no time during the Class Period did Mr. Sesay, Ms. Yearwood, or Subclass members have access to the pre-release design, manufacturing, and field-testing data, and they had no reason to believe that their vehicles possessed distinctive shortcomings. Throughout the Class Period, they relied on Defendants to identify any latent features that distinguished their vehicles from similar vehicles without the ignition switch risk, and the Defendants' failure to do so tended to mislead consumers into believing no distinctive risk was present in their vehicles.

83.    With respect to the Subclass, Defendants violated Md. Code, Comm. Laws § 13-301(3) throughout the Class Period by failing to state a material fact, the omission of which tended to mislead consumers, by concealing the ignition switch risk from Plaintiffs and Subclass members. Plaintiffs were harmed by the diminished value of their vehicles to themselves and on the open market and by the imposition of increased risk and the associated loss of full use of their automobiles.

84.    Plaintiffs seek compensatory damages and an order enjoining Defendants' unfair or deceptive acts or practices, and attorney's fees, and any other just and proper relief available under Md. Code, Com. Laws § 13-408.

**COUNT V**
**Asserted on Behalf of Plaintiffs and the Nationwide and all Subclasses**
**(Civil Conspiracy, Joint Action, Aiding and Abetting)**

85.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

86.    This Count is brought on behalf of the nationwide Class and all Subclasses.

87.    Defendants are jointly and severally liable for Plaintiffs' and Class and Subclass members' injuries because they acted in concert to cause those injuries.

88.    Defendants are jointly and severally liable for Plaintiffs' and class and subclass members' injuries because they entered into specific agreement, explicit and implied, with each other and with others, including but not limited to the other defendants, dealers, engineers, accountants and lawyers (the co-conspirators) described in the preceding paragraphs of this First Amended Complaint, to inflict those injuries and to conceal their actions from Plaintiffs, Class and Subclass members and others. By these agreements, Defendants conspired to violate each of the laws that form the basis for the claims in the preceding Counts of this Complaint.

89.    Defendants each committed overt acts in furtherance of the conspiracy.

90.    Defendants knew that the conduct of the co-conspirators constituted a breach of duties to the plaintiffs.

91.    Defendants gave substantial assistance and encouragement to the co-conspirators in their course of conduct in violation of the rights of the plaintiffs.

92.    Defendants were aware that their assistance and encouragement of the wrongful acts herein complained of substantially assisted the wrongful acts herein complained of.

93.    The wrongful acts herein complained of harmed plaintiffs.

94.    All defendants are therefore liable under the law of joint liability, civil conspiracy, and aiding and abetting for all harm to plaintiffs and class members as described in this complaint.

### ALLEGATIONS IN SUPPORT OF PRELIMINARY RELIEF

95.    As of the date of the filing of this Complaint, GM concedes that it knew but did not disclose that some 20 million GM products have safety related risks that create an unreasonable danger of death or serious bodily harm to their drivers, vehicle occupants, nearby drivers, and bystanders.

96.    Despite purporting to admit and cease its campaign of concealment and deceit

27

in February 2014, GM has failed to take measures to ensure that these vehicles do not remain

on the roads as a source of further death and injury. GM has recklessly endangered the public

safety and the safety of Plaintiffs and class members. GM has not effectively remedied its

policies and practices to ensure that this misconduct does not continue, and accordingly its

business practices continue to threaten the public safety, warranting that this Court impose

preliminary and permanent relief to ensure that all elements of the enterprise alleged in this

Complaint are identified and eliminated.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

respectfully request that this Court enter a judgment against GM and Delphi, and grant the

following relief:

A.    Determine that this action may be maintained as a Class action and certify it as

such under Fed. R. Civ. P. 23(a) and 23(b)(3) and/or Fed. R. Civ. P. 23(b)(2), and/or Fed. R. Civ.

23(c)(2), or alternatively certify all issues and claims that are appropriately certified; and

designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen

counsel as Class Counsel;

B.    Declare, adjudge and decree that Defendants have recklessly endangered the

public safety and order specific steps that Defendants must take to restore public safety,

including but not limited to preliminary relief aimed at removing unreasonably dangerous GM

vehicles from the public streets and thoroughfares forthwith; providing safe replacement vehicles

for Plaintiffs and Class and Subclass members that do not contain safety related risks; and, in

light of the nature of GM's wrongdoing, the substantial threat to the public health it has

wrongfully caused, its apparent management recalcitrance or incompetence as evidenced by

GM's failure to take significant remedial steps for the past six months since it has publicly

28

admitted its years-long campaign of concealment and deceit, providing continuing judicial

management over New GM through the appointment of a Special Master with expertise in the

automobile industry and ethical risk management practices to assist in the judicial supervision of

GM's management reforms designed to ensure that the Company does not continue to threaten

the public safety in the future; and permanent injunctive relief aimed at ensuring that GM

deploys reasonable and responsible management controls with respect to safety or cease its

business of marketing to the public complex products that can so easily be a threat of death or

serious bodily injury if not manufactured properly;

C.       Declare, adjudge and decree that the ignition switches in Plaintiffs' and Class

and Subclass Members vehicles are unreasonably dangerous, and/or that the vehicles themselves

are unreasonably dangerous;

D.       .Declare, adjudge and decree that Defendants violated 18 U.S.C. §§ 1962(c)

and (d) by conducting the affairs of the RICO Enterprise through a pattern of racketeering

activity and conspiring to do so;

E.       Declare, adjudge and decree the conduct of Defendants as alleged herein to be

unlawful, unfair, and/or deceptive, enjoin any such future conduct, and direct Defendants to

permanently, expeditiously, and completely repair the Plaintiffs', Class and Subclass Members'

vehicles to eliminate the ignition switch danger;

F.       Declare, adjudge and decree that Defendants are financially responsible for

notifying all Class Members about the dangerous nature of the Class Vehicles;

G.       Declare, adjudge and decree that Defendants must disgorge, for the benefit of

Plaintiffs, Class Members, and Subclass Members all or part of the ill-gotten gains it received

from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class

Members;

29

H.  Award Plaintiffs, Class Members, and Subclass Members the greater of actual compensatory damages or statutory damages as proven at trial;

I.      Award Plaintiff and the nation-wide Class Members treble damages pursuant to 18 U.S.C. § 1964 (c);

J.      Award Plaintiff, Class Members, and Subclass Members punitive damages in such amount as proven at trial;

K.      Award Plaintiff, Class Members and Subclass Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

L.      Award Plaintiff, Class Members, and Subclass Members such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on all the legal claims alleged in this Complaint.


Respectfully submitted


_____
Gary Peller (GP0419), ~~pro hac vice admission pending~~
600 New Jersey Avenue, N.W.
Washington, D.C. 2000
(202) 662-9122 (voice)
(202) 662-9680 (facsimile)
peller@law.georgetown.edu
Attorney for Plaintiffs Ishmail Sesay
and Joanne Yearwood