KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                                          :    Chapter 11
                                                               :
MOTORS LIQUIDATION COMPANY, *et al.*,                          :    Case No.: 09-50026 (REG)
        f/k/a General Motors Corp., *et al.*                   :
                                                               :
                                Debtors.                       :    (Jointly Administered)
---------------------------------------------------------------x

### NOTICE OF FILING OF SIXTH SUPPLEMENT TO SCHEDULE "2" TO THE MOTION OF GENERAL MOTORS LLC PURSUANT TO 11 U.S.C. §§ 105 AND 363 TO ENFORCE THE COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION

**PLEASE TAKE NOTICE** that on August 7, 2014, General Motors LLC filed the attached *Sixth Supplement to Schedule "2" to the Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction* with the United States Bankruptcy Court for the Southern District of New York.

23374129.3

Dated: New York, New York
August 7, 2014

Respectfully submitted,

/s/ Scott I. Davidson
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for General Motors LLC*

23374129.3

**SIXTH SUPPLEMENT[1] TO SCHEDULE "2"**

**SAMPLE ALLEGATIONS/CAUSES OF ACTION IN IGNITION SWITCH COMPLAINTS FILED AGAINST NEW GM NOT CONTAINED IN THE FIFTH SUPPLEMENT TO SCHEDULE "2" TO MOTION TO ENFORCE[2]**

| Lead Plaintiff | Allegations |
|---|---|
| Kosovec | The term "GM" is defined in the Complaint to include both Old GM and New GM. *See* Compl., ¶ 3. |
| | "As a result, all purchasers and lessees of the Defective Vehicles overpaid for their cars at the time of purchase." Compl., ¶ 10. |
| | "Plaintiff's [2008] Chevrolet Cobalt was manufactured, sold, distributed, advertised, marketed, and warranted by GM." Compl., ¶ 19. |
| | "The new company also assumed certain liabilities of Old GM under Bankruptcy Code 363, including the express warranty for Plaintiff's vehicle." Compl., ¶ 21. |
| | "At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Defective Vehicles, and other motor vehicles and motor vehicle components throughout the United States." Compl., ¶ 23. |
| | Because GM acquired and operated Old GM and ran it as a continuing business enterprise . . . GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint." Compl., ¶ 24. |
| | Paragraphs 41 through 66 and 86 through 87 of the Complaint describe events that took place prior to the closing of the 363 Sale. |
| | "Further, when GM marketed the Defective Vehicles as safe, reliable and quality vehicles, GM had actual knowledge of the defect in the Ignition Switch." Compl., ¶ 94. |
| | "Plaintiff and the Class Members reasonably relied on GM's statements in marketing and advertising material that the Defective Vehicles were safe, and would not have purchased |

---

[1] This schedule supplements the Fifth Supplement to Schedule "2" [Dkt. No. 12781] ("**Fifth Supplement to Schedule 2**") filed with the Bankruptcy Court on July 21, 2014, the Fourth Supplement to Schedule "2" [Dkt. No. 12723] filed with the Bankruptcy Court on June 13, 2014, the Third Supplement to Schedule "2" [Dkt. No. 12720] filed with the Bankruptcy Court on June 2, 2014, the Second Supplement to Schedule "2" [Dkt. No. 12699] filed with the Bankruptcy Court on May 19, 2014, the Supplement to Schedule "2" [Dkt. No. 12672-8] filed with the Bankruptcy Court on April 30, 2014, and Schedule "2" [Dkt. No. 12620-2] filed with the *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction* on April 21, 2014 [Dkt. No. 12620].

[2] Due to space limitations, this chart contains only a ***sample*** of statements, allegations and/or causes of action contained in the complaints referenced herein. This chart does ***not*** contain ***all*** statements, allegations and/or causes of action that New GM believes violates the provisions of the Court's Sale Order and Injunction and the MSPA.

