# Exhibit B

**COUNSEL FOR THE PARTIES ARE**
**LISTED IN THE SIGNATURE BLOCK**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | **Case No.:  09-50026 (REG)** |
| f/k/a **General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

----------------------------------------------------------------X

**CERTAIN PLAINTIFFS, THROUGH DESIGNATED COUNSEL, AND**
**THE *GROMAN* PLAINTIFFS' AGREED-UPON STIPULATIONS OF FACT**
**IN CONNECTION WITH THE FOUR THRESHOLD ISSUES IDENTIFIED**
**IN THIS COURT'S JULY 11, 2014 SUPPLEMENTAL SCHEDULING ORDER**[1]

Pursuant to this Court's *Supplemental Scheduling Order, Dated July 11, 2014, Regarding*

*(i) the Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the*

*Court's July 5, 2009 Sale Order and Injunction, (ii) the Objection Filed by Certain Plaintiffs in*

*Respect Thereto, and (iii) Adversary Proceeding No. 14-01929* (the "**Supplemental Scheduling**

**Order**"), Certain Plaintiffs, through Designated Counsel, and the *Groman* Plaintiffs (hereinafter

"**Plaintiffs**") hereby submit the following agreed-upon stipulations of fact concerning the Four

Threshold Issues.[2]

In addition, annexed hereto as Exhibit "A" are Certain Plaintiffs' proposed stipulations of

fact that have not been agreed to by New GM.

---

[1] Unless otherwise indicated, capitalized terms not defined herein shall have the meanings ascribed to them in the Supplemental Scheduling Order (as defined herein).

[2]  Plaintiffs reserve the right to rely on any of the stipulations of fact agreed upon by Counsel for the Identified Parties.

## AGREED-UPON STIPULATIONS OF FACT

1.     When the Ignition Switch is turned to the "Accessory" or "Off" position in the Subject Vehicles, power to a part called the Sensing Diagnostic Module is lost.  The Sensing Diagnostic Module determines when and whether airbags should deploy.  When the Sensing Diagnostic Module is powered down, the airbags will not deploy.  If the Sensing Diagnostic Module loses power during a crash, the Sensing Diagnostic Module's crash sensing protection would continue (and airbags could still deploy) for approximately 150 milliseconds after the power loss.   But if the Sensing Diagnostic Module loses power prior to the crash, then the Sensing Diagnostic Module would power down and would not trigger airbag deployment. (V.R. at 28-29).[3]

2.     According to New GM, the Subject Vehicles were recalled in 2014 (the "**Ignition Switch Recall**").

3.     In connection with the Ignition Switch Recall, New GM stated that:

> There is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine . . . If the ignition switch is not in the run position, the airbags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality.

(General Motors, Ignition Recall Safety Information Frequently Asked Questions (2014), *available at* http://gmignitionupdate.com/faq.html#L (last visited May 23, 2014)).

---

[3] "V.R." refers to Anton R. Valukas, Report to Board of Directors of General Motors Company Regarding Ignition Recalls, dated May 29, 2014, which can be found at http://www.nhtsa.gov/staticfiles/nvs/pdf/Valukas-report-on-gm-redacted.pdf.

4.    In 2003, Thomas Gottschalk, Old GM's[4] former general counsel, stated to members of Old GM's legal department in a memorandum that "[i]f you as an attorney are aware of any threatened, on-going, or past violation of a federal, state or local law or regulation . . . it is your responsibility to respond appropriately." (V.R. at 109).

5.    Gottschalk's memorandum also discussed what to do if one's superiors had concluded that appropriate action had been taken in response to a perceived problem, but the more junior lawyer disagreed.  If they believed that the conclusion was wrong, the more junior lawyer should continue to seek an appropriate resolution.  Gottschalk said it was the duty of the more junior lawyers to bring the situation to the attention of their supervisors or their supervisors' supervisors, as necessary.  If the more junior lawyers believed that their supervisor had not addressed the issue appropriately or if the more junior lawyer felt that bringing it to the attention of their supervisors would be futile, the more junior lawyers were told to pursue it higher in the organization – if necessary, to the General Counsel.  (V.R. at 109-110).

6.    In a February 19, 2004 report concerning the model year 2004 Saturn Ion, Old GM employee Onassis Matthews stated: "The location of the ignition key was in the general location where my knee would rest (I am 6'3" tall, not many places to put my knee). On several occasions, I inadvertently turn [sic] the ignition key off with my knee while driving down the road. For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position." (V.R. at 57).

7.    In an April 15, 2004 report concerning the model year 2004 Saturn Ion, Old GM employee Raymond P. Smith reported experiencing a one-time inadvertent shut-off, and

---

4 **"Old GM"** means Motors Liquidation Company, formerly known as General Motors Corporation.

that "I thought that my knee had inadvertently turned the key to the off position." (V.R. at

57).

8.    In 2004, an engineer in Old GM's High Performance Vehicle Operations

Group reported that the driver repeatedly experienced a moving stall during a track test of the

Chevrolet Cobalt SS when the driver's knee slightly grazed the key fob.

9.    An Old GM 2005 Problem Resolution Tracking System report states, in part:

"Customer concern is that the vehicle ignition will turn off while driving."

http://democrats.energycommerce.house.gov/sites/default/files/documents/GM-PRTS-Chevrolet-

Cobalt-March-2005.pdf.

10.    In December 2005, Old GM issued Service Bulletin 05-02-35-007 (the

**December 2005 Service Bulletin**") to its dealers, with the subject reference "Information on

Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs ("**Diagnostic**

**Trouble Codes**")" for the 2005-2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2003-2006 Saturn

Ion, and 2006 Pontiac Solstice vehicles. (Apr. 1 Cong. Hr'g, Doc. 12).[5]

A.    The December 2005 Service Bulletin stated that the concern about

inadvertently turning off the ignition "is more likely to occur if the driver is short and has a

large and/or heavy key chain" and that, when a customer brought his or her vehicle in for

service, he or she "should be advised of this potential and should take steps to prevent it – such

as removing unessential items from their key chain."

---

[5] The hearing transcript can be found at *The GM Ignition Switch Recall: Why Did It Take So Long?: Hearing Before the Subcommittee on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 2014 WL 1317290 (2014). The hearing transcript and the documents released by Congress in connection with the hearing can be found at http://energycommerce.house.gov/hearing/%E2%80%pC-gm-ignition-switch-recall-why-did-it-take-so-long%E2%80%9D. (last visited July 24, 2014). Citation to "Doc. ___" refer to the documents produced by New GM to Congress in connection with the hearings regarding the Ignition Switch Recall before the House Energy and Commerce Committee on April 1, 2014.

B.    The December 2005 Service Bulletin also stated that "there is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort."

C.    Old GM did not issue any public statements related to the December 2005 Service Bulletin. (Apr. 1 Cong. Hr'g at 35).

D.    The December 2005 Service Bulletin did not describe the issue as involving a "stall." (V.R. at 93).

E.    Prior to this time, Steven Oakley,[6] an Old GM brand quality manager, had written a service bulletin request form that used the term "stall." (V.R. at 92).

11.    In October 2006, Old GM updated the December 2005 Service Bulletin (hereinafter referred to, with that update, as the **"October 2006 Service Bulletin"**) to include additional vehicle models and model years – namely, the 2007 Saturn Ion, 2007 Saturn Sky, the 2007 Chevrolet HHR, the 2007 Pontiac Solstice, and the 2007 Pontiac G5. (Feb. 7 Notice; Feb. 24 Notice).

