# Exhibit C

## Groman Plaintiffs' Disputed Stipulated Facts

1. From at least 2001 through early July 2009, the Old GM "lawyers in charge of safety issues ... reported to the General Counsel of GM North America." (V.R. at 104).

2. From at least 2001 through early July 2009, the Old GM "lawyers in charge of product liability litigation reported to the General Counsel of GM North America." (V.R. at 104).

3. During his employment, William Kemp reported to the General Counsel of GM North America. (V.R. at 104).

4. During his employment, Larry Buonomo reported to the General Counsel of GM North America. (V.R. at 104).

5. As of the date of the filing of Old GM's bankruptcy case, Michael Robinson was aware of and possessed information that drivers of Subject Vehicles had experienced moving stalls while driving Subject Vehicles.

6. As of the date of the filing of Old GM's bankruptcy case, Michael Robinson was aware of and possessed information that some or all of the moving stalls were related to a defective Ignition Switch.

7. Before commencement of Old GM's bankruptcy case, William Kemp provided information about moving stalls experienced in Subject Vehicles to Chris Johnson.

8. Before commencement of Old GM's bankruptcy case, William Kemp provided information about moving stalls experienced in Subject Vehicles to Michael Robinson.

9. Before commencement of Old GM's bankruptcy case, William Kemp provided information about the defective Ignition Switches to Chris Johnson.

10. Before commencement of Old GM's bankruptcy case, William Kemp provided information about the defective Ignition Switches to Michael Robinson.

11. Before commencement of Old GM's bankruptcy case, Larry Buonomo was an Old GM lawyer in charge of product liability litigation.

12. Before commencement of Old GM's bankruptcy case, Larry Buonomo provided information about moving stalls experienced in Subject Vehicles to Chris Johnson.

13. Before commencement of Old GM's bankruptcy case, Larry Buonomo provided information about moving stalls experienced in Subject Vehicles to Michael Robinson.

14. Before commencement of Old GM's bankruptcy case, Larry Buonomo provided information about the defective Ignition Switches to Chris Johnson.

1

2073812.2

15. Before commencement of Old GM's bankruptcy case, Larry Buonomo provided information about the defective Ignition Switches to Michael Robinson.

16. Before commencement of Old GM's bankruptcy case, Chris Johnson provided information about moving stalls experienced in Subject Vehicles to Robert Osborne.

17. Before commencement of Old GM's bankruptcy case, Chris Johnson provided information about moving stalls experienced in Subject Vehicles to Thomas Gottschalk.

18. Before commencement of Old GM's bankruptcy case, Chris Johnson provided information about the defective Ignition Switches to Robert Osborne.

19. Before commencement of Old GM's bankruptcy case, Chris Johnson provided information about the defective Ignition Switches to Thomas Gottschalk.

20. Before commencement of Old GM's bankruptcy case, Michael Robinson provided information about moving stalls experienced in Subject Vehicles to Robert Osborne.

21. Before commencement of Old GM's bankruptcy case, Michael Robinson provided information about the defective Ignition Switches to Robert Osborne.

22. During the pendency of Old GM's bankruptcy case, Robert Osborne provided information about moving stalls experienced in Subject Vehicles to Michael Millikin.

23. During the pendency of Old GM's bankruptcy case, Robert Osborne provided information about the defective Ignition Switches to Michael Millikin.

24. The Delphi Settlement's reference to the phrase "ignition switch failure" is the defective Ignition Switch.

25. Larry Buonomo was involved in or participated in some manner in the Delphi Settlement.

26. Larry Buonomo received information that the phrase "ignition switch failure," which is mentioned on the chart attached to the Delphi Settlement, refers or relates to the defective Ignition Switch.

27. Larry Buonomo provided information regarding the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement to Chris Johnson.

28. William Kemp was involved in or participated in some manner in the Delphi Settlement.

29. William Kemp received information that the phrase "ignition switch failure," which is mentioned on the chart attached to the Delphi Settlement, refers or relates to the defective Ignition Switch.

2

30. William Kemp provided information regarding the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement to Chris Johnson.

31. Chris Johnson was involved in or participated in some manner in the Delphi Settlement.

32. Chris Johnson received information that the phrase "ignition switch failure," which is mentioned on the chart attached to the Delphi Settlement, refers or relates to the defective Ignition Switch.

33. Chris Johnson provided information regarding the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement to Robert Osborne.

34. Robert Osborne was involved in or participated in some manner in the Delphi Settlement.

35. Robert Osborne received information that the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement refers or relates to the defective Ignition Switch.

36. Robert Osborne provided information regarding the "ignition switch failure" mentioned on the chart attached to the Delphi Settlement to Frederick "Fritz" Henderson.

