# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| JACKIE ROLLINS, EARL GOLSTON, and MARY GREENE, individually and on behalf of all similarly situated persons, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **FOR INJUNCTIVE RELIEF, EQUITABLE RELIEF, AND DAMAGES** |
| GENERAL MOTORS, LLC; and DELPHI AUTOMOTIVE, PLC, | **JURY DEMANDED** |
| Defendant | Related to MDL No. 2543 |

Plaintiffs Jackie Rollins, Earl Golston, and Mary Greene, individually and on behalf of all similarly situated persons (collectively termed "Plaintiffs") bring this action against Defendants General Motors, LLC ("GM" or "New GM") and Delphi Automotive, PLC ("Delphi") (collectively termed "Defendants") and alleges as follows:

## I.    NATURE OF THE CASE

1.    This case arises from GM's active concealment, for over a decade, of its knowledge of a dangerously defective ignition switch installed at least 8.2 million GM vehicles. Specifically, as a result of having a defective ignition switch, the vehicles at issue are at risk of shutting down during normal driving conditions

2:14-cv-19051-RMS-RSW    Doc # 1-4    Filed 08/08/14    Pg 4 of 54    Pg ID 42

– shutting down the engine and losing power to major electrical systems responsible for critical safety features such as airbags, power steering, and antilock brakes – thus creating an extreme and unreasonable risk of accident, serious bodily harm, and death.

2.     The vehicles at issue ("Defective Vehicles") include the following make and model years:

- Cadillac CTS (2003-14 model years);

- Cadillac SRX (2004-06 model years);

- Chevrolet Cobalt (2005-2010 model years);

- Chevrolet HHR (2006-2011 model years);

- Chevrolet Impala (2000-05 model years);

- Chevrolet Malibu (1997-2005 model years);

- Chevrolet Monte Carlo (2000-05 model years);

- Oldsmobile Intrigue (1998-2002 model years);

- Oldsmobile Alero (1999-2004 model years);

- Pontiac G5 (2006-2007 model years);

- Pontiac Grand Am (1999-2005 model years);

- Pontiac Grand Prix (2004-08 model years);

- Pontiac Solstice (2006-2010 model years);

- Saturn Ion (2003-2007 model years); and

- Saturn Sky (2007-2010 model years).

3.     Other models may be affected by this defect, but are currently unknown to the public. Plaintiffs reserve the right to supplement this Complaint to include additional vehicle models which were manufactured with the defective ignition switch.

4.     It has come to light that GM knew of the defective ignition switch as early as 2001, before the switches was placed into production, but continued to market and sell the vehicles with this defect. Reports have surfaced that the GM engineer charged with designing the defective ignition switch, Ray DeGiorgio, referred to it as the "switch from hell." Despite ignition switch failure to meet GM's specifications, DeGiorgio approved the switch for production, despite its failure to meet GM's specifications.

5.     Almost immediately after the switch was installed into the Saturn Ion, the first car equipped with the defective switch, GM started getting complaints of unexpected stalling from drivers. These complaints only increased as the switch was installed on more GM models. However, even as the chorus of complaints increase, GM willful ignored the problem as annoying but not particularly problematic – definitely not a safety issue. GM reasoned that drivers could still

wrestle their vehicles to the side of the road, if they did stall, despite the fact that the ignition switch defect disabled both the power-assisted steering and airbags.

6.     As a result, rather than replacing the defective ignition switch, or notifying the National Highway Traffic Safety Administration ("NHTSA") or the public of this danger, GM made a "business" decision to conceal the defects. When Defendants eventually began manufacturing vehicles with a corrected part, they used the same part number to avoid notice of or questions regarding the change.

7.     It was only after at least thirteen deaths, and mounting public criticism that GM finally admitted there was a problem. However, even after GM was confronted with conclusive proof of the defective nature of the ignition switch, GM waited several months to recall the effected vehicles and did so in a piece-meal fashion.

8.     Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, along with its accompanying regulations, a manufacturer must promptly disclose any safety defects as soon as they are known. 49 U.S.C. § 30118(c)(1) & (2). If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect promptly. 49 U.S.C. § 30118(b)(2)(A) & (B).

9.      GM violated the TREAD Act by failing to timely inform NHTSA of the Ignition Switch Defect and allowed cars to remain on the road that were inherently dangerous. GM's violations of the TREAD Act also constitute violations of various state consumer protection laws. In addition to the TREAD Act, GM breached its implied warranties and fraudulently concealed the deadly ignition switch defect from consumers, owners, and lessees of the Defective Vehicles.

10.     Plaintiffs and the Class have been damaged by Defendant's misrepresentations, concealment and non-disclosure of the Ignition Switch Defect in the Subject Vehicles, as they are now in possession of dangerous vehicles the value of which has greatly diminished because of GM's failure to timely disclose the serious defect. Plaintiffs now bring this class action to seek redress for these injuries.

## II.   **PARTIES**

11.     Plaintiff JACKIE ROLLINS is a Texas citizen and resides in Texarkana, Texas. Ms. Rollins owns a 2006 Saturn Ion which was purchased at Cross Landers and is subject to the recall at issue. Ms. Rollins' Saturn Ion was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Ms. Rollins purchased her GM vehicle primarily for her personal, family, and

household use. Ms. Rollins has experienced several incidents consistent with the ignition defects at issue.

