# EXHIBIT A

# WEIL, GOTSHAL & MANGES LLP

200 CRESCENT COURT
SUITE 300
DALLAS, TEXAS 75201

(214) 746-7700
FAX: (214) 746-7777

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
SINGAPORE
WARSAW
WASHINGTON, D.C.

ANGELA C. ZAMBRANO
DIRECT LINE (214) 746-7704
E-MAIL: angela.zambrano@weil.com

July 27, 2010

## MEDIATION STATEMENT ON BEHALF OF
## MOTORS LIQUIDATION COMPANY
## SUBJECT TO RULE 408 – NOT ADMISSIBLE AS EVIDENCE

Mary Burdin, Esq.
Burdin Mediations
4514 Cole Avenue
Suite 1450
Dallas, Texas 75205-4181

Re:  *In re Motors Liquidation Company, et al. f/k/a General Motors Corp., et al.*, Case No. 09-50026 [Powledge Mediation]

Dear Ms. Burdin:

### I.     INTRODUCTION

Motors Liquidation Company ("MLC") and its attorneys recognize that the Claimants have suffered a great personal tragedy. However, there is no credible evidence that the Powledge crash was caused by any vehicle defect or malfunction. As sad as the underlying facts may be, MLC is confident that a jury would find that the vehicle was not the cause of the accident. Even if liability could somehow be established, Claimants' inflated settlement demands suggest that they believe—incorrectly—that there is punitive damages exposure in this case. In fact, the Claimants cannot recover punitive damages against MLC, both because the bankruptcy court would not allow it and because there is no factual support for it. Further, if this case cannot be settled at mediation, it will likely not be litigated in Galveston, Texas as the Claimants suggest. Rather, MLC will ask for the case to be transferred and litigated in the United States District Court for the Southern District of New York.

Importantly, this case was previously settled in principle for far less than the Claimants' latest demand. Specifically, in mid-April 2009, following the deposition of Claimants' expert and provision of the reports and test data prepared by defense experts, a settlement was negotiated with Claimants' then counsel in which it was agreed that Claimants would settle all claims for the sum of $375,000. Claimants ultimately backed out of the agreed settlement and

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 2

hired new counsel. While Claimants now distance themselves from such agreement, it is important to note that the expert report of Stephen Syson, upon which Claimants rely for virtually every assertion made in their Opening Statement, is exactly the same analysis that was presented before the $375,000 settlement agreement was reached. This is an important consideration to MLC's posture and position for mediation.

There is no doubt that a judge or jury will sympathize with the Claimants and their loss, but they will also require them to prove the vehicle was defective. To do so, there would need to be a finding that the cruise control system malfunctioned, the brakes failed, the brake electrical disconnect switch failed, and the steering stopped working, *all* at the same time. When consideration is given to how the vehicle actually works, none of these claims are credible, much less all of them.

## II.    FACTUAL BACKGROUND

### A.    The Accident

On October 18, 2005, Adam Powledge ("Powledge"), was driving his 2004 Chevrolet Malibu, VIN 1G1ND52F34M598780,[1] at approximately the 4600 block of Interstate 45, and near the intersection of Holland Road, in Texas City, Galveston County, Texas. (*See* Pls. Fourth Am. Pet., attached hereto as Exhibit A, ¶ 1.) According to witnesses, Mr. Powledge sideswiped another vehicle before going off the road and onto the grass shoulder/median between the freeway and the access road. He entered the median at a shallow angle, then came back down into the center of the median, where he drove a considerable distance in a straight line, at high speed, directly into a large support post for an overhead highway sign. (*See* photographs attached as Exhibit B.)

Witnesses say Mr. Powledge made no apparent attempt to maneuver the Malibu back onto the road or to slow down or stop. Linda Paige Gilman, the driver of the car that was sideswiped, testified in her deposition that she watched the car the whole time, and the brake lights never came on. (*See* Gilman Dep. 19:4-20, attached hereto as Exhibit C.)

Due to the speed and location of the impact, the Malibu split in half and caught fire. All occupants died from blunt force trauma, including head injuries and multiple fractures. It is unknown why Mr. Powledge drove into the pole without steering or braking to avoid it. What is

---

[1] Plaintiff Doris A. Powledge ("Mrs. Powledge") purchased the Malibu used from Norman Frede Chevrolet in Houston, Texas on January 21, 2005. At the time, the vehicle had 22,682 miles on it. The vehicle previously was registered in California to Alamo Rent-A-Car, which had purchased the vehicle new from Prospect Motors in Jackson, California. At no time during its history of usage did anyone report a problem with the acceleration, steering, or braking control systems of the car.

