KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
Arthur Steinberg
Scott Davidson

-and-

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Richard C. Godfrey, P.C. (admitted pro hac vice)
Andrew B. Bloomer, P.C. (admitted pro hac vice)

*Attorneys for General Motors LLC*
*f/k/a General Motors Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | **Case No.:  09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | : | |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------x

**OBJECTION BY GENERAL MOTORS LLC TO MOTION FOR
LEAVE TO PURSUE CLAIMS AGAINST GENERAL MOTORS LLC,
AND, ALTERNATIVELY, TO FILE A POST-BAR-DATE PROOF OF
CLAIM IN THE MOTORS LIQUIDATION COMPANY BANKRUPTCY**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................ 4

    A.    The 363 Sale ..................................................................................... 4

    B.    The Movant's Civil Action Against New GM ...................................... 7

OBJECTION ................................................................................................................ 9

    A.    New GM Did Not Assume Any of the Liabilities that Movant Asserts in
the Civil Action ............................................................................... 9

    B.    When Movant's Alleged Claims "Accrued" Is Irrelevant; His Claims
Arose Pre-Sale And Are Thus Barred By The Sale Order And Injunction ......... 11

    C.    Movant Received Sufficient Notice of the 363 Sale ............................ 16

    D.    New GM Has Never Admitted That It Is the Same Company As Old GM,
And It May Compensate Some Holders of Retained Liabilities While Not
Compensating Others ........................................................................ 17

        1.    In A Bankruptcy Sale, The Purchaser Can Pick And Choose Which
Liabilities To Assume And Which Not To Assume ............................... 19

        2.    Cases Outside The Bankruptcy Context Support New GM's
Ability To Voluntarily Compensate Some Holders of Retained
Liabilities, And Not Others .................................................................. 21

        3.    New GM's Settlement Of Certain Claims Should Have No Bearing
On the Enforceability Of Other Claims ................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
  842 F. Supp.2d 1216 (C.D. Cal. 2012) ............................................................... 22

*Atkins v. Cory (In re Cory)*,
  Adv. No. 08-4107, 2008 WL 5157515 (Bankr. W.D. Mo. July 18, 2008) .......................... 14

*Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC)*,
  471 B.R. 654 (N.D. Ala. 2012) ........................................................................ 14

*Braniff Airways v. Exxon*,
  814 F.2d 1336 (5th Cir. 1987) ......................................................................... 12

*Brunswick Bank & Trust Co. v. Atanasov (In re Atanasov)*,
  221 B.R. 113 (D.N.J. 1998) ............................................................................ 14

*Carroll v. Henry Cnty, Georgia*,
  336 B.R. 578 (N.D. Ga. 2006) ......................................................................... 14

*Castillo v. Gen. Motors Co.*,
  Adv. Proc. No. 09-00509, 2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17,
  2012), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013) ............................................... 18, 20

*Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Mgmt., Inc.)*,
  4 F.3d 1329 (5th Cir. 1993) ............................................................................. 12

*City of New York v. New York N.H. & H.R. Co.*,
  344 U.S. 293 (1953) ...................................................................................... 16

*Danzig Claimants v. Grynberg (In re Grynberg)*,
  113 B.R. 709 (Bankr. D. Colo. 1990), *aff'd*, 966 F.2d 570 (10th Cir. 1992) .............. 12

*FCC v. NextWave Pers. Comm'ns Inc.*,
  537 U.S. 293 (2003) ...................................................................................... 11

*In re Caldor, Inc.*,
  240 B.R. 180 (Bankr. S.D.N.Y. 1999) .................................................................. 11

*Gillispie v. Timmerman-Cooper*,
  835 F. Supp.2d 482 (S.D. Ohio 2011) ................................................................... 8

*Hayes v. Boston Pub. Health Comm'n*, No. 11–11859–MLW,
  2013 WL 5564184 (D. Mass. Oct. 7, 2013) ............................................................ 23

*Heck v. Humphrey*,
  512 U.S. 477 (1994) ...................................................................................... 12

*In re AMR Corp.*,
  478 B.R. 599 (Bankr. S.D.N.Y. 2012) .................................................................. 23

*In re Caldor, Inc.*,
  240 B.R. 180 (Bankr. S.D.N.Y. 1999) .................................................................. 11

*In re Chrysler LLC*,
  576 F.3d 108 (2d Cir. 2009), *cert. dismissed*, 557 U.S. 961, and
  *cert. granted judgment vacated* 558 U.S. 1087 (2009) .......................................... 20

*In re Finley, Kumble, Wagner, Heine*,
  160 B.R. 882 (Bankr. S.D.N.Y. 1993) .................................................................. 12

*In re Gen. Motors Corp.*,
 407 B.R. 463 (Bankr. S.D.N.Y. 2009) ....................................................... 15, 16, 19

*In re Houbigant*,
 188 B.R. 347 (Bankr. S.D.N.Y. 1995) ................................................................ 12

*In re Jenkins*,
 410 B.R. 182 (W.D. Va. 2008) ........................................................................... 14

*In re Stewart Foods, Inc.*,
 64 F.3d 141 (4th Cir. 1995) ............................................................................... 12

*In re Texaco Inc.*,
 2011 WL 4526538 (S.D.N.Y. Sept. 28, 2011) ...................................................... 11

*In re U.S.H. Corp. of New York*,
 223 B.R. 654 (Bankr. S.D.N.Y. 1998) ................................................................ 16

*In re XO Commc'ns, Inc.*,
 301 B.R. 782 (Bankr. S.D.N.Y. 2003) ................................................................ 16

*Johnson v. Mitchell*, No. CIV S-10-1968,
 2011 WL 1586069 (E.D. Cal. Apr. 25, 2011) ...................................................... 14

*Laforest v. Honeywell Intern. Inc.*, No. 03-CV-6248T,
 2004 WL 1498916 (W.D.N.Y. July 01, 2004) ...................................................... 23

*Lynn v. CSX Transp., Inc.*,
 84 F.3d 970 (7th Cir. 1996) ............................................................................... 23

*Marenyi v. Packard Press Corp.*, No. 90-cv-4439,
 1994 WL 16000129 (S.D.N.Y. June 9, 1994) ................................................. 21, 22

*Matter of DG Acquisition Corp.*,
 188 B.R. 918 (Bankr. D. Del. 1995) ................................................................... 12

*Memphis Cmty. Sch. Dist. v. Stachura*,
 477 U.S. 299 (1986)........................................................................................... 10

