UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, (REG) | : | Case No.: 09-50026 |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------x


**PLAINTIFFS' NO STAY PLEADING, MOTION FOR ORDER OF DISMISSAL FOR LACK OF SUBJECT MATTER AND PERSONAL JURISDICTION, OBJECTIONS TO GM'S MOTION TO ENFORCE, TO THE COURT'S ORDERS AS APPLIED TO ANY OF THEIR CLAIMS, TO "DESIGNATED COUNSEL" OR ANY OTHER PERSON NOT A PARTY TO OR INTERESTED IN THE CONTROVERSY BETWEEN NON-DEBTOR GM AND THEMSELVES BEING HEARD IN CONNECTION WITH THEIR CONTROVERSY, AND FOR RELATED RELIEF[1]**

---

[1] Plaintiffs' request leave to file this combined pleading, which would exceed the Court's stated preferences with respect to length were it filed in connection with a single motion. Plaintiffs combined their applications into a single pleading for efficiency and for the convenience of the Court and parties. Plaintiffs are amenable to disaggregating their papers into separate applications for relief if the Court would prefer to consider them in such fashion.

## Preliminary Statement[2]

Ishmail Sesay and Joanne Yearwood (collectively "**the *Sesay* Plaintiffs**" or "**Plaintiffs**") are entitled to pursue their lawsuit[3] against General Motors LLC ("**Non-Debtor GM**")[4] without the hindrance of any order—whether temporary, preliminary, or permanent--enjoining them from holding Non-Debtor GM to account for its gross and possibly criminal years of, and allegedly ongoing, corporate misconduct—a culture of irresponsibility fueled by greed that Non-Debtor GM has publicly conceded, one that elevates showing profits and pleasing

---

[2] Plaintiffs submit this pleading to avoid failing to comply with the Court's Scheduling Order with which they have been served by electronic mail. That Order appears to require them either to submit these papers or to be bound by the stay stipulations that other parties entered into. As explained below, Plaintiffs contend that GM has not properly initiated any action against them because it has failed to serve either a complaint to initiate an adversary proceeding, FRBP 7001, or a motion to initiate a contested matter, FRBP 9014(b). Non-Debtor GM concedes that it has not served its motion on the *Sesay* Plaintiffs.

Plaintiffs believe that, because Non-Debtor GM seeks injunctive relief, the applicable rules mandate that such proceedings be initiated as an adversary proceeding, with all the procedural protections that attend such a proceeding. FRBP 7001(7). Even if Plaintiffs are wrong, however, and the injunctive relief that Non-Debtor GM seeks is properly available to a Non-Debtor and non-party to the Debtor's bankruptcy proceedings by way of the initiation of a contested matter, such a contested matter must be initiated by a motion served in accordance with the Bankruptcy rules. 9014(b). Non-Debtor GM has not served its motion on the *Sesay* Plaintiffs.

Plaintiffs *do not consent* to this way of proceeding, and do not intend to waive any rights with respect to the lack of proper service on them. They submit these papers to protect their rights and to protect themselves against charges that they have engaged in contemptible conduct.

[3] *Sesay et al. v. General Motors LLC*, 1:14-cv-0618 (JMF); 1:14-md-02543 (JMF) ("**the *Sesay* lawsuit**").

[4] Because Plaintiffs believe that the nomenclature purporting to distinguish between a "New GM" and an "Old GM" serves Non-Debtor GM's illegitimate public relations goals to misrepresent Non-Debtor GM to consumers, investors, governmental officials, and the public as if it had instituted changes in its practices and policies with respect to risk and safety when it has not, Plaintiffs respectfully prefer not to adopt that usage.

investors over appropriate regard for the safety of Plaintiffs, putative class members, and the public in this country and abroad, the same greed that led Non-Debtor GM to actively conceal from Plaintiffs the deadly dangers posed by the use of their GM vehicles, a dangerous greed that has already caused death and serious injuries to hundreds, and a seemingly consuming greed that continues to put millions more at risk of death or serious bodily injury while Non-Debtor GM, still singularly focused on the bottom line, refuses to take effective measures to ensure the public's safety and that of putative class members.

This same greed drives Non-Debtor GM's cynical Motion to seek the Bankruptcy Court's protection from redress sought by the victims of *its* wrongdoing, for which *it* is entirely and independently responsible, and for which General Motors Corporation ("**Debtor GM**") was never liable and never could have been liable, because each wrongful act and omission alleged by the *Sesay* Plaintiffs occurred after that entity's formal demise. Non-Debtor GM seeks the equitable protection of this Court, not against *creditors* of Debtor GM trying to collaterally attack the Sale Order, but rather to shield itself from the *victims* of *its* continuing wrongdoing. Non-Debtor GM does not deserve the protection of this Court against the *Sesay* lawsuit, and, thankfully, it is not legally entitled to it--at least until it files its own, independent petition.

Plaintiffs' claims are based on *Non-Debtor GM's misconduct* occurring exclusively and explicitly from the period October 19, 2009, to the present, misconduct which had not yet occurred when Debtor GM sold Non-Debtor GM its assets on July 10, 2009.

Ms. Yearwood bought her 2010 Cobalt in December 2009.  The only basis that Non-Debtor GM has offered to connect her claims to the Sale Order--which does not purport to protect Non-Debtor GM from its own liability for cars it sold through dealers *after the asset sale*--is the speculation that her post-petition car may contain parts from Debtor GM that may have been put in her vehicle in the event (never alleged) that she had sought to have the car repaired, and in the further event (never alleged) that the repair proceeded by obtaining after market parts, and in the further event (never alleged) that the after market parts that such repair entailed installing in her car happened to be parts that were originally distributed by Debtor GM, and in the further event that Non-Debtor GM can find anything in the Sale Oder and Injunction that could have given anyone reasonable notice that such decree was ever intended to enjoin with such wide a swath on such a flimsy basis.[5]

---

[5] This theory is nowhere set forth in New GM's papers. It was provided in response to the Court's query as to the basis for seeking to enforce the Sale Order and Injunction against post-353 Sale purchasers at a May 2, 2014, hearing this Court held, months before the *Sesay* suit was filed, with respect to GM's attempt to enforce the Sale Order against other lawsuits:

What such fanciful speculation might have to do with Ms. Yearwood's claims against Non-Debtor GM is never explained. Non-Debtor GM's liability to her does not depend, under law upon which her claims rest, on the source of the part in her car. And, of course, the connection between Ms. Yearwood's 2010 Cobalt and "pre-petition" parts is pure speculation. No allegations have been made, much less evidence offered, to establish that Ms. Yearwood's post-petition vehicle in fact contains such parts.

Mr. Sesay, the owner of a pre-petition vehicle, asserts no claim whatsoever in connection with his purchase, whether sounding in warranty, strict product liability, fraud, consumer protection, negligence, or any other claim typically asserted by consumers against manufacturers of allegedly defective or unsafe vehicles.  He asserts no claim even arguably addressed in this Court's 2009 Sale Order.

---

What happened was someone with a new car, which had a good ignition switch, would go in to have their car repaired and there was a possibility that the person who repaired that car, which may have been a GM dealer or may have been someone totally different, they may have actually put in an old ignition switch part. They may have taken a good part out and put a bad part in. And since New GM didn't know whether -- whether that -- which cars that occurred to it announced the recall for some post-sale cars. But the cars that would ever be impacted by this is a very,very small element, but New GM is repairing all of those ignition switches.

May 2, 2014, Hearing Tr. 34-35.

The graveman of each claim the *Sesay* Plaintiffs *do* assert is that, since October 19, 2009, Non-Debtor knew but failed to disclose and actively concealed that their cars, and those of millions of others, are unsafe to drive.

This Court approved the Sale on July 2, 2009. The Sale was consummated on July 10, 2009. Nevertheless, and despite the facts that the *Sesay* Plaintiffs make no claims based on the wrongful conduct of Debtor GM, they allege no facts regarding Debtor GM's conduct, and they *explicitly* disavow any claims based on successor, derivative, or transferee liability--the only pre-petition breach of warranty or products liability claims GM is even arguably protected against in the Sale Order--Non-Debtor GM nevertheless listed the *Sesay* lawsuit on a periodic bulk submission of lawsuits that it would like to see enjoined, its connection to the Sale Order based on nothing more than a sampling of several sentences from the *Sesay* Complaint that do not themselves state any claims for which Debtor GM could have ever been liable or make any allegations about Old GM's conduct, along with Non-Debtor GM's unilateral assertion that the Sale Order is implicated.

Under the auspices of this Court's stay power, Non-Debtor GM has successfully managed to close virtually every courthouse in America to its victims, even those who desperately need judicial help to protect themselves and their communities from the public safety menace GM has loosed and refuses to remedy. American law does not allow a wrongdoer to escape responsibility for its acts in

this manner, either permanently or preliminarily pending the determination of threshold issues that do not concern the *Sesay* Plaintiffs' claims in the least.

Non-Debtor GM's Motion to Enforce the Sale Order against the *Sesay* Plaintiffs should be denied. Non-Debtor GM wronged the Plaintiffs, they allege, and that wrong has nothing to do with any other wrongs that General Motors Corporation ("**Debtor GM**") might *also* have committed against them. *No Court has the power to immunize future wrongdoing*, and yet that would be the consequence of adopting Non-Debtor GM's baseless interpretation of the Sale Order to reach the *Sesay* Plaintiffs' claims, causes of action based solely and exclusively on the conduct of Non-Debtor GM occurring after the sale of assets that is the subject of the Sale Order, and based solely and exclusively on breaches of non-derivative, non-successor, independent duties that Non-Debtor GM owed to Plaintiffs, and breached, to Plaintiffs' continuing detriment.

This Court should reject GM's Motion to enjoin the *Sesay* Plaintiffs from prosecuting their claims because, in addition to the consequence of closing judicial avenues for relief from Non-Debtor GM's continuing reckless endangerment of the public safety—a result that plainly violates the public interest—such relief would entail a host of infirmities, many of them of constitutional dimension, because:

1) GM has never served the *Sesay* Plaintiffs with any papers formally required to initiate a proceeding or matter in this Court, and to establish personal

jurisdiction over them.[6] Plaintiffs were served with "Sixth Supplements" to Schedules 1 and 2 of Non-Debtor GM's Motion to Enforce, as well as this Court's Scheduling Orders, but no complaint with which Non-Debtor might initiate an adversary proceeding, nor any motion to initiate a contested matter were that the appropriate procedure in these circumstances.

2)    This Court lacks subject matter jurisdiction over the *Sesay* Plaintiffs' claims under its narrowly delimited constitutional and statutory grants of authority, because their claims do not "relate to" any matter properly before the Court in that they bear no conceivable relationship to any liabilities of Debtor GM, past or present;

3)    Non-Debtor GM's Motion to Enforce[7] should be denied because, on its face, the Sale Order does not purport to reach the claims that the *Sesay* Plaintiffs assert, and Non-Debtor GM presents no basis from which this Court could reasonably conclude that it has jurisdiction over the claims asserted by the *Sesay* Plaintffs or that their claims implicate the Sale Order in any way, and caution is warranted in light of the post-confirmation nature of the application for relief;

5)    Non-Debtor GM's Motion should be denied because it does not address, much less carry, its burden of establishing any of the requisite grounds for the temporary, preliminary, or permanent relief sought against the *Sesay* lawsuit;

6)    Non-Debtor GM's Motion should be denied because application of the Sale Order to the *Sesay* Plaintiffs would violate their due process rights in that no notice was directed to them and they in fact received no effective notice nor

---

[6]Establishing proper service is also integral to determining whether the Court has personal jurisdiction over the defaulting defendant. *See In re Kalikow*, 602 F.3d 82, 92 (2d Cir. 2010) ("Before a federal court may exercise personal jurisdiction over a [party], the procedural requirement of service . . . must be satisfied." (*quoting Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006).

