# Exhibit C – Part 1

1   Darin T. Beffa (SBN 248768)
2   Email: darin.beffa@kirkland.com
    KIRKLAND & ELLIS LLP
3   333 S. Hope Street, Suite 2900
    Los Angeles, CA  90071
4   Telephone:   (213) 680-8400
    Facsimile:   (213) 680-8500
5   *Attorneys for Defendant*
6   *General Motors LLC*

7

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11   THE PEOPLE OF THE STATE OF          )   CASE NO.  2:14-CV-6143
     CALIFORNIA, acting by and through   )
12   Orange County District Attorney Tony )
     Rackauckas,                         )
13                                       )   **DEFENDANT'S NOTICE OF**
                      Plaintiff,         )   **REMOVAL OF ACTION UNDER 28**
14                                       )   **U.S.C. § 1441(a) (BANKRUPTCY**
                 vs.                     )   **COURT AND SUBJECT MATTER**
15                                       )   **JURISDICTION)**
     GENERAL MOTORS LLC,                 )
16                                       )
                      Defendant.         )
17   _____ )

18

19   TO:   The United States District Court for the Central District of California:

20         Defendant General Motors LLC ("New GM") gives notice that it is removing

21   this case to the United States District Court for the Central District of California on

22   the grounds set forth below.

23         1.    On June 27, 2014, an action was commenced in the Superior Court of

24   Orange County, California, entitled *THE PEOPLE OF THE STATE OF*

25   *CALIFORNIA, acting by and through Orange County District Attorney Tony*

26   *Rackauckas v. GENERAL MOTORS LLC,* Case No. 30-2014-00731038-CU-BT-CXC.

27   A copy of the Summons and Complaint is attached as Exhibit A.

28         2.    Plaintiff served its Summons and Complaint upon Defendant General

1   Motors LLC on July 8, 2014.  This Notice is timely filed under 28 U.S.C. § 1446(b).

2       3.      This civil action is within this Court's original jurisdiction pursuant to

3   §1334(b) because it (a) arises under title 11, United States Code, 11 U.S.C. §§ 101 *et*

4   *seq.* (the "Bankruptcy Code"); (b) arises in a case under the Bankruptcy Code; and/or

5   (c) is related to a case under the Bankruptcy Code.  Thus, this civil action may be

6   removed to this Court under 28 U.S.C. § 1441(a) and Rule 9027 of the Federal Rules

7   of Bankruptcy Procedure ("Bankruptcy Rules").  This is also a civil action within this

8   Court's original jurisdiction pursuant to 28 U.S.C. § 1331 because it raises a

9   substantial federal question.

10      4.      This action involves claims related to the design, manufacture, supply,

11  and subsequent recall of vehicles allegedly containing an "ignition switch defect" and

12  34 other "known defects," including vehicles manufactured and sold by

13  General Motors Corporation ("Old GM") before it filed for bankruptcy under Chapter

14  11 of the United States Bankruptcy Code on June 1, 2009.  (Compl. ¶¶ 1, 2.)  Plaintiff

15  claims that defendant's alleged "systematic concealment" of these alleged defects

16  violated California law.  (*Id.* ¶ 5.)  Plaintiff specifically claims that defendant violated

17  the federal National Traffic and Motor Vehicle Safety Act (*id.* ¶¶ 217-24, 252) and the

18  California Business and Professions Code (Counts I and II).  (*Id.* ¶¶ 24, 253-74.)

19                          **Bankruptcy Jurisdiction**

20      5.      In June 2009, Old GM initiated Chapter 11 proceedings in the United

21  States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court").

22  Through a bankruptcy-approved sale process pursuant to Section 363 of the

23  Bankruptcy Code, New GM acquired most of Old GM's assets under a June 26, 2009

24  Amended and Restated Master Sale and Purchase Agreement ("Sale Agreement").

25  (Ex. B.)    After notice, extensive discovery, and an evidentiary hearing, the

26  Bankruptcy Court approved the asset purchase in its Sale Order and Injunction, which

27  incorporated the Sale Agreement (Ex. C, 7/5/09 Bankr. Sale Order & Inj.).  *See In re*

28  *Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009).  The Sale Order and

Injunction was affirmed in all respects by two different district court judges in the Southern District of New York. *In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010); *In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010). New GM's purchase of Old GM's assets closed on July 10, 2009.

6.  Under the Sale Agreement, New GM acquired Old GM's assets free and clear of all liens, claims, liabilities, and encumbrances, other than specifically-identified liabilities that New GM expressly assumed. (Ex. C at 13.) Specifically, New GM assumed only three expressly defined categories of liabilities for vehicles and parts manufactured and/or sold by Old GM: (a) claims based on post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damages; (b) repairs provided for under the "Glove Box Warranty," a specific written warranty of limited duration that only covers repairs and replacement of parts; and (c) Lemon Law claims essentially tied to the failure to honor the written Glove Box Warranty. (*Id.* ¶ 2.3(a)) (collectively, the "Assumed Liabilities").[1]

7.  All other liabilities relating to vehicles and parts manufactured and/or sold by Old GM were legacy liabilities retained by Old GM. *See id.* at 44-45; *see also In re Gen. Motors Corp.*, 407 B.R. at 481, *aff'd sub nom., In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010), and 430 B.R. 65 (S.D.N.Y. 2010). The Bankruptcy Court's Sale Order and Injunction explicitly provided that New GM would have no responsibility for any liabilities (except for Assumed Liabilities) relating to the operation of Old GM's business, or the production of vehicles and parts before July 10, 2009. (Ex. C, ¶¶ 46, 9 & 8.) The Order also enjoined "[a]ll persons and entities . . . holding claims against [Old GM] or the Purchased Assets arising under or out of, in connection with, or in any way relating to [Old GM], the Purchased

---

[1]  *See also* Ex. B, Sale Agreement § 1.1, at p. 11 (defining "Lemon Laws" as "a state statute requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts").

Assets, the operation of the Purchased Assets prior to the Closing . . . from asserting [such claims] against [New GM]. . . ." (*Id.* ¶ 8.)

8.    The Bankruptcy Court reserved exclusive and continuing jurisdiction to enforce its injunction and to address and resolve all controversies concerning the interpretation and enforcement of the Sale Order and Injunction. (*Id.* at 48-49.)  Old GM's bankruptcy case is still pending in the Bankruptcy Court, and that Court has previously exercised its exclusive and continuing jurisdiction to enforce the Sale Order and Injunction to actions filed against New GM, including cases based on alleged defects in Old GM vehicles. *See Trusky v. Gen. Motors Co. (In re Motors Liquidation Co.)*, Adv. No. 12-09803, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013); *Castillo v. Gen. Motors Co. (In re Motors Liquidation Co.)*, Adv. No. 09-00509, 2012 WL 1339496 (Bankr. S.D.N.Y. Apr. 17, 2012), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013); *see also In re Motors Liquidation Co.*, 2011 WL 6119664 (Bankr. S.D.N.Y. 2010).

9.    On April 21, 2014, New GM moved to enforce the Sale Order and Injunction by asking the Bankruptcy Court to direct plaintiffs in various cases alleging ignition switch defects to cease and desist from prosecuting their claims and dismiss those claims with prejudice (the "Ignition Switch Motion to Enforce").  (Ex. D, 4/21/14 GM Mot. to Enforce.)  New GM's Motion to Enforce is currently pending before the Bankruptcy Court, Judge Gerber presiding.  Immediately upon removal, New GM will identify this case on a supplemental schedule in the Bankruptcy Court as an Ignition Switch Action subject to the Motion to Enforce.[2]

---

[2]    On August 1, 2014, New GM filed a Motion to Enforce the Sale Order and Injunction Against Monetary Relief Actions, Other Than Ignition Switch Actions, and, on the same date, GM filed a Motion to Enforce the Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits, although that motion is not applicable here given that plaintiff asserts no personal injury claims. *See* Motion of General Motors LLC pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition

(Continued…)

10.     Under 28 U.S.C. § 157(b), the Bankruptcy Court had core jurisdiction to enter the Sale Order and Injunction pursuant to section 363 of the Bankruptcy Code. Plaintiff's claims in this case, and any dispute concerning the Sale Agreement and the Sale Order and Injunction, arise under the Bankruptcy Code or in a case under the Bankruptcy Code, and the Bankruptcy Court therefore has core jurisdiction over this action under 28 U.S.C. §§ 157(b) and 1334(b).  *See In re Hereford Biofuels, L.P.,* 466 B.R. 841, 844 (Bankr. N.D. Tex. 2012) (post-confirmation dispute regarding interpretation and enforcement of a sale order was a core proceeding); *Tenet HealthSystem Phila., Inc. v. Nat'l Union of Hosp. & Health Care Employees*, 265 B.R. 88, 95-96 (Bankr. W.D. Pa. 2001) ("a bankruptcy court has core subject matter jurisdiction to construe its own orders," which involve "sales of assets within the bankruptcy court pursuant to 11 U.S.C. § 363").  Removal to federal court is proper where, as here, a "federal court . . . 'has jurisdiction of such claim or cause of action' under the Bankruptcy Code." *Hamilton v. Try Us, LLC*, 491 B.R. 561, 563 (W.D. Mo. 2013).[3]

_____

Switch Actions (Bankr. Ct. Docket No. 12808), attached hereto as Ex. E.  Thus, even if plaintiff's Complaint was not subject to the Ignition Switch Motion to Enforce by virtue of the express ignition switch allegations contained therein, which it is, plaintiff's Complaint would be subject to the recently-filed Monetary Relief Actions Motion to Enforce with respect to the other 34 "known defects" alleged by plaintiff.

3     Indeed, this Action cannot proceed in any court, much less in state court, for the simple and dispositive reason that its claims present an impermissible collateral attack upon a final order of the Bankruptcy Court.  *See Celotex Corp. v. Edwards*, 514 U.S. 300, 306 (1995) (holding that creditors were required to obey bankruptcy court order and were forbidden from launching a collateral attack in another federal court, relying on "the well-established rule that persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order") (internal quotation marks omitted); *see also In re Gruntz*, 202 F.3d 1074, 1082 (9th Cir. 2000); *In re Pardee*, 218 B.R. 916, 926 (B.A.P. 9th Cir. 1998); *Huntsinger v. Shaw Grp., Inc.*, 410 F. Supp. 2d 968, 976 (D. Or. 2006).

11.    Plaintiff seeks to avoid the Sale Order and Injunction by purporting to base its claims on New GM's alleged conduct after the effective date of the Sale. (Compl. ¶ 3.)    The Bankruptcy Court already has rejected such a challenge to its subject-matter jurisdiction in overruling an objection to the Bankruptcy Court's ability to stay plaintiffs in scores of individual Ignition Switch Actions pending the Bankruptcy Court's determination of certain threshold issues related to New GM's Ignition Switch Motion to Enforce.    (7/30/14 Decision with Respect to No Stay Pleading (Phaneuf Plaintiffs), attached hereto as Ex. F.)    Specifically, just as the plaintiff does here, one group of plaintiffs (the "Phaneuf Plaintiffs") attempted to plead around the Bankruptcy Court's core and exclusive jurisdiction by arguing that they are "asserting only post-sale claims" unrelated to Old GM's conduct.    (Ex. F at 7.)    Judge Gerber flatly rejected the argument, holding that because the Phaneuf complaint involved "cars manufactured before the [bankruptcy sale]," the Phaneuf Plaintiffs' "material reliance on the alleged conduct of Old GM" had "easily… established" the "threshold applicability of the Sale Order."    (*Id.* at 14-15.)    Judge Gerber expressly held:

> I've found as a fact . . . that their complaint (apparently intentionally) merges pre- and post-sale conduct by Old GM and New GM; and that their complaint places express reliance on at least seven actions by Old GM, before New GM was formed—that at least much of the Phaneuf Plaintiffs' complaint seeks to impose liability on New GM based on Old GM's pre-sale acts. Efforts of that character are expressly forbidden by the two [Sale Order] injunctive provisions just quoted. . . . [A]t this point the Sale Order injunctive provisions apply. And it need hardly be said that I have jurisdiction to interpret and enforce my own orders, just as I've previously done, repeatedly, with respect to the very Sale Order here.

(*Id.* at 16.)

12.    Exactly like the Phaneuf Plaintiffs' claims, plaintiff's filing of this action directly violates applicable provisions of the Sale Order and Injunction entered by the Bankruptcy Court.    The vehicles at issue in this action—described by plaintiff as

1    "over 17 million GM-branded vehicles from model years 2003 to 2014"—include

2    "used" and/or "GM certified" vehicles manufactured and sold by Old GM before the

3    Petition Date.[4]    (Compl. ¶¶ 31, 225.)    Plaintiff's Complaint is also replete with

4    allegations concerning Old GM's purported conduct. [5]    (*Id.* ¶¶ 179-211.)    Because

5    plaintiff asserts claims that relate to the operation of Old GM's business and the

6    production of vehicles and parts before July 10, 2009, those claims are barred by the

7    Bankruptcy Court's Sale Order and Injunction and, as Judge Gerber has already held,

8    the Bankruptcy Court has exclusive jurisdiction to adjudicate that issue.    (*See*, *e.g.*,

9    Ex. C, ¶¶ 46, 9 & 8.).    Accordingly, bankruptcy jurisdiction exists and removal to

10    federal court is proper.    *See Hamilton*, 491 B.R. at 563.

11    **Federal Question Jurisdiction**

12    13.    Plaintiff's Complaint also is removable to federal court because

13

14    —————————————

15    4    Many of the defects plaintiff alleges, including each of the first seven cited in
16    the Complaint, were allegedly present in vehicles of model year ("MY") 2009 and
      earlier.    (Compl. ¶¶ 74-76 ("ignition switch defect," MY 2003-2011); ¶ 81 ("power
17    steering defect," MY 2003-2010); ¶ 92 ("airbag defect," MY 2007-2013); ¶ 106
      ("brake light defect," MY 2004-2012); ¶ 126 ("shift cable defect," MY 2004-2010); ¶
18    138 ("safety belt defect," MY 2008-2014); ¶ 142 ("ignition lock cylinder defect," MY
19    2003-2011).)

20    5    These include, but are by no means limited to, the claims that Old GM "sold a
21    large number of unsafe vehicle models with myriad defects" (*id.* ¶ 31); that Old GM
      was "a company that valued cost-cutting over safety" (*id.* ¶ 32); that an Old GM
22    engineer purportedly concealed a defect "while working for Old GM" (*id.* ¶ 47); that
      "Old GM did not view vehicle stalling and the loss of power steering as a 'safety
23    issue'" (*id.* ¶ 54); that Old GM's approach to the "design and manufacture" of its
24    vehicles—including those sold before the effective date of the Sale Order—"presents
      a disturbing picture" (*id.* ¶ 179); that "Old GM reduced the TREAD Reporting team
25    from eight to three employees," leaving it without "sufficient resources… to better
26    identify and understand potential defects" (*id.* ¶ 190); and that an Old GM "training
      document" from 2008 reveals "the lengths to which GM went to ensure that known
27    defects were concealed" (*id.* ¶¶ 199-200).
28

1  plaintiff's claims raise a substantial federal question and, therefore, provide original

2  federal question jurisdiction under 28 U.S.C. § 1331.  *See* 28 U.S.C. § 1441(a).

3  14.    The Supreme Court and other federal courts recognize the existence of

4  federal jurisdiction over claims that, while not created by federal law, nonetheless

5  involve substantial questions of federal law necessary to a plaintiff's right to relief.

6  *See, e.g., City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997);

7  *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1,

8  27-28 (1983); *Smith v. Kan. City Title & Trust Co.,* 255 U.S. 180 (1921).

9  15.    Pursuant to *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg*.,

10  545 U.S. 308 (2005), federal question jurisdiction exists where a state-law claim

11  necessarily raises a stated federal issue, "actually disputed and substantial, which a

12  federal forum may entertain without disturbing [any] congressionally approved

13  balance of federal and state judicial responsibilities." *Id*.

14  16.    Although framed in the language of California statutory law, plaintiff's

15  Complaint raises a substantial federal question.  *See, e.g., Federated Dep't Stores, Inc.

16  v. Moitie*, 452 U.S. 394, 397 n.2 (1981) ("Courts will not permit plaintiff to use artful

17  pleading to close off defendant's right to a federal forum.") (internal quotation marks

18  omitted); *Hall v. N. Am. Van Lines, Inc.*, 476 F.3d 683, 687 (9th Cir. 2007) ("The

19  absence of a federal claim on the face of [plaintiff's] complaint does not end our

20  jurisdictional inquiry.").

21  17.    In this action, plaintiff seeks to recover for purported violations of a

22  federal law under the guise of bringing state-law claims.  Plaintiff alleges that "GM's

23  unlawful business acts and/or practices… violated numerous federal" laws.  (Compl.

24  ¶ 257.)  Specifically, plaintiff claims that New GM violated the National Traffic and

25  Motor Vehicle Safety Act of 1966 (the "Motor Vehicle Safety Act") (*Id*. ¶ 217-24,

26  citing 49 U.S.C. § 30101 *et seq.*)  Plaintiff asserts that a manufacturer is required to

27  provide the National Highway Traffic Safety Administration ("NHTSA") with various

28  information, including "'early warning reporting' (EWR) data," notice of "defects and

recalls in motor vehicles in foreign countries," and "quarterly field reports" relating to vehicle models.   (Compl. ¶¶ 219-21, *citing*  49 U.S.C. § 30166(m)(3)(B) and 49 CFR §§ 573.6, 579.11-12, and 579.21.)  Plaintiff further alleges that manufacturers must furnish certain information to NHTSA "within five days of discovering a defect" and must also notify vehicle "dealers and purchasers and remedy the defect without charge."   (Compl. ¶¶ 218-19, *citing* 49 U.S.C. § 30118 and 49 CFR § 573.6.) According to plaintiff, New GM "violated" these federal statutes and regulations "when it failed to timely inform NHTSA of the defects and allowed cars to remain on the road with these defects."  (Compl. ¶ 252.)

18.    Although plaintiff frames these purported violations and failures under the Motor Vehicle Safety Act as state-law claims brought pursuant to the California Business and Professions Code, on their face, plaintiff's allegations require the Court to determine New GM's duties and obligations under federal motor vehicle safety standards and whether those requirements were met by defendant.  (*Id.* ¶¶ 217-24, 257.)  Accordingly, removal is proper since this is a civil action brought in state court over which the federal courts have original jurisdiction based on the existence of a substantial federal question.  *See* 28 U.S.C. § 1331; *see also id.* § 1441.

## Conclusion

19.    This action may be removed by defendant pursuant to 28 U.S.C. § 1441. Removal to the United States District Court for the Central District of California is proper because the Central District of California embraces Los Angeles County.

20.    Exhibit A comprises all process, pleadings, and orders served upon defendant in this action.

WHEREFORE, the defendant gives notice that the action pending against it in the Superior Court of Los Angeles County, California, has been removed from that court to the United States District Court for the Central District of California, and

WHEREFORE, the defendant also attaches as Exhibit G the NOTICE TO STATE COURT OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)

1   (BANKRUPTCY COURT AND SUBJECT MATTER JURISDICTION) that they

2   shall file with the Clerk of the Superior Court of Los Angeles County, California.

3

4   DATED:  August 5, 2014                 Respectfully submitted,

5                                      KIRKLAND & ELLIS LLP

6

7

8                                    _____/s/ Darin T. Beffa_____
                                   Darin T. Beffa

9                                    Attorneys for Defendant

10                                   GENERAL MOTORS LLC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SUPERIOR COURT OF CALIFORNIA

### ORANGE

**751 W. Santa Ana Blvd**

**Santa Ana , CA 92701**

**(657) 622-5300**

**www.occourts.org**

## NOTICE OF CASE ASSIGNMENT

Case Number: **30-2014-00731038-CU-BT-CXC**

Your case has been assigned for all purposes to the judicial officer indicated below. A copy of this information must be provided with the complaint or petition, and with any cross-complaint that names a new party to the underlying action.

| ASSIGNED JUDGE | COURT LOCATION | DEPARTMENT/ROOM | PHONE |
|---|---|---|---|
| Hon.<br>  Kim G. Dunning | Civil Complex Center | CX104 | (657) 622-5300 |
| Hearing: | Date: | Time: | |
| **JUDGE** | **COURT LOCATION** | **DEPARTMENT/ROOM** | **PHONE** |
| Hon. | | | |

[ x ]  ADR Information attached.

## SCHEDULING INFORMATION

**Judicial Scheduling Calendar Information**

Individual courtroom information and the items listed below may be found at: www.occourts.org.

Case Information, Court Local Rules, filing fees, forms, Civil Department Calendar Scheduling Chart, Department phone numbers, Complex Civil E-filing, and Road Map to Civil Filings and Hearings.

**Ex Parte Matters**

Rules for Ex Parte Applications can be found in the California Rules of Court, rules 3.1200 through 3.1207 at: www.courtinfo.ca.gov.  Trials that are in progress have priority; therefore, you may be required to wait for your ex parte hearing.

**Noticed Motions**

* The following local Orange County Superior Court rules are listed for your convenience:
     - Rule 307 - Telephonic Appearance Litigants - Call CourtCall, LLC at (310) 914-7884 or (888) 88-COURT.
     - Rule 380 - Fax Filing, Rule 450 - Trial Pre-Conference  (Unlimited Civil)
* All Complex Litigation cases are subject to mandatory Electronic Filing, unless excused by the Court.
* Request to Enter Default and Judgment are strongly encouraged to be filed as a single packet.

**Other Information**

Hearing dates and times can be found on the Civil Department Calendar Scheduling Chart.

All fees and papers must be filed in the Clerk's Office of the Court Location address listed above.

Date:  06/27/2014

Irma Cook

_____ , Deputy Clerk

**NOTICE OF CASE ASSIGNMENT**

| *Attorney or Party without Attorney*<br>MARK P. ROBINSON, JR., ESQ., Bar #054426<br>ROBINSON, CALCAGNIE, ROBINSON et al.<br>19 CORPORATE PLAZA DRIVE<br>NEWPORT BEACH, CA 92660<br>*Telephone No* (949) 720-1288    *FAX No* (949) 720-1292 | *For Court Use Only* |
|---|---|
| | *Ref. No. or File No.* | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange |
| *Attorney for* Plaintiff | |
| *Insert name of Court, and Judicial District and Branch Court:*<br>ORANGE COUNTY SUPERIOR COURT, CENTRAL COMPLEX DIVISION | **07/23/2014** at 09:35:00 AM<br>Clerk of the Superior Court |
| *Plaintiff:* THE PEOPLE OF THE STATE OF CALIFORNIA | By e Clerk,Deputy Clerk |
| *Defendant:* GENERAL MOTORS LLC | |

| **PROOF OF SERVICE OF SUMMONS ON FIRST AMENDED COMPLAINT** | *Hearing Date* | *Time* | *Dept/Div* | *Case Number*<br>30-2014-00731038-CU-BT-CXC |
|---|---|---|---|---|

1.  *At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the SUMMONS ON FIRST AMENDED COMPLAINT; FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW AND FALSE ADVERTISING LAW; CIVIL CASE COVER SHEET; ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE.

3.  a. *Party served:*      GENERAL MOTORS LLC
    b. *Person served:*      BECKY DEGEORGE, CSC LAWYERS INCORPORATING SERVICE, REGISTERED AGENT.

4.  *Address where the party was served:*      2710 North Gateway Oaks Drive
    Suite 150
    SACRAMENTO, CA 95833

5.  *I served the party.*
    a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Tue., Jul. 08, 2014 (2) at: 2:50PM

6.  The "Notice to the Person Served" (on the Summons) was completed as follows:
    *on behalf of:* GENERAL MOTORS LLC
    *Other:* a limited liability company.

7.  *Person Who Served Papers:*          Recoverable Cost Per CCP 1033.5(a)(4)(B)
    a. Michael Morris      d. *The Fee for Service was:*   $216.41



       1814 "I" Street
       Sacramento, CA 95814
       Telephone    (916) 444–5111
       Fax          (916) 443–3111
       www.firstlegalnetwork.com

e. I am: (3) registered California process server
     (i)    Independent Contractor
     (ii)   *Registration No.:*    2012-33
     (iii)   *County:*        Sacramento
     (iv)   *Expiration Date:*    Fri, Jul. 01, 2016

8.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

    Date: Mon, Jul. 14, 2014

                                                   (Michael Morris)

Judicial Council Form POS-010            **PROOF OF SERVICE**                           *9748958;ac.marro.630361*
Rule 2.150,(a)&(b) Rev January 1, 2007      **SUMMONS ON FIRST AMENDED**

**CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Mark P. Robinson, Jr., SBN 054426<br>ROBINSON CALCAGNIE ROBINSON SHAPIRO DAVIS, INC.<br>19 Corporate Plaza Drive<br><br>Newport Beach, CA 92660<br>TELEPHONE NO.: 949-720-1288    FAX NO.: 949-720-1292<br>ATTORNEY FOR *(Name):* Plaintiffs | FOR COURT USE ONLY<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br><br>**06/27/2014** at 12:18:58 PM<br>Clerk of the Superior Court<br>By Irma Cook, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 751 West Santa Ana Boulevard
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: CIVIL COMPLEX CENTER

CASE NAME: The People of the State of California v. General Motors LLC

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER 30-2014-00731038-CU-BT-CXC |
|---|---|---|
| [x] Unlimited  [ ] Limited<br>(Amount  (Amount<br>demanded  demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE: Judge Kim G. Dunning<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [x] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify):* 2
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 27, 2014

Mark P. Robinson, Jr., SBN 054426
(TYPE OR PRINT NAME)

*(signature)* Mark P. Robinson, Jr.
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice– Physicians & Surgeons
   Other Professional Health Care Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip and fall)
   Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
   Intentional Infliction of Emotional Distress
   Negligent Infliction of Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
   Contract/Warranty Breach—Seller Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/ Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
   Collection Case—Seller Plaintiff
   Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court Case Matter
   Writ–Other Limited Court Case Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of County)
   Confession of Judgment *(non-domestic relations)*
   Sister State Judgment
   Administrative Agency Award *(not unpaid taxes)*
   Petition/Certification of Entry of Judgment on Unpaid Taxes
   Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-harassment)*
   Mechanics Lien
   Other Commercial Complaint Case *(non-tort/non-complex)*
   Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief from Late Claim
   Other Civil Petition

ORANGE COUNTY DISTRICT ATTORNEY
Tony Rackauckas, District Attorney
Joseph D'Agostino, Senior Assistant District Attorney
401 Civil Center Drive
Santa Ana, CA 92701-4575
Tel: (714) 834-3600
Fax: (714) 648-3636

– In association with –

Mark P. Robinson, Jr., SBN 05442
Kevin F. Calcagnie, SBN 108994
Scot D. Wilson, SBN 223367
ROBINSON CALCAGNIE ROBINSON
  SHAPIRO DAVIS, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660
Tel: (949) 720-1288
Fax: (949) 720-1292
mrobinson@rcrlaw.net

Steve W. Berman (*Pro Hac Vice* Pending)
Andrew Volk (*Pro Hac Vice* Pending)
HAGENS BERMAN SOBOL
  SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Plaintiff*
*THE PEOPLE OF THE STATE OF CALIFORNIA*

ELECTRONICALLY FILED
Superior Court of California,
County of Orange

06/27/2014 at 12:18:58 PM
Clerk of the Superior Court
By Irma Cook, Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF ORANGE – COMPLEX LITIGATION DIVISION**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Orange County District Attorney Tony Rackauckas,<br><br>                                        Plaintiff,<br><br>     v.<br><br>GENERAL MOTORS LLC<br><br>                                        Defendant. | Case No. 30-2014-00731038-CU-BT-CXC<br><br>Judge Kim G. Dunning<br><br>**COMPLAINT FOR VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW AND FALSE ADVERTISING LAW** |

010440-12  692229 V1

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     PLAINTIFF'S AUTHORITY ...............................................................................5

III.    DEFENDANT ........................................................................................................5

IV.     JURISDICTION AND VENUE .............................................................................6

V.      FACTUAL BACKGROUND .................................................................................6

        A.      There Are Serious Safety Defects in Millions of GM Vehicles Across Many
                Models and Years, and, Until Recently, GM Concealed them from Consumers..........6

                1.      The ignition switch defects.................................................................7

                2.      The power steering defect. ............................................................. 16

                3.      Airbag defect. ................................................................................. 17

                4.      The brake light defect. .................................................................... 20

                5.      Shift cable defect ............................................................................ 23

                6.      Safety belt defect. ........................................................................... 25

                7.      Ignition lock cylinder defect........................................................... 26

                8.      The Camaro key-design defect......................................................... 26

                9.      The ignition key defect. ................................................................... 27

                10.     At least 26 other defects were revealed by GM in recalls during the
                        first half of 2014. ........................................................................... 27

        B.      GM Valued Cost-Cutting Over Safety, and Actively Encouraged Employees
                to Conceal Safety Issues. ............................................................................. 32

        C.      The Ignition Switch Defects Have Harmed Consumers in Orange County
                and the State ................................................................................................. 37

        D.      Given GM's Knowledge of the Defects and the Risk to Public Safety, it
                Was Obliged to Promptly Disclose and Remedy the Defects. ....................... 38

        E.      GM's Misrepresentations and Deceptive, False, Untrue and Misleading
                Advertising, Marketing and Public Statements ............................................. 41

VI.     CAUSES OF ACTION.......................................................................................... 51

        FIRST CAUSE OF ACTION:  VIOLATION OF BUSINESS AND PROFESSIONS
        CODE SECTION 17200 ....................................................................................... 51

SECOND CAUSE OF ACTION:  VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500 .......................................................................................................54

PRAYER FOR RELIEF...........................................................................................................56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Plaintiff, the People of the State of California ("Plaintiff" or "the People"), by and through

2    Tony Rackauckas, District Attorney for the County of Orange ("District Attorney"), alleges the

3    following, on information and belief:

4    **I.    INTRODUCTION**

5    1.    This is an action for unfair, unlawful, and fraudulent business practices and false

6    advertising in violation of California Business and Professions Code sections 17200 *et seq*., the

7    Unfair Competition Law ("UCL"), and 17500 *et seq*., the False Advertising Law ("FAL"),

8    involving sales, leases, or other wrongful conduct or injuries occurring in California.  The

9    defendant is General Motors LLC ("Defendant" or "GM"), which is based in Detroit, Michigan.

10    2.    This case arises from GM's egregious failure to disclose, and the affirmative

11    concealment of, at least 35 separate known defects in vehicles sold by GM, and by its predecessor,

12    "Old GM" (collectively, "GM-branded vehicles").  By concealing the existence of the many known

13    defects plaguing many models and years of GM-branded vehicles and the fact that GM values cost-

14    cutting over safety, and concurrently marketing the GM brand as "safe" and "reliable," GM enticed

15    vehicle purchasers to buy GM vehicles under false pretenses.

16    3.    This action seeks to hold GM liable only for its ***own*** acts and omissions ***after*** the

17    July 10, 2009 effective date of the Sale Order and Purchase Agreement through which GM

18    acquired virtually all of the assets and certain liabilities of Old GM.

19    4.    A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth

20    more than an otherwise similar vehicle made by a disreputable manufacturer that is known to

21    devalue safety and to conceal serious defects from consumers and regulators.  GM Vehicle Safety

22    Chief Jeff Boyer has recently stated that:  "Nothing is more important than the safety of our

23    customers in the vehicles they drive."  Yet GM failed to live up to this commitment, instead

24    choosing to conceal at least 35 serious defects in over 17 million GM-branded vehicles sold in the

25    United States (collectively, the "Defective Vehicles").

26    5.    The systematic concealment of known defects was deliberate, as GM followed a

27    consistent pattern of endless "investigation" and delay each time it became aware of a given defect.

