# Exhibit C – Part 4

C.   **The Ignition Switch Defects Have Harmed Consumers in Orange County and the State**

212.   GM's unprecedented concealment of a large number of serious defects, and its irresponsible approach to safety issues, has caused damage to consumers in Orange County and throughout California.

213.   A vehicle made by a reputable manufacturer of safe and reliable vehicles who stands behind its vehicles after they are sold is worth more than an otherwise similar vehicle made by a disreputable manufacturer known for selling defective vehicles and for concealing and failing to remedy serious defects after the vehicles are sold.

214.   A vehicle purchased or leased under the reasonable assumption that it is safe and reliable is worth more than a vehicle of questionable safety and reliability due to the manufacturer's recent history of concealing serious defects from consumers and regulators.

215.   Purchasers and lessees of new and used GM-branded vehicles after the July 10, 2009, inception of GM paid more for the vehicles than they would have had GM disclosed the many defects it had a duty to disclose in GM-branded vehicles. Because GM concealed the defects and the fact that it was a disreputable brand that valued cost-cutting over safety, these consumers did not receive the benefit of their bargain. And the value of all their vehicles has diminished as the result of GM's deceptive conduct.

216.   If GM had timely disclosed the many defects as required by the TREAD Act and California law, California vehicle owners' GM-branded vehicles would be considerably more valuable than they are now. Because of GM's now highly publicized campaign of deception, and its belated, piecemeal and ever-expanding recalls, so much stigma has attached to the GM brand that no rational consumer would pay what otherwise would have been fair market value for GM-branded vehicles.

D.   **Given GM's Knowledge of the Defects and the Risk to Public Safety, it Was Obliged to Promptly Disclose and Remedy the Defects.**

217.   The National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") requires manufacturers of motor vehicles and motor vehicle equipment to submit certain information to the National Highway Traffic Safety Administration (NHTSA) in order "to reduce

1    traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101 *et.*

2    *seq.*

3         218.   Under the Safety Act, the manufacturer of a vehicle has a duty to notify dealers and

4    purchasers of a safety defect and remedy the defect without charge. 49 U.S.C. § 30118. In

5    November 2000, Congress enacted the Transportation Recall Enhancement, Accountability and

6    Documentation (TREAD) Act, 49 U.S.C. §§ 30101-30170, which amended the Safety Act and

7    directed the Secretary of Transportation to promulgate regulation expanding the scope of the

8    information that manufacturers are required to submit to NHTSA.

9         219.   The Safety Act requires manufacturers to inform NHTSA within five days of

10   discovering a defect. 49 CFR § 573.6 provides that a manufacturer "shall furnish a report to the

11   NHTSA for each defect in his vehicles or in his items of original or replacement equipment that he

12   or the Administrator determines to be related to motor vehicle safety, and for each noncompliance

13   with a motor vehicle safety standard in such vehicles or items of equipment which either he or the

14   Administrator determines to exist," and that such reports must include, among other

15   things:  identification of the vehicles or items of motor vehicle equipment potentially containing

16   the defect or noncompliance, including a description of the manufacturer's basis for its

17   determination of the recall population and a description of how the vehicles or items of equipment

18   to be recalled differ from similar vehicles or items of equipment that the manufacturer has not

19   included in the recall; in the case of passenger cars, the identification shall be by the make, line,

20   model year, the inclusive dates (month and year) of manufacture, and any other information

21   necessary to describe the vehicles; a description of the defect or noncompliance, including both a

22   brief summary and a detailed description, with graphic aids as necessary, of the nature and physical

23   location (if applicable) of the defect or noncompliance; a chronology of all principal events that

24   were the basis for the determination that the defect related to motor vehicle safety, including a

25   summary of all warranty claims, field or service reports, and other information, with their dates of

26   receipt; a description of the manufacturer's program for remedying the defect or noncompliance;

27   and a plan for reimbursing an owner or purchaser who incurred costs to obtain a remedy for the

28

1    problem addressed by the recall within a reasonable time in advance of the manufacturer's

2    notification of owners, purchasers and dealers.

