# Exhibit C – Part 6

amendment, or supplement does not have a material adverse effect on the Debtors' estates.  Any

such proposed modification, amendment, or supplement that does have a material adverse effect

on the Debtors' estates shall be subject to further order of the Court, on appropriate notice.

      69.     The provisions of this Order are nonseverable and mutually dependent on

each other.

      70.     As provided in Fed.R.Bankr.P. 6004(h) and 6006(d), this Order shall not

be stayed for ten days after its entry, and instead shall be effective as of 12:00 noon, EDT, on

Thursday, July 9, 2009.  The Debtors and the Purchaser are authorized to close the 363

Transaction on or after 12:00 noon on Thursday, July 9.  Any party objecting to this Order must

exercise due diligence in filing any appeal and pursuing a stay or risk its appeal being foreclosed

as moot in the event Purchaser and the Debtors elect to close prior to this Order becoming a Final

Order.

> **Deleted:** Pursuant to Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for ten days after its entry and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the 363 Transaction immediately upon entry of this Order.

      71.     This Court retains exclusive jurisdiction to enforce and implement the

terms and provisions of this Order, the MPA, all amendments thereto, any waivers and consents

thereunder, and each of the agreements executed in connection therewith, including the Deferred

Termination Agreements, in all respects, including, but not limited to, retaining jurisdiction to (a)

compel delivery of the Purchased Assets to the Purchaser, (b) compel delivery of the purchase

price or performance of other obligations owed by or to the Debtors, (c) resolve any disputes

arising under or related to the MPA, except as otherwise provided therein, (d) interpret,

implement, and enforce the provisions of this Order, (e) protect the Purchaser against any of the

Retained Liabilities or the assertion of any lien, claim, encumbrance, or other interest, of any

kind or nature whatsoever, against the Purchased Assets, and (f) resolve any disputes with

respect to or concerning the Deferred Termination Agreements.  The Court does not retain

jurisdiction to hear disputes arising in connection with the application of the Participation

US_ACTIVE:\43085833\07\43085833_7.DOC\.        48

Exhibit C
Page 403

Agreements, stockholder agreements or other documents concerning the corporate governance of

the Purchaser, and documents governed by foreign law, which disputes shall be adjudicated as

Exhibit C
Page 404

necessary under applicable law in any other court or administrative agency of competent

jurisdiction.

Dated: New York, York
      July **5**, 2009


                         _____s/Robert E. Gerber_____
                         UNITED STATES BANKRUPTCY JUDGE

Exhibit C
Page 405

US_ACTIVE:\43085833\07\43085833_7.DOC\,

Exhibit C
Page 406

# Exhibit D

**Hearing Date and Time:  To Be Determined**
**Objection Deadline:  To Be Determined**
**Reply Deadline:  To Be Determined**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Richard C. Godfrey, P.C. (*pro hac vice* pending)
Andrew B. Bloomer, P.C. (*pro hac vice* pending)

*Attorneys for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X
In re                                     :      Chapter 11
                                          :
**MOTORS LIQUIDATION COMPANY,** *et al.,*    :      Case No.:  09-50026 (REG)
       **f/k/a General Motors Corp.,** *et al.*    :
                                          :
             **Debtors.**                  :      (Jointly Administered)
                                          :
------------------------------------------------------------------x

**MOTION OF GENERAL MOTORS LLC PURSUANT**
**TO 11 U.S.C. §§ 105 AND 363 TO ENFORCE**
**THE COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION**

## TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ........................................................................................................ iv

**INTRODUCTION** .......................................................................................................................... 1

**BACKGROUND STATEMENT OF FACTS** ............................................................................... 5

I.    OLD GM FILED FOR PROTECTION UNDER THE BANKRUPTCY CODE IN
      JUNE 2009 ............................................................................................................................. 6

      A.    Objectors to the Sale Motion Argued that New GM Should Assume
            Additional Liabilities of the Type Plaintiffs Now Assert in the Ignition
            Switch Actions ............................................................................................................ 6

      B.    The Court Issued Its Sale Order And Injunction, And The Product
            Liability Claimants And Others Appealed Because They Objected to the
            Fact That New GM Was Not Assuming *Their* Liabilities ....................................... 7

      C.    Upon Approval Of The MSPA And Issuance Of The Sale Order And
            Injunction, New GM Assumed Certain Narrowly Defined Liabilities, But
            The Bulk Of Old GM's Liabilities Remained With Old GM ................................... 10

      D.    The Court's Sale Order And Injunction Expressly Protects New GM From
            Litigation Over Retained Liabilities ...................................................................... 11

II.   NEW GM HAS RECALLED CERTAIN VEHICLES AND IN RESPONSE,
      PLAINTIFFS HAVE FILED MULTIPLE IGNITION SWITCH ACTIONS ................. 14

**NEW GM'S ARGUMENT TO ENFORCE THE COURT'S SALE ORDER AND
INJUNCTION** ............................................................................................................................... 16

I.    THIS  COURT'S  SALE  ORDER  AND  INJUNCTION  SHOULD  BE
      ENFORCED ....................................................................................................................... 17

II.   NEW  GM  CANNOT  BE  HELD  LIABLE  FOR  OLD  GM'S  ALLEGED
      CONDUCT,  EITHER  DIRECTLY  OR  AS  OLD  GM'S  ALLEGED
      "SUCCESSOR." .................................................................................................................. 19

III.  PLAINTIFFS'  WARRANTY  ASSERTIONS  AND  STATE  LEMON  LAW
      ALLEGATIONS  DO  NOT  ENABLE  THEM  TO  CIRCUMVENT  THE
      COURT'S SALE ORDER AND INJUNCTION ................................................................ 21

      A.    The Limited Glove Box Warranty is Not Applicable.  But As a Practical
            Matter, Plaintiffs Already Are Obtaining Such Relief As Part of the
            Recall ...................................................................................................................... 21

ii

**Page**

B.    Any Purported State Lemon Law Claims Are Premature At Best, And Cannot Be Adequately Pled. ............................................................................ 22

**CONCLUSION** ........................................................................................................... **23**

**NOTICE AND NO PRIOR REQUESTS** ................................................................. **26**

iii

# TABLE OF AUTHORITIES

### Cases

*Ayers v. Gen. Motors*,
234 F.3d 514, (11th Cir. 2000) ....................................................................................... 11

*Back v. LTV Corp. (In re Chateaugay Corp.)*,
213 B.R. 633 (S.D.N.Y. 1997)........................................................................................ 17

*Baker v. Chrysler Corp.*,
Civ. A. No. 91–7092, 1993 WL 18099 (E.D. Pa. Jan. 25, 1993) ..................................... 23

*Burton v. Chrysler Group, LLC (In re Old Carco LLC)*,
492 B.R. 392 (Bankr. S.D.N.Y. 2013).......................................................................... 21, 23

*Callan v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
428 B.R. 43 (S.D.N.Y. 2010)........................................................................................ 9, 10

*Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
Adv. Proc. No. 09–00509, 2012 WL 1339496 (Bankr. S.D.N.Y. April 17, 2012), *aff'd*,
500 B.R. 333 (S.D.N.Y. 2013)....................................................................................... 7, 18

*Celotex Corp. v. Edward*,
*514 U.S. 300 (1995)* ............................................................................................... 4, 16, 18

*DiVigenze v. Chrysler Corp.*,
345 N.J. Super. 314, 785 A.2d 37 (App. Div. 2001) ........................................................ 23

*GTE Sylvania, Inc. v. Consumers Union of U. S., Inc.*,
445 U.S. 375 (1980)....................................................................................................... 18

*Handy v. Gen. Motors Corp.*,
518 F.2d 786 (9th Cir 1975) ......................................................................................... 11

*Iams v. DaimlerChrysler Corp.*,
174 Ohio App. 3d 537, 883 N.E.2d 466 (2007)............................................................... 23

*In re Cont'l Airlines, Inc.*,
236 B.R. 318 (Bankr. D. Del. 1999) .............................................................................. 17

*In re Gen. Motors Corp.*,
No. M 47 (LAK), 2009 WL 2033079 (S.D.N.Y. July 9, 2009) .……………………….3

*In re Gen. Motors Corp.*,
407 B.R. 463 (Bankr. S.D.N.Y. 2009)....................................................................... 7, 8, 9

iv

Exhibit D
Page 411

**Page**

*In re Gruntz,*
    202 F.3d 1074 (9th Cir. 2000) ........................................................................................ 19

*In re McGhan,*
    288 F.3d 1172 (9th Cir. 2002) ........................................................................................ 19

*In re Motors Liquidation Co.,*
    No. 09-50026 (REG), 2011 WL 6119664 (Bankr. S.D.N.Y. 2011) ................................. 17

*In re Wilshire Courtyard,*
    729 F.3d 1279 (9th Cir. 2013) ........................................................................................ 17

*McLaughlin v. Chrysler Corp.,*
    262 F. Supp. 2d 671 (N.D.W. Va. 2002) ........................................................................ 23

*Palmer v. Fleetwood Enterp., Inc.,*
    Nos. C040161, C040765, 2003 WL 21228864 (Cal. Ct. App. May 28, 2003) ................ 23

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.),*
    430 B.R. 65 (S.D.N.Y. 2010) .......................................................................................... 10

*Pratt v. Ventas, Inc.,*
    365 F.3d 514 (6th Cir. 2004) .......................................................................................... 19

*Sipe v. Fleetwood Motor Homes of Penn., Inc.,*
    574 F. Supp. 2d 1019 (D. Minn. 2008) ........................................................................... 23

*Spartan Mills v. Bank of Am. Ill.,*
    112 F.3d 1251 (4th Cir. 1997) ........................................................................................ 19

*Tatum v. Chrysler Group LLC,*
    Adv. Proc. No. 11-09411 (Bankr. S.D.N.Y. Feb. 15, 2012)........................................... 21

*Travelers Indem. Co. v. Bailey,*
    557 U.S. 137 (2009)........................................................................................................ 17

*Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.),*
    Adv. Proc. No. 09–09803, 2013 WL 620281 (Bankr. S.D.N.Y. Feb. 19, 2013).. 11, 18, 20

*Tulacro v. Chrysler Group LLC, et al.,*
    Adv. Proc. No. 11-09401 (Bankr. S.D.N.Y. Oct. 28, 2011) ........................................... 21

*U.S. Lines, Inc. v. GAC Marine Fuels, Ltd. (In re McClean Indus., Inc.),*
    68 B.R. 690 (Bankr. S.D.N.Y. 1986) .............................................................................. 17

v

**Page**

**Statutes and Rules**

11 U.S.C. § 105 ........................................................................................................... 17

11 U.S.C. § 363 ............................................................................................................. 8

11 U.S.C. § 363(m) ....................................................................................................... 8

49 C.F.R. § 554.1 ......................................................................................................... 14

49 U.S.C. § 30119 ....................................................................................................... 14

vi

## INTRODUCTION

In June 2009, General Motors LLC ("**New GM**") was a newly formed entity, created by the U.S. Treasury, to purchase substantially all of the assets of Motors Liquidation Company, formerly known as General Motors Corporation ("**Old GM**").  Through a bankruptcy-approved sale process, New GM acquired Old GM's assets, free and clear of all liens, claims, liabilities and encumbrances of Old GM, other than liabilities expressly assumed by New GM under a June 26, 2009 Amended and Restated Master Sale and Purchase Agreement ("**MSPA**").[1]  The Bankruptcy Court approved the asset purchase transaction and the terms of the MSPA in its "**Sale Order and Injunction**," dated July 5, 2009.[2]

This Motion to Enforce does not address any litigation involving an accident or incident causing personal injury, loss of life or property damage.  Further, this Motion to Enforce does not involve whether New GM should repair the ignition switch defect.  New GM has committed to replacing the defective ignition switch as a result of the recall being conducted under the supervision of the National Highway Traffic Safety Administration ("**NHTSA**"), the government agency with jurisdiction over recalls.  Instead, this Motion to Enforce involves *only* litigation in which the plaintiffs seek economic losses against New GM relating to an Old GM vehicle or part, including, for example, for the claimed diminution in the vehicle's value, and for loss of use, alternative transportation, child care or lost wages for time spent in seeking prior repairs.  Those types of claims were never assumed by New GM and are barred by the Court's Sale Order and Injunction.

---

[1]    *See* Exhibit A, MSPA.  Exhibits to this Motion are contained in the Compendium of Exhibits, filed simultaneously herewith.

[2]    *See* Exhibit B, "Order (i) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (ii) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (iii) Granting Related Relief, entered by the Court on July 5, 2009."

Under the MSPA approved by the Court, New GM assumed only three expressly defined categories of liabilities for vehicles and parts sold by Old GM:  (a) post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damage; (b) repairs provided for under the "Glove Box Warranty"— a specific written warranty, of limited duration, that only covers repairs and replacement of parts and (c) Lemon Law claims essentially tied to the failure to honor the Glove Box Warranty.[3]  All other liabilities relating to vehicles and parts sold by Old GM were legacy liabilities that were retained by Old GM.  *See* MSPA § 2.3(b).

New GM's assumption of just these limited categories of liabilities was based on the independent judgment of U.S. Treasury officials as to which liabilities, if paid, would best position New GM for a successful business turnaround.  It was an absolute condition of New GM's purchase offer that New GM not take on all of Old GM's liabilities.  That was the bargain struck by New GM and Old GM, and approved by the Court as being in the best interests of Old GM's bankruptcy estate and the public interest.

The primary objections to the sale were made by prepetition creditors who essentially wanted New GM to assume their liabilities.  But the Court found that, if not for New GM's purchase offer, which provided for a meaningful distribution to prepetition unsecured creditors, Old GM would have liquidated and those creditors would have received nothing.  Indeed, had the objectors been successful in opposing the Sale Order and Injunction, it would have been a pyrrhic victory, and disaster not only for them but for thousands of others who relied on the continued viability of the business being sold to New GM.   Judge Lewis Kaplan aptly summarized the point:  "No sentient American is unaware of the travails of the automobile

---

[3]    *See also* MSPA § 1.1, at p. 11 (defining "Lemon Laws" as "a state statute requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute.").

industry in general and of General Motors Corporation ([Old] GM) in particular.  As the
Bankruptcy Court found, [Old] GM will be forced to liquidate — with appalling consequences
for its creditors, its employees, and our nation — unless the proposed sale of its core assets to a
newly constituted purchaser is swiftly consummated."  *In re Gen. Motors Corp.*, No. M 47
(LAK), 2009 WL 2033079, at *1 (S.D.N.Y. July 9, 2009).

One of the most vigorous groups that objected to Old GM's asset sale motion was a
coalition representing Old GM vehicle owners.  That group included State Attorneys General,
individual accident victims, the Center for Auto Safety, Consumer Action and other consumer
advocacy groups.  The gist of their objections was:  as long as New GM was assuming any of
Old GM liabilities, then it should assume *all* vehicle owner liabilities as well.  In particular, the
objectors argued, unsuccessfully, that New GM should assume successor liability claims, all
warranty claims (express and implied), economic damages claims based upon defects in Old GM
vehicles and parts, and tort claims, in addition to the limited categories of claims that New GM
already agreed to assume.

A critical element of protecting the integrity of the bankruptcy sale process, however,
was to ensure that New GM, as the good faith purchaser for substantial value, received the
benefit of its Court-approved bargain.  This meant that New GM would be insulated from
lawsuits by Old GM's creditors based on Old GM liabilities it did not assume.  The MSPA and
the Sale Order and Injunction were expressly intended to provide such protections.  The Order
thus enjoined such proceedings against New GM, and expressly reserved exclusive jurisdiction
to this Court to ensure that the sale transaction it approved would not be undermined or
collaterally attacked.

3

As this Court undoubtedly is aware, New GM recently sent notices to NHTSA concerning problems with ignition switches and ignition switch repairs in certain vehicles and parts manufactured by Old GM.  Shortly after New GM issued the recall notice, numerous plaintiffs throughout the country sued New GM for claimed economic losses allegedly resulting from ignition switch defects in Old GM vehicles and parts — the very type of claims retained by Old GM for which New GM has no liability.

GM's Motion to Enforce thus presents a single, simple, overarching question for the Court to decide:

> **May New GM be sued in violation of this Court's Sale Order
> and Injunction for economic damages relating to vehicles and
> parts sold by Old GM?**

To ask the question is to answer it.  In all of the cases based on the ignition switch defect that are the subject of this Motion to Enforce, plaintiffs assert claims for liabilities that, under the Sale Order and Injunction, were retained by Old GM.  Plaintiffs apparently decided to not appear in this Court to challenge the Sale Order and Injunction — and with good reason:  this Court has rejected prior challenges to that Order and it is now too late, as the Order has been affirmed by the appellate courts and has been a final Order for several years.  Faced with a fundamental bar to many of their claims against New GM, the ignition switch plaintiffs simply have decided to ignore the Court's Sale Order and Injunction, and proceed as though it never existed.  The law is settled, however, that persons subject to a Court's injunction do not have that option.  As the United States Supreme Court explained in *Celotex Corp. v. Edwards*, the rule is "well-established" that "'persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.'"  514 U.S. 300, 306 (1995).

4

Based on this Court's prior proceedings and Orders, New GM has brought this Motion to Enforce to require the plaintiffs (collectively, the "**Plaintiffs**") in the actions listed in Schedule 1 attached hereto ("**Ignition Switch Actions**") to comply with the Court's Sale Order and Injunction by directing Plaintiffs to (a) cease and desist from further prosecuting against New GM claims that are barred by the Sale Order and Injunction, (b) dismiss with prejudice those void claims because they were brought by the Plaintiffs in violation of the Sale Order and Injunction, and (c) show cause whether they have any claims against New GM not otherwise already barred by the Sale Order and Injunction.[4]

### BACKGROUND STATEMENT OF FACTS

1.  In June 2009, in the midst of a national financial crisis, Old GM was insolvent with no alternative other than to seek bankruptcy protection to sell its assets.  New GM, a newly created, government-sponsored entity, was the only viable purchaser, but it would not purchase Old GM's assets unless the sale was free and clear of all liens and claims (except for the claims it expressly agreed to assume). The Court approved this sale transaction, which set the framework for New GM to begin its business operations.  During the last five years, New GM has operated its business based on the fundamental structure of the MSPA and Sale Order and Injunction — that its new business enterprise would not be burdened with liabilities retained by Old GM.  The Ignition Switch Actions represent a collateral attack on this Court's Sale Order and Injunction. The Plaintiffs may not rewrite, years later, the Court-approved sale to a good faith purchaser, which was affirmed on appeal, and which has been the predicate ever since for literally millions of transactions between New GM and third parties.

---

[4]    New GM reserves the right to supplement the list of Ignition Switch Actions contained in Schedule 1 in the event additional cases are brought against New GM after the filing of this Motion to Enforce that implicate similar provisions of the Sale Order and Injunction.

I.    **OLD GM FILED FOR PROTECTION UNDER THE BANKRUPTCY CODE IN JUNE 2009.**

2.    On June 1, 2009, Old GM and certain of its affiliates filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  Old GM simultaneously filed a motion seeking approval of the original version of the MSPA ("**Original MSPA**"), pursuant to which substantially all of Old GM's assets were to be sold to New GM ("**Sale Motion**").  The Original MSPA (like the MSPA) provided that New GM would assume only certain specifically identified liabilities (*i.e.*, the "**Assumed Liabilities**"); all other liabilities would be retained by Old GM (*i.e.*, the "**Retained Liabilities**").

A.    **Objectors to the Sale Motion Argued that New GM Should Assume Additional Liabilities of the Type Plaintiffs Now Assert in the Ignition Switch Actions.**

3.    Many objectors, including various State Attorneys General, certain individual accident victims ("**Product Liability Claimants**"), the Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizens (collectively, the "**Consumer Organizations**"), the Ad Hoc Committee of Consumer Victims, and the Official Committee of Unsecured Creditors challenged various provisions in the Original MSPA relating to actual and potential tort and contract claims held by Old GM vehicle owners.  These objectors argued that the Court should not approve the Original MSPA unless New GM assumed additional Old GM liabilities (beyond the Glove Box Warranty), including those now being asserted by the Plaintiffs in the Ignition Switch Actions.

4.    The Original MSPA was amended so that New GM would assume (for vehicles and parts sold by Old GM) Lemon Law claims, as well as personal injury, loss of life and

6

property damage claims for accidents taking place after the closing of the sale.[5]    Product

Liability Claimants and the Consumer Organizations were not satisfied and pressed their

objections, arguing that New GM should assume broader warranty-related claims as well as

successor liability claims.[6]    Representatives from the U.S. Treasury declined to make further

changes.  *See* Hr'g Tr. 151:1 – 10, July 1, 2009.  The Court found that New GM would not have

consummated the "[t]ransaction (i) if the sale . . . was not free and clear of all liens, claims,

encumbrances, and other interests . . . , including rights or claims based on any successor or

transferee liability or (ii) if [New GM] would, or in the future could, be liable for any such liens,

claims, encumbrances, and other interests, including rights or claims based on any successor or

transferee liability (collectively, the 'Retained Liabilities'), other than, in each case, the Assumed

Liabilities."  *See* Sale Order and Injunction ¶ DD.  The Court ultimately overruled the objectors

on these issues.  *See id.*, ¶ 2.

    **B.**    **The Court Issued Its Sale Order And Injunction, And The Product Liability
Claimants And Others Appealed Because They Objected to the Fact That
New GM Was Not Assuming *Their* Liabilities**

    5.    The Court held a three-day hearing on the Sale Motion, then issued its Sale

Decision on July 5, 2009, finding that the only alternative to the immediate sale to New GM

pursuant to the MSPA was a liquidation of Old GM, in which case unsecured creditors, such as

the Plaintiffs now suing New GM, would receive nothing.  *See In re Gen. Motors Corp.*, 407

---

[5]    Assumption of the Glove Box Warranty was provided for in the Original MSPA.

[6]    As noted in the Court's *Castillo* decision, numerous State Attorneys General also objected, seeking to expand
the definition of New GM's Assumed Liabilities to include implied warranty claims. *Castillo v. Gen. Motors
LLC (In re Motors Liquidation Co.),* Adv. Proc. No. 09–00509, 2012 WL 1339496, at *5 (Bankr. S.D.N.Y.
April 17, 2012), *aff'd,* 500 B.R. 333 (S.D.N.Y. 2013).

B.R. 463, 474 (Bankr. S.D.N.Y. 2009). The Court analyzed the law of successor liability, devoted several pages of its opinion to this issue (*id.* at 499-506), and ruled that: "[T]he law in this Circuit and District is clear; the Court will permit (Old) GM's assets to pass to the purchaser (New GM) ***free and clear of successor liability claims***, and in that connection, will issue the requested findings and associated injunction." *Id.* at 505-06 (emphasis added).

6.     In approving the sale, the Court specifically found that New GM was a "good faith purchaser, for sale-approval purposes, and also for the purpose of the protections section 363(m) provides." *Id.* at 494 (citing 11 U.S.C. § 363(m)). The Sale Order and Injunction expressly enjoined parties (like the Plaintiffs in the Ignition Switch Actions) from proceeding against New GM with respect to Retained Liabilities at any time in the future. *See* Sale Order and Injunction, ¶¶ 8, 47. This Court well understood the circumstances of accident victims (who are not the subject of this Motion to Enforce), and that if they could not look to New GM as an additional source of recovery, they would recover only modest amounts on their claims from Old GM. *See Gen. Motors*, 407 B.R. at 505. But the Court also recognized that if a Section 363 purchaser like New GM did not obtain protection against claims against Old GM, like successor liability claims, it would pay less for the assets because of the risks of known and unknown liabilities. *Id.* at 500; *see* 11 U.S.C. § 363. The Court further recognized that, under the law, a Section 363 purchaser could choose which liabilities of the debtors to assume, and not assume (*id.* at 496), and that the U.S. Treasury, on New GM's behalf, could rightfully condition its purchase offer on its refusal to assume the liabilities now being asserted by Plaintiffs in the Ignition Switch Actions.

7.     Old GM, the proponent of the asset sale transaction, presented evidence that established that if the MSPA was not approved, Old GM would liquidate. If it did, objecting

8

creditors seeking incremental recoveries would end up with nothing, given that the book value of Old GM's global assets was $82 billion, the book value of its global liabilities was $172 billion (s*ee Gen. Motors*, 407 B.R. at 475), and that, in a liquidation, the value of Old GM's assets was probably less than 10% of stated book value (*id.*).

8.      Objectors also presented evidence that the book value of certain contingent liabilities was about $934 million. *Id.* at 483.  The Court noted that contingent liabilities were "difficult to quantify." *Id.*  And, if the book value of all contingent liabilities was understated, that simply meant Old GM was even more insolvent — an even greater reason for New GM to decline to assume the liabilities retained by GM.

9.      Whether Old GM presented evidence regarding a particular claim or specific defect was not germane to this Court's approval of the Sale Order and Injunction.  Indeed, as the Court found in the Sale Order and Injunction, the proper analysis for approving the asset sale is whether Old GM obtained the "highest or best" available offer for the Purchased Assets.  *See* Sale Order and Injunction, ¶ G.  In contrast, the quantification of liabilities left behind with Old GM (*i.e.*, the Retained Liabilities) was pertinent to a different phase of the bankruptcy case (the claims process) which did not involve New GM.

10.      New GM's refusal to assume a substantial portion of Old GM's liabilities was fundamental to the sale transaction and was widely disclosed by Old GM to all interested parties.  Indeed, the Product Liability Claimants objected to and appealed the Sale Order and Injunction to specifically challenge this aspect of the sale.  *See Callan v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43 (S.D.N.Y. 2010).  Although on appeal, the District Court focused on the appellants' failure to seek a stay of the Sale and on equitable mootness principles, the District Court also found that this Court had jurisdiction to enjoin successor liability claims.

9

*See id. at* 59-60. Indeed, the Sale Order and Injunction was affirmed on appeal by two different

District Court Judges. *Id.; Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430

B.R. 65 (S.D.N.Y. 2010). There were no further appeals.

> **C.      Upon Approval Of The MSPA And Issuance Of The Sale Order And
> Injunction, New GM Assumed Certain Narrowly Defined Liabilities, But The
> Bulk Of Old GM's Liabilities Remained With Old GM.**

11.      Under the MSPA and the Sale Order and Injunction, New GM became

responsible for "Assumed Liabilities." *See* MSPA § 2.3(a). These included New GM's

assumption of liability claims for post-sale accidents and Lemon Law claims, as well as the

Glove Box Warranty—a written warranty of limited duration (typically three years or 36,000

miles, whichever comes first) provided at the time of sale, for repairs and replacement of parts.

The Glove Box Warranty expressly excludes economic damages.[7] New GM assumed no other

Old GM warranty obligations, express or implied:

> The Purchaser is assuming the obligations of the Sellers pursuant to and subject to
> conditions and limitations contained in their express written warranties, which
> were delivered in connection with the sale of vehicles and vehicle components
> prior to the Closing of the 363 Transaction and specifically identified as a
> "warranty." ***The Purchaser is not assuming responsibility for Liabilities
> contended to arise by virtue of other alleged warranties, including implied
> warranties and statements in materials such as, without limitation, individual
> customer communications, owner's manuals, advertisements, and other
> promotional materials, catalogs, and point of purchase materials.***

Sale Order and Injunction, ¶ 56 (emphasis added).

12.      Independent of the Assumed Liabilities under the MSPA, New GM covenanted to

perform Old GM's recall responsibilities under federal law. *See* MSPA ¶ 6.15(a). But there

were no third party beneficiary rights granted under the MSPA with respect to that covenant (*see*

MSPA § 9.11), and there is no private right of action for third parties to sue for a breach of a

---

[7]      A copy of a typical Glove Box Warranty is annexed in the Compendium of Exhibits as Exhibit C.

recall obligation.  *See Ayers v. Gen. Motors*, 234 F.3d 514, 522-24 (11th Cir. 2000); *Handy v. Gen. Motors Corp.*, 518 F.2d 786, 787-88 (9th Cir 1975).  Thus, New GM's recall covenant does not create a basis for the Plaintiffs to sue New GM for economic damages relating to a vehicle or part sold by Old GM.

13.     All liabilities of Old GM not expressly defined as Assumed Liabilities constituted "Retained Liabilities" that remained an obligation of Old GM.   MSPA §§ 2.3(a), 2.3(b). Retained Liabilities include economic damage claims relating to vehicles and parts manufactured by Old GM (the primary claims asserted by the Plaintiffs in the Ignition Switch Actions) such as:

(a)     liabilities "arising out of, relating to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers."  MSPA § 2.3(b)(xvi), *see also* MSPA ¶ 6.15(a). This would include liability based on state consumer statutes, except Lemon Law claims.

(b)     All liabilities (other than Assumed Liabilities) of Old GM based upon contract, tort or any other basis.  MSPA § 2.3(b)(xi).  This covers claims based on negligence, concealment and fraud.

(c)     All liabilities relating to vehicles and parts sold by Old GM with a design defect (*i.e.*, the ignition switch).[8]

(d)     All Liabilities based on the conduct of Old GM including any allegation, statement or writing attributable to Old GM. This covers fraudulent concealment type claims.  *See* Sale Order and Injunction, ¶ 56.

(e)     All claims based on the doctrine of "successor liability."  *See, e.g.,* Sale Order and Injunction, ¶ 46.

