Gary Peller
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-9122
peller@law.georgetown.edu
Counsel for Ishmail Sesay and
Joanne Yearwood

HEARING:    October 15, 2014
            9:45 a.m.
            Courtroom 523

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MOTORS LIQUIDATION COMPANY, *et al.*, | : | Case No. 09-50026 (REG) |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------x

---------------------------------------------------------------x

| | | |
|---|---|---|
| ISHMAIL SESAY et al. | : | Case No. 1:14-cv-0618 (JMF) |
| | : | |
| v. | : | |
| | : | |
| GENERAL MOTORS LLC et al. | : | |

---------------------------------------------------------------x

---------------------------------------------------------------x

| | | |
|---|---|---|
| IN RE: | : | Case No. 14-md-2543 (JMF) |
| GENERAL MOTORS LLC IGNITION | : | |
| SWITCH LITIGATION | : | |

---------------------------------------------------------------x

**PLAINTIFFS' AMENDED NO STAY PLEADING, MOTION FOR
ORDER OF DISMISSAL FOR LACK OF SUBJECT MATTER AND PERSONAL
JURISDICTION, OBJECTIONS TO GM'S MOTION TO ENFORCE,
OBJECTIONS TO THE COURT'S ORDERS,
AND FOR RELATED RELIEF**

## Table of Contents

Table of Authorities ................................................................................................. iv

Preliminary Statement............................................................................................... 1

BACKGROUND ........................................................................................................ 3

   **1.**  *The Sale Order and Injunction* ..................................................................... 3

   **2.**  *GM's Motion to Enforce the Sale Order and Injunction*................................. 6

   **3.**  *Claims Asserted in the Sesay Plaintiffs' Complaint* ..................................... 7

   **4.**  *The Court's Scheduling Orders* .................................................................. 11

ARGUMENT ........................................................................................................... 12

**I. THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER EACH OF THE SESAY PLAINTIFFS' CLAIMS AGAINST NON-DEBTOR GM.** ...................................... 12

   **A.**  *GM Bears the Burden of Establishing this Court's Subject Matter Jurisdiction*. ......... 12

   **B.**  *The Sesay Plaintiffs' Claims Do Not "Relate to" Any Proceeding Before the Court.* .. 12

   **C.**  *The Sesay Plaintiffs' Claims Do Not "Relate to" Any of the Liabilities that Were the Subject of the Sale Order and Injunction.*.................................................................. 21

   **D.**  *GM's Shell Game Regarding "Pre-Petition Vehicles and Parts"* ................................ 23

**II.  NON-DEBTOR GM'S MOTION SHOULD BE DENIED BECAUSE APPLICATION OF THE SALE ORDER TO THE *SESAY* PLAINTIFFS WOULD VIOLATE THEIR DUE PROCESS RIGHTS IN THAT NO NOTICE WAS DIRECTED TO THEM AND THEY IN FACT RECEIVED NO EFFECTIVE NOTICE NOR ANY REASONABLE OPPORTUNITY TO BE HEARD WITH RESPECT TO THE ENTRY OF THE SALE ORDER AND INJUNCTION, NOR ANY NOTICE PRIOR TO THESE PROCEEDINGS THAT THE SALE ORDER AND INJUNCTION WAS ADDRESSED TO THEM OR TO ANY OF THE CLAIMS THEY ASSERT AGAINST NON-DEBTOR GM.**......................... 29

**III.  NON-DEBTOR GM'S MOTION DOES NOT ADDRESS, MUCH LESS CARRY, ITS BURDEN OF ESTABLISHING ANY OF THE REQUISITE GROUNDS FOR THE TEMPORARY, PRELIMINARY, OR PERMANENT RELIEF SOUGHT AGAINST THE *SESAY* LAWSUIT.** ....................................................................................... 33

**IV. THE SESAY PLAINTIFFS OBJECT TO THE APPLICATION OF THE COURT'S SCHEDULING BECAUSE THE SESAY PLAINTIFFS HAD NO NOTICE NOR ANY OPPORTUNITY TO BE HEARD BEFORE THOSE ORDERS WERE ENTERED TO THEIR PREJUDICE**………………………………………………………...…34

**IV.  THE *SESAY* PLAINTIFFS OBJECT TO THE COURT'S SCHEDULING ORDERS BECAUSE THEY IMPOSE BURDENS ON THE *SESAY* PLAINTIFFS THAT**

**CONSTITUTE INDEPENDENT VIOLATIONS OF THE *SESAY* PLAINTIFFS' RIGHT TO A REASONABLE OPPORTUNITY TO BE HEARD BEFORE THEY ARE DEPRIVED OF THEIR CONSTITUTIONALLY BASED INTERESTS IN PURSUING THEIR LAWSUITS IN A TIMELY FASHION.** ....................................................................... **36**

**A.**   *The imposition of a three-day deadline for the submission of "no stay pleadings" requiring presentation of complex legal contentions does not afford a reasonable opportunity to be heard.* ............................................................................. **36**

**B.**   *Under the terms of the Scheduling Order, Plaintiffs bear the burden of persuading the Court that Non-Debtor GM is not entitled to a stay of their lawsuits against it.* ......... **37**

**C.**   *The Scheduling Orders reflect a de facto consolidation that is not provided for in the procedural rules that govern this proceeding and that has been effected without ensuring the procedural safeguards that lawfully consolidated proceedings that are provided for in other fora would entail…………...* ……………………………………... **37**

**V.  THE COURT SHOULD ABSTAIN FROM EXERCISING ANY JURISDICTION IT MAY CONCLUDE IT HAS OVER THIS MATTER.** ........................................................... **39**

**CONCLUSION**…………………………………………………………………...……..**40**

## Table of Authorities

### Cases

*Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) ........................................................... 32

*Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863) ..................................................... 32

*Bank of La. v. Craig's Stores of Tex., Inc.* .................................................................. 15

*Binder v. Price Waterhouse & Co., LLP* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 161 (3rd Cir. 2004) ................................................................................................................ 14

*Coffin v. Malvern Fed. Sav. Bank*, 90 F.3d 851, 854 (3d Cir.1996) ............................. 14

*Compak Cos. LLC v. Johnson*, 415 B.R. 334, 340 n.8 (N.D. Ill. 2009); ...................... 30

*Diagnostic Int'l, Inc. v. Aerobic Life Prods. Co.* (*In re Diagnostic Int'l, Inc.*), 257 B.R. 511, 514 (Bankr. D. Ariz. 2000) ................................................................................... 14

*Doolittle v. Cnty. of Santa Cruz* (*In re Metzger*), 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006) ... 31

*Geruschat v. Ernst Young LLP* (*In re Seven Fields Dev. Corp.*), 505 F.2d 237 (3d Cir. 2007). ... 39

*Geruschat v. Ernst Young LP* (*In re Seven Fields Dev Corp.*), 505 F.3d 237 (2007). ................. 19

*Gray v. Polar Molecular Corp.* (*In re Polar Molecular Corp.*), 195 B.R. 548, 555 (Bankr. D.Mass. 1996) ........................................................................................................... 16

*Guttman v. Martin* (*In re Railworks Corp.*), 325 B.R. 709, 722-23 (Bankr. D. Md. 2005) ......... 14

*Harstad v. First Am. Bank*, 39 F.3d 898, 902 n.7 (8th Cir. 1994) ................................ 14

*Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143, 155 (E.D.N.Y. 2012) ....... 30

*In re Continental Airlines, Inc.*, 236 B.R. 318, 323 (Bankr.D.Del.1999).................... 14

*In re Cuyahoga Equip. Corp.*, 980 F.2d 110 (2d Cir. 1992)......................................... 18

*In re Dreir*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010) ...................................................... 18

*In re Fairchild Aircraft Corp.*, 184 B.R. 910 (Bankr. W.D. Tex. 1995) ...................... 13

*In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) ............................ 5

*In re Grumman*, 445 B.R. 243, 255 (Bankr. S.D.N.Y. 2011) ....................................... 19

In re Johns Manville Corp., 517 F.3d 52, 66 (2d Cir. 2008)........................................... 28

*In re Kubly, 818 F.2d 643* (7th Cir. 1987) ................................................................... 19

*In re Metro-Goldwyn-Mayer Studios Inc.,* 459 B.R. 550 (Bankr. S.D.N.Y. 2011) ...................... 16

*In re Old Carco LLC*, 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) ............................... 18

*In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012) .......................................... 13, 18

*In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995) ............................................................. 19

*Ins. Corp. v. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). 14

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (1979).......................... 33

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-71 (1951) .................... 32

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 .................................................... 12

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).......................................................... 32

*Matter of Mooney Aircraft, Inc.*, 730 F.2d 367, 374-75 (5th Cir. 1984) ...................... 13

*Metal Founds. Acquisition, LLC v. Reinert* (*In re Reinert*), 467 B.R. 830, 832 (Bankr. W.D. Pa. 2012) ........................................................................................................................ 31

*Morgan Olson L.L.C. v. Frederico* (*In re Grumman Olson Indus., Inc.*), 467 B.R. 694, 708 (S.D.N.Y. 2012) ....................................................................................................... 30

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)...................... 32, 34

*n re Kalikow*, 602 F.3d 82, 92 (2d Cir. 2010).............................................................. 2

*NVF Co. v. New Castle County*, 276 B.R. 340, 348 (D.Del.2002).............................. 16

*Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) .......................................... 18

*Pension Benefit Guar. Corp.* ("*PBGC*") *v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009) ........ 31

*Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994) .................................. 33

*Shenango Group*, 501 F.3d 338 at 344 n.1 (3rd Cir. 2007) ........................................................ 14

*Trusky v. Gen. Motors Co. (In re Motors Liquidation Co.),* 2013 Bankr. LEXIS 620 at *33, 3013 WL 620281, at *11 (Bank. S.D.N.Y. Feb. 19, 2013) ............................................................... 14

*U.S. Brass Corp.*, 301 F.3d at 303 (5th Cir. 2002) .................................................................... 14

*United States Trustee v. Gryphon at the Stone Mansion*, 216 B.R. 764, 769 (W.D.Pa.1997)...... 14

*Valley Historic Ltd. Partnership*, 486 F.3d at 831, 837 (4th Cir. 2007)...................................... 14

*Vanguard Prods. Corp. v. Citrin (In re Indicon),* 499 B.R. 395 (D. Conn. 2013) ...................... 16

*Washington Mutl, Inc. v. XL Specialty Ins. Co. (In re Washington Mut., Inc.),* 2012 Bankr. LEXIS 4673, *14-*15 (Bank. Del 2012)................................................................................ 16

*Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994)................................... 13, 14

**Statutes**

18 U.S.C. § 1962................................................................................................................................ 9

28 U.S.C. § 1334.............................................................................................................................. 13

U.S. Const. art. III............................................................................................................................ 12

## Preliminary Statement[1]

Ishmail Sesay and Joanne Yearwood (collectively "**the *Sesay* Plaintiffs**" or "**Plaintiffs**")

are entitled to pursue without delay their lawsuit[2] against General Motors LLC ("**Non-Debtor

GM**").[3] They seek redress for *Non-Debtor GM's* wrongdoing, for which *it* is entirely and

independently responsible, and for which General Motors Corporation ("**Debtor GM**") was

never liable and never could have been liable, because each wrongful act and omission alleged

by the *Sesay* Plaintiffs occurred after that entity ceased operations. Plaintiffs' claims are based on

*Non-Debtor GM's misconduct* occurring exclusively and explicitly from the period October 19,

2009, to the present, misconduct which had not yet occurred when Debtor GM sold Non-Debtor

GM its assets on July 10, 2009. Non-Debtor GM seeks the equitable protection of this Court, not

against *creditors* of Debtor GM trying to collaterally attack the Sale Order, but rather to shield

itself from the *victims* of *its* continuing wrongdoing. It is not entitled to such protection.

