# Exhibit B



**CORPORATION SERVICE COMPANY®**

null / ALL
**Transmittal Number: 12858315**
**Date Processed: 08/19/2014**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Rosemarie Williams<br>General Motors LLC<br>Mail Code 48482-038-210<br>400 Renaissance Center<br>Detroit, MI 48265 |

| | |
|---|---|
| **Entity:** | General Motors LLC<br>Entity ID Number  3113523 |
| **Entity Served:** | General Motors, LLC. |
| **Title of Action:** | Alers Sr., Alejandro vs. General Motors LLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Los Angeles County Superior Court, California |
| **Case/Reference No:** | VC064207 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 08/18/2014 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Regular Mail |
| Sender Information: | Alejandro Alers, Jr. (Inglewood, CA)<br>310-672-0369 |
| **Client Requested Information:** | Year: 2010<br>Make: Chevrolet<br>Model: Cobalt<br>VIN: 1G1AD5F52A7210982 |

| | |
|---|---|
| **Notes:** | Alejandro Alers, Jr. 611 North Park Avenue Inglewood, CA 90302<br>CSC Location document was served: Corporation Service Company 2711 Centerville Road Wilmington, DE 19808<br>The document matches the original as it was received.  Every page served is attached in the image.  The first page in Exhibit H states 1 of 3, there are no pages 2 or 3 of 3 attached. |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

GENERAL MOTORS, LLC.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

ALEJANDRO ALERS, SR.

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

AUG 11 2014

Sherri R. Carter, Executive Officer/Clerk

By Beatriz Gonzalez, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* NORWALK COURTHOUSE<br><br>12720 NORWALK BLVD.<br>NORWALK, CALIFORNIA 90650 | CASE NUMBER:<br>*(Número del Caso):* VC064207 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ALEJANDRO ALERS, JR., Esq., 611 NORTH PARK AVENUE, INGLEWOOD, CA. 90302

| | | | |
|---|---|---|---|
| DATE: 8- ~~9 2014~~ AUG 11 2014<br>*(Fecha)* | SHERRI R. CARTER Clerk, by<br>*(Secretario)* | B. Gonzalez | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* GENERAL MOTORS, LLC.

under: ☑ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

1  ALEJANDRO ALERS, JR., Esq. SBN 240532
2  611 North Park Avenue
   Inglewood, CA. 90302
3  310-672-0369
   alalersjr@att.net
4

5  Attorneys for Plaintiff,
   ALEJANDRO ALERS, SR.
6

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

AUG 11 2014

Sherri R. Carter, Executive Officer/Clerk
By Beatriz Gonzalez, Deputy

7

8

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA
10      COUNTY OF LOS ANGELES-SOUTHEAST DISTRICT
              NORWALK COURTHOUSE
11            UNLIMITED JURISDICTION

12  ALEJANDRO ALERS, SR.

13           Plaintiff,              COMPLAINT

         vs.                                VC064207
14

15  GENERAL MOTORS, LLC.

         Defendant.
16

## JURISDICTION
17

18      1.      This Court has jurisdiction over this
matter because the contract was entered into in the
19
County of Los Angeles. The Defendant does business
20
within the State of California and Los Angeles County.
21
The Plaintiff resides within the County of Los Angeles.
22
In addition, BBB Auto Line, third party dispute
23
resolution source, has denied jurisdiction over this
24
matter. Exhibit I.
25

26

## BACKGROUND FACTS
27

28      2.      The Defendant, General Motors, manufactured
                                            COMPLAINT
                                                    1

1    and sold new automobiles to the public through its

2    authorized dealer, S&J Chevrolet, Inc. in Cerritos

3    California. The Defendant initially manufactured the

4    Saturn Ion in 2003 and in 2005 its cousin, the

5    Chevrolet Cobalt. In 2002, Delphi Automotive, the

6    supplier of ignition switches for the Defendant,

7    informed the Defendant that ignition switches installed

8    in the Saturn Ion failed to meet the Defendant's torque

9    standards, the rotational force needed to keep the

10   switch in the "run" position. The Defendant approved

11   the installation of the sub-par switches, even though,

12   it would have cost approximately one-dollar added onto

13   the sales price of the Saturn Ion to upgrade the

14   ignition switches torque to meet the Defendant's torque

15   requirements. The Defendant claimed its refusal to

16   upgrade the ignition switches on expensive re-tooling

17   of the supplier's manufacturing plant and delays in

18   production costs.

19

20        3.        The result of the Defendant's failure to

21   upgrade the ignition switches was the ignition switch

22   would go from the "run" position to the "off" position,

23   which caused the power system on the automobile to stop

24   functioning. The power steering failed to operate;

25   power brakes failed to operate; and the air bags failed

26   to deploy. The automobile became uncontrollable during

27   this episode. The failure to upgrade by the Defendant

28                                              COMPLAINT

                                                    2

1   resulted in 13 deaths and a number of serious injuries

2   directly related to the ignition switch.

3

4       4.      The Defendant continued to approve the

5   installation of the sub-par ignition switches in the

6   Saturn Ion and Chevrolet Cobalt.

7

8       5.      The Defendant refused to disclose to

9   the sub-par ignition switch problem to the public until

10  February 2014. The National Highway Traffic Safety

11  Administration(NHTSA) claimed there was not enough

12  evidence to indicate a defect trend.

13

14      6.      The Defendant issued a recall on 2.6

15  million automobiles, including the Saturn Ion and 2008-

16  2010 Chevrolet Cobalt. The Defendant sent a recall

17  notice(Exhibit A) to the Plaintiff in April 2014.

18

19      7.      The Defendant, later, was fined by the

20  U.S. Government regulators $35 million dollars for

21  Defendant's long delay to notify the public and recall

22  its defective automobiles.(Exhibit B).

23

24              **First Cause of Action**

25       **Breach of Contract and Express Warranty**

26          **California Civil Code Section 1791.2**

27      8.      Plaintiff incorporates paragraphs 1-7

28                                          COMPLAINT

                                                 3

herein.

9.      To recover damages for breach of contract,
Plaintiff must prove the following: (1) That Plaintiff
and Defendant entered into a contract; (2) That
Plaintiff did all, or substantially all, of the
significant things that the contract required him to do
or that he was excused from doing those things; (3)
That all conditions required by the contract for
Defendant's performance had occurred or were excused;
(4)That Defendant failed to do something that the
contract required him to do; and (5) That Plaintiff was
harmed by that failure.

10.      (1) The Plaintiff and Defendant had
entered into a contract. The Plaintiff purchased a new
2010 Chevrolet Cobalt(VIN 1G1AD5F52A7210982)on June 19,
2010 from Defendant's authorized dealer, S&J Chevrolet,
Inc. located in Cerritos California for a total
purchase price of $ 18,097.58.Exhibit C.

11.      (2) That the Plaintiff did all, or
substantially all, of the significant things that the
contract required him to do or that he was excused from
doing those things. The Plaintiff traded-in another car
that was of greater value than the Chevrolet Cobalt
being purchased. The Plaintiff received an offset of

COMPLAINT
4

1 | $902.42.

2

3 | 12.        (3) That all conditions required by the
4 | contract for Defendant's performance had occurred or
5 | were excused. The Plaintiff had paid the full contract
6 | price for the Chevrolet Cobalt.

7

8 | 13.        (4) That Defendant failed to do something
9 | that the contract required him to do. The Defendant
10 | failed to satisfy its express warranty:

11 |     "GM is committed to assuring satisfaction with
12 |     your new vehicle. Your dealer also wants you to
13 |     be completely satisfied and invites you to
14 |     return for all your service needs, both during
15 |     and after the warranty period." Exhibit D.
16 | The Defendant manufactured and sold to the Plaintiff a
17 | new automobile that had a sub-par ignition switch which
18 | made the automobile defective, unreliable and dangerous
19 | to the Plaintiff and anyone else in the vicinity of the
20 | automobile. The ignition switch should have had a
21 | torque specification range between 15 to 25 Newton-
22 | centimeters. The ignition switch sold to the Plaintiff
23 | had a torque specification range between 10 to 15
24 | Newton-centimeters. The ignition switch sold to the
25 | Plaintiff was below the quality and standard of an
26 | ignition switch that the Plaintiff had bargained for
27 | under the contract.

28

COMPLAINT

5

1    Second, the Defendant had knowledge of the
2  sub-par ignition switches since 2001-2002 and failed to
3  provide the Plaintiff with any written or oral notice
4  at the time of purchase in 2010 regarding the sub-par
5  ignition switches.

6    14.    (5) That the Plaintiff was harmed by that
7  failure. The Plaintiff bargained for a new reliable and
8  safe automobile. In return, the Plaintiff received a
9  dangerous(linked to 13 deaths), unreliable(motor could
10  shut-off if too many keys were on the key ring or if
11  the automobile rolled over a bump on the road or bumpy
12  terrain)automobile. Even though the automobile has been
13  repaired by the Dealer, the Plaintiff does not have
14  confidence in the Defendant's repairs because of the
15  Defendant's intentional refusal to disclose the sub-par
16  ignition switch problem. The Defendant, already, had a
17  propensity to lie by its refusal to disclose to the
18  public the ignition switch problem.  There was no
19  independent third party verification that the repairs
20  made by the Defendant met its specifications. The
21  Defendant's credibility was very low as to the
22  reliability of the repairs. The Defendant has conducted
23  only 8 safety tests to ensure that the new ignition
24  switches were reliable and worked properly. Exhibit E.

25    There is a future harm as well. The Plaintiff
26  should not be required to be a "guinea pig" and
27  experiment with the defective automobile's safety, and

28
                                        COMPLAINT
                                            6

1  hope in the future, the ignition switch will not fail.

2  The Defendant has offered owners of recalled autos

3  discounts towards the purchase of a new GM auto. This

4  indicates that the Defendant has no confidence in the

5  recalled autos, the ignition switch replacement, and a

6  desire to remove these autos from the street to reduce

7  the Defendant's potential liability. Exhibit H. Also if

8  the ignition switch fails in the future, the Plaintiff

9  may be potentially  liable to others for injuries,

10  economic loss and property damage.

11      Second, the Defendant has admitted liability as to

12  the sub-par ignition switches. Exhibit F. The Defendant

13  has created a "compensation fund" for victims who were

14  killed and injured because of the sub-par ignition

15  switches. However, the Defendant has refused to offer a

16  "Buy-Back or reimbursement" fund to purchasers who

17  suffered only an economic loss. Exhibit G. The

18  Defendant cannot limit its liability as to only one

19  class of purchasers. The two class of purchasers

20  (injured/kill vs. economic loss) were parallel to each

21  other except in the extent of the damages. Economic

22  loss purchasers should have been compensated in a "Buy-

23  Back or reimbursement" program as well.

24

25                    **Second Cause of Action**

26                    **Fraud-Concealment**

27      15.    Plaintiff incorporates by reference

28
                                              COMPLAINT
                                              7

paragraphs 1-14 herein.

16.    To recover, the Plaintiff must prove the following;(1) That Defendant intentionally failed to disclose an important fact that was known only to Defendant and that Plaintiff could not have discovered; or that Defendant actively concealed an important fact from Plaintiff, or prevented the Plaintiff from discovering that fact; (2) That Plaintiff did not know of the concealed fact; (3) That Defendant intended to deceive the Plaintiff by concealing the fact; (4) That the Plaintiff reasonably relied on Defendant's deception; (5) That the Plaintiff was harmed; and (6) That the Defendant's concealment was a substantial factor in causing Plaintiff's harm.

17.    (1) Defendant intentionally failed to disclose an important fact that was known only to the Defendant and that Plaintiff could not have discovered. The ignition switch's defect to slip from the "run" position to the "off" position which resulted in the Chevrolet Cobalt's loss of power steering, power brakes and air-bag deployment was an important fact. The Defendant knew of the defect since 2001-2002. The Defendant knew of the accidents and deaths related to the defective ignition switches in 2004. The Defendant intentionally failed to disclose the defective ignition

COMPLAINT
8

1  switch problem to the Plaintiff in 2010 at the time of

2  purchase. The Defendant failed to disclose and the

3  NHTSA did not see a defective trend in the ignition

4  switches, so the Plaintiff could not have discovered

5  the ignition switch problem.

6

7      18.      (1)Defendant actively concealed an

8  important fact from Plaintiff. Since 2001-2002, the

9  Defendant knew the sub-par ignition switches were

10  defective and failed to meet the Defendant's torque

11  requirements or standards as a safe and reliable

12  ignition switch.  Defendant kept the problem regarding

13  the ignition switches a secret from the public who had

14  purchased these defective automobiles. The Defendant

15  refused to disclose the ignition switch problem to the

16  Plaintiff at the time of purchase in 2010.

17

18      19.      (2)Plaintiff did not know of the concealed

19  fact. Plaintiff had no knowledge of the defective, sub-

20  par ignition switch problem at the time of purchase in

21  2010.

