# Exhibit A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM ROSS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, ) ) ) ) | CASE NO. 13-3670 |
| PLAINTIFF, ) | **PLAINTIFF'S ORIGINAL CLASS** |
| ) | **ACTION COMPLAINT FOR** |
| V. ) | **INJUNCTIVE RELIEF, EQUITABLE** |
| ) | **RELIEF, AND DAMAGES** |
| GENERAL MOTORS LLC; GENERAL MOTORS HOLDING, LLC; DELPHI AUTOMOTIVE PLC; AND DPH-DAS LLC F/K/A DELPHI AUTOMOTIVE SYSTEMS, LLC, ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| DEFENDANTS. ) | |

## NATURE OF CLAIM

1.      Plaintiff William Ross brings this action for himself and on behalf of all persons similarly situated who purchased or leased certain vehicles manufactured, distributed, and/or sold by GENERAL MOTORS LLC, GENERAL MOTORS HOLDING, LLC, GENERAL MOTORS CORPORATION, GENERAL MOTORS COMPANY, and/or its related subsidiaries, successors, or affiliates ("GM") with defective ignition switches manufactured by DELPHI AUTOMOTIVE PLC, DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC, and/or its related subsidiaries, successors, or affiliates ("Delphi"), as described below.  Where relevant, "old GM" refers to GM and/or its related subsidiaries, successors, or affiliates prior to bankruptcy and restructuring, and "new GM" refers to GM and/or its related subsidiaries, successors, or affiliates after the bankruptcy and reorganization in July 2009.

## NATURE OF CASE

2.      Every day, hundreds of millions of people travel on our nation's highways and streets.  When people operate motor vehicles, ride in them as passengers, or walk along roadways as pedestrians, they trust and rely on companies to make those vehicles safe.  Indeed,

with a 2,500 pound machine traveling at highway speeds, there is no room for error.  When mistakes happen, the consequences can be significant and life-altering—and even life-threatening.  By failing to disclose critical information about the safety of millions of vehicles, Defendants have violated the public's trust and shown a blatant disregard for its safety.

3.      Plaintiff bring this class action seeking redress and remedy from Defendants on behalf of themselves and the other Class members, each of whom purchased or leased one or more of the following vehicles:  2005-2010 Chevrolet Cobalt, 2006-2011 Chevrolet HHR, 2006-2010 Pontiac Solstice, 2005-2010 Pontiac G5, and 2007-2010 Saturn Sky vehicles (collectively, the "Defective Vehicles").

4.      Each of the Defective Vehicles contains a uniformly-designed ignition switch and cylinder, which is substantially similar in all of the Defective Vehicles, with the key position of the lock module on the steering column, and an ignition key with a slot for a key ring at the top (hereinafter collectively referred to as the "Key System").  The Key System on these vehicles is prone to fail during ordinary and foreseeable driving situations.[1]  Each of the Defective Vehicles also contains the uniformly designed Airbag System that shuts off when the Key System on these vehicles fails during ordinary and foreseeable driving situations. Collectively, the Key System and Airbag System defects are referred to as the "Key Defects" in this Complaint.

5.      Defendants have actual knowledge that, because of the way in which the Key System and Airbag System were designed and integrated into the Defective Vehicles, the ignition switch can suddenly fail during normal operation.  This failure cuts off engine power and certain electrical systems in the cars, which, in turn, disables key vehicle components, safety features (like airbags), and/or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

---

[1] That all of the Defective Vehicles indeed have a common safety defect, and are of a substantially similar design to one another in regard to their Key System, is evidenced by the fact that GM has identified these specific models for recall for the same safety design defects in its March 2014 recall letter.

6. The Key System and Airbag System are not automotive components that vehicle manufacturers or reasonable consumers expect will be defective, thereby triggering the need for replacement.

7. The ignition switch can move from the "run" to the "accessory/off" position at any time during normal and proper operation of the Defective Vehicles. This means that the power to the vehicle may fail while the vehicle is moving at 65 mph (or faster) on the freeway, leaving the driver unable to control the vehicle.

8. The Key System and Airbag System defects in the Defective Vehicles have been linked to at least 31 crashes and 13 deaths,[2] and GM has recognized that the Key System poses an "increas[ed] risk of injury or fatality" to occupants because the ignition switch may move out of the "run" position during operation.[3]

9. Although Defendants have and had actual knowledge of safety defects in the Key System and Airbag System in the Defective Vehicles for years, they fraudulently concealed, and continue to fraudulently conceal, material facts regarding the extent and nature of safety defects in the Defective Vehicles and what must be done to remedy the defects in the Key System and Airbag System.

10. In fact, GM has not only fraudulently concealed material facts relating to the safety defects in the Key System in the Defective Vehicles for years, but it has also made, and continues to make, affirmative fraudulent and misleading statements to the public regarding the nature and extent of the safety defects in the Key System in the Defective Vehicles. A reasonable manufacturer would not have sold a vehicle if it contained the Key Defects. Moreover, reasonable consumers who knew about the Key Defects would not have purchased the

---

[2] These numbers of crashes and deaths are taken from the GM Recall letter, but news reports have suggested the numbers of crashes and deaths associated with the Key System defects in the Defective Vehicles likely is much higher. *See, e.g.*, March 13, 2014 letter from the Center for Auto Safety to David J. Friedman, Acting Administrator, NHTSA, available at:
http://www.cbsnews.com/htdocs/pdf/Friedman_Letter_March_13_2014_Full.pdf (last visited March 21, 2014).

[3] *See id.*

Class Vehicles due to the unexpected risk of a sudden and dangerous ignition switch failure that places the vehicle's occupants and others at serious risk of injury or death.

11.      While GM instituted an initial recall of identified vehicles in which it acknowledges a defect with the ignition switch itself, it knew—**and its own engineering documents reflect**—that the defects transcend the design of the ignition switch and also include the placement of the ignition switch on the steering column, a lack of adequate protection of the ignition switch from forces of inadvertent driver contact, and the use of a different type of key. Additionally, there was as well as the need to redesign the Airbag System so that it would not immediately shut off when the Key System fails in ordinary and foreseeable driving situations. In the wake of great pressure from Plaintiff, Congress, and regulators, GM subsequently expanded its recall to include some of these elements; however, it has not changed the placement of the ignition switch and has not redesigned the Airbag System.  To fully remedy the problem and render the Defective Vehicles safe and of economic value to their owners again, these additional design elements (and perhaps others) are needed.

12.      The fact that GM's recall to date has been incomplete and inadequate underscores GM's ongoing fraudulent concealment and fraudulent misrepresentation of the nature and extent of the defects, and makes this action even more important to obtaining a proper remedy for Plaintiff and the other Class members.

13.      The defective Key System and Airbag System designs, the Defendants' past and ongoing failure to adequately warn of, or remedy, that design, and their past and ongoing fraudulent concealment and/or fraudulent misrepresentations of the full nature and extent of the defects in that design in the Defective Vehicles, has proximately caused, and continues to cause, Plaintiff and the other Class members to suffer economic damages. Plaintiffs purchased or leased vehicles that:  (a) have diminished value as they presently exist because the Key System cannot be operated safely without fear of a catastrophic event; and (b) require modification of the Key System and Airbag System, beyond that included in the recent GM recall of the Defective

Vehicles, to be operated safely or sold to other buyers, as demonstrated by GM's own internal documents that have not been disclosed to the general public (but that are discussed below).

14.     Through this action, Plaintiff, individually and on behalf of the other Class members, seeks injunctive relief in the form of a repair to fully remedy the defects in the Key System and Airbag System such that the Defective Vehicles have their economic value restored and can be operated safely, and/or damages to compensate them for the diminished value of their Defective Vehicles as a result of the defects and Defendants' wrongful conduct related to same.

15.     Further, and not withstanding GM's belated recall of the Class Vehicles, litigation is necessary in order to ensure that Class Members receive full and fair compensation, under the auspices of court order, for their injuries.

## PARTIES

### I.     Plaintiff

#### A.     William Ross

16.     Plaintiff William Ross is a citizen of the state of New York and he resides in Bellmore, Long Island, New York.  Mr. Ross owns a 2005 Chevrolet Cobalt that he purchased new in 2005 at a dealership in Hicksville, Nassau County, New York.  Mr. Ross's Chevrolet Cobalt was manufactured, sold, distributed, advertised, marketed, and warranted by GM. Mr. Ross purchased his vehicle primarily for his personal, family, and household use.  Mr. Ross has experienced at least two incidents caused by the Key Defects.

17.     On or about June 23, 2012, Mr. Ross was driving his Chevrolet Cobalt in Hempstead, Nassau County, New York when the ignition was inadvertently switched into the accessory position, causing the engine to lose power. The car's power steering and power braking systems and the airbag were disabled.  Mr. Ross lost control of the car, and the car crashed into a divider lined with rubber pylons.  The airbag did not deploy.  If the ignition had not been inadvertently switched into the accessory position, Mr. Ross would not have lost control of his vehicle and the crash would not have occurred.  In addition, the airbag would have remained enabled.

5

18.     This crash caused damage to Mr. Ross's car, including damage to the front bumper, front body, front windshield, roof, front doors, rear door, and rear bumper. The amount of damage to Mr. Ross's vehicle was estimated at $6,279.97.

19.     Mr. Ross also suffered personal injuries in this accident, including permanent disabling injuries to his right forearm. As a result of the accident, a muscle in Mr. Ross's right forearm became separated from the ligament connecting the muscle to Mr. Ross's arm bone. As a result, Mr. Ross's right arm is permanently scarred and disfigured. This injury also causes Mr. Ross ongoing pain and suffering and interferes with his daily activities. Before the accident, Mr. Ross enjoyed physical activities such as bowling. Now he can no longer participate in these activities. If the airbag in Mr. Ross's car had deployed at the time of the accident, or if the engine had not suddenly shut down causing him to lose control of the vehicle resulting in the collision, Mr. Ross would not have suffered these painful, disfiguring, and disabling injuries. At the time the accident occurred, because of Defendants' fraudulent concealment of the Key Defects, Mr. Ross did not realize that the Ignition Switch was defective or that the Defect had caused the accident.

