# EXHIBIT A

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

Luzerne _____ County

| | For Prothonotary Use Only: |
|---|---|
| | Docket No: |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Transfer from Another Jurisdiction
- ☐ Petition
- ☐ Declaration of Taking

| Lead Plaintiff's Name: KAREN BLOOM | Lead Defendant's Name: GENERAL MOTORS, LLC |
|---|---|

| Are money damages requested? ☒Yes ☐ No | Dollar Amount Requested: (check one) ☒ within arbitration limits ☐ outside arbitration limits |
|---|---|

| Is this a *Class Action Suit?* ☐ Yes ☒ No | Is this an *MDJ Appeal?* ☐ Yes ☒ No |
|---|---|

Name of Plaintiff/Appellant's Attorney: __DAVID J. GORBERG__

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**SECTION B**

<u>Nature of the Case:</u>  Place an "X" to the left of the **ONE** case category that most accurately describes your *PRIMARY CASE.* If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☒ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
- ☐ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

*Updated 1/1/2011*

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

KAREN BLOOM

     PLAINTIFF

     VS.

GENERAL MOTORS, LLC

     DEFENDANT.

{ IN THE COURT OF COMMON PLEAS
{ LUZERNE COUNTY, PENNSYLVANIA
{ NO.
{ CIVIL ACTION – LAW –
{ IN

CIVIL ACTION

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the Complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Wilkes-Barre Law Library Association

822-6712

North Penn Legal Services
15 Public Square, Suite 410, Wilkes-Barre, PA 18701
825-8567

AVISO

LE HAN DEMANDADO A USTED EN LA CORTE, SI DESEA DEFENDERSE CONTRA LAS QUEJAS PRESENTADAS, ES ABSOLUTAMENTE NECESSARIO QUE USTED RESPONDA DENTRO DE 20 DIAS DESPUES DE SER SERVIDO CON ESTA DEMANDA Y AVISO. PARA DEFENDERSE ES NECESSARIO QUE USTED, O SU ABOGADO, REGISTRE CON LA CORTE EN FORMA ESCRITA, EL PUNTO DE VISTA DE USTED Y CUALQUIER OBJECCION CONTRA LAS QUEJAS EN ESTA DEMANDA.

RECUERDE: SI USTED NO RESPONDE A ESTA DEMANDA, SE PUEDE PROSEGUIR CON EL PROCESO SIN SU PARTICIPACION, ENTONCES, LA CORTE PUEDE, SIN NOTIFICARIO, DECIDIR A FAVOR DEL DEMANDANTE Y REQUERIRA QUE USTED CUMPLA CO TODAS LAS PROVISIONES DE ESTA DEMANDA. POR PRAZON DE ESA DECISION, ES POSSIBLE QUE USTED PUEDE PERDER DINERO, PROPIEDAD U OTROS DERECHOS IMPORTANTES.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATEMENTE.
SE NO CONOCE A UN ABOGADO, LLAME AL "LAWYER REFERENCE SERVICE", (SERVICIO DE REFERENCIA DE ABOGADOS), 215-238-6300.

Wilkes-Barre Law Library Association

822-6712

North Penn Legal Services
15 Public Square, Suite 410, Wilkes-Barre, PA 18701
825-8567

DAVID J. GORBERG & ASSOCIATES, P.C.
By: DAVID J. GORBERG                    Attorney for Plaintiff
Identification No.: 53084
32 Parking Plaza
Suite 700
Ardmore, PA 19003
215-665-7660


Karen Bloom
135 Morris Ave
Scranton, PA 18504

                                        COURT OF COMMON PLEAS

    vs.

                                        Luzerne

General Motors, LLC
C/O CSC
2595 INTERSTATE DRIVE
SUITE 103
HARRISBURGH PA 17110


## **COMPLAINT**

1.      Plaintiff, Karen Bloom, is an adult individual citizen and legal resident

of the Commonwealth of Pennsylvania, residing 135 Morris Ave,

Scranton, PA 18504

2.      Defendant, General Motors, LLC is a business corporation qualified to do

business and regularly conducts business in the Commonwealth of Pennsylvania and can be

served c/o CSC Interstate Drive, Suite 103, Harrisburg, PA 17110.

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

## BACKGROUND

3.    Plaintiff incorporates by reference paragraphs 1 and 2 as fully as if set forth here length.

4.    On or about 4/18/08, Plaintiff purchased a new 2008 Chevrolet Cobalt (hereinafter referred to as the "vehicle"), manufactured and warranted by Defendant bearing the Vehicle Identification Number 1G1AK58F8F987248747.  The vehicle was purchased and registered in the Commonwealth of Pennsylvania.

5.    The price of the vehicle, including registration charges, document fees, sales tax, but, excluding other collateral charges not specified, totaled $.

6.    Plaintiff avers that as a result of the ineffective repair attempts made by Defendant through its authorized dealer, the vehicle cannot be utilized for the purposes intended by Plaintiff at the time of acquisition and as such, the vehicle is worthless.

7.    In consideration of the purchase of the above vehicle, Defendant, issued to Plaintiff several warranties, fully outlined in the warranty booklet.

8.    On or about 4/18/08, Plaintiff took possession of the above mentioned vehicle and experienced nonconformities, which substantially impaired the use, value and/or safety of the vehicle.

9.    Said nonconformities consisted of but was not limited to, ingnition.  Copies of repair receipts are attached hereto and marked as Exhibit "A".

10.    The nonconformities violate the express written warranties issued to Plaintiff by Defendant.

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

11.    Plaintiff avers the vehicle has been subject to repair more than two (2) times for the same nonconformity, and the nonconformity remains uncorrected.

12.    Plaintiff has delivered the nonconforming vehicle to an authorized service and repair facility of the defendant on numerous occasions. After a reasonable number of attempts, Defendant was unable to repair the nonconformities.

13.    In addition, the above vehicle has or will in the future be out of service by reason of the non-conformities complained of for a cumulative total of thirty (30) days or more.

14.    The vehicle continues to exhibit defects and nonconformities which substantially impair it's use, value and/or safety.

15.    Plaintiff avers the vehicle has been subject to additional repair attempts for defects and/or nonconformities and/or conditions for which the Defendant and or it's authorized service center, may not have maintained records.

16.    Plaintiff has been and will continue to be financially damaged due to Defendant's failure to comply with the provisions of its' warranty.

17.    Plaintiff seeks relief for losses due to the nonconformities and defects in the above mentioned vehicle in addition to attorney fees and all court costs.

## COUNT I
## PENNSYLVANIA AUTOMOBILE LEMON LAW CLAIM

18.    Plaintiff hereby incorporates all facts and allegations set forth in this Complaint by reference as if fully set forth at length herein.

19.    Plaintiff is a "Purchaser" as defined by 73 P.S. §1952.

20.    Defendant is a "Manufacturer" as defined by 73 P.S. §1952.

21.    Plaintiff's vehicle is a "New Motor Vehicle" as defined by 73 P.S. §1952.

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

22.    Said vehicle experienced non conformities within the first year of purchase, which substantially impairs the use, value and safety of said vehicle.

23.    Defendant failed to correct and or repair said nonconformities.

24.    The vehicle continues to exhibit defects and nonconformities which substantially impair it's use, value and/or safety.

25.    Defendant does not require participation in any informal dispute settlement program prior to filing suit.

26.    As a direct and proximate result of Defendant's failure to repair the nonconformities , Plaintiff has suffered damages and, in accordance with 73 P.S. §1958, Plaintiff is entitled to bring suit for such damages and other legal and equitable relief.

27.    Plaintiff avers that upon successfully prevailing upon the Lemon Law claim herein, all attorney fees are recoverable and are demanded against the Defendant.

WHEREFORE, Plaintiff respectfully demands judgment in his favor and against the Defendant in an amount equal to three (3) times the purchase price of the subject vehicle, plus all available collateral changes and attorney fees. Amount not in excess of $50,000.00.

## COUNT II
## MAGNUSON-MOSS FEDERAL TRADE COMMISSION IMPROVEMENT ACT

28.    Plaintiff hereby incorporates all facts and allegations set forth in this Complaint by reference as if fully set forth at length herein.

29.    Plaintiff is a "Consumer" as defined by 15 U.S.C. §2301(3).

30.    Defendant is a "Warrantor" as defined by 15 U.S.C. §2301(5).

31.    Plaintiff uses the subject product for personal, family and household purposes.

32.    By the terms of the express written warranties referred to in this Complaint,

Defendant agreed to perform effective warranty repairs at no charge for parts and/or labor.

33.    Defendant failed to make effective repairs.

34.    As a direct and proximate result of Defendant's failure to comply with the express

written warranties, Plaintiff has suffered damages and, in accordance with 15 U.S.C. §2310(d)

(1), Plaintiff is entitled to bring suit for such damages and other legal and equitable relief.

35.    Section 15 U.S.C. §2310 (d) (1) provides:
If a consumer finally prevails on an action brought under paragraph (1) of this subsection, he may be allowed by the Court to recover as part of the judgment a sum equal to the amount of aggregate amount of costs and expenses (including attorney fees based upon actual time expended), determined by the Court to have been reasonably incurred by the Plaintiff for, or in connection with the commencement and prosecution of such action, unless the Court, in its discretion shall determine that such an award of attorney's fees would be inappropriate.

36.    Plaintiff avers that upon successfully prevailing upon the Magnuson-Moss claim

herein, all attorney fees are recoverable and are demanded against the Defendant.

WHEREFORE, Plaintiff respectfully demands judgment in his favor and against the

Defendant in an amount equal to three (3) times the purchase price of the subject vehicle, plus all

available collateral changes and attorney fees. Amount not in excess of $50,000.00.

### COUNT III
### UNIFORM COMMERCIAL CODE

37.    Plaintiff hereby incorporates all the paragraphs of this Complaint by reference as

if fully set forth at length herein.

38.    The defects and nonconformities existing within the vehicle constitute a breach of

contractual and statutory obligations of the Defendant, including but not limited to the following;

a.    Breach of Express Warranty

b.    Breach of Implied Warranty of Merchantability;

c.    Breach of Implied Warranty of Fitness For a Particular Purpose;

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

    d.      Breach of Duty of Good Faith.

39.    The purpose for which Plaintiff purchased the vehicle include but are not limited to his personal, family and household use.

40.    At the time of this purchase and at all times subsequent thereto, Plaintiff has justifiably relied upon Defendant's express warranties and implied warranties of fitness for a particular purpose and implied warranty of merchantability.

41.    At the time of the purchase and at all times subsequent thereto, Defendant was aware Plaintiff was relying upon Defendant's express and implied warranties, obligations, and representations with regard to the subject vehicle.

42.    Plaintiff has incurred damages as a direct and proximate result of the breach and failure of Defendant to honor its express and implied warranties.

43.    Such damages include, but are not limited to, the purchase price of the vehicle plus all collateral charges, including attorney fees and costs, as well as other expenses, the full extent of which are not yet known.

WHEREFORE, Plaintiff respectfully demands judgment in his favor and against the Defendant in an amount equal to three (3) times the purchase price of the subject vehicle, plus all available collateral changes and attorney fees. Amount not in excess of $50,000.00.

### COUNT IV
### PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION CLAIM

44.    Plaintiff hereby incorporates all the paragraphs of this Complaint by reference as if set forth at length herein.

45.    The Unfair Trade Practices and Consumer Protection Law defines unfair methods of competition to include the following:

(xiv). Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to, or after a contract for the purchase of goods or services is made.

46.    Plaintiff, as a Pennsylvania resident, believes, and therefore, avers Defendant's failure to comply with the terms of the written warranty constitutes an unfair method of competition.

47.    Section 201-9.2(a) of the Unfair Trade Practices and Consumer Protection Law, authorizes the Court, in its discretion, to award up to three (3) times the actual damages sustained for violations of the Act.

WHEREFORE, Plaintiff respectfully demands judgment in his favor and against the Defendant in an amount equal to three (3) times the purchase price of the subject vehicle, plus all available collateral changes and attorney fees. Amount not in excess of $50,000.00.

DAVID J. GORBERG & ASSOCIATES, P.C.

BY: _____
        DAVID J. GORBERG, ESQUIRE
        Attorney for Plaintiff

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

# V E R I F I C A T I O N

The undersigned, after having read the attached pleading verifies that the within Civil Action
Complaint is based on information furnished to counsel, which information has been gathered by
counsel in the course of this lawsuit.    The language of the Civil Action Complaint is that of
counsel and not of signer.    Signer verifies that he has read the within Civil Action Complaint and
that they are true and correct to the best of the signer's knowledge, information and belief.    To the
extent that the contents of the Civil Action Complaint are that of counsel, verifier has relied upon
counsel in taking this verification.    This verification is made subject to the penalties of 18 Pa. C.S. 4904
relating to unsworn falsification to authorities.

X /S/ David J. Gorberg
DAVID J. GORBERG

Date: _____

## Vehicle Report
Printed on: 07/11/2014 15:30:34



**VIN:** 1G1AK58F987248747    **Vehicle Model:** 2008 COBALT 4-DOOR LS SEDAN    **Delivery Date:** 04/18/2008

**Service Consultant :**

### Vehicle Summary

| OnStar Status | OVD Enabled | DMN Enabled | Radio Status | Radio ID |
|---|---|---|---|---|
| Not Equipped | No | No | Equipped - InActive | WQZGY0CG |

### Required Field Actions

| Number | Type | Description | Release Date | Status |
|---|---|---|---|---|
| 10023 | Product Safety Recall | LOSS OF POWER STEERING ASSIST - REPLACE ELECTRIC POWER STEERING MOTOR | 03/18/2010 | Closed |
| 14092 | Product Safety Recall | IGNITION SWITCH REPLACEMENT | 04/03/2014 | Open |
| 14133 | Product Safety Recall | REPLACE IGNITION KEY | 04/18/2014 | Open |

### Applicable Warranties

| Description | Effective Date | Effective Odometer | End Date | End Odometer | Warranty Status |
|---|---|---|---|---|---|
| Corrosion Limited Warranty | 04/18/2008 | 61 MI | 04/18/2014 | 100061 MI | Expired |
| PZEV Emission Limited Warranty | 04/18/2008 | 61 MI | 04/18/2023 | 150061 MI | Applicable |
| Emission Select State Component Ltd Wty | 04/18/2008 | 61 MI | 04/18/2023 | 150061 MI | Applicable |
| Emission Limited Warranty | 04/18/2008 | 61 MI | 04/18/2023 | 150061 MI | Applicable |
| Powertrain Limited Warranty | 04/18/2008 | 61 MI | 04/18/2013 | 100061 MI | Expired |
| Bumper to Bumper Limited Warranty | 04/18/2008 | 61 MI | 04/18/2011 | 36061 MI | Expired |

### Service Contracts

| Policy Number | Owner Name | Description | Deductible Amount | Daily Rental Allowance | Effective Date | Effective Odometer | Expiration Date | Expiration Odometer |
|---|---|---|---|---|---|---|---|---|
| 817389649 | BLOOM | GMPP 60/60 MAJOR GUARD | $0.00 | $35.00 | 04/18/2008 | 61 MI | 04/18/2013 | 60061 MI |

### Service Information

| Type | Number | Description | Date Posted |
|---|---|---|---|
| | | No information found for this vehicle. | |

### Vehicle Transaction History

| Service Date | R.O. Number | Transaction Type | OP Code | Description | Odometer Reading | Service Type |
|---|---|---|---|---|---|---|
| 03/07/2013 | 236812 | ZSCT | E2147 | Stabilizer Shaft Link Replacement - Both Sides | 31622 MI | Warranty |
| 03/07/2013 | 236812 | ZSCT | E3651 | Strut, Front - Left - Replace | 31622 MI | Warranty |
| 03/07/2013 | 236812 | ZSCT | E3557 | Front Lower Control Arm Bushing Replacement - Both Sides | 31622 MI | Warranty |
| 03/07/2013 | 236812 | ZFAT | V2220 | 10023 - Replace Power Steering Assist Motor (including Test Drive) | 31622 MI | Warranty |
| 10/05/2012 | 0158708 | ZREG | N6604 | Ignition System Wiring and/or Connector Repair or Replacement | 27106 MI | Warranty |

Please Note: This document may be considered current for 24 hours from the time it was printed.