23374129.3

| | |
|---|---|
| | or leased the Defective Vehicles had they known of the defects in the Ignition Switches, or would not have paid the artificially inflated price of the Defective Vehicles." Compl., ¶ 100.<br><br>"GM . . . breached the implied warranty of merchantability." Compl., ¶ 119.<br><br>"In addition, GM breached its implied warranty of merchantability to Plaintiff and the Class Members because the Defective Vehicles, as a result of the defective Ignition Switch, would not pass without objection in the trade." Compl., ¶ 121.<br><br>"Plaintiff and the Class Members have suffered damages as a result of GM's breaches of implied warranties as set forth above. *See* 15 U.S.C. § 2310(d)(l)-(2)." Compl., ¶ 123. |
| Rukeyser | "Defendant has designed, manufactured, advertised, promoted, warranted and sold millions of GM Vehicles containing defective ignition switches for use in the United States and worldwide." Compl., ¶ 2.<br><br>"Defendant marketed and warranted to consumers, including Plaintiff and the Class, that its GM Vehicles were of superior quality and engineered and built to be safe, long-lasting and reliable." Compl., ¶ 3.<br><br>"However, Defendant failed to properly and adequately design, formulate and test its GM Vehicles before advertising and selling them as safe, durable and fit for use to Plaintiff and the Class." Compl., ¶ 4.<br><br>"Defendant and its predecessor, General Motors Corporation ('Former General Motors'), have known about ignition switch defects and failures in GM Vehicles since at least 2001." Compl., ¶ 7.<br><br>"Had Plaintiff and Class been provided with information regarding the defective nature of Defendant's GM Vehicles . . . they would not have purchased or otherwise acquired the defective vehicles. Moreover, they would not have relied on the marketing and warranty representations made by the Defendant which suggested that the vehicles were safe and worry-free." Compl., ¶ 13.<br><br>Named Plaintiff purchased a Chevy Cobalt in 2008 and "[p]laintiff relied on Defendant's marketing and representations . . . ." Compl., ¶ 20.<br><br>Class questions include (i) "[w]hether Defendant's ignition switches are defective, defectively designed, and/or defectively manufactured;" and (ii) "[w]hether Defendant breached warranties relating to its GM Vehicles and ignition switches[.]" Compl., ¶ 30(a), (d).<br><br>"Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Defendant's conduct in designing, manufacturing, marketing, advertising, warranting and selling the defective GM Vehicles . . . ." Compl., ¶ 31.<br><br>"Defendant is, and at all times relevant hereto was, engaged in the business of designing, developing, manufacturing, distributing, marketing, and selling GM Vehicles." Compl., ¶ 34.<br><br>"Defendant has successor liability for Former General Motors' actions related to the |

23374129.3

|  |  |
|---|---|
|  | design, manufacture, promotion and sales of GM Vehicles because Defendant has continued the general business of Former General Motors . . . ." Compl., ¶ 45.<br><br>Paragraphs 53 through 63 of the Complaint describe events that took place prior to the closing of the 363 Sale.<br><br>"Had Plaintiff and members of the Class known the true facts about the defects in the GM Vehicles they would not have purchased them for use." Compl., ¶ 83.<br><br>"In addition, as alleged herein, Defendant intended that Plaintiff and the Class consumers would be misled and/or deceived into believing that they were purchasing GM Vehicles that did not contain defective ignition switches, and that did not require additional maintenance, recall and repair to function as promised and represented." Compl., ¶ 87.<br><br>"Defendant, when it marketed, advertised and sold its GM Vehicles, represented to Plaintiff and Class members that the GM Vehicles were free of manufacturing defects and safe . . . ." Compl., ¶ 102.<br><br>Count Five is based on "Breach of Implied Warranty of Merchantability."<br><br>"Defendant has failed to comply with the terms of its warranties - written, express and implied - with regard to the GM Vehicles that it manufactured, advertised, distributed, marketed and/or sold." Compl., ¶ 153. |
| Sesay | "New GM acquired all the books, records and accounts of General Motors Corporation ("Old GM") . . . . New GM also retained the engineering, legal and management officials who were responsible for designing, engineering, and concealing safety-related risks at Old GM . . . ." Compl., ¶ 4.<br><br>"Defendants first deployed their campaign of deception on the day that New GM began operating." Compl., ¶ 7.<br><br>[F]rom its inception in 2009, various New GM engineers, attorneys, and management officials knew of, and took measures to conceal, the ignition switch risk and/or diminish its significance." Compl., ¶ 19.<br><br>"New GM knew from its inception that the part number irregularity was intended to conceal the faulty ignition switches in Plaintiffs' and class members' vehicles." Compl., ¶ 21(j).<br><br>The purported Class includes anyone who owned one of the vehicles listed in the Complaint (which includes many Old GM vehicles) as of October, 2009. *See* Compl., ¶ 41.<br><br>"At the time of New GM's inception in 2009, Defendants knew that the ignition switch used or which would be placed in the Plaintiffs' and class members' vehicles could inadvertently move from "run" to "accessory" or "off," under regular driving conditions." Compl., ¶ 65.<br><br>"Plaintiffs and class members reasonably relied on GM's communications and material omissions to their detriment," Compl., ¶ 67. |