A.    The October 2006 Service Bulletin stated:

There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they will have the seat positioned closer to the steering column. In cases that fit this profile, question the customer thoroughly to determine if this may [sic] the cause. The customer should be advised of this potential and should take steps to prevent it – such as removing unessential items from their key chain.

---

[6] Oakley is discussed infra at ¶ 15,S.

5

B.      The October 2006 Service Bulletin did not describe the issue as involving a "stall."

12.      When Gary Altman, Old GM's Program Engineering Manager for the Chevrolet Cobalt, was asked at a deposition whether "it would be true that if it was a safety recall, the dealership and the consumers would be more aware of the issue than if it were a technical service bulletin," Altman replied: "I'm sure it is. It has to go through NHTSA. It goes through the public announcement, the record, and I'm pretty concerned—or pretty sure that every customer would be contacted." (Altman Dep. 54:3-11).

13.      "In 2006, one Better Business Bureau arbitrator decision mandated that Old GM repurchase a Cobalt from a customer who complained of intermittent stalling." (V.R. 89, fn. 378).

14.      Certain Old GM Personnel and New GM Personnel, as they relate to the Ignition Switch, are as follows:

A.      Alan Adler was Old GM's manager for safety communications in the Fall of 2006. (V.R. at 57-58).

i.      On October 24, 2006, a crash occurred in which a 2005 Cobalt left the road and struck a telephone box and two trees, leaving two passengers dead and the driver severely injured. The crash first came to Old GM's attention on November 15, 2006, through a TV reporter's inquiry. Adler e-mailed Dwayne Davidson, Senior Manager for TREAD Reporting at Old GM, and others, copying Old GM employees Gay Kent, Jaclyn Palmer, Brian Everest, and Douglas Wachtel, with the subject line "2005 Cobalt Air Bags – Fatal Crash; Alleged Non-Deployment," asking whether anyone knew about the accident and other airbag incidents involving the Cobalt (the "**November 2006 Adler E-mail**"). Certain recipients

6

responded to the e-mail and provided available data on Cobalt frontal airbag claims. (V.R. at

114).

          ii.     Adler was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale. (V.R. at 140).

         B.     Gary Altman was Old GM's Program Engineering Manager for the

Chevrolet Cobalt when it was launched. (V.R. at 57-58). As of June 2013 he had worked at Old

GM and then New GM for approximately 35 years. (Altman Dep. 6:12-15).

          i.     "Around the time of the Cobalt launch, two reports surfaced of

moving stalls caused by a driver bumping the key fob or chain with his knee. First, at a summer

or fall 2004 press event associated with the launch of the Cobalt in Santa Barbara, California, a

journalist informed Doug Parks, the Cobalt Chief Engineer, that while adjusting his seat in the

Cobalt he was driving, the journalist had turned off the car by hitting his knee against the key fob

or chain. Parks asked Gary Altman, the Program Engineering Manager, to follow up on the

complaint by trying to replicate the incident and to determine a fix." (V.R. at 59-60). "After the

Cobalt press event, Altman and another GM engineer test drove a Cobalt at the Milford Proving

Grounds and replicated the incident described by the journalist." (V.R. at 60).

          ii.     The entity within Old GM responsible for opening and reviewing the

November 2004 Problem Resolution Tracking System was a Current Production Improvement

Team. (V.R. at 63-64). The Current Production Improvement Team included a cross-section of

business people and engineers, along with the Program Engineering Manager that was

responsible for the vehicle. (V.R. at 64). It was chaired by the Vehicle Line Director, who was

the business lead for the vehicle program and reported directly to the Vehicle Line Executive,

who at the time was Lori Queen. (V.R. at 64).

iii.  An Old GM November 19, 2004 Problem Resolution Tracking

System was closed with no action on March 9, 2005. (V.R. at 60).  There were multiple reasons

given for closing the November 2004 Problem Resolution Tracking System investigation and,

ultimately, certain Old GM personnel concluded that none of the solutions represents an

acceptable business case. (*Id.*; Doc. 8, at GMHEC000001735; V.R. at 69).    The phrase "none of

the solutions represents an acceptable business case" was a standard phrase by certain Old GM

personnel for closing a Problem Resolution Tracking System investigation without action. (V.R.

at 69).  Here, according to certain Old GM personnel, the proposed changes were not

implemented because none of them were guaranteed to resolve the problem completely.  (*Id.*).

iv.  In May 2005, Steven Oakley opened a Field Performance Report to

investigate a complaint by Jack Weber, an Old GM engineer who reported turning off a

Chevrolet Cobalt SS with his knee while "heel-toe downshifting." (V.R. at 76).

v.  Altman has testified, *inter alia*, that:

a)  movement of the ignition key from the "Run" position to

the "Accessory" position in the 2005 Chevrolet Cobalt can be dangerous in certain situations.

(Altman Dep. 12:5-10, 23-25; 23:23-24:2).

b)  when the ignition key moves from the "Run" position to the

"Accessory" position in the 2005 Chevrolet Cobalt, the engine stalls and power steering stops

working.  (Altman Dep. 10:14-22).

vi.  In February 2009, Old GM engineer Joseph Manson copied Altman

on an e-mail which, among other things, stated that the issue with respect to the Cobalt key

(keyed off with knee while driving) "has been around since man first lumbered out of [the] sea

and stood on two feet." (V.R. at 132-33).

vii. Altman was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (*See, e.g.*, V.R. at 222).

C.    Kathy Anderson was an Old GM Field Performance Assessment engineer who was assigned to gather information and assess technical issues in lawsuits and claims not in litigation. (V.R. at 105-106). Field Performance Assessment engineers conduct their own technical assessments, which might include reviewing police reports and medical records, interviewing witnesses, inspecting vehicles, and analyzing Sensing Diagnostic Module data. (V.R. at 106). Oftentimes, Field Performance Assessment engineers share their technical assessments with product litigation staff attorneys and outside counsel, assist in responding to plaintiffs' discovery requests, and may testify as experts or 30(b)(6) witnesses. "FPA engineers' technical assessments are the lawyers' primary source of technical information for the early case evaluations, and are a critical factor in the evaluation of settlement decisions." (V.R. at 106).

i.    In 2006, Anderson investigated two fatal crashes: the July 4, 2004 fatal crash of a 2004 Saturn Ion (the "**July 2004 Fatal Crash**") and the July 29, 2005 fatal crash of a 2005 Chevrolet Cobalt (the "**July 2005 Fatal Crash**"). (V.R. at 110, 112). In the July 2004 Fatal Crash, a vehicle occupant died after her 2004 Saturn Ion left the road at high speed, went over a low curb, braked, and then struck a large utility pole head on. The airbag did not deploy. (V.R. at 112). In the July 2005 Fatal Crash, the airbags did not deploy. (V.R. at 110).

ii.    "Settlements of between $100,000 and $1.5 million (a limit which was eventually increased to $2 million) required approval at a committee known as the "Roundtable." The Roundtable Committee met weekly, and was led by the Litigation Practice Area Manager, and all product litigation staff attorneys were invited to attend. Settlement offers between $2 and $5 million required approval of a group called the Settlement Review

Committee, which met monthly, and was chaired by the head of global litigation. Members of the Settlement Review Committee included both the GC of GM North America and Kemp. When a case was before the Roundtable or the Settlement Review Committee, the responsible product litigation staff attorney would present his/her case." (V.R. at 106-108).

      iii.    FPA engineers Manuel Peace, Kathy Anderson, and Douglas Brown of the Old GM Legal Staff were assigned to the July 2004 Fatal Crash and the July 2005 Fatal Crash. (V.R. at 110). Anderson and the other investigators identified the July 2004 Fatal Crash as one in which there should have been an airbag deployment, and that the deployment likely would have saved the occupant's life. (V.R. at 112-113).

      iv.    Anderson was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (*See, e.g.,* V.R. at 141).