37. Frederick "Fritz" Henderson was involved in or participated in some manner in the Delphi Settlement.

38. Frederick "Fritz" Henderson received information that the phrase "ignition switch failure," which is mentioned on the chart attached to the Delphi Settlement, refers or relates to the defective Ignition Switch.

39. Before commencement of Old GM's bankruptcy case, the following Old GM officers, managers, or employees (among others named) were aware of the defective Ignition Switch:

    (a)    Rick Wagoner;
    (b)    Thomas G. Stephens;
    (c)    John Calabrese;
    (d)    Alicia Boler-Davis;
    (e)    Jim Frederico;
    (f)    Terry Woychowski;
    (g)    Each GM employee fired by New GM in connection with the subject matter of the Valukas Report.

40. Before commencement of Old GM's bankruptcy case, the following Old GM officers, managers, or employees (among others named) were aware of the liabilities or potential legal exposure to Old GM arising from or related to the defective Ignition Switch:

    (a)    Rick Wagoner;
    (b)    Thomas G. Stephens;

3

    (c)    John Calabrese;
    (d)    Alicia Boler-Davis;
    (e)    Jim Frederico;
    (f)    Terry Woychowski;
    (g)    Each GM employee fired by New GM in connection with the subject matter of the Valukas Report.

41. Both Old GM and New GM implemented internal controls and compliance procedures designed to ensure compliance with the reporting and other legal requirements of the Safety Act and TREAD Act.

42. Senior compliance officers at Old GM had final authority to report safety issues to NHTSA.

43. Old GM's senior compliance officers were senior executives within various departments of Old GM, including the general counsel's office.

44. Before entry of the Sale Order, Old GM disclosed the defective Ignition Switch or related potential claims to the U.S. Government.

45. Before entry of the Sale Order, Old GM did not disclose the defective Ignition Switch or related potential claims to the U.S. Government.

46. Before entry of the Sale Order, Old GM and the U.S. Government had discussions or other communications concerning whether potential claims arising from the defective Ignition Switch should be retained liabilities of Old GM or assumed liabilities of New GM.

47. Before entry of the Sale Order, Old GM and the U.S. Government had no discussions or other communications concerning whether potential claims arising from the defective Ignition Switch should be retained liabilities of Old GM or assumed liabilities of New GM.

48. Before entry of the Sale Order, Old GM and the U.S. Government reached no agreement concerning whether potential claims arising from the defective Ignition Switch should be retained liabilities of Old GM.

49. Prior to the commencement of Old GM's bankruptcy case, Old GM employees who participated in a Company Vehicle Evaluation Program ("**CVEP**") with respect to the Subject Vehicles submitted incident reports to Old GM that reflected that the Old GM employees experienced moving stalls and/or accidents where the keys moved into the 'Accessory' or 'Off' position.

50. Prior to the commencement of Old GM's bankruptcy case, Old GM employees who participated in a CVEP with respect to the Subject Vehicles submitted incident reports to Old GM that reflected that the airbags did not deploy in frontal collisions.

4

2073812.2

51. Prior to the commencement of Old GM's bankruptcy case, Old GM received warranty reports from dealers concerning Subject Vehicles in the CVEP that that the driver experienced moving stalls and/or accidents where the keys moved into the 'Accessory' or 'Off' position.

52. Prior to the commencement of Old GM's bankruptcy case, Old GM received warranty reports from dealers concerning Subject Vehicles in the CVEP that that the driver experienced a frontal collision where the airbag did not deploy.

53. NHTSA sent nineteen "death inquiries" to GM regarding crashes of Subject Vehicles. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

54. A "death inquiry" that an automaker receives from NHTSA requests further information regarding data reported by the automaker in an EWR. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

55. NHTSA sent "death inquiries" to GM regarding the fatal crashes of Benjamin Hair and Amy Kosilla, who each were driving Subject Vehicles. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

56. In response to these "death inquiries," GM did not explain to NHTSA the cause of the crashes. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

57. At the time of those death inquiries, GM was aware that the accident at issue involved a moving stall and airbag non-deployment.

58. In connection with NHTSA's death inquiry for the 2006 Wisconsin Fatal Crash, GM told NHTSA that it did not have sufficient reliable information to accurately assess the cause of the incident. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

59. At the time of the death inquiry for the 2006 Wisconsin Fatal Crash, GM was aware that the accident at issue involved a moving stall and airbag non-deployment.

60. In connection with NHTSA's death inquiry of a 2009 crash of an Subject Vehicle in Tennessee, GM told NHTSA that it had not looked into the circumstances of the crash. Ruiz, Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

61. At the time GM told NHTSA that it had not looked into the circumstances of the 2009 crash in Tennessee, GM had already in fact conducted a review of that crash. Ruiz,

5

    Rebecca R. and Ivory, Danielle, *Documents Show General Motors Kept Silent on Fatal Crashes*, New York Times, July 15, 2014.