12.    Plaintiff EARL GOLSTON is an Arkansas citizen and resides in Nashville, Arkansas. Mr. Golston owns a 2007 Saturn Ion which was purchased at Orr Chevrolet and is subject to the recall at issue. Mr. Golston's Saturn Ion was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Mr. Golston purchased his GM vehicle primarily for his personal, family, and household use. Mr. Golston has experienced several incidents consistent with the ignition defects at issue.

13.    Plaintiff MARY GREEN is an Arkansas citizen and resides in Ogden, Arkansas. Ms. Green owns a 2006 Chevrolet HHR which was purchased at Ashdown Chevrolet and is subject to the recall at issue. Ms. Green's Chevrolet HHR was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Ms. Green purchased her GM vehicle primarily for her personal, family, and household use.

14.    Defendant GENERAL MOTORS LLC ("GM" or "New GM") is a Delaware corporation with its headquarters in Detroit, Michigan. During the relevant time period, GM manufactured, marketed and sold motor vehicles under

the brands Chevrolet, GMC, Cadillac, Saturn, Pontiac and Hummer. GENERAL

MOTORS LLC is the successor in interest to the General Motors Corporation.

15.    General Motors Corporation ("Old GM") was a Delaware corporation

with its headquarters in Detroit, Michigan. General Motors LLC is registered with

the Secretary of State and conducts business in all fifty states (including the

District of Columbia). GM was incorporated in 2009 and on July 10, 2009,

acquired substantially all assets and assumed certain liabilities of General Motors

Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy

Code.

16.    In 2009, Old GM filed for bankruptcy, and substantially all of its

assets were sold pursuant to a Master Sales and Purchase Agreement

("Agreement") to New GM. Under the Agreement, New GM also expressly

assumed certain liabilities of Old GM, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the
> certification, reporting and recall requirements of the National Traffic
> and Motor Vehicle Safety Act, the Transportation Recall
> Enhancement, Accountability and Documentation Act, the Clean Air
> Act, the California Health and Safety Code and similar Laws, in each
> case, to the extent applicable in respect of vehicles and vehicle parts
> manufactured or distributed by Seller.

In addition, New GM expressly set forth that it:

> shall be responsible for the administration, management and payment
> of all Liabilities arising under (i) express written warranties of Sellers

7

2:14-cv-19051-RHC-RSW   Doc # 1-4   Filed 08/08/14   Pg 14 of 47   Pg ID 8

[General Motors Corporation] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

17.    Because New GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition defects at issue in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

18.    Defendant DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC ("Delphi") is a corporation with its headquarters in Troy, Michigan. Delphi began as a wholly-owned subsidiary of Old GM, until it was launched as an independent publicly-held corporation in 1999.

19.    In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi plants to assist with its post-bankruptcy restructuring. In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

20.    At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

## III.    VENUE AND JURISDICTION

21.    This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

22.    Venue is proper in this District under 28 U.S.C. § 1391 because GM conducts substantial business in this District, has a principal place of business in this District, has caused harm to Class members residing in this District, and because, as a corporation, GM is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## IV.    STATEMENT OF FACTS

### a.    The Ignition Switch Defect

23.    The ignition switch on most vehicles has several positions which allows the driver to select the vehicle's mode of operation by turning a key. Most vehicles' ignition switches have several common positions, including "run" (or

2:14-cv-13051-RHC-RSW   Doc # 1-4   filed 08/06/14   Pg 14 of 54   Pg ID 20

"on"), "off," and "acc" (or "accessory"). At the "run" position, the vehicle's engine is running and the electrical systems are fully activated to allow normal vehicle operation; at the "accessories" position, the engine is turned off, however electrical power is generally supplied to the vehicle's lighting, displays, and entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles, a driver must intentionally turn the key in the ignition to move to these various positions.

24.    GM began installing the Delphi-manufactured ignition switches beginning in its 2002 vehicle models. Upon information and belief, both GM and Delphi knew these ignition switches were defectively designed, and did not meet GM's specifications, but nonetheless were continued to be manufactured and installed in GM vehicles, including the Defective Vehicles.

25.    The portion of the ignition switch at issue is a relatively small and inexpensive part, as can be seen in the photographs take by McSwain Engineering, Inc., below:



Exemplar Chevrolet Cobalt Switch Detent Plungers

Upon information and belief, in the recalled vehicles, the spring on the detent plunger was both too short and too weak. Accordingly, the spring did not create enough tension to hold the key in position; thus, very little force was required to turn the ignition key.

26.    Because of its inherent design, the ignition switches installed in the Defective Vehicles are unable to hold the vehicle's key in the "on" or "run" position. As such, normal forces associated with driving the vehicle and/or the weight of the objects on any attached key ring could turn the ignition to the "off" or "acc" position (the "Ignition Switch Defect"). Also compounding this problem is the fact that the ignition module is located in an area where the driver could often bump or jar any attached key ring, further causing the ignition to shift positions. When this ignition is shifted to the "off" or "acc" position, the engine

11

and certain electrical components, such as the power-assisted steering and anti-lock brakes, are turned off, thereby endangering the vehicle occupants.