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 3

known is that this tragic incident cannot be explained as the result of a vehicle defect or malfunction.[2]

### B. The Petition

On September 21, 2007, Plaintiffs Mrs. Powledge, along with Mr. Powledge's two surviving children Austin Powledge and Amber Powledge, and Mr. Powledge's mother Mary Lou Powledge ("Plaintiffs" or "Claimants") on behalf of themselves and as representatives of the estates of Mr. Powledge, Jacob Powledge, Christian Powledge, Rachel Powledge, and Isaac Powledge filed their Original Petition and Request for Disclosure (the "Action"). On June 30, 2008, Plaintiffs filed their Fourth Amended Petition ("Petition") alleging that Defendant General Motors Corporation ("GM") was negligent "in the design, manufacture, assembly, marketing, and/or testing" of the Malibu and this negligence was the proximate cause of the fatal injuries to Mr. Powledge, Jacob, Christian, Rachel, and Isaac. (*See* Pet. ¶ 14.) Plaintiffs allege the following defects: (i) electrical, computer, and mechanical failures that allowed the vehicle's engine to race out of control; (ii) unwanted engine racing; (iii) unwanted engine acceleration; (iv) violations of GM's internal performance, reliability, and quality standards; (v) breach of implied warranties of fitness for a particular purpose and merchantability; and (vi) violations of FMVSS provisions and recommended guidelines set forth by SAE. (*See generally* Pet.)

The Petition alleges economic and non-economic damages for (i) disfigurement, conscious physical and emotional pain, torment, mental anguish, and/or emotional distress prior to death for the victims; (ii) loss of care, maintenance, support, services, advice, counsel, reasonable contributions of a pecuniary value, loss of companionship and society, loss of consortium, and mental anguish for Plaintiffs Mrs. Powledge and Austin, Amber, and Mary Lou Powledge; (iii) medical, funeral, and burial expenses for Plaintiff Mrs. Powledge; (iii) loss of inheritance for Plaintiffs Doris, Austin, and Amber Powledge; (iv) prejudgment and postjudgment interest; and (v) costs of suit.[3]

---

[2] Although the evidence will show that Mr. Powledge made no apparent attempt to maneuver the Malibu back onto the road or to slow down or stop, MLC does not now take the position that Mr. Powledge committed suicide. As noted in the report of expert witness Dr. Lighthall, Mr. Powledge could have experienced some kind of disabling medical event. He also could have inadvertently applied the wrong pedal, hitting the accelerator instead of the brake.

[3] On June 3, 2010, Mrs. Powledge filed Plaintiff's Original Petition (the "DTPA Petition") against defendants Norman Frede, Norman Frede Chevrolet Co, Alamo Rent A Car LLC, G. Richard Wagner, and GM setting forth a claim under the Texas Deceptive Trade Practices Act in connection with the Action and claiming economic damages of $200,000,000.00 and mental anguish damages of $100,000,000.00. (*See* Pl's Original Pet., attached hereto as Exhibit D.) The filing of the DTPA Petition was directly in violation of the automatic stay provisions found at section 362(a) of chapter 11 of title 11 of the United States Code and MLC formally requested on June 25, 2010 that Mrs. Powledge withdraw the DTPA Petition. On July 9, 2010, Mrs. Powledge filed Plaintiff's Motion for Non-suit ("Motion for Non-suit") requesting that the District Court of the 10th Judicial District, Galveston County, Texas, enter a non-suit against GM without prejudice. (*See* Mot. for Non-suit, attached hereto as Exhibit E.)

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 4

The former venue of the Action prior to the chapter 11 filing was the 10th Judicial District Court in Galveston County, Texas (the "Texas State Court"), and the Action was pending before the Honorable David E. Garner.

### C. The Chapter 11 Filing

On June 1, 2009, GM commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The bankruptcy stayed all proceedings relating to the Action. Shortly after filing, GM filed a motion to essentially sell its assets and transfer certain liabilities to Vehicle Acquisition Holdings, LLC, which has now changed its name to General Motors Company ("New GM"). New GM is a Delaware corporation. On July 5, 2009, the Bankruptcy Court issued an order approving the asset-sale motion ("Sale Order"). Liability for all claims or causes of action asserted in this Action against MLC have been retained by MLC.