*Mullane v. Cent. Hanover Bank & Trust Co.*,
 339 U.S. 306 (1950)........................................................................................... 16

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
 430 B.R. 65 (S.D.N.Y. 2010) ............................................................................. 19

*State v. Gillispie*, No. 24456,
 2012 WL 1264496 (Ohio App. 2 Dist. Apr. 13, 2012)............................................ 8

*Stone v. Kmart Corp.*, No. 2:06-cv-302-WKW,
 2007 WL 1034959 (M.D. Ala. 2007) ............................................................. 13, 14

*Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
 Adv. Proc. No. 09–09803, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013)............. 9, 18

*United States v. Gerth*,
 991 F.2d 1428 (8th Cir. 1993) ........................................................................... 12

## STATUTES

11 U.S.C. § 101(5) .......................................................................................................... 11

42 U.S.C. § 1983............................................................................................... 8, 10, 12, 13

## OTHER AUTHORITIES

H. Rep. No. 595, 95th Cong., 2d Sess. 309 (1978)....................................................... 11

General Motors LLC ("**New GM**"), by its undersigned counsel, submits this objection ("**Objection**") to the *Motion For Leave To Pursue Claims Against General Motors LLC, And, Alternatively, To File A Post-Bar-Date Proof Of Claim In The Motors Liquidation Company Bankruptcy* ("**Motion for Leave**"), filed by Roger Dean Gillispie ("**Movant**") on June 17, 2014 [Dkt. No. 12727] and, in support thereof, represents as follows:

## PRELIMINARY STATEMENT

1.        Movant's claim is based on events that took place ***over 18 years before*** New GM came into existence.  He has not alleged – nor could he allege – any improper conduct of New GM.  The alleged improper conduct is that of Old GM.  Movant's claim is based on a "successor liability" theory.  Under this Court's Order, dated July 5, 2009 ("**Sale Order and Injunction**"),[1] which approved the sale ("**363 Sale**") of substantially all of the Debtors' assets, New GM, as purchaser, acquired Old GM's business, free and clear of all claims against Old GM based on, among other things, Old GM's conduct, and claims based on ***successor liability***.[2]  Accordingly, Movant's claims against New GM are barred as a matter of law.[3]

2.        Movant's entire argument is based on a flawed premise.  At the time of Old GM's bankruptcy filing, he was ***not*** a "future creditor" of Old GM.  Thus, there is no conceivable basis

---

[1]    The full title of the Sale Order and Injunction is "Order (i) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (ii) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (iii) Granting Related Relief," entered by the Court on July 5, 2009.  A copy of the Sale Order and Injunction is annexed hereto as **Exhibit A**.

[2]    In the 363 Sale, pursuant to the Amended and Restated Master Sale and Purchase Agreement ("**Sale Agreement**") New GM agreed to assume specific liabilities.  Movant's claim is not an Assumed Liability within the meaning of the Sale Agreement (*See* Exhibit B).

[3]    The Movant also seeks alternative relief against Motors Liquidation Company (f/k/a General Motors Corporation) ("**Old GM**"), in the event the relief requested against New GM is denied.  New GM takes no position on that portion of the Motion that is directed against Old GM.

to challenge the prohibition in the Sale Order and Injunction on asserting claims against New GM based on Old GM's conduct or successor liability.[4]

3.      As of the 363 Sale, Movant held a prepetition, contingent, disputed, unliquidated claim against Old GM.  The event that Movant asserts gave rise to his alleged claim occurred around calendar year 1991, and was related to testimony given by Old GM employees in connection with Movant's arrest and conviction.  The fact that Movant could not commence a litigation against Old GM until his conviction was overturned does not change the categorization of his claim as a prepetition claim, albeit one subject to a contingency (the successful challenge to his conviction).

4.      Movant concedes this point when he alleges that he has "labored tirelessly for over 20 years to clear his name." (Motion for Leave, p. 2).  Thus, it is indisputable that the alleged "bad act," which is the predicate for Movant's "claim," was a prepetition event, and that he was fully cognizant of that event for many years.  In such circumstance, Movant could never be considered a "future creditor" of Old GM.

5.      Movant does not allege that New GM was aware of his claim against Old GM at the time of the 363 Sale.  Indeed, Movant has to take that position because he constructed his flawed legal argument on the notion that he was not a creditor of Old GM at the time of the 363 Sale.  Movant thus has conceded that he was an "unknown" prepetition creditor with a contingent, disputed claim as of the 363 Sale.

6.      Movant also cannot assert that the 363 Sale deprived him of a remedy against Old GM.  The substantial consideration that New GM paid to Old GM as part of the 363 Sale is the only reason that Old GM ultimately was able to make a material distribution to its unsecured

_____

[4]    Even if Movant was a "future creditor," his successor liability claim against New GM would still be barred by the Sale Order and Injunction.

2

creditors. Thus, even if there was no protection for New GM under the Sale Order and Injunction with respect to successor liability claims, Movant still would not be able to assert such a claim against New GM, based on the material, admitted facts of this case.

7.    Movant erroneously claims that he could not have filed a claim in Old GM's bankruptcy case until his 20 year effort to overturn his conviction was vindicated. That clearly is wrong. Contingent creditors were instructed to file claims by the claims bar date. Movant claims he never received direct mail notice of the 363 Sale. That is true, but as a contingent, unknown, prepetition creditor who had not sued Old GM as of the 363 Sale based on an event that had occurred 18 years before, the only notice of the 363 Sale that he was entitled to receive was publication notice, which was provided by Old GM.

8.    Finally, Movant's assertion that New GM has "admitted" that it is the same company as Old GM is belied by the facts and the law of the case. The selective quotations cited in the Motion for Leave are taken entirely out of context. Moreover, New GM's actions since the 363 Sale make clear that it is a distinct company from Old GM. As this Court is aware, New GM has filed numerous motions with this Court since 2009, three over the last several months. Most recently, New GM has argued that it is not responsible for a variety of claims asserted against it in over 100 civil actions pending across the country precisely because such claims constitute Old GM liabilities that were not assumed by New GM under the Sale Agreement,[5] and the Sale Order and Injunction. The fact that New GM has decided, based upon a unique set of facts of to provide a discreet group of accident victims with an alternative to the enforcement of the Sale Order and Injunction against them does not modify the Court-approved protections New GM obtained under the Sale Agreement, and the Sale Order and Injunction. Indeed, in the

---

[5]    A copy of the Sale Agreement is annexed hereto as **Exhibit B**.