[7] Since the *Sesay* Plaintiffs believe that proper service of the Motion has not been effected, they do not believe any motion pertaining to them is before the Court, or that this Court has personal jurisdiction over them with respect to New GM's Motion to Enforce the Court's July 2009 Sale Order and Injunctions, *In re Motors Liquidation*, 1:09-bk-50026, Doc. No. 12620, April 21, 2014 ("**Motion to Enforce**"). They reserve all rights and waive none by the submission of these objections and requests for relief.

any reasonable opportunity to be heard with respect to the entry of the Sale Order and Injunction that Non-Debtor GM now seeks to enforce against them, nor any notice prior to these proceedings that the Sale Order and Injunction was addressed to them or to the claims they assert against Non-Debtor GM;[8]

7)    The *Sesay* Plaintiffs object to the Court's Scheduling Orders to the extent they have been and will be applied in proceedings between Non-Debtor GM and themselves because the *Sesay* Plaintiffs had no notice nor any opportunity to be heard before those Orders were entered, and Plaintiffs in distinct controversies to which the *Sesay* Plaintiffs are not parties or in privity with any parties did not represent the *Sesay* Plaintiffs' interests, nor did such "Designated Counsel" or other Plaintiffs' counsel purport to speak for the *Sesay* Plaintiffs;

8)    The *Sesay* Plaintiffs object to the Court's Scheduling Orders because they impose burdens on the *Sesay* Plaintiffs that constitute independent violations of the *Sesay* Plaintiffs' right to a reasonable opportunity to be heard before they are deprived of their constitutionally based interests in pursuing their lawsuits in a timely fashion, namely:

a)    the imposition of a three day deadline for the submission of "no stay pleadings" requiring presentation of complex legal contentions;

b)    the shifting of the burden of proof to demonstrate jurisdiction and entitlement to temporary, preliminary and permanent relief from Non-Debtor GM, which invoked this Court's jurisdiction and seeks such extraordinary equitable relief, to Plaintiffs, who under the Court's

---

[8] To be clear, this is *not* a contention that the *Sesay* Plaintiffs were entitled to notice of the Bankruptcy proceedings more generally. To the contrary, *they were not creditors* of Debtor GM with respect to the claims they now assert against Non-Debtor GM and thus do not claim, as other Plaintiffs in other controversies may, that successor liability or other derivative claims could not be barred because they failed to receive the requisite notice. The *Sesay* Plaintiffs assert no such claims. Their contention regarding lack of notice rests the ground--independent of the notice that Bankruptcy law may require before the claims of known and unknown creditors can be barred--that basic due process requirements prevent them from being enjoined by an Order of which they received no notice, constructive or otherwise, nor about which they were accorded no reasonable opportunity to be heard, nor of which they were notified prior to their receipt of "Sixth Supplement" papers and subsequent investigation into their genesis.

Scheduling Orders are required to bear the burden of demonstrating why their claims, which the Court has presumptively treated as subject to the 2009 Sale Order, are not so subject, and to bear the burden of proving that Non-Debtor GM is not entitled to preliminary relief;

c)     the *de facto* treatment of distinct purported contested matters and an adversary proceeding as a single proceeding, a rump consolidation that is not provided for in the rules that govern this Court and one that bears none of the procedural safeguards that lawfully consolidated proceedings that are provided for in other fora would entail; and

d)     the associated restriction of the *Sesay* Plaintiffs' rights to notice and an opportunity to be heard manifest in the designation of counsel representing "certain" Plaintiffs in distinct controversies as "Designated Counsel" entitled to notices, opportunities to be heard in matters in which it lacks interest, influence over the sequence by which the Court considers the various issues before it, and various courtesies that the *Sesay* Plantiffs are denied by virtue of their lack of that or similar designation; and

9)     Non-Debtor GM's Motion should be denied or deferred in the interests of comity and of avoiding a jurisdictional conflict with another federal court. This Court should decline to exercise jurisdiction it may believe it has over the *Sesay* lawsuit because the federal Court before which the *Sesay* lawsuit is pending has indicated that that Plaintiffs may commence prosecuting their claims before that Court despite any stay stipulation they many have entered or this Court may have purported to impose.

## BACKGROUND

Starting in February 2014, and in piecemeal ever since, Non-Debtor GM has publicly admitted that Non-Debtor GM employees and lawyers knew about safety-related defects in millions of vehicles, including the vehicle models owned by Plaintiffs, and that Non-Debtor GM did not disclose those defects as it was required to do by law. GM'S CEO, Mary Barra attributed Non-Debtor GM's

"failure to disclose critical pieces of information," in her words, to Non-Debtor

GM's policies and practices that mandated and rewarded the unreasonable

elevation of cost concerns over safety risks.

An August 1, 2014, Ishmael Sesay and Joanne filed the *Sesay* lawsuit in the

Southern District of New York, alleging *inter alia* that Non-Debtor GM breached

independent, non-derivative, non-successor, non-transferee duties that Non-Debtor

GM owed to them and putative class members to disclose the dangers that use of

their GM cars entailed--material information that Non-Debtor GM knew but

Plaintiffs had no way of knowing--and that these breaches caused them legally

cognizable injuries (hereafter "**Non-Sale Order Claims**"). The *Sesay* Plaintiffs

alleged several claims under the law of Maryland, the law of the several states, the

law of select states, and under the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 *et seq*. They seek to represent a nationwide class

and several subclasses of consumers from identified states. Complaint, *Sesay et al*

*v. General Motors LLC et al*, Doc. No. 1.

Mr. Sesay's claims relate to a so-called "pre-petition" vehicle, a 2007

Chevrolet Impala LS. Ms. Yearwood's claims involve a "post-petition" car, a 2010

Chevrolet Cobalt that she purchased in December 2009.

Their lawsuit, which Non-Debtor GM seeks this Court to order stayed, is

pending before the Honorable Jesse M. Furman, to whom it was assigned on

August 7, 2014, on the basis of its relation to the ongoing Multidistrict proceedings (hereafter "the MDL proceedings"), *In re General Motors LLC Ignition Switch Litigation*, 1:14-md-02543 (JMF).  Their claims are discussed in greater detail below.

1.    *The Sale Order and Injunction*

On June 1, 2009 ("**the petition date**"), Debtor GM and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the Southern District of New York, jointly administered by this Court under case number 09-50026 (REG) (the "**Chapter 11 Cases**"). On the Petition Date, Debtor GM filed a motion (the "**Sale Procedures Motion**") seeking to approve procedures for the sale of substantially all of its assets to Non-Debtor GM, pursuant to Bankruptcy Code Sections 105(a), 363 and 365 (the "**Sale**"). See Doc. No. 9. On the same day, June 1, 2009, this Court held a hearing on the Sale Procedures Motion and, on the next day, June 2, 2009, entered an Order granting the motion in its entirety ("**the Sale Procedures Order**").

The GM Bankruptcy was a "pre-packaged" transaction in which the Debtor sought to move on an expedited basis through the bankruptcy process.[9] In its Sale

---

[9] One of its architects has written an admiring account of the whirlwind quality of the Court proceedings he and his colleagues orchestrated. Forbes,

Procedures Motion, Debtor GM emphasized that it required that the Bankruptcy Court suspend the notice requirements that would otherwise apply and approve the sale on an unusually expedited basis.[10] Debtor GM did not provide notice of the Sale Procedures Motion to the Plaintiffs.[11] In its Sale Procedures Order, issued the

---

[10] In its motion, Debtor GM stated

> The gravity of the circumstances cannot be overstated. The need for speed in approving and consummating the 363 Transaction is crucial. The business and assets to be transferred are extremely sensitive and will be subject to major value erosion unless they are quickly sold and transferred to New GM. Any delay will result in significant irretrievable revenue perishability to the detriment of all interests and will exacerbate consumer resistance to readily accept General Motors products. *Expeditiously restoring and maintaining consumer confidence* is a prerequisite to the successful transformation and future success of New GM. … The expedited approval and execution of the 363 Transaction is the foundation of the U.S. Government's objective 'to create the GM of the future…'

Sale Procedure Motion, ¶¶ 28, 29.

[11] *See* Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006 (I) Approving Procedures For Sale Of Debtors' Assets Pursuant to Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser; (Ii) Scheduling Bid Deadline and Sale Hearing Date; (Iii) Establishing Assumption and Assignment Procedures; and (Iv) Fixing Notice Procedures And Approving Form Of Notice ("**the Sale Procedures Order**"), Doc. No. 274, at 2, listing those who had been notified of Debtor GM's motion:

> [D]ue and proper notice of the Motion having been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the United States Department of the Treasury (the "U.S. Treasury"), (iii) the attorneys for Export Development Canada ("EDC"), (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), (viii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers— Communications Workers of America, (ix) the United States Department of

---

next day, the Court approved the notice for the Sale and hearing that Debtor GM

proposed. Notice of the application for the Sale Order and injunction were mailed

to various identified creditors.[12] Unknown creditors were to be given publication

notice in select newspapers that appear to have been selected to reach the financial

community but not Plaintiffs and putative class members in the mid-Atlantic

---

Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the
attorneys for the ad hoc bondholders committee, and it appearing that no other or further
notice need be provided.

[12] The Court approved Debtor GM's proposed list to receive individual notice of the Sale
hearing::

the attorneys for the U.S. Treasury; the attorneys for Export Development Canada; the
attorneys for the agent under the Debtors' prepetition secured term loan agreement; the
attorneys for the agent under the Debtors' prepetition amended and restated secured
revolving credit agreement; the attorneys for the Creditors Committee (and, if no
statutory committee of unsecured creditors has been appointed, the holders of the 50
largest unsecured claims against the Debtors on a consolidated basis); the attorneys for
the UAW; the attorneys for the International Union of Electronic, Electrical, Salaried, and
Furniture Workers Communications Workers of America;  the U.S. Department of Labor;
the attorneys for the National Automobile Dealers Association; the attorneys for the ad
hoc bondholders committee; any party who, in the past three years, expressed in writing
to the Debtors an interest in the Purchased Assets and who the Debtors and their
representatives reasonably and in good faith determine potentially have the financial
wherewithal to effectuate the transaction contemplated in the MPA; non-Debtor parties to
the Assumable Executory Contracts; all parties who are known to have asserted any lien,
claim, encumbrance or interest in or on the Purchased Assets; the SEC; the Internal
Revenue Service; all applicable state attorneys general, local environmental enforcement
agencies and local regulatory authorities; all applicable state and local taxing authorities;
the Federal Trade Commission; the U.S. Attorney General/Antitrust Division of the
Department of Justice; the U.S. Environmental Protection Agency and similar state
agencies; the United States Attorney's Office; all dealers with current agreements for the
sale or leasing of GM brand vehicles; the Office of the United States Trustee for the
Southern District of New York; all entities that requested notice in these chapter 11 cases
under Bankruptcy Rule 2002; and all other known creditors and equity security holders of
the Debtors.

Sale Procedures Order, ¶ 9(a)-(d).

region.[13] The parties' discussion of the notice issues centered on notice to investors and others who might have claims against Debtor GM. The form of the notice itself was not designed to be comprehensible, or even noticeable, to a reasonable consumer, even if they happened upon it.[14] On the expedited Schedule the Court approved, objectors were to file their objections within 19 days of the entry of the Sale Procedures Order, and a hearing was scheduled for 11 days later.[15] Anyone who failed to file a timely objection on the expedited Schedule would be purportedly barred from asserting, "at the Sale Hearing *or thereafter*...any objection to the Motion, to the consummation and performance of the 363 Transaction contemplated by the MPA or a Participation Agreement, if any (including the transfer free and clear of all liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability,

---

[13] Publication notice was approved for publication:

> in the global edition of The Wall Street Journal, the national edition of The New York Times, the global edition of The Financial Times, the national edition of USA Today, the Detroit Free Press/Detroit News, Le Journal de Montreal, the Montreal Gazette, The Globe and Mail and The National Post, as well as on the website of the Debtors' claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.

Sale Procedures Order ¶9(e).

[14] To the contrary, it was the very same small font, densely worded, bankruptcy notice that was sent by mail sent to various known creditors, sophisticated parties who might know the import of the otherwise opaque notice. Sale Procedures Order ¶

[15] Sale Procedures Order ¶5.

of each of the Purchased Assets transferred as part of the 363 Transaction)…"
Sale Procedures Order, ¶12 (*emphasis added*).

Following the hearing, on July 5, 2009, the Court entered its Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition holdings LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement available at *In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (the "**Sale Decision**") Doc. No. 2967, and the Sale Order and Injunction, Doc. No. 2968. The Sale closed on July 10, 2009.

Pursuant to the Sale Order, Non-Debtor GM acquired substantially all of Debtor GM's assets. Non-Debtor GM did not, however, assume all of Debtor GM's liabilities. The MSPA and the Sale Order contain specific provisions determining which of *the liabilities of Debtor GM* that Non-Debtor GM would assume and which of those that Debtor GM would retain – Non-Debtor GM would have no responsibility or liability with respect to such "retained" liabilities. The entire transaction was concerned with liabilities originally incurred by Debtor GM—not the kinds of claims the *Sesay* Plaintiffs assert, which are based on post-Sale wrongdoing by Non-Debtor GM and thus not derivative of liability originally incurred by Debtor GM. There was some mention of "future claims" of those

exposed to asbestos before the Sale Order who might develop injuries afterward,[16] a cause of action that could not accrue until the injury manifest but arguably a liability originally incurred by Debtor GM if it was liable for the exposure that caused symptoms years later. But the Sale Order was did not address future claims that might asserted against Non-Debtor GM based on *its own conduct* after the sale, and based on breaches of duties it owed Plaintiffs completely independent of whatever duties it assumed that were originally owe d by Debtor GM pursuant to the Sale Order.