28    In fact, recently revealed documents show that GM valued cost-cutting over safety, trained its

- 1 -
COMPLAINT

1    personnel to **never** use the words "defect," "stall," or other words suggesting that any GM-branded

2    vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and

3    discouraged employees from acting to address safety issues.

4          6.     Under the Transportation Recall Enhancement, Accountability and Documentation

5    Act ("TREAD Act")[1] and its accompanying regulations, when a manufacturer learns that a vehicle

6    contains a safety defect, the manufacturer must promptly disclose the defect.[2] If it is determined

7    that the vehicle is defective, the manufacturer may be required to notify vehicle owners,

8    purchasers, and dealers of the defect, and may be required to remedy the defect.[3]

9          7.     GM **explicitly assumed** the responsibilities to report safety defects with respect to

10    all GM-branded vehicles as required by the TREAD Act.  GM also had the same duty under

11    California law.

12          8.     When a manufacturer with TREAD Act responsibilities is aware of myriad safety

13    defects and fails to disclose them as GM has done, that manufacturer's vehicles are not safe.  And

14    when that manufacturer markets and sells its new vehicles by touting that its vehicles are "safe," as

15    GM has also done, that manufacturer is engaging in deception.

16          9.     GM has recently been forced to disclose that it had been concealing a large number

17    of known safety defects in GM-branded vehicles ever since its inception in 2009, and that other

18    defects arose on its watch due in large measure to GM's focus on cost-cutting over safety, its

19    discouragement of raising safety issues and its training of employees to avoid using language such

20    as "stalls," "defect" or "safety issue" in order to avoid attracting the attention of regulators.  As a

21    result, GM has been forced to recall over 17 million vehicles in some 40 recalls covering 35

22    separate defects during the first five and a half months of this year –20 times more than during the

23    same period in 2013.  The cumulative negative effect on the value of the vehicles sold by GM has

24    been both foreseeable and significant.

25

26

27        [1] 49 U.S.C. §§ 30101-30170.

28        [2] 49 U.S.C. § 30118(c)(1) & (2).

    [3] 49 U.S.C. § 30118(b)(2)(A) & (B).

1      10.     The highest-profile defect concealed by GM concerns the ignition switches in more

2  than 1.5 million vehicles sold by GM's predecessor (the "ignition switch defect").  The ignition

3  switch defect can cause the affected vehicles' ignition switches to inadvertently move from the

4  "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a

5  loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to

6  deploy.  GM continued to use defective ignition switches in "repairs" of vehicles it sold after July

7  10, 2009.

8      11.     For the past five years, GM received reports of crashes and injuries that put GM on

9  notice of the serious safety issues presented by its ignition switch system.  GM was aware of the

10  ignition switch defects (and many other serious defects in numerous models of GM-branded

11  vehicles) *from the very date of its inception on July 10, 2009.*

12      12.     Yet, despite the dangerous nature of the ignition switch defects and the effects on

13  critical safety systems, GM concealed the existence of the defects and failed to remedy the problem

14  from the date of its inception until February of 2014.  In February and March of 2014, GM issued

15  three recalls for a combined total of 2.19 million vehicles with the ignition switch defects.

16      13.     On May 16, 2014, GM entered a Consent Order with NHTSA in which it admitted

17  that it violated the TREAD Act by not disclosing the ignition switch defect, and agreed to pay the

18  maximum available civil penalties for its violations.

19      14.     Unfortunately for all owners of vehicles sold by GM, the ignition switch defect was

20  only one of a seemingly never-ending parade of recalls in the first half of 2014 – many concerning

21  safety defects that had been long known to GM.

22      15.     Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States

23  were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly

24  fail during ordinary driving conditions and revert back to manual steering, requiring greater effort

25  by the driver to steer the vehicle and increasing the risk of collisions and injuries (the "power

26  steering defect").

27      16.     As with the ignition switch defect, GM was aware of the power steering defect from

28  the date of its inception, and concealed the defect for years.

1       17.     From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles were sold in

2  the United States with defective wiring harnesses.  Increased resistance in the wiring harnesses of

3  driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may

4  cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash (the

5  "airbag defect").  The vehicles' failure to deploy airbags and pretensioners in a crash increases the

6  risk of injury and death to the drivers and front-seat passengers.

7       18.     Once again, GM knew of the dangerous airbag defect from the date of its inception

8  on July 10, 2009, but chose instead to conceal the defect, and marketed its vehicles as "safe" and

9  "reliable."

10       19.     To take just one more example, between 2003 and 2012, 2.4 million GM-branded

11  vehicles in the United States were sold with a wiring harness defect that could cause brake lamps to

12  fail to illuminate when the brakes are applied or cause them to illuminate when the brakes are not

13  engaged (the "brake light defect").  The same defect could also disable traction control, electronic

14  stability control, and panic braking assist operations.  Though GM received hundreds of complaints

15  and was aware of at least 13 crashes caused by this defect, it waited until May of 2014 before

16  finally ordering a full recall.

17       20.     As further detailed in this Complaint, the ignition switch, power steering, airbag,

18  and brake light defects are just 4 of the **35** separate defects that resulted in 40 recalls of GM-

19  branded vehicles in the first five and a half months of 2014, affecting over 17 million vehicles.

20  Most or all of these recalls are for safety defects, and many of the defects were apparently known

21  to GM, but concealed for years.

22       21.     This case arises from GM's breach of its obligations and duties, including but not

23  limited to:  (i) its concealment of, and failure to disclose that, as a result of a spate of safety defects,

24  over 17 million Defective Vehicles were on the road nationwide – and many hundreds of thousands

25  in California; (ii) its failure to disclose the defects despite its TREAD Act obligations; (iii) its

26  failure to disclose that it devalued safety and systemically encouraged the concealment of known

27  defects; (iv) its continued use of defective ignition switches as replacement parts; (v) its sale of

28  used "GM certified" vehicles that were actually plagued with a variety of known safety defects;

1   and (vi) its repeated and false statements that its vehicles were safe and reliable, and that it stood

2   behind its vehicles after they were purchased.

3        22.    From its inception in 2009, GM has known that many defects exist in millions of

4   GM-branded vehicles sold in the United States.  But, to protect its profits and to avoid remediation

5   costs and a public relations nightmare, GM concealed the defects and their sometimes tragic

6   consequences.

7        23.    GM violated the TREAD Act by failing to timely inform NHTSA of the myriad

8   safety defects plaguing GM-branded vehicles and allowed the Defective Vehicles to remain on the

9   road.  In addition to violating the TREAD Act, GM fraudulently concealed the defects from owners

10   and from purchasers of new and used vehicles sold after July 10, 2009, and even used defective

11   ignition switches as replacement parts.  These same acts and omissions also violated California law

12   as detailed below.

13        24.    GM's failure to disclose the many defects, as well as advertising and promotion

14   concerning GM's record of building "safe" cars of high quality, violated California law.

15              **II.**      **PLAINTIFF'S AUTHORITY**

16        25.    Tony Rackauckas, District Attorney of the County of Orange, acting to protect the

17   public as consumers from unlawful, unfair, and fraudulent business practices, brings this action in

18   the public interest in the name of the People of the State of California for violations of the Unfair

19   Competition Law pursuant to California Business and Professions Code Sections 17200, 17204 and

20   17206, and for violations of the False Advertising Law pursuant to California Business and

21   Professions Code Sections 17500, 17535 and 17536.  Plaintiff, by this action, seeks to enjoin GM

22   from engaging in the unlawful, unfair, and fraudulent business practices alleged herein, and seeks

23   civil penalties for GM's violations of the above statutes.

24              **III.**      **DEFENDANT**

25        26.    Defendant General Motors LLC ("GM") is a foreign limited liability company

26   formed under the laws of Delaware with its principal place of business located at 300 Renaissance

27   Center, Detroit, Michigan.  GM was incorporated in 2009.

28

27.     GM has significant contacts with Orange County, California, and the activities complained of herein occurred, in whole or in part, in Orange County, California.

28.     At all times mentioned GM was engaged in the business of designing, manufacturing, distributing, marketing, selling, leasing, certifying, and warrantying the GM cars that are the subject of this Complaint, throughout the State of California, including in Orange County, California.

## IV.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over this matter pursuant to the California Constitution, Article XI, section 10 and California Code of Civil Procedure ("CCP") section 410.10 because GM transacted business and committed the acts complained of herein in California, specifically in the County of Orange.  The violations of law alleged herein were committed in Orange County and elsewhere within the State of California.

30.     Venue is proper in Orange County, California, pursuant to CCP section 395 and because many of the acts complained about occurred in Orange County.

## V.     FACTUAL BACKGROUND

**A.     There Are Serious Safety Defects in Millions of GM Vehicles Across Many Models and Years, and, Until Recently, GM Concealed them from Consumers.**

31.     In the first five and a half months of 2014, GM announced some 40 recalls affecting over 17 million GM-branded vehicles from model years 2003-2014.  The recalls concern 35 separate defects.  The numbers of recalls and serious safety defects are unprecedented, and can only lead to one conclusion:  GM and its predecessor sold a large number of unsafe vehicle models with myriad defects during a long period of time.

32.     Even more disturbingly, the available evidence shows a common pattern:  From its inception in 2009, GM knew about an ever-growing list of serious safety defects in millions of GM-branded vehicles, but concealed them from consumers and regulators in order to boost sales and avoid the cost and publicity of recalls.

33.     GM inherited from Old GM a company that valued cost-cutting over safety, actively discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words

010440-12  692229 V1

- 6 -
COMPLAINT

1    like "stall" that might attract the attention of NHTSA and suggest that a recall was required, and

2    trained its employees to avoid the use of words such as "defect" that might flag the existence of a

3    safety issue.  GM did nothing to change these practices.

4         34.    The Center for Auto Safety recently stated that it has identified 2,004 death and

5    injury reports filed by GM with federal regulators in connection with vehicles that have recently

6    been recalled.[4]  Many of these deaths and injuries would have been avoided had GM complied with

7    its TREAD Act obligations over the past five years.

8         35.    The many defects concealed by GM affected key safety systems in GM vehicles,

9    including the ignition, power steering, airbags, brake lights, gear shift systems, and seatbelts.

10        36.    The available evidence shows a consistent pattern:  GM learned about a particular

11   defect and, often at the prodding of regulatory authorities, "investigated" the defect and decided

12   upon a "root cause."  GM then took minimal action – such as issuing a carefully-worded

13   "Technical Service Bulletin" to its dealers, or even recalling a very small number of affected

14   vehicles.  All the while, the true nature and scope of the defects were kept under wraps, vehicles

15   affected by the defects remained on the road, and GM enticed consumers to purchase its vehicles

16   by touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer

17   that stands behind its products.

18        37.    The nine defects affecting the greatest number of vehicles are discussed in some

19   detail below, and the remainder are summarized thereafter.

20       **1.**    **The ignition switch defects.**

21        38.    The ignition switch defects can cause the vehicle's engine and electrical systems to

22   shut off, disabling the power steering and power brakes and causing non-deployment of the

23   vehicle's airbag and the failure of the vehicle's seatbelt pretensioners in the event of a crash.

24        39.    The ignition switch systems at issue are defective in at least three major respects.

25   The first is that the switches are simply weak; because of a faulty "detent plunger," the switch can

26   inadvertently move from the "run" to the "accessory" or "off" position.

27

28      [4] *See Thousands of Accident Reports Filed Involving Recalled GM Cars: Report*, Irvin Jackson (June 3, 2014).

010440-12  692229 V1       - 7 -

1    40.    The second defect is that, due to the low position of the ignition switch, the driver's

2    knee can easily bump the key (or the hanging fob below the key), and cause the switch to

3    inadvertently move from the "run" to the "accessory" or "off" position.

4    41.    The third defect is that the airbags immediately become inoperable whenever the

5    ignition switch moves from the "run" to the "accessory" position.  As NHTSA's Acting

6    Administrator, David Friedman, recently testified before Congress, NHTSA is not convinced that

7    the non-deployment of the airbags in the recalled vehicles is solely attributable to a mechanical

8    defect involving the ignition switch:

> And it may be even more complicated than that, actually.  And that's one of the questions that we actually have in our timeliness query to General Motors.  It is possible that it's not simply that the – the power was off, but a much more complicated situation where the very specific action of moving from on to the accessory mode is what didn't turn off the power, but may have disabled the algorithm.
>
> That, to me, frankly, doesn't make sense.  From my perspective, if a vehicle – certainly if a vehicle is moving, the airbag's algorithm should require those airbags to deploy.  Even if the – even if the vehicle is stopped and you turn from 'on' to 'accessory,' I believe that the airbags should be able to deploy.
>
> So this is exactly why we're asking General Motors this question, to understand is it truly a power issue or is there something embedded in their [software] algorithm that is causing this, something that should have been there in their algorithm.[5]

18    42.    Vehicles with defective ignition switches are, therefore, unreasonably prone to be

19    involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm

20    or death to the drivers and passengers of the vehicles.

21    43.    Alarmingly, GM knew of the deadly ignition switch defects and at least some of

22    their dangerous consequences from the date of its inception on July 10, 2009, but concealed its

23    knowledge from consumers and regulators.

24    44.    In part, GM's knowledge of the ignition switch defects arises from the fact that key

25    personnel with knowledge of the defects remained in their same positions once GM took over from

26    Old GM.

27

28    _____
[5] Congressional Transcript, Testimony of David Friedman, Acting Administrator of NHTSA (Apr. 2, 2014), at 19.

45.    For example, the Old GM Design Research Engineer who was responsible for the rollout of the defective ignition switch in 2003 was Ray DeGiorgio.  Mr. DeGiorgio continued to serve as an engineer at GM until April 2014 when he was suspended as a result of his involvement in the defective ignition switch problem.  Later in 2014, in the wake of the GM Report,[6] Mr. DeGiorgio was fired.

46.    In 2001, two years *before* vehicles with the defective ignition switches were ever available to consumers, Old GM privately acknowledged in an internal pre-production report for the model/year ("MY") 2003 Saturn Ion that there were problems with the ignition switch.[7]  Old GM's own engineers had personally experienced problems with the ignition switch.  In a section of the internal report titled "Root Cause Summary," Old GM engineers identified "two causes of failure," namely:  "[l]ow contact force and low detent plunger force."[8]  The report also stated that the GM person responsible for the issue was Ray DeGiorgio.[9]

47.    Mr. DeGiorgio actively concealed the defect, both while working for Old GM *and* while working for GM.

48.    Similarly, Gary Altman was Old GM's program-engineering manager for the Cobalt, which is one of the models with the defective ignition switches and hit the market in MY 2005.  He remained as an engineer at GM until he was suspended on April 10, 2014, by GM for his role in the ignition switch problem and then fired in the wake of the GM Report.

49.    On October 29, 2004, Mr. Altman test-drove a Cobalt.  While he was driving, his knee bumped the key and the vehicle shut down.

50.    In response to the Altman incident, Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue.  According to the chronology provided to NHTSA by GM in March 2014, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

---

[6] References to the "GM Report" are to the "*Report to Board of Directors of General Motors Company Regarding Ignition Switch Recalls*," Anton R. Valukas, Jenner & Block (May 29, 2014).

[7] GM Report/Complaint re "Electrical Concern" opened July 31, 2001, GMHEC000001980-90.

[8] *Id*. at GMHEC000001986.

[9] *Id*. at GMHEC000001981, 1986.

51.    The PRTS concluded in 2005 that:

There are two main reasons that we believe can cause a lower effort in turning the key:

1.    A low torque detent in the ignition switch and

2.    A low position of the lock module in the column.[10]

52.    The 2005 PRTS further demonstrates the knowledge of Ray DeGiorgio (who, like Mr. Altman, worked for Old GM and continued until very recently working for GM), as the PRTS's author states that "[a]fter talking to Ray DeGiorgio, I found out that it is close to impossible to modify the present ignition switch.  The switch itself is very fragile and doing any further changes will lead to mechanical and/or electrical problems."[11]

53.    Gary Altman, program engineering manager for the 2005 Cobalt, recently admitted that Old GM engineering managers (including himself and Mr. DeGiorgio) knew about ignition switch problems in the vehicle that could disable power steering, power brakes, and airbags, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

54.    Incredibly, GM now claims that it and Old GM did not view vehicle stalling and the loss of power steering as a "safety issue," but only as a "customer convenience" issue.[12]  GM bases this claim on the equally incredible assertion that, at least for some period of time, it was not aware that when the ignition switch moves to the "accessory" position, the airbags become inoperable – even though Old GM itself designed the airbags to not deploy under that circumstance.[13]

55.    Even crediting GM's claim that some at the Company were unaware of the rather obvious connection between the defective ignition switches and airbag non-deployment, a stall and loss of power steering and power brakes is a serious safety issue under any objective view.  GM

---

[10] Feb. 1, 2005 PRTS at GMHEC000001733.

[11] *Id.*

[12] GM Report at 2.

[13] *Id.*

010440-12  692229 V1                                    - 10 -
COMPLAINT

1   *itself* recognized in 2010 that a loss of power steering **standing alone** was grounds for a safety

2   recall, as it did a recall on such grounds.

3         56.    In fact, as multiple GM employees confirm, GM **intentionally** avoids using the

4   word "stall" "because such language might draw the attention of NHTSA" and "may raise a

5   concern about safety, which suggests GM should recall the vehicle…."[14]

6         57.    Rather than publicly admitting the dangerous safety defects in the vehicles with the

7   defective ignition switches, GM attempted to attribute these and other incidents to "driver error."

8   GM continued to receive reports of deaths in Cobalts involving steering and/or airbag failures from

9   its inception up through at least 2012.

10         58.    In April 2006, the GM design engineer who was responsible for the ignition switch

11   in the recalled vehicles, Design Research Engineer Ray DeGiorgio, authorized part supplier Delphi

12   to implement changes to fix the ignition switch defect.[15]  The design change "was implemented to

13   increase torque performance in the switch."[16]  However, testing showed that, even with the

14   proposed change, the performance of the ignition switch was **still** below original specifications.[17]

15         59.    Modified ignition switches – with greater torque – started to be installed in 2007

16   model/year vehicles.[18]  In what a high-level engineer at Old GM now calls a "cardinal sin" and "an

17   extraordinary violation of internal processes," Old GM changed the part design **but kept the old**

18   **part number**.[19]  That makes it impossible to determine from the part number alone which GM

19   vehicles produced after 2007 contain the defective ignition switches.

20         60.    At a May 15, 2009 meeting, Old GM engineers (soon to be GM engineers) learned

21   that data in the black boxes of Chevrolet Cobalts showed that the dangerous ignition switch defects

22

23

---

24   [14] GM Report at 92-93.

   [15] General Motors Commodity Validation Sign-Off (Apr. 26, 2006), GMHEC000003201.  *See*
25   *also* GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

26      [16] *Id.*

   [17] Delphi Briefing, Mar. 27, 2014.

27      [18] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

28      [19] "'*Cardinal sin': Former GM engineers say quiet '06 redesign of faulty ignition switch was a*
*major violation of protocol*." *Automotive News* (Mar. 26, 2014).

1    existed in hundreds of thousands of Defective Vehicles.  But still GM did not reveal the defect to

2    NHTSA, Plaintiff, or consumers.

3        61.    After the May 15, 2009 meeting, GM continued to get complaints of unintended

4    shut down and continued to investigate frontal crashes in which the airbags did not deploy.

5        62.    After the May 15, 2009 meeting, GM told the families of accident victims related to

6    the ignition switch defects that it did not have sufficient evidence to conclude that there was any

7    defect.  In one case involving the ignition switch defects, GM threatened to sue the family of an

8    accident victim for reimbursement of its legal fees if the family did not dismiss its lawsuit.  In

9    another, GM sent the victim's family a terse letter, saying there was no basis for any claims against

10    GM.  These statements were part of GM's campaign of deception.

11        63.    In July 2011, GM legal staff and engineers met regarding an investigation of crashes

12    in which the air bags did not deploy.  The next month, in August 2011, GM initiated a Field

13    Performance Evaluation ("FPE") to analyze multiple frontal impact crashes involving MY 2005-

14    2007 Chevrolet Cobalt vehicles and 2007 Pontiac G5 vehicles, as well as a review of information

15    related to the Ion, HHR, and Solstice vehicles, and airbag non-deployment.[20]

16        64.    GM continued to conceal and deny what it privately knew – that the ignition

17    switches were defective.  For example, in May 2012, GM engineers tested the torque of the

18    ignition switches in numerous Old GM vehicles.[21]  The results from the GM testing showed that

19    the majority of the vehicles tested from the 2003 to 2007 model/years had torque performance at or

20    below 10 Newton centimeters ("Ncm"), which was below the original design specifications

21    required by GM.[22]  Around the same time, high ranking GM personnel continued to internally

22    review the history of the ignition switch issue.[23]

23        65.    In September 2012, GM had a GM Red X Team Engineer (a special engineer

24    assigned to find the root cause of an engineering design defect) examine the changes between the

25

26        [20] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

27        [21] GMHEC000221427; *see also* Mar. 11, 2014 Ltr. to NHTSA, attached chronology.

        [22] *Id*.

28        [23] GMHEC000221438.

1    2007 and 2008 Chevrolet Cobalt models following reported crashes where the airbags failed to

2    deploy and the ignition switch was found in the "off" or "accessory" position.[24]

3    66.    The next month, in October of 2012, Design Research Engineer Ray DeGiorgio (the

4    lead engineer on the defective ignition switch) sent an email to Brian Stouffer of GM regarding the

5    "2005-7 Cobalt and Ignition Switch Effort," stating:  "If we replaced switches on ALL the model

6    years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch."[25]

7    67.    The October 2012 email makes clear that GM considered implementing a recall to

8    fix the defective ignition switches in the Chevy Cobalt vehicles, but declined to do so in order to

9    save money.

10    68.    In April 2013, GM again *internally* acknowledged that it understood that there was

11    a difference in the torque performance between the ignition switch parts in later model Chevrolet

12    Cobalt vehicles compared with the 2003-2007 model/year vehicles.[26]

13    69.    Notwithstanding what GM actually knew and privately acknowledged,[27] its public

14    statements and position in litigation was radically different.  For example, in May 2013, Brian

15    Stouffer testified in deposition in a personal injury action (*Melton v. General Motors*) that the Ncm

16    performance (a measurement of the strength of the ignition switch) was *not* substantially different

17    as between the early (*e.g.*, 2005) and later model year (*e.g.*, 2008) Chevrolet Cobalt vehicles.[28]

18    70.    Similarly, a month before Mr. Stouffer's testimony, in April 2013, GM engineer

19    Ray DeGiorgio denied the existence of any type of ignition switch defect:

20    Q:  Did you look at, as a potential failure mode for this switch, the
ease of which the key could be moved from run to accessory?

21

22    . . .

23

24    [24] Email from GM Field Performance Assessment Engineer to GM Red X Team Engineer (Sept. 6, 2012, 1:29:14 p.m., GMHEC000136204).

25    [25] GMHEC000221539.

26    [26] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 4.

[27] *See* GMHEC000221427.

27    [28] GMHEC000146933.  That said, "[t]he modified switches used in 2007-2011 vehicles were

28    also approved by GM despite not meeting company specifications." Mar. 31, 2014 Ltr. to Mary Barra from H. Waxman, D. DeGette, and J. Schankowsky.

1

2

3

THE WITNESS:  No, because in our minds, moving the key from, I want to say, ***run to accessory is not a failure mode, it is an expected condition***.  It is important for the customer to be able to rotate the key fore and aft, so as long as we meet those requirements, ***it's not deemed as a risk***.

4

5

Q:  Well, it's not expected to move from run to accessory when you're driving down the road at 55 miles an hour, is it?

6

. . .

7

THE WITNESS:  ***It is expected for the key to be easily and smoothly transitioned from one state to the other*** without binding and without harsh actuations.

8

9

Q: And why do you have a minimum torque requirement from run to accessory?

10

. . .

11

12

13

14

15

THE WITNESS:  It's a design feature that is required.  You don't want anything flopping around.  You want to be able to control the dimensions and basically provide – one of the requirements in this document talks about having a smooth transition from detent to detent.  One of the criticisms – I shouldn't say criticisms.  One of the customer complaints we have had in the – and previous to this was he had cheap feeling switches, they were cheap feeling, they were higher effort, and the intent of this design was to provide a smooth actuation, provide a high feeling of a robust design.  That was the intent.

16

17

18

Q:  I assume the intent was also to make sure that when people were using the vehicle under ordinary driving conditions, that if the key was in the run position, it wouldn't just move to the accessory position, correct?

19

. . .

20

21

A:  That is correct, but also – it was not intended – ***the intent was to make the transition to go from run to off with relative ease.***[29]

22    71.    Brian Stouffer, in an email to Delphi regarding the ignition switch in the Chevy

23    Cobalt, acknowledged that the ignition switch in early Cobalt vehicles – although bearing the same

24    part number – was different than the ignition switch in later Cobalt vehicles.[30] Mr. Stouffer

25    claimed that "[t]he discovery of the plunger and spring change was made aware to GM during a

26

27

28

_____

[29] GMHEC000138906 (emphasis added).

[30] GMHEC000003197.

010440-12  692229 V1

- 14 -

COMPLAINT

1  [sic] course of a lawsuit (*Melton v. GM*)."[31]  Delphi personnel responded that GM had authorized

2  the change back in 2006 but the part number had remained the same.[32]

3       72.    Eventually, the defect could no longer be ignored or swept under the rug.

4       73.    After analysis by GM's Field Performance Review Committee and the Executive

5  Field Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of *some* of the

6  vehicles with defective ignition switches on January 31, 2014.

7       74.    Initially, the EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5

8  for model years 2005-2007.

9       75.    After additional analysis, the EFADC expanded the recall on February 24, 2014, to

10  include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for

11  model years 2003-2007, and the Saturn Sky for model year 2007.

12       76.    Most recently, on March 28, 2014, GM expanded the recall a third time, to include

13  Chevrolet Cobalts, Pontiac G5s and Solstices, Saturn Ions and Skys from the 2008 through 2010

14  model years, and Chevrolet HHRs from the 2008 through 2011 model years.

15       77.    All told, GM has recalled some 2.19 million vehicles in connection with the ignition

16  switch defect.

17       78.    In a video message addressed to GM employees on March 17, 2014, CEO Mary

18  Barra admitted that the Company had made mistakes and needed to change its processes.

19       79.    According to Ms. Barra, "[s]omething went terribly wrong in our processes in this

20  instance, and terrible things happened."  Barra went on to promise, "[w]e will be better because of

21  this tragic situation if we seize this opportunity."[33]

22       80.    Based on its egregious conduct in concealing the ignition switch defect, GM

23  recently agreed to pay the maximum possible civil penalty in a Consent Order with the National

24  Highway Traffic Safety Administration ("NHTSA") and admitted that it had violated its legal

25  obligations to promptly disclose the existence of known safety defects.

26

27       [31] *Id.  See also* GMHEC000003156-3180.

28       [32] *See* GMHEC000003192-93.
         [33] "*Something Went 'Very Wrong' at G.M., Chief Says.*"  N.Y. TIMES (Mar. 18, 2014).

**2.    The power steering defect.**

81.    Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

82.    As with the ignition switch defects, GM was aware of the power steering defect long before it took anything approaching full remedial action.

83.    When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver.  Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

84.    In 2010, GM first recalled Chevy Cobalt and Pontiac G5 models for these power steering issues, yet it did ***not*** recall the many other vehicles that had the very same power steering defect.

85.    Documents released by NHTSA show that GM waited years to recall nearly 335,000 Saturn Ions for power steering failure – despite receiving nearly 4,800 consumer complaints and more than 30,000 claims for warranty repairs.  That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent.  By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[34]  Here, the rate translates to 1430 complaints per 100,000 vehicles.

86.    In response to the consumer complaints, in September 2011 NHTSA opened an investigation into the power steering defect in Saturn Ions.

87.    NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

88.    NHTSA linked approximately 12 crashes and two injuries to the power steering defect in the Ions.

_____

[34] *See* http://www-odi.nhtsa.dot.gov/cars/problems/defect/-results.cfm?action_number=EA06002&SearchType=QuickSearch&summary=true.

1     89.    In 2011, GM missed yet another opportunity to recall the additional vehicles with

2    faulty power steering when CEO Mary Barra – then head of product development – was advised by

3    engineer Terry Woychowski that there was a serious power steering issue in Saturn Ions.

4    Ms. Barra was also informed of the ongoing NHTSA investigation.  At the time, NHTSA

5    reportedly came close to concluding that Saturn Ions should have been included in GM's 2005

6    steering recall of Cobalt and G5 vehicles.

7     90.    Yet GM took no action for four years.  It wasn't until March 31, 2014, that GM

8    finally recalled the approximately 1.3 million vehicles in the United States affected by the power

9    steering defect.

10     91.    After announcing the March 31, 2014 recall, Jeff Boyer, GM's Vice President of

11    Global Vehicle Safety, acknowledged that GM recalled some of these same vehicle models

12    previously for the *same issue*, but that GM "did not do enough."

13    **3.**    **Airbag defect.**[35]

14     92.    From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles in the United

15    States were sold with defective wiring harnesses.  Increased resistance in the wiring harnesses of

16    driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may

17    cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash.  The

18    vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and

19    death to the drivers and front-seat passengers.

20     93.    Once again, GM knew of the dangerous airbag defect long before it took anything

21    approaching the requisite remedial action.

22     94.    As the wiring harness connectors in the SIABs corrode or loosen over time,

23    resistance will increase.  The airbag sensing system will interpret this increase in resistance as a

24    fault, which then triggers illumination of the "SERVICE AIR BAG" message on the vehicle's

25    dashboard.  This message may be intermittent at first and the airbags and pretensioners will still

26

27

28

---

[35] This defect is distinct from the airbag component of the ignition switch defect discussed
above and from other airbag defects affecting a smaller number of vehicles, discussed below.

1    deploy.  But over time, the resistance can build to the point where the SIABs, pretensioners, and

2    front center airbags will not deploy in the event of a collision.[36]

3    95.    The problem apparently arose when GM made the switch from using gold-plated

4    terminals to connect its wire harnesses to cheaper tin terminals in 2007.

5    96.    In June 2008, Old GM noticed increased warranty claims for airbag service on

6    certain of its vehicles and determined it was due to increased resistance in airbag wiring.  After

7    analysis of the tin connectors in September 2008, Old GM determined that corrosion and wear to

8    the connectors was causing the increased resistance in the airbag wiring.  It released a technical

9    service bulletin on November 25, 2008, for 2008-2009 Buick Enclaves, 2009 Chevy Traverse,

10    2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the

11    defect by using Nyogel grease, securing the connectors, and adding slack to the line.  Old GM also

12    began the transition back to gold-plated terminals in certain vehicles.  At that point, Old GM

13    suspended all investigation into the defective airbag wiring and took no further action.[37]

14    97.    In November 2009, GM learned of similar reports of increased airbag service

15    messages in 2010 Chevy Malibu and 2010 Pontiac G6 vehicles.  After investigation, GM

16    concluded that corrosion and wear in the same tin connector was the root of the airbag problems in

17    the Malibu and G6 models.[38]

18    98.    In January 2010, after review of the Malibu and G6 airbag connector issues, GM

19    concluded that ignoring the service airbag message could increase the resistance such that an SIAB

20    might not deploy in a side impact collision.  On May 11, 2010, GM issued a Customer Satisfaction

21    Bulletin for the Malibu and G6 models and instructed dealers to secure both front seat-mounted,

22    side-impact airbag wire harnesses and, if necessary, reroute the wire harness.[39]

23    99.    From February to May 2010, GM revisited the data on vehicles with faulty harness

24    wiring issues, and noted another spike in the volume of the airbag service warranty claims.  This

25

26    [36] See GM Notice to NHTSA dated March 17, 2014, at 1.