3         220.    Manufacturers are also required to submit "early warning reporting" (EWR) data

4    and information that may assist the agency in identifying safety defects in motor vehicles or motor

5    vehicle equipment. *See* 49 U.S.C. § 30166(m)(3)(B).  The data submitted to NHTSA under the

6    EWR regulation includes:  production numbers (cumulative total of vehicles or items of equipment

7    manufactured in the year); incidents involving death or injury based on claims and notices received

8    by the manufacturer; claims relating to property damage received by the manufacturer; warranty

9    claims paid by the manufacturer (generally for repairs on relatively new products) pursuant to a

10   warranty program (in the tire industry these are warranty adjustment claims); consumer complaints

11   (a communication by a consumer to the manufacturer that expresses dissatisfaction with the

12   manufacturer's product or performance of its product or an alleged defect); and field reports

13   (prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack

14   of durability or other performance problem of a motor vehicle or item of motor vehicle equipment).

15        221.    Regulations promulgated under the TREAD Act also require manufacturers to

16   inform NHTSA of defects and recalls in motor vehicles in foreign countries.  Under 49 CFR §§

17   579.11 and 579.12 a manufacturer must report to NHTSA not later than five working days after a

18   manufacturer determines to conduct a safety recall or other safety campaign in a foreign country

19   covering a motor vehicle sold or offered for sale in the United States.  The report must include,

20   among other things:  a description of the defect or noncompliance, including both a brief summary

21   and a detailed description, with graphic aids as necessary, of the nature and physical location (if

22   applicable) of the defect or noncompliance; identification of the vehicles or items of motor vehicle

23   equipment potentially containing the defect or noncompliance, including a description of the

24   manufacturer's basis for its determination of the recall population and a description of how the

25   vehicles or items of equipment to be recalled differ from similar vehicles or items of equipment

26   that the manufacturer has not included in the recall; the manufacturer's program for remedying the

27   defect or noncompliance, the date of the determination and the date the recall or other campaign

28   was commenced or will commence in each foreign country; and identify all motor vehicles that the

1   manufacturer sold or offered for sale in the United States that are identical or substantially similar

2   to the motor vehicles covered by the foreign recall or campaign.

3       222.    49 CFR § 579.21 requires manufacturers to provide NHTSA quarterly field reports

4   related to the current and nine preceding model years regarding various systems, including, but not

5   limited to, vehicle speed control.  The field reports must contain, among other things:  a report on

6   each incident involving one or more deaths or injuries occurring in the United States that is

7   identified in a claim against and received by the manufacturer or in a notice received by the

8   manufacturer which notice alleges or proves that the death or injury was caused by a possible

9   defect in the manufacturer's vehicle, together with each incident involving one or more deaths

10  occurring in a foreign country that is identified in a claim against and received by the manufacturer

11  involving the manufacturer's vehicle, if that vehicle is identical or substantially similar to a vehicle

12  that the manufacturer has offered for sale in the United States, and any assessment of an alleged

13  failure, malfunction, lack of durability, or other performance problem of a motor vehicle or item of

14  motor vehicle equipment (including any part thereof) that is originated by an employee or

15  representative of the manufacturer and that the manufacturer received during a reporting period.

16      223.    GM has known throughout the liability period that many GM-branded vehicles sold

17  or leased in the State of California were defective – and, in many cases, dangerously so.

18      224.    Since the date of GM's inception, many people have been injured or died in

19  accidents relating to the ignition switch defects alone.  While the exact injury and death toll is

20  unknown, as a result of GM's campaign of concealment and suppression of the large number of

21  defects plaguing over 17 million GM-branded vehicles, numerous other drivers and passengers of

22  the Defective Vehicles have died or suffered serious injuries and property damage.  All owners and

23  lessees of GM-branded vehicles have suffered economic damage to their property due to the

24  disturbingly large number of recently revealed defects that were concealed by GM.  Many are

25  unable to sell or trade their cars, and many are afraid to drive their cars.