**D.     The Court's Sale Order And Injunction Expressly Protects New GM From Litigation Over Retained Liabilities.**

14.     On July 10, 2009, the parties consummated the Sale.   New GM acquired substantially all of the assets of Old GM free and clear of all liens, claims and encumbrances,

---

[8]     *See* Sale Order and Injunction, ¶ AA; *see also Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 09–09803, 2013 WL 620281, at *2 (Bankr. S.D.N.Y. Feb. 19, 2013).

11

except for the narrowly defined Assumed Liabilities.  In particular, paragraphs 46, 9 and 8 of the Sale Order and Injunction provide that New GM would have no responsibility for any liabilities (except for Assumed Liabilities) relating to the operation of Old GM's business, or the production of vehicles and parts before July 10, 2009:

> Except for the Assumed Liabilities expressly set forth in the [MSPA] . . . [New GM] . . . shall [not] have any liability for any claim that arose prior to the Closing Date, *relates to the production of vehicles prior to the Closing Date*, or otherwise is assertable against [Old GM] . . . prior to the Closing Date . . . . Without limiting the foregoing, [New GM] shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims, including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity . . . and products . . . liability, *whether known or unknown* as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

Sale Order and Injunction, ¶ 46 (emphasis added); *see also id.*, ¶ 9(a) ("(i) no claims other than Assumed Liabilities, will be assertable against the Purchaser; (ii) the Purchased Assets [are] transferred to the Purchaser free and clear of all claims (other than Permitted Encumbrances) . . ."); and *id.*, ¶ 8 ("All persons and entities . . . holding claims against [Old GM] or the Purchased Assets arising under or out of, in connection with, or in any way relating to [Old GM], the Purchased Assets, *the operation of the Purchased Assets* prior to the Closing . . . are forever barred, estopped, and permanently enjoined . . . from asserting [such claims] against [New GM]. . . .") (emphasis added).

     15.     Anticipating the possibility that New GM might be wrongfully sued for Retained Liabilities, the Sale Order and Injunction contains an injunction permanently enjoining claimants from asserting claims of the type made in the Ignition Switch Actions:

> [A]ll persons and entities . . . holding liens, claims and encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against [Old GM] or the Purchased Assets (whether legal or equitable, secured or unsecured, *matured or unmatured*, *contingent or noncontingent*, senior or subordinated), *arising under or out of, in connection with, or in any way relating to [Old GM], the Purchased Assets, the*

> *operation of the Purchased Assets prior to the Closing . . . are forever barred, estopped, and permanently enjoined . . . from asserting against [New GM] . . . such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.*

Sale Order and Injunction, ¶ 8 (emphasis added); *see also id.*, ¶ 47.

16.    The Court specifically found that the provisions of the Sale Order and Injunction, as well as the MSPA, were binding on all creditors, ***known and unknown*** alike.  *See* Sale Order and Injunction, ¶ 6 ("This [Sale] Order and M[S]PA "shall be binding in all respects upon the Debtors, their affiliates, ***all known and unknown creditors*** of, and holders of equity security interests in, any Debtor, including any holders of liens, claims, encumbrances, or other interests, including rights or claims based on any successor or transferee liability . . . ." (emphasis added)); *see also id.*, ¶ 46.  In short, except for Assumed Liabilities, claims based on Old GM vehicles and parts remained the legal responsibility of Old GM, and are not the responsibility of New GM.

17.    Finally, paragraph 71 of the Sale Order and Injunction makes this Court the gatekeeper to enforce its own Order. It provides for this Court's ***exclusive jurisdiction*** over matters and claims regarding the Sale, including jurisdiction to protect New GM against any Retained Liabilities of Old GM:

> *This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the M[S]PA,* all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, . . ., in all respects, including, but not limited to, ***retaining jurisdiction to . . . (c) resolve any disputes arising under or related to the M[S]PA,*** except as otherwise provided therein, (d) ***interpret, implement, and enforce the provisions of this Order, (e) protect the Purchaser against any of the Retained Liabilities*** or the assertion of any lien, claim, encumbrance, or other interest, of any kind or nature whatsoever, against the Purchased Assets . . . .  (Emphasis added.)

13

**II.     NEW GM HAS RECALLED CERTAIN VEHICLES AND IN RESPONSE,
PLAINTIFFS HAVE FILED MULTIPLE IGNITION SWITCH ACTIONS.**

18.     Consistent with its obligations under the Sale Order and Injunction, New GM

informed NHSTA on February 7, 2014, of a problem with ignition switches in certain vehicles

and parts manufactured by Old GM, and that a recall would be conducted by New GM to replace

the ignition switches (at no cost to the owners).  (*See* Exhibit D.)  A short time later, New GM

sent NHTSA a second letter, dated February 24, 2014, which gave NHTSA additional

information about the ignition switch and the defect, and what owners should do to ameliorate

the problem while waiting for their vehicles to be repaired.  (*See* Exhibit E.)  GM sent recall

notices approved by NHTSA to all vehicle owners subject to the recall (Exhibit F), which

informed owners about how to safely drive the vehicles prior to the recall.

19.     In March 2014, New GM sent another notice to NHTSA concerning a problem

with Old GM ignition switches that may have been installed during repairs to certain Old GM

and New GM vehicles, and that a recall would be conducted for those vehicles.  (Exhibit G.)

The notice contained the same safety instruction, and the same repair and reimbursement

statements made by New GM for the earlier recall.  New GM expects that only a small fraction

of the cars being recalled for potentially faulty repairs actually have the defective ignition switch

part in them at this time.[9]

20.     The recall is underway and New GM already has started to replace the ignition

switches.  NHTSA, as the government agency responsible for overseeing the technical and

highly-specialized domain of automotive safety defects and recalls, administers the rules

concerning the content, timing, and means of delivering a recall notice to affected motorists and

---

[9]     In April 2014, New GM sent a recall notice to NHTSA concerning an ignition cylinder lock issue that is
different than the issue presented in the Ignition Switch Actions.

14

dealers.    *See*  49 C.F.R. § 554.1; 49 U.S.C. § 30119.    Other governmental agencies and the Congress are also examining various issues relating to the ignition switch recall.

21.    Since the recall was announced, numerous Ignition Switch Actions have been filed against New GM based upon vehicles and parts sold by Old GM, and virtually each day, additional cases are being filed.  (*See* Schedule 1, attached to this Motion.)  These cases include over 50 class actions and two individual actions.  The Ignition Switch Actions have been brought in over 20 federal courts and two state courts.  Plaintiffs in some of those actions have filed motions with the Judicial Panel for Multidistrict Litigation ("**MDL**") to consolidate at least 19 actions for pre-trial purposes.  It is expected that the number of Ignition Switch Actions identified to the MDL Panel for consolidation will grow.[10]

22.    The Ignition Switch Actions assert claims that are barred by the MSPA and the Sale Order and Injunction.  The primary claims at issue are for economic losses premised on alleged defects in vehicles and components designed and sold by Old GM, which are unrelated to any accident causing personal injury, loss of life or property damage.  In their complaints, the Plaintiffs conflate Old GM and New GM, but the Sale Order and Injunction is clear that New GM is a separate entity from Old GM (*see* Sale Order and Injunction, ¶ R), and is not liable for successor liability claims (*see, e.g., id.*, ¶¶ 46, 47).  To be sure, the causes of action asserted by the Plaintiffs in the Ignition Switch Actions are varied, and in some instances, because of the imprecise factual allegations, it is unclear whether there might be a viable cause of action (of the many) being asserted against New GM.  What is clear, however, is that the crux of virtually all of Plaintiffs' claims is a problem in the ignition switch in vehicles and parts sold by Old GM.

---

[10]    The MDL Panel has scheduled a hearing on the motions for May 29, 2014.

Claims based on that factual predicate are Retained Liabilities and may not be brought against New GM.[11]

23.    This Court is uniquely situated to enforce its own Order and interpret what the parties to the MSPA agreed to, and what issues were raised and resolved in connection with the asset sale.  This Motion to Enforce respectfully requests that the Court enforce the Sale Order and Injunction by directing Plaintiffs to cease and desist from pursuing claims for Retained Liabilities of Old GM against New GM, direct Plaintiffs to dismiss with prejudice those void claims that are barred by the Sale Order and Injunction, and direct Plaintiffs to show cause whether there is any claim that they may properly pursue against New GM that is not in violation of the Court's Sale Order and Injunction.

### NEW GM'S ARGUMENT TO ENFORCE THE COURT'S
### SALE ORDER AND INJUNCTION

24.    The Plaintiffs do not have the choice of simply ignoring the Court's Sale Order and Injunction.  As the Supreme Court expressed in its *Celotex* decision:  "If respondents believed the Section 105 Injunction was improper, they should have challenged it in the Bankruptcy Court, like other similarly situated bonded judgment creditors have done . . . Respondents chose not to pursue this course of action, but instead to collaterally attack the Bankruptcy Court's Section 105 Injunction in the federal courts in Texas.  This they cannot be permitted to do without seriously undercutting the orderly process of the law."  514 U.S. at 313.  These settled principles bind Plaintiffs in the Ignition Switch Actions.  Those who purchased vehicles or parts from Old GM before the Sale, whether they were a known or unknown creditor

---

[11]    The allegations and claims asserted in the Ignition Switch Actions include Retained Liabilities, such as implied warranty claims, successor liability claims, and miscellaneous tort and statutory claims premised in whole or in part on the alleged acts or omissions of Old GM.  *See* para. 39 *infra*, and Schedule 2, attached to this Motion to Enforce, for a sample of such statements, allegations and/or causes of action.

at the time, are subject to the terms of the Court's Sale Order and Injunction, and are barred by this Court's Injunction from suing New GM on account of Old GM's Retained Liabilities.

## I.    THIS COURT'S SALE ORDER AND INJUNCTION SHOULD BE ENFORCED.

25.    It is well settled that a "Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders." *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re Wilshire Courtyard*, 729 F.3d 1279, 1290 (9th Cir. 2013) (affirming bankruptcy court's post-confirmation jurisdiction to interpret and enforce its orders; "[i]nterpretation of the Plan and Confirmation Order is the only way for a court to determine the essential character of the negotiated Plan transactions in a way that reflects the deal the parties struck in chapter 11 proceedings"); *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 326 (Bankr. D. Del. 1999) ("In the bankruptcy context, courts have specifically, and consistently, held that the bankruptcy court retains jurisdiction, *inter alia*, to enforce its confirmation order."); *U.S. Lines, Inc. v. GAC Marine Fuels, Ltd. (In re McClean Indus., Inc.)*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("[a]ll courts, whether created pursuant to Article I or Article III, have inherent contempt power to enforce compliance with their lawful orders.  The duty of any court to hear and resolve legal disputes carries with it the power to enforce the order.").  In addition, Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out" the Bankruptcy Code's provisions, and this section "codif[ies] the bankruptcy court's inherent power to enforce its own orders." *Back v. LTV Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 640 (S.D.N.Y. 1997); 11 U.S.C. § 105(a).

26.    Consistent with these authorities, this Court retained subject matter jurisdiction to enforce its Sale Order and Injunction.  Indeed, this is not the first time that this Court has been asked to enforce its injunction against plaintiffs improperly seeking to sue New GM for Old GM's Retained Liabilities.  *See In re Motors Liquidation Co.*, No. 09-50026 (REG), 2011 WL

6119664 (Bankr. S.D.N.Y. 2011) (ordering various plaintiffs to dismiss with prejudice civil actions in which they had brought claims against New GM that are barred by the Sale Order and Injunction); *Castillo v. Gen. Motors Co. (In re Motors Liquidation Co.)*, Adv. Proc. No. 09-00509 (Bankr. S.D.N.Y.), Hr'g Tr. 9:3-9:14, May 6, 2010 ("when you are looking for a declaratory judgment on an agreement that I approved [*i.e.*, the MSPA] that was affected by an order that I entered [*i.e.*, the Sale Order and Injunction], and with the issues permeated by bankruptcy law as they are, and which also raise issues as to one or more injunctions that I entered, how in the world would you have brought this lawsuit in Delaware Chancery Court.  I'm not talking about getting in personam jurisdiction or whether you can get venue over a Delaware corporation in Delaware.  I'm talking about what talks and walks and quacks like an intentional runaround of something that's properly on the watch of the U.S. Bankruptcy Court for the Southern District of New York."); *Castillo*, 2012 WL 1339496 (entering judgment in favor of New GM) (affirmed by 500 B.R. 333, 335 (S.D.N.Y. 2013)); *see also Trusky*, 2013 WL 620281, at *2 (finding that "claims for design defects [of 2007-2008 Chevrolet Impalas] may not be asserted against New GM and that "New GM is not liable for Old GM's conduct or alleged breaches of warranty").

27.    Contrary to New GM's bargained for rights under the MSPA and the Court's Sale Order and Injunction, Plaintiffs in the Ignition Switch Actions are suing New GM for defects in Old GM vehicles and/or parts in courts across the country.  Plaintiffs may not simply ignore the Court's injunction through these collateral attacks, especially when the Sale Order and Injunction is a final order no longer subject to appeal.  *See Celotex Corp.*, 514 U.S. at 306, 313  ("'persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed'") (quoting *GTE Sylvania, Inc. v. Consumers Union of U. S., Inc.*,

445 U.S. 375, 386 (1980)); *Pratt v. Ventas, Inc.*, 365 F.3d 514, 520 (6th Cir. 2004) (applying doctrine to dismiss suits filed in violation of injunction in confirmation order entered by bankruptcy court); *In re McGhan*, 288 F.3d 1172, 1180-81 (9th Cir. 2002) (applying doctrine to enforce discharge order in favor of debtors and holding that only the bankruptcy court could grant relief from the order); *see also In re Gruntz*, 202 F.3d 1074, 1082 (9th Cir. 2000) (applying this doctrine in the context of an automatic stay entered by the bankruptcy court); *Spartan Mills v. Bank of Am. Ill.*, 112 F.3d 1251, 1255 (4th Cir. 1997) (applying doctrine to bankruptcy court order approving sales of assets free and clear of liens).

## II.    NEW GM CANNOT BE HELD LIABLE FOR OLD GM'S ALLEGED CONDUCT, EITHER DIRECTLY OR AS OLD GM'S ALLEGED "SUCCESSOR."

28.    Plaintiffs acknowledge that most of the vehicles and parts at issue in the Ignition Switch Actions were manufactured, marketed, and sold by Old GM prior to the Sale Order and Injunction.  *See, e.g.*, *Benton* Compl., ¶ 31 (discussing Plaintiff's alleged review of Old GM advertisements and purchase of a 2005 Chevy Cobalt); *Ponce* Compl., ¶ 35 ("In or about 2007 or early 2008, Plaintiff purchased a 2007 Chevrolet HHR in Southern California."); *Maciel* Compl., ¶¶ 21, 25, 33, 38, 46, 50, 58, 62 (alleging named plaintiffs own, among other vehicles, 2005, 2007 and 2008 Chevrolet Cobalts; a 2007 Chevrolet HHR; and 2003, 2004, 2006 Saturn Ions); *Jawad* Compl., ¶ 8; *Jones* Compl., preamble paragraph at p. 1; *Maciel* Compl., ¶¶ 1, 196-97.

29.    Many of the complaints in the Ignition Switch Actions are similar, and while several reflect an effort to plead around the Court's Sale Order and Injunction, in fact they all generally assert the same underlying allegations made about Old GM:  that it designed and sold vehicles with a defective ignition switch.  (*See* Schedules 1 and 2 attached hereto.)  And, they all seek to hold New GM liable for economic damages based on Old GM's conduct — claims that are prohibited by the Sale Order and Injunction.  In short, New GM did not agree, and this Court

19

previously held, that New GM did not assume any economic injury liabilities based on design

defects in any of Old GM's vehicles and parts.  *See Trusky*, 2013 WL 620281, at *2.

30.    Similarly, various Plaintiffs attempt to impose "successor" liability upon

New GM, but New GM is not a successor to Old GM and did not assume any liabilities in

connection with successor or transferee liability.  This is expressly provided by the Court's Sale

Order and Injunction:

> ***The Purchaser shall not be deemed***, as a result of any action taken in connection
> with the M[S]PA or any of the transactions or documents ancillary thereto or
> contemplated thereby or in connection with the acquisition of the Purchased
> Assets, ***to:  (i) be a legal successor***, or otherwise be deemed a successor to the
> Debtors (other than with respect to any obligations arising under the Purchased
> Assets from and after the Closing); ***(ii) have, de facto or otherwise, merged with
> or into the Debtors; or (iii) be a mere continuation or substantial continuation
> of the Debtors or the enterprise of the Debtors***.  Without limiting the foregoing,
> the Purchaser (New GM) shall not have any successor, transferee, derivative, or
> vicarious liabilities of any kind or character for any claims, including, but not
> limited to, under any theory of successor or transferee liability, de facto merger or
> continuity, environmental, labor and employment, and products or antitrust
> liability, whether known or unknown as of the Closing, now existing or hereafter
> arising, asserted, or unasserted, fixed or contingent, liquidated or unliquidated.

Sale Order and Injunction ¶ 46 (emphasis added); *see also id.*, ¶¶ AA, BB, DD, 6, 7, 8, 10 and

47; MSPA § 9.19.

31.    Plaintiffs' express successor liability allegations are simply a violation of this

Court's Sale Order and Injunction.    But whether or not Plaintiffs' claims expressly allege

successor liability, their claims against New GM based on Old GM's conduct are essentially

successor liability claims cast in a different way and are precluded by that Order.

20

### III. PLAINTIFFS' WARRANTY ASSERTIONS AND STATE LEMON LAW ALLEGATIONS DO NOT ENABLE THEM TO CIRCUMVENT THE COURT'S SALE ORDER AND INJUNCTION.

#### A. The Limited Glove Box Warranty is Not Applicable. But As a Practical Matter, Plaintiffs Already Are Obtaining Such Relief As Part of the Recall.

32.    The Glove Box Warranty is for a limited duration and virtually all of the vehicles that are the subject of the Ignition Switch Actions were sold more than three years ago. Thus, the Glove Box Warranty has expired. In any event, the Glove Box Warranty provides only for repairs and replacement parts; the economic losses asserted by Plaintiffs in the Ignition Switch Actions are of an entirely different character and are expressly barred by the Glove Box Warranty. This distinction is not unique to Old GM's Sale. In the Chrysler bankruptcy case, the court likewise found that the assumed liabilities were limited to the standard limited warranty of repair issued in connection with sales of vehicles. *See, e.g., Burton v. Chrysler Group, LLC (In re Old Carco LLC)*, 492 B.R. 392, 404 (Bankr. S.D.N.Y. 2013) ("New Chrysler did agree to honor warranty claims — the Repair Warranty. None of the statements attributed to New Chrysler state or imply that it assumed liability to pay consequential or other damages based upon pre-existing defects in vehicles manufactured and sold by Old Carco.").[12] Finally, as a practical matter, New GM will make the necessary ignition switch repairs as part of the recall, which is all that the Glove Box Warranty would have required New GM to do anyway. Hence, any claims, if they existed, are moot.

33.    Similarly, the MSPA and the Sale Order and Injunction provide that the implied warranty and other implied obligation claims asserted by Plaintiffs here are Retained Liabilities for which New GM is not responsible. *See* Sale Order and Injunction, ¶ 56 (New GM "is not

---

[12]    *See also; Tulacro v. Chrysler Group LLC, et al.*, Adv. Proc. No. 11-09401 (Bankr. S.D.N.Y. Oct. 28, 2011) [Dkt. No. 18] (Exhibit H, Compendium of Exhibits); *Tatum v. Chrysler Group LLC*, Adv. Proc. No. 11-09411 (Bankr. S.D.N.Y. Feb. 15, 2012) [Dkt. No. 73] (Exhibit I, Compendium of Exhibits).

assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, *including implied warranties* and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs and point of purchase materials." (emphasis added)); *see also* MSPA § 2.3(b)(xvi) (one of the Retained Liabilities of Old GM was any liabilities "arising out of, related to or in connection with any (A) *implied warranty* or other *implied obligation arising under statutory or common law* without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to [Old GM]." (emphasis added)).

34.    In short, any breach of warranty claims Plaintiffs pursue relating to Old GM vehicles or parts (whether express or implied) improperly seek damages against New GM in violation of the Sale Order and Injunction.

**B.    Any Purported State Lemon Law Claims Are Premature At Best, And Cannot Be Adequately Pled.**

35.    In an apparent attempt to circumvent the Court's Sale Order and Injunction, certain of the Ignition Switch Actions purport to assert claims based on alleged violations of state Lemon Laws. But merely referencing state Lemon Laws is not sufficient. Plaintiffs must actually plead facts giving rise to Lemon Law liability as defined by the MSPA. Even a cursory review of the complaints reveals they have not done so.

36.    New GM agreed to assume Old GM's "obligations under state 'lemon law' statutes, which require a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute, after a *reasonable number of attempts* as further defined in the statute, and other related regulatory obligations under such statutes." Sale Order and Injunction, ¶ 56 (emphasis added). None of the Plaintiffs has alleged that New GM has not conformed the vehicle "after a reasonable number of

22

attempts." And not only is New GM in the process of conforming the vehicles (through the recall), but the statutes of limitations on Lemon Law claims as defined in the MSPA have expired.

37.    As Judge Bernstein found in *Old Carco*, whether claimants can assert a valid Lemon Law claim "depends on the law that governs each plaintiff's claim and whether the plaintiff can plead facts that satisfy the requirements of the particular Lemon Law." 492 B.R. at 406. He further held as follows:

> With some variation, the party asserting a Lemon Law claim must typically plead and ultimately prove that (1) the vehicle does not conform to a warranty, (2) the nonconformity substantially impairs the use or value of the vehicle, and (3) the nonconformity continues to exist after a reasonable number of repair attempts.[13]

Judge Bernstein ultimately found that the claimants there did "not plead that any of the[m] brought their vehicles in for servicing, or that New Chrysler was unable to fix the problem after a reasonable number of attempts." *Id.* at 407. As was the case in *Old Carco*, none of the Plaintiffs here have pled that they brought their vehicles in to be fixed and, after a reasonable number of attempts, that they could not be fixed. They merely base their claims on the recall notices and letters to owners that New GM previously issued.

## CONCLUSION

38.    New GM was created to purchase the assets of Old GM pursuant to the MSPA. The limited category of liabilities it agreed to assume as part of the purchase was the product of a negotiated bargain, which was approved by this Court in July 2009. Plaintiffs in the Ignition Switch Actions have essentially ignored this; they wrongfully treat New GM and Old GM

---

[13]    *Old Carco*, 492 B.R. at 406 (citing *Sipe v. Fleetwood Motor Homes of Penn., Inc.*, 574 F. Supp. 2d 1019, 1028 (D. Minn. 2008); *McLaughlin v. Chrysler Corp.*, 262 F. Supp. 2d 671, 679 (N.D.W. Va. 2002); *Baker v. Chrysler Corp.*, Civ. A. No. 91–7092, 1993 WL 18099, at *1–2 (E.D. Pa. Jan. 25, 1993); *Palmer v. Fleetwood Enterp., Inc.*, Nos. C040161, C040765, 2003 WL 21228864, at *4 (Cal. Ct. App. May 28, 2003); *Iams v. DaimlerChrysler Corp.*, 174 Ohio App. 3d 537, 883 N.E.2d 466, 470 (2007); *DiVigenze v. Chrysler Corp.*, 345 N.J. Super. 314, 785 A.2d 37, 48 (App. Div. 2001)).

interchangeability and are pursuing Old GM claims that they cannot lawfully pursue against New GM.

39.    Schedule 2 provides examples of allegations that on their face relate to the Retained Liabilities asserted by the Plaintiffs in the Ignition Switch Actions.  Set forth below are illustrations of what Plaintiffs have improperly alleged in such Actions.

(a)    **Express Warranty, other than the Glove Box Warranty**.  *See, e.g.*, Ashbridge Compl., ¶¶ 164-65 (New GM's "express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act" and New GM "breached these express . . . warranties as described in more detail above."); Maciel Compl., ¶¶ 212-13 (same) and fifth, eleventh, thirteenth, and fifteenth, seventeenth, and nineteenth causes of action assert claims for breach of express warranty); Balls Compl., ¶¶ 137-141 (alleging a breach of an express warranty); Cox Compl., ¶¶ 124-127 (the third cause action asserts a breach of express warranty).

(b)    **Implied Warranty**.  *See, e.g.*, DePalma Compl. (Count IV asserts a breach of implied warranty of merchantability); Jawad Compl. ¶¶ 41, 42 (alleging New GM "breached its implied warranty in the design of the Defective GM Vehicles" and that New GM "breached its implied warranty in the manufacturing of Defective GM Vehicles"); Ross Compl., ¶¶ 124-125 (asserting that "GM gave an implied warranty . . . namely, the implied warranty of merchantability" and that GM "breached the implied warranty of merchantability"); Maciel Compl., ¶¶ 274 (New GM "breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles that are defective.").

(c)    **Implied Obligations under Statute or Common Law**.  *See, e.g.*, Heuler Compl. (asserting causes of action under state consumer protection statutes); Jones Compl. (asserting violations of numerous state consumer protection and unfair competition statutes); Benton Compl., (asserting violations of numerous state consumer protection and unfair competition statutes); Maciel Compl., (asserting violations of numerous state consumer protection and unfair competition statutes).

(d)    **Successor Liability**.  *See, e.g.*, Malaga Compl., ¶ 117 (alleging that New GM "has successor liability for GM Corporation's acts and omissions in the marketing and sale of the Defective Vehicles"); McConnell Compl., ¶ 12 (alleging that New GM "has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defect"); Phillip Compl., ¶ 50 (alleging that "[b]ecause GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability . . ."); Maciel Compl. ¶¶ 70, 80 ("GM, which is the successor GM entity resulting from

24

the GM chapter 11 bankruptcy proceeding, contractually assumed liability [in the MSPA] for the claims in this lawsuit" and "is liable under theories of successor liability in addition to, or in the alternative to, other bases of liability.").

(e)    **Design Defect**. *See, e.g.*, Brown Compl. (the fifth cause of action is premised on a design defect theory); Stafford Compl. (the fifth cause of action is premised on a design defect theory); Ramirez Compl., ¶ 150(f) (alleging that had "Plaintiff and other Class Members known that the Class Vehicles had the Ignition Switch Defect, they would not have purchased a Class Vehicle"); Maciel Compl. ¶¶ 213, 232, 257, 271, 282, 310, 336, 362 (first, third, fifth, sixth, seventh, ninth, twelfth, and fourteenth causes of action are premised on claim that "the Defective Vehicles share a common design defect").

(f)    **Tort, Contract or Otherwise**. *See, e.g.*, Ashworth Compl., ¶¶ 519-523 (second cause of action asserts a claim based on, among other things, common law breach of contract); Ratzlaff Compl. (Count II asserts a fraudulent concealment theory); Shollenberger Compl., ¶ 69 (alleging that New GM "breached its contractual duties by, inter alia, selling Class Vehicles with a known safety defect and failing to timely recall them"); Maciel Compl. ¶¶ 218-28 (second cause of action asserts fraudulent concealment theory).

(g)    **The Conduct of Old GM**. *See, e.g.*, Brandt Compl., ¶ 48 (asserting that "GM knew at the time they sold the vehicles to the Plaintiffs that such vehicles would be used for" a specific purpose); Darby Compl., ¶ 131 (alleging that "Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class to purchase Vehicles at a higher price for the vehicles, which did not match the vehicles' true value"); DeSutter Compl., ¶¶ 12, 67(e) (alleging that the Named Plaintiffs own a 2006 Saturn Ion or a 2006 Chevrolet Cobalt, that such vehicles were purchased new, and that "GM intended for Plaintiffs, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiffs and Class Members would purchase or lease the Defective Vehicles"); Maciel Compl. ¶ 155 (alleging that "neither old GM, nor GM disclosed its knowledge about the dangerous Key System defects to its customers."

40.    New GM has no liability or responsibility for these Retained Liability claims and, under the Sale Order and Injunction, Plaintiffs in the Ignition Switch Actions are enjoined from bringing them against New GM. *See, e.g.,* Sale Order and Injunction, ¶¶ 8, 47. Accordingly, the Court should enforce the terms of its Sale Order and Injunction by ordering Plaintiffs to promptly dismiss all of their claims that violate the provisions of that Order, to cease and desist from all efforts to assert such claims against New GM that are void because of the Sale Order

25

and Injunction, and to show cause whether they have any claims that are not already barred by this Court's Sale Order and Injunction.

### NOTICE AND NO PRIOR REQUESTS

41.    Notice of this Motion to Enforce has been provided to (a) counsel for Plaintiffs in each of the Ignition Switch Actions, (b) counsel for Motors Liquidation Company General Unsecured Creditors Trust, and (c) the Office of the United States Trustee.  New GM submits that such notice is sufficient and no other or further notice need be provided.

42.    No prior request for the injunctive relief sought in this Motion has been made to this or any other Court.

WHEREFORE, New GM respectfully requests that this Court:    (i) enter an order substantially in the form set forth as Exhibit "J" in the Compendium of Exhibits, granting the relief sought herein; and (ii) grant New GM such other and further relief as the Court may deem just and proper.