Non-Debtor GM's Motion to Enforce the Sale Order against the *Sesay* Plaintiffs should

be denied. Non-Debtor GM wronged the Plaintiffs, they allege, and that wrong has nothing to do

with any other wrongs that General Motors Corporation ("**Debtor GM**") might *also* have

committed against them. *No Court has the power to immunize future wrongdoing*, and yet that

---

[1] Plaintiffs submit this pleading to avoid failing to comply with the Court's Scheduling Order with which they have been served by electronic mail. Plaintiffs contend that GM has not properly initiated any action against them because it has failed to serve either a complaint to initiate an adversary proceeding, FRBP 7001, or a motion to initiate a contested matter, FRBP 9014(b). Non-Debtor GM concedes that it has not served its motion on the *Sesay* Plaintiffs. Plaintiffs *do not consent* to this way of proceeding, and do not intend to waive any rights with respect to the lack of proper service on them. They submit these papers to protect their rights and to protect themselves against charges that they have engaged in contemptible conduct.

[2] *Sesay et al. v. General Motors LLC*, 1:14-cv-0618 (JMF); 1:14-md-02543 (JMF) ("**the *Sesay* lawsuit**").
[3] Because Plaintiffs believe that the nomenclature purporting to distinguish between a "New GM" and an "Old GM" serves Non-Debtor GM's illegitimate public relations goals to misrepresent Non-Debtor GM to consumers, investors, governmental officials, and the public as if it had instituted changes in its practices and policies with respect to risk and safety when it has not, Plaintiffs respectfully prefer not to adopt that usage.

would be the consequence of adopting Non-Debtor GM's interpretation of the Sale Order to

reach the *Sesay* Plaintiffs' claims. Moreover,

1)   GM has never served the *Sesay* Plaintiffs with any papers formally required to initiate a proceeding or matter in this Court, and to establish personal jurisdiction over them;[4]

2)   This Court lacks subject matter jurisdiction over the *Sesay* Plaintiffs' claims, because their claims do not "relate to" any matter properly before the Court;

3)   Non-Debtor GM's Motion to Enforce[5] should be denied because, on its face, the Sale Order does not purport to reach the claims that the *Sesay* Plaintiffs assert;

5)   Non-Debtor GM's Motion should be denied because it does not establish any of the requisite grounds for preliminary, or permanent relief sought against the *Sesay* lawsuit;

6)   Non-Debtor GM's Motion should be denied because application of the Sale Order to the *Sesay* Plaintiffs would violate their due process rights in that no notice was directed to them and they in fact received no effective notice nor any reasonable opportunity to be heard with respect to its entry, nor any notice prior to these proceedings that the Sale Order and Injunction was addressed to them or to the claims they assert against Non-Debtor GM;[6]

7)   The *Sesay* Plaintiffs object to the Court's Scheduling Orders to the extent they have been and will be applied in proceedings between Non-Debtor GM and themselves because the *Sesay* Plaintiffs had no notice nor any opportunity to be heard before those Orders were entered, and Plaintiffs in distinct controversies to which the *Sesay* Plaintiffs are not

---

[4] Plaintiffs were served with "Sixth Supplements" to Schedules 1 and 2 of Non-Debtor GM's Motion to Enforce, as well as this Court's Scheduling Orders, but no complaint with which Non-Debtor might initiate an adversary proceeding, nor any motion to initiate a contested matter that the appropriate procedure in these circumstances. Establishing proper service is also integral to determining whether the Court has personal jurisdiction over the defaulting defendant. *See In re Kalikow*, 602 F.3d 82, 92 (2d Cir. 2010) ("Before a federal court may exercise personal jurisdiction over a [party], the procedural requirement of service . . . must be satisfied." (*quoting Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006).

[5] Since the *Sesay* Plaintiffs believe that proper service of the Motion has not been effected, they do not believe any motion pertaining to them is before the Court, or that this Court has personal jurisdiction over them with respect to New GM's Motion to Enforce the Court's July 2009 Sale Order and Injunctions, *In re Motors Liquidation*, 1:09-bk-50026, Doc. No. 12620, April 21, 2014) ("**Motion to Enforce**"). They reserve all rights and waive none by the submission of these objections and requests for relief.

[6] This is *not* a contention that the *Sesay* Plaintiffs were entitled to notice of the Bankruptcy proceedings more generally. To the contrary, *they were not creditors* of Debtor GM with respect to the claims they now assert against Non-Debtor GM and thus do not claim, as other Plaintiffs in other controversies may, that successor liability or other derivative claims could not be barred because they failed to receive the requisite notice. The *Sesay* Plaintiffs assert no such claims. Their contention regarding lack of notice rests the ground--independent of the notice that Bankruptcy law may require before the claims of known and unknown creditors can be barred--that basic due process requirements prevent them from being enjoined by an Order of which they received no notice, constructive or otherwise, nor about which they were accorded no reasonable opportunity to be heard, nor of which they were notified prior to their receipt of "Sixth Supplement" papers and subsequent investigation into their genesis.

parties or in privity with any parties did not represent the *Sesay* Plaintiffs' interests, nor did such "Designated Counsel" or other Plaintiffs' counsel purport to speak for the *Sesay* Plaintiffs;

8)  The *Sesay* Plaintiffs object to the Court's Scheduling Orders because they impose burdens on the *Sesay* Plaintiffs that constitute independent violations of the *Sesay* Plaintiffs' right to a reasonable opportunity to be heard before they are deprived of their constitutionally based interests in pursuing their lawsuits in a timely fashion, namely:

   a)  the imposition of a three day deadline for the submission of "no stay pleadings" requiring presentation of complex legal contentions;

   b)  the shifting of the burden of proof to demonstrate jurisdiction and entitlement to preliminary and permanent relief from Non-Debtor GM, which invoked this Court's jurisdiction and seeks such extraordinary equitable relief, to Plaintiffs;

   c)  the *de facto* treatment of distinct purported contested matters and an adversary proceeding as a single proceeding; and

   d)  the associated restriction of the *Sesay* Plaintiffs' rights to notice and an opportunity to be heard manifest in the designation of counsel representing "certain" Plaintiffs in distinct controversies as "Designated Counsel" entitled to notices, opportunities to be heard in matters in which it lacks interest, influence over the sequence by which the Court considers the various issues before it, and various courtesies that the *Sesay* Plantiffs are denied by virtue of their lack of that or similar designation; and

9)  Non-Debtor GM's Motion should be denied or deferred in the interests of comity and of avoiding a jurisdictional conflict with another federal court. This Court should decline to exercise jurisdiction it may believe it has over the *Sesay* lawsuit because the federal Court before which the *Sesay* lawsuit is pending has indicated that that Plaintiffs may commence prosecuting their claims before that Court despite any stay stipulation they many have entered or this Court may have purported to impose.

## BACKGROUND

*1.  The Sale Order and Injunction*

On June 1, 2009 ("**the petition date**"), Debtor GM and certain of its affiliates filed

voluntary petitions for relief.  Debtor GM presented a "pre-packaged" transaction in which it

sought to move on an expedited basis through the bankruptcy process. Debtor GM emphasized

that it required that the Bankruptcy Court suspend the notice requirements that would otherwise

apply and approve the sale on an unusually expedited basis.[7] Debtor GM did not provide notice

of the Sale Procedures Motion to the Plaintiffs.[8] Notice of the application for the Sale Order and

injunction were mailed to various identified creditors.[9] Unknown creditors were to be given

publication notice in select newspapers which appear to have been selected to reach the financial

community but not Plaintiffs and putative class members in the mid-Atlantic region.[10] The

parties' discussion of the notice issues centered on notice to investors and others who might have

then had claims against Debtor GM. The form of the notice itself was not designed to be

comprehensible, or even noticeable, to a reasonable consumer, even if they happened upon it.

Anyone who failed to file a timely objection on the expedited Schedule[11] would purportedly be

barred from asserting

> "at the Sale Hearing *or thereafter*...any objection to the Motion, to the
> consummation and performance of the 363 Transaction contemplated by the MPA
> or a Participation Agreement, if any (including the transfer free and clear of all
> liens, claims, encumbrances, and interests, including rights or claims based on any
> successor or transferee liability, of each of the Purchased Assets transferred as
> part of the 363 Transaction)…"

---

[7] In its motion, Debtor GM stated
> The gravity of the circumstances cannot be overstated. The need for speed in approving and
> consummating the 363 Transaction is crucial. The business and assets to be transferred are
> extremely sensitive and will be subject to major value erosion unless they are quickly sold and
> transferred to New GM. Any delay will result in significant irretrievable revenue perishability to
> the detriment of all interests and will exacerbate consumer resistance to readily accept General
> Motors products. *Expeditiously restoring and maintaining consumer confidence* is a prerequisite
> to the successful transformation and future success of New GM. … The expedited approval and
> execution of the 363 Transaction is the foundation of the U.S. Government's objective 'to create
> the GM of the future…'

Sale Procedure Motion, ¶¶ 28, 29.

[8] *See* Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006 (I) Approving
Procedures For Sale Of Debtors' Assets Pursuant to Master Sale and Purchase Agreement with Vehicle Acquisition
Holdings Llc, a U.S. Treasury-Sponsored Purchaser; (II) Scheduling Bid Deadline and Sale Hearing Date; (Iii)
Establishing Assumption and Assignment Procedures; and (Iv) Fixing Notice Procedures And Approving Form Of
Notice ("**the Sale Procedures Order**"), Doc. No. 274, at 2.

[9] Sale Procedures Order, ¶ 9(a)-(d).

[10] Sale Procedures Order ¶9(e).

[11] Sale Procedures Order ¶5.

Sale Procedures Order, ¶12 (*emphasis added*).  Following the hearing, on July 5, 2009,

the Court entered the Sale Order and Injunction, Doc. No. 2968, that is the subject of

Non-Debtor GM's motion to enforce. The Sale closed on July 10, 2009.[12]

Pursuant to the Sale Order, Non-Debtor GM acquired substantially all of Debtor GM's

assets but did not assume all of Debtor GM's liabilities. The MSPA and the Sale Order contain

specific provisions determining which of *the liabilities of Debtor GM* that Non-Debtor GM

would assume and which of those that Debtor GM would retain. There was some mention of

"future claims" of those exposed to asbestos before the Sale Order who might develop injuries

afterward,[13] a cause of action that could not accrue until the injury manifest but arguably a

liability originally incurred by Debtor GM if it was liable for the exposure that caused symptoms

years later. But the Sale Order did not address future claims that might be asserted against Non-

Debtor GM based on *its own conduct* after the sale, and based on breaches of duties it owed

Plaintiffs independent of duties it assumed that were originally owed by Debtor GM.

The Sale Order purports to bar claims against Non-Debtor GM "based on any successor

or transferee liability." *See* Sale Order ¶¶ 10, 46, 48. Likewise, Non-Debtor GM would have no

liability for any claim arising "prior to the Closing Date," related to production "prior to the

Closing Date," that could have been asserted against Debtor GM "prior to the Closing Date." *See*

Sale Order ¶ 46. The Sale order additionally enjoins the pursuit of any claim asserting "successor

---

[12] *See* Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition holdings LLC; (2) Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement available at *In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (the "**Sale Decision**") Doc. No. 2967.

[13] This Court recognized at the time the Sale Order was entered that it would be "constitutionally suspect" to bar the claims of those on whom "the notice given . . . was not fully effective, since without knowledge of an ailment that had not yet manifested itself, any recipient would be in no position to file a present claim." *In re GM Corp.*, 407 B.R. at 505-07; *see also* Doc. No. 12727 at 9.

or transferee liability" against Non-Debtor GM unless the claim is otherwise assumed. *See* Sale

Order ¶ 8, 47.