22

23      20.      (3)Defendant intended to deceive the

24  Plaintiff by concealing the fact. In 2002, Delphi

25  Automotive, supplier of the ignition switches to the

26  Defendant, informed the Defendant that the ignition

27  switches failed to meet the Defendant's specifications.

28                                          COMPLAINT
                                                  9

1    The Defendant told the supplier to install the switches

2    anyway. The Defendant sold the automobiles to the

3    public without the disclosure of the information that

4    the ignition switches failed to meet the Defendant's

5    specifications  was an intent to deceive the Plaintiff.

6

7        21.        (4) That the Plaintiff reasonably relied

8    on Defendant's deception. Plaintiff was a consumer.

9    Plaintiff had no skill, knowledge or expertise

10   regarding automobile design or engineering. The

11   Defendant was known as one of the premier automobile

12   manufactures in the United States. Plaintiff reasonably

13   relied upon the Defendant's expertise in manufacturing

14   new, safe and reliable automobiles.

15

16       22.        (5) That the Plaintiff was harmed. The

17   Plaintiff incorporates by reference herein paragraph

18   14.

19

20       23.        (6) That the Defendant's concealment was a

21   substantial factor in causing the Plaintiff's harm. The

22   Defendant has accepted liability for the sub-par

23   ignition switch problem. Exhibits E and F. The

24   Defendant has recognized that the Defendant's approval

25   of the supplier's manufacturing and installing of the

26   sub-par ignition switches were the cause of the

27   multiple accidents, deaths, property damage and

28                                                          COMPLAINT
                                                                 10

1  economic losses suffered by consumers. The Defendant's

2  approval of the manufacture and installation of the

3  sub-par ignition switches were a substantial factor in

4  causing the Plaintiff's harm.

5

6  **Third Cause of Action-Rescission**

7  **California Civil Code Section 1688**

8     24.    Plaintiff incorporates by reference herein

9  paragraphs 1-23.

10

11     25.    California Civil Code Sections 1688 and

12  1689(b)(1) permitted rescission when the consenting

13  party gave consent to the contract formation based on

14  fraud by the connivance of the party to whom he

15  rescinds or any other party jointly interested in the

16  contract. At the time the Plaintiff signed the contract

17  to purchase the Cobalt in 2010, the Defendant refused

18  to disclose the ignition switch problem although the

19  Defendant had knowledge of the sub-par ignition switch

20  problem since 2002, and knowledge of the deaths and

21  major injuries related to the ignition switch problem

22  since 2004. Had the Defendant disclosed the sub-par

23  ignition switch problem to the Plaintiff, Plaintiff

24  would not have purchased the 2010 Chevrolet Cobalt.

25

26     26.    California Civil Code Section 1692

27  permitted relief based on rescission. Plaintiff is

28

COMPLAINT

11

1    entitled to complete relief(damages), including

2    restitution of benefits conferred onto the Defendant as

3    well as consequential damages.

4

5    27.    The statute of limitations for fraud cause

6    of action is three years from date of discovery by

7    Plaintiff. California Code of Civil Procedure Section

8    338(d);Utility Audit Co. v. City of Los Angeles, 112

9    Cal. App.4th 950,962(2003). The Defendant issued the

10   recall to the public in February 2014. The statute of

11   limitations for rescission of a written contract is

12   four years from the date of discovery by the Plaintiff.

13   California Code of Civil Procedure Section 337.

14

15                     **Interest on Damages**

16   28.    California Civil Code Sections 3288 and

17   3289(b) permitted Plaintiff to recover interest on the

18   contract price paid by Plaintiff under the contract.

19

20                     **Punitive Damages**

21   29.    If the court finds a violation of

22   California Civil Code Section 1791.2, the court may

23   award damages under Civil Code Section 1794. In

24   addition, California Civil Code Section 1794(c) stated

25   that if the buyer establishes that the failure to

26   comply was willful, the judgment may include... a civil

27   penalty not exceed twice the amount of actual damages.

28
                                              COMPLAINT
                                                   12

1           30.      If the court finds fraud by concealment,

2    the court may award punitive damages based on

3    California Civil Code Section 3294(a) and <u>Robinson</u>

4    <u>Helicopter Co.,Inc. v.Dana Corp.</u>, 34 Cal 4th 979,

5    991(2004). The concealment of the sub-par ignition

6    switches from the Plaintiff and the public was

7    independent of the breach of contract of selling a

8    defective automobile. Defendant's concealment satisfies

9    the definitions of "malice" and "fraud". Defendant

10   acted with a willful and conscious disregard of the

11   safety of the Plaintiff and consumers in general by

12   Defendant's refusal to disclose the consequences of a

13   sub-par ignition switch, i.e., the losses of power

14   brakes, power steering and no air-bag deployment when

15   the ignition switch goes from the "run" position to the

16   "off" position.

17

18          31.      The measure of punitive damages should be

19   at least ten times the actual damages awarded. The

20   reprehensibility of the Defendant's concealment was

21   egregious. <u>Johnson v. Ford Motor Co.</u>, 35 Cal. 4th 1191,

22   1204(2005). The Defendant's concealment affected 2.6

23   million cars. The Defendant knew of the link between

24   the sub-par ignition switches and death-related

25   accidents in 2004. At that time, Defendant refused to

26   halt its approval of the manufacture and installation

27   of the sub-par ignition switches in the Saturn Ion and

28                                                    COMPLAINT

                                                          13

1  Chevrolet Cobalt. But instead, the Defendant continued

2  the manufacture and installation of the sub-par

3  ignition switches because company profits were more

4  important than consumer safety. <u>Johnson</u>, supra, at page

5  1206. The Defendant sold the same defective, sub-par

6  ignition switch to the Plaintiff in 2010. It was not

7  until February 2014 that the Defendant disclosed the

8  sub-par ignitions switch problem, 10 years after the

9  Defendant had notice of deaths linked to the sub-par

10 ignition switch.

11

12                          **<u>DAMAGES</u>**

13     32.      Plaintiff prays for judgment for costs of

14 suit; for such relief as is fair, just and equitable;

15 and for:

16 A. Damages:

17     **COMPENSATORY DAMAGES:**

18        1.Contract Price:              $18,097.58

19     **CONSEQUENTIAL**

20        **DAMAGES:**

21        1.Loss of use-60

22          Days in

23          repair shop:                 1,800.00

24        2.Insurance Prem.

25          Paid for 60 days:            200.00

26        3.Interest on

27          Contract Price

28                                    COMPLAINT
                                          14

1          Date:6/19/10

2          10% per yr:                          7,239.32

3      4.Attorney's Fees

4        According to

5        Proof:

6      **PUNITIVE DAMAGES:**

7      1.Punitive Damages

8        10 times contract

9        price:

10     2.Civil Penalty

11       2 times contract

12       price:

13

14

15  DATED: August 2, 2014

16

17                    By: _____

18                        ALEJANDRO ALERS,JR., Esq.

19

20

21

22

23

24

25

26

27

28
                                          COMPLAINT
                                               15

EX - A


April 2014

Alejandro Alers
1543 6th Ave.
Los Angeles, CA 90019-4302

Dear Alejandro Alers:

This notice is sent to you in accordance with the National Traffic and Motor Vehicle Safety Act.

General Motors has decided that one or more defects as described below which relate to motor vehicle safety may exist in all 2008-2010 model year (MY) Chevrolet Cobalt, 2008-2011 MY Chevrolet HHR, 2008-2010 MY Pontiac Solstice, 2008-2010 MY Pontiac G5, and 2008-2010 MY Saturn Sky vehicles. As a result, GM is conducting a recall. We apologize for this inconvenience. However, we are concerned about your safety and continued satisfaction with our products.

---

## IMPORTANT

- This notice applies to your 2010 model year Chevrolet Cobalt, **VIN 1G1AD5F52A7210982.**

  **Until the recall repairs have been performed, it is <u>very</u> important that you remove all items from your key ring, leaving only the vehicle key. The key fob (if applicable), should also be removed from your key ring. Also, when exiting your vehicle, always make sure your vehicle is in "Park", or in the case of a manual transmission, put the transmission into reverse gear and set the parking brake.**

- Parts are not presently available to remedy your vehicle. When parts become available, GM will send you another letter to notify you to schedule an appointment with your GM dealer.

- The recall will be performed for you at **no charge.**

---

| | |
|---|---|
| **Why is your vehicle being recalled?** | GM records indicate a defective Ignition & Start Switch or a kit containing a defective Ignition & Start Switch may have been installed in some 2008-2010 MY Chevrolet Cobalt, 2008-2011 MY Chevrolet HHR, 2008-2010 MY Pontiac Solstice, 2008-2010 MY Pontiac G5, and 2008-2010 MY Saturn Sky vehicles. |
| | If your vehicle has the defective Ignition & Start Switch, there is a risk, under certain conditions, that your ignition switch may move out of the "run" position, resulting in a partial loss of electrical power and turning off the engine. This risk increases if your key ring is carrying added weight (such as more keys or the key fob) or your vehicle experiences rough road conditions or other jarring or impact related events. If the ignition switch is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality. |

GM

Some of these vehicles may also have a condition in which the ignition key may be removed when the ignition is not in the "Off" position. If the ignition key is removed when the ignition is not in the "Off" position, unintended vehicle motion may occur: (a) for an automatic transmission, if the transmission is not in "Park"; or (b) for a manual transmission, if the parking brake is not engaged and the transmission is not in reverse gear. This could result in a vehicle crash and occupant or pedestrian injuries.

**Until the recall repairs have been performed, it is <u>very</u> important that you remove all items from your key ring, leaving only the vehicle key. The key fob (if applicable), should also be removed from your key ring. Also, when exiting your vehicle, always make sure your vehicle is in "Park", or in the case of a manual transmission, put the transmission into reverse gear and set the parking brake.**

**What will we do?**

Whether or not your ignition switch has been previously serviced, GM will replace the ignition switch on your vehicle. This measure is being taken in an abundance of caution, to make sure all defective ignition switches have been removed from all vehicles.

PARTS ARE NOT CURRENTLY AVAILABLE, but when parts are available, your GM dealer will replace the ignition switch on your vehicle whether it is the original switch or a replacement, and for vehicles that have not previously had an ignition cylinder replacement under warranty, dealers will replace the ignition cylinder. Dealers will also cut and if necessary re-learn two ignition keys for each vehicle. This service will be performed for you at **no charge**. Because of scheduling requirements, it is likely that your dealer will need your vehicle longer than the actual service correction time of approximately 90 minutes.

We are working as quickly as possible to obtain parts. We will notify you with at least a second letter as soon as parts are available so that you can schedule an appointment with your dealer to have your vehicle repaired.

If required, your GM dealer will provide you with some form of courtesy transportation at no charge while your vehicle is at the dealership for this repair.

**What should you do?**

When GM notifies you that parts are available, you should contact your GM dealer to arrange a service appointment. **Until the recall repairs have been performed, it is <u>very</u> important that you remove all items from your key ring, leaving only the vehicle key. The key fob (if applicable), should also be removed from your key ring. Also, when exiting your vehicle, always make sure your vehicle is in "Park", or in the case of a manual transmission, put the transmission into reverse gear and set the parking brake.**

| | |
|---|---|
| **Did you already pay for this repair?** | When GM notifies you that parts are available, GM will also provide instructions for you to request reimbursement if you paid for repairs for the recall condition previously. |
| **Do you have questions?** | If you have questions or concerns that your dealer is unable to resolve, please contact the Chevrolet Customer Assistance Center at 1.800.222.1020 (TTY 1.800.833.2438). |

If after contacting your dealer and the Customer Assistance Center, you are still not satisfied we have done our best to remedy this condition without charge and within a reasonable time, you may wish to write the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE., Washington, DC 20590, or call the toll-free Vehicle Safety Hotline at 1.888.327.4236 (TTY 1.800.424.9153), or go to http://www.safercar.gov.  The National Highway Traffic Safety Administration Campaign ID Number for these recalls are 14V047 and 14V171.

Federal regulation requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

For additional information regarding this recall, please go to www.gmignitionupdate.com.