20.     On or about March 10, 2014, Mr. Ross received a letter from Jim Molony, General Director – Customer & Relationship Services for General Motors, entitled "Important Safety Recall" (the "Recall Notice"). Upon receiving this notice, Mr. Ross realized for the first time that the Key Defects had caused his 2012 accident. The Recall Notice did not fully disclose the Key Defects and in fact downplayed the widespread prevalence of the problem and minimized the risk of the Defect occurring during normal operation of Mr. Ross's car.

21.     Stating that parts were not immediately available to repair the defective ignition switch in Mr. Ross's car, the Recall Notice informed Mr. Ross that General Motors would not repair his vehicle until further notice and advised Mr. Ross to continue driving the vehicle with heavy items removed from the keychain. Following the advice in the Recall Notice, Mr. Ross removed all non-essential keys from his keychain and continued to drive the car.

22.     On or about March 30, 2014, Mr. Ross again experienced the Key Defects.  While Mr. Ross was driving his Chevrolet Cobalt in Nassau County, New York, the ignition was again inadvertently switched into the accessory position, causing the vehicle to lose power to the engine.  As in the previous manifestation of the Defect, the car's power steering and braking systems and the airbag were disabled.  Mr. Ross lost control of the car and hit a divider.  As a result, the car's wheels were knocked out of alignment, requiring the wheels to be rebalanced at an approximate cost of $175.00.  If the ignition had not been inadvertently switched into the accessory position, Mr. Ross would not have lost control of his vehicle and the crash would not have occurred.

## II.     Defendants

23.     General Motors Corporation was a Delaware corporation with its headquarters in Detroit, Michigan.  The Corporation through its various entities designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brands of automobiles in New York and multiple other locations in the United States and worldwide.

24.     In 2009, General Motors Corporation filed for bankruptcy, and substantially all of its assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement") to General Motors LLC.   General Motors LLC may be served with process by its registered agent, Corporation Service Company, Albany, New York, 12207-2543.

25.     Under the Agreement, General Motors LLC also expressly assumed certain liabilities of General Motors Corporation, including certain statutory requirements:

> From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

In addition, General Motors LLC expressly set forth that it:

> shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [General Motors Corporation] that are

7

> specifically identified as warranties and delivered in connection
> with the sale of new, certified used or pre-owned vehicles or new
> or remanufactured motor vehicle parts and equipment (including
> service parts, accessories, engines and transmissions)
> manufactured or sold by Sellers or Purchaser prior to or after the
> Closing and (ii) Lemon Laws.

26.    General Motors LLC is a Delaware corporation with its headquarters in Detroit, Michigan.  General Motors LLC is registered with the New York Department of State to conduct business in New York.

27.    At all times relevant herein, General Motors Corporation and its successor in interest, General Motors LLC, were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, and other motor vehicles and motor vehicle components throughout the United States.

28.    Defendant Delphi Automotive PLC ("Delphi") is headquartered in Gillingham, Kent, United Kingdom.  Delphi is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan.  Delphi Automotive Systems LLC may be served with process by its registered agent, CT Corporation System, 111 Eighth Avenue, New York, New York 10011.

29.    Delphi began as a wholly-owned subsidiary of General Motors Corporation until it was launched as an independent publicly-held corporation in 1999.

30.    In 2005, Delphi declared Chapter 11 bankruptcy. After emerging from bankruptcy in 2009, GM purchased certain Delphi assets, including Delphi's steering assets, and four Delphi plants to assist with its post-bankruptcy restructuring. In 2011, GM finally ended its ownership interest in Delphi by selling back the assets.

31.    At all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the subject ignition switches.

32.    GM and Delphi are collectively referred to in this Complaint as "Defendants."

## JURISDICTION AND VENUE

33.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

34.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because GM conducts substantial business in this District, has caused harm to Class Members residing in this District, and Plaintiff William Ross resides in this District.

## FACTUAL BACKGROUND

### A.     The Defective Vehicles

35.     The Saturn Ion was a compact car first introduced in 2002 for the 2003 model year and was discontinued in 2007.

36.     The Chevrolet Cobalt was a compact car first introduced in 2004 for the 2005 model year and was discontinued in 2010.

37.     The Pontiac G5 was first introduced in 2004 for the 2005 model year and was discontinued in 2009.  The coupe and four-door sedan versions of the G5 were marketed in Canada from 2005 to 2010, but are not vehicles at issue in this action.

38.     The Chevrolet HHR was a compact car first introduced in 2005 for the 2006 model year and was discontinued in 2011.

39.     The Pontiac Solstice was a sports car first introduced in 2005 for the 2006 model year and was discontinued in 2009.

40.     The Saturn Sky was first introduced in 2006 for the 2007 model year and was discontinued in 2009.

41.     The Saturn Ion, Pontiac G5, Chevrolet HHR, and Chevrolet Cobalt were constructed on GM's Delta Platform.

42.     The Saturn Sky and Pontiac Solstice were constructed on GM's Kappa Platform.

43.     Upon information and belief, GM promoted these Class Vehicles as safe and reliable in numerous uniform, standardized, widely and continuously disseminated marketing and advertising materials.

44.     No reasonable consumer expects that the vehicle that he or she purchases or leases contains a known but undisclosed design defect that poses a safety risk at the time of purchase or lease.

### B.     GM Field Reports and Internal Testing Reveal a Problem

45.     In 2001, during pre-production of the 2003 Saturn Ion, GM engineers learned that the ignition switch could unintentionally move from the "run" position to the "accessory" or "off" position.  In an internal report generated at the time, GM identified the cause of the problem as "low detent plunger force." The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key. The report stated that than an "ignition switch design change" was believed to have resolved the problem.

46.     In 2003, a second report documented an incident with a Saturn Ion where "a service technician observed a stall while driving."  There the technician noted that the owner had several keys on the key ring and surmised that the "weight of the keys had worn out the ignition switch."  The switch was replaced and the matter was closed.

47.     GM engineers encountered the problem again in 2004 just prior to the launch of the 2005 Chevrolet Cobalt. GM learned of an incident in which a Cobalt vehicle suddenly switched out of the "run" position and lost engine power.  GM engineers were able to replicate this problem during test drives of the Cobalt.  According to GM, an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") was able to pinpoint the problem and evaluate a number of solutions; however, after considering "lead time required, cost, and effectiveness," GM decided to do nothing.

48.     After the Chevrolet Cobalt entered the market in 2004, GM began receiving complaints about incidents involving a sudden loss of engine power.  GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently."  Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch . . . [and a] low position of the lock module [on] the [steering] column."

49.     Additional PRTS's were opened to investigate the problem, and in May 2005, GM engineers proposed redesigning the key head from a "slotted" to a "hole" configuration to prevent inadvertent shifting of the key in the ignition.  Although GM initially approved the design, the company once again declined to act.

50.     In testimony given on April 1, 2014, before the House Committee on Energy and Commerce, GM CEO Mary Barra explained that the proposed "fix" for the Key Defects was rejected in 2005 because it would have taken too long and cost too much.  Ms. Barra testified that GM's decision making was the product of a "cost culture" versus a "culture that focuses on safety and quality."

51.     In April 2006, GM finally approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by the supplier Delphi. According to GM, the changes included a new detent plunger and spring, but there was no corresponding change in the ignition switch part number.  GM estimates that Delphi began producing the redesigned ignition switch for all Subject Vehicles during the 2007 model year.

52.     Delphi assigned its newly designed switch the same part number assigned to the faulty ignition switch.  Upon information and belief, Delphi's action was intended to make it difficult to trace the defective switch back to its original design in 2001.

53.     After another PRTS in 2009, GM redesigned the Chevrolet Cobalt key, changing the top of the key from a "slot" design to a "hole" design—as had been suggested in 2005. GM

instituted the change after finding that consumers "with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off" and the design change was intended to "significantly reduce downward force and the likelihood of this occurrence." The new key design was produced for 2010 model year.

54.     According to Delphi, the component required to fix the Key Defects costs approximately $2 to $5.  GM management estimated that replacement components would cost an additional 90 cents per vehicle, but would only save 10 to 15 cents in warranty costs.

55.     GM also now acknowledges that Field Product Reports and PRTS reports related to the Subject Vehicles from 2003 and 2006 concerned engine stalling in the Saturn Ion and may be related to the Key Defects.

### C.     GM Issues Information Service Bulletins

56.     In 2005, as a result of internal investigation, GM issued an Information Service Bulletin entitled the "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007) to GM dealers warning about a stalling problem related to inadvertent shifting of the ignition switch.  The bulletin applied to 2005 and 2006 Chevrolet Cobalt, 2006 Chevrolet HHR, 2005 and 2006 Pontiac Pursuit (Canada only), 2006 Pontiac Solstice, and 2003 to 2006 Saturn Ion, which all had the same ignition switch.

57.     The bulletin advised that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort," noting that risk was greater "if the driver is short and has a large and/or heavy key chain" such that "the driver's knee would contact the key chain while the vehicle was turning." GM dealers were told to inform consumers of this risk, and recommend "removing unessential items from their key chain."  The bulletin also informed dealers that GM had developed an insert for the key ring so that "the key ring cannot move up and down in the slot any longer – it can only rotate on the hole" and that the key ring has been replaced by a smaller design such that "the keys [will] not hang[ ] as low as in the past."