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

# Vehicle Report
Printed on: 07/11/2014 16:30:34



**VIN:** 1G1AK58F987248747

**Service Consultant :**

**Vehicle Model:** 2008 COBALT 4-DOOR LS SEDAN

**Delivery Date:** 04/18/2008

## Vehicle Transaction History

| Service Date | R.O. Number | Transaction Type | OP Code | Description | Odometer Reading | Service Type |
|---|---|---|---|---|---|---|
| 02/08/2010 | 203588 | ZREG | E7200 | Ignition Lock Cylinder Replacement | 8367 MI | Warranty |
| 02/05/2010 | 797998 | ZREG | Z2080 | ROADSIDE SERVICE (TOWING) | 8000 MI | Warranty |
| 03/07/2008 | 014040 | ZPDI | Z6999 | PDI Related Fluid Adds | 4 MI | Warranty |
| 02/21/2008 | A48747 | ZPDI | Z7000 | Pre-Delivery Inspection - Base Time | 0 MI | Warranty |

## Repair Order History

| | R.O. Closure Date | R.O. Number | Service Location | 1st R.O. Job Description Text | R.O. Job Count | Job Type Indicators | Vehicle R.O. Mileage |
|---|---|---|---|---|---|---|---|
| | 03/08/2013 | 236812 | PA | REPLACE POWER STEERING ASSIST MOTOR | 4 | W | 31625 MI |
| | 10/24/2012 | 158708 | PA | WIRING AND OR CONN | 2 | W | 27108 MI |

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

Please Note: This document may be considered current for 24 hours from the time it was printed.

**TOM HESSER CHEVROLET/BMW, INC.**

1001 N. WASHINGTON AVENUE
SCRANTON, PA 18509
TELEPHONE (570) 343-1221
(800) 435-9586
www.tomhesser.com

CUSTOMER #: 86534

252097

*INVOICE*

KAREN BLOOM
37 LIDY RD
DUPONT, PA 18641-2149
HOME:570-313-3193  CONT:570-313-3193
BUS:         CELL:

PAGE 1

SERVICE CONSULTANT   1163 NICOLA DOUGHER

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|---|---|---|---|---|---|---|
|  | 08 | CHEVROLET COBALT | 1G1AK58F987248747 |  | 40237/40237 | T3537 |

| DEL DATE | PROD DATE | WARR EXP | PROMISED | PO NO | RATE | PAYMENT | INV DATE |
|---|---|---|---|---|---|---|---|
| 1JAN08 DD |  |  | WAIT 25JUL14 |  | 91.00 | CASH | 25JUL14 |

R/O OPENED:     READY:     OPTIONS:   ENG:2.2_Liter_MFI_DOHC
25JUL14          25JUL14

| LINE OPCODE TECH TYPE HOURS | LIST | NET | TOTAL |
|---|---|---|---|
| A14092A SERVICE | | | |
| CAUSE: INSTALLED SWITCH | | | |
| REMOVE/REPLACE IGNITION / START SWITCH | | | |
| 1112   WC  0.40 | | | (N/C) |
| FC: 9090 | | | (N/C) |
| PART# | | | |
| COUNT: 1 | | | |
| CLAIM TYPE: | | | |
| AUTH CODE: | | | |

*****************************************

CAUSE: CUT AND PROGRAMED KEYS
CUT TWO KEYS AND PERFORM KEY LEARN
PROCEDURE
FC: 9090 PART#:  COUNT:
CLAIM TYPE:
AUTH CODE:

*****************************************

DEAR CUSTOMER
YOUR SATISFACTION IS OUR #1 GOAL. IF YOU
CANNOT ANSWER ALL OF THE MANUFACTURER'S
SURVEY QUESTIONS AS COMPLETELY SATISFIED,
PLEASE CONTACT US. WE WILL DO EVERYTHING IN
OUR POWER TO DESERVE A COMPLETELY SATISFIED
RESPONSE FROM YOU. THANK YOU.

**STATEMENT OF DISCLAIMER**
The factory warranty constitutes all of the warranties with respect to the sale of this Item/Items. The Seller hereby expressly disclaims all warranties other express or implied, including any implied warranty of merchantability or fitness for a particular purpose. Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this Item/Items.

CUSTOMER SIGNATURE

| DESCRIPTION | TOTALS |
|---|---|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 0.00 |
| PLEASE PAY THIS AMOUNT | 0.00 |

Case# 2014-10215-0 Received and Luzerne County Prothonotary on 09/2/

**PENNSYLVANIA**
**MOTOR VEHICLE INSTALLMENT-SALE CONTRACT,** · Dated ___04/18/2008___

(R) **SIMPLE INTERES**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all scheduled payments. | Total Sale Price The total cost of your purchase on credit, including your downpayment of $ ___4382.33___ |
|---|---|---|---|---|
| 5.49 % | $ 2305.14 | $ 13102.14 | $ 15407.28 | $ 19789.51 |

Your Payment Schedule will be:

| No. of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | $ 213.99 | Monthly, beginning 05/18/2008 |
| | $ N/A | |
| | $ N/A | |

Filing Fees: $ ___5.00___

Late Charge: If a payment is late, you will be charged 2% of the portion of the payment which is late for each month, or part of a month greater than ten 10 days, that it remains unpaid.

See below and any other Contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

Security: You are giving a security interest in the motor vehicle being purchased.

Prepayment: If you pay off early, you will not have to pay a penalty.

92.0110536

e means estimate

In this Contract we are the SELLER.

**BONNER CHEVROLET CO INC**
Name
**694 WYOMING AVENUE** Address **KINGSTON PA 18704-** Zip Code

You are the BUYER(S).

**KAREN BLOON**
Name(s)
**237 LINY RD** Address(es) **DUPONT, PA 18641-** Zip Code(s)

If there is more than one Buyer, each promises, separately and together, to pay all sums due us and to perform all agreements in this Contract.

TRADE-IN: You have traded in the following vehicle **1999 Chevrolet Blazer 1GNDT13WXX2150380**
Year and Make Description

If a balance is still owing on the vehicle you have traded in, the Seller will pay off this amount on your behalf. You warrant and represent to us that any trade-in is free from lien, claim, encumbrance or security interest, except as shown in the Itemization of Amount Financed as the "Lien Payoff."

PROPERTY INSURANCE: You may choose the person through whom insurance is obtained against loss or damage to the Vehicle and against liability arising out of use or ownership of the Vehicle. In this Contract, you are promising to insure the Vehicle and keep it insured.

CREDIT INSURANCE IS NOT REQUIRED: Credit Life Insurance and Credit Accident & Health (Disability) Insurance are not required to obtain credit, and will not be provided unless you sign below and agree to pay the additional cost(s). Please read the NOTICE OF PROPOSED CREDIT INSURANCE on the reverse side. Your insurance certificate or policy will tell you the MAXIMUM amount of insurance available. All insurance purchased will be for the term of the credit. In this Contract you may receive a financial benefit from your purchase of credit insurance.

By signing, you select Single Credit Life Insurance, which costs $ ___N/A___ What is your age? ____ Years

Signature of Buyer to be insured for Single Credit Life Insurance

By signing, you select Single Credit Accident & Health Insurance, which costs $ ___N/A___ What is your age? ____ Years

Signature of Buyer to be insured for Single Credit Accident & Health Insurance

By signing, you both select Joint Credit Life Insurance, which costs $ ___N/A___ What are your ages?

1. _____

2. _____

Signatures of both Buyers to be insured for Joint Credit Life Insurance

By signing, you both select Joint Credit Accident & Health Insurance, which costs $ ___N/A___ What are your ages? Percentage to be insured

1. _____ %

2. _____ %

Signatures of both Buyers to be insured for Joint Credit Accident & Health Insurance

Insurer: _____

VEHICLE: You have agreed to purchase, under the terms of this Contract, the following motor vehicle and its extra equipment, which is called the "Vehicle" in this Contract.

| N/U | Year and Make | Series | Body Style | No. Cyl. | Truck Ton Capacity | Serial Number |
|---|---|---|---|---|---|---|
| N | 2008 Chevrolet | Cobalt | SDN | 4 | | 1G1AK58P987248747 |

Equipped with: ___ A.T. ___ P.S. ___ AM-FM Stereo ___ 5 Spd. ___ Other _____
___ A.C. ___ P.W. ___ AM-FM Tape ___ Vinyl Top

ASSIGNEE: We may assign this Contract and Security Agreement to a sales finance company which is the "Assignee." If the Assignee assigns the Contract to a subsequent assignee, the term also refers to such subsequent assignee. After the assignment, all rights and benefits of the Seller in this Contract and in the Security Agreement shall belong to and be enforceable by the Assignee. The Assignee will notify you when and if Seller makes an assignment.

**FIRST NATIONAL COMMUNITY BANK**
**DUNMORE, PENNSYLVANIA**

IF YOU DO NOT MEET YOUR CONTRAC OBLIGATIONS, YOU MAY LOSE THE MOTO VEHICLE AND PROPERTY THAT YO BOUGHT WITH THIS CONTRACT, AND/O MONEY ON DEPOSIT WITH THE ASSIGNEE

This Contract is between Seller and Buyer. A disclosures have been made by Seller, Selle intends to assign this Contract to the Assignee

**Itemization of Amount Financed**

Cash Price
$ 15965.00

Cash Downpayment
$ 2000.00

Trade-In
Value of Trade-in
$ 2382.23

Lien Payoff to :
$ N/A

Unpaid Cash Price Balance
$ 11582.77

To Credit Insurance Company
$ N/A

To Public Officials for:
License, Tags and Registration
$ 28.50

Lien Fee
$ 5.00

To DOC FEE/TIRE
$ 59.50

To SVC CONTRACT
$ 690.00

To
$ N/A

To TAXES
$ 736.37

Amount Financed
$ 13102.14

Finance Charge
$ 2305.14

Total of Payments (Time Balance)
$ 15407.28

ASSIGNEE: We agree to pay to us the Amount Financed plus interest in

71 payments of $ 213.99
each, and a final payment of

We may retain a portion of amounts marked

Paid to Others on Your Behalf

Case# 2014-10215-0 Received at Luzerne County Prothonotary on 09/05/2014 12:52 PM, Fee = $152.00

JOHNSON, PENNSYLVANIA

**CO-SIGNER:** Any person signing the Co-Signer's Agreement below promises separately and together with all Co-Signer(s) and Buyer(s), to pay all sums due and to perform all agreements in this Contract. Co-Signer(s) will not be an Owner of the Vehicle.

**CO-OWNER:** Any person signing the Co-Owner's Security Agreement below gives us a security interest in the Vehicle and agrees separately and, together with all Co-Owner(s) and Buyer(s), to perform all agreements in the Security Agreement and all other parts of this Contract except the "Promise to Pay" section.

**TERMS:** The terms shown in the boxes above are part of this Contract.

each, and a final payment of
$  **213.99** . The first
payment will be due on   **MAY 18**
**2008** , and then payments
will be due on that same day of each month
following.

**PROMISE TO PAY:** You agree to pay us the Total Sale Price for the Vehicle by making the Cash Downpayment and assigning the Trade-In, if shown above, on or before the date of this Contract, and paying us the Amount Financed plus Interest. You promise to make payments in accordance with the Payment Schedule. You promise to make payments on or before the same day of each month as the first payment due date. You agree to pay all other amounts which may become due under the terms of this Contract. You agree to pay the Seller or Assignee costs of suit. You also agree to pay reasonable attorneys' fees if Seller or Assignee hires an attorney to collect amounts due under this Contract or to protect or get possession of the Vehicle. You agree to make payments at the place or to send payments to the address which the Assignee most recently specifies in the written notice to you.

**ADDITIONAL TERMS AND CONDITIONS: THIS CONTRACT CONTINUES ON THE REVERSE SIDE. YOU ARE OBLIGATED TO ALL THE TERMS OF THE CONTRACT WHICH APPEAR ON THE FRONT AND REVERSE SIDES.**

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

By signing below, we agree to sell the Vehicle to you under the terms of this Contract.

NOTICE TO BUYER—DO NOT SIGN THIS CONTRACT IN BLANK. YOU ARE ENTITLED TO AN EXACT COPY OF THE CONTRACT YOU SIGN. KEEP IT TO PROTECT YOUR LEGAL RIGHTS.

SELLER _____ BONNER CHEVROLET CO. INC. _____

BUYER _____ (SEAL) __04/18/2

BY: _____ Treas. ____ 04/18/2008

BUYER _____ (SEAL)
                                                    Date

**CO-SIGNER: YOU SHOULD READ THE NOTICE TO CO-SIGNER, WHICH HAS BEEN GIVEN TO YOU ON A SEPARATE DOCUMENT, BEFORE SIGNING THE CO-SIGNER'S AGREEMENT.**

**CO-SIGNER'S AGREEMENT:** You, the person (or persons) signing below as "Co-Signer," promise to pay to us all sums due on this Contract and to perform all agreements in this Contract. You intend to be legally bound by all the terms of this Contract, separately and together, with the Buyer. You are making this promise to induce us to make this Contract with the Buyer, even though we will use the proceeds only for the Buyer's benefit. You agree to pay even though we may not have made any prior demand for payment on the Buyer or exercised our security interest. You also acknowledge receiving a completed copy of this Contract.