23374129.3

| | |
|---|---|
| | Because the dangerous ignition switch created a foreseeable risk of severe personal and property injury to drivers, passengers, other motorists, and the public at large, Defendants had a duty to warn consumers about and fix, the risk as soon as soon as they learned of the problem- upon the inception of New GM in October 2009." Compl., ¶ 71.<br><br>"Upon the inception of GM in 2009, Defendants knew the Plaintiffs and Subclass members' vehicles, due to the ignition switch risk, are prone to engine and electric failure during normal and expected driving conditions." Compl., ¶ 81. |
| The People of the State of California | The term "GM-branded vehicles" is defined in the Complaint to include vehicles sold by Old GM and New GM. *See* Compl., ¶ 2.<br><br>"GM was aware of the ignition switch defects (and many other serious defects in numerous models of GM-branded vehicles) *from the very date of its inception on July 10, 2009*." Compl., ¶ 11 (emphasis in original).<br><br>"Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the "power steering defect")." Compl., ¶ 15.<br><br>"As with the ignition switch defect, GM was aware of the power steering defect from the date of its inception . . . ." Compl., ¶ 16.<br><br>"From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles were sold in the United States with defective wiring harnesses." Compl., ¶ 17.<br><br>"Once again, GM knew of the dangerous airbag defect from the date of its inception on July 10, 2009 . . . ." Compl., ¶ 18.<br><br>"[B]etween 2003 and 2012, 2.4 million GM-branded vehicles in the United States were sold with a wiring harness defect that could cause brake lamps to fail to illuminate when the brakes are applied or cause them to illuminate when the brakes are not engaged (the "brake light defect")." Compl., ¶ 19.<br><br>"From its inception in 2009, GM has known that many defects exist in millions of GM-branded vehicles sold in the United States." Compl., ¶ 22.<br><br>"GM inherited from Old GM a company that valued cost-cutting over safety . . ." Compl., ¶ 33.<br><br>"In part, GM's knowledge of the ignition switch defects arises from the fact that key personnel with knowledge of the defects remained in their same positions once GM took over from Old GM." Compl., ¶ 44.<br><br>Paragraphs 46, 47, 49, 51, 52, 58, 59, 60, 96, 113, 114, 149, 189, and 190 of the Complaint describe events that took place prior to the closing of the 363 Sale.<br><br>"It appears that the defects were concealed pursuant to a company policy GM inherited from Old GM." Compl., ¶ 199. |

23374129.3

|  | "[An Old GM training document] consists of slides from a 2008 Technical Learning Symposium for 'designing engineers,' 'company vehicle drivers,' and other employees at Old GM." Compl., ¶ 200. |
|---|---|

23374129.3