      D.    Douglas Brown was in-house counsel at Old GM. (V.R. at 110). In late 2005 and 2006, Cobalt and Ion airbag non-deployment cases began to reach the Old GM Legal Staff, including Brown. (V.R. at 103 & n.419).

      i.    Brown was assigned to the July 2004 Fatal Crash and the July 2005 Fatal Crash. (*Id.*; V.R. at 124-126).

      ii.    On October 3, 2006, Brown presented the July 2004 Fatal Crash to a Roundtable meeting, and reported that despite extensive analysis, the engineers have no solid technical explanation. The engineers agree that 1) the airbags should have deployed; 2) the Sensing Diagnostic Module did not record the crash event, for unknown reasons; and 3) it is reasonably likely that deployment of the driver airbag would have prevented death in this accident. The Roundtable granted settlement authority and Old GM settled the case. (V.R. at 113).

iii.    On November 15, 2006, Jaclyn Palmer forwarded to Brown an e-mail sent by Alan Adler that referred to the October 26, 2006 fatal crash of a 2005 Cobalt in which the airbag did not deploy. In the November 2006 Adler e-mail, Adler asked if anyone knew about the accident. (V.R. at 114).

iv.    Brown was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

E.    Eric Buddrius was an engineer in Old GM's Product Investigations unit. The Product Investigations unit at Old GM was the primary unit charged with investigating and resolving significant engineering problems, including both customer satisfaction and safety problems. (V.R. at 86). The Old GM Product Investigations group would present its findings at one or more weekly Information Status Review meetings attended by the Field Performance Evaluation Director, the Product Investigations Director, and representatives from the Legal Department, Customer Care and After Sales, Field Performance Evaluation, and Product Investigation. (V.R. at 290).

i.    Witnesses have inconsistent recollections as to whether the Product Investigations group became involved in the Cobalt airbag non-deployment issues at this stage. One witness, Brian Everest, reported that in April 2007, the Field Performance Assessment group transitioned the Cobalt airbag matter to the Product Investigations unit, where it was assumed by Buddrius. Documents in Buddrius's files indicate that he was working on the issue, and a May 4, 2007 Investigation Status Review Presentation Planning Worksheet states that Buddrius was scheduled to present on an issue described as "Cobalt/Ion Airbag (NHTSA discussion item)." Buddrius has no recollection of involvement. (V.R. at 119-120).

ii.     Continental manufactured the Sensing Diagnostic Module for the Chevrolet Cobalt.  (V.R. at 29).

iii.     According to Brian Everest, on May 15, 2009, Buddrius attended a meeting with Continental along with his colleagues John Sprague, Brian Everest, Lisa Stacey, James Churchwell, William Hohnstadt, John Dolan, and Legal Staff Attorney Jaclyn Palmer, to discuss Continental's findings regarding a Cobalt crash (hereinafter, the **"May 2009 Continental Meeting"**).  Continental provided a report regarding a September 13, 2008 accident involving a 2006 Chevrolet Cobalt (the **"Continental Report"**).

iv.     The Continental Report stated that the Sensing Diagnostic Module did not deploy the airbag because the algorithms were disabled at the start of the event.  The report identified two possible causes for the disabled algorithm:  (a) the vehicle experienced "loss of battery" or (b) the Sensing Diagnostic Module received a power mode status of "Off" from the body control module (BCM).  (V.R. at 134).

v.     Buddrius was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.  (V.R. at 153 n.685).

F.     William K. Chase worked for Old GM and then New GM from 1984 through 2009.  (Chase Dep. 7:2-3, 6:24-7:3).  In 2005, Chase worked as a warranty engineer in the warranty engineering department at Old GM, where he was responsible for trying to reduce warranty costs for vehicles produced in Lordstown, Ohio, where the Cobalt and the Pontiac G5 were produced.  (Chase Dep. 7:16-8:2, 20:14-18).  Old GM's warranty system contained reports of incidents that included dealer comments on incidents, if the dealer had chosen to enter a comment. (Chase Dep. 12:23-13:3).  Those reports were organized by labor code, included the

VIN, dealer name, the amount charged against the claim, any comments, any customer codes, and any trouble codes the dealer might have entered. (Chase Dep. 8:3-8).

   i. According to Chase, he first learned of a problem with the 2005 Cobalt in 2005 from Steve Oakley, the Cobalt brand quality manager at the time. (Chase Dep. 7:7-14). Oakley brought the issue to Chase's attention by submitting a Problem Resolution Tracking System report (PRTS No. N182276) on May 16, 2005 and asked Chase to estimate the warranty impact. (Chase Dep. 8:3-8).

   ii. Pursuant to a PRTS initiated in February 2009, a design change was implemented to change the ignition key design for 2010 Chevrolet Cobalt vehicles from a slot to a hole. (Feb. 7 Notice; Feb. 24 Notice; Chase Dep. 31:20-32:11).

   iii. Chase was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

  G. James Churchwell was an Old GM engineer. (V.R. at 135, 150 n.666). According to Everest, Churchwell attended the May 2009 Continental Meeting. (V.R. at 134-135).

   i. Churchwell was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (V.R. at 153).

  H. Dwayne Davidson was Old GM's Senior Manager for TREAD Reporting. (V.R. at 113-114, 117). Davidson received the November 2006 Adler E-mail. (V.R. at 114). Davidson thereafter conducted a search of Old GM's TREAD database that yielded over 700 records of field reports and complaints, which he offered to summarize. (V.R. at 114 n.477).

   i. In February 2007, Wisconsin State Patrol Trooper Keith Young wrote a Collision Analysis & Reconstruction Report about a fatal crash in October 2006 of a 2005

Chevrolet Cobalt (the "**Wisconsin Report**"). Davidson stated that, in 2007, he obtained a copy

of the Wisconsin Report. The Wisconsin Report stated that it appears likely that the vehicle's

key turned to Accessory as a result of the low key cylinder torque/effort and connected this to the

failure of the airbags to deploy. Davidson stated he obtained the Wisconsin Report from

someone at Old GM Legal in 2007 and that he provided the Wisconsin Report to NHTSA in

2007 in connection with GM's quarterly death and injury report. None of the GM lawyers and

engineers interviewed in connection with the Valukas Report who were working on Cobalt

matters recall being aware of the Wisconsin Report until 2014. (V.R. at 116-118).

       ii.    Davidson was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale. (*See, e.g.,* V.R. at 159).

       I.    Raymond DeGiorgio was an Old GM Design Release Engineer.[7] (V.R. at

37). A Design Release Engineer is responsible for a particular component or part in a vehicle.