62. At the time of the death inquiry for the 2009 crash in Tennessee, GM was aware that the accident at issue involved a moving stall and airbag non-deployment.

63. In each of the six lawsuits involving non-deployment of airbags in Subject Vehicles prior to commencement of Old GM's bankruptcy case, Old GM's legal department was aware that accident related to a moving stall.

64. At all times between 2000 through commencement of Old GM's bankruptcy case, Old GM submitted Early Warning Reports ("**EWR**") to NHTSA pursuant to 49 CFR § 579.21(b)(1).

65. According to EWRs submitted to NHTSA before commencement of Old GM's bankruptcy case, Old GM had received information about at least 503 accidents in which it was alleged or proved that the death or injury reported in the EWR was caused by a possible defect in Subject Vehicles.

66. These accidents reported in Old GM's EWRs before commencement of Old GM's bankruptcy case include at least:

    a.    317 claims relating to a Chevrolet Cobalt;
    b.    98 claims relating to a Saturn Ion;
    c.    54 claims relating to a Chevrolet HHR;
    d.    19 claims relating to a Pontiac Solstice;
    e.    10 claims relating to a Pontiac G5; and
    f.    5 claims relating to a Saturn Sky.

67. Before commencement of Old GM's bankruptcy case, the EWR data was accessible by Old GM.

68. Old GM did not disclose to the Bankruptcy Court any of, or only a few of, the 503 or more accidents identified in the EWR data referenced in paragraph 66 hereof or any claims arising therefrom.

69. Subsequent to the 363 Sale, New GM submitted EWRs to NHTSA concerning Subject Vehicles.

70. Had Old GM conducted a recall of the Subject Vehicles before commencement of Old GM's bankruptcy case, the recall would have cost Old GM several hundred million dollars or more [or, alternatively, $_____. (NOTE: GM to suggest amount)].

71. At some point between 2007 and the commencement of Old GM's bankruptcy case, John Sprague hypothesized that the defective Ignition Switch caused the airbag non-deployments in some or all of the Subject Vehicles. (V.R. at 9)

6

72. Raymond DeGiorgio was granted authority under Old GM's chain of authority and/or policies and procedures to approve a change to the ignition switch. (V.R. at 101).

73. At all times between 2001 and 2008, under Old GM's chain of authority and/or policies and procedures, Raymond DeGiorgio was authorized to approve or disapprove the inclusion and use of an ignition switch in a new vehicle. (V.R. at 101).

74. When the ignition switch is turned to Accessory or Off, a Subject Vehicle would lose power brakes. (V.R. at 25).

75. In 2003, Old GM became aware of Saturn customer complaints about intermittent engine stalls while driving. (V.R. at 54).

76. In October 2003, a Field Performance Report, 3101/2003/US, lists 65 Ion stalls and states: "Customers comment of intermittent stall while driving. In most cases, there are no trouble codes associated with the stall." This Field Performance Report lists a vehicle with 15 miles as the youngest vehicle affected. (V.R. at 54-55).

77. Before 2008, a handful of Old GM engineers other than Raymond DeGiorgio also received information describing the change to the Ignition Switch for the model year 2008 Chevrolet Cobalt, including four engineers who received a June 30, 2006 email from Delphi to DeGiorgio stating that the detent plunger had been changed "to increase torque forces to be within specification." (V.R. at 102).

78. When first told of the defective Ignition Switch in or about March 2005, Steven Oakley formed the view that the defective Ignition Switch was a safety issue. (V.R. at 76).

79. In or about November 15, 2004, one individual was killed and another was severely injured in a crash involving a 2004 Saturn Ion where the airbags did not deploy. (V.R. at 124). Manuel Peace, an Old GM engineer who assisted Old GM's legal department in evaluating cases, did a case evaluation for this incident. (V.R. at 124). In his case evaluation, Peace stated he had never seen a situation like this where the airbags did not deploy, and that the best explanation for why the airbags did not deploy was that the vehicle lost power. (V.R. at 125)

80. At some point between 2007 and the commencement of Old GM's bankruptcy case, John Sprague and the Field Performance Assessment team observed a pattern of airbag non-deployments in Cobalts and Ions. (V.R. at 9, 118-19, 134).

81. At the time John Sprague and Brian Everest met with Continental, Sprague and Everest knew that the rotation of the ignition switch from Run to Accessory or Off could cause the Sensing and Diagnostic Module to receive a power mode message of Accessory or Off. (V.R. at 135).

82. At or about the time of the meeting with Continental in May 2009, Brian Everest and John Sprague had spoken with members of Old GM's Product Investigations group about the non-deployment of airbags in Cobalts. (V.R. at 135).

83. Joseph Taylor, an Old GM Program Quality Manager who administered the Captured Test Fleet program for the Chevrolet Cobalt drove a 2005 Cobalt test vehicle and personally experienced moving stalls with the Cobalt. (V.R. at 58).

8