27.     Given the importance that a vehicle and its electrical operating systems remain operational during ordinary driving conditions, it is imperative that a vehicle manufacturer ensure that its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle. With respect to the Defective Vehicles, Defendants have failed to do so.

28.     Here, the Ignition Switch Defect can occur at any time during normal and proper operation of the Defective Vehicles, meaning the ignition can suddenly switch off while it is moving at freeway speeds, leaving the driver unable to control the vehicle, and vulnerable to have an accident with a nonfunctioning safety airbag system. Additionally, some drivers have experienced difficulty turning the key back to the desired position after experiencing the Ignition Switch Defect, thus preventing them from quickly correcting the problem.

29.     The Defective Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

30.     GM has acknowledged that the Ignition Switch Defect has caused at least thirteen (13) deaths and forty-seven (47) accidents. GM has refused, however, to disclose the identities of those it counts among these thirteen (13) deaths. Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Defective Vehicle models alone. The actual number of deaths for all Defective Vehicle models is expected to be much higher.

### b.     GM Knew of the Defective Ignition Switches but Failed to Act

31.     Upon information and belief, prior to the sale of the Defective Vehicles, Defendants knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to GM, collected by the NHTSA's Office of Defect Investigation and/or posted on public online vehicle owner forums, field testing done in response to those complaints, aggregate data from GM dealers, and accident data.

32.     Indeed, according to a memorandum released by Congress, a 2001 pre-production report for the 2003 Saturn Ion identified issues with the ignition switch. In a section entitled "Root Cause Summary," the report stated that the "two causes of failure" were "[l]ow contact force and low detent plunger force." The

report stated that a design change would resolve the problem, however no action was taken.

33.     GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power. GM engineers were able to replicate this problem during test drives of the Cobalt. According to GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions; however, after considering lead time required, cost, and effectiveness, GM decided to do nothing.

34.     After the Chevrolet Cobalt entered the market, GM began receiving complaints about incidents of sudden loss of engine power. GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently."  Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the

ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

35.     Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition. See below.



36.     Although GM initially approved the design, the company once again declined to act. GM CEO Mary Barra explained in her April 1, 2014 testimony before the House Committee on Energy and Commerce that the proposed "fixes" for the Ignition Switch Defect were rejected in 2005 because it would have taken too long and cost too much. Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

37.     In April 2006, GM approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier, Delphi. According to GM,

15

the changes included a new detent plunger and spring. GM estimates that Delphi began producing the redesigned ignition switch for all Defective Vehicles during the 2007 model year.

38.     Defendants assigned its newly designed switch the same part number assigned to the faulty ignition switch. Upon information and belief, Decedents' action was intended to make it difficult to trace the defective switch back to its original design in 2001.

39.     After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design – as had been suggested in 2005. GM instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

40.     GM now acknowledges that Field Product Reports and PRTS reports related to the Defective Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Ignition Switch Defect.

41.     In May 2009, GM engineers again concluded that millions of cars that GM sold had this serious safety defect. In the months and years that followed, as

the internal documents and studies increasingly confirmed the safety problems, GM hid that information, but finally publicly disclosed the existence of those safety problems in February 2014.

42.    GM's CEO Mary Barra recently admitted that: "Something went wrong with our process in this instance, and terrible things happened." In Ms. Barra written opening remarks before Congress on April 1, 2014, she further acknowledged GM's delay: "Sitting here today, I cannot tell you why it took years for a safety defect to be announced in that program, but I can tell you that we will find out."

43.    Despite all its prior knowledge of the Ignition Switch Defect, GM failed to disclose the defect but instead actively concealed it from Plaintiffs and members of the Class and the public, and continued to market and advertise the Defective Vehicles as reliable and safe. GM's egregious deceit lasted the better part of a decade, continuing installation of these defective ignition switch systems in models from 2002 through at least 2010. Even when GM eventually fixed the problem, it further attempted to hide the defect by assigning the same part number to the corrected part, making it much harder for customers to identify and fix the Ignition Switch Defect.

###### c.    GM's Belated Repair Recall of Some Vehicles

44.    On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall 2005 to 2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles. The notice stated that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Ignition Switch Defect could occur under normal driving conditions, even when the key ring is not carrying added weight. The notice also did not identify all the vehicles affected by the Ignition Switch Defect.

45.    The notice failed to indicate the full extent to which GM had been aware of the defect. The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

46.    In a February 24, 2014 letter to the NHTSA, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that

2:14-cv-13051-RHC-RSW    Doc # 1-4    Filed 08/06/14    Pg 19 of 47    Pg ID 19

GM first learned of the Ignition Switch Defect during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

47.     On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Ignition Switch Defect. Specifically, GM identified the 2003 to 2007 model years of the Saturn Ion, 2006 and 2007 model years of the Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007 model year of Saturn Sky vehicles.

48.     According to the NHTSA Acting Administrator David Friedman, the chronology information provided by GM on February 24, 2014 "raise[d] serious questions as to the timeliness of GM's recall." Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

49.     On March 4, 2014, the NHTSA issued GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information to "evaluate the timing of GM's defective decision-making and reporting of the safety defect to NHTSA."