On September 16, 2009, the Bankruptcy Court entered the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(b)(9)) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof establishing November 30, 2009 at 5:00 p.m. (Eastern) as the deadline to file proofs of claim against MLC based on prepetition claims.

On November 24, 2009, four proofs of claim based on the Action were filed by Angel Hagmaier, Esq. ("Hagmaier") with the Bankruptcy Court on behalf of Plaintiffs Mrs. Powledge and Amber, Austin, and Mary Powledge and assigned claims number 44614, 44615, 44616, and 44617 (the "Proofs of Claim"), each asserting a claim for $250,000,000.

On February 23, 2010, the Bankruptcy Court entered the Order Pursuant to 11 U.S.C. § 1050(a) and General Order M-390 Authorizing Implementation of Alternate Dispute Procedures, Including Mandatory Mediation (the "ADR Order") [Docket No. 5037]. (*See* ADR Order, attached hereto as Exhibit F.) The ADR Order provides a mechanism whereby MLC can designate a claim for mediation by requesting that a Claimant "cap" their claim at a fixed amount. Specifically, the ADR Order states that "if the claim Amount Cap is accepted by [MLC], the Claim Amount Cap will become binding on the Designated Claimants, and the ultimate value of his or her Unliquidated/Litigation Claim will not exceed the Claim Amount Cap." (ADR Order (Ex. F) at 4-5.)[4]

---

[4] If the "cap" is accepted by MLC, MLC may then be responsible for all or a portion of the fees and costs associated with any subsequent mediation, as consideration for the "cap" forever barring a claimant from seeking recovery above this "cap."

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 5

       Pursuant to the Bankruptcy Court's ADR Order, on March 23, 2010, Claimants sent their Capping Claim Letters to MLC. (*See* Mar. 23, 2010 Capping Claim Ltrs., attached hereto as Exhibit G.) On April 8, 2010, MLC sent a letter (the "April 8 Letter") accepting the cap offers (the "Claim Amount Cap") submitted in relation to this Action as follows:

          Claim No. 44614    $55,000,000
          Claim No. 44615    $5,000,000
          Claim No. 44616    $5,000,000
          Claim No. 4417     $5,000,000

(*See* Apr. 8 Ltr. attached hereto as Exhibit H.) The April 8 Letter made it clear that acceptance of these caps by MLC would result in permanent capping of the Action and the ultimate value of the Proofs of Claim could not exceed the Claim Amount Cap of $70,000,000. (*See* Apr. 8 Ltr. (Ex. H) at 1 ("Please note that upon mailing of the ADR Notice, [MLC] will direct their claims agent to update the official claims register with the Claim Amount Cap listed above. This means that, pursuant to the ADR Order, the ultimate value of your claim(s) shall not exceed the Claim Amount Cap and **that you are forever barred from seeking recovery above the Claim Amount Cap.**") (emphasis in original).)

       On April 15, 2010, MLC sent notice to Hagmaier (the "ADR Notice") submitting the Proofs of Claim to alternate dispute resolution pursuant to the procedures established by the ADR Order (the "ADR Procedures"). (*See* ADR Notice, attached hereto as Exhibit I.) The ADR Notice further made a settlement offer in the amount of an allowed general unsecured claim for $750,000.

       On May 13, 2010, Hagmaier rejected MLC's offer and made a counteroffer (the "Counteroffer") as follows:

          Claim No. 44614    $27,500,000
          Claim No. 44615    $5,000,000
          Claim No. 44616    $5,000,000
          Claim No. 4417     $3,000,000

(*See* May 13, 2010 Ltr., attached hereto as Exhibit J.) On June 1, 2010, MLC rejected the Counteroffer and designated the claims for nonbinding mediation. (*See* June 1, 2010 Ltr., attached hereto as Exhibit K and Mediation Notice, attached hereto as Exhibit L.)