Ignition Switch Actions, the Designated Counsel, the Groman Plaintiffs, the GUC Trust and the Unitholders conceded this very point at a hearing attended by Movant's counsel *after* Movant had filed the Motion for Leave. *See* Supplemental Scheduling Order, dated July 11, 2014, at 3-4.

9.     For all the foregoing reasons, and as more fully explained below, the Motion for Leave should be denied as it pertains to New GM.

## BACKGROUND

### A.    The 363 Sale

10.     On June 1, 2009 ("**Petition Date**"), Old GM and certain of its affiliates (collectively, the "**Debtors**") commenced cases under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**" or "**Court**").

11.     On the Petition Date, Old GM filed a motion ("**Sale Motion**") seeking approval of the original version of the Sale Agreement, pursuant to which substantially all of Old GM's assets were to be sold to Vehicle Acquisition Holdings LLC, a newly formed, government-sponsored entity that would ultimately become New GM.  Old GM was the proponent of the Sale Motion and had the burden of seeking its approval, and with complying with all due process requirements.

12.     In the Sale Motion (paragraphs 46 and 55), Old GM stated that it was not practicable to provide direct mail notice to contingent creditors, and that publication notice should be sufficient under the circumstances.  In the Sale Procedures Order, dated June 2, 2009 (paragraph E), the Court noted that publication notice of the 363 Sale ("**Publication Notice**") was appropriate for unknown creditors and parties otherwise not required to be served with the Sale Notice.

13.     Under the Sale Order and Injunction (paragraph E), the Court held that, "[w]ith respect to parties who may have claims against the Debtors, but whose identities are not reasonable ascertainable by the Debtors (including potential contingent warranty claims against the Debtors), the Publication Notice was sufficient and reasonably calculated under the circumstances to reach such parties."

14.     Movant claims he was not a creditor of Old GM at the time of the 363 Sale. Based on his self-description, Movant was a contingent, unknown creditor of Old GM.  As such, he received proper notice of the 363 Sale through the Publication Notice.

15.     The Sale Order and Injunction (at paragraph 7) provides that, with the exception of certain limited liabilities expressly assumed under the Sale Agreement (none of which are applicable here), the assets acquired by New GM were transferred "free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever . . . including rights or claims based on any successor or transferee liability . . . ."

16.     The "no successor liability" provision was set forth a number of times in the Sale Order and Injunction.  For example, in paragraph 9 thereof, Old GM creditors were permanently enjoined from attempting to enforce liabilities against New GM (other than Assumed Liabilities[6]), as follows:

> [A]ll persons and entities … holding liens, claims and encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against [Old GM] or the Purchased Assets (whether legal or equitable, secured or unsecured, ***matured or unmatured***, **contingent or noncontingent**, senior or subordinated), arising under or out of, in connection with, or in any

---

[6]    "Assumed Liabilities" was defined in Section 2.3(a) of the Sale Agreement.  None of the categories of liabilities in Section 2.3(a) are applicable to this matter.  All liabilities of Old GM not expressly defined as Assumed Liabilities constituted "Retained Liabilities" that remained an obligation of Old GM.  *See* Sale Agreement, §§ 2.3(a), 2.3(b).

> way relating to [Old GM], the Purchased Assets, ***the operation of the Purchased Assets prior to the Closing*** … are forever barred, estopped, and permanently enjoined … from asserting against [New GM] … such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

Sale Order and Injunction, ¶ 8 (emphasis added); *see also* ¶ 9 ("This Order (a) shall be effective as a determination that, as of the Closing, (i) no claims other than Assumed Liabilities, will be assertable against the Purchaser, its affiliates, their present or contemplated members or shareholders, successors, or assigns, or any of their respective assets (including the Purchased Assets); (ii) the Purchased Assets shall have been transferred to the Purchaser free and clear of all claims (other than Permitted Encumbrances) . . . .")

      17.    Paragraph 46 of the Sale Order and Injunction similarly provides:

> Except for the Assumed Liabilities expressly set forth in the [Sale Agreement] … ***[New GM] … shall [not] have any liability for any claim that arose prior to the Closing Date . . . or otherwise is assertable against [Old GM] … prior to the Closing Date* ….** Without limiting the foregoing, [New GM] shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims, including, but not limited to, under any theory of ***successor or transferee liability,*** de facto merger or continuity … and products … liability, ***whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.***

*Id.* ¶ 47 (emphasis added); *see also* Sale Order and Injunction, ¶ 47 ("Effective upon the Closing … all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action … against [New GM] … with respect to any (i) claim against [Old GM] other than Assumed Liabilities").

      18.    While a specific category of liabilities did not have to be contained in Section 2.3(b) of the Sale Agreement to be considered Retained Liabilities, Section 2.3(b)(xi) expressly

provides that "all Liabilities to third parties for Claims based upon Contract, tort or any other basis" are Retained Liabilities.

19.     Moreover, New GM did not assume any liabilities "arising in any way in connection with any agreements, ***acts, or failures to act, of any of [Old GM]*** or any of [Old GM's] predecessors or affiliates, ***whether known or unknown***, contingent or otherwise, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to, claims otherwise arising under doctrines of successor or transferee liability." Sale Order and Injunction, ¶ AA (emphasis added).  This provision insulated New GM from any claims based on Old GM's conduct.

20.     The Sale Order and Injunction made clear that the Sale Agreement would

> be binding in all respects upon the Debtors, their affiliates, all ***known and unknown creditors*** of, and holders of equity security interests in, any Debtor, including any holders of liens, claims, encumbrances, or other interests, including rights or claims based on any ***successor or transferee liability . . . .***

*Id.* ¶ 6 (emphasis added).

21.     All of these provisions, taken individually and together, act to protect New GM from the Movant's claims.

**B      The Movant's Civil Action Against New GM**

22.     In 1991 – ***18 years before Old GM's bankruptcy*** – Movant was convicted of certain crimes in State court in Ohio.  Twenty years after his conviction and after numerous appeals, motions, and other legal proceedings (the first of which was filed immediately after the guilty verdict in 1991), Movant's conviction was called into question, first in 2011 by a federal court, and then in 2012 by a state court.  *See Gillispie v. Timmerman*-Cooper, 835 F. Supp.2d

482 (S.D. Ohio 2011), and *State v. Gillispie*, No. 24456, 2012 WL 1264496 (Ohio App. 2 Dist. Apr. 13, 2012).