The Sale Order purports to bar claims against Non-Debtor GM "based on any successor or transferee liability." *See* Sale Order ¶¶ 10, 46, 48. Likewise, Non-Debtor GM would have no liability for any claim arising "prior to the Closing Date," related to production "prior to the Closing Date," that could have been asserted against Non-Debtor GM "prior to the Closing Date." *See* Sale Order ¶ 46.[17] The Sale order additionally enjoins the pursuit of any claim asserting

---

[16] This Court recognized at the time the Sale Order was entered that it would be "constitutionally suspect" to bar the claims of those on whom "the notice given . . . was not fully effective, since without knowledge of an ailment that had not yet manifested itself, any recipient would be in no position to file a present claim." *In re GM Corp.*, 407 B.R. at 505-07; *see also* Doc. No. 12727 at 9.

[17] More fully:

> Except for the Assumed Liabilities expressly set forth in the Sale Order … [New GM] … shall [not] have any liability for any claim that arose prior to the Closing Date . . . or otherwise is assertable against [Old GM] … prior to the Closing Date ….Without limiting the foregoing, [New GM] shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any

"successor or transferee liability" against Non-Debtor GM unless the claim is

otherwise assumed. *See* Sale Order ¶ 8, 47.

Paragraph 8 of the Sale Order and Injunction provides:

> [A]all persons and entities … holding liens, claims and
> encumbrances, and other interests of any kind or nature whatsoever,
> including right or claims based on any successor or transferee
> liability, against [Old GM] or the Purchased Assets (whether legal or
> equitable, secured or unsecured, matured or unmatured, contingent or
> noncontingent, senior or subordinated), arising under or out of, in
> connection with, or in any way relating to [Old GM], the Purchased
> Assets, the operation of the Purchased Assets prior to the Closing …
> are forever barred, estopped, and permanently enjoined … from
> asserting against [New GM] … such persons' or entities' liens,
> claims, encumbrances, and other interests, including rights or claims
> based on any successor or transferee liability.

Sale Order and Injunction, ¶ 8.

### 2.    *GM's Motion to Enforce the Sale Order and Injunction*

On April 21, 2014, GM moved this Court to enforce its July 5, 2009, Sale

Order by restraining various parties from suing Non-Debtor GM for claims related

to "ignition switch defects" insofar as such claims were based on liability that

Debtor GM retained under the Sale Order. It seeks to

> require the plaintiffs (collectively, the 'Plaintiffs') in the actions listed
> in Schedule 1 attached hereto ('Ignition Switch Actions') to comply
> with the Court's Sale Order and Injunction by directing Plaintiffs to

---

> claims, including, but not limited to, under any theory of successor or transferee
> liability, de facto merger or continuity … and products … liability, whether
> known or unknown as of the Closing, now existing or hereafter arising, asserted
> or unasserted, fixed or contingent, liquidated or unliquidated.

(a) cease and desist from further prosecuting against New GM claims that are barred by the Sale Order and Injunction, (b) dismiss with prejudice those void claims because they were brought by the Plaintiffs in violation of the Sale Order and Injunction, and (c) show cause whether they have any claims against New GM not otherwise already barred by the Sale Order and Injunction.

GM's Motion is *exclusively* concerned with establishing whether and which liabilities of the Non-Debtor GM it did or did not assume. Under the Sale Order, it argues, "New GM would be insulated from lawsuits by Old GM's creditors based on Old GM liabilities [New GM] did not assume. The MSPA and Sale Order and Injunction were expressly intended to provide such protections."[18] Non-Debtor GM contends that it did not assume potential product liability, breach of warranty, negligence, successor liability, or other liabilities that the Debtor GM might have had with respect to vehicles sold before the asset sale to Non-Debtor GM.[19] Non-Debtor GM claims that the "Ignition Switch Actions represent a collateral attack on this Court's Sale Order and Injunction." ¶ 1.

### 3.  Claims Asserted in the Sesay Plaintiffs' Complaint

The Complaint alleges five causes of action. Each of these causes of action alleges liability only for the acts or omissions of Non-Debtor GM and Delphi Automotive PLLC committed after October 19, 2014.

---

[18] Motion to Enforce, ¶ 3

[19] Id. at ¶11 (quoting Master Sale and Purchase Agreement (*Motors*, Doc. No. 2968, July 05, 2009)) (hereafter MSPA).

In their pleading, Plaintiffs explicitly disavow any claims based on Non-Debtor

GM's potential liability under successor, transferee, or derivative theories of

liability:

> General Motors LLC is a limited liability company formed under the laws of
> Delaware with its principal place of business in Detroit, Michigan. On
> October 19, 2009, it began conducting the business of designing,
> manufacturing, constructing, assembling, marketing, warranting,
> distributing, selling, leasing, and servicing automobiles, including the
> vehicles of class members, and other motor vehicles and motor vehicle
> components throughout the United States. Plaintiffs' claims and allegations
> against GM refer solely to this entity. …Plaintiffs are not making any claim
> against Old GM (General Motors Corporation) whatsoever, and Plaintiffs
> are not making any claim against New GM based on its having purchased
> assets from Old GM or based on its having continued the business or
> succeeded Old GM. Plaintiffs disavow any claim based on the design or sale
> of vehicles by Old GM, or based on any retained liability of Old GM.
> Plaintiffs seek relief from New GM solely for claims that have arisen after
> October 19, 2009, and solely based on actions and omissions of New GM.

Complaint, ¶ 14.

Separate from this paragraph, there are three other references to "Old GM"

in the Complaint. *See* FAC ¶ 4. These references occur in a single paragraph that

describes how Non-Debtor GM came to know the critical information that it

concealed from Plaintiffs and others. *See id*. None of the references include

allegations of any act, omission or other liability creating conduct on the part of

Non-Debtor GM.

The Class Periods for each of the proposed Classes and Subclasses for which the *Sesay* Plaintiffs seek certification do not begin until October 19, 2009. ¶¶ 40, 42(a)-(b).

*The RICO Claim*: Count I is for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq*. The basis for this claim is that Non-Debtor GM, Delphi, their inside and outside counsel, engineers and dealers engaged in a racketeering enterprise, and used the mails and wires fraudulently to deceive plaintiffs and the public by concealing serious safety defects that posed imminent risks of death, serious bodily injury, and property damage, and that the RICO actors conspired to keep the illegal racketeering from being exposed, and entered into a common scheme to defraud victims. ¶¶ 52-61. The RICO enterprise also included tampering with witnesses and intimidating victims. ¶¶ 62-63.

This count alleges wrongful behavior that has occurred only after Non-Debtor GM purchased Non-Debtor GM's assets. *See* ¶¶ 58, 60-61. It alleges no acts or omissions occurring before October 19, 2014, nor asserts any duties whose origin could possibly have been in the Retained liabilities of Non-Debtor GM under the Sale Order. This Count does not allege and has no connection with any similar racketeering enterprise that the Debtor GM may have engaged in, and that *other* Plaintiffs in this proceeding might have alleged. The Sesay Plaintiffs make

no allegations about any wrongful acts that may have occurred prior to October 19, 2009.

*The common law fraud claim*: The common-law fraud count alleges that when Non-Debtor GM learned about the safety defects in its vehicles on or after October 19, 2009, it came under a duty to disclose that material information to Plaintiffs and others, and Non-Debtor GM breached that duty, causing legally cognizable harm to Plaintiffs and others, by concealing the dangerousness of the vehicles, information material to the determinations of Plaintiffs and others' whether their vehicles were safe to drive, and that this conduct caused both economic harm and exposure to increased risk of death or injury. Like the RICO count, the fraud allegations are explicitly limited to actions by the Non-Debtor GM and others after Non-Debtor GM's purchase of the assets in October 2009, to wit, the concealment of the defects. *See* ¶¶ 65-67. This Count does not allege any similar fraudulent conduct that Non-Debtor GM might have engaged in.

*The negligent infliction of economic loss and increased risk claim*: Count III alleges that, upon acquiring knowledge of the imminent personal injury risks that GM cars posed after October 19, 2009, and knowing that Plaintiffs and others had no reasonable way of learning the risks unless GM disclosed the risks to them, Non-Debtor GM came under a duty to disclose those risks to the Plaintiffs and to others, and Non-Debtor GM acted unreasonably and in breach of this duty when it

actively concealed rather than disclosed the information, causing economic loss and increased risks of death and serious physical injury to the Plaintiffs and others. The claim is asserted on behalf of residents of the group of states where courts have recently recognized duties not to act negligently to violate these interests.

*The Maryland Consumer Protection Act claim*: Count IV alleges that Non-Debtor GM violated the Maryland's Consumer Protection Act ("**MDCPA**"), Md. Code, Comm. Law § 13-101 *et seq*., by failing to disclose critical safety defects to the public. Just like the previous counts, the MDCPA count complains only of the acts of Non-Debtor GM and Delphi, occurring after the inception of the Non-Debtor GM. ¶ 91.

*Joint liability, aiding and abetting and civil conspiracy claims*: Count V is an omnibus joint and several liability count, asserting claims for civil conspiracy, aiding and abetting, and joint action. It asserts that Defendant Delphi and Defendant Non-Debtor GM, as well as the accountants, lawyers and engineers who participated in the illegal conduct, are jointly liable for each other's acts because they acted jointly to cause Plaintiffs and others harm, or under a theory of civil conspiracy, or because they aided and abetted each other in wrongful conduct. Count V does not purport to hold Non-Debtor GM liable for conduct of the Non-Debtor GM, nor does it allege any acts that may have occurred prior to October 19, 2009.

3.    *The Court's Scheduling Orders*

On August 7, 2014, approximately forty minutes after the lawsuit styled

*Sesay et al.  v. General Motors LLC et al.* was assigned to Judge Furman, Non-

Debtor GM listed the action among three others on its Sixth Supplement to

Schedule "1" to the Motion to Enforce.  It also listed the *Sesay* lawsuit on Non-

Debtor GM's accompanying Sixth Supplement to Schedule "2" of the Motion to

Enforce. That Sixth Supplement to Schedule 2 identified the year, make and model

of the vehicles owned by the *Sesay* Plaintiffs, offered a few select quotations from

the *Sesay* Complaint, and characterized the Plaintiffs' claims. Doc. No. 12819.

The same day, Non-Debtor GM then delivered by electronic mail to counsel

files containing the Courts May 16, July 8, and July 11, 2014, Scheduling Orders,

the Sixth Supplements described above, and a document purporting already to

contain the signature of counsel for the *Sesay* Plaintiffs labeled "Sesay Stay

Stipulation Staying Action SD NY." The message accompanying the files

identified the attachments and explained that

> [t]he form of the Scheduling Order and Supplemental Scheduling
> Order presented to the Bankruptcy Court were negotiated with and
> approved by counsel representing certain of the Plaintiffs who have
> filed Actions against New GM ('Designated Counsel'). Designated
> Counsel appeared at the May 2, 2014 Bankruptcy Court hearing and
> spoke on behalf of the clear majority of Plaintiffs. They have agreed
> to try and coordinate the efforts of Plaintiffs' counsel in this
> matter…If you choose not to enter into a Stay Stipulation, pursuant to
> the Newly-Filed VIS Action Procedures Order, you are required to
> file a pleading in the Bankruptcy Court by no later than August 12,

2014 setting forth why you should not be directed to stay your Action
("No Stay Pleading").  New GM will file a response to the No Stay
Pleading and the Bankruptcy Court will hold a hearing on a date set
by the Bankruptcy Court. …Please be advised, pursuant to the terms
of the Newly-Filed VIS Action Procedures Order, if any plaintiff
chooses not to (i) execute a Stay Stipulation, or (ii) file a No Stay
Pleading, the terms of the Stay Stipulation shall automatically be
binding on such plaintiff.

The Scheduling Orders that Non-Debtor GM sent to counsel were

considered and entered before the *Sesay* plaintiffs had filed their lawsuit and before

they were part of any proceeding before the Court. They had no notice of them nor

were they accorded an opportunity to be heard before they were deemed subject to

them. By their terms, the Court seems to have consolidated the various

controversies raised by GM's Motion to Enforce into a single proceeding much

like a Multidistrict consolidation—but without the procedural safeguards that

attend proceedings pursuant to 28 U.S.C. § 1407.

The May 16 Order provides *inter alia* "that the contested matter for the

Motion, the Objection and the Adversary Proceeding shall be jointly administered

by this Court."  The Order identifies threshold issues and sets forth a schedule for

their briefing and consideration, limiting participation in such processes to

"counsel for the identified parties." The Order noted that "[c]ertain Plaintiffs

designated the law firms … (collectively "Designated Counsel") to speak on their

behalf at the [May 2] Conference." The May 16, 2014 Order also provided that

Plaintiffs shall be given until May 23, 2014,

> to enter into voluntary stipulations with New GM … staying all proceedings in their Ignition Switch Action against New GM …other than the JPMLproceedings set forth in paragraph 4 above and, if the Transferee Court so chooses, proceedings in the Transferee Court for the appointment of plaintiff and defendant liaison counsel and the formation of a plaintiffs' steering committee or other committee of plaintiffs' counsel. The Order is without prejudice to the rights of any party to request that this Court stay the Plaintiff(s) from further proceedings before the Transferee Court or for any party to oppose such relief.