27    [37] See GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

28    [38] See id., at 2.

     [39] See id.

1  led GM to conclude that the November 2008 bulletin was "not entirely effective in correcting the

2  [wiring defect present in the vehicles]."  On November 23, 2010, GM issued another Customer

3  Satisfaction Bulletin for certain 2008 Buick Enclave, 2008 Saturn Outlook, and 2008 GMC Acadia

4  models built from October 2007 to March 2008, instructing dealers to secure SIAB harnesses and

5  re-route or replace the SIAB connectors.[40]

6       100.    GM issued a revised Customer Service Bulletin on February 3, 2011, requiring

7  replacement of the front seat-mounted side-impact airbag connectors in the same faulty vehicles

8  mentioned in the November 2010 bulletin.  In July 2011, GM again replaced its connector, this

9  time with a Tyco-manufactured connector featuring a silver-sealed terminal.[41]

10       101.    But in 2012, GM noticed another spike in the volume of warranty claims relating to

11  SIAB connectors in vehicles built in the second half of 2011.  After further analysis of the Tyco

12  connectors, it discovered that inadequate crimping of the connector terminal was causing increased

13  system resistance.  In response, GM issued an internal bulletin for 2011-12 Buick Enclave, Chevy

14  Traverse, and GMC Acadia vehicles, recommending dealers repair affected vehicles by replacing

15  the original connector with a new sealed connector.[42]

16       102.    The defect was still uncured, however, because in 2013 GM again marked an

17  increase in service repairs and buyback activity due to illuminated airbag service lights.  On

18  October 4, 2013, GM opened an investigation into airbag connector issues in 2011-2013 Buick

19  Enclave, Chevy Traverse, and GMC Acadia models.  The investigation revealed an increase in

20  warranty claims for vehicles built in late 2011 and early 2012.[43]

21       103.    On February 10, 2014, GM concluded that corrosion and crimping issues were again

22  the root cause of the airbag problems.[44]

23       104.    GM initially planned to issue a less-urgent Customer Satisfaction Program to

24  address the airbag flaw in the 2010-2013 vehicles.  But it wasn't until a call with NHTSA on

25      [40] *See id.*, at 3.

26      [41] *See id.*

27      [42] *See id.*, at 4.

    [43] *See id.*

28      [44] *See id.*, at 5.

1    March 14, 2014, that GM finally issued a full-blown safety recall on the vehicles with the faulty

2    harness wiring – years after it first learned of the defective airbag connectors, after four

3    investigations into the defect, and after issuing at least six service bulletins on the topic.  The recall

4    as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover

5    approximately 1.2 million vehicles.[45]

6        105.    On March 17, 2014, GM issued a recall for 1,176,407 vehicles potentially afflicted

7    with the defective airbag system.  The recall instructs dealers to remove driver and passenger SIAB

8    connectors and splice and solder the wires together.[46]

9        **4.    The brake light defect.**

10        106.    Between 2004 and 2012, approximately 2.4 million GM-branded vehicles in the

11    United States were sold with a safety defect that can cause brake lamps to fail to illuminate when

12    the brakes are applied or to illuminate when the brakes are not engaged; the same defect can

13    disable cruise control, traction control, electronic stability control, and panic brake assist operation,

14    thereby increasing the risk of collisions and injuries.[47]

15        107.    Once again, GM knew of the dangerous brake light defect for years before it took

16    anything approaching the requisite remedial action.  In fact, although the brake light defect has

17    caused at least 13 crashes since 2008, GM did not recall all 2.4 million vehicles with the defect

18    until May 2014.

19        108.    The vehicles with the brake light defect include the 2004-2012 Chevrolet Malibu,

20    the 2004-2007 Malibu Maxx, the 2005-2010 Pontiac G6, and the 2007-2010 Saturn Aura.[48]

21        109.    According to GM, the brake defect originates in the Body Control Module (BCM)

22    connection system.  "Increased resistance can develop in the [BCM] connection system and result

23    in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause

24

25

———————————————

26    [45] *See id.*

27    [46] *See id.*

    [47] *See* GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

28    [48] *Id.*

1    service brakes lamp malfunction."[49]  The result is brake lamps that may illuminate when the brakes

2    are not being applied and may not illuminate when the brakes are being applied. [50]

3        110.    The same defect can also cause the vehicle to get stuck in cruise control if it is

4    engaged, or cause cruise control to not engage, and may also disable the traction control, electronic

5    stability control, and panic-braking assist features.[51]

6        111.    GM now acknowledges that the brake light defect "may increase the risk of a

7    crash."[52]

8        112.    As early as September 2008, NHTSA opened an investigation for model year 2005-

9    2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver

10    had not depressed the brake pedal and may turn on when the brake pedal was depressed.[53]

11        113.    During its investigation of the brake light defect in 2008, Old GM found elevated

12    warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005,

13    and found "fretting corrosion in the BCM C2 connector was the root cause" of the problem.[54]  Old

14    GM and its part supplier Delphi decided that applying dielectric grease to the BCM C2 connector

15    would be "an effective countermeasure to the fretting corrosion."[55]  Beginning in November of

16    2008, the company began applying dielectric grease in its vehicle assembly plants.[56]

17        114.    On December 4, 2008, Old GM issued a TSB recommending the application of

18    dielectric grease to the BCM C2 connector for the MY 2005-2009, Pontiac G6, 2004-2007

19    Chevrolet Malibu/Malibu Maxx and 2008 Malibu Classic and 2007-2009 Saturn Aura vehicles.[57]

20    One month later, in January 2009, Old GM recalled only a small subset of the vehicles with the

21

22    _____

23    [49] *Id.*

24    [50] *Id.*

25    [51] *Id.*

26    [52] *Id.*

27    [53] *Id.* at 2.

28    [54] *Id.*

[55] *Id.*

[56] *Id* at 3.

[57] *Id.* at 2.

1    brake light defect – 8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January,

2    2005.[58]

3        115.    Not surprisingly, the brake light problem was far from resolved.

4        116.    In October 2010, GM released an updated TSB regarding "intermittent brake lamp

5    malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of

6    vehicles for which it recommended the application of dielectric grease to the BCM C2 connector.[59]

7        117.    In September of 2011, GM received an information request from Canadian

8    authorities regarding brake light defect complaints in vehicles that had not yet been recalled.  Then,

9    in June 2012, NHTSA provided GM with additional complaints "that were outside of the build

10    dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.[60]

11        118.    In February of 2013, NHTSA opened a "Recall Query" in the face of 324

12    complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu and Aura vehicles

13    that had not yet been recalled.[61]

14        119.    In response, GM asserts that it "investigated these occurrences looking for root

15    causes that could be additional contributors to the previously identified fretting corrosion," but that

16    it continued to believe that "fretting corrosion in the BCM C2 connector" was the "root cause" of

17    the brake light defect.[62]

18        120.    In June of 2013, NHTSA upgraded its "Recall Query" concerning brake light

19    problems to an "Engineering Analysis."[63]

20        121.    In August 2013, GM found an elevated warranty rate for BCM C2 connectors in

21    vehicles built *after* Old GM had begun applying dielectric grease to BCM C2 connectors at its

22

23

24    _____

25    [58] *Id.*

      [59] *Id.*

26    [60] *Id.*

27    [61] *Id.* at 3.

      [62] *Id.*

28    [63] *Id.*

1    assembly plants in November of 2008.[64]  In November of 2013, GM concluded that "the amount of

2    dielectric grease applied in the assembly plant starting November 2008 was insufficient…."[65]

3         122.    Finally, in March of 2014, "GM engineering teams began conducting analysis and

4    physical testing to measure the effectiveness of potential countermeasures to address fretting

5    corrosion.  As a result, GM determined that additional remedies were needed to address fretting

6    corrosion."[66]

7         123.    On May 7, 2014, GM's Executive Field Action Decision Committee finally decided

8    to conduct a safety recall.

9         124.    According to GM, "Dealers are to attach the wiring harness to the BCM with a

10    spacer, apply dielectric lubricant to both the BCM CR and harness connector, and on the BAS and

11    harness connector, and relearn the brake pedal home position."[67]

12         125.    Once again, GM sat on and concealed its knowledge of the brake light defect, and

13    did not even consider available countermeasures (other than the application of grease that had

14    proven ineffective) until March of this year.

15    **5.**    **Shift cable defect**

16         126.    From 2004 through 2010, more than 1.1 million GM-branded vehicles were sold

17    throughout the United States with a dangerously defective transmission shift cable.  The shift cable

18    may fracture at any time, preventing the driver from switching gears or placing the transmission in

19    the "park" position.  According to GM, "[i]f the driver cannot place the vehicle in park, and exits

20    the vehicle without applying the park brake, the vehicle could roll away and a crash could occur

21    without prior warning."[68]

22         127.    Yet again, GM knew of the shift cable defect long before it issued the recent recall

23    of more than 1.1 million vehicles with the defect.

---

[64] *Id.*

[65] *Id.*

[66] *Id.* at 4.

[67] *Id.*

[68] *See* GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

- 23 -

COMPLAINT

128.    In May of 2011, NHTSA informed GM that it had opened an investigation into failed transmission cables in 2007 model year Saturn Aura vehicles.  In response, GM noted "a cable failure model in which a tear to the conduit jacket could allow moisture to corrode the interior steel wires, resulting in degradation of shift cable performance, and eventually, a possible shift cable failure."[69]

129.    Upon reviewing these findings, GM's Executive Field Action Committee conducted a "special coverage field action for the 2007-2008 MY Saturn Aura vehicles equipped with 4 speed transmissions and built with Leggett & Platt cables."  GM apparently chose that cut-off date because, on November 1, 2007, Kongsberg Automotive replaced Leggett & Platt as the cable provider.[70]

130.    GM did not recall any of the vehicles with the shift cable defect at this time, and limited its "special coverage field action" to the 2007-2008 Aura vehicles even though "the same or similar Leggett & Platt cables were used on … Pontiac G6 and Chevrolet Malibu (MMX380) vehicles."

131.    In March 2012, NHTSA sent GM an Engineering Assessment request to investigate transmission shift cable failures in 2007-2008 MY Auras, Pontiac G6s, and Chevrolet Malibus.[71]

132.    In responding to the Engineering Assessment request, GM for the first time "noticed elevated warranty rates in vehicles built with Kongsberg shift cables."  Similar to their predecessor vehicles built with Leggett & Platt shift cables, in the vehicles built with Kongsberg shift cables "the tabs on the transmission shift cable end may fracture and separate without warning, resulting in failure of the transmission shift cable and possible unintended vehicle movement."[72]

133.    Finally, on September 13, 2012, the Executive Field Action Decision Committee decided to conduct a safety recall.  This initial recall was limited to 2008-2010 MY Saturn Aura, Pontiac G6, and Chevrolet Malibu vehicles with 4-speed transmission built with Kongsberg shifter

---

[69] *Id.* at 2.

[70] *Id.*

[71] *Id.*

[72] *Id.*

cables, as well as 2007-2008 MY Saturn Aura and 2005-2007 MY Pontiac G6 vehicles with 4-speed transmissions which may have been serviced with Kongsberg shift cables.[73]

134.    But the shift cable problem was far from resolved.

135.    In March of 2013, NHTSA sent GM a second Engineering Assessment concerning allegations of failure of the transmission shift cables on all 2007-2008 MY Saturn Aura, Chevrolet Malibu, and Pontiac G6 vehicles.[74]

136.    GM continued its standard process of "investigation" and delay.  But by May 9, 2014, GM was forced to concede that "the same cable failure mode found with the Saturn Aura 4-speed transmission" was present in a wide population of vehicles.[75]

137.    Finally, on May 19, 2014, GM's Executive Field Actions Decision Committee decided to conduct a safety recall of more than 1.1 million vehicles with the defective shift cable issue, including the following models and years (as of May 23, 2014):  MY 2007-2008 Chevrolet Saturn; MY 2004-2008 Chevrolet Malibu; MY 2004-2007 Chevrolet Malibu Maxx; and MY 2005-2008 Pontiac G6.

**6.    Safety belt defect.**

138.    Between the years 2008-2014, more than 1.4 million GM-branded vehicles were sold with a dangerous safety belt defect.  According to GM, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outside of the front outboard seating positions can fatigue and separate over time as a result of occupant movement into the seat.  In a crash, a separated cable could increase the risk of injury to the occupant."[76]

139.    On information and belief, GM knew of the safety belt defect long before it issued the recent recall of more than 1.3 million vehicles with the defect.

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *See* GM Notice to NHTSA dated May 19, 2014, at 1.

010440-12  692229 V1

1   140. While GM has yet to submit its full chronology of events to NHTSA, suffice to say

2 that GM has waited some five years before disclosing this defect.  This delay is consistent with

3 GM's long period of concealment of the other defects as set forth above.

4   141. On May 19, 2014, GM's Executive Field Action Decision Committee decided to

5 conduct a recall of the following models and years in connection with the safety belt defect:  MY

6 2009-2014 Buick Enclave; MY 2009-2014 Chevrolet Traverse; MY 2009-2014 GMC Acadia; and

7 MY 2009-2010 Saturn Outlook.

8   **7. Ignition lock cylinder defect.**

9   142. On April 9, 2014, GM recalled 2,191,014 GM-branded vehicles to address faulty

10 ignition lock cylinders.[77]  Though the vehicles are the same as those affected by the ignition switch

11 defect,[78] the lock cylinder defect is distinct.

12   143. In these vehicles, faulty ignition lock cylinders can allow removal of the ignition

13 key while the engine is not in the "Off" position.  If the ignition key is removed when the ignition

14 is not in the "Off" position, unintended vehicle motion may occur.  That could cause a vehicle

15 crash and injury to the vehicle's occupants or pedestrians.  As a result, some of the vehicles with

16 faulty ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard

17 number 114, "*Theft Prevention and Rollaway Prevention*."[79]

18   144. On information and belief, GM was aware of the ignition lock cylinder defect for

19 years before finally acting to remedy it.

20   **8. The Camaro key-design defect.**

21   145. On June 13, 2014, GM recalled more than 500,000 MY 2010-2014 Chevrolet

22 Camaros because a driver's knee can bump the key fob out of the "run" position and cause the

23 vehicle to lose power.  This issue that has led to at least three crashes.  GM said it learned of the

24 issue which primarily affects drivers who sit close to the steering wheel, during internal testing it

25

26 ―――――――――――――
  [77] *See* GM Notice to NHTSA dated April 9, 2014.

27  [78] Namely, MY 2005-2010 Chevrolet Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.

28  [79] GM Notice to NHTSA dated April 9, 2014, at 1.

1    conducted following its massive ignition switch recall earlier this year.  GM knows of three crashes

2    that resulted in four minor injuries attributed to this defect.

3        **9.    The ignition key defect.**

4        146.    On June 16, 2014, GM announced a recall of 3.36 million cars due to a problem

5    with keys that can turn off ignitions and deactivate air bags, a problem similar to the ignition

6    switch defects in the 2.19  million cars recalled earlier in the year.

7        147.    The company said that keys laden with extra weight – such as additional keys or

8    objects attached to a key ring – could inadvertently switch the vehicle's engine off if the car struck

9    a pothole or crossed railroad tracks.

10        148.    GM said it was aware of eight accidents and six injuries related to the defect.

11        149.    As early as December 2000, drivers of the Chevrolet Impala and the other newly

12    recalled cars began lodging complaints about stalling with the National Highway Traffic Safety

13    Administration.  "When foot is taken off accelerator, car will stall without warning," one driver of

14    a 2000 Cadillac Deville told regulators in December 2000.  "Complete electrical system and engine

15    shutdown while driving," another driver of the same model said in January 2001.  "Happened three

16    different times to date.  Dealer is unable to determine cause of failure."

17        150.    The vehicles covered include the Buick Lacrosse, model years 2005-09; Chevrolet

18    Impala, 2006-14; Cadillac Deville, 2000-05; Cadillac DTS, 2004-11; Buick Lucerne, 2006-11;

19    Buick Regal LS and RS, 2004-05; and Chevrolet Monte Carlo, 2006-08.

20        **10.    At least 26 other defects were revealed by GM in recalls during the first half of 2014.**

21

22        151.    The nine defects discussed above – and the resultant 12 recalls – are but a subset of

23    the 40 recalls ordered by GM in connection with 35 separate defects during the first five and one-

24    half months of 2014.  The additional 26 defects are briefly summarized in the following

25    paragraphs.

26        152.    **Transmission oil cooler line defect:**  On March 31, 2014, GM recalled 489,936

27    MY 2014 Chevy Silverado, 2014 GMC Sierra, 2014 GMC Yukon, 2014 GMC Yukon XL, 2015

28    Chevy Tahoe, and 2015 Chevy Suburban vehicles.  These vehicles may have transmission oil

1  cooler lines that are not securely seated in the fitting.  This can cause transmission oil to leak from

2  the fitting, where it can contact a hot surface and cause a vehicle fire.

3       153.    **Power management mode software defect:**  On January 13, 2014, GM recalled

4  324,970 MY 2014 Chevy Silverado and GMC Sierra Vehicles.  When these vehicles are idling in

5  cold temperatures, the exhaust components can overheat, melt nearby plastic parts, and cause an

6  engine fire.

7       154.    **Substandard front passenger airbags:**  On March 17, 2014, GM recalled 303,013

8  MY 2009-2014 GMC Savana vehicles.  In certain frontal impact collisions below the air bag

9  deployment threshold in these vehicles, the panel covering the airbag may not sufficiently absorb

10  the impact of the collision.  These vehicles therefore do not meet the requirements of Federal

11  Motor Vehicle Safety Standard number 201, "Occupant Protection in Interior Impact."

12       155.    **Light control module defect**:  On May 16, 2014, GM recalled 218,214 MY 2004-

13  2008 Chevrolet Aveo (subcompact) and 2004-2008 Chevrolet Optra (subcompact) vehicles.  In

14  these vehicles, heat generated within the light control module in the center console in the

15  instrument panel may melt the module and cause a vehicle fire.

16       156.    **Front axle shaft defect:**  On March 28, 2014, GM recalled 174,046 MY 2013-2014

17  Chevrolet Cruze vehicles.  In these vehicles, the right front axle shaft may fracture and separate. If

18  this happens while the vehicle is being driven, the vehicle will lose power and coast to a halt.  If a

19  vehicle with a fractured shaft is parked and the parking brake is not applied, the vehicle may move

20  unexpectedly which can lead to accident and injury.

21       157.    **Brake boost defect:**  On May 13, 2014, GM recalled 140,067 MY 2014 Chevrolet

22  Malibu vehicles.  The "hydraulic boost assist" in these vehicles may be disabled; when that

23  happens, slowing or stopping the vehicle requires harder brake pedal force, and the vehicle will

24  travel a greater distance before stopping.  Therefore, these vehicles do not comply with Federal

25  Motor Vehicle Safety Standard number 135, "Light Vehicle Brake Systems," and are at increased

26  risk of collision.

27       158.    **Low beam headlight defect**:  On May 14, 2014, GM recalled 103,158 MY 2005-

28  2007 Chevrolet Corvette vehicles.  In these vehicles, the underhood bussed electrical center

1    (UBEC) housing can expand and cause the headlamp low beam relay control circuit wire to bend.

2    When the wire is repeatedly bent, it can fracture and cause a loss of low beam headlamp

3    illumination.  The loss of illumination decreases the driver's visibility and the vehicle's conspicuity

4    to other motorists, increasing the risk of a crash.

5        159.    **Vacuum line brake booster defect**:  On March 17, 2014, GM recalled 63,903 MY

6    2013-2014 Cadillac XTS vehicles.  In these vehicles, a cavity plug on the brake boost pump

7    connector may dislodge and allow corrosion of the brake booster pump relay connector.  This can

8    have an adverse impact on the vehicle's brakes.

9        160.    **Fuel gauge defect**:  On April 29, 2014, GM recalled 51,460 MY 2014 Chevrolet

10   Traverse, GMC Acadia and Buick Enclave vehicles.  In these vehicles, the engine control module

11   (ECM) software may cause inaccurate fuel gauge readings.  An inaccurate fuel gauge may result in

12   the vehicle unexpectedly running out of fuel and stalling, and thereby increases the risk of accident.

13       161.    **Acceleration defect**:  On April 24, 2014, GM recalled 50,571 MY 2013 Cadillac

14   SRX vehicles.  In these vehicles, there may be a three- to four-second lag in acceleration due to

15   faulty transmission control module programming.  That lag may increase the risk of a crash.

16       162.    **Flexible flat cable airbag defect**:  On April 9, 2014, GM recalled 23,247 MY

17   2009-2010 Pontiac Vibe vehicles.  These vehicles are susceptible to a failure in the Flexible Flat

18   Cable ("FFC") in the spiral cable assemble connecting the driver's airbag module.  When the FFC

19   fails, connectivity to the driver's airbag module is lost and the airbag is deactivated.  The resultant

20   failure of the driver's airbag to deploy increases the risk of injury to the driver in the event of a

21   crash.

22       163.    **Windshield wiper defect**:  On May 14, 2014, GM recalled 19,225 MY 2014

23   Cadillac CTS vehicles.  A defect leaves the windshield wipers in these vehicles prone to failure.

24   Inoperative windshield wipers can decrease the driver's visibility and increase the risk of a crash.

25       164.    **Brake rotor defect**:  On May 7, 2014, GM recalled 8,208 MY 2014 Chevrolet

26   Malibu and Buick LaCrosse vehicles.  In these vehicles, GM may have accidentally installed rear

27   brake rotors on the front brakes.  The rear rotors are thinner than the front rotors, and the use of

28   rear rotors in the front of the vehicle may result in a front brake pad detaching from the caliper.

1    The detachment of a break pad from the caliper can cause a sudden reduction in braking which

2    lengthens the distance required to stop the vehicle and increases the risk of a crash.

3        165.    **Passenger-side airbag defect**:  On May 16, 2014, GM recalled 1,402 MY 2015

4    Cadillac Escalade vehicles.  In these vehicles, the airbag module is secured to a chute adhered to

5    the backside of the instrument panel with an insufficiently heated infrared weld.  As a result, the

6    front passenger-side airbag may only partially deploy in the event of crash, and this will increase

7    the risk of occupant injury.  These vehicles do not conform to Federal Motor Vehicle Safety

8    Standard number 208, "Occupant Crash Protection."

9        166.    **Electronic stability control defect**:  On March 26, 2014, GM recalled 656 MY

10    2014 Cadillac ELR vehicles.  In these vehicles, the electronic stability control (ESC) system

11    software may inhibit certain ESC diagnostics and fail to alert the driver that the ESC system is

12    partially or fully disabled.  Therefore, these vehicles fail to conform to Federal Motor Vehicle

13    Safety Standard number 126, "Electronic Stability Control Systems."  A driver who is not alerted

14    to an ESC system malfunction may continue driving with a disabled ESC system.  That may result

15    in the loss of directional control, greatly increasing the risk of a crash.

16        167.    **Steering tie-rod defect**:  On May 13, 2014, GM recalled 477 MY 2014 Chevrolet

17    Silverado, 2014 GMC Sierra and 2015 Chevrolet Tahoe vehicles.  In these vehicles, the tie-rod

18    threaded attachment may not be properly tightened to the steering gear rack.  An improperly

19    tightened tie-rod attachment may allow the tie-rod to separate from the steering rack and result in a

20    loss of steering that greatly increases the risk of a vehicle crash.

21        168.    **Automatic transmission shift cable adjuster**:  On February 20, 2014, GM recalled

22    352 MY 2014 Buick Enclave, Buick LaCrosse, Buick Regal, Verano, Chevrolet Cruze, Chevrolet

23    Impala, Chevrolet Malibu, Chevrolet Traverse, and GMC Acadia vehicles.  In these vehicles, the

24    transmission shift cable adjuster may disengage from the transmission shift lever.  When that

25    happens, the driver may be unable to shift gears, and the indicated gear position may not be

26    accurate.  If the adjuster is disengaged when the driver attempts to stop and park the vehicle, the

27    driver may be able to shift the lever to the "PARK" position but the vehicle transmission may not

28

1   be in the "PARK" gear position.  That creates the risk that the vehicle will roll away as the driver

2   and other occupants exit the vehicle, or anytime thereafter.

3        169.    **Fuse block defect**:  On May 19, 2014, GM recalled 58 MY 2015 Chevrolet

4   Silverado HD and GMC Sierra HD vehicles.  In these vehicles, the retention clips that attach the

5   fuse block to the vehicle body can become loose allowing the fuse block to move out of position.

6   When this occurs, exposed conductors in the fuse block may contact the mounting studs or other

7   metallic components, which in turn causes a "short to ground" event.  That can result in in an

8   arcing condition, igniting nearby combustible materials and starting an engine compartment fire.

9        170.    **Diesel transfer pump defect**:  On April 24, 2014, GM recalled 51 MY 2014 GMC

10  Sierra HD and 2015 Chevrolet Silverado HD vehicles.  In these vehicles, the fuel pump

11  connections on both sides of the diesel fuel transfer pump may not be properly torqued.  That can

12  result in a diesel fuel leak, which can cause a vehicle fire.

13       171.    **Base radio defect**:  On June 5, 2014, GM recalled 57,512 MY 2014 Chevrolet

14  Silverado LD, 2014 GMC Sierra LD and model year 2015 Silverado HD, Tahoe and Suburban and

15  2015 GMC Sierra HD and Yukon and Yukon XL vehicles because the base radio may not work.

16  The faulty base radio prevents audible warnings if the key is in the ignition when the driver's door

17  is open, and audible chimes when a front seat belt is not buckled.  Vehicles with the base radio

18  defect are out of compliance with motor vehicle safety standards covering theft protection,

19  rollaway protection and occupant crash protection.

20       172.    **Shorting bar defect:**  On June 5, 2014, GM recalled 31,520 MY 2012 Buick

21  Verano and Chevrolet Camaro, Cruze, and Sonic compact cars for a defect in which the shorting

22  bar inside the dual stage driver's air bag may occasionally contact the air bag terminals.  If contact

23  occurs, the air bag warning light will illuminate.  If the car and terminals are contacting each other

24  in a crash, the air bag will not deploy.  GM admits awareness of one crash with an injury where the

25  relevant diagnostic trouble code was found at the time the vehicle was repaired.  GM is aware of

26  other crashes where air bags did not deploy but it does not know if they were related to this

27  condition.  GM conducted two previous recalls for this condition involving 7,116 of these vehicles

28  with no confirmed crashes in which this issue was involved.

173.    **Front passenger airbag end cap defect**:  On June 5, 2014, GM recalled 61 model year 2013-2014 Chevrolet Spark and 2013 model year Buick Encore vehicles manufactured in Changwon, Korea from December 30, 2012 through May 8, 2013 because the vehicles may have a condition in which the front passenger airbag end cap could separate from the airbag inflator. In a crash, this may prevent the passenger airbag from deploying properly.

174.    **Sensing and Diagnostic Model ("SDM") defect:**  On June 5, 2014, GM recalled 33 model year 2014 Chevrolet Corvettes in the U.S. because an internal short-circuit in the sensing and diagnostic module (SDM) could disable frontal air bags, safety belt pretensioners and the Automatic Occupancy Sensing module.

175.    **Sonic Turbine Shaft:**  On June 11, 2014, GM recalled 21,567 Chevrolet Sonics due to a transmission turbine shaft that can malfunction.

176.    **Electrical System defect:**  On June 11, 2014, GM recalled 14,765 model year 2014 Buick LaCrosse sedans because a wiring splice in the driver's door can corrode and break, cutting power to the windows, sunroof, and door chime under certain circumstances.

177.    **Seatbelt Tensioning System defect:**  On June 11, 2014, GM recalled 8,789 model year 2004-11 Saab 9-3 convertibles because a cable in the driver's seatbelt tensioning system can break.

178.    In light of GM's history of concealing known defects, there is little reason to think that either GM's recalls have fully addressed the 35 recently revealed defects or that GM has addressed each defect of which it is or should be aware.

**B.    GM Valued Cost-Cutting Over Safety, and Actively Encouraged Employees to Conceal Safety Issues.**

179.    Recently revealed information presents a disturbing picture of GM's approach to safety issues – both in the design and manufacture stages, and in discovering and responding to defects in GM-branded vehicles that have already been sold.

180.    GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its

employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

181.     One "directive" at GM was "cost is everything."[80] The messages from top leadership at GM to employees, as well as their actions, were focused on the need to control cost.[81]

182.     One GM engineer stated that emphasis on cost control at GM "permeates the fabric of the whole culture.'"[82]

183.     According to Mark Reuss (President of GMNA from 2009-2013 before succeeding Mary Barra as Executive Vice President for Global Product Development, Purchasing and Supply Chain in 2014), cost and time-cutting principles known as the "Big 4" at GM "emphasized timing over quality."[83]

184.     GM's focus on cost-cutting created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred cost and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.[84]

185.     As another cost-cutting measure, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[85]

186.     Because of GM's focus on cost-cutting, GM Engineers did not believe they had extra funds to spend on product improvements.[86]

187.     GM's focus on cost-cutting also made it harder for GM personnel to discover safety defects, as in the case of the "TREAD Reporting team."

---

[80] GM Report at 249.

[81] GM Report at 250.

[82] GM Report at 250.

[83] GM Report at 250.

[84] GM Report at 250.

[85] GM Report at 251.

[86] GM Report at 251.

1       188.    GM used its TREAD database (known as "TREAD") to store the data required to be

2   reported quarterly to NHTSA under the TREAD Act.[87]  From the date of its inception in 2009,

3   TREAD has been the principal database used by GM to track incidents related to its vehicles.[88]

4       189.    From 2003-2007 or 2008, the TREAD Reporting team had eight employees, who

5   would conduct monthly searches and prepare scatter graphs to identify spikes in the number of

6   accidents or complaints with respect to various GM-branded vehicles.  The TREAD Reporting

7   team reports went to a review panel and sometimes spawned investigations to determine if any

8   safety defect existed.[89]

9       190.    In or around 2007-08, Old GM reduced the TREAD Reporting team from eight to

10  three employees, and the monthly data mining process pared down.[90]  In 2010, GM restored two

11  people to the team, but they did not participate in the TREAD database searches.[91]  Moreover, until

12  2014, the TREAD Reporting team did not have sufficient resources to obtain any of the advanced

13  data mining software programs available in the industry to better identify and understand potential

14  defects.[92]

15      191.    By starving the TREAD Reporting team of the resources it needed to identify

16  potential safety issues, GM helped to insure that safety issues would not come to light.

17      192.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."

18  The culture, atmosphere and supervisor response at GM "discouraged individuals from raising

19  safety concerns."[93]

20      193.    GM CEO Mary Barra experienced instances where GM engineers were "unwilling

21  to identify issues out of concern that it would delay the launch" of a vehicle.[94]

22

23      [87] GM Report at 306.

24      [88] GM Report at 306.