26

27

28

E.    **GM's Misrepresentations and Deceptive, False, Untrue and Misleading Advertising, Marketing and Public Statements**

225.    Despite its knowledge of the many serious defects in millions of GM-branded vehicles, GM continued to (1) sell new Defective Vehicles; (2) sell used Defective Vehicles as "GM certified"; and (3) use defective ignition switches to repair GM vehicles, all without disclosing or remedying the defects. As a result, the injury and death toll associated with the Defective Vehicles has continued to increase and, to this day, GM continues to conceal and suppress this information.

226.    During this time period, GM falsely assured California consumers in various written and broadcast statements that its cars were safe and reliable, and concealed and suppressed the true facts concerning the many defects in millions of GM-branded vehicles, and GM's policies that led to both the manufacture of an inordinate number of vehicles with safety defects and the subsequent concealment of those defects once the vehicles are on the road. To this day, GM continues to conceal and suppress information about the safety and reliability of its vehicles.

227.    Against this backdrop of fraud and concealment, GM touted its reputation for safety and reliability, and knew that people bought and retained its vehicles because of that reputation, and yet purposefully chose to conceal and suppress the existence and nature of the many safety defects. Instead of disclosing the truth about the dangerous propensity of the Defective Vehicles and GM's disdain for safety, California consumers were given assurances that their vehicles were safe and defect free, and that the Company stands behind its vehicles after they are on the road.

228.    GM has consistently marketed its vehicles as "safe" and proclaimed that safety is one of its highest priorities.

229.    It told consumers that it built the world's best vehicles:

> We truly are building a new GM, from the inside out. Our vision is clear: to design, build and sell the world's best vehicles, and we have a new business model to bring that vision to life. We have a lower cost structure, a stronger balance sheet and a dramatically lower risk profile. We have a new leadership team – a strong mix of executive talent from outside the industry and automotive veterans – and a passionate, rejuvenated workforce.

> "Our plan is to steadily invest in creating world-class vehicles, which will continuously drive our cycle of great design, high quality and higher profitability."

1    230.    It represented that it was building vehicles with design excellence, quality and

2    performance:

3        And across the globe, other GM vehicles are gaining similar acclaim
         for design excellence, quality and performance, including the Holden
4        Commodore in Australia.  Chevrolet Agile in Brazil, Buick LaCrosse
         in China and many others.
5
         The company's progress is early evidence of a new business model
6        that begins and ends with great vehicles.  We are leveraging our
         global resources and scale to maintain stringent cost management
7        while taking advantage of growth and revenue opportunities around
         the world, to ultimately deliver sustainable results for all of our
8        shareholders.

9    ///

10    ///

11    ///

12    ///

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

231.   The theme below was repeated in advertisements, company literature, and material at dealerships as the core message about GM's Brand:

The new General Motors has one clear vision: to design, build and sell the world's best vehicles. Our new business model revolves around this vision, focusing on fewer brands, compelling vehicle design, innovative technology, improved manufacturing productivity and streamlined, more efficient inventory processes. The end result is products that delight customers and generate higher volumes and margins—and ultimately deliver more cash to invest in our future vehicles.

# A New Vision,
## a New Business Model

Our vision is simple, straightforward and clear; to design, build and sell the world's best vehicles. That doesn't mean just making our vehicles better than the ones they replace. We have set a higher standard for the new GM—and that means building the best.

Our vision comes to life in a continuous cycle that starts, ends and begins again with great vehicle designs. To accelerate the momentum we've already created, we reduced our North American portfolio from eight brands to four: Chevrolet, Buick, Cadillac and GMC. Worldwide, we're aggressively developing and leveraging global vehicle architectures to maximize our talent and resources and achieve optimum economies of scale.