26

Dated: New York, New York            Respectfully submitted,
      April 21, 2014

                                        /s/ Arthur Steinberg
                                        Arthur Steinberg
                                        Scott Davidson
                                        KING & SPALDING LLP
                                        1185 Avenue of the Americas
                                        New York, New York  10036
                                        Telephone:    (212) 556-2100
                                        Facsimile:    (212) 556-2222

                                        Richard C. Godfrey, P.C. (*pro hac vice* pending)
                                        Andrew B. Bloomer, P.C. (*pro hac vice* pending)
                                        KIRKLAND & ELLIS LLP
                                        300 North LaSalle
                                        Chicago, IL 60654
                                        Telephone: (312) 862-2000
                                        Facsimile: (312) 862-2200

                                        *Attorneys for General Motors LLC*

27

## SCHEDULE "1"

### CHART OF IGNITION SWITCH ACTIONS

| | Name | Class Models | Plaintiffs' Model[1] | Court | Filing Date |
|---|---|---|---|---|---|
| 1 | Silvas[2] | N/A | 2006 Chevy Cobalt | Southern District of Texas 2:14-cv-00089 | 2/27/2014[3] |
| 2 | Brandt (Class Action)[4] | Various models from 2003 to 2007 | 2007 Chevy Cobalt | Southern District of Texas 2:14-cv-00079 | 3/13/14 |
| 3 | Woodward (Class Action)[5] | Various models from 2003 to 2007 | 2007 Chevy HHR | Northern District of Illinois 1:14-cv-01877 | 3/17/14 |
| 4 | Jawad (Class Action)[6] | Various models from 2003 to 2007 | 2007 Chevy Cobalt | Eastern District of Michigan 4:14-cv-11151 | 3/19/14 |
| 5 | McConnell (Class Action)[7] | Various models from 2003 to 2007 | 2007 Saturn Ion | Central District of California 8:14-cv-00424 | 3/19/14 |
| 6 | Jones (Class Action)[8] | Various models from 2003 to 2007 | 2006 Saturn Ion | Eastern District of Michigan 4:14-cv-11197 | 3/21/14 |

[1]  The purported class in an alleged class action should not be greater in scope than the claims related to the named representative plaintiffs.  Except for a portion of four Ignition Switch Actions (Camlan, Maciel, McCarthy, and Saclo), the proposed representative plaintiffs all owned vehicles designed and manufactured by Old GM.  In Camlan, Maciel, McCarthy, and Saclo, the overwhelming majority of the named plaintiffs claim to own vehicles designed and manufactured by Old GM.

[2]  A copy of the complaint filed in the Silvas Action is contained in the Compendium of Exhibits as Exhibit "K."

[3]  The Silvas Action was originally commenced in State Court in Texas.  New GM removed the Silvas Action to the Southern District of Texas on March 21, 2014.

[4]  A copy of the complaint filed in the Brandt Action is contained in the Compendium of Exhibits as Exhibit "L."

[5]  A copy of the complaint filed in the Woodward Action is contained in the Compendium of Exhibits as Exhibit "M."

[6]  A copy of the complaint filed in the Jawad Action is contained in the Compendium of Exhibits as Exhibit "N."

[7]  A copy of the complaint filed in the McConnell Action is contained in the Compendium of Exhibits as Exhibit "O."

[8]  A copy of the complaint filed in the Jones Action is contained in the Compendium of Exhibits as Exhibit "P."

| | | | | | |
|---|---|---|---|---|---|
| 7 | Ponce (Class Action)[9] | Various models from 2003 to 2007 | 2007 Chevy HHR | Central District of California 2:14-cv-02161 | 3/21/14 |
| 8 | Maciel (Class Action)[10] | Various models from 2003 to 2007, and 2005 to 2010 Chevrolet Cobalts | 2010 Chevy Cobalt 2007 Chevy Cobalt 2008 Chevy Cobalt 2010 Chevy Cobalt 2005 Chevy Cobalt 2003 Saturn Ion 2010 Chevy Cobalt 2004 Saturn Ion 2007 Chevy HHR 2006 Saturn Ion | Northern District of California 4:14-cv-01339 | 3/24/14 |
| 9 | Benton (Class Action)[11] | Various models from 2003 to 2007 | 2005 Chevy Cobalt | Central District of California 5:14-cv-00590 | 3/26/14 |
| 10 | Kelley (Class Action)[12] | Various models from 2003 to 2007 | 2007 Chevy Cobalt 2007 Chevy HHR | Central District of California 8:14-cv-00465 | 3/26/14 |
| 11 | Shollenberger (Class Action)[13] | Various models from 2003 to 2007 | 2006 Chevy Cobalt | Middle District of Pennsylvania 1:14-cv-00582 | 3/27/14 |
| 12 | Ramirez (Class Action)[14] | Various models from 2003 to 2007 | 2007 Saturn Ion 2006 Saturn Ion 2007 Saturn Sky 2007 Saturn Sky 2007 Chevy Cobalt 2005 Chevy Cobalt 2005 Saturn Ion 2004 Saturn Ion 2006 Chevy Cobalt 2007 Chevy Cobalt 2007 Chevy Cobalt | Central District of California 2:14-cv-02344 | 3/27/14 |

[9] A copy of the complaint filed in the Ponce Action is contained in the Compendium of Exhibits as Exhibit "Q."
[10] A copy of the complaint filed in the Maciel Action is contained in the Compendium of Exhibits as Exhibit "R."
[11] A copy of the complaint filed in the Benton Action is contained in the Compendium of Exhibits as Exhibit "S."
[12] A copy of the complaint filed in the Kelley Action is contained in the Compendium of Exhibits as Exhibit "T."
[13] A copy of the complaint filed in the Schollenberger Action is contained in the Compendium of Exhibits as Exhibit "U."
[14] A copy of the complaint filed in the Ramirez Action is contained in the Compendium of Exhibits as Exhibit "V."

| | | | 2007 Pontiac G5 | | |
|---|---|---|---|---|---|
| 13 | Grumet (Class Action)[15] | Various models from 2003 to 2007 | 2004 Saturn Ion 2006 Saturn Ion 2007 Chevy HHR 2007 Saturn Ion 2006 Chevy Cobalt 2007 Chevy Cobalt | Southern District of California 3:14-cv-00713 | 3/27/14 |
| 14 | Deushane (Class Action)[16] | 2005 to 2010 Chevy Cobalts | 2005 Chevy Cobalt | Central District of California 8:14-cv-00476 | 3/28/14 |
| 15 | Ratzlaff (Class Action)[17] | Various models from 2003 to 2011 | 2005 Chevy Equinox 2005 Saturn Ion | Central District of California 2:14-cv-2424 | 3/31/14 |
| 16 | Satele (Class Action)[18] | Various models from 2003 to 2011 | 2006 Chevy Cobalt 2006 Chevy Cobalt | Central District of California 8:14-cv-00485 | 3/31/14 |
| 17 | Santiago (Class Action)[19] | Various models from 2003 to 2007 | 2007 Saturn Ion | Southern District of Florida 1:14-cv-21147 | 3/31/14 |
| 18 | Elliott[20] | N/A | 2006 Trailblazer SS Chevy Cobalt SS | Superior Court of the District of Columbia 2014 CA 1980 B | 4/1/14 |
| 19 | Heuler (Class Action)[21] | Various models from 2003 to 2011 | 2006 Chevy Cobalt | Central District of California 8:14-cv-00492 | 4/1/14 |

---

[15] A copy of the complaint filed in the Grumet Action is contained in the Compendium of Exhibits as Exhibit "W."

[16] A copy of the complaint filed in the Deushane Action is contained in the Compendium of Exhibits as Exhibit "X."

[17] A copy of the complaint filed in the Ratzlaff Action is contained in the Compendium of Exhibits as Exhibit "Y."

[18] A copy of the complaint filed in the Satele Action is contained in the Compendium of Exhibits as Exhibit "Z."

[19] A copy of the complaint filed in the Santiago Action is contained in the Compendium of Exhibits as Exhibit "AA."

[20] A copy of the complaint filed in the Elliott Action is contained in the Compendium of Exhibits as Exhibit "BB."

[21] A copy of the complaint filed in the Heuler Action is contained in the Compendium of Exhibits as Exhibit "CC."

| 20 | Balls (Class Action)[22] | Various models from 2003 to 2011 | 2007 Saturn Ion | Central District of California 2:14-cv-02475 | 4/1/14 |
|---|---|---|---|---|---|
| 21 | Hamid (Class Action)[23] | Various models from 2003 to 2007 | 2007 Chevy Cobalt | District of Colorado 1:14-cv-00953 | 4/2/14 |
| 22 | Ashworth (Class Action)[24] | Various models from 2003 to 2007 | 2005 Chevy Cobalt 2005 Saturn Ion 2005 Saturn Ion 2007 Pontiac Solstice 2003 Saturn Ion 2006 Chevy HHR 2007 Pontiac G5 | Northern District of Alabama 2:14-cv-00607 | 4/2/14 |
| 23 | Phillip (Class Action)[25] | Various models from 2003 to 2011 | 2006 Saturn Ion 2009 Chevy HHR 2007 Chevy Cobalt 2007 Saturn Ion | District of Arizona 3:14-cv-08053 | 4/2/14 |
| 24 | Robinson (Class Action)[26] | Various models from 2003 to 2011 | 2005 Saturn Ion 2009 Chevy HHR 2007 Chevy Cobalt 2005 Saturn Ion 2009 Chevy Cobalt | Central District of California 2:14-cv-02510 | 4/3/14 |
| 25 | Ross (Class Action)[27] | Various models from 2003 to 2011 | 2007 Chevy Cobalt 2006 Saturn Ion 2007 Chevy Cobalt 2005 Chevy Cobalt | Eastern District of New York 1:14-cv-02148 | 4/3/14 |
| 26 | Darby (Class Action)[28] | Various models from 2003 to 2011 | 2006 Chevy HHR | Central District of California 5:14-cv-00676 | 4/4/14 |

---

[22]   A copy of the complaint filed in the Balls Action is contained in the Compendium of Exhibits as Exhibit "DD."
[23]   A copy of the complaint filed in the Hamid Action is contained in the Compendium of Exhibits as Exhibit "EE."
[24]   A copy of the complaint filed in the Ashworth Action is contained in the Compendium of Exhibits as Exhibit "FF."
[25]   A copy of the complaint filed in the Phillip Action is contained in the Compendium of Exhibits as Exhibit "GG."
[26]   A copy of the complaint filed in the Robinson Action is contained in the Compendium of Exhibits as Exhibit "HH."
[27]   A copy of the complaint filed in the Ross Action is contained in the Compendium of Exhibits as Exhibit "II."
[28]   A copy of the complaint filed in the Darby Action is contained in the Compendium of Exhibits as Exhibit "JJ."

| 27 | Roush (Class Action)[29] | Various models from 2003 to 2011 | 2007 Chevy Cobalt | Western District of Missouri 2:14-cv-04095 | 4/4/14 |
|----|----|----|----|----|----|
| 28 | Forbes (Class Action)[30] | Various models from 2003 to 2011 | Chevy Cobalt (purchased in 2007) | Eastern District of Pennsylvania 2:14-cv-02018 | 4/4/14 |
| 29 | Camlan (Class Action)[31] | Various models from 2003 to 2011 | 2007 Chevy HHR 2008 Chevy HHR 2006 Chevy HHR 2011 Chevy HHR 2006 Chevy HHR | Central District of California 8:14-cv-00535 | 4/7/14 |
| 30 | Cox (Class Action)[32] | Various models from 2003 to 2011 | 2007 Saturn Ion | Central District of California 2:14-cv-02608 | 4/7/14 |
| 31 | Hurst (Class Action)[33] | Various models from 2003 to 2011 | 2005 Chevy Cobalt | Central District of California 2:14-cv-02619 | 4/7/14 |
| 32 | Malaga (Class Action)[34] | Various models from 2003 to 2011 | 2006 Chevy Cobalt 2006 Chevy Cobalt | Central District of California 8:14-cv-00533 | 4/7/14 |
| 33 | Groman (Class Action)[35] | Various models from 2003 to 2011 | 2008 Chevy HHR | Southern District of New York 1:14-cv-02458 | 4/7/14 |
| 34 | DePalma (Class Action)[36] | Various models from 2003 to 2007 | 2007 Chevy Cobalt 2006 Chevy Cobalt 2007 Chevy Cobalt | Middle District of Pennsylvania 1:14-cv-00681 | 4/8/14 |

---

[29]    A copy of the complaint filed in the Roush Action is contained in the Compendium of Exhibits as Exhibit "KK."

[30]    A copy of the complaint filed in the Forbes Action is contained in the Compendium of Exhibits as Exhibit "LL."

[31]    A copy of the complaint filed in the Camlan Action is contained in the Compendium of Exhibits as Exhibit "MM."

[32]    A copy of the complaint filed in the Cox Action is contained in the Compendium of Exhibits as Exhibit "NN."

[33]    A copy of the complaint filed in the Hurst Action is contained in the Compendium of Exhibits as Exhibit "OO."

[34]    A copy of the complaint filed in the Malaga Action is contained in the Compendium of Exhibits as Exhibit "PP."

[35]    A copy of the complaint filed in the Groman Action is contained in the Compendium of Exhibits as Exhibit "QQ."

[36]    A copy of the complaint filed in the DePalma Action is contained in the Compendium of Exhibits as Exhibit "RR."

| 35 | Deighan (Class Action)[37] | Various models from 2003 to 2007 | 2004 Saturn Ion | Western District of Pennsylvania 2:14-cv-00458 | 4/9/14 |
| 36 | Ashbridge (Class Action)[38] | Various models from 2003 to 2011 | 2003 Saturn Ion | Western District of Pennsylvania 2:14-cv-00463 | 4/10/14 |
| 37 | Henry (Class Action)[39] | Various models from 2003 to 2011 | 2004 Saturn Ion 2005 Chevy Cobalt | Eastern District of Texas 4:14-cv-00218 | 4/10/14 |
| 38 | DeSutter (Class Action)[40] | Various models from 2003 to 2007 | 2006 Saturn Ion 2006 Chevy Cobalt | Southern District of Florida 9:14-cv-80497 | 4/11/14 |
| 39 | Salerno (Class Action)[41] | Various models from 2003 to 2011 | 2006 Saturn Ion | Eastern District of Pennsylvania 2:14-cv-02132 | 4/11/14 |
| 40 | Stafford (Class Action)[42] | Various models from 2003 to 2011 | 2004 Saturn Ion | Northern District of California 3:14-cv-01702 | 4/11/14 |
| 41 | Brown (Class Action)[43] | Various models from 2003 to 2011 | 2006 Chevy HHR | Central District of California 2:14-cv-02828 | 4/13/14 |
| 42 | Coleman (Class Action)[44] | Various models from 2003 to 2011 | 2007 Pontiac G5 | Middle District of Louisiana 3:14-cv-00220 | 4/13/14 |

[37]    A copy of the complaint filed in the Deighan Action is contained in the Compendium of Exhibits as Exhibit "SS."

[38]    A copy of the complaint filed in the Ashbridge Action is contained in the Compendium of Exhibits as Exhibit "TT."

[39]    A copy of the complaint filed in the Henry Action is contained in the Compendium of Exhibits as Exhibit "UU."

[40]    A copy of the complaint filed in the DeSutter Action is contained in the Compendium of Exhibits as Exhibit "VV."

[41]    A copy of the complaint filed in the Salerno Action is contained in the Compendium of Exhibits as Exhibit "WW."

[42]    A copy of the complaint filed in the Stafford Action is contained in the Compendium of Exhibits as Exhibit "XX."

[43]    A copy of the complaint filed in the Brown Action is contained in the Compendium of Exhibits as Exhibit "YY."

[44]    A copy of the complaint filed in the Coleman Action is contained in the Compendium of Exhibits as Exhibit "ZZ."

| 43 | Ruff (Class Action)[45] | Various models from 2003 to 2011 | 2009 Chevy Cobalt 2007 Chevy Cobalt 2006 Chevy Cobalt | District of New Jersey 3:14-cv-02375 | 4/14/14 |
| 44 | Lewis (Class Action)[46] | Various models from 2003 to 2007 | 2007 Chevy HHR | Southern District of Indiana 1:14-cv-00573 | 4/14/14 |
| 45 | Roach (Class Action)[47] | Various models from 2003 to 2011 | 2008 Chevy Malibu | Southern District of Illinois 3:14-cv-00443 | 4/15/14 |
| 46 | Letterio (Class Action)[48] | Various models from 2003 to 2011 | 2007 Pontiac Solstice | Western District of Pennsylvania 2:14-cv-00488 | 4/15/14 |
| 47 | Bedford (Class Action)[49] | Various models from 2003 to 2011 | 27 Chevy Cobalts 7 Saturn Ions 2 Chevy HHRs | Eastern District of Michigan 2:14-cv-11544 | 4/16/14 |
| 48 | DeLuco (Class Action)[50] | Various models from 2003 to 2011 | 2006 Saturn Ion | Southern District of New York 1:14-cv-02713 | 4/16/14 |
| 49 | Saclo (Class Action)[51] | Various models from 2003 to 2011 | 15 Chevy Cobalts 5 Saturn Ions 3 Chevy HHRs 1 Pontiac Sky 1 Pontiac G5 | Central District of California 8:14-cv-00604 | 4/16/14 |

---

[45]   A copy of the complaint filed in the Ruff Action is contained in the Compendium of Exhibits as Exhibit "AAA."

[46]   A copy of the complaint filed in the Lewis Action is contained in the Compendium of Exhibits as Exhibit "BBB."

[47]   A copy of the complaint filed in the Roach Action is contained in the Compendium of Exhibits as Exhibit "CCC."

[48]   A copy of the complaint filed in the Letterio Action is contained in the Compendium of Exhibits as Exhibit "DDD."

[49]   A copy of the complaint filed in the Bedford Action is contained in the Compendium of Exhibits as Exhibit "EEE."

[50]   A copy of the complaint filed in the DeLuco Action is contained in the Compendium of Exhibits as Exhibit "FFF."

[51]   A copy of the complaint filed in the Saclo Action is contained in the Compendium of Exhibits as Exhibit "GGG."

| 50 | Mazzocchi (Class Action)[52] | Various models from 2003 to 2011 | 2003 Saturn Ion | Southern District of New York 7:14-cv-02714 | 4/16/14 |
| 51 | McCarthy (Class Action)[53] | Various models from 2003 to 2011 | 2010 Chevy Cobalt | Eastern District of Louisiana 2:14-cv-00895 | 4/17/14 |
| 52 | Leval (Class Action)[54] | Various models from 2003 to 2011 | 2007 Chevy HHR | Eastern District of Louisiana 2:14-cv-00901 | 4/18/14 |
| 53 | Foster (Class Action)[55] | Various models from 2003 to 2011 | 2006 Chevy Cobalt | Northern District of Ohio 1:14-cv-00844 | 4/18/14 |
| 54 | Burton (Class Action)[56] | Various models from 2003 to 2011 | 2007 Saturn Ion | Western District of Oklahoma 5:14-cv-00396 | 4/18/14 |

---

[52] A copy of the complaint filed in the Mazzocchi Action is contained in the Compendium of Exhibits as Exhibit "HHH."

[53] A copy of the complaint filed in the McCarthy Action is contained in the Compendium of Exhibits as Exhibit "III."

[54] A copy of the complaint filed in the Leval Action is contained in the Compendium of Exhibits as Exhibit "JJJ."

[55] A copy of the complaint filed in the Foster Action is contained in the Compendium of Exhibits as Exhibit "KKK."

[56] A copy of the complaint filed in the Burton Action is contained in the Compendium of Exhibits as Exhibit "LLL."

## SCHEDULE "2"

## SAMPLE ALLEGATIONS/CAUSES OF ACTION IN IGNITION SWITCH COMPLAINTS[1]

| Lead Plaintiff | Allegations |
|---|---|
| Ashbridge | "In addition to the liability arising out of the statutory obligations assumed by GM, it is also subject to successor liability for the deceptive and unfair acts and omissions of Old GM because, as described below, Defendant has continued the business enterprise of Old GM with full knowledge of the ignition switch defects. In light of this continuing course of business, GM and Old GM together will be referred to as 'GM' hereafter, unless noted otherwise."  Compl., ¶ 8.

Alleging Named Plaintiffs own a 2003 Saturn ION, purchased in 2002, and that Plaintiff would not have purchased the vehicle if she knew about the defect.  Compl., ¶ 15.

"Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the Vehicles' ignition switch defects, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged herein."  Compl., ¶ 114.

A few of the Class questions are: (i) "Whether Defendants were negligent in the design, manufacturing, and distribution of the Vehicles" (Compl., ¶ 119(c)); (ii) "Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed defectively designed Vehicles into the stream of commerce in the United States" (Compl., ¶ 119(d)); and (iii) "Whether Class members overpaid for their Vehicles as a result of the defects alleged herein (Compl., ¶ 119(h)).

"Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class to purchase Vehicles at a higher price for the vehicles, which did not match the vehicles' true value."  Compl., ¶ 131.

"GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(6). The Vehicles' implied warranties are covered under 15 U.S.C. §2301(7)."  Compl., ¶ 164.

"GM breached these express and implied warranties as described in more detail above . . .."  Compl., ¶ 165. |
| Ashworth | "Defendant, GM and its predecessor [footnote omitted], manufactured and distributed the [subject] vehicles [various models from 2003 through 2007] during the class period . . .."  Compl., ¶ 2. |

---

[1]    Due to space limitations and the ever increasing number of Ignition Switch Actions, this chart contains only a **sample** of statements, allegations and/or causes of action contained in certain complaints filed in the Ignition Switch Actions.  This chart does **not** contain **all** statements, allegations and/or causes of action that New GM believes violates the provisions of the Court's Sale Order and Injunction and the MSPA.

|  |  |
|---|---|
|  | "GM and its predecessor marketed, warranted and sold the Class Models as safe and reliable." Compl., ¶ 3. |
|  | There are well over 50 individuals identified in the Complaint, all of whom either purchased or leased a vehicle that was designed and manufactured by Old GM prior to the closing of the 363 Sale, and an allegation that they would not have purchased or leased the vehicle if they knew about the defect. |
|  | "GM is liable through successor liability for the deceptive and unfair acts and omissions of GM Corp., as alleged in the Compliant." Compl., ¶ 469. |
|  | Alleging that GM breached express warranties. Compl., ¶¶ 513-14. |
|  | Asserting causes of Action for breach of contract and breach of warranty. Compl., ¶ 519-523. |
| Balls | Alleging Named Plaintiffs own a 2007 Saturn ION and that Plaintiffs would not have purchased the vehicle if they knew about the defect. Compl., ¶ 31. |
|  | Discussing Old GM's promotion and marketing of vehicles. Compl., ¶¶ 80-87. |
|  | Asserting that New GM "has successor liability for Old GM's acts and omissions in the marketing and sale of the Subject Vehicles . . . ." Compl., ¶ 96; *see also* Compl., ¶ 145. |
|  | Asserting that the "sale of the Subject Vehicles to Plaintiffs and the Class occurred within 'trade and commerce' within the meaning of" the Michigan Consumer Protection Act ("**MCPA**"). Compl., ¶ 115. |
|  | Alleging numerous violations of the MCPA by Old GM. *See* Compl., ¶¶ 119-123. |
|  | Alleging a breach of an express warranty. *See* Compl., ¶¶ 137-141. |
| Bedford | "In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects." Compl., 12; *see also* Compl., ¶¶ 34, 86, 97(j). |
|  | Allegations that Old GM promoted the Defective Vehicles as safe and reliable, referring to advertisements from 2001, 2003 and 2006. Compl., ¶¶ 70-75. |
|  | Count II concerns a "breach of implied warranty," and Count III concerns a "breach of implied warranty of fitness for a particular purpose." |
| Benton[2] | Asserting that if Plaintiff and others knew about the defect, she would not have purchased the vehicle (a 2005 Chevy Cobalt). Compl., ¶ 31. |
|  | Asserting that "GM is liable through successor liability for deceptive and unfair acts and omissions of Old GM, as alleged in the Compliant." Compl., ¶ 35; *see also* Compl., ¶ 88. One of the Class questions is "[w]hether, and to what extent, GM has successor liability for the acts and omissions of Old GM." Compl., ¶ 100(i). |

---

[2]    The *Ratzlaff* Action was commenced by the same attorneys as those that commenced the *Benton* Action, and the complaints are very similar.

| | |
|---|---|
| Brandt | Discussing "implied terms of sale" (Compl., ¶ 35) and referencing "advertising and marketing materials emphasizing the safety quality of its vehicles" (Compl., ¶ 36). |
| | Stating "GM knew at the time they sold the vehicles to the Plaintiffs that such vehicles would be used for" a specific purpose.  Compl., ¶ 48. |
| Brown | "In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects."  Compl., ¶ 15; *see also* Compl., ¶ 104. |
| | Alleging that in connection with their purchase of a 2006 HHR, the Named Plaintiffs "saw advertisements for Old GM vehicles before they purchased the HHR. Plaintiffs do recall that safety and quality were consistent themes in the advertisements they saw. These representations about safety and quality influenced Plaintiffs' decision to purchase the HHR."  Compl., ¶ 35. |
| | "Had Old GM and/or Defendant disclosed the ignition switch defects, Plaintiffs would not have purchased the HHR, or would have paid less than they did, and would not have retained the vehicle."  Compl., ¶ 35. |
| | A Class question is "whether Defendant is liable for a design defect."  Compl., ¶ 114(f). |
| | "At all times relevant, Defendant sold, marketed, advertised, distributed, and otherwise placed Defective Vehicles into the stream of commerce in an unlawful, unfair, fraudulent, and/or deceptive manner that was likely to deceive the public."  Compl., ¶ 143. |
| | The Fifth Cause of Action is premised on a design defect theory. |
| | "As a direct and proximate result of Defendant's breach of written warranties, Plaintiffs and Class members sustained damages and other losses."  Compl., ¶ 171. |
| | "Defendant breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles containing the ignition switch defects."  Compl., ¶ 182. |
| Burton | Alleging that the Named Plaintiff's 2007 Saturn Ion was "manufactured, sold, distributed, advertised, marketed, and warranted by GM."  Compl., ¶ 17. |
| | "At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States."  Compl., ¶ 22. |
| | Two Class questions are: (i) "whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM Vehicle" (Compl., ¶ 106 (c)), (ii) "whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability" (Compl., ¶ 106 (j)). |

| | |
|---|---|
| | "In furtherance of its scheme to defraud, GM's February 28, 2005 Service Bulletin was issued in furtherance of its scheme to defraud." Compl., ¶ 123. |
| | "In June of 2005, GM issued a public statement through the mail and wires in furtherance of its scheme to defraud." Compl., ¶ 124. |
| | "Defendants intended that Plaintiff and Class Members rely on their misrepresentations and omissions, so that Plaintiff and other Class Members would purchase or lease the Class Vehicles." Compl., ¶ 140(h). |
| | "Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value." Compl., ¶ 149. |
| | "GM breached its implied warranty of merchantability to Plaintiff and the Nationwide, Multi-State and Oklahoma Class because the Class Vehicles were not fit for the ordinary purposes for which they are used - a safe passenger motor vehicle." Compl., ¶ 164. |
| | The Fifth Claim for Relief is based on a "breach of implied warranty." |
| Camlan | Class questions include: (i) "whether and to what extent GM breached its express warranties relating to the safety and quality of its vehicles" (Compl., ¶ 32(b)), and (ii) "whether and to what extent GM breached any implied warranties relating to the safety and quality of its vehicles (Compl., ¶ 32(c)). |
| | Allegations that New GM is liable to Plaintiffs on a successor liability theory. Compl., ¶¶ 121-125. |
| | Allegation that New GM's "business practices include, without limitation: (a) Selling to Plaintiffs and the Class vehicles which contain defects or design flaws which make them inherently more dangerous than other similar vehicles . . . ." Compl., ¶ 135(a). |
| | "Defendant engaged in the advertising and the failure to disclose the defects and design flaws in its products herein alleged with the intent to induce Plaintiffs and the Class to purchase Defendant's products." Compl., ¶ 147. |
| Coleman | "In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects." Compl., ¶ 12; *see also* Compl., ¶84. |
| | Alleging that in connection with her purchase of a 2007 Pontiac G5, the Named Plaintiff "saw advertisements for Old GM vehicles before she purchased the G5, and, although she does recall the specifics of the advertisements, she does recall that safety and quality were consistent themes across the advertisements she saw. These representations about safety and quality influenced Plaintiff's decision to purchase the G5.." Compl., ¶ 30. |
| | "Had Old GM disclosed the ignition switch defects, Plaintiff would not have purchased her G5, or would have paid less than she did, and would not have retained the vehicle." |

| | |
|---|---|
| | Compl., ¶ 30. |
| | Allegations that Old GM promoted the Defective Vehicles as safe and reliable, referring to advertisements from 2001, 2003 and 2006. Compl., ¶¶ 70-75. |
| | Three Class questions are (i) "Whether GM's practices in connection with the promotion, marketing, advertising, packaging, labeling and sale of the Defective Vehicles unjustly enriched GM at the expense of, and to the detriment of, Plaintiffs and the other members of the Class" (Compl., ¶ 94(i)); (ii) "Whether GM breached implied warranties in its sale and lease of the Defective Vehicles, thereby causing harm to Plaintiffs and the other members of the Class" (Compl., ¶ 94(j)); and (iii) "Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM" (Compl., ¶ 94(m)). |
| | "GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7). MG [sic] breached these warranties as described in more detail above." Compl., ¶¶ 107-108. |
| | "The sale of the Defective Vehicles to Plaintiffs and the Class occurred within 'trade and commerce' within the meaning of" the MCPA. Compl., ¶ 116. |
| | "While Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Defective Vehicles until 2007." Compl., ¶ 123. |
| | Count IV concerns a breach of implied warranty. |
| Cox | Old GM and New GM "are the alter-egos of one another and [Old GM] exercised decision-making and control over [New GM] with respect to the conduct giving rise to Plaintiffs' claims." Compl., ¶ 6. |
| | "Because GM is a mere continuation of Old GM, GM has successor liability for the conduct of Old GM as alleged herein." Compl., 15. |
| | A Class question is "whether GM has successor liability for the acts of Old GM." Compl., ¶ 92(p). |
| | A cause of action asserts a breach of express warranty. Compl., ¶¶124-127 |
| Darby | Alleging Named Plaintiff owns a 2006 Chevy HHR and that Plaintiff would not have purchased the vehicle if he knew about the defect. Compl., ¶ 15. |
| | "Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the Vehicles' ignition switch defects, GM is liable through successor liability for deceptive and unfair acts and omissions of Old GM, as alleged herein." Compl., ¶ 114. |
| | Class questions include (i) "[w]hether GM was negligent in the design, manufacturing, and distribution of the Vehicles" (Compl., ¶ 119(c)); and (ii) "[w]hether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed defectively designed Vehicles into the stream of commerce in the United States" (Compl., ¶ 119(d)). |
| | "Defendants actively concealed and/or suppressed these material facts, in whole or in |

|  |  |
|---|---|
|  | part, with the intent to induce Plaintiff and the Class to purchase Vehicles at a higher price for the vehicles, which did not match the vehicles' true value." Compl., ¶ 131 |
| DeLuco | The Named Plaintiff purchased a new 2006 Saturn Ion in 2006 after seeing advertisements for G.M. vehicles . . . and, although she does not recall the specifics of the advertisements, she recalls that safety and quality were consistent themes across the advertisements she saw before making the purchase of her 2006 Saturn Ion. She also recalls seeing promotional materials about the Saturn at the dealership where she purchased her 2006 Saturn Ion and spoke with Saturn salespeople who told her that the Saturn Ion was one of the safest vehicles in its class." Compl., ¶¶ 11-12.