    *2. GM's Motion to Enforce the Sale Order and Injunction*

    On April 21, 2014, GM moved this Court to enforce its July 5, 2009, Sale Order by

restraining various parties from suing Non-Debtor GM for claims related to "ignition switch

defects" insofar as such claims were based on liability that Debtor GM retained under the Sale

Order. It an order

> directing Plaintiffs to (a) cease and desist from further prosecuting against New
> GM claims that are barred by the Sale Order and Injunction, (b) dismiss with
> prejudice those void claims because they were brought by the Plaintiffs in
> violation of the Sale Order and Injunction, and (c) show cause whether they have
> any claims against New GM not otherwise already barred by the Sale Order and
> Injunction. [14]

    GM's Motion is *exclusively* concerned with establishing whether and which liabilities of

the Debtor GM it did or did not assume. Under the Sale Order, it argues, "New GM would be

insulated from lawsuits by Old GM's creditors based on Old GM liabilities [New GM] did not

assume. The MSPA and Sale Order and Injunction were expressly intended to provide such

protections." *Id*. at ¶6. Non-Debtor GM contends that it did not assume potential product

liability, breach of warranty, negligence, successor liability, or other liabilities that the Debtor

GM might have had with respect to vehicles sold before the asset sale to Non-Debtor GM.[15]

Non-Debtor GM claims that the "Ignition Switch Actions represent a collateral attack on this

Court's Sale Order and Injunction." *Id*. ¶1.

---

[14] Motion to Enforce, p.5.
[15] Id. at ¶11 (quoting Master Sale and Purchase Agreement (*Motors*, Doc. No. 2968, July 05, 2009)) (hereafter MSPA).

3. *Claims Asserted in the Sesay Plaintiffs' First Amended Complaint*

Starting in February 2014, and in piecemeal fashion since, Non-Debtor GM has admitted that Non-Debtor GM employees and lawyers knew about safety-related defects in millions of vehicles, including the vehicle models owned by Plaintiffs, and that Non-Debtor GM did not disclose those defects as it was required to do by law. GM'S CEO, Mary Barra attributed Non-Debtor GM's "failure to disclose critical pieces of information," in her words, to Non-Debtor GM's policies and practices that mandated and rewarded the unreasonable elevation of cost concerns over safety risks.

On August 1, 2014, Ishmail Sesay and Joanne Yearwood filed the *Sesay* lawsuit in the Southern District of New York, alleging *inter alia* that Non-Debtor GM breached independent, non-derivative, non-successor, non-transferee duties that Non-Debtor GM owed to them and putative class members to disclose the dangers that use of their GM cars entailed--material information that Non-Debtor GM knew but Plaintiffs had no way of knowing--and that these breaches caused them legally cognizable injuries (hereafter "**Non-Sale Order Claims**"). The *Sesay* Plaintiffs alleged several claims under the law of Maryland, the law of the several states, the law of select states, and under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. They seek to represent a nationwide class and several subclasses of consumers from identified states. They amended their Complaint an August 28, 2014, *Sesay et al v. General Motors LLC et al*, 14-cv-6018, Doc. No. 14 ("**First Amended Complaint**").

Ms. Yearwood bought her 2010 Cobalt in December 2009.  The only basis that Non-Debtor GM has offered to connect her claims to the Sale Order--which does not purport to protect Non-Debtor GM from its own liability for cars it sold through dealers *after the asset sale*--is the speculation that her post-petition car may contain parts from Debtor GM that may have

been put in her vehicle in the event (never alleged) that she had sought to have the car repaired,

and in the further event (never alleged) that the repair proceeded by obtaining after market parts,

and in the further event (never alleged) that the after market parts that such repair entailed

installing in her car happened to be parts that were originally distributed by Debtor GM, and in

the further event that Non-Debtor GM can find anything in the Sale Order and Injunction that

could have given anyone reasonable notice that such decree was ever intended to enjoin with

such a wide swath on such a flimsy basis.[16]

     Mr. Sesay, the owner of a pre-petition vehicle, asserts no claim whatsoever in connection

with his purchase, whether sounding in warranty, strict product liability, fraud, consumer

protection, negligence, or any other claim typically asserted by consumers against manufacturers

of allegedly defective or unsafe vehicles.  He asserts no claim even arguably addressed in this

Court's 2009 Sale Order.

     The gravamen of each claim the *Sesay* Plaintiffs *do* assert is that, since October 19, 2009,

Non-Debtor knew but failed to disclose and actively concealed that their cars, and those of

millions of others, are unsafe to drive. The Complaint alleges five causes of action. Each of these

causes of action alleges liability only for the acts or omissions of Non-Debtor GM and other

defendants committed after October 19, 2009. In their pleading, Plaintiffs explicitly disavow any

---

[16] This theory is nowhere set forth in New GM's papers. It was provided in response to the Court's query as to the basis for seeking to enforce the Sale Order and Injunction against post-353 Sale purchasers at a May 2, 2014, hearing this Court held, months before the *Sesay* suit was filed, with respect to GM's attempt to enforce the Sale Order against other lawsuits:

> What happened was someone with a new car, which had a good ignition switch, would go in to have their car repaired and there was a possibility that the person who repaired that car, which may have been a GM dealer or may have been someone totally different, they may have actually put in an old ignition switch part. They may have taken a good part out and put a bad part in. And since New GM didn't know whether -- whether that -- which cars that occurred to it announced the recall for some post-sale cars. But the cars that would ever be impacted by this is a very,very small element, but New GM is repairing all of those ignition switches.

May 2, 2014, Hearing Tr. 34-35.

claims based on Non-Debtor GM's potential liability under successor, transferee, or derivative

theories of liability.[17] The Class Periods for each of the proposed Classes and Subclasses for

which the *Sesay* Plaintiffs seek certification do not begin until October 19, 2009. First Amended

Complaint ¶¶ 40-42.

    *The RICO Claim*: Count I is for violation of the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1962 *et seq*. This count alleges wrongful behavior that has

occurred only after Non-Debtor GM purchased Debtor GM's assets.  ¶¶ 58-63. It alleges no acts

or omissions occurring before October 19, 2009, nor asserts any duties whose origin could

possibly have been in the Retained liabilities of Debtor GM under the Sale Order. This Count

does not allege and has no connection with any similar racketeering enterprise that the Debtor

GM may have engaged in, and that *other* Plaintiffs in other contested matters might have alleged.

    *The common law fraud claim*: The common-law fraud count alleges that when Non-

Debtor GM learned about the safety defects in its vehicles on or after October 19, 2009, it came

under a duty to disclose that material information to Plaintiffs and others, and Non-Debtor GM

breached that duty, causing legally cognizable harm to Plaintiffs and others, by concealing the

dangerousness of the vehicles, information material to the determinations of Plaintiffs and others

whether their vehicles were safe to drive, and that this conduct caused both economic harm and

---

[17] Complaint, ¶ 34:

    General Motors LLC is a limited liability corporation. On July 10, 2009, it began conducting the
business of designing, manufacturing, constructing, assembling, marketing, warranting,
distributing, selling, leasing, and servicing automobiles, including the vehicles of class members,
and other motor vehicles and motor vehicle components throughout the United States. Plaintiffs'
claims and allegations against GM refer solely to this entity. In this First Amended Complaint,
Plaintiffs are not making any claim against General Motors Corporation ("Defunct GM")
whatsoever, and Plaintiffs are not making any claim against GM based on its having purchased
assets from Defunct GM or based on its having continued the business or succeeded Defunct GM.
Plaintiffs disavow any claim based on the design or sale of vehicles by defunct GM, or based on
any retained liability of Defunct GM. Plaintiffs seek relief from GM solely for claims that have
arisen after October 19, 2009, and solely based on actions and omissions of GM, the Non-Debtor
entity that began operations on July 10, 2009

exposure to increased risk of death or injury. The fraud allegations are explicitly limited to actions by the Non-Debtor GM and others after Non-Debtor GM's purchase of the assets in October 2009, to wit, the concealment of the defects.   ¶¶ 65-67.

*The negligent infliction of economic loss and increased risk claim*: Count III alleges that, upon acquiring knowledge of the imminent personal injury risks that GM cars posed after October 19, 2009, and knowing that Plaintiffs and others had no reasonable way of learning the risks unless GM disclosed the risks to them, Non-Debtor GM came under a duty to disclose those risks to the Plaintiffs and to others, and Non-Debtor GM acted unreasonably and in breach of this duty when it actively concealed rather than disclosed the information, causing economic loss and increased risks of death and serious physical injury to the Plaintiffs and others. The claim is asserted on behalf of residents of the group of states where courts have recently recognized duties not to act negligently to violate these interests. ¶¶ 69-76.

*The Maryland Consumer Protection Act claim*: Count IV alleges that Non-Debtor GM violated the Maryland's Consumer Protection Act ("**MDCPA**"), Md. Code, Comm. Law § 13-101 *et seq*., by failing to disclose critical safety defects to the public. Just like the previous counts, the MDCPA count complains only of the acts of Non-Debtor GM and Delphi, occurring after the inception of the Non-Debtor GM.   ¶¶ 77-84.

*Joint liability, aiding and abetting and civil conspiracy claims*: Count V is an omnibus joint and several liability count, asserting claims for civil conspiracy, aiding and abetting, and joint action. It asserts that Defendant Delphi and Defendant Non-Debtor GM, as well as the accountants, lawyers and engineers who participated in the illegal conduct, are jointly liable for each other's acts because they acted jointly to cause Plaintiffs and others harm, or under a theory of civil conspiracy, or because they aided and abetted each other in wrongful conduct. Count V

does not purport to hold Non-Debtor GM liable for conduct of the Debtor GM, nor does it allege

any acts that may have occurred prior to October 19, 2009.  ¶¶ 85-94.

    4.    *The Court's Scheduling Orders*

On August 7, 2014, after the *Sesay* lawsuit was assigned to Judge Furman, Non-Debtor

GM listed the action among three others on its Sixth Supplement to Schedule "1" to the Motion

to Enforce. It also listed the *Sesay* lawsuit on Non-Debtor GM's accompanying Sixth

Supplement to Schedule "2" of the Motion to Enforce. That Sixth Supplement to Schedule 2

identified the year, make and model of the vehicles owned by the *Sesay* Plaintiffs, offered a few

select quotations from the *Sesay* Complaint, and characterized the Plaintiffs' claims. Doc. No.

12819.

The same day, Non-Debtor GM then delivered by electronic mail to counsel files

containing the Court's May 16, July 8, and July 11, 2014, Scheduling Orders, the Sixth

Supplements described above, and a document purporting already to contain the signature of

counsel for the *Sesay* Plaintiffs labeled "Sesay Stay Stipulation Staying Action SD NY."

The Scheduling Orders that Non-Debtor GM sent to counsel were considered and entered

before the *Sesay* plaintiffs had filed their lawsuit and before they were part of any proceeding

before the Court. They had no notice of them nor were they accorded an opportunity to be heard

before they were deemed subject to them.[18]

---

[18] The May 16 Order provides *inter alia* that Plaintiffs:

        enter into voluntary stipulations with New GM … staying all proceedings in their Ignition Switch
        Action against New GM …other than the JPMLproceedings set forth in paragraph 4 above and, if
        the Transferee Court so chooses, proceedings in the Transferee Court for the appointment of
        plaintiff and defendant liaison counsel and the formation of a plaintiffs' steering committee or
        other committee of plaintiffs' counsel. The Order is without prejudice to the rights of any party to
        request that this Court stay the Plaintiff(s) from further proceedings before the Transferee Court or
        for any party to oppose such relief.

The Court noted "the issue whether Plaintiffs may file a consolidated complaint in the transferee court shall
be addressed at the July Conference."

## ARGUMENT

## I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER EACH OF THE SESAY PLAINTIFFS' CLAIMS AGAINST NON-DEBTOR GM.[19]

*A.    GM Bears the Burden of Establishing this Court's Subject Matter Jurisdiction.*

Federal courts are courts of limited jurisdiction. See U.S. Const. art. III, § 2, cl. 1; *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). The "burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.*

*B.  The Sesay Plaintiffs' Claims Do Not "Relate to" Any Proceeding Before the Court.*

---

The July 11, 2014 Order restricts counsel who may be heard in relation to the disposition of the threshold issues as "Designated Counsel and counsel for New GM, the Groman Plaintiffs, the GUC Trust and the Unitholders are collectively referred to herein as 'Counsel for the Identified Parties.'" While the May 16 Scheduling Order provided for counsel for other plaintiffs to be heard at the July 2, 2014 hearing, the July 11, 2014 Scheduling Order restricted participation in the proceedings to these "counsel for the identified parties." On July 8, 2014, the Court granted GM's Motion to Establish Procedures for Newly Filed Ignition Switch Actions, which similarly required Plaintiffs in actions GM identified either to enter a stay stipulation or file a no stay pleading, but reduced the time period for posing any objection to a stay to three days. It provided that

> If a plaintiff in any such Ignition Switch Action fails to either enter into a Stay Stipulation with New GM or file a No Stay Pleading with the Court within three (3) business days of receipt of a Stay Stipulation and Scheduling Order, the terms of the Stay Stipulation shall automatically be binding on such plaintiff.