Jim Moloney
General Director – Customer & Relationship Services

GM Recall Numbers: 14092 and 14113 or 14133

Customer Number:**341864**    Invoice No.2**470926**    **FELIX CHEVROLET CO.**

WORKORDER

**ALEJANDRO ALERS**
1543 6TH AVE
LOS ANGELES, CA 90019-4302

**Page 1 of 1**

3330 S. FIGUEROA (AT JEFFERSON)
**LOS ANGELES, CALIFORNIA 90007**
(213) 748-6141

DLR #20170

Home:        s:        Cell:

Email: dnh@email.com | home

SERVICE ADVISOR: **4489 MARTINEZ,FELIPE**

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/ OUT | TAG |
|---|---|---|---|---|---|---|
| SILVER | 10 | CHEVROLET COBALT | 1G1AD5F52A7210982 | 6NCA957 | 1238 / | **TF982** |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 01JAN10 D | | | 17:00 04APR14 | | | CASH | |

| R.O. OPENED | BOOKED | OPTIONS: ENG:2.2 Liter |
|---|---|---|
| 11:18 04APR2014 | | |

LINE OP CODE   TECH. TYPE   DESCRIPTIONS/INSTRUCTIONS

# A  S10            WC     CAMP #14092 IGNITION SWITCH REPLACEMENT

# B  S10            WC     2 WAY SHUTTLE RIDE REQUIRED

# C  0101           ISA    CUSTOMER REQUESTED TO PERFORM COMPLIMENTARY MULTI
                           POINTS VEHICLE INSPECTION, PERFORM EXTERIOR LIGHT
                           FUNCTION TEST, MEASURE TIRE TREAD DEPTH, PERFORM
                           VISUAL BRAKE INSPECTION, INSPECT ALL FLUID LEVELS A

# D  0401           ISA    CLIENT REQUEST STATE MANDATED TIRE PRESSURE INSPECTION
                           AND CORRECTION TO MANUFACTURER'S SPECIFICATIONS

E-mail: dnh@email.com

CC869984 Q (02/14)

I HEREBY AUTHORIZE THE REPAIR WORK TO BE DONE ALONG WITH THE NECESSARY MATERIALS, AND HEREBY GRANT YOUR EMPLOYEES PERMISSION TO OPERATE THE VEHICLE HEREIN DESCRIBED ON STREETS, HIGHWAYS OR ELSEWHERE FOR THE PURPOSE OF TESTING AND/OR INSPECTION. ALL LABOR CHARGES ARE FIXED PRICES, AND BEAR NO RELATIONSHIP TO ACTUAL HOURS OF LABOR PERFORMED. ALL REFERENCES HEREIN OR OTHERWISE, INCLUDING ANY POSTING OF LABOR RATES OR FLAT RATE LABOR HOURS ARE FOR INFORMATION ONLY TO INDICATE TO THE CUSTOMER THE BASIS UPON WHICH THE FIXED PRICES WERE ESTABLISHED BUT NEITHER SUCH PREFERENCES OR POSTING NOR THE FACT THAT THE ACTUAL HOURS OF LABOR PERFORMED MAY BE MORE OR LESS THAN THE INDICATED FLAT RATE HOURS SHALL HAVE ANY EFFECT WHATSOEVER ON THE FIXED PRICE SO CHARGED.

**METHOD OF PAYMENT**
FOR YOUR CONVENIENCE WE ACCEPT
THE FOLLOWING CREDIT CARDS:
VISA · MASTERCARD · AMERICAN EXPRESS · DISCOVER
WE ALSO ACCEPT PERSONAL CHECKS.

**PRIOR BODY DAMAGE**



X _____
CUSTOMER ACKNOWLEDGES RECEIPT OF A COPY HEREOF

X _____
CUSTOMER INITIALS

**PRELIMINARY ESTIMATE  $**

SERVICE AND PARTS DEPT. HOURS
MONDAY THRU FRIDAY 7:30 A.M. TO 6:00 P.M.
SATURDAY 8:00 A.M. TO 2:00 P.M.
VEHICLES MUST BE PICKED UP
DURING SERVICE DEPARTMENT HOURS.
ASK ABOUT OUR FREE SHUTTLE SERVICE

ALL PARTS REMOVED FROM YOUR VEHICLE
WILL BE DISCARDED UNLESS OTHERWISE INSTRUCTED
AT THE TIME THE ORDER IS PLACED

"By law, you may choose another licensed Smog Check facility to perform any needed repairs or adjustments that the Smog Check test indicates are necessary."

IMPORTANT: REMOVE ALL PERSONAL PROPERTY AND VALUABLES FROM YOUR VEHICLE. WE DO NOT ASSUME RESPONSIBILITY FOR LOSS OR DAMAGE TO CARS OR ARTICLES LEFT IN CARS IN CASE OF FIRE, THEFT OR ANY OTHER CAUSE BEYOND OUR CONTROL.

CHANGE OIL ☐        CHANGE OIL ☐ / FILTER CART. ☐
MAJOR ☐  CHANGE ☐  CHANGE ☐
LUBE     TRANS. OIL  DIFF. OIL

**Notice to Consumer: Please read important information on back.**

Copyright 2000 ADP, Inc.   ELF XSW4C_SERVICE_WORKORDER

**ALL PARTS ARE NEW UNLESS SPECIFIED OTHERWISE**

BAR ARD 131281        EPA CAD981373210

» Print

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Insight: Deadly GM ignition switches started with 2003 Saturn Ion

Fri, Apr 11 2014

By Paul Lienert and Marilyn Thompson

DETROIT/WASHINGTON (Reuters) - The 2003 Saturn Ion was supposed to be a pivotal car for General Motors Co. Instead, it came to represent the compromises and corner cutting that almost destroyed GM and now find the company in a global recall of some of its most popular models.



The Ion debuted two years before the Chevy Cobalt, the model most associated with the current recall of 2.6 million vehicles, and it was the first car with the defective ignition switch linked to at least 13 deaths, when engines turned off, disabling airbags.

Priced from $12,000, it was the automaker's answer to the class-leading Toyota Corolla and Honda Civic, a small car that could finally be built at a profit to GM, which at the time was losing up to $2,000 on every compact it sold.

The all-new Ion was to be a standard bearer for GM's import-fighting Saturn brand, as well as the advance guard for a new family of compacts, code-named "Delta," that eventually would include the 2005 Cobalt.

Instead, the Ion, and the safety of its ignition switch, were compromised by GM's determination to cut its bloated costs, fractious relations with parts maker Delphi Automotive, and pressure to stick to a schedule, a close look at GM documents released to Congress and interviews with former GM executives show.

In many ways the problems with all of the cars affected by the recall are reflected in the Ion's troubled start.

Delphi alerted GM that the switch did not meet the automaker's standards by early 2002, the parts maker told Congress. The switch cost less than $1 to produce.

But changing it just before the start of production would have cost hundreds of thousands of dollars in factory retooling and caused an expensive and embarrassing delay in the Ion's introduction, former GM officials told Reuters.

GM decided to proceed with the sub-par switch in February 2002, only five months before the first Ions were expected to roll out of a Tennessee factory, Delphi told Congress. The decision would have far-reaching consequences over the next 12 years.

GM, which is pursuing its own investigation of the recall, said it would not comment on specifics "until our internal review is complete." Delphi declined to comment.

The Ion was one of the first products developed under the watch of industry veteran Bob Lutz, who rejoined GM in September 2001 as vice chairman in charge of product development and was sometimes compared by insiders with the tough-talking judge who is the title character in Elmore Leonard's novel, Maximum Bob. Then-Chairman Rick Wagoner had lured Lutz to the automaker to revitalize its tired vehicles, as well as its product development organization.

There is no evidence that Lutz played any role in the switch decision or knew about its problems. But Twelve years ago, corporate pressure to keep the 2003 Ion on schedule was intense, former GM executives told Reuters.

"Would you want to be the guy who told 'Maximum Bob' that his baby was going to be late?" asked a retired GM purchasing manager familiar with the small-car program.

Lutz declined to comment.

A SWITCH IS BORN

The lead designer for the Ion ignition switch was Ray DeGiorgio, a GM engineer who testified in a deposition last year that he developed the project jointly with a small team of Delphi engineers. The Ion switch was DeGiorgio's first project as a lead designer, he testified.

DeGiorgio was one of two GM engineers on Thursday who were placed on paid leave for undisclosed reasons as part of GM's ongoing investigation of the switch-related recall. [ID:nL3N0N243F] It is not clear what role, if any, he played in the 2002 decision not to change the switch, and Reuters attempts to reach him were unsuccessful.

A former GM subsidiary that had spun off in 1999, Delphi, based in Troy, Michigan, still relied heavily on GM business. A number of Delphi officials, including CEO J.T. Battenberg, were former GM executives.

The relationship was complex from the start. The U.S. Securities and Exchange Commission in 2004 began investigating the automaker's accounting practices in the early 2000s, including how GM had handled some transactions with Delphi, and eventually reached a settlement with the automaker in 2009. The SEC also investigated Delphi's accounting practices, including certain transactions with GM, settling most charges in 2006.

Relations between the carmaker and its supplier were often strained by issues involving money, one former executive said.

The supplier "was blamed for many of the product problems GM was experiencing in the field," according to the retired GM finance manager who helped monitor product quality at the time.

"Since executive bonuses were partially pegged to profitability and quality metrics, Delphi and other suppliers became convenient scapegoats," the manager said. GM people would look at recall costs in terms of the effect on their pay. They "were constantly score-carding bonus payout thresholds and the adverse impact of potential product recalls."

Both companies were struggling with high labor and material costs and eventually declared bankruptcy later in the decade. In the early 2000s, cost reduction was a mantra at both companies.

Vehicle teams at GM, such as the one designing and engineering the Ion, were given strict cost targets, as were suppliers like Delphi. To meet them, "cheaper, less robust components were approved for new vehicles," according to the retired finance manager. He declined to be more specific.

Against this backdrop, the Ion development program rolled on. Delphi told House investigators last month that it informed GM the switch didn't meet the automaker's requirements for torque, the rotational force needed to keep the switch in the "run" position. But GM signed off on use of the switch in February, 2002, Delphi said.

## ION'S DEBUT

Six months later, the first Saturn Ion, a sporty silver-blue model, rolled off the production line in Spring Hill, Tennessee, applauded by top GM and union officials.

The car was panned almost immediately by consumers and critics alike. Car and Driver magazine proclaimed it "the most disappointing all-new American car in a decade."

Problems cropped up almost immediately with the Ion's ignition switch. GM sent a service bulletin to Saturn dealers in December 2002, when the Ion had been on the road for just four months, telling technicians how to replace the ignition lock cylinder.

Another service bulletin in June 2004 addressed issues with engines failing to start. A third bulletin in March 2005 advised technicians about "inadvertent turning" off of the switch, which caused engine stalling.

GM already had updated the switch for the launch of the Ion's sibling, the Cobalt, and recommended to Saturn dealers that it replace older ignition switches with the newer one. Even then, owners complained about keys accidentally switching off the ignition and engines stalling. Crash fatalities mounted.

The first Ion crash fatality occurred in December 2003, according to GM and NHTSA records, followed by seven more deaths in five more Ion crashes by June 2005. Neither GM nor NHTSA has said if those deaths were potentially linked to the defective ignition switch. But GM last month acknowledged four switch-related deaths in Saturns, all of them 2004 Ions.

All models of the recalled cars, including Ions, had a second ignition-related problem, GM revealed on Thursday: keys coming out of ignitions while the engine is running, that caused at least tone non-fatal injury.

A brand-new ignition switch was considered, then rejected in September 2005 by GM engineers working on the Ion and Cobalt, because the new switch would have required $400,000 in new tooling and added 90 cents to the cost of each car, GM emails released to Congress show.

Instead, yet another ignition switch revision for the Ion and other cars was approved in April 2006 by GM's DeGiorgio, according to a GM document. DeGiorgio authorized Delphi to change the switch's internal workings by replacing two tiny parts that helped control how much force it took to turn the switch.

Delphi officials told congressional investigators last month that the redesigned switch approved by DeGiorgio provided "a significant increase in . . . performance, but the values were still below GM's original specifications."

House Democrats in late March said Delphi told them GM's original torque specifications called for a range of 15 to 25 Newton-centimeters, but testing of the original switch in 2002 showed actual torque between 4 and 10 N-cm in most cases. The redesigned switch in 2006 showed test results of 10 to 15 N-cm, Delphi told investigators.

DeGiorgio, questioned about his approval during a 2013 court deposition in a switch-related lawsuit against GM, denied that he was aware of or approved any change.

## MISSED SIGNALS

Neither GM nor federal regulators told the public until early this year about the faulty switch, although there were plenty of warning signals over the past decade.

Saturn Ion drivers in complaints to the National Highway Traffic Safety Administration described putting their lives at risk when engines inexplicably stalled. There were more than 550 complaints for the 2003 Ion alone.

One owner of a new 2003 Ion reported being "nearly killed in the vehicle twice" when the car stalled on a freeway. Another told NHTSA "on three different occasions, my knee has accidentally hit the keys, causing the engine to shut off," including two incidents at highway speeds.

The federal agency has repeatedly said it did not have enough evidence to show a defect trend.

In late February, the carmaker recalled its entire five-year production run of Saturn Ions and said it will replace the faulty ignition switches with a newly manufactured version.

That upgrade will apply to the estimated 475,000 Ions still on the road.

(Additional reporting by Eric Beech and Richard Cowan in Washington and Nick Carey in Chicago, editing by Peter Henderson)

© Thomson Reuters 2014. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.



» Print

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Timeline: GM's ignition-switch recall crisis

Mon, Jun 30 2014

General Motors Co is grappling with a crisis over its decade-long failure to recall cars equipped with faulty ignition switches. The flaw could cause engines to shut off, leading to a sudden loss of power steering and power brakes, and the failure of air bags to deploy in a crash. So far, GM has attributed at least 61 crashes and 16 deaths to switch-related malfunctions. It was only in February of this year that GM finally began recalling 2.6 million Chevrolet Cobalts, Saturn Ions and other older models equipped with the faulty switches.