58.     On July 19, 2005, the New York Times reported that Chevrolet dealers were telling Cobalt owners to remove extra items from their key rings to prevent accidental stalling of their vehicles. Alan Adler, GM's Manager for Safety Communications, stated that the problem manifested in only "rare cases when a combination of factors is present."  Adler advised that consumers "can virtually eliminate this possibility by taking several steps, including removing nonessential material from their key rings."

59.     The Times reporter noted that his wife had already encountered the problem with the Chevrolet Cobalt.  She was driving on a freeway, accidentally bumped the steering column with her knee, and found the engine "just went dead."  She was able to safely coast to the side of the road. When the vehicle was brought back to the Chevrolet dealer for an inspection, nothing was found wrong and they were advised of the service bulletin.  The reporter stated that the key chain being used at the time of the stalling incident was provided by GM, and included only the key fob and a tag.

60.     GM, in a statement through Adler, insisted that this problem was not a safety issue because "[w]hen this happens, the Cobalt is still controllable" and the "engine can be restarted after shifting to neutral." Adler also claimed that this ignition issue was widespread because "practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition…."

61.     In October 2006, GM updated the Information Service Bulletin, "Information on Inadvertent Turning of Key Cylinder, Loss of Electrical System and No DTCs" (#05-02-35-007A) to include additional vehicles and model years.  Specifically, GM included the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky.  The updated bulletin included the same service advisories to GM dealers as the earlier version.

62.     According to GM, the service bulletin was the appropriate response "given that the car's steering and braking systems remained operational even after a loss of engine power."

13

GM reports that GM dealers provided 474 key inserts to GM vehicle owners who brought their vehicles in for servicing.

**D.    Reports of Unintended Engine Shut Down**

63.    A number of reports from warranty and technical assistance data beginning in 2003, "addressed complaints of stalling Ion vehicles." Despite these reports, the Saturn Ion remained in production until 2007.

64.    On May 26, 2005, a reporter for The Daily Item in Sunbury, Pennsylvania reviewed the Chevrolet Cobalt and found that during his test drives of the vehicle there were "[u]nplanned engine shutdowns [that] happened four times during a hard-driving test week" with the vehicle.

**E.    Crash Reports and Data**

65.    The Defendants knew of the Key Defects and its dangerous, even deadly consequences for consumers, but concealed that information from safety regulators and the public.

66.    National Highway Traffic Safety Administration (NHTSA) data shows that there were three fatal car crashes involving Saturn Ions due to a failure of the airbag to deploy prior to July 2005.

67.    In July 2005, a sixteen-year old was killed when her 2005 Chevrolet Cobalt crashed with the ignition switch in the accessory mode, which disabled the airbag.

68.    In 2006, there were at least two fatalities associated with a Chevrolet Cobalt crash.  Information from the car's data recorder indicated that the ignition switch was in "accessory" instead of run, and the front airbags failed to deploy.

69.    In 2007, GM reviewed available sensor data from nine front-impact Cobalt crashes where the airbags did not deploy. GM discovered that in four of the crashes, the ignition was in the "accessory position." Crash information for the other Subject Vehicles was not reviewed.

1171403.2

70.     In 2007, NHTSA's early warning division reviewed available data provided by GM on airbag non-deployments in Chevrolet Cobalt vehicles.  This review identified 43 incidents in which airbags may not have deployed in a crash.  The early warning division referred the case to NHTSA's data analysis division for further screening.  A defects panel was convened, but after reviewing the data and consulting with GM, the panel ultimately concluded that "[t]he data available at the time of this evaluation did not indicate a safety defect or defect trend that would warrant the agency opening a formal investigation."  In prepared remarks delivered April 1, 2014, to the Committee on Energy and Commerce, NHTSA Acting Administrator David Friedman stated, "At the time of these reviews, NHTSA did not have the information that GM has since provided—for instance, new evidence linking airbag non-deployment to faulty ignition switches."

71.     GM has identified 23 frontal-impact crashes in the United States involving 2005 to 2007 Chevrolet Cobalts and 2007 Pontiac G5s in which the Key Defects may have caused or contributed to the failure of the safety airbags to deploy.

72.     GM has identified 8 frontal-impact crashes in the United States involving 2003 to 2007 Saturn Ion vehicles in which the Key Defects may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in four fatalities and six injuries to occupants.

73.     GM has identified 3 frontal-impact crashes in the United States involving 2006 and 2007 model year Chevrolet HHR vehicles in which the Key Defects may have caused or contributed to the failure of the safety airbags to deploy. These crashes resulted in three injuries to occupants.

74.     On information and belief, many more crashes, resulting in injuries and deaths, have involved the Key Defects and gone unreported because Defendants have concealed the problem.  These crashes continue to occur, even as GM responds to Congressional investigation and has announced a recall; and the crashes will continue to occur unless and until the Key Defects are completely and effectively corrected.

15

F.     **Restructured GM Continues to Conceal Key Defects**

75.     GM provided to consumers false and misleading advertisements, technical data and other representations regarding the safety, performance, reliability, quality, and nature of the Class Vehicles that created express and implied warranties related to the future performance of the Class Vehicles.

76.     Moreover, although GM was aware of the Key Defects throughout the bankruptcy proceedings and restructuring, GM purposefully concealed this information from its creditors, and omitted this material information from its numerous filings in the bankruptcy court.

77.     In 2009, after declaring bankruptcy and restructuring, the new GM entity expressly assumed all liability related to express warranties under its sales agreement to purchase assets of the prior GM entity. In addition, the new GM entity had a duty to disclose what it knew under GM's ongoing warranty obligations.  The new GM entity, however, continued to omit, conceal, and fail to disclose material facts about the Key Defects.

78.     In March 2010, GM recalled nearly 1.1 million Cobalt and Pontiac G5 models for faulty power steering issues.  Despite its knowledge of the Key Defects, GM did not include the Key Defects in this recall.  Further, although the Saturn Ion used the same steering system as the Cobalt and Pontiac G5 (and had the same Key Defects), GM did not recall any Saturn Ion vehicles.

79.     In September 2011, after the NHTSA began to make inquiries about the safety of the Saturn Ion, GM admitted that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 Saturn Ion vehicles.

80.     The following month, a GM engineer informed Mary Barra that the Saturn Ion may have the same power steering issues that plagued the Chevy Cobalt and Pontiac G5.

81.     Instead of recalling the Saturn Ion, GM sent dealers a service bulletin in May of 2012 identifying complaints about the steering system in the vehicle.

1171403.2

82.     According to an analysis by the New York Times published on April 20, 2014, GM has "repeatedly used technical service bulletins to dealers and sometimes car owners as stopgap safety measures instead of ordering a timely recall."

83.     Former NHTSA head Joan Claybrook echoed this conclusion, stating, "There's no question that service bulletins have been used where recalls should have been."

84.     In addition to its failure to recall the Saturn Ion in March 2010, restructured GM has been recently reprimanded by NHTSA for issuing service bulletins where product recalls were more appropriate.  In July 2012, GM issued a service bulletin for what NHTSA later called a "fairly obvious" safety concern over defective airbags in the Buick Verano and Chevrolet Cruze vehicles.  GM later recalled some of these vehicles in October 2012.  It expanded the recall in January 2013, and then again in November 2013.

85.     NHTSA has recently criticized GM for issuing service bulletins on at least four additional occasions in which a recall would have been more appropriate and in which GM later, in fact, recalled the subject vehicles.

86.     These inappropriate uses of service bulletins prompted Frank Borris, the top defect investigator for NHTSA, to write to GM's product investigations director in July 2013, complaining that "GM is slow to communicate, slow to act, and, at times, requires additional effort . . . that we do not feel is necessary with some of [GM's] peers."

87.     By the time GM finally recalled the Saturn Ion in March of 2014, NHTSA had received more than 1200 complaints about the vehicle's power steering.  Similar complaints resulted in over 30,000 warranty claims with GM.

88.     GM continued to conceal, omit, and make false representations to the public that the Class Vehicles were safe with minor service adjustments, rather than informing consumers that a recall was necessary to address the Key Defects. These omissions and misrepresentations were directly related to the prior GM entity's false and misleading advertisements and other information provided to consumers regarding the safety, performance, reliability, quality, and nature of the Class Vehicles prior to the sale of the Class Vehicles.

### G.    GM's Belated Repair Recall of Some Vehicles

89.    On February 7, 2014, GM filed a Part 573 Defect Notice with the NHTSA to recall the 2005 to 2007 model year Chevrolet Cobalt and the 2007 Pontiac G5 vehicles.  The notice identified that the "ignition switch torque performance may not meet General Motors' specifications," explaining that if "the key ring is carrying weight or the vehicle goes off road or experiences some other jarring event, the ignition switch may inadvertently be moved out of the 'run' position" and may result in deactivating the airbags. The notice did not acknowledge that the Key Defects could occur under normal driving conditions, even when the key ring is not carrying added weight.

90.    The notice also did not identify all the vehicles affected by the Key Defects.

91.    The notice failed to indicate the full extent to which GM has been aware of the Defect.  The notice suggests that GM's knowledge of the defect is recent, stating that "[t]he issue was presented to the Field Performance Evaluation Review Committee and on January 31, 2014, the Executive Field Action Decision Committee decided to conduct a safety recall."

92.    In a February 24, 2014 letter to the NHTSA, GM amended the Part 573 Report to include a more detailed chronology. The chronology indicated that GM first learned of the Key Defects during the launch of the 2005 Chevrolet Cobalt from field tests by its engineers.

93.    On February 25, 2014, GM amended its Part 573 Report to cover additional models and model years due to the same Key Defects.  Specifically, GM identified the 2003 to 2007 model years of the MY Saturn Ion, 2006 and 2007 model years of the MY Chevrolet HHR, 2007 model year of the Pontiac Solstice, and 2007 model year of MY Saturn Sky vehicles.