Co-Signer's Signature _____ (SEAL)    Address _____    Date ____

Co-Signer's Signature _____ (SEAL)    Address _____    Date ____

**CO-OWNER'S SECURITY AGREEMENT:** You, the person signing below as "Co-Owner," together with the Buyer or otherwise being all of the Owners of the Vehicle, give us a Security Interest in the Vehicle identified above. You agree to be bound by the terms of the Security Agreement and all other parts of this Contract except the "Promise To Pay" section. You are giving us the security interest to induce us to make this Contract with the Buyer, and to secure the payment by the Buyer of all sums due on this Contract. You will not be responsible for any deficiency which might be due after repossession and sale of the Vehicle.

Co-Owner's Signature _____ (SEAL)    Address _____    Date ____

**BUYER, CO-SIGNER AND CO-OWNER, AS APPLICABLE, ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS CONTRACT AT THE TIME OF SIGNING.**

BUYER _____    BUYER _____    CO-SIGNER _____    CO-SIGNER OR CO-OWNER _____

**NOTICE: SEE REVERSE SIDE FOR IMPORTANT INFORMATION.**

BANCSOURCE FORM PA 123-SLC 2/1/2004

ORIGINAL - White • DEALER COPY - Canary • BORROWER'S/CO-SIGNER'S COPY - Pink • COPY - Goldenrod

© 2004 BANCSOURCE SERVICE, INC.

**CANCELED**

**MAR 17 2014**

**F.N.C.B.**

## ADDITIONAL TERMS AND CONDITIONS



**1. SECURITY AGREEMENT:** To secure the payment of all sums due and the performance of all required obligations under this Contract, you give a security interest in the Vehicle, in all parts (called "accessions") attached to the Vehicle at any later time, and in any proceeds of the Vehicle, including insurance proceeds. The Assignee may set-off any amounts due and unpaid under this Contract against any of your money on deposit with Assignee. This includes any money which is now or may in the future be deposited with Assignee by you. Assignee may do this without any prior notice to you.

**2. HOW THE TOTAL OF PAYMENTS IS COMPUTED:** The Total of Payments is the sum of the Amount Financed and the Finance Charge. The Finance Charge consists solely of interest computed daily on the outstanding balance of the Amount Financed. The Finance Charge shown on the front side has been computed on the assumption that we will receive all payments on their scheduled due dates.

**3. COMPUTING INTEREST:** We will charge interest on a daily basis on the outstanding balance subject to interest on each day of the loan term, including any period for which a late charge is also imposed. The daily interest rate is equal to the Annual Percentage Rate divided by the number of days in that calendar year. Buyer agrees that because interest is calculated on a daily basis, late payments will result in additional interest (and, if applicable, a late charge). Early payments will result in less interest being charged. Early and/or late payments will cause the amount of the final payment to change.

**4. LATE CHARGE:** Buyer agrees to pay a late charge for any payment not made within 10 days after its due date. The late charge will be 2% per month on the unpaid amount of the payment. We will consider any part of a month in excess of 10 days to be a full month. The late charge will be due when earned. No late charge will be due if the reason that the payment is late is because, after default, the entire outstanding balance on this Contract is due. No late charge will be due if the only reason that the payment is late is because of a late charge assessed on an earlier payment.

**5. APPLICATION OF PAYMENTS:** We will apply payments in the following order of priority: first to interest; and then to late charges, fees, principal and any other amounts you owe in the order that we choose.

**6. PREPAYMENT:** You may prepay, in full or in part, the amount owed on this Contract at any time without penalty. If you prepay the Contract in part, you agree to continue to make regularly scheduled payments until you pay all amounts due under this Contract. This will not reduce the number of payments you will make.

**7. WAIVERS.**

a. **WAIVER BY SELLER AND ASSIGNEE:** We and Assignee waive the right to treat any property as security for the repayment of this Contract, except for the Vehicle and the other security specifically mentioned in this Contract.

b. **WAIVERS BY BUYER, CO-SIGNER AND CO-OWNER:** You agree to make all payments on or before they are due without our having to ask. If you don't, we may enforce our rights without notifying you in advance. You give up any right you may have to require that we enforce our rights against some other person or property before we enforce our rights against you. You agree that we may give up our rights against some other person but not against you. You waive due diligence in collection and all defenses based on suretyship and impairment of collateral or security.

**8. INTEREST AFTER MATURITY AND JUDGEMENT:** Interest at the rate provided in this Contract shall continue to accrue on the unpaid balance until paid in full, even after maturity and/or after we get a judgment against you for the amounts due. This will apply even if the maturity occurs because of acceleration. If at any time interest as provided for in this paragraph is not permitted by law, interest shall accrue at the highest rate allowed by applicable law beginning at that time.

**9. YOUR PROMISES ABOUT OUR SECURITY INTEREST:** You will not permit anyone other than us to obtain a security interest or other rights in the Vehicle. You will pay all filing fees necessary for us to obtain and maintain our security interest in the Vehicle. You will assist us in having our security interest noted on the Certificate of Title to the Vehicle. You will not sell or give away the Vehicle. If someone puts a lien on the Vehicle, you will pay the obligation and clear the lien.

**10. YOUR PROMISES ABOUT THE VEHICLE:** You will keep the Vehicle in good condition and repair. You will pay all taxes and charges on the Vehicle. You will pay all costs of maintaining the Vehicle. You will not abuse the Vehicle or permit anything to be done to the Vehicle which will reduce its value, other than for normal wear and use. You will not use the Vehicle for illegal purposes or for hire or lease. You will not move the Vehicle from your address shown on the front of this Contract to a new permanent place of garaging without notifying us in advance.

**11. YOUR PROMISES ABOUT INSURANCE:** You will keep the Vehicle insured against fire, theft and collision until all sums due us are paid in full. The insurance coverage must be satisfactory to us and protect your interests and our interests at the time of any insured loss. The insurance must name us as a "loss-payee" on the policy. The insurance must be written by an insurance company qualified to do business in Pennsylvania and licensed to sell insurance in the state where the Vehicle is permanently garaged. The insurance policy must provide us with at least ten (10) days prior written notice of any cancellation or reduction in coverage. On request, you shall deliver the policy or other evidence of insurance coverage to us. In the event of the loss or damage to the Vehicle, you will immediately notify us in writing and file a proof of loss with the insurer.

a. **OUR RIGHT TO FILE PROOF OF LOSS:** In the event of any loss or damage to the Vehicle, if you fail or refuse to file a claim or proof of loss with the insurance company, you agree that the Seller, Assignee, any subsequent assignee, or any authorized employee of any of them ("we") may file a proof of loss with the insurance company in your name and acting as your agent, with respect to the insured claim. You agree that you do not have the right to and will not revoke the power you have given us to file a proof of loss. You agree that we may exercise this power for our benefit and not for your benefit, except as provided in this Contract and by law.

b. **OUR RIGHT TO ENDORSE INSURANCE CHECKS:** You agree that the Seller, Assignee,

**12. OUR RIGHTS IF YOU BREAK YOUR PROMISES ABOUT THE SECURITY INTEREST, VEHICLE OR INSURANCE:** If you fail to keep your promises to pay filing fees, taxes, liens or the costs necessary to keep the Vehicle in good condition and repair, we may advance any money you promised to pay. If you fail to keep your promises about required insurance, we may advance money to obtain insurance to cover loss or damage to the Vehicle. We have the choice of whether or not to advance any money for these purposes. Such insurance will be limited to an amount not greater than you owe on this Contract. THE INSURANCE WE PURCHASE MAY BE SIGNIFICANTLY MORE EXPENSIVE AND PROVIDE YOU LESS COVERAGE THAN INSURANCE YOU COULD PURCHASE YOURSELF.

We will add any money we advance on your behalf to the balance on which we impose Finance Charges at the Annual Percentage Rate of this Contract. You agree to repay the money advanced as we alone may specify: (i) immediately on demand, or (ii) along with your monthly payments. If we choose to allow you to repay the money advanced along with your monthly payments, we can choose the amount of these payments and how long you have to repay. If any of our rights stated in this paragraph are not permitted by law, we still have the other rights mentioned. Our payments on your behalf will not cure your failure to perform your promises in this Contract.

**13. DEFAULT:** In this paragraph "You" means the Buyer, Co-Signer and Co-Owner, or any one of them. You will be in "Default" of the Contract if any one or more of the following things happen:

a. You do not make any payment on or before it is due; or

b. You do not keep any promise you made in this Contract or

c. You do not keep any promise you made in another Contract, Note, Loan or Agreement with Seller or Assignee; or

d. You made any untrue statement in the credit application for this Contract; or

e. You committed any forgery in connection with this Contract; or

f. You die, are convicted of a crime involving fraud or dishonesty, or are found by a court with jurisdiction to do so to be incapacitated; or

g. You file bankruptcy or insolvency proceedings, or anyone files bankruptcy or insolvency proceedings against you; or

h. You take the Vehicle outside the United States or Canada without our written consent; or

i. You use the Vehicle or allow someone else to use it in a way that causes it not to be covered by your insurance; or

j. You do something that causes the Vehicle to be subject to confiscation by government authorities; or

k. The Vehicle is lost, stolen, destroyed or damaged beyond economical repair, and not fixed or found within a reasonable time; or

l. Another creditor tries to take the Vehicle or your money on deposit with Assignee by legal process.

**14. OUR RIGHTS IF YOU ARE IN DEFAULT OF THIS CONTRACT:** If you are in Default of this Contract, we may enforce our rights according to law. We may also do the things specifically mentioned in this Contract. We may do one of these things and at the same time or later do another. Some of the things we may do are the following:

a. **ACCELERATION:** We can demand that you pay to us the entire unpaid balance owing on the Contract and all unpaid Finance Charges and other money due. You agree that you will pay this money to us in one single payment immediately upon receiving our demand.

b. **REPOSSESSION:** We can repossess the Vehicle, unless prohibited by law. We can do this ourselves, have a qualified person do it (or us, or have a government official (by replevin) do it for us. You agree that we can peaceably come on to your property to do this. We may take any other things found in the Vehicle, but will return these things to you if you ask. If you want these things back, you may reclaim them within thirty (30) days of our mailing you a Notice of Repossession. If you do not reclaim the things found in the Vehicle within that time, we may dispose of those things in the same manner as the motor vehicle. You agree that we may use your license plates in repossessing the Vehicle and taking it to a place for storage.

c. **VOLUNTARY DELIVERY:** We can ask you to give us the Vehicle at a reasonably convenient place. You agree to give us the Vehicle if we ask.

d. **DELAY IN ENFORCEMENT:** We can delay enforcing our rights under this Contract without losing any rights.

**15. SOME THINGS YOU SHOULD KNOW IF WE REPOSSESS THE VEHICLE:** If we repossess without using a government official (by replevin):

a. **NOTICE:** We will send you a Notice of Repossession to your last address we know about. This Notice will tell you how to buy back (redeem) the Vehicle. You will NOT have the right to reinstate the Contract. This means you will have to pay the total balance on the Contract and other amounts due. You may not get the Vehicle back by paying delinquent installments. This Notice will tell you other information required by law.

b. **REDEMPTION:** You have the right to buy back (redeem) the Vehicle within 15 days of the mailing of the Notice and at any later time before we sell the Vehicle. If you redeem the Vehicle, we will deliver the Vehicle to you at a place as provided by law, as soon as is reasonably possible, but in not more than ten (10) business days of our receipt of the funds required. If you do not redeem, you give up all claim to the Vehicle.

c. **SALE:** If you don't redeem, we will sell the Vehicle. The money received at sale will be used to pay costs and expenses you owe, and then to pay the amount you owe on the Contract.

d. **SURPLUS OR DEFICIENCY:** If there is money left, we will pay it to the Buyer. If there is not enough money from the sale to pay what you owe, Buyer and Co-Signer agree to pay what is still owed to us.

e. **EXPENSES:** You agree to pay the costs of repossessing, storing, repairing, preparing for sale and selling the Vehicle as may be allowed by law. These costs will only be due if:

1. Default exceeds fifteen (15) days at the time of repossession;

2. The amount of costs are actual, necessary and reasonable; and

3. We can prove the costs were paid.

**16. HEIRS AND PERSONAL REPRESENTATIVES BOUND:** After your death, this Contract shall be enforceable against your heirs and personal representatives of your estate

Contract and by law.

b. **OUR RIGHT TO ENDORSE INSURANCE CHECKS:** You agree that the Seller, Assignee, any subsequent assignee, or an authorized employee of any of them ("we") may endorse your name, acting as your agent, to any check, draft or other instrument we receive in payment of an insured loss or return of insurance premiums. You agree that you do not have the right to and will not revoke the power you have given us to make your endorsement. You agree that we may exercise this power for our benefit and not for your benefit, except as provided in this Contract and by law.

c. **USE OF PROCEEDS:** We may apply any insurance proceeds we receive to repair or replace the Vehicle if, in our opinion, it is economically feasible and you are not then in default of this Contract. Otherwise, we will apply the insurance proceeds to reduce the unpaid balance due us. After the balance due us is paid, any excess will belong to you.

3. We can prove the costs were paid.

16. **HEIRS AND PERSONAL REPRESENTATIVES BOUND:** After your death, this Contract sh[illegible] be enforceable against your heirs and personal representatives of your estate.

17. **GOVERNING LAW:** This Contract is to be interpreted according to the law of Pennsylvania.

18. **SEVERABILITY OF PROVISIONS:** If for any reason any part of this Contract shall become illegal, void or unenforceable, that part shall not be a part of this Contract.

19. **ASSIGNMENT BY BUYER:** Buyer shall not assign this Contract.

20. **THERE ARE NO WARRANTIES BY SELLER, EXPRESSED OR IMPLIED, INCLUDING TH[E] WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOS[E] UNLESS WE HAVE GIVEN YOU A SEPARATE WRITTEN WARRANTY OR UNLESS SE[LLER] ENTERS INTO A SERVICE CONTRACT WITH BUYER WITHIN 90 DAYS FROM THE DATE [OF] THIS CONTRACT.**

**Buyer's Guide Window Sticker. If the Car which is described on the face of this Contract has a Buyer's Guide Window Sticker required by the Fede[ral] Trade Commission Used Car Trade Regulation Rule, the following notice applies:**

**The information you see on the window form for this Vehicle is part of this Contract. Information on the window form overrides a[ny] contrary provisions in the contract of sale.**

**NOTICE—ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COU[LD] ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVER[Y] HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**NOTICE OF PROPOSED CREDIT INSURANCE**

The signor(s) of this Contract hereby take(s) notice that Group Credit Life Insurance coverage or Group Credit Accident and Disability Insurance coverage will be applicable to this Contract if so marked on the front of this Contract, and each such type of coverage will be written by the insurance company named. This insurance, subject to acceptance by the insurer, covers only the person or persons signing the request for such insurance. The amount of charge is indicated for each type of Credit Insurance to be purchased. The term of insurance will commence as of the date the indebtedness is incurred and will expire on the original scheduled maturity date of the indebtedness. Subject to acceptance by the insurer and within 30 days, there will be delivered to the insured debtor(s) a certificate of insurance more fully describing the insurance. In the event of prepayment of the indebtedness, a refund of insurance charges will be made when due.