(V.R. at 37 n.114). He had worked at Old GM as a Design Release Engineer since 1991,

focusing on vehicle switches. DeGiorgio was the project or lead design engineer for the Ignition

Switch used in the 2003 Saturn Ion and 2005 Chevrolet Cobalt. (DeGiorgio Dep. 11:6-10; 13:7-

10, 18-19). Additionally, he was the lead design engineer for an ignition switch that replaced the

Ignition Switch. (DeGiorgio Dep. 11:11-15; 21:5-9). He took over responsibility as Design

Release Engineeer for the Ignition Switch between October 1999 and March 2001. (V.R. at 6,

37, 212).

       i.    On March 22, 2001, DeGiorgio "finalized" the specification for the

Ignition Switch, a designation that signaled to the supplier that additional changes to the switch

---

[7] Old GM's Design Release Engineers had responsibility for working with Old GM's suppliers to develop specific
vehicle components for use in particular Old GM vehicles - their "design" responsibilities - and to ensure that those
components satisfied Old GM's requirements and specifications before ultimately approving the part for use in an
Old GM vehicle – "releasing" the part.

were not anticipated and memorialized accepted agreements related to the specification at that

point in time.  (V.R. at 38).   The supplier for the Ignition Switch was Delphi Mechatronics

("**Delphi**").  The initial specification for the Ignition Switch included a "TARGET" force

displacement curve specifying 20 Newton-centimeters ("**N-cm**") as the torque needed to turn the

ignition from "Run" to "Accessory."  (V.R. at 36).  By March 2001, based on DeGiorgio's

finalization of the torque requirement, the torque necessary to move the Ignition Switch from

Run to Accessory was, pursuant to the specification, required to fall somewhere between 15 N-

cm and 25 N-cm.  (V.R. at 39).  In September 2001, DeGiorgio corresponded with

representatives of Koyo Steering Systems North America ("**Koyo**"), the supplier of the Ion

steering column into which Delphi's switch was installed.    In his correspondence, DeGiorgio

stated he recently learned that 10 of 12 prototype switches from Delphi failed to meet

engineering requirements, and the failure is significant, adding that DeGiorgio himself must

ensure this new design meets engineering requirements.   (V.R. at 44).  According to DeGiorgio,

the "engineering requirements" and failures he referenced in this e-mail were electrical

requirements and not failures related to the Ignition Switch torque.  (V.R. at 44-45).

      ii.    At the same time that DeGiorgio was dealing with electrical problems

with the Ignition Switch, Delphi was also conducting tests on the mechanical requirements,

including the torque required to turn the Ignition Switch.  (V.R. at 45).  In February 2002, Delphi

personnel informed DeGiorgio that the accessory detent was at 9.5 N-cm, which was below

DeGiorgio's requested target based on TALC samples, and advised DeGiorgio that the torque

could be increased, but there were risks that changes would trigger other issues.  These risks

included cracking of the rotors, premature wear-out of the detent, and impact on the electrical

functions (particularly the printed circuit board).  (V.R. at 46-47).

iii.    DeGiorgio approved production of the Ignition Switch, although it did not meet the Specification. (V.R. at 38-40, 50, 52). The Ignition Switch was installed in Saturn Ion and Chevrolet Cobalt vehicles. (*See, e.g.,* V.R. at 53).

iv.    Problems with the Ignition Switch were brought to DeGiorgio's attention in 2003, 2004, and 2005. (V.R. at 53). These included at least one complaint that the Ignition Switch in a customer's vehicle had insufficient torque and caused that vehicle to shut off while driving. (V.R. at 77). In 2005, DeGiorgio received torque test results from Old GM's review of the Ignition Switch turning from the "Run" to the "Accessory" position in certain Chevrolet Cobalt vehicles. (DeGiorgio Dep. 58:4-19). DeGiorgio discussed changes to the Ignition Switch used in the Chevrolet Cobalt with John Hendler and later proposed changes to the Cobalt VAPIR Team. (2014 House Panel Report, e-mail from Raymond DeGiorgio to Andrew C. Brenz, dated Nov. 22, 2004 (GMHEC000330211-14)).

v.    In 2006, DeGiorgio approved a change in the Ignition Switch that increased the torque required to turn the key, but there was no change to the part number. (V.R. at 9-10, 39). NHTSA was not informed of the change to the Ignition Switch. (Apr. 1 Cong. Hr'g at 75).

vi.    On or about August 14, 2007, Old GM entered into a Warranty Settlement Agreement with Delphi (as a debtor in bankruptcy) where the estimated warranty costs could exceed $1 million (the "**Delphi Settlement**"). The Delphi Settlement identified 49 issues that were resolved as part of the settlement, including something labelled "ignition switch failure" on the model year 2003-04 Saturn Ion and model year 2005-06 Chevrolet Cobalt.

vii.    DeGiorgio was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (V.R. at 179).

16

J.    John Dolan was an electrical engineer for Old GM and, according to Everest, attended the May 2009 Continental Meeting. (V.R. at 134, 165).

i.    Dolan was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (V.R. at 174 n.793).

K.    Brian Everest, an engineer, was an Old GM Field Performance Assessment Supervisor. (V.R. at 114, 118-119). John Sprague an Old GM Field Performance Assessment Engineer stated that he generally remembers sharing his Excel spreadsheet listing the various Cobalt accidents and non-deployments with Everest, but he does not remember sharing the spreadsheet at any formal meeting. (V.R. at 119). Everest attended the May 2009 Continental Meeting. (V.R. at 134). At some point after that time, Everest investigated how the Cobalt's Body Control Module, the part responsible for controlling the engine, could send a power mode status of "Off" to the Sensing Diagnostic Module. (V.R. at 135).

i.    Everest was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (V.R. at 153).

L.    Michael Gruskin was an attorney for Old GM and then for New GM. (V.R. at 110). At some point in time, he headed GM's product litigation team. (V.R. at 105, 110). In addition, Gruskin chaired the Settlement Review Committee and the Roundtable[8] from September 2007 to March 2012. (V.R. at 107). During the time Gruskin chaired the Roundtable (which generally met on a weekly basis), the Roundtable reviewed the following crashes. First, in September 2007, the Roundtable reviewed a crash involving a person who sustained severe injuries after his 2005 Saturn Ion ran into the rear of an illegally parked tractor trailer on June 26, 2005 (the "**June 2005 Non-Fatal Crash**"). The presentation made at the

---

[8] The Roundtable is discussed *supra* at ¶15,C, ii.

Roundtable indicated that the Sensing Diagnostic Module data was incomplete and inaccurate, as a probable result of power loss during the crash. Second, in July 2008 the Roundtable reviewed a December 29, 2006 crash of a 2005 Chevrolet Cobalt which caused serious injuries and in which neither Old GM nor outside counsel had an explanation for why the airbag did not deploy. According to the Sensing Diagnostic Module data, the ignition was in the Run position at the time of the accident.

i.      Gruskin was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

M.     Victor Hakim was an Old GM employee, who, as of June 11, 2013, had been with Old GM and then New GM for 43 years. (Hakim Dep. 6:23-7:1). Hakim testified at his deposition that there was a summary Excel spreadsheet from the Old GM Company Vehicle Evaluation Program, which contained comments from drivers of Ion vehicles. (Hakim Dep. 155:9-15). The Old GM Company Vehicle Evaluation Program spreadsheet included a January 9, 2004 statement from one driver of a Saturn Ion that the Ignition Switch was positioned too low on the steering column, that the keys hit his knee while driving, that the Ignition Switch should be raised on the steering column at least one inch, that this was a basic design flaw, and that it should be corrected if Old GM wanted repeat sales. (Hakim Dep. 155:23-24; 156:22-157:5).

i.      Hakim was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (*See, e.g.,* V.R. at 145).