50.     On March 11, 2014, GM filed a new Part 573 report superseding its February 24, 2014 filing. The new chronology provided with the report indicated that GM was aware of the Ignition Switch Defect in 2001—significantly earlier than its previous 2004 disclosure. GM now indicated that it had a report from 2001

that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

51.     On March 28, 2014, GM filed a new Part 573 report, which expanded the recall set forth in its February 25, 2014 filing. GM's March 28 report indicated that several additional model year vehicles may be affected by the Ignition Switch Defect. GM identified those vehicles as the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac Solstice, 2008-2010 Pontiac G5, and 2008-2010 Saturn Sky. The March 28 report added over one million vehicles to the total number affected by the Ignition Switch Defect.

52.     GM notified dealers of the recall of the Defective Vehicles in February and March 2014. GM also notified owners of the recall of the Defective Vehicles by letter. The letter minimized the risk of the defect, indicating that the Ignition Switch Defect would occur only "under certain conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions." Despite the recall, many owners of the Defective Vehicles are still waiting for the parts required to safely operate their vehicles. According, these individuals are often left without a suitable and safe method of transport.

53.    As a result of GM's alleged misconduct, Plaintiffs and the Class were harmed and suffered actual damages in that the Defective Vehicles are unsafe, unfit for their ordinary and intended use, and have manifested, or are at unreasonable risk of manifesting, the Ignition Switch Defect by way of a sudden and dangerous failure that puts them and others at serious risk of injury or death. Drivers and owners of the Defective Vehicles, including Plaintiff, did not receive the benefit of their bargain as purchasers and/or lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Drivers and owners of the Defective Vehicles, including Plaintiffs, did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided, as GM knew but did not disclose, through the use of non-defective ignition parts. Plaintiffs and the Class paid more for the Subject Vehicles than they would have had they known of the Ignition Switch Defect or they would not have purchased the Defective Vehicles at all.

21

## V.    SUCCESSOR LIABILITY

54.    As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure and concealment of the Ignition Switch Defect from the date of its formation on July 10, 2009.

55.    New GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM. Additionally, New GM has admitted that it knew of the Ignition Switch Defect from the very date of its formation; New GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM; New GM retained the bulk of the employees of Old GM; New GM acquired, owned, and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property; New GM acquired the contracts, books, and records of Old GM; and New GM acquired all goodwill and other intangible personal property of Old GM.

## VI.    TOLLING OF THE STATUTES OF LIMITATION.

56.    All applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein. Plaintiffs and Class members did not discover - and were not aware of material

22

facts that would have caused a reasonable person to suspect - that Old GM and New GM had information in their possession about the existence and dangerousness of the ignition switches in the Defective Vehicles and that they affirmatively concealed that information until shortly before this class action Complaint was filed.

57.     Because of the active concealment by Defendants, any and all limitations periods otherwise applicable to the claims of Plaintiffs and members of the Class have been tolled.

## VII.   CLASS ACTION ALLEGATIONS

58.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) and 23(b)(3) for the following Class of persons:

> All persons in the United States who currently own or lease one or more of the following GM vehicles: 2005-2010 model year Chevrolet Cobalt; 2006-2010 model year Pontiac Solstice; 2007-2010 model year Pontiac G5; 2007-2010 model year Saturn Sky; 2006-2011 model year Chevrolet HHR; and 2003- 2007 model year Saturn Ion.

59.     This list will be supplemented to include other GM vehicles that have the Ignition Switch Defect, which inadvertently turns off the engine and vehicle electrical systems during ordinary driving conditions.

60.     Plaintiffs also bring this action on behalf of the following State Subclasses:

> **Arkansas Subclass**: All Class Members who reside in and purchased or leased a Defective Vehicle in the State of Arkansas ("Arkansas Subclass").

> **Texas Subclass**: All Class Members who reside in and purchased or leased a Defective Vehicle in the State of Texas ("Texas Subclass").

61.     Excluded from the Class are all legal entities, Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant, as well as any judge, justice or judicial officer presiding over this matter and members of their immediate families and judicial staff.

62.     Plaintiffs are informed and believe that GM manufactured and sold to consumers at least 8.2 million of the Defective Vehicles nationwide and hundreds-of-thousands of Defective Vehicles in the Subclass States.

63.     The Class can be readily identified using registration records, sales records, production records, and other information kept by GM or third parties in the usual course of business and within their control.

64.     Plaintiffs' claims are typical of the claims of the other members of the Class. All members of the Class have been and/or continue to be similarly affected by Defendant's wrongful conduct as complained of herein, in violation of state and federal law. Plaintiffs have no interests adverse to the Class.

24

65.     Plaintiffs will fairly and adequately protect the Class members'
interests and have retained counsel competent and experienced in consumer class
action lawsuits and complex litigation.