**D.**    **The Claimants' Prior Settlement of Their Claims for $375,000**

       Initially, Plaintiffs were represented by attorney E. Todd Tracy of Dallas, Texas, in association with Anthony G. Buzbee of Galveston, Texas. Mr. Tracy is a very well known, successful, and experienced attorney with a particular focus upon automotive product liability matters. Similarly, Mr. Buzbee is a well known, successful plaintiffs' attorney in the Galveston

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 6

area. Following the deposition of Plaintiffs' expert and the exchange of the reports and test data prepared by defense experts (as discussed below), a settlement was negotiated with Mr. Tracy in which it was agreed that Claimants would settle all claims for the sum of $375,000. This agreement was reached in mid-April, 2009. Although Mr. Tracy advised that he had been given full authority to negotiate a settlement, Mrs. Powledge refused to follow through with the settlement agreed to by counsel. On April 24, 2009, Mr. Tracy and Mr. Buzbee filed their Unopposed Motion to Withdraw as Counsel of Record. On June 25, 2009, the Texas Court granted the motion.

The chapter 11 filing occurred shortly thereafter. On June 15, 2009, Plaintiffs filed their Designation of Attorney-in-Charge appointing Hagmaier as new counsel for Plaintiffs. On June 25, 2010, Dax O. Faubus filed his Notice of Appearance with the Bankruptcy Court, joining in Hagmaier as counsel for the Plaintiffs. (*See* Notice of Appearance, attached hereto as Exhibit M.)

### III.   MLC'S POSITION

#### A.   Claimants Cannot Prove That the Crash Was Caused By a Product Defect

Claimants' assertion that MLC is strictly liable for the car accident fails because Claimants cannot prove that the crash was caused by a product defect. (*See* Pet. ¶ 14.) Texas has adopted section 402A of the Restatement (Second) of Torts, providing for strict liability for the sale of dangerously defective products. See *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788-89 (Tex. 1967). The essential elements of a strict liability case are: (1) a product defect; (2) that existed at the time the product left the manufacturer's hands; (3) the defect made the product unreasonably dangerous; and (4) the defect was a producing cause of plaintiff's injuries. See *Rourke v. Garza*, 530 S.W.2d 794, 798, 801 (Tex. 1975), *abrogated on other grounds by*, *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007); *Parsons v. Ford Motor Co.*, 85 S.W.3d 323, 330 (Tex. App.—Austin 2002, pet. denied).

Here, Claimants have no evidence of any actual product defect. This is fatal to their case, under any theory of recovery. At best, Claimants have a set of mismatched *theories*, none of which have been substantiated by scientific evidence or testing on the part of their expert, and all of which have either been rebutted by videotaped testing performed by MLC, or disavowed in Claimants' own expert's deposition testimony.

Numerous entirely independent defects are alleged in Claimants' effort to make out a claim that the car was somehow responsible for this tragic incident. For all of these claims, Claimants rely upon the report of Mr. Stephen Syson (the "Claimants' Expert"). What they overlook is that the Claimants' Expert gave a deposition at which he admitted that he had no actual evidence to support the assertions contained in his report. Claimants further ignore the fact that the Claimants' Expert's theories were rebutted by actual vehicle testing. The testing is described in detail in the reports of four defense experts: (1) electrical engineer David G.

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 7

McKendry's ("McKendry") report addressed throttle, acceleration and cruise control issues; (2) mechanical engineer Bruce R. Bowman's ("Bowman") report addressed brake related issues; (3) electrical engineer Karl Stopschinski's ("Stopschinski ") report addressed cruise control electronics and accident reconstruction; and (4) biomechanics expert Dr. James Lighthall's ("Lighthall") report evaluated biomechanics and injury mechanism issues. The McKendry report is attached as Exhibit N; the Bowman report is attached as Exhibit O; the Stopschinksi report is attached as Exhibit P, and the Lighthall report is attached as Exhibit Q.

     The Claimants' Expert's theories require failures of both the cruise control and brake systems, as well as the inability to steer. As explained in the expert reports of Mr. McKendry and Mr. Stopschinski, the cruise control design requires that multiple conditions be met before it will engage at all. Testing done by Mr. Bowman shows that the brakes are able to stop the car even with the throttle fully applied. Further, the application of the brake pedal cuts off power to the cruise control. It does this through a brake switch that is entirely separate from the cruise control system. So, at a minimum, Claimants' contentions require an unexplained and electronic failure in the cruise control electronics *and* a complete failure of the brakes *and* a failure of the brake switch. These are three separate and distinct systems.