23.     Based on the federal and state courts' decisions, in December 2013, Movant commenced a civil action ("**Civil Action**") against numerous defendants, including New GM, in the Southern District of Ohio asserting various causes of action under 42 U.S.C. § 1983.  The genesis of the Civil Action is a string of events that occurred ***prior to*** Movant's conviction in 1991. These events include an alleged conspiracy by certain Old GM employees, police officers and other public officials that purportedly resulted in Movant's arrest and incarceration.  It is undisputed that every one of these events occurred ***between 18 and 21 years before the commencement of Old GM's bankruptcy case***, and that every action complained of concerns the conduct of an Old GM (and not New GM) employee.  There is absolutely no allegation that New GM was in any way involved in any of the conduct complained of by Movant.

24.     Moreover, as Movant asserts in his Motion for Leave, he has "steadfastly maintained his innocence and labored tirelessly for over 20 years to clear his name."  Motion for Leave, p. 2.  In this regard, both the federal and state decisions detail Movant's efforts to secure his release.  For example, on February 26, 1991 – two weeks after his conviction  – Movant filed a motion in state court seeking a new trial.  *See Gillispie*, 835 F. Supp.2d at 487.  Thereafter, between 1992 and 2008, Movant sought some type of relief from the courts at least 18 times, all of which had the ultimate goal of overturning his conviction.  *See id.* at 487-492.

25.     Based on this conduct, it is clear that Movant believed from the time of his conviction in 1991 that he was wrongfully prosecuted and convicted, and would have had knowledge of whatever claim he might purport to assert against Old GM at that time.

## OBJECTION

26.     As noted, New GM acquired substantially all of the assets of Old GM on July 10,

2009, in a transaction approved by this Court. The scope and limitations of New GM's

responsibilities are defined in the Sale Agreement and Sale Order and Injunction.  As set forth

below, Movant's claims are barred by the plain terms of the Sale Order and Injunction.

**A.      New GM Did Not Assume Any of the
         Liabilities that Movant Asserts in the Civil Action**

27.     Every cause of action Movant asserts in his Civil Action is based on the conduct

of Old GM employees that occurred almost two decades before New GM came into existence.

*See, e.g.*, Amended Complaint (attached to Motion for Leave as Exhibit 1), ¶ 77 (defendants

allegedly destroyed, failed to disclose or withheld exculpatory evidence from the prosecution in

connection with a trial that occurred in 1991), ¶ 84 ("improper and suggestive procedures"

allegedly tainted the pretrial identification of Movant and was used against him at trial in 1991);

¶ 91 (evidence was allegedly fabricated and offered at trial in 1991); ¶¶ 98-103 (asserting a cause

of action for malicious prosecution in connection with Movant's conviction in 1991).

28.     As this Court has previously held in upholding the injunction contained in the

Sale Order and Injunction, "New GM is not liable for Old GM's conduct . . . ." *Trusky v. Gen.*

*Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 09–09803, 2013 WL 620281, at *2

(Bankr. S.D.N.Y. Feb. 19, 2013); *see also* Sale Order and Injunction, ¶ AA (New GM did not

assume any liabilities "arising in any way in connection with any agreements, acts, or failures to

act, of any of [Old GM] or any of [Old GM's] predecessors or affiliates, whether known or

unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement

of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or

otherwise, including, but not limited to, claims otherwise arising under doctrines of successor or

transferee liability"). As all of Movant's claims are based on Old GM's conduct, they are Retained Liabilities that cannot be maintained against New GM.

29. In essence, Movant is attempting to impose "successor" liability upon New GM, but New GM is not a successor to Old GM and it did not assume any liabilities in connection with successor or transferee liability. This is expressly provided by the Court's Sale Order and Injunction:

> The Purchaser **shall not be deemed**, as a result of any action taken in connection with the [Sale Agreement] or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to: (i) **be a legal successor, or otherwise be deemed a successor to the Debtors** (other than with respect to any obligations arising under the Purchased Assets from and after the Closing); (ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors. Without limiting the foregoing, the **Purchaser [New GM] shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims**, including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity, environmental, labor and employment, and products or antitrust liability, **whether known or unknown as of the Closing**, now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or unliquidated.

Sale Order and Injunction, ¶ 46 (emphasis added); *see also id.* ¶¶ AA, BB, DD, 6, 7, 8, 10 and 47; Sale Agreement, § 9.19. On their face, Movant's successor liability allegations are a violation of this Court's Sale Order and Injunction.

30. Moreover, the Sale Agreement specifically states that Retained Liabilities include "all Liabilities to third parties for Claims based upon Contract, tort or any other basis[.]" Sale Agreement, § 2.3(b)(xi). Movant's claims in the Amended Complaint – *i.e.*, claims based on 42 U.S.C. § 1983 (*see* Motion for Leave, p. 2) – sound in tort and are therefore Retained Liabilities that cannot be maintained against New GM. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986) ("We have repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability . . . ." (internal citations omitted)).

31. Based on the foregoing, the claims that Movant asserts in the Amended Complaint against New GM clearly constitute Retained Liabilities, not Assumed Liabilities. They thus directly contravene the Sale Order and Injunction, and are barred as against New GM.

**B.    When Movant's Alleged Claims "Accrued" Is Irrelevant; His Claims
       Arose Pre-Sale And Are Thus Barred By The Sale Order And Injunction**

32. Movant spends many pages in his Motion asserting that he is a "future" creditor because he could not have commenced a lawsuit until his conviction was called into question. In this regard, Movant continually asserts that his claims did not "accrue" until after the 363 Sale, and thus he could not have filed a timely claim against the bankruptcy estate. *See, e.g.*, Motion for Leave, p. 8

33. Movant's argument demonstrates a fundamental misunderstanding of when a claim *arises* for bankruptcy purposes. "Federal bankruptcy law determines when . . . state-law contract or tort claims ar[i]se." *In re Texaco Inc.*, 2011 WL 4526538, at *4 (S.D.N.Y. Sept. 28, 2011). The Bankruptcy Code defines a "claim" as "[a] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . ." 11 U.S.C. § 101(5). The Supreme Court has recognized that the term "claim" is intended to have "the broadest available definition," *FCC v. NextWave Pers. Comm'cns Inc.*, 537 U.S. 293, 302 (2003), and the House Report explained that the definition in Section 101(5) of the Bankruptcy Code was intended as the "broadest possible definition" encompassing "all legal obligations of the debtor, *no matter how remote or contingent*." H. Rep. No. 595, 95th Cong., 2d Sess. 309 (1978) (emphasis added).