The Court noted "the issue whether Plaintiffs may file a consolidated complaint in the transferee court shall be addressed at the July Conference."

The July 11, 2014 Order restricts counsel who may be heard in relation to the disposition of the threshold issues as "Designated Counsel and counsel for New GM, the Groman Plaintiffs, the GUC Trust and the Unitholders are collectively referred to herein as 'Counsel for the Identified Parties.'" While the May 16 Scheduling Order provided for counsel for other plaintiffs to be heard at the July 2, 2014 hearing, the July 11, 2014 Scheduling Order restricted participation in the proceedings to these "counsel for the identified parties." On July 8, 2014, the Court granted GM's Motion to Establish Procedures for Newly Filed Ignition Switch Actions, which similarly required Plaintiffs in actions GM identified either to enter a stay stipulation or file a no stay pleading, but reduced the time period for posing any objection to a stay to three days. It provided that

> If a plaintiff in any such Ignition Switch Action fails to either enter into a Stay Stipulation with New GM or file a No Stay Pleading with

the Court within three (3) business days of receipt of a Stay
Stipulation and Scheduling Order, the terms of the Stay Stipulation
shall automatically be binding on such plaintiff.

The No Stay Stipulation purports to bind the plaintiffs who agree[20] to it

significantly, even with respect to their representation of Plaintiffs before the

Article III Court with supervisory power over this one.[21] The agreement represents

---

[20] Each of the "certain Plaintiffs" whom Designated Counsel represent agreed to agreements
styled as "voluntary," and participated without objection in mandating that other Plaintiffs would
be subject to these provisions. To date, four sets of Plaintiffs have challenged sought relief
through the "no stay pleading" mechanism, out of some one hundred actions which Non-Debtor
GM seeks to bar.

[21] It provides, *inter alia*:

WHEREAS, subject to the terms hereof, and any further order of the Bankruptcy Court,
the Plaintiff(s) have agreed to voluntarily stay this Action and any proceeding before the
Transferee Court pending a resolution by the Bankruptcy Court of the issues raised in the
Motion to Enforce, and the objections thereto, or as otherwise set forth herein.

**NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED** by and
between the Plaintiff(s) and New GM (collectively, the "**Parties**"), as follows:

1. Subject to paragraph 5 hereof, the Parties have agreed to enter into this
Stipulation to stay the Action against New GM, and that Plaintiff(s), subject to further
order of the Bankruptcy Court, shall not seek to further prosecute this Action during the
"Interval" against New GM.  For purposes hereof, (a) the "**Interval**" shall commence on
the date of this Stipulation and shall end 30 days after a Final Order(s) is entered
resolving all issues raised in the Motion to Enforce, and (b) "**Final Order**" shall mean
the entry of an order by the Bankruptcy Court, and the time period to file an appeal of
such order has expired.

2. The Parties will continue to abide by this Stipulation in the Transferee Court
during the Interval, *provided, however*, that Plaintiffs may, if the Transferee Court so
chooses, take such administrative actions relating to the appointment of plaintiff and
defendant liaison counsel and forming a plaintiffs' steering committee or other committee
of plaintiffs' counsel.

3. This Stipulation is without prejudice to the rights of New GM to request that
the Bankruptcy Court stay the Plaintiff(s) from any further proceedings before the
Transferee Court, or for the Plaintiff(s) to oppose such relief.

4. The Parties agree that this Stipulation terminates when, and only to the extent
that, the Bankruptcy Court grants relief from the stay of this Action as agreed to by this
Stipulation; provided however if a plaintiff in a different Ignition Switch Action (as
defined in the Motion to Enforce) does not sign a stipulation similar to this Stipulation,

that the Stipulation terminates when, and only to the extent that, the Bankruptcy

Court grants relief from the stay of this Action as agreed to by this Stipulation…"

It provides that if a "plaintiff in a different ignition switch action" prevails in a no

stay plea, the signatory reserves the right to request the same relief if the same

factual and legal predicates are present. It also purports to bind the signatory to the

stay through the issuance of the equivalent of a final judgment disposing of all the

controversies between GM and various groups of plaintiffs in other matters. After

September 1, 2014, signatories may request relief from the Bankruptcy Court, but

only "for cause shown." Finally, the agreement requires the signatory to agree to

the false recitation that GM's counsel and Plaintiffs' counsel "have jointly

negotiated and prepared this Stipulation and are fully satisfied with its terms." It is

a uniform agreement whose form has been adopted by the Court, as far as Plaintiffs

are aware, and thus not subject to negotiation over its terms.

---

and prior to September 1, 2014 obtains a ruling from the Bankruptcy Court which permits
that plaintiff to go forward in its Ignition Switch Action, the Plaintiff who signed this
Stipulation reserves the right to promptly seek the same relief from the Bankruptcy Court
as it applies to this Action but only if the same factual and/or legal predicate on which the
other plaintiff obtained relief applies to the Plaintiff in this Action as it did to the plaintiff
in the other Ignition Switch Action who obtained such relief.

# ARGUMENT

1. *This Court Lacks Subject Matter Jurisdiction Over Each of the Sesay
   Plaintiffs' Claims Against Non-Debtor GM.*[22]

   a. *GM Bears the Burden of Establishing this Court's Subject Matter
      Jurisdiction.*

Federal courts are courts of limited jurisdiction. See U.S. Const. art. III, § 2, cl.

1; *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). The "burden of

establishing the contrary rests upon the party asserting jurisdiction." *Id.*

   b. *The Sesay Plaintiffs' Claims Do Not "Relate to" Any Proceeding
      Before the Court.*

28 U.S.C. § 1334 provides for original jurisdiction in the district courts for

"all cases under title 11" and "all civil proceedings arising under title 11, or arising

in or related to cases under title 11." The technical jurisdiction issue presented is

whether the *Sesay* Plaintiffs' claims against Non-Debtor GM "relate to" any

proceeding properly before the Court, in that their claims themselves assuredly do

not "arise in" the proceedings that Non-Debtor GM initiated. While jurisdiction to

Enforce the Sale Order may uncontroversially be exercised under §105, the broad

---

[22] The Court has shown concern for the views of other Plaintiffs not parties to the controversy
between Non-Debtor GM and the particular group of Plaintiffs prosecuting a lawsuit that GM
wants to bar. See August 5 Tr. at   ,    cite  To the extent that the Court finds it relevant, all
Plaintiffs appear to agree that this Court lacks subject matter jurisdiction over the kinds of claims
that the *Sesay* Plaintiffs assert:  When the same issue was raised in an earlier hearing in a distinct
matter, Mr. Weisfelner, speaking for the Designated Counsel group, declared: "this Court didn't
have, couldn't have protected New GM from actions that New GM took or violations that New
GM is responsible for. …We agree with Mr. Peller in terms of the limitations of the bankruptcy
court's jurisdiction in that regard."

powers of §105 create no independent jurisdiction. The ancillary jurisdiction courts possess to enforce their own orders "is itself limited by the jurisdictional limits of the order sought to be enforced." *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 916 (Bankr. W.D. Tex. 1995) (*citing* Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 163 (7th Cir. 1994); *Matter of Mooney Aircraft, Inc.*, 730 F.2d 367, 374-75 (5th Cir. 1984), vacated on other grounds, 220 B.R. 909 (Bankr. W.D. Tex. 1998). ; *see In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012).

This Court may have had "arising in" jurisdiction originally to issue the Sale Order in general under the bankruptcy code (although it would not have had jurisdiction in issuing its Order to have enjoined the *Sesay* Plaintiffs future claims based on post-Sale conduct by the Non-Debtor Purchaser and on independent, non-successor, non-derivative, non-transferee duties the Non-Debtor owed Plaintiffs), and to reserve jurisdiction to interpret and enforce that Order. However, the Bankruptcy Courts are not able, through that power, to "write their own jurisdictional ticket," and thereby, by the retention of exclusive jurisdiction to interpret and enforce their own orders, to bootstrap their reach to matters that have nothing to do with the bankruptcy case.[23]

---

[23] Even the dubious designation of this proceeding as "core" does not affect the subject matter jurisdiction analysis:

> We need not resolve whether this is a "core" proceeding for subject matter jurisdictional purposes because "[w]hether a particular proceeding is core represents a question wholly

A plan's jurisdiction retention provision cannot expand a bankruptcy court's post-confirmation jurisdiction beyond that provided by statute. *See*, *e.g.*, *Shenango Group*, 501 F.3d at 344 n.1 (analyzing the existence of post-confirmation "related-to" jurisdiction and stating that court has "not placed any independent weight upon the retention of jurisdiction provision in [the debtor's] Reorganization Plan"); *Valley Historic Ltd. Partnership*, 486 F.3d at 837 (stating that "neither the parties nor the bankruptcy court can create § 1334 jurisdiction by simply inserting a retention of jurisdiction provision in a plan of reorganization if jurisdiction over a dispute, it cannot create that jurisdiction by simply stating that it has jurisdiction in a confirmation or other order."); *U.S. Brass Corp.*, 301 F.3d at 303 (5th Cir. 2002) ("In asserting jurisdiction, the bankruptcy court relied on both a broad retention-of-jurisdiction provision in the confirmed plan and its authority under the Bankruptcy Code to clarify and enforce its own orders. 'However, the source of the bankruptcy court's subject matter jurisdiction is neither the Bankruptcy Code nor the express

---

separate from that of subject-matter jurisdiction." *In re Marcus Hook*, 943 F.2d at 266. Under 28 U.S.C. § 157, a bankruptcy court might have jurisdiction over a proceeding but still might not be able to enter final judgments and orders. *Id.* Non-core "related to" jurisdiction is the broadest of the potential paths to bankruptcy jurisdiction, so we need only determine whether a matter is at least "related to" the bankruptcy. *Donaldson*, 104 F.3d at 552.

*In re Resorts Int'l*, 372 F.3d at 157. *See also Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 4th Cir 2007) The determination that a claim is core or noncore is one that should not be reached, however, if subject matter jurisdiction does not exist. An assertion that the action is a core or noncore proceeding is not an allegation of federal jurisdiction; rather, it relates to the power of the bankruptcy court to resolve the issues brought before it after jurisdiction is established.

terms of the Plan. The source of the bankruptcy court's jurisdiction is 28 U.S.C. §§ 1334 and 157.'" (citation omitted)); *Harstad v. First Am. Bank*, 39 F.3d 898, 902 n.7 (8th Cir. 1994) (acknowledging that plan provision cannot confer jurisdiction upon bankruptcy court); *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) ("[T]he fact that the bankruptcy court, in the orders approving the bankruptcy sale and later in the plan of reorganization, purported expressly to assume jurisdiction to entertain such proceedings could not confer jurisdiction. A court cannot write its own jurisdictional ticket."); *Guttman v. Martin* (*In re Railworks Corp.*), 325 B.R. 709, 722-23 (Bankr. D. Md. 2005) ("If there is no jurisdiction under 28 U.S.C. § 1334 retention of jurisdiction provisions in a plan of reorganization or trust agreement are fundamentally irrelevant.*"); Diagnostic Int'l, Inc. v. Aerobic Life Prods. Co.* (*In re Diagnostic Int'l, Inc.*), 257 B.R. 511, 514 (Bankr. D. Ariz. 2000) (stating that retention of jurisdiction clause cannot grant subject-matter jurisdiction over proceeding when proceeding is outside court's jurisdictional limits defined by statute); *see also Ins. Corp. v. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (stating that subject matter jurisdiction cannot be conferred upon a federal court by consent of the parties).

Retention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction. *But neither the bankruptcy court nor the parties can write their own jurisdictional ticket.* Subject matter jurisdiction "cannot be conferred by consent" of the parties. *Coffin v. Malvern Fed. Sav.*

*Bank*, 90 F.3d 851, 854 (3d Cir.1996). Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization. *In re Continental Airlines, Inc.*, 236 B.R. 318, 323 (Bankr.D.Del.1999), aff'd, 2000 WL 1425751 (D.Del. September 12, 2000), aff'd, 279 F.3d 226 (3rd Cir.2002). Similarly, if a court lacks jurisdiction over a dispute, it cannot create that jurisdiction by simply stating it has jurisdiction in a confirmation or other order.*Id.*; *accord United States Trustee v. Gryphon at the Stone Mansion*, 216 B.R. 764, 769 (W.D.Pa.1997) ("A retention of jurisdiction provision within a confirmed plan does not grant a bankruptcy court jurisdiction."), aff'd, 166 F.3d 552 (3d Cir.1999). …If there is no jurisdiction under 28 U.S.C. § 1334 or 28 U.S.C. § 157, retention of jurisdiction provisions in a plan of reorganization or trust agreement are fundamentally irrelevant. But if there is jurisdiction, we will give effect to retention of jurisdiction provisions. Consequently, we will examine whether this dispute falls within the Bankruptcy Court's subject matter jurisdiction.