25      [89] GM Report at 307.
        [90] GM Report at 307.

26      [91] GM Report at 307-308.

27      [92] GM Report at 208.
        [93] GM Report at 252.

28      [94] GM Report at 252.

1         194.     GM supervisors warned employees to "never put anything above the company" and
2  "never put the company at risk."[95]

3         195.     GM "pushed back" on describing matters as safety issues and, as a result, "GM
4  personnel failed to raise significant issues to key decision-makers." [96]

5         196.     So, for example, GM discouraged the use of the word "stall" in Technical Service
6  Bulletins ("TSBs") it sometimes sent to dealers about issues in GM-branded vehicles.  According
7  to Steve Oakley, who drafted a TSB in connection with the ignition switch defects, "the term 'stall'
8  is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about
9  vehicle safety, which suggests GM should recall the vehicle, not issue a bulletin."[97]  Other GM
10  personnel confirmed Oakley on this point, stating that "there was concern about the use of 'stall' in
11  a TSB because such language might draw the attention of NHTSA."[98]

12         197.     Oakley further noted that "he was reluctant to push hard on safety issues because of
13  his perception that his predecessor had been pushed out of the job for doing just that."[99]

14         198.     Many GM employees "did not take notes at all at critical safety meetings because
15  they believed GM lawyers did not want such notes taken." [100]

16         199.     A GM training document released by NHTSA as an attachment to its Consent Order
17  sheds further light on the lengths to which GM went to ensure that known defects were concealed.
18  It appears that the defects were concealed pursuant to a company policy GM inherited from Old
19  GM.

20         200.     The document consists of slides from a 2008 Technical Learning Symposium for
21  "designing engineers," "company vehicle drivers," and other employees at Old GM.  On
22  information and belief, the vast majority of employees who participated in this webinar
23  presentation continued on in their same positions at GM after July 10, 2009.

24
     [95] GM Report at 252-253.
25     [96] GM Report at 253.
26     [97] GM Report at 92.
     [98] GM Report at 93.
27     [99] GM Report at 93.
28     [100] GM Report at 254.

1      201.    The presentation focused on recalls, and the "reasons for recalls."

2      202.    One major component of the presentation was captioned "Documentation

3   Guidelines," and focused on what employees should (and should not say) when describing

4   problems in vehicles.

5      203.    Employees were instructed to "[w]rite smart," and to "[b]e factual, not fantastic" in

6   their writing.

7      204.    Company vehicle drivers were given examples of comments to avoid, including the

8   following:  "This is a safety and security issue"; "I believe the wheels are too soft and weak and

9   could cause a serious problem"; and "Dangerous … almost caused accident."

10     205.    In documents used for reports and presentations, employees were advised to avoid a

11   long list of words, including: "bad," "dangerous," "defect," "defective," "failed," "flawed," "life-

12   threatening," "problem," "safety," "safety-related," and "serious."

13     206.    In truly Orwellian fashion, the Company advised employees to use the words (1)

14   "Issue, Condition [or] Matter" instead of "Problem"; (2) "Has Potential Safety Implications"

15   instead of "Safety"; (3) "Broke and separated 10 mm" instead of "Failed"; (4)

16   "Above/Below/Exceeds Specification" instead of "Good [or] Bad"; and (5) "Does not perform to

17   design" instead of "Defect/Defective."

18     207.    As NHTSA's Acting Administrator Friedman noted at the May 16, 2014 press

19   conference announcing the Consent Order concerning the ignition switch defect, it was GM's

20   company policy to avoid using words that might suggest the existence of a safety defect:

21          GM must rethink the corporate philosophy reflected in the
22          documents we reviewed, including training materials that explicitly
            discouraged employees from using words like 'defect,' 'dangerous,'
            'safety related,' and many more essential terms for engineers and
23          investigators to clearly communicate up the chain when they suspect
            a problem.
24

25     208.    GM appears to have trained its employees to conceal the existence of known safety

     defects from consumers and regulators.  Indeed, it is nearly impossible to convey the potential
26
     existence of a safety defect without using the words "safety" or "defect" or similarly strong
27
     language that was verboten at GM.
28

1    209. So institutionalized at GM was the "phenomenon of avoiding responsibility" that

2 the practice was given a name: "the 'GM salute,'" which was "a crossing of the arms and pointing

3 outward towards others, indicating that the responsibility belongs to someone else, not me."[101]

4    210. CEO Mary Barra described a related phenomenon , "known as the 'GM nod," which

5 was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with

6 no intention to follow through, and the nod is an empty gesture."[102]

7    211. According to the GM Report prepared by Anton R. Valukas, part of the failure to

8 properly correct the ignition switch defect was due to problems with GM's organizational

9 structure.[103] Part of the failure to properly correct the ignition switch defect was due to a corporate

10 culture that did not care enough about safety.[104] Part of the failure to properly correct the ignition

11 switch defect was due to a lack of open and honest communication with NHTSA regarding safety

12 issues.[105] Part of the failure to properly correct the ignition switch defect was due to improper

13 conduct and handling of safety issues by lawyers within GM's Legal Staff.[106] On information and

14 belief, all of these issues also helped cause the concealment of and failure to remedy the many

15 defects that have led to the spate of recalls in the first half of 2014.

16 **C.** **The Ignition Switch Defects Have Harmed Consumers in Orange County and the State**

17

18    212. GM's unprecedented concealment of a large number of serious defects, and its

19 irresponsible approach to safety issues, has caused damage to consumers in Orange County and

20 throughout California.

21    213. A vehicle made by a reputable manufacturer of safe and reliable vehicles who

22 stands behind its vehicles after they are sold is worth more than an otherwise similar vehicle made

23

24 —————————————

25 [101] GM Report at 255.

 [102] GM Report at 256.

26 [103] GM Report at 259-260.

27 [104] GM Report at 260-261.

 [105] GM Report at 263.

28 [106] GM Report at 264.

by a disreputable manufacturer known for selling defective vehicles and for concealing and failing to remedy serious defects after the vehicles are sold.

214.    A vehicle purchased or leased under the reasonable assumption that it is safe and reliable is worth more than a vehicle of questionable safety and reliability due to the manufacturer's recent history of concealing serious defects from consumers and regulators.

215.    Purchasers and lessees of new and used GM-branded vehicles after the July 10, 2009, inception of GM paid more for the vehicles than they would have had GM disclosed the many defects it had a duty to disclose in GM-branded vehicles.  Because GM concealed the defects and the fact that it was a disreputable brand that valued cost-cutting over safety, these consumers did not receive the benefit of their bargain.  And the value of all their vehicles has diminished as the result of GM's deceptive conduct.

216.    If GM had timely disclosed the many defects as required by the TREAD Act and California law, California vehicle owners' GM-branded vehicles would be considerably more valuable than they are now.  Because of GM's now highly publicized campaign of deception, and its belated, piecemeal and ever-expanding recalls, so much stigma has attached to the GM brand that no rational consumer would pay what otherwise have been fair market value for GM-branded vehicles.

**D.    Given GM's Knowledge of the Defects and the Risk to Public Safety, it Was Obliged to Promptly Disclose and Remedy the Defects.**

217.    The National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") requires manufacturers of motor vehicles and motor vehicle equipment to submit certain information to the National Highway Traffic Safety Administration (NHTSA) in order "to reduce traffic accidents and deaths and injuries resulting from traffic accidents."  49 U.S.C. § 30101 *et. seq*.

218.    Under the Safety Act, the manufacturer of a vehicle has a duty to notify dealers and purchasers of a safety defect and remedy the defect without charge.  49 U.S.C. § 30118.  In November 2000, Congress enacted the Transportation Recall Enhancement, Accountability and Documentation (TREAD) Act, 49 U.S.C. §§ 30101-30170, which amended the Safety Act and

1    directed the Secretary of Transportation to promulgate regulation expanding the scope of the

2    information that manufacturers are required to submit to NHTSA.

3        219.    The Safety Act requires manufacturers to inform NHTSA within five days of

4    discovering a defect.  49 CFR § 573.6 provides that a manufacturer "shall furnish a report to the

5    NHTSA for each defect in his vehicles or in his items of original or replacement equipment that he

6    or the Administrator determines to be related to motor vehicle safety, and for each noncompliance

7    with a motor vehicle safety standard in such vehicles or items of equipment which either he or the

8    Administrator determines to exist," and that such reports must include, among other

9    things:  identification of the vehicles or items of motor vehicle equipment potentially containing

10   the defect or noncompliance, including a description of the manufacturer's basis for its

11   determination of the recall population and a description of how the vehicles or items of equipment

12   to be recalled differ from similar vehicles or items of equipment that the manufacturer has not

13   included in the recall; in the case of passenger cars, the identification shall be by the make, line,

14   model year, the inclusive dates (month and year) of manufacture, and any other information

15   necessary to describe the vehicles; a description of the defect or noncompliance, including both a

16   brief summary and a detailed description, with graphic aids as necessary, of the nature and physical

17   location (if applicable) of the defect or noncompliance; a chronology of all principal events that

18   were the basis for the determination that the defect related to motor vehicle safety, including a

19   summary of all warranty claims, field or service reports, and other information, with their dates of

20   receipt; a description of the manufacturer's program for remedying the defect or noncompliance;

21   and a plan for reimbursing an owner or purchaser who incurred costs to obtain a remedy for the

22   problem addressed by the recall within a reasonable time in advance of the manufacturer's

23   notification of owners, purchasers and dealers.

24       220.    Manufacturers are also required to submit "early warning reporting" (EWR) data

25   and information that may assist the agency in identifying safety defects in motor vehicles or motor

26   vehicle equipment.  *See* 49 U.S.C. § 30166(m)(3)(B).  The data submitted to NHTSA under the

27   EWR regulation includes:  production numbers (cumulative total of vehicles or items of equipment

28   manufactured in the year); incidents involving death or injury based on claims and notices received

1    by the manufacturer; claims relating to property damage received by the manufacturer; warranty

2    claims paid by the manufacturer (generally for repairs on relatively new products) pursuant to a

3    warranty program (in the tire industry these are warranty adjustment claims); consumer complaints

4    (a communication by a consumer to the manufacturer that expresses dissatisfaction with the

5    manufacturer's product or performance of its product or an alleged defect); and field reports

6    (prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack

7    of durability or other performance problem of a motor vehicle or item of motor vehicle equipment).

8    221.    Regulations promulgated under the TREAD Act also require manufacturers to

9    inform NHTSA of defects and recalls in motor vehicles in foreign countries.  Under 49 CFR §§

10    579.11 and 579.12 a manufacturer must report to NHTSA not later than five working days after a

11    manufacturer determines to conduct a safety recall or other safety campaign in a foreign country

12    covering a motor vehicle sold or offered for sale in the United States.  The report must include,

13    among other things:  a description of the defect or noncompliance, including both a brief summary

14    and a detailed description, with graphic aids as necessary, of the nature and physical location (if

15    applicable) of the defect or noncompliance; identification of the vehicles or items of motor vehicle

16    equipment potentially containing the defect or noncompliance, including a description of the

17    manufacturer's basis for its determination of the recall population and a description of how the

18    vehicles or items of equipment to be recalled differ from similar vehicles or items of equipment

19    that the manufacturer has not included in the recall; the manufacturer's program for remedying the

20    defect or noncompliance, the date of the determination and the date the recall or other campaign

21    was commenced or will commence in each foreign country; and identify all motor vehicles that the

22    manufacturer sold or offered for sale in the United States that are identical or substantially similar

23    to the motor vehicles covered by the foreign recall or campaign.

24    222.    49 CFR § 579.21 requires manufacturers to provide NHTSA quarterly field reports

25    related to the current and nine preceding model years regarding various systems, including, but not

26    limited to, vehicle speed control.  The field reports must contain, among other things:  a report on

27    each incident involving one or more deaths or injuries occurring in the United States that is

28    identified in a claim against and received by the manufacturer or in a notice received by the

1    manufacturer which notice alleges or proves that the death or injury was caused by a possible

2    defect in the manufacturer's vehicle, together with each incident involving one or more deaths

3    occurring in a foreign country that is identified in a claim against and received by the manufacturer

4    involving the manufacturer's vehicle, if that vehicle is identical or substantially similar to a vehicle

5    that the manufacturer has offered for sale in the United States, and any assessment of an alleged

6    failure, malfunction, lack of durability, or other performance problem of a motor vehicle or item of

7    motor vehicle equipment (including any part thereof) that is originated by an employee or

8    representative of the manufacturer and that the manufacturer received during a reporting period.

9        223.    GM has known throughout the liability period that many GM-branded vehicles sold

10    or leased in the State of California were defective – and, in many cases, dangerously so.

11        224.    Since the date of GM's inception, many people have been injured or died in

12    accidents relating to the ignition switch defects alone.  While the exact injury and death toll is

13    unknown, as a result of GM's campaign of concealment and suppression of the large number of

14    defects plaguing over 17 million GM-branded vehicles, numerous other drivers and passengers of

15    the Defective Vehicles have died or suffered serious injuries and property damage.  All owners and

16    lessees of GM-branded vehicles have suffered economic damage to their property due to the

17    disturbingly large number of recently revealed defects that were concealed by GM.  Many are

18    unable to sell or trade their cars, and many are afraid to drive their cars.

19    **E.    GM's Misrepresentations and Deceptive, False, Untrue and Misleading Advertising,
         Marketing and Public Statements**

20        225.    Despite its knowledge of the many serious defects in millions of GM-branded

21    vehicles, GM continued to (1) sell new Defective Vehicles; (2) sell used Defective Vehicles as

22    "GM certified"; and (3) use defective ignition switches to repair GM vehicles, all without

23    disclosing or remedying the defects.  As a result, the injury and death toll associated with the

24    Defective Vehicles has continued to increase and, to this day, GM continues to conceal and

25    suppress this information.

26        226.    During this time period, GM falsely assured California consumers in various written

27    and broadcast statements that its cars were safe and reliable, and concealed and suppressed the true

28

1    facts concerning the many defects in millions of GM-branded vehicles, and GM's policies that led

2    to both the manufacture of an inordinate number of vehicles with safety defects and the subsequent

3    concealment of those defects once the vehicles are on the road.  To this day, GM continues to

4    conceal and suppress information about the safety and reliability of its vehicles.

5          227.    Against this backdrop of fraud and concealment, GM touted its reputation for safety

6    and reliability, and knew that people bought and retained its vehicles because of that reputation,

7    and yet purposefully chose to conceal and suppress the existence and nature of the many safety

8    defects.  Instead of disclosing the truth about the dangerous propensity of the Defective Vehicles

9    and GM's disdain for safety, California consumers were given assurances that their vehicles were

10    safe and defect free, and that the Company stands behind its vehicles after they are on the road.

11          228.    GM has consistently marketed its vehicles as "safe" and proclaimed that safety is

12    one of its highest priorities.

13          229.    It told consumers that it built the world's best vehicles:

> We truly are building a new GM, from the inside out. Our vision is clear: to design, build and sell the world's best vehicles, and we have a new business model to bring that vision to life. We have a lower cost structure, a stronger balance sheet and a dramatically lower risk profile. We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce.

> "Our plan is to steadily invest in creating world-class vehicles, which will continuously drive our cycle of great design, high quality and higher profitability."

20          230.    It represented that it was building vehicles with design excellence, quality and

21    performance:

> And across the globe, other GM vehicles are gaining similar acclaim for design excellence, quality and performance, including the Holden Commodore in Australia.  Chevrolet Agile in Brazil, Buick LaCrosse in China and many others.

> The company's progress is early evidence of a new business model that begins and ends with great vehicles.  We are leveraging our global resources and scale to maintain stringent cost management while taking advantage of growth and revenue opportunities around the world, to ultimately deliver sustainable results for all of our shareholders.

231.    The theme below was repeated in advertisements, company literature, and material at dealerships as the core message about GM's Brand:

The new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity and streamlined, more efficient inventory processes. The end result is products that delight customers and generate higher volumes and margins— and ultimately deliver more cash to invest in our future vehicles.

# A New Vision,
## a New Business Model

Our vision is simple, straightforward and clear: to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently

and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

232.   It represented that it had a world-class lineup in North America:








**Chevrolet Equinox**
The Chevrolet Equinox delivers best-in-segment 32-mpg highway fuel economy in a sleek, roomy new package. With the success of the Equinox and other strong-selling crossovers, GM leads the U.S. industry in total unit sales for the segment.

**Chevrolet Sonic**
Stylish four-door sedan and sporty five-door hatchback versions of the Chevrolet Sonic will be in U.S. showrooms in fall 2011. Currently the only small car built in the United States, it will be sold as the Aveo in other parts of the world.

**Buick LaCrosse**
Buick builds on the brand's momentum in the United States and China with the fuel-efficient LaCrosse. With eAssist technology, the LaCrosse achieves an expected 37 mpg on the highway.

**Buick Verano**
The all-new Buick Verano, which will be available in late 2011, appeals to customers in the United States, Canada and Mexico who want great fuel economy and luxury in a smaller but premium package.



233.    It boasted of its new "culture":



234.    In its 2012 Annual Report, GM told the world the following about its brand:

What is immutable is our focus on the customer, which requires us to go from "good" today to "great" in everything we do, including product design, initial quality, durability and service after the sale.

235.    GM also indicated it had changed its structure to create more "accountability" which, as shown above, was a blatant falsehood:

That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for produce execution, profitability and customer satisfaction.

236.    And GM represented that product quality was a key focus – another blatant falsehood:

Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.

237.    In its 2013 Letter to Stockholders GM noted that its brand had grown in value and boasted that it designed the "World's Best Vehicles":

Dear Stockholder:

Your company is on the move once again.  While there were highs and lows in 2011, our overall report card shows very solid marks, including record net income attributable to common stockholders of $7.6 billion and EBIT-adjusted income of $8.3 billion.

- GM's overall momentum, including a 13 percent sales increase in the United States, created new jobs and drove investments.  We have announced investments in 29 U.S. facilities totaling more than $7.1 billion since July 2009, with more than 17,500 jobs created or retained.

Design, Build and Sell the World's Best Vehicles

This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define.  It means creating vehicles that people desire, value and are proud to own. When we get this right, it transforms our reputation and the company's bottom line.

Strengthen Brand Value

Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth. They are Chevrolet, which embodies the qualities of value, reliability, performance and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful.  At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.

Each day the cultural change underway at GM becomes more striking.  The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.

1        That's the crux of our plan.  The plan is something we can control.
         We like the results we're starting to see and we're going to stick to
2        it – always.

3        238.    Once it emerged from bankruptcy, GM told the world it was a new and improved

4   company:



239.    A radio ad that ran from GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

240.    An online ad for "GM certified" used vehicles that ran from July 6, 2009 until April 5, 2010, stated that "GM certified means no worries."

241.    GM's Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "[a]s long as there are babies, there'll be Chevys to bring them home."

242.    Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

243.    An online national ad campaign for GM in April of 2012 stressed "Safety. Utility. Performance."

244.    A national print ad campaign in April of 2013 states that "[w]hen lives are on the line, you need a dependable vehicle you can rely on.  Chevrolet and GM … for power, performance and safety."

245.    A December 2013 GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

246.    GM's website, GM.com, states:

> Innovation:  Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification.  Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive.  Our engineers thoroughly test our vehicles for durability, comfort and noise minimization before you think about them.  The same quality process ensures our safety technology performs when you need it.

247.    On February 25, 2014, GM North America President Alan Batey publically stated: "Ensuring our customers' safety is our first order of business.  We are deeply sorry and we are working to address this issue as quickly as we can."

248.    These proclamations of safety and assurances that GM's safety technology performs when needed were false and misleading because they failed to disclose the dangerous defects in millions of GM-branded vehicles, and the fact GM favored cost-cutting and concealment over safety.  GM knew or should have known that its representations were false and misleading.

249.    GM continues to make misleading safety claims in public statements, advertisements, and literature provided with its vehicles.

250.    GM violated California law in failing to disclose and in actively concealing what it knew regarding the existence of the defects, despite having exclusive knowledge of material facts not known to the Plaintiff or to California consumers, and by making partial representations while at the same time suppressing material facts.  *LiMandri v. Judkins* (1997) 52 Cal. App. 4th 326, 337, 60 Cal. Rptr. 2d 539.  In addition, GM had a duty to disclose the information that it knew about the defects because such matters directly involved matters of public safety.

251.    GM violated California law in failing to conduct an adequate retrofit campaign (*Hernandez v. Badger Construction Equip. Co.* (1994) 28 Cal. App. 4th 1791, 1827), and in failing to retrofit the Defective Vehicles and/or warn of the danger presented by the defects after becoming aware of the dangers after their vehicles had been on the market (*Lunghi v. Clark Equip. Co.* (1984) 153 Cal. App. 3d 485; *Balido v. Improved Machinery, Inc.* (1972) 29 Cal. App. 3d 633).

252.    GM also violated the TREAD Act, and the regulations promulgated under the Act, when it failed to timely inform NHTSA of the defects and allowed cars to remain on the road with these defects. By failing to disclose and actively concealing the defects, by selling new Defective Vehicles and used "GM certified" Defective Vehicles without disclosing or remedying the defects, and by using defective ignition switches for "repairs,"  GM engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.*, including (1) representing that GM vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that new Defective Vehicles and ignition switches and used "GM certified" vehicles are of a particular standard, quality, and grade when they are not; (3) advertising GM vehicles with the intent not to sell them as advertised; (4) representing that the subjects of transactions involving GM

1    vehicles have been supplied in accordance with a previous representation when they have not; and

2    (5) selling Defective Vehicles in violation of the TREAD Act.

3    **VI.    CAUSES OF ACTION**

4    **FIRST CAUSE OF ACTION**

5    **VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200**

6    253.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

7    254.    GM has engaged in, and continues to engage in, acts or practices that constitute

8    unfair competition, as that term is defined in section 17200 of the California Business and

9    Professions Code.

10    255.    GM has violated, and continues to violate, Business and Professions Code section

11    17200 through its unlawful, unfair, fraudulent, and/or deceptive business acts and/or practices.

12    GM uniformly concealed, failed to disclose, and omitted important safety-related material

13    information that was known only to GM and that could not reasonably have been discovered by

14    California consumers.  Based on GM's concealment, half-truths, and omissions, California

15    consumers agreed to purchase or lease one or more (i) new or used GM vehicles sold on or after

16    July 10, 2009; (ii) "GM certified" Defective Vehicles sold on or after July 10, 2009; (iii) and/or to

17    have their vehicles repaired using GM's defective ignition switches.  GM also repeatedly and

18    knowingly made untrue and misleading statements in California regarding the purported reliability

19    and safety of its vehicles, and the importance of safety to the Company.  The true information

20    about the many serious defects in GM-branded vehicles, and GM's disdain for safety, was known

21    only to GM and could not reasonably have been discovered by California consumers.

22    256.    As a direct and proximate result of GM's concealment and failure to disclose the

23    many defects and the Company's institutionalized devaluation of safety, GM intended that

24    consumers would be misled into believing that that GM was a reputable manufacturer of reliable

25    and safe vehicles when in fact GM was an irresponsible manufacture of unsafe, unreliable  and

26    often dangerously defective vehicles.

27

28

**UNLAWFUL**

257.    The unlawful acts and practices of GM alleged above constitute unlawful business acts and/or practices within the meaning of California Business and Professions Code section 17200.  GM's unlawful business acts and/or practices as alleged herein have violated numerous federal, state, statutory, and/or common laws – and said predicate acts are therefore per se violations of section 17200.  These predicate unlawful business acts and/or practices include, but are not limited to, the following:  California Business and Professions Code section 17500 (False Advertising), California Civil Code section 1572 (Actual Fraud – Omissions), California Civil Code section 1573 (Constructive Fraud by Omission), California Civil Code section 1710 (Deceit), California Civil Code section 1770 (the Consumers Legal Remedies Act – Deceptive Practices), California Civil Code section 1793.2 *et seq.* (the Consumer Warranties Act), and other California statutory and common law; the National Traffic and Motor Vehicle Safety Act (49 U.S.C. § 30101 *et. seq.*), as amended by the Transportation Recall Enhancement, Accountability and Documentation TREAD Act, (49 U.S.C. §§ 30101-30170) including, but not limited to 49 U.S.C. §§ 30112, 30115, 30118 and 30166, Federal Motor Vehicle Safety Standard 124 (49 C.F.R. § 571.124), and 49 CFR §§ 573.6, 579.11, 579.12, and 579.21.

**UNFAIR**

258.    GM's concealment, omissions, and misconduct as alleged in this action constitute negligence and other tortious conduct and gave GM an unfair competitive advantage over its competitors who did not engage in such practices.  Said misconduct, as alleged herein, also violated established law and/or public policies which seek to promote prompt disclosure of important safety-related information.  Concealing and failing to disclose the nature and extent of the numerous safety defects to California consumers, before (on or after July 10, 2009) those consumers (i) purchased one or more GM vehicles; (ii) purchased used "GM certified" Defective Vehicles; or (iii) had their vehicles repaired with defective ignition switches, as alleged herein, was and is directly contrary to established legislative goals and policies promoting safety and the prompt disclosure of such defects, prior to purchase.  Therefore GM's acts and/or practices alleged herein were and are unfair within the meaning of Business and Professions Code section 17200.

1      259.    The harm to California consumers outweighs the utility, if any, of GM's acts and/or

2 practices as alleged herein. Thus, GM's deceptive business acts and/or practices, as alleged herein,

3 were unfair within the meaning of Business and Professions Code section 17200.

4      260.    As alleged herein, GM's business acts and practices offend established public

5 policies, including, but not limited to, public policies against making partial half-truths and failing

6 to disclose important material facts to consumers.

7      261.    In addition, as alleged herein, GM intended that California consumers would be

8 misled and/or deceived into believing that they would be purchasing a safe and reliable vehicle

9 built by a reputable manufacturer that values safety and stands behind its vehicles after they are

10 sold, when, in fact, they were in many cases obtaining a vehicle that had defects that had the

11 potential to cause serious bodily injury and/or death, and, in every case, obtaining a vehicle made

12 by an irresponsible manufacturer that does not value safety and was concealing myriad known

13 safety defects in millions of GM-branded vehicles. This practice is and was immoral, unethical,

14 oppressive, unscrupulous, or substantially injurious to consumers and thus unfair within the

15 meaning of Business and Professions Code section 17200.

16      262.    At all times relevant, GM's misconduct and omissions alleged herein: (a) caused

17 substantial injury to the Public; (b) had no countervailing benefit to consumers or to competition

18 that could possibly outweigh this substantial injury; and (c) caused injury that could not have been

19 avoided or even discovered by ordinary consumers, because it resulted from GM's concealment,

20 failure to disclose and/or omission of important safety related material information that only the

21 Defendant knew or could have known. Thus, GM's acts and/or practices as alleged herein were

22 unfair within the meaning of Business and Professions Code section 17200.

23                                               **FRAUDULENT**

24      263.    GM's acts and practices, as alleged herein, were likely to, and did, deceive the

25 Public. GM's concealment, material omissions, acts, practices and non-disclosures, as alleged

26 herein, therefore constitute fraudulent business acts and/or practices within the meaning of

27 California Business and Professions Code section 17200.

28

264.    California consumers have been, and continue to be, deceived by GM's concealment and material omissions as alleged herein.  California consumers have suffered injury and lost money as a direct result of the deceptive conduct as alleged herein.  The unlawful, unfair, deceptive, and/or fraudulent business acts and practices of GM, as fully described herein, present a continuing threat to the citizens of California to be misled and/or deceived by GM as alleged herein, and/or to be substantially injured by these dangerously defective cars.

### SECOND CAUSE OF ACTION

### VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500

265.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

266.    California Business and Professions Code § 17500 states: "It is unlawful for any ... corporation ... with intent directly or indirectly to dispose of real or personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, ... or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

267.    GM caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers.

268.    GM has violated section 17500 because the misrepresentations and omissions regarding the safety and reliability of its vehicles and the importance of safety to the Company as set forth in this Complaint were material and likely to deceive a reasonable consumer.

269.    California consumers were exposed to and saw advertisements for GM vehicles on television, in magazines, on billboards, in brochures at dealerships, and on the Internet before purchasing GM vehicles.  Had those advertisements, window stickers, or any other materials disclosed that millions of GM-branded vehicles contained serious safety defects and that GM did

1    not value safety, consumers would not have purchased new GM vehicles on or after July 10, 2009

2    and would not have purchased "GM certified" Defective Vehicles on or after July 10, 2009.

3         270.    Despite notice of the serious safety defects in so many its vehicles, GM did not

4    disclose to consumers that its vehicles – which GM for years had advertised as "safe" and

5    "reliable" – were in fact not as safe or reliable as a reasonable consumer expected due to the risks

6    created by the many known defects, and GM's focus on cost-cutting at the expense of safety and

7    the resultant concealment of numerous safety defects.  GM never disclosed what it knew about the

8    defects.  Rather than disclose the truth, GM concealed the existence of the defects, and claimed to

9    be a reputable manufacturer of safe and reliable vehicles.

10        271.    GM, by the acts and misconduct alleged herein, violated Business & Professions

11   Code section 17500, and GM has engaged in, and continues to engage in, acts or practices that

12   constitute false advertising.

13        272.    GM has violated, and continues to violate, Business and Professions Code section

14   17500 by disseminating untrue and misleading statements as defined by Business and Professions

15   Code 17500.  GM has engaged in acts and practices with intent to induce members of the public to

16   purchase its vehicles by publicly disseminated advertising which contained statements which were

17   untrue or misleading, and which GM knew, or in the exercise of reasonable care should have

18   known, were untrue or misleading, and which concerned the real or personal property or services

19   or their disposition or performance.

20        273.    GM repeatedly and knowingly made untrue and misleading statements in California

21   regarding the purported reliability and safety of its vehicles.  The true information was known only

22   to GM and could not reasonably have been discovered by California consumers.  GM uniformly

23   concealed, failed to disclose and omitted important safety-related material information that was

24   known only to GM and that could not reasonably have been discovered by California consumers.

25   Based on GM's concealment, half-truths, and omissions, California consumers agreed (on or after

26   July 10, 2009) (i) to purchase GM vehicles; (ii) to purchase used "GM certified" Defective

27   Vehicles; and/or (iii) to have their vehicles repaired using defective ignition switches,

28

1    274.    As a direct and proximate result of GM's concealment and failure to disclose the

2  many safety defects, GM intended that consumers would be misled into believing that they would

3  be purchasing a safe and reliable vehicle built by a reputable manufacturer that values safety, when

4  in fact they were purchasing vehicles that were in many cases dangerously defective and were in

5  every case overpriced because they were in fact built by an irresponsible manufacturer that valued

6  cost-cutting over safety and routinely concealed a myriad of serious defects from regulators and the

7  public.

8                              **PRAYER FOR RELIEF**

9            WHEREFORE, Plaintiff prays for judgment against GM as follows:

10            A.    Pursuant to Business and Professions Code sections 17203 and 17535, that GM, its

11  employees, agents, representatives, successors, assigns, and all persons who act in concert with

12  them be permanently enjoined from committing any acts of unfair competition, including the

13  violations alleged herein.

14            B.    Pursuant to Business and Professions Code sections 17206 and 17536, that GM be

15  ordered to pay a civil penalty in the amount of Two Thousand Five Hundred dollars ($2,500.00) for

16  each violation of Business and Professions Code section 17200 and for Five Thousand dollars

17  ($5,000) for each violation of Business and Professions Code section 17500 by GM in an amount

18  according to proof.