Across our manufacturing operations, we have largely eliminated overcapacity in North America while making progress in Europe, and we're committed to managing inventory with a new level of discipline. By using our manufacturing capacity more efficiently

and maintaining leaner vehicle inventories, we are reducing the need to offer sales incentives on our vehicles. These moves, combined with offering attractive, high-quality vehicles, are driving healthier margins—and at the same time building stronger brands.

Our new business model creates a self-sustaining cycle of reinvestment that drives continuous improvement in vehicle design, manufacturing discipline, brand strength, pricing and margins, because we are now able to make money at the bottom as well as the top of the industry cycles.

We are seeing positive results already. In the United States, for example, improved design, content and quality have resulted in solid gains in segment share, average transaction prices and projected residual values for the Chevrolet Equinox, Buick LaCrosse and Cadillac SRX. This is just the beginning.

232.    It represented that it had a world-class lineup in North America:

# A World-Class Lineup in North America



**Chevrolet Cruze**
Global success is no surprise for the new Chevrolet Cruze, which is sold in more than 60 countries around the world. In addition to a 42 mpg Eco model build in North America, Cruze's globally influenced design is complemented by its exceptional quietness, high quality and attention to detail not matched by the competition.

**Buick Regal**
The sport-injected Buick Regal is the brand's latest addition, attracting a whole new demographic for the Buick brand. The newly designed Buick lineup, which saw 53 percent volume growth in 2010 in the United States alone, is appealing to a broader spectrum of buyers.









**Chevrolet Equinox**
The Chevrolet Equinox delivers best-in-segment 32 mpg highway fuel economy in a sleek, roomy new package. With the success of the Equinox and other energy-saving innovation, GM leads the U.S. industry in total unit sales for the segment.

**Chevrolet Sonic**
Stylish four-door sedan and sporty five-door hatchback versions of the Chevrolet Sonic will train U.S. showrooms in fall 2011. Currently the only small car built in the United States, it will be sold as the Aveo in other parts of the world.

**Buick LaCrosse**
Buick builds on this brand's momentum in the United States and China with the fuel-efficient LaCrosse. With eAssist technology, the LaCrosse achieves an expected 37 mpg on the highway.

**Buick Verano**
The all-new Buick Verano, which will be available in late 2011, appeals to customers in the United States, Canada and Mexico who want great fuel economy and luxury in a smaller but premium package.



FIRST AMENDED COMPLAINT

010440-12 692229 V1

233.    It boasted of its new "culture":



A New Attitude

We are making major strides in becoming a GM that works smart, thinks big and moves fast. The new GM culture values simplicity, agility and action—making and implementing decisions faster, pushing accountability deeper into the organization and demanding results from everyone. There's never been a greater need to change, and there's never been a better time.

234.    In its 2012 Annual Report, GM told the world the following about its brand:

What is immutable is our focus on the customer, which requires us to go from "good" today to "great" in everything we do, including product design, initial quality, durability and service after the sale.

235.    GM also indicated it had changed its structure to create more "accountability" which, as shown above, was a blatant falsehood:

That work continues, and it has been complemented by changes to our design and engineering organization that have flattened the structure and created more accountability for produce execution, profitability and customer satisfaction.

236.    And GM represented that product quality was a key focus – another blatant falsehood:

Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures.

237.    In its 2013 Letter to Stockholders GM noted that its brand had grown in value and boasted that it designed the "World's Best Vehicles":

Dear Stockholder:

Your company is on the move once again.  While there were highs and lows in 2011, our overall report card shows very solid marks, including record net income attributable to common stockholders of $7.6 billion and EBIT-adjusted income of $8.3 billion.

- GM's overall momentum, including a 13 percent sales increase in the United States, created new jobs and drove investments.  We have announced investments in 29 U.S. facilities totaling more than $7.1 billion since July 2009, with more than 17,500 jobs created or retained.