"Because G.M. acquired and operated Old G.M. and ran it as a continuing business enterprise, and because G.M. was aware from its inception of the ignition switch defects in the Defective Vehicles G.M. is liable through successor liability for the deceptive and unfair acts and omissions of Old G.M., as alleged in this Complaint." Compl., ¶ 17; *see also* Compl., ¶¶ 56, 80, 89, 107, 124.

Two Class questions are: (i) "Whether G.M. and its predecessor breached its applicable warranties" and (ii) "Whether G.M. bears successor liability for Defective Vehicles that Class Members purchased or leased before July 10, 2009, the date G.M. acquired substantially all of the assets of its predecessor." Compl., ¶ 65.

"As more fully described above, G.M. breached its express and implied warranties to Plaintiff and the members of the Class . . . ." Compl., ¶ 78.

"Old G.M. and G.M. caused to be made or disseminated in New York, through advertising, marketing and other publications, statements regarding the quality, safety and reliability of the Defective Vehicles that were untrue or misleading." Compl., ¶ 120 |
| DePalma | "This case arises from GM's breach of express warranties, as well as its obligations and duties, including GM's failure to disclose . . . ." Compl., ¶ 8.

"Plaintiffs and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the defective Vehicles they purchased are worth less than they would have been without the ignition switch defect." Compl., ¶ 19.

Allegations that Old GM promoted the Defective Vehicles as safe and reliable, referring to advertisements from 2001, 2003 and 2006. Compl., ¶¶ 74-77.

Allegations that "GM has successor liability for Old GM's acts and omissions in the marketing and sale of" the vehicles "because it continued the business enterprise of Old GM . . . ." Compl., ¶ 91.

"Concealment of the known ignition switch defects at the time of sale denied the Class an opportunity to refuse delivery of the Defective Vehicles." Compl., ¶ 123.

Count IV asserts a breach of implied warranty of merchantability, and Counts VI and VII assert breaches of express warranty. |

| | |
|---|---|
| DeSutter | Alleging Named Plaintiffs own a 2006 Saturn Ion or a 2006 Chevrolet Cobalt, each purchased new, and that Plaintiffs would not have purchased the vehicles if he knew about the defect. Compl., ¶ 12. |
| | GM is also liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint, because GM acquired and operated Old GM and ran it as a continuing business enterprise, utilizing substantially the same brand names, logos, plants, offices, leadership, personnel, engineers, and employees, GM was aware from its inception of the Ignition Switch Defect and Power Steering Defect in the Defective Vehicles, and GM and Old GM concealed both Defects from the public, regulators, and the bankruptcy court.  Because GM is liable for the wrongful conduct of Old GM, there is no need to distinguish between the conduct of Old GM and GM, and the complaint will hereinafter simply refer to GM as the corporate actor when describing the relevant facts." Compl., ¶ 16. |
| | "GM intended for Plaintiffs, Class Members, the public, and the government to rely on its misrepresentations and omissions, so that Plaintiffs and Class Members would purchase or lease the Defective Vehicles." Compl., ¶ 67(e); *see also* Compl., ¶ 89(e). |
| | "GM actively concealed and/or suppressed these material facts, in whole or in part, to induce Plaintiffs and Class Members to purchase or lease the Defective Vehicles at high prices, and to protect its profits and avoid a costly recall, and it did so at the expense of Plaintiffs and the Class." Compl., ¶ 78. |
| Deushane | "Through advertising, marketing, and other publications, GM caused statements to be disseminated that were untrue or misleading . . . ." Compl., ¶ 31. |
| | "Had Plaintiff and the other California Sub Class members known this, they would not have purchased or leased their Defective Cobalts and/or paid as much for them." Compl., ¶ 34. |
| | "GM made express warranties to Plaintiff" (Compl., ¶ 44), the "Defective Cobalts are covered by GM's express warranties" (Compl., ¶ 46), and "GM breach[ed] its express warranties . . . . (Compl., ¶ 47). |
| | Asserting that "GM is a 'manufacturer' of the Defective Vehicles" (Compl., ¶ 54) and that "GM impliedly warranted" to Plaintiff and the Class that the vehicles were "merchantable" (Compl., ¶ 55). |
| Deighan | "In addition to the liability arising out of the statutory obligations assumed by GM, it is also subject to successor liability for the deceptive and unfair acts and omissions of Old GM because, as described below, Defendant has continued the business enterprise of Old GM with full knowledge of the ignition switch defects. In light of this continuing course of business, GM and Old GM together will be referred to as 'GM' hereafter, unless noted otherwise." Compl., ¶ 8. |
| | "Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the Vehicles' ignition switch defects, GM is liable through successor liability for the deceptive and unfair acts and |

|  | omissions of Old GM, as alleged herein." Compl., ¶ 114. |
|---|---|
| Forbes | "Plaintiff and the Class either paid more for the Defective Vehicles than they would have had they known of the ignition switch defects, or they would not have purchased the Defective Vehicles at all had they known of the defects." Compl., ¶ 34. |
|  | "GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it continued the business enterprise of Old GM, for the following reasons . . ." Compl., ¶ 36. |
| Foster | Alleging that the Named Plaintiff's 2006 Chevrolet Cobalt was "manufactured, sold, distributed, advertised, marketed, and warranted by GM." Compl., ¶ 17. |
|  | "At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States." Compl., ¶ 22. |
|  | Two Class questions are: (i) "whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM Vehicle" (Compl., ¶ 104 (c)), (ii) "whether the Class Vehicles were fit for their ordinary and intended use, in violation of the implied warranty of merchantability" (Compl., ¶ 106 (h)). |
|  | "Defendants intended that Plaintiff and Class Members rely on their misrepresentations and omissions, so that Plaintiff and other Class Members would purchase or lease the Class Vehicles." Compl., ¶ 116(h). |
|  | "GM is liable to Plaintiff and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability." Compl., ¶ 127. |
|  | "GM breached its implied warranty of merchantability to Plaintiff and the Nationwide, Class because the Class Vehicles were not fit for the ordinary purposes for which they are used – namely a safe passenger motor vehicle." Compl., ¶ 128. |
|  | The Third Claim for Relief is based on a "breach of implied warranties" and the Sixth Claim for Relief is based on a "tortious breach of warranty." |
|  | "Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value." Compl., ¶ 153. |
|  | "Defendants violated the CSPA when they represented, through advertising, warranties, and other express representations, that the Class Vehicles had characteristics and benefits that they did not actually have." Compl., ¶ 163. |
|  | "Defendants failed to use appropriate design, engineering, and parts in manufacturing the Class Vehicles, and in other respects, Defendants breached its duties by being wantonly reckless, careless, and negligent." Compl., ¶ 185. |

| Groman | Referencing a 2008 Chevrolet HHR, "Groman saw advertisements for G .M. vehicles before he purchased the car and . . . safety and quality were consistent themes across the advertisements . . . . These representations about safety and quality influenced Groman's decision to purchase the 2008 Chevrolet HHR. . . . Had G.M. disclosed the ignition switch defects , he would not have purchased the vehicle and would not have paid as much for it." Compl., ¶ 12. |
|---|---|
| | "G.M. actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the other members of the Class to purchase Defective Vehicles at a higher price for the Defective Vehicles.  Compl., ¶ 98. |
| | "Plaintiff and the other members of the Class reasonably relied on G.M.'s statements in its marketing and advertising that the Defective Vehicles were safe, and would not have purchased or leased the Defective Vehicles had they known of the defects in the ignition switches, or would not have paid as much as they did."  Compl., ¶ 100, 129. |
| | "Old G.M. and G.M. caused to be made or disseminated . . . through advertising, marketing and other publications, statements regarding the quality, safety and reliability of the Defective Vehicles that were untrue or misleading."  Compl., ¶ 124. |
| | With respect to the breach of express warranty of merchantability count, "at the time that Old G.M. and G.M. warranted, sold and leased the Defective Vehicles, it knew that the Defective Vehicles did not conform to the warranties and were inherently defective, and wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Defective Vehicles." Compl., ¶ 142. |
| | "G.M. has successor liability for Old G.M.'s acts and omissions in the marketing and sale of the Defective Vehicles during the Class Period because G.M. has continued the business enterprise of Old G.M., for the following reasons . . ." Compl., ¶ 60. |
| Grumet | Referencing the Saturn Ion and a 2007 advertisement that the car was "safe and sound", "G.M. knew this flaw existed from the moment the car hit dealers' floors . . . ." Compl., ¶ 45. |
| | G.M. breached its express and implied warranties . . . by, among other things: selling and/or leasing the Defective Vehicles in an unmerchantable condition; selling and/or leasing the Defective Vehicles when they were not fit for the ordinary purposes for which vehicles are used, and which were not fully operational, safe or reliable."  Compl., ¶ 88. |
| | "Plaintiffs and the other members of the Class reasonably relied on G.M.'s statements in its marketing and advertising that the Defective Vehicles were safe, and would not have purchased or leased the Defective Vehicles had they known of the defects in the ignition switches, or would not have paid as much as they did."  Compl., ¶ 106, 139. |
| | Referencing the express warranty of merchantability, "[t]he Defective Vehicles are covered by Old G.M.'s and G.M.'s express warranties."  Compl., ¶ 152. |

|  |  |
|---|---|
|  | "Old G.M. and G.M. breached the implied warranty of merchantability by manufacturing and selling the Defective Vehicles with defective ignition switch systems."  Compl., ¶ 168. |
|  | "G.M. has successor liability for Old G.M.'s acts and omissions in the marketing and sale of the Defective Vehicles during the Class Period because G.M. has continued the business enterprise of Old G.M., for the following reasons . . ."  Compl., ¶ 65. |
| Hamid | "Had Plaintiff known of the ignition problem, he would not have purchased his Cobalt or, at a minimum, would have paid less than he did." Compl., ¶ 10. |
|  | With respect to consumer protection act count, "GM had a statutory duty to refrain from misleading and confusing unfair or deceptive acts in the manufacture, marketing and/or sale or leasing of the recalled vehicles . . . ." Compl., ¶ 16. |
|  | "GM expressly warranted that the recalled vehicles were safe and were merchantable and fit for use for particular purposes at the time of purchase and sale." Compl., ¶ 21. |
|  | "GM implicitly warranted that the recalled vehicles were safe and were merchantable and fit for use for particular purposes at the time of purchase and sale."  Compl., ¶ 26. |
| Henry | "In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects."  Compl., ¶ 12; *see also* Compl., ¶ 86. |
|  | Alleging Named Plaintiffs own a 2004 Saturn Ion and a 2005 Chevrolet Cobalt and that Plaintiffs would not have purchased their vehicle if they knew about the defect.  Compl., ¶¶ 30, 31. |
|  | Alleging that Old GM promoted the Defective Vehicles as safe and reliable.  Compl., ¶¶ 71-75. |
|  | Two Class questions are:  (i) "Whether GM's practices in connection with the promotion, marketing, advertising, packaging, labeling and sale of the Defective Vehicles unjustly enriched GM at the expense of, and to the detriment of, Plaintiffs and the other members of the Class" (Compl., ¶ 97(i)), and (ii) "Whether GM breached implied warranties in its sale and lease of the Defective Vehicles, thereby causing harm to Plaintiffs and the other members of the Class" (Compl., ¶ 97(j)). |
|  | Count IV concerns breach of implied warranty. |
| Heuler | Alleging Named Plaintiff owns a 2006 Chevy Cobalt and that Plaintiffs would not have purchased the vehicle if they knew about the defect.  Compl., ¶ 31. |
|  | "GM is liable through successor liability for the deceptive and unfair acts and omissions of GM Corp., as alleged in the Compliant."  Compl., ¶ 35; *see also* Compl., ¶ 87.  One of the Class questions is "[w]hether, and to what extent, GM has successor liability for the acts and omissions of Old GM."  Compl., ¶ 99(k). |

| | |
|---|---|
| | Alleging that Old GM promoted the Defective Vehicles as safe and reliable.  Compl., ¶¶ 70-75 |
| Hurst | "On information and belief, in marketing and advertising materials, Old GM consistently promoted the Defective Vehicles as safe and reliable."  Compl., ¶ 39. |
| | "Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed, or they would not have purchased or leased the vehicle at all had they known the truth."  Compl., ¶ 51. |
| | "Old GM and Defendant's nondisclosure about safety considerations of the Defective Vehicles while selling and advertising the products were material."  Compl., ¶ 92. |
| | "GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM . . ."  Compl., ¶ 62. |
| Jawad | In the negligence count, stating "GM designed, manufactured, tested, inspected, marketed, labeled and sold the Defective Vehicles . . . ."  Compl., ¶ 30. |
| | "GM owed Plaintiff a duty of care in the design, manufacture, testing, inspecting, marketing, labeling and sale of its product."  Compl., ¶ 31. |
| | "The Defective GM Vehicles was [sic] defective at the time it left GM's control . . . . Compl., ¶ 37. |
| | "GM breached its implied warranty in the design of the Defective GM Vehicles . . . . Compl., ¶ 41. |
| | "GM breached its implied warranty in the manufacturing of Defective GM Vehicles . . . ."  Compl., ¶ 42. |
| | "An implied term of the sale . . . ."  Compl., ¶ 53. |
| | "GM knew at the time they sold the vehicles to the Plaintiffs that such vehicles would be used for" a specific purpose.  Compl., ¶ 59. |

| | |
|---|---|
| Jones | Asserting that if Plaintiff and others knew about the defect, she would not have purchased the vehicle (a 2006 Saturn Ion).  Compl., ¶ 10. |
| | Referencing advertisements and promotion of the vehicles at issue which, according to the complaint were all manufactured prior to the closing of the 363 Sale.  Compl., ¶¶ 2, 11. |
| | An advertisement for a 2006 Saturn Ion was attached to the Complaint as Exhibit "B." Plaintiff also references advertisements from 2003 through 2007.  Compl., ¶ 29. |
| | Allegations that "GM has successor liability for GM Corp.'s acts and omissions in the marketing and sale of" the vehicles.  Compl., ¶ 77. |
| | A question common to the class is "[w]hether GM and its predecessor breached its express or implied warranties." Compl., ¶ 87; *see also* ¶¶ 97, 101-106 (breach of express warranty),  107-166 (breach of contract and implied warranty). |
| | Alleging that Defendant "engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices with respect to the sale of" the vehicles in violation of statutes in numerous States.  Compl., ¶¶ 132-177. |
| Letterio | "In addition to the liability arising out of the statutory obligations assumed by GM, it is also subject to successor liability for the deceptive and unfair acts and omissions of Old GM because, as described below, Defendant has continued the business enterprise of Old GM with full knowledge of the ignition switch defects. In light of this continuing course of business, GM and Old GM together will be referred to as "GM" hereafter, unless noted otherwise." Compl., ¶ 8; *see also* Compl., ¶ 114. |
| | "GM designed, manufactured, marketed, advertised, and warranted that all of its Vehicles were safe and reliable and fit for the ordinary purpose such Vehicles are used for, and were free from defects in materials and workmanship."  Compl., ¶ 11. |
| | Named Plaintiff purchased a new 2007 Pontiac Solstice on November 30, 2007, and asserts that had "Defendants disclosed the ignition switch defect, Plaintiff would not have purchased her 2007 Pontiac Solstice." Compl., ¶ 15. |
| | A Class question includes "[w]hether Defendants were negligent in the design, manufacturing, and distribution of the Vehicles." Compl., ¶ 119(c). |
| | "Such misconduct materially affected the purchasing decisions of Plaintiff and the members of the Pennsylvania Subclass as Plaintiff and the Pennsylvania Subclass relied on Defendants' misstatements and omissions regarding the Vehicles' safety and/or reliability when purchasing or leasing the Vehicles." Compl., ¶ 156. |
| | "GM breached these express and implied warranties as described in more detail above . . . ." Compl., ¶ 165. |
| Leval | "In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the |

| | |
|---|---|
| | ignition switch defects." Compl., ¶ 12, *see also* Compl., ¶¶ 33, 84. |
| | The Named Plaintiff owns a 2007 Chevy HHR which was purchased "in part because she [sic] wanted a safely designed and manufactured vehicle. Plaintiff saw advertisements for Old GM vehicles before he purchased the HHR . . . ." Compl., ¶ 30. |
| | "Had Old GM disclosed the ignition switch defects, Plaintiff would not have purchased his HHR, or would have paid less than he did, and would not have retained the vehicle." Compl., ¶ 30. |
| | Allegations that Old GM promoted the Defective Vehicles as safe and reliable, referring to advertisements from 2001, 2003 and 2006. Compl., ¶¶ 70-75. |
| | A Class question is "[w]hether GM breached implied warranties in its sale and lease of the Defective Vehicles, thereby causing harm to Plaintiffs and the other members of the Class." Compl., ¶ 94(j). |
| | GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Defective Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7). GM breached these warranties as described in more detail above." Compl., ¶¶ 107-108. |
| | "While Old GM knew of the ignition switch defects by 2001, it continued to design, manufacture, and market the Defective Vehicles until 2007." Compl., ¶ 123. |
| | Count IV is based on a "breach of implied warranty." |
| | "Defendants, as manufacturer of the defective vehicle, are responsible for damages caused by the failure of its product to conform to well-defined standards." Compl., ¶ 148. |
| | "The vehicle as sold and promoted by Defendants possessed a redhibitory defect because it was not manufactured and marketed in accordance with industry standards and/or was unreasonably dangerous as described above, which rendered the vehicle useless or its use so inconvenient that it must presumed that a buyer would not have bought the vehicle had she known of the defect." Compl., ¶ 151. |
| Lewis | Plaintiffs 2007 Chevrolet HHR "was manufactured, sold, distributed, advertised, marketed, and warranted by GM . . . ." Compl., ¶ 12. |
| | "At all relevant times herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States." Compl., ¶ 18. |
| | A Class question is "whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM Vehicle." Compl., ¶ 87(c). |
| | "Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Class Vehicles at |

| | |
|---|---|
| | a higher price for the vehicles, which did not match the vehicles' true value." Compl., ¶ 107. |
| Maciel | Certain of the Named Plaintiffs purchased a subject vehicle prior to the closing of the 363 Sale, and assert that they would not have purchased the vehicle if they knew about the defect.  See, e.g., Compl., ¶¶ 23, 36, 48.

"GM, which is the successor GM entity resulting from the GM chapter 11 bankruptcy proceeding, contractually assumed liability for the claims in this lawsuit and "is liable under theories of successor liability in addition to, or in the alternative to, other bases of liability." Compl., ¶¶ 70, 80.

"[N]ew GM, the Defendant here, is the owner of all 'vehicles' and 'finished goods' (such as cars) of old GM, 'wherever [they are] located,' and including any such vehicles or finished goods in the 'possession of' 'customers.'" Compl., ¶ 74.

Allegations regarding breaches of express warranties.  See, e.g., Compl., ¶¶ 212, 213.

"By failing to disclose these material facts, GM intended to induce Plaintiffs and other Class members to purchase or lease the Defective Vehicles." Compl., ¶ 223. |
| Malaga | Referencing the 2006 Chevrolet Cobalt, ". . . Plaintiff bought a dangerous vehicle that was not of the quality that was advertised. . . . If GM had disclosed the nature and extent of its problems, Plaintiff would not have purchased a vehicle from GM, or would not have purchased that the vehicle for the price paid." Compl., ¶ 18, 21.

"In leasing and/or purchasing the vehicles . . . Plaintiffs and the Class . . . reasonably believed and/or depended on the material false and/or misleading information . . . with respect to the safety and quality of the vehicles manufactured and sold by Defendant. . . . Defendant induced Plaintiffs and the Class to purchase the Defective Vehicles . . ." Compl., ¶ 136.

"Defendant engaged in the advertising and the failure to disclose the defects and design flaws in its products herein alleged with the intent to induce Plaintiffs and the Class to purchase Defendant's products." Compl., ¶ 142.

"Plaintiffs and the Class were exposed to Defendant's advertising and its false and misleading statements and were affected by the advertising in that Plaintiffs and the Class believed it to be true and/or relied on it when making purchasing decisions." Compl., ¶ 145.

"At the time of the sale, Defendant had knowledge of the purpose for which its products were purchased and impliedly warranted the same to be, in all respects, fit and proper for this purpose." Compl., ¶ 167.

With respect to the negligence count, "[d]efendant breached that duty by designing, manufacturing, and selling products to Plaintiffs and the Class that had a serious ignition switch defect without disclosing . . ." Compl., ¶ 187.

"GM also has successor liability for GM Corporation's acts and omissions in the marketing and sale of the Defective Vehicles . . ." Compl., ¶ 117. |

| | |
|---|---|
| Mazzocchi | Named Plaintiff's vehicle is a 2003 Saturn Ion which "was manufactured, sold, distributed, advertised, marketed, and warranted by GM." Compl., ¶ 17.<br><br>"At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States." Compl., ¶ 21.<br><br>Two Class question are: (i) "whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM Vehicle" (Compl., ¶ 110(c)), and (ii) "whether the Class Vehicles were fit for their ordinary and intended use, in violation of the implied warranty of merchantability" (Compl., ¶ 110(i)).<br><br>"In furtherance of its scheme to defraud, GM issued the February 28, 2005 Service Bulletin. It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the Defective Vehicles to customers, including Plaintiff and other members of the Class." Compl., ¶ 127.<br><br>"In June of 2005, GM issued a public statement through the mail and wires in furtherance of its scheme to defraud." Compl., ¶ 128.<br><br>"GM is liable to Plaintiffs and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(l), because it breached the implied warranty of merchantability." Compl., ¶ 155.<br><br>"GM breached its implied warranty of merchantability to Plaintiffs and the Nationwide Class because the Class Vehicles were not fit for the ordinary purposes for which they are used~namely, as a safe passenger motor vehicle." Compl., ¶ 156.<br><br>The Fourth Claim for Relief is based on a "breach of implied warranty." |
| McCarthy | "At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States." Compl., ¶ 20.<br><br>Two Class questions are: (i) "whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM Vehicle" (Compl., ¶ 100(c)), and (ii) "whether GM concealment of the true defective nature of the Class Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing the Vehicles" (Compl., ¶ 100(f)).<br><br>"Defendants designed, manufactured, sold and distributed the Class Vehicles which Defendants placed into the stream of commerce. Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520." Compl., ¶ 108. |

| | |
|---|---|
| | Allegations that GM breached the implied warranty of merchantability." Compl., ¶¶ 117-121. |
| | The Third Claim for Relief is based on a "breach of implied warranties of merchantability and fitness," and the Fourth Claim for Relief is based on a "breach of warranty of fitness for ordinary use." |
| McConnell | "GM . . . has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defect." Compl., ¶ 12; *see also* Compl., ¶ 87. |
| | With reference to a 2007 Saturn Ion Coupe, "Plaintiff saw advertisements for Old GM vehicles before she purchased the Saturn" and would not have purchased it if she knew about the defect. Compl., ¶ 31. |
| | "On information and belief, in marketing and advertising materials, Old GM consistently promoted the Defective Vehicles as safe and reliable." Compl., ¶ 70. |
| | Referencing the "sale of the Defective Vehicle" in the cause of action alleging violations of the Michigan Consumer Protection Act. Compl., ¶ 108. |
| Phillip | "[H]ad Old GM or GM disclosed the ignition switch defects and safety risks presented sooner . . . Plaintiffs and members of the Class . . . would not have purchased the vehicles they did; would have paid less than they did. . ." Compl., ¶ 26. |
| | "Although it had actual knowledge of the ignition switch defects that it was concealing, Old GM continued to sell hundreds of thousands of Defective Vehicles . . ." Compl., ¶ 80. |
| | "GM and Old GM also expressly warranted through statements and advertisements that the Defective Vehicles were of high quality, and at a minimum, would actually work properly and safety." Compl., ¶ 292. |
| | "Contrary to the applicable implied warranties, Old GM's and GM's Defective Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose." Compl., ¶ 319. |
| | "GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects." Compl., ¶ 11. |
| | "Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability . . . ." Compl., ¶ 50. |
| Ponce | The Named Plaintiff purchased a 2007 Chevrolet HHR in "2007 or 2008" and, based on Chevrolet's reputation, representations and advertising," he alleges that had "he known about the defect, he would not have purchased this vehicle, would not have paid a premium price, and would not have retained the vehicle." Compl., ¶ 9; *see also* Compl., ¶¶ 35-36, 40. |

| | |
|---|---|
| | "GM is liable for both its own acts and omissions, and the acts and omissions of Old GM, as alleged in the Complaint." Compl., ¶ 14. |
| | Class questions include: (i) Whether Defendant's practices and representations made in connection with the labeling, advertising, marketing, promotion and sale of the Subject Vehicles" violated certain statutes. Compl., ¶¶ 46(e), 46(f) |
| | Count one asserts a breach of express and implied warranties with respect to the Subject Vehicles (which are various models manufactured from 2003 through 2007). *See* Compl., ¶¶ 56-62. |
| Ramirez | "Defendants intended that Plaintiffs and Class Members rely on their misrepresentations and omissions, so that Plaintiffs and other Class Members would purchase or lease the Class Vehicles . . ." Compl., ¶ 110(h). |
| | Defendant engaged in deceptive business practices in violation of California's Consumer Legal Remedies Act by, among other things, "advertising Class Vehicles with the intent not to sell or lease them as advertised . . ." Compl., ¶ 147(c). |
| | "Had Plaintiff and other Class Members known that the Class Vehicles had the Ignition Switch Defect, they would not have purchased a Class Vehicle." Compl., ¶ 150(f). |
| | "Defendants made express warranties to Plaintiffs and Class Members both in its warranty manual and advertising . . ." Compl., ¶ 190. |
| | Defendants allegedly violated the Maryland Consumer Protection Act "when it falsely represented, throughout its advertising, warranties and other express representations, that the Class Vehicles were of certain quality or standard when they were not." Compl., ¶ 210. |
| | Mentions that New GM expressly assumed certain liabilities, including statutory requirements, citing the MSA. *See* Compl., ¶ 27. |
| | "At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States." Compl., ¶ 29. |
| Roach | "In addition to the liability arising out of the statutory obligations assumed by GM, it is also subject to successor liability for the deceptive and unfair acts and omissions of Old GM because, as described below, Defendant has continued the business enterprise of Old GM with full knowledge of the ignition switch defects. In light of this continuing course of business, GM and Old GM together will be referred to as "GM" hereafter, unless noted otherwise." Compl., ¶ 8; *see also* Compl., ¶ 114. |
| | "Had Defendants disclosed the ignition switch defect, Plaintiff would not have purchased his 2008 Chevy Malibu LS." Compl., ¶ 15. |
| | Two Class Questions are (i) "Whether Defendants were negligent in the design, manufacturing, and distribution of the Vehicles" (Compl., ¶ 119(c)), and (ii) "Whether |

| | |
|---|---|
| | Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed defectively designed Vehicles into the stream of commerce in the United States" (Compl., ¶ 119(d)).<br><br>"A reasonable consumer with knowledge of the defective nature of the defective GM Models ignition switch would not have purchased the defective GM Models equipped with a defective ignition switch or would have paid less for them." Compl., ¶ 158.<br><br>"GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301(6). The Vehicles' implied warranties are covered under 15 U.S.C. §2301(7).  GM breached these express and implied warranties as described in more detail above . . . ." Compl., ¶ 169-170. |
| Robinson | Referencing alleged violation of the California False Advertising Law, "Defendants caused to be made or disseminated to consumers throughout California and the United States, advertising, marketing and other publications, statements about the Defective Vehicles that were untrue or misleading." Compl., ¶ 137.<br><br>"Defendants violated Minn. Stat. § 325D.44(9) by advertising, marketing, and selling the Defective Vehicles as reliable and without a known defect while knowing those claims were false." Compl., ¶ 145.<br><br>"GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects." Compl., ¶ 13.<br><br>"Because GM acquired and operated Old GM and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint." Compl., ¶ 27. |
| Ross | With respect to alleged violations of the Michigan Consumer Protection Act, "Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Class Vehicles . . . " Compl., ¶114(b).<br><br>"GM gave an implied warranty . . . namely, the implied warranty of merchantability." Compl., ¶ 124.<br><br>"Defendants violated [New York's Deceptive Trade Practices Act] when they represented, through advertising, warranties, and other express representations, that the Class Vehicles had characteristics and benefits that they did not actually have." Compl., ¶ 161.<br><br>"At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles . . . ." Compl., ¶ 22. |