The stay stipulation restricts plaintiffs who agree to it significantly, even with respect to their representation of Plaintiffs before the Article III Court with supervisory power over this one. The agreement represents that the Stipulation terminates when, and only to the extent that, the Bankruptcy Court grants relief from the stay of this Action as agreed to by this Stipulation…" It provides that if a "plaintiff in a different ignition switch action" prevails in a no stay plea, the signatory reserves the right to request the same relief if the same factual and legal predicates are present. It also purports to bind the signatory to the stay through the issuance of the equivalent of a final judgment disposing of all the controversies between GM and various groups of plaintiffs in other matters. After September 1, 2014, signatories may request relief from the Bankruptcy Court, but only "for cause shown." Finally, the agreement requires the signatory to agree to the false recitation that GM's counsel and Plaintiffs' counsel "have jointly negotiated and prepared this Stipulation and are fully satisfied with its terms." It is a uniform agreement whose form has been adopted by the Court, as far as Plaintiffs are aware, and thus not subject to negotiation over its terms.

[19] The Court has shown concern for the views of other Plaintiffs not parties to the controversy between Non-Debtor GM and the particular group of Plaintiffs prosecuting a lawsuit that GM wants to bar. See August 5 Tr. at 70.  To the extent that the Court finds it relevant, all Plaintiffs appear to agree that this Court lacks subject matter jurisdiction over the kinds of claims that the *Sesay* Plaintiffs assert:  When the same issue was raised in an earlier hearing in a distinct matter, Mr. Weisfelner, speaking for the Designated Counsel group, declared: "this Court didn't have, couldn't have protected New GM from actions that New GM took or violations that New GM is responsible for. …We agree with Mr. Peller in terms of the limitations of the bankruptcy court's jurisdiction in that regard."

28 U.S.C. § 1334 provides for original jurisdiction in the district courts for "all cases under title 11" and "all civil proceedings arising under title 11, or arising in or related to cases under title 11." The technical jurisdiction issue presented is whether the *Sesay* Plaintiffs' claims against Non-Debtor GM "relate to" any proceeding properly before the Court, in that their claims themselves assuredly do not "arise in" the proceedings that Non-Debtor GM initiated. While jurisdiction to Enforce the Sale Order may uncontroversially be exercised under §105, the broad powers of §105 create no independent jurisdiction. The ancillary jurisdiction courts possess to enforce their own orders "is itself limited by the jurisdictional limits of the order sought to be enforced." *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 916 (Bankr. W.D. Tex. 1995) (*citing Zerand-Bernal Group, Inc. v. Cox*; *Matter of Mooney Aircraft, Inc.*, 730 F.2d 367, 374-75 (5th Cir. 1984), vacated on other grounds, 220 B.R. 909 (Bankr. W.D. Tex. 1998); *see In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012).

This Court may have had "arising in" jurisdiction originally to issue the Sale Order in general under the bankruptcy code (although it would not have had jurisdiction in issuing its Order to have enjoined the *Sesay* Plaintiffs future claims based on post-Sale conduct by the Non-Debtor Purchaser and on independent, non-successor, non-derivative, non-transferee duties the Non-Debtor owed Plaintiffs), and to reserve jurisdiction to interpret and enforce that Order. However, the Bankruptcy Courts are not able, through that power, to "write their own jurisdictional ticket," and thereby, by the retention of exclusive jurisdiction to interpret and enforce their own orders, to bootstrap their reach to matters that have nothing to do with the bankruptcy case.[20]

---

[20] Even the designation of this proceeding as "core" does not affect the subject matter jurisdiction analysis:
We need not resolve whether this is a "core" proceeding for subject matter jurisdictional purposes because "[w]hether a particular proceeding is core represents a question wholly separate from that

It is well-established that a reorganization plan's jurisdiction retention provision cannot expand a bankruptcy court's post-confirmation jurisdiction beyond that provided by statute.[21]

---

of subject-matter jurisdiction." *In re Marcus Hook*,943 F.2d at 266. Under 28 U.S.C. § 157, a bankruptcy court might have jurisdiction over a proceeding but still might not be able to enter final judgments and orders. *Id.* Non-core "related to" jurisdiction is the broadest of the potential paths to bankruptcy jurisdiction, so we need only determine whether a matter is at least "related to" the bankruptcy.

*In re Resorts Int'l*, 372 F.3d at 157.

[21]As the Court stated in *Binder v. Price Waterhouse & Co., LLP* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 161 (3rd Cir. 2004),

> Retention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction. *But neither the bankruptcy court nor the parties can write their own jurisdictional ticket.* Subject matter jurisdiction "cannot be conferred by consent" of the parties. *Coffin v. Malvern Fed. Sav. Bank*, 90 F.3d 851, 854 (3d Cir.1996). Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization. *In re Continental Airlines, Inc.*, 236 B.R. 318, 323 (Bankr.D.Del.1999), aff'd, 2000 WL 1425751 (D.Del. September 12, 2000), aff'd, 279 F.3d 226 (3rd Cir.2002). Similarly, if a court lacks jurisdiction over a dispute, it cannot create that jurisdiction by simply stating it has jurisdiction in a confirmation or other order.*Id.*; *accord United States Trustee v. Gryphon at the Stone Mansion*, 216 B.R. 764, 769 (W.D.Pa.1997) ("A retention of jurisdiction provision within a confirmed plan does not grant a bankruptcy court jurisdiction."), aff'd, 166 F.3d 552 (3d Cir.1999). …If there is no jurisdiction under 28 U.S.C. § 1334 or 28 U.S.C. § 157, retention of jurisdiction provisions in a plan of reorganization or trust agreement are fundamentally irrelevant. But if there is jurisdiction, we will give effect to retention of jurisdiction provisions. Consequently, we will examine whether this dispute falls within the Bankruptcy Court's subject matter jurisdiction.

*See also Trusky v. Gen. Motors Co. (In re Motors Liquidation Co.),* 2013 Bankr. LEXIS 620 at *33, 3013 WL 620281, at *11 (Bank. S.D.N.Y. Feb. 19, 2013) ("Gm-Trusky") (stating that once the GM Sale Order was interpreted, it would be difficult to "see how I would have subject matter jurisdiction to decide anything else."); *Shenango Group*, 501 F.3d 338 at 344 n.1 (3rd Cir. 2007) (analyzing the existence of post-confirmation "related-to" jurisdiction and stating that court has "not placed any independent weight upon the retention of jurisdiction provision in [the debtor's] Reorganization Plan"); *Valley Historic Ltd. Partnership*, 486 F.3d at 831, 837 (4th Cir. 2007) (stating that "neither the parties nor the bankruptcy court can create § 1334 jurisdiction by simply inserting a retention of jurisdiction provision in a plan of reorganization if jurisdiction is otherwise lacking."); *U.S. Brass Corp.*, 301 F.3d at 303 (5th Cir. 2002) ("In asserting jurisdiction, the bankruptcy court relied on both a broad retention-of-jurisdiction provision in the confirmed plan and its authority under the Bankruptcy Code to clarify and enforce its own orders. 'However, the source of the bankruptcy court's subject matter jurisdiction is neither the Bankruptcy Code nor the express terms of the Plan. The source of the bankruptcy court's jurisdiction is 28 U.S.C. §§ 1334 and 157'") (*citation omitted*); *Harstad v. First Am. Bank*, 39 F.3d 898, 902 n.7 (8th Cir. 1994) (acknowledging that plan provision cannot confer jurisdiction upon bankruptcy court); *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) ("[T]he fact that the bankruptcy court, in the orders approving the bankruptcy sale and later in the plan of reorganization, purported expressly to assume jurisdiction to entertain such proceedings could not confer jurisdiction. A court cannot write its own jurisdictional ticket."); *Guttman v. Martin (In re Railworks Corp.)*, 325 B.R. 709, 722-23 (Bankr. D. Md. 2005) ("If there is no jurisdiction under 28 U.S.C. § 1334 retention of jurisdiction provisions in a plan of reorganization or trust agreement are fundamentally irrelevant.*")*; *Diagnostic Int'l, Inc. v. Aerobic Life Prods. Co. (In re Diagnostic Int'l, Inc.)*, 257 B.R. 511, 514 (Bankr. D. Ariz. 2000) (stating that retention of jurisdiction clause cannot grant subject-matter jurisdiction over proceeding when proceeding is outside court's jurisdictional limits defined by statute); *see also Ins. Corp. v. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (stating that subject matter jurisdiction cannot be conferred upon a federal court by consent of the parties).

It is time for Non-Debtor GM to stop hiding behind the protective embrace of this

Court.  "Since the purpose of reorganization clearly is to rehabilitate the business and start it

off on a new and to-be-hoped for more successful career, it should be the objective of courts

to cast off as quickly as possible all leading strings which may limit and hamper its activities

and throw doubt upon its responsibility. *It is not consonant with the purposes of the Act, or*

*feasible as a judicial function, for the courts to assume to supervise a business somewhat*

*indefinitely." In re Indicon,* 499 B.R. at 555, *quoting North Am. Car Corp. v. Peerless*

*Weighing and Vending Mach. Corp.,* 143 F.2d 938, 940 (2d Cir. 1944).[22]

The final decree confirming Debtor GM's reorganization was entered and Debtor

GM's case was closed on April 18, 2013.   Particularly in a post-confirmation setting where a

bankruptcy court's jurisdictional basis is most tenuous,[23] bankruptcy courts must use caution

---

[22] As Judge Easterbrook put it,
> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval.  The firm also is without the *protection* of the bankruptcy court.  *It may not come running to the bankruptcy judge every time something unpleasant happens….* Formerly a ward of the court, the debtor is emancipated by the plan of reorganization.  A firm that has emerged from bankruptcy is just like any other defendant in a tort case: it must protects its interests in the way provided by the applicable non-bankruptcy law, here by pleading the statute of limitations in the pending cases.

*Pettibone Corp. v. Easley (In re MGM Studios),* 935 F.2d 120, 122 (7th Cir. 1991).