Following is a timeline of recent events.

June 30, 2014 - GM recalls 8.23 million mostly older cars linked by the automaker to three deaths. The latest recalls swell the total number of vehicles recalled by GM this year to 29 million. The automaker also says it will increase by $500 million a second-quarter charge to cover the cost of the recalls. So far this year, the writedowns are expected to total $2.5 billion. It also announces details of a compensation fund that will provide at least $1 million to victims of crashes tied to defective switches in older compact cars.

June 18, 2014 - U.S. lawmakers accuse GM of a "disturbing pattern" of neglecting safety and reveal emails from 2005 in which a GM employee warned a "big recall" may be necessary over an ignition-switch problem that was only addressed this week.

June 16, 2014 - GM recalls 3 million more cars for ignition-switch issues, roughly doubling the number of GM vehicles with known switch problems. GM also raises a recall-related charge for the second quarter to $700 million from $400 million.

June 13, 2014 - GM recalls 511,528 Chevrolet Camaros for an ignition switch problem similar to the defect linked to at least 13 deaths in Chevrolet Cobalts and other models.

June 6, 2014 - GM announces four more recalls, unrelated to ignition issues.

June 5, 2014 - GM says it fired 15 people for misconduct and failure to act on the recall of the defective ignition switches for years after first gaining knowledge of the problem. GM also releases findings of an internal probe, blaming what the report described as incompetent lower-level employees and saying there was no cover-up.

May 21, 2014 - GM says it is recalling more than 284,000 older Chevrolet small cars in the United States and other markets because of a potential fire hazard, bringing U.S. recalls at the automaker this year to 29 and almost 13.8 million vehicles.

May 16, 2014 - GM is slapped with a $35 million fine by the U.S. Department of Transportation for its delayed response to the ignition-switch defect.

April 24, 2014 - GM says it is the subject of five different government probes related to its massive recalls.

April 11, 2014 - Documents released by a U.S. House committee show that GM engineers were aware of serious problems with ignition switches in small cars but rejected several opportunities to make fixes. Federal regulators as early as 2007 were concerned that GM was dragging its heels on safety measures as consumer complaints mounted, but top officials at the National Highway Traffic Safety Administration never followed through on staffers' recommendations to open a broad investigation, according to the documents.

April 2, 2014 - GM Chief Executive Officer Mary Barra comes under withering attack at a U.S. Senate hearing where lawmakers accuse the company of "criminal" behavior and "a culture of cover-up."

April 1, 2014 - Barra tells a U.S. House panel she is "deeply sorry" for the company's failure to respond quickly.

March 18, 2014 - GM names Jeff Boyer to the new position of vehicle safety chief, responsible for product safety issues, including recalls.

Feb. 25, 2014 - GM more than doubles its ignition-switch recall, mostly in North America, to 1,620,665 vehicles.

Feb. 13, 2014 - GM says it is recalling 776,562 older-model Chevrolet Cobalt and Pontiac G5 compact cars in North America to correct a condition that may allow the engine and other components, including air bags, to be turned off unintentionally.

Jan. 15, 2014 - Barra, 52, takes over as chief executive, becoming the first female to lead a major automaker. The 33-year GM veteran previously headed, at different times, the automaker's manufacturing engineering, human resources and product development.

(Compiled by Matthew Lewis, Chicago newsroom)

© Thomson Reuters 2014. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

EX – B

# Bloomberg

# GM to Pay Record $35 Million Fine Over Handling of Recall

By Jeff Plungis and Tim Higgins - May 16, 2014

General Motors Co. (GM) will pay a record $35 million fine as part of the U.S. government's investigation into how it handled the recall of 2.59 million small cars over faulty ignition switches, the Transportation Department said.

GM's agreement with regulators includes "significant and wide-ranging internal changes" to how it reviews safety issues and decides on recalls, the department said in a statement.

"GM did not act and did not alert us in a timely manner," U.S. Transportation Secretary Anthony Foxx told reporters today at a news conference. "What GM did was break the law. They failed to meet their public-safety obligations."

The National Highway Traffic Safety Administration has been investigating why it took the largest U.S. automaker years to address engineering concerns and consumer complaints about engine stalling dating from 2004. At least 13 fatalities have been linked to the defect, which can deactivate air bags.

**Related:** GM Recalls Bring 2014 Total to Record 11.2 Million in May

"General Motors' decision making, structure and process stood in the way of safety at a time when air bags were failing to work properly in millions of GM products," NHTSA Acting Administrator David Friedman said today in Washington. "Our investigation also found that General Motors was training employees in ways that could've compounded these problems."

The record fine "was a given," Clarence Ditlow, executive director of the Center for Auto Safety, a Washington-based advocacy group, said today in a telephone interview. "The only thing that was left to be decided was when they were going to impose the penalty."

## 'Stronger Company'

GM confirmed in an e-mailed statement that it had reached an agreement with NHTSA and said it has begun working with the agency to review processes and policies to avoid future recalls of this nature.

"We have learned a great deal from this recall," Chief Executive Officer Mary Barra said today in a statement. "We will now focus on the goal of becoming an industry leader in safety. We will emerge from this situation a stronger company."

GM has said heavy key rings or jarring can cause ignition switches on some cars to slip out of the "on" position, cutting off power and deactivating air bags.

GM shares slid 1 percent to $34 at the close in New York. They have dropped 17 percent this year.

GM hasn't fully complied with an extensive request for information by the regulator. Since April 3, the company has been accruing fines of $7,000 per day. GM said it was waiting for an internal investigation to be complete before answering some of NHTSA's questions.

## Forced Changes

In addition to the fine, the regulators are requiring changes to GM's culture that led to questions about its handling of the recall, which is still the subject of investigations by Congress and the U.S. Justice Department.

While Friedman said he didn't have any records of Barra being briefed on the ignition-switch issues, other company executives and employees were aware: Some were notified by a supplier in 2009, and by 2012 communication among the automaker's staff was "very explicit about an unreasonable risk to safety."

GM's slow reaction to the safety complaints reflected systemic failures throughout the company, from its organization to the sharing of information, Friedman said.

"GM engineers knew about the defect, GM investigators knew about the defect, GM lawyers knew about the defect, but GM did not act to protect Americans from that defect," Friedman said. "The fact that GM took so long to report this defect says something was very wrong with the company's values."

## 'Defect, Dangerous'

GM's training materials "explicitly discouraged" employees from using words like "defect, dangerous, safety related and many more essential terms for engineers and investigators to clearly communicate up the chain when they suspect a problem," Friedman said.

Even before the ignition-switch recall, some within NHTSA were complaining about GM dragging its heels responding to safety concerns. Documents released in April by a congressional panel reviewing the recall pointed to a history of contentiousness between GM and its regulator that continued beyond the automaker's bailout by U.S. taxpayers.

In July 2013, less than a year before GM's recall, the head of NHTSA's Office of Defects Investigation, Frank Borris, complained to Carmen Benavides, who was then GM's director of product investigations. "The general perception is that GM is slow to communicate, slow to act, and, at times, requires additional effort of ODI that we do not feel is necessary with some of your peers," Borris said.

## Consent Order

The consent order that GM agreed to laid out a list of things the company must do from submitting a written list each month of every vehicle-safety issue under consideration to monthly meetings with the agency for a year. GM also agreed to quarterly meetings to discuss the implementation of the requirements of the agreement. Jeff Boyer, as the vice president of global vehicle safety, and other named executives are to be there unless there are "compelling circumstances."

GM agreed to improve its analytics to better identify safety issues, to establish a way for employees to quickly report concerns, and to change its training to "disavow statements diluting the safety message." GM also agreed to give NHTSA by June 30 a "full and complete copy of the report" that GM expects Jenner & Block LLC Chairman Anton Valukas to complete on his investigation.

## Record Fine

The $35 million fine is the largest ever paid by an automaker in the U.S. for delays in issuing a safety recall. Ford Motor Co. (F) and Toyota Motor Corp. previously paid $17.4 million, the maximum allowable at the time.

Congress has since changed the maximum NHTSA fine to $35 million. Regulators are pushing lawmakers to approve fines of as much as $300 million for a bigger deterrent effect, the Transportation Department said.

"It's disappointing that there's no criminal prosecution," Ditlow said. "This shows how hand-tied the Department of Transportation is under the Safety Act: The fine is too small, but that's the maximum."

GM earned $5.3 billion last year and has more than $37 billion in available liquidity on its balance sheet at the end of the first quarter, according to a company web presentation. Its first quarter profit fell 82 percent with the cost of recalls rising to $1.3 billion during the period.

"Today was just a show," Robert Hilliard, a Corpus Christi, Texas-based lawyer, representing families in lawsuits against GM over the ignition-switch recall, said today in an interview. "It was taking GM to an artificial woodshed and pretending as if GM will now become responsible."

He reiterated his recommendation that the government should've forced GM to park the effective vehicles. "$35 million is a complete win for GM," he said.

## GM Changes

Even before today's announcement, Barra, in response to the recall crisis, has been making changes at GM. She named Boyer vice president for global vehicle safety in March, and he's part of a newly aligned engineering department aimed at reducing compartmentalization and catching future safety issues.

Many of Barra's changes inside GM are focused on resolving safety reviews more quickly.

John Calabrese, vice president of global vehicle engineering, is retiring and his department is being split into two parts with new executives overseeing the units. The Global Product Integrity division has been given about 35 new safety investigators to speed up reviews.

Boyer said in an interview this week that his team has been focusing swift resolution of ongoing reviews.

"We also want to make sure we expedite any new issues that we need to take appropriate action on, and we're doing that promptly as well," he said. "We're not waiting for trends to emerge."

## Valukas Investigation

Barra has asked Valukas, who served as the Justice Department's examiner of the downfall of Lehman Brothers Holdings Inc., to help lead the automaker's internal probe of the recall along with GM General Counsel Michael Millikin. She's also asked for a review by lawyer Kenneth Feinberg, who determined compensation for survivors of the Sept. 11 and Boston Marathon terrorist attacks, to make recommendations on what GM should do for victims of the crashes.

The agreement follows yesterday's announcement by GM of five new recalls totaling 2.7 million in the U.S. that increases the total number of vehicles called back for fixes this year so far to a record of 11.2 million. The 2014 total through mid-May is more than GM recalled during the previous six

years combined, according to NHTSA records. The company's previous peak year for recalls in the U.S. was 10.7 million in 2004, according to NHTSA records.

"The recent ignition recall has lead us to reexamine really every part of our business to make sure our customers and their safety are at the heart of everything we do," Boyer said this week. "As part of that, we've made some changes in our overall recall process and these changes, I'm sure that you've seen, have resulted in a much larger than normal number of GM vehicle recalls since the beginning of the year."

To contact the reporters on this story: Jeff Plungis in Washington at jplungis@bloomberg.net; Tim Higgins in Southfield, Michigan, at thiggins21@bloomberg.net

To contact the editors responsible for this story: Bernard Kohn at bkohn2@bloomberg.net; Jamie Butters at jbutters@bloomberg.net Jamie Butters

©2014 BLOOMBERG L.P. ALL RIGHTS RESERVED.