94.    According to the NHTSA Acting Administrator David Friedman, the chronology information provided by GM on February 24, 2014 "raise[d] serious questions as to the timeliness of GM's recall." Therefore, the NHTSA opened a "timeliness query" on February 26, 2014.

95.    On March 4, 2014, the NTHSA issued GM a Special Order demanding that it provide additional information by April 3, 2014, on 107 specific requests, including information

to "evaluate the timing of GM's defect decision making and reporting of the safety defect to NHTSA."

96.     On March 11, 2014, GM filed a new Part 573 report superseding its February 25 filing.  The new chronology provided with the report indicated that GM was aware of the Key Defects in 2001—significantly earlier than its previous 2004 disclosure.  GM now indicated that it had a report from 2001 that revealed a problem with the ignition switch during pre-production of the Saturn Ion.

97.     On March 28, 2014, GM filed a new Part 573 report that expanded the recall set forth in its February 25, 2014 filing.  GM's March 28 report indicated that several additional model year vehicles may be affected by the Key Defects.  GM identified those vehicles as the 2008-2010 Chevrolet Cobalt, 2008-2011 Chevrolet HHR, 2008-2010 Pontiac Solstice, 2008-2010 Pontiac G5, and 2008-2010 Saturn Sky.  The March 28 report added over one million vehicles to the total affected by the Key Defects.  On April 8, 2014, NHTSA fined GM $28,000—the maximum amount permitted by law—for its failure to comply with the Special Order issued on March 4, 2014.  Although NHTSA demanded that GM answer 107 questions about the timing of its knowledge of the Key Defects, GM failed to provide a single answer by April 8, 2014.  According to the NHTSA, GM refused to answer even simple questions, such as whether the Ignition Switch was redesigned at any time other than in 2006.

98.     On April 10, 2014, GM placed two engineers on paid leave as part of an internal investigation of the Key Defects recall.  One of these engineers, Ray DeGiorgio, was the lead designer for the Ignition Switches.

99.     GM notified dealers of the Defective Vehicles of the recall in February and March 2014.  GM also notified owners of the Defective Vehicles by letter of the recall.  The letter minimized the risk of the defect, indicating that the Key Defects would occur only "under certain conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."  On April 9, 2014, GM filed a new Part 573 report, which further expanded the recall to include a defect identified with ignition lock

19

cylinders. GM's report indicates that the defective cylinders can allow for the removal of the
ignition key while the engine is still running, allowing for the possibility of a rollaway, "vehicle
crash and occupant or pedestrian injuries." GM cautioned owners of the Defective Vehicles that
"it is very important before exiting the vehicle for customers to make sure the vehicle is in
"Park" . . . ."

100.    GM has advised the public that the replacement ignition switches "ARE NOT
CURRENTLY AVAILABLE." During her testimony before Congress, GM CEO Mary Barra
testified that replacement switches would be available beginning April 7, 2014.  On April 7,
2014, multiple news outlets reported that replacement switches were not available.

101.    GM's recall letter also failed to inform customers whether temporary loaner
vehicles would be made available while they were waiting for the Key Defects to be repaired.
Upon information and belief, customers in receipt of the recall letter have been denied
replacement vehicles; told they must incur significantly higher insurance payments in exchange
for a temporary replacement; or been informed that there are simply no loaner vehicles available.

## TOLLING OF THE STATUTE OF LIMITATIONS

### I.    Fraudulent Concealment Tolling

102.    Upon information and belief, GM has known of the Key Defects in the vehicles
since at least 2001, certainly well before Plaintiff and Class Members purchased the Class
Vehicles, and has concealed from or failed to notify Plaintiff, Class Members, and the public of
the full and complete nature of the Ignitions Switch Defect, even when directly asked about it by
Class Members during communications with GM and GM dealers.

103.    Although GM has now acknowledged that "[t]here is a risk, under certain
conditions, that your ignition switch may move out of the "run" position, resulting in a partial
loss of electrical power and turning off the engine," GM did not fully disclose the Key Defects
and, in fact, downplayed the widespread prevalence of the problem, and minimized the risk of
the Defect occurring during normal operation of the Class Vehicles.

20

1171403.2

104.    In 2005, GM issued a Technical Service Bulletin to dealers and service technicians directing that customers be advised to "remove unessential items from their key chains" to avoid inadvertent ignition switching, but did not identify or disclose the Defect.

105.    GM also stated, in 2005, that it was "rare" for the Ignition Switches in Class Vehicles to unintentionally move from the "on" position to the "accessory" or "off" position. GM knew that this statement was untrue, but issued the statement to exclude suspicion and preclude inquiry.

106.    In 2007 and 2010, GM withheld information from the NHTSA when it knew that the NHTSA was investigating airbag non-deployment in certain GM vehicles.  Indeed, NHTSA understood that airbag systems "were designed to continue to function in the event of a power loss during a crash." This understanding was confirmed by available GM service literature reviewed during NHTSA's due diligence effort.  GM, however, had evidence that power loss caused by the Key Defects could also prevent the deployment of airbags.  Despite its knowledge and familiarity with NHTSA's investigation, GM withheld this information, which delayed its recall by several years.

107.    In February 2014, GM instituted only a limited recall, identifying only two of the several models with the Key Defects. Likewise, the later recall expanded to include five additional model years and makes does not fully disclose all the vehicles affected by the Key Defects.  On March 28, GM expanded the recall yet again to include all model years of each vehicle affected by the ignition switch recall.  GM has revealed the scope of the recall in a hazardous, piecemeal fashion, under duress from Congress and intense consumer backlash.

108.    Upon information and belief, there are other Class Vehicles that have the Key Defects that have not yet been disclosed by GM.

109.    As GM CEO Mary Barra explained during testimony before the House Committee on Energy and Commerce on April 1, 2014, GM's active concealment of the Key Defects was the result of a "cost culture" versus one that placed an emphasis on safety.

110.    Pursuant to 49 U.S.C. § 30118(c), GM was obligated and had a duty to disclose the Key Defects to the NHTSA when it learned of the Defect and/or decided in good faith that the Class Vehicles did not comply with an applicable motor vehicle safety standard.

111.    Any applicable statute of limitation has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## II.    Estoppel

112.    GM was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the vehicles.  GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.  Plaintiff and Class Members reasonably relied upon GM's knowledge and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## III.    Discovery Rule

113.    The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their vehicles had the Key Defects.

114.    However, Plaintiff and Class Members had no realistic ability to discern that the vehicles were defective until—at the earliest—after the Key Defects caused a sudden unintended ignition shut off.  Even then, Plaintiff and Class Members had no reason to know the sudden loss of power was caused by a defect in the ignition switch because of GM's active concealment of the Key Defects.

115.    Not only did GM fail to notify Plaintiff or Class Members about the Key Defects, GM, in fact, denied any knowledge of or responsibility for the Key Defects when directly asked about them. Thus Plaintiff and Class Members were not reasonably able to discover the Key Defects until after they had purchased the vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Key Defects caused their vehicles to suddenly lose power.

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this lawsuit as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or c(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

117.    The proposed nationwide class and subclass is defined as:

### Nationwide Class

All persons in the United States who purchased or leased a GM Class Vehicle (2005–2010 Chevrolet Cobalt; 2006–2011 Chevrolet HHR; 2006–2010 Pontiac Solstice; 2003–2007 Saturn Ion; 2007–2010 Saturn Sky; and 2005–2010 Pontiac G5), and any other GM vehicle model containing the same ignition switch as those Class Vehicle models.

### Subclass

All persons in the United States who purchased or leased a GM Class Vehicle (2005–2010 Chevrolet Cobalt; 2006–2011 Chevrolet HHR; 2006–2010 Pontiac Solstice; 2003–2007 Saturn Ion; 2007–2010 Saturn Sky; and 2005–2010 Pontiac G5), and any other GM vehicle model containing the same ignition switch as those Class Vehicle models and whose Class Vehicles were involved in collisions when the ignition inadvertently switched into the accessory or off positions.

118.    Plaintiff also brings this action on behalf of a statewide class of all persons who purchased or leased a Class Vehicle in the State of New York and a statewide subclass of those whose Class Vehicles were involved in collisions when the ignition inadvertently switched into the accessory or off position.

119.    Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have filed individual lawsuits seeking compensation for personal injuries as a result of the facts alleged herein.  Plaintiff reserves the

right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into additional subclasses, or modified in any other way.

## II. Numerosity and Ascertainability

120.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  Class Members are readily identifiable from information and records in GM's possession, custody, or control.

## III. Typicality

121.    The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class Members, purchased or leased a GM Class Vehicle designed, manufactured, and distributed by Defendants.  The representative Plaintiff, like all Class Members, has been damaged by Defendants' misconduct in that he has incurred costs relating to the Key Defects.  In addition, like all members of the Nationwide Subclass and the New York Subclass, Mr. Ross suffered injuries and damages when his car was involved in collisions when the ignition inadvertently switched into the accessory or off positions. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

## IV. Adequate Representation

122.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

123.    Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiff nor his counsel has interests adverse to those of the Class.