**NOTICE: SEE OTHER SIDE FOR IMPORTANT INFORMATION.**
**THE PROVISION BELOW IS NOT PART OF THE PENNSYLVANIA MOTOR VEHICLE INSTALLMENT SALE CONTRACT BETWEEN THE BUYER AND SELLER.**

**ASSIGNMENT**

To induce you, the "Assignee" identified on the face of this Contract or as follows, ______________________ (Name), to purchase the within Contract, the Seller hereby warrants and represents, and continues to warrant and represent that: the sale has been made in strict conformity with all applicable federal, state and local laws and regulations, including, but not limited to, Article 2 of the Pennsylvania Uniform Commercial Code (13 Pa. C.S.A. §§2101 et seq); our title to the Contract and the Vehicle covered thereby is absolute, free of all liens, encumbrances and security interests, and is subject only to the rights of the Buyer as set forth therein; the Contract is genuine, the signatures thereon are not forgeries, arose from the sale of the Vehicle therein described, and all parties thereto are of full age and had capacity to contract; the description of the Vehicle and extra equipment is complete and correct; the cash downpayment and/or trade-in allowance were actually received and no part thereof consisted of notes, post-dated checks, other credit advanced by us to Buyer or rebates or similar payments from us to the Buyer (however manufacturer rebates may constitute all or a part of the downpayment); all warranties and statements therein are true; there is owing thereon the Amount Financed plus interest at the Annual Percentage Rate of the Contract set forth therein; we are duly licensed under the Pennsylvania Motor Vehicle Sales Finance Act and have duly complied with all requirements thereof with respect to the transaction and with the federal Truth-in-Lending Act and with any other federal or state law, rule or regulation applicable to this Contract; a motor vehicle title certificate showing a lien or encumbrance in favor of Assignee has been or will be applied for promptly; the registration of the Vehicle has not been suspended and the Seller knows of no facts which may result in the suspension of said registration under the Pennsylvania Motor Vehicle Financial Responsibility Act; the Buyer(s) named in the within Contract is (are) personally known to the Seller to be the same identical person(s) whose signature(s) is (are) affixed to this Contract; and Seller has no knowledge of facts impairing the validity or value of the Contract. If any such warranties or representations should be breached at any time, Seller shall repurchase said Contract from Assignee, on demand, and will pay therefor, in cash, the amount owing thereon, computed as set forth below, and said remedy shall be cumulative and not exclusive, and shall not affect any other right or remedy that Assignee might have at law or in equity against Seller. In the event that Buyer fails or refuses to make any payment due hereunder on the assertion, either oral or written, that the Vehicle is defective, not as represented to the Buyer by Seller, or that Seller refuses to honor any warranty or service agreement of Seller or manufacturer, Seller agrees that, on being advised by Assignee of such claim of Buyer, Seller will repurchase the Contract from Assignee and pay Assignee for same immediately in accordance with the repurchase terms set forth below, and Seller further agrees to hold Assignee harmless from any other claims of Buyer, including attorneys' fees, costs and expenses incurred in defending against claims asserted by Buyer and including claims for refund of payments made by Buyer to Assignee. If the Seller contracts to purchase property insurance on behalf of the Buyer, and that insurance is cancelled by the insurance company prior to its scheduled expiration date, Seller will attempt to place comparable coverage with another insurance company on behalf of the Buyer. If Seller is unable to do so, Seller will notify Buyer and pay to Buyer any additional costs incurred by the Buyer in obtaining replacement insurance for the unexpired period of the original insurance policy. By signing and dating the Contract, as Seller, delivering the Contract to the Assignee and accepting payment for it, Seller authorizes the Assignee to act as the Seller's agent for the purpose of completing or correcting the identification of the Assignee in this Assignment to reflect the true Assignee who purchased the Contract and/or for the purpose of signing Seller's name to this Assignment, without recourse, if the Assignment is delivered without the Seller's signature. Assignee may exercise the power given in this paragraph for the benefit of the Assignee and not for the benefit of the Seller. Seller does not have the right to and agrees not to revoke the power given in this paragraph.

In the event that Seller is required by this Assignment to repurchase the Contract and/or Vehicle, Seller shall pay to Assignee, in cash, the full unpaid balance of the Contract as of the date of repurchase, plus any then earned Finance Charge and any and all costs and expenses paid or incurred by Assignee in respect thereto, including reasonable attorneys' fees, in connection with claims by or against any Buyer, Owner or persons in possession of the Vehicle and/or by or against Seller.

For value received, Seller hereby sells, assigns and transfers unto the Assignee, its successors and assigns, the within Contract, all moneys due and to become due thereunder, and all right, title and interest in and to the Vehicle therein described, with full power in the Assignee in its or our name to take such legal or other action which we might have taken save for this Assignment. Unless Seller marks either of the endorsements below, titled "WITH FULL RECOURSE" or "WITH REPURCHASE," Seller's assignment shall, except for the provisions of the paragraph titled "Assignment," be without recourse.

☐ WITH FULL RECOURSE—Seller agrees that, in addition to the paragraph above titled "Assignment," in the event of default by Buyer in the full payment on the due date thereof of any installment payable under the Contract or in the prompt performance of any other obligation to be performed under the Contract by Buyer, Seller will, on demand by Assignee, forthwith repurchase the Contract from Assignee for a repurchase price, in cash, computed as set forth above.

☐ WITH REPURCHASE—Seller agrees that, in addition to the provisions of the paragraph above titled "Assignment," in the event of any default by Buyer which shall entitle Assignee to repossess the Vehicle, Seller will, if the Vehicle is repossessed by Assignee and delivered to Seller, and without regard to the then condition of the Vehicle, forthwith repurchase the Contract and the Vehicle from Assignee for a repurchase price, in cash, computed as set forth above.

By signing below, we agree to the terms of the Assignment.

Seller ______________________ By ______________________ ______________
Date

BANCONSUMER FORM PA 123-31C 2/1/2004

Case 2015-0 Received at Prothonotary

# EXHIBIT B

Section 2.3(b)(iv), Section 2.3(b)(vi) and Section 2.3(b)(ix), (2) Liabilities arising under any dealer sales and service Contract and any Contract related thereto, to the extent such Contract has been designated as a Rejectable Executory Contract, and (3) Liabilities otherwise assumed in this Section 2.3(a);

(vi)    all Transfer Taxes payable in connection with the sale, transfer, assignment, conveyance and delivery of the Purchased Assets pursuant to the terms of this Agreement;

(vii)    (A) all Liabilities arising under express written warranties of Sellers that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws;

(viii)    all Liabilities arising under any Environmental Law (A) relating to conditions present on the Transferred Real Property, other than those Liabilities described in Section 2.3(b)(iv), (B) resulting from Purchaser's ownership or operation of the Transferred Real Property after the Closing or (C) relating to Purchaser's failure to comply with Environmental Laws after the Closing;

(ix)    all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance (for avoidance of doubt, Purchaser shall not assume, or become liable to pay, perform or discharge, any Liability arising or contended to arise by reason of exposure to materials utilized in the assembly or fabrication of motor vehicles manufactured by Sellers and delivered prior to the Closing Date, including asbestos, silicates or fluids, regardless of when such alleged exposure occurs);

(x)    all Liabilities of Sellers arising out of, relating to, in respect of, or in connection with workers' compensation claims against any Seller, except for Retained Workers' Compensation Claims;

(xi)    all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing;

(xii)    all Liabilities (A) specifically assumed by Purchaser pursuant to Section 6.17 and (B) arising out of, relating to or in connection with the salaries and/or wages and vacation of all Transferred Employees that are accrued and unpaid (or with respect to vacation, unused) as of the Closing Date;

-29-

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                    :    Chapter 11
                                                         :
MOTORS LIQUIDATION COMPANY, *et al.*,                    :    Case No.: 09-50026 (REG)
          f/k/a General Motors Corp., *et al.*           :
                                                         :
                                Debtors.                 :    (Jointly Administered)
-----------------------------------------------------------x

DECISION WITH RESPECT TO NO STAY
PLEADING (PHANEUF PLAINTIFFS)[1]

APPEARANCES:

KING & SPALDING LLP
*Attorneys for General Motors LLC*
1185 Avenue of the Americas
New York, New York 10036
By:    Arthur J. Steinberg, Esq. (argued)
       Scott I. Davidson, Esq.

KIRKLAND & ELLIS LLP
*Attorneys for General Motors LLC*
300 North LaSalle
Chicago, Illinois 60654
By:    Richard C. Godfrey, Esq.
       Andrew B. Bloomer, Esq.

BLOCK & LEVITON LLP
*Attorneys for Phaneuf Plaintiffs*
155 Federal Street, Suite 400
Boston, Massachusetts 02110
By:    Jeffrey C. Block, Esq. (argued)
       Joel A. Fleming, Esq.

---

[1]    This written decision memorializes and amplifies on the oral decision that I issued after the close of oral argument at the hearing on this matter on July 2, 2014 (the "July 2 Hearing.") Because it had its origins in the originally dictated decision, it has a more conversational tone. As a general matter, it speaks as of the time I issued the original decision, though by footnote (*see* n.8), I've updated it to describe an event that took place after I dictated the original decision.

-1-

FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP
*Attorneys for Phaneuf Plaintiffs*
1279 Route 300
Newburg, New York 12551
By:    Todd Garber, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In February 2014, General Motors LLC ("New GM") announced ignition switch

defects in Chevy Cobalts and Pontiac G5s going back to the 2005 model year—at least

seemingly in material part before the chapter 11 filing of Reorganized Debtor General

Motors Corporation, now called Motors Liquidation Corp. ("Old GM"), from whom

New GM purchased the bulk of Old GM assets in a section 363 "free and clear" sale[2] in

July 2009.[3] The 2014 announcement came many years after ignition switch issues were

first discovered by at least some personnel at Old GM. Very nearly immediately after

New GM's announcement, a large number of class actions (and to a lesser extent,

individual lawsuits) relating to those defects, referred to here as the **"Ignition Switch**

**Actions,"** were commenced against New GM.

At the time of the 363 Sale, New GM assumed many, but much less than all, of

Old GM's liabilities.[4] Focusing on that distinction, in April 2014, New GM filed a

---

[2]    I approved the sale—referred to here as the "363 Sale"—by order dated July 5, 2009 (the "Sale
Order") (ECF No. 2968), and the sale closed a few days thereafter.

[3]    In a February 2014 letter to the National Traffic and Highway Administration, New GM made
reference to 2005–2007 model year Chevy Cobalts, and 2007 model year Pontiac G5s. Defective
ignition switches, manufactured at a time yet to be determined (before the 363 Sale, after the 363
Sale, or both), may also have been installed in other vehicles, including those in other (and
possibly later) model years, including some after the 363 Sale. I make no findings as to any of
these matters at this point in time; I merely identify them as matters that may eventually need to be
stipulated to or otherwise resolved.

[4]    The Old GM liabilities assumed by New GM, on the one hand, and not assumed, on the other,
were described in the 363 Sale's underlying sale agreement, captioned "Amended and Restated
Master Purchase and Sale Agreement," often referred to by the parties as the "ARMSPA,"
"MPA," or "MSPA." As in the past—because, as I've repeatedly noted, all but the most common
acronyms are singularly unhelpful to those who haven't been living with a case—I instead use the

-2-

motion before me (the "Motion to Enforce")[5] to enforce the free and clear provisions of

the Sale Order—contending (though these contentions are disputed) that most, if not all,

of the claims in the Ignition Switch Actions related to vehicles or parts manufactured and

sold by Old GM; that the Ignition Switch Actions assert liabilities not assumed by New

GM; and that the Sale Order's free and clear provisions proscribe such claims. At very

nearly the same time, counsel for one group of plaintiffs—the "Groman Plaintiffs"—

commenced a class action adversary proceeding in this Court (the "Groman

Adversary")[6] seeking a declaration that their claims were not so proscribed.

    In this jointly administered proceeding in which I address issues in New GM's

Motion to Enforce and the Groman Adversary,[7] I must determine whether one out of

88 Ignition Switch Actions—brought by a group of plaintiffs (the "Phaneuf Plaintiffs"),

suing on their own behalf and on behalf of a purported class—should be allowed to

proceed when the plaintiffs in every other Ignition Switch Actions agreed to stay their

actions while the issues in the Motion to Enforce were being litigated.[8]

---

more descriptive term "Sale Agreement." *See, e.g., Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 2012 Bankr. LEXIS 1688, at *13 n.25, 2012 WL 1339496, at *5 n.25 (Bankr. S.D.N.Y. Apr. 17, 2012) (Gerber, J.), *aff'd*, 500 B.R. 333 (S.D.N.Y. 2013) (Furman, J.) ("The Sale Agreement was more formally entitled 'Amended and Restated Master Purchase and Sale Agreement,' and referred to more than occasionally as the 'ARMSPA.' By reason of the Court's dislike of acronyms, which rarely are helpful to anyone lacking intimate familiarity with the subject, the Court simply says 'Sale Agreement'").

[5]    ECF No. 12620.

[6]    Adv. No. 14-01929.

[7]    I determined early on that the largely overlapping issues in the contested matter that resulted from New GM's Motion to Enforce and the Groman Adversary should be heard together in this Court. For brevity I'll hereafter refer to the Motion to Enforce as a shorthand means to collectively refer to both.

[8]    At the time I orally ruled with respect to the Phaneuf Plaintiffs' issues at the July 2 Hearing, they were the only plaintiff group that had declined to stipulate to stay its Ignition Switch Action. In proceedings later that day, I granted leave to two initially *pro se* individual plaintiffs (the "Elliott Plaintiffs"), who had so stipulated but later retained counsel, to be relieved of the stipulation they had agreed to while *pro se*. Thus, after having delivered my oral decision on this matter, I now have one more group of plaintiffs seeking to proceed before all of the others.

Some of the issues that I'll later need to decide may turn out to be difficult, but those here are not. I rule that the Phaneuf Plaintiffs should be treated no differently than those in the 87 other Ignition Switch Actions who agreed to voluntary stays, with adherence to the orderly procedures in this Court that were jointly agreed to by counsel for those other plaintiffs and New GM. The Phaneuf Plaintiffs' complaint alleges matters that, on their face, involve matters preceding Old GM's chapter 11 filing and 363 sale, with respect to which the Sale Order's "free and clear" injunctive provisions, at least in the first instance, apply. And the Phaneuf Plaintiffs would not be prejudiced at all, much less materially, by litigating their needs and concerns along with the other New GM consumers raising substantially identical claims. Though injunctive provisions are already in place and thus a preliminary injunction is unnecessary, New GM has also shown an entitlement to a preliminary injunction staying the Phaneuf Plaintiffs from proceeding with their litigation elsewhere while the issues here are being determined.