N.     William Hohnstadt was an Old GM sensing performance engineer. (V.R. at 134). On July 16, 2007, Hohnstadt received Sensing Diagnostic Module data from Continental relating to a Cobalt crash in which the airbags did not deploy. The report concluded that the vehicle's Sensing Diagnostic Module had experienced loss of battery prior to the non-

deployment. (V.R. at 126, 127 n.543). According to one witness, Hohnstadt attended the May 2009 Continental Meeting. (V.R. at 134).

      i.   Hohnstadt was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

      O.   William J. Kemp was Old GM's Counsel for Engineering Organization, and was a member of Old GM's Settlement Review Committee. (V.R. at 104). He was an Old GM senior attorney who worked closely with the engineering groups and who had shared responsibility for safety issues in the legal department. (V.R. at 85). Kemp sat on the Settlement Review Committee, whose purpose was to determine whether and at what price to settle product liability lawsuits. "A reason for that assignment is to ensure that information from lawsuits finds its way into GM's safety function, that is, to the engineers who make safety decisions." (V.R. at 105, 108).

      i.   In the late spring of 2004, certain Old GM employees, including Gay Kent, discussed engine stalling with NHSTA. (V.R. at 72). On June 3, 2004, during the meeting with NHTSA, Old GM personnel presented their perspective on engine stalls—specifically, that those occurring on acceleration required more rigorous review. GM also represented to NHTSA that in assessing a given stall, it considered severity, incident rate, and warning to the driver. Kemp's notes related to this meeting indicate NHTSA told Old GM that, in a case where the number of failures was "inordinately high," the factors considered by Old GM to assess the problem should be considered but did not necessarily "immunize" a manufacturer from conducting a safety recall. (V.R. at 73-74).

      ii.   In or around June 2005, Kemp was informed of an article to be published in the Cleveland Plain Dealer that criticized Old GM's response to engine stall in the

Cobalt. Kemp suggested that Old GM should give the columnist a videotape demonstration showing the remoteness of this risk. Elizabeth Zatina, another Old GM attorney, responded that she was not optimistic we can come up with something compelling. Kemp replied that they can't stand hearing, after the article is published, that they didn't do enough to defend a brand new launch. (V.R. at 85-86).

        iii.   Kemp was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (V.R. at 151).

        P.    Gay Kent was Old GM's Director of Product Investigations. In or around 2005, Old GM Product Investigations Manager Douglas Wachtel assigned Old GM Product Investigations employee Elizabeth Kiihr to investigate the Cobalt Ignition Switch shut-off. (V.R. at 86). In addition, Wachtel and Gay Kent obtained a Cobalt and drove around Old GM's property in Warren, Michigan. Kent had a long and heavy key chain and was able to knock the Ignition Switch from "Run" to "Accessory" by moving her leg so that her jeans caused friction against the fob. Wachtel could reproduce the phenomenon more easily, but still only by contacting the key chain rather than hitting bumps in the road. (V.R. at 87).

        i.   On March 29, 2007, a group of Old GM engineers, including Gay Kent and Brian Everest, attended a Quarterly Review meeting at NHTSA headquarters. During that meeting, or during a break, NHTSA officials told the Old GM representatives that they had observed a number of airbag non-deployments in Cobalt and Ion vehicles. NHTSA made no formal request and did not ask Old GM to report back to it about the non-deployment issue.

        ii.   Kent was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

        Q.    Elizabeth Kiihr was an engineer in Old GM's Product Investigations unit.

     i.    Kiihr was assigned in or around 2005 to investigate the Cobalt Ignition Switch shut-off. (V.R. at 86).

     ii.    Kiihr created a file in 2005 that contained customer complaints and a copy of a February 2005 "Preliminary Information" on engine stalls in the Cobalt. (V.R. at 66, 156). The file contained, among other things: (a) several TREAD data reports regarding the Cobalt; (b) PowerPoint presentations, including presentations from an Investigation Status Review meeting in 2005 and a Vehicle and Progress Integration Review ("**VAPIR**")[9] meeting in 2005; (c) a cost estimate for changing the design of the key; and (d) a copy of a Product Investigation Bulletin titled "Engine Stalls, Loss of Electrical Systems, and No DTCs." (V.R. at 164).

     iii.    Kiihr was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

     R.    Alberto Manzor was an Old GM engineer.

     i.    Manzor became involved in the investigation of the Cobalt ignition switch in the spring of 2005. Manzor claims that he said, at the time, that the Cobalt ignition switch issue was incorrectly categorized as a moderate issue and should have been classified as a safety issue. (V.R. at 83). There was no documentary evidence of Manzor making such a statement. Manzor claims that he said that he discussed his safety concerns about the Cobalt, including the potential for airbag non-deployment, with Doug Parks, Gary Altman, and an Old GM safety engineer, Naveen Ramachandrarappa Nagapola, but these employees either do not recall or else deny the conversation took place. (V.R. at 83-84). On June 17, 2005, Manzor

---

[9] VAPIR (Vehicle and Process Integration Review), by design, includes a cross-section of Vehicle System Engineers because they are supposed to be able to recognize whether an issue impacts other functions within the vehicle. (V.R. at 66).

conducted testing on the Cobalt Ignition Switch, and the proposed GMT 191 Ignition Switch, at

Old GM's Milford Proving Ground, to evaluate how the Ignition Switches performed using a key

with a slotted key head versus a key head with a hole. (V.R. at 81). According to Manzor, these

experiments demonstrated that changing the key head design and replacing the Ignition Switch

had the potential to address the torque problem. They also demonstrated that the rotational

torque required to move the key out of "Run" was 10 N-cm. This was below the specification of

15 to 25 N-cm. (V.R. at 82). However, neither Parks nor Manzor compared the test results to the

actual specification.

       ii.      Following the tests, Manzor took steps to expedite the key-head

design change of the ignition key. Later, in June 2005, the Old GM Vehicle and Process

Integration Review Committee approved a service fix for existing customers—a plug that could

be inserted into keys when customers came to the dealer reporting problems – and a change to

the key for production in the future (a change that was not implemented). On July 12, 2005,

another Preliminary Information was issued, stating (only for the 2005 Cobalt and 2005 Pontiac

Pursuit) that a fix was available (the key insert). Certain Old GM engineers still regarded the

key head design change as only a temporary solution – or, as one engineer described it, a "band-

aid." (V.R. at 82-83).

       iii.     Manzor was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale.

       S.      Steven Oakley was a brand quality manager for Old GM in 2005 and had

been continuously employed by Old GM since 1990. (Oakley Dep. 7:1-6, 18-20).

       i.      In or around March 2005, Oakley first became aware of an issue

with the Ignition Switch. (Oakley Dep. 12:8-14, 16-19, 22-23; 14:9-22; *see also* V.R. at 86, 92).