66.     Defendants have acted with respect to the Class in a manner generally
applicable to each Class member. Common questions of law and fact exist as to all
Class members and predominate over any questions wholly affecting individual
Class members. There is a well-defined community of interest in the questions of
law and fact involved in the action, which affect all Class members. Among the
questions of law and fact common to the Class are, *inter alia*:

> a.      whether the Defective Vehicles suffer from Ignition Switch
>         Defect detailed in this Complaint;
>
> b.      whether Defendants knew or should have known about the
>         Ignition Switch Defect detailed in this Complaint;
>
> c.      if Defendants knew of the Ignition Switch Defect detailed in
>         this Complaint, how long Defendants knew of such defects;
>
> d.      whether Defendants attempted to conceal the Ignition Switch
>         Defect detailed in this Complaint from Plaintiffs and Class
>         members;

e.    whether Defendants misrepresented to Plaintiffs and Class Members that the Defective Vehicles were safe;

f.    whether Defendants engaged in fraudulent concealment;

g.    whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches;

h.    whether the nature of the defective ignition switches in the Defective Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Defective Vehicle;

i.    whether Defendants had a duty to disclose the defective nature of the Defective Vehicles to Plaintiffs and Class Members;

j.    whether the Defective Vehicles were fit for their intended purpose;

k.    whether the Defective Vehicles were of merchantable quality;

1.    whether Old GM's and GM's unlawful, unfair and/or deceptive practices harmed Plaintiffs and the members of the Class;

     m.      whether Defendants violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann.§§ 4-88-101, *et seq*., ("ADTPA"), and, if so, what remedies are available under the ADTPA;

     n.      whether Defendants violated the Texas Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq*. ("TDTPA");

     o.      whether, and to what extent, GM has successor liability for the acts and omissions of Old GM; and

     p.      whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

67.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

68.    The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications for individual Class

members, which would establish incompatible standards of conduct for GM. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

69.    Defendants have acted on grounds generally applicable to the entire Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## VIII.  <u>CAUSES OF ACTION</u>

**COUNT I**
**FRAUDULENT CONCEALMENT**
**(On Behalf of All Classes)**

70.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

71.    Defendants had knowledge of the Ignition Switch Defect as early as 2001, as alleged above.

72.    Defendants' omissions were material because they directly implicate the safety of the Defective Vehicles. Whether a vehicle has an increased risk of losing power to the engine and/or major electrical systems in the course of driving is a material safety concern.

73.    Defendants concealed and suppressed material facts concerning the Ignition Switch Defect, and GM has successor liability for the acts of concealment and oppression of Old GM as set forth above.

74.    Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as reliable and safe and proclaimed that Defendants maintain the highest safety standards.

75.    Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

76.    Defendants had a duty to disclose the Ignition Switch Defect because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew they were not known to nor reasonably discoverable by Plaintiffs and the Class. These omitted and concealed facts were material because they directly impact the safety of the Defective Vehicles.

77.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, in reckless disregard of Plaintiffs and the Class's rights and well-being, and for the sole purpose of enriching Defendants.

<u>COUNT II</u>
**VIOLATION OF MAGNUSON-MOSS CONSUMER WARRANTIES ACT,
15 U.S.C. §§ 2301, *et. seq*. ("MMWA")**
**(On Behalf of the Class)**

78.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

79.    The MMWA provides a private right of action by purchasers of consumer products against manufacturers or retailers who, *inter alia*, fail to comply with the terms of the written, express and/or implied warranties. 15 U.S.C. § 2310(d)(l). As alleged above, Defendants have failed to comply with the terms of its written, express, and/or implied warranties.

80.    The Defective Vehicles are consumer products, as that term is defined in 15 U.S.C. § 2301(a).

81.    GM is a supplier and warrantor, as that term is defined in 15 U.S.C. § 2301(4) and (5).

82.    Plaintiffs and each member of the Classes are consumers, as that term is defined in 15 U.S.C. § 2301(3).

83.    As a warrantor, GM is obligated to afford the Class, as consumers, all rights and remedies available under the MMWA, regardless of privity.

84.    The MMWA provides a cause of action for breach of warranty or other violations of the Act. 15 U.S.C. § 2310(d)(l ). GM has breached its warranties as alleged herein.

85.    GM has breached its implied warranty of merchantability and fitness, which it cannot disclaim under the MMWA, 15 U.S.C. § 2308(a)(1), by failing to provide a vehicle which could not be safely operated.

86.    Plaintiffs have suffered damages as a result of GM's breaches of express and implied warranties as set forth herein; thus, this action lies. 15 U.S.C. § 2310(d)(1)-(2).

87.    GM was on notice of the Ignition Switch Defect as early as 2001, yet did not undertake any opportunity to cure until 2014, nearly thirteen years later, when GM's knowledge of the Ignition Switch Defect was first made public. Also, once Plaintiffs' representative capacity is determined, notice and opportunity to cure on behalf of the Class – through Plaintiffs – can be provided under 15 U.S.C. § 2310(e).

88.     Plaintiffs and the Class Members have suffered, and are entitled to recover, damages as a result of GM's breaches of warranty and violations of the MMWA.

89.     Additionally, or in the alternative, the MMWA provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by the MMWA. 15 U.S.C. § 2310(d)(1). Rescission and revocation of acceptance are equitable remedies available to Class Members under the MMWA.

90.     Plaintiffs also seek an award of costs and expenses, including attorneys' fees, under the MMWA, to prevailing consumers in connection with the commencement and prosecution of this action. 15 U.S.C. §2310(d)(2). Plaintiffs and the Class intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

91.     It was not necessary for Plaintiffs and each Class Member to give GM notice of GM's breach of the implied warranty of merchantability because GM had actual notice of the Ignition Switch Defect.