     Claimants' Expert further claimed that in the process of driving through the median, the right front wheel hit a concrete culvert, deflating the tire and denting the wheel rim. Claimants included a photograph of the culvert in their Opening Statement. Mr. Stopschinski's report shows that the raised edge of the culvert is only a couple of inches high. The raised edge is far too minimal to puncture a tire and dent a steel wheel rim. Further, Mr. Bowman performed a videotaped demonstration with an exemplar vehicle showing that steering control is maintained with a deflated front tire and that a vehicle can easily be steered through similar grassy terrain in this condition.

     Additionally, despite Claimants' arguments otherwise, the fact that the brake pedal was found to be bent after the crash does not establish why it is bent. The brake pedal deformation is readily explainable as a result of impact damage. (*See* report of Mr. Stopschinski (Ex. P).) Further, the brakes are a mechanical/hydraulic system, not an electronic system. Ineffectiveness of the brakes would require a separate, independent malfunction—separate from whatever is speculated to have caused the vehicle to accelerate. (*See* report of Mr. Bowman (Ex. O).)

     Finally, Mr. Bowman did a test in which he measured the force required to bend an exemplar brake pedal, and provided the results of that test to Dr. Lighthall, a biomechanics expert. Dr. Lighthall reviewed the autopsy reports and Mr. Bowman's measurement of the force needed to bend a brake pedal. He reported that the force level sufficient to bend the brake pedal would have caused an ankle fracture that was not found during the autopsy of Mr. Powledge. The brake pedal is merely one of many parts of the car that were bent and distorted by the violent crash.

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 8

Accordingly, Claimants' claims fail because they cannot demonstrate that there was any defect in the vehicle. *See Rourke*, 530 S.W.2d at 798; *Parsons*, 85 S.W.3d at 330.

Moreover, Claimants' reliance on alleged vehicle recalls and consumer complaints is not persuasive. Claimants' Opening Statement, in the section titled "The Defective Car," places great emphasis upon a list of recalls taken from the National Highway Traffic Safety Administration ("NHTSA") website and upon complaints allegedly made to the NHTSA by drivers or passengers of other vehicles. None of this information is admissible in court, much less persuasive. The reliance upon recalls is entirely misplaced. (*See* Opening Statement at 8 and attachments C and D.) Claimants neglect to mention that Claimants' Expert himself admitted under oath at deposition that not a single one of the recalls applies to the car at issue. (*See* Dep. of Stephen Syson, 18:6-12, excerpts attached hereto as Exhibit R.) The recalls cited by the Claimants' Expert are simply irrelevant and would not be admissible at trial.

Similarly, statements allegedly made by other consumers are unreliable, inadmissible hearsay. This is well established under Texas law:

> Complaint letters in a manufacturer's files may be true, but they also may be accusatory and self-serving; they are rarely under oath and never subject to cross-examination. As they are necessarily out-of-court statements, they are hearsay if offered to prove the truth of the assertions therein – that the incidents complained of occurred as reported . . . Thus, consumer complaints in a company's files are generally hearsay within hearsay, and require their own exception in addition to that for business records generally.

*Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 139-140 (Tex. 2004). While the law grants certain exemptions to the hearsay rule to "data, findings, and reports" *made* by government agencies, those exemptions do not apply to "out-of-court complaints" *sent* to the government from third parties who are not under oath. *Id.* at 142 (emphasis added). Thus, because Claimants cannot demonstrate any defect and any alleged "recalls" or consumer statements are irrelevant and inadmissible, Claimants' claims will fail at trial.

B.    **Plaintiff's Burden of Proof in an Unintended Acceleration Case**

It is important to note that Plaintiffs will bear the burden of proof at trial. The proof required in an unintended acceleration case has been clearly stated by the Texas Supreme Court:

> In all [unintended acceleration] cases, it was not enough that a vehicle accelerated when claimants swore they had done nothing. Instead, we have consistently required competent expert testimony and objective proof

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 9

> that a defect caused the acceleration. The courts of appeals have done the same, holding liability cannot be based on unintended acceleration alone, on lay testimony regarding its cause, or on defects not confirmed by actual inspection.

*Nissan Motor Co. Ltd.*, 145 S.W.3d at 137 (footnotes omitted).