34. A claim arises regardless of enforcement efforts (*i.e.*, future litigation) or whether the claim is contingent, unliquidated, or unmatured when the petition is filed. *See In re Caldor, Inc.*, 240 B.R. 180, 192 (Bankr. S.D.N.Y. 1999) ("Because contingent and unmatured rights of

payment are 'claims' under the Bankruptcy Code, a right to payment that is not yet enforceable under non-bankruptcy law may be defined as a claim" under the Bankruptcy Code); *United States v. Gerth*, 991 F.2d 1428, 1433 (8th Cir. 1993) ("[D]ependency on a postpetition event does not prevent a debt from arising prepetition."); *In re Stewart Foods, Inc.*, 64 F.3d 141, 146 (4th Cir. 1995) ("[T]hat the payments became due after the bankruptcy filing does not alter the conclusion that the payments are pre-petition obligations.") (citing *Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Mgmt., Inc.)*, 4 F.3d 1329, 1335 n.7 (5th Cir. 1993) ("A claim is not rendered a post-petition claim simply by the fact that time for payment is triggered by an event that happens after the filing of the petition.")); *Braniff Airways v. Exxon*, 814 F.2d 1030, 1336 (5th Cir. 1987) ("The character of a claim is not transformed from pre-petition to postpetition simply because it is contingent, unliquidated, or unmatured when the debtor's petition is filed."); *Matter of DG Acquisition Corp.*, 188 B.R. 918, 922 (Bankr. D. Del. 1995) ("A creditor may possess a bankruptcy claim and not possess a cause of action on that claim.").

35.     To determine when a claim arose, some "triggering act" constituting the basis for a cause of action must have occurred prior to the filing of the bankruptcy petition. *Danzig Claimants v. Grynberg (In re Grynberg)*, 113 B.R. 709 (Bankr. D. Colo. 1990), *aff'd*, 966 F.2d 570 (10th Cir. 1992); *see also In re Finley, Kumble, Wagner, Heine*, 160 B.R. 882, 891-92 (Bankr. S.D.N.Y. 1993) (when obligation stems from a contractual obligation, even a postpetition breach will be treated as giving rise to a prepetition liability if the contract was executed prepetition); *In re Houbigant*, 188 B.R. 347, 355 (Bankr. S.D.N.Y. 1995) (same).

36.     In *Heck* – the main case relied on by Movant – the Supreme Court addressed the issue of when a prisoner could file a Section 1983 claim against county prosecutors and a state police investigator for his alleged unlawful arrest and conviction. *See Heck v. Humphrey*, 512 U.S. 477 (1994). *Heck* does not concern when a claim arises for bankruptcy purposes. The

Supreme Court held that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not *accrue* until the conviction or sentence has been invalidated." *Id*. at 489–90 (emphasis added) .

37.     Here, however, the issue is not when Movant's Section 1983 claim *accrued* so that he could file a lawsuit against state and local officials, but rather when Movant's claim *arose* in the context of the bankruptcy proceeding.  Such a bankruptcy claim clearly arose almost two decades prior to the closing of the 363 Sale.

38.     A case directly on point is *Stone v. Kmart Corp.*, No. 2:06-cv-302-WKW, 2007 WL 1034959 (M.D. Ala. 2007).  In *Stone*, the plaintiff was arrested and charged with theft from Kmart prior to the commencement of Kmart's bankruptcy case.  After the bar date for asserting claims, "the [theft] charge against plaintiff was *nolle prosequi* [*i.e.*, no longer prosecuted], and she subsequently filed [an] action in state court exactly two years later . . . claiming the proceedings instituted by Kmart were done maliciously and without probable cause." *Id*. at *1. The court aptly summed up the parties contentions as follows:  "Kmart claims the cause of action 'arose' during the claim period because the arrest occurred during that period.  Plaintiff responds that her cause of action for malicious prosecution did not accrue until all the elements were in place, which was February 23, 2004, when the charges were *nolle prosequi*." *Id.*  This is the same issue here.

39.     While the court in *Stone* agreed with plaintiff that her claim for malicious prosecution did not accrue until "the charges were *nol-prosed* by the prosecut[ion]" (*id.* at *2), that was not the end of the inquiry.  The court also agreed with Kmart's argument, that "the definition of a claim under the Bankruptcy Code is broad and should include Plaintiff's cause of action." *Id.*  The court further found as follows:

> The accrual time for Plaintiff's malicious prosecution claim under Alabama law does not control this action.  The relevant inquiry is whether a claim has accrued

under bankruptcy law based upon the statutory definition of a claim. The court finds that Plaintiff's claim accrued for purposes of bankruptcy law prior to the Bar Date. Applying the broad definition of claim to the facts of this case, Plaintiff, at the time of her arrest, had an arguably remote claim for malicious prosecution against Kmart. The scope of the term claim, as determined through the legislative history of the Bankruptcy Code, is more than broad enough to accommodate a malicious prosecution action, although the action has not accrued for purposes of state law. The claim is contingent upon termination of the criminal case in favor of Plaintiff, which at least arguably would happen at some point during her criminal investigation or trial. That makes the claim at least "contingent" or "unmatured" in the context of the Code. Although, at first blush, the result seems unfair to Plaintiff, her claim is inextricably intertwined with the pre-bankruptcy state of Kmart, and therefore, if allowed, would render the "fresh start" mandate of Congress meaningless.

*Id.* at *3 (citations omitted). The *Stone* case is on "all fours" with the case at hand and disposes of Movant's arguments.

40.    The cases Movant relies on either support New GM or are inapposite. For example, in *Austin v. BFW Liquidation, LLC (In re BFW Liquidation, LLC)*, 471 B.R. 654 (N.D. Ala. 2012), the plaintiff commenced an action against the debtor and the purchaser of its assets, asserting various claims based on her arrest for using checks with insufficient funds. All of plaintiff's claims were dismissed *as against the purchaser* because the actions complained of – just like the situation here – occurred prior to the purchase of the debtor's assets. *Id.* at 660-61. In addition, the passage of *BFW Liquidation* that the Movant quotes concerned the plaintiff's claims against the debtor, not the purchaser of the debtor's assets. *Id.* at 667. Thus, *BFW Liquidation* does not support Movant's position.[7]