*Binder v. Price Waterhouse & Co., LLP* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 161 (3rd Cir. 2004). *See also Trusky v. Gen. Motors Co.* (*In re Motors Liquidation Co.*), 2013 Bankr. LEXIS 620, at *33, 2013 WL 620281, at *11 (Bankr. S.D.N.Y. Feb. 19, 2013) ("GM-Trusky) (conceding it, once the Sale Order were interpreted, it would be difficult to "see how I would have subject matter jurisdiction to decide anything eIse.")

It is time for Non-Debtor GM to stop hiding behind the protective embrace of this Court. "Since the purpose of reorganization clearly is to rehabilitate the business and start it off on a new and to-be-hoped-for more successful career, it should be the objective of courts to cast off as quickly as possible all leading strings which may limit and hamper its activities and throw doubt upon its responsibility. *It is not consonant with the purposes of the Act, or feasible as a*

*judicial function, for the courts to assume to supervise a business somewhat indefinitely.*" *In re Indicon*, 499 B.R. at 555, *quoting North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp.*, 143 F.2d 938, 940 (2d Cir. 1944).[24]

*See*

The final decree confirming Debtor GM's reorganization was entered and Debtor GM's case was closed on April 18, 2013.  Particularly in this post-confirmation setting where a bankruptcy court's jurisdictional basis is most tenuous,[25]

---

[24] As Judge Easterbrook put it,

> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the *protection* of the bankruptcy court. *It may not come running to the bankruptcy judge every time something unpleasant happens*.... Formerly a ward of the court, the debtor is emancipated by the plan of reorganization. A firm that has emerged from bankruptcy is just like any other defendant in a tort case: it must protect its interests in the way provided by the applicable non-bankruptcy law, here by pleading the statute of limitations in the pending cases.

*Pettibone Corp. v. Easley* (*In re MGM Studios*), 935 F.2d 120, 122 (7th Cir. 1991)

[25] *As the Court explained in In re Resots Int'l*, *supra* at 164-65.

The post-confirmation context of this dispute affects our "related to" inquiry because bankruptcy court jurisdiction "must be confined within appropriate limits and does not extend indefinitely, particularly after the confirmation of a plan and the closing of a case." *Donaldson*, 104 F.3d at 553.7 After confirmation of a reorganization plan, retention of bankruptcy jurisdiction may be problematic. *See Bank of La. v. Craig's Stores of Tex., Inc.* (*In re Craig's Stores of Tex., Inc.*), 266 F.3d 388, 391 (5th Cir.2001); *In re Fairfield Cmtys., Inc.*, 142 F.3d 1093, 1095-96 (8th Cir.1998). This is so because, under traditional *Pacor* analysis, bankruptcy jurisdiction will not extend to a dispute between non-debtors unless the dispute creates "the logical possibility that the estate will be affected." *In re Federal-Mogul Global*, Inc., 300 F.3d 368, 380 (3d Cir.2002) (*internal quotations omitted*), cert. denied, 537 U.S. 1148, 123 S.Ct. 884, 154 L.Ed.2d 851 (2003). At the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred. *See In re Fairfield Cmtys.*, 142 F.3d at 1095 (holding that once a bankrupt debtor's plan has been confirmed the debtor's estate ceases to exist). Unless otherwise provided by the plan or order confirming the plan, "the confirmation of a plan vests all of the property of the estate" in the reorganized debtor. 11 U.S.C. § 1141(b). *See also NVF Co. v. New Castle County*, 276 B.R. 340, 348

---

bankruptcy courts must use caution lest applications for protection by a Non-Debtor seeking relief be abused, as it has in this instance. Just as the jurisdictional "arising in" power originally to issue the Sale Order may not constitutionally have reached claims—like those of the *Sesay* Plaintiffs--having nothing to do with the Bankruptcy case, the power to interpret and enforce that Order cannot extend the original jurisdictional limits of the Court. "Most courts agree that once confirmation occurs, the bankruptcy court's jurisdiction shrinks. The Second Circuit has used the 'close nexus test' to determine post-confirmation subject matter jurisdiction." *Vanguard Prods. Corp. v. Citrin* (*In re Indicon*), 499 B.R. 395 (D. Conn. 2013); *In re Metro-Goldwyn-Mayer Studios Inc.*, 459 B.R. 550 (Bankr. S.D.N.Y. 2011); *Washington Mut., Inc. v. XL Specialty Ins. Co.* (*In re Washington Mut., Inc.*), 2012 Bankr. LEXIS 4673, *14-*15 (Bank. Del 2012) (citations omitted):

> If including a retention of jurisdiction clause in a Plan was sufficient, the limitation on post-confirmation jurisdiction would be easily eliminated. Rather, to have a sufficiently close nexus to retain post-confirmation jurisdiction, the plan must 'specifically describe[] an action over which the Court had 'related to' jurisdiction pre-confirmation and expressly provide[] for the retention of such jurisdiction to liquidate that claim for the benefit of the estate's creditors. . . .' Such specific language helps ensure that "bankruptcy court jurisdiction would not raise the specter of unending jurisdiction" post-confirmation.

---

(D.Del.2002) (holding that the confirmation of a plan revests the estate's property in the reorganized debtor, and accordingly, the bankruptcy estate "no longer existed"), aff'd 61 Fed.Appx. 778 (3d Cir.2003).Although the statutory basis for a bankruptcy court's jurisdiction does not change after confirmation of a plan of reorganization (i.e., jurisdiction still is governed by 28 U.S.C.§ 1334), bankruptcy courts generally recognize that the scope of their jurisdiction narrows after confirmation of a plan. *See Penthouse Media Group v. Guccione* (*In re General Media, Inc.*), 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) (stating that while section 1334 does not limit a bankruptcy court's jurisdiction after plan confirmation, "all courts that have addressed the question have ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks"). This reduced scope of jurisdiction follows from the fact that as time passes after confirmation, the universe of matters that relates to a bankruptcy cases necessarily diminishes. *See Gray v. Polar Molecular Corp.* (*In re Polar Molecular Corp.*), 195 B.R. 548, 555 (Bankr. D.Mass. 1996) ("*Polar Molecular*").

Respectfully, the Court's approach in the *Elliott* matter was mistaken—the proper object of jurisdictional analysis is each of the claims that Plaintiffs actually assert, and the proper question is whether those claims could have or had any conceivable effect on the liabilities of the Debtor—and not whether this Court had the power to issue and has the power to interpret and enforce the Sale Order without regard for the nature of claims that Plaintiffs assert. In fact, had the Sesay Plaintiffs been notified of and accorded an opportunity to object to the issuance of the Sale Order, and if the Sale Order had even purported to encompass their claims, which it does not, they would have made this same jurisdictional argument as an objection to such hypothetical provisions.  Of course, to state the hypothetical is to demonstrate the absurdity of Non-Debtor GM's contention that the Sale Order enjoined Plaintiffs from asserting these claims. Even with notice, Plaintiffs could not have had standing to object to the Sale Order, as their claims had not accrued under any plausible theory of when claim arise.

Notably, the Court itself expressed doubt about its power to reach the "future claims" of those whose pre-sale exposure to asbestos would ripen into injury post-sale. Sale Order Decision. The relation between the Sale Order and the *Sesay* claims is even more remote, as the *Sesay* Plaintiffs, unlike the future asbestos victims whose interests the court found no one then before it had standing to assert, *id.*, do not claim that Debtor GM's conduct and original liability gave rise to any of

their claims against Non-Debtor GM.  Not only their injury, but also the conduct

that gives rise to their claims, occurred well after the Sale. *Cf. Lothian Cassidy,*

*LLC v. Lothian Exploration & Dev. II*, L.P., 487 B.R. 158, 162 (S.D.N.Y. 2013)

(Marrero, J.) ("Where, as here, the bankruptcy plan in question has already been

confirmed, the Bankruptcy Court's jurisdiction shrinks to cover only matters that

have a "close nexus" to the bankruptcy plan and the plan provides for jurisdiction

over the dispute.")

Like most circuits, the Second Circuit has adopted the Third Circuit's *Pacor*

test[26] for determining a bankruptcy court's jurisdiction over a lawsuit between third

parties to the bankruptcy case. *See Travelers Co v. Bailey*, 557 U.S. 137, 146

(2009). The court of Appeals has repeatedly warned lower Court's to exercise

particular care when healthy non-debtors seek to avail themselves of the protective

power of the Bankruptcy courts. It has made clear that this Court's "related to"

jurisdiction is limited to power over litigants in proceedings *only* when the

outcome of that proceeding could conceivably have any effect on the estate being

administered in bankruptcy. *See Manville II*, 517 F.3d at 66; *In re Cuyahoga*

*Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test for determining whether

litigation has a significant connection with a pending bankruptcy [sufficient to

---

26 *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)

confer bankruptcy jurisdiction] is whether its outcome might have any conceivable effect on the bankrupt estate." (*internal quotation marks omitted*); *In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012) ("'related to' jurisdiction to enjoin a third party dispute exists where the subject of the third party dispute is property of the estate, or the dispute would have an effect on the estate.") (*internal quotation marks omitted*); *See also In re Old Carco LLC*, 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) ("Nevertheless, the *law may impose a separate duty to warn on New Chrysler*," and there would in such circumstances be no subject matter jurisdiction over third party claims against New Chrysler);  *In re Dreier*, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010) ("While the Bar Order is limited to creditors and parties in interest in the LLP and Dreier cases, these parties may also have *direct* claims against GSO") (*emphasis added*); *In re Grumman*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) ("§ 362(f) authorizes the Court to absolve the buyer of *in personam* liability for pre-confirmation claims in a chapter 11 case. The rule does not extend to potential future tort claims of the type now asserted by the Fredericos, and the GM sale order did not grant the buyer this relief.")[27]

---

[27] Nothing in *Travelers* is to the contrary. As the Court stated, whether the Bankruptcy Court had jurisdiction and authority to enter the injunction in 1986 was not properly before the Court of Appeals in 2008 and is not properly before us…. Our holding is narrow. We do not resolve whether a bankruptcy court, in 1986 or today, could properly enjoin claims against nondebtor insurers that are not derivative of the debtor's wrongdoing. *Travelers Indem. Co. v. Bailey,* 557 U.S. at 148. That issue was resolved definitively on remand in *Manville III*, 600 F.3d at 148-49. The answer is no.

In the particular context of third party claims against non-debtors, like those that the *Sesay* Plaintiffs assert against Non-Debtor GM, the rule for determining "related to" jurisdiction, and thus the constitutional bounds of this Court's power, is crystal clear and easy to apply: When the third-party's claims against a non-debtor rest on *independent duties* that the non-debtor allegedly owed the third party, rather than derivative, successor, or transferee duties of the debtor, there is no Bankruptcy Court subject matter jurisdiction over the dispute without an affirmative showing of some conceivable impact on the res of the bankrupt. *In re Johns-Manville Corp.*, 517 F.3d 52, 65 (2d Cir. 2008) ("Manville II"), *vacated & remanded on other grounds*, 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009), aff'g in part & rev'g in part, 600 F.3d 135, 2010 U.S. App. LEXIS 5877, 2010 WL 1007832 (2d Cir. Mar. 22, 2010) ("Manville III"); *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995); *In re Kubly*, 818 F.2d 643, 645 (7th Cir. 1987); *Geruschat v. Ernst Young LLP* (*In re Seven Fields Dev. Corp.*), 505 F.3d 237

Nor can the good intentions of a bankruptcy court to protect the purchaser of a bankrupt's assets to help it achieve "global peace" replace the necessity for a prior determination that subject matter jurisdiction, some connection to the bankrupt, be shown when a non-debtor like GM seeks its extraordinary protection:

> The district court emphasized the bankruptcy court's declaration that its "repeated use of the term[s] 'arising out of' and 'related to' [was] not gratuitous or superfluous; they were meant to provide . . . global finality for Travelers. But global finality is only as "global" as the bankruptcy court's jurisdiction. A court's ability to provide finality to a third-party is defined by its jurisdiction, not its good intentions.