19            C.    That Plaintiff recover its costs of suit, including costs of investigation.

20            D.    For reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5,

21  or other applicable law; and

22            E.    For such other equitable relief as is just and proper.

23

24

25

26

27

28

Dated:  June 27, 2014         Respectfully submitted,

TONY RACKAUCKAS, DISTRICT ATTORNEY
COUNTY OF ORANGE, STATE OF CALIFORNIA

By: *Tony Rackauckas*
     TONY RACKAUCKAS
Joseph D'Agostino, Senior Assistant District Attorney
401 Civil Center Drive
Santa Ana, CA 92701-4575
Tel: (714) 834-3600
Fax: (714) 648-3636

Dated:  June 27, 2014         ROBINSON, CALCAGNIE AND ROBINSON

By: *Mark P. Robinson, Jr.*
     MARK P. ROBINSON, JR., SBN 05442
Kevin F. Calcagnie, SBN. 108994
Scot D. Wilson, SBN. 223367
ROBINSON CALCAGNIE ROBINSON
   SHAPIRO DAVIS, INC.
19 Corporate Plaza Drive
Newport Beach, California 92660
Tel.: (949) 720-1288
Fax: (949) 720-1292
mrobinson@rcrlaw.net

Dated:  June 27, 2014         HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman (Pro Hac Vice Pending)
Andrew Volk (Pro Hac Vice Pending)
HAGENS BERMAN SOBOL
   SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Plaintiff*
*THE PEOPLE OF THE STATE OF CALIFORNIA*

# SUMMONS

**SUM-100**

## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**  GENERAL MOTORS LLC
*(AVISO AL DEMANDADO):*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**06/27/2014** at 12:18:58 PM

Clerk of the Superior Court
By Irma Cook, Deputy Clerk

**YOU ARE BEING SUED BY PLAINTIFF:**  THE PEOPLE OF THE STATE
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*  OF CALIFORNIA, acting by
and through Orange County District Attorney Tony Rackauckas

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case. *¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
ORANGE COUNTY SUPERIOR COURT
751 West Santa Ana Boulevard
Santa Ana, CA 92701
CIVIL COMPLEX CENTER

**CASE NUMBER:** *(Número del Caso):* 30-2014-00731038-CU-BT-CXC

Judge Kim G. Dunning

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark P. Robinson, Jr., SBN 054426                                      949-720-1288                949-720-1292
ROBINSON CALCAGNIE ROBINSON SHAPIRO DAVIS, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660

DATE:  06/27/2014                    Alan Carlson           Clerk, by _____ Irma Cook _____, Deputy
*(Fecha)*                                                *(Secretario)*                                *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal
Solutions
℞ Plus

Code of Civil Procedure §§ 412.20, 465

1   ORANGE COUNTY DISTRICT ATTORNEY

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**07/01/2014** at 12:58:00 PM
Clerk of the Superior Court
By Irma Cook,Deputy Clerk

2   Tony Rackauckas, District Attorney
    Joseph D'Agostino, Senior Assistant District Attorney

3   401 Civil Center Drive
    Santa Ana, CA 92701-4575

4   Tel: (714) 834-3600
    Fax: (714) 648-3636

5

6   – In association with –

7   Mark P. Robinson, Jr., SBN 05442       Steve W. Berman (*Pro Hac Vice* Pending)
    Kevin F. Calcagnie, SBN 108994         Andrew Volk (*Pro Hac Vice* Pending)

8   Scot D. Wilson, SBN 223367             HAGENS BERMAN SOBOL
    ROBINSON CALCAGNIE ROBINSON               SHAPIRO LLP

9     SHAPIRO DAVIS, INC.                  1918 Eighth Avenue, Suite 3300
    19 Corporate Plaza Drive               Seattle, WA  98101

10  Newport Beach, CA 92660               Tel: (206) 623-7292
    Tel: (949) 720-1288                    Fax: (206) 623-0594

11  Fax: (949) 720-1292                    steve@hbsslaw.com
    mrobinson@rcrlaw.net

12

13  *Attorneys for Plaintiff*
    *THE PEOPLE OF THE STATE OF CALIFORNIA*

14

15              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16      **IN AND FOR THE COUNTY OF ORANGE – COMPLEX LITIGATION DIVISION**

17  THE PEOPLE OF THE STATE OF              Case No. 30-2014-00731038-CU-BT-CXC
    CALIFORNIA, acting by and through Orange

18  County District Attorney Tony Rackauckas,    **FIRST AMENDED COMPLAINT FOR**
                                                 **VIOLATIONS OF CALIFORNIA**
19                                               **UNFAIR COMPETITION LAW AND**
                              Plaintiff,         **FALSE ADVERTISING LAW**
20

21          v.

22  GENERAL MOTORS LLC

23                            Defendant.

24

25

26

27

28

010440-12  692229 V1

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION ...................................................................................................1

II.     PLAINTIFF'S AUTHORITY ...............................................................................5

III.    DEFENDANT .......................................................................................................6

IV.     JURISDICTION AND VENUE ............................................................................6

V.      FACTUAL BACKGROUND ................................................................................6

        A.      There Are Serious Safety Defects in Millions of GM Vehicles Across Many
                Models and Years, and, Until Recently, GM Concealed them from Consumers..........6

                1.      The ignition switch defects..................................................................8

                2.      The power steering defect. ...............................................................16

                3.      Airbag defect. ....................................................................................17

                4.      The brake light defect. ......................................................................20

                5.      Shift cable defect ..............................................................................23

                6.      Safety belt defect. .............................................................................25

                7.      Ignition lock cylinder defect.............................................................26

                8.      The Camaro key-design defect..........................................................27

                9.      The ignition key defect. ....................................................................27

                10.     At least 26 other defects were revealed by GM in recalls during the
                        first half of 2014. .............................................................................27

        B.      GM Valued Cost-Cutting Over Safety, and Actively Encouraged Employees
                to Conceal Safety Issues. ............................................................................33

        C.      The Ignition Switch Defects Have Harmed Consumers in Orange County
                and the State .................................................................................................38

        D.      Given GM's Knowledge of the Defects and the Risk to Public Safety, it
                Was Obliged to Promptly Disclose and Remedy the Defects. .....................38

        E.      GM's Misrepresentations and Deceptive, False, Untrue and Misleading
                Advertising, Marketing and Public Statements ...........................................42

VI.     CAUSES OF ACTION........................................................................................52

        FIRST CAUSE OF ACTION:  VIOLATION OF BUSINESS AND PROFESSIONS
        CODE SECTION 17200 ......................................................................................52

- i -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND CAUSE OF ACTION:  VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500 .......................................................................................55

PRAYER FOR RELIEF...........................................................................................57

- ii -
FIRST AMENDED COMPLAINT

1       Plaintiff, the People of the State of California ("Plaintiff" or "the People"), by and through

2     Tony Rackauckas, District Attorney for the County of Orange ("District Attorney"), alleges the

3     following, on information and belief:

4                          **I.    INTRODUCTION**

5       1.    This is a law enforcement action which primarily seeks to protect the public safety

6     and welfare, brought by a governmental unit in the exercise of and to enforce its police power. *City*

7     *& Cnty. of San Francisco v. PG & E Corp.,* 433 F.3d 1115, 1124-1125 (9th Cir. 2006). The action

8     is  brought by Tony Rackauckas, District Attorney of the County of Orange, under California

9     Business and Professions Code sections 17200 *et seq.,* the Unfair Competition Law ("UCL"), and

10    17500 *et seq.,* the False Advertising Law ("FAL"), and involves sales, leases, or other wrongful

11    conduct or injuries occurring in California.  The defendant is General Motors LLC ("Defendant" or

12    "GM"), which is based in Detroit, Michigan.

13      2.    This case arises from GM's egregious failure to disclose, and the affirmative

14    concealment of, at least 35 separate known defects in vehicles sold by GM, and by its predecessor,

15    "Old GM" (collectively, "GM-branded vehicles").  By concealing the existence of the many known

16    defects plaguing many models and years of GM-branded vehicles and the fact that GM values cost-

17    cutting over safety, and concurrently marketing the GM brand as "safe" and "reliable," GM enticed

18    vehicle purchasers to buy GM vehicles under false pretenses.

19      3.    This action seeks to hold GM liable only for its *own* acts and omissions *after* the

20    July 10, 2009 effective date of the Sale Order and Purchase Agreement through which GM

21    acquired virtually all of the assets and certain liabilities of Old GM.

22      4.    A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth

23    more than an otherwise similar vehicle made by a disreputable manufacturer that is known to

24    devalue safety and to conceal serious defects from consumers and regulators.  GM Vehicle Safety

25    Chief Jeff Boyer has recently stated that:  "Nothing is more important than the safety of our

26    customers in the vehicles they drive."  Yet GM failed to live up to this commitment, instead

27    choosing to conceal at least 35 serious defects in over 17 million GM-branded vehicles sold in the

28    United States (collectively, the "Defective Vehicles").

010440-12  692229 V1                              - 1 -

1        5.     The systematic concealment of known defects was deliberate, as GM followed a

2 consistent pattern of endless "investigation" and delay each time it became aware of a given defect.

3 In fact, recently revealed documents show that GM valued cost-cutting over safety, trained its

4 personnel to **never** use the words "defect," "stall," or other words suggesting that any GM-branded

5 vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and

6 discouraged employees from acting to address safety issues.

7        6.     Under the Transportation Recall Enhancement, Accountability and Documentation

8 Act ("TREAD Act")[1] and its accompanying regulations, when a manufacturer learns that a vehicle

9 contains a safety defect, the manufacturer must promptly disclose the defect.[2]  If it is determined

10 that the vehicle is defective, the manufacturer may be required to notify vehicle owners,

11 purchasers, and dealers of the defect, and may be required to remedy the defect.[3]

12        7.     GM **explicitly assumed** the responsibilities to report safety defects with respect to

13 all GM-branded vehicles as required by the TREAD Act.  GM also had the same duty under

14 California law.

15        8.     When a manufacturer with TREAD Act responsibilities is aware of myriad safety

16 defects and fails to disclose them as GM has done, that manufacturer's vehicles are not safe.  And

17 when that manufacturer markets and sells its new vehicles by touting that its vehicles are "safe," as

18 GM has also done, that manufacturer is engaging in deception.

19        9.     GM has recently been forced to disclose that it had been concealing a large number

20 of known safety defects in GM-branded vehicles ever since its inception in 2009, and that other

21 defects arose on its watch due in large measure to GM's focus on cost-cutting over safety, its

22 discouragement of raising safety issues and its training of employees to avoid using language such

23 as "stalls," "defect" or "safety issue" in order to avoid attracting the attention of regulators.  As a

24 result, GM has been forced to recall over 17 million vehicles in some 40 recalls covering 35

25 separate defects during the first five and a half months of this year –20 times more than during the

---

[1] 49 U.S.C. §§ 30101-30170.

[2] 49 U.S.C. § 30118(c)(1) & (2).

[3] 49 U.S.C. § 30118(b)(2)(A) & (B).

1    same period in 2013.  The cumulative negative effect on the value of the vehicles sold by GM has

2    been both foreseeable and significant.

3         10.    The highest-profile defect concealed by GM concerns the ignition switches in more

4    than 1.5 million vehicles sold by GM's predecessor (the "ignition switch defect").  The ignition

5    switch defect can cause the affected vehicles' ignition switches to inadvertently move from the

6    "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a

7    loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to

8    deploy.  GM continued to use defective ignition switches in "repairs" of vehicles it sold after July

9    10, 2009.

10        11.    For the past five years, GM received reports of crashes and injuries that put GM on

11   notice of the serious safety issues presented by its ignition switch system.  GM was aware of the

12   ignition switch defects (and many other serious defects in numerous models of GM-branded

13   vehicles) *from the very date of its inception on July 10, 2009.*

14        12.    Yet, despite the dangerous nature of the ignition switch defects and the effects on

15   critical safety systems, GM concealed the existence of the defects and failed to remedy the problem

16   from the date of its inception until February of 2014.  In February and March of 2014, GM issued

17   three recalls for a combined total of 2.19 million vehicles with the ignition switch defects.

18        13.    On May 16, 2014, GM entered a Consent Order with NHTSA in which it admitted

19   that it violated the TREAD Act by not disclosing the ignition switch defect, and agreed to pay the

20   maximum available civil penalties for its violations.

21        14.    Unfortunately for all owners of vehicles sold by GM, the ignition switch defect was

22   only one of a seemingly never-ending parade of recalls in the first half of 2014 – many concerning

23   safety defects that had been long known to GM.

24        15.    Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States

25   were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly

26   fail during ordinary driving conditions and revert back to manual steering, requiring greater effort

27   by the driver to steer the vehicle and increasing the risk of collisions and injuries (the "power

28   steering defect").

1    16.    As with the ignition switch defect, GM was aware of the power steering defect from

2    the date of its inception, and concealed the defect for years.

3    17.    From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles were sold in

4    the United States with defective wiring harnesses.  Increased resistance in the wiring harnesses of

5    driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may

6    cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash (the

7    "airbag defect").  The vehicles' failure to deploy airbags and pretensioners in a crash increases the

8    risk of injury and death to the drivers and front-seat passengers.

9    18.    Once again, GM knew of the dangerous airbag defect from the date of its inception

10    on July 10, 2009, but chose instead to conceal the defect, and marketed its vehicles as "safe" and

11    "reliable."

12    19.    To take just one more example, between 2003 and 2012, 2.4 million GM-branded

13    vehicles in the United States were sold with a wiring harness defect that could cause brake lamps to

14    fail to illuminate when the brakes are applied or cause them to illuminate when the brakes are not

15    engaged (the "brake light defect").  The same defect could also disable traction control, electronic

16    stability control, and panic braking assist operations.  Though GM received hundreds of complaints

17    and was aware of at least 13 crashes caused by this defect, it waited until May of 2014 before

18    finally ordering a full recall.

19    20.    As further detailed in this First Amended Complaint, the ignition switch, power

20    steering, airbag, and brake light defects are just 4 of the *35* separate defects that resulted in 40

21    recalls of GM-branded vehicles in the first five and a half months of 2014, affecting over 17

22    million vehicles.  Most or all of these recalls are for safety defects, and many of the defects were

23    apparently known to GM, but concealed for years.

24    21.    This case arises from GM's breach of its obligations and duties, including but not

25    limited to:  (i) its concealment of, and failure to disclose that, as a result of a spate of safety defects,

26    over 17 million Defective Vehicles were on the road nationwide – and many hundreds of thousands

27    in California; (ii) its failure to disclose the defects despite its TREAD Act obligations; (iii) its

28    failure to disclose that it devalued safety and systemically encouraged the concealment of known

010440-12 692229 V1                                - 4 -
FIRST AMENDED COMPLAINT

1    defects; (iv) its continued use of defective ignition switches as replacement parts; (v) its sale of

2    used "GM certified" vehicles that were actually plagued with a variety of known safety defects;

3    and (vi) its repeated and false statements that its vehicles were safe and reliable, and that it stood

4    behind its vehicles after they were purchased.

5        22.    From its inception in 2009, GM has known that many defects exist in millions of

6    GM-branded vehicles sold in the United States.  But, to protect its profits and to avoid remediation

7    costs and a public relations nightmare, GM concealed the defects and their sometimes tragic

8    consequences.

9        23.    GM violated the TREAD Act by failing to timely inform NHTSA of the myriad

10    safety defects plaguing GM-branded vehicles and allowed the Defective Vehicles to remain on the

11    road.  In addition to violating the TREAD Act, GM fraudulently concealed the defects from owners

12    and from purchasers of new and used vehicles sold after July 10, 2009, and even used defective

13    ignition switches as replacement parts.  These same acts and omissions also violated California law

14    as detailed below.

15        24.    GM's failure to disclose the many defects, as well as advertising and promotion

16    concerning GM's record of building "safe" cars of high quality, violated California law.

17                    **II.    PLAINTIFF'S AUTHORITY**

18        25.    Tony Rackauckas, District Attorney of the County of Orange, acting to protect the

19    public as consumers from unlawful, unfair, and fraudulent business practices, brings this action in

20    the public interest in the name of the People of the State of California for violations of the Unfair

21    Competition Law pursuant to California Business and Professions Code Sections 17200, 17204 and

22    17206, and for violations of the False Advertising Law pursuant to California Business and

23    Professions Code Sections 17500, 17535 and 17536.  Plaintiff, by this action, seeks to enjoin GM

24    from engaging in the unlawful, unfair, and fraudulent business practices alleged herein, and seeks

25    civil penalties for GM's violations of the above statutes.

26

27

28

### III.    DEFENDANT

26.    Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009.

27.    GM has significant contacts with Orange County, California, and the activities complained of herein occurred, in whole or in part, in Orange County, California.

28.    At all times mentioned GM was engaged in the business of designing, manufacturing, distributing, marketing, selling, leasing, certifying, and warrantying the GM cars that are the subject of this First Amended Complaint, throughout the State of California, including in Orange County, California.

### IV.    JURISDICTION AND VENUE

29.    This Court has jurisdiction over this matter pursuant to the California Constitution, Article XI, section 10 and California Code of Civil Procedure ("CCP") section 410.10 because GM transacted business and committed the acts complained of herein in California, specifically in the County of Orange.  The violations of law alleged herein were committed in Orange County and elsewhere within the State of California.

30.    Venue is proper in Orange County, California, pursuant to CCP section 395 and because many of the acts complained about occurred in Orange County.

### V.    FACTUAL BACKGROUND

**A.    There Are Serious Safety Defects in Millions of GM Vehicles Across Many Models and Years, and, Until Recently, GM Concealed them from Consumers.**

31.    In the first five and a half months of 2014, GM announced some 40 recalls affecting over 17 million GM-branded vehicles from model years 2003-2014.  The recalls concern 35 separate defects.  The numbers of recalls and serious safety defects are unprecedented, and can only lead to one conclusion:  GM and its predecessor sold a large number of unsafe vehicle models with myriad defects during a long period of time.

32.    Even more disturbingly, the available evidence shows a common pattern:  From its inception in 2009, GM knew about an ever-growing list of serious safety defects in millions of

010440-12  692229 V1

- 6 -

1    GM-branded vehicles, but concealed them from consumers and regulators in order to boost sales

2    and avoid the cost and publicity of recalls.

3         33.    GM inherited from Old GM a company that valued cost-cutting over safety, actively

4    discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words

5    like "stall" that might attract the attention of NHTSA and suggest that a recall was required, and

6    trained its employees to avoid the use of words such as "defect" that might flag the existence of a

7    safety issue.  GM did nothing to change these practices.

8         34.    The Center for Auto Safety recently stated that it has identified 2,004 death and

9    injury reports filed by GM with federal regulators in connection with vehicles that have recently

10    been recalled.[4]  Many of these deaths and injuries would have been avoided had GM complied with

11    its TREAD Act obligations over the past five years.

12         35.    The many defects concealed by GM affected key safety systems in GM vehicles,

13    including the ignition, power steering, airbags, brake lights, gear shift systems, and seatbelts.

14         36.    The available evidence shows a consistent pattern:  GM learned about a particular

15    defect and, often at the prodding of regulatory authorities, "investigated" the defect and decided

16    upon a "root cause."  GM then took minimal action – such as issuing a carefully-worded

17    "Technical Service Bulletin" to its dealers, or even recalling a very small number of affected

18    vehicles.  All the while, the true nature and scope of the defects were kept under wraps, vehicles

19    affected by the defects remained on the road, and GM enticed consumers to purchase its vehicles

20    by touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer

21    that stands behind its products.

22         37.    The nine defects affecting the greatest number of vehicles are discussed in some

23    detail below, and the remainder are summarized thereafter.

24

25

26

27

28

---

[4] *See Thousands of Accident Reports Filed Involving Recalled GM Cars: Report*, Irvin Jackson
(June 3, 2014).

1        **1.    The ignition switch defects.**

2        38.    The ignition switch defects can cause the vehicle's engine and electrical systems to

3    shut off, disabling the power steering and power brakes and causing non-deployment of the

4    vehicle's airbag and the failure of the vehicle's seatbelt pretensioners in the event of a crash.

5        39.    The ignition switch systems at issue are defective in at least three major respects.

6    The first is that the switches are simply weak; because of a faulty "detent plunger," the switch can

7    inadvertently move from the "run" to the "accessory" or "off" position.

8        40.    The second defect is that, due to the low position of the ignition switch, the driver's

9    knee can easily bump the key (or the hanging fob below the key), and cause the switch to

10    inadvertently move from the "run" to the "accessory" or "off" position.

11        41.    The third defect is that the airbags immediately become inoperable whenever the

12    ignition switch moves from the "run" to the "accessory" position.  As NHTSA's Acting

13    Administrator, David Friedman, recently testified before Congress, NHTSA is not convinced that

14    the non-deployment of the airbags in the recalled vehicles is solely attributable to a mechanical

15    defect involving the ignition switch:

16            And it may be even more complicated than that, actually.  And that's
            one of the questions that we actually have in our timeliness query to
17            General Motors.  It is possible that it's not simply that the – the
            power was off, but a much more complicated situation where the
18            very specific action of moving from on to the accessory mode is what
            didn't turn off the power, but may have disabled the algorithm.
19
            That, to me, frankly, doesn't make sense.  From my perspective, if a
20            vehicle – certainly if a vehicle is moving, the airbag's algorithm
            should require those airbags to deploy.  Even if the – even if the
21            vehicle is stopped and you turn from 'on' to 'accessory,' I believe
            that the airbags should be able to deploy.
22
            So this is exactly why we're asking General Motors this question, to
23            understand is it truly a power issue or is there something embedded
            in their [software] algorithm that is causing this, something that
24            should have been there in their algorithm.[5]

25

26

27
    _____
28        [5] Congressional Transcript, Testimony of David Friedman, Acting Administrator of NHTSA
    (Apr. 2, 2014), at 19.

1      42.    Vehicles with defective ignition switches are, therefore, unreasonably prone to be

2  involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm

3  or death to the drivers and passengers of the vehicles.

4      43.    Alarmingly, GM knew of the deadly ignition switch defects and at least some of

5  their dangerous consequences from the date of its inception on July 10, 2009, but concealed its

6  knowledge from consumers and regulators.

7      44.    In part, GM's knowledge of the ignition switch defects arises from the fact that key

8  personnel with knowledge of the defects remained in their same positions once GM took over from

9  Old GM.

10      45.    For example, the Old GM Design Research Engineer who was responsible for the

11  rollout of the defective ignition switch in 2003 was Ray DeGiorgio.  Mr. DeGiorgio continued to

12  serve as an engineer at GM until April 2014 when he was suspended as a result of his involvement in

13  the defective ignition switch problem.  Later in 2014, in the wake of the GM Report,[6] Mr. DeGiorgio

14  was fired.

15      46.    In 2001, two years *before* vehicles with the defective ignition switches were ever

16  available to consumers, Old GM privately acknowledged in an internal pre-production report for

17  the model/year ("MY") 2003 Saturn Ion that there were problems with the ignition switch.[7]  Old

18  GM's own engineers had personally experienced problems with the ignition switch.  In a section of

19  the internal report titled "Root Cause Summary," Old GM engineers identified "two causes of

20  failure," namely:  "[l]ow contact force and low detent plunger force."[8]  The report also stated that

21  the GM person responsible for the issue was Ray DeGiorgio.[9]

22      47.    Mr. DeGiorgio actively concealed the defect, both while working for Old GM *and*

23  while working for GM.

24

25

26      [6] References to the "GM Report" are to the "*Report to Board of Directors of General Motors Company Regarding Ignition Switch Recalls*," Anton R. Valukas, Jenner & Block (May 29, 2014).

27      [7] GM Report/Complaint re "Electrical Concern" opened July 31, 2001, GMHEC000001980-90.

28      [8] *Id*. at GMHEC000001986.

       [9] *Id*. at GMHEC000001981, 1986.

48.     Similarly, Gary Altman was Old GM's program-engineering manager for the Cobalt, which is one of the models with the defective ignition switches and hit the market in MY 2005.  He remained as an engineer at GM until he was suspended on April 10, 2014, by GM for his role in the ignition switch problem and then fired in the wake of the GM Report.

49.     On October 29, 2004, Mr. Altman test-drove a Cobalt.  While he was driving, his knee bumped the key and the vehicle shut down.

50.     In response to the Altman incident, Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue.  According to the chronology provided to NHTSA by GM in March 2014, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

51.     The PRTS concluded in 2005 that:

> There are two main reasons that we believe can cause a lower effort in turning the key:
>
> 1.     A low torque detent in the ignition switch and
>
> 2.     A low position of the lock module in the column.[10]

52.     The 2005 PRTS further demonstrates the knowledge of Ray DeGiorgio (who, like Mr. Altman, worked for Old GM and continued until very recently working for GM), as the PRTS's author states that "[a]fter talking to Ray DeGiorgio, I found out that it is close to impossible to modify the present ignition switch.  The switch itself is very fragile and doing any further changes will lead to mechanical and/or electrical problems."[11]

53.     Gary Altman, program engineering manager for the 2005 Cobalt, recently admitted that Old GM engineering managers (including himself and Mr. DeGiorgio) knew about ignition switch problems in the vehicle that could disable power steering, power brakes, and airbags, but launched the vehicle anyway because they believed that the vehicles could be safely coasted off the road after a stall.  Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

---

[10] Feb. 1, 2005 PRTS at GMHEC000001733.

[11] Id.

1    54.    Incredibly, GM now claims that it and Old GM did not view vehicle stalling and the

2    loss of power steering as a "safety issue," but only as a "customer convenience" issue.[12]  GM bases

3    this claim on the equally incredible assertion that, at least for some period of time, it was not aware

4    that when the ignition switch moves to the "accessory" position, the airbags become inoperable –

5    even though Old GM itself designed the airbags to not deploy under that circumstance.[13]

6    55.    Even crediting GM's claim that some at the Company were unaware of the rather

7    obvious connection between the defective ignition switches and airbag non-deployment, a stall and

8    loss of power steering and power brakes is a serious safety issue under any objective view.  GM

9    *itself* recognized in 2010 that a loss of power steering *standing alone* was grounds for a safety

10    recall, as it did a recall on such grounds.

11    56.    In fact, as multiple GM employees confirm, GM *intentionally* avoids using the

12    word "stall" "because such language might draw the attention of NHTSA" and "may raise a

13    concern about safety, which suggests GM should recall the vehicle…."[14]

14    57.    Rather than publicly admitting the dangerous safety defects in the vehicles with the

15    defective ignition switches, GM attempted to attribute these and other incidents to "driver error."

16    GM continued to receive reports of deaths in Cobalts involving steering and/or airbag failures from

17    its inception up through at least 2012.

18    58.    In April 2006, the GM design engineer who was responsible for the ignition switch

19    in the recalled vehicles, Design Research Engineer Ray DeGiorgio, authorized part supplier Delphi

20    to implement changes to fix the ignition switch defect.[15]  The design change "was implemented to

21    increase torque performance in the switch."[16]  However, testing showed that, even with the

22    proposed change, the performance of the ignition switch was *still* below original specifications.[17]

23

24    [12] GM Report at 2.

25    [13] *Id*.

26    [14] GM Report at 92-93.

[15] General Motors Commodity Validation Sign-Off (Apr. 26, 2006), GMHEC000003201.  *See
27    also* GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

[16] *Id*.
28
[17] Delphi Briefing, Mar. 27, 2014.

1       59.     Modified ignition switches – with greater torque – started to be installed in 2007

2    model/year vehicles.[18]  In what a high-level engineer at Old GM now calls a "cardinal sin" and "an

3    extraordinary violation of internal processes," Old GM changed the part design ***but kept the old***

4    ***part number***.[19]  That makes it impossible to determine from the part number alone which GM

5    vehicles produced after 2007 contain the defective ignition switches.

6       60.     At a May 15, 2009 meeting, Old GM engineers (soon to be GM engineers) learned

7    that data in the black boxes of Chevrolet Cobalts showed that the dangerous ignition switch defects

8    existed in hundreds of thousands of Defective Vehicles.  But still GM did not reveal the defect to

9    NHTSA, Plaintiff, or consumers.

10       61.     After the May 15, 2009 meeting, GM continued to get complaints of unintended

11    shut down and continued to investigate frontal crashes in which the airbags did not deploy.

12       62.     After the May 15, 2009 meeting, GM told the families of accident victims related to

13    the ignition switch defects that it did not have sufficient evidence to conclude that there was any

14    defect.  In one case involving the ignition switch defects, GM threatened to sue the family of an

15    accident victim for reimbursement of its legal fees if the family did not dismiss its lawsuit.  In

16    another, GM sent the victim's family a terse letter, saying there was no basis for any claims against

17    GM.  These statements were part of GM's campaign of deception.

18       63.     In July 2011, GM legal staff and engineers met regarding an investigation of crashes

19    in which the air bags did not deploy.  The next month, in August 2011, GM initiated a Field

20    Performance Evaluation ("FPE") to analyze multiple frontal impact crashes involving MY 2005-

21    2007 Chevrolet Cobalt vehicles and 2007 Pontiac G5 vehicles, as well as a review of information

22    related to the Ion, HHR, and Solstice vehicles, and airbag non-deployment.[20]

23       64.     GM continued to conceal and deny what it privately knew – that the ignition

24    switches were defective.  For example, in May 2012, GM engineers tested the torque of the

25

26    _____

    [18] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

27    [19] "'*Cardinal sin*': Former GM engineers say quiet '06 redesign of faulty ignition switch was a *major violation of protocol.*"  *Automotive News* (Mar. 26, 2014).

28    [20] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 2.

1    ignition switches in numerous Old GM vehicles.[21]  The results from the GM testing showed that

2    the majority of the vehicles tested from the 2003 to 2007 model/years had torque performance at or

3    below 10 Newton centimeters ("Ncm"), which was below the original design specifications

4    required by GM.[22]  Around the same time, high ranking GM personnel continued to internally

5    review the history of the ignition switch issue.[23]

6          65.    In September 2012, GM had a GM Red X Team Engineer (a special engineer

7    assigned to find the root cause of an engineering design defect) examine the changes between the

8    2007 and 2008 Chevrolet Cobalt models following reported crashes where the airbags failed to

9    deploy and the ignition switch was found in the "off" or "accessory" position.[24]

10         66.    The next month, in October of 2012, Design Research Engineer Ray DeGiorgio (the

11   lead engineer on the defective ignition switch) sent an email to Brian Stouffer of GM regarding the

12   "2005-7 Cobalt and Ignition Switch Effort," stating:  "If we replaced switches on ALL the model

13   years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch."[25]

14         67.    The October 2012 email makes clear that GM considered implementing a recall to

15   fix the defective ignition switches in the Chevy Cobalt vehicles, but declined to do so in order to

16   save money.

17         68.    In April 2013, GM again **internally** acknowledged that it understood that there was

18   a difference in the torque performance between the ignition switch parts in later model Chevrolet

19   Cobalt vehicles compared with the 2003-2007 model/year vehicles.[26]

20         69.    Notwithstanding what GM actually knew and privately acknowledged,[27] its public

21   statements and position in litigation was radically different.  For example, in May 2013, Brian

22   Stouffer testified in deposition in a personal injury action (*Melton v. General Motors*) that the Ncm

---

[21] GMHEC000221427; *see also* Mar. 11, 2014 Ltr. to NHTSA, attached chronology.

[22] *Id.*

[23] GMHEC000221438.

[24] Email from GM Field Performance Assessment Engineer to GM Red X Team Engineer (Sept. 6, 2012, 1:29:14 p.m., GMHEC000136204).