Design, Build and Sell the World's Best Vehicles

This pillar is intended to keep the customer at the center of everything we do, and success is pretty easy to define.  It means creating vehicles that people desire, value and are proud to own. When we get this right, it transforms our reputation and the company's bottom line.

Strengthen Brand Value

Clarity of purpose and consistency of execution are the cornerstones of our product strategy, and two brands will drive our global growth. They are Chevrolet, which embodies the qualities of value, reliability, performance and expressive design; and Cadillac, which creates luxury vehicles that are provocative and powerful.  At the same time the Holden, Buick, GMC, Baojun, Opel and Vauxhall brands are being carefully cultivated to satisfy as many customers as possible in select regions.

Each day the cultural change underway at GM becomes more striking.  The old internally focused, consensus-driven and overly complicated GM is being reinvented brick by brick, by truly accountable executives who know how to take calculated risks and lead global teams that are committed to building the best vehicles in the world as efficiently as we can.

1          That's the crux of our plan.  The plan is something we can control.
We like the results we're starting to see and we're going to stick to

2          it – always.

3      238.    Once it emerged from bankruptcy, GM told the world it was a new and improved

4  company:



010440-12 692229 V1

- 49 -

FIRST AMENDED COMPLAINT

239.    A radio ad that ran from GM's inception until July 16, 2010, stated that "[a]t GM, building quality cars is the most important thing we can do."

240.    An online ad for "GM certified" used vehicles that ran from July 6, 2009 until April 5, 2010, stated that "GM certified means no worries."

241.    GM's Chevrolet brand ran television ads in 2010 showing parents bringing their newborn babies home from the hospital, with the tagline "[a]s long as there are babies, there'll be Chevys to bring them home."

242.    Another 2010 television ad informed consumers that "Chevrolet's ingenuity and integrity remain strong, exploring new areas of design and power, while continuing to make some of the safest vehicles on earth."

243.    An online national ad campaign for GM in April of 2012 stressed "Safety. Utility. Performance."

244.    A national print ad campaign in April of 2013 states that "[w]hen lives are on the line, you need a dependable vehicle you can rely on. Chevrolet and GM … for power, performance and safety."

245.    A December 2013 GM testimonial ad stated that "GM has been able to deliver a quality product that satisfies my need for dignity and safety."

246.    GM's website, GM.com, states:

> Innovation: Quality & Safety; GM's Commitment to Safety; Quality and safety are at the top of the agenda at GM, as we work on technology improvements in crash avoidance and crashworthiness to augment the post-event benefits of OnStar, like advanced automatic crash notification. Understanding what you want and need from your vehicle helps GM proactively design and test features that help keep you safe and enjoy the drive. Our engineers thoroughly test our vehicles for durability, comfort and noise minimization before you think about them. The same quality process ensures our safety technology performs when you need it.

247.    On February 25, 2014, GM North America President Alan Batey publically stated: "Ensuring our customers' safety is our first order of business. We are deeply sorry and we are working to address this issue as quickly as we can."

248.     These proclamations of safety and assurances that GM's safety technology performs when needed were false and misleading because they failed to disclose the dangerous defects in millions of GM-branded vehicles, and the fact GM favored cost-cutting and concealment over safety.  GM knew or should have known that its representations were false and misleading.

249.     GM continues to make misleading safety claims in public statements, advertisements, and literature provided with its vehicles.

250.     GM violated California law in failing to disclose and in actively concealing what it knew regarding the existence of the defects, despite having exclusive knowledge of material facts not known to the Plaintiff or to California consumers, and by making partial representations while at the same time suppressing material facts. *LiMandri v. Judkins* (1997) 52 Cal. App. 4th 326, 337, 60 Cal. Rptr. 2d 539.  In addition, GM had a duty to disclose the information that it knew about the defects because such matters directly involved matters of public safety.