| | |
|---|---|
| Roush | "Had Plaintiffs known of the defect, they would not have purchased the vehicle." Compl., ¶ 18. |
| | Referencing the alleged violation of Missouri's Merchandising Practices Act, "GM has used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of Class Vehicles." Compl., ¶ 48. |
| Ruff | Alleging Named Plaintiffs own a 2009 Chevrolet Cobalt or a 2006 Chevrolet Cobalt, each of which were purchased new.  With respect to the 2006 Chevrolet Cobalt, Plaintiffs assert that it "was manufactured, sold, distributed, advertised, marketed, and warranted by GM." Compl. ¶ 16. |
| | "At all times relevant herein, General Motors Corporation and its successor in interest General Motors LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States." Compl., ¶ 21. |
| | A Class question is "whether the Class Vehicles were fit for their ordinary and intended use, in violation of the implied warranty of merchantability." Compl., ¶ 108(g). |
| | The second claim for relief asserts a breach of implied warranties. |
| | "Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and Class Members to purchase Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value." Compl., ¶ 142. |
| Saclo | "GM breached these warranties as described in more detail above. Without limitation, the Defective Vehicles share a common design defect . . . ." Compl., ¶ 314. |
| | "By failing to disclose these material facts, GM intended to induce Plaintiffs and the other Class members to purchase or lease the Defective Vehicles." Compl., ¶ 325. |
| | Through advertising, marketing, and other publications, OM caused statements to be disseminated that were untrue or misleading, and that were known, or that by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers, including Plaintiff Cohen and the other California State Class members." Compl., ¶ 346. |
| | "GM made express warranties to Plaintiff Cohen and the other California State Class members within the meaning of [California statutes] in its warranty, manual, and advertising, as described above." Compl., ¶ 359. |
| | "The Defective Vehicles are covered by GM's express warranties." Compl., ¶ 361. |
| | "GM breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles that are defective." Compl., ¶ 377. |

|  |  |
|---|---|
|  | "GM has defectively designed, manufactured, sold, or otherwise placed in the stream of commerce Defective Vehicles as set forth above.  GM impliedly warranted that the Defective Vehicles were merchantable for the ordinary purpose for which they were designed, manufactured, and sold."  Compl., ¶¶ 553-554. |
| Salerno | The Named Plaintiff alleges that she "owns a 2006 Saturn Ion," which was manufactured, sold, distributed, advertised, marketed, and warranted by GM."  Compl., ¶ 15.<br><br>One of the Class questions is "whether the Class Vehicles were fit for their ordinary and intended use, in violation of the implied warranty of merchantability."  Compl., ¶ 101(g).<br><br>"Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Class Vehicles."  Compl., ¶ 113(b).<br><br>"Defendants intended that Plaintiff and Class Members rely on their misrepresentations and omissions, so that Plaintiff and other Class Members would purchase or lease the Class Vehicles."  Compl., ¶ 113(h).<br><br>"In connection with its sales of the Class Vehicles, GM gave an implied warranty as defined in IS U.S.C. § 2301(7); namely, the implied warranty of merchantability" (Compl., ¶ 123), and "GM is liable to Plaintiff and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(l), because it breached the implied warranty of merchantability" (Compl., ¶ 124).<br><br>Count III concerns breach of implied warranty.<br><br>"Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value."  Compl., ¶ 151. |
| Santiago | Alleging that New GM is liable under a successor liability theory, Plaintiffs allege: "Because GM is liable for the wrongful conduct of Old GM, there is no need to distinguish between the conduct of Old GM and GM, and the complaints will hereinafter simply refer to GM as the corporate actor when describing relevant facts."  Compl., ¶ 16.<br><br>Named Plaintiff bought a 2007 Saturn Ion Coupe new, and alleged that "[h]ad Plaintiffs and the Class known about the full extent of the Ignition Switch Defect, they would either not have purchased the vehicle at all or would have paid less for them . . . ."  Compl., ¶ 102.<br><br>"GM actively concealed and/or suppressed these material facts, in whole or in part, to induce Plaintiff and Class Members to purchase or lease the Defective Vehicles . . . ."  Compl., ¶ 110. |

| | |
|---|---|
| Shollenberger | "GM expressly warranted that the Class Vehicles were of high quality and, at minimum, would actually work properly."  Compl., ¶ 52. |
| | "Plaintiff relied on GM's express warranty when purchasing his Class Vehicles." Compl., ¶ 53. |
| | "GM breached this warranty by selling to Plaintiff and the Class members the Class Vehicles with known ignition switch defects . . ."  Compl., ¶ 54. |
| | "GM manufactured and/or supplied the Class Vehicles, and prior to the time these goods were purchased by Plaintiff and the putative Class, GM impliedly warranted to Plaintiff that they would be merchantable."  Compl., ¶ 60. |
| | "GM breached its contractual duties by, *inter alia*, selling Class Vehicles with a known safety defect and failing to timely recall them."  Compl., ¶ 69. |
| Stafford | "In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects."  Compl., ¶ 15; *see also* Compl., ¶ 104. |
| | Alleging that in connection with his purchase of a 2004 Saturn Ion, the Named Plaintiff "saw advertisements for Old GM vehicles before he purchased the Ion. Plaintiff does recall that safety and quality were consistent themes in the advertisements he saw. These representations about safety and quality influenced Plaintiff's decision to purchase the Ion."  Compl., ¶ 35. |
| | "Had Old GM and/or Defendant disclosed the ignition switch defects, Plaintiff would not have purchased the Ion, or would have paid less than he did."  Compl., ¶ 35. |
| | A Class question is "whether Defendant is liable for design defect."  Compl., ¶ 114(f). |
| | "As a direct and proximate result of Defendant's violations, Plaintiff suffered injury in fact and lost money because they purchased the Defective Vehicle and paid the price they paid believing it to be free of defects when it was not."  Compl., ¶ 137. |
| | "At all times relevant, Defendant sold, marketed, advertised, distributed, and otherwise placed Defective Vehicles into the stream of commerce in an unlawful, unfair, fraudulent, and/or deceptive manner that was likely to deceive the public."  Compl., ¶ 143. |
| | The Fifth Cause of Action is premised on a design defect theory. |
| | "As a direct and proximate result of Defendant's breach of written warranties, Plaintiff and Class members sustained damages and other losses."  Compl., ¶ 171. |
| | "Defendant breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles containing the ignition switch defects."  Compl., ¶ 182. |

# Exhibit E

**Hearing Date and Time:  To Be Determined**
**Objection Deadline:  To Be Determined**
**Reply Deadline:  To Be Determined**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:     (212) 556-2100
Facsimile:      (212) 556-2222
Arthur Steinberg
Scott Davidson

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)

*Attorneys for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X
| | | |
|---|---|---|
| **In re** | **:** | **Chapter 11** |
| | **:** | |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | **:** | **Case No.:  09-50026 (REG)** |
| **f/k/a General Motors Corp.,** *et al.* | **:** | |
| | **:** | |
| **Debtors.** | **:** | **(Jointly Administered)** |
| | **:** | |

-----------------------------------------------------------------x

**MOTION OF GENERAL MOTORS LLC PURSUANT**
**TO 11 U.S.C. §§ 105 AND 363 TO ENFORCE THE**
**COURT'S JULY 5, 2009 SALE ORDER AND INJUNCTION**
**(MONETARY RELIEF ACTIONS, OTHER THAN IGNITION SWITCH ACTIONS)**

## TABLE OF CONTENTS

**Page**

**INTRODUCTION** ..................................................................................................... **1**

**BACKGROUND STATEMENT OF FACTS** ........................................................ **7**

**I.    OLD GM FILED FOR PROTECTION UNDER THE BANKRUPTCY
CODE IN JUNE 2009.** ...................................................................................... **7**

    A.    Objectors to the Sale Motion Argued that New GM Should Assume
Additional Liabilities of the Type Plaintiffs Now Assert in the Monetary
Relief Actions. ............................................................................................... 8

    B.    The Court Issued Its Sale Order And Injunction, And The Product
Liability Claimants And Others Appealed Because They Objected To The
Fact That New GM Was Not Assuming *Their* Liabilities. ..................................... 9

    C.    Upon Approval Of The Sale Agreement And Issuance Of The Sale Order
And Injunction, New GM Assumed Certain Narrowly Defined Liabilities,
But The Bulk Of Old GM's Liabilities Remained With Old GM. ....................... 11

    D.    The Court's Sale Order And Injunction Expressly Protects New GM From
Litigation Over Retained Liabilities. ................................................................. 13

**II.    NEW GM HAS RECALLED CERTAIN VEHICLES AND IN RESPONSE,
PLAINTIFFS HAVE FILED MONETARY RELIEF ACTIONS.** ........................... **15**

**NEW GM'S ARGUMENT TO ENFORCE THE COURT'S SALE ORDER AND
INJUNCTION** ........................................................................................................... **17**

**I.    THIS COURT'S SALE ORDER AND INJUNCTION SHOULD BE
ENFORCED.** ...................................................................................................... **17**

**II.    NEW GM CANNOT BE HELD LIABLE FOR OLD GM'S ALLEGED
CONDUCT, EITHER DIRECTLY OR AS OLD GM'S ALLEGED
"SUCCESSOR."** .............................................................................................. **20**

**III.    PLAINTIFFS' WARRANTY ASSERTIONS AND STATE LEMON LAW
ALLEGATIONS DO NOT ENABLE THEM TO CIRCUMVENT THE
COURT'S SALE ORDER AND INJUNCTION.** ................................................ **22**

    A.    The Limited Glove Box Warranty is Not Applicable.  But As a Practical
Matter, Plaintiffs Already Are Obtaining Such Relief As Part of the
Recall. ......................................................................................................... 22

ii

**Page**

B.    Any Purported State Lemon Law Claims Are Premature At Best, And
Cannot Be Adequately Pled. ................................................................................. 24

**CONCLUSION** ........................................................................................................... **25**

**NOTICE AND NO PRIOR REQUESTS** ................................................................ **27**

iii

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Ayers v. Gen. Motors*,
    234 F.3d 514 (11th Cir. 2000) ............................................................................................12

*Back v. LTV Corp. (In re Chateaugay Corp.)*,
    213 B.R. 633 (S.D.N.Y. 1997)............................................................................................18

*Burton v. Chrysler Group, LLC (In re Old Carco LLC)*,
    492 B.R. 392 (Bankr. S.D.N.Y. 2013)....................................................................22, 24, 25

*Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    428 B.R. 43 (S.D.N.Y. 2010)....................................................................................8, 11, 13

*In re Cont'l Airlines, Inc.*,
    236 B.R. 318 (Bankr. D. Del. 1999) ...................................................................................17

*In re Gen. Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009)..............................................................................9, 10

*In re Gen. Motors Corp.*,
    No. M 47 (LAK), 2009 WL 2033079 (S.D.N.Y. July 9, 2009).................................................4

*In re Gruntz*,
    202 F.3d 1074 (9th Cir. 2000) ...........................................................................................20

*Handy v. Gen. Motors Corp.*,
    518 F.2d 786 (9th Cir 1975) ..............................................................................................12

*In re McGhan*,
    288 F.3d 1172 (9th Cir. 2002) ...........................................................................................19

*In re Motors Liquidation Co.*,
    No. 09-50026 (REG), 2011 WL 6119664 (Bankr. S.D.N.Y. 2011) .......................................18

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
    430 B.R. 65 (S.D.N.Y. 2010)..............................................................................................11

*Parker v. Motors Liquidation Company*,
    Case No. 10-4882-bk (2d Cir. July 28, 2011)........................................................................11

*Pratt v. Ventas, Inc.*,
    365 F.3d 514 (6th Cir. 2004) ..............................................................................................19

iv

**Page**

*Spartan Mills v. Bank of Am. Ill.*,
112 F.3d 1251 (4th Cir. 1997) ............................................................................20

*Travelers Indem. Co. v. Bailey*,
557 U.S. 137 (2009)...........................................................................................17

*U.S. Lines, Inc. v. GAC Marine Fuels, Ltd. (In re McClean Indus., Inc.)*,
68 B.R. 690 (Bankr. S.D.N.Y. 1986)....................................................................18

*In re Wilshire Courtyard*,
729 F.3d 1279 (9th Cir. 2013) ............................................................................17

### STATUTES

11 U.S.C. § 105(a) ............................................................................................... 18

11 U.S.C. § 363.....................................................................................................10

11 U.S.C. § 363(m)..................................................................................................9

49 C.F.R. § 554.1 ..................................................................................................15

49 U.S.C. § 30119..................................................................................................15

v

## INTRODUCTION

In June 2009, General Motors LLC ("**New GM**") was a newly formed entity, created by the U.S. Treasury, to purchase substantially all of the assets of Motors Liquidation Company, formerly known as General Motors Corporation ("**Old GM**").  Through a bankruptcy-approved sale process, New GM acquired Old GM's assets, free and clear of all liens, claims, liabilities and encumbrances, other than liabilities that New GM expressly assumed under a June 26, 2009 Amended and Restated Master Sale and Purchase Agreement ("**Sale Agreement**").[1]   The Bankruptcy Court approved the sale ("**363 Sale**") from Old GM to New GM and the terms of the Sale Agreement in its "**Sale Order and Injunction**," dated July 5, 2009.[2]

This Motion does not address the approximately 90 lawsuits ("**Ignition Switch Actions**") against New GM that seek monetary relief (*i.e.*, where there was no accident causing personal injury, loss of life, or property damage) relating to allegedly defective ignition switches ("**Ignition Switch**") in certain vehicle models.  New GM previously filed a motion with this Court on April 21, 2014 ("**Ignition Switch Motion to Enforce**") seeking to enforce the Sale Order and Injunction with respect to the Ignition Switch Actions, the Court held Scheduling Conferences on May 2, 2014 and July 2, 2014 with respect to that Motion, and the initial phase of that contested proceeding is being governed by Scheduling Orders entered by the Court on May 16, 2014 and July 11, 2014 ("**Scheduling Orders**")[3]

---

[1]   A copy of the Sale Agreement is annexed hereto as Exhibit "A."

[2]   The full title of the Sale Order and Injunction is "Order (i) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (ii) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (iii) Granting Related Relief, entered by the Court on July 5, 2009."  A copy of the Sale Order and Injunction is annexed hereto as Exhibit "B."

[3]   As New GM did when it filed the Ignition Switch Motion to Enforce, New GM will seek a conference before the Court upon filing this Motion to Enforce to discuss procedural issues raised by the relief sought herein, including the possibility of consolidating this Motion with the Ignition Switch Motion to Enforce.

At the time the Ignition Switch Motion to Enforce was filed, New GM had recently instituted a recall ("**Ignition Switch Recall**") covering vehicles that had an allegedly defective Ignition Switch, and New GM subsequently was named as a defendant in numerous lawsuits that referenced the Ignition Switch Recall.  New GM later instituted various other recalls regarding vehicles and/or parts designed, manufactured and/or sold by Old GM.  Like the plaintiffs in the actions that are covered by the Ignition Switch Motion to Enforce, other plaintiffs have filed actions against New GM based on these later recalls.  These lawsuits were served on New GM beginning in late May 2014, and could not have been included in the Ignition Switch Motion to Enforce.

The timing of the filing of this Motion is dictated by the Scheduling Orders which set forth specific deadlines for the development of agreed upon factual stipulations, and the briefing of Threshold Issues (as defined in the Scheduling Orders). Generally, the Plaintiffs' counsel related to this Motion are already involved in the Ignition Switch Motion to Enforce.[4]  However, to the extent there is not complete overlap, and to ensure that all parties in interest have an opportunity to address common issues before the Court, this Motion is being filed now.

This Motion to Enforce also does not address any litigation involving an accident or incident causing personal injury, loss of life or property damage.  Any such lawsuits against New GM that concern accidents or incidents that occurred prior to the closing of the 363 Sale are the subject of a separate motion filed by New GM at this time.[5]

---

[4]    It is significant, and unexplainable that, in connection with the Ignition Switch Actions, Plaintiffs' attorneys entered into Voluntary Stay Stipulations recognizing the Court's exclusive jurisdiction to decide issues relating to the Sale Order and Injunction. Yet the same counsel continue to file law suits against New GM in other courts for Retained Liabilities as if the Sale Order and Injunction does not exist (thus necessitating the filing of this Motion and other motions to enforce).

[5]    Liabilities related to accidents or incidents that occurred after the closing of the 363 Sale that allegedly caused personal injury, loss of life or property damage were assumed by New GM pursuant to the Sale Order and

2

Furthermore, New GM has committed to repairing (at no cost to the owners) such vehicles that are the subject of a recalls conducted by New GM under the supervision of the National Highway Traffic Safety Administration ("**NHTSA**").  This Motion does not involve those repairs or costs.

Instead, this Motion to Enforce involves *only* litigation in which Plaintiffs seek economic losses, monetary and other relief against New GM relating to an Old GM vehicle or part (other than the Ignition Switch).  Like the Ignition Switch Actions, liabilities for these types of claims were never assumed by New GM and are barred by the Court's Sale Order and Injunction.[6]

Under the Sale Agreement approved by the Court, New GM assumed only three expressly defined categories of liabilities for vehicles and parts sold by Old GM:  (a) post-sale accidents involving Old GM vehicles causing personal injury, loss of life or property damage; (b) repairs provided for under the "Glove Box Warranty"— a specific written warranty, of limited duration, that only covers repairs and replacement of parts; and (c) Lemon Law[7] claims essentially tied to the failure to honor the Glove Box Warranty.  All other liabilities relating to vehicles and parts sold by Old GM were "Retained Liabilities" of Old GM.  *See* Sale Agreement § 2.3(b).

New GM's assumption of just these limited categories of liabilities was based on the independent judgment of U.S. Treasury officials as to which liabilities, if paid, would best

---

Injunction, and the Sale Agreement.  Lawsuits based on such circumstances are not the subject of this or any other motion filed by New GM with the Bankruptcy Court.

[6]    To the extent the lawsuits that are the subject of this Motion to Enforce concern vehicles that were manufactured solely by New GM, and do not concern any allegedly defective parts manufactured by Old GM or concern Old GM conduct, those portions of such lawsuits are not implicated by this Motion to Enforce.

[7]    *See* Sale Agreement § 1.1, at p. 11 (defining "Lemon Laws" as "a state statute requiring a vehicle manufacturer to provide a consumer remedy when such manufacturer is unable to conform a vehicle to the express written warranty after a reasonable number of attempts, as defined in the applicable statute.").

3

position New GM for a successful business turnaround. It was an absolute condition of New GM's purchase offer that New GM not take on all of Old GM's liabilities. That was the bargain struck by New GM and Old GM, and approved by the Court as being in the best interests of Old GM's bankruptcy estate and the public.

The primary objections to the 363 Sale were made by prepetition creditors who essentially wanted New GM to assume their liabilities. But the Court found that, if not for New GM's purchase offer, which provided for a meaningful distribution to prepetition unsecured creditors, Old GM would have liquidated its assets and those unsecured creditors would have received nothing. Indeed, had the objectors been successful in opposing the Sale Order and Injunction, it would have been a pyrrhic victory, and disaster not only for them but for thousands of others who relied on the continued viability of the assets being sold to New GM. Judge Lewis Kaplan aptly summarized the point: "No sentient American is unaware of the travails of the automobile industry in general and of General Motors Corporation ([Old] GM) in particular. As the Bankruptcy Court found, [Old] GM will be forced to liquidate — with appalling consequences for its creditors, its employees, and our nation — unless the proposed sale of its core assets to a newly constituted purchaser is swiftly consummated." *In re Gen. Motors Corp.*, No. M 47 (LAK), 2009 WL 2033079, at *1 (S.D.N.Y. July 9, 2009).

One of the groups that objected most vigorously to the 363 Sale was a coalition representing Old GM vehicle owners. That group included State Attorneys General, individual accident victims, the Center for Auto Safety, Consumer Action, and other consumer advocacy groups. The gist of their objections was: as long as New GM was assuming any of Old GM liabilities, then it should assume *all* vehicle-owner liabilities as well. In particular, the objectors argued, unsuccessfully, that New GM should assume successor liability claims, all warranty

4

claims (express and implied), economic damages claims based upon defects in Old GM vehicles and parts, and tort claims, in addition to the limited categories of claims that New GM already agreed to assume.

A critical element of protecting the integrity of the bankruptcy sale process, however, was to ensure that New GM, as the good faith purchaser for substantial value, received the benefit of its Court-approved bargain. This meant that New GM would be insulated from lawsuits by Old GM's creditors based on Old GM liabilities it did not assume. The Sale Agreement and the Sale Order and Injunction were expressly intended to provide such protections. The Order thus enjoined such proceedings against New GM, and expressly reserved exclusive jurisdiction to this Court to ensure that the sale transaction it approved would not be undermined or collaterally attacked.

As this Court may be aware, New GM recently sent various recall notices to NHTSA concerning issues in certain vehicles and parts, many of which were manufactured by Old GM. Shortly after New GM issued these recall notices, various Plaintiffs sued New GM for claimed economic losses, monetary and other relief allegedly resulting from the issues addressed by the recalls. These lawsuits, in part, concern Old GM vehicles and/or parts—the very type of claims retained by Old GM for which New GM has no liability.

This Motion to Enforce, thus, presents the very same issue that the Court is addressing in the Ignition Switch Motion to Enforce:

**May New GM be sued in violation of this Court's Sale Order and Injunction for economic losses, monetary and other relief relating to vehicles and parts manufactured and/or sold by Old GM?**

As is the case in the Ignition Switch Actions, Plaintiffs in the cases based on the later recalls assert claims, either in whole or in part, for liabilities that Old GM retained under the Sale

5

Order and Injunction.  Plaintiffs apparently decided to not appear in this Court to challenge the Sale Order and Injunction; and with good reason:  they know that this Court has previously enforced the Sale Order and Injunction, and they were seeking to evade this Court's injunction that bars them from suing New GM on account of liabilities retained by Old GM.

Simply put, Plaintiffs cannot ignore the Court's Sale Order and Injunction, and proceed in other courts as though it never existed.  The law is settled that persons subject to a Court's injunction do not have that option.  As the United States Supreme Court explained in *Celotex Corp. v. Edwards*, the rule is "well-established" that "'persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.'"  514 U.S. 300, 306 (1995).

Based on this Court's prior proceedings and Orders, New GM has brought this Motion to Enforce to require the plaintiffs (collectively, the "**Plaintiffs**") in the actions listed in Schedule 1 attached hereto ("**Monetary Relief Actions**") to comply with the Court's Sale Order and Injunction by directing Plaintiffs to (a) cease and desist from further prosecuting against New GM claims that are barred by the Sale Order and Injunction, (b) dismiss with prejudice those void claims brought in violation of the Sale Order and Injunction, and (c) specifically identify which claims against New GM they believe are not otherwise barred by the Sale Order and Injunction.[8]

---

[8]    At this time, the following Monetary Relief Actions have been commenced against New GM:  (i) *Yagman v. General Motors Company, et al.* (a copy of the *Yagman* Complaint is annexed hereto as Exhibit "C"); (ii) *Andrews v. General Motors LLC* (a copy of the *Andrews* Complaint is annexed hereto as Exhibit "D"); (iii) *Stevenson v. General Motors LLC* (a copy of the *Stevenson* Complaint is annexed hereto as Exhibit "E"); and (iv) *Jones v. General Motors LLC* (a copy of the *Jones* Complaint is annexed hereto as Exhibit "F").

New GM reserves the right to supplement the list of Monetary Relief Actions contained in Schedule 1 in the event additional cases are brought against New GM that implicate similar provisions of the Sale Order and Injunction.

### BACKGROUND STATEMENT OF FACTS

1.      In June 2009, in the midst of a national financial crisis, Old GM was insolvent with no alternative other than to seek bankruptcy protection to sell its assets.  New GM, a newly created, government-sponsored entity, was the only viable purchaser, but it would not purchase Old GM's assets unless the sale was free and clear of all liens and claims (except for the claims it expressly agreed to assume). The Court approved this sale transaction, which set the framework for New GM to begin its business operations.  During the last five years, New GM has operated its business based on the fundamental structure of the Sale Agreement and Sale Order and Injunction — a new business enterprise that would not be burdened with liabilities retained by Old GM.  The Monetary Relief Actions represent a collateral attack on this Court's Sale Order and Injunction.  The Plaintiffs may not rewrite, years later, the Court-approved sale to a good faith purchaser, which was affirmed on appeal, and which has been the predicate ever since for literally millions of transactions between New GM and third parties.

**I.      OLD GM FILED FOR PROTECTION UNDER THE BANKRUPTCY CODE IN JUNE 2009.**

2.      On June 1, 2009, Old GM and certain of its affiliates filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  Old GM simultaneously filed a motion seeking approval of the original version of the Sale Agreement ("**Original Sale Agreement**"), pursuant to which substantially all of Old GM's assets were to be sold to New GM ("**Sale Motion**").  The Original Sale Agreement (like the Sale Agreement) provided that New GM would assume only certain specifically identified liabilities (*i.e.*, the "**Assumed Liabilities**"); all other liabilities would be retained by Old GM (*i.e.*, the "**Retained Liabilities**").

7

**A.    Objectors to the Sale Motion Argued that New GM Should Assume Additional Liabilities of the Type Plaintiffs Now Assert in the Monetary Relief Actions.**

3.    Many objectors, including various State Attorneys General, certain individual accident victims ("**Product Liability Claimants**"), the Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizens (collectively, the "**Consumer Organizations**"), the Ad Hoc Committee of Consumer Victims, and the Official Committee of Unsecured Creditors challenged various provisions in the Original Sale Agreement relating to actual and potential tort and contract claims held by Old GM vehicle owners. These objectors argued that the Court should not approve the Original Sale Agreement unless New GM assumed additional Old GM liabilities (beyond the Glove Box Warranty), including those now being asserted by the Plaintiffs in the Monetary Relief Actions.

4.    The Original Sale Agreement was amended so that New GM would assume Lemon Law claims, as well as personal injury, loss of life and property damage claims for accidents taking place after the closing of the 363 Sale.[9] Product Liability Claimants and the Consumer Organizations were not satisfied and pressed their objections, arguing that New GM should assume broader warranty-related claims as well as successor liability claims.[10] Representatives from the U.S. Treasury declined to make further changes. *See* Hr'g Tr. 151:1 – 10, July 1, 2009. The Court found that New GM would not have consummated the "[t]ransaction (i) if the sale . . . was not free and clear of all liens, claims, encumbrances, and

---

[9]    Assumption of the Glove Box Warranty was provided for in the Original Sale Agreement.

[10]    Numerous State Attorneys General also objected, seeking to expand the definition of New GM's Assumed Liabilities to include implied warranty claims. *Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 09–00509, 2012 WL 1339496, at *5 (Bankr. S.D.N.Y. April 17, 2012), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013). The *Castillo* decision has been appealed to the Second Circuit and that appeal remains pending.

other interests . . . , including rights or claims based on any successor or transferee liability or (ii) if [New GM] would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability (collectively, the 'Retained Liabilities'), other than, in each case, the Assumed Liabilities."  *See* Sale Order and Injunction ¶ DD.  The Court ultimately overruled the objectors on these issues.  *See id.*, ¶ 2.

      **B.**      **The Court Issued Its Sale Order And Injunction, And The Product Liability Claimants And Others Appealed Because They Objected To The Fact That New GM Was Not Assuming *Their* Liabilities.**

      5.      The Court held a three-day hearing on the Sale Motion, then issued its Sale Decision on July 5, 2009, finding that the only alternative to the immediate sale to New GM pursuant to the Sale Agreement was a liquidation of Old GM, in which case unsecured creditors, such as the Plaintiffs now suing New GM, would receive nothing.  *See In re Gen. Motors Corp.*, 407 B.R. 463, 474 (Bankr. S.D.N.Y. 2009).  The Court analyzed the law of successor liability at length (*see id.* at 499-506), and ruled that: "[T]he law in this Circuit and District is clear; the Court will permit [Old] GM's assets to pass to the purchaser [New GM] *free and clear of successor liability claims*, and in that connection, will issue the requested findings and associated injunction."  *Id.* at 505-06 (emphasis added).

      6.      In approving the 363 Sale, the Court specifically found that New GM was a "good faith purchaser, for sale-approval purposes, and also for the purpose of the protections section 363(m) provides." *Id.* at 494 (citing 11 U.S.C. § 363(m)).  The Sale Order and Injunction expressly enjoined parties (like the Plaintiffs in the Monetary Relief Actions) from proceeding against New GM with respect to Retained Liabilities at any time in the future.  *See* Sale Order and Injunction, ¶¶ 8, 47.  The Court recognized that if a Section 363 purchaser like New GM did not obtain protection from claims against Old GM, like successor liability claims, it would pay

9

less for the assets because of the risks of known and unknown liabilities. *Id.* at 500; *see* 11 U.S.C. § 363. The Court further recognized that, under the law, a Section 363 purchaser could choose which liabilities of the debtors to assume (*id.* at 496), and that the U.S. Treasury, on New GM's behalf, could rightfully condition its purchase offer on its refusal to assume the liabilities now being asserted by Plaintiffs in the Ignition Switch Actions.