[23] As the Third Circuit has concluded,
> The post-confirmation context of this dispute affects our "related to" inquiry because bankruptcy court jurisdiction "must be confined within appropriate limits and does not extend indefinitely, particularly after the confirmation of a plan and the closing of a case." *Donaldson,* 104 F.3d at 553.7 After confirmation of a reorganization plan, retention of bankruptcy jurisdiction may be problematic. *See Bank of La. v. Craig's Stores of Tex., Inc.* (*In re Craig's Stores of Tex., Inc.*), 266 F.3d 388, 391 (5th Cir.2001); *In re Fairfield Cmtys., Inc.,* 142 F.3d 1093, 1095-96 (8th Cir.1998). This is so because, under traditional *Pacor* analysis, bankruptcy jurisdiction will not extend to a dispute between non-debtors unless the dispute creates "the logical possibility that the estate will be affected." *In re Federal-Mogul Global,* Inc., 300 F.3d 368, 380 (3d Cir.2002) (*internal quotations omitted*), cert. denied, 537 U.S. 1148, 123 S.Ct. 884, 154 L.Ed.2d 851 (2003). At the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred. *See In re Fairfield Cmtys.,* 142 F.3d at 1095 (holding that once a bankrupt debtor's plan has been confirmed the debtor's estate ceases to exist). Unless otherwise provided by the plan or order confirming the plan, "the confirmation of a plan vests all of the property of the estate" in the reorganized debtor. 11 U.S.C. § 1141(b). *See also NVF Co. v. New Castle County,* 276 B.R. 340, 348 (D.Del.2002) (holding that the confirmation of a plan revests the estate's property in the reorganized debtor, and accordingly, the bankruptcy estate "no longer existed"), aff'd 61

lest applications for protection by a Non-Debtor seeking relief be abused, as it has in this

instance. Just as the jurisdictional "arising in" power originally to issue the Sale Order may

not constitutionally have reached claims—like those of the *Sesay* Plaintiffs--having nothing

to do with the Bankruptcy case, the power to interpret and enforce that Order cannot extend

the original jurisdictional limits of the Court. "Most courts agree that once confirmation

occurs, the bankruptcy court's jurisdiction shrinks.  The Second Circuit has used the 'close

nexus text' to determine post-confirmation subject matter jurisdiction." *Vanguard Prods.*

*Corp. v. Citrin (In re Indicon),* 499 B.R. 395 (D. Conn. 2013); *In re Metro-Goldwyn-Mayer*

*Studios Inc.,* 459 B.R. 550 (Bankr. S.D.N.Y. 2011); *Washington Mutl, Inc. v. XL Specialty*

*Ins. Co. (In re Washington Mut., Inc.),* 2012 Bankr. LEXIS 4673, *14-*15 (Bank. Del 2012)

(citations omitted):

> If including a retention of jurisdiction clause in a Plan was sufficient, the
> limitation on post-confirmation jurisdiction would be easily eliminated.  Rather,
> to have a sufficiently close nexus to retain post-confirmation jurisdiction, the
> plan must 'specifically describe an action over which the Court had 'related to'
> jurisdiction pre-confirmation and expressly provide for the retention of such
> jurisdiction to liquidate that claim for the benefit of the estate's creditors…'
> Such specific language helps ensure that "bankruptcy court jurisdiction would
> not raise the specter of unending jurisdiction" post-confirmation.
> Respectfully, the Court's approach in *Elliott* was mistaken—the proper object of

jurisdictional analysis is each of the claims that Plaintiffs actually assert, and the proper

---

Fed.Appx. 778 (3d Cir.2003).Although the statutory basis for a bankruptcy court's jurisdiction
does not change after confirmation of a plan of reorganization (i.e., jurisdiction still is governed by
28 U.S.C.§ 1334), bankruptcy courts generally recognize that the scope of their jurisdiction
narrows after confirmation of a plan. *See Penthouse Media Group v. Guccione* (*In re General
Media, Inc.*), 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) (stating that while section 1334 does not
limit a bankruptcy court's jurisdiction after plan confirmation, "all courts that have addressed the
question have ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks").
This reduced scope of jurisdiction follows from the fact that as time passes after confirmation, the
universe of matters that relates to a bankruptcy cases necessarily diminishes. *See Gray v. Polar
Molecular Corp.* (*In re Polar Molecular Corp.*), 195 B.R. 548, 555 (Bankr. D.Mass. 1996) ("*Polar
Molecular*").

question is whether those claims could have or had any conceivable effect on the liabilities of

the Debtor—and not whether this Court had the power to issue and has the power to interpret

and enforce the Sale Order without regard for the nature of claims that Plaintiffs assert. In

fact, had the *Sesay* Plaintiffs been notified of and accorded an opportunity to object to the

issuance of the Sale Order, and if the Sale Order had even purported to encompass their

claims, which it does not, they would have made this same jurisdictional argument as an

objection to such hypothetical provisions.  Of course, to state the hypothetical is to

demonstrate the absurdity of Non-Debtor GM's contention that the Sale Order enjoined

Plaintiffs from asserting these claims. Even with notice, Plaintiffs could not have had

standing to object to the Sale Order, as their claims had not accrued under any plausible

theory of when claim arise.

Notably, the Court itself expressed doubt about its power to reach the "future claims"

of those whose pre-sale exposure to asbestos would ripen into injury post-sale. The relation

between the Sale Order and the *Sesay* claims is even more remote, as the *Sesay* Plaintiffs,

unlike the future asbestos victims whose interests the court found no one before it had

standing to assert, *id.* do not claim that Debtor GM's conduct and original liability gave rise

to any of their claims against Non-Debtor GM. Not only their injury, but also the conduct

that gives rise to their claims, occurred well after the Sale. *Cf. Lothian Cassidy, LLC v.

Lothian Exploration & Dev. II*, 487 B.R. 158, 162 (S.D.N.Y. 2013) (Marrero, J.) ("Where, as

here, the bankruptcy plan in question has already been confirmed, the Bankruptcy Court's

jurisdiction shrinks to cover only matters that have a 'close nexus' to the bankruptcy plan and

the plan provides for jurisdiction over the dispute.")

Like most circuits, the Second Circuit has adopted the Third Circuit's *Pacor* test[24] for determining a bankruptcy court's jurisdiction over a lawsuit between third parties to the bankruptcy case. *See Travelers Co. v. Bailey*, 557 U.S. at 137, 146 (2009). The court of Appeals has repeatedly warned lower Courts to exercise particular care when healthy non-debtors seek to avail themselves of the protective power of the Bankruptcy courts. It has made clear that this Court's "related to" jurisdiction is limited to power over litigants in proceedings *only* when the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. *See Manville II*, 517 F.3d at 66; *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test for determining whether litigation has a significant connection with a pending bankruptcy [sufficient to confer bankruptcy jurisdiction] is whether its outcome might have any conceivable effect on the bankrupt estate." (*internal quotation marks omitted*); *In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012) ("'related to' jurisdiction to enjoin a third party dispute exists where the subject of the third party dispute is property of the estate, or the dispute would have an effect on the estate.") (*internal quotation marks omitted*); *See also In re Old Carco LLC*, 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013) ("Nevertheless, the *law may impose a separate duty to warn on New Chrysler*," and there would in such circumstances be no subject matter jurisdiction over third party claims against New Chrysler); *In re Dreier*, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010) ("While the Bar Order is limited to creditors and parties in interest in the LLP and Dreier cases, these parties may also have *direct* claims against GSO") *(emphasis added)*; *In re Grumman*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) ("§ 362(f) authorizes the Court to absolve the buyer of *in personam* liability for pre-confirmation claims in a chapter 11 case. The

---

24 *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).

rule does not extend to potential future tort claims of the type now asserted by the Fredericos, and the GM sale order did not grant the buyer this relief.")[25]

In the particular context of third party claims against non-debtors, like those that the *Sesay* Plaintiffs assert against Non-Debtor GM, the rule for determining "related to" jurisdiction, and thus the constitutional bounds of this Court's power, is crystal clear and easy to apply: When the third-party's claims against a non-debtor rest on *independent duties* that the non-debtor allegedly owed the third party, rather than derivative, successor, or transferee duties of the debtor, there is no Bankruptcy Court subject matter jurisdiction over the dispute without an affirmative showing of some conceivable impact on the *res* of the bankrupt. *In re Johns-Manville Corp.*, 517 F.3d 52, 65 (2d Cir. 2008) ("Manville II"), *vacated & remanded on other grounds*, 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009), aff'g in part & rev'g in part, 600 F.3d 135, 2010 U.S. App. LEXIS 5877, 2010 WL 1007832 (2d Cir. Mar. 22, 2010) ("Manville III"); *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995); *In re Kubly*, 818 F.2d 643, 645 (7th Cir. 1987); *Geruschat v. Ernst Young LP (In re Seven Fields Dev Corp.),* 505 F.3d 237 (2007).

Nor can the good intentions of a bankruptcy court to protect the purchaser of a bankrupt's assets to help it achieve "global peace" replace the necessity for a prior determination that subject matter jurisdiction, some connection to the bankrupt, be shown when a non-debtor like GM seeks its extraordinary protection:

> The district court emphasized the bankruptcy court's declaration that its "repeated use of the term[s] 'arising out of' and 'related to' [was] not gratuitous or superfluous; they were meant to provide . . . global finality for Travelers. But

---

[25] Nothing in *Travelers* is to the contrary. As the Court stated, whether the Bankruptcy Court had jurisdiction and authority to enter the injunction in 1986 was not properly before the Court of Appeals in 2008 and is not properly before us…Our holding is narrow. We do not resolve whether a bankruptcy court, in 1986 or today, could properly enjoin claims against nondebtor insurers that are not derivative of the debtor's wrongdoing. *Travelers Indem.Co.v. Bailey,* 557 U.S. at 148. That issue was resolved definitively on remand in *Manville III,* 600 F.3d at 148-49. The answer is no.

> global finality is only as "global" as the bankruptcy court's jurisdiction. A court's ability to provide finality to a third-party is defined by its jurisdiction, not its good intentions.

*In re Johns Manville Corp.*, 517 F.3d at 66 (2d Cir. 2008). To justify the unusual transaction in which Debtor GM sold all of its assets *prior* to any approval of its reorganization, this Court emphasized in its Sale Order decision how economically important the limits on the assumed liability of the purchaser, the entity that would become Non-Debtor GM, were to the success of the proposed reorganization, and in turn to the Debtor's and the national interest. But even that exigency has its jurisdictional, and constitutional, limits. However crucial this Court might have believed that the limits on the Purchaser's assumed liabilities were to value of the assets to be sold, and hence to the success of the Debtor's reorganization, this Court lacked and lacks power to immunize or privilege future wrongdoing by the purchaser, Non-Debtor GM, no matter how much more attractive such immunity might make the Debtor's assets. By barring Plaintiffs from suing it for relief from the post-conduct harm Non-Debtor has and continues to cause them by its own post-sale conduct that Plaintiffs allege breach independent duties that Non-Debtor GM owes them, duties independent of whatever duties Debtor GM might have also owed them, the Court would be doing just that. There was no jurisdictional basis to reach such claims when the Sale Order was originally issued, and there is no greater jurisdiction now to enjoin Plaintiffs from pursuing such claims.

The power of Bankruptcy Courts to act equitably and do justice has roots in ancient powers of the equity court. But the constitutional and statutory jurisdiction of the Court runs out thankfully at least at the point where, as in the case in bar, the power is called upon, not to extend empathy and care to an ailing person or entity struggling to survive, but rather to put the shield of the Stay at the disposal of a robust multi-national corporation accused of historic acts of

corporate misconduct so that it is able to avoid responsibility for its wrongs. Respectfully, this

Court has no jurisdiction over their claims and Non-Debtor GM may not utilize the extraordinary

Stay power of this Court simply as a tool in its quest to tamp down its potential liability for its

wrongdoing, or to delay lawsuit like that of the *Sesay* Plaintiffs that it has no hope of

permanently barring.

> C.    *The Sesay Plaintiffs' Claims Do Not "Relate to" Any of the Liabilities that Were the Subject of the Sale Order and Injunction.*

Non-Debtor GM asserts that the Sale Order protects it against any claims that are based

on "successor or transferee liability," claims that arose before the "closing date" and claims that

existed against Debtor GM at the time of the closing of the sale. *See* Sale Order ¶¶ 7, 10, 46, 48.

The Sale Order does not *immunize* Non-Debtor GM for any wrongdoing it commits. The claims

the *Sesay* Plaintiffs bring do not fall within the scope of the Sale Order because they neither

allege, nor depend, upon successor or transferee liability, they did not arise before the "closing

date," and they do not implicate any past liability Debtor GM might have had in any way. The

claims they wish to bring only arose when Non-Debtor GM came into being and allegedly began

concealing and suppressing material, and potentially fatal, safety defects from them. The identity

and origin of the particular vehicles in which those safety defects inhered is not dispositive of

whether Non-Debtor GM and Delphi Automotive PLLC illegally concealed the defects from

Plaintiffs, the public, and government officials, and then attempted to suppress lawsuits related

thereto. It wouldn't matter to Plaintiffs' claims if Non-Debtor GM had bought the assets from a

thriving manufacturer rather than an ailing debtor. The *Sesay* Plaintiffs' claims depend upon no

wrongdoing by Debtor GM and could not have existed against Debtor GM because the alleged

wrongdoing did not occur until after Debtor GM had ceased to exist – this is true despite the fact

that, in this particular case, the *Sesay* Plaintiffs may have had *other* claims against Debtor GM.