EX - C



ALEJANDRO   ALERS, JR.,

611 N. PARK   AVENUE

INGLEWOOD,  CA. 90302

# RETAIL INSTALLMENT SALE CONTRACT – SIMPLE FINANCE CHARGE

| Dealer Number | Contract Number | R.O.S. Number | Stock Number |
|---|---|---|---|
| | | 18952124 | 101199 |

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|
| ALEJANDRO SR ALERS<br>1543 6 TH AVE<br>LOS ANGELES CA 90019<br>LOS ANGELES | | S & J CHEVROLET INC<br>18606 STUDEBAKER RD<br>CERRITOS CA 90701<br>LOS ANGELES |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| NEW | 2010 | CHEV COBALT | 8 | 1G1AD5F52A7210982 | ☒ personal, family or household<br>☐ business or commercial |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 9000.00 |
|---|---|---|---|---|
| 0.00 % | $ 0.00 (e) | $ -902.42 | $ -902.42 | $ 18097.58 (e) |

(e) means an estimate

**YOUR PAYMENT SCHEDULE WILL BE:**

| Number of Payments | Amount of Payments | When Payments Are Due: |
|---|---|---|
| One Payment of | N/A | N/A |
| One Payment of N/A | N/A | N/A |
| 1 Payments | -902.42 | Monthly, Beginning 08/03/2010 |
| Payments | N/A | Monthly, Beginning |
| One Final Payment | N/A | |

**Late Charge.** If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
**Prepayment.** If you pay off all your debt early, you may be charged a minimum finance charge.
**Security Interest.** You are giving a security interest in the vehicle being purchased.
**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

### ITEMIZATION OF THE AMOUNT FINANCED (Seller may keep part of the amounts paid to others.)

1. **Total Cash Price**
   A. Cash Price of Motor Vehicle and Accessories ... $ 14807.50 (A)
      1. Cash Price Vehicle ... $ 14807.50
      2. Cash Price Accessories ... $ N/A
      3. Other (Nontaxable)
         Describe N/A ... $ N/A
         Describe N/A ... $ N/A
   B. Document Preparation Fee (not a governmental fee) ... $ 55.00 (B)
   C. Smog Fee Paid to Seller ... $ N/A (C)
   D. (Optional) Theft Deterrent Device (to whom paid) S & J CHEVRO ... $ 325.00 (D)
   E. (Optional) Theft Deterrent Device (to whom paid) S & J CHEVRO ... $ 180.00 (E)
   F. (Optional) Theft Deterrent Device (to whom paid) N/A ... $ N/A (F)
   G. (Optional) Surface Protection Product (to whom paid) N/A ... $ N/A (G)
   H. (Optional) Surface Protection Product (to whom paid) N/A ... $ N/A (H)
   I. Sales Tax (on taxable items in A through H) ... $ 1498.33 (I)
   J. Optional DMV Electronic Filing Fee ... $ N/A (J)
   K. (Optional) Service Contract (to whom paid) GMPP ... $ 960.00 (K)
   L. (Optional) Service Contract (to whom paid) N/A ... $ N/A (L)
   M. (Optional) Service Contract (to whom paid) N/A ... $ N/A (M)
   N. (Optional) Service Contract (to whom paid) N/A ... $ N/A (N)
   O. (Optional) Service Contract (to whom paid) N/A ... $ N/A (O)
   P. Prior Credit or Lease Balance paid by Seller to N/A ... $ N/A (P)
      (see downpayment and trade-in calculation)
   Q. (Optional) Gap Contract (to whom paid) N/A ... $ N/A (Q)
   R. (Optional) Used Vehicle Contract Cancellation Option Agreement ... $ N/A (R)
   S. Other (to whom paid) N/A
      For N/A ... $ N/A (S)
   Total Cash Price (A through S) ... $ 17825.83 (1)
2. **Amounts Paid to Public Officials**
   A. License Fees ESTIMATED ... $ 176.00 (A)
   B. Registration/Transfer/Titling Fees ... $ 87.00 (B)
   C. California Tire Fees ... $ 8.75 (C)
   D. Other N/A ... $ N/A (D)
   Total Official Fees (A through D) ... $ 271.75 (2)

## STATEMENT OF INSURANCE

NOTICE. No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

### Vehicle Insurance

| | | Term | | Premium |
|---|---|---|---|---|
| $ N/A Ded. Comp., Fire & Theft | | N/A | Mos. | $ N/A |
| $ N/A Ded. Collision | | N/A | Mos. | $ N/A |
| Bodily Injury | $ N/A Limits | | Mos. | $ N/A |
| Property Damage | $ N/A Limits | | Mos. | $ N/A |
| Medical | $ N/A | | Mos. | $ N/A |
| | | N/A | Mos. | $ N/A |

Total Vehicle Insurance Premiums ... $ N/A (e)

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X _____
Co-Buyer X _____
Seller X _____

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

### Application for Optional Credit Insurance

☐ Credit Life     ☐ Buyer   ☐ Co-Buyer   ☐ Both
☐ Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life N/A | N/A Mos. | | $ N/A |
| Credit Disability N/A | N/A Mos. | | $ N/A |

Total Credit Insurance Premiums ... $ N/A (b)

Insurance Company Name N/A

Home Office Address N/A

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).

You want to buy the credit insurance.

| | X | |
|---|---|---|
| Date | Buyer Signature | Age |
| | X N/A | |
| Date | Co-Buyer Signature | Age |

D. Total Official Fees (A through D) ....................... $ **N/A** (D)

**3. Amount Paid to Insurance Companies**
(Total premiums from Statement of Insurance column a + b) ....... $ **N/A** (3)

**4.** ☑ Smog Certification or ☐ Exemption Fee Paid to State ...... $ **N/A** (4)

**5. Subtotal** (1 through 4) ........................................ $ **18097.58** (5)

**6. Total Downpayment**

A. Agreed Trade-In Value  Yr **2010**  Make **HONDA** ... $ **19000.00** (A)

Model **CR-V**  Odom **20**

VIN **5J6RE3H54AL019770**

B. Less Prior Credit or Lease Balance .................... $ **N/A** (B)

C. Net Trade-In (A less B) (indicate if a negative number) ... $ **19000.00** (C)

D. Deferred Downpayment ................................ $ **N/A** (D)

E. Manufacturer's Rebate ................................ $ **N/A** (E)

F. Other _____ ............. $ **N/A** (F)

G. Cash ................................................. $ **19000.00** (G)

**Total Downpayment** (C through G) .................... $ **19000.00** (6)
(If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1P above)

**7. Amount Financed** (5 less 6) ......................... $ **-902.42** (7)

---

**SELLER ASSISTED LOAN**
BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.

Proceeds of Loan From:
Amount $ **N/A**
Total $ **N/A**  Finance Charge $ **N/A**  Payable in **N/A**
installments of $ **N/A** $ **N/A**
from this Loan is shown in item 6D.

**AUTO BROKER FEE DISCLOSURE**
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:

☐ Name of autobroker receiving fee, if applicable: _____

---

**OPTIONAL GAP CONTRACT:** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided, unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in item 1O of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term _____ Mos. _____
Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X _____

**OPTIONAL SERVICE CONTRACT(S)** You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in item 1K,1L, 1M, 1N, and/or 1O.

1K Company **GHPP**
Term **72** Mos. or **48000** Miles

1L Company **N/A**
Term **N/A** Mos. or **N/A** Miles

1M Company **N/A**
Term **N/A** Mos. or **N/A** Miles

1N Company **N/A**
Term **N/A** Mos. or **N/A** Miles

1O Company **N/A**
Term **N/A** Mos. or **N/A** Miles

Buyer X _____

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X _____
Co-Buyer Signs X **N/A**

---

**SELLER'S RIGHT TO CANCEL** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the back giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply.
X _____  X _____
Buyer  Co-Buyer

---

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before **N/A** , Year _____. SELLER'S INITIALS _____

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.

WARNING:
YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.
FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

B/S X _____  X _____

**Payoff Agreement:** Seller relied on information from you and/or the lienholder or lessor of your trade-in vehicle to arrive at the payoff amount shown in item 6B of the Itemization of Amount Financed as the "Prior Credit or Lease Balance." Seller agrees to pay the payoff amount shown in item 6B to the lienholder or lessor of the trade-in vehicle, or its designee. If the actual payoff amount is more than the amount shown in item 6B, you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in item 6B, Seller will refund the difference to you. Except as stated in the "NOTICE" on the back of this contract, any assignee of this contract will not be obligated to pay the Prior Credit or Lease Balance shown in 6B or any refund due from the Seller.

Buyer Signature X _____  Co-Buyer Signature X **N/A**

**Notice to buyer:** (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof.
After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.

Buyer Signature X _____  Co-Buyer Signature X **N/A**

---

**The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.**

---

**THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION**
California law does not provide for a "cooling-off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud. However, California law does require a seller to offer a 2-day contract cancellation option on used vehicles with a purchase price of less than $40,000, subject to certain statutory conditions. This contract cancellation option requirement does not apply to the sale of a recreational vehicle, a motorcycle, or an off-highway motor vehicle subject to identification under California law. See the vehicle contract cancellation option agreement for details.

YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ ALL PAGES OF THIS CONTRACT, INCLUDING THE ARBITRATION CLAUSE ON THE REVERSE SIDE, BEFORE SIGNING BELOW. YOU CONFIRM THAT YOU RECEIVED A COMPLETELY FILLED-IN COPY WHEN YOU SIGNED IT.

Buyer Signature X _____ Date **06/19/10**  Co-Buyer Signature X **N/A** _____ Date _____

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other Owner Signature X _____  Address _____

**GUARANTY:** To induce us to sell the vehicle to Buyer, each person who signs as a Guarantor individually guarantees the payment of this contract. If Buyer fails to pay any money owing on this contract, each Guarantor must pay it when asked. Each Guarantor will be liable for the total amount owing even if other persons also sign as Guarantor, and even if Buyer has a complete defense to Guarantor's demand for reimbursement. Each Guarantor agrees to be liable even if we do one or more of the following: (1) give the Buyer more time to pay one or more complete defense to Guarantor's demand for reimbursement. Each Guarantor agrees to be liable even if we do one or more of the following: (1) give the Buyer more time to pay one or more payments; (2) give a full or partial release to any other Guarantor; (3) release any security; (4) accept less from the Buyer than the total amount owing; or (5) otherwise reach a settlement relating to this contract or extend the contract. Each Guarantor acknowledges receipt of a completed copy of this contract and guaranty at the time of signing.
Guarantor waives notice of acceptance of this Guaranty, notice of the Buyer's non-payment, non-performance, and default; and notices of the amount owing at any time, and of any demands upon the Buyer.

Guarantor X _____ Date _____  Guarantor X _____ Date _____
Address _____  Address _____

Seller Signs **S & J CHEVROLET, INC.** Date **06/19/10** By X _____ Title _____

**LAW** FORM NO. 553-CA-ARB (REV. 1/10) U.S. PATENT NO. D400,782
©2010 The Reynolds and Reynolds Company. TO ORDER: www.reysource.com; 1-800-344-0996; fax 1-800-531-9055
THE PRINTER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

CUSTOMER / TRUTH IN LENDING COPY

CASE # CHV1420200

EX - D

## Important Message to Owners...    1

### GM's Commitment

GM is committed to assuring satisfaction with your new vehicle.

Your dealer also wants you to be completely satisfied and invites you to return for all your service needs, both during and after the warranty period.

### Owner Assistance

The dealer is best equipped to provide all your vehicle's service needs. Should you ever encounter a problem that is not resolved during or after the limited warranty period, talk to a member of dealer management. Under certain circumstances, GM and/or GM dealers may provide assistance after the limited warranty period has expired when the problem results from a defect in material or workmanship. These instances will be reviewed on a case-by-case basis. If the issue has not been resolved to your satisfaction, follow the *Customer Satisfaction Procedure on page 30*.

We thank you for choosing GM.

### GM Participation in an Alternative Dispute Resolution Program

See *Customer Satisfaction Procedure on page 30* for information on the voluntary, non-binding Alternative Dispute Resolution Program in which GM participates.

### Warranty Service – United States and Canada

The selling dealer has invested in the proper tools, training and parts inventory to ensure that any necessary warranty repairs can be made. GM requests that the vehicle be returned to the selling dealer for warranty repairs. In the event of an emergency repair, an authorized GM dealer can make the warranty repairs, however, not all dealers may be able to perform the repair due to the special tool and training requirements. If a dealer is unable to repair the vehicle, contact the *Customer Assistance Offices on page 35*. If you are unable to return to the selling dealer, contact a dealer that sells the vehicle's brand in the United States or Canada for warranty service.

EX - E



The Valley's Homepage

# general motors recalls How switch design went wrong

Tuesday, July 8, 2014

By TOM KRISHER

AP Auto Writer

DETROIT

General Motors' deadly ignition-switch flaws emerged from an effort to improve its cars.

As the company began developing new small cars in the late 1990s, it listened to customers who complained about "cheap-feeling" switches that required too much effort to turn. GM set about making switches that would work more smoothly and give drivers the impression that they were better-designed, a GM switch engineer testified in a lawsuit deposition in the spring of 2013.

The switches, though, were too loose, touching off events that led to at least 13 deaths, more than 50 crashes and a raft of legal trouble for the Detroit automaker.

Former U.S. Attorney Anton Valukas, hired by GM in March to investigate the switch problems, told a congressional subcommittee last month that GM wanted each small-car ignition to "feel like it was a European sports car or something." After years of lagging behind the Japanese, GM was eager to make better, more- competitive small cars.

But as it turned out, the new switches in models such as the Chevrolet Cobalt and Saturn Ion can slip unexpectedly from "run" to "accessory," causing engines to stall. That shuts off the power steering, making cars harder to control, and disables air bags in crashes. GM says the problem has caused at least 13 deaths, but some members of Congress put the death toll near 100.

The problem led GM to recall 2.6 million small cars in February and forced the company to admit it knew about the switch troubles for more than a decade before taking action. It has touched off federal investigations and prodded GM to review other safety issues, leading to 54 recalls this year covering 29 million vehicles.

The Associated Press traced the history of the problem using Valukas' report as well as a deposition of GM switch engineer Ray DeGiorgio that was released by a House subcommittee. The deposition also was released by lawyers suing GM, but DeGiorgio's comments were redacted in that version.

In a wrongful-death case in Georgia, DeGiorgio testified that he started out trying to make the switches easier to turn. But from the beginning, he was consumed by electrical issues in the switch, not its mechanical parts.

When the switch supplier, Delphi, pointed out tests showing the switches turned too easily, DeGiorgio told Delphi not to change them because he was concerned mechanical alterations would harm the switch's electrical performance, according to Valukas.