## V.      Predominance of Common Issues

124.    There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members.  These common legal and factual issues include:

a.      whether the Class Vehicles suffer from the Key Defects;

b.      whether Defendants knew or should have known about the Key Defects, and, if so, how long Defendants have known of the Defect;

c.      whether Defendants were negligent in designing, manufacturing, and selling the Class vehicles with the Key Defects;

d.      whether Defendants are strictly liable for injuries caused by the Defect;

e.      whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a GM

f.      whether GM had a duty to disclose the defective nature of the Vehicles to Plaintiff and Class Members;

g.      whether GM omitted and failed to disclose material facts about the Class Vehicles;

h.      whether GM concealment of the true defective nature of the Class Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing the Vehicles;

i.      whether GM engaged in an unlawful enterprise that included a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

j.      whether GM violated state consumer protection statutes, including, *inter alia*, the Michigan Consumer Protection Act ("MCPA"), MICH. COMP. L. ANN. § 445.903 *et seq.*, and §§ 349–350 of the New York General Business Law;

k.      whether the Class Vehicles were fit for their ordinary and intended use, in violation of the implied warranty of merchantability;

l.      whether Plaintiff and Class Members are entitled to a declaratory judgment stating that the ignition switches in the Class Vehicles are defective and/or not merchantable;

m.      whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

n.      whether GM should be declared responsible for notifying all Class Members of the Defect and ensuring that all GM vehicles with the Key Defects are recalled and repaired.

o.      what aggregate amounts of punitive or exemplary damages or statutory penalties, as available under the laws of Michigan and New York are sufficient to punish and deter Defendants and to vindicate statutory and public policy, and how such penalties should most equitably be distributed among Class members.

## VI.    <u>Superiority</u>

125.    Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

126.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

127.    Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve

the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

128.    Defendants have acted in a uniform manner with respect to the Plaintiff and Class Members, as demonstrated in the following form "Dear GM Customer" letter:

July 2013

Dear General Motors Customer:

This notice is sent to you in accordance with the requirements of the National Traffic and Motor Vehicle Safety Act.

General Motors, based on data and information from supplier IMPCO Automotive, has decided that a defect, which relates to motor vehicle safety, exists in certain compressed natural gas (CNG) fuel systems installed by IMPCO Automotive on 2011–2013 model year CNG equipped Chevrolet Express and GMC Savana vehicles.  As a result, General Motors and IMPCO Automotive are conducting a safety recall. We apologize for this inconvenience.  However, we are concerned about your safety and continued satisfaction with our products.

---

### I M P O R T A N T

- Your 2011-2013 model year Chevrolet Express or GMC Savana CNG equipped vehicle is involved in safety recall 13139.

- Owners who have not been contacted by General Motors concerning this recall should schedule an appointment with their Chevrolet or GMC dealer to arrange for the repairs to be completed.

- This service will be performed for you at **no charge.**

---

**Why is your vehicle being recalled?**  The underbody shut-off solenoid connector to a CNG fuel tank may corrode and could form a high-resistance short in the connector, potentially causing overheating or a self- extinguishing flame. If there is a fuel leak or other combustible material in the vicinity, there is a risk of fire.

**What will we do?**  To correct this condition, improved solenoids and securing nuts will be installed for all exterior tanks and the regulator, and the 30 amp gas fuel pump fuse will be replaced with either a 7.5 amp fuse (for the four tank configuration) or a 5.0 amp fuse (for the three tank configuration). In addition, the wiring routing will be adjusted, if necessary, to eliminate any undue tension on the connector, and anti-corrosion sealing plugs will be

27

installed into the valve body (2013 model year vehicles have these plugs already installed). This service will be performed at no charge. The approximate time for the actual repair can be as much as four hours per vehicle, but the wait time for your vehicle may be longer depending on how busy the dealership is.

**What should you do?** General Motors will contact certain fleets directly to arrange for the performance of the required repair. If you have not already been contacted by General Motors, please schedule an appointment with your Chevrolet or GMC dealer for this repair.

**Do you have questions?** If you have questions or concerns that your dealer is unable to resolve, please contact the GM Fleet Action Center at 1-800-353-3867.

If after contacting your dealer and the Fleet Action Center, you are still not satisfied GM has done their best to remedy this condition without charge and within a reasonable time, you may wish to write the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE., Washington, DC 20590, or call the toll-free Vehicle Safety Hotline at 1.888.327.4236 (TTY 1.800.424.9153), or go to http://www.safercar.gov. The National Highway Traffic Safety Administration Campaign ID Number for this recall is 13V225.

Federal regulation requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

Jim Moloney
General Director,
Customer and Relationship Services
GM Recall #13139

129.     Classwide declaratory, equitable, and injunctive relief is appropriate under Rule

23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the

class, and inconsistent adjudications with respect to the Defendants' liability would establish

incompatible standards and substantially impair or impede the ability of Class Members to

protect their interests. Classwide relief assures fair, consistent, and equitable treatment and

protection of all Class Members, and uniformity and consistency in Defendants' discharge of

their duties to perform corrective action regarding the Key Defects.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Asserted on Behalf of the Nationwide Class
### (Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*)

130.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

131.    This Claim is brought on behalf of the Nationwide Class.

132.    Defendants, Plaintiff, and the Nationwide Class are "persons" within the meaning of RICO, § 1961(3).

### B.    The RICO Enterprise

133.    From on or about 2001, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

134.    Defendants' existence was separate and distinct from the RICO Enterprise.

135.    The RICO enterprise is separate and distinct from the pattern of racketeering activity in which Defendants engaged, and are currently engaging in.

136.    The RICO enterprise which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein.

137.    The RICO enterprise, which engaged in, and whose activities affected, interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included:

138.    ***Defendant GM***:  GM's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates-in-fact in the Enterprise to

deceive Plaintiff and other Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and defect from Plaintiff and the other Class members, including, but not limited to Ray DeGiorgio, GM's design engineer who designed the Ignition Switch; and Mary T. Barra, GM's current CEO, and the former head of Global Product Development who oversaw Mr. DeGiorgio and was responsible for product recalls;

139.    ***Defendant Delphi:*** Delphi's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates-in-fact in the Enterprise to deceive Plaintiff and other Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and defect from Plaintiff and the other Class members.

140.    ***GM's Dealers:*** GM dealers who GM instructed to present false and misleading information to Plaintiff and other members of the Class, through, *inter alia*, multiple Service Bulletins, and who did in fact present such false and misleading information.

141.    The RICO Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which GM has engaged and is engaging. The RICO Enterprise was and is used as a tool to effectuate the pattern of racketeering activity.

142.    The members of the RICO Enterprise all had a common purpose: to increase and maximize Defendants' revenues by deceiving Plaintiff and other Class Members into purchasing dangerous and Defective Vehicles, and actively concealing the Key Defects from Plaintiff and the other Class Members. The members of the RICO Enterprise shared the bounty of their enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the RICO Enterprise benefited from the common purpose of the scheme to defraud: GM sold or leased more vehicles with the Key Defects, Delphi sold more of the defective ignition switches, and GM's dealers sold and serviced more vehicles with the Key Defects.

C.    **The Pattern of Racketeering Activity**

143.    As set forth below, Defendants conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than a decade, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

a.    GM, with the assistance and collaboration of the other persons associated in fact with the enterprise devised and employed a scheme or artifice to defraud by use of the telephone and internet and transmitted, or caused to be transmitted, by means of wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including GM's website, Service Bulletins to dealers, and communications with other members of the Enterprise, for the purpose of executing such scheme or artifice to defraud, in violation of 18 U.S.C. § 1341 and § 1343.

b.    As part of the scheme to defraud, the RICO Enterprise utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the false pretenses and artifice to defraud, as described herein.

c.    The concealment of the dangerous and defective condition of the defective GM vehicles is the core purpose of the underlying racketeering offense. The Enterprise had an ascertainable structure by which GM operated and managed the association-in-fact by using its Dealers and Delphi to concoct, obfuscate, carry out, and attempt to justify the fraudulent scheme described herein.

144.    In furtherance of its scheme to defraud, although GM was aware of the Key Defects, and the need for a recall of the Defective Vehicles, throughout the bankruptcy proceedings and restructuring, GM purposefully omitted this material information from its numerous filings in the bankruptcy court.

145.    GM's February 28, 2005 Service Bulletin was issued in furtherance of its scheme to defraud. It instructed GM's dealers to disseminate false and misleading information about the

1171403.2

dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class. The February 28, 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

146.    In furtherance of its scheme to defraud, in June 2005, GM issued a public statement through the mail and wires in furtherance of its scheme to defraud. The statement provided the public, including Plaintiff and the other Class members, with false and misleading information about the dangerous and defective condition of the defective vehicles, and sought to conceal that condition by minimizing the issue and offering an ineffective fix. As such, the statement constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

147.    GM's December 2005 Service Bulletin was issued in furtherance of its scheme to defraud. It instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class – namely, that the issue could be resolved by removing items from key chains. The December 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

148.    In October of 2006, GM issued an update to its December 2005 Service Bulletin in furtherance of its scheme to defraud. The update repeated the instruction to GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and other members of the Class. The update to the December 2005 Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

149.    In furtherance of its scheme to defraud, GM communicated with Delphi via the mail and/or wires regarding the manufacture of the defective ignition switch system. Through those communications, GM instructed Delphi to continue manufacturing the defective part even though it did not meet GM's own specifications. Through those communications, GM also instructed Delphi to make a change to the defective ignition switch system in 2006, and to

32

fraudulently conceal the change by not assigning a new part number. GM's communications with Delphi constitute repeated violations of 18 U.S.C. §§ 1341 and 1343.

150.    In 2010, when NHTSA made inquiries regarding airbag non-deployment in GM Class Vehicles, GM withheld information that could have altered NHTSA's analysis.  GM engaged in this concealment in an effort to obfuscate the existence of its scheme to defraud.

151.    In May of 2012, and in furtherance of its scheme to defraud, GM issued a Service Bulletin concerning power steering failures in its Saturn Ion vehicles.  The Service Bulletin instructed GM's dealers to disseminate false and misleading information about the dangerous and defective condition of the defective vehicles to customers, including Plaintiff and members of the Class.  The Service Bulletin was sent via the mail and/or wires and constitutes a violation of 18 U.S.C. §§ 1341 and 1343.