My Findings of Fact, Conclusions of Law, and bases for the exercise of my discretion follow.

### Findings of Fact

As previously noted, very nearly immediately after New GM's public announcement of the ignition switch defects, a very large number of Ignition Switch Actions were commenced against New GM. Although back in 2009, New GM had voluntarily undertaken to assume liability for death, personal injury, and property damage arising from accidents and incidents after the 363 Sale, these lawsuits were for something else—for "economic loss," which I understand to cover (possibly among things) claims for alleged diminishment in value of affected vehicles, out of pocket expenses, inconvenience, and, additionally, punitive damages, RICO damages, and attorneys fees.

-4-

*A. The Context of this Controversy*

Very shortly after it filed its Motion to Enforce, New GM sought a conference
with me to establish procedures to manage the litigation of its motion. With the Groman
Adversary also having been filed, and with additional similar litigation foreseeable, I
granted new GM's request for the conference. I solicited comments from interested
parties with respect to the agenda for that conference, and held an on-the-record
conference on May 2 (the "**May 2 Conference**"). By the time of the May 2 Conference,
I understood there to be about 65 Ignition Switch Actions; I'm informed that their
number has now reached 88.

To deal with the very large number of plaintiffs' attorneys who might be impacted
by any rulings I might issue, I asked them to designate a smaller group of their number
who'd speak on their behalf. The plaintiffs' lawyers community did so. They designated
the law firms of Brown Rudnick, LLP; Caplin & Drysdale, Chartered; and Stutzman,
Bromberg, Esserman & Plifka, PC (whose practices include the representation of tort and
asbestos plaintiffs in bankruptcy courts) to speak on their behalf; those three firms came
to be known as the "**Designated Counsel.**" And at the May 2 Conference, it became
apparent that this controversy had the potential to impact prepetition creditors of Old
GM, who, under Old GM's reorganization plan, had become unit holders ("**Unit
Holders**") in a General Unsecured Creditors Trust—referred to colloquially as the "**GUC
Trust**"—which, among other things, would quarterback objections to claims on behalf of
Old GM unsecured creditors, whose recoveries might be diluted by others' claims against
Old GM. Thus I determined that I should give counsel for the GUC Trust and Unit
Holders the opportunity to be heard as well. Though I provided means for other
plaintiffs' counsel to be heard to the extent that the Designated Counsel didn't

-5-

satisfactorily present the others' views, I ruled that I should primarily hear from

Designated Counsel to avoid duplication and to allow the issues to be decided in an

orderly manner.

At the May 2 Conference, with knowledge of the injunctive provisions of the Sale

Order, I determined that while the litigation process was underway in this Court,

plaintiffs in Ignition Switch Actions would either

(i) agree to enter into a stipulation ("Stay Stipulation") with New GM

staying the Ignition Switch Actions they'd brought elsewhere, or

(ii) file with the Bankruptcy Court a "No Stay Pleading"—as later

defined in a heavily negotiated scheduling order (the "May 16 Order")[9] I signed

after the May 2 Conference—setting forth why they believed their Ignition Switch

Actions should not be stayed.

The May 16 Order further provided that after September 1, any party may request that I

"modify the stay for cause shown, including based on any rulings in this case, or any

perceived delay in the resolution of the Threshold Issues."[10]

---

[9]    ECF No. 12697.

[10]    The "Threshold Issues" are:

a. Whether Plaintiffs' procedural due process rights were
violated in connection with the Sale Motion and the Sale
Order and Injunction, or alternatively, whether Plaintiffs'
procedural due process rights would be violated if the Sale
Order and Injunction is enforced against them ("Due Process
Threshold Issue");

b. If procedural due process was violated as described in (a)
above, whether a remedy can or should be fashioned as a
result of such violation and, if so, against whom ("Remedies
Threshold Issue");

c. Whether any or all of the claims asserted in the Ignition
Switch Actions are claims against the Old GM bankruptcy
estate (and/or the GUC Trust) ("Old GM Claim Threshold
Issue"); and

On June 9, the Ignition Switch Actions, which were brought in many judicial districts in the United States, were transferred, under 28 U.S.C. § 1407, upon a decision of the Judicial Panel on Multidistrict Litigation[11] to the United States District Court for the Southern District of New York. They're now pending in this district for pretrial purposes before the Hon. Jesse Furman, United States District Judge. Each of Judge Furman and I has granted comity to the other, and he has entered a scheduling order in his court that accomplishes his needs while respecting mine.[12] By a subsequent MDL Panel order, the Phaneuf Plaintiffs' action is before Judge Furman too.

Plaintiffs in 87 out of 88 Ignition Switch Actions agreed to enter into stay stipulations.[13] But the Phaneuf Plaintiffs declined to do so. Instead, they filed a No Stay Pleading, contending that they are asserting only post-sale claims, and thus that their claims should be treated differently. They argue that they should be allowed to proceed with their action even while the Motion to Enforce is pending.

---

d.  If any or all of the claims asserted in the Ignition Switch Actions are or could be claims against the Old GM bankruptcy estate (and/or the GUC Trust), should such claims or the actions asserting such claims nevertheless be disallowed/dismissed on grounds of equitable mootness ("Equitable Mootness Threshold Issue").

[11]  *See In re General Motors LLC Ignition Switch Litigation*, --- F.Supp.2d ---, 2014 U.S. Dist. LEXIS 79713, 2014 WL 2616819 (J.P.M.L. June 9, 2014) (*"JPML Decision"*).

[12]  Order No. 1, *In re General Motors LLC Ignition Switch Litigation*, No. 14-MC-2543 (S.D.N.Y. June 24, 2014), ECF No. 3 (the "June 24 Order").

[13]  But see n.8 above, with respect to the Elliott Plaintiffs' request, which I granted, to withdraw from their earlier stipulation.

-7-

- -

*B. The Sale Agreement and Sale Injunctions*

As noted above, the Sale Agreement and Sale Order set out Old GM liabilities
that New GM would assume and not assume.[14] Under the Sale Agreement, New GM did
not assume liability for most **"Product Liability Claims"** (as there defined).[15] But New
GM expressly assumed responsibility for claims for death, personal injury or damage to
property caused by "accidents or incidents" first occurring after the 363 Sale,[16] even if
such might otherwise be claims against Old GM.[17]

Under the Sale Agreement (and the Sale Order, which had corresponding
provisions), New GM also took on, as additional Assumed Liabilities, some, but not all,
claims other than for death, personal injury or property damage caused by accidents or
incidents. In addition, the Sale Order included several injunctive provisions. Relevant
provisions of the Sale Order follow.

*1. Sale Order Provisions re Assumed Liabilities*

Under the Sale Order (and as described with greater precision there), New GM
assumed Old GM's obligations under express warranties (colloquially referred to as the
"glove box" warranty) that had been delivered in connection with the sale of vehicles and

---

[14]    Liabilities New GM agreed to assume were called "Assumed Liabilities," in each of the Sale
Agreement and Sale Order. Those New GM did not assume (and that Old GM retained) were
called "Retained Liabilities."

[15]    *See* Sale Agreement § 2.3(a)(ix) (as amended on June 30, 2009 (see pages 11-12 of ECF No.
2968-2)).

[16]    *Id.*

[17]    *See generally In re Motors Liquidation Co.*, 447 B.R. 142, 149 (Bankr. S.D.N.Y. 2011) (Gerber,
J.) ("*GM-Deutsch*") (construing the "incidents" portion of the "accidents or incidents" language
(in the context of claims against New GM by the estate of a consumer who had been in an accident
before the 363 Sale, but died thereafter) as covering more than just "accidents," but covering
things that were similar, such as fires, explosions, or other definite events that caused injuries and
resulted in the right to sue).

-8-

vehicle parts prior to the 363 Sale.[18]  But New GM did not assume  responsibility for

other alleged warranties, including implied warranties and statements in materials such as

individual customer communications, owner's manuals, advertisements, and other

promotional materials.[19]

  The Sale Order also provided that except for the Assumed Liabilities expressly set

forth in the Sale Agreement, New GM would not "have any liability for any claim that

arose prior to the Closing Date, relates to the production of vehicles prior to the Closing

Date, or otherwise is assertable against the Debtors or is related to the Purchased Assets

prior to the Closing Date."[20]  And it went on to say that:

> The Purchaser [New GM] shall not be deemed, as a
> result of any action taken in connection with the
> MPA [Sale Agreement] or any of the transactions or
> documents ancillary thereto or contemplated
> thereby or in connection with the acquisition of the
> Purchased Assets, to:
>
> > (i) be a legal successor, or otherwise
> > be deemed a successor to the Debtors (other
> > than with respect to any obligations arising
> > under the Purchased Assets from and after
> > the Closing);
> >
> > (ii) have, de facto or otherwise,
> > merged with or into the Debtors; or
> >
> > (iii) be a mere continuation or
> > substantial continuation of the Debtors or
> > the enterprise of the Debtors.

---

[18] *See* Sale Order ¶ 56. New GM also assumed Old GM obligations under state "lemon law"
statutes—which generally require a manufacturer to provide a consumer remedy when the
manufacturer is unable to conform the vehicle to the warranty, as defined in the applicable statute,
after a reasonable number of attempts as further defined in the statute—and other related
regulatory obligations under such statutes.  *Id.*

[19] *Id.*

[20] Sale Order ¶ 46.

-9-

> Without limiting the foregoing, the Purchaser shall
> not have any successor, transferee, derivative, or
> vicarious liabilities of any kind or character
>
> for any claims, including, but not limited to, under
> any theory of successor or transferee liability, de
> facto merger or continuity, environmental, labor and
> employment, and products or antitrust liability,
> whether known or unknown as of the Closing, now
> existing or hereafter arising, asserted, or unasserted,
> fixed or contingent, liquidated or unliquidated.[21]

The Sale Order also provided:

> Except for the Assumed Liabilities, or as expressly
> permitted or otherwise specifically provided for in
> the MPA or this Order,
>
> the Purchaser shall have no liability or
> responsibility for any liability or other obligation of
> the Sellers [Old GM and its Debtor subsidiaries]
> arising under or related to the Purchased Assets.
>
> Without limiting the generality of the foregoing,
> and except as otherwise specifically provided in this
> Order and the MPA,
>
> the Purchaser shall not be liable for any claims
> against the Sellers or any of their predecessors or
> Affiliates, and
>
> the Purchaser shall have no successor, transferee, or
> vicarious liabilities of any kind or character,
>
> including, but not limited to, any theory of antitrust,
> environmental, successor, or transferee liability,
> labor law, de facto merger, or substantial continuity,
>
> whether known or unknown as of the Closing, now
> existing or hereafter arising, whether fixed or
> contingent, asserted or unasserted, liquidated or
> unliquidated, with respect to the Sellers or any
> obligations of the Sellers arising prior to the
> Closing.[22]

---

[21] Sale Order ¶ 46 (reformatted for readability).

[22] Sale Order ¶ 48 (reformatted for readability).

-10-

*2. Sale Order Injunctive Provisions*

Importantly for this matter, the Sale Order also included injunctive provisions.

The first of them provided, in relevant part:

> Except as expressly permitted or otherwise
> specifically provided by the MPA or this Order,
>
> all persons and entities, including, but not limited to
> . . . litigation claimants . . .
>
> holding . . . claims . . . of any kind or nature
> whatsoever, including rights or claims based on any
> successor or transferee liability, against . . . a Seller
> . . .
>
> arising under or out of, in connection with, or in any
> way relating to, the Sellers, the Purchased Assets,
> the operation of the Purchased Assets prior to the
> Closing, or the 363 Transaction,
>
> are forever barred, estopped, and permanently
> enjoined (with respect to future claims or demands
> based on exposure to asbestos, to the fullest extent
> constitutionally permissible)
>
> from asserting against the Purchaser, its successors
> or assigns, its property, or the Purchased Assets,
> such persons' or entities' . . . claims . . . , including
> rights or claims based on any successor or
> transferee liability.[23]

The second injunctive provision provided, in relevant part:

> Effective upon the Closing and except as may be
> otherwise provided by stipulation filed with or
> announced to the Court with respect to a specific
> matter or an order of the Court,
>
> all persons and entities are forever prohibited and
> enjoined

---

[23]    Sale Order ¶ 8 (reformatted for readability).

-11-

> from commencing or continuing in any manner any
> action or other proceeding, whether in law or
> equity,
>
> in any judicial, administrative, arbitral, or other
> proceeding against the Purchaser . . . or the
> Purchased Assets, with respect to any
>
> > (i) claim against the Debtors other than
> > Assumed Liabilities, or
> >
> > (ii) successor or transferee liability of the
> > Purchaser for any of the Debtors, including,
> > without limitation, the following actions:
> >
> > > (a) commencing or continuing any
> > > action or other proceeding pending
> > > or threatened against the Debtors as
> > > against the Purchaser, or its
> > > successors, assigns, affiliates, or
> > > their respective assets, including the
> > > Purchased Assets;
> > >
> > > . . . .
> > >
> > > (e) commencing or continuing any
> > > action, in any manner or place, that
> > > does not comply, or is inconsistent
> > > with, the provisions of this Order or
> > > other orders of this Court, or the
> > > agreements or actions contemplated
> > > or taken in respect thereof . . . .[24]

### C.. *The Phaneuf Plaintiffs' Claims*

The Phaneuf Plaintiffs' complaint alleges that after the 363 Sale (which it will be

recalled took place in July 2009), at various times in the period from November 2009 to

September 2010, Phaneuf Plaintiffs:

- Lisa Phaneuf purchased a 2006 Chevy HHR;

- Adam Smith purchased a 2007 Pontiac Solstice; and

---

[24]    Sale Order ¶ 47 (reformatted for readability).

-12-

    • Catherine and Joseph Cabral purchased a 2007 Chevy Cobalt.[25]

Each was a vehicle manufactured by Old GM.[26]

But the Phaneuf Plaintiffs' Ignition Switch Action was brought against New GM.

New GM was sued as alleged "successor in interest" to Old GM,[27] and the Phaneuf

Plaintiffs repeatedly rely on alleged conduct of Old GM, in part by referring to the two

entities collectively,[28] and in part by specific reference to acts undertaken by Old GM

before New GM was created. In seven places in their complaint, the Phaneuf Plaintiffs

speak of acts that took place in February 2005;[29] April 2005;[30] June 2005;[31] March

---

[25]    *See* Phaneuf Compl. ¶¶ 8, 9, 15, ECF No. 12698-10 ("Compl.").