Around that time, Oakley drafted a service bulletin request form describing the engine-cut-off problems as a stall, but the Technical Service Bulletin issued in December 2005 did not use that language. (V.R. at 76). Oakley has stated, at times, that he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of his job for doing just that. In this particular event, Oakley stated that his initial concern that the Ignition Switch presented a safety issue was alleviated after discussions with the engineers. (V.R. at 93).

  ii. Oakley received a customer demand that Old GM repurchase the customer's Cobalt in May 2005 because the Ignition Switch shut off during normal driving with no apparent contact between the driver's knee and the key chain or fob. (V.R. at 76). Oakley forwarded this information internally at Old GM, stating that the customer reported that the ignition switch goes to the off position too easily shutting the car off. (V.R. at 76 n.309). Oakley told Old GM employee Joseph Joshua, to whom he forwarded the customer demand, that

> the field rep will swap the parts if we want them to. He is concerned that this will not correct the condition, as he feels several stock cars at the dealership have about the same level of effort for the switch. They would like to have a column sent to them that we have some kind of confidence is better than what they are taking out. Again, if you just want a swap out we can do this, but without the ability to measure the effort, I have a hard time persuading them this will actually fix the car.

(V.R. at 77).

  iii. One of the people the e-mail was forwarded to was DeGiorgio, who does not remember receiving this e-mail. (V.R. at 77).

  iv. Oakley was a Transferred Employee (as such term defined is defined in the Sale Agreement), after the 363 Sale.

  T. Jaclyn C. Palmer was an Old GM product liability attorney and attended Roundtable meetings. (V.R. at 108). Palmer, described as an "airbag lawyer," received the

November 2006 Adler E-mail and forwarded it to Doug Brown, another Old GM airbag lawyer,

so that he could be prepared for any potential claims related to the 2005 crash involving a Cobalt

in which the airbag failed to deploy. (V.R. at 114, n.477). Palmer attended the May 2009

Continental Meeting. (V.R. at 135).

        i.     Palmer was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale. (*See, e.g.,* V.R. at 140-141).

        ii.     Doug Parks was Old GM's Vehicle Chief Engineer for the Chevrolet

Cobalt leading up to its launch. V.R. at 57-58). In late 2004, Parks asked Altman to follow up

on a complaint that the driver had turned off a Cobalt by hitting his knee against the key fob

(V.R. at 59-60). Altman was able to replicate the incident. (V.R. at 60). On May 4, 2005, Parks

sent an e-mail to various Old GM personnel including Altman, regarding "GMX 001: Inadvertent

Ign turn-off," writing, "for service, can we come up with a 'plug' to go into the key that centers

the ring through the middle of the key and not the edge/slot? This appears to me to be the only

real, quick solution." (Doc. 12).

        iii.     Parks was a Transferred Employee (as such term is defined in the Sale

Agreement), after the 363 Sale.

        U.     Manuel Peace was an Old GM Field Performance Assessment Engineer.

He investigated at least three crashes in Saturn Ion or Chevrolet Cobalt vehicles, including the

July 2004 Fatal Crash, the June 2005 Non-Fatal Crash, and the July 2005 Fatal Crash. (V.R. at

110, 112, 124, 126). Peace and Kathy Anderson were assigned to investigate the July 2004 Fatal

Crash and the July 2005 Fatal Crash. Peace and the other Old GM investigators identified the

July 2004 Fatal Crash as a crash in which there should have been an airbag deployment and that

it was reasonably likely that the deployment of the driver airbag would have prevented the occupant's death in this accident.  (V.R. at 111-113).

      i.    In 2007, Old GM's Legal Staff was made aware of the June 2005 Non-Fatal Crash.  (V.R. at 125-126).  Manuel Peace and John Sprague were the Old GM Field Performance Assessment investigators and Doug Brown was the Old GM lawyer assigned to the June 2005 Non-Fatal Crash.  (V.R. at 126).  The investigation proceeded to a Roundtable presentation on September 18, 2007.  (*Id.*).

      ii.    Peace was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

      V.    Craig St. Pierre worked for a company called Ortech, the supplier of the Chevrolet Cobalt ignition cylinder, as a supplier resident engineer for approximately five years. During this time, he maintained a desk at Old GM.   (St. Pierre Dep. 7:10-13; 8:3-13; 10:1-18). During the launch of the Chevrolet Cobalt, St. Pierre learned that there was a problem with the ignition key turning from the "Run" to the "Accessory" position under normal operating conditions.  He was made aware of this problem so that he could communicate back to Ortech. (St. Pierre Dep. 8:22-25; 10:1-8).

      i.    By September 13, 2005, St. Pierre and Trush determined that the detent effort in the Ignition Switch in the Cobalt was too low. (St. Pierre Dep. 14:11-15:3).

      ii.    In September 2005, regarding the Ignition Switch problem, St. Pierre stated in a Problem Resolution Tracking System Report that the detent efforts on Ignition Switch are too low allowing the key to be cycled to off position inadvertently.  Changes to the key can be made to reduce the moment which can be applied to key by key ring/keys.  This will assist in limiting the issue but will not completely eliminate it.  Changes to the switch will not be

forthcoming from electrical group until model year 2007. (2005 PRTS, originated May 17, 2005, at GMHEC0000001748).

        iii.     David Kepczynski was an Old GM engineering group manager. In 2006, Kepczynski recommended closing the 2005 PRTS without action because the business case was not accepted by the program team. Kepczynski also stated that a service fix was already available and in the field. (2005 PRTS, originated May 17, 2005, at GMHEC000001750-1751).

        W.     Keith Schultz was Manager of Internal Investigations in Old GM's Product Investigations unit at or around March, 2007. (V.R. at 118).

        i.     After Old GM personnel returned from a March 29, 2007 meeting with NHTSA, in which NHTSA officials had told the Old GM representatives that they had observed airbag non-deployments in the Cobalt and Ion vehicles, Everest and John Sprague, an Old GM Field Performance Assessment airbag engineer, compiled information on Cobalt and Ion NISMs (as defined in paragraph 15, X) and lawsuits. Dwayne Davidson pulled the TREAD data for similar instances. (V.R. at 118). Sprague began compiling an Excel spreadsheet listing the various Cobalt accidents and non-deployments to look for trends, but he did not remember sharing the spreadsheet at any formal meeting. (V.R. at 118-119). Schultz sent an e-mail to Brian Everest and John Sprague on May 3, 2007, stating that they were planning to have a brief discussion on the Cobalt/Ion Air Bag non-deployment issue tomorrow as part of their bi-weekly Investigation Status Review and that they were both welcome to join for this discussion and that it may be helpful if at least one of them can. (V.R. at 119 n. 500).

        ii.     Schultz was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale.

X.    John Sprague was an Old GM Field Performance Assessment Engineer. His job was to support Old GM's products liability defense team. (V.R. at 9). According to Everest, in 2007, Sprague was asked by Schultz to compile information on Cobalt and Ion not-in-suit matters and lawsuits. (V.R. at 118).    Sprague investigated the June 2005 Non-Fatal Crash. (V.R. at 126). According to Everest, he also attended the May 2009 Continental Meeting. (V.R. at 134).

i.    After the meeting with Continental in May 2009, Sprague collected information regarding power mode status, added it to his spreadsheet, and discovered that the power mode status was recorded as Off or Accessory in a number of accidents. (V.R. 135)

ii.    Sprague was a Transferred Employee (as such term is defined in the Sale Agreement), after the 363 Sale. (*See, e.g.,* V.R. at 141).