92.     Prior to the filing of this action, GM issued a safety recall for the Defective Vehicles acknowledging the Ignition Switch Defect. GM admitted it had notice of the Ignition Switch Defect as early as 2001.

2:14-cv-13051-RHC-RSW   Doc # 1   Filed 08/06/14   Pg 33 of 47   Pg ID 33

93.    At the time of the safety recall, GM also acknowledged that numerous accidents and fatalities were caused by the Ignition Switch Defect. In addition to the above, the filing of this action is sufficient to provide GM notice of its breaches of the implied warranty of merchantability with respect to the Defective Vehicles.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(On Behalf of the Class)**

94.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

95.    GM is a merchant who sold the Defective Vehicles to Plaintiffs and Class members.

96.    GM impliedly warranted to Plaintiffs and members of the Class that the Defective Vehicles were free of defects, and were merchantable and fit for the ordinary purpose for which such goods were sold and used.

97.    As alleged herein, GM's sales of the Defective Vehicles breached this implied warranty of merchantability because the Defective Vehicles were sold with latent defects described herein as the Ignition Switch Defect. As such, the Defective Vehicles are defective, un-merchantable, and unfit for the ordinary, intended purpose at the time of sale. This Ignition Switch Defect creates serious safety risks in the operation of the Defective Vehicles.

98.    GM, however, marketed, promoted, and sold the Defective Vehicles as safe and free from defects.

99.    GM breached its implied warranty of merchantability to Plaintiffs and the Class because the Defective Vehicles would not pass without objection in the trade, as they contained the Ignition Switch Defect.

100.   GM further breached its implied warranty of merchantability to Plaintiffs and Class Members because the Defective Vehicles were not adequately contained, packaged, and labeled. The directions and warnings that accompanied the Defective Vehicles did not adequately instruct Plaintiffs on the proper use of the Defective Vehicles in light of the Ignition Switch Defect or adequately warn Plaintiffs of the dangers of improper use of the Defective Vehicles.

101.   GM had knowledge of, yet concealed, these defects for over a decade. Plaintiffs provided reasonable and adequate notice to GM through its dealer network when seeking repairs on the vehicle following an accident. GM failed to cure the Ignition Switch Defect that existed, and were known to GM yet concealed from Plaintiffs, at the time Plaintiffs purchased their Defective Vehicles.

102.   Defendants' purported disclaimer or exclusion of the implied warranty of merchantability in its written warranty is invalid, void, and unenforceable per MMWA 15 U.S.C. § 2308(a)(l). GM's warranty disclaimers, exclusions, and

limitations were unconscionable and unenforceable because they disclaimed defects known but not disclosed to consumers at or before the time of purchase.

103.   Any contractual language contained in GM's written warranty that attempts to limit remedies is unconscionable, fails to conform to the requirements for limiting remedies under applicable law, causes the warranty to fail of its essential purpose, and is, thus, unconscionable, unenforceable, and/or void.

104.   As a direct and proximate result of the breach of said warranty, Plaintiffs and the Class suffered and will continue to suffer losses as alleged herein in an amount to be determined at trial.

105.   Additionally, or in the alternative, Plaintiffs and the Class seek declaratory relief relating to the Ignition Switch Defect alleged herein, and the opportunity to rescind the purchase agreement for the Defective Vehicle.

106.   It was not necessary for Plaintiffs and each Class Member to give GM notice of GM's breach of the implied warranty of merchantability because GM had actual notice of the Ignition Switch Defect. Prior to the filing of this action, GM issued a safety recall for the Defective Vehicles acknowledging the Ignition Switch Defect. GM admitted it had notice of the Ignition Switch Defect as early as 2001. At the time of the safety recall, GM also acknowledged that numerous accidents and fatalities were caused by the Ignition Switch Defect. In addition to the above,

the filing of this action is sufficient to provide GM notice of its breaches of the implied warranty of merchantability with respect to the Defective Vehicles.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**
**(On behalf of the Class)**

107.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

108.   GM is a manufacture of motor vehicles which knew that the vehicles sold to Plaintiffs and the Class would be used for the specific purpose of, *inter alia*, providing safe transportation at relatively high rates of speed.

109.   GM impliedly warranted to Plaintiffs and members of the Class that the Defective Vehicles were fit for the purpose of providing safe transportation.

110.   As alleged herein, GM's sales of the Defective Vehicles breached this implied warranty of fitness because the Defective Vehicles were sold with latent defects described herein as the Ignition Switch Defect. As such, the Defective Vehicles are defective, not safe to operate at any speed, and thus unfit for their intended purpose at the time of sale. These Ignition Switch Defect create serious safety risks in the operation of the Defective Vehicles.

111.   GM had knowledge of, yet concealed, these defects for over a decade. Plaintiffs and Class members provided reasonable and adequate notice to GM

through its dealer network when seeking repairs on the vehicle following an accident. GM failed to cure the Ignition Switch Defect that existed, and were known to GM yet concealed from Plaintiffs, at the time Plaintiffs purchased their Defective Vehicle.