> These requirements are not peculiar to unintended acceleration cases. We recently held in *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600-01 (Tex. 2004)]that an engine fire in an older vehicle was not evidence that the vehicle was defective; there were simply too many potential causes to assume from the one that the other must have been the culprit. Instead, we held that a specific defect must be identified by competent evidence **and other possible causes must be ruled out.**

*Nissan Motor Co. Ltd.*, 145 S.W.3d at 137 (footnotes omitted; emphasis added).

> **These requirements are especially compelling in unintended acceleration cases.** Not only are there many potential causes (from floor mats to cruise control), but one of the most frequent causes (inadvertently stepping on the wrong pedal) is untraceable and unknown to the person who did it.

*Nissan Motor Co. Ltd.*, 145 S.W.3d at 137 (footnotes omitted; emphasis added). In essence, the claimants are trying to bootstrap the fact that an accident occurred into proof of a product defect. That is flatly unacceptable under Texas law:

> **Accordingly, we again affirm that the mere occurrence of an unintended acceleration incident is not evidence that a vehicle is defective.**

*Nissan Motor Co. Ltd.*, 145 S.W.3d at 137 (footnotes omitted; emphasis added).

### C.  Comparative Fault Will Reduce or Bar Any Recovery

Even if Claimants could prove that MLC was somehow strictly liable or negligent for the car accident—and they cannot—their claims will be barred by the doctrine of comparative fault. Texas law applies "modified" comparative fault principles that diminish wrongful death recovery based on negligence of plaintiff's decedent. *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 594 (Tex. 1999). A plaintiff's recovery is barred completely if he or she bears more than 50% of the responsibility. *See* Tex. Civ. Prac. & Rem. Code § 33.001.

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 10

Under the facts of this case, there is ample evidence from which it could be found that Mr. Powledge was negligent. Eye witness, Linda Paige Gilman, testified in her deposition that she watched the Powledge car the whole time from when it passed her until it hit the overhead sign support pole. The car drove in a straight line into the pole, and she is "absolutely certain" that the brake lights never came on. (*See* Dep. of Linda Paige Gilman, 19:4-20:1, Ex. C.) The evidence will also show that after the crash, the throttle was found to be held in an open position. Claimants' own expert conceded when his deposition was taken that, at best, the condition of the throttle post-crash only proves the throttle was applied at impact. (*See* Dep. of Stephen Syson, 117:1-18, Ex. R.) This is exactly what would occur if the driver's foot was on the gas pedal at impact. This evidence supports the conclusion that the crash was caused entirely by driver error. At the very least, it constitutes comparative fault that would reduce or bar recovery.

D. **Claimants Will No Longer Have Access to a "More Favorable" State Forum**

Claimants imply that if mediation is not successful, they will benefit from a favorable state court forum—the Texas Court. However, any determination regarding the allowance or disallowance of Claimants' claims is a core proceeding to be determined by the Bankruptcy Court, not the Texas Court.

Cases or proceedings "arising under" or "arising in" a case under title 11 are considered core proceedings.[5] By filing a proof of claim, a creditor renders his claims core proceedings and necessarily becomes a party under the bankruptcy court's core jurisdiction and submits himself to the "equitable power of the bankruptcy court to disallow its claim." *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1389 (2d Cir. 1990) (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989)); see *S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702, 705 (2d Cir. 1995). (*See* Proofs of Claim, attached hereto as Exhibit S.)

---

[5] Although section 157(b)(2) of title 28 of the United States Code specifically excludes from the definition of core the "liquidation or estimation of contingent or unliquidated personal injury or wrongful death claims against the estate for purposes of distribution in a case under title 11" (28 U.S.C. § 157(b)(2)), this exclusion is of no moment because this matter does not concern "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims" so as to implicate Section 157(b)(2)(B), but rather merely concerns the allowance or disallowance of timely filed Proofs of Claim as a matter of law. *In re Alper Holdings USA*, 386 B.R. 441, 450 (Bankr. S.D.N.Y.) (stating that in personal injury action the courts in the Second Circuit have repeatedly held that proceedings to determine the allowance or disallowance of claims are core matters), *aff'd*, 398 B.R. 736 (S.D.N.Y. 2008); *see also In re Chateaugay Corp.*, 111 B.R. 67, 76 (Bankr. S.D.N.Y. 1990) ("the bankruptcy court must have jurisdiction to make the threshold determination of whether as a matter of law, a claim exists which can be asserted against the debtor, even if that claim sounds in personal injury or wrongful death"), *aff'd*, 146 B.R. 339 (S.D.N.Y. 1992).