---

[7]    Movant's other cases are inapposite. *See Johnson v. Mitchell*, No. CIV S-10-1968, 2011 WL 1586069 (E.D. Cal. Apr. 25, 2011) (discussing a malicious prosecution claim as property of the estate, ***not*** as a claim against the debtor's estate (emphasis added)); *In re Jenkins*, 410 B.R. 182 (W.D. Va. 2008)(same); *Carroll v. Henry Cnty, Georgia*, 336 B.R. 578 (N.D. Ga. 2006)(same); *Brunswick Bank & Trust Co. v. Atanasov (In re Atanasov)*, 221 B.R. 113 (D.N.J. 1998)(discussing ***debtor's*** malicious prosecution claim for purposes of setoff, not a creditor's claim against the estate for malicious prosecution (emphasis added)); *Atkins v. Cory (In re Cory)*, Adv. No. 08-4107, 2008 WL 5157515 (Bankr. W.D. Mo. July 18, 2008) (the "parties ***agreed*** that the outcome of the Debtors' motion [that plaintiff's claim ***against the debtors*** for malicious prosecution was time barred] turn[ed] on the date on which the Plaintiff's cause of action for malicious prosecution ***accrued*** under state law" (emphasis added); the claim was not being asserted against a purchaser of assets (emphasis added)).

41.     Here, the conviction in 1991 was the "triggering act" that gave rise to Movant's cause of action.    Movant affirms that he continually asserted his innocence during his incarceration and "labored tirelessly for 20 years to clean his name."  Therefore, at the time of the closing of the 363 Sale—*more than eighteen years after Movant's conviction*— Movant was aware of the facts giving rise to his claim against the bankruptcy estate.  Movant believed he had a claim in 1991, and never wavered from that belief for the next 20 years.  As his claims arose prior to the closing of the 363 Sale, they cannot be maintained against New GM pursuant to the injunction provisions contained in the Sale Order and Injunction.

42.     Movant's comparison of his situation to potential claimants who may become sick in the future from prepetition exposure to asbestos is inapt.  *First,* such potential claimants have not manifested any type of injury and therefore are unaware that they may have claims against the debtor.   In contrast, as described above, Movant knew about his unmatured, contingent claims for years before the closing of the 363 Sale.  He thus has a claim that is barred by and enjoined under the Sale Order and Injunction.  *Second*, this Court already has recognized that asbestos claimants are a unique and limited category of claims for purposes of the Sale Order and Injunction. It found that "Future Claims issues, in the Court's view, are best addressed here by adding language to the injunction paragraph to which objection has been made, applicable (*only*) to asbestos claims and demands, making the injunction enforceable 'to the fullest extent constitutionally permissible.'"  *In re Gen. Motors Corp.*, 407 B.R. 463, 507 (Bankr. S.D.N.Y. 2009) (emphasis added).  The injunction provisions are, thus, enforceable against future asbestos claimants in the way mandated by the Court.  In any event, Movant is not a future creditor, is not an asbestos claimant, and may not avail himself of a provision in the Sale Order and Injunction that does not apply to his alleged claims.  The provisions that do concern his claims make clear

that such claims are barred as against New GM.  *See* Sale Order and Injunction, ¶¶ 7, 8, 9, 46, 47.

### C.     Movant Received Sufficient Notice of the 363 Sale

43.     As an unknown, contingent creditor of Old GM at the time of the 363 Sale, Movant received Publication Notice of the 363 Sale, which was sufficient under the circumstances of this case.

44.     It is well-settled that when a creditor is "unknown" to the debtor, publication notice is adequate constructive notice to satisfy due process requirements because, "in the case of persons missing or unknown, employment of an indirect and even probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." *In re U.S.H. Corp. of New York*, 223 B.R. 654, 659 (Bankr. S.D.N.Y. 1998) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *see also City of New York v. New York N.H. & H.R. Co.*, 344 U.S. 293, 296 (1953) (concluding publication of the bar claims date satisfies requirements of due process with respect to providing notice to unknown creditors); *In re XO Commc'ns, Inc.,* 301 B.R. 782, 792–93 (Bankr. S.D.N.Y. 2003) (same); *In re U.S.H. Corp.,* 223 B.R. at 659 (holding publication notice "more than sufficient to satisfy due process requirements" and that if plaintiffs were "'unknown' creditors at the time of the Bar Order," their claims are barred) (collecting cases).

45.     Clearly, Movant's claims were unknown to Old GM as Movant has alleged he was not even a creditor of Old GM as of the 363 Sale.  Old GM thus satisfied its burden of providing notice to unknown creditors by Publication Notice.  *See In re Gen. Motors Corp.*, 407 B.R. at 494  ("Notice was extensively given, and it complied with all applicable rules."); Sale Order and Injunction, ¶ 6 ("This Order and the [Sale Agreement] shall be binding in all respects upon the Debtors, their affiliates, ***all known and unknown creditors*** of . . . the Debtors . . . ."); ¶

16

E ("With respect to parties who may have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors . . . the Publication Notice was sufficient and reasonably calculated under the circumstances to reach such parties.").  Movant was put on notice that his interests could be affected by the 363 Sale at the time.  He is, thus, bound by the Sale Order and Injunction.

D.    **New GM Has Never Admitted That It Is the Same Company As Old GM, And It May Compensate Some Holders of Retained Liabilities While Not Compensating Others**

46.    In an effort to allege some type of successor liability claim against New GM (which is clearly barred pursuant to numerous provisions of the Sale Order and Injunction), Movant takes a few selective quotes from a 338-page transcript of Congressional testimony completely out of context when trying to show that New GM is "the same corporation as Motors Liquidation Company – Old GM."  Motion for Leave, p. 14.  This simply is false.  For example, the full text of Mary Barra's quote at page 105 of the Congressional testimony (the transcript of which is annexed to the Motion for Leave as Exhibit 4) is as follows:  "We will make the best decisions for our customers, recognizing that we have legal obligations and responsibilities as well as moral obligations.  We are committed to our customers and we are going to work very hard to do the right thing for our customers."  Nowhere does Ms. Barra "admit" that New GM and Old GM are the same.

47.    Equally important, New GM's actions belie any claim that New GM has admitted it is the same company as Old GM.  As this Court well knows, since April of this year, New GM has filed three motions to enforce the Sale Order and Injunction in this Court, asserting exactly the opposite of what Movant claims:  New GM is a completely different entity from Old GM, and New GM is not responsible for liabilities not assumed by it in connection with the 363 Sale.  New GM's position in this regard has been consistent since the closing of the 363 Sale; if a

claimant asserts a liability against New GM that was not assumed as part of the 363 Sale, New GM has sought to enforce the Sale Order and Injunction to bar such claims. *See, e.g.*, *Castillo v. Gen. Motors Co.*, Adv. Proc. No. 09-00509, 2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17, 2012), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013) (barring claims by class action plaintiffs who were parties to a prepetition unconsummated settlement, finding such claims Retained Liabilities);[8] *Trusky*, 2013 WL 620281, at *2 (barring claims of owners of prepetition vehicles, finding them Retained Liabilities).