*In re Johns Manville Corp.*, 517 F.3d at 66 (2d Cir. 2008). To justify the unusual

transaction in which Debtor GM sold all of its assets *prior* to any approval of its

reorganization, this Court emphasized in its Sale Order decision how economically

important the limits on the assumed liability of the purchaser, the entity that would

become Non-Debtor GM, were to the success of the proposed reorganization, and in

turn to the Debtor's and the national interest. But even that exigency has its

jurisdictional, and constitutional, limits.  However crucial this Court might have

believed that the limits on the Purchaser's assumed liabilities were to value of the

assets to be sold, and hence to the success of the Debtor's reorganization, this Court

lacked and lacks power to immunize or privilege future wrongdoing by the purchaser,

Non-Debtor GM, no matter how much more attractive such immunity might make the

Debtor's assets. By barring Plaintiffs from suing it for relief from the post-conduct

harm Non-Debtor has and continues to cause them by its own post-sale conduct that

Plaintiffs allege breach independent duties that Non-Debtor GM owes them, duties

independent of whatever duties Debtor GM might have also owed them, the Court

would be doing just that. There was no jurisdictional basis to reach such claims when

the Sale Order was originally issued, and there is no greater jurisdiction now to enjoin Plaintiffs from pursuing such claims.

The power of Bankruptcy Courts to act equitably and do justice has roots in ancient powers of the equity court. But the constitutional and statutory jurisdiction of the Court runs out thankfully at least at the point where, as in the case in bar, the power is called upon, not to extend empathy and care to an ailing person or entity struggling to survive, but rather to put the shield of the Stay at the disposal of a robust multi-national corporation accused of historic acts of corporate misconduct so that it is able to avoid responsibility for its wrongs . Respectfully, this Court has no jurisdiction over their claims and Non-Debtor GM may not utilize the extraordinary Stay power of this Court simply as a tool in its quest to tamp down its potential liability for its wrongdoing, or to delay lawsuit like that of the *Sesay* Plaintiffs that it has no hope of permanently barring.

    C.    *The Sesay Plaintiffs' Claims Do Not Relate to Any of the Liabilities that Were the Subject of the Sale Order and Injunction.*

Non-Debtor GM asserts that the Sale Order protects it against any claims that are based on "successor or transferee liability," claims that arose before the "closing date" and claims that existed against Debtor GM at the time of the closing of the sale. *See* Sale Order ¶¶ 7, 10, 46, 48. The Sale Order does not *immunize* Non-Debtor GM for any wrongdoing it commits. The claims the *Sesay* Plaintiffs bring do not fall within the scope of the Sale Order because they neither allege, nor

depend, upon successor or transferee liability, they did not arise before the "closing

date," and they do not implicate any past liability Debtor GM might have had in

any way. The claims they wish to bring only arose when Non-Debtor GM came

into being and allegedly began concealing and suppressing material, and

potentially fatal, safety defects from them. The identity and origin of the particular

vehicles in which those safety defects inhered is not dispositive of whether Non-

Debtor GM and Delphi Automotive PLLC illegally concealed the defects from

Plaintiffs, the public, and government officials, and then attempted to suppress

lawsuits related thereto. It wouldn't matter to Plaintiffs' claims if Non-Debtor GM

had bought the assets from a thriving manufacturer rather than an ailing debtor.

The *Sesay* Plaintiffs' claims depend upon no wrongdoing by Debtor GM and could

not have existed against Debtor GM because the alleged wrongdoing did not occur

until after Debtor GM had ceased to exist – this is true despite the fact that, in this

particular case, the *Sesay* Plaintiffs may have had *other* claims against Non-Debtor

GM. All liability addressed in the Sale Order was either assumed by Non-Debtor

GM or retained by Debtor GM. Non-Debtor GM could not have assumed liability

for the *Sesay* Plaintiffs' claims from Debtor GM, and Debtor GM could not have

retained liability for the *Sesay* Plaintiffs' claims, because Non-Debtor GM never

had liability for the *Sesay* Plaintiffs' claims, nor could it have. For this reason, the

Sale Order, by its clear terms, simply does not reach the claims brought by the

*Sesay* Plaintiffs against Non-Debtor GM.

The *Sesay* Plaintiffs' case is also distinguishable from prior rulings

enforcing the July 2009 Sale Order and Injunction. The "Trusky Plaintiffs," for

example, alleged that Non-Debtor GM "breached warranty obligations Non-Debtor

GM *assumed* from Non-Debtor GM in the 363 Sale." *In re Motors Liquidation

Co.*, 09-50026 REG, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013). The

*Sesay* Plaintiffs make no allegations dependent upon duties or obligations that

Non-Debtor GM *could* have assumed from Non-Debtor GM *at all*. The "Castillo

Plaintiffs," meanwhile, sought a declaratory judgment that Non-Debtor GM

"*assumed* a settlement agreement between Non-Debtor GM and the Castillo

Plaintiffs as part of Non-Debtor GM's purchase." *In re Motors Liquidation Co.*,

09-50026 REG, 2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17, 2012). Non-Debtor

GM could *not* have assumed the liabilities at issue in the Sesay Plaintiffs' claims,

because they never *existed* against Non-Debtor GM. Finally, unlike the plaintiffs

addressed in the Court's May 17, 2010 Order Pursuant to 11 U.S.C. § 105(a)

Enforcing 363 Sale Order (*Motors*, Doc. No. 6237), who brought personal injury

claims against Non-Debtor GM after accidents that occurred *before* the closing

date, the *Sesay* Plaintiffs allege only the injury that occurred *after* Non-Debtor GM

had come into existence. Their case not distinguishable from the *Elliott v. GM*

matter that the Court considered in CITE. The Court misapplied the law in that

ruling and mistakenly thought that it had "arising in" jurisdiction over such claims

and that it therefore did not need to attend to the tests that the Second Circuit has

mandated in order to determine subject matter jurisdiction of the bankruptcy courts

over third party claims. *In re Motors* , . Courts have declined to find "related to"

jurisdiction where "the asset [in question] had been sold, the bankruptcy estate was

not a party to the action, and the defendants were not debtors or creditors." *In re*

*DVI, Inc.*, 305 B.R. at 417 (discussing *New Horizon of N.Y. LLC v. Jacobs*, 231

F.3d 143 (4th Cir. 2000)

> **D.     *GM's Shell Game Regarding "Pre-Petition Vehicles and Parts"***

As noted above, Non-Debtor GM's Motion to Enforce the Sale Order that

prompted these proceedings takes great pains to carefully to distinguish the

liabilities of Debtor GM that it assumed from the liabilities of Debtor GM that it

did not assume and that were accordingly retained by Debtor GM. Non-Debtor GM

then concludes that, because particular claims were retained by Debtor GM,

Plaintiffs asserting *any* claims that relate to the assets it purchased from Non-

Debtor GM must be enjoined.

To state GM's contention is to demonstrate its inadequacy. The Sale Order

and MSPA speak to how the liabilities of Non-Debtor GM associated with the

assets it was selling to Non-Debtor GM would be divided between Non-Debtor

GM, the seller, and Non-Debtor GM, the purchaser. The *Sesay* Plaintiffs assert

legal claims that GM contends relate to "pre-petition vehicles and parts" because

they refer to Non-Debtor GM's concealment from the Sesay Plaintiffs and others

of material information about the risks presented by driving the Mr. Sesay's 2007

GM car. GM contends that the fact that the Sesay Plaintiffs assert claims that have

anything to do with an asset it bought from Debtor GM means that they must be

violating the Sale Order injunction simply by asserting the claims.

The missing analytic step is to examine the claims that the *Sesay* Plaintiffs

*do* assert, and to determine if any of the claims rest on liabilities that Non-Debtor

GM retained. As the above description of the *Sesay* Plaintiffs' claims

demonstrates, the *Sesay* Plaintiffs have taken care to honor[28] Non-Debtor GM's

contentions that the Sale Order bars lawsuits against it based on liabilities that

Debtor GM retained, by carefully crafting their allegations so that they assert no

such claims. Nor, of course, are the *Sesay* Plaintiffs asserting claims based on

liabilities of the Debtor GM that Non-Debtor GM concedes it did assume. The

*Sesay* Plaintiffs' claims have nothing to do with the Sale Order, or with Non-

Debtor GM's purported motion to enforce that Order, because each of the *Sesay*

Plaintiffs' claims is based on breaches by Non-Debtor GM of duties it allegedly

---

[28] That is, to observe the boundaries of GM's interpretation of the Sale Order in its Motion to Enforce. Plaintiffs in no way mean to indicate that they agree with GM's interpretation of its liabilities under that document and those proceedings. They do not.

owed to Plaintiffs and others, none of which have anything to do with the division

of *Debtor GM's* liabilities reflected in the Sale Order.

In its papers to date, GM nowhere demonstrates any connection between the

*Sesay* Plaintiffs' factual allegations and the legal claims they assert, on the one

hand, and the particular legal claims that Non-Debtor GM contends it has no

liability for by virtue of the Sale Order. From the premise that Non-Debtor GM is

protected from lawsuits that are based on Debtor GM's liabilities that it did not

assume, Non-Debtor GM leaps to the unwarranted conclusion (which it apparently

hedges for ethical reasons) that any claims made against Non-Debtor GM by

owners of vehicles sold by (or even containing parts sold by) Debtor GM must be

"Retained Liabilities":

> To be sure, the causes of action asserted by Plaintiffs in the Ignition
> Switch Actions are varied, and in some instances, because of
> imprecise drafting, it is unclear whether there *might be a viable cause
> of action …being asserted against Non-Debtor GM*. What is clear,
> however, is *that the crux of Plaintiffs' claims* is a problem in the
> ignition switch in vehicles and parts sold by the Non-Debtor GM.
> Claims based on that factual predicate are Retained Liabilities.

GM then identifies the actions it claims violate the Sale Order, in an *en masse* chart

that provides no information about the lawsuits other than that they involve

particular GM Models and presumably (inferring from the inclusion of the *Elliott*

action) the factual allegations used the words "ignition switch."

*In order to connect that information to possible violations of the Sale Order* — a critical step given the extraordinary relief that Non-Debtor GM seeks from third party lawsuits, *GM would need to show not only that the lawsuits mentioning ignition switches involve pre-petition vehicles or parts, but also that **the claims being asserted are the claims that it is protected against under the Sale Order***. The critical question is not what year vehicles or auto parts were made, but whether the duties that Plaintiffs allege that Non-Debtor GM violated involved retained liabilities of Non-Debtor GM or instead, as Plaintiffs contend, involve independent duties that Non-Debtor GM owed them.

Rather than provide this requisite analysis to connect factual allegations about ignition switches in pre-petition vehicles to the claims that the *Sesay* Plaintiffs assert (an absurd possibility in that the *Sesay* lawsuit was initiated months after Non-Debtor GM lodged the Motion that it purports applies to the *Sesay* lawsuit, although such motion was never served on the Sesay Plaintiffs and does not by its terms address the claims they assert), Non-Debtor GM's Motion purports to establish its entitlement to extraordinary relief from each "ignition switch action" by means of "sample" allegations it cherry-picked from a small number of pleadings. GM represents to the Court (in a footnote) that "[t]he allegations and claims asserted in the Ignition Switch Actions include Retained Liabilities such as implied warranty claims, successor liability claims, and

miscellaneous tort and statutory claims premised in whole or in part on the alleged acts or omissions of Non-Debtor GM." GM's only support for the conclusion is its reference to another chart purportedly containing *samples* of such allegations from select cases.  Presumably, the "Sixth" Supplements that Non-Debtor GM sent the *Sesay* Plaintiffs are intended to individualized the *de factor* omnibus motion, but they contain no analysis whatsoever as to what the sentences that Non-Debtor GM sampled have to do with its Motion to Enforce. As noted above, the lack of connection to Plaintiffs' actual claims is particularly egregious with respect to Ms. Yearwood's claims as a post-petition purchaser.  GM's bald speculation about possibilities that some of the same GM models may have had Debtor parts installed has no factual or legal basis.

Whatever its possible merits in relation to other litigants, GM's argument is plain wrong with respect to the *Sesay* Plaintiffs. Respectfully, Plaintiffs are entitled to individual rather than bulk consideration before their rights to litigate their claims are restricted or, as in the case of their rights to pursue preliminary relief, extinguished. They also should not to be presumed to be in violation of this Court's Orders based on GM's carefully crafted representations to the Court that, upon scrutiny, avoid explicitly saying anything directly about the *Sesay* Plaintiffs' claims at all.

To emphasize, Non-Debtor GM is wrong to include the *Sesay* action within the ambit of its Motion to Enforce because the *Sesay* Plaintiffs are not complaining that Debtor GM sold them a vehicle with a bad ignition switch and that Non-Debtor GM is liable for that act. They complain that *Non-Debtor GM* violated *its* duties to disclose that their vehicles were dangerous to drive, in part because of the ignition switch defect that Non-Debtor GM has now publicly conceded that *it* (or more precisely, its engineers, lawyers, risk managers, and management) concealed from the Plaintiffs, the public, and governmental regulators. Whether the *Sesay* Plaintiffs will prevail on this theory is not for this Court to determine, but rather the issue to be determined is solely whether such allegations impinge in any way on retained liabilities of Debtor GM. They plainly do not.