[25] GMHEC000221539.

[26] GM Mar. 11, 2014 Ltr. to NHTSA, attached chronology at 4.

[27] *See* GMHEC000221427.

FIRST AMENDED COMPLAINT

1  performance (a measurement of the strength of the ignition switch) was **not** substantially different

2  as between the early (*e.g.*, 2005) and later model year (*e.g.*, 2008) Chevrolet Cobalt vehicles.[28]

3        70.  Similarly, a month before Mr. Stouffer's testimony, in April 2013, GM engineer

4  Ray DeGiorgio denied the existence of any type of ignition switch defect:

> Q:  Did you look at, as a potential failure mode for this switch, the ease of which the key could be moved from run to accessory?
>
> . . .
>
> THE WITNESS:  No, because in our minds, moving the key from, I want to say, ***run to accessory is not a failure mode, it is an expected condition***.  It is important for the customer to be able to rotate the key fore and aft, so as long as we meet those requirements, ***it's not deemed as a risk***.
>
> Q:  Well, it's not expected to move from run to accessory when you're driving down the road at 55 miles an hour, is it?
>
> . . .
>
> THE WITNESS:  ***It is expected for the key to be easily and smoothly transitioned from one state to the other*** without binding and without harsh actuations.
>
> Q:  And why do you have a minimum torque requirement from run to accessory?
>
> . . .
>
> THE WITNESS:  It's a design feature that is required.  You don't want anything flopping around.  You want to be able to control the dimensions and basically provide – one of the requirements in this document talks about having a smooth transition from detent to detent.  One of the criticisms – I shouldn't say criticisms.  One of the customer complaints we have had in the – and previous to this was he had cheap feeling switches, they were cheap feeling, they were higher effort, and the intent of this design was to provide a smooth actuation, provide a high feeling of a robust design.  That was the intent.
>
> Q:  I assume the intent was also to make sure that when people were using the vehicle under ordinary driving conditions, that if the key was in the run position, it wouldn't just move to the accessory position, correct?
>
> . . .

---

[28] GMHEC000146933.  That said, "[t]he modified switches used in 2007-2011 vehicles were also approved by GM despite not meeting company specifications."  Mar. 31, 2014 Ltr. to Mary Barra from H. Waxman, D. DeGette, and J. Schankowsky.

010440-12_692229 V1

- 14 -

FIRST AMENDED COMPLAINT

A:  That is correct, but also – it was not intended – ***the intent was to make the transition to go from run to off with relative ease.***[29]

71.    Brian Stouffer, in an email to Delphi regarding the ignition switch in the Chevy Cobalt, acknowledged that the ignition switch in early Cobalt vehicles – although bearing the same part number – was different than the ignition switch in later Cobalt vehicles.[30]  Mr. Stouffer claimed that "[t]he discovery of the plunger and spring change was made aware to GM during a [sic] course of a lawsuit (*Melton v. GM*)."[31]  Delphi personnel responded that GM had authorized the change back in 2006 but the part number had remained the same.[32]

72.    Eventually, the defect could no longer be ignored or swept under the rug.

73.    After analysis by GM's Field Performance Review Committee and the Executive Field Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of ***some*** of the vehicles with defective ignition switches on January 31, 2014.

74.    Initially, the EFADC ordered a recall of only the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.

75.    After additional analysis, the EFADC expanded the recall on February 24, 2014, to include the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.

76.    Most recently, on March 28, 2014, GM expanded the recall a third time, to include Chevrolet Cobalts, Pontiac G5s and Solstices, Saturn Ions and Skys from the 2008 through 2010 model years, and Chevrolet HHRs from the 2008 through 2011 model years.

77.    All told, GM has recalled some 2.19 million vehicles in connection with the ignition switch defect.

78.    In a video message addressed to GM employees on March 17, 2014, CEO Mary Barra admitted that the Company had made mistakes and needed to change its processes.

---

[29] GMHEC000138906 (emphasis added).

[30] GMHEC000003197.

[31] *Id.  See also* GMHEC000003156-3180.

[32] *See* GMHEC000003192-93.

79.    According to Ms. Barra, "[s]omething went terribly wrong in our processes in this instance, and terrible things happened."  Barra went on to promise, "[w]e will be better because of this tragic situation if we seize this opportunity."[33]

80.    Based on its egregious conduct in concealing the ignition switch defect, GM recently agreed to pay the maximum possible civil penalty in a Consent Order with the National Highway Traffic Safety Administration ("NHTSA") and admitted that it had violated its legal obligations to promptly disclose the existence of known safety defects.

**2.    The power steering defect.**

81.    Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

82.    As with the ignition switch defects, GM was aware of the power steering defect long before it took anything approaching full remedial action.

83.    When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver.  Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

84.    In 2010, GM first recalled Chevy Cobalt and Pontiac G5 models for these power steering issues, yet it did *not* recall the many other vehicles that had the very same power steering defect.

85.    Documents released by NHTSA show that GM waited years to recall nearly 335,000 Saturn Ions for power steering failure – despite receiving nearly 4,800 consumer complaints and more than 30,000 claims for warranty repairs.  That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent.  By way of

---

[33] *"Something Went 'Very Wrong' at G.M., Chief Says."*  N.Y. TIMES (Mar. 18, 2014).

1    comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000

2    vehicles.[34]  Here, the rate translates to 1430 complaints per 100,000 vehicles.

3        86.    In response to the consumer complaints, in September 2011 NHTSA opened an

4    investigation into the power steering defect in Saturn Ions.

5        87.    NHTSA database records show complaints from Ion owners as early as June 2004,

6    with the first injury reported in May 2007.

7        88.    NHTSA linked approximately 12 crashes and two injuries to the power steering

8    defect in the Ions.

9        89.    In 2011, GM missed yet another opportunity to recall the additional vehicles with

10   faulty power steering when CEO Mary Barra – then head of product development – was advised by

11   engineer Terry Woychowski that there was a serious power steering issue in Saturn Ions.

12   Ms. Barra was also informed of the ongoing NHTSA investigation.  At the time, NHTSA

13   reportedly came close to concluding that Saturn Ions should have been included in GM's 2005

14   steering recall of Cobalt and G5 vehicles.

15       90.    Yet GM took no action for four years.  It wasn't until March 31, 2014, that GM

16   finally recalled the approximately 1.3 million vehicles in the United States affected by the power

17   steering defect.

18       91.    After announcing the March 31, 2014 recall, Jeff Boyer, GM's Vice President of

19   Global Vehicle Safety, acknowledged that GM recalled some of these same vehicle models

20   previously for the *same issue*, but that GM "did not do enough."

21       **3.    Airbag defect.[35]**

22       92.    From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles in the United

23   States were sold with defective wiring harnesses.  Increased resistance in the wiring harnesses of

24   driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may

25   cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash.  The

26   _____

27       [34] *See* http://www-odi.nhtsa.dot.gov/cars/problems/defect/-
     results.cfm?action_number=EA06002&SearchType=QuickSearch&summary=true.

28       [35] This defect is distinct from the airbag component of the ignition switch defect discussed
     above and from other airbag defects affecting a smaller number of vehicles, discussed below.

1    vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and

2    death to the drivers and front-seat passengers.

3    93.    Once again, GM knew of the dangerous airbag defect long before it took anything

4    approaching the requisite remedial action.

5    94.    As the wiring harness connectors in the SIABs corrode or loosen over time,

6    resistance will increase. The airbag sensing system will interpret this increase in resistance as a

7    fault, which then triggers illumination of the "SERVICE AIR BAG" message on the vehicle's

8    dashboard. This message may be intermittent at first and the airbags and pretensioners will still

9    deploy. But over time, the resistance can build to the point where the SIABs, pretensioners, and

10    front center airbags will not deploy in the event of a collision.[36]

11    95.    The problem apparently arose when GM made the switch from using gold-plated

12    terminals to connect its wire harnesses to cheaper tin terminals in 2007.

13    96.    In June 2008, Old GM noticed increased warranty claims for airbag service on

14    certain of its vehicles and determined it was due to increased resistance in airbag wiring. After

15    analysis of the tin connectors in September 2008, Old GM determined that corrosion and wear to

16    the connectors was causing the increased resistance in the airbag wiring. It released a technical

17    service bulletin on November 25, 2008, for 2008-2009 Buick Enclaves, 2009 Chevy Traverse,

18    2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the

19    defect by using Nyogel grease, securing the connectors, and adding slack to the line. Old GM also

20    began the transition back to gold-plated terminals in certain vehicles. At that point, Old GM

21    suspended all investigation into the defective airbag wiring and took no further action.[37]

22    97.    In November 2009, GM learned of similar reports of increased airbag service

23    messages in 2010 Chevy Malibu and 2010 Pontiac G6 vehicles. After investigation, GM

24    concluded that corrosion and wear in the same tin connector was the root of the airbag problems in

25    the Malibu and G6 models.[38]

26    

27    [36] *See* GM Notice to NHTSA dated March 17, 2014, at 1.

28    [37] *See* GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

[38] *See id.*, at 2.

FIRST AMENDED COMPLAINT

98.     In January 2010, after review of the Malibu and G6 airbag connector issues, GM concluded that ignoring the service airbag message could increase the resistance such that an SIAB might not deploy in a side impact collision.  On May 11, 2010, GM issued a Customer Satisfaction Bulletin for the Malibu and G6 models and instructed dealers to secure both front seat-mounted, side-impact airbag wire harnesses and, if necessary, reroute the wire harness.[39]

99.     From February to May 2010, GM revisited the data on vehicles with faulty harness wiring issues, and noted another spike in the volume of the airbag service warranty claims.  This led GM to conclude that the November 2008 bulletin was "not entirely effective in correcting the [wiring defect present in the vehicles]."  On November 23, 2010, GM issued another Customer Satisfaction Bulletin for certain 2008 Buick Enclave, 2008 Saturn Outlook, and 2008 GMC Acadia models built from October 2007 to March 2008, instructing dealers to secure SIAB harnesses and re-route or replace the SIAB connectors.[40]

100.     GM issued a revised Customer Service Bulletin on February 3, 2011, requiring replacement of the front seat-mounted side-impact airbag connectors in the same faulty vehicles mentioned in the November 2010 bulletin.  In July 2011, GM again replaced its connector, this time with a Tyco-manufactured connector featuring a silver-sealed terminal.[41]

101.     But in 2012, GM noticed another spike in the volume of warranty claims relating to SIAB connectors in vehicles built in the second half of 2011.  After further analysis of the Tyco connectors, it discovered that inadequate crimping of the connector terminal was causing increased system resistance.  In response, GM issued an internal bulletin for 2011-12 Buick Enclave, Chevy Traverse, and GMC Acadia vehicles, recommending dealers repair affected vehicles by replacing the original connector with a new sealed connector.[42]

102.     The defect was still uncured, however, because in 2013 GM again marked an increase in service repairs and buyback activity due to illuminated airbag service lights.  On

---

[39] *See id.*

[40] *See id.*, at 3.

[41] *See id.*

[42] *See id.*, at 4.

- 19 -
FIRST AMENDED COMPLAINT

1    October 4, 2013, GM opened an investigation into airbag connector issues in 2011-2013 Buick

2    Enclave, Chevy Traverse, and GMC Acadia models.  The investigation revealed an increase in

3    warranty claims for vehicles built in late 2011 and early 2012.[43]

4        103.    On February 10, 2014, GM concluded that corrosion and crimping issues were again

5    the root cause of the airbag problems.[44]

6        104.    GM initially planned to issue a less-urgent Customer Satisfaction Program to

7    address the airbag flaw in the 2010-2013 vehicles.  But it wasn't until a call with NHTSA on

8    March 14, 2014, that GM finally issued a full-blown safety recall on the vehicles with the faulty

9    harness wiring – years after it first learned of the defective airbag connectors, after four

10   investigations into the defect, and after issuing at least six service bulletins on the topic.  The recall

11   as first approved covered only 912,000 vehicles, but on March 16, 2014, it was increased to cover

12   approximately 1.2 million vehicles.[45]

13       105.    On March 17, 2014, GM issued a recall for 1,176,407 vehicles potentially afflicted

14   with the defective airbag system.  The recall instructs dealers to remove driver and passenger SIAB

15   connectors and splice and solder the wires together.[46]

16       **4.    The brake light defect.**

17       106.    Between 2004 and 2012, approximately 2.4 million GM-branded vehicles in the

18   United States were sold with a safety defect that can cause brake lamps to fail to illuminate when

19   the brakes are applied or to illuminate when the brakes are not engaged; the same defect can

20   disable cruise control, traction control, electronic stability control, and panic brake assist operation,

21   thereby increasing the risk of collisions and injuries.[47]

22       107.    Once again, GM knew of the dangerous brake light defect for years before it took

23   anything approaching the requisite remedial action.  In fact, although the brake light defect has

24

25   _____

26   [43] *See id.*

     [44] *See id.*, at 5.

27   [45] *See id.*

     [46] *See id.*

28   [47] *See* GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

1    caused at least 13 crashes since 2008, GM did not recall all 2.4 million vehicles with the defect

2    until May 2014.

3        108.    The vehicles with the brake light defect include the 2004-2012 Chevrolet Malibu,

4    the 2004-2007 Malibu Maxx, the 2005-2010 Pontiac G6, and the 2007-2010 Saturn Aura.[48]

5        109.    According to GM, the brake defect originates in the Body Control Module (BCM)

6    connection system. "Increased resistance can develop in the [BCM] connection system and result

7    in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause

8    service brakes lamp malfunction."[49]  The result is brake lamps that may illuminate when the brakes

9    are not being applied and may not illuminate when the brakes are being applied. [50]

10       110.    The same defect can also cause the vehicle to get stuck in cruise control if it is

11   engaged, or cause cruise control to not engage, and may also disable the traction control, electronic

12   stability control, and panic-braking assist features.[51]

13       111.    GM now acknowledges that the brake light defect "may increase the risk of a

14   crash."[52]

15       112.    As early as September 2008, NHTSA opened an investigation for model year 2005-

16   2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver

17   had not depressed the brake pedal and may turn on when the brake pedal was depressed.[53]

18       113.    During its investigation of the brake light defect in 2008, Old GM found elevated

19   warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005,

20   and found "fretting corrosion in the BCM C2 connector was the root cause" of the problem.[54]  Old

21   GM and its part supplier Delphi decided that applying dielectric grease to the BCM C2 connector

22

23   _____

24       [48] *Id.*

25       [49] *Id.*

         [50] *Id.*

26       [51] *Id.*

27       [52] *Id.*

         [53] *Id.* at 2.

28       [54] *Id.*

1    would be "an effective countermeasure to the fretting corrosion."[55]  Beginning in November of

2    2008, the company began applying dielectric grease in its vehicle assembly plants.[56]

3        114.    On December 4, 2008, Old GM issued a TSB recommending the application of

4    dielectric grease to the BCM C2 connector for the MY 2005-2009, Pontiac G6, 2004-2007

5    Chevrolet Malibu/Malibu Maxx and 2008 Malibu Classic and 2007-2009 Saturn Aura vehicles.[57]

6    One month later, in January 2009, Old GM recalled only a small subset of the vehicles with the

7    brake light defect – 8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January,

8    2005.[58]

9        115.    Not surprisingly, the brake light problem was far from resolved.

10        116.    In October 2010, GM released an updated TSB regarding "intermittent brake lamp

11    malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of

12    vehicles for which it recommended the application of dielectric grease to the BCM C2 connector.[59]

13        117.    In September of 2011, GM received an information request from Canadian

14    authorities regarding brake light defect complaints in vehicles that had not yet been recalled.  Then,

15    in June 2012, NHTSA provided GM with additional complaints "that were outside of the build

16    dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.[60]

17        118.    In February of 2013, NHTSA opened a "Recall Query" in the face of 324

18    complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu and Aura vehicles

19    that had not yet been recalled.[61]

20        119.    In response, GM asserts that it "investigated these occurrences looking for root

21    causes that could be additional contributors to the previously identified fretting corrosion," but that

22

23

24        [55] *Id.*

25        [56] *Id* at 3.

    [57] *Id.* at 2.

26        [58] *Id.*

27        [59] *Id.*

    [60] *Id.*

28        [61] *Id.* at 3.

1    it continued to believe that "fretting corrosion in the BCM C2 connector" was the "root cause" of

2    the brake light defect.[62]

3        120.    In June of 2013, NHTSA upgraded its "Recall Query" concerning brake light

4    problems to an "Engineering Analysis."[63]

5        121.    In August 2013, GM found an elevated warranty rate for BCM C2 connectors in

6    vehicles built *after* Old GM had begun applying dielectric grease to BCM C2 connectors at its

7    assembly plants in November of 2008.[64]  In November of 2013, GM concluded that "the amount of

8    dielectric grease applied in the assembly plant starting November 2008 was insufficient…."[65]

9        122.    Finally, in March of 2014, "GM engineering teams began conducting analysis and

10    physical testing to measure the effectiveness of potential countermeasures to address fretting

11    corrosion.  As a result, GM determined that additional remedies were needed to address fretting

12    corrosion."[66]

13        123.    On May 7, 2014, GM's Executive Field Action Decision Committee finally decided

14    to conduct a safety recall.

15        124.    According to GM, "Dealers are to attach the wiring harness to the BCM with a

16    spacer, apply dielectric lubricant to both the BCM CR and harness connector, and on the BAS and

17    harness connector, and relearn the brake pedal home position."[67]

18        125.    Once again, GM sat on and concealed its knowledge of the brake light defect, and

19    did not even consider available countermeasures (other than the application of grease that had

20    proven ineffective) until March of this year.

21        **5.    Shift cable defect**

22        126.    From 2004 through 2010, more than 1.1 million GM-branded vehicles were sold

23    throughout the United States with a dangerously defective transmission shift cable.  The shift cable

24    _____

25    [62] *Id.*

    [63] *Id.*

26    [64] *Id.*

27    [65] *Id.*

    [66] *Id.* at 4.

28    [67] *Id.*

may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position.  According to GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[68]

127.    Yet again, GM knew of the shift cable defect long before it issued the recent recall of more than 1.1 million vehicles with the defect.

128.    In May of 2011, NHTSA informed GM that it had opened an investigation into failed transmission cables in 2007 model year Saturn Aura vehicles.  In response, GM noted "a cable failure model in which a tear to the conduit jacket could allow moisture to corrode the interior steel wires, resulting in degradation of shift cable performance, and eventually, a possible shift cable failure."[69]

129.    Upon reviewing these findings, GM's Executive Field Action Committee conducted a "special coverage field action for the 2007-2008 MY Saturn Aura vehicles equipped with 4 speed transmissions and built with Leggett & Platt cables."  GM apparently chose that cut-off date because, on November 1, 2007, Kongsberg Automotive replaced Leggett & Platt as the cable provider. [70]

130.    GM did not recall any of the vehicles with the shift cable defect at this time, and limited its "special coverage field action" to the 2007-2008 Aura vehicles even though "the same or similar Leggett & Platt cables were used on … Pontiac G6 and Chevrolet Malibu (MMX380) vehicles."

131.    In March 2012, NHTSA sent GM an Engineering Assessment request to investigate transmission shift cable failures in 2007-2008 MY Auras, Pontiac G6s, and Chevrolet Malibus.[71]

132.    In responding to the Engineering Assessment request, GM for the first time "noticed elevated warranty rates in vehicles built with Kongsberg shift cables."  Similar to their predecessor

---

[68] *See* GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

[69] *Id.* at 2.

[70] *Id.*

[71] *Id.*

FIRST AMENDED COMPLAINT

1    vehicles built with Leggett & Platt shift cables, in the vehicles built with Kongsberg shift cables

2    "the tabs on the transmission shift cable end may fracture and separate without warning, resulting

3    in failure of the transmission shift cable and possible unintended vehicle movement."[72]

4        133.    Finally, on September 13, 2012, the Executive Field Action Decision Committee

5    decided to conduct a safety recall.  This initial recall was limited to 2008-2010 MY Saturn Aura,

6    Pontiac G6, and Chevrolet Malibu vehicles with 4-speed transmission built with Kongsberg shifter

7    cables, as well as 2007-2008 MY Saturn Aura and 2005-2007 MY Pontiac G6 vehicles with 4-

8    speed transmissions which may have been serviced with Kongsberg shift cables.[73]

9        134.    But the shift cable problem was far from resolved.

10        135.    In March of 2013, NHTSA sent GM a second Engineering Assessment concerning

11    allegations of failure of the transmission shift cables on all 2007-2008 MY Saturn Aura, Chevrolet

12    Malibu, and Pontiac G6 vehicles.[74]

13        136.    GM continued its standard process of "investigation" and delay.  But by May 9,

14    2014, GM was forced to concede that "the same cable failure mode found with the Saturn Aura 4-

15    speed transmission" was present in a wide population of vehicles.[75]

16        137.    Finally, on May 19, 2014, GM's Executive Field Actions Decision Committee

17    decided to conduct a safety recall of more than 1.1 million vehicles with the defective shift cable

18    issue, including the following models and years (as of May 23, 2014):  MY 2007-2008 Chevrolet

19    Saturn; MY 2004-2008 Chevrolet Malibu; MY 2004-2007 Chevrolet Malibu Maxx; and MY 2005-

20    2008 Pontiac G6.

21        **6.    Safety belt defect.**

22        138.    Between the years 2008-2014, more than 1.4 million GM-branded vehicles were

23    sold with a dangerous safety belt defect.  According to GM, "[t]he flexible steel cable that connects

24    the safety belt to the vehicle at the outside of the front outside of the front outboard seating

25    _____

26        [72] *Id.*

27        [73] *Id.*

        [74] *Id.*

28        [75] *Id.*

1  positions can fatigue and separate over time as a result of occupant movement into the seat.  In a

2  crash, a separated cable could increase the risk of injury to the occupant."[76]

3      139.    On information and belief, GM knew of the safety belt defect long before it issued

4  the recent recall of more than 1.3 million vehicles with the defect.

5      140.    While GM has yet to submit its full chronology of events to NHTSA, suffice to say

6  that GM has waited some five years before disclosing this defect.  This delay is consistent with

7  GM's long period of concealment of the other defects as set forth above.

8      141.    On May 19, 2014, GM's Executive Field Action Decision Committee decided to

9  conduct a recall of the following models and years in connection with the safety belt defect:  MY

10  2009-2014 Buick Enclave; MY 2009-2014 Chevrolet Traverse; MY 2009-2014 GMC Acadia; and

11  MY 2009-2010 Saturn Outlook.

12      **7.    Ignition lock cylinder defect.**

13      142.    On April 9, 2014, GM recalled 2,191,014 GM-branded vehicles to address faulty

14  ignition lock cylinders.[77]  Though the vehicles are the same as those affected by the ignition switch

15  defect,[78] the lock cylinder defect is distinct.

16      143.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition

17  key while the engine is not in the "Off" position.  If the ignition key is removed when the ignition

18  is not in the "Off" position, unintended vehicle motion may occur.  That could cause a vehicle

19  crash and injury to the vehicle's occupants or pedestrians.  As a result, some of the vehicles with

20  faulty ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard

21  number 114, "*Theft Prevention and Rollaway Prevention*."[79]

22      144.    On information and belief, GM was aware of the ignition lock cylinder defect for

23  years before finally acting to remedy it.

24

25  _____

26  [76] *See* GM Notice to NHTSA dated May 19, 2014, at 1.

    [77] *See* GM Notice to NHTSA dated April 9, 2014.

27  [78] Namely, MY 2005-2010 Chevrolet Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac
    G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.

28  [79] GM Notice to NHTSA dated April 9, 2014, at 1.

**8.    The Camaro key-design defect.**

145.    On June 13, 2014, GM recalled more than 500,000 MY 2010-2014 Chevrolet Camaros because a driver's knee can bump the key fob out of the "run" position and cause the vehicle to lose power.  This issue that has led to at least three crashes.  GM said it learned of the issue which primarily affects drivers who sit close to the steering wheel, during internal testing it conducted following its massive ignition switch recall earlier this year.  GM knows of three crashes that resulted in four minor injuries attributed to this defect.

**9.    The ignition key defect.**

146.    On June 16, 2014, GM announced a recall of 3.36 million cars due to a problem with keys that can turn off ignitions and deactivate air bags, a problem similar to the ignition switch defects in the 2.19  million cars recalled earlier in the year.

147.    The company said that keys laden with extra weight – such as additional keys or objects attached to a key ring – could inadvertently switch the vehicle's engine off if the car struck a pothole or crossed railroad tracks.

148.    GM said it was aware of eight accidents and six injuries related to the defect.

149.    As early as December 2000, drivers of the Chevrolet Impala and the other newly recalled cars began lodging complaints about stalling with the National Highway Traffic Safety Administration.  "When foot is taken off accelerator, car will stall without warning," one driver of a 2000 Cadillac Deville told regulators in December 2000.  "Complete electrical system and engine shutdown while driving," another driver of the same model said in January 2001.  "Happened three different times to date.  Dealer is unable to determine cause of failure."

150.    The vehicles covered include the Buick Lacrosse, model years 2005-09; Chevrolet Impala, 2006-14; Cadillac Deville, 2000-05; Cadillac DTS, 2004-11; Buick Lucerne, 2006-11; Buick Regal LS and RS, 2004-05; and Chevrolet Monte Carlo, 2006-08.

**10.    At least 26 other defects were revealed by GM in recalls during the first half of 2014.**

151.    The nine defects discussed above – and the resultant 12 recalls – are but a subset of the 40 recalls ordered by GM in connection with 35 separate defects during the first five and one-

1    half months of 2014.  The additional 26 defects are briefly summarized in the following

2    paragraphs.

3         152.    **Transmission oil cooler line defect:**  On March 31, 2014, GM recalled 489,936

4    MY 2014 Chevy Silverado, 2014 GMC Sierra, 2014 GMC Yukon, 2014 GMC Yukon XL, 2015

5    Chevy Tahoe, and 2015 Chevy Suburban vehicles.  These vehicles may have transmission oil

6    cooler lines that are not securely seated in the fitting.  This can cause transmission oil to leak from

7    the fitting, where it can contact a hot surface and cause a vehicle fire.

8         153.    **Power management mode software defect:**  On January 13, 2014, GM recalled

9    324,970 MY 2014 Chevy Silverado and GMC Sierra Vehicles.  When these vehicles are idling in

10    cold temperatures, the exhaust components can overheat, melt nearby plastic parts, and cause an

11    engine fire.

12         154.    **Substandard front passenger airbags:**  On March 17, 2014, GM recalled 303,013

13    MY 2009-2014 GMC Savana vehicles.  In certain frontal impact collisions below the air bag

14    deployment threshold in these vehicles, the panel covering the airbag may not sufficiently absorb

15    the impact of the collision.  These vehicles therefore do not meet the requirements of Federal

16    Motor Vehicle Safety Standard number 201, "Occupant Protection in Interior Impact."

17         155.    **Light control module defect**:  On May 16, 2014, GM recalled 218,214 MY 2004-

18    2008 Chevrolet Aveo (subcompact) and 2004-2008 Chevrolet Optra (subcompact) vehicles.  In

19    these vehicles, heat generated within the light control module in the center console in the

20    instrument panel may melt the module and cause a vehicle fire.

21         156.    **Front axle shaft defect:**  On March 28, 2014, GM recalled 174,046 MY 2013-2014

22    Chevrolet Cruze vehicles.  In these vehicles, the right front axle shaft may fracture and separate. If

23    this happens while the vehicle is being driven, the vehicle will lose power and coast to a halt.  If a

24    vehicle with a fractured shaft is parked and the parking brake is not applied, the vehicle may move

25    unexpectedly which can lead to accident and injury.

26         157.    **Brake boost defect:**  On May 13, 2014, GM recalled 140,067 MY 2014 Chevrolet

27    Malibu vehicles.  The "hydraulic boost assist" in these vehicles may be disabled; when that

28    happens, slowing or stopping the vehicle requires harder brake pedal force, and the vehicle will

1    travel a greater distance before stopping.  Therefore, these vehicles do not comply with Federal

2    Motor Vehicle Safety Standard number 135, "Light Vehicle Brake Systems," and are at increased

3    risk of collision.

4         158.    **Low beam headlight defect**:  On May 14, 2014, GM recalled 103,158 MY 2005-

5    2007 Chevrolet Corvette vehicles.  In these vehicles, the underhood bussed electrical center

6    (UBEC) housing can expand and cause the headlamp low beam relay control circuit wire to bend.

7    When the wire is repeatedly bent, it can fracture and cause a loss of low beam headlamp

8    illumination.  The loss of illumination decreases the driver's visibility and the vehicle's conspicuity

9    to other motorists, increasing the risk of a crash.

10        159.    **Vacuum line brake booster defect**:  On March 17, 2014, GM recalled 63,903 MY

11   2013-2014 Cadillac XTS vehicles.  In these vehicles, a cavity plug on the brake boost pump

12   connector may dislodge and allow corrosion of the brake booster pump relay connector.  This can

13   have an adverse impact on the vehicle's brakes.

14        160.    **Fuel gauge defect**:  On April 29, 2014, GM recalled 51,460 MY 2014 Chevrolet

15   Traverse, GMC Acadia and Buick Enclave vehicles.  In these vehicles, the engine control module

16   (ECM) software may cause inaccurate fuel gauge readings.  An inaccurate fuel gauge may result in

17   the vehicle unexpectedly running out of fuel and stalling, and thereby increases the risk of accident.

18        161.    **Acceleration defect**:  On April 24, 2014, GM recalled 50,571 MY 2013 Cadillac

19   SRX vehicles.  In these vehicles, there may be a three- to four-second lag in acceleration due to

20   faulty transmission control module programming.  That lag may increase the risk of a crash.

21        162.    **Flexible flat cable airbag defect**:  On April 9, 2014, GM recalled 23,247 MY

22   2009-2010 Pontiac Vibe vehicles.  These vehicles are susceptible to a failure in the Flexible Flat

23   Cable ("FFC") in the spiral cable assemble connecting the driver's airbag module.  When the FFC

24   fails, connectivity to the driver's airbag module is lost and the airbag is deactivated.  The resultant

25   failure of the driver's airbag to deploy increases the risk of injury to the driver in the event of a

26   crash.

27

28

1    163.    **Windshield wiper defect**:  On May 14, 2014, GM recalled 19,225 MY 2014

2    Cadillac CTS vehicles.  A defect leaves the windshield wipers in these vehicles prone to failure.

3    Inoperative windshield wipers can decrease the driver's visibility and increase the risk of a crash.

4    164.    **Brake rotor defect**:  On May 7, 2014, GM recalled 8,208 MY 2014 Chevrolet

5    Malibu and Buick LaCrosse vehicles.  In these vehicles, GM may have accidentally installed rear

6    brake rotors on the front brakes.  The rear rotors are thinner than the front rotors, and the use of

7    rear rotors in the front of the vehicle may result in a front brake pad detaching from the caliper.

8    The detachment of a break pad from the caliper can cause a sudden reduction in braking which

9    lengthens the distance required to stop the vehicle and increases the risk of a crash.