251.     GM violated California law in failing to conduct an adequate retrofit campaign (*Hernandez v. Badger Construction Equip. Co.* (1994) 28 Cal. App. 4th 1791, 1827), and in failing to retrofit the Defective Vehicles and/or warn of the danger presented by the defects after becoming aware of the dangers after their vehicles had been on the market (*Lunghi v. Clark Equip. Co.* (1984) 153 Cal. App. 3d 485; *Balido v. Improved Machinery, Inc.* (1972) 29 Cal. App. 3d 633).

252.     GM also violated the TREAD Act, and the regulations promulgated under the Act, when it failed to timely inform NHTSA of the defects and allowed cars to remain on the road with these defects. By failing to disclose and actively concealing the defects, by selling new Defective Vehicles and used "GM certified" Defective Vehicles without disclosing or remedying the defects, and by using defective ignition switches for "repairs,"  GM engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.*, including (1) representing that GM vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that new Defective Vehicles and ignition switches and used "GM certified" vehicles are of a particular standard, quality, and grade when they are not; (3) advertising GM vehicles with the intent not to sell them as advertised; (4) representing that the subjects of transactions involving GM

1    vehicles have been supplied in accordance with a previous representation when they have not; and

2    (5) selling Defective Vehicles in violation of the TREAD Act.

3                                  **VI.    CAUSES OF ACTION**

4                                  **FIRST CAUSE OF ACTION**

5            **VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200**

6            253.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

7            254.    GM has engaged in, and continues to engage in, acts or practices that constitute

8    unfair competition, as that term is defined in section 17200 of the California Business and

9    Professions Code.

10           255.    GM has violated, and continues to violate, Business and Professions Code section

11   17200 through its unlawful, unfair, fraudulent, and/or deceptive business acts and/or practices.

12   GM uniformly concealed, failed to disclose, and omitted important safety-related material

13   information that was known only to GM and that could not reasonably have been discovered by

14   California consumers.  Based on GM's concealment, half-truths, and omissions, California

15   consumers agreed to purchase or lease one or more (i) new or used GM vehicles sold on or after

16   July 10, 2009; (ii) "GM certified" Defective Vehicles sold on or after July 10, 2009; (iii) and/or to

17   have their vehicles repaired using GM's defective ignition switches.  GM also repeatedly and

18   knowingly made untrue and misleading statements in California regarding the purported reliability

19   and safety of its vehicles, and the importance of safety to the Company.  The true information

20   about the many serious defects in GM-branded vehicles, and GM's disdain for safety, was known

21   only to GM and could not reasonably have been discovered by California consumers.

22           256.    As a direct and proximate result of GM's concealment and failure to disclose the

23   many defects and the Company's institutionalized devaluation of safety, GM intended that

24   consumers would be misled into believing that that GM was a reputable manufacturer of reliable

25   and safe vehicles when in fact GM was an irresponsible manufacture of unsafe, unreliable  and

26   often dangerously defective vehicles.

27

28

010440-12 692229 V1                              - 52 -
                                    FIRST AMENDED COMPLAINT

**UNLAWFUL**

257.   The unlawful acts and practices of GM alleged above constitute unlawful business acts and/or practices within the meaning of California Business and Professions Code section 17200. GM's unlawful business acts and/or practices as alleged herein have violated numerous federal, state, statutory, and/or common laws – and said predicate acts are therefore per se violations of section 17200. These predicate unlawful business acts and/or practices include, but are not limited to, the following:  California Business and Professions Code section 17500 (False Advertising), California Civil Code section 1572 (Actual Fraud – Omissions), California Civil Code section 1573 (Constructive Fraud by Omission), California Civil Code section 1710 (Deceit), California Civil Code section 1770 (the Consumers Legal Remedies Act – Deceptive Practices), California Civil Code section 1793.2 *et seq.* (the Consumer Warranties Act), and other California statutory and common law; the National Traffic and Motor Vehicle Safety Act (49 U.S.C. § 30101 *et. seq.*), as amended by the Transportation Recall Enhancement, Accountability and Documentation TREAD Act, (49 U.S.C. §§ 30101-30170) including, but not limited to 49 U.S.C. §§ 30112, 30115, 30118 and 30166, Federal Motor Vehicle Safety Standard 124 (49 C.F.R. § 571.124), and 49 CFR §§ 573.6, 579.11, 579.12, and 579.21.