7. Old GM, the proponent of the asset sale transaction, presented evidence establishing that if the Sale Agreement was not approved, Old GM would have liquidated. In a liquidation, objecting creditors seeking incremental recoveries would have ended up with nothing, given that the book value of Old GM's global assets was $82 billion, the book value of its global liabilities was $172 billion (s*ee Gen. Motors*, 407 B.R. at 475), and that, in a liquidation, the value of Old GM's assets was probably less than 10% of stated book value (*id.*).

8. Objectors also presented evidence that the book value of certain contingent liabilities was about $934 million. *Id.* at 483. The Court noted that contingent liabilities were "difficult to quantify." *Id.* And, if the book value of all contingent liabilities was understated, that simply meant Old GM was even more insolvent—an even greater reason for New GM to decline to assume the liabilities retained by GM.

9. Whether Old GM presented evidence regarding a particular claim or specific defect was not germane to this Court's approval of the Sale Order and Injunction. Indeed, as the Court found in the Sale Order and Injunction, the proper analysis for approving the asset sale was whether Old GM obtained the "highest or best" available offer for the Purchased Assets. *See* Sale Order and Injunction, ¶ G. In contrast, the quantification of liabilities left behind with Old GM (*i.e.*, the Retained Liabilities) was pertinent to a different phase of the bankruptcy case (the claims process) which did not involve New GM.

10

10.     New GM's refusal to assume a substantial portion of Old GM's liabilities was fundamental to the sale transaction and was widely disclosed by Old GM to all interested parties. Indeed, the Product Liability Claimants objected to and appealed the Sale Order and Injunction to specifically challenge this aspect of the sale.  *See Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43 (S.D.N.Y. 2010).  On appeal, although the District Court focused on the appellants' failure to seek a stay of the Sale and on equitable mootness principles, it also found that this Court had jurisdiction to enjoin successor liability claims.  *See id. at* 59-60Indeed, the Sale Order and Injunction was affirmed on appeal by two different District Court Judges.  *Id. ; Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65 (S.D.N.Y. 2010).  There were no further appeals.[11]

C.     **Upon Approval Of The Sale Agreement And Issuance Of The Sale Order And Injunction, New GM Assumed Certain Narrowly Defined Liabilities, But The Bulk Of Old GM's Liabilities Remained With Old GM.**

11.     Under the Sale Agreement and the Sale Order and Injunction, New GM became responsible for "Assumed Liabilities."  *See* Sale Agreement § 2.3(a).  These included liability claims for post-sale accidents and Lemon Law claims, as well as the Glove Box Warranty—a written warranty of limited duration (typically three years or 36,000 miles, whichever comes first) provided at the time of sale for repairs and replacement of parts. The Glove Box Warranty expressly excludes economic damages.   New GM assumed no other Old GM warranty obligations, express or implied:

> The Purchaser is assuming the obligations of the Sellers pursuant to and subject to conditions and limitations contained in their express written warranties, which were delivered in connection with the sale of vehicles and vehicle components

---

[11]    The Product Liability Claimants appealed the District Court's decision, but pursuant to a stipulation so-ordered by the Second Circuit Court of Appeals on September 23, 2010, the appeal was withdrawn.  The *Parker* decision was also appealed, but that appeal was dismissed as equitably moot because the appellant had not obtained a stay pending appeal. *See Parker v. Motors Liquidation Company*, Case No. 10-4882-bk (2d Cir. July 28, 2011).

prior to the Closing of the 363 Transaction and specifically identified as a "warranty." ***The Purchaser is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, including implied warranties and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs, and point of purchase materials.***

Sale Order and Injunction, ¶ 56 (emphasis added).

12.    Independent of the Assumed Liabilities under the Sale Agreement, New GM covenanted to perform Old GM's recall responsibilities under federal law.  *See* Sale Agreement ¶ 6.15(a).  But there were no third party beneficiary rights granted under the Sale Agreement with respect to that covenant (*see* Sale Agreement § 9.11), and there is no private right of action for third parties to sue for a breach of a recall obligation.  *See Ayers v. Gen. Motors*, 234 F.3d 514, 522-24 (11th Cir. 2000); *Handy v. Gen. Motors Corp.*, 518 F.2d 786, 787-88 (9th Cir 1975).  Thus, New GM's recall covenant provides no basis for the Plaintiffs to sue New GM for economic losses, monetary or other relief relating to a vehicle or part sold by Old GM.

13.    All liabilities of Old GM not expressly defined as Assumed Liabilities constituted "Retained Liabilities" that remained obligations of Old GM.  *See* Sale Agreement §§ 2.3(a), 2.3(b).  Retained Liabilities include economic losses and other monetary relief relating to vehicles and parts manufactured by Old GM (the primary claims asserted by the Plaintiffs in the Monetary Relief Actions) such as:

    (a)    liabilities "arising out of, relating to or in connection with any (A) implied warranty or other implied obligation arising under statutory or common law without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to Sellers."  Sale Agreement § 2.3(b)(xvi), *see also id.* ¶ 6.15(a). This would include liability based on state consumer statutes, except Lemon Law claims.

    (b)    All liabilities (other than Assumed Liabilities) of Old GM based upon contract, tort or any other basis.  Sale Agreement § 2.3(b)(xi).  This covers claims based on negligence, concealment and fraud.

12

(c)    All liabilities relating to vehicles and parts sold by Old GM with a design defect.[12]

(d)    All Liabilities based on the conduct of Old GM including any allegation, statement or writing attributable to Old GM. This covers fraudulent concealment type claims. *See* Sale Order and Injunction, ¶ 56.

(e)    All claims based on the doctrine of "successor liability." *See, e.g.,* Sale Order and Injunction, ¶ 46.

**D.    The Court's Sale Order And Injunction Expressly Protects New GM From Litigation Over Retained Liabilities.**

14.    On July 10, 2009, the parties consummated the Sale. New GM acquired substantially all of the assets of Old GM free and clear of all liens, claims and encumbrances, except for the narrowly defined Assumed Liabilities. In particular, paragraphs 46, 9, and 8 of the Sale Order and Injunction provide that New GM would have no responsibility for any liabilities (except for Assumed Liabilities) relating to the operation of Old GM's business, or the production of vehicles and parts before July 10, 2009:

> Except for the Assumed Liabilities expressly set forth in the [Sale Agreement] . . . [New GM] . . . shall [not] have any liability for any claim that arose prior to the Closing Date, ***relates to the production of vehicles prior to the Closing Date***, or otherwise is assertable against [Old GM] . . . prior to the Closing Date . . . . Without limiting the foregoing, [New GM] shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims, including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity . . . and products . . . liability, ***whether known or unknown*** as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

Sale Order and Injunction, ¶ 46 (emphasis added); *see also id.*, ¶ 9(a) ("(i) no claims other than Assumed Liabilities, will be assertable against the Purchaser; (ii) the Purchased Assets [are] transferred to the Purchaser free and clear of all claims (other than Permitted Encumbrances) . . ."); and *id.*, ¶ 8 ("All persons and entities . . . holding claims against [Old GM]

---

[12]    *See* Sale Order and Injunction, ¶ AA; *see also Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*, Adv. Proc. No. 09–09803, 2013 WL 620281, at *2 (Bankr. S.D.N.Y. Feb. 19, 2013).

13

or the Purchased Assets arising under or out of, in connection with, or in any way relating to

[Old GM], the Purchased Assets, *the operation of the Purchased Assets* prior to the Closing . . .

are forever barred, estopped, and permanently enjoined . . . from asserting [such claims] against

[New GM]. . . .") (emphasis added).

15.    Anticipating the possibility that New GM might be wrongfully sued for Retained

Liabilities, the Sale Order and Injunction permanently enjoins claimants from asserting claims of

the type made in the Monetary Relief Actions:

> [A]ll persons and entities . . . holding liens, claims and encumbrances, and other
> interests of any kind or nature whatsoever, including rights or claims based on any
> successor or transferee liability, against [Old GM] or the Purchased Assets
> (whether legal or equitable, secured or unsecured, *matured or unmatured,
> contingent or noncontingent*, senior or subordinated), *arising under or out of, in
> connection with, or in any way relating to [Old GM], the Purchased Assets, the
> operation of the Purchased Assets prior to the Closing* . . . *are forever barred,
> estopped, and permanently enjoined . . . from asserting against [New GM]* . . .
> *such persons' or entities' liens, claims, encumbrances, and other interests,
> including rights or claims based on any successor or transferee liability*.

Sale Order and Injunction, ¶ 8 (emphasis added); *see also id.*, ¶ 47.

16.    The Court specifically found that the provisions of the Sale Order and Injunction,

as well as the Sale Agreement, were binding on all creditors, *known and unknown* alike.  *See*

Sale Order and Injunction, ¶ 6 ("This [Sale] Order and [Sale Agreement] "shall be binding in all

respects upon the Debtors, their affiliates, *all known and unknown creditors* of, and holders of

equity security interests in, any Debtor, including any holders of liens, claims, encumbrances, or

other interests, including rights or claims based on any successor or transferee liability . . . ."

(emphasis added)); *see also id.*, ¶ 46.  In short, except for Assumed Liabilities, claims based on

Old GM vehicles and parts remained the legal responsibility of Old GM, and are not the

responsibility of New GM.

14

17.    Finally, paragraph 71 of the Sale Order and Injunction makes this Court the gatekeeper to enforce its own Order. It provides for this Court's *exclusive jurisdiction* over matters and claims regarding the 363 Sale, including jurisdiction to protect New GM against any Retained Liabilities of Old GM:

> *This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the [Sale Agreement],* all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, . . ., in all respects, including, but not limited to, *retaining jurisdiction to . . . (c) resolve any disputes arising under or related to the [Sale Agreement],* except as otherwise provided therein, (d) *interpret, implement, and enforce the provisions of this Order, (e) protect the Purchaser against any of the Retained Liabilities* or the assertion of any lien, claim, encumbrance, or other interest, of any kind or nature whatsoever, against the Purchased Assets . . . . (Emphasis added.)

## II.    NEW GM HAS RECALLED CERTAIN VEHICLES AND IN RESPONSE, PLAINTIFFS HAVE FILED MONETARY RELIEF ACTIONS.

18.    Consistent with its obligations under the Sale Order and Injunction, New GM, over the last several months, has informed NHSTA of certain issues in various vehicles and parts, including those manufactured by Old GM, and that New GM would conduct recalls to remedy the problems (at no cost to the owners). New GM sent NHTSA-approved recall notices to all vehicle owners subject to the recalls. All of the recalls are underway and New GM already has started to fix the vehicles identified by the recalls. NHTSA, as the government agency responsible for overseeing the technical and highly-specialized domain of automotive safety defects and recalls, administers the rules concerning the content, timing, and means of delivering a recall notice to affected motorists and dealers. *See* 49 C.F.R. § 554.1; 49 U.S.C. § 30119.

19.    Since the various recalls were announced, Monetary Relief Actions have been filed against New GM related to these recalls, including recalls of vehicles and parts sold or manufactured by Old GM (*see* Schedule 1, attached to this Motion); additional similar cases will likely be filed in the future.   At this time, these cases include four class actions.

15

20.    The non-ignition switch Monetary Relief Actions assert claims that are barred by the Sale Agreement and the Sale Order and Injunction.  The claims at issue that are the subject of this Motion to Enforce are for economic losses, monetary and other relief premised on alleged defects in vehicles and components manufactured and/or sold by Old GM, which are unrelated to any accident causing personal injury, loss of life or property damage.  In their complaints, the Plaintiffs, at times, conflate Old GM and New GM, but the Sale Order and Injunction is clear that New GM is a separate entity from Old GM (*see* Sale Order and Injunction, ¶ R), and is not liable for successor liability claims (*see, e.g., id.*, ¶¶ 46, 47).  To be sure, the claims asserted by the Plaintiffs in the Monetary Relief Actions are varied, and in some instances, because of the imprecise factual allegations, it is unclear whether there might be a viable cause of action (of the many) being asserted against New GM.  What is clear, however, is that the crux of certain of the Plaintiffs' claims is a problem in vehicles and/or parts manufactured and/or sold by Old GM.  Claims based on that factual predicate are Retained Liabilities and may not be brought against New GM.[13]

21.    This Court is uniquely situated to enforce its own Order and interpret what the parties to the Sale Agreement agreed to, and what issues were raised and resolved in connection with the 363 Sale.  This Motion to Enforce requests that the Court enforce the Sale Order and Injunction by directing Plaintiffs to cease and desist from pursuing claims against New GM for Retained Liabilities of Old GM, direct Plaintiffs to dismiss with prejudice those void claims that are barred by the Sale Order and Injunction, and direct Plaintiffs to specifically identify which

---

[13]    The allegations and claims asserted in the Monetary Relief Actions include Retained Liabilities, such as implied warranty claims, successor liability claims, and miscellaneous tort and statutory claims premised in whole or in part on the alleged acts or omissions of Old GM.  *See* Schedule 2 annexed hereto for a sample of such statements, allegations and/or causes of action.

16

claims they may properly pursue against New GM that are not in violation of the Court's Sale

Order and Injunction.

**NEW GM'S ARGUMENT TO ENFORCE THE COURT'S
SALE ORDER AND INJUNCTION**

22.    The Plaintiffs do not have the choice of simply ignoring the Court's Sale Order

and Injunction.  As the Supreme Court expressed in its *Celotex* decision:

> If respondents believed the Section 105 Injunction was improper, they should
> have challenged it in the Bankruptcy Court, like other similarly situated bonded
> judgment creditors have done . . .  Respondents chose not to pursue this course of
> action, but instead to collaterally attack the Bankruptcy Court's Section 105
> Injunction in the federal courts in Texas.  This they cannot be permitted to do
> without seriously undercutting the orderly process of the law.

514 U.S. at 313.  These settled principles bind Plaintiffs in the Monetary Relief Actions.  Those

who purchased vehicles or parts manufactured by Old GM, whether they were a known or

unknown creditor at the time, are subject to the terms of the Court's Sale Order and Injunction,

and are barred by this Court's Injunction from suing New GM on account of Old GM's Retained

Liabilities.

**I.    THIS COURT'S SALE ORDER AND INJUNCTION SHOULD BE ENFORCED.**

23.    It is well settled that a "Bankruptcy Court plainly ha[s] jurisdiction to interpret

and enforce its own prior orders."  *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009);

*In re Wilshire Courtyard*, 729 F.3d 1279, 1290 (9th Cir. 2013) (affirming bankruptcy court's

post-confirmation jurisdiction to interpret and enforce its orders; "[i]nterpretation of the Plan and

Confirmation Order is the only way for a court to determine the essential character of the

negotiated Plan transactions in a way that reflects the deal the parties struck in chapter 11

proceedings"); *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 326 (Bankr. D. Del. 1999) ("In the

bankruptcy context, courts have specifically, and consistently, held that the bankruptcy court

retains jurisdiction, *inter alia*, to enforce its confirmation order."); *U.S. Lines, Inc. v. GAC*

17

*Marine Fuels, Ltd. (In re McClean Indus., Inc.)*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("[a]ll courts, whether created pursuant to Article I or Article III, have inherent contempt power to enforce compliance with their lawful orders. The duty of any court to hear and resolve legal disputes carries with it the power to enforce the order."). In addition, Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out" the Bankruptcy Code's provisions, and this section "codif[ies] the bankruptcy court's inherent power to enforce its own orders." *Back v. LTV Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 640 (S.D.N.Y. 1997); 11 U.S.C. § 105(a).

24.     Consistent with these authorities, this Court retained subject matter jurisdiction to enforce its Sale Order and Injunction. Indeed, this is not the first time that this Court has been asked to enforce its injunction against plaintiffs improperly seeking to sue New GM for Old GM's Retained Liabilities. *See In re Motors Liquidation Co.*, No. 09-50026 (REG), 2011 WL 6119664 (Bankr. S.D.N.Y. 2011) (ordering various plaintiffs to dismiss with prejudice civil actions in which they had brought claims against New GM that are barred by the Sale Order and Injunction); *Castillo v. Gen. Motors Co. (In re Motors Liquidation Co.)*, Adv. Proc. No. 09-00509 (Bankr. S.D.N.Y.), Hr'g Tr. 9:3-9:14, May 6, 2010 ("when you are looking for a declaratory judgment on an agreement that I approved [*i.e.*, the Sale Agreement] that was affected by an order that I entered [*i.e.*, the Sale Order and Injunction], and with the issues permeated by bankruptcy law as they are, and which also raise issues as to one or more injunctions that I entered, ***how in the world would you have brought this lawsuit in Delaware Chancery Court. I'm not talking about getting in personam jurisdiction or whether you can get venue over a Delaware corporation in Delaware. I'm talking about what talks and walks and quacks like an intentional runaround of something that's properly on the watch of the***

18

*U.S. Bankruptcy Court for the Southern District of New York*.") (emphasis added); *Castillo*, 2012 WL 1339496 (entering judgment in favor of New GM) (affirmed by 500 B.R. 333, 335 (S.D.N.Y. 2013)); *see also Trusky*, 2013 WL 620281, at *2 (finding that "claims for design defects [of 2007-2008 Chevrolet Impalas] may not be asserted against New GM and that "New GM is not liable for Old GM's conduct or alleged breaches of warranty").

25.    This Court is also presently addressing New GM's Ignition Switch Motion to Enforce, which raises issues that overlap and are indistinguishable from the issues raised herein. Specifically, both this Motion to Enforce and the Ignition Switch Motion to Enforce concern Retained Liabilities stemming from vehicles and/or parts manufactured and/or sold by Old GM. This Court has exercised jurisdiction over the issues raised in the Ignition Switch Motion to Enforce; the Court should do the same here.

26.    Contrary to New GM's bargained for rights under the Sale Agreement and the Court's Sale Order and Injunction, Plaintiffs in the Monetary Relief Actions are suing New GM, in part, for defects in Old GM vehicles and/or parts in various courts.  As in the Ignition Switch Actions, Plaintiffs may not simply ignore the Court's injunction through these collateral attacks, especially when the Sale Order and Injunction is a final order no longer subject to appeal.  *See Celotex Corp.*, 514 U.S. at 306, 313  ("'persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed'") (quoting *GTE Sylvania, Inc. v. Consumers Union of U. S., Inc.*, 445 U.S. 375, 386 (1980)); *Pratt v. Ventas, Inc.*, 365 F.3d 514, 520 (6th Cir. 2004) (applying doctrine to dismiss suits filed in violation of injunction in confirmation order entered by bankruptcy court); *In re McGhan*, 288 F.3d 1172, 1180-81 (9th Cir. 2002) (applying doctrine to enforce discharge order in favor of debtors and holding that only the bankruptcy court could grant relief from the order); *see also In re Gruntz*,

19

202 F.3d 1074, 1082 (9th Cir. 2000) (applying this doctrine in the context of an automatic stay

entered by the bankruptcy court); *Spartan Mills v. Bank of Am. Ill.*, 112 F.3d 1251, 1255 (4th Cir.

1997) (applying doctrine to bankruptcy court order approving sales of assets free and clear of

liens).

## II.    NEW GM CANNOT BE HELD LIABLE FOR OLD GM'S ALLEGED CONDUCT, EITHER DIRECTLY OR AS OLD GM'S ALLEGED "SUCCESSOR."

27.    Many of the vehicles and parts at issue in the Monetary Relief Actions were

manufactured, marketed, and sold by Old GM prior to the Sale Order and Injunction.  *See, e.g.*,

*Yagman* Compl., ¶ 5 (alleging the named plaintiff owns a 2007 Buick Lucerne); *Andrews*

Compl., ¶ 25 (alleging that the class includes all persons who own or lease any new or used GM-

branded vehicle sold between July 10, 2009, and April 1, 2014); *Stevenson* Compl., ¶ 17

(alleging that the named plaintiff purchased a 2007 Saturn Ion in or around November 2007).

28.    Certain of the Monetary Relief Actions reflect an effort to plead around the

Court's Sale Order and Injunction.  In fact they all generally assert the same underlying

allegations made about Old GM:  that it manufactured and/or sold vehicles with some type of

defect.  (*See* Schedules 1 and 2 attached hereto.)  And, they all seek, at least in part, to hold

New GM liable for economic losses, monetary and other relief based on Old GM's conduct —

claims that are prohibited by the Sale Order and Injunction.

29.    For example, in *Andrews*, the Plaintiffs seek to limit their class to people who

purchased GM vehicles after July 10, 2009.  However, vehicles are not limited to only New GM

vehicles; the "Affected Vehicles" as defined in the Andrews complaint encompasses all new and

used GM vehicles subject to a recall (other than the Ignition Switch Recall).  The Complaint

specifically excludes from the class "owners and lessors of model year 2005-2010 Chevrolet

Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-

20

2010 Saturn Skys, whose vehicles were recalled for an ignition switch defect." Id., ¶ 25.  There are no other specific exclusions from the purported class of plaintiffs and, thus, such class necessarily includes vehicles manufactured by Old GM.

30.    In connection with the Ignition Switch Motion to Enforce, this Court addressed similar allegations by a group of plaintiffs (i.e., the *Phaneuf* Plaintiffs) in an Ignition Switch Action.  The *Phaneuf* Plaintiffs argued that the Sale Order and Injunction did not apply to them because the class was also limited to individuals who purchased GM vehicles after July 10, 2009.  However, because the vehicles in question were not limited to New GM vehicles, but included Old GM vehicles as well, this Court ruled

> that the sale order now applies, though it is possible, without prejudging any issues, that, after I hear from the other 87 litigants, I might ultimately rule that it does not apply to some kinds of claims and that, even if the sale order didn't apply, that New GM would be entitled to a preliminary injunction temporarily staying the Phaneuf plaintiffs' action from going forward, pending a determination by me on the other 87 litigants' claims under the standards articulated by the circuit in Jackson Dairy and its progeny.

Hr'g Tr. 91:12-21, July 2, 2014.  Accordingly, as was the case with the *Phaneuf* Plaintiffs, the Sale Order and Injunction applies to the *Andrews* Action in the first instances, subject to the rights of the *Andrews* Plaintiff – in this Court -- to argue that it should not apply.

31.    Similarly, as in the Ignition Switch Actions, certain Plaintiffs attempt to impose "successor" liability upon New GM, but New GM is not a successor to Old GM and did not assume any liabilities in connection with successor or transferee liability.  This is expressly provided by the Court's Sale Order and Injunction:

> ***The Purchaser shall not be deemed***, as a result of any action taken in connection with the [Sale Agreement] or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, ***to:  (i) be a legal successor***, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchased Assets from and after the Closing); ***(ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial***

21

> *continuation of the Debtors or the enterprise of the Debtors*.  Without limiting
> the foregoing, the Purchaser (New GM) shall not have any successor, transferee,
> derivative, or vicarious liabilities of any kind or character for any claims,
> including, but not limited to, under any theory of successor or transferee liability,
> de facto merger or continuity, environmental, labor and employment, and
> products or antitrust liability, whether known or unknown as of the Closing, now
> existing or hereafter arising, asserted, or unasserted, fixed or contingent,
> liquidated or unliquidated.

Sale Order and Injunction ¶ 46 (emphasis added); *see also id.*, ¶¶ AA, BB, DD, 6, 7, 8, 10 and

47; Sale Agreement § 9.19.

32.    Plaintiffs' successor liability allegations are simply a violation of this Court's Sale

Order and Injunction.  But whether or not Plaintiffs' claims expressly allege successor liability,

their claims against New GM based on Old GM's conduct are essentially successor liability

claims cast in a different way and are precluded by that Order.

### III.    PLAINTIFFS' WARRANTY ASSERTIONS AND STATE LEMON LAW ALLEGATIONS DO NOT ENABLE THEM TO CIRCUMVENT THE COURT'S SALE ORDER AND INJUNCTION.

#### A.    The Limited Glove Box Warranty is Not Applicable.  But As a Practical Matter, Plaintiffs Already Are Obtaining Such Relief As Part of the Recall.

33.    The Glove Box Warranty is for a limited duration and many of the vehicles that

are the subject of the Monetary Relief Actions were sold more than three years ago.  Thus, the

Glove Box Warranty has expired for those vehicles.  In any event, the Glove Box Warranty

provides only for repairs and replacement parts; the economic losses asserted by Plaintiffs in the

Monetary Relief Actions are of an entirely different character and are expressly barred by the

Glove Box Warranty.  This distinction is not unique to Old GM's 363 Sale.  In the Chrysler

bankruptcy case, the court likewise found that the assumed liabilities were limited to the standard

limited warranty of repair issued in connection with sales of vehicles.  *See, e.g.*, *Burton v.

Chrysler Group, LLC (In re Old Carco LLC)*, 492 B.R. 392, 404 (Bankr. S.D.N.Y. 2013)

("New Chrysler did agree to honor warranty claims — the Repair Warranty.  None of the

22

statements attributed to New Chrysler state or imply that it assumed liability to pay consequential or other damages based upon pre-existing defects in vehicles manufactured and sold by Old Carco.").[14] Finally, as a practical matter, New GM will make the necessary repairs as part of the various on-going recalls, which is all that the Glove Box Warranty would have required. Hence, any claims, if they existed, are moot.

34.       Similarly, the Sale Agreement and the Sale Order and Injunction provide that the implied warranty and other implied obligation claims that Plaintiffs assert here are Retained Liabilities for which New GM is not responsible.  *See* Sale Order and Injunction, ¶ 56 (New GM "is not assuming responsibility for Liabilities contended to arise by virtue of other alleged warranties, ***including implied warranties*** and statements in materials such as, without limitation, individual customer communications, owner's manuals, advertisements, and other promotional materials, catalogs and point of purchase materials." (emphasis added)); *see also* Sale Agreement § 2.3(b)(xvi) (one of the Retained Liabilities of Old GM was any liabilities "arising out of, related to or in connection with any (A) ***implied warranty*** or other ***implied obligation arising under statutory or common law*** without the necessity of an express warranty or (B) allegation, statement or writing by or attributable to [Old GM]." (emphasis added)).

35.       In short, any breach of warranty claims Plaintiffs pursue relating to Old GM vehicles or parts (whether express or implied) improperly seek damages against New GM in violation of the Sale Order and Injunction.

---

[14]    *See also Tulacro v. Chrysler Group LLC, et al.*, Adv. Proc. No. 11-09401 (Bankr. S.D.N.Y. Oct. 28, 2011) [Dkt. No. 18] (Exhibit "G" annexed hereto); *Tatum v. Chrysler Group LLC*, Adv. Proc. No. 11-09411 (Bankr. S.D.N.Y. Feb. 15, 2012) [Dkt. No. 73] (Exhibit "H" annexed hereto).

**B.    Any Purported State Lemon Law Claims Are Premature At Best, And Cannot Be Adequately Pled.**

36.    In an apparent attempt to circumvent the Court's Sale Order and Injunction, certain of the Monetary Relief Actions purport to assert claims based on alleged violations of state Lemon Laws.  But merely referencing state Lemon Laws is not sufficient.  Plaintiffs must actually plead facts giving rise to Lemon Law liability as defined in the Sale Agreement.  Even a cursory review of the complaints reveals they have not done so.

37.    New GM agreed to assume Old GM's "obligations under state 'lemon law' statutes, which require a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute, after a ***reasonable number of attempts*** as further defined in the statute, and other related regulatory obligations under such statutes."  Sale Order and Injunction, ¶ 56 (emphasis added).  None of the Plaintiffs has alleged that New GM has not conformed the vehicle "after a reasonable number of attempts."  And, not only is New GM in the process of conforming the vehicles (through the various recalls), but the statutes of limitations on Lemon Law claims as defined in the Sale Agreement have expired for many of the Old GM vehicles referenced in the Monetary Relief Actions.

38.    As Judge Bernstein found in *Old Carco*, whether claimants can assert a valid Lemon Law claim "depends on the law that governs each plaintiff's claim and whether the plaintiff can plead facts that satisfy the requirements of the particular Lemon Law."  492 B.R. at 406.  He further held as follows:

> With some variation, the party asserting a Lemon Law claim must typically plead
> and ultimately prove that (1) the vehicle does not conform to a warranty, (2) the

24

nonconformity substantially impairs the use or value of the vehicle, and (3) the nonconformity continues to exist after a reasonable number of repair attempts.[15]

Judge Bernstein ultimately found that the claimants there did "not plead that any of the[m] brought their vehicles in for servicing, or that New Chrysler was unable to fix the problem after a reasonable number of attempts." *Id.* at 407. As was the case in *Old Carco*, none of the Plaintiffs here have pled that they brought their vehicles in to be fixed and, after a reasonable number of attempts, that they could not be fixed. They merely base their claims on the recall notices and letters to owners that New GM previously issued.

## CONCLUSION

39.    New GM was created to purchase the assets of Old GM pursuant to the Sale Agreement. The limited category of liabilities that New GM agreed to assume as part of the purchase was the product of a  negotiated bargain, which was approved by this Court in July 2009. Plaintiffs in the Monetary Relief Actions have essentially ignored this; they wrongfully treat New GM and Old GM interchangeably and are pursuing Old GM claims that they cannot lawfully pursue against New GM.

40.    Schedule 2 provides examples of allegations that on their face relate to the Retained Liabilities asserted by the Plaintiffs in the Monetary Relief Actions. Set forth below are illustrations of what Plaintiffs have improperly alleged in such Actions.