All liability addressed in the Sale Order was either assumed by Non-Debtor GM or retained by

Debtor GM. Non-Debtor GM could not have assumed liability for the *Sesay* Plaintiffs' claims

from Debtor GM, and Debtor GM could not have retained liability for the *Sesay* Plaintiffs'

claims, because Debtor GM never had liability for the *Sesay* Plaintiffs' claims, nor could it have.

For this reason, the Sale Order, by its clear terms, simply does not reach the claims brought by

the *Sesay* Plaintiffs against Non-Debtor GM.

The *Sesay* Plaintiffs' case is also distinguishable from prior rulings enforcing the July

2009 Sale Order and Injunction. The "Trusky Plaintiffs," for example, alleged that Non-Debtor

GM "breached warranty obligations Non-Debtor GM *assumed* from Debtor GM in the 363

Sale." *In re Motors Liquidation Co.*, 09-50026 REG, 2013 WL 620281 (Bankr. S.D.N.Y. Feb.

19, 2013). The *Sesay* Plaintiffs make no allegations dependent upon duties or obligations that

Non-Debtor GM *could* have assumed from Non-Debtor GM *at all*. The "Castillo Plaintiffs,"

meanwhile, sought a declaratory judgment that Non-Debtor GM "*assumed* a settlement

agreement between Debtor GM and the Castillo Plaintiffs as part of Non-Debtor GM's

purchase." *In re Motors Liquidation Co.*, 09-50026 REG, 2012 WL 1339496 (Bankr. S.D.N.Y.

Apr. 17, 2012). Non-Debtor GM could *not* have assumed the liabilities at issue in the *Sesay*

Plaintiffs' claims, because they never *existed* against Debtor GM. Finally, unlike the plaintiffs

addressed in the Court's May 17, 2010 Order Pursuant to 11 U.S.C. § 105(a) Enforcing 363 Sale

Order (*Motors*, Doc. No. 6237), who brought personal injury claims against Non-Debtor GM

after accidents that occurred *before* the closing date, the *Sesay* Plaintiffs allege only the injury

that occurred *after* Non-Debtor GM had come into existence. Their case is not distinguishable

from the *Elliott v. GM* matter that the Court has already considered.  See Doc. No. 12815. The

Court misapplied the law in that ruling and mistakenly thought that it had "arising in"

jurisdiction over such claims and that it therefore did not need to attend to the tests that the

Second Circuit has mandated in order to determine subject matter jurisdiction of the bankruptcy

courts over third party claims. *In re Motors,* Courts have declined to find "related to" jurisdiction

where "the asset [in question] had been sold, the bankruptcy estate was not a party to the action,

and the defendants were not debtors or creditors." *In re DVI, Inc.,* 305 B.R. at 417 (discussing

*New Horizon of N.Y. LLC v. Jacobs,* 231 F.3d 143 (4th Cir. 2000)).

> D.    *GM's Shell Game Regarding "Pre-Petition Vehicles and Parts"*

As noted above, Non-Debtor GM's Motion to Enforce the Sale Order that prompted these

proceedings takes great pains to carefully distinguish the liabilities of Debtor GM that it assumed

from the liabilities of Debtor GM that it did not assume and that were accordingly retained by

Debtor GM. Non-Debtor GM then concludes that, because particular claims were retained by

Debtor GM, Plaintiffs asserting *any* claims that relate to the assets it purchased from Non-Debtor

GM must be enjoined.

To state GM's contention is to demonstrate its inadequacy. The Sale Order and MSPA

speak to how the liabilities of Debtor GM associated with the assets it was selling to Non-Debtor

GM would be divided between Debtor GM, the seller, and Non-Debtor GM, the purchaser. The

*Sesay* Plaintiffs assert legal claims that Non-Debtor GM contends relate to "pre-petition vehicles

and parts" because they refer to Non-Debtor GM's concealment from the *Sesay* Plaintiffs and

others of material information about the risks presented by driving Mr. Sesay's 2007 GM car.

Non-Debtor GM contends that the fact that the *Sesay* Plaintiffs assert claims that have anything

to do with an asset it bought from Debtor GM means that they must be violating the Sale Order

injunction simply by asserting the claims.

The missing analytic step is to examine the claims that the *Sesay* Plaintiffs *do* assert, and

to determine if any of the claims rest on liabilities that Debtor GM retained. As the above

description of the *Sesay* Plaintiffs' claims demonstrates, the *Sesay* Plaintiffs have taken care to honor[26] Non-Debtor GM's contentions that the Sale Order bars lawsuits against it based on liabilities that Debtor GM retained, by carefully crafting their allegations so that they assert no such claims. Nor, of course, are the *Sesay* Plaintiffs asserting claims based on liabilities of the Debtor GM that Non-Debtor GM concedes it did assume. The *Sesay* Plaintiffs' claims have nothing to do with the Sale Order, or with Non-Debtor GM's purported motion to enforce that Order, because each of the *Sesay* Plaintiffs' claims is based on breaches by Non-Debtor GM of duties it allegedly owed to Plaintiffs and others, none of which have anything to do with the division of *Debtor GM's* liabilities reflected in the Sale Order.

In its papers to date, GM nowhere demonstrates any connection between the *Sesay* Plaintiffs' factual allegations and the legal claims they assert, on the one hand, and the particular legal claims that Non-Debtor GM contends it has no liability for by virtue of the Sale Order. From the premise that Non-Debtor GM is protected from lawsuits that are based on Debtor GM's liabilities that it did not assume, Non-Debtor GM leaps to the unwarranted conclusion (which it apparently hedges for ethical reasons) that any claims made against Non-Debtor GM by owners of vehicles sold by (or even containing parts sold by) Debtor GM must be "Retained Liabilities":

> To be sure, the causes of action asserted by Plaintiffs in the Ignition Switch Actions are varied, and in some instances, because of imprecise drafting, it is unclear whether there *might be a viable cause of action …being asserted against Non-Debtor GM*. What is clear, however, is *that the crux of Plaintiffs' claims* is a problem in the ignition switch in vehicles and parts sold by the Non-Debtor GM. Claims based on that factual predicate are Retained Liabilities.

GM then identifies the actions it claims violate the Sale Order, in an *en masse* chart that provides no information about the lawsuits other than that they involve particular GM Models and

---

[26] That is, to observe the boundaries of GM's interpretation of the Sale Order in its Motion to Enforce. Plaintiffs in no way mean to indicate that they agree with GM's interpretation of its liabilities under that document and those proceedings. They do not.

presumably (inferring from the inclusion of the *Elliott* action) the factual allegations used the words "ignition switch."

*In order to connect that information to possible violations of the Sale Order* — a critical step given the extraordinary relief that Non-Debtor GM seeks from third party lawsuits, *Non-Debtor GM would need to show not only that the lawsuits mentioning ignition switches involve pre-petition vehicles or parts, but also that* **the claims** *being asserted are the claims that it is protected against under the Sale Order*. The critical question is not what year vehicles or auto parts were made, but whether the duties that Plaintiffs allege that Non-Debtor GM violated involved retained liabilities of Debtor GM or instead, as Plaintiffs contend, involve independent duties that Non-Debtor GM owed them.

Rather than provide this requisite analysis to connect factual allegations about ignition switches in pre-petition vehicles to the claims that the *Sesay* Plaintiffs assert (an absurd possibility in that the *Sesay* lawsuit was initiated months after Non-Debtor GM lodged the Motion that it purports applies to the *Sesay* lawsuit, although such motion was never served on the *Sesay* Plaintiffs and does not by its terms address the claims they assert), Non-Debtor GM's Motion purports to establish its entitlement to extraordinary relief from each "ignition switch action" by means of "sample" allegations it cherry-picked from a small number of pleadings. GM represents to the Court (in a footnote) that "[t]he allegations and claims asserted in the Ignition Switch Actions include Retained Liabilities such as implied warranty claims, successor liability claims, and miscellaneous tort and statutory claims premised in whole or in part on the alleged acts or omissions of New GM." Non-Debtor GM's only support for the conclusion is its reference to another chart purportedly containing *samples* of such allegations from select cases. Presumably, the "Sixth" Supplements that Non-Debtor GM sent the *Sesay* Plaintiffs are intended

to individualize the *de facto* omnibus motion, but they contain no analysis whatsoever as to what the sentences that Non-Debtor GM sampled have to do with its Motion to Enforce. As noted above, the lack of connection to Plaintiffs' actual claims is particularly egregious with respect to Ms. Yearwood's claims as a post-petition purchaser.  Non-Debtor GM's bald speculation about possibilities that some of the same GM models may have had Debtor parts installed has no factual or legal basis.

 Whatever its possible merits in relation to other litigants, Non-Debtor GM's argument is plain wrong with respect to the *Sesay* Plaintiffs. Respectfully, Plaintiffs are entitled to individual rather than bulk consideration before their rights to litigate their claims are restricted or, as in the case of their rights to pursue preliminary relief, extinguished. They also should not be presumed to be in violation of this Court's Orders based on Non-Debtor GM's carefully crafted representations to the Court that, upon scrutiny, avoid explicitly saying anything directly about the *Sesay* Plaintiffs' claims at all.

To emphasize, Non-Debtor GM is wrong to include the *Sesay* action within the ambit of its Motion to Enforce because the *Sesay* Plaintiffs are not complaining that Debtor GM sold them a vehicle with a bad ignition switch and that Non-Debtor GM is liable for that act. They complain that *Non-Debtor GM* violated *its* duties to disclose that their vehicles were dangerous to drive, in part because of the ignition switch defect that GM has now publicly conceded that *it* (or more precisely, its engineers, lawyers, risk managers, and management) concealed from the Plaintiffs, the public, and governmental regulators. Whether the *Sesay* Plaintiffs will prevail on this theory is not for this Court to determine, but rather the issue to be determined is solely whether such allegations impinge in any way on retained liabilities of Debtor GM. They plainly do not.

Legal duties are owed by persons to other persons; they do not inhere in vehicles or auto parts or other objects in the material world. The fact that Mr. Sesay's legal claims for relief from Non-Debtor GM relate to a "pre-petition" vehicle simply means that Mr. Sesay may have had *potential* claims against Debtor GM, say for breach of implied warranty, common law misrepresentation, or state consumer protection violations, *in addition to* those claims they have chosen to assert. But it does not mean that the *Sesay* Plaintiffs are in fact *asserting* such claims. They are not.

Mr. Sesay's claims do relate to a "pre-petition" vehicle, but that single fact cannot act as a shorthand to justify neglecting the more extended consideration required to reach the ultimate conclusion that such claims are encompassed by the Sale Order and Injunction and therefore that Plaintiffs and their counsel must necessarily be acting in violation of this Court's authority by asserting such claims. Before such a conclusion can reasonably (or constitutionally) be reached, an analysis is necessary *first* to determine if their third-party non-debtor claims assert derivative or successor liability on the part of Non-Debtor GM for retained liability of Debtor GM, in which case the claims may well be within the terms of the Sale Order, or if they are based instead on allegations that Non-Debtor GM violated *independent* duties that Non-Debtor GM owed to the *Sesay* Plaintiffs, causing them legally cognizable harm, in which case the claims would not be, and constitutionally could not have been, encompassed by the Sale Order and Injunction.[27] This analysis, which GM's invocation of "pre-petition" vehicles and auto parts neglects, is also required to determine the *constitutional* authority of this Court because, as discussed below, Bankruptcy Courts have no subject matter jurisdiction over third party non-debtor claims that

---

[27] Presumably Non-Debtor GM will argue that it owed no such duties, and it may win that argument. But the relevant question before this Court is not whether the claims will withstand legal challenge, that is, whether there is a legal basis for the duties Plaintiffs allege were owed and breached, but more narrowly whether the *allegations* are essentially of breaches of independent or derivative duties.

allege breaches of duties independently owed by third party non debtors such as Non-Debtor

GM. And, as discussed above, the relation to Ms. Yearwood's claims to any possible retained

liabilities is based on pure speculation about parts that may or may not be present in her car.