Delphi spokeswoman Claudia Tapia said the company isn't commenting on the details of GM's recall.

In the end, DeGiorgio approved switches that were far below GM's specifications for the force required to turn them. The result was a smooth-turning key but also one that could slip out of position. Several years later, DeGiorgio signed off on a design change that fixed the problem, but he didn't change the part number, which stymied later attempts to figure out what was wrong with the cars.

Repeated efforts to reach DeGiorgio have been unsuccessful. He was one of 15 employees dismissed by the company last month because of the recalls. At a House subcommittee hearing last month, GM CEO Mary Barra didn't mince words when lawmakers asked her about DeGiorgio's statements to Valukas and congressional investigators.

"I don't find Mr. DeGiorgio credible," Barra said.

GM spokesman Greg Martin said Valukas' report cites several opportunities that the company missed to fix the problem before the switches went into production. "It should never have happened regardless of what the reasons for changing the initial specifications for the switches were," he said.

Subsequent safety reviews also found ignition-switch troubles in other cars. The company has issued five recalls for 17.1 million cars with switch problems this year.

Among the recalls are 3.4 million large cars such as the Chevrolet Impala, which had switches DeGiorgio worked on. GM says the combined force of a large bump and a swinging key chain can cause those switches to slip and stall the engine. GM is changing the keyhole from a slot to a small circle to limit how much key chains can swing and tug on the ignition.

Unlike the Cobalt and Ion switches, GM says the ignition switches on the large cars meet its specifications, and the key design is the problem. GM says it conducted eight separate driving tests with the new key, and the ignition didn't move out of the "run" position in any of the tests.

But some experts believe the switches still can slip out of "run" too easily.

"They're finding that it's still possible for it to happen," said Erin Shipp, a mechanical engineer who helped uncover the small-car ignition-switch problems while working for attorneys suing GM.

EX - E



**News**    United States

# GM to Implement Compensation Program for Ignition Switch Recall

*2014-06-05*

**DETROIT** – General Motors today announced it will implement a compensation program for those who have lost loved ones or who have suffered serious physical injuries as the result of an ignition switch failure in recently recalled vehicles.

"We are taking responsibility for what has happened by taking steps to treat these victims and their families with compassion, decency and fairness," said GM CEO Mary Barra. "We made serious mistakes in the past and as a result we're making significant changes in our company to ensure they never happen again."

The program will be independently administered by Kenneth Feinberg, who is highly regarded for his handling of other significant compensation programs.

The program is expected to cover approximately 1.6 million model-year 2003-2007 recalled vehicles manufactured with an ignition switch defect and approximately 1 million model year 2008-2011 recalled vehicles that may have been repaired with a recalled ignition switch.

Pending the independent administrator's development of final guidelines for the compensation program, GM currently expects the program will begin to accept claims on Aug. 1, 2014. It is GM's understanding that the administrator's final compensation program guidelines will be developed in the coming weeks and will include details on where and how to apply for compensation.

**General Motors Co.** (NYSE:GM, TSX: GMM) and its partners produce vehicles in 30 countries, and the company has leadership positions in the world's largest and fastest-growing automotive markets. GM, its subsidiaries and joint venture entities sell vehicles under the Chevrolet, Cadillac, Baojun, Buick, GMC, Holden, Jiefang, Opel, Vauxhall and Wuling brands. More information on the company and its subsidiaries, including OnStar, a global leader in vehicle safety, security and information services, can be found at http://www.gm.com.

### Forward-Looking Statements

In this press release and in related comments by our management, our use of the words "expect," "anticipate," "possible," "potential," "target," "believe," "commit," "intend," "continue," "may," "would," "could," "should," "project," "appears," "projected," "positioned," "outlook" or similar expressions is intended to identify forward-looking statements that represent our current judgment about possible future events. We believe these judgments are reasonable, but these statements are not guarantees of any events or financial results, and our actual results may differ materially due to a variety of important factors. Among other items, such factors may include: our ability to

realize production efficiencies and to achieve reductions in costs as a result of our restructuring initiatives and labor modifications; our ability to maintain quality control over our vehicles and avoid material vehicle recalls and the cost and effect on our reputation of product recalls; our ability to maintain adequate financing sources, including as required to fund our planned significant investment in new technology; our ability to successfully integrate Ally Financial's International Operations; the ability of our suppliers to timely deliver parts, components and systems; our ability to realize successful vehicle applications of new technology; overall strength and stability of our markets, particularly outside of North America and China; costs and risks associated with litigation, government investigations, and compensation program, including those related to our recent recalls; our ability to remain competitive in Korea and our ability to continue to attract new customers, particularly for our new products. GM's most recent annual report on Form 10-K and quarterly report on Form 10-Q provides information about these and other factors, which we may revise or supplement in future reports to the SEC.



## You must be logged in to view Media Contacts

**Login | Consumer Contacts**

G E N E R A L   M O T O R S

© Copyright General Motors  Privacy Policy



**The New York Times** | http://nyti.ms/1x4FWfB

**BUSINESS DAY**  |  NYT NOW

# G.M.'s Payout Formula Offers Multimillion Dollar Compensation to Families of Dead

## Plan for Victims of Faulty Ignition Switch

**By HILARY STOUT**   JUNE 30, 2014

WASHINGTON — A $1 million starting point for each death anchors the formula to pay families of those who died in accidents caused by a defective ignition switch in General Motors cars, under a plan unveiled Monday by a compensation expert hired by the automaker.

The plan, announced by the expert, Kenneth R. Feinberg, is broad and inclusive, and seems certain to account for deaths beyond the 13 that G.M. has publicly linked to the defect.

There is no cap on the amount of money G.M. has agreed to spend on victims' payments, Mr. Feinberg said, and the company will not invoke its protection from liabilities involving incidents before its July 10, 2009, bankruptcy restructuring agreement.

Under Mr. Feinberg's formula, families of those who died are entitled to at least $1 million, and added to that will be a calculation of lifetime earnings lost as well as $300,000 for a spouse and for each dependent.

In a hypothetical example given by Mr. Feinberg in an interview, the family of a 25-year-old married woman with two children who was earning $46,400 a year at the time of her accident would receive $4 million.

People with life-altering catastrophic injuries could receive considerably more. A child who became a paraplegic as a result of an accident could potentially receive a payout in the double-digit millions, he said, based on a lifetime medical care plan, lost earning power and other exceptional factors.

The broad protocol, which provides for payouts even for accidents that have not yet happened (crashes through Dec. 31, 2014, are eligible) could cost the company financially — possibly in the billions — but is an important step toward restoring public trust. Mary T. Barra, G.M.'s chief executive, has called it the company's "civic duty" to compensate victims.

"We are pleased that Mr. Feinberg has completed the next step with our ignition switch compensation program to help victims and their families," Ms. Barra said in a statement. "We are taking responsibility for what has happened by treating them with compassion, decency and fairness. To that end, we are looking forward to Mr. Feinberg handling claims in a fair and expeditious manner."

In determining who is eligible for payments, Mr. Feinberg has come up with more flexible criteria than the standards the company had been using to determine victims. For example, victims of rear and side impact crashes are potentially eligible, he said.

Claims may be filed starting Aug. 1 until Dec. 31. The first checks are likely to go out in the fall, and Mr. Feinberg and his associates said they hoped to issue the final payments by the middle of next year.

That element of speed and certainty, G.M. hopes, will lead victims to seek relief through Mr. Feinberg's program rather than through the courts. But, in a nod to the many plaintiff's lawyers he consulted in developing the plan, Mr. Feinberg said victims do not have to forgo their right to sue to file a claim. It is only if they agree to accept the money from G.M. that they waive that right. In the end, G.M. is counting on the certainty of a quick payment to prevail.

"Why wouldn't a claimant file?" said Mr. Feinberg in an interview before the announcement. "You get a free preview on eligibility and only if you decide 'I accept this check' do you relinquish the right to sue."

Nevertheless, the plan is certain to be picked apart by many.

"People will understandably be skeptical," Mr. Feinberg said. "The only way you solve that problem is to get the money out fast and in a generous fashion. There is no substitute for getting the money out."

There are two fixed thresholds for eligibility. The crash must have involved one of the models of cars that the company has recalled for the defective switch, including Chevrolet Cobalts, Saturn Ions and others. A complete list is on a website for the compensation program: www.gmignitioncompensation.com.

Also, there must be evidence that the air bags did not deploy.

The defective switch can suddenly shut down the power in a moving car, disabling air bags and other safety features like power steering and brakes. If the air bags deployed, or seatbelts locked, Mr. Feinberg said, "that means the power was on" and the faulty switch was not responsible.

However, Mr. Feinberg said he would accept evidence other than definitive black-box proof that air bags had failed and would work with claimants to help find that evidence. Among the possibilities, he said, were police reports, witness statements, photographs, hospital reports, insurance claims, even warranty and maintenance records that showed the vehicle had a history of unexpected stalls.

Families may choose a different review if they feel they have exceptional circumstances that deserve a higher payment, Mr. Feinberg said.

Senator Richard Blumenthal, who has been critical of G.M. in the ignition switch scandal, said that the creation of the fund was an important step for victims. But he also said that it had a long way to go.

"The devil here is in the discretion, not just the details," said Mr. Blumenthal, Democrat of Connecticut. "Flexibility in the deadlines, as well as the burdens of proof, will be key to fairness."

G.M. has acknowledged engineers and others in the company knew about the problem as early as 2001 but it was not until this year that it disclosed the issue and recalled 2.6 million cars. Mr. Feinberg said G.M. would send notices about the compensation plan to all past and present owners of the recalled cars that it has on record, as well as to anyone who had contacted the company about an accident suspected to have been caused by a defect in the car.

The compensation plan sets payments to those who were treated for less-severe injuries, including people who have fully recovered. Anyone treated either at a hospital or an outpatient medical facility within 48 hours of the accident is eligible to file a claim.

For those claims that are accepted, the formula is $20,000 for one night in the hospital; $70,000 for two to seven overnights; $170,000 for eight to 15

overnights; up to a maximum of $500,000 for 32 or more overnights. People treated on an outpatient basis could receive a maximum of $20,000.

Mr. Feinberg, who has overseen funds set up to compensate victims of the Sept. 11 terrorist attacks and the Boston Marathon bombings, said he had consulted with numerous G.M. executives, including Ms. Barra, and also had conversations with prominent auto safety advocates as well as lawyers representing numerous victims.

One of the biggest problems, he said, is that many of the accidents happened years ago. "The car is going to be gone. Many of the records are gone. We're going to have to reconstruct what happened 10 years ago," he said. But, Mr. Feinberg added, "We will bend over backward to work with people."

---

© 2014 The New York Times Company

EX-G

May 16, 2014

LAW OFFICE OF ALEX ALERS
611 North Park Avenue
Inglewood, CA. 90302
310-672-0369

GENERAL MOTORS
P.O. BOX 33170
Detroit, MI. 48232-5170

## RE: 2010 CHEVY COBALT DEFECTIVE IGNITION SWITCH RECALL
## VIN 1G1AD5F52A7210982

Registered Owner:
Alejandro Alers, Sr.
1543 6th Avenue
Los Angeles, CA. 90019

The Law Office of Alex Alers has been retained by registered owner, Alejandro Alers,Sr., to represent Mr. Alers in the reimbursement of money Mr. Alers paid to purchase the new 2010 Chevrolet Cobalt in 2010.

### Background Information

In 2003, General Motors planned to mass market the Saturn Ion, cousin to the 2005 Chevrolet Cobalt. The two cars were designed to compete against the Japanese automakers Toyota and Honda at a reduced price. The price reduction also required the reduction in production costs and labor costs to mass produce these two cars. So the "mantra" at General Motors was cost reduction. Unfortunately for consumers like Mr. Alers, General Motors goal to cut bloated costs, fractious relations with parts supplier Delphi Automotive and the pressure to stick to production schedules resulted in the mass production and installation of non-conforming defective ignition switches.

As early as 2002, General Motors had knowledge that the switches produced by Delphi Automotive failed to meet General Motors's requirements for torque of 15 to 25 Newton-centimeters and the requirement of rotational force- to keep the ignition switch in the "run" position. General Motors installed the non-conforming defective ignition switches anyway.

1

In the years of 2002-2005, General Motors sent Service Bulletins to dealers of problems with the ignition switch and how to make repairs.

Fatal crashed related to the non-conforming defective ignition switches began in 2003. In 2005, General Motors rejected Delphi Automotive's plan to retool and produce a conforming ignition switch because of expensive retooling costs( $400,000.00) which the retooling costs would have added only $1.00 to the overall sale price of the automobile.

General Motors failed to inform the public of the non-conforming defective ignition switches until 2014. The public had a right to know in 2002 when General Motors received notification from Delphi Automotive of the non-conforming defective ignition switches. Mr. Alers at the time he purchased the 2010 Chevrolet Cobalt was not given notice by the Dealer or General Motors about the non-conforming defective ignition switch problems.