152.    The predicate acts constituted a variety of unlawful activities, each conducted in furtherance of the enterprise and with the common purpose of defrauding Plaintiff and other Class Members and obtaining significant funds while providing defective vehicles worth significantly less than the purchase price paid by customers. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

153.    The predicate acts all had the purpose of generating significant revenue and profits for the Defendants at the expense of Plaintiff and the Class Members, who were never informed of the Key Defects in their defective vehicles. The predicate acts were committed or caused to be committed by GM, through its participation in the RICO enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and all other Class Members' funds.

154.    Defendants' conduct in furtherance of this scheme was intentional. Plaintiff and Class Members were harmed in that they relied to their detriment on Defendants' conduct and, as a result, purchased dangerous and defective vehicles for significantly more money than they would have paid absent Defendants' scheme to defraud. Defendants unfairly reaped millions of

dollars in excessive sales revenue as a result of this scheme and its conduct in furtherance of this scheme.

### D.    Plaintiff's Injuries and Damages

155.    By reason and as a result of Defendants' RICO-violative scheme, plaintiff and the Class Members have been injured and damages in their business and property: their cars have lost value, and they have and will continue to incur expense and loss in connection with their efforts to implement the Key Defects correction and/or eliminate or reduce the risks and costs to which the Defective Vehicles and parts expose them.

156.    By reason of the foregoing the defendants, through their managerial officials, have unlawfully, knowingly and willfully conducted and participated directly or indirectly in the following enterprises through a pattern of racketeering activity in violation or attempted violation of 18 U.S.C. § 1962(c).

157.    These violations of 18 U.S.C. § 1962(c) by the Defendants have directly and proximately caused Plaintiff's and Class Members' injuries and damage set forth above. Plaintiff and Class Members are entitled to bring this action for three times their actual damages, as well as punitive damages and its costs and reasonable attorneys' fees at trial and on appeal pursuant to 18 U.S.C. § 1964(c).

### SECOND CAUSE OF ACTION

**Asserted on Behalf of the Nationwide Class
(Violation of Michigan Consumer Protection Act ("MCPA),
Michigan Comp. Laws Ann. § 445.903 *et seq*., and the Consumer Protection Acts of
Substantially Similar States)**

158.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

159.    This Claim is brought on behalf of the Nationwide Class.

160.    At all times relevant hereto, there was in full force and effect MICH. COMP. LAWS ANN. § 445.903 *et seq.* (the "MCPA").

161.    Plaintiff and the Nationwide Class Members were "person[s]" within the meaning of the MCPA, § 445.902(1)(d).

162.    At all relevant times hereto, Defendants were "persons" engaged in "trade or commerce" within the meaning of the MCPA, § 445.902(1)(d) and (g).

163.    The MCPA holds unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." § 445.902(1).

164.    The practices of Defendants violate the MCPA for, *inter alia*, one or more of the following reasons:

    a.    represented that the Class Vehicles had approval, characteristics, uses, and benefits that they do not have;

    b.    Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the safety, performance, reliability, quality, and nature of the Class Vehicles;

    c.    Defendants represented that the Class Vehicles were of a particular standard, quality, or grade, when they were of another;

    d.    Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about the Class Vehicles, which did and tended to mislead Plaintiff and the Class about facts that could not reasonably be known by the consumer until the February and March 2014 recalls;

    e.    Defendants failed to reveal facts concerning the Key Defects that were material to the transaction in light of representations of fact made in a positive manner;

    f.    Defendants failed to reveal material facts concerning the Key Defects to Plaintiff and the Class Members, the omission of which would tend to mislead or deceive consumers, including Plaintiff and the Class;

35

g.      Defendants made material representations and statements of fact to Plaintiff and the Class that resulted in Plaintiff and the Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were; and

h.      Defendants intended that Plaintiff and Class Members rely on their misrepresentations and omissions, so that Plaintiff and other Class Members would purchase or lease the Class Vehicles; and

165.    In the event that Michigan law is not applied, Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes.

166.    Plaintiff seeks injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts or; seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Class Member, reasonable attorneys' fees; and any other just and proper relief available under the MCPA, § 445.911.

167.    Plaintiff also seeks punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of Class Vehicles, deceived Plaintiff and Class Members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles they repeatedly promised Plaintiff and Class Members were safe. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## THIRD CAUSE OF ACTION

### Asserted on Behalf of the Nationwide Class and the New York Class
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA"))

168.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

36

169.    This Claim is brought against GM on behalf of the Nationwide Class under Michigan law.

170.    At all times relevant hereto, there was in full force and effect the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA").

171.    Plaintiff and the Nationwide Class are consumers as defined in 15 U.S.C. § 2301(3).  They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranty.

172.    GM is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

173.    Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

174.    In connection with its sales of the Class Vehicles, GM gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability.  As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, marketed, and were adequately contained, packaged, and labeled. MICH. COMP. LAWS ANN. § 440.2314(2)(a), (c), and (e), and U.C.C. § 2-314(b)(1), (3), and (5). GM is liable to Plaintiff and the Nationwide Class pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability.

175.    GM breached its implied warranty of merchantability to Plaintiff and the Nationwide Class because the Class Vehicles were not fit for the ordinary purposes for which they are used—namely, as a safe passenger motor vehicle.  The Key Defects, which affects Ignition Switches in the Class Vehicles, may, among other things, result in the vehicle's airbags not deploying in a crash event, increasing the potential for occupant injury or death.  This safety defect makes the Class Vehicles unfit for their ordinary purpose of providing safe transportation.

Case 2:14-cv-03610-PO-ADS-ARL    Document 3-1    Filed 08/20/14    Page 38 of 91    PageID #: 38

176.    GM further breached its implied warranty of merchantability to Plaintiff and the Nationwide Class because the Class Vehicles would not pass without objection in the trade, as they contained a defect that relates to motor vehicle safety due to the Key Defects in each of the Class Vehicles.

177.    GM further breached its implied warranty of merchantability to Plaintiff and the Nationwide Class because the Class Vehicles were not adequately contained, packaged, and labeled.  The directions and warnings that accompanied the Class Vehicles did not adequately instruct Plaintiff on the proper use of the Class Vehicles in light of the Key Defects, or adequately warn Plaintiff of the dangers of improper use of the Class Vehicles.

178.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiff to not place extra weight on his vehicle's key chain, including a fob or extra keys.  According to GM, placing extra weight on the vehicle's key chain increases the chances that the Ignition Switch will unintentionally move from the "on" position to the "accessory" or "off" position.

179.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiff to avoid rough, bumpy, and uneven terrain while driving his vehicle. Traveling across such terrain increases the chances that the Ignition Switch in the Class Vehicles will unintentionally move from the "on" position and into the "accessory" or "off" position, especially when the key chains were weighted down with a fob, additional keys, or other items.

180.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiff to carefully avoid brushing or bumping up against their  vehicles' key chains with a body part.  According to GM, brushing or bumping up against the Class Vehicles' key chains increases the chances that the Ignition Switch in the Class Vehicles will unintentionally move from the "on" position and into the "accessory" or "off" position.

181.    At the time of the delivery of the Class Vehicles, GM did not adequately warn Plaintiff of the dangers of not taking the necessary steps outlined above to prevent the Ignition Switches in their vehicles from unintentionally moving from the "on" position and into the

"accessory" or "off" position while in motion, including the loss of power and shut off of the engine resulting in an increased difficulty in maneuvering the vehicles, the lack of airbag deployment in the event of a crash, and injury or death.

182.     Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and the Nationwide Class are entitled to recover the damages caused to them by GM's breach of the implied warranty of merchantability, which damages constitute the difference in value between the Class Vehicles as warranted (their sales prices) and the Class Vehicles as actually delivered (perhaps worth $0.00) (i.e, a total or partial refund of the full purchase prices of the Class Vehicles), plus loss of use and other consequential damages arising after the date of delivery of the Class Vehicles.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the Nationwide Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiff and the Nationwide Class in connection with the commencement and prosecution of this action.

## FOURTH CAUSE OF ACTION

### Asserted on Behalf of the Nationwide Class and the New York Class
### (Breach of Implied Warranties)

183.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

184.     This Claim is brought on behalf of the Nationwide Class under Michigan law.

185.     Further, this Claim is brought on behalf of the New York Class.

186.     At all times relevant hereto, there was in full force and effect the Michigan Comp. Laws Ann. § 440.2314 and N.Y. U.C.C. Law § 2–314.

187.     GM is a "merchant" as to the Class Vehicles within the meaning of MICH. COMP. LAWS ANN. § 44.2104 and N.Y. U.C.C. LAW § 2–104.  GM manufactured and sold the Class Vehicles, which are "goods" within the meaning of these statutory provisions.  Consequently, pursuant to MICH. COMP. LAWS ANN. § 440.2314 and N.Y. U.C.C. LAW § 2–314, GM impliedly

warranted that the Class Vehicles were merchantable, including that they were fit for their ordinary purposes as safe passenger vehicles, that they could pass without objection in the trade, and that they were adequately contained, packaged, and labeled.

188.    GM breached its implied warranty of merchantability to Plaintiff and the Nationwide and New York Class because the Class Vehicles were not fit for the ordinary purposes for which they are used—namely as a safe passenger motor vehicle. MICH. COMP. LAWS ANN. § 440.2314(2)(c); N.Y. U.C.C. LAW § 2–314(2)(c). Specifically, and according to GM's representatives, the Class Vehicles contain the Key Defects, which makes the Class Vehicles unfit for their ordinary purpose of providing safe transportation.

189.    GM further breached its implied warranty of merchantability to Plaintiff and the Nationwide and New York Class because the Class Vehicles would not pass without objection in the trade, as they contained the Key Defects. MICH. COMP. LAWS ANN. § 440.2314(2)(a); N.Y. U.C.C. LAW § 2–314(2)(a).