[26]    The Phaneuf Plaintiffs' Complaint suggests that others in their group—Mike Garcia, who bought a
2010 Cobalt; Javier Delacruz, who bought a 2009 Cobalt (in September 2009, which conceivably
could have been manufactured after the July 2009 363 Sale); Steve Sileo, who bought a 2010
Cobalt; Steven Bucci, who bought a 2009 Cobalt (in November 2009, which, like Delacruz's
Cobalt, conceivably could have been manufactured after the July 2009 363 Sale); and David
Padilla, who purchased a 2010 Cobalt (*see* Compl. ¶¶ 10–14)—might have purchased vehicles
manufactured by New GM, rather than Old GM, and that they thus might have factual
circumstances that distinguish them from Phaneuf, Smith, and the Cabrals. But all of the Phaneuf
Plaintiffs sue under a common complaint. In the briefing to follow, Garcia, Delacruz, Sileo, Bucci
and Padilla, like others, will be free to flesh out the facts with respect to the manufacture of their
vehicles, and to point out any factual distinctions that might be warranted.

[27]    *See* Compl. at page 1, before the beginning of numbered paragraphs ("Plaintiffs . . . allege the
following against Defendant General Motors LLC ('New GM') *successor-in-interest to General
Motors Corporation ('Old GM')* (collectively, the 'Company,' or 'GM')") (emphasis added).

[28]    The Phaneuf Plaintiffs' effort to treat Old GM and New GM as a single entity is inappropriate, as
a matter of bankruptcy law, if not as a matter of other law as well. As if it cures the deficiency,
the Phaneuf Plaintiffs continue, in a footnote:

> Any reference to "GM" relating to a date before July 10, 2009
> means Old GM. Any reference to "GM" relating to a date
> after July 10, 2009 means New GM. Any reference to "GM"
> that does not related to a specific date means Old GM and
> New GM, collectively.

Compl. n.2. That tactic underscores the Phaneuf Plaintiffs' efforts to muddy the distinctions
between the two entities, and to impose liability on New GM based on Old GM's conduct.

[29]    *See* Compl. ¶ 26 ("In 2005, for example, GM launched the 'Only GM' advertising campaign. . . .
'Safety and security' were the first two features highlighted in the Company's February 17, 2005
press release describing the campaign.").

[30]    *Id.* ¶ 27 ("Similarly, an April 5, 2005 press release about the 'Hot Button marketing program'
stated that the 'Value of GM's Brands [Was] Bolstered By GM's Focus On Continuous Safety'
and explained that the Hot Button program was 'intended to showcase the range of GM cars,

-13-

2005;[32] November 2005;[33] April 2006;[34] and as early as 2003.[35] Each of those acts took

place before the formation of New GM, and would have been more candidly described in

the Phaneuf Plaintiffs' complaint if, in each instance, the reference to "GM" were to "Old

GM." The allegations do not describe actions taken by New GM.

   I don't now make any finding as to any respects in which New GM might be

liable for its own post-sale conduct, or whether the Sale Order (or any part of it) should

be invalidated, by reason of due process concerns or any of the other matters that

Designated Counsel will be briefing in the upcoming weeks.[36] But I do find the Phaneuf

Plaintiffs' efforts to merge pre- and post-sale acts, and to place reliance on the alleged

conduct of Old GM, especially collectively, are much more than sufficient for me to find

that the Phaneuf Plaintiffs place material reliance on Old GM actions that took place

before the Sale Order, and assert claims with respect to vehicles that were manufactured

before the 363 Sale. Thus I find as a fact, or mixed question of fact and law, that the

---

trucks and SUVs that offer drivers continuous safety-protection before, during and after a
vehicle collision.'") (hyphen in original).

[31]   *Id.* ¶ 28 ("On June 14, 2005, GM issued a press release stating that 'Safety [Was The] No. 1
Concern For Women At The Wheel' . . . .").

[32]   *Id.* ¶ 29 ("In a statement aired on Good Morning America on March 7, 2005, a GM
spokesperson stated that 'the [Chevrolet] Cobalt exceeds all Federal safety standards that
provide – significant real-world safety before, during, and after a crash.'" (alteration and
hyphen in original).

[33]   *Id.* (" In November 2005, GM ran radio advertisements stating that 'One of the best things to
keep you [and your] family safe is to buy a Chevy equipped with OnStar . . . from Cobalt to
Corvette there's a Chevy to fit your budget.'") (alterations in original).

[34]   *Id.* ¶ 41 ("In April 2006, GM attempted to fix the Ignition Defect by replacing the original detent
spring and plunger with a longer detent spring and plunger.").

[35]   *Id.* ¶ 45 ("[I]n 2003, a GM service technician observed the Ignition Defect while he was
driving").

[36]   I likewise don't make a finding now as to the significance of the pre- or post-sale timing of the
design or manufacture of *parts* that might have gone into vehicles that were built pre- or post-sale.
I assume that issues of that character will be addressed by Designated Counsel, New GM, and
others in the briefing in the upcoming weeks, and those parties deserve to be heard before I make
any decisions in that regard.

threshold applicability of the Sale Order—and its injunctive provisions—has easily been established in the first instance, at least for the purposes of the Phaneuf Plaintiffs' claims.[37]

### Discussion

In that factual context, I rule that the Phaneuf Plaintiffs' claims will be treated the same as those in the other 87 Ignition Switch Actions. The stay already imposed by the injunctive provisions of Paragraphs 8 and 47 of the Sale Order (and that I may also impose by preliminary injunction) will remain in place insofar as it affects the Phaneuf Plaintiffs' complaint—subject to the right, shared by all of the other plaintiffs in the Ignition Switch Actions, to ask that I revisit the issue after September 1.

*A. Applicability of the Sale Order*

Paragraph 8 of the Sale Order provides, among other things, that all persons and entities "are . . . enjoined . . . from asserting against the Purchaser [New GM] . . . such persons' or entities' . . . claims . . ., including rights or claims based on any successor or transferee liability."

Similarly, Paragraph 47 of the Sale Order provides, among other things, that all persons and entities "are . . . enjoined from commencing or continuing in any manner any action or other proceeding . . . against the Purchaser . . . with respect to any (i) claim against the Debtors other than Assumed Liabilities, or (ii) successor or transferee liability of the Purchaser for any of the Debtors . . . ."

---

[37]    That is not to say, of course, that what the Sale Order says will be the end of the inquiry, either in the Phaneuf Plaintiffs' case or in the case of the other 87 Ignition Switch Actions. By reason of the due process contentions that the other litigants will address, or otherwise, the Sale Order may turn out to have exceptions or self-destruct. But for now it's in place.

ꞁ                                                                              ‐

I've found as a fact—based on the Phaneuf Plaintiffs' complaint's express

reference to New GM as the "successor in interest" to Old GM,[38] and the facts that at

least three of them purchased cars manufactured before the 363 Sale;[39] that their

complaint (apparently intentionally) merges pre- and post-sale conduct by Old GM and

New GM;[40] and that their complaint places express reliance on at least seven actions by

Old GM, before New GM was formed[41]—that at least much of the Phaneuf Plaintiffs'

complaint seeks to impose liability on New GM based on Old GM's pre-sale acts.

Efforts of that character are expressly forbidden by the two injunctive provisions just

quoted. Though I can't rule out the possibility that a subset of matters the Phaneuf

Plaintiffs might ultimately show would not similarly be forbidden, at this point the Sale

Order injunctive provisions apply. And it need hardly be said that I have jurisdiction to

interpret and enforce my own orders,[42] just as I've previously done, repeatedly, with

respect to the very Sale Order here.[43]

---

[38]    See page 13 & n.27 above.

[39]    See pages 12–13 & n.25 above.

[40]    See page 13 & n.28 above.

[41]    See pages 13–14 & nn.29–35 above.

[42]    See Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 (2009) ("Travelers") ("[A]s the Second
Circuit recognized . . . the Bankruptcy Court plainly had jurisdiction to interpret and enforce its
own prior orders"); see also In re Lyondell Chem. Co., 445 B.R. 277, 287 (Bankr. S.D.N.Y. 2011)
(Gerber, J.) (same).

[43]    See Castillo v. Gen. Motors LLC (In re Motors Liquidation Co.), 2012 Bankr. LEXIS 1688, at
*17, 20, 31, 50, 2012 WL 1339496, at *6–7, 9, 14 (Bankr. S.D.N.Y. April 17, 2012) (Gerber, J.),
aff'd, 500 B.R. 333 (S.D.N.Y. 2013) (Furman, J.) (interpreting the Sale Order, among other
extrinsic evidence bearing on the intent of Old GM and New GM in entering into the Sale
Agreement, to aid in determining whether New GM assumed Old GM's settlement with the
Castillo Plaintiffs; Trusky v. Gen. Motors LLC (In re Motors Liquidation Co.), 2013 Bankr.
LEXIS 620, at *4, 11–24, 2013 WL 620281, at *1, 4–8 (Bankr. S.D.N.Y. Feb. 19, 2013) (Gerber,
J.) (construing the Sale Order, and then remanding the remainder of a controversy, involving
issues unrelated to the Sale Order, to the Eastern District of Michigan); GM-Deutsch, discussed at
n.17 above.

Other judges in the Southern District of New York, at both the District Court and Bankruptcy
Court levels, have recognized this as well. See, e.g., In re Grumman Olson Indus., Inc., 467 B.R.

-16-

Thus unless and until I rule, after hearing from counsel in the other 87 Ignition

Switch Actions, that I should not enforce the Sale Order, in whole or in part (or that with

respect to any particular matters, the Sale Order does not apply), the Phaneuf Plaintiffs

remain enjoined under it. As the Supreme Court held in *Celotex*,[44] persons subject to an

injunctive order issued by a court with jurisdiction are expected to obey that decree until

it is modified or reversed, even if they have proper grounds to object to the order.

Then even assuming (though this is debatable) that I could deprive New GM of

the benefits of the Sale Order's injunctive provisions in the exercise of my discretion, I

am not prepared to do so now. I have 88 Ignition Switch Actions before me—in most of

which parties are likely to make similar contentions. Under section 105(d) authority[45]

---

694 (S.D.N.Y. 2012) (Oetken, J.), *aff'g*, 445 B.R. 243, 247–50 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.) ("*Grumman Olson*") (confirming that a bankruptcy judge can interpret the scope and effect of his or her court's prior sale order, post-confirmation, and as between non-debtors (citing *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223, 228–31 (2d Cir.2002) (holding that Bankruptcy Court could exercise continuing postconfirmation jurisdiction over non-debtor parties, in part because "the dispute . . . was based on rights established in the sale order" and noting that a "bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders"))); *In re Old Carco LLC*, 505 B.R. 151, 159 & 163 n.17 (Bankr. S.D.N.Y. 2014) (Bernstein, C.J.) ("the Court retains bankruptcy jurisdiction under 28 U.S.C. § 1334 to interpret its prior sale order even when the dispute involves non-debtor third parties"); *see also Moelis Co. LLC v. Wilmington Trust FSB (In re Gen. Growth Props., Inc.)*, 460 B.R. 592, 595 (Bankr. S.D.N.Y. 2011) (Gropper, J.) ("[a] bankruptcy court always has jurisdiction to interpret its own orders. It does not matter that the State Court Action is purportedly between two non-debtors or the Chapter 11 Cases have been confirmed.") (citation omitted).

[44]    *Celotex Corp. v. Edwards*, 514 U.S. 300, 306–07 (1995).

[45]    Bankruptcy Code section 105(d) provides:

The court, on its own motion or on the request of a party in interest—

(1) shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and

(2) unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically . . . .

-17-

given to me by Congress, I established an orderly process, with input from Designated
Counsel and counsel for New GM, the Groman Adversary Plaintiffs, the GUC Trust and
others by which I can fairly address these issues. It would be grossly unfair to the
plaintiffs in the 87 Ignition Switch Actions who stipulated to stay their cases to give a
single litigant group leave to proceed on its own. My efforts to manage 88 cases, with
largely overlapping issues, require that they proceed in a coordinated way.

     There is no basis in law or equity, or logic, for the notion that I should except one
plaintiff group from the process to which the other 87 litigant groups are bound. Making
an exception for the Phaneuf Plaintiffs would be monumentally bad case management.
During the July 2 Hearing, we had lengthy discussion as to what would make the most
sense in managing the issues in this case—which are in many respects difficult ones.
Except for the limited purpose of having concluded that the Phaneuf Plaintiffs' complaint
raises contentions forbidden, in the first instance, by the Sale Order, I need to minimize
piecemeal rulings now, by me or by any other judge—assuming that he or she would
disregard express provisions in the Sale Order giving me exclusive jurisdiction to decide
the matters before me now.[46] Nor should I simply let the Phaneuf Plaintiffs' claims
proceed without the scrutiny that all of the other Ignition Switch Action claims will
undergo.

     I've determined that the Sale Order applies in the first instance. The procedures
established by my earlier orders are necessary to ensure the fair adjudication of the issues
before me. The Phaneuf Plaintiffs have not come close to making a sufficient showing as

---

[45]    *See* Sale Order ¶ 71 ("This Court retains exclusive jurisdiction to enforce and implement the terms
and provisions of this Order, the MPA, . . . and each of the agreements executed in connection
therewith, . . . including, but not limited to, retaining jurisdiction to . . . (c) resolve any disputes
arising under or related to the MPA, except as otherwise provided therein . . . .").

-18-

to why I should make an exception for them—nor for allowing them to proceed ahead of

the other 87 Ignition Switch Actions.

*B. Preliminary Injunction*

Additionally, I determine that even if the Sale Order lacked the injunctive

provisions it has, it would be appropriate to enter a preliminary injunction protecting New

GM from the need now to defend claims that, under the Sale Agreement and Sale Order,

it did not assume, and preventing the piecemeal litigation of the Phaneuf Plaintiffs'

claims ahead of all of the other lawsuits similarly situated.

The standards for entry of a preliminary injunction in the Second Circuit, as set

out in its well-known decision in *Jackson Dairy*[47] and its progeny,[48] are well established.

As stated in *Jackson Dairy*, "the standard in the Second Circuit for injunctive relief

clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success

on the merits or (2) sufficiently serious questions going to the merits to make them a fair

ground for litigation and a balance of hardships tipping decidedly toward the party

requesting the preliminary relief."[49]  Those requirements are easily met here.

*1. Irreparable Harm*

Here, irreparable injury, in terms of the case management concerns and prejudice

to the litigants in the other 87 actions, has been established. It's foreseeable, if not

obvious, that at least many of the 87 other litigants will present issues that the Phaneuf

Plaintiffs now present.

---

[47]    *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) ("*Jackson Dairy*").

[48]    *See, e.g., Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F. 3d 206, 215
(2d Cir. 2012) (applying the *Jackson Dairy* standard, though not citing *Jackson Dairy* directly);
*UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (citing
*Jackson Dairy*); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598
F.3d 30, 35 (2d Cir. 2010) (same).

[49]    *Jackson Dairy*, 596 F.2d at 72.