Y.    Lisa Stacey was an Old GM Field Performance Assessment engineer. (V.R. at 132).  In late 2008 or early 2009, Old GM Field Performance Assessment engineers learned about a September 13, 2008 Cobalt crash in Stevensville, Michigan, which resulted in two deaths (the "**September 2008 Fatal Crash**").  After the September 2008 Fatal Crash was reported to an ESIS[10] employee, Old GM opened a "rumor file."  (V.R. at 132).  "Rumor files" were an informal tracking system by which ESIS investigators or other Old GM legal staff would start files on cases that were not formally involved in litigation but potentially could lead to litigation.  (V.R. at 122).   Rumor files were noted by some as being hard to track, difficult to access, and not easily searchable. Stacey reviewed the publicly available information, examined the vehicle, and visited the crash scene.  She thought that this was an incident where an airbag deployment would have been expected.  Old GM acquired the vehicle involved in the September

---

[10] ESIS acted as a claims administrator for Old GM and conducts field investigations and processes NISM claims. They maintained offices at Old GM and worked with Old GM's Legal Staff.

2008 Fatal Crash and provided the vehicle's Sensing Diagnostic Module to its supplier,

Continental, for further analysis. (V.R. at 132). Stacey also attended the May 2009 Continental

Meeting.

      i.    Stacey was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale.

      Z.    David Trush was the Old GM design engineer for the ignition cylinder and

key of the 2005 Chevrolet Cobalt. (Trush Dep. 11:1-3). In 2004, Trush first learned of a

concern that the Saturn Ion's key could move from the "Run" position to the "Accessory"

position after receiving a call from an Old GM employee. (Trush 20:11-16; 21:10-17). Trush

did not recall the specifics of the conversation.

      i.    At some point, Trush became aware of an incident occurring in the

Fall of 2004 involving a Chevrolet Cobalt in which, while driving the vehicle, the driver's knee

bumped the key in such a manner as to turn off the ignition. (Trush Dep. 32:22-33:9).

      ii.    Trush testified that, as of February 2009, he had feedback from the

Lordstown, Ohio, plant that assembled the Chevrolet Cobalt that, while installing the steering

column in a vehicle, the workers at the plant were inadvertently hitting the ignition key and

moving the key to different positions. (Trush Dep. 108:20-111:21).

      iii.    Trush was a Transferred Employee (as such term is defined in the

Sale Agreement), after the 363 Sale.

      AA.    Douglas Wachtel was a manager in Old GM's Product Investigations unit.

      i.    Wachtel was copied on the November 2006 Adler E-mail. (V.R. at

114). In his e-mail response to Adler, Wachtel reviewed existing field actions involving the

Cobalt and recommended that Old GM acquire Event Data Recorder data. (V.R. at 114 n.477).

Wachtel was sent an e-mail from an Old GM employee, Christopher Janik, that contained a summary of the two Cobalt frontal airbag non-deployment claims in the NHTSA database. (*Id.*).

ii.    In March-April 2007, Old GM's technical bulletin group proposed publishing a revised version of the December 2005 Service Bulletin that would change the subject line to include the word "stalls."   The proposed title was: "Information on Inadvertent Turning off of Key Cylinder, Loss of Electrical System, Hesitation, Stalls and No DTCs Set." (V.R. at 120).

iii.    On April 24, 2007, Wachtel (then Old GM Senior Manager – Internal Investigation, Product Investigations) provided his approval to add the word "stall" to the symptoms section of the bulletin.  Wachtel later forwarded this e-mail chain to Gay Kent.

iv.    Old GM had no record of publication of the 2007 Technical Service Bulletin. (*See, e.g.,* V.R. at 145).

v.    Kemp instructed Wachtel to open a 2011 Product Investigation into the ignition switch issue, and Wachtel assigned the investigation to Brian Stouffer.  (V.R. at 145)

vi.    During this investigation, Stouffer was given material regarding the 2005 Cobalt moving stall and quickly located the December 2005 Service Bulletin.  (V.R. at 145).

vii.    Wachtel was a Transferred Employee (as such term is defined on the Sale Agreement), after the 363 Sale.  (*See, e.g.,* V.R. at 145).

BB.    In February 2007, ESIS Claims Administrator Kristy Gibb received a copy of Wisconsin State Trooper Keith Young's "Collision Analysis & Reconstruction Report." (V.R. at 112).

29

CC.    In September 2006, Dykema Gossett, LLP, an Old GM outside law firm, sent to Old GM's legal staff a case evaluation regarding the July 2004 Fatal Crash. (V.R. at 112).

DD.    In May 2007, Hartline, Dacus, Berger & Dryer, LLP (**"Hartline Dacus"**) submitted to Old GM an evaluation of an airbag non-deployment crash involving the November 2004 Fatal Crash that said that Old GM's FPA engineer did not determine precisely how the vehicle lost power. (V.R. at 124-125). In January 2008, Hartline Dacus submitted its second evaluation of the November 2004 Fatal Crash to Old GM. (V.R. at 129-130).

EE.    The Captured Test Fleet was a group of early production cars driven by Old GM employees who were charged with identifying problems before launch. (V.R. at 58).

FF.    Captured Test Fleet reports were organized by the Old GM Quality Group and spreadsheets were sent to the chief engineer, the Program Engineering Manager, and the program team, and were discussed at weekly team meetings. (V.R. at 300).

15.    Old GM collected data from unspecified vehicles equipped with the OnStar Advanced Automated Crash Notification during the time period of May 2005-2006. (*See A Study of US Crash Statistics From Automated Crash Notification Data* by M.K. Verma, R.C. Lange and D.C. McGarry, General Motors Corp., ESV paper number 07-0058-0, available at *http://www-nrd.nhtsa.dot.gov/pdf/esv/esv20/07-0058-O.pdf*). During that time period, there were 1,045 recorded frontal crashes with frontal airbag deployment in the unspecified Advance Automated Crash Notification equipped vehicles. In addition, there were 356 cases of 'non-deployment' in unspecified Advanced Automated Crash Notification equipped vehicles where the predetermined thresholds for Advanced Automated Crash Notification in frontal impact were

reached or exceeded. The study does not indicate whether data was collected from any of the Subject Vehicles. (*Id.*).

16.     According to Bill Merrill (an Old GM Red X North America Manager whom Old GM Product Investigations engineer Brian Stouffer emailed to request assistance from the Red X team to examine changes on the Cobalt between 2007 and 2008 model years), at his March 18, 2014 interview – "if an [Old GM] employee tried to raise a safety issue five years ago, the employee would get pushback." (V.R. at 187, 252).

17.     Old GM employee Andrew Brenz or Alberto Manzor described a GM phenomenon of avoiding responsibility, as the "'GM Salute,' a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me." (V.R. at 255).

18.     New GM CEO Mary Barra "described a phenomenon known as the 'GM Nod.'" In one part of the Report, Barra described the nod as "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture." (V.R. at 256).   In another part of the Report, it is described as "when everyone nods in agreement to a proposed plan of action, but then leaves the room and does nothing." (V.R. at 2).

19.     Barra stated that problems occurred during a prior vehicle launch as a result of engineers being unwilling to identify issues out of concern that it would delay the launch. (V.R. at 252).

20.     Barra testified that a cost-benefit analysis on a safety issue or a safety defect is not acceptable. (Apr. 1 Cong. Hr'g, at 32).