112.    Defendants' purported disclaimer or exclusion of the implied warranty of merchantability in its written warranty is invalid, void, and unenforceable per MMWA, 15 U.S.C. § 2308(a)(l). GM's warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable because they disclaimed defects known but not disclosed to consumers at or before the time of purchase.

113.    Any contractual language contained in GM's written warranty that attempts to limit remedies is unconscionable, fails to conform to the requirements for limiting remedies under applicable law, causes the warranty to fail of its essential purpose, and is, thus, unconscionable, unenforceable, and/or void.

114.    As a direct and proximate result of the breach of said warranty, Plaintiffs and the Class suffered and will continue to suffer losses as alleged herein in an amount to be determined at trial.

115.    Additionally, or in the alternative, Plaintiffs and the Class seek declaratory relief relating to the Ignition Switch Defect alleged herein, and the opportunity to rescind the purchase agreement for the Defective Vehicle.

116.   It was not necessary for Plaintiffs and each Class Member to give GM notice of GM's breach of the implied warranty of merchantability because GM had actual notice of the Ignition Switch Defect. Prior to the filing of this action, GM issued a safety recall for the Defective Vehicles acknowledging the Ignition Switch Defect. GM admitted it had notice of the Ignition Switch Defect as early as 2001. At the time of the safety recall, GM also acknowledged that numerous accidents and fatalities were caused by the Ignition Switch Defect. In addition to the above, the filing of this action is sufficient to provide GM notice of its breaches of the implied warranty of merchantability with respect to the Defective Vehicles.

### COUNT V
### VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT,
### ARK. CODE ANN. §§ 4-88-101, *et seq*. (the "ADTPA")
### (On Behalf of the Arkansas Subclass)

117.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

118.   This claim is brought on behalf of Plaintiffs EARL GOLSON, MARY GREENE, and the Arkansas Subclass.

119.   As detailed throughout this Complaint, Defendants committed deceptive and unfair acts in the conduct of trade and commerce as prohibited by Ark. Code Ann. § 4-88-107(a).

38

120.   Defendants and Plaintiffs EARL GOLSTON and MARY GREENE
are "persons" under ADTPA § 4-88-102(5).

121.   By failing to disclose and actively concealing the dangerous risk of
ignition switch movement, engine shutdown, and disabled safety airbags in
Defective Vehicles, Defendants engaged in deceptive business practices prohibited
by the ADTPA § 4-88-107(a), including:

a.    Defendants represented that the Defective Vehicles had
approval, characteristics, uses, and benefits that they do not
have;

b.    Defendants provided, disseminated, marketed, and otherwise
distributed uniform false and misleading advertisements,
technical data and other information to consumers regarding the
safety, performance, reliability, quality, and nature of the
Defective Vehicles;

c.    Defendants represented that the Defective Vehicles were of a
particular standard, quality, or grade, when they were of
another;

d.    Defendants engaged in unconscionable commercial practices in
failing to reveal material facts and information about the

39

Defective Vehicles, which did and tended to mislead Plaintiffs

and the Class about facts that could not reasonably be known by

the consumer until the 2014 recalls;

e.    Defendants failed to reveal facts concerning the faulty ignition

switch in the Defective Vehicles that were material to the

transaction in light of representations of fact made in a positive

manner;

f.    Defendants failed to reveal material facts concerning the faulty

ignition switch in the Defective Vehicles to Plaintiffs and the

Class Members, the omission of which would tend to mislead

or deceive consumers, including Plaintiffs and the Class;

g.    Defendants made material representations and statements of

fact to Plaintiffs and the Class that resulted in Plaintiffs and the

Class Members reasonably believing the represented or

suggested state of affairs to be other than what they actually

were; and

h.    Defendants intended that Plaintiffs and Class Members rely on

their misrepresentations and omissions, so that Plaintiffs and

40

other Class Members would purchase or lease the Defective Vehicles.

122. Defendants' Fraudulent concealment of material facts, as complained of herein, is also a violation of ADTPA § 4-88-108.

123. Plaintiffs and the Class have suffered an injury, including the loss of money and property, as a result of Defendants' unfair, unlawful, and deceptive practices. Defendants failed to inform Plaintiffs and Class Members that its Defective Vehicles had a defective ignition switch that could lead to injury or death. Had Plaintiffs and the Class known this, they either would not have purchased their vehicles at all, or they would have paid less for them. Plaintiffs and the Class have therefore suffered a "loss" because of the violations of the ADTPA complained of herein.

124. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Defendants' business.

125. Plaintiffs requests that this Court enjoin GM from continuing its unfair, unlawful, and deceptive practices, and award to Plaintiffs and each Class Member their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, reasonable attorneys' fees, and other appropriate relief pursuant to ADTPA § 4-88-113.

## COUNT VI
## VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT, TEX. BUS. & COM. CODE, §§ 17.41, *et seq*. ("TDTPA")
### (On Behalf of the Texas Subclass)

126.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

127.    This claim is brought on behalf of Plaintiff JACKIE ROLLINS, and the Texas Subclass.

128.    Defendants' above-described acts and omissions constitute false, misleading or deceptive acts or practices under the TDTPA.

129.    Plaintiff JACKIE ROLLINS is a "consumer" within the meaning of the TDTPA, who purchased or leased one or more Defective Vehicles.