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 11

      Even if Claimants' claims do not remain in the Bankruptcy Court, the claims would not be litigated in state court. *See* 28 U.S.C. § 157(b)(5) (stating that "the district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending"); *accord In re Chateaugay Corp.*, 111 B.R. at 72.[6] Accordingly, Claimants will not benefit from the perceived more favorable state court forum in litigating their Proofs of Claim. Rather, Claimants will be required to litigate their claims in the Southern District of New York.

E.    **Claimants' Claims Are Capped For All Purposes**

      Contrary to the Claimants' recent statements, Claimants cannot seek more than the caps to which they have already agreed, even if ADR is unsuccessful. Pursuant to the ADR Order, Claimants' cap was accepted by MLC and the Claim Amount Cap is binding upon the Claimants for all purposes. (*See* ADR Order (Ex. F) at 4-5; April 8 Ltr. (Ex. H).) Claimants were clearly notified of the capping procedures and the effect of capping their Proofs of Claim pursuant to the ADR Order and various correspondence from MLC. (*See* ADR Order (Ex. F) at 4-5; various correspondence Exs. G-L.) In fact, MLC's agreement to pay for the mediation costs, as well as designation of such claims for mediation in advance of many other claims, was consideration for the "cap," forever barring Claimants from seeking recovery above this "cap."

      Thus, Claimants' statement in the Opening Statement that "[i]n the event this case does not settle at mediation, MLC may rest assured that Claimants will pursue damages many times greater than the caps at trial, where Federal Rule of Evidence 408 will exclude any reference to the agreed caps" is simply wrong. Any attempt to pursue damages greater than the Claim Amount Cap would violate the Bankruptcy Court's ADR Order and subject Claimants to possible sanctions by the Bankruptcy Court.

F.    **Claimants' Damages Claims are Significantly Exaggerated**

    1.    *Claimants Are Not Entitled To Punitive Damages*

      Claimants will not recover punitive damages from MLC. The purpose of awarding punitive damages is to punish wrongdoers and deter future wrongful conduct. *See In re Johns-Manville Corp.*, 68 B.R. 618, 627 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), citing *Williams v. City of N.Y.*, 508 F.2d 356 (2d Cir. 1974); *Sibley v. KLM-*

---

[6] Though a district court could abstain from exercising jurisdiction to try personal injury tort claims in a district court under 28 U.S.C. § 1334(c)(1) and permit the claim to be tried in state court, it is unlikely to do so here because "transfer is the rule and abstention is the exception." *In re Ice Cream Liquidation, Inc.*, 281 B.R. 154, 159 (Bankr. D. Conn. 2002) (citing *In re Pan Am Corp.*, 16 F.3d 513, 516 (2d Cir. 1994)); *see also In re Winstead Mem. Hosp.*, 236 B.R. 556, 562 (Bankr. D. Conn. 1999) ("The doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a [Federal] Court to adjudicate a controversy properly before it.").

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 12

*Royal Dutch Airlines*, 454 F. Supp. 425 (S.D.N.Y. 1978). However, in situations where the recovery of punitive damages by some creditors depletes the recovery afforded to other creditors, courts have regularly exercised their equitable power pursuant to section 105 of the Bankruptcy Code to disallow or subordinate punitive damage claims. *See, e.g., In re Johns-Manville*, 68 B.R. at 627; *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 562 (E.D. Va. 1988). Awarding punitive damage claims to certain unsecured creditors in cases where all unsecured creditors are not receiving full satisfaction of their claims in effect forces those impaired creditors to pay for the debtor's wrongful conduct. *See In re Johns-Manville Corp.*, 68 B.R. 618, 627-28 (Bankr. S.D.N.Y. 1986) (stating "it is well within the authority of this court to disallow a claim for punitive damages . . . where allowing such a claim would ill serve the policy of such awards").