48.     Movant appears to assert that by deciding to retain Kenneth Feinberg to develop and design a protocol ("**Feinberg Protocol**") for the submission, evaluation, and settlement of death or physical injury claims resulting from accidents allegedly caused by defective ignition switches in certain vehicles, New GM has purportedly "admitted" that it is the same entity as Old GM.  To the contrary, New GM's Presale Accident Motion to Enforce filed with this Court on August 1, 2014, specifically seeks to enforce the Sale Order and Injunction against various personal injury plaintiffs who have asserted claims against New GM arising from an accident that occurred prior to the closing of the 363 Sale, including plaintiffs who may be eligible to submit claims under the Feinberg Protocol.  As stated in New GM's Presale Accident Motion to Enforce, the Feinberg Protocol provides eligible claimants with an alternative (*i.e.*, a source of recovery) to the application and enforcement of the Sale Order and Injunction against them.  The Feinberg Protocol, as demonstrated by the Presale Accident Motion to Enforce, is in no way an admission by New GM that it is the same company as Old GM.

49.     Moreover, in the bankruptcy context, it is well-established that a purchaser, as part of a bankruptcy sale, can pick and choose which liabilities of the seller it will assume, and

---

[8]     The *Castillo* decision is currently on appeal in the Second Circuit Court of Appeals.

which it will not.  The same holds true outside the bankruptcy context for post-sale voluntary

payments.

1.    **In A Bankruptcy Sale, The Purchaser Can Pick And
Choose Which Liabilities To Assume And Which Not To Assume**

50.    In its decision approving the 363 Sale, this Court found that New GM, as a newly-

formed entity purchasing Old GM's assets, could decide which pre-363 Sale liabilities it would

pay, and which ones it would not:

> The Court senses a disappointment on the part of dissenting bondholders that the
> Purchaser did not choose to deliver consideration to them in any manner other
> than by the Purchaser's delivery of consideration to GM as a whole, pursuant to
> which bondholders would share like other unsecured creditors—while many
> supplier creditors would have their agreements assumed and assigned, and new
> GM would enter into new agreements with the UAW and the majority of the
> dealers.  But that does not rise to the level of establishing a sub rosa plan.  The
> objectors' real problem is with the decisions of the Purchaser, not with the
> Debtor, nor with any violation of the Code or caselaw.

*In re Gen. Motors*, 407 B.R. at 496; *see also id.* at 474-75 (finding that "GM's assets simply are

being sold, with the consideration to GM to be hereafter distributed to stakeholders, consistent

with their statutory priorities, under a subsequent plan.  Arrangements that will be made by the

Purchaser do not affect the distribution of the *Debtor's* property, and will address wholly

different needs and concerns—arrangements that the Purchaser needs to create a new GM that

will be lean and healthy enough to survive" (emphasis in original)).

51.    Moreover, in the bondholder appeal of the Sale Order and Injunction, the District

Court reiterated the point made by this Court in the Sale Decision:  "It is conceded that Treasury

favored a Section 363 sale.  However, no impropriety in having opted for a Section 363 sale has

been established.  Indeed, 'cherry picking' of assets and liabilities to assume is exactly what

Section 363 allows . . . ."  *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430

B.R. 65, 79 (S.D.N.Y. 2010) (citations omitted).

52.      The Second Circuit, in *Chrysler*, similarly found as follows: "Moreover, the assets are typically burnished (or 'cleansed') because (with certain limited exceptions) they are sold free and clear of liens, claims and liabilities. A § 363 sale can often yield the highest price for the assets because the buyer can select the liabilities it will assume and purchase a business with cash flow (or the near prospect of it)." *In re Chrysler LLC*, 576 F.3d 108, 115-16 (2d Cir. 2009), *cert. dismissed*, 557 U.S. 961, and *cert. granted judgment vacated* 558 U.S. 1087 (2009).

53.      Moreover, in *Castillo*, which concerned an unconsummated prepetition class action settlement, certain evidence demonstrated that, even though the class action liability at issue was a Retained Liability of Old GM, New GM continued to make voluntary payments for a few months after the Closing Date. 2012 WL 1339496. In addition, New GM later issued a special policy which provided additional benefits for such vehicle owners (*i.e.*, certain reimbursement rights or a credit to the purchase of a new vehicle). This Court found "that this was a desire on the part of Mr. Henderson to voluntarily do more for Saturn owners (to protect the brand and aid in achieving customer satisfaction), as compared and contrasted to implementing a view that New GM was legally bound to do it." *Id*. at *8. New GM was found to have not assumed the class action settlement liability at issue; its voluntary payments to certain members of the class, at various times, did not establish that it had assumed the entire liability to the class.

54.      The same holds true here. New GM can voluntarily agree to compensate certain holders of Retained Liabilities through the Feinberg Protocol, while maintaining the protections of the Sale Order and Injunction with respect to Retained Liabilities in general. As noted, the Designated Counsel, the Groman Plaintiffs, the GUC Trust, and certain Unitholders have conceded this point. *See* July 11, 2014 Supplemental Scheduling Order, at 3-4 ("Designated Counsel, the Groman Plaintiffs, the GUC Trust and the Unitholders are hereby deemed to have

released and waived any argument or claim that their clients may have that New GM will violate any legal principle, theory or rule of law arising under, in or related to the Bankruptcy Code in the event New GM voluntarily compensates pre-sale accident victims that allege that their accident was caused by a defective ignition switch.").