Legal duties are owed by persons to other persons; they do not inhere in vehicles or auto parts or other objects in the material world. The fact that Mr. Sesay's legal claims for relief from Non-Debtor GM relate to a "pre-petition" vehicle simply means that Mr. Sesay may have had *potential* claims against Non-Debtor GM, say for breach of implied warranty, common law misrepresentation, or state consumer protection violations, *in addition to* those claims they have chosen to assert. But it does not mean that the *Sesay* Plaintiffs are in fact *asserting* such claims. They are not.

Mr. Sesay's claims do relate to a "pre-petition" vehicle, but that single fact cannot act as a shorthand to justify neglecting the more extended consideration required to reach the ultimate conclusion that such claims are encompassed by the Sale Order and Injunction and therefore that Plaintiffs and their counsel must necessarily be acting in violation of this Court's authority by asserting such claims. Before such a conclusion can reasonably (or constitutionally) be reached, an analysis is necessary *first* to determine if their third-party non-debtor claims assert derivative or successor liability on the part of Non-Debtor GM for retained liability of Debtor GM, in which case the claims may well be within the terms of the Sale Order, or if they are based instead on allegations that Non-Debtor GM violated *independent* duties that Non-Debtor GM owed to the *Sesay* Plaintiffs, causing them legally cognizable harm, in which case the claims would not be, and constitutionally could not have been, encompassed by the Sale Order and Injunction.[29] This analysis, which Non-Debtor GM's invocation of "pre-petition" vehicles and auto parts neglects, is also required to determine the *constitutional* authority of this Court because, as discussed below, Bankruptcy Courts have no subject matter jurisdiction over third party non-debtor claims that allege breaches of duties independently owed by third party non debtors such as Non-Debtor GM.

---

[29] Presumably New GM will argue that it owed no such duties, and it may win that argument. But the relevant question before this Court is not whether the claims will withstand legal challenge, that is, whether there is a legal basis for the duties Plaintiffs allege were owed and breached, but more narrowly whether the *allegations* are essentially of breaches of independent or derivative duties.

And, as discussed above, the relation to Ms. Yearwood's claims to any possible

retained liabilities is based on pure speculation about parts that may or may not be

present in her car.

The Court of Appeals has admonished the lower courts to conduct this

analysis of the *Sesay* Plaintiffs claims:

> In our view, the jurisdictional analysis by the lower courts falls short for
> several reasons…The courts below appeared to view the jurisdictional
> inquiry as a factual one: if the direct actions "arose out of" or are "related to"
> the Manville-Travelers relationship, then the court had jurisdiction. But the
> factual determination was only half of the equation. The nature and extent of
> Travelers' duty to the Direct Action plaintiffs is a function of state law.
> Neither court looked to the laws of the states where the claims arose to
> determine if indeed Travelers did have an independent legal duty in its
> dealing with plaintiffs, notwithstanding the factual background in which the
> duty arose. … it is evident that Plaintiffs' Direct Action claims constitute
> independent tort actions… [And even] the states' unwillingness to recognize
> these actions does not vest a federal court with jurisdiction to enjoin all such
> future claims.

*In re Johns Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008), vacated & remanded

on other grounds, 557 U.S. 137 (2009), aff'g in part & rev'g in part, 600 F.3d 135

(2d Cir. 2010) ("Manville III").[30]

It is ironic that the *Sesay* Plaintiffs (and their counsel), who have expended

great effort to *comply with* this Court's Sale Order, and accordingly have made

---

[30] The Supreme Court's intervening decision in *Travelers v. Bailey* did not alter the Second
Circuit's statement of applicable law governing subject matter jurisdiction, but merely
considered whether an Order that may have been issued without jurisdiction could be collaterally
attacked on that basis years later. The Court held that it could not, on equitable mootness
grounds.

every effort to *avoid* making any claims that could arguably be within the terms of this Court's injunction,[31] have nevertheless been treated as presumptive violators of the Order solely and exclusively because they make claims against Non-Debtor GM on behalf of owners of "pre-petition" vehicles and, if Plaintiffs understand, that pre-petition auto parts may exist in post-petition vehicles. Surely neither GM nor the Court interpret the Sale Order to enjoin these third-party non-debtor claims because the such parties *could have* asserted claims in alleged violation of the Sale Order *but chose not to*. And surely no reasonable interpretation of the Sale Order would read it to immunize Non-Debtor GM from all civil liability for *its* alleged criminal and reckless endangerment of the public safety and the lives of Plaintiffs, their families, and millions of other drivers, passengers and bystanders who may come into contact with GM vehicles posing imminent and unreasonable danger of inflicting personal injury and property damage.

Non-Debtor GM has already admitted that *Non-Debtor GM* decided to conceal rather than to disclose the risks about which the *Sesay* Plaintiffs complain, as part of an episode of gross corporate misconduct, plaintiffs allege, perpetuated through a criminal enterprise engaged in various acts of racketeering activity systematically designed to conceal and minimize the risks posed by GM vehicles.

---

[31] GM can't have it both ways—the careful compliance with this Court's Sale Order is not "artful pleading around the Sale Order" but compliance with it.

Plaintiffs claims center around that *concealment by Non-Debtor GM*. Whether the *Sesay* Plaintiffs prevail may depend on whether the courts who ultimately hear their claims agree that GM owed them a duty to disclose in these circumstances, and that the alleged concealment breached that duty. But the ultimate legal *merits* of the *Sesay* Plaintiffs' allegations have nothing to do with the question here—do the *Sesay* Plaintiffs' claims rest on duties they allege the Non-Debtor GM owed them, independent of any duties that it may or may not have assumed from the Debtor GM? Because they implicate no successor, transferee, or derivative liability of Non-Debtor GM, the claims asserted in the *Sesay* lawsuit have nothing whatsoever to do with the Sale Order transaction, and their motion to dismiss should be granted forthwith.

**II.    Non-Debtor GM's Motion Should Be Denied Because Application of the Sale Order to The *Sesay* Plaintiffs Would Violate their Due Process Rights in that No Notice Was Directed to Them and They in Fact Received No Effective Notice Nor any Reasonable Opportunity to be Heard with Respect to the Entry of the Sale Order And Injunction, Nor any Notice Prior to these Proceedings that the Sale Order and Injunction was Addressed to them or to any of the Claims They Assert Against Non-Debtor GM.**

It is not surprising that the Court did not consider, and Debtor GM did not propose, notice to those like the *Sesay* Plaintiffs whose future claims would be based on misconduct that had not yet occurred, and whose claims would not implicate Debtor GM's retained liability in any way, insofar as the Sale Order does not purport to reach such claims.  The lack of notice is nevertheless important in

the event that this Court determines that it has jurisdiction to enjoin Plaintiffs from

pursuing their claims. The Court's prior decisions indicate that it intends to apply

the Sale Order directly to enjoin those whose "No Stay Pleading" it denies.

Because the injunctive measure of a stay would deprive the *Sesay* Plaintiffs

of important interests, indeed interests of constitutional dimension and weight, in

being able to pursue civil redress for injuries they have suffered, and continue to

suffer, at the hands of Non-Debtor GM, they were entitled to notice of and a

reasonable opportunity to contest the entry of the Order upon which such

injunctive relief purports to be based. GM has not established such due process

prerequisites, nor could it.  The record, contained in the filings appearing on this

Court's docket, establish the contrary, even before the recent Stipulation that

restated the obvious lack of such notice.

Given the lack of notice to the *Sesay* Plaintiffs, they cannot be barred by the

Sale Order and Injunction. *See Manville III* 600 F.3d at  148; DPWN *Holdings*

*(USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143, 155 (E.D.N.Y. 2012);

*Morgan Olson L.L.C. v. Frederico* (*In re Grumman Olson Indus., Inc.*), 467 B.R.

694, 708 (S.D.N.Y. 2012); *Compak Cos. LLC v. Johnson*, 415 B.R. 334, 340 n.8

(N.D. Ill. 2009); *PolycelStructural Foam, Inc. v. Pool Builders Supply of the*

*Carolinas* (*In re Polycel Liquidation, Inc.*), 2007 WL 77336, at *8-9 (D.N.J. Jan. 9,

2007); *Metal Founds. Acquisition, LLC v. Reinert* (*In re Reinert*), 467 B.R. 830,

832 (Bankr. W.D. Pa. 2012); *Doolittle v. Cnty. of Santa Cruz* (*In re Metzger*), 346

B.R. 806, 819 (Bankr. N.D. Cal. 2006).

Since they had no claim at the time of the Sale, they could not be barred by

the Sale Notice from asserting a claim, even if their claims do implicate Debtor

GM's liability, which they do not. The Bankruptcy Code broadly defines a "claim"

as a "right to payment, whether or not such right is reduced to judgment,

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §101(5)(A). While

a "claim" encompasses "all legal obligations of the debtor," *Chateaugay I*,

944 F.2d at 1003, "the definition's reach is not infinite." *Pension Benefit Guar.*

*Corp.* ("*PBGC*") *v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009) (*citing LTV*

*Steel Co. v. Shalala* (*In re Chateaugay Corp.*) ("*Chateaugay II*"), 53 F.3d 478,

496-97 (2d Cir. 1995)). Instead, a valid bankruptcy "claim" exists if and only if

"the claimant possessed a right to payment" and "that right arose before the filing

of the petition." *Id*. Moreover, a right to payment necessitates that "the relationship

between the debtor and the creditor contained all of the elements necessary to

give rise to a legal obligation . . . under the relevant non-bankruptcy law" before

the sale at issue. *Chateaugay II*, 53 F.3d at 496-97 (*internal quotation marks*

*omitted*); *accord Chateaugay I*, 944 F.2d at 1003-05 (articulating relationship test

for analyzing future claims); PBGC, 562 F.3d at 157 ("No matter how broadly the

term 'claim' is construed, it cannot extend to a right to payment that does not yet exist under federal law."). In other words, as a matter of federal bankruptcy law, the Second Circuit has made clear that it looks to "the substantive nonbankruptcy law that gives rise to the debtor's obligation" – in this case, applicable federal and state tort law – to determine the existence of a claim under the Code. *PBGC*, 562 F.3d at 157 (*citing Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007)).

Because the *Sesay* Plaintiffs did not have any cognizable "claim" under the Bankruptcy Code at the time of the Sale Order – and did not know whether they ever would have one – applying the Sale Order to bar their causes of action against Non-Debtor GM would violate their due process rights.

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Fuentes v. Shevin*, *supra* at 80-81 (1972); *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-71 (1951) (Justice Frankfurter concurring); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863).

To be effective in the bankruptcy context, notice must not only "'reasonably

… convey the required information,' *i.e.*, the nature and purpose of the

proceeding," but also must inform the claimant of "the nature of the charges or

claims that will be adjudicated." *DPWN*, 871 F. Supp. 2d at 153,155 (citations

omitted); *see also Johns-Manville Corp. v. Chubb Indemnity Ins. Co.* (*In re Johns-*

*Manville Corp.*), 600 F.3d 135, 158 (2d Cir. 2010) (holding claimant could not be

bound by bankruptcy court orders where, even with notice, "it could not have

anticipated . . . that its . . .claims . . . would be enjoined"); *In re Waterman*

*Steamship Corp.*, 141 B.R. at 556 (finding notice ineffective if reader would not

have known it affected his rights). "At its core, the concern is whether a claimant

can be 'force[d] . . . to be bound by proceedings in which he did not and could not

participate.'" *Grumman*, 467 B.R. at 706 (citation omitted).

Here, there is no question that *Sesay* Plaintiffs not only did not participate in

the Sale Order transaction, but they could not have. The events giving rise to their

claims had not yet occurred, nor had they yet suffered injury. Even in a

counterfactual world had their claim accrued, the dense notice that was distributed

with the Sale Order made no mention of future claims like theirs based on conduct

that had not yet occurred, and so the *Sesay* Plaintiffs were "in no position to file a

present claim," *In re GM*, 407 B.R. at 507, nor did they have any reason to know

that they would one day have any "claim" to bring. *See DPWN*, 871 F. Supp. 2d at

157-59 (finding due process had not been satisfied where claimant had actual

notice of proceeding but not that it could bring a claim).

**III.  Non-Debtor GM's Motion Does Not Address, Much Less Carry, Its Burden Of Establishing Any Of The Requisite Grounds For The Temporary, Preliminary, Or Permanent Relief Sought Against The Sesay Lawsuit.**

A party seeking injunctive relief ordinarily must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and (c) a balance of hardships tipping decidedly in the movant's favor. *See, e.g., Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (1979) (per curiam). A higher standard applies where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.

Non-Debtor GM's motion does not address these factors in any way. To the extent it may rely on the risk of inconsistent judgments to establish "irreparable harm," such reliance would be misplaced because the *Sesay* lawsuit has been consolidated with most other actions against GM and therefore it presents no risk of inconsistent judgments. Plaintiffs, not Non-Debtor GM, are likely to prevail on the merits of this controversy, for the reasons described at length above. Their

inability to bring injunctive relief to protect themselves and the public from the

dangers Non-Debtor GM refuses to address effectively is a far greater hardship

than Non-GM daces from having the *Sesay* lawsuit proceed before Judge Furman

as part of lawfully consolidated proceedings there.