10    165.    **Passenger-side airbag defect**:  On May 16, 2014, GM recalled 1,402 MY 2015

11    Cadillac Escalade vehicles.  In these vehicles, the airbag module is secured to a chute adhered to

12    the backside of the instrument panel with an insufficiently heated infrared weld.  As a result, the

13    front passenger-side airbag may only partially deploy in the event of crash, and this will increase

14    the risk of occupant injury.  These vehicles do not conform to Federal Motor Vehicle Safety

15    Standard number 208, "Occupant Crash Protection."

16    166.    **Electronic stability control defect**:  On March 26, 2014, GM recalled 656 MY

17    2014 Cadillac ELR vehicles.  In these vehicles, the electronic stability control (ESC) system

18    software may inhibit certain ESC diagnostics and fail to alert the driver that the ESC system is

19    partially or fully disabled.  Therefore, these vehicles fail to conform to Federal Motor Vehicle

20    Safety Standard number 126, "Electronic Stability Control Systems."  A driver who is not alerted

21    to an ESC system malfunction may continue driving with a disabled ESC system.  That may result

22    in the loss of directional control, greatly increasing the risk of a crash.

23    167.    **Steering tie-rod defect**:  On May 13, 2014, GM recalled 477 MY 2014 Chevrolet

24    Silverado, 2014 GMC Sierra and 2015 Chevrolet Tahoe vehicles.  In these vehicles, the tie-rod

25    threaded attachment may not be properly tightened to the steering gear rack.  An improperly

26    tightened tie-rod attachment may allow the tie-rod to separate from the steering rack and result in a

27    loss of steering that greatly increases the risk of a vehicle crash.

28

1      168.    **Automatic transmission shift cable adjuster**:  On February 20, 2014, GM recalled

2    352 MY 2014 Buick Enclave, Buick LaCrosse, Buick Regal, Verano, Chevrolet Cruze, Chevrolet

3    Impala, Chevrolet Malibu, Chevrolet Traverse, and GMC Acadia vehicles.  In these vehicles, the

4    transmission shift cable adjuster may disengage from the transmission shift lever.  When that

5    happens, the driver may be unable to shift gears, and the indicated gear position may not be

6    accurate.  If the adjuster is disengaged when the driver attempts to stop and park the vehicle, the

7    driver may be able to shift the lever to the "PARK" position but the vehicle transmission may not

8    be in the "PARK" gear position.  That creates the risk that the vehicle will roll away as the driver

9    and other occupants exit the vehicle, or anytime thereafter.

10      169.    **Fuse block defect**:  On May 19, 2014, GM recalled 58 MY 2015 Chevrolet

11    Silverado HD and GMC Sierra HD vehicles.  In these vehicles, the retention clips that attach the

12    fuse block to the vehicle body can become loose allowing the fuse block to move out of position.

13    When this occurs, exposed conductors in the fuse block may contact the mounting studs or other

14    metallic components, which in turn causes a "short to ground" event.  That can result in in an

15    arcing condition, igniting nearby combustible materials and starting an engine compartment fire.

16      170.    **Diesel transfer pump defect**:  On April 24, 2014, GM recalled 51 MY 2014 GMC

17    Sierra HD and 2015 Chevrolet Silverado HD vehicles.  In these vehicles, the fuel pump

18    connections on both sides of the diesel fuel transfer pump may not be properly torqued.  That can

19    result in a diesel fuel leak, which can cause a vehicle fire.

20      171.    **Base radio defect:**  On June 5, 2014, GM recalled 57,512 MY 2014 Chevrolet

21    Silverado LD, 2014 GMC Sierra LD and model year 2015 Silverado HD, Tahoe and Suburban and

22    2015 GMC Sierra HD and Yukon and Yukon XL vehicles because the base radio may not work.

23    The faulty base radio prevents audible warnings if the key is in the ignition when the driver's door

24    is open, and audible chimes when a front seat belt is not buckled.  Vehicles with the base radio

25    defect are out of compliance with motor vehicle safety standards covering theft protection,

26    rollaway protection and occupant crash protection.

27      172.    **Shorting bar defect:**  On June 5, 2014, GM recalled 31,520 MY 2012 Buick

28    Verano and Chevrolet Camaro, Cruze, and Sonic compact cars for a defect in which the shorting

1    bar inside the dual stage driver's air bag may occasionally contact the air bag terminals. If contact

2    occurs, the air bag warning light will illuminate. If the car and terminals are contacting each other

3    in a crash, the air bag will not deploy. GM admits awareness of one crash with an injury where the

4    relevant diagnostic trouble code was found at the time the vehicle was repaired. GM is aware of

5    other crashes where air bags did not deploy but it does not know if they were related to this

6    condition. GM conducted two previous recalls for this condition involving 7,116 of these vehicles

7    with no confirmed crashes in which this issue was involved.

8         173.    **Front passenger airbag end cap defect**:  On June 5, 2014, GM recalled 61 model

9    year 2013-2014 Chevrolet Spark and 2013 model year Buick Encore vehicles manufactured in

10   Changwon, Korea from December 30, 2012 through May 8, 2013 because the vehicles may have a

11   condition in which the front passenger airbag end cap could separate from the airbag inflator. In a

12   crash, this may prevent the passenger airbag from deploying properly.

13        174.    **Sensing and Diagnostic Model ("SDM") defect:**  On June 5, 2014, GM recalled

14   33 model year 2014 Chevrolet Corvettes in the U.S. because an internal short-circuit in the sensing

15   and diagnostic module (SDM) could disable frontal air bags, safety belt pretensioners and the

16   Automatic Occupancy Sensing module.

17        175.    **Sonic Turbine Shaft:**  On June 11, 2014, GM recalled 21,567 Chevrolet Sonics due

18   to a transmission turbine shaft that can malfunction.

19        176.    **Electrical System defect:**  On June 11, 2014, GM recalled 14,765 model year 2014

20   Buick LaCrosse sedans because a wiring splice in the driver's door can corrode and break, cutting

21   power to the windows, sunroof, and door chime under certain circumstances.

22        177.    **Seatbelt Tensioning System defect:**  On June 11, 2014, GM recalled 8,789 model

23   year 2004-11 Saab 9-3 convertibles because a cable in the driver's seatbelt tensioning system can

24   break.

25        178.    In light of GM's history of concealing known defects, there is little reason to think

26   that either GM's recalls have fully addressed the 35 recently revealed defects or that GM has

27   addressed each defect of which it is or should be aware.

28

**B.**    **GM Valued Cost-Cutting Over Safety, and Actively Encouraged Employees to Conceal Safety Issues.**

179.    Recently revealed information presents a disturbing picture of GM's approach to safety issues – both in the design and manufacture stages, and in discovering and responding to defects in GM-branded vehicles that have already been sold.

180.    GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

181.    One "directive" at GM was "cost is everything." [80]  The messages from top leadership at GM to employees, as well as their actions, were focused on the need to control cost.[81]

182.    One GM engineer stated that emphasis on cost control at GM "permeates the fabric of the whole culture.'" [82]

183.    According to Mark Reuss (President of GMNA from 2009-2013 before succeeding Mary Barra as Executive Vice President for Global Product Development, Purchasing and Supply Chain in 2014), cost and time-cutting principles known as the "Big 4" at GM "emphasized timing over quality."[83]

184.    GM's focus on cost-cutting created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred cost and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.[84]

185.    As another cost-cutting measure, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[85]

---

[80] GM Report at 249.

[81] GM Report at 250.

[82] GM Report at 250.

[83] GM Report at 250.

[84] GM Report at 250.

[85] GM Report at 251.

1      186.    Because of GM's focus on cost-cutting, GM Engineers did not believe they had

2   extra funds to spend on product improvements.[86]

3      187.    GM's focus on cost-cutting also made it harder for GM personnel to discover safety

4   defects, as in the case of the "TREAD Reporting team."

5      188.    GM used its TREAD database (known as "TREAD") to store the data required to be

6   reported quarterly to NHTSA under the TREAD Act.[87]   From the date of its inception in 2009,

7   TREAD has been the principal database used by GM to track incidents related to its vehicles.[88]

8      189.    From 2003-2007 or 2008, the TREAD Reporting team had eight employees, who

9   would conduct monthly searches and prepare scatter graphs to identify spikes in the number of

10   accidents or complaints with respect to various GM-branded vehicles.   The TREAD Reporting

11   team reports went to a review panel and sometimes spawned investigations to determine if any

12   safety defect existed. [89]

13      190.    In or around 2007-08, Old GM reduced the TREAD Reporting team from eight to

14   three employees, and the monthly data mining process pared down.[90]   In 2010, GM restored two

15   people to the team, but they did not participate in the TREAD database searches.[91]   Moreover, until

16   2014, the TREAD Reporting team did not have sufficient resources to obtain any of the advanced

17   data mining software programs available in the industry to better identify and understand potential

18   defects.[92]

19      191.    By starving the TREAD Reporting team of the resources it needed to identify

20   potential safety issues, GM helped to insure that safety issues would not come to light.

21

22

23

24      [86] GM Report at 251.

25      [87] GM Report at 306.

        [88] GM Report at 306.

26      [89] GM Report at 307.

27      [90] GM Report at 307.

        [91] GM Report at 307-308.

28      [92] GM Report at 208.

1       192.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."

2    The culture, atmosphere and supervisor response at GM "discouraged individuals from raising

3    safety concerns." [93]

4       193.    GM CEO Mary Barra experienced instances where GM engineers were "unwilling

5    to identify issues out of concern that it would delay the launch" of a vehicle.[94]

6       194.    GM supervisors warned employees to "never put anything above the company" and

7    "never put the company at risk."[95]

8       195.    GM "pushed back" on describing matters as safety issues and, as a result, "GM

9    personnel failed to raise significant issues to key decision-makers." [96]

10       196.    So, for example, GM discouraged the use of the word "stall" in Technical Service

11    Bulletins ("TSBs") it sometimes sent to dealers about issues in GM-branded vehicles.  According

12    to Steve Oakley, who drafted a TSB in connection with the ignition switch defects, "the term 'stall'

13    is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about

14    vehicle safety, which suggests GM should recall the vehicle, not issue a bulletin."[97]  Other GM

15    personnel confirmed Oakley on this point, stating that "there was concern about the use of 'stall' in

16    a TSB because such language might draw the attention of NHTSA."[98]

17       197.    Oakley further noted that "he was reluctant to push hard on safety issues because of

18    his perception that his predecessor had been pushed out of the job for doing just that."[99]

19       198.    Many GM employees "did not take notes at all at critical safety meetings because

20    they believed GM lawyers did not want such notes taken." [100]

21

22

---

23    [93] GM Report at 252.

24    [94] GM Report at 252.

    [95] GM Report at 252-253.

25    [96] GM Report at 253.

26    [97] GM Report at 92.

    [98] GM Report at 93.

27    [99] GM Report at 93.

28    [100] GM Report at 254.

FIRST AMENDED COMPLAINT

1      199.    A GM training document released by NHTSA as an attachment to its Consent Order

2    sheds further light on the lengths to which GM went to ensure that known defects were concealed.

3    It appears that the defects were concealed pursuant to a company policy GM inherited from Old

4    GM.

5      200.    The document consists of slides from a 2008 Technical Learning Symposium for

6    "designing engineers," "company vehicle drivers," and other employees at Old GM.  On

7    information and belief, the vast majority of employees who participated in this webinar

8    presentation continued on in their same positions at GM after July 10, 2009.

9      201.    The presentation focused on recalls, and the "reasons for recalls."

10      202.    One major component of the presentation was captioned "Documentation

11    Guidelines," and focused on what employees should (and should not say) when describing

12    problems in vehicles.

13      203.    Employees were instructed to "[w]rite smart," and to "[b]e factual, not fantastic" in

14    their writing.

15      204.    Company vehicle drivers were given examples of comments to avoid, including the

16    following:  "This is a safety and security issue"; "I believe the wheels are too soft and weak and

17    could cause a serious problem"; and "Dangerous … almost caused accident."

18      205.    In documents used for reports and presentations, employees were advised to avoid a

19    long list of words, including: "bad," "dangerous," "defect," "defective," "failed," "flawed," "life-

20    threatening," "problem," "safety," "safety-related," and "serious."

21      206.    In truly Orwellian fashion, the Company advised employees to use the words (1)

22    "Issue, Condition [or] Matter" instead of "Problem"; (2) "Has Potential Safety Implications"

23    instead of "Safety"; (3) "Broke and separated 10 mm" instead of "Failed"; (4)

24    "Above/Below/Exceeds Specification" instead of "Good [or] Bad"; and (5) "Does not perform to

25    design" instead of "Defect/Defective."

26      207.    As NHTSA's Acting Administrator Friedman noted at the May 16, 2014 press

27    conference announcing the Consent Order concerning the ignition switch defect, it was GM's

28    company policy to avoid using words that might suggest the existence of a safety defect:

010440-12  692229 V1                                    - 36 -

> GM must rethink the corporate philosophy reflected in the documents we reviewed, including training materials that explicitly discouraged employees from using words like 'defect,' 'dangerous,' 'safety related,' and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem.

208.    GM appears to have trained its employees to conceal the existence of known safety defects from consumers and regulators.  Indeed, it is nearly impossible to convey the potential existence of a safety defect without using the words "safety" or "defect" or similarly strong language that was verboten at GM.

209.    So institutionalized at GM was the "phenomenon of avoiding responsibility" that the practice was given a name: "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[101]

210.    CEO Mary Barra described a related phenomenon , "known as the 'GM nod," which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[102]

211.    According to the GM Report prepared by Anton R. Valukas, part of the failure to properly correct the ignition switch defect was due to problems with GM's organizational structure.[103]  Part of the failure to properly correct the ignition switch defect was due to a corporate culture that did not care enough about safety.[104]  Part of the failure to properly correct the ignition switch defect was due to a lack of open and honest communication with NHTSA regarding safety issues.[105]  Part of the failure to properly correct the ignition switch defect was due to improper conduct and handling of safety issues by lawyers within GM's Legal Staff.[106]  On information and belief, all of these issues also helped cause the concealment of and failure to remedy the many defects that have led to the spate of recalls in the first half of 2014.

---

[101] GM Report at 255.

[102] GM Report at 256.

[103] GM Report at 259-260.

[104] GM Report at 260-261.

[105] GM Report at 263.

[106] GM Report at 264.

FIRST AMENDED COMPLAINT

**C.    The Ignition Switch Defects Have Harmed Consumers in Orange County and the State**

212.    GM's unprecedented concealment of a large number of serious defects, and its irresponsible approach to safety issues, has caused damage to consumers in Orange County and throughout California.

213.    A vehicle made by a reputable manufacturer of safe and reliable vehicles who stands behind its vehicles after they are sold is worth more than an otherwise similar vehicle made by a disreputable manufacturer known for selling defective vehicles and for concealing and failing to remedy serious defects after the vehicles are sold.

214.    A vehicle purchased or leased under the reasonable assumption that it is safe and reliable is worth more than a vehicle of questionable safety and reliability due to the manufacturer's recent history of concealing serious defects from consumers and regulators.

215.    Purchasers and lessees of new and used GM-branded vehicles after the July 10, 2009, inception of GM paid more for the vehicles than they would have had GM disclosed the many defects it had a duty to disclose in GM-branded vehicles.  Because GM concealed the defects and the fact that it was a disreputable brand that valued cost-cutting over safety, these consumers did not receive the benefit of their bargain.  And the value of all their vehicles has diminished as the result of GM's deceptive conduct.

216.    If GM had timely disclosed the many defects as required by the TREAD Act and California law, California vehicle owners' GM-branded vehicles would be considerably more valuable than they are now.  Because of GM's now highly publicized campaign of deception, and its belated, piecemeal and ever-expanding recalls, so much stigma has attached to the GM brand that no rational consumer would pay what otherwise would have been fair market value for GM-branded vehicles.

**D.    Given GM's Knowledge of the Defects and the Risk to Public Safety, it Was Obliged to Promptly Disclose and Remedy the Defects.**

217.    The National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") requires manufacturers of motor vehicles and motor vehicle equipment to submit certain information to the National Highway Traffic Safety Administration (NHTSA) in order "to reduce

1   traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101 *et.*

2   *seq.*

3   218.   Under the Safety Act, the manufacturer of a vehicle has a duty to notify dealers and

4   purchasers of a safety defect and remedy the defect without charge. 49 U.S.C. § 30118. In

5   November 2000, Congress enacted the Transportation Recall Enhancement, Accountability and

6   Documentation (TREAD) Act, 49 U.S.C. §§ 30101-30170, which amended the Safety Act and

7   directed the Secretary of Transportation to promulgate regulation expanding the scope of the

8   information that manufacturers are required to submit to NHTSA.

9   219.   The Safety Act requires manufacturers to inform NHTSA within five days of

10   discovering a defect. 49 CFR § 573.6 provides that a manufacturer "shall furnish a report to the

11   NHTSA for each defect in his vehicles or in his items of original or replacement equipment that he

12   or the Administrator determines to be related to motor vehicle safety, and for each noncompliance

13   with a motor vehicle safety standard in such vehicles or items of equipment which either he or the

14   Administrator determines to exist," and that such reports must include, among other

15   things:  identification of the vehicles or items of motor vehicle equipment potentially containing

16   the defect or noncompliance, including a description of the manufacturer's basis for its

17   determination of the recall population and a description of how the vehicles or items of equipment

18   to be recalled differ from similar vehicles or items of equipment that the manufacturer has not

19   included in the recall; in the case of passenger cars, the identification shall be by the make, line,

20   model year, the inclusive dates (month and year) of manufacture, and any other information

21   necessary to describe the vehicles; a description of the defect or noncompliance, including both a

22   brief summary and a detailed description, with graphic aids as necessary, of the nature and physical

23   location (if applicable) of the defect or noncompliance; a chronology of all principal events that

24   were the basis for the determination that the defect related to motor vehicle safety, including a

25   summary of all warranty claims, field or service reports, and other information, with their dates of

26   receipt; a description of the manufacturer's program for remedying the defect or noncompliance;

27   and a plan for reimbursing an owner or purchaser who incurred costs to obtain a remedy for the

28

1    problem addressed by the recall within a reasonable time in advance of the manufacturer's

2    notification of owners, purchasers and dealers.

3          220.    Manufacturers are also required to submit "early warning reporting" (EWR) data

4    and information that may assist the agency in identifying safety defects in motor vehicles or motor

5    vehicle equipment. *See* 49 U.S.C. § 30166(m)(3)(B). The data submitted to NHTSA under the

6    EWR regulation includes:  production numbers (cumulative total of vehicles or items of equipment

7    manufactured in the year); incidents involving death or injury based on claims and notices received

8    by the manufacturer; claims relating to property damage received by the manufacturer; warranty

9    claims paid by the manufacturer (generally for repairs on relatively new products) pursuant to a

10   warranty program (in the tire industry these are warranty adjustment claims); consumer complaints

11   (a communication by a consumer to the manufacturer that expresses dissatisfaction with the

12   manufacturer's product or performance of its product or an alleged defect); and field reports

13   (prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack

14   of durability or other performance problem of a motor vehicle or item of motor vehicle equipment).

15         221.    Regulations promulgated under the TREAD Act also require manufacturers to

16   inform NHTSA of defects and recalls in motor vehicles in foreign countries.  Under 49 CFR §§

17   579.11 and 579.12 a manufacturer must report to NHTSA not later than five working days after a

18   manufacturer determines to conduct a safety recall or other safety campaign in a foreign country

19   covering a motor vehicle sold or offered for sale in the United States.  The report must include,

20   among other things:  a description of the defect or noncompliance, including both a brief summary

21   and a detailed description, with graphic aids as necessary, of the nature and physical location (if

22   applicable) of the defect or noncompliance; identification of the vehicles or items of motor vehicle

23   equipment potentially containing the defect or noncompliance, including a description of the

24   manufacturer's basis for its determination of the recall population and a description of how the

25   vehicles or items of equipment to be recalled differ from similar vehicles or items of equipment

26   that the manufacturer has not included in the recall; the manufacturer's program for remedying the

27   defect or noncompliance, the date of the determination and the date the recall or other campaign

28   was commenced or will commence in each foreign country; and identify all motor vehicles that the

1    manufacturer sold or offered for sale in the United States that are identical or substantially similar

2    to the motor vehicles covered by the foreign recall or campaign.

3        222.    49 CFR § 579.21 requires manufacturers to provide NHTSA quarterly field reports

4    related to the current and nine preceding model years regarding various systems, including, but not

5    limited to, vehicle speed control.  The field reports must contain, among other things:  a report on

6    each incident involving one or more deaths or injuries occurring in the United States that is

7    identified in a claim against and received by the manufacturer or in a notice received by the

8    manufacturer which notice alleges or proves that the death or injury was caused by a possible

9    defect in the manufacturer's vehicle, together with each incident involving one or more deaths

10   occurring in a foreign country that is identified in a claim against and received by the manufacturer

11   involving the manufacturer's vehicle, if that vehicle is identical or substantially similar to a vehicle

12   that the manufacturer has offered for sale in the United States, and any assessment of an alleged

13   failure, malfunction, lack of durability, or other performance problem of a motor vehicle or item of

14   motor vehicle equipment (including any part thereof) that is originated by an employee or

15   representative of the manufacturer and that the manufacturer received during a reporting period.

16       223.    GM has known throughout the liability period that many GM-branded vehicles sold

17   or leased in the State of California were defective – and, in many cases, dangerously so.

18       224.    Since the date of GM's inception, many people have been injured or died in

19   accidents relating to the ignition switch defects alone.  While the exact injury and death toll is

20   unknown, as a result of GM's campaign of concealment and suppression of the large number of

21   defects plaguing over 17 million GM-branded vehicles, numerous other drivers and passengers of

22   the Defective Vehicles have died or suffered serious injuries and property damage.  All owners and

23   lessees of GM-branded vehicles have suffered economic damage to their property due to the

24   disturbingly large number of recently revealed defects that were concealed by GM.  Many are

25   unable to sell or trade their cars, and many are afraid to drive their cars.

26

27

28

**E.      GM's Misrepresentations and Deceptive, False, Untrue and Misleading Advertising, Marketing and Public Statements**

225.      Despite its knowledge of the many serious defects in millions of GM-branded vehicles, GM continued to (1) sell new Defective Vehicles; (2) sell used Defective Vehicles as "GM certified"; and (3) use defective ignition switches to repair GM vehicles, all without disclosing or remedying the defects.  As a result, the injury and death toll associated with the Defective Vehicles has continued to increase and, to this day, GM continues to conceal and suppress this information.

226.      During this time period, GM falsely assured California consumers in various written and broadcast statements that its cars were safe and reliable, and concealed and suppressed the true facts concerning the many defects in millions of GM-branded vehicles, and GM's policies that led to both the manufacture of an inordinate number of vehicles with safety defects and the subsequent concealment of those defects once the vehicles are on the road.  To this day, GM continues to conceal and suppress information about the safety and reliability of its vehicles.

227.      Against this backdrop of fraud and concealment, GM touted its reputation for safety and reliability, and knew that people bought and retained its vehicles because of that reputation, and yet purposefully chose to conceal and suppress the existence and nature of the many safety defects.  Instead of disclosing the truth about the dangerous propensity of the Defective Vehicles and GM's disdain for safety, California consumers were given assurances that their vehicles were safe and defect free, and that the Company stands behind its vehicles after they are on the road.

228.      GM has consistently marketed its vehicles as "safe" and proclaimed that safety is one of its highest priorities.

229.      It told consumers that it built the world's best vehicles:

> We truly are building a new GM, from the inside out. Our vision is clear: to design, build and sell the world's best vehicles, and we have a new business model to bring that vision to life. We have a lower cost structure, a stronger balance sheet and a dramatically lower risk profile. We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce.

> "Our plan is to steadily invest in creating world-class vehicles, which will continuously drive our cycle of great design, high quality and higher profitability."

- 42 -

FIRST AMENDED COMPLAINT

1          230.    It represented that it was building vehicles with design excellence, quality and

2    performance:

3                  And across the globe, other GM vehicles are gaining similar acclaim
                   for design excellence, quality and performance, including the Holden
4                  Commodore in Australia.  Chevrolet Agile in Brazil, Buick LaCrosse
                   in China and many others.

5
                   The company's progress is early evidence of a new business model
6                  that begins and ends with great vehicles.  We are leveraging our
                   global resources and scale to maintain stringent cost management
7                  while taking advantage of growth and revenue opportunities around
                   the world, to ultimately deliver sustainable results for all of our
8                  shareholders.

9    ///

10    ///

11    ///

12    ///

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

231.    The theme below was repeated in advertisements, company literature, and material at dealerships as the core message about GM's Brand:

The new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity and streamlined, more efficient inventory processes. The end result is products that delight customers and generate higher volumes and margins—and ultimately deliver more cash to invest in our future vehicles.

## A New Vision, a New Business Model

Our vision is simple, straightforward and clear; to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently

and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

1

232.    It represented that it had a world-class lineup in North America:








- 45 -

FIRST AMENDED COMPLAINT



///

///

///

///

///

///

///

233.    It boasted of its new "culture":



234.    In its 2012 Annual Report, GM told the world the following about its brand:

> What is immutable is our focus on the customer, which requires us to go from "good" today to "great" in everything we do, including product design, initial quality, durability and service after the sale.

235.    GM also indicated it had changed its structure to create more "accountability" which, as shown above, was a blatant falsehood:

That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for produce execution, profitability and customer satisfaction.

236. And GM represented that product quality was a key focus – another blatant falsehood:

Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.

237. In its 2013 Letter to Stockholders GM noted that its brand had grown in value and boasted that it designed the "World's Best Vehicles":

Dear Stockholder:

Your company is on the move once again. While there were highs and lows in 2011, our overall report card shows very solid marks, including record net income attributable to common stockholders of $7.6 billion and EBIT-adjusted income of $8.3 billion.

- GM's overall momentum, including a 13 percent sales increase in the United States, created new jobs and drove investments. We have announced investments in 29 U.S. facilities totaling more than $7.1 billion since July 2009, with more than 17,500 jobs created or retained.

Design, Build and Sell the World's Best Vehicles

This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define. It means creating vehicles that people desire, value and are proud to own. When we get this right, it transforms our reputation and the company's bottom line.

Strengthen Brand Value

Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth. They are Chevrolet, which embodies the qualities of value, reliability, performance and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful. At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.

Each day the cultural change underway at GM becomes more striking. The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.

1         That's the crux of our plan.  The plan is something we can control.
     We like the results we're starting to see and we're going to stick to
2         it – always.

3        238.    Once it emerged from bankruptcy, GM told the world it was a new and improved

4    company:



239.    A radio ad that ran from GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

240.    An online ad for "GM certified" used vehicles that ran from July 6, 2009 until April 5, 2010, stated that "GM certified means no worries."

241.    GM's Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "[a]s long as there are babies, there'll be Chevys to bring them home."

242.    Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

243.    An online national ad campaign for GM in April of 2012 stressed "Safety. Utility. Performance."

244.    A national print ad campaign in April of 2013 states that "[w]hen lives are on the line, you need a dependable vehicle you can rely on.  Chevrolet and GM … for power, performance and safety."

245.    A December 2013 GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

246.    GM's website, GM.com, states:

> Innovation:  Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification.  Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive.  Our engineers thoroughly test our vehicles for durability, comfort and noise minimization before you think about them.  The same quality process ensures our safety technology performs when you need it.

247.    On February 25, 2014, GM North America President Alan Batey publically stated: "Ensuring our customers' safety is our first order of business.  We are deeply sorry and we are working to address this issue as quickly as we can."

248.    These proclamations of safety and assurances that GM's safety technology performs when needed were false and misleading because they failed to disclose the dangerous defects in millions of GM-branded vehicles, and the fact GM favored cost-cutting and concealment over safety.  GM knew or should have known that its representations were false and misleading.

249.    GM continues to make misleading safety claims in public statements, advertisements, and literature provided with its vehicles.

250.    GM violated California law in failing to disclose and in actively concealing what it knew regarding the existence of the defects, despite having exclusive knowledge of material facts not known to the Plaintiff or to California consumers, and by making partial representations while at the same time suppressing material facts.  *LiMandri v. Judkins* (1997) 52 Cal. App. 4th 326, 337, 60 Cal. Rptr. 2d 539.  In addition, GM had a duty to disclose the information that it knew about the defects because such matters directly involved matters of public safety.

251.    GM violated California law in failing to conduct an adequate retrofit campaign (*Hernandez v. Badger Construction Equip. Co.* (1994) 28 Cal. App. 4th 1791, 1827), and in failing to retrofit the Defective Vehicles and/or warn of the danger presented by the defects after becoming aware of the dangers after their vehicles had been on the market (*Lunghi v. Clark Equip. Co.* (1984) 153 Cal. App. 3d 485; *Balido v. Improved Machinery, Inc.* (1972) 29 Cal. App. 3d 633).

252.    GM also violated the TREAD Act, and the regulations promulgated under the Act, when it failed to timely inform NHTSA of the defects and allowed cars to remain on the road with these defects. By failing to disclose and actively concealing the defects, by selling new Defective Vehicles and used "GM certified" Defective Vehicles without disclosing or remedying the defects, and by using defective ignition switches for "repairs,"  GM engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.*, including (1) representing that GM vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that new Defective Vehicles and ignition switches and used "GM certified" vehicles are of a particular standard, quality, and grade when they are not; (3) advertising GM vehicles with the intent not to sell them as advertised; (4) representing that the subjects of transactions involving GM

1    vehicles have been supplied in accordance with a previous representation when they have not; and

2    (5) selling Defective Vehicles in violation of the TREAD Act.

3                                   **VI.        CAUSES OF ACTION**

4                                     **FIRST CAUSE OF ACTION**

5            **VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200**

6            253.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

7            254.    GM has engaged in, and continues to engage in, acts or practices that constitute

8    unfair competition, as that term is defined in section 17200 of the California Business and

9    Professions Code.

10           255.    GM has violated, and continues to violate, Business and Professions Code section

11   17200 through its unlawful, unfair, fraudulent, and/or deceptive business acts and/or practices.

12   GM uniformly concealed, failed to disclose, and omitted important safety-related material

13   information that was known only to GM and that could not reasonably have been discovered by

14   California consumers.  Based on GM's concealment, half-truths, and omissions, California

15   consumers agreed to purchase or lease one or more (i) new or used GM vehicles sold on or after

16   July 10, 2009; (ii) "GM certified" Defective Vehicles sold on or after July 10, 2009; (iii) and/or to

17   have their vehicles repaired using GM's defective ignition switches.  GM also repeatedly and

18   knowingly made untrue and misleading statements in California regarding the purported reliability

19   and safety of its vehicles, and the importance of safety to the Company.  The true information

20   about the many serious defects in GM-branded vehicles, and GM's disdain for safety, was known

21   only to GM and could not reasonably have been discovered by California consumers.

22           256.    As a direct and proximate result of GM's concealment and failure to disclose the

23   many defects and the Company's institutionalized devaluation of safety, GM intended that

24   consumers would be misled into believing that that GM was a reputable manufacturer of reliable

25   and safe vehicles when in fact GM was an irresponsible manufacture of unsafe, unreliable  and

26   often dangerously defective vehicles.