**UNFAIR**

258.   GM's concealment, omissions, and misconduct as alleged in this action constitute negligence and other tortious conduct and gave GM an unfair competitive advantage over its competitors who did not engage in such practices. Said misconduct, as alleged herein, also violated established law and/or public policies which seek to promote prompt disclosure of important safety-related information. Concealing and failing to disclose the nature and extent of the numerous safety defects to California consumers, before (on or after July 10, 2009) those consumers (i) purchased one or more GM vehicles; (ii) purchased used "GM certified" Defective Vehicles; or (iii) had their vehicles repaired with defective ignition switches, as alleged herein, was and is directly contrary to established legislative goals and policies promoting safety and the prompt disclosure of such defects, prior to purchase. Therefore GM's acts and/or practices alleged herein were and are unfair within the meaning of Business and Professions Code section 17200.

259. The harm to California consumers outweighs the utility, if any, of GM's acts and/or practices as alleged herein. Thus, GM's deceptive business acts and/or practices, as alleged herein, were unfair within the meaning of Business and Professions Code section 17200.

260. As alleged herein, GM's business acts and practices offend established public policies, including, but not limited to, public policies against making partial half-truths and failing to disclose important material facts to consumers.

261. In addition, as alleged herein, GM intended that California consumers would be misled and/or deceived into believing that they would be purchasing a safe and reliable vehicle built by a reputable manufacturer that values safety and stands behind its vehicles after they are sold, when, in fact, they were in many cases obtaining a vehicle that had defects that had the potential to cause serious bodily injury and/or death, and, in every case, obtaining a vehicle made by an irresponsible manufacturer that does not value safety and was concealing myriad known safety defects in millions of GM-branded vehicles. This practice is and was immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and thus unfair within the meaning of Business and Professions Code section 17200.

262. At all times relevant, GM's misconduct and omissions alleged herein: (a) caused substantial injury to the Public; (b) had no countervailing benefit to consumers or to competition that could possibly outweigh this substantial injury; and (c) caused injury that could not have been avoided or even discovered by ordinary consumers, because it resulted from GM's concealment, failure to disclose and/or omission of important safety related material information that only the Defendant knew or could have known. Thus, GM's acts and/or practices as alleged herein were unfair within the meaning of Business and Professions Code section 17200.

**FRAUDULENT**

263. GM's acts and practices, as alleged herein, were likely to, and did, deceive the Public. GM's concealment, material omissions, acts, practices and non-disclosures, as alleged herein, therefore constitute fraudulent business acts and/or practices within the meaning of California Business and Professions Code section 17200.

264.   California consumers have been, and continue to be, deceived by GM's

concealment and material omissions as alleged herein.  California consumers have suffered injury

and lost money as a direct result of the deceptive conduct as alleged herein.  The unlawful, unfair,

deceptive, and/or fraudulent business acts and practices of GM, as fully described herein, present a

continuing threat to the citizens of California to be misled and/or deceived by GM as alleged

herein, and/or to be substantially injured by these dangerously defective cars.

### SECOND CAUSE OF ACTION

### VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500

265.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

266.   California Business and Professions Code § 17500 states: "It is unlawful for any ...

corporation ... with intent directly or indirectly to dispose of real or personal property ... to induce

the public to enter into any obligation relating thereto, to make or disseminate or cause to be made

or disseminated ... from this state before the public in any state, in any newspaper or other

publication, or any advertising device, ... or in any other manner or means whatever, including over

the Internet, any statement ... which is untrue or misleading, and which is known, or which by the

exercise of reasonable care should be known, to be untrue or misleading."