(a)    **Implied Warranty**. *See, e.g.*, *See, e.g.*, *Yagman* Compl., ¶ 16 ("defendants and each of them violated the warranty of merchantability . . . ."); *id.*, ¶ 17 ("defendants violated the warranty of fitness for a particular use of their product"); *Stevenson* Compl., ¶ 185 ("Old GM breached the implied warranty of

---

[15]   *Old Carco*, 492 B.R. at 406 (citing *Sipe v. Fleetwood Motor Homes of Penn., Inc.*, 574 F. Supp. 2d 1019, 1028 (D. Minn. 2008); *McLaughlin v. Chrysler Corp.*, 262 F. Supp. 2d 671, 679 (N.D.W. Va. 2002); *Baker v. Chrysler Corp.*, Civ. A. No. 91–7092, 1993 WL 18099, at *1–2 (E.D. Pa. Jan. 25, 1993); *Palmer v. Fleetwood Enterp., Inc.*, Nos. C040161, C040765, 2003 WL 21228864, at *4 (Cal. Ct. App. May 28, 2003); *Iams v. DaimlerChrysler Corp.*, 174 Ohio App. 3d 537, 883 N.E.2d 466, 470 (2007); *DiVigenze v. Chrysler Corp.*, 345 N.J. Super. 314, 785 A.2d 37, 48 (App. Div. 2001)).

25

merchantability by manufacturing and selling Defective Vehicles containing defects leading to the potential safety issues during ordinary driving conditions.").

(b)    **Implied Obligations under Statute or Common Law**.  *See, e.g.*, *Andrews* Compl. (asserting causes of action under California Consumer Legal Remedies Act and California Unfair Competition Law); *Stevenson* Compl. (asserting causes of action under California Consumer Legal Remedies Act and California Unfair Competition Law); *Jones* Complaint (asserting causes of action under States' consumer protection statutes).

(c)    **Successor Liability**.  *See, e.g.*, *Yagman* Compl. (not differentiating between Old GM and New GM); *Andrews* Compl., ¶ 59 ("GM inherited from Old GM a company that valued cost-cutting over safety . . . ."); *id.*, ¶ 24 (alleging that New GM knew "[f]rom its inception" about many of the defects that existed in Old GM vehicles); *Stevenson* Compl, ¶¶ 65, 72-74 (allegations discussing Old GM's conduct).

(d)    **Design Defect**.  *See, e.g.*, *Yagman* Compl., ¶ 12 ("Defendant GM manufactured a defective vehicle"); *id.*, ¶ 13 ("Defendant GM sold a defective vehicle."); *Andrews* Compl., ¶¶ 17-21 (alleging that vehicles manufactured by Old GM were sold with a defect); *id.*, ¶ 232 (asserting as a common class question "[w]hether numerous GM vehicles suffer from serious defects").

(e)    **Tort, Contract or Otherwise**.  *See, e.g.*, *Andrews* Compl. (asserting a cause of action based on fraudulent concealment); *Stevenson* Compl. (asserting causes of action based on fraudulent concealment and tortious interference with contract); *Jones* Complaint (asserting causes of action based on fraudulent concealment and tortious interference with contract).

(f)    **The Conduct of Old GM**.  *See, e.g.*, *Yagman* Compl., ¶ 14 ("Defendant GM knew the vehicle [*i.e.*, a 2007 Buick Lucerne] was defective at the time it was put into the stream of commerce for sale and was sold); *Andrews* Compl., ¶ 3 ("GM enticed Plaintiff and all GM vehicle purchasers [not differentiating between purchasers who bought from Old GM and New GM] to buy vehicles that have now diminished in value as the truth about the GM brand has come out, and a stigma has attached to all GM-branded vehicles."); *Stevenson* Compl., ¶¶ 65, 72-74 (allegations discussing Old GM's conduct); *Jones* Compl., ¶¶ 65, 72-74 (allegations discussing Old GM's conduct).

41.    New GM has no liability or responsibility for these Retained Liability claims and, under the Sale Order and Injunction, Plaintiffs in the Monetary Relief Actions are enjoined from bringing them against New GM, and their pursuit of these claims violates the Court's injunction. *See, e.g.,* Sale Order and Injunction, ¶¶ 8, 47.  Accordingly, the Court should enforce the terms

of its Sale Order and Injunction by ordering Plaintiffs to promptly dismiss all of their claims that violate the provisions of that Order, to cease and desist from all efforts to assert such claims against New GM that are void because of the Sale Order and Injunction, and to specifically identify which claims, if any, they might have which are not barred by this Court's Sale Order and Injunction.

### NOTICE AND NO PRIOR REQUESTS

42.    Notice of this Motion to Enforce has been provided to (a) counsel for Plaintiffs in each of the Monetary Relief Actions, (b) Designated Counsel and other lead counsel involved in the Ignition Switch Motion to Enforce, (c) counsel for Motors Liquidation Company General Unsecured Creditors Trust, and (d) the Office of the United States Trustee.  New GM submits that such notice is sufficient and no other or further notice need be provided.

43.    No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, New GM respectfully requests that this Court: (i) enter an order substantially in the form set forth as Exhibit "I" annexed hereto, granting the relief sought herein; and (ii) grant New GM such other and further relief as the Court may deem just and proper.

27

Dated: New York, New York                       Respectfully submitted,
      August 1, 2014


    /s/ Arthur Steinberg
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036
Telephone:      (212) 556-2100
Facsimile:      (212) 556-2222

Richard C. Godfrey, P.C. (admitted *pro hac vice*)
Andrew B. Bloomer, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for General Motors LLC*

28

**SCHEDULE "1"**

**CHART OF ECONOMIC LOSS ACTIONS**

| | Name | Class Models | Plaintiffs' Model[1] | Court | Filing Date |
|---|---|---|---|---|---|
| 1 | Yagman (Class Action) | Buick Lucerne Model Year 2006-2011 | 2007 Buick Lucerne | Central District of California 2:14-cv-04696 | 6/18/14 |
| 2 | Andrews (Class Action) | Numerous models manufactured by Old GM and New GM[2] | 2010 Buick LaCrosse | Central District of California 5:14-cv-01239 | 6/18/14 |
| 3 | Stevenson (Class Action) | Various models from 2004 to 2010 | 2007 Saturn Ion | Southern District of New York 14-cv-5137 | 7/3/14 |
| 4 | Jones (Class Action) | Various models from 2004 to 2010 | 2008 Chevy Malibu | Southern District of New York 14-cv-5850 | 7/29/14 |

---

[1] The purported class in an alleged class action should not be greater in scope than the claims related to the named representative plaintiffs. Other than the proposed representative in the *Andrews* Action, the proposed representative plaintiffs all owned vehicles designed and manufactured by Old GM.

[2] The class in the *Andrews* Action includes all persons who own or lease any new or used GM-branded vehicle sold between July 10, 2009, and April 1, 2014, excluding "owners and lessors of model year 2005-2010 Chevrolet Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys, whose vehicles were recalled for an ignition switch defect." *Andrews* Compl., ¶ 25.

## SCHEDULE "2"

## SAMPLE ALLEGATIONS/CAUSES OF ACTION
## IN IGNITION SWITCH COMPLAINTS[1]

| Lead Plaintiff | Allegations |
|---|---|
| Andrews | "GM enticed Plaintiff and all GM vehicle purchasers to buy vehicles that have now diminished in value as the truth about the GM brand has come out, and a stigma has attached to all GM-branded vehicles." Compl., ¶ 3.

Allegations regarding defects in numerous vehicles manufactured by Old GM. *See, e.g.*, Compl., ¶¶ 17-21, 86, 97, 111, 131, 143.

The purported class of plaintiffs appears to include all owners of GM vehicles (whether manufactured by Old GM or New GM) that purchased their vehicles between July 10, 2009 and April 1, 2014. Compl., ¶ 25.[2]

"GM inherited from Old GM a company that valued cost-cutting over safety, actively discouraged its personnel from taking a 'hard line' on safety issues, avoided using 'hot' words like 'stall' that might attract the attention of NHTSA and suggest that a recall was required, and trained its employees to avoid the use of words such as 'defect' or 'problem' that might flag the existence of a safety issue. GM did nothing to change these practices." Compl., ¶ 59.

"In April 2006, the GM design engineer who was responsible for the ignition switch in the recalled vehicles, Design Research Engineer Ray DeGiorgio, authorized part supplier Delphi to implement changes to fix the ignition switch defect. [footnote omitted]  The design change 'was implemented to increase torque performance in the switch.' [footnote omitted]  However, testing showed that, even with the proposed change, the performance of the ignition switch was still below original specifications. [footnote omitted]  ***Yet no recall occurred.***" Compl., ¶ 76 (emphasis in original).

"Modified ignition switches – with greater torque – started to be installed in 2007 model/year vehicles." Compl., ¶ 77.

"In June 2008, Old GM noticed increased warranty claims for airbag service on certain of its vehicles and determined it was due to increased resistance in airbag wiring. After analysis of the tin connectors in September 2008, Old GM determined that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring. It released a technical service bulletin on November 25, 2008, for 2008-2009 Buick |

---

[1]    Due to space limitations, this chart contains only a ***sample*** of statements, allegations and/or causes of action contained in the complaints filed in the Economic Loss Actions.  This chart does ***not*** contain ***all*** statements, allegations and/or causes of action that New GM believes violates the provisions of the Court's Sale Order and Injunction and the MSPA.

[2]    Excluded from the class are "owners and lessors of model year 2005-2010 Chevrolet Cobalts, 2005-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys, whose vehicles were recalled for an ignition switch defect."  *Andrews* Compl., ¶ 25.

|  |  |
|---|---|
|  | Enclaves, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line. Old GM also began the transition back to gold-plated terminals in certain vehicles. At that point, Old GM suspended all investigation into the defective airbag wiring and took no further action." Compl., ¶ 101.<br><br>"On December 4, 2008, Old GM issued a TSB recommending the application of dielectric grease to the BCM C2 connector for the MY 2005-2009, Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx and 2008 Malibu Classic and 2007-2009 Saturn Aura vehicles." Compl., ¶ 119.<br><br>A class question is "[w]hether GM misrepresented to Affected Vehicle purchasers that GM vehicles are safe, reliable, and of high quality[.]" Compl., ¶ 232(c).<br><br>"Had they been aware of the many defects that existed in GM-branded vehicles, the Company's disregard for safety, Plaintiff either would have paid less for her vehicle or would not have purchased it at all." Compl., ¶ 248.<br><br>"From the date of its inception on July 10, 2009, GM knew of many serious defects affecting many models and years of GM-branded vehicles, both because of the knowledge of Old GM personnel who remained at GM and continuous reports, investigations, and notifications from regulatory authorities. GM became aware of other serious defects years ago, but concealed all of them until recently." Compl., ¶ 261. |
| Jones | "This case arises out of General Motors ('GM') and its predecessor's [footnote omitted] failure to disclose and lengthy concealment of a known defect affecting the Electronic Power Steering ('EPS') system of over 1.3 million vehicles and compromising the safety and integrity of those vehicles." Compl., ¶ 1.<br><br>"From 2004 until March of 2014, GM concealed and did not fix the serious quality and safety problems affecting the Defective Vehicles." Compl., ¶ 7.<br><br>"From at least 2004 to the present both Old GM and GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its EPS system." Compl., ¶ 9.<br><br>"The applicability of the bar on successor liability claims against GM for the acts and omissions of Old GM prior to the Sale Order is an issue that is currently pending in Bankruptcy Court in the Southern District of New York. To the extent permitted by the Bankruptcy Court, Plaintiff herein will seek leave of this Court to amend the complaint to add successor liability claims against GM for the acts and omissions of Old GM." Compl., p. 5 n.6.<br><br>Paragraph 64 of the Complaint references alleged "training materials" from 2008.<br><br>"Over 1.2 million vehicles sold by Old GM and later GM between 2003 and 2010 had defective wiring harnesses." Compl., ¶ 70.<br><br>Paragraphs 72 and 73 concern events that occurred between June 2008 and September 2008. |

|  |  |
|--|--|
|  | The purported Class is defined as following: "During the fullest period allowed by law, all persons in the United States who own or lease, or who sold after March 1, 2014, one or more of the following GM vehicles: 2005-2006, 2007-2010 Pontiac G6; 2004-2006, 2008-2009 Chevy Malibu; 2004-2006 Chevy Malibu Max; 2009-2010 Chevy HHR; 2008-2009 Saturn Aura." Compl., ¶ 99.<br><br>Plaintiff alleges that a Class question is "[w]hether the Defective Vehicles suffer from EPS system defects." Compl., ¶ 106(A). |
| Stevenson | Named Plaintiff "purchased a 2007 Saturn Ion on or around November 2007, in Bakersfield, California." Compl., ¶ 17.<br><br>"Plaintiff and Class members' vehicles are worth less than they would be without the defects. A vehicle purchased, leased, or retained with serious safety defects is worth less than the equivalent vehicle leased, purchased, or retained without the defect." Compl., ¶ 58.<br><br>"A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of accident because of the EPS defects." Compl., ¶ 59.<br><br>Allegations discussing Old GM conduct are contained in various paragraphs including, without limitation, paragraphs 65, 72 to 74.<br><br>"Old GM impliedly warranted to Plaintiff and Class members that its Defective Vehicles were 'merchantable' within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792 . . . ." Compl., ¶ 180.<br><br>"Old GM breached the implied warranty of merchantability by manufacturing and selling Defective Vehicles containing defects leading to the potential safety issues during ordinary driving conditions." Compl., ¶ 185. |
| Yagman | "Plaintiff is an owner of a 2007 Buick Lucerne." Compl., ¶ 5.<br><br>"Plaintiff now is an owner of a defective vehicle. Defendant GM manufactured a defective vehicle. Defendant GM sold a defective vehicle. Defendant GM knew the vehicle was defective at the time it was put into the stream of commerce for sale and was sold." Compl., ¶¶ 11-14.<br><br>"[D]efendants and each of them violated the warranty of merchantability and thereby damaged plaintiff." Compl., ¶ 16.<br><br>"[D]efendants violated the warranty of fitness for a particular use of their product.' Compl., ¶ 17 |

# Exhibit F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
In re                                                   :    Chapter 11
                                                        :
MOTORS LIQUIDATION COMPANY, *et al.*,                    :    Case No.: 09-50026 (REG)
        f/k/a General Motors Corp., *et al.*             :
                                                        :
                        Debtors.                        :    (Jointly Administered)
-----------------------------------------------------------------x

DECISION WITH RESPECT TO NO STAY
PLEADING (PHANEUF PLAINTIFFS)[1]

APPEARANCES:

KING & SPALDING LLP
*Attorneys for General Motors LLC*
1185 Avenue of the Americas
New York, New York 10036
By:    Arthur J. Steinberg, Esq. (argued)
        Scott I. Davidson, Esq.

KIRKLAND & ELLIS LLP
*Attorneys for General Motors LLC*
300 North LaSalle
Chicago, Illinois 60654
By:    Richard C. Godfrey, Esq.
        Andrew B. Bloomer, Esq.

BLOCK & LEVITON LLP
*Attorneys for Phaneuf Plaintiffs*
155 Federal Street, Suite 400
Boston, Massachusetts 02110
By:    Jeffrey C. Block, Esq. (argued)
        Joel A. Fleming, Esq.

---

[1]    This written decision memorializes and amplifies on the oral decision that I issued after the close
       of oral argument at the hearing on this matter on July 2, 2014 (the "**July 2 Hearing**").  Because it
       had its origins in the originally dictated decision, it has a more conversational tone.  As a general
       matter, it speaks as of the time I issued the original decision, though by footnote (*see* n.8), I've
       updated it to describe an event that took place after I dictated the original decision.

-1-

FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
*Attorneys for Phaneuf Plaintiffs*
1279 Route 300
Newburg, New York 12551
By:    Todd Garber, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In February 2014, General Motors LLC ("**New GM**") announced ignition switch

defects in Chevy Cobalts and Pontiac G5s going back to the 2005 model year—at least

seemingly in material part before the chapter 11 filing of Reorganized Debtor General

Motors Corporation, now called Motors Liquidation Corp. ("**Old GM**"), from whom

New GM purchased the bulk of Old GM assets in a section 363 "free and clear" sale[2] in

July 2009.[3]  The 2014 announcement came many years after ignition switch issues were

first discovered by at least some personnel at Old GM.  Very nearly immediately after

New GM's announcement, a large number of class actions (and to a lesser extent,

individual lawsuits) relating to those defects, referred to here as the "**Ignition Switch**

**Actions**," were commenced against New GM.

At the time of the 363 Sale, New GM assumed many, but much less than all, of

Old GM's liabilities.[4]  Focusing on that distinction, in April 2014, New GM filed a

---

[2]    I approved the sale—referred to here as the "**363 Sale**"—by order dated July 5, 2009 (the "**Sale Order**") (ECF No. 2968), and the sale closed a few days thereafter.

[3]    In a February 2014 letter to the National Traffic and Highway Administration, New GM made reference to 2005–2007 model year Chevy Cobalts, and 2007 model year Pontiac G5s.  Defective ignition switches, manufactured at a time yet to be determined (before the 363 Sale, after the 363 Sale, or both), may also have been installed in other vehicles, including those in other (and possibly later) model years, including some after the 363 Sale.  I make no findings as to any of these matters at this point in time; I merely identify them as matters that may eventually need to be stipulated to or otherwise resolved.

[4]    The Old GM  liabilities assumed by New GM, on the one hand, and not assumed, on the other, were described in the 363 Sale's underlying sale agreement, captioned "Amended and Restated Master Purchase and Sale Agreement," often referred to by the parties as the "**ARMSPA**," "**MPA**," or "**MSPA**."  As in the past—because, as I've repeatedly noted, all but the most common acronyms are singularly unhelpful to those who haven't been living with a case—I instead use the

-2-

motion before me (the "**Motion to Enforce**")[5] to enforce the free and clear provisions of the Sale Order—contending (though these contentions are disputed) that most, if not all, of the claims in the Ignition Switch Actions related to vehicles or parts manufactured and sold by Old GM; that the Ignition Switch Actions assert liabilities not assumed by New GM; and that the Sale Order's free and clear provisions proscribe such claims.  At very nearly the same time, counsel for one group of plaintiffs—the "**Groman Plaintiffs**"—commenced a class action adversary proceeding in this Court (the "**Groman Adversary**")[6] seeking a declaration that their claims were not so proscribed.

In this jointly administered proceeding in which I address issues in New GM's Motion to Enforce and the Groman Adversary,[7] I must determine whether one out of 88 Ignition Switch Actions—brought by a group of plaintiffs (the "**Phaneuf Plaintiffs**"), suing on their own behalf and on behalf of a purported class—should be allowed to proceed when the plaintiffs in every other Ignition Switch Actions agreed to stay their actions while the issues in the Motion to Enforce were being litigated.[8]

---

more descriptive term "**Sale Agreement**."  *See, e.g.*, *Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 2012 Bankr. LEXIS 1688, at *13 n.25, 2012 WL 1339496, at *5 n.25 (Bankr. S.D.N.Y. Apr. 17, 2012) (Gerber, J.), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013) (Furman, J.) ("The Sale Agreement was more formally entitled 'Amended and Restated Master Purchase and Sale Agreement,' and referred to more than occasionally as the 'ARMSPA.'  By reason of the Court's dislike of acronyms, which rarely are helpful to anyone lacking intimate familiarity with the subject, the Court simply says 'Sale Agreement'").

[5]    ECF No. 12620.

[6]    Adv. No. 14-01929.

[7]    I determined early on that the largely overlapping issues in the contested matter that resulted from New GM's Motion to Enforce and the Groman Adversary should be heard together in this Court.  For brevity I'll hereafter refer to the Motion to Enforce as a shorthand means to collectively refer to both.

[8]    At the time I orally ruled with respect to the Phaneuf Plaintiffs' issues at the July 2 Hearing, they were the only plaintiff group that had declined to stipulate to stay its Ignition Switch Action.  In proceedings later that day, I granted leave to two initially *pro se* individual plaintiffs (the "**Elliott Plaintiffs**"), who had so stipulated but later retained counsel, to be relieved of the stipulation they had agreed to while *pro se*.  Thus, after having delivered my oral decision on this matter, I now have one more group of plaintiffs seeking to proceed before all of the others.

-3-

Some of the issues that I'll later need to decide may turn out to be difficult, but those here are not. I rule that the Phaneuf Plaintiffs should be treated no differently than those in the 87 other Ignition Switch Actions who agreed to voluntary stays, with adherence to the orderly procedures in this Court that were jointly agreed to by counsel for those other plaintiffs and New GM. The Phaneuf Plaintiffs' complaint alleges matters that, on their face, involve matters preceding Old GM's chapter 11 filing and 363 sale, with respect to which the Sale Order's "free and clear" injunctive provisions, at least in the first instance, apply. And the Phaneuf Plaintiffs would not be prejudiced at all, much less materially, by litigating their needs and concerns along with the other New GM consumers raising substantially identical claims. Though injunctive provisions are already in place and thus a preliminary injunction is unnecessary, New GM has also shown an entitlement to a preliminary injunction staying the Phaneuf Plaintiffs from proceeding with their litigation elsewhere while the issues here are being determined.

My Findings of Fact, Conclusions of Law, and bases for the exercise of my discretion follow.

### Findings of Fact

As previously noted, very nearly immediately after New GM's public announcement of the ignition switch defects, a very large number of Ignition Switch Actions were commenced against New GM. Although back in 2009, New GM had voluntarily undertaken to assume liability for death, personal injury, and property damage arising from accidents and incidents after the 363 Sale, these lawsuits were for something else—for "economic loss," which I understand to cover (possibly among things) claims for alleged diminishment in value of affected vehicles, out of pocket expenses, inconvenience, and, additionally, punitive damages, RICO damages, and attorneys fees.

-4-

A. *The Context of this Controversy*

Very shortly after it filed its Motion to Enforce, New GM sought a conference with me to establish procedures to manage the litigation of its motion. With the Groman Adversary also having been filed, and with additional similar litigation foreseeable, I granted new GM's request for the conference. I solicited comments from interested parties with respect to the agenda for that conference, and held an on-the-record conference on May 2 (the "**May 2 Conference**"). By the time of the May 2 Conference, I understood there to be about 65 Ignition Switch Actions; I'm informed that their number has now reached 88.

To deal with the very large number of plaintiffs' attorneys who might be impacted by any rulings I might issue, I asked them to designate a smaller group of their number who'd speak on their behalf. The plaintiffs' lawyers community did so. They designated the law firms of Brown Rudnick, LLP; Caplin & Drysdale, Chartered; and Stutzman, Bromberg, Esserman & Plifka, PC (whose practices include the representation of tort and asbestos plaintiffs in bankruptcy courts) to speak on their behalf; those three firms came to be known as the "**Designated Counsel**." And at the May 2 Conference, it became apparent that this controversy had the potential to impact prepetition creditors of Old GM, who, under Old GM's reorganization plan, had become unit holders ("**Unit Holders**") in a General Unsecured Creditors Trust—referred to colloquially as the "**GUC Trust**"—which, among other things, would quarterback objections to claims on behalf of Old GM unsecured creditors, whose recoveries might be diluted by others' claims against Old GM. Thus I determined that I should give counsel for the GUC Trust and Unit Holders the opportunity to be heard as well. Though I provided means for other plaintiffs' counsel to be heard to the extent that the Designated Counsel didn't

-5-

satisfactorily present the others' views, I ruled that I should primarily hear from Designated Counsel to avoid duplication and to allow the issues to be decided in an orderly manner.

At the May 2 Conference, with knowledge of the injunctive provisions of the Sale Order, I determined that while the litigation process was underway in this Court, plaintiffs in Ignition Switch Actions would either

(i) agree to enter into a stipulation ("**Stay Stipulation**") with New GM staying the Ignition Switch Actions they'd brought elsewhere, or

(ii) file with the Bankruptcy Court a "**No Stay Pleading**"—as later defined in a heavily negotiated scheduling order (the "**May 16 Order**")[9] I signed after the May 2 Conference—setting forth why they believed their Ignition Switch Actions should not be stayed.

The May 16 Order further provided that after September 1, any party may request that I "modify the stay for cause shown, including based on any rulings in this case, or any perceived delay in the resolution of the Threshold Issues."[10]

---

[9]    ECF No. 12697.

[10]    The "Threshold Issues" are:

a.  Whether Plaintiffs' procedural due process rights were violated in connection with the Sale Motion and the Sale Order and Injunction, or alternatively, whether Plaintiffs' procedural due process rights would be violated if the Sale Order and Injunction is enforced against them ("**Due Process Threshold Issue**");

b.  If procedural due process was violated as described in (a) above, whether a remedy can or should be fashioned as a result of such violation and, if so, against whom ("**Remedies Threshold Issue**");

c.  Whether any or all of the claims asserted in the Ignition Switch Actions are claims against the Old GM bankruptcy estate (and/or the GUC Trust) ("**Old GM Claim Threshold Issue**"); and

-6-

On June 9, the Ignition Switch Actions, which were brought in many judicial districts in the United States, were transferred, under 28 U.S.C. § 1407, upon a decision of the Judicial Panel on Multidistrict Litigation[11] to the United States District Court for the Southern District of New York.  They're now pending in this district for pretrial purposes before the Hon. Jesse Furman, United States District Judge.  Each of Judge Furman and I has granted comity to the other, and he has entered a scheduling order in his court that accomplishes his needs while respecting mine.[12]  By a subsequent MDL Panel order, the Phaneuf Plaintiffs' action is before Judge Furman too.

Plaintiffs in 87 out of 88 Ignition Switch Actions agreed to enter into stay stipulations.[13]  But the Phaneuf Plaintiffs declined to do so.  Instead, they filed a No Stay Pleading, contending that they are asserting only post-sale claims, and thus that their claims should be treated differently.  They argue that they should be allowed to proceed with their action even while the Motion to Enforce is pending.

---

d.  If any or all of the claims asserted in the Ignition Switch Actions are or could be claims against the Old GM bankruptcy estate (and/or the GUC Trust), should such claims or the actions asserting such claims nevertheless be disallowed/dismissed on grounds of equitable mootness ("**Equitable Mootness Threshold Issue**").

[11]  *See In re General Motors LLC Ignition Switch Litigation*, --- F.Supp.2d ---, 2014 U.S. Dist. LEXIS 79713, 2014 WL 2616819 (J.P.M.L June 9, 2014) ("***JPML Decision***").

[12]  Order No. 1, *In re General Motors LLC Ignition Switch Litigation*, No. 14-MC-2543 (S.D.N.Y. June 24, 2014), ECF No. 3 (the "**June 24 Order**").

[13]  But see n.8 above, with respect to the Elliott Plaintiffs' request, which I granted, to withdraw from their earlier stipulation.

-7-

B. *The Sale Agreement and Sale Injunctions*

As noted above, the Sale Agreement and Sale Order set out Old GM liabilities

that New GM would assume and not assume.[14]  Under the Sale Agreement, New GM did

not assume liability for most "**Product Liability Claims**" (as there defined).[15]  But New

GM expressly assumed responsibility for claims for death, personal injury or damage to

property caused by "accidents or incidents" first occurring after the 363 Sale,[16] even if

such might otherwise be claims against Old GM.[17]

Under the Sale Agreement (and the Sale Order, which had corresponding

provisions), New GM also took on, as additional Assumed Liabilities, some, but not all,

claims other than for death, personal injury or property damage caused by accidents or

incidents.  In addition, the Sale Order included several injunctive provisions.  Relevant

provisions of the Sale Order follow.

1. *Sale Order Provisions re Assumed Liabilities*

Under the Sale Order (and as described with greater precision there), New GM

assumed Old GM's obligations under express warranties (colloquially referred to as the

"glove box" warranty) that had been delivered in connection with the sale of vehicles and

---

[14]    Liabilities New GM agreed to assume were called "**Assumed Liabilities**," in each of the Sale
Agreement and Sale Order.  Those New GM did not assume (and that Old GM retained) were
called "**Retained Liabilities**."

[15]    *See* Sale Agreement § 2.3(a)(ix) (as amended on June 30, 2009 (see pages 111–12 of ECF No.
2968-2)).

[16]    *Id.*

[17]    *See generally In re Motors Liquidation Co*., 447 B.R. 142, 149 (Bankr. S.D.N.Y. 2011) (Gerber,
J.) ("***GM-Deutsch***") (construing the "incidents" portion of the "accidents or incidents" language
(in the context of claims against New GM by the estate of a consumer who had been in an accident
before the 363 Sale, but died thereafter) as covering more than just "accidents," but covering
things that were similar, such as fires, explosions, or other definite events that caused injuries and
resulted in the right to sue).

vehicle parts prior to the 363 Sale.[18]  But New GM did not assume  responsibility for

other alleged warranties, including implied warranties and statements in materials such as

individual customer communications, owner's manuals, advertisements, and other

promotional materials.[19]

The Sale Order also provided that except for the Assumed Liabilities expressly set

forth in the Sale Agreement, New GM would not "have any liability for any claim that

arose prior to the Closing Date, relates to the production of vehicles prior to the Closing

Date, or otherwise is assertable against the Debtors or is related to the Purchased Assets

prior to the Closing Date."[20]  And it went on to say that:

> The Purchaser [New GM] shall not be deemed, as a
> result of any action taken in connection with the
> MPA [Sale Agreement] or any of the transactions or
> documents ancillary thereto or contemplated
> thereby or in connection with the acquisition of the
> Purchased Assets, to:
>
> > (i) be a legal successor, or otherwise
> > be deemed a successor to the Debtors (other
> > than with respect to any obligations arising
> > under the Purchased Assets from and after
> > the Closing);
> >
> > (ii) have, de facto or otherwise,
> > merged with or into the Debtors; or
> >
> > (iii) be a mere continuation or
> > substantial continuation of the Debtors or
> > the enterprise of the Debtors.