The Court of Appeals has admonished the lower courts to conduct this analysis of the

*Sesay* Plaintiffs claims.[28]

It is ironic that the *Sesay* Plaintiffs (and their counsel), who have expended great effort to

*comply with* this Court's Sale Order, and accordingly have made every effort to *avoid* making

any claims that could arguably be within the terms of this Court's injunction,[29] have nevertheless

been treated as presumptive violators of the Order solely and exclusively because they make

claims against Non-Debtor GM on behalf of owners of "pre-petition" vehicles and, if Plaintiffs

understand, that pre-petition auto parts may exist in post-petition vehicles. Surely neither GM

nor the Court interpret the Sale Order to enjoin these third-party non-debtor claims because such

parties *could have* asserted claims in alleged violation of the Sale Order *but chose not to*. And

surely no reasonable interpretation of the Sale Order would read it to immunize Non-Debtor GM

from all civil liability for *its* alleged criminal and reckless endangerment of the public safety and

---

[28] In our view, the jurisdictional analysis by the lower courts falls short for several reasons…The courts below appeared to view the jurisdictional inquiry as a factual one: if the direct actions "arose out of" or are "related to" the Manville-Travelers relationship, then the court had jurisdiction. But the factual determination was only half of the equation. The nature and extent of Travelers' duty to the Direct Action plaintiffs is a function of state law. Neither court looked to the laws of the states where the claims arose to determine if indeed Travelers did have an independent legal duty in its dealing with plaintiffs, notwithstanding the factual background in which the duty arose. … it is evident that Plaintiffs' Direct Action claims constitute independent tort actions… [And even] the states' unwillingness to recognize these actions does not vest a federal court with jurisdiction to enjoin all such future claims.
*In re Johns Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008), vacated & remanded on other grounds, 557 U.S. 137 (2009), aff'g in part & rev'g in part, 600 F.3d 135 (2d Cir. 2010) ("Manville III"). The Supreme Court's intervening decision in *Travelers v. Bailey* did not alter the Second Circuit's statement of applicable law governing subject matter jurisdiction, but merely considered whether an Order that may have been issued without jurisdiction could be collaterally attacked on that basis years later. The Court held that it could not, on equitable mootness grounds.

[29] GM can't have it both ways—the careful compliance with this Court's Sale Order is not "artful pleading around the Sale Order" but compliance with it.

the lives of Plaintiffs, their families, and millions of other drivers, passengers and bystanders who may come into contact with GM vehicles posing imminent and unreasonable danger of inflicting personal injury and property damage.

Non-Debtor GM has already admitted that *Non-Debtor GM* decided to conceal rather than to disclose the risks about which the *Sesay* Plaintiffs complain, as part of an episode of gross corporate misconduct, plaintiffs allege, perpetuated through a criminal enterprise engaged in various acts of racketeering activity systematically designed to conceal and minimize the risks posed by GM vehicles. Plaintiffs claims center around that *concealment by Non-Debtor GM*. Whether the *Sesay* Plaintiffs prevail may depend on whether the courts who ultimately hear their claims agree that GM owed them a duty to disclose in these circumstances, and that the alleged concealment breached that duty. But the ultimate legal *merits* of the *Sesay* Plaintiffs' allegations have nothing to do with the question here—do the *Sesay* Plaintiffs' claims rest on duties they allege the Non-Debtor GM owed them, independent of any duties that it may or may not have assumed from the Debtor GM? Because they implicate no successor, transferee, or derivative liability of Non-Debtor GM, the claims asserted in the *Sesay* lawsuit have nothing whatsoever to do with the Sale Order transaction, and their motion to dismiss should be granted forthwith.

## II.    NON-DEBTOR GM'S MOTION SHOULD BE DENIED BECAUSE APPLICATION OF THE SALE ORDER TO THE *SESAY* PLAINTIFFS WOULD VIOLATE THEIR DUE PROCESS RIGHTS IN THAT NO NOTICE WAS DIRECTED TO THEM AND THEY IN FACT RECEIVED NO EFFECTIVE NOTICE NOR ANY REASONABLE OPPORTUNITY TO BE HEARD WITH RESPECT TO THE ENTRY OF THE SALE ORDER AND INJUNCTION, NOR ANY NOTICE PRIOR TO THESE PROCEEDINGS THAT THE SALE ORDER AND INJUNCTION WAS ADDRESSED TO THEM OR TO ANY OF THE CLAIMS THEY ASSERT AGAINST NON-DEBTOR GM.

It is not surprising that the Court did not consider, and Debtor GM did not propose, notice to those like the *Sesay* Plaintiffs whose future claims would be based on misconduct that had not

yet occurred, and whose claims would not implicate Debtor GM's retained liability in any way, insofar as the Sale Order does not purport to reach such claims. The lack of notice is nevertheless important in the event that this Court determines that it has jurisdiction to enjoin Plaintiffs from pursuing their claims. The Court's prior decisions indicate that it intends to apply the Sale Order directly to enjoin those whose "No Stay Pleading" it denies.

Because the injunctive measure of a stay would deprive the *Sesay* Plaintiffs of important interests, indeed interests of constitutional dimension and weight, in being able to pursue civil redress for injuries they have suffered, and continue to suffer, at the hands of Non-Debtor GM, they were entitled to notice of and a reasonable opportunity to contest the entry of the Order upon which such injunctive relief purports to be based. GM has not established such due process prerequisites, nor could it. The record, contained in the filings appearing on this Court's docket, establish the contrary, even before the recent Stipulation that restated the obvious lack of such notice.

Given the lack of notice to the *Sesay* Plaintiffs, they cannot be barred by the Sale Order and Injunction. *See Manville IV*, 135 F.3d at 140; DPWN *Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143, 155 (E.D.N.Y. 2012); *Morgan Olson L.L.C. v. Frederico* (*In re Grumman Olson Indus., Inc.*), 467 B.R. 694, 708 (S.D.N.Y. 2012); *Compak Cos. LLC v. Johnson*, 415 B.R. 334, 340 n.8 (N.D. Ill. 2009); *PolycelStructural Foam, Inc. v. Pool Builders Supply of the Carolinas* (*In re Polycel Liquidation, Inc.*), 2007 WL 77336, at *8-9 (D.N.J. Jan. 9, 2007); *Metal Founds. Acquisition, LLC v. Reinert* (*In re Reinert*), 467 B.R. 830, 832 (Bankr. W.D. Pa. 2012); *Doolittle v. Cnty. of Santa Cruz* (*In re Metzger*), 346 B.R. 806, 819 (Bankr. N.D. Cal. 2006).

Since they had no claim at the time of the Sale, they could not be barred by the Sale

Notice from asserting a claim, even if their claims do implicate Debtor GM's liability, which they do not. The Bankruptcy Code broadly defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §101(5)(A). While a "claim" encompasses "all legal obligations of the debtor," *Chateaugay I*, 944 F.2d at 1003, "the definition's reach is not infinite." *Pension Benefit Guar. Corp.* ("*PBGC*") *v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009) (*citing LTV Steel Co. v. Shalala* (*In re Chateaugay Corp.*) ("*Chateaugay II*"), 53 F.3d 478, 496-97 (2d Cir. 1995)). Instead, a valid bankruptcy "claim" exists if and only if "the claimant possessed a right to payment" and "that right arose before the filing of the petition." *Id*. Moreover, a right to payment necessitates that "the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation . . . under the relevant non-bankruptcy law" before the sale at issue. *Chateaugay II*, 53 F.3d at 496-97 (*internal quotation marks omitted*); *accord Chateaugay I*, 944 F.2d at 1003-05 (articulating relationship test for analyzing future claims); *PBGC,* 562 F.3d at 157 ("No matter how broadly the term 'claim' is construed, it cannot extend to a right to payment that does not yet exist under federal law."). In other words, as a matter of federal bankruptcy law, the Second Circuit has made clear that it looks to "the substantive nonbankruptcy law that gives rise to the debtor's obligation" – in this case, applicable federal and state tort law – to determine the existence of a claim under the Code. *PBGC*, 562 F.3d at 157 (*citing Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007)).

Because the *Sesay* Plaintiffs did not have any cognizable "claim" under the Bankruptcy Code at the time of the Sale Order – and did not know whether they ever would have one – applying the Sale Order to bar their causes of action against Non-Debtor GM would violate their

due process rights.

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Fuentes v. Shevin, supra* at 80-81 (1972); *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-71 (1951) (Justice Frankfurter concurring); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863).

To be effective in the bankruptcy context, notice must not only "'reasonably … convey the required information,' i.e., the nature and purpose of the proceeding," but also must inform the claimant of "the nature of the charges or claims that will be adjudicated." *DPWN*, 871 F. Supp. 2d at 153,155 (citations omitted); *see also Johns-Manville Corp. v. Chubb Indemnity Ins. Co.* (*In re Johns-Manville Corp.*), 600 F.3d 135, 158 (2d Cir. 2010) (holding claimant could not be bound by bankruptcy court orders where, even with notice, "it could not have anticipated . . . that its . . .claims . . . would be enjoined"); *In re Waterman Steamship Corp.*, 141 B.R. at 556 (finding notice ineffective if reader would not have known it affected his rights). "At its core, the concern is whether a claimant can be 'force[d] . . . to be bound by proceedings in which he did not and could not participate.'" *Grumman*, 467 B.R. at 706 (citation omitted).

Here, there is no question that *Sesay* Plaintiffs not only did not participate in the Sale Order transaction, but they could not have. The events giving rise to their claims had not yet occurred, nor had they yet suffered injury. Even in a counterfactual world had their claim accrued, the dense notice that was distributed with the Sale Order made no mention of future claims like theirs based on conduct that had not yet occurred, and so the *Sesay* Plaintiffs were "in

no position to file a present claim," *In re GM*, 407 B.R. at 507, nor did they have any reason to

know that they would one day have any "claim" to bring. *See DPWN*, 871 F. Supp. 2d at 157-59

(finding due process had not been satisfied where claimant had actual notice of proceeding but

not that it could bring a claim).

### III.    NON-DEBTOR GM'S MOTION DOES NOT ADDRESS, MUCH LESS CARRY, ITS BURDEN OF ESTABLISHING ANY OF THE REQUISITE GROUNDS FOR THE TEMPORARY, PRELIMINARY, OR PERMANENT RELIEF SOUGHT AGAINST THE *SESAY* LAWSUIT.

A party seeking injunctive relief ordinarily must show: (a) that it will suffer irreparable

harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii)

sufficiently serious questions going to the merits to make them a fair ground for litigation and (c)

a balance of hardships tipping decidedly in the movant's favor. *See*, *e.g.*, *Polymer Technology*

*Corp. v. Mimran*, 37 F.3d 74, 77-78 (2d Cir. 1994); *Reuters Ltd. v. United Press Int'l, Inc.*, 903

F.2d 904, 907 (2d Cir. 1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72

(1979) (per curiam). A higher standard applies where: (i) an injunction will alter, rather than

maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the

relief sought and that relief cannot be undone even if the defendant prevails at a trial on the

merits.

Non-Debtor GM's motion does not address these factors in any way. To the extent it may

rely on the risk of inconsistent judgments to establish "irreparable harm," such reliance would be

misplaced because the *Sesay* lawsuit has been consolidated with most other actions against GM

and therefore it presents no risk of inconsistent judgments. Plaintiffs, not Non-Debtor GM, are

likely to prevail on the merits of this controversy, for the reasons described at length above.

Their inability to bring injunctive relief to protect themselves and the public from the dangers

Non-Debtor GM refuses to address effectively is a far greater hardship than Non-GM faces from

having the *Sesay* lawsuit proceed before Judge Furman as part of lawfully consolidated proceedings there.