### Reimbursement and Related Costs

Since the recall notice was first sent to Mr. Alers and the related problems with the non-conforming defective switch( switch goes from run position to accessory position, airbag may not deploy in an accident, do not drive car on bumpy roads, Mr. Alers's safety concerns about continued driving of the car) Mr. Alers took the car to the Dealer for recall repairs on April 4, 2014. The car has been with the Dealer since April 4, 2014 waiting for repairs. The Dealer claimed no parts are available to make the necessary repairs. Consequently, the car has been out of service for over 41 days continuously which violates the Tanner Consumer Protection Act(California Civil Code Section 1793.22(b)(3). This recall has been botched as admitted to by General Motors CEO. General Motors had the ability to install conforming ignition switches since 2005, but General Motors refused to pay the extra production costs in retooling as the parts supplier recommended. So, obtaining the part by General Motors is not beyond their control, but a matter of contract negotiations and saving money on General Motors's part.

General Moors should be ordered to reimburse Mr. Alers for the contract price of $18,097.58 he paid for the 2010 Chevrolet Cobalt. In addition, General Motors should not receive a credit for the use of the car prior to notification of General Motors because General Motors willfully installed the non-conforming defective ignition switches when General Motors had prior knowledge of its non-conformity.

General Motors should be ordered to pay twice the contract price as a civil penalty for its willful conduct. California Civil Code Section 1794 c.

2

{ INCLUDEPICTURE ⬤ http://www.globalmotors.net/wp-cont⬤ uploads/2008/12/gm-logo.jpg" \*
, MERGEFORMATINET }

June 26, 2014

Alejandro Alers Jr, Esq.
ALEX ALERS
611 North Park Avenue
Inglewood, CA 90302

RE:    Alejandro Alers Sr.
       Service Request: 71-1309317466
       2010 Chevrolet Cobalt
       Vehicle Identification Number: 1G1AD5F52A7210982
       Customer Relationship Specialist: Reynaldo

Dear Mr. Alers:

After careful research and evaluation of the above case by General Motors, our research indicates the following facts that lead to the denial of your request:

♦ We have factually investigated this matter and at this time have concluded that General Motors has fulfilled its obligations as contained in its written limited warranty.

General Motors would like to assist you in addressing any outstanding concerns in accordance with the terms of the existing warranty coverage. Should subsequent factual developments warrant, we would be willing to consider a renewed request for assistance.

If you have further questions, please contact our Business Resource Center at 1-800-231-1841 Monday through Friday between 8:00 a.m. and 5:00 p.m., Eastern Time. Please refer to the service request number above and a Customer Relationship Specialist will be happy to assist you.

Sincerely,

General Motors

cc: FILE

EX - H

# GM offers employee pricing to owners of recalled cars

Kelsey Mays, Cars.com    *7:40 p.m. EDT May 5, 2014*



*(Photo: Toby Talbot AP)*

General Motors is offering employee pricing on a new GM vehicle to owners of 2.6 million small cars under recall for faulty ignition switches. Some 2.2 million of those recalled cars — a slew of 2000s-era Saturns, Chevrolets and Pontiacs — are in the U.S., with repair work currently underway.

The quiet move comes weeks after GM said it would offer $500 off the purchase of a new vehicle to affected drivers — a provision that ran through April 30. The automaker's latest program, also unadvertised, will save even more money for those who use it.

"This isn't something we're marketing, but it's just something the dealers have in their toolbox," GM spokesman Jim Cain told us. "People are taking advantage of it. The numbers — we're not going to disclose the numbers at this time, but it's several hundred. And you know (it will) probably increase as time goes on."

How much does employee pricing save? Cain said he'd "prefer not to" reveal that but confirmed that the prices are generally under invoice, and — a crucial detail — owners can pile any existing cash-back offers on top of them.

"They have to have a recalled vehicle in their household, and it doesn't require a trade (in)," Cain said. "It becomes a no-haggle price, but you are eligible for other discounts that might be in the market. ... You'd get employee price plus any additional cash."

Though it sounds tempting, it's unclear if typical owners of the 2003 to 2011 cars — especially the older models — would be able to afford, or qualify for, new-car loans. The cars often are on second or third owners, either people who can't afford more than the few thousand dollars for, say, a 2005 Chevrolet Cobalt, or who use them simply as "beaters" — essentially, spare cars or ones used for chores or daily commutes instead of newer cars.

The recalled models that wind up being traded-in for other vehicles at a GM dealership have to be checked for all recalls and have all recall repairs made before they're resold, says GM spokesman Greg Martin. That's part of the dealers' franchise agreement with GM.

"We don't expect a lot of trade-ins, and for those that are traded, we have no special plans. There always is a market for low-price, high-mileage used vehicles," Martin said.

He said GM continues to forecast an October completion for the recall repairs.

Among the most attractive offers are up to $1,500 off certain 2014 Chevrolet Cruzes and $2,500 off 2014 Chevrolet Malibu sedans, as well as up to $4,750 and $3,750 off 2014 Chevrolet Silverado and GMC Sierra 1500 pickup trucks, respectively. Buick, meanwhile, offers up to $1,500 off the LaCrosse or Enclave. Subtract those amounts from the employee pricing, and you could see serious savings on a new car.

If affected drivers want a used GM replacement, the automaker will offer $500 off the purchase of a GM certified pre-owned vehicle, Cain said.

*Contributing: James R. Healey, USA TODAY*

Read or Share this story: http://usat.ly/1q0TatH



RECOMMENDED FOR YOU                    ✖
Stanford breakthrough might triple
battery life

# GM Recalls Damage Used Car Value

July 26, 2014 by Paul Ausick



Source: courtesy of General Motors

When General Motors Co. (NYSE: GM) recalled the more than 5 million vehicles with an ignition switch defect, the company reserved more than $1 billion to pay for its recalls and set up an unlimited fund to compensate victims of crashes where the vehicle's airbags failed to deploy properly. But millions of other owners will also get hit in the pocketbook because of the recall and there is nothing they can do about it.

If you own one of the vehicles recalled to repair the defective ignition switch, that fact alone has lowered your car's value by 14% from March through June 2014, compared with March through June of 2013 and adjusted for inflation. That is double the average 7% for a GM car not involved in the recall and more than double the 6.7% drop for all cars of similar size and age.

That data comes from iSeeCars.com, a used car search engine and website that analyzed prices for more than 11 million used cars for the periods March through June of 2013 and 2014 and calculated average price changes for GM cars recalled for a faulty ignition switch, price changes for all cars and price changes for all GM cars.

ALSO READ: Chrysler Sales Surge in July

Over the 13-month period to June 2014, the average price drop was 15.5% from May to June 2014 for all GM's recalled cars. The decline has been growing, from a month-over-month drop of 12.5% in March, followed by consecutive drops of 13.9% in both April and May. These cars are losing value at a phenomenal pace.

The model year 2005 through 2007 Chevy Cobalt and model year 2007 Pontiac G5 took the worst hit, down 13.7%, more than double the average decline. A model year 2003 to 2007 Saturn Ion has lost 13.6% of its value and a 2006 to 2007 Chevy HHR has lost 11.5%.

Not all the recalled cars were subject to the same price cut. For example, a base model 2006 Chevy Cobalt LS with 75,000 miles on the clock in good condition has a private-party resale value of around $5,100, according to Kelley Blue Book. A base model 2006 Saturn Ion with 75,000 miles on the clock and in good condition carries a private-party resale value of about $4,000. A 2006 Honda Civic with similar numbers should sell for about $7,400.

iSeeCars.com CEO Phong Ly told 24/7 Wall St., "We believe the post-recall price drops we're seeing with these vehicles is largely a result of sellers wanting to move them and dropping their prices more than normal to make it more compelling for buyers." That sounds about right to us.

ALSO READ: 10 Cars Americans Don't Want to Buy

Tags: General Motors (NYSE:GM)
Posted in Autos | Comments Off

24/7 Wall St. is proudly powered by WordPress
http://247wallst.com/autos/2014/07/26/gm-recalls-damage-used-car-value/ printed on July 26, 2014

a

EX. - I



**BBB AUTO LINE**



June 11, 2014

ALEJANDRO  ALERS  C/O ALEJANDRO  ALERS JR
611  NORTH  PARK  AVENUE
INGLEWOOD  CA 90302

Re: CHV1420200 ALERS vs Chevrolet Motor Division 1G1AD5F52A7210982

Dear ALEJANDRO ALERS C/O ALEJANDRO  ALERS JR.:

We have received your *Customer Claim Form* and supporting documentation
concerning your complaint against the manufacturer of your vehicle.

After careful review of your case, we have determined that your complaint is not
within the jurisdiction of the BBB AUTO LINE program. We have made this
determination for the following reasons:

In order for a claim to be eligible it must involve disputes that arise
under a participating manufacturer's warranty.  As your concern does not
involve a warrantable manufacturing defect or non conformity your claim
would be ineligible.

Please refer to the booklet How BBB AUTO LINE Works for further explanation
of jurisdictional requirements.

If you disagree with this finding, you may appeal it by sending us a
written statement indicating why you think your claim is within the
jurisdiction of the BBB AUTO LINE program.  This statement must be mailed
to the following address within 30 days from the date of this letter:

BBB AUTO LINE
3033 Wilson Blvd
Suite 600
Arlington, VA 22201

You may fax your appeal to our office at 1.703.247.9700

When your appeal is received in our office it will be forwarded to the
manufacturer representative who will be given five days to submit a written
position on the appeal. If a written position is received it will be shared
with you, and you will be given five days to submit written comments. A BBB
AUTO LINE arbitrator will review your Customer Claim Form, your appeal
letter, this Out of Jurisdiction Notice, any written position from the
manufacturer, any comments, and the Arbitration Rules.  The arbitrator will

then make a decision as to whether your allegations are potentially within the jurisdiction of BBB
AUTO LINE arbitration. If this review determines that you may proceed to arbitration, your
complaint will proceed to a hearing before a different arbitrator in accordance with the BBB AUTO
LINE Rules for Arbitration.

Please note the arbitrator ruling on your appeal will only decide whether your claim may be heard in
arbitration. Even if this arbitrator decides that your claim is potentially within the program's
jurisdiction, the arbitrator who presides over your hearing will examine all the facts in your case
and may decide that the evidence presented at the hearing does not establish that the claim is
within the jurisdiction of BBB AUTO LINE or that any award should be made in your case.

Thank you for bringing your complaint to our attention.

Sincerely,

Santiago Gonzalez at Extension 530

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Alejandro Alers, Jr. Esq. State Bar No. 240532<br>611 North Park Avenue<br>Inglewood, California 90302<br><br>TELEPHONE NO.: 310-672-0369    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* alalersjr@att.net<br>ATTORNEY FOR *(Name):* Alejandro Alers, Sr. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 12720 NORWALK BLVD.
MAILING ADDRESS: Same as above
CITY AND ZIP CODE: NORWALK 90650
BRANCH NAME: SOUTHEAST DISTRICT- NORWALK CT HOUSE

| | CASE NUMBER: |
|---|---|
| PLAINTIFF/PETITIONER: ALEJANDRO ALERS, SR.<br><br>DEFENDANT/RESPONDENT: GENERAL MOTORS, LLC. | VC064207 |
| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [✓] summons
   b. [✓] complaint
   c. [ ] Alternative Dispute Resolution (ADR) package
   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [✓] other *(specify documents):* NOTICE OF CASE MANAGEMENT CONFERENCE

3. a. Party served *(specify name of party as shown on documents served):*
      GENERAL MOTORS, LLC.

   b. [✓] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
      CORPORATION SERVICE COMPANY-CSC

4. Address where the party was served:
   2711 Centerville Road  Wilmington, Delaware 19808
5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party  (1) on *(date):*          (2) at *(time):*
   b. [ ] **by substituted service.** On *(date):*          at *(time):*          I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*          from *(city):*          or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| PLAINTIFF/PETITIONER: ALEJANDRO ALERS, SR. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: GENERAL MOTOR, LLC. | VC064207 |

5. c. [✓] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):* 8-12-14     (2) from *(city):* INGLEWOOD

    (3) [✓] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) [✓] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. [ ] **by other means** *(specify means of service and authorizing code section):*

    [ ] Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. [ ] as an individual defendant.
  b. [ ] as the person sued under the fictitious name of *(specify):*
  c. [ ] as occupant.
  d. [✓] On behalf of *(specify):* GENERAL MOTORS, LLC
    under the following Code of Civil Procedure section:
    [✓] 416.10 (corporation)     [ ] 415.95 (business organization, form unknown)
    [ ] 416.20 (defunct corporation)     [ ] 416.60 (minor)
    [ ] 416.30 (joint stock company/association)   [ ] 416.70 (ward or conservatee)
    [ ] 416.40 (association or partnership)   [ ] 416.90 (authorized person)
    [ ] 416.50 (public entity)     [ ] 415.46 (occupant)
        [ ] other:

7. **Person who served papers**
  a. Name: Alejandro Alers, Jr., Esq.
  b. Address: 611 North Park Avenue, Inglewood, California 90302
  c. Telephone number: 310-672-0369
  d. **The fee for service was:** $ 0.00
  e. I am:
    (1) [✓] not a registered California process server.
    (2) [ ] exempt from registration under Business and Professions Code section 22350(b).
    (3) [ ] a registered California process server:
      (i) [ ] owner [ ] employee [ ] independent contractor.
      (ii) Registration No.:
      (iii) County:

8. [✓] **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

  or

9. [ ] **I am a California sheriff or marshal** and I certify that the foregoing is true and correct.