190.    GM further breached its implied warranty of merchantability to Plaintiff and the Nationwide and New York Class because the Class Vehicles were not adequately contained, packaged, and labeled in that the directions and warnings that accompanied the Class Vehicles did not adequately instruct Plaintiff on the proper use of the Class Vehicles in light of the Key Defects. MICH. COMP. LAWS ANN. § 440.2314(2)(e); N.Y. U.C.C. LAW § 2–314(2)(e).

191.    At the time of delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiff to not place extra weight on his vehicles' key chain, including a fob or extra keys. In and around March of 2014, GM publicly stated that placing extra weight on the key chain of the Class Vehicles increases the chances that the Ignition Switch in the Class Vehicle will move from the "on" position and into the "accessory" or "off" position.

192.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and/or warnings to Plaintiff to avoid rough, bumpy, and uneven terrain while driving. In and around March of 2014, GM publicly stated that traveling across such terrain increases the

chances that the Ignition Switch in the Class Vehicle will move from the "on" position to the "accessory" or "off" position.

193.    Additionally, at the time of delivery of the Class Vehicles, GM did not adequately warn Plaintiff of the dangers of not taking the necessary steps outlined above to prevent the Ignition Switch in the Class Vehicle from moving from the "on" position to the "accessory" or "off" position while the Vehicle is in motion.

194.    As a proximate result of GM's breach of the implied warranty of merchantability, Plaintiff and the Nationwide and New York Class were damaged in the amount of, and entitled to recover, the difference in value between the Class Vehicles as warranted (their sales price) and the Class Vehicles as actually delivered (perhaps worth $0.00) (i.e., a total refund of the full or partial purchase and/or lease price of the Class Vehicles), plus loss of use and other consequential damages arising after the date of delivery of the Class Vehicles.

195.    It was not necessary for Plaintiff and each Nationwide and New York Class Members to give GM notice of GM's breach of the implied warranty of merchantability because GM had actual notice of the Key Defects.  Prior to the filing of this action, GM issued a safety recall for the Class Vehicles acknowledging the Key Defects.  GM admitted it had notice of the Key Defects as early as 2004, and possibly as early as 2001.  At the time of the safety recall, GM also acknowledged that numerous accidents and fatalities were caused by the Key Defects.  In addition to the above, the filing of this action is sufficient to provide GM notice of its breaches of the implied warranty of merchantability with respect to the Class Vehicles.

## FIFTH CAUSE OF ACTION

### Asserted on Behalf of the Nationwide Class
### (Fraud by Concealment)

196.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

197.    This Claim is brought on behalf of the Nationwide Class.

198.    As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.

199.    Defendants had a duty to disclose these safety issues because they consistently marketed their vehicles as reliable and safe and proclaimed that Defendants maintain the highest safety standards. Once Defendants made representations to the public about safety, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

200.    In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who have superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and Class Members. These omitted facts were material because they directly impact the safety of the Class Vehicles. Whether or not a vehicle ignition switch will unexpectedly and suddenly move to the "off" or "accessory" position, thereby disabling power steering, anti-lock brakes and air bag deployment while the car is in motion, is a material safety concern. Defendants possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles.

201.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and Class Members to purchase Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

202.    Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and Class Members' actions were justified. Defendants were in exclusive control of the material facts concerning the Key Defects and such facts were not known to the public or the Class Members.

203. As a result of the concealment and/or suppression of facts, Plaintiff and Class Members have sustained and will continue to sustain damages arising from the difference between the actual value of that which Plaintiff and the Classes paid and the actual value of that which they received.

204. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### SIXTH CAUSE OF ACTION

### Asserted on Behalf of the New York Class
### (Violation of New York's Deceptive Trade Practices Act ("NYDTPA"), N.Y. Gen. Bus. Law § 349.)

205. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

206. This Count is brought on behalf of Plaintiff William Ross and the New York Class.

207. Plaintiff is a "persons" within the meaning of N.Y. GEN. BUS. LAW § 349(h).

208. Defendants are "persons," "firms," "corporations" or "associations" within the meaning of N.Y. GEN. BUS. LAW § 349.

209. The NYDTPA prohibits "deceptive acts and practices in the conduct of any business, trade or commerce, or in the furnishing of any service in the state." N.Y. GEN. BUS. LAW § 349(a). Defendants' conduct, as described above, constitutes "deceptive acts and practices" within the meaning of this statute. Further, Defendants' deceptive acts and practices, which were intended to mislead consumers who were in the process of purchasing and/or leasing the Class Vehicles, was consumer-oriented conduct.

Case 2:14-cv-00362-PoABS-ARL    Document 4    Filed 08/20/14    Page 44 of 91    PageID #: 44

210.    Defendants violated the NYDTPA when they represented, through advertising, warranties, and other express representations, that the Class Vehicles had characteristics and benefits that they did not actually have.

211.    Defendants violated the NYDTPA when they falsely represented, through advertising, warranties, and other express representations, that the Class Vehicles were of certain quality or standard when they were not.

212.    Defendants violated the NYDTPA by fraudulently concealing from and/or failing to disclose to Plaintiff and the New York Class the defects associated with the Class Vehicles.

213.    Defendants violated the NYDTPA by actively misrepresenting in, and/or concealing and omitting from, their advertising, marketing, and other communications, material information regarding the Class Vehicles.  The material information included:

      a.    that there was a substantial risk of ignition switch failure that far exceeded the risk of such defect normally associated with similar consumer products;

      b.    that the Key Defects might not become apparent until after the warranty had expired; and

      c.    that Defendants were not committed to repairing the Key Defects if it was discovered after the warranty expired.

214.    As a direct and proximate cause of Defendants' violations of the NYDTPA, Plaintiff and members of the New York Class have suffered injury in fact and/or actual damage, in that they purchased a Class Vehicle that contains inherent design defects.

215.    Pursuant to N.Y. GEN. BUS. LAW § 349(h), Plaintiff, on behalf of himself and all others similarly situated, seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $50 for Plaintiff and each New York Class Member.  Because Defendants' conduct was committed willfully and knowingly, Plaintiff is entitled to recover three times actual damages, up to $1,000, for Plaintiff and each New York Class Member.

1171403.2

216.     Plaintiff also seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 349.

## SEVENTH CAUSE OF ACTION

### Asserted on Behalf of the New York Class
### (Violation of New York's False Advertising Act, N.Y. GEN. BUS. LAW § 350)

217.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

218.     This Count is brought on behalf of Plaintiff William Ross and the New York Class.

219.     Defendants were and are engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW § 350.

220.     NEW YORK GEN. BUS. LAW § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . . ." N.Y. GEN. BUS. LAW § 350-a.

221.     Defendants caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and Plaintiff.

222.     Defendants have violated § 350 because the misrepresentations and omissions regarding the Key Defects, as set forth above, were material and likely to deceive a reasonable consumer.

223.     Plaintiff and the New York Class have suffered an injury, including the loss of money or property, as a result of GM's false advertising.  In purchasing or leasing their vehicles, Plaintiff and the New York Class relied on the misrepresentation and/or omissions of Defendants

45

with respect to the safety and reliability of the Class Vehicles. Defendants' representations were false and/or misleading because the Key Defects may cause the engine to shut down, disabling power steering, power brakes, and disabling deployment of safety airbags. Had Plaintiff and the New York Class known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

224.    Pursuant to N.Y. GEN. BUS. LAW § 350-e, Plaintiff, on behalf of himself and all others similarly situated, seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for Plaintiff and each New York Class Member. Because Defendants' conduct was committed willfully and knowingly, Plaintiff is entitled to recover three times actual damages, up to $10,000, for Plaintiff and each New York Class Member.

225.    Plaintiff also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under General Business Law §§ 349–350.

## EIGHTH CAUSE OF ACTION

### Asserted on Behalf of the Nationwide Subclass and New York Subclass (Negligence)

226.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

227.    This Count is brought on behalf of Plaintiff William Ross and the Nationwide Subclass and New York Subclass.

228.    Defendants negligently designed, manufactured, and sold the Class Vehicles with the Key Defects, presenting an unreasonable risk of harm to Plaintiff William Ross and members of the Nationwide Subclass and New York Subclass.

229.    Because of the Key Defects, the Class Vehicles were dangerous and unsafe for their intended use.

46

230.    As a direct and proximate result of Defendants' negligence, Plaintiff William Ross and members of the Nationwide Subclass and New York Subclass suffered property damage and/or personal injuries when their Class Vehicles were involved in collisions after the ignition was inadvertently switched into the accessory or off position.

## NINTH CAUSE OF ACTION

### Asserted on Behalf of the Nationwide Subclass and New York Subclass
### (Strict Products Liability)

231.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

232.    This Count is brought on behalf of Plaintiff William Ross and the Nationwide Subclass and New York Subclass.

233.    At all relevant times, the Class Vehicles and their ignition switches were defective in design, manufacture, and in having inadequate warnings, causing the Class Vehicles to be dangerously defective and unsafe for their intended use.

234.    The Class Vehicles were not adequately contained, packaged, and labeled in that the directions and warnings that accompanied the Class Vehicles did not adequately instruct Plaintiff on the proper use of the Class Vehicles in light of the Key Defects.  MICH. COMP. LAWS ANN. § 440.2314(2)(e); N.Y. U.C.C. LAW § 2–314(2)(e).

235.    At the time of delivery of the Class Vehicles, GM did not provide instructions and warnings to Plaintiff to not place extra weight on his vehicles' key chain, including a fob or extra keys.  In and around March of 2014, GM publicly stated that placing extra weight on the key chain of the Class Vehicles increases the chances that the Ignition Switch in the Class Vehicle will move from the "on" position and into the "accessory" or "off" position.

236.    At the time of the delivery of the Class Vehicles, GM did not provide instructions and/or warnings to Plaintiff to avoid rough, bumpy, and uneven terrain while driving.  In and around March of 2014, GM publicly stated that traveling across such terrain increases the

chances that the Ignition Switch in the Class Vehicle will move from the "on" position to the "accessory" or "off" position.