-19-

And when actions raise overlapping issues, even if they're not wholly congruent, coordinated disposition is essential.[50] The facts that the Phaneuf Plaintiffs present may not appear in every one of those 88 cases. But the chances that similar facts will not be present in at least many of them are remote. I well understand the desires of litigants to get their cases moving as quickly as possible. But those desires are insufficient to trump the normal case management concerns that I and most other judges have.

Indeed, these concerns underlie why MDL proceedings, like the one before Judge Furman, come into being. For reasons that would be obvious to most, the MDL Panel determined that Ignition Switch Actions should be handled by a single judge for coordinated or consolidated pretrial proceedings. Irreparable injury in terms of case management concerns, for each of me and Judge Furman (not to mention prejudice to the litigants in the other 87 actions), would plainly occur if I were to allow the Phaneuf Plaintiffs to proceed before all of the others.

Judge Furman's case management concerns were apparent in his June 24 Order,[51] which, among other things, set up his cases for adjudication in an orderly way,[52] just as I

---

[50]    Exemplifying this is the Phaneuf Plaintiffs' reliance on the Bankruptcy Court and District Court decisions in *Grumman Olson*, see n.43 above, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.), and 467 B.R. 694 (S.D.N.Y. 2012) (Oetken, J.), respectively. I have no doubt whatever that in the subsequent proceedings before me in connection with the other 87 Ignition Switch Actions, Designated Counsel will place reliance on one or both of those cases, and that New GM will argue, in contrast, that in respects relevant here, those cases are distinguishable or wrongly decided. (The GUC Trust may also wish to be heard on the *Grumman Olson* cases, though its likely position is less obvious.) That is exactly why the Phaneuf Plaintiffs' contentions should not be heard on their own, and why I should not be making early judgments on the merits of the issues now—especially before Designated Counsel, New GM, the GUC Trust and any others with differing views have had a chance to be heard.

[51]    See n.12 above.

[52]    See, e.g., June 24 Order at Section XI, regulating motion practice (providing that "[a]ny and all pending motions in the transferor courts are denied without prejudice, and will be adjudicated under procedures set forth in this Order and subsequent orders issued by this Court"); *id.* at Section XII, regulating discovery (providing that "[p]ending the development of a fair and efficient schedule, all outstanding discovery proceedings are suspended until further order of this Court, and no further discovery shall be initiated," but further providing that the June 24 Order

-20-

did. Each of us recognizes the need for coordinated proceedings in a matter of this size
and complexity.

    *2. Sufficiently Serious Questions Going to the Merits*

    But I don't need to, and should not, make a finding of likelihood of success on the
merits. That would require me to decide too much at this time, to the potential prejudice
of the plaintiffs in the other 87 Ignition Switch Actions, New GM, and the GUC Trust. I
need not address likelihood of success because, as I've previously noted, serious
questions going to the merits provide an alternate basis for the entry of a preliminary
injunction, when coupled with the requisite tipping of hardships.

    New GM has easily shown serious issues going to the merits with respect to relief
from this Court, though it is premature for me to go beyond such a narrow finding. It
now appears, from the preceding discussion, that at least many of the Phaneuf Plaintiffs'
claims were not assumed by New GM. It's possible that the Phaneuf Plaintiffs or others
could eventually establish that a subset of their claims would fall outside of the Sale
Order's scope, but New GM has already made at least a prima facie showing that it did
not assume a significant portion of the Phaneuf Plaintiffs' claims. Similarly, while we
know that other Ignition Switch Action plaintiffs will want to be heard on whether due
process concerns place constraints on New GM's ability to rely on the Sale Order, the
starting point is the Sale Order itself. New GM has shown serious issues going to the
merits with respect to the protection it was granted under the express language of that
order, which would remain unless and until due process (or other) concerns make some
or all of the Sale Order's protections drop out of the picture.

    would not "preclude any discovery that is agreed or ordered to facilitate matters in the Bankruptcy
Court, *provided that* to the extent any discovery is undertaken in the Bankruptcy Court, it shall be
coordinated with this Court.") (italics in original).

### 3. Balance of Hardships

Finally, I turn to the balance of hardships.    That too weighs in New GM's favor.

The hardship to New GM if it were forced to litigate against the Phaneuf Plaintiffs on one track, and the other 87 actions, on another, would be significant.  New GM would have to defend largely similar claims in multiple forums, thus exposing it to both unnecessary expense and the possibility of inconsistent results.  And New GM, the non-bankruptcy court and I would all be prejudiced by confusion with respect to which issues could be decided in the non-bankruptcy court, and which would have to be decided here. There also could be prejudice to the plaintiffs in the other 87 Ignition Switch Actions, who might be affected (presumably not by *res judicata* or collateral estoppel, but still by *stare decisis*) by adverse rulings in the non-bankruptcy court.  And there would be significant prejudice to my case management needs, as the extensively negotiated coordinated mechanism for dealing with 88 separate actions, with coordinated briefing of threshold issues, was cut away.

By contrast, by being treated the same as the plaintiffs in the other 87 actions, the Phaneuf Plaintiffs would not be harmed in any material respect.  Their effort to proceed going it alone rests on the notion that another federal judge—here, Judge Furman— would consider it productive to allow one plaintiff group to move forward in its action while 87 others are stayed, pending the determination in this Court of critical threshold issues that will determine what claims may, and what claims may not, be asserted in light of the Sale Order.  That premise is unrealistic.

Reasons cited by the Multidistrict Panel in sending the Ignition Switch Actions to New York included its recognition that I "already [have] been called upon by both General Motors and certain plaintiffs to determine whether the 2009 General Motors

-22-

bankruptcy Sale Order prohibits plaintiffs' ignition switch defect lawsuits."[53]  Proceeding

without regard to the agreed-on mechanisms for determining those issues in this Court

would frustrate the purpose for which the Ignition Switch Actions were sent here.  And

there is little or no basis for the Phaneuf Plaintiffs' assumption (or hope) that Judge

Furman would deprive me of the ability to do my job.

        To the contrary, Judge Furman has been highly sensitive to the Bankruptcy

Court's needs and concerns.  His first order provided that while he might appoint lead

and liaison counsel before I ruled, he would be open to consideration as to whether such

appointment should be amended if "the Bankruptcy Court rules that some, but less than

all, of the claims now pending here may be asserted."[54]  He asked counsel appearing

before him to address, among other things, "the extent to which proceedings in this Court

should proceed before rulings by the Bankruptcy Court, on the one hand, or should be

deferred pending such rulings, on the other."[55]  He provided, as I have, for an initial

suspension of discovery, but provided further that his directive would not "preclude any

discovery that is agreed or ordered to facilitate matters in the Bankruptcy Court, *provided

that* to the extent any discovery is undertaken in the Bankruptcy Court, it shall be

coordinated with this Court."[56]  And he expressly provided that matters addressed in his

order could be reconsidered "to the extent necessary or desirable to address any rulings

---

[53]     *JPML Decision,* --- F.Supp.2d at ---, 2014 U.S. Dist. LEXIS 79713, at *4, 2014 WL 2616819, at
        *2.

[54]     June 24 Order Section IX.

[55]     *Id.* Section X(B).

[56]     *Id.* Section XII (italics in original).

by the Bankruptcy Court or any higher court exercising appellate authority over the
Bankruptcy Court's decision."[57]

    Given the respect evidenced by each of the Multidistrict Panel and Judge Furman
of the Bankruptcy Court's responsibility to determine matters pending here, there is no
reasonable basis for a conclusion that Judge Furman would want—or allow—the Phaneuf
Plaintiffs' action, which has been added to the lengthy list of cases before him, to proceed
on its own.

    Thus, even if I had not already found that the Sale Order's injunctive provisions
already apply, New GM would be entitled to a preliminary injunction in its favor until
I've ruled on the Threshold Issues.

<center>Conclusion</center>

    For the above reasons, the Phaneuf Plaintiffs' Ignition Switch Action, like the
others, will be stayed pending further rulings in the matters before me, or my further
order.

    This decision is without prejudice to the rights of the plaintiffs in all of the other
87 Ignition Switch Actions, and of any other parties (including, without limitation, New
GM and the GUC Trust) who might hereafter want to be heard on issues before me.

    New GM is to settle an order in accordance with this ruling.

Dated: New York, New York          _s/Robert E. Gerber_____
      July 30, 2014               United States Bankruptcy Judge

---

[57]    *Id.* Section XVI.

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                                    :      Chapter 11
                                                         :
MOTORS LIQUIDATION COMPANY, *et al.*,                    :      Case No.: 09-50026 (REG)
        f/k/a General Motors Corp., *et al.*             :
                                                         :
                        Debtors.                         :      (Jointly Administered)
------------------------------------------------------------x

DECISION WITH RESPECT TO NO STAY
PLEADING AND RELATED MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER
JURISDICTION (ELLIOTT PLAINTIFFS)[1]

APPEARANCES:

KING & SPALDING LLP
*Attorneys for General Motors LLC*
1185 Avenue of the Americas
New York, New York 10036
By:    Arthur J. Steinberg, Esq. (argued)
       Scott I. Davidson, Esq.

KIRKLAND & ELLIS LLP
*Attorneys for General Motors LLC*
300 North LaSalle
Chicago, Illinois 60654
By:    Richard C. Godfrey, Esq.
       Andrew B. Bloomer, Esq.

GARY PELLER
*Attorney for Lawrence and Celestine Elliott*
600 New Jersey Avenue, NW
Washington, DC 20001
By:    Gary Peller, Esq. (argued)

---

[1]     This written decision memorializes and amplifies on the oral decision that I issued after the close
of oral argument at the hearing on this matter on August 5, 2014.  Because it had its origins in the
originally dictated decision, it has a more conversational tone.

-1-

TALOS LAW
*Attorneys for Lawrence and Celestine Elliott*
705 4th Street NW #403
Washington DC 20001
By:    Daniel Hornal, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

Once again, a plaintiff group wishing to proceed ahead of all of the others (only

one week after I issued the written opinion memorializing my earlier oral ruling

proscribing such an effort)[2] has asked for leave to go it alone. Its request is denied. With

a single exception, the issues raised by this group (the "**Elliott Plaintiffs**") don't differ

from those addressed in *Phaneuf*. And as to that single exception—their claim that I

don't have subject matter jurisdiction to construe and enforce the Sale Order in this

case[3]— their contention is frivolous, disregarding controlling decisions of the United

States Supreme Court[4] and Second Circuit;[5] district court authority in this District;[6] four

---

[2]    *In re Motors Liquidation Company,* --- B.R. ---, 2014 Bankr. LEXIS 3239, 2014 WL 3747338
(Bankr. S.D.N.Y. Jul. 30, 2014) ("*Phaneuf*"), incorporated here by reference.

[3]    Defined terms are as used in *Phaneuf.*

[4]    *Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 151 (U.S. 2009)  ("*Travelers*") ("the only question
left is whether the Bankruptcy Court had subject-matter jurisdiction to enter the Clarifying Order.
The answer here is easy:  as the Second Circuit recognized, and respondents do not dispute, the
Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders").

[5]    *Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.),* 304 F.3d 223 (2d Cir.2002)
("*Petrie Retail*") ("A bankruptcy court retains post-confirmation jurisdiction to interpret and
enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization.
The plan consummation motion was filed in response to Luan's demand for excluded liabilities
and sought enforcement of the injunction provisions outlined in the sale order, plan of
reorganization, and confirmation order. Therefore, the dispute between Luan and Marianne
involved interpretation of the bankruptcy court's orders.  The bankruptcy court thus had
jurisdiction over the plan consummation motion and, specifically, had jurisdiction to consider
whether Luan was seeking excluded liabilities and, if so, to enforce the injunction provisions of its
orders.") (citations omitted); *Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers,
Inc.),* 419 F.3d 83, 97 (2d Cir. 2005) ("*Millenium Seacarriers*") ("Bankruptcy courts retain
jurisdiction to enforce and interpret their own orders." (citing *Petrie Retail*)).

[6]    *Lothian Cassidy, LLC v. Lothian Exploration & Dev. II, L.P.,* 487 B.R. 158, 162 (S.D.N.Y. 2013)
(Marrero, J.) ("*Lothian-Cassidy*") ("'Arising in' claims may include '[m]atters involving the
enforcement or construction of a bankruptcy court order . . . .'").

-2-

earlier decisions that I personally have issued;[7] three decisions by other bankruptcy

judges in the Southern District of New York,[8] and the leading treatise in the area,

*Collier*.[9] The Elliott Plaintiffs' motion to dismiss for lack of subject matter jurisdiction

thus likewise is denied.

### Discussion

Given the ease of these issues, and my earlier discussion in *Phaneuf* (incorporated

into this decision by reference), this discussion will be brief.

---

[7] *See Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.),* 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003) ("*Sterling Optical*") ("Matters involving the enforcement or construction of a bankruptcy court order are in [the 'arising in'] category."); *NWL Holdings, Inc. v. Eden Ctr., Inc. (In re Ames Dep't Stores, Inc.),* 317 B.R. 260, 272 (Bankr. S.D.N.Y. 2004) ("*Ames Department Stores*") ("As in *Petrie Retail* and *Millenium Seacarriers,* this Court has subject matter jurisdiction to enforce its orders not only because they were entered in proceedings in a case under title 11 . . . with respect to which it undoubtedly had subject matter jurisdiction, but also by reason of the power granted to any federal court to enforce its own orders.") (citation omitted); *In re Motors Liquidation Co.,* 457 B.R. 276, 287 (Bankr. S.D.N.Y. 2011) ("*GM-UAW*") ("And it's well established, of course, that bankruptcy courts, like other federal courts, have the jurisdiction to enforce their earlier orders, even after confirmation."); *Trusky v. Gen. Motors Co. (In re Motors Liquidation Co.),* 2013 Bankr. LEXIS 620, at *33, 2013 WL 620281, at *11 (Bankr. S.D.N.Y. Feb. 19, 2013) ("*GM-Trusky*") ("There is subject matter jurisdiction in this Court under the 'arising in' prong of 28 U.S.C. § 1334, for me to construe my Sale Order, though I have great difficulty in seeing how I'd have subject matter jurisdiction to decide anything else.").

[8] *In re Portrait Corp. of Am., Inc.,* 406 B.R. 637, 641 (Bankr. S.D.N.Y. 2009) (Drain, J.) ("*Portrait Corporation of America*") (determining not just that court had subject matter jurisdiction to "interpret and enforce" the sale order in that case; it was a core matter); *Moelis & Co., LLC v. Wilmington Trust FSB (In re Gen. Growth Props., Inc.),* 460 B.R. 592, 598 (Bankr. S.D.N.Y. 2011) (Gropper, J.) ("*General Growth*") (determining not just that court had subject matter jurisdiction to interpret and enforce the sale order in that case; it was a core matter: The argument that the dispute did not "arise in" the Chapter 11 Cases was "wholly specious." The controversy "implicate[d] the 'enforcement or construction of a bankruptcy court order,' in this case the confirmation order. *A bankruptcy court always has jurisdiction to interpret its own orders.* It does not matter that the State Court Action is purportedly between two non-debtors, or that the Chapter 11 Cases have been confirmed.") (emphasis added) (citations omitted); *Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus.),* 445 B.R. 243, 248 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.) ("*Grumman Olson*") ("In addition, Morgan's request for declaratory and injunctive relief asks the Court to interpret and enforce the Sale Order by enjoining the Fredericos from proceeding with their successor liability claims. The presence of these two factors renders the dispute core. . . . [T]he Court has subject matter jurisdiction to interpret and enforce the Sale Order.") (citations omitted).

[9] *See 10 Collier* ¶ 7087.01 (discussing *GM-Trusky,* noting that while the bankruptcy court's subject matter jurisdiction over the underlying merits of a contract dispute between New GM and the UAW was debatable, construction of the Sale Order was a matter over which the bankruptcy court had "unquestioned subject matter jurisdiction" under the "arising in" prong of 28 U.S.C. § 1334).

I.

## Subject Matter Jurisdiction[10]

In addition to contending that they should be allowed to proceed on their own

because the Sale Order should not be deemed to apply to them, the Elliott Plaintiffs

contend that I lack subject matter jurisdiction to enforce the Sale Order. They say

"[b]ecause New GM's claims are not 'related to' any proceedings before this Court, this

Court lacks jurisdiction to stay their lawsuit or to restrict the Elliotts in any way . . . ."[11]

I disagree. Their argument misses the point. "Related to" jurisdiction has nothing

to do with the issues here. Bankruptcy courts (and when it matters, district courts) have

subject matter jurisdiction to enforce their orders in bankruptcy cases and proceedings

under those courts' *"arising in"* jurisdiction.[12] The nearly a dozen cases cited above

expressly so hold.

---

[10]   Though the argument comes second in the Elliott Plaintiff's brief, I consider it as a threshold issue. *See, e.g., Millenium Seacarriers, Inc. v. Allfirst Bank (In re Millenium Seacarriers, Inc.),* 2004 WL 63501, at *4 (S.D.N.Y. 2004) (Patterson, J.) (*"Millenium Seacarriers (S.D.N.Y.)"*) ("When a court's jurisdiction is challenged, the court has an obligation to resolve that issue before proceeding to the other issues in a proceeding."), *aff'd, Millenium Seacarriers,* n.5 above; *Ames Department Stores,* 317 B.R. at 268 & n.29 (same, quoting *Millenium Seacarriers (S.D.N.Y.)*).

[11]   Elliott Pls.' Br. at 5.

[12]   *See* page 5 below. For this reason, I found the Elliott Plaintiffs' reference to *Johns-Manville* puzzling. *See* Elliott Pls.' Br. at 28, 32, 33 (citing *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.),* 517 F.3d 52 (2d Cir. 2008) (*"Johns-Manville"*), *rev'd and remanded sub nom. Travelers, see* n.4 above. Preliminarily, the Elliott Plaintiffs twice cited *Johns-Manville* for its asserted relevance to "related to" jurisdiction, which is not the question here. And the controversy in *Johns-Manville* didn't deal with a Bankruptcy court's subject matter jurisdiction to construe and enforce its own orders; in fact the *Johns-Manville* court assumed that a Bankruptcy court had jurisdiction to interpret and enforce its own orders, *Johns-Manville* at 60–61 ("It is undisputed that the bankruptcy court had continuing jurisdiction to interpret and enforce its own 1986 orders."). And though the Supreme Court in *Travelers* reversed the Second Circuit's order for other reasons, it agreed with the Second Circuit in that respect. *See* n.4 above. While *Johns-Manville* may be argued to be relevant in proceedings hereafter to determine whether or not the language of the Sale Order is determinative, it does not deprive me of subject matter jurisdiction to construe and enforce my earlier order now.

-4-

As explained in many of those cases,[13] section 1334 of the Judicial Code,

28 U.S.C. § 1334—which immediately follows the provisions covering subject matter

jurisdiction in federal question, diversity, and admiralty cases, 28 U.S.C. §§ 1331, 1332

and 1333, respectively—addresses the subject matter of the district courts (and hence the

bankruptcy courts) with respect to the exercise of their bankruptcy jurisdiction. After

providing, in its subsection "(a)," that the district courts have jurisdiction (and, indeed,

exclusive jurisdiction) over *cases* under title 11 (a matter not relevant here), § 1334

provides, in relevant part, with respect to bankruptcy *proceedings* (which include the

contested matter and adversary proceeding that are before me here):

> (b) . . . . the district courts shall have original but
> not exclusive jurisdiction of all civil proceedings
> arising under title 11, or arising in or related to
> cases under title 11.

The three types of jurisdiction that district (and hence bankruptcy) courts may exercise

are thus those colloquially referred to as (1) "arising under";[14] (2) "arising in"; and

(3) "related to" jurisdiction.[15] The second of these—"arising in"—focuses on whether

the claim would have no existence outside of bankruptcy.[16] "Matters involving the

enforcement or construction of a bankruptcy court order are in this category."[17]

---

[13] *See, e.g., Sterling Optical*, 302 B.R. at 800–02; *Ames Department Stores*, 317 B.R. at 268–69. *See also ML Media Partners, LP v. Century/ML Cable Venture (In re Adelphia Commc'ns Corp.)*, 285 B.R. 127, 136–37 (Bankr. S.D.N.Y. 2002) (Gerber, J.) ("*Adelphia*").

[14] This is analytically the same as "federal question" jurisdiction, but the claim must arise under title 11, as contrasted to any other title or provision, of the U.S. Code. It is not relevant here.

[15] *See, e.g., Ames Dept. Stores*, 317 B.R. at 269.

[16] *See Sterling Optical*, 302 B.R. at 801.

[17] *Id. Accord Lothian-Cassidy*, 487 B.R. at 162 ("'Arising in' claims may include '[m]atters involving the enforcement or construction of a bankruptcy court order . . .'").

-5-

As in *Ames Department Stores*,[18] the Elliott Plaintiffs make their subject matter

jurisdiction contentions on the premise that the outcome of the sale order interpretation

would have no effect on the debtor's estate.[19] But even assuming such is true (though I

am not sure that it is, since if New GM is not liable for an otherwise enforceable

obligation, that increases the likelihood that Old GM would be), it misses the point.

Effect on the estate is the standard for "related to" jurisdiction,[20] not "arising in."[21] The

bankruptcy court's subject matter jurisdiction when it comes to construing or enforcing

---

[18]   *See* n.22 below.

[19]   *See* Elliott Pls.' Br. at 5 ("Because their claims are not 'related to' any proceedings before this
Court, this Court lacks jurisdiction to stay their lawsuit or to restrict the Elliotts in any way . . . .");
*id.* at 31 ("The technical jurisdiction issue presented is whether the Elliotts' claims against New
GM 'relate to' any proceeding properly before the Court . . . ."); *id.* at 32 ("The Second Circuit has
. . . made clear that this Court's 'related to' jurisdiction is limited to power over litigants in
proceedings *only* when the outcome of that proceeding could conceivably have any effect on the
estate being administered in bankruptcy" (emphasis in original) (citing *Cuyahoga Equipment*, n.21
below)). In the portion of their brief beginning at page 31 (captioned "The Elliotts Claims Do Not
'Relate to' Any Proceeding Before the Court"), the Elliott Plaintiffs continue in conclusory terms,
after stating the issue to be whether their claims against New GM "'relate to' any proceeding
properly before the Court," "that their claims themselves assuredly do not 'arise in' the
proceedings that Old GM initiated." *Id.* That conclusory assertion is the only place in their brief
where "arising in" jurisdiction is mentioned, and—apart from misstating how "arising in"
jurisdiction is analyzed—it is made without any explanation or, especially, authority.

[20]   *See, e.g., Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984); *Publicker Industries Inc. v.
United States (In re Cuyahoga Equipment Corp.)*, 980 F.2d 110, 113–15 (2d Cir.1992).

[21]   As I held in *GM-Trusky*:

> The Trusky Plaintiffs' claims, arising under state law, don't
> arise under title 11 (the Bankruptcy Code), and as they're
> asserted against New GM, not Old GM, it's difficult to see,
> under the *Pacor* and *Cuyahoga Equipment* tests applicable in
> this Circuit, . . . how they would have sufficient impact on Old
> GM or the administration of its chapter 11 case to be "related
> to" that case. But construction of my bankruptcy court Sale
> Order, which was entered in Old GM's chapter 11 case, and
> which would not have been entered, or necessary to construe,
> if there were no bankruptcy case, is a garden-variety example
> of a proceeding "arising in" a chapter 11 case.

2013 Bankr. LEXIS 620, at *33 n.7, 2013 WL 620281, at *11 n.7.

-6-

.ment

Pg 7 of 10

its earlier orders has wholly different underpinnings,[22] as review of any of the nearly

dozen decisions cited above would have revealed.

Nor is it an answer for the Elliott Plaintiffs' to premise jurisdictional arguments

on the conclusion they ultimately want me to reach—that upon construction of the Sale

Order and the Sale Agreement, their claims would be permissible under each. That

assumes the fact to be decided, in the proceedings the Elliott Plaintiffs wish to sidestep.

Their argument conflates the conclusion I might reach after analysis of matters before

me—that certain claims ultimately might not be covered by the Sale Order—with my

jurisdiction to decide whether or not they are.[23]

The motion to dismiss for asserted lack of subject matter jurisdiction is denied.

## II.

### The No Stay Request

I then reach the issue that the plaintiffs in 86 other Ignition Switch actions did not

bother to raise, and that I addressed in the only other exception, *Phaneuf.* The Elliott

Plaintiffs have given me no greater reason to conclude that they should be a special case

than the Phaneuf Plaintiffs did.

---

[22]    *See, e.g., Ames Dept. Stores*, 317 B.R. at 269 ("Eden Center premises its argument on the truism
that at this juncture, with Ames having already effected its assignment, the outcome of this
controversy will not have an economic or other effect on the Ames estate, as has traditionally been
required in this Circuit and elsewhere, to invoke 'related to' jurisdiction. But Eden Center fails
satisfactorily to recognize that subject matter jurisdiction here is not based on 'related to'
jurisdiction. Rather, it exists by reason of 'arising in' jurisdiction, by reason of the Court's earlier
orders in this case . . . , and the need to enforce them.").

[23]    I considered a similar issue in *GM-Trusky*, where I exercised my "arising in" jurisdiction to
construe the very same Sale Order that we have here, and then abstained with respect to the
remainder of the controversy, sending it to the Eastern District of Michigan. *See* 2013 Bankr.
LEXIS 620, at *33, 2013 WL 620281, at *11. Exercising jurisdiction to adjudicate issues (and
hold other matters in abeyance pending that adjudication) does not preordain the latter's outcome.
To the extent that Designated Counsel do not satisfactorily present arguments by the Elliott
Plaintiffs and others that claims the latter wish to assert are not forbidden by the Sale Order, the
Elliott Plaintiffs will be free to do so—but only pursuant to the orderly procedures that will apply
to everyone.

-7-

Like *Phaneuf* plaintiffs Lisa Phaneuf, Adam Smith, and Catherine and Joseph

Cabral, Elliott Plaintiffs Lawrence and Celestine Elliott purchased a car manufactured by

Old GM—in this case, a 2006 Chevy Cobalt.[24] The Sale Order provided, among other

things, that except for the Assumed Liabilities expressly set forth in the Sale Agreement,

New GM would not

> have any liability for any claim that arose prior to
> the Closing Date, *relates to the production of
> vehicles prior to the Closing Date,* or otherwise is
> assertable against the Debtors or is related to the
> Purchased Assets prior to the Closing Date.[25]

On their face, the Elliott Plaintiffs' claims "relate[] to the production of vehicles prior to

the Closing Date"—even assuming, without deciding, that the Elliott Plaintiffs do not

also assert liability for a claim that "that arose prior to the Closing Date," or "otherwise is

assertable against the Debtors or is related to the Purchased Assets prior to the Closing

Date."

And while the Elliott Plaintiffs' brief disclaims reliance on Old GM acts, their

complaint doesn't bear that out. Though to a lesser degree than in *Phaneuf*, the Elliott

Plaintiffs' complaint also relies on the conduct of Old GM in asserting claims against

New GM, accusing Old GM of "unlawful concealment": "New GM acquired all the

---

[24]    It appears that the amended Elliotts' complaint includes the claims of an additional plaintiff, Berenice Summerville, who purchased a 2010 Chevy Cobalt in December 2009. (Am. Comp. ¶ 5.) Assuming that the facts bear this out, this additional plaintiff seemingly is in the same category as some of the Phaneuf Plaintiffs—those who purchased vehicles that conceivably could have been manufactured after the July 2009 363 Sale. For the avoidance of doubt, I am not going to put this additional plaintiff in a different category than the Phaneuf Plaintiffs, or Lawrence and Celestine Elliott, as discussed below.

[25]    Sale Order ¶ 46 (emphasis added).

-8-

books, records and accounts of [Old GM], including records that document *the unlawful concealment of* defects in vehicles sold by Old GM prior to New GM's existence."[26]

As in *Phaneuf*, I find that the Elliott Plaintiffs are asserting claims with respect to vehicles that were manufactured before the 363 Sale, and, although to a lesser extent than in *Phaneuf*, relying on the conduct of Old GM. Thus I find as a fact, or mixed question of fact and law, that the threshold applicability of the Sale Order—and its injunctive provisions—has been established in the first instance.

And once again, even if the Sale Order did not apply in the first instance, a preliminary injunction would also be appropriate here, for the reasons discussed at length in *Phaneuf*, which I will not repeat at comparable length here—other than to say that the prejudice to all of the other litigants, and to the case management concerns I had with respect to the Phaneuf Plaintiffs, is just as much a matter of concern here.

As in *Phaneuf*, I will not allow the Elliott Plaintiffs to go it alone. The Elliott Plaintiffs' claims can be satisfactorily addressed—and will have to be addressed—as part of the coordinated proceedings otherwise pending before me.

### Conclusion

For the reasons set forth above and in *Phaneuf*, the relief requested in the Elliott Plaintiffs' No Stay Pleading (including their motion to dismiss for lack of subject matter jurisdiction) is denied. The Elliott Plaintiffs' claims will be treated the same as those in all of the other Ignition Switch Actions. The stay already imposed by the injunctive provisions of Paragraphs 8 and 47 of the Sale Order (and that the Court may also impose by preliminary injunction) will remain in place insofar as it affects the Elliott Plaintiffs'

---

[26]     Am. Compl. ¶ 6 (emphasis added).

-9-

complaint—subject to the right, shared by all of the other plaintiffs in the Ignition Switch

Actions, to ask that the Court revisit the issue after September 1.

Dated: New York, New York      _s/Robert E. Gerber_
       August 6, 2014          United States Bankruptcy Judge

-10-