21.   New GM informed NHTSA in July 2014 that, in 2003, GM learned of a customer complaint of intermittent vehicle shut offs in a MY 2003 Grand Am from a Michigan dealership. Despite multiple attempts, the dealership could not duplicate the condition.  GM's Brand Quality Manager for the Grand Am personally visited the dealership and requested that the customer demonstrate the problem. The customer had an excess key ring and mass (containing approximately 50 keys and a set of brass knuckles), and was able to recreate the shut off upon driving over a speed bump at approximately 30-35 mph.

22.   On January 7, 2003, GM opened Problem Resolution Tracking System 0084/2003. On May 22, 2003, GM issued a voicemail to dealerships describing the condition and identifying the relevant population of vehicles as 1999 through 2003 MY Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.  The notice directed dealers to pay attention to the key size and mass of the customer's key ring in order to better diagnose the customer's complaint. On July 24, 2003, Engineering Work Order (EWO) 211722 was initiated to increase the detent plunger force on the ignition switch replacing P/N 22688239 with P/N 22737173.  This was a running change made in 2004 to the Malibu, Grand Am and the Alero.  The production and service stock disposition for P/N 22688239 was designated "use," so it is possible that P/N 22688239 was used to service vehicles. New GM informed NHTSA in July 2014 that, on March 17, 2004, EWO 317693 was initiated to increase the detent plunger force on the ignition switch on the Grand Prix in order to maintain commonality between the Grand Prix and the Malibu, Grand Am and the Alero. The old Grand Prix part number, P/N10310896, was not changed to a new part number when the detent plunger force was changed, rather P/N 10310896 remained the part number for the new ignition switch. The service stock disposition was designated "use," so it is possible that the old switch was used to service vehicles.

32

23.     Chris Johnson was General Counsel of GM North America from October 15, 2001 until October 31, 2008.

24.     On September 1, 2006, Robert Osborne succeeded Thomas Gottschalk as Old GM's General Counsel and maintained that position until July 2009.

25.     Michael Robinson was General Counsel of GM North America from November 1, 2008 until September 30, 2009.

26.     From 2001 through early July 2009, the General Counsel of GM North America for Old GM reported to Old GM's General Counsel.

27.     Prior to the 363 Sale, Old GM initiated at least eight vehicle recalls in 2009 that were unrelated to the Ignition Switch Defect. *See* Recalls 09V036000; 09V073000; 09V080000; 09V116000; 09V153000; 09V154000; 09V155000; 09V172000.

61730333 v3-WorksiteUS-000002/3179

# Exhibit A

**EXHIBIT A**

**CERTAIN PLAINTIFFS' PROPOSED STIPULATIONS
OF FACT NOT AGREED TO BY NEW GM**

1.      On November 19, 2004, Old GM personnel opened a Problem Resolution

Tracking System report to address a complaint at a press event that a Subject Vehicle could be

"keyed off with knee while driving. This was the first of six reports opened between 2004 and

2009 in connection with moving stalls in the Cobalt." (V.R. at 63). As part of the November 19,

2004 Problem Resolution Tracking System investigation, Old GM engineers suggested solutions

to address the complaint that the ignition could be "keyed off with knee while driving," and

presented them to the Current Production Improvement Team. (V.R. at 64-68).

2.      As Old GM's Program Engineering Manager for the Chevrolet Cobalt when it

was launched, Gary Altman would have been present at Current Production Improvement Team

and Vehicle and Process Integration Review meetings in which possible solutions were presented

to address reports that drivers had inadvertently turned off the ignition switch in Cobalt vehicles

by hitting their knees against the key or key fob. (V.R. at 63-67).

3.      A May 2007 case evaluation, by Old GM's outside counsel, of an accident in a

2004 Saturn Ion in which the airbag failed to deploy despite the fact that the vehicle went off the

road, traveled through a brush line and struck a tree head on, resulting in one fatality and one

severe injury, was deemed "unusual." "In discussing the technical issues in the case, outside

counsel explained that, given the severity of the impact, the airbag non-deployment 'must be'

attributable to power loss." (V.R. at 124-125).

4.      A January 2008 second evaluation by Old GM outside counsel of a non-

deployment case involving a Subject Vehicle hitting a tree concluded that "[t]he impact with the

tree was clearly severe enough to warrant deployment of the vehicle's airbags. As a result, from

a technical standpoint, there is a potential problem with the non-deployment, which was

originally attributed to a pre-collision power loss." While outside counsel and Old GM Field

Performance Assessment Engineer Manuel Peace thought the non-deployment event was not

caused by a power loss, outside counsel concluded that "it was likely 'that a jury will find that

the vehicle was defective' [and] GM eventually settled the case in 2008." (V.R. at 129-30).

5.    In March 2009, Old GM CEO Rick Wagoner had a "back-up" slide of a slide deck

that included a reference to the Cobalt's inadvertent shut-off issue, that was presented at a

meeting of the Vehicle Program Review team. That slide, in a 72-page slide presentation,

described a proposed change in the Cobalt's key design from a slot to a hole. The slide deck was

found in the data collected from Wagoner's computer from March 2009. (V.R. at 245).

6.    In furtherance of Old GM's admitted culture of avoiding responsibility, an Old

GM 2008 Q1 Interior Technical Learning Symposium presentation provided examples of

comments and phrases employees should avoid using in reports:

i.    "This is a lawsuit waiting to happen . . ." ; "Unbelievable Engineering

screw up . . ."; "This is a safety and security issue . . ."; "Scary for the customer . . ."; "Kids

and wife panicking over the situation . . . "; "I believe the wheels are too soft and weak and could

cause serious problems. . ."; "Dangerous . . . almost cause accident."

ii.    The presentation also stated that documents used for reports and

presentations should only concern engineering results, facts, and judgments. Some examples of

words or phrases that are to be avoided are: *always* (emphasis in original), annihilate,

apocalyptic, bad, Band-Aid, big time, brakes like an "X" car, cataclysmic, catastrophic,

Challenger, chaotic, Cobain, condemns, Corvair-like, crippling, critical, dangerous, deathtrap,

debilitating, decapitating, *defect* (emphasis in original), defective, detonate, disemboweling, enfeebling, evil, eviscerated, explode, failed, failure, flawed, genocide, ghastly, grenadelike, grisly, gruesome, Hindenburg, Hobbling, Horrific, impaling, inferno, Kevorkianesque, lacerating, life-threatening, maiming, malicious, mangling, maniacal, mutilating, *never* (emphasis in original), potentially-disfiguring, powder keg, problem, rolling sarcophagus (tomb or coffin), safety, safety related, serious, spontaneous combustion, startling, suffocating, suicidal, terrifying, Titanic, tomblike, unstable, widow-maker, words or phrases with biblical connotation, you're toast.

7.    "In addition to being trained on how to write, a number of GM employees reported that they did not take notes at all critical safety meetings because they believed GM lawyers did not want such notes taken." (V.R. at 254).

8.    Between the years 2003 and 2012, consumers raised 133 warranty claims with GM dealers about 2003-2007 Ion vehicles, 2005-2007 Cobalt vehicles, 2006-2007 HHR vehicles, a 2006 Solstice, and two 2007 G5 vehicles, that unexpectedly stalled or turned off when going over bumps or when the key was struck.  (Supplemental Memorandum, dated April 1, 2014, U.S. House of Representatives Committee on Energy and Commerce Democratic Staff, at 1-2, which can be found at:

http://democrats.energycommerce.house.gov/sites/default/files/documents/Supplemental-Memo-GM-Warranty-Claims-2014-4-1.pdf.