130.    By failing to disclose and actively concealing the dangerous risk of ignition switch movement, engine shutdown, and disabled safety airbags in Defective Vehicles, Defendants engaged in deceptive business practices prohibited by the TDTPA, including:

      a.    representing that Defective Vehicles have characteristics, uses, benefits, and qualities which they do not have;

      b.    representing that Defective Vehicles are of a particular standard, quality, and grade when they are not;

42

c.   advertising Defective Vehicles with the intent not to sell them as advertised;

d.   representing that a transaction involving Defective Vehicles confers or involves rights, remedies, and obligations which it does not; and

e.   failing to disclose information concerning Defective Vehicles with the intent to induce consumers to purchase or lease the Defective Vehicles.

131.   Defendants also breached express and implied warranties to Plaintiffs and the Class, as set out above, and are, therefore liable to Plaintiffs and the Class for damages under §§ 17.50(a)(2) and 17.50(b) of the TDTPA. Defendants' actions also constitute an unconscionable action or course of action under §17.50(a)(3) of the TDTPA.

132.   Plaintiffs and the Class have suffered an injury, including the loss of money and property, as a result of Defendants' unfair, unlawful, and deceptive practices. Defendants failed to inform Plaintiffs and Class Members that its Defective Vehicles had a defective ignition switch that could lead to injury or death. Had Plaintiffs and the Class known this, they either would not have purchased their vehicles at all or they would have paid less for them. Plaintiffs and

43

the Class have therefore suffered a "loss" because of the violations of the TDTPA complained of herein.

133.   As alleged above, Defendants made numerous material statements about the safety and reliability of Defective Vehicles that were either false or misleading. Each of these statements contributed to the deceptive context of Defendants' unlawful advertising and representations as a whole.

134.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Texas Subclass Members, about the true safety and reliability of Defective Vehicles.

135.   In purchasing or leasing their vehicles, the Plaintiffs and Texas Subclass Members relied on the misrepresentations and/or omissions of Defendants with respect of the safety and reliability of the vehicles. Defendants' representations turned out not to be true because the vehicles can unexpectedly and dangerously have ignition switch movement, shutting down the engine, and disabling the safety airbags.

136.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Defendants' business.

137.   Plaintiffs request that this Court enjoin GM from continuing its unfair, unlawful, and deceptive practices, and award to Plaintiffs and each Class Member

their actual damages as the result of GM's unfair, unlawful, and deceptive trade practices, reasonable attorneys' fees pursuant to § 17.50(d) of the TDTPA, and other appropriate relief. For those Plaintiffs and the Class who wish to rescind their purchases, they are entitled under § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the TDTPA.

## IX.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf all others similarly situated, respectfully requests that this Court enter a judgment against GM and Delphi in favor of Plaintiffs and the Class, and grant the following relief:

A.   Determine that this action may be maintained as a class action and certify it as such under Rule 23(b)(3), or, alternatively, certify all issues and claims that are appropriately certified and designate and appoint Plaintiffs as Class and Subclass Representatives and Plaintiffs' chosen counsel as Class Counsel;

B.   Declare, adjudge and decree the conduct of GM and Delphi as alleged herein to be unlawful, unfair and/or deceptive, and enjoin any such future conduct;

C.   Award Plaintiffs and Class Members actual, compensatory damages, nominal damages, and/or statutory damages, as proven at trial;

D.      Alternatively, if elected by Plaintiffs and the Class, permit rescission of the purchase agreement for the Defective Vehicles requiring GM's buy-back of the Defective Vehicles;

E.      Alternatively, if elected by Plaintiffs and the Class, require GM to repair the defective ignition switches or provide a comparable vehicle that does not have Ignition Switch Defect;

F.      Award Plaintiffs and the Class all monies paid to Old GM because of GM's violation of the State Unfair Trade Practices and Consumer Protection Laws as set forth herein;

G.      Award Plaintiffs and Class Members exemplary/punitive damages;

H.      Award Plaintiffs and Class Members their reasonable attorneys' fees, costs, and pre- and post-judgment interest; and

I.      Award Plaintiffs and the Class such other further and different relief as the case may require or as determined to be just, equitable, and proper by this Court.

## X.    <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on any and all issues in this action so triable of right.

Respectfully submitted,

SOMMERS SCHWARTZ, P.C.

Dated:  August 6, 2014         By: /s/ Jason J. Thompson
                               Jason Thompson (P47184)
                               Lance Y. Young (P51254)
                               One Towne Square, Suite 1700
                               Southfield, MI  48076
                               (248) 355-0300
                               jthompson@sommerspc.com
                               lyoung@sommerspc.com

                               FINKELSTEIN & KRINSK LLP

                               Jeffrey R. Krinsk, Esq. (SBN 109234)
                               Mark L. Knutson, Esq. (SBN 131770)
                               Trenton R. Kashima, Esq. (SBN 291405)
                               501 West Broadway, Suite 1250
                               San Diego, California 92101-3579
                               Telephone: (619) 238-1333
                               Facsimile:  (619) 238-5425
                               jrk@classactionlaw.com
                               mlk@classactionlaw.com
                               trk@classactionlaw.com

                               *Attorneys for Plaintiffs*

47