Punitive damage claims are particularly inappropriate in instances such as this one, where the debtor is liquidating, as there is no deterrent purpose in awarding punitive damages. Notably, in chapter 7 liquidations, punitive damages are subject to statutory subordination and relegated to a fourth level in the distribution scheme—below that of unsecured claims—because they may be cut off when available funds are insufficient to pay even compensatory damages. 11 U.S.C. § 726(a)(4).[7]

Here, Claimants appear to seek punitive damages based on MLC's alleged "tradition" of placing unreasonably dangerous products on the market, specifically the Malibu. (*See* Opening Statement at 9.) However, MLC is liquidating. Further, under MLC's anticipated chapter 11 plan, unsecured creditors will not receive full value on account of their claims.[8] Thus, it is very unlikely that Claimants would be able to recover punitive damages against MLC even if they had evidence to support such claims, which they do not.[9]

2.   *Damages Recoverable in a Wrongful Death Claim Are Limited*

Moreover, the Claimants' claims for conscious pain and suffering lack factual support. "In Texas, only pain consciously suffered and experienced is compensable." *Ruiz v.*

---

[7] Although section 726(a)(4) of the Bankruptcy Code is not directly applicable to chapter 11 cases, in addition to the court's equitable authority under section 105 of the Bankruptcy Code, courts have also contemplated that section 510(c) of the Bankruptcy Code provides statutory authority for the subordination of punitive damage claims in chapter 11 cases. *See In re Colin*, 44 B.R. 806, 810 (Bankr. S.D.N.Y. 1984) ("the [] trustee's claim for punitive damages against the estate shall, pursuant to § 510(c) of the [Bankruptcy] Code, be accorded a status inferior to all general nonsubordinated unsecured claims."); *In re Johns-Manville Corp.*, 68 B.R. at 627 ("Finally, it should be observed that arguably under § 510 of the [Bankruptcy] Code, bankruptcy courts have the statutory power to subordinate claims for punitive damages.").

[8] The most Claimants could hope to receive would be punitive damages that would be equitably subordinated to unsecured claims.

[9] Even if Claimants somehow were able to obtain an award for punitive damages in state court—and they cannot—the Bankruptcy Court would have to examine such award.

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 13

*Guerra*, 293 S.W.3d 706, 722 (Tex. App.—San Antonio 2009, no pet.), citing *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 248 (Tex. App.—Texarkana 2005, no pet.). "The duration of the pain and mental anguish is an important consideration." *Id.*, citing *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.). Consciousness of approaching death is a proper element to be considered in evaluating mental suffering. *Ruiz*, 293 S.W.3d at 723, quoting *Jenkins v. Hennigan*, 298 S.W.2d 905, 911 (Tex. App.—Beaumont 1957, writ ref'd n.r.e.).

The autopsy reports indicate that all of the occupants of the Malibu died from blunt force trauma, including head injuries and multiple fractures. There is no evidence that any of the decedents survived the crash even for a short time. The crash severity was such that the deaths were almost certainly instantaneous. Claimants cannot make the factual showing that any of the decedents remained conscious after the crash. While Texas law does allow the "consciousness of approaching death" to be considered when evaluating mental suffering, the parties can only speculate as to what decedents were thinking prior to the crash, or for how long. Moreover, the time during which any of the decedents could have been aware of impending death was very short. The police report shows that the car traveled a total of 1419 feet through the grass before hitting the pole. At 60 miles per hour, this would take only 16 seconds, and all parties agree that the actual speed of the car was faster than that. Accordingly, while a jury could potentially award damages for conscious pain and suffering, the suggestion that this would be a major factor in assessing damages is strained.

3. *Lost Earning Capacity/Loss of Support Damages Are Limited*

Finally, any damages ultimately obtained based on lost earning capacity/loss of support that would have been provided by Mr. Powledge will be limited based on Mr. Powledge's spotty work history and modest earnings. Mr. Powledge was employed by Mission Petroleum at the time of his death (October 18, 2005). He was hired approximately three months earlier as a dispatcher, at a pay rate of $12.50 per hour. His application for employment at Mission Petroleum reflects an erratic job history prior to his employment at Mission Petroleum, with modest earnings. Accordingly, any damages recovered for lost earning capacity/loss of support that would have been provided by Mr. Powledge would be limited.

WEIL, GOTSHAL & MANGES LLP

Mary Burdin, Esq.
July 27, 2010
Page 14

## IV. CONCLUSION

We appreciate your services as mediator and look forward to seeing you in your office on August 9, 2010. In the meantime, if you have any questions, please call us.

Respectfully submitted,

*[signature] With permission UC*

Angela C. Zambrano

cc: Angel Hagmaier, Esq.
Dax O. Faubus, Esq.
Kent B. Hanson, Esq.
Joseph H. Smolinsky, Esq.