### 2. Cases Outside The Bankruptcy Context Support New GM's Ability To Voluntarily Compensate Some Holders of Retained Liabilities, And Not Others

55.     Cases outside of the bankruptcy context support the proposition that a purchaser of assets can voluntarily pay certain debts of the seller without becoming liable for the seller's other debts.  For example, in *Marenyi v. Packard Press Corp.*, No. 90-cv-4439, 1994 WL 16000129 (S.D.N.Y. June 9, 1994), a former employee of a company whose assets were sold sought to enforce against the purchaser a judgment obtained against the seller for breach of contract.  It was undisputed that the asset purchase agreement provided that the purchaser was not assuming the debt of the employee.  Nonetheless, as evidence of purchaser's intent to assume the employee's claim, the employee asserted that the purchaser participated in a settlement of a sexual harassment claim by another former company employee, and that such claim was not previously assumed by the purchaser.  The employee argued that, "because [the purchaser] did not stand on its APA disclaimer as a limit to its liability in the sexual harassment case, it should be estopped from asserting the disclaimer as a defense to liability in this proceeding."  *Id.* at *7. The court rejected this argument, finding that:

> The mere fact of voluntary payment of some of the debts of the predecessor will not ground an inference that the successor assumed all of the former's debts.  15 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 7124 (perm. ed. rev. vol. 1990). [The employee] has cited no law controverting this truism.  I cannot agree with [the employee] that [the purchaser's] participation in the settlement of one claim can be taken to show an intention to assume other debts of [the predecessor company], particularly in the absence of any evidence of any representations by [the purchaser's] officers or spokespeople suggestive of such an intention, and the presence of express provisions in the APA and [a separate agreement] disclaiming such an intention.

21

*Id.*; *see also Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp.2d 1216, 1231 (C.D. Cal. 2012) (in dismissing portions of the plaintiff's complaint, the court found that although certain paragraphs of the pleading "relate[d] to the fact that Bank of America has voluntarily paid to settle several cases against Countrywide and its former officers and directors," the "fact that Bank of America has voluntarily paid certain debts of Countrywide does not mean that it was legally obligated to pay them, nor that it is legally obligated to pay others").[9]

56.    As the above-cited cases demonstrate, unless there is evidence that a purchaser intended to pay specific debts, the fact that a purchaser voluntarily paid some debts does not mean it has assumed a legal obligation to pay other debts.    Stated differently, New GM's voluntarily payment of some Retained Liabilities through the Feinberg Protocol does not mean New GM has assumed a legal obligation to pay other Retained Liabilities.    At no time has New GM expressed any intent to pay liabilities of the type asserted by Movant, *i.e.*, claims that arose years before the closing of the 363 Sale and which have nothing to do with the continued viability of company.

### 3.    New GM's Settlement Of Certain Claims Should Have No Bearing On the Enforceability Of Other Claims

57.    In other contexts, courts have found that previous settlements with one plaintiff are not determinative of present claims by a different plaintiff, and such settlements do not provide an evidentiary basis to support or prove a plaintiff's claim.    For example, in *Hayes v.*

---

[9]    The *Allstate* court further stated that certain statements in the complaint could "also be read to mean that Bank of America will pay some of Countrywide's debts but not others.    Even read in the manner most favorable to Allstate, the statements reflect a present intent by Bank of America to voluntarily pay Countrywide's liabilities."    *Allstate Ins. Co.*, 842 F.Supp.2d at 1230.    The court found that no precedent was cited "for conflating a present intent to voluntarily pay the debts of another with a legal assumption of those debts."    *Id.*

*Boston Pub. Health Comm'n*, No. 11–11859–MLW, 2013 WL 5564184, at *3 (D. Mass. Oct. 7, 2013), the court stated as follows:

> Even if the facts of the Georges litigation were comparable to the facts alleged in this matter, Hayes has not shown that the Settlement Agreement is likely to lead to the discovery of admissible evidence. Settlement agreements reflect compromises that have been negotiated between parties to a litigation. They do not determine the outcome of factual disputes or establish an evidentiary record. Therefore, discovery of the Georges Settlement Agreement would not reveal any facts that could be used by Hayes to prove her claims against the defendants. Furthermore, parties choose to settle cases for many different reasons based on the particular circumstances of the case. Therefore, information as to how BPHC defended or settled claims brought against it in another litigation would reveal little if anything about its defenses in this action.

58.    Similarly, in *Lynn v. CSX Transp., Inc.*, 84 F.3d 970, 974 (7th Cir. 1996), the Seventh Circuit stated as follows:

> Lynn also asserts that the district court improperly quashed his subpoena of Charles Lockwood, a former employee who sued CSX. He seems to believe that Lockwood sued CSX on a theory related to the letter from Collinson, and that CSX chose to settle Lockwood's claim. Lynn argues that his inability to conduct further discovery on this issue compels reversal. Even if Lynn is correct, however, that Lockwood received a settlement payment from CSX on a similar claim, his legal position is unchanged. Whether CSX chose to settle a previous claim by Lockwood has no bearing on the merits of Lynn's legal argument. A settlement agreement is not a concession by a defendant that a claimant's argument, legal or factual, has merit. There are many reasons why a defendant may choose to settle, and avoiding legal expenses is one of them.

59.    Courts have also recognized that there is a public policy to promote settlements of disputes. *See, e.g.*, *In re AMR Corp.*, 478 B.R. 599, 606 (Bankr. S.D.N.Y. 2012) (when discussing Rule 408 of the Federal Rules of Evidence, noting that such rule is "intended to promote 'the public policy favoring compromise and settlement of disputes.'" (citing the 1972 Advisory Committee Notes to Fed. R. Evid. 408)); *see also Laforest v. Honeywell Intern. Inc.*, No. 03-CV-6248T, 2004 WL 1498916, at *6 (W.D.N.Y. July 01, 2004) ("The intent of Rule 408 is to promote public policy favoring compromise and the settlement of disputes."). Arguing that

a settlement by New GM of one claim imposes liability on New GM with respect to another claim runs counter to this public policy.

60.    Accordingly, there is no material factual dispute concerning whether New GM is the same company as Old GM.  There have been no admissions by New GM, and New GM's conduct – since the closing of the 363 Sale – has been consistent.  It has always maintained that it is a separate company from Old GM, and that it should not be burdened with liabilities it did not assume.  This Court should thus find that New GM's decision to compensate certain potential holders of Retained Liabilities has no bearing on claims asserted by holders of other Retained Liabilities (like Movant), and that such liabilities are barred by the Sale Order and injunction.

WHEREFORE, New GM respectfully requests that this Court (i) deny the relief requested in the Motion for Leave in its entirety, (ii) direct the Movant to cease and desist from further prosecuting any claim contained in the Amended Complaint against New GM; (iii) direct Movant to dismiss the Civil Action as against New GM immediately; and (iv) grant New GM such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        August 19, 2014

Respectfully submitted,

_____/s/ Arthur Steinberg_____
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

-and-

Richard C. Godfrey, P.C. (admitted pro hac vice)
Andrew B. Bloomer, P.C. (admitted pro hac vice)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for General Motors LLC*