Just as if will not be entitled to permanent relief on its Motion, Non-Debtor

GM is not entitled to any preliminary injunction during any interim it takes the

Court to resolve the issues raised by the attempt to apply its Motion to Enforce to

the *Sesay's* lawsuit. Because they have presented all the argument they wish to

present in opposition to Non-Debtor GM's Motion to Enforce, and there is nothing

left to litigate between the parties with respect to the relief that Non-Debtor GM

seeks, Plaintiffs request that the Court finalize to the fullest extent of the Court's

authority its disposition of Non-Debtor GM's Motion to Enforce as against the

*Sesay* Plaintiffs whichever direction that disposition rests.

## VI.   The *Sesay* Plaintiffs Object To The Court's Scheduling Orders Application In Proceedings Between Non-Debtor GM And Themselves Because The *Sesay* Plaintiffs Had No Notice Nor Any Opportunity To Be Heard Before Those Orders Were Entered To Their Prejudice

For many of the same reasons that the Sale Order may not constitutionally

be applied to the *Sesay* Plaintiffs, nor can the Court's Scheduling Orders. Before

their interests in the prompt resolution of their lawsuit against Non-Debtor GM can

be restricted or denied, they must have had notice and a reasonable opportunity to

be heard. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S.at 314 (1950).

They received neither, as the Scheduling Orders were agreed to by other parties in

other matters that do not concern the *Sesay* Plaintiffs, some weeks and months

before they even initiated their lawsuit.

The Court's reliance on the input of "Designated Counsel" to justify this

rump procedure is misplaced as such counsel have conflicting interests—they

represent Plaintiffs who *do* assert claims that implicate retained liabilities in the

Sale Order; they therefore have an interest in the "threshold issues" that they and

Non-Debtor GM have agreed to "tee up" before any other the issues presented by

any of the other lawsuits are to be considered.  The Court may not ignore these

conflicting interest and treat the designated counsel as if they were the ones "who

were speaking for ignition switch action plaintiffs" generally.  Tr. Of July 2, 2014,

Hearing at 79-80. Designated Counsel may want to prevent the *Sesay* Plaintiffs and

others from even being heard because, at least with respect to that issue, they have

determined that they share interests with Non-Debtor GM to oppose the relief that

the *Sesay* Plaintiffs seek. *Id*. While the Court early on advised them to consult with

fellow Plaintiffs counsel, no other obligations to act in the common interest were

ever placed upon them, and they recognize none.[32] Rather than address the

---

[32] The *Sesay* Plaintiffs corresponded with Designated Counsel about their roles prior to making this assertion.

manifest conflict that makes it inappropriate to treat Designated Counsel as

representing the interests of ignition switch plaintiffs generally, the Court in the

past has fostered the conflict by giving Designated Counsel an opportunity,

accorded no other Plaintiffs' counsel, to appear at hearings on matters of which

they have no "interest" as that term is defined in 11 U.S.C. § 1109(b), and to speak

at the Court's invitation in a distinct contested matter against the relief that another

Plaintiff seeks. *See, e.g.* Transcript of August 5, 2014 Hearing at 6-7; 35. In fact,

the Court poses the issue whether to grant a particular Plaintiffs' group explicitly in

terms of denying one group an opportunity to speak in favor of another group:

"The issue before me is the extent to which I should let you argue it instead of

people like Mr. Weisfelner who know a little bit more about the case and a little bit

more about bankruptcy law."

The resolution of the "Threshold Issues" in this Court will have absolutely

no relevance to any legal or factual claim the *Sesay* Plaintiffs assert. Because they

do not assert claims depending on retained liabilities, it does not matter to them

whether such claims might not be barred because those holding such claims did not

receive proper notice to make a claims, or whether the doctrine of equitable

mootness might nevertheless bar their claims, or whether any bar must be lifted

because of a fraud on the Court. The decision of Non-Debtor GM and designated

counsel with different and conflicting interest that they should nevertheless "wait

in line" while the issues they would prefer to assert are considered, cannot bind

Plaintiffs.

**V.    The *Sesay* Plaintiffs Object To The Court's Scheduling Orders Because They Impose Burdens On The *Sesay* Plaintiffs That Constitute Independent Violations Of The *Sesay* Plaintiffs' Right To A Reasonable Opportunity To Be Heard Before They Are Deprived Of Their Constitutionally Based Interests In Pursuing Their Lawsuits In A Timely Fashion.**

> *1.    The imposition of a three-day deadline for the submission of "no stay pleadings" requiring presentation of complex legal contentions does not afford a reasonable opportunity to be heard.*

Like counsel for many lawsuits seeking relief for harms caused by GM's

wrongdoing, counsel for *Sesay* does not practice in bankruptcy, but rather

primarily in consumer protection law. The *Sesay* Plaintiffs are aware that the Court

would prefer to be addressed by counsel specializing in bankruptcy law, and that

the Court expects counsel to distinguish their case from the over one hundred other

ignition switch cases before it, as well as address a plethora of legal authority that

the Court insists is relevant. Tr of July 2, 2014 Hearing at 86.  Particularly given

the fact that the Court has recognized no ground upon which a "No Stay Pleading"

is to be granted, counsel must construct complex constitutional arguments like

those contained in this submission, a feat that can hardly be accomplished in three

days, some of which might be expected to be spent in locating and retaining

specialized counsel for other Plaintiffs who may possess the means to do so. In

fact, the three day time period seems more designed to induce counsel lacking in

bankruptcy knowledge and presented with a list of "Designated Counsel" who are

presented as if they represent the Plaintiffs' group generally to simply give up, let

designated counsel, who profess bankruptcy expertise and demand no assessment,

run the show, and hope for the best. Respectfully, that is no the way that due

process is supposed to be accorded.

> 2.    *Under the terms of the Scheduling Order, Plaintiffs bear the burden of persuading the Court that Non-Debtor GM is not entitled to a stay of their lawsuits against it.*

Under the terms of the Scheduling Orders, a stay is presumptive and

Plaintiffs must demonstrate what about their case makes it different from the others

that are stayed. This results in an impermissible shifting of the burden of proof to

demonstrate jurisdiction and entitlement to temporary, preliminary and permanent

relief from Non-Debtor GM, which invoked this Court's jurisdiction and seeks

such extraordinary equitable relief, to Plaintiffs, who under the Court's Scheduling

Orders are required to bear the burden of demonstrating why their claims, which

the Court has presumptively treated as subject to the 2009 Sale Order, are not so

subject, and to bear the burden of proving that Non-Debtor GM is not entitled to

preliminary relief. The Court has ruled that the "[t]he stay [is] already imposed by

the injunctive provisions of Paragraphs 8 and 47 of the Sale Order (and that the

Court may also impose by preliminary injunction) …"

3.    *The Scheduling Orders reflect a de facto consolidation that is not provided for in the procedural rules that govern this proceeding and that has been effected without ensuring the procedural safeguards that lawfully consolidated proceedings that are provided for in other fora would entail.*

Plaintiffs object to these proceedings because GM has not properly initiated any action against them. It has failed to serve either a complaint to initiate an adversary proceeding, FRBP 7001, or a motion to initiate a contested matter, FRBP 9014(b). Non-Debtor GM concedes that it has not served its motion on the *Sesay* Plaintiffs and states no intention to do so.[33]

Plaintiffs believe that, because Non-Debtor GM seeks injunctive relief, the applicable rules mandate that such proceedings be initiated as an adversary proceeding, with all the procedural protections that attend such a proceeding. FRBP 7001(7). Even if Plaintiffs are wrong, however, and the injunctive relief that Non-Debtor GM seeks is properly available to a Non-Debtor and non-party to the Debtor's bankruptcy proceedings by way of the initiation of a contested matter, such a contested matter must be initiated by a motion served in accordance with the Bankruptcy rules. 9014(b). Non-Debtor GM has not served its motion on the *Sesay* Plaintiffs.

---

[33] Counsel confirmed this positon in correspondence with counsel for Non-Debtor GM.

Plaintiffs *do not consent* to this way of proceeding.  But Non-Debtor GM's

nonchalance about procedural formalities is a reflection of the due process fiasco

that the rump consolidation of matters into a single proceeding has produced.[34]

Non-Debtor GM has been given free rein to treat diverse Plaintiffs' lawsuits in

bulk, wholesale fashion, as if it were itself a debtor-in-possession, rounding up all

the creditors for their haircuts. And the Court itself refers to a singular "contested

matter" when referring to the matters relating to Non-Debtor GM's Motion to

Enforce.  The wholesale treatment of Plaintiffs lawsuits was initiated by Non-

Debtor GM's first bulk submission of 46 lawsuits identified in its Motion to

Enforce.  The Court, with the acquiescence of many Plaintiffs as described above,

has treated the Plaintiffs' diverse mattes as if they were a single matter, even

purporting to incorporate equitable factors from one matter to another, despite the

lack of any identity of interest between them.[35] the associated restriction of the

*Sesay* Plaintiffs' rights to notice and an opportunity to be heard manifest in the

designation of counsel representing "certain" Plaintiffs in distinct controversies as

---

[34] Under the Bankruptcy rules, such consolidation is available only in proceedings involving the Debtor. FRBP 1015.

[35] *See*, *e.g.*, Ruling Denying the Elliotts' No Stay Pleading, Doc. No. 12815 at 9.

> Even if the Sale Order did not apply in the first instance, a preliminary injunction would also be appropriate here, for the reasons discussed at length in *Phaneuf*, which I will not repeat at comparable length here—other than to say that the prejudice to all of the other litigants, and to the case management concerns I had with respect to the Phaneuf Plaintiffs, is just as much a matter of concern here.  As in *Phaneuf*, I will not allow the Elliott Plaintiffs to go it alone. The Elliott Plaintiffs' claims can be satisfactorily addressed—and will have to be addressed—as part of the coordinated proceedings otherwise pending before me.

"Designated Counsel" entitled to notices, opportunities to be heard in matters in which it lacks interest, influence over the sequence by which the Court considers the various issues before it, and various courtesies that the *Sesay* Plantiffs are denied by virtue of their lack of that or similar designation

Such a process denies the Sesay Plaintiffs their rights to be heard without having to defer to others whose interests in being heard have been elevated informally and to the detriment of the Sesay Plaintiffs over their own.

## VII.  The Court Should Abstain From Exercising Any Jurisdiction It May Conclude It Has Over This Matter.

Non-Debtor GM's Motion should be denied or deferred in the interests of comity and of avoiding a jurisdictional conflict with another federal court. This Court should decline to exercise jurisdiction it may believe it has over the *Sesay* lawsuit because the federal Court before which the *Sesay* lawsuit is pending has indicated that that Plaintiffs may commence prosecuting their claims before that Court despite any stay stipulation they many have entered or this Court may have purported to impose. This Court should abstain from hearing the hindering the prosecution of the Sesay lawsuit as it is primarily concerned with claims under State law. *See Geruschat v. Ernst Young LLP* (*In re Seven Fields Dev. Corp.*), 505 F.3d 237 (3d Cir. 2007).

### CONCLUSION

For all of the following reasons, Plaintiffs motions to dismiss for lack of subject matter and personal jurisdiction should be granted forthwith, if the Court determines that it has jurisdiction it should abstain from exercising such, the Plaintiffs should be relieved from the May 16 and July 8 Scheduling Orders, and, should a hearing be held, other Plaintiffs not a party to their dispute with Non-Debtor GM should not be heard, Non-Debtor GM's Motion to Enforce should be denied in its entirety with respect the *Sesay* lawsuit, and the *Sesay* Plaintiffs should be free to prosecute their action against Non-Debtor GM without further hindrance.

Respectfully submitted,

*/s/ Gary Peller*
Gary Peller
Counsel for the *Sesay* Plaintiffs
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9122
(202) 662-9680 (facsimile)
peller@law.georgetown.edu

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re                                        :        Chapter 11
                                             :
MOTORS LIQUIDATION COMPANY, *et al.*,        :        Case No.: 09-50026
(REG)
            f/k/a General Motors Corp., *et al.*     :
                                             :
                        Debtors.             :        (Jointly Administered)
------------------------------------------------------------------x

**<u>Order</u>**

Upon consideration of the *Sesay* Plaintiffs' motion to dismiss for lack of

subject matter, it is hereby ORDERED that the *Sesay* Plaintiffs are released from

the jurisdiction of this court.

**So Ordered**

_____

Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21th of August 2014, a copy of the foregoing motion

and proposed order was filed with the Clerk of the court and also served via

CM/ECF upon all parties.


_____/s/_____
Gary Peller
Counsel for the *Sesay* Plaintiffs
Gary Peller
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 662-9122
(202) 662-9680 (facsimile)
peller@law.georgetown.edu