27

28

**UNLAWFUL**

257.    The unlawful acts and practices of GM alleged above constitute unlawful business acts and/or practices within the meaning of California Business and Professions Code section 17200.  GM's unlawful business acts and/or practices as alleged herein have violated numerous federal, state, statutory, and/or common laws – and said predicate acts are therefore per se violations of section 17200.  These predicate unlawful business acts and/or practices include, but are not limited to, the following:  California Business and Professions Code section 17500 (False Advertising), California Civil Code section 1572 (Actual Fraud – Omissions), California Civil Code section 1573 (Constructive Fraud by Omission), California Civil Code section 1710 (Deceit), California Civil Code section 1770 (the Consumers Legal Remedies Act – Deceptive Practices), California Civil Code section 1793.2 *et seq.* (the Consumer Warranties Act), and other California statutory and common law; the National Traffic and Motor Vehicle Safety Act (49 U.S.C. § 30101 *et. seq.*), as amended by the Transportation Recall Enhancement, Accountability and Documentation TREAD Act, (49 U.S.C. §§ 30101-30170) including, but not limited to 49 U.S.C. §§ 30112, 30115, 30118 and 30166, Federal Motor Vehicle Safety Standard 124 (49 C.F.R. § 571.124), and 49 CFR §§ 573.6, 579.11, 579.12, and 579.21.

**UNFAIR**

258.    GM's concealment, omissions, and misconduct as alleged in this action constitute negligence and other tortious conduct and gave GM an unfair competitive advantage over its competitors who did not engage in such practices.  Said misconduct, as alleged herein, also violated established law and/or public policies which seek to promote prompt disclosure of important safety-related information.  Concealing and failing to disclose the nature and extent of the numerous safety defects to California consumers, before (on or after July 10, 2009) those consumers (i) purchased one or more GM vehicles; (ii) purchased used "GM certified" Defective Vehicles; or (iii) had their vehicles repaired with defective ignition switches, as alleged herein, was and is directly contrary to established legislative goals and policies promoting safety and the prompt disclosure of such defects, prior to purchase.  Therefore GM's acts and/or practices alleged herein were and are unfair within the meaning of Business and Professions Code section 17200.

1    259.    The harm to California consumers outweighs the utility, if any, of GM's acts and/or

2    practices as alleged herein.  Thus, GM's deceptive business acts and/or practices, as alleged herein,

3    were unfair within the meaning of Business and Professions Code section 17200.

4    260.    As alleged herein, GM's business acts and practices offend established public

5    policies, including, but not limited to, public policies against making partial half-truths and failing

6    to disclose important material facts to consumers.

7    261.    In addition, as alleged herein, GM intended that California consumers would be

8    misled and/or deceived into believing that they would be purchasing a safe and reliable vehicle

9    built by a reputable manufacturer that values safety and stands behind its vehicles after they are

10   sold, when, in fact, they were in many cases obtaining a vehicle that had defects that had the

11   potential to cause serious bodily injury and/or death, and, in every case, obtaining a vehicle made

12   by an irresponsible manufacturer that does not value safety and was concealing myriad known

13   safety defects in millions of GM-branded vehicles.  This practice is and was immoral, unethical,

14   oppressive, unscrupulous, or substantially injurious to consumers and thus unfair within the

15   meaning of Business and Professions Code section 17200.

16   262.    At all times relevant, GM's misconduct and omissions alleged herein:  (a) caused

17   substantial injury to the Public; (b) had no countervailing benefit to consumers or to competition

18   that could possibly outweigh this substantial injury; and (c) caused injury that could not have been

19   avoided or even discovered by ordinary consumers, because it resulted from GM's concealment,

20   failure to disclose and/or omission of important safety related material information that only the

21   Defendant knew or could have known.  Thus, GM's acts and/or practices as alleged herein were

22   unfair within the meaning of Business and Professions Code section 17200.

23                              **FRAUDULENT**

24   263.    GM's acts and practices, as alleged herein, were likely to, and did, deceive the

25   Public.  GM's concealment, material omissions, acts, practices and non-disclosures, as alleged

26   herein, therefore constitute fraudulent business acts and/or practices within the meaning of

27   California Business and Professions Code section 17200.

28

264.    California consumers have been, and continue to be, deceived by GM's concealment and material omissions as alleged herein.  California consumers have suffered injury and lost money as a direct result of the deceptive conduct as alleged herein.  The unlawful, unfair, deceptive, and/or fraudulent business acts and practices of GM, as fully described herein, present a continuing threat to the citizens of California to be misled and/or deceived by GM as alleged herein, and/or to be substantially injured by these dangerously defective cars.

**SECOND CAUSE OF ACTION**

**VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500**

265.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

266.    California Business and Professions Code § 17500 states: "It is unlawful for any ... corporation ... with intent directly or indirectly to dispose of real or personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, ... or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

267.    GM caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers.

268.    GM has violated section 17500 because the misrepresentations and omissions regarding the safety and reliability of its vehicles and the importance of safety to the Company as set forth in this First Amended Complaint were material and likely to deceive a reasonable consumer.

269.    California consumers were exposed to and saw advertisements for GM vehicles on television, in magazines, on billboards, in brochures at dealerships, and on the Internet before purchasing GM vehicles.  Had those advertisements, window stickers, or any other materials disclosed that millions of GM-branded vehicles contained serious safety defects and that GM did

1    not value safety, consumers would not have purchased new GM vehicles on or after July 10, 2009

2    and would not have purchased "GM certified" Defective Vehicles on or after July 10, 2009.

3    270.    Despite notice of the serious safety defects in so many its vehicles, GM did not

4    disclose to consumers that its vehicles – which GM for years had advertised as "safe" and

5    "reliable" – were in fact not as safe or reliable as a reasonable consumer expected due to the risks

6    created by the many known defects, and GM's focus on cost-cutting at the expense of safety and

7    the resultant concealment of numerous safety defects.  GM never disclosed what it knew about the

8    defects.  Rather than disclose the truth, GM concealed the existence of the defects, and claimed to

9    be a reputable manufacturer of safe and reliable vehicles.

10    271.    GM, by the acts and misconduct alleged herein, violated Business & Professions

11    Code section 17500, and GM has engaged in, and continues to engage in, acts or practices that

12    constitute false advertising.

13    272.    GM has violated, and continues to violate, Business and Professions Code section

14    17500 by disseminating untrue and misleading statements as defined by Business and Professions

15    Code 17500.  GM has engaged in acts and practices with intent to induce members of the public to

16    purchase its vehicles by publicly disseminated advertising which contained statements which were

17    untrue or misleading, and which GM knew, or in the exercise of reasonable care should have

18    known, were untrue or misleading, and which concerned the real or personal property or services

19    or their disposition or performance.

20    273.    GM repeatedly and knowingly made untrue and misleading statements in California

21    regarding the purported reliability and safety of its vehicles.  The true information was known only

22    to GM and could not reasonably have been discovered by California consumers.  GM uniformly

23    concealed, failed to disclose and omitted important safety-related material information that was

24    known only to GM and that could not reasonably have been discovered by California consumers.

25    Based on GM's concealment, half-truths, and omissions, California consumers agreed (on or after

26    July 10, 2009) (i) to purchase GM vehicles; (ii) to purchase used "GM certified" Defective

27    Vehicles; and/or (iii) to have their vehicles repaired using defective ignition switches,

28

1    274.    As a direct and proximate result of GM's concealment and failure to disclose the

2    many safety defects, GM intended that consumers would be misled into believing that they would

3    be purchasing a safe and reliable vehicle built by a reputable manufacturer that values safety, when

4    in fact they were purchasing vehicles that were in many cases dangerously defective and were in

5    every case overpriced because they were in fact built by an irresponsible manufacturer that valued

6    cost-cutting over safety and routinely concealed a myriad of serious defects from regulators and the

7    public.

8                              **PRAYER FOR RELIEF**

9          WHEREFORE, Plaintiff prays for judgment against GM as follows:

10         A.    Pursuant to Business and Professions Code sections 17203 and 17535, that GM, its

11   employees, agents, representatives, successors, assigns, and all persons who act in concert with

12   them be permanently enjoined from committing any acts of unfair competition, including the

13   violations alleged herein.

14         B.    Pursuant to Business and Professions Code sections 17206 and 17536, that GM be

15   ordered to pay a civil penalty in the amount of Two Thousand Five Hundred dollars ($2,500.00) for

16   each violation of Business and Professions Code section 17200 and for Five Thousand dollars

17   ($5,000) for each violation of Business and Professions Code section 17500 by GM in an amount

18   according to proof.

19         C.    That Plaintiff recover its costs of suit, including costs of investigation.

20         D.    For reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5,

21   or other applicable law; and

22         E.    For such other equitable relief as is just and proper.

23

     ///

24

     ///

25

     ///

26

     ///

27

     ///

28

     010440-12  692229 V1                          - 57 -
                              FIRST AMENDED COMPLAINT

1    Dated: July 1, 2014    Respectfully submitted,

2    TONY RACKAUCKAS, DISTRICT ATTORNEY
    COUNTY OF ORANGE, STATE OF CALIFORNIA

3

4    By: _____
        TONY RACKAUCKAS

5    Joseph D'Agostino, Senior Assistant District Attorney
    401 Civil Center Drive

6    Santa Ana, CA 92701-4575
    Tel: (714) 834-3600

7    Fax: (714) 648-3636

8    Dated: July 1, 2014    ROBINSON, CALCAGNIE AND ROBINSON

9    By: _____

10        MARK P. ROBINSON, JR., SBN 05442
    Kevin F. Calcagnie, SBN. 108994

11    Scot D. Wilson, SBN. 223367
    ROBINSON CALCAGNIE ROBINSON

12      SHAPIRO DAVIS, INC.
    19 Corporate Plaza Drive

13    Newport Beach, California 92660
    Tel.: (949) 720-1288

14    Fax: (949) 720-1292
    mrobinson@rcrlaw.net

15

16    Dated: July 1, 2014    HAGENS BERMAN SOBOL SHAPIRO LLP

17    Steve W. Berman (Pro Hac Vice Pending)
    Andrew Volk (Pro Hac Vice Pending)

18    HAGENS BERMAN SOBOL
      SHAPIRO LLP

19    1918 Eighth Avenue, Suite 3300
    Seattle, WA 98101

20    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594

21    steve@hbsslaw.com

22    *Attorneys for Plaintiff*

23    *THE PEOPLE OF THE STATE OF CALIFORNIA*

24

25

26

27

28

| **SUMMONS** ON FIRST AMENDED COMPLAINT | **SUM-100** |
|---|---|
| *(CITACION JUDICIAL)* | |

**NOTICE TO DEFENDANT:**  GENERAL MOTORS LLC
*(AVISO AL DEMANDADO):*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**07/01/2014** at 12:58:00 PM
Clerk of the Superior Court
By Irma Cook, Deputy Clerk

**YOU ARE BEING SUED BY PLAINTIFF:**  THE PEOPLE OF THE STATE
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* OF CALIFORNIA, acting by and through Orange County District Attorney Tony Rackauckas

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
ORANGE COUNTY SUPERIOR COURT
751 West Santa Ana Boulevard
Santa Ana, CA 92701
CIVIL COMPLEX CENTER

CASE NUMBER:
*(Número del):* 30-2014-00731038-CU-BT-CXC

Judge Kim G. Dunning

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark P. Robinson, Jr., SBN 054426          949-720-1288          949-720-1292
ROBINSON CALCAGNIE ROBINSON SHAPIRO DAVIS, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660

DATE:  07/01/2014          Alan Carlson          Clerk, by _Irma Cook_ , Deputy
*(Fecha)*                       *(Secretario)*          Irma Cook          *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465



**CORPORATION SERVICE COMPANY®**

# Notice of Service of Process

**null / ALL**
**Transmittal Number: 12710196**
**Date Processed: 07/09/2014**

| | |
|---|---|
| **Primary Contact:** | Rosemarie Williams<br>General Motors LLC<br>Mail Code 48482-038-210<br>400 Renaissance Center<br>Detroit, MI 48265 |

| | |
|---|---|
| **Entity:** | General Motors LLC<br>Entity ID Number  3113523 |
| **Entity Served:** | General Motors LLC |
| **Title of Action:** | The People of the State of California vs. General Motors LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Violation of State/Federal Act |
| **Court/Agency:** | Orange County Superior Court, California |
| **Case/Reference No:** | 30-2014-00731038-CU-BT-CXC |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 07/08/2014 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Robinson Calcagnie Robinson Shapiro Davis, Inc. (Newport, CA)<br>949-720-1288 |

**Notes:**     Robinson Calcagnie Robinson Shapiro Davis, Inc. 19 Corporate Plaza Newport Beach, CA 92660
CSC Location document was served: Corporation Service Company which will do business in California as
Csc-Lawyers Incorporating Service 2710 Gateway Oaks Drive Suite 100 Sacramento, CA 95833

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not
constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

| **SUMMONS** ON FIRST AMENDED COMPLAINT | **SUM-100** |
|---|---|
| *(CITACION JUDICIAL)* | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:** GENERAL MOTORS LLC
*(AVISO AL DEMANDADO):*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**07/01/2014** at 12:58:00 PM
Clerk of the Superior Court
By Irma Cook, Deputy Clerk

**YOU ARE BEING SUED BY PLAINTIFF:** THE PEOPLE OF THE STATE
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* OF CALIFORNIA, acting by
and through Orange County District Attorney Tony Rackauckas

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>ORANGE COUNTY SUPERIOR COURT<br>751 West Santa Ana Boulevard<br>Santa Ana, CA 92701<br>CIVIL COMPLEX CENTER | CASE NUMBER:<br>*(Número del Caso):* 30-2014-00731038-CU-BT-CXC<br><br>Judge Kim G. Dunning |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark P. Robinson, Jr., SBN 054426     949-720-1288     949-720-1292
ROBINSON CALCAGNIE ROBINSON SHAPIRO DAVIS, INC.
19 Corporate Plaza Drive
Newport Beach, CA 92660

| DATE: 07/01/2014 | Alan Carlson | Clerk, by | Irma Cook | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* General Motors LLC

under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
☒ other *(specify):* UCC
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Legal<br>Solutions<br>& Plus | Code of Civil Procedure §§ 412.20, 465 |

1   ORANGE COUNTY DISTRICT ATTORNEY

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**07/01/2014** at 12:58:00 PM
Clerk of the Superior Court
By Irma Cook, Deputy Clerk

Tony Rackauckas, District Attorney

2   Joseph D'Agostino, Senior Assistant District Attorney

401 Civil Center Drive

3   Santa Ana, CA 92701-4575

4   Tel: (714) 834-3600
Fax: (714) 648-3636

5

   *– In association with –*

6

7   Mark P. Robinson, Jr., SBN 05442

Steve W. Berman (*Pro Hac Vice* Pending)

Kevin F. Calcagnie, SBN 108994

Andrew Volk (*Pro Hac Vice* Pending)

8   Scot D. Wilson, SBN 223367

HAGENS BERMAN SOBOL

ROBINSON CALCAGNIE ROBINSON

 SHAPIRO LLP

9    SHAPIRO DAVIS, INC.

1918 Eighth Avenue, Suite 3300

19 Corporate Plaza Drive

Seattle, WA 98101

10   Newport Beach, CA 92660

Tel: (206) 623-7292

Tel: (949) 720-1288

Fax: (206) 623-0594

11   Fax: (949) 720-1292

steve@hbsslaw.com

mrobinson@rcrlaw.net

12

13   *Attorneys for Plaintiff*
*THE PEOPLE OF THE STATE OF CALIFORNIA*

14

15        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16   **IN AND FOR THE COUNTY OF ORANGE – COMPLEX LITIGATION DIVISION**

17   THE PEOPLE OF THE STATE OF

Case No. 30-2014-00731038-CU-BT-CXC

18   CALIFORNIA, acting by and through Orange
County District Attorney Tony Rackauckas,

**FIRST AMENDED COMPLAINT FOR**
**VIOLATIONS OF CALIFORNIA**

19

20                 Plaintiff,

**UNFAIR COMPETITION LAW AND**
**FALSE ADVERTISING LAW**

21       v.

22   GENERAL MOTORS LLC

23                 Defendant.

24

25

26

27

28

010440-12 692229 V1

1

## TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................... 1

II.   PLAINTIFF'S AUTHORITY ................................................................................. 5

III.  DEFENDANT ......................................................................................................... 6

IV.   JURISDICTION AND VENUE ............................................................................. 6

V.    FACTUAL BACKGROUND ................................................................................. 6

      A.    There Are Serious Safety Defects in Millions of GM Vehicles Across Many
            Models and Years, and, Until Recently, GM Concealed them from Consumers ......... 6

            1.    The ignition switch defects ................................................................. 8

            2.    The power steering defect. .................................................................. 16

            3.    Airbag defect. ...................................................................................... 17

            4.    The brake light defect .......................................................................... 20

            5.    Shift cable defect ................................................................................. 23

            6.    Safety belt defect. ............................................................................... 25

            7.    Ignition lock cylinder defect. .............................................................. 26

            8.    The Camaro key-design defect. ........................................................... 27

            9.    The ignition key defect ........................................................................ 27

            10.   At least 26 other defects were revealed by GM in recalls during the
                  first half of 2014. ................................................................................ 27

      B.    GM Valued Cost-Cutting Over Safety, and Actively Encouraged Employees
            to Conceal Safety Issues ............................................................................................ 33

      C.    The Ignition Switch Defects Have Harmed Consumers in Orange County
            and the State ............................................................................................................... 38

      D.    Given GM's Knowledge of the Defects and the Risk to Public Safety, it
            Was Obliged to Promptly Disclose and Remedy the Defects. ................................... 38

      E.    GM's Misrepresentations and Deceptive, False, Untrue and Misleading
            Advertising, Marketing and Public Statements ......................................................... 42

VI.   CAUSES OF ACTION ........................................................................................... 52

      FIRST CAUSE OF ACTION: VIOLATION OF BUSINESS AND PROFESSIONS
      CODE SECTION 17200 .......................................................................................... 52

- i -
FIRST AMENDED COMPLAINT

SECOND CAUSE OF ACTION:  VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500 ......................................................................................... 55

PRAYER FOR RELIEF .................................................................................................... 57

- ii -

FIRST AMENDED COMPLAINT

1    Plaintiff, the People of the State of California ("Plaintiff" or "the People"), by and through

2    Tony Rackauckas, District Attorney for the County of Orange ("District Attorney"), alleges the

3    following, on information and belief:

4                    **I.    INTRODUCTION**

5         1.    This is a law enforcement action which primarily seeks to protect the public safety

6    and welfare, brought by a governmental unit in the exercise of and to enforce its police power. *City*

7    *& Cnty. of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1124-1125 (9th Cir. 2006). The action

8    is brought by Tony Rackauckas, District Attorney of the County of Orange, under California

9    Business and Professions Code sections 17200 *et seq.*, the Unfair Competition Law ("UCL"), and

10   17500 *et seq.*, the False Advertising Law ("FAL"), and involves sales, leases, or other wrongful

11   conduct or injuries occurring in California.  The defendant is General Motors LLC ("Defendant" or

12   "GM"), which is based in Detroit, Michigan.

13        2.    This case arises from GM's egregious failure to disclose, and the affirmative

14   concealment of, at least 35 separate known defects in vehicles sold by GM, and by its predecessor,

15   "Old GM" (collectively, "GM-branded vehicles").  By concealing the existence of the many known

16   defects plaguing many models and years of GM-branded vehicles and the fact that GM values cost-

17   cutting over safety, and concurrently marketing the GM brand as "safe" and "reliable," GM enticed

18   vehicle purchasers to buy GM vehicles under false pretenses.

19        3.    This action seeks to hold GM liable only for its *own* acts and omissions *after* the

20   July 10, 2009 effective date of the Sale Order and Purchase Agreement through which GM

21   acquired virtually all of the assets and certain liabilities of Old GM.

22        4.    A vehicle made by a reputable manufacturer of safe and reliable vehicles is worth

23   more than an otherwise similar vehicle made by a disreputable manufacturer that is known to

24   devalue safety and to conceal serious defects from consumers and regulators.  GM Vehicle Safety

25   Chief Jeff Boyer has recently stated that:  "Nothing is more important than the safety of our

26   customers in the vehicles they drive."  Yet GM failed to live up to this commitment, instead

27   choosing to conceal at least 35 serious defects in over 17 million GM-branded vehicles sold in the

28   United States (collectively, the "Defective Vehicles").

010440-12 692229 V1                              - 1 -

                              FIRST AMENDED COMPLAINT

1      5.      The systematic concealment of known defects was deliberate, as GM followed a

2    consistent pattern of endless "investigation" and delay each time it became aware of a given defect.

3    In fact, recently revealed documents show that GM valued cost-cutting over safety, trained its

4    personnel to *never* use the words "defect," "stall," or other words suggesting that any GM-branded

5    vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and

6    discouraged employees from acting to address safety issues.

7      6.      Under the Transportation Recall Enhancement, Accountability and Documentation

8    Act ("TREAD Act")[1] and its accompanying regulations, when a manufacturer learns that a vehicle

9    contains a safety defect, the manufacturer must promptly disclose the defect.[2]  If it is determined

10    that the vehicle is defective, the manufacturer may be required to notify vehicle owners,

11    purchasers, and dealers of the defect, and may be required to remedy the defect.[3]

12      7.      GM *explicitly assumed* the responsibilities to report safety defects with respect to

13    all GM-branded vehicles as required by the TREAD Act.  GM also had the same duty under

14    California law.

15      8.      When a manufacturer with TREAD Act responsibilities is aware of myriad safety

16    defects and fails to disclose them as GM has done, that manufacturer's vehicles are not safe.  And

17    when that manufacturer markets and sells its new vehicles by touting that its vehicles are "safe," as

18    GM has also done, that manufacturer is engaging in deception.

19      9.      GM has recently been forced to disclose that it had been concealing a large number

20    of known safety defects in GM-branded vehicles ever since its inception in 2009, and that other

21    defects arose on its watch due in large measure to GM's focus on cost-cutting over safety, its

22    discouragement of raising safety issues and its training of employees to avoid using language such

23    as "stalls," "defect" or "safety issue" in order to avoid attracting the attention of regulators.  As a

24    result, GM has been forced to recall over 17 million vehicles in some 40 recalls covering 35

25    separate defects during the first five and a half months of this year –20 times more than during the

26

27    [1] 49 U.S.C. §§ 30101-30170.

      [2] 49 U.S.C. § 30118(c)(1) & (2).

28    [3] 49 U.S.C. § 30118(b)(2)(A) & (B).

1    same period in 2013. The cumulative negative effect on the value of the vehicles sold by GM has

2    been both foreseeable and significant.

3         10.    The highest-profile defect concealed by GM concerns the ignition switches in more

4    than 1.5 million vehicles sold by GM's predecessor (the "ignition switch defect"). The ignition

5    switch defect can cause the affected vehicles' ignition switches to inadvertently move from the

6    "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a

7    loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to

8    deploy. GM continued to use defective ignition switches in "repairs" of vehicles it sold after July

9    10, 2009.

10         11.    For the past five years, GM received reports of crashes and injuries that put GM on

11    notice of the serious safety issues presented by its ignition switch system. GM was aware of the

12    ignition switch defects (and many other serious defects in numerous models of GM-branded

13    vehicles) *from the very date of its inception on July 10, 2009.*

14         12.    Yet, despite the dangerous nature of the ignition switch defects and the effects on

15    critical safety systems, GM concealed the existence of the defects and failed to remedy the problem

16    from the date of its inception until February of 2014. In February and March of 2014, GM issued

17    three recalls for a combined total of 2.19 million vehicles with the ignition switch defects.

18         13.    On May 16, 2014, GM entered a Consent Order with NHTSA in which it admitted

19    that it violated the TREAD Act by not disclosing the ignition switch defect, and agreed to pay the

20    maximum available civil penalties for its violations.

21         14.    Unfortunately for all owners of vehicles sold by GM, the ignition switch defect was

22    only one of a seemingly never-ending parade of recalls in the first half of 2014 – many concerning

23    safety defects that had been long known to GM.

24         15.    Between 2003 and 2010, over 1.3 million GM-branded vehicles in the United States

25    were sold with a safety defect that causes the vehicle's electric power steering ("EPS") to suddenly

26    fail during ordinary driving conditions and revert back to manual steering, requiring greater effort

27    by the driver to steer the vehicle and increasing the risk of collisions and injuries (the "power

28    steering defect").

010440-12 692229 V1

- 3 -

FIRST AMENDED COMPLAINT

1    16.    As with the ignition switch defect, GM was aware of the power steering defect from

2    the date of its inception, and concealed the defect for years.

3    17.    From 2007 until at least 2013, nearly 1.2 million GM-branded vehicles were sold in

4    the United States with defective wiring harnesses.  Increased resistance in the wiring harnesses of

5    driver and passenger seat-mounted, side-impact air bag ("SIAB") in the affected vehicles may

6    cause the SIABs, front center airbags, and seat belt pretensioners to not deploy in a crash (the

7    "airbag defect").  The vehicles' failure to deploy airbags and pretensioners in a crash increases the

8    risk of injury and death to the drivers and front-seat passengers.

9    18.    Once again, GM knew of the dangerous airbag defect from the date of its inception

10   on July 10, 2009, but chose instead to conceal the defect, and marketed its vehicles as "safe" and

11   "reliable."

12   19.    To take just one more example, between 2003 and 2012, 2.4 million GM-branded

13   vehicles in the United States were sold with a wiring harness defect that could cause brake lamps to

14   fail to illuminate when the brakes are applied or cause them to illuminate when the brakes are not

15   engaged (the "brake light defect").  The same defect could also disable traction control, electronic

16   stability control, and panic braking assist operations.  Though GM received hundreds of complaints

17   and was aware of at least 13 crashes caused by this defect, it waited until May of 2014 before

18   finally ordering a full recall.

19   20.    As further detailed in this First Amended Complaint, the ignition switch, power

20   steering, airbag, and brake light defects are just 4 of the *35* separate defects that resulted in 40

21   recalls of GM-branded vehicles in the first five and a half months of 2014, affecting over 17

22   million vehicles.  Most or all of these recalls are for safety defects, and many of the defects were

23   apparently known to GM, but concealed for years.

24   21.    This case arises from GM's breach of its obligations and duties, including but not

25   limited to:  (i) its concealment of, and failure to disclose that, as a result of a spate of safety defects,

26   over 17 million Defective Vehicles were on the road nationwide – and many hundreds of thousands

27   in California; (ii) its failure to disclose the defects despite its TREAD Act obligations; (iii) its

28   failure to disclose that it devalued safety and systemically encouraged the concealment of known

010440-12 692229 V1

- 4 -

FIRST AMENDED COMPLAINT

1   defects; (iv) its continued use of defective ignition switches as replacement parts; (v) its sale of

2   used "GM certified" vehicles that were actually plagued with a variety of known safety defects;

3   and (vi) its repeated and false statements that its vehicles were safe and reliable, and that it stood

4   behind its vehicles after they were purchased.

5          22.    From its inception in 2009, GM has known that many defects exist in millions of

6   GM-branded vehicles sold in the United States. But, to protect its profits and to avoid remediation

7   costs and a public relations nightmare, GM concealed the defects and their sometimes tragic

8   consequences.

9          23.    GM violated the TREAD Act by failing to timely inform NHTSA of the myriad

10  safety defects plaguing GM-branded vehicles and allowed the Defective Vehicles to remain on the

11  road. In addition to violating the TREAD Act, GM fraudulently concealed the defects from owners

12  and from purchasers of new and used vehicles sold after July 10, 2009, and even used defective

13  ignition switches as replacement parts. These same acts and omissions also violated California law

14  as detailed below.

15         24.    GM's failure to disclose the many defects, as well as advertising and promotion

16  concerning GM's record of building "safe" cars of high quality, violated California law.

17                      II.    PLAINTIFF'S AUTHORITY

18         25.    Tony Rackauckas, District Attorney of the County of Orange, acting to protect the

19  public as consumers from unlawful, unfair, and fraudulent business practices, brings this action in

20  the public interest in the name of the People of the State of California for violations of the Unfair

21  Competition Law pursuant to California Business and Professions Code Sections 17200, 17204 and

22  17206, and for violations of the False Advertising Law pursuant to California Business and

23  Professions Code Sections 17500, 17535 and 17536. Plaintiff, by this action, seeks to enjoin GM

24  from engaging in the unlawful, unfair, and fraudulent business practices alleged herein, and seeks

25  civil penalties for GM's violations of the above statutes.

26

27

28

010440-12 692229 V1                                    - 5 -
                                    FIRST AMENDED COMPLAINT

### III.    DEFENDANT

26.    Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  GM was incorporated in 2009.

27.    GM has significant contacts with Orange County, California, and the activities complained of herein occurred, in whole or in part, in Orange County, California.

28.    At all times mentioned GM was engaged in the business of designing, manufacturing, distributing, marketing, selling, leasing, certifying, and warrantying the GM cars that are the subject of this First Amended Complaint, throughout the State of California, including in Orange County, California.

### IV.    JURISDICTION AND VENUE

29.    This Court has jurisdiction over this matter pursuant to the California Constitution, Article XI, section 10 and California Code of Civil Procedure ("CCP") section 410.10 because GM transacted business and committed the acts complained of herein in California, specifically in the County of Orange.  The violations of law alleged herein were committed in Orange County and elsewhere within the State of California.

30.    Venue is proper in Orange County, California, pursuant to CCP section 395 and because many of the acts complained about occurred in Orange County.

### V.    FACTUAL BACKGROUND

**A.    There Are Serious Safety Defects in Millions of GM Vehicles Across Many Models and Years, and, Until Recently, GM Concealed them from Consumers.**

31.    In the first five and a half months of 2014, GM announced some 40 recalls affecting over 17 million GM-branded vehicles from model years 2003-2014.  The recalls concern 35 separate defects.  The numbers of recalls and serious safety defects are unprecedented, and can only lead to one conclusion: GM and its predecessor sold a large number of unsafe vehicle models with myriad defects during a long period of time.

32.    Even more disturbingly, the available evidence shows a common pattern:  From its inception in 2009, GM knew about an ever-growing list of serious safety defects in millions of

1  GM-branded vehicles, but concealed them from consumers and regulators in order to boost sales

2  and avoid the cost and publicity of recalls.

3       33.    GM inherited from Old GM a company that valued cost-cutting over safety, actively

4  discouraged its personnel from taking a "hard line" on safety issues, avoided using "hot" words

5  like "stall" that might attract the attention of NHTSA and suggest that a recall was required, and

6  trained its employees to avoid the use of words such as "defect" that might flag the existence of a

7  safety issue. GM did nothing to change these practices.

8       34.    The Center for Auto Safety recently stated that it has identified 2,004 death and

9  injury reports filed by GM with federal regulators in connection with vehicles that have recently

10 been recalled.[4] Many of these deaths and injuries would have been avoided had GM complied with

11 its TREAD Act obligations over the past five years.

12      35.    The many defects concealed by GM affected key safety systems in GM vehicles,

13 including the ignition, power steering, airbags, brake lights, gear shift systems, and seatbelts.

14      36.    The available evidence shows a consistent pattern: GM learned about a particular

15 defect and, often at the prodding of regulatory authorities, "investigated" the defect and decided

16 upon a "root cause." GM then took minimal action – such as issuing a carefully-worded

17 "Technical Service Bulletin" to its dealers, or even recalling a very small number of affected

18 vehicles. All the while, the true nature and scope of the defects were kept under wraps, vehicles

19 affected by the defects remained on the road, and GM enticed consumers to purchase its vehicles

20 by touting the safety, quality, and reliability of its vehicles, and presenting itself as a manufacturer

21 that stands behind its products.

22      37.    The nine defects affecting the greatest number of vehicles are discussed in some

23 detail below, and the remainder are summarized thereafter.

24

25

26

27

28      [4] *See Thousands of Accident Reports Filed Involving Recalled GM Cars: Report*, Irvin Jackson
(June 3, 2014).

010440-12  692229 V1                                  - 7 -
                        FIRST AMENDED COMPLAINT