267.   GM caused to be made or disseminated through California and the United States,

through advertising, marketing, and other publications, statements that were untrue or misleading,

and which were known, or which by the exercise of reasonable care should have been known to

GM, to be untrue and misleading to consumers.

268.   GM has violated section 17500 because the misrepresentations and omissions

regarding the safety and reliability of its vehicles and the importance of safety to the Company as

set forth in this First Amended Complaint were material and likely to deceive a reasonable

consumer.

269.   California consumers were exposed to and saw advertisements for GM vehicles on

television, in magazines, on billboards, in brochures at dealerships, and on the Internet before

purchasing GM vehicles.  Had those advertisements, window stickers, or any other materials

disclosed that millions of GM-branded vehicles contained serious safety defects and that GM did

1    not value safety, consumers would not have purchased new GM vehicles on or after July 10, 2009

2    and would not have purchased "GM certified" Defective Vehicles on or after July 10, 2009.

3        270.    Despite notice of the serious safety defects in so many its vehicles, GM did not

4    disclose to consumers that its vehicles – which GM for years had advertised as "safe" and

5    "reliable" – were in fact not as safe or reliable as a reasonable consumer expected due to the risks

6    created by the many known defects, and GM's focus on cost-cutting at the expense of safety and

7    the resultant concealment of numerous safety defects.  GM never disclosed what it knew about the

8    defects.  Rather than disclose the truth, GM concealed the existence of the defects, and claimed to

9    be a reputable manufacturer of safe and reliable vehicles.

10        271.    GM, by the acts and misconduct alleged herein, violated Business & Professions

11    Code section 17500, and GM has engaged in, and continues to engage in, acts or practices that

12    constitute false advertising.

13        272.    GM has violated, and continues to violate, Business and Professions Code section

14    17500 by disseminating untrue and misleading statements as defined by Business and Professions

15    Code 17500.  GM has engaged in acts and practices with intent to induce members of the public to

16    purchase its vehicles by publicly disseminated advertising which contained statements which were

17    untrue or misleading, and which GM knew, or in the exercise of reasonable care should have

18    known, were untrue or misleading, and which concerned the real or personal property or services

19    or their disposition or performance.

20        273.    GM repeatedly and knowingly made untrue and misleading statements in California

21    regarding the purported reliability and safety of its vehicles.  The true information was known only

22    to GM and could not reasonably have been discovered by California consumers.  GM uniformly

23    concealed, failed to disclose and omitted important safety-related material information that was

24    known only to GM and that could not reasonably have been discovered by California consumers.

25    Based on GM's concealment, half-truths, and omissions, California consumers agreed (on or after

26    July 10, 2009) (i) to purchase GM vehicles; (ii) to purchase used "GM certified" Defective

27    Vehicles; and/or (iii) to have their vehicles repaired using defective ignition switches,

28

274.    As a direct and proximate result of GM's concealment and failure to disclose the many safety defects, GM intended that consumers would be misled into believing that they would be purchasing a safe and reliable vehicle built by a reputable manufacturer that values safety, when in fact they were purchasing vehicles that were in many cases dangerously defective and were in every case overpriced because they were in fact built by an irresponsible manufacturer that valued cost-cutting over safety and routinely concealed a myriad of serious defects from regulators and the public.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against GM as follows:

A.    Pursuant to Business and Professions Code sections 17203 and 17535, that GM, its employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition, including the violations alleged herein.

B.    Pursuant to Business and Professions Code sections 17206 and 17536, that GM be ordered to pay a civil penalty in the amount of Two Thousand Five Hundred dollars ($2,500.00) for each violation of Business and Professions Code section 17200 and for Five Thousand dollars ($5,000) for each violation of Business and Professions Code section 17500 by GM in an amount according to proof.

C.    That Plaintiff recover its costs of suit, including costs of investigation.

D.    For reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5, or other applicable law; and

E.    For such other equitable relief as is just and proper.

///
///
///
///
///