---

[18]    *See* Sale Order ¶ 56.  New GM also assumed Old GM obligations under state "lemon law"
statutes—which generally require a manufacturer to provide a consumer remedy when the
manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute,
after a reasonable number of attempts as further defined in the statute—and other related
regulatory obligations under such statutes.  *Id.*

[19]    *Id.*

[20]    Sale Order ¶ 46.

-9-

Without limiting the foregoing, the Purchaser shall
not have any successor, transferee, derivative, or
vicarious liabilities of any kind or character

for any claims, including, but not limited to, under
any theory of successor or transferee liability, de
facto merger or continuity, environmental, labor and
employment, and products or antitrust liability,
whether known or unknown as of the Closing, now
existing or hereafter arising, asserted, or unasserted,
fixed or contingent, liquidated or unliquidated.[21]

The Sale Order also provided:

Except for the Assumed Liabilities, or as expressly
permitted or otherwise specifically provided for in
the MPA or this Order,

the Purchaser shall have no liability or
responsibility for any liability or other obligation of
the Sellers [Old GM and its Debtor subsidiaries]
arising under or related to the Purchased Assets.

Without limiting the generality of the foregoing,
and except as otherwise specifically provided in this
Order and the MPA,

the Purchaser shall not be liable for any claims
against the Sellers or any of their predecessors or
Affiliates, and

the Purchaser shall have no successor, transferee, or
vicarious liabilities of any kind or character,

including, but not limited to, any theory of antitrust,
environmental, successor, or transferee liability,
labor law, de facto merger, or substantial continuity,

whether known or unknown as of the Closing, now
existing or hereafter arising, whether fixed or
contingent, asserted or unasserted, liquidated or
unliquidated, with respect to the Sellers or any
obligations of the Sellers arising prior to the
Closing.[22]

---

[21]    Sale Order ¶ 46 (reformatted for readability).

[22]    Sale Order ¶ 48 (reformatted for readability).

-10-

*2. Sale Order Injunctive Provisions*

Importantly for this matter, the Sale Order also included injunctive provisions.

The first of them provided, in relevant part:

> Except as expressly permitted or otherwise
> specifically provided by the MPA or this Order,
>
> all persons and entities, including, but not limited to
> . . . litigation claimants . . .
>
> holding . . . claims . . . of any kind or nature
> whatsoever, including rights or claims based on any
> successor or transferee liability, against . . . a Seller
> . . .
>
> arising under or out of, in connection with, or in any
> way relating to, the Sellers, the Purchased Assets,
> the operation of the Purchased Assets prior to the
> Closing, or the 363 Transaction,
>
> are forever barred, estopped, and permanently
> enjoined (with respect to future claims or demands
> based on exposure to asbestos, to the fullest extent
> constitutionally permissible)
>
> from asserting against the Purchaser, its successors
> or assigns, its property, or the Purchased Assets,
> such persons' or entities' . . . claims . . . , including
> rights or claims based on any successor or
> transferee liability.[23]

The second injunctive provision provided, in relevant part:

> Effective upon the Closing and except as may be
> otherwise provided by stipulation filed with or
> announced to the Court with respect to a specific
> matter or an order of the Court,
>
> all persons and entities are forever prohibited and
> enjoined

---

[23]    Sale Order ¶ 8 (reformatted for readability).

-11-

from commencing or continuing in any manner any action or other proceeding, whether in law or equity,

in any judicial, administrative, arbitral, or other proceeding against the Purchaser . . . or the Purchased Assets, with respect to any

> (i) claim against the Debtors other than Assumed Liabilities, or

> (ii) successor or transferee liability of the Purchaser for any of the Debtors, including, without limitation, the following actions:

>> (a) commencing or continuing any action or other proceeding pending or threatened against the Debtors as against the Purchaser, or its successors, assigns, affiliates, or their respective assets, including the Purchased Assets;

>> . . . .

>> (e) commencing or continuing any action, in any manner or place, that does not comply, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof . . . .[24]

### C..  *The Phaneuf Plaintiffs' Claims*

The Phaneuf Plaintiffs' complaint alleges that after the 363 Sale (which it will be recalled took place in July 2009), at various times in the period from November 2009 to September 2010, Phaneuf Plaintiffs:

- Lisa Phaneuf purchased a 2006 Chevy HHR;

- Adam Smith purchased a 2007 Pontiac Solstice; and

---

[24]    Sale Order ¶ 47 (reformatted for readability).

- Catherine and Joseph Cabral purchased a 2007 Chevy Cobalt.[25]

Each was a vehicle manufactured by Old GM.[26]

But the Phaneuf Plaintiffs' Ignition Switch Action was brought against New GM. New GM was sued as alleged "successor in interest" to Old GM,[27] and the Phaneuf Plaintiffs repeatedly rely on alleged conduct of Old GM, in part by referring to the two entities collectively,[28] and in part by specific reference to acts undertaken by Old GM before New GM was created. In seven places in their complaint, the Phaneuf Plaintiffs speak of acts that took place in February 2005;[29] April 2005;[30] June 2005;[31] March

---

[25] *See* Phaneuf Compl. ¶¶ 8, 9, 15, ECF No. 12698-10 ("**Compl.**").

[26] The Phaneuf Plaintiffs' Complaint suggests that others in their group—Mike Garcia, who bought a 2010 Cobalt; Javier Delacruz, who bought a 2009 Cobalt (in September 2009, which conceivably could have been manufactured after the July 2009 363 Sale); Steve Sileo, who bought a 2010 Cobalt; Steven Bucci, who bought a 2009 Cobalt (in November 2009, which, like Delacruz's Cobalt, conceivably could have been manufactured after the July 2009 363 Sale); and David Padilla, who purchased a 2010 Cobalt (*see* Compl. ¶¶ 10–14)—might have purchased vehicles manufactured by New GM, rather than Old GM, and that they thus might have factual circumstances that distinguish them from Phaneuf, Smith, and the Cabrals. But all of the Phaneuf Plaintiffs sue under a common complaint. In the briefing to follow, Garcia, Delacruz, Sileo, Bucci and Padilla, like others, will be free to flesh out the facts with respect to the manufacture of their vehicles, and to point out any factual distinctions that might be warranted.

[27] *See* Compl. at page 1, before the beginning of numbered paragraphs ("Plaintiffs . . . allege the following against Defendant General Motors LLC ('New GM') *successor-in-interest to General Motors Corporation ('Old GM')* (collectively, the 'Company,' or 'GM')") (emphasis added).

[28] The Phaneuf Plaintiffs' effort to treat Old GM and New GM as a single entity is inappropriate, as a matter of bankruptcy law, if not as a matter of other law as well. As if it cures the deficiency, the Phaneuf Plaintiffs continue, in a footnote:

> Any reference to "GM" relating to a date before July 10, 2009 means Old GM. Any reference to "GM" relating to a date after July 10, 2009 means New GM. Any reference to "GM" that does not related to a specific date means Old GM and New GM, collectively.

Compl. n.2. That tactic underscores the Phaneuf Plaintiffs' efforts to muddy the distinctions between the two entities, and to impose liability on New GM based on Old GM's conduct.

[29] *See* Compl. ¶ 26 ("In 2005, for example, GM launched the 'Only GM' advertising campaign. . . . 'Safety and security' were the first two features highlighted in the Company's February 17, 2005 press release describing the campaign.").

[30] *Id.* ¶ 27 ("Similarly, an April 5, 2005 press release about the 'Hot Button marketing program' stated that the 'Value of GM's Brands [Was] Bolstered By GM's Focus On Continuous Safety' and explained that the Hot Button program was 'intended to showcase the range of GM cars,

-13-

2005;[32] November 2005;[33] April 2006;[34] and as early as 2003.[35]  Each of those acts took

place before the formation of New GM, and would have been more candidly described in

the Phaneuf Plaintiffs' complaint if, in each instance, the reference to "GM" were to "Old

GM."  The allegations do not describe actions taken by New GM.

I don't now make any finding as to any respects in which New GM might be

liable for its own post-sale conduct, or whether the Sale Order (or any part of it) should

be invalidated, by reason of due process concerns or any of the other matters that

Designated Counsel will be briefing in the upcoming weeks.[36]  But I do find the Phaneuf

Plaintiffs' efforts to merge pre- and post-sale acts, and to place reliance on the alleged

conduct of Old GM, especially collectively, are much more than sufficient for me to find

that the Phaneuf Plaintiffs place material reliance on Old GM actions that took place

before the Sale Order, and assert claims with respect to vehicles that were manufactured

before the 363 Sale.  Thus I find as a fact, or mixed question of fact and law, that the

---

trucks and SUVs that offer drivers continuous safety-protection before, during and after a
vehicle collision.'") (hyphen in original).

[31]    *Id.* ¶ 28 ("On June 14, 2005, GM issued a press release stating that 'Safety [Was The] No. 1
Concern For Women At The Wheel' . . . .").

[32]    *Id.* ¶ 29 ("In a statement aired on Good Morning America on March 7, 2005, a GM
spokesperson stated that 'the [Chevrolet] Cobalt exceeds all Federal safety standards that
provide – significant real-world safety before, during, and after a crash.'" (alteration and
hyphen in original).

[33]    *Id.* (" In November 2005, GM ran radio advertisements stating that 'One of the best things to
keep you [and your] family safe is to buy a Chevy equipped with OnStar . . . from Cobalt to
Corvette there's a Chevy to fit your budget.'") (alterations in original).

[34]    *Id.* ¶ 41 ("In April 2006, GM attempted to fix the Ignition Defect by replacing the original detent
spring and plunger with a longer detent spring and plunger.").

[35]    *Id.* ¶ 45 ("[I]n 2003, a GM service technician observed the Ignition Defect while he was
driving").

[36]    I likewise don't make a finding now as to the significance of the pre- or post-sale timing of the
design or manufacture of *parts* that might have gone into vehicles that were built pre- or post-sale.
I assume that issues of that character will be addressed by Designated Counsel, New GM, and
others in the briefing in the upcoming weeks, and those parties deserve to be heard before I make
any decisions in that regard.

threshold applicability of the Sale Order—and its injunctive provisions—has easily been established in the first instance, at least for the purposes of the Phaneuf Plaintiffs' claims.[37]

<u>Discussion</u>

In that factual context, I rule that the Phaneuf Plaintiffs' claims will be treated the same as those in the other 87 Ignition Switch Actions. The stay already imposed by the injunctive provisions of Paragraphs 8 and 47 of the Sale Order (and that I may also impose by preliminary injunction) will remain in place insofar as it affects the Phaneuf Plaintiffs' complaint—subject to the right, shared by all of the other plaintiffs in the Ignition Switch Actions, to ask that I revisit the issue after September 1.

*A. Applicability of the Sale Order*

Paragraph 8 of the Sale Order provides, among other things, that all persons and entities "are . . . enjoined . . . from asserting against the Purchaser [New GM] . . . such persons' or entities' . . . claims . . ., including rights or claims based on any successor or transferee liability."

Similarly, Paragraph 47 of the Sale Order provides, among other things, that all persons and entities "are . . . enjoined from commencing or continuing in any manner any action or other proceeding . . . against the Purchaser . . . with respect to any (i) claim against the Debtors other than Assumed Liabilities, or (ii) successor or transferee liability of the Purchaser for any of the Debtors . . . ."

---

[37]    That is not to say, of course, that what the Sale Order says will be the end of the inquiry, either in the Phaneuf Plaintiffs' case or in the case of the other 87 Ignition Switch Actions. By reason of the due process contentions that the other litigants will address, or otherwise, the Sale Order may turn out to have exceptions or self-destruct. But for now it's in place.

-15-

I've found as a fact—based on the Phaneuf Plaintiffs' complaint's express reference to New GM as the "successor in interest" to Old GM,[38] and the facts that at least three of them purchased cars manufactured before the 363 Sale;[39] that their complaint (apparently intentionally) merges pre- and post-sale conduct by Old GM and New GM;[40] and that their complaint places express reliance on at least seven actions by Old GM, before New GM was formed[41]—that at least much of the Phaneuf Plaintiffs' complaint seeks to impose liability on New GM based on Old GM's pre-sale acts. Efforts of that character are expressly forbidden by the two injunctive provisions just quoted.  Though I can't rule out the possibility that a subset of matters the Phaneuf Plaintiffs might ultimately show would not similarly be forbidden, at this point the Sale Order injunctive provisions apply.  And it need hardly be said that I have jurisdiction to interpret and enforce my own orders,[42] just as I've previously done, repeatedly, with respect to the very Sale Order here.[43]

---

[38]    *See* page 13 & n.27 above.

[39]    *See* pages 12–13 & n.25 above.

[40]    *See* page 13 & n.28 above.

[41]    *See* pages 13–14 & nn.29–35 above.

[42]    *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("**Travelers**") ("[A]s the Second Circuit recognized . . . the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); *see also In re Lyondell Chem. Co.*, 445 B.R. 277, 287 (Bankr. S.D.N.Y. 2011) (Gerber, J.) (same).

[43]    *See Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 2012 Bankr. LEXIS 1688, at *17, 20, 31, 50, 2012 WL 1339496, at *6–7, 9, 14 (Bankr. S.D.N.Y. April 17, 2012) (Gerber, J.), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013) (Furman, J.) (interpreting the Sale Order, among other extrinsic evidence bearing on the intent of Old GM and New GM in entering into the Sale Agreement, to aid in determining whether New GM assumed Old GM's settlement with the Castillo Plaintiffs); *Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 2013 Bankr. LEXIS 620, at *4, 11–24, 2013 WL 620281, at *1, 4–8 (Bankr. S.D.N.Y. Feb. 19, 2013) (Gerber, J.) (construing the Sale Order, and then remanding the remainder of a controversy, involving issues unrelated to the Sale Order, to the Eastern District of Michigan); *GM-Deutsch*, discussed at n.17 above.

Other judges in the Southern District of New York, at both the District Court and Bankruptcy Court levels, have recognized this as well.  *See, e.g., In re Grumman Olson Indus., Inc.*, 467 B.R.

-16-

Thus unless and until I rule, after hearing from counsel in the other 87 Ignition Switch Actions, that I should not enforce the Sale Order, in whole or in part (or that with respect to any particular matters, the Sale Order does not apply), the Phaneuf Plaintiffs remain enjoined under it. As the Supreme Court held in *Celotex*,[44] persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.

Then even assuming (though this is debatable) that I could deprive New GM of the benefits of the Sale Order's injunctive provisions in the exercise of my discretion, I am not prepared to do so now. I have 88 Ignition Switch Actions before me—in most of which parties are likely to make similar contentions. Under section 105(d) authority[45]

---

694 (S.D.N.Y. 2012) (Oetken, J.), *aff'g*, 445 B.R. 243, 247–50 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.) ("**Grumman Olson**") (confirming that a bankruptcy judge can interpret the scope and effect of his or her court's prior sale order, post-confirmation, and as between non-debtors (citing *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 228–31 (2d Cir.2002) (holding that Bankruptcy Court could exercise continuing postconfirmation jurisdiction over non-debtor parties, in part because "the dispute . . . was based on rights established in the sale order" and noting that  a "bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders"))); *In re Old Carco LLC*, 505 B.R. 151, 159 & 163 n.17 (Bankr. S.D.N.Y. 2014) (Bernstein, C.J.) ("the Court retains bankruptcy jurisdiction under 28 U.S.C. § 1334 to interpret its prior sale order even when the dispute involves non-debtor third parties"); *see also Moelis Co. LLC v. Wilmington Trust FSB (In re Gen. Growth Props., Inc.)*, 460 B.R. 592, 595 (Bankr. S.D.N.Y. 2011) (Gropper, J.) ("[a] bankruptcy court always has jurisdiction to interpret its own orders.  It does not matter that the State Court Action is purportedly between two non-debtors or the Chapter 11 Cases have been confirmed.") (citation omitted).

[44]    *Celotex Corp. v. Edwards*, 514 U.S. 300, 306–07 (1995).

[45]    Bankruptcy Code section 105(d) provides:

> The court, on its own motion or on the request of a party in interest—

>> (1) shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and

>> (2) unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically . . . .

-17-

given to me by Congress, I established an orderly process, with input from Designated Counsel and counsel for New GM, the Groman Adversary Plaintiffs, the GUC Trust and others by which I can fairly address these issues.  It would be grossly unfair to the plaintiffs in the 87 Ignition Switch Actions who stipulated to stay their cases to give a single litigant group leave to proceed on its own.  My efforts to manage 88 cases, with largely overlapping issues, require that they proceed in a coordinated way.

There is no basis in law or equity, or logic, for the notion that I should except one plaintiff group from the process to which the other 87 litigant groups are bound.  Making an exception for the Phaneuf Plaintiffs would be monumentally bad case management.  During the July 2 Hearing, we had lengthy discussion as to what would make the most sense in managing the issues in this case—which are in many respects difficult ones.  Except for the limited purpose of having concluded that the Phaneuf Plaintiffs' complaint raises contentions forbidden, in the first instance, by the Sale Order, I need to minimize piecemeal rulings now, by me or by any other judge—assuming that he or she would disregard express provisions in the Sale Order giving me exclusive jurisdiction to decide the matters before me now.[46]  Nor should I simply let the Phaneuf Plaintiffs' claims proceed without the scrutiny that all of the other Ignition Switch Action claims will undergo.

I've determined that the Sale Order applies in the first instance.  The procedures established by my earlier orders are necessary to ensure the fair adjudication of the issues before me.  The Phaneuf Plaintiffs have not come close to making a sufficient showing as

---

[46]    *See* Sale Order ¶ 71 ("This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of this Order, the MPA, . . . and each of the agreements executed in connection therewith, . . . including, but not limited to, retaining jurisdiction to . . . (c) resolve any disputes arising under or related to the MPA, except as otherwise provided therein . . . .").

-18-

to why I should make an exception for them—nor for allowing them to proceed ahead of

the other 87 Ignition Switch Actions.

*B. Preliminary Injunction*

Additionally, I determine that even if the Sale Order lacked the injunctive

provisions it has, it would be appropriate to enter a preliminary injunction protecting New

GM from the need now to defend claims that, under the Sale Agreement and Sale Order,

it did not assume, and preventing the piecemeal litigation of the Phaneuf Plaintiffs'

claims ahead of all of the other lawsuits similarly situated.

The standards for entry of a preliminary injunction in the Second Circuit, as set

out in its well-known decision in *Jackson Dairy*[47] and its progeny,[48] are well established.

As stated in *Jackson Dairy*, "the standard in the Second Circuit for injunctive relief

clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success

on the merits or (2) sufficiently serious questions going to the merits to make them a fair

ground for litigation and a balance of hardships tipping decidedly toward the party

requesting the preliminary relief."[49]  Those requirements are easily met here.

*1. Irreparable Harm*

Here, irreparable injury, in terms of the case management concerns and prejudice

to the litigants in the other 87 actions, has been established.  It's foreseeable, if not

obvious, that at least many of the 87 other litigants will present issues that the Phaneuf

Plaintiffs now present.

---

[47]    *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ("***Jackson Dairy***").

[48]    *See, e.g., Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F. 3d 206, 215 (2d Cir. 2012) (applying the *Jackson Dairy* standard, though not citing *Jackson Dairy* directly); *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (citing *Jackson Dairy*); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (same).

[49]    *Jackson Dairy*, 596 F.2d at 72.

And when actions raise overlapping issues, even if they're not wholly congruent, coordinated disposition is essential.[50]  The facts that the Phaneuf Plaintiffs present may not appear in every one of those 88 cases.  But the chances that similar facts will not be present in at least many of them are remote.  I well understand the desires of litigants to get their cases moving as quickly as possible.  But those desires are insufficient to trump the normal case management concerns that I and most other judges have.

Indeed, these concerns underlie why MDL proceedings, like the one before Judge Furman, come into being.  For reasons that would be obvious to most, the MDL Panel determined that Ignition Switch Actions should be handled by a single judge for coordinated or consolidated pretrial proceedings.  Irreparable injury in terms of case management concerns, for each of me and Judge Furman (not to mention prejudice to the litigants in the other 87 actions), would plainly occur if I were to allow the Phaneuf Plaintiffs to proceed before all of the others.

Judge Furman's case management concerns were apparent in his June 24 Order,[51] which, among other things, set up his cases for adjudication in an orderly way,[52] just as I

---

[50]    Exemplifying this is the Phaneuf Plaintiffs' reliance on the Bankruptcy Court and District Court decisions in *Grumman Olson*, see n.43 above, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.), and 467 B.R. 694 (S.D.N.Y. 2012) (Oetken, J.), respectively.  I have no doubt whatever that in the subsequent proceedings before me in connection with the other 87 Ignition Switch Actions, Designated Counsel will place reliance on one or both of those cases, and that New GM will argue, in contrast, that in respects relevant here, those cases are distinguishable or wrongly decided.  (The GUC Trust may also wish to be heard on the *Grumman Olson* cases, though its likely position is less obvious.)  That is exactly why the Phaneuf Plaintiffs' contentions should not be heard on their own, and why I should not be making early judgments on the merits of the issues now—especially before Designated Counsel, New GM, the GUC Trust and any others with differing views have had a chance to be heard.

[51]    *See* n.12 above.

[52]    *See, e.g.*, June 24 Order at Section XI, regulating motion practice (providing that "[a]ny and all pending motions in the transferor courts are denied without prejudice, and will be adjudicated under procedures set forth in this Order and subsequent orders issued by this Court"); *id.* at Section XII, regulating discovery (providing that "[p]ending the development of a fair and efficient schedule, all outstanding discovery proceedings are suspended until further order of this Court, and no further discovery shall be initiated," but further providing that the June 24 Order

-20-

did.  Each of us recognizes the need for coordinated proceedings in a matter of this size and complexity.

>*2. Sufficiently Serious Questions Going to the Merits*

But I don't need to, and should not, make a finding of likelihood of success on the merits.  That would require me to decide too much at this time, to the potential prejudice of the plaintiffs in the other 87 Ignition Switch Actions, New GM, and the GUC Trust.  I need not address likelihood of success because, as I've previously noted, serious questions going to the merits provide an alternate basis for the entry of a preliminary injunction, when coupled with the requisite tipping of hardships.

New GM has easily shown serious issues going to the merits with respect to relief from this Court, though it is premature for me to go beyond such a narrow finding.  It now appears, from the preceding discussion, that at least many of the Phaneuf Plaintiffs' claims were not assumed by New GM.  It's possible that the Phaneuf Plaintiffs or others could eventually establish that a subset of their claims would fall outside of the Sale Order's scope, but New GM has already made at least a prima facie showing that it did not assume a significant portion of the Phaneuf Plaintiffs' claims.  Similarly, while we know that other Ignition Switch Action plaintiffs will want to be heard on whether due process concerns place constraints on New GM's ability to rely on the Sale Order, the starting point is the Sale Order itself.  New GM has shown serious issues going to the merits with respect to the protection it was granted under the express language of that order, which would remain unless and until due process (or other) concerns make some or all of the Sale Order's protections drop out of the picture.

---

would not "preclude any discovery that is agreed or ordered to facilitate matters in the Bankruptcy Court, *provided that* to the extent any discovery is undertaken in the Bankruptcy Court, it shall be coordinated with this Court.") (italics in original).

### 3. Balance of Hardships

Finally, I turn to the balance of hardships.   That too weighs in New GM's favor.

The hardship to New GM if it were forced to litigate against the Phaneuf Plaintiffs on one track, and the other 87 actions, on another, would be significant.  New GM would have to defend largely similar claims in multiple forums, thus exposing it to both unnecessary expense and the possibility of inconsistent results.  And New GM, the non-bankruptcy court and I would all be prejudiced by confusion with respect to which issues could be decided in the non-bankruptcy court, and which would have to be decided here.  There also could be prejudice to the plaintiffs in the other 87 Ignition Switch Actions, who might be affected (presumably not by *res judicata* or collateral estoppel, but still by *stare decisis*) by adverse rulings in the non-bankruptcy court.  And there would be significant prejudice to my case management needs, as the extensively negotiated coordinated mechanism for dealing with 88 separate actions, with coordinated briefing of threshold issues, was cut away.

By contrast, by being treated the same as the plaintiffs in the other 87 actions, the Phaneuf Plaintiffs would not be harmed in any material respect.  Their effort to proceed going it alone rests on the notion that another federal judge—here, Judge Furman—would consider it productive to allow one plaintiff group to move forward in its action while 87 others are stayed, pending the determination in this Court of critical threshold issues that will determine what claims may, and what claims may not, be asserted in light of the Sale Order.  That premise is unrealistic.

Reasons cited by the Multidistrict Panel in sending the Ignition Switch Actions to New York included its recognition that I "already [have] been called upon by both General Motors and certain plaintiffs to determine whether the 2009 General Motors

bankruptcy Sale Order prohibits plaintiffs' ignition switch defect lawsuits."[53]  Proceeding

without regard to the agreed-on mechanisms for determining those issues in this Court

would frustrate the purpose for which the Ignition Switch Actions were sent here.  And

there is little or no basis for the Phaneuf Plaintiffs' assumption (or hope) that Judge

Furman would deprive me of the ability to do my job.

To the contrary, Judge Furman has been highly sensitive to the Bankruptcy

Court's needs and concerns.  His first order provided that while he might appoint lead

and liaison counsel before I ruled, he would be open to consideration as to whether such

appointment should be amended if "the Bankruptcy Court rules that some, but less than

all, of the claims now pending here may be asserted."[54]  He asked counsel appearing

before him to address, among other things, "the extent to which proceedings in this Court

should proceed before rulings by the Bankruptcy Court, on the one hand, or should be

deferred pending such rulings, on the other."[55]  He provided, as I have, for an initial

suspension of discovery, but provided further that his directive would not "preclude any

discovery that is agreed or ordered to facilitate matters in the Bankruptcy Court, *provided

that* to the extent any discovery is undertaken in the Bankruptcy Court, it shall be

coordinated with this Court."[56]  And he expressly provided that matters addressed in his

order could be reconsidered "to the extent necessary or desirable to address any rulings

---

[53]    *JPML Decision*, --- F.Supp.2d at ---, 2014 U.S. Dist. LEXIS 79713, at *4, 2014 WL 2616819, at
*2.

[54]    June 24 Order Section IX.

[55]    *Id.* Section X(B).

[56]    *Id.* Section XII (italics in original).

-23-

by the Bankruptcy Court or any higher court exercising appellate authority over the Bankruptcy Court's decision."[57]

Given the respect evidenced by each of the Multidistrict Panel and Judge Furman of the Bankruptcy Court's responsibility to determine matters pending here, there is no reasonable basis for a conclusion that Judge Furman would want—or allow—the Phaneuf Plaintiffs' action, which has been added to the lengthy list of cases before him, to proceed on its own.

Thus, even if I had not already found that the Sale Order's injunctive provisions already apply, New GM would be entitled to a preliminary injunction in its favor until I've ruled on the Threshold Issues.

<u>Conclusion</u>

For the above reasons, the Phaneuf Plaintiffs' Ignition Switch Action, like the others, will be stayed pending further rulings in the matters before me, or my further order.

This decision is without prejudice to the rights of the plaintiffs in all of the other 87 Ignition Switch Actions, and of any other parties (including, without limitation, New GM and the GUC Trust) who might hereafter want to be heard on issues before me.

New GM is to settle an order in accordance with this ruling.

Dated:  New York, New York          _**s/Robert E. Gerber**_____
          July 30, 2014                          United States Bankruptcy Judge

---

[57]     *Id.* Section XVI.

-24-

1    Darin T. Beffa (SBN 248768)
     Email: darin.beffa@kirkland.com
2    KIRKLAND & ELLIS LLP
     333 South Hope Street, Suite 2900
3    Los Angeles, California 90071
     Telephone: (213) 680-8400
4    Facsimile (213) 680-8500

5    *Attorneys for Defendant*
     *General Motors LLC*

6

7

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        FOR THE COUNTY OF ORANGE

10                     COMPLEX LITIGATION DIVISION

11   | THE PEOPLE OF THE STATE OF | Case No. 30-2014-00731038-CU-BT-CXC |
     | CALIFORNIA, acting by and through | |
12   | Orange County District Attorney Tony | JUDGE KIM G. DUNNING |
     | Rackauckas, | |
13   | | **DEFENDANT'S NOTICE OF FILING** |
     |                        Plaintiff, | **OF REMOVAL** |
14   | | |
     |          vs. | |
15   | | |
     | GENERAL MOTORS LLC, | |
16   | | |
     |                        Defendant. | |
17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLEASE TAKE NOTICE that Defendant General Motors LLC has filed a Notice of Removal of this action to the United States District Court for the Central District of California on August 5, 2014.  This Court may proceed no further in this case unless and until this case is remanded.  *See* 28 U.S.C. § 1446(d).

A true and correct copy of the Notice of Removal is attached to this Notice as Exhibit A.

DATED:  August 6, 2014          Respectfully submitted,

                                KIRKLAND & ELLIS LLP


                                By:_____
                                          Darin T. Beffa

                                Attorneys for Defendant
                                GENERAL MOTORS LLC

2
NOTICE OF FILING OF REMOVAL