Just as it will not be entitled to permanent relief on its Motion, Non-Debtor GM is not entitled to any preliminary injunction during any interim it takes the Court to resolve the issues raised by the attempt to apply its Motion to Enforce to the *Sesay's* lawsuit. Because they have presented all the argument they wish to present in opposition to Non-Debtor GM's Motion to Enforce, and there is nothing left to litigate between the parties with respect to the relief that Non-Debtor GM seeks, Plaintiffs request that the Court finalize to the fullest extent of the Court's authority its disposition of Non-Debtor GM's Motion to Enforce as against the *Sesay* Plaintiffs whichever direction that disposition rests.

## IV.   THE SESAY PLAINTIFFS OBJECT TO APPLICATION OF THE COURT'S SCHEDULING BECAUSE THE SESAY PLAINTIFFS HAD NO NOTICE NOR ANY OPPORTUNITY TO BE HEARD BEFORE THOSE ORDERS WERE ENTERED TO THEIR PREJUDICE

For many of the same reasons that the Sale Order may not constitutionally be applied to the *Sesay* Plaintiffs, nor can the Court's Scheduling Orders. Before their interests in the prompt resolution of their lawsuit against Non-Debtor GM can be restricted or denied, they must have had notice and a reasonable opportunity to be heard. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S.at 314 (1950). They received neither, as the Scheduling Orders were agreed to by other parties in other matters that do not concern the *Sesay* Plaintiffs, some weeks and months before they even initiated their lawsuit.

The Court's reliance on the input of "Designated Counsel" to justify this rump procedure is misplaced as such counsel have conflicting interests—they represent Plaintiffs who *do* assert claims that implicate retained liabilities in the Sale Order; they therefore have an interest in the "threshold issues" that they and Non-Debtor GM have agreed to "tee up" before any other the

issues presented by any of the other lawsuits are to be considered.  The Court may not ignore

these conflicting interest and treat the designated counsel as if they were the ones "who were

speaking for ignition switch action plaintiffs" generally.  Tr. Of July 2, 2014, Hearing at 79-80.

Designated Counsel may want to prevent the *Sesay* Plaintiffs and others from even being heard

because, at least with respect to that issue, they have determined that they share interests with

Non-Debtor GM to oppose the relief that the *Sesay* Plaintiffs seek. *Id*. While the Court early on

advised them to consult with fellow Plaintiffs' counsel, no other obligations to act in the

common interest were ever placed upon them, and they recognize none.[30] Rather than address the

manifest conflict that makes it inappropriate to treat Designated Counsel as representing the

interests of ignition switch plaintiffs generally, the Court in the past has fostered the conflict by

giving Designated Counsel an opportunity, accorded no other Plaintiffs' counsel, to appear at

hearings on matters of which they have no "interest" as that term is defined in 11 U.S.C. §

1109(b), and to speak at the Court's invitation in a distinct contested matter against the relief that

another Plaintiff seeks. *See, e.g.* Transcript of August 5, 2014 Hearing at 6-7; 35. In fact, the

Court poses the issue whether to grant a particular Plaintiffs' group explicitly in terms of denying

one group an opportunity to speak in favor of another group: "The issue before me is the extent

to which I should let you argue it instead of people like Mr. Weisfelner who know a little bit

more about the case and a little bit more about bankruptcy law."

The resolution of the "Threshold Issues" in this Court will have absolutely no relevance

to any legal or factual claim the *Sesay* Plaintiffs assert. Because they do not assert claims

depending on retained liabilities, it does not matter to them whether such claims might not be

barred because those holding such claims did not receive proper notice to make claims, or

---

[30] The *Sesay* Plaintiffs corresponded with Designated Counsel about their roles prior to making this assertion.

whether the doctrine of equitable mootness might nevertheless bar their claims, or whether any

bar must be lifted because of a fraud on the Court. The decision of Non-Debtor GM and

designated counsel with different and conflicting interest that they should nevertheless "wait in

line" while the issues they would prefer to assert are considered, cannot bind Plaintiffs.

**V.    THE *SESAY* PLAINTIFFS OBJECT TO THE COURT'S SCHEDULING
ORDERS BECAUSE THEY IMPOSE BURDENS ON THE *SESAY* PLAINTIFFS
THAT CONSTITUTE INDEPENDENT VIOLATIONS OF THE *SESAY*
PLAINTIFFS' RIGHT TO A REASONABLE OPPORTUNITY TO BE HEARD
BEFORE THEY ARE DEPRIVED OF THEIR CONSTITUTIONALLY BASED
INTERESTS IN PURSUING THEIR LAWSUITS IN A TIMELY FASHION.**

> *A.    The imposition of a three-day deadline for the submission of "no stay pleadings"
> requiring presentation of complex legal contentions does not afford a reasonable
> opportunity to be heard.*

Like counsel for many lawsuits seeking relief for harms caused by GM's wrongdoing,

counsel for *Sesay* does not practice in bankruptcy, but rather primarily in consumer protection

law. The *Sesay* Plaintiffs are aware that the Court would prefer to be addressed by counsel

specializing in bankruptcy law, and that the Court expects counsel to distinguish their case from

the over one hundred other ignition switch cases before it, as well as address a plethora of legal

authority that the Court insists is relevant. Tr. Of August 5, 2014, Hearing *passim*.  Particularly

given the fact that the Court has recognized no ground upon which a "No Stay Pleading" is to be

granted, counsel must construct complex constitutional arguments like those contained in this

submission, a feat that can hardly be accomplished in three days, some of which might be

expected to be spent in locating and retaining specialized counsel for other Plaintiffs who may

possess the means to do so. In fact, the three day time period seems more designed to induce

counsel lacking in bankruptcy knowledge and presented with a list of "Designated Counsel" who

are presented as if they represent the Plaintiffs' group generally to simply give up, let designated

counsel, who profess bankruptcy expertise and demand no assessment, run the show, and hope

for the best. Respectfully, that is not the way that due process is supposed to be accorded.

> B.     *Under the terms of the Scheduling Order, Plaintiffs bear the burden of persuading the Court that Non-Debtor GM is not entitled to a stay of their lawsuits against it.*

Under the terms of the Scheduling Orders, a stay is presumptive and Plaintiffs must

demonstrate what about their case makes it different from the others that are stayed. This results

in an impermissible shifting of the burden of proof to demonstrate jurisdiction and entitlement to

temporary, preliminary and permanent relief from Non-Debtor GM, which invoked this Court's

jurisdiction and seeks such extraordinary equitable relief, to Plaintiffs, who under the Court's

Scheduling Orders are required to bear the burden of demonstrating why their claims, which the

Court has presumptively treated as subject to the 2009 Sale Order, are not so subject, and to bear

the burden of proving that Non-Debtor GM is not entitled to preliminary relief. The Court has

ruled that the "[t]he stay [is] already imposed by the injunctive provisions of Paragraphs 8 and 47

of the Sale Order (and that the Court may also impose by preliminary injunction) …."

> C.     *The Scheduling Orders reflect a de facto consolidation that is not provided for in the procedural rules that govern this proceeding and that has been effected without ensuring the procedural safeguards that lawfully consolidated proceedings that are provided for in other fora would entail.*

Plaintiffs object to these proceedings because GM has not properly initiated any action

against them. It has failed to serve eithera complaint to initiate an adversary proceeding, FRBP

7001, or a motion to initiate a contested matter, FRBP 9014(b).  Non-Debtor GM concedes that it

has not served its motion on the *Sesay* Plaintiffs and states no intention to do so.[31]

---

[31] Counsel confirmed this positon in correspondence with counsel for Non-Debtor GM.

Plaintiffs believe that, because Non-Debtor GM seeks injunctive relief, the applicable

rules mandate that such proceedings be initiated as an adversary proceeding, with all the

procedural protections that attend such a proceeding. FRBP 7001(7). Even if Plaintiffs are

wrong, however, and the injunctive relief that Non-Debtor GM seeks is properly available to a

Non-Debtor and non-party to the Debtor's bankruptcy proceedings by way of the initiation of a

contested matter, such a contested matter must be initiated by a motion served in accordance

with the Bankruptcy rules. 9014(b). Non-Debtor GM has not served its motion on the *Sesay*

Plaintiffs.

Plaintiffs *do not consent* to this way of proceeding.  But Non-Debtor GM's nonchalance

about procedural formalities is a reflection of the due process fiasco that the rump consolidation

of matters into a single proceeding has produced.[32]  Non-Debtor GM has been given free rein to

treat diverse Plaintiffs' lawsuits in bulk, wholesale fashion, as if it were itself a debtor-in-

possession, rounding up all the creditors for their haircuts. And the Court itself refers to a

singular "contested matter" when referring to the matters relating to Non-Debtor GM's Motion

to Enforce.  The wholesale treatment of Plaintiffs' lawsuits was initiated by Non-Debtor GM's

first bulk submission of 46 lawsuits identified in its Motion to Enforce.  The Court, with the

acquiescence of many Plaintiffs as described above, has treated the Plaintiffs' diverse matters as

if they were a single matter, even purporting to incorporate equitable factors from one matter to

another, despite the lack of any identity of interest between them.[33] The associated restriction of

---

[32] Under the Bankruptcy rules, such consolidation is available only in proceedings involving the Debtor. FRBP 1015.

[33] *See*, *e.g*., Tr. Of August 5, 2014, hearing at 80:

> Even if the Sale Order did not apply in the first instance, a preliminary injunction would also be appropriate here, for the reasons discussed at length in *Phaneuf*, which I will not repeat at comparable length here— other than to say that the prejudice to all of the other litigants, and to the case management concerns I had

the *Sesay* Plaintiffs' rights to notice and an opportunity to be heard manifest in the designation of counsel representing "certain" Plaintiffs in distinct controversies as "Designated Counsel" entitled to notices, opportunities to be heard in matters in which it lacks interest, influence over the sequence by which the Court considers the various issues before it, and various courtesies that the *Sesay* Plantiffs are denied by virtue of their lack of that or similar designation.

Such a process denies the *Sesay* Plaintiffs their rights to be heard without having to defer to others whose interests in being heard have been elevated informally and to the detriment of the *Sesay* Plaintiffs over their own.

## VII.    THE COURT SHOULD ABSTAIN FROM EXERCISING ANY JURISDICTION IT MAY CONCLUDE IT HAS OVER THIS MATTER.

Non-Debtor GM's Motion should be denied or deferred in the interests of comity and of avoiding a jurisdictional conflict with another federal court. This Court should decline to exercise jurisdiction it may believe it has over the *Sesay* lawsuit because the federal Court before which the *Sesay* lawsuit is pending has indicated that that Plaintiffs may commence prosecuting their claims before that Court despite any stay stipulation they many have entered or this Court may have purported to impose. This Court should abstain from hindering the prosecution of the *Sesay* lawsuit as it is primarily concerned with claims under State law.  *See Geruschat v. Ernst Young LLP (In re Seven Fields Dev. Corp.),* 505 F.2d 237 (3d Cir. 2007).

### CONCLUSION

For all of the foregoing reasons, Plaintiffs' motions to dismiss for lack of subject matter and personal jurisdiction should be granted forthwith, if the Court determines that it has jurisdiction it should abstain from exercising such, the Plaintiffs should be relieved from the May

---

with respect to the Phaneuf Plaintiffs, is just as much a matter of concern here.  As in *Phaneuf*, I will not allow the Elliott Plaintiffs to go it alone. The Elliott Plaintiffs' claims can be satisfactorily addressed—and will have to be addressed—as part of the coordinated proceedings otherwise pending before me.

16 and July 8 Scheduling Orders, and other Plaintiffs not a party to their dispute with Non-Debtor GM should not heard, Non-Debtor GM's Motion to Enforce should be denied in its entirety with respect to the *Sesay* lawsuit, and the *Sesay* Plaintiffs should be free to prosecute their action against Non-Debtor GM without further hindrance.

Respectfully submitted,

*/s/Gary Peller*_____
Gary Peller
Counsel for the *Sesay* Plaintiffs
600 New Jersey Ave. NW
Washington, DC  20001
(202) 662-9122
peller@law.georgetown.edu