Date: August 12, 2014

Alejandro Alers, Jr., Esq.
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)     (SIGNATURE)

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

**AUG 12 2014**

Sherri R. Carter, Executive Officer/Clerk

By Antonieta Heras, Deputy

COURTHOUSE ADDRESS: 12720 NORWALK BLVD NORWALK CA, 90650

PLAINTIFF: Alejandro Alas Sr

DEFENDANT: General Motors LLC

### NOTICE OF CASE MANAGEMENT CONFERENCE

CASE NUMBER: **VC064207**

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

Date: **DEC 16 2014**    Time: 1:30    Dept.: F

NOTICE TO DEFENDANT:    THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.10, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated: **AUG 11 2014**

_Margaret M. Bernal_
Judicial Officer    **Margaret M. Bernal**

---

### CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☐ by depositing in the United States mail at the courthouse in ___**NORWALK**___, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☑ by personally giving the party notice upon filing of the complaint.

SHERRI R. CARTER, Executive/Officer Clerk

Dated: **AUG 11 2014**    By _____ A. Heras
Deputy Clerk



*The* Superior Court
12720 NORWALK BOULEVARD
NORWALK, CALIFORNIA 90650
CHAMBERS OF
MARGARET M. BERNAL
SUPERVISING JUDGE

TELEPHONE
(562) 807-7241

## TO ATTORNEY OF RECORD

Your case has been assigned to the Master Calendar Trial Delay Reduction Program in
Superior Court of California, County of Los Angeles, Southeast District. It is your
responsibility as an attorney to immediately familiarize yourself with the detailed
provisions of the California Rules of Court re: Civil Case Management Rules as
amended August 14, 2009, and Chapter Three of the Los Angeles County Superior
Court Rules. A reading of this notice does not relieve you of the responsibility to
become intimately familiar with the requirements of these rules. The following critical
provisions are summarized for your assistance in avoiding rule violations, and the
imposition of sanctions.

### APPLICATION

The California Rules of Court re: Civil Case Management and Chapter Three of the
Los Angeles County Superior Court Rules apply to all civil cases filed in or transferred
into the Southeast District.

### TIME STANDARDS

Please refer to the NOTICE TO LITIGANTS which is attached for your convenience for
information related to Case Management, referenced in the California Rules of Court.

### CASE MANAGEMENT CONFERENCE

Notice of the Initial Case Management conference shall be served by the Clerk on the
plaintiff upon the filing of the complaint. The Case Management Conference shall be
held on the first available court day following 150 days after the complaint is filed.
Plaintiff shall service Notice of Case Management Conference with the Summons and
Complaint or, if already served, within **10 days** of service of this notice or, if not a served
party, when the party appears in the action. Failure of the plaintiff to give complete and
immediate notice which causes delay or continuance will result in sanctions.

No later than 15 calendar days before the date set for the Case Management
Conference, each party (individually or jointly) must file a Case Management
Conference Statement using the mandatory Judicial Council Form No. CM-110.
Failure to comply with said rules may result in the imposition of sanctions.

.....continued

## FINAL STATUS CONFERENCE

The Final Status Conference shall be set **ten days prior to the trial date.** All attorneys and parties in propria persona must appear at the Conference. Trial documents, as described in the Case Management Order are to be filed 5 days prior to the Final Status Conference.

## SANCTIONS

The Court will impose appropriate sanctions for the failure or refusal: (1) To comply with Master Calendar Rules; (2) To comply with any Order made hereunder; or (3) To meet the time standards and/or deadlines established herein. Such sanctions may include: (1) Dismissal of the Action; (2) Striking of a responsive pleading and entry of default; (3) Vacating a trial date with the possible consequence of dismissal under Code of Civil Procedures Sections 583.360 or 583.420; (4) Evidentiary and witness limitations, restrictions or exclusions; (5) Reasonable monetary sanctions; and/or (6) Other reasonable sanctions as authorized by Code of Civil Procedure Sections 128, 128.5, 177.5, 575.2, 583.150, 583.430, 2016-2036; Government Code Section 68609(d) and California Rules of Court 227. Such sanctions may be imposed on a party and/or if appropriate, on counsel for such party.

_____
Hon. Margaret M. Bernal
Supervising Judge
Southeast District

# NOTICE TO LITIGANTS
# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

INFORMATION REGARDING CALIFORNIA RULES OF COURT

This brief synopsis is provided to inform litigants, attorneys, and the general public of changes to the California Rules of Court which affect the processing and filing of limited and unlimited civil cases (with the exception of Unlawful Detainers, Small Claim actions, complex civil cases, probate, guardianship, conservatorship, family law, juvenile court proceedings, and short cause cases).

The full extent of these changes can be found in the California Rules of Court.

**RULE 3.110  (Re Time for Service of Complaint, Cross-Complaint and Response)**
Complaints are to be served and proofs of service filed with the court within 60 days after filing of the complaint.

On amended complaints, the added defendant must be served and proof of service must be filed within 30 days after filing of the complaint.

A Cross-Complaint against a party who has already appeared in the action, must be accompanied by proof of service of the cross-complaint at the time it is filed.

The plaintiff within 10 days after the time for response has elapsed must file a Request for Entry of Default (to avoid sanctions), and must obtain a default judgment within 45 days after entry of default.

**RULE 3.220  (Re Case Cover Sheet)**
Required in each civil limited or unlimited action.

**RULE 3.722 (Re Case Management Conference;)  RULE 3.724 (Duty to Meet and Confer) and  RULE 3.728 (Case Management Order)**
A Case Management Review/Conference must be completed no later than 180 days from filing of the complaint.  The Los Angeles Superior Court will set said review/conference date 140 to 160 days from filing of the complaint.  Individual courts may set additional earlier status conferences.

Notice of the Case Management Review/Conference will be given to all parties no later than 45 days before the review/conference date.  If the court determines that appearances are not necessary at the Case Management Review/ Conference, the court may issue a Case Management Order and notify the parties that no appearance is necessary.  No later than 15 calendar days before the date set for the Case Management Review/Conference, each party (individually or jointly) must file a Case Management Conference Statement using the mandatory Judicial Council Form No.CM-110.

Parties must meet and confer to consider the issues identified in Rules 3.724 and 3.727 no later than 30 calendar days before the date set for the initial Case Management Conference.  The court will issue a Case Management Order setting a schedule for subsequent CMC's and other proceedings, if necessary.

A.   **Service:** Except as otherwise permitted by court order, within 60 days after filing the complaint, the plaintiff must 1) serve each defendant with the complaint; and 2) file a corresponding proof of service.  When filing a cross-complaint or amended pleading, the pleading party must also file a proof of service on all of the parties who previously appeared and, within 30 days,  a) serve each new party with the pleading, and b) file a corresponding proof of service.

B.   **Rules and Forms:**  All parties must abide by the state and local rules of court and use proper state and local forms.

C.   **All Case Management Conferences (CMC):**  Parties must file a completed Case Management Statement either individually or jointly, no later than 15 calendar days before the CMC.  Counsel for each party and each self-represented party must appear at the CMC.

D.   **Sanctions:** Parties and counsel who fail to comply with state or local rules of court will be subject to the imposition of sanctions. [CRC Rule 2.30]

## Sample Civil Case Time Schedule

| Day | Event | Comment |
|-----|-------|---------|
| 1 | Complaint filed with Case Cover Sheet | Notice of Case Assignment issued by clerk. |
| 60 | Proof(s) of service filed with the court | Plaintiff must file the proof(s) of service or OSC may be set. |
| 70 | Plaintiff request entry of default of defendant. | Entry of default processed. |
| 110 | Parties to meet and confer. | Issues resolved. |
| 115 | Plaintiff Request Default Judgment | Default Judgment entered. |
| 125 | Deadline to File Case Management (CMC) Statement. | Parties to file individually or jointly. |
| 140 | Initial Case Management Conference. | Hearing held and necessary orders made. |

# *** ATTENTION ***

## TO ALL COUNSEL AND INTERESTED PARTIES

## COMMENCING JUNE 28, 2010
## TENTATIVE ORDERS WILL BE POSTED ON-LINE AT THE
## L.A. SUPERIOR COURT WEBSITE

### WWW.LASUPERIORCOURT.ORG

### DEPARTMENT SE-C LAW & MOTION
### PROCEDURES ARE NOW AS FOLLOWS:

APPEARANCES:

The Court will hear oral arguments on all matters at 8:30 a.m. If all counsel intend to submit on the Tentative Order and do not want oral argument, please advise the clerk, in Department "C", by calling (562-807-7245). If all sides submit on the Tentative Order and the clerk is so advised, the Tentative Order will become the final order of the court and the prevailing party shall give written Notice of Ruling per CRC 3.1312.

If the Moving and Responding parties do not agree to submit on the Tentative Order, the motion will be called as calendared for hearing. There is no need to contact Department "C", as the matter will remain on calendar for hearing.

If the Moving party does not call Department "C" to submit on the Tentative Order and there is no appearance by any party, then the motion(s), at the Court's discretion, may be taken off calendar without ruling on the motion(s).

ORDERS:

The minute order reflecting the Court's Order will constitute the final Order. No additional orders should be submitted to the Court for signature unless required by law or by the Court. Prevailing party shall give written Notice of Ruling per CRC 3.1312.

Minute orders, which constitute the final Order of the Court, will only be sent to the parties, via U.S. mail or facsimile, for the following: OSC re: sanctions, OSC re: contempt or matters taken under submission after oral arguments or briefing. Counsel or parties may request copies of all other minute orders/final orders either at the clerk's office or in writing. If a request is in writing, a self-addressed stamped envelope and the appropriate fee for copies shall be submitted.

**POS-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Alejandro Alers, Jr. Esq. State Bar No. 240532<br>611 North Park Avenue<br>Inglewood, California 90302<br><br>TELEPHONE NO.: 310-672-0369     FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* alalersjr@att.net<br>ATTORNEY FOR *(Name):* Alejandro Alers, Sr. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 12720 NORWALK BLVD.
MAILING ADDRESS: SAME AS ABOVE
CITY AND ZIP CODE: NORWALK 90650
BRANCH NAME: SOUTHEAST DISTRICT-NORWALK COURTHOUSE

PLAINTIFF/PETITIONER: ALEJANDRO ALERS, SR.

DEFENDANT/RESPONDENT: GENERAL MOTORS, LLC.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>VC064207 |
|---|---|

TO *(insert name of party being served):* CORPORATION SERVICE COMPANY- CSC

## NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: August 12, 2014

ALEJANDRO ALERS, JR. Esq.
(TYPE OR PRINT NAME)                                (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [✓] A copy of the summons and of the complaint.
2. [✓] Other *(specify):*
   NOTICE OF CASE MANAGEMENT CONFERENCE

*(To be completed by recipient):*

Date this form is signed:

_____          _____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,          (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)          ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]          **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**          Page 1 of 1
Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

**POS-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Alejandro Alers, Jr. Esq. State Bar No. 240532<br>611 North Park Avenue<br>Inglewood, California 90302<br><br>TELEPHONE NO.: 310-672-0369       FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: alalersjr@att.net<br>ATTORNEY FOR *(Name)*: Alejandro Alers, Sr. | **FOR COURT USE ONLY** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 12720 NORWALK BLVD.
MAILING ADDRESS: SAME AS ABOVE
CITY AND ZIP CODE: NORWALK  90650
BRANCH NAME: SOUTHEAST DISTRICT-NORWALK COURTHOUSE

PLAINTIFF/PETITIONER: ALEJANDRO ALERS, SR.

DEFENDANT/RESPONDENT: GENERAL  MOTORS, LLC.

| | |
|---|---|
| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>VC064207 |

TO *(insert name of party being served)*: CORPORATION SERVICE COMPANY- CSC

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing: August 12, 2014

ALEJANDRO ALERS, JR. Esq.
              (TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:

1. [✓]  A copy of the summons and of the complaint.
2. [✓]  Other *(specify)*:
       NOTICE OF CASE MANAGEMENT CONFERENCE

*(To be completed by recipient):*

Date this form is signed:

▶

_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

_____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

---

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Page 1 of 1<br>Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov |



**FROM:**

A. ALERS
611 N. PARK AVENUE
INGLEWOOD CA 70302

**TO:**

CORPORATION SERVICE COMPANY
2711 CENTERVILLE ROAD
WILMINGTON, DE. 19808



**Utility Mailer
10 1/2" x 16"**