237.    Additionally, at the time of delivery of the Class Vehicles, GM did not adequately warn Plaintiff of the dangers of not taking the necessary steps outlined above to prevent the Ignition Switch in the Class Vehicle from moving from the "on" position to the "accessory" or "off" position while the Vehicle is in motion.

238.    Plaintiff William Ross and the Nationwide Subclass and New York Subclass were purchasers, lessors, and/or users of the Class Vehicles manufactured and sold by GM containing defective ignition switches manufactured and sold by Delphi.

239.    Defendants placed the defective ignition switches and Class Vehicles in the stream of commerce.  The ignition switches and Class Vehicles were defective when they left Defendants' control.

240.    Plaintiff William Ross and the Nationwide Subclass and New York Subclass used the ignition switches and Class Vehicles in the manner intended by Defendants and in a manner that was reasonably foreseeable by Defendants as involving substantial danger not readily apparent.  Defendants failed to adequately warn Plaintiff and the members of the Nationwide Subclass and New York Subclass of the danger.

241.    Defendants knew that the Class Vehicles and ignition switches were dangerously defective and could not be safely used for their intended purpose.  Defendants further knew that these dangerous defects would not be apparent to the public and that Plaintiff and Nationwide Subclass and New York Subclass would use the Class Vehicles without adequate warning of the Key Defects.  Defendants nevertheless placed the ignition switches and the Class Vehicles into the stream of commerce in willful and conscious disregard of public safety, meriting punitive damages.

242.    Plaintiff seeks punitive damages against Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others.  Defendants intentionally and willfully misrepresented the safety and reliability of Class Vehicles,

deceived Plaintiff and Class Members on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles it repeatedly promised Plaintiff and Class Members were safe.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

243.    As a direct and proximate result of the Key Defects, Plaintiff William Ross and members of the Nationwide Subclass and New York Subclass suffered property damage and/or personal injuries when their Class Vehicles were involved in collisions after the ignition was inadvertently switched into the accessory or off position.

### TENTH CAUSE OF ACTION

### (Claim for Actual Damages/Expense Reimbursement Fund)

244.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

245.    This Count is brought on behalf of Plaintiff and Members of the Nationwide Class and New York Class and on behalf of members of the Nationwide Subclass and New York Subclass.

246.    Plaintiff and the Nationwide and New York Subclass Members have incurred damages and suffered personal injuries as a result of Defendants' common course of conduct.  In addition, Plaintiff and the Nationwide and New York Class Members have incurred out-of-pocket expenses and damages in attempting to rectify the Key Defects in their Vehicles, and such expenses and losses will continue as they must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process to correct the Defect.

247.    Plaintiff and Class Members seek payment of such damages and reimbursement of such expenses under the consumer statutes and applicable law invoked in this Complaint. Plaintiff and the Class members suffered damages and injuries all arising from a common cause and should not be put to the inefficiency and expense of pursing individual litigation in order to obtain compensation for these injuries.

248.    While such damages and expenses are individualized in detail and amount, the right of the Class Members to recover them presents common questions of law.  Equity and fairness to all Class Members requires the establishment by court decree and administration under Court supervision of a Defendant-funded program, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defect.

### **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against the Defendants, as follows:

A.    an order certifying the proposed Classes and Subclasses, designating Plaintiff as the named representatives of the Classes and Subclasses, and designating the undersigned as Class Counsel;

B.    a declaration that the Ignition Switches in Class Vehicles are defective;

C.    a declaration that the Defendants are financially responsible for notifying all Nationwide and New York Class Members about the defective nature of the Class Vehicles;

D.    an order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles to eliminate the Key Defects;

E.    an award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

F.    a declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

G.    an award of attorneys' fees and costs, as allowed by law;

H.    an award of pre-judgment and post-judgment interest, as provided by law;

I.    leave to amend this Complaint to conform to the evidence produced at trial; and

J.      such other relief as may be appropriate under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  June 10, 2014                    Respectfully submitted,


By:  ___*/s/* Jonathan Selbin_____
      Jonathan Selbin (JS 3097)
      jselbin@lchb.com
      Sudarsana Srinivasan (SS 0222)
      dsrinivasan@lchb.com
      LIEFF CABRASER HEIMANN &
      BERNSTEIN, LLP
      250 Hudson Street, 8th Floor
      New York NY 10013
      Telephone:  (212) 355-9500
      Facsimile:  (212) 355-9592

      Michael A. Caddell (pro hac vice forthcoming)
      mac@caddellchapman.com
      Cynthia B. Chapman (pro hac vice forthcoming)
      cbc@caddellchapman.com
      Cory S. Fein (pro hac vice forthcoming)
      csf@caddellchapman.com
      CADDELL & CHAPMAN
      1331 Lamar, Suite 1070
      Houston TX 77010-3027
      Telephone:  (713) 751-0400
      Facsimile:  (713) 751-0906

      ***Attorneys for Plaintiff William Ross***

JS 44 (Rev. 1/2013)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1   U.S. Government
Plaintiff

❏ 3   Federal Question
*(U.S. Government Not a Party)*

❏ 2   U.S. Government
Defendant

❏ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance<br>❏ 120 Marine<br>❏ 130 Miller Act<br>❏ 140 Negotiable Instrument<br>❏ 150 Recovery of Overpayment & Enforcement of Judgment<br>❏ 151 Medicare Act<br>❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>❏ 153 Recovery of Overpayment of Veteran's Benefits<br>❏ 160 Stockholders' Suits<br>❏ 190 Other Contract<br>❏ 195 Contract Product Liability<br>❏ 196 Franchise | **PERSONAL INJURY**<br>❏ 310 Airplane<br>❏ 315 Airplane Product Liability<br>❏ 320 Assault, Libel & Slander<br>❏ 330 Federal Employers' Liability<br>❏ 340 Marine<br>❏ 345 Marine Product Liability<br>❏ 350 Motor Vehicle<br>❏ 355 Motor Vehicle Product Liability<br>❏ 360 Other Personal Injury<br>❏ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>❏ 365 Personal Injury - Product Liability<br>❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>❏ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>❏ 370 Other Fraud<br>❏ 371 Truth in Lending<br>❏ 380 Other Personal Property Damage<br>❏ 385 Property Damage Product Liability | ❏ 625 Drug Related Seizure of Property 21 USC 881<br>❏ 690 Other | ❏ 422 Appeal 28 USC 158<br>❏ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>❏ 820 Copyrights<br>❏ 830 Patent<br>❏ 840 Trademark<br><br>**SOCIAL SECURITY**<br>❏ 861 HIA (1395ff)<br>❏ 862 Black Lung (923)<br>❏ 863 DIWC/DIWW (405(g))<br>❏ 864 SSID Title XVI<br>❏ 865 RSI (405(g)) | ❏ 375 False Claims Act<br>❏ 400 State Reapportionment<br>❏ 410 Antitrust<br>❏ 430 Banks and Banking<br>❏ 450 Commerce<br>❏ 460 Deportation<br>❏ 470 Racketeer Influenced and Corrupt Organizations<br>❏ 480 Consumer Credit<br>❏ 490 Cable/Sat TV<br>❏ 850 Securities/Commodities/ Exchange<br>❏ 890 Other Statutory Actions<br>❏ 891 Agricultural Acts<br>❏ 893 Environmental Matters<br>❏ 895 Freedom of Information Act<br>❏ 896 Arbitration |
| **REAL PROPERTY**<br>❏ 210 Land Condemnation<br>❏ 220 Foreclosure<br>❏ 230 Rent Lease & Ejectment<br>❏ 240 Torts to Land<br>❏ 245 Tort Product Liability<br>❏ 290 All Other Real Property | **CIVIL RIGHTS**<br>❏ 440 Other Civil Rights<br>❏ 441 Voting<br>❏ 442 Employment<br>❏ 443 Housing/ Accommodations<br>❏ 445 Amer. w/Disabilities - Employment<br>❏ 446 Amer. w/Disabilities - Other<br>❏ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>❏ 463 Alien Detainee<br>❏ 510 Motions to Vacate Sentence<br>❏ 530 General<br>❏ 535 Death Penalty<br>**Other:**<br>❏ 540 Mandamus & Other<br>❏ 550 Civil Rights<br>❏ 555 Prison Condition<br>❏ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>❏ 710 Fair Labor Standards Act<br>❏ 720 Labor/Management Relations<br>❏ 740 Railway Labor Act<br>❏ 751 Family and Medical Leave Act<br>❏ 790 Other Labor Litigation<br>❏ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>❏ 462 Naturalization Application<br>❏ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>❏ 870 Taxes (U.S. Plaintiff or Defendant)<br>❏ 871 IRS—Third Party 26 USC 7609 | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>❏ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

❏ 1   Original Proceeding
❏ 2   Removed from State Court
❏ 3   Remanded from Appellate Court
❏ 4   Reinstated or Reopened
❏ 5   Transferred from Another District *(specify)*
❏ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ❏ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #   _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

I, _____, counsel for _____, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

        monetary damages sought are in excess of $150,000, exclusive of  interest and costs,

        the complaint seeks injunctive relief,

        the matter is otherwise ineligible for the following reason

### DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

     Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

### RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

### NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.)     Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County:_____

2.)     If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?_____

b) Did the events of omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District?_____

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?_____
     (Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

### BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.
          Yes                        No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?
          Yes    (If yes, please explain)       No

I certify the accuracy of all information provided above.

**Signature:**_____

AO 440 (Rev. 06/12)  Summons in a Civil Action

# United States District Court

### for the

_____ District of _____

|  |  |
|---|---|
| _____ | ) |
| *Plaintiff(s)* | ) ) ) ) ) |
| v. | )  Civil Action No. |
| _____ | ) ) ) ) ) |
| *Defendant(s)* | ) |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

## DